UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

CITY OF HARPER WOODS EMPLOYEES' )
RETIREMENT SYSTEM, Derivatively on )   Case No.
Behalf of BAE SYSTEMS PLC, )
19617 Harper Avenue )
Harper Woods, MI 48225 )
)
                   Plaintiff, )

      vs.

RICHARD (DICK) L. OLVER
Bay Lodge
Mill Lane
Dan Bury
Chelmsford U.K. CMC 4HX,

     and

MICHAEL J. TURNER
79 Fairmile Lane
Cobham, Kent
U.K. KT 112 DG,

     and

WALTER P. HAVENSTEIN
90 Colonel Daniels Drive
Bedford, NH 03110,

     and

Case: 1:07-cv-01646
Assigned To : Collyer, Rosemary M.
Assign. Date : 9/19/2007
Description: Contract

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

_____ )   DEMAND FOR JURY TRIAL
[Caption continued on following page.] )

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR INTENTIONAL,
RECKLESS OR NEGLIGENT BREACH OF FIDUCIARY DUTY, CORPORATE WASTE
AND *ULTRA VIRES* CONDUCT

IAN G. KING                                )
22 The Ridgeway                            )
Fareham                                    )
Hampshire U.K. PO 168RE,                   )
                                           )
          and                              )
                                           )
GEORGE W. ROSE                             )
Craven Fold                                )
Moorside Lane                              )
Wiswell, Clitherow                         )
U.K. BB7 9DB,                              )
                                           )
          and                              )
                                           )
CHRISTOPHER V. GEOGHEGAN                    )
Garden Close                               )
Maidenhead                                 )
Kent U.K. SL6 4PA,                         )
                                           )
          and                              )
                                           )
PHILLIP J. CARROLL                         )
2121 Kriby Drive, Unit 34S                 )
Houston, TX  77019,                        )
                                           )
          and                              )
                                           )
MICHAEL J. HARTNALL                        )
Monkswood Priors Hatch Lane                )
Hurtmore                                   )
Godalming U.K. GU7 2RJ,                    )
                                           )
          and                              )
                                           )
SIR PETER JAMES MASON                      )
45 Graham Terrace                          )
City of Westminster                        )
London U.K. SW1 W8HN,                      )
                                           )
          and                              )
                                           )
ROBERTO QUARTA                             )
100 Eaton Place, #3A                       )
London U.K. SW1 X8LU,                      )
                                           )
_____

[Caption continued on following page.]

and                                            )
                                               )
SIR ANTHONY NIGEL RUSSELL RUDD                 )
Shirley House                                  )
Shirley Common                                 )
Park Lane                                      )
Ashbourne                                      )
London U.K. DE6 3AZ,                           )
                                               )
        and                                    )
                                               )
PETER A. WEINBERG                              )
14 Perkins Road                                )
Greenwich, CT 06830,                           )
                                               )
        and                                    )
                                               )
ANDREW GEORGE INGLIS                           )
63 Nelson Road                                 )
London U.K. E4 9AP,                            )
                                               )
        and                                    )
                                               )
ULRICH CARTELLIERI                             )
26 Gledhow Gardens                             )
Kensington and Chelsea                         )
London U.K. SW5 OA2,                           )
                                               )
        and                                    )
                                               )
SUE BIRLEY                                     )
Aspen Lodge                                    )
Boreham Street                                 )
Hailsham, Sussex BN27 4SH,                     )
                                               )
        and                                    )
                                               )
MICHAEL LESTER                                 )
49 Sheldon Avenue                              )
Haringey Highgate                              )
London U.K. 464JR,                             )
                                               )
        and                                    )
_____ )
[Caption continued on following page.]

MARK H. RONALD )
7110 44th Street )
Chevy Chase, MD 20815, )
)
    and )
)
MICHAEL DENZIL XAVIER PORTILLO )
25 Victoria Square )
London U.K. SW1 WORB, )
)
    and )
)
SIR RICHARD HARRY EVANS )
Hall Cross Manor )
Kirkham Road )
Freckleton )
Preston PR4 1HU, )
)
    and )
)
LORD ALEXANDER HESKETH )
15 Cranley Place )
Kensington, Chelsea )
London U.K. 5W7 3AE, )
)
    and )
)
JOHN PIX WESTON )
The Starlings )
Oxshott )
Leatherhead Surrey )
U.K. KT220 QN, )
)
    and )
)
KEITH CLARK BROWN )
Lyndsay's Farm )
Fryerning House, Beggar Hill )
Fryerning, Ingatestone )
Essex U.K. CM4 0PF, )
)
    and )
)

[Caption continued on following page.]

STEVE LEWIS MOGFORD                          )
Ainsworth Farm                               )
Backlane, Heath Charnock                     )
Chorley, Lancashure  PR6 9DJ,                 )
                                             )
        and                                  )
                                             )
PAOLO SCARONI                                )
C/o Enel Energy                              )
Viale Regina Margherita #137                 )
00198 Rome, Italy,                           )
                                             )
        and                                  )
                                             )
SIR ROBIN BIGGAM                             )
Old Linslade Grange                          )
Old Linslade Road Heath and Reach            )
Leighton Buzzard                             )
Bedfordshire U.K. LU7 0DU,                   )
                                             )
        and                                  )
                                             )
SIR CHARLES BEECH GORDON                     )
    MASEFIELD                                )
33/4 Palgrave Gardens                        )
Camden Town                                  )
London U.K. NW1 6EN,                         )
                                             )
        and                                  )
                                             )
PRINCE BANDAR BIN SULTAN                     )
Glympton Park                                )
Glympton                                     )
West Oxfordshire                             )
U.K. OX2O 1AU,                               )
                                             )
        and                                  )
                                             )
THE PNC FINANCIAL SERVICES GROUP,            )
INC, as Successor to RIGGS NATIONAL          )
CORPORATION/RIGGS BANK, N.A.                 )
One PNC Plaza, 249 Fifth Avenue              )
Pittsburgh, PA  15222,                       )
                                             )
        and                                  )
_____    )

[Caption continued on following page.]

JOSEPH L. ALLBRITTON                  )
2940 Fox Hall Road                    )
Washington, D.C.  20016,              )
                                      )
        and                           )
                                      )
ROBERT L. ALLBRITTON                  )
2430 Wyoming Avenue Northwest         )
Washington, D.C.  20008,              )
                                      )
        and                           )
                                      )
BARBARA ALLBRITTON                    )
2940 Fox Hall Road                    )
Washington, D.C.  20016,              )
                                      )
                  Defendants,         )
                                      )
        and                           )
                                      )
BAE SYSTEMS PLC, an England and Wales )
corporation,                          )
Stirling Square                       )
Carlton Gardens                       )
London U.K. SW1Y 5AD,                 )
                                      )
                  Nominal Defendant.  )
                                      )
_____   )

    This writing/publication is a creative work fully protected by all applicable copyright laws, as well as by misappropriation, trade secret, unfair competition and other applicable laws.  The authors of this work have added value to the underlying factual materials herein through one or more of the following:  unique and original selection, coordination, expression, arrangement, and classification of the information.

    No copyright is claimed in the text of statutes, regulations, and any excerpts from analysts' reports quoted within this work.

    Copyright © 2007 by Patrick J. Coughlin and Coughlin Stoia Geller Rudman & Robbins LLP.  Patrick J. Coughlin and Coughlin Stoia Geller Rudman & Robbins LLP will vigorously defend all of their rights to this writing/publication.

    All rights reserved – including the right to reproduce in whole or in part in any form.  Any reproduction in any form by anyone of the material contained herein without the permission of Patrick J. Coughlin and Coughlin Stoia Geller Rudman & Robbins LLP is prohibited.

"I would be offended if I thought we had the monopoly on corruption . . . . We did not invent corruption . . . . This happened since Adam and Eve. . . . [T]his is human nature."

PRINCE BANDAR BIN SULTAN

*WGBH Interview*
September 2001

## INTRODUCTION

1.      This is a stockholder derivative action on behalf of BAE Systems plc ("BAE" or the "Company") against the entire current BAE Board of Directors (the "Board") and several of its present or former officers and directors (collectively the "BAE Defendants") for intentional, reckless and/or negligent breaches of their fiduciary duties of care, control and candor, involving illegal, improper and/or *ultra vires* conduct, including causing BAE to violate the laws of the United States and international business conduct codes and conventions relating to honest trade and business practices by making, or permitting to be made, improper and/or illegal bribes, kickbacks and other payments.  Also named as defendants are Prince Bandar Bin Sultan ("Bandar"), PNC Financial Services Group, Inc. ("PNC"), legal successor by merger to Riggs National Corporation/Riggs Bank, N.A. ("Riggs"), and three former Riggs executives and controlling shareholders, which were, respectively, the primary recipient or beneficiary of the bribes, payoffs and improper payments and the primary intermediary via which these Bandar payments were laundered, actively concealing them from government regulators and BAE's own auditors.  This conduct has caused, and is continuing to cause, BAE damage, including the substantial costs of responding to (and the substantial fines and penalties which may be involved in resolving) civil and criminal investigations and proceedings – here in the United States and elsewhere – as well as serious harm to BAE's reputation and goodwill, due to the adverse publicity resulting from these events.

2.      BAE is a publicly owned company.  Its American Depository Receipts ("ADRs") are registered with the United States Securities and Exchange Commission ("SEC"), traded over-the-

counter in this country and owned by hundreds if not thousands of U.S. citizens.[1]  Its ordinary

shares, traded overseas, are also owned by thousands of U.S.-based investors – individuals and

institutional.  Approximately 50% of BAE's shareholders reside in the U.S.  BAE is one of the

largest defense contractors in the U.S. and one of the largest suppliers to the U.S. Defense

Department.  The Company has operations in 36 states here and generates some 40% of its annual

revenues – over $9 billion – in the U.S.  BAE has more operations in the U.S. than in any other

single country, including substantial operations here in Washington, D.C., which coordinate and

oversee its billions of dollars of annual business with the Pentagon.

3.    To hold onto their positions of power, prestige and profit with BAE, BAE's officers

and directors have represented in annual directors' reports and otherwise that under their

stewardship, BAE was a highly ethical, law abiding corporation which was achieving very

substantial profits due to the skills of its top managers, while operating in accordance with applicable

rules and laws under the oversight of BAE's Board of Directors.  As a result, these top managers and

directors of BAE held onto, and thus enjoyed, their prestigious and lucrative BAE positions,

benefiting from the considerable perquisites of their positions with one of the world's largest

corporations.

4.    However, the true facts were quite different than these corporate fiduciaries presented

to BAE's shareholders in their reports and otherwise.  In fact, BAE's officers and directors were

resorting to, or encouraging and/or permitting BAE's managers to resort to, improper, illegal and

*ultra vires* activities to boost BAE's reported results, including paying bribes and kickbacks and

making other improper payments, as detailed herein, to obtain contracts to make their stewardship of

BAE appear more successful.  These illegal and improper actions had the desired effect, *i.e.,*

---

[1]    Each ADR represents four ordinary BAE shares and has the same rights as an ordinary
share.

- 2 -

increasing BAE's apparent success and profitability – in the short term. Given the fact that the BAE Defendants had limited tenures in their positions at BAE, this was their real concern, not BAE's long-term profitability or the long-term interests of the actual owners of BAE, *i.e.*, its public shareholders. Defendants' imprudent and unlawful actions have had an inevitable damaging impact, and a very negative one indeed, for BAE's long-term future and the interests of its shareholder community. Despite repeated warnings and "red flags" regarding the dangers of this reckless, imprudent and/or illegal conduct, BAE's directors refused to stop such conduct or take actions they knew were necessary to correct or remedy the dangerous conditions created by that conduct. Those defendants who joined the Company as this course of conduct was ongoing have joined in that conduct, endorsed and affirmed it, allowing it to continue while taking steps to conceal it and cover it up – both from BAE shareholders as well as government investigators. The BAE directors' and officers' false statements and representations and negligent, reckless or intentional failure to properly oversee the operation and conduct of this enterprise have exposed BAE to millions of dollars in damages and potentially hundreds of millions of dollars in remedial costs and possible debarment in the U.S., and have badly damaged BAE's corporate image and reputation.

5.    In an effort to present themselves as competent, honest stewards and managers of BAE's business, the BAE Defendants have repeatedly misrepresented how they were overseeing, managing and operating BAE in a lawful and ethical manner. They told the owners of BAE – the shareholders – that compliance with anti-bribery and anti-corruption laws was especially critical to BAE given the nature of its business, *i.e.*, defense contracts with foreign governments, and thus BAE had in place rigorous internal controls to assure compliance with anti-corruption and anti-bribery laws and extensive training programs for its executives and managers in this regard, and, as a result, it was in compliance with such laws and conventions. These representations were false and misleading. Under their stewardship, the BAE Defendants have caused BAE to engage in a pattern

and practice of making illegal and improper payments to secure contracts and false and misleading statements to conceal and cover them up, thus violating the U.S. Foreign Corrupt Practices Act ("FCPA"), the anti-corruption convention of the Organization for Economic Cooperation and Development ("OECD Convention") and Section 463 of the U.K. Companies Act of 2006 ("Section 463"), all of which were applicable to BAE. Defendants' misconduct also involved repeatedly misleading BAE's shareholders to entrench and enrich themselves by boosting BAE's apparent short-term profits and to justify paying themselves excessive compensation and benefits, even though they knew or recklessly disregarded that their actions would damage BAE in the longer term.

6.     In the mid-1980s, BAE was attempting to obtain a very large military contract from the Saudi Arabian Ministry of Defense to supply 120 fighter/bomber aircraft over the next 20+ years. The officers and directors of BAE knew that if this huge contract – known as "Al Yamamah" – could be obtained, they could point to it as concrete evidence of their successful stewardship of BAE, which would in turn help them hold onto their positions of power, prestige and profit with BAE, so they could receive lucrative payments and bonuses in connection with those positions for many, many years going forward.

7.     Prince Sultan of Saudi Arabia was then in line for the royal throne and serving as the head of Saudi Arabia's Ministry of Defense. Prince Sultan's son was Bandar Bin Sultan. Bandar was the apple of his father's eye. For over 20 years – and during most of the time period relevant hereto – Bandar resided in the U.S. and served as Saudi Arabia's Ambassador to the U.S. Prince Turki bin Nasser is Bandar's brother-in-law. He was head of the Saudi Air Force. Because of their positions and relationships, Prince Sultan, Bandar and Nasser were each in a position to significantly influence whether BAE was awarded the Al-Yamamah contract.

8.     To advance their own positions with BAE by winning the Al-Yamamah contract, the then officers and directors of BAE named as defendants herein undertook illegal and improper

- 4 -

conduct (engaging in *ultra vires* activities) in breach of their fiduciary duties to BAE, including

paying bribes or kickbacks (a/k/a "backhanders") to Bandar and making other improper payments

for his (and his family's) benefit, which have amounted to over $2 billion over the last 20 years.

Although paying such bribes or kickbacks is *ultra vires* and in violation of international business

standards and the laws of the U.S., including the FCPA and the OECD Convention, as well as

BAE's own stated business policies and practices, defendants caused BAE to funnel these illegal

payments to Bandar in significant part through Riggs, located in Washington, D.C., via accounts

that, while nominally in the name of Saudi Arabia, were controlled by Bandar, over which he had

discretion and signature authority and which he used for his personal use and benefit. Riggs was

selected for this purpose because its Washington, D.C. location gave Bandar ready access to it and

because Riggs had a reputation in international commercial circles as a bank willing to facilitate

questionable, if not illegal, currency transfers for international transactions.[2] For many years, Riggs

actively participated in, facilitated and advanced the illegal bribe payments to Bandar, hiding them

from government investigation and BAE's auditors. Then – much later on – as Riggs' questionable

currency activities came under increasing government scrutiny, in an effort to stave off government

action to seize or close the bank, it identified one or more of the accounts being utilized by BAE and

Bandar to facilitate the kickback payments as involving highly questionable or improper conduct and

transactions and took steps to shut them down. At or about that time, Bandar resigned his post as

---

[2]    Riggs was ultimately exposed to have had persistent and widespread involvement in improper currency transfers and other money laundering activities. Riggs, the largest Washington D.C.-based commercial bank for much of its long history, was acquired by PNC in 2004 after various corporate scandals and management problems involving its lucrative embassy business forced Riggs to plead guilty to criminal money-laundering violations and pay $25 million in fines and penalties. In addition to funneling billions of dollars in bribes through BAE to Bandar, Riggs accounts were used to route Saudi money to 9/11 hijackers, to help Augusto Pinochet disguise millions stolen from the Chilean people, and to obfuscate transfers and unreported withdrawals of millions in oil revenues by the dictator of Equatorial Guinea.

Ambassador to the U.S. for "personal reasons" and returned to Saudi Arabia. His father remains heir to the Saudi Arabian throne and head of its Ministry of Defense.

9.     These illegal or improper payments were secretly bargained for at the outset of the Al-Yamamah contract. The payments were provided for in secret schedules to the contract entitled "Letters of Offer and Acceptance." They purported to provide compensation for "support services," which, in fact, Bandar never performed, and which was known by the participants to be a code word and cover for the bribe or kickback payments he, his father and other members of his family were receiving or benefiting from. Most of the monies paid to Bandar were received by him here in the U.S. in Washington, D.C. Significant amounts have been spent by Bandar here in the U.S., including over $100 million to build one of the largest and most lavish personal residences in the U.S., located in Aspen, Colorado.

10.     The illegal and/or improper payments have not only included outright payments to Bandar personally, but also payments by BAE for other expenditures benefiting Bandar and Bandar's family, including paying for his fantastically outfitted Airbus private aircraft, which cost over $100 million, and expenses for members of his family, including millions of dollars paid for a lavish multi-week, multi-country honeymoon for Bandar's daughter and new son-in-law.

11.     The transcript of a BBC Television documentary exposing the details of the illegal payments made in connection with the Al Yamamah contract is attached as Ex. A. These payments are being investigated by the United States Department of Justice ("DOJ") and the SEC. The making of these improper payments has recently received widespread, adverse publicity. For instance, according to a 6/07 edition of *Financial Times*:

**BAE faces threat of fines in US probe**

*     *     *

BAE Systems faces the threat of substantial fines, criminal prosecution of managers and the forced appointment of an independent monitor to oversee its

American business after the US Department of Justice launched a corruption probe into the company.

Europe's biggest arms manufacturer told the London Stock Exchange yesterday that the DoJ is to investigate the 20-year-old Al-Yamamah arms deal with Saudi Arabia. The news caused the company's shares to plunge 8 per cent as investors took fright at the possible damage to BAE's crucial US business.

\* \* \*

The US Securities and Exchange Commission is also investigating BAE for possible violations of the books and records provisions of the Foreign Corrupt Practices Act . . . .

Similarly, in late 6/07, *Dow Jones* reported:

Shares of Britain's top arms dealer, BAE Systems, dropped sharply on Tuesday after the company said it was the target of a U.S. Justice Department probe into alleged corruption, notably in its dealings with Saudi Arabia.

\* \* \*

News of the enquiry, although widely rumored, sent BAE shares plunging as much as 11%, wiping 1.5 billion pounds ($3 billion) off its stock market value. . . .

The probe could hamper BAE Systems' efforts to gain a larger share of the U.S. defense market. Already the company generates about 40% of sales in the U.S.

\* \* \*

The move by the Justice Department wasn't unexpected, as BAE has been accused, notably on the BBC News television program and in articles in *The Guardian* newspaper, of making multimillion-pound payments via a secret slush fund to Saudi Arabia's Prince Bandar bin Sultan to secure a fighter-jet deal.

\* \* \*

*The alleged payments to Bandar come under the jurisdiction of the U.S. Department of Justice because the money went through a U.S. bank. Earlier this month, the Guardian first reported allegations that BAE paid the money to Bandar for a least 10 years through Riggs Bank in Washington.*

*BAE has never denied the payments, but has insisted that all payments it has made in connection to the fighter-jet contractor were legal.*

The deal, known as al-Yamamah and worth an estimated 43 billion pounds ($86 billion), provided Hawk and Tornado jets and other military equipment to the Saudis. . . .

On 7/2/07, *FT.com* published an article stating:

> BAE has admitted it paid commissions to agents as part of the £43bn deal, which they say is normal practice in the business, and that given the size of the contracts, the sums were often large. But it has declined to say who received them while repeatedly denying any wrongdoing.
>
> If US Department of Justice investigators find such payments, they would invoke the 1977 US Foreign Corrupt Practices Act that covers US companies, their foreign affiliates and foreign companies issuing securities registered in the US. *In 2003, BAE registered American Depository Receipts with the Securities and Exchange Commission.*
>
> *The act also covers foreign companies where the business associated with the alleged payments had a connection to the US.*
>
> *     *     *
>
> [I]t is *clear that other payments were made by BAE on behalf of Saudi officials, and those payments did involve transactions in the US.*
>
> *     *     *
>
> *[D]ocuments, seen by the FT, are records of a London-based travel company called Travellers World and include invoices and bank statements.*
>
> They show the travel company's records of payments to cover expenses for lavish hospitality, entertainment and other expenses incurred by Prince Turki bin Nasser, who is also *Prince Bandar's brother-in-law* . . . .
>
> These expenses include hired aircraft, including on one occasion a Boeing 747; and big hotel bills in the US, London and elsewhere. The documents include travel company invoices to BAE for these and other expenses as well as bank statements showing the reimbursement of the exact sums. The *records show more than £60m was paid by BAE's customer solutions and support division to Travellers World to cover these payments over the period from 1991 to February 2002.*
>
> *     *     *
>
> One UK government official familiar with the investigation said the hospitality payments to Prince Turki were just a small part of the total investigation, "a subset of a subset of a general category."

12.    The improper payments also included other payments for Bandar's benefit.

According to the *Sunday Times (London)*:

*THE British arms firm BAE Systems secretly paid nearly £250,000 for a honeymoon for the daughter of Prince Bandar, the Saudi Arabian prince at the centre of bribery allegations.*

A senior BAE executive authorised the payments, allowing Bandar's daughter to enjoy a six-week honeymoon in luxury resorts in Singapore, Malaysia, Bali, Australia and Hawaii. . . .

Peter Gardiner, managing director of the travel agency that organised the honeymoon, said: *"BAE instructed me to give Bandar's daughter and her husband the honeymoon of a lifetime at BAE's expense. Who says that big business doesn't have a heart?"*

\*     \*     \*

*[T]he honeymoon for Bandar's daughter, Princess Reema, was paid for through a £60m slush fund which the Serious Fraud Office (SFO) believes was set up by BAE to encourage Saudi royals to continue with a £ 43 billion arms contract to supply Hawk and Tornado jets.*

The latest twist in the BAE affair has been disclosed by Gardiner, who said he has made a detailed statement to the SFO. He described how his company, Travellers World, was used by BAE to make payments to Saudi royals when they were holidaying around the world. His company would arrange and pay for hotels, airline tickets, apartments, boat and jet charters, as well as hiring limousines and bodyguards.

\*     \*     \*

Last week Gardiner said Tony Winship, a senior BAE marketing executive responsible for overseeing the slush fund, approved the costs of the six-week trip for Princess Reema bint Bandar and Prince Faisal bin Turki, the son of Prince Turki bin Nasser, another Saudi royal implicated in the SFO's bribery inquiry.

\*     \*     \*

The couple were married in Riyadh, the Saudi capital, in December 1996. They flew on Turki's private Boeing 707, staffed by an English captain and crew, to Singapore. There they stayed for a week at Raffles, the country's most exclusive hotel where suites cost from £ 500 to £ 2,800 a night.

They then traveled for a week's stay to the Pangkor Laut resort on a privately owned island off Malaysia. It is often described as the best resort in the world.

\*     \*     \*

After a week in Malaysia, Bandar's daughter and her groom flew by private jet to Bali where they stayed at the five-star Four Seasons Jimbaran Bay resort before flying to Australia, spending Christmas at the Regent hotel in Sydney. During that visit the prince who, like his father-in-law Bandar, is a fan of the Dallas Cowboys

American football team, was keen to watch a critical game. Gardiner says he found a private club in a town 60 miles away that could show the game live on cable TV. The entire club was hired so Bandar's daughter and her husband could watch the match. The three-hour stay cost £ 6,000. BAE again footed the bill.

The couple then flew to the Gold Coast where they stayed at the five-star Sheraton Mirage and Spa. On a day trip they hired a Gulfstream jet to fly to the Great Barrier Reef. The bill, paid by Travellers World and reimbursed by BAE, was £15,000.

Documents in the possession of the SFO show that Travellers World invoiced BAE £45,490 for the couple's stay in Australia. The item is billed as "HM.Aus", which Gardiner said was shorthand for "Honeymoon, Australia". The couple moved on to Hawaii where they spent a few days at the Halekulani on Waikiki beach. From there they flew to the Grand Wailea, on the Hawaiian island of Maui, where their penthouse suite on a private floor cost about £ 4,000.

The files show one part of the bill for Hawaii was £ 101,412. The payments, again paid by BAE, appear as "HM. Haw." and "HM Haw.Xtra". For the month of January alone the cost was £ 190,486. According to Gardiner, this did not include the first leg of the honeymoon, which began in mid-December the previous year. The total cost was nearly £ 250,000, he said.

13.    According to the 6/18/07 edition of *Newsweek*:

**Bandar and the $2 Billion Question**

Hundreds of pages of confidential U.S. bank records may be the missing link in illuminating new allegations that a major British arms contractor funneled up to $2 billion in questionable payments to Saudi Prince Bandar bin Sultan. The BBC and Guardian newspaper reported last week that BAE Systems made "secret" payments to a Washington, D.C., bank account controlled by Bandar, the longtime Saudi ambassador to the United States who is now the kingdom's national-security adviser. The payments are alleged to be part of an *$80 billion* military-aircraft deal between London and Riyadh. . . .  Before the U.K. closed the inquiry, British investigators contacted the U.S. Justice Department seeking access to records related to the Saudi bank accounts. Many of these records were first obtained by NEWSWEEK in 2004. At the time, the magazine reported that federal regulators had been alerted to millions of dollars in *"suspicious" activities in Saudi accounts at the now-defunct Riggs Bank*.

*           *           *

The Riggs Bank records show the use of those funds raised concerns among bank officials and U.S. regulators. *In November 2003, Riggs filed a "suspicious activity report" with the Treasury Department disclosing that over a four-month period*, $17.4 million from the Saudi Defense account had been disbursed to a single individual in Saudi Arabia. When Riggs officials asked the Saudis who the person was and why he was receiving the funds, they were told the individual "coordinates

home improvement/construction *projects for Prince Bandar in Saudi Arabia," and the payments were for a "new Saudi palace," one document shows.*

In another instance, Bandar wired $400,000 from a Riggs account to a luxury-car dealer overseas. "It was impossible to distinguish between government funds and what would normally be considered personal purposes," *said David Caruso, who served as Riggs's compliance officer at the time. Caruso also confirmed to NEWSWEEK that the Saudi Defense account was regularly replenished with $30 million each quarter from an account in London.* But the bank never knew the source of the funds. *The bank was so concerned about the withdrawals that it cut off all business with the Saudis. In May 2005, the U.S. Treasury fined Riggs $25 million for failing to monitor "extensive and frequent suspicious" activity in Saudi and other accounts.*

14.     The Al Yamamah payments were part of a broader pattern and course of conduct of illegal and/or improper payments by the BAE Defendants. The U.K. Serious Fraud Office ("SFO") is investigating allegations that BAE made corrupt payments to politicians and officials in Tanzania, Chile, the Czech Republic, Romania, South Africa and other countries. According to the 5/15/07 *New York Times:*

**Swiss Investigating BAE In Money Laundering Case**

Law enforcement authorities in Switzerland confirmed Monday that they had opened a criminal investigation into possible money laundering at BAE Systems, adding to the international scrutiny of the company, the top British military contractor.

Jeanette Balmer, a spokeswoman for the office of the Swiss federal prosecutor in Bern, confirmed that an investigation had been opened after a report from Swiss money laundering investigators.

15.     Demand on the directors of BAE to bring this lawsuit or vigorously pursue it would be a futile and useless act as their conduct was illegal, not the product of the valid exercise of business judgment or candor taken in good faith. Additionally, their conduct cannot be ratified or approved by BAE's shareholders, as that conduct was illegal and *ultra vires* and also violates Section 463. To bring this action, these directors would have to sue themselves and/or people they have hired and supervised and thus not only expose their own incompetent and/or illegal behavior, but also expose themselves to huge uninsured liabilities. This they will not do. In addition, all the

- 11 -

current directors have knowingly or recklessly participated in the continuing publication of false and misleading Directors Reports and a cover up of the Al-Yamamah payments, as well as other illegal or improper payments made by BAE, and have repeatedly publicly represented that all payments made in connection with the Al-Yamamah and other contracts mentioned herein were proper, legal and did not involve wrongdoing. Thus, in order for the true facts to be uncovered, discovered and proved, and the past harm to BAE remedied, with future harm to BAE ameliorated or prevented, this action must be pursued by the plaintiff derivatively on behalf of and for the benefit of BAE. This action is brought in good faith for the benefit of BAE and it is respectfully requested that this Court permit this action to proceed.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1). The amount in controversy exceeds the jurisdictional minimum of this Court, exclusive of interest and costs, and plaintiff and defendants are citizens of, and domiciled in, different states. Many of the acts alleged in this Complaint arose in Washington D.C. Venue is therefore proper in this District.

17.     Each individual defendant has had substantial and continuous contacts with Washington D.C. and the United States that makes the exercise of personal jurisdiction over him or her proper. BAE does substantial business in Washington, D.C. and the United States, including operating a major office in Washington, D.C. Riggs was the largest D.C.-based commercial bank for most of its history. The Albritton defendants described in ¶¶54-56 operated Riggs out of this District and continue to reside in Washington, D.C. and to operate substantial business operations here. Bandar was a resident of Washington, D.C. for some 15-20 years during the period relevant to the allegations herein. A substantial part of the wrongdoing occurred in and/or had effect in Washington, D.C. Evidence relevant to and necessary to prove plaintiff's claims – including the location of important physical and documentary evidence and witnesses able to provide live

- 12 -

testimony – is here in Washington, D.C. The DOJ and the SEC are both investigating BAE here in Washington, D.C. for important aspects of the conduct complained of herein.

## THE PARTIES

### Plaintiff

18.     Plaintiff City of Harper Woods Employees' Retirement Systems was at relevant times a stockholder of BAE. This plaintiff currently owns approximately 3,500 BAE ADRs. Plaintiff brings this action derivatively in the right of and for the benefit of BAE. Plaintiff will fairly and adequately represent the interests of BAE and its shareholders in enforcing the rights of BAE.

### Nominal Defendant

19.     Nominal defendant BAE is a U.K. corporation with its corporate headquarters in London. BAE has a huge operating subsidiary that operates in the U.S. called BAE Systems, Inc., a Delaware corporation. BAE Systems, Inc. ("BAE-USA") is a wholly owned subsidiary of BAE and a Delaware corporation. BAE has several offices located here in the District. BAE has mitigated the Company's foreign ownership through entry into a Special Security Agreement between the U.S. Government, BAE-USA and BAE. That agreement calls for the appointment of outside directors who, in conjunction with other U.S.-based board members, comprise a Government Security Committee. The Government Security Committee has the responsibility for overseeing the Company's compliance with U.S. Government security and export regulations and meets regularly with U.S. Government defense officials. Compliance with the SSA allows BAE to supply products and services to the U.S. Department of Defense ("DOD"), Intelligence Community and Homeland Security on some of our Nation's most sensitive programs.

20.     BAE has recently described its very substantial business in the U.S. as follows:

(a)     BAE's 2006 Annual Report stated:

BAE Systems is one of the world's leading defence companies and is one of only four companies with global defence sales in excess of $20bn. *It . . . ranks number seven within the US defence industry.*

- 13 -

*     *     *

*The Group's US business now delivers over US$9bn (£5bn) of annual sales and employs approximately 40,000 people in 36 states.*

BAE Systems is both a prime contractor to the US government and a supplier of major sub-systems to the other large prime contractors. . . . BAE Systems has a substantial business supporting network systems and IT for US government agencies and provides technical support services to the US Navy, US Army, NASA and the FAA. In land systems, the Group is one of the two largest suppliers of armoured vehicles in the US and the wider accessible global market.

The US defence market . . . remains one of BAE Systems' key markets . . . . US defence spending has increased substantially over recent years . . . . This high level of funding is expected to sustain further growth in the near term . . . .

. . . [T]he Group is well placed to support the US Department of Defense's likely continued emphasis on force sustainment and readiness.

*The U.S. Defense Department is BAE's largest single customer.*

(b)      Regarding the U.S. market, BAE's 2000 Annual Report stated:

*     *     *

The US is by far the largest defence market . . . . *BAE SYSTEMS recognises that participation in the US market is a prerequisite to establishing and growing a leading position in the global defence industry.*

*     *     *

**North America**   Four acquisitions in 2000 have enhanced the company's position in the US market.

*     *     *

BAE SYSTEMS North America also has a strong, well-established presence in the services and support market. It is the largest single technical support contractor for the US Navy, with a legacy relationship of more than 35 years. In 2000, it was awarded a $450m contract to provide systems engineering and technical assistance for the Federal Aviation Administration's air traffic control programme.

(c)      BAE's 2001 Annual Report stated:

The US is the world's largest defence market. In 2001, we have seen benefits starting to flow as our recent US acquisitions have been successfully integrated into the group. Our strategy – to strengthen our position in that market – is working to good effect.

*     *     *

**Strategic development**

The US is the world's largest defence market and it is growing. . . .

*Our position as one of the DoD top suppliers has been enhanced by the successful integration of the four North American acquisitions we made in 2000.*

(d)     CEO Michael J. Turner's 2002 letter (dated 2/03) stated:

BAE SYSTEMS has also continued to build its position in the US, the world's largest, and growing, defence market. The US is the defence technology powerhouse of the world and for BAE SYSTEMS to retain a position at the top of its industry *it must have a strong US presence. The company has already grown its position successfully, establishing itself as a key constituent of the US defence community. BAE SYSTEMS North America is performing strongly and the continued growth of our US industrial position remains an important part of our strategy.*

(e)     BAE's 2004 Annual Report – in CEO Turner's letter – stated:

In the US, five acquisitions were completed. . . .  With these acquisitions BAE Systems now generates annualised sales of some $5.6bn in its North America business and now employs over 27,000 people across the US.

(f)     BAE's 2005 Annual Report – in Chairman Richard L. Olver's letter – stated:

With the increasing importance of BAE Systems' operations in the United States, which now manage 35% of sales, we have appointed three new non-executive directors to the Board to provide further US perspective and experience.

(g)     BAE's 2005 Annual Report stated:

**Grow our business in the United States**

In the summer of 2005, BAE Systems completed the acquisition of United Defense, growing the US business base by $2.6bn in annual sales and 8,000 additional employees. This acquisition established BAE Systems as a major land systems prime contractor with a strong position in support of the US Department of Defense's requirements for force sustainment and affordable transformation.

(h)     BAE's U.S. operations include operations in:  Acton, Massachusetts; Alexandria, Virginia; Anniston, Alabama; Arlington, Virginia; Austin, Texas; Bellevue, Nebraska; Berthoud, Colorado; Brea, California; Burlington, Massachusetts; Cheshire, Connecticut; Colorado Springs, Colorado; Columbia, Maryland; Falls Church, Virginia; Fort Wayne, Indiana; Fort Worth, Texas; Greenlawn, New York; Heath, Ohio; Honolulu, Hawaii; Hudson, New Hampshire; Irving,

Texas; Johnson City, New York; Lansdale, Pennsylvania; Lexington, Massachusetts; Los Angeles,

California; Manassas, Virginia; McLean, Virginia; Merrimack, New Hampshire; Minneapolis,

Minnesota; Mojave, California; Mount Laurel, New Jersey; Nashua, New Hampshire; Newington,

Virginia; Ontario, California; Pittsburgh, Pennsylvania; Norfolk, Virginia; Redmond, Washington;

Reston, Virginia; Rockville, Maryland; Rome, New York; San Diego, California; Washington, D.C.;

Wayne, New Jersey; Yonkers, New York; and York, Pennsylvania.

      (i)    BAE securities are registered with the SEC pursuant to an Amended and

Restated Deposit Agreement dated as of 5/03 and traded Over-the-Counter ("OTC") in the U.S.

According to BAE's 2006 Annual Report:

> The BAE Systems plc American Depositary Receipts (ADRs) are traded on the Over The Counter market (OTC) under the symbol BAESY. One ADR represents four BAE Systems plc ordinary shares.
>
> JPMorgan Chase Bank, N.A. is the depositary.
>
> If you should have any queries, please contact:
>
> JPMorgan Chase Bank, N.A.
> JPMorgan Service Center
> PO Box 3408
> South Hackensack, NJ  07606-3408
> USA

    21.    BAE is incorporated under English law, which permits or will permit this action to be

maintained based on the allegations made in this Complaint. However, due to BAE's extensive U.S.

operations, the large number of BAE shareholders in the U.S., the U.S. connection to the primary

wrongdoing alleged herein, and the interests of the U.S. impacted by that conduct, under the local

law exception to the internal affairs doctrine, the laws of Washington, D.C. (or another appropriate

U.S. jurisdiction) may, if necessary, be applied to permit this action to be maintained.

**The BAE Defendants**

    22.    The defendants described in ¶¶23-36 include the entire BAE Board of Directors as of

the filing of this Complaint and are referred to herein sometimes as the "Director Defendants."

Along with the Director Defendants, the remainder of the current and/or former BAE officers and directors named below at ¶¶37-48 are referred to herein as the "BAE Defendants."

23.     Defendant Richard (Dick) L. Olver ("Olver") has served as Chairman of BAE since 7/1/04 and as a director since 5/17/04. Olver resides in and is a citizen of the U.K. Olver serves as Chairman of the BAE Board's Nominations Committee and Chairman of its Non-Executive Directors Fees Committee. Olver receives a fee of £500,000 per annum and other benefits, including the private use of a chauffeur. BAE does not consider Olver to be an independent director.

24.     Defendant Michael J. Turner ("Turner") has served as the Chief Executive Officer ("CEO") of BAE since 2002 and as an Executive Director since 1994. Turner previously served as Chief Operating Officer ("COO") of BAE from 1999 to 3/02. Turner originally joined British Aerospace in 1978 as a Contracts Manager (Military) of what had by then become the Manchester Division of the British Aerospace Aircraft Group. Turner resides in and is a citizen of the U.K. Turner serves on the BAE Board's Executive Committee and its Non-Executive Directors Fees Committees. Turner's current salary is set at £945,000 per annum plus a supplementary payment of 30% of his annual salary in lieu of pension benefits. Turner received £2.4 million in salary, bonus and other compensation in 2006 and £1.6 million in salary, bonus and other compensation 2005.

25.     Defendant Walter P. Havenstein ("Havenstein") has served as an Executive Director of BAE since 1/2/07 and currently serves as its COO, having held a variety of executive positions at BAE since 2000. Havenstein joined Sanders (when it was a part of Lockheed Martin) in 2/99 prior to BAE's acquisition of Sanders in 2000. Havenstein has also served as President and CEO of BAE-USA (formerly, BAE Systems North America, Inc.), a U.S. subsidiary of BAE, since 1/1/07, and serves as a director of BAE-USA. Havenstein resides in and is a citizen of New Hampshire. Havenstein serves as a member of the BAE Board's Executive Committee and its Non-Executive Director Fees Committee. Havenstein's current salary is set at $750,000 per annum plus pension

- 17 -

benefits, including a 50% match on his contributions to his 401(k) plan up to a maximum contribution of 8% of BAE's earnings.

26.     Defendant Ian G. King ("King") has served as a director of BAE and as COO for the U.K. and Rest of World ("RoW") organization, responsible for all U.K. and RoW businesses (excluding BAE's US-led businesses) since 1/07. King joined Marconi in 1976 prior to BAE's acquisition of Marconi. In 1999 King assumed the position of Group Strategy and Planning Director of BAE. King resides in and is a citizen of the U.K. King's current salary is set at £530,000 per annum plus pension benefits.

27.     Defendant George W. Rose ("Rose") has served as BAE's Group Finance Director and an Executive Director since 1998. Rose was previously appointed Director of Financial Control and Accounting of British Aerospace in 6/92 and Director for Finance and Treasury in 2/95. Rose resides in and is a citizen of the U.K. Rose serves as a member of the BAE Board's Executive Committee. Rose's current salary is set at £560,000 per annum plus pension benefits. King received £1.1 million in salary, bonus and other compensation in 2006 and £1 million in salary, bonus and other compensation 2005.

28.     Defendant Christopher V. Geoghegan ("Geoghegan") has served as an Executive Director of BAE since 7/02 and previously served as COO of BAE from 4/02 until being removed from that position in 1/07. Geoghegan originally joined British Aerospace, Manchester, as a Senior Contracts Officer in 1976, and has held a variety of executive positions at the Company and its predecessors. Geoghegan is a past Council Member of SBAC and a member of the BAE Board's Executive Committee. Geoghegan resides in and is a citizen of the U.K. Geoghegan's current salary is set at £490,000 per annum plus an annual payment of 30% of his salary in lieu of pension benefits. Geoghegan received £1 million in salary, bonus and other compensation in 2006 and £893,000 in salary, bonus and other compensation 2005.

29.     Defendant Phillip J. Carroll ("Carroll") has served as a Non-Executive Director of BAE since 2005. Carroll resides in and is a citizen of the Texas. Carroll serves on the Board's Nominations and Corporate Responsibility Committees. As of 12/06, Carroll owned no BAE stock. Carroll received a directors' stipend of £70,000 during fiscal 2006 and £18,000 during fiscal 2005.

30.     Defendant Michael J. Hartnall ("Hartnall") has served as a Non-Executive Director of BAE since 2003. Hartnall resides in and is a citizen of the U.K. Hartnall, a fellow of the Institute of Chartered Accountants in England and Wales, chairs the BAE Board's Audit Committee. Hartnall received a directors' stipend of £78,000 during fiscal 2006 and £73,000 during fiscal 2005.

31.     Defendant Sir Peter James Mason ("Mason") has served as a Non-Executive Director of BAE since 2003. Mason resides in and is a citizen of the U.K. Mason is a member of BAE's Audit and Nominations Committees. Mason received a directors' stipend of £73,000 during fiscal 2006 and £63,000 during fiscal 2005.

32.     Defendant Roberto Quarta ("Quarta") has served as a Non-Executive Director of BAE since 2005. Quarta resides in and is a citizen of the U.K. Quarta serves on the Board's Audit and Remuneration Committees. As of 12/06, Quarta owned no BAE stock. Quarta received a directors' stipend of £58,000 during fiscal 2006 and £18,000 during fiscal 2005.

33.     Defendant Sir Anthony Nigel Russell Rudd ("Rudd") has served as a Non-Executive Director of BAE since 9/06. Rudd resides in and is a citizen of the U.K. Rudd serves on the Board's Remuneration and Corporate Responsibility Committees. As of 12/06, Rudd owned no BAE stock. Rudd received a directors' stipend of £15,000 during fiscal 2006.

34.     Defendant Peter A. Weinberg ("Weinberg") has served as a Non-Executive Director of BAE since 2005. Weinberg resides in and is a citizen of the Connecticut. Weinberg chairs the Board's Corporate Responsibility Committee and serves on its Remuneration Committee. As of

12/06 Weinberg owned no BAE stock. Weinberg received a directors' stipend of £77,000 during fiscal 2006 and £34,000 during fiscal 2005.

35.    Defendant Andrew George Inglis ("Inglis") was appointed to the BAE Board by the current Board members on 5/31/07 and was seated on 6/13/07. Inglis resides in and is a citizen of the U.K.

36.    Defendant Ulrich Cartellieri ("Cartellieri") has served as a Non-Executive Director of BAE since 1999. Cartellieri resides in and is a citizen of the U.K. Cartellieri served on the Board's Audit Committee. As of 12/06, Cartellieri owned no BAE stock. Cartellieri received directors' stipends of £58,000 during fiscal 2006 and £53,000 during fiscal 2005.

37.    Defendant Sue Birley ("Birley") previously served as a BAE Director from 2000 to 2/07. Birley resides in and is a citizen of the U.K. Birley chaired the Board's Remuneration Committee and served on its Corporate Responsibility Committee. Birley received directors' stipends of £73,000 during fiscal 2006 and £63,000 during fiscal 2005.

38.    Defendant Michael Lester ("Lester") previously served as BAE's Group Legal Director and an Executive BAE Director from 1999 until he resigned in 12/06. Lester resides in and is a citizen of the U.K. Lester received £1.15 million in salary, bonus and other compensation in 2006 and £1.1 million in salary, bonus and other compensation 2005.

39.    Defendant Mark H. Ronald ("Ronald") previously served as a BAE Executive Director from 4/02 until he resigned in 12/06. Ronald previously served as BAE USA's President, COO and CEO until he resigned in 12/06. Ronald resides in and is a citizen of the Maryland. Upon his resignation, Ronald received a lump sum equal to 12 months' salary (or £1 million), continuance of medical benefits for 18 months from his termination date, and was appointed as an advisor and non-executive Chairman of BAE-USA effective 1/15/07. Ronald received £1.9 million in salary,

- 20 -

bonus and other compensation in 2006 and £1.3 million in salary, bonus and other compensation 2005.

40.    Defendant Michael Denzil Xavier Portillo ("Portillo") previously served as a Non-Executive Director of BAE from 2002 to 5/06. Portillo resides in and is a citizen of the U.K. Portillo owned no BAE common stock as of 12/06. Portillo received a directors' stipend of £17,000 during fiscal 2006 and £53,000 during fiscal 2005.

41.    Defendant Sir Richard (Dick) Harry Evans ("Evans") is the former Chairman of BAE. Evans began his career in the 1960s with government department posts in the then-nationalized British defense sector. Evans was appointed CEO of BAE's predecessor in 1990 and rose to become Chairman in 5/98. Evans made his name by securing the largest arms deal in British history – the Al-Yamamah sales to Saudi Arabia. For being the architect of the gigantic deal, he was rewarded with a huge salary, a knighthood and considerable power within BAE. However, during Evans' tenure as Chairman it has been reported "there [was] a feeling in the City that BAE [was] run by a 'mafia,' that Dick is the head and that they are a law unto themselves." Evans stepped down in 2004 but remained on BAE's payroll as a consultant. Evans resides in and is a citizen of the U.K.

42.    Defendant Lord Alexander Hesketh ("Hesketh") previously served as a Non-Executive Director of BAE from 1994 to 5/05. Hesketh resides in and is a citizen of the U.K. Hesketh was receiving £45,000 per year at the time of his termination.

43.    Defendant John Pix Weston ("Weston") previously served as CEO of BAE and as a member of its Board from 1998 until 2002 when he was asked to resign following the Company's shocking profit warning in 12/02 caused by massive cost overruns on two regular Ministry of Defense projects resulting in a £750 million charge on the contracts. Weston originally joined British Aircraft Corporation in 1970, and served in various positions until 1998, when he became the CEO. Weston was replaced by Turner. Weston resides in and is a citizen of the U.K. Weston

received a salary of £130,000 for fiscal 2002, a £520,000 payment upon termination and assets of £939,000 payable upon termination of his employment contract. During fiscal 2000 and 2001, Weston received a salary of £500,000 and £520,000, respectively, plus a bonus of £100,000 each year.

44.    Defendant Keith Clark Brown ("Brown") previously served as a Non-Executive Director of BAE from 1989 to 2003. Brown resides in and is a citizen of the U.K. Brown served as Chairman of the Board's Audit Committee and received a directors' stipend of £40,000 during fiscal 2001 and £35,000 during fiscal 2000.

45.    Defendant Steve Lewis Mogford ("Mogford") served as a BAE Executive Director and as COO – Programmes – from 4/00 until he was removed as COO in 1/07. Mogford, who originally joined British Aerospace Military Aircraft in 1977 as a Supply Engineer, continued serving as a BAE Board member until 5/07. In 4/07 Mogford announced he was resigning from the BAE Board and joining Finmeccanica SpA's Selex subsidiary as its CEO. Mogford resides in and is a citizen of the U.K. Mogford received salary, bonus and other compensation of £956,000 and £910,000 during fiscal 2006 and 2005, respectively.

46.    Defendant Paolo Scaroni ("Scaroni") previously served as a Non-Executive Director of BAE from 2002-2004 when he resigned. Scaroni backed the replacement of Weston with Turner following the 12/02 shocking profit warning. Scaroni resides in and is a citizen of the Italy. Scaroni, who served on the Board's Audit Committee, owned no BAE stock as of 12/03. Scaroni received directors' stipends of £34,000 during fiscal 2002 and 2003.

47.    Defendant Sir Robin Biggam ("Biggam") previously served as a Non-Executive Director of BAE from 1994-2003. Biggam resides in and is a citizen of the U.K. Biggam served on the Audit, Remuneration and Nominations Committees. Biggam received directors' stipends of £40,000 and £13,000 during fiscal 2002 and 2003, respectively.

48.    Defendant Sir Charles Beech Gordon Masefield ("Masefield") served as Vice Chairman of the BAE Board from 2002 until his termination in 2003. Masefield joined the BAE Board in 1999 when he was appointed Group Marketing Director. Masefield resides in and is a citizen of the U.K. Masefield received a salary of £431,000 and a bonus of £65,000 during fiscal 2002.

**Prince Bandar**

49.    Defendant Prince Bandar Bin Sultan ("Bandar") is a highly influential Saudi official. He was Saudi ambassador to the United States from 1983 to 2005 and is now Secretary-General of the Saudi Arabia National Security Council. Bandar is a son of Crown Prince Sultan bin Abdul Aziz, who was the head of the Saudi Arabia Ministry of Defense for some 20 years and is now the Deputy Prime Minister of Saudi Arabia. Bandar was the Saudi Arabian Ambassador to the United States from approximately 1995 to 2005 when he "resigned" for personal reasons. He lived in the United States for over 20 years, owns property here in the United States worth over $100 million and has transacted over $2 billion in monetary transactions in Washington, D.C. over the past 20 years – mostly through Riggs. Bandar helped negotiate the 1985 Al Yamamah deal and a series of arms sales by BAE to Saudi Arabia worth over £40 billion, including the sale of more than 100 warplanes. To pay off Bandar after the Al Yamamah deal was signed, and to assure that Saudi Arabia continued to make purchases under the contract, BAE funneled secret payments of at least £2 billion into two Saudi embassy accounts in Washington at Riggs, in quarterly or yearly installments for many years. Bandar took money for personal use out of the accounts. The purpose of one of the accounts was to pay the operating expenses of Bandar's private Airbus A340. Bandar resides in and is a citizen of the U.K. Bandar is sued for knowingly and intentionally inducing the other defendants' breaches of their fiduciary duties, aiding and abetting their breaches, conspiring with them to commit and

advance their breaches or scheming with them to commit and advance their breaches of fiduciary duty and of U.S. and/or U.K. or European Union laws or conventions.

**PNC/Riggs**

50.     Defendant PNC Financial Services Group, Inc. ("PNC"), incorporated and headquartered in Pennsylvania, is the legal successor by merger to Riggs Bank, N.A. and Riggs National Corporation (collectively "Riggs"), a Washington, D.C.-based commercial bank, which was for most of its history the largest bank headquartered in the nation's capital. After various corporate scandals and management problems, in 2004 Riggs was acquired by PNC by merger and PNC became its legal successor, legally responsible for Riggs' conduct referred to herein. Notably, Riggs accounts were established for two of the 9/11 hijackers and funded by Bandar's wife. Upon discovery of these transactions, the FBI began investigating the bank for possible money-laundering and terrorist financing. Investigators found lax safeguards at Riggs regarding money laundering. Several Saudi accounts were discovered to have financial improprieties, including a lack of required background checks and a consistent failure to alert regulators of large transactions, in violation of the law. Many of these transactions involved Bandar personally, often transferring over $1 million at a time. On the Al Yamamah deal alone, Bandar received billions in bribes from BAE through Riggs.

51.     Similarly, Augusto Pinochet, the former dictator of Chile, has been widely accused since 1973 of corruption, illegal arms sales, and torture. Nonetheless, in 1994, Riggs officials invited Pinochet to open an account at Riggs. Arrested in 1998 in Britain for possible extradition to Spain, his accounts were ordered frozen by court orders. A recent U.S. Senate report has revealed that Riggs executives helped Pinochet disguise millions of dollars that had been stolen from the Chilean people. By using shell companies and hiding accounts from federal regulators, Riggs illegally allowed Pinochet to retain access to much of his fortune.

52.    In 7/04, the U.S. Senate published an investigation into Riggs, into which most of Equatorial Guinea's oil revenues were paid. The Senate report showed that accounts based at the Equatorial Guinea embassy to the United States were allowed to make large withdrawals without properly notifying federal authorities. In that hearing, the President of Riggs was asked why the bank would willingly enter into a business arrangement with the dictator of Equatorial Guinea, a man who willingly exercises his hold over his people with demonstrations of murder and torture on state-run television. In correspondence to President Mbasogo, a Riggs letter "thanked the president for his establishment of several bank accounts, and encouraged a working relationship to help establish and secure the stable reign of his country."

53.    For its transgressions, Riggs was ultimately fined $25 million for violations of money-laundering laws. A long running DOJ investigation was wrapped up in 2/05, with Riggs pleading guilty and paying a $16 million fine for violations of the U.S. Bank Secrecy Act. And in 2/05, the bank and its controlling shareholder agreed to pay $9 million to Pinochet victims for concealing and illegally facilitating movement of Pinochet money out of Britain. Upon completion of PNC's acquisition of Riggs in 2/05, the Riggs name was abandoned, but PNC has continued its operations in Washington, D.C.

**The Allbritton Defendants**

54.    Defendant Joseph L. Allbritton ("Joe Allbritton") served as Chief Executive Officer and Chairman of Riggs Bank, N.A. until 2001 when his son Robert assumed those positions. Joe Allbritton continued serving on the Board of Directors of Riggs National Corporation (collectively with Riggs Bank, N.A., "Riggs") until May 2004. Joe Allbritton controlled most of the Allbritton family's 41% interest in Riggs and ran the bank as his own private fiefdom until the 2005 sale to PNC following the bank's 2004 plea to federal money laundering charges. Joe Allbritton resides in and operates a substantial business enterprise in the District.

- 25 -

55.    Defendant Robert L. Allbritton ("Robert Allbritton") is the son of defendant Joe Allbritton and served as Riggs' CEO and Chairman from 2001 until the bank's sale to PNC in February 2005. Robert Allbritton acquiesced in and participated in his father's efforts to expand the bank's embassy business at all costs. Robert Allbritton has been chairman and CEO of Allbritton Communications, which owns television stations and a newspaper in Washington D.C., since 2001. Robert Allbritton resides in the District.

56.    Defendant Barbara Allbritton ("Barbara Allbritton") is the wife of defendant Joe Allbritton and served as a director of Riggs National Corporation until May 2004. Barbara Allbritton acquiesced in and participated in her husband's efforts to expand the bank's embassy business at all costs. Barbara Allbritton resides in the District.

57.    The defendants listed in ¶¶54-56 are referred to herein as the "Allbritton Defendants" and these defendants acted in concert with defendant PNC (formerly Riggs) to aid and abet violations of fiduciary duty by the Director Defendants.

58.    The Allbritton Defendants purchased a controlling interest in Riggs in 1981 at the peak of the bank's influence and prestige. With all of the bank's assets at their disposal, including its Gulfstream jet, the Allbrittons scoured the globe acquiring 95% of Washington D.C.'s embassy account business for Riggs. The Allbrittons courted an expansive unsavory international clientele, including Bandar, former Chilean strongman Augusto Pinochet, and Teodoro Obiang Nguema, dictator of Equatorial Guinea. The top two federal bank regulators – the Federal Reserve Board and the Treasury Department's Office of the Comptroller of the Currency – began a criminal investigation into the Riggs' embassy division in 2002, focusing on transactions in hundreds of accounts associated with Saudi Arabia, Equatorial Guinea and General Pinochet. U.S. Senate investigations followed and disclosed mounds of evidence documenting the Allbritton Defendants' efforts to obtain and retain embassy business for Riggs: "I am also grateful for our thriving personal

friendship which you have demonstrated through your gracious hospitality and stalwart support of the Riggs," Joe Allbritton wrote in a draft letter to General Pinochet dated November 1997, a year when Riggs was expanding its relationship with both Pinochet and the Chilean military. "I thank you for the marvelous gifts to both Barbie and myself, including the history books which I found fascinating."

59.     Evidence of millions of dollars being funneled through Riggs accounts by diplomats of Saudi Arabia has also been disclosed, including funds paid to Bandar.  In its May 2005 enforcement action against Riggs, the U.S. Office of the Comptroller of the Currency specifically cited Riggs' failure to file suspicious activity reports for large-denomination withdrawals of cash by Bandar and others.

60.     Following the 9/11 attacks, in December 2002 the F.B.I. and federal bank regulators began examining Riggs accounts in connection with Saudi cash transactions.  What regulators expected to be a one-month examination lasted five months as regulators uncovered improprieties in some of the 150 Saudi accounts at Riggs. Under U.S. law, banks are required to vet the background of their customers, report outsized movements of cash and alert regulators when any banking activities are suspicious. Regulators and members of Congress said Riggs frequently failed to carry out these duties, especially with regards to Saudi accounts. A July 2004 Senate report disclosed that the Saudi accounts were "equally troubling" as other accounts at Riggs that had come under scrutiny, but noted that a more thorough Congressional examination of the Saudi accounts was under way at the Senate Governmental Affairs Committee.  Federal regulators eventually concluded that the Allbritton led Riggs inadequately monitored the destinations and uses of large amounts of cash, often more than $1 million at a time, in the Saudi accounts. Many of these transactions involved Bandar personally.

61.    Problems with the Saudi accounts led federal bank regulators to issue a rare and public cease-and-desist order against Riggs in early 2003, requiring it to clean up its practices or face further penalties. But unexplained transactions continued to flow through the Saudi accounts throughout late 2003. By March 2004, though Riggs publicly stated it had closed all Saudi accounts, minutes of a Riggs meeting on April 7, 2004 noted that Bandar had recently requested "$2 million in cash for traveling expenses." "Prince Bandar then asked that Riggs wire $2 million to another bank, which was done," the minutes said, adding that the bank notified regulators about the transaction.

62.    In 2005 Riggs was fined $25 million for violations of money-laundering provisions of the U.S. Bank Secrecy Act and the bank was placed on federal probation. The bank and Allbritton family also agreed to pay $9 million to Pinochet victims for concealing and illegally facilitating movement of Pinochet money out of Britain. This payment was made in settlement of litigation commenced in Spain against Riggs, the Allbritton family and other Riggs executives. The $25 million money-laundering fine for Riggs' "willful, systemic" failure to report suspicious transactions, and its years of failing to follow anti-money laundering laws, was the largest such fine ever levied on an American bank. The members of the Allbritton family all immediately resigned from all Riggs boards. Meanwhile, the family had collectively received tens of millions of dollars in compensation and other perks as a result of their facilitation of the bank's illegal misconduct.

## APPLICABLE ANTI-CORRUPTION LAWS AND CONVENTIONS AND THE U.K. COMPANIES ACT OF 2006

63.    The United States Foreign Corrupt Practices Act ("FCPA") for many years prohibited payments to foreign officials for purposes of:

> *(A)(i)   influencing any act or decision of such foreign official in his official capacity, (ii) inducing such foreign official to do or omit to do any such official, or (iii) securing any improper advantage . . . in order to assist [the company making the payment] in obtaining or retaining business for or with, or directing business to any person.*

- 28 -

15 U.S.C. §78dd-1(a)(1). Thus, the FCPA criminalized every payment to a foreign official that is intended to (1) *influence* a foreign official to act or make a decision in his official capacity, or (2) induce such an official to perform or refrain from performing some act in violation of his duty, or (3) secure some wrongful advantage to the payor.

64.    In 1998, Congress amended the FCPA to implement the Organization of Economic Cooperation and Development ("OECD") Convention on Combating Bribery of Foreign Public Officials in International Business Transactions ("OECD Convention"), signed in 12/97. The amendments expanded FCPA coverage to "*any person*" – not just "*issuers*" or "*domestic concerns*" (defined as any American citizen, national or resident, or American corporation). 15 U.S.C. §§78dd-1 to 78dd-3. The 1998 amendments also removed the requirement – for issuers and domestic concerns – *of a territorial* connection to the United States. Under the FCPA, any United States person or entity violating the FCPA outside the United States is subject to prosecution, regardless of whether any means of interstate commerce were used. 15 U.S.C. §§78dd-1 to 78dd-3; *see* U.S. Const. art. I, §8, cl 1, cl 3 ("The Congress shall have Power . . . . To regulate Commerce with foreign Nations, and among the several States . . . .").

65.    The U.K. Companies Act of 2006 provides:

*Liability for false or misleading statements in reports*

463    **Liability for false or misleading statements in reports**

(1)    The reports to which this section applies are –

(a)    *the directors' report,*

(b)    *the directors' remuneration report*, and

(c)    *a summary financial statement so far as it is derived from either of those reports*.

(2)    *A director of a company is liable to compensate the company for any loss suffered by it as a result of* –

(a)    *any untrue or misleading statement in a report to which this section applies*, or

(b)    *the omission from a report to which this section applies of anything required to be included in it*.

(3)    *He is so liable only if –*

(a)    he knew the statement to be untrue or misleading *or was reckless as to whether it was untrue or misleading*, or

(b)    *he knew the omission to be dishonest concealment of a material fact.*

(4)    No person shall be subject to any liability to a person *other than the company* resulting from reliance, by that person or another, on information in a report to which this section applies.

## DEFENDANTS' FIDUCIARY DUTIES

66.    By reason of their positions as officers, directors and/or fiduciaries of BAE and because of their ability to control the business and corporate affairs of BAE, the BAE Defendants owed BAE and its shareholders fiduciary obligations of fidelity, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage BAE in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of BAE and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

67.    Each director and officer of the Company owes to BAE the fiduciary duty to comply with the U.K. Companies Act and to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing. In addition, as officers and/or directors of a publicly held company, the BAE Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's finances and operations, and defendants also had an obligation not to entrench themselves as officers and/or directors of the Company, to allow open and honest board

elections and to not advance their own personal, financial or economic interests over and at the expense of the Company's public shareholders.

68. The BAE Defendants, because of their positions of control and authority as directors or officers of BAE, were able to and did, directly and indirectly, control the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with BAE, each of the defendants had access to all non-public information about the financial condition, operations and future business prospects of BAE, including, without limitation, the illegal and improper activities which the BAE Defendants caused BAE to engage in.

69. At all times material hereto, each of the BAE Defendants was the agent of each of the other BAE Defendants and of BAE, and was at all times acting within the course and scope of said agency.

70. To discharge their duties, the officers and directors of BAE were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and operational affairs of BAE. By virtue of such duties, the officers and directors of BAE were required, among other things, to:

(a) Manage, conduct, supervise and direct the business and internal affairs of BAE in accordance with the laws and regulations of England, the United States, and every country in which BAE conducts business, and pursuant to the charter and bylaws of BAE;

(b) Neither violate nor knowingly permit any officer, director or employee of BAE to violate applicable laws, rules and regulations;

(c) Remain informed as to the status of BAE's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection

therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with applicable laws and regulations;

(d)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of BAE and procedures for the reporting of the business and internal affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    Maintain and implement an adequate and functioning system of internal legal, financial and management controls, such that BAE's operations would comply with all applicable anti-corruption/anti-bribery laws, BAE's financial statements and information filed with the English and U.S. financial regulators and disseminated to the public and to BAE shareholders in Directors' Reports would be accurate and the actions of its directors would be in accordance with all applicable laws; and

(f)    Exercise reasonable control and supervision over the public statements to the securities markets, investors and public shareholders of BAE by the officers and employees of BAE and any other reports or other information required by law from BAE and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of BAE and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

71.    During all times relevant hereto, each of the BAE Defendants occupied positions with BAE or were associated with the Company in such a manner as to make them privy to confidential and proprietary information concerning BAE, its operations, finances and financial condition. Because of these positions and such access, each of the BAE Defendants knew that the true relevant facts specified herein had not been disclosed to and were concealed from BAE's shareholders. The BAE Defendants, as corporate fiduciaries entrusted with non-public information, are obligated to

disclose material information regarding BAE and to take any and all actions necessary to ensure that the officers and directors of BAE do not abuse their privileged positions of trust, loyalty and fidelity in a manner which causes the Company to violate the law.

72.   BAE's Board of Directors has admitted that the very type of conduct alleged herein, *i.e.*, payment of improper kickbacks or bribes, can harm BAE – while at the same time falsely assuring BAE's shareholders (owners) that no such conduct had occurred or would occur. BAE's 2006 Annual Report issued in 4/07 stated:

**The Group is subject to risk from a failure to comply with laws and regulations.**

> *The Group's operations are subject to numerous domestic and international laws, regulations and restrictions, and non-compliance with these laws, regulations and restrictions could expose the Group to fines, penalties, suspension or debarment, which could have a material adverse effect.*

> The Group has contracts and operations in many parts of the world and operates in a highly regulated environment. *The Group is subject to numerous UK, US and other laws and regulations, including, without limitation, regulations relating to import-export controls, money-laundering, false accounting, anti-bribery and anti-boycott provisions. . . .*

> *Failure by the Group or its sales representatives, marketing advisers or others acting on its behalf to comply with these laws and regulations could result in administrative, civil or criminal liabilities and could result in significant fines and penalties and could result in the suspension or debarment of the Group from government contracts for some period of time or suspension of the Group's expert privileges.*

> *Addressing this exposure the Group has mandated policies and procedures to help ensure that employees act with the highest ethical standards and comply with relevant laws and regulations. In particular, all dealing with sales representatives and market advisers are governed by detailed compliance procedures, the application of which is monitored by a dedicated compliance function.*

73.   BAE's 2004 Annual Report also stressed the importance of compliance with anti-bribery and anti-corruption laws, stating:

**Compliance with international anti-corruption laws**

> *BAE Systems demands and expects honesty, integrity and fairness in all aspects of its business. In support of this expectation, the company is committed to*

*compliance with laws implementing the OECD Anti-Bribery Convention and the US Foreign Corrupt Practices Act. The company will not tolerate bribery or any attempt by way of gifts, payments or favours to influence improperly the decisions of our customers or suppliers.*

*A comprehensive compliance programme has been in place for a number of years and is aimed at ensuring that our policies in this area are observed and enforced. . . .*

*The Board recognises that compliance with these two areas is of critical importance to the company.*

74.    BAE's 2005 Annual Report stated:

**Key issues for our business**

\*        \*        \*

*The key areas our stakeholders consider material to our business are anti-bribery and corruption practices . . . .*

\*        \*        \*

**Ethics**

BAE Systems is committed to meeting the highest ethical standards in our dealings with others. The nature of our business means it is particularly important that we have strong values and an awareness of public concerns. *We are confident that we meet the highest ethical standards in our dealings with others and have the processes in place to ensure our employees comply with the law in all the countries where we operate. We also recognise the importance of demonstrating this to our stakeholders.*

(b)    The 2006 Directors' Corporate Responsibility Report stated:

**Ethics**

We are committed to meeting the highest ethical standards in our relationships with others. We will not tolerate unethical behaviour or attempts to improperly influence the decisions of customers or suppliers.

*Unethical behaviour is wrong, could lead to loss of business, seriously damage our reputation and leave the Group and its employees open to criminal sanction.*

\*        \*        \*

**Progress**

**Meeting our standards**

The Group has training and awareness programmes to ensure employees understand our policies and the standards expected of them.

We provide training on our anti-bribery programme to managers from marketing, commercial, procurement, finance, customer support and other functions . . . . On completing the training, employees are required to sign a statement confirming they will comply with our policies and will report any issues of concern. This training is mandatory for all senior employees and for those employees involved in dealings with marketing advisers. All BAE Systems' marketing advisers are subject to rigorous due diligence under our compliance programme, are made aware of our anti-bribery policy and are expected to maintain our ethical standards.

*     *     *

***We do not tolerate unethical or illegal conduct.***

75.     BAE's Board has admitted it is its responsibility to assure BAE's compliance with such laws. According to BAE, in describing its Board, its procedures and responsibilities:

**Board Charter**

The Board is responsible for the good management of the Company . . . .

*     *     *

**Standards and Values**

The Board shall set values and standards and agree[d] policies and processes that shall be used to guide the affairs of the Company. ***This shall include the setting of clear principles of ethical conduct that apply to all activities undertaken by the Company***.

*     *     *

**Controls**

The Board shall ensure that an effective system of internal controls is in place at all times. Such a system shall be used to identify and manage risks that threaten the fulfilment of the Company's business objectives. ***This includes . . . non-compliance with law and regulation, fraud . . . and failure to maintain appropriate accounting records***.

*     *     *

**Matters reserved for the Board**

1.     Approving the Company's . . . ***principles of ethical conduct*** . . . .

76.     Elsewhere, BAE's 2000 Annual Report stated:

- 35 -

**Statement of directors' responsibilities**

*      *      *

The directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the company and to enable them to ensure that the accounts comply with the Companies Act 1985. They have a general responsibility for taking such steps as are reasonably open to them to safeguard the assets of the group and to prevent and detect fraud and other irregularities.

77.    BAE's 2001 Annual Report also stated:

**Statement of directors' responsibilities**

*      *      *

The directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the company and to enable them to ensure that the accounts comply with the Companies Act 1985.

78.    BAE's 2003 Annual Report stated:

**Statement of directors' responsibilities**

*      *      *

The directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the company and to enable them to ensure that the financial statements comply with the Companies Act 1985.

79.    According to BAE's Board, responsibility for compliance with anti-corruption/anti-bribery laws is assigned to the Board's Corporate Responsibility Committee. The BAE Board has stated:

**Corporate Responsibility Committee – Terms of Reference**

*      *      *

6.    **Duties**

6.1    The Committee shall assist the Board in overseeing the development of strategy and policy **on . . . *ethical issues*.**

6.2.    The Committee shall monitor and review the Company's performance in managing . . . ethical and reputational risks. Specifically, the Committee shall be satisfied that appropriate

- 36 -

policies, systems and metrics are in place . . . . *These shall include . . . business ethics and compliance with anti-corruption laws and regulation.*

\*        \*        \*

6.5.    The Committee Chairman shall report to the Board . . . on a regular basis.

80.    BAE's 2004 Annual Report also stated:

**Corporate responsibility**

The information below acts as a summary of our principles and corporate responsibility activities during 2004 and key highlights from the last year. For the first time the full Corporate Responsibility Report has been formally reviewed by the BAE Systems Board and is available to all stakeholders.

\*        \*        \*

We are determined to be regarded as a well-managed, responsible company. *As a global aerospace and defence business, our* competitiveness and *future success* depends not only on the skills of our employees and the quality of our products, but also on our standing in the community and our commitment to high standards of corporate governance *and corporate responsibility (CR). We aim to be, and to be seen as, a responsible corporate citizen in all the communities in which we operate worldwide.*

We have developed broad statements of intent to encapsulate our strategy and direction on corporate responsibility. These are:

\*        \*        \*

**Marketplace**: *We are committed to ensure compliance with the laws and controls governing defence exports everywhere we operate and ensure we meet the highest standards of conduct in our work.*

**Management**

Overall responsibility for CR lies with the board of directors.

\*        \*        \*

**Governance and risk**

Governance of CR risks are an integral part of our overall corporate governance.

\*        \*        \*

- 37 -

*As a company we demand and expect honesty, integrity and fairness in all aspects of our business. We are committed to comply with the law in every country where we operate.  This includes laws implementing the OECD Anti-Bribery Convention and the US Foreign Corrupt Practices Act. We will not tolerate bribery or other attempts to influence improperly the decisions of customers and suppliers.*

*We have an anti-corruption compliance programme in place throughout the company.  This includes robust procedures governing transactions with marketing consultants, the proper use of corporate hospitality and our procurement processes.*

81.     BAE's directors have repeatedly denied any impropriety regarding the Al-Yamamah contract.  According to BAE's web site:

**OUR POLICIES ON BUSINESS ETHICS**

*The intent of our policies is to establish compliance with the law as the minimum . . . .*

Our Operational Framework includes policies and governance systems on business ethics. *It requires all BAE Systems employees to act with honesty [and] integrity . . . and states that we will not tolerate bribery or other attempts to improperly influence the decisions of customers or suppliers.*

\*        \*        \*

*The Operational Framework is supported by more detailed policies covering topics such as . . . anti-corruption. Our anticorruption programme has been established in alignment with international standards . . . .*

\*        \*        \*

**ETHICS MANAGEMENT STRUCTURE**

Compliance with our ethical policies and principles is the specific responsibility of our Group Legal Director, Philip Bramwell, who performs this task on behalf of the Executive Committee and the Board of Directors. . . .

The heads of each business are responsible for ensuring that employees in their area are familiar with the requirements of our business ethics policies, know what is expected of them and know how to act if they suspect wrongdoing. . . .

In the UK our Ethics Review Committee is chaired by the Group Audit Director; its members are the Director of Corporate Responsibility, the Director of Employee Relations, the Director of International Compliance and the Director of Security. The Committee reviews issues raised on the ethics helpline to ensure that these matters are investigated and that appropriate action is taken.

- 38 -

In the US our ethics programme is run by an Ethics Steering Committee with representatives from each operating group and our legal and human resources departments. This reports to an Executive Ethics Oversight Committee made up of senior executives and chaired by the Senior Vice President General Counsel of BAE Systems. An Ethics Officer in each North American business unit is responsible for investigating allegations of unethical conduct.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

82.     Plaintiff brings this action derivatively in the right and for the benefit of BAE to redress injuries suffered and to be suffered by BAE as a direct result of the breaches of fiduciary duty, violations of law, misappropriation of information and corporate waste, as well as the aiding and abetting thereof, by the BAE Defendants. BAE is named as a nominal party solely in a derivative capacity.

83.     In bringing this action, plaintiff has satisfied all statutory procedural requirements of applicable law. First, plaintiff has standing to bring this action as it is a shareholders and/or beneficial owner of BAE and was a shareholder and/or beneficial owner of BAE at relevant times. Second, plaintiff will fairly and adequately represent the interests of BAE in enforcing it rights, as detailed herein. Third, this action is not being used by plaintiff to gain any personal advantage, nor does plaintiff maintain any personal agenda other than seeking to correct the wrong that has been done to the Company. Fourth, this action is not a collusive one to confer jurisdiction on this Court which it might not otherwise have. To this end, plaintiff has taken steps to file this action and has retained counsel experienced in derivative litigation and corporate governance actions. To the extent court permission is required to continue this action, such permission is hereby sought.

84.     As of the filing of this Complaint, the BAE Board consists of defendants Olver, Cartellieri, Turner, Geoghegan, Havenstein, King, Rose, Carroll, Hartnall, Mason, Quarta, Rudd, Weinberg and Inglis. These defendants are referred to as the "BAE Board."

85.     The BAE Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action, as detailed herein, and thus,

pursuant to Federal Rule of Civil Procedure 23.1 and otherwise, plaintiff's demand upon the Company to take the action requested herein is excused. For the following reasons and those detailed elsewhere in this Complaint, BAE's Board and its management are also antagonistic to this lawsuit and thus, plaintiff has not made a pre-filing demand on the BAE Board to initiate this action:

        (a)    The factual allegations contained herein detail a widespread, continuous, global pattern and practice of misconduct that spans more than 20 years. Each of the BAE Defendants had the ability to cause BAE to disclose the existence of the kickback scheme during that 20-year period and failed to do so.

        (b)    The misconduct alleged herein is so egregious that it has created a substantial fear of criminal or civil liability in the BAE Board in light of the pending U.K. SFO and DOJ investigations. As a result, the entire BAE Board is incapable of exercising valid business judgment as of the filing of this suit, as to investigate and/or prosecute these claims would expose (or increase the exposure of) each Board member to criminal and/or civil liability for the misconduct alleged herein.

        (c)    In addition, the misconduct is so widespread and persisted over so many years that it cannot be the result of an isolated incident or periodic failure of oversight of procedure – it had to be the result of a deliberate policy of the Board or willful or reckless disregard for what has been going on with said illegal or improper payments.

        (d)    The BAE Board has repeatedly denied allegations of wrongdoing alleged herein and claimed the "payments" alleged herein were proper. According to BAE's web site:

### FREQUENTLY ASKED QUESTIONS

1.    IS THERE ANY SUBSTANCE IN THE ONGOING MEDIA ALLEGATIONS ON BRIBERY AND CORRUPTION?

We are disappointed that recent media coverage is proceeding on the assumption, unsupported by any evidence, that allegations against BAE Systems are true and offences have been committed. *We continue to reject these allegations.* . . .

- 40 -

We take our obligations under the law extremely seriously and will *continue* to comply with all legal requirements around the world.

*    *    *

5.    DO YOU PAY COMMISSIONS TO ADVISERS OR CONSULTANTS TO WIN EXPORT SALES?

Companies operating in global markets, in any industry, need access to local advise, capabilities and guidance in order to pursue business. It is perfectly legitimate that such advisers/consultants are paid for what they do. *As with all aspects of our business we audit these arrangements to ensure that no impropriety is taking place* . . . .

(e)    Vigorously investigating the allegations contained herein would require the BAE Board to denounce entrenched positions. Defendants could also have to reveal evidence of their culpability and criminality. Prosecution of the allegations contained herein in light of the BAE Board's prior claims of "innocence" would undermine each Board member's defense and exponentially increase each Board member's exposure to potential civil and/or criminal liability.

(f)    The members of BAE's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein. These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

(g)    The members of BAE's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action. Defendants Olver, Turner, Havenstein, King, Rose and Geoghegan are so-called "inside directors" as they are executives of BAE. In fact, nearly half of BAE's 13 directors are executives of the Company and are dependent upon the other

defendants for continuation of their livelihood. The inside directors were well compensated for their services during the relevant period, as follows:

(i) **Cash Bonuses.** The inside directors are eligible to receive significant cash bonuses as part of their compensation equal to 100% of base salary (150% for the US-based executive director and the CEO). The performance measures the Board's Remuneration Committee uses to justify these cash bonuses include earnings per share ("EPS") and cash targets (and EBITA). The EPS figure used for the bonus plan (and the Executive Share Option Plan described below) is based on underlying reported EPS but may be adjusted (up or down) at the Committee's discretion. The Remuneration Committee determined for 2006 that the Executive Directors earned "stretch" bonuses based on the Company's performance, regardless of the fact that that "performance" was enhanced by the misconduct alleged herein.

(ii) **Stock Options.** Options granted under the BAE Executive Share Option Plan ("ESOP") are exercisable between the third and tenth anniversary of their grant. Option grants under the ESOP may be set as high as 1.5 times base salary (2.25 times base salary for the CEO). In determining the performance measure for the ESOP (and for the Matching Shares in the Share Matching Plan described below), reported EPS is a heavily weighted factor.

(iii) **Performance Share Plan.** Awards of shares made under the Performance Share Plan ("PSP") are vested based on BAE meeting performance criteria established by the Remuneration Committee. Awards under the PSP can be as high as 2 times base salary. Vesting is based largely on a Total Shareholder Return (share price growth plus dividends) ranking relative to a comparator group of 18 other defense and aerospace companies operating internationally, as selected by the Remuneration Committee. By focusing almost exclusively on BAE's share performance *vis-a-vis* other defense/aerospace companies, and disregarding ethical and operational compliance issues, the PSP encouraged the misconduct alleged herein and will continue

- 42 -

to encourage such misconduct. For instance, performance for the 2007 awards provides that: "100% of the conditional shares [will be] awarded to directors if the Company's TSR [Total Shareholder Return] over a three-year period *is in the top 20% of TSRs* achieved by the sectoral comparator group, with 25% vesting if the TSR *is in the top 50%*." Thus BAE's officers are encouraged to obtain market share at all costs.

(iv)    **Restricted Share Plan ("RSP")**. BAE previously provided inside directors with the option to taking all or a portion of their cash bonus in the form of restricted shares. If an election was made to take shares through the RSP, they were held in trust for a period of three years after which the Company awarded the individual an equal number of shares (Matching Shares). The matching award of shares was historically not subject to any performance criteria but has now been superseded by the Share Matching Plan which is subject to performance criteria.

(v)    **Share Incentive Plan**. The BAE Share Incentive Plan permits inside directors to purchase Partnership Shares in BAE. Dividends paid in respect of the Partnership Shares are reinvested as Dividend Shares. In 12/06, the Remuneration Committee added a Matching Shares element to the Share Incentive Plan Partnership Shares arrangement and inside directors now receive one free Matching Share for every two Partnership Shares owned. The Matching Shares are not subject to performance conditions.

(h)    The BAE Board has delegated to the Remuneration Committee its authority to set executive pay for the Chairman and executive directors. Specifically, the Remuneration Committee is charged with: "Approv[ing] the creation of employee share based incentive schemes and . . . any performance conditions to be used for such schemes" and "[d]etermining any share scheme performance criteria." The Remuneration Committee currently consists of (and consisted in 2006 of) defendants Birley (Chair), Rudd, Quarta and Weinberg. The Remuneration Committee consisted in 2005 of Birley (Chair), Quarta and Weinberg and in 2004 of Birley (Chairman),

- 43 -

Cartellieri and Mason. The Committee included Birley (Chairman), Cartellieri and Mason in 2003 and was part of the Nominations Committee in 2002. By virtue of the fact that each member of the Remuneration Committee was charged with ensuring that BAE's compensation principles preserved the Company's assets and promoted long-term shareholder value, and the compensation principles actually applied achieved the contrary, defendants Birley, Rudd, Quarta, Weinberg, Cartellieri and Mason are personally implicated by the allegations contained herein. Moreover, the Remuneration Committee consults defendants Olver and Turner in establishing the pay for the other executive director defendants, effectively permitting Olver and Turner to dominate and control the other executive defendants.

(i)    The BAE Board's non-executive directors are also rewarded handsomely. Fees payable to the non-executive directors are set by the Non-Executive Directors' Fees Committee. In addition to receiving a directors' stipend (including additional fees for serving as chairs of the BAE Board committees), directors receive a transatlantic meeting allowance of £4,000 per board meeting for traveling to the U.S. from Europe for board meetings or vice versa. The fees payable to the non-executive directors were revised in 2/07 as follows: a fee of £77,500 for the chairman of the Audit Committee; a fee of £72,500 for each of the chairmen of the Remuneration Committee, Corporate Responsibility Committee, and the Senior Independent Director; and a fee of £57,500 for each of the other non-executive directors. Beginning in 1/05, the Board delegated its authority to determine fees payable to non-executive directors to the Non-Executive Directors' Fees Committee which is currently comprised of defendants Olver (Chairman), Havenstein, and Turner and Group Legal Director Philip Bramwell. The Non-Executive Directors' Fees Committee was comprised in 2005-2006 of Olver (Chairman), Turner, Lester and Ronald. By virtue of the fact that each member of the Non-Executive Directors' Fees Committee was charged with ensuring that BAE's compensation principles preserved the Company's assets and promoted long-term

- 44 -

shareholder value, and the compensation principles actually applied achieved the contrary, defendants Olver, Havenstein, Lester, Turner and Ronald are personally implicated in the allegations contained herein.

(j)      Despite defendants' failure to oversee and manage the Company's operations, its repeated violations of law and its resulting exposure to potential criminal liability, excessive fines and penalties, the directors and officers were rewarded handsomely throughout the Relevant Period. Set forth below are tables showing the compensation to the BAE Defendants during 2002-2006:

**Executive Director Defendant Compensation**

| | Year | Salary | Bonus | Salary + Bonus | 2002-2006 |
|---|---|---|---|---|---|
| **Turner** | 2002 | £577,000 | £115,000 | £692,000 | **£7,067,000** |
| Chief Executive Officer | 2003 | 675,000 | 491,000 | 1,166,000 | |
| | 2004 | 730,000 | 712,000 | 1,442,000 | |
| | 2005 | 800,000 | 792,000 | 1,592,000 | |
| | 2006 | 870,000 | 1,305,000 | 2,175,000 | |
| **Geoghegan** | 2002 | £186,000 | £19,000 | £205,000 | **£3,408,000** |
| Group Executive | | | | | |
| Officer | 2003 | 403,000 | 198,000 | 601,000 | |
| | 2004 | 423,000 | 399,000 | 822,000 | |
| | 2005 | 445,000 | 423,000 | 868,000 | |
| | 2006 | 468,000 | 444,000 | 912,000 | |
| **Lester** | 2002 | £487,000 | £73,000 | £560,000 | **£4,493,000** |
| Group Legal Director | 2003 | 502,000 | 231,000 | 733,000 | |
| | 2004 | 518,000 | 489,000 | 1,007,000 | |
| | 2005 | 540,000 | 529,000 | 1,069,000 | |
| | 2006 | 568,000 | 556,000 | 1,124,000 | |
| **Mogford** | 2002 | £391,000 | £39,000 | £430,000 | **£3,656,000** |
| Group Executive | | | | | |
| Officer | 2003 | 403,000 | 169,000 | 572,000 | |
| | 2004 | 423,000 | 414,000 | 837,000 | |
| | 2005 | 445,000 | 441,000 | 886,000 | |
| | 2006 | 468,000 | 463,000 | 931,000 | |
| **Ronald** | 2002 | £345,000 | £97,000 | £442,000 | **£4,905,000** |
| Chief Operating Officer | 2003 | 451,000 | 388,000 | £839,000 | |
| | 2004 | 433,000 | 637,000 | £1,070,000 | |
| | 2005 | 495,000 | 744,000 | £1,239,000 | |
| | 2006 | 542,000 | 773,000 | £1,315,000 | |

| | Year | Salary | Bonus | Salary + Bonus | 2002-2006 |
|---|---|---|---|---|---|
| **Rose** | 2002 | £435,000 | £44,000 | £479,000 | **£4,068,000** |
| Group Finance Director | 2003 | 448,000 | 188,000 | 636,000 | |
| | 2004 | 463,000 | 446,000 | 909,000 | |
| | 2005 | 500,000 | 495,000 | 995,000 | |
| | 2006 | 530,000 | 519,000 | 1,049,000 | |

| | 2002 | 2003 | 2004 | 2005 | 2006 | 2002-2006 |
|---|---|---|---|---|---|---|
| **Chairman Fees/Salary** | | | | | | |
| Evans | £528,000 | £400,000 | | | | £928,000 |
| Olver | | | £256,000 | £500,000 | £500,000 | £1,256,000 |
| | | | | | | |
| **Non-Executive Director Defendant Fees** | | | | | | |
| Birley | £36,000 | £44,000 | £55,000 | £63,000 | £73,000 | £271,000 |
| Carroll | | | | £18,000 | £70,000 | £88,000 |
| Cartellieri | £36,000 | £36,000 | £45,000 | £53,000 | £58,000 | £228,000 |
| Hartnall | | £36,000 | £65,000 | £73,000 | £78,000 | £252,000 |
| Mason | | £42,000 | £55,000 | £63,000 | £73,000 | £233,000 |
| Portillo | £11,000 | £36,000 | £45,000 | £53,000 | £17,000 | £162,000 |
| Quarta | | | | £18,000 | £58,000 | £76,000 |
| Rudd | | | | | £15,000 | £15,000 |
| Weinberg | | | | £34,000 | £77,000 | £111,000 |

(k)    Moreover, since *none* of the non-executive director fees are paid in the form of stock or stock options and *there are no share ownership requirements* for non-executive directors, the substantial majority of outside directors *own no equity interest in BAE*, including defendants Carroll, Cartellieri, Portillo, Quarta, Rudd, and Weinberg. As these directors have no pecuniary interest in BAE other than their director stipends, the continuation of which is incumbent upon their remaining in the good graces of BAE's executive directors, defendants Carroll, Cartielliri, Portillo, Quarta, Rudd, and Weinberg are dominated and controlled by the inside directors, including Olver, Turner and Havenstein.

(l)    The members of BAE's Audit Committee were charged with (i) reviewing the effectiveness of the Company's financial reporting, and internal control policies and procedures for the identification, assessment and reporting of risk; (ii) monitoring the role and effectiveness of the internal audit function; (iii) considering and making recommendations to the Board on the

appointment of the outside auditors; (iv) keeping the relationship with the outside auditors under review, including the terms of their engagement and fees, their independence and their expertise, resources and qualifications; (v) monitoring the integrity of the Company's financial statements; and (vi) reviewing significant financial reporting issues and judgments. The Audit Committee specifically received presentations during the relevant period addressing the Company's purported "anti-bribery compliance processes." The Audit Committee currently consists of defendants Hartnall (Chairman), Cartellieri and Mason, though defendant Quarta attends all meetings but cannot formally sit on the Committee as the Audit Committee Charter requires that a majority be British nationals and Quarta and Cartellieri are both U.S. citizens. The Audit Committee consisted of Hartnall (Chairman), Cartellieri, Mason, Quarta and Portillo during 2006 and 2005. In 2004 the Audit Committee included Hartnall (Chairman), Birley, Mason and Portillo; in 2003 it included Hartnall (Chairman), Birley and Portillo. By virtue of the fact that each member of the Audit Committee was charged with ensuring that BAE complied with its anti-bribery compliance processes and applicable law and with ensuring that BAE's accounting and reporting practices reflected all potential liability, defendants Hartnall, Cartellieri, Quarta, Mason, Portillo and Birley are personally implicated by the allegations contained herein.

      (m)    Members of the BAE Board as a whole have close alliances with and allegiances to the inside directors, who engaged in the primary illegal activities complained of herein, and are dependent upon them for continuation of their lucrative and prestigious positions as directors:

      (i)    ***Interlocking Directorships***. Until 7/1/04, Olver was deputy group chief executive at BP p.l.c. and was appointed to the number two slot at BP on 1/9/03. Olver still serves as deputy chairman of TNK-BP, which houses and operates BP's Russian assets. Inglis serves as managing director of BP, and director of BP and chief executive of its exploration &

production business which oversees TNK-BP.  BP is currently embroiled in a political scandal involving allegations that BP provided sex, drugs and prostitutes to Russian businessmen to obtain BP's Russian assets.  Upon disclosure of BP's nefarious negotiation tactics, the Russian government unilaterally stripped BP of significant valuable Russian oil assets.

        (ii)     **Interlocking Directorships**: Since 2006, defendant Turner has served as a director of Lazard Group, a global investment bank, and its U.S. subsidiary Lazard Ltd. Defendant Carroll is a former CEO of Shell Oil Co., the U.S. arm of Royal Dutch Shell, which does substantial business with the Lazard banks.  Defendant Weinberg is a partner in the boutique investment bank Perella Weinberg Partners.  Perella was formerly with Wasserstein Perella, the investment bank he co-founded with Bruce Wasserstein, who is now the head of Lazard. One of the Perella Weinberg partners formerly worked at Worms & Cie., the Lazard-controlled French bank at the heart of the French Synarchist movement.

        (iii)     **Interlocking Directorships**:  Defendant Quarto is a partner in the private equity fund Clayton, Dubilier & Rice, which has significant ties to J.P. Morgan bank. Defendant Carroll is a former chairman and CEO of Fluor Corp., a global engineering firm now headed by J.P. Morgan vice chairman Lord Robin Renwick.

        (iv)     **Interlocking Directorships**: Michael (Mike) P. Rouse serves as Group Marketing Director of Programmes of BAE. Rouse has also been a director of Saab AB since 2000. Defendant Rose has served as a director and member of the Remuneration Committee at Saab since 1998.

        (n)     In order to bring this action for breaching their fiduciary duties, the members of the BAE Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

(o)    BAE's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of BAE. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions which eliminate coverage for any action brought directly by BAE against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of BAE, there would be no directors' and officers' insurance protection and thus, this is a further reason why the Director Defendants will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

## SUBSTANTIVE ALLEGATIONS

**The BAE Directors' False and Misleading Reports**

86.    For many years in their Directors' Annual Reports and other communications with shareholders, BAE's directors have stressed their successful management and oversight of BAE, its ethical behavior and compliance with anti-corruption laws. Each of these representations was false and misleading and was made with reckless disregard for the truth by the directors issuing them. The Directors' Reports to BAE shareholders set forth at ¶¶72-81 and the annual directors' reports set forth below were each false and misleading.

87.    The 2000 Chairman's letter dated (2/01) by Evans stated:

BAE Systems is a well-balanced company *underpinned by a strong order book* and robust balance sheet . . . .

88.    BAE's 2001 Annual Report stated:

- 49 -

**Overview**

In 2001, we successfully delivered on our plans . . . . The order book increased 6.8% to £43.8bn.

(Footnote omitted.)

89.    Chairman Evans' 2001 letter (dated 2/02) stated:

BAE SYSTEMS has delivered on its plans for 2001. . . . The outlook for our defence businesses remains good with a number of important new programmes set to contribute to our profitability.

90.    CEO Weston's 2001 letter (dated 2/02) stated:

Since the early nineties, we have been pursuing a strategy to transform the company into a world-wide business with systems engineering at its heart. The progress in 2001 has secured that transformation. The company's strategy for growth is directed along three main avenues:

–    To maximise the value of our existing portfolio through the growth of our order book . . . .

*        *        *

We have made good progress against each of these.

91.    Chairman Evans' 2002 letter to shareholders (dated 2/03) stated:

BAE SYSTEMS is an immensely capable company whose core strength is its people. Its innovation and technological excellence comes from providing an environment in which those people can realise the highest level of performance.

92.    BAE's 2002 Annual Report stated:

**Business integrity**

We are committed to do business in an ethical manner. *__This means complying with all applicable laws and regulations and with the ethical standards we have set ourselves.__*

*        *        *

*__BAE SYSTEMS adheres to the relevant charters, codes of practice, guidelines and internal policies that govern exports of defence equipment__*.

Our policy is to:

–    maintain an active and open dialogue with relevant government departments in the territories in which we operate *__to ensure compliance with government__*

*policy and the law and regulations of those territories governing the export of our products*;

\*     \*     \*

—     *respect the values of the international community and the laws of those countries where we conduct our business.*

93.     Chairman Evans' 2003 letter (dated 2/04) stated:

**Significant progress**

This has been a year of significant progress. We have continued to build on our good first half and have delivered full year results to plan.

\*     \*     \*

**Business transformation**

. . . Today BAE Systems is one of a small group of companies at the top of the world's aerospace and defence industry.

94.     CEO Turner's 2003 letter (dated 2/04) stated:

**Performance**

BAE Systems has market leading businesses operating in the fields of systems and software, support services and, through Airbus, large commercial jets. . . .

The North America business group performed well, with double digit organic growth and strong cash flows. This business continued to design, develop and supply world class systems and expertise to key US programmes.

95.     BAE's 2004 Annual Report stated:

**Highlights**

Programmes business outlook improving

\*     \*     \*

North America delivering good growth

\*     \*     \*

Strong cash flow

\*     \*     \*

Record order book

\*    \*    \*

**Outlook**

\*    \*    \*

      Overall, the performance of the company's defence businesses is expected to continue to improve in 2005 . . . .

\*    \*    \*

      BAE Systems is now delivering well against its strategy and objectives. . . . [T]he actions continuously being taken to improve performance, enable the group to look forward with confidence to delivering growing returns to its shareholders.

96.    Chairman Olver's 2004 letter (dated 2/05) stated:

I am pleased to report that BAE Systems has made good progress in 2004. . . . Much progress has been made to deliver long-term shareholder value.

97.    CEO Turner's 2004 letter (dated 2/05) stated:

      BAE Systems performed well in 2004, both in delivering good financial results and executing actions that will underpin performance improvement over the longer term.

\*    \*    \*

We look forward with confidence to delivering growing returns for our shareholders in the future.

98.    The BAE 2004 Annual Report also stated:

**Corporate governance**

      Successful companies are valuable not only to their shareholders but also to a wide community of individuals and organisations that benefit from the goods, services and wealth they generate. A company's board is ultimately responsible for ensuring that the right leadership, strategy and control structures are present to produce and sustain the delivery of this value. The essential elements of good corporate governance are having well thought out and robust means of delivering the right leadership, the right strategy and the right controls.

\*    \*    \*

**The Board**

\*    \*    \*

The Board of BAE Systems recognises that it is responsible for the leadership of the company and that in discharging this responsibility it is required to take decisions objectively and in the best interests of the company. The Board through a single document, the Operational Framework, has provided all employees with details of the standards of behaviour and key policies that are mandatory across the company. The areas covered by it include:

—    business ethics

\*        \*        \*

**Internal control**

\*        \*        \*

BAE Systems has developed a system of internal control that encompasses, amongst other things, the policies, processes, tasks and behaviours, that taken together, seek to:

—    facilitate the effective and efficient operation of the company by enabling it to respond appropriately to significant operational, financial, ***compliance*** and other risks that it faces in carrying out its business;

—    assist in ensuring that internal and external reporting is accurate and timely and based on the maintenance of proper records supported by robust information gathering processes; and

—    assist in ensuring that the company complies with applicable laws and regulations at all times and also internal policies in respect of the standards of behaviour and conduct mandated by the Board.

\*        \*        \*

The Board has delegated to the Audit Committee responsibility for reviewing in detail the effectiveness of the company's system of internal controls including risk management processes. Having undertaken such reviews, the Committee reports to the Board on its findings so that the Board as a whole can take a view on these matters. In order to assist the Audit Committee and the Board in this review, the company utilises a process, the Operational Assurance Statement (OAS) process. This has been subject to regular review over a number of years, which has resulted in a number of refinements being made.

\*        \*        \*

*The overall responsibility for the system of internal control within BAE Systems rests with the directors of the company*.

\*        \*        \*

**Corporate responsibility**

- 53 -

Recognising the importance of corporate responsibility (CR) concerns the social, environmental and ethical issues associated with the company's operations the Board has agreed that it will review formally on an annual basis the company's performance in this area.

\* \* \*

**Export of defence equipment**

The key elements of our policy concerning the export of defence equipment are:

— to maintain an active and open dialogue with relevant government departments in the territories in which we operate to *ensure compliance with government policy and the law and regulations of those territories governing the export of our products*;

\* \* \*

— *to respect the values of the international community and the laws of those countries where we conduct our business.*

**Compliance with international anti-corruption laws**

*BAE Systems demands and expects honesty, integrity and fairness in all aspects of its business. In support of this expectation, the company is committed to compliance with laws implementing the OECD Anti-Bribery Convention and the US Foreign Corrupt Practices Act. The company will not tolerate bribery or any attempt by way of gifts, payments or favours to influence improperly the decisions of our customers or suppliers.*

*A comprehensive compliance programme has been in place for a number of years and is aimed at ensuring that our policies in this area are observed and enforced. . . .*

*The Board recognises that compliance with these two areas is of critical importance to the company.*

The company publishes a separate Corporate Responsibility Report.

99.    BAE's 2005 Annual Report stated:

**Highlights, outlook and results in brief**

\* \* \*

• Programmes business profitability and risk profile improved

\* \* \*

- 54 -

**Outlook**

Looking forward to 2006, we anticipate an improved performance . . . .

100.    Chairman Olver's 2005 letter (dated 2/06) stated:

With a combination of effective strategy, continued good programme execution and achievement of key business objectives, including a focus on winning future business, 2005 was a successful year for BAE Systems.

\*        \*        \*

In addition to overseeing Company strategy, the Board is responsible for monitoring the Company's performance, maintaining the governance framework, overseeing succession planning for the Board and senior executives, setting appropriate standards of conduct and monitoring compliance with those standards.

101.    CEO Turner's 2005 letter (dated 2/06) stated:

BAE Systems has performed well against its objectives in 2005. Financial results have been delivered in line with our plan and further significant steps have been taken to implement the Company's strategy.

\*        \*        \*

In 2005, the Company has continued to improve performance . . . .

\*        \*        \*

In summary, we have had a good year, delivering a strong set of financial results and meeting our overall objectives for 2005.

*We are successfully executing our strategy. . . . We are delivering shareholder value by being the premier transatlantic defence and aerospace company.*

102.    The 2005 Report also stated:

BAE Systems recognises its responsibilities to the people it employs, its customers and suppliers, its shareholders, the wider community and to the environment.

\*        \*        \*

*Corporate responsibility (CR) in BAE Systems is about good business practice and continual improvement. We recognise our wide-ranging responsibilities and our CR framework has been developed around key stakeholder interest and feedback, potential risk to our business and the extension, review and improvement of existing practices.*

- 55 -

**Governance of CR**

The board of directors has overall responsibility for governance of CR matters within the Company.

*     *     *

**Key issues for our business**

It is important that our CR reporting addresses issues that are material to our business and reflect stakeholder concerns. . . .

*The key areas our stakeholders consider material to our business are anti-bribery and corruption practices* . . . .

*     *     *

**Ethics**

BAE Systems is committed to meeting the highest ethical standards in our dealings with others. The nature of our business means it is particularly important that we have strong values and an awareness of public concerns. *We are confident that we meet the highest ethical standards in our dealings with others and have the processes in place to ensure our employees comply with the law in all the countries where we operate. We also recognise the importance of demonstrating this to our stakeholders*. . . .

*We do not tolerate unethical or illegal conduct. The consequences of such conduct may be far reaching and severe not only for the Company and its employees, but also for other stakeholders. For example, we, and our employees, may be subject to criminal sanction, our reputation may be tarnished and we may suffer a loss of business. Such conduct is also morally wrong.*

103.    BAE's 2006 Annual Report issued in 3/07 contained false statements:

(a)     Olver's 2006 letter, dated 2/21/07, stated:

Good operational performance and effective implementation of a well-defined, soundly based strategy are combining to deliver real performance.

The focus of the Group's strategy in recent years has seen a drive to improve returns and eliminate excessive risk in the UK-based operations, alongside the expansion of the Group's presence in the US. This twin approach is transforming the Group's performance in the UK market and has established BAE Systems as one of the major US defence companies.

Notable achievements in 2006 included the resolution of the approach to funding the deficit on the Group's pension schemes, the completion of the sale of our 20% interest in Airbus and good progress towards securing further significant

- 56 -

business in Saudi Arabia.  Underlying these individual achievements has been a broad-based improvement in performance across the Group.

In addition to continuing to pursue the development of the Group in its two largest defence and aerospace markets, the UK and the US, the Group's strategy recognises opportunities in the other home markets in which BAE systems has a local presence and capability:  Australia, Saudi Arabia, South Africa and Sweden.

Alongside the development of the Group in these six home markets, BAE Systems will continue to nurture a high performance culture.  The delivery of continuous performance improvement remains key to the twin objectives of delivering cost-effective capability to our customers and maximizing returns for our shareholders.

The Group's strategy is reviewed regularly as part of the Group's annual business planning process.  This review tests the continued relevance of the current strategy.  The adaptations made to the strategy are set out on page 11 and reflect the progress made over the past 12 months.

\*        \*        \*

*Our policies for conducting ethical business are clear and unambiguous, with established processes to ensure compliance.*

The underlying UK company law provisions concerning narrative reporting have changed since our last annual report.  The matters required to be reported as part of the new business review requirements are dealt with on pages 2 to 40 of this report and cover the Group's activities during the year and likely future developments. . . .

The Group's corporate responsibility performance is summarised on pages 35 to 40 and also detailed in an important separately published report.  Like all high performance companies, our policies are kept constantly under review, and we are committed to take action wherever necessary to maintain the highest standard of corporate governance.

(b)     Turner's 2006 letter, dated 2/21/07, stated:

**Year in review**

BAE Systems delivered another year of good financial performance, underpinned by programme schedule and cost adherence across the Group and reflecting the benefits now flowing from our world-class Lifecycle Management and Performance Centred Leadership processes.

The performance of the US businesses has again been excellent with the Group's expansion in the US market over recent years generating good returns. Good progress has continued in the UK businesses with programmes on track and meeting their key milestones.

A number of export opportunities have also progressed, most notably in the Kingdom of Saudi Arabia where, under an agreement between the Kingdom of Saudi Arabia and the UK government, the Group is working to modernise the Saudi armed forces including progressing towards a contract for 72 Typhoon aircraft.

*    *    *

Flight development of the Nimrod MRA4 programme continues . . . .

*    *    *    .

Recognising that the security and welfare of the 4,600 employees and their dependants in Saudi Arabia is paramount, a major construction programme is well underway to create two new residential and workplace facilities.

These investments establish a significant industrial footprint in Saudi Arabia with a growing in-Kingdom technical capability. This will enable the group to satisfy many of its Saudi customer's needs from on-shore companies.

*    *    *

In summary, BAE Systems is progressing well. The Group's strategy is delivering a focused, high performing, defence and aerospace business with good positions in key markets around the globe. As a result, the Group has a robust plan to deliver profitable growth for our shareholders.

(c)    BAE's 2006 Annual Report between pages 2-40 stated:

**Business portfolio actions**

The drive to build sustainable, profitable, through-life businesses in the air, land and sea sectors of the UK market continues, building on the good progress last year.

We continue to seek growth in the US through continuing to target above-market organic growth from the Group's established business activities, and by looking for value-enhancing acquisitions.

Following our success in recent years in establishing a global land systems business we continue to pursue growth opportunities in this market sector.

*    *    *

Two new actions have been introduced.

Building on a relationship that spans several decades we will pursue opportunities to grow our business in the Kingdom of Saudi Arabia. Our focus will be the transition of the relationship from one of an export market to the implementation of a home market strategy.

- 58 -

\*   \*   \*

BAE Systems is one of the world's leading defence companies and is one of only four companies with global defence sales in excess of $20bn. It is Europe's largest defence company and ranks number seven within the US defence industry.

\*   \*   \*

## United States

The Group's US business now delivers over US$9bn (£5bn) of annual sales and employs approximately 40,000 people in 36 states.

\*   \*   \*

## The Kingdom of Saudi Arabia

*Saudi Arabia has been an important market for BAE Systems for many decades and there are significant new opportunities to both continue, and strengthen, this relationship into the future.*

A key growth opportunity is the Group's role in supporting the partnership between the governments of the Kingdom of Saudi Arabia and the UK in updating the capability of the Kingdom's armed forces. We are committed to assisting the Kingdom in developing its defence industrial base and the training and up-skilling of its workforce.

\*   \*   \*

## The Group is subject to risk from a failure to comply with laws and regulations

The Group's operations are operations are subject to numerous domestic and international laws, regulations and restrictions, and non-compliance with these laws, regulations and restrictions could expose the Group to fines, penalties, suspension or debarment, which could have a material adverse effect.

The Group has contracts and operations in many parts of the world and operates in a highly regulated environment. The Group is subject to numerous UK, US and other laws and regulations, including, without limitation, regulations relating to import-export controls, money-laundering, false accounting, anti-bribery and anti-boycott provisions. . . .

Failure by the Group or its sales representatives, marketing advisers or others acting on its behalf to comply with these laws and regulations could result in administrative, civil or criminal liabilities and could result in significant fines and penalties and could result in the suspension or debarment of the Group from government contracts for some period of time or suspension of the Group's export privileges.

*Addressing this exposure the Group has mandated policies and procedures to help ensure that employees act with the highest ethical standards and comply with relevant laws and regulations. In particular, all dealing with sales representatives and marketing advisers are governed by detailed compliance procedures, the application of which is monitored by a dedicated compliance function.*

In 2004 the UK Serious Fraud Office and Ministry of Defence Police commenced an investigation into suspected false accounting and corruption. *The investigation is wide ranging and concerns a number of jurisdictions and contractual arrangements.*

*    *    *

## Governance of CR

The board of directors has overall responsibility for the governance of CR matters within the Group. Specific responsibility has been assigned to the CR committee of the Board. All members of this Committee are non-executive directors and comprise Peter Weinberg, Professor Sue Birley, Sir Nigel Rudd and Phil Carroll.

*Reputation is vital to the long-term sustainability of all companies.* The CR Committee is central to the Board's oversight of the critical non-financial issues that are fundamental to the Group's reputation. The Committee is responsible for reviewing and monitoring the processes the Group uses to manage social, environmental and ethical risk, as well as supporting the Board in the approval of strategy and policy in this area.

The Committee is supported by the Group Legal Director, Audit Director, Group HR Director and Director of Corporate Responsibility.

*    *    *

## Ethics

We are committed to meeting the highest ethical standards in our relationships with others. *We will not tolerate unethical behaviour or attempts to improperly influence the decisions of customers or suppliers. Unethical behaviour is wrong, could lead to loss of business, seriously damage our reputation and leave the Group and its employees open to criminal sanction.*

## 2006 Objectives

In 2006 two objectives specifically relating to ethics were set within the leadership objectives.

—    Meet the standards defined in our internal assurance statement (for ethical issues, the minimum acceptable score within our assurance process is confirmation of compliance with all applicable laws and standards).

- 60 -

—    Develop, pilot and roll out ethics training to all employees in the UK and Australia.

**Progress**

Meeting our standards

The Group has training and awareness programmes to ensure employees understand our policies and the standards expected of them.

We provide training on our anti-bribery programme to managers from marketing, commercial, procurement, finance, customer support and other functions. On completing the training, employees are required to sign a statement confirming they will comply with our policies and will report any issues of concern. This training is mandatory for all senior employees and for those employees involved in dealings with marketing advisers.

\*        \*        \*

Working with others

In July 2006 BAE Systems and other UK defence companies established the UK Defence Industry Anti-corruption Forum, to share good practice on ethics and anti-corruption programmes. Members of the Forum met twice in 2006 and heard from a range of speakers including the Institute of Business Ethics, ICC (UK), Transparency International (UK) and law firms, Linklaters and Bryan Cave LLP.

In the US we are a signatory to the Defense Industry Initiative on Ethics and Business Conduct, and a sponsoring partner of the Ethics and Compliance Officers Association.

\*        \*        \*

Internal Control

The Board has conducted a review of the effectiveness of the Group's system of internal controls, including financial, operational and compliance controls and risk management systems, in accordance with the Turnbull guidance.

BAE Systems has developed a system of internal control, which has been in place throughout 2006 and to the date of this report, that encompasses, amongst other things, the policies, processes and behaviours that, taken together, seek to:

—    facilitate the effective and efficient operation of the Company by enabling it to respond appropriately to significant operational, financial, compliance and other risks that it faces in carrying out its business;

—    assist in ensuring that internal and external reporting is accurate and timely and based on the maintenance of proper records supported by robust information gathering processes; and

—    assist in ensuring that the Company complies with applicable laws and regulations at all times and also internal policies in respect of the standards of behaviour and conduct mandated by the Board.

*    *    *

The Board has delegated to the Audit Committee responsibility for reviewing in detail the effectiveness of the Company's system of internal controls. Having undertaken such reviews, the Committee reports to the Board on its findings so that the Board as a whole can take a view on this matter. In order to assist the Audit Committee and the Board in this review, the Company has developed the Operational Assurance Statement (OAS) process. This has been subject to regular review over a number of years, which has resulted in a number of refinements being made.

The OAS requires that each part of the business completes a formal review of its compliance against the Operational Framework, including operational and financial controls and risk management processes. The review is signed off by the managing director of every line of business and relevant functional directors. The OAS is completed every half year and includes a formal assessment of business risk. The overall responsibility for the system of internal control within BAE systems rests with the directors of the Company. Responsibility for establishing and operating detailed control procedures lies with the managing director of each operating business.

(d)    Elsewhere, BAE's 2006 Annual Report stated:

The directors of BAE Systems plc present their report, together with the financial statements for the year ended 31 December 2006.

*    *    *

**Business Review**

The information provided in the operating and financial review on pages 2 to 40 reports on the activities during the year, post balance sheet events and likely future developments. The information in this review constitutes the business review required under the Companies Act and forms part of this Directors' Report.

*    *    *

The Company, through its internal audit department, monitors compliance against the principal policies and guidelines (including the utilisation of credit) and any exceptions found are reported to the TRMC.

*    *    *

By order of the Board
David Parkes
Company Secretary
21 February 2007

**Statement of directors' responsibilities in respect of the annual report and the financial statements**

The directors are responsible for preparing the Annual Report and the group and parent company financial statements, in accordance with applicable law and regulations.

Company law requires the directors to prepare group and parent company financial statements for each financial year. Under that law the directors are required to prepare the group financial statements in accordance with International Financial Reporting Standards (IFRS) as adopted by the EU and have elected to prepare the parent company financial statements in accordance with UK Accounting Standards.

The group financial statements are required by law and IFRSs as adopted by the EU to present fairly the financial position and performance of the group: the Companies Act 1985 provides in relation to such financial statements that references in the relevant part of that Act to financial statements giving a true and fair view are references to their achieving a fair presentation.

The parent company financial statements are required by law to give a true and fair view of the state of affairs of the parent company.

In preparing each of the group and parent company financial statements, the directors are required to:

– select suitable accounting policies and then apply them consistently;

– make judgements and estimates that are reasonable and prudent;

– for the group financial statements, state whether they have been prepared in accordance with IFRSs as adopted by the EU;

– for the parent company financial statements, state whether applicable UK Accounting Standards have been followed, subject to any material departures disclosed and explained in the parent company financial statements; and

– prepare the financial statements on the going concern basis unless it is inappropriate to presume that the group and the parent company will continue in business.

The directors are responsible for keeping proper accounting records that disclose with reasonable accuracy at any time the financial position of the parent company and enable them to ensure that its financial statements comply with the Companies Act 1985. They have general responsibility for taking such steps as are reasonably open to them to safeguard the assets of the group and to prevent and detect fraud and other irregularities.

Under applicable law and regulations, the directors are also responsible for preparing a Directors' Report. Directors' Remuneration Report and Corporate Governance Statement that comply with that law and those requirements.

104.    For several years, BAE's Board of Directors has caused to be published annually a

BAE Corporate Responsibility Report to its shareholders.

(a)    The 2001 Director's Corporate Responsibility Report stated:

We are, of course, transparent about our business performance and publish a detailed report to shareholders.

\*        \*        \*

**Honesty, integrity and fairness**

*We demand and expect honesty, integrity and fairness in all aspects of our business. We are committed to comply with laws implementing the OECD Anti-Bribery Convention and the US Foreign Corrupt Practices Act. . . .*

**Export of defence equipment**

BAE SYSTEMS adheres to relevant laws, charters, codes of practice and guidelines in addition to our own internal policies, which are designed to ensure the necessary control over the export of defence equipment. It is our policy:

- To maintain an active and open dialogue with relevant government departments in the territories in which we operate *to ensure compliance with the government policy and the law and regulations of those territories governing the export of our products*.

\*        \*        \*

- *To respect the values of the international community and the laws of those countries where we conduct our business.*

(b)    The 2002 Corporate Responsibility Report stated:

We see social, ethical and environmental issues as important to our business performance, posing both risks and opportunities. It is essential that we manage these issues well. Our principles, code of behaviour and detailed corporate governance policies are included within the BAE SYSTEMS Operational Framework.

\*        \*        \*

Effective management starts with the senior management team that provides strong leadership and is clearly accountable. The Control and Risk Frameworks control the group's activities and are underpinned by requirements on behaviour, ethics and policy compliance.

\*        \*        \*

**Ethics Policy**

In 2002 we formalised our UK Ethics Policy, using the same approach taken by our US operations. The policy gives our UK employees guidance on the behaviour we expect of them in their daily dealings with each other, customers and our stakeholders. An independent hotline is available for employees to discuss their ethical concerns, get advice or report possible breaches of our ethical standards.

An Ethics Review Committee was set up to monitor the policy. This is chaired by the Audit Director and its members are all senior executives drawn from the legal, internal audit, human resource and security departments. The committee meets quarterly. It will review details of all contacts with the hotline to ensure that proper and timely action is taken to resolve issues.

(c)    The 2003 Directors' Corporate Responsibility Report stated:

**Anti-corruption measures**

*We demand and expect honesty, integrity and fairness in all aspects of our business. We are committed to comply with the law in every country where we operate. This includes laws implementing the OECD Anti-Bribery Convention and the US Foreign Corrupt Practises Act. We will not tolerate bribery or other attempts to improperly influence the decisions of customers and suppliers.*

*We have an anti-corruption compliance programme in place throughout the company. This includes robust procedures governing transactions with marketing consultants, the proper use of corporate hospitality and our procurement processes. This is supported by an awareness-training programme and underpinned by a clear statement that infringements will result in disciplinary action.*

*The valuable experience available from our US colleagues under the Foreign Corrupt Practices Act has also been drawn upon and a review of our policies has been undertaken by external lawyers in the UK and the US. Our procedures accord with anti-corruption rules promulgated by the International Chamber of Commerce.*

We continually review and monitor our policies and procedures in this area and take note of external progress in improving anti-corruption measures across all industries . . . .

\*         \*         \*

An Ethics Review Committee of senior executives meets quarterly to review details of all contacts with the hotline and ensure that action is taken to resolve issues where necessary. The Committee is chaired by the Audit Director, who monitors compliance with the policy.

- 65 -

**ETHICAL BUSINESS CONDUCT POLICY**

In all aspects of doing business, we will behave ethically. What do we mean by behaving ethically? Each of us has an idea of what ethical behaviour means in our daily lives. In our work for the company, behaving ethically means:

- Obeying the laws and regulations in force, wherever we are Preventing actions which harm others or the environment

*    *    *

- *Showing honesty*, integrity and openness *in dealing with . . . customers [and] representatives of governments . . .*

*    *    *

- Complying with the standards of conduct we have set ourselves

- *Not tolerating unethical behaviour by others*

- *Reporting unethical behaviour which we encounter*

(d)    The 2004 Directors' Corporate Responsibility Report stated:

**Business ethics and operating principles**

*    *    *

*BAE Systems is committed to comply with all laws governing defence sales and to meeting the highest ethical standards in our dealings with others.*

*We would never condone unethical or illegal conduct.* It is not only wrong, it could also damage the national interests of the countries where we operate, harm the commercial prospects of the company and leave employees and directors liable to imprisonment.

*Our Operational Framework sets out our policies and governance systems to ensure that all employees carry out our business in an ethical way. The Framework is reviewed and updated annually.*

**Ethical conduct**

We are committed to conduct our business to the highest ethical standards. *We comply with the law in all countries where we operate, including laws implementing the OECD Anti-Bribery Convention and the US Foreign Corrupt Practices Act.*

*All BAE Systems' employees are required to act with honesty, integrity and fairness. We will not tolerate bribery or other attempts to improperly influence the decisions of customers or suppliers.*

(e)    The 2005 Directors' Corporate Responsibility Report stated:

"Bribery and corruption are bad for business. Bribery is illegal in most countries and is a form of 'stealing' from shareholders. Being caught making bribes or engaging in corrupt behaviour can seriously damage a company's reputation and lead to loss of business.

The defence industry is one of three sectors most at risk from bribery and corruption . . . ."

\*    \*    \*

*We are committed to meeting the highest ethical standards in our dealings with others. The nature of our business means it is particularly important that we have strong values . . . .*

*We do not condone unethical or illegal conduct. The consequences of such conduct may be far reaching and severe not only for the Company and its employees, but also for other stakeholders. Unethical behaviour is wrong, could lead to loss of business, could seriously damage our reputation and leave the Company and its employees open to criminal sanction.*

\*    \*    \*

**Our policies on business ethics**

*The intent of our policies is to establish compliance with the law as the minimum and to aim for higher standards where possible.*

Our Operational Framework includes policies and governance systems on business ethics. *It requires all BAE Systems employees to act with honesty, integrity, and fairness and states that we will not tolerate bribery or other attempts to improperly influence the decisions of customers or suppliers.*

(f)    The 2005 CEO letter in the 2005 Directors' Corporate Responsibility Report

(dated 2/06) stated:

**Ethics**

\*    \*    \*

Ethical business conduct is fundamental to the reputation and success of our company and we accept no compromise of our principles and policies.

**Our five principles of ethical business conduct are:**

- Accountability – we are personally answerable for our conduct and actions.

- Honesty – there is no substitute for the truth.

- Integrity – we say what we do, we do what we say.

- Openness – when questions are asked, we are frank and straightforward in our answers.

*     *     *

**These principles apply to everything we do.**

**Compliance with Laws & Regulations**

*We conduct ourselves in accordance with applicable laws and regulations of the countries within which we do business. Ignorance of the law and regulations is no excuse.*

*     *     *

**Anti Bribery & Corruption**

*Bribery is a criminal offence. We do not, and will not, pay bribes or offer improper inducements to anyone for any purpose, nor do we or will we accept bribes or improper inducements. To use a third party as a conduit to channel bribes to others is a criminal offence. We do not, and will not, engage indirectly in or otherwise encourage bribery.*

*     *     *

*Any action which is unlawful, dishonest, harmful to others or which is otherwise against our policies is unacceptable. We will take disciplinary action against anyone whose behaviour does not meet our standards.*

     (g)    The 2006 Directors' Corporate Responsibility Report stated:

**Ethics**

We are committed to meeting the highest ethical standards in our dealings with others. We will not tolerate unethical behaviour or attempts to improperly influence the decisions of customers or suppliers. *Unethical behaviour is wrong, could lead to loss of business, seriously damage our reputation and leave the Group and its employees open to criminal sanction.*

*     *     *

**Progress**

Meeting our standards

The Group has training and awareness programmes to ensure employees understand our policies and the standards expected of them.

- 68 -

> We provide training on our anti-bribery programme to managers from commercial, procurement, finance, customer support and other functions. . . . On completing the training, employees are required to sign a statement confirming they will comply with our policies and will report any issues of concern. This training is mandatory for all senior employees and for those employees involved in dealings with marketing advisers. All BAE Systems' marketing advisers are subject to rigorous due diligence under our compliance programme, are made aware of our anti-bribery policy and are expected to maintain our ethical standards.

105.    The statements in BAE's 2001-2006 Annual Reports were false and misleading when made and known to be false by the directors and officers of BAE when those statements were made. The repeated positive and reassuring statements about BAE's controls, procedures and practices to comply with anti-bribery laws, rules and conventions, BAE's actual compliance with them, and BAE's dedication to high ethical standards were false. In fact, BAE's top officers and directors were actively permitting the circumventing of those preventative procedures and controls by permitting the payment of bribes, kickbacks and other improper payments, *i.e.*, unethical and illegal activities.

106.    BAE's 2001-2006 financial statements, published by, and the responsibility of, its directors, were false and misleading in failing to disclose the existence of the illegal and improper payments and/or for failing to make provision for the money fines and penalties likely to result from those payments.

107.    BAE stated that its financial statements are prepared in accordance with "EU endorsed International Financial Reporting Standards (IFRS), International Financial Reporting Interpretations Committee Interpretations (IFRICs) and the Companies At 1985 applicable to companies reporting under IFRS."

108.    To the extent BAE was engaging in conduct that would result in fines or penalties, it was required to disclose these under IFRS. Since the amount was capable of a reasonable estimate – at least $50 million – and the liability was probable, the Company was required to record a provision for them.

- 69 -

109.    International Accounting Standards ("IAS") No. 37, *Provisions, Contingent Liabilities and Contingent Assets Recognition*, requires that a provision be recognized when:

(a)    an entity has a present obligation . . . as a result of a past event;

(b)    it is probable an outflow of resources . . . will be required to settle the obligation; and

(c)    a reliable estimate can be made of the amount of the obligation.

110.    Importantly, IAS No. 37, ¶19, includes as an example a violation of law leading to liability as a situation where a provision needs to be recorded:

> It is only those obligations arising from past events existing independently of an entity's future actions (*i.e.* the future conduct of its business) that are recognised as provisions. Examples of such obligations are penalties or clean-up costs for unlawful environmental damage, both of which would lead to an outflow of resources embodying economic benefits in settlement regardless of the future actions of the entity. Similarly, an entity recognises a provision for the decommissioning costs of an oil installation or a nuclear power station to the extent that the entity is obliged to rectify damage already caused.

Also, unless the possibility of an outflow related to a contingent liability is "remote," the entity must disclose the contingent liability, estimating the financial effect and the timing. IAS No. 37, ¶86. Because a financial penalty was not remote, at a minimum, disclosure was required.

**The *Ultra Vires*, Illegal and Improper Conduct**

111.    BAE operates in a competitive environment. To justify their continuation in their lucrative and prestigious executive and director positions, the BAE Defendants wanted to make it appear that BAE was succeeding under their stewardship and doing so by operating in an ethical manner, in compliance with the laws and conventions applicable to it.

112.    In the mid-1980s, BAE was attempting to obtain a very large military aircraft contract from the Saudi Arabian Ministry of Defense to supply over 120 fighter/bomber aircraft over the next 20+ years, known as the "Al-Yamamah" contract. The officers and directors of BAE knew that if this huge contract could be obtained, they could point to it as concrete evidence of their business acumen and successful stewardship of BAE, which would help justify them holding on to their

positions of power, prestige and profit with BAE, including lucrative payments and bonuses they received in connection with those positions for many, many years going forward.

113.    Prince Sultan of Arabia, then in line for the royal throne, served as the head of Saudi Arabia's Ministry of Defense. He was in a position to significantly influence and determine whether or not BAE received the coveted Al-Yamamah contract. Sultan's son was Bandar, who was the apple of his father's eye. For over 20 years – and during most of the time period relevant hereto – Bandar served as Saudi Arabia's Ambassador to the U.S. and because of his positive relationship with his father was also in a key position to influence and determine if BAE was awarded the Al-Yamamah contract. In order to advance their own positions with BAE by winning the Al-Yamamah contract, the then officers and directors of BAE named as defendants herein undertook a course of illegal and improper conduct (engaging in *ultra vires* activities) in breach of their fiduciary duties to BAE, including paying huge bribes or kickbacks (a/k/a "backhanders") to Bandar, which payments have amounted to over $2 billion over the last 20 years. Although paying such bribes or kickbacks is an *ultra vires* act in violation of international business standards and the laws of the U.S., including the FCPA and the OECD Convention and BAE's own policies of business conduct, defendants caused BAE to funnel these illegal payments to Bandar. The payments were made in significant part through Riggs located in Washington, D.C., where the money was wired by BAE on a regular basis into accounts that, while nominally in the name of Saudi Arabia, were accounts controlled by Bandar and over which he had discretion and signature authority and which accounts (and the proceeds therefrom) he used for his own personal use and benefit.

114.    Riggs was selected for this purpose because its Washington, D.C. location gave Bandar ready access to it and because Riggs had a reputation in international commercial circles as a bank willing to facilitate highly questionable, if not illegal, currency transfers for international transactions, conduct which years later would ultimately lead to the shut down of Riggs. In fact, as

Riggs' activities came under increasing government scrutiny in an effort to stave off action to close Riggs, the bank identified one or more of the accounts being utilized by BAE and Bandar to facilitate the kickback payments to him as accounts involving highly questionable or improper conduct and transactions and took steps to shut down those accounts. At or about that time, Bandar resigned his post as Ambassador to the U.S. for "personal reasons" and returned to Saudi Arabia. His father remains heir to the Saudi Arabian throne and head of its Ministry of Defense.

115.    These illegal kickback payments were explicitly bargained for and recognized at the outset of the Al-Yamamah contract between BAE and the Saudis involved. The payments were provided for in certain schedules to the contract which were kept secret. They were entitled "Letters of Offer and Acceptance" and purported to provide compensation for certain "support services," which, in fact, Bandar never performed and which was known by the participants to be a code word and cover for the bribe or kickback payments he (and his father) were receiving and/or benefiting from.

116.    Most of the bribe and kickback monies paid to or for the benefit of Bandar were received by him here in the U.S. in Washington, D.C. over the last 20 years. Significant amounts of the illegal bribe/kickback payments received by him have been spent by Bandar here in the U.S., including the expenditure of over $100 million on one of the largest and most lavish personal residences here in the U.S., located in Aspen, Colorado, on the ski mountain there, which Bandar currently has for sale for $135 million.

117.    Up to £120 million a year was sent by BAE Systems from the U.K. into two Saudi embassy accounts with Riggs in Washington. These accounts were actually a conduit to Bandar. The purpose of one of the accounts was to pay the expenses of Bandar's private Airbus.

118.    David Caruso, an investigator who worked for Riggs, where the accounts were held, has said Bandar had been taking money for his own personal use out of accounts that seemed to belong to his government. He said:

> "There wasn't a distinction between the accounts of the embassy, or official government accounts as we would call them, and the accounts of the royal family."

Caruso said he understood this had been going on for "'years and years.'" The payments were written into the arms deal contract in secret annexes, described as "support services."

119.    The cash bribe and kickback payments to Bandar have not only included outright payments to him personally, but also payments made by BAE for other personal family expenditures of Bandar's family, including paying for his fantastically outfitted Airbus private aircraft, which cost over $100 million, and lavish expenses for members of his family, including millions and millions of dollars paid for a lavish multi-week, multi-country honeymoon. These illegal and improper payments have continued until recent times.

120.    According to the 6/18/07 edition of *Newsweek*:

Bandar and the $2 Billion Question

> Hundreds of pages of confidential U.S. bank records may be the missing link in illuminating new allegations that a major British arms contractor funneled up to $2 billion in questionable payments to Saudi Prince Bandar bin Sultan. The BBC and Guardian newspaper reported last week that BAE Systems made "secret" payments to a Washington, D.C., bank account controlled by Bandar, the longtime Saudi ambassador to the United States who is now the kingdom's national-security adviser. The payments are alleged to be part of an *$80 billion* military-aircraft deal between London and Riyadh. . . . Before the U.K. closed the inquiry, British investigators contacted the U.S. Justice Department seeking access to records related to the Saudi bank accounts. Many of these records were first obtained by NEWSWEEK in 2004. At the time, the magazine reported that federal regulators had been alerted to millions of dollars in *"suspicious" activities in Saudi accounts at the now-defunct Riggs Bank*.

> Tom Rose, a British lawyer for Bandar, denied the Saudi prince had received "improper secret" commissions. He said the BAE funds were actually being paid into a *Saudi Defense Ministry account over which Bandar had signature authority*, but any payouts from those accounts "were exclusively for purposes approved" by the ministry. The accounts were known both to the British and Saudi governments. (A BAE spokesman said, "*We deny all allegations of wrongdoing*.")

The Riggs Bank records show the use of those funds raised concerns among bank officials and U.S. regulators. *In November 2003, Riggs filed a "suspicious activity report" with the Treasury Department disclosing that over a four-month period*, $17.4 million from the Saudi Defense account had been disbursed to a single individual in Saudi Arabia. When Riggs officials asked the Saudis who the person was and why he was receiving the funds, they were told the individual "coordinates home improvement/construction *projects for Prince Bandar in Saudi Arabia*," and the payments *were for a "new Saudi palace," one document shows*.

In another instance, Bandar wired $400,000 from a Riggs account to a luxury-car dealer overseas. "It was impossible to distinguish between government funds and what would normally be considered personal purposes," *said David Caruso, who served as Riggs's compliance officer at the time. Caruso also confirmed to NEWSWEEK that the Saudi Defense account was regularly replenished with $30 million each quarter from an account in London*. But the bank never knew the source of the funds. *The bank was so concerned about the withdrawals that it cut off all business with the Saudis. In May 2005, the U.S. Treasury fined Riggs $25 million for failing to monitor "extensive and frequent suspicious" activity in Saudi and other accounts*.

121.    The improper payments also included other payments for Bandar's benefit.

According to the *Sunday Times (London)*:

THE British arms firm BAE Systems secretly paid nearly £250,000 for a honeymoon for the daughter of Prince Bandar, the Saudi Arabian prince at the centre of bribery allegations.

A senior BAE executive authorized the payments, allowing Bandar's daughter to enjoy a six-week honeymoon in luxury resorts in Singapore, Malaysia, Bali, Australia and Hawaii. The couple stayed in five-star hotels costing up to £4,000 a night and had a private jet trip to the Great Barrier Reef.

Peter Gardiner, managing director of the travel agency that organized the honeymoon, said: "BAE instructed me to give Bandar's daughter and her husband the honeymoon of a lifetime at BAE's expense. Who says that big business doesn't have a heart?"

                    *       *       *

[T]he honeymoon for Bandar's daughter, Princess Reema, was paid for through a £60m slush fund which the Serious Fraud Office (SFO) believes was set up by BAE to encourage Saudi royals to continue with a £ 43 billion arms contract to supply Hawk and Tornado jets.

The latest twist in the BAE affair has been disclosed by Gardiner, who said he has made a detailed statement to the SFO. He described how his company, Travellers World, was used by BAE to make payments to Saudi royals when they were holidaying around the world. His company would arrange and pay for hotels,

airline tickets, apartments, boat and jet charters, as well as hiring limousines and bodyguards.

*    *    *

Last week Gardiner said Tony Winship, a senior BAE marketing executive responsible for overseeing the slush fund, approved the costs of the six-week trip for Princess Reema bint Bandar and Prince Faisal bin Turki, the son of Prince Turki bin Nasser, another Saudi royal implicated in the SFO's bribery inquiry.

"They were a young, attractive couple in love and on a dream honeymoon. They knew nothing about BAE paying and must have believed it was their parents paying. I was instructed by BAE not to discuss payments with them – or with anyone. I was told by BAE to give them the very best," Gardiner said.

"The couple selected the itinerary. I chose and arranged the hotels, transportation, diplomatic arrivals. They never took advantage and any personal expenditure such as shopping they paid for themselves."

The couple were married in Riyadh, the Saudi capital, in December 1996. They flew on Turki's private Boeing 707, staffed by an English captain and crew, to Singapore. There they stayed for a week at Raffles, the country's most exclusive hotel where suites cost from £ 500 to £ 2,800 a night.

They then traveled for a week's stay to the Pangkor Laut resort on a privately owned island off Malaysia. It is often described as the best resort in the world.

"The honeymoon suite was a two-bedroom, overwater bungalow with a partial glass floor so that guests could see the sea below them," said Gardiner, who accompanied the royal couple during the early part of their stay.

After a week in Malaysia, Bandar's daughter and her groom flew by private jet to Bali where they stayed at the five-star Four Seasons Jimbaran Bay resort before flying to Australia, spending Christmas at the Regent hotel in Sydney. During that visit the prince who, like his father-in-law Bandar, is a fan of the Dallas Cowboys American football team, was keen to watch a critical game. Gardiner says he found a private club in a town 60 miles away that could show the game live on cable TV. The entire club was hired so Bandar's daughter and her husband could watch the match. The three-hour stay cost £ 6,000. BAE again footed the bill.

The couple then flew to the Gold Coast where they stayed at the five-star Sheraton Mirage and Spa. On a day trip they hired a Gulfstream jet to fly to the Great Barrier Reef. The bill, paid by Travellers World and reimbursed by BAE, was £15,000.

Documents in the possession of the SFO show that Travellers World invoiced BAE £45,490 for the couple's stay in Australia. The item is billed as "HM.Aus", which Gardiner said was shorthand for "Honeymoon, Australia". The couple moved on to Hawaii where they spent a few days at the Halekulani on Waikiki beach. From

there they flew to the Grand Wailea, on the Hawaiian island of Maui, where their penthouse suite on a private floor cost about £ 4,000.

The files show one part of the bill for Hawaii was £ 101,412. The payments, again paid by BAE, appear as "HM. Haw." and "HM Haw.Xtra". For the month of January alone the cost was £ 190,486. According to Gardiner, this did not include the first leg of the honeymoon, which began in mid-December the previous year. The total cost was nearly £ 250,000, he said.

122.    Riggs was the intermediary chosen to funnel the bribe payments to Bandar.  Riggs was chosen because BAE and Bandar knew Riggs would cooperate in secreting the fund transfers, *i.e.*, laundering them to hide them from government regulators and BAE's own auditors, which Riggs did for many years under Joe Allbritton's tutelage. Riggs and Joe Allbritton permitted Bandar to manipulate Saudi accounts to divert funds to himself and members of his family and did so because of the enormous profits Riggs and the Allbritton Defendants made off the Saudi/Bandar accounts and transactions.

123.    In the early 2000s, Riggs was beset with scandal.  Investigations found little oversight was conducted involving suspicious international transactions.  A Saudi named Omar al-Bayoumi housed and opened bank accounts for two of the 9/11 hijackers.  About two weeks after the assistance began, al-Bayoumi's wife began receiving monthly payments totaling tens of thousands of dollars from Princess Haifa bint Faisal, the wife of Saudi ambassador Prince Bandar, through a Riggs bank account. Upon discovery of these transactions, the FBI began investigating the bank for possible money-laundering and terrorist financing.  Investigators found lax safeguards on monetary transfers at Riggs.  Several Saudi accounts were discovered to have financial improprieties, including a lack of required background checks and a consistent failure to alert regulators of large transactions, in violation of the law.  Many of these transactions involved Bandar personally, often transferring over $1 million at a time.  In the Al Yamamah deal, Bandar received some $2 billion in bribes from BAE through the Riggs.

124.    Augusto Pinochet, the former dictator of Chile, has been widely accused since 1973 of corruption, illegal arms sales, and torture. In 1994, Riggs officials invited Pinochet to open an account at Riggs. Arrested in 1998 in Britain for possible extradition to Spain, his accounts were ordered frozen by court orders. A U.S. Senate report revealed that Riggs executives helped Pinochet disguise millions of dollars that had been stolen from the Chilean people, although some of Pinochet's supporters have claimed that the money came from supporters outside Chile. By using shell companies and hiding accounts from federal regulators, Riggs illegally allowed Pinochet to retain access to much of his fortune. The disclosure of the Riggs accounts reignited the case against Pinochet and a ruling that he was not mentally competent to stand trial was overturned when it was proven that Pinochet himself had orchestrated some of the huge transactions. In 2004, he was ordered to stand trial for crimes against humanity, and additional claims of mental and physical incompetence have been overruled.

125.    In 7/04, the U.S. Senate published an investigation into Riggs, into which most of Equatorial Guinea's oil revenues were paid until recently. This showed that accounts based at the embassy to the United States of Equatorial Guinea were allowed to make large withdrawals without properly notifying federal authorities. At least $35 million was siphoned off by long-time dictator of Equatorial Guinea, Teodoro Obiang Nguema Mbasogo, his family and senior officials of his regime. The same Mbasogo bought, in 11/06, a $35 million house in Malibu, California. Simon Kareri, the Riggs employee in charge of the Equatorial Guinea and other accounts, stands accused of money laundering in separate charges. As the account manager, it is alleged that he established a fake holding company in his wife's name and diverted funds into this account. In the Senate Permanent Subcommittee on Investigations hearing in 7/04, Kareri refused to answer any questions of the panel by invoking his Fifth Amendment rights. In that hearing, the President of Riggs was asked why the bank would willingly enter into a business arrangement with the dictator of Equatorial Guinea, a

man who willingly exercises his hold over his people with demonstrations of murder and torture on state-run television. In a copy of correspondence to President Mbasogo, the letter "thanked the president for his establishment of several bank accounts, and encouraged a working relationship to help establish and secure the stable reign of his country."

126.    Riggs was fined $25 million for violations of money-laundering laws. A long running Justice Department investigation was wrapped up in 2/05, with Riggs pleading guilty and paying a $16 million fine for violations of the U.S. Bank Secrecy Act after a *Wall Street Journal* article reported on 12/31/04 that Riggs had extensive ties to the CIA, including that several bank officials held security clearances. Also, in 2/05, the bank and its controlling shareholder agreed to pay $9 million to Pinochet victims for concealing and illegally facilitating movement of Pinochet money out of Britain. Riggs was acquired by PNC in 2004. On 5/26/05, the Riggs name was officially retired and all Riggs branches opened as PNC branches.

127.    In 5/04, federal regulators fined Riggs a record $25 million for violating anti-money laundering laws in its handling of tens of millions of dollars in cash transactions in Saudi-controlled accounts under investigation for possible links to terrorism financing. The civil fine against Riggs, a bank with a near-exclusive franchise on business with the capital's diplomatic community, was the largest ever imposed on a financial institution for such violations. The action by the Treasury Department's Office of the Comptroller of the Currency came in an order. The order said the bank's internal controls "were, and continue to be, seriously deficient." "Riggs failed to properly monitor, and report as suspicious, transactions involving tens of millions of dollars in cash withdrawals, international drafts that were returned to the bank, and numerous sequentially numbered cashiers' checks," it said.

128.    The Senate Finance Committee Chairman, Charles Grassley of Iowa, said:

"Riggs Bank deserves every penny of this huge fine. . . . Banks have a patriotic duty, not to mention legal requirement, to report suspicious activity. When banks look the

other way, they put our national security at risk. Whether it's through incompetence, negligence or greed, they are allowing terrorists to funnel their blood money through the system."

129.    Riggs was accused by Treasury regulators of failing to comply with a law requiring banks to notify the government of suspicious transactions. It was classified by the comptroller's office as a "troubled institution" for not complying fully with a 7/03 consent order under which it agreed to strengthen its anti-money laundering controls.

130.    For its transgressions, Riggs was ultimately fined $25 million for violations of money-laundering laws. A long running Justice Department investigation was wrapped up in 2/05, with Riggs pleading guilty and paying a $16 million fine for violations of the U.S. Bank Secrecy Act. And in 2/05, the bank and its controlling shareholder agreed to pay $9 million to Pinochet victims for concealing and illegally facilitating the movement of Pinochet money out of Britain. Upon completion of PNC's acquisition of Riggs in 2/05, the Riggs name was abandoned, but PNC has continued its operations in Washington, D.C.

**BAE'S Pattern and Practice of Illegal/Improper Bribes, Kickbacks and Payments**

131.    The improper and/or illegal Al Yamamah payments were part of a broader pattern and course of conduct of improper payments by the BAE Defendants.

132.    In 1994, the OECD urged member countries to put a stop to overseas bribery. A binding convention was adopted in 1997. It was signed by Britain and came into force in 1999. Signatories promised to outlaw such corruption. To avoid compliance, Evans moved BAE's whole worldwide system of agent payments to Switzerland. Britain's SFO later concluded: "The whole system is maintained in such conditions of secrecy that there is a legitimate suspicion concerning the real purpose of the payments." The system was run from a secure block, Warwick House, at BAE's Farnborough premises. "HQ Marketing Services" was headed by Hugh Dickinson. A board-level committee also met to approve each agency agreement. BAE set up a front company called Novelmight Ltd. With the help of the Swiss branch of its bankers, Lloyds TSB, the firm rented a

- 79 -

high-security office in Geneva, on the sixth floor of a block at 48 Route des Acacias. Then, just before Britain signed up to the OECD convention in 1997, the filing cabinets and safes containing the agent details were loaded into a van and driven by trusted staff from Farnborough to Geneva. BAE added a new layer of concealment when the convention came into force in 1999. Novelmight was officially closed down as a U.K.-registered subsidiary. But it was secretly re-registered as an offshore entity in the Caribbean where beneficial ownership could be hidden. Agents often received their payments into Swiss accounts. When agreements were ready to be made or renewed, BAE personnel flew to Geneva and unlocked the office at Route des Acacias for the signing. The contracts were kept in Geneva and could only be inspected there. The purpose of these tortuous arrangements was to ensure that nothing questionable involving the hiring of agents took place within U.K. legal jurisdiction.

133.    In 2/98, "Red Diamond Trading Ltd" was anonymously incorporated by BAE in the British Virgin Islands. It was used to channel payments all over the world, via Red Diamond accounts in London, Switzerland and New York. Secret payments have also been made to agents in South America, Tanzania, Romania, South Africa, Qatar, Chile and the Czech Republic. The BAE Defendants never disclosed the existence of Red Diamond in BAE's published company accounts, and have never explained why it was set up. BAE used British Lloyds TSB to transfer cash through Red Diamond accounts and on to its final destination. The next year, BAE set up a second front company, purely to handle the Saudi commission payments for Al-Yamamah. "Poseidon Trading Investments Ltd" was incorporated in the British Virgin Islands on 6/25/99. Funds passed through its accounts to Saudi agents in transfers made by Lloyds TSB. A different method was used to disguise corrupt benefits for Saudi officials who went on vacation trips to the U.S. and Europe. This was what became known as BAE's "slush fund." The head of the Saudi air force, Nasser, along with his relatives, were provided with unlimited shopping, plane tickets and free holidays by BAE. They

ran up enormous bills, totaling £60 million, over the years. BAE used two cooperative companies of travel agents to pick up the bills – Robert Lee International and Travellers World. Peter Gardiner, Travellers World managing director, has stated how deliberately misleading invoices were organized by BAE's executives. They referred merely to "accommodation and support services."

134.    The SFO is investigating BAE for improper or illegal payments of corruption and bribery activities in South Africa, Tanzania, Romania, Chile, the Czech Republic, Qatar, Bosnia, Nigeria, Zambia, Costa Rica and Egypt. The SFO has begun a series of interviews under caution with executives from BAE implicated in allegations of corruption involving investigations into its dealings in other jurisdictions, including Romania, the Czech Republic, Tanzania and South Africa.

135.    Clare Short, a former U.K. international development secretary, has stated she had been told by SFO investigators they had documents showing there was bribery in an arms deal involving the supply of an air-traffic control system by BAE to Tanzania. According to *The Guardian (London)*, the SFO told Short it has seen documents showing that the sale of radar equipment to Tanzania by BAE was corrupt.

136.    The SFO is investigating "substantial payments" made by BAE to a senior South African defense ministry official who had influence over a £1.5 billion contract won by the arms company to supply planes. South Africa's organized crime unit, the Scorpions, was handling a "mutual legal assistance" request from the SFO to investigate the financial accounts of Fana Hlongwane, a politically well-connected businessman, in relation to the 1999 deal. Mr. Hlongwane is a former special adviser to the then South African defense minister, Joe Modise. Modise has been named in allegations of corruption, including claims that he took a £500,000 bribe from BAE and $10 million from a German consortium that signed a contract to sell submarines. The SFO is also investigating John Bredenkamp, a tycoon who is BAE's agent in southern Africa and whose U.K. home and offices were raided in 10/06. Suspicion was cast on the aircraft deal after Modise changed

- 81 -

the formula by which the contract would be decided to discount price as a factor. South Africa's air force chiefs had selected Italian aircraft as cheaper and more modern, but the amended specifications shifted the balance in favor of the aging British Hawks – at nearly double the price. BAE has admitted that it paid tens of millions of pounds in secret commissions to win the £1.5 billion contract. The arms company originally intended to pay 12% of the contract price in commissions but agreed to cut that back to 7% – more than £100 million – following questions from the British authorities underwriting the deal. An internal Foreign Office memo three years ago says BAE named the agent handling the commissions in South Africa as the company Osprey. BAE claimed Osprey had no links with anyone involved in awarding contracts but, in truth, it had close ties with Modise. Among Osprey's shareholders was Tsebe Properties, of which Hlongwane was a director.

137.    According to the 5/31/07 *Financial Times*:

South Africa's former top defence official has revealed that he resigned because he suspected corruption in a UK-backed arms deal involving BAE Systems and other big European companies.

. . . Lt Gen Pierre Steyn told the Financial Times that his concerns led him to leave office in 1998 – months before the prime minister *backed the 30bn rand (£2.1bn) deal by signing an agreement on a package of spin-off industrial projects*.

The controversial arms deal is now being investigated in Britain and Germany . . . .

Gen Steyn said he was concerned about the possibility of graft during negotiations on the deal to buy military aircraft and vessels, although he added that he did not want to make allegations against specific individuals or companies.

*"I suspected corruption – for sure," he said. "So that made me more determined to enforce good practice."*

He said he resigned because he was not satisfied that sufficient safeguards were in place to enable him to prevent or expose any corruption in the bidding process, whose winners included BAE, Germany's Thyssen-Krupp, France's Thales and Saab of Sweden, which is 20 percent owned by BAE.

"When my attempts were frustrated, I said, *'That's it, I must relinquish my responsibility,'"* he said.

- 82 -

138.    A committee has been set up by the Hungarian government to investigate a defense

contract signed with a consortium of the U.K.'s BAE and Sweden's Saab. The government ordered

the investigation into the Gripen fighter jet contract, which was signed in 2001, after an allegation in

the Swedish media that Austrian businessman Alfons Mensdorf-Poilly had received around $6

million to intermediate in the contract. Swedish prosecutors are investigating bribery allegations

relating to BAE's dealings in the Czech Republic. Czech police have said they began investigating

bribery allegations involving BAE in response to a request by the SFO, which is probing the

Company's activities in six countries. The deal under scrutiny by Swedish and Czech authorities is a

2001 (£1.43 billion) agreement to sell 24 Gripen fighters to the Czech military. The deal was done

by a 50-50 joint venture between Saab and BAE. Police in Prague have said: "These investigations

have begun and are continuing."

139.    According to the 5/15/07 *New York Times*:

Swiss Investigating BAE In Money Laundering Case

Law enforcement authorities in Switzerland confirmed Monday that they had
opened a criminal investigation into possible money laundering at BAE Systems,
adding to the international scrutiny of the company, the top British military
contractor.

Jeanette Balmer, a spokeswoman for the office of the Swiss federal
prosecutor in Bern, confirmed that an investigation had been opened after a report
from Swiss money laundering investigators.

\*    \*    \*

Swiss banks are required by law to report any suspicious financial
transactions. According to The Guardian, a British daily, Swiss investigators will be
able to examine accounts held by Wafic Said, a Syrian financier who may have acted
as a middleman for payments and whom the Swiss consider a potential witness.

\*    \*    \*

The news follows a meeting last week in The Hague of prosecutors from
Austria, Britain, the Czech Republic, Sweden and Switzerland. They are seeking to
coordinate corruption inquiries related to the sale and lease of Gripen fighter jets,
which are built by Saab of Sweden and sold through a joint venture with BAE. The
two companies are accused of offering intermediaries as much as 1 billion kronor,

- 83 -

about $150 million, to promote the sale of the jets to the Czech Republic and Austria in 2002.

Ms. Balmer said that the meeting had been convened under the auspices of Eurojust, an arm of the European Union established in 2002 to coordinate prosecution of serious cross-border and organized crime.

140.    The SFO is also reviewing a Jersey case of tens of millions of pounds of payments allegedly made by a number of European arms companies to a senior Qatari minister. The Jersey probe began in 2000 after the discovery of a trust fund containing £100 million controlled by Sheikh Hamad bin Jassem bin Jabr al-Thani, the Qatari foreign minister. The minister received "substantial commissions from companies seeking to do business with the state of Qatar," according to a 12/01 Jersey court judgment that was published in 2003 after a long court battle by the Jersey *Evening Post* newspaper. According to the 2001 court judgment, al-Thani acknowledged receiving commissions but said they were not bribes. He added that his actions had been authorized by the Emir of Qatar. Jersey court documents show that Qatar tried to derail the investigation into al-Thani by arguing it "vexed" the "peace of nations," foreshadowing the national security concerns. But the Jersey courts said the Qatari argument "went too far," adding that the law had to "take its proper course." "An investigation cannot be stifled because it is the cause of political embarrassment," the 2001 judgment said.

141.    Anti-fraud officials in Slovakia are investigating an arms contract won by BAE. The contract, won in late 2005 and worth about pounds 144m, is for military mobile communications equipment. BAE won the contract, called MOKYS, not long after it donated computer equipment to the country's ministry of defense, something that was not disclosed at the time.

## BAE's Non-Compliance with the FCPA's Accounting and Record-Keeping Requirements and FCPA/OECD Conventions Anti-Bribery Rules

142.    The FCPA imposes accounting and record-keeping requirements specifically applicable to those companies that elect to conduct business in a foreign country. Nevertheless, throughout the relevant time period, BAE did not have an FCPA/OECD Convention compliance

program and, in fact, did not have any meaningful FCPA/OECD Convention compliance procedures in place. More specifically:

    (a)    BAE's Board did not enforce its own anti-corruption policies;

    (b)    BAE's Board did not provide its employees with necessary information concerning applicable anti-corruption laws and conventions;

    (c)    BAE's Board never conducted any effective anti-corruption compliance training; and

    (d)    BAE's Board did not maintain any due diligence files on its foreign agents.

143.    BAE's Board, although there were "storm warnings" concerning its failure to comply with the accounting and record-keeping requirements of the FCPA, failed to properly investigate these warnings and take corrective action.

## FIRST CLAIM FOR RELIEF

### (Derivative Claim for Breach of Fiduciary Duties Against the BAE Defendants)

144.    Plaintiff hereby incorporates ¶¶1-143.

145.    The BAE Defendants are fiduciaries of BAE and of all of its public shareholders and owe to them the duty to conduct the business of the Company loyally, faithfully, carefully, diligently and prudently. This cause of action is asserted based upon these defendants' acts in violation of applicable law, which acts constitute a breach of fiduciary duty.

146.    The BAE Defendants, in their roles as executives and/or directors of the Company, made false and misleading statement in Annual Reports and participated in the acts of mismanagement alleged herein and/or acted in gross disregard of the facts and/or failed to exercise due care to prevent the unlawful and *ultra vires* conduct complained of.

147.    The BAE Defendants are responsible for the gross mismanagement of BAE, for abdicating their corporate responsibilities and mismanaging the Company in at least the following ways:

(a)    They caused BAE to violate applicable law, disregarding their duties as fiduciaries and directors and officers.

(b)    They have caused BAE to violate anti-bribery/corruption laws and conventions and exposed the Company to criminal liability and unnecessary costs, fines and penalties – by engaging in *ultra vires* and illegal conduct.

(c)    They exposed the Company and its shareholders to massive fines and penalties.

(d)    They subjected BAE to adverse publicity and loss of goodwill.

148.    As a result of these defendants' wrongful conduct and wrongful actions, including the failure to maintain a system of internal controls adequate to insure the Company's compliance with all applicable laws and conventions, BAE has suffered considerable damage.

149.    All the BAE Defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company.

150.    The BAE Defendants abused the control vested in them by virtue of their high-level positions in the Company.

151.    By reason of the foregoing, these defendants have breached their fiduciary obligations of care, candor and control to BAE and its shareholders, and violated Section 463 of the U.K. Companies Act.

152.    BAE and its shareholders have been injured by reason of these defendants' failure to exercise the reasonable and ordinary care owed to the Company by its directors, officers, managing agents and employees in disregard of their fiduciary duties to the Company.  Plaintiff, as a

- 86 -

shareholders and a representative of BAE, seeks damages and other relief for the Company as hereinafter set forth.

## SECOND CLAIM FOR RELIEF

### (Derivative Claim for Waste of Corporate Assets Against the BAE Defendants)

153.    Plaintiff hereby incorporates ¶¶1-152.

154.    As a direct result of the wrongdoing alleged herein, the BAE Defendants have unreasonably and unnecessarily caused BAE to wrongfully expend and waste billions of dollars of corporate assets, and have subjected the Company to additional liability in the untold millions of dollars, to the extreme detriment of the Company.

155.    Additionally, as set forth above, these defendants have awarded themselves and their allies excessively lucrative compensation and payments which have no reasonable basis, but instead are designed only to enrich themselves.

156.    As a direct and proximate result of these defendants' waste of corporate assets as alleged herein, BAE has sustained damages.

## THIRD CLAIM FOR RELIEF

### (Derivative Claim for Aiding and Abetting Breaches of Fiduciary Duties Against Bandar, PNC/Riggs and the Allbritton Defendants)

157.    Plaintiff hereby incorporates ¶¶1-156.

158.    By encouraging and accomplishing the illegal and improper payments alleged herein and concealing them from government regulators, Bandar, PNC/Riggs and the Allbritton Defendants have each encouraged, facilitated and advanced the BAE Defendants' breaches of their fiduciary duties and waste of corporate assets. In so doing, Bandar, PNC/Riggs and the Allbritton Defendants have each aided and abetted, conspired and schemed with BAE Defendants to breach their fiduciary duties, waste BAE's corporate assets and engage in the *ultra vires* and illegal conduct complained of.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure defendants do not participate therein or benefit thereby;

B.    Directing all defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

C.    Directing BAE to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with Section 463 of the U.K. Companies Act and the Sarbanes-Oxley Act of 2002, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the companies' Articles and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)    an amendment to the Company's Articles limiting the number of executive directors on the BAE Board to two;

(ii)    a proposal to strengthen the BAE Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(iii)    establishing an effective anti-corruption and bribery exposure oversight committee, staffed fully with independent directors and provided a budget to retain independent counsel and advisors;

- 88 -

      (iv)    a provision to permit the shareholders of BAE to nominate at least three candidates for election to the BAE Board;

      (v)    appropriately test and then strengthen the internal audit and control functions;

      (vi)    reform executive compensation;

      (vii)    require full compliance with Sarbanes-Oxley and Section 463; and

      (viii)    permit shareholders to question all executive directors of BAE at the Annual General Meeting and establish a more transparent process for receiving and evaluating shareholder proposals.

    D.    Awarding punitive damages;

    E.    Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

    F.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury with respect to each claim in this Complaint.

DATED: September 13, 2007        LAW OFFICES OF ROGER M. ADELMAN
                                      ROGER M. ADELMAN (DC Bar # 056358)

                                      ROGER M. ADELMAN

                                      1100 Connecticut Ave., NW, Suite 730
                                      Washington, DC 20036
                                      Telephone: 202/822-0600
                                      202/822-6722 (fax)

                                      Local Counsel

COUGHLIN STOIA GELLER RUDMAN
   & ROBBINS LLP
DARREN J. ROBBINS
MARY K. BLASY
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

CUNEO GILBERT & LaDUCA, L.L.P.
JONATHAN W. CUNEO(DC Bar # 939389)
WILLIAM H. ANDERSON (DC Bar # 502380)
507 C Street, N.E.
Washington, DC 20002
Telephone: 202/789-3960
202/789-1813 (fax)

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

S:\CptDraft\Derivative\CPT BAE SYSTEMS WSL.doc

## VERIFICATION

I, Mary K. Blasy, hereby declare as follows:

1.      I am an associate of the law firm of Coughlin Stoia Geller Rudman & Robbins LLP, counsel for plaintiff in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 12th day of September, 2007, at San Diego, California

_____
MARY K. BLASY

EXHIBIT A

# B B C NEWS

# Transcript: Princes, Planes & Pay-offs

NB: THIS TRANSCRIPT WAS TYPED FROM A TRANSCRIPTION UNIT RECORDING AND NOT COPIED FROM AN ORIGINAL SCRIPT: BECAUSE OF THE POSSIBILITY OF MIS-HEARING AND THE DIFFICULTY, IN SOME CASES OF IDENTIFYING INDIVIDUAL SPEAKERS, THE BBC CANNOT VOUCH FOR ITS ACCURACY.

**PANORAMA Princes, Planes and Pay-offs** RECORDED FROM TRANSMISSION: BBC ONE DATE: 11:06:07

JEREMY VINE: Hello, I'm Jeremy Vine, and this is Panorama. Tonight, the Saudi Prince who received secret payments from Britain's biggest arms deal, how the money was paid and how it was spent, and why our Panorama revelations have left the world's top leaders lost for words.

GEORGE BUSH: [to Tony Blair ] (laughing) I'm glad you're answering that question.

He's a friend of mine!

VINE: Britain could have made a stand against corruption.

JEREMY CARVER: Instead we're just sleaze boards.

VINE: The decision to pull the plug on a corruption investigation into Britain's biggest arms deal was widely condemned as a cover up both here and across the world. Whatever the real reason the files were sent to the basement of the serious fraud office. It would be wrong to say that nobody has continued to investigate exactly where the money went and who knew about it, there's Panorama's Jane Corbin for a start.

PRINCES, PLANES & PAY-OFFS

Reporter: Jane Corbin

CORBIN: This is a story about princes and planes, about arms dealers and millions of pounds secretly flowing through mysterious bank accounts, commissions to some, corruption to others. It all centres on a fabulously wealthy mover and shaker with extraordinary access.

I shall lose a prince, a statesman and a friend.

CORBIN: As British and Saudi governments tried to keep the lid on this scandal for over two decades, a corruption investigation was scrapped just as it was getting close to the truth. The only way to discover what really happened is to follow the money, so that's what we did.

I'm on my way to Washington on the trail of the money, hundreds of millions of pounds in kickbacks which went from Britain's largest arms company to one of Saudi Arabia's most colourful and controversial princes. The story ends with the British government caving in to blackmail, halting its own investigation into the scandal, and all the while protesting they were still committed to stamping out corruption. Take a look at this. (Plays film on laptop)

IAN McCARTNEY MP Foreign Office Minister Government anti-corruption promotional film

Hello, my name's Ian McCartney. Corruption is a very serious issue. The British Government is totally committed to combating corruption, overseas and here at home.

CORBIN: But is it? tonight we'll show you just how committed the government really is to stamping out

corruption. The central character in our story is Prince Bandar in Sultan, a friend of prime ministers, royalty and presidents, the son of a Saudi royal and a slave girl, Bandar rose to become his county's high profile ambassador to Washington, prized guest on US talk shows.

BANDAR: You know what, I would be offended if I thought we had the monopoly on corruption.

CORBIN: I'd flown to Washington to meet an ex-secret service agent who's never spoken publicly before.

Mr Caruso, I'm Jane Corbin. Nice to meet you.

CARUSO: Welcome.

CORBIN: Thank you very much.

David Caruso is an expert in money laundering and found out a great deal about Prince Bandar's financial arrangements in America. After 9/11 when most of the Al-Qaeda hijackers turned out to be Saudi, Mr Caruso was called in by the Ambassador's bankers, Riggs Bank. They wanted to find out if any funds were going to terrorists from the Saudi Embassy.

[in taxi from airport]

CARUSO: Those funds were in Prince Bandar's account, in his wife's account.

CORBIN: So there were substantial amounts of cash.

DAVID CARUSO Compliance & Security Riggs Bank 2003-2005

Yes, there's large sums, there's a large relationship, there's a hundred plus million dollar relationship.

CORBIN: A hundred plus million dollars.

No links to terrorism were found but Mr Caruso did identify many suspicious transactions in some of the Embassy accounts.

CARUSO: What we discovered was clearly large movements of money, both cash and other types of money, that we simply could not understand.

CORBIN: And was the Saudi Ambassador himself, Prince Bandar, prepared to tell you what lay at the root of all this?

CARUSO: We were never able to get those answers.

CORBIN: And did you worry, did you think this sounds fishy?

CARUSO: Absolutely.

CORBIN: Now Panorama has established that millions of pounds identified as suspicious in Washington came from London. They were part of the proceeds of a huge arms deal, but instead of staying in the UK, the money was quietly being deposited abroad. Why? That's what the Serious Fraud Office was trying to get to the bottom of. Two years before it had begun looking at a slush fund which provided other Saudi officials with luxury holidays, limos and call girls.

ROBERT WARDLE Director, Serious Fraud Office

My job is to decide whether there are reasonable grounds to suspect an offence involving fraud. I looked at what we had and I took the view there was so we commenced the investigation.

CORBIN: The investigation was to lead to one of the most powerful men in Saudi Arabia, Prince Bandar Bin Sultan is the subject of a new book launched in London last month, written by his old friend Bill Simpson, who first met the Prince in the RAF back in the 60s.

WILLIAM SIMPSON: [addressing patrons at book launch] Here was someone who would shape world events, both as a diplomat and a statesman over the years.

CORBIN: What sort of a character is Prince Bandar?

WILLIAM SIMPSON Prince Bandar's biographer

Complex. He is an enigma. He is charismatic beyond belief, amazingly kind, amazingly generous, often Machiavellian, but overall a very powerful individual who understands how to use power.

CORBIN: Ever since Bandar trained here as a fighter pilot he's had a soft spot for England. He's been a friend of three prime ministers, one of whom recorded a special message for the reception.

MARGARET THATCHER: I was always pleased to see him when I was Prime Minister because he brought me extraordinary insight and bold proposals.

CORBIN: The boldest proposal Bandar brought her was in 1984, to equip the Saudi Air Force with a fleet of Tornados and Hawks and a whole infrastructure for the warplanes. The deal was called Al-Yamamah, the dove of peace. It would earn the UK more than 40 billion pounds over the next two decades and save the plane's struggling manufacturer - British Aerospace.

How key was Prince Bandar to that arms deal?

SIMPSON: He was central to the deal. He approached Margaret Thatcher and effectively the deal was done without the paperwork, that sort of followed on later. He negotiated the aircraft which became the Al-Yamamah contract which has been running ever since.

CORBIN: But corruption within the Saudi Royal Family was a big problem that Whitehall had long been aware of. Our Ambassador to Riyadh had even spelled it out in a telegram to the Foreign Office in 1971. Let me tell you what it says:

"Your Ambassador is being extremely undiplomatic about one of the most powerful men in the Saudi government, the Defence Minister. He has, of course.." said the Ambassador "a corrupt interest in all contracts.

But did that stop the deal?

[NEWS] Today's signing at Lancaster House was a triumphant climax to a year of patient bargaining.

CORBIN: In 1985 the British Defence Minister signed the Al-Yamamah agreement with his Saudi counterpart Prince Sultan, the very man accused in the telegram of having a corrupt interest in every contract. With him was his son, Prince Bandar, who'd schmoozed Margaret Thatcher.

The Saudi's paid for the planes not in cash but in another commodity - oil. Britain was getting up to 600,000 barrels full a day. That's this much, a tanker full, every day, and it's been going on for 20 years. Al-Yamamah was and still is the biggest and most lucrative arms deal in history.

The deal was good for Britain's economy, good for British Aerospace and Saudi security, but it would be even better for some Saudi princes. They siphoned off vast sums of their country's wealth, money belonging to their people, courtesy of the arms deal. No sooner did the Tornados start arriving in the kingdom than there were rumours Prince Bandar and others were getting 600 million pounds in kickbacks from the deal. In Saudi, as elsewhere, the price of arms is often hyped, so money can be skimmed off the top.

How do we know? Well now we've got the proof that under the UK/Saudi deal the Saudis did pay more than the

Tornadoes were actually worth. Secret British Government documents released last year by mistake and hastily recalled let the cat out of the bag. They show that each tornado was worth around 60 million pounds but over 21 million is the amount that the Saudi Defence Minister, Prince Bandar's father, agreed to pay. That's a mark up a third, or 600 million pounds, and that's exactly the sum that Bandar and the others were rumoured to be getting at the time.

So do you think that those corruption allegations have any truth in them?

SIMPSON: Well I can't answer that. I can only say that I've tackled him directly and he has been absolutely direct in saying that he did not.

CORBIN: Prince Bandar negotiated a second phase of Al-Yamamah worth billions more two years later. He was becoming British Aerospace's best salesman, but he was also a public official, son of the customer who'd signed the deal. Yet as Panorama discovered, even bigger payments were soon being wired into accounts controlled by Bandar. Here, let me show you what those payments amounted to: this much (taking viewer into secure room stacked solid, chest high, with £50 notes) - £120 million a year give or take a few million, and it went on for at least ten years, so that's over a billion pounds in total, and the payments were actually written in to the Al-Yamamah contract. They were in secret annexes called: 'letters of offer and acceptance'.

Support services is how the payments were described. And Prince Bandar didn't just get huge sums of money. The ex-fighter pilot got to run his own plane, courtesy of the Al-Yamamah deal, British Aerospace and the British Government. It wasn't one of these, a small executive jet which costs around six million pounds. It wasn't even one of these, a larger executive jet. This one would set you back... oh around 15 million pounds or so. No, Bandar got a plane even bigger than one of these, an airbus long range jet which cost around 75 million eight years ago. It took a year to fit it out to his personal specifications.

Tell us about the plane.

SIMPSON: It's a small aircraft. Well... I tell a fib, it was an Airbus 340, it has its own kitchen, it has a large lounge which is where he sits. It's a very luxurious, fitted, aircraft, very well appointed.

CORBIN: Bandar's airbus, registration HZ124 has been seen all over the globe. It's painted in the blue and white colours of his favourite American football team, the Dallas Cowboys. There have been some great parties on board for presidents and kings.

It's become a bit of a legend amongst plane spotters all over the world. They've logged it from Beijing to Barcelona and just about everywhere in between.

SIMPSON: When I last looked at the records of the aircraft, it's been all over the world but he, on an average year, over the first 8 years, it was to the moon and back and round the globe three times every year.

CORBIN: And while Bandar was mixing business with pleasure it was kickback from Al-Yamamah which paid, amongst other things, to run the plane. For years successive governments have denied to Parliament any commissions had been paid to any Saudi officials. British Aerospace, now called BAE, consistently issue denials too.

Sir RICHARD EVANS Chairman, BAE Systems 1998-2004

I can certainly assure you that we, and I believe most governments, are not in the business of making payments going to the members of any government.

CORBIN: But as we've discovered, Prince Bandar has been receiving millions of pounds, via BAE over the years, cash and travelling expenses. This is how it worked. Our welfare sources have confirmed to Panorama that every three months a letter would be sent from Bandar's office to the Ministry of Defence.

It reminded them it was time to make the payments for support services authorised under the Al-Yamamah contract. The MoD would notify British Aerospace who then wired the money into two accounts - thirty million into one, and hundreds of thousands for Bandar's plane into the other. In the vaults at the SFO they were

amassing the evidence of these payments.

They seized documents from British Aerospace, and last autumn they took computer records from the MoD and questioned high-level civil servants. The money trail led abroad to Europe and across the Atlantic, and where did the money sent by BAE with government authority go to in America? Well, to Washington, and some of those Saudi Embassy accounts at Riggs Bank that David Caruso had been investigating, accounts he confirmed Prince Bandar used as a personal piggy bank.

CARUSO: There wasn't a distinction between the accounts of the Embassy or official government accounts as we would call them, and the accounts of the Royal Family.

CORBIN: So you discovered that Prince Bandar was taking money for his own personal use out of accounts that seemed to be accounts belonging to his government.

DAVID CARUSO Compliance & Security Riggs Bank 2003-2005

Yes, certainly, yeah that was a common practice, and that was a practice, from my understanding, that had gone on for years and years.

CORBIN: And large sums of money involved?

CARUSO: Oh yeah, hundreds of thousands and millions of dollars.

CORBIN: Most of the money was wired into the Saudi Ministry of Defence and Aviation account. In reality it might have been better described as a conduit to Bandar.

So money was coming into the Ministry of Defence and Aviation account and coming out for Prince Bandar and his family.

CARUSO: Yes, and it also was used for other embassy operations as well. But it seemed to be, if you could picture the accounts as a spider web, that was a wheel, a hub and spoke, that was the hub, and then from that account money would be transferred to other accounts.

CORBIN: We obtained the details of one striking example from an internal Riggs Bank document. It shows that though the account was in the name of a Saudi ministry, Bandar took a large sum out for himself. It happened, it says here, in the summer of 2003 when 17 million dollars were transferred from the account of the Saudi Arabian Ministry of Defence and Aviation and ended up in the hands of Prince Bandar's personal architect.

I understand that out of that account for example came large sums, some 17 million, which went to Prince Bandar's architect in Saudi Arabia.

CARUSO: We were told that some of the funds in those accounts were being used to build a home, I believe, for the Prince in Saudi.

CORBIN: A home or a palace?

CARUSO: Well... a palace, yeah... well I would imagine a palace with that type of money, yeah.

CORBIN: But when Prince Bandar was tackled on American television about his country's reputation for corruption he shrugged it off.

Interview with Prince Bandar Frontline, WGBH Boston 2002

Now if you tell me that building this whole country and spending 350 billion out of 400 billion that we had misused or corrupt you 50 billion I'll tell you yes, but I'll take that any time.

CORBIN: Rigg's Bank could never get satisfactory answers from Bandar or his embassy, so they closed down all their accounts. Within months the Prince resigned as Ambassador for personal reasons and headed back to Saudi. The SFO needed to establish if the payments Bandar received via BAE and the MoD were actually illegal. These have continued well beyond 2002 when UK law was changed after the Blair Government signed up to an international anti-bribery convention at the OECD.

The government's made a big deal of its fight against corruption, but the new law still has loopholes. Illegal or not, payments like the Al-Yamamah kickbacks are what everyone thought we'd signed up to outlaw. So what does a leading legal expert think, having examined what we found? How would you classify those payments?

JEREMY CARVER Board Member, Transparency International

Those payments, on the face of it, are straightforward bribes as defined by the Ant-Bribery Convention.

CORBIN: No doubt about that.

CARVER: There's no doubt about it at all. Senior officials, a minister, it's quite plain that he meets the test of who is an official, a foreign official, for the purpose of the OECD Convention.

CORBIN: As the SFO uncovered the payments made to Bandar and other Saudi middle men, the government got nervous, so did the Prince who'd benefited most from the deal. He had a new job now, head of Saudi National Security. The plane paid for by Al-Yamamah set off.

Did the itinerary reveal its mission was to scupper the investigation? Well we've uncovered some curious coincidences. Bandar headed first for England. He knew he had a powerful weapon, the third phase of the Al-Yamamah deal worth 20 billion pounds was in the process of negotiation. Prince Bandar's plane has been seen many times in Britain. Plane spotters have snapped it, and those same plane spotters' logs show that interestingly enough, Prince Bandar was here at Brize Norton twice last autumn, in October and again in November, and this was just at the time that behind the scenes the government was agonising over what to do about the SFO investigation. British ministers had assured the Saudis the investigation was going nowhere, but the SFO, it seemed, just hadn't got the message.

ROBERT WARDLE Director, Serious Fraud Office

We traced evidence to Switzerland, we traced money to Switzerland, and it was at that stage that the representations were made.

CORBIN: Representations from Saudi Arabia.

WARDLE: So I understand.

CORBIN: The met stop for Bandar's airbus was Switzerland. A spotter snapped it in Basel on November 15th.

PLANE SPOTTER: We do not definitely know why it was here, but it was very lucky to get it here.

CORBIN: The SFO had asked the Swiss authorities for details of bank accounts belonging to business managers who act for Bandar and his father. The Saudis were furious.

WILLIAM SIMPSON Prince Bandar's biographer

The fact that they may be looking at personal records of some of the Saudi royal family was unacceptable and that's where I think Bandar was pressed into a role of dropping a word to his friend Tony Blair.

CORBIN: So did Bandar, the Saudi Security Chief who lobbied Mr Blair, threaten to stop cooperating in the war against terror? Well that's the line the Prime Minister chose to take with the SFO and the British public.

WARDLE: The information I had came from the minute from the Prime Minister I think it was to the attorney

asking that we consider the public interest and I also had the advantage of talking about it with our ambassador in Saudi Arabia.

CORBIN: So it was at the point when you got to the Swiss bank accounts that, if you like, the balloon went up and the alarm bells started ringing.

WARDLE: Yes.

CORBIN: The pressure was ratcheted up at Bandar's next port of call - Paris.

PLANE SPOTTER; It's one of my favourite air bus so I'm always taking pictures of all the 340s in the world.

CORBIN: The Prince had come to be seen with President Chirac. The subtext - the Saudis were thinking a French fighter might well replace BAE's plane in the new round of Al-Yamamah.

SIMPSON: That's as clear a way, I would have thought, as any of pointing a gun at the British Government's head.

CORBIN: But there had to be another reason to stop the corruption probe, not the risk to a contract or jobs, the Anti-bribery Convention forbids that, so our ambassador to Riyadh visited the SFO three times to make it clear there'd be a price to pay if the Saudis stopped cooperating on terrorism.

WARDLE: I was convinced that if this happened, if this cooperation was withdrawn, there was a significant risk to life.

CORBIN: What, lives are at stake?

WARDLE: Yeah.

CORBIN: That was a lot of pressure to put on you.

WARDLE: Well, sure, but I mean if that's what's going to happen, then I've got to make a decision on that basis.

CORBIN: Maybe you could have stood up to this.

WARDLE: Well, maybe I could and maybe if I did that and took a risk maybe there'd have been some explosion on the streets of London.

CORBIN: And who controls the flow of Saudi intelligence on terrorism? Prince Bandar. Mr Wardle dropped the case.

WARDLE: Of course I'm not very happy when an investigation is stopped in its tracks like that but sometimes you have to make these difficult decisions and that's what I did.

CORBIN: That's life, that's politics in this case.

WARDLE: Well it's politics, it's the law, it's the way things are.

CORBIN: The Government and BAE had successfully muzzled the legal process, that's how many saw it. BAE wouldn't be interviewed by Panorama, but in a statement they said they acted lawfully in accordance with the terms of the relevant contracts and with the approval of the Saudi Government and the Ministry of Defence. It's the same line they took in a letter to the SFO when they admitted paying for support services under the Al-Yamamah contract.

For more information visit bbc.co.uk/panorama

CORBIN: Was that effectively a get out for them or what?

ROBERT WARDLE Director, Serious Fraud Office

Not necessarily. I think their view was to... our intention was to follow these payments and see whether they amounted to criminal offences.

CORBIN: So merely by saying they were acting under contractual arrangements didn't get them off the hook.

WARDLE: Well of course not. I think in any arrangement where corrupt payments are made, BAE or whatever it is, the payments are going to be within the contract in some way, shape or form. The question is whether they were improper payments.

CORBIN: Now we may never know. But the MoD still has questions to answer about payments to Bandar they so willingly facilitated. They refused us an interview because, they said in a statement:

"Disclosing confidential Al-Yamamah information would cause the damage which ending the investigation was designed to prevent. This does not imply that we believe the allegations you propose to make in the programme are true."

For two years the Government's chief law officer the Attorney General, backed the SFO's corruption probe, but then they got hold of MoD documents and the Swiss looked like opening up those accounts. Then Lord Goldsmith declared the case wasn't going to succeed.

The Attorney General made it clear afterwards that he thought that the SFO, that you, did not have a case. I mean leaving aside the public interest argument, do you agree with that?

WARDLE: I felt that in a normal case one would have pursued the line of evidence to see whether there was sufficient evidence to justify a prosecution. To that extent I disagree with him, yes.

CORBIN: You felt you hadn't reached the end of the line?

WARDLE: Absolutely yes.

CORBIN: Lord Goldsmith? Hello, it's Jane Corbin from Panorama. We wanted to do an interview with you about the dropping of the SFO inquiry.

LORD GOLDSMITH Attorney General

Oh you've got lots of information about that already. You've got plenty of information.

CORBIN: We want to actually specifically to ask you about the payments that were made to Prince Bandar.

GOLDSMITH: Why don't you ask the Director of the SFO?

CORBIN: Well we have asked him, but we wonder what your view was. GOLDSMITH: Well you know my view because I've expressed it in Parliament and I've expressed it many times, so you've got that. Alright?

CORBIN: But I don't think you've talked to Parliament about Prince Bandar.

GOLDSMITH: I've talked about all of this.

CORBIN: Thank you very much.

GOLDSMITH: Alright.

Case 1:07-cv-01646-RMC   Document 3   Filed 09/19/2007   Page 9 of 9

CORBIN: In fact, the Attorney General never told Parliament about Prince Bandar. But we know that he knows the SFO knows payments went through his government to the Prince. The Swiss, meanwhile, have begun their own investigation and the Americans may launch one too under their stringent anticorruption laws.

CARVER: It's been a tremendous disappointment internationally that whereas they looked to the United Kingdom to come up with solutions, a practical good example. Instead we're just sleaze boards.

For more information visit bbc.co.uk/panorama

CORBIN: Prince Bandar declined an interview but his lawyers have admitted payments were made into Riggs Bank with the UK and Saudi Government's approval, just as Panorama has revealed. "Bandar was a signatory" they said "but the money went for purposes approved by the Saudi Ministry of Defence, not for him personally, the palace, an official residence. But the big question remains, why were such huge payments made by such a secretive and convoluted route, and what were they for? Here's a last word from the Prince on the subject of corruption.

BANDAR: We did not invent corruption. This happens since Adam and Eve. I mean Adam and Eve were of heaven and they had hanky panky and they had to go down to earth, so this is human nature. But we are not as bad as you think.

CORBIN: And so the moral of the story is that if you're a British arms dealer, make sure you've got government cover written into the contract, then a kickback or two should be no problem.

VINE: Jane Corbin there. Well the Serious Fraud Office is still investigating other BAE arms deals including sales to South Africa and Tanzania. No word yet on their outcome. Next week: is TV bad for my kids? Panorama finds out what happens when you take TVs, computers and games consuls away from a class of 7 and 8 year olds.

Story from BBC NEWS:
http://news.bbc.co.uk/go/pr/fr/-/1/hi/programmes/panorama/6745233.stm

Published: 2007/06/12 14:09:16 GMT

© BBC MMVII

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

CITY OF HARPER WOODS EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of BAE SYSTEMS PLC

## DEFENDANTS

RICHARD (DICK) L. OLVER
(SEE ATTACHMENT B)

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Michigan
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

LAW OFFICES OF ROGER M. ADELMAN
ROGER M. ADELMAN
1100 Connecticut Ave., NW, Suite 730
Washington, DC  20036
Telephone:  202/822-0600

ATTORNEYS (IF KNOWN)

Case: 1:07-cv-01646
Assigned To : Collyer, Rosemary M.
Assign. Date : 9/19/2007
Description: Contract

*JURY ACTION*

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
◉ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZ
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ◉ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ◉ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)** OR ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC  7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

(31)

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ◎ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☒ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding    ○ 2 Removed from State Court    ○ 3 Remanded from Appellate Court    ○ 4 Reinstated or Reopened    ○ 5 Transferred from another district (specify)    ○ 6 Multi district Litigation    ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

28 USC 1332

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR INTENTIONAL, RECKLESS OR NEGLIGENT BREACH OF FIDUCIARY DUTY

**VII. REQUESTED IN COMPLAINT**    ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ To be determined    Check YES only if demanded in complaint
JURY DEMAND:    YES ☒    NO ☐

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE September 19, 2007    SIGNATURE OF ATTORNEY OF RECORD    Roger M. Adelman

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.