UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITY OF HARPER WOODS EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of BAE SYSTEMS PLC,<br><br>Plaintiff,<br><br>vs.<br><br>RICHARD (DICK) L. OLVER, et al.,<br><br>Defendants,<br><br>– and –<br><br>BAE SYSTEMS PLC, an England and Wales corporation,<br><br>Nominal Defendant. | Civil No. 1:07-cv-01646<br><br>Assigned to: Judge Rosemary M. Collyer |

PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO SERVE PROCESS BY ALTERNATIVE MEANS

# TABLE OF CONTENTS

**Page**

I. PRELIMINARY STATEMENT ........................................................................1

II. STATEMENT OF FACTS ........................................................................3

III. SERVICE OF PROCESS BY ALTERNATIVE MEANS IS NECESSARY AND PROPER IN THIS CASE. ........................................................................4

A. Service of Process by Alternative Means Is Not Extraordinary Relief and Can Take a Variety of Forms........................................................................4

B. Service by Alternative Means Should Be Authorized in This Case. .......................6

IV. CONCLUSION........................................................................7

## TABLE OF AUTHORITIES

**Page**

### CASES

*Avianca, Inc. v. Corriea*,
705 F. Supp. 666 (D.D.C. 1989) .....5

*Forum Fin. Group, LLC v. President & Fellows*,
199 F.R.D. 22 (D. Me. 2001) .....5

*Mullane v. Central Hanover Bank & Trust Co*.,
339 U.S. 306 (1950) .....5

*Rio Props. v. Rio Int'l. Interlink*,
284 F.3d 1007 (9th Cir. 2002) .....4, 5

*Ryan v. Brunswick Corp.*,
No. 02-CV-0133E, 2002 WL 1628933
(W.D.N.Y. May 31, 2002) .....5

*Tinicum Props. Assocs. Ltd. P'ship v. Garnett*,
No. 92-0860, 1992 WL 99590
(E.D. Pa. Apr. 29, 1992) .....3

### RULES

Federal Rules of Civil Procedure
Rule 4(f) .....4
Rule 4(f)(3) .....4, 5

## I.     PRELIMINARY STATEMENT

By this motion, plaintiff seeks permission to effect service of process on a foreign defendant in this action who was proven to be elusive by certified mail directed at his U.S. counsel and to his U.S. and U.K. residences.

On September 19, 2007, plaintiff the City of Harper Woods Employees' Retirement System, a long-term shareholder of BAE Systems plc ("BAE" or the "Company"), filed this stockholder derivative action on behalf of BAE against its entire Board of Directors and several of its present and former officers and directors alleging intentional, reckless and/or negligent breaches of their fiduciary duties of care, control and candor, involving illegal, improper and/or *ultra vires* conduct, including causing BAE to violate the laws of the United States and international business conduct codes and conventions relating to honest trade and business practices by making, or permitting to be made, an estimated $2 billion in improper and/or illegal bribes, kickbacks and other payments to Prince Bandar Bin Sultan ("Bandar").   Also named as defendants are Bandar, PNC Financial Services Group, Inc. ("PNC") (legal successor by merger to Riggs National Corporation/Riggs Bank, N.A.), and three former Riggs executives and controlling shareholders, which were, respectively, the primary recipient or beneficiary of the $2 billion in bribes, payoffs and improper payments and the primary intermediary *via* which these payments to Bandar payments were laundered, actively concealing them from government regulators and BAE's own auditors.   The claims against Bandar arise out of his aiding and abetting the breaches of fiduciary duties of the officers and directors of BAE in relation to their causing BAE to pay Bandar the $2 billion in bribes to secure defense contracts with the Saudi government.   The action seeks an accounting and the imposition of a constructive trust over the bribe monies paid to Bandar, in whatever form they are presently held, and recovery of resulting damages to BAE, including damage to reputation and the cost of defending this action and professional fees.

Bandar is a highly influential Saudi politician and was the Saudi Ambassador to the United States from 1983 to 2005. Upon relinquishing his ambassadorship, Bandar was appointed Secretary-General of the Saudi National Security Council by King Abdullah bin Abdul Aziz on October 16, 2005. Bandar owns a $135 million residential estate in the State of Colorado known as "Hala Ranch" which was considered, at the time it was listed for sale in June 2006, to be the most expensive residence in the U.S. *See* Affidavit of Mark K. Blasy in Support of Plaintiff's Memorandum of Law in Support of Motion for Leave to Serve Process by Alternative Means ("Blasy Aff."), ¶13. Plaintiff alleges Hala Ranch was acquired with bribe money illegally paid to Bandar which rightly belongs to BAE. *Id.*, ¶14. Bandar also owns an estate in Glympton Park (Estate House), West Oxfordshire in the U.K. *Id.*, ¶3.

Despite the best efforts of plaintiff and its attorneys, plaintiff has not yet been able to serve the Summons and Complaint in this action on the defendant Bandar, who has proven to be elusive. *Id.*, ¶2. Plaintiff therefore now moves the Court for leave to serve defendant Bandar by one or a combination of the following methods:

(a)     Through service by certified mail upon the attorneys representing Bandar in unrelated litigation pending in the Southern District of New York arising out of the 9/11 terrorist attacks;

(b)     through service by certified mail upon Bandar's Colorado attorney designated on the title to his Colorado residential estate, which is alleged in this action to have been purchased with bribe money illegally paid by and belonging to BAE, and who is representing Bandar in the sale of that residence; and

(c)     by certified mail to defendant Bandar at his known residences in the U.S. and the U.K.

## II.     STATEMENT OF FACTS

Plaintiff and its attorneys have used their best efforts to serve process on defendant Bandar. However, despite having served as the Saudi ambassador to the U.S. from 1983-2005, owning several U.S. residences, including one of the most valuable U.S. residential estates, and Bandar's frequent visits to the U.S., Bandar has proven elusive for the purposes of service in this action. Blasy Aff., ¶2.

As an initial matter, plaintiff and its attorneys fully explored the possibility of personally serving Bandar in Saudi Arabia, but for a number of reasons, this option appears futile.  Saudi Arabia, where Bandar is a citizen, is not a party to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, so plaintiff is unable to avail itself of the procedures provided by that treaty.  *See* U.S. Department of State Circular on Service of Legal Documents Abroad, available at http://www. travel.state.gov/law/info/judicial/ judicial_680.html (listing countries that are parties to the Hague Convention); *Tinicum Props. Assocs. Ltd. P'ship v. Garnett*, No. 92-0860, 1992 WL 99590, at *1 (E.D. Pa. Apr. 29, 1992) (noting that Saudi Arabia is not a party to the Hague Convention).

Plaintiff and its attorneys have also determined that it would be extremely difficult to identify an individual who would be willing to attempt to serve process on Bandar in Saudi Arabia.  Blasy Aff., ¶¶5-9.  In another action in this District arising out of the 9/11 litigation, *Burnett v. Al Baraka Inv. and Dev. Corp.*, No. 1-02-01616-JR, Complaint  (D.D.C. dated, Aug. 15, 2002), where the plaintiffs also moved to serve a Saudi national in Saudi Arabia by alternative means, the plaintiffs submitted an affidavit to the court from Nelson Tucker ("Tucker") the President of Process Service Network, an international service of process firm.  In that affidavit, Tucker underscored that it is extremely difficult to find a reliable process server in Saudi Arabia, particularly given the ongoing tensions in the Middle East region.  *See* Blasy Aff., ¶7; *see also Ehrenfeld v. Mahfouz*, No. 04-cv-

9641 (RCC), Memorandum and Order (S.D.N.Y. Mar. 23, 2005) (Blasy Aff., Ex. K) (granting plaintiffs' request for permission to conduct service by alternative means on a Saudi citizen citing the Tucker Affidavit).

Even if plaintiff were to identify a person willing to attempt service on Bandar, which its process server advises will be "'difficult if not impossible,'" (Blasy Aff., ¶7), it is highly unlikely that such a person would succeed in this endeavor. Bandar, a member of the Saudi Royal Family and head of the Company's Security Council, no doubt protects himself with well-trained security personnel who would preclude a process server from being in his physical presence. *See* Blasy Aff., ¶4. And if a process server did try to penetrate Bandar's security apparatus, he or she could potentially suffer grievous harm. *Id*., ¶7. Tucker reported in his affidavit that a Saudi process server was apparently murdered in his attempt to serve some of the *Burnett* defendants. Blasy Aff., Ex. E at 2.

Finally, personal service on Bandar is also difficult because, despite their best efforts, plaintiff and its attorneys have not been able to obtain Bandar's home address in Saudi Arabia, but understand Bandar is presently in Saudi Arabia and not at his U.S. or U.K. residences. Blasy Aff., ¶2. Attempts to serve Bandar outside Saudi Arabia have failed. *Id*.

## III. SERVICE OF PROCESS BY ALTERNATIVE MEANS IS NECESSARY AND PROPER IN THIS CASE.

### A. Service of Process by Alternative Means Is Not Extraordinary Relief and Can Take a Variety of Forms

Service of process on individuals in a foreign country is governed by Rule 4(f) of the Federal Rules of Civil Procedure. Subsection 3 of this Rule provides that service upon individuals not within any judicial district of the United States may be effected by means as directed by the Court, provided such means are not prohibited by international agreement.

The case law interpreting Rule 4(f)(3) establishes that service by alternative means is neither a "'last resort' nor extraordinary relief.'" *Rio Props. v. Rio Int'l. Interlink*, 284 F.3d 1007, 1015 (9th

Cir. 2002) (quoting *Forum Fin. Group, LLC v. President & Fellows*, 199 F.R.D. 22, 23 (D. Me. 2001).) A party "need not exhaust all possible methods of service," but it must show that it has "reasonably attempted to effectuate service on the defendant(s) and that the circumstances are such that the district court's intervention is necessary to obviate the need to undertake methods of service that are unduly burdensome or that are untried but likely futile." *Ryan v. Brunswick Corp.*, No. 02-CV-0133E, 2002 WL 1628933, at *2 (W.D.N.Y. May 31, 2002).

Any method of service approved under Rule 4(f)(3) must be "'reasonably calculated, under all the circumstances, to apprize interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Ryan*, 2002 WL 1628933, at *2, (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950)). "[D]ue process [only] requires that the method of service employed be reasonably calculated to give actual notice and afford an adequate opportunity to be heard." *Avianca, Inc. v. Corriea*, 705 F. Supp. 666 (D.D.C. 1989), (citing *Mullane*, 399 U.S. at 314). The courts have approved a variety of methods under these standards. *Rio Props.*, 284 F.3d at 1016 ("trial courts have authorized a wide variety of alternative methods of service including publication, ordinary mail, mail to the defendant's last known address, delivery to the defendant's attorney, telex, and most recently, e-mail").

Service of process on a defendant's attorney – even when the attorney has stated that he or she is not authorized to receive service – has been approved when the defendant is elusive. *E.g., Forum Fin. Group, LLC,* 199 F.R.D. at 24-25; *see also Rio Props.*, 284 F.3d at 1017; Blasy Aff., Ex. M at 3. And, where it is alleged that "tortious acts and omissions occurred within the District, resulting in injuries in the District," the D.C. Code specifically permits a court to exercise personal jurisdiction over a "foreign party successfully avoiding service of process by conventional methods" through service by alternative means to effectuate the Court's jurisdiction in the District of Columbia. *Avianca*, 705 F. Supp. at 685.

**B.    Service by Alternative Means Should Be Authorized in This Case.**

Under the standards set forth in the cases cited above, service by one or a combination of the methods proposed by plaintiff is necessary and proper. Plaintiff and its attorneys have made reasonable efforts to attempt to effect service on defendant Bandar without seeking this Court's authorization for service by alternative means, and any additional attempts by plaintiff to serve process without this Court's intervention would likely be futile, and possibly dangerous. Thus, this Court's intervention is necessary to establish the appropriate means for service of process.

The alternative methods suggested by plaintiff are reasonably calculated to give defendant Bandar notice of plaintiff's action and are appropriate given the facts at hand. Bandar holds title to very valuable U.S. property allegedly acquired with bribe money in the U.S., recovery of which is sought by this action. Blasy Aff., ¶13. Bandar also has counsel in this District he retained in connection with the litigation arising out of the September 11, 2001 attacks on the Twin Towers and the U.S. Pentagon (the "9/11 Litigation") where Bandar was named as a defendant. *See* Blasy Aff., ¶¶10-12. Permitting plaintiff to effect service of process by alternative means on any of Bandar's U.S. lawyers does not prejudice Bandar who can still contest this Court's personal jurisdiction should he chose to do so.

Service on Bandar's Colorado counsel or in the 9/11 Litigation would be proper. Bandar is highly likely to be in contact with these attorneys, as he is likely monitoring the litigation in the 9/11 Litigation and holding and selling valuable Colorado real estate with the assistance of large and prestigious law firms in the United States. Blasy Aff., ¶¶10-13. Plaintiff's counsel has sent the Complaint and Summons to these lawyers, seeking Bandar's waiver of service. *Id.*, ¶15. Accordingly, it cannot be questioned that Bandar would receive adequate notice of the present action if the Summons and Complaint were served on either of these attorneys.

Finally, although plaintiff has no knowledge of whether Bandar regularly receives mail at his residences in Colorado and in the U.K., it would seem to be worth attempting to serve him with process there in order to exhaust all possible avenues.

## IV. CONCLUSION

The Court should exercise its discretion to permit alternative means of serving process. Accordingly, and for the foregoing reasons and those set forth in the accompanying Affidavit of Mary Blasy, plaintiff requests that this Court grant it leave to serve defendant Bandar by whatever combination of the proposed alternative means the Court deems appropriate.

DATED: November 14, 2007

Respectfully submitted,

COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN
MARK SOLOMON
MARY K. BLASY

s/ MARY K. BLASY
MARY K. BLASY

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

CUNEO GILBERT & LaDUCA, L.L.P.
JONATHAN W. CUNEO(DC Bar # 939389)
WILLIAM H. ANDERSON (DC Bar # 502380)
507 C Street, N.E.
Washington, DC  20002
Telephone:  202/789-3960
202/789-1813 (fax)

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

LAW OFFICES OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)
1100 Connecticut Ave., NW, Suite 730
Washington, DC  20036
Telephone:  202/822-0600
202/822-6722 (fax)

Local Counsel

S:\CasesSD\BAE Derivative\BRF00046143.doc

CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 14, 2007.

s/ MARY K. BLASY
MARY K. BLASY

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: MaryB@csgrr.com

# Mailing Information for a Case 1:07-cv-01646-RMC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roger M. Adelman**
  radelman@erols.com,maryb@csgrr.com,scotts@csgrr.com,lisamp@csgrr.com,tlatimer@csgrr.com
- **Mary K. Blasy**
  maryb@csgrr.com
- **Lawrence Byrne**
  larry.byrne@linklaters.com
- **Patrick J. Coughlin**
  patc@csgrr.com
- **Christopher Talbott Lutz**
  clutz@steptoe.com
- **Mark Solomon**
  marks@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

BAE DERIVATIVE
Service List - 11/13/2007 (07-0195)
Page 1 of 2

William R. Jordan III
Aspcol Corporation, N.V.
418 E. Cooper Avenue, Suite 202
Aspen, CO 81611
907/925-1214

Nancy H. Dutton
Dutton & Dutton PC
5017 Tiden Street, N.W.
Washington, DC 20016
202/686-3500
202/966-6621 (Fax)

Lawrence Byrne
Michael Osnato
Linklaters LLP
1345 Avenue of the Americas
New York, NY 10105
212/903-9000
212/903-9100 (Fax)

Richard L. Brusca
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
202/371-7000
202/393-5760 (Fax)

Christopher T. Lutz
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036-1795
202/429-3000
202/429-3902 (Fax)

Eric M. Roth
Adir G. Waldman
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
212/403-1000
212/403-2000 (Fax)

**Counsel For Plaintiff(s)**

Patrick J. Coughlin
Mark Solomon
Mary K. Blasy
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
619/231-1058
619/231-7423 (Fax)

Jonathan W. Cuneo
William H. Anderson
Cuneo Gilbert & LaDuca, L.L.P.
507 C Street, N.E.
Washington, DC 20002
202/789-3960
202/789-1813 (Fax)

BAE DERIVATIVE

Service List - 11/13/2007  (07-0195)

Page 2 of 2

Roger M. Adelman
Law Offices of Roger M. Adelman
1100 Connecticut Ave., N.W., Suite 730
Washington, DC  20036
   202/822-0600
   202/822-6722 (Fax)

Michael J. VanOverbeke
Thomas C. Michaud
VanOverbeke Michaud & Timmony, P.C.
79 Alfred Street
Detroit, MI  48201
   313/578-1200
   313/578-1201 (Fax)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITY OF HARPER WOODS EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of BAE SYSTEMS PLC,<br><br>Plaintiff,<br><br>vs.<br><br>RICHARD (DICK) L. OLVER, et al.,<br><br>Defendants,<br><br>– and –<br><br>BAE SYSTEMS PLC, an England and Wales corporation,<br><br>Nominal Defendant. | Civil No. 1:07-cv-01646<br><br>Assigned to: Judge Rosemary M. Collyer |

AFFIDAVIT OF MARY K. BLASY IN SUPPORT OF PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO SERVE PROCESS BY ALTERNATIVE MEANS

I, MARY K. BLASY, declare as follows:

1.      I am counsel for plaintiff in this action and am fully familiar with the matters set forth in this affidavit.  I have been admitted *pro hac vice* in this action.  I make this affidavit in support of plaintiff's motion pursuant to Fed. R. Civ. P. 4(f)(3) for leave to serve the summons and complaint in this action (*see* Ex. A hereto) on defendant Prince Bandar Bin Sultan ("Bandar"), a Saudi Arabian national, by one or a combination of the following alternative means:

        (a)      Through service by certified mail upon the attorneys representing Bandar in unrelated litigation pending in the Southern District of New York arising out of the 9/11 terrorist attacks;

        (b)      through service by certified mail upon Bandar's Colorado attorney designated on the title to his Colorado residential estate, which is alleged in this action to have been purchased with bribe money paid by and belonging to BAE Systems, and who is personally assisting Bandar with the sale of that estate; and

        (c)      by certified mail to defendant Bandar at his known residences in the U.S. and the U.K.

2.      Specifically, I make this affidavit to provide the Court with information concerning the various potential alternative means of providing defendant Bandar with legal notice of this action, so that the Court can order how service is to be effected.  Service has either been effected on all other defendants, or their counsel have contacted counsel for plaintiffs and acceptance of service is being negotiated.  I understand, through investigation and attempts at service, that Bandar is presently  in Saudi Arabia.  Bandar owns several U.S. residences and travels here often; but, his travel plans are not typically disclosed until after the fact.  Bandar was in the U.K. in late October, but my process server was advised he had already returned to Saudi Arabia when service was attempted.

3.      Defendant Bandar is a wealthy Saudi Arabian diplomat whom we have found to be difficult to personally serve with process by traditional means in this action.  Defendant Bandar carefully controls the publicly available information about himself, limiting the means by which he can be directly contacted.  His actual address in Saudi Arabia remains unknown to plaintiff, though counsel for plaintiff is informed Bandar is presently in Saudi Arabia and not the United States or at his United Kingdom estate in Glympton Park (Estate House), West Oxfordshire.  He engages attorneys and other professionals to act on his behalf in the conduct of his affairs.  For instance, Bandar holds title to his $135 million Hala Ranch property in the State of Colorado in the name of a Netherlands Antilles corporation that lists Bandar's Colorado lawyer, William R. Jordan III, as it's administrator (*see* Ex. B hereto).

4.      Moreover, traditional means of serving defendant Bandar with process in this action would be an expensive and dangerous exercise in futility.  Bandar's biography obtained from the Saudi Embassy website indicates he is a well protected member of the Saudi Royal family (*see* Ex. C hereto).  Bandar is also the Secretary-General of the Saudi National Security Council. *Id.*  If Bandar does not want to accept service of process in this action, his security forces will prevent service of process.

**FUTILITY OF ATTEMPTING PERSONAL SERVICE IN SAUDI ARABIA**

5.      Attempts at personal service on defendant Bandar in Saudi Arabia, even if we had an address at which service could be made, which we have been unable to obtain, would prove extremely difficult and dangerous, if not utterly futile.

6.      First, since Saudi Arabia does not subscribe to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or commercial Matters, such service would not be sanctioned by that convention.  *See* U.S. Department of State Circular on Service of Legal Documents Abroad, *available at* http://www. travel.state.gov/law/info/judicial/judicial_680.html

(listing countries that are parties to the Hague Convention); *Tinicum Props. Assocs. Ltd. P'ship v. Garnett*, No. 92-0860, 1992 WL 99590, at *1 (E.D. Pa. Apr. 29, 1992) (noting that Saudi Arabia is not a party to the Hague Convention). Accordingly, unless expressly ordered by this Court, such service would be of no effect.

7.     Second, cultural hostility and fear of retaliation would very likely make it impossible to find anyone in Saudi Arabia willing or able to execute service of process. Indeed, my process servers in this action, APS International, Ltd., "highly recommend[s]" I not attempt service on Bandar in Saudi Arabia, stating it is "extremely dangerous" and will be "difficult (if not impossible)" due to Bandar's "level of influence in Saudi Arabia." In fact, there is documented concern that attempted personal service in Saudi Arabia could pose a risk of physical harm to the process server. *See* Affidavit of Nelson Tucker dated March 14, 2003 the original of which was filed with the court in connection with the *Burnett v. Al Barnka Investment* matter and a copy of which is annexed as Ex. D.

8.     Third, travel to, or hostile service on behalf of plaintiff in, Saudi Arabia presents unreasonable risks. According to information obtained from the website of the U.S. State Department (Ex. E hereto at 6-7), Saudi Arabia's relations with the United States have been "strained" following the September 11, 2001, terrorist attacks in which 15 of the suicide bombers were Saudi citizens. The State Department's website documents this characterization with the following reported recent events:

(a)     On May 12, 2003 suicide bombers killed 35 people, including nine Americans, in attacks at three housing compounds for Westerners in Riyadh;

(b)     On November 8, 2003 terrorists attacked another compound housing foreign workers from mainly Arab countries. At least 18 people, including 5 children died in this attack, and more than 100 were injured;

(c) On May 1, 2004 terrorists killed two Americans in the Yanbu oil facility in the western part of Saudi Arabia;

(d) On May 29, 2004 terrorists killed one American and wounded several others in attacks on an official building and housing compound in al-Khobar in the Eastern Province;

(e) On June 6, 2004 terrorists shot and killed a BBC journalist;

(f) On June 9 and June 12, 2004 terrorists killed Americans Robert Jacobs and Kenneth Scroggs;

(g) On June 18, 2004 terrorists kidnapped and beheaded American Paul Johnson;

(h) On December 6, 2004 terrorists attacked the U.S. Consulate in Jeddah, killing five consulate employees. Terrorists also targeted and killed other foreign nationalities during this time; and

(i) In February 2007, four French nationals were killed in western Saudi Arabia in a suspected terrorist attack.

9. The United States Department of State, Bureau of Consular Affairs' "Travel Warning" issued June 14, 2007 (*see* Ex. F hereto), further dictates:

> ***Due to concerns about the possibility of additional terrorist activity directed against American citizens and interests, the Department of State continues to warn U.S. citizens to defer non-essential travel to Saudi Arabia.*** The United States Mission in Saudi Arabia remains an unaccompanied post as a result of continued security concerns. Non-emergency employees and all dependents of the U.S. Embassy Riyadh and Consulates General Jeddah and Dhahran were ordered to leave the country on April 15, 2004. An armed attack on the U.S. Consulate General in Jeddah occurred on December 6, 2004, resulting in casualties among the non-American staff and damage to consulate facilities. On November 13, 2005, the Consulate General in Jeddah closed the visa section for security reasons that require the assistance of the Government of Saudi Arabia to resolve. On May 12, 2006 a lone gunman fired shots at the U.S. Consulate in Jeddah. There were no injuries. The consular section remains open for American citizen services.
>
> ***Terrorist groups continue to target housing compounds and other establishments where Westerners may be located.*** Saudi Government facilities are also targets. ***In addition to car bombs and armed assaults involving multiple gunmen against such facilities, terrorists have used ambush attacks to kidnap***

> ***and/or assassinate individual Westerners.*** In February 2007, four French residents of Saudi Arabia returning from Madain Saleh were killed in a shooting incident while resting on the side of the Tabruk-Medina highway, approximately 17 km north of Medina. In February 2006, there was a terrorist attack on Saudi oil facilities in Abqaiq in the Eastern Province. There were no U.S. citizens or Westerners injured in this attack.
>
> ***American citizens who choose to visit or remain in Saudi Arabia despite this Travel Warning are strongly urged to avoid staying in hotels or housing compounds that do not apply stringent security measures including, but not limited to, the presence of an armed guard force, inspection of all vehicles, and a hardened security perimeter to prevent unauthorized vehicles from approaching the facility.*** American citizens are further advised to exercise caution and maintain good situational awareness when visiting commercial establishments frequented by Westerners or in primarily Western environments. Keep a low profile, varying times and routes for all required travel, and ensure that travel documents and visas are valid. American citizens are also advised to exercise caution while driving, entering or exiting vehicles.

## DEFENDANT BANDAR'S U.S. ATTORNEYS

### Bandar's Counsel in Pending 9/11 Litigation in the Southern District of New York

10. Following the September 11, 2001 terrorist attacks on the Twin Towers and the U.S. Pentagon, a civil action was filed on September 10, 2003 in the Southern District of New York alleging a conspiracy among certain individuals, corporations, and foreign nations said to have provided financial support for the al-Qaeda terrorist attackers. Bandar and other members of the Royal Saudi family were named as defendants. Several dozen insurance providers filed these actions asserting a variety of tortious acts and omissions by the defendants as individuals and as part of a conspiracy. Similar actions filed in other districts were transferred to the Southern District of New York for coordinated pretrial proceedings in *In Re: Terrorist Attacks on September 11, 2001,* No. 03-md-01570 (S.D.N.Y.) (the "9/11 Litigation"). Bandar is represented in the 9/11 Litigation action by Nancy H. Dutton and Mark Charles Hansen of Dutton and Dutton PC ("Dutton"), a law firm located in the District of Columbia. Dutton entered a *pro hac* appearance for Bandar on March 14, 2003. (*see* Ex. G hereto.)

11.     On May 24, 2004, Bandar, along with the Royal Embassy of Saudi Arabia, Princess Haifa Al-Faisal (his wife), Ahmed A. Kattan (Deputy Chief of Mission of the Royal Embassy of Saudi Arabia), and Abdul Rahman I. Al-Noah (Counselor at the Embassy of Saudi Arabia) made a limited appearance under Federal Rule of Civil Procedure 12(b)(2).  Plaintiffs voluntarily dismissed their claims against Bandar without prejudice (*see* Ex. H hereto) following his filing of a motion to dismiss based on diplomatic immunity in light of his then-status as the Saudi ambassador to the United States.

12.     Despite having been voluntarily dismissed as a defendant in the 9/11 Litigation, ***the dismissal was without prejudice***.  As such, Bandar's counsel should continue to receive electronic service of all filings in the 9/11 Litigation which is still ongoing.  Because Bandar's dismissal was without prejudice, he is subject to being renamed as a party in that action.

**Bandar's Colorado Real Estate Counsel**

13.     On January 23, 1989 Bandar purchased a residential estate in Aspen Colorado described as Sub: Starwood Ranch Split Lot: 2 (Assessors' Parcel No. 264326203002).  The home he built there in 1991 is colloquially known as "Hala Ranch" and, when it was listed for sale for $135 million in June 2006, was the most expensive residential estate in the United States.  Title to Hala Ranch is held in the name of a Netherlands Antilles corporation, ASPCOL Corporation N V, in care of William R. Jordan III ("Jordan") of 418 East Cooper Avenue, #202, Aspen Colorado, Bandar's Colorado real estate counsel.  *See* Ex. B.  A copy of a July 13, 2006 *Aspen Times* article quoting Jordan confirming Bandar still owns and visits Hala Ranch is attached as Ex. I.  Bandar listed the Colorado residence for sale in June 2006 and a copy of the sales flyer is attached as Ex. J.  The residential estate remains listed for sale through Joshua & Company, an affiliate of Great Estates, the real estate arm of Christie's auction house.

14. As alleged in ¶¶9 and 116 in the Shareholder Derivative Complaint for Breach of Fiduciary Duties and Corporate Waste ("Complaint") filed herein on September 19, 2007, the bribe monies illegally paid by BAE Systems to "Bandar were received by him here in the U.S. in Washington, D.C." and "[s]ignificant amounts [were] spent by Bandar here in the U.S., including over $100 million to build one of the largest and most lavish personal residences in the U.S., located in Aspen, Colorado." The Complaint seeks equitable relief to recover the damage suffered by BAE Systems as a result of this illegal bribe scheme, including an order "Directing all defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct . . . and imposing a constructive trust thereon." *Id*. at ¶158(B).

15. Plaintiff sent a copy of the Complaint and summons filed in this matter to both of Bandar's U.S. attorneys, along with a waiver of service. (*See* Exs. K and L). Neither counsel has responded. While to the best of my knowledge, none of Bandar's U.S. attorneys are authorized to accept service of process for him in this action, it could reasonably be assumed that these attorneys are in regular contact with Bandar and would see that he receives notice of this action (in the unlikely event they have not already done so) and notice of this Court's Order granting leave for alternative service. Accordingly, a direction from the Court that alternative service be made on these

attorneys would certainly give Bandar adequate notice of this action. A similar request was granted in *Ehrenfeld v. Mahfouz*, No. 04-cv-9641 (RCC), Memorandum and Order (S.D.N.Y. Mar. 23, 2005) (Ex. M).

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of November , 2007, at San Diego, California.

s/ MARY K. BLASY

MARY K. BLASY

S:\CasesSD\BAE Derivative\AFF00046153.doc

CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 14, 2007.

s/ MARY K. BLASY

MARY K. BLASY

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: MaryB@csgrr.com

# Mailing Information for a Case 1:07-cv-01646-RMC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roger M. Adelman**
  radelman@erols.com,maryb@csgrr.com,scotts@csgrr.com,lisamp@csgrr.com,tlatimer@csgrr.com
- **Mary K. Blasy**
  maryb@csgrr.com
- **Lawrence Byrne**
  larry.byrne@linklaters.com
- **Patrick J. Coughlin**
  patc@csgrr.com
- **Christopher Talbott Lutz**
  clutz@steptoe.com
- **Mark Solomon**
  marks@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

BAE DERIVATIVE
Service List - 11/13/2007 (07-0195)
Page 1 of 2

William R. Jordan III
Aspcol Corporation, N.V.
418 E. Cooper Avenue, Suite 202
Aspen, CO 81611
907/925-1214

Nancy H. Dutton
Dutton & Dutton PC
5017 Tiden Street, N.W.
Washington, DC 20016
202/686-3500
202/966-6621 (Fax)

Lawrence Byrne
Michael Osnato
Linklaters LLP
1345 Avenue of the Americas
New York, NY 10105
212/903-9000
212/903-9100 (Fax)

Richard L. Brusca
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
202/371-7000
202/393-5760 (Fax)

Christopher T. Lutz
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036-1795
202/429-3000
202/429-3902 (Fax)

Eric M. Roth
Adir G. Waldman
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
212/403-1000
212/403-2000 (Fax)

**Counsel For Plaintiff(s)**

Patrick J. Coughlin
Mark Solomon
Mary K. Blasy
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
619/231-1058
619/231-7423 (Fax)

Jonathan W. Cuneo
William H. Anderson
Cuneo Gilbert & LaDuca, L.L.P.
507 C Street, N.E.
Washington, DC 20002
202/789-3960
202/789-1813 (Fax)

BAE DERIVATIVE

Service List - 11/13/2007  (07-0195)

Page 2 of 2

Roger M. Adelman
Law Offices of Roger M. Adelman
1100 Connecticut Ave., N.W., Suite 730
Washington, DC  20036
  202/822-0600
  202/822-6722 (Fax)

Michael J. VanOverbeke
Thomas C. Michaud
VanOverbeke Michaud & Timmony, P.C.
79 Alfred Street
Detroit, MI  48201
  313/578-1200
  313/578-1201 (Fax)

# EXHIBIT A

AO 440 (Rev. DC - September 2003) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
## District of Columbia

CITY OF HARPER WOODS EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of BAE SYSTEMS PLC,

**SUMMONS IN A CIVIL CASE**

V.

RICHARD (DICK) L. OLVER, MICHAEL J. TURNER, WALTER P. HAVENSTEIN,

[redacted]

Case: 1:07-cv-01646
Assigned To : Collyer, Rosemary M.
Assign. Date : 9/19/2007
Description: Contract

TO: (Name and address of Defendant)

PRINCE BANDAR BIN SULTAN
Glympton Park
Glympton
West Oxfordshire
U.K. OX2O 1AU

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

LAW OFFICES OF ROGER M. ADELMAN
ROGER M. ADELMAN
1100 Connecticut Ave., NW, Suite 730
Washington, DC 20036
Telephone: 202/822-0600
202/822-6722 (fax)

an answer to the complaint which is served on you with this summons, within 20 days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

NANCY MAYER-WHITTINGTON
CLERK

SEP 19 2007
DATE

Maureen Higgins
(By) DEPUTY CLERK

AO 440 (Rev. DC - September 2003) Summons in a Civil Action

## RETURN OF SERVICE

| Service of the Summons and complaint was made by me[1] | DATE |
|---|---|
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: __________

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left: __________

☐ Returned unexecuted: __________

☐ Other (specify): __________

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on __________ Date

__________ *Signature of Server*

__________ *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Nancy M. Mayer-Whittington
Clerk

## NOTICE OF RIGHT TO CONSENT TO TRIAL BEFORE UNITED STATES MAGISTRATE JUDGE

The substantial criminal caseload in this Court and the requirements of the criminal Speedy Trial Act frequently result in a delay in the trial of civil cases. Aware of the hardship and expense to the parties, counsel, and witnesses caused by the delays which are beyond the control of the Court, this notice is to advise you of your right to a trial of your case by a United States Magistrate Judge. By statute, 28 U.S.C. § 636(c), Fed.R.Civ.P.73 and Local Rule 502, the parties, by consent, can try their case by means of a jury trial or bench trial before a United States Magistrate Judge. Appeals from judgments and final orders are taken directly to the United States Court of Appeals for the District of Columbia Circuit, in the same manner as an appeal from a judgment of a District Judge in a civil case.

### WHAT IS THE PROCEDURE?

One of the matters you are required to discuss at the meet-and-confer conference mandated by Local Rule 206 is whether the case should be assigned to a United States Magistrate Judge for all purposes, including trial.

All parties must consent before the case is assigned to a Magistrate Judge for trial. You may consent at any time prior to trial. If you expressly decline to consent or simply fail to consent early in the case, you are not foreclosed from consenting later in the case. However, a prompt election to proceed before a Magistrate Judge is encouraged because it will facilitate a more orderly scheduling of the case.

Attached is a copy of the "Consent to Proceed Before a United States Magistrate Judge for All Purposes" form. Your response should be made to the Clerk of the United States District Court only.

### WHAT IS THE ADVANTAGE?

The case will be resolved sooner and less expensively. The earlier the parties consent to assigning the case to a Magistrate Judge the earlier a firm and certain trial date can be established, even if the case is to be tried to a jury.

Upon the filing of the consent form and with the approval of the District Judge, the case will be assigned for all purposes to a Magistrate Judge.

CO-942A
Rev 3/95
Rev 7/99

Rev. 4/06

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

# INITIAL ELECTRONIC CASE FILING ORDER

Subsequent filings in this case must be made electronically using the Court's Electronic Case Filing System (ECF) pursuant to Local Rule 5.4.

ORDERED that counsel shall:

- Submit in paper, the original and copy of the complaint/notice of removal/petitions for habeas corpus and any accompanying papers **(not including summons and civil cover sheets)**. Additionally, litigants are hereby required to provide those filings in PDF Format on a floppy disk or CD-Rom compact disk. The disk should be clearly labeled with the case number (if known) and the name of the parties. If unable to deliver the filing on a disk at the time of the new case filing, counsel should e-mail the initiating document and accompanying papers to dcd_cmecf@dcd.uscourts.gov by the close of business the day the new case was filed. Failure to supply electronic copies of the new case in a timely manner, will result in the attorney's name being added to the attorney non-compliant list and shared with the Court's ECF Judge's Committee. **Regardless of what option counsel chooses, the complaint/notice** of removal and accompanying papers must come to the Court as PDF documents. Each exhibit to the new case shall be in a separate PDF file. Failure to submit PDF versions of the complaint/notice of removal and other documents will delay the opening of the case in ECF.

- Register, if not previously registered, to become an electronic filer by completing and returning the enclosed ECF Registration Form found on the Court's Website at (www.dcd.uscourts.gov). The login and password are case specific and can be used for all cases.

- **Make all subsequent filings electronically. This is mandatory.**

- Have a PACER (Public Access to Court Electronic Records) account, in order to view dockets and documents. Call 1-800-676-6856 or visit www.pacer.psc.uscourts.gov for additional information.

- Schedule a training class at the Courthouse by going to the Court's ECF Internet Website (www.dcd.uscourts.gov/ecf.html). Also, filing instructions and an interactive tutorial can be found at this Internet Website.

COLLYER, J. RMC

UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

## ELECTRONIC CASE FILES
## Attorney/Participant Registration Form

LIVE SYSTEM

This form shall be used to register for an account on the Court's Electronic Case Files (ECF) system and to subscribe to the ECF EMail (Listserver) notification service. Registered attorneys and other participants will have privileges both to electronically submit documents, and to view and retrieve electronic docket sheets and documents for all cases assigned to the Electronic Case Files system. Listserver subscribers receive email messages whenever the Court wishes to electronically notify ECF registrants of pertinent ECF information.

The following information is required for registration:

If you are appointed pro bono or pro hac vice, please provide the case number: ________________

First Name/Middle Initial/Last Name ________________ ____ ________________

Last four digits of Social Security Number ____________

DC Bar ID#: ________________

Firm Name ________________________________________

Firm Address ________________________________________

________________________________________

________________________________________

Voice Phone Number ________________

FAX Phone Number ________________

Internet E-Mail Address ________________________________________

By submitting this registration form, the undersigned agrees to abide by the following rules:

1. This system is for use only in cases permitted by the ***U.S. District Court for the District of Columbia.*** It may be used to file and view electronic documents, docket sheets, and notices. Please visit the Court's ECF Internet, www.dcd.uscourts.gov, website to schedule training.

2. Pursuant to Federal Rule of Civil Procedure 11, every pleading, motion, and other paper (except list, schedules, statements or amendments thereto) shall be signed by at least one attorney of record or, if the party is not represented by an attorney, all papers shall be signed by the party. An attorney's/participant's password issued by the court combined with the user's identification, serves as and constitutes the attorney's/participant's signature. Therefore, an attorney/participant must protect and secure the password issued by the court.

If there is any reason to suspect the password has been compromised in any way, it is the duty and responsibility of the attorney/participant to immediately notify the court. This should include the resignation or reassignment of the person with authority to use the password. The Court will immediately delete that password from the electronic filing system and issue a new password.

3. An attorney's/participant's registration will not waive conventional service of a summons and complaint, subpoena, or other judicial process; submit the client to the jurisdiction of the Court; or operate as a consent to accept service of pleadings, documents, and orders in actions in which such attorney/participant has not entered an appearance. An attorney's/participant's registration will constitute a waiver in law only of conventional service of other non-process pleadings, documents, and orders in the case. The attorney/participant agrees to accept, on behalf of the client, service of notice of the electronic filing by hand, facsimile or authorized e-mail.

4. Upon receipt of your login and password, you are strongly encouraged to change your password, which may be done through the Utilities function, to a name easily recalled. **You may be subjected to a fee, should the Clerk's Office have to create a new password for you, or alternatively, you may be required to appear in person to receive your new password.**

5. Attorneys who are active members of the bar of this Court, or government attorneys who are employed or retained by the United States, or who have been permitted to proceed *pro hac vice*, must file pleadings electronically.

Please return this form to:

U.S. District Court for the District of Columbia
Attn: Attorney Admissions
333 Constitution Avenue NW, Room 1825
Washington, DC 20001

Or FAX to:

Peggy Trainum
U.S. District Court for the District of Columbia
(202) 354-3023

Applicant's Signature ______________________________

______________________ ____ ________

Full Last Name | Initial of First Name | Last 4 Digits SS#

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

CITY OF HARPER WOODS EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of BAE SYSTEMS PLC,
19617 Harper Avenue
Harper Woods, MI 48225

Plaintiff,

vs.

RICHARD (DICK) L. OLVER
Bay Lodge
Mill Lane
Dan Bury
Chelmsford U.K. CMC 4HX,

and

MICHAEL J. TURNER
79 Fairmile Lane
Cobham, Kent
U.K. KT 112 DG,

and

WALTER P. HAVENSTEIN
90 Colonel Daniels Drive
Bedford, NH 03110,

and

[Caption continued on following page.]

Case No.

Case: 1:07-cv-01646
Assigned To : Collyer, Rosemary M.
Assign. Date : 9/19/2007
Description: Contract

DEMAND FOR JURY TRIAL

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR INTENTIONAL, RECKLESS OR NEGLIGENT BREACH OF FIDUCIARY DUTY, CORPORATE WASTE AND *ULTRA VIRES* CONDUCT

IAN G. KING
22 The Ridgeway
Fareham
Hampshire U.K. PO 168RE,

and

GEORGE W. ROSE
Craven Fold
Moorside Lane
Wiswell, Clitherow
U.K. BB7 9DB,

and

CHRISTOPHER V. GEOGHEGAN
Garden Close
Maidenhead
Kent U.K. SL6 4PA,

and

PHILLIP J. CARROLL
2121 Kriby Drive, Unit 34S
Houston, TX 77019,

and

MICHAEL J. HARTNALL
Monkswood Priors Hatch Lane
Hurtmore
Godalming U.K. GU7 2RJ,

and

SIR PETER JAMES MASON
45 Graham Terrace
City of Westminster
London U.K. SW1 W8HN,

and

ROBERTO QUARTA
100 Eaton Place, #3A
London U.K. SW1 X8LU,

[Caption continued on following page.]

and

SIR ANTHONY NIGEL RUSSELL RUDD
Shirley House
Shirley Common
Park Lane
Ashbourne
London U.K. DE6 3AZ,

and

PETER A. WEINBERG
14 Perkins Road
Greenwich, CT 06830,

and

ANDREW GEORGE INGLIS
63 Nelson Road
London U.K. E4 9AP,

and

ULRICH CARTELLIERI
26 Gledhow Gardens
Kensington and Chelsea
London U.K. SW5 OA2,

and

SUE BIRLEY
Aspen Lodge
Boreham Street
Hailsham, Sussex BN27 4SH,

and

MICHAEL LESTER
49 Sheldon Avenue
Haringey Highgate
London U.K. 464JR,

and

[Caption continued on following page.]

MARK H. RONALD
7110 44th Street
Chevy Chase, MD 20815,

and

MICHAEL DENZIL XAVIER PORTILLO
25 Victoria Square
London U.K. SW1 WORB,

and

SIR RICHARD HARRY EVANS
Hall Cross Manor
Kirkham Road
Freckleton
Preston PR4 1HU,

and

LORD ALEXANDER HESKETH
15 Cranley Place
Kensington, Chelsea
London U.K. 5W7 3AE,

and

JOHN PIX WESTON
The Starlings
Oxshott
Leatherhead Surrey
U.K. KT220 QN,

and

KEITH CLARK BROWN
Lyndsay's Farm
Fryerning House, Beggar Hill
Fryerning, Ingatestone
Essex U.K. CM4 0PF,

and

[Caption continued on following page.]

STEVE LEWIS MOGFORD )
Ainsworth Farm )
Backlane, Heath Charnock )
Chorley, Lancashure PR6 9DJ, )

and )

PAOLO SCARONI )
C/o Enel Energy )
Viale Regina Margherita #137 )
00198 Rome, Italy, )

and )

SIR ROBIN BIGGAM )
Old Linslade Grange )
Old Linslade Road Heath and Reach )
Leighton Buzzard )
Bedfordshire U.K. LU7 0DU, )

and )

SIR CHARLES BEECH GORDON MASEFIELD )
33/4 Palgrave Gardens )
Camden Town )
London U.K. NW1 6EN, )

and )

PRINCE BANDAR BIN SULTAN )
Glympton Park )
Glympton )
West Oxfordshire )
U.K. OX2O 1AU, )

and )

THE PNC FINANCIAL SERVICES GROUP, INC, as Successor to RIGGS NATIONAL CORPORATION/RIGGS BANK, N.A. )
One PNC Plaza, 249 Fifth Avenue )
Pittsburgh, PA 15222, )

and )

[Caption continued on following page.]

JOSEPH L. ALLBRITTON )
2940 Fox Hall Road )
Washington, D.C. 20016, )
)
and )
)
ROBERT L. ALLBRITTON )
2430 Wyoming Avenue Northwest )
Washington, D.C. 20008, )
)
and )
)
BARBARA ALLBRITTON )
2940 Fox Hall Road )
Washington, D.C. 20016, )
)
Defendants, )
)
and )
)
BAE SYSTEMS PLC, an England and Wales )
corporation, )
Stirling Square )
Carlton Gardens )
London U.K. SW1Y 5AD, )
)
Nominal Defendant. )
)
)

This writing/publication is a creative work fully protected by all applicable copyright laws, as well as by misappropriation, trade secret, unfair competition and other applicable laws. The authors of this work have added value to the underlying factual materials herein through one or more of the following: unique and original selection, coordination, expression, arrangement, and classification of the information.

No copyright is claimed in the text of statutes, regulations, and any excerpts from analysts' reports quoted within this work.

Copyright © 2007 by Patrick J. Coughlin and Coughlin Stoia Geller Rudman & Robbins LLP. Patrick J. Coughlin and Coughlin Stoia Geller Rudman & Robbins LLP will vigorously defend all of their rights to this writing/publication.

All rights reserved – including the right to reproduce in whole or in part in any form. Any reproduction in any form by anyone of the material contained herein without the permission of Patrick J. Coughlin and Coughlin Stoia Geller Rudman & Robbins LLP is prohibited.

"I would be offended if I thought we had the monopoly on corruption . . . . We did not invent corruption . . . . This happened since Adam and Eve. . . . [T]his is human nature."

PRINCE BANDAR BIN SULTAN

*WGBH Interview*
September 2001

## INTRODUCTION

1. This is a stockholder derivative action on behalf of BAE Systems plc ("BAE" or the "Company") against the entire current BAE Board of Directors (the "Board") and several of its present or former officers and directors (collectively the "BAE Defendants") for intentional, reckless and/or negligent breaches of their fiduciary duties of care, control and candor, involving illegal, improper and/or *ultra vires* conduct, including causing BAE to violate the laws of the United States and international business conduct codes and conventions relating to honest trade and business practices by making, or permitting to be made, improper and/or illegal bribes, kickbacks and other payments. Also named as defendants are Prince Bandar Bin Sultan ("Bandar"), PNC Financial Services Group, Inc. ("PNC"), legal successor by merger to Riggs National Corporation/Riggs Bank, N.A. ("Riggs"), and three former Riggs executives and controlling shareholders, which were, respectively, the primary recipient or beneficiary of the bribes, payoffs and improper payments and the primary intermediary via which these Bandar payments were laundered, actively concealing them from government regulators and BAE's own auditors. This conduct has caused, and is continuing to cause, BAE damage, including the substantial costs of responding to (and the substantial fines and penalties which may be involved in resolving) civil and criminal investigations and proceedings – here in the United States and elsewhere – as well as serious harm to BAE's reputation and goodwill, due to the adverse publicity resulting from these events.

2. BAE is a publicly owned company. Its American Depository Receipts ("ADRs") are registered with the United States Securities and Exchange Commission ("SEC"), traded over-the-

counter in this country and owned by hundreds if not thousands of U.S. citizens.[1] Its ordinary shares, traded overseas, are also owned by thousands of U.S.-based investors – individuals and institutional. Approximately 50% of BAE's shareholders reside in the U.S. BAE is one of the largest defense contractors in the U.S. and one of the largest suppliers to the U.S. Defense Department. The Company has operations in 36 states here and generates some 40% of its annual revenues – over $9 billion – in the U.S. BAE has more operations in the U.S. than in any other single country, including substantial operations here in Washington, D.C., which coordinate and oversee its billions of dollars of annual business with the Pentagon.

3. To hold onto their positions of power, prestige and profit with BAE, BAE's officers and directors have represented in annual directors' reports and otherwise that under their stewardship, BAE was a highly ethical, law abiding corporation which was achieving very substantial profits due to the skills of its top managers, while operating in accordance with applicable rules and laws under the oversight of BAE's Board of Directors. As a result, these top managers and directors of BAE held onto, and thus enjoyed, their prestigious and lucrative BAE positions, benefiting from the considerable perquisites of their positions with one of the world's largest corporations.

4. However, the true facts were quite different than these corporate fiduciaries presented to BAE's shareholders in their reports and otherwise. In fact, BAE's officers and directors were resorting to, or encouraging and/or permitting BAE's managers to resort to, improper, illegal and *ultra vires* activities to boost BAE's reported results, including paying bribes and kickbacks and making other improper payments, as detailed herein, to obtain contracts to make their stewardship of BAE appear more successful. These illegal and improper actions had the desired effect, *i.e.*,

---

1 Each ADR represents four ordinary BAE shares and has the same rights as an ordinary share.

increasing BAE's apparent success and profitability – in the short term. Given the fact that the BAE Defendants had limited tenures in their positions at BAE, this was their real concern, not BAE's long-term profitability or the long-term interests of the actual owners of BAE, *i.e.*, its public shareholders. Defendants' imprudent and unlawful actions have had an inevitable damaging impact, and a very negative one indeed, for BAE's long-term future and the interests of its shareholder community. Despite repeated warnings and "red flags" regarding the dangers of this reckless, imprudent and/or illegal conduct, BAE's directors refused to stop such conduct or take actions they knew were necessary to correct or remedy the dangerous conditions created by that conduct. Those defendants who joined the Company as this course of conduct was ongoing have joined in that conduct, endorsed and affirmed it, allowing it to continue while taking steps to conceal it and cover it up – both from BAE shareholders as well as government investigators. The BAE directors' and officers' false statements and representations and negligent, reckless or intentional failure to properly oversee the operation and conduct of this enterprise have exposed BAE to millions of dollars in damages and potentially hundreds of millions of dollars in remedial costs and possible debarment in the U.S., and have badly damaged BAE's corporate image and reputation.

5. In an effort to present themselves as competent, honest stewards and managers of BAE's business, the BAE Defendants have repeatedly misrepresented how they were overseeing, managing and operating BAE in a lawful and ethical manner. They told the owners of BAE – the shareholders – that compliance with anti-bribery and anti-corruption laws was especially critical to BAE given the nature of its business, *i.e.*, defense contracts with foreign governments, and thus BAE had in place rigorous internal controls to assure compliance with anti-corruption and anti-bribery laws and extensive training programs for its executives and managers in this regard, and, as a result, it was in compliance with such laws and conventions. These representations were false and misleading. Under their stewardship, the BAE Defendants have caused BAE to engage in a pattern

and practice of making illegal and improper payments to secure contracts and false and misleading statements to conceal and cover them up, thus violating the U.S. Foreign Corrupt Practices Act ("FCPA"), the anti-corruption convention of the Organization for Economic Cooperation and Development ("OECD Convention") and Section 463 of the U.K. Companies Act of 2006 ("Section 463"), all of which were applicable to BAE. Defendants' misconduct also involved repeatedly misleading BAE's shareholders to entrench and enrich themselves by boosting BAE's apparent short-term profits and to justify paying themselves excessive compensation and benefits, even though they knew or recklessly disregarded that their actions would damage BAE in the longer term.

6. In the mid-1980s, BAE was attempting to obtain a very large military contract from the Saudi Arabian Ministry of Defense to supply 120 fighter/bomber aircraft over the next 20+ years. The officers and directors of BAE knew that if this huge contract – known as "Al Yamamah" – could be obtained, they could point to it as concrete evidence of their successful stewardship of BAE, which would in turn help them hold onto their positions of power, prestige and profit with BAE, so they could receive lucrative payments and bonuses in connection with those positions for many, many years going forward.

7. Prince Sultan of Saudi Arabia was then in line for the royal throne and serving as the head of Saudi Arabia's Ministry of Defense. Prince Sultan's son was Bandar Bin Sultan. Bandar was the apple of his father's eye. For over 20 years – and during most of the time period relevant hereto – Bandar resided in the U.S. and served as Saudi Arabia's Ambassador to the U.S. Prince Turki bin Nasser is Bandar's brother-in-law. He was head of the Saudi Air Force. Because of their positions and relationships, Prince Sultan, Bandar and Nasser were each in a position to significantly influence whether BAE was awarded the Al-Yamamah contract.

8. To advance their own positions with BAE by winning the Al-Yamamah contract, the then officers and directors of BAE named as defendants herein undertook illegal and improper

conduct (engaging in *ultra vires* activities) in breach of their fiduciary duties to BAE, including paying bribes or kickbacks (a/k/a "backhanders") to Bandar and making other improper payments for his (and his family's) benefit, which have amounted to over $2 billion over the last 20 years. Although paying such bribes or kickbacks is *ultra vires* and in violation of international business standards and the laws of the U.S., including the FCPA and the OECD Convention, as well as BAE's own stated business policies and practices, defendants caused BAE to funnel these illegal payments to Bandar in significant part through Riggs, located in Washington, D.C., via accounts that, while nominally in the name of Saudi Arabia, were controlled by Bandar, over which he had discretion and signature authority and which he used for his personal use and benefit. Riggs was selected for this purpose because its Washington, D.C. location gave Bandar ready access to it and because Riggs had a reputation in international commercial circles as a bank willing to facilitate questionable, if not illegal, currency transfers for international transactions.[2] For many years, Riggs actively participated in, facilitated and advanced the illegal bribe payments to Bandar, hiding them from government investigation and BAE's auditors. Then – much later on – as Riggs' questionable currency activities came under increasing government scrutiny, in an effort to stave off government action to seize or close the bank, it identified one or more of the accounts being utilized by BAE and Bandar to facilitate the kickback payments as involving highly questionable or improper conduct and transactions and took steps to shut them down. At or about that time, Bandar resigned his post as

---

2 Riggs was ultimately exposed to have had persistent and widespread involvement in improper currency transfers and other money laundering activities. Riggs, the largest Washington D.C.-based commercial bank for much of its long history, was acquired by PNC in 2004 after various corporate scandals and management problems involving its lucrative embassy business forced Riggs to plead guilty to criminal money-laundering violations and pay $25 million in fines and penalties. In addition to funneling billions of dollars in bribes through BAE to Bandar, Riggs accounts were used to route Saudi money to 9/11 hijackers, to help Augusto Pinochet disguise millions stolen from the Chilean people, and to obfuscate transfers and unreported withdrawals of millions in oil revenues by the dictator of Equatorial Guinea.

Ambassador to the U.S. for "personal reasons" and returned to Saudi Arabia. His father remains heir to the Saudi Arabian throne and head of its Ministry of Defense.

9. These illegal or improper payments were secretly bargained for at the outset of the Al-Yamamah contract. The payments were provided for in secret schedules to the contract entitled "Letters of Offer and Acceptance." They purported to provide compensation for "support services," which, in fact, Bandar never performed, and which was known by the participants to be a code word and cover for the bribe or kickback payments he, his father and other members of his family were receiving or benefiting from. Most of the monies paid to Bandar were received by him here in the U.S. in Washington, D.C. Significant amounts have been spent by Bandar here in the U.S., including over $100 million to build one of the largest and most lavish personal residences in the U.S., located in Aspen, Colorado.

10. The illegal and/or improper payments have not only included outright payments to Bandar personally, but also payments by BAE for other expenditures benefiting Bandar and Bandar's family, including paying for his fantastically outfitted Airbus private aircraft, which cost over $100 million, and expenses for members of his family, including millions of dollars paid for a lavish multi-week, multi-country honeymoon for Bandar's daughter and new son-in-law.

11. The transcript of a BBC Television documentary exposing the details of the illegal payments made in connection with the Al Yamamah contract is attached as Ex. A. These payments are being investigated by the United States Department of Justice ("DOJ") and the SEC. The making of these improper payments has recently received widespread, adverse publicity. For instance, according to a 6/07 edition of *Financial Times*:

> **BAE faces threat of fines in US probe**
>
> * * *
>
> BAE Systems faces the threat of substantial fines, criminal prosecution of managers and the forced appointment of an independent monitor to oversee its

American business after the US Department of Justice launched a corruption probe into the company.

Europe's biggest arms manufacturer told the London Stock Exchange yesterday that the DoJ is to investigate the 20-year-old Al-Yamamah arms deal with Saudi Arabia. The news caused the company's shares to plunge 8 per cent as investors took fright at the possible damage to BAE's crucial US business.

* * *

The US Securities and Exchange Commission is also investigating BAE for possible violations of the books and records provisions of the Foreign Corrupt Practices Act . . . .

Similarly, in late 6/07, *Dow Jones* reported:

Shares of Britain's top arms dealer, BAE Systems, dropped sharply on Tuesday after the company said it was the target of a U.S. Justice Department probe into alleged corruption, notably in its dealings with Saudi Arabia.

* * *

News of the enquiry, although widely rumored, sent BAE shares plunging as much as 11%, wiping 1.5 billion pounds ($3 billion) off its stock market value. . . .

The probe could hamper BAE Systems' efforts to gain a larger share of the U.S. defense market. Already the company generates about 40% of sales in the U.S.

* * *

The move by the Justice Department wasn't unexpected, as BAE has been accused, notably on the BBC News television program and in articles in *The Guardian* newspaper, of making multimillion-pound payments via a secret slush fund to Saudi Arabia's Prince Bandar bin Sultan to secure a fighter-jet deal.

* * *

***The alleged payments to Bandar come under the jurisdiction of the U.S. Department of Justice because the money went through a U.S. bank. Earlier this month, the Guardian first reported allegations that BAE paid the money to Bandar for a least 10 years through Riggs Bank in Washington.***

***BAE has never denied the payments, but has insisted that all payments it has made in connection to the fighter-jet contractor were legal.***

The deal, known as al-Yamamah and worth an estimated 43 billion pounds ($86 billion), provided Hawk and Tornado jets and other military equipment to the Saudis. . . .

On 7/2/07, *FT.com* published an article stating:

> BAE has admitted it paid commissions to agents as part of the £43bn deal, which they say is normal practice in the business, and that given the size of the contracts, the sums were often large. But it has declined to say who received them while repeatedly denying any wrongdoing.
>
> If US Department of Justice investigators find such payments, they would invoke the 1977 US Foreign Corrupt Practices Act that covers US companies, their foreign affiliates and foreign companies issuing securities registered in the US. ***In 2003, BAE registered American Depositary Receipts with the Securities and Exchange Commission.***
>
> ***The act also covers foreign companies where the business associated with the alleged payments had a connection to the US.***
>
> * * *
>
> [I]t is ***clear that other payments were made by BAE on behalf of Saudi officials, and those payments did involve transactions in the US.***
>
> * * *
>
> ***[D]ocuments, seen by the FT, are records of a London-based travel company called Travellers World and include invoices and bank statements.***
>
> They show the travel company's records of payments to cover expenses for lavish hospitality, entertainment and other expenses incurred by Prince Turki bin Nasser, who is also ***Prince Bandar's brother-in-law*** . . . .
>
> These expenses include hired aircraft, including on one occasion a Boeing 747, and big hotel bills in the US, London and elsewhere. The documents include travel company invoices to BAE for these and other expenses as well as bank statements showing the reimbursement of the exact sums. The ***records show more than £60m was paid by BAE's customer solutions and support division to Travellers World to cover these payments over the period from 1991 to February 2002.***
>
> * * *
>
> One UK government official familiar with the investigation said the hospitality payments to Prince Turki were just a small part of the total investigation, "a subset of a subset of a general category."

12. The improper payments also included other payments for Bandar's benefit. According to the *Sunday Times (London)*:

***THE British arms firm BAE Systems secretly paid nearly £250,000 for a honeymoon for the daughter of Prince Bandar, the Saudi Arabian prince at the centre of bribery allegations.***

A senior BAE executive authorised the payments, allowing Bandar's daughter to enjoy a six-week honeymoon in luxury resorts in Singapore, Malaysia, Bali, Australia and Hawaii. . . .

Peter Gardiner, managing director of the travel agency that organised the honeymoon, said: "***BAE instructed me to give Bandar's daughter and her husband the honeymoon of a lifetime at BAE's expense. Who says that big business doesn't have a heart?***"

* * *

***[T]he honeymoon for Bandar's daughter, Princess Reema, was paid for through a £60m slush fund which the Serious Fraud Office (SFO) believes was set up by BAE to encourage Saudi royals to continue with a £ 43 billion arms contract to supply Hawk and Tornado jets.***

The latest twist in the BAE affair has been disclosed by Gardiner, who said he has made a detailed statement to the SFO. He described how his company, Travellers World, was used by BAE to make payments to Saudi royals when they were holidaying around the world. His company would arrange and pay for hotels, airline tickets, apartments, boat and jet charters, as well as hiring limousines and bodyguards.

* * *

Last week Gardiner said Tony Winship, a senior BAE marketing executive responsible for overseeing the slush fund, approved the costs of the six-week trip for Princess Reema bint Bandar and Prince Faisal bin Turki, the son of Prince Turki bin Nasser, another Saudi royal implicated in the SFO's bribery inquiry.

* * *

The couple were married in Riyadh, the Saudi capital, in December 1996. They flew on Turki's private Boeing 707, staffed by an English captain and crew, to Singapore. There they stayed for a week at Raffles, the country's most exclusive hotel where suites cost from £ 500 to £ 2,800 a night.

They then traveled for a week's stay to the Pangkor Laut resort on a privately owned island off Malaysia. It is often described as the best resort in the world.

* * *

After a week in Malaysia, Bandar's daughter and her groom flew by private jet to Bali where they stayed at the five-star Four Seasons Jimbaran Bay resort before flying to Australia, spending Christmas at the Regent hotel in Sydney. During that visit the prince who, like his father-in-law Bandar, is a fan of the Dallas Cowboys

American football team, was keen to watch a critical game. Gardiner says he found a private club in a town 60 miles away that could show the game live on cable TV. The entire club was hired so Bandar's daughter and her husband could watch the match. The three-hour stay cost £ 6,000. BAE again footed the bill.

The couple then flew to the Gold Coast where they stayed at the five-star Sheraton Mirage and Spa. On a day trip they hired a Gulfstream jet to fly to the Great Barrier Reef. The bill, paid by Travellers World and reimbursed by BAE, was £15,000.

Documents in the possession of the SFO show that Travellers World invoiced BAE £45,490 for the couple's stay in Australia. The item is billed as "HM.Aus", which Gardiner said was shorthand for "Honeymoon, Australia". The couple moved on to Hawaii where they spent a few days at the Halekulani on Waikiki beach. From there they flew to the Grand Wailea, on the Hawaiian island of Maui, where their penthouse suite on a private floor cost about £ 4,000.

The files show one part of the bill for Hawaii was £ 101,412. The payments, again paid by BAE, appear as "HM. Haw." and "HM Haw.Xtra". For the month of January alone the cost was £ 190,486. According to Gardiner, this did not include the first leg of the honeymoon, which began in mid-December the previous year. The total cost was nearly £ 250,000, he said.

13. According to the 6/18/07 edition of *Newsweek*:

**Bandar and the $2 Billion Question**

Hundreds of pages of confidential U.S. bank records may be the missing link in illuminating new allegations that a major British arms contractor funneled up to $2 billion in questionable payments to Saudi Prince Bandar bin Sultan. The BBC and Guardian newspaper reported last week that BAE Systems made "secret" payments to a Washington, D.C., bank account controlled by Bandar, the longtime Saudi ambassador to the United States who is now the kingdom's national-security adviser. The payments are alleged to be part of an ***$80 billion*** military-aircraft deal between London and Riyadh. . . . Before the U.K. closed the inquiry, British investigators contacted the U.S. Justice Department seeking access to records related to the Saudi bank accounts. Many of these records were first obtained by NEWSWEEK in 2004. At the time, the magazine reported that federal regulators had been alerted to millions of dollars in ***"suspicious" activities in Saudi accounts at the now-defunct Riggs Bank***.

* * *

The Riggs Bank records show the use of those funds raised concerns among bank officials and U.S. regulators. ***In November 2003, Riggs filed a "suspicious activity report" with the Treasury Department disclosing that over a four-month period***, $17.4 million from the Saudi Defense account had been disbursed to a single individual in Saudi Arabia. When Riggs officials asked the Saudis who the person was and why he was receiving the funds, they were told the individual "coordinates

home improvement/construction ***projects for Prince Bandar in Saudi Arabia," and the payments were for a "new Saudi palace," one document shows***.

In another instance, Bandar wired $400,000 from a Riggs account to a luxury-car dealer overseas. "It was impossible to distinguish between government funds and what would normally be considered personal purposes," ***said David Caruso, who served as Riggs's compliance officer at the time. Caruso also confirmed to NEWSWEEK that the Saudi Defense account was regularly replenished with $30 million each quarter from an account in London***. But the bank never knew the source of the funds. ***The bank was so concerned about the withdrawals that it cut off all business with the Saudis. In May 2005, the U.S. Treasury fined Riggs $25 million for failing to monitor "extensive and frequent suspicious" activity in Saudi and other accounts***.

14. The Al Yamamah payments were part of a broader pattern and course of conduct of illegal and/or improper payments by the BAE Defendants. The U.K. Serious Fraud Office ("SFO") is investigating allegations that BAE made corrupt payments to politicians and officials in Tanzania, Chile, the Czech Republic, Romania, South Africa and other countries. According to the 5/15/07 *New York Times*:

**Swiss Investigating BAE In Money Laundering Case**

Law enforcement authorities in Switzerland confirmed Monday that they had opened a criminal investigation into possible money laundering at BAE Systems, adding to the international scrutiny of the company, the top British military contractor.

Jeanette Balmer, a spokeswoman for the office of the Swiss federal prosecutor in Bern, confirmed that an investigation had been opened after a report from Swiss money laundering investigators.

15. Demand on the directors of BAE to bring this lawsuit or vigorously pursue it would be a futile and useless act as their conduct was illegal, not the product of the valid exercise of business judgment or candor taken in good faith. Additionally, their conduct cannot be ratified or approved by BAE's shareholders, as that conduct was illegal and *ultra vires* and also violates Section 463. To bring this action, these directors would have to sue themselves and/or people they have hired and supervised and thus not only expose their own incompetent and/or illegal behavior, but also expose themselves to huge uninsured liabilities. This they will not do. In addition, all the

current directors have knowingly or recklessly participated in the continuing publication of false and misleading Directors Reports and a cover up of the Al-Yamamah payments, as well as other illegal or improper payments made by BAE, and have repeatedly publicly represented that all payments made in connection with the Al-Yamamah and other contracts mentioned herein were proper, legal and did not involve wrongdoing. Thus, in order for the true facts to be uncovered, discovered and proved, and the past harm to BAE remedied, with future harm to BAE ameliorated or prevented, this action must be pursued by the plaintiff derivatively on behalf of and for the benefit of BAE. This action is brought in good faith for the benefit of BAE and it is respectfully requested that this Court permit this action to proceed.

**JURISDICTION AND VENUE**

16. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1). The amount in controversy exceeds the jurisdictional minimum of this Court, exclusive of interest and costs, and plaintiff and defendants are citizens of, and domiciled in, different states. Many of the acts alleged in this Complaint arose in Washington D.C. Venue is therefore proper in this District.

17. Each individual defendant has had substantial and continuous contacts with Washington D.C. and the United States that makes the exercise of personal jurisdiction over him or her proper. BAE does substantial business in Washington, D.C. and the United States, including operating a major office in Washington, D.C. Riggs was the largest D.C.-based commercial bank for most of its history. The Albritton defendants described in ¶¶54-56 operated Riggs out of this District and continue to reside in Washington, D.C. and to operate substantial business operations here. Bandar was a resident of Washington, D.C. for some 15-20 years during the period relevant to the allegations herein. A substantial part of the wrongdoing occurred in and/or had effect in Washington, D.C. Evidence relevant to and necessary to prove plaintiff's claims – including the location of important physical and documentary evidence and witnesses able to provide live

testimony – is here in Washington, D.C. The DOJ and the SEC are both investigating BAE here in Washington, D.C. for important aspects of the conduct complained of herein.

## THE PARTIES

### Plaintiff

18. Plaintiff City of Harper Woods Employees' Retirement Systems was at relevant times a stockholder of BAE. This plaintiff currently owns approximately 3,500 BAE ADRs. Plaintiff brings this action derivatively in the right of and for the benefit of BAE. Plaintiff will fairly and adequately represent the interests of BAE and its shareholders in enforcing the rights of BAE.

### Nominal Defendant

19. Nominal defendant BAE is a U.K. corporation with its corporate headquarters in London. BAE has a huge operating subsidiary that operates in the U.S. called BAE Systems, Inc., a Delaware corporation. BAE Systems, Inc. ("BAE-USA") is a wholly owned subsidiary of BAE and a Delaware corporation. BAE has several offices located here in the District. BAE has mitigated the Company's foreign ownership through entry into a Special Security Agreement between the U.S. Government, BAE-USA and BAE. That agreement calls for the appointment of outside directors who, in conjunction with other U.S.-based board members, comprise a Government Security Committee. The Government Security Committee has the responsibility for overseeing the Company's compliance with U.S. Government security and export regulations and meets regularly with U.S. Government defense officials. Compliance with the SSA allows BAE to supply products and services to the U.S. Department of Defense ("DOD"), Intelligence Community and Homeland Security on some of our Nation's most sensitive programs.

20. BAE has recently described its very substantial business in the U.S. as follows:

(a) BAE's 2006 Annual Report stated:

> BAE Systems is one of the world's leading defence companies and is one of only four companies with global defence sales in excess of $20bn. ***It . . . ranks number seven within the US defence industry.***

* * *

***The Group's US business now delivers over US$9bn (£5bn) of annual sales and employs approximately 40,000 people in 36 states.***

BAE Systems is both a prime contractor to the US government and a supplier of major sub-systems to the other large prime contractors. . . . BAE Systems has a substantial business supporting network systems and IT for US government agencies and provides technical support services to the US Navy, US Army, NASA and the FAA. In land systems, the Group is one of the two largest suppliers of armoured vehicles in the US and the wider accessible global market.

The US defence market . . . remains one of BAE Systems' key markets . . . . US defence spending has increased substantially over recent years . . . . This high level of funding is expected to sustain further growth in the near term . . . .

. . . [T]he Group is well placed to support the US Department of Defense's likely continued emphasis on force sustainment and readiness.

***The U.S. Defense Department is BAE's largest single customer.***

(b) Regarding the U.S. market, BAE's 2000 Annual Report stated:

* * *

The US is by far the largest defence market . . . . ***BAE SYSTEMS recognises that participation in the US market is a prerequisite to establishing and growing a leading position in the global defence industry.***

* * *

**North America** Four acquisitions in 2000 have enhanced the company's position in the US market.

* * *

BAE SYSTEMS North America also has a strong, well-established presence in the services and support market. It is the largest single technical support contractor for the US Navy, with a legacy relationship of more than 35 years. In 2000, it was awarded a $450m contract to provide systems engineering and technical assistance for the Federal Aviation Administration's air traffic control programme.

(c) BAE's 2001 Annual Report stated:

The US is the world's largest defence market. In 2001, we have seen benefits starting to flow as our recent US acquisitions have been successfully integrated into the group. Our strategy – to strengthen our position in that market – is working to good effect.

* * *

**Strategic development**

The US is the world's largest defence market and it is growing. . . .

***Our position as one of the DoD top suppliers has been enhanced by the successful integration of the four North American acquisitions we made in 2000.***

(d) CEO Michael J. Turner's 2002 letter (dated 2/03) stated:

BAE SYSTEMS has also continued to build its position in the US, the world's largest, and growing, defence market. The US is the defence technology powerhouse of the world and for BAE SYSTEMS to retain a position at the top of its industry ***it must have a strong US presence. The company has already grown its position successfully, establishing itself as a key constituent of the US defence community. BAE SYSTEMS North America is performing strongly and the continued growth of our US industrial position remains an important part of our strategy.***

(e) BAE's 2004 Annual Report – in CEO Turner's letter – stated:

In the US, five acquisitions were completed. . . . With these acquisitions BAE Systems now generates annualised sales of some $5.6bn in its North America business and now employs over 27,000 people across the US.

(f) BAE's 2005 Annual Report – in Chairman Richard L. Olver's letter – stated:

With the increasing importance of BAE Systems' operations in the United States, which now manage 35% of sales, we have appointed three new non-executive directors to the Board to provide further US perspective and experience.

(g) BAE's 2005 Annual Report stated:

**Grow our business in the United States**

In the summer of 2005, BAE Systems completed the acquisition of United Defense, growing the US business base by $2.6bn in annual sales and 8,000 additional employees. This acquisition established BAE Systems as a major land systems prime contractor with a strong position in support of the US Department of Defense's requirements for force sustainment and affordable transformation.

(h) BAE's U.S. operations include operations in: Acton, Massachusetts; Alexandria, Virginia; Anniston, Alabama; Arlington, Virginia; Austin, Texas; Bellevue, Nebraska; Berthoud, Colorado; Brea, California; Burlington, Massachusetts; Cheshire, Connecticut; Colorado Springs, Colorado; Columbia, Maryland; Falls Church, Virginia; Fort Wayne, Indiana; Fort Worth, Texas; Greenlawn, New York; Heath, Ohio; Honolulu, Hawaii; Hudson, New Hampshire; Irving,

Texas; Johnson City, New York; Lansdale, Pennsylvania; Lexington, Massachusetts; Los Angeles, California; Manassas, Virginia; McLean, Virginia; Merrimack, New Hampshire; Minneapolis, Minnesota; Mojave, California; Mount Laurel, New Jersey; Nashua, New Hampshire; Newington, Virginia; Ontario, California; Pittsburgh, Pennsylvania; Norfolk, Virginia; Redmond, Washington; Reston, Virginia; Rockville, Maryland; Rome, New York; San Diego, California; Washington, D.C.; Wayne, New Jersey; Yonkers, New York; and York, Pennsylvania.

(i) BAE securities are registered with the SEC pursuant to an Amended and Restated Deposit Agreement dated as of 5/03 and traded Over-the-Counter ("OTC") in the U.S. According to BAE's 2006 Annual Report:

> The BAE Systems plc American Depositary Receipts (ADRs) are traded on the Over The Counter market (OTC) under the symbol BAESY. One ADR represents four BAE Systems plc ordinary shares.
>
> JPMorgan Chase Bank, N.A. is the depositary.
>
> If you should have any queries, please contact:
>
> JPMorgan Chase Bank, N.A.
> JPMorgan Service Center
> PO Box 3408
> South Hackensack, NJ 07606-3408
> USA

21. BAE is incorporated under English law, which permits or will permit this action to be maintained based on the allegations made in this Complaint. However, due to BAE's extensive U.S. operations, the large number of BAE shareholders in the U.S., the U.S. connection to the primary wrongdoing alleged herein, and the interests of the U.S. impacted by that conduct, under the local law exception to the internal affairs doctrine, the laws of Washington, D.C. (or another appropriate U.S. jurisdiction) may, if necessary, be applied to permit this action to be maintained.

**The BAE Defendants**

22. The defendants described in ¶¶23-36 include the entire BAE Board of Directors as of the filing of this Complaint and are referred to herein sometimes as the "Director Defendants."

# EXHIBIT A

Along with the Director Defendants, the remainder of the current and/or former BAE officers and directors named below at ¶¶37-48 are referred to herein as the "BAE Defendants."

23. Defendant Richard (Dick) L. Olver ("Olver") has served as Chairman of BAE since 7/1/04 and as a director since 5/17/04. Olver resides in and is a citizen of the U.K. Olver serves as Chairman of the BAE Board's Nominations Committee and Chairman of its Non-Executive Directors Fees Committee. Olver receives a fee of £500,000 per annum and other benefits, including the private use of a chauffeur. BAE does not consider Olver to be an independent director.

24. Defendant Michael J. Turner ("Turner") has served as the Chief Executive Officer ("CEO") of BAE since 2002 and as an Executive Director since 1994. Turner previously served as Chief Operating Officer ("COO") of BAE from 1999 to 3/02. Turner originally joined British Aerospace in 1978 as a Contracts Manager (Military) of what had by then become the Manchester Division of the British Aerospace Aircraft Group. Turner resides in and is a citizen of the U.K. Turner serves on the BAE Board's Executive Committee and its Non-Executive Directors Fees Committees. Turner's current salary is set at £945,000 per annum plus a supplementary payment of 30% of his annual salary in lieu of pension benefits. Turner received £2.4 million in salary, bonus and other compensation in 2006 and £1.6 million in salary, bonus and other compensation 2005.

25. Defendant Walter P. Havenstein ("Havenstein") has served as an Executive Director of BAE since 1/2/07 and currently serves as its COO, having held a variety of executive positions at BAE since 2000. Havenstein joined Sanders (when it was a part of Lockheed Martin) in 2/99 prior to BAE's acquisition of Sanders in 2000. Havenstein has also served as President and CEO of BAE-USA (formerly, BAE Systems North America, Inc.), a U.S. subsidiary of BAE, since 1/1/07, and serves as a director of BAE-USA. Havenstein resides in and is a citizen of New Hampshire. Havenstein serves as a member of the BAE Board's Executive Committee and its Non-Executive Director Fees Committee. Havenstein's current salary is set at $750,000 per annum plus pension

benefits, including a 50% match on his contributions to his 401(k) plan up to a maximum contribution of 8% of BAE's earnings.

26. Defendant Ian G. King ("King") has served as a director of BAE and as COO for the U.K. and Rest of World ("RoW") organization, responsible for all U.K. and RoW businesses (excluding BAE's US-led businesses) since 1/07. King joined Marconi in 1976 prior to BAE's acquisition of Marconi. In 1999 King assumed the position of Group Strategy and Planning Director of BAE. King resides in and is a citizen of the U.K. King's current salary is set at £530,000 per annum plus pension benefits.

27. Defendant George W. Rose ("Rose") has served as BAE's Group Finance Director and an Executive Director since 1998. Rose was previously appointed Director of Financial Control and Accounting of British Aerospace in 6/92 and Director for Finance and Treasury in 2/95. Rose resides in and is a citizen of the U.K. Rose serves as a member of the BAE Board's Executive Committee. Rose's current salary is set at £560,000 per annum plus pension benefits. King received £1.1 million in salary, bonus and other compensation in 2006 and £1 million in salary, bonus and other compensation 2005.

28. Defendant Christopher V. Geoghegan ("Geoghegan") has served as an Executive Director of BAE since 7/02 and previously served as COO of BAE from 4/02 until being removed from that position in 1/07. Geoghegan originally joined British Aerospace, Manchester, as a Senior Contracts Officer in 1976, and has held a variety of executive positions at the Company and its predecessors. Geoghegan is a past Council Member of SBAC and a member of the BAE Board's Executive Committee. Geoghegan resides in and is a citizen of the U.K. Geoghegan's current salary is set at £490,000 per annum plus an annual payment of 30% of his salary in lieu of pension benefits. Geoghegan received £1 million in salary, bonus and other compensation in 2006 and £893,000 in salary, bonus and other compensation 2005.

29.    Defendant Phillip J. Carroll ("Carroll") has served as a Non-Executive Director of BAE since 2005. Carroll resides in and is a citizen of the Texas. Carroll serves on the Board's Nominations and Corporate Responsibility Committees. As of 12/06, Carroll owned no BAE stock. Carroll received a directors' stipend of £70,000 during fiscal 2006 and £18,000 during fiscal 2005.

30.    Defendant Michael J. Hartnall ("Hartnall") has served as a Non-Executive Director of BAE since 2003. Hartnall resides in and is a citizen of the U.K. Hartnall, a fellow of the Institute of Chartered Accountants in England and Wales, chairs the BAE Board's Audit Committee. Hartnall received a directors' stipend of £78,000 during fiscal 2006 and £73,000 during fiscal 2005.

31.    Defendant Sir Peter James Mason ("Mason") has served as a Non-Executive Director of BAE since 2003. Mason resides in and is a citizen of the U.K. Mason is a member of BAE's Audit and Nominations Committees. Mason received a directors' stipend of £73,000 during fiscal 2006 and £63,000 during fiscal 2005.

32.    Defendant Roberto Quarta ("Quarta") has served as a Non-Executive Director of BAE since 2005. Quarta resides in and is a citizen of the U.K. Quarta serves on the Board's Audit and Remuneration Committees. As of 12/06, Quarta owned no BAE stock. Quarta received a directors' stipend of £58,000 during fiscal 2006 and £18,000 during fiscal 2005.

33.    Defendant Sir Anthony Nigel Russell Rudd ("Rudd") has served as a Non-Executive Director of BAE since 9/06. Rudd resides in and is a citizen of the U.K. Rudd serves on the Board's Remuneration and Corporate Responsibility Committees. As of 12/06, Rudd owned no BAE stock. Rudd received a directors' stipend of £15,000 during fiscal 2006.

34.    Defendant Peter A. Weinberg ("Weinberg") has served as a Non-Executive Director of BAE since 2005. Weinberg resides in and is a citizen of the Connecticut. Weinberg chairs the Board's Corporate Responsibility Committee and serves on its Remuneration Committee. As of

12/06 Weinberg owned no BAE stock. Weinberg received a directors' stipend of £77,000 during fiscal 2006 and £34,000 during fiscal 2005.

35.     Defendant Andrew George Inglis ("Inglis") was appointed to the BAE Board by the current Board members on 5/31/07 and was seated on 6/13/07. Inglis resides in and is a citizen of the U.K.

36.     Defendant Ulrich Cartellieri ("Cartellieri") has served as a Non-Executive Director of BAE since 1999. Cartellieri resides in and is a citizen of the U.K. Cartellieri served on the Board's Audit Committee. As of 12/06, Cartellieri owned no BAE stock. Cartellieri received directors' stipends of £58,000 during fiscal 2006 and £53,000 during fiscal 2005.

37.     Defendant Sue Birley ("Birley") previously served as a BAE Director from 2000 to 2/07. Birley resides in and is a citizen of the U.K. Birley chaired the Board's Remuneration Committee and served on its Corporate Responsibility Committee. Birley received directors' stipends of £73,000 during fiscal 2006 and £63,000 during fiscal 2005.

38.     Defendant Michael Lester ("Lester") previously served as BAE's Group Legal Director and an Executive BAE Director from 1999 until he resigned in 12/06. Lester resides in and is a citizen of the U.K. Lester received £1.15 million in salary, bonus and other compensation in 2006 and £1.1 million in salary, bonus and other compensation 2005.

39.     Defendant Mark H. Ronald ("Ronald") previously served as a BAE Executive Director from 4/02 until he resigned in 12/06. Ronald previously served as BAE USA's President, COO and CEO until he resigned in 12/06. Ronald resides in and is a citizen of the Maryland. Upon his resignation, Ronald received a lump sum equal to 12 months' salary (or £1 million), continuance of medical benefits for 18 months from his termination date, and was appointed as an advisor and non-executive Chairman of BAE-USA effective 1/15/07. Ronald received £1.9 million in salary,

bonus and other compensation in 2006 and £1.3 million in salary, bonus and other compensation 2005.

40.    Defendant Michael Denzil Xavier Portillo ("Portillo") previously served as a Non-Executive Director of BAE from 2002 to 5/06. Portillo resides in and is a citizen of the U.K. Portillo owned no BAE common stock as of 12/06. Portillo received a directors' stipend of £17,000 during fiscal 2006 and £53,000 during fiscal 2005.

41.    Defendant Sir Richard (Dick) Harry Evans ("Evans") is the former Chairman of BAE. Evans began his career in the 1960s with government department posts in the then-nationalized British defense sector. Evans was appointed CEO of BAE's predecessor in 1990 and rose to become Chairman in 5/98. Evans made his name by securing the largest arms deal in British history – the Al-Yamamah sales to Saudi Arabia. For being the architect of the gigantic deal, he was rewarded with a huge salary, a knighthood and considerable power within BAE. However, during Evans' tenure as Chairman it has been reported "there [was] a feeling in the City that BAE [was] run by a 'mafia,' that Dick is the head and that they are a law unto themselves." Evans stepped down in 2004 but remained on BAE's payroll as a consultant. Evans resides in and is a citizen of the U.K.

42.    Defendant Lord Alexander Hesketh ("Hesketh") previously served as a Non-Executive Director of BAE from 1994 to 5/05. Hesketh resides in and is a citizen of the U.K. Hesketh was receiving £45,000 per year at the time of his termination.

43.    Defendant John Pix Weston ("Weston") previously served as CEO of BAE and as a member of its Board from 1998 until 2002 when he was asked to resign following the Company's shocking profit warning in 12/02 caused by massive cost overruns on two regular Ministry of Defense projects resulting in a £750 million charge on the contracts. Weston originally joined British Aircraft Corporation in 1970, and served in various positions until 1998, when he became the CEO. Weston was replaced by Turner. Weston resides in and is a citizen of the U.K. Weston

received a salary of £130,000 for fiscal 2002, a £520,000 payment upon termination and assets of £939,000 payable upon termination of his employment contract. During fiscal 2000 and 2001, Weston received a salary of £500,000 and £520,000, respectively, plus a bonus of £100,000 each year.

44.    Defendant Keith Clark Brown ("Brown") previously served as a Non-Executive Director of BAE from 1989 to 2003. Brown resides in and is a citizen of the U.K. Brown served as Chairman of the Board's Audit Committee and received a directors' stipend of £40,000 during fiscal 2001 and £35,000 during fiscal 2000.

45.    Defendant Steve Lewis Mogford ("Mogford") served as a BAE Executive Director and as COO – Programmes – from 4/00 until he was removed as COO in 1/07. Mogford, who originally joined British Aerospace Military Aircraft in 1977 as a Supply Engineer, continued serving as a BAE Board member until 5/07. In 4/07 Mogford announced he was resigning from the BAE Board and joining Finmeccanica SpA's Selex subsidiary as its CEO. Mogford resides in and is a citizen of the U.K. Mogford received salary, bonus and other compensation of £956,000 and £910,000 during fiscal 2006 and 2005, respectively.

46.    Defendant Paolo Scaroni ("Scaroni") previously served as a Non-Executive Director of BAE from 2002-2004 when he resigned. Scaroni backed the replacement of Weston with Turner following the 12/02 shocking profit warning. Scaroni resides in and is a citizen of the Italy. Scaroni, who served on the Board's Audit Committee, owned no BAE stock as of 12/03. Scaroni received directors' stipends of £34,000 during fiscal 2002 and 2003.

47.    Defendant Sir Robin Biggam ("Biggam") previously served as a Non-Executive Director of BAE from 1994-2003. Biggam resides in and is a citizen of the U.K. Biggam served on the Audit, Remuneration and Nominations Committees. Biggam received directors' stipends of £40,000 and £13,000 during fiscal 2002 and 2003, respectively.

48. Defendant Sir Charles Beech Gordon Masefield ("Masefield") served as Vice Chairman of the BAE Board from 2002 until his termination in 2003. Masefield joined the BAE Board in 1999 when he was appointed Group Marketing Director. Masefield resides in and is a citizen of the U.K. Masefield received a salary of £431,000 and a bonus of £65,000 during fiscal 2002.

**Prince Bandar**

49. Defendant Prince Bandar Bin Sultan ("Bandar") is a highly influential Saudi official. He was Saudi ambassador to the United States from 1983 to 2005 and is now Secretary-General of the Saudi Arabia National Security Council. Bandar is a son of Crown Prince Sultan bin Abdul Aziz, who was the head of the Saudi Arabia Ministry of Defense for some 20 years and is now the Deputy Prime Minister of Saudi Arabia. Bandar was the Saudi Arabian Ambassador to the United States from approximately 1995 to 2005 when he "resigned" for personal reasons. He lived in the United States for over 20 years, owns property here in the United States worth over $100 million and has transacted over $2 billion in monetary transactions in Washington, D.C. over the past 20 years – mostly through Riggs. Bandar helped negotiate the 1985 Al Yamamah deal and a series of arms sales by BAE to Saudi Arabia worth over £40 billion, including the sale of more than 100 warplanes. To pay off Bandar after the Al Yamamah deal was signed, and to assure that Saudi Arabia continued to make purchases under the contract, BAE funneled secret payments of at least £2 billion into two Saudi embassy accounts in Washington at Riggs, in quarterly or yearly installments for many years. Bandar took money for personal use out of the accounts. The purpose of one of the accounts was to pay the operating expenses of Bandar's private Airbus A340. Bandar resides in and is a citizen of the U.K. Bandar is sued for knowingly and intentionally inducing the other defendants' breaches of their fiduciary duties, aiding and abetting their breaches, conspiring with them to commit and

advance their breaches or scheming with them to commit and advance their breaches of fiduciary duty and of U.S. and/or U.K. or European Union laws or conventions.

**PNC/Riggs**

50. Defendant PNC Financial Services Group, Inc. ("PNC"), incorporated and headquartered in Pennsylvania, is the legal successor by merger to Riggs Bank, N.A. and Riggs National Corporation (collectively "Riggs"), a Washington, D.C.-based commercial bank, which was for most of its history the largest bank headquartered in the nation's capital. After various corporate scandals and management problems, in 2004 Riggs was acquired by PNC by merger and PNC became its legal successor, legally responsible for Riggs' conduct referred to herein. Notably, Riggs accounts were established for two of the 9/11 hijackers and funded by Bandar's wife. Upon discovery of these transactions, the FBI began investigating the bank for possible money-laundering and terrorist financing. Investigators found lax safeguards at Riggs regarding money laundering. Several Saudi accounts were discovered to have financial improprieties, including a lack of required background checks and a consistent failure to alert regulators of large transactions, in violation of the law. Many of these transactions involved Bandar personally, often transferring over $1 million at a time. On the Al Yamamah deal alone, Bandar received billions in bribes from BAE through Riggs.

51. Similarly, Augusto Pinochet, the former dictator of Chile, has been widely accused since 1973 of corruption, illegal arms sales, and torture. Nonetheless, in 1994, Riggs officials invited Pinochet to open an account at Riggs. Arrested in 1998 in Britain for possible extradition to Spain, his accounts were ordered frozen by court orders. A recent U.S. Senate report has revealed that Riggs executives helped Pinochet disguise millions of dollars that had been stolen from the Chilean people. By using shell companies and hiding accounts from federal regulators, Riggs illegally allowed Pinochet to retain access to much of his fortune.

52. In 7/04, the U.S. Senate published an investigation into Riggs, into which most of Equatorial Guinea's oil revenues were paid. The Senate report showed that accounts based at the Equatorial Guinea embassy to the United States were allowed to make large withdrawals without properly notifying federal authorities. In that hearing, the President of Riggs was asked why the bank would willingly enter into a business arrangement with the dictator of Equatorial Guinea, a man who willingly exercises his hold over his people with demonstrations of murder and torture on state-run television. In correspondence to President Mbasogo, a Riggs letter "thanked the president for his establishment of several bank accounts, and encouraged a working relationship to help establish and secure the stable reign of his country."

53. For its transgressions, Riggs was ultimately fined $25 million for violations of money-laundering laws. A long running DOJ investigation was wrapped up in 2/05, with Riggs pleading guilty and paying a $16 million fine for violations of the U.S. Bank Secrecy Act. And in 2/05, the bank and its controlling shareholder agreed to pay $9 million to Pinochet victims for concealing and illegally facilitating movement of Pinochet money out of Britain. Upon completion of PNC's acquisition of Riggs in 2/05, the Riggs name was abandoned, but PNC has continued its operations in Washington, D.C.

**The Allbritton Defendants**

54. Defendant Joseph L. Allbritton ("Joe Allbritton") served as Chief Executive Officer and Chairman of Riggs Bank, N.A. until 2001 when his son Robert assumed those positions. Joe Allbritton continued serving on the Board of Directors of Riggs National Corporation (collectively with Riggs Bank, N.A., "Riggs") until May 2004. Joe Allbritton controlled most of the Allbritton family's 41% interest in Riggs and ran the bank as his own private fiefdom until the 2005 sale to PNC following the bank's 2004 plea to federal money laundering charges. Joe Allbritton resides in and operates a substantial business enterprise in the District.

55. Defendant Robert L. Allbritton ("Robert Allbritton") is the son of defendant Joe Allbritton and served as Riggs' CEO and Chairman from 2001 until the bank's sale to PNC in February 2005. Robert Allbritton acquiesced in and participated in his father's efforts to expand the bank's embassy business at all costs. Robert Allbritton has been chairman and CEO of Allbritton Communications, which owns television stations and a newspaper in Washington D.C., since 2001. Robert Allbritton resides in the District.

56. Defendant Barbara Allbritton ("Barbara Allbritton") is the wife of defendant Joe Allbritton and served as a director of Riggs National Corporation until May 2004. Barbara Allbritton acquiesced in and participated in her husband's efforts to expand the bank's embassy business at all costs. Barbara Allbritton resides in the District.

57. The defendants listed in ¶¶54-56 are referred to herein as the "Allbritton Defendants" and these defendants acted in concert with defendant PNC (formerly Riggs) to aid and abet violations of fiduciary duty by the Director Defendants.

58. The Allbritton Defendants purchased a controlling interest in Riggs in 1981 at the peak of the bank's influence and prestige. With all of the bank's assets at their disposal, including its Gulfstream jet, the Allbrittons scoured the globe acquiring 95% of Washington D.C.'s embassy account business for Riggs. The Allbrittons courted an expansive unsavory international clientele, including Bandar, former Chilean strongman Augusto Pinochet, and Teodoro Obiang Nguema, dictator of Equatorial Guinea. The top two federal bank regulators – the Federal Reserve Board and the Treasury Department's Office of the Comptroller of the Currency – began a criminal investigation into the Riggs' embassy division in 2002, focusing on transactions in hundreds of accounts associated with Saudi Arabia, Equatorial Guinea and General Pinochet. U.S. Senate investigations followed and disclosed mounds of evidence documenting the Allbritton Defendants' efforts to obtain and retain embassy business for Riggs: "I am also grateful for our thriving personal

friendship which you have demonstrated through your gracious hospitality and stalwart support of the Riggs," Joe Allbritton wrote in a draft letter to General Pinochet dated November 1997, a year when Riggs was expanding its relationship with both Pinochet and the Chilean military. "I thank you for the marvelous gifts to both Barbie and myself, including the history books which I found fascinating."

59.     Evidence of millions of dollars being funneled through Riggs accounts by diplomats of Saudi Arabia has also been disclosed, including funds paid to Bandar. In its May 2005 enforcement action against Riggs, the U.S. Office of the Comptroller of the Currency specifically cited Riggs' failure to file suspicious activity reports for large-denomination withdrawals of cash by Bandar and others.

60.     Following the 9/11 attacks, in December 2002 the F.B.I. and federal bank regulators began examining Riggs accounts in connection with Saudi cash transactions. What regulators expected to be a one-month examination lasted five months as regulators uncovered improprieties in some of the 150 Saudi accounts at Riggs. Under U.S. law, banks are required to vet the background of their customers, report outsized movements of cash and alert regulators when any banking activities are suspicious. Regulators and members of Congress said Riggs frequently failed to carry out these duties, especially with regards to Saudi accounts. A July 2004 Senate report disclosed that the Saudi accounts were "equally troubling" as other accounts at Riggs that had come under scrutiny, but noted that a more thorough Congressional examination of the Saudi accounts was under way at the Senate Governmental Affairs Committee. Federal regulators eventually concluded that the Allbritton led Riggs inadequately monitored the destinations and uses of large amounts of cash, often more than $1 million at a time, in the Saudi accounts. Many of these transactions involved Bandar personally.

61. Problems with the Saudi accounts led federal bank regulators to issue a rare and public cease-and-desist order against Riggs in early 2003, requiring it to clean up its practices or face further penalties. But unexplained transactions continued to flow through the Saudi accounts throughout late 2003. By March 2004, though Riggs publicly stated it had closed all Saudi accounts, minutes of a Riggs meeting on April 7, 2004 noted that Bandar had recently requested "$2 million in cash for traveling expenses." "Prince Bandar then asked that Riggs wire $2 million to another bank, which was done," the minutes said, adding that the bank notified regulators about the transaction.

62. In 2005 Riggs was fined $25 million for violations of money-laundering provisions of the U.S. Bank Secrecy Act and the bank was placed on federal probation. The bank and Allbritton family also agreed to pay $9 million to Pinochet victims for concealing and illegally facilitating movement of Pinochet money out of Britain. This payment was made in settlement of litigation commenced in Spain against Riggs, the Allbritton family and other Riggs executives. The $25 million money-laundering fine for Riggs' "willful, systemic" failure to report suspicious transactions, and its years of failing to follow anti-money laundering laws, was the largest such fine ever levied on an American bank. The members of the Allbritton family all immediately resigned from all Riggs boards. Meanwhile, the family had collectively received tens of millions of dollars in compensation and other perks as a result of their facilitation of the bank's illegal misconduct.

**APPLICABLE ANTI-CORRUPTION LAWS AND CONVENTIONS AND THE U.K. COMPANIES ACT OF 2006**

63. The United States Foreign Corrupt Practices Act ("FCPA") for many years prohibited payments to foreign officials for purposes of:

> ***(A)(i) influencing any act or decision of such foreign official in his official capacity, (ii) inducing such foreign official to do or omit to do any such official, or (iii) securing any improper advantage . . . in order to assist [the company making the payment] in obtaining or retaining business for or with, or directing business to any person.***

15 U.S.C. §78dd-1(a)(1). Thus, the FCPA criminalized every payment to a foreign official that is intended to (1) ***influence*** a foreign official to act or make a decision in his official capacity, or (2) induce such an official to perform or refrain from performing some act in violation of his duty, or (3) secure some wrongful advantage to the payor.

64. In 1998, Congress amended the FCPA to implement the Organization of Economic Cooperation and Development ("OECD") Convention on Combating Bribery of Foreign Public Officials in International Business Transactions ("OECD Convention"), signed in 12/97. The amendments expanded FCPA coverage to "***any person***" – not just "***issuers***" or "***domestic concerns***" (defined as any American citizen, national or resident, or American corporation). 15 U.S.C. §§78dd-1 to 78dd-3. The 1998 amendments also removed the requirement – for issuers and domestic concerns – ***of a territorial*** connection to the United States. Under the FCPA, any United States person or entity violating the FCPA outside the United States is subject to prosecution, regardless of whether any means of interstate commerce were used. 15 U.S.C. §§78dd-1 to 78dd-3; *see* U.S. Const. art. I, §8, cl 1, cl 3 ("The Congress shall have Power . . . . To regulate Commerce with foreign Nations, and among the several States . . . .").

65. The U.K. Companies Act of 2006 provides:

*Liability for false or misleading statements in reports*

463 **Liability for false or misleading statements in reports**

(1) The reports to which this section applies are –

(a) ***the directors' report,***

(b) ***the directors' remuneration report***, and

(c) ***a summary financial statement so far as it is derived from either of those reports.***

(2) ***A director of a company is liable to compensate the company for any loss suffered by it as a result of –***

(a) ***any untrue or misleading statement in a report to which this section applies***, or

(b) ***the omission from a report to which this section applies of anything required to be included in it***.

(3) ***He is so liable only if –***

(a) he knew the statement to be untrue or misleading ***or was reckless as to whether it was untrue or misleading***, or

(b) ***he knew the omission to be dishonest concealment of a material fact.***

(4) No person shall be subject to any liability to a person ***other than the company*** resulting from reliance, by that person or another, on information in a report to which this section applies.

**DEFENDANTS' FIDUCIARY DUTIES**

66. By reason of their positions as officers, directors and/or fiduciaries of BAE and because of their ability to control the business and corporate affairs of BAE, the BAE Defendants owed BAE and its shareholders fiduciary obligations of fidelity, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage BAE in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of BAE and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

67. Each director and officer of the Company owes to BAE the fiduciary duty to comply with the U.K. Companies Act and to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing. In addition, as officers and/or directors of a publicly held company, the BAE Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's finances and operations, and defendants also had an obligation not to entrench themselves as officers and/or directors of the Company, to allow open and honest board

elections and to not advance their own personal, financial or economic interests over and at the expense of the Company's public shareholders.

68. The BAE Defendants, because of their positions of control and authority as directors or officers of BAE, were able to and did, directly and indirectly, control the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with BAE, each of the defendants had access to all non-public information about the financial condition, operations and future business prospects of BAE, including, without limitation, the illegal and improper activities which the BAE Defendants caused BAE to engage in.

69. At all times material hereto, each of the BAE Defendants was the agent of each of the other BAE Defendants and of BAE, and was at all times acting within the course and scope of said agency.

70. To discharge their duties, the officers and directors of BAE were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and operational affairs of BAE. By virtue of such duties, the officers and directors of BAE were required, among other things, to:

(a) Manage, conduct, supervise and direct the business and internal affairs of BAE in accordance with the laws and regulations of England, the United States, and every country in which BAE conducts business, and pursuant to the charter and bylaws of BAE;

(b) Neither violate nor knowingly permit any officer, director or employee of BAE to violate applicable laws, rules and regulations;

(c) Remain informed as to the status of BAE's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection

therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with applicable laws and regulations;

(d) Establish and maintain systematic and accurate records and reports of the business and internal affairs of BAE and procedures for the reporting of the business and internal affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) Maintain and implement an adequate and functioning system of internal legal, financial and management controls, such that BAE's operations would comply with all applicable anti-corruption/anti-bribery laws, BAE's financial statements and information filed with the English and U.S. financial regulators and disseminated to the public and to BAE shareholders in Directors' Reports would be accurate and the actions of its directors would be in accordance with all applicable laws; and

(f) Exercise reasonable control and supervision over the public statements to the securities markets, investors and public shareholders of BAE by the officers and employees of BAE and any other reports or other information required by law from BAE and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of BAE and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

71. During all times relevant hereto, each of the BAE Defendants occupied positions with BAE or were associated with the Company in such a manner as to make them privy to confidential and proprietary information concerning BAE, its operations, finances and financial condition. Because of these positions and such access, each of the BAE Defendants knew that the true relevant facts specified herein had not been disclosed to and were concealed from BAE's shareholders. The BAE Defendants, as corporate fiduciaries entrusted with non-public information, are obligated to

disclose material information regarding BAE and to take any and all actions necessary to ensure that the officers and directors of BAE do not abuse their privileged positions of trust, loyalty and fidelity in a manner which causes the Company to violate the law.

72. BAE's Board of Directors has admitted that the very type of conduct alleged herein, *i.e.*, payment of improper kickbacks or bribes, can harm BAE – while at the same time falsely assuring BAE's shareholders (owners) that no such conduct had occurred or would occur. BAE's 2006 Annual Report issued in 4/07 stated:

> **The Group is subject to risk from a failure to comply with laws and regulations.**
>
> ***The Group's operations are subject to numerous domestic and international laws, regulations and restrictions, and non-compliance with these laws, regulations and restrictions could expose the Group to fines, penalties, suspension or debarment, which could have a material adverse effect.***
>
> The Group has contracts and operations in many parts of the world and operates in a highly regulated environment. ***The Group is subject to numerous UK, US and other laws and regulations, including, without limitation, regulations relating to import-export controls, money-laundering, false accounting, anti-bribery and anti-boycott provisions*. . . .**
>
> ***Failure by the Group or its sales representatives, marketing advisers or others acting on its behalf to comply with these laws and regulations could result in administrative, civil or criminal liabilities and could result in significant fines and penalties and could result in the suspension or debarment of the Group from government contracts for some period of time or suspension of the Group's expert privileges.***
>
> ***Addressing this exposure the Group has mandated policies and procedures to help ensure that employees act with the highest ethical standards and comply with relevant laws and regulations. In particular, all dealing with sales representatives and market advisers are governed by detailed compliance procedures, the application of which is monitored by a dedicated compliance function.***

73. BAE's 2004 Annual Report also stressed the importance of compliance with anti-bribery and anti-corruption laws, stating:

> **Compliance with international anti-corruption laws**
>
> ***BAE Systems demands and expects honesty, integrity and fairness in all aspects of its business. In support of this expectation, the company is committed to***

*compliance with laws implementing the OECD Anti-Bribery Convention and the US Foreign Corrupt Practices Act. The company will not tolerate bribery or any attempt by way of gifts, payments or favours to influence improperly the decisions of our customers or suppliers.*

*A comprehensive compliance programme has been in place for a number of years and is aimed at ensuring that our policies in this area are observed and enforced. . . .*

*The Board recognises that compliance with these two areas is of critical importance to the company.*

74. BAE's 2005 Annual Report stated:

**Key issues for our business**

* * *

*The key areas our stakeholders consider material to our business are anti-bribery and corruption practices . . . .*

* * *

**Ethics**

BAE Systems is committed to meeting the highest ethical standards in our dealings with others. The nature of our business means it is particularly important that we have strong values and an awareness of public concerns. ***We are confident that we meet the highest ethical standards in our dealings with others and have the processes in place to ensure our employees comply with the law in all the countries where we operate. We also recognise the importance of demonstrating this to our stakeholders.***

(b) The 2006 Directors' Corporate Responsibility Report stated:

**Ethics**

We are committed to meeting the highest ethical standards in our relationships with others. We will not tolerate unethical behaviour or attempts to improperly influence the decisions of customers or suppliers.

***Unethical behaviour is wrong, could lead to loss of business, seriously damage our reputation and leave the Group and its employees open to criminal sanction.***

* * *

**Progress**

**Meeting our standards**

The Group has training and awareness programmes to ensure employees understand our policies and the standards expected of them.

We provide training on our anti-bribery programme to managers from marketing, commercial, procurement, finance, customer support and other functions . . . . On completing the training, employees are required to sign a statement confirming they will comply with our policies and will report any issues of concern. This training is mandatory for all senior employees and for those employees involved in dealings with marketing advisers. All BAE Systems' marketing advisers are subject to rigorous due diligence under our compliance programme, are made aware of our anti-bribery policy and are expected to maintain our ethical standards.

* * *

***We do not tolerate unethical or illegal conduct.***

75. BAE's Board has admitted it is its responsibility to assure BAE's compliance with such laws. According to BAE, in describing its Board, its procedures and responsibilities:

**Board Charter**

The Board is responsible for the good management of the Company . . . .

* * *

**Standards and Values**

The Board shall set values and standards and agree[d] policies and processes that shall be used to guide the affairs of the Company. ***This shall include the setting of clear principles of ethical conduct that apply to all activities undertaken by the Company.***

* * *

**Controls**

The Board shall ensure that an effective system of internal controls is in place at all times. Such a system shall be used to identify and manage risks that threaten the fulfilment of the Company's business objectives. ***This includes . . . non-compliance with law and regulation, fraud . . . and failure to maintain appropriate accounting records.***

* * *

**Matters reserved for the Board**

1. Approving the Company's . . . ***principles of ethical conduct*** . . . .

76. Elsewhere, BAE's 2000 Annual Report stated:

**Statement of directors' responsibilities**

* * *

The directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the company and to enable them to ensure that the accounts comply with the Companies Act 1985. They have a general responsibility for taking such steps as are reasonably open to them to safeguard the assets of the group and to prevent and detect fraud and other irregularities.

77. BAE's 2001 Annual Report also stated:

**Statement of directors' responsibilities**

* * *

The directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the company and to enable them to ensure that the accounts comply with the Companies Act 1985.

78. BAE's 2003 Annual Report stated:

**Statement of directors' responsibilities**

* * *

The directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the company and to enable them to ensure that the financial statements comply with the Companies Act 1985.

79. According to BAE's Board, responsibility for compliance with anti-corruption/anti-bribery laws is assigned to the Board's Corporate Responsibility Committee. The BAE Board has stated:

**Corporate Responsibility Committee – Terms of Reference**

* * *

6. **Duties**

6.1 The Committee shall assist the Board in overseeing the development of strategy and policy ***on . . . ethical issues***.

6.2. The Committee shall monitor and review the Company's performance in managing . . . ethical and reputational risks. Specifically, the Committee shall be satisfied that appropriate

policies, systems and metrics are in place . . . . ***These shall include . . . business ethics and compliance with anti-corruption laws and regulation.***

* * *

6.5. The Committee Chairman shall report to the Board . . . on a regular basis.

80. BAE's 2004 Annual Report also stated:

**Corporate responsibility**

The information below acts as a summary of our principles and corporate responsibility activities during 2004 and key highlights from the last year. For the first time the full Corporate Responsibility Report has been formally reviewed by the BAE Systems Board and is available to all stakeholders.

* * *

We are determined to be regarded as a well-managed, responsible company. ***As a global aerospace and defence business, our*** competitiveness and ***future success*** depends not only on the skills of our employees and the quality of our products, but also on our standing in the community and our commitment to high standards of corporate governance ***and corporate responsibility (CR). We aim to be, and to be seen as, a responsible corporate citizen in all the communities in which we operate worldwide.***

We have developed broad statements of intent to encapsulate our strategy and direction on corporate responsibility. These are:

* * *

**Marketplace**: ***We are committed to ensure compliance with the laws and controls governing defence exports everywhere we operate and ensure we meet the highest standards of conduct in our work.***

**Management**

Overall responsibility for CR lies with the board of directors.

* * *

**Governance and risk**

Governance of CR risks are an integral part of our overall corporate governance.

* * *

***As a company we demand and expect honesty, integrity and fairness in all aspects of our business. We are committed to comply with the law in every country where we operate. This includes laws implementing the OECD Anti-Bribery Convention and the US Foreign Corrupt Practices Act. We will not tolerate bribery or other attempts to influence improperly the decisions of customers and suppliers.***

***We have an anti-corruption compliance programme in place throughout the company. This includes robust procedures governing transactions with marketing consultants, the proper use of corporate hospitality and our procurement processes.***

81. BAE's directors have repeatedly denied any impropriety regarding the Al-Yamamah contract. According to BAE's web site:

**OUR POLICIES ON BUSINESS ETHICS**

***The intent of our policies is to establish compliance with the law as the minimum*** . . . .

Our Operational Framework includes policies and governance systems on business ethics. ***It requires all BAE Systems employees to act with honesty [and] integrity . . . and states that we will not tolerate bribery or other attempts to improperly influence the decisions of customers or suppliers.***

* * *

***The Operational Framework is supported by more detailed policies covering topics such as . . . anti-corruption. Our anticorruption programme has been established in alignment with international standards*** . . . .

* * *

**ETHICS MANAGEMENT STRUCTURE**

Compliance with our ethical policies and principles is the specific responsibility of our Group Legal Director, Philip Bramwell, who performs this task on behalf of the Executive Committee and the Board of Directors. . . .

The heads of each business are responsible for ensuring that employees in their area are familiar with the requirements of our business ethics policies, know what is expected of them and know how to act if they suspect wrongdoing. . . .

In the UK our Ethics Review Committee is chaired by the Group Audit Director; its members are the Director of Corporate Responsibility, the Director of Employee Relations, the Director of International Compliance and the Director of Security. The Committee reviews issues raised on the ethics helpline to ensure that these matters are investigated and that appropriate action is taken.

In the US our ethics programme is run by an Ethics Steering Committee with representatives from each operating group and our legal and human resources departments. This reports to an Executive Ethics Oversight Committee made up of senior executives and chaired by the Senior Vice President General Counsel of BAE Systems. An Ethics Officer in each North American business unit is responsible for investigating allegations of unethical conduct.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

82. Plaintiff brings this action derivatively in the right and for the benefit of BAE to redress injuries suffered and to be suffered by BAE as a direct result of the breaches of fiduciary duty, violations of law, misappropriation of information and corporate waste, as well as the aiding and abetting thereof, by the BAE Defendants. BAE is named as a nominal party solely in a derivative capacity.

83. In bringing this action, plaintiff has satisfied all statutory procedural requirements of applicable law. First, plaintiff has standing to bring this action as it is a shareholders and/or beneficial owner of BAE and was a shareholder and/or beneficial owner of BAE at relevant times. Second, plaintiff will fairly and adequately represent the interests of BAE in enforcing it rights, as detailed herein. Third, this action is not being used by plaintiff to gain any personal advantage, nor does plaintiff maintain any personal agenda other than seeking to correct the wrong that has been done to the Company. Fourth, this action is not a collusive one to confer jurisdiction on this Court which it might not otherwise have. To this end, plaintiff has taken steps to file this action and has retained counsel experienced in derivative litigation and corporate governance actions. To the extent court permission is required to continue this action, such permission is hereby sought.

84. As of the filing of this Complaint, the BAE Board consists of defendants Olver, Cartellieri, Turner, Geoghegan, Havenstein, King, Rose, Carroll, Hartnall, Mason, Quarta, Rudd, Weinberg and Inglis. These defendants are referred to as the "BAE Board."

85. The BAE Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action, as detailed herein, and thus,

pursuant to Federal Rule of Civil Procedure 23.1 and otherwise, plaintiff's demand upon the Company to take the action requested herein is excused. For the following reasons and those detailed elsewhere in this Complaint, BAE's Board and its management are also antagonistic to this lawsuit and thus, plaintiff has not made a pre-filing demand on the BAE Board to initiate this action:

(a) The factual allegations contained herein detail a widespread, continuous, global pattern and practice of misconduct that spans more than 20 years. Each of the BAE Defendants had the ability to cause BAE to disclose the existence of the kickback scheme during that 20-year period and failed to do so.

(b) The misconduct alleged herein is so egregious that it has created a substantial fear of criminal or civil liability in the BAE Board in light of the pending U.K. SFO and DOJ investigations. As a result, the entire BAE Board is incapable of exercising valid business judgment as of the filing of this suit, as to investigate and/or prosecute these claims would expose (or increase the exposure of) each Board member to criminal and/or civil liability for the misconduct alleged herein.

(c) In addition, the misconduct is so widespread and persisted over so many years that it cannot be the result of an isolated incident or periodic failure of oversight of procedure – it had to be the result of a deliberate policy of the Board or willful or reckless disregard for what has been going on with said illegal or improper payments.

(d) The BAE Board has repeatedly denied allegations of wrongdoing alleged herein and claimed the "payments" alleged herein were proper. According to BAE's web site:

> **FREQUENTLY ASKED QUESTIONS**
>
> 1. IS THERE ANY SUBSTANCE IN THE ONGOING MEDIA ALLEGATIONS ON BRIBERY AND CORRUPTION?
>
> We are disappointed that recent media coverage is proceeding on the assumption, unsupported by any evidence, that allegations against BAE Systems are true and offences have been committed. ***We continue to reject these allegations***. . . .

We take our obligations under the law extremely seriously and will ***continue*** to comply with all legal requirements around the world.

* * *

5. DO YOU PAY COMMISSIONS TO ADVISERS OR CONSULTANTS TO WIN EXPORT SALES?

Companies operating in global markets, in any industry, need access to local advise, capabilities and guidance in order to pursue business. It is perfectly legitimate that such advisers/consultants are paid for what they do. ***As with all aspects of our business we audit these arrangements to ensure that no impropriety is taking place*** . . . .

(e) Vigorously investigating the allegations contained herein would require the BAE Board to denounce entrenched positions. Defendants could also have to reveal evidence of their culpability and criminality. Prosecution of the allegations contained herein in light of the BAE Board's prior claims of "innocence" would undermine each Board member's defense and exponentially increase each Board member's exposure to potential civil and/or criminal liability.

(f) The members of BAE's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein. These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

(g) The members of BAE's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action. Defendants Olver, Turner, Havenstein, King, Rose and Geoghegan are so-called "inside directors" as they are executives of BAE. In fact, nearly half of BAE's 13 directors are executives of the Company and are dependent upon the other

defendants for continuation of their livelihood. The inside directors were well compensated for their services during the relevant period, as follows:

        (i)      **Cash Bonuses**. The inside directors are eligible to receive significant cash bonuses as part of their compensation equal to 100% of base salary (150% for the US-based executive director and the CEO). The performance measures the Board's Remuneration Committee uses to justify these cash bonuses include earnings per share ("EPS") and cash targets (and EBITA). The EPS figure used for the bonus plan (and the Executive Share Option Plan described below) is based on underlying reported EPS but may be adjusted (up or down) at the Committee's discretion. The Remuneration Committee determined for 2006 that the Executive Directors earned "stretch" bonuses based on the Company's performance, regardless of the fact that that "performance" was enhanced by the misconduct alleged herein.

        (ii)      **Stock Options**. Options granted under the BAE Executive Share Option Plan ("ESOP") are exercisable between the third and tenth anniversary of their grant. Option grants under the ESOP may be set as high as 1.5 times base salary (2.25 times base salary for the CEO). In determining the performance measure for the ESOP (and for the Matching Shares in the Share Matching Plan described below), reported EPS is a heavily weighted factor.

        (iii)      **Performance Share Plan**. Awards of shares made under the Performance Share Plan ("PSP") are vested based on BAE meeting performance criteria established by the Remuneration Committee. Awards under the PSP can be as high as 2 times base salary. Vesting is based largely on a Total Shareholder Return (share price growth plus dividends) ranking relative to a comparator group of 18 other defense and aerospace companies operating internationally, as selected by the Remuneration Committee. By focusing almost exclusively on BAE's share performance *vis-a-vis* other defense/aerospace companies, and disregarding ethical and operational compliance issues, the PSP encouraged the misconduct alleged herein and will continue

to encourage such misconduct. For instance, performance for the 2007 awards provides that: "100% of the conditional shares [will be] awarded to directors if the Company's TSR [Total Shareholder Return] over a three-year period ***is in the top 20% of TSRs*** achieved by the sectoral comparator group, with 25% vesting if the TSR ***is in the top 50%***." Thus BAE's officers are encouraged to obtain market share at all costs.

(iv) **Restricted Share Plan ("RSP").** BAE previously provided inside directors with the option to taking all or a portion of their cash bonus in the form of restricted shares. If an election was made to take shares through the RSP, they were held in trust for a period of three years after which the Company awarded the individual an equal number of shares (Matching Shares). The matching award of shares was historically not subject to any performance criteria but has now been superseded by the Share Matching Plan which is subject to performance criteria.

(v) **Share Incentive Plan.** The BAE Share Incentive Plan permits inside directors to purchase Partnership Shares in BAE. Dividends paid in respect of the Partnership Shares are reinvested as Dividend Shares. In 12/06, the Remuneration Committee added a Matching Shares element to the Share Incentive Plan Partnership Shares arrangement and inside directors now receive one free Matching Share for every two Partnership Shares owned. The Matching Shares are not subject to performance conditions.

(h) The BAE Board has delegated to the Remuneration Committee its authority to set executive pay for the Chairman and executive directors. Specifically, the Remuneration Committee is charged with: "Approv[ing] the creation of employee share based incentive schemes and . . . any performance conditions to be used for such schemes" and "[d]etermining any share scheme performance criteria." The Remuneration Committee currently consists of (and consisted in 2006 of) defendants Birley (Chair), Rudd, Quarta and Weinberg. The Remuneration Committee consisted in 2005 of Birley (Chair), Quarta and Weinberg and in 2004 of Birley (Chairman),

Cartellieri and Mason. The Committee included Birley (Chairman), Cartellieri and Mason in 2003 and was part of the Nominations Committee in 2002. By virtue of the fact that each member of the Remuneration Committee was charged with ensuring that BAE's compensation principles preserved the Company's assets and promoted long-term shareholder value, and the compensation principles actually applied achieved the contrary, defendants Birley, Rudd, Quarta, Weinberg, Cartellieri and Mason are personally implicated by the allegations contained herein. Moreover, the Remuneration Committee consults defendants Olver and Turner in establishing the pay for the other executive director defendants, effectively permitting Olver and Turner to dominate and control the other executive defendants.

(i) The BAE Board's non-executive directors are also rewarded handsomely. Fees payable to the non-executive directors are set by the Non-Executive Directors' Fees Committee. In addition to receiving a directors' stipend (including additional fees for serving as chairs of the BAE Board committees), directors receive a transatlantic meeting allowance of £4,000 per board meeting for traveling to the U.S. from Europe for board meetings or vice versa. The fees payable to the non-executive directors were revised in 2/07 as follows: a fee of £77,500 for the chairman of the Audit Committee; a fee of £72,500 for each of the chairmen of the Remuneration Committee, Corporate Responsibility Committee, and the Senior Independent Director; and a fee of £57,500 for each of the other non-executive directors. Beginning in 1/05, the Board delegated its authority to determine fees payable to non-executive directors to the Non-Executive Directors' Fees Committee which is currently comprised of defendants Olver (Chairman), Havenstein, and Turner and Group Legal Director Philip Bramwell. The Non-Executive Directors' Fees Committee was comprised in 2005-2006 of Olver (Chairman), Turner, Lester and Ronald. By virtue of the fact that each member of the Non-Executive Directors' Fees Committee was charged with ensuring that BAE's compensation principles preserved the Company's assets and promoted long-term

# EXHIBIT A

shareholder value, and the compensation principles actually applied achieved the contrary, defendants Olver, Havenstein, Lester, Turner and Ronald are personally implicated in the allegations contained herein.

(j) Despite defendants' failure to oversee and manage the Company's operations, its repeated violations of law and its resulting exposure to potential criminal liability, excessive fines and penalties, the directors and officers were rewarded handsomely throughout the Relevant Period. Set forth below are tables showing the compensation to the BAE Defendants during 2002-2006:

**Executive Director Defendant Compensation**

| | **Year** | **Salary** | **Bonus** | **Salary + Bonus** | **2002-2006** |
|---|---|---|---|---|---|
| **Turner** | 2002 | £577,000 | £115,000 | £692,000 | **£7,067,000** |
| Chief Executive Officer | 2003 | 675,000 | 491,000 | 1,166,000 | |
| | 2004 | 730,000 | 712,000 | 1,442,000 | |
| | 2005 | 800,000 | 792,000 | 1,592,000 | |
| | 2006 | 870,000 | 1,305,000 | 2,175,000 | |
| **Geoghegan** | 2002 | £186,000 | £19,000 | £205,000 | **£3,408,000** |
| Group Executive Officer | 2003 | 403,000 | 198,000 | 601,000 | |
| | 2004 | 423,000 | 399,000 | 822,000 | |
| | 2005 | 445,000 | 423,000 | 868,000 | |
| | 2006 | 468,000 | 444,000 | 912,000 | |
| **Lester** | 2002 | £487,000 | £73,000 | £560,000 | **£4,493,000** |
| Group Legal Director | 2003 | 502,000 | 231,000 | 733,000 | |
| | 2004 | 518,000 | 489,000 | 1,007,000 | |
| | 2005 | 540,000 | 529,000 | 1,069,000 | |
| | 2006 | 568,000 | 556,000 | 1,124,000 | |
| **Mogford** | 2002 | £391,000 | £39,000 | £430,000 | **£3,656,000** |
| Group Executive Officer | 2003 | 403,000 | 169,000 | 572,000 | |
| | 2004 | 423,000 | 414,000 | 837,000 | |
| | 2005 | 445,000 | 441,000 | 886,000 | |
| | 2006 | 468,000 | 463,000 | 931,000 | |
| **Ronald** | 2002 | £345,000 | £97,000 | £442,000 | **£4,905,000** |
| Chief Operating Officer | 2003 | 451,000 | 388,000 | £839,000 | |
| | 2004 | 433,000 | 637,000 | £1,070,000 | |
| | 2005 | 495,000 | 744,000 | £1,239,000 | |
| | 2006 | 542,000 | 773,000 | £1,315,000 | |

| | Year | Salary | Bonus | Salary + Bonus | 2002-2006 |
|---|---|---|---|---|---|
| **Rose** | 2002 | £435,000 | £44,000 | £479,000 | **£4,068,000** |
| Group Finance Director | 2003 | 448,000 | 188,000 | 636,000 | |
| | 2004 | 463,000 | 446,000 | 909,000 | |
| | 2005 | 500,000 | 495,000 | 995,000 | |
| | 2006 | 530,000 | 519,000 | 1,049,000 | |

| | 2002 | 2003 | 2004 | 2005 | 2006 | 2002-2006 |
|---|---|---|---|---|---|---|
| **Chairman Fees/Salary** | | | | | | |
| Evans | £528,000 | £400,000 | | | | £928,000 |
| Olver | | | £256,000 | £500,000 | £500,000 | £1,256,000 |
| **Non-Executive Director Defendant Fees** | | | | | | |
| Birley | £36,000 | £44,000 | £55,000 | £63,000 | £73,000 | £271,000 |
| Carroll | | | | £18,000 | £70,000 | £88,000 |
| Cartellieri | £36,000 | £36,000 | £45,000 | £53,000 | £58,000 | £228,000 |
| Hartnall | | £36,000 | £65,000 | £73,000 | £78,000 | £252,000 |
| Mason | | £42,000 | £55,000 | £63,000 | £73,000 | £233,000 |
| Portillo | £11,000 | £36,000 | £45,000 | £53,000 | £17,000 | £162,000 |
| Quarta | | | | £18,000 | £58,000 | £76,000 |
| Rudd | | | | | £15,000 | £15,000 |
| Weinberg | | | | £34,000 | £77,000 | £111,000 |

(k) Moreover, since ***none*** of the non-executive director fees are paid in the form of stock or stock options and ***there are no share ownership requirements*** for non-executive directors, the substantial majority of outside directors ***own no equity interest in BAE***, including defendants Carroll, Cartellieri, Portillo, Quarta, Rudd, and Weinberg. As these directors have no pecuniary interest in BAE other than their director stipends, the continuation of which is incumbent upon their remaining in the good graces of BAE's executive directors, defendants Carroll, Cartielliri, Portillo, Quarta, Rudd, and Weinberg are dominated and controlled by the inside directors, including Olver, Turner and Havenstein.

(l) The members of BAE's Audit Committee were charged with (i) reviewing the effectiveness of the Company's financial reporting, and internal control policies and procedures for the identification, assessment and reporting of risk; (ii) monitoring the role and effectiveness of the internal audit function; (iii) considering and making recommendations to the Board on the

appointment of the outside auditors; (iv) keeping the relationship with the outside auditors under review, including the terms of their engagement and fees, their independence and their expertise, resources and qualifications; (v) monitoring the integrity of the Company's financial statements; and (vi) reviewing significant financial reporting issues and judgments. The Audit Committee specifically received presentations during the relevant period addressing the Company's purported "anti-bribery compliance processes." The Audit Committee currently consists of defendants Hartnall (Chairman), Cartellieri and Mason, though defendant Quarta attends all meetings but cannot formally sit on the Committee as the Audit Committee Charter requires that a majority be British nationals and Quarta and Cartellieri are both U.S. citizens. The Audit Committee consisted of Hartnall (Chairman), Cartellieri, Mason, Quarta and Portillo during 2006 and 2005. In 2004 the Audit Committee included Hartnall (Chairman), Birley, Mason and Portillo; in 2003 it included Hartnall (Chairman), Birley and Portillo. By virtue of the fact that each member of the Audit Committee was charged with ensuring that BAE complied with its anti-bribery compliance processes and applicable law and with ensuring that BAE's accounting and reporting practices reflected all potential liability, defendants Hartnall, Cartellieri, Quarta, Mason, Portillo and Birley are personally implicated by the allegations contained herein.

(m)    Members of the BAE Board as a whole have close alliances with and allegiances to the inside directors, who engaged in the primary illegal activities complained of herein, and are dependent upon them for continuation of their lucrative and prestigious positions as directors:

(i)    ***Interlocking Directorships***. Until 7/1/04, Olver was deputy group chief executive at BP p.l.c. and was appointed to the number two slot at BP on 1/9/03. Olver still serves as deputy chairman of TNK-BP, which houses and operates BP's Russian assets. Inglis serves as managing director of BP, and director of BP and chief executive of its exploration &

production business which oversees TNK-BP. BP is currently embroiled in a political scandal involving allegations that BP provided sex, drugs and prostitutes to Russian businessmen to obtain BP's Russian assets. Upon disclosure of BP's nefarious negotiation tactics, the Russian government unilaterally stripped BP of significant valuable Russian oil assets.

(ii)    ***Interlocking Directorships***:  Since 2006, defendant Turner has served as a director of Lazard Group, a global investment bank, and its U.S. subsidiary Lazard Ltd. Defendant Carroll is a former CEO of Shell Oil Co., the U.S. arm of Royal Dutch Shell, which does substantial business with the Lazard banks.  Defendant Weinberg is a partner in the boutique investment bank Perella Weinberg Partners.  Perella was formerly with Wasserstein Perella, the investment bank he co-founded with Bruce Wasserstein, who is now the head of Lazard. One of the Perella Weinberg partners formerly worked at Worms & Cie., the Lazard-controlled French bank at the heart of the French Synarchist movement.

(iii)    ***Interlocking Directorships***:  Defendant Quarto is a partner in the private equity fund Clayton, Dubilier & Rice, which has significant ties to J.P. Morgan bank. Defendant Carroll is a former chairman and CEO of Fluor Corp., a global engineering firm now headed by J.P. Morgan vice chairman Lord Robin Renwick.

(iv)    ***Interlocking Directorships***: Michael (Mike) P. Rouse serves as Group Marketing Director of Programmes of BAE. Rouse has also been a director of Saab AB since 2000. Defendant Rose has served as a director and member of the Remuneration Committee at Saab since 1998.

(n)    In order to bring this action for breaching their fiduciary duties, the members of the BAE Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

(o) BAE's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of BAE. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions which eliminate coverage for any action brought directly by BAE against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of BAE, there would be no directors' and officers' insurance protection and thus, this is a further reason why the Director Defendants will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

## SUBSTANTIVE ALLEGATIONS

### The BAE Directors' False and Misleading Reports

86. For many years in their Directors' Annual Reports and other communications with shareholders, BAE's directors have stressed their successful management and oversight of BAE, its ethical behavior and compliance with anti-corruption laws. Each of these representations was false and misleading and was made with reckless disregard for the truth by the directors issuing them. The Directors' Reports to BAE shareholders set forth at ¶¶72-81 and the annual directors' reports set forth below were each false and misleading.

87. The 2000 Chairman's letter dated (2/01) by Evans stated:

> BAE Systems is a well-balanced company ***underpinned by a strong order book*** and robust balance sheet . . . .

88. BAE's 2001 Annual Report stated:

**Overview**

In 2001, we successfully delivered on our plans . . . . The order book increased 6.8% to £43.8bn.

(Footnote omitted.)

89. Chairman Evans' 2001 letter (dated 2/02) stated:

BAE SYSTEMS has delivered on its plans for 2001. . . . The outlook for our defence businesses remains good with a number of important new programmes set to contribute to our profitability.

90. CEO Weston's 2001 letter (dated 2/02) stated:

Since the early nineties, we have been pursuing a strategy to transform the company into a world-wide business with systems engineering at its heart. The progress in 2001 has secured that transformation. The company's strategy for growth is directed along three main avenues:

– To maximise the value of our existing portfolio through the growth of our order book . . . .

* * *

We have made good progress against each of these.

91. Chairman Evans' 2002 letter to shareholders (dated 2/03) stated:

BAE SYSTEMS is an immensely capable company whose core strength is its people. Its innovation and technological excellence comes from providing an environment in which those people can realise the highest level of performance.

92. BAE's 2002 Annual Report stated:

**Business integrity**

We are committed to do business in an ethical manner. ***This means complying with all applicable laws and regulations and with the ethical standards we have set ourselves.***

* * *

***BAE SYSTEMS adheres to the relevant charters, codes of practice, guidelines and internal policies that govern exports of defence equipment.***

Our policy is to:

– maintain an active and open dialogue with relevant government departments in the territories in which we operate ***to ensure compliance with government***

***policy and the law and regulations of those territories governing the export of our products***;

* * *

– ***respect the values of the international community and the laws of those countries where we conduct our business.***

93. Chairman Evans' 2003 letter (dated 2/04) stated:

**Significant progress**

This has been a year of significant progress. We have continued to build on our good first half and have delivered full year results to plan.

* * *

**Business transformation**

. . . Today BAE Systems is one of a small group of companies at the top of the world's aerospace and defence industry.

94. CEO Turner's 2003 letter (dated 2/04) stated:

**Performance**

BAE Systems has market leading businesses operating in the fields of systems and software, support services and, through Airbus, large commercial jets. . . .

The North America business group performed well, with double digit organic growth and strong cash flows. This business continued to design, develop and supply world class systems and expertise to key US programmes.

95. BAE's 2004 Annual Report stated:

**Highlights**

Programmes business outlook improving

* * *

North America delivering good growth

* * *

Strong cash flow

* * *

Record order book

* * *

**Outlook**

* * *

Overall, the performance of the company's defence businesses is expected to continue to improve in 2005 . . . .

* * *

BAE Systems is now delivering well against its strategy and objectives. . . . [T]he actions continuously being taken to improve performance, enable the group to look forward with confidence to delivering growing returns to its shareholders.

96. Chairman Olver's 2004 letter (dated 2/05) stated:

I am pleased to report that BAE Systems has made good progress in 2004. . . . Much progress has been made to deliver long-term shareholder value.

97. CEO Turner's 2004 letter (dated 2/05) stated:

BAE Systems performed well in 2004, both in delivering good financial results and executing actions that will underpin performance improvement over the longer term.

* * *

We look forward with confidence to delivering growing returns for our shareholders in the future.

98. The BAE 2004 Annual Report also stated:

**Corporate governance**

Successful companies are valuable not only to their shareholders but also to a wide community of individuals and organisations that benefit from the goods, services and wealth they generate. A company's board is ultimately responsible for ensuring that the right leadership, strategy and control structures are present to produce and sustain the delivery of this value. The essential elements of good corporate governance are having well thought out and robust means of delivering the right leadership, the right strategy and the right controls.

* * *

**The Board**

* * *

The Board of BAE Systems recognises that it is responsible for the leadership of the company and that in discharging this responsibility it is required to take decisions objectively and in the best interests of the company. The Board through a single document, the Operational Framework, has provided all employees with details of the standards of behaviour and key policies that are mandatory across the company. The areas covered by it include:

– business ethics

* * *

**Internal control**

* * *

BAE Systems has developed a system of internal control that encompasses, amongst other things, the policies, processes, tasks and behaviours, that taken together, seek to:

– facilitate the effective and efficient operation of the company by enabling it to respond appropriately to significant operational, financial, ***compliance*** and other risks that it faces in carrying out its business;

– assist in ensuring that internal and external reporting is accurate and timely and based on the maintenance of proper records supported by robust information gathering processes; and

– assist in ensuring that the company complies with applicable laws and regulations at all times and also internal policies in respect of the standards of behaviour and conduct mandated by the Board.

* * *

The Board has delegated to the Audit Committee responsibility for reviewing in detail the effectiveness of the company's system of internal controls including risk management processes. Having undertaken such reviews, the Committee reports to the Board on its findings so that the Board as a whole can take a view on these matters. In order to assist the Audit Committee and the Board in this review, the company utilises a process, the Operational Assurance Statement (OAS) process. This has been subject to regular review over a number of years, which has resulted in a number of refinements being made.

* * *

***The overall responsibility for the system of internal control within BAE Systems rests with the directors of the company.***

* * *

**Corporate responsibility**

Recognising the importance of corporate responsibility (CR) concerns the social, environmental and ethical issues associated with the company's operations the Board has agreed that it will review formally on an annual basis the company's performance in this area.

* * *

**Export of defence equipment**

The key elements of our policy concerning the export of defence equipment are:

– to maintain an active and open dialogue with relevant government departments in the territories in which we operate to ***ensure compliance with government policy and the law and regulations of those territories governing the export of our products***;

* * *

– ***to respect the values of the international community and the laws of those countries where we conduct our business.***

**Compliance with international anti-corruption laws**

***BAE Systems demands and expects honesty, integrity and fairness in all aspects of its business. In support of this expectation, the company is committed to compliance with laws implementing the OECD Anti-Bribery Convention and the US Foreign Corrupt Practices Act. The company will not tolerate bribery or any attempt by way of gifts, payments or favours to influence improperly the decisions of our customers or suppliers.***

***A comprehensive compliance programme has been in place for a number of years and is aimed at ensuring that our policies in this area are observed and enforced. . . .***

***The Board recognises that compliance with these two areas is of critical importance to the company.***

The company publishes a separate Corporate Responsibility Report.

99. BAE's 2005 Annual Report stated:

**Highlights, outlook and results in brief**

* * *

- Programmes business profitability and risk profile improved

* * *

**Outlook**

Looking forward to 2006, we anticipate an improved performance . . . .

100. Chairman Olver's 2005 letter (dated 2/06) stated:

With a combination of effective strategy, continued good programme execution and achievement of key business objectives, including a focus on winning future business, 2005 was a successful year for BAE Systems.

* * *

In addition to overseeing Company strategy, the Board is responsible for monitoring the Company's performance, maintaining the governance framework, overseeing succession planning for the Board and senior executives, setting appropriate standards of conduct and monitoring compliance with those standards.

101. CEO Turner's 2005 letter (dated 2/06) stated:

BAE Systems has performed well against its objectives in 2005. Financial results have been delivered in line with our plan and further significant steps have been taken to implement the Company's strategy.

* * *

In 2005, the Company has continued to improve performance . . . .

* * *

In summary, we have had a good year, delivering a strong set of financial results and meeting our overall objectives for 2005.

***We are successfully executing our strategy. . . . We are delivering shareholder value by being the premier transatlantic defence and aerospace company.***

102. The 2005 Report also stated:

BAE Systems recognises its responsibilities to the people it employs, its customers and suppliers, its shareholders, the wider community and to the environment.

* * *

***Corporate responsibility (CR) in BAE Systems is about good business practice and continual improvement. We recognise our wide-ranging responsibilities and our CR framework has been developed around key stakeholder interest and feedback, potential risk to our business and the extension, review and improvement of existing practices.***

**Governance of CR**

The board of directors has overall responsibility for governance of CR matters within the Company.

* * *

**Key issues for our business**

It is important that our CR reporting addresses issues that are material to our business and reflect stakeholder concerns. . . .

***The key areas our stakeholders consider material to our business are anti-bribery and corruption practices*** . . . .

* * *

**Ethics**

BAE Systems is committed to meeting the highest ethical standards in our dealings with others. The nature of our business means it is particularly important that we have strong values and an awareness of public concerns. ***We are confident that we meet the highest ethical standards in our dealings with others and have the processes in place to ensure our employees comply with the law in all the countries where we operate. We also recognise the importance of demonstrating this to our stakeholders***. . . .

***We do not tolerate unethical or illegal conduct. The consequences of such conduct may be far reaching and severe not only for the Company and its employees, but also for other stakeholders. For example, we, and our employees, may be subject to criminal sanction, our reputation may be tarnished and we may suffer a loss of business. Such conduct is also morally wrong.***

103. BAE's 2006 Annual Report issued in 3/07 contained false statements:

(a) Olver's 2006 letter, dated 2/21/07, stated:

Good operational performance and effective implementation of a well-defined, soundly based strategy are combining to deliver real performance.

The focus of the Group's strategy in recent years has seen a drive to improve returns and eliminate excessive risk in the UK-based operations, alongside the expansion of the Group's presence in the US. This twin approach is transforming the Group's performance in the UK market and has established BAE Systems as one of the major US defence companies.

Notable achievements in 2006 included the resolution of the approach to funding the deficit on the Group's pension schemes, the completion of the sale of our 20% interest in Airbus and good progress towards securing further significant

business in Saudi Arabia. Underlying these individual achievements has been a broad-based improvement in performance across the Group.

In addition to continuing to pursue the development of the Group in its two largest defence and aerospace markets, the UK and the US, the Group's strategy recognises opportunities in the other home markets in which BAE systems has a local presence and capability: Australia, Saudi Arabia, South Africa and Sweden.

Alongside the development of the Group in these six home markets, BAE Systems will continue to nurture a high performance culture. The delivery of continuous performance improvement remains key to the twin objectives of delivering cost-effective capability to our customers and maximizing returns for our shareholders.

The Group's strategy is reviewed regularly as part of the Group's annual business planning process. This review tests the continued relevance of the current strategy. The adaptations made to the strategy are set out on page 11 and reflect the progress made over the past 12 months.

* * *

***Our policies for conducting ethical business are clear and unambiguous, with established processes to ensure compliance.***

The underlying UK company law provisions concerning narrative reporting have changed since our last annual report. The matters required to be reported as part of the new business review requirements are dealt with on pages 2 to 40 of this report and cover the Group's activities during the year and likely future developments. . . .

The Group's corporate responsibility performance is summarised on pages 35 to 40 and also detailed in an important separately published report. Like all high performance companies, our policies are kept constantly under review, and we are committed to take action wherever necessary to maintain the highest standard of corporate governance.

(b) Turner's 2006 letter, dated 2/21/07, stated:

**Year in review**

BAE Systems delivered another year of good financial performance, underpinned by programme schedule and cost adherence across the Group and reflecting the benefits now flowing from our world-class Lifecycle Management and Performance Centred Leadership processes.

The performance of the US businesses has again been excellent with the Group's expansion in the US market over recent years generating good returns. Good progress has continued in the UK businesses with programmes on track and meeting their key milestones.

A number of export opportunities have also progressed, most notably in the Kingdom of Saudi Arabia where, under an agreement between the Kingdom of Saudi Arabia and the UK government, the Group is working to modernise the Saudi armed forces including progressing towards a contract for 72 Typhoon aircraft.

* * *

Flight development of the Nimrod MRA4 programme continues . . . .

* * *

Recognising that the security and welfare of the 4,600 employees and their dependants in Saudi Arabia is paramount, a major construction programme is well underway to create two new residential and workplace facilities.

These investments establish a significant industrial footprint in Saudi Arabia with a growing in-Kingdom technical capability. This will enable the group to satisfy many of its Saudi customer's needs from on-shore companies.

* * *

In summary, BAE Systems is progressing well. The Group's strategy is delivering a focused, high performing, defence and aerospace business with good positions in key markets around the globe. As a result, the Group has a robust plan to deliver profitable growth for our shareholders.

(c) BAE's 2006 Annual Report between pages 2-40 stated:

**Business portfolio actions**

The drive to build sustainable, profitable, through-life businesses in the air, land and sea sectors of the UK market continues, building on the good progress last year.

We continue to seek growth in the US through continuing to target above-market organic growth from the Group's established business activities, and by looking for value-enhancing acquisitions.

Following our success in recent years in establishing a global land systems business we continue to pursue growth opportunities in this market sector.

* * *

Two new actions have been introduced.

Building on a relationship that spans several decades we will pursue opportunities to grow our business in the Kingdom of Saudi Arabia. Our focus will be the transition of the relationship from one of an export market to the implementation of a home market strategy.

* * *

BAE Systems is one of the world's leading defence companies and is one of only four companies with global defence sales in excess of $20bn. It is Europe's largest defence company and ranks number seven within the US defence industry.

* * *

**United States**

The Group's US business now delivers over US$9bn (£5bn) of annual sales and employs approximately 40,000 people in 36 states.

* * *

**The Kingdom of Saudi Arabia**

***Saudi Arabia has been an important market for BAE Systems for many decades and there are significant new opportunities to both continue, and strengthen, this relationship into the future.***

A key growth opportunity is the Group's role in supporting the partnership between the governments of the Kingdom of Saudi Arabia and the UK in updating the capability of the Kingdom's armed forces. We are committed to assisting the Kingdom in developing its defence industrial base and the training and up-skilling of its workforce.

* * *

**The Group is subject to risk from a failure to comply with laws and regulations**

The Group's operations are operations are subject to numerous domestic and international laws, regulations and restrictions, and non-compliance with these laws, regulations and restrictions could expose the Group to fines, penalties, suspension or debarment, which could have a material adverse effect.

The Group has contracts and operations in many parts of the world and operates in a highly regulated environment. The Group is subject to numerous UK, US and other laws and regulations, including, without limitation, regulations relating to import-export controls, money-laundering, false accounting, anti-bribery and anti-boycott provisions. . . .

Failure by the Group or its sales representatives, marketing advisers or others acting on its behalf to comply with these laws and regulations could result in administrative, civil or criminal liabilities and could result in significant fines and penalties and could result in the suspension or debarment of the Group from government contracts for some period of time or suspension of the Group's export privileges.

***Addressing this exposure the Group has mandated policies and procedures to help ensure that employees act with the highest ethical standards and comply with relevant laws and regulations. In particular, all dealing with sales representatives and marketing advisers are governed by detailed compliance procedures, the application of which is monitored by a dedicated compliance function.***

In 2004 the UK Serious Fraud Office and Ministry of Defence Police commenced an investigation into suspected false accounting and corruption. ***The investigation is wide ranging and concerns a number of jurisdictions and contractual arrangements.***

* * *

**Governance of CR**

The board of directors has overall responsibility for the governance of CR matters within the Group. Specific responsibility has been assigned to the CR committee of the Board. All members of this Committee are non-executive directors and comprise Peter Weinberg, Professor Sue Birley, Sir Nigel Rudd and Phil Carroll.

***Reputation is vital to the long-term sustainability of all companies***. The CR Committee is central to the Board's oversight of the critical non-financial issues that are fundamental to the Group's reputation. The Committee is responsible for reviewing and monitoring the processes the Group uses to manage social, environmental and ethical risk, as well as supporting the Board in the approval of strategy and policy in this area.

The Committee is supported by the Group Legal Director, Audit Director, Group HR Director and Director of Corporate Responsibility.

* * *

**Ethics**

We are committed to meeting the highest ethical standards in our relationships with others. ***We will not tolerate unethical behaviour or attempts to improperly influence the decisions of customers or suppliers. Unethical behaviour is wrong, could lead to loss of business, seriously damage our reputation and leave the Group and its employees open to criminal sanction.***

**2006 Objectives**

In 2006 two objectives specifically relating to ethics were set within the leadership objectives.

– Meet the standards defined in our internal assurance statement (for ethical issues, the minimum acceptable score within our assurance process is confirmation of compliance with all applicable laws and standards).

– Develop, pilot and roll out ethics training to all employees in the UK and Australia.

**Progress**

Meeting our standards

The Group has training and awareness programmes to ensure employees understand our policies and the standards expected of them.

We provide training on our anti-bribery programme to managers from marketing, commercial, procurement, finance, customer support and other functions. On completing the training, employees are required to sign a statement confirming they will comply with our policies and will report any issues of concern. This training is mandatory for all senior employees and for those employees involved in dealings with marketing advisers.

* * *

Working with others

In July 2006 BAE Systems and other UK defence companies established the UK Defence Industry Anti-corruption Forum, to share good practice on ethics and anti-corruption programmes. Members of the Forum met twice in 2006 and heard from a range of speakers including the Institute of Business Ethics, ICC (UK), Transparency International (UK) and law firms, Linklaters and Bryan Cave LLP.

In the US we are a signatory to the Defense Industry Initiative on Ethics and Business Conduct, and a sponsoring partner of the Ethics and Compliance Officers Association.

* * *

Internal Control

The Board has conducted a review of the effectiveness of the Group's system of internal controls, including financial, operational and compliance controls and risk management systems, in accordance with the Turnbull guidance.

BAE Systems has developed a system of internal control, which has been in place throughout 2006 and to the date of this report, that encompasses, amongst other things, the policies, processes and behaviours that, taken together, seek to:

– facilitate the effective and efficient operation of the Company by enabling it to respond appropriately to significant operational, financial, compliance and other risks that it faces in carrying out its business;

– assist in ensuring that internal and external reporting is accurate and timely and based on the maintenance of proper records supported by robust information gathering processes; and

– assist in ensuring that the Company complies with applicable laws and regulations at all times and also internal policies in respect of the standards of behaviour and conduct mandated by the Board.

* * *

The Board has delegated to the Audit Committee responsibility for reviewing in detail the effectiveness of the Company's system of internal controls. Having undertaken such reviews, the Committee reports to the Board on its findings so that the Board as a whole can take a view on this matter. In order to assist the Audit Committee and the Board in this review, the Company has developed the Operational Assurance Statement (OAS) process. This has been subject to regular review over a number of years, which has resulted in a number of refinements being made.

The OAS requires that each part of the business completes a formal review of its compliance against the Operational Framework, including operational and financial controls and risk management processes. The review is signed off by the managing director of every line of business and relevant functional directors. The OAS is completed every half year and includes a formal assessment of business risk. The overall responsibility for the system of internal control within BAE systems rests with the directors of the Company. Responsibility for establishing and operating detailed control procedures lies with the managing director of each operating business.

(d) Elsewhere, BAE's 2006 Annual Report stated:

The directors of BAE Systems plc present their report, together with the financial statements for the year ended 31 December 2006.

* * *

**Business Review**

The information provided in the operating and financial review on pages 2 to 40 reports on the activities during the year, post balance sheet events and likely future developments. The information in this review constitutes the business review required under the Companies Act and forms part of this Directors' Report.

* * *

The Company, through its internal audit department, monitors compliance against the principal policies and guidelines (including the utilisation of credit) and any exceptions found are reported to the TRMC.

* * *

By order of the Board
David Parkes
Company Secretary
21 February 2007

**Statement of directors' responsibilities in respect of the annual report and the financial statements**

The directors are responsible for preparing the Annual Report and the group and parent company financial statements, in accordance with applicable law and regulations.

Company law requires the directors to prepare group and parent company financial statements for each financial year. Under that law the directors are required to prepare the group financial statements in accordance with International Financial Reporting Standards (IFRS) as adopted by the EU and have elected to prepare the parent company financial statements in accordance with UK Accounting Standards.

The group financial statements are required by law and IFRSs as adopted by the EU to present fairly the financial position and performance of the group: the Companies Act 1985 provides in relation to such financial statements that references in the relevant part of that Act to financial statements giving a true and fair view are references to their achieving a fair presentation.

The parent company financial statements are required by law to give a true and fair view of the state of affairs of the parent company.

In preparing each of the group and parent company financial statements, the directors are required to:

- select suitable accounting policies and then apply them consistently;
- make judgements and estimates that are reasonable and prudent;
- for the group financial statements, state whether they have been prepared in accordance with IFRSs as adopted by the EU;
- for the parent company financial statements, state whether applicable UK Accounting Standards have been followed, subject to any material departures disclosed and explained in the parent company financial statements; and
- prepare the financial statements on the going concern basis unless it is inappropriate to presume that the group and the parent company will continue in business.

The directors are responsible for keeping proper accounting records that disclose with reasonable accuracy at any time the financial position of the parent company and enable them to ensure that its financial statements comply with the Companies Act 1985. They have general responsibility for taking such steps as are reasonably open to them to safeguard the assets of the group and to prevent and detect fraud and other irregularities.

Under applicable law and regulations, the directors are also responsible for preparing a Directors' Report. Directors' Remuneration Report and Corporate Governance Statement that comply with that law and those requirements.

104. For several years, BAE's Board of Directors has caused to be published annually a BAE Corporate Responsibility Report to its shareholders.

(a) The 2001 Director's Corporate Responsibility Report stated:

We are, of course, transparent about our business performance and publish a detailed report to shareholders.

* * *

**Honesty, integrity and fairness**

***We demand and expect honesty, integrity and fairness in all aspects of our business. We are committed to comply with laws implementing the OECD Anti-Bribery Convention and the US Foreign Corrupt Practices Act. . . .***

**Export of defence equipment**

BAE SYSTEMS adheres to relevant laws, charters, codes of practice and guidelines in addition to our own internal policies, which are designed to ensure the necessary control over the export of defence equipment. It is our policy:

- To maintain an active and open dialogue with relevant government departments in the territories in which we operate ***to ensure compliance with the government policy and the law and regulations of those territories governing the export of our products***.

* * *

- ***To respect the values of the international community and the laws of those countries where we conduct our business***.

(b) The 2002 Corporate Responsibility Report stated:

We see social, ethical and environmental issues as important to our business performance, posing both risks and opportunities. It is essential that we manage these issues well. Our principles, code of behaviour and detailed corporate governance policies are included within the BAE SYSTEMS Operational Framework.

* * *

Effective management starts with the senior management team that provides strong leadership and is clearly accountable. The Control and Risk Frameworks control the group's activities and are underpinned by requirements on behaviour, ethics and policy compliance.

* * *

**Ethics Policy**

In 2002 we formalised our UK Ethics Policy, using the same approach taken by our US operations. The policy gives our UK employees guidance on the behaviour we expect of them in their daily dealings with each other, customers and our stakeholders. An independent hotline is available for employees to discuss their ethical concerns, get advice or report possible breaches of our ethical standards.

An Ethics Review Committee was set up to monitor the policy. This is chaired by the Audit Director and its members are all senior executives drawn from the legal, internal audit, human resource and security departments. The committee meets quarterly. It will review details of all contacts with the hotline to ensure that proper and timely action is taken to resolve issues.

(c) The 2003 Directors' Corporate Responsibility Report stated:

**Anti-corruption measures**

***We demand and expect honesty, integrity and fairness in all aspects of our business. We are committed to comply with the law in every country where we operate. This includes laws implementing the OECD Anti-Bribery Convention and the US Foreign Corrupt Practises Act. We will not tolerate bribery or other attempts to improperly influence the decisions of customers and suppliers.***

***We have an anti-corruption compliance programme in place throughout the company. This includes robust procedures governing transactions with marketing consultants, the proper use of corporate hospitality and our procurement processes.*** This is supported by an awareness-training programme and underpinned by a clear statement that infringements will result in disciplinary action.

***The valuable experience available from our US colleagues under the Foreign Corrupt Practices Act has also been drawn upon and a review of our policies has been undertaken by external lawyers in the UK and the US. Our procedures accord with anti-corruption rules promulgated by the International Chamber of Commerce.***

We continually review and monitor our policies and procedures in this area and take note of external progress in improving anti-corruption measures across all industries . . . .

* * *

An Ethics Review Committee of senior executives meets quarterly to review details of all contacts with the hotline and ensure that action is taken to resolve issues where necessary. The Committee is chaired by the Audit Director, who monitors compliance with the policy.

**ETHICAL BUSINESS CONDUCT POLICY**

In all aspects of doing business, we will behave ethically. What do we mean by behaving ethically? Each of us has an idea of what ethical behaviour means in our daily lives. In our work for the company, behaving ethically means:

- Obeying the laws and regulations in force, wherever we are Preventing actions which harm others or the environment

* * *

- ***Showing honesty***, integrity and openness ***in dealing with*** . . . ***customers [and] representatives of governments*** . . .

* * *

- Complying with the standards of conduct we have set ourselves
- ***Not tolerating unethical behaviour by others***
- ***Reporting unethical behaviour which we encounter***

(d) The 2004 Directors' Corporate Responsibility Report stated:

**Business ethics and operating principles**

* * *

***BAE Systems is committed to comply with all laws governing defence sales and to meeting the highest ethical standards in our dealings with others.***

***We would never condone unethical or illegal conduct.*** It is not only wrong, it could also damage the national interests of the countries where we operate, harm the commercial prospects of the company and leave employees and directors liable to imprisonment.

***Our Operational Framework sets out our policies and governance systems to ensure that all employees carry out our business in an ethical way. The Framework is reviewed and updated annually.***

**Ethical conduct**

We are committed to conduct our business to the highest ethical standards. ***We comply with the law in all countries where we operate, including laws implementing the OECD Anti-Bribery Convention and the US Foreign Corrupt Practices Act.***

***All BAE Systems' employees are required to act with honesty, integrity and fairness. We will not tolerate bribery or other attempts to improperly influence the decisions of customers or suppliers.***

    (e) The 2005 Directors' Corporate Responsibility Report stated:

"Bribery and corruption are bad for business. Bribery is illegal in most countries and is a form of 'stealing' from shareholders. Being caught making bribes or engaging in corrupt behaviour can seriously damage a company's reputation and lead to loss of business.

The defence industry is one of three sectors most at risk from bribery and corruption . . . ."

* * *

***We are committed to meeting the highest ethical standards in our dealings with others. The nature of our business means it is particularly important that we have strong values*** . . . .

***We do not condone unethical or illegal conduct. The consequences of such conduct may be far reaching and severe not only for the Company and its employees, but also for other stakeholders. Unethical behaviour is wrong, could lead to loss of business, could seriously damage our reputation and leave the Company and its employees open to criminal sanction.***

* * *

**Our policies on business ethics**

***The intent of our policies is to establish compliance with the law as the minimum and to aim for higher standards where possible.***

Our Operational Framework includes policies and governance systems on business ethics. ***It requires all BAE Systems employees to act with honesty, integrity, and fairness and states that we will not tolerate bribery or other attempts to improperly influence the decisions of customers or suppliers.***

(f) The 2005 CEO letter in the 2005 Directors' Corporate Responsibility Report (dated 2/06) stated:

**Ethics**

* * *

Ethical business conduct is fundamental to the reputation and success of our company and we accept no compromise of our principles and policies.

**Our five principles of ethical business conduct are:**

- Accountability – we are personally answerable for our conduct and actions.
- Honesty – there is no substitute for the truth.

- Integrity – we say what we do, we do what we say.
- Openness – when questions are asked, we are frank and straightforward in our answers.

* * *

**These principles apply to everything we do.**

**Compliance with Laws & Regulations**

***We conduct ourselves in accordance with applicable laws and regulations of the countries within which we do business. Ignorance of the law and regulations is no excuse.***

* * *

**Anti Bribery & Corruption**

***Bribery is a criminal offence. We do not, and will not, pay bribes or offer improper inducements to anyone for any purpose, nor do we or will we accept bribes or improper inducements. To use a third party as a conduit to channel bribes to others is a criminal offence. We do not, and will not, engage indirectly in or otherwise encourage bribery.***

* * *

***Any action which is unlawful, dishonest, harmful to others or which is otherwise against our policies is unacceptable. We will take disciplinary action against anyone whose behaviour does not meet our standards.***

(g) The 2006 Directors' Corporate Responsibility Report stated:

**Ethics**

We are committed to meeting the highest ethical standards in our dealings with others. We will not tolerate unethical behaviour or attempts to improperly influence the decisions of customers or suppliers. ***Unethical behaviour is wrong, could lead to loss of business, seriously damage our reputation and leave the Group and its employees open to criminal sanction.***

* * *

**Progress**

Meeting our standards

The Group has training and awareness programmes to ensure employees understand our policies and the standards expected of them.

> We provide training on our anti-bribery programme to managers from commercial, procurement, finance, customer support and other functions. . . . On completing the training, employees are required to sign a statement confirming they will comply with our policies and will report any issues of concern. This training is mandatory for all senior employees and for those employees involved in dealings with marketing advisers. All BAE Systems' marketing advisers are subject to rigorous due diligence under our compliance programme, are made aware of our anti-bribery policy and are expected to maintain our ethical standards.

105. The statements in BAE's 2001-2006 Annual Reports were false and misleading when made and known to be false by the directors and officers of BAE when those statements were made. The repeated positive and reassuring statements about BAE's controls, procedures and practices to comply with anti-bribery laws, rules and conventions, BAE's actual compliance with them, and BAE's dedication to high ethical standards were false. In fact, BAE's top officers and directors were actively permitting the circumventing of those preventative procedures and controls by permitting the payment of bribes, kickbacks and other improper payments, *i.e.*, unethical and illegal activities.

106. BAE's 2001-2006 financial statements, published by, and the responsibility of, its directors, were false and misleading in failing to disclose the existence of the illegal and improper payments and/or for failing to make provision for the money fines and penalties likely to result from those payments.

107. BAE stated that its financial statements are prepared in accordance with "EU endorsed International Financial Reporting Standards (IFRS), International Financial Reporting Interpretations Committee Interpretations (IFRICs) and the Companies At 1985 applicable to companies reporting under IFRS."

108. To the extent BAE was engaging in conduct that would result in fines or penalties, it was required to disclose these under IFRS. Since the amount was capable of a reasonable estimate – at least $50 million – and the liability was probable, the Company was required to record a provision for them.

109. International Accounting Standards ("IAS") No. 37, *Provisions, Contingent Liabilities and Contingent Assets Recognition*, requires that a provision be recognized when:

> (a) an entity has a present obligation . . . as a result of a past event;
>
> (b) it is probable an outflow of resources . . . will be required to settle the obligation; and
>
> (c) a reliable estimate can be made of the amount of the obligation.

110. Importantly, IAS No. 37, ¶19, includes as an example a violation of law leading to liability as a situation where a provision needs to be recorded:

> It is only those obligations arising from past events existing independently of an entity's future actions (*i.e.* the future conduct of its business) that are recognised as provisions. Examples of such obligations are penalties or clean-up costs for unlawful environmental damage, both of which would lead to an outflow of resources embodying economic benefits in settlement regardless of the future actions of the entity. Similarly, an entity recognises a provision for the decommissioning costs of an oil installation or a nuclear power station to the extent that the entity is obliged to rectify damage already caused.

Also, unless the possibility of an outflow related to a contingent liability is "remote," the entity must disclose the contingent liability, estimating the financial effect and the timing. IAS No. 37, ¶86. Because a financial penalty was not remote, at a minimum, disclosure was required.

**The *Ultra Vires*, Illegal and Improper Conduct**

111. BAE operates in a competitive environment. To justify their continuation in their lucrative and prestigious executive and director positions, the BAE Defendants wanted to make it appear that BAE was succeeding under their stewardship and doing so by operating in an ethical manner, in compliance with the laws and conventions applicable to it.

112. In the mid-1980s, BAE was attempting to obtain a very large military aircraft contract from the Saudi Arabian Ministry of Defense to supply over 120 fighter/bomber aircraft over the next 20+ years, known as the "Al-Yamamah" contract. The officers and directors of BAE knew that if this huge contract could be obtained, they could point to it as concrete evidence of their business acumen and successful stewardship of BAE, which would help justify them holding on to their

positions of power, prestige and profit with BAE, including lucrative payments and bonuses they received in connection with those positions for many, many years going forward.

113.    Prince Sultan of Arabia, then in line for the royal throne, served as the head of Saudi Arabia's Ministry of Defense. He was in a position to significantly influence and determine whether or not BAE received the coveted Al-Yamamah contract. Sultan's son was Bandar, who was the apple of his father's eye. For over 20 years – and during most of the time period relevant hereto – Bandar served as Saudi Arabia's Ambassador to the U.S. and because of his positive relationship with his father was also in a key position to influence and determine if BAE was awarded the Al-Yamamah contract. In order to advance their own positions with BAE by winning the Al-Yamamah contract, the then officers and directors of BAE named as defendants herein undertook a course of illegal and improper conduct (engaging in *ultra vires* activities) in breach of their fiduciary duties to BAE, including paying huge bribes or kickbacks (a/k/a "backhanders") to Bandar, which payments have amounted to over $2 billion over the last 20 years. Although paying such bribes or kickbacks is an *ultra vires* act in violation of international business standards and the laws of the U.S., including the FCPA and the OECD Convention and BAE's own policies of business conduct, defendants caused BAE to funnel these illegal payments to Bandar. The payments were made in significant part through Riggs located in Washington, D.C., where the money was wired by BAE on a regular basis into accounts that, while nominally in the name of Saudi Arabia, were accounts controlled by Bandar and over which he had discretion and signature authority and which accounts (and the proceeds therefrom) he used for his own personal use and benefit.

114.    Riggs was selected for this purpose because its Washington, D.C. location gave Bandar ready access to it and because Riggs had a reputation in international commercial circles as a bank willing to facilitate highly questionable, if not illegal, currency transfers for international transactions, conduct which years later would ultimately lead to the shut down of Riggs. In fact, as

Riggs' activities came under increasing government scrutiny in an effort to stave off action to close Riggs, the bank identified one or more of the accounts being utilized by BAE and Bandar to facilitate the kickback payments to him as accounts involving highly questionable or improper conduct and transactions and took steps to shut down those accounts. At or about that time, Bandar resigned his post as Ambassador to the U.S. for "personal reasons" and returned to Saudi Arabia. His father remains heir to the Saudi Arabian throne and head of its Ministry of Defense.

115.    These illegal kickback payments were explicitly bargained for and recognized at the outset of the Al-Yamamah contract between BAE and the Saudis involved. The payments were provided for in certain schedules to the contract which were kept secret. They were entitled "Letters of Offer and Acceptance" and purported to provide compensation for certain "support services," which, in fact, Bandar never performed and which was known by the participants to be a code word and cover for the bribe or kickback payments he (and his father) were receiving and/or benefiting from.

116.    Most of the bribe and kickback monies paid to or for the benefit of Bandar were received by him here in the U.S. in Washington, D.C. over the last 20 years. Significant amounts of the illegal bribe/kickback payments received by him have been spent by Bandar here in the U.S., including the expenditure of over $100 million on one of the largest and most lavish personal residences here in the U.S., located in Aspen, Colorado, on the ski mountain there, which Bandar currently has for sale for $135 million.

117.    Up to £120 million a year was sent by BAE Systems from the U.K. into two Saudi embassy accounts with Riggs in Washington. These accounts were actually a conduit to Bandar. The purpose of one of the accounts was to pay the expenses of Bandar's private Airbus.

# EXHIBIT A

118. David Caruso, an investigator who worked for Riggs, where the accounts were held, has said Bandar had been taking money for his own personal use out of accounts that seemed to belong to his government. He said:

> "There wasn't a distinction between the accounts of the embassy, or official government accounts as we would call them, and the accounts of the royal family."

Caruso said he understood this had been going on for "'years and years.'" The payments were written into the arms deal contract in secret annexes, described as "support services."

119. The cash bribe and kickback payments to Bandar have not only included outright payments to him personally, but also payments made by BAE for other personal family expenditures of Bandar's family, including paying for his fantastically outfitted Airbus private aircraft, which cost over $100 million, and lavish expenses for members of his family, including millions and millions of dollars paid for a lavish multi-week, multi-country honeymoon. These illegal and improper payments have continued until recent times.

120. According to the 6/18/07 edition of *Newsweek*:

> Bandar and the $2 Billion Question
>
> Hundreds of pages of confidential U.S. bank records may be the missing link in illuminating new allegations that a major British arms contractor funneled up to $2 billion in questionable payments to Saudi Prince Bandar bin Sultan. The BBC and Guardian newspaper reported last week that BAE Systems made "secret" payments to a Washington, D.C., bank account controlled by Bandar, the longtime Saudi ambassador to the United States who is now the kingdom's national-security adviser. The payments are alleged to be part of an ***$80 billion*** military-aircraft deal between London and Riyadh. . . . Before the U.K. closed the inquiry, British investigators contacted the U.S. Justice Department seeking access to records related to the Saudi bank accounts. Many of these records were first obtained by NEWSWEEK in 2004. At the time, the magazine reported that federal regulators had been alerted to millions of dollars in ***"suspicious" activities in Saudi accounts at the now-defunct Riggs Bank***.
>
> Tom Rose, a British lawyer for Bandar, denied the Saudi prince had received "improper secret" commissions. He said the BAE funds were actually being paid into a ***Saudi Defense Ministry account over which Bandar had signature authority***, but any payouts from those accounts "were exclusively for purposes approved" by the ministry. The accounts were known both to the British and Saudi governments. (A BAE spokesman said, "***We deny all allegations of wrongdoing***.")

The Riggs Bank records show the use of those funds raised concerns among bank officials and U.S. regulators. ***In November 2003, Riggs filed a "suspicious activity report" with the Treasury Department disclosing that over a four-month period,*** $17.4 million from the Saudi Defense account had been disbursed to a single individual in Saudi Arabia. When Riggs officials asked the Saudis who the person was and why he was receiving the funds, they were told the individual "coordinates home improvement/construction ***projects for Prince Bandar in Saudi Arabia,***" and the payments ***were for a "new Saudi palace," one document shows.***

In another instance, Bandar wired $400,000 from a Riggs account to a luxury-car dealer overseas. "It was impossible to distinguish between government funds and what would normally be considered personal purposes," ***said David Caruso, who served as Riggs's compliance officer at the time. Caruso also confirmed to NEWSWEEK that the Saudi Defense account was regularly replenished with $30 million each quarter from an account in London.*** But the bank never knew the source of the funds. ***The bank was so concerned about the withdrawals that it cut off all business with the Saudis. In May 2005, the U.S. Treasury fined Riggs $25 million for failing to monitor "extensive and frequent suspicious" activity in Saudi and other accounts.***

121. The improper payments also included other payments for Bandar's benefit. According to the *Sunday Times (London)*:

THE British arms firm BAE Systems secretly paid nearly £250,000 for a honeymoon for the daughter of Prince Bandar, the Saudi Arabian prince at the centre of bribery allegations.

A senior BAE executive authorized the payments, allowing Bandar's daughter to enjoy a six-week honeymoon in luxury resorts in Singapore, Malaysia, Bali, Australia and Hawaii. The couple stayed in five-star hotels costing up to £4,000 a night and had a private jet trip to the Great Barrier Reef.

Peter Gardiner, managing director of the travel agency that organized the honeymoon, said: "BAE instructed me to give Bandar's daughter and her husband the honeymoon of a lifetime at BAE's expense. Who says that big business doesn't have a heart?"

* * *

[T]he honeymoon for Bandar's daughter, Princess Reema, was paid for through a £60m slush fund which the Serious Fraud Office (SFO) believes was set up by BAE to encourage Saudi royals to continue with a £ 43 billion arms contract to supply Hawk and Tornado jets.

The latest twist in the BAE affair has been disclosed by Gardiner, who said he has made a detailed statement to the SFO. He described how his company, Travellers World, was used by BAE to make payments to Saudi royals when they were holidaying around the world. His company would arrange and pay for hotels,

airline tickets, apartments, boat and jet charters, as well as hiring limousines and bodyguards.

* * *

Last week Gardiner said Tony Winship, a senior BAE marketing executive responsible for overseeing the slush fund, approved the costs of the six-week trip for Princess Reema bint Bandar and Prince Faisal bin Turki, the son of Prince Turki bin Nasser, another Saudi royal implicated in the SFO's bribery inquiry.

"They were a young, attractive couple in love and on a dream honeymoon. They knew nothing about BAE paying and must have believed it was their parents paying. I was instructed by BAE not to discuss payments with them – or with anyone. I was told by BAE to give them the very best," Gardiner said.

"The couple selected the itinerary. I chose and arranged the hotels, transportation, diplomatic arrivals. They never took advantage and any personal expenditure such as shopping they paid for themselves."

The couple were married in Riyadh, the Saudi capital, in December 1996. They flew on Turki's private Boeing 707, staffed by an English captain and crew, to Singapore. There they stayed for a week at Raffles, the country's most exclusive hotel where suites cost from £ 500 to £ 2,800 a night.

They then traveled for a week's stay to the Pangkor Laut resort on a privately owned island off Malaysia. It is often described as the best resort in the world.

"The honeymoon suite was a two-bedroom, overwater bungalow with a partial glass floor so that guests could see the sea below them," said Gardiner, who accompanied the royal couple during the early part of their stay.

After a week in Malaysia, Bandar's daughter and her groom flew by private jet to Bali where they stayed at the five-star Four Seasons Jimbaran Bay resort before flying to Australia, spending Christmas at the Regent hotel in Sydney. During that visit the prince who, like his father-in-law Bandar, is a fan of the Dallas Cowboys American football team, was keen to watch a critical game. Gardiner says he found a private club in a town 60 miles away that could show the game live on cable TV. The entire club was hired so Bandar's daughter and her husband could watch the match. The three-hour stay cost £ 6,000. BAE again footed the bill.

The couple then flew to the Gold Coast where they stayed at the five-star Sheraton Mirage and Spa. On a day trip they hired a Gulfstream jet to fly to the Great Barrier Reef. The bill, paid by Travellers World and reimbursed by BAE, was £15,000.

Documents in the possession of the SFO show that Travellers World invoiced BAE £45,490 for the couple's stay in Australia. The item is billed as "HM.Aus", which Gardiner said was shorthand for "Honeymoon, Australia". The couple moved on to Hawaii where they spent a few days at the Halekulani on Waikiki beach. From

there they flew to the Grand Wailea, on the Hawaiian island of Maui, where their penthouse suite on a private floor cost about £ 4,000.

The files show one part of the bill for Hawaii was £ 101,412. The payments, again paid by BAE, appear as "HM. Haw." and "HM Haw.Xtra". For the month of January alone the cost was £ 190,486. According to Gardiner, this did not include the first leg of the honeymoon, which began in mid-December the previous year. The total cost was nearly £ 250,000, he said.

122.    Riggs was the intermediary chosen to funnel the bribe payments to Bandar. Riggs was chosen because BAE and Bandar knew Riggs would cooperate in secreting the fund transfers, *i.e.*, laundering them to hide them from government regulators and BAE's own auditors, which Riggs did for many years under Joe Allbritton's tutelage. Riggs and Joe Allbritton permitted Bandar to manipulate Saudi accounts to divert funds to himself and members of his family and did so because of the enormous profits Riggs and the Allbritton Defendants made off the Saudi/Bandar accounts and transactions.

123.    In the early 2000s, Riggs was beset with scandal. Investigations found little oversight was conducted involving suspicious international transactions. A Saudi named Omar al-Bayoumi housed and opened bank accounts for two of the 9/11 hijackers. About two weeks after the assistance began, al-Bayoumi's wife began receiving monthly payments totaling tens of thousands of dollars from Princess Haifa bint Faisal, the wife of Saudi ambassador Prince Bandar, through a Riggs bank account. Upon discovery of these transactions, the FBI began investigating the bank for possible money-laundering and terrorist financing. Investigators found lax safeguards on monetary transfers at Riggs. Several Saudi accounts were discovered to have financial improprieties, including a lack of required background checks and a consistent failure to alert regulators of large transactions, in violation of the law. Many of these transactions involved Bandar personally, often transferring over $1 million at a time. In the Al Yamamah deal, Bandar received some $2 billion in bribes from BAE through the Riggs.

124. Augusto Pinochet, the former dictator of Chile, has been widely accused since 1973 of corruption, illegal arms sales, and torture. In 1994, Riggs officials invited Pinochet to open an account at Riggs. Arrested in 1998 in Britain for possible extradition to Spain, his accounts were ordered frozen by court orders. A U.S. Senate report revealed that Riggs executives helped Pinochet disguise millions of dollars that had been stolen from the Chilean people, although some of Pinochet's supporters have claimed that the money came from supporters outside Chile. By using shell companies and hiding accounts from federal regulators, Riggs illegally allowed Pinochet to retain access to much of his fortune. The disclosure of the Riggs accounts reignited the case against Pinochet and a ruling that he was not mentally competent to stand trial was overturned when it was proven that Pinochet himself had orchestrated some of the huge transactions. In 2004, he was ordered to stand trial for crimes against humanity, and additional claims of mental and physical incompetence have been overruled.

125. In 7/04, the U.S. Senate published an investigation into Riggs, into which most of Equatorial Guinea's oil revenues were paid until recently. This showed that accounts based at the embassy to the United States of Equatorial Guinea were allowed to make large withdrawals without properly notifying federal authorities. At least $35 million was siphoned off by long-time dictator of Equatorial Guinea, Teodoro Obiang Nguema Mbasogo, his family and senior officials of his regime. The same Mbasogo bought, in 11/06, a $35 million house in Malibu, California. Simon Kareri, the Riggs employee in charge of the Equatorial Guinea and other accounts, stands accused of money laundering in separate charges. As the account manager, it is alleged that he established a fake holding company in his wife's name and diverted funds into this account. In the Senate Permanent Subcommittee on Investigations hearing in 7/04, Kareri refused to answer any questions of the panel by invoking his Fifth Amendment rights. In that hearing, the President of Riggs was asked why the bank would willingly enter into a business arrangement with the dictator of Equatorial Guinea, a

man who willingly exercises his hold over his people with demonstrations of murder and torture on state-run television. In a copy of correspondence to President Mbasogo, the letter "thanked the president for his establishment of several bank accounts, and encouraged a working relationship to help establish and secure the stable reign of his country."

126. Riggs was fined $25 million for violations of money-laundering laws. A long running Justice Department investigation was wrapped up in 2/05, with Riggs pleading guilty and paying a $16 million fine for violations of the U.S. Bank Secrecy Act after a *Wall Street Journal* article reported on 12/31/04 that Riggs had extensive ties to the CIA, including that several bank officials held security clearances. Also, in 2/05, the bank and its controlling shareholder agreed to pay $9 million to Pinochet victims for concealing and illegally facilitating movement of Pinochet money out of Britain. Riggs was acquired by PNC in 2004. On 5/26/05, the Riggs name was officially retired and all Riggs branches opened as PNC branches.

127. In 5/04, federal regulators fined Riggs a record $25 million for violating anti-money laundering laws in its handling of tens of millions of dollars in cash transactions in Saudi-controlled accounts under investigation for possible links to terrorism financing. The civil fine against Riggs, a bank with a near-exclusive franchise on business with the capital's diplomatic community, was the largest ever imposed on a financial institution for such violations. The action by the Treasury Department's Office of the Comptroller of the Currency came in an order. The order said the bank's internal controls "were, and continue to be, seriously deficient." "Riggs failed to properly monitor, and report as suspicious, transactions involving tens of millions of dollars in cash withdrawals, international drafts that were returned to the bank, and numerous sequentially numbered cashiers' checks," it said.

128. The Senate Finance Committee Chairman, Charles Grassley of Iowa, said:

> "Riggs Bank deserves every penny of this huge fine. . . . Banks have a patriotic duty, not to mention legal requirement, to report suspicious activity. When banks look the

other way, they put our national security at risk. Whether it's through incompetence, negligence or greed, they are allowing terrorists to funnel their blood money through the system."

129.    Riggs was accused by Treasury regulators of failing to comply with a law requiring banks to notify the government of suspicious transactions. It was classified by the comptroller's office as a "troubled institution" for not complying fully with a 7/03 consent order under which it agreed to strengthen its anti-money laundering controls.

130.    For its transgressions, Riggs was ultimately fined $25 million for violations of money-laundering laws. A long running Justice Department investigation was wrapped up in 2/05, with Riggs pleading guilty and paying a $16 million fine for violations of the U.S. Bank Secrecy Act. And in 2/05, the bank and its controlling shareholder agreed to pay $9 million to Pinochet victims for concealing and illegally facilitating the movement of Pinochet money out of Britain. Upon completion of PNC's acquisition of Riggs in 2/05, the Riggs name was abandoned, but PNC has continued its operations in Washington, D.C.

**BAE'S Pattern and Practice of Illegal/Improper Bribes, Kickbacks and Payments**

131.    The improper and/or illegal Al Yamamah payments were part of a broader pattern and course of conduct of improper payments by the BAE Defendants.

132.    In 1994, the OECD urged member countries to put a stop to overseas bribery. A binding convention was adopted in 1997. It was signed by Britain and came into force in 1999. Signatories promised to outlaw such corruption. To avoid compliance, Evans moved BAE's whole worldwide system of agent payments to Switzerland. Britain's SFO later concluded: "The whole system is maintained in such conditions of secrecy that there is a legitimate suspicion concerning the real purpose of the payments." The system was run from a secure block, Warwick House, at BAE's Famborough premises. "HQ Marketing Services" was headed by Hugh Dickinson. A board-level committee also met to approve each agency agreement. BAE set up a front company called Novelmight Ltd. With the help of the Swiss branch of its bankers, Lloyds TSB, the firm rented a

high-security office in Geneva, on the sixth floor of a block at 48 Route des Acacias. Then, just before Britain signed up to the OECD convention in 1997, the filing cabinets and safes containing the agent details were loaded into a van and driven by trusted staff from Famborough to Geneva. BAE added a new layer of concealment when the convention came into force in 1999. Novelmight was officially closed down as a U.K.-registered subsidiary. But it was secretly re-registered as an offshore entity in the Caribbean where beneficial ownership could be hidden. Agents often received their payments into Swiss accounts. When agreements were ready to be made or renewed, BAE personnel flew to Geneva and unlocked the office at Route des Acacias for the signing. The contracts were kept in Geneva and could only be inspected there. The purpose of these tortuous arrangements was to ensure that nothing questionable involving the hiring of agents took place within U.K. legal jurisdiction.

133. In 2/98, "Red Diamond Trading Ltd" was anonymously incorporated by BAE in the British Virgin Islands. It was used to channel payments all over the world, via Red Diamond accounts in London, Switzerland and New York. Secret payments have also been made to agents in South America, Tanzania, Romania, South Africa, Qatar, Chile and the Czech Republic. The BAE Defendants never disclosed the existence of Red Diamond in BAE's published company accounts, and have never explained why it was set up. BAE used British Lloyds TSB to transfer cash through Red Diamond accounts and on to its final destination. The next year, BAE set up a second front company, purely to handle the Saudi commission payments for Al-Yamamah. "Poseidon Trading Investments Ltd" was incorporated in the British Virgin Islands on 6/25/99. Funds passed through its accounts to Saudi agents in transfers made by Lloyds TSB. A different method was used to disguise corrupt benefits for Saudi officials who went on vacation trips to the U.S. and Europe. This was what became known as BAE's "slush fund." The head of the Saudi air force, Nasser, along with his relatives, were provided with unlimited shopping, plane tickets and free holidays by BAE. They

ran up enormous bills, totaling £60 million, over the years. BAE used two cooperative companies of travel agents to pick up the bills – Robert Lee International and Travellers World. Peter Gardiner, Travellers World managing director, has stated how deliberately misleading invoices were organized by BAE's executives. They referred merely to "accommodation and support services."

134.    The SFO is investigating BAE for improper or illegal payments of corruption and bribery activities in South Africa, Tanzania, Romania, Chile, the Czech Republic, Qatar, Bosnia, Nigeria, Zambia, Costa Rica and Egypt. The SFO has begun a series of interviews under caution with executives from BAE implicated in allegations of corruption involving investigations into its dealings in other jurisdictions, including Romania, the Czech Republic, Tanzania and South Africa.

135.    Clare Short, a former U.K. international development secretary, has stated she had been told by SFO investigators they had documents showing there was bribery in an arms deal involving the supply of an air-traffic control system by BAE to Tanzania. According to *The Guardian (London)*, the SFO told Short it has seen documents showing that the sale of radar equipment to Tanzania by BAE was corrupt.

136.    The SFO is investigating "substantial payments" made by BAE to a senior South African defense ministry official who had influence over a £1.5 billion contract won by the arms company to supply planes. South Africa's organized crime unit, the Scorpions, was handling a "mutual legal assistance" request from the SFO to investigate the financial accounts of Fana Hlongwane, a politically well-connected businessman, in relation to the 1999 deal. Mr. Hlongwane is a former special adviser to the then South African defense minister, Joe Modise. Modise has been named in allegations of corruption, including claims that he took a £500,000 bribe from BAE and $10 million from a German consortium that signed a contract to sell submarines. The SFO is also investigating John Bredenkamp, a tycoon who is BAE's agent in southern Africa and whose U.K. home and offices were raided in 10/06. Suspicion was cast on the aircraft deal after Modise changed

the formula by which the contract would be decided to discount price as a factor. South Africa's air force chiefs had selected Italian aircraft as cheaper and more modern, but the amended specifications shifted the balance in favor of the aging British Hawks – at nearly double the price. BAE has admitted that it paid tens of millions of pounds in secret commissions to win the £1.5 billion contract. The arms company originally intended to pay 12% of the contract price in commissions but agreed to cut that back to 7% – more than £100 million – following questions from the British authorities underwriting the deal. An internal Foreign Office memo three years ago says BAE named the agent handling the commissions in South Africa as the company Osprey. BAE claimed Osprey had no links with anyone involved in awarding contracts but, in truth, it had close ties with Modise. Among Osprey's shareholders was Tsebe Properties, of which Hlongwane was a director.

137. According to the 5/31/07 *Financial Times*:

> South Africa's former top defence official has revealed that he resigned because he suspected corruption in a UK-backed arms deal involving BAE Systems and other big European companies.
>
> . . . Lt Gen Pierre Steyn told the Financial Times that his concerns led him to leave office in 1998 – months before the prime minister ***backed the 30bn rand (£2.1bn) deal by signing an agreement on a package of spin-off industrial projects***.
>
> The controversial arms deal is now being investigated in Britain and Germany . . . .
>
> Gen Steyn said he was concerned about the possibility of graft during negotiations on the deal to buy military aircraft and vessels, although he added that he did not want to make allegations against specific individuals or companies.
>
> ***"I suspected corruption – for sure," he said. "So that made me more determined to enforce good practice."***
>
> He said he resigned because he was not satisfied that sufficient safeguards were in place to enable him to prevent or expose any corruption in the bidding process, whose winners included BAE, Germany's Thyssen-Krupp, France's Thales and Saab of Sweden, which is 20 percent owned by BAE.
>
> "When my attempts were frustrated, I said, ***'That's it, I must relinquish my responsibility,'***" he said.

138. A committee has been set up by the Hungarian government to investigate a defense contract signed with a consortium of the U.K.'s BAE and Sweden's Saab. The government ordered the investigation into the Gripen fighter jet contract, which was signed in 2001, after an allegation in the Swedish media that Austrian businessman Alfons Mensdorf-Poilly had received around $6 million to intermediate in the contract. Swedish prosecutors are investigating bribery allegations relating to BAE's dealings in the Czech Republic. Czech police have said they began investigating bribery allegations involving BAE in response to a request by the SFO, which is probing the Company's activities in six countries. The deal under scrutiny by Swedish and Czech authorities is a 2001 (£1.43 billion) agreement to sell 24 Gripen fighters to the Czech military. The deal was done by a 50-50 joint venture between Saab and BAE. Police in Prague have said: "These investigations have begun and are continuing."

139. According to the 5/15/07 *New York Times*:

Swiss Investigating BAE In Money Laundering Case

> Law enforcement authorities in Switzerland confirmed Monday that they had opened a criminal investigation into possible money laundering at BAE Systems, adding to the international scrutiny of the company, the top British military contractor.
>
> Jeanette Balmer, a spokeswoman for the office of the Swiss federal prosecutor in Bern, confirmed that an investigation had been opened after a report from Swiss money laundering investigators.
>
> * * *
>
> Swiss banks are required by law to report any suspicious financial transactions. According to The Guardian, a British daily, Swiss investigators will be able to examine accounts held by Wafic Said, a Syrian financier who may have acted as a middleman for payments and whom the Swiss consider a potential witness.
>
> * * *
>
> The news follows a meeting last week in The Hague of prosecutors from Austria, Britain, the Czech Republic, Sweden and Switzerland. They are seeking to coordinate corruption inquiries related to the sale and lease of Gripen fighter jets, which are built by Saab of Sweden and sold through a joint venture with BAE. The two companies are accused of offering intermediaries as much as 1 billion kronor,

about $150 million, to promote the sale of the jets to the Czech Republic and Austria in 2002.

Ms. Balmer said that the meeting had been convened under the auspices of Eurojust, an arm of the European Union established in 2002 to coordinate prosecution of serious cross-border and organized crime.

140. The SFO is also reviewing a Jersey case of tens of millions of pounds of payments allegedly made by a number of European arms companies to a senior Qatari minister. The Jersey probe began in 2000 after the discovery of a trust fund containing £100 million controlled by Sheikh Hamad bin Jassem bin Jabr al-Thani, the Qatari foreign minister. The minister received "substantial commissions from companies seeking to do business with the state of Qatar," according to a 12/01 Jersey court judgment that was published in 2003 after a long court battle by the Jersey *Evening Post* newspaper. According to the 2001 court judgment, al-Thani acknowledged receiving commissions but said they were not bribes. He added that his actions had been authorized by the Emir of Qatar. Jersey court documents show that Qatar tried to derail the investigation into al-Thani by arguing it "vexed" the "peace of nations," foreshadowing the national security concerns. But the Jersey courts said the Qatari argument "went too far," adding that the law had to "take its proper course." "An investigation cannot be stifled because it is the cause of political embarrassment," the 2001 judgment said.

141. Anti-fraud officials in Slovakia are investigating an arms contract won by BAE. The contract, won in late 2005 and worth about pounds 144m, is for military mobile communications equipment. BAE won the contract, called MOKYS, not long after it donated computer equipment to the country's ministry of defense, something that was not disclosed at the time.

**BAE's Non-Compliance with the FCPA's Accounting and Record-Keeping Requirements and FCPA/OECD Conventions Anti-Bribery Rules**

142. The FCPA imposes accounting and record-keeping requirements specifically applicable to those companies that elect to conduct business in a foreign country. Nevertheless, throughout the relevant time period, BAE did not have an FCPA/OECD Convention compliance

program and, in fact, did not have any meaningful FCPA/OECD Convention compliance procedures in place. More specifically:

(a) BAE's Board did not enforce its own anti-corruption policies;

(b) BAE's Board did not provide its employees with necessary information concerning applicable anti-corruption laws and conventions;

(c) BAE's Board never conducted any effective anti-corruption compliance training; and

(d) BAE's Board did not maintain any due diligence files on its foreign agents.

143. BAE's Board, although there were "storm warnings" concerning its failure to comply with the accounting and record-keeping requirements of the FCPA, failed to properly investigate these warnings and take corrective action.

**FIRST CLAIM FOR RELIEF**

**(Derivative Claim for Breach of Fiduciary Duties Against the BAE Defendants)**

144. Plaintiff hereby incorporates ¶¶1-143.

145. The BAE Defendants are fiduciaries of BAE and of all of its public shareholders and owe to them the duty to conduct the business of the Company loyally, faithfully, carefully, diligently and prudently. This cause of action is asserted based upon these defendants' acts in violation of applicable law, which acts constitute a breach of fiduciary duty.

146. The BAE Defendants, in their roles as executives and/or directors of the Company, made false and misleading statement in Annual Reports and participated in the acts of mismanagement alleged herein and/or acted in gross disregard of the facts and/or failed to exercise due care to prevent the unlawful and *ultra vires* conduct complained of.

147. The BAE Defendants are responsible for the gross mismanagement of BAE, for abdicating their corporate responsibilities and mismanaging the Company in at least the following ways:

(a) They caused BAE to violate applicable law, disregarding their duties as fiduciaries and directors and officers.

(b) They have caused BAE to violate anti-bribery/corruption laws and conventions and exposed the Company to criminal liability and unnecessary costs, fines and penalties – by engaging in *ultra vires* and illegal conduct.

(c) They exposed the Company and its shareholders to massive fines and penalties.

(d) They subjected BAE to adverse publicity and loss of goodwill.

148. As a result of these defendants' wrongful conduct and wrongful actions, including the failure to maintain a system of internal controls adequate to insure the Company's compliance with all applicable laws and conventions, BAE has suffered considerable damage.

149. All the BAE Defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company.

150. The BAE Defendants abused the control vested in them by virtue of their high-level positions in the Company.

151. By reason of the foregoing, these defendants have breached their fiduciary obligations of care, candor and control to BAE and its shareholders, and violated Section 463 of the U.K. Companies Act.

152. BAE and its shareholders have been injured by reason of these defendants' failure to exercise the reasonable and ordinary care owed to the Company by its directors, officers, managing agents and employees in disregard of their fiduciary duties to the Company. Plaintiff, as a

shareholders and a representative of BAE, seeks damages and other relief for the Company as hereinafter set forth.

**SECOND CLAIM FOR RELIEF**

**(Derivative Claim for Waste of Corporate Assets Against the BAE Defendants)**

153. Plaintiff hereby incorporates ¶¶1-152.

154. As a direct result of the wrongdoing alleged herein, the BAE Defendants have unreasonably and unnecessarily caused BAE to wrongfully expend and waste billions of dollars of corporate assets, and have subjected the Company to additional liability in the untold millions of dollars, to the extreme detriment of the Company.

155. Additionally, as set forth above, these defendants have awarded themselves and their allies excessively lucrative compensation and payments which have no reasonable basis, but instead are designed only to enrich themselves.

156. As a direct and proximate result of these defendants' waste of corporate assets as alleged herein, BAE has sustained damages.

**THIRD CLAIM FOR RELIEF**

**(Derivative Claim for Aiding and Abetting Breaches of Fiduciary Duties Against Bandar, PNC/Riggs and the Allbritton Defendants)**

157. Plaintiff hereby incorporates ¶¶1-156.

158. By encouraging and accomplishing the illegal and improper payments alleged herein and concealing them from government regulators, Bandar, PNC/Riggs and the Allbritton Defendants have each encouraged, facilitated and advanced the BAE Defendants' breaches of their fiduciary duties and waste of corporate assets. In so doing, Bandar, PNC/Riggs and the Allbritton Defendants have each aided and abetted, conspired and schemed with BAE Defendants to breach their fiduciary duties, waste BAE's corporate assets and engage in the *ultra vires* and illegal conduct complained of.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.      Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure defendants do not participate therein or benefit thereby;

B.      Directing all defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

C.      Directing BAE to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with Section 463 of the U.K. Companies Act and the Sarbanes-Oxley Act of 2002, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the companies' Articles and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)      an amendment to the Company's Articles limiting the number of executive directors on the BAE Board to two;

(ii)     a proposal to strengthen the BAE Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(iii)    establishing an effective anti-corruption and bribery exposure oversight committee, staffed fully with independent directors and provided a budget to retain independent counsel and advisors;

(iv) a provision to permit the shareholders of BAE to nominate at least three candidates for election to the BAE Board;

(v) appropriately test and then strengthen the internal audit and control functions;

(vi) reform executive compensation;

(vii) require full compliance with Sarbanes-Oxley and Section 463; and

(viii) permit shareholders to question all executive directors of BAE at the Annual General Meeting and establish a more transparent process for receiving and evaluating shareholder proposals.

D. Awarding punitive damages;

E. Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury with respect to each claim in this Complaint.

DATED: September 13, 2007

LAW OFFICES OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)

ROGER M. ADELMAN

1100 Connecticut Ave., NW, Suite 730
Washington, DC 20036
Telephone: 202/822-0600
202/822-6722 (fax)

Local Counsel

COUGHLIN STOIA GELLER RUDMAN
  & ROBBINS LLP
DARREN J. ROBBINS
MARY K. BLASY
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

CUNEO GILBERT & LaDUCA, L.L.P.
JONATHAN W. CUNEO(DC Bar # 939389)
WILLIAM H. ANDERSON (DC Bar # 502380)
507 C Street, N.E.
Washington, DC 20002
Telephone: 202/789-3960
202/789-1813 (fax)

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

S:\CptDraft\Derivative\CPT BAE SYSTEMS WSL.doc

**VERIFICATION**

I, Mary K. Blasy, hereby declare as follows:

1.    I am an associate of the law firm of Coughlin Stoia Geller Rudman & Robbins LLP, counsel for plaintiff in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.    I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 12th day of September, 2007, at San Diego, California

MARY K. BLASY

EXHIBIT A

BBC NEWS

# Transcript: Princes, Planes & Pay-offs

NB: THIS TRANSCRIPT WAS TYPED FROM A TRANSCRIPTION UNIT RECORDING AND NOT COPIED FROM AN ORIGINAL SCRIPT: BECAUSE OF THE POSSIBILITY OF MIS-HEARING AND THE DIFFICULTY, IN SOME CASES OF IDENTIFYING INDIVIDUAL SPEAKERS, THE BBC CANNOT VOUCH FOR ITS ACCURACY.

**PANORAMA Princes, Planes and Pay-offs** RECORDED FROM TRANSMISSION: BBC ONE DATE: 11:06:07

JEREMY VINE: Hello, I'm Jeremy Vine, and this is Panorama. Tonight, the Saudi Prince who received secret payments from Britain's biggest arms deal, how the money was paid and how it was spent, and why our Panorama revelations have left the world's top leaders lost for words.

GEORGE BUSH: [to Tony Blair ] (laughing) I'm glad you're answering that question.

He's a friend of mine!

VINE: Britain could have made a stand against corruption.

JEREMY CARVER: Instead we're just sleaze boards.

VINE: The decision to pull the plug on a corruption investigation into Britain's biggest arms deal was widely condemned as a cover up both here and across the world. Whatever the real reason the files were sent to the basement of the serious fraud office. It would be wrong to say that nobody has continued to investigate exactly where the money went and who knew about it, there's Panorama's Jane Corbin for a start.

PRINCES, PLANES & PAY-OFFS

Reporter: Jane Corbin

CORBIN: This is a story about princes and planes, about arms dealers and millions of pounds secretly flowing through mysterious bank accounts, commissions to some, corruption to others. It all centres on a fabulously wealthy mover and shaker with extraordinary access.

I shall lose a prince, a statesman and a friend.

CORBIN: As British and Saudi governments tried to keep the lid on this scandal for over two decades, a corruption investigation was scrapped just as it was getting close to the truth. The only way to discover what really happened is to follow the money, so that's what we did.

I'm on my way to Washington on the trail of the money, hundreds of millions of pounds in kickbacks which went from Britain's largest arms company to one of Saudi Arabia's most colourful and controversial princes. The story ends with the British government caving in to blackmail, halting its own investigation into the scandal, and all the while protesting they were still committed to stamping out corruption. Take a look at this. (Plays film on laptop)

IAN McCARTNEY MP Foreign Office Minister Government anti-corruption promotional film

Hello, my name's Ian McCartney. Corruption is a very serious issue. The British Government is totally committed to combating corruption, overseas and here at home.

CORBIN: But is it? tonight we'll show you just how committed the government really is to stamping out

corruption. The central character in our story is Prince Bandar in Sultan, a friend of prime ministers, royalty and presidents, the son of a Saudi royal and a slave girl, Bandar rose to become his county's high profile ambassador to Washington, prized guest on US talk shows.

BANDAR: You know what, I would be offended if I thought we had the monopoly on corruption.

CORBIN: I'd flown to Washington to meet an ex-secret service agent who's never spoken publicly before.

Mr Caruso, I'm Jane Corbin. Nice to meet you.

CARUSO: Welcome.

CORBIN: Thank you very much.

David Caruso is an expert in money laundering and found out a great deal about Prince Bandar's financial arrangements in America. After 9/11 when most of the Al-Qaeda hijackers turned out to be Saudi, Mr Caruso was called in by the Ambassador's bankers, Riggs Bank. They wanted to find out if any funds were going to terrorists from the Saudi Embassy.

[in taxi from airport]

CARUSO: Those funds were in Prince Bandar's account, in his wife's account.

CORBIN: So there were substantial amounts of cash.

DAVID CARUSO Compliance & Security Riggs Bank 2003-2005

Yes, there's large sums, there's a large relationship, there's a hundred plus million dollar relationship.

CORBIN: A hundred plus million dollars.

No links to terrorism were found but Mr Caruso did identify many suspicious transactions in some of the Embassy accounts.

CARUSO: What we discovered was clearly large movements of money, both cash and other types of money, that we simply could not understand.

CORBIN: And was the Saudi Ambassador himself, Prince Bandar, prepared to tell you what lay at the root of all this?

CARUSO: We were never able to get those answers.

CORBIN: And did you worry, did you think this sounds fishy?

CARUSO: Absolutely.

CORBIN: Now Panorama has established that millions of pounds identified as suspicious in Washington came from London. They were part of the proceeds of a huge arms deal, but instead of staying in the UK, the money was quietly being deposited abroad. Why? That's what the Serious Fraud Office was trying to get to the bottom of. Two years before it had begun looking at a slush fund which provided other Saudi officials with luxury holidays, limos and call girls.

ROBERT WARDLE Director, Serious Fraud Office

My job is to decide whether there are reasonable grounds to suspect an offence involving fraud. I looked at what we had and I took the view there was so we commenced the investigation.

CORBIN: The investigation was to lead to one of the most powerful men in Saudi Arabia, Prince Bandar Bin Sultan is the subject of a new book launched in London last month, written by his old friend Bill Simpson, who first met the Prince in the RAF back in the 60s.

WILLIAM SIMPSON: [addressing patrons at book launch] Here was someone who would shape world events, both as a diplomat and a statesman over the years.

CORBIN: What sort of a character is Prince Bandar?

WILLIAM SIMPSON Prince Bandar's biographer

Complex. He is an enigma. He is charismatic beyond belief, amazingly kind, amazingly generous, often Machiavellian, but overall a very powerful individual who understands how to use power.

CORBIN: Ever since Bandar trained here as a fighter pilot he's had a soft spot for England. He's been a friend of three prime ministers, one of whom recorded a special message for the reception.

MARGARET THATCHER: I was always pleased to see him when I was Prime Minister because he brought me extraordinary insight and bold proposals.

CORBIN: The boldest proposal Bandar brought her was in 1984, to equip the Saudi Air Force with a fleet of Tornados and Hawks and a whole infrastructure for the warplanes. The deal was called Al-Yamamah, the dove of peace. It would earn the UK more than 40 billion pounds over the next two decades and save the plane's struggling manufacturer - British Aerospace.

How key was Prince Bandar to that arms deal?

SIMPSON: He was central to the deal. He approached Margaret Thatcher and effectively the deal was done without the paperwork, that sort of followed on later. He negotiated the aircraft which became the Al-Yamamah contract which has been running ever since.

CORBIN: But corruption within the Saudi Royal Family was a big problem that Whitehall had long been aware of. Our Ambassador to Riyadh had even spelled it out in a telegram to the Foreign Office in 1971. Let me tell you what it says:

"Your Ambassador is being extremely undiplomatic about one of the most powerful men in the Saudi government, the Defence Minister. He has, of course.." said the Ambassador "a corrupt interest in all contracts.

But did that stop the deal?

[NEWS] Today's signing at Lancaster House was a triumphant climax to a year of patient bargaining.

CORBIN: In 1985 the British Defence Minister signed the Al-Yamamah agreement with his Saudi counterpart Prince Sultan, the very man accused in the telegram of having a corrupt interest in every contract. With him was his son, Prince Bandar, who'd schmoozed Margaret Thatcher.

The Saudi's paid for the planes not in cash but in another commodity - oil. Britain was getting up to 600,000 barrels full a day. That's this much, a tanker full, every day, and it's been going on for 20 years. Al-Yamamah was and still is the biggest and most lucrative arms deal in history.

The deal was good for Britain's economy, good for British Aerospace and Saudi security, but it would be even better for some Saudi princes. They siphoned off vast sums of their country's wealth, money belonging to their people, courtesy of the arms deal. No sooner did the Tornados start arriving in the kingdom than there were rumours Prince Bandar and others were getting 600 million pounds in kickbacks from the deal. In Saudi, as elsewhere, the price of arms is often hyped, so money can be skimmed off the top.

How do we know? Well now we've got the proof that under the UK/Saudi deal the Saudis did pay more than the

Tornados were actually worth. Secret British Government documents released last year by mistake and hastily recalled let the cat out of the bag. They show that each tornado was worth around 60 million pounds but over 21 million is the amount that the Saudi Defence Minister, Prince Bandar's father, agreed to pay. That's a mark up a third, or 600 million pounds, and that's exactly the sum that Bandar and the others were rumoured to be getting at the time.

So do you think that those corruption allegations have any truth in them?

SIMPSON: Well I can't answer that. I can only say that I've tackled him directly and he has been absolutely direct in saying that he did not.

CORBIN: Prince Bandar negotiated a second phase of Al-Yamamah worth billions more two years later. He was becoming British Aerospace's best salesman, but he was also a public official, son of the customer who'd signed the deal. Yet as Panorama discovered, even bigger payments were soon being wired into accounts controlled by Bandar. Here, let me show you what those payments amounted to: this much (taking viewer into secure room stacked solid, chest high, with £50 notes) - £120 million a year give or take a few million, and it went on for at least ten years, so that's over a billion pounds in total, and the payments were actually written in to the Al-Yamamah contract. They were in secret annexes called: 'letters of offer and acceptance'.

Support services is how the payments were described. And Prince Bandar didn't just get huge sums of money. The ex-fighter pilot got to run his own plane, courtesy of the Al-Yamamah deal, British Aerospace and the British Government. It wasn't one of these, a small executive jet which costs around six million pounds. It wasn't even one of these, a larger executive jet. This one would set you back... oh around 15 million pounds or so. No, Bandar got a plane even bigger than one of these, an airbus long range jet which cost around 75 million eight years ago. It took a year to fit it out to his personal specifications.

Tell us about the plane.

SIMPSON: It's a small aircraft. Well... I tell a fib, it was an Airbus 340, it has its own kitchen, it has a large lounge which is where he sits. It's a very luxurious, fitted, aircraft, very well appointed.

CORBIN: Bandar's airbus, registration HZ124 has been seen all over the globe. It's painted in the blue and white colours of his favourite American football team, the Dallas Cowboys. There have been some great parties on board for presidents and kings.

It's become a bit of a legend amongst plane spotters all over the world. They've logged it from Beijing to Barcelona and just about everywhere in between.

SIMPSON: When I last looked at the records of the aircraft, it's been all over the world but he, on an average year, over the first 8 years, it was to the moon and back and round the globe three times every year.

CORBIN: And while Bandar was mixing business with pleasure it was kickback from Al-Yamamah which paid, amongst other things, to run the plane. For years successive governments have denied to Parliament any commissions had been paid to any Saudi officials. British Aerospace, now called BAE, consistently issue denials too.

Sir RICHARD EVANS Chairman, BAE Systems 1998-2004

I can certainly assure you that we, and I believe most governments, are not in the business of making payments going to the members of any government.

CORBIN: But as we've discovered, Prince Bandar has been receiving millions of pounds, via BAE over the years, cash and travelling expenses. This is how it worked. Our welfare sources have confirmed to Panorama that every three months a letter would be sent from Bandar's office to the Ministry of Defence.

It reminded them it was time to make the payments for support services authorised under the Al-Yamamah contract. The MoD would notify British Aerospace who then wired the money into two accounts - thirty million into one, and hundreds of thousands for Bandar's plane into the other. In the vaults at the SFO they were

amassing the evidence of these payments.

They seized documents from British Aerospace, and last autumn they took computer records from the MoD and questioned high-level civil servants. The money trail led abroad to Europe and across the Atlantic, and where did the money sent by BAE with government authority go to in America? Well, to Washington, and some of those Saudi Embassy accounts at Riggs Bank that David Caruso had been investigating, accounts he confirmed Prince Bandar used as a personal piggy bank.

CARUSO: There wasn't a distinction between the accounts of the Embassy or official government accounts as we would call them, and the accounts of the Royal Family.

CORBIN: So you discovered that Prince Bandar was taking money for his own personal use out of accounts that seemed to be accounts belonging to his government.

DAVID CARUSO Compliance & Security Riggs Bank 2003-2005

Yes, certainly, yeah that was a common practice, and that was a practice, from my understanding, that had gone on for years and years.

CORBIN: And large sums of money involved?

CARUSO: Oh yeah, hundreds of thousands and millions of dollars.

CORBIN: Most of the money was wired into the Saudi Ministry of Defence and Aviation account. In reality it might have been better described as a conduit to Bandar.

So money was coming into the Ministry of Defence and Aviation account and coming out for Prince Bandar and his family.

CARUSO: Yes, and it also was used for other embassy operations as well. But it seemed to be, if you could picture the accounts as a spider web, that was a wheel, a hub and spoke, that was the hub, and then from that account money would be transferred to other accounts.

CORBIN: We obtained the details of one striking example from an internal Riggs Bank document. It shows that though the account was in the name of a Saudi ministry, Bandar took a large sum out for himself. It happened, it says here, in the summer of 2003 when 17 million dollars were transferred from the account of the Saudi Arabian Ministry of Defence and Aviation and ended up in the hands of Prince Bandar's personal architect.

I understand that out of that account for example came large sums, some 17 million, which went to Prince Bandar's architect in Saudi Arabia.

CARUSO: We were told that some of the funds in those accounts were being used to build a home, I believe, for the Prince in Saudi.

CORBIN: A home or a palace?

CARUSO: Well... a palace, yeah... well I would imagine a palace with that type of money, yeah.

CORBIN: But when Prince Bandar was tackled on American television about his country's reputation for corruption he shrugged it off.

Interview with Prince Bandar Frontline, WGBH Boston 2002

Now if you tell me that building this whole country and spending 350 billion out of 400 billion that we had misused or corrupt you 50 billion I'll tell you yes, but I'll take that any time.

CORBIN: Rigg's Bank could never get satisfactory answers from Bandar or his embassy, so they closed down all their accounts. Within months the Prince resigned as Ambassador for personal reasons and headed back to Saudi. The SFO needed to establish if the payments Bandar received via BAE and the MoD were actually illegal. These have continued well beyond 2002 when UK law was changed after the Blair Government signed up to an international anti-bribery convention at the OECD.

The government's made a big deal of its fight against corruption, but the new law still has loopholes. Illegal or not, payments like the Al-Yamamah kickbacks are what everyone thought we'd signed up to outlaw. So what does a leading legal expert think, having examined what we found? How would you classify those payments?

JEREMY CARVER Board Member, Transparency International

Those payments, on the face of it, are straightforward bribes as defined by the Ant-Bribery Convention.

CORBIN: No doubt about that.

CARVER: There's no doubt about it at all. Senior officials, a minister, it's quite plain that he meets the test of who is an official, a foreign official, for the purpose of the OECD Convention.

CORBIN: As the SFO uncovered the payments made to Bandar and other Saudi middle men, the government got nervous, so did the Prince who'd benefited most from the deal. He had a new job now, head of Saudi National Security. The plane paid for by Al-Yamamah set off.

Did the itinerary reveal its mission was to scupper the investigation? Well we've uncovered some curious coincidences. Bandar headed first for England. He knew he had a powerful weapon, the third phase of the Al-Yamamah deal worth 20 billion pounds was in the process of negotiation. Prince Bandar's plane has been seen many times in Britain. Plane spotters have snapped it, and those same plane spotters' logs show that interestingly enough, Prince Bandar was here at Brize Norton twice last autumn, in October and again in November, and this was just at the time that behind the scenes the government was agonising over what to do about the SFO investigation. British ministers had assured the Saudis the investigation was going nowhere, but the SFO, it seemed, just hadn't got the message.

ROBERT WARDLE Director, Serious Fraud Office

We traced evidence to Switzerland, we traced money to Switzerland, and it was at that stage that the representations were made.

CORBIN: Representations from Saudi Arabia.

WARDLE: So I understand.

CORBIN: The met stop for Bandar's airbus was Switzerland. A spotter snapped it in Basel on November 15th.

PLANE SPOTTER: We do not definitely know why it was here, but it was very lucky to get it here.

CORBIN: The SFO had asked the Swiss authorities for details of bank accounts belonging to business managers who act for Bandar and his father. The Saudis were furious.

WILLIAM SIMPSON Prince Bandar's biographer

The fact that they may be looking at personal records of some of the Saudi royal family was unacceptable and that's where I think Bandar was pressed into a role of dropping a word to his friend Tony Blair.

CORBIN: So did Bandar, the Saudi Security Chief who lobbied Mr Blair, threaten to stop cooperating in the war against terror? Well that's the line the Prime Minister chose to take with the SFO and the British public.

WARDLE: The information I had came from the minute from the Prime Minister I think it was to the attorney

asking that we consider the public interest and I also had the advantage of talking about it with our ambassador in Saudi Arabia.

CORBIN: So it was at the point when you got to the Swiss bank accounts that, if you like, the balloon went up and the alarm bells started ringing.

WARDLE: Yes.

CORBIN: The pressure was ratcheted up at Bandar's next port of call - Paris.

PLANE SPOTTER; It's one of my favourite air bus so I'm always taking pictures of all the 340s in the world.

CORBIN: The Prince had come to be seen with President Chirac. The subtext - the Saudis were thinking a French fighter might well replace BAE's plane in the new round of Al-Yamamah.

SIMPSON: That's as clear a way, I would have thought, as any of pointing a gun at the British Government's head.

CORBIN: But there had to be another reason to stop the corruption probe, not the risk to a contract or jobs, the Anti-bribery Convention forbids that, so our ambassador to Riyadh visited the SFO three times to make it clear there'd be a price to pay if the Saudis stopped cooperating on terrorism.

WARDLE: I was convinced that if this happened, if this cooperation was withdrawn, there was a significant risk to life.

CORBIN: What, lives are at stake?

WARDLE: Yeah.

CORBIN: That was a lot of pressure to put on you.

WARDLE: Well, sure, but I mean if that's what's going to happen, then I've got to make a decision on that basis.

CORBIN: Maybe you could have stood up to this.

WARDLE: Well, maybe I could and maybe if I did that and took a risk maybe there'd have been some explosion on the streets of London.

CORBIN: And who controls the flow of Saudi intelligence on terrorism? Prince Bandar. Mr Wardle dropped the case.

WARDLE: Of course I'm not very happy when an investigation is stopped in its tracks like that but sometimes you have to make these difficult decisions and that's what I did.

CORBIN: That's life, that's politics in this case.

WARDLE: Well it's politics, it's the law, it's the way things are.

CORBIN: The Government and BAE had successfully muzzled the legal process, that's how many saw it. BAE wouldn't be interviewed by Panorama, but in a statement they said they acted lawfully in accordance with the terms of the relevant contracts and with the approval of the Saudi Government and the Ministry of Defence. It's the same line they took in a letter to the SFO when they admitted paying for support services under the Al-Yamamah contract.

For more information visit bbc.co.uk/panorama

CORBIN: Was that effectively a get out for them or what?

ROBERT WARDLE Director, Serious Fraud Office

Not necessarily. I think their view was to... our intention was to follow these payments and see whether they amounted to criminal offences.

CORBIN: So merely by saying they were acting under contractual arrangements didn't get them off the hook.

WARDLE: Well of course not. I think in any arrangement where corrupt payments are made, BAE or whatever it is, the payments are going to be within the contract in some way, shape or form. The question is whether they were improper payments.

CORBIN: Now we may never know. But the MoD still has questions to answer about payments to Bandar they so willingly facilitated. They refused us an interview because, they said in a statement:

"Disclosing confidential Al-Yamamah information would cause the damage which ending the investigation was designed to prevent. This does not imply that we believe the allegations you propose to make in the programme are true."

For two years the Government's chief law officer the Attorney General, backed the SFO's corruption probe, but then they got hold of MoD documents and the Swiss looked like opening up those accounts. Then Lord Goldsmith declared the case wasn't going to succeed.

The Attorney General made it clear afterwards that he thought that the SFO, that you, did not have a case. I mean leaving aside the public interest argument, do you agree with that?

WARDLE: I felt that in a normal case one would have pursued the line of evidence to see whether there was sufficient evidence to justify a prosecution. To that extent I disagree with him, yes.

CORBIN: You felt you hadn't reached the end of the line?

WARDLE: Absolutely yes.

CORBIN: Lord Goldsmith? Hello, it's Jane Corbin from Panorama. We wanted to do an interview with you about the dropping of the SFO inquiry.

LORD GOLDSMITH Attorney General

Oh you've got lots of information about that already. You've got plenty of information.

CORBIN: We want to actually specifically to ask you about the payments that were made to Prince Bandar.

GOLDSMITH: Why don't you ask the Director of the SFO?

CORBIN: Well we have asked him, but we wonder what your view was. GOLDSMITH: Well you know my view because I've expressed it in Parliament and I've expressed it many times, so you've got that. Alright?

CORBIN: But I don't think you've talked to Parliament about Prince Bandar.

GOLDSMITH: I've talked about all of this.

CORBIN: Thank you very much.

GOLDSMITH: Alright.

CORBIN: In fact, the Attorney General never told Parliament about Prince Bandar. But we know that he knows the SFO knows payments went through his government to the Prince. The Swiss, meanwhile, have begun their own investigation and the Americans may launch one too under their stringent anticorruption laws.

CARVER: It's been a tremendous disappointment internationally that whereas they looked to the United Kingdom to come up with solutions, a practical good example. Instead we're just sleaze boards.

For more information visit bbc.co.uk/panorama

CORBIN: Prince Bandar declined an interview but his lawyers have admitted payments were made into Riggs Bank with the UK and Saudi Government's approval, just as Panorama has revealed. "Bandar was a signatory" they said "but the money went for purposes approved by the Saudi Ministry of Defence, not for him personally, the palace, an official residence. But the big question remains, why were such huge payments made by such a secretive and convoluted route, and what were they for? Here's a last word from the Prince on the subject of corruption.

BANDAR: We did not invent corruption. This happens since Adam and Eve. I mean Adam and Eve were of heaven and they had hanky panky and they had to go down to earth, so this is human nature. But we are not as bad as you think.

CORBIN: And so the moral of the story is that if you're a British arms dealer, make sure you've got government cover written into the contract, then a kickback or two should be no problem.

VINE: Jane Corbin there. Well the Serious Fraud Office is still investigating other BAE arms deals including sales to South Africa and Tanzania. No word yet on their outcome. Next week: is TV bad for my kids? Panorama finds out what happens when you take TVs, computers and games consuls away from a class of 7 and 8 year olds.

Story from BBC NEWS:
http://news.bbc.co.uk/go/pr/fr/-/1/hi/programmes/panorama/6745233.stm

Published: 2007/06/12 14:09:16 GMT

© BBC MMVII

# EXHIBIT B



**Pitkin County, Colorado**
**Janice K. Vos Caudill**
**Clerk & Recorder**
**530 East Main**
**Aspen, CO 81611**

State of Colorado
County of Pitkin
I, Janice K. Vos Caudill, County Clerk and Recorder in and for said Pitkin County, in the State of Colorado aforesaid, do hereby certify that the foregoing is a full, true and correct certified copy of:

| Reception # | Document Type | Record Date |
|---|---|---|
| 312490 | CERTIFIED COPY | 6-20-89 |

Given under my hand and official seal on 10/1/2007 1:15:27PM

PITKIN COUNTY COLORADO * SEAL *

Janice K. Vos Caudill
Clerk & Recorder

Deputy

Recorded at ______ o'clock ____ M. ______ Recorder. BOOK 595 PAGE 253
Reception No. ______

312480

# QUIT CLAIM DEED

SILVIA DAVIS
PITKIN CNTY RECORDER

JUN 20 3 57 PM '89

THIS DEED, Made this day of May, 1989, between RED MOUNTAIN DITCH COMPANY, a Colorado mutual ditch company of the County of Pitkin and State of Colorado, grantor, and ASPCOL CORPORATION, N.V.

whose legal address is c/o William R. Jordan III, Austin, Jordan, Young & Peirce, 600 E. Hopkins, Aspen, Colorado 81611 of the County of Pitkin and State of Colorado, grantee.

WITNESSETH, That the grantor, for and in consideration of the sum of One dollar and other good and valuable consideration------ the receipt and sufficiency of which is hereby acknowledged, has remised, released, sold, conveyed and QUIT CLAIMED, and by these presents does remise, release, sell, convey and QUIT CLAIM unto the grantee, its successors and assigns, forever, all the right, title, interest, claim and demand which the grantor has in and to the real property, together with improvements, if any, situate, lying and being in the County of Pitkin and State of Colorado, described as follows:

All right, title and interest in and to that segment of the original alignment and easement for the Red Mountain Ditch as such is generally described as a ditch alignment which has as its centerline:

Beginning at a point whence the northwest corner said Lot 2 bears N 78°24'28" West, 2568.85 feet to a point on the centerline of an existing pipe, the true point of beginning; thence along the centerline of said existing pipe the following five (5) courses:

1) North 61°48'48" West 117.55 feet; thence
2) North 14°12'47" East 154.09 feet; thence
3) North 36°59'27" East 80.82 feet; thence
4) North 45°00'00" East 90.00 feet; thence
5) North 06°59'58" East 200.00 feet to the point of terminus,

whence said northwest corner said Lot 2 bears South 89°39'32" West 2587.36 feet.
Said Lot 2, Starwood Ranch Lot Split filed in Plat Book 20 at Page 64 of the Pitkin County Records.

also known by street and number as:

TO HAVE AND TO HOLD the same, together with all and singular the appurtenances and privileges thereunto belonging or in anywise thereunto appertaining, and all the estate, right, title, interest and claim whatsoever, of the grantor, either in law or equity, to the only proper use, benefit and behoof of the grantee, its successors and assigns forever.

IN WITNESS WHEREOF, The grantor has executed this deed on the date set forth above.

RED MOUNTAIN DITCH COMPANY

ATTEST: [signature]
Secretary

By: ______
Charles W. Racine, President

JUN 20 1989

STATE OF COLORADO,
County of Pitkin } ss.

The foregoing instrument was acknowledged before me this 15th day of June, 1989 by Charles W. Racine as President of Red Mountain Ditch Company.

My commission expires January 4, 1991. Witness my hand and official seal.

[Notary seal: NOTARY PUBLIC]

[signature]
Address: 600 E. Hopkins, #301
Aspen, Colorado 81611

*If by natural person or persons here insert name or names; if by person acting in representative or official capacity or as attorney-in-fact, then insert name of person as executor, attorney-in-fact or other capacity or description; if by officer of corporation, then insert name of such officer or officers, as the president or other officers of such corporation, naming it.

No. 933. Rev. 3-85. QUIT CLAIM DEED

Received Time Oct 1 12:34PM

Oct 1 2007 1:32PM Law Office of Jeremy Bernstein No 0253 P 5

Pitkin
County

**Pitkin County, Colorado**
**Janice K. Vos Caudill**
**Clerk & Recorder**
**530 East Main**
**Aspen, CO 81611**

State of Colorado
County of Pitkin
I, Janice K. Vos Caudill, County Clerk and Recorder in and for said Pitkin County, in the State of Colorado aforesaid, do hereby certify that the foregoing is a full, true and correct certified copy of:

| Reception # | Document Type | Record Date |
| --- | --- | --- |
| 313468 | CERTIFIED COPY | 7-20-89 |

Given under my hand and official seal on 10/1/2007 1:15:26PM

PITKIN COUNTY * SEAL * COLORADO

Janice K. Vos Caudill
Clerk & Recorder

[signature]
Deputy

Received Time Oct 1 12:34PM

Recorded at ______ o'clock ______ M. ______
Reception No. ______ Recorder

BOOK 597 PAGE 680

313468

SILVIA DAVIS
PITKIN CNTY RECORDER

JUL 20 9 43 AM '89

## BARGAIN AND SALE DEED

KNOW ALL MEN BY THESE PRESENTS, That I, James E. Moore ("Grantor")

~~whose address is~~

County of Pitkin

and State of Colorado, for the consideration of Ten Dollars ($10.00) and other good and valuable considerations

XXXXXX

in hand paid, hereby sell(s) and convey(s) to ASPCOL CORPORATION, N.V., a Netherlands Antilles corporation

whose legal address is c/o Austin, Jordan, Young & Peirce, 600 East Hopkins Avenue, Suite 205, Aspen, Colorado 81611

the following real property situate in the County of Pitkin

and State of Colorado, to wit: All right, title and interest of Grantor in and to Lot 2, Starwood Ranch Lot Split, according to the Amended and Restated Plat thereof recorded April 6, 1989 in Plat Book 22 at page 31 of the Pitkin County real property records

JUL 20 1989

0

~~also known by street and number as~~

with all its appurtenances.

Signed and delivered this 3rd day of April, 19 89.

James E. Moore
James E. Moore

STATE OF COLORADO
County of } ss.

The foregoing instrument was acknowledged before me this 3rd day of April, 19 89, by James E. Moore.

My commission expires , 19 . Witness my hand and official seal.

My Commission Expires December 23, 1989

Sharon L. Stapleton
Notary Public
1370 Owl Creek Road
Aspen, Colorado 81611

7-20-89

No. 401. Rev. 2-88. BARGAIN AND SALE DEED (Statutory Form) Bradford Publishing, 5825 W. 6th Ave., Lakewood, CO 80214 — (303) 233-6900



**Pitkin County, Colorado**
**Janice K. Vos Caudill**
**Clerk & Recorder**
**530 East Main**
**Aspen, CO 81611**

State of Colorado
County of Pitkin
I, Janice K. Vos Caudill, County Clerk and Recorder in and for said Pitkin County, in the State of Colorado aforesaid, do hereby certify that the foregoing is a full, true and correct certified copy of:

| Reception # | Document Type | Record Date |
|---|---|---|
| 16448 | CERTIFIED COPY | 1-23-89 |

Given under my hand and official seal on 10/1/2007 1:15:23PM

PITKIN COUNTY COLORADO SEAL

[signature]
Clerk & Recorder

[signature]
Deputy

BOOK 584 PAGE 210

GENERAL WARRANTY DEED

STARWOOD RANCH, INC., a Texas Corporation, whose address is P.O. Box 53137, Houston, Texas 77052, for the consideration of Ten Dollars ($10.00) and other good and valuable consideration, in hand paid, hereby sells and conveys to ASPCOL CORPORATION, N.V., whose street address is c/o Austin, Jordan, Young & Peirce, 600 E. Hopkins Ave., Suite 205, Aspen, Colorado 81611, the following real property in the County of Pitkin, State of Colorado, to wit:

Lot 2, Starwood Ranch Lot Split, according to the plat thereof recorded February 16, 1988 in Plat Book 20 at Page 64 as Reception No. 297468

with all its appurtenances, and warrants the title to the same, except for general taxes for 1989 and thereafter payable in 1990 and thereafter; and subject to right of the proprietor of a vein or lode to extract and remove his ore therefrom, as reserved in United States Patent recorded in Book 55 at Page 201 and recorded in Book 55 at Page 48 and recorded in Book 55 at Page 582 and recorded in Book 162 at Page 191; Right of way for ditches or canals as reserved in United States Patent recorded in Book 55 at Page 201 and recorded in Book 55 at Page 48 and recorded in Book 55 at Page 582 and recorded in Book 162 at Page 191; terms, conditions and obligations of Trentaz Corral Spring Collection System and Storage Tank decree as set forth in instrument recorded in Book 263 at Page 350; all terms, provisions, conditions, and obligations set forth in that certain Agreement recorded in Book 402 at Page 761; Agreement; Agreement regarding private roads recorded in Book 294 at Page 124; easement recorded in Plat Book 6 at Page 61; terms, agreements, provisions, conditions, and obligations as set forth in Deed recorded in Book 419 at Page 347; terms, conditions, stipulations, and obligations of Protective Covenants as set forth in that certain Contract recorded in Book 402 at Page 765 and as amended by instrument recorded in Book 479 at Page 610, Second Resolution of Amendment recorded in Book 537 at Page 76; terms, conditions, provisions, and obligations as set forth in Resolution of the Board of County Commissioners of Pitkin County, recorded in Book 481 at Page 780; utility easements recorded in Book 265 at Page 980, in Book 493 at Page 144, in Book 494 at Page 227, in Book 496 at Page 886 and in Book 509 at Page 167; terms, conditions, obligations and restrictions as set forth in Resolution of the Board of County Commissioners recorded in Book 521 at Page 588; terms, conditions, obligations, and provisions of Subdivision Improvements Agreement recorded in Book 557 at Page 94; terms, conditions, obligations and provisions of Occupancy Deed Restriction and Agreement for caretaker Employee Dwelling Unit recorded in Book 561 at Page 301; easements and rights-of-way, common areas, sites, dedication of right of way for Utility Purposes

JAN 23 1989

$350.00

308129

SILVIA DAVIS PITKIN CNTY RECORD

JAN 23 4 43 PM '89

1-23-89

all as shown and depicted on plat recorded in Plat Book 20 at Page 64; perpetual, non-exclusive easement recorded in Book 578 at Page 846.* ALL REFERENCES BEING TO THE REAL PROPERTY RECORDS OF PITKIN COUNTY, COLORADO.

Signed this 23rd day of January, 1989.

STARWOOD RANCH, INC., a Texas corporation

By [signature]
J. Scott Thompson, President

By [signature]
Jerry W. Anderson, Secretary

STATE OF TEXAS )
)ss.
COUNTY OF HARRIS )

The foregoing instrument was acknowledged before me this 30th day of January, 1989, by J. Scott Thompson as President, and Jerry W. Anderson as Secretary of Starwood Ranch, Inc., a Texas corporation.

Witness my hand and official seal.

My commission expires:

[stamp: CONNIE K. JAMES Notary Public, State of Texas My Commission Expires 10-6-92]

[signature]
Notary Public

[seal: Notary Public State of Texas]

LEG1.36

*and subject to that certain Agreement of Amendments between Starwood Ranch, Inc. and Greg Abbott, dated January 23, 1989, a copy of which is attached hereto as Exhibit A and the original counterparts of which will be recorded in the real property records of Pitkin County, Colorado.

STARWOOD RANCH, INC.

By [signature]
Thomas C. Thompson, Chairman of the Board of Directors

1-23-89

EXHIBIT A

BOOK 584 PAGE 212

AGREEMENT OF AMENDMENT

THIS AGREEMENT OF AMENDMENT, made and entered into this 23rd day of January, 1989, by and between STARWOOD RANCH, INC., a Texas corporation ("Seller"), and GREG ABBOTT ("Purchaser"),

W I T N E S S E T H:

WHEREAS, Seller and Purchaser are all of the parties to that certain Vacant Land Contract to Buy and Sell Real Estate dated October 12, 1988 (and a September 21, 1988 Letter attached as Exhibit A to said Contract), which Contract was recorded November 17, 1988 in Book 578 at page 794 of the Pitkin County, Colorado real property records (hereafter the "Contract and Letter"); and

WHEREAS, Seller and Purchaser and Stewart Title of Aspen, Inc. ("Escrow Agent") are all of the parties to certain Escrow Instructions dated November 17, 1986, pursuant to which Seller escrowed with Escrow Agent the sum of $200,000.00 as security for Seller's full performance of its various post-closing obligations to Purchaser under the Contract and Letter. Said Escrow Instructions are hereby incorporated in this Agreement of Amendment by this reference; and

WHEREAS, Seller and Purchaser desire by this instrument to amend the Contract and Letter, and the Escrow Instructions, in several respects, and to agree upon certain ancillary matters.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements set forth herein and for other good and valuable considerations, the receipt and sufficiency of which are hereby acknowledged, Seller and Purchaser agree that the Contract and Letter, and the Escrow Instructions, are hereby amended in the following respects:

1. Site No. 2 Relocation. The parties are about to submit to Pitkin County a proposed Restated and Amended Plat of Starwood Ranch Lot Split, as contemplated by the Contract and Letter and the Escrow Instructions. Instead of simply moving inward the northwesterly boundary of Building Site No. 2, however, the parties agree to make every reasonable effort to relocate Site No. 2 entirely to the new location depicted on attached Schedule A, or to some other location that is mutually acceptable to all parties. If the County will not allow this relocation, Site No. 2 will remain in its present location and the northwesterly boundary will be moved inward on the Restated and Amended Plat as originally agreed.

2. Road Realignment. If the County approves the relocation of Site No. 2 as set forth in Paragraph 1 above, the parties

1-23-89



agree that the northerly portion of the common access road across Lot 2 will be realigned along the route generally depicted and described on attached Schedule A as "realigned access road". The cost of such road relocation shall be borne by Seller, and Seller agrees to accomplish the construction and graveling of the new part of the road, to the Lot 1 boundary, and to the Purchaser's reasonable satisfaction, prior to September 1, 1989. If the County does not approve the relocation of Site No. 2, the existing physical alignment of the common access road shall remain unchanged, and the Restated and Amended Plat shall dedicate that present alignment.

3. Special Review Support. Seller (or its successor in interest in the record ownership of Lot 2) intends to submit to Pitkin County a Special Review application for approval for construction of up to 15 bedrooms in the single-family residence to be constructed on Site No. 3 on Lot 2. Purchaser hereby agrees to assist Seller or its successor in every reasonable manner (as may be requested by Seller or its successor) in connection with such Special Review process. Specifically, but without limitation, Purchaser agrees to write letters to Pitkin County, as requested by Seller's or its successor's attorneys, encouraging Pitkin County to grant the request for additional bedrooms.

4. Reduction of Escrow. In the event the County approves the relocation of Site No. 2 as set forth in Paragraph 1 above, upon the recording in the Pitkin County records of the fully-executed Restated and Amended Plat and the Restated and Amended Covenants for Starwood Ranch Lot Split, Purchaser agrees to authorize and instruct Escrow Agent to release immediately to Seller from the "Funds" previously deposited with Escrow Agent pursuant to the Escrow Instructions, all of such Funds (including accrued interest) except the sum of $100,000.00, which sum shall remain in escrow subject to the Escrow Instructions, and less any unreimbursed legal expenses, which shall be paid by Escrow Agent directly to Purchaser.

5. In all other respects, the Contract and Letter and the Escrow Instructions shall remain unmodified hereby and in full force and effect.

6. This Agreement of Amendment may be executed in several counterparts, in which case all such counterparts together shall constitute one and the same instrument, and shall be binding on all of the parties hereto notwithstanding that all parties are not signatory to the original or to the same counterpart or that their signatures do not appear on the same signature page.

1-23-89



7. This Agreement of Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns forever in the record ownership of Lots 1 and 2, respectively, Starwood Ranch Lot Split, and shall be recorded in the Pitkin County real property records.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals the day and year first above written.

Seller: Starwood Ranch, Inc., a Texas corporation

By: David J Curran
Its: Senior Vice President

Purchaser: ______________________
Greg Abbott

STATE OF TEXAS )
) ss.
COUNTY OF HARRIS )

The foregoing Agreement of Amendment was acknowledged before me this 20th day of January, 1989, by David J. Curran as Senior Vice President of Starwood Ranch, Inc., a Texas corporation.

Witness my hand and official seal.

My commission expires:

Connie R. James
Notary Public

1-23-89

STATE OF ________ )
) ss.
COUNTY OF ________ )

The foregoing Agreement of Amendment was acknowledged before me this _____ day of ____________, 1989, by Greg Abbott.

Witness my hand and official seal.

My commission expires:

______________________
Notary Public

Acknowledgment by Escrow Agent

The undersigned Escrow Agent hereby recites and acknowledges that it has read the foregoing Agreement of Amendment, and agrees to continue to perform its responsibilities under the Escrow Instructions as so amended.

Dated: January 23, 1989.

Escrow Agent: Stewart Title of Aspen, Inc.

By: [signature]
Its: Escrow Officer

1-23-89

Received Time Oct 1. 12:34PM

BOOK 584 PAGE 216
1-23-89
STARWOOD RANCH LOT SPLIT
CERTIFICATE OF OWNERSHIP & DEDICATION
LOT 1
LOT 2
STARWOOD
SURVEYOR'S CERTIFICATE
CONSENT AND APPROVAL OF MORTGAGEE
POOR COPY

# Pitkin County Assessor/Treasurer

## Parcel Detail Information

Assessor/Treasurer Property Search | Assessor Subset Query | Assessor Sales Search
Clerk & Recorder Reception Search

Basic Building Characteristics | Tax Information

Parcel Detail | Value Detail | Sales Detail | Residential/Commercial Improvement Detail
Land Detail | Photographs

| Tax Area | Account Number | Parcel Number | Mill Levy |
|---|---|---|---|
| 058 | R012763 | 264326203002 | 51.111 |

### Owner Name and Address

ASPCOL CORPORATION N V
C/O WILLIAM R JORDAN III
418 E COOPER AVE #202
ASPEN, CO 81611

### Legal Description

SUB:STARWOOD RANCH SPLIT LOT:2

### Location

| | |
|---|---|
| Physical Address: | 691 KESSLER (WASTE TREAT) DR ASPEN |
| Subdivision: | STARWOOD RANCH SPLIT |
| Land Acres: | 90.01 |
| Land Sq Ft: | 0 |

### Property Tax Valuation Information

| | Actual Value | Assessed Value |
|---|---|---|
| Land: | 14,250,000 | 1,134,300 |
| Improvements: | 69,508,200 | 5,532,850 |
| Total: | 83,758,200 | 6,667,150 |

| | |
|---|---|
| Sale Date: | 1/23/1989 |
| Sale Price: | 3,500,000 |

## Basic Building Characteristics

| | |
|---|---|
| Number of Residential Buildings: | 3 |
| Number of Comm/Ind Buildings: | 0 |

| Residential Building Occurrence 1 Characteristics | |
|---|---|
| ENCLOSED PORCH: | 288 |
| 1/2 STORY: | 465 |
| FIRST FLOOR: | 961 |
| Total Heated Area: | 1,426 |
| Property Class: | SINGLE FAM RES-IMPROVEMEN |
| Actual Year Built: | 1938 |
| Effective Year Built: | 1980 |
| Bedrooms: | 2 |
| Baths: | 1 |
| Quality of Construction: | GOOD T 12 |
| Exterior Wall: | WD SID LOW |
| Interior Wall: | DRYWALL |
| Floor: | BASE |
| Heat Type: | WALL/CONVE |
| Heating Fuel: | ELECTRIC |
| Roof Cover: | ASP SHINGL |
| Roof Structure: | GABLE/HIP |
| Neighborhood: | STAR MOUNTAIN RANCH TRACTS |
| Super Nbhd: | STARWD AND WHS |

## Tax Information

| Tax Year | Transaction Type | Amount |
|---|---|---|
| 1997 | Tax Amount | $96,516.04 |
| 1997 | Tax Payment: Whole | ($96,516.04) |
| 1998 | Tax Amount | $96,387.38 |

| | | |
|---|---|---|
| 1998 | Tax Payment: Whole | ($96,387.38) |
| 1999 | Tax Amount | $101,067.78 |
| 1999 | Tax Payment: Whole | ($101,067.78) |
| 2000 | Tax Amount | $111,846.06 |
| 2000 | Tax Payment: Whole | ($111,846.06) |
| 2001 | Tax Amount | $163,877.62 |
| 2001 | Tax Payment: Whole | ($163,877.62) |
| 2002 | Tax Amount | $128,409.42 |
| 2002 | Tax Payment: Whole | ($128,409.42) |
| 2003 | Tax Amount | $135,341.90 |
| 2003 | Interest Charge | $1,353.42 |
| 2003 | Interest Payment | ($1,353.42) |
| 2003 | Tax Payment: Whole | ($135,341.90) |
| 2004 | Tax Amount | $134,886.52 |
| 2004 | Tax Payment: First Half | ($67,443.26) |
| 2004 | Tax Payment: Second Half | ($67,443.26) |
| 2005 | Tax Amount | $206,527.34 |
| 2005 | Tax Payment: First Half | ($103,263.67) |
| 2005 | Tax Payment: Second Half | ($103,263.67) |
| 2006 | Tax Amount | $227,643.28 |
| 2006 | Tax Payment: First Half | ($113,821.64) |
| 2006 | Tax Payment: Second Half | ($113,821.64) |

# EXHIBIT C

# Prince Bandar Biography

## His Royal Highness
## Prince Bandar bin Sultan bin Abdulaziz Al-Saud

His Royal Highness Prince Bandar bin Sultan bin Abdulaziz was appointed Secretary-General of the National Security Council by the Custodian of the Two Holy Mosques King Abdullah on October 16, 2005. Prior to his appointment, Prince Bandar served as the Ambassador of the Kingdom of Saudi Arabia to the United States of America from October 24, 1983 to September 8, 2005.

Prince Bandar was born in Saudi Arabia on March 2, 1949, at Taif, the summer capital of the Kingdom, the son of His Royal Highness Crown Prince Sultan bin Abdulaziz Al-Saud, the Deputy Prime Minister, Minister of Defense and Aviation, and Inspector-General. He is married to Princess Haifa Bint Faisal. He has four sons and four daughters.

Prince Bandar was appointed Ambassador to the United States by the Custodian of the Two Holy Mosques King Fahd bin Abdulaziz Al-Saud on September 27, 1983 and presented his credentials to President Ronald Reagan on October 24, 1983. On August 7, 1995, he was promoted to the rank of Minister. During his tenure in Washington, Prince Bandar served as the Dean of the Diplomatic Corps.

Prince Bandar graduated from the British Royal Air Force College at Cranwell, England, in 1968 and was commissioned as a second lieutenant in the Royal Saudi Air Force (RSAF). He received pilot training in the United Kingdom and the United States, and has flown numerous fighter aircraft including the JP 3-4, T-38, T-33, F-5, F-53/55, F-102, and the F-15. During his seventeen-year military career he attained the rank of lieutenant colonel, commanded fighter squadrons at three RSAF bases, and undertook program management responsibilities in the major RSAF modernization project Peace Hawk. In addition, Prince Bandar carried out special assignments in Washington, DC, during the debates between

the U.S. administration and the Congress concerning the sale to Saudi Arabia of F-15s in 1978 and of AWACs in 1981. In 1982 he was assigned to Washington, DC, as the Kingdom's defense attaché.

Prince Bandar completed his postgraduate work in several U.S. military schools including staff courses with the Air Command and Staff College at Maxwell Air Force Base in Montgomery, Alabama, and with the Industrial College of the Armed Forces at Fort McNair in Washington, DC. He received his master's degree in international public policy from the Johns Hopkins University School of Advanced International Studies, Washington, DC, in 1980.

As special envoy for the Custodian of the Two Holy Mosques King Fahd bin Abdulaziz, Prince Bandar was involved in cease-fire negotiations in the Lebanese civil war, and has been instrumental in resolving a number of regional and international crises, such as the Lockerbie incident in 1999. He was the Saudi delegate in the Gulf Cooperation Council mission observing the 1991 Middle East peace talks in Madrid, and has been a regular member of the Kingdom's delegation to the United Nations General Assembly since 1984. Prince Bandar has been awarded many medals and decorations, including the Hawk Flying Medal of Aviation, the King Faisal Medal, and the King Abdulaziz Sash, as well as honors from other nations.

---

All contents on this web site is copyrighted ©2006 Information Office of the Royal Embassy of Saudi Arabia in Washington DC. To contact the embassy by phone please call (202) 342-3800. For the VISA Section please call (202) 944-3126 or send a fax to (202) 337-4084. You may also send e-mails to info@saudiembassy.net

# EXHIBIT D

# EXHIBIT B

## Affidavit of Nelson Tucker

I, Nelson Tucker, declare under penalty of perjury of the laws of the United States of America, that the following is true and correct, that I have personal knowledge as to the facts stated, and that I could competently testify, if called, that:

1. I am the President of *Process Service Network*, an international service of process firm, am over the age of 18 years, and not a party to the within-named action. I have been a Registered Process Server and owner of an attorney service since 1978. I have authored two (2) books on service of process, investigations and court filing procedures and have conducted training seminars for the past 18 years. I regularly serve, or cause to be served, legal documents domestically and worldwide and supervise all international service assignments. I currently teach Service of Process and Court Filing Procedures at *Los Angeles Valley College* and Service of Process at *Legal Services Institute*. I am a Life Member of the *National Association of Investigative Specialists* and the *International Process Servers Association*. I am qualified as an expert witness on the following subjects: service of process, international service of process, and court filing procedures. In addition, I am fully familiar with the *Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters* ("Hague Service Convention") and service of process laws of most foreign nations.

2. This Declaration is made related to international service of process upon various Defendants in Saudi Arabia, Sudan, and United Arab Emirates, related to the matter *Burnett, et al. v. Al Baraka Investment, et al.*, case No. 1-02-01616-JR, filed in the United States District Court, District of Columbia.

3. On or about October 1, 2002, I received an assignment from the law firm of Young Riley Dudley & DeBrota, along with instructions to serve all parties named as defendants in the above-cited case.

4. On or about October 10, 2002, I assigned the services that do not require translation to the appropriate process server, or Central Authority.

5. On or about November 4, 2002, I assigned various services to be served in Saudi Arabia, Sudan, and the United Arab Emirates to Ahmed Salah, a private process server in Riyadh, Saudi Arabia. I forwarded copies for service in English and Arabic.

6. In December 2002, and continuing in January 2003, I attempted to obtain the status on the progress of the services in Saudi Arabia and United Arab Emirates. I could not make contact with the process server.

7. In February 2003, I contracted with a private investigator in Saudi Arabia who was instructed to attempt to make personal contact with the process server. On two (2) occasions, the private investigator advised my office that the process server's office was "not occupied."

8. On March 10, 2003, I received a message from the private investigator advising me that he had reasonable belief that the process server, Salah, had been murdered while carrying out service of process in Harad, Saudi Arabia. He based his finding on comments made by a business owner adjacent to Salah's previous address. The private investigator stated that he recalled reading about the murder of a private investigator in December 2002 or January 2003.

9. It is my belief that some of the defendants were served in Saudi Arabia, Sudan, and United Arab Emirates, based on the filing of written responses to the Court by some defendants in those nations.

10. It will be extremely difficult to complete the services in the three (3) referenced countries since there are no other known private process servers who will accept assignments from entities in the United States of America, and due to the political situation in the region. We, and others in our industry, have previously had difficulty locating competent process servers in Saudi Arabia and United Arab Emirates. During the past 8 years, we have only found two (2) process servers in the region who will serve legal documents. The other process server who we have used in the past cannot be located. Persons who engage in investigative and legal support activities in that region are very unreliable and have proved to be untrustworthy in their business dealings with entities

from the United States and other Western nations.

I declare and can competently testify, under penalty of perjury of the laws of the United States of America, that the foregoing is true and correct. Executed on March 14, 2003, at Los Angeles, CA.

Nelson Tucker

# EXHIBIT E



U.S. DEPARTMENT of STATE

*Bureau of Near Eastern Affairs*
**June 2007**

# Background Note: Saudi Arabia

Vacationers are silhouetted at beach in Jiddah, Saudi Arabia, with the landmark Jiddah fountain in background. May 7, 2004. [© AP Images]

## PROFILE

**OFFICIAL NAME:**
Kingdom of Saudi Arabia

**Geography**
Area: 1,960,582 sq. km. (784,233 sq. mi.), slightly more than one-fifth the size of the continental United States.
Cities (2006 est.): *Capital*--Riyadh (pop. 4.3 million). *Other cities*--Jeddah (3.4 million), Makkah, (1.6 million), Dammam/Khobar/Dhahran, (1.6 million).
Terrain: Primarily desert with rugged mountains in the southwest.
Climate: Arid, with great extremes of temperature in the interior; humidity and temperature are both high along the coast.

**People**
Nationality: *Noun*--Saudi(s). *Adjective*--Saudi Arabian or Saudi.
Population (2007 est.): 27.6 million (22.0 million Saudis, 5.6 million foreign nationals).
Annual growth rate: (2007 est.): 2.06%.
Ethnic groups: Arab (90% of native pop.), Afro-Asian (10% of native pop.).
Religion: Islam.
Language: Arabic (official).
Education: *Literacy*--Total: 78.8% (male 84.7%, female 70.8%).
Health: *Infant mortality rate* (2007 est.)--12.4/1,000. *Life expectancy*--male 74 years, female 78 years.
Work force: 6.76 million, about 35% foreign workers (2005 est.); *industry*--25%; *services* (including government)--63%; *agriculture*--12%.

**Government**
Type: Monarchy with Council of Ministers and Consultative Council.
Unification: September 23, 1932.
Constitution: The Holy Qur'an (governed according to Islamic law), Shari'a, and the Basic Law.
Branches: *Executive*--King (chief of state and head of government). *Legislative*--a Consultative Council with advisory powers was formed September 1993. *Judicial*--Supreme Council of Justice, Islamic Courts of First Instance and Appeals.
Administrative divisions: 13 provinces.
Political parties: None.

**Economy**
GDP (2006 est.): $374 billion.
Annual growth rate (2006 est.): 5.9%.
Per capita GDP (2006 est.): $13,800.

Natural resources: Hydrocarbons, gold, uranium, bauxite, coal, iron, phosphate, tungsten, zinc, silver, copper.
Agriculture: *Products*--dates, grains, livestock, vegetables. *Arable land*--1.76%.
Industry: *Types*--petroleum, petrochemicals, cement, fertilizer, light industry.
Trade (2006 est.): *Exports*--$204.5 billion: petroleum and petroleum products. *Imports*--$64.16 billion:
manufactured goods, transportation equipment, clothing and textiles, processed food products. *Major trading
partners*--U.S., Japan, South Korea, China, Germany, U.K., France, Italy (2005).

**PEOPLE**
Saudi Arabia's 2007 population was estimated to be about 27.6 million, including about 5.6 million resident
foreigners. Until the 1960s, most of the population was nomadic or seminomadic; due to rapid economic and
urban growth, more than 95% of the population now is settled. Some cities and oases have densities of more
than 1,000 people per square kilometer (2,600 per sq. mi).

Saudi Arabia is known as the birthplace of Islam, which in the century following Muhammad's death in 632 A.D.
spread west to Spain and east to India. Islam obliges all Muslims to make the Hajj, or pilgrimage to Makkah, at
least once during their lifetime if they are able to do so. The cultural environment in Saudi Arabia is highly
conservative; the country adheres to a strict interpretation of Islamic religious law (Shari'a). Cultural
presentations must conform to narrowly defined standards of ethics. Men and women are not permitted to
attend public events together and are segregated in the work place.

Most Saudis are ethnically Arab. Some are of mixed ethnic origin and are descended from Turks, Iranians,
Indonesians, Indians, Africans, and others, most of whom immigrated as pilgrims and reside in the Hijaz region
along the Red Sea coast. Many Arabs from nearby countries are employed in the kingdom. There also are
significant numbers of Asian expatriates mostly from India, Pakistan, Bangladesh, Indonesia, and the
Philippines. There are less than 100,000 Westerners in Saudi Arabia.

**HISTORY**
Except for a few major cities and oases, the harsh climate historically prevented much settlement of the Arabian
Peninsula. People of various cultures have lived in the peninsula over a span of more than 5,000 years. The
Dilmun culture, along the Gulf coast, was contemporaneous with the Sumerians and ancient Egyptians, and
most of the empires of the ancient world traded with the states of the peninsula.

The Saudi state began in central Arabia in about 1750. A local ruler, Muhammad bin Saud, joined forces with
an Islamic reformer, Muhammad Abd Al-Wahhab, to create a new political entity. Over the next 150 years, the
fortunes of the Saud family rose and fell several times as Saudi rulers contended with Egypt, the Ottoman
Empire, and other Arabian families for control on the peninsula. The modern Saudi state was founded by the
late King Abdul Aziz Al Saud (known internationally as Ibn Saud). In 1902, Abdul Aziz recaptured Riyadh, the Al
Saud dynasty's ancestral capital, from the rival Al-Rashid family. Continuing his conquests, Abdul Aziz subdued
Al-Hasa, the rest of Nejd, and the Hijaz between 1913 and 1926. In 1932, these regions were unified as the
Kingdom of Saudi Arabia.

Boundaries with Jordan, Iraq, and Kuwait were established by a series of treaties negotiated in the 1920s, with
two "neutral zones"--one with Iraq and the other with Kuwait--created. The Saudi-Kuwaiti neutral zone was
administratively partitioned in 1971, with each state continuing to share the petroleum resources of the former
zone equally. Tentative agreement on the partition of the Saudi-Iraqi neutral zone was reached in 1981, and
partition was finalized by 1983. The country's southern boundary with Yemen was partially defined by the 1934
Treaty of Taif, which ended a brief border war between the two states. A June 2000 treaty further delineated
portions of the boundary with Yemen. The location and status of Saudi Arabia's boundary with the United Arab
Emirates is not final; a de facto boundary reflects a 1974 agreement. The border between Saudi Arabia and
Qatar was resolved in March 2001. The border with Oman also is not demarcated.

King Abdul Aziz died in 1953 and was succeeded by his eldest son, Saud, who reigned for 11 years. In 1964,
Saud abdicated in favor of his half-brother, Faisal, who had served as Foreign Minister. Because of fiscal
difficulties, King Saud had been persuaded in 1958 to delegate direct conduct of Saudi Government affairs to
Faisal as Prime Minister; Saud briefly regained control of the government in 1960-62. In October 1962, Faisal
outlined a broad reform program, stressing economic development. Proclaimed King in 1964 by senior royal
family members and religious leaders, Faisal also continued to serve as Prime Minister. This practice has been
followed by subsequent kings.

The mid-1960s saw external pressures generated by Saudi-Egyptian differences over Yemen. When civil war
broke out in 1962 between Yemeni royalists and republicans, Egyptian forces entered Yemen to support the
new republican government, while Saudi Arabia backed the royalists. Tensions subsided only after 1967, when
Egypt withdrew its troops from Yemen.

Saudi forces did not participate in the Six-Day (Arab-Israeli) War of June 1967, but the government later
provided annual subsidies to Egypt, Jordan, and Syria to support their economies. During the 1973 Arab-Israeli
war, Saudi Arabia participated in the Arab oil boycott of the United States and Netherlands. A member of the
Organization of Petroleum Exporting Countries (OPEC), Saudi Arabia had joined other member countries in
moderate oil price increases beginning in 1971. After the 1973 war, the price of oil rose substantially,

dramatically increasing Saudi Arabia's wealth and political influence.

In 1975, King Faisal was assassinated by a nephew, who was executed after an extensive investigation concluded that he acted alone. Faisal was succeeded by his half-brother Khalid as King and Prime Minister; their half-brother Prince Fahd was named Crown Prince and First Deputy Prime Minister. King Khalid empowered Crown Prince Fahd to oversee many aspects of the government's international and domestic affairs. Economic development continued rapidly under King Khalid, and the kingdom assumed a more influential role in regional politics and international economic and financial matters.

In June 1982, King Khalid died, and Fahd became King and Prime Minister in a smooth transition. Another half-brother, Prince Abdullah, Commander of the Saudi National Guard, was named Crown Prince and First Deputy Prime Minister. King Fahd's brother, Prince Sultan, the Minister of Defense and Aviation, became Second Deputy Prime Minister. Under King Fahd, the Saudi economy adjusted to sharply lower oil revenues resulting from declining global oil prices. Saudi Arabia supported neutral shipping in the Gulf during periods of the Iran-Iraq war and aided Iraq's war-strained economy. King Fahd played a major part in bringing about the August 1988 cease-fire between Iraq and Iran and in organizing and strengthening the Gulf Cooperation Council (GCC), a group of six Arabian Gulf states dedicated to fostering regional economic cooperation and peaceful development.

In 1990-91, King Fahd played a key role before and during the Gulf war. King Fahd's action also consolidated the coalition of forces against Iraq and helped define the tone of the operation as a multilateral effort to reestablish the sovereignty and territorial integrity of Kuwait. Acting as a rallying point and personal spokesman for the coalition, King Fahd helped bring together his nation's GCC allies, Western allies, and Arab allies, as well as nonaligned nations from Africa and the emerging democracies of eastern Europe. He used his influence as Custodian of the Two Holy Mosques to persuade other Arab and Islamic nations to join the coalition.

King Fahd suffered a stroke in November 1995. From 1997, Crown Prince Abdullah took on much of the day-to-day responsibilities of running the government. Upon King Fahd's death on August 1, 2005, Abdullah assumed the throne as King. Prince Sultan, Minister of Defense and Aviation, became Crown Prince and First Deputy Prime Minister.

**GOVERNMENT AND POLITICAL CONDITIONS**
The central institution of Saudi Arabian Government is the monarchy. The Basic Law adopted in 1992 declared that Saudi Arabia is a monarchy ruled by the sons and grandsons of King Abd Al Aziz Al Saud, and that the Holy Qur'an is the constitution of the country, which is governed on the basis of Islamic law (Shari'a). There are no political parties or national elections; however, the country held its first municipal elections in 2005. The king's powers are limited because he must observe the Shari'a and other Saudi traditions. He also must retain a consensus of the Saudi royal family, religious leaders (ulema), and other important elements in Saudi society. The leading members of the royal family choose the king from among themselves with the subsequent approval of the ulema.

Saudi kings gradually have developed a central government. Since 1953, the Council of Ministers, appointed by and responsible to the king, has advised on the formulation of general policy and directed the activities of the growing bureaucracy. This council consists of a prime minister, the first and second deputy prime ministers, 20 ministers (of whom the minister of defense also is the second deputy prime minister), two ministers of state, and a small number of advisers and heads of major autonomous organizations.

Legislation is by resolution of the Council of Ministers and the Shura Council, ratified by royal decree, and must be compatible with the Shari'a. Justice is administered according to the Shari'a by a system of religious courts whose judges are appointed by the king on the recommendation of the Supreme Judicial Council, composed of 12 senior jurists. The independence of the judiciary is protected by law. The king acts as the highest court of appeal and has the power to pardon. Access to high officials (usually at a majlis, or public audience) and the right to petition them directly are well-established traditions.

The kingdom is divided into 13 provinces governed by princes or close relatives of the royal family. All governors are appointed by the King.

In March 1992, King Fahd issued several decrees outlining the basic statutes of government and codifying for the first time procedures concerning the royal succession. The King's political reform program also provided for the establishment of a national Consultative Council, with appointed members having advisory powers to review and give advice on issues of public interest. It also outlined a framework for councils at the provincial or emirate level.

In September 1993, King Fahd issued additional reform decrees, appointing the members of the national Consultative Council and spelling out procedures for the new council's operations. He announced reforms regarding the Council of Ministers, including term limitations of 4 years and regulations to prohibit conflict of interest for ministers and other high-level officials. The members of 13 provincial councils and the councils' operating regulations also were announced in September 1993. In February, March, and April 2005, Saudis

voted in the country's first municipal elections in more than 50 years. Women, and male members of the military, were not permitted to vote.

In July 1997, the membership of the Consultative Council was expanded from 60 to 90 members, and again in May 2001 from 90 to 120 members. In 2005, membership was expanded to 150 members. Membership has changed significantly during expansions of the council as many members have not been reappointed. The role of the council is gradually expanding as it gains experience.

In November 2006, King Abdallah announced the formation of an Allegiance Committee which, in the future, will select the Crown Prince.

**Principal Government Officials**
King, Prime Minister, Custodian of the Two Holy Mosques--King Abdullah bin Abdul Aziz Al Saud
Minister of Foreign Affairs--Prince Saud Al Faysal bin Abdul Aziz Al Saud
Ambassador to the U.S--Adel al-Jubir

The Embassy of the Kingdom of Saudi Arabia is located at 601 New Hampshire Avenue NW, Washington, DC 20037; tel. 202-342-3800.

**ECONOMY**
Oil was discovered in Saudi Arabia by U.S. geologists in the 1930s, although large scale production did not begin until after World War II. Oil wealth has made possible rapid economic development, which began in earnest in the 1960s and accelerated spectacularly in the 1970s, transforming the kingdom.

Saudi oil reserves are the largest in the world, and Saudi Arabia is the world's leading oil producer and exporter. Oil accounts for more than 90% of the country's exports and nearly 75% of government revenues. Proven reserves are estimated to be 263 billion barrels, about one-quarter of world oil reserves.

More than 95% of all Saudi oil is produced on behalf of the Saudi Government by the parastatal giant Saudi ARAMCO. In June 1993, Saudi ARAMCO absorbed the state marketing and refining company (SAMAREC), becoming the world's largest fully integrated oil company. Most Saudi oil exports move by tanker from Gulf terminals at Ras Tanura and Ju'aymah. The remaining oil exports are transported via the east-west pipeline across the kingdom to the Red Sea port of Yanbu.

Due to a sharp rise in petroleum revenues in 1974 following the 1973 Arab-Israeli war, Saudi Arabia became one of the fastest-growing economies in the world. It enjoyed a substantial surplus in its overall trade with other countries; imports increased rapidly; and ample government revenues were available for development, defense, and aid to other Arab and Islamic countries.

But higher oil prices led to development of more oil fields around the world and reduced global consumption. The result, beginning in the mid-1980s, was a worldwide oil glut, which introduced an element of planning uncertainty for the first time in a decade. Saudi oil production, which had increased to almost 10 million barrels per day (b/d) during 1980-81, dropped to about 2 million b/d in 1985. Budgetary deficits developed, and the government drew down its foreign assets. Responding to financial pressures, Saudi Arabia gave up its role as the "swing producer" within OPEC in the summer of 1985 and accepted a production quota. Since then, Saudi oil policy has been guided by a desire to maintain market and quota shares and to support stability in the international oil market.

Saudi Arabia was a key player in coordinating the successful 1999 campaign of OPEC and other oil-producing countries to raise the price of oil to its highest level since the Gulf War by managing production and supply of petroleum. That same year, Saudi Arabia established the Supreme Economic Council to formulate and better coordinate economic development policies in order to accelerate institutional and industrial reform.

In response to increasing international demand for oil, Saudi ARAMCO is engaged in an expansion of its oil production capacity, and plans to raise its capacity from the current 9.5-10 million barrels/day (mb/d) to 12 mb/d within the next several years. Saudi ARAMCO is also increasing production of associated and non-associated natural gas to feed the expanding petrochemical sector. Notably, Saudi Arabia has awarded contracts to foreign companies to conduct gas exploration in selected regions of the country--the first such foreign participation in the petroleum sector upstream since the nationalization of ARAMCO in the 1970s.

Saudi Arabia continues to pursue rapid industrial expansion, led by the petrochemical sector. The Saudi Basic Industries Corporation (SABIC), a parastatal petrochemical company, is now one of the world's leading petrochemical producers, and the government promotes private sector involvement in petrochemicals. The government also plans new investments in the mining sector and in refining,

After Saudi Arabia announced its intention to join the World Trade Organization (WTO), negotiations focused on increasing market access to foreign goods and services and the timeframe for becoming fully compliant with

WTO obligations. In April 2000, the government established the Saudi Arabian General Investment Authority to encourage foreign direct investment in the country. Saudi Arabia signed a Trade Investment Framework Agreement with the U.S. in July 2003, and joined the WTO in December 2005.

Through 5-year development plans, the government has sought to allocate its petroleum income to transform its relatively undeveloped, oil-based economy into that of a modern industrial state while maintaining the kingdom's traditional Islamic values and customs. Although economic planners have not achieved all their goals, the economy has progressed rapidly. Oil wealth has increased the standard of living of most Saudis. However, significant population growth has strained the government's ability to finance further improvements in the country's standard of living. Heavy dependence on petroleum revenue continues, but industry and agriculture now account for a larger share of economic activity. The mismatch between the job skills of Saudi graduates and the needs of the private job market at all levels remains the principal obstacle to economic diversification and development; about 4.6 million non-Saudis are employed in the economy.

Saudi Arabia's first two development plans, covering the 1970s, emphasized infrastructure. The results were impressive--the total length of paved highways tripled, power generation increased by a multiple of 28, and the capacity of the seaports grew tenfold. For the third plan (1980-85), the emphasis changed. Spending on infrastructure declined, but it rose markedly on education, health, and social services. The share for diversifying and expanding productive sectors of the economy (primarily industry) did not rise as planned, but the two industrial cities of Jubail and Yanbu--built around the use of the country's oil and gas to produce steel, petrochemicals, fertilizer, and refined oil products--were largely completed.

In the fourth plan (1985-90), the country's basic infrastructure was viewed as largely complete, but education and training remained areas of concern. Private enterprise was encouraged, and foreign investment in the form of joint ventures with Saudi public and private companies was welcomed. The private sector became more important, rising to 70% of non-oil GDP by 1987. While still concentrated in trade and commerce, private investment increased in industry, agriculture, banking, and construction companies. These private investments were supported by generous government financing and incentive programs. The objective was for the private sector to have 70% to 80% ownership in most joint venture enterprises.

The fifth plan (1990-95) emphasized consolidation of the country's defenses; improved and more efficient government social services; regional development; and, most importantly, creating greater private-sector employment opportunities for Saudis by reducing the number of foreign workers.

The sixth plan (1996-2000) focused on lowering the cost of government services without cutting them and sought to expand educational training programs. The plan called for reducing the kingdom's dependence on the petroleum sector by diversifying economic activity, particularly in the private sector, with special emphasis on industry and agriculture. It also continued the effort to "Saudiize" the labor force.

The seventh plan (2000-2004) focused more on economic diversification and a greater role of the private sector in the Saudi economy. For the period 2000-2004, the Saudi Government aimed at an average GDP growth rate of 3.16% each year, with projected growths of 5.04% for the private sector and 4.01% for the non-oil sector. The government also set a target of creating 817,300 new jobs for Saudi nationals.

The eighth plan (2005-2010) again focuses on economic diversification in addition to education and inclusion of women in society. The plan calls for establishing new universities and new colleges with technical specializations. Privatization as well as emphases on a knowledge-based economy and tourism will help promote the goal of economic diversification.

**FOREIGN RELATIONS**

Saudi foreign policy objectives are to maintain its security and its paramount position on the Arabian Peninsula, defend general Arab and Islamic interests, promote solidarity among Islamic governments, and maintain cooperative relations with other oil-producing and major oil-consuming countries.

Saudi Arabia signed the UN Charter in 1945. The country plays a prominent and constructive role in the International Monetary Fund, the World Bank, and Arab and Islamic financial and development assistance institutions. One of the largest aid donors in the world, it still gives some aid to a number of Arab, African, and Asian countries. Jeddah is the headquarters of the Secretariat of the Organization of the Islamic Conference and its subsidiary organization, the Islamic Development Bank, founded in 1969.

Membership in the 11-member OPEC and in the technically and economically oriented Arab producer group--the Organization of Arab Petroleum Exporting Countries--facilitates coordination of Saudi oil policies with other oil-exporting governments. As the world's leading exporter of petroleum, Saudi Arabia has a special interest in preserving a stable and long-term market for its vast oil resources by allying itself with healthy Western economies which can protect the value of Saudi financial assets. It generally has acted to stabilize the world oil market and tried to moderate sharp price movements.

The Saudi Government frequently helps mediate regional crises and support the Israeli-Palestinian peace

negotiations. A charter member of the Arab League, Saudi Arabia supports the position that Israel must withdraw from the territories which it occupied in June 1967, as according to United Nations Resolution 242. Saudi Arabia supports a peaceful resolution of the Arab-Israeli conflict but rejected the Camp David accords, claiming that they would be unable to achieve a comprehensive political solution that would ensure Palestinian rights and adequately address the status of Jerusalem. Although Saudi Arabia broke diplomatic relations with and suspended aid to Egypt in the wake of Camp David, the two countries renewed formal ties in 1987. In March 2002, Crown Prince Abdallah offered a Middle East peace plan, now known as the Arab Peace Initiative, at the annual summit of the Arab League in which Arab governments would offer "normal relations and the security of Israel in exchange for a full Israeli withdrawal from all occupied Arab lands, recognition of an independent Palestinian state with Jerusalem as its capital, and the return of Palestinian refugees." In March 2007 the Arab League reiterated its support for the Arab Peace Initiative by endorsing it as the foundation for a broad Arab-Israeli peace.

In 1990-91, Saudi Arabia played an important role in the Gulf War, developing new allies and improving existing relationships between Saudi Arabia and some other countries. Saudi Arabia provided water, food, shelter, and fuel for coalition forces in the region. Saudi Arabia's combined costs in payments, foregone revenues, and donated supplies were $55 billion. More than $15 billion went toward reimbursing the United States alone. However, there also were diplomatic and financial costs. Relations between Saudi Arabia and Tunisia, Algeria, and Libya deteriorated. Each country had remained silent following Iraq's invasion of Kuwait but called for an end to violence once the deployment of coalition troops began. Relations between these countries and Saudi Arabia have returned to their pre-war status. Saudi Arabia's relations with those countries which expressed support for Saddam Hussein's invasion of Kuwait--Yemen, Jordan, and Sudan--were severely strained during and immediately after the war. For example, several hundred thousand Yemenis were expelled from Saudi Arabia after the Government of Yemen announced its position, thus exacerbating an existing border dispute. Saudi-Yemeni relations, especially in the wake of the 1994 Yemen civil war, remained fragile and of significant concern to the Saudi Government. Relations have slowly warmed over time and the Yemeni-Saudi border was finally demarcated in 2000. The Palestine Liberation Organization's support for Iraq cost it financial aid as well as good relations with Saudi Arabia and other Gulf states. Recently, though, Saudi Arabia's relations with Jordan and the Palestinian Authority have improved, with the Saudi Government providing assistance for the Palestinian Authority.

As it had during the 1990-91 Gulf War, Saudi Arabia provided important support to Coalition efforts in Operation Iraqi Freedom. In 2006, Saudi Arabia hosted a conference to promote sectarian reconciliation within Iraq, and has pledged substantial debt relief to aid the elected government. Saudi Arabia is an important player in promoting stability and security in the Gulf region, and provided critical reconstruction support to Lebanon following the 2006 conflict between Hezbollah and Israel. Saudi Arabia has also taken a more prominent leadership role within the Organization of the Islamic Conference. In addition to promoting its Arab Peace initiative in 2007, in February it brokered an agreement between Palestinian factions known as the "Mecca Agreement," and in May 2007 King Abdullah brokered a reconciliation agreement between Chad and Sudan.

**U.S.-SAUDI ARABIAN RELATIONS**
Saudi Arabia's unique role in the Arab and Islamic worlds, its possession of the world's largest reserves of oil, and its strategic location make its friendship important to the United States. Diplomatic relations were established in 1933; the U.S. embassy opened in Jeddah in 1944 and moved to Riyadh in 1984. The Jeddah embassy became a U.S. consulate. Meanwhile, a U.S. consulate opened in Dhahran in 1944.

The United States and Saudi Arabia share a common concern about regional security, oil exports and imports, and sustainable development. Close consultations between the U.S. and Saudi Arabia have developed on international, economic, and development issues such as the Middle East peace process and shared interests in the Gulf. The continued availability of reliable sources of oil, particularly from Saudi Arabia, remains important to the prosperity of the United States as well as to Europe and Japan. Saudi Arabia is one of the leading sources of imported oil for the United States, providing more than one million barrels/day of oil to the U.S. The U.S. is Saudi Arabia's largest trading partner, and Saudi Arabia is the largest U.S. export market in the Middle East.

In addition to economic ties, a longstanding security relationship continues to be important in U.S.-Saudi relations. A U.S. military training mission established at Dhahran in 1953 provides training and support in the use of weapons and other security-related services to the Saudi armed forces. The United States has sold Saudi Arabia military aircraft (F-15s, AWACS, and UH-60 Blackhawks), air defense weaponry (Patriot and Hawk missiles), armored vehicles (M1A2 Abrams tanks and M-2 Bradley infantry fighting vehicles), and other equipment. The U.S. Army Corps of Engineers has had a long-term role in military and civilian construction activities in the Kingdom.

The Gulf War and Operation Iraqi Freedom demonstrated U.S.-Saudi cooperation in the areas of cultural accommodation, as well as in military operations. For example, the U.S. military issued general orders prohibiting the consumption of alcohol and setting guidelines for off-duty behavior and attire. Saudi Arabia accommodated U.S. culture and its military procedures by allowing U.S. servicewomen to serve in their varied roles throughout the kingdom--a major step for a highly patriarchal society. In August 2003, following the U.S.-led war in Iraq in March and April 2003, the United States withdrew its troops stationed in Saudi Arabia.

Saudi Arabia's relations with the United States were strained after the September 11, 2001, terrorist attacks in which 15 of the suicide bombers were Saudi citizens. On May 12, 2003 suicide bombers killed 35 people, including nine Americans, in attacks at three housing compounds for Westerners in Riyadh. On November 8, 2003 terrorists attacked another compound housing foreign workers from mainly Arab countries. At least 18 people, including 5 children died in this attack, and more than 100 were injured.

On May 1, 2004 terrorists killed two Americans in the Yanbu oil facility in the western part of the country. On May 29, 2004 terrorists killed one American and wounded several others in attacks on an official building and housing compound in al-Khobar in the Eastern Province. On June 6, terrorists shot and killed a BBC journalist. On June 9 and June 12, 2004 terrorists killed Americans Robert Jacobs and Kenneth Scroggs. On June 18, 2004 terrorists kidnapped and beheaded American Paul Johnson. On December 6, 2004 terrorists attacked the U.S. Consulate in Jeddah, killing five consulate employees. Terrorists also targeted and killed other foreign nationalities during this time. In February 2007, four French nationals were killed in western Saudi Arabia in a suspected terrorist attack.

Currently, Saudi Arabia is an important partner in the campaign against terrorism, providing assistance in the military, diplomatic, and financial arenas. Counterterrorism cooperation between Saudi Arabia and the United States increased significantly after the May 12, 2003 bombings in Riyadh and continues today. In February 2005, the Saudi government sponsored the first ever Counter-Terrorism International Conference in Riyadh.

**Human Rights**
Despite close cooperation on security issues, the United States remains concerned about human rights conditions in Saudi Arabia. Principal human rights problems include abuse of prisoners and incommunicado detention; prohibitions or severe restrictions on the freedoms of speech, press, peaceful assembly and association, and religion; denial of the right of citizens to change their government; systematic discrimination against women and ethnic and religious minorities; and suppression of workers' rights.

**Principal U.S. Officials**
Ambassador--Ford Fraker
Deputy Chief of Mission--Michael Gfoeller
Counselor for Consular Affairs--Kathleen Riley
Counselor for Economic Affairs--Robert Murphy
Counselor for Political Affair--David Rundell
Counselor for Political-Military Affairs--Clarence Hudson
Counselor for Public Affairs--Walter Douglas
Consul General, Dhahran--John Kincannon
Consul General, Jeddah--Tatiana Gfoeller

The U.S. Embassy in Saudi Arabia is located in the Diplomatic Quarter of Riyadh (tel. 966-1-488-3800). The Consulate General in Jeddah is located on Palestine Road, Ruwais, Jeddah (tel. 966-2-667-0080); and the Consulate General in Dhahran is located between ARAMCO Headquarters and the King Abdul Aziz Airbase (tel. 966-3-330-3200). The embassy and consulates are open for business Saturday through Wednesday, in accordance with the official workweek of Saudi Arabia.

**TRAVEL AND BUSINESS INFORMATION**
The U.S. Department of State's Consular Information Program advises Americans traveling and residing abroad through Consular Information Sheets, Public Announcements, and Travel Warnings. **Consular Information Sheets** exist for all countries and include information on entry and exit requirements, currency regulations, health conditions, safety and security, crime, political disturbances, and the addresses of the U.S. embassies and consulates abroad. **Public Announcements** are issued to disseminate information quickly about terrorist threats and other relatively short-term conditions overseas that pose significant risks to the security of American travelers. **Travel Warnings** are issued when the State Department recommends that Americans avoid travel to a certain country because the situation is dangerous or unstable.

For the latest security information, Americans living and traveling abroad should regularly monitor the Department's Bureau of Consular Affairs Internet web site at http://www.travel.state.gov, where the current Worldwide Caution, Public Announcements, and Travel Warnings can be found. Consular Affairs Publications, which contain information on obtaining passports and planning a safe trip abroad, are also available at http://www.travel.state.gov. For additional information on international travel, see http://www.usa.gov/Citizen/Topics/Travel/International.shtml.

The Department of State encourages all U.S citizens traveling or residing abroad to register via the State Department's travel registration website or at the nearest U.S. embassy or consulate abroad. Registration will make your presence and whereabouts known in case it is necessary to contact you in an emergency and will enable you to receive up-to-date information on security conditions.

Emergency information concerning Americans traveling abroad may be obtained by calling 1-888-407-4747 toll free in the U.S. and Canada or the regular toll line 1-202-501-4444 for callers outside the U.S. and Canada.

The National Passport Information Center (NPIC) is the U.S. Department of State's single, centralized public contact center for U.S. passport information. Telephone: 1-877-4USA-PPT (1-877-487-2778). Customer service representatives and operators for TDD/TTY are available Monday-Friday, 7:00 a.m. to 12:00 midnight, Eastern Time, excluding federal holidays.

Travelers can check the latest health information with the U.S. Centers for Disease Control and Prevention in Atlanta, Georgia. A hotline at 877-FYI-TRIP (877-394-8747) and a web site at http://www.cdc.gov/travel/index.htm give the most recent health advisories, immunization recommendations or requirements, and advice on food and drinking water safety for regions and countries. A booklet entitled "Health Information for International Travel" (HHS publication number CDC-95-8280) is available from the U.S. Government Printing Office, Washington, DC 20402, tel. (202) 512-1800.

**Further Electronic Information**
**Department of State Web Site**. Available on the Internet at http://www.state.gov, the Department of State web site provides timely, global access to official U.S. foreign policy information, including Background Notes and daily press briefings along with the directory of key officers of Foreign Service posts and more. The Overseas Security Advisory Council (OSAC) provides security information and regional news that impact U.S. companies working abroad through its website http://www.osac.gov

Export.gov provides a portal to all export-related assistance and market information offered by the federal government and provides trade leads, free export counseling, help with the export process, and more.

STAT-USA/Internet, a service of the U.S. Department of Commerce, provides authoritative economic, business, and international trade information from the Federal government. The site includes current and historical trade-related releases, international market research, trade opportunities, and country analysis and provides access to the National Trade Data Bank.

# EXHIBIT F

# Travel Warning

United States Department of State
*Bureau of Consular Affairs*
*Washington, DC 20520*

---

*This information is current as of today, Fri Oct 05 15:04:39 2007.*

## SAUDI ARABIA

**June 14, 2007**

This Travel Warning updates information on the security situation in Saudi Arabia and reminds U.S. citizens of recommended security precautions.  It supersedes the Travel Warning issued December 19, 2006.

Due to concerns about the possibility of additional terrorist activity directed against American citizens and interests, the Department of State continues to warn U.S. citizens to defer non-essential travel to Saudi Arabia.  The United States Mission in Saudi Arabia remains an unaccompanied post as a result of continued security concerns.  Non-emergency employees and all dependents of the U.S. Embassy Riyadh and Consulates General Jeddah and Dhahran were ordered to leave the country on April 15, 2004.  An armed attack on the U.S. Consulate General in Jeddah occurred on December 6, 2004, resulting in casualties among the non-American staff and damage to consulate facilities. On November 13, 2005, the Consulate General in Jeddah closed the visa section for security reasons that require the assistance of the Government of Saudi Arabia to resolve. On May 12, 2006 a lone gunman fired shots at the U.S. Consulate in Jeddah. There were no injuries.  The consular section remains open for American citizen services.

Terrorist groups continue to target housing compounds and other establishments where Westerners may be located. Saudi Government facilities are also targets.  In addition to car bombs and armed assaults involving multiple gunmen against such facilities, terrorists have used ambush attacks to kidnap and/or assassinate individual Westerners.  In February 2007, four French residents of Saudi Arabia returning from Madain Saleh were killed in a shooting incident while resting on the side of the Tabruk-Medina highway, approximately 17 km north of Medina.  In February 2006, there was a terrorist attack on Saudi oil facilities in Abqaiq in the Eastern Province.  There were no U.S. citizens or Westerners injured in this attack.

American citizens who choose to visit or remain in Saudi Arabia despite this Travel Warning are strongly urged to avoid staying in hotels or housing compounds that do not apply stringent security measures including, but not limited to, the presence of an armed guard force, inspection of all vehicles, and a hardened security perimeter to prevent unauthorized vehicles from approaching the facility.  American citizens are further advised to exercise caution and maintain good situational awareness when visiting commercial establishments frequented by Westerners or in primarily Western environments.  Keep a low profile, varying times and routes for all required travel, and ensure that travel documents and visas are valid.  American citizens are also advised to exercise caution while driving, entering or exiting vehicles.

U.S. citizens who travel to or remain in Saudi Arabia despite this Travel Warning are strongly urged to register with the U.S. Embassy in Riyadh or the Consulates in Jeddah and Dhahran through the State Department's travel registration website, https://travelregistration.state.gov , in order to be included in the Mission's warden network.  Updated travel and security information for Saudi Arabia is issued periodically via the warden network.

From time to time, the U.S. Embassy and Consulates in Saudi Arabia may restrict the travel of official Americans or suspend public services for security reasons.  In those instances, the Embassy and Consulates will keep the local American citizen community apprised through the Warden System and make every effort to provide emergency services to U.S. citizens.  Warden messages can be found on the U.S. Embassy Riyadh website: http://riyadh.usembassy.gov .

Updated information on travel and security in Saudi Arabia may be obtained from the Department of State by calling 1-888-407-4747 from within the U.S. or Canada or, from outside the U.S. or Canada, on a regular toll line at 1-202-501-4444. For additional information, consult the Department of State's Consular Information Sheet for Saudi Arabia, the Worldwide Caution Public Announcement, and Middle East and North Africa Public Announcement at http://travel.state.gov .

# EXHIBIT G



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---x

**IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001**

**Civil Action No: 03 MDL 1570 (RCC)** • file
Relates to: C.A. No: 1:03-6978 (RCC)

---x

**MOTION FOR ADMISSION *PRO HAC VICE***

PLEASE TAKE NOTICE that, upon the annexed Affidavits, with exhibits, Defendant HRH Prince Bandar bin Sultan ("Prince Bandar"), hereby moves this Court for an Order pursuant to Local Civil Rule 1.3 (c) admitting Nancy H. Dutton *pro hac vice* to appear as counsel for Prince Bandar.

Dated: March 9, 2004

Respectfully submitted,

DUTTON AND DUTTON, PC

By: [signature]

Nancy H. Dutton (ND9608)
5017 Tilden Street, NW
Washington, DC 20016
Phone: (202) 686-3500
Fax: (202) 966-6621

*Counsel for Defendant H.R.H. Prince Bandar bin Sultan bin Abdulaziz Al-Saud*

APPLICATION GRANTED
[signature] 3/17/04
HON. RICHARD CONWAY CASEY

MICROFILM
MAR 17 2004 -12 00 PM

# EXHIBIT H

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2-22-05

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re Terrorist Attacks on September 11, 2001

03 MD 1570 (RCC)
ECF Case

This document relates to: *Continental Casualty Co. et al. v. Al Qaeda Islamic Army*, 04-CV-5970 (RCC)

**NOTICE OF VOLUNTARY DISMISSAL**

Pursuant to F.R.C.P. 41(a)(1), plaintiffs hereby voluntarily dismiss without prejudice their claims in the above referenced action against defendants Prince Bandar bin Sultan bin Abdulaziz and Princess Haifa Al-Faisal, who have not answered or filed any responsive pleadings. All parties will bear their own attorneys' fees, costs, and expenses.

Dated: February 8, 2005
New York, New York

FERBER FROST CHAN & ESSNER, LLP

By: ______________________
Robert M. Kaplan (RK 1428)
530 Fifth Avenue, 23rd Floor
New York, New York 10036-5101
Telephone: (212) 944-2200

Attorneys for Plaintiffs

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2-22-05

MICROFILM
FEB 22 2005 -3 00 PM

SO ORDERED:

2/18/05

U.S.D.J.

614UB

# EXHIBIT I



# Bandar's charity may not end with sale of estate

**Greg Schreier**
July 13, 2006

Prince Bandar may be unloading his 56,000-square-foot mansion in Starwood, but his attorney says that doesn't mean the Saudi is forsaking Aspen or its charities.

Real estate agent Joshua Saslove on Tuesday announced that Prince Bandar bin Sultan bin Abdul Aziz had put his Starwood compound on the market for $135 million. That price tag makes it one of the most expensive homes in the United States, if not the most expensive.

Saslove said Bandar is spending considerably more time in Saudi Arabia as chairman of the nation's new national security council. But Bandar's attorney, William Jordan III, said the prince still owns property in Aspen and plans to visit.

"It is not that he's not going to come here anymore," Jordan said. "He and his family remain very attached to Aspen."

Jordan said he has not met with Bandar recently about his charitable donations in Aspen, but he has not received any indication that he will stop donating in the area.

"I have no reason to believe that his pattern of generosity will change," Jordan said.

Bandar is well-known for his contributions to charities such as the Aspen Valley Medical Foundation, the Aspen Youth Center, the Aspen Education Foundation and a bevy of other valley nonprofits. Bandar makes annual donations the Aspen Youth Center and is a consistent donor with other institutions.

Bandar still donates to the Aspen Youth Center annually, and Executive Director Sarah Blangsted said he was a huge catalyst in building the center in the 1980s.

"His contribution was very instrumental in getting the center started," Blangsted said.

Some of his other contributions range widely, from a portion of a $2,100 donation for the 2005 Wintersköl event to a $300,000 trauma room at Aspen Valley Hospital, donated in 1998. A story in The Aspen Times in November 2001 conservatively estimated his total donations to be at least $5 million, and his contributions have not ceased.

On Wednesday, Blangsted couldn't say for certain if Bandar would continue donating. But she recognized his importance as a donor in the valley and said she hopes his contributions will continue.

"He makes donations to a huge number of nonprofits in the valley," she said.

Nikki Beinstein Strait, the development officer at the Aspen Community Foundation, said Bandar has been a reliable donor. The sale of his mansion causes "no need for alarm," she said.

"He feels connected to this place and will continue to feel connected to this place whether he has a large home here or not," Strait said.

Greg Schreier's e-mail address is gschreier@aspentimes.com

---

BACK

# EXHIBIT J



Christie's Great Estates | Hala Ranch - Aspen, Colorado Page 1 of 2

CHRISTIE'S
GREAT ESTATES®
International Luxury
Real Estate Specialists

GREATEST E

Translate to French

WELCOME
PRESIDENT'S MESSAGE
PROPERTIES FOR SALE
FEATURED PROPERTIES
GREATEST ESTATES
GREAT DESTINATIONS
VIDEO GALLERY
BUYING & SELLING
MAGAZINE
NEWS & EVENTS
GREAT ESTATES FINDER
CONTACT

Greatest Estates List | Add To

## Hala Ranch

**Aspen, Colorado**

Hala Ranch, with its 56,000-square-foot main house and multiple secondary buildings, is perhaps the most magnificent property ever offered for sale anywhere in the world. The pristine beauty of the mountains, the breadth of the offering, and the grandeur of the architecture combine to create a residence that is quite simply beyond compare.

Perched high on its 95-acre site, Hala Ranch is the rarest of offerings. Handsome mahogany wood is used throughout, along with custom hand-cast solid-bronze hardware. Stone columns and massive timber beams make this the quintessential Aspen mountain home.

**PROPERTY INFORMAT**

**Property ID:** hala3568

**Location:** Aspen, Colora

**Price:** $135,000,000 US

**Approximate Lot Size:** Acres

**Type:** Ranch

**Contact:**

**Joshua & Co.**
Joshua Saslove
300 South Hunter Stree
Aspen, Colorado 81611
(970) 925 8810
joshua@joshuaco.com

**Christie's Great Estate**
Gregory Antonsen
125 Lincoln Avenue
Santa Fe, New Mexico 8
(505) 983 8733
gantonsen@christiesge.

**Click here to visit this affiliate's Web site**

**Send an e-mail inquir**

**Click here to view a vi this property**

**Print a Brochure**

http://www.christiesgreatestates.com/greatest_estates/view_13243/ 10/26/2007

Designed by the renowned architectural firm of Hagman Yaw,
Hala Ranch can accommodate the grandest in entertaining. The
expansive great room, with its woodburning fireplace,
handcrafted stained glass and metalwork, is the ideal venue for
entertaining guests. Enormous windows throughout the home
frame the wraparound views of the Rocky Mountains. A full
commercial kitchen serves the residence.

The private quarters of Hala Ranch pamper. The master wing has
a complete beauty and barber room for massages, pedicures, and
styling. Three junior suites on the main level open to a courtyard
with a reflecting pool, flowers, and a waterfall. Patios are found
off all the bedrooms. A private children's wing comprises four
bedroom suites and a sitting room.

The property can accommodate a large staff, with designated
areas on the lower level of the main house and in surrounding
structures including an estate manager's house and a ranch
manager's residence. The estate is fully self-sufficient. A
dedicated wastewater treatment plant and mechanical shop with
a car wash and gasoline pumps serve the property. An extensive
and sophisticated security system surrounds the entire 95-acre
estate, ensuring peace of mind and the utmost in protection.

All manner of recreation is afforded here, including an indoor
pool, a steam room, an exercise room, a regulation-size indoor
racquetball court, a tennis court, a fishing pond, cross-country ski
trails, and an enormous firepit. For the equestrian, superb
facilities are provided by a heated haybarn and a heated stable.

The legacy of Hala Ranch is one of unrivaled beauty. This
sanctuary of timeless tranquillity elevates the standards of luxury
and comfort to previously unimagined levels ■

Greatest Estates List | Add To Favorites

www.christies.com                          HOME   FIND AN AFFILIATE   DIRECTORY   AFFILIATE SITE   SITE MAP

© 1999-2007 Christie's Great Estates, all ri

# EXHIBIT K



Y

SAN DIEGO • SAN FRANCISCO
NEW YORK • BOCA RATON
WASHINGTON, DC • HOUSTON
LOS ANGELES • PHILADELPHIA

Lisa Popkins
lisamp@csgrr.com

October 29, 2007

VIA FEDERAL EXPRESS

Aspcol Corporation N.V.
William R. Jordan III
418 E. Cooper Avenue #202
Aspen, CO 81611

Re: *City of Harper Woods Employees' Retirement Systems v. Richard L. Olver et al.*

Dear Mr. Jordan:

We understand that your office represents Prince Bandar Bin Sultan in relation to his real estate holdings in Aspen, Colorado. Please find attached a Notice of Lawsuit and Request for Waiver of Service of Summons in connection with the BAE derivative action filed against Prince Bandar Bin Sultan in the District of Columbia entitled *City of Harper Woods Employees' Retirement System v. Richard L. Olver et al.* Please advise immediately as to whether you will accept service of the complaint. If you agree accept service, please sign the enclosed waiver and return to me as soon as possible.

Sincerely yours,

Lisa M Popkins

LISA M. POPKINS
Paralegal

:lmp
Enclosure

I:\LisaMP\BAE Systems\Letters\Letter to Jordan in Colorado re Service.doc

# EXHIBIT L



Y

SAN DIEGO • SAN FRANCISCO
NEW YORK • BOCA RATON
WASHINGTON, DC • HOUSTON
LOS ANGELES • PHILADELPHIA

Lisa Popkins
lisamp@csgrr.com

October 29, 2007

VIA FEDERAL EXPRESS

Nancy H. Dutton
Dutton & Dutton PC
5017 Tiden Street N.W.
Washington, D.C. 20016

Re: *City of Harper Woods Employees' Retirement Systems v. Richard L. Olver et al.*

Dear Ms. Dutton:

We understand that your office represents Prince Bandar Bin Sultan in the *In re Terrorist Attacks on September 11, 2001*, No. 03 MD 1570 (RCC) in the Southern District of New York. Please find attached a Notice of Lawsuit and Request for Waiver of Service of Summons in connection with the BAE derivative action filed against Prince Bandar Bin Sultan in the District of Columbia entitled *City of Harper Woods Employees' Retirement System v. Richard L. Olver et al.* Please advise immediately as to whether you will accept service of the complaint. If you agree accept service, please sign the enclosed waiver and return to me as soon as possible.

Sincerely yours,

LISA M. POPKINS
Paralegal

:lmp
Enclosure

cc:

I:\LisaMP\BAE Systems\Letters\Letter to Dutton in SDNY case re service.doc

# EXHIBIT M

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RACHEL EHRENFELD,

Plaintiff,

- against -

KHALID SALIM A BIN MAHFOUZ,

Defendant.

04 Civ. 9641 (RCC)

MEMORANDUM & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______
DATE FILED: 3-23-05

**RICHARD CONWAY CASEY, United States District Judge:**

Plaintiff Rachel Ehrenfeld brought this action for a declaratory judgment against Khalid Salim a bin Mahfouz ("Defendant"). Now before the Court is Plaintiff's motion to serve Defendant with the summons and complaint pursuant to Federal Rule of Civil Procedure 4(f)(3). For the following reasons, the motion is **GRANTED**.

## I. BACKGROUND

Plaintiff filed this suit seeking a declaratory judgment that Defendant cannot enforce a default judgment that he has obtained or will obtain against her in the United Kingdom.[1] The action in the United Kingdom arises out of Plaintiff's allegedly defamatory statements in her book, Funding Evil: How Terrorism is Financed — and How to Stop It. Plaintiff filed this suit on December 8, 2004, but has been unable to effect service of process on Defendant, who resides in the Kingdom of Saudi Arabia. Plaintiff has located a website that Defendant purportedly operates and an e-mail address associated with the website, a post-office box in Saudi Arabia listed on the court papers from the United Kingdom as belonging to Defendant, and a business

[1] The complaint states that Defendant's "attorneys have threatened to enter judgment on default" if Plaintiff does not appear in the U.K action. (Compl. ¶ 20.)

address of a company with which Defendant may be affiliated. She has not identified Defendant's residence address, however. The legal documents served on Plaintiff from the United Kingdom suit bear the address of Defendant's attorneys ("Defendant's U.K. attorneys"). In addition, Defendant is involved in another suit before this Court stemming from the terrorist attacks on the World Trade Center of September 11, 2001, and is represented in that suit by the law firm of Jones Day in Washington, D.C. ("Defendant's U.S. attorneys"). Plaintiff seeks leave to serve Defendant by e-mail, by mail to the post-office box and to the place of business, and through Defendant's U.K. and U.S. attorneys.

## II. DISCUSSION

Rule 4(f) governs service of process upon individuals in foreign countries and provides three mechanisms of service:

> (1) by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents; or
> (2) if there is no internationally agreed means of service or the applicable international agreement allows other means of service, provided that service is reasonably calculated to give notice:
> (A) in the manner prescribed by the law of the foreign country for service in that country in an action in any of its courts of general jurisdiction; or
> (B) as directed by the foreign authority in response to a letter rogatory or letter of request; or
> (C) unless prohibited by the law of the foreign country, by
> (i) delivery to the individual personally of a copy of the summons and the complaint; or
> (ii) any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served; or
> (3) by other means not prohibited by international agreement as may be directed by the court.

Fed. R. Civ. P. 4(f).

The only limitations on Rule 4(f)(3) are that the means of service must be directed by the

court and must not be prohibited by international agreement. Rio Props., Inc. v. Rio Int'l Interlink, 284 F.3d 1007, 1015 (9th Cir. 2002). "[S]ervice of process under Rule 4(f)(3) is neither a 'last resort' nor 'extraordinary relief.' It is merely one means among several which enables service of process on an international defendant." Id. (internal citation omitted). Because the Court is not aware of any international agreement that speaks to service of process in Saudi Arabia, Plaintiff needs only to obtain the Court's permission. To do so, she must show that "the facts and circumstances of the present case necessitate[] . . . district court[] intervention." Id. at 1016. The proposed means of service must also comport with constitutional notions of due process. Id.

Plaintiff has reasonably asserted that the Court's intervention is needed here. First, Plaintiff does not have the option of utilizing the service means authorized by the Hague Convention because Saudi Arabia is not a party to that treaty. See U.S. Dep't of State Circular on Service of Legal Documents Abroad, available at http://www.travel.state.gov/law/info/judicial/judicial_680.html (listing countries that are parties to the Hague Convention); Tinicum Props. Assocs. Ltd. P'ship v. Garnett, No. Civ. A 92-0860, 1992 WL 99590, at *1 (E.D. Pa. Apr. 29, 1992) (noting that Saudi Arabia is not a party to the Hague Convention). Second, Plaintiff has stated that it would be extremely difficult to identify someone who would be willing to attempt personal service on Defendant in Saudi Arabia. Plaintiff submits the affidavit of the President of Process Service Network, a firm specializing in international service of process, which supports the claim that locating a process service in Saudi Arabia is extremely difficult at the present time. (Affidavit of Nelson Tucker ¶¶ 9-10, Ex. D to Affidavit of Mark Platt ("Platt Aff.").) Furthermore, Plaintiff's counsel states that he has been

unable to locate a residence address for Defendant. (Platt Aff. ¶ 4.) Rule 4(f) does not otherwise permit service by mail without a signed receipt, see Rule 4(f)(2)(C)(ii), and the website provides only an e-mail address. Finally, Plaintiff's counsel requested that Defendant's U.S. attorneys accept service on Defendant's behalf. (Platt Aff. ¶ 6.) Those attorneys declined to do so and also declined to provide Plaintiff's counsel with Defendant's residence address. (Id. ¶¶ 6-7.) Therefore, Plaintiff has demonstrated that the circumstances of the case necessitate the Court's intervention.

Plaintiff offers five proposed court-ordered means of service: (1) by certified mail on Defendant's U.S. attorneys; (2) by Federal Express on Defendant's U.K. attorneys; (3) by e-mail to the e-mail address on Defendant's website; (4) by Federal Express to the business address in Saudi Arabia; and (5) by international mail to Defendant's post-office box in Saudi Arabia. Service of process must be "reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950). The Court finds that some but not all of these methods would satisfy due-process considerations.

Service on Defendant's U.K. and U.S. attorneys would satisfy this standard. Both sets of attorneys must be in communication with Defendant in relation to the pending legal proceedings in the United States and the United Kingdom and will know how to locate Defendant. See Rio Props., 284 F.3d at 1017 (upholding service on the defendant's attorney under Rule 4(f)(3) because he was in communication with the defendant at its location abroad); Forum Fin. Group, LLC v. President & Fellows of Harvard Coll., 199 F.R.D. 22, 25 (D. Me. 2001) (holding that service on foreign defendant's attorney was likely to provide the defendant with notice because

the attorney was in communication with his client). In addition, Defendant's counsel in the United Kingdom is aware of the facts underlying this suit and therefore will not be likely to disregard notice of the suit. Accordingly, service on Defendant's attorneys is reasonably calculated to provide Defendant with notice of this suit.

Service via mail to Defendant's post-office box would also likely notify Defendant of the proceedings. Defendant has listed the post-office box in Saudi Arabia as his address for purposes of the lawsuit against Plaintiff in the United Kingdom. He therefore has represented that he will receive communications that are sent to the post-office box. Based on that representation, the Court finds that service by mail to the post-office box is reasonably calculated to provide Defendant with notice.

Service via e-mail and service on the place of business, however, do not meet the constitutional standard under the circumstances. Although courts have upheld service via e-mail, those cases involved e-mail addresses undisputedly connected to the defendants and that the defendants used for business purposes. See, e.g., Rio Props. 284 F.3d at 1017-18; Ryan v. Brunswick Corp., No. 02-CV-0133E, 2002 WL 1628933, at *2 (W.D.N.Y. May 31, 2002). In Rio Properties, the Ninth Circuit upheld service via e-mail when the defendant company maintained a website and designated its e-mail address as its preferred means of communication. See 284 F.3d at 1017-18. Similarly, the court in Ryan permitted service by e-mail because the defendant maintained an Internet site and listed an e-mail address as a means of business communication. See 2002 WL 1628933, at *2. In contrast, Plaintiff has provided no information that would lead the Court to conclude that Defendant maintains the website, monitors the e-mail address, or would be likely to receive information transmitted to the e-mail

address. The website directs individuals seeking information to send inquiries to "information@binmahfouz.info." (Platt Aff. ¶ 15.) In Rio Properties and Ryan, the e-mail addresses were the mechanisms by which the defendants conducted business, presumably on a daily basis; here, the e-mail address is apparently only used as an informal means of accepting requests for information rather than for receiving important business communications. Accordingly, the Court does not authorize service by e-mail in this case.

Finally, the Court denies Plaintiff's request to serve the Defendant by Federal Express to a business address in Saudi Arabia. Plaintiff's counsel states that he "obtained an address for a company named Al-Murjan Company in Saudi Arabia with which defendant is affiliated." (Platt Aff. ¶ 14.) That is the extent of the information provided to the Court about this business. Plaintiff's counsel does not state the basis of his conclusion that Defendant is affiliated with this company, nor the means by which he obtained this address. The Court therefore has no way of knowing whether service of process to this address will have any chance of reaching Defendant.

## III. CONCLUSION

Plaintiff's motion to serve by alternative means under Rule 4(f)(3) is **GRANTED**. Plaintiff shall effect service of process on Defendant by (1) certified mail on Defendant's U.S. attorneys; (2) Federal Express on Defendant's U.K. attorneys; and (3) mail to Defendant's post-office box in Saudi Arabia. Plaintiff shall serve the summons and complaint, along with a copy of this order, within 30 days of the date that this order is entered on the Court's docket.

**So Ordered:** New York, New York
March 23, 2005

[signature]

**Richard Conway Casey, U.S.D.J.**