UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITY OF HARPER WOODS EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of BAE SYSTEMS PLC,<br><br>                  Plaintiff,<br><br>  vs.<br><br>RICHARD (DICK) L. OLVER, et al.,<br><br>                  Defendants,<br><br>  – and –<br><br>BAE SYSTEMS PLC, an England and Wales corporation,<br><br>                  Nominal Defendant. | Civil No. 1:07-cv-01646<br><br>Assigned to: Judge Rosemary M. Collyer |

SUPPLEMENT TO PLAINTIFF'S MOTION FOR LEAVE TO SERVE PROCESS BY
ALTERNATIVE MEANS

On November 14, 2007, the undersigned attorneys for plaintiff moved the Court pursuant to Fed. R. Civ. P. 4(f)(3) for an order granting leave to serve defendant Prince Bandar Bin Sultan ("Bandar"), a Saudi Arabian national residing in Saudi Arabia, by a combination of alternative means.

On November 25, 2007, a *New York Times* story entitled "Payload: Taking Aim at Corporate Bribery" disclosed that Bandar recently retained U.S. counsel in connection with the U.S. Department of Justice's criminal investigation into potential Foreign Corrupt Practices Act violations concerning alleged illegal bribe payments funneled by BAE Systems executives to Bandar through Riggs Bank in the District of Columbia. A copy of that article is attached hereto marked Exhibit A. According to the *New York Times*, Bandar is now represented in the criminal investigation by former Federal Bureau of Investigation director Louis J. Freeh and Retired U.S. District Court Judge Stanley Sporkin.

Since the subject matter of that investigation overlaps some of the underlying allegations in this action, plaintiff, through the undersigned counsel, hereby supplements its November 14, 2007 motion by additionally seeking permission to serve Bandar through service by certified mail upon the attorneys retained to represent Bandar in the U.S. Department of Justice's Foreign Corrupt Practices Act criminal investigation. A conforming order is submitted herewith.

DATED: November 28, 2007            Respectfully submitted,

                                                      COUGHLIN STOIA GELLER RUDMAN
                                                         & ROBBINS LLP
                                                      PATRICK J. COUGHLIN
                                                      MARK SOLOMON
                                                      MARY K. BLASY

                                                      s/ MARY K. BLASY
                                                        MARY K. BLASY

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

CUNEO GILBERT & LaDUCA, L.L.P.
JONATHAN W. CUNEO (DC Bar # 939389)
WILLIAM H. ANDERSON (DC Bar # 502380)
507 C Street, N.E.
Washington, DC 20002
Telephone: 202/789-3960
202/789-1813 (fax)

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

LAW OFFICES OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)
1100 Connecticut Ave., NW, Suite 730
Washington, DC 20036
Telephone: 202/822-0600
202/822-6722 (fax)

Local Counsel

S:\CasesSD\BAE Derivative\MOT00047443.doc

# EXHIBIT A

# Payload: Taking Aim At Corporate Bribery

### Inquiry Shows A New Reach For an Old Law

By NELSON D. SCHWARTZ
and LOWELL BERGMAN

LATE last month, five jumbo jets from Riyadh touched down at Heathrow Airport in London. They brought with them 13 members of the Saudi royal family, including King Abdullah and his retainers — and controversy. Over the last four years, the British government has been dogged by criticism of its relationship with Saudi Arabia, which is Britain's biggest trading partner in the Middle East.

The state visit, the first by a Saudi monarch in 20 years, was no exception, with much of the storm centering on controversial financial ties linking the British military contracting giant, **BAE Systems**, to Downing Street and the desert kingdom. The leader of one major British political party boycotted King Abdullah's visit while protesters turned out for his ceremonial carriage ride to Buckingham Palace.

Much of the debate turns on the fact that BAE made billions of dollars in clandestine and questionable payments to Saudi royals over the last 20 years as part of an $80 billion contract to supply the kingdom with advanced fighter jets and other military hardware. While the investigation of BAE's business practices has followed a circuitous path in Britain, it has recently gained independent momentum in the United States, where the Justice Department is now investigating the company.

BAE generates nearly half its revenue in the United States, and it recently acquired a major supplier of armored Humvees used by American forces in Iraq. American officials who were granted anonymity because they were not authorized to speak publicly about the matter said the Justice Department is examining whether BAE violated domestic laws banning international bribery and money laundering. Accounts in Switzerland, the Caribbean and elsewhere are involved, and, like Britain, the United States has a strategic relationship with the Saudis that the investigation threatens.

Although the cast of players in the BAE story is unusually broad — it includes Saudi royals like Prince Bandar bin Sultan, the kingdom's former ambassador to the United States, as well as Tony Blair, the former British prime minister — the investigation is but one in a bounty of cases that the Justice Department recently started under a once-obscure law called the Foreign Corrupt Practices Act (or F.C.P.A.).

BAE and the Saudis have openly acknowledged the payments at the center of the investigation, deny any wrongdoing and say that the payments were known to the British and Saudi governments. "We are aware of the U.S. D.O.J. investigation and we are fully cooperating," a BAE spokeswoman said. "As it is an ongoing investigation, we cannot comment any further."

While the BAE investigation apparently ran aground in Britain, it has gained enough interest in the United States to cause some of those in the middle of it to secure high-profile legal advisers. Prince Bandar, a confidant of the Bush family, recently retained the former Federal Bureau of Investigation director Louis J. Freeh, as well as one of the fathers of the F.C.P.A., the retired federal judge Stanley Sporkin, to represent him.

"There have been no charges filed," Mr. Freeh said in an interview. "The prince denies any impropriety and violating any statutes in the United Kingdom or the United States."

The revelation that British investigators had discovered that BAE deposited $2 billion in payments into Prince Bandar's Washington bank accounts led the Justice Department to enter what analysts describe as the highest-profile F.C.P.A. case to date. Passed by Congress three decades ago in the wake of Watergate, it is only in the last

ILLUSTRATION BY THE NEW YORK TIMES

*Continued on Page 9*

THE NEW YORK TIMES, SUNDAY, NOVEMBER 25, 2007                    YT    BU    9

# Payload: Taking Aim At Corporate Bribery

*From Page 1*

five years that the F.C.P.A. has become a powerful tool for prosecuting domestic and overseas companies suspected of bribing foreign officials to secure business.

Justice Department officials estimate that there are about 60 such cases under investigation or prosecution in the United States, with a new, five-member F.B.I. team dedicated to examining possible violations of the act. According to the Organization for Economic Cooperation and Development, a group based in Paris that represents 30 industrialized countries, there are more than 150 prosecutions or investigations worldwide involving possible bribery of government officials for commercial gain.

While law enforcement officials and governments in disparate jurisdictions once hesitated to work together to combat corporate fraud, graft has come to be seen as such a severe impediment to global economic growth that cooperation is becoming more frequent.

Analysts say that this shift, along with the enactment of the Sarbanes-Oxley law tightening corporate oversight — and a greater willingness among companies themselves to tackle corruption — has also begun to change how many corporations operate in poorer, developing countries where graft has been most detrimental.

Lawyers, prosecutors and corporate executives in the United States and abroad say they are closely watching the BAE investigation because it offers a test of how aggressively anti-corruption initiatives will be pursued globally, particularly in countries like Britain and Japan that have resisted enforcing such efforts. "The BAE case is a watershed moment," says Mark Pieth, who oversees anti-bribery efforts for the O.E.C.D. "Large multinationals in many countries have come to us and told us that."

For BAE, the fact that billions in payments to Prince Bandar and his relatives might be considered bribes means more than just the potential imposition of heavy fines. It may also mean, analysts say, that BAE executives potentially could go to prison and the company might find itself barred from doing business with the United States government.

The taint of bribery scandals in emerging markets could also have bruising financial implications for BAE. In regions of the world where bribe-taking has long been baked into business transactions — East Asia, the former Soviet Union, Africa and Latin America, for example — legal investigations could make the company vulnerable as those areas become more desirable for military contractors looking for new clients.

For companies that have not adapted to the new legal landscape, the consequences are becoming more serious. This year, Baker Hughes, the oil services company, paid a record $44 million fine after admitting that it had bribed officials in Kazakhstan, Angola, Russia, Nigeria and elsewhere.

Halliburton, an oil services giant that was once headed by Vice President Dick Cheney, has disclosed that it is facing an F.C.P.A. investigation into its activities in Nigeria before, during and after Mr. Cheney's tenure at the company. A spokeswoman for the vice president declined to comment. Halliburton did not respond to an interview request.

Aon, a major insurance broker, recently disclosed in corporate filings that it is the subject of an F.C.P.A. inquiry but declined to provide further details. Last month, the Willbros Group, an oil services company, said it would pay $32 million to settle an F.C.P.A. charge related to bribes paid in Nigeria and elsewhere — including $1 million handed over in a suitcase. A former Willbros executive who pleaded guilty to federal charges in the case faces a prison sentence of as much as five years. While executives involved in paying bribes can be jailed, foreign officials cannot be charged under the law.

"The F.C.P.A. has now surpassed Sarbanes-Oxley for being at the nerve endings of corporate general counsels and executives," says Daniel E. Karson, executive managing director at Kroll Associates, a private investigative firm that conducts due diligence and background investigations for corporations and other clients.

Last week, Alice Fisher, assistant attorney general and head of the Justice Department's criminal division, traveled to Rome for an anticorruption conference marking the 10th anniversary of the O.E.C.D.'s adoption of anti-bribery regulations, which parallel the Foreign Corrupt Practices Act.

Ms. Fisher, who declined to comment on the BAE case, said her F.C.P.A. caseload this year was running at twice last year's pace, and she predicted that the upward trend would continue in 2008. She said she planned to press her overseas law enforcement counterparts in Rome for continued collaboration to combat corporate bribery.

"I don't take many foreign trips, but this is important to the overall program," she said. "There are a lot of countries that can do more."

ONE of those countries, ironically, is Britain, usually among the closest of allies of the United States. Historically, according to documents in British government archives, Britain, long dependent on foreign trade, has resisted anticorruption efforts because it believes that they undermine the country's business interests abroad.

After a series of articles in 2003 and 2004 in The Guardian, the British newspaper, about possible bribes and other improprieties involving BAE, the Serious Fraud Office of Britain started an official investigation. But after the Saudi government strongly objected to the investigation, Mr. Blair, then the prime minister, ordered it halted late last year on security grounds.

"The result would have been devastating for our relationship with an important country with whom we cooperate closely on terrorism, on security, on the

*Continued on Following Page*

**The Overseas Reach Of the BAE Investigation**

**Britain**
Aborted investigation of more than $2 billion in possible payments to Saudi royal family; continuing investigations of suspected bribes in South Africa, Tanzania and Central Europe

**Sweden**
Investigation of allegations that BAE and Saab paid public officials in four countries to promote sale of Sweden's Gripen fighter

**Central Europe**
Multiple investigations of the BAE-Saab partnership

**Switzerland**
Money-laundering investigation of BAE involving allegations that secret accounts were used to pay Saudis and officials in more than a half-dozen countries

**Romania**
British inquiry into BAE sale of naval vessels

**Saudi Arabia**
U.S. investigation of billions in possible payments by BAE to the Saudi royal family

Sources: American and European law enforcement officials; corporate filings

THE NEW YORK TIMES

*Marlena Telvick contributed reporting.*

---

# Blame the Borrowers? Not So Fast

*From Page 1*

default is more than 14 percent. And researchers at the Center for Responsible Lending say that 64 percent of completed foreclosures filed during the 12 months ended June 30 involved subprime loans. A September report from Banc of America Securities said that 93 percent of completed foreclosures this year involved adjustable-rate loans that were made in 2006, pooled and sold to investors.

Regulators have recently stepped up their calls for lenders prove it.

They come from NeighborWorks America, a nonprofit organization created in 1978 by Congress to deliver financial aid and training to troubled urban communities. Its affiliate, the Neighborhood Housing Services of America, makes loans to home buyers of low and moderate incomes, a group that resembles the typical subprime borrower. And it's revealing to compare the delinquency and foreclosure rates for subprime loans made by traditional lenders with mortgages during that period by the Mortgage Bankers Association.

Compared with subprime loans over all, the NeighborWorks loans really outperform. Its 3.34 percent delinquency rate is well below the 14.54 percent on subprime loans nationwide.

Foreclosure figures show a similar pattern. The NeighborWorks loans that went into foreclosure during the second quarter of 2007 totaled 0.56 percent, while subprime loan foreclosures came in at 2.45 percent during that period. The foreclosure rate for

**Many**

For example, according to data presented to an Office of Thrift Supervision forum last December, around 90 percent of subprime loans originated between 2004 and 2006 carried exploding adjustable rates. Some 70 percent of subprime loans have prepayment penalties, versus 2 percent of prime loans. The Center for Responsible Lending estimates that 52 percent of home purchase loans made to African-American families were subprime, and that 41 percent of loans to Latino borrowers were subprime.

And what of the real estate speculators whom many lenders like to blame for the subprime problem? Banc of America Securities estimated in a report in late September that just 7 percent of foreclosures involving adjustable-rate loans were made to such borrowers. The report also noted that the difference in delinquency rates between speculators and resident borrowers was 0.1 percentage point.

The NeighborWorks counselors are now advising borrowers trapped in problem loans made by other institutions. Mr. Wade said that in the third quarter of this year, his organization logged 57,000 calls, up 90 percent from the second quarter. One in five callers, he said, had income of $42,000 to $60,000 a year while 13 percent made more than $60,000 a year.

Robert L. Gnaizda, policy director and general counsel of the Greenlining Institute, an advocacy organization in Berkeley, Calif., says he believes that lenders, not borrowers, should shoulder the blame for this debacle.

"Lenders were like the worst stockbrokers peddling stocks in 1999 saying there is a new dynamic now," he said. "We believe financial institutions have a fiduciary responsibility. They shouldn't be promoting instruments that are high-risk and they know it." ☐



POOL PHOTO BY FIONA HA
King Abdullah of Saudi Arabia and Prince Philip of Britain in October during the king's state visit to London. It was the first state visit by a Saudi monarch in two decades.

*From Preceding Page*

Middle East peace process," Mr. Blair said at a news conference. "That is leaving aside the thousands of jobs which would have been lost, which is not the consideration in this case, but I just point it out."

The British High Court recently ordered a full judicial review of Mr. Blair's decision not to pursue the BAE investigation. Meanwhile, the Justice Department's BAE investigation has benefited from cooperation by law enforcement agencies elsewhere in Europe, according to people with direct knowledge of the inquiry. A decade ago, such cooperation would have been impossible because many European governments considered corporate bribery tolerable — and in the case of Germany, even made it tax-deductible, as "schmear gelt," or "grease money."

Since then, German authorities have become particularly aggressive in pursuing possible corruption violations, as illustrated through their continuing investigation of Siemens AG, the German industrial conglomerate. Although some American companies once actively lobbied to water down the F.C.P.A., arguing that it made it hard to compete overseas, many corporations here have now thrown their weight behind it in the belief that it can be used to prevent competitors from indulging in bribes. So anti-corruption efforts in the United States are now gathering legal steam.

"There has been a dramatic increase in the resources dedicated to enforcing the law by the Justice Department and the F.B.I., and even more important, a strong public commitment to compliance as well as enforcement," says Peter B. Clark, who oversaw F.C.P.A. prosecutions at the Justice Department from the enactment of the law in 1977 until his retirement two years ago.

According to top Justice Department officials, strengthening F.C.P.A. enforcement isn't only about getting American companies to clean up their act or punishing foreign enterprises for breaking domestic laws. It is also part of an attempt to deal with the long-term impact that bribery has on emerging markets.

"Corruption undercuts democracy, stifles economic growth and creates an uneven playing field for U.S. companies overseas," Ms. Fisher says. "We are facing transnational crime all over the place."

Any company with an American connection — a listing on the New York Stock Exchange, for example, or the use of an American bank account to transfer suspect payments — opens the door for prosecution under the F.C.P.A. For example, the Justice Department began investigating BAE's payments to the Saudi royals, and Prince Bandar in particular, this year, after it learned that BAE deposited billions of dollars in such payments in American banks.

Among those institutions was Riggs Bank. Riggs, a subsidiary of the Riggs National Corporation, paid $41 million in federal penalties in 2004 and 2005 to settle a high-profile federal investigation of money-laundering violations before it was taken over by the PNC Financial Services Group. A PNC spokesman declined to comment directly on the BAE matter, but said that any possible transgressions occurred before the takeover and that Riggs was required to divest units catering to diplomats and foreign clients before the buyout.

O N a rainy morning this August, an unusual visitor arrived at the Justice Department's headquarters in Washington. Although a British citizen, he had, for security reasons, taken a circuitous route via Paris to meet with senior Justice Department prosecutors, F.B.I. agents and members of the criminal division of the Internal Revenue Service.

During two days of questioning in a windowless conference room, that visitor, Peter Gardiner, detailed how he had helped BAE disburse millions to the Saudi royal family to pay for everything from luxury travel to female escorts, according to people with knowledge of the meeting who insisted on anonymity because they were not authorized to publicly discuss the case.

Much of the money Mr. Gardiner said he had disbursed went to cover expenses racked up by Prince Turki bin Nasser, head of the Saudi air force and a major BAE customer. Other funds were earmarked for the honeymoon of Prince Bandar's daughter. Mr. Gardiner owned a travel agency that catered to the needs of BAE and its Saudi customers, and his information about their dealings has been known to British authorities for some time. It was also a primary basis for some of The Guardian's articles about the matter.

But the meetings, on Aug. 20 and 21, signaled that the Justice Department had moved beyond asking London for assistance with the investigation to interviewing witnesses and collecting documents directly, based on the belief that BAE's payments may have violated United States laws banning international bribery and money laundering.

When contacted for an interview about the meetings, Mr. Gardiner said that the Justice Department had asked him not to comment.

In September, about 10 months after Mr. Blair quashed the BAE investigation in Britain, the company won a new contract to supply Typhoon jets to Saudi Arabia; the deal could amount to $60 billion over the next 25 years, according to trade publications.

By the time Mr. Blair shut down the British investigation late last year, however, the Justice Department was already aware of BAE's practices. As far back as July 2002, representatives from the State, Justice and Defense departments, as well as the C.I.A., sat down in Washington with senior British officials from the Ministry of Defense to complain about suspected bribery by BAE in Central Europe, the Persian Gulf and South Africa.

Sir Kevin Tebbit, then Britain's permanent under secretary of the Ministry of Defense, rejected the suspicions as baseless. American officials who participated in the meeting later nicknamed him Sir Topham Hatt after a character in the Thomas the Tank Engine children's series because of what they said was "his almost haughty disdain for the allegations of bribery involving BAE" and the manner in which he challenged them to detail evidence of wrongdoing.

Mr. Tebbit, now retired, declined to comment and referred questions about his interactions with American officials to his former employers in the Ministry of Defense. The ministry declined to comment.

The meeting with Mr. Tebbit came after the United States Defense Department, along with the military contractors Lockheed and Boeing, formally withdrew from a competition to sell fighter aircraft to the Czech Republic in 2001. A letter written by Lt. Gen. Tome H. Walters Jr., then head of overseas sales for the Pentagon, to the Czech foreign minister said that there was a "lack of transparency" in the negotiations. The letter also cited a conclusion by the United States government that competition for the contract was not above board. The contract was subsequently awarded to BAE and its Swedish partner, Saab.

In an interview, General Walters, now retired, said that the problems in the Czech Republic followed similar problems trying to sell American jets to the Hungarian government. BAE secured the Hungarian contract as well. American officials say they believe that the Hungarian and Czech governments were influenced by payments. They cite a C.I.A. briefing during which they were told that BAE paid millions

> A 30-year-old U.S. law aims to flex its muscle worldwide.



SEBASTIAN MEYER/GETTY IMAGES

People protesting the British government's relationship with Saudi Arabia and BAE when King Abdullah visited London.

of dollars to the major political parties in Hungary to win the contracts there.

BAE said it is unaware of any investigations of the company in Hungary. "BAE Systems has very strong policies and processes in place which it is clearly committed to communicating to its employees and advisers," a spokesman said. "Any action which is unlawful, dishonest, harmful to others or otherwise against our policies, is unacceptable."

Although Mr. Gardiner's cooperation signaled a possible escalation in the American investigation, those with knowledge of the inquiry say British authorities are resisting requests from Washington for help. Representatives of the Home Office of Britain, which handles these requests, have told Parliament that they have yet to decide whether to cooperate.

Despite tensions between the United States and Britain over the matter, Swiss law enforcement authorities have decided to cooperate with the Justice Department investigation, according to a person with direct knowledge of the matter. The Swiss are likely to soon begin sharing records of financial transactions and bank accounts with American prosecutors. That will be crucial to charting what law enforcement officials describe as a flow of dollars from BAE to a network of company agents and public officials in Saudi Arabia, South Africa, Hungary and the Czech Republic.

So far, the American investigation hasn't harmed BAE's booming business with the Pentagon. This summer, Senator John Kerry, Democrat of Massachusetts, citing the inquiry, objected to BAE's purchase of Armor Holdings, which makes armored Humvees and other military equipment, in letters to the Justice Department and the Treasury Department. But the Armor Holdings sale was completed in July for $4.5 billion.

D ESPITE the new fondness for the F.C.P.A. in domestic law enforcement circles, the cases are notoriously complex to prosecute and are made even more so by the fact that many overseas jurisdictions are involved. Even in an era of increasing cooperation, internal politics in other countries can become roadblocks.

"The rhetoric has changed," says Benjamin W. Heineman Jr., who was General Electric's chief legal officer from 1987 to 2005. "Everybody says the right thing now, but what are they doing?"

Mr. Heineman praises the Justice Department's efforts but says he is frustrated that the O.E.C.D. isn't doing even more, especially in the BAE case. "They don't powerfully name and shame the laggards," he says.

The threat of an indictment under the F.C.P.A., more than financial penalties, is what worries most companies that may come under scrutiny as part of the Justice Department's crackdown on bribery.

"No publicly traded company wants to be branded with the stigma of an indictment," says David Zornow, who directs the white-collar criminal practice in New York for the law firm of Skadden, Arps, Slate, Meagher & Flom. "It's potentially ruinous."

Multinational companies competing in these countries are turning to law and accounting firms as well corporate investigators like Kroll to help them navigate through the F.C.P.A.'s regulations and to vet local partners in countries like China and Nigeria.

PricewaterhouseCoopers has doubled the size of its F.C.P.A. practice over the past five years. Deloitte & Touche has mobilized in a similar way. It says that when it scrutinizes companies for possible bribery problems, it looks for such red flags as tuition payments for the children of government administrators, property purchases or rentals from foreign officials or their relatives, and payments in exchange for information about competitor's activities.

Lawyers with experience in F.C.P.A. cases say that gathering facts in such matters is never easy. Kevin T. Abikoff, a lawyer at Hughes, Hubbard & Reed who has represented several companies accused of running afoul of the F.C.P.A. in Nigeria, says that large companies typically cut employees loose once they are charged with a crime.

"It's a rare person who says, 'It was me; it's my fault,'" he says. "There's finger-pointing up, down and sideways."

During the O.E.C.D. anti-corruption meeting in Rome last week, which celebrated the 10th anniversary of the organization's treaty outlawing international bribery, its head, Angel Gurría, said that national security concerns — the reason Mr. Blair gave for terminating the BAE investigation in Britain — "should not be used" as a reason for quashing bribery investigations. He also voiced concern that anti-corruption efforts were in danger of weakening.

"Now I do not want to spoil the birthday party, but I do have to say that what we have achieved is still not good enough," he added. "There will be big risks that countries will go back to doing 'business as usual,' including corruption. The only way to prevent this is to ensure that everyone plays by the same rules." □

CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 28, 2007.

s/ MARY K. BLASY
MARY K. BLASY

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  MaryB@csgrr.com

# Mailing Information for a Case 1:07-cv-01646-RMC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roger M. Adelman**
  radelman@erols.com,maryb@csgrr.com,scotts@csgrr.com,lisamp@csgrr.com,tlatimer@csgrr.com

- **Mary K. Blasy**
  maryb@csgrr.com

- **Lawrence Byrne**
  larry.byrne@linklaters.com

- **Patrick J. Coughlin**
  patc@csgrr.com

- **Christopher Talbott Lutz**
  clutz@steptoe.com

- **Mark Solomon**
  marks@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

BAE DERIVATIVE
Service List - 11/28/2007  (07-0195)
Page 1 of 2

William R. Jordan III
Aspcol Corporation, N.V.
418 E. Cooper Avenue, Suite 202
Aspen, CO  81611
  907/925-1214

Louis J. Freeh
Attorney at Law
100 Bentley Lane
Wilmington, DE  19807

Louis J. Freeh
Attorney at Law
322 East 82nd Street
New York, NY  10028
  212/933-1757

Nancy H. Dutton
Dutton & Dutton PC
5017 Tiden Street, N.W.
Washington, DC  20016
  202/686-3500
  202/966-6621 (Fax)

Lawrence Byrne
Michael Osnato
Linklaters LLP
1345 Avenue of the Americas
New York, NY  10105
  212/903-9000
  212/903-9100 (Fax)

Richard L. Brusca
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, DC  20005-2111
  202/371-7000
  202/393-5760 (Fax)

Christopher T. Lutz
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, DC  20036-1795
  202/429-3000
  202/429-3902 (Fax)

Eric M. Roth
Adir G. Waldman
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY  10019
  212/403-1000
  212/403-2000 (Fax)

BAE DERIVATIVE

Service List - 11/28/2007  (07-0195)

Page 2 of 2

Stanley Sporkin
Weil, Gotshal & Manges LLP
1300 Eye Street, NW, Suite 900
Washington, DC  20005
  202/682-7000
  202/857-0940(Fax)


**Counsel For Plaintiff(s)**

Patrick J. Coughlin
Mark Solomon
Mary K. Blasy
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
  619/231-1058
  619/231-7423(Fax)

Jonathan W. Cuneo
William H. Anderson
Cuneo Gilbert & LaDuca, L.L.P.
507 C Street, N.E.
Washington, DC  20002
  202/789-3960
  202/789-1813(Fax)

Roger M. Adelman
Law Offices of Roger M. Adelman
1100 Connecticut Ave., N.W., Suite 730
Washington, DC  20036
  202/822-0600
  202/822-6722(Fax)

Michael J. VanOverbeke
Thomas C. Michaud
VanOverbeke Michaud & Timmony, P.C.
79 Alfred Street
Detroit, MI  48201
  313/578-1200
  313/578-1201(Fax)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITY OF HARPER WOODS EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of BAE SYSTEMS PLC,<br><br>                    Plaintiff,<br><br>   vs.<br><br>RICHARD (DICK) L. OLVER, et al.,<br><br>                    Defendants,<br><br>   – and –<br><br>BAE SYSTEMS PLC, an England and Wales corporation,<br><br>                  Nominal Defendant. | Civil No. 1:07-cv-01646<br><br>Assigned to: Judge Rosemary M. Collyer |

[SUPPLEMENTAL PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION TO SERVE PROCESS BY ALTERNATIVE MEANS

Having considered Plaintiff's Motion for Leave to Serve Process by Alternative Means (the "Motion"), the Court hereby grants plaintiff's Motion. Pursuant to Fed. R. Civ. P. 4(f)(3), plaintiff may serve defendant Prince Bandar Bin Sultan ("Bandar"), a Saudi Arabian national residing in Saudi Arabia, by one or a combination of the following alternative means:

(a) Through service by certified mail upon the attorneys retained to represent Bandar in the U.S. Department of Justice's Foreign Corrupt Practices Act criminal investigation;

(b) through service by certified mail upon the attorneys representing Bandar in unrelated litigation pending in the Southern District of New York arising out of the 9/11 terrorist attacks;

(c) through service by certified mail upon Bandar's Colorado attorney designated on the title to his Colorado residential estate, which is alleged in this action to have been purchased with bribe money illegally paid by and belonging to BAE Systems, and who is assisting Bandar with the sale of that estate; and

(d) by certified mail to defendant Bandar at his known residences in the U.S. and the U.K.

IT IS SO ORDERED.

DATED: _____     _____
THE HONORABLE ROSEMARY M. COLLYER
UNITED STATES DISTRICT JUDGE

S:\CasesSD\BAE Derivative\ORD00047444.doc

CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 28, 2007.

s/ MARY K. BLASY
MARY K. BLASY

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  MaryB@csgrr.com

# Mailing Information for a Case 1:07-cv-01646-RMC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roger M. Adelman**
  radelman@erols.com,maryb@csgrr.com,scotts@csgrr.com,lisamp@csgrr.com,tlatimer@csgrr.com

- **Mary K. Blasy**
  maryb@csgrr.com

- **Lawrence Byrne**
  larry.byrne@linklaters.com

- **Patrick J. Coughlin**
  patc@csgrr.com

- **Christopher Talbott Lutz**
  clutz@steptoe.com

- **Mark Solomon**
  marks@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

BAE DERIVATIVE
Service List - 11/28/2007  (07-0195)
Page 1 of 2

| | |
|---|---|
| William R. Jordan III<br>Aspcol Corporation, N.V.<br>418 E. Cooper Avenue, Suite 202<br>Aspen, CO  81611<br>   907/925-1214 | Louis J. Freeh<br>Attorney at Law<br>100 Bentley Lane<br>Wilmington, DE  19807 |
| Louis J. Freeh<br>Attorney at Law<br>322 East 82nd Street<br>New York, NY  10028<br>   212/933-1757 | Nancy H. Dutton<br>Dutton & Dutton PC<br>5017 Tiden Street, N.W.<br>Washington, DC  20016<br>   202/686-3500<br>   202/966-6621 (Fax) |
| Lawrence Byrne<br>Michael Osnato<br>Linklaters LLP<br>1345 Avenue of the Americas<br>New York, NY  10105<br>   212/903-9000<br>   212/903-9100 (Fax) | Richard L. Brusca<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>1440 New York Avenue, N.W.<br>Washington, DC  20005-2111<br>   202/371-7000<br>   202/393-5760 (Fax) |
| Christopher T. Lutz<br>Steptoe & Johnson LLP<br>1330 Connecticut Avenue, N.W.<br>Washington, DC  20036-1795<br>   202/429-3000<br>   202/429-3902 (Fax) | Eric M. Roth<br>Adir G. Waldman<br>Wachtell, Lipton, Rosen & Katz<br>51 West 52nd Street<br>New York, NY  10019<br>   212/403-1000<br>   212/403-2000 (Fax) |

BAE DERIVATIVE
Service List - 11/28/2007  (07-0195)
Page 2 of 2

Stanley Sporkin
Weil, Gotshal & Manges LLP
1300 Eye Street, NW, Suite 900
Washington, DC 20005
   202/682-7000
   202/857-0940 (Fax)


**Counsel For Plaintiff(s)**

Patrick J. Coughlin
Mark Solomon
Mary K. Blasy
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
   619/231-1058
   619/231-7423 (Fax)

Jonathan W. Cuneo
William H. Anderson
Cuneo Gilbert & LaDuca, L.L.P.
507 C Street, N.E.
Washington, DC 20002
   202/789-3960
   202/789-1813 (Fax)

Roger M. Adelman
Law Offices of Roger M. Adelman
1100 Connecticut Ave., N.W., Suite 730
Washington, DC 20036
   202/822-0600
   202/822-6722 (Fax)

Michael J. VanOverbeke
Thomas C. Michaud
VanOverbeke Michaud & Timmony, P.C.
79 Alfred Street
Detroit, MI 48201
   313/578-1200
   313/578-1201 (Fax)