# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITY OF HARPER WOODS EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of BAE SYSTEMS PLC, ) ) ) ) | Civil No. 1:07-cv-01646 |
| Plaintiff, ) ) | Assigned to: Judge Rosemary M. Collyer |
| vs. ) ) | |
| RICHARD (DICK) L. OLVER et al., ) ) | |
| Defendants, ) ) | |
| - and – ) ) | |
| BAE SYSTEMS PLC, an England and Wales corporation, ) ) ) | |
| Nominal Defendant. | |

## <u>DECLARATION OF MARTIN MOORE QC</u>

Pursuant to 28 U.S.C. § 1746, I, Martin Luke Moore QC of Erskine Chambers, 33 Chancery Lane, London WC2A 1EN, declare as follows:

## BACKGROUND

1    I am a barrister in private practice in London. I was called to the Bar of England and Wales in 1982 and, on completion of my pupillage,[1] became a member of Erskine Chambers in 1983. Erskine Chambers, a set of Barristers Chambers, is widely regarded as the foremost company law Chambers in England and Wales. I was appointed Queens Counsel[2] in 2002. During the course of my practice as a barrister, I have focused on company law litigation and advice, corporate finance, mergers and acquisitions, financial services, insolvency and corporate reorganisations, including the reorganisation of the businesses of banks and insurance and reinsurance companies. I have extensive experience advising companies ranging in size from major multinational public companies to small family companies. As I have become more senior, however, the focus of my practice has moved firmly toward acting for public limited companies, more often than not companies whose securities are publicly traded.

---

[1]    My pupil masters were Lord Justice Longmore, as he became, and Oliver Weaver QC.

[2]    The Bar Council of England and Wales' website describes Queen's Counsel as follows: "A limited number of senior barristers are made Queen's Counsel as a mark of outstanding ability. They are normally instructed in very serious or complex cases. Most senior judges once practiced as QCs."

**2**     Exhibit 1 hereto includes a true copy of my profile maintained on Erskine Chambers' website and extracts from *Chambers UK: A Client's Guide to the UK Legal Profession 2008* published by Chambers & Partners and *The Legal 500 2007* published by Legalease.

**3**     BAE SYSTEMS plc ("BAE PLC") has asked me to make this Declaration on aspects of English company law in so far as they apply to the VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR INTENTIONAL, RECKLESS OR NEGLIGENT BREACH OF FIDUCIARY DUTY, CORPORATE WASTE AND *ULTRA VIRES* CONDUCT, dated 13 September 2007 and filed 19 September 2007 in the United States District Court for the District of Columbia (the "Complaint"). I have studied the Complaint in detail, although I have not been supplied with the transcript of the BBC Documentary referred to in Paragraph 11 as Ex.A.

**4**     Save for acting for BAE PLC many years ago in relation to an annual general meeting, I have no other prior connection to BAE PLC.

**5**     It is an important requirement of the Court in England and Wales that persons giving expert evidence owe their duties to the Court to which their evidence is to be tendered and not to the party appointing them. Regardless of whether such a requirement exists in the United States District Court for the District of Columbia, I have made this declaration on the same basis as I would were it made in English proceedings.

**6**     I have been asked to give my view as to the circumstances in which, as a matter of English law, a shareholder in an English incorporated company, such as BAE PLC, can bring proceedings derivatively on behalf of that company to remedy alleged harm caused to the company concerned. I have also been asked to consider from an English law standpoint whether the Plaintiff's allegations in this action are sufficient to establish its right to bring the claims asserted in the Complaint derivatively on behalf of BAE PLC against the named defendants.

**7**     Following a description of the Companies Act 2006 and the Plaintiff's Complaint, this Declaration discusses the requirements under English law for a derivative action. I conclude that the Complaint fails on the facts pleaded to state a valid basis for the maintenance of a derivative action. For this reason, it is my view that the Complaint does not assert a valid claim under English law.

## THE COMPANIES ACT 2006

**8**     For many years the circumstances in which a shareholder of an English company could maintain a derivative action were laid down by the rule in <u>*Foss v. Harbottle*</u> (1843) 2 Hare 461 and its exceptions, as developed by the Courts. However, since the coming into force of the Companies Act 2006 ("the 2006 Act") a new statutory derivative action has replaced the common law remedy.

**9**     The new statutory derivative action is contained in Part 11 of the 2006 Act, Sections 260-269. The ability to bring the new statutory derivative action is like the old common law

derivative action subject to the Court's permission but the new provisions have wrought considerable change to the previously established position. For example, the new action includes within its ambit negligent breaches of duty not involving personal benefit to the wrongdoer and it is no longer necessary to establish wrongdoer control which was, save in certain circumstances, a pre-requisite of entitlement to sue derivatively. Now, save in cases of actual ratification, the Court has a discretion as to whether or not to allow a claim to proceed unless it is satisfied that bringing proceedings is not in the interests of the company concerned.

10      However, it remains the case that a derivative action may only be brought by a member of the company concerned; that is to say, a person who has agreed to become a member <u>and</u> whose name is entered on the register of members.[3] The 2006 Act has, in addition, by S.260(5)(b) extended the definition of member to include a person to whom the shares have been transferred or transmitted by operation of law.

11      The provisions of Section 260 came into force on the 1st October 2007[4] so that any derivative action commenced thereafter is subject to the new procedure.

12      However, Paragraph 20(3) of the statutory instrument bringing it into force provides as follows:

> *"If, or to the extent that, the claim arises from acts or omissions that occurred before 1st October 2007, the court must exercise its powers under those sections so as to secure that the claim is allowed to proceed as a derivative claim only if, or to the extent that, it would have been allowed to proceed as a derivative claim under the law in force immediately before that date."*[5]

In the light of Paragraph 20(3) it will be necessary to examine the Complaint to ascertain whether an English Court in considering the matter would apply the law as it stood prior or subsequent to commencement. For reasons which will become plain an English Court will, in my view, apply the law as it stood prior to commencement of the 2006 Act.

---

[3]   Section 22 of the Companies Act 1985 ("the 1985 Act").

[4]   SI 2007/2194 Article 2(1)(e).

[5]   SI 2007/2194 Article 9, Schedule 3, Paragraph 20(3). This position was foreshadowed by the Government in a statement issued on 26 June 2007 by Margaret Hodge, Minister for Industry and the Regions:

> *"We also consulted specifically on transitionals in respect of the provisions on derivative claims and proceedings in part 11 of the 2006 Act. In the light of the consultation responses, we have concluded that the new, clearer procedures should be used for all claims started on or after 1 October 2007; but the courts should ensure that the outcome of any claim based on acts or omissions by a director before 1 October 2007 will be what it would have been under the old, common law that applied at the time."*

**THE COMPLAINT**

13    The Complaint asserts that it is a derivative action seeking to remedy wrongs alleged to have been done to BAE PLC:

> "*This is a stockholder derivative action on behalf of BAE Systems plc… against the entire current BAE Board of Directors… and several of its present or former officers and directors… for intentional, reckless and/or negligent breaches of their fiduciary duties of care, control and candor, involving illegal, improper and/or ultra vires conduct, including causing BAE to violate the laws of the United States and international business conduct codes and conventions relating to honest trade and business practices by making, or permitting to be made, improper and/or illegal bribes, kickbacks and other payments.*" (Opening sentence of Paragraph 1 of the Complaint).

14    The Complaint names as defendants BAE PLC's current Board of Directors as well as certain former members of the BAE PLC Board (collectively, the "Director Defendants"). The Plaintiffs also name as defendants Prince Bandar Bin Sultan, The PNC Financial Services Group, Inc. (as successor to Riggs National Corporation/Riggs Bank N.A.), Joe L. Allbritton, Robert L. Allbritton, and Barbara Allbritton (Paragraph 1 of the Complaint).

15    The Complaint asserts claims on behalf of BAE PLC against current and former Directors for breach of fiduciary duty and waste of corporate assets along with claims against others for aiding and abetting these infringements. The factual basis of the Complaint divides into three areas of primary fact: (i) the alleged payment of bribes, kickbacks and other improper payments to/for the benefit of Prince Bandar Bin Sultan and his family in order to secure BAE PLC's role in the Al-Yamamah programme between the United Kingdom and the Kingdom of Saudi Arabia; (ii) an alleged broader pattern and course of conduct by BAE PLC of illegal and/or improper payments to politicians and officials in various countries including Tanzania, Chile, the Czech Republic, Romania and South Africa; and, (iii) alleged misleading statements made by the Director Defendants to the effect that BAE PLC operated in accordance with applicable rules and laws. Although the Complaint starts with the third category, it seems to me more logical to deal with the substantive claims first rather than a claim which can only ever be consequential upon establishing the substantive claims.

### -- Claims of Failure of Oversight

16    The particular allegations against the Director Defendants are put in terms of, or derived from, their

> "*resorting to, or encouraging and/or permitting BAE's managers to resort to, improper, illegal and ultra vires activities to boost BAE's reported results, including paying bribes and kickbacks and making other improper payments… to obtain contracts to make their stewardship of BAE appear more successful*" (Paragraph 4 of the Complaint)

and that they

"*repeatedly misrepresented how they were overseeing, managing and operating BAE in a lawful and ethical manner.*" (Paragraph 5 of the Complaint).

At the end of paragraph 4 it is said:

"*The BAE directors' and officers' false statements and representations and negligent, reckless or intentional failure to properly oversee the operation and conduct of this enterprise have exposed BAE to millions of dollars in damages and potentially hundreds of millions of dollars in remedial costs and possible disbarment in the U.S., and have badly damaged BAE's corporate image and reputation".*

At the end of Paragraph 5 it is stated:

"*Under their stewardship, the BAE Defendants have caused BAE to engage in a pattern and practice of making illegal and improper payments to secure contracts and false and misleading statements to conceal and cover them up…*"

17      The essence of the claim against the BAE PLC Defendants is one of mismanagement and failure of oversight. That this is so is clear from the way in which the directors' duties are formulated in the Complaint. In Paragraph 66 it is stated

"*By reason of their positions as officers and/or fiduciaries of BAE and because of their ability to control the business and corporate affairs of BAE, the BAE Defendants owed BAE and its shareholders fiduciary obligations of fidelity, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage BAE in a fair, just and honest and equitable manner, and were and are required to act in furtherance of the best interests of BAE and its shareholders.*"

In Paragraph 70 the duty is particularised in these terms:

"*to discharge their duties, the officers and directors of BAE were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial and operational affairs of BAE.  By virtue of such duties, the officers and directors of BAE were required, among other things, to:*

*(a) manage, conduct, supervise and direct the business and internal affairs of BAE in accordance with the laws and regulations of England, the United States, and every country in which BAE conducts business, and pursuant to the charter and bylaws of BAE;*

*(b) neither violate nor knowingly permit any officer, director or employee of BAE to violate applicable laws, rules and regulations;*"

**-- The Al-Yamamah Programme**

18      Although fore-shadowed earlier in the Complaint, Paragraphs 111-130 under the heading "The Ultra Vires, Illegal and Improper Conduct" contain the allegations in relation to the Al-Yamamah programme.   The nature of the allegations is set out in Paragraph 113 as follows:

> "*In order to advance their own positions with BAE by winning the Al-Yamamah contract the then officers and directors of BAE named as defendants herein undertook a course of illegal and improper conduct (engaging in ultra vires activities) in breach of their fiduciary duties to BAE, including paying huge bribes or kick backs (a/k/a "backhanders") to Bandar, which payments have amounted to over $2 billion over the last 20 years*".

19      The actions complained of in relation to Prince Bandar and Riggs Bank are not asserted to have continued after February 2005 following the acquisition of Riggs Bank by PNC.  The other complaint in relation to the kickbacks allegedly paid in connection with the Al-Yamamah programme relates to the honeymoon of a relative of Prince Bandar, which appears to have taken place in 1996.

20      It follows that the relevant acts and omissions occurred before the 1st October 2007 and therefore the English court would apply the law as it stood prior to commencement of the 2006 Act. Indeed, it would be odd if it were otherwise given that the Complaint is expressed in the past tense and is dated 13th September 2007.

## -- The Alleged Worldwide Pattern and Practice of Illegal/Improper Bribes

21      This relatively short section of the Complaint (Paragraphs 131-141) contains allegations of diverse instances of corrupt payments. Some instances are dated but many are not. The dated events all precede the 1st October 2007 and, in so far as they are not given dates, for the reason given in Paragraph 20 above must pre-date the 1st October 2007.

## -- The BAE PLC Directors' Alleged False and Misleading Reports

22      These allegations (Paragraph 86-110) are in substance consequential upon the previous two broad topics since the allegations consist of a series of extracts from the annual reports of BAE PLC between 2000 and 2006 said to be inconsistent with the reality. The substance of these allegations falls into three parts.

> "*105     The statements in BAE's 2001 -2006 Annual Reports were false and misleading when made and known to be false by the directors and officers of BAE when those statements were made. The repeated positive and reassuring statements about BAE's controls, procedures and practices to comply with anti-bribery laws, rules and conventions, BAE's actual compliance with them, and BAE's dedication to high ethical standards were false...*

> 106    BAE's 2001-2006 financial statements, published by, and the responsibility of, its directors, were false and misleading in failing to disclose the existence of the illegal and improper payments and/or failing to make provision for the money fines and penalties likely to result from those payments…
>
> 107………
>
> 108    To the extent BAE was engaging in conduct that would result in fines and penalties, it was required to disclose these under IFRS. Since the amount was capable of a reasonable estimate—at least $50 million—and the liability was probable, the Company was required to record a provision for them".

**23**    The most recent accounts to 31st December 2006 were distributed to members on 7th April 2007, so I am instructed, although the Complaint itself refers to March 2007 in Paragraph 103, and thus, as with the other allegations it is plain that they fall within Paragraph 20(3) of the commencement order.

**24**    In consequence the English Court is mandated to apply the law as it stood prior to 1st October 2007[6] and to decline to apply the new standards of the Companies Act 2006.

**25**    Bringing these threads together the nature of the claim against the BAE PLC Defendants is summarised in Paragraphs 146 and 147 as follows:

> "146    The BAE Defendants, in their roles as executives and/or directors of the Company, made false and misleading statements in Annual Reports and participated in the acts of mismanagement alleged herein and/or acted in gross disregard of the facts and/or failed to exercise due care to prevent the unlawful and ultra vires conduct complained of.
>
> 147    The BAE Defendants are responsible for the gross mismanagement of BAE, for abdicating their corporate responsibilities and mismanaging the Company in at least the following ways:
>
> (a)    They caused BAE to violate applicable law, disregarding their duties as fiduciaries and directors and officers.
>
> (b)    They have caused BAE to violate anti-bribery/corruption laws and conventions and exposed the Company to criminal liability and

---

[6]    I add that so far as I am aware there has been no case in which the Court has had to consider the new statutory derivative action so there is no body of post-commencement law.

*unnecessary costs, fines and penalties – by engaging in ultra vires and illegal conduct*

(c)     *They exposed the Company and its shareholders to massive fines and penalties."*

## MEMBERSHIP OF THE COMPANY

26     As a threshold matter, the Complaint states at Paragraph 83 that the Plaintiff has standing to bring the claim *"as it is a shareholder and/or beneficial owner of BAE and was shareholder and/or beneficial owner of BAE at relevant times."* I disagree. Under the previous procedure it was a pre-requisite of standing that the plaintiff be a member (see <u>Birch v. Sullivan</u> [1957] 1 WLR 1247). A member has for many years been statutorily defined[7] as a person who has agreed to become a member and whose name is entered on the register of members. Under the new procedure it remains the case that the plaintiff must be a member[8].

27     The Complaint states at Paragraph 18 that the Plaintiff holds approximately 3,500 ADRs or American Depositary Receipts. As is clear from Paragraph 20(i) of the Complaint, these ADRs only represent the shares in BAE PLC and JPMorgan Chase Bank NA is the depositary of the shares. I am instructed that, as I would expect, the custodian of the Depositary is registered as the member in relation to all BAE PLC shares in the ADR programme. An ADR holder has no legal interest in the shares but a contractual agreement with the Depositary and to the extent that the law of that agreement gives an ADR holder a beneficial interest it is not one required to be recognised by BAE PLC. It is axiomatic in English law that a company is not bound to recognise a trust in respect of registered shares[9].

28     Accordingly, the Plaintiff's name is not entered on the BAE PLC register of members and as a result it does not have standing at present to pursue this claim. I add that the extended definition of member in S.260 (5) (b) does not extend to ADR holders.

## THE RULE IN *FOSS v. HARBOTTLE*

29     The Complaint at Paragraph 21 suggests that English law permits or will permit this action to be maintained based on the allegations made in the Complaint. Again, for the reasons I set out below I disagree.

30     Based upon my analysis of the Complaint, in my view the English Court will apply the law as it stood prior to commencement of the new statutory derivative action set out in the 2006 Act. Accordingly, I have not considered the approach a Court may take under those

---

[7]   S.22 of the 1985 Act; S.112 of the 2006 Act.

[8]   S.261(1) of the 2006 Act.

[9]   S.360 of the 1985 Act; S.126 of the 2006 Act.

new provisions and the extent, if any, to which it might lead to a different outcome[10]. It follows that the Court will therefore apply the famous rule in _Foss v. Harbottle_. The principle encapsulated by the rule in _Foss v. Harbottle_ is derived from the separate legal personality of a company and the methods by which the will of that company is expressed under its constitution. The principle is simply that when a wrong is done to a company, whether by a director or anyone else[11], the proper plaintiff is the company, just as if the injured party were an individual. However, judges have developed exceptions to the rule or determined that in certain circumstances the rule is not applicable.

31    It is only to be expected with a body of case law which has developed over 165 years that not every case in which _Foss v. Harbottle_ has been considered is consistent with every other one or that judges have described the underpinnings of the rule with complete uniformity. However, the Court of Appeal authoritatively restated the rule in _Prudential Assurance v. Newman Industries_ [1982] 1 Ch 204 _("Prudential")_ at 210, 211[12] where the nature of a derivative action, and its origin, was described as follows:-

> "_A derivative action is an exception to the elementary principle that A cannot, as a general rule, bring an action against B to recover damages or secure other relief on behalf of C for an injury done by B to C. C is the proper plaintiff because C is the party injured, and, therefore, the person in whom the cause of action is vested. This is sometimes referred to as the rule in Foss v. Harbottle (1843) 2 Hare 461 when applied to corporations, but it has a wider scope and is fundamental to any rational system of jurisprudence. The rule in Foss v. Harbottle also embraces a related principle, that an individual shareholder cannot bring an action in the courts to complain of an irregularity (as distinct from an illegality) in the conduct of the company's internal affairs if the irregularity is one which can be cured by a vote of the company in general meeting. We are not concerned with this aspect of the rule._
>
> _The classic definition of the rule in Foss v. Harbottle is stated in the judgment of Jenkins L.J. in Edwards v. Halliwell [1950] 2 All E.R. 1064 as follows. (1) The proper plaintiff in an action in respect of a wrong alleged to be done to a corporation is, prima facie, the corporation. (2) Where the alleged wrong is a transaction which might be made binding on the corporation and on all its members by a simple majority of the members, no individual member of the corporation is allowed to maintain an action in respect of that matter because, if the majority confirms the transaction, cadit quaestio; or, if the majority challenges the transaction, there is no valid reason why_

---

[10]  See Footnote 6 above.

[11]  Under English case law, derivative actions typically involve only the directors of the company on whose behalf the suit is brought and not, as is the case here, additional defendants as well. However, the requirements for bringing a derivative suit under English law are not affected by whether a plaintiff sues only the directors of the company or whether he sues the directors and other individuals as well. Consequently, the fact that various non-director defendants have also been named in the Complaint does not affect any of my conclusions with respect to the requirements of English law for bringing a derivative action.

[12]  The general principles governing derivative actions were described in similar terms by the Court of Appeal in _Barrett v. Duckett_ [1995] 1BCLC 243.

*the company should not sue. (3) There is no room for the operation of the rule if the alleged wrong is ultra vires the corporation, because the majority of members cannot confirm the transaction. (4) There is also no room for the operation of the rule if the transaction complained of could be validly done or sanctioned only by a special resolution or the like, because a simple majority cannot confirm a transaction, which requires the concurrence of a greater majority. (5) There is an exception to the rule where what has been done amounts to fraud and the wrongdoers are themselves in control of the company. In this case the rule is relaxed in favour of the aggrieved minority, who are allowed to bring a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue.*"

32    The first and second propositions set out in Prudential amount to a statement of what is the substance of the rule in *Foss v. Harbottle* ("the Rule"). The remaining three propositions set out what are conventionally described as the exceptions to the Rule; although in truth only the third is an exception.

## -- The Exceptions to the Rule in *Foss v. Harbottle*

33    The three exceptions to the Rule are as follows:

33.1    The alleged wrong is ultra vires ("the Ultra Vires Exception");

33.2    The validity of the transaction is dependent upon a majority greater than a simple majority ("the Super Majority Exception"); and

33.3    The wrong alleged amounts to fraud and the wrongdoers are themselves in control of the company, and could thus procure ratification ("the Fraud on the Minority Exception").

## WHAT THE PLAINTIFF MUST SHOW TO BRING A DERIVATIVE ACTION

34    The course of the proceedings in *Prudential* (discussed above in Paragraph 31) raised in an acute form the question of what a plaintiff had to do in order to bring a derivative claim in reliance on the exceptions, in that case the Fraud on the Minority Exception[13]. Was it sufficient simply to allege facts which, if accepted as correct, brought his case within the exception?

---

[13]  It has been argued that the "interests of justice" could provide a fourth exception to the rule in *Foss v. Harbottle*, but the Court of Appeal has firmly rejected this contention. See *Prudential* at p.221; *Konamaneni v. Rolls Royce Industrial Power (India) Ltd* [2002] 1 BCLC 336 at para. 47. In *Prudential*, the court stated "[t]he second observation which we wish to make is merely a comment on Vinelott J.'s decision that there is an exception to the rule in *Foss v. Harbottle* whenever the justice of the case so requires.  We are not convinced that this is a practical test, particularly if it involves a full dress-trial before the test is applied".  The court then reiterated that the plaintiff must show a prima facie case that its claim falls within the boundaries of the existing exceptions to the rule in *Foss v. Harbottle* before proceeding with a derivative lawsuit.  In *Konamaneni*, Mr Justice Lawrence Collins stated that the assumption that there was an interests of justice exception to the rule in *Foss v. Harbottle* "was no longer justified since the *Prudential Assurance* case". Although Australian law recognizes such an exception see *Biala* v. *Mallina* [1993] 11 A.C.S.R. 785 at 847 referring with approval to *Hawksbury Development Company v. Landmark Finance Ltd* [1969] 2 N.S.W.R. 782, English law does not.

**35**    The Court concluded that the plaintiff ought at least to be required to establish a two part prima facie case:-

**35.1**    that the company is entitled to the relief claimed; and

**35.2**    that the action falls within the proper boundaries of the exceptions to the rule in _Foss v. Harbottle_.

## -- Ratification

**36**    The Rule as set out above requires a court first to examine whether the alleged wrongs are capable of ratification by a simple majority of shareholders. If the alleged wrongs are capable of ratification, then the decision as to whether to pursue an action can and should be taken by the members of the company and the action cannot proceed as a derivative action unless it falls within one of the exceptions to the Rule.

**37**    According to the Plaintiff's case, various acts of the company occurring during the Defendant Directors' tenures on the Board gave rise to or will give rise to regulatory, civil and criminal penalties to the detriment of the company. No doubt in so far as the events which give rise to regulatory, civil or criminal penalties are concerned, they are not ratifiable in the sense that the shareholders cannot by resolution change the fact that they gave rise to such penalties. However, that is not what is meant by ratification in this context.  Ratification here applies to the acts giving rise to the claimed liability of the directors for harm to the Company.

**38**    Where the claims are for various breaches of duty which have occasioned loss to the company, such breaches of duty are all capable of ratification in the sense that the shareholders can by ordinary resolution ensure that the acts of the directors are no longer breaches of duty by ratifying them. If ratified by the shareholders, such conduct ceases to be wrongful as against the company and its corporators.[14] It is not necessary that actual ratification take place; it is only necessary that the acts of the directors are capable of ratification.

**39**    The Complaint makes allegations of unratifiability in Paragraph 15, but those allegations do not suffice under English law. The wrong which can form a subject of a derivative action is a wrong which harms the company. In this Complaint, however, the wrongs which have allegedly been done to BAE PLC are not the breaches of regulatory, civil or criminal law — those are the wrongs done by BAE PLC — but the failures of duty of the directors in causing BAE PLC to commit such wrongs and in failing to supervise and ensure that BAE PLC did not commit such wrongs. As it is put in the Complaint it is the directors' conduct which is said to be ultra vires and therefore unratifiable. Paragraph 15 states of the Defendant Directors _"their conduct cannot be ratified or approved by BAE's shareholders,_

---

[14]  This is distinct from the point discussed at paragraph 64 below which deals with the concept of waiving claims arising from ultra vires acts, in circumstances where a majority of independent shareholders resolves, or would resolve, not to prosecute a claim in respect of the ultra vires act.

*as that conduct was illegal and ultra vires and also violates Section 463"*.  But as a matter of law, such breaches of duty are not ultra vires and are therefore capable of ratification by an ordinary resolution of the shareholders.

40    Accordingly, the Plaintiffs cannot prosecute the action against the Director Defendants on behalf of BAE PLC unless they can bring the Complaint within one of the exceptions to the Rule.

--- **The Ultra Vires Exception**

41    The expression "*ultra vires*" in English company law refers to a transaction which is either beyond the capacity of the company as established by its memorandum of association or a transaction prohibited by the statute to which the company owed its existence. This is what is meant by "an illegality" in the passage from the judgment in *Prudential* quoted at Paragraph 31 above. An example of such a breach is the prohibition against a company giving financial assistance for the purpose of the acquisition of its shares contrary to Section 151 et seq. of the 1985 Act (as was the case in *Smith v. Croft (No2 )* [1988] 1 Ch 114) or in making a return of capital otherwise than through the statutorily prescribed procedure (as in *Drown v. Gaumont British Picture Corp* [1937] Ch 402).

42    Although the Complaint employs the term "*ultra vires*" frequently, there is no allegation anywhere in the Complaint of a wrong which would be considered ultra vires under English law. In this context it is important to appreciate the sense in which ultra vires is used for the purpose of the exception because in the company law field one sees the phrase "*ultra vires*" not infrequently used in two senses.  In its narrow, and proper, sense it means acts beyond the capacity of the company concerned in the sense described in Paragraph 41 above. It is also used, somewhat loosely, to describe acts of directors which are outside the scope of the directors' powers because, for example, they act from some improper motive.  The distinction is well illustrated in a passage from *Smith v. Croft* when Knox J said at p. 159:

> "*I take as the fundamental rule in considering the scope of what is properly called ultra vires, by which I mean beyond the capacity of the company as opposed to that of its officers, the following passage in the judgment of Slade L.J. in Rolled Steel Products (Holdings) Ltd. V. British Steel Corporation [1986] Ch. 246, 295:*
>
> > "*if a particular act … is of a category which, on its true construction of the company's memorandum, is <u>capable</u>[15] of being performed as reasonably incidental to the attainment or pursuit of its objects, it will not be rendered ultra vires the company merely because in a particular instance its directors, in performing the act in its name, are in truth doing so for purposes other than those set out in its memorandum.  Subject to any express restrictions on the relevant power which may be contained in the memorandum, the state of mind of knowledge of the persons managing the company's affairs or of the persons dealing with it is irrelevant in considering the questions of corporate capacity*"

---

[15]  Emphasis in original text.

> *On that basis, whereas excessive remuneration of a director may well be an abuse of power where, as here, the power to decide on remuneration is vested in the Board, it cannot be ultra vires the company."*

**43**     Also in <u>Rolled Steel</u> Browne-Wilkinson LJ observed at p. 303 that:-

> *"It is therefore established that a company has capacity to carry out a transaction which falls within its objects even though carried out by the wrongful exercise of its powers."*

**44**     Thus, it is important to keep the two senses in which ultra vires is used firmly separate. To do otherwise and conflate the two is to fall into the fallacy identified by Oliver J[16] in <u>Re Halt Garage (1964) Ltd</u> [1982] 3 All ER 1016 that because a power must not be abused therefore beyond the limit of propriety it does not exist[17].

**45**     The payment by a company of commission to agents of third parties in carrying out its business is clearly capable of being within the objects specified in a company's memorandum. The alleged payments described in the Complaint take their character as improper payments because they are alleged to be bribes; i.e. payments to an agent that are not disclosed to the principal (although I note that the Complaint does not actually allege non-disclosure). The suggestion is that the payments were illegal and improper and thus beyond the scope of the proper exercise by the directors of their powers. Although the term ultra vires is used in the Complaint, in my view, an English Court would not proceed as if the allegation were ultra vires in its true sense of an act beyond the capacity of the corporation, but as an allegation of abuse of the powers of the directors of the corporation. It is noteworthy that there is no suggestion in the Complaint that BAE PLC as a company lacked the capacity to make the payments under its memorandum of association or the statute to which BAE PLC owes its existence.

**46**     This principle is specifically demonstrated in English law with respect to assertions of bribery. In <u>Arab Monetary Fund v. Hashim and Others</u> [1993] 1 Lloyd's Rep. 543 the plaintiffs claimed that a payment made for the purposes of securing a construction contract was a bribe and as such was ultra vires. Mr Justice Evans observed that the distinction between ultra vires or lack of capacity on the one hand, and want of authority on the other, was "*fundamental*" to the question of whether a bribe could be considered ultra vires a company. He stated that it was "*established that a company has capacity to carry out a transaction which falls within its objects even though carried out by the wrongful exercise of its powers*". The submission that a bribe was ultra vires a company "*involves distinguishing between a bribe and a lawful commission, which would involve questions as to knowledge and state of mind of the persons who purported to act on behalf of the company; yet these are irrelevant to the construction of the memorandum [of association] and therefore to corporate capacity*" (citing Lord Justice Brown Wilkinson in <u>Rolled Steel</u>).

---

[16]   Later Lord Oliver a member of the House of Lords.

[17]   p1029g-1030a.

Therefore a payment is not considered ultra vires in its proper sense under English law of being beyond the capacity of the company even if established to have been a bribe.

**47**    When _Edwards v. Halliwell_ (the case cited in _Prudential_ stating the Rule and its exceptions), was decided, a transaction beyond the capacity of the company as established by the memorandum of association was incapable of ratification even by all the shareholders. However, by reason of changes in the law reflected in Section 35 of the Companies Act 1985 ("the 1985 Act"), a past transaction outside the objects of the company is no longer prima facie ultra vires because it can be ratified by a special resolution, so that it falls within the Super Majority Exception. It remains the case that any shareholder can bring an action to restrain the company from entering into such a transaction (see Section 35(2) of the 1985 Act).

**48**    However, a transaction which is "ultra vires" in the sense that it is prohibited by the 1985 Act or 2006 Act is still clearly incapable of ratification, even by all the shareholders, with the result that any member can bring an action to restrain an act which is "ultra vires" in that sense.

**49**    In this case, the Complaint contains many allegations of illegality by reason of the references to breaches of regulatory, civil or criminal law, but illegality of that kind is not within the ultra vires exception, which by virtue of S.35 of the 1985 Act is now limited to acts prohibited by the statute to which the company owes its existence. The fact that an act or omission by a company involves an infringement of the general law does not make that act or omission ultra vires within the meaning set out in Paragraph 41. Ultra vires refers to an action that is beyond the capacity of the company and not merely in violation of the general law. Here, there is no allegation of a transaction that is beyond the capacity of BAE PLC as established by its memorandum of association or a transaction prohibited by a statute to which BAE PLC owes its existence.[18]

**50**    Conversely, the mere fact that conduct is ultra vires does not necessarily prevent the company from incurring liability under the general law, whether civil or criminal. This is now established in relation to a company incorporated under the 1985 Act by Section 35(1) of the 1985 Act, which provides that, subject to exceptions immaterial to this point, the validity of an act done by a company shall not be called into question on the ground of capacity by reason of anything in the company's memorandum.

---

[18]    For the sake of completeness, I should mention a well-known academic article from 1957 by Lord Wedderburn entitled "Shareholders' Rights and the Rule in Foss v Harbottle", at 1957 Cambridge Law Journal 194, in which he sought to argue at pp 204, 205 that the "_ultra vires_" exception extends not only to acts which are prohibited by the law to which the company owes its existence but also to acts which are prohibited under the general law. The Court of Appeal of the Northern Territory of Australia discussed Lord Wedderburn's theory in _Australian Agricultural Co. v Oatmont Pty_ [1992] 8 A.C.S.R. 255 at 263 to 265 and dismissed it. Lord Wedderburn's theory has received scant consideration in the English courts and has never been adopted here. Additionally, the cases cited by Lord Wedderburn in support of the theory, do not in my opinion support an extension of the exception to the Rule to infringements of the general law, which exception has consistently been stated by the English courts in terms of transactions which are ultra vires in the sense described in Paragraph 41 above.

51    It follows, in my view, that where directors of a company incorporated under the Companies Acts or its predecessors cause a company to carry on activities which, while within the power of the company as a matter of capacity and not made unlawful by the those Acts, involve breach of the general law, whether civil or criminal, a minority shareholder will not be able to bring a claim against the directors on the company's behalf in reliance on either of the non-Fraud Exceptions (that is to say the ultra vires exception or the super majority exception). He will only be able to bring a claim against the directors on the company's behalf if the conduct of the directors involved a breach of their duty to the company and he can bring himself within the Fraud on the Minority Exception.

## -- The Super Majority Exception

52    The Complaint contains no allegation of any transaction which is outside the objects of the company within the meaning of Section 35 of the 1985 Act or of any other transaction which could only be sanctioned by a special resolution. Accordingly, this exception cannot apply.

## -- The Fraud on the Minority Exception

53    Most of the decided cases are concerned with this exception. It is important to note that the exception is not confined to "fraud" in the common law sense involving dishonesty, but extends to any transaction or a series of transactions where the defendants, in breach of their fiduciary duty, take advantage of their position to commit the company to a transaction or a series of transactions which benefits themselves at the expense of the company[19]. Thus, if the wrong consists of negligence on the part of the defendants, even if categorised as "gross" negligence, the exception will apply only if the wrong enabled the defendants to make a profit at the expense of the company[20].

54    It is of the essence for application of the exception that if the company were to pass a resolution either ratifying the transaction or deciding that the company should not pursue a claim against the wrongdoers, such a resolution would be passed only as a result of votes cast by the wrongdoers and persons acting in concert with them (frequently referred to as "wrongdoer control") and whether or not this is the case may itself be a matter in dispute[21]. It is for this reason that the exception is called "fraud on the minority" because, by passing a resolution not to sue, the majority vote would be a fraud on the minority who vote to sue, although some commentators suggest that the exception is misnamed as the fraud is on the company. The truth is that the acts complained of must be a fraud both on the company and the minority.

---

[19]   See, for example, _Daniels v. Daniels_ [1978] 1 Ch 406 at 413, 414.

[20]   _Pavlides v. Jensen_ [1956] Ch 565 at 576; _Daniels v. Daniels_ [1978] 1 Ch 406 at 413.

[21]   _Prudential_ at p 219.

**55**    "Wrongdoer control" means control of the company in general meeting, because it is on ratification by the company in general meeting that the Rule and its exceptions are based. English law requires a public company to hold at least one general shareholder meeting per year. General meetings can be called either by the board of directors or a quorum of shareholders. Courts have not clearly stated what a plaintiff must show as a factual matter to establish control of a general meeting of shareholders, either annual or extraordinary. Nevertheless, it is clear that it is not enough to satisfy the wrongdoer control requirement to allege that the incumbent board would not commence proceedings, whether by reason of culpability, cupidity or affinity.

**56**    It thus must always be borne in mind that for the exception to apply it must be the case <u>both</u> that there was fraud within the meaning of Paragraph 58 below <u>and</u> that there is "wrongdoer control" as described in Paragraph 55 above and further in Paragraph 62 below.

**57**    In my view, the Plaintiffs have not brought themselves within either necessary limb of the Fraud on the Minority Exception.

## No Fraudulent Conduct

**58**    The Complaint does not sufficiently allege fraud or fraudulent conduct by any Director Defendant, which is what is required to come within the first limb of the exception. In particular, there is no allegation that the breaches of duty have, in the relevant sense, benefited the Defendants personally at the expense of the company.

**59**    There is a reference in Paragraph 6 of the Complaint to the Director Defendants' "*lucrative payments and bonuses*". This is in the context of an averment as to why it would be futile to demand that the Board commence proceedings and is in any event not something directly connected to any alleged wrong by a director. Under English law, merely being paid a previously agreed compensation is very far from the necessary self-dealing by a director sufficient to underpin the Fraud on the Minority Exception.

**60**    There is also an allegation in Paragraph 155 of the Complaint that "*these* [Director] *defendants have awarded themselves and their allies excessively lucrative compensation and payments which have no reasonable basis, but instead are designed only to enrich themselves.*" Again this allegation is conclusory and appears to be unsupported by any pleaded facts. At most, this allegation essentially says that the Defendants failed to perform their jobs properly and, at the same time, were overpaid. Even a grossly negligent or reckless employee is not engaged in "self-dealing" simply because he is being paid by his employer in spite of his deficient performance. Conclusory allegations of the kind referred to above could and would be made in virtually every derivative action. A rule of law cannot be so easily circumvented.

**61**    In summary, there is no allegation of fraudulent conduct by any Defendant of the nature required to come within the first limb of the exception. The allegations of breach of duty do

not disclose the existence of a case of fraud or its functional equivalent.

No Wrongdoer Control

**62**    Even if one were to assume that the Plaintiffs have sufficiently alleged fraudulent conduct under the first limb of the Fraud on the Minority Exception (and I do not believe they have), the Complaint fails to satisfy the second limb of that exception, namely, "wrongdoer control". In fact, the Complaint says nothing about whether the Defendants can exercise control over BAE PLC in general meeting. With respect to the Director Defendants, the Complaint is silent on this question.

**63**    Thus, even if the Court were to accept as sufficient the Plaintiff's allegations of "fraud" in the Complaint, the derivative claims still would fail to fall within the Fraud on the Minority Exception because the wrongdoer control requirement has not been met. This is fatal to Plaintiff's derivative claims under English law regardless of whether the Plaintiffs have adequately alleged self-dealing by the Defendants.

**64**    I should add for completeness that the English courts have developed a further consideration even where a plaintiff has shown an ultra vires act, properly so called, or even wrongdoer control. Generally, where a majority of the independent shareholders resolve not to prosecute the company's claims against the directors arising out of ultra vires conduct the Court will not permit the plaintiff to proceed. In _Smith v. Croft (No2)_ [1988] 1 Ch 114, Mr Justice Knox held that a derivative suit involving ultra vires conduct inconsistent with the statute to which the company in question owed its existence could not proceed because an independent majority of the minority shareholders had resolved not to pursue the company's rights against the directors, in effect allowing an independent majority to forgive the breach of duty arising out of the conduct, which involved ultra vires, properly so called, with the same consequence as if the conduct itself had been legally ratified. He based his decision on _Taylor v. NUM_ [1985] BCLC 237, where a plaintiff was refused permission to continue proceeding against officers of a union in a claim arising out of ultra vires acts because of the probability of a decision not to proceed against the officers by a majority of independent members. Since neither an ultra vires act, properly so-called, nor wrongdoer control has been alleged I have not lengthened this declaration with a consideration of the ramifications of this aspect of the rules relating to potential derivative actions.

## SECTION 463 OF THE 2006 ACT AND ALLEGEDLY MISLEADING ACCOUNTS

**65**    I should add some remarks concerning Section 463 of the 2006 Act. It is alleged at Paragraphs 5 and 15 of the Complaint that the Director Defendants breached Section 463 of the 2006 Act. First, it appears that virtually all of the Plaintiff's allegations are outside the temporal scope of this provision as I discuss in more detail below. Further, in my view, there appears to be a misunderstanding as to the importance of this section. Directors are,

quite independently of Section 463, under statutory and common law duties to their companies to comply with the extensive obligations relating to the preparation of accounts and reports[22]. It is well settled that such duties are owed to the company concerned and not individually to shareholders (see _Devlin v. Slough Estates Ltd_ [1983] BCLC 497; _Caparo Industries plc v. Dickman_ [1990] 2 A.C. 605).

66    Section 463 does not in truth add very much to the existing law. Section 463 provides:-

"(1)    The reports to which this section applies are -

(a)    the directors' report,

(b)    the directors' remuneration report, and

(c)    a summary financial statement so far as it is derived from either of those reports.

(2)    A director of a company is _liable to compensate the company for any loss suffered by it as a result of_—

(a)    any untrue or misleading statement in a report to which this section applies, or

(b)    the omission from a report to which this section applies of anything required to be included in it.

(3)    He is so liable only if—

(a)    he knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading, or

(b)    he knew the omission to be dishonest concealment of a material fact.

(4)    No person shall be subject to any liability to a person other than the company resulting from reliance, by that person or another, on information in a report to which this section applies.

(5)    The reference in subsection (4) to a person being subject to a liability includes a reference to another person being entitled as against him to be granted any civil remedy or to rescind or repudiate an agreement.

(6)    This section does not affect—

(a)    liability for a civil penalty, or

(b)    liability for a criminal offence." (emphasis added)

## -- Standing to bring a claim under Section 463

67    As a threshold matter, I note that no right of action is vested in the shareholders or any third party under Section 463. As such, any shareholder who wishes to bring a claim under Section 463 on behalf of a company in respect of acts/omissions prior to October 2007 must do so under the rule in _Foss v. Harbottle_, or the exceptions thereto, which are

---

[22] Ss. 226 & 227 of the 1985 Act.

analysed above. In my opinion, the allegations concerning misleading statements could not support a derivative claim on behalf of BAE PLC under that rule for the reasons outlined above.

## -- Scope of Section 463

68    Notwithstanding the above, I will address here whether the Complaint states a claim for misstatement under Section 463 in case it should be relevant.  Section 463 creates a statutory tort, actionable only at the instance of the company, in relation to certain statutory reporting requirements under the 2006 Act. The reports to which Section 463 applies are limited solely to directors' reports, directors' remuneration reports and summary financial statements, so far as they are derived from either of those director reports.

69    Section 463 came into force on 20 January 2007 and only applicable reports sent to members after that date can form the basis for an action under Section 463[23]. All references to statements made in applicable reports and sent to members before 20 January 2007 are therefore outside of its scope.

70    With the exception of two small sections set out at Paragraph 103(d) under "Business Review", none of the allegedly misleading statements cited in the Complaint are found in reports post-dating 20 January 2007 for the purposes of Section 463.  Therefore virtually all of the Complaint's allegations in this regard are outside the temporal scope of Section 463 and cannot form the basis for a violation of the statute.

71    I next turn to the two claimed misstatements described in the Complaint which do fall within the time period to which Section 463 applies.  These two sections are found in the Directors' Report included in BAE PLC's 2006 Annual Report which, I am instructed, was circulated to shareholders on 7 April 2007.

72    Section 463(2) provides that compensation is payable to the company for any loss suffered "as a result" of untrue or misleading statements. A causal link must therefore be shown to exist between an alleged misleading statement and the loss that it is said was caused by that misleading statement.

## -- Causal link between statements and loss

73    The Complaint does not specify what loss, if any, is directly attributable to the alleged misleading statements themselves. It is insufficient for the purposes of a claim under Section 463 merely to allege that losses have flowed from dereliction of fiduciary duty and unlawful dissipation of corporate assets. These are, in effect, direct consequences of the Defendants' alleged conduct itself rather than consequences of any statements made about that conduct in relevant directors' reports. The Plaintiffs therefore fail to establish the

---

[23] Companies Act 2006 (Commencement No. 1, Transitional Provisions and Savings) Order 2006, Schedule 5, Paragraph 3: "*Section 463 of the Companies Act 2006 (liability for false or misleading statements in reports) does not apply to a directors' report, directors' remuneration report or summary financial statement first sent to members and others under section 238 or 251 of the 1985 Act, or Article 246 or 259 of the 1986 Order, before 20th January 2007.*"

necessary causal link between the "false and misleading" statements and the loss alleged in the Complaint.

**74**    The Plaintiff cannot prosecute the action against the Director Defendants on behalf of BAE PLC under Section 463 unless it has pleaded a causal link between the alleged misrepresentations and the loss pleaded. It is my view that this has not been set out in the Complaint and is an insuperable barrier to the claim under Section 463.

## REMEDIES FOR DIRECTOR MISCONDUCT GENERALLY

**75**    The focus of this declaration has been upon the ability of the Plaintiffs to sue derivatively on behalf of BAE PLC in relation to the alleged breaches by the directors of their fiduciary duties and duties to exercise the requisite degree of skill and care. However, the derivative action is but one avenue open to regulate and remedy conduct of directors of English companies that is below acceptable standards.

**76**    Shareholders in English companies can assert statutory rights to require the company to hold meetings of shareholders and submit resolutions for consideration at general meetings. They also have a statutory right to remove directors by ordinary resolution. There are a number of conditions to the exercise of these rights, which broadly require there to be a minimum, but generally low, level of support for such initiatives before they can be considered at a general meeting. One such initiative may be a resolution requiring and directing the company to bring proceedings against delinquent directors. If such an initiative was to be considered at a general meeting it would, in common with any other such initiative, not become binding on the company unless it commanded the approval of the requisite majority of shareholders.

**77**    In addition, a member can petition[24] the High Court in England for relief on the grounds that the affairs of the company have been, are being or will be conducted in a way that was, is or will be unfairly prejudicial to their interests as members. The English Court, which has exclusive jurisdiction to grant this extensive statutory remedy, when granting relief from unfair prejudice has wide flexibility in fashioning a remedy short of winding up the company. This section is applied most often to disputes between majority and minority shareholders in closely held companies with the remedy most often applied being the directed buyout of the minority shareholders at a fair price set by the court. Such disputes often involve cases of directors' misconduct involving breaches of their duties to the relevant company.

**78**    There may also be circumstances in which a director's misconduct gives rise to a direct claim by a shareholder. This is most likely to be the case if the director has breached some duty owed directly to the shareholder or where a statutory right of compensation has

---

[24]   S.459 of the 1985 Act; S.994 of the 2006 Act.

arisen, for example, under Section 90 of the Financial Services and Markets Act 2000 for misleading statements in offering documents.

79    Clearly, the foregoing is but a very brief and by no means definitive description of the various remedies available to shareholders to regulate and remedy misconduct of directors. It simply illustrates the fairly obvious proposition that English law as a developed and sophisticated jurisdiction provides a wide range of remedial options to shareholders dissatisfied with the conduct of directors which, depending on the circumstances, may be available to them.

## CONCLUSION

80    It is my view that the Complaint does not contain sufficient averments which as a matter of English law are necessary to bring it within those classes of cases in which a member of a company can maintain an action on behalf of the company of which he is a member.

81    It is also my view that, irrespective of the lack of standing, the Complaint fails to establish a prima facie case under Section 463 of the 2006 Act due to the failure of the Plaintiffs to establish a causal link between the allegedly misleading statements made after 20 January 2007 and the loss it is claimed the company has suffered.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 30 January 2008.

Martin Luke Moore QC

**EXHIBIT 1**

# ERSKINE CHAMBERS

## About Chambers
## Areas of Practice
## Overseas Work
## Lectures and Seminars
## Pupillage
## Clerks Room
## Mailing List

**Members of Chambers**

John Cone
Thomas Stockdale Bt
David Oliver QC
Leslie Kosmin QC
Michael Todd QC
David Mabb QC
Martin Moore QC
David Chivers QC
Ceri Bryant
Richard Snowden QC
Catherine Roberts
Philip Gillyon
Andrew Thompson
Dan Prentice
Nigel Dougherty
Leon Kuschke
James Potts
Andrew Thornton
Edward Davies
Stephen Horan
Benjamin Shaw
Ben Griffiths
Matthew Parfitt
Richard Nolan(Door Tenant)

# Martin Moore QC

**Called: 1982**    **Silk: 2002**



**Further Inform**

🖨 Print Full

🗐 Case List

**Utilities**

? Make an En

✉ Email this li

## Profile:

Martin concerns himself with company law litigation and advice, corporate finance, financial services, insolvency, corporate reorganisations and insurance company schemes. Martin has experience of litigation relating to all aspects of company law ranging from petitions under section 459 of the Companies Act, breaches of fiduciary duty and issues arising in insolvencies. Martin has acted in many corporate and capital reorganisations and transactions. Advisory work has a particular emphasis upon transactional work; the non-contentious litigation is centred on capital reductions, schemes of arrangement and schemes for the transfer of long-term business between life assurance companies.

## Education

Education: Winchester College 1973-1977; Lincoln College, Oxford 1978-1981.

Called to the bar: 1982 Lincoln's Inn

Practice: Joined Erskine Chambers in 1983

Member: COMBAR; Chancery Bar Association; South Eastern Circuit; Insolvency Lawyers' Association.

## CV
**PRACTICE REVIEW:**

Martin's work has continued to be a mix of transactional and litigious matters, and in each case a mixture of advisory and Court work.

Martin has advised and appeared for (amongst others)

- GUS plc on its demerger of the Experian Group

- London Merchant Securities plc on demerger of its investment

division.

· Pilkington plc on its acquisition by Nippon Sheet Glass.

· The Peninsular and Oriental Steam Navigation Company on its acquisition by DP World.

· Exel plc on its acquisition by Deutsche Post.

· Banco Santander on its takeover of Abbey National Plc

· Safeway Plc on its acquisition by Wm Morrison Supermarkets Plc

· Securicor Plc in relation to the merger of their security business with Group 4 Falck

Martin has also advised upon a very large number of corporate transactions. He advised companies and individuals on all aspects of company law from potential acquisitions, financial assistance, insider dealing and market abuse to the conduct of general meetings. He has given expert evidence of English Company Law proceedings in the United States.

Martin has continued to play a leading part in applying and clarifying the Court's jurisdiction under Part VII of the Financial Services and Markets Act 2000 in relation to the transfer of banking business and insurance business (both general and long-term). He has advised and appeared for (amongst others)

· The Resolution Life group of companies on that group's reorganisation of its long-term insurance business.

· The transfer to Swiss Reinsurance Company of the GE Frankona general and long-term reinsurance businesses.

· Royal Sun Alliance plc on its rationalisation of its inwards reinsurance book.

· The Aviva group of companies on that group's reorganisation of its general business carriers

· The General Electric Company on its reorganisation of its European business·

· Bristol & West plc on the transfer of its retail banking to the Britannia Building Society.

· Merrill Lynch International Bank Limited on its rationalisation

of its European Operations.

·      Standard Chartered Bank in connection with incorporation in Hong Kong of its Hong Kong branch

In relation to corporate reconstructions Martin acted and appeared for SFI Group plc in its debt for equity swap and also for a group of bondholders in Telewest Communications Plc.

Martin has also given talks on company law and financial services to conferences and to solicitors.

Martin is in the list of the top six company law silks in The Legal 500 (2006) and in Chambers Guide to the Legal Profession (2007) is referred to in company matters as "advising and litigating with equal aplomb," "Renowned for his corporate law work and expertise on restructuring law, he undertakes cases in many jurisdictions" and "the silk of choice for regulated procedures such as transfers of business under Part 7 of FSMA"

---

**Case List**
Click here to view the Case list for Martin Moore QC

© Erskine Chambers. Tel: 020 7242 5532. Fax: 020 7831 0125.
Email: clerks@erskine-chambers.co.uk
Site Hosted by Nasstar

# COMPANY

www.ChambersandPartners.com

www.Chamb

## LONDON

| Company<br>London<br>Leading Sets | Ranked<br>QCs | Jnrs |
|---|---|---|
| **Band 1** | | |
| Erskine Chambers | | 11 |
| **Band 2** | | |
| 4 Stone Buildings (George Bompas QC) | 6 | 6 |
| **Band 3** | | |
| Maitland Chambers (Lyndon Stanford & Aldous) | 6 | 3 |
| Serle Court (Lord Neill of Bladen QC) | 5 | 4 |
| 3-4 South Square (Michael Crystal QC) | 1 | 1 |
| **Band 4** | | |
| Enterprise Chambers (Bernard Weatherill QC) | 2 | 1 |
| One Essex Court (Lord Grabiner QC) | 2 | 0 |
| New Square Chambers (Rodney Stewart Smith) | 3 | 1 |
| XXIV Old Buildings (Mann QC & Steinfeld QC) | 2 | 0 |

### Erskine Chambers
See full details p.1895

This leading set for company work is the only one to specialise in the area and is particularly recommended for more technical and rare matters. "What really marks it out is its depth," remarked one interviewee; "even if you can't get the leaders you'll be satisfied with anyone there." Another remarked: "They are like Brighton Rock, quality from one end to the other." Aside from its unwavering quality of advice, clients also rave about the set's "accessibility and pragmatism – it uses modern communication methods and has none of the stuffiness traditionally associated with barristers' sets." Universally hailed as "exactly what the modern barrister should aspire to be," David Chivers QC is "accessible, happy to get his hands dirty and, most importantly, commercially astute." As one interviewee put it: "He has that perfect combination of knowing the law inside and out whilst also realising how to apply it in a commercial context – when you find someone like that you stick with them." Hailed as "the world expert on poison pills," Leslie Kosmin QC (see p.1782) is another silk valued for his commercial approach. In addition, solicitors admire his people skills: "He's very sensitive to client situations – you can bring clients before him and he always seems to know how best to handle them." "Stratospherically clever and a 'can-do' sort of guy," Richard Snowden QC (see p.1839) is one of the finest litigators in the company sphere. He is an expert on the potential fallout subsequent to the all-important new Companies Act. A "fantastic advocate and an expert on schemes of arrangement," David Mabb QC "knows his subject area inside-out." A great favourite among M&A solicitors, Martin Moore QC (see p.1803) "really knows how to get you out of a scrape." "A big personality," he has a "great presence in court, where his punchy approach is extremely effective." Solicitors also enjoy his "willingness to sit down and talk through issues, rather than coming across as a tutor." "A great litigator and big hitter with wonderful insight into company law," David Oliver QC has a track record in the area that demands respect. "He's great at addressing problems quickly, paring down the issues and then coming up with a commercial review," remarked one interviewee. Another silk consistently lauded by the City's best corporate lawyers is Michael Todd QC (see p.1850), who splits his practice between litigation and advisory work. "Extremely sensible" and a provider of "commercially robust advice," he is tipped by some as "the next big one at Erskine." "When it comes to the very technical points, there is no one better than John Cone (see p.1730)," according to commentators. "An outstanding adviser," he has a spotless and stellar reputation in the field. "A real expert when it comes to very specialised areas," Sir Thomas Stockdale (see p.1843) is "at the top of his game." The "wonderfully bright" Ceri Bryant (see p.1717) is "very much in the Erskine mould when offering advice on complex, non-contentious issues." She has the full support of the market, as does Nigel Dougherty (see p.1740) who is "very clear in the way he expresses himself" and "really knows his way around shareholder disputes and directors' duties cases." Interviewees regard him as "a formidable opponent when it comes to long paper battles." "A very able advocate who is extremely user-friendly," James Potts (see p.1819) is a firm favourite with solicitors who feel that "he really gets involved" in cases on which he is instructed. Catherine Roberts (see p.1827) "consistently comes up with sensible and reasoned advice," and "puts up quite a fight in court," while the "confidence-inspiring" Andrew Thompson (see p.1849) possesses a "calm and measured delivery in court that impresses judges." It seems barely possible that there is only one Andrew Thornton (see p.1849), given the vast number of high-flying City corporate lawyers who seek out his "pragmatic, down-to-earth and efficient advice." A natural port of call for schemes of arrangement, he picks up a wide range of company work. His popularity can be put down to his "affable demeanour" and his "ability to pick up a question, deal with it straight away and seemingly always find the right answer." Company and corporate insolvency expert Philip Gillyon has a "tremendous reputation in the field," while the "exceptionally able" Dan Prentice possesses – as one would expect of an Oxford Professor – a "wonderfully broad grasp of the parameters of company law." Edward Davies (see p.1736) remains a fine prospect within the corridors of Erskine Chambers and is seemingly set to follow in the footsteps of his illustrious superiors at this virtual conveyer belt of company law talent.

### 4 Stone Buildings
See full details p.1977

When it comes to company litigation of a more hostile kind, 4 Stone Buildings harbours some of the finest practitioners around. As one peer put it: "If you hear someone is from 4 Stone, your inclination is to assume that they are good." Others made reference to an "extremely talented group of juniors coming through within the set," evidence that suggests this reputation for excellence will stand for a long time to come. Head clerk David Goddard was singled out for "knowing exactly what is going on within the chambers – he always knows how to put you on the right track." "When it comes to advising on wider corporate/commercial issues rather than just strict company matters, there is no one more capable than George Bompas QC (see p.1712)," according to one source. While his commercial chancery practice tends to be litigation-heavy, his company practice is more advisory in nature, focusing in particular on section 459 matters. Clients value his "clear and authoritative opinions." As one put it, "he understands the pragmatics of a transaction and he's a great person to go to if you need to stress-test a situation." Robert Hildyard QC (see p.1769) is a "formidable practitioner" who offers both litigation and advisory expertise across the company law gamut. "He's extremely thorough, has a good court presence and has a lovely manner with clients," remarked one admirer. He and Robert Miles QC (see p.1800) are consulting editors for Oxford University Press' book on the new Companies Act. Miles' company practice revolves around litigation, though he does take on some advisory work. A "fantastic advocate," he "builds up a great rapport with judges." "Very clever and extremely astute," John Brisby QC "always gets right to the heart of a matter." Returning to private practice following his eight-year stint as First Treasury Counsel (Chancery), the "incredibly talented" Jonathan Crow QC (see p.1734) is "something quite special – he's strong on his feet and doesn't miss a trick." "A master on technical company work with a fine eye for detail," Malcolm Davis-White QC (see p.1737) provides litigation and advisory expertise, and is particularly praised for his work on schemes of arrangement and reductions of capital. "An excellent litigator with real ability," Richard Hill (see p.1769) is the junior of choice for some of the top silks in the company field. Another popular figure is Rosalind Nicholson (see p.1810). "Extremely knowledgeable within her field especially when it comes to directors' duties," Nicholson is "very much on the ball and someone with whom it's great to sit down and thrash out a problem." Peter Griffiths (see p.1761) maintains the set's reputation and is someone who "knows company law off the top of his head," while Sarah Harman is a "tough opponent who gives no quarter – you certainly know about it when you're up against her." A talent for the future at 4 Stone Buildings is Gregory Denton-Cox (see p.1738), whose "wonderful manner with clients is a great strength." Sharif Shivji (see p.1836) joins the rankings this year on account of his "genuine promise."

### Maitland Chambers
See full details p.1942

The pre-eminent set for commercial chancery, Maitland also has a number of distinguished practitioners in the company law field. "One of the finest litigators in the company arena," Charles Aldous QC "is at the top-end of his profession and makes a success of whatever work he turns his hand to." "Always full of ideas," he "has a real talent for handling heavyweight and drawn-out cases." Matthew Collings QC (see p.1729) is a "real ideas man" whose "willingness to take on some of the tougher cases around" sets him apart from the field. Paul Girolami QC (see p.1755) is a "fantastically good advocate" whose expertise on the forthcoming Companies Act will stand him in good stead as the effects of the legislation begin to be felt. "Very straight and easy to deal with," Guy Newey QC (see p.1809) is a "very capable pair of hands in the company arena." "Tenacious, able and confident," Catherine Newman QC's (see p.1809) broad-ranging practice takes in a good deal of company work; in 2006 she led a team on a breach of contract and misrepresentation claim worth around USD1 billion. "A forceful advocate with an extensive knowledge of the area," Anthony Trace QC (see p.1851) joins the ranking this year. An advocate who "never takes a backward step" is Rebecca Stubbs QC (see p.1844), whose work for the Crown attracted widespread praise. Gregory Banner (see p.1705) splits his practice between commercial and company work, taking on a number of section 459 petitions, shareholder warranties and reductions of capital. Recommended as a bright prospect at the set, Thomas Grant (see p.1759) has an "enormous capacity for work" and knows the law inside-out."

### Serle Court
See full details p.1973

A chancery and commercial set of true quality, Serle Court houses practitioners who get involved in big-hitting company litigation. "Extremely able and a giant of the Bar," Alan Boyle QC (see p.1713) is a major force in company litigation. "A man of many talents, he is a match for all in this field." "A forceful advocate and a worthy opponent," Philip Marshall QC (see p.1795) has a broad-based company practice, but draws especial praise for his work on shareholder disputes. 2006 saw

James Corbett QC cases. "He won ... p.1777), a barrister: any company case, the subject. He is a shareholder dispu always have a firm case," and is known most vital compani and firm but court practice often spa "Usually in about when the power b with and extremi p.1711) handles including claims a with a wonde Collingwood (see and clients. Profici ... fields, he recently ... fast in two branch o p.1791) joins this strongly recomm

**Company**
**London**
**Leading Silks**

**Band 1**
Aldous Charles *Maitland Chambers*
Chivers David *Erskine Chambers*
Kosmin Leslie *Erskine Chambers*
Moss Gabriel *3-4 South Square*

Bompas George *4 Stone Buildings*
Hildyard Robert *4 Stone Buildings*
Miles Robert *4 Stone Buildings*
Snowden Richard *Erskine Chambers*

**Band 2**
Boyle Alan *Serle Court*
Crow Jonathan *4 Stone Buildings*
Dicker Robin *3-4 South Square*
Marshall Philip *Serle Court*
Oliver David *Erskine Chambers*
Vos Geoffrey *3 Stone Buildings*

Brisby John *4 Stone Buildings*
Davis-White Malcolm *4 Stone Buildings*
Mabb David *Erskine Chambers*
Moore Martin *Erskine Chambers*
Todd Michael *Erskine Chambers*

**Band 3**
Arden Peter *Enterprise Chambers*
Corbett James *Serle Court*
de Garr Robinson Anthony *One Essex Court*
Hollington Robin *New Square Chambers*
Jones Philip *Serle Court*
Moverley Smith Stephen *XXIV Old Buildings*
Newey Guy *Maitland Chambers*
Rabinowitz Laurence *One Essex Court*
Trace Anthony *Maitland Chambers*

Collings Matthew *Maitland Chambers*
Crystal Michael *3-4 South Square*
Girolami Paul *Maitland Chambers*
Joffe Victor *Serle Court*
Knowles Robin *3-4 South Square*
Mowschenson Terence *Wilberforce Chambers*
Newman Catherine *Maitland Chambers*
Steinfeld Alan *XXIV Old Buildings*
Trower William *3-4 South Square*

**Leading Juniors**

**Band 1**
Cone John *Erskine Chambers*

**Band 2**
Bryant Ceri *Erskine Chambers*
Hill Richard *4 Stone Buildings*
Nicholson Rosalind *4 Stone Buildings*
Roberts Catherine *Erskine Chambers*
Thompson Andrew *Erskine Chambers*

Stockdale Thomas *Erskine Chambers*

Dougherty Nigel *Erskine Chambers*
Lightman Daniel *Serle Court*
Potts James *Erskine Chambers*
Stubbs Rebecca *Maitland Chambers*
Thornton Andrew *Erskine Chambers*

**Band 3**
Banner Gregory *Maitland Chambers*
Collingwood Timothy *Serle Court*
Gillyon Philip *Erskine Chambers*
Grant Thomas *Maitland Chambers*
Griffiths Peter *4 Stone Buildings*
Machell John *Serle Court*
Shekerdemian Marcia *11 Stone Buildings*
Toube Felicity *3-4 South Square*

Blayney David *Serle Court*
Eaton Turner David *New Square Chambers*
Goldring Jeremy *3-4 South Square*
Green Michael *Fountain Court Chambers*
Harman Sarah *4 Stone Buildings*
Prentice Dan *Erskine Chambers*
Stonefrost Hilary *3-4 South Square*
Zelin Geoffrey *Enterprise Chambers*

**Up-and-coming individuals**
Davies Edward *Erskine Chambers*
McCulloch Niall *Enterprise Chambers*

Denton-Cox Gregory *4 Stone Buildings*
Shivji Sharif *4 Stone Buildings*

James Corbett QC (see p.1732) lead on two section 459 cases. He won praise alongside Victor Joffe QC (see p.1777), a barrister who brings a "wealth of experience to any company case," having authored an academic text on the subject. He is noted as being "extremely impressive in shareholder disputes." Philip Jones QC (see p.1778) will "always have a firm grasp of absolutely every aspect of a case," and is known to get on "some of the biggest and most vital company cases around." "Extremely thorough, and firm but courteous," Daniel Lightman's (see p.1788) practice often spans the company and chancery divide. "Usually in about three courts a day," as a junior "he is often the power behind the throne." "A pleasure to deal with and extremely competent," David Blayney (see p.1711) handles a good deal of company litigation, including claims against directors. "Combining a sharp mind with a wonderfully easy-going manner," Timothy Collingwood (see p.1730) is a favourite with both silks and clients. Proficient across the chancery and insolvency fields, he recently demonstrated his company law experience in two breach of directors' duty claims. John Machell (see p.1791) joins the rankings this year having been strongly recommended" for his company work.

### 3-4 South Square
See full details p.1974
"Past masters at the company/insolvency crossover," the barristers here appear in the meatiest work in the area and prove particularly adept at schemes of arrangement work. Gabriel Moss QC (see p.1805) climbs to the top of the rankings this year on the back of commentators' unflagging praise. One went so far as to call him "the most active and pre-eminent name in company law at the moment." "You can't let your guard down against him," remarked another. Like Moss, Robin Dicker QC (see p.1739) appears in "company cases of leading authority" and is something of an expert on schemes. "A superb litigator," he is "enormously respected" by his peers. "Blessed with a thorough understanding of the commercial aspects of a case," Michael Crystal QC remains a prominent figure within the company arena. "Open, approachable and very capable," Robin Knowles CBE QC (see p.1782) came in for extended praise. "He's a master of detail and has a uniquely clinical style of advocacy," remarked one peer. Another expert on schemes of arrangement is the "extremely responsive and helpful" William Trower QC (see p.1853). Jeremy

Goldring (see p.1757) "gets some fantastic cases," and according to one source, is "everyone's favourite junior." "More than a safe pair of hands," Hilary Stonefrost (see p.1843) joins the rankings this year on account of her "excellent reputation for schemes of arrangement work." Felicity Toube (see p.1851) has a "great delivery in court," and takes on general commercial and insolvency work, as well as company matters, in a broad-ranging practice. "Phenomenally bright," she also writes extensively on her subject.

### Enterprise Chambers
See full details p.1894
"Very strong across company and corporate insolvency," Peter Arden QC impresses with his "firm handle on all the issues involved in a case." "An extremely able practitioner who really knows his stuff," Geoffrey Zelin is another fine mind within the company/insolvency crossover. A promising young barrister within the chambers is Niall McCulloch, whose company-heavy practice often takes him to the British Virgin Islands.

### One Essex Court
See full details p.1896
2006 silk Anthony de Garr Robinson QC (see p.1737) joins the rankings this year on the back of very positive peer feedback: "He's a pleasure to work with and he really knows his way around all aspects of company law," remarked one. Another silk with broad experience in the area is the "highly in demand" Laurence Rabinowitz QC (see p.1823) whose advisory work "richly deserves its excellent reputation."

### New Square Chambers
See full details p.1948
"Quiet, but competent and effective as an advocate," Robin Hollington QC (see p.1771) is "a mine of company knowledge" having written a key work on minority shareholders' rights. "A very strong opponent," David Eaton Turner (see p.1742) operates within the company/insolvency realm handling, amongst other matters, section 459 proceedings and shareholder disputes.

### XXIV Old Buildings
See full details p.1949
Titan of the Bar Alan Steinfeld QC (see p.1842) demonstrated his talent in the company field in a 2006 warrant dispute, and is a "fine litigator combining a dogged approach with lashings of talent." Joining the rankings this year is Stephen Moverley Smith (see p.1842) whose highly regarded company practice has a distinctly international flavour.

### Other Notable Practitioners
Current chairman of the Bar Geoffrey Vos QC of 3 Stone Buildings has had many superlatives attached to his name over the years. "Incredibly energetic and with a quick mind," his all-round abilities extend to the company sphere. "Very straight-up and capable," Michael Green (see p.1760) of Fountain Court Chambers takes on a broad range of company work but is best known for his expertise in directors' disqualifications. With his "silky-smooth delivery," commentators believe "he won't remain a junior for much longer." "A powerful technical lawyer," Terence Mowschenson QC (see p.1806) of Wilberforce Chambers is a leading mind in the area of directors' liabilities. He advises on an array of corporate matters, including takeovers and share schemes. "A pleasure to work with and extremely competent," Marcia Shekerdemian (see p.1835) of 11 Stone Buildings is well versed in the law surrounding directors' disqualifications and shareholder disputes.

# THE LONDON BAR

## Commodities – Leading Juniors

Edmund Broadbent[†] 20 Essex Street
Siobán Healy[†] 7 King's Bench Walk
Charles Priday[†] 7 King's Bench Walk

Michael Coburn[†] 20 Essex Street
Charles Kimmins[†] 20 Essex Street

Clare Ambrose[†] 20 Essex Street
Michael Ashcroft[†] 20 Essex Street
Guy Blackwood[†] Quadrant Chambers
Claire Blanchard[†] Essex Court Chambers
Paul Downes[†] 2 Temple Gardens
Philip Edey[†] 20 Essex Street
Charles Holroyd[†] 7 King's Bench Walk
Susannah Jones[†] 20 Essex Street
Julian Kenny[†] 20 Essex Street
Peter MacDonald Eggers[†] 7 King's Bench Walk
Sara Masters[†] 20 Essex Street
Sean O'Sullivan[†] 4 Pump Court

*sets and individuals are listed A-Z within tiers*

David Quest[†] and others at 3 Verulam Buildings are 'efficient and thorough', with particular strength in trade finance disputes from the banking perspective.

'Very bright and user-friendly' Sean O'Sullivan's reputation at 4 Pump Court continues to grow with handling Commercial Court actions involving rice and crude oil cargoes and fuel oil sales. He acted successfully for an appellant in an LMAA arbitration regarding the carriage of palm oil.

One Essex Court's Ian Glick QC[†] is described as 'ultra-reliable, very clever and extremely well organised' and Laurence Rabinowitz QC[†] 'lives up to his hype' according to solicitors.

## Company

Few would dispute the contention that Erskine Chambers remains the leading set for company law, although some suggest the gap between the set, and other Chancery Bar rivals, is narrowing, particularly at the junior end. City comment that the set is 'probably the best set for pure Companies Act work' and that 'I have only ever used Erskine Chambers for corporate work' are typical. All seven of the silks are high up in our list. They include Leslie Kosmin QC[†] ('very approachable, full of common sense and fills you with confidence'), and Richard Snowden QC[†], 'extremely bright' 'one of the nicest and brightest of the newer silks', who recently concluded the

mammoth Court of Appeal case of *Ultraframe (UK) Ltd*, a technical and procedural *tour de force*. Martin Moore QC[†] is seen to have 'a market-leading reputation which is more than justified' and is praised for being 'polite and, where occasion demands it, firm... he is very good at managing expectations, and gives extremely clear

explanations'. Michael Todd QC[†] was almost universally celebrated for his legal acumen; his work in *Anglo Petroleum Ltd* as well as his Privy Council cases, stand out. David Chivers QC[†] is seen as is 'immensely impressive... he is clear, to the point and constructive' and as being a 'remarkable advocate, unflappable under pressure'. David Mabb QC[†] is 'immensely experienced in company law'; he acted for the Co-op in *Stansell Ltd v Co-operative Group (CWS) Ltd* on appeal in a case in an area where no previous clear authority had existed for 130 years (on transfers of engagement), as well as acting for the WRU on company law issues following coach Mike Ruddock's departure.

Senior juniors Sir Thomas Stockdale[†], John Cone[†] and Ceri Bryant[†] possess a wealth of experience in major restructurings and schemes of arrangement. Cone and Bryant are seen as 'excellent juniors'. Andrew Thornton[†], Andrew Thompson[†] (who 'writes excellent opinions, untangling very complex facts and law with clarity and economy') and James Potts[†] are all identified as juniors who 'perform to high expectations.' Thornton acted on many of the leading takeover transactions throughout 2006 and 2007; Thompson's work on *DEG v Koshy*; Potts' work on schemes of arrangement are enviable by any standard. Philip Gillyon[†], and Nigel Dougherty[†] are also recommended.

4 Stone Buildings maintains a strong focus on company law, with an emphasis on litigation, and is seen as 'a good, all-round commercial Chancery set with particular experience in Companies Act issues'. 'Accessible and user friendly' a silk who has often 'delivered some very good results', said solicitors of Robert Hildyard QC[†] whose work in the pending Privy Council appeal of *Oracle Fund*

## Company – Leading Sets

**ERSKINE CHAMBERS** John Cone

**4 STONE BUILDINGS** George Bompas QC
**MAITLAND CHAMBERS** Michael Lyndon-Stanford QC, Charles Aldous QC and Michael Driscoll QC
**SERLE COURT** Lord Neill of Bladen QC

**XXIV Old Buildings** Martin Mann QC and Alan Steinfeld QC
**3-4 South Square** Michael Crystal QC
**Wilberforce Chambers** Jules Sher QC

**One Essex Court** Lord Grabiner QC
**New Square Chambers** Rodney Stewart Smith
**3 Stone Buildings** Geoffrey Vos QC

*Sets and individuals are listed A-Z within tiers*

[†]see biography in Volume 2

# THE LONDON BAR

## Company – Leading Silks

| | |
|---|---|
| **GEORGE BOMPAS QC**[†] 4 Stone Buildings | **1** |
| **ALAN BOYLE QC**[†] Serle Court | |
| **ROBERT HILDYARD QC**[†] 4 Stone Buildings | |
| **LESLIE KOSMIN QC**[†] Erskine Chambers | |
| **MARTIN MOORE QC**[†] Erskine Chambers | |
| **GUY NEWEY QC**[†] Maitland Chambers | |
| **DAVID OLIVER QC**[†] Erskine Chambers | |
| **MICHAEL TODD QC**[†] Erskine Chambers | |

| | |
|---|---|
| **Charles Aldous QC**[†] Maitland Chambers | **2** |
| **John Brisby QC**[†] 4 Stone Buildings | |
| **David Chivers QC**[†] Erskine Chambers | |
| **Paul Girolami QC**[†] Maitland Chambers | |
| **David Mabb QC**[†] Erskine Chambers | |
| **Gabriel Moss QC** 3-4 South Square | |
| **Richard Snowden QC**[†] Erskine Chambers | |
| **Geoffrey Vos QC**[†] 3 Stone Buildings | |

| | |
|---|---|
| **Michael Crystal QC**[†] 3-4 South Square | **3** |
| **Malcolm Davis-White QC**[†] 4 Stone Buildings | |
| **Robin Dicker QC**[†] 3-4 South Square | |
| **Robin Hollington QC**[†] New Square Chambers | |
| **Victor Joffe QC**[†] Serle Court | |
| **Philip Marshall QC**[†] Serle Court | |
| **Robert Miles QC**[†] 4 Stone Buildings | |
| **Terence Mowschenson QC**[†] Wilberforce Chambers | |
| **Christopher Pymont QC**[†] Maitland Chambers | |
| **Jules Sher QC**[†] Wilberforce Chambers | |
| **Alan Steinfeld QC**[†] XXIV Old Buildings | |
| **Anthony Trace QC**[†] Maitland Chambers | |

| | |
|---|---|
| **Richard Adkins QC**[†] 3-4 South Square | **Richard Gillis QC**[†] One Essex Court |
| **Peter Arden QC**[†] Enterprise Chambers | **Jane Giret QC**[†] 11 Stone Buildings |
| **Edward Bannister QC**[†] 3 Stone Buildings | **John McDonnell QC**[†] Thirteen Old Square |
| **Lawrence Cohen QC**[†] XXIV Old Buildings | **John Nicholls QC**[†] Maitland Chambers |
| **Matthew Collings QC**[†] Maitland Chambers | **Stephen Moverley Smith QC**[†] |
| **James Corbett QC**[†] Serle Court | XXIV Old Buildings |
| **Mark Cunningham QC**[†] Maitland Chambers | **Martin Pascoe QC**[†] 3-4 South Square |
| **Anthony de Garr Robinson QC**[†] | **Francis Tregear QC**[†] XXIV Old Buildings |
| One Essex Court | **John Wardell QC**[†] Wilberforce Chambers |
| **Philip Jones QC**[†] Serle Court | **Antony Zacaroli QC**[†] 3-4 South Square |

Sets and individuals are listed A-Z within tiers

continues. George Bompas QC[†] – active in cases like *Johnson v UBS*- and *Re. Watford Petroleum* - leads a set whose members were consistently praised as 'high quality, knowledgeable in their chosen fields and user friendly. They deal with work quickly and efficiently, qualities very much required by demanding clients.' Malcolm Davis-White QC[†] has extensive experience of directors' disqualification cases; recent cases include *Transtec Plc*, and *Re. Blackspur* on the impact of EHCR decisions on completed disqualification proceedings. Several juniors are noted for their company law work: Rosalind Nicholson[†], who is 'very hard working' and acted for

| London Bar | |
|---|---|
| Maps of the Inns of Court | 690 |
| Barristers' charges and earnings | 691 |
| Overview | 692 |
| Administrative and public law | 697 |
| Agriculture | 702 |
| Aviation | 703 |
| Banking and finance | 705 |
| Charities | 709 |
| Civil liberties and human rights | 710 |
| Clinical negligence and healthcare | 713 |
| Commercial arbitration | 716 |
| Commercial litigation | 718 |
| Commodities | 722 |
| **Company** | **724** |
| Construction | 727 |
| Consumer | 730 |
| Costs | 732 |
| Crime | 733 |
| Defamation and privacy | 735 |
| EU and competition | 737 |
| Education | 740 |
| Employment | 742 |
| Energy | 745 |
| Environment | 747 |
| Family | 750 |
| Fraud: civil | 752 |
| Fraud: crime | 755 |
| Health and safety | 758 |
| Immigration and nationality | 759 |
| Information technology | 761 |
| Insolvency | 764 |
| Insurance and reinsurance | 767 |
| Intellectual property | 770 |
| Licensing | 773 |
| Media and entertainment | 774 |
| Partnership | 777 |
| Pensions | 778 |
| Personal injury | 780 |
| Planning | 783 |
| Police law | 786 |
| Private client: personal tax | 788 |
| Private client: trusts and probate | 789 |
| Product liability | 792 |
| Professional negligence | 793 |
| Property litigation | 798 |
| Public inquiries | 801 |
| Public international law | 803 |
| Shipping | 804 |
| Sport | 807 |
| Tax: corporate | 808 |
| Tax: VAT | 810 |
| Regional Bar | 813 |
| Scottish Bar | 831 |
| Other sections: solicitors | |
| London | 271 |
| UK regions | 697 |
| Offshore firms | 661 |
| Foreign firms | 677 |
| **Detailed national index** | **3** |