# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITY OF HARPER WOODS EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of BAE SYSTEMS PLC, | ) ) ) | Civil No. 1:07-cv-01646 |
| | ) | Assigned to: Judge Rosemary M. Collyer |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| RICHARD (DICK) L. OLVER et al., | ) ) ) | |
| Defendants, | ) ) | |
| - and – | ) ) | |
| BAE SYSTEMS PLC, an England and Wales corporation, | ) ) ) | |
| Nominal Defendant. | ) | |

## APPENDIX OF FOREIGN AUTHORITIES CITED IN DECLARATION OF MARTIN MOORE QC

*CASES*

*Tab No.*

*Foss v. Harbottle* (1843) 2 Hare 461 ....................................................................... A

*Birch v. Sullivan* [1957] 1 WLR 1247 ..................................................................... B

*Prudential Assurance v. Newman Industries* [1982] 1 Ch 204 .............................. C

*Barrett v. Duckett* [1995] 1BCLC 243 .................................................................. D

*Konamaneni v. Rolls Royce Industrial Power (India) Ltd*
    [2002] 1 BCLC 336. [2002] All ER 979 .............................................................. E

*Biala* v. *Mallina* [1993] 11 A.C.S.R.E. 785 ........................................................... F

*Hawksbury Development Company v. Landmark Finance Ltd*
    [1969] 2 N.S.W.R. 782 ...................................................................................... G

*Smith v. Croft (No2 )* [1988] 1 Ch 114 .................................................................. H

*Drown v. Gaumont British Picture Corp* [1937] Ch 402 ...................................... I

*Rolled Steel Products (Holdings) Ltd. V. British Steel Corporation*
    [1986] Ch. 246, 295 .......................................................................................... J

*Re Halt Garage (1964) Ltd* [1982] 3 All ER 10106 ............................................. K

*Arab Monetary Fund v. Hashim and Others*
    [1993] 1 Lloyd's Rep. 543 ................................................................................. L

*Edwards v. Halliwell* [1950] 2 All ER 1064 ......................................................... M

*Australian Agricultural Co. v Oatmont Pty* [1992] 8 A.C.S.R. 255 ................... N

*Daniels v. Daniels* [1978] 1 Ch 406 ...................................................................... O

*Pavlides v. Jensen* [1956] Ch 565 .......................................................................... P

*Taylor v. NUM* [1985] BCLC 257 ........................................................................ Q

*Devlin v. Slough Estates Ltd* [1983] BCLC 497 ................................................. R

*Caparo Industries plc v. Dickman* [1990] 2 A.C. 605 ......................................... S

### *STATUTES*

*Companies Act 2006*, S. 112, 126, 260-269, 463,
    994, Commencement No. 1 .................................................................. T

*Companies Act 1985,* S. 22, 35, 226, 227, 360, 459 ........................................... U

*SI 2007/2194* Article 2(1)(e); Article 9, Schedule 3, Paragraph 20(3)… ............ V

**TAB A**

the petition and schedule, to be given to three distinct classes of creditors: first, the creditors at whose suit the prisoner shall be in custody; secondly, the other creditors in the schedule; and, thirdly, all creditors (if any) not named in the schedule; for, after expressly directing that the Court shall decree notice to be given to the first and second classes, the Act adds, "and to be inserted in the *London Gazette;* and also, if the said Court shall think fit, in the *Edinburgh* and *Dublin Gazettes,* or either of them; and also in such other newspaper or newspapers as the said Court shall direct."]

Now, adverting to the scope of the petition, namely, that the prisoner may be discharged from prison in respect of all debts owing at the time of presenting his petition; that the schedule is to contain all debts and claims; that notice is to be publicly given of the hearing of the petition, and consideration of the schedule generally, as well as particularly to the creditors therein named; that any creditor upon proving his debt may oppose the prisoner's discharge, and challenge the correctness of the schedule; that the Act contemplates the case of the schedule requiring amendment, that its truth may be the subject of examination and report, and that the prisoner is ultimately **[460]** to swear to the truth of it (considering what the truth so to be sworn to must be), and the different rules for making dividends before and after adjudication, I cannot discover the foundation for the arguments of the Plaintiff's counsel, that no creditors of the insolvent at the time of filing his petition have any interest in his estate under the insolvency, unless the insolvent has volunteered to put their names upon his schedule. The obvious purport of the Act appears to be that all the debts of the insolvent shall be ascertained; and I presume the Court would not adjudicate that he be discharged unless and until he submitted to make his schedule true.

So far, therefore, as the case depends upon the tender alone, I think the assignees were not guilty of a breach of duty in proceeding to a sale after the tender was made.

In these circumstances, without reference to the question whether the purchase to be effected by the deed was proposed to be made for the benefit of a Plaintiff or of a stranger, and whatever the result of any inquiry as to that fact might be, even supposing the case were now open to any such inquiry, it is impossible that a Court of Equity can say that the assignees were guilty of a breach of trust, of which a purchaser was bound to take notice, because they made no better offer, as a condition upon which the sale should be stayed, than that which was made on their behalf by their solicitor, Mr. Acton, and refused by Mr. Hughes, on the part of the proposed purchaser. The bill must be dismissed as against Babb, with costs, and as against the assignees without costs. I leave the costs of the assignees to the judgment of the Court for the Relief of Insolvent Debtors, to whom it will properly belong to determine, with reference to the question of costs, whether they have or not taken the proper course in dealing with the insolvent's estates.

**[461]** FOSS v. HARBOTTLE. *March* 4, 6, 7, 8, 25, 1843.

[See *Hallows* v. *Fernie,* 1867-68, L. R. 3 Eq. 532; L. R. 3 Ch. 467; *Hoole* v. *Great Western Railway Company,* 1867. L. R. 3 Ch. 274; *Seaton* v. *Grant,* 1867, 36 L. J. Ch. 642; *Clinch* v. *Financial Corporation,* 1868, L. R. 5 Eq. 482; L. R. 4 Ch. 117; *Atwool v. Merryweather,* 1868, L. R. 5 Eq. 467, n.; *Turquand* v. *Marshall,* 1869, L. R. 4 Ch. 386; *Gray* v. *Lewis* (No. 1), 1869-73, L. R. 8 Eq. 541; L. R. 8 Ch. 1050; *Pickering* v. *Stephenson,* 1872, L. R. 14 Eq. 339; *Menier* v. *Hooper's Telegraph Works,* 1874, L. R. 9 Ch. 353; *Ward* v. *Sittingbourne and Sheerness Railway Company,* 1874, L. R. 9 Ch. 492, n.; *Macdougall* v. *Gardiner* (No. 1), 1875, L. R. 20 Eq. 393; L. R. 10 Ch. 606; *Macdougall* v. *Gardiner* (No. 2), 1875, 1 Ch. D. 13; *Russell* v. *Wakefield Waterworks Company,* 1875, L. R. 20 Eq. 480; *Duckett* v. *Gover,* 1877, 25 W. R. 554; *Pender* v. *Lushington,* 1877, 6 Ch. D. 80; *Isle of Wight Railway Company* v. *Tahourdin,* 1883, 25 Ch. D. 333; *Studdert* v. *Grosvenor,* 1886, 33 Ch. D. 535; *La Compagnie de Mayville* v. *Whitley* [1896], 1 Ch. 807; *Tiessen* v. *Henderson* [1899], 1 Ch. 866; *Alexander* v. *Automatic Telephone Company* [1900], 2 Ch. 69; *Burland* v. *Earle* [1902], A. C. 93; *Punt* v. *Symons & Company Ltd.* [1903], 2 Ch. 516.]

Bill by two of the proprietors of shares in a company incorporated by Act of Parliament, on behalf of themselves and all other the proprietors of shares except the Defendants,

against the five directors (three of whom had become bankrupt), and against a proprietor who was not a director, and the solicitor and architect of the company, charging the Defendants with concerting and effecting various fraudulent and illegal transactions, whereby the property of the company was misapplied, aliened and wasted ; that there had ceased to be a sufficient number of qualified directors to constitute a board ; that the company had no clerk or office ; that in such circumstances the proprietors had no power to take the property out of the hands of the Defendants, or satisfy the liabilities or wind up the affairs of the company ; praying that the Defendants might be decreed to make good to the company the losses and expenses occasioned by the acts complained of ; and praying the appointment of a receiver to take and apply the property of the company in discharge of its liabilities, and secure the surplus : the Defendants demurred.

Held, that, upon the facts stated, the continued existence of a board of directors *de facto* must be intended ; that the possibility of convening a general meeting of proprietors capable of controlling the acts of the existing board was not excluded by the allegations of the bill ; that in such circumstances there was nothing to prevent the company from obtaining redress in its corporate character in respect of the matters complained of ; that therefore the Plaintiffs could not sue in a form of pleading which assumed the practical dissolution of the corporation ; and that the demurrers must be allowed.

When the relation of trustee and *cestui que trust* begins, as between the projectors of public companies and such companies.

Some forms prescribed for the government of a corporation may be imperative, and others directory only.

On argument of a demurrer, facts not averred in the bill, and which might possibly have been denied by plea, if they had been averred, intended against the pleader.

The bill was filed in October 1842 by Richard Foss and Edward Starkie Turton, on behalf of themselves and all other the shareholders or proprietors of shares in the company called "The Victoria Park Company," except such of the same shareholders or proprietors of shares as were Defendants thereto, against Thomas Harbottle, Joseph Adshead, Henry Byrom, John Westhead, Richard Bealey, Joseph Denison, Thomas Bunting and Richard Lane ; and also against H. Rotton, E. Lloyd, T. Peet, J. Biggs and S. Brooks, the several assignees of Byrom, Adshead and Westhead, who had become bankrupts.

The bill stated, in effect, that in September 1835 certain persons conceived the design of associating for the purchase of about 180 acres of land, situated in the parish of Manchester, belonging to the Defendant, Joseph Denison, and others, and of enclosing and planting the same in an ornamental and park-like manner, and erecting houses thereon with attached gardens and pleasure-grounds, and selling, letting or otherwise disposing thereof ; and the Defendants, Harbottle, Adshead, Byrom, Westhead, Bealey, Denison, Bunting and Lane, agreed to form a joint stock company, to consist of themselves and others, for the said purpose : that in October 1835 [462] plans of the land, and a design for laying it out, were prepared ; that, after the undertaking had been projected and agreed upon, Denison purchased a considerable portion of the said land of the other original owners with the object of reselling it at a profit, and Harbottle, Adshead, Byrom, Westhead, Bunting and Lane, and one P. Leicester, and several other persons, not members of the association, purchased the said land in parcels of Denison and the other owners, so that at the time of passing the Act of Incorporation Harbottle, Adshead, Byrom, Westhead, Bunting and Lane owned more than half of the land in question, the remainder being the property of persons who were not shareholders : that Denison and the last-named five Defendants made considerable profits by reselling parts of the said land at increased chief rents before the Act was passed.

The bill stated that, between September 1835 and the beginning of 1836, various preliminary steps were taken for enabling the projectors of the said company to set it on foot : that in April 1836 advertisements, describing the objects of the proposed company and the probabilities of its profitable result, were published, in which it was proposed to form the association on the principle of a tontine : that the first eight

named Defendants and several other persons subscribed for shares in the proposed
company, and, among others, the Plaintiff, Foss, subscribed for two shares, and the
Plaintiff, Turton, for twelve shares of £100 each, and signed the contract, and paid the
deposit of £5 per share : that at a public meeting of the subscribers called in May
1836 it was resolved that the report of the provisional committee should be received,
and the various suggestions therein contained be adopted, subject to the approval of the
directors, who were requested to complete such purchases of land, and also such other
acts as they might **[463]** consider necessary for carrying the objects of the undertaking
into effect; and it also resolved that Harbottle, Adshead, Byrom, Westhead and
Bealey should be appointed directors, with power to do such acts as they might
consider necessary or desirable for the interests of the company ; and Westhead, W.
Grant and J. Lees were appointed auditors, Lane architect, and Bunting solicitor :
that, in order to avoid the responsibilities of an ordinary partnership, the Defendants
Harbottle and others suggested to the subscribers the propriety of applying for an
Act of Incorporation, which was accordingly done : that in compliance with such
application, by an Act, intituled "An Act for Establishing a Company for the Purpose
of Laying Out and Maintaining an Ornamental Park within the Townships of Rusholme,
Charlton-upon-Medlock and Moss Side, in the County of Lancaster," which received
the Royal assent on the 5th of May 1837 (7 Will. 4), it was enacted that certain
persons named in the Act, including Harbottle, Adshead, Bealey, Westhead, Bunting
and Denison and others, and all and every such other persons or person, bodies or
body politic, corporate or collegiate, as had already subscribed or should thereafter
from time to time become subscribers or a subscriber to the said undertaking, and be
duly admitted proprietors or a proprietor as thereinafter mentioned, and their respec-
tive successors, executors, administrators and assigns, should be and they were thereby
united into a company for the purposes of the said Act, and should be and they were
thereby declared to be one body politic and corporate by the name of "The Victoria
Park Company," and by that name should have perpetual succession and a common
seal, and by that name should and might sue and be sued, plead or be impleaded, at
law or in equity, and should and might prefer and prosecute any bill or bills of
indictment or information against any person or **[464]** persons who should commit
any felony, misdemeanour, or other offence indictable or punishable by the laws of
this realm, and should also have full power and authority to purchase and hold lands,
tenements and hereditaments to them, and their successors and assigns, for the use of
the said undertaking, in manner thereby directed. [The bill stated several other
clauses of the Act.(1)]

---

(1) The substance of the Act, as stated in the bill, was as follows :—Section 3.
The company empowered to purchase the lands mentioned in the schedule ; 5. And
other lands within a mile from the boundary of the said lands ; 15. For a sum or sums
in gross, or annual rent service or perpetual rent-charge (notwithstanding the existence
of any unperformed contract for the sale of any such lands to the company of pro-
prietors, or any of them). 16. Power to lay out the lands ; and build thereon, as the
directors might think proper. 18. Capital to be £500,000, and to be applied first,
in payment of the expenses of obtaining the Act ; and then in payment of the
purchase-monies of the lands, and making and maintaining the parks and buildings,
and the other purposes of the Act. 19. None of the powers given by the Act to be
exercised before £50,000 should be raised. 20. The capital to be divided in 5000
shares of £100 each. 22. The shares to be personal estate. 23, 24, 25, 26, 27. Pro-
visions with respect to the nominees of shareholders, and the duration of the interests
of the shareholders, on the principle of tontine. 29. Register of the names and
additions of shareholders and their nominees to be kept by the clerk or secretary
of the company, and the common seal affixed thereto. 34. Directors to make calls,
and enforce payment of the same, with such calls not to exceed £10 per share at one time,
and to be at least two months from each other : the money to be put into the hands
of the treasurer, and applied as aforesaid. 35. Declaration and evidence necessary
in actions for calls. 38. That the business affairs and concerns of the company
shall, from time to time, and at all times hereafter, be under the control of five
shareholders (to be appointed directors), who shall have the entire ordering,
managing and conducting of the company, and of the capital, estates, revenue.

[465] The bill also stated the schedule annexed to the Act, whereby the different plots of the said land, numbered [466] from 1 to 37, were stated to have been purchased by the Victoria Park Company from the various persons whose [467] names were therein set forth, and including the following names :—"Mr. P. Leicester and others ; " "Mr. Lacy and another ; " "Mr. Lane " and "Mr. Adshead ; " that [468] the land so stated to be purchased of "P. Leicester and others " was at the time of passing of the Act vested partly in P. Leicester, and partly in Westhead, Bunting

---

effects and affairs, and other the concerns thereof, and who shall also regulate and determine the mode and terms of carrying on and conducting the business and affairs of the company, conformably to the provisions contained in this Act ; and no proprietor, not being a director, shall, on any account or pretence whatsoever, in any way meddle or interfere in the managing, ordering or conducting the company, or the capital, estates, revenue, effects or other the business, affairs or concerns thereof, but shall fully and entirely commit, entrust and leave the same to be wholly ordered, managed and conducted by the directors for the time being, and the persons whom they shall appoint, save as hereinafter mentioned.  39. That the said T. Harbottle, J. Adshead, H. Byrom, J. Westhead and R. Bealy shall be the present and first directors of the company.  40. Three directors to constitute a board, and the acts of three or more to be as effectual as if done by the five. 42. Minutes of the proceedings of every board to be entered in a book to be kept by the clerk or secretary at the office of the company.  43. The board of directors for the time being to have full power and authority to appoint or remove the banker, broker, architect, surveyor, solicitor, builder, treasurer and clerk, and also a secretary, and all other agents, officers, clerks and servants.  45. Books of account of all the transactions of the company to be kept, and half-yearly reports and balance-sheets to be made : the proprietors to have access to, and to be at liberty to inspect, all books, accounts, documents and writings belonging to the company, at all reasonable times. 46. That a meeting of the proprietors of the company shall be convened and held on the first Monday in the month of July 1837, and on the same day in every succeeding year, at eleven o'clock in the forenoon, at their office, or such other convenient place in Manchester as the directors may think proper to appoint, of which meeting the clerk or secretary for the time being of the company shall give fourteen days' previous notice, by an advertisement in one of the Manchester newspapers ; and each meeting so to be convened and held shall be called "The Annual General Meeting," and the proprietors respectively qualified to act and vote therein, according to the provisions therein contained, and who personally, or by such proxy as hereinafter authorised, shall attend the same shall have full power and authority to decide upon all such matters and questions as by virtue of this Act shall be brought before such annual general meeting.  47. Board of directors empowered to call extraordinary general meetings.  48. That ten or more proprietors of the company for the time being qualified to vote as hereinafter mentioned, or three full fourth parts in number and value of all the proprietors for the time being of the company may, at any time, by writing under their hands, require the board of directors for the time being to call an extraordinary general meeting of the proprietors, and every such requisition shall set forth the object of such extraordinary meeting, and shall be left with the clerk or secretary for the time being at the principal office of the company, at least one calendar month before the time named in the requisition for the meeting to be holden, otherwise the said board shall not be bound to take notice thereof ; but in case the directors shall refuse or neglect for fourteen days, after such requisition shall be so left as aforesaid, to call such extraordinary meeting, then the proprietors signing the requisition may, for the purposes mentioned in such requisition, call an extraordinary general meeting of the proprietors, by notice signed by them, and advertised in one or more of the Manchester newspapers, at least fourteen days before the time fixed for holding the meeting ; and in every such advertisement the object of such extraordinary meeting, and the day and hour and place in the town of Manchester of holding the same, and the delivery of the requisition to the said board, and of its refusal to call such extraordinary meeting, shall be specified. 65. Two of the directors selected by lot amongst themselves to retire from office at

and Byrom, and the land so stated to be purchased of "Mr. Lacy and another" was at the time of the passing of the Act vested partly in Mr. Lacey and partly in Lane.

The bill stated that the purchase and sale of the said land as aforesaid was the result of an arrangement fraudulently concerted and agreed upon between Harbottle, Adshead, Byrom, Westhead, Denison, Bunting and Lane, at or after the formation of the company was agreed upon, with the object of enabling themselves to derive a

the annual general meeting in July 1841, and be replaced by two qualified proprietors, to be then elected by the majority of votes at such meeting, and two others, the longest in office, or so selected to retire, at every subsequent annual general meeting; but the retiring directors to be re-eligible.  67. No person shall be a director who shall not be a holder in his own right of the number of shares hereinafter mentioned in the capital of the company, viz., who shall not be a holder of ten shares at least, so long as the total number of the shares shall exceed 500; and from and after the total number of shares of the company shall be reduced to and shall not exceed 100, then who shall not be a holder of five shares at least; and, if any of the then or future directors shall cease to hold the respective number of shares aforesaid in his own right, his office as director shall thereupon and thenceforth become vacated. 68. Directors may vacate by resigning their offices.  70. Board of directors to appoint qualified persons to fill up the offices of directors dying, resigning, removed or becoming disqualified before their time of retirement; such appointments to be subject to the approbation of the next general meeting.  73. Cheques, bills, notes and other negotiable securities to be signed, &c., by the treasurer or such other officer of the company as the board should by minute appoint, and no others to be binding on the company.  74. That all actions, suits and other proceedings at law or in equity to be commenced and prosecuted by or on behalf of the company shall and lawfully may be commenced and instituted or prosecuted in the name of the treasurer, or any one of the directors of the company for the time being, as the nominal Plaintiff for and on behalf of the company; and all actions, &c., against the company shall be commenced and instituted and prosecuted against the treasurer, or any one of the directors of the company for the time being, as the nominal Defendant for and on behalf of the company.  78. Directors to have power to sell or declare forfeited shares for non-payment of debts or liabilities to the company.  83, 84, 85.  Shares vested in executors, legatees and assignees of proprietors, upon being transferred and duly registered, and such executors, legatees, assignees, &c., to be liable to calls, &c., as if original proprietors.  90. After one-half of the capital of £500,000 should have been paid up, the board of directors, with the sanction of a general meeting, empowered to borrow at interest any sum or sums of money, not exceeding £150,000 in the whole, on the security of the lands, property and effects of the company, by deed or writing under their common seal: entries of all such mortgages, and the particulars thereof, to be made in a book to be kept by the clerk of the company, and such book to be open for the perusal at all reasonable times of any proprietor or creditor of the company.  93. Mortgagees not required to see to the necessity for or application of the mortgage money.  105. Board of directors, with the sanction of two successive general meetings, and the proportion in number and value of the proprietors and shares therein mentioned, empowered to put an end to the tenure by way of tontine, and discharge the shares from all benefit of survivorship.  107, 108.  Power to dissolve the company, and wind up the affairs thereof, in manner therein mentioned, under the sanction of such general meetings.  112. Notices to proprietors sent by post, according to their addresses in the register, to be sufficient.  129. That in all cases wherein it may be requisite or necessary for any person or party to serve any notice, or any writ or other legal proceedings upon the said company, the service thereof upon the clerk or secretary to the company, or any agent or officer employed by the said director, or leaving the same at the office of such clerk or secretary, agent or officer, or at his last or usual place of abode, or upon any one of the said directors, or delivery thereof to some inmate at his last or usual place of abode, shall be deemed good and sufficient service of the same respectively on the company or their directors.

V.-C. XII.—7

profit or personal benefit from the establishment of the said company; and that the arrangement amongst the persons who were parties to the plan was that a certain number from amongst themselves should be appointed directors, and should purchase for the company the said plots of land from the persons in whom they were vested, at greatly increased and exorbitant prices: that it was with a view to carry the arrangement into effect that Harbottle, Adshead, Byrom and Westhead procured themselves to be appointed directors, and Denison procured himself to be appointed auditor: that accordingly, after the said plots of land had become vested in the several persons named in the schedule, and before the passing of the Act, the said directors, on behalf of the company, agreed to purchase the same from the persons named in the schedule at rents or prices greatly exceeding those at which the said persons had purchased the same: that after the Act was passed Harbottle, Adshead, Byrom, Westhead and Bealey continued to act as directors of the incorporated company in the same manner as before: that Adshead continued to act as director until the 18th of July 1839, Byrom until the 2d of December 1839, and [469] Westhead until the 2d of January 1840, at which dates respectively fiats in bankruptcy were issued against them, and they were respectively declared bankrupts, and ceased to be qualified to act as directors, and their offices as directors became vacated.

The bill stated that upwards of 3000 shares of £100 in the capital of the company were subscribed for: that the principle of tontine was abandoned: that before 1840 calls were made, amounting, with the deposit, to £35 per share, the whole of which were not, however, paid by all the proprietors, but that a sum exceeding £35,000 in the whole was paid.

The bill stated that, after the passing of the Act, Harbottle, Adshead, Byrom, Westhead, Bunting and Lane, with the concurrence of Denison and of Bealey, proceeded to carry into execution the design which had been formed previously to the incorporation of the company, of fraudulently profiting and enabling the other persons who had purchased and then held the said land, to profit by the establishment of the company and at its expense; and that the said directors accordingly, on behalf of the company, purchased, or agreed to purchase, from themselves, Harbottle, Adshead, Byrom and Westhead, and from Bunting and Lane, and the other persons in whom the said land was vested, the same plots of land, for estates corresponding with those purchased by and granted to the said vendors, by the original owners thereof, charged with chief or fee-farm rents, greatly exceeding the rents payable to the persons from whom the said vendors had so purchased the same: that of some of such plots the conveyances were taken to the Victoria Park Company, by its corporate name; of others, to Harbottle, Adshead, Byrom, Westhead and Bealey, as directors in trust for the company; [470] and others rested in agreement only, without conveyance: that by these means the company took the land, charged not only with the chief rents reserved to the original landowners, but also with additional rents, reserved and payable to Harbottle, Adshead, Byrom, Westhead, Denison, Bunting, Lane and others: that, in further pursuance of the same fraudulent design, the said directors, after purchasing the said land for the company, applied about £27,000 of the monies in their hands, belonging to the company, in the purchase or redemption of the rents so reserved to themselves, Harbottle, Adshead, Byrom, Westhead, Denison, Bunting, Lane and others, leaving the land subject only to the chief rent reserved to the original landowners.

The bill stated that the plans of the park were contrived and designed by Lane, in concert with Denison, the directors and Bunting, so as to render the formation of the park the means of greatly increasing the value of certain parcels of land, partly belonging to Denison and partly to Lane, situated on the outside of the boundary line of the park, but between such boundary line and one of the lodges and entrance gates, called Oxford Lodge and Gate, erected on a small part of the same land purchased by the company; and through which entrance, and the land so permitted to be retained by Denison and Lane, one of the principal approaches to the park was made: that the said land so retained by Denison and Lane was essentially necessary to the establishment of the park, according to the plans prepared by Lane, and the same was virtually incorporated in the park, and houses erected thereon would enjoy

all the advantages of the park, and plots thereof were in consequence sold by Denison and Lane for building land at enhanced prices.

[471] The bill stated that, after the purchase of the land as aforesaid, the directors proceeded to carry into effect the design of converting the same into a park, and they accordingly erected lodges and gates, marked out with fences the different crescents, terraces, streets and ways; formed drains and sewers, and made roadways, and planted ornamental trees and shrubs; that they also caused to be erected in different parts of the park several houses and buildings, some of which only were completed; and that the directors alleged the monies expended in the roads, drains and sewers amounted to £12,000, and in the houses and buildings to £39,000, or thereabouts: that the said directors sold and let several plots of land, and also sold and let several of the houses and buildings, and received the rents and purchase-money of the same.

The bill stated that Harbottle, Denison, Bunting and Lane did not pay up their calls, but some of them retained part, and others the whole thereof; Harbottle and Lane claiming to set off the amount of the calls against the chief rents of the lands which they sold to the company, Bunting claiming to set off the same against the chief rents, and the costs and charges due to him from the company; and Denison claiming to set off the amount of the calls against the rents payable to him out of the land which he sold to persons who resold the same to the company.

The bill stated that owing to the large sums retained out of the calls, the sums appropriated by the said directors to themselves, and paid to others in reduction of the increased chief rents, and payment of such rents, and owing to their having otherwise wasted and misapplied a considerable part of the monies belonging to the company, the funds of the company which came [472] to their hands shortly after its establishment were exhausted: that the said directors, with the privity, knowledge and concurrence of Denison, Bunting and Lane, borrowed large sums of money from their bankers upon the credit of the company: that, as a further means of raising money, the said directors, and Bunting and Lane, with the concurrence of Denison, drew, made and negotiated various bills of exchange and promissory notes; and that the said directors also caused several bonds to be executed under the corporate seal of the company for securing several sums of money to the obligees thereof: that by the middle or latter part of the year 1839 the directors, and Bunting and Lane, had come under very heavy liabilities; the chief rents payable by the company were greatly in arrear, and the board of directors, with the concurrence of Denison, Bunting and Lane, applied to the United Kingdom Life Assurance Company to advance the Victoria Park Company a large sum of money by way of mortgage of the lands and hereditaments comprised in the park; but the Assurance Company were advised that the Victoria Park Company were, by the 90th section of their Act, precluded from borrowing money on mortgage, until one-half of their capital (namely £500,000) had been paid up, and on that ground declined to make the required loan: that the directors, finding it impossible to raise money by mortgage in a legitimate manner, resorted to several contrivances for the purpose of evading the provisions of the Act, and raising money on mortgage of the property of the company, by which means several large sums of money had been charged by way of mortgage or lien upon the same: that to effect such mortgages or charges, the directors procured the persons who had contracted to sell plots of land to the company, but had not executed conveyances, to convey the same, by the direction of the board, to some [473] other person or persons in mortgage, and afterwards to convey the equity of redemption to the directors in trust for the company: that the directors also conveyed some of the plots of land which had been conveyed to them in trust for the company to some other persons by way of mortgage, and stood possessed of the equity of redemption in trust for the company: that, for the same purpose, the board of directors caused the common seal of the company to be affixed to several conveyances of plots of land which had been conveyed to the company by their corporate name, and to the directors in trust for the company, whereby the said plots of land were expressed to be conveyed for a pretended valuable consideration to one or more of the said directors absolutely, and the said directors or director then conveyed the same to other persons on mortgage to secure sometimes

monies advanced to the said directors, and by them paid over to the board in satis-
faction of the consideration monies expressed to be paid for the said prior conveyances
under the common seal, sometimes antecedent debts in respect of monies borrowed
by the board, and sometimes monies which had been advanced by the mortgagees
upon the security of the bills and notes which had been made or discounted as
aforesaid: that, in other cases, the said directors and Bunting deposited the title-deeds
of parcels of the land and buildings of the company with the holders of such bills and
notes to secure the repayment of the monies due thereon, and in order to relieve the
parties thereto: that, by the means aforesaid, the directors, with the concurrence of
Denison, Bunting and Lane, mortgaged, charged or otherwise incumbered the greater
part of the property of the company: that many of such mortgagees and incum-
brancers had notice that the said board of directors had not power under the Act to
mortgage or charge the property of the company, and that the **[474]** said mortgages,
charges and incumbrances were fraudulent and void as against the company, but that
the Defendants allege that some of the said incumbrances were so planned and
contrived that the persons in whose favour they were created had not such notice.

That the said directors having exhausted every means which suggested themselves
to them of raising money upon credit, or upon the security of the property and effects
of the company, and being unable by those means to provide for the whole of the
monies due to the holders of the said bills and notes, and the other persons to whom
the said directors in the said transactions had become indebted as individuals, and to
satisfy the debts which were due to the persons in whose favour the said mortgages
and incumbrances had been improperly created, and in order to release themselves
from the responsibility which they had personally incurred by taking conveyances or
demises of parts of the said land to the said directors as individuals in trust for the
company, containing covenants on their parts for payment of the reserved rents, the
said directors resolved to convey and dispose of the property of the company, and
they accordingly themselves executed and caused to be executed under the common
seal of the company, divers conveyances, assignments and other assurances, whereby
divers parts of the said lands and effects of the company were expressed to be
conveyed or otherwise assured absolutely to the holders of some of the said bills and
notes, and some of the said mortgagees and incumbrancers, in consideration of the
monies thereby purported to be secured; and also executed, and caused to be executed
under the common seal of the company, divers conveyances and assurances of other
parts of the said lands to the persons who sold the same to the company, in considera-
tion of their releasing them from **[475]** the payment of the rents reserved and
payable out of the said lands: that many of such conveyances had been executed by
Harbottle, Adshead, Westhead and Bealey, and a few by Byrom, who had been
induced to execute them by being threatened with suits for the reserved rents: that
Harbottle, Adshead, Byrom, Westhead and Bealey threatened and intended to convey
and assure the remaining parcels of land belonging to the company to the holders of
others of the said bills and notes, and to others of the said mortgagees and incum-
brancers and owners of the chief rents, in satisfaction and discharge of the said monies
and rents due and to become due to them respectively.

The bill stated that, upon the bankruptcy of Byrom, Adshead and Westhead,
their shares in the company became vested in the Defendants, their assignees, and
that they (the bankrupts) had long since ceased to be, and were not, shareholders in
the company: that the whole of the land resold by them was vested in some persons
unknown to the Plaintiffs, but whose names the Defendants knew and refused to
discover: that, upon the bankruptcy of Westhead, there ceased to be a sufficient
number of directors of the company to constitute a board for transacting the business
of the company in manner provided by the Act, and Harbottle and Bealey became
the only remaining directors whose office had not become vacated, and no person or
persons had been appointed to supply the vacancies in the board of directors occasioned
by such bankruptcies, and consequently there never had been a properly constituted
board of directors of the company since the bankruptcy of Westhead.

That Byrom, Adshead and Westhead, nevertheless, after their respective bank-
ruptcies, executed the several **[476]** absolute conveyances and other assurances of the
lands and property of the company, which were so executed for the purposes and in

manner aforesaid, after the directors had exhausted their means of raising money upon credit or upon the security of the property of the company.

That about the end of the year 1839, or commencement of the year 1840, the said directors discharged Brammell, the secretary of the company, and gave up the office taken by the company in Manchester, and transferred the whole or the greater part of the title-deeds, books and papers of the said company into the hands of Bunting; and from that time to the present the company had had no office of its own, but the affairs of the company had been principally conducted at the office of Bunting.

That the only parts of the land bought by the company which had not been conveyed away either absolutely or by way of mortgage, and the only part of the other property and effects of the company which had not been disposed of and made away with in manner aforesaid, remained vested in, and in the order and disposition of, Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting, in whose custody or power the greater part of the books, deeds and papers belonging to the company which had not been made away with remained : that by the fraudulent acts and proceedings in the premises to which Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting were parties, the property and effects of the said company had been and then were involved in almost inextricable difficulties, and if such property and effects were any longer allowed to remain in their order and disposition, the same would be in danger of being wholly dissipated and irretrievably [477] lost : that the said company were then largely indebted to their bankers and other persons who had *bonâ fide* advanced money to the company, and to the builders and other persons who had executed some of the works in the park, and provided materials for the same ; while, in consequence of the property of the company having been wasted and improperly disposed of by the directors, there were at present no available funds which could be applied in satisfaction of the debts of the company, and that some of the creditors of the said company had obtained judgments in actions at law brought by them against the company for the amount of their debts, on which judgments interest was daily accumulating.

The bill stated that in the present circumstances of the company, and the board of directors thereof, the proprietors of shares had no power to take the property and effects of the company out of the hands of Harbottle, Adshead, Byron, Westhead, Bealey and Bunting, and they had no power to appoint directors to supply the vacancies in the board occasioned by the said bankruptcies, and the proprietors of shares in the company had no power to wind up, liquidate or settle the accounts, debts or affairs of the company, or to dissolve the company, nor had they any power to provide for and satisfy the existing engagements and liabilities of the company with a view to its continuance, and the prosecution of the undertaking for which it was established without the assistance of the Court : that if a proper person were appointed by the Court to take possession of and manage the property and effects of the company, and if the company were to be repaid the amount of all losses and expenses which it had sustained or incurred by reason of the fraudulent and improper acts and proceedings of the Defendants in the premises, and [478] which the Defendants, or any of them, were liable to make good to the said company, as thereinafter prayed ; and if the company were decreed to take and have conveyed to them so much of the said land which was retained by Denison and Lane as aforesaid, upon paying or accounting to them for the fair value thereof at the time when the undertaking was first projected ; and Denison and Lane were to pay or account to the said company for the price received by them for so much of the same land as had been sold by them, over and above what was the fair price for the same at the time the undertaking was first projected ; and if the mortgages, charges, incumbrances and liens, and the said conveyances and other assurances, by means of which the property and effects of the company had been improperly incumbered and disposed of, which could be redeemed or avoided, as against the persons claiming thereunder, were redeemed and set aside, and the property and effects of the company thereby affected were restored to it, and the Defendants, who had not become bankrupt, and who had not paid up, but ought to have paid up, into the joint stock capital of the company the amounts of the several calls made by the directors on their respective shares, were to pay up the same, the lands, property and effects of the company would not only be

sufficient to satisfy the whole of its existing debts and liabilities, but leave a surplus, which would enable the company to proceed with, and either wholly or in part accomplish, the undertaking for which it was incorporated.

The bill stated that the Defendants concealed from the Plaintiffs, and the other shareholders in the company, who were not personally parties thereto, the several fraudulent and improper acts and proceedings of the said directors and the said other Defendants, and [479] the Plaintiffs and the other shareholders had only recently ascertained the particulars thereof, so far as they were therein stated, and they were unable to set forth the same more particularly, the Defendants having refused to make any discovery thereof, or to allow the Plaintiffs to inspect the books, accounts or papers of the company.

The bill charged that Harbottle and Bealey, and the estates of Adshead, Byrom and Westhead, in respect of that which occurred before their said bankruptcies, and Adshead, Byrom and Westhead, as to what occurred since their said bankruptcies, were liable to refund and make good to the company the amount of the losses and expenses which it had sustained in respect of the fraudulent and improper dealings of the said directors of the company with its lands and property : that Denison, Bunting and Lane had counselled and advised the directors in their said proceedings, and had derived considerable personal benefit and advantage therefrom : that Denison, Bunting and Lane were all parties to the said fraudulent scheme planned and executed as aforesaid, by which the several plots or parcels of land in the park were purchased and resold to the said company at a profit and at a price considerably exceeding the real value of the same, and that Denison, Bunting and Lane had derived considerable profit from the increased price or chief rents made payable out of the several plots or parcels of land which were purchased and resold by them in manner aforesaid, and from the monies which were paid to them as a consideration for the reduction of the same chief rents as before mentioned.

The bill charged that several general meetings, and extraordinary general meetings, and other meetings of [480] the shareholders of the company, were duly convened and held at divers times, between the time when the company was first established and the year 1841, and particularly on or about the several days or times thereinafter mentioned (naming ten different dates, from July 1837 to December 1839), and that at such meetings false and delusive statements respecting the circumstances and prospects of the company were made by the directors to the proprietors who attended such meetings, and the truth of the several fraudulent and improper acts and proceedings therein complained of was not disclosed.

The bill charged that, under the circumstances, Denison, Bunting and Lane, having participated in and personally benefited by and concealed from the other shareholders the several fraudulent and improper acts aforesaid, were all jointly and severally liable together, with the said directors, to make good to the company the amount of the losses and expenses which had been or might be incurred in consequence of such of the said wrongful and fraudulent acts and proceedings as they were parties or privies to : that Harbottle, Byrom, Adshead, Westhead and Bealey, respectively, had still some of the property and effects belonging to the company : that the said last-named Defendants had not paid up the calls due and payable on their respective shares : that the Plaintiffs had as yet paid only three of the calls on their shares, not having paid the remainder in consequence of learning that, owing to some misconduct of the directors, the affairs of the company were in difficulties, the cause of which difficulties the Plaintiffs had but lately, and with considerable difficulty, ascertained to have arisen from the proceedings aforesaid, but in all other respects the Plaintiffs had conformed to the provisions of the Act : that there were not any [481] shareholders in the company who had not paid up the calls on their shares besides the Plaintiffs and the said Defendants : that the names and places of abode of the other persons who are not shareholders in the company, but are interested in or liable in respect of any of the said matters, were unknown to the Plaintiffs, and the Defendants ought to discover the same : that the number of shareholders in the company was so great, and their rights and liabilities were so subject to change and fluctuation, by death and otherwise, that it would be impossible to prosecute the suit with effect if they were all made parties thereto.

The bill charged that Bunting claimed a lien upon the documents in his possession belonging to the company for the costs of business done by him as the attorney of the company, but a great part of such business consisted of the fraudulent acts aforesaid; and that he had received out of the funds of the company divers large sums of money exceeding the amount properly due to him: that Bunting had deposited some of the deeds belonging to the company with certain bankers at Liverpool, and, among the rest, the contract executed by the Plaintiffs and the other shareholders before the Act was passed, as a security for the payment of a bill of exchange for £3000, to which Bunting was individually a party, but for which he untruly pretended that the company was responsible; and that the holders of such deeds threatened to sue the Plaintiffs for the said £3000, as parties to the contract, on the ground that the capital was not paid up; and also that the said directors threatened to cause actions at law to be brought against the Plaintiffs, under the powers of the Act, in the name of Harbottle or Bealey, as the nominal Plaintiff on behalf of the company, for the amount of the unpaid calls on their shares.

[482] The bill charged that Harbottle and Bealey were two directors of the company, but they respectively refused to use or allow either of their names to be used as the nominal Plaintiffs in this suit on behalf of the company; but that Harbottle was a necessary party, not only in respect of his liability, but also as a nominal Defendant on behalf of the company.

After various charges, recapitulating in terms the alleged title of the Plaintiffs to the relief and discovery sought by the prayer, the bill prayed that an account might be taken of all monies received by the Defendants, Harbottle, Adshead, Byrom, Westhead, Bealey, Denison and Lane, or any of them, for the use of the company, or which but for their wilful default might have been received, and of the application thereof; also an account of the losses and expenses incurred in consequence of the said fraudulent and improper dealings of the Defendants with the monies, lands and property of the company which they or any of them were liable to make good, and that they might be respectively decreed to make good the same, including in particular the profits made by Harbottle, Denison, Bunting and Lane, by buying and reselling the said land, and the profits made by Denison and Lane out of the said land retained by them; and that Denison and Lane might be decreed to convey the residue of the said land to the company, upon payment of the fair value thereof at the time the undertaking was projected: that it might be declared that the said mortgages, charges, incumbrances and liens upon the lands and property created as aforesaid, so far as regards the Defendants who executed the same or were privy thereto, were created fraudulently and in violation of the provisions of the Act, and that Harbottle, Bealey, Denison, Bunting and Lane might be decreed to make good to the company the principal [483] money and interest due and owing upon security of such of the mortgages, charges and liens as were still subsisting, with all costs sustained by the company in relation thereto; and that it might be declared that Harbottle, Adshead, Byrom, Westhead and Bealey, by executing the said conveyances and assurances of the lands and property of the company to the said mortgagees, holders of notes and bills and others, committed a fraudulent breach of trust, and that Harbottle, Adshead, Byrom, Westhead, Bealey, Denison, Bunting and Lane might be decreed to make good to the company the purchase-money and rents paid by the company for such lands, and expended in building and improving the same, with interest and expenses; and that the monies so recovered from the Defendants might be applied in redeeming and repurchasing the said lands and restoring them to the company. And that inquiries might be directed to ascertain which of the mortgages and incumbrances, and of the conveyances and assurances, of the lands and property of the company could be avoided and set aside as against the persons claiming the benefit thereof, and that proceedings might be taken for avoiding them accordingly. And that an account might be taken of all the property and effects of the company, and the unpaid calls sued for and recovered, and that a sufficient part of such property might be applied in liquidating the existing debts and liabilities of the company, and the residue secured for its benefit. And that, for the purposes aforesaid, a receiver might be appointed to take possession of, recover and get in the lands, property and effects of the company, and for that purpose to sue in

the names of Harbottle and Bealey, or otherwise, as occasion might require; and that Harbottle, Adshead, Byrom, Westhead, Bealey and Bunting might be decreed to deliver up to **[484]** such receiver the property, effects, deeds, muniments and documents belonging to the company. And that the same Defendants might be restrained by injunction from holding, receiving or intermeddling with the property and effects of the company, and from executing, or causing to be executed, under the common seal of the company, any deed or instrument conveying, assigning or disposing of the same. And that Harbottle, Denison, Bunting and Lane might be restrained from entering or distraining upon any of the said lands sold by them to or in trust for the company as aforesaid. And the Plaintiffs thereby offered to pay into Court the amount of the unpaid calls due from them to the company.

The Defendants, Harbottle, Adshead and Westhead, demurred to the bill, assigning for cause want of equity, want of parties and multifariousness; and suggesting that all the proprietors of shares in the company, the assignees of P. Leicester, and the owners of land named in the schedule to the Act, were necessary parties. The Defendant Bealey, the Defendant Denison and the Defendants Bunting and Lane also put in three several demurrers, assigning like causes.

Mr. Lowndes and Mr. Rolt, in support of the demurrers of Harbottle, Adshead and Westhead, and of Bunting and Lane.

Mr. Walker and Mr. Glasse, in support of the demurrers of Bealey and Denison.

Mr. James Russell, Mr. Roupell and Mr. Bartrum, for the bill.

**[485]** On the part of the Defendants it was contended that the suit complaining of injuries to the corporation was wholly informal in having only some of its individual members, and not the corporation itself, before the Court; that this defect would not be cured by adding the corporation as parties Defendants, for the Plaintiffs were not entitled to represent the corporate body, even as distinguished from the Defendants and for the purpose of impeaching the transactions complained of; and the Plaintiff's bill could not therefore be sustained.

It was further argued that the Plaintiffs, if they had any ground for impeaching the conduct of the Defendants, might have used the name of the corporation; and, in that case, it would have been open to the Defendants, or to the body of directors or proprietors assuming the government of the company, to have applied to the Court for the stay of proceedings, or to prevent the use of the corporate name; and, upon that application, the Court would have inquired into the alleged usurpation or abuse of authority, and determined whether the Plaintiff should be permitted to proceed. Or the suit might have been in the shape of an information by the Attorney-General to correct the alleged abuse of powers granted for public purposes. The statements of fact in the bill, it was also contended, did not support the general charges of fraud upon which the title to relief was founded. Several other points of equity, as applicable to the cases made against the several Defendants, and in respect of the suggested defects of parties, were also made, but the judgment did not turn on these points.

On the part of the Plaintiff, so far as related to the **[486]** point on which the decision proceeded, namely, their right to sustain the bill on behalf of themselves and the other shareholders against the Defendants, without regard to the corporate character of the body, it was argued that the company was not to be treated as an ordinary corporation; that it was in fact a mere partnership, having objects of private benefit, and that it must be governed by rules analogous to those which regulated partnerships or joint stock companies, consisting of numerous persons, but not incorporated. The Act of Incorporation was intended to be beneficial to the company, and to promote the undertaking, but not to extinguish any of the rights of the proprietors *inter se.* The directors were trustees for the Plaintiffs to the extent of their shares in the company; and the fact that the company had taken the form of a corporation would not be allowed to deprive the *cestui que trusts* of a remedy against their trustees for the abuse of their powers. The Act of Incorporation, moreover, expressly exempted the proprietors of the company, or persons dealing with the company, from the necessity of adopting the form of proceeding applicable to a pure corporation; for the 74th section (*supra*, p. 464, n.) enabled them to sue and be sued

FOSS *v.* HARBOTTLE                201

in the name of the treasurer, or any one of the directors for the time being : the bill alleged that the two remaining directors had refused to institute the suit, and shewed, in fact, that it would be against their personal interest to do so, inasmuch as they were answerable in respect of the transactions in question ; if the Plaintiffs could not, therefore, institute the suit themselves they would be remediless.  The directors were made Defendants ; and, under the 74th clause of the Act, any one of the directors might be made the **[487]** nominal representative of the company ; the corporation was therefore distinctly represented in the suit.  The present proceeding was, in fact, the only form in which the proprietors could now impeach the conduct of the body to whom their affairs had been intrusted.  The 38th section expressly excluded any proprietor, not being a director, from interfering in the management of the business of the company on any pretence whatever.  The extinction of the board of directors by the bankruptcy and consequent disqualification of three of them (sect. 67), and the want of any clerk or office, effectually prevented the fulfilment of the form which the 46th, 47th and 48th sections of the Act required, in order to the due convening of a general meeting of proprietors competent to secure the remaining property of the company, and provide for its due application.

The following cases were cited during the argument :—*The Charitable Corporation* v. *Sutton* (2 Atk. 400), *Attorney-General* v. *Jackson* (11 Ves. 365), *Adley* v. *The Whitstable Company* (17 Ves. 315 ; 2 M. & Sel. 53 ; 19 Ves. 304 ; 1 Mer. 107, S. C.), *Blackburn* v. *Jepson* (3 Swans. 138), *Hichens* v. *Congreve* (4 Russ. 562), *Blain* v. *Agar* (2 Sim. 289), *Richards* v. *Davies* (2 R. & M. 347), *Ranger* v. *Great Western Railway Company* (1 Railway Cases, 1), *Seddon* v. *Connell* (10 Sim. 58, 79), *Preston* v. *Grand Collier Dock Company* (11 Sim. 327, S. C. ; 2 Railway Cases, 335), *Attorney-General* v. *Wilson* (Cr. & Ph. 1), *Wallworth* v. *Holt* (4 Myl. & Cr. 619), *Bligh* v. *Brent* (2 Y. & Coll. 295 ; *per* Alderson, B.), 6 Viner. Ab. 306, tit. Corporation, U., Bacon, Ab. tit. Statute, I. 2.

**[488]** *March* 25.  THE VICE-CHANCELLOR [Sir James Wigram].  The relief which the bill in this case seeks, as against the Defendants who have demurred, is founded on several alleged grounds of complaint ; of these it is only necessary that I should mention two, for the consideration of those two grounds involves the principle upon which I think all the demurrers must be determined.  One ground is that the directors of the Victoria Park Company, the Defendants Harbottle, Adshead, Byrom and Bealey, have, in their character of directors, purchased their own lands of themselves for the use of the company, and have paid for them, or rather taken to themselves out of the monies of the company a price exceeding the value of such lands : the other ground is that the Defendants have raised money in a manner not authorized by their powers under their Act of Incorporation ; and especially that they have mortgaged or incumbered the lands and property of the company, and applied the monies thereby raised in effect, though circuitously, to pay the price of the land which they had so bought of themselves.

I do not now express any opinion upon the question whether, leaving out of view the special form in which the Plaintiffs have proceeded in the suit, the bill alleges a case in which a Court of Equity would say that the transactions in question are to be opened or dealt with in the manner which this bill seeks that they should be ; but I certainly would not be understood by anything I said during the argument to do otherwise than express my cordial concurrence in the doctrine laid down in the case of *Hichens* v. *Congreve* (4 Russ. 562) and other cases of that class.  I take those cases to be in accordance with the principles of this Court, and to be founded on **[489]** justice and commonsense.  Whether particular cases fall within the principle of *Hichens* v. *Congreve* is another question.  In *Hichens* v. *Congreve* property was sold to a company by persons in a fiduciary character, the conveyance reciting that £25,000 had been paid for the purchase ; the fact being that £10,000 only had been paid, £15,000 going into the hands of the persons to whom the purchase was entrusted.  I should not be in the least degree disposed to limit the operation of that doctrine in any case in which a person projecting the formation of a company invited the public to join him in the project, on a representation that he had acquired property which was intended to be applied for the purposes of the company.  I should strongly incline to hold that to be an invitation to the public to participate in the benefit of the property purchased, on the terms on which the projector had acquired it.  The fiduciary

V.-C. XII.—7*

character of the projector would, in such a case, commence from the time when he
first began to deal with the public, and would of course be controlled in equity by
the representation he then made to the public.   If persons, on the other hand, intend-
ing to form a company, should purchase land with a view to the formation of it, and
state at once that they were the owners of such land, and proposed to sell it at a price
fixed, for the purposes of the company about to be formed, the transaction, so far as
the public are concerned, commencing with that statement, might not fall within the
principle of *Hichens* v. *Congreve.*  A party may have a clear right to say : "I begin
the transaction at this time ; I have purchased land, no matter how or from whom, or
at what price ; I am willing to sell it a certain price for a given purpose."  It is not
necessary that I should determine the effect of the transactions that are stated to have
occurred in the present case.  I make these observations only that I may not be
supposed, from anything which fell from me during the argu-[490]-ment, to entertain
the slightest hesitation with regard to the application, in a proper case, of the principles
I have referred to.  For the present purpose I shall assume that a case is stated
entitling the company, as matters now stand, to complain of the transactions mentioned
in the bill.

The Victoria Park Company is an incorporated body, and the conduct with which
the Defendants are charged in this suit is an injury not to the Plaintiffs exclusively ;
it is an injury to the whole corporation by individuals whom the corporation entrusted
with powers to be exercised only for the good of the corporation.  And from the case
of *The Attorney-General* v. *Wilson* (Cr. & Ph. 1) (without going further) it may be stated
as undoubted law that a bill or information by a corporation will lie to be relieved in
respect of injuries which the corporation has suffered at the hands of persons standing
in the situation of the directors upon this record.  This bill, however, differs from that
in *The Attorney-General* v. *Wilson* in this—that, instead of the corporation being formally
represented as Plaintiffs, the bill in this case is brought by two individual corporators,
professedly on behalf of themselves and all the other members of the corporation, except
those who committed the injuries complained of—the Plaintiffs assuming to themselves
the right and power in that manner to sue on behalf of and represent the corporation
itself.

It was not, nor could it successfully be, argued that it was a matter of course for
any individual members of a corporation thus to assume to themselves the right of
suing in the name of the corporation.  In law the corporation and the aggregate
members of the corporation are not the same thing for purposes like this ; and the
[491] only question can be whether the facts alleged in this case justify a departure
from the rule which, *primâ facie,* would require that the corporation should sue in its
own name and in its corporate character, or in the name of someone whom the law
has appointed to be its representative.

The demurrers are—first, of three of the directors of the company, who are also
alleged to have sold lands to the corporation under the circumstances charged ;
secondly, of Bealey, also a director, alleged to have made himself amenable to the
jurisdiction of the Court to remedy the alleged injuries, though he was not a seller
of land ; thirdly, of Denison, a seller of land, in like manner alleged to be implicated
in the frauds charged, though he was not a director ; fourthly, of Mr. Bunting, the
solicitor, and Mr. Lane, the architect of the company.  These gentlemen are neither
directors nor sellers of lands, but all the frauds are alleged to have been committed
with their privity, and they also are in this manner sought to be implicated in them.
The most convenient course will be to consider the demurrer of the three against whom
the strongest case is stated ; and the consideration of that case will apply to the
whole.

The first objection taken in the argument for the Defendants was that the
individual members of the corporation cannot in any case sue in the form in which
this bill is framed.  During the argument I intimated an opinion, to which, upon
further consideration, I fully adhere, that the rule was much too broadly stated on
the part of the Defendants.  I think there are cases in which a suit might properly
be so framed.  Corporations like this, of a private nature, are in truth little more than
private partnerships ; and in cases which may easily be suggested it would be too
much to hold that a society [492] of private persons associated together in under-

takings, which, though certainly beneficial to the public, are nevertheless matters of private property, are to be deprived of their civil rights, *inter se*, because, in order to make their common objects more attainable, the Crown or the Legislature may have conferred upon them the benefit of a corporate character. If a case should arise of injury to a corporation by some of its members, for which no adequate remedy remained, except that of a suit by individual corporators in their private characters, and asking in such character the protection of those rights to which in their corporate character they were entitled, I cannot but think that the principle so forcibly laid down by Lord Cottenham in *Wallworth v. Holt* (4 Myl. & Cr. 635; see also 17 Ves. 320, *per* Lord Eldon) and other cases would apply, and the claims of justice would be found superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue.

But, on the other hand, it must not be without reasons of a very urgent character that established rules of law and practice are to be departed from, rules which, though in a sense technical, are founded on general principles of justice and convenience; and the question is whether a case is stated in this bill entitling the Plaintiffs to sue in their private characters. [His Honor stated the substance of the Act, sections 1, 38, 39, 43, 46, 47, 48, 49, 67, 70, 114 and 129 (*supra*, p. 464, n. *et seq.*).] The result of these clauses is that the directors are made the governing body, subject to the superior control of the proprietors assembled in general meetings; and, as I understand the Act, the proprietors so assembled have power, due notice being given of the purposes of the meeting, to originate proceedings for any purpose within [493] the scope of the company's powers, as well as to control the directors in any Acts which they may have originated. There may possibly be some exceptions to this proposition, but such is the general effect of the provisions of the statute.

Now, that my opinion upon this case may be clearly understood, I will consider separately the two principal grounds of complaint to which I have adverted, with reference to a very marked distinction between them. The first ground of complaint is one which, though it might *primâ facie* entitle the corporation to rescind the transactions complained of, does not absolutely and of necessity fall under the description of a void transaction. The corporation might elect to adopt those transactions, and hold the directors bound by them. In other words, the transactions admit of confirmation at the option of the corporation. The second ground of complaint may stand in a different position; I allude to the mortgaging in a manner not authorized by the powers of the Act. This, being beyond the powers of the corporation, may admit of no confirmation whilst any one dissenting voice is raised against it. This distinction is found in the case of *Preston v. The Grand Collier Dock Company* (11 Sim. 327, S. C.; 2 Railway Cases, 335).

On the first point it is only necessary to refer to the clauses of the Act to shew that, whilst the supreme governing body, the proprietors at a special general meeting assembled, retain the power of exercising the functions conferred upon them by the Act of Incorporation, it cannot be competent to individual corporators to sue in the manner proposed by the Plaintiffs on the present record. This in effect purports to be a suit by *cestui que trusts* complaining of a fraud committed or [494] alleged to have been committed by persons in a fiduciary character. The complaint is that those trustees have sold lands to themselves, ostensibly for the benefit of the *cestui que trusts*. The proposition I have advanced is that, although the Act should prove to be voidable, the *cestui que trusts* may elect to confirm it. Now, who are the *cestui que trusts* in this case? The corporation, in a sense, is undoubtedly the *cestui que trust*; but the majority of the proprietors at a special general meeting assembled, independently of any general rules of law upon the subject, by the very terms of the incorporation in the present case, has power to bind the whole body, and every individual corporator must be taken to have come into the corporation upon the terms of being liable to be so bound. How then can this Court act in a suit constituted as this is, if it is to be assumed, for the purposes of the argument, that the powers of the body of the proprietors are still in existence, and may lawfully be exercised for a purpose like that I have suggested? Whilst the Court may be declaring the acts complained of to be void at the suit of the present Plaintiffs, who in fact may be the only proprietors who disapprove of them, the governing body of proprietors may

defeat the decree by lawfully resolving upon the confirmation of the very acts which are the subject of the suit. The very fact that the governing body of proprietors assembled at the special general meeting may so bind even a reluctant minority is decisive to shew that the frame of this suit cannot be sustained whilst that body retains its functions. In order then that this suit may be sustained it must be shewn either that there is no such power as I have supposed remaining in the proprietors, or, at least, that all means have been resorted to and found ineffectual to set that body in motion: this latter point is nowhere suggested in the bill: there is no suggestion that an attempt has been made by any proprietor to set the body of proprietors in [495] motion, or to procure a meeting to be convened for the purpose of revoking the acts complained of. The question then is whether this bill is so framed as of necessity to exclude the supposition that the supreme body of proprietors is now in a condition to confirm the transactions in question; or, if those transactions are to be impeached in a Court of Justice, whether the proprietors have not power to set the corporation in motion for the purpose of vindicating its own rights.

[His Honor recapitulated the history and present situation of the company, as it appeared upon the bill.]

I pause here to examine the difficulty which is supposed by the bill to oppose itself to the body of proprietors assembling and acting at an extraordinary general meeting. The 48th section of the Act says that a certain number of proprietors may call such a meeting by means of a notice to be addressed to the board of directors, and left with the clerk or secretary, at the principal office of the company, one month before the time of meeting, or the board is not bound to notice it. The bill says that there is no board of directors properly constituted, no clerk, no principal office of the company, no power of electing more directors, and that, the appointment of the clerk being in the board of directors, no clerk can in fact now be appointed. I am certainly not prepared to go the whole length of the Plaintiff's argument founded upon the 48th section. I admit that the month required would probably be considered imperative; but is not the mode of service directory only? Could the board of directors *de facto*, for the time being, by neglecting to appoint a clerk or have a principal office, deprive the superior body, the body of proprietors, of the power which the Act gives that body over the board of directors? Would not a notice in substance, a notice for example such as the 129th sec-[496]-tion provides for in other cases, be a sufficient notice? Is not the particular form of notice which is pointed out by the 48th section a form of notice given only for the convenience of the proprietors and directors? And if an impediment should exist, and, *à fortiori*, if that impediment should exist by the misconduct of the board of directors, it would be difficult to contend with success that the powers of the corporation are to be paralyzed, because there is no clerk on whom service can be made. I require more cogent arguments than I have yet heard to satisfy me that the mode of service prescribed by the 48th section, if that were the only point in the case, is more than directory. The like observations will apply to the place of service; but, as to that, I think the case is relieved from difficulty by the fact that the business of the company is stated to be principally conducted at the office of the solicitors, for I am not aware that there is anything in the statute which attaches any peculiar character to the spot designated as the principal office. In substance, the board of directors *de facto*, whether qualified or not, carry on the business of the company at a given place, and under this Act of Parliament it is manifest that service at that place would be deemed good service on the company.

If that difficulty were removed, and the Plaintiff should say that by the death or bankruptcy of directors, and the carelessness of proprietors (for that term must be added), the governing body has lost its power to act, I should repeat the inquiries I have before suggested, and ask whether, in such a case also, the 48th section is not directory, so far as it appears to require the refusal or neglect of the board of directors to call a general meeting, before the proprietors can by advertisement call such a meeting for themselves. Adverting to the undoubted powers conferred upon the proprietors to hold special general meetings without the consent and [497] against the will of the board of directors, and the permanent powers which the body of proprietors must of necessity have, I am yet to be persuaded that the existence of this corporation (for without a lawful governing body it cannot usefully or practically

continue) can be dependent upon the accidents which at any given moment may reduce the number of directors below three. The board of directors, as I have already observed, have no power to put a *veto* upon the will of any ten proprietors who may desire to call a special general meeting; and if ten proprietors cannot be found who are willing to call a special general meeting, the Plaintiffs can scarcely contend that this suit can be sustained. At all events what is there to prevent the corporators from suing in the name of the corporation? It cannot be contended that the body of proprietors have not sufficient interest in these questions to institute a suit in the name of the corporation. The latter observations, I am aware, are little more than another mode of putting the former questions which I have suggested. I am strongly inclined to think, if it were necessary to decide these points, it could not be successfully contended that the clauses of the Act of Parliament which are referred to are anything more than directory, if it be, indeed, impossible from accident to pursue the form directed by the Act. I attribute to the proprietors no power which the Act does not give them: they have the power, without the consent and against the will of the directors, of calling a meeting, and of controlling their acts; and if by any inevitable accident the prescribed form of calling a meeting should become impracticable, there is still a mode of calling it, which, upon the general principles that govern the powers of corporations, I think would be held to be sufficient for the purpose.

It is not, however, upon such considerations that I **[498]** shall decide this case. The view of the case which has appeared to me conclusive is that the existence of a board of directors *de facto* is sufficiently apparent upon the statements in the bill. The bankruptcy of Westhead, the last of the three directors who became bankrupt, took place on the 2d of January 1840: the bill alleges that he thereupon ceased to be *qualified* to act as director, and his office became vacated; but it does not say that he ceased to *act* as a director; nor, although it is said that thenceforward there was no board "properly constituted," is it alleged that there was no board *de facto* exercising the functions of directors. These, and several other statements of the bill, are pregnant with the admission of the existence of a board *de facto*. By whom was the company governed, and its affairs conducted, between the time of Westhead's bankruptcy and that of the bill in October 1842? What directors or managers of the business of the company have lent their sanction to the mortgages and other transactions complained of, as having taken place since January 1840, and by which the corporation is said or supposed to be, at least to some extent, legally bound? Whatever the bill may say of the *illegal* constitution of the board of directors, because the individual directors are not duly qualified, it does not anywhere suggest that there has not been during the whole period, and that there was not when the bill was filed, a board of directors *de facto*, acting in and carrying on the affairs of the corporation, and whose acting must have been acquiesced in by the body of proprietors; at least, ever since the illegal constitution of the board of directors became known, and the acts in question were discovered. But if there has been or is a board *de facto*, their acts may be valid, although the persons so acting may not have been duly qualified. The 114th section (not stated in the bill) of the Act provides **[499]** that all acts, deeds and things done or executed at any meeting of the directors, by any person acting as a director of the said company, shall, notwithstanding it may afterwards be discovered that there was some defect or error in the appointment of such director, or that such director was disqualified, or being an *interim* director, was disapproved of by an annual general meeting of proprietors, be as valid and effectual as if such person had been duly appointed and was qualified to be a director. The foundation upon which I consider the Plaintiffs can alone have a right to sue in the form of this bill must wholly fail, if there has been a governing body of directors *de facto*. There is no longer the impediment to convening a meeting of proprietors, who by their vote might direct proceedings like the present to be taken in the name of the corporation or of a treasurer of the corporation (if that were necessary); or who, by rejecting such a proposal, would, in effect, decide that the corporation was not aggrieved by the transactions in questions. Now, since the 2d of January 1840, there must have been three annual general meetings of the company held in July in every year, according to the provisions of the Act. These

annual general meetings can only be regularly called by the board of directors. The bill does not suggest that the requisitions of the Act have not been complied with in this respect, either by omitting to call the meeting, or by calling it informally ; but the bill, on the contrary, avers that several general meetings and extraordinary general meetings, and other meetings of the shareholders of the company, were duly convened and held at divers times between the time when the company was established and the year 1841 ; including, therefore, in this period of formality of proceeding, as well as of capacity in constitution, an entire year after Westhead's bankruptcy.

[500] Another statement of the bill leading to the same inference—the existence of an acting board—is that which avers that since the year 1839 down, in fact, to the time of filing the bill, that is, during these three years, the company has had no office of its own, but the affairs of the company have been principally conducted at the office of Mr. Bunting. Now this, as I must read it, is a direct admission that the affairs of the company have been carried on by some persons. By whom then have they been carried on ? The statute makes the board of directors the body by whom alone those affairs are to be ordered and conducted. There is no other person or set of persons empowered by the Act to conduct the affairs of the company ; and there is no allegation in the bill that any persons, other than the board of directors originally appointed, have taken upon themselves that business. In the absence of any special allegation to the contrary I am bound to assume that the affairs of the company have been carried on by the body in whom alone the powers for that purpose were vested by the Act, namely, a board of directors.

Again the bill alleges that, since the bankruptcy of Westhead, the bankrupts have joined in executing the conveyances of the property of the company to mortgagees. It could only have been in the character of directors that they could confer any title by the conveyance ; in that character the mortgagees would have required them to be parties, and it is in that character that I must assume they executed the deeds.

If the case rested here, I must of necessity assume the existence of a board of directors, and in the absence of any allegation that the board *de facto*, in whose acting the company must, upon this bill, be taken to have acquiesced, have been applied to and have refused to ap-[501]-point a clerk and treasurer (if that be necessary), or take such other steps as may be necessary for calling a special general meeting, or had refused to call such special general meeting, the bill does not exclude every case which the pleader was bound to exclude in order to justify a suit on behalf of a corporation, in a form which assumes its practical dissolution. But the bill goes on to shew that special general meetings have been holden since January 1840. The bill, as I have before observed, states that several general meetings and extraordinary general meetings have been holden between the establishment of the company and the year 1841, not excluding the year 1840, which was during Westhead's disqualification, "and that at such meetings false and delusive statements respecting the circumstances and prospects of the company were made by the said directors of the company to the proprietors who attended such meetings, and the truth of the several fraudulent and improper acts and proceedings herein complained of was not disclosed ; " and the bill specifies some meetings in particular. Against the pleader I must intend that some such meetings may have been holden at a time when there was no board properly constituted, and no clerk or treasurer or principal office of the company, save such as appear by the bill to have existed ; and if that were so, the whole of the case of the Plaintiffs, founded on the impracticability of calling a special general meeting, fails. Assuming then, as I am bound to do, the existence, for some time at least, of a state of things in which the company was governed by a board of directors *de facto*, some of the members of which were individually disqualified, and in which, notwithstanding the want of a clerk, treasurer or office, the powers of the proprietors were called into exercise at general meetings, the question is, when did that state of things cease to exist, so as to justify the extraordinary proceeding of the Plain-[502]-tiffs by this suit ? The Plaintiffs have not stated by their bill any facts to shew that such was not the actual state of things at the time their bill was filed, and, in the absence of any statement to the contrary, I must intend that it was so.

The case of *Preston* v. *The Grand Collier Dock Company* was referred to as an example of a suit in the present form ; but there the circumstances were in no respect parallel with the present : the object of that suit was to decide the rights or liabilities of one class of the members of the corporation against another, in respect of a matter in which the corporation itself had no power to vary the situation of either.

I have applied strictly the rule of making every intendment against the pleader in this case—that is, of intending everything to have been lawful and consistent with the constitution of the company, which is not expressly shewn on the bill to have been unlawful or inconsistent with that constitution.   And I am bound to make this intendment, not only on the general rule, but also on the rules of pleading which require a Plaintiff to frame his case so distinctly and unambiguously, that the Defendant may not be embarrassed in determining on the form which his defence should assume.   *Attorney-General* v. *Corporation of Norwich* (2 Myl. & Cr. 406). The bill, I cannot but observe, is framed with great care, and with more than ordinary professional skill and knowledge ; but the averments do not exclude that which, *primâ facie*, must be taken to have been the case, that during the years 1840, 1841 and 1842 there was a governing body, that by such body the business of the company was carried on, that there was no insurmountable impediment to the **[503]** exercise of the powers of the proprietors assembled in general meetings to control the affairs of the company, and that such general meetings were actually held.   The continued existence of a board *de facto* is not merely not excluded by the averments, but the statements in the bill of the acts which have been done suppose, and even require, the existence of such a board.   Now, if the Plaintiff had alleged that there had been no board of directors *de facto*, and had on that ground impeached the transactions complained of, the Defendants might have met the case by plea, and thereby have defended themselves from answering the bill.   If it should be said that the Defendants might now have pleaded that there was a board of directors *de facto*, the answer is that they might then have been told that the fact sufficiently appeared upon the bill, and therefore they ought to have demurred.   Uncertainty is a defect in pleading of which advantage may be taken by demurrer.   If I were to overrule these demurrers, I might be depriving the Defendants of the power of so protecting themselves ; and that because the Plaintiff has not chosen, with due precision, to put forward that fact, which, if alleged, might have been met by plea, but which, not being so alleged, leaves the bill open to demurrer.

I must further observe that, although the bill does, with great caution, attempt to meet every case which, it was supposed, might have been fatal to it upon demurrer, yet it is by allegations of the most general kind, and many of which cannot by possibility be true.   It alleges the recent discovery of the acts complained of, but it gives no allegation whatsoever for the purpose of telling when or how such discovery was made, or what led to it.   I am bound to give the Plaintiff, on a general demurrer, the benefit of the allegation that the matters complained of have been recently discovered, whatever the term " re-**[504]**cently discovered " may mean ; but when I look into the schedule to the Act I find that many of those matters must have been known at a very early period in the history of the company.   I find also provisions of the Act requiring that books shall be kept in which all transactions shall be fully and fairly stated ; and I do not find in the bill anything like a precise allegation that the production of those books would not have given the information, or that there have not been means of seeing those books at least at some time since 1835, or since the transactions in question took place, so that, in point of fact, many of the transactions might and may have been sooner known.   These are observations upon which I do not found my judgment, but which I use as explaining why it is I have felt bound in favour of the Defendants to construe this bill with strictness.

The second point which relates to the charges and incumbrances alleged to have been illegally made on the property of the company is open to the reasoning which I have applied to the first point, upon the question whether, in the present case, individual members are at liberty to complain in the form adopted by this bill ; for why should this anomalous form of suit be resorted to, if the powers of the corporation may be called into exercise ?   But this part of the case is of greater difficulty upon the merits.   I follow, with entire assent, the opinion expressed by the Vice-

Chancellor in *Preston* v. *The Grand Collier Dock Company*, that if a transaction be void, and not merely voidable, the corporation cannot confirm it, so as to bind a dissenting minority of its members.   But that will not dispose of this question.   The case made with regard to these mortgages or incumbrances is, that they were executed in violation of the provisions of the Act.   The mortgagees are not Defendants to the bill, nor does the bill seek to avoid the **[505]** security itself, if it could be avoided, on which I give no opinion.   The bill prays inquiries with a view to proceedings being taken *aliunde* to set aside these transactions against the mortgagees.   The object of this bill against the Defendants is to make them individually and personally responsible to the extent of the injury alleged to have been received by the corporation from the making of the mortgages.   Whatever the case might be, if the object of the suit was to rescind these transactions, and the allegations in the bill shewed that justice could not be done to the shareholders without allowing two to sue on behalf of themselves and others, very different considerations arise in a case like the present, in which the consequences only of the alleged illegal Acts are sought to be visited personally upon the directors.   The money forming the consideration for the mortgages was received, and was expended in, or partly in, the transactions which are the subject of the first ground of complaint.   Upon this, one question appears to me to be, whether the company could confirm the former transactions, take the benefit of the money that has been raised, and yet, as against the directors personally, complain of the acts which they have done, by means whereof the company obtains that benefit which I suppose to have been admitted and adopted by such confirmation.   I think it would not be open to the company to do this ; and my opinion already expressed on the first point is that the transactions which constitute the first ground of complaint may possibly be beneficial to the company, and may be so regarded by the proprietors, and admit of confirmation.   I am of opinion that this question—the question of confirmation or avoidance—cannot properly be litigated upon this record, regard being had to the existing state and powers of the corporation, and that therefore that part of the bill which seeks to visit the directors personally with the consequences of the impeached mortgages and charges, the benefit of which **[506]** the company enjoys, is in the same predicament as that which relates to the other subjects of complaint.   Both questions stand on the same ground, and, for the reasons which I stated in considering the former point, these demurrers must be allowed.

**[506]** WOODWARD *v.* CONEBEER.   *April* 27, 28, *May* 11, 25, 1843.

[S. C. 1 Hare, 297.]

A Defendant, in custody for not answering, and brought up to have the bill taken *pro confesso* against him, within the time limited by the statute, 1 W. 4, c. 36, s. 15, rule 13, asked for time to put in his answer, and three weeks was thereupon given him, with liberty to apply for his discharge upon having answered.   The time fixed by the same rule of the statute for retaining a Defendant in custody, without obtaining the order for taking the bill *pro confesso*, expired during the three weeks : no answer was put in.   Held that, in such circumstances, the Defendant was not entitled to his discharge under the 13th rule of the statute, but was remitted to the situation he would have been in if that provision of the statute had not existed.

The process against the Defendant, up to the time that he was committed to the Fleet, *cum causis*, is stated in a former report of proceedings in this cause.   (Vol. 1, p. 297.)   On the 9th of May 1842 the Defendant was brought up by *habeas corpus*, in order that the bill might be taken *pro confesso* against him : the Defendant then asked for time to put in his answer ; the Plaintiff did not oppose the Defendant's application, and three weeks' time was given.(1)   No answer was, however, put in.

---

(1) The Order of the 9th of May 1842 was as follows :—" Whereas by an order, dated the 21st day of February 1842, it was ordered that the Defendant, R. Conebeer,

**TAB B**

[1957] 1 W.L.R. 1247                                                                 Page 1
1957 WL 17460 (Ch D), [1958] 1 All E.R. 56, [1957] 1 W.L.R. 1247, (1957) 101 S.J. 974
(Cite as: [1957] 1 W.L.R. 1247)

**\*1247** Birch v. Sullivan and Another
1957 B. No. 2628

Chancery Division
Ch D
Harman J.
1957 Nov. 26, 27

Company-
-Shareholder--Bankruptcy--Misfeasance action by
minority shareholder-- Company as defendant-
-Allegations to be pleaded in statement of claim-
-Whether bankrupt shareholder can maintain action
while still on the register-- R.S.C., Ord. 25, r. 4.

Company--Misfeasance action.

Bankruptcy--Company--Bankruptcy of share-
holder--Whether entitled to maintain misfeasance
action against company.

Where a misfeasance action is brought by a
minority shareholder (suing on behalf of himself
and other shareholders) in which the company and
the remaining shareholders are defendants, it must
be proved not only at the trial but also stated in the
statement of claim why the action cannot be
brought in the name of the company, and the alleg-
ations on which that is founded.

Pavlides v. Jensen [1956] Ch. 565; [1956] 3
W.L.R. 224; [1956] 2 All E.R. 518 considered.

*Semble* that a bankrupt minority shareholder
can bring an action against the company even after
his adjudication while he remains on the register.

Procedure SummonsThe defendants, Michael
Sullivan Ltd. and Michael Sullivan, on this proced-
ure summons, asked that the statement of claim be
struck out under R.S.C., Ord. 25, r. 4, or alternat-
ively, under the inherent jurisdiction of court, on
the grounds, inter alia, that (a) the plaintiff, Albert
Ralph Edward Birch, was adjudicated bankrupt on
January 5, 1956, and no order having been made
since for his discharge he had no right or title to sue

and his statement of claim disclosed no reasonable
cause of action against the defendants or either of
them, and was frivolous and vexatious; (b) the
plaintiff's statement of claim disclosed no cause of
action, in that in respect of the matters complained
of therein the defendant company alone would have
had any right or title to sue the defendant Sullivan.

The statement of claim, so far as relevant, al-
leged: the defendant company was incorporated in
1947 to carry on business as proprietors of con-
certs, variety agencies and allied objects. The
plaintiff and the defendant Sullivan were, and at all
material times had both been, shareholders of the
defendant company, the £100 issued and authorized
capital of the company being held as follows: the
plaintiff, 25 preference and 20 ordinary shares; the
defendant Sullivan, 25 preference and 24 ordinary
shares; one Anne Eileen Birch, five ordinary
shares; and one Mildred Simmons, formerly Sulli-
van, one ordinary share.

The defendant Sullivan was, and at all material
times had been, director of the company.

**\*1248** A second company was incorporated in
1950, in which the plaintiff held 17 shares and the
defendant 16 shares of the authorized and issued
capital of 100 £1 shares. The defendant was direct-
or of that company, which had been promoted by
the plaintiff and the defendant Sullivan to act as ad-
junct to the defendant company. It was dissolved on
June 14, 1957.

From about 1951 or 1952 or at some other date,
including 1955, of which the plaintiff could not at
this stage give particulars, the company acted as
agents and managers of one Shirley Bassey, a stage
artiste, and for her part in the theatrical entertain-
ments in which she appealed.

The plaintiff could not at this stage give better
particulars of the contractual arrangements between
Shirley Bassey on the one hand and the company
on the other, save by reference to extracts from
books of the defendant company and the second

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1957 WL 17460 (Ch D), [1958] 1 All E.R. 56, [1957] 1 W.L.R. 1247, (1957) 101 S.J. 974

**(Cite as: [1957] 1 W.L.R. 1247)**

company for the year 1955; which showed that from April to September of that year one or other or both of the companies was or were booking engagements for Shirley Bassey in theatres in different parts of England, receiving her salary for the said engagements, taking and splitting commissions, and paying her expenses.

From about 1955 the popularity of Shirley Bassey with the public increased with exceptional rapidity and to an exceptional degree, so that as from such time she became and had (to an ever increasing extent) remained capable of earning large salaries.

In September, 1955, the defendant Sullivan, being then in de facto control both of the defendant and the second company, caused both of them to cease trade with the purpose and effect of acquiring for his own personal benefit, in breach of his duty and trust to the said companies as their director, and in fraud of the plaintiff as a shareholder, the profits to be gained from the continuance of the business of acting as agent and manager for Shirley Bassey. The defendant Sullivan had at all times since, under a contract or arrangement with Shirley Bassey of which the plaintiff could not give particulars at this stage, acted as her agent and manager, and continued so to do, and had in fact thereby diverted to himself to the loss and damage of the defendant company, and (until its dissolution) the second company, and of the plaintiff, very substantial profits and commissions thereby earned. The plaintiff could not at this stage give particulars of the profits or commissions.

**Representation**

Robert Boyd for the applicants, defendants in the action.

Morris Finer for the respondent, plaintiff in the action.

**The following cases, not referred to in the judgment, were cited in argument:**

Spokes v. Grosvenor Hotel Co. [FN1]; Cook v.

Deeks [FN2]; Morgan v. Gray. [FN3]

***1249** HARMAN J.

The first ground for the summons is that the plaintiff is an undischarged bankrupt, and was one when the writ was issued and the statement of claim was delivered, the latter being at the same time as the issue of the writ. The allegation here is that any rights of the plaintiff to bring an action are rights of property, or choses in action, which have devolved upon the trustee, and that the plaintiff is not therefore a competent plaintiff. At the date when the writ was issued and the statement of claim delivered, the plaintiff was still a registered holder of shares in the defendant company. Since those events the trustee in bankruptcy has had himself put on the register so that the plaintiff has no longer any interest in the shares, and it is now admitted that if anybody could maintain this action the trustee in bankruptcy alone could do so.

FN1 [1897] 2 Q.B. 124; 13 T.L.R. 431.

FN2 [1916] 1 A.C. 554.

FN3 [1953] Ch. 83; [1953] 2 W.L.R. 140; [1953] 1 All E.R. 213.

I need not, as things now stand, consider further whether when the writ was issued the plaintiff was entitled to sue. He certainly was not entitled to sue so far as a direct claim in his own favour was concerned, but it is at least possible that he was entitled as the registered holder of shares to complain of a wrong done to the company in which he was a registered shareholder. The circumstances under which a shareholder, if he be in the minority, may in his own name bring such an action, are well settled. Supposing all the conditions be present and the registered shareholder were not bankrupt, he would be in a position to bring an action because of the wrongful act of the director in not paying money to the company, and I am not satisfied that so long as he remains registered he could not maintain such an action even if he be a bankrupt. However that may be, he certainly can no longer maintain it when he has ceased to be a registered

1957 WL 17460 (Ch D), [1958] 1 All E.R. 56, [1957] 1 W.L.R. 1247, (1957) 101 S.J. 974
**(Cite as: [1957] 1 W.L.R. 1247)**

holder.

On that part of the claim, therefore, I should certainly stay the action so long as the plaintiff alone remained the plaintiff, giving a reasonable opportunity to the trustee to put the position right if he is minded to adopt the action.

As a second ground, it is said that the statement of claim is demurrable because it does not contain the necessary allegations. The nature of the case is that the individual defendant, in fraud of the rights of the defendant company, either terminated or did not renew a very advantageous contract which the defendant company had to manage or arrange for the services of a music hall actress. That had been done through this company for some time while, the actress was comparatively poor and obscure, but as the plaintiff says, when she began to get into what is called "the big money," the company ceased, in some mysterious way, to act for her or on her behalf, and Michael John Sullivan himself became the only director of her activities. That is said to have been a misfeasance as against the defendant company. Whether any such case can be proved, of course, I need not consider at this stage, but if all those facts could be proved then there would have been misfeasance by Michael John Sullivan. The person **1250** to complain of that undoubtedly is Michael Sullivan Ltd., but Michael John Sullivan is the only member of the board of that company. It is said that, by reason of his position and because he holds or controls half the shares of that company, he is in a position to prevent the company taking any action against him. If that were true, an action might lie at the suit of a minority or a frustrated shareholder suing on behalf of himself and all other members of the company other than the individual defendant himself. But the statement of claim does not, in my judgment, make any allegation necessary to found such an action. It would be necessary to allege, as well as thereafter to prove, that the plaintiff could not, by reason of the first defendant's opposition, obtain the name of the company to issue proceedings: that he was in the position in which the minority shareholders are in the comparatively rare cases where such actions have been allowed.

There has been a recent case on this subject, a decision of Danckwerts J., called Pavlides v. Jensen. [FN4] There Danckwerts J. went carefully into the question: did the law permit such an action? He concluded that as only negligence and not fraud was alleged in that particular case, the action was not within the rule in Foss v. Harbottle, [FN5] and could not be maintained. But it is clear enough from such extracts from the pleadings as there are in the report that those facts must not only be proved at the trial but must be alleged in the pleadings. The present pleading is defective in several respects.

FN4 [1956] Ch. 565; [1956] 3 W.L.R. 224; [1956] 2 All E.R. 518.

FN5 (1843) 2 Hare 461.

I propose, therefore, first of all, to stay the action so long as the plaintiff alone remains the plaintiff, with liberty to apply to dismiss it if the trustee in bankruptcy does not cause himself to be put on record as plaintiff within three months. Secondly, I propose to strike out the statement of claim without prejudice, nevertheless, to the right of the new plaintiff when added to deliver a fresh statement of claim, which he may do within 21 days of his becoming plaintiff.

**Representation**

Solicitors: Arnold & Co.; Henry E. Goodrich.

Order accordingly.

I. G. R. M.

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

**TAB C**

[1982] Ch. 204                                                                                                    Page 1
1981 WL 188137 (CA (Civ Div)), [1982] 1 All E.R. 354, [1982] Ch. 204, [1982] 2 W.L.R. 31
**(Cite as: [1982] Ch. 204)**

C

*204 Prudential Assurance Co. Ltd. v. Newman In-
dustries Ltd. and Others (No.
2)

[1976 P. No. 112]; [1982] 2 W.L.R. 31

Court of Appeal
CA

Cumming-Bruce, Templeman and Brightman L.JJ.
1981 March 23, 24, 25, 26, 27, 30, 31; April 1, 2, 3,
6, 7, 8, 9, 13, 14, 15,
28, 29, 30; May 1, 5, 6, 11, 12, 13, 14, 15, 18, 19,
20, 21, 22; June 2, 3, 4,
5, 10, 11, 22; July 27, 28, 30, 31; Oct. 5

Company--Shareholder--Rights against company
directors--Minority shareholder's action--Directors
advising acquisition of another company's assets-
-Majority of shareholders voting to acquire assets-
-Directors having no control over voting rights-
-Whether minority shareholder entitled to bring ac-
tion on behalf of itself, company and other share-
holders suffering damage-- Whether right to bring
derivative action to be determined as preliminary
issue

The plaintiffs, P Ltd., held 3.2 per cent. of the is-
sued ordinary shares in N Ltd., the first defendant.
B, the second defendant, was at the material time
the chairman and chief executive of N Ltd. and the
third defendant, L, was a non-executive director
and its vice-chairman. B was also the non-executive
chairman of the fourth defendant, T.P.G., and its
vice-chairman and chief executive.

Between 1972 and the end of 1974, T.P.G. acquired
the assets of S Ltd. whose shares were beneficially
owned by B and L and which owned 35 per cent. of
T.P.G.'s shares and some of N Ltd.'s shares. T.P.G.
increased its holding in Ltd. to 25 per cent. and also
acquired shares in various other companies which it
financed by the issue of its own shares and bank
loans. By January 1975, T.P.G. was in serious fin-
ancial difficulties and the "January agreements"
were entered into whereby, undisclosed to the

board of N Ltd., N Ltd. agreed to buy T.P.G.'s hold-
ings in two companies for £85,000 and £146,000
respectively, and under the agreement, unbeknown
to the board, N Ltd. paid £215,950.

B then prepared a memorandum ("the strategy doc-
ument") which recommended that the board of N
Ltd. should purchase from T.P.G. all its assets, ex-
cept its shareholding in N Ltd. and a loan from S
Ltd. of £100,000, in consideration of N Ltd. assum-
ing T.P.G.'s liabilities and paying T.P.G. the sum of
£350,000. At a board meeting all the directors ex-
cept M agreed to accept the proposals in principle.
On M's suggestion a report was obtained from N
Ltd.'s auditors. The January agreements were con-
cealed from the auditors who valued the assets as £
325,000 and the board of N Ltd. accepted that valu-
ation as a basis of negotiation.

On June 3, 1975, B signed the agreement on behalf
of N Ltd. ("the June agreement") for the purchase
of the assets of T.P.G. for £325,000 which was con-
ditional, as required by Stock Exchange regula-
tions, on the approval of the shareholders of N Ltd.
and T.P.G. Extraordinary general meetings *205 of
both companies were convened. The notice which
convened the extraordinary general meeting of N
Ltd. contained a letter signed by B, with documents
annexed ("the circular") which recommended share-
holders to vote in favour of the proposal and which
referred to a payment of £216,000 by N Ltd. as be-
ing an advance payment for the purchase of
T.P.G.'s assets. All the members of a committee of
the board approved the letter apart from M. The ex-
traordinary general meeting was postponed as a res-
ult of the pressure by M, the plaintiffs and other in-
stitutional investors in order that a report be pre-
pared by a merchant bank, but before the report was
ready, the meeting was held on July 29, 1975, and a
resolution passed approving the purchase of
T.P.G.'s assets by N Ltd.

By an amended writ and statement of claim, the
plaintiffs claimed, inter alia, declaratory relief and
as against B, L and T.P.G. damages on behalf of the

Case 1:07-cv-01646-RMC     Document 39-3     Filed 01/31/2008     Page 7 of 156

plaintiffs, N Ltd. and all the shareholders of N Ltd. on July 29, 1975, who like the plaintiffs had suffered damage and were entitled to relief. The plaintiffs were claiming in a direct capacity, in a derivative action on behalf of N Ltd. and in a representative capacity on behalf of the shareholders.

By a summons of May 10, 1979, the defendants applied to have heard as a preliminary issue whether the plaintiffs as a minority shareholder in N Ltd. were entitled to maintain the claim against them. On June 18, 1979, Vinelott J. refused the application and dismissed the summons.

On the hearing of the action in February 1980, Vinelott J. held, inter alia, that B and L, in order to benefit T.P.G. had conspired to injure N Ltd. and indirectly its shareholders whereby the shareholders had suffered damage and that, on the evidence, the interests of justice required that the plaintiffs as a minority shareholder in N Ltd. should be permitted to prosecute an action on behalf of the company.

On appeal by B and L:-

Held, allowing the appeal in part, (1) that on the evidence the serious findings against B and L of conspiracy and fraudulent conduct were not substantiated other than that they dishonestly concealed the January agreements and payments thereunder from the directors and shareholders of N Ltd. in order to facilitate the acceptance of the proposals in the strategy document; and that the dishonest concealment involved and included a misleading statement in the circular of the origin and purpose of the payment by N Ltd. of £216,000 to T.P.G. whereby the assets purchased by N Ltd. were overvalued by £45,000, thereby causing damage to N Ltd. by that amount (post, pp. 232B-D, 234D-E).

(2) That where fraud was practised on a company, it was the company that prima facie should bring the action and it was only in circumstances where the board of the company was under the control of the fraudsters that a derivative action should be brought; that the question whether a company was under the control of those practising an alleged fraud on it should be determined before a derivative

action was heard and, accordingly, the judge erred in not determining as a preliminary issue whether the plaintiffs should be allowed to proceed in their derivative action (post, pp. 211A, B, 221A-B); but that, since the action had been heard and N Ltd. had indicated that it would, as a party to the action, take the benefit of an order made in its favour, the question **\*206** whether the plaintiffs had status to bring the derivative action did not arise for determination (post, p. 220C-F).

*Per curiam.* It is doubtful whether it is a practical test of an exception to the rule in Foss v. Harbottle (1843) 2 Hare 461 that the justice of the case requires the bringing of a derivative action (post, pp. 221F - 222B). The right to bring a derivative action should not be determined as a preliminary issue on the hypothesis that all the allegations in the statement of claim of "fraud " and "control" are facts. Whatever may be the properly defined boundaries of the exception to the rule, the plaintiff before proceeding with his action ought at least to be required to establish a prima facie case that the company is entitled to the relief claimed and the action falls within the proper boundaries of the exception to the rule in Foss v. Harbottle (post, pp. 221F - 222B).

(3) That the plaintiffs' personal action, to which the representative action was linked, was an action to recover damages on the basis that the company in which the plaintiffs were interested had suffered damage; that, since the plaintiffs' right as holders of shares was merely a right of participation in the company on the terms of the articles of association, any damage done to the company had not affected that right and, accordingly, the action was misconceived (post, pp. 222F - 223B).

Order of Vinelott J. [1981] Ch. 257; [1980] 3 W.L.R. 543; [1980] 2 All E.R. 841 varied in part.

The following cases are referred to in the judgment:

Atwool v. Merryweather (1867) L.R. 5 Eq. 464; 37 L.J.Ch. 35.

Baillie v. Oriental Telephone and Electric Co. Ltd. [1915] 1 Ch. 503, C.A..

1981 WL 188137 (CA (Civ Div)), [1982] 1 All E.R. 354, [1982] Ch. 204, [1982] 2 W.L.R. 31

**(Cite as: [1982] Ch. 204)**

Clinch v. Financial Corporation (1868) L.R. 5 Eq. 450.

Cotter v. National Union of Seamen [1929] 2 Ch. 58, C.A..

East Pant Du United Lead Mining Co. Ltd. v. Merryweather (1864) 2 Hem. & M. 254.

Edwards v. Halliwell [1950] 2 All E.R. 1064, C.A..

Foss v. Harbottle (1843) 2 Hare 461.

Gray v. Lewis (1873) L.R. 8 Ch.App. 1035.

Heyting v. Dupont [1963] 1 W.L.R. 1192; [1963] 3 All E.R. 97; [1964] 1 W.L.R. 843; [1964] 2 All E.R. 273, C.A..

Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474.

The following additional cases were cited in argument:

Cockburn v. Thompson (1809) 16 Ves.Jun. 321.

Wallworth v. Holt (1841) 4 My1. &; Cr. 619.

APPEAL from Vinelott J.

The plaintiffs, Prudential Assurance Co. Ltd., held 3.2 per cent. of the issued ordinary shares of the first defendant, Newman Industries Ltd. The second defendant, Alan Frank Bartlett, was at the material time the chairman and chief executive of Newman and the third defendant, John Knox Laughton, was a non-executive director and its vice-chairman. Mr. Bartlett was also the non-executive chairman of the fourth defendant, Thomas Poole & Gladstone China Ltd. (T.P.G.) and Mr. Laughton its vice-chairman and chief executive.

**\*207** Between 1972 and the end of 1974, T.P.G. acquired interests in various companies including the assets of Strongpoint Ltd., whose shares were beneficially owned by Mr. Bartlett and Mr. Laughton and which owned 35 per cent. of the shares of T.P.G. and a number of Newman shares. T.P.G.

also increased its holding in Newman to 25 per cent. and acquired shares in Alfred Clough Ltd., S. Newman Ltd. (a private company), Dover Engineering Ltd., Metropole Industries Ltd. and Agar Cross Ltd. T.P.G. also formed a new company, Smithamcote Ltd., to acquire shares in two other companies in exchange for shares in Smithamcote. T.P.G. took 49 per cent. of voting shares of Smithamcote and sold to Smithamcote for £100,000 (which remained outstanding as a debt due from Smithamcote) shares of an investment company into which had been put T.P.G.'s minority holding of shares of S. Newman Ltd. T.P.G.'s acquisitions were financed by the issue of its own shares and loans from banks. By January 1975 it was in serious financial difficulty and, in those circumstances, the "January agreements" were entered into by which, undisclosed to the Newman board, Newman agreed to buy T.P.G.'s shareholdings in Metropole and Dover for £ 85,000 and £146,000 respectively. The amount was above the value of those shares on the Stock Exchange and, under the agreements, Newman paid £215,950 unknown to the Newman board, although the sum mentioned in the circular referred to below was £216,000.

Mr. Bartlett then prepared a memorandum ("the strategy document"), which made a recommendation to the Newman board, inter alia, that Newman should purchase from T.P.G. all its assets, except its shareholding in Newman and a loan from Strongpoint of £100,000, in consideration for Newman assuming T.P.G.'s liabilities and paying to T.P.G. the sum of £350,000. At a board meeting all the directors, except Mr. Angus Murray, agreed to accept the recommendation in principle and, on Mr. Murray's suggestion, a report was to be obtained from Newman's auditors, Deloitte & Co. Mr. Cooper of Deloitte made a valuation of the net assets to be acquired by Newman but, in making that valuation, the January agreements were concealed from him, and, after speaking to Mr. Laughton, he increased his provisional assessment of the assets from £235,000 to £325,000. The board accepted that valuation as a basis for negotiation. On June 3, Mr. Bartlett signed on behalf of Newman an agreement for the purchase of the assets of T.P.G. for

1981 WL 188137 (CA (Civ Div)), [1982] 1 All E.R. 354, [1982] Ch. 204, [1982] 2 W.L.R. 31
**(Cite as: [1982] Ch. 204)**

£325,000 ("the June agreement") but the agreement was conditional on the approval of Newman and T.P.G. As the agreement was between companies having among their directors the same people, the Stock Exchange regulations required that the agreement be approved at extraordinary general meetings of Newman and T.P.G. With the notice convening the extraordinary general meeting of Newman, a letter signed by Mr. Bartlett with documents annexed ("the circular") was sent to the shareholders. The letter stated that the directors of the Newman board recommended that the shareholders voted in favour of the proposal. The letter had been approved by the members of a committee of the board except for Mr. Murray, who objected to it on the basis that not all the directors had considered and approved the proposals. The extraordinary general meeting was postponed as a result of pressure from Mr. Murray, the plaintiffs and other institutional investors, so that **208** a report could be prepared by the merchant bankers, Schroder, Wagg & Co. The report could not be produced in time, and a resolution was passed at an extraordinary general meeting of Newman held on July 29, 1975, approving the purchase of T.P.G.'s assets by Newman.

By an amended writ and statement of claim, the plaintiffs, Prudential Assurance Co. Ltd., sued (i) on behalf of themselves and all the shareholders of Newman other than Mr. Bartlett and T.P.G.; (ii) in the plaintiffs' personal capacity; and (iii) on behalf of all the shareholders of Newman on July 29, 1975, who like the plaintiffs had suffered damage and were entitled to damages. They claimed, inter alia, a declaration that the circular sent by Newman to their shareholders and signed by Mr. Bartlett, was and had at all times been misleading and/or tricky; damages against Mr. Bartlett and Mr. Laughton for conspiracy and breach of duty; and further or in the alternative as against the fourth defendant T.P.G., a declaration that in entering into the agreement of June 3, 1975, or in the alternative in receiving the money under the terms of the agreement, when it knew or ought reasonably to have known that for Newman to enter into the agreement, upon the terms on which it did so, involved a conspiracy and breach of duty on the part

of Mr. Bartlett and Mr. Laughton, T.P.G. (a) acquired the benefit of the agreement as constructive trustees of Newman and, accordingly, held the benefit of the agreement on trust for Newman, and (b) was liable to account to Newman for the full amount of the loss suffered by Newman as a result of the acquisition of the benefit.

By their defence the defendants denied the allegations made by the plaintiffs and claimed that the plaintiffs were not entitled to any of the relief claimed. They sought to have heard as a preliminary issue whether the plaintiffs, as a minority shareholder in Newman, were entitled under the rule in Foss v. Harbottle (1843) 2 Hare 461 to maintain the claim against them. On June 18, 1979, Vinelott J. refused the defendants' application: see [1981] Ch. 229, 233.

Vinelott J. found that Mr. Bartlett and Mr. Laughton had conspired to injure Newman and indirectly the shareholders with the result that Newman had acquired T.P.G.'s assets for £445,000 more than Newman need have paid for them. He held that since the plaintiffs' personal, derivative and representative claims were all founded on the conspiracy to injure Newman, there was no objection to them being joined in one action, and, although Mr. Bartlett and Mr. Laughton did not have control of Newman, it was doubtful whether the shareholders would have the independent advice which would enable them to exercise a proper judgment on whether Newman should bring an action and, in those circumstances, justice required the court to entertain the action of a minority shareholder.

The defendants Mr. Bartlett and Mr. Laughton appealed. On July 27, 28, 30, 31 the Court of Appeal delivered a reserved judgment divided into seven chapters under the headings: (1) Introduction; (2) The position of Newman Ltd. and T.P.G. Ltd. on March 31, 1973; (3) Events after March 31, 1973; (4) The proceedings; (5) The law; (6) The examination **209** of the judgment of Vinelott J.; and (7) Conclusions. Only chapters 5 and 7 are included in this report.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1981 WL 188137 (CA (Civ Div)), [1982] 1 All E.R. 354, [1982] Ch. 204, [1982] 2 W.L.R. 31

**(Cite as: [1982] Ch. 204)**

On July 31, no order was made by the court and the matter was adjourned for argument on the form of the order and costs. On October 5 the parties stated that all outstanding matters between them had been settled.

The second and third defendants, Mr. Bartlett and Mr. Laughton, appeared in person on the hearing of the appeal.

*Leonard Caplan Q.C., Peter Curry Q.C.* and *Philip Heslop* for the plaintiffs.

*Robert Reid Q.C.* and *David Hodge* for the first defendant.

The fourth defendant did not appear and was not represented on the hearing of the appeal.

*Judith Jackson,* on October 5, for the second and third defendants.

*Jules Sher Q.C.* and *Charles Turnbull,* on October 5, for the fourth defendant.

*Caplan Q.C.* for the plaintiffs. The rule in Foss v. Harbottle (1843) 2 Hare 461 is a rule of procedure and not of substantive law. A minority shareholder can sue the company where the needs of justice so require. The rule is of respectable antiquity and on the facts of the present case, the plaintiffs were entitled to prosecute an action on behalf of the company as a minority shareholder in the interests of justice.

[On June 10, 1981, the court stated that argument on the exception to the rule in Foss v. Harbottle was not open to the plaintiffs as a demurrer because the preliminary issue was not the subject of appeal in the court. The preliminary point had been overtaken by the decision in the trial before Vinelott J. [1981] Ch. 257. For these reasons, the court did not wish to hear further argument on the matter.]

*Cur. adv. vult.*

July 27, 28, 30, 31. CUMMING-BRUCE, TEMPLEMAN and BRIGHTMAN L.JJ.

took it in turns to read the following judgment of the court. In the course of the introduction their Lordships said:

The great length of this judgment has naturally caused us to consider whether it would be sensible to hand down a typed or printed version, as an alternative to the many hours in court which will inevitably be spent on delivering our judgment. We have rejected this obvious and convenient expedient for two reasons. First, the appellants have been found guilty by the trial judge of a civil conspiracy in circumstances which, subject to stricter procedures, could equally well have led to their conviction on a charge of criminal conspiracy. In such circumstances we think that whichever way our verdict may go we should express our conclusions orally in open court. Secondly, the delay which would be caused by typing or printing and then proof-reading a written judgment suitable for handing down would postpone judgment over the Long Vacation. When men's reputations are at stake, we do not think it is right to impose an avoidable two months delay. [Having read chapters one to four, they continued:] **\*210** *Chapter 5 - The law*

As we have indicated, when, on January 9, 1976, the writ was issued the plaintiffs, Prudential Assurance Co. Ltd., sued only in their personal capacity and sought only to establish that the June agreement had not been duly approved at a valid meeting. When the writ was first amended in red on March 8, 1976, the title of the plaintiffs was altered so as to indicate that it was suing on behalf of Newman, the first defendant, using the time-honoured formula for this purpose "On behalf of themselves and all other shareholders, etc...." The writ was also amended by adding Mr. Laughton and T.P.G. as defendants. The writ was expanded by claiming as against T.P.G. rescission of the agreement and damages; and also, as against Mr. Bartlett and Mr. Laughton, damages for breach of duty and damages for conspiracy.

As we have already related, it was a matter of debate in the court below whether the action as reconstituted was exclusively a "derivative" action for an

1981 WL 188137 (CA (Civ Div)), [1982] 1 All E.R. 354, [1982] Ch. 204, [1982] 2 W.L.R. 31
**(Cite as: [1982] Ch. 204)**

injury allegedly done to Newman, as counsel for Mr. Bartlett and Mr. Laughton assumed, or was additionally a "personal" action for injury allegedly done to the plaintiffs and other shareholders. Whether the action as then constituted and the claim as then formulated could properly be regarded as pursuing both derivative and personal remedies is not a matter which we need to consider.

A derivative action is an exception to the elementary principle that A cannot, as a general rule, bring an action against B to recover damages or secure other relief on behalf of C for an injury done by B to C. C is the proper plaintiff because C is the party injured, and, therefore, the person in whom the cause of action is vested. This is sometimes referred to as the rule in Foss v. Harbottle (1843) 2 Hare 461 when applied to corporations, but it has a wider scope and is fundamental to any rational system of jurisprudence. The rule in Foss v. Harbottle also embraces a related principle, that an individual shareholder cannot bring an action in the courts to complain of an irregularity (as distinct from an illegality) in the conduct of the company's internal affairs if the irregularity is one which can be cured by a vote of the company in general meeting. We are not concerned with this aspect of the rule.

The classic definition of the rule in Foss v. Harbottle is stated in the judgment of Jenkins L.J. in Edwards v. Halliwell [1950] 2 All E.R. 1064 as follows. (1) The proper plaintiff in an action in respect of a wrong alleged to be done to a corporation is, prima facie, the corporation. (2) Where the alleged wrong is a transaction which might be made binding on the corporation and on all its members by a simple majority of the members, no individual member of the corporation is allowed to maintain an action in respect of that matter because, if the majority confirms the transaction, cadit quaestio; or, if the majority challenges the transaction, there is no valid reason why the company should not sue. (3) There is no room for the operation of the rule if the alleged wrong is ultra vires the corporation, because the majority of members cannot confirm the transaction. (4) There is also no room for the operation of the rule if the transaction complained of

could be validly done or sanctioned only by a special resolution or the like, because a simple majority cannot confirm **211 a transaction which requires the concurrence of a greater majority. (5) There is an exception to the rule where what has been done amounts to fraud and the wrongdoers are themselves in control of the company. In this case the rule is relaxed in favour of the aggrieved minority, who are allowed to bring a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue.

By their summons issued on May 10, 1979, Mr. Bartlett and Mr. Laughton invoked the rule in Foss v. Harbottle. After some 2 1/2 days of argument Vinelott J. dismissed the summons on June 18, 1979, not on the ground that the plaintiffs were entitled to bring a derivative action but on the ground that it was more convenient to decide that issue after the action had been tried. For reasons which we explain later we have no doubt whatever that that was a wrong decision.

Although not a party to the summons of May 10, Newman supported it. Newman was represented by leading counsel, who made a forceful statement on day 1 to the effect that, although the action was brought for the benefit of Newman, "it is the concern of the board that the company shall not be killed by kindness. " He added that not only was it the view of the board that the action was one which they did not wish to pursue on behalf of the company but that it was quite contrary to the interests of the company that the transaction should now be the subject of any rescission or criticism. He said: "I am therefore concerned ... that this action ... shall not proceed - a fortiori ... it should be disposed of as quickly as possible." This protest was repeated at the close of the plaintiffs' case on day 34, when counsel formally withdrew in order to avoid needless expense. This is what counsel then told the court:

"My clients, Newman Industries Ltd., are necessary formal parties to this action, but they are

1981 WL 188137 (CA (Civ Div)), [1982] 1 All E.R. 354, [1982] Ch. 204, [1982] 2 W.L.R. 31

**(Cite as: [1982] Ch. 204)**

neither prosecuting it as a corporate entity nor now defending it in a combative role. The circumstances of the case ... as far as my researches go are unique. They are unique from the company's point of view in this particular material respect in that, although the action is framed in part as a minority shareholder's action, there is in fact no shareholding or board control vested in the personal defendants. Indeed, as regards the Newman board Mr. Laughton has not been a director since before the commencement of this action, and Mr. Bartlett, although holding such office, has at all material times been but one only of a number of directors comprising the present Newman board. As I indicated briefly to your Lordship at the commencement of this trial, my learned junior and I were at pains to defend it by decision of the independent board, that is to say Mr. Bartlett taking no part in that decision. The independent board, so I have it, was motivated by the desire and wish that your Lordship might be afforded every assistance which a substantial public quoted company might be expected to render a court concerned with its affairs.... The independent board itself has throughout maintained the view that, whilst it was powerless to prevent the Prudential from pursuing the action, it was not one it, the independent board, *212 wished to adopt on Newman's behalf, nor had it been approached by any shareholder requesting that it should. It has been and in fact remains the view of the independent board that any advantage to the company which this action could procure for it is vastly outweighed by harm being inflicted upon it by the action continuing with the consequent adverse publicity and other side effects."

Observe what was being said on behalf of Newman to the judge: "any advantage to the company which this action could procure is *vastly outweighed* by harm being inflicted upon it." This was an apparently responsible statement made by eminent leading counsel on the instructions of persons said to be the independent members of the board. The judge does not refer to this statement in his judgment; he does not say that he did not believe it; he does not say that he regarded the independent members of the board as acting under the influence of Mr. Bartlett. He does not seem to have asked himself the

all-important question: "Ought I to be trying a derivative action?"

The assertion by Newman's counsel that the independent board "was powerless to prevent the Prudential from pursuing the action" may have been based on the supposition that the plaintiffs had on the facts alleged in the statement of claim a personal cause of action for damages against Mr. Bartlett and Mr. Laughton independently of Newman's cause of action for damages. This supposition, if it existed, was erroneous for reasons which we explain later. It would have been open to Newman to have issued its own summons before the trial in order to test the right of the Prudential to pursue a derivative action, and to have supported it with evidence proving the objectiveness of the board's view and explaining the potential injury to Newman which would be caused by the proceedings.

At the end of the day the judge found that a fraud had been committed by Mr. Bartlett and Mr. Laughton against Newman. The judge then addressed his mind to the question whether the right of a shareholder to sue in a case of fraud extended beyond a case of voting control by the wrongdoers. It was not pleaded, and could not be alleged, that Mr. Bartlett and Mr. Laughton had voting control. The conclusion reached by the judge was that a shareholder was entitled to prosecute an action on behalf of the company if "the interests of justice do require that a minority action should be permitted" see [1981] Ch. 257, 327; and that this was established in the instant case because the judge was satisfied on the evidence as a whole:

"that there was no way in which Prudential could have ensured that the question whether proceedings should be brought by Newman would be fairly put to the shareholders or even that a full investigation would be made into all the circumstances surrounding the transaction including in particular Mr. Cooper's valuation."

In widening the scope of the accepted exception to the rule in Foss v. Harbottle by holding that a derivative action can be maintained whenever the interests of justice so require, the judge, at pp.

Case 1:07-cv-01646-RMC    Document 39-3    Filed 01/31/2008    Page 13 of 156

1981 WL 188137 (CA (Civ Div)), [1982] 1 All E.R. 354, [1982] Ch. 204, [1982] 2 W.L.R. 31

**(Cite as: [1982] Ch. 204)**

322-323, drew attention to references to "the justice of the case" which appear in some of the *213 reported authorities on this topic: Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474, 480 and Edwards v. Halliwell [1950] 2 All E.R. 1064, 1067; to which may be added Baillie v. Oriental Telephone and Electric Co. Ltd. [1915] 1 Ch. 503, 518; Cotter v. National Union of Seamen [1929] 2 Ch. 58, 69 and Heyting v. Dupont [1964] 1 W.L.R. 843, 851.

We turn now to certain of the authorities, starting with Foss v. Harbottle, 2 Hare 461. It came before Sir James Wigram V.-C., on demurrer. The facts are narrated in that report at intimidating length and can be summarised as follows. The company concerned was the Victoria Park Company, which had been incorporated by Act of Parliament in 1837 to develop certain plots of land. There were eight promoters, Harbottle, Adshead, Byrom, Westhead, Bealey, Denison, Bunting and Lane. The directors were the first five of these gentlemen.

Lane was the architect and Bunting the solicitor. Foss and Turton were the complaining shareholders. They filed a bill on behalf of themselves and all other shareholders in the company (except the defendants) against the eight promoters, including the assignees of three of them who had become bankrupt. It was alleged that the plots had been bought by the company in pursuance of an arrangement fraudulently concocted between seven of the promoters to enable them to derive a personal benefit from the establishment of the company and the sale to it of the plots at exorbitant prices. It was further alleged, at pp. 478-479, 480:

"... the defendants concealed from the plaintiffs ... the several fraudulent and improper acts of the ... defendants, and the plaintiffs ... had only recently ascertained the particulars thereof ... and they were unable to set forth the same more particularly, - the defendants having refused to make any discovery thereof, or to allow the plaintiffs to inspect the books, accounts, or papers of the company ... and that at [general meetings of the company] false and delusive statements respecting the circumstances and prospects of the company were made by the directors to the proprietors who attended such meetings, and the truth of the several fraudulent and improper acts and proceedings therein complained of was not disclosed."

The bill charged that, in the circumstances, the defendants were jointly and severally liable to make good to the company the losses incurred in consequence of the wrongful and fraudulent acts and proceedings to which they were parties or privies. The defendants (except Byrom, who took no part) demurred to the bill on the ground that the corporation was not before the court, and that the defect could not be cured by making the corporation a defendant because the plaintiffs were not entitled to represent the corporation.

For the purposes of the application Wigram V.-C. made the assumption that the company was entitled, as matters then stood, to complain of the transactions mentioned in the bill. He continued at pp. 490-491, 492:

"... the bill ... is brought by two individual corporators, professedly on behalf of themselves and all the other members of the corporation, *214 except those who committed the injuries complained of, - the plaintiffs assuming to themselves the right and power in that manner to sue on behalf of and represent the corporation itself.

"It was not, nor could it successfully be argued, that it was a matter of course for any individual members of a corporation thus to assume to themselves the right of suing in the name of the corporation. In law, the corporation, and the aggregate members of the corporation, are not the same thing for purposes like this; and the only question can be, whether the facts alleged in this case justify a departure from the rule which prima facie would require that the corporation should sue in its own name and in its corporate character, or in the name of some one whom the law has appointed to be its representative.... If a case should arise of injury to a corporation by some of its members, for which no adequate remedy remained, except that of a suit by individual corporators in their private characters, and asking in such character the protection of those rights to which in their corporate character they were entitled, I cannot but think that the principle

1981 WL 188137 (CA (Civ Div)), [1982] 1 All E.R. 354, [1982] Ch. 204, [1982] 2 W.L.R. 31
**(Cite as: [1982] Ch. 204)**

so forcibly laid down by Lord Cottenham in Wallworth v. Holt, and other cases, would apply, and the claims of justice would be found superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue.

"But, on the other hand, it must not be without reasons of a very urgent character that established rules of law and practice are to be departed from, - rules, which, though in a sense technical, are founded on general principles of justice and convenience; and the question is, whether a case is stated in this bill, entitling the plaintiffs to sue in their private characters."

Wigram V.-C. then proceeded to answer this question in the negative, for the reasons indicated in the following extracts from his judgment, at pp. 492-493:

"... the directors are made the governing body, subject to the superior control of the proprietors assembled in general meetings; and, as I understand the Act, the proprietors so assembled have power, due notice being given of the purposes of the meeting, to originate proceedings for any purpose within the scope of the company's powers, as well as to control the directors in any acts which they may have originated.... The first ground of complaint is one which, though it might prima facie entitle the corporation to rescind the transactions complained of, does not absolutely and of necessity fall under the description of a void transaction. The corporation might elect to adopt those transactions, and hold the directors bound by them. In other words, the transactions admit of confirmation at the option of the corporation...."

Wigram V.-C. then considered the second ground of complaint (which we need not deal with) and continued, at pp. 493, 494-495:

"... whilst the supreme governing body, the proprietors at a special *215 general meeting assembled, retain the power of exercising the functions conferred upon them by the act of incorporation, it cannot be competent to individual corporators to sue in the manner proposed by the plaintiffs on the present record ... the majority of the proprietors at a special general meeting assembled, independently of any general rules of law upon the sub-

ject, by the very terms of the incorporation in the present case, has power to bind the whole body, and every individual corporator must be taken to have come into the corporation upon the terms of being liable to be so bound. How then can this court act in a suit constituted as this is, if it is to be assumed, for the purposes of the argument, that the powers of the body of the proprietors are still in existence, and may lawfully be exercised for a purpose like that I have suggested? Whilst the court may be declaring the acts complained of to be void at the suit of the present plaintiffs, who in fact may be the only proprietors who disapprove of them, the governing body of proprietors may defeat the decree by lawfully resolving upon the confirmation of the very acts which are the subject of the suit. The very fact that the governing body of proprietors assembled at the special general meeting may so bind even a reluctant minority, is decisive to show that the frame of this suit cannot be sustained whilst that body retains its functions. In order then that this suit may be sustained, it must be shown either that there is no such power as I have supposed remaining in the proprietors, or, at least, that all means have been resorted to and found ineffectual to set that body in motion: this latter point is nowhere suggested in the bill: there is no suggestion that an attempt has been made by any proprietor to set the body of proprietors in motion, or to procure a meeting to be convened for the purpose of revoking the acts complained of. The question then is, whether this bill is so framed as of necessity to exclude the supposition that the supreme body of proprietors is now in a condition to confirm the transactions in question; or, if those transactions are to be impeached in a court of justice, whether the proprietors have not power to set the corporation in motion for the purpose of vindicating its own rights."

These questions were answered against the plaintiffs.

The next case which falls for consideration related to the fraudulent promotion of some worthless lead mines. There were in fact two actions. It is important to observe that in the first action there was a motion to strike out, but no such motion in the second action, which proceeded to trial. The first

1981 WL 188137 (CA (Civ Div)), [1982] 1 All E.R. 354, [1982] Ch. 204, [1982] 2 W.L.R. 31

**(Cite as: [1982] Ch. 204)**

action is reported as East Pant Du United Lead Mining Co. Ltd. v. Merryweather (1864) 2 Hem. & M. 254. It was alleged that Merryweather, a director of the company, acting in concert with one of his co-directors, Whitworth, had fraudulently sold the mines to the company for £4,000 cash, which they shared between themselves, and 600 shares, to be allotted to Merryweather. In June 1864 a bill was filed in the name of the company against Merryweather to set aside the sale. In August the defendant moved to strike out the bill by way of demurrer. The court adjourned the application in order to allow an opportunity for a general meeting to be held. The meeting was held in October. A *216 resolution was proposed for adopting the proceedings and continuing the action. Whitworth proposed an amendment to stay the action and refer the dispute to arbitration. The amendment was put to the vote, and a poll was taken. Out of 668 votes cast 324 were against the stay and 344 were in favour of the stay, but of the latter 78 votes were cast by Merryweather and 28 votes by Whitworth; if Merryweather had not voted, the motion would have been supported by only 266 votes and would have been lost. It was argued by counsel for the company, at p. 257:

"If a minority of a company were allowed to file a bill in the company's name, charging fraud against some of the majority, and alleging that those persons were not to be considered as shareholders or entitled to vote, and thus endeavouring to turn their minority into a majority so as to acquire the right to use the name of the company, any company's affairs might be made the subject of litigation, upon allegations of fraud which might be entirely false; and yet, as this could not be proved till the hearing, irremediable mischief might be done in the meantime."

Page Wood V.-C. acceded to the motion, expressing his reasons, at p. 261:

"Then comes the question, has the company now sanctioned the suit? To decide that it has done so, would be to discard Mr. Merryweather's votes, and to do that would, in effect, be to decide now on this application the question at issue in the suit. But if I assume, as upon this motion I must assume, that Mr. Merryweather was entitled to the 600 shares which he actually holds in the company, the further question occurs, has he a right to vote in respect of such shares upon a question in which he is personally interested? Now as to the management of the company by the board, no director is entitled to vote as a director in respect of any contract in which he is interested; but the case is different when he acts as one of the whole body of shareholders. The shareholders of one company may have dealings with interests in other companies, and therefore it would be manifestly unfair to prevent an individual shareholder from voting as a shareholder in the affairs of the company. At a general meeting, therefore, Mr. Merryweather's votes must be held to be good, so long as he continues to hold his shares. Further than this, the court cannot be asked now to give an opinion, for to do so would be to decide the very question at issue in the cause." A shareholder then began another action in December, suing on behalf of himself and all other shareholders (except Merryweather and Whitworth) against Merryweather, Whitworth and the company. This is reported as Atwool v. Merryweather in a footnote to Clinch v. Financial Corporation (1868) L.R. 5 Eq. 450, 464, and more fully in 37 L.J.Ch. 35. On this occasion the defendant did not move to strike out the bill. The action was fought to a finish. Page Wood V.-C. held, first, that the contract was a complete fraud, and secondly, that there was not such a defect in the constitution of the suit as would be fatal according to the authority of Foss v. Harbottle. Page Wood V.-C. referred to the fact that there was *217 plainly a majority of shareholders, independent of those implicated in the fraud, who supported the bill.

The principles which seem to emerge from these two cases are (i) that if the defendant against whom fraud is alleged applies to strike out the action in limine, it will not be assumed that he was guilty of fraud so as to disentitle him from casting his votes at a general meeting against the action; but, (ii) that if the action is in fact fought to a conclusion, and the court finds the defendant guilty of fraud, it will in those circumstances discount the votes of those implicated in the fraud in reaching a conclusion

whether the plaintiff is authorised to sue on the company's behalf. What the two cases leave open is the question in what circumstances the alleged delinquent, or the company, can halt the proceedings in limine.

Vinelott J. placed considerable reliance on this case in widening the accepted exception to the rule in Foss v. Harbottle. He said [1981] Ch. 257, 320:

"... Atwool v. Merryweather, L.R. 5 Eq. 464 shows that the court has jurisdiction to entertain a claim by a minority shareholder and to make an order in favour of the defendant company even where the other defendants, alone or together with the plaintiffs, do not have a majority of votes in general meeting and where the other shareholders are not parties. If that is so, then as I see it, the exception can only be founded on a general jurisdiction of the court to make an order for recovery of property or damages in favour of a defendant company against co-defendants where the jurisdiction is invoked by a minority shareholder."

We doubt whether Atwool v. Merryweather goes so far in support of the judge's conclusion. It was not a case in which the company or the delinquents sought to stop the action in limine. The action had been fought to a conclusion, the liability of the defendant directors had been established, and nothing, therefore, remained except for the company to reap the benefit of the judgment. The court could hardly deny the right of the plaintiff to an order in favour of the company to give effect to its proved rights, in the face of a resolution which, excluding the votes of the proven fraudsters, was a majority resolution. Page Wood V.-C. said, at p. 468:

"having it plainly before me that I have a majority of the shareholders, independent of those implicated in the fraud, supporting the bill, it would be idle to go through the circuitous course of saying that leave must be obtained to file a bill for the company, and pro forma have a totally different litigation."

There is a clear distinction to be drawn between the application of the rule in Foss v. Harbottle when it is sought to stay proceedings in limine, and its application when nothing remains but to enforce a

judgment in a derivative action which has been permitted to proceed.

A simple application of the first aspect of the rule in Foss v. Harbottle is to be found in Gray v. Lewis (1873) L.R. 8 Ch.App. 1035 . The facts, shortly stated, were as follows: Charles Lafitte & Co. Ltd. ("the company") was incorporated in December 1865 to purchase the right to extend to this **\*218** country the business of Charles Lafitte & Co. of Paris ("the partnership"). The plaintiff Gray subscribed for shares. The company never acquired anything from the partnership, and was ordered to be wound up in November 1866. Shortly thereafter Gray filed a bill on behalf of himself and all other shareholders in the company, against the company, its directors, its liquidator and the National Bank, alleging that the assets of the company had been misapplied by the National Bank and by the directors of the company, and seeking an order that the bank and the directors of the company might be declared liable to make "good to the shareholders of the company" the loss sustained "by the shareholders." Sir Richard Malins V.-C. made a decree declaring that the bank and the directors were liable to replace the money, and directed that the amount found due should be paid into court. The National Bank, and Lewis and Henshaw, two of the directors, appealed. The appeal of the National Bank was compromised with the concurrence of the liquidator, on the basis (clearly unobjectionable) that the National Bank should discharge the debts of the company. The appeal by Lewis and Henshaw came before the Court of Appeal in Chancery, and was allowed. The reasons were put trenchantly by James L.J., with whom Mellish L.J. agreed, in these words at p. 1050:

"The bill should not have been filed by a shareholder on behalf of himself and all other shareholders. It is very important, in order to avoid oppressive litigation, to adhere to the rule laid down in Mozley v. Alston (1847) 1 Ph. 790 and Foss v. Harbottle, 2 Hare 464, which cases have always been considered as settling the law of this court, that where there is a corporate body capable of filing a bill for itself to recover property either from its directors or officers, or from any other person, that

corporate body is the proper plaintiff, and the only proper plaintiff. One object of incorporating bodies of this kind was, in my opinion, to avoid the multiplicity of suits which might have arisen where one shareholder was allowed to file a bill on behalf of himself and a great number of other shareholders. The shareholder who first filed a bill might dismiss it, and if he was a poor man the defendant would be unable to obtain his costs, then another shareholder might file a bill, and so on. It was also stated to us in the course of the argument that even after the plaintiff had dismissed his bill against a particular defendant a fresh bill might be filed against the defendant so dismissed. Therefore there might be as many bills as there are shareholders multiplied into the number of defendants. The result would be fearful, and I think the defendant has a right to have the case made against him by the real body who are entitled to complain of what he has done.

"Now in this case I am of opinion that the only person - if you may call it a person - having a right to complain was the incorporated society called Charles Laffitte & Co. In its corporate character it was liable to be sued, and was entitled to sue; and if the company sued in its corporate character, the defendant might allege a release or a compromise by the company in its corporate character - a defence which would not be open in a suit where a plaintiff is suing on behalf of himself and other shareholders. I think it is of the utmost **\*219** importance to maintain the rule laid down in Mozley v. Alstonand Foss v. Harbottle, to which, as I understand, the only exception is where the corporate body has got into the hands of directors and of the majority, which directors and majority are using their powers for the purpose of doing something fraudulent against the minority, who are overpowered by them, as in Atwool v. Merryweather, L.R. 5 Eq. 464, where Page Wood V.-C. under those circumstances, sustained a bill by a shareholder on behalf of himself and others, and there it was after an attempt had been made to obtain a proper authority from the corporate body itself in public meeting assembled."

This case highlights what the rule in Foss v. Harbottle is primarily concerned with, namely, is a

plaintiff shareholder entitled to prosecute an action on behalf of the company for a wrong done to it, or ought the action to be struck out on the footing that it is for the company and not for a shareholder to sue? That is what Foss v. Harbottle itself was about, and what the first East Pant Ducase, 2 Hem. & M. 254, was about. The second East Pant Du case, Atwool v. Merryweather, L.R. 5 Eq. 464, raised a related but different question, namely, if at the end of the day fraud is proved, are the circumstances such that the company is capable of condoning the fraud? Clearly not, if the fraud will only be confirmed by a majority by the use of the fraudsters' own voting power.

It is commonly said that an exception to the rule in Foss v. Harbottle arises if the corporation is "controlled" by persons implicated in the fraud complained of, who will not permit the name of the company to be used as plaintiffs in the suit: see Russell v. Wakefield Waterworks Co., L.R. 20 Eq. 474, 482. But this proposition leaves two questions at large, first, what is meant by "control," which embraces a broad spectrum extending from an overall absolute majority of votes at one end, to a majority of votes at the other end made up of those likely to be cast by the delinquent himself plus those voting with him as a result of influence or apathy. Secondly, what course is to be taken by the court if, as happened in Foss v. Harbottle, in the East Pant Du case and in the instant case, but did not happen in Atwool v. Merryweather, the court is confronted by a motion on the part of the delinquent or by the company, seeking to strike out the action? For at the time of the application the existence of the fraud is unproved. It is at this point that a dilemma emerges. If, upon such an application, the plaintiff can require the court to assume as a fact every allegation in the statement of claim, as in a true demurrer, the plaintiff will frequently be able to outmanoeuvre the primary purpose of the rule in Foss v. Harbottle by alleging fraud and "control" by the fraudster. If on the other hand the plaintiff has to prove fraud and "control" before he can establish his title to prosecute his action, then the action may need to be fought to a conclusion before the court can decide whether or not the plaintiff should be

[1982] Ch. 204
1981 WL 188137 (CA (Civ Div)), [1982] 1 All E.R. 354, [1982] Ch. 204, [1982] 2 W.L.R. 31
**(Cite as: [1982] Ch. 204)**

Case 1:07-cv-01646-RMC    Document 39-3    Filed 01/31/2008    Page 18 of 156

Page 13

permitted to prosecute it. In the latter case the purpose of the rule in Foss v. Harbottle disappears. Either the fraud has not been proved, so cadit quaestio; or the fraud has been proved and the delinquent is accountable unless there is a valid decision of the board or a valid decision of the company in general meeting, reached without impropriety or unfairness, to condone the fraud.

*220 We think that this brief look at the authorities is sufficient for present purposes. For it so happens that this court cannot properly on this appeal decide the scope of the exception to the rule in Foss v. Harbottle. The reason is this. Vinelott J. permitted the action by the plaintiffs on behalf of Newman to proceed, and there was no appeal from that decision. In the result he found that Newman was entitled as against Mr. Bartlett and Mr. Laughton to damages for conspiracy and breach of fiduciary duty, and he directed an inquiry as to damages subject to a stay in case of an appeal. Thereafter, Newman had three choices, subject to the operation of the stay. First, it might do nothing. In this case the plaintiffs would be entitled, if they so desired, to issue a summons to proceed with the inquiry. Secondly, Newman might decide for some proper reason, assuming that a proper reason might exist, and duly resolve at a proper board or general meeting, to proceed no further with the claim against Mr. Bartlett and Mr. Laughton. In this event, assuming that the resolution of the board or of the company in general meeting was in all respects proper, the plaintiffs would be unable to proceed with the inquiry because a valid release could be pleaded by Mr. Bartlett and Mr. Laughton. Thirdly, Newman might adopt the order which the plaintiffs had obtained on its behalf and pursue the inquiry accordingly. This would occasion no procedural problem nor even any special procedural step. Any party, plaintiff or defendant, can issue a summons to proceed upon an order. It would not be necessary for Newman to apply to be made a plaintiff, or to start a fresh action and rely upon the principle of res judicata, as was suggested at one time in the course of the argument. The order has been made. Newman is a party to the action. Newman can enforce the order. If this course were adopted, the rule

in Foss v. Harbottle is irrelevant. The rule has no room to operate where the company itself is proceeding with an action, or to enforce a judgment, pursuant to a valid board or company resolution.

Newman by its counsel, acting (as we must assume) upon due authority conferred by the company, stated before us that if the finding of fraud stood it would accept the benefit of the order made in its favour. That is the end of Foss v. Harbottle so far as this appeal is concerned. It is plainly impossible for Mr. Bartlett or Mr. Laughton to prevent the board of Newman instructing its solicitors to proceed with the inquiry, and recovering from Mr. Bartlett and Mr. Laughton what may be certified to be due.

It was in the light of these considerations that we declined to hear any argument from Mr. Caplan and Mr. Curry on the topic of Foss v. Harbottle. However desirable it might be in the public interest that we should express our conclusions on Vinelott J.'s analysis of the rule in Foss v. Harbottle and what he saw as the exception to it, it was necessary for us to bear in mind that the rule had ceased to be of the slightest relevance to the case. It would have been a grave injustice to all parties to increase the already horrendous costs of this litigation by allowing time for argument on an interesting but irrelevant point. Such consideration of the law as appears in this judgment is, apart from a few *221 missions made by Mr. Bartlett, merely a reflection of our own thoughts without the benefit of sustained argument.

In the result it would be improper for us to express any concluded view on the proper scope of the exception or exceptions to the rule in Foss v. Harbottle. We desire, however, to say two things. First, as we have already said, we have no doubt whatever that Vinelott J. erred in dismissing the summons of May 10, 1979. He ought to have determined as a preliminary issue whether the plaintiffs were entitled to sue on behalf of Newman by bringing a derivative action. It cannot have been right to have subjected the company to a 30-day action (as it was then estimated to be) in order to enable him to decide whether the plaintiffs were en-

titled in law to subject the company to a 30-day ac-
tion. Such an approach defeats the whole purpose
of the rule in Foss v. Harbottle and sanctions the
very mischief that the rule is designed to prevent.
By the time a derivative action is concluded, the
rule in Foss v. Harbottle can have little, if any, role
to play. Either the wrong is proved, thereby estab-
lishing conclusively the rights of the company; or
the wrong is not proved, so cadit quaestio. In the
present case a board, of which all the directors save
one were disinterested, with the benefit of the Sch-
roder-Harman report, had reached the conclusion
before the start of the action that the prosecution of
the action was likely to do more harm than good.
That might prove a sound or unsound assessment,
but it was the commercial assessment of an appar-
ently independent board. Obviously the board
would not have expected at that stage to be as well
informed about the affairs of the company as it
might be after 36 days of evidence in court and an
intense examination of some 60 files of documents.
But the board clearly doubted whether there were
sufficient reasons for supposing that the company
would at the end of the day be in a position to count
its blessings; and clearly feared, as counsel said,
that it might be killed by kindness. Whether in the
events which have happened Newman (more ex-
actly the disinterested body of shareholders) will
feel that it has all been well worth while, or must
lick its wounds and render no thanks to those who
have interfered in its affairs, is not a question which
we can answer. But we think it is within the bounds
of possibility that if the preliminary issue had been
argued, a judge might have reached the considered
view that the prosecution of this great action should
be left to the decision of the board or of a specially
convened meeting of the shareholders, albeit less
well informed than a judge after a 72-day action.

So much for the summons of May 10. The second
observation which we wish to make is merely a
comment on Vinelott J.'s decision that there is an
exception to the rule in Foss v. Harbottle whenever
the justice of the case so requires. We are not con-
vinced that this is a practical test, particularly if it
involves a full-dress trial before the test is applied.
On the other hand we do not think that the right to

bring a derivative action should be decided as a
preliminary issue upon the hypothesis that all the
allegations in the statement of claim of "fraud" and
"control" are facts, as they would be on the trial of
a preliminary point of law. In our view, whatever
may be the properly defined boundaries of the ex-
ception to the rule, the plaintiff ought at least to be
required before proceeding *222 with his action to
establish a prima facie case (i) that the company is
entitled to the relief claimed, and (ii) that the action
falls within the proper boundaries of the exception
to the rule in Foss v. Harbottle. On the latter issue it
may well be right for the judge trying the prelimin-
ary issue to grant a sufficient adjournment to enable
a meeting of shareholders to be convened by the
board, so that he can reach a conclusion in the light
of the conduct of, and proceedings at, that meeting.

We turn to the personal action. In the statement of
claim, as amended on day 12. the plaintiffs pleaded
that Mr. Bartlett and Mr. Laughton

   "in breach ... of their obligation to the sharehold-
ers ... conspired together to benefit T.P.G. at the ex-
pense of ... the shareholders," and that "in further-
ance of such conspiracy and in breach of ... their
obligation to the shareholders ... the defendants
Bartlett and Laughton procured the circular to be ...
distributed ... well knowing and intending it to be
misleading and tricky"; and "by reason of the fore-
going the defendants Bartlett and Laughton are in
breach of ... their obligation to the shareholders."
In the amended prayer the plaintiffs in their person-
al capacity as a shareholder in Newman claimed
damages for conspiracy against Mr. Bartlett and
Mr. Laughton, and a declaration to the like effect
on behalf of all other shareholders who had
suffered damages and were on the register on July
29, 1975 (the date of the adjourned extraordinary
general meeting). Counsel for the plaintiffs agreed
before us that no facts are relied upon in support of
the personal claim which are not relied upon in sup-
port of the derivative claim.

Vinelott J. upheld the plaintiffs' personal claim, and
also the representative claim with which it was
linked. He began with the proposition, which accor-
ded with his findings, that Newman had been in-

duced by fraud to approve an agreement under which Newman paid more (he thought about £445,000 more) than the value of the assets acquired and thus £445,000 more than it needed to pay; therefore Newman's indebtedness to its bankers immediately after the transaction (about £5m.) was £445,000 more than it would have been but for the fraud; therefore the fraud caused a reduction in net profits, which must have affected the quoted price of Newman shares; therefore, the plaintiffs suffered some damage in consequence of the conspiracy and that was sufficient to complete the cause of action, the quantum of damages being left to an inquiry.

In our judgment the personal claim is misconceived. It is of course correct, as the judge found and Mr. Bartlett did not dispute, that he and Mr. Laughton, in advising the shareholders to support the resolution approving the agreement, owed the shareholders a duty to give such advice in good faith and not fraudulently. It is also correct that if directors convene a meeting on the basis of a fraudulent circular, a shareholder will have a right of action to recover any loss which he has been personally caused in consequence of the fraudulent circular; this might include the expense of attending the meeting. But what he cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the **\*223** market value of his shares, or equal to the likely diminution in dividend, because such a "loss" is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only "loss" is through the company, in the diminution in the value of the net assets of the company, in which he has (say) a 3 per cent. shareholding. The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. The shares themselves. his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practised upon the plaintiff does not affect the shares; it merely enables the defendant to rob the company. A simple illustration will prove the logic of this approach. Suppose that the sole asset of a company is a cash box containing £100,000. The company has an issued share capital of 100 shares, of which 99 are held by the plaintiff. The plaintiff holds the key of the cash box. The defendant by a fraudulent misrepresentation persuades the plaintiff to part with the key. The defendant then robs the company of all its money. The effect of the fraud and the subsequent robbery, assuming that the defendant successfully flees with his plunder, is (i) to denude the company of all its assets; and (ii) to reduce the sale value of the plaintiff's shares from a figure approaching £100,000 to nil. There are two wrongs, the deceit practised on the plaintiff and the robbery of the company. But the deceit on the plaintiff causes the plaintiff no loss which is separate and distinct from the loss to the company. The deceit was merely a step in the robbery. The plaintiff obviously cannot recover personally some £100,000 damages in addition to the £100,000 damages recoverable by the company.

Counsel for the plaintiffs sought to answer this objection by agreeing that there cannot be double recovery from the defendants, but suggesting that the personal action will lie if the company's remedy is for some reason not pursued. But how can the failure of the company to pursue its remedy against the robber entitle the shareholder to recover for himself? What happens if the robbery takes place in year 1, the shareholder sues in year 2, and the company makes up its mind in year 3 to pursue its remedy? Is the shareholder's action stayed, if still on foot? Supposing judgment has already been recovered by the shareholder and satisfied, what then?

A personal action could have the most unexpected consequences. If a company with assets of £500m. and an issued share capital of £50m. were defrauded of £ 500,000 the effect on dividends and share prices would not be discernible. If a company with assets of £10m. were defrauded, there would be no effect on share prices until the fraud was discovered; if it were first reported that the company had been defrauded of £500,000 and subsequently reported that the company had discovered oil in

1981 WL 188137 (CA (Civ Div)), [1982] 1 All E.R. 354, [1982] Ch. 204, [1982] 2 W.L.R. 31
**(Cite as: [1982] Ch. 204)**

property acquired by the company as part of the fraud and later still reported that the initial loss to the company could not have exceeded £50,000, the effect on share prices would be bewildering and the effect on dividends would either be negligible or beneficial.

The plaintiffs in this action were never concerned to recover in the personal action. The plaintiffs were only interested in the personal action *224 as a means of circumventing the rule in Foss v. Harbottle. The plaintiffs succeeded. A personal action would subvert the rule in Foss v. Harbottle and that rule is not merely a tiresome procedural obstacle placed in the path of a shareholder by a legalistic judiciary. The rule is the consequence of the fact that a corporation is a separate legal entity. Other consequences are limited liability and limited rights. The company is liable for its contracts and torts; the shareholder has no such liability. The company acquires causes of action for breaches of contract and for torts which damage the company. No cause of action vests in the shareholder. When the shareholder acquires a share he accepts the fact that the value of his investment follows the fortunes of the company and that he can only exercise his influence over the fortunes of the company by the exercise of his voting rights in general meeting. The law confers on him the right to ensure that the company observes the limitations of its memorandum of association and the right to ensure that other shareholders observe the rule, imposed upon them by the articles of association. If it is right that the law has conferred or should in certain restricted circumstances confer further rights on a shareholder the scope and consequences of such further rights require careful consideration. In this case it is neither necessary nor desirable to draw any general conclusions.

The rule in Foss v. Harbottle is founded on principle but it also operates fairly by preserving the rights of the majority. We were invited to give judicial approval to the public spirit of the plaintiffs who, it was said, are pioneering a method of controlling companies in the public interest without involving regulation by a statutory body. In our view

the voluntary regulation of companies is a matter for the City. The compulsory regulation of companies is a matter for Parliament. We decline to draw general conclusions from the exceptional circumstances of the present case. But the results of the present action give food for thought. Vinelott J. thought it possible that Newman had suffered damage amounting to £445,000 by the fraud of Mr. Bartlett and Mr. Laughton. Counsel for Newman submitted in the court below that damage to Newman by the prosecution of the action exceeded the benefits liable to be derived from the action. The costs of the proceedings at the end of the trial were said in newspaper reports to be in the region of £750,000. If the judge's order is upheld and if the damages suffered by Newman are assessed at £445,000 and the costs at £750,000 then those damages and about 95 per cent. of the costs will fall on T.P.G. pursuant to the judge's order except in so far as they are recovered from Mr. Bartlett and Mr. Laughton. If Newman recover any damages they must indemnify the plaintiffs thereout against the difference between the costs of the plaintiffs paid by T.P.G. and (with small exceptions) the costs of the plaintiffs on a common fund basis. Part of Newman's costs must be borne by Newman in any event. Part of the plaintiffs' costs must be borne by the plaintiffs in any event.

If this appeal succeeds the burden of the costs on the plaintiffs will be enormous. The innocent shareholders of Newman, T.P.G. and the plaintiffs may well wonder, whether this appeal succeeds or not, if there is not something to be said after all for the old fashioned rule in Foss v. Harbottle. *225 [Their Lordships then read Chapter 6 in which they examined the judgment of Vinelott J. and continued:]

*Chapter 7 - Conclusions*

The problems involved in this case were caused by the fact that the Prudential were the wrong plaintiffs.

If, indeed, Mr. Bartlett and Mr. Laughton defrauded Newman then the proper plaintiff was Newman. In an action by Newman against Mr. Bartlett and Mr.

Laughton for defrauding the company, and against T.P.G. for enjoying the fruits of the fraud, the circular would be largely evidential The principal frauds pleaded would have been frauds practised on the directors and practised on Mr. Cooper. Each fraudulent representation or fraudulent concealment would have been pleaded with particularity. Furthermore, in an action by Newman against Mr. Bartlett and Mr. Laughton all the documents necessary to enable Newman to plead its case and to make sensible discovery would have been in the possession of Newman at the outset. Newman would have known which documents held by T.P.G. were relevant to be discovered. Newman would then have been in a position to determine which of the discovered documents were sufficiently important to produce to the court.

Mr. Caplan frankly admitted that the plaintiffs pleaded and relied upon the circular because that was the only document revealed to the plaintiffs as a shareholder and the only document upon which they could make out a case on the pleadings prior to discovery. Mr. Caplan also frankly admitted that conspiracy was only pleaded because the plaintiffs thought that a direct action could not succeed in the absence of a plea of conspiracy. The direct action was only pleaded because it was feared that the derivative action might be defeated by the rule in Foss v. Harbottle, 2 Hare 461.

In these circumstances discovery was a shambles, there was no proper selection of documents to be used at the trial because no one knew what to select and what to discard, and the pleadings were never adequately clarified or timeously amended. The complications and obscurities of the statement of claim and the reliance on the circular and the enormous weight of the discovered documents made it impossible for the defendants adequately to prepare for the trial or to foresee the course or length of the trial or to cope with the many trials of strength with regard to their recollection and probity.

The obscurities and confusion of the pleadings, the mass of documentary evidence, the fact that the

Prudential, not being the proper plaintiffs, had no knowledge of what had gone on inside Newman and the assumed need to prove conspiracy led to the plaintiffs submitting that every Newman and T.P.G. document and every act or omission by Mr. Bartlett or Mr. Laughton was a badge of fraud, and to submit that Mr. Cooper's valuation was only explicable by cunning on the part of Mr. Laughton and incompetence on the part of Mr. Cooper, and that the directors of Newman were bemused and the advisers of Newman blinded.

The task of the judge was made very difficult because the pleadings of the plaintiffs were concentrated on the circular for tactical reasons *226 connected with the personal action; the statement of claim was vague and obscure; the real issues were buried under general assertions of trickiness. The defendants' advisers, no doubt overwhelmed by the number of ingenious accusations of fraud which emerged, were not able adequately to assist the judge by defining those accusations which were material and sounded in damages, those accusations which were relevant but which did not give rise to any damage, and those accusations which were wholly irrelevant save as to credit.

As the case proceeded and the nature of the plaintiffs' accusations were gradually disclosed, it is not surprising that the judge decided to intervene and himself to ask questions in order to clarify the evidence being given by the witnesses. But we must criticise some of the interventions of the judge. When Mr. Murray was giving evidence, some of the interventions appeared only capable of being answered in a way which would confirm the views already formed by the judge. In the case of the evidence of Mr. Bartlett and Mr. Cooper some of the judge's interventions indicated that he had already formed a hostile view of the explanations that the witnesses were trying to give. Experienced counsel represented the plaintiffs and Mr. Bartlett. The judge should have allowed Mr. Scott to elucidate from his witnesses the evidence that they were trying to give, without interruption save in so far as it was necessary for clarification. and it was for Mr. Scott and Mr. Caplan to make their points in cross-

1981 WL 188137 (CA (Civ Div)), [1982] 1 All E.R. 354, [1982] Ch. 204, [1982] 2 W.L.R. 31
**(Cite as: [1982] Ch. 204)**

examination. It is not appropriate for leading questions to be put from the Bench.

The judge found a conspiracy which had never been pleaded, and fraudulent conduct which had never been particularised. The plaintiffs, in this court, attempted to overwhelm us with 30 or more accusations of fraud, but in the end fell back on six claims which they submitted had been pleaded and found proven. Of those six the second was abandoned in the course of the submissions of Mr. Caplan.

The first claim concerns the commercial reasons. Those reasons must be read in the context of the information furnished by the circular with regard to the size of the minority shareholdings which were to be acquired in associated companies, the activities and trading results of the principal associated companies and the management influence said to have been obtained by the vendor T.P.G. through those minority shareholdings. So read, the commercial reasons informed the Newman shareholders that Newman would benefit from a development and expansion of Newman's international trade which would result from a partnership between Newman and the associated companies secured by the acquisition of T.P.G.'s minority shareholdings. In effect, Mr. Bartlett was imparting to the Newman shareholders his belief that he could influence the management of the affairs of Newman and the associated companies for the benefit of all concerned. So he believed. Therefore, to this limited extent the circular was not misleading or tricky to the knowledge of Mr. Bartlett and Mr. Laughton. But it does not follow, because there were valid commercial reasons for the transaction, that Mr. Bartlett and Mr. Laughton, as directors of Newman, recommended the transaction to the Newman shareholders in the bona fide belief that it was a transaction into *227 which Newman ought to enter. On this aspect we express our conclusion later.

The second claim was abandoned. The third claim was that the circular was tricky and misleading in concealing that the attributed values of quoted associated companies were much higher than their current stock market values: see statement of claim ad-

ded by amendment after the trial began, and the judgment [1981] Ch. 257, 294, 297.

The argument is that appendix 3 of the circular ought to have included a comparison between the stock market price and Mr. Cooper's value of each quoted shareholding in Metropole, Dover, Agar Cross and Clough.

The exact charge against Mr. Bartlett and Mr. Laughton is still not spelled out. The claim may mean that Mr. Bartlett and Mr. Laughton believed that Mr. Cooper's value exceeded a fair value for Newman to pay. It may mean that Mr. Bartlett and Mr. Laughton knew and believed that it was excessive for Newman to pay a price significantly in excess of the stock market price. It may mean that Mr. Bartlett and Mr. Laughton believed that Mr. Cooper's value represented a fair price for Newman to pay but realised that nevertheless the shareholders of Newman ought to have an opportunity of comparing the Stock Exchange price with Mr. Cooper's value. Whichever charge is made we consider that it has not been proved.

There is no evidence that Mr. Bartlett or Mr. Laughton thought that the value of the shares of Clough, Dover, Agar Cross and Metropole suggested in Mr. Laughton's letter to Mr. Cooper of April 11, 1975, was excessive for Newman to pay. There is no evidence that they were afraid of revealing Stock Exchange prices. Mr. Bartlett gave evidence that he did not believe that Stock Exchange prices were a reliable guide to the value of the shareholdings, carrying with them the opportunities and potentialities for which they had been purchased and which Newman acquired from T.P.G. Neither Mr. Cooper nor Schroders appear to have taken the view that Stock Exchange prices were a reliable guide. It was impossible for Mr. Bartlett to explain to the shareholders in the circular that Clough was a buy or sell situation together with the reasons. It was impossible to reveal to the shareholders the plans of Mr. Laughton and Mr. Bartlett with regard to Dover, Metropole and Agar Cross.

The fourth claim was that the circular was tricky

1981 WL 188137 (CA (Civ Div)), [1982] 1 All E.R. 354, [1982] Ch. 204, [1982] 2 W.L.R. 31
**(Cite as: [1982] Ch. 204)**

and misleading in the indication that the £100,000 Smithamcote loan was worth its face value: statement of claim, paragraph 16; judgment [1981] Ch. 257, 296. The evidence is that Mr. Bartlett and Mr. Laughton believed that the loan was worth the S. Newman Ltd. shares and that the S. Newman Ltd. shares were worth more than £ 100,000.

The fifth claim is that the circular was tricky and misleading in the indication that the £30,000 Abbott debt was worth its face value: statement of claim, paragraph 16A added after the trial began, and judgment at p. 297. The evidence is that Mr. Bartlett and Mr. Laughton believed the Abbott loan to be worth £30,000 and that T.P.G. was willing to give Newman a guarantee of payment of principal and interest.

It did not occur to Mr. Cooper to reduce the value of the debt because of the terms of the payment or the rate of interest. That being so, it is **\*228** not permissible to infer that Mr. Bartlett or Mr. Laughton considered that the value of the loan ought to be reduced and fraudulently concealed their belief.

The sixth claim is that the circular was tricky and misleading in that it concealed the January agreements: statement of claim, paragraph 18A.

We have already indicated that there was ample evidence to justify the finding of the judge that the January agreements, and the payments thereunder, were dishonestly concealed from the directors of Newman (to the extent that we have indicated) and from the shareholders of Newman with the object, inter alia, of facilitating the acceptance of the proposals set forth in the strategy document, and that this dishonest concealment involved and included a misleading statement in the circular of the origin and purpose of the payment of £216,000 by Newman to T.P.G.

As Mr. Angus Murray made plain in his evidence, he was always puzzled because it was difficult, in discussions with Mr. Bartlett, to discover whether, as he spoke, he was wearing a Newman or a T.P.G. hat. T.P.G. was a dealing and investment holding company. Newman was a trading company. If T.P.G. identified and developed a commercial opportunity, the moment might come when it would be sensible, in the interests of the companies, for Newman to take over the T.P.G. interest in a particular company. Hence Mr. Bartlett's proposals for "restructure" of Newman and T.P.G. interests in associated companies in early December 1974. and in its development of opportunities by improving the management of associates T.P.G. introduced into its associated companies those directors of Newman who were most suited to bring T.P.G.'s plans to fruition. Further, the T.P.G. holding in Newman shares, and the option held by Newman over shares of T.P.G., had the double effect that T.P.G. had a financial interest in the success of Newman, and Newman could use T.P.G.'s shareholding to protect Newman from a takeover by a third party at a time when its shares were unduly depressed on the market as a consequence of the general financial climate which had nothing to do with the profitability or assets of Newman. The period at the end of 1974, when T.P.G. was in serious liquidity trouble, coincided with the occasion when Mr. Bartlett genuinely regarded Newman as needing strengthening through diversification as Newman's existing manufacturing activities showed signs of contraction. Mr. Bartlett and Mr. Laughton were optimists, and Mr. Bartlett was always eager to impress his personal commercial judgment upon his colleagues on the Newman board. He met his match in Mr. Angus Murray, who was a concerned about the administrative capacity and organisation in Newman, worried about the risk of muddle through the close relationship of Newman and T.P.G., and rightly cautious about the risk of overstretching Newman's resources. He knew very little about the T.P.G. shareholdings, or about the reasons of Mr. Laughton in selecting them. In this his position was vastly different from that of Mr. Bartlett, Mr. Laughton, Mr. Bush and Mr. Baldwin, and from officials such as Mr. Gollop who understood the opportunities presented to Newman when the chance for stepping into T.P.G.'s shoes presented itself to Newman in February 1975. The first **\*229** serious Newman boardroom conflict was manifested on January 2, 1975. The evidence proves that Mr.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1982] Ch. 204
1981 WL 188137 (CA (Civ Div)), [1982] 1 All E.R. 354, [1982] Ch. 204, [1982] 2 W.L.R. 31
**(Cite as: [1982] Ch. 204)**

Bartlett, with Mr. Laughton's support, then used every weapon available to carry the board with him as far as he could. He kept Mr. Murray in the dark and proceeded to enter into the January agreements and to arrange payments of the consideration to T.P.G. which in the event amounted to £ 216,000, knowing full well that Mr. Murray would have tried to prevent it had he known what w as happening. Once embarked on this course Mr. Bartlett and Mr. Laughton could or would not disclose to Mr. Murray and the Newman board as a board what they had done, and Mr. Bartlett ended by confusing the history of the £216,000 to Mr. Fryer of the Stock Exchange and misrepresenting it to the shareholders on July 8.

But these deceptions of Mr. Murray and of the shareholders at the extraordinary general meeting were not because they believed that the net consideration of £350 to £325,000 was too high. We are satisfied that throughout Mr. Bartlett believed that his original figure was about right and was content to rely upon his expectation that Deloittes would, after their independent investigation, arrive at much the same conclusion.

The judge accepted the plaintiffs' submission that Mr. Bartlett and Mr. Laughton must have known, and did know, that £350 to £325,000 was much too much. So he never had to consider the question whether the explanation of the facts lay in an attempt by Mr. Bartlett, with Mr. Laughton's concurrence, to keep Mr. Murray in the dark and thus carry the rest of the board with him.

So what the judge would have found about this explanation must remain unknown. But we are ourselves satisfied that this is the inference that should be drawn from the evidence of primary fact about the concealment of the January agreements and the advance payments of £216,000 made pursuant thereto.

Turning from the plaintiffs' claims as submitted in this court to the issues which we indicated in chapter 6, the first issue is whether Mr. Bartlett and Mr. Laughton genuinely believed that it was in Newman's interest to accept the proposals contained in the strategy document. The evidence establishes that the transaction recommended in the strategy document, namely, the purchase by Newman of the undertaking of T.P.G. with certain exceptions, was a gamble from the start. In our judgment Mr. Angus Murray was quite right in 1975 in urging that it was not a gamble which Newman ought to take. The question, however, is whether Mr. Bartlett and Mr. Laughton genuinely believed that it was a gamble which it was in the interests of Newman to take, or whether they merely put forward the strategy document because T.P.G. needed to be rescued from a gamble which had failed. If Mr. Bartlett and Mr. Laughton urged Newman to gamble on the strategy document transaction not because they believed Newman should take the gamble but only because they could see no other way of rescuing T.P.G., then Mr. Bartlett and Mr. Laughton were fraudulent; it would matter not that they hoped the gamble would succeed and were content for the price to be assessed by an independent valuer. If, on the other hand, they believed that the strategy document recommendation was for the benefit of Newman because it represented **\*230** a golden opportunity for Newman to reap the benefit of T.P.G.'s initiative at a fair price, then they were not fraudulent.

Quite rightly, counsel for the plaintiffs emphasised, both here and below, the financial difficulties which faced T.P.G. It does not follow that Mr. Bartlett and Mr. Laughton were guilty of fraud or breach of duty because the transaction benefited T.P.G. more than Newman, or even that it was inspired as a rescue operation for T.P.G. If a conflict of interest and duty arises because a transaction is proposed between two companies, and directors of one company are also directors of the other company, there are two, and only two, possible legal views on the legal viability of the transaction. Either the transaction is one which the directors can properly propose to each company, *despite* their conflict of interest and duty, or it is one which they cannot properly propose *because* of their conflict of interest and duty. The second view is basically correct in the case of overlapping trusteeships. The

1981 WL 188137 (CA (Civ Div)), [1982] 1 All E.R. 354, [1982] Ch. 204, [1982] 2 W.L.R. 31
**(Cite as: [1982] Ch. 204)**

first view is rightly accepted as correct in the present case.

If, as we must assume, the transaction could properly go ahead despite the conflict of interest and duty, then Mr. Bartlett and Mr. Laughton were entitled to propose the transaction in order to benefit T.P.G.; and similarly they were entitled to propose the transaction in order to benefit Newman. Indeed, they were not entitled to propose the transaction except for the purpose of benefiting both Newman and T.P.G.

The court cannot and will not enter into an inquiry in order to discover whether the transaction would benefit one company more than the other, or whether Mr. Bartlett and Mr. Laughton believed it would. If such an inquiry were relevant, it would mean that the court would have to hold such a transaction void unless the transaction would be, or was thought to be, of equal benefit (whatever that might mean) to each company. Such an inquiry would be quite impracticable. It also follows that the transaction is capable of being upheld although initiated as a rescue operation for T.P.G. Every contract of sale must be initiated either by the vendor or by the purchaser. If a sale is legally viable between a particular vendor and a particular purchaser, the existence and nature and weight of the pressures affecting the initiator may explain the existence of a fraud but do not justify an inference of fraud.

The judge's findings that there was a conspiracy to benefit T.P.G. at the expense of Newman appear to indicate that he believed that the strategy document was not bona fide propounded by Mr. Bartlett and Mr. Laughton in the interests of Newman. But this and other indications in the judgment to the like effect are contradicted by the judge's comment [1981] Ch. 257, 330, that Mr. Bartlett

"may well have believed that it would be for the ultimate benefit of Newman that it should be placed in relation to the network of associated companies in the central position which was originally to have been occupied by T.P.G."

We need not resolve these contradictions in the judgment because we do not consider that a dishon-

est motive on the part of Mr. Bartlett and Mr. **\*231** Laughton in urging the adoption of the recommendations contained in the strategy document can now sound in damages.

Even if the recommendation by Mr. Bartlett and Mr. Laughton that Newman should gamble on the strategy document proposal was not bona fide made in the interests of Newman, in the result Newman did gamble, and gambled successfully. For obvious reasons Newman decided to keep the fruits of the gamble rather than demand repayment of the stake and hand over the fruits. If a punter is induced by fraud to bet on a horse and the horse loses, then the punter can recover his stake from the fraudster. But if the horse wins, then the punter cannot both keep his winnings and claim back his stake. In the present case Newman decided to keep its winnings. It is true that the purchase of the Smithamcote shares shows a loss against the value attributed to the Smithamcote shares by Mr. Cooper, but the transaction offered by T.P.G. and accepted by Newman was one transaction in which Newman gambled £1.5 million and obtained advantages which it has elected to keep. If Newman were induced to purchase the T.P.G. assets by fraud, then Newman, on discovering the fraud, could rescind the contract of purchase and claim damages, or, alternatively, claim damages for the fraud without rescission. But Newman having abandoned the remedy of rescission because the gamble paid off, has suffered no damage as a result of that fraud.

The second issue is whether Mr. Bartlett and Mr. Laughton believed that £ 350,000 was a fair price for Newman to pay for the acquisition of T.P.G.'s undertaking. The net consideration of £350,000 was based on assets worth £1.5 million subject to liabilities of £1,150,000. If Mr. Bartlett and Mr. Laughton thought that the assets were not worth £1.5 million but were only worth, for example, £1.3 million, then irrespective of any fraud involved in inducing Newman to gamble at all, Mr. Bartlett and Mr. Laughton were guilty of fraud in advising Newman to pay a price which to the knowledge of Mr. Bartlett and Mr. Laughton exceeded the price which Newman should be advised to pay. The fact

1981 WL 188137 (CA (Civ Div)), [1982] 1 All E.R. 354, [1982] Ch. 204, [1982] 2 W.L.R. 31
**(Cite as: [1982] Ch. 204)**

that the gamble succeeded and that Newman intend to keep its winnings is irrelevant. Newman, on this hypothesis, lost £200,000 because they paid £200,000 more than Mr. Bartlett and Mr. Laughton knew to be a fair price for Newman to pay to acquire the assets.

In our judgment, however, there was no, or no sufficient, evidence from which the judge could properly find that Mr. Bartlett and Mr. Laughton did not genuinely believe that the assets were worth £1.5 million subject to an independent valuation.

There was no challenge to Mr. Bartlett's explanation of the origin of the figure of £350,000 in the strategy document or in the origin of the pro forma balance sheet. There was no, or no sufficient, evidence to support the theory of a conspiracy to procure a persuadable accountant instead of a non-persuadable merchant banker to act as valuer and then to persuade the valuer to accept inflated values for the Smithamcote shares, the Smithamcote loan and the Abbott loan, which were not capable of being inflated. There is no evidence that Mr. Laughton did not genuinely believe in the values he put forward in his letter dated April 11, 1975. All the events which we have chronicled and all the **\*232** contemporaneous written evidence go to show that Mr. Bartlett and Mr. Laughton were confident rather than crooked and that Mr. Laughton's disappointment when Mr. Cooper first put forward a net consideration of less than £350,000 was genuine. The theory that Mr. Laughton then over-persuaded Mr. Cooper over the telephone is not supported by any evidence and was contradicted by Mr. Cooper. The theory that Mr. Cooper was over-persuaded was then fortified by the theory that Mr. Cooper was not competent.

The third issue is whether Mr. Bartlett or Mr. Laughton made false representations to, or knowingly concealed facts from, Mr. Cooper which might influence his valuation.

There is no, or no sufficient, evidence of any false representations to, or deliberate concealment from, Mr. Cooper in relation to any matter other than the January agreements and the payments thereunder. Again the plaintiffs' theories are unsupported by the contemporaneous evidence. We have dealt fully with the facts and inferences which are relevant to the January agreements and to the payments thereunder.

It must now be accepted that the January agreements and the payments thereunder were dishonestly concealed from the board of Newman to the extent indicated. They were not disclosed to Mr. Cooper. They should have been disclosed to Mr. Cooper because by accepting and retaining £215,950 in advance under the January agreements T.P.G. was adhering to the prices specified in the January agreements. Thus Mr. Bartlett should have mentioned the January agreements in the body of the strategy document, should have mentioned the January agreements to the board and should have told Mr. Cooper the facts concerning the January agreements and the payments. The January agreements and the payments should have been disclosed also because Mr. Laughton, who had agreed on behalf of T.P.G. to sell 800,000 Dover shares for £146,000 and to sell the Metropole shares for £85,000, had written to Mr. Cooper on April 11, 1975, saying that 832,000 Dover shares were worth £240,000 and that the Metropole shares were worth £350,000. The last payment of the instalments of the aggregate sum of £215,950 was made after Mr. Cooper had been instructed. Mr. Laughton should have told Mr. Cooper that £215,950 had been paid in advance when he was putting forward his arguments that £75,000 should be included in Mr. Cooper's valuation under the heading of interest. When Mr. Cooper later found out about the payment of £215,950 he was allowed to believe that the payments had been made on account of the strategy document transaction. Then Mr. Bartlett lied about the origin and purpose of the payments in advance to the shareholders at the extraordinary general meeting. He did that in order to conceal the existence of the January agreements, but there was no point in concealing the January agreements unless they were thought to be relevant or possibly relevant to the strategy document proposals and to the value of the assets. If Mr. Bartlett had been

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1981 WL 188137 (CA (Civ Div)), [1982] 1 All E.R. 354, [1982] Ch. 204, [1982] 2 W.L.R. 31
**(Cite as: [1982] Ch. 204)**

truthful at the extraordinary general meeting then at the very least there would, or might, have been a demand for Mr. Cooper to reconsider his valuation in the light of the January agreements and the payments thereunder. When the circular was prepared Mr. Bartlett knew that the January agreements **\*233** were material because in evidence he said that the position was that if the strategy document proposals had not been accepted by the shareholders, then the January agreements would have been put forward. When the circular was prepared Mr. Bartlett and Mr. Laughton must have known that the statement that £216,000 was an advance payment for the strategy document transaction was at best a half-truth. They were originally payments on account of the January agreements and those payments had never been formally ratified and continued as payments on account of the strategy document proposal. If the circular had been revised so as to disclose the January agreements and the payments, then Mr. Cooper, as a member of Deloittes considering and playing a prominent part in the production of the circular, would have had at least an opportunity to inquire about the January agreements and to reconsider his valuation in the light of those agreements.

The judge appears to have found that Mr. Bartlett and Mr. Laughton dishonestly concealed the January agreements and the payments thereunder from Mr. Cooper, because in his judgment Vinelott J. said:

"Mr. Cooper was not told of the sale in January of the shares in Metropole to Newman at the price of £85,000. He agreed that if he had known of this sale he would have found it impossible to attribute any value to the shares of Metropole except the agreed £85,000."

The judge made a similar comment about the Dover shares.

It is unsatisfactory that because the statement of claim was directed wholly to the circular, Mr. Bartlett and Mr. Laughton were not directly accused, and the judge did not directly hold, that Mr. Bartlett and Mr. Laughton dishonestly concealed the January agreements and the payments thereunder from Mr. Cooper. But we consider that the dishonest

concealment from the board and the shareholders (amply proved) necessarily involved dishonest concealment from Mr. Cooper, even if Mr. Bartlett and Mr. Laughton did not appreciate wholly or at all the significance to Mr. Cooper of the January agreements in connection with value. Mr. Bartlett's untrue statements to the shareholders at the extraordinary general meeting and his acquiescence in misleading Mr. Cooper and in the form of the circular support the inference that from start to finish Mr. Bartlett and Mr. Laughton were dishonest in concealing the agreements from everybody concerned, namely, the board, Mr. Cooper and the shareholders. Although the statement of claim was directed in terms solely to the circular, Mr. Bartlett and Mr. Laughton must have appreciated, once the statement of claim raised the issue of the January agreements, that they were accused of concealing the January agreements and the payments thereunder at all times from January 7, 1975, until completion of the sale in July 1975, including concealment from Mr. Cooper. Mr. Bartlett gave evidence to explain why the January agreements and the payments thereunder were not disclosed and that explanation was not accepted by the judge.

It is not possible to be certain whether and to what extent Mr. Cooper's valuation would have been affected by a disclosure of the January agreements and payments. It was only after some tendentious **\*234** cross-examination by Mr. Caplan and some forceful intervention by the judge that Mr. Cooper was persuaded to reach the conclusion which the judge had already reached, and to make the remarks upon which the judge relied.

Nevertheless we think that Mr. Cooper must have been impressed, and ought to have been impressed, by the fact that T.P.G. had accepted the prices specified in the January agreements as fair and reasonable values for the Dover and Metropole shares, provided that the £215,950 was paid by instalments beginning in January. and £215,950 was paid in advance by Newman and accepted by T.P.G. between January and April 1975. Had Mr. Cooper known the facts he would have valued the Dover shares at £150,000, i.e. the January price of £146,000 for

800,000 Dover shares adjusted for the fact that Mr. Cooper was valuing 832,000 shares. He would have valued the Metropole shares at £85,000, the January price, instead of £100,000. This would have reduced the net consideration by £ 45,000, originally from £225,000 to £180,000.

On this basis the damage caused to Newman by the dishonest concealment of the January agreements and the payments thereunder from Mr. Cooper was £45,000. The damages are not affected by the fact that Newman have accepted the transaction from T.P.G. and have kept their winnings instead of reclaiming their stake.

In the result we consider that the evidence, the statement of claim and the judgment of Vinelott J. establish Newman's entitlement to damages for dishonest concealment of the January agreements. That concealment caused foreseeable loss to Newman of £45,000. Where such dishonest concealment causes foreseeable loss, a cause of action in fraud is established, even though the defendants did not deliberately intend to cause the loss. This fraud having been established, we do not consider that the uncertain character of the pleadings requires this court to relieve Mr. Bartlett or Mr. Laughton from the consequences of that fraud.

No amount of further evidence by Mr. Laughton or any other witness could explain away the admitted fact that T.P.G. had accepted £215,950 as advance consideration under the January agreements, that Mr. Angus Murray and Mr. Cooper knew nothing of the January agreements or the payments thereunder and that Mr. Bartlett, with the acquiescence and knowledge of Mr. Laughton, lied to the shareholders about the nature of the payments.

The issue of fraud in connection with the January agreements was clearly raised by the pleadings, albeit that the express allegation was directed to the circular. The dishonest concealment of the January agreements was, we think, clearly established by the evidence. We have commented adversely on the manner in which the whole action was clouded by the pleadings and the presentation of the case, but

we do not consider that these defects enable Mr. Bartlett and Mr. Laughton to escape from the consequences of the one relevant fraud which was pleaded, proved, argued and decided.

We wish to hear argument in due course about costs in the court below and in this court. T.P.G. may wish to ask this court to review the order for costs against them made by the judge. We also wish to hear **235** argument about the plaintiffs' costs and their possible responsibility for Newman's costs in the light of the plaintiffs' responsibility for pleading the personal action and thereby prevailing upon the judge to hear the derivative action despite the protests of Newman. We also wish to hear arguments as to whether the enormous costs incurred by the plaintiffs as a result of their own pleadings and presentation of the case ought to be visited upon Mr. Bartlett and Mr. Laughton. We also wish to hear argument whether in the exceptional circumstances of the present case Mr. Bartlett and Mr. Laughton are entitled to be relieved by the plaintiffs in respect of the costs, or part of the costs, which were incurred by Mr. Bartlett and Mr. Laughton themselves in repelling the indiscriminate attacks which were made upon them, in a case in which the dishonesty which alone founds our finding of damages was never clearly pleaded. We may have to consider whether it was practicable for the defendants to consider paying something into court, if they were so minded - not£450,000, but perhaps £45,000 or thereabouts - and so save themselves the risk of paying lawyers' costs due to one side or the other of half a million or more. At present we know nothing about the costs of this lamentable litigation, and we wish to know about the figures involved on all sides as costs in the High Court and this court. We expect all parties to present those figures when we hear the argument about costs on the date arranged for restoring the appeal in order to settle the order of the court, and to decide upon the proper orders for costs. We wish to hear argument as to whether the £45,000 should be paid by T.P.G., who benefited from the fraud, or by Mr. Bartlett and Mr. Laughton.

We would add this. The plaintiffs have painted Mr.

Bartlett and Mr. Laughton as crooks, deliberately milking Newman of vast sums of money for their own benefit. This very serious allegation, persisted in to the end in this court, has not been proved. Mr. Bartlett and Mr. Laughton have successfully established that that case was based on a series of misunderstandings. The plaintiffs have proved that in order to win the boardroom battle in January, and to carry through a transaction which has proved to be advantageous to Newman, Mr. Bartlett and Mr. Laughton kept Mr. Angus Murray in the dark about the January agreements and the advance payments made thereunder. Once embarked on this course of concealment they could not, or would not, make a belated disclosure of the matters they had concealed, and so were led into two further concealments - from Mr. Cooper and ultimately from the shareholders. It was foreseeable that as a consequence of the non-disclosure to Mr. Cooper his valuation would be too high, and though £45,000 is not a great amount in relation to £1.5 million, it is significant enough to escape the description of minimal.

We are sorry that Mr. Laughton was not here to hear this court pronounce that all but one of the serious allegations made against him were not proved.

Before we rise we would say one thing. It is proposed to restore the case in order to determine the form of the order and to hear the submissions of the parties about costs, and the date that is provisionally arranged is October 2. It is difficult to predict how long the submissions **\*236** of the parties will be. There are five parties concerned and the submissions may be fairly long. Mr. Bartlett and Mr, Laughton in the court below evidently spent a small fortune on their own costs and we know nothing about their present financial position; but if it is practicable for them, they may think that there would be great advantage in their instructing their solicitors again to instruct counsel, who are already familiar with the case, in order to argue those questions of costs which Mr. Bartlett and Mr. Laughton wish to submit, and also to make any submissions which are appropriate on how the liability for the£ 45,000 should fall as between T.P.G., who enjoyed

the cash consideration from the purchase, and the two personal defendants. Whether it will be practicable for Mr. Bartlett and Mr. Laughton to dig again into their pockets for the purpose of legal representation on the order for costs we do not know. As we have said, we do not know what the figures are. It may be that the figures altogether might run into, not five figures but six. So that if it is practicable for the two gentlemen we have mentioned to make a further investment - whether it would be properly described as commercial judgment or a gamble we know not - that might be to their advantage.

\*

October 5. On the resumed hearing, counsel announced that the parties had agreed the terms of a settlement and by consent the following order was made.

### Representation

Solicitors: C. F. Whitehorn; Macfarlanes.

### Representation

Solicitors: Simmons & Simmons; C. F. Whitehorn; Macfarlanes; Hopkins, Fuller.

Hearing adjourned. Appeal allowed in part. Respondent's notice dismissed. Order of Vinelott J. varied to extent stated in judgment. Leave granted to fourth defendant to proceed with appeal from judgment of Vinelott J. in terms of amended notice of appeal. On basis that all parties had agreed terms of settlement on all matters (including any party's rights to damages, costs or any other relief) no further order made. All further proceedings stayed. (L. G. S. )

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

**TAB D**

Butterworths Company Law Cases/BCLC 1995 1/Barrett v Duckett and others - [1995] 1 BCLC 243

**[1995] 1 BCLC 243**

# Barrett v Duckett and others

**COURT OF APPEAL, CIVIL DIVISION**

**RUSSELL, BELDAM AND PETER GIBSON LJJ**

**20, 21, 22 , 27  1994**

*Derivative action - Action by shareholder on behalf of company - Whether a shareholder had locus standi to bring such an action.*

Nightingale Travel Ltd (Travel) carried on the business of vehicle hirers. B was a 50% shareholder in Travel. D also held 50% of Travel's shares and was the sole director of Travel. D was also one of two shareholders in Nightingale Coaches Ltd (Coaches) and his wife was a director of that company. B, whose daughter had been married to D, commenced proceedings on behalf of Travel alleging inter alia that D and his wife had been instrumental in diverting business which rightfully belonged to Travel from Travel to Coaches. B also alleged that D had paid moneys belonging to Travel into his own bank account. D had presented a petition to wind up Travel on the grounds that the company was unable to pay its debts or that it was just and equitable that the company should be wound up. The defendants sought to strike out the action on the grounds that the action of B was not a permissible derivative action or at least to stay it until the hearing of the winding-up petition. The defendants appealed against the decision of the judge dismissing their application.

**Held** - Appeal allowed. A shareholder would be allowed to bring a derivative action on behalf of a company where the action was brought bona fide for the benefit of the company for wrongs to the company for which no other remedy is available and not for an ulterior purpose. Conversely, if the action was brought for an ulterior purpose or if another adequate remedy was available, the court would not allow the derivative action to proceed. On the facts, the opportunity to put the company into liquidation provided an alternative remedy to the derivative action. In addition, B was not pursuing the action bona fide in the interests of the company but was pursuing it for personal reasons associated with the divorce of her daughter from D. Accordingly, the appeal would be allowed and the action struck out.

### Cases referred to in judgments

*Cook v Deeks* [1916] 1 AC 554, PC.

*Ebrahimi v Westbourne Galleries Ltd* [1972] 2 All ER 492, [1973] AC 360, [1972] 2 WLR 1289, HL.

*Fargro Ltd v Godfroy* [1986] BCLC 370, [1986] 3 All ER 279, [1986] 1 WLR 1134.

*Ferguson v Wallbridge* [1935] 3 DLR 66, [1935] 1 WWR 673, PC.

*Nurcombe v Nurcombe* [1984] BCLC 557, [1985] 1 All ER 65, [1985] 1 WLR 370, CA.

*Wallersteiner v Moir (No 2)* [1975] 1 All ER 849, [1975] QB 373, [1975] 2 WLR 389, CA.

**Cases also cited or referred to in skeleton arguments**

*CBS/Sony Hong Kong Ltd v Television Broadcasts Ltd* [1987] FSR 262, Hong Kong SC.

*Chesterfield Catering Co Ltd, Re* [1976] 3 All ER 294, [1977] Ch 373.

*Daniels v Daniels* [1978] 2 All ER 89, [1978] Ch 406.

*Embassy Art Products Ltd, Re* [1988] BCLC 1.

*Estmanco (Kilner House) Ltd v Greater London Council* [1982] 1 All ER 437, [1982] 1 WLR 2.

*Forrest v Manchester, Sheffield and Lincolnshire Rly Co* (1861) 4 De GF & J 126, 45 ER 1131, LC.

*Foss v Harbottle* (1843) 2 Hare 461, 67 ER 189.

*Gibson v Barton* (1875) LR 10 QB 329.

*Gray v Lewis* (1873) LR 8 Ch App 1035, LJJ.

*Leon v York-o-Matic Ltd* [1966] 3 All ER 277, [1966] 1 WLR 1450.

*Maidstone Buildings Provisions Ltd, Re* [1971] 3 All ER 363, [1971] 1 WLR 1085.

*Mason v Harris* (1879) 11 Ch D 97, CA.

*Megarity v Law Society* [1981] 1 All ER 641, [1982] AC 81, HL.

*Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] 1 All ER 354, [1982] Ch 204, CA.

*Robson v Dodds* (1869) LR 8 Eq 301.

*Russell v Wakefield Waterworks Co* (1875) LR 20 Eq 474.

*Smith v Croft* [1986] BCLC 207, [1986] 1 WLR 580.

*Smith v Croft (No 2)* [1987] BCLC 206, [1988] Ch 114.

*Western Counties Steam Bakeries & Milling Co, Re* [1897] 1 Ch 617, CA.

**Interlocutory appeals**

By notices of appeal dated 19 November 1993 Christopher Francis Duckett, Janet Frances Duckett and Nightingale Coaches Ltd, the first, second and fourth defendants respectively in an action brought by the plaintiff, Elisabeth Ellen Barrett, appealed with the leave of the Court of Appeal (Hoffmann LJ) given on 12 November 1993 from the order of Sir Mervyn Davies sitting as a judge of the High Court in the Chancery Division dated 28 July 1993 ([1995] 1 BCLC 73) whereby he effectively dismissed their applications to strike out the action and made no order on their alternative applications for a stay of the action until after the hearing of the winding-up petition presented on 13 November 1992 against the third defendant, Nightingale Travel Ltd, in the Leicester County Court (and subsequently transferred to the High Court) but directed the action to be set down to be heard with that petition. The facts are set out in the judgment of Peter Gibson LJ.

*Philip Cayford* (instructed by *Harris Rosenblatt & Kramer*) for the first defendant.

*Anthony Mann QC* (instructed by *Ines de Vecchi*) for the second and fourth defendants.

*David Guy* (instructed by *Nathan Silman*) for the plaintiff.

*Cur adv vult*

**27 July 1994. The following judgments were delivered.**

**PETER GIBSON LJ**

(giving the first judgment at the invitation of Russell LJ). This is a most unhappy case. On its face it is an action brought by a shareholder to right grievous wrongs done to the company of which she is a shareholder. But unfortunately the circumstances in which the action is brought and pursued include a bitter matrimonial dispute between the plaintiff's daughter and the primary defendant. That bitterness appears to have infected decisions taken in relation to these proceedings, added to which there has been a notable lack of realism on the part of the plaintiff and her advisers. The litigation, even though it has not progressed beyond certain interlocutory steps, appears to have exhausted the finances of the plaintiff and, while the amounts claimed for the company are large, to an objective observer the likelihood of significant recoveries seems very small indeed. The two individual defendants who have been served with the proceedings are on legal aid. The result so far is that this litigation has been ruinous to the plaintiff and has caused heavy costs to be incurred by the public purse.

The appeal is brought by the first defendant, Christopher Duckett (Christopher), the second defendant, Janet Duckett (Janet) and the fourth defendant, Nightingale Coaches Ltd (Coaches), from the order of Sir Mervyn Davies, sitting as a judge of the High Court, on 28 July 1993 (*Barrett v Duckett* [1995] 1 BCLC 73). Those defendants had applied by motion to strike out or stay the action brought against them by the plaintiff, Elizabeth Barrett (Mrs Barrett), suing on behalf of the third defendant, Nightingale Travel Ltd (Travel), as well as herself. The judge by his order made no order on the motions and ordered that the action should be set down for hearing with a petition presented by Christopher for the winding up of Travel. The judge refused leave to appeal but such leave was granted by Hoffmann LJ.

Mrs Barrett is the widow of Mr A E Barrett and the mother of Carol Duckett (Carol). Carol was married to Christopher until their divorce on 11 February 1991. She was joined as a third party by Christopher and we have also been shown an order by the judge on 28 July 1993 by which she was made the fifth defendant and Christopher's father was made the sixth defendant in the action. This order has not been served on Carol or Christopher's father and the pleadings have not been amended to include claims against them.

Mr Barrett had carried on a coach hire business in his own name until Travel was incorporated in 1979 and

took over that business. Christopher had worked for Mr Barrett and on Travel's incorporation he and Mr Barrett each took 50 of the 100 £1 shares in Travel and each became a director. On 19 February 1983 Mr Barrett died. Mrs Barrett inherited his shares and for ten months was a director, but she resigned at the end of 1983 when Carol became a director in her place. Christopher was the managing director and the business expanded. Travel acquired and operated several bus routes, Christopher holding the necessary certificate of competence. Travel earned profits sufficient to provide Christopher and Carol with what Mrs Barrett called 'a good living' and Mrs Barrett said that whilst their marriage subsisted she had no cause for concern about the way in which Travel's business was being conducted. She has never received any dividends from her shares nor worked for Travel.

But in February 1989 Christopher's and Carol's marriage broke down. He started to cohabit with Janet, then a certified accountant working for Travel's accountants. Later that year he offered her a job with Travel as its accountant at an annual salary of £28,000 and she commenced work at the end of October 1989. She married Christopher in August 1991. That month she was appointed company secretary, a position which she still holds.

Coaches was incorporated on 13 July 1990. It was acquired by Janet and Christopher, each of whom took one £1 share, and was given the name Portledge Coaches Ltd which they changed to its present name on 8 January 1991. Janet was the sole director of Coaches until December 1991, when she resigned as director and became the company secretary of Coaches. Christopher then became the sole director until August 1992 when he resigned and Janet and Christopher's father became the directors of Coaches. Christopher at that time also sold his one share to his father for £2,000.

In the divorce there are still unresolved ancillary relief proceedings, and it was in those proceedings that Christopher revealed serious misfeasances which had been occurring. He acknowledged that since October 1986 he had diverted cash receipts of Travel into two Post Office Giro accounts, one in the joint names of himself and Carol and the other in his sole name. Sums amounting to £89,000 were placed in the joint account and £128,000 in the sole account. Moreover those receipts were not recorded in the books or accounts or tax returns of Travel. Part of those moneys was used in the refurbishment of a second home for Christopher and Carol, The Noakes in Herefordshire. Once the diversions of Travel's moneys were revealed, draft accounts for Travel were prepared, showing those moneys as directors' loans, and the Inland Revenue were informed. Not only was tax payable on those undeclared receipts but also such loans had adverse tax consequences, attracting as they did advance corporation tax in a substantial sum on which interest ran until the loans were repaid, when there would be a right to recover the tax and interest would cease to accrue. The commonsense solution was to extinguish the loans as quickly as possible.

On the break-down of the marriage, Carol had remained with Christopher's and her two children in the jointly owned but heavily mortgaged matrimonial home in Gerrards Cross, while Christopher and Janet lived in another even more heavily mortgaged property of which Janet is the beneficial owner. The one disposable asset available to Christopher and Carol to reduce the debt to Travel was The Noakes. But Carol refused to sell The Noakes. On 27 September 1990, however, Christopher and Carol met with the Revenue and it was agreed that The Noakes should be transferred to Travel as soon as possible. But Carol refused to co-operate with Christopher on this and other matters relating to Travel; for example she refused to sign the accounts of Travel which could therefore not be filed, in breach of the directors' statutory duties. To break the impasse Christopher attempted to have another director appointed in 1990, but Mrs Barrett opposed this. However on 3 June 1991 in the matrimonial proceedings, Carol gave an undertaking to the court to resign as director and secretary of Travel forthwith and to transfer The Noakes to Travel. Despite the undertaking Carol refused to resign and it was only after an application for her committal that she finally resigned on 17 August 1991, leaving Christopher as the sole director of Travel.

A further difficulty arose between Christopher and Carol over the operation of Travel's bank account on which Carol was a signatory. The defendants say that she continued throughout 1989 and 1990 to draw cheques on that account for her own purposes and the evidence from Janet before us is that over £20,000 of what was agreed with the Revenue to be treated as the directors' loan account is represented by such drawings. Janet says that to enable Travel to have banking facilities, cheques payable to Travel from December 1990 were paid through Coaches' bank account, Coaches in turn paying cheques on behalf of

Travel and supplying cash for wages. £308,000 was paid into Coaches' bank account in this way and, it is said by Janet, paid out by Coaches on Travel's behalf.

In the meantime there had been an offer by Travel to purchase Mrs Barrett's 50 shares for £40,000 in September 1989. Those negotiations failed, but on 24 April 1991 Mrs Barrett offered to sell her shares to Christopher for £70,000 plus a tax indemnity. Christopher offered £70,000 without the indemnity, but she gave as her price, if she had to pay capital gains tax, the sum of £85,000, which was increased to £90,000 on 17 July 1991. Intertwined with the sale of shares in these negotiations was the transfer of The Noakes to Travel, consent to which was sought from Mrs Barrett, who said she would agree to it if the sale of her shares was agreed. But Christopher was unable to raise the purchase moneys demanded, and Mrs Barrett withheld her consent to the transfer and Carol hers to a sale of The Noakes. Christopher applied in the matrimonial proceedings for an order to compel Carol to sign a contract for the sale of The Noakes and on 24 February 1992 by a consent order Carol undertook to sign a sale contract and to allow the sale proceeds to go to Travel subject to a capital gains tax retention. Three months later, alarmed by the risk of repossession of the matrimonial home because no mortgage payments had been made for some months, she successfully applied to the court to be released from her undertaking to allow the sale proceeds of The Noakes to go to Travel on the ground that it represented the only available capital with which she and her children could be rehoused if they lost their home. In December 1992 The Noakes was sold and the net proceeds of just under £100,000 are held on deposit in the joint names of the solicitors of Christopher and Carol pursuant to an order of the court. Thus although Christopher had declared himself on 20 December 1990 a trustee for Travel of his interest in The Noakes, no part of the proceeds has gone to reduce the debt to Travel and interest on the tax on the directors' loans continues to accrue. On 29 May 1992 Travel's auditors advised it that the Revenue were owed £180,000, excluding penalties for the incorrect returns which have yet to be quantified.

In July 1992 the auditors advised Christopher that Travel might be insolvent and on their advice he consulted an insolvency practitioner in Messrs Pannell Kerr Forster (PKF). PKF advised on 10 August 1992 on the options for the company. They pointed out that to continue trading Travel needed continued support from the bank to which it owed £25,000 and that support was not forthcoming, the bank having requested repayment by the end of September 1992. They concluded that it would be difficult to continue trading in the long term and suggested asking the bank to appoint a receiver, which they accepted it might well not be willing to do. They continued:

> 'this presents a problem to the director as on past performance Mrs. E. Barrett would not pass a resolution to wind up the company. The way round this would be for the director to petition the Court to wind up the company due to a break down between the shareholders, the company being insolvent and no longer able to continue trading.'

That advice (in draft) had been received a little earlier and on 8 August 1992 Travel ceased to trade. It sold to Coaches its tangible assets (including its vehicles subject to hire purchase liabilities taken over by Coaches) for £36,895, that being the value put on the assets by a independent valuer. The purchase price was largely borrowed from a bank on security provided by Christopher's father. Christopher called an extraordinary general meeting of Travel at which he proposed that it enter a creditors' voluntary winding up and that a partner in PKF be appointed liquidator. But as PKF correctly forecast, that resolution was defeated by Mrs Barrett's opposition on 29 October 1992. Accordingly on 13 November 1992 Christopher petitioned in the Leicester County Court for the compulsory winding up of Travel. He did so on two grounds: one was that the company was insolvent and unable to pay its debts as they fell due; the other was on the just and equitable ground because of the deadlock position in which the company found itself. The petition has been advertised, but no creditor has appeared to support it. Mrs Barrett opposes the petition. The petition has been transferred to the High Court on the order of Vinelott J.

An estimated statement of affairs at 29 October 1992 shows that Travel's assets at their book value exceed its liabilities by £46,743. But that assumes that the directors will repay their loan account of £239,000. Even if the proceeds of The Noakes were paid to the company in part payment of the loans with a consequent reduction in the sum owed to the Revenue, the liabilities would substantially exceed the assets in the absence of further repayment of the loans.

On 11 March 1993 this action was commenced by the issue of a specially indorsed writ. By the statement of claim Mrs Barrett states that she 'brings this action in a representative capacity on behalf of Travel and/or on behalf of herself' and 'is an oppressed minority shareholder and is entitled to bring this action to recover on behalf of Travel and/or on behalf of herself.' Relief is sought under the following heads:

(A) against Christopher, damages of at least £217,000, the moneys diverted into the Post Office Giro accounts;

(B) against Christopher and/or Janet, who is alleged to be a de facto director of Travel, damages of at least £268,000 being as to £27,000 one year's pay to Janet and as to the remainder remuneration paid to Christopher between 1986/87 and 1990/91, no resolution having been passed by Travel for directors' remuneration;

(C) against Christopher, Janet and Coaches, who are alleged to have entered into a conspiracy together; (1) damages of at least £308,000 (I have already referred to what Janet has said of this sum); (2) accounts and inquiries in respect of the transfer of assets (including confidential information) from Travel to Coaches; (3) declarations that the shares in Coaches are held for Travel and that the assets of Coaches are held for Travel; and (4) a declaration that Travel is entitled to an indemnity against any liability to the Revenue arising out of the matters the subject of complaint.

On the same day Mrs Barrett moved ex parte for and obtained from Mummery J injunctive relief in Mareva form and what may be called a modified Anton Piller form, that is to say requiring the immediate disclosure of the whereabouts of documents comprising all the financial records of Travel and Coaches for the period 1 November 1989 to 31 October 1992. The applications were supported by an affidavit in which Mrs Barrett swore to her belief that Christopher, Janet and Coaches would seek to hide or destroy documents. One curious feature in respect of this order is the fact that on 19 January 1993 a draft affidavit to be sworn by Mrs Barrett in the winding-up proceedings and exhibiting a draft statement of claim for the intended Chancery proceedings (the draft being in almost identical form to that actually issued) was served on Christopher. I find it difficult to believe that Mummery J could have had his attention drawn to the fact that for more than seven weeks Christopher had been alerted to the allegations against him.

The order made by Mummery J was executed and Mrs Barrett obtained access to the records of Travel and Coaches which she sought. An affidavit was sworn by Christopher verifying his and Travel's assets. He has an equal interest with Carol in the former matrimonial home in Gerrards Cross, but because of the increasing mortgage arrears as well as 'heave' problems, it is doubtful what that interest is worth, if anything. He has an interest under Travel's pension scheme, but it is inherently improbable that he could presently obtain any moneys therefrom. He has already declared himself a trustee for Travel of his interest in The Noakes and so has no interest in its proceeds. Apart from that he has 50 shares in Travel. Janet has sworn an affidavit verifying her and Coaches' assets. She owns the equity of the house where Christopher and she live but the equity in it is only said to be worth some £20,000-£30,000. She has no other assets apart from her one share in Coaches. Coaches has vehicles worth £80,000 (subject to hire purchase liabilities) and its cash at its bank less its debt to the bank is £7,000. Christopher, Janet and Coaches promptly applied to discharge Mummery J's order, but that application has not yet been heard.

On 9 June 1993 Christopher, Janet and Coaches issued their notices of motion to strike out the action or to stay it until after the hearing of the winding-up petition presented by Christopher. They did so on the basis that an alternative remedy to the derivative action existed and that Mrs Barrett is an inappropriate person to conduct such litigation on behalf of the company. Janet also applied under RSC Ord 18, r 19 to strike out the claims made against her as a de facto director. The judge rejected those claims, holding that the practical course was to list the action for hearing with the petition (see *Barrett v Duckett* [1995] 1 BCLC 73 at 83).

The general principles governing actions in respect of wrongs done to a company or irregularities in the conduct of its affairs are not in dispute:

1. The proper plaintiff is prima facie the company.

2. Where the wrong or irregularity might be made binding on the company by a simple majority of its members, no individual shareholder is allowed to maintain an action in respect of that matter.

3. There are however recognised exceptions, one of which is where the wrongdoer has control which is or would be exercised to prevent a proper action being brought against the wrongdoer: in such a case the shareholder may bring a derivative action (his rights being derived from the company) on behalf of the company.

4. When a challenge is made to the right claimed by a shareholder to bring a derivative action on behalf of the company, it is the duty of the court to decide as a preliminary issue the question whether or not the plaintiff should be allowed to sue in that capacity.

5. In taking that decision it is not enough for the court to say that there is no plain and obvious case for striking out; it is for the shareholder to establish to the satisfaction of the court that he should be allowed to sue on behalf of the company.

6. The shareholder will be allowed to sue on behalf of the company if he is bringing the action bona fide for the benefit of the company for wrongs to the company for which no other remedy is available. Conversely if the action is brought for an ulterior purpose or if another adequate remedy is available, the court will not allow the derivative action to proceed.

Although Mrs Barrett is not a minority shareholder but a person holding the same number of shares as the other shareholder, Christopher, in the circumstances of this case she can be treated as being under the same disability as a minority shareholder in that as a practical matter it would not have been possible for her to set the company in motion to bring the action.

The debate before the judge and before us has largely turned on the applicability of the propositions in para 6 to the facts of the case, and because of their importance I will illustrate those propositions by reference to three authorities.

First on the necessity for the absence of an ulterior purpose, the words of Lawton LJ in *Nurcombe v Nurcombe* [1984] BCLC 557 at 562, [1985] 1 WLR 370 at 376 are apposite:

> 'It is pertinent to remember, however, that a minority shareholder's action in form is nothing more than a procedural device for enabling the court to do justice to a company controlled by miscreant directors or shareholders. Since the procedural device has evolved so that justice can be done for the benefit of the company, whoever comes forward to start the proceedings must be doing so for the benefit of the company and not for some other purpose. It follows that the court has to satisfy itself that the person coming forward is a proper person to do so.'

Second on the availability of alternative remedies, there are two authorities on the effect of liquidation in relation to a derivative action. In *Ferguson v Wallbridge* [1935] 3 DLR 66 at 83 Lord Blanesburgh delivering the judgment of the Privy Council said:

> 'in their Lordships' judgment, [the present action] could have been so maintained if the company were not in liquidation. *Cook v Deeks* ([1916] 1 AC 554) is clear authority for this. But could it be so maintained now that the company is assumed to be in liquidation? And the answer must again, as their Lordships think, be in the negative. The permissibility of the form of proceeding thus assumed, where the company concerned is a going concern, is an excellent illustration of the golden principle that procedure with its rules is the handmaid and not the mistress of justice. The form of action so authorised is necessitated by the fact that in the case of such a claim as was successfully made by the plaintiff in *Cook v Deeks* - and there is at least a family likeness between that case and this - justice would be denied to him if the mere possession of the company's seal in the hands of his opponents were to prevent the assertion at his instance of the corporate rights of the company as against them. But even in the case of a going company a minority shareholder is not entitled to proceed in a representative action if he is unable to show when challenged that he has exhausted every effort to secure the joinder of the company as plaintiff and has failed. But *cessante ratione legis, cessat lex ipsa*. So as soon as the company goes into liquidation the necessity for any such expedient in procedure disappears. Passing over the superficial difficulty that a company in compulsory liquidation cannot be proceeded against without the leave of the Court, the real complainants, the minority shareholders, are no longer at the mercy of the majority, wrongly retaining the property of the company by the strength of their votes. If the liquidator,

> acting at the behest of the majority, refuses when requested to take action in the name of the company against them, it is open to any contributory to apply to the Court, [and then he refers to the Canadian statute and says:] and under s 234 of the Provincial Companies Act which corresponds to s 252 of the Imperial Statute (Companies Act, 1929 (Imp.), c. 23 [now s 112 of the Insolvency Act 1986], it is open to the Court, on cause shown, either to direct the liquidator to proceed in the company's name or on proper terms as to indemnity, and otherwise to give to the applicant leave to use the company's name as plaintiff in any action necessary to be brought for the vindication of the company's rights.'

That reasoning was applied by Walton J in *Fargro Ltd v Godfroy* [1986] BCLC 370, [1986] 1 WLR 1134. In that case a minority shareholder in a company which was deadlocked wished to bring a derivative action, alleging that the other shareholder and directors had diverted assets and opportunities belonging to the company to their own use. Before the writ was issued the company went into liquidation. When the plaintiff issued the writ, the defendants applied to strike out. The application succeeded. Walton J said ([1986] BCLC 370 at 372, [1986] 1 WLR 1134 at 1136):

> 'But once the company goes into liquidation the situation is completely changed, because one no longer has a board, or indeed a shareholders' meeting, which is in any sense in control of the activities of the company of any description, let alone its litigation. Here, what has happened is that the liquidator is now the person in whom that right is vested. Now, that being the case, the plaintiff can take a variety of courses. The plaintiff can ask the liquidator to bring the action in the name of the company. Doubtless, as in virtually all cases, the liquidator will require an indemnity from the persons who wish to set the company in motion against all the costs, including, of course, the costs of the defendants, which he may have to incur in bringing that action. The liquidator may ask for unreasonable terms or, on the other hand, the liquidator may be unwilling to bring the action, and under those circumstances it is always possible for the shareholders who wish the action to be brought to go to the court asking for an order either that the liquidator bring the action in the name of the company or, more usually, that they are given the right to bring the action in the name of the company, of course, against the usual type of indemnity, which will, if there is any difficulty about the matter, be settled by the court. And I think that this has been the practice and procedure for a very long time indeed.'

He then cited *Ferguson v Wallbridge* and commented ([1986] BCLC 370 at 374, [1986] 1 WLR 1134 at 1138):

> 'So there is clear authority in the Privy Council as to the vast distinction that there is between the position where the company is a going concern and the minority shareholders' action can be brought, and a case where when it goes into liquidation where there is no longer any necessity for bringing a minority shareholders' action. Because, subject if necessary to obtaining the directions of the court, which is in itself an excellent thing as acting as a filter against any totally wrong-headed action, the action can be brought directly in the name of the company as it should be so brought.'

In *Fargro Ltd v Godfroy* the liquidator had in fact agreed to bring the action, but it is clear from the reasoning of both Lord Blanesburgh and Walton J that even if the liquidator's views were unknown the derivative action would not be allowed to proceed. The obvious factual difference between *Fargro Ltd v Godfroy* and the present case is that Travel, unlike the company in *Fargro*, was not in liquidation at the time the derivative action was commenced. I shall return later to the question whether this difference is of crucial importance in the present case.

At this point it is convenient to rehearse what seem to me to be the salient features of this case.

1. Mrs Barrett was until the breakdown of her daughter's marriage a merely passive shareholder, taking no part after 1983 in the running of Travel. She received no dividends from her holding in the company. Her only prospect of obtaining a benefit from her shares has been and is if there were to be a winding up or a sale of her shares to Christopher or the company. It is inconceivable that an outside purchaser could be found for her shares alone. At an extraordinary general meeting of Travel on 16 June 1992, her accountant and proxy, Mr Wellstood, when asked whether she was aware that her refusal to consent to the transfer of The Noakes into Travel effectively reduced her shareholding in the company to a negligible value whilst also putting the company at risk, replied that she did understand this and had written off her interest in Travel.

2. For a considerable time after being aware of the conduct of Travel's affairs of which complaint is now made by her and which plainly could be said to have been conduct in a manner which was unfairly prejudicial

to her interest as a shareholder, she took no legal action, but participated in active negotiations for the sale of her shares which she offered to sell. That was a realistic attitude as she is a lady of 73 and no one has been put forward as available to run the company other than Christopher. But when those negotiations broke down on price, despite having professional advisers she did not avail herself of what one would have thought was the plain and obvious legal remedy available to her, namely a petition under s 459 of the Companies Act 1985, asking for relief under s 461(2)(d), namely the purchase of her shares, with the alternative, if she thought the company should be recovering what had wrongly been taken from it, of seeking relief under s 461(2)(c), namely authority for civil proceedings to be brought in the name and on behalf of the company by such person or persons and on such terms as the court may direct.

3. Travel is deadlocked, has not traded since August 1992 and is probably insolvent. On the evidence before this court Christopher and Carol are unable to repay the directors' loans in full.

4. When Christopher attempted to put Travel into a creditors' voluntary liquidation, Mrs Barrett prevented it.

5. Christopher's attempt to put Travel into compulsory liquidation is opposed by Mrs Barrett because she says that she believes Travel has a future. But that future depends on her succeeding in her claim that the shares in and assets of Coaches are held in trust for Travel and also that Mr Wellstood is right in his advice to Mrs Barrett in an unsworn report made by him on 27 May 1993 after the action commenced and after examination of the documents produced by the order of 11 March 1993. In it he said that had Travel's business been offered for sale on the open market -

> 'I suspect that a price of 6 times pre-tax profits (that is the adjusted profit after adding back excess remuneration, etc.) would have been established, giving a value of approximately £400,000.'

I have to say that I regard that suspicion which is based on a large number of assumptions, as unrealistically optimistic given that it is through Christopher holding a certificate of competence that bus routes have been and are operated and that Christopher appears to have no service agreement with Travel (or Coaches for that matter).

6. It was only after Christopher's attempts to put Travel into liquidation that Mrs Barrett belatedly commenced this action. Thereby she has demonstrated that she is not content that it should be left to a liquidator to bring proceedings but that she wants control of such proceedings.

7. Travel has arguable claims against Christopher, Janet and Coaches, and some against Christopher are undisputed. There is however dispute as to whether some particular claims are arguable. For example, on the evidence before this court it may be doubted whether Mrs Barrett's advisers, in causing her to claim damages of £308,000, have understood what occurred in relation to the £308,000, and Janet hotly denies ever acting as de facto director. But it is unnecessary to decide these disputes, given that it is conceded that there are claims which in a properly constituted action should be allowed to go to trial.

8. Travel has arguable claims against Carol. In Mrs Barrett's own words (in her affidavit of 1 March 1993 in support of her application for Mareva and Anton Piller injunctions):

> 'It would seem that . . . [Christopher] and, to a lesser extent Carol, have diverted funds or stolen monies belonging to Travel and have thereby caused Travel to incur a very large liability for advance corporation tax, interest and, probably, associated fines and/or penalties.'

9. Mrs Barrett has no moneys of her own to continue this action. She says that she incurred legal costs prior to 28 July 1993 of £52,000 which used up her life savings. Surprisingly in view of *Wallersteiner v Moir (No 2)* [1975] 1 All ER 849 at 859, 865-866, [1975] QB 373 at 392, 400, she was granted legal aid until the certificate was discharged on 8 April 1994. She has applied to this court (but we have not yet heard the application) for an order that Travel should indemnify her for the costs which she has expended and will have to expend in this action, this appeal and that application. The only moneys presently available to Travel are the £36,895 proceeds of the sale to Coaches.

10. Mrs Barrett remains close to Carol and as she frankly acknowledged in her affidavit of 1 June 1993:

> 'I would be less than truthful if I were to deny that I was reluctant to sue my own daughter.'

The joinder of Carol as a defendant to the action remains, in the absence of amendment of the statement of claim to include claims against her and in the absence of service of proceedings on Carol, a token gesture.

Mr Anthony Mann QC for Janet and Coaches and Mr Cayford for Christopher point out that the circumstances of the present case are unprecedented. In all the reported cases on derivative actions the wrongdoer has by his exercise of control over the company prevented proceedings being brought against him, whereas in the present case the alleged wrongdoer, by trying to put the company into liquidation, has attempted before the action commenced and is attempting to create a situation where the allegedly oppressed minority shareholder is no longer at the mercy of the controlling shareholder and director. In my judgment the court is entitled to view with suspicion and caution the actions of the alleged wrongdoer lest on their true interpretation they are no more than attempts to defeat or at least to defer judgment being obtained against him. But in the present case it is significant that Christopher's attempts to put the company into liquidation (i) came after a long period of deadlock during which he was frustrated in his attempt to put The Noakes or its proceeds into Travel to reduce the directors' loan account and the tax debt, (ii) followed advice from an insolvency practitioner in a well-known firm of accountants and (iii) preceded not only the commencement of the action but also any intimation that the action would be commenced.

Mr Guy for Mrs Barrett submitted that the judge was right to reject the contention that she had another available remedy through proceedings in the liquidation of Travel.

First he said it was not certain that Travel would be wound up on Christopher's petition. But that ignores the fact that Mrs Barrett was given, but rejected, the opportunity to have Travel put into a creditors' voluntary liquidation, and whilst I accept that it is possible that the court in the exercise of its discretion would not on an opposed petition compulsorily wind up the company when the petitioner is the alleged wrongdoer, that possibility is only a live one because of her opposition. Even if she continued to oppose the petition, the court may be driven to accept that there is no alternative to a winding up, given the apparent insolvency and worsening financial position of Travel while further interest accrues to the Revenue and given the deadlock in the company.

Second, Mr Guy supported the judge's comment that there was no certainty that the liquidator would sue and that Mrs Barrett had no means of compelling him to sue. Mr Guy said that the liquidator needed to incur the cost of applying to the court to sue. It is of course correct that the liquidator has a discretion. A liquidator in a compulsory liquidation can bring an action with the approval of either the liquidation committee or the court (see s 167(1) of the Insolvency Act 1986). If Mrs Barrett is aggrieved by the decision of such a liquidator, she can apply to the court under s 168(5) of the 1986 Act. In the case of a voluntary winding up, the liquidator is not obliged to obtain the sanction of the court or liquidation committee to bring any proceedings (see Sch 4, para 4 of the 1986 Act) and an aggrieved contributory has power to apply to the court under s 112(1) of the 1986 Act. But in any event it is apparent from the reasoning of Lord Blanesburgh in *Ferguson v Wallbridge* and of Walton J in *Fargro Ltd v Godfroy* that the fact that a liquidator has a discretion in relation to the bringing of an action is no answer to the objection based on the availability of an alternative remedy. No doubt the liquidator may be inhibited from pursuing claims by the shortage of available funds and may seek an indemnity from Mrs Barrett if she wants him to pursue claims which the assets available to him would not justify. But I see no injustice in that. On her own evidence she lacks the means to pursue this action further. As the company does have some money which might be used in litigating the claims, it is in my opinion manifest that it is better that the decision whether or not to use the money should be taken by an independent liquidator rather than by Mrs Barrett.

I therefore conclude that in the unusual circumstances of this case, the opportunity that Travel be put into liquidation which was offered and continues to be offered by Christopher can be said to provide an alternative remedy such as makes the derivative action inappropriate.

But the matter does not stop there. I turn to the second ground on which Mr Mann and Mr Cayford submit

that this action should not be allowed to proceed, namely that Mrs Barrett has an ulterior motive which makes her an inappropriate person to bring these proceedings. On this the judge commented ([1995] 1 BCLC 73 at 82):

> 'No doubt there is ill-feeling between Mrs Barrett and Mr Duckett but that in itself cannot debar Mrs Barrett - were it to do so, most derivative actions would be frustrated.'

I see the force of that, but I am not persuaded that it is a sufficient answer to the point put against her in the light of the particular circumstances. Here I repeat what I have referred to as the salient features of this case. Personal rather than financial considerations would appear to be impelling her to pursue an action, in the outcome of which she would have no financial interest if the company were insolvent, and in preventing a winding up when that would provide the only practical means of obtaining some benefit from her shares if the company were in fact solvent.

I can well understand that Mrs Barrett is upset at what has occurred between Christopher and Carol and that she is indignant at the supplanting of Carol by Janet. But her partiality shows through all her evidence, and it is by her behaviour in relation to the claims against Carol, in contrast to the claims against Christopher and Janet, that I have become convinced that she is not pursuing this action bona fide on behalf of the company. If she had been, she would have had to sue Carol no less than Christopher in respect of diverted moneys. She claims that she did not sue Carol because Carol does not have any assets. But when Mr Guy was asked what assets Christopher had to make him worth suing, the first two items listed by Mr Guy were the jointly owned former matrimonial home in Gerrards Cross and the proceeds of The Noakes in each of which Carol retains her interest. Mr Guy sought to assure us that now that the decision had been made to sue Carol, the action would proceed against her. I am afraid that I simply do not believe that Mrs Barrett would pursue any claim against her daughter to the point of enforcing judgment: to my mind it is improbable in the extreme that she would force her daughter and grandchildren out of their home and I quite understand why she would not. Her failure to take the order making Carol a defendant any further speaks volumes. On the other hand I do not doubt that she would pursue the other defendants as far as she could, regardless of whether there is any real likelihood of recovery. This is not a satisfactory basis for an action on behalf of the company.

I am left in no doubt that this is an action which should not be allowed to proceed. Hoffmann LJ in giving leave to appeal said:

> 'As a matter of common sense, it seems arguable that the parties should not be subjected to lengthy and costly proceedings exacerbated by family hostilities when an independent liquidator might decide that the action could be settled on reasonable terms.'

I entirely agree with such argument. I hope that even now Mrs Barrett will agree to a voluntary winding up to save costs and that she will promptly give the liquidator the benefit of all the work that has been done in this case on her behalf to facilitate any proceedings which he may wish to pursue.

For these reasons I respectfully differ from the judge in his conclusions. I would allow the appeal and strike out this action.


**BELDAM LJ.**


In this unprofitable litigation a once successful family venture has been brought to ruin by false accounting and tax evasion for which Christopher Duckett must bear the main responsibility. The company's resulting insolvency could perhaps have been retrieved had not Carol Duckett been supplanted as wife and director by Janet Duckett. The impasse in the company's affairs is a predictable result, as is Mrs Barrett's desire, so far as she could, to ensure that Christopher and Janet Duckett should not deprive her daughter and grandchildren of a share in the profits of the business of the company her husband had built up and in which

she held 50% of the shares. Mrs Barrett may not have been well advised on the choice of the steps available to her; her daughter may have gone back on an undertaking to assist in the transfer to the company of The Noakes, though the court undoubtedly considered she had grounds which justified releasing her from the undertaking. For all this, I am unimpressed by the criticisms voiced by counsel for Christopher and Janet Duckett. It does not lie well in the mouth of those who have effectively ousted Mrs Barrett's family from sharing in the profits of the company to be critical of her, or to question her motives. Nevertheless with reluctance, rather than by persuasion by the argument, I too have reached the conclusion that the action brought by Mrs Barrett should not proceed. I have sympathy for the dilemma which faced the judge and as I am differing from his solution I shall state my reasons.

Between 1986 and 1990 a sum of £212,500 was diverted from the company's trading receipts into private accounts of the directors, Christopher and Carol Duckett. These substantial depredations seem to have escaped the notice of the company's accountants and auditors and only came to light when, in divorce proceedings between Christopher and Carol Duckett, her claim to ancillary relief for herself and the children was vigorously contested. It appears that Christopher Duckett was then advised by the company's accountants to disclose this dishonesty to the Inland Revenue and to seek the advice of insolvency practitioners. The result was an insolvency practitioner's report of 10 August 1992 with attached estimate of the state of affairs of the company showing the debt due from the directors under the cosmetic soubriquet 'Directors' Loan Account, £240,000'. To this arrangement it is said the Inland Revenue agreed. I find it difficult to see how this sum could legitimately be regarded as a loan made by the company to the directors when by s 330 of the Companies Act 1985 the company would have been prohibited from making it. As appears from the affidavits put before the court, there is no reasonable prospect of either of the directors making any significant reduction in this debt. The company is insolvent and has ceased to trade. The principal creditor appears to have decided to let matters drift.

Gibson LJ has fully described the events leading up to Mrs Barrett's resistance to a creditor's voluntary winding up and to the presentation of the winding-up petition by Christopher Duckett. Those events do not persuade me that the absence of merit on her part exceeds that of the other parties in this dispute.

If, as the judge decided, both the derivative action and the winding-up petition were to continue, the result would be even more wasteful of the company's meagre resources than the proceedings to date. Neither the action nor the petition would inevitably resolve the stalemate. Ultimately, I think, the court would be required to choose between allowing the plaintiff to pursue the company's remedies when she has not and could not realistically be expected to pursue them with the impartiality necessary for such an action or having to accede to a petition to wind up the company by a director whose criminal conduct has instigated its insolvency, a question which clearly troubled Vinelott J when he heard the application to transfer the petition to London. The public interest lies in adopting the course which is most likely to recover the revenue of which it has been defrauded.

Whilst it will be for the court hearing the winding-up petition to decide if the order can be justified on either of the grounds put forward by Christopher Duckett, I find difficulty in understanding how it could be said to be just and equitable for the court to wind up the company in these circumstances. In *Ebrahimi v Westbourne Galleries Ltd* [1972] 2 All ER 492, [1973] AC 360 Lord Wilberforce, after reviewing the authorities which led to the adoption of the words 'just and equitable' in company and partnership law, said ([1972] 2 All ER 492 at 500, [1973] AC 360 at 379):

> 'The words are a recognition of the fact that a limited company is more than a mere judicial entity, with a personality in law of its own: that there is room in company law for recognition of the fact that behind it, or amongst it, there are individuals, with rights, expectations and obligations inter se which are not necessarily submerged in the company structure. That structure is defined by the Companies Act 1948 and by the articles of association by which shareholders agree to be bound. In most companies and in most contexts, this definition is sufficient and exhaustive, equally so whether the company is large or small. The "just and equitable" provision does not, as the respondents suggest, entitle one party to disregard the obligation he assumes by entering a company, nor the court to dispense him from it. It does, as equity always does, enable the court to subject the exercise of legal rights to equitable considerations; considerations, that is, of a personal character arising between one individual and another, which may make it unjust, or inequitable, to insist on legal rights, or to exercise them in a particular way.'

In the circumstances of this case the court could hardly decide that it is just and equitable for a defaulting director to exercise his right to petition to wind up this company if it is opposed by another and equal shareholder. As Lord Cross said ([1972] 2 All ER 492 at 501, [1973] AC 360 at 387):

> 'A petitioner who relies on the "just and equitable" clause must come to court with clean hands, and if the breakdown in confidence between him and the other parties to the dispute appears to have been due to his misconduct he cannot insist on the company being wound up if they wish it to continue.'

Nor do I think it relevant in the circumstances of this case that Mrs Barrett was a 'passive' shareholder, content to receive no dividend from her holding, until her daughter was ousted from the company by the arrival of Janet Duckett. It is not suggested that Mrs Barrett was aware that the company's receipts were being diverted for the purpose of evading tax. She was no doubt content that her daughter and grandchildren should receive any benefits which might otherwise have accrued to her in the form of a dividend on her shares.

As to the other ground on which the petition is based, the company is undoubtedly insolvent. Both Christopher and Carol Duckett are liable to the company for the majority of the deficiency. The company has ceased trading as its assets and goodwill have been transferred to Nightingale Coaches Ltd. The company's only additional 'asset' is its undeniable cause of action against its former directors and the possibility of a claim against Janet Duckett. If a liquidator were appointed, he would be bound to proceed against the former directors and would no doubt obtain summary judgment. Any claim against Janet Duckett and Nightingale Coaches Ltd is more problematical and its pursuit would require resources which neither the company nor Mrs Barrett have. A decision whether to pursue the claim in the interests of the company having regard to the limited resources available is, in my judgment, better left to a liquidator. But there still remains the difficult question whether it is an insuperable bar to the making of a winding-up order on the ground that the company is insolvent that its insolvency was caused by the conduct of the petitioning director in taking the company's moneys and by his inability to pay them back.

I am not convinced that in all circumstances a director's past wrongdoing should be regarded as a bar to his presenting a winding-up petition. It is not in the public interest to deter those who have defrauded the Revenue from coming forward to admit their wrongdoing. Although the disclosure in the present case was prompted rather by necessity than conscience, if a winding-up order is made a liquidator would be in a position to ensure so far as he could that Christopher and Carol Duckett fulfilled their obligation to reimburse the company. No doubt some of the earnings which accrue to Christopher Duckett from the use of the assets acquired from the company could be used for this purpose.

In their original application before the judge all the appellants applied for an order that Mrs Barrett's action either be struck out or stayed. At one time I was attracted to the latter course but, on reflection, I consider that the public interest in recovering the misappropriated assets would be better served by dismissing her action and allowing the winding-up petition to continue.


**RUSSELL LJ.**


I agree that this appeal should be allowed and Mrs Barrett's action struck out for all the reasons appearing in the judgment of Peter Gibson LJ.

*Appeal allowed.*

L I Zysman Esq Barrister.

**TAB E**

a     # Konamaneni and others v Rolls-Royce Industrial Power (India) Ltd and others

CHANCERY DIVISION

b    LAWRENCE COLLINS J

21–23, 26–28 NOVEMBER, 20 DECEMBER 2001

*Company – Minority shareholder – Representative action – Foreign company –*
*Whether English court having jurisdiction to hear derivative claim in relation to foreign*
*company – Whether appropriate forum for determining shareholders' entitlement to*
c    *bring derivative claim to be taken into account by English court when considering*
*appropriate forum for trial of action – CPR 6.20(3), 19.9.*

The claimants were minority shareholders in SPGL, an Indian company. All the
directors of SPGL were Indian citizens, and all but two of them lived in India.
d    The shareholders brought a derivative claim in England against two English
companies, seeking to enforce a claim by SPGL in respect of bribes allegedly paid
by the English companies to SPGL's managing director, an Indian living in India,
for the purpose of securing contracts for the construction and maintenance of a
power station in India. A large number of actions or criminal complaints relating
to the project were pending in India, some of which raised issues of wrongdoer
e    control that also arose in the English action. In that action, the shareholders
alleged that the general meeting of SPGL was indirectly under the control of the
wrongdoers; that it was therefore plain that the general meeting would not pass
a resolution authorising or approving the pursuit of proceedings against the
English companies; that at least half of SPGL's board were closely associated with
f    the managing director; that it was therefore unlikely that the board would pass
any resolution that might facilitate a decision to pursue proceedings against the
English companies; and that accordingly the shareholders were entitled to rely on
the 'fraud on the minority' exception to the usual rule that a company was the
proper claimant in an action to redress a harm done to it or to enforce a cause of
action vested in it (the fraud exception). In accordance with CPR 19.9[a], the rule
g    of procedure governing derivative claims brought on behalf of a 'company' by its
members, the shareholders joined SPGL as defendant to the proceedings. They
therefore sought the court's permission under CPR 6.20(3)[b] to serve the
proceedings on SPGL out of the jurisdiction. Under r 6.20(3), the court could
grant such permission if a claim was made against someone on whom the claim
h    form had been or would be served, and (a) there was between the claimant and
that person a 'real issue' which it was reasonable for the court to try, and (b) the
claimant wished to serve the claim form on another person who was a necessary
or proper party to the claim. The master granted permission, and the defendants
subsequently applied, inter alia, for that order to be set aside. On the application,
SPGL contended that in a derivative action there was no 'real issue', within the
j    meaning of r 6.20(3), between the shareholder claimant and the substantive

_____

a    Rule 19.9, so far as material, provides: '(1) This rule applies where a company … is alleged to be
      entitled to claim a remedy and a claim is being made by one or more members of the company …
      for it to be given that remedy …
         (2) The company … for whose benefit a remedy is sought must be a defendant to the claim …'
b    Rule 6.20, so far as material, is set out at [42], below

defendant, that in any event 'company' in r 19.9 referred only to English
companies and that accordingly the English court had no jurisdiction to hear a
derivative claim in relation to a foreign company. Alternatively, the defendants
contended that England was not the appropriate forum for the action. The issue
arose whether the court was concerned purely with the identification of the
appropriate forum for the trial of the bribery allegations or whether it was also
concerned with the appropriate forum for determining the issue of the
shareholders' entitlement to bring a derivative action.

**Held** – (1) The English court did have jurisdiction to hear a derivative claim in
relation to a foreign company. There was no basis for restricting CPR 19.9 to
English companies, and in any event to do so would not have the effect of
depriving the court of jurisdiction to entertain a derivative claim. As for r 6.20(3),
the requirement that there should be a real issue between the claimant and those
served, or to be served, within the jurisdiction was intended to ensure that the
claim was brought bona fide against the defendant in the jurisdiction, and not
merely in order to bring in the foreign defendant as a necessary or proper party
(see [44], below).

    (2) In determining the appropriate forum for a derivative action in relation to
a foreign company, the questions which arose in considering whether the fraud
exception applied were a significant factor to be taken into account. Those
questions were an integral part of the claim in a derivative action, and it would
be wholly unjust and inappropriate to treat them as a purely procedural matter
to be excluded from the equation. Moreover, if issues arose relating to the
exercise of discretionary powers of management, considerable weight should be
accorded to the potential role of the courts of the place of incorporation. It was
doubtful whether they had exclusive jurisdiction to deal with such issues: it
might, for example, be wholly unjust to require recourse to an offshore haven to
pursue fraudulent directors in a case which had no connection with the jurisdiction
other than that it was the place of incorporation. Nevertheless, the courts of the
place of incorporation would almost invariably be the most appropriate forum
for the resolution of the issues which related to the existence of the right of
shareholders to sue on behalf of the company. In the instant case, the Indian
connections were overwhelming, and the shareholders had fallen far short of
satisfying the burden to show clearly that England was the appropriate forum for
the derivative claim. Accordingly, the master's order would be set aside (see
[65]–[67], [128], [188], below); *Pergamon Press Ltd v Maxwell* [1970] 2 All ER 809
considered.

    Per curiam. The law of the place of the incorporation of a company governs
the right of a shareholder to bring a derivative action in England since the basic
rule is that shareholders have no direct rights. Although for purely English
domestic purposes, the exceptions to that rule have been regarded as a purely
procedural device, their real nature is not procedural in the international context.
They confer a right on the shareholders to protect the value of their shares by
giving them a right to sue and recover on behalf of the company. It would be
very odd if that right could be conferred on the shareholders of a company
incorporated in a jurisdiction which has no such rule, and under which they have
acquired their shares (see [50], below).

*a*

**Notes**

For actions in respect of corporate wrongs and for service out of the jurisdiction with permission of the court, see respectively 7(2) *Halsbury's Laws* (4th edn reissue) para 1171 and 37 *Halsbury's Laws* (4th edn reissue) para 346.

**Cases referred to in judgment**

*b*

*Amin Rasheed Shipping Corp v Kuwait Insurance Co, The Al Wahab* [1983] 2 All ER 884, [1984] AC 50, [1983] 3 WLR 241, HL.

*Arab Monetary Fund v Hashim* [1993] 1 Lloyd's Rep 543; *affd* [1996] 1 Lloyd's Rep 589, CA.

*Atlantic Star, The, Owners of the Atlantic Star v Owners of the Bona Spes* [1973] 2 All ER 175, [1974] AC 436, [1973] 2 WLR 795, HL.

*c*

*Bahrein Petroleum Co Ltd v P J Pappu* AIR 1966 SC 634, India SC.

*Barrett v Duckett* [1995] 1 BCLC 243, CA.

*Batchelder v Kawamoto* (1998) 147 F (3d) 915, US Ct of Apps (9th Cir).

*Bhamboo Mal v Ram Narain* AIR 1928 Lahore 297, Lahore CA.

*BP Exploration Co (Libya) Ltd v Hunt* [1976] 3 All ER 879, [1976] 1 WLR 788.

*d*

*Brink's-MAT Ltd v Elcombe* [1988] 3 All ER 188, [1988] 1 WLR 1350, CA.

*Burland v Earle* [1902] AC 83, PC.

*Connelly v RTZ Corp plc* [1997] 4 All ER 335, [1998] AC 854, [1997] 3 WLR 373, HL.

*CTS Corp v Dynamics Corp of America, Indiana v Dynamics Corp of America* (1987) 481 US 69, US SC.

*Edwards v Halliwell* [1950] 2 All ER 1064, CA.

*e*

*Electric Furnace Co v Selas Corp of America* [1987] RPC 23, CA.

*Far Eastern Steamship Co (Kakinada, petitioner) v Koika Trading Co Ltd* AIR 1978 Andhra Pradesh 433, Andhra Pradesh HC.

*Fargro Ltd v Godfroy* [1986] 3 All ER 279, [1986] 1 WLR 1134.

*Ferguson v Wallbridge* [1935] 3 DLR 66, PC.

*f*

*Foss v Harbottle* (1843) 2 Hare 461, 67 ER 189.

*Hagen, The* [1908] P 189, [1908–10] All ER Rep 21, CA.

*Hausman v Buckley* (1962) 299 F (2d) 696, US Ct of Apps (2nd Cir).

*Heyting v Dupont* [1964] 2 All ER 273, [1964] 1 WLR 843, CA.

*Hira Lal Patni v Kali Nath Co Ltd* AIR 1962 SC 199, India SC.

*Hovenden & Sons v Millhoff* (1900) 83 LT 41, [1900–3] All ER Rep 848, CA

*g*

*Industries and General Mortgage Co v Lewis* [1949] 2 All ER 573.

*Jalakrishna, The* [1983] 2 Lloyd's Rep 628.

*Kiran Singh v Chaman Paswan* AIR 1954 SC 340, India SC.

*Lubbe v Cape plc* [2000] 4 All ER 268, [2000] 1 WLR 1545, HL.

*Mahesan v Malaysia Government Officers' Co-operative Housing Society Ltd* [1978] 2 All ER 405, [1979] AC 374, [1978] 2 WLR 444, PC.

*h*

*McDermott Inc v Lewis* (1987) 531 A (2d) 206, Delaware SC.

*Nurcombe v Nurcombe* [1985] 1 All ER 65, [1985] 1 WLR 370, CA.

*Oppenheimer v Louis Rosenthal & Co AG* [1937] 1 All ER 23, CA.

*Pergamon Press Ltd v Maxwell* [1970] 2 All ER 809, [1970] 1 WLR 1167.

*j*

*Petrotrade Inc v Smith* [2000] 1 Lloyd's Rep 486.

*Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] 1 All ER 354, [1982] Ch 204, [1982] 2 WLR 31, CA.

*Radhakrishna Hospitality Service Private Ltd v EIH Ltd* [1999] 2 Lloyd's Rep 249.

*Raja Setrucharlu Ramabhadra Raju Bahadur v Maharaja of Jeypore* AIR 1919 PC 150, PC.

*Smith v Croft (No 2)* [1987] 3 All ER 909, [1988] Ch 114, [1987] 3 WLR 405.

*Spiliada Maritime Corp v Cansulex Ltd, The Spiliada* [1986] 3 All ER 843, [1987]          *a*
    AC 460, [1986] 3 WLR 972, HL.
*Spokes v Grosvenor and West End Railway Terminus Hotel Co Ltd* [1897] 2 QB 124, CA.
*Vishva Ajay, The* [1989] 2 Lloyd's Rep 558.

**Applications**

By application dated 10 May 2001 the first and second defendants, Rolls-Royce          *b*
Industrial Power (India) Ltd and Heaton Power Ltd (the Rolls-Royce defendants),
applied for a declaration that the court had no jurisdiction to hear a derivative
action brought against them by the claimants, Lakshmi Konamaneni, Santha
Reddy Pekety, Vansanth Rao Mitta and Spectrum Technologies USA Inc, as
members of the third defendant, Spectrum Power Generation Ltd (SPGL), an
Indian company. Alternatively, the Rolls-Royce defendants applied for a stay of          *c*
proceedings on the grounds of forum non conveniens or for an order setting aside
the order of Master Moncaster on 2 February 2001 granting the claimants
permission to serve proceedings on SPGL out of the jurisdiction. SPGL also
applied for an order setting aside the master's order. The facts are set out in the
judgment.          *d*

*Robert Hildyard QC* and *Robert Miles* (instructed by *Freshfields Bruckhaus Deringer*)
    for the Rolls-Royce defendants.
*David Mackie QC* and *Sarah Garvey* of *Allen & Overy* for SPGL.
*Leslie Kosmin QC* and *Andrew Thompson* (instructed by *S J Berwin*) for the claimants.
          *e*
                                                                      *Cur adv vult*

20 December 2001. The following judgment was delivered.

**LAWRENCE COLLINS J.**
          *f*

I. INTRODUCTION

    [1] These proceedings involve a derivative claim by four claimants. Two of
the claimants are individuals resident in India, one is an individual resident in the
United States, and the fourth claimant is a company incorporated in Mauritius.
They sue as members of Spectrum Power Generation Ltd (SPGL), an Indian
company which is joined as a defendant. The claimants seek to enforce a claim          *g*
by the company against two English companies in the Rolls-Royce group which,
it is alleged, paid bribes, through a British Virgin Islands company, Towanda
Services Ltd, to the managing director of the company, an Indian resident in
India, to secure contracts for the construction and maintenance of a power
station in India. The 208MW power station has been fully operational since 1998          *h*
and was one of the first power plants in India to be operated in the private sector.
The plant was constructed by the Rolls-Royce defendants, and the Rolls-Royce
group remains involved in the maintenance of the plant.
    [2] There are pending in India some 18 actions or criminal complaints relating
to the interests in, and conduct of, the project, in which the principal protagonists          *j*
are, on the one hand, the managing director of the company, Mr Kishan Rao, and,
on the other hand, Dr Mohan Rao, who is related to Kishan Rao by marriage, and
who was a principal promoter of the project. The information on which the
claimants base their action is derived from Mohan Rao, and he gives instructions
to their lawyers. The proceedings are funded by his business associate and
relative by marriage, Mr Ravi Reddy, who is also a relative by marriage of two of

*a*  the individual claimants (the other claimant being the wife of a senior employee of one of his companies) and who owns, indirectly, shares in the fourth claimant and thereby in SPGL.

[**3**] The defendants challenge the existence and/or exercise of jurisdiction by the English court. When Master Moncaster was asked to give permission to serve the Indian company outside the jurisdiction he expressed concerns about whether *b*  the English court had jurisdiction to entertain a derivative action brought for the benefit of a foreign company, but those concerns were allayed by the claimants' advisors on the without notice application. This case raises, apparently for the first time in England, the question of the operation in the international context of derivative claims and the exceptions to the rule in *Foss v Harbottle* (1843) 2 Hare *c*  461, 67 ER 189.

II. THE CLAIM AND THE PROTAGONISTS

[**4**] The claim was brought originally by the first three claimants. Between them they hold 9,000 shares in the third defendant, SPGL. The number of issued shares in SPGL is about 141m, and the claimants' shares amounted in aggregate *d*  to about 0·005% of the issued share capital, and are worth about the equivalent of £2,000 in aggregate. The fourth claimant, Spectrum Technologies USA Inc, a company incorporated in Mauritius (STUSA (Mauritius)), is a company which owns about 22% of the issued shares in SPGL. It is managed by Mohan Rao, who has an indirect interest in some of its shares. STUSA (Mauritius) was added as a *e*  claimant to allay the concern of Master Moncaster whether the court would allow a derivative action by shareholders who had no significant interest in the outcome of the proceedings and who were acting on the directions of Ravi Reddy.

*Ravi Reddy*

*f*  [**5**] Mr Ravi Reddy is a successful businessman who has been resident in the United States since 1978, and who is a non-resident Indian (NRI). He is connected with each of the claimants in ways on which I shall elaborate in [8]–[10], below. He is an NRI, and is now a United States citizen. His business interests are primarily in the United States, and he says his net worth is more than $US 100m. He is related, through marriage, to Mohan Rao. Mr Reddy, who is indirectly a *g*  substantial shareholder in SPGL and in STUSA (Mauritius), is funding the claimants (including the provision of security for costs) and has agreed to indemnify SPGL in relation to its costs of the action if leave to continue is obtained by the claimants under CPR 19.9. He says he is funding the litigation because he feels morally bound to support the shareholders, and they do not *h*  necessarily have the sophistication or financial means to chase down fraud within the company.

[**6**] For reasons which will be mentioned below (at [100]) the Rolls-Royce group became substantial shareholders in SPGL, through Rolls-Royce Godavari Power Ltd. Ravi Reddy sought to purchase its interest in SPGL. That would have *j*  given him and Mohan Rao a controlling interest in SPGL. The negotiations for the purchase terminated in 1999. The Rolls-Royce evidence (from Mr Mead, who was a project development manager with Rolls-Royce, and who left earlier this year) is that Ravi Reddy said on various occasions that if the deal did not proceed he would seek other avenues to exert control over SPGL, and Mr Mead says he understood that to be a threat of further legal action against, amongst others, Rolls-Royce.

*Dr Mohan Rao*

[7] Dr Mohan Rao is a United States citizen of Indian origin. He has been involved all his working career in the power generation field. After taking a first degree in engineering in Hyderabad, he obtained a PhD in Mechanical and Electrical Engineering from an American university, and then worked for 18 years from 1972 with GE Power Systems, a leading manufacturer of power equipment, where he was a development engineer and subsequently a manager of mechanical systems. Since about 1990 he has been associated with the STUSA group of companies. He was said to be the source of much of the information relied upon by Mrs Konamaneni, the first claimant, and by Mr Mervis, the claimants' solicitor, in their witness statements in support of the application for permission to serve out of the jurisdiction. In his own witness statement he says that he is responsible for the day-to-day affairs of STUSA with regard to the litigation concerning the project.

*The individual claimants*

[8] The first claimant, Mrs Konamaneni, is resident in Hyderabad. She is a deputy manager with Vysya Bank in Hyderabad. She owns 3,600 shares of ten rupees nominal value each in SPGL out of a total issued share capital of 141m shares (ie about 0·0025% of the issued share capital). She is the wife of Mr K Satish, a senior employee of STUSA. She says that her husband told her that Mohan Rao had told him that Kishan Rao had taken bribes from Rolls-Royce. She was shocked and she jumped at the chance to take legal action when her husband told her that Ravi Reddy (who is a good friend of her husband) was prepared to bear the legal expenses.

[9] The second claimant, Mrs Pekety, who lives in the United States, owns 2,700 shares in SPGL (approximately 0·0019% of the issued share capital). Mrs Pekety is the mother-in-law of Ravi Reddy, and she is also the aunt of Mohan Rao's wife. She says she heard about the bribery allegation from Ravi Reddy in about 1999. She is a claimant in eight derivative actions on behalf of SPGL in Hyderabad in India against, inter alios, Rolls-Royce Industrial Power (India) Ltd and Heaton Power Ltd. She is also the complainant in three actions brought against SPGL and various directors of SPGL before the criminal courts in Hyderabad. I deal in sections IX and XII below with these proceedings.

[10] The third claimant, Mr Mitta, is resident in Hyderabad, and owns 2,700 shares in SPGL (approximately 0·0019% of the issued share capital). He is the first named claimant in the eight derivative actions in Hyderabad. Mr Mitta's brother is Mohan Rao's brother-in-law. He says that most of his information about the allegations comes from Ravi Reddy.

*Kishan Rao and Jaya Food Industries*

[11] Kishan Rao has, at all material times, been the managing director of SPGL. He is resident in India. He is Mohan Rao's relation by marriage, Kishan Rao's daughter-in-law being Mohan Rao's niece. Mohan Rao involved Kishan Rao and his company Jaya Food Industries Pvt Ltd (Jaya Food) in the project at its outset in 1992. Jaya Food was engaged in the production of dry foods, such as pasta and was Kishan Rao's principal business and his vehicle for his original investment in SPGL. It was incorporated in India, and is now called Bambino Agro Industries Pvt Ltd. His sons, M Raghuveer and M Subramanyam, are associated with him in business and are directors of SPGL.

*a*
*SPGL*

[**12**] SPGL was incorporated on 26 October 1992 under the Indian Companies Act 1956. The current shareholders are as follows: (a) Rolls-Royce Godavari Power Ltd (a Mauritius company) and part of the Rolls-Royce group (47·5%); (b) Kishan Rao and associates (about 26%); (c) Mohan Rao and associates (about 25%). The remaining shares are held by the general public.

*b*
[**13**] All the directors of SPGL are Indian citizens and, apart from Mohan Rao and his nominee director Mr Bharteey, are resident in India. Mohan Rao and Mr Bharteey have been directors since 1994. Rolls-Royce is not represented on the board.

[**14**] According to SPGL, the affiliations of the other directors are as follows:

*c*
| Name | Affiliation |
| --- | --- |
| Mr Raghuveer | Kishan Rao's son |
| Mr Subramanyam | Kishan Rao's son |
| Mr Bhattacharyya | No affiliation, and formerly the deputy managing director of the State Bank of India |
| Mr Shukla | No affiliation, and a chartered accountant who also sits on the board of companies owned by Kishan Rao |
| Professor Narain | No affiliation, a leading Indian economist from Osmania University in Andhra Pradesh |
| Mr Krishnan | No affiliation, nominated by State Bank of India, of which he was former chief general manager |
| Mr Upasani | No affiliation, nominated by Industrial Development Bank of India a former chief secretary to the government of Maharashtra and a former chairman of the Indian Company Law Board |
| Mr Loonkar | No affiliation, nominated by the Industrial Finance Corp of India Ltd, of which he is the chief general manager, Hyderabad |

*g*
[**15**] The present debt to equity ratio is about 8:1, and it is obvious that the board members nominated by the financial institutions are there to look after the interests of the lenders, and not simply to decorate the board. I should mention at this point that although SPGL says that Mr Bhattacharyya, Mr Shukla and Professor Narain have no affiliation with either of the Kishan Rao and Mohan Rao camps, the first claimant says that Mohan Rao has told her that they are all close friends of Kishan Rao.

*The STUSA group*

*j*
[**16**] The relevant companies in the STUSA group are: (a) Spectrum Technologies USA Inc, a New York company (STUSA), which is owned by Mohan Rao and Brij Bharteey, and holds about 2m shares in SPGL; (b) STUSA (Mauritius), which holds about 26m shares in SPGL, and which is 100% owned by Spectrum Infrastructure Ltd (SIL) (Mauritius); (c) SIL (Mauritius), which is owned by Spectrum Power Investors Group (SPIG), various individuals, and SIL (Jersey); (d) SIL (Jersey), which holds about 900,000 shares in SPGL, and is owned by Mohan Rao and Brij Bharteey; (e) SPIG, which is owned as to 50% by Ravi Reddy.

*Rolls-Royce*

[**17**]  The defendants are two companies in the Rolls-Royce engineering group. I shall refer to them together as the 'Rolls-Royce defendants'. The first defendant, Rolls-Royce Industrial Power (India) Ltd (RRIP), and the second defendant, Heaton Power Ltd (Heaton), contracted with SPGL in 1994 for the engineering, procurement and construction (EPC) of the plant. RRIP contracted with SPGL in 1995 for the operation and maintenance (O & M) of the plant. The Rolls-Royce companies were associated with companies in the Westinghouse Electric Corp group in these contracts, with Westinghouse as a co-contractor or principal sub-contractor. Heaton will be referred to by its current name, although its name was Parsons Turbine Generations Systems Ltd until 1997, following the sale in 1996 of most of its business to Siemens. RRIP and Heaton are wholly-owned subsidiaries of Rolls-Royce Power Engineering plc, which itself is a subsidiary of Rolls-Royce plc. As I have mentioned already, another company in the group, Rolls-Royce Godavari Power Ltd (which is incorporated in Mauritius), put equity into SPGL between 1995 and 1998 and holds about 47·5% of its issued shares, but is not represented on its board.

[**18**]  At all times material to this action, the only business of RRIP related to power projects in India. RRIP has several offices in India, and conducts all of its operations in India. It is registered in India as a foreign company, and has filed the names of persons there to accept service on its behalf. Heaton's business was principally concerned with power projects in India. It now has only two full-time employees. According to their published accounts, RRIP and Heaton did not trade on their own account but acted as agents for Rolls-Royce Power Engineering plc until 1996, and thereafter as agents for Rolls-Royce plc.

*The allegations*

[**19**]  After setting out some of the history of the project (with which I deal in greater detail in section VI) the particulars of claim allege that on 1 November 1993 Heaton and RRIP entered into two agency agreements (the agency agreements) with a British Virgin Islands company, Towanda Services Ltd (Towanda), under which Towanda was to assist them in presenting bids for, and promoting the securing of, the EPC and O & M contracts for the Rolls-Royce defendants. If the contracts were secured, $US 19·3m was to be paid to Towanda in respect of the EPC contract and £1·5m was to be paid in respect of the O & M contract.

[**20**]  It is alleged that the agency agreements were shams, that Towanda was a creature of Kishan Rao which had no relevant expertise and was not intended to perform any genuine services; and that the agency agreements were intended by Kishan Rao and the parties to the agency agreements as a cloak for payments to Kishan Rao in the nature of bribes, intended by RRIP and Heaton to induce Kishan Rao as managing director of SPGL to procure or do his best to procure that SPGL awarded the EPC contract and the O & M contract to companies in the Rolls-Royce group; that the payments were made by the Rolls-Royce defendants or other companies in the Rolls-Royce group to Towanda; that the Rolls-Royce defendants knew that Towanda was beneficially owned or controlled by Kishan Rao; that the bribes were not disclosed to shareholders of SPGL, either in general meeting or otherwise; or disclosed to the board of SPGL; and that Kishan Rao was influenced by the bribes to procure or use his best endeavours to procure that SPGL granted the EPC contract and the O & M contract to

a companies in the Rolls-Royce group (or that is in any event to be irrebuttably presumed as a matter of law).

[21] The claim is for restitution of the amounts paid or for damages in the same amounts.  The particulars of claim make it clear that this is a derivative claim by the claimants as members of SPGL to enforce causes of action vested in SPGL and to seek relief on its behalf.  In order to bring the claim within one of
b the exceptions to the rule that a shareholder cannot normally sue for a wrong done to the company (the rule in *Foss v Harbottle,* with which I deal below in section III), the particulars allege that the general meeting of SPGL is controlled or is capable of being controlled by Rolls-Royce Godavari Power Ltd and Kishan Rao and his group of companies and thereby indirectly by Rolls-Royce plc and/or the Rolls-Royce group and Kishan Rao.  Accordingly, it is said, it is plain
c that the general meeting of SPGL would not pass a resolution authorising or approving the pursuit of proceedings by SPGL against RRIP and Heaton; and that of the ten directors (including Kishan Rao) at least five are closely associated with him, and it is highly unlikely that the board would pass any resolution which might facilitate a decision that the company should pursue proceedings against
d the Rolls-Royce defendants and/or Kishan Rao seeking the relief sought in the claim.

*Applications*

[22] There are before the court: (a) the application of the Rolls-Royce defendants for a declaration that the court has no jurisdiction, or for a stay of the proceedings on grounds of forum non conveniens, or for an order to set aside the
e order of Master Moncaster of 2 February 2001 granting permission to serve SPGL out of the jurisdiction and service made thereunder; and (b) the application by SPGL to set aside the order of Master Moncaster.

[23] The applications raise, among others, the following issues: (a) whether the English court ever has jurisdiction to hear a derivative claim in relation to a
f foreign company; (b) whether the action falls within the provisions of CPR Pt 6, which allows service to be permitted on a person outside the jurisdiction who is 'a necessary or proper party' to a claim against someone who is served or is to be served within the jurisdiction, and whether there is between the claimant and the person within the jurisdiction 'a real issue which it is reasonable for the court to try' (r 6.20(3)); (c) whether England is the appropriate forum; and (d) whether
g there was any material non-disclosure on the without notice application to Master Moncaster and, if so, whether the order should be set aside as a result.

III. DERIVATIVE ACTIONS

[24] It is an elementary principle that 'A cannot, as a general rule, bring an
h action against B to recover damages or secure other relief on behalf of C for an injury done by B to C' (*Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] 1 All ER 354 at 357, [1982] Ch 204 at 210).

[25] The usual rule is that a company is the proper claimant in an action to redress a harm done to the company or enforce a cause of action vested in the
j company (the so-called 'rule in *Foss v Harbottle*').  There are, however, a number of exceptions to the rule.  The exception relied upon in this case is an alleged 'fraud on the minority'.  The remedy was 'introduced on the ground of necessity alone in order to prevent a wrong doing without redress' (see *Smith v Croft (No 2)* [1987] 3 All ER 909 at 957, [1988] Ch 114 at 185).  Where what has been done amounted to a fraud and the wrongdoers are themselves in control of the company, the rule is relaxed in favour of the aggrieved minority who are allowed

to bring a minority shareholders' action on behalf of themselves and all others. The reason for this is that if they were denied that right, their grievance would never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue (see *Edwards v Halliwell* [1950] 2 All ER 1064 at 1067, the *Prudential Assurance* case [1982] 1 All ER 354 at 358, [1982] Ch 204 at 211). As Browne-Wilkinson LJ said in *Nurcombe v Nurcombe* [1985] 1 All ER 65 at 71, [1985] 1 WLR 370 at 378:

> 'Since the wrong complained of is a wrong to the company, not to the shareholder, in the ordinary way the only competent plaintiff in an action to redress the wrong would be the company itself. But, where such a technicality would lead to manifest injustice, the courts of equity permitted a person interested to bring an action to enforce the company's claim.'

[26] A 'fraud on the minority' involves two elements. The first is a cause of action in the company that can be characterised as an equitable fraud. Fraud includes all cases where the wrongdoers are endeavouring, directly or indirectly to appropriate themselves money, property or advantages which belong to the company or in which the other shareholders are entitled to participate (see *Burland v Earle* [1902] AC 83 at 93). The second element is control of the company by the wrongdoers.

[27] Wrongdoer control may be established by proof that the wrongdoers own a majority of the shares carrying votes, but the essential question is whether the claimant (or perhaps, more accurately, the company) is being prevented from pursuing a claim which the company legitimately has: see *Smith v Croft (No 2)* [1987] 3 All ER 909 at 956–957, [1988] Ch 114 at 185 per Knox J, who said:

> 'Ultimately the question which has to be answered in order to determine whether the rule in *Foss v Harbottle* ((1843) 2 Hare 461, 67 ER 189) applies to prevent a minority shareholder seeking relief as plaintiff for the benefit of the company is: is the plaintiff being prevented improperly from bringing these proceedings on behalf of the company? If it is an expression of the corporate will of the company by an appropriate independent organ that is preventing the plaintiff from prosecuting the action he is not improperly but properly prevented and so the answer to the question is No. The appropriate independent organ will vary according to the constitution of the company concerned and the identity of the defendants, who will in most cases be disqualified from participating by voting in expressing the corporate will.'

[28] For present purposes, the following propositions may be derived from the modern cases: (1) Since the bringing of the derivative claim requires the exercise of the equitable jurisdiction of the court on the grounds that the interests of justice require it, the court will not allow such an action to be used in an inequitable manner so as to produce an injustice: *Nurcombe v Nurcombe* [1985] 1 All ER 65 at 71, [1985] 1 WLR 370 at 378 per Browne-Wilkinson LJ. (2) Accordingly, a claimant who has participated in the wrong of which complaint is made will be disqualified from bringing the action: Gower's *Principles of Modern Company Law* (6th edn, 1997) p 669, the then equivalent passage of which was approved in *Nurcombe v Nurcombe* [1985] 1 All ER 65 at 69, [1985] 1 WLR 370 at 376 per Lawton LJ. (3) The claimant must be acting bona fide for the benefit of the company (see *Nurcombe v Nurcombe* and *Barrett v Duckett* [1995] 1 BCLC 243 at 250).

[29] The defendants also rely on a further proposition, namely that there must be no other adequate remedy available, which is derived from *Barrett v Duckett*.

a  That was a case in which the alternative remedy was a claim by the liquidator, since a petition had been presented to wind up the company. Both Peter Gibson and Beldam LJJ considered that the decision whether to pursue an action against directors alleged to have diverted the business of the company is best left to the judgment of an independent liquidator. Peter Gibson LJ relied on two other decisions: *Ferguson v Wallbridge* [1935] 3 DLR 66, *Fargro Ltd v Godfroy* [1986] 3 All ER

b  279, [1986] 1 WLR 1134, in which derivative actions failed because there was a liquidator who was in a position to take action. This is not the occasion to express a final view, but it seems to be that the notion that there must be no alternative remedy expressed in *Barrett v Duckett* is not an independent bar to a derivative action, but simply an example of a case where there will be no relevant wrongdoer control.

c

*Procedural aspects*

[**30**] A derivative action is brought in representative form, and the company is joined as a defendant in order for it to be bound by any judgment and to receive the fruits (if any) of the judgment, and because the action has not been authorised

d  by its board or general meeting (see *Spokes v Grosvenor and West End Railway Terminus Hotel Co Ltd* [1897] 2 QB 124).

[**31**] In the *Prudential Assurance* case the Court of Appeal considered what course was to be taken by the court if, as happened in *Foss v Harbottle* and in the *Prudential Assurance* case itself, the court was confronted by a motion on the part of the delinquent or by the company, seeking to strike out the action. A dilemma

e  would emerge if the claimant could require the court to assume, as a fact, every allegation made by the claimant, since this would absolve the claimant from the burden of bringing himself within the exception simply by alleging fraud and control. But if the claimant had to prove fraud and control before he could establish his title to prosecute the action, then the action may need to be brought

f  to a conclusion before the court could decide whether or not the claimant should be permitted to prosecute it.

[**32**] Accordingly, the Court of Appeal held:

'... whatever may be the properly defined boundaries of the exception to the rule, the plaintiff ought at least to be required before proceeding with his
g  action to establish a prima facie case (i) that the company is entitled to the relief claimed and (ii) that the action falls within the proper boundaries of the exception to the rule in *Foss v Harbottle* ((1843) 2 Hare 461, 67 ER 189). On the latter issue it may well be right for the judge trying the preliminary issue to grant a sufficient adjournment to enable a meeting of shareholders to be
h  convened by the board, so that he can reach a conclusion in the light of the conduct of, and proceedings at, that meeting.' (See [1982] 1 All ER 354 at 366, [1982] Ch 204 at 221–222.)

[**33**] In *Smith v Croft* Knox J considered that the striking out procedure was appropriate for the determination of the right of the shareholders to sue, since
j  questions of fact could be gone into on such applications and in exceptional cases cross-examination could be permitted on affidavits, although in that case there was no application for cross-examination. He said:

'My conclusion is that it is the question stated by the Court of Appeal that has to be decided as a preliminary matter, that it is a special form of procedure concerned with giving sensible operation to the rule in *Foss v Harbottle*, and

which is concerned with avoiding the Scylla and Charybdis, on the one hand, *a*
of having a preliminary issue which effectively requires one to try the whole
action where the rule serves no useful purpose and, on the other side of the
strait, of assuming that everything that the plaintiffs allege is necessarily
correct as a matter of fact, which is of course the technique the court adopts
when it has what was called a strict demurrer. The Court of Appeal, it seems
to me, has laid down a halfway house for this very special type of case, one *b*
in which the legal issues in this particular case are sufficiently well defined for
the parties to be able to argue them. Further, I am satisfied that they will
determine the result of the action completely if answered in one particular
way (not if answered in the other way, but that is seldom obtainable).' (See
[1987] 3 All ER 709 at 921, [1988] Ch 114 at 138–139.)

*c*
[**34**] Knox J said ([1987] 3 All ER 909 at 921, [1988] Ch 114 at 138) that the
purpose of the adjournment referred to in the *Prudential Assurance* case to enable
a meeting of shareholders to be convened was not to discern whether the
defendants had control, but was to secure for the benefit of the judge, who was
deciding whether to allow the minority shareholder's action on behalf of the
company to go forward, the commercial assessment whether the prosecution of *d*
the action was likely to do more harm than good or, the phrase used in argument
in the *Prudential Assurance* case, 'kill the company by kindness'. He said that the
whole tenor of the Court of Appeal's judgment was directed at securing that a
realistic assessment of the practical desirability of the action going forward should
be made by the organ that has the power and ability to take decisions on behalf *e*
of the company.
[**35**] In 1994 RSC Ord 15, r 12A was added to introduce a filter, and its
provisions are substantially reproduced in CPR 19.9, which applies to 'derivative
claims', ie 'where a company, other incorporated body or trade union is alleged
to be entitled to claim a remedy and a claim is made by one or more members …
for it to be given that remedy'. In such a case, after the claim has been issued the *f*
claimant must apply, with written evidence in support to the court for permission
to continue the claim. There is no reported case on how the power under the
rule is to be applied in order to deal with the concerns expressed in the *Prudential
Assurance* case, although it has been suggested that the rule is not providing an
effective filter (see Reed 'Derivative Claims: the application for permission to *g*
continue' (2000) 21 Company Lawyer 156).

IV. THE FOREIGN ELEMENT
[**36**] SPLG is an Indian company. Four shareholders pursue a derivative action
on its behalf against two companies incorporated in England. Two of the
individual claimants are resident in India, a third is resident in the United States *h*
and the corporate claimant is incorporated in Mauritius.
[**37**] Three questions arise: (a) does the English court have jurisdiction in a
derivative claim on behalf of a foreign company? (b) if so, what law applies to
determine whether a derivative claim can be brought? (c) if there is jurisdiction,
and the applicable law permits a derivative claim, how do forum conveniens rules *j*
apply in the context of applications to stay proceedings or to set aside service
outside the jurisdiction?
[**38**] The position of the claimants is that if the company has a cause of action
against wrongdoers within the jurisdiction, then the court has jurisdiction in a
shareholders' derivative action against the wrongdoers and the company can be
joined as a necessary or proper party under r 6.20(3); that whether a derivative

*a* claim can be brought is a matter of procedure, and therefore governed by English law as the lex fori, and the necessary procedure is regulated by r 19.9. On the principles for staying of actions or setting aside service outside the jurisdiction, the claimants argue that the normal rules apply, and the court is primarily concerned with the appropriate forum for the underlying claim, and that the derivative nature of the claim is insignificant in the context of the question of the
*b* appropriate forum.

[**39**] The claimants say that it makes practical sense for there to be no blanket rule excluding jurisdiction in respect of all derivative claims made on behalf of foreign companies. Such a rule would make no practical sense at all. (1) There might be no other court which would be competent to hear the action (which, ex hypothesi, the English court does have jurisdiction to hear). (2) If there were
*c* another competent court, it might not be the appropriate court. (3) In particular, the courts of the place of incorporation of the company might well be either not competent or not appropriate. (4) Further, there is no reason why a derivative claim on behalf of a foreign company would necessarily be inconvenient to hear in England. For example, procedural issues arising from the derivative nature of
*d* the claim may be insignificant or even non-existent (as in this case).

[**40**] SPGL's position is that the court either does not have jurisdiction to determine a derivative claim because there is no applicable provision in CPR Pt 6 for service on the foreign company, or, if there is in theory a basis for the application of Pt 6, then the court will not exercise jurisdiction because (a) r 19.9 does not or may not apply to foreign companies or (b) there is a general rule that
*e* the court will not interfere in the management of a foreign company. Alternatively it is argued that if the court has jurisdiction under Pt 6, and if r 19.9 applies to foreign companies, then the jurisdiction should be exercised very rarely and not extraterritorially.

*f* *CPR Pt 6*

[**41**] The provisions for service out of the jurisdiction, replacing RSC Ord 11, are in Pt 6. The overriding principle is that the court will not give permission unless satisfied that England is the proper place in which to bring the claim: see r 6.21(2A).

[**42**] The effect of r 6.20(3) is that a claim form may be served out of the
*g* jurisdiction if—

'a claim is made against someone on whom the claim form has been or will be served and—(a) there is between the claimant and that person a real issue which it is reasonable for the court to try; and (b) the claimant wishes to serve the claim form on another person who is a necessary or proper party
*h* to that claim.'

By r 6.21(2) in such a case the written evidence must state the grounds on which it is said that there is between the claimant and the person on whom the claim form has been, or will be served, a real issue which it is reasonable for the court
*j* to try.

[**43**] SPGL argues that there are two reasons why the court has no jurisdiction in a derivative claim in relation to a foreign company. First, there is no real issue between the claimants and the Rolls-Royce defendants, because the underlying claim is by the company and not by the claimants, who are suing on behalf of the company. The second is that the reference in r 19.9 to companies and other incorporated bodies should be interpreted to mean only English companies.

[**44**] In my judgment, there is no basis for restricting r 19.9 to English companies, and in any event to do so would not have the effect of depriving the court of jurisdiction to entertain a derivative claim. There is more substance in the argument on r 6.20(3), but I do not consider that it is right. The requirement that there should be a real issue between the claimant and those served, or to be served, within the jurisdiction is intended to ensure that the claim was brought bona fide against the defendant in the jurisdiction, and not merely in order to bring in the foreign defendant as a necessary or proper party: see the cases cited in *Civil Procedure* (White Book, 2001) para 6.21.28. If that conclusion is right then there can be no doubt that, if it were an appropriate case for service outside the jurisdiction, SPGL would be a necessary party since it has long been the rule, confirmed by r 19.9(2), that the company for whose benefit a derivative claim is brought must be a defendant to the claim.

*Governing law*

[**45**] The arguments in this case canvassed the question of what law governs the right of a shareholder to bring a derivative action in England. The first main candidate is English law as the lex fori on the basis that the right of shareholders to sue is a matter of procedure, and the second is the law of incorporation as the law governing the relationship of the company and its shareholders. Master Moncaster, when considering the without notice application, canvassed the possibility that the English court might not allow a derivative action unless and until it had been authorised by the foreign court. There is little to be said for another possible candidate, the law of the underlying claim which it is sought to bring on behalf of the company.

[**46**] In favour of English law as the lex fori is that in English law, but not necessarily in cases with a foreign element, the exceptions to the rule that only the company which is injured may sue are regarded as remedial or procedural. It was probably in this sense that Browne-Wilkinson LJ spoke of the courts of equity permitting the action if a technicality led to manifest injustice (see *Nurcombe v Nurcombe* [1985] 1 All ER 65 at 71, [1985] 1 WLR 370 at 378). *Gower* (p 665) goes as far as to say that the basic rule in *Foss v Harbottle* is part of the law of civil procedure, although it is not easy to see how the basic rule stated in *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] 1 All ER 354 at 357, [1982] Ch 204 at 210 that 'A cannot, as a general rule, bring an action against B to recover damages or secure other relief on behalf of C for an injury done by B to C' can be regarded as a merely procedural rule.

[**47**] The application of English law as the lex fori is supported by a decision of the Court of Appeal, albeit a decision in which the point does not appear to have been taken, still less arisen for decision. In *Heyting v Dupont* [1964] 2 All ER 273, [1964] 1 WLR 843 the plaintiff was a minority shareholder in a Jersey company which had been incorporated to exploit an invention of the defendant. The articles had deadlock provisions. The plaintiff contended that the defendant had by misfeasance damaged the company. In the Court of Appeal it was observed that it was 'essentially a dispute between two discordant partners' (see [1964] 2 All ER 273 at 275, [1964] 1 WLR 843 at 848). The plaintiff obtained leave to serve the company out of the jurisdiction (see [1964] 1 WLR 843 at 846). It was held that on the assumption that there was a general exception to the rule in *Foss v Harbottle* (1843) 2 Hare 461, 67 ER 189 where the interests of justice so require (an assumption no longer justified since the *Prudential Assurance* case), there was no

*a*  basis for the application of that exception. Although no point on jurisdiction or choice of law appears to have been taken, Russell LJ said:

> 'I dare say that the rule in *Foss* v. *Harbottle* is a conception as unfamiliar in the Channel Islands as is the Clameur de Haro in the jurisdiction of England and Wales; but clearly this is a matter of procedure to be decided according to the law of this forum.' (See [1964] 2 All ER 273 at 275, [1964] 1 WLR 843
*b*  at 848.)

[48] The second candidate for the law applicable to the question whether a shareholder has a right to claim in respect of wrongs to a company is the law of the place of incorporation. There is no authority in England which is directly on *c*  point, but the question has been considered in the United States, where derivative actions are frequently brought in one state in relation to the affairs of corporations which have been incorporated in another state. The approach in these cases is that the right of the shareholder to bring the derivative action is governed by the law of the state of incorporation, but that the wrongdoers may be sued in a state which has personal jurisdiction over them, but subject to the American principles *d*  of forum non conveniens. In the international context it has been held also that the right to bring a derivative action depends on the law of the place of incorporation.

[49] In *Batchelder v Kawamoto* (1998) 147 F (3d) 915, a holder of American Depository Receipts (ADRs) for shares of the Japanese corporation Honda Motor Co Ltd brought a derivative action for wrongs allegedly committed by *e*  directors and other officers and employees of Honda Japan and its American subsidiary. Under Japanese law only shareholders, and not holders of ADRs, had a right to bring a derivative action. The action in the Federal Court in California was dismissed. The principal ground was that Japanese law did not give the holder of ADRs a right to sue and that Japanese law applied because the plaintiff *f*  purchased his ADRs pursuant to a deposit agreement expressly providing for the law of Japan to govern shareholder rights. But it was held that even if there had not been the choice of law provision in the deposit agreement (at 920):

> '... ordinary conflicts-of-law principles would direct us to apply Japanese law to Batchelder's claim. Batchelder holds an interest in Honda Japan, not *g*  American Honda. Under the "internal affairs" doctrine, the rights of shareholders in a foreign company, including the right to sue derivatively, are determined by the law of the place where the company is incorporated. See *Hausman v. Buckley* ((1962) 299 F (2d) 696); *McDermott Inc. v. Lewis* ((1987) 531 A (2d) 206 at 214–217); cf. *CTS Corp v Dynamics Corp of America, Indiana v* *h*  *Dynamics Corp of America* (1987) 481 US 69 at 89 ("This beneficial free market system depends at its core upon the fact that a corporation—except in the rarest situations—is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the State of incorporation").'

[50] It is possible that this approach is influenced by the notion (mentioned by *j*  Browne-Wilkinson LJ in *Nurcombe v Nurcombe*) that in the United States the derivative action is really two actions, one of which is a claim by the minority shareholder against the company for failure to enforce the company's rights, and the other being the claim by the company against the wrongdoer. In the present case, the important question of choice of law does not arise for decision, because there is no material difference between English law and Indian law. It is clear

from the evidence, and the texts on Indian company law (Ramaiya *Guide to the Companies Act* (15th edn, 2001) pp 165 et seq) that the Indian courts follow English case law on the point and permit derivative actions based on the exceptions to the rule in *Foss v Harbottle*. If it had arisen for decision I would have held that the law of the place of incorporation governs. That is because the basic rule is that the shareholders have no direct rights, as the *Prudential Assurance* case makes clear. Although for purely English domestic purposes, the exceptions to the rule have been regarded as a procedural device, I do not consider that in the international context their real nature is procedural. They confer a right on shareholders to protect the value of their shares by giving them a right to sue and recover on behalf of the company. It would be very odd if that right could be conferred on the shareholders of a company incorporated in a jurisdiction which had no such rule, and under which they had acquired their shares.

*Discretionary powers and jurisdiction*

[51] The question of choice of the applicable law is therefore not decisive for present purposes. But in contending that the law of the place of incorporation governs, Mr David Mackie QC for SPGL has relied on material which I do consider is relevant to the issues. He relies on *Dicey and Morris on the Conflict of Laws* (13th edn, 2000) rule 154(2), p 1110: 'All matters concerning the constitution of a corporation are governed by the law of the place of incorporation'; and on the comment (p 1112):

> 'English courts are reluctant to intervene in domestic issues between members of a foreign corporation. In particular they will not seek to exercise powers which are given to officers of a foreign corporation by its constitution. The reluctance of the courts to intervene is perhaps responsible for the dearth of authority on the subject of Rule 154(2), but none the less it is submitted that the Rule is soundly based in that reference to any other legal system would be absurd.'

[52] The authority cited for the reluctance of the English court to intervene is *Pergamon Press Ltd v Maxwell* [1970] 2 All ER 809, [1970] 1 WLR 1167, a decision of Pennycuick J. The case arose out of the first main Maxwell cause celebre in the late 1960s. In 1969 an American company, Leasco, was proposing to make a bid for Pergamon Press Ltd (Limited), an English public company. Limited held 70% of the shares of a New York company, Pergamon Press Inc (Inc). The byelaws of Inc provided that special meetings of shareholders were to be called at any time at the request in writing of shareholders earning a majority of the shares. While the Leasco takeover of Limited was still in prospect, Robert Maxwell, who was then chairman and managing director of Limited, used the voting powers of Limited in Inc to procure the byelaws of Inc to be amended by removing the power of shareholders to call a meeting. The Leasco bid was withdrawn when accounting irregularities were discovered.

[53] Maxwell was ousted from the board of Limited, but he and his co-directors refused to give up control of Inc. The new board of Limited failed in proceedings in New York to obtain an order convening a meeting of shareholders to remove the directors of Inc. Limited then brought proceedings in England against Maxwell for an order that he should, under the byelaw which gave the president of Inc power to convene a meeting, forthwith convene a special meeting of Inc for the purpose of the shareholders removing him and his co-directors and of re-amending the byelaws so as to restore the pre-existing

*a*   rights. Limited contended that Maxwell had acted in breach of his fiduciary duty to Limited by casting its votes in favour of the resolution of Inc since he had thereby deprived Limited of the valuable right of insisting that a special meeting of Inc should be called.

[54] The argument of Limited was that Maxwell had been in breach of his fiduciary duty to Limited by procuring the alteration of the byelaws of Inc and

*b*   that he should be ordered to use his power as director of Inc to convene a meeting to restore the position. But it was held that, because his power under the byelaws of Inc to convene a special meeting was a fiduciary power of a discretionary nature invested in him as president of Inc, the only proper court in which to seek to control the exercise of that power was the New York court, and that an English court could not control the exercise of a fiduciary power arising in the internal

*c*   management of a foreign company. Pennycuick J said:

*d*   '… the power [to call a meeting of the New York subsidiary in his capacity as president] is a fiduciary power of a discretionary nature, vested in the defendant in the capacity of an officer of Incorporated. It follows that the defendant is bound to exercise that power in good faith in the interest of Incorporated as a whole. There is no suggestion that the law of New York is different in this respect from that of England. That being the position, it seems to me, in the first place, that the court of New York is the only proper tribunal in which the members of Incorporated could seek to control the exercise of this discretionary power. It cannot be open to an English court

*e*   to control the exercise of a fiduciary power arising in the internal management of a foreign company.' (See [1970] 1 WLR 1167 at 1171–1172, [1970] 2 All ER 809 at 813–814.)

[55] Two points are being made by Pennycuick J. The first is that the extent of the duties of the director of a foreign company is governed by the law of that

*f*   company's place of incorporation. The second is that the courts of that place are 'the only proper tribunal' in which the members can seek to control the exercise of that power. The first point is unexceptional and indeed obvious, but it may be that the second proposition goes too far, in allocating exclusive responsibility to the courts of the place of incorporation for making orders controlling the exercise of discretionary powers. The decision predates the development of the modern

*g*   forum non conveniens principles from later in the 1970s (see *The Atlantic Star, Owners of the Atlantic Star v Owners of the Bona Spes* [1973] 2 All ER 175, [1974] AC 436), and was given at a time when the prevailing view was that if the English court had jurisdiction, there was not normally a discretion to refuse to exercise it. If a similar point were to arise for decision today, I consider that the correct

*h*   approach would be to say that the courts of the place of incorporation are very likely indeed to be the appropriate forum, but not so overwhelmingly that they will necessarily be the exclusive forum. So understood, the *Pergamon Press* case confirms that questions of internal management are governed by the law of the place of incorporation, and that the courts of that place are best suited to give

*j*   decisions on the control and extent of the powers of the management.

*Forum and discretion*

[56] The relevant forum conveniens principles on the application to set aside service out of the jurisdiction and the application for a stay of proceedings are set out authoritatively in *Spiliada Maritime Corp v Cansulex Ltd, The Spiliada* [1986] 3 All ER 843, [1987] AC 460. English defendants may take advantage of these

principles in stay applications, although there are very few cases in which English
defendants have succeeded.

[57] There is an important difference between the principles applicable to the
discretion to set aside service and the discretion to order a stay. In the case of
service out of the jurisdiction the claimant has to show that England is 'the proper
place in which to bring the claim' (see CPR 6.21(2A)). But also because the
exercise of jurisdiction involves bringing foreign parties to England:

> 'The effect is, not merely that the burden of proof rests on the plaintiff to
> persuade the court that England is the appropriate forum for the trial of the
> action, but that he has to show that this is clearly so. In other words, the
> burden is, quite simply, the obverse of that applicable where a stay is sought
> of proceedings started in this country as of right.' (See [1986] 3 All ER 843 at
> 858, [1987] AC 460 at 481 per Lord Goff of Chieveley.)

[58] In order to obtain a stay of proceedings the basic principle is that a stay
will only be granted on the ground of forum non conveniens where the court is
satisfied that there is some other available forum, having competent jurisdiction,
which is the appropriate form for the trial of the action, ie in which the case may
be tried more suitably for the interests of all the parties and the ends of justice; the
defendant must show not only that England is not the natural or appropriate
forum for the trial but to establish that there is another available forum which is
clearly or distinctly more appropriate than the English forum (see [1986] 3 All ER
843 at 855, [1987] AC 460 at 476–477).

[59] If the defendant does satisfy that test, then the proceedings will be stayed
unless the claimant establishes that there are circumstances by reason of which
justice requires that a stay should nevertheless not be granted (see [1986] 3 All ER
843 at 856, [1987] AC 460 at 478, *Connelly v RTZ Corp plc* [1987] 4 All ER 335 at 345,
[1998] AC 854 at 872, *Lubbe v Cape plc* [2000] 4 All ER 268 at 275, [2000] 1 WLR
1545 at 1155). *Connelly*'s case shows, by the citation of *Oppenheimer v Louis
Rosenthal & Co AG* [1937] 1 All ER 23, that in some circumstances a similar policy
may work in cases of service outside the jurisdiction. There are some
circumstances where the claimant would not obtain a fair trial in the foreign
court, or where the injustice which would be done by restricting the claimant to
the foreign court would be so great that the foreign court would not be regarded
as an available forum. In such circumstances, provided the case came within the
provisions for service out of the jurisdiction, England would be regarded as the
appropriate forum.

[60] In *Connelly*'s case Lord Goff said, in relation to stay applications:

> '[The] general principle ... is that, if a clearly more appropriate forum
> overseas has been identified, generally speaking the plaintiff will have to take
> that forum as he finds it, even if it is in certain respects less advantageous to
> him than the English forum. He may, for example, have to accept lower
> damages, or do without the more generous English system of discovery ...
> Only if the plaintiff can establish that substantial justice cannot be done in the
> appropriate forum, will the court refuse to grant a stay ...' (See [1997] 4 All ER
> 335 at 345, [1998] AC 854 at 872–873.)

[61] The relevant factors 'include not only factors affecting convenience or
expense (such as availability of witnesses), but also other factors such as the law
governing the relevant transaction ... and the places where the parties

*a*   respectively reside or carry on business' (see *The Spiliada* [1986] 3 All ER 843 at 856, [1987] AC 460 at 478). 'In considering this question the court must take into account the nature of the dispute, the legal and practical issues involved, such questions as local knowledge, availability of witnesses and their evidence and expense' (*Amin Rasheed Shipping Corp v Kuwait Insurance Co, The Al Wahab* [1983] 2 All ER 884 at 896, [1984] AC 50 at 72 per Lord Wilberforce).

*b*   [**62**]  There are two points of principle which I should deal with at this stage. The first is whether this is a case for the application both of the principles relating to stay of proceedings and the principles with regard to service out of the jurisdiction. The second is whether I am concerned purely with the identification of the appropriate forum for trial of the bribery allegations or whether I am also concerned with the appropriate forum for determination of the question whether this is a proper case for a derivative action.

*c*   [**63**]  On the first question I am satisfied that I should approach the matter on the basis of the application of the principles relating to service out of the jurisdiction. SPGL are necessary parties to the action, and unless the claimants can show that England is clearly the appropriate forum, service will be set aside, and the action cannot proceed in the absence of SPGL. Conversely, if the claimants can show that England is clearly the appropriate forum, then any application for a stay by the Rolls-Royce defendants would be doomed to failure.

*d*   [**64**]  The Rolls-Royce defendants have joined SPGL in arguing the service out of the jurisdiction points, and have also applied to set aside the order of Master Moncaster permitting service on SPGL. The point taken by the claimants that the Rolls-Royce defendants have no standing to apply to set aside an order which does not directly affect them is sterile, since they can only succeed if SPGL succeeds, and if SPGL succeeds then there will be no proceedings in England against the Rolls-Royce defendants by the claimants. Nor do I consider that SPGL can be criticised for making the application to set aside the order granting permission. The claimants say that a company in relation to which a derivative action is brought should be essentially neutral. SPGL says that it is entirely neutral with regard to the underlying dispute, but that it is entitled to say that these matters should not be dealt with in England at great expense and inconvenience. I do not consider that this attitude is open to criticism.

*g*   [**65**]  On the second question, I am satisfied that the questions which arise on whether the fraud exception to the rule in *Foss v Harbottle* applies are to be taken into account in determining the appropriate forum, and that they are a significant factor. This is so notwithstanding that the forum conveniens cases habitually speak of the appropriate forum for trial of the action, and that the peculiarly *Foss v Harbottle* issues may be determined at a preliminary stage without trial. But it is clear that these issues are an integral part of the claim in a derivative action, and it would be wholly unjust and inappropriate to treat them as a purely procedural matter to be excluded from the equation.

*j*   [**66**]  I also consider that the effect of the *Pergamon Press* case is, at the least, that if issues arise relating to the exercise of what Pennycuick J described as discretionary powers of management, then I should accord considerable weight to the potential role of the courts of the place of incorporation. I doubt whether they have exclusive jurisdiction to deal with such issues. For example it may be wholly unjust to require recourse to an offshore haven to pursue fraudulent directors in a case which has no connection with the jurisdiction other than that it is the place of incorporation.

[**67**] I therefore proceed on the following basis. The court has power to permit service on SPGL in a derivative claim by shareholders against English defendants, but the order for service can stand only if the claimants can show that England is the clearly appropriate forum for determination of the questions whether they are entitled to bring a derivative action and whether the defendants are liable to SPGL for the alleged bribery.

V. THE AVAILABILITY OF THE INDIAN FORUM

[**68**] There were several rounds of written evidence on the Indian law relating to jurisdiction. The evidence for the claimants was that of former Chief Justice Ahmadi and Mr Raghunandan Rao, a practising lawyer; for the Rolls-Royce defendants, Ms Goswami, an advocate of the Supreme Court who acts for the Rolls-Royce group in India; and for SPGL, Mrs Shroff, a partner in a firm of advocates and solicitors acting for SPGL in India, and Mr Vaidyanathan, a senior advocate, practising chiefly before the Supreme Court.

[**69**] Most, but not all, of the rules relating to the jurisdiction of the Indian courts are statutory. For present purposes they derive from the Code of Civil Procedure of 1908, which appears to have been designed to deal primarily with territorial jurisdiction as between the different parts of India, but has been applied to international cases to determine the jurisdiction of Indian courts in relation to persons outside India; and from the Indian Companies Act 1956, which contains provisions in ss 591 to 597 equivalent to those in Pt XXIII of the Companies Act 1985 relating to registration of foreign companies with places of business within India and the filing of the name and address of one or more persons authorised to accept service of process.

[**70**] The potentially relevant provisions of the 1908 Code are ss 19 to 21. The broad effect of these provisions is as follows: (a) an action for damages may be brought within the jurisdiction where the wrong was done or in the place where the defendant resides, or carries on business, or personally works for gain: s 19; (b) an action may be brought in a jurisdiction in which the defendant (or, if more than one, each of them) actually and voluntarily resides, or carries on business, or personally works for gain: s 20(a); (c) an action may be brought against more than one defendant in the jurisdiction in which one of them actually and voluntarily resides, or carries on business, or personally works for gain, provided that in such a case either (i) the leave of the court is given or (ii) the defendants who do not reside etc in the jurisdiction acquiesce in the institution of the suit: s 20(b); (d) an action may be brought in the jurisdiction within which the cause of action, wholly or in part, arises: s 20(c); and (e) for the purposes of determining where a corporation carries on business, it is deemed to carry on business at its sole or principal office in India, or, in respect of any cause of action arising at any place where it has also a subordinate office, at such place: explanation to s 20.

[**71**] There are two relevant statutory provisions recognising the possibility of submission to the jurisdiction. The first is in s 20(b), referred to above, the effect of which is that if an action is properly brought against someone within the jurisdiction, another defendant may acquiesce in the institution of the proceedings. The second is in s 21(1), which deals only with the effect on appeal of a failure in the court below to object to jurisdiction, and provides: 'No objection as to the place of suing shall be allowed by any Appellate or Revisional Court unless such objection was taken in the Court of first instance at the earliest possible opportunity ...'

*a*

[72] In order to guard against the possibility that there would be some doubt as to whether they might otherwise be subject to the jurisdiction of the Indian courts, the Rolls-Royce defendants have agreed to submit. If that is effective under Indian law, then that would make India an available forum for the purposes with which I am concerned (see *Lubbe v Cape plc* [2000] 4 All ER 268 at 272–277, [2000] 1 WLR 1545 at 1552–1556).

*b*

[73] It is also clear that if the claimants were to sue Kishan Rao in India the Rolls-Royce defendants could be joined either if leave were given, or if they submit. This is conceded by the claimants, and is confirmed by the course of the litigation in sections VIII, IX and XI below, in which parties outside India have been joined in actions in which there are Indian defendants.

*c*

[74] On the other possible bases of jurisdiction, the defendants' evidence is to the effect that: (a) the Indian courts have jurisdiction to give leave to serve out of the jurisdiction, because the alleged wrong was done in India, or the cause of action arises wholly or partly in India, because SPGL is wholly in India and it suffered the damage there: ss 19 and 20(c); (b) RRIP has an office in India, and therefore falls within definition of carrying on business or personally working for

*d*

gain in Indian jurisdiction. Heaton operates plant and so carries on business or personally works for gain. Consequently there is jurisdiction under s 20(a) and (b); (c) RRIP has a liaison office in Delhi which is registered with the Registrar of Companies, and several project/site offices, and has filed under s 592 of the 1956 Act the name of a person authorised to accept service; (d) a foreign party could submit to the jurisdiction of an Indian court.

*e*

[75] The claimants' evidence, from former Chief Justice Ahmadi, is: (a) no part of the cause of action arose in India because no part of the wrong/fraud took place in India; (b) there is no jurisdiction over a foreign corporate defendant unless it has either (i) its principal office in India, or (ii) a subordinate office in India in circumstances where the cause of action also arose in India; and

*f*

accordingly since neither of the Rolls-Royce defendants has its principal office in India, the Indian court would not have jurisdiction; if a company has more than one place of business, then the cause of action must arise at the place where the action is brought; (c) parties cannot submit because parties cannot by consent confer jurisdiction where none otherwise exists under the 1908 Code, except where two courts potentially have jurisdiction.

*g*

[76] Following the conclusion of argument in these applications, I sent a note on 4 December 2001 to the parties to say that it seemed to me that the evidence did not sufficiently deal with the question whether a party could simply submit to the jurisdiction of the Indian court by appearing and not objecting to territorial jurisdiction; and that having looked at statements in Mulla on the *Code of Civil*

*h*

*Procedure* (16th edn, 2001) (the leading work in India on the subject), and two decisions of the Supreme Court of India, it seemed to me that a party could submit to the jurisdiction of a court with general competence and could waive any objection based on territorial jurisdiction. I asked leading counsel to take instructions from the experts. On 12 December all parties lodged further opinions

*j*

from their experts.

[77] The cases to which I referred the parties were *Hira Lal Patni v Kali Nath Co Ltd* AIR 1962 SC 199 and *Bahrein Petroleum Co Ltd v P J Pappu* AIR 1966 SC 634. In *Patni's* case the Supreme Court of India said (at 201):

'The objection to its territorial jurisdiction is one which does not go to the competence of the court and can, therefore, be waived … It is well settled

that the objection as to local jurisdiction of a court does not stand on the
same footing as an objection to the competence of a court to try a case.
Competence of a court to try a case goes to the very root of the jurisdiction,
and where it is lacking, it is a case of inherent lack of jurisdiction. On the
other hand an objection as to the local jurisdiction of a court can be waived
and this principle has been given a statutory recognition by enactments like
S. 21 of the Code of Civil Procedure.'

[78] In the *Bahrein Petroleum* case the Supreme Court of India confirmed
(at 636) that s 21 of the 1908 Code was a statutory recognition of the principle that
the defect as to the place of suing under ss 15 to 20 may be waived. Mulla *Code of
Civil Procedure* p 461, says precisely the same (but without any citation to the
case).

[79] The experts for the defendants, Ms Goswami and Mr Vaidyanathan, both
give clear evidence that the effect of the decisions of the Supreme Court of India,
as confirmed by *Mulla* is that a party may submit to the jurisdiction of a court of
general competence and may waive any objection based on territorial jurisdiction.

[80] Former Chief Justice Ahmadi gave an opinion that the parties to a legal
dispute could not by agreement confer jurisdiction as to competence and
territorial jurisdiction on an Indian court, although there was a form of statutory
estoppel available in certain limited circumstances provided by s 21 of the 1908
Code which applied only at an appellate or revisional level. He relied on decisions
of the Supreme Court and of the Privy Council, each relating to jurisdiction over
land, and a decision in 1928 of the Lahore Court of Appeal. *Kiran Singh v Chaman
Paswan* AIR 1954 SC 340 dealt with an action for recovery of possession of land,
and in that case it was said (at 342):

> 'A defect of jurisdiction, whether it is pecuniary or territorial, or whether
> it is in respect of the subject-matter of the action, strikes at the very authority
> of the Court to pass any decree, and such a defect cannot be cured even by
> consent of parties.'

[81] In *Raja Setrucharlu Ramabhadra Raju Bahadur v Maharaja of Jeypore* AIR
1919 PC 150, the action at first instance in Vizagapatam was for the sale of land
subject to a mortgage. Section 17 of the 1908 Code provided that a suit to obtain
relief in respect of immovable property might be instituted in the court within the
local limits of whose jurisdiction any portion of the property was situate. The
land was outside the jurisdiction of the court, but no point was taken on
jurisdiction at trial. It was held by the Privy Council that the point could be taken
on appeal, notwithstanding s 21, which provides that no objection could be
taken on appeal (in this case before the Madras court) 'as to the place of suing'
unless the objection had been taken in the court below. The reason was (at 152):
'This is not an objection as to place of suing; it is an objection going to the nullity
of the order on the ground of want of jurisdiction.'

[82] The decisions of the Supreme Court and of the Privy Council do not
appear to me to be inconsistent with the later decisions of the Supreme Court in
1962 and 1966, each of which state that s 21 is declaratory of the principle that, at
least in actions in personam, objections to territorial jurisdiction can be waived.
All that *Singh*'s case appears to say is that a court has no authority to make a
decree in relation to land outside its jurisdiction. So also *Raju Bahadur*'s case holds
that the provision that objections as to 'place of suing' which cannot be raised on
appeal if they have not been taken below does not apply to jurisdiction over land

*a*  in the agency tracts which was excluded from the operation of the 1908 Code.  If the former Chief Justice were right in saying that objections to territorial jurisdiction could not be waived under s 21, not only would it be contrary to the two decisions of the Supreme Court in 1962 and 1966, but it would deprive s 21 of all meaning.

*b*  [**83**]  The decision of the Lahore Court of Appeal in *Bhamboo Mal v Ram Narain* AIR 1928 Lahore 297 cited by former Chief Justice Ahmadi does say that s 21 has no application to foreigners not otherwise subject to the jurisdiction.  But the opposite was decided in 1978 in Andhra Pradesh in *Far Eastern Steamship Co (Kakinada, petitioner) v Koika Trading Co Ltd* AIR 1978 Andhra Pradesh 433, and the decision in the *Bahrein Petroleum* case, where it was held there had been a submission to the Cochin court, was an international case and does not appear *c*  (despite the references to Bahrein Petroleum having an agent in Bombay) to have depended on there being another court in India with jurisdiction.

[**84**]  My conclusion is that India is an available forum for these reasons: (a) RRIP has a place of business in India and has registered an agent to accept service, and the claimants have not disputed this either as a matter of fact or law, *d*  and Heaton could be joined with leave to an action against RRIP, or could acquiesce in such an action under s 20(b) of the 1908 Code; or (b) Kishan Rao is amenable to the jurisdiction of the Indian courts, and the Rolls-Royce defendants could be joined with leave, or could acquiesce under s 20(b): if the claimants are right in their allegations, Kishan Rao is liable, and any failure to sue him would be purely tactical; or (c) the strong weight of authority is that a submission to the *e*  jurisdiction of the Indian court would be effective, and the Rolls-Royce defendants have offered to submit.

[**85**]  The claimants purported to introduce new matters in the final opinion of former Chief Justice Ahmadi, for which they had neither sought nor been granted permission.  The point on jurisdiction is that because the action would be a *f*  derivative action, permission is required to commence it and the court might refuse permission if it appeared that the cause of action had not arisen within its jurisdiction or that the defendants did not reside or carry on business within the jurisdiction; and that third parties interested in the suit might join the proceedings and raise the issue of jurisdiction.  The defendants have not had an opportunity to answer this evidence, which should not have been sought to be *g*  introduced at this stage. But former Chief Justice Ahmadi does not appear to have been instructed on RRIP's registration under the 1956 Act as a foreign company and its having filed the name of a person authorised to accept service.  In any event, the problem would not arise if Kishan Rao were a defendant, and has not arisen in the eight derivative actions in Hyderabad to which the Rolls-Royce *h*  defendants (and other foreign companies) are parties.  A point on limitation is taken, to the effect that if time had begun to run in India, it would not have been prevented from running by the institution of the English proceedings.  If that is so, then the remedy for that has always been in the hands of the claimants.  But I take no account of this point, raised as it is without permission after numerous *j*  rounds of evidence.

VI.  HISTORY OF THE PROJECT

[**86**]  In this section I shall set out the history of the project.  Not all of the facts are common ground, and in setting out the history, which is derived from the witness statements and exhibits, I am not intending to make any finding of disputed fact.

*The project*

[**87**] In the late 1980s National Thermal Power Corp (NTPC) was given a licence to set up a gas-based power project at Kakinada, Andhra Pradesh. NTPC is a state-owned power utility company, and the largest supplier of power in India. In the early 1990s the Andhra Pradesh State Electricity Board invited tenders for the construction and maintenance of the plant. With the encouragement of the then chief minister of Andhra Pradesh, Mohan Rao resigned from GE Power Systems, and established STUSA to make a bid for the project.

[**88**] In March 1992 the government of Andrah Pradesh issued a letter of intent to STUSA to give it the responsibility of setting up the project. Following meetings with NTPC and officials of the power ministry in India, it was decided that the project would be established and run by a joint venture company in which CMS (a major United States power generation company), STUSA and NTPC would participate. It was also decided that Kishan Rao's Jaya Food would be added as a promoter to and participant in the project due to the close family relationship between Mohan Rao and Kishan Rao, and his access to local capital.

[**89**] A joint venture company was formed using the STUSA name, ie Spectrum, and it was registered on 26 October 1992, as Spectrum Power Generation Ltd. Because STUSA and Mohan Rao could not purchase shares in the Indian company without first obtaining exchange control approvals, Kishan Rao and his sons were the notional promoters of the company. In January 1993 the Indian Ministry of Energy required NTPC's participation in the equity on a minority basis.

[**90**] Once the joint venture company had been formed, it became necessary to formalise the relationship between the three joint venture partners in a promoters' agreement. A promoters' agreement was executed on 20 June 1993 between STUSA, Jaya Food and NTPC, on which I elaborate below at [96] and [97]. In June 1994 the relationship between CMS and the other parties broke down, and CMS agreed to a lump sum payment for the expenses it had incurred was agreed. SPGL was unable to obtain exchange control clearance and as a result CMS instituted proceedings in a Michigan Federal Court for the money. The only relevance of this for the purposes of these proceedings is that the Rolls-Royce defendants rely on statements made by Mohan Rao in those proceedings.

*Award of contracts*

[**91**] SPGL sought tenders for the project from 1992. The main contracts were to be contracts for engineering, procurement and construction (EPC) and operation and maintenance (O&M). Tenders for the EPC contract were received from ABB, Siemens, a Rolls-Royce/Westinghouse consortium, Bharat Heavy Electricals of India, and General Electric. There was a separate tendering process for the O&M contract, in which the tenders were Rolls-Royce/Westinghouse, NTPC and three United States companies.

[**92**] Both sets of contracts were awarded to Rolls-Royce/Westinghouse. Following a series of letters of intent and the signature of an outline version, and after consideration of the tenders, the EPC contracts were entered into on 12 December 1994: between SPGL, RRIP, and Westinghouse International Service Co Ltd for the erection, supervision and commissioning of the plant; and between SPGL, Heaton and Westinghouse Electric Corp for the manufacture and supply of plant. Following board approval in March 1995, Mohan Rao and

*a*  Kishan Rao were authorised to execute the O&M contract with RRIP.  The contract was executed on 14 March 1995, with Westinghouse as principal sub-contractor.

*Agency agreements*

[**93**] On 1 November 1993 two agency agreements were entered into with Towanda, which had been incorporated in the British Virgin Islands on 5 October
*b*  1993.  One was with Heaton for the purpose of securing an EPC contract with SPGL, and the other with RRIP to secure an O&M contract.  The commission in the former was to be $US 19·3m (in instalments commencing on signature), and in the latter agreement the commission was to be $US 1·5m.  The agreements were to be governed by English law.

*c*  [**94**] There is a major conflict of evidence on the role of Mohan Rao in the inception and conclusion of these agreements.  He says that he did not see them until 1997 and did not appreciate their significance until 1999, when, in proceedings against him by Kishan Rao in Hyderabad (to which I shall refer below in section XI) Kishan Rao alleged that Towanda was owned and controlled by him. The Rolls-Royce witnesses say that Mohan Rao was not only aware of the agency
*d*  agreements, but that he pressed for them to be completed and participated in the negotiations for their conclusion.

[**95**] Rolls-Royce has produced a contemporary memorandum to the then head of Rolls-Royce Power Generation Systems Ltd in October 1993, attaching the 'Draft Agency Agreement for handing over during your discussions with
*e*  Mohan Rao in Hyderabad next week'.  It is accepted by some of the Rolls-Royce witnesses that the draft was probably not handed over, and I shall revert to the evidence on this below in section XV.

*Promoters' agreement*

*f*  [**96**] On 29 June 1993 NTPC, Jaya Food and STUSA entered into a promoters' agreement to set out the terms on which the promoters would set up and run the power project.  It included terms as to the division between equity and debt funding and the extent to which equity would be made available to the public. The promoters' agreement also provided that of the 90% to be allotted to Jaya Food and STUSA, 50% of such shares could be issued to an 'Affiliate' of those
*g*  parties.  According to Rolls-Royce, it was agreed that Kishan Rao would become managing director, and that representatives of Jaya Food, STUSA and NTPC would sit on the board.

[**97**] Ninety per cent of the initial issued and paid up equity capital was to be subscribed and held by Jaya Food, STUSA and its affiliates including CMS, and
*h*  10% by NTPC.  Out of the 90% held by Jaya Food and STUSA they could offer up to 20% to the public for subscription at par.

[**98**] On 27 July 1995 STUSA and STUSA (Mauritius) entered into an agreement under which STUSA (Mauritius) as an affiliate of STUSA would invest $US 8,335,070 as equity.

*j*  [**99**] According to the evidence of SPGL, no equity contributions were made by NTPC and no shares were issued to it.  As a result of NTPC's failure to make its equity contribution the financial position of the project became difficult.  In addition it is said that, in breach of the promoters' agreement, Mohan Rao failed to furnish guarantees on behalf of STUSA to financial institutions to secure SPGL's debt.  As a result, Kishan Rao arranged for further funds to be contributed from his own resources and those of his companies.  He also arranged a loan with

ANZ Grindlays of £50m in 1995 which was guaranteed by the State Bank of India.      *a*
He also guaranteed other loans, and arranged unsecured loans of £4m.

[**100**] As a result of the non-Indian debt the company was required to obtain
non-Indian equity, and the board therefore agreed on 24 February 1994 a different
shareholding structure: NRIs 4·5%; overseas corporate bodies 13·5%; foreign
companies/foreigners 42%; resident Indians 40%. To meet the foreign equity
requirement SPGL obtained in 1995 an equity contribution from a Mauritian      *b*
company in the Rolls-Royce group, Rolls-Royce Godavari Power Ltd, which
became, following further contributions in 1998, the largest shareholder with
47·53%. STUSA and its associates took up 24·76%.

[**101**] According to Rolls-Royce, it was asked to take up equity to demonstrate
its confidence in SPGL and to get the project kick-started. It thought that SPGL
would issue a substantial number of shares to other subscribers, but this was      *c*
prevented by the dispute between Kishan Rao and Mohan Rao, leaving
Rolls-Royce in the position which it had not anticipated of owning a substantial
long-term stake.

[**102**] Relations between the Mohan Rao camp and the Kishan Rao camp
broke down after about December 1995 when the board of SPGL rescinded its      *d*
adoption of the promoters' agreement. There ensued litigation in India concerning
the validity of the board decision to rescind the promoters' agreement, but the
dispute has significantly escalated since 1999 following a criminal complaint
made by Kishan Rao against Mohan Rao and his associate Mr Brij Bharteey in the
Court for the Special Judge for Economic Offences at Hyderabad. Kishan Rao
accused them of having defrauded NRI investors by persuading them to invest in      *e*
SPGL and then misappropriating the money by purchasing shares in the name of
STUSA (Mauritius).

[**103**] Shortly afterwards Mohan Rao wrote a long and angry letter to
Kishan Rao, in which he said:

> 'Maybe you forgot, but let me try to recollect for your sake that you were      *f*
> in the Chutta, Atta and Vermicelli business in a very small way and knew
> nothing of POWER or power generation, excepting that you were greedy
> for power, money and had a flair for show of power. Dear Mr. Kishan Rao,
> is it not out of trust and the faith I had in you that I associated you with this
> project right from the time after STUSA responded to the tender of the      *g*
> AP State Electricity Board. Did I not trust you and treated you as an elder,
> take you to all the meetings and discussions we had with the various
> departments of Government—both at State level and Central level? You had
> every knowledge of the entire project right from the beginning, as you were
> so close to all our functioning. Mr. Kishan Rao were you not aware of how      *h*
> we ie, for STUSA generated funds abroad and how we channelled them into
> the project after obtaining all the necessary approvals? Which aspect of our
> involvement is not known to you Mr. Kishan Rao? Being a relative of mine
> that too close relative, you knew each and every aspect of my life including
> my bankruptcy proceedings in USA of the year 1983. You had my every
> particular and detail with you, which would not have been available to you      *j*
> had we been mere business partners. Mr. Kishan Rao, I really am amazed at
> your memory and memory retrieval capacities. What you knew happened
> in 1983 you found it relevant to use against me now in the year 1999. And
> that too when we started working on the project from 1990. Mr. Kishan Rao
> your action in doing all these is very apparent. You are doing all these with

a

a deliberate scheming and purpose. Your aim is to harm my name and reputation and ruin me even as a person. This is nothing but sheer slander and criminal intimidation … Dear Mr. Kishan Rao, as it is you started acting malafide and developed a greedy intent towards SPGL, and wanted to have a monopoly and total control over the project. You acted malafide and worked hard trying to throw out NTPC, which was there in this project right

b

since the inception of thought for this power project. You had no qualms in cruelly cutting it out from the project. You then targeted STUSA and started using all the tricks in your hat to throttle and suffocate us and make our existence in SPGL miserable … Dear Mr. Kishan Rao, I know that you filed this criminal case against me in the Economic Offences Court without any legal basis. I gave any amount of thought as to why you did this. Your letter

c

to Ms Mangala J. Reddy and other NRI Investors gives out the answer and made your malintents clear and transparent. You both got the Court issue summons and address a letter to the US Embassy at Delhi. You obtain copies of the said letter and summons. You then bundle them up copy of the complaint, copy of the letter issued by Court to US Embassy and the

d

summons of Court, and send them to the NRI Investors in US … If you fail to act on my letter and comply with calls made by me herein, I will be having no other option but to initiate necessary legal action against you to safeguard myself, my name and reputation, and seek legal remedies including Civil and Criminal against you in all available forums.'

e

VII. INDIAN LITIGATION: OVERVIEW

[104]  The Indian litigation consists of 18 separate civil and criminal cases, with some considerable overlap in the allegations and the issues. In all but one of the cases (the NTPC action to invalidate the rescission of the promoters' agreement) the principal protagonists are Kishan Rao and Jaya Food, and SPGL, on the one

f

side and Mohan Rao and his companies or his nominees on the other.

[105]  A broadly chronological account of the litigation will show how the dispute has escalated. The proceedings are as follows: (1) Delhi proceedings by STUSA in 1996 (followed by a similar case by NTPC in 1997) to set aside the board decision rescinding the promoters' agreement; (2) eight derivative actions

g

brought in Hyderabad in January 1999 on behalf of SPGL by nominees of Mohan Rao or Ravi Reddy (including the second and third claimants in this action) against Kishan Rao alleging that he had acquired shares in SPGL by fraudulently paying out its money on bogus construction contracts to entities controlled by him; (3) a 1999 criminal complaint in Hyderabad by Kishan Rao against Mohan

h

Rao alleging that he had defrauded NRIs by using their money to buy STUSA's interest in SPGL; (4) proceedings by Kishan Rao in Hyderabad in May 1999, alleging that he had advanced money through Towanda to Mohan Rao for the purchase of shares in SPGL, which had not been repaid; (5) three criminal complaints in Hyderabad in January 2000 brought by the second claimant in this

j

action, alleging fraud by Kishan Rao in siphoning off money from SPGL to the same bogus contractors alleged in the derivative actions; (6) proceedings in 2001 by STUSA to challenge the settlement of the NTPC proceedings in connection with the promoters' agreement; (7) three criminal complaints brought against Kishan Rao and his sons in July 2001 alleging forgery of revenue-stamped contracts.

[**106**] In the proceedings to challenge the rescission of the promoters' *a* agreement there have been many interlocutory applications, involving applications relating to control over the issues of shares and the taking of management decisions. In 1998 the court in Delhi unsuccessfully endeavoured to procure a settlement by making an order under which the Industrial Development Bank of India convened a meeting of all parties to negotiate a settlement. In the course of those negotiations Mohan Rao sought to be made *b* joint managing director with equal representation of STUSA and Jaya Food on the board.

VIII. ACTIONS IN DELHI BY STUSA IN 1996 AND BY NTPC IN 1997 TO CHALLENGE SPGL'S RESCISSION OF THE PROMOTERS' AGREEMENT

[**107**] The defendants are SPGL, Jaya Food, and NTPC. The proceedings *c* alleged that SPGL and Jaya Food were seeking to avoid their obligations under the promoters' agreement; that the board minutes of 14 December 1995 to rescind the promoters' agreement had been falsified; that SPGL had failed to issue shares to STUSA and NTPC; that Jaya Food was attempting to grab control and management of SPGL by hijacking the project. The proceedings sought a *d* declaration of invalidity of the board resolution and orders prohibiting any increase in SPGL's share capital and directing that no steps were taken in SPGL's management without its and NTPC's consent.

[**108**] NTPC's claim was similar, except that it joined as defendants many more parties, including the Rolls-Royce defendants. The action was settled in *e* April 2001. But the Supreme Court of India said that this did not preclude STUSA from challenging the settlement agreement, and a derivative action was brought by STUSA on its own behalf and on behalf of other shareholders against Jaya Food, and Kishan Rao and his sons, to challenge the settlement agreement. In September 2001 Justice Kapok refused to grant an injunction to prevent implementation of the settlement agreement. *f*

*Interim applications and appeals*

[**109**] There were numerous interim applications in these actions and on appeal, including applications to restrain management of SPGL without the consent of STUSA (and NTPC), for injunctions to restrain the issue of further *g* shares, for orders that STUSA should jointly operate SPGL, and for the appointment of a receiver. All of these applications were unsuccessful at first instance and on appeal in the Delhi Civil Appellate Division. STUSA has applied for special leave to appeal from the Supreme Court of India, and in that application has asked for the appointment of a receiver. In the course of these *h* appeals STUSA joined the defendants in the NTPC proceedings (including the Rolls-Royce defendants) as additional defendants to its proceedings.

[**110**] On 24 July 2000 the Supreme Court of India ordered that, pending the appeals, 'In the mean time the parties shall maintain status quo as on today and shall not take any major decision except the decisions to carry on day-to-day *j* functions' (the status quo order). The evidence of SPGL is that the effect of the status quo order has been to make it difficult for it to raise additional capital without permission of the court. Mohan Rao has successfully challenged an order giving such permission, and made an offer (which was declined) to make capital contributions.

IX. HYDERABAD DERIVATIVE ACTIONS: JANUARY 1999

*a*

[111] The eight derivative actions in the Hyderabad City Civil Court were commenced in January 1999. The same six plaintiffs sue in each action, in each case as shareholders claiming to hold 2,700 shares in SPGL. The first plaintiff, Mr Mitta, is Mohan Rao's brother-in-law and is the third claimant in these proceedings, and the second plaintiff, who sues as Ms Santha Reddy, is Ravi

*b* Reddy's mother-in-law and is the second claimant in these proceedings. The other four plaintiffs are members of the Reddy family.

[112] The claim in each action is that shares in SPGL held by Kishan Rao's company, Bambino Finance Pvt Ltd, were paid for from money fraudulently diverted from SPGL through bogus contracts with fictitious entities or entities

*c* controlled by Kishan Rao and his sons. The entities concerned are Blue Star Constructions Co and Real Builders, which are said to be sham partnerships, and Kris Engineers, which is said to be owned by Kishan Rao's sons. Consequently it is alleged that the shares were issued for no consideration, and that the funds of SPGL were used for the purchase of its own shares. The actions seek an order that shares in SPGL held by Bambino be declared null and void, and that the

*d* register of SPGL be rectified by cancelling the shares. The Rolls-Royce companies (including Rolls-Royce Godavari Power Ltd) are parties (for the purpose of requiring them to furnish information) and jurisdiction to try the suit is said to arise from the fact that Bambino, the principal defendant, is within the territorial jurisdiction of the court.

*e*

[113] The derivative actions claim that (a) the persons in control of SPGL are close relatives of Kishan Rao; (b) no purpose would be served 'in moving the domestic forum'; (c) where the wrongdoers are in control, the shareholders can move the court for the necessary relief; (d) the issue of the shares was wrongful and ultra vires, and a fraud on the minority, and the majority directors would

*f* have no interest in protecting the interests of SPGL since they acquired their majority by fraudulent means; (e) there is no alternative remedy before the Indian Company Law Board.

[114] The significant features for present purposes are: (a) the plaintiffs are associated with Mohan Rao and Ravi Reddy; (b) the information for the action comes from STUSA; (c) the actions raise questions of wrongdoer control and the

*g* honesty of Kishan Rao.

X. HYDERABAD CRIMINAL PROCEEDING BY KISHAN RAO AGAINST MOHAN RAO AND BRIJ BHARATEEY: 1999

*h* [115] The criminal complaint was made by Kishan Rao against Mohan Rao and Brij Bharateey in the Court of the Special Judge for Economic Offences in Hyderabad. The complaint alleges fraud under the Indian Companies Act 1956. The essence of the complaint is that the accused induced NRIs to invest in SPGL, and misappropriated the funds so as to buy shares in SPGL in the names of

*j* STUSA, Spectrum Infrastructure (Jersey) and STUSA (Mauritius).

[116] Mohan Rao claims that the purpose of these proceedings is to cause damage to the STUSA companies and to retain control of SPGL in order 'to further siphon off funds with the active connivance of the so-called independent professional directors': judgment of Judge Raghavaiah in the Hyderabad debt proceedings.

XI.  HYDERABAD DEBT ACTION BY KISHAN RAO: MAY 1999

[117] In this action, commenced in May 1999, Kishan Rao sues Mohan Rao, STUSA, Spectrum Infrastructure Ltd (Jersey) and STUSA (Mauritius).  Kishan Rao claims $US4·9m, which he says he lent to Mohan Rao in February 1995, because Mohan Rao could not afford to pay for his equity contribution in SPGL. Kishan Rao claims that it was agreed that Mohan Rao would repay the money once he had sufficient funds.  There is said to be a document in Mohan Rao's handwriting giving the payment instructions.  Kishan Rao claims that the money was paid to Mohan Rao's nominee's account in Panama, and Kishan Rao's sons were present in Lugano when Mohan Rao withdrew the money.  Mohan Rao then used this money to pay for shares in SPGL that were allotted to the STUSA group of companies.  It is also alleged (as in the criminal complaint) that Mohan Rao had collected $US9·3m from NRIs for investment in SPGL but had failed to use the money for that purpose.  Kishan Rao claims that Mohan Rao concealed from him that he had been adjudged insolvent by a New York federal bankruptcy court in 1983.

[118] Kishan Rao says that he owns and controls Towanda and that its bank statements indicated that $US4·9m was remitted to Mohan Rao's nominee accounts in February 1995: $US4m to Darofe SA, Panama, account with Banco di Credito, Lugano and $US900,000 to Mount Stevens Investment Ltd, account with BNPI Mauritius.  Mohan Rao denies the allegations and says he knows nothing of the companies alleged to be his nominees.  Kishan Rao has replied that in an application made in an appeal against the dismissal of an interim application in the 1996 action, Mohan Rao claimed that Mount Stevens Investments Ltd was associated with him, and that his sons were present when Mohan Rao and Ravi Reddy received cash in Lugano.  The defendants put Kishan Rao to proof of his assertion that Towanda was his company, and say that no material had been put forward to show that Towanda was owned by Kishan Rao.  In the course of dismissing an application for attachment of the defendants' assets Judge Raghavaiah  took the view that Kishan Rao had not placed satisfactory evidence on record to show that Towanda was owned by Kishan Rao, or that the payees were connected with Mohan Rao.

XII.  CRIMINAL COMPLAINTS BY MRS SANTHA REDDY PEKETY: JANUARY 2000

[119] Mrs Pekety, the second claimant in these proceedings and the mother-in-law of Ravi Reddy, made three separate criminal complaints in the Court of the Special Judge for Economic Offences in Hyderabad.  Each of the complaints was brought in January 2000.  In each case Mrs Pekety, as the holder of 2,700 shares in SPGL, says that she 'met Dr A V Mohan Rao, one of the promoter directors of SPGL and inquired into the reasons for non-payment of dividends by SPGL in spite of making the investment in the shares way back in the year 1995'.  In each case it is alleged that 'several crores [hundred of millions] of rupees were siphoned off by giving bogus contracts to family or friends of' Kishan Rao.  It is alleged that contracts relating to site levelling and construction work were awarded to companies established by Kishan Rao as a device to transfer funds from SPGL; and that Kishan Rao and his sons, having been entrusted with control over the funds of SPGL, have committed criminal breaches of trust.  The principal entities alleged to be involved are the same as in the eight Hyderabad derivative actions, Kris Engineers, Blue Star Constructions and Real Builders.

XIII. CRIMINAL COMPLAINTS BY STUSA: JULY 2001

a     [120]  In July 2001 STUSA lodged three criminal complaints against Kishan Rao and his sons, alleging that the contracts with Kris Engineering, Real Builders, and Blue Star Constructions had been executed on revenue stamped paper which had been obtained fraudulently. STUSA has been seeking to have Kishan Rao arrested.

b     XIV. ALLEGATIONS OF FRAUD AND BRIBERY

     [121]  In the course of the applications and appeals at first instance and on appeal in the Delhi High Court Mohan Rao alleged that 'cost overruns ... resulted from the mismanagement and suspected siphoning of funds' by Kishan Rao (6 January 1998) and that rescission of the promoters' agreement was part of a

c     strategy of concealing 'financial mismanagement and siphoning away of funds from SPGL' and 'several crores of rupees were siphoned off by giving bogus contracts to family of friend's owned companies' of Kishan Rao (18 November 1999).

     [122]  In the eight derivative actions and three criminal complaints in Hyderabad, the complainants allege that Kishan Rao defrauded SPGL by

d     siphoning off money to pay for bogus construction work.  In the three new criminal complaints by STUSA, Kishan Rao is accused of forgery in relation to the same contracts.

     [123]  In the application to the Supreme Court of India for the appointment of a receiver, Mohan Rao made an affidavit on 5 January 2001 that he had:

e          '... recently come to know that two agency agreements were executed for procuring the operation and maintenance contract (O&M) as well as engineering procurement and construction (EPC) contract.  While one agreement was executed between Rolls Royce Industrial Power (India) Ltd and Towanda Services Ltd for procuring the O&M contract, the second

f          agency agreement was executed between Parsons Turbine Generators Ltd and Towanda Services Pvt Ltd for procuring the EPC contract ... From the said agreement it transpires that a sum of £1·5m and $US19·3m was to be paid to Towanda Services Ltd by Rolls-Royce Group as agency fee/kick-back for obtaining/procuring O&M contract as well as EPC contract in respect of the power project at Kakinada ie SPGL.  The fact that Towanda Services is

g          owned and controlled by Mr. Kishan Rao is admitted fact in the suit being OS No 239 of 1999 filed in the Court of Chief Judge, City Civil Courts, Hyderabad by Mr. Kishan Rao as plaintiff ... From a collective reading of the above documents, it is apparent that not only bribes have been paid by Rolls-Royce to Mr. Kishan Rao for procuring the engineering procurement

h          and construction (EPC) contract as well as operation and maintenance (O&M) contract but also a major amount of the alleged bribe has been re-circulated into the company as equity contribution of RRGP.  In fact, as no real funds have actually been invested by RRGP, RRGP has never taken any stand in the matter in courts below.'

j     [124]  On 6 November 2001 STUSA made an application to the Supreme Court of India for the following relief: (a) that the present management of SPGL, comprising Kishan Rao and his sons, and Mr Shukla and Mr Bhattacharyya be removed, (b) that the board of directors be reconstituted in accordance with the promoters' agreement, (c) that SPGL be operated, run and managed in accordance with the promoters' agreement and that a representative of STUSA

should be appointed as managing director/CEO of the company with all
executive powers, (d) that Kishan Rao and sons be ordered to repay all moneys
siphoned from SPGL, totalling at least Rs58·21 crores.

[**125**] According to the application (which remains pending):

'From the limited inspection of SPGL records, it is apparent that the
present management of SPGL comprising of Kishan Rao, his family
members and friends have not only committed fraud but they have also
siphoned off money from SPGL.'

[**126**] In the proceedings commenced earlier this year to set aside the NPTC
settlement agreement, Mohan Rao on behalf of STUSA said:

'There is evidence of any amount of collusion between [Kishan Rao]
and Rolls-Royce group of companies in the matter of management of SPGL.
Rolls-Royce group of companies has assisted, colluded and actively aided
siphoning out huge sums of money by bogus agency agreements … (a) huge
amounts have been siphoned of [sic] from SPGL by Kishan Rao, his family
members and the corporates owned-controlled by them in the name of land
and site development contracts and bogus book entries and was already
included in the EPC contract with Rolls-Royce (b) the amount so siphoned
off was brought in by them as alleged equity contribution in SPGL.'

XV. THE APPROPRIATE FORUM

*General*

[**127**] I have given reasons why India is an available forum for resolution of
this claim. The thrust of the claimants' case on forum is that in determining the
question of forum it is not sufficient for there to be Indian contacts with the case
and that the essential question is with what country the issues are connected, and
the relevant issues are primarily those relating to the allegations of bribery rather
than the issues relative to the claimants' right to bring the action.

[**128**] It is clear that in the normal case the starting point must be the
identification of the issues which are likely to arise. In section IV, I expressed the
view that it was for the claimants to establish that England was clearly the more
appropriate forum for the determination of the issues not only in relation to the
bribery allegations but also in relation to the question of their standing to sue,
even if that question is resolved without any form of trial or oral evidence. In my
judgment the courts of the place of incorporation will almost invariably be the
most appropriate forum for the resolution of the issues which relate to the
existence of the right of shareholders to sue on behalf of the company.

[**129**] Apart from a reference in the latest opinion of former Chief Justice
Ahmadi to permission being required to commence a representative action, there
is no material in the evidence to indicate how Indian courts would deal with the
problem (recognised in the Indian text on company law) which came to the fore
in *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)* [1982] 1 All ER 354,
[1982] Ch 204 and which is the subject of CPR 19.9. But whether the problem is
dealt with by way of a preliminary issue or at trial, the issues will arise at some
stage. In any event it is not easy to compartmentalise all of the issues. For
example, the Rolls-Royce defendants say that Mohan Rao was well aware of the
agency agreements, and benefited from the payments to Towanda. This may be
relevant to several issues: whether the action is brought for ulterior purposes;

*a*  whether Mohan Rao participated in the alleged wrongs; and whether the payments were legitimate.

*Connections with England and India*

[**130**] I accept that there is an important connection of the proceedings with England, and it is that the Rolls-Royce defendants are English companies.  But *b*  they conduct no operations in England, and the operations they conduct in India are conducted as agents for other companies in the Rolls-Royce group.  In any event Heaton now has a minimal staff.  But it seems that most of the Rolls-Royce executives who dealt with the project can be made available in England without difficulty.  Of the four individuals who have so far given evidence on their behalf, two live in England, one is in India and the fourth is in Norway.

*c*  [**131**]  No doubt many of the relevant documents in the Rolls-Royce group will be in England (although the evidence is that the documents of RRIP are in India), but those which are in India could no doubt be made easily available in England.  I do not regard as significant the claimants' suggestion that an Indian judgment would have to be enforced in England: there has been no suggestion that the *d*  Rolls-Royce defendants would not satisfy any judgment against them, and in any event Indian judgments are enforceable in England under the Foreign Judgments (Reciprocal Enforcement) Act 1933.

[**132**] The only other connections with England are, first, that the agency agreements were, it would seem, executed by a Rolls-Royce executive in England.  Although the place where transactions take place is a relevant factor, *e*  the actual place of signature is often accidental, and there is no reason to believe that in this case it is a significant factor. So also the fact that the agency agreements are expressed to be governed by English law and subject to English jurisdiction is of no relevance.  If they are shams and utterly bogus, then the choice of law and jurisdiction clauses are equally bogus.  If they are genuine the *f*  choice is effective, but is irrelevant for the purposes of this case because this is not a claim under the agreements.  It is alleged (and not yet contested) that the payments were made under the agency agreements from England.  If so, this is not a matter which will require much investigation, and does not point to England as an appropriate forum.

*g*  [**133**]  On the other hand, there are very strong connections with India.  The claim is a derivative claim by Indians and an NRI, and an NRI-controlled Mauritian company.  The nominal claimants are linked with NRIs who have substantial investments in India.  The claim is made on behalf of an Indian company complaining of a fraud consisting of bribes taken by the managing director in connection with construction and maintenance contracts executed in *h*  India for a power project in India.  The board which is said to be controlled by the wrongdoers is entirely, apart from Mohan Rao and his colleague, in India.  There are many civil and criminal actions pending in India which relate to the project, to the shareholding in the company, and to allegations of mismanagement by the company.  As a result of the status quo order of the Supreme Court of India the *j*  operations of the company are subject to close scrutiny by the courts.

*Other countries*

[**134**] The fact that Mohan Rao and Ravi Reddy (and one of the individual claimants) are mainly resident in the United States does not detract from India being the country with the overwhelmingly strong connections with the case.  It

is obvious that they have strong connections with India, and there is no evidence
that they have substantial connections with England. Their companies are
incorporated in New York, Mauritius and Jersey, but no doubt they are in practice
controlled from the United States. The fact that Towanda is a British Virgin
Islands company and is administered from Switzerland, and that the Towanda
payments by Rolls-Royce (and, allegedly, to Mohan Rao) were made to
Switzerland, have little or no bearing on the forum issues in this case. Nor is it
material that Rolls-Royce's partner in the project is a United States group,
Westinghouse.

*The issues*

[135] The principal issues which, on the proceedings so far, are likely to arise
are these: (a) is the derivative action brought bona fide for the benefit of the
company by shareholders, as the claimants contend, or is it, as the defendants
claim, a claim brought by nominees of Mohan Rao and Ravi Reddy as part of their
continuing struggle with Kishan Rao for control of SPGL and designed to involve
Rolls-Royce in a resolution of that struggle? (b) is SPGL being improperly
prevented from bringing or adopting the claim? (c) if the payments to Towanda
were illegitimate, did Mohan Rao know about them and/or knowingly benefit
from them so as to disqualify his nominees from bringing the action? (d) is there
any other remedy available? (e) were the payments under the agency agreements
legitimate, and if not, did the Rolls-Royce defendants know?

*Ulterior motive*

[136] The defendants' position is this: the current English action is part of the
wider factional battle between the two main camps of joint venturers in SPGL.
The action has been brought by the Mohan Rao/STUSA/Ravi Reddy camp to
seek to pressurise the Rolls-Royce defendants into becoming involved in settling
the overall disputes between the two camps. The English proceedings were first
threatened at about the time when STUSA's attempts to achieve results through
the Indian courts had been frustrated. The Rolls-Royce defendants say that in the
course of settlement negotiations which took place in January to March 2001, part
of the settlement proposed was the termination of the English proceedings. The
individual claimants say in their witness statements that they knew nothing about
that proposal, and the defendants say that this shows that the proceedings in the
various jurisdictions are being controlled and maintained by others, and that the
individual claimants have allowed their names to be put forward as participants
in the wider dispute.

[137] Ravi Reddy has tried and failed to purchase the Rolls-Royce interest in
SPGL, and the defendants say that he still has ambitions of acquiring it. They say
that the purpose of the proceedings is to seek to force the Rolls-Royce defendants
to involve themselves in breaking the impasse between the groups of promoters.
This amounts to an ulterior purpose, ie the furtherance of sectional or factional
interests rather than the interests of the company itself.

[138] The resolution of this question is, of course, for the court which decides
whether the derivative claim can be brought. The three original individual
claimants have no financial interest in the outcome. Even if the proceedings were
to succeed and SPGL were to be paid the full amounts claimed, the individual
claimants' proportionate interest would be about £5 each. It would be wholly
unrealistic on the material before me to suppose that this is not a claim in reality being

*a*   pursued by Mohan Rao and Ravi Reddy for their own purposes. The claimants are being funded by Ravi Reddy and get their information from Mohan Rao.

[**139**] It must be they who took the decisions and gave the instructions even before STUSA (Mauritius) was joined as a party, for example not to make Kishan Rao a defendant to the English proceedings. I have no doubt that this was purely tactical, and designed to support the case for English jurisdiction, just like the recent
*b*   application by Mohan Rao on behalf of STUSA in the Indian court to remove the Rolls-Royce defendants because of their claim in England that the proceedings should be stopped because of the Indian proceedings.

[**140**] It is a striking feature of the case that the claimants have chosen not to join Kishan Rao as a defendant. Their stated reasons are these: they need to
*c*   recover only once; there would be difficulty of enforcement against Kishan Rao; joining him would increase the costs and complexity, and he would delay the proceedings, whereas Rolls-Royce would have to consider the merits (ie settle). But their case is that he has received many millions of dollars; and that the bribery case is a simple one.

[**141**] Ravi Reddy says he feels 'morally bound to support the individual
*d*   claimants' and that he is supporting them because (among other reasons) they do not have the 'financial means to chase down the fraud within the company'. But if their object is 'to chase down fraud within the company' proceedings in England are an absurd method of accomplishing that mission, when it is clear that the Indian authorities have wide powers of investigation under the Indian
*e*   Companies Act 1956.

*Role of Mohan Rao*

[**142**] I have already said that the role of Mohan Rao is relevant to different aspects of this case. There can be no doubt that he and Ravi Reddy are behind
*f*   the claimants, and that there is therefore a probability that any court seised with the derivative action issues would be prepared to treat him as a claimant for the purposes of those issues. There would then be a serious issue as to whether he had participated in the alleged wrongdoing.

[**143**] There is a clear conflict of evidence on the role played by Mohan Rao in the negotiations for the contracts in the period 1993 to 1995. According to
*g*   Mohan Rao, he was in the negotiating team, but was only responsible for the technical side, and Kishan Rao dealt exclusively with the financial/commercial side.

[**144**] According to the Rolls-Royce evidence, there were intense and very difficult negotiations, principally with Mohan Rao, who led them. At the time of the negotiations Kishan Rao had inadequate command of English to undertake
*h*   the negotiations without the presence of either of Mohan Rao or one of his own sons. Kishan Rao was a local Indian businessman with no previous experience in power projects but who could bring his governmental and other contacts to assist the development of the project. The Rolls-Royce defendants rely on board minutes in 1994 and 1995 as indicating that Mohan Rao played a very active role
*j*   in evaluating the tenders and in awarding the contracts. He signed the EPC contract and witnessed the O&M contract. In October 1993 Mohan Rao signed an application on behalf of SPGL addressed to the Industrial Development Bank of India (IDBI) for financial assistance, and in August 1994 he signed the loan agreement between SPGL and IDBI, who are its main bankers, and have board representation in SPGL.

[145] This conflict is of course not to be resolved in these applications, but it is plain that the issues raised are relevant to the issues and are far from frivolous. Apart from the Rolls-Royce evidence to which I have referred there are statements made by Mohan Rao which belie his account of his role, and which suggest strongly that Mohan Rao has significantly downplayed his role in SPGL in these proceedings, and support the contention of the defendants that he was the driving force behind the project, and was involved in negotiating all aspects of SPGL's involvement in the project, including the funding and financial arrangements.

[146] When he verified the 1996 claim by STUSA in Delhi he stated that 'the entire project was thought of and conceived' by him and that 'he has been the life and soul of the entire project since 1990'. In the course of an appeal in interlocutory proceedings in the same litigation he said in January 1998:

'... [the] EPC contract and O & M contract have been completely initiated, discussed, negotiated and finalised by Dr Mohan Rao. His vital role has been acknowledged ... by the EPC contractors and [SPGL]. Both the EPC and O & M contracts have been signed by Dr Mohan Rao on behalf of [SPGL]. All this time, the managing director Mr Kishan Rao and his so-called experienced in-house technical team played a passive role and did not make any significant contributions to either the deliberations and it was the technical expertise and effort of [STUSA] and NTPC which are behind the success of the project.'

[147] In the proceedings in the Federal Court in Michigan by CMS for its unpaid expenses a brief on behalf of STUSA stated out that even before his appointment to the board in March 1994 Mohan Rao had held himself out, and acted, as a board member in dealings with potential project partners.

[148] There is also a major conflict of evidence on the role of Mohan Rao in the negotiation and conclusion of the agency agreements. The Rolls-Royce defendants say that he played a major role. His position is that he did not know of them until 1997, when he first saw them but did not appreciate their significance. He first became aware of their significance when Kishan Rao alleged in the Hyderabad debt action in 1999 that Towanda was owned and controlled by him. But in those proceedings he put Kishan Rao to proof that Towanda was owned by him, and Mohan Rao told the Supreme Court of India in January 2001 that he had 'recently come to know' of the execution of the agency agreements.

[149] The documents in this case indicate that a draft agency agreement for the EPC contract was drafted on behalf of RRIP (with a date in June 1993). On 27 October 1993 Mr Hynd, who was then the sales and marketing director of Heaton, wrote a memorandum to Dr Singleton, who was then the head of Rolls-Royce Power Generation Systems Ltd. The memorandum said: 'Attached is the draft agency agreement for handing over during your discussions with Mohan Rao in Hyderabad next week.'

[150] Dr Singleton's evidence in these proceedings was that he does not believe that he did in fact hand over the draft to Mohan Rao on that occasion. But he says that he is confident that Mohan Rao was, at that time, already well aware of what became known as the Towanda agreements and that he was involved in the negotiations of those agreements. Mr Hynd says that he does not recall what happened regarding the agency agreement after the date of his memorandum, but the fact that the draft was to be handed over to Mohan Rao is consistent, he

a
says, with his understanding about the knowledge of and involvement in the negotiations on the terms of what became as the Towanda agreements. Mr Hynd says that given his knowledge of the role of Mohan Rao as the originator of the project and the extent of his involvement in all aspects, he does not accept the statement by Mohan Rao to the effect that he did not appreciate the true nature of the Towanda agreements.

b
[151] Mr Lockton, who was then the managing director of Rolls-Royce (India) Ltd says that he believes that the draft agreement was handed over to both Kishan Rao and Mohan Rao, but his evidence is that it is inconceivable to him that Mohan Rao would not have received or at least been shown a copy of the draft by Kishan Rao, or at the very least have been told about the content. Mr Lockton says that he had several conversations with both Kishan Rao and

c
Mohan Rao in relation to those agreements during 1993, and in particular a meeting in Delhi in June 1993 with Kishan Rao and Mohan Rao at which they discussed, among other topics, a planned visit to the United Kingdom by both of them in July 1993 for discussions in relation to the agency agreements. He recalls a further meeting with Mohan Rao in Delhi towards the end of September 1993

d
in which he pressed for the agency arrangements to be finalised. Mr Lockton says that Mohan Rao pressed him, as his main Rolls-Royce contact in the initial stages of the project, to exert his influence to have the necessary arrangements put in place.

[152] Kishan Rao has alleged in the Hyderabad debt proceedings that Mohan Rao received substantial payments from Towanda, which were used

e
by Mohan Rao to invest in shares in SPGL via STUSA. These allegations are denied by Mohan Rao, and in interlocutory proceedings the judge in Hyderabad ruled that Kishan Rao did not adduce sufficient evidence of his ownership of Towanda or that the payees were connected with Mohan Rao. But there are documents linking Mohan Rao with one of the payees, Mount Stevens Ltd. If the

f
allegations are ultimately made out, it will show that Mohan Rao and STUSA not merely knew of and participated in the production of the original agency agreements, but also benefited from payments made by Towanda.

*Wrongdoer control*

g
[153] It is already apparent that this unusual case differs from the typical derivative action. One respect in which it differs is that in the normal case the principal defendants are the allegedly fraudulent directors who are said to control the board and the general meeting. In this case not only is the director not a party, but the company has a board which includes senior bankers who are there to look after the interests of lending institutions including the IDBI, the Industrial

h
Finance Corp of India, and the State Bank of India. The banks have contributed in loans some eight times the capital which has been introduced by Mohan Rao/Ravi Reddy and their associates, Kishan Rao and his associates, and Rolls-Royce. The IDBI was entrusted by the Delhi court with the task of settling the shareholder disputes, but its efforts failed, apparently because of Mohan Rao's

j
demands.

[154] The board has independent members of considerable standing. The court seised with the dispute could stay the proceedings until the board has been given an opportunity to consider whether to commence or continue proceedings. The board would have to consider (inter alia) the broad commercial implications of suing SPGL's most important and vital trading partners and continuing

contractors, and whether by suing the Rolls-Royce defendants those defendants
may resurrect and bring forward cross-claims against SPGL, the size and
importance of the likely return in the context of the commercial project involving
a total cost of $US250m. If the board decided that there should be proceedings
then the action would continue in the name of the company. If it decided not do
so, then issues of good faith might arise, and there might have to be evidence
from the independent board members.

[155] If the true question is, as I think it is, whether the company is being
wrongly prevented from seeking redress then India is plainly the appropriate
forum for determining whether the relevant organ is the company in general
meeting or the board, and if it is the board, whether there is an independent board
which can properly consider whether the prosecution of the action is likely to do
more harm than good (cf *Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)*
[1982] 1 All ER 354 at 365, [1982] Ch 204 at 221). The Indian courts, as the courts
of the place of incorporation and business of SPGL, are far better placed as a
practical matter to determine questions of wrongdoer control and whether the
proceedings are being brought bona fide in the interests of SPGL.

*Alternative remedy*

[156] The court seised with the question of whether the derivative action is
justified will also have to consider whether there is an alternative remedy as
expressed by Peter Gibson LJ in *Barrett v Duckett* [1995] 1 BCLC 243 at 250, and
what is meant by that expression. The defendants argue that the remedies
available to the Company Law Board are alternative in a relevant sense. In view
of what I have said above (at [29]), I need say no more than I am doubtful whether
the remedy in the Company Law Board is the type of alternative remedy that the
case envisages. But even if it did, I am satisfied that the remedies available in the
Company Law Board would not be a substitute for this action if it is held to have
the bona fide intention of recovery from the Rolls-Royce defendants. But the
remedies under the 1956 Act are sufficient if the true purpose of the claimants is,
as is said, to chase down the fraud and root out corruption. There are several
various avenues under the 1956 Act whereby minority shareholders may apply
for an investigation into the affairs of the company by the Company Law Board
or inspectors appointed by the central government: see ss 235, 237 and 388B to
388E of the Indian Companies Act 1956.

*Bribery issues*

[157] In relation to the underlying allegations of bribery, the claimants say that
the focus is simply on the conduct of the Rolls-Royce companies, rather than
SPGL's internal affairs. A claimant may claim the sum paid by the briber from
either the briber itself or the bribed fiduciary on a comparatively narrow basis, in
restitution and/or in tort, with the benefit of certain irrebuttable presumptions in
the claimants' favour. The claimants say that the Rolls-Royce defendants have
consistently refused to answer the bribery allegations in correspondence, and that
even now their case amounts to no more than a bare denial. The claimants say
that since the Rolls-Royce defendants have really put forward no case which
amounts to a defence of the bribery claim then there are no issues which will go
to trial, and therefore England as the place where the defendants are is the
appropriate forum for what would in substance be a claim for summary

*a*  judgment. None of the usual forum factors, location of witnesses, location of documents, governing law etc would have any significant role to play.

[**158**] The argument is this. A bribe is a secret commission paid to an agent or other fiduciary by the payer, who knows that the payee is an agent or fiduciary and fails to disclose the payment to the principal or other person to whom the fiduciary duty is owed (see *Industries and General Mortgage Co v Lewis* [1949] 2 All ER

*b*  573 at 575, *Petrotrade Inc v Smith* [2000] 1 Lloyd's Rep 486 at 489–490). The motive of the briber when giving the bribe is not relevant and evidence as to such motive will not be allowed; there is an irrebuttable presumption in favour of the claimant that the fiduciary was influenced by the bribe; at least where the agent is 'a confidential buyer of goods for his principal from the briber', there is an

*c*  irrebuttable presumption in favour of the claimant that the true price of the goods as between him and the purchaser company must be taken to have been less than the price paid by at least the amount or value of the bribe (see *Hovenden v Millhoff* (1900) 83 LT 41, [1900–3] All ER Rep 848, *Mahesan v Malaysia Government Officers' Co-operative Housing Society Ltd* [1978] 2 All ER 405, [1979] AC 374).

*d*  [**159**] Accordingly the claimants contend: (1) Rolls-Royce has paid very substantial sums of money to Towanda; (2) Towanda was beneficially owned by Kishan Rao; (3) Rolls-Royce must have known that Towanda was beneficially owned by Kishan Rao; (4) unless the agency agreements were fully disclosed by either Kishan Rao or Rolls-Royce to SPGL's shareholders, and sanctioned by them in general meeting, those arrangements constituted bribery for civil

*e*  purposes; (5) therefore, it is to be presumed irrebuttably that Rolls-Royce's motive was corrupt, that those arrangements did influence Kishan Rao, and that Rolls-Royce would have been prepared to enter into the EPC and O & M contracts at prices less than the actual prices by the amount of money it promised, or alternatively actually paid, to Towanda. SPGL is therefore entitled to recover

*f*  those sums promised or actually paid to Towanda.

[**160**] The claimants argue that it is insufficient for present purposes for Rolls-Royce to do no more than simply assert in evidence that the agency agreements 'are purely commercial arrangements and do not constitute kick-backs for obtain/procuring [the] O & M contract as well as the EPC contract'

*g*  (David Bale, Rolls-Royce plc's principal legal advisor, in the proceedings in the Supreme Court of India in answer to Mohan Rao's allegation of bribery). The claimants say that Rolls-Royce is in no position to deny that Towanda was owned by Kishan Rao. They also say that the evidence is that Rolls-Royce knew that Towanda was a Kishan Rao creature.

*h*  [**161**] But the evidence on which the claimants rely is the evidence of the Rolls-Royce executives who dealt with Kishan Rao and Mohan Rao, and I have set it out fully in [149]–[151], above. The evidence does not indicate that Towanda was Kishan Rao's creature. But if, as the claimants say, it would have been plain to Roll-Royce that Towanda must have been Kishan Rao's creature

*j*  then the same evidence would show that it was also Mohan Rao's creature and that he was deeply implicated, as a de facto director and agent of SPGL, in the bribery which they allege. The claimants' assertion that the evidence that Rolls-Royce knew that Towanda was a Kishan Rao creature is to be derived from their account of the 1993 meetings can only suggest that there is a real issue as to whether Mohan Rao was also to benefit from payments to Towanda.

*Evidence and evaluation*

[**162**] I am satisfied that prima facie the court of the place of incorporation is best fitted to deal with the derivative action issues. But in my judgment on any view of the facts of this case the Indian court is clearly the appropriate forum to consider whether the action is brought for ulterior purposes; whether the appropriate organ for the purposes of wrongdoer control is the board or the general meeting; if it is the board, whether it is capable of taking independent decisions, and, if so, how they should be taken; and how to deal with the allegation that Mohan Rao was deeply involved in the impugned transactions. I accept that there may be little need for cross-examination on all but the last issue, but that is a matter for whichever court decides (if it does) to deal with these questions as a preliminary matter.

[**163**] The negotiations and conclusion of the contracts for the commissioning and maintenance of the project will be relevant even if the claimants are right in contending that they will have the benefit of some irrebuttable presumptions.

[**164**] It is plain that determination of these issues will involve the evidence of a number of participants in the transactions. The Rolls-Royce defendants say that they will wish to say that the agency agreements were known to all those then concerned with SPGL, which was then to be identified with Mohan Rao and Kishan Rao; that Kishan Rao had no authority to commit SPGL to the EPC and O&M contracts, and therefore the presumption that the alleged bribe influenced the contract price does not operate. They wish to have the opportunity to adduce evidence of the surrounding circumstances, including the competitive tendering process, the scrutiny given to the tenders by STUSA (ie by Mohan Rao), its foreign consultants employed by STUSA and by representatives of NTPC. They do not suggest that the existence of a tendering process is a conclusive answer in itself to the bribe allegations. On the other hand, they say that the existence of a competitive tendering process and the steps taken thereunder are clearly part of the surrounding circumstances which will bear on the court's determination of the status of the agency agreements and their effect.

[**165**] Apart from three of the Rolls-Royce witnesses, most of the potential witnesses in both the derivative action issues (particularly on motive, wrongdoer control, and 'clean hands') and the bribery issues are in India or are closely connected with India as NRIs, and none are in England. They include (a) the three individual claimants; (b) Kishan Rao; (c) the two sons of Kishan Rao; (d) representatives of NTPC; (e) Mohan Rao; (f) Ravi Reddy; and (g) the other directors of SPGL. The evidence of Westinghouse executives may also be relevant. They may be in the United States, but there is no reason to suppose that they are in England.

[**166**] This is already an odd case without Kishan Rao as a party. His importance as a witness in these proceedings is obvious. On the claimants' case he is the principal wrongdoer. He was the managing director of SPGL at the time the allegedly corrupt transactions were entered into, and it is to SPGL that he owed fiduciary duties. He is the person alleged to have received bribes. The Indian courts would be able to compel his attendance as a witness (both to give oral evidence and to provide documents). If the proceedings were to continue in England no such powers of compulsion would be available in relation to his evidence, and the parties would have to resort to letters rogatory, which would be of doubtful utility in a case of this kind. The same considerations apply to his two sons and his advisers, who were involved in the relevant transactions.

a  [**167**]  The other main protagonist is Mohan Rao.  His evidence will be central in relation to many of the issues.  It will plainly be relevant to two central questions in the derivative action issues, namely that of ulterior motive and participation in the wrongdoing.  Rolls-Royce will seek to show that he has been centrally involved in all the relevant transactions, from the inception of the project; that he was aware of and involved in the negotiation of the agency agreements and was
b  also the main contact as SPGL involved in negotiating the EPC and O&M contracts; that he was also centrally involved in the competitive tendering process and the decisions of the SPGL board to award the contracts to the Rolls-Royce defendants.

[**168**]  Ravi Reddy is also likely to be able to give evidence in relation to many of the same issues.  In particular, his evidence is likely to be relevant to the
c  question of the purposes for which this litigation has been commenced and, in particular, whether the proceedings can be properly regarded as having been brought in the best interests of SPGL.

[**169**]  The documents of SPGL and NTPC are almost certainly located in India. Mohan Rao accepts his own documents are located in India. The documents
d  of STUSA are located in the United States.  It is likely that the documents of Kishan Rao are in India.  The documents of RRIP are in India, and those of Heaton are in England.  There is no evidence about the location of documents of other Rolls-Royce companies, including those for which they were agents.  Most of the relevant documents are likely to be located outside England, and if the
e  proceedings were in England it would be very difficult and cumbersome to use the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (The Hague, 18 March 1970, TS 20 (1977); Cmnd 6727) to reach Indian documents in the possession of non-parties.

f  *Applicable law*

[**170**]  This is not a factor of great significance in this case because there is no evidence of any difference between English law and Indian law on the relevant matters.  But the case does involve some developing and controversial areas of law such as the scope of the right to bring derivative actions and the law of bribery.  I have expressed the view that the question of the right to bring a
g  derivative action is governed by Indian law, and it is likely that the bribery issues are governed by Indian law (see *Arab Monetary Fund v Hashim* [1993] 1 Lloyd's Rep 543; affirmed on this aspect [1996] 1 Lloyd's Rep 589).  To the extent that there are controversial issues it would be better for them to be decided by the court which can authoritatively rule on them, and whose judgments are subject to
h  appeal.  But since there is no evidence of any differences, and since the application of foreign law is an everyday occurrence in English courts, this is not a significant pointer to India as the proper forum.

*Indian litigation*

j  [**171**]  I regard the Indian litigation as a significant factor in India being the forum conveniens.  I do so not on the basis of the 'Cambridgeshire factor', identified in *Spiliada Maritime Corp v Cansulex Ltd, The Spiliada* [1986] 3 All ER 843, [1987] AC 460, ie the saving in convenience and costs which would be occasioned by the claim being dealt with by the Indian lawyers who have acquired knowledge and expertise through the Indian proceedings.

[172] This is not a case where there is strictly a lis alibi pendens. The bribery allegations in India are made only in the context of an interim application for a receiver, and will not arise as such at trial, and the Rolls-Royce defendants are only parties to some of the Indian proceedings for the purpose of obtaining discovery or as nominal defendants in their capacity as shareholders.

[173] But there are extensive allegations of mismanagement and fraud in the Indian proceedings against Kishan Rao, and the derivative actions in Hyderabad raise the same questions of wrongdoer control as would arise in these proceedings. There is therefore a risk of inconsistent findings in the broader sense. I have set out in section XIV some of the principal allegations and I will not repeat them. In addition, looked at broadly, the Indian proceedings are to a large extent about control of voting power and of management of SPGL, and support the conclusion that these proceedings are part of a power struggle for control of SPGL. The Indian courts are far better equipped to evaluate them.

*Cross-claims*

[174] I do not consider the fact that the Rolls-Royce defendants may assert cross-claims is of any significance to the forum issues. Earlier this year RRIP repeated to SPGL that it was still owed more than £3m under the EPC contract. There is also a claim in excess of £10m under the O&M contract. The contract contains a clause which provides that in the case of currency fluctuation the price may be adjusted following negotiation. If agreement is not reached the either party may terminate the agreement. Rolls-Royce says that the true effect is that a revised price may become due notwithstanding that the only express remedy is termination. The contract is subject to Indian law and arbitration in Switzerland. I heard argument on the merits of the cross-claim and whether it is capable of being a defence to the restitutionary claim made in these proceedings. Those questions do not arise for decision now, but I am satisfied that they are neutral on the issue of forum.

*Delay*

[175] In a case involving service out of the jurisdiction under CPR 6.20 the burden is on the claimants to show that England is clearly the more appropriate forum, and if they do not discharge that burden, that is the end of the matter and there is no room (as there is in the case of staying of actions) for the English court to retain jurisdiction if the claimant shows that it would be unjust for him to be deprived of a remedy on the ground that, in the words of Lord Goff in *Connelly v RTZ Corp plc* [1997] 4 All ER 335 at 345, [1998] AC 854 at 873, 'substantial justice cannot be done in the appropriate forum'.

[176] I have expressed the view (above, at [59]) that in the context of service out of the jurisdiction there is room only for such an argument if the injustice in what would otherwise be the appropriate forum is such that it cannot be regarded as an 'available forum'. In such a case it might be argued that England is clearly the more appropriate forum, because there is no effective alternative. The main objection to India advanced by the claimants is that there is likely to be greater delay there. Mr Raghunandan Rao says that it might take up to five years to get to trial in India, and the earliest disposal that could be expected would be about four years. Former Chief Justice Ahmadi says that it might be up to ten years.

[177] Delay has been a factor taken into account in cases involving applications to stay on the ground that India is the appropriate forum (see *The*

*a*  *Jalakrishna* [1983] 2 Lloyd's Rep 628 and *The Vishva Ajay* [1989] 2 Lloyds Rep 558;
but contrast *Radhakrishna Hospitality Service Private Ltd v EIH Ltd* [1999] 2 Lloyd's
Rep 249).  It is well known that in the past there were substantial delays in the
Indian legal system, caused by the combination of an enormous population and
an overworked and understaffed judiciary, but it is also well known that very
great efforts have been made in recent years to reduce the backlog of cases.  The
*b*  evidence in this case goes nowhere near showing that it is so serious as to amount
to a substantial injustice, and nowhere near showing that it is such as to deprive
the claimants of any remedy at all.  It is not seriously arguable that 'substantial
justice cannot be done' in India in relation to claims by Indian residents and NRIs
(and their companies) in relation to an Indian company and its affairs, and it
would be a substantial breach of comity to stigmatise the Indian legal system in
*c*  that way.  This is typically the situation in which the claimant will have to 'take
[the appropriate] forum as he finds it' (see *Connelly*'s case [1997] 4 All ER 335 at
345, [1998] AC 854 at 872).

[**178**]  In any event, these claimants and parties associated with them have
brought a series of actions in the courts of India, and they have had ready access
*d*  to the Indian court system at all levels up to the Supreme Court of India.  They
have not shown concern about delay.  They took more than a year between writing
their first letter before action (3 December 1999) and obtaining permission to serve
out of the jurisdiction (2 February 2001).

*e*  XVI. NON-DISCLOSURE

[**179**]  In view of the conclusion which I have reached that the order for service
should be set aside because the claimants have not clearly shown that England is
the appropriate forum, I will deal shortly with the allegations of non-disclosure.
About 50 pages of witness statements and more than 400 pages of documents
were before Master Moncaster when he made his order in February 2001.
*f*
[**180**]  On an application without notice the duty of the applicant is to make a
full and fair disclosure of all the material facts, ie those which it is material (in the
objective sense) for the judge to know in dealing with the application as made:
materiality is to be decided by the court and not by the assessment of the
applicant or his legal advisors; the duty is a strict one and includes not merely
*g*  material facts known to the applicant but also additional facts which he would
have known if he had made proper inquiries (see *Brink's-MAT Ltd v Elcombe* [1988]
3 All ER 188 at 192–193, [1988] 1 WLR 1350 at 1356–1357).  But an applicant does
not have a duty to disclose points against him which have not been raised by the
other side and in respect of which there is no reason to anticipate that the other
*h*  side would raise such points if it were present.

[**181**]  These principles have long been applied to applications for permission
to serve out of the jurisdiction (see, eg *The Hagen* [1908] P 189 at 201, [1908–10]
All ER Rep 21 at 26).  In that context it has been held that it would not be
reasonable to expect an applicant for permission to serve out to anticipate all the
*j*  arguments or points which might be raised against his case (see *Electric Furnace Co v
Selas Corp of America* [1987] RPC 23 at 29).  A failure to refer to arguments on the
merits which the defendant might raise at trial should not generally be
characterised as a 'failure to make full and fair disclosure', unless they are of such
weight that their omission may mislead the court in exercising its jurisdiction
under the rule and its discretion whether or not to grant permission (see

*BP Exploration Co (Libya) Ltd v Hunt* [1976] 3 All ER 879 at 889, approved in the *Electric Furnace* case [1987] RPC 23 at 29).

[**182**] In the *BP Exploration* case, Kerr J warned (at 894):

'… the court should not consider the supporting affidavit as though it were marking an examination paper, deciding one way or the other merely on the basis of the extent to which the affidavit could have been improved. The primary question should be whether in all the circumstances the effect of the affidavit is such as to mislead the court in any material respect concerning its jurisdiction and the discretion under the rule.'

[**183**] I do not consider that, subject to one point, there is any case for setting aside for non-disclosure. The witness statements may have been somewhat partial and overzealous, but the criticism made by the defendants amounts to no more than the evidence did not fully anticipate all the points on the exercise of the discretion which they have now made.

[**184**] There was one material fact which was not disclosed before the master made his order on 2 February 2001. Before that date he had been told that the bribery allegations formed no part of the Indian proceedings. The first claimant's witness statement denied that the issues were substantially the same as those in the Indian proceedings, and stated: '… in fact they are completely different. In particular, I am informed by Dr A V Mohan Rao that the issue of bribery by Rolls-Royce is simply not raised in the Indian proceedings.'

[**185**] The claimants' solicitor, Mr Mervis, said: 'From my review of extracts of the Delhi and Hyderabad proceedings, it would not appear that those proceedings relate to the bribes to which the English proceedings relate. Dr Rao has informed me that they do not in fact concern the bribes.'

[**186**] After reviewing the papers Master Moncaster wrote to the claimants' solicitors to say that he was not minded to give permission, and raised a number of concerns about the application, including the question whether there was an overlap with the Indian proceedings. In response the claimants' solicitors put before Master Moncaster in December 2000 a draft skeleton argument and a further witness statement of Mr Mervis, each of which stated (in slightly different terms) that there was no allegation of bribery in the Indian proceedings and little or no overlap between the issues in these proceedings and the Indian proceedings.

[**187**] But on 5 January 2001 Mohan Rao swore an affidavit in the proceedings before the Supreme Court of India making those allegations in support of STUSA's application for the appointment of a receiver. It is clear from the witness statement of Mr Mervis to which I have referred that he was well aware of the importance of the bribery allegations in relation to the English proceedings. When the claimants' solicitors learned of this they informed the master, who decided not to revoke his order (as he was entitled to do: CPR 3.1(7)). The claimants accept that the fact that the bribery allegations were referred to in that affidavit should have been disclosed. The non-disclosure was serious, and culpable, but in the circumstances I see no basis for setting aside for non-disclosure, since the non-disclosure cannot be said to have led to the continuance of the order giving permission to serve out of the jurisdiction.

XVII. CONCLUSIONS

*a*  [**188**]  The Indian connections of this case are overwhelming.  Even though the first and second defendants are English companies, the joinder of SPGL is a necessary element in the claim, and the claimants have fallen far short of satisfying the burden to show clearly that England is the appropriate forum for the derivative claim.  I will therefore set aside the order of Master Moncaster.

*b*  [**189**]  I should add this: an order for service out of the jurisdiction can be set aside if the claimant fails to show that there is a serious issue to be tried.  SPGL relied on the alternative remedy point in support of the proposition that there would have been no serious issue to be tried on the derivative aspects of the claim.  I have already expressed the view that it would be unrealistic to view these proceedings as anything other than as being pursued by Mohan Rao and Ravi Reddy

*c*  for their own purposes.  If that view is right, then the claimants would not have succeeded at the stage of the application under CPR 19.9 in obtaining permission to continue with the claim, and therefore there would be no serious issue to be tried on the derivative claim.  That, however, will now be a question for the judge in India.

*Order accordingly.*

Neneh Munu    Barrister.

**TAB F**

`Copyright 1997 Reed International Books Australia Pty Ltd
trading as Butterworths

AUSTRALIAN CORPORATIONS AND SECURITIES REPORTS

**BIALA** PTY LTD and ANOTHER v MALLINA HOLDINGS LTD and OTHERS

SUPREME COURT OF WESTERN AUSTRALIA

11 A.C.S.R. 785

2-31 August, 1 September, 12 October 1993

12 October 1993

**CATCHWORDS:**
Duties - Joint venture - Breach of fiduciary duties to company by former director and substantial shareholder in capacity as joint venturer - Obligation to make full and accurate disclosure - Breach by misrepresentation and withholding of information.

Shareholders - Derivative action - Rule in **Foss v Harbottle** - Fourth exception - Element of control of the company - Time when control to be assessed - Whether at issue of writ or commencement of trial.

Shareholders - Derivative action - Rule in **Foss v Harbottle** - Fifth exception - Whether fifth exception based on considerations of justice exists - Whether justice required plaintiffs' claim to be allowed.

Remedies - Equitable compensation - Questions of causation, foreseeability and remoteness left aside - Full benefit of hindsight applied - Calculation of quantum of compensation.

Negligence - Directors - Chief executive director - Non-executive directors - Failure to make independent inquiries - Non-executive directors entitled to rely on and accept chief executive's judgment - Chief executive's error in trusting third party not negligent.

**HEADNOTES:**

     In September 1984, the first defendant, Mallina Holdings Ltd (Mallina) and the sixth defendant, Dempster Nominees Pty Ltd (Dempster Nominees), jointly began to pursue an "exclusive mandate" from the Western Australian State Government to carry out a feasibility study for the development of a petrochemical complex in Western Australia. The second defendant, Dempster, was chairman and managing director of both Mallina and Dempster Nominees, and took charge of taking the project forward.

     There was no written or oral agreement between Mallina and Dempster Nominees concerning the joint venture, and no resolution of directors of Mallina relating to the formation of the joint venture.

     Over the next 2 years, various negotiations between Dempster and the State Minister for Minerals and Energy (Parker) and the Department of Resource Development (DRD) took place in relation the grant of an exclusive mandate for the project.

On 25 August 1985, Dempster resigned from the board of Mallina but remained a substantial share-holder. The third defendant, Rakich, took over as Mallina's chief executive officer. However, the carriage of the project for the joint venture remained with Dempster, who at all times was the dominant force in charge of the joint venture's dealings with the government and others. Apart from Rakich, the other directors of Mallina (the fourth and fifth defendants) were non-executive directors who played no part in the day to day running of the business.

In August 1986, while negotiations were continuing, an issue arose as to whether Mallina had failed to pay $ 100,000 in mining royalties in respect of attapulgite (an absorbent clay) sales. However, on 8 September 1986, Parker wrote to Rakich stating that he had decided to seek cabinet approval to award an exclusive mandate to Mallina for a period of 6 months. However, the recommendation to cabinet was never made. Continued doubts arose as to whether Mallina would get the exclusive mandate because of the problems and publicity conerning the royalty payments and Mallina's financial position generally.

On 15 September 1986, Dempster spoke to Connell, another Western Australian businessman, about the prospect of Connell becoming a joint venture partner of Dempster or Dempster Nominees in the petrochemical project. The next day, following discussions with Rakich, it was agreed that, in return for payment of $ 150,000 to it, Mallina would give up its interests in the joint venture with Dempster Nominees and pass on all relevant information to the new joint venture between Dempster and Connell. Dempster and Connell interests each held 50% equity in an unlisted public company, Petrochemical Industries Company Ltd (PICL). Connell paid $ 150,000 to Mallina and $ 250,000 to Dempster Nominees. Dempster had not told Rakich that Connell would be paying him $ 250,000. Mallina's annual report, issued on 15 October 1986, said nothing about the abandonment of the joint venture project.

On 6 October 1986, the Western Australian Cabinet approved a minute calling for expressions of interest in the petrochemical project, it having been decided by the Premier and Parker that it would be desirable to have an open tender before deciding to award an exclusive mandate.

On 28 January 1987, PICL was awarded the exclusive mandate to prepare a bankable feasibility study for the project. In October 1988, the interests associated with Dempster and Connell in the project were transferred to Bond Corporation Holdings Ltd and Western Australian Government Holdings Ltd. Connell interests received $ 350m and Dempster interests received $ 50m.

In these proceedings the plaintiffs, who were minority shareholders in Mallina, brought derivative claims, seeking an account of profits or alternatively equitable compensation or damages, against:

(i) Dempster Nominees alleging that it committed breaches of fiduciary duty it owed to Mallina under the joint venture which existed between them;

(ii) Dempster, first, alleging that he was a knowing participant in the breaches of fiduciary duties by Dempster Nominees, and was liable to Mallina to the same extent as Dempster Nominees on the basis of *Barnes v Addy* (1874) 9 Ch App 244; and second, that while he was a de facto director of Mallina he committed breaches of the fiduciary duties he owed to Mallina by reason of that office;

(iii) Rakich and the fourth defendant, Griffin, alleging that they committed breaches of the fiduciary duties they owed Mallina as its directors.

The plaintiffs sought to bring their claims under the fourth exception to the rule in *Foss v Harbottle*. The plaintiffs argued that the date at which "control" of Mallina was to be determined for the purposes of deciding whether there had been a fraud on the minority was the date the writ was issued, in which case they had made out their case. The defendants argued that the appropriate date for determining control was the

date of the trial. Between the date of the writ and the commencement of the trial Dempster Nominees and Dempster disposed of a substantial portion of their shares in Mallina. Accordingly, they argued that it had not been established that the majority of shareholders could or would prevent Mallina from instituting the action brought by the plaintiffs.

The plaintiffs also sought to bring their claims within the "fifth exception" to the rule in *Foss v Harbottle*, viz, that a shareholder is entitled to bring a derivative action on the general ground that considerations of justice required such an action to be brought.

The plaintiffs also brought personal claims for damages against Rakich and Griffin under s 574(8) of the Companies (WA) Code (the Code) alleging that they contravened s 229(1) of the Code by failing to act honestly in the exercise of their powers and the discharge of their duties as directors of Mallina. The plaintiffs also claimed damages against Rakich, Griffin and the fifth defendants, two other directors, alleging that each contravened s 229(2) of the Code by failing to exercise a reasonable degree of care and diligence in the exercise of his powers and the discharge of his duties as a director.

**Held**:

**Breach of fiduciary duties**

(i) The relationship between Mallina and Dempster Nominees, however it be characterised, was founded on the mutual trust and confidence of each in the skill, knowledge and integrity of the other. Each of the participants in the joint venture owed a duty of the utmost good faith to each other. Dempster Nominees was bound to state everything with strict and scrupulous accuracy, and not only to abstain from stating as fact that which was not so, but to omit no one fact within its knowledge the existence of which might in any degree affect the decision to be taken by Mallina.

United Dominions Corporation Ltd v Bryan Pty Ltd (1985) 157 CLR 1;; New Brunswick and Canada Railway Company v Muggridge 1-Dr&Sm-363 (1860) 1 Dr & Sm 363, APPLIED.

(ii) There was an obligation on Dempster, on behalf of Dempster Nominees, to make full and accurate disclosure to Rakich, on behalf of Mallina, of the facts that Dempster had learnt in relation to the project. Accordingly, the misrepresentations made by Dempster to Rakich constituted a serious breach of the fiduciary obligations owed by Dempster Nominees to Mallina.

(iii) Whatever liability attached to Dempster Nominees for such a breach also attached to Dempster, he knowingly having assisted Dempster Nominees in that breach and having deliberately persuaded Mallina to give up its rights to the exclusive mandate so as to be able to substitute Connell for Mallina as the co-joint venturer of Dempster Nominees.

Barnes v Addy (1874) 9 Ch App 244;; Consul Developments Pty Ltd v DPC Estates Pty Ltd (1975) 132 CLR 373;5 ALR 231, APPLIED.

(iv) Dempster Nominees, in failing to inform Mallina that it was to receive $ 250,000 from Connell, and in retaining that sum, committed a breach of its fiduciary duties of candour and honesty. Dempster was similarly liable to the same extent as Dempster Nominees, he having knowingly assisted Dempster Nominees in that breach.

(v) There was no evidence that Rakich knew that he was allowing an opportunity to be taken from Mallina by Dempster for Dempster's own benefit and advantage, and that he thereafter knowingly assisted in that deprivation by persuading his fellow directors to concur in the decision to withdraw from the joint ven-

ture. It had not been established that Rakich knew that Dempster was misrepresenting the situation when he spoke to him on 15 September 1988.

**Rule in *Foss v Harbottle* -- fourth exception**

(vi) The question of control for the purposes of determining whether there had been fraud on the minority remained a live issue to be determined after the trial had commenced, and could only be determined by reference to the pleaded issues. It was artificial, and not conducive to justice, to determine the question of fraud as at the date of the issue of the writ when matters that have arisen subsequent to the writ, relevant to the writ, had properly been pleaded. Those matters then fell for adjudication in order to ascertain whether there had been a fraud as alleged.

Prudential Assurance Company Ltd v Newman Industries Ltd (No 2) [1982] 1 Ch 204, APPLIED.

(vii) On the facts, the plaintiffs had not established that more than 50% of the shareholders would, at the date of the trial, have voted against commencing or proceeding with the action. Accordingly, the plaintiffs failed to bring their claim within the fourth exception to the rule in *Foss v Harbottle*.

(viii) A minority shareholder who has commenced a derivative action has no equity in the litigation and cannot claim priority over the rights of shareholders who have acquired shares subsequent to the commencement of the proceedings. Those shareholders have an unfettered right to decide whether or not the litigation should continue. However, this view did not detract from any argument that may be raised as to general considerations of justice that may become relevant under the fifth exception to the rule in *Foss v Harbottle*.

Prudential Assurance Company Ltd v Newman Industries Ltd (No 2) [1982] 1 Ch 204, APPLIED.

**Rule in *Foss v Harbottle* -- fifth exception**

(ix) The courts should not shrink from determining whether the justice of the case should allow a shareholder to proceed with a derivative action. Equity is concerned with substance and not form, and it was contrary to principle to require wronged minority shareholders to bring themselves within the boundaries of well-recognised exceptions and to deny jurisdiction even where an unjust or unconscionable result may otherwise ensue. It was desirable to allow a minority shareholder to bring a derivative claim where the justice of the case clearly demanded that such a claim be brought, irrespective of whether the claim falls within the confines of the established exceptions.

Heyting v Dupont [1964] 1 WLR 843;; Scarel Pty Ltd v City Loan and Credit Corporation Pty Ltd (No 2) (1988) 79 ALR 483;12 ACLR 730;6 ACLC 219;; Hawkesbury Development Company Ltd v Landmark Finance Pty Ltd [1969] 2 NSWR 782;; Estmanco (Kilner House) Ltd v Greater London Council [1982] 1 WLR 2, APPLIED.

(x) Dempster Nominees had committed serious breaches of its fiduciary duties to Mallina and Dempster was the instrument of those breaches and Mallina would be entitled to substantial compensation; the directors of Mallina had at all times opposed the plaintiffs' action; although it had not been shown that the majority of shareholders would oppose the action, it had not been shown that they would support it; until Dempster disposed of of his shares a fraud on the minority had been perpetrated; the courts should be slow to assist in the practice whereby majority shareholders can dispose of their shares after a writ for derivative claim has been issued so as to protect wrongdoers and defeat justice; the shareholders who acquired shares in Mallina subsequent to the issue of the writ did so with full knowledge of the pending litigation; it was not

appropriate that, should the derivative claims be dismissed, it be left to shareholders in general meeting to require the board to commence proceedings afresh. Accordingly, taking into account all these matters, justice required the plaintiffs to be allowed to prosecute their derivate claim.

**Remedies and equitable compensation**

(xi) The proper remedy was restitution on the part of Dempster Nominees for the loss suffered by Mallina. In assessing the equitable compensation that should be paid to Mallina, the rules of equity required that questions of causation (save that compensation will only be awarded for losses caused by the breach of fiduciary duties), foreseeability and remoteness be left aside, and the full benefit of hindsight be applied.

Re Dawson (deceased) [1966] 2 NSWLR 211;; Hill v Rose; Canson Enterprises Ltd v Boughton and Company [1990] VLR 129;; Canson Enterprises Ltd v Boughton and Company (1991) 85 DLR (4th) 129, APPLIED.

(xii) But for Dempster's misrepresentations Mallina would have remained in the joint venture; by not doing so it lost the opportunity to make the kind of profits that Dempster Nominees eventually made through its participation. Applying a common sense test of causation, the net profit which Mallina had been deprived the chance or opportunity of earning by the breach of fiduciary duties was to be assessed at $ 38,075,000. Taking into account all the factors, in September 1986, Mallina had a 60 per cent chance of making this profit. Accordingly, Mallina's lost opportunity or chance, for which it should be compensated, was to be valued at $ 22,845,000. Dempster was liable to pay this sum to the same extent as Dempster Nominees.

(xiii) Dempster Nominees took $ 250,000 from Connell for Mallina's half interest in the joint venture. Accordingly, Dempster Nominees must account to Mallina for this amount, and Dempster was liable to the same extent.

Brickenden v London Loan and Savings Co [1934] 3 DLR 465, APPLIED.

**Negligence of directors**

(xiv) None of the directors applied his mind to whether it was in Mallina's interests to remain in the joint venture, but accepted without question that what he had been told was true. The question was whether it was negligent for each to trust Dempster and make no independent enquiries themselves.

(xv) The non-executive directors were not negligent. Dempster Nominees owed fiduciary duties to Mallina and the directors had no reason to believe that that company would not honour its obligations. They were entitled to assume that Rakich, as chief executive, was reporting accurately to them when he told them that he had been informed by Dempster that Mallina would not get the mandate. They were entitled to rely on his judgment and if he was satisfied that that information was correct, they were entitled to accept that.

AWA Ltd v Daniels (1992) 7 ACSR 759, APPLIED.

(xvi) While Rakich was guilty of an error of judgment in trusting Dempster on so important an issue without attempting to verify what he had been told, his conduct was not negligent. Regard was to be had to the long relationship that had existed between Rakich and Dempster and the fact that Rakich had for a long period relied on and trusted Dempster.

**INTRODUCTION:**

This was a consolidated action by minority shareholders in the first defendant, Malllina Holdings Ltd, bringing both derivative and personal claims against various other defendants for breach of fiduciary duties and contraventions of the Companies (WA) Code, and seeking an account of profits or equitable compensation or damages. The facts appear sufficiently in the following judgment.

**COUNSEL:**

R J Bainton QC and A Mizen instructed by Alan Mizen for the plaintiffs. J A Chaney instructed by Minter Ellison Northmore Hale for the first defendant. W S Martin QC and J I Bishop instructed by Clayton Utz for the second and sixth defendants. P G Clifford instructed by Freehill Hollingdale & Page for the third, fourth and fifth defendants.

**JUDGES:** IPP J

**JUDGMENTS:** Ipp J.

The derivative and personal claims

The plaintiffs (Biala Pty Ltd and T S Holdings Pty Ltd) in this consolidated action are minority shareholders of the first defendant (to which I shall refer as Mallina). They bring both derivative and personal claims against the various other defendants. I shall briefly sketch the bases of those claims.

The plaintiffs make derivative claims against the sixth defendant, Dempster Nominees Pty Ltd (Dempster Nominees). They allege that Dempster Nominees committed breaches of fiduciary duties it owed to Mallina under a joint venture which existed between them. A wide spectrum of equitable relief is claimed against Dempster Nominees, in favour of Mallina; in particular claims are made for an account of profits by Dempster Nominees alternatively for equitable compensation or damages to be paid by Dempster Nominees.

Derivative proceedings are also brought against the second defendant, Dallas Reginald Dempster, on two grounds. The first ground is that Dempster was a knowing participant in the breaches of fiduciary duties by Dempster Nominees. It is submitted that Dempster is liable to Mallina to the same extent as Dempster Nominees on the basis of Barnes v Addy (1874) 9 Ch App 244. The second is that while Dempster was a defacto director of Mallina he committed breaches of the fiduciary duties he owed Mallina by reason of that office (despite the fact that at the time the breaches allegedly occurred he had formally resigned as a director). The same relief sought against Dempster Nominees is sought against Dempster.

Derivative claims, for similar relief, are also brought against the third defendant, Peter Brian Rakich (Rakich), and the fourth defendant, John Fallon Griffin (Griffin). Both Rakich and Griffin were at the relevant time directors of Mallina. The plaintiffs claim that Rakich and Griffin committed breaches of the fiduciary duties they owed Mallina as its directors.

The plaintiffs' personal claims are based upon s 574(8) of the Companies (Western Australia) Code (the Code). (It is common cause between all the parties that the issues in this case are to be determined by reference to the Code and not the Corporations Law.) The plaintiffs claim damages under s 574(8) against Rakich and Griffin, alleging that each contravened s 229(1) of the Code by failing to act honestly in the exercise of his powers and the discharge of his duties as a director of Mallina.

The plaintiffs similarly claim damages against Rakich, Griffin and the fifth defendants (two other directors, Sir Ernest Lee-Steere (Lee-Steere) and Frederick Alfred Wallis (Wallis)), alleging that each contravened

s 229(2) of the Code by failing to exercise a reasonable degree of care and diligence in the exercise of his powers and the discharge of his duties as a director.

Initially, when the trial commenced, Mallina sought an adjournment of the trial. The application was unsuccessful for reasons given by me on 3 August 1993. Thereafter Mallina adopted a passive role save that it led some evidence in support of the other defendants' submission that the plaintiffs lacked standing to bring derivative claims. For convenience I shall refer to the defendants other than Mallina as "the defendants", they being the parties against whom, in substance, relief is sought.

As regards the derivative claims, the defendants concerned deny that they committed any breach of duties. They put in issue the nature and extent of the fiduciary duties said to be owed by them. They assert that the plaintiffs have no standing to bring a derivative action. They say that at the relevant time the defendants and interests associated with them were not in a position to control a general meeting of the members of Mallina and there is no reason to infer that Mallina would not itself commence proceedings against the defendants (if it so wished) in its own name. Moreover, the defendants deny that the plaintiffs are able to bring their claims within any of the recognised exceptions to the rule in Foss v Harbottle (1843) 2 Hare 461;67 ER 189.The defendant directors deny any dishonest dealing or negligence on their part and assert that, in any event, s 574(8) of the Code does not entitle the plaintiffs to the relief sought. Finally, issues arise as to the nature and quantum of the relief sought by the plaintiffs.

I have sketched the bare bones of the issues between the parties. These issues arise out of a decision made by Mallina in September 1986 to abandon whatever rights it had to participate in an attempt by it and Dempster Nominees to obtain the State government's agreement to the two of them being given the exclusive right to conduct a feasibility study concerning the establishment of a petrochemical plant in Western Australia. The plaintiffs allege that that decision was either taken in fraud of the minority shareholders of Mallina or negligently. The critical factual disputes concern largely what was said and done in September 1986, principally by the defendants and Mr David Parker, the Minister for Minerals and Energy (Parker). These factual disputes cannot properly be understood without an appreciation of the background circumstances which I shall, firstly, attempt to outline.

Mallina/Dempster Nominees and the petrochemical project: the background circumstances

Several factors existed in Western Australia which provided incentives for the establishment of a petrochemical plant. By at least 1980 the State Government was desirous of causing such a plant to be set up, and in that year brought to Perth Mr R G Suttie (Suttie), a chemical engineer to help establish one. Suttie was employed by the Department of Resource Development (DRD) and worked on the project from then on. He became the project manager within the DRD. As he put it, there was no aspect of the project on which he did not need to have an opinion "except perhaps the politics of it". He was assisted by qualified technical persons employed by the DRD whose task it was to examine the feasibility of proposals and who were able to give the government fairly sophisticated advice.

At about the same time, Dempster, a well known businessman in Perth, became interested in developing a project in Western Australia which would utilise the surplus gas produced by the Northwest Shelf Gas Project. At that stage, his family companies, including Dempster Nominees, shared offices with Mallina at 249 Stirling Highway, Nedlands. Dempster was then a substantial shareholder in Mallina and was also chairman and managing director of the company, as well as chairman and managing director of Dempster Nominees and the Dempster group of companies.

In September 1984 Dempster was introduced to Mr Nicholas Yellachich (Yellachich), a chemical engineer. Dempster and Yellachich had discussions about the development of a petrochemical complex in West-

ern Australia and Dempster resolved to pursue the idea of developing such a complex. He determined that this would be done jointly by Mallina and Dempster Nominees.

Mallina was then a relatively small listed public company concerned principally with the mining and production of attapulgite, an absorbent clay. It employed two accountants (including Rakich -- who was also a director), a geologist, a chemical engineer (one Fitch) and various plant workers in Geraldton.

Dempster hoped that the joint venture of Mallina and Dempster Nominees would obtain an "exclusive mandate" from the State government to carry out a feasibility study into the petrochemical project he contemplated, and set about achieving this. An "exclusive mandate" was a concept developed by the DRD. An exclusive mandate gave companies, which would not otherwise be prepared to spend money in developing feasibility studies, an exclusive position for a set period of time to enable them to proceed with their projects to a stage where contracts could be signed. By granting a company an exclusive mandate the DRD would agree that the company had a stipulated period of time in which it could exclusively pursue its project. During that time the government would not deal with any one else concerning that project. If by the end of the mandate period, further contracts were not arrived at, the exclusive position of the mandate holder would end.

There were four stages contemplated in the establishment of a petrochemical project. The first stage was the provision of a preliminary feasibility study. The next stage was the provision of a feasibility study including full mechanical diagrams and full costing. The third stage was a bankable feasibility study (a "bankable" study was a study which would convince a bank that it should lend money for the project.) It was for the latter stage that the joint venture subsequently sought an "exclusive mandate". These processes were to occur prior to a decision being made actually to build the project. That decision was to be taken at some point after "bankability" and once the finance was in place. The construction of the project represented the fourth stage.

There needed to be a great deal of enthusiasm, energy, money, entrepreneurial skill and business contacts on the part of the proponent of the project. Dempster believed that he possessed those requirements and there was no one else within Mallina at the time who had the experience or capability to get the proposal for a mandate off the ground. Accordingly, he, on behalf of both Mallina and Dempster Nominees, took charge of the project.

The State Energy Commission of Western Australia (SECWA) was interested in whatever project was to be established as it was the initial purchaser of the gas from the Northwest Shelf and would be the supplier of the gas. As any successful tenderer would have to work closely with SECWA and to some extent would have control over SECWA's supply of gas to domestic consumers, it was important to the government that the right tenderer should be chosen.

Dempster instructed Fitch, the chemical engineer employed by Mallina, to obtain as much information as he could from SECWA and any other relevant authority as to their requirements for a petrochemical project. Dempster also retained Yellachich to advise the joint venture as Yellachich had the necessary knowledge, experience and contacts within the industry. Dempster and Fitch remained in communication with Yellachich as he worked on the project.

In December 1984 Yellachich provided Dempster with a proposal for a petrochemical complex in Western Australia. Dempster then attempted to interest Parker in the idea and instructed Fitch to discuss the matter with officers of the DRD. Representatives of the joint venture and the DRD met to discuss proposals for a petrochemical complex. In January 1985 Yellachich gave Dempster a preliminary feasibility study and, in February, a budget for the cost of the feasibility study. Dempster, Fitch and Yellachich continued to gather information from SECWA and others to determine whether the project was viable or not.

During May 1985 SECWA sent letters of invitation to about 19 organisations requesting submissions in the form of pre-feasibility studies for the extraction of LPG from the Northwest Shelf Gas Project. They were informed that one organisation would be selected as the project sponsor and would be given a mandate to evaluate the project fully by the end of 1985.

On 10 May 1985 Mallina (acting on behalf of the joint venture) sent a letter to the DRD enclosing the preliminary feasibility study prepared by Yellachich in January 1985. On 14 May 1985 SECWA invited Mallina/Dempster Nominees to submit a feasibility proposal for an LPG extraction plant. At this stage the Government was contemplating three projects, an LPG extraction plant, an ammonia/urea plant, and a petrochemical plant.

In June 1985 Yellachich travelled to Perth to have a meeting with the DRD and thereafter Dempster, Fitch and Yellachich went to the United States of America to carry out further investigations. They met with B F Goodrich, an internationally known organisation, experienced in the petrochemical field, and on 12 June 1985 Dempster concluded heads of agreement with them. Dempster, Fitch and Yellachich also met with similar organisations in the United States and Europe.

In early July 1985 Yellachich came to live in Perth. He worked initially from Mallina's offices and then from the offices of the Dempster group of companies which had moved to 40 The Esplanade, Perth.

On 19 July 1985 Dempster Nominees Pty Ltd and Mallina Holdings Ltd submitted their proposal to the DRD. It was said on their behalf that three large overseas corporations (B F Goodrich, Foster Wheeler International and Alcoa Australia Ltd) "will be offered equity in the project as well as lending their support in the areas of providing technology and engineering and purchasers of various end products", and further that "the financing aspect has also been addressed and the very experienced London based Morgan Grenfell have expressed interest in managing this aspect of the project".

The Mallina/Dempster Nominees submission was different from the other submissions received by the DRD as it dealt not only with the extraction of LPG but also included a petrochemical complex and a plant producing fertiliser. This was a massive project and combined all three major chemical projects that were being considered by the government at the time.

Further information was supplied to SECWA in August 1985. Mallina and Dempster Nominees later gave a presentation of their proposal to SECWA and DRD representatives.

Earlier, in July 1985, Griffin had joined Dempster Nominees and was appointed to the board of directors of Mallina. On 25 August 1985 Dempster resigned from the board of Mallina but remained a substantial shareholder. Rakich took over as chief executive officer of Mallina. The carriage of the project for the joint venture remained with Dempster.

In September 1985 the joint venture's proposal relating to the LPG extraction plant was rejected. Eventually Wesfarmers was chosen to set up the LPG extraction project. Mallina and Dempster Nominees continued to work on a proposal for a petrochemical complex.

By letter dated 27 September 1985 the joint venture sought Parker's approval "to an exclusive mandate from your government and the State Energy Commission of Western Australia to proceed to a fully bankable feasibility study for the development of a petrochemical complex". The letter stated:

We firmly believe that the development of the complex is in the best interests of the State. We have put a considerable amount of time, effort and expense into the preparation of our original proposal and are fully prepared to commit the further funds necessary to progress the complex to a full bankable feasibility study.

The letter further stated that Mallina/Dempster Nominees anticipated a maximum of 5 to 6 months to complete the detailed studies and have the final financial packages in place. The "exclusive mandate" was sought on the basis that "on completion of our study a State agreement would be entered into to allow us to proceed with the development of the proposed petrochemical complex". According to the letter, the joint venture anticipated a total investment at that stage of $ 475m. Dempster sent a copy of this letter to the State Premier, Mr Brian Burke (Burke).

Discussions continued between the joint venture's representatives and the DRD and SECWA and the joint venture continued to do preparatory work.

By October 1985 the construction of a fertiliser plant (for the production of ammonia and urea) was under consideration by DRD as was the application by Mallina/Dempster Nominees for a mandate for the petrochemical project. No other party, apart from Mallina/Dempster Nominees, was seeking a mandate to do a feasibility study on the development of a petrochemical complex at its own expense.

On 22 October 1985 Yellachich wrote to the DRD stating:

We are now ready to proceed immediately with a fully bankable feasibility of the petrochemical complex, as soon as we receive an exclusive mandate from the relevant government bodies.

This letter enclosed a revised proposal from Mallina/Dempster Nominees.

The proposals by Mallina/Dempster Nominees were analysed by officers of the DRD. They investigated such matters as the financial strength of the propositions, the location of the project, whether it would be acceptable to the community, whether it would be environmentally acceptable, whether sales contracts were possible in the future, how good were the costs estimates. At no time was any serious investigation carried out into the capacity of Mallina or Dempster Nominees to finance the project. It appears to have been generally accepted that once "bankable feasibility" had been established, the project would be largely self-funding, ie it would be financed by "non-recourse" loans (namely, loans for which repayment would be obtained from the proceeds of the project and not from the borrowers).

By letter dated 5 November 1985 Parker wrote to Dempster stating "I certainly share your belief that the establishment of (a petrochemical) complex would be a most welcome development and be in the best interests of the State". Parker asked that further discussions be arranged between representatives of the joint venture and officers of the DRD and SECWA.

On 19 November 1985 the DRD reported to Parker that the joint venture was seeking an exclusive mandate to enable them to proceed with their studies and on obtaining a mandate they would spend funds to produce a full bankable feasibility study. The DRD's report observed that "fairly small changes in capital cost ... could only be compensated by a very large variation of gas or power prices". Further, small variations of the price of vinyl chloride monomer (VCM) would require large variations in the price of gas or power to compensate. "Thus for only moderate variation in VCM price, SECWA could expect large fluctuations in revenue." Accordingly, SECWA and the DRD would need to be confident in their perception of the future VCM market prior to recommending any commitment in the long term. The report stated:

In general the prospects are that in the longer term the project will prove to have a high potential, however, at this stage there is insufficient justification to recommend that the State enter into an exclusive mandate.

Further, the letter noted that the approach of DRD and SECWA on the LPG project was to give an exclusive mandate to Wesfarmers only after obtaining competitive proposals from a number of sources. It was observed that:

The competitive approach provided the Government with a considerable amount of information on which to base their decision. It is considered that it would be inappropriate to award Mallina an exclusive mandate without going through such a competitive procedure. There have been other companies who have approached DRD on this project and we should not rule them out at this stage.

The report expressed warnings as to environmental aspects of the project and said: "Obviously a great deal of ground work would have to be done prior to making any announcement of the project to the public". The DRD advised against offering Mallina/Dempster Nominees an exclusive mandate.

Despite the reservations expressed in the report, Suttie was impressed with the fact that Alcoa, Goodrich and Foster Wheeler were apparently assisting Mallina. These were highly respected names in the petrochemical industry.

In March 1986 Dempster arranged for two senior representatives of B F Goodrich to travel to Perth to meet with Burke and senior officers of the DRD and SECWA. According to a briefing memo dated 19 March 1986 from Parker to Burke, provided prior to that meeting:

In considering Mallina's proposals and the forthcoming discussions with the Premier, the following major points are relevant:

(1) Departmental appraisals and indications to hand from the Chem Systems study are such that although a limited market window for prospective sales of VCM and EDC (ethylene di-chloride) into Pacific Rim markets may emerge in the late 1980's and early 1990's, the economic viability of a project in Western Australia would be extremely sensitive to several key parameters including capital cost of the plant and power and ethane supply costs.

(2) Current planning for an LPG extraction plant includes provision for subsequent ethane extraction facilities. However the level of ethane availability is dependent upon dom gas sales and, in addition, SECWA is currently negotiating with the JVP on the question of gas composition.

(3) In regard to the exclusive mandate request by Mallina it is suggested that this be further considered after the receipt and study of the Chem Systems report. In view of at least one other expression of interest (Asahi) the Government may wish to also consider the preferred process for selecting a proponent. In addition, SECWA may need to review its position in regard to commitments made to Alcoa under the Alcoa Gas Sales Agreement which is understood to provide for Alcoa to have the first right to extract ethane from the dom gas supply.

At the meeting with Burke, Dempster confirmed that Mallina/Dempster Nominees were seeking a mandate from the government to carry the project forward to the feasibility stage and if findings were favourable, to establish a project. Burke indicated that the government did not wish to become involved in a project that did not have a firm commercial basis. He said that there would not be any commitment to a feasibility study until the various government departments had had the opportunity to consider the overall impact of the project. Burke remarked that Mallina could expect to be advised of the government's position by mid May.

Discussions between the DRD and Mallina (particularly through Yellachich) continued. Yellachich was very positive about Mallina's prospects. In a note dated 9 April 1986 to Griffin, Yellachich recorded an observation by Dr J Saunders (an adviser to Parker on energy matters and a special adviser to the SECWA Com-

missioner) that the government would give preference to projects led by a West Australian company, and referred to a "window" (a term used in the "Chem Systems" report commissioned by the government) in the marketing of VCM which "indicates that our project is viable".

At a meeting of directors of Mallina on 30 April 1986 it was reported that SECWA was concerned with the gas price "but they have offered the joint venture a project with a guaranteed return after interest of 12%. It is considered that we will receive a mandate to continue on a full feasibility by the end of May".

On 8 May 1986 representatives of the DRD and SECWA met to discuss the Chem Systems report on the feasibility for the petrochemical complex. Under the heading "Briefing to Minister" the following was said:

It was agreed that briefing advice should be prepared by DKD for the Minister, with regard to the Chem Systems study and findings and suggesting a course by which the government could proceed in responding to Mallina's request for an exclusive mandate.

It was suggested that the advice should include response to the following major points:

(i) The Chem Systems report has been received and has reinforced the view that prospects for establishing a petrochemical project in WA are somewhat marginal.

(ii) The impact of recent oil price variations and the flow on effects to JVP-SECWA gas supply contract needs to be clarified.

(iii) It is preferable that there be a commitment to establishment of the LPG plant before the government can entertain any mandate for the petrochemical plant because of the interrelationships.

(iv) The cumulative risk analysis should include an assessment of the impact of a petrochemical complex in the Kwinana industrial area.

By a memorandum dated 14 May 1986 the co-ordinator of the DRD reported to Parker that the Chem Systems study: "... has reinforced the view of previous studies that any (VCM/EDC petrochemical) plant will be extremely marginal and could require significant government support with regards to gas and electricity tariffs. Analysis of the report has raised further questions that it is felt require determination before the Government can consider offering a mandate to any other company.

The "further questions" concerned the following five matters. First, there was uncertainty as to the viability of the LPG plant, which was still being assessed by Wesfarmers; a commitment was expected to be made by mid July. Secondly, it was necessary for further work to be carried out to determine the capital and operating cost of separating ethane from the gas stream in the proposed LPG plant. Thirdly, it was necessary for SECWA to complete negotiations relating to the oil price before an accurate assessment of ethane availability could be made. Fourthly, SECWA was considering the correct timing to make an approach to Alcoa in regard to the latter's right of first refusal to ethane. Fifthly, an analysis was required of the suitability of possible locations for the project.

The memorandum of 14 May 1986 concluded:

As the government currently has three separate prospective proponents in Mallina, Asahi and Parry Corporation, it would seem inappropriate to give a mandate to one company without obtaining detailed proposals.

However, as outlined above there are several significant steps that need to be put in place before the government is in a position to actively seek proposals.

In fact it was soon thereafter established by the government that the only serious proponent was Mallina/Dempster Nominees.

By letter dated 22 May 1986 Rakich wrote to Parker pointing out that since the meeting in March DRD and SECWA "have received a marketing study on petrochemicals which we have been advised indicate (sic) that there is a window for VCM product on world market by 1990". Rakich sought a reply concerning the request for an exclusive mandate.

By letter dated 26 May 1986 Parker wrote to Dempster, setting out the five concerns reflected in the memorandum of 14 May 1986 and concluded:

Consequently with these matters outstanding, I do not feel that the government is as yet in a position to determine how they should best proceed or whether it is appropriate to award a mandate to a particular company to carry out a feasibility study on the petrochemical complex.

I appreciate Mallina's continued interest in the project and suggest that your company maintains a close liaison with my department of Resources Development who will keep you informed of developments as they occur.

By letter dated 4 June 1986 Parker wrote to Rakich stating: "There are several significant issues that the government must resolve before determining how they should best proceed with regard to a feasibility study". He encouraged Mallina to maintain continued close contact with the DRD.

By 20 June 1986 the chief manager, business development of SECWA, informed the commissioner of SECWA that he was "leaning to the view that there isn't too much to lose in proceeding" with the mandate for Mallina/Dempster Nominees. According to Suttie, by this time, having regard to the expertise of the consultants to Mallina/Dempster Nominees and the professionalism with which the joint venture had approached their task so far, he considered that it was worth "going with" them on the petrochemical project. He did not see any reason why they should not be given the mandate.

On 4 July 1986 Parker was advised, apparently by SECWA, that "Mallina continued to be enthusiastic about the prospect and it is considered every opportunity should be taken to allow them to pursue the project, provided an absolute commitment is not made by the State/SECWA before their definitive feasibility study is completed." It was pointed out that the feasibility study of Mallina/Dempster Nominees need not be delayed by the uncertainty in regard to oil prices and the availability of LPG.

On 7 July 1986 Mallina/Dempster Nominees submitted to the DRD two financial models for the petrochemical complex and stated that it would be able to finalise the full bankable feasibility study within 6 months.

On 23 July 1986 Parker wrote to Rakich stating:

I am pleased to inform you that, although there are some important issues which will need to be addressed in full with the proponent before support for a full feasibility study can be confirmed, the government is keen to move expeditiously towards the endorsement of a company to carry out the detailed study. The issues to be addressed including the status of the LPG project and the effect on ethane availability.

He sought a firm proposal from Mallina/Dempster Nominees for the project outlining its preferred arrangements with the State in regard to the proposed mandate and other matters. The letter stated that:

After receiving this updated pre-feasibility study information, the Government will be able to thoroughly assess your position before deciding finally to award a mandate.

However, it should be recognised that following any award of a mandate and the completion of a feasibility study then both the State and the proponents would wish to review their respective positions and neither would be committed to proceed with the project unless all aspects are acceptable.

Rakich replied by letter dated 24 July 1986 setting out further information and seeking various assurances. By letter dated 12 August 1986 the DRD informed Rakich that Parker was overseas and the information provided was being studied.

On 15 August 1986 the *Western Mail* newspaper requested some information from Rakich relating to royalties owing by Mallina to the government in respect of attapulgite sales. Rakich telexed the *Western Mail* on the same date stating "Mallina has no royalty payments outstanding".

Also, on 15 August 1986, Rakich prepared a letter (signed by Lee-Steere, as chairman of directors) which was sent to shareholders of Mallina. This letter gave a very optimistic picture of the future of Mallina and, with regard to the petrochemical project, stated that a preliminary feasibility had been completed which indicated the project to be "extremely viable, even at today's depressed market prices." The purpose of the letter was to persuade shareholders to invest further funds in Mallina.

On the weekend of 16/17 August 1986, the *Western Mail* published an article on the front page to the effect that Parker had quashed an inspection of the records of Mallina's mine "when it was suspected the company owed more than $ 100,000 in royalties". The article recorded that Dempster was a major shareholder in Mallina and was chairman when the inspection was urged.

On 21 August 1986 the joint venture sent to the DRD their financial model for the project showing that, subject to the assumptions made therein, from 1991 the project was expected to make significant profits.

On the same day the DRD provided Parker with briefing notes for a meeting to be held with Mallina/Dempster Nominees' representatives. The recommendation of the DRD was contained in this paragraph:

The marketing outlook for this type of project is not good and you will recollect that the study undertaken by Chem Systems of New York took a somewhat pessimistic view of proposals for petrochemicals at this time. However, Mallina continue to be enthusiastic about the prospect and I believe they could be allowed to pursue the project provided an absolute commitment is not made by the State/SECWA before their definitive feasibility study is completed and reviewed.

The briefing note set out pending major issues in relation to the project. These were the five matters referred to in the memorandum dated 14 May 1986 from the co-ordinator of the DRD to Parker. The briefing note concluded:

I suggest that the above issues need to be resolved before Government can proceed to provide Mallina with an exclusive position to progress the petrochemical project.

On the weekend of 23/24 August 1986 the *Western Mail* published an article in its first edition reporting that Parker rejected the allegation that he had quashed an inspection of Mallina's books and that the director general of mines had decided that an inspection of the books was not appropriate at that stage. Parker was also reported as having said that it was not "technically correct to say that Mallina owes anything at all in royalties" until certain matters were clarified and a decision was made on Mallina's waiver application. In the second edition on 23/24 August 1986, in a slightly different article, Parker was reported to be considering whether action was justified against Mallina for late payment of mining royalties.

On 25 August 1986 Rakich wrote to the director general of mines stating:

As we have heard nothing from either the Minister or the Mines Department since our letter to the Minister of 11th March 1985, we have been under the impression that the Minister accepted our submission of 13th January 1985 wherein we requested a moratorium on royalties until 1 September 1986.

Rakich contended in the letter that Mallina "should in fact be entitled to a refund on the royalties assessed".

On 28 August 1986 a meeting took place between Parker, officials of the State Government and Dempster, Griffin, Rakich and Yellachich. No reference was made at this meeting to Mallina's financial position, the *Western Mail* articles or the fact that royalties were said to be owing by Mallina.

On the same day Parker instructed Suttie to prepare a draft minute to cabinet recommending the grant of a mandate for the petrochemical project to Mallina/Dempster Nominees and also to draft an appropriate letter to Mallina.

On 5 September 1986 Rakich wrote a letter to Mr T S Plunkett (Plunkett), a major shareholder in and director of the plaintiff companies, requesting the grant of an option to enable him to purchase from Plunkett or his companies, up to 3 million shares in Mallina at a price of 30c per share. The period of the option was for 6 months. The share price of Mallina was then between 17 and 18c per share. At the same time Rakich sought an option from Dempster to purchase up to 2,500,000 shares in Mallina also at a price of 30c per share. Plunkett refused this request on 27 October 1986.

On 8 September 1986 Parker signed a letter which was sent to Rakich. The letter had been drafted by Suttie and approved by the DRD. The letter stated:

After full consideration of the implications of an exclusive mandate for this project, I have decided to seek cabinet agreement to the award of an exclusive mandate to your company subject to conditions.

I anticipate that it will take about 2-3 weeks to obtain cabinet's decision in this matter.

Suttie commenced preparing the conditions for the award of the mandate to Mallina/Dempster Nominees and continued doing so throughout September and early October 1986.

On 1 September 1986 Suttie had sent a first draft of the proposed cabinet minute to SECWA, reflecting the award of the mandate to Mallina/Dempster Nominees, and on 10 September 1986 he passed his final version of the draft to the co-ordinator of the DRD who approved it on behalf of the DRD.

The draft minute recorded that there might be a market opportunity for a petrochemical project in the early part of the next decade and "to take advantage of this potential opportunity further development of the project must begin as soon as possible, both to accommodate the anticipated 5 year construction time and to pre-empt plans for similar projects elsewhere in Southeast Asia". The minute referred to the existing problems concerning finalising arrangements with Wesfarmers for the LPG plant, the difficulty of providing a guarantee of ethane supply, problems with the site at Kwinana and environmental safety aspects. Under the heading "Recommendations", the following was said:

While advice to me indicates that the prospects for the petrochemical project are not encouraging and whilst I do not wish to mislead the company, I am conscious that Mallina Holdings Ltd are keen to conduct the feasibility study. Provided the company is prepared to take the risk that the feasibility study may produce a negative result, I believe the State can provide an exclusive mandate as desired by the company.

I therefore recommend:

(i) That cabinet endorse the award of an exclusive mandate to Mallina Holdings Ltd to conduct a feasibility study into a Western Australian petrochemical project entirely at the company's own cost.

(ii) That the above mandate be subject to conditions which, among other things, will ensure that there is no commitment at this stage by the State or SECWA to supply ethane, power or gas to the project on any particular terms and conditions.

(iii) That the above mandate be for a period no greater than 6 months.

According to Suttie, whose evidence I accept, after the long and detailed discussions and submissions that had been lodged by Mallina/Dempster Nominees and as a result of there being no alternative proponent, the DRD was prepared to grant the joint venture the mandate in question. The government wanted a petrochemical project and no one else had really been interested in establishing a petrochemical plant since about 1981. As it was put by Suttie, the question was not really why the government should give it to Mallina/Dempster but why it should not give it to them. It was Suttie's view (which, eventually, became the official view of the DRD) that the impediments to a bankable feasibility study could be tackled and resolved while the mandate was being performed. It is to be emphasised that the mandate was to do a feasibility study, not to construct a project.

Basically the view of the DRD was that Mallina/Dempster Nominees should be supported; if they wanted to spend their money on a feasibility study the DRD would provide resources to assist them wherever it could.

On 12 September 1986 a general meeting of shareholders of Mallina took place. Amongst those present were Lee-Steere, Griffin, Rakich and Wallis. Resolutions were passed concerning the placement of shares, and increasing the ceiling of directors' fees from $ 20,000 to $ 50,000 per annum. The minutes of the general meeting concluded:

Prior to closing the meeting the chairman advised of the work commitments being put in by the company's senior executives and of general confidence being shown by them in the future prospects for the company.

On the weekend of 13/14 September 1986 the *Western Mail* published another article concerning the royalty payments. According to the article, an audit department officer had inspected mines department records on Mallina's attapulgite mining royalty payments. It was again reported that Parker was considering whether action was justified "against the Dallas Dempster-owned company for late royalty payments".

On 15 September 1986, apparently early in the morning, Parker signed the draft cabinet minute in the terms submitted to him, recommending that cabinet endorse the award of an exclusive mandate to Mallina and Dempster Nominees.

In the normal course of cabinet procedure there had to be 10 days' notice of any item to be included on an agenda for cabinet meetings. The purpose of the 10 day rule was to give the cabinet office time to circulate copies of cabinet submissions to other ministers so that they could seek advice from their own departments on any particular proposition. However, ministers were permitted to seek that that requirement be waived and to present a minute to the cabinet meeting without notice. This was colloquially referred to as "walking in" a minute.

The appropriate 10 days notice had not been given in regard to the minute signed by Parker. Later, on the morning of 15 September 1986, but prior to 10am, Parker went to see Burke. Parker told Burke that he had considered walking in the minute to have it placed on the agenda for the cabinet meeting to be held that day at 10.00am. Burke told Parker that he did not think that the minute should be walked in. He said that the minute should be circulated to other departments so that they could have an input. Whatever else was said

between Burke and Parker during this meeting is a critical issue and is disputed. I will, below, deal with this meeting in more detail.

Later that morning Dempster was advised that the minute would not be walked in. How he was advised and what else was said to him is another critical issue in the case to which I will return.

Dempster then spoke to Mr L R Connell (Connell) and discussed with him the prospect of Connell becoming a joint venture partner of Dempster or Dempster Nominees in the petrochemical project. Dempster proceeded to have lunch with Rakich and had further discussions with him then. It is sufficient at this stage merely to record that Dempster told Rakich in effect that he had information from "the Minister's office" that, because of the problems and publicity concerning the royalty payments and Mallina's financial position generally, Mallina would not get the mandate. Dempster also said that he had been having discussions with Connell -- with whom he, Dempster, would "try a joint application" -- and Connell would pay Mallina its costs expended on preparation plus further moneys which would be a profit to Mallina. He also said that if the project was a success, and Dempster and Connell's joint venture company was floated on the stock exchange, he would ensure that Mallina could, if it wished, subscribe for up to 10% of the equity in that company. I stress that this is merely a summary of what occurred and is set out at this stage purely for narrative purposes. I shall below deal in more detail with this important conversation.

Rakich communicated thereafter with Lee Steere, Griffin and Wallis who agreed that Mallina should accept Dempster's proposals as relayed to them. On 16 September 1993 Rakich, on behalf of Mallina, agreed with Dempster that, in return for payment of $ 150,000 to it, Mallina would give up its interests in the joint venture with Dempster Nominees and pass on all the information at its disposal to the new joint venture between Dempster and Connell. What was said during all these discussions forms a significant part of the disputed issues in the case and will be dealt with later.

On 16 September 1986 Dempster, on the letterhead of Dempster Nominees Pty Ltd, wrote to Connell setting out the terms of agreement between them. In summary, the Dempster and Connell interests were each to hold 50% of the equity in a public company to be named Petrochemical Industries Company Ltd (PICL). Connell was to pay $ 150,000 to Mallina and $ 250,000 to Dempster Nominees. Yellachich was to work for PICL.

These terms were subsequently implemented.

On the same date, 19 September 1986, Dempster drafted a letter for Rakich to sign on Mallina's letterhead. This Rakich did, returned it to Dempster who sent it to Parker on that date under cover of a letter addressed to "Dear David". Mallina's letter to Parker advised him that an unlisted public company, PICL, had been registered to carry out the mandate, gave particulars as to the directors of that company (who included Dempster, Connell, and Rakich), and explained that "the company is a joint venture between Dempster Nominees Pty Ltd and L R Connell and Partners, and it is proposed that at an appropriate time the company will be listed on the Associated Stock Exchanges of Australia."

On 19 September 1986 Griffin on behalf of Dempster Nominees wrote a letter recording:

Several financiers experienced in project finance work, are aware of progress on the petrochemical complex, and have kept in regular touch. We would expect the project to be on a "without recourse" basis, and work on the banking submission would run in parallel with the engineering work, etc.

After 15 September 1986 Parker distributed to selected government departments his draft cabinet minute recommending that an exclusive mandate be granted to Mallina. The departments concerned referred to

various problems of a technical nature and some opposed the grant of the mandate for those reasons. One department commented:

The proposal is politically very hazardous. It would lock the State into one proponent for at least 6 months, and would give it the front running thereafter. To do this without formally calling for expressions of interest is unwise, as the Midland Abattoir experience has shown. This would be compounded by the fact that the companies have no experience whatsoever in the petrochemical industry, and are perceived by some to be close to government. Instead, expressions of interest should be sought and evaluated: the risk of a few months delay are outweighed by the political and other risks of proceeding in a manner proposed in the cabinet minute.

No department referred to the financial position of Mallina, the royalty payments or anything related thereto. None had been asked to examine or investigate these matters. None had been told of the withdrawal of Mallina, nor was there any suggestion that the departments had been informed that either the minister or the premier entertained negative views about Mallina.

Prior to 6 October 1986 the DRD submitted a briefing note to Parker stating:

During the period the cabinet minute has been available to other Departments for comment, we have had indications of concerns that the award to Mallina will not follow a period of competition between companies for the exclusive position and there has been no advertisement that the government was considering the award of an exclusive position on this project. This is seen to be unfair to any group, apart from Mallina, which may have been working on the project without contacting the government ...

Other technical concerns were expressed.

The note further recorded:

There have been numerous expressions of interest in the petrochemical project over the years and serious pre-feasibility studies have been done in the past. We are not aware, however, of any serious expressions of interest from the major companies since Asahi Chemicals apparently lost interest in our project over a year ago. If there is a company seriously working on the project (apart from Mallina), it seems most unlikely that they could make very much progress without at least seeking some discussions with SECWA on ethane supply since the ethane is the essential feed stock to the project. SECWA advises that it is not aware of any such interest.

The view was expressed

If the project is shown to be viable at the end of the six months, then there is an implied obligation to negotiate with Mallina/Dempster to develop the project further. I believe we would do this in any case.

On 6 October 1986 the cabinet approved a minute calling for expressions of interest in the petrochemical project for a period of one month "or basis decided by Minister and checked with Premier".

On 15 October 1986 the annual report of Mallina was issued. Under the heading "Petrochemical Project" the following was said:

Mallina is the co-sponsor of a proposal submitted to the Western Australian Government for the construction of a $ 460m integrated petrochemical complex. The submission is currently being considered by the government. In the meantime we have moved to limit our future financial exposure, cover all costs to date and guarantee an equity position for Mallina should the project proceed.

The directors' report included a section dealing with events subsequent to the end of the financial year. Nothing was said about the abandonment of the joint venture project, notwithstanding the letter to shareholders of 15 August 1986.

The annual general meeting of shareholders of Mallina was held on 25 November 1986. The minutes record a shareholder asking about progress on the petrochemical project and that:

Mr Rakich explained that the company had been a co-sponsor on this project. There has been no decision by the State Government as yet on the granting of a mandate. The company has moved to limit its liability on the next phase as to the bankable feasibility but maintain an opportunity to take up an equity position thereafter.

On 24 October 1986 Suttie prepared letters to twelve companies (but not including PICL), who had expressed interest in the project, to see if they were interested in conducting a feasibility study. The minister considered the letters but, at first, did not sign or send them. Eventually, on 4 December 1986, the DRD sent letters in the terms drafted to those companies. On that date Dempster received a copy of a letter from Parker addressed to PICL inviting the submission of a proposal for a mandate for a feasibility study.

On 5 December 1986 a letter, signed on Parker's behalf, was sent to Rakich as executive director of Mallina. The letter informed him that letters had been sent to other companies who had previously indicated an interest in the project, to ascertain whether they would be interested in undertaking an investigation of the feasibility of the project. Parker's letter concluded:

In view of the government's requirement for a response by 9 January 1987 detailing the approach, timing and commitment which prospective companies may be willing to undertake, you are invited to resubmit or elaborate upon your existing submission if you feel that it is deficient in any way.

The letter of 5 December 1986, save for the concluding paragraph, was drafted by Suttie. The concluding paragraph was inserted by Parker or someone in his office.

By letter dated 16 December 1986 from PICL, signed by Dempster as chairman, PICL informed the DRD that it would be the sponsor for the exclusive mandate previously undertaken by Mallina and Dempster Nominees.

PICL proceeded to submit its proposal. In so doing it used the same basic information for its proposal that Mallina/Dempster had obtained.

With the exception of Mitsui, all other responses to the government's invitation to express interest in conducting a feasibility study were in the negative. In any event Mitsui thought that the DRD was advertising for them to do a study for which the DRD would pay. When the true position was appreciated they withdrew. No one apart from PICL was interested. It is plain from the evidence of Suttie that this was expected.

On 28 January 1987 PICL was awarded the exclusive mandate to prepare a bankable feasibility study. In July 1987 PICL submitted such a study to the government. Thereafter PICL continued to investigate and work on the project.

In October 1988 the interests associated with Dempster and Connell in the petrochemical project were transferred to Bond Corporation Holdings Ltd (BCH) and Western Australian Government Holdings Ltd (WAGH). In consequence of the transfer the Connell interests received $ 350m and the Dempster interests received $ 50m.

The conversation between Burke and Parker on 15 September 1986

In determining what was said between Burke and Parker on 15 September 1986 it is helpful to have regard to their subsequent conduct and the surrounding circumstances. Regretfully it will be necessary to repeat some of the facts I have already mentioned so that a full chronological picture can be given.

By September 1986 Mallina and Dempster Nominees had been dealing with Parker and the DRD since the beginning of 1985. These dealings had been conducted by Mallina on the joint venture's behalf. The correspondence and minutes of meetings between the joint venture and the DRD show that all involved referred to the joint venture as "Mallina". No distinction was made between the two companies.

Dempster was at all times the dominant force in charge of the joint venture's dealings with the government and others. He controlled those dealings, in effect not only on behalf of Dempster Nominees, but on behalf of Mallina. Until Dempster resigned from his executive position with Mallina in August 1985 he had been the managing director of both companies. He remained a substantial shareholder of Mallina. After he resigned he continued to represent Mallina in its negotiations concerning the petrochemical project and indeed wrote a letter to Parker on Mallina's letterhead which he signed as managing director of Mallina. Dempster says this occurred by mistake. If it did, in my view it was because Dempster at least subconsciously thought he was in effective control of Mallina's interests in the joint venture. On 5 November 1985 and 26 May 1986 Dempster received letters from Parker incorrectly addressed to him as chairman of Mallina. No attempt was made to advise Parker of the true position.

Accordingly I consider it to be unlikely that Burke, Parker or the DRD perceived that there was a significant difference between Mallina and Dempster Nominees. They were both regarded as Dempster controlled companies.

By 15 September 1986 there were obvious political drawbacks in the government being seen to grant Mallina and Dempster Nominees favoured treatment. There was a public perception that Dempster had influence with the government. I have referred to the comment made by a government department that Mallina and Dempster Nominees were perceived by some to be close to government and there was other evidence that Dempster knew Burke and Parker and was influential with them. There were therefore good political reasons why the government should have insisted in its dealings with the Dempster companies that all proper forms of procedures be complied with. This meant that there were good reasons for Parker not to grant Mallina/Dempster Nominees an exclusive mandate, without there being a public tender, and for Burke not to waive the 10 day rule and to insist on all departments being able to comment on the proposal in the usual way.

This of course did not mean that if the proper procedures were complied with that the application by Mallina/Dempster Nominees should not be granted, and there is strong reason to suppose that the government would have wanted to please Dempster. He was a powerful figure in the business world, had in mid 1985, in a period of some 3 weeks, donated about $ 600,000 to Burke's "Leaders Fund", and was personally known to Burke and Parker.

The problems in waiving established procedures in regard to the joint venture's application for a mandate were exacerbated by the articles in the *Western Mail* concerning Mallina's royalty payments. These articles bear closer examination.

The first article appeared in the edition of the weekend of 16/17 August 1986. The article referred to Mallina "owing more than $ 100,000 in royalties" and ignoring "several requests to pay royalties" but it was not suggested that Mallina was unable to pay what was owing. The article referred to a denial by Rakich that any

royalty payments were outstanding and so the inference is that there was a dispute about the royalties. The newsworthy point made in the article, and the justification for its appearance on the front page, was that Parker had "quashed an inspection" of the records of Mallina's attapulgite mine when Dempster was a major shareholder of Mallina and had been chairman when "the inspection was urged".

The second article appeared in the edition of the weekend of 23/24 August 1986. The headline was that "Parker rejects royalty allegation" and the thrust of the article was that Parker denied that he "quashed" an inspection of Mallina's records. Reference was again made to Dempster's connection with Mallina. The article in the first edition reported a statement by Parker that "the question of how much is owing in royalties is not easily answered" and that it was "not technically correct to say that Mallina owes anything at all in royalties until (certain) matters are clarified and a decision is made on their waiver application." The article in the later edition was in similar terms but reported in addition that Parker "is considering whether action is justified against Dallas Dempster's company Mallina Holdings for late payment of royalties".

The next article appeared in the edition of the weekend of 13/14 September 1986. It recorded that "(an) Audit Department officer has inspected mines department records on Mallina Holdings' attapulgite mining royalty payments" and noted that the inspection came after the earlier report in the *Western Mail* that Mallina had failed to pay royalties. It also reported that a spokesman for Parker said that the inspection was "part of a normal audit done at this time of the year". The article repeated that Parker was "considering whether action is justified against the Dallas Dempster owned company for late royalty payments". The article concluded: "Mallina has paid $ 66,000 in royalties but this may not be necessarily correct ... Assistant Director General of Mines Jim Blake said that there was confusion over the information the company should supply because royalty calculation methods had changed. The company had now supplied detailed information, he said."

The overall impression conveyed by these articles as a whole is not that Mallina was unable to pay the royalties outstanding, but that initially there was something odd in Parker's involvement, particularly by reason of Dempster's connection with Mallina, that after the *Western Mail's* articles Parker had subsequently altered his approach and investigations were being made with a view to action being taken on royalty claims which were not without their difficulties.

The points that emerge from these articles, in the context of this case, are first, that Mallina was being identified closely with Dempster; secondly that there was some suggestion of favours having being done by Parker for Dempster; and, thirdly, that there was a potential dispute between the mines department and Mallina as to the extent of the royalties owing.

As a result of the articles the mines department had discussions with Rakich and others on behalf of Mallina and, probably prior to 15 September 1986, the mines department were given the figures for the previous 7 years attapulgite production showing that each year Mallina had incurred a loss in its attapulgite operations. There is no evidence that this information was passed on to Parker, but even if it had been, I do not accept that it would have been of any importance to him as regards the decision whether to grant the joint venture the exclusive mandate it was seeking. At the time in question the financial position of Mallina was not sound. However, it had been in a similar financial position for several years hitherto. Its financial circumstances had always been apparent from its published accounts. The details of Mallina's situation were and had always been public knowledge. The government and the DRD must have known this from the inception of their dealings with Mallina on the petrochemical project.

The truth is that the DRD had never been concerned about the financial standing of Mallina, and by 16 September 1986 (and even thereafter) Parker had asked no questions of Mallina or the DRD about the for-

mer's finances. I infer that there was an absence of interest because the fourth and final stage of the project was expected to be self funding on a non recourse basis. The fact that it was thought that Dempster, who was considered to be a very wealthy person, stood behind Mallina, also may have played a part, but very much to a lesser extent. The cost of constructing a project of the kind contemplated was so vast that finance from large institutions and other organisations would be required. The wealth of an individual would be quite insufficient.

On the other hand, it was no doubt taken for granted by the government and the DRD that the relatively minor cost of financing the bankable feasibility study would be met by the joint venture of Mallina and Dempster Nominees. It is on this score that the financial standing of Dempster himself as the person involved in and the major shareholder of these two companies might have been thought by the government to be relevant.

By 15 September 1986 Mallina/Dempster Nominees had been dealing with the government for some 21 months. The DRD had initially been against granting the joint venture an exclusive mandate, but by about the end of August 1986, it had changed its views and had recommended the grant of the exclusive mandate. On 8 September Parker wrote to Mallina saying:

After full consideration of the implications of an exclusive mandate I have decided to seek cabinet agreement to the award of an exclusive mandate to your company subject to conditions.

Early on the morning of 15 September 1986 Parker signed the draft cabinet minute containing the recommendation that cabinet "endorse the award of an exclusive mandate to Mallina Holdings and Dempster Nominees ..."

It is in the aforegoing context that the evidence of Burke has to be considered.

According to Burke, Parker came to see him early on the morning of 15 September 1986. Parker told Burke that the DRD had prepared a cabinet minute the previous week recommending the grant of the exclusive mandate to Mallina and Dempster Nominees. Parker had considered "walking in" the minute to have it placed on the agenda for the cabinet meeting to be held later that day at 10am.

Burke testified that Parker told him that he, Parker, was concerned by the recent publicity surrounding Mallina and the fact that the mines department was owed monies by Mallina. He said: "Mr Parker was clearly of the view and sought to influence (sic) to the view that it was not appropriate for Mallina to be given this mandate and it was Mr Parker's view also that the matter should be subject to open tender." According to Burke, Parker said that he did not want the cabinet to consider the proposal that day and he said that he thought that Mallina should not be awarded the mandate.

Under cross-examination Burke said:

My recollection is that (Parker) told me that he had made enquiries and that -- what he said to me was that he had a minute, that it recommended a certain course of action that he did not believe was viable and that it was the case that Mallina could not be awarded the mandate for the following reasons: He said politically it was untenable; he said financially the company was not up to it and they were the words he used -- he said "It's just not up to it" and he said that it was important that we be seen internationally in this particular area to be looking for substantial people to prosecute different projects and what he was really saying to me was "Look, I've got this minute. I was going to walk it in but I want you to know that my view about it is this," and that's the situation.

According to Burke, Parker made it clear that politically the newspaper articles made it very difficult to give the mandate to Mallina. Burke said that the idea that Mallina should not be awarded the proposal emanated from Parker, and he, Burke, agreed with that.

Burke testified that he said to Parker that he did not see how the cabinet could support a recommendation to award a mandate to a joint venture that included Mallina because Mallina was not paying monies it owed the government. According to Burke he told Parker that it would not look good for the government to be involved with a company that was in default in its relationship with the government in another area. Burke told Parker that the minute should not be walked in for the cabinet meeting to be held that day. He said that it should be circulated to other departments so that they could have an input. Parker agreed.

While the evidence that Burke believed that the publicity made it politically inappropriate for the minute to be "walked in" and for the mandate to be granted without publicly calling for expressions of interest from others, is readily understandable, I have considerable difficulty with the remainder of his evidence that I have recounted.

Parker's attitude, as described by Burke, is entirely inconsistent with his conduct prior to their meeting. Not only had Parker advised Mallina a week earlier that he had decided to seek cabinet agreement to the award of an exclusive mandate to it, but that very morning (and it could hardly have been more than two hours prior to the meeting) he had signed the cabinet minute recommending the grant of the mandate. The royalties dispute had been public knowledge since mid August; what then is the explanation for the *volte-face* shortly after he signed the cabinet minute?

Burke attempted to provide an explanation by saying that if a cabinet minister was not satisfied with proposals made by his department he might still put the proposals to cabinet on the basis that cabinet should solve the problems. Those problems might not be mentioned in the submission to cabinet. Burke said that a minister might choose to bring a minute to cabinet that did not reflect his views "so that the Minister, not wanting to disturb the Department, would still bring it to cabinet and say 'Look, cabinet kicked it back; I've brought it in'." Burke said that it was not "unusual at all" for a minister to sign a recommendation with which he did not want to proceed. He agreed with the proposition that it was not unusual for a minister to pretend to the department that he agreed with their view and then come and tell cabinet something entirely different.

Nevertheless, Burke replied in the negative when he was asked: "Would you have expected Minister Parker to put up a recommendation to cabinet and keep back from cabinet a view, if he had one, that the party concerned simply couldn't finance the proposal that he was seeking from the Government?" About 2 weeks later, after the 10 days rule had been complied with, the very same minute that had earlier been signed by Parker was put before cabinet. No mention was made in the papers put to cabinet of the difficulties with Mallina, said to have been discussed between Burke and Parker. When questioned about this, Burke said:

You may say to me "Isn't it strange that a week after or two weeks after signing a minute that the Minister disagreed with, that same minute went to the cabinet?". That, again, is an example of what I was trying to say to you before. It was used as a vehicle by the Minister who had decided to progress the matter but not in line with the contents of the minute.

It is, however, in my opinion, strange that the cabinet minute signed by Parker on 15 September 1986 was distributed amongst all the departments thought to be relevant without any reference to the concerns and views of Parker and Burke. The departments were being asked for their comments without being told about what were plainly highly important opinions being entertained by the premier and the relevant minister.

None of the departments that was asked to and did comment on the cabinet minute was referred to or asked to exainine the financial capacity of Mallina.

Subsequently, Parker sent his letter of 5 December 1986 to Mallina. As I have pointed out, the last paragraph of that letter was inserted by Parker or someone in Parker's office and signed on his authority. That paragraph, as I have mentioned, was in these terms:

In view of the government's requirement for a response by 9 January 1987 detailing the approach, timing and commitment which prospective companies may be willing to undertake, you are invited to resubmit or elaborate upon your existing submission if you feel that it is deficient in any way.

The invitation to Mallina to resubmit the submission is again entirely inconsistent with Parker holding the view that Mallina was completely unsuitable to be a proponent of the petrochemical project.

Despite Burke's explanations I find it difficult to accept that a minister of the Crown would deliberately sign a cabinet minute recommending one course of action (in the full knowledge that he was diametrically opposed to that recommendation which was to be disseminated in his name and under his signature) and then, within an hour or two, adopt a course of conduct to the opposite effect so as to negate completely his recommendation, and proceed to request advice from several government departments about the recommendation he made, but conceal from those departments that he had decided to abandon that recommendation and had taken steps to make that abandonment effective.

There was, in any event, no evidence to explain why Parker would not want to disclose to the DRD that he believed that the exclusive mandate should not be awarded to Mallina by reason of the royalties dispute and its financial difficulties. It is not apparent why Parker would want to misrepresent to the DRD that he agreed with their recommendations, and put to cabinet the converse of the minute he had signed and distributed.

I was not persuaded by Burke's evidence and I consider that his testimony concerning his conversation with Parker was not a reliable record of what transpired. I accept that he and Parker decided that it would be politically inappropriate, particularly because of the articles in the *Western Mail*, for the 10 days rule to be waived in regard to the cabinet minute signed by Parker on 15 September 1986. I accept that they decided, for similar reasons, that it would be desirable to call for expressions of interest before deciding to award an exclusive mandate. I also accept that they both believed that the continued existence of a dispute with Mallina over royalties might prejudice it when it came to awarding the exclusive mandate. I do not accept, however, that they decided that Mallina was financially incapable of carrying out the mandate. I reject the evidence that they decided that Mallina was an unacceptable candidate for the grant of the mandate and that the mandate should not be granted to it.

In coming to these conclusions I have had regard to a letter dated 19 April 1989 sent by Parker to Rakich in which he stated that: "By the middle of September 1986 it had become apparent that the joint Mallina Holdings'/Dempster Nominees' submission seeking an exclusive petrochemical mandate would be unacceptable to the government." In that letter Parker referred to the royalties that were in arrears and stated: "There was also a conviction within cabinet that all relevant parties should have an opportunity to express their interest in the project".

Parker was overseas at the time of the trial and it was not possible to arrange for his attendance as a witness. I have not attached much weight to what is said in his letter. I regard his actions at the time in question as more reliable.

Finally, it should be observed that even on Burke's own evidence, it could not be said that on 15 September 1986 the government had decided that Mallina would not be awarded the mandate. This is apparent from the following exchange in cross-examination:

Mr Burke does it accord with your view as to proper government for the government to have reached a decision that an applicant for some concession from the government is to be refused but not tell him and let him continue to spend money in the meanwhile, is that proper -- No, that's not proper but that wasn't done in this case.

I suggest to you that that is precisely what was done if what you've told us is correct -- Well my position is completely contrary to yours in that it is not competent for me to tell anyone that a decision of cabinet has been made prior to cabinet making the decision. The minute did not go to cabinet on 15 September.

If you as the Premier and Mr Parker as the Minister were going to recommend against the grant it wouldn't have been granted would it? -- That's not the case. I can recall occasions when I very strongly opposed matters and had the support of very able Ministers in my opposition and was defeated on the point of view I was putting, but that's not even relevant. What is relevant is that it's not until cabinet makes the decision that I'm able to say government has decided.

To put Burke's evidence at its highest for the defendants, it is that he and Parker agreed between themselves that Mallina should not be awarded the mandate, but the effective decision in this regard was that of the cabinet. On Burke's own evidence it could only be said that the government had decided that Mallina would not be awarded the mandate when that decision had been made by the cabinet. Until then there was always a prospect that, despite the views of Parker and Burke, cabinet might decide otherwise.

The circumstances surrounding the conversations on 15 and 16 September 1986 between Dempster and Rakich, and Rakich and the other directors

The conversations between Dempster and Rakich, on 15 and 16 September 1986 have to be seen in the context of Mallina's financial position at the time, its prospects generally, and the beliefs of the directors as to the benefits it stood to receive from the exclusive mandate -- should that be awarded to the joint venture -- and the petrochemical project as a whole. Mallina's liability for attapulgite royalties and its ability to pay those royalties have to be considered. It is also necessary to determine the terms of the joint venture between Mallina and Dempster Nominees, how it was conducted, and the nature of the personal relationship between Dempster and Rakich, and Rakich and the other directors.

The terms of the joint venture

There was no written agreement between Mallina and Dempster Nominees concerning the joint venture. There also appears to have been no oral agreement. The reason for this is that the idea of the joint venture was conceived and implemented by Dempster alone as managing director of Mallina and as managing director of Dempster Nominees. Dempster testified that he suggested to Rakich that Mallina and Dempster Nominees should submit a joint proposal to the Western Australian Government to obtain a mandate for the right to conduct a feasibility study into the petrochemical complex. According to Dempster, Rakich said that it would be a matter of some interest to Mallina and he would speak to the other directors. I think it unlikely that this occurred. Evidence to similar effect was not given by Rakich. No resolution of directors of Mallina relating to the formation of the joint venture was put into evidence. Dempster, as I have said, was the dominant force on the part of both companies in relation to the project. Generally he made the important decisions, many without a resolution of the board but within the general authority impliedly having been conferred upon him. It is probable, in my opinion, that Dempster merely informed Rakich that Mallina would pursue the joint

venture with Dempster Nominees. There was, however, ample evidence that, from the inception of the joint venture, both Mallina and Dempster Nominees accepted that initially each would have a 50% interest therein.

The ultimate object of the joint venture was to attempt to interest the government in agreeing to the construction and undertaking of a petrochemical project by the joint venture or interests or an entity associated with them. The initial object was to obtain an exclusive mandate to prepare a bankable feasibility study, and thereafter to complete that study successfully. Until then the structure of the joint venture would remain with Mallina and Dempster Nominees each holding a 50% interest therein.

If the joint venture were to be afforded the right to construct and undertake the petrochemical project (after the provision of a bankable feasibility study), it was likely that a public company would be formed and sophisticated arrangements would be made to finance the project. This would probably involve other large institutions taking an interest in the project at that later stage, although Dempster explained to Plunkett towards the end of 1984 that if the government granted Mallina the right to do a feasibility study the joint venture "would get it off the ground with borrowed money, borrowed on a non-recourse basis, and it would be a very big project".

There was simply no agreement as to how the final construction stage of the project would be financed, and how the equity therein would be allocated, if that final stage ever were to be reached. It was, however, expected that at that stage Mallina would probably end up with a 10% or a 15% free carried interest in the project, which would be likely to be very valuable. Until then each would retain a 50% interest in the project.

There was no express agreement between the parties as to the basis upon which the expenses for the project, up to the stage of completing the bankable feasibility study, would be paid. By 15 September 1986 Mallina had paid about $ 75,000 in respect of expenses. It was not proved exactly how much Dempster Nominees had paid. Dempster believed that it had paid about $ 750,000 but expenditure to this extent was not proved. It seems to me probable that Dempster Nominees paid more than Mallina but it was not established how much more.

At no stage did Dempster Nominees require Mallina to pay its 50% share of the expenses of the project. At no time did it send Mallina statements of account for joint venture expenditure. Dempster Nominees appeared to be quite content to pay more than 50% itself and not to claim the excess from Mallina. Mallina's records similarly did not reflect that it was indebted to Dempster Nominees for any expenses in relation to the joint venture.

There can be no doubt that Mallina contributed significantly to the joint venture. Dempster himself worked continuously on the petrochemical project; until he resigned as a director of Mallina he did so in his capacity as executive director of both companies. At least during 1985, Fitch, an employee of Mallina, worked on the project. Apart from Dempster, the most important person working for the joint venture on the project was Yellachich. Yellachich was retained as a technical consultant by Mallina to work on the project. It is by no means clear to me (despite the evidence of Dempster and Rakich to this effect) that Yellachich was retained by Dempster Nominees as well, but many of his expenses were paid by the latter company. Until early in 1986 Yellachich worked from Mallina's offices. Later, he moved to the offices of Dempster Nominees. The arrangements with Yellachich were very loose and haphazard, and little distinction was made between Mallina and Dempster Nominees as regards his relationship with them. No attempt was made to ensure that the costs of retaining Yellachich were paid by one or the other of Mallina and Dempster Nominees, or shared equally between them.

Wallis believed that Mallina was contributing its share of the joint venture by providing office space, personnel and paying some expenses. On this basis there was no additional liability by Mallina to reimburse Dempster Nominees for the expenditure of over 50% incurred by the latter. There is a great deal to be said for this view; certainly the conduct of the parties appears to have been consistent with it.

The way in which the joint venture was conducted: the relationship between Rakich and Dempster

Dempster agreed with the proposition that nothing of importance occurred in the joint venture without him first being consulted, and if he did not endorse it it would not happen, but if he wanted something done it would happen. I have no doubt, having regard to the extent of Dempster's shareholding and the personalities of the relevant individuals as evinced in the witness box, that that proposition is accurate.

Apart from Rakich, the other directors of Mallina at the relevant time played no part in the day to day running of the business. They were very much non-executive directors.

Rakich commenced employment with the Dempster Group in 1971. He was employed by Mallina from 1977 and by training he is an accountant. For many years Rakich had been the secretary of Tilden Holdings Pty Ltd, a company of which Dempster and his wife were the directors, and also of Dempster Nominees. He had had a close business relationship with Dempster for many years before 1986. Until August 1985 when Dempster stepped down from the board of Mallina, Dempster was accurately described as Rakich's boss. It seemed to me that Dempster was very much the dominant person in this relationship, both by the force of his personality and his position.

After August 1985, when Dempster resigned as a director of Mallina he ceased to be involved with its day-to-day business, moved his offices from Mallina's premises in Nedlands and established an office in Perth. He nevertheless continued to play the controlling role on behalf of the joint venture in regard to the petrochemical project.

Rakich did not recall any prior warning having been given of Dempster's resignation as director of Mallina, or having been specifically briefed with the matters dealt with by Dempster. Rakich did not acquaint himself with the file that was kept for the project. He had no knowledge of the detailed discussions that had taken place with overseas consultants and the overseas parties who were thought of as potential shareholders in the project. Although Rakich attended a number of important meetings concerning the petrochemical project, he did not appear to have had any interest or knowledge in depth as to the issues discussed.

By April 1986, when Yellachich was reporting positively on the prospects of the joint venture, Rakich was attending to other aspects of Mallina's business and appeared to have little knowledge of the details on which Yellachich's views were based. Reports were made to Rakich from time to time but he himself did not take any initiative in connection with the project, it was the responsibility of others to advance it. Rakich never made independent inquiries concerning the joint venture affairs other than from Yellachich. Significant decisions relating to the submissions by the joint venture were made by Dempster in consultation with Yellachich, and Rakich accepted those without demur. The impression I have is that Rakich took very little personal interest in what was going on in regard to the project, he knew little about the detail, even important detail, and simply received reports from Dempster and Yellachich from time to time.

The inference is that Rakich, as chief executive officer of Mallina, was content to allow Dempster to deal with matters relating to the joint venture. Dempster was the prime mover in the project and it appears to have been left to him to make whatever decisions were necessary, whether on the part of Mallina or Dempster Nominees.

The royalties dispute

I have already referred to the royalties issue from the point of view of the facts known to Burke and Parker on 15 September 1986, but it is now necessary to deal with the same issue from the point of view of Mallina and Dempster Nominees.

Mallina was required to pay royalties to the government in respect of the attapulgite mined by it. On 30 January 1985 Mallina, for various reasons, requested the Government to waive the payment of royalties. Parker as the minister for mines replied by letter dated 8 March 1985 advising that the department of mines had been directed to contact Mallina to obtain certain financial information. Mallina provided that information by letter dated 11 March 1985. By letter dated 28 March 1985 the director general of mines advised that a review of the figures supplied was being undertaken and requested further information. Mallina did not receive that letter and made no reply. Nothing further occurred until August 1986 when, after the first *Western Mail* article, department of mines' officials communicated with Rakich.

On 25 August 1986 Rakich wrote to the director general of mines pointing out that Mallina had never received the letter of 28 March 1985. Rakich stated further:

As we have heard nothing from either the Minister or the Mines Department since our letter to the Minister of 11 March 1985, we have been under the impression that the Minister accepted our submission of 13 January 1985 wherein we requested a moratorium on royalties until 1 September 1986.

The letter claimed that Mallina "should in fact be entitled to a refund on the royalties assessed".

Meetings took place between Mallina representatives and department of mines' officials in August and September. At some time, probably before 13 September 1986, Mallina gave the mines department calculations relating to the amount of royalties payable, and information concerning Mallina's attapulgite mining operations over the last 7 years.

Toward the end of August Rakich became aware that the Mines Department were claiming about $ 110,000 from Mallina. As a result of his discussions with them, and further investigations he carried out, Rakich believed that at that stage royalties between $ 60,000 and $ 100,000 were probably payable.

In September 1986 the position with regard to the royalties was by no means clear cut, discussions continued and the amount owing by Mallina was only resolved on 29 April 1987.

It is to be borne in mind, firstly, that in August and September, Rakich was negotiating with the mines department officials (whom he described as "very sympathetic"), the amount involved was not settled, and there must have been some prospect of agreeing a lesser sum than that being claimed. It was open to Mallina to pay what was being claimed, and remove the threat that the dispute posed to its mandate application, or continue negotiations in the hope of arriving at a reduced indebtedness. Mallina chose the latter course. It would have been somewhat difficult for Mallina to find the money to pay the royalties, but I have little doubt that it could have obtained the funds had it wished. I shall deal with this aspect later when discussing Mallina's financial position.

After the article in the *Western Mail* appeared on the weekend of 16/17 August 1986, Dempster telephoned Rakich. He told Rakich that the problem with royalties could be an embarrassment in regard to the joint submission to the Government. During the week commencing 25 August 1986 Dempster spoke to Rakich again about the articles that appeared in the *Western Mail* on 23/24 August 1986. He said that he told Rakich that he thought that the publicity concerning Mallina would be disastrous for the joint application. Rakich told him that he had forwarded financial information concerning Mallina's affairs over the past 7 years

to the mines department and it did not look good for Mallina, meaning, as I understood the evidence, that Rakich thought that royalties were probably payable by Mallina.

According to Dempster, on about 4 or 5 September 1986, he had a telephone conversation with Parker. Parker told him that grave concerns were being expressed within government and particularly within his department about Mallina's involvement in the application for a mandate. Parker said that whilst he and the DRD were quite enthusiastic about the concept, serious concerns were being canvassed. There was the viability of the project generally as expressed by SECWA, there was Mallina's poor financial position and the fact that it seemed that he, as minister for minerals and energy, would have to act against Mallina on the non-payment of royalties.

I reject this evidence. There was no other testimony about "grave concerns" being expressed at that time within government and Parker's department about Mallina's involvement in the application for a mandate. The tenor of Suttie's evidence was quite to the contrary. Burke said nothing to support this contention. It is inconsistent with the facts that I have outlined. In any event I was not impressed by Dempster's evidence, generally, and I do not consider I can rely on it without other appropriate confirmation.

Mallina's financial position, its prospects generally and in regard to the petrochemical project

Mallina had had liquidity problems for many years. In 1985, on a consolidated basis, its total assets exceeded its total liabilities by $ 4,546,995. Its current liabilities, however, then amounted to $ 6,040,613 whereas its current assets amounted to $ 1,125,542. Its consolidated position had by 30 June 1986 improved. Its total assets had increased by some $ 60,000 to $ 12,525,576 and its total liabilities had reduced by about $ 419,000 to $ 7,498,677; its net assets amounted to $ 5,026,899. Its current assets had increased by more than $ 800,000 to $ 1,962,964 and its current liabilities had reduced by more than $ 2.3m to $ 3,732,355. There was an accumulated loss of $ 9,389,534. The financial statements were qualified by the auditors who noted that investments in two mining ventures of about $ 3.9m were "dependent upon the successful development, exploitation and/or sale (of those investments) at amounts at least equal to their book values". A similar qualification had been made in the previous year.

Mallina had for a number of years been operating to a significant extent on borrowings and for the year ended 30 June 1986 had paid interest on those borrowings in the sum of $ 1,226,368. The high interest charges materially affected the operating result for the year which was a loss of $ 1,966,011.

These figures notwithstanding, the statement by directors, forming part of the financial statements for the 1986 year, signed by Lee-Steere and Rakich on 15 October 1986 and prepared a few weeks prior to that date, stated that in the opinion of the directors "(a)t the date of this Statement there are reasonable grounds to believe that the company will be able to pay its debts as and when they fall due".

The chairman's report of the same date, for the year ended 30 June 1986, drafted by Rakich and signed by Lee-Steere on behalf of the board, struck a most positive note. This report commenced:

I am pleased to report that the company has significantly improved its position since the last annual report and is on the threshold of a major phase of expansion.

The chairman's report was particularly encouraging about attapulgite sales. It recorded that its sales of attapulgite clay at $ 1,463,000 for the financial year were a record since production began some 7 years previously. The figure was 14% higher than for the previous year and 72% up on the sales in 1983-84. Lee-Steere noted that "we are in fact budgeting for substantially increased sales during the 1986/87 year". Plant modifications costing $ 300,000 had been carried out substantially increasing efficiency. The report referred to a reorganisation of a company known as Katanning Holdings Ltd in which Mallina had a significant value

and stated: "Your directors expect the value of Mallina's investment in Katanning to show considerable improvement in the future". The report referred to gold exploration prospects where there had been promising results and there was "potential". The conclusion was that Mallina was "now in a position to consolidate and move on to develop the very real potential which this company has".

Rakich's view as to Mallina's future prospects, as evidenced by the chairman's report, was confirmed by his request to Plunkett on 5 September 1986 for the 6 months option to purchase up to 3m shares in Mallina at a price of 30c per share (and his request to Dempster for a similar option). This is particularly significant when regard is had to the fact that at the time the share price of Mallina was between 17 and 18 cents per share. Rakich's letter to Plunkett stated that he believed he "could arrange the financial backing to purchase up to 25% of the holding of Dallas and yourself".

At that time neither Dempster nor Plunkett was prepared to put more money into Mallina. Nevertheless, Rakich's request for an option at 30c per share demonstrates that he considered Mallina to have a good future and was confident as to its viability.

That Rakich's views as to the prospects of Mallina were shared by the board, is graphically demonstrated by Lee-Steere's letter to shareholders of 15 August 1986. This letter was drafted by Rakich, signed by Lee-Steere and in cross-examination none of the directors quibbled to any significant degree with anything said therein.

The letter commenced:

I am delighted to be able to inform you that Mallina Holdings Ltd has significantly improved its financial position since the last annual report and your company is on the threshold of a major phase of expansion.

Your directors have implemented a programme to rationalise some of Mallina's activities and interests and devote greater attention to the development of the company's industrial minerals which are considered to have enormous potential.

Reference was made to the sale of an interest in Katanning Holdings Ltd and a placement of Mallina shares which raised $ 720,000. The letter continued:

The above transactions have substantially improved the financial position of your company with a result in significant reduction in borrowings. Part of the funds have been used to improve the profitability of the attapulgite processing plant with the installation of new screening equipment.

Reference was made to the attapulgite sales increase, as follows:

Sales of attapulgite at $ 1,463,000 for the year ended 30 June 1986 were a record since production began at the Geraldton plant 7 years ago. The figure was 14% higher than for the previous year and a massive 72% up on the sales of $ 852,000 in 1983-84.

It was said that "sales are expected to lift considerably during the 1986-87 year".

Reference was made to the interest which Mallina retained in Katanning Holdings Ltd in these terms:

Your directors expect the value of Mallina's investment in Katanning to show considerable improvement in the future.

The letter dealt with the petrochemical project in the following way: *460 million dollars petrochemical complex*

Mallina is the co-sponsor of a proposal submitted to the Western Australian Government for the construction of a 460 million dollar integrated petrochemical complex. A joint venture has been initiated of Western Australian companies, together with overseas corporations with expertise in the relevant field. We envisage that Mallina will hold a significant equity in this major project. A preliminary feasibility has been completed which indicates the project to be extremely viable, even at today's depressed market prices. We are currently awaiting a decision from the government on the project.

Reference was then made to a process to produce a bleaching earth from attapulgite clay. The letter stated that gold exploration was being maintained and, where warranted, expanded and that the company was continuing its efforts to develop its diatomaceous earth resource. The letter continued:

With so many excellent current and new projects, your directors have made considerable progress towards securing the future of your company.

However, despite the generation of substantial cash through the Katanning transactions and the share placement, additional funds may be needed to finance the various exciting projects that are either being undertaken or are in the pipeline. Such funds, or part thereof, will be raised either by share placements or by a rights issue to all shareholders.

The letter stated that to this end a special meeting was being called for 12 September 1986 to seek shareholders' approval for directors to be given the discretionary power to raise funds as required through share placement.

Shareholders were also informed that the directors would be seeking their approval on three other matters, including the increase of the ceiling of directors' fees to $ 50,000 from the current ceiling of $ 20,000 set in 1981.

Rakich confirmed in his testimony that: "All of our directors, including myself, would have regarded that project as one with significant potential". Yellachich was described by several witnesses as being "bullish" or "buoyant" or "positive" about the project, and he was considered to be an expert in the area. On 21 August 1986 he had, on behalf of Mallina/Dempster Nominees, sent to the DRD a diagrammatic representation of the joint venture's financial model for the project. This showed that, on the assumptions he had made, in 1990 the project was expected to incur a loss of $ 2.62m, but subsequently to make a before tax profit increasing each year from $ 4.31m in 1991 to over $ 70m in 1998 and similar amounts thereafter.

It is the case that "in or around September 1986" Mallina's bank requested Mallina to reduce its overdraft facilities, (and there is some suggestion that similar requests had been made earlier) but according to an affidavit signed by Rakich in other proceedings, in August 1986 "Mallina's financial dealings with its bankers and with the finance companies with which it normally dealt were excellent". From May 1985 to September 1986 over $ 4m in cash had been injected into Mallina from share placements, share issues and sales of assets. Rakich himself testified: "I haven't said that we wouldn't be able to raise the $ 750,000. I have expressed a view that it would be difficult but I haven't said we wouldn't be able to do it".

I regard Lee-Steere's letter to shareholders of 15 August 1986 as the best contemporaneous evidence of the directors' views. This letter was written for a serious purpose, namely to persuade shareholders to invest further funds in the company, and also to justify an increase in the ceiling of directors fees from $ 20,000 per annum to $ 50,000 (the latter purpose hardly being indicative of a public company in serious financial difficulties). The views of the directors could not have been more plainly expressed than by the statement therein that:

We envisage that Mallina will hold a significant equity in this major project. A preliminary feasibility has been completed which indicates the project to be extremely viable, even at today's depressed market prices.

On the basis of these remarks it is apparent that the directors believed that there were very good reasons to proceed with the project, with the object of successfully obtaining the exclusive mandate to do a bankable feasibility study, completing that and being in a position to acquire "a significant equity" in the project at the final stage. This, after all, had always been the ultimate object of Mallina. The directors did not consider in mid-August that Mallina's financial position stood in the way of the company's progress in regard to the project.

All the directors testified that at 15 September 1986 they were concerned at Mallina's financial position and believed it to be in the best interests of Mallina to give up its rights in the joint venture on the terms offered by Dempster to Rakich. I do not accept this testimony, which is in direct contrast to the letter of 15 August 1986.

Mallina had believed throughout 1986, and probably since 1985, that the cost of the mandate that would have to be borne by it would be about $ 750,000. Until September 1986 it had persisted, without hesitation, in pursuing the mandate. While there can be little doubt that the company was experiencing liquidity problems and financial difficulties, the annual report for 1986, the letter of 15 August 1986 and Rakich's request for options are not indicative of a company on the verge of winding up, or receivership (as was suggested). In my view Mallina would have been able to pay between $ 60,000 and $ 100,000 for royalties, had this been considered desirable, and to raise $ 750,000 for a mandate to investigate a project that the directors believed to be "extremely viable".

I consider the directors' evidence on this aspect to be based on rationalisation and self justification after the event. Their contemporaneous statements, in my view, carry far greater weight than their testimony at the trial, by which I was not persuaded.

There is no doubt that Mallina would not have been able to contribute in any significant way to the financing of the petrochemical project had the joint venture been awarded the contract for the construction and undertaking of the complex. But in September 1986 that stage was far away, and, in any event, I repeat that it had always been anticipated that once bankable feasibility had been achieved, finance would be by way of non-recourse loans and investments from large international institutions. In September 1986, as regards the petrochemical project, the financial position of Mallina was only relevant insofar as it bore upon Mallina's ability to fund its share of the expenses relating to preparing the bankable feasibility study and to settle its royalty debts to the government. In my view, Mallina was financially able to attend to these matters.

The advice received by Dempster as to Mallina's prospects of obtaining the mandate and his discussion with Connell

I have already commented adversely on Dempster's reliability as a witness. My impression was that his testimony was given without any attempt to recount accurately and with care the events about which he was being questioned. When cross-examined on critical issues, it seemed to me, his replies were often based on reconstruction and rationalisation designed to achieve the best possible result for his case, but without regard for the truth. The discussion of the credibility issues involving his testimony should be seen in the light of this view.

Dempster's evidence in chief as to what he was told about Mallina's prospects of being granted the exclusive mandate bears close analysis.

According to Dempster's statement, which constituted his evidence in chief, on the morning of 15 September 1986: "either Mr Yellachich or Mr Rakich informed me that the article in the *Western Mail* (ie on 13/14 September 1986) had been the final straw with respect to Mallina's involvement in the joint submission for a mandate for a petrochemical project feasibility study". It is to be emphasised that Dempster, in his evidence in chief, did not expressly say that Yellachich or Rakich told him (Dempster) that he (Yellachich or Rakich) had been given this information by anyone else. On its face the sentence concerned records a personal view by Yellachich or Rakich and not the view of some other person which Yellachich or Rakich was reporting.

Dempster's statement then recounts that he, Dempster, was informed either by Yellachich or Rakich that "someone from Mr Parker's office had informed them that morning that Mr Parker was extremely embarrassed by the further publicity surrounding Mallina." This, in contra-distinction to the prior sentence, is clear evidence of a report having been made to Dempster as to information emanating from a government source concerning the attitude of Parker to Mallina's application. It is, indeed, the only part of Dempster's evidence in chief which constitutes testimony as to what his informant had been told by a person from Parker's office.

Dempster's statement goes on to record that Yellachich said that "it" was the "kiss of death" for any chance Mallina might have had with obtaining a government mandate. It is not clear whether "it" is intended to refer to Parker's embarrassment or the *Western Mail* article of 13/14 September 1986. In any event no averment is made in the statement (and, therefore, in evidence in chief) that Yellachich told Dempster that "someone from Mr Parker's office", or indeed anyone else, had informed Yellachich that Parker's embarrassment or the article was the "kiss of death". The remark concerning the "kiss of death" is, again, evidence of Yellachich's personal opinion.

At the outset I should say that Dempster's informant is hardly likely to have been Rakich, as Dempster arranged to meet Rakich for lunch that day for the purpose of advising him of the information "from Mr Parker's office" which he had received. It is in any event plain from Rakich's evidence that he was not Dempster's informant.

According to Dempster's testimony this leaves Yellachich as the informant. Yellachich did not testify and was in Russia at the time of the trial. Dempster, under cross-examination, said: "My initial recollection was that it was either Mr Rakich or Mr Yellachich. I believe it was Nicholas Yellachich because he was in my office working at the time and he came to me very early on the morning of the 15th, we discussed it ..." Dempster's firming up in cross-examination that Yellachich was the informant is to be contrasted with the uncertainty displayed in his statement in evidence in chief when he said that his informant was either Rakich or Yellachich. When Dempster was asked to identify his informant in previous testimony, given elsewhere, he said he thought it was Rakich. In my view, Dempster, in truth, did not remember who gave him the information that he received on the morning of 15 September 1986 and his testimony that it was Yellachich, which I do not accept, was an attempt at reconstruction.

The following was an exchange between Dempster and myself while he was being cross-examined:

Mr Dempster, you were told by Mr Rakich or Mr Yellachich of the view of someone in the government as to the prospects of Mallina getting the mandate, as I understand your evidence? -- Yes.

Can you please tell me exactly what you were told, using more or less the words of the person who gave you the information? -- Yes, my recollection was that someone, either Parker or Parker's office, had rung to say that the position with Mallina was at an end, in other words, it would not be granted --

Were those the words that were used when reporting to you? -- Yes, in those basic terms, and also the fact that it was -- the kiss of death was the article that appeared on the Friday and Saturday evening in the *Western Mail*.

Was that all you were told? -- No. We were obviously concerned as to how that took place, but early in September, I think it was around the --

No, can you just come back to this advice, the first advice that you were told by Mr Rakich or Mr Yellachich? What precisely was it that you were told? -- That the minister had decided not to proceed with the recommendation to cabinet and that Mallina would not be getting a mandate.

Is that all you were told? -- Yes, I think that was all at the time.

You were not told why, then? -- Yes, because of the problems associated with the royalties. Parker had rung --

Just hold on a minute? -- Sorry.

That's all you were told by Mr Rakich or Yellachich -- Yes, that the matter was at an end and the cabinet --

Because of the problems with the royalties? -- Because of the problems with Mallina and the royalties were a principal factor...

The statement that "either Parker or Parker's office had rung" was not made by Dempster in his evidence in chief -- the reference to the possibility that Parker himself had rung was new. It is not entirely clear whether Dempster intended to convey in the above exchange that he had been told by the informant that Parker or Parker's office had said that "the position with Mallina was at an end, in other words, it would not be granted" or whether this was an opinion being expressed by the informant himself (it should be noted that I had asked Dempster to recount what he had been told "using more or less the words of the person who gave you the information"). Similarly, it is not entirely clear whether Dempster intended to convey that he had been told by the informant that Parker or Parker's office had said that "the kiss of death was the article that appeared on the Friday and Saturday evening in the *Western Mail*." His evidence was however unequivocal when asked: "Can you just come back to this advice, the first advice that you were told by Mr Rakich or Mr Yellachich? What precisely was it that you were told?" He replied: "That the Minister had decided not to proceed with the recommendation to cabinet and that Mallina would not be getting a mandate." Testimony in these terms does not appear in the statement that constitutes Dempster's evidence in chief.

In determining, on a balance of probabilities, what information Dempster was given on the morning of 15 September 1986 concerning decisions taken by Parker about Mallina's prospects of being awarded the mandate regard has to be had to the surrounding circumstances.

I have found that that morning Burke and Parker had decided that it would be politically inappropriate, particularly because of the articles in the *Western Mail*, for the 10 days rule to be waived in regard to the cabinet minute signed by Parker on 15 September 1986, and that, for similar reasons, it would be desirable to call for expressions of interest before deciding to award an exclusive mandate. I have found that they both believed that the continued existence of a dispute with Mallina over royalties might prejudice it when it came to awarding the exclusive mandate. I have rejected the evidence that they decided that Mallina was an unacceptable candidate for the grant of the mandate and that the mandate should not be granted to it. I have pointed out that even on Burke's own evidence, it could not be said that on 15 September 1986 the government had decided that Mallina would not be awarded the mandate.

The facts are that the cabinet minute signed by Parker that morning was not "walked in" and a decision was made by Parker not to grant Mallina and Dempster Nominees an exclusive mandate at that stage but to call firstly for expressions of interest from a number of potential candidates. These facts explain why a report was made to Dempster at all. It is apparent from Dempster's evidence that he (and the directors of Mallina) had hoped that cabinet would grant the joint venture the mandate immediately and that there would be no quasi-public tender. Parker's letter of 8 September 1986 justified an expectation that this would occur. What in fact occurred was a disappointment to the joint venture and it is to be expected that Parker would arrange for Dempster to be given an explanation for what transpired.

These facts also explain why the informant reported that Parker was "extremely embarrassed" by the further publicity surrounding Mallina." In the light of these matters I accept Dempster's evidence in chief that he was told that "someone from Mr Parker's office had informed (the informant) that morning that Mr Parker was extremely embarrassed by the further publicity surrounding Mallina.

The reference to "the further publicity" plainly refers to the article in the *Western Mail* that had appeared the previous weekend and I accept Dempster's testimony in cross-examination that the informant was told that the article and the royalties issue were the cause of the decision that had been taken. I similarly accept that Dempster was told by the informant that Parker had decided not to proceed that morning with the recommendation to cabinet, and that Parker came to that decision by reason of the publicity and "the problems associated with the royalties." After all, by agreeing that the minute should not be "walked in", Parker in fact decided not to proceed with the recommendation to cabinet.

I reject the evidence given by Dempster, in cross-examination, to the effect that the informant told him that someone in Parker's office had advised him that the position with Mallina was "at an end", that the article was the "kiss of death" to Mallina's prospects of ever getting the mandate and that Parker had decided Mallina would never be granted the mandate. I reject this evidence as I consider that Dempster's testimony in regard thereto cannot be relied upon and is a deliberate embellishment of the facts to advance his case.

Mr Martin QC, senior counsel for Dempster Nominees and Dempster, referred to the fact that Dempster had obtained, from an intermediary, the information which he conveyed to Rakich. He submitted that as that intermediary did not testify, a finding that the report made by Dempster to Rakich was false would be based on mere conjecture. He pointed out that the intermediary may have misunderstood what he was being told and submitted that there was no foundation for any such finding. He drew attention to the distinction between inference and conjecture and relied on authorities such as Luxton v Vines (1952) 85 CLR 352 at 358;[1952] aLR 308,and ; Nominal Defendant v Owens (1978) 22 ALR 128 at 132-3.I have however made my findings as to what Dempster was told by accepting, in effect, all of his evidence in chief on this issue, part of his evidence in cross-examination, and rejecting other testimony given by him in cross-examination.

Dempster's telephone conversation with Connell

The advice that cabinet would not be considering the mandate that day and that expressions of interest were being sought would have distressed Dempster, who had hoped that the mandate would be granted there and then. Dempster regarded the petrochemical project as a major enterprise, having great potential, and likely to bring great rewards to the successful proponents.

Dempster's concern would have been exacerbated by the information that the reasons for the decision were based on the publicity about the royalties. According to Rakich, when the first article appeared in the *Western Mail* Dempster was angry, and forecast problems for the joint venture in consequence. In my view Dempster decided there and then that Mallina was something of an albatross around his neck and should be removed.

That morning, having received the news from his informant, Dempster telephoned Connell. Dempster contacted Connell because he perceived Connell "to be a man of enormous wealth" who "had a certain amount of influence with the Government of the day". Connell was obviously a more desirable partner than Mallina.

Dempster told Connell that Mallina and his family company had made submissions to the Government seeking an exclusive mandate to carry out a feasibility study into the construction of the petrochemical project. Dempster said that in view of the bad publicity surrounding Mallina's non-payment of royalties, the minister had expressed grave concerns about Mallina and he, Dempster, had been informed that Mallina "would be or had been" rejected by the government as a suitable entity to carry out the feasibility study. Dempster said that he believed in the concept but he felt that it needed strong financial backing for it to get anywhere with the government. Connell said that he would be interested in joining Dempster as a joint partner to a submission for a mandate and that his company could act as a financier. Connell said that they could perhaps form a joint venture company.

The conversations between Dempster and Rakich on 15 and 16 September 1986

Dempster thereupon invited Rakich to lunch that day at Simon's Seafood Restaurant. According to Dempster he told Rakich at lunch that "in view of Mallina's obvious difficulties it would not be awarded the mandate". He said that he had a proposal for Rakich. He said that "L R Connell and Partners could reimburse Mallina for the monies Mallina expended on the preparation of the previous applications and obtaining any information, technical or otherwise, for a mandate." Dempster said that he would ensure that Mallina was not only reimbursed, but made a profit on such sum.

Rakich said that he would have to discuss it with his directors, but that his recommendation would be that if Mallina could not only get its money back but make a profit on its expenditure, it would obviously be in its best interests.

Dempster said that if the directors were happy to proceed with that cause then he would "try a joint application in a new company with L R Connell and Partners which I would own 50/50 with L R Connell and Partners".

Dempster said that "should a joint venture company be awarded the mandate and then subsequently be awarded the right to build such a project and if the project got under way and was floated on the stock exchange I would ensure that Mallina had the right, subject to its ability to do so, to subscribe for up to 10% of the equity capital". Dempster said that he would invite Rakich to join the board of a new joint venture company that could be formed.

Rakich's version of these conversations is as follows:

During that lunch Dempster said to me, or said words to the effect of "I have been advised that the government does not want to award an exclusive mandate to develop a petrochemical complex to a joint venture involving Mallina because Mallina is not seen as having sufficient financial strength to participate in such a project. Because of this I have had preliminary discussions with Connell to join with him in pursuing the development of a petrochemical complex. It is proposed a new company be formed which would be owned by Connell and me on a 50/50 basis and Connell and I are to each nominate two directors to go on the board of a new company".

And further:

The previous submissions of the joint venture contain information which would be useful for any future submissions. I will arrange for Mallina to be reimbursed for the costs and expenses it has incurred in preparing its previous submissions.

And further:

I am sorry about how the government's decision will affect Mallina. However, I intend that Mallina will be involved in the project further down the track. If the project goes ahead and is floated on the Stock Exchange I will ensure that Mallina is given the right to subscribe to up to 10% of the capital in that company. I will make this available from my own 50% holding. As a further sign of good faith to Mallina and to secure my undertaking to Mallina that Mallina will have the right to subscribe I invite you to join the board of a new company.

Under further questioning Rakich said that Dempster had told him the following which -- he said -- Dempster told him had emanated from Parker's office:

(T)he Minister had been embarrassed by the revelations in the *Western Mail* about Mallina's non-payment of royalties; that we were considered a political liability because of the article that the Minister had quashed an internal departmental investigation on the royalty situation; that they felt that they would be -- that putting up -- giving a mandate to Mallina for a project which was an international standard project -- that the Government would be held up to ridicule in international circumstances.

To summarise therefore -- on the evidence of Dempster and Rakich -- Dempster told Rakich that his informant had advised him that someone at Parker's office had reported that:

(a) In view of Mallina's obvious difficulties it would not be awarded the mandate.

(b) The government did not want to award an exclusive mandate to develop a petrochemical complex to a joint venture involving Mallina because Mallina was seen as not having sufficient financial strength to participate in such a project.

(c) The minister had been embarrassed by the revelations in the *Western Mail* about Mallina's non-payment of royalties.

(d) Mallina was considered a political liability because of the report in the article that the minister had quashed an internal departmental investigation on the royalty situation.

(e) "They" (the cabinet or the government) felt that if they gave a mandate to Mallina for an international standard project, the government would be held up to ridicule.

I accept that the aforegoing is what Rakich was told by Dempster. These representations are to be contrasted with my findings that Dempster had only been told by his informant that:

(i) Parker was "extremely embarrassed" by the further publicity surrounding Mallina.

(ii) Parker had decided that the minute should not be "walked in" so that he would not proceed that morning with the recommendation to cabinet.

(iii) Burke and Parker had decided that expressions of interest should publicly be called for before any award of the mandate were to be made.

(iv) The article and the royalties issue were the cause of the decisions that had been taken.

An issue of some importance is whether Dempster told Rakich at the lunch that he had arrived at a firm agreement with Connell. There was some conflict in the accounts given by Rakich on this question but in my view the position is that Dempster told Rakich in effect that he had arrived at an agreement in principle with Connell.

On 15 September, according to Rakich, Dempster asked him what expenditure Mallina had incurred to date on the petrochemical project. On returning to his office, he instructed the accountant to give him that information which he passed on to Dempster. On 16 September 1986, the next day, Rakich telephoned Dempster to say that "his directors had agreed to Dempster's proposal, that he had calculated Mallina's expenditure at about $ 75,600 and that upon repayment of an appropriate sum, it would no longer pursue a mandate, and would transfer all its rights and interests it had in any information". On the other hand, Dempster's evidence is that the offer to pay $ 150,000 was made on 15 September, and other directors of Mallina testified that Rakich told them on 15 September that Dempster was offering $ 150,000 to Mallina. It is not clear to me at what particular stage Dempster mentioned the offer of $ 150,000 but that does not seem to be significant.

On one further issue Dempster and Rakich differ significantly as to what was said between them on 15 September, and that is as to whether Dempster told Rakich that Deinpster Nominees would be paid $ 250,000 by Connell, as part of the proposed transaction with him.

On 16 September 1986 Dempster wrote to Connell as follows:

Re Petrochemical Complex - Western Australia

This letter is to confirm the arrangements agreed and the steps to be taken for our joint venture of the above complex.

I have today instructed Robinson Cox, solicitors, to form a public company, with a name as close to Petrochemical Industries Company Ltd, as is possible.

The directors will be: Dallas Reginald Dempster, Chairman, Lawrence Robert Connell, Peter Kenneth Lucas and Peter Brian Rakich.

Dempster Nominees Pty Ltd will hold 50% of the equity and L R Connell and Partners, 50% equity.

L R Connell and Partners will pay $ 150,000 to Mallina Holdings Ltd, and $ 250,000 to Dempster Nominees Pty Ltd, to acquire a 50% equity in the proposal. This will enable Mallina Holdings Ltd and Dempster Nominees Pty Ltd to write to the Hon Minister, advising him of the joint venture company's name for the granting of an exclusive mandate to investigate the viability, and then the construction of a petrochemical complex in Western Australia.

I would appreciate you forwarding your cheques to me so that I can arrange for the letter to be issued to the Minister forthwith.

On issuance of the mandate, we could, within six (6) months, have the fully bankable proposal and State agreement finalised. The "key" Chemical Engineer, Mr Nicholas Yellachich, is on a full-time basis with me, here in Perth, and he will now work directly for our new company.

I look forward to the successful completion of this project with you.

Dempster testified that he discussed the terms of this letter with Rakich on 15 September, the day before he sent it, and told him everything that appears in the letter except he might not have told him who the auditors would be.

In his testimony Rakich said: "I don't have a recollection of being told that Mr Connell would pay any money to Dempster Nominees". And again: "It's my present recollection that on either 15th or 16th September I was not told that". He was asked if he could have forgotten this had he been told, and he said: "I wouldn't have thought so". Later he said that he might indeed have forgotten that he had been told that $ 250,000 had been paid to Dempster Nominees by Connell. I do not accept his retraction in this regard. In my view it is most unlikely that Rakich would have forgotten this piece of information had it been given to him, and I did not find convincing his later statement that he might have forgotten.

My finding is that Dempster did not tell Rakich that Connell would be paying him, Dempster, $ 250,000.

The conversations between Rakich and the other directors

The evidence relating to what Rakich told Lee-Steere, Wallis and Griffin about his conversation with Dempster on 15 September 1986 is substantially consistent.

Typical of these conversations is that between Rakich and Wallis. Rakich told him that:

We had been refused a mandate to proceed with that and also that we could receive $ 150,000 and in addition to that we had been promised that we would have the opportunity to acquire an equity in due course.

And, further:

I have spoken to Dallas Dempster and he told me that the Government has rejected the Dempster/Mallina proposal because of Mallina's financial position. This has been brought to light by Mallina's non-payment of royalties. However, Dallas undertook to do his best to include Mallina in the project if it was in fact successful at a later date and if it was floated publicly. He said he would do his best to ensure that Mallina had the right to subscribe on a commercial basis for 10% of issued shares in the new company when and if it was offered to the public. Dallas also said that another party had offered $ 150,000 for a reimbursement of Mallina's costs and to buy information that had been gathered so far.

It is not necessary to recount the other evidence on this issue which is all more or less in the same terms and which I have no reason to doubt.

The transaction between Dempster and Connell and the establishment of PICL

At some stage on 15 September 1986 (and it is not clear precisely when) Dempster had a further discussion with Connell. He told Connell of Mallina's decision to withdraw. He informed Connell that Mallina had expended $ 75,600 in relation to the previous submissions and that he would be "looking for" Mallina to receive $ 150,000. Connell said he would pay that sum but that he needed to receive a breakdown of Mallina's expenses. Dempster informed Connell that he would require $ 250,000 for the costs which he had expended (even though he believed that he had spent about $ 750,000 by that time). Dempster said to Connell that "providing he (Connell) paid $ 150,000 to Mallina and $ 250,000 to Dempster Nominees, we would then form a company with Dempster Nominees and L R Connell and Partners starting on an equal basis from then on dollar for dollar which would pursue the mandate". Connell agreed.

It was further agreed that Dempster would be the project manager and Connell, would be the financier. The fee structure of the project manager was agreed to be "5% feasibility stage and then 5% for supervision at construction". The 5% was to be of the estimated cost of the project at the feasibility stage and the further 5% was to supervise the construction when the project proceeded. Connell would charge the normal standard fees for arranging funding.

Dempster thereupon instructed his solicitors to obtain a public unlisted shelf company. On 16 September 1986 he dictated the letter to Connell to which I have referred above. He also drafted a letter to be sent by Mallina to Parker and forwarded it to Rakich for his signature. On 19 September 1986 Rakich returned the signed letter to him. The letter (in the following terms) was then sent to Parker.

Re Proposed Petrochemical Complex Mandate - Western Australia

This letter is to formally advise you that an unlisted public company Petrochemical Industries Company Ltd has been registered to carry out the mandate to develop the above complex.

The company's registered office will be ...

The directors of the company will be:

Dallas Reginald Dempster (Chairman), Lawrence Robert Connell, Peter Kenneth Lucas, and myself, Peter Brian Rakich.

The company is a joint venture between Dempster Nominees Pty Ltd and L R Connell and Partners, and it is proposed that at an appropriate time the company will be listed on the Associated Stock Exchanges of Australia.

B F Goodrich licensed technology will be the basis of project and marketing strategy to prove a bankable viability. Foster Wheeler will be commissioned to carry out the engineering aspects. Mr Nicholas Yellachich, Chemical Engineer will be in charge of the project and other key personnel will be appointed as soon as the mandate is given.

Thus, after approaching Rakich on 15 September, and coming to an agreement with him on 16 September, by 19 September Dempster had reached agreement with Connell and had taken steps to find an appropriate company and to have appropriate persons appointed as directors.

The benefits to Dempster from the transaction with Connell

At the time of the deal between Connell and Dempster in September 1986, Dempster held 25.2% of the shareholding in Mallina. By Mallina giving up its interests in the joint venture, Dempster lost the rights he would have had to participate as a shareholder to that extent. But there were short and long term advantages to him in Mallina being replaced by Connell.

First, Connell was a far more desirable partner than Mallina in what was plainly to be a gigantic project certain to have problems of a political and financial nature. Connell was thought to be enormously wealthy and to have considerable influence with the government. He could therefore contribute significantly in both problem areas.

Mallina on the other hand had liquidity problems and was not financially strong. Not only did it have no influence with the government but it was in dispute with the mines department through the attapulgite royalties and had caused Parker embarrassment.

There were also substantial financial pickings available through the transaction with Connell. The 5% project management fee relating to the estimated cost of the project at the feasibility stage would entitle Dempster to up to $ 30m and the subsequent 5% management fee relating to supervising the construction would entitle Dempster to up to a further $ 30m. In fact $ 10m was later paid as a project management fee to Dempster Nominees (but reversed as part of the transaction whereby the Dempster entities received $ 50m). These monies were raised by PICL by way of loans and paid to Dempster Nominees.

Dempster also received about US$ 1.4m in Hong Kong through a company known as Gofair Investments Ltd (Gofair) of Hong Kong, a company which was the trustee of a blind trust but which in effect was controlled by Connell and Dempster. Dempster, under cross-examination, accepted that, in September 1986, when he and Connell "got together", it was his intention that money from the project would go to him and Connell through a company such as Gofair. The moneys passing to Dempster Nominees through Gofair were described as consultancy fees. Dempster agreed that the movement of moneys through Gofair would not have been done in the joint venture with Mallina.

These matters were strong incentives to Dempster to arrange for Mallina to be replaced by Connell in the transaction.

PICL completes the bankable feasibility study and Dempster and Connell sell their interests

After September 1986 Yellachich continued to be paid as a consultant, either directly by PICL or Dempster Nominees (which was reimbursed by PICL). His connection with Mallina was severed and he was retained apparently by PICL.

In January 1987 PICL submitted a feasibility report to the government as part of its application for an exclusive mandate to prepare a bankable feasibility study. According to Professor Smith, an expert in the field of chemical engineering and metallurgical engineering, the pre 1987 feasibility reports submitted by Mallina and Dempster Nominees to the DRD provided the basis for the preparation of the January 1987 report submitted by PICL to the government. According to Professor Smith "some sections have been revised and updated but there is no doubt that particular sections of the pre 1987 reports appear in the January 1987 report". He said (and his evidence was not challenged):

The information gathered for the 1985 and 1986 reports would have been extremely useful in the preparation of the January 1987 report. Much of the ground work carried out in compilation of the 1985 and 1986 reports would not have needed to be repeated for the January 1987 report. The January 1987 report was to a large extent derivative from and based on the pre 1987 reports.

On 28 January 1987 Dempster was informed by the department of the premier that the cabinet had agreed to give PICL the exclusive mandate.

From February 1987 until June 1987 Yellachich and others worked full-time on the preparation of the feasibility study which was submitted to the Government in July 1987.

In October 1988 Dempster and Connell's interest in the petrochemical project were transferred to BCH and WAGH. This was done by a series of extraordinarily complex steps. Prior to those steps a company associated with Connell and other entities associated with Dempster each held 50% of the issued shares in PICL. At the conclusion of those steps the Connell company and the Dempster entities had divested themselves of their interests which had become held by BCH and WAGH. The Connell company received $ 350m at the conclusion of those steps and the Dempster entities $ 50m. No explanation was proffered for the very strange difference in the consideration received by the two equal shareholders.

Was Dempster a de facto director of Mallina?

The plaintiffs sought to hold Dempster liable to Mallina for breach of fiduciary duties as a de facto director of Mallina. This proposition was but faintly advanced by Mr Bainton QC, senior counsel for the plaintiffs, and in my view, there is no evidentiary basis for it. The pleaded particulars of this allegation were not made out and in my opinion the evidence does not establish that Dempster -- in his conduct on 15 and 16 September 1986 -- was acting in that capacity.

The fiduciary duties owed by Dempster Nominees by reason of the joint venture and their breach

Mallina and Dempster Nominees associated together for the purpose of undertaking a single, but continuing venture out of which they hoped to make profits which they agreed to share equally. It is not necessary to decide whether they were partners in the strict sense (although I think that they probably were) or whether they were joint venturers. Whatever the characterisation of their relationship, it was plainly based upon mutual confidence and trust.

There was a sharing of employees, consultants, knowledge and the fruits of investigation. It was expected that the officers, employees and consultants of each of the two companies who carried out investigations and obtained relevant information would use that information for their joint benefit. Similarly, it was expected that, as representatives of each company developed relationships of some intimacy with overseas institutions, State Government officials and ministers, those relationships would be used for their mutual benefit.

After Dempster resigned as chief executive director of Mallina, Rakich was content to leave the progress of the petrochemical project in the hands of Dempster, the managing director of Dempster Nominees. Mallina trusted Dempster to use the information and knowledge so gathered by him to advance the prospects of the joint venture.

Their relationship was founded on the mutual trust and confidence of each in the skill, knowledge and integrity of the other. In the words of Mason, Brennan and Dean JJ in United Dominions Corp Ltd v Bryan Pay Ltd (1985) 157 CLR 1 at 13 each participant in the joint venture "was under a fiduciary duty to refrain from pursuing, obtaining or retaining for itself or himself any collateral advantage in relation to the proposed project without the knowledge and informed assent of the other participants". Further, each of the participants in the joint venture owed a duty of the utmost good faith to the other: ; United Dominions Corp Ltd v Bryan Pty Ltd at 6 per Gibbs CJ. Dempster Nominees, when obtaining the cooperation of Mallina on a matter in respect of which Mallina had no other information on the subject other than that which it, Dempster Nominees, chose to convey, was required to display the utmost candour and honesty: ; Directors, etc of Central Railway Company of Venezuela v Kisch [1867] LR 2 HL 99 at 113 per Lord Chelmsford LC. In addition, in a situation where, on the one hand, Dempster Nominees stood to gain benefits if Mallina retired from the joint venture (and was replaced by Connell) and Mallina, on the other, could suffer detriment by retiring, and Dempster Nominees was conveying information to Mallina relevant to Mallina taking that decision, other important fiduciary duties were imposed on Dempster Nominees. To paraphrase Kindersley V-C in ; New Brunswick and Canada Railway Co v Muggridge (1860) 1 Dr & Sm 363 at 381,cited by Lord Chelmsford in ; Directors, etc of Central Railway Co of Venezuela v Kisch, Dempster Nominees was bound to state everything with strict and scrupulous accuracy, and not only to abstain from stating as fact that which was not so, but to omit no one fact within its knowledge the existence of which might in any degree affect the decision to be taken by Mallina. See also ; Erlanger v New Sombrero Phosphate Company (1878) 3 App Cas 1218; ; Nocton v Lord Ashburton [1914] AC 932; ; Hill v Rose [1990] VLR 129 at 144 at 141;; Commonwealth Bank of Australia v Smith (1991) 102 ALR 453 at 477-8; ; Canson Enterprises Ltd v Boughton and Company (1991) 85 DLR (4th) 129 at 141-3 (per La Forest J).

Put simply, there was an obligation on Dempster (on behalf of Dempster Nominees) to make a full and accurate disclosure to Rakich (on behalf of Mallina) of the facts that Dempster learned from his informant on 15 September 1986.

I have, under the heading "The conversations between Dempster and Rakich on 15 and 16 September 1986" set out my findings as to what Dempster was told by his informant on 15 September 1986 and what he

told Rakich as to what he had been informed. It is apparent from those findings that there were serious inaccuracies in what Dempster told Rakich.

It is not to the point whether those inaccuracies were conveyed deliberately or whether they were conveyed recklessly by Dempster: Nocton v Lord Ashburton. I consider, however, that the probabilities are that Dempster knowingly misrepresented the true facts to Rakich. Accordingly, the misrepresentations made by Dempster to Rakich constituted a serious breach of the fiduciary obligations owed by Dempster Nominees to Mallina.

Whatever liability attaches to Dempster Nominees for such breach also attaches to Dempster; he knowingly having assisted Dempster Nominees in that breach and having deliberately persuaded Mallina to give up its rights to the exclusive mandate so as to be able to substitute Connell for Mallina as the co-joint venturer of Dempster Nominees: Barnes v Addy; ; Consul Development Pty Ltd v DPC Estates Pty Ltd (1975) 132 CLR 373;5 ALR 231.

The breach by Dempster Nominees of its fiduciary duties: the payment of $ 250,000

The plaintiffs' claim that Dempster Nominees, through Dempster, had committed a breach of its fiduciary duties in regard to the payment to Connell of $ 250,000 was introduced into the pleadings at a very late stage of the trial. The critical document on which the claim was largely based -- the letter from Dempster Nominees of 16 September 1986 -- was discovered late by Dempster Nominees and produced either shortly before the trial or after the trial had commenced. Because of the late discovery and production Mr Bainton only saw the letter after the trial had commenced. Cross-examination took place on this issue without objection. I offered Mr Martin the opportunity to recall any witness he wished for cross-examination if he considered he had been taken by surprise by the introduction (which in my view he had not). The offer was declined. In the circumstances I allowed the amendment introducing the claim.

The claim was put in this way. It was said that on 15 September 1986 Dempster, either on his own behalf or as the agent for Dempster Nominees, entered into an agreement with Connell whereby Dempster Nominees agreed to cause Mallina's interest in the joint venture to be transferred to a company to be jointly owned by Dempster Nominees and Connell. It was said further that in the implementation of that transaction Dempster Nominees received from Connell the sum of $ 250,000 for its own benefit and did not disclose that receipt to Mallina. It was submitted that the receipt and retention of that sum was a breach by Dempster Nominees of its fiduciary duty to Mallina.

It was suggested by Rakich and by other directors of Mallina, and it was also submitted on their behalf by Mr Clifford, counsel for the other directors, that all Mallina had done in consideration for the $ 150,000 from Connell was to give to Connell the information which it had obtained as a joint venturer with Dempster Nominees. Mr Martin, on behalf of Dempster Nominees, also put forward this proposition. In my view it is without substance. Mallina was in possession of far more than information. For some 21 months the joint venture had actively been pursuing with the government the proposal that it should be awarded the exclusive mandate. By 15 September 1986 the progress of the joint venture was significantly advanced. Not only had the participants developed their proposal to a degree where they were in a position to persuade the government to grant it the mandate, they had established important business relationships with the government, the DRD, highly reputed international institutions who would be interested in advising or investing in the proposed joint venture, and had built up a multi-faceted goodwill in regard thereto. Further, as Rakich accepted, the joint venture was some months ahead of any other potential competitors, and this was a significant advantage when assessing the prospects of the joint venture being awarded the exclusive mandate.

The withdrawal of Mallina allowed Connell to replace it, to take over its share of the goodwill that had been established and to pursue the other advantages that had accrued to it. The intangible goodwill and other advantages that Mallina had acquired as a participant in the joint venture were assets of value. Prior to 15 September 1986 Mallina possessed the opportunity to participate in the exclusive mandate and further advancement of the petrochemical project, and to make the profits that might in consequence ensue. Through Dempster's conduct it lost that opportunity which was given to Connell.

Mr Martin submitted that on analysis all that had happened was the following:

(a) Mallina had agreed to withdraw from the joint venture and to transfer information to Connell for $ 150,000.

(b) Mallina was indebted to Dempster Nominees for the excess expenditure incurred by Dempster Nominees on the joint venture's behalf, over and above its 50% share.

(c) Dempster Nominees merely agreed with Connell that Connell could take his place in the joint venture without there being any indebtedness attaching to him in relation to the past debts incurred by Mallina, on payment of $ 250,000 to Dempster Nominees.

I may well not have done justice to Mr Martin's submissions in this regard. The fact is that any analysis of the transaction in an attempt to place each element in a legal pigeon hole is artificial. The parties to the transaction did not apply their minds to the legal elements of what they were doing. They merely intended to bring about a particular result and did so. Mallina wished to give up its rights to the joint venture and was content to transfer whatever rights it had to Connell for $ 150,000. For that reason Rakich agreed to sign the letter to Parker of 19 September 1986 in which he advised that PICL would carry out the mandate. Connell, who is to be treated as an innocent third party, was willing to pay $ 400,000 to take Mallina's place in the mandate. Dempster Nominees wished to arrange for Mallina to give up its rights in the joint venture, to have Connell as its joint venture partner, and to receive $ 250,000. As Dempster wrote to Connell on 16 September 1986: when confirming: "... the arrangements agreed and the steps to be taken for our joint venture of the above complex", what was to occur was that "L R Connell and Partners will pay $ 150,000 to Mallina Holdings Ltd, and $ 250,000 to Dempster Nominees Pty Ltd, to acquire a 50% equity in the proposal".

Dempster sought to justify the payment to him of $ 250,000. He said that payment was "proper": because of the amount of money that both companies had contributed. It was only fair and reasonable that Dempster Nominees should be reimbursed for its extra costs involved, and the fact is that Mallina itself was put in a position where it received double the money it had contributed.

I do not accept this argument. Whether it was "fair and reasonable that Dempster Nominees should be reimbursed for its extra costs involved" is open to question. I have pointed out that it is by no means clear that Mallina and Dempster Nominees were to share the costs incurred by the joint venture equally. At the very least, by not informing Mallina of his intentions with regard to the $ 250,000, Dempster prevented Mallina from putting its contentions and negotiating in this regard.

The information that was withheld from Mallina was material not necessarily because it would or might have caused Mallina to act differently, but because it was essential to the decision which Mallina had to make: Hill v Rose at 142.

Further, the fact that Mallina "received double the money it had contributed" is not to the point. The true question is whether Mallina received all the relevant information in Dempster Nominees' possession, which should have been given to it (ie Mallina) with the utmost candour and honesty consonant with Dempster Nominees' fiduciary obligations, so as to enable it to make a properly informed decision.

In my opinion Dempster Nominees, in failing to inform Mallina that it was to receive $ 250,000 from Connell, and in retaining that sum, committed a breach of its fiduciary duties of candour and honesty. Dempster is similarly liable to the same extent as Dempster Nominees, he having knowingly assisted Dempster Nominees in that breach.

Was there a breach by Rakich and Griffin of their fiduciary duties?

The plaintiffs contend that Rakich complied with Dempster's wishes, knowing that he was allowing an opportunity to be taken from Mallina by Dempster for Dempster's own benefit and advantage, and that he, Rakich, thereafter knowingly assisted in that deprivation by persuading his fellow directors to concur in the decision to withdraw from the joint venture.

There is no direct evidence justifying this contention. Further, in my opinion it is not established by inference that Rakich knew that Dempster was misrepresenting the situation when he spoke to him on 15 September 1986.

I should deal specifically with the submission that Rakich, as chief executive director of Mallina, had been less than candid in giving replies to the plaintiffs over a lengthy period when they were attempting to ascertain precisely what occurred when Mallina gave up its rights as a participant in the joint venture, and that Rakich, in that capacity, had not provided proper discovery of the relevant documents in the case. It was said that an inference should be drawn from this conduct to the effect that Rakich was attempting to conceal his dishonest participation in a scheme by Dempster. I accept that Rakich was less than candid in certain replies; but the inference from that is equally open that he wished to protect himself from claims for negligence. I also accept that discovery was not as timeous and complete as it should have been, but I am not persuaded that I should infer from that that Rakich was in effect conspiring with Dempster.

I consider that Rakich was ignorant of any wrongdoing by Dempster. In my view, Rakich trusted Dempster and believed everything that Dempster told him.

The plaintiffs also submit that it should be inferred that Grimm also had knowledge that Dempster was misrepresenting the situation. This submission was based in effect largely on the fact that Griffin was an employee of Dempster Nominees. In my opinion there is no justification for the inference that the plaintiffs seek to be drawn.

The element of "control" in the fourth exception to the rule in Foss v Harbottle: the relevant time for assessment

In determining whether the plaintiffs are entitled to claim for the breach of fiduciary duties that has been established, regard must be had to the cardinal principle that the proper plaintiff in an action relating to a wrong alleged to be done to a corporation is, prima facie, the corporation. This principle is generally referred to as the rule in Foss v Harbottle, to which there are recognised exceptions.

In Prudential Assurance Company Ltd v Newman Industries Ltd (No 2) [1982] 1 Ch 204 the Court of Appeal (constituted by Cumming-Bruce, Templeman and Brightman LJJ) described what is commonly referred to as the fourth exception to the rule in ; Foss v Harbottle in the following terms:

There is an exception to the rule where what has been done amounts to fraud and the wrongdoers are themselves in control of the company. In this case the rule is relaxed in favour of the aggrieved minority, who are allowed to bring a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue.

The reference to those "in control of the company" is prima facie "a reference to those who command a majority of the votes at an ordinary general meeting of the company": Eromanga Hydrocarbons NL v Austrails Mining NL (1988) 13 ACLR 804;14 ACLR 486;6 ACLC 906 at 909 (per Malcolm CJ).Examples of "control" being determined in this manner are several. It is sufficient to refer to ; Mason v Harris (1879) 11 Ch D 97, ; Russell v Wakefield Water Works Company [1875] LR 20 Eq 474 at 482,and ; Daniels v Daniels [1978] 1 Ch 406.

The plaintiffs seek to bring their claims under the fourth exception. All the defendants argue that the plaintiffs have not established that, at the relevant time, Dempster Nominees and Dempster controlled Mallina in the sense to which I have adverted.

It is necessary to appreciate that this is a consolidated action. The first action was commenced in 1989. The second action was commenced in 1992. By order dated 24 July 1992 the statement of claim dated 11 June 1992 in the second action was ordered to stand as the statement of claim in the consolidated action. It was accepted by all counsel that the date of the writ for the purposes of the consolidated action should be regarded as 11 June 1992.

It is common cause that at the date of the issue of the writ Dempster and Dempster Nominees controlled substantially more than 50% of the issued capital of Mallina.

Accordingly, if the date at which "control" of Mallina is to be determined for the purposes of deciding whether there has been a fraud on the minority is the date the writ was issued, the plaintiffs have made out the necessary elements of their case. They have established that Dempster Nominees is in breach of fiduciary duties owed to Mallina, that Dempster is equally liable on the basis that he knowingly assisted Dempster Nominees in the breaches, and that the board of Mallina has refused to bring proceedings for appropriate relief arising out of such breaches and has indeed resisted the plaintiffs' attempts to procure that such an action be brought. Further, as at the date of the issue of the writ, Dempster Nominees and Dempster were in control of Mallina and were in a position to and would have prevented the general body of shareholders from exercising their powers to require that proceedings against them be brought. It is true that Dempster was then not a director of Mallina, but on the facts I have outlined the situation was one in which the majority of shareholders were able to exercise their powers to prevent the company from recovering substantial compensation from them for the loss brought about by the majority's breach of fiduciary duties. That is a blatant case of fraud on the minority shareholders.

The defendants submit however that the appropriate date for determining the question of control is not the date of the issue of the writ but the date of the trial. Between the issue of the writ and the commencement of the trial Dempster Nominees and Dempster disposed of a substantial portion of their shareholdings in Mallina. These disposals occurred between September 1992 and April 1993. The defendants alleged that at the date the trial commenced the majority of the shares in Mallina were held by shareholders who were not under the control of Dempster Nominees and Dempster. On this basis, it is submitted, a crucial element necessary to establish the existence of a fraud on the minority is missing. It has not been established, according to the defendants, that the majority of shareholders can or will prevent Mallina from instituting the action now brought by the plaintiffs.

I have not been referred to any authority where this issue has been squarely considered. In Foss v Harbottle itself, the relevant date was considered to be the commencement of the proceedings. As was said by Sir James Wigram V-C at 502, the plaintiffs were required to show "the actual state of things at the time their bill was filed". This assumption has been made in several cases. In ; Alexander v Automatic Telephone Company [1900] 2 Ch 56 the issue was whether "when this action was commenced" the defendants "held

such a preponderance of shares that they could not be controlled by the other shareholders". These remarks were referred to with apparent approval by Templeman J in ; Daniels v Daniels. Similar language is used in ; Hurley v BGH Nominees (1982) 31 SASR 250 at 254 and 256;6 ACLR 791.In none of these cases was the point properly in issue and the remarks made merely reflect what the judges concerned took for granted.

There are serious practical difficulties in regarding the question of control as being, according to the term used by counsel for the defendants, "ambulatory", in an unrestrained sense. If the question of control were to be absolutely ambulatory, it is arguable that the date of the trial, itself, should not necessarily be the critical date. Why should that not be any time before evidence is concluded? Or after addresses and before judgment is delivered? And what occurs if there is a change in shareholding after the delivery of judgment and before the hearing of an appeal?

Mr Bainton submitted that the practice of sometimes determining the question of control as a preliminary issue is inconsistent with the date of the trial being the relevant date. He argued that that would necessitate a degree of judicial foresight not judicially available.

Mr Martin and Mr Clifford relied on cases such as Bamford v Bamford [1970] Ch D 212;; Hogg v Cramphorn [1967] 1 Ch 254 and ; Winthrop Investments Ltd v Winns Ltd [1975] 2 NSWLR 666;1 ACLR 219 for their submission that control was to be determined at the commencement of the trial. It is to be observed that these are not cases which were concerned with the fourth exception to the rule in ; Foss v Harbottle. They are cases involving the third exception, concerned with allegations that personal rights of shareholders had been infringed, or were about to be infringed, and that the wrong to the plaintiff could not be rectified by an ordinary resolution of the company. They generally involve the question whether proceedings should be stayed pending possible ratification by the company, in general meeting, of the wrongful conduct. Ratification of a wrong is different in principle to the question of control, in a derivative action, relevant to whether there has been a fraud on the minority shareholders. The question of ratification is in effect a defence of confession and avoidance. The question of whether there has been a fraud on the minority is an element of the plaintiffs' cause of action. In my opinion not a great deal of assistance can be obtained from these cases.

In Prudential Assurance Company Ltd v Newman Industries (No 2) the Court of Appeal said at 221:

(The trial judge) ought to have determined as a preliminary issue whether the plaintiffs were entitled to sue on behalf of Newman by bringing a derivative action. It cannot have been right to have subjected the company to a 30 day action (as it was then estimated to be) in order to enable him to decide whether the plaintiffs were entitled in law to subject the company to a 30 day action.

And at 221-2:

In our view, whatever may be the properly defined boundaries of the exception to the rule, the plaintiff ought at least to be required before proceeding with his action to establish a prima facie case that the company is entitled to the relief claimed, and (ii) that the action falls within the proper boundaries of the exception to the rule in Foss v Harbottle. On the latter issue it may well be right for the judge trying the preliminary issue to grant a sufficient adjournment to enable a meeting of shareholders to be convened by the board so that he can reach a conclusion in the light of the conduct, and proceedings at, that meeting.

In my reasons delivered on 3 August 1993 I explained why I thought it inappropriate, in the circumstances of this case, to have determined -- as a preliminary issue -- whether the plaintiffs were entitled to sue on behalf of Mallina by bringing a derivative action. I was satisfied, as I indicated, that a prima facie case existed. I declined, for the reasons given, to adjourn the hearing to enable a meeting of shareholders to be

convened by the board. Nevertheless, the remarks made by the Court of Appeal are consistent with a view that the question of control remains a live issue to be determined even after the trial has commenced.

In my view the issue raised can only be decided by reference to the pleaded issues. In order to appreciate how the pleadings developed it is necessary to give a brief historical account of what occurred.

When, shortly after the trial commenced, I refused an application for the trial of preliminary issues, I pointed out in my reasons delivered on 3 August 1993 that there was confusion in the statement of claim as to the relevant date on which it was alleged that the defendants were in control of the company. I also pointed out that although it was apparent that the defendants intended to rely on a change in the shareholding after the issue of the writ they had not made any allegations in regard to such charges in their pleadings. I concluded that:

Unless I am satisfied that the questions that arise concerning the relevant date on which control is to be determined are properly pleaded I should proceed to determine (as a preliminary issue) which date is, as a matter of law, the relevant date.

Thereafter, the parties accepted that appropriate allegations should be made in the pleadings and that the trial should commence on all issues. The plaintiffs' statement of claim initially alleged that Dempster, Rakich, Griffin, Lee-Steere and Wallis "by themselves and by their respective associates held at or about the time the writ herein was issued ... shares in the issued capital of Mallina representing 76.94% of the issued capital of Mallina." And, further, that:

At the time of the issue of the writ herein (on 11 June 1992) the defendants or some one or more of them (other than Mallina) controlled or were in a position to control:

(i) The board of directors of (Mallina).

(ii) Any general meeting of members of (Mallina).

(iii) The casting of more than 50% of the votes at any general meeting of (Mallina).

By amendment after the trial had commenced, the plaintiffs alleged that, in the alternative, at all times after the issue of the writ, the defendants, other than Mallina, or some one or more of them controlled or were in a position to control the board of directors of Mallina or any general meeting of its members.

All the defendants, other than Mallina, proceeded to amend their defences to allege that the relevant date for the determination of control of the general meeting of the members of Mallina was the date of commencement of the trial. They asserted in effect that at that date they together controlled significantly less than 50% of the issued shares in Mallina.

The plaintiffs filed a reply in which they alleged in effect that at the date of the trial all the defendants other than Mallina together controlled or were in a position to influence in their favour sufficient votes at a general meeting of Mallina to prevent the passing of any resolution which would have required or enabled Mallina to commence proceedings for the relief sought in this action.

Order 20 r 10 entitles a party, in any pleading, to plead any matter which has arisen at any time, whether before or since the issue of the writ. There has for a very long time been a "settled rule of practice ... that amendments are not admissible when they prejudice the rights of the opposite party as existing at the date of such amendments": Weldon v Neal (1887) 19 QBD 394 at 395 (per Lord Esher MR). But it has also been said that rigid adherence to that rule of practice "had too often produced injustice": ; Brickfield Properties Ltd v Newton [1971] 1 WLR 862 at 872 per Sachs J.

It seems to me that the defendants in a derivative action, who wish to raise events subsequent to the issue of the writ that affect the control of the company, would have to amend their pleadings to allege those subsequent events. They might then be met with opposition based on prejudice and unfairness. Whether they would succeed in obtaining the amendment would depend on the particular circumstances and the court would no doubt have regard to considerations of the kind referred to in Weldon v Neal and ; Gruljesich v Gruljesich (unreported, SC(WA), Library No 920253) delivered 6 May 1993; per Seaman J. This, in my view, is the way in which the court would deal with problems caused by late attempts to introduce these matters and to call for an adjournment so as to determine what the company in general meeting would do.

The essential question remains whether the plaintiffs have established a fraud on the minority of shareholders. Ordinarily the issue would be whether the fraud existed at the date of the issue of the writ. That is, however, dependent on the state of the pleadings. If, subsequent to the issue of the writ, issues are properly raised on pleadings which affect the question whether the plaintiffs are being prevented improperly from bringing the proceedings on behalf of the company, in my view, the court must proceed to determine those issues on the pleadings.

In the present case these issues have properly been raised and have to be determined in accordance with the pleadings. It is artificial in my view, and not conducive to justice, to determine the question of fraud as at the date of the issue of the writ when matters that have arisen subsequent to the writ, relevant to that question, have properly been pleaded. Those matters then fall for adjudication in order to ascertain whether there has been a fraud as alleged. It is not then to the point, once the allegations form part of the pleadings, whether they were in existence at the date of the issue of the writ or whether they came into existence thereafter.

The element of "control" in the fourth exception to the rule in Foss v Harbottle: the facts as at the date of the trial

As I have mentioned, in their reply the plaintiffs aver that Dempster Nominees, Dempster, Rakich, Griffin, Lee-Steere and Wallis and their associates controlled, or were in a position to influence in their favour, sufficient votes at a general meeting of Mallina held at the date of the trial so as to prevent the passing of any resolution enabling Mallina to commence proceedings for the relief sought in this action.

As I understood Mr Bainton, in his closing address, he did not submit that these allegations had been made out. Rather, he submitted that, as at that date, the majority of the shareholders would have voted against a motion that action be instituted against Dempster Nominees and Dempster. This, he submitted, would in effect have been a ratification of the breach by Dempster Nominees of its fiduciary duties and that ratification would in itself have been a fraud on the minority.

I turn therefore to the factual question so raised, namely whether, at the relevant time, the majority of the shareholders would have voted against a motion that action be instituted against Dempster Nominees and Dempster.

The total issued share capital of Mallina as at the commencement of the trial was 41,344,992 shares. The plaintiffs contended that holders of 22,656,998 shares would probably have voted against bringing the action sought by the plaintiffs.

The holders of the 22,656,998 shares were made up as follows: 6,395,404 were held under the control of one Teh; 8,190,914 were held by Mr M B Perrott (Perrott) and his associates; Rakich controlled 1,633,251; Dempster controlled shares amounted to 1,389,176; Sisani Pty Ltd (the trustee for the Mallina staff share plan) held 658,000; Mr and Mrs Wallis held 123,200; Lee-Steere held 78,000; staff, consultants and associ-

ates held 1,581,400; a company known as Tony B Holdings Pty Ltd held 500,000 and shares held by Valazco Pty Ltd and under the control of one Favretto, amounted to 2,107,653.

I am satisfied that the votes in respect of the shares controlled by Rakich, Dempster, Wallis and Lee-Steere would all have been cast against any motion to proceed with the kind of action presently brought by the plaintiffs.

Teh acquired shares held under his control in what can only be termed peculiar circumstances. On 31 July 1992 he entered into an agreement with a Dempster controlled company to acquire the shares now held by him at the then market price of 7 cents per share. The purchase by Teh was subject to the Dempster group of companies agreeing to abandon its claim for $ 6m against Mallina in respect of loans made by the group to Mallina. The explanation for this was said to be that in about July 1992 the bankers to the Dempster group required the group to reduce its overdraft by $ 6m. While Mallina owed the Dempster group $ 6m it was said to be unable to pay that sum. The solution for Dempster, it is said, was to sell his shares in Mallina and thereby realise $ 6m in that fashion. Dempster said that he decided that the Dempster group would write off its claim for $ 6m against Mallina so as to enable him to sell his shares in Mallina at a reasonable price. The peculiarity of the transaction with Teh however is that Dempster did not, prior to that transaction, write off the $ 6m and thereby publicly improve Mallina's financial position to that extent. Had that been done there can be little doubt that the Mallina share price would have increased significantly above 7c per share, and Dempster would have been able to sell his shares to Teh at a much higher price. What he did, however, was to sell more than 8 million shares to Teh at the market price of 7c per share and write off the $ 6m owed by Mallina to the Dempster group as part of that transaction. Dempster thereby gave Teh the opportunity to acquire more than 8 million shares at a price based on the existence of Mallina's debt of $ 6m, while agreeing to eliminate that debt. Thereafter, when it became known that the $ 6m had been written off, the shares in Mallina increased sharply in value and within a month or two large parcels of shares in Mallina were being sold at about 30c per share. There can be no doubt that Dempster afforded Teh a considerable benefit, and I do not regard him as a disinterested party.

In any event, Teh, throughout these proceedings, manifested a view strongly against their continuation. He would have voted against a motion to institute action against Dempster.

Tony B Holdings Pty Ltd (Tony B Holdings) is a company under the control of Mr Anthony Barlow (Barlow). The transaction whereby Barlow acquired shares from Dempster is also unusual. It was governed by a document dated 27 April 1993 entitled "Loan Agreement". This agreement is in the following terms:

The borrower (Tony B Holdings) is to purchase from the lender (Dempster controlled companies) one million fully paid shares in Mallina Holdings Ltd.

The lender agrees to advance to the purchaser the sum of $ 250,000 until 30 June 1993. The lender also grants the borrower the unconditional right to extend the loan term for one month to 31 July 1993.

The loan is to be free of interest, secured only by one million fully paid shares in Mallina Holdings Ltd; and repayment by the borrower shall be limited to the value of one million Mallina Holdings Ltd shares purchased from the lender. The borrower will provide the lender with a signed transfer and share certificates will be held by the lender.

The $ 250,000 in fact represented a "sale" price of the one million shares in Mallina at 25c a share. In terms of that agreement nothing had to be paid by Tony B Holdings for the shares until 30 June 1993. The amount to be repaid was limited to the value of the shares from time to time. As the agreement was made on 27 April 1993 Tony B Holdings was thereby granted over 2 months to pay. Barlow agreed under cross-

examination that if, when Tony B Holdings sold the shares, they did not realise enough to pay the $ 250,000, Tony B Holdings merely would have to pay the realised amount. If the shares realised more than 25c each the profit was entirely that of Tony B Holdings. Barlow agreed therefore, as is the case, that he was at "absolutely no risk of losing anything, but he had a prospect of gaining". Provided Tony B Holdings sold the shares between 27 April 1993 and 30 June 1993 it was at no risk whatever of incurring any loss and and profit was to be for its own account.

By this transaction it was made to appear to the investing public that Dempster had indeed sold shares, in the ordinary way, to Tony B Holdings, whereas the latter was, in effect, acting as a conduit for selling the shares to the public. In attempting to explain the situation Barlow testified that:

Mr Dempster wanted to sell his shares in Mallina to reduce his debt with one of his bankers. And the market, I guess, realising that Mr Dempster was in that position would obviously be concerned about Mr Dempster's shares coming on the market in a big volume. So when Mr Dempster tried to sell the shares on the market it was obviously more difficult to sell in the parcels that he was talking about and when he was offered -- he offered me the shares at a premium I thought it was a good investment.

The transaction was plainly a good investment for Barlow as it involved no risk whatever. It also enabled Dempster to represent that there had been a genuine sale and, at the same time, to conceal the fact that he was placing a large parcel of shares on the market. By effecting the transaction in this way he was conferring a favour upon Barlow.

I do not regard Barlow as a disinterested party and consider that he would vote against any motion proposing action to be taken against Dempster.

The shares held by Valazco Pty Ltd and Favretto fall into the same category as Tony B Holdings.

I now turn to the shares held by Perrott and his associates. Perrott, who testified, made it plain that he would vote against the bringing of an action against Dempster Nominees and Dempster. Of the 8,190,914 shares held by persons described as "Perrott and his associates", 2,693,190 were held by entities that were not proved to be controlled by Perrott. These 2,693,190 shares were held by entities referred to as Kroyer, Hard Rock Capital, Keow Weng and Co-operation Retirement Benefit Fund Ltd. The evidence did not establish what attitude the holders of these 2,693,190 shares would have taken.

Of the 1,581,400 shares held by staffs consultants, and associates, 1,023,000 were held by Mr B K Shepherd (Shepherd) and his associates. From Shepherd's evidence it is plain that he would not have voted in favour of an action against Dempster. There remains of the 1,581,400 shares in question, however, 558,400 shares which were held by persons who did not testify and about whom there is insufficient evidence to establish that they would have voted in favour of an action of the kind brought by the plaintiffs.

Sisam Pty Ltd (Sisam) held 658,000 shares. The two shareholders and directors of Sisam Pty Ltd were Rakich and one Cook, an employee of Mallina. It is by no means certain how Sisarn Pty Ltd would have voted, but it is not necessary to make a decision in this regard.

A total of 3,251,590 shares were held by Kroyer, Hard Rock Capital, Keow Weng, the Co-operation Retirement Benefit Fund Ltd and staffs consultants and associates, other than the Shepherd interests. I have omitted Sisam from this calculation. When that total is deducted from the 22,656,998 shares relied upon by the plaintiffs 19,405,408 shares are left. That represents 46.94% of the shareholders of Mallina who would not be in favour of bringing proceedings against Dempster.

Mr Bainton submitted that the share register showed several hundred shareholders holding about 80,000 shares whose correct address was unknown and who would not receive notice of the meeting and therefore would not attend and vote. If those 80,000 are deducted from the 41,344,992 issued shares of Mallina 41,264,992 shares are left. 19,405,408 shares out of 41,264,992 shares is 47.02%.

Accordingly the plaintiffs have not been able to satisfy me that more than 50% of the shareholders of Mallina would, at the date of the trial, have voted against commencing or proceeding with the action. This, of course, is not a finding that less than 50% of the shareholders would have voted in favour of the action. It is a finding that the plaintiffs have not established their case as regards this allegation.

The right of new shareholders to object to the derivative action

In their reply the plaintiffs further alleged that "it would be inequitable and unjust that an action properly brought and awaiting trial could be defeated by the transfers by the (defendants) or some one or more of them of their shares in Mallina, or of some of such shares to persons aware that the said proceedings are pending, or at all".

In answer, Mr Martin submitted on behalf of Dempster Nominees and Dempster that shareholders have no general equitable interest in the affairs of the company beyond the rights conferred upon them as shareholders.

In Prudential Assurance v Newman Industries (No 2) the Court of Appeal said at 224:

When the shareholder acquires a share he accepts the fact that the value of his investment follows the fortune of the company and that he can only exercise his influence over the fortunes of the company by the exercise of his voting rights in general meeting. The law confers on him the right to ensure that the company observes the limitations of its Memorandum of Association and the right to ensure that other shareholders observe the rule, imposed upon them by the Articles of Association. If it is right that the law has conferred or should in certain restricted circumstances confer further rights on a shareholder the scope and consequences of such further rights require careful consideration.

In Peterson American Delicacy Co Ltd v Heath (1939) 61 CLR 457 Dixon J said at 503-504:

Primarily a share in a company is a piece of property conferring rights in relation to distributions of income and of capital. In many respects the proprietary rights are defined by the articles of association ... The shareholders are not trustees for one another, and, unlike directors, they occupy no fiduciary position and are under no fiduciary duty. They vote in respect of their shares, which are property, and the right to vote is attached to the share itself as an incident of property to be enjoyed and exercised for the owner's personal advantage.

In my view a minority shareholder who has commenced a derivative action has no equity in the litigation and cannot claim priority over the rights of shareholders who have acquired shares subsequent to the commencement of proceedings. In my opinion those new shareholders have an unfettered right to decide whether or not the litigation should continue. Take, for example, the circumstances in which a company may have commenced litigation, and a majority of new shareholders acquire shares subsequent to the issue of the writ. There can be no doubt that the majority in such a case may impose their will upon the minority. They may insist on the company abandoning the litigation even though the writ has been issued. A shareholder who has commenced a derivative action cannot be in a better position.

I emphasise however that this view relates only to the priorities as between a minority shareholder who has commenced a derivative action under the fourth exception to the rule in Foss v Harbottle and a new in-

coming shareholder who wishes to exercise his rights as a shareholder at a general meeting of the company. It does not detract from any argument that may be raised as to general considerations of justice that arguably may become relevant under the fifth exception.

The plaintiffs' failure to establish the elements of the fourth exception

There is authority that a fraudulent breach of directors' fiduciary duty cannot be ratified or condoned by the company. See for example Hurley v BGH Nominees, but this is not a case of fraudulent breach of directors' fiduciary duty. The breach of fiduciary duty is by a third party who is a shareholder. Whether a general meeting of a company cannot ratify such a breach, as submitted by Mr Bainton, is open to question. It is, however, unnecessary for me to extend these lengthy reasons by dealing with this issue.

In the light of my finding that it was not established that more than 50% of the shareholders of Mallina would vote against bringing proceedings against Dempster and Dempster Nominees, the plaintiffs have failed to bring their claim within the fourth exception to the rule in Foss v Harbottle.

The fifth exception to the rule in Foss v Harbottle: does it exist?

It is a matter of controversy as to whether there is a fifth exception to the rule in Foss v Harbottle which entitles a shareholder to bring a derivative action on the general ground that considerations of justice require such an action to be brought.

In Foss v Harbottle itself, Sir James Wigram V-C made remarks indicative of a view that there should be a general power of interference by the courts where justice demands that such a power be exercised. He said at 492:

If a case should arise of injury to a corporation by some of its members, for which no adequate remedy remained, except that of a suit by individual corporators in their private characters, and asking in such character the protection of those rights to which in their corporate character they were entitled, I cannot but think that the principles so forcibly laid down by Lord Cottenham in Wallworth v Holt (4 Myl & Cr 365; see also 17 Ves 320, per Lord Eldon) and other cases would apply, and the claims of justice would be found superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue.

In Heyting v Dupont [1964] 1 WLR 843 Russell LJ at 850 referred to "certain dicta indicating that exception to the rule (in ; Foss v Harbottle ) might be allowed when the attainment of justice required it". His Lordship went on at 850-1 to say the following:

In Baillie v Oriental Telephone and Electric Company Ltd [1915] 1 Ch 503 Swinfen-Eady LJ, after quoting from Wigram V-C in ; Foss v Harbottle, said at 518:

"In other words it has been said that in certain cases members may sue on behalf of the corporation if the interests ofjustice require it."

In Russell v Wakefield Water Works Company [1875] LR 20 Eq 474 Sir George Jessel MR said of the rule at 480:

"But that is not a universal rule; that is, it is a rule subject to exceptions, and the exceptions depend very much on the necessity of the case; that is, the necessity for the court doing justice."

And after referring to cases of ultra vires application of a company's funds he said at 482:

"But that is not the only case. Any other case in which the claims of justice require it is within the exception."

Again, in Edwards v Halleywell [1952] All ER 1064 Jenkins LJ said at 1067:

"The cases falling within the general ambit of the rule are subject to certain exceptions. It has been noted in the course of argument that in cases where the act complained of is wholly ultra vires the company or association the rule has no application because there is no question of the transaction being confirmed by any majority. It has further been pointed out that where what has been done amounts to what is generally called in these cases a fraud on the minority and the wrongdoers are themselves in control of the company, the rule is relaxed in favour of the aggrieved minority who are allowed to bring what is known as a minority share-holders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue. Those exceptions are not directly in point in this case, but they show, especially the last one, that the rule is not an inflexible rule and it will be relaxed where necessary in the interests of justice."

To these may be added the comment of Romer J in Cotter v National Union of Seamen [1929] 2 Ch 58 at 69:

"An action at the suit of individual members of an incorporated company is no doubt permissible where justice so requires,"

And he then proceeded to refer to instances of exception from the rule.

At 851 his Lordship said:

I am prepared to assume for the purposes of this case (though I must not be understood as accepting it as a proposition of law) that there may be occasions in which justice requires departure from the rule when all that is asserted is damage to the company, arising from misfeasance in withholding an asset of the company without fraud or ultra vires.

But he held that justice did not require it in that case. Harman LJ at 854 was of a similar mind, pointing out (without coming to any conclusion on the law) that:

As Russell LJ's judgment shows, there are cases which suggest that the rule is not a rigid one and that exception will be made where the justice of case demands it.

In Hodgson v NALGO [1972] 1 WLR 130 Goulding J remarked at 138 that: "This case does not fall within any of the well known exceptions to the rule in ; Foss v Harbottle. " Nevertheless, he granted a declaration and an injunction to an individual member of a trade union to prevent the governing body exceeding their powers because otherwise injustice would ensue.

These English cases to which I have referred support the existence of the fifth exception. Counsel for the defendants relied on the other hand on Prudential Assurance Company Ltd v Newman Industries (No 2) in which the Court of Appeal expressed views contrary to the existence of the fifth exception. It is to be noted however that their Lordships were careful to point out at 220-1 that:

Such consideration of the law as appears in this judgment is, apart from a few submissions ..., merely a reflection of our own thoughts without the benefit of sustained argument.

In the result it would be improper for us to express any concluded view on the proper scope of the exception or exceptions to the rule in Foss v Harbottle.

Even subject to this caveat, their views concerning the fifth exception were tentative. The clearest expression of their attitude was at 221 where they said that they were "not convinced" that the proposition that

there was an exception to the rule in Foss v Harbottle "whenever the justice of the case so requires" was "a practical test, particularly if it involves a full dress trial before the test is applied".

The remarks of the Court of Appeal at 221-222 (to which I have already referred in another context) further indicate the lack of finality in their views. They said:

In our view, *whatever may be the properly defined boundaries of the exception to the rule the plaintff ought at least to be required before proceeding with his action* (my italics), to establish a prima facie case that the company is entitled to the relief claimed, and (ii) that the action falls within the proper boundaries of the exception to the rule in Foss v Harbottle.

With respect, I consider that the courts should not shrink from determining whether the justice of the case should allow a shareholder to proceed with a derivative action. I agree with respect with the learned author of *Pennington's Company Law*, 6th ed at 666 who has written:

The tendency of decisions since the beginning of this century has been to confine the action to cases where the defendants are in control, but there is much to be said for allowing it in other cases too, provided that the plaintiff can show a prima facie case and so avoid the need for a full trial merely in order to ascertain whether he is entitled to sue at all.

I pause to observe that the procedure suggested was adopted in this case and the plaintiffs were found to have a prima facie case.

In this State Malcolm CJ has indicated views contrary to the existence of the fifth exception. In Eromanga Hydrocarbons NL v Australis Mining NL the learned Chief Justice said at 910:

In my opinion, in the present circumstances, I am not persuaded that the fifth exception ought to be recognised as having been established.

Again, however, the mode of expression employed by the learned Chief Justice (and in particular the reference to not "being persuaded" in "the present circumstances") does not, with respect, suggest a firm and final view.

In Scarel Pty Ltd v City Loan and Credit Corporation Pty Ltd (No 2) (1988) 12 ACLR 730;6 ACLC 219 Gummow J reviewed many of the authorities on this issue without coming to a firm conclusion. One of the cases which he mentioned was ; Campbell v Kitchen & Sons Ltd and Brisbane Soap Company Ltd (1910) 12 CLR 515.He discussed it in the following terms:

In that case, half of the shares of company B were owned by company A or its nominees. Company A brought an action against company B and recovered judgment in its favour. The directors of company B were equally divided in opinion on the question of whether an appeal should be brought to the High Court. The other half of the shares in company B were held by C or his nominees. In the High Court, leave was given to C to appeal on behalf of himself and all other members of the company B, Griffith CJ saying (at p 514):

"Under these circumstances there must be some remedy, and I think we ought to apply the analogy of the practice of the Court of Chancery, which is now adopted by the Supreme Court of Judicature, and give leave to some person who is substantially interested to come in and institute the appeal."

Counsel had cited Foss v Harbottle and such decisions as ; Burland v Earle [1902] AC 83.The case does not appear to fall clearly within any of the four recognised exceptions to the rule in ; Foss v Harbottle.

In Hawkesbury Development Company Ltd v Landmark Finance Pay Ltd [1969] 2 NSWR 782 Street J discussed the issue at 789 and said:

It is, perhaps, a useful door to be left open lest in some extremely unusual circumstances injustice would result from applying the rule. No exhaustive or even descriptive statement of such circumstances has been propounded. ... It is the absence of definition or example of such exception that, no doubt, underlies such observations as are to be found to the effect that there is in truth no admissible ground for further exception. It would, however, be regrettable if the difficulty of foreseeing a possible need for allowing any further exception were to be elevated to an anticipatory refusal to recognise any future case as being justly treated as an exception.

For the purposes of the present judgment I am prepared to accept the existence of a further exception to the rule in Foss and Harbottle where justice so requires.

I note that the learned authors of *Equity, Doctrine and Remedies*, 3rd ed Meagher, Gummow and Lehane at paras 21-30 accept that apart from the four recognised exceptions to the rule in Foss v Harbottle there is a further exception "in any other case where justice requires it".

In coming to a conclusion on this particularly difficult question I have been particularly persuaded by the sentiments expressed by Sir Robert Megarry V-C in Estmanco (Kilner House) Ltd v Greater London Council [1982] 1 WLR 2 at 11-12 where he said:

Plainly there must be some limit to the power of the majority to pass resolutions which they believe to be in the best interests of the company and yet remain immune from interference by the courts. It may be in the best interests of the company to deprive the minority of some of their rights or some of their property, yet I do not think that this gives the majority an unrestricted right to do this, however unjust it may be, and however much it may harm shareholders whose rights as a class differ from those of the majority. If a case falls within one of the exceptions from Foss v Harbottle I cannot see why the right of the minority to sue under that exception should be taken away from them merely because the majority of the company reasonably believe it to be in the best interests of the company that this should be done. This is particularly so if the exception from the rule falls under the rubric of "fraud on a minority".

Although Sir Robert Megarry made express reference to "fraud on a minority", his views equally justify the existence of a fifth exception so as to protect minority shareholders in those rare cases where they are unable to bring themselves within the recognised exceptions and where a serious injustice would arise if they were precluded from pursuing a derivative action.

I take into account further that as Gummow J said in Scarel Pty Ltd v City Loan and Credit Corporation Pty Ltd (No 2) at 223:

(T)he rule in Foss v Harbottle and its exceptions have generally been considered part of the powers and procedures of modern courts of equity ...

Equity is concerned with substance and not form, and it seems to me to be contrary to principle to require wronged minority shareholders to bring themselves within the boundaries of the well recognised exceptions and to deny jurisdiction to a court of equity even where an unjust or unconscionable result may otherwise ensue.

The circumstances of modern commercial life are very different to those which existed when Foss v Harbottle was decided. The body of shareholders of a public company is ordinarily far greater in number, and the controlling minds of individual shareholders are far more difficult to identify than was the case with the relatively small corporations that existed 150 years ago. These developments and the complexities and sophistication of modern shareholding make it often very difficult to bring derivative claims within the established ex-

ceptions. To the extent that policy may be relevant in determining whether a fifth and general exception to the rule should be recognised, I consider it to be desirable to allow a minority shareholder to bring a derivative claim where the justice of the case clearly demands that such a claim be brought, irrespective of whether the claim falls within the confines of the established exceptions. In this regard I note the recommendation of the Companies and Securities Advisory Committee reported in the Australian Securities Commission release issued on 2 August 1993 (CASAC 93/02), that the rule in ; Foss v Harbottle be abolished to allow shareholders and others a general right to bring derivative actions on behalf of companies.

Accordingly I uphold the argument of the plaintiffs that the court may allow a derivative action by shareholders in circumstances whenever the justice of the case so requires.

Does justice require the plaintiffs' action to be allowed

In considering this question I take into account the following matters:

(1) It has been established that Dempster Nominees has committed serious breaches of its fiduciary duties to Mallina and that Dempster was the instrument of those breaches.

(2) In consequence, provided that the action is allowed to be brought, Mallina would be entitled to a substantial sum of money by way of compensation.

(3) The directors of Mallina have at all times opposed the bringing of the plaintiffs' action and continue to do so.

(4) While the plaintiffs have been unable to satisfy me that a majority of the shareholders would oppose the bringing of the action, it has not been shown that the majority would support such an action. A substantial minority of the shareholders are in some way associated with the wrongdoers, Dempster Nominees and Dempster. In practice, the prospect of the company itself, as presently constituted, commencing proceedings is remote. Even if the company does commence proceedings afresh -- based on the cause of action which arose in 1986 -- it will be faced no doubt with powerful defences based on the delay in bringing the proceedings. The fact is that if the plaintiffs' action is not allowed there is little prospect that Mallina will recover the money owing to it.

(5) Until Dempster disposed of his shares a fraud on the minority had been perpetrated. Until the pleadings were amended, after the trial commenced, it could not have been argued that there was an absence of control for the purposes of the fourth exception. The disposal of shares by Dempster, after the issue of the writ, and with a significant number of shares being disposed of pursuant to unusual transactions, has in effect alone protected him and his company from a fourth exception claim for fraud on the minority.

(6) After a writ for a derivative claim has been issued, and negative legal advice as to their prospects of success in the action received, there could well be an incentive to majority shareholders (who have committed a fraud on the minority) to dispose of a material parcel of their shares. Should this occur, it may then be very difficult in practice for the minority on the one hand, to establish the requisite degree of control to prove that the company remains in the hands of the wrongdoers, and, on the other, to muster sufficient votes at a general meeting to require a hostile board to sue the wrongdoers. In my opinion, the courts should be slow to assist this practice, which would be designed to protect wrongdoers and defeat justice being done.

(7) The shareholders who have acquired shares in Mallina subsequent to the issue of the writ did so, it is reasonable to assume, with full knowledge of the pending litigation. As I mentioned in my reasons delivered on 3 August 1993, it was established that they at least knew of the existence of the proceedings no later than 26 May 1993. Under the articles of association a general meeting can be called on 14 days' notice. No ex-

planation was given as to why they were prepared to acquire their shares in the knowledge that the derivative litigation was pending, and did nothing to attempt to bring it to an end until immediately before the commencement of the trial when some sought an adjournment to call a general meeting to ratify the conduct of the directors in not proceeding in the company's name.

(8) While there may have been valid commercial reasons for opposing the proceedings before the trial started, I find it difficult to appreciate how that attitude can properly be maintained at this stage. There is an air of unreality in the submission that after this lengthy trial, with the court having come to the conclusions expressed in these reasons, the derivative claims should be dismissed, leaving it to shareholders in general meeting to require the board to commence proceedings afresh. This consequence was recognised in Prudential Assurance Company Ltd v Newman Industries Ltd (No 2) at 221 by the Court of Appeal when they said:

By the time a derivative action is concluded, the rule in Foss v Harbottle can have little, if any, role to play. Either the wrong is proved, thereby establishing conclusively the rights of the company; or the wrong is not proved, *so cadit quaestio.*

(9) The wrong has been proved; if the plaintiffs were to succeed Mallina would be entitled to recover several millions of dollars; the value of the underlying assets of Mallina should increase significantly; it is absurd, in my view, for shareholders to complain at this stage that the action should not be brought.

It was submitted that relief under the fifth exception to the rule in Foss v Harbottle should not be allowed where there is some other remedy and it was submitted that a remedy did exist in this case, namely, s 320 of the Code. In my view, however, when relief is to be given on the basis of broad considerations of justice, no hard and fast formulae should be laid down for determining the justice of the case. When the action commenced, there were several strings to the plaintiffs' bow. They included the case based on the fourth exception to the rule in ; Foss v Harbottle, the case based on the fifth exception and the case based on the alleged negligence of the directors. These were all reasonably arguable. It was most convenient to bring all these claims as part of the same proceedings. It would have been absurd, for example, to bring the case based on the fourth exception in one set of proceedings and to attempt to obtain relief under s 320 in other proceedings. In my opinion, the fact that there might have been another form of relief under s 320 of the Code does not affect the justice of the plaintiffs' case.

Factually, this is a most unusual case. I have not been referred to any other instance where fraud on the minority has been established at the date of the writ, but where, thereafter, the majority have disposed of most of their shares so as to defeat the allegation that at the time of the trial they were in control of the company.

Taking all the matters to which I have referred above into account I conclude that justice requires the plaintiffs to be allowed to prosecute their derivative claim.

The false information given by Dempster to Rakich on 15 September 1986: the appropriate remedy

As a result of Dempster's misrepresentations to Rakich on 15 September 1986 Mallina was induced to abandon its rights in the joint venture and allow Connell to be substituted.

Dempster Nominees did not, in consequence, acquire Mallina's share or the goodwill which Mallina had in the joint venture and the information which Mallina had acquired. The information was sold to Connell, the rights in the joint venture were given up and the goodwill and other intangible benefits in effect passed to Connell. At the same time Dempster Nominees acquired the other benefits to which I have already referred.

I do not think that it could be said, as was suggested by Mr Bainton, that Dempster Nominees' 50% share in PICL was held by it on trust for Mallina. Mallina's share in the joint venture was, as I have indicated, simply given up by it. It is also likely that at least a substantial part of the profits Dempster Nominees made by reason of the joint venture would have been made by it in any event, had Mallina remained as its co-joint venturer and had the joint venture been awarded the exclusive mandate. Accordingly, it is, in my view, inappropriate to attempt to establish and distinguish between the profits that Dempster Nominees would have made but for the misrepresentation and the profits that it in fact made.

In my view the proper remedy is restitution on the part of Dempster Nominees for the loss suffered by Mallina; that is to say the court should order equitable compensation to be paid to Mallina.

Although equitable damages or rather "equitable compensation" is normally concerned with the profit which has been made by the defendant, it can also be based upon the detriment suffered by the plaintiff: Nocton v Lord Ashburton; McKenzie v McDonald [1927] VLR 134; ; Re Dawson (deceased) [1966] 2 NSWR 211;; Hill v Rose; ; Canson Enterprises Ltd v Boughton and Company.

In Hill v Rose Tadgell J said at 143:

In Nocton v Lord Ashburton [1914] AC 932 at 952-293, Viscount Haldane LC affirmed that a court of equity has inherent and exclusive jurisdiction to award compensation against a fiduciary in favour of a beneficiary who has suffered loss by reason of a breach of the fiduciary's obligation. In ; McKenzie v McDonald [1927] VLR 134 at 146 Dixon AJ regarded ; Nocton v Lord Ashburton as showing "that the jurisdiction to remedy breaches of fiduciary duty extends to decreeing compensation to the person whose confidence has been abused" ... The remedy, like any equitable remedy, is necessarily to be fashioned to meet the needs of the case. The method of calculation of monetary compensation will vary according to the nature of the fiduciary obligation whose breach is to be redressed. It might be appropriate to compensate the plaintiffs loss by reference to the defendant's gain, as in ; McKenzie v McDonald.  Compensation may be awarded, however, in an appropriate case whether or not the defendant has made any direct pecuniary gain.

I turn now to the principles applicable in determining the extent of the compensation to be awarded.

In Re Dawson Street J said:

The obligation of a defaulting trustee is essentially one of effecting a restitution to the estate. The obligation is of a personal character and its extent is not to be limited by common law principles governing remoteness of damage. ... Caffrey v Darby (1801) 6 Ves 488;31 ER 1159 is consistent with the proposition that if a breach has been committed then the trustee is liable to place the trust estate in the same position as it would have been in if no breach had been committed. Considerations of causation, foreseeability and remoteness do not readily enter into the matter. To the same effect is the case of ; Clough v Bond (1838) My & Cr 490;40 ER 1016... The principles embodied in this approach do not appear to involve any enquiry as to whether the loss was caused by or flowed from the breach. Rather the enquiry in each case would appear to be whether the loss would have happened if there had been no breach ... The cases to which I have referred demonstrate that the obligation to make restitution, which courts of equity have from very, very early times imposed on defaulting trustees and other fiduciaries, is of a more absolute nature than the common law obligation to pay damages for tort or breach of contract. It is on this fundamental ground that I regard the principles in ; Thompkinson's case [1961] AC 1007 as distinguishable. Moreover, the distinction between common law damages and relief against a defaulting trustee is strikingly demonstrated by reference to the actual form of relief granted in equity in respect of breaches of trust. The form of relief is couched in terms appropriate to require the defaulting trustee to restore to the estate the assets of which he deprived it. Increases in market value between the date of breach and the date of recoupment are for the trustee's account: the effect of such

increases would, at common law, be excluded from the computation of damages but in equity a defaulting trustee must make good the loss by restoring to the estate the assets of which he deprived it notwithstanding the market values may have increased in the meantime. The obligation to restore to the estate the assets of which he deprived it necessarily connotes that, where a monetary compensation is to be paid in lieu of restoring assets, that compensation is to be assessed by reference to the value of the assets at the date of restoration and not at the date of deprivation. In this sense the obligation is a continuing one and ordinarily, if the assets are for some reason not restored in specie, it will fall for quantification at the date when recoupment is to be effected, and not before.

This passage has been adopted by courts of high authority.

Similar views have been expressed by the Supreme Court of Canada in Canson Enterprises Ltd v Boughton and Company. McLachlin J, in that case, said at 161:

Thus while the loss must flow from the breach of fiduciary duty, it need not be reasonably foreseeable at the time of the breach.

And at 162:

A related question which must be addressed is the time of assessment of the loss. In this area tort and contract law are of little help. There, the general rule is that damages are assessed based on the value of the shares as at the time of the wrongful act, in view of what was then foreseeable, either by a reasonable person, or in the particular expectation of the party. Various exceptions or apparent exceptions are made for items difficult to value, such as shares traded in a limited market. The basis of compensation at equity, by contrast, is the restoration of the actual value of the thing lost through the breach. The foreseeable value of the items is not in issue. As a result the losses are to be assessed as at the time of the trial, using the full benefit of hindsight.

And at 163:

In summary, compensation is an equitable monetary remedy which is available when the equitable remedies of restitution and account are not appropriate. By analogy with restitution, it attempts to restore to the plaintiff what has been lost as a result of the breach, ie the plaintiffs lost opportunity. The plaintiffs actual loss as a consequence of the breach is to be assessed with the full benefit of hindsight. Foreseeability is not a concern in assessing compensation, but it is essential that the losses made good are only those which on a common sense view of causation, were caused by the breach.

Accordingly, I am required by the rules of equity, in assessing compensation, to leave aside questions of causation (save that compensation will only be awarded for losses caused by the breach of fiduciary duties), foreseeability and remoteness, and to apply the full benefit of hindsight.

The false information given by Dempster to Rakich on 15 September 1986: the equitable compensation to be awarded

I have made findings that, as at September 1986, Mallina's directors regarded the petrochemical project as having the potential to confer significant benefits on the company, and that Mallina was financially able to pay its share of the costs of the exclusive mandate.

For these reasons I consider that but for Dempster's misrepresentations Mallina would have remained in the joint venture; by not doing so it lost the opportunity to make the kind of profits that Dempster Nominees eventually made through its participation.

Dempster Nominees eventually received $ 50m for its share in the joint venture. Connell received $ 350m for his equal share, but save for observing that this sum appears to have some connection with debts owed by Rothwells Ltd, a bank controlled by Connell, the circumstances relating to the discrepancy between the amounts received by the Dempster and Connell interests are on the evidence quite inexplicable and so bizarre that I am unable to conclude therefrom that $ 350m represents the genuine value of Connell's share.

In a television interview conducted on 8 December 1989 Dempster stated that he was happy to "sell" his half share in the petrochemical plant for $ 50m as he "was not prepared to stay in the project as a minority shareholder". He acknowledged that he was "a 50/50 shareholder at that time", but said: "I was never offered $ 200m, I was offered $ 50m for my half interest and I accepted it". He was asked: "As the 50/50 partner, how do you explain Mr Connell's $ 350m price?". He replied: "I think that's a question you would have to ask Bond Corp and the government". He was not prepared to say why Connell received $ 350m for his half share and he, Dempster, $ 50m for his.

In May 1988 one Webb prepared a valuation of the project showing that it was worth $ 1 billion. Dempster said that he believed that the project was worth "around perhaps $ 400m at that time; maybe $ 250 to $ 450m, depending on ... a lot of other qualifications". Webb's valuation was shown to potential investors. According to Dempster: "I made sure this report was distributed to the potential investors and it was up to them to make their own assessment as to what they thought the value was". Despite this testimony of a higher value than $ 50m, I consider that the best evidence of the value of Dempster Nominees' share in the project at the time of the acquisition by BCH and WAGH is the acceptance of $ 50m by Dempster.

I must have regard to the expenses incurred by Dempster Nominees in getting to the stage where its share was disposed of for $ 50m. The evidence in this regard is, to say the least, confusing.

The total cost of performing the exclusive mandate was estimated by Mallina to be $ 1.5m. Mallina's share of that expense would have been $ 750,000. According to Dempster, however, the cost alone of employing outside consultants was $ 3m, and Dempster Nominees charged $ 10m for its management services. The $ 10m was subsequently reversed at the insistence of those who purchased the interest for $ 50m on the basis that the $ 50m consideration encompassed the $ 10m. Nevertheless, at one point in his evidence Dempster said that "by the end of July 1988 the project cost was $ 850,000." Regard should also be had to the so-called consultancy fees of $ 1.4m paid in Hong Kong to Gofair.

It seems, however, from the financial statements as at 30 June 1988 of PICL, that it was funded by share capital of $ 500,005 and the remainder of its working capital was obtained by way of loans. This loan capital was used to pay PICL's expenses. In other words, it does not seem that Dempster Nominees was significantly more than $ 250,000 out of pocket as regards its contribution to the expenses incurred by PICL. It is of relevance however that, according to Dempster, of the order of $ 20m of the loan funds used to finance PICL came from Rothwells. It was apparently because Rothwells had advanced the $ 10m, which was paid by PICL to Dempster Nominees as management fees, that the purchasers of the interests of Dempster and Connell in the joint venture insisted on those fees being reversed. Moreover, as I have mentioned, it is apparent that the financial position of Rothwells had some bearing on the receipt by Connell of $ 350m in contrast to the $ 50m received by Dempster.

I think I have said enough to show that what occurred with regard to the payment of fees to Dempster Nominees, the significance of the involvement of Rothwells and the consideration payable to Dempster and Connell for their interests in PICL are clouded by motives and considerations that extend far beyond the issues in this trial. The evidence concerning these matters was sparse and I am unable to penetrate the ob-

scurity that surrounds these peculiar and extraordinary transactions. I shall nevertheless attempt to do the best I can with the material available.

It seems to me that on the basis of my finding that the value of Dempster Nominees' share in the project at the time of the acquisition by BCH and WAGH was $ 50m, it follows that had Mallina remained in the joint venture, had the joint venture been awarded the exclusive mandate, had they provided the bankable feasibility study and had the two participants in the joint venture (Mallina and Dempster Nominees) sold their interests in the joint venture (in whatever form it was constituted), they would have received $ 100m.

Accordingly, applying the rules of equity to which I have referred, I shall assume that, but for the breach by Dempster Nominees, the gross consideration that would have been received for the interests of the joint venture would have been $ 100m.

I doubt whether, without Connell's connection and influence, a joint venture of Mallina and Dempster Nominees would have been able to finance the project substantially by way of bank loans direct to the company undertaking the project, as PICL did. Therefore, in my view, the expenses of the joint venture would have had to have been paid by the participants personally, and those expenses have to be deducted from the $ 100m so as to arrive at the notional net profit to the participants.

Accepting at face value the assertion that consultants' charges amounted to $ 3m and assuming that the other costs amounting to $ 850,000 were over and above that sum, $ 3,850,000 has to be deducted from the $ 100m, leaving $ 96,150,000.

Ignoring for the moment the management fees to be paid to Dempster Nominees, each participant would then be entitled to $ 48,075,000.

Dempster Nominees' charge of $ 10m for management fees appears to be arbitrary and excessive. Nevertheless, taking into account the personalities involved and the fact that Dempster Nominees would probably have provided the management, expertise and finance, I accept that Mallina would probably have agreed to Dempster levying a similar charge. In such circumstances there would be no reason for Dempster Nominees agreeing to the reversal of such a charge. This leaves Mallina with a notional profit on that basis of $ 38,075,000.

Finally, on this aspect, I propose to ignore the "consultancy" fees that were transferred out of Australia through Gofair. They seem to have been levied arbitrarily and bear no relation to work actually done. Taking into account the $ 10m charged by Dempster Nominees for management fees, there appears to have been no proper basis for the charging of Gofair's fees.

I pause to remark that the factors that I have taken into account in reducing the gross profit to a net profit do not, in my view, involve matters of causation, foreseeability and remoteness, and regard has to be had to them.

In my opinion, applying a common sense test of causation, Dempster Nominees' breach of fiduciary duties deprived Mallina of the chance or opportunity to earn a net profit which I have assessed at $ 38,075,000.

The next step is to value that opportunity or chance that was lost.

There were plainly obstacles in the path of Mallina succeeding in obtaining the exclusive mandate, performing that mandate and selling its interest in the project. I have already referred to those factors which made it less likely that the mandate would have been awarded to a joint venture consisting of Dempster Nominees and Mallina than to one consisting of Dempster Nominees and Connell. The royalties dispute, Mallina's lack of political influence and the embarrassment it had caused Parker were all negative factors.

There was also some possibility that Mallina might have had difficulty in raising the money to pay for its share of the cost of the mandate. A joint venture consisting of Mallina and Dempster Nominees would have been substantially less effective than one consisting of Dempster Nominees and Connell; the advantages of Connell's wealth and his connection with the government would have been significantly missed, not least in being able to find a buyer for the joint venture interests at an appropriate price.

There are positive factors to be balanced against the negative factors to which I have referred. Mallina had the support of the DRD. As regards the cabinet, it was identified with Dempster (who had influence with the government). The government wished to introduce a petrochemical project in Western Australia. The joint venture between Dempster Nominees was about 6 months ahead of any other party that wished to attempt the project and, in any event, there was in reality no other competition. Finally, in my view, Mallina could probably have found the funds necessary to pay its share of producing the bankable feasibility study.

Taking into account all the factors I have mentioned I consider that in September 1986 Mallina had a 60% chance of making a profit of $ 38,075,000. I accordingly value Mallina's lost opportunity or chance, for which it should be compensated, at $ 22,845,000. I would order Dempster Nominees to pay Mallina this sum, and I consider, for the reasons previously stated, that Dempster should be ordered to be liable to the same extent.

Mr Bainton argued that interest should be ordered on the amount of compensation but made no submissions as to the rate of such interest. I am satisfied that there is power to order interest: see Hungerfords v Walker (1989) 171 CLR 125 at 148.No evidence was led as to the rate of interest that should be awarded, and in the absence of argument on this issue I consider it should stand over for determination at a later date and the plaintiffs have liberty to apply.

The payment of $ 250,000 to Connell: the appropriate remedy

As regards the claim for $ 250,000 as I have indicated, in my opinion, what in effect occurred was that Dempster Nominees took $ 250,000 from Connell for Mallina's half interest in the joint venture.

It is no argument to suggest that had all the facts been disclosed Mallina would have been content with $ 150,000. In Brickenden v London and Loan Savings Company (1934) 3 DLR 465 at 469, in a passage applied in ; Commonwealth Bank of Australia v Smith at 479 Lord Thankerton, in expressing the advice of the Privy Council, said:

When a party, holding a fiduciary relationship, commits a breach of his duty by non-disclosure of material facts, which his constituent is entitled to know in connection with the transaction, he cannot be heard to maintain that disclosure would not have altered the decision to proceed with the transaction, because the constituent's action would be solely determined by some other factor, such as the valuation by another of the property proposed to be mortgaged. Once the court has determined that the non-disclosed facts were material, speculation as to what course the constituent or disclosure would have taken is not relevant.

In my opinion Dempster Nominees must therefore account to Mallina for the amount of $ 250,000: Furs Ltd v Tomkies (1936) 54 CLR 583 at 590-591, 592 and 604-605;; Consul Developments Pty Ltd v DPC Estates Pty Ltd at 393.

For the reasons I have previously given Dempster is liable to the same extent as Dempster Nominees.

The comments I made previously as to interest apply equally to this claim.

Negligence of the directors

In the case of Lee-Steere, Wallis and Griffin I find that each believed that Rakich had accurately reported to them what Dempster had said. In the case of Rakich, I find that he believed that Dempster had accurately reported to him what he, Dempster, had been told. Each trusted Dempster implicitly.

The basic complaint of the plaintiffs in regard to negligence is that none of the directors made any inquiry or took any step to check in any way the information given to him, in the case of Rakich by Dempster, and in the case of each of the others by Rakich. It is said that if any one of them had checked with the DRD or Parker's office they would have discovered that the situation was other than as told to them.

All the directors asserted that they decided on receipt of the relevant information that it was in effect a good thing for Mallina to give up its participation in the joint venture. I do not accept this evidence. In my opinion none of the directors applied his mind to whether it was in Mallina's interests to remain in the joint venture. Each simply accepted without question that what he had been told was time, namely that the government or cabinet or the minister had decided that Mallina would not get the mandate, and each regarded that as a fait accompli. None applied his mind to whether the information should be verified or thought further about the matter.

Rakich's attitude, as demonstrated by his evidence on this aspect, is typical of the attitude of all the directors. Rakich thought that there was simply no prospect of continuing the joint venture with Dempster Nominees. When asked whether he considered that as a possibility, he said "I don't believe it was an option that was available to us". He said that it was not put to the other directors as an option and there was no discussion with other directors relating to that issue. There was no doubt in Rakich's mind what should be done, and that was to accept Dempster's offer.

In essence the case regarding negligence against the directors depends upon whether it was indeed negligent for each to trust Dempster and make no independent inquiries themselves.

In AWA Ltd v Daniels (1992) 7 ACSR 759 Rogers CJ Comm Div observed that the standard of care required from a director might, depending on the circumstances, vary in the individual case. At 864 he said:

What constitutes the proper performance of the duties of a director of a particular company is considered to be dependent:

(a) Upon the actual knowledge and experience of the individual director.

(b) The nature and extent of the corporation's business.

(c) On the distribution of responsibilities in the particular corporation.

At 867 Rogers CJ Comm Div noted that:

The directors rely on management to manage the corporation. The board does not expect to be informed of the details of how the corporation is managed. They would expect to be informed of anything untoward or anything appropriate for consideration by the board.

This proposition is particularly apposite to non-executive directors, in the ordinary course. Rogers CJ Comm Div at 867 discussed the division of functions between non-executive directors and the chief executive officer or managing director. He said:

In contrast to the managing director, non-executive directors are not bound to give continuous attention to the affairs of the corporation. Their duties are of an intermittent nature to be performed at periodic board meetings, and at meetings of any committee of the board upon which the director happens to be placed. Notwithstanding a small number of professional company directors there is no objective standard of the rea-

sonably competent company director to which they may aspire. The very diversity of companies and the variety of business endeavours do not allow of a uniform standard.

His Honour pointed out at 868:

A director is justified in trusting officers of the corporation to perform all duties that, having regard to the exigencies of the business, the intelligent devolution of labour and the articles of association, may properly be left to such officers.

See also Australian Securities Commission v Gallagher (1993) 10 ACSR 43 and ; Vrisakis v Australian Securities Commission (unreported, SC(WA), Library No 930427, 6 August 1993).

It is necessary to apply the above principles, firstly, to the claims against Lee-Steere, Wallis and Griffin, they being non-executive directors.

I have no hesitation in finding that they were not negligent. Dempster Nominees owed fiduciary duties to Mallina and the directors had no reason to believe that that company would not honour its obligations. They were entitled to assume that Rakich, the chief executive director, was reporting accurately to them when he told them that he had been informed by Dempster that Mallina would not get the mandate. They were entitled to rely on his judgment and if he was satisfied that that information was correct, they were entitled to accept that.

There was a greater responsibility on Rakich, as chief executive director of Mallina, to be satisfied that what Dempster told him was accurate.

It is the case that a mere telephone call to the appropriate source should have caused him to ascertain the correct position. Moreover Rakich should have known that it was unlikely that the government would have changed its mind so fundamentally as Dempster asserted. After all, when Rakich saw Parker's letter of 9 September 1986 he said that he would have regarded it as virtually certain that the joint venture would get the mandate. He said that he accepted from that letter that cabinet approval was imminent.

I also regard Dempster's promise of some equity in the project at some future date as merely a sop to Mallina, having little or no legal value, and no reliance should have been placed on it. The fact that Rakich (and the other directors) did rely on it demonstrates a naivety consistent with the acceptance without question of the alleged change of mind on the part of the government.

In my view, however, applying the tests laid down in the authorities to which I have referred, I consider that while Rakich was guilty of an error of judgment in trusting Dempster on so important an issue without attempting to verify what he had been told, his conduct was not negligent. In coming to this conclusion I have had regard to the long relationship that had existed between Rakich and Dempster and the fact that Rakich had for a long period relied on and trusted Dempster. I also have regard to the fact that the way that the information was conveyed, coupled as it was with the incentive that Mallina would make 100% over its expenses, was calculated to allay any suspicions. In the circumstances, in my view, Rakich was not negligent in trusting Dempster.

In the circumstances the claims for negligence are dismissed.

**TAB G**

(3
Act
the :
to re
the :
it fr
proc
and
the
pens

SUPREME COURT OF NEW SOUTH WALES

## HAWKESBURY DEVELOPMENT CO. LTD. v. LANDMARK FINANCE PTY. LTD. and Others

STREET, J.

12-14, 19-21, 26-28 August; 2-4, 16-18, 23-25, 30 September;
1, 2, 8, 9, 21 October; 2 December 1969

Companies—Suit to declare void a debenture and to restrain receiver and manager —Defect in manner of affixation of seal—Directors not holding qualifying shares— *Ultra vires*—Misjoinder of parties—Shareholder plaintiff, company defendant—Rule in *Foss* v. *Harbottle*—Onus of proof of invalidating purposes—Statutory validation of *ultra vires* acts—Powers of company to include those in Third Schedule to Companies Act 1961—Whether this provision applies to company incorporated under Companies Act 1936—"Proceedings against a company by a member . . . to restrain the doing of any act"—"Proceedings by . . . member against the . . . officers of the company"—Companies Act 1961, ss. 19 and 20.

Words and phrases—"Company"—"Powers of company to include those in Third Schedule"—Whether company includes one incorporated under Companies Act 1936 —"Proceedings against the company by a member to restrain the doing of any act"—Whether suit to declare void debenture and restrain actions of receiver-manager under it is a proceeding to restrain the doing of an act—"Proceedings by . . . member against the . . . officers of the company"—Whether receiver-manager under impugned debenture is an officer of the company—Companies Act 1961, ss. 19 and 20.

D1, a company incorporated under the Companies Act 1936, borrowed money from D2 on the security of a debenture jointly with two associated companies. Alone it borrowed more on the security of a second debenture. P purchased all the shares in D1 and lent it money without security. Default was made under the debentures and D3, on behalf of D2, entered into possession of D1 as receiver-manager. P sought to have the debentures declared void and to have D3 restrained from continuing to act as receiver-manager on the grounds that the debentures had been invalidly executed and, additionally as to the first debenture, that the grant of the debenture was *ultra vires* D1. D1 filed a submitting appearance but D2 and D3 contended that the suit was wrongly constituted and that D1 and not P should have been plaintiff.

*Held*: (1) The suit was brought to redress a wrong done to D1 or to recover money or damages alleged to be done to it. The rule in *Foss* v. *Harbottle* (1843), 2 Hare. 461, prima facie applied to prevent such a suit being brought without D1 being joined as plaintiff.

*Foss* v. *Harbottle, supra; Burland* v. *Earle,* [1902] A.C. 83; *Australian Coal and Shale Employees' Federation* v. *Smith* (1937), 38 S.R. (N.S.W.) 48, followed.

(2) None of the suggested bases for disregarding the rule in *Foss* v. *Harbottle* was established. As to basis (a), that the rule does not apply where the plaintiff is the sole shareholder of the company, because no such exception exists. As to basis (b), that the rule does not apply where the plaintiff seeks to restrain the company or its officers from disregarding the terms of its articles of association, because (without deciding whether such exception exists) a suit in which the only relief sought is a declaration of invalidity of some completed act and an injunction against a debenture holder and receiver-manager is not such a suit. As to basis (c), that the rule may be disregarded where the justice of the case requires it, because (without deciding whether such exception exists) the justice of the present case did not require the court to disregard the rule.

Observations upon the office of receiver-manager, the extent of his powers over the affairs of the company and the affect of his appointment upon the powers and office of directors, particularly the power of the directors to institute proceedings on behalf of the company and to retain a solicitor.

As to basis (d), because although there is an exception to the rule in the case of an *ultra vires* transaction, this exception is limited to cases where the shareholder seeks to restrain the company and its officers from proceeding further with the performance of the *ultra vires* transaction and in the present case no such relief was sought.

*Simpson* v. *Westminster Palace Hotel Co.* (1860), 8 H.L. Cas. 712; *Russell* v. *Wakefield Waterworks Co.* (1875), L.R. 20 Eq. 474, referred to.

*Nankivell* v. *Benjamin* (1892), 18 V.L.R. 543, followed.

Se
actic
coul
do l
head
is it
the
and

(4
beca
was
(b)
char
be s
and

(1
set
by
prio
auth
artic

(

Suit
T
the

(3) The rule in *Foss* v. *Harbottle* is not displaced by s. 20 of the Companies Act 1961. The effect of this section is (a) to confirm the denial to a shareholder of the status to propound on his company's behalf rights belonging to the company to recover assets disposed of in an *ultra vires* transaction (s. 20 (1)); (b) to confirm the status of an individual shareholder to proceed against his company to restrain it from pursuing an *ultra vires* course of conduct and to enable him, in the same proceedings, to seek relief against the other party to the transaction (s. 20 (2)); and (c) where, in the latter case, an order of the court would affect rights between the company and the third party, to confer upon the court jurisdiction to order compensation to be paid between the company and the third party (s. 20 (3)).

Observations upon the legislative scheme in s. 20 (1), (2) and (3).

Section 20 (1) applied in this case to prevent the plaintiff attacking the transaction on the ground that a joint borrowing was *ultra vires* D1 unless the plaintiff could bring itself within the exceptions created by s. 20 (2). This it could not do because: (a) for the reasons expressed in paragraphs 2 (b) and (d) of this headnote, this is not a proceeding by a shareholder against the company; (b) neither is it a proceeding against D3 in his capacity as an officer of the company because the plaintiff could not rely on the debenture to allege that D3 became such officer and at the same time attack it as void.

(4) Without deciding whether s. 20 applies where the transaction is *ultra vires* because it was not for the purposes of D1, the factual basis for such an exception was not established because (a) extraneous purpose was not adequately pleaded, (b) the onus of proof of extraneous purpose was on the plaintiff and was not discharged, and (c) where the act of a company is challenged on this ground it must be shown that the other party to the transaction knew of the invalidating purpose and this was not shown.

(5) Section 19 of the Companies Act 1961, confers upon a company the powers set forth in the Third Schedule to that Act unless expressly excluded or modified by the memorandum or articles. This section applies to companies incorporated prior to that Act coming into force. Clauses 12, 13, 25, and 26 of the Third Schedule authorize the giving of a joint debenture and are not modified or excluded by the articles of D1.

(6) The suit should be dismissed.

**Suit**

The nature of the proceedings and the relevant facts appear sufficiently from the judgment of Street, J. The judgment is divided into sections, namely:—

Nature and form of suit (p. 784).
Summary of facts (p. 785).
Defences (p. 786).
Rule in *Foss* v. *Harbottle* in answer to defective sealing and no valid directors (p. 787).
First suggested basis for disregarding *Foss* v. *Harbottle* (p. 789).
Second suggested basis for disregarding *Foss* v. *Harbottle* (p. 789).
Third suggested basis for disregarding *Foss* v. *Harbottle* (p. 789).
Conclusion on *Foss* v. *Harbottle* as an answer to defective sealing and no valid directors (p. 791).
Rule in *Foss* v. *Harbottle* in answer to *ultra vires* (p. 791).
Section 20 (1) of the Companies Act (p. 794).
Section 20 (2) (a) of the Companies Act (p. 796).
Section 20 (2) (b) of the Companies Act (p. 798).
Section 19 of the Companies Act (p. 799).
Conclusion on *ultra vires* (p. 800).
Decree (p. 800).

*D. L. Mahoney, Q.C.*, and *K. R. Handley*, for the plaintiff.

*John H. Eager* (solicitor), for the first defendant.

*W. P. Deane, Q.C.*, with him *A. M. Gleeson*, for the second defendant.

*D. A. Staff, Q.C.*, and *R. J. Bainton*, for the third defendant.

*Cur. adv. vult.*

**Street, J.:**

*Nature and form of suit*

The plaintiff (a company I shall call Hawkesbury) holds all the shares in the first defendant (a company I shall call Landmark Finance). In this suit (commenced against the three defendants in May 1968) Hawkesbury challenges two mortgage debentures given respectively on 13 April 1964, and 5 August 1966, by Landmark Finance to the second defendant, United Dominions Corp. (Aust.) Ltd. (a company I shall call U.D.C.). A third debenture is mentioned in the statement of claim, but no relief is now sought in respect of it. Pursuant to the two relevant debentures U.D.C. on 11 January 1968, appointed the third defendant, Bruce Henry Smith, to be receiver and manager of the assets and business of Landmark Finance. At the time of this appointment there was allegedly owing by Landmark Finance to U.D.C. under the security of these two debentures a total of $1,996,505; $1,320,367 was alleged to be owing and secured by the first debenture; and $676,138 was alleged to be owing and secured by the second debenture.

Hawkesbury seeks a declaration that the two debentures are void, an injunction restraining U.D.C. from enforcing or attempting to enforce them, and an injunction restraining Smith from continuing to act as receiver and manager of Landmark Finance. Hawkesbury also seeks orders that Smith account for his receipts and disbursements (other than payments to U.D.C.) as receiver and manager of Landmark Finance, and that he pay the surplus of his receipts over disbursements to Landmark Finance. Finally, Hawkesbury seeks an order that U.D.C. repay to Landmark Finance any moneys received by it from Smith during his receivership and management.

Hawkesbury's attack on the first debenture is brought on three grounds. First, it is said that the giving of the debenture was *ultra vires* the powers of Landmark Finance; second, it is alleged that the seal of Landmark Finance was not affixed to the debenture in such a manner as to render Landmark Finance bound thereby; and third, it is alleged that the persons who purported on behalf of Landmark Finance to act as its directors in connexion with the giving of the debenture and the borrowing of moneys thereunder were not directors of Landmark Finance and were incapable of being appointed to such office.

Hawkesbury's attack on the second debenture is based upon the same grounds as provide the second and third grounds of challenge to the first debenture. No question of *ultra vires* arises in connexion with the second debenture.

It is apparent that the immediate party to benefit if Hawkesbury succeeds in this suit will be Landmark Finance itself. Indirectly, any benefits flowing to Landmark Finance will pass on to Hawkesbury as the sole shareholder in and a substantial creditor of Landmark Finance. A submitting appearance has been filed on behalf of Landmark Finance. Although its assets are in fact at the present time in the hands and under the control of Smith as receiver and manager, there are currently directors in office in Landmark Finance. The instructions which led to a submitting appearance being filed on its behalf were given by its managing director, R. J. Blackburn, he being also the managing director of Hawkesbury. It is quite apparent that the directors of both Hawkesbury and Landmark Finance have concurred in the present suit being constituted with Hawkesbury as plaintiff and Landmark Finance as the first defendant.

Prior to the hearing, objection was taken by the solicitors for U.D.C. and Smith to the present suit being brought in the name of Hawkesbury rather than by Landmark Finance itself. This objection has been reiterated from time to time throughout the hearing; Hawkesbury and Landmark Finance have been invited to amend to meet the objection. The last such invitation was as late as the sixteenth day of the twenty-four day hearing when, during the course of the final address of senior counsel for U.D.C., I formally noted that U.D.C. informed the Court that, if application were made by Hawkesbury to substitute Landmark Finance as plaintiff at that stage, no objection would be taken to that application being granted, and U.D.C. would not challenge the retainer

of those acting for Landmark Finance. This invitation was declined by Hawkesbury, as had been all earlier objections and invitations relating to the form in which the suit is cast. I mention this for the reason that, as will subsequently appear, significance attaches to the form in which the suit is cast. It 5 would be regrettable to see the fate of any litigation turning simply upon a question of form in circumstances where the selection of the form of the proceedings might have been made *per in curiam* or involuntarily by reason of the absence of any alternative. In the present suit, however, the form of the proceedings was carefully and advisedly selected and retained. It is possible 10 that the reason for this lies in an argument propounded by Hawkesbury under s. 20 of the Companies Act; but this is mere irrelevant speculation.

*Summary of facts*

  [His Honour then stated the facts in some detail. For the purposes of this report, the facts may be summarized as follows:—

15   (a)  Article 2c (i) of the articles of Landmark Finance was in the following terms:—

  "The said class 'A' shares shall confer on the holders for the time being thereof respectively the right to the management of the said business and the control of the Company, and they alone respectively shall be capable of being 20 Directors of the Company."

  (b)  Article 67 of the articles of Landmark Finance commenced:—

  "The business of the Company shall be managed by the Directors . . . ."

  (c)  Between October 1963 and January 1968 (four months before the institution of this suit) Landmark Finance was controlled by Landmark 25 Corporation Ltd.; from October 1963 to January 1966 it was a wholly owned subsidiary of Landmark Corporation Ltd.; and since January 1966 it was wholly owned by Hawkesbury which in turn was up to January 1968 controlled by Landmark Corporation Ltd. The persons purporting from time to time between October 1963 and January 1968 to act as directors of Landmark 30 Finance (Barton, Armstrong, Cotter and Bovill) were directors of Landmark Corporation Ltd. None of these persons held class A shares, or any shares, in Landmark Finance.

  (d)  The article dealing with the common seal of Landmark Finance (art. 17) was in the following terms:—

35   "The Directors may from time to time determine who shall sign in the name of the Company on its behalf, bills, notes, acceptances, endorsements, cheques and any other documents that the Directors may specify and who shall sign on their behalf and execute documents which, to be binding, must be made under seal, and who are authorised to affix the seal of the Company to such 40 documents PROVIDED ALWAYS that the number of the Directors authorised shall be not less than two."

  (e)  Since mid-1967, and possibly prior to that date, Landmark Finance was insolvent.

  (f)  As well as being the sole shareholder of Landmark Finance, Hawkesbury was also a creditor of Landmark Finance for $460,000 plus interest; 45 certain debentures had been given by Landmark Finance to U.D.C. and if these debentures were valid, Hawkesbury would not receive any dividend on this loan.

  (g)  The first debenture was given on 3 April 1964 pursuant to a deed of contract for loan expressed to be made between U.D.C., therein called the 50 lender, of the one part, and Landmark Finance and two other associated companies (both wholly owned subsidiaries of Landmark Corporation Ltd.), therein called the borrowers, of the other part. The deed of contract for loan related to a lending to the borrowers jointly and severally of the sum of $50,000 together with further advances and accommodation from time to time as might be mutually agreed upon. In association with this deed, the borrowers charged all their respective assets to U.D.C. as security for repayment. The deed bears, *inter alia*, the common seal of Landmark Finance expressed to have been duly affixed pursuant to a resolution of directors and in the presence of the secretary; two directors, Barton and Bovill, were present at the affixing of the seal; it is attested by the signature of one director and the secretary.

30-JAN-2008  13:22  FROM  IALS DS UF8100          TO 902074562222          P.007

Case 1:07-cv-01646-RMC    Document 39-4    Filed 01/31/2008    Page 6 of 162
786        SUPREME COURT OF NEW SOUTH WALES        [1969] 2 N.S.W.R.

The first debenture similarly bears the common seal of Landmark Finance attested by the signature of one director and the secretary.

(h) Further advances were made by U.D.C. according to what became an established course of business. This included the lodging with U.D.C. of a formal request bearing, *inter alia,* the common seal of Landmark Finance with one director's signature appended and an authority to pay bearing, *inter alia,* the common seal of Landmark Finance with one director's signature appended.

(i) The particular challenges made to the first debenture were that a joint and several borrowing along with two other companies such as was involved in the deed of 3 April 1964 was *ultra vires* so far as Landmark Finance was concerned; that the common seal of Landmark Finance was not affixed in the manner required by its articles; and that Barton and Bovill were not directors in that they did not hold "A" shares in Landmark Finance, and that accordingly they could not commit Landmark Finance to the transaction nor could they, so as to bind it thereto, receive moneys for Landmark Finance in the form of the various advances made under the first debenture.

(j) The second debenture was given on 5 August 1966. There were some minor differences between the substance of this transaction and that of the earlier transaction. In the first place, there was only one borrower, namely Landmark Finance. There was accordingly no challenge on the basis of *ultra vires* so far as the second debenture was concerned. The manner of execution was the same—the deed of contract for loan and the deed of charge were both attested by one director and the secretary; two directors were present at the affixing of the seal.

(k) A regular procedural pattern was adopted in relation to advances under the second debenture. Each was preceded by a formal request addressed to U.D.C. and purporting to bear the common seal of Landmark Finance with one director's signature appended. Accompanying the request was a document addressed to U.D.C. similarly purporting to be sealed, *inter alia,* by Landmark Finance (with one director's signature appended) indicating the manner in which the amount was to be paid.

(l) The challenge to the second debenture was confined to the last two grounds on which the first debenture was challenged, namely the defective sealing and the non-qualification of the directors to hold their offices.

His Honour then proceeded:—]

*Defences*

Against this factual background the three attacks made on the first debenture and the two attacks made on the second debenture are met by a number of alternative defences. As U.D.C. and Smith, although separately represented, have a common interest in opposing the grant of relief to the plaintiff, and as there has throughout the hearing been no divergence of interest either in fact or law between U.D.C. and Smith, I shall not differentiate between the defences advanced by each of these defendants. I shall treat them as a single series of defences.

The defences may be summarized as follows:—

A. As to the whole suit: Hawkesbury, as a shareholder, is seeking to assert and enforce rights of Landmark Finance against U.D.C. and Smith; the rule in *Foss* v. *Harbottle* (1843), 2 Hare 461, precludes Hawkesbury having the status to bring such a suit.

B. As to the *ultra vires* challenge to the first debenture:—
(i) The granting of joint debentures was *intra vires* the objects and powers of Landmark Finance.
(ii) Section 19 of the Companies Act 1961, conferred the necessary powers on Landmark Finance (see cll. 12, 13, 25 and 26 of the Third Schedule).
(iii) Section 20 (1) of the Companies Act prevents the debenture from being invalid on the ground of *ultra vires.*
(iv) Section 20 (2) of the Companies Act prevents it being alleged in these proceedings that the debenture was *ultra vires.*

W.R.

ance

e an
of a
ance
*inter*
ature

joint
olved
: was
n the
ctors
that
i nor
ce in

some
f the
amely
*ultra*
ution
: both
it the

under
ed to
: with
iment
imark
ier in

t two
ective

: first
by a
irately
:o the
ice of
l not
:nts. I

ng to
h; the
having

:s and

:essary
Third

: from

ged in

(v) Even if a joint borrowing and the giving of a joint debenture was *ultra vires*, the debenture will be valid in equity as regards all moneys actually lent to Landmark Finance (*Re Johnston Foreign Patents Co. Ltd.*, [1904] 2 Ch. 234).

5    C. As to the challenge that there were no valid directors of Landmark Finance:—

(i) Hawkesbury became a shareholder and creditor as a result of the acts of these individuals as directors and therefore cannot reprobate their holding of such offices.

10    (ii) They were validly appointed directors—art. 2c (i) does not operate in the case where there is only one holder of shares.

(iii) If art. 2c (i) does apply where there is only one holder of shares, it was, and is, void as contravening either s. 120 of the Companies Act 1936, or s. 114 (2) of the Companies Act 1961.

15    (iv) The persons acting as directors were appointed and acted in all things with the knowledge and consent of all shareholders, and consequently the appointment was effective.

(v) Section 119 of the Companies Act 1961, and art. 88 of Table A validate the acts of the directors.

20    (vi) The rule in *Turquand's Case* (1858), 6 E. & B. 327 (or in *Mahony's Case* (1875), L.R. 7 H.L. 869) precludes Landmark Finance from asserting against U.D.C. that its directors were invalidly appointed.

(vii) Section 51A of the Conveyancing Act requires the debentures to be deemed to be duly executed.

25    (viii) All shareholders of Landmark Finance knew, approved and consented to the giving of the debentures and this makes them valid and effective notwithstanding any defect in the appointment of the directors or failure to comply with the articles of association.

(ix) All shareholders of Landmark Finance subsequently ratified the transactions involving the giving of the debentures and the borrowings thereunder.

30    (x) Both Hawkesbury and Landmark Finance are estopped from alleging against U.D.C. and Smith that the debentures are invalid.

D. As to the challenge that the seal was not affixed in accordance with the articles:—

35    (i) In the absence of a determination by the directors in accordance with art. 87, that article does not apply, and ordinary common law principles govern the affixing of the seal, no attestation being required.

(ii) On its true construction art. 87 only requires two directors to affix and not to attest the affixing of the seal.

40    (iii) The original articles were amended or varied at a meeting of directors attended by both shareholders on 22 September 1960, resolving that the seal should not be affixed except in the presence of one director and countersigned by the secretary.

(iv) Even if the seal were not properly affixed it would operate as a signature on behalf of the company and would be effective in equity to create an equitable charge.

45    (v) The same defence as noted in C (vii).
(vi) The same defence as noted in C (viii).
(vii) The same defence as noted in C (ix).
(viii) The same defence as noted in C (x).

E. As to the whole suit: the Court has jurisdiction under s. 366 of the Companies Act to negative avoidance of these debentures on all of the challenges made to them and in the circumstances this jurisdiction should be exercised in favour of U.D.C. and Smith.

*Rule in Foss v. Harbottle in answer to defective sealing and no valid directors*

I shall deal first with the *Foss* v. *Harbottle* defence to the attacks based upon the alleged failure to comply with the article governing the affixing of the seal and the alleged invalidity of the appointment of directors. The application of the rule in *Foss* v. *Harbottle, supra*, to the attack on the ground of *ultra vires* raises somewhat different considerations. I shall return later to discuss that aspect.

I have been referred during the course of argument to a great many authorities and learned writings upon the principle known as the rule in *Foss* v. *Harbottle, supra*. The classic statement of that rule is in the words of Lord Davey in *Burland* v. *Earle*, [1902] A.C. 83, at pp. 93-4: "It is an elementary principle of the law relating to joint stock companies that the Court will not interfere with the internal management of companies acting within their powers, and in fact has no jurisdiction to do so. Again, it is clear law that in order to redress a wrong done to the company or to recover moneys or damages alleged to be due to the company, the action should prima facie be brought by the company itself. These cardinal principles are laid down in the well-known cases of *Foss* v. *Harbottle, supra*, and *Mozley* v. *Alston* (1847), 1 Ph. 790, and in numerous later cases which it is unnecessary to cite. But an exception is made to the second rule, where the persons against whom the relief is sought, themselves hold and control the majority of the shares in the company, and will not permit an action to be brought in the name of the company. In that case the courts allow the shareholders complaining to bring an action in their own names. This, however, is mere matter of procedure in order to give a remedy for a wrong which would otherwise escape redress, and it is obvious that in such an action the plaintiffs cannot have a larger right to relief than the company itself would have if it were plaintiff and cannot complain of acts which are valid if done with the approval of the majority of the shareholders, or are capable of being confirmed by the majority. The cases in which the minority can maintain such an action are, therefore, confined to those in which the acts complained of are of a fraudulent character or beyond the powers of the company. A familiar example is where the majority are endeavouring directly or indirectly to appropriate to themselves money, property, or advantages which belong to the company, or in which the other shareholders are entitled to participate, as was alleged in the case of *Menier* v. *Hooper's Telegraph Works* (1874), 9 Ch. App. 350. It should be added that no mere informality or irregularity which can be remedied by the majority will entitle the minority to sue, if the act when done regularly would be within the powers of the company and the intention of the majority of the shareholders is clear."

In *Australian Coal and Shale Employees' Federation* v. *Smith* (1937), 38 S.R. (N.S.W.) 48, Jordan, C.J., drew attention to the two branches of this rule. Recognition of these two branches, or principles, is necessary for the understanding of the many cases in which reference is made simply to the rule in *Foss* v. *Harbottle, supra*. I adopt the description of these two principles put forward by Mr. Mahoney, Q.C.: the first is the proper plaintiff principle; the second is the internal management principle. Frequently the operation of these two principles overlaps. But in the present case it is the first, or proper plaintiff, principle in respect of which the rule in *Foss* v. *Harbottle, supra*, is significant.

In challenging the two debentures given by Landmark Finance, Hawkesbury is asserting a right or entitlement in favour of Landmark Finance as against U.D.C. and Smith. The relief sought falls within the general description used by Lord Davey, ". . . in order to redress a wrong done to the company or to recover moneys or damages alleged to be due to the company . . .". It is the company's cause of action against U.D.C. and Smith that Hawkesbury seeks to litigate. This, perhaps, is most clearly demonstrated by the prayers in the statement of claim. In none of the prayers, except that relating to costs, does Hawkesbury seek any relief for itself. The relief sought is the freeing of Landmark Finance from being bound by these debentures to U.D.C., the restraining of the enforcement of the debentures, and the investigation of Smith's dealings, with a view to recoupment being made to Landmark Finance. These are claims which "should prima facie be brought by the company itself".

Notwithstanding the depth of the argument, no occasion arises in the present suit to investigate the reasons or justification for the rule in *Foss* v. *Harbottle, supra*. It is a firmly entrenched principle of company law. Jordan, C.J., described it in *Australian Coal and Shale Employees' Federation* v. *Smith, supra*, at p. 59 as a rule of substance of sturdy growth. It may at times simply have procedural consequences. It may at other times, as in the present suit,

HAWKESBURY DEVELOPMENT v. LANDMARK FINANCE (Street, J.)    789

have substantive consequences. But whichever be the consequence of applying the rule in a given case, the effect of the rule is clear. Prima facie action must be brought in the name of the company; disregard of this will inevitably lead to the dismissal of the suit unless such disregard can be justified under one of the exceptions to the rule.

*First suggested basis for disregarding Foss v. Harbottle*

It has been argued by the plaintiff that there are three grounds upon which the present suit may be regarded as an exception to the rule. The first of these grounds is that the present plaintiff is in fact the sole shareholder in Landmark Finance. It is said that in such circumstances no occasion arises to apply the rule. I have not been referred to any case in which this circumstance has been regarded as justifying an exception to the rule. It is said that an exception exists where a minority is being fraudulently over-ridden and hence if a minority can sue in some circumstances surely the sole shareholder can sue in all circumstances. But this argument erroneously assumes that this exception simply gives to a minority a right to sue that is available to the majority. Of course it does not. A majority is just as much bound by the rule as a minority. The only significance of there being a sole shareholder is that there can never be occasion for allowing the fraudulently over-ridden minority exception. The rule itself applies directly and the suit must be brought in the company's name.

*Second suggested basis for disregarding Foss v. Harbottle*

In the second place it is contended that the rule does not apply in proceedings in which a shareholder in a company is seeking to restrain the company or its officers from disregarding the terms of the articles of association. It is contended that in such a suit brought by a shareholder against his company or its officers, relief can also be sought for the benefit of the company against a stranger, such stranger being said to be a proper defendant to such a suit. Without wishing to be taken to assent to a general proposition in these terms, I need not stay to examine its validity. The fact is that this is not in form or in substance a suit to restrain either Landmark Finance or its officers from disregarding the requirements of the articles. No relief whatever is sought against Landmark Finance. And the relief sought against U.D.C. and Smith (even if Smith be regarded as an officer of the company for this purpose) is not relief requiring observance by them of the articles. The relief sought is grounded on their acting tortiously and without any authority from Landmark Finance. The only relief sought is against wrongs done and threatened by them to the company. I reject this suggested basis for disregarding the rule in *Foss* v. *Harbottle* (1843), 2 Hare. 461.

*Third suggested basis for disregarding Foss v. Harbottle*

In the third place it is alleged that there remains open an exception to the rule in *Foss* v. *Harbottle, supra,* where justice so requires. There are to be found amongst discussions of the rule in *Foss* v. *Harbottle, supra,* some expressions of doubt as to whether there is in truth any room for any further extension of the exceptions under this broad heading. (See for example, *Pavlides* v. *Jenson,* [1956] 2 All E.R. 518; [1956] Ch. 565, at pp. 574-6 and the discussion of the rule by Dr. Rice in *The Conveyancer* vol. 25, 44, at p.54.) It is, perhaps, a useful door to be left open lest in some extremely unusual circumstances injustice would result from applying the rule. No exhaustive or even descriptive statement of such circumstances has been propounded. Nor have I been referred to any case constituting an example of the rule being disregarded solely because the justice of the case so required, not being a case falling within one of the other recognized exceptions. It is the absence of definition or example of such exception that, no doubt, underlies such observations as are to be found to the effect that there is in truth no admissible ground for further exceptions. It would, however, be regrettable if the difficulty of foreseeing a possible need for allowing any further exception were to be elevated to an anticipatory refusal to recognize any future case as being justly treated as an exception.

For the purposes of the present judgment I am prepared to accept the existence of a further exception to the rule in *Foss* v. *Harbottle, supra,* where justice so requires (cf. *Heyting* v. *Dupont,* [1964] 2 All E.R. 273; [1964] 1

30-JAN-2008 13:24 FROM IALS DS UF8100    TO 902074562222    P.011

Case 1:07-cv-01646-RMC    Document 39-4    Filed 01/31/2008    Page 10 of 162
790    SUPREME COURT OF NEW SOUTH WALES    [1969] 2 N.S.W.R.

W.L.R. 843, at pp. 851, 854). But I am unable to conclude that either of the two particular matters put forward is sufficient to render the present case within such an exception. The first of such particular matters is that Hawkesbury is a substantial creditor of Landmark Finance and, as such, ought to be recognized as having the status to sue, notwithstanding the rule in *Foss* v. *Harbottle, supra*. There is no basis in principle for permitting a creditor to assert, in proceedings brought by him in his own name, causes of action reposing in his debtor against third parties. Such a creditor is confronted with hurdles more deeply rooted in principle than the rule in *Foss* v. *Harbottle, supra*. As a general proposition this does not merit discussion. I reject Hawkesbury's interest as a creditor as a basis for justice requiring departure from the rule.

The other suggested basis for justice requiring a departure from the rule is that Landmark Finance is in the hands of a receiver and manager, and is accordingly unable to bring these proceedings in its own name. Here again I note at the outset the absence of any authority recognizing this as a basis for disregarding the rule. The point does not appear to have been put forward on any earlier occasion. Indeed, in the ordinary course of business in this and other courts, one not uncommonly encounters challenges to debentures made in the name of the debtor company as plaintiff at a point of time when there is a receiver and manager purporting to have the control and management of the company's assets and business. A recent example in this Court was *A. E. Goodwin Ltd.* v. *Ogilvy* (7 June 1969, unreported). Examples are to be found amongst the reports of decisions in the High Court: *Mayfair Trading Company Pty. Ltd.* v. *Dreyer* (1958), 101 C.L.R. 428; *J. B. Witts Pty. Ltd.* v. *Wholesalers (Australia) Pty. Ltd.*, [1965] A.L.R. 444; 109 C.L.R. 322.

There are directors of Landmark Finance currently in office. Indeed, it was the managing director, R. J. Blackburn, who gave instructions for the submitting appearance to be filed on behalf of Landmark Finance. Receivership and management may well dominate exclusively a company's affairs in its dealings and relations with the outside world. But it does not permeate the company's internal domestic structure. That structure continues to exist notwithstanding that the directors no longer have authority to exercise their ordinary business-management functions. A valid receivership and management will ordinarily supersede, but not destroy, the company's own organs through which it conducts its affairs. The capacity of those organs to function bears a direct inverse relationship to the validity and scope of the receivership and management.

If the present attack on the debenture be well founded, then the interference by Smith in the affairs of Landmark Finance is wrongful, and Landmark Finance both has the power to bring and ought to bring the challenge in its own name. For it to be claimed on behalf of Hawkesbury that Landmark Finance cannot sue in its own name because there is a receiver and manager in possession overlooks the point of substance that it is the validity of the receiver and manager's title which provides the core of the present suit. It is not as if the receiver and manager has been able to create a situation in which the shareholders in Landmark Finance through their duly appointed board are literally unable to bring such a suit as this in the name of Landmark Finance. Indeed it is not easy to envisage such a situation. As Buckley says: "If the case be one in which the company ought to be plaintiff, the fact that the seal is in the possession of the adverse party will not necessarily preclude the intending plaintiffs from using the company's name." (*Buckley on The Companies Acts*, 13th ed., p. 171.)

If the case is well founded, then the directors undoubtedly have the capacity and power to bring it in the name of Landmark Finance. But even if the attack on the debentures is not well-founded, and ultimately fails, I am still of the view that the directors of Landmark Finance have the capacity, notwithstanding the apparently all-embracing terms of the debenture and the appointment of the receiver and manager, to cause proceedings to be instituted in the company's name challenging the debenture. It would be strange to contemplate a debenture, or, for that matter, any other engagement, being permitted to stand on such a high plane as to be immune from challenge

HAWKESBURY DEVELOPMENT v. LANDMARK FINANCE (STREET, J.)   791

by the party entering into it. If it be necessary to go so far, I would hold that
a floating charge purporting to extend, as does the present, to the whole of
the assets and undertaking of a company, does not, upon appointment of a
receiver and manager thereunder, extend to fettering the capacity or power of
5   the directors of the company to cause proceedings to be instituted in the name
of the company challenging that debenture. Both principle and common sense
provide substantial support for this proposition. Its validity is perhaps well
demonstrated by postulating a situation in which a debenture is invalid, and
inquiring by whom the proceedings to challenge it are to be instituted. It
10   borders on the absurd to contemplate the receiver and manager having the
power to institute proceedings in the name of the company, challenging the
very debenture to which he owes his office; and if the power does not reside in
him to use the company's name to challenge it, it would seem that it must
remain with those who control whatever residual aspects of the company's
15   affairs are not caught by the debenture; that is to say, it must remain with the
directors.

It is in my view not to the point to assert that proceedings such as these,
if brought in the name of the company, could be diverted into a contest on
the validity of the retainer of the solicitor purporting to act in the name of
20   the company. A challenge to retainer is an interlocutory procedural step, and
ordinarily the Court would not on such a challenge determine the whole point
at issue in the suit. There might, of course, be cases in which the wishes of
the parties or other appropriate circumstances might induce the Court to deter-
mine the major substantive issue upon such an application. But whether in
25   the ordinary course of a final hearing, or in the course of making a final
determination at an earlier stage, it is in my view open to a company to liti-
gate before a court in proceedings instituted in its own name a challenge to a
debenture in respect of which a receiver and manager has been appointed. I
should, however, add that in recognizing this residual capacity in the company
30   I am not to be taken to be expressing the view that its credit for costs could
be pledged in priority to or equally with the claim of the debenture holder in
the event of the company's challenge failing.

*Conclusion on Foss v. Harbottle as an answer to defective sealing and no valid
directors*

35   For the foregoing reasons I do not consider that the present case is to be
regarded as brought within an exception to the rule in *Foss* v. *Harbottle*
(1843), 2 Hare. 461. The challenge to the appointment and actions of the
directors and to the affixing of the seal is a challenge which ought to have
been made in a suit instituted by Landmark Finance as plaintiff. This course,
not having been followed, the consequence is that the suit, so far as it rests
40   on those two challenges, fails.

The decision I have reached upon the rule in *Foss* v. *Harbottle, supra,* leads
to the failure of both challenges to the second debenture, and of the second
and third challenges to the first debenture. (leaving the *ultra vires* question
outstanding). I shall refrain from discussing other defences.

45   [His Honour then explained his reasons for taking this course and
continued:—]

I turn to the challenge made to the first debenture on the ground that it was
*ultra vires.* The basis of the challenge is that the debenture was entered into
by Landmark Finance jointly and severally with two other companies of the
Landmark group, the terms of the debenture being effective to create a charge
50   over the assets and undertaking of Landmark Finance to secure joint and
several advances to Landmark Finance and the other two companies.

*Rule in Foss v. Harbottle in answer to ultra vires*

The rule in *Foss* v. *Harbottle, supra,* is relied upon by U.D.C. and Smith
in answer to the plaintiff's claim that the giving of the first debenture was *ultra
vires.* The plaintiff replies that a company in general meeting cannot ratify
an act which is *ultra vires.* Hence, it is said, an individual shareholder can
bring proceedings in his own name seeking relief from the Court in respect
of an *ultra vires* transaction entered into by his company.

792     SUPREME COURT OF NEW SOUTH WALES      [1969] 2 N.S.W.R.

I have some doubt as to whether prospective ratification is a real element underlying the application of the rule in *Foss* v. *Harbottle, supra*. I am aware that in many cases in which an individual shareholder has failed by reason of the rule, it has been said that the company in general meeting might well ratify the transaction under challenge. Equally, the converse has been said where an *ultra vires* transaction is under consideration and an exception to the rule has been allowed. It may be that it is not so much the prospect of ratification which is of significance, but rather the prospect of the company declining to make an affirmative decision to propound and prosecute a claim in respect of the transaction. But whether this be so or not, the authorities establish that an individual shareholder, regardless of the rule in *Foss* v. *Harbottle* (1843), 2 Hare. 461, may bring proceedings to restrain his company from pursuing an *ultra vires* course of conduct, and in such proceedings may propound against third parties rights belong to his company. Two of the leading authorities are *Simpson* v. *Westminster Palace Hotel Co.* (1860), 8 H.L. Cas. 712 and *Russell* v. *Wakefield Waterworks Co.* (1875), L.R. 20 Eq. 474.

In *Simpson's Case* the defendant company had entered into an agreement to lease part of the company's premises. The plaintiff joined as defendants to his bill the company itself as well as the other party to the agreement for lease; the relief sought in the bill was a declaration that the agreement was invalid, and an injunction restraining the company from proceeding with its performance. The main contest on the suit was whether the agreement was *ultra vires*. In the House of Lords it was contended on behalf of the company that the plaintiff had no right to maintain the suit, and reference was made, *inter alia*, to *Foss* v. *Harbottle, supra*, and *Mozley* v. *Alston* (1847), 1 Ph. 790. The House of Lords did not deal specifically with this defence; their Lordships were all of the view that the agreement was not *ultra vires*. In effect they entertained the suit brought at the instance of an individual shareholder, although on the merits they declined to grant relief.

*Russell* v. *Wakefield Waterworks Co., supra*, is more directly in point. In that case the individual shareholder who sued as plaintiff purported to sue on behalf of himself and all other shareholders except the defendants. He named his own company as a defendant, together with its directors and six other persons who were alleged to have received moneys paid out by the company *ultra vires*. The defendants demurred on the ground that the plaintiff's bill did not sufficiently allege that the payment was *ultra vires*, and on the second ground that the suit was wrongly framed, reference being in the latter regard being made to *Foss* v. *Harbottle, supra*, and *Mozley* v. *Alston, supra*. Jessel, M.R., upheld the first ground of demurrer. He went on to discuss the second ground, and in L.R. 20 Eq., at p. 481 said: "It remains to consider what are those exceptional cases in which, for the due attainment of justice, such a suit should be allowed. We are all familiar with one large class of cases which are certainly the first exception to the rule. They are cases in which an individual corporator sues the corporation to prevent the corporation either commencing or continuing the doing of something which is beyond the powers of the corporation. Such a bill, indeed, may be maintained by a single corporator, not suing on behalf of himself and of others, as was settled in the House of Lords in a case of *Simpson* v. *Westminster Palace Hotel Co., supra*. If the subject-matter of the suit is an agreement between the corporation acting by its directors or managers and some other corporation or some other person strangers to the corporation, it is quite proper and quite usual to make that corporation or person a Defendant to the suit, because that other corporation or person has an interest, and a great interest, in arguing the question and having it decided, once for all, whether the agreement in question is really within the powers or without the powers of the corporation of which the corporator is a member. So that in these cases you must always bring before the Court the other corporation . . . . When you have got the second corporation or person a party to the suit, it may happen that, in addition to the relief that you are entitled to as regards the first, you are entitled to have relief against the second for something that has been done under the *ultra vires* agreement. You may be entitled to have money paid back which has been paid under the *ultra vires* agreement, as in the case of *Salomons* v. *Laing*

HA'

(18
othe
the
part
Cou
prin
at p
or t
whi
on
in a
to r
to t

T
shar
seek
with
prin
not,
does
but
a cl:
out,
Fina
U.D
to r
(18'
is s
543
2 H
ceed
asse

In
rule
by I
565,
"In
reco
the
an i
thin
thir
incic
the
the
"If,
com

If
relic
of r
rule
plair
incic
soug
in F
Cou
is a
Lane
treat
oper
If
the

HAWKESBURY DEVELOPMENT v. LANDMARK FINANCE (Street, J.)   793

(1850), 12 Beav. 339, and you may be entitled to have property returned or
other acts done. If the detainer or holder of the money or property, that is,
the second corporation or other person, is already a party, and a necessary
party, to the suit, it would be indeed a lame and halting conclusion if the
5   Court were to say it cannot [The report reads 'could'; this is clearly a mis-
print for 'cannot'—see 44 L.J. Ch. 496, at p. 499, and 32 L.T. (N.S.) 685,
at p. 689.] do justice in a suit so framed by ordering the money to be returned
or the property restored. It is a necessary incident to the first part of the relief
which can be obtained by individual corporators, and will do complete justice
10  on each side, and that has always been the practice of the Court. Therefore,
in a case so framed there is no objection to a suit by an individual corporator
to recover from another corporator, or from any other persons being strangers
to this corporation, the money or property so improperly obtained."

The law as laid down in this authoritative statement permits an individual
15  shareholder to seek relief against a stranger in a suit in which the shareholder
seeks also to restrain his company and its officers from proceeding further
with the performance of the *ultra vires* transaction under challenge. This
principle is too securely rooted in authority to be open to question. It does
not, however, necessarily extend to a case in which the individual shareholder
20  does not seek any relief whatever against his own company or its officers,
but simply seeks to litigate against a stranger for the benefit of his company
a claim that a particular transaction was *ultra vires*. As I have already pointed
out, in the present suit Hawkesbury does not seek any relief against Landmark
Finance; it seeks simply to propound rights of Landmark Finance against
U.D.C. and Smith. There is in my view a great deal to be said for declining
25  to regard the principles laid down in *Russell* v. *Wakefield Waterworks Co.*
(1875), L.R. 20 Eq. 474, as covering a case such as the present. Indeed, there
is specific authority to this effect: in *Nankivell* v. *Benjamin* (1892), 18 V.L.R.
543, at pp. 550-1, Hodges, J., held that the rule in *Foss* v. *Harbottle* (1843),
2 Hare 461, lays down that a company is the only proper plaintiff in pro-
30  ceedings in which the only relief sought is the recovery for the company of
assets disposed of by it in an *ultra vires* transaction.

In *Buckley on the Companies Act*, 13th ed., pp. 169-71, the effect of the
rule in *Foss* v. *Harbottle, supra,* is summarized in terms which were approved
by Danckwerts, J., in *Pavlides* v. *Jensen*, [1956] 2 All E.R. 516; [1956] 1 Ch.
35  565, at pp. 572-4. The second proposition in *Buckley* is in the following terms:
"In any proceeding brought to redress a wrong done to the corporation or to
recover property of the corporation, or to enforce rights of the corporation,
the corporation is the only proper plaintiff. Except that if (see rule 3, *infra*)
an individual corporator sues the corporation to prevent it from doing some-
40  thing *ultra vires*, e.g., to restrain it from carrying out an agreement with a
third party, and joins that third party as a defendant, then as a necessary
incident to the first part of the relief claimed, the court will go on to direct
the repayment of money, or restoration of property paid or disposed of under
the agreement." In a rider to the third proposition in *Buckley*, it is stated:
"If, however, a majority are opposed to the illegal act, *quaere* whether the
45  company should not be made, or at any rate joined, as plaintiff."

If in a shareholder's action based upon *ultra vires* the true position be that
relief against a third party is granted as "a necessary incident" to the grant
of relief restraining the company from carrying out the transaction, then the
rule in *Foss* v. *Harbottle, supra,* stands squarely across the path of the present
plaintiff. The relief sought against U.D.C. and Smith is not simply a necessary
50  incident to the grant of relief against Landmark Finance: it is the only relief
sought in the suit. It is difficult to avoid the conclusion that the basic principle
in *Foss* v. *Harbottle* denies Hawkesbury the right as a plaintiff to sue in this
Court in respect of corporate rights belonging to Landmark Finance. There
is a great deal to be said for the proposition that in a suit such as this
Landmark Finance is the only proper plaintiff, and that there is no basis for
treating the present *ultra vires* challenge as excepted from or lying outside the
operation of the rule in *Foss* v. *Harbottle, supra.*

If it were necessary so to do, I would hold for the foregoing reasons that
the plaintiff's challenge to the first debenture based on the ground of *ultra*

30-JAN-2008 13:27 FROM IALS DS UF8100 TO 902074562222 P.015

Case 1:07-cv-01646-RMC Document 39-4 Filed 01/31/2008 Page 14 of 162
794 SUPREME COURT OF NEW SOUTH WALES [1969] 2 N.S.W.R.

*vires* fails by reason of the operation of the rule in *Foss* v. *Harbottle, supra*. I recognize, however, that, apart from what was said by Hodges, J., in *Nankivell* v. *Benjamin, supra*, there is not in the decided cases or in treatises on company law a direct proposition on all fours with this view. Moreover, the frequent references to be found in the authorities to the concept of "ratification" as underlying the rule in *Foss* v. *Harbottle* leave room for debate on the point. I think it preferable, therefore, to base my conclusion in relation to the ultra vires challenge upon s. 20 of the Companies Act.

### Section 20 (1) of the Companies Act

Section 20 is in the following terms:—

"20. (1) No act of a company (including the entering into of an agreement by the company) and no conveyance or transfer of property, whether real or personal, to or by a company shall be invalid by reason only of the fact that the company was without capacity or power to do such act or to execute or take such conveyance or transfer.

"(2) Any such lack of capacity or power may be asserted or relied upon only in —

(a) proceedings against the company by any member of the company or where the company has issued debentures secured by a floating charge over all or any of the company's property, by the holder of any of those debentures or the trustees for the holders of those debentures, to restrain the doing of any act or acts or the conveyance or transfer of any property to or by the company;

(b) any proceedings by the company or by any member of the company against the present or former officers of the company; or

(c) any petition by the Minister to wind up the company.

"(3) If the unauthorised act, conveyance or transfer sought to be restrained in any proceedings under paragraph (a) of subsection (2) of this section is being or is to be performed or made pursuant to any contract to which the company is a party, the Court may if all the parties to the contract are parties to the proceedings and if the Court deems it to be just and equitable set aside and restrain the performance of the contract and may allow to the company or to the other parties to the contract (as the case requires) compensation for the loss or damage sustained by either of them which may result from the action of the Court in setting aside and restraining the performance of the contract but anticipated profits to be derived from the performance of the contract shall not be awarded by the Court as a loss or damage sustained."

It is to be observed in relation to s. 20 that if, in truth a concept of prospective ratification underlies the rule in *Foss* v. *Harbottle*, those considerations no longer have significance in the light of s. 20 (1). The old doctrine of *Ashbury Railway Carriage and Iron Co.* v. *Riche* (1875), L.R. 7 H.L. 653, no longer has the same far-reaching significance upon an ultra vires transaction. This lends added force to the proposition that the rule in *Foss* v. *Harbottle* should now be directly applied to deny to an individual shareholder a right to bring proceedings against a stranger seeking solely to recover for his company the proceeds of some ultra vires transaction. As I have already said, it appears to me that this proposition may be well founded even without calling in aid s. 20. The intervention of the legislature in limiting the operation of the doctrine of ultra vires by s. 20 presents an even greater justification for applying the rule to the present suit. There is now less reason for distinguishing, when considering the application of the rule in *Foss* v. *Harbottle*, between an ultra vires transaction and any other transaction in which a company's rights against a third party are in suit.

The plaintiff contends that the first debenture was ultra vires Landmark Finance for two reasons: first, that the debenture is ultra vires because it was given by Landmark Finance jointly with two other companies, this being said to be outside the scope of the memorandum; and, second, that it is ultra vires because it was not given for the purposes of Landmark Finance. The plaintiff contends that these are two distinct heads for challenging the debenture as being ultra vires, and that s. 20 operates only in respect of the first of such heads of challenge. The argument is that where an exercise of a power is

HAWKESBURY DEVELOPMENT v. LANDMARK FINANCE (Street, J.)    795

vitiated by an extraneous purpose so as to render the act of exercise *ultra vires*, then s. 20 will not operate.

I need not stay to examine the validity of this argument. The case as pleaded by the plaintiff does not in terms allege as a ground for holding the first debenture to be *ultra vires* that it was given otherwise than for the purposes of Landmark Finance. The giving of the debenture is not challenged as a fraud on the power; it is challenged as lying outside power. Not only is there no allegation in the statement of claim that the joint debenture is *ultra vires* because it was given otherwise than for the purposes of Landmark Finance, but the evidence does not enable me to reach such a conclusion in point of fact. So far from not being pleaded or brought out during the course of the evidence, the argument that the first debenture, although within the literal terms of the objects clause, was nevertheless *ultra vires* by reason of not being for the purposes of Landmark Finance, was not put as part of the plaintiff's submissions in chief; the submission then made was that "the memorandum does not authorise joint and several borrowing or charging to secure a joint and several borrowing". The suggested invalidating purpose was first mentioned in the submissions put in reply by the plaintiff's counsel.

The onus of establishing the invalidating purpose rests on the plaintiff. On this aspect of the matter I am not satisfied that this onus has been discharged. Moreover, it is clear on the authorities that if an act within the literal scope of the objects clause is to be held *ultra vires* by reason of the presence of an invalidating purpose, knowledge of that invalidating purpose must be brought home to the other party to the transaction (*Re David Payne & Co. Ltd.*; *Young v. David Payne & Co. Ltd.*, [1904] 2 Ch. 608; *Caines v. J. E. Austin and Sons Ltd.* (1958), 75 W.N. (N.S.W.) 267, at pp. 270-1; *Re Introductions Ltd.*; *Introductions Ltd. v. National Provincial Bank Ltd.*, [1969] 1 All E.R. 887; and *Charterbridge Corporation v. Lloyds Bank*, [1969] 3 W.L.R. 122). So far from the evidence establishing that U.D.C. had knowledge of any invalidating purpose, its understanding of the purpose of the transaction was set out in its letter of instructions to the solicitors acting for it some months before the actual signing of the debenture, namely:—

"The purpose of the loan is:

"(a) To pay out the existing loan mentioned in first paragraph of this letter (Approximate pay-out figure is £8125).

"(b) To provide cash to Landmark Finance Pty. Limited for working capital."

This was the purpose understood to underlie the first advance of £50,000 on the first charge. And I am not satisfied that the plaintiff has discharged the onus of proving that the officers of U.D.C. had, in respect of any of the later individual advances under the first debenture, knowledge or notice that the purpose thereof was such as to render the borrowing *ultra vires*.

I place aside the contention that the borrowing was invalidated by the presence of an extraneous purpose. In summary, (a) the presence of an invalidating extraneous purpose was not pleaded, nor did it form any part of the plaintiff's case prior to the plaintiff's argument in reply; (b) I am not satisfied on the evidence that the plaintiff has discharged the onus of proving the presence of an invalidating extraneous purpose; and (c) I am not satisfied on the evidence that the plaintiff has discharged the onus of proving that U.D.C. was aware of the presence of an invalidating extraneous purpose. I return, then, to consider the operation of s. 20 on the basis that the plaintiff's challenge on *ultra vires* is confined to a claim that the joint borrowing lay outside the literal scope of the borrowing power of Landmark Finance as conferred in the objects clause of its memorandum.

Section 20 (1) is in my view directly applicable to the plaintiff's contention that a joint borrowing was beyond the power of Landmark Finance. The plaintiff's allegation is that Landmark Finance lacked the power to give this joint debenture to secure joint borrowings. But, even if it did, s. 20 (1) provides in terms that Landmark Finance's act in that connexion shall not be invalid by reason only of the fact that Landmark Finance was without such power. Generally speaking, subsection (1) strikes down the absolute effect of

the *ultra vires* doctrine. An *ultra vires* transaction is no longer a complete
nullity, incapable of being recognized as a transaction at all. On the contrary,
it is a transaction which, in general terms, is not invalid by reason only of the
fact that the company was without the capacity or power to enter into the
transaction. But whilst the general nullifying effect of the *ultra vires* doctrine
is abolished by s. 20 (1), the legislature has marked out certain fields within
which significance will still attach to an excess by a company or its officers of
the legitimate scope for its activities as enunciated and restricted by the terms
of its objects clause.

### Section 20 (2) (a) of the Companies Act

There has been argument in the present suit upon the effect of subsections
(2) and (3) of s. 20. The plaintiff contends that it is entitled to make the
assertion of *ultra vires* in this suit under subsection (2) (a) of s. 20. This will
permit lack of power to be asserted or relied on in "proceedings" falling within
s. 20 (2) (a). It is argued that s. 20 (2) (a) encompasses two types of pro-
ceedings, viz.: "proceedings against the company by any member of the
company", and "proceedings against the company . . . where the company has
issued debentures secured by a floating charge over all or any of the com-
pany's property, by the holder of any of those debentures or the trustee for
the holder of those debentures, to restrain the doing of any act or acts or the
conveyance or transfer of any property to or by the company."

Alternatively it is argued that, if the concluding portion commencing "to
restrain" is descriptive of each of the two types of proceedings, then this con-
cluding portion itself is divided into two parts, viz.: "to restrain the doing of
any act or acts" and "to restrain . . . the conveyance or transfer of any property
to or by the company".

On the basis of these arguments Hawkesbury contends that these are pro-
ceedings against Landmark Finance by a member. Alternatively it is contended
that they are proceedings against Landmark Finance by a member to restrain
the doing of acts.

I do not consider that either of these alternative arguments correctly
construes s. 20 (2) (a). As an exercise in grammatical analysis both arguments
are open. But when read as an ordinary piece of legal language there is a
strong predisposition towards reading the "to restrain" portion back as
descriptive of the words "proceedings against the company". And similarly
there is a strong predisposition towards reading the final words "to or by the
company" as extending throughout the portion commencing "to restrain".

The purpose of para. (a) is to allow proceedings asserting *ultra vires* to be
brought against the company by a member, debenture holder or trustee. Those
proceedings must be meaningful so far as the company is concerned. They
must be proceedings for relief against the company. In the concluding portion
of the paragraph one finds, as one would expect, an indication of the relief
to be sought if proceedings are to be permissible. That relief is restraint not
simply against the doing of acts. It is restraint against the doing of acts etc.
to or by the company.

In the present suit, as I have already pointed out, no relief is sought against
Landmark Finance except, perhaps, that it is a party to the debenture which
it is sought to have declared void. The transaction is wholly and completely
executed so far as Landmark Finance is concerned. There is no occasion for
restraining it from taking any step. The relief sought in the suit is the recovery
for Landmark Finance of such of its property as has been or is being dealt
with by Smith and received by U.D.C.

Section 20 (3) may be called in aid for the purpose of construing subsection
(2) (a). It is, in a sense, appended to subsection (2) (a) inasmuch as it confers
upon the Court certain jurisdiction in proceedings brought under subsection
(2) (a). When subsection (3) is so called in aid, it becomes, in my view,
apparent that the proceedings mentioned in subsection (2) (a) are proceedings
to restrain the company from committing or pursuing an "unauthorised act,
conveyance or transfer".

Subsection (3) makes it clear that the proceedings allowable under sub-
section (2) (a) will not automatically result in the stranger, that is to say, the
other party to the *ultra vires* transaction, being denied the benefit of the general

validating effect of subsection (1). Subsections (1), (2)(a) and (3) appear
to me to stand together so as to result in the stranger being entitled to remain
aloof from an internal dispute in which a shareholder alleges against his com-
pany that some actual or threatened conduct of the company is *ultra vires.* If
it is simply threatened conduct, then no occasion would arise for the stranger
to be made a party to the proceedings, and the Court could ordinarily be
expected to entertain the shareholder's suit and grant relief to him against the
company. If, however, the proceedings under subsection (2)(a) do involve
the rights of the stranger in the sense that a contract has already been entered
into between him and the company, generally speaking the stranger would be
a necessary party to the suit (*Russell v. Wakefield Waterworks Co.* (1875),
L.R. 20 Eq. 474, at p. 481). It would then become a question for the Court
under s. 20 (3) to choose between taking no step adverse to the stranger or,
on the other hand, if the Court deemed it just and equitable, to set aside and
restrain performance of the contract and adjust the rights of the parties by
monetary compensation as the case might require.

The old situation in which the other party could simply be confronted with
a declaration that the contract was null and void as being *ultra vires,* and hence
incapable of conferring any rights on the other party, has been displaced by
the provisions of s. 20. In effect, where pursuant to s. 20 (2)(a) a shareholder
brings proceedings against his company and a stranger in respect of an
existing *ultra vires* contract, the Court is given wide power under subsection
(3) to achieve justice and equity as between the company and the stranger.
In some cases the Court might decline to intervene under subsection (3), thus
permitting performance of the contract to go forward; alternatively, the Court
might deem it to be just and equitable simply to set aside and restrain perfor-
mance of the contract; in other cases, the order to set aside and restrain might
be coupled with an order that the company pay compensation to the stranger;
and in yet other cases the setting aside and restrain might be accompanied
by an order that the stranger pay compensation to the company. The Court
is given a wide charter by s. 20 (3).

A further reason for declining to recognize the present suit as "proceedings"
within s. 20 (2)(a) is that this would place U.D.C. in a significantly weaker
position in proceedings such as the present that is to say, proceedings
brought by a shareholder, than it would be in if the proceedings had been
brought by Landmark Finance itself. It is an inescapable ingredient of the rule
in *Foss v. Harbottle* (1843), 2 Hare. 461, that in a shareholder's suit ". . . it
is obvious that in such an action the plaintiffs can not have a larger right to
relief than the company itself would have if it were plaintiff" (per Lord Davey
in *Burland v. Earle,* [1902] A.C. 83). The effect of s. 20 (1) is to preclude a
company itself from bringing proceedings against the other party to an *ultra
vires* transaction to recover for the company assets disposed of in that trans-
action. Yet if the plaintiff be right, the simple stratagem of procuring the suit
to be brought in the name of a shareholder and joining the company as a defen-
dant without seeking any relief against the company (other than, perhaps, a
declaration) could render the stranger liable to the full rigours of the applica-
tion of the old *ultra vires* doctrine. In such a suit these full rigours would not
in any way be tempered by the grant of jurisdiction under s. 20 (3), as no
restraint need be therein sought against any unauthorized act, conveyance or
transfer. The legislature in s. 20 (2) has not evinced any intention to weaken,
nor in truth has it weakened, the significance of this aspect of the rule in *Foss
v. Harbottle, supra.* On the contrary, s. 20 (1), s. 20 (2)(a) and s. 20 (3) fit
logically and satisfactorily into what I regard as the ordinary operation of the
rule in *Foss v. Harbottle* in (a) denying to a shareholder status to propound
on his company's behalf rights belonging to the company to recover assets
disposed of in an *ultra vires* transaction (*Nankivell v. Benjamin* (1892), 18
V.L.R. 543), and (b) recognizing the status of an individual shareholder to
proceed against his company restraining it from pursuing the performance of
an *ultra vires* course of conduct and in the same proceedings seeking relief for
the company against the other party to the transaction (*Russell v. Wakefield
Waterworks Co.* (1875), L.R. 20 Eq. 474).

The present suit is not within the meaning of "proceedings against the com-
pany" in s. 20 (2)(a) in that they are not meaningful as a suit by Hawkesbury

against Landmark Finance. No relief is sought against Landmark Finance. The suit is in form and in substance one brought solely for the benefit of Landmark Finance.

*Section* 20 (2) (b) *of the Companies Act*

In the next place, the plaintiff contends that the present suit is permissible under s. 20 (2) (b), that is to say, as being "... proceedings ... by any member of the company against the present or former officers of the company". It is contended that Smith, being the receiver and manager of the company, is a present officer of the company. The definition of "Officer" in s. 5 includes "a receiver and manager of any part of the undertaking of the corporation appointed under a power contained in any instrument".

The difficulty confronting the plaintiff in seeking to support its suit on s. 20 (2) (b) is that, if the plaintiff's assertion that the debenture is *ultra vires* is upheld, then Smith is not an officer of the company; conversely, for him to be an officer the debenture must be *intra vires*. The plaintiff's very entitlement to sue under s. 20 (2) (b) is inextricably interwoven with the crucial point in issue between the parties on this aspect of the suit. The plaintiff is not suing Smith on the basis that Smith as an officer of the company is threatening to commit or has committed the company to *ultra vires* transactions. The plaintiff seeks to sue Smith on the basis that his authority to act for the company is *ultra vires*, and hence that he has no authority at all to act as an officer of the company. There is in my view a real distinction between this situation and, for example, the type of situation canvassed in argument, namely, where a shareholder seeks, pursuant to s. 20 (2) (b), to restrain the managing director from committing the company to an *ultra vires* transaction and the managing director, in defence, asserts that there is some defect in his appointment so that he is not really managing director at all. In such a situation the question of *ultra vires* would pass from relevance: the shareholder would have an independent equity against the managing director stemming from the invalidity of his appointment. It is one thing to take a broad view of possible irregularities, defects, or even invalidities in the appointment of an officer where proceedings are sought to be taken against him pursuant to s. 20 (2) (b) to restrain him from committing the company to some *ultra vires* transaction. But it is quite another thing to recognize and accept his capacity as an officer within s. 20 (2) (b) so as to justify proceedings being taken within that paragraph when the very *ultra vires* transaction itself under challenge is or underlies his appointment to such office.

In my view it is not open to the plaintiff to support this suit alleging *ultra vires* against U.D.C. and Smith, the receiver and manager appointed by U.D.C., upon the ground that Smith is an officer of the company so as to entitle the plaintiff to proceed pursuant to s. 20 (2) (b). I would point out in passing that, in a practical sense, even if s. 20 (2) (b) were available to support the present challenge, little would be achieved by the grant to Hawkesbury of an injunction against Smith. That would not affect U.D.C. in any way. U.D.C.'s other remedies under its debenture would remain fully open to it.

For the foregoing reasons I am of the view that Hawkesbury fails in its challenge to the first debenture on the ground that it was *ultra vires* the powers of Landmark Finance. The ground upon which I so hold is that s. 20 (1) precludes the debenture and the borrowings thereunder from being held to be invalid by reason only of the fact that Landmark Finance was without the capacity or power to give the debenture and borrow the moneys; the present suit is not within the limited type of proceedings specified in s. 20 (2) in which this lack of capacity or power may be asserted or relied upon. This is enough to dispose of the *ultra vires* challenge, but if it were necessary to look further into the matter I would hold that the suit is on this aspect demurrable, in that the rule in *Foss* v. *Harbottle, supra,* lays down that the company is the only proper plaintiff in proceedings in which the only relief sought is the recovery for the company of assets disposed of by the company in an *ultra vires* transaction (*Nankivell* v. *Benjamin* (1892), 18 V.L.R. 543).

HA
Sec
F
s.
Fin:
Sect
"

C
def
this
cha
as
is 1
prir
alre
196
s. 1
nan
'cor
clau
pur
and
mer
to :
exis
boo
wou
con
M
befo
as g
fort
in r
doe
in t
give
defi
"I

T
forv
"cor
I
sari
to r
mus
The
real
a p
dun
sha
as :
"Tc
sect
T
to t
pan
alte
witl

*Section 19 of the Companies Act*

Finally, if it be necessary to look yet further into this *ultra vires* challenge, s. 19 of the Companies Act confers the necessary powers on Landmark Finance, even if those powers are not found within its existing objects clause. Section 19 (c) is in the following terms:—

"19. The powers of a company shall include —

(c) unless expressly excluded or modified by the memorandum or articles the powers set forth in the Third Schedule."

Clauses 12, 13, 25 and 26 of the Third Schedule are relied upon by the defendants as conferring the requisite power upon Landmark Finance to give this joint debenture over its assets and undertaking. Although the plaintiff challenges the operation of these or any other clauses in the Third Schedule as conferring power on Landmark Finance to give this joint debenture, there is little room for doubt on the point, and I shall not stay to discuss it. The principal argument concerning s. 19 was that it does not apply to companies already in existence on the date the 1961 Act came into force, namely, 1 July 1962. Some support for this proposition is to be found in the footnotes to s. 19 in *Wallace and Young's Australian Company Law and Practice*, p. 95, namely: "It may be argued—and this is the preferred view—that the word 'company' was not intended to have its defined meaning because (1) there are clauses in the Third Schedule, which, having regard to the definition of 'mining purposes' in s. 5 are inappropriate to no-liability companies (e.g. clauses 1, 10 and 11); (2) para. (c) might involve in some cases a conflict with an existing memorandum or existing articles; and (3) it is unlikely that it was intended to alter in this oblique manner the powers of companies which may have existed for many years." As against this, the other standard Australian text-book, *Paterson and Ednie on Australian Company Law*, p. 185, states: "It would appear that s. 19 (c) is retrospective in operation so as to apply to all companies incorporated prior to the commencement of the State Act."

My own view is that s. 19 applies to all companies, whether incorporated before or after the 1961 Act. I would not, myself, be disposed to describe this as giving s. 19 retrospective operation; there is no suggestion of the powers set forth in the Third Schedule being considered to have been conferred by s. 19 in respect of any point of time prior to 1 July 1962. As I see it, retrospectivity does not enter into the question. The problem is simply one of applying s. 19 in the light of the definition section of the Companies Act, due regard being given to such matters as are mentioned in *Wallace and Young*. In the definition section, s. 5, it is provided:—

"In this Act unless the contrary intention appears —

'Company' means a company incorporated pursuant to this Act or pursuant to any corresponding previous enactment."

This definition is clear enough. I am unable to regard the three reasons put forward in *Wallace and Young* as a contrary intention precluding the word "company" in s. 19 from bearing this defined meaning.

It is said that the requirement of express exclusion or modification necessarily imports reference to the terms of the Third Schedule. But this appears to me to overlook the wording of s. 19 (c). It is not the Third Schedule which must be expressly excluded or modified; it is the powers therein set forth. There is little by way of innovation in those powers. And there is no lack of reality in contemplating express exclusion or modification of these powers in a pre-existing memorandum. To give a simple example, an existing memorandum might well directly preclude a company's assets from being invested in shares in a mining company. There would be no difficulty in regarding this as an express modification of clause 5 of the Third Schedule, which reads: "To take, or otherwise acquire, and hold, shares, debentures, or other securities of any other company."

The ordinary process of statutory construction leads in my view inevitably to the word "company" in s. 19 being construed as including an existing company. Moreover, the conferring upon a company by s. 28 (1) of freedom to alter the provisions of its memorandum with respect to its objects, coupled with the statutory modification of the *ultra vires* doctrine effected by s. 20,

30-JAN-2008  13:30  FROM  IALS DS UF8100          TO  902074562222          P.021

Case 1:07-cv-01646-RMC    Document 39-4    Filed 01/31/2008    Page 20 of 162
800        SUPREME COURT OF NEW SOUTH WALES          [1969] 2 N.S.W.R.

prevents any real argument on the merits being presented against construing s. 19 so as to apply to existing companies. I would accordingly, if it were necessary, hold that s. 19 had conferred on Landmark Finance at the time it entered into the first debenture the powers set forth in the Third Schedule, and that clauses 12, 13, 25 and 26 of the Third Schedule are wide enough to authorize the giving of the joint debenture.

### Conclusion on ultra vires

Apart from having held against the plaintiff that s. 20 precludes it from asserting against U.D.C. that the first debenture was *ultra vires*, I have indicated views on two other bases (*Foss v. Harbottle, supra*, and s. 19) on which the *ultra vires* challenge would fail, if it were necessary to consider them. A further aspect litigated in the present suit which, once again, would make the plaintiff's task difficult on this *ultra vires* challenge is the principle in *Re Johnston Foreign Patents Case*, [1904] 2 Ch. 234. And there remains, of course, what is perhaps the primary question upon which I have indicated no view, that is to say, whether the giving of this joint debenture did in truth fall outside the scope of the powers conferred upon Landmark Finance by its memorandum. An expression of opinion on this point seems so far removed from decisive significance in the suit as to render it unnecessary to prolong these reasons by examining or stating conclusions on the terms of the objects clause in the memorandum of Landmark Finance.

### Decree

For the foregoing reasons I hold that the present suit fails. I pronounce a decree in the following terms: The suit is dismissed; no order as to the costs of the first defendant; plaintiff to pay the costs of the second and third defendants, including reserved costs; I order that the security for costs furnished by the plaintiff be applied in or towards satisfaction of these orders for costs; I order that it be referred to the Master to give directions for the taking of such steps as are necessary to carry into effect the realization and application of the said security in accordance with this order; there will be general liberty to apply and particular liberty to apply in respect of any outstanding interlocutory orders regarding costs or otherwise.

*Decree and orders accordingly.*

Solicitors for the plaintiff: *A. B. Jackson, Heyes & Wilson.*

Solicitors for the first defendant: *Maxwell & Boyd.*

Solicitors for the second defendant: *Dawson Waldron.*

Solicitors for the third defendant: *Philip Malouf & Co.*

D. I CASSIDY
BARRISTER-AT-LAW

**TAB H**

Case 1:07-cv-01646-RMC    Document 39-4    Filed 01/31/2008    Page 22 of 162

Westlaw.

[1988] Ch. 114    Page 1
1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
(Cite as: [1988] Ch. 114)

**C**

***114** Smith and Others v. Croft and Others (No. 2)
[1985 S. No. 637]; [1987] 3 W.L.R. 405

Chancery Division
Ch D
Knox J.
1986 Oct. 29 , 30, 31; Nov. 3, 4, 5, 6, 7, 10, 11, 13,
14, 17, 18, 19, 20, 21;
Dec. 19

Company--Shareholder--Rights against company or
directors--Minority shareholders' action--Minority
shareholders alleging ultra vires acts by company
and directors--Majority of independent minority
shareholders not wishing to pursue action--Whether
minority shareholders' action to be struck out-
-Whether striking out procedure
appropriate--R.S.C., Ord. 18, r. 19

F. Ltd. was a company engaged in the specialised
business of guaranteeing the completion of films on
time and within their budget. The articles of associ-
ation provided that a director should be remuner-
ated for his services at the rate of £150 per annum,
the chairman receiving an additional £100 per an-
num, but the rate of remuneration could be in-
creased by an ordinary resolution. The directors
were also empowered to appoint one or more of
their number to be holders of an executive office,
and any director appointed to such office was to re-
ceive such additional remuneration by way of
salary, lump sum, commission or participation in
profits as the directors might determine. During the
course of 1982 the appointed executive directors
and companies with which they were associated ac-
quired sufficient shares in F. Ltd. to give them
overall voting control. The shares were bought by
means of payments made to three of the associated
companies in August 1982 of £33,000 each, part of
which was then lent to the fourth to discharge a
bank loan taken out for the purpose of obtaining
cash to buy shares in F. Ltd. and the remainder was
used for the purchase of shares by ***115** the three
associated companies. The plaintiffs, who held a

minority of shares in F. Ltd., brought an action
against F. Ltd., three executive directors and the
chairman, a non-executive director, and four com-
panies closely associated with one or other of the
three executive directors, claiming that the directors
had paid themselves excessive remuneration, that
the payments in 1982 to the associated companies
were contrary to section 42 of the Companies Act
1981 [FN1] and that certain payments of expenses
to directors were excessive. The plaintiffs between
them held 11.86 per cent. of the issued shares in F.
Ltd.; the defendants between them held 62.54 per
cent.; of the remaining shares 2.54 per cent. were
held by a company which actively supported the
plaintiffs, while 3.22 per cent. were held by persons
or companies which, it was common ground, were
to be treated as supporting the defendants. W. Ltd.,
a company not under the control of either the
plaintiffs or the defendants, held 19.66 per cent. of
the shares in F. Ltd. and was opposed to the con-
tinuance of the plaintiffs' action.

FN1 Companies Act 1981, s. 42: see post, p.
164B-D.

On a motion by the chairman and F. Ltd. to strike
out the plaintiffs' action under R.S.C., Ord. 18, r. 19
or under the inherent jurisdiction as vexatious,
frivolous or an abuse of process:-

**Held:**

(1) that the defendants' application raised the is-
sue whether the plaintiffs could proceed with their
minority shareholders' action and, although that
raised difficult questions of law, the defendants, by
invoking the procedure under R.S.C., Ord. 18, r. 9
rather than the procedure for determining a prelim-
inary issue of law under R.S.C., Ord. 33, r. 3, had
not adopted such an inherently defective procedure
that the court should not proceed to determine the
issues raised; and that since the effect of the court
deciding those issues against the plaintiffs would be
determinative of the action, the court would enter-
tain the application and consider whether prima

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

facie the company was entitled to the relief claimed in the action and whether the action was within the exception to the rule in Foss v. Harbottle (post, pp. 135B-C, E-G, 138G - 139B, 145C-F).

Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204, C.A. and Williams and Humbert Ltd. v. W. [1986] A.C. 368, H.L.(E.) considered.

(2) That although excessive remuneration paid to directors might be an abuse of power, where the power to decide remuneration was vested in the board, it could not be ultra vires the company; and that in view of the uncontradicted evidence about the specialised field in which the company operated and the high levels of remuneration obtaining there it was more likely that the plaintiffs would fail than succeed on the issue of quantum; that likewise no prima facie case had been shown that the executive directors' expenses were excessive; and that, prima facie, the payments to associated companies were not ultra vires since payments at the request of an executive director to an outside entity were capable of being payments in respect of services rendered by the executive director, save that there was a prima facie case of irregularity regarding certain payments not fully cured by subsequent adoption of the accounts at the annual general meetings at **116** which those payments should have been disclosed; that since the admitted payments of £33,000 to associated companies had not been shown to be reasonably necessary for the purpose of providing for amounts likely to be incurred by way of directors' remuneration there was a prima facie case of infringement of section 42 of the Companies Act 1981 (post, pp. 159F - 160D, 163C - 164A, 165C - 166A).

In re George Newman & Co. [1895] 1 Ch. 674, C.A. and Rolled Steel Products (Holdings) Ltd. v. British Steel Corporation [1986] Ch. 246, C.A. applied.

(3) That although a minority shareholder had locus standi to bring an action on behalf of a company to recover property or money transferred or paid away in an ultra vires transaction, he did not have an indefeasible right to prosecute such an action on the company's behalf; that it was proper to

have regard to the views of the independent shareholders, and their votes should be disregarded only if the court was satisfied that they would be cast in favour of the defendant directors in order to support them rather than for the benefit of the company, or if there was a substantial risk of that happening; that there was no evidence to suggest that the votes of W. Ltd. would be cast otherwise than for reasons genuinely thought to be for the company's advantage; and that, accordingly, since the majority of the independent shareholders' votes, including those of W. Ltd., would be cast against allowing the action to proceed, the statement of claim should be struck out (post, pp. 170A-D, 177B-C, 186E-F, 189C-E).

Foss v. Harbottle (1843) 2 Hare 461 considered.

The following cases are referred to in the judgment of 13 November ruling that the defendants could proceed with their application to strike out:

Foss v. Harbottle (1843) 2 Hare 461

Lawrance v. Lord Norreys (1890) 15 App.Cas. 210, H.L.(E.).

Prudential Assurance Co. Ltd. v. Newman Industries Ltd. [1981] Ch. 229; [1980] 2 W.L.R. 339; [1979] 3 All E.R. 507

Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204; [1982] 2 W.L.R. 31; [1982] 1 All E.R. 354, C.A..

Smith v. Croft [1986] 1 W.L.R. 580; [1986] 2 All E.R. 551

Wallersteiner v. Moir (No. 2) [1975] Q.B. 373; [1975] 2 W.L.R. 389; [1975] 1 All E.R. 849, C.A..

Wenlock v. Moloney [1965] 1 W.L.R. 1238; [1965] 2 All E.R. 871, C.A..

Williams and Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd. [1986] A.C. 368; [1986] 2 W.L.R. 24; [1986] 1 All E.R. 129, H.L.(E.).

Windsor Refrigerator Co. Ltd. v. Branch Nominees Ltd. [1961] Ch. 375; [1961] 2 W.L.R. 196; [1961] 1 All E.R. 277, C.A..

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

The following additional cases were cited in argument on the question whether the defendants should be permitted to proceed with their application:

Bagshaw v. Eastern Union Railway Co. (1849) 7 Hare 114

Carter v. Commissioner of Police of the Metropolis [1975] 1 W.L.R. 507; [1975] 2 All E.R. 33, C.A..

City of London Corporation v. Horner (1914) 111 L.T. 512, C.A..

Daniels v. Daniels [1978] Ch. 406; [1978] 2 W.L.R. 73; [1978] 2 All E.R. 89

Electrical Development Co. of Ontario v. Attorney-General for Ontario [1919] A.C. 687, P.C..

*117 Estmanco (Kilner House) Ltd. v. Greater London Council [1982] 1 W.L.R. 2; [1982] 1 All E.R. 437

Goodson v. Grierson [1908] 1 K.B. 761, C.A..

Isaacs (M) and Sons Ltd. v. Cook [1925] 2 K.B. 391

Morris v. Sanders Universal Products [1954] 1 W.L.R. 67; [1954] 1 All E.R. 47, C.A..

National Real Estate and Finance Co. Ltd. v. Hassan [1939] 2 K.B. 61; [1939] 2 All E.R. 154, C.A..

Nissan v. Attorney-General [1970] A.C. 179; [1969] 2 W.L.R. 926; [1969] 1 All E.R. 629, H.L.(E.).

Radstock Co-operative and Industrial Society Ltd. v. Norton-Radstock Urban District Council [1968] Ch. 605; [1968] 2 W.L.R. 1214; [1968] 2 All E.R. 59, C.A..

Richards v. Naum [1967] 1 Q.B. 620; [1966] 3 W.L.R. 1113; [1966] 3 All E.R. 812, C.A..

Rolled Steel Products (Holdings) Ltd. v. British Steel Corporation [1986] Ch. 246; [1985] 2 W.L.R. 908; [1985] 3 All E.R. 52, C.A..

Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474

Salomons v. Laing (1850) 12 Beav. 377

Tilling v. Whiteman [1980] A.C. 1; [1979] 2 W.L.R. 401; [1979] 1 All E.R. 737, H.L.(E.).

Western Steamship Co. Ltd. v. Amaral Sutherland & Co. Ltd. [1914] 3 K.B. 55, C.A..

The following cases are referred to in the judgment of 19 December:

Allen v. Gold Reefs of West Africa Ltd. [1900] 1 Ch. 656, C.A..

Bagshaw v. Eastern Union Railway Co. (1849) 7 Hare 114

Baillie v. Oriental Telephone and Electric Co. Ltd. [1915] 1 Ch. 503, C.A..

Bamford v. Bamford [1970] Ch. 212; [1969] 2 W.L.R. 1107; [1969] 1 All E.R. 969, C.A..

Birch v. Sullivan [1957] 1 W.L.R. 1247; [1958] 1 All E.R. 56

Brown v. British Abrasive Wheel Co. Ltd. [1919] 1 Ch. 290

Burland v. Earle [1902] A.C. 83, P.C..

Clinch v. Financial Corporation (1868) L.R. 5 Eq. 450; L.R. 4 Ch.App. 117

Daniels v. Daniels [1978] Ch. 406; [1978] 2 W.L.R. 73; [1978] 2 All E.R. 89

Edwards v. Halliwell [1950] 2 All E.R. 1064, C.A..

Estmanco (Kilner House) Ltd. v. Greater London Council [1982] 1 W.L.R. 2; [1982] 1 All E.R. 437

Foss v. Harbottle (1843) 2 Hare 461

Gray v. Lewis (1873) L.R. 8 Ch.App. 1035

Halt Garage (1964) Ltd., In re [1982] 3 All E.R. 1016

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

Hellenic & General Trust Ltd., In re [1976] 1 W.L.R. 123; [1975] 3 All E.R. 382

Hogg v. Cramphorn Ltd. [1967] Ch. 254; [1966] 3 W.L.R. 995; [1966] 3 All E.R. 420

MacDougall v. Gardiner (1875) 1 Ch.D. 13, C.A..

Mason v. Harris (1879) 11 Ch.D. 97, Malins V.-C. and C.A..

Mozley v. Alston (1847) 1 Ph. 790

Newman (George) & Co., In re [1895] 1 Ch. 674, C.A..

Pavlides v. Jensen [1956] Ch. 565; [1956] 3 W.L.R. 224; [1956] 2 All E.R. 518

Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204; [1982] 2 W.L.R. 31; [1982] 1 All E.R. 354, C.A..

Rolled Steel Products (Holdings) Ltd. v. British Steel Corporation [1986] Ch. 246; [1985] 2 W.L.R. 908; [1985] 3 All E.R. 52, C.A..

**\*118** Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474

Salomons v. Laing (1850) 12 Beav. 377

Seaton v. Grant (1867) L.R. 2 Ch.App. 459

Sidebottom v. Kershaw, Leese & Co. Ltd. [1920] 1 Ch. 154, C.A..

Simpson v. Westminster Palace Hotel Co. (1860) 8 H.L.Cas. 712, H.L.(E.).

Smith v. Croft [1986] 1 W.L.R. 580; [1986] 2 All E.R. 551

Taylor v. National Union of Mineworkers (Derbyshire Area) [1985] B.C.L.C. 237

Towers v. African Tug Co. [1904] 1 Ch. 558, C.A..

Viscount of the Royal Court of Jersey v. Shelton [1986] 1 W.L.R. 985, P.C..

Wallersteiner v. Moir (No. 2) [1975] Q.B. 373; [1975] 2 W.L.R. 389; [1975] 1 All E.R. 849, C.A..

The following additional cases were cited in argument; some of them being cited before the judgment of 13 November was delivered:

Atwool v. Merryweather (1867) L.R. 5 Eq. 464n

Australian Coal & Shale Employees' Federation v. Smith (1937) 38 S.R. (N.S.W.) 48

Banco de Bilbao v. Sancha [1938] 2 K.B. 176

Burt v. British Nation Life Assurance Association (1859) 4 De G. & J. 158;

Clemens v. Clemens Bros. Ltd. [1976] 2 All E.R. 268

Cook v. Deeks [1916] 1 A.C. 554, P.C..

Cotter v. National Union of Seamen [1929] 2 Ch. 58, C.A..

Cullerne v. London and Suburban General Permanent Building Society (1890) 25 Q.B.D. 485, C.A..

Davidson v. Tulloch (1860) 3 Macq. 783, H.L.(Sc.).

Devlin v. Slough Estates Ltd. [1983] B.C.L.C. 497

Dominion Cotton Mills Co. Ltd. v. Amyot [1912] A.C. 546, P.C..

Duomatic Ltd., In re [1969] 2 Ch. 365

Electrical Development Co. of Ontario v. Attorney-General for Ontario [1919] A.C. 687, P.C..

Gray v. Lewis (1869) L.R. 8 Eq. 526

Greenhalgh v. Arderne Cinemas Ltd. [1951] Ch. 286; [1950] 2 All E.R. 1120, C.A..

Gregory v. Patchett (1864) 33 Beav. 595

Heyting v. Dupont [1963] 1 W.L.R. 1192; [1963] 3 All E.R. 97; [1964] 1 W.L.R. 843; [1964] 2 All E.R. 273, C.A..

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

Hichens v. Congreve (1828) 4 Russ. 562

Hoole v. Great Western Railway Co. (1867) L.R. 3 Ch.App. 262

Horsley & Weight Ltd., In re [1982] Ch. 442; [1982] 3 W.L.R. 431; [1982] 3 All E.R. 1045, C.A..

Lee, Behrens & Co. Ltd., In re [1932] 2 Ch. 46

Lord v. Governor and Company of Copper Miners (1848) 2 Ph. 740

MacDougall v. Gardiner (1875) L.R. 20 Eq. 383

Menier v. Hooper's Telegraph Works (1874) L.R. 9 Ch.App. 350

Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd. [1983] Ch. 258; [1983] 3 W.L.R. 492; [1983] 2 All E.R. 563, C.A..

North-West Transportation Co. Ltd. v. Beatty (1887) 12 App.Cas. 589, H.L. (E.).

Orr v. Glasgow, Airdrie and Monklands Junction Railway Co. (1860) 3 Macq. 799

Peel v. London and North Western Railway Co. [1907] 1 Ch. 5, C.A..

Pender v. Lushington (1877) 12 App.Cas. 70

Pickering v. Stephenson (1872) L.R. 14 Eq. 322

*119 Prudential Assurance Co. Ltd. v. Newman Industries Ltd. [1981] Ch. 229 [1980] 2 W.L.R. 339; [1979] 3 All E.R. 507

Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1981] Ch. 257; [1980] 2 W.L.R. 339; [1979] 3 All E.R. 507

Radstock Co-operative and Industrial Society Ltd. v. Norton-Radstock Urban District Council [1968] Ch. 605; [1968] 2 W.L.R. 1214; [1968] 2 All E.R. 59, C.A..

Richards v. Naum [1967] 1 Q.B. 620; [1966] 3

W.L.R. 1113; [1966] 3 All E.R. 812, C.A..

Russian Commercial and Industrial Bank v. Comptoir D'Escompte de Mulhouse [1925] A.C. 112, H.L.(E.).

Shuttleworth v. Cox Brothers & Co. (Maidenhead) Ltd. [1927] 2 K.B. 9, C.A..

Sinclair v. Brougham [1914] A.C. 398, H.L.(E.).

Smith & Fawcett Ltd., In re [1942] Ch. 304; [1942] 1 All E.R. 542, C.A..

Spokes v. Grosvenor and West End Railway Terminus Hotel Co. Ltd. [1897] 2 Q.B. 124, C.A..

Studdert v. Grosvenor (1886) 33 Ch.D. 528

Turquand v. Marshall (1869) L.R. 4 Ch.App. 376

Wall v. London and Northern Assets Corporation [1898] 2 Ch. 469, C.A..

Yorkshire Miners' Association v. Howden [1905] A.C. 256, H.L.(E.).

**MOTIONS**

By a writ dated 7 February 1985, the plaintiffs, Nora Smith, Lucienne Crane, and the Right Honourable Felim O'Neill, Baron Rathcavan, in a specially endorsed writ claimed various sums of money to be paid by various defendants to the company, Film Finances Ltd., the ninth named defendant, upon whose behalf the plaintiffs claimed to sue, as being minority shareholders of the company. Those claims were based on allegations that the eighth defendant, Brindeel Ltd., an associated company controlled by the company's executive directors, William Alan Croft, Richard Martin Francis Soames and David Alexander Korda (the first to third defendants) had purchased 19,900 shares in the company, with money borrowed from a bank; that Brindeel Ltd. had been acquired by the executive directors on or about 11 June 1982 with a view to the purchase of the 19,900 shares; that each of three other associated companies controlled by the executive directors, Mannergrand Services Ltd.,

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038

**(Cite as: [1988] Ch. 114)**

Cushingham Ltd., and Bellwedge Ltd. (the fifth to seventh defendants), had received £33,000 from the company in early August 1982, and had lent £28,000 to Brindeel Ltd. thereafter, and that these sums were used by Brindeel Ltd. to discharge its bank indebtedness. It was alleged that the payments by the company to the associated companies constituted financial assistance for the purchase of its shares within the meaning of section 42(2) of the Companies Act 1981. The writ claimed also a declaration that Brindeel Ltd. held the 19,900 shares on constructive trust for the company absolutely, and an order for the payment by Brindeel Ltd. to the company of £71,640, and for damages for conspiracy. There was also a claim against the majority shareholders and Michael Lewis Carr, the chairman and a non-executive director of the company (the fourth defendant), for interest under section 35A of the Supreme Court Act 1981, or under the court's inherent equitable jurisdiction. Further and other relief and costs were also claimed.

*120 By a notice of motion dated 24 February 1986 the company applied for an order pursuant to R.S.C., Ord. 18, r. 19 or under the court's inherent jurisdiction, that the action be struck out as being frivolous, vexatious or an abuse of process, on the grounds that the plaintiffs were not in fact entitled to bring or to continue the same, and that the plaintiffs do pay the defendants' costs of the action to be taxed. By a further notice of motion, dated 17 March 1986 the fourth defendant sought an order, pursuant to R.S.C., Ord. 18, r. 19 or the court's inherent jurisdiction, that the action be similarly struck out on the grounds that the plaintiffs were not in fact entitled to bring the same, or alternatively that the action was obviously unsustainable against him (the fourth defendant), and that the plaintiffs do pay the defendant's costs of the action to be taxed.

The facts are stated in the ruling of 13 November 1986 and in the judgment of 19 December 1986.

*Charles Aldous Q.C.* and *Caroline Hutton,* for the company. This minority shareholders action is brought in respect of allegations of fraud and breach of duty by directors, allegedly on behalf of all shareholders other than the alleged wrongdoers. But it is strongly opposed by a majority of independent shareholders, and if the action goes ahead, the company may be killed by kindness ending up a worthless company. The action has already been before Walton J. (see Smith v. Croft [1986] 1 W.L.R. 580) on an application as to whether the plaintiffs should be allowed to continue the action at the company's expense. It was there held that it was clear from undisputed facts that the action had little chance of success and was being prosecuted against the wishes of the majority of the independently held shares, and accordingly that it would be unjust to grant the plaintiffs an indemnity for costs in bringing the action. Where the company may be damaged, the court should reach a determination as to the plaintiffs' right to bring this action, at an early stage.

This is a derivative action; the plaintiffs have no independent cause of action of their own. Where minority shareholders seek to recover for the benefit of the company sums paid away, and the defendants wish to challenge their locus standi to bring proceedings, on the basis that the rule in Foss v. Harbottle (1843) 2 Hare 461, prevents them from so doing, the proper procedure is by way of an application for striking out. It being an abuse of process for a person to bring an action for damages suffered by another, similarly it is an abuse of process for a minority shareholder in the circumstances of this case to bring an action on behalf of the company. A minority shareholder's right to sue on behalf of the company presupposes that the company is being controlled by wrongdoers. Where the company would be damaged by the conduct of the action, the court should rule upon the plaintiffs' right, if any, at an early stage. Where a majority of the independent shareholders are sufficiently informed and oppose the bringing of proceedings, the court ought to accede to their views: see Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204, 219, where the Court of Appeal has given clearly considered views as to the appropriate *121 procedure. The grounds on which the defendants rely are essentially the same as those on which they

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 467459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038

**(Cite as: [1988] Ch. 114)**

relied before Walton J. [1986] 1 W.L.R. 580. The plaintiffs are unable to show a sufficient case even if the company itself were the plaintiff, they cannot produce evidence of fraud, ultra vires or illegality. In any event the action is contrary to the wishes of the independent majority of the minority shareholders. [Reference was made to Devlin v. Slough Estates Ltd. [1983] B.C.L.C. 497.] It would be totally illogical to demand the trial of a preliminary issue under R.S.C., Ord. 33, r. 3, which might necessitate hearing a very lengthy case in full, before being able to decide if there was a cause of action. Most of the relevant facts here are not in dispute, there being no real issue over the amounts paid to the directors, by way of salary, bonus or expenses.

The court is invited to find that there is no prima facie case, even for the company, on either fraud, ultra vires or illegality. [Reference was made to Gower, Modern Company Law, 4th ed. (1979), pp. 641 to 644.] A distinction must be drawn between a personal action and a derivative one; the former is to restrain ultra vires or illegal acts or to enforce entrenched rights of shareholders; the latter to recover money or property or damages on behalf of the company, whether in respect of losses already sustained by reason of fraud or breach of duty, or in respect of ultra vires or illegal acts. There is no personal action to recover money or property already lost by reason of such matters. The principle is that where the wrongdoers are in control the court will not allow them to stifle the claim, whether based on fraud ultra vires or illegality, either by ratification, where the transaction is capable of being ratified, or by resolving not to sue. Although ultra vires transactions cannot be ratified, the company through an independent board or by shareholders' resolution can compromise proceedings already brought, or resolve not to sue, subject always to one proviso, namely that the decision taken is for proper reasons in the best interests of the shareholders, or maybe the creditors, if the company is on the verge of insolvency. Where there is no independent board, then the decision can be left to the shareholders. Where the compromise is bona fide in what the board considers to be in the best interests of the company, the compromise can bar individual share-

holders from suing upon the same cause of action. Otherwise once litigation was begun it would have to be fought to a finish, unless every single shareholder were to agree to a compromise. If the company is under the control of an independent board then no individual shareholder can bring a derivative action at all; if there is no independent board then the question must rest with the independent shareholders as a body. The only exception is where the decision taken is not in the best interests of the company but amounts to oppression of or discrimination against the minority; see Viscount of the Royal Court of Jersey v. Shelton [1986] 1 W.L.R. 985, P.C.; Pennington's Company Law, 5th ed. (1985), p. 731 and two articles by Mr. Wedderburn on "Shareholders rights and the rule in Foss v. Harbottle" [1957] C.L.J. 194 and [1958] C.L.J. 93; Burland v. Earle [1902] A.C. 83. Atwool v. Merryweather (1867) L.R. 5 Eq. 464n seems to show that if the majority of the independent shareholders had not supported the *122 action in that case the court would have held the suit to be improperly framed. The only limit on the power of compromise would be where it would be a fraud on the minority or the creditors. The wrongdoers cannot use their voting power to oppress the minority; see Cook v. Deeks [1916] 1 A.C. 554, 557, 559-563; Birch v. Sullivan [1957] 1 W.L.R. 1247; Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1981] Ch. 257, 267, 304, 308, 326 and [1982] Ch. 204, 210, 219, C.A.; Estmanco (Kilner House) Ltd. v. Greater London Council [1982] 1 W.L.R. 2 and Devlin v. Slough Estates Ltd. [1983] B.C.L.C. 497. There has been some confusion in the authorities between the personal action, to recover personal loss, i.e. otherwise than through the company or to enforce the articles of association, and the derivative action, to recover damage caused to the company. In Edwards v. Halliwell [1950] 2 All E.R. 1064, 1065, although it concerns trade unions, the same principles are applicable. The statements of the law in the Prudential Assurance v. Newman Industries and in the Estmanco cases are of general application, although in both cases what was in issue was breaches of duty. In both those cases the company was the ultimate master of its action. On the question whether a

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038

**(Cite as: [1988] Ch. 114)**

minority shareholder can sue on the company's behalf, the onus of proof is not clear, but in the present case it is contended it matters not where the onus lies, because the evidence is overwhelming. It is necessary to see first in whom the cause of action is vested: if it is in the company, then the case is subject to wider considerations as to whether the minority shareholder can sue on its behalf.

The right of a company, acting through an independent board of directors or on a resolution of independent shareholders, to stop a derivative action stems from basic principles, and not from the rigid rules evolved in order to get round the rule in Foss v. Harbottle, 2 Hare 461. The basis of the rule is not confined to company law but is of wide general application. It must be appreciated that a company is free to decide whether or not to pursue a cause of action vested in it. Despite the rule in Foss v. Harbottle individual shareholders are entitled to have the company's memorandum and articles of association observed, under which shareholders have entrenched rights. An action to recover loss already sustained by the company, however it arises, is vested in the company, and can only be brought by individual shareholders on the company's behalf in certain circumstances. No personal action for such loss can be brought by an individual shareholder, the derivative action being a purely procedural device. The only circumstances in which an individual shareholder can sue, on the company's behalf, are cases where the company has failed or refused to do so, and where the loss has been sustained by ultra vires or illegal acts, or otherwise by a fraud on a minority. In each case the rationale behind the exception is because the act cannot be ratified either wholly or by those directly implicated. The rationale for both exceptions is that a shareholder is entitled to vote according to his own vested interests, and to ratify, retrospectively, matters complained of.

As a matter of general principle in company law, whether the transaction complained of can be ratified or not, a company acting **\*123** through an independent board of directors, or pursuant to a resolution passed by a majority of independent shareholders can always compromise - or can waive the cause of action vested in it, provided only it does so for good practical reasons in what the board or the shareholders believe to be the company's best interests: see Viscount of the Royal Court of Jersey v. Shelton [1986] 1 W.L.R. 985. Such a compromise in waiver binds every shareholder, and defeats an action already commenced. A plaintiff in a derivative action can be in no better position than the company itself; in the present case if a meeting were to be convened and a resolution passed by a majority of disinterested shareholders free from manipulation by the wrongdoers, then the present proceedings should be discontinued: it would plainly be wrong for the action to proceed. There is no prima facie case that the company would succeed.

Walton J. was right in saying that the present case is primarily concerned with remuneration of directors. Payments made to them were undoubtedly ultra vires. While a company has the capacity to pay a fair and reasonable level of remuneration, to pay directors an excessive amount might well be fraud on a minority. [Reference was made to In re George Newman & Co. [1895] 1 Ch. 674; In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016, 1023-1033, 1039; In re Horsley & Weight Ltd. [1892] Ch. 442, 445, 448, 450, 452, 454, 455 and Rolled Steel Products (Holdings) Ltd. v. British Steel Corporation [1986] Ch. 246.] The articles give the directors power to fix their own remuneration, but a director's duty is nevertheless to act bona fide in what they consider to be in the interests of the company: In re Smith & Fawcett Ltd. [1942] Ch. 304. The court will only interfere if no reasonable board of directors could have concluded that the level of remuneration was justified. *Palmer's Company Law,* 23rd ed. (1982), vol. 1, p. 851, paras. 64-66. No credible evidence as to the proper level in this field. Not only were the payments not ultra vires, they were in fact proper. Apart from a period in 1980-1981 all payments were disclosed at properly convened meetings. The following principles apply to voting: - (1) every shareholder has a right to vote even though he has a direct personal interest, provided it is for the benefit of the general body of shareholders and not a fraud on creditors. (2) If val-

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

idly authorised the act becomes the act of the company and no shareholder can therefore complain. (3) The onus of showing impropriety rests with the party attacking it. (4) To succeed the attacker must prove that no honest and intelligent person could have thought that the level of remuneration paid to him was reasonable. (5) It is not the court's function to enter into the commercial field and to decide what is in the company's best interests. (6) The plaintiffs must be able to show a prima facie case. (7) The right of an interested shareholder to vote is in contrast to the case where there has been proven fraud or abuse of power, in which case the court will disregard their votes. [Reference was made to North-West Transportation Co. Ltd. v. Beatty (1887) 12 App. Cas. 589; Allen v. Gold Reefs of West Africa Ltd. [1900] 1 Ch. 656; Greenhalgh v. Arderne Cinemas Ltd. [1951] Ch. 286 and Dominion Cotton Mills Co. Ltd. v. Amyot [1912] A.C. 546, 549, 551, 553.]

**\*124** The only issue is whether the plaintiffs have shown a sufficient prima facie case that the payments were so excessive as to be fraud, so that the defendants, as shareholders, could not honestly have believed them to be justified. [Reference was made to Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd. [1983] Ch. 258 and Gore-Browne on Companies, 44th ed. (1986), vol. 2, para. 27.21.2.] Unless a decision of the shareholders is unanimous, an individual shareholder is entitled to complain of alleged fraud on a minority. Since the level of remuneration was opposed not only by the defendants but by Wren Trust Ltd., the plaintiffs would have to show mala fides or manipulation in respect of disinterested votes. If they cannot show either, then there is no logical reason to ascribe dishonesty to the defendants, when disinterested shareholders who agree with them are acting properly. [Reference was made to In re Duomatic Ltd. [1969] 2 Ch. 365; Buckley on the Companies Acts, 14th ed. (1981), vol. 2, p. 1594.] Even if some of the payments for some technical reason were not authorised at the time, they were subsequently ratified, which operates retrospectively: Halsbury's Laws of England, 4th ed. (1973), vol. 1, para. 768.

David Oliver Q.C. for the fourth defendant. The arguments advanced by Mr. Aldous are adopted. It is fundamental that the court will not interfere with the internal management of a company, in the absence of mala fides: Burland v. Earle [1902] A.C. 83. It is a corollary of the majority rule. Exceptions to this general rule are where the company is proposing to do some illegal act: this is logical since however large the majority it cannot authorise an illegal act, and the same applies in the case of ultra vires acts. No amount of authorisation can confer a capacity, which it does not possess. Once an ultra vires act has been done, the position is different. It is inappropriate, in the absence of bad faith, for the court to interfere in the decision as to what is to be done about what has happened. In so far as Pennington's Company Law, 5th ed. (1985) or Vinelott J. in the Prudential Assurance v. Newman Industries case [1981] Ch. 229 suggests otherwise, it is not supportable either on principle or on authority: the propositions there advanced are not supported by either: see Spokes v. Grosvenor and West End Railway Terminus Hotel Co. Ltd. [1897] 2 Q.B. 124, 126, 128 and Salomons v. Laing (1850) 12 Beav. 377, 381 or Edwards v. Halliwell [1950] 2 All E.R. 1064.

The real question is capable of a relatively simple formulation, namely, when will the court oppose the wishes of the majority. [Reference was made to Clemens v. Clemens Bros. Ltd. [1976] 2 All E.R. 268.] There are situations where sectional interests will deprive the votes cast of their validity. In this case the decision of Wren Trust Ltd. and Gresham Trust Ltd. are devoid of any sectional interests being merely for the protection of Wren's investment. Their votes are therefore not vitiated. The decision should not rest those shareholders who are not defendants in the action. [Reference was made to Lawrance v. Lord Norreys (1890) 15 App.Cas. 210, 215. Vinelott J.'s judgment in Prudential Assurance Co. Ltd. v. Newman Industries Ltd. [1981] Ch. 229, 307 was criticised in the Court of Appeal but it actually contains a **\*125** very sound analysis of the position: apart from his misreading of Edwards v. Halliwell [1950] 2 All E.R. 1064, and the justice of the case his judgment stands unblemished by the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

criticism. The plaintiffs' allegations of fraud etc. cannot be maintained. [Reference was made to Wallersteiner v. Moir (No. 2) [1975] Q.B. 373.]

*Robin Potts Q.C.* and *Daniel Serota* for the plaintiffs. The present applications are utterly misconceived. It is wholly inappropriate to proceed by way of striking out under R.S.C., Ord. 18, r. 19, when what it is sought to contend is that the proceedings are suitable to be brought under the rule in Foss v. Harbottle, 2 Hare 461. The correct procedure, where a Foss v. Harbottle point is raised, is for the determination of an issue of law or fact. The Court of Appeal has specifically so stated in Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204. But no application has been made for trial of a preliminary issue. Such a trial is only available where there is a particular issue which can be precisely and readily defined, and which in isolation can effectively determine the action. That is not the position here. Virtually all the issues of fact or law arising in this case have been covered in argument by the defendants and there is no single issue that could determine the action. There has to be an order of court, deciding the trial of a preliminary issue under R.S.C., Ord. 33, r. 3. In Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204 the issue was one of law, and in a limited respect, one of fact, the issue of law being whether Prudential could proceed with their action where there was no allegation in the pleadings, of control by wrongdoers, the issue of fact was whether the wrongdoers were in fact in control, since they were not in control so far as voting was concerned. The issue in the present case is quite different; it involves a counting of heads in two stages, stage 1 being to ascertain whether the wrongdoers are in control, and stage 2 a counting of heads amongst the majority. This gives rise to a plethora of issues, both legal and factual.

The issues include the following: (i) Can a larger disinterested majority stop a smaller minority from suing on the company's behalf? (ii) If yes, does the Wren Trust fulfil that position of disinterestedness? and (iii) What does the word "disinterested" or "in-

dependent" mean in law?

The plaintiffs contend that any one shareholder is entitled either to an injunction restraining an ultra vires transaction, or to a declaration that a transaction, if not yet implemented, would be ultra vires, or, if already completed, was ultra vires, and, where already completed, that the plaintiffs are entitled to make the wrongdoing directors liable to compensate the company, or to make restitution, in that they are accounting parties. A minority shareholder is also entitled to maintain an action for "rescission." The plaintiffs contend that the moneys paid away were not remuneration or fees for services rendered, but were simply improper withdrawals. Questions of fact are involved as to the nature of any obligation to make the payments in question and as to the state of mind of the payer in making the payment. The minority shareholders' right to maintain such an action is an individual right, although the relief claimed is payment to the company. Here the plaintiffs seek to have the payments set aside; where wrongdoers are in **\*126** control, there should be no counting of heads as to the minority. The court does not have any supervisory role, where the claim is by a minority shareholder and the wrongdoers are in control. It would not be appropriate to direct the trial of a preliminary issue, where the facts are in dispute. [Reference was made to Western Steamship Co. Ltd. v. Amaral Sutherland & Co. Ltd. [1914] 3 K.B. 55; M. Isaacs and Sons Ltd. v. Cook [1925] 2 K.B. 391; National Real Estate and Finance Co. Ltd. v. Hassan [1939] 2 K.B. 61 and Morris v. Sanders Universal Products [1954] 1 W.L.R. 67, 73.] It is hotly disputed that Wren Trust Ltd. can be regarded as independent or disinterested, the court could not be satisfied on this point without cross examination and discovery.

It is undesirable to decide a point of law which involves underlying facts which are in dispute: Windsor Refrigerator Co. Ltd. v. Branch Nominees Ltd. [1961] Ch. 375; Richards v. Naum [1967] 1 Q.B. 620; Nissan v. Attorney-General [1970] A.C. 179; Tilling v. Whiteman [1980] A.C. 1; Radstock Co-operative and Industrial Society Ltd. v. Norton-Radstock Urban District Council [1968] Ch. 605;

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-01646-RMC    Document 39-4    Filed 01/31/2008    Page 32 of 162

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

Lawrance v. Lord Norreys, 15 App.Cas. 210 and Wenlock v. Moloney [1965] 1 W.L.R. 1238, 1242.]

Unless there is no doubt about the factual position, as set out in the affidavits, one should not be looking at the affidavits at all. [Reference was made to Goodson v. Grierson [1908] 1 K.B. 761, 766 and Williams & Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd. [1986] A.C. 368, 416, 434, 436, 441.] A striking out application is inappropriate unless it is going to determine the substantive issues. [Reference was made to City of London Corporation v. Horner (1914) 111 L.T. 512, 514 and Electrical Development Co. of Ontario v. Attorney-General for Ontario [1919] A.C. 687.] In determining whether Wren Trust Ltd. is an independent shareholder it is essential to know the motives for their expressed opposition.

The striking out procedure is wholly inappropriate, because the question is not plain and obvious: Salomons v. Laing, 12 Beav. 377; Bagshaw v. Eastern Union Railway Co. (1849) 7 Hare 114; Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474, 481, 482. [Reference was also made to W. E. Paterson, H. A. Ednie & H. A. J. Ford on Australian Company Law (Butterworths) 33/12; Hichens v. Congreve (1828) 4 Russ. 562; Mozley v. Alston (1847) 1 Ph. 790, 798, 801; Lord v. Governor and Company of Copper Miners (1848) 2 Ph. 740, 747, 748, 751, 752.] In Burt v. British Nation Life Assurance Association (1859) 4 De G. & J. 158, 174, Knight Bruce L.J. contemplates the possibility of a single shareholder bringing an action on behalf of himself and all other shareholders, although all the others were against it. [Reference was made to Simpson v. Westminster Palace Hotel Co. (1860) 8 H.L. Cas. 712, 714, 716-719; Davidson v. Tulloch (1860) 3 Macq. 783, 786, 789, 791, 796; Orr v. Glasgow, Airdrie and Monklands Junction Railway Co. (1860) 3 Macq. 799, 802; Gregory v. Patchett (1864) 33 Beav. 595, 597.] If something is ultra vires, an individual shareholder has an individual right to sue for compensation, on behalf of the company: Hoole v. Great Western Railway Co. (1867) L.R. 3 Ch.App. 262 , 266-268, 272, 274; Clinch v. Financial Corporation (1868) L.R. 5 Eq. 450 , 469,

474, 482 **\*127** and L.R. 4 Ch.App. 117, 120, 122; Gray v. Lewis (1869) L.R. 8 Eq. 526, 534, 536, 539, 541 and (1873) L.R. 8 Ch.App. 1035, 1049, 1050, 1051 and Pickering v. Stephenson (1872) L.R. 14 Eq. 322, 329, 331.

*Aldous Q.C.* in reply on procedure. Pure question of law can be decided on motion. Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204 was not concerned with control, since the wrongdoers did not have voting control. The real issue was whether the board was independent, or was being manipulated: could they safely be relied on to decide whether the action should go ahead? It cannot be right to argue that complex questions of law have to go to trial. The plaintiffs must show a prima facie case, otherwise the proceedings must be struck out. The court has to ask the same questions, whether the procedure is by striking out under R.S.C., Ord. 18, r. 19, or is by way of trial of a preliminary issue under R.S.C., Ord. 33. [Reference was made to Dominion Cotton Mills Co. Ltd. v. Amyot [1912] A.C. 546 and Carter v. Commissioner of Police of the Metropolis [1975] 1 W.L.R. 507].

*Oliver Q.C.* in reply on procedure. Strong objection is taken to allegations of mala fides, which appears nowhere in any sworn evidence of the plaintiffs. Either the striking out procedure or the trial of a preliminary issue would be appropriate. But striking out would be the better procedure. [Reference was made to Russian Commercial and Industrial Bank v. Comptoir D'Escompte de Mulhouse [1925] A.C. 112, 119.]

*Potts Q.C.* in rejoinder. There is a clear confusion between the ambit of R.S.C., Ord. 18, r. 19 and R.S.C., Ord. 33, the latter being a trial. In the former case the burden of proof lies on the applicant (i.e. the defendant here). [Reference was made to Daniels v. Daniels [1978] Ch. 406 and Carter v. Commissioner of Police of the Metropolis [1975] 1 W.L.R. 507.]

### 13 November 1986. KNOX J.

I have to give a ruling in relation to two motions

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

that are before me. The first is a motion by the ninth defendant, Film Finances Ltd. ("the company ") for an order pursuant to R.S.C., Ord. 18, r. 19, or under the inherent jurisdiction of the court that this action be struck out as being frivolous or vexatious or an abuse of the process of the court on the ground that, the proceedings being purportedly brought by the plaintiffs on behalf of the ninth defendant, the plaintiffs are in fact not entitled to bring or continue the same. There is an application with regard to costs.

The other notice of motion is one by the fourth defendant, Michael Lewis Carr, in terms very similar to the first motion, for an order pursuant to R.S.C., Ord. 18, r. 19 or under the inherent jurisdiction, that this action be struck out as being frivolous or vexatious or an abuse of the process of the court on the grounds that the proceedings being purportedly brought by the plaintiffs on behalf of the ninth defendant, the plaintiffs are in fact not entitled to bring or continue the same, and then there is an additional ground: "alternatively that the same is obviously unsustainable against the fourth defendant." I am not **\*128** concerned, in relation to this ruling, with that second ground in the second notice of motion.

The ruling which I have to make falls really into two parts. First, is the procedure, which it will be seen has been adopted by those two defendants, an application under R.S.C., Ord. 18, r. 19 and the inherent jurisdiction, appropriate at all to this type of proceeding? Secondly, if that question is answered in the affirmative, should these two applications be dismissed because the questions raised thereby do not have plain and obvious answers? It is not disputed but that difficult questions of law arise. If the right test to apply is that the applications should be dismissed unless the court is satisfied that the plaintiffs are bound to fail in the action without going in detail into the legal issues raised, then it is not disputed but that that test is not satisfied. It is common ground between the parties, and those familiar with the complications of the rule in Foss v. Harbottle (1843) 2 Hare 461 will not find this a matter of surprise, that difficult questions do arise.

I have not heard full argument from the respondents to the notices of motion, the plaintiffs in the action, on these issues of law, or on the issue of fact which I will mention in a moment. In those circumstances I do not propose to say anything about such preliminary views as I may have formed regarding those issues, whether of law or of fact. The action is one brought by the three plaintiffs, who are minority shareholders in the company, in respect of payments that have been made out of the company's funds and which, for a variety of reasons, the plaintiffs claim were improperly paid, and should be recouped to the company. The action has in fact been before the court already, and was the subject of a decision by Walton J. on 27 January 1986: see Smith v. Croft [1986] 1 W.L.R. 580. By that decision Walton J. discharged some earlier orders that were made by Master Chamberlain. The first of those earlier orders authorised the plaintiffs to bring these proceedings, down to the conclusion of discovery and inspection of documents, on terms that the company should indemnify the plaintiffs against the costs, putting it shortly. The master's later order was ancillary to that earlier one, and authorised the plaintiffs to have periodic taxation, and for a payment to them of the proportion of the costs thereby certified by the taxing master. Those orders were made on the authority of the Court of Appeal's decision in Wallersteiner v. Moir (No. 2) [1975] Q.B. 373.

On 3 July 1986 leave to appeal from Walton J.'s order was granted by a single judge of the Court of Appeal, May L.J., who said:

"I think I had better direct that this appeal [should] not be heard until after the application to strike out," - which is the application before me - "because if it is struck out then, as I have said, the question does not arise, and this appeal falls naturally by the wayside. To the extent that it is struck out [it] may affect the exercise of the Court of Appeal's discretion if they come to the conclusion that the judge below exercised his discretion wrongly so that they have the opportunity of exercising their own."

It is, therefore, necessary that this application be

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

disposed of, at least unless there is some serious delay for external reasons, before the **\*129** appeal, which is pending in the Court of Appeal from that decision of Walton J., is heard.

The issues in the action need not be analysed in any detail for the purposes of this application, but it is desirable that I should state briefly what seem to me to be the issues that arise in the application to strike out, assuming of course that it proceeds. There are two issues of law and one of fact. The first issue of law can perhaps be stated in this way. Are actions to recover money paid away ultra vires by a company altogether outside the rule in Foss v. Harbottle, 2 Hare 461, so that even one shareholder can bring such actions'? I interpose to mention that it is not disputed but that actions to restrain threatened ultra vires acts do fall within that category of cases outside the rule in Foss v. Harbottle. But the issue that arises between the parties is how far that state of affairs obtains in relation to past and completed transactions.

The second issue arises if the first is answered in the negative, and it can be stated in this way. Should the views of an independent majority of shareholders, on the question whether the action should proceed, prevail, if all the votes, either controlled or exercised or influenced by those accused of wrongdoing, are excluded from the computation, so that only independent votes are counted? If that question is answered in the affirmative then a question of fact would appear to arise, namely whether the votes of one particular shareholder, Wren Trust Ltd., should be treated as being independent for the purposes of that exercise.

The procedure which has been sought to be followed by the two defendants who issued notices of motion, is based firmly, and indeed I think exclusively, on what fell from the Court of Appeal in Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204. I do not propose to read the very lengthy headnote in that case, which was also concerned with the rule in Foss v. Harbottle, but which was in fact concerned with a case where there was quite clearly no voting control. That is different from this case, where equally clearly the defendants in these proceedings do have voting control. Also it was a case where there was no allegation of ultra vires as such, as a principal issue in the action. But the Court of Appeal, after an examination of what the rule in Foss v. Harbottle was about, said, at p. 219:

"It is commonly said that an exception to the rule in Foss v. Harbottle arises if the corporation is 'controlled' by persons implicated in the fraud complained of, who will not permit the name of the company to be used as plaintiffs in the suit: see Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474, 482. But this proposition leaves two questions at large, first, what is meant by 'control,' which embraces a broad spectrum extending from an overall absolute majority of votes at one end, to a majority of votes at the other end, made up of those likely to be cast by the delinquent himself plus those voting with him as a result of influence or apathy. Secondly, what course is to be taken by the court if, as happened in Foss v. Harbottle, in the East Pant Du case (1864) 2 Hem. & M. 254 and in the instant case, but did not happen in Atwool v. Merryweather (1867) L.R. 5 Eq. 464n, the court is confronted by a motion on the part of the delinquent or by the **\*130** company, seeking to strike out the action? For at the time of the application the existence of the fraud is unproved. It is at this point that a dilemma emerges. If, upon such an application, the plaintiff can require the court to assume as a fact every allegation in the statement of claim, as in a true demurrer, the plaintiff will frequently be able to outmanoeuvre the primary purpose of the rule in Foss v. Harbottle by alleging fraud and 'control' by the fraudster. If on the other hand the plaintiff has to prove fraud and 'control' before he can establish his title to prosecute his action, then the action may need to be fought to a conclusion before the court can decide whether or not the plaintiff should be permitted to prosecute it. In the latter case the purpose of the rule in Foss v. Harbottle disappears. Either the fraud has not been proved, so cadit quaestio; or the fraud has been proved and the delinquent is accountable unless there is a valid decision of the board or a valid de-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038

**(Cite as: [1988] Ch. 114)**

cision of the company in general meeting, reached without impropriety or unfairness, to condone the fraud.

"We think that this brief look at the authorities is sufficient for present purposes. For it so happens that this court cannot properly on this appeal decide the scope of the exception to the rule in Foss v. Harbottle"

And then the Court of Appeal goes on to explain the reason why that was so, which is special to that case, and put quite briefly it was that the company decided to adopt the action at the end of the day. Passing over those two paragraphs I pick it up at p. 220:

"It was in the light of these considerations that we declined to hear any argument from Mr. Caplan and Mr. Curry on the topic of Foss v. Harbottle. However desirable it might be in the public interest that we should express our conclusions on Vinelott J.'s analysis of the rule in Foss v. Harbottle and what he saw as the exception to it, it was necessary for us to bear in mind that the rule had ceased to be of the slightest relevance to the case. It would have been a grave injustice to all parties to increase the already horrendous costs of this litigation by allowing time for argument on an interesting but irrelevant point. Such consideration of the law as appears in this judgment is, apart from a few submissions made by Mr. Bartlett, merely a reflection of our own thoughts without the benefit of sustained argument.

"In the result it would be improper for us to express any concluded view on the proper scope of the exception or exceptions to the rule in Foss v. Harbottle. We desire, however, to say two things. First, as we have already said, we have no doubt whatever that Vinelott J. erred in dismissing the summons of 10 May 1979. He ought to have determined as a preliminary issue whether the plaintiffs were entitled to sue on behalf of Newman by bringing a derivative action. It cannot have been right to have subjected the company to a 30-day action (as it was then estimated to be) in order to enable him to decide whether the plaintiffs were en-

titled in law to subject the company to a 30-day action. Such an approach *131 defeats the whole purpose of the rule in Foss v. Harbottle and sanctions the very mischief that the rule is designed to prevent. By the time a derivative action is concluded, the rule in Foss v. Harbottle can have little, if any, role to play. Either the wrong is proved, thereby establishing conclusively the rights of the company; or the wrong is not proved, so cadit quaesio. In the present case a board, of which all the directors save one were disinterested, with the benefit of the Schroder-Harman report, had reached the conclusion before the start of the action that the prosecution of the action was likely to do more harm than good. That might prove a sound or unsound assessment, but it was the commercial assessment of an apparently independent board. Obviously the board would not have expected at that stage to be as well informed about the affairs of the company as it might be after 36 days of evidence in court and an intense examination of some 60 files of documents. But the board clearly doubted whether there were sufficient reasons for supposing that the company would at the end of the day be in a position to count its blessings; and clearly feared, as counsel said, that it might be killed by kindness. Whether in the events which have happened Newman (more exactly the disinterested body of shareholders) will feel that it has all been well worth while, or must lick its wounds and render no thanks to those who have interfered in its affairs, is not a question which we can answer. But we think it is within the bounds of possibility that if the preliminary issue had been argued, a judge might have reached the considered view that the prosecution of this great action should be left to the decision of the board or of a specially convened meeting of the shareholders, albeit less well informed than a judge after a 72-day action.

"So much for the summons of 10 May. The second observation which we wish to make is merely a comment on Vinelott J.'s decision that there is an exception to the rule in Foss v. Harbottle whenever the justice of the case so requires. We are not convinced that this is a practical test, particularly if it involves a full-dress trial before the test is applied. On the other hand we do not think that the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

right to bring a derivative action should be decided as a preliminary issue upon the hypothesis that all the allegations in the statement of claim of 'fraud' and 'control' are facts, as they would be on the trial of a preliminary point of law. In our view, whatever may be the properly defined boundaries of the exception to the rule, the plaintiff ought at least to be required before proceeding with his action to establish a prima facie case (i) that the company is entitled to the relief claimed, and (ii) that the action falls within the proper boundaries of the exception to the rule in Foss v. Harbottle. On the latter issue it may well be right for the judge trying the preliminary issue to grant a sufficient adjournment to enable a meeting of shareholders to be convened by the board, so that he can reach a conclusion in the light of the conduct of, and proceedings at, that meeting."

There is there, of course, a reference to the summons of 10 May, and it appears from the report of the decisions at first instance, the first of the **\*132** two, by Vinelott J., what the nature of that summons was. In the same case, Prudential Assurance Co. Ltd. v. Newman Industries Ltd. [1981] Ch. 229, 233, one finds:

"In those circumstances" - that is the circumstances that obtained at the beginning of the proceedings - "the second and third defendants took out a summons asking for an order, under R.S.C., Ord. 33, r. 3, that it be determined as a preliminary issue whether as a matter of law the plaintiff was entitled to maintain the action against them. A similar application was made by T.P.G."

There is therefore, as it seems to me, no doubt but that Mr. Potts is right in submitting that what was before the Court of Appeal was a summons under R.S.C., Ord. 33. There was in fact no appeal on that summons, but it was that summons that they were concerned with in making the references to preliminary issue so far as those proceedings were concerned.

Mr. Potts further submitted that the fact that the onus of proof is clearly cast, in that passage which I have read from the Court of Appeal, on the plaintiffs of showing a prima facie case on those

two matters indicates that it was a reference to the procedure under R.S.C., Ord. 33, r. 3 rather than that under R.S.C., Ord. 18, r. 19 that the Court of Appeal had in mind. R.S.C., Ord. 18, r. 19 reads:

"(1) The court may at any stage of the proceedings order to be struck out or amended any pleading or the indorsement of any writ in the action, or anything in any pleading or in the indorsement, on the ground that - (a) it discloses no reasonable cause of action... or (b) it is scandalous, frivolous or vexatious; or (c) it may prejudice, embarrass or delay the fair trial of the action; or (d) it is otherwise an abuse of the process of the court; and may order the action to be stayed or dismissed or judgment to be entered accordingly, as the case may be. (2) No evidence shall be admissible on an application under paragraph (1)(a)." That is, that it discloses no reasonable cause of action or defence as the case may be.

The whole of R.S.C., Ord. 33 is preceded by the heading "Place and mode of trial" and rule 3, under a heading "Time, etc. of trial of questions or issues," provides:

"The court may order any question or issue arising in a cause or matter, whether of fact or law or partly of fact and partly of law, and whether raised by the pleadings or otherwise, to be tried before, at or after the trial of the cause or matter, and may give directions as to the manner in which the question or issue shall be stated."

Mr. Aldous and Mr. Oliver have submitted to me that the proper procedure in such a case as this, where minority shareholders are seeking to bring an action to recover for the benefit of the company in which they are shareholders sums paid away and the defendants wish to challenge that on the basis that the rule in Foss v. Harbottle, 2 Hare 461 prevents such a proceeding, is for there to be an application by way of **\*133** striking out, mainly on the ground that this is the appropriate relief in relation to a challenge to the locus standi of a plaintiff, and that it is the inevitable result if the application succeeds. Secondly they submit that the Court of Ap-

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

peal has given clearly considered views of the procedure, which they submitted were not intended to refer to Ord. 33, r. 3. In reliance on that, they pointed to the reference to striking out in a passage which I have in fact read in Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204, 219, the actual sentence being:

"Secondly, what course is to be taken by the court if, as happened in Foss v. Harbottle, in the East Pant Du case, 2 Hem. & M., 254 and in the instant case, but did not happen in Atwool v. Merryweather, L.R. 5 Eq. 464n the court is confronted by a motion on the part of the delinquent or by the company, seeking to strike out the action?"
And at that point they submitted that the Court of Appeal was clearly contemplating what must at its lowest be a possible form of procedure. Equally they pointed to an earlier passage which I have not read but which is quite short, which shows the sort of procedure that the Court of Appeal contemplated, at p. 212:

"The assertion by Newman's counsel that the independent board 'was powerless to prevent the Prudential from pursuing the action' may have been based on the supposition that the plaintiffs had on the facts alleged in the statement of claim a personal cause of action for damages against Mr. Bartlett and Mr. Laughton independently of Newman's cause of action for damages. This supposition, if it existed, was erroneous for reasons which we explain later. It would have been open to Newman to have issued its own summons before the trial in order to test the right of the Prudential to pursue a derivative action, and to have supported it with evidence proving the objectiveness of the board's view and explaining the potential injury to Newman which would be caused by the proceedings."
That, they say, indicates the sort of procedure which the Court of Appeal envisaged as a possibility.

There has been a decision of the House of Lords, in connection with the interrelationship between R.S.C., Ord. 33, r. 3 and R.S.C., Ord. 18, r. 19. The decision is Williams and Humbert Ltd. v. W. & H.

Trade Marks (Jersey) Ltd. [1986] A.C. 368, and there is a passage in the speech of Lord Templeman, at p. 435:

"In Hubbuck & Sons Ltd. v. Wilkinson [1899] 1 Q.B. 86 Sir Nathaniel Lindley M.R. pointed out the distinction between Ord. 18, r. 19 (then Ord. xxv, r. 4), which dealt with striking out and Ord. 33, r. 3 (then Ord. xxv, r. 2), which enables a point of law to be set down and argued as a preliminary issue. He said, at p. 91: 'Two courses are open to a defendant who wishes to raise the question whether, assuming a statement of claim to be proved, it entitles the plaintiff to relief. One method is to raise the question of law as directed by Ord. xxv, r. 2; the other is to apply to strike out **134** the statement of claim under Ord. xxv, r. 4. The first method is appropriate to cases requiring argument and careful consideration. The second and more summary procedure is only appropriate to cases which are plain and obvious, so that any master or judge can say at once that the statement of claim as it stands is insufficient, even if proved, to entitle the plaintiff to what he asks.' The observations of Lindley M.R. directed to striking out a statement of claim apply equally to applications to strike out a defence or part of a defence. There has been recently a difference of judicial approach to the construction of Ord. 18, r. 19. In McKay v. Essex Area Health Authority [1982] Q.B. 1166, the majority of the Court of Appeal (Stephenson and Ackner L.JJ.) cited with approval the observations of Sir Gordon Willmer in Drummond-Jackson v. British Medical Association [1970] 1 W.L.R. 688, 700 where he said: 'The question whether a point is plain and obvious does not depend upon the length of time it takes to argue. Rather the question is whether, when the point has been argued, it has become plain and obvious that there can be but one result.' On the other hand Griffiths L.J. dissented on the point in McKay v. Essex Area Health Authority [1982] Q.B. 1166 and said, at p. 1191: 'If on an application to strike out as disclosing no cause of action a judge realises that he cannot brush aside the argument, and can only decide the question after a prolonged and serious legal argument, he should refuse to embark upon that argument and should dismiss the application unless

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

there is a real benefit to the parties in determining the point at that stage. For example, where striking out the cause of action will put an end to the litigation a judge may well be disposed to embark on a substantial hearing because of the possibility of finally disposing of the action. But even in such a case the judge must be on his guard that the facts as they emerge at the trial may not make it easier to resolve the legal question.' My Lords, if an application to strike out involves a prolonged and serious argument the judge should, as a general rule, decline to proceed with the argument unless he not only harbours doubts about the soundness of the pleading but, in addition, is satisfied that striking out will obviate the necessity for a trial or will substantially reduce the burden of preparing for trial or the burden of the trial itself. In the present case, the general rule would seem to require a refusal by the judge to embark on the problems of international law involved in the present appeal, leaving those problems to be solved at the trial if they become material. If at the trial the appellants were cleared of any impropriety in their management of the affairs of the Rumasa group, then the problems of international law would not arise. Moreover, even if those problems did arise I do not believe that the length of time, namely seven days, occupied by the judge in deciding to strike out the pleadings would have been added to the time required to decide other issues. But there are special circumstances which, in my view, made it right for the judge to proceed and to make the order which he made. If the appellants' pleadings and particulars had not been struck out, the appellants *135 would have proceeded to demand discovery before trial and to lead evidence at the trial, harassing to the plaintiffs and embarrassing to the court and designed to support the allegations and insinuations of oppression and bad faith on the part of the Spanish authorities which appear in the amended defences and particulars. These allegations are irrelevant to the trade marks action and the banks' action and are inadmissible as a matter of law and comity and were rightly disposed of at the first opportunity."

In my judgment it appears from what fell from Lord Templeman in that case, that even in the type of case where the issue in the preliminary application is one of the issues in the action, there may be circumstances which overall justify the use of Ord. 18, r. 19 where equally Ord. 33, r. 3 might serve. It depends in my judgment on the particular facts of the particular case.

A further point which was relied upon by Mr. Aldous and Mr. Oliver was that the parties were in this case armed and prepared both with leading counsel and a multitude of books to argue the issues which were clear to them some time before the proceedings came before me, and that it was only at the last moment that an objection to the form of procedure was made. I do not regard that as a determinant factor in any sense since either the point is a good one or it is not, and the lateness with which it was in fact taken does not impinge on that. On the other hand, it is capable of being relevant that the issues were sufficiently defined for the parties to prepare themselves, and that the matter was organised for trial by earlier applications on the notices of motion when the time of trial was estimated without doubts being raised as to the propriety of the procedure.

I am satisfied that the statements which I have read in the Court of Appeal as to the procedure to be adopted in these appeals, although plainly obiter as was in fact conceded, should be regarded by me as a guide to be followed as faithfully as possible. In my judgment, as a matter of procedural law, either Ord. 18, r. 19 or Ord. 33, r. 3 is a potentially possible vehicle for such an application as is involved in the present case to decide whether a plaintiff minority shareholder has the necessary locus standi. But for present purposes it is sufficient for my decision to hold, as I do, that the procedure under Ord. 18, r, 19 is not of itself an impossible procedure which leads to an application, made under that rule or under the inherent jurisdiction, to be struck out as being evidently improper. It seems to me that although the Court of Appeal undoubtedly had Order 33 procedure before it in the form of the summons in relation to which they were discussing the propriety of what had happened below, their guidance was intended to be general in relation to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

minority shareholders' actions, and on that basis I find that the procedure is not inherently defective.

That leads me to the second of the two issues with which I am faced, and that is the effect of the answer to the problems that are raised not being plain or obvious. Mr. Potts has relied on two separate lines of very well established authority, one on Ord. 18, r. 19, which is summarised conveniently at p. 305 of *The Supreme Court Practice 1985* **\*136** under the rubric "Exercise of powers under this rule," the note being numbered 18/19/3, where the text reads:

"It is only in plain and obvious cases that recourse should be had to the summary process under this rule... The summary procedure under this rule can only be adopted when it can be clearly seen that a claim or answer is on the face of it 'obviously unsustainable'... The summary remedy under this rule is only to be implied in plain and obvious cases when the action is one which cannot succeed or is in some way an abuse of the process or the case unarguable... It cannot be exercised by a minute and protracted examination of the documents and facts of the case, in order to see whether the plaintiff really has a cause of action..."

As a typical example of this type of authority he cited, along with other cases, the decision in Wenlock v. Moloney [1965] 1 W.L.R. 1238, where the headnote reads:

"By his writ and statement of claim the plaintiff claimed damages against the three defendants for conspiring to oust him from the business of a company. His original statement of claim was a long, inartistic and wandering document to which the defendants refused to plead. He, accordingly, remodelled it and delivered a second statement of claim in which he alleged the conspiracy and set out four stages of the conspiracy at various times between January 1961 and January 1964 as a result of which he alleged, inter alia, that he had been deprived of his shares and interest in the company. The defendants delivered defences denying the allegations made against them in the statement of claim, and sought further and better particulars of the state-

ment of claim which the plaintiff gave. After the pleadings were closed the plaintiff issued a summons for directions in the ordinary way, but before it was heard the defendants applied to the master under R.S.C., Ord. 18, r. 19, alternatively under the inherent jurisdiction of the court, to strike out the pleadings and dismiss the action on the grounds that the pleadings disclosed no reasonable cause of action, were frivolous and vexatious, and an abuse of the process of the court. On the hearing of the applications to strike out, ten affidavits were filed, five by the defendants in support of the applications and five by the plaintiff in opposition thereto. The master read the affidavits, the documents exhibited thereto, and considered the issues of fact raised by the affidavits in a four-day hearing. There was no cross-examination on the affidavits or oral evidence. In his reserved judgment, which occupied 22 pages, the master held that the plaintiff's action was most unlikely to succeed and he, accordingly, struck out the pleadings and the action. The plaintiff appealed to the judge in chambers, who dismissed his appeal.

"On appeal to the Court of Appeal, which refused to look at the affidavits: -

"*Held,* allowing the appeal, that the trial by the master of issues of fact on affidavits to ascertain whether the plaintiff had a case was a usurpation of the functions of the trial judge and was a wholly **\*137** improper procedure... and that since the pleadings on their face disclosed a reasonable cause of action and raised issues of fact which required to be determined on oral evidence by a judge, the action would not be struck out but would proceed to trial."

Danckwerts L.J. said, at p. 1243:

"The practice under R.S.C., Ord. 25, r. 4, and under the inherent jurisdiction of the court was well settled. Under the rule it had to appear on the face of the plaintiff's pleading that the action could not succeed or was objectionable for some other reason. No evidence could be filed. In the case of the inherent power of the court to prevent abuse of its procedure by frivolous or vexatious proceedings or

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

proceedings which were shown to be an abuse of the process of the court, an affidavit could be filed to show why the action was objectionable. The commonest case was where a plaintiff was seeking to bring an action on a point which had already been decided or was obviously wholly imaginary. An example of that is Willis v. Earl Howe [1893] 2 Ch. 545. But, as the procedure was of a summary nature, the party was not to be deprived of his right to have his case tried by a proper trial, unless the matter was clear."

And he went on to quote Lord Herschell in Lawrance v. Lord Norreys (1890) 15 App.Cas. 210, 219 where he said:

"It cannot be doubted that the court has an inherent jurisdiction to dismiss an action which is an abuse of the process of the court. It is a jurisdiction which ought to be very sparingly exercised, and only in very exceptional cases."

That was one line of authority on which Mr. Potts relied. The other line of authority is concerned with the trial of preliminary issues, but Mr. Potts relied on that as being equally applicable, and in that context I cite again, as an example of the numerous cases that were cited, the decision of Windsor Refrigerator Co. Ltd. v. Branch Nominees Ltd. [1961] Ch. 375. I need not read the headnote, but Lord Evershed M.R. summed up the principle involved at the end of his judgment, saying, at p. 396:

"For the reasons that I have stated, I conclude that the answer to this case is that on the assumptions of fact which I have indicated - which can be determined only in the action - this instrument would be capable of being a writing as contemplated by the debenture taking effect on the date (28 February) when it was in fact, according to the defendants, passed over to Greenwood after a demand had been made by Inkin with the authority of the debenture holders. I would, therefore, order accordingly, and set aside the judgment of Cross J., though, as I say, I do not express any view upon the matter with which he expressly dealt, namely, whether the document took effect in the circumstances (or was capable of taking effect) as a deed. I repeat what I said at the beginning, that the course

which this matter has taken emphasises, as clearly as any case in my experience has emphasised, the extreme unwisdom - save in very exceptional cases - of adopting this procedure of **\*138** preliminary issues. My experience has taught me (and this case emphasises the teaching) that the shortest cut so attempted inevitably turns out to be the longest way round."

Harman L.J. said, at p. 396:

"I concur, and find myself doing so with particular heartiness with reference to the last observations my Lord has made. The number of conditions he has found it necessary to use to fence in the expression of this court's opinion shows at once the undesirability of this kind of procedure. It is highly undesirable that the court should be constrained to tie itself in so many knots, and in the end merely say: 'Well, if this was thus, then that was so.'"

That highlights, in a typically trenchant way, the proposition that It is often profoundly unsatisfactory for a court to give a decision as a preliminary matter in an action on an individual issue on various hypothetical bases of fact. The plain objection being that the hypothetical bases may prove not to be bases and illusory, and in those circumstances the decision of the court is so much air.

Both those lines of authority were distinguished by Mr. Aldous and Mr. Oliver on one single basis, and that is that they were without exception concerned with the interlocutory disposal of an issue which was going to form part of the issues in the action, and they submit that that is a piecemeal way of carrying on which is inherently open to the objections both under the inherent jurisdiction and under Ord. 18, r. 19 where there has to be a very obvious case before the issues can in effect be short-circuited, and to the preliminary trial of issues on assumed facts under Ord. 33, r. 3. In the present case they submit we have a fundamentally different situation, namely one where what has to be done is not to decide an issue in the action itself but an issue which the Court of Appeal has described in the way which I have read, namely whether a prima facie case on those two points has in fact been established by the plaintiff, and it is at least possible, and in many

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

cases probable - and they would submit in this case near certain - that the issue there is not one which would occupy the court at the final trial of the action.

They support their submissions by further submissions that it is plain from the passage which I read from Danckwerts L.J.'s decision in the Windsor Refrigerator case [1961] Ch. 375, 396, and indeed from many other passages, that questions of fact can be gone into under Ord. 18, r. 19, and in exceptional cases cross-examination can be permitted on affidavits. In this particular case the principal affidavit on which the defendants rely in relation to the issue of fact which I have mentioned as the third of the potential issues in these applications is one sworn by Mr. Baldock and cross-examination was in fact offered during the course of the hearing on a number of different occasions but never applied for by Mr. Potts, and it would not be in accordance with the practice of this court to direct a cross-examination without an application for it. But my conclusion is that it is the question stated by the Court of Appeal as a preliminary matter that has to be decided that it is a special form of procedure concerned with giving sensible operation to the rule in Foss v.Harbottle, 2 Hare 461 *139 and which was concerned with avoiding the Scylla and Charybdis, on the one hand of having a preliminary issue which effectively requires one to try the whole action where the rule serves no useful purpose, and on the other side of the strait, of assuming that everything that the plaintiffs allege is necessarily correct as a matter of fact, which is of course the technique the court adopts when it has what was called a strict demurrer. The Court of Appeal, it seems to me, has laid down a halfway house for this very special type of case, one in which the legal issues in this particular case are sufficiently well defined for the parties to be able to argue them. Further, I am satisfied that they will determine the result of the action completely if answered in one particular way - not if answered in the other way, but that is seldom obtainable.

As regards the factual issue which I have sought to outline, that is to say the independence of Wren

Trust Ltd., in my judgment that lies within a sufficiently small compass and is sufficiently independent of what I take to be the issues in the action itself for it to fall outside the lines of authority that Mr. Potts has cited and whose validity inside their scope is unchallenged. I do not propose to analyse the evidence in relation to the independence or otherwise of Wren Trust Ltd., it would be both impracticable and undesirable for me to do so not having had the benefit of submissions from Mr. Potts in relation to the evidence that is at present before the court. I therefore confine my observations exclusively to the question whether the existence of that issue of fact is a fatal obstacle to the adoption of the procedure which has in fact been chosen by the two defendants who have moved these motions before me, and to that extent I am not satisfied that there is any such fatal objection. Although, therefore, I view with mounting apprehension the escalation of authority which seems inevitably attendant on the difficult questions that arise in this case, I have reached the firm conclusion that it would not be right for me to stop these applications at this stage, and I so rule.

*Order accordingly.*

*Costs reserved*

The hearing of the motions to strike out was then continued.

*Potts Q.C.* continuing on the main case. The cases cited so far have all been concerned with ultra vires, or internal management; none of them has dealt with fraud on a minority. Atwool v. Merryweather (1867) L.R. 5 Eq. 464n clearly shows that where a contract entered into by the company is void, different considerations apply. [Reference was made to MacDougall v. Gardiner (1875) L.R. 20 Eq. 383 and (1875) 1 Ch.D. 13; Menier v. Hooper's Telegraph Works (1874) L.R. 9 Ch.App. 350 and Mason v. Harris (1879) 11 Ch.D. 97, 101.]

There is no case, relating to a fraud on a minority, which indicates that the court can go beyond seeing whether the wrongdoers are in control, or is concerned to see what other, independent shareholders

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

think. In Mason v. Harris (1879) 11 Ch.D. 97 there were a number of **\*140** such independent shareholders. [Reference was made to Studdert v. Grosvenor (1886) 33 Ch.D. 528; Pickering v. Stephenson (1872) L.R. 14 Eq. 322; Cullerne v. London and Suburban General Permanent Building Society (1890) 25 Q.B.D. 485; Burland v. Earle [1902] A.C. 83; Yorkshire Miners' Association v. Howden [1905] A.C. 256, 263 and Taylor v. National Union of Mineworkers (Derbyshire Area) [1985] B.C.L.C. 237, 241, 246, 247, 254, 255.]

An individual shareholder has locus standi to bring proceedings on behalf of the company, to recover assets, where there has been misappropriation, or an ultra vires transaction, and not merely a right to seek an injunction to restrain such matters.

[At this point on 14 November the plaintiff sought leave to appeal on the ruling given as to procedure. Knox J. refused leave, and the case was then adjourned for an application for leave to be made to the Court of Appeal. The Court of Appeal refused leave and the hearing was resumed on 17 November.]

*Potts Q. C.* continuing. The rule in Foss v. Harbottle, 2 Hare 461 does not prevent an individual shareholder from seeking an order for repayment and has no impact where the claim is based on ultra vires. The board cannot release a claim maintained by an individual shareholder for repayment to the company. A valid release could only be made by way of special resolution at a general meeting of the company: Buckley on the Companies Acts, 14th ed. (1981), vol. 1, p. 988. [Reference was made to Yorkshire Miners' Association v. Howden [1905] A.C. 256, 263; Dominion Cotton Mills v. Amyot [1912] A.C. 546 and Pickering v. Stephenson, L.R. 14 Eq. 322.]

Two quite separate principles exist: in the case of ultra vires transactions, the question who is in control is irrelevant; but in the case of fraud on a minority it is clearly very relevant. In the former case release is impossible. The argument that directors can release any cause of action could logic-

ally apply just as well to prospective transactions, as to past ones. [Reference was made to Towers v. African Tug Co. [1904] 2 Ch. 558, 564, 566, 567, 569; Baillie v. Oriental Telephone and Electric Co. Ltd. [1915] 1 Ch. 503, 510, 511, 518; Cotter v. National Union of Seamen [1929] 2 Ch. 58, 67-70, 72, 86, 99, 100, 107, 110; Edwards v. Halliwell [1950] 2 All E.R. 1064; Pavlides v. Jensen [1956] Ch. 565, 567, 568, 572-574; Birch v. Sullivan [1957] 1 W.L.R. 1247, 1250; Heyting v. Dupont [1963] 1 W.L.R. 1192 and [1964] 1 W.L.R. 843 and Australian Coal & Shale Employees' Federation v. Smith (1937) 38 S.R.(N.S.W.) 48, 53-57, 60.]

In Wallersteiner v. Moir (No. 2) [1975] Q.B. 373, 390 there was no suggestion whatever that there was any need for a secondary counting of heads amongst the independent shareholders. [Reference was made to Daniels v. Daniels [1978] Ch. 406; Estmanco (Kilner House) Ltd. v. Greater London Council [1982] 1 W.L.R. 2, 15, 16; Devlin v. Slough Estates Ltd. [1983] B.C.L.C. 497, 502, 503 and Viscount of the Royal Court of Jersey v. Shelton [1986] 1 W.L.R. 985.]

In English law any provision purporting to release a director from his obligations would be void. Criticism of Vinelott J.'s judgment in Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204 **\*141** presupposes that the facts alleged by the plaintiffs in that case fall within the exception to the rule in Foss v. Harbottle, 2 Hare 461 based on fraud on a minority. That was the only issue on which they could have been relying and on that point - a preliminary issue would have been within a small company, since there was no control by the wrongdoers. If a writ had not already been issued and some shareholders wished to stop the proceedings they would have to show that the company had no cause of action. The company in general meeting would require a special resolution to overrule the board's decision not to issue. The question of release is irrelevant in the context of ultra vires.

In re Hellenic & General Trust Ltd. [1976] 1 W.L.R. 123 provides a common sense test; a meet-

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

ing of the class affected was required to "enable them to consult together." By analogy the shareholders of Wren Trust Ltd. should be allowed to consult together, to clarify the company's position, and establish their independence or otherwise. [Reference was made to *Buckley on the Companies Acts,* 14th ed., vol. 1, p. 199. Mason v. Harris (1879) 1 Ch.D. 97, 107, 109; Gower, Modern Company Law,4th ed. (1979), p. 653 (footnotes).]

The sole question for the court is whether the plaintiff has sufficiently demonstrated that he can put the company in motion; the idea of a "counting of heads" amongst the minority is specifically reflected in Russell v. Wakefield Waterworks Co., L.R. 20 Eq. 474, 482. [Reference was made to articles by Wedderburn on "Shareholders' Rights and the rule in Foss v. Harbottle. " [1957] C.L.J. 194 and [1958] C.L.J. 93; In re Halt Garage(1964) Ltd. [1982] 3 All E.R. 1016 , 1023, 1028, 1032.] In the present case the payments to the directors were not made under board resolution, a purported resolution, and no services were rendered by the associated companies.

The payments have not even been characterised in the accounts as being "remuneration." Only actual liabilities should count for the purpose of testing the propriety of the payments. The payments to associated companies appear to constitute "sham" payments. In re Lee, Behrens & Co. Ltd. [1932] 2 Ch. 46, where a pension granted to the widow of a company director was held to be void, and the widow was not entitled to prove for it in a winding up, is a useful guide in considering whether something is a breach of a director's fiduciary duty or is a proper exercise of fiduciary power. The transactions complained of, or some of them, had the effect of reducing the company's net assets, by giving financial assistance in the purchase of its own shares, in contravention of section 42 of the Companies Act 1981. [Reference was made to section 87(4)(c) of the Companies Act 1980.] Breach of section 42 is a criminal offence; it cannot be described as a 'technicality.' The 1982 accounts were not even in existence at the time the payments complained of were made. These transactions are

pivotal to this case since it was only by their means that the directors gained "control." As a matter of law directors cannot act informally. The court cannot presume that "unlabelled" payments to directors were by way of remuneration for services. It is clear that the fourth defendant was a party to the transactions complained of. It is also clear that Wren Trust Ltd. participated. Prima facie they were not "disinterested." On the ***142** footing of establishing a prima facie case, the proceedings are in a "shambles, " because if the burden of proof rests upon a party, that party should be entitled to address the court first.

*Aldous Q.C.* in reply on the main case. The question whether there was a contractual obligation to make the payments does not arise, because they were clearly made to the associated companies for their services; the issue is whether the payments made were fair and reasonable for the work done. It is a familiar practice for companies to be paid for services rendered by individual directors. There was a power to pay any level of remuneration, and when paid out of divisible profits, any level of remuneration is capable of being authorised. [Reference was made to In re George Newman & Co. [1895] 1 Ch. 674 and In re Duomatic Ltd. [1969] 2 Ch. 365; North-West Transportation Co. Ltd. v. Beatty (1887) 12 App.Cas. 589 and In re Hellenic & General Trust Ltd. [1976] 1 W.L.R. 123.]

In so far as the question is one of law, it is desirable that it should be decided, since it is unlikely to arise at trial, and it may dispose of the proceedings, if it is decided in the defendant's favour. The point of law does not depend on disputed facts. The case proceeds on the basis of whether a prima facie case is shown. Reliance is placed on Williams Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd. [1986] A.C. 368. Confusion has been caused by the 19th century cases, because many of them were decided on demurrer, because some of them combined personal and derivative claims in the same action, and because in some cases analogies were drawn with the law on partnerships or trusts or on trade unions. The company itself is capable of ratifying or com-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

promising the claim or effectively resolving not to sue, so as to bind all shareholders: there is no reason why it should not be able to stop proceedings brought on its behalf by majority shareholders, who can be in no better position than the company itself. Potts Q.C. contends that the minority shareholder has a personal right to sue on the company's behalf, once he has established the company is in the control of the wrongdoers! [Reference was made to Gower, Modern Company Law, 4th ed. (1979), p. 651, para. (iii).]

It is said that even if the board is independent, and 99 per cent. of the shares were to be held by "outsiders," the remaining one per cent. could bring a derivative action; if that were so it would have far reaching consequences, since it would enable a trade rival to buy single share in order to maintain a derivative action for wholly improper reasons. The Court of Appeal in Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204 clearly contemplated that the views of independent shareholders should be consulted: see [1981] Ch. 323 *per* Vinelott J. [Reference was made to Burland v. Earle [1902] A.C. 83; Sinclair v. Brougham [1914] A.C. 398, 414, to 418, 433, 440, 452; *Palmer's Company Law,* 23rd ed. (1982) p. 848; Buckley on the Companies Acts, 14th ed., vol. 1, pp. 898, 992; Hogg v. Cramphorn Ltd. [1967] Ch. 254; Bamford v. Bamford [1970] Ch. 212; Gower, Modern Company Law, 4th ed., pp. 147, 148, 643 and Wallersteiner v. Moir (No. 2) [1975] Q.B. 373; 404.]

**\*143** It does not follow that because a derivative action is not demurrable that the plaintiff can maintain it, it may still be an abuse of process, where the claim has in fact been released. The statement of claim might appear sound on its face, but the objections arising from the split nature of the claim, between "personal" and "derivative," might only come to the surface on the defence. [Reference was made to Taylor v. National Union of Mineworkers (Derbyshire Area) [1985] B.C.L.C. 237, 241-245.] In demurrer cases, the claim will be struck out where the complaint is ratifiable. [Reference was made to Mozley v. Alston (1847) 1 Ph. 790; Lord v.

Governor and Company of Copper Miners (1848) 2 Ph. 740; Bagshaw v. Eastern Union Railway Co. (1849) 7 Hare 114; Salomons v. Laing (1850) 12 Beav. 377; Clinch v. Financial Corporation (1868) L.R. 5 Eq. 450; Gray v. Lewis, L.R. 8 Eq. 526; L.R. 8 Ch.App. 1035; Russell v. Wakefield Waterworks Co., L.R. 20 Eq. 474; Atwool v. Merryweather (1867) L.R. 5 Eq. 464n: Simpson v. Westminster Palace Hotel Co. (1860) 8 H.L.Cas. 712; Davidson v. Tulloch (1860) 3 Macq. 783, Orr v. Glasgow, Airdrie and Monklands Junction Railway Co. (1860) 3 Macq. 799; Gregory v. Patchett (1864) 33 Beav. 595; Pickering v. Stephenson (1872) L.R. 14 Eq. 322; Hoole v. Great Western Railway Co. (1867) L.R. 3 Ch.App. 262; MacDougall v. Gardiner, L.R. 20 Eq. 383; Mason v. Harris, 11 Ch.D. 97; Cullerne v. London and Suburban General Permanent Building Society, 25 Q.B.D. 485; Yorkshire Miners Association v. Howden [1905] A.C. 256; Dominion Cotton Mills Co. Ltd. v. Amyot [1912] A.C. 546: Burt v. British Nation Life Assurance Association (1855) 4 De G. & J. 158: Towers v. African Tug Co. [1904] 1 Ch. 558 and Baillie v. Oriental Telephone and Electric Co. Ltd. [1915] 1 Ch. 503.; Cotter v. National Union of Seamen [1929] 2 Ch. 58; Edwards v. Halliwell [1950] 2 All E.R. 1064; Pavlides v. Jensen [1956] Ch. 565; Birch v. Sullivan [1957] 1 W.L.R. 1247; Heyting v. Dupont [1964] 1 W.L.R. 843 and Daniels v. Daniels [1978] Ch. 406) Turquand v. Marshall (1869) L.R. 4 Ch.App. 326 .]

To sum up: (i) None of the payments were in fact ultra vires in the true sense, since they fell within the provisions of paragraph 3 of the memorandum of association; (ii) None of the payments were in breach of duty, and all of them should be regarded as being made for individual services rendered by the directors; (iii) None were unreasonable in amount, and all were approved by all directors; (iv) Save for relatively small amounts they were disclosed in the company's accounts, and were approved by the shareholders; (v) There is no evidence to impugn the votes cast, since third parties, including Wren Trust, voted in favour; (vi) There was no breach of section 42 of the Companies Act 1981; all payments were subsequently included in

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

the accounts as being for directors' services, and were ratified in general meeting by the shareholders. The payments were in line with the emoluments paid in previous and subsequent years. There is no ground for any allegations of fraud. It would be wrong to allow the action to proceed.

*Oliver Q.C.* in reply. The arguments advanced by Mr. Aldous are adopted. It is not only desirable, but important that the court should decide the points of law arising. [Reference was made to Russian Commercial and Industrial Bank v. Comptoir D'Escompte de Mulhouse[1925] A.C. 112 *144 , and Banco de Bilbao v. Sancha [1938] 2 K.B. 176.] Where the court embarks on a prolonged and thorough examination of facts and law cross examination and discovery could be ordered if appropriate. [Reference was made to Pickering v. Stephenson, L.R. 14 Eq. 322 and Peel v. London and North Western Railway Co. [1907] 1 Ch. 5, 11, 12, 20.] Cases in the 19th century tend to confuse ultra vires with breach of trust. There is no case which decides that where the majority of independent shareholders oppose the action it should be allowed to continue, and the reverse is suggested by Taylor v. National Union of Mineworkers (Derbyshire Area) [1985] B.C.L.C. 237. The opposite is consistent with common sense and principle. The question as to what to do after an ultra vires act has been committed is one of internal management, not of ratification. Every shareholder should be regarded as independent unless at the meeting at which his vote was exercised, there was reason to regard it as tainted. The precise ambit of the principle is not clear; a personal interest does not disqualify, but there is a duty to vote bona fide for the benefit of the company as a whole. [Reference was made to *Lindley on Partnership,* 15th ed. (1984), 478.] There is an overriding duty to consider the views of the minority and the power of the majority to bind them is based on bona fides. [Reference was made to Menier v. Hooper's Telegraph Works (1874) L.R. 9 Ch.App. 350, 353, 354; Pender v. Lushington (1877) 6 Ch.D. 70, 75, 76; North-West Transportation Co. Ltd. v. Beatty (1887) 12 App.Cas. 589 , 593, 594; Wall v. London and Northern Assets Corporation [1898] 2 Ch. 469, 474, 480; Allen v. Gold Reefs of West Africa Ltd.

[1900] 1 Ch. 656, 667, 670, 678, 679; Brown v. British Abrasive Wheel Co. Ltd. [1919] 1 Ch. 290, 295; Sidebottom v. Kershaw, Leese & Co. Ltd. [1920] 1 Ch. 154, 170; Shuttleworth v. Cox Brothers & Co. (Maidenhead) Ltd. [1927] 2 K.B. 9, 18; Greenhalgh v. Arderne Cinemas Ltd. [1951] Ch. 286; Clemens v. Clemens Bros. Ltd. [1976] 2 All E.R. 268 and Estmanco (Kilner House) Ltd. v. Greater London Council [1982] 1 W.L.R. 2.] It is clear that the exercise of votes is subject to equitable considerations, not confined to special resolutions; a personal interest does not disqualify a shareholder from voting. The court tolerates a conflict of interest up to a certain degree; the boundaries are essentially evidential. It does appear that where the defendants cast votes against proceedings where a prima facie case exists, a presumption is raised against the votes having been properly cast, i.e. that the court will not tolerate them. Beyond that in each case the court will look for credible evidence as to the motives for voting. The mere fact the votes were cast against proceedings does not vitiate them unless the shareholders' motives were unreasonable. Nor is it necessarily fatal that a person who is not a defendant and who votes against proceedings may have some association with the defendants, other than as a shareholder, but in such a case the court will be conscious of the possibility of conflict and will embark on an investigation as to his motives. In so far as the test propounded by Mr. Potts, citing In re Hellenic & General Trust Ltd. [1976] 1 W.L.R. 123, deviates from the test described above it is inappropriate. If fraud was to be pleaded it should have been pleaded with the highest degree of particularity.

**\*145 Potts Q.C.** in rejoinder on cases cited, Neither Hogg v. Cramphorn Ltd. [1967] Ch. 254, nor Bamford v. Bamford [1970] Ch. 212 was concerned with fraud on a minority. Breach of duty is not the same as fraud on a minority.

19 December.

KNOX J.

read the following judgment. I have before me two

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

notices of motion. The first is on behalf of the ninth defendant for an order pursuant to R.S.C., Ord. 18, r. 19, or under the inherent jurisdiction of the court that this action be struck out as being frivolous or vexatious or an abuse of the process of the court on the grounds that being purportedly brought by the plaintiffs on behalf of the ninth defendant the plaintiffs are in fact not entitled to bring or continue the same. The second is on behalf of the fourth defendant for an order in similar terms, with an alternative ground, "alternatively that [the action] is obviously unsustainable against the fourth defendant." I have earlier ruled that the procedure thus adopted is not so defective that the application should in any event fail.

In the course of giving that ruling I expressed the view that the task for the court was to seek to follow the guidance given by the Court of Appeal in Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204, 221, where the following passage from the judgment of the court appears:

"In our view, whatever may be the properly defined boundaries of the exception to [the rule in Foss v. Harbottle (1843) 2 Hare 461] the plaintiff ought at least to be required before proceeding with his action to establish a prima facie case (i) that the company is entitled to the relief claimed, and (ii) that the action falls within the proper boundaries of the exception to the rule in Foss v. Harbottle."
That I now proceed to attempt to assess.

Much of the factual background to these proceedings is not in issue and the dispute is far more concerned with the mental element in what was done and the manner in which it was done than with what happened.

The present voting position among the single class of ordinary shareholders is as follows. The three plaintiffs, Nora Smith, Lucienne Crane and Lord Rathcavan, are the holders of 13,400, 1,000 and 4,000 shares respectively in the ninth defendant, Film Finances Ltd. ("the company") out of the issued share capital of 155,100 fully paid shares. Together they therefore hold 18,400 shares which is

11.86 per cent. of the voting rights. The defendants against whom claims are made in the statement of claim are between them the holders of 97,000 shares, i.e. 62.54 per cent. of the voting rights. These defendants fall into three groups. The first, second and third defendants, William Alan Croft, Richard Martin Francis Soames and David Alexander Korda ("the executive directors"), form one group. It is against them primarily that charges are brought. The fifth, sixth, seventh and eighth defendants, Mannergrand Services Ltd. ("Mannergrand"), Cushingham Ltd. ("Cushingham"), Bellwedge Ltd. ("Bellwedge") and Brindeel Ltd. ("Brindeel"), form the second group. I shall refer to them together as "the associated **\*146** companies." They are controlled or closely associated with one or more of the executive directors, Mannergrand with Mr. Croft, Cushingham with Mr. Soames, Bellwedge with Mr. Korda and Brindeel with all three of the executive directors. Finally there is the fourth defendant, Michael Lewis Carr. He is the chairman and a non-executive director of the company. He is a director of Wren Trust Ltd. and nominated by it to the board of the company. That leaves 39,700 shares unaccounted for which fall into the following groups:

(i) 4,000 are held by Messel Nominees Ltd., a company whose shares are owned by another company, Defester Ltd., the shares in which are owned by Stephen Richard Hill and Peter Welsford, both of whom have been active in promoting the plaintiffs' claims. The votes attached to these shares are clearly in the plaintiffs' camp, bringing up their voting strength to 22,400 or 14.44 per cent. of the whole.

(ii) Two other shareholders, Georgian Investments Ltd., who hold 2,000 shares, and Sir Reginald Sheffield, who owns 50 shares, are not under the control of or closely associated with the defendants against whom claims are made and have unequivocally stated their opposition to the further prosecution of this action. They account for 1.32 per cent. of the voting rights.

(iii) Film Finances Pension Fund holds 2,950 shares

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

or 1.9 per cent. of the voting rights. It is common ground that it is under the control of Mr. Soames and Mr. Korda and is to be treated for present purposes as on a par with the executive directors so far as voting is concerned.

(iv) Wren Trust Ltd. ("Wren Trust") holds 30,500 shares, i.e. 19.66 per cent. of the votes in the company. This company is a wholly owned subsidiary of Gresham Trust Plc., which is a member of the Eagle Star Group of companies. Wren Trust is thus owned and controlled by a large outside financial institution. One of the issues canvassed before me has been whether it should be regarded for the purposes of this application as independent or disinterested so far as the question whether or not these proceedings should continue is concerned. The boards of Wren Trust and of Gresham Trust Plc. have both expressed the view that the proceedings should not continue.

(v) Finally there are two holders of 100 shares each who have not committed themselves. This shareholding is so small as not to be of practical significance.

The following conclusions can be drawn from these shareholdings: (1) The executive directors with the associated companies have overall voting control. (2) If one excludes the votes of the executive directors, the associated companies and Film Finances Pension Fund, then the votes of Georgian Investments Ltd., Sir Reginald Sheffield and Wren Trust totalling 32,550 (or almost 20.99 per cent. of the whole) comfortably exceed those of the plaintiffs and the Messel Nominees totalling 22,400 (14.44 per cent. of the whole) but not so comfortably as to give a 75 per cent. majority of the votes excluding those mentioned above. The majority is in fact about 59.24 per cent. Such a majority can carry an ordinary but not a special resolution. (3) If the votes of Wren Trust are excluded as well as those of the executive directors, the associated companies and Film Finance Pensions Fund, then the plaintiffs *147 and Messel Nominees with 22,400 votes have a very large majority over Georgian Investments Ltd. and Sir Reginald Sheffield, with 2,050 votes.

That majority would be one of 91.62 per cent. and sufficient to pass either an ordinary or a special resolution.

The factual background is as follows. It will be appreciated that I am not making findings of fact at the end of an action and I am therefore limiting this account of the facts to that which seems to me necessary to explain the reason for my decision on the questions I have to answer and which appear from the quotation at the outset of this judgment from the Court of Appeal decision in Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204.

The company was incorporated on 24 February 1950 with an initial paid up capital of £7,500. Throughout its history its trade has been the unusual one (it appears its only significant competitors are overseas companies) of guaranteeing the completion of films on time and within budget. It is obvious that this is a specialised business requiring for its successful operation both wide contacts in the film making world and skill and experience in the production of films. It is also a business which requires a very small number of highly skilled personnel. The number of executives has not exceeded ten. It is the absolute antithesis of mass production.

The founder of the business retired in 1959, and Robert Garrett became chairman and managing director. He had for a number of years a joint managing director, Bernard Smith, who died in 1977. The first plaintiff is his widow. Mr. Soames, the second defendant, joined the company as an employee in 1971, became a director in 1975 and managing director in 1977 in place of Bernard Smith and Robert Garrett, who continued as chairman. Mr. Croft, the first defendant, has been a director since well before October 1979. He is a chartered accountant and deals with the financial side of the business such as investments. This is very important more especially as it is from the income from premiums received by the company and invested that its profit is largely derived. In this it resembles many insurance companies which suffer underwriting losses but remain profitable because of their in-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

vested income. A Mr. Aikin, a solicitor, became an executive director in 1978 but resigned in September 1981 and Mr. Carr, the fourth defendant, was appointed director in October 1979 as the nominee of Wren Trust. Mr. Korda, the third defendant, became an executive director in July 1981. He ceased to be an executive director in January 1985 when he became managing director of R.K.O. Film Group International at a very large salary but remained a non-executive director of the company. So from October 1979 until October 1982 Mr. Garrett was chairman, the directors who were executives were Mr. Croft, Mr. Soames and Mr. Aikin or Mr. Korda, there being a short period in 1981 when both were on the board, and Mr. Carr was a non-executive director.

At the beginning of 1982 the executive directors only had shares carrying about 20 per cent. of the voting rights and the associated companies had none, but Mr. Aikin who had resigned by September 1981 had 7.5 per cent. of the voting rights. During the course of 1982 *148 the executive directors and the associated companies acquired enough shares to give them, together with Wren Trust, overall voting control. Those acquisitions include transactions which the plaintiffs seek to impeach in these proceedings as having been effected by means of financial assistance from the company in breach of section 42 of the Companies Act 1981. Specifically Bellwedge bought 2,400 shares, Mannergrand bought 3,050 shares, as did Cushingham, and Brindeel bought 19,900. Bellwedge's purchase is not challenged in the statement of claim while those of Mannergrand, Cushingham and Brindeel are, but it was the latter that Mr. Potts, for the plaintiffs, placed in the forefront of his argument on section 42 of the Companies Act 1981.

The purchase of 19,900 shares by Brindeel with money borrowed from the bank, the fact that Brindeel was acquired by the executive directors on or about 11 June 1982 with a view to the purchase of the 19,900 shares, that each of Mannergrand, Cushingham and Bellwedge received £33,000 from the company in early August and lent £28,000 to Brindeel thereafter, and that these sums were used

by Brindeel to discharge its bank indebtedness are all admitted. What is denied is that the payments by the company to those three associated companies constituted financial assistance within section 42(2) of the Companies Act 1981. The defendants contend that these payments were in satisfaction of anticipated liabilities by way of salary or bonus payable to the executive directors and that on that basis there was no reduction of the net assets of the company for the purposes of section 42(2). I shall return to this later.

By 1982 there had been dissension for some time on the board of the company between Mr. Garrett, the chairman, who had been involved with the company from very early days and who was by then 70 years or so old, and the executive directors who were younger and had adopted a policy of expanding the company's business overseas, a project to which Mr. Garrett was opposed. Matters came to a head in 1982, when the executive directors had completed their share purchases, which were not revealed in advance to Mr. Garrett, and Mr. Garrett was forced to resign as a director in October 1982 and received a £60,000 ex gratia payment. This caused a good deal of bitterness. One consequence was that Mr. Garrett consulted Mr. Hill to advise him about the executive directors' and Mr. Carr's activities, and Mr. Garrett provided Mr. Hill with a good deal of documentary material from the company's offices. This continued after Mr. Garrett's departure through Mr. Garrett's secretary, a Mrs. Byford, who clearly disapproved of the way Mr. Garrett was forced to resign and who continued, unbeknown to the executive directors for some time to provide Mr. Hill with documentary material from the company's offices.

Armed with this material Mr. Hill launched a sustained campaign of criticism of the conduct of the affairs of the company by the executive directors, and Mr. Carr in particular, at the amounts drawn out of the company by the executive directors and the associated companies. Here again there is no dispute about the amounts drawn out. I ignore sickness benefits, pension scheme payments and small fixed directors' fees. In other respects payments

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

were made as follows: **\*149**

TABULAR OR GRAPHIC MATERIAL SET
FORTH AT THIS POINT IS NOT DISPLAY-
ABLE

The ex gratia payment of £60,000 mentioned above
was also paid to him. Mr. Aikin's payments I need
not detail. Finally in relation to Mr. Carr, there
were payments of £1,500 made to Gresham Trust
Plc. in the years 1980, 1981 and 1982 and £7,595 in
1983 and £5,028 in 1984.

Before the annual general meeting of the company
called for 10 December 1982 Mr. Hill's solicitors
wrote a letter dated 7 December 1982 to Mr. Carr:

"Strictly private and confidential. Re: Film Fin-
ances Ltd. We are writing to you in your capacity
as chairman and nominee of a minority shareholder
in the above company. We are instructed by Mr. S.
R. Hill, F.C.A., who has been appointed to act as
adviser to a number of minority shareholders in the
company holding in total over 40 per cent. of the is-
sued share capital, including the executors of
Patrick Garrett for whom we also act.

"We understand that Mr. Hill informed you last
week that: (1) The 1982 published accounts of the
company are grossly misleading, indicating as they
do a profit before tax of over £500,000 whereas
compliance with current accounting standards and
the usual statutory requirements would result in
showing a loss of over £500,000. (2) The amounts
proposed in the accounts as directors' remuneration
are excessive, unreasonable and so out of all pro-
portion as to cause very considerable doubt as to
the collective bona fides of the executive directors.
(3) There is firm evidence that the managing direct-
or of the company earlier this year approached a
merchant bank (not your own of course) to seek ad-
vice on how to employ the company's funds to en-
able the executive directors to obtain 100 per cent.
control of the company. It would appear that the ad-
vice given was based upon an incomplete explana-
tion of the provisions of sections 42 to 44 of the
Companies Act 1981, which sections also **\*150** im-
pose criminal penalties for failure to comply with
their provisions.

"We understand that Mr. Hill did not inform you

of this aspect of item (3) above as he would have
preferred to have told you this in person and shown
to you the evidence. However, Mr. Hill did inform
you that there is evidence that the executive direct-
ors have partially adopted this misleading advice in
the current year, in that there are accounting irregu-
larities in respect of items passing through the bank
pass sheets not entered in the cash book of the com-
pany. (Mr. Hill, of course, only has detailed inform-
ation up to mid-October when Mr. Garrett retired
from chairmanship of the company.) In view of the
prima facie evidence of fraud, the minority share-
holders' group requires that further investigations
be carried out to enable this evidence to be substan-
tiated or refuted and the available remedies pursued
if necessary. It would be preferable that you use
your position as chairman of the company to effect
this, as the alternatives would be a Department of
Industry or fraud squad investigation which could
result in very far-reaching consequences including
exposure damaging to the company. (4) There is
evidence of other financial irregularities that are not
of such pressing importance as points (1) to (3)
above and which may be regulated in due course
following the full and early investigation that must
be carried out into the affairs of the company. ..."

At the annual general meeting of the company on
10 December 1982 at which the accounts for the
year ending 30 June 1982, approved by the direct-
ors on 18 November 1982, were to be laid for ap-
proval, there were angry scenes and allegations of
accounts incorrect by £1 million. Mr. Carr ad-
journed the meeting and forthwith instructed
Messrs. Peat Marwick Mitchell & Co. to investigate
and report upon Mr. Hill's complaints. Initial in-
structions were by telephone but the formal instruc-
tion was in a letter from Mr. Soames dated 14
December 1982. It is addressed to Peat, Marwick
Mitchell & Co. for the attention of Tom Allen, Esq.
and reads:

"Dear Sirs, I write to confirm the board's instruc-
tions to you to carry out an investigation of the af-
fairs of this company in respect of its accounting
period to 30 June 1982, the following period and
any preceding period or periods you may think ne-
cessary in relation to the allegations set out in

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

points (1) to (4) inclusive of the letter from Wood Nash & Winters dated 7 December 1982 addressed to Michael Carr. " - That letter is the one which I have just read. - "In view of the seriousness of the allegations you are requested to commence and complete the investigation as soon as possible and make a full report to the board at the earliest possible date.

"While the board's instructions are to investigate specific points referred to, it is not their intention to prevent or restrict you from extending the investigation where you believe it to be necessary in the cause of establishing the truth or in the event that other irregularities are revealed.

"I confirm that instructions have been given to all the executives and employees of the company and to its solicitors and auditors to *151 co-operate with you to the fullest extent and to give you such information as you may require."
That is signed on behalf of Film Finances Ltd. by Mr. Soames.

Mr. Allen of Peat, Marwick Mitchell & Co. interviewed the company's staff and directors, met Mr. Hill and his helper Mr. Welsford twice, and had access to the company's books. His report ("the report") was produced on 11 March 1983. It contains the following passage, after having set out the circumstances of the investigation being instituted:

"We have decided that it would be appropriate for us to submit a report at this stage, which addresses the matters set out above and summarises our comments in relation to the work we have so far carried out. The directors will then be in a position, having considered this report and received any representations which shareholders think fit to make to them, to consider whether or not we should be asked to pursue any of the matters discussed, or any other matters."
The report is therefore not to be regarded as necessarily definitive. substantial part of the report was concerned with criticisms made by Mr. Hill and set out in his solicitor's letter of 7 December 1982, which I have read, concerning the accountancy deficiencies in the preparation of the company's accounts. These criticisms were effectively rejected in the report. No claims are made in this action about

this and I pass over that part of the report. [His Lordship read part of the report, headed "Directors remuneration and allied matters" and continued:] Then there are set out in tabular form figures for emoluments and payments to connected firms or companies which correspond, so far as the figures are concerned, with the figures in the statement of claim.

Two things appear from the extract of the report quoted above. The first is that it was Mr. Allen's view that the payments to Cushingham in the years ending 30 June 1980, 1981, 1982 of £15,000, £18,500 and £61,000 should have been disclosed as part of Mr. Soames' emoluments because in the circumstances they did fall within the requirements of section 196 of the Companies Act 1948. The inclusion in the note on directors' salaries of the £61,000 for 1982 in the revised 1982 accounts which were presented to and passed by the adjourned annual general meeting on 30 March 1983 and the inclusion therein of the £18,500 for 1981 in the comparative figures in those accounts constitute a major difference between those accounts and the original 1982 accounts which were approved by the directors on 18 November 1982 and laid or intended to be laid before the annual general meeting on 10 December 1982.

The second is that if the only basis upon which the payments to Mannergrand or Billsons and Bellwedge could be justified was that of remuneration for acting as a director or in connection with the management of the affairs of the company the same conclusion as that reached regarding Cushingham would have applied. But Mr. Allen took the view that these payments were for services rendered by the organisations to which payments were made and were exempt from disclosure under section 196 of the Companies Act 1948 because the *152 services could have been provided whether or not Mr. Croft and Mr. Korda had been directors of the company. In relation to Mr. Korda there is a later reference in the report to "the technicality that Mr. Korda works for Bellwedge Ltd. which provides his services to the company." The amounts involved are not limited to those mentioned for the year end-

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

ing 30 June 1982 with which the report was primarily concerned but also so far as Mr. Croft is concerned £13,150 and £42,650 for the years ending 30 June 1981 and 1982.

The report went on to deal with some matters which I need not discuss because they are not in issue in this action, such as Mr. Carr's consultancy fees paid to Gresham Trust Plc., the taxation treatment of directors' emoluments, the relevance of dividend waivers and continued:

"Mr. Carr, who became chairman of the company in October 1982, was previously a non-executive director and a non non-executive chairman. Mr. Soames and Mr. Korda are both engaged full time in working for the company (ignoring the technicality that Mr. Korda works for Bellwedge Ltd. which provides his services to the company). Mr. Croft is in practice as a chartered accountant, but spends at least two full days a week at the company's offices and we understand that he is available to the company at all times for such other time as is needed.

"The company operates in an industry where the risks and rewards are high. The levels of remuneration, and standards of living, enjoyed by prominent people in the industry are often high in relation to those enjoyed by prominent people in many other industries. In their business relationships with companies in the industry, the directors are dealing with prominent people in the companies concerned.

"It has been indicated to us that the time devoted by Mr. Garrett to the affairs of the company in recent years was substantially less than full time. However, Mr. Garrett had, in the past, been active in the company's affairs and continued to be identified with the company as a prominent member of the industry.

"In forming a view as to whether the level of emoluments and charges paid or payable to the directors and/or the connected companies is reasonable, there are no absolute yardsticks and, while members will no doubt want to form their own views they may wish to have regard to our general comments, as set out above.

"The arrangements for the determination of the levels of remuneration, and the acceptance of charges from connected companies, would appear to have been conducted with very little formality. We understand that the present directors do not have service agreements. Mr. Garrett had a service agreement which was not due to expire until 31 March 1985; this was terminated on his resignation in October 1982. As a consequence of the termination of his service contract, the company made an ex gratia payment of £60,000 to Mr. Garrett and agreed to indemnify him against liabilities arising out of claims or proceedings brought against the company or himself relating to the term of his employment **\*153** (excluding liability for taxes for which Mr. Garrett might be personally assessable).

"There is some reference in the minutes to agreed salary levels, but a substantial part of the total remuneration has been by way of bonus and, for the most part, it is not possible to point to specific memoranda or minutes of directors' meetings confirming the levels of remuneration and charges from connected companies.

"The view has probably been taken that, because of the very few people involved, the frequent overseas travel which is necessary (making formal meetings difficult to arrange) and the ability of the directors to deal with matters on an informal basis, there is no need for formal confirmation of matters discussed informally between the directors. In any event, it can be argued that the approval of the company's accounts by the directors for submission to members constitutes implicit approval of all the amounts included in the accounts. This is not, however, a company in which all the shares are owned by the directors, nor is it a company in which all the directors have been, or have remained, in agreement with one another. In our view it is most important that there should be a proper record of directors' meetings and confirmation of approval by the directors of their remuneration, amounts payable to companies with which they are connected and other significant matters. We do not think that the lack of formal confirmations affects the validity of the charges accepted by the company but, not least in the directors' own interests, we strongly recommend that in future these matters should be properly recorded."

Mr. Potts attacked the adequacy of the report, re-

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

garding payments thus dealt with, principally on the ground that Mr. Allen had failed entirely to address himself to the question of the characterisation of the disputed payments, and had not satisfied himself on the question whether there was or was not a contractual obligation on the company to the several associated companies, and whether the latter ever did actually render any services to the company.

[His Lordship read part of the report dealing with the directors' expenses incurred in travelling and promoting the company, stated that, in relation to the impeached share transactions and the complaints made under section 42 of the Companies Act 1981, the report first of all set out the transfers in question, then stated that the transfers were approved by a directors' meeting of 19 October 1982, that the payments for the three parcels of shares bought by Brindeel were made on 1 and 14 July and 7 September 1982 which was the date when the transfers were lodged for stamping with the Inland Revenue and that the approval of the accounts of the company, for submission to members by the directors, on 18 November 1982, effectively constituted implicit approval of all the items included in the accounts and the necessary formal approval of various charges relating to the directors and connected companies might be said to be implicit in the approval by the directors of the accounts of the company. That part of the report also criticised the lack of formal procedures for the approval of expenditure but *154 concluded that the question of whether the payments made in August 1982 were properly made by the company depended on whether or not the charges from the companies in question were proper charges for the company to accept. His Lordship continued:] The report does not in terms say that the charges made by the associated companies were proper charges. That was in a sense left for shareholders to make up their minds about in the light of the general considerations set out in the earlier passage in the report which I have already quoted.

Here too Mr. Potts criticised the report on the following grounds. The reliance on the accounts for the year ending 30 June 1982 was, he submitted, misplaced, because those accounts, even in the first edition, were not approved by the directors until 18 November 1982 and were therefore not in existence in August 1982 when the three cheques for £33,000 plus V.A.T. were signed in favour of the associated companies. Everything hinged, he submitted, on whether there was at that date an obligation to pay, a question which was assumed rather than decided in the report. So far as the executive directors were concerned the only liability of the company was under such service contracts as existed.

As to service contracts there is no dispute on the facts. Mr. Soames had a service agreement dated 27 May 1975 which by clause (4) provided for him to receive a fixed salary of £10,000 per annum with such bonuses as the directors might determine with a proviso that in no event should the said salary and bonus payable in any one year exceed £20,000. That agreement has not been terminated. Various resolutions have been passed by the board resolving that clause (4) of the service agreement should be varied by increasing Mr. Soames' salary to figures in excess of £20,000, or that his basic emoluments or salary should be increased to figures in excess of £20,000. With effect from 1 July 1980 the operative figure under the latest such resolution is £50,000. Mr. Korda too had a letter dated 15 April 1981 setting out the terms of his employment as a full-time executive of the company at a salary of £35,000 per annum. So far as Mr. Croft is concerned there was no formal service contract but there have from time to time been board resolutions increasing his salary. The amounts paid to the executive directors and the associated companies in respect of services rendered have at all material times exceeded the amounts provided for by the relevant service agreement or board resolution and the justification for this is claimed to reside in the board's powers under the articles, and if necessary that of the company in general meeting.

The relevant articles provide as follows. (I take the version exhibited to Mr. Croft's affidavit of 9 January 1986 as more up to date than that exhibited earlier by Mr. Hill. Only the numbering differs; the texts are the same so far as relevant.) Article 10

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

reads:

"The first sentence of clause 76 of Part I of Table 'A' shall be deemed to be deleted. Each of the directors shall be paid out of the funds of the company by way of remuneration for his services as a director, at the rate of £150 per annum and the chairman shall also be paid additional remuneration for his services as chairman at the rate of £ 100 per annum. Such rates of remuneration may be increased by an ordinary resolution of the company."

**\*155** Article 18 reads:

"(A) The directors may from time to time appoint one or more of their body to be holder of any executive office, including the office of chairman, deputy chairman, managing or joint managing director or manager, on such terms and for such period as they may determine. ... (C) A director appointed to any such office as is mentioned in sub-paragraph (A) of this article shall receive in addition to any remuneration to which he is or may become entitled under clause 76 of Part I of Table A hereof such additional remuneration by way of salary, lump sum, commission or participation in profits as the directors may determine, and he or his dependants may receive from the company such pension or other gratuity benefit or retiring allowance as the directors shall think fit."

Article 76 of Table A provides:

"The remuneration of the directors shall from time to time be determined by the company in general meeting. Such remuneration shall be deemed to accrue from day to day. The directors may also be paid all travelling, hotel and other expenses properly incurred by them in attending and returning from meetings of the directors or any committee of the directors or general meetings of the company or in connection with the business of the company."

I mention in passing that article 80 of Table A is not modified or excluded, and thus the business of the company is to be managed by the directors.

Purely as a matter of construction it is in my judgment clear that the exclusion of the first sentence in article 76 of Table A contained in article 10 relates only to remuneration for activity as a director and does not operate to exclude the residual power of the company in general meeting to approve remu-

neration for executive services. Even on that basis, however, the actual right to remuneration, over and above what any relevant service agreement provided in relation to services rendered in the year ending 30 June 1982, would not have arisen, on any view, before the directors' meeting approving the accounts for that year in October 1982, and therefore after August 1982 when the impeached payments to the associated companies were made. So if Mr. Potts is right in his submission that only actual liabilities counted for the purpose of testing the propriety of a payment by a company in relation to section 42 of the Companies Act 1981, a breach of the section would be established at least prima facie. I shall return to this later.

Once the report was issued a revised version of the accounts for the year ending 30 June 1982 was prepared, and the annual general meeting, which had been adjourned on 10 December 1982 and once again later, was completed on 30 March 1983. At that meeting those accounts, as thus revised, were approved by a majority of the shareholders, but there is no undisputed evidence of how the majority was made up. There were many criticisms voiced at that meeting, mainly by Mr. Hill. In general terms they were principally directed either at accounting questions concerning the calculation of profits or at the level of **\*156** remuneration which the executive directors were receiving. There were also criticisms, not only from Mr. Hill, of the payment of £61,000 to Cushingham Ltd. and its treatment in the accounts and in the report. It is not, however, now claimed in the action that any of the matters now complained of, regarding the year ending 30 June 1982, were not, at least in general terms, matters of which the ordinary shareholders were made aware, through the report and the revised accounts for that year.

In the last two years in which there are payments which are impeached (the years ending 30 June 1983 and 1984) Mr. Soames received the whole of the payments made in connection with his services, and nothing was paid to Cushingham. On the other hand apart from the fixed director's fee of £150 and the relatively trivial payments for sickness insur-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

ance neither Mr. Croft nor Mr. Korda received salary or bonus, but Billsons and Mannergrand between them received £65,150 in the first of those years and £85,150 in the second, while Bellwedge received £93,750 and £131,867 in those years respectively. There is no allegation that these sums were not revealed in the company's accounts for those years, and those accounts were passed at an annual general meeting of the company, as regards one year, with one dissentient voice (that of a representative of Messel Nominees) and, as regards the other, without dissent.

During 1984 the company, in accordance with the relevant provision of the Companies Act 1981, purchased 44,900 issued shares, principally from members of the family of Mr. Garrett, who had died on Christmas Eve 1982, and the executive directors purchased other shareholdings from one or more of the vendors to the company totalling 12,350 shares at the same price of £9 per share. Other minority shareholders were offered the same price but, save for a Mr. Travis who sold 4,000 shares in July 1984 to Mr. Soames and Mr. Korda, again at £9 per share, no further shares changed hands, leaving the voting position as I described it at the outset.

Over the years while the executive directors have had control of the management of the company the trend both of profits, net assets and dividends have all followed a general upward course. In the year ending 30 June 1977 there was a loss before taxation of £237,257, net current assets of £6,439 and no dividend was declared, while for the year ending 30 June 1984 the accounts show group profit on ordinary activities before taxation of £1,244,185, net current assets of £4,090,518 and a dividend of £1.50 per share was declared. On any view the business has expanded and is very substantial. This has been reflected by the trend in the price paid for shares in the company, which has risen from £3 in early 1982 to £9 in 1984. The plaintiffs' complaint is that the profits should have been larger still, if the executive directors had behaved with the same commercial enthusiasm so far as the company's earnings are concerned, but with greater legal and accountancy propriety and honesty so far as pay-

ments out by the company are concerned.

The writ was issued on 7 February 1985 with the statement of claim endorsed upon it. The claims made in the very lengthy statement of claim can be placed in four categories.

*157 (1) There are claims of excessive remuneration in the strict sense of excessive payments to the person who is alleged to be overpaid. For example, paragraph 32 of the statement of claim avers that Mr. Soames was paid £170,239 in respect of the year ending 30 June 1984 in addition to his fixed £150 under the articles, that these payments purported to be by way of salary and bonus, that it is not admitted that any of these sums were duly paid to him, save in so far as they were authorised by his service agreement, and that at least to the extent to which £170,239 exceeded £93,543 (viz. what Mr. Soames was paid in the year ending 30 June 1982) that was in excess of a commercially fair, reasonable and proper remuneration. The conclusion is drawn that to the extent of not less than £76,696 there was an ultra vires gift by the company, that the executive directors and Mr. Carr, in procuring such payments, did not act in good faith or for the benefit of the company, but with a view to benefiting Mr. Soames, were in breach of their fiduciary duties and guilty of a fraud upon the minority shareholders, that those breaches were dishonest and that the executive directors and Mr. Carr were guilty of a conspiracy in so acting.

(2) The second category of claims made relates to payments to one or other of the associated companies or Billsons which are claimed also to be in whole or in part payments not authorised by the board or otherwise and constituting an ultra vires gift by the company made otherwise than in good faith or for the benefit of the company but rather with a view to benefiting the executive director concerned and made in dishonest breach of fiduciary duties by way of fraud upon the minority shareholders and the product of conspiracy.

I take as an example a claim to a sum of £55,300 referred to in paragraph 31(iii) of the statement of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038

**(Cite as: [1988] Ch. 114)**

claim. In relation to that it is pleaded by paragraph 31(i) that in respect of the financial year ending 30 June 1984 the executive directors and Mr. Carr procured the payment out of the company's funds of £85,150 to Mannergrand and/or Billson, that none of those payments was authorised by the company either by virtue of any resolution of its board of directors or otherwise, and that in relation to those payments to the extent of not less than £55,300 they were received by Mannergrand and/or Billson purportedly in respect of services allegedly rendered to the company by Mannergrand and/or

Billson during that financial year but that in reality the company received no consideration or benefit of any kind for any of those payments to that extent but they amounted in substance to a gift out of the funds of the company and were ultra vires the company. That figure of £55,300, which is the part of the total of £85,150 paid out to Mannergrand and Billson, and is claimed to be thus vitiated, is arrived at by deducting from the total payments of £85,150 £ 29,850, which is what Mr. Croft received from the company in respect of the financial year ended 30 June 1983 and with regard to which the plaintiffs, while not admitting that they ever became payable to Mr. Croft except to the extent that a fixed salary was payable to Mr. Croft in accordance with the resolutions of the board, the last of which was for Mr. Croft's existing salary to be increased to £15,000 per annum, nevertheless do not raise a claim of an ultra vires gift or make a claim for repayment to the company. Similar *158 claims are raised in relation to payments made to Bellwedge such as a claim to £86,868 in respect of the financial year ending 30 June 1984, being the excess over £45,000 described as the maximum total sum which Bellwedge was properly entitled to receive in respect of that year in respect of Mr. Korda's employment as a full-time executive of the company.

(3) The third category of claim is that based on infringements of section 42 of the Companies Act 1981, more especially in relation to Brindeel's purchase of 19,900 shares in the company.

(4) The fourth and last category of claim relates to expenses of the executive directors in respect of which it is alleged that the sums in question were not paid in respect of any expenses which the executive director concerned had ever incurred in rendering any services to the company. As regards those payments it is similarly alleged that they were in substance gifts, either to the executive director concerned or other persons, and therefore ultra vires the company and made by the executive directors concerned in fraudulent breach of fiduciary duties which constituted a fraud on the minority shareholders. Here again the issue is not whether the payment was made, for that is conceded, but whether it was a proper expense of the director concerned.

Finally as regards all the claims made the payments which it is sought to impeach were all made out of profits available for distribution. There is no question raised at any stage of an improper return of capital or potential fraud on creditors.

There have been earlier proceedings in this court in this action. Walton J. on 27 June 1986 discharged orders made the previous year by Master Chamberlain, notably an order made on 28 March 1985 on an ex parte application by the plaintiffs whereby he gave liberty to the plaintiffs to continue the action until the conclusion of discovery and inspection of documents, on terms that the company should pay the plaintiffs' costs on a common fund basis down to that stage of the action and indemnify the plaintiffs against any liability for costs down to that stage. The decision of Walton J. is reported as Smith v. Croft [1986] 1 W.L.R. 580. It is primarily concerned with the costs aspects of the matter with which I am not concerned but Walton J. observed of the application before him, at p. 591:

"This is, of course, not an application to strike out the action on the grounds that it cannot be justified as a minority shareholders' action, but quite clearly the same kind of considerations apply."
Similarly it is my view that there is a very large degree of overlap in the material to be evaluated in the two applications.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

Both parties agreed in submitting to me that I was not in any way bound by Walton J.'s findings or his view of the matter in that decision, but not surprisingly the plaintiffs submitted that Walton J.'s approach was wrong and not one which I should follow, whereas the fourth and ninth defendants invited me to reach similar conclusions to those which he reached and for the same reasons. The situation is not simplified for me by the facts that Walton J. refused leave to appeal, and May L.J. subsequently gave leave to appeal on 3 July 1986, directing that the **\*159** appeal be not heard until the application to strike out, that is the application before me, was dealt with. It would be wrong for me to liken the Court of Appeal to the deep blue sea and even more wrong for me to liken Walton J. to the devil, but there is very clearly rather more scope than usual for any view I express to be in conflict with more authoritative ones. However, I have come to the conclusion that I should express my own views.

I adopt the same four-fold classification as that which I have used above in setting out the nature of the claims made by the plaintiffs in the statement of claim. I emphasise that, in assessing whether or not the plaintiffs have established a prima facie case that the company is entitled to the relief claimed, I am not deciding anything conclusively. In these circumstances it is undesirable for me to say more than is strictly necessary to give my reasons for the view I have formed. In particular I propose to deal differently with the questions of law which are involved in the determination of the first question which I have to answer, namely whether the plaintiffs have established a prima facie case that the company is entitled to the relief claimed, from those which are involved in the determination of the second question which I have to answer, namely whether the plaintiffs have established a prima facie case that the action falls within the proper boundaries of the exceptions to the rule in Foss v. Harbottle, 2 Hare 461. The former are bound to arise in the action if it proceeds and are in some cases dependent on findings of fact to be made in the action. The latter are unlikely to arise in the action, and in so far as questions of fact arise they are collateral to the issues in the action. I therefore propose only to give my prima facie view with regard to the former, but to decide the latter, more especially as they were very fully argued by counsel on both sides.

I return to the four categories of claim.

*(1) Payments made to an executive director purportedly by way of remuneration*

No arguable ultra vires claim arises here in my view. I take as the fundamental rule in considering the scope of what is properly called ultra vires, by which I mean beyond the capacity of the company as opposed to that of its officers, the following passage in the judgment of Slade L.J. in Rolled Steel Products (Holdings) Ltd. v. British Steel Corporation [1986] Ch. 246, 295:

"if a particular act... is of a category which, on the true construction of the company's memorandum, is *capable* of being performed as reasonably incidental to the attainment or pursuit of its objects, it will not be rendered ultra vires the company merely because in a particular instance its directors, in performing the act in its name, are in truth doing so for purposes other than those set out in its memorandum. Subject to any express restrictions on the relevant power which may be contained in the memorandum, the state of mind or knowledge of the persons managing the company's affairs or of the persons dealing with it is irrelevant in considering questions of corporate capacity."
**\*160** On that basis, whereas the excessive remuneration of a director may well be an abuse of power where, as here, the power to decide on remuneration is vested in the board, it cannot be ultra vires the company. In re George Newman & Co. [1895] 1 Ch. 674 in my judgment supports that view.

Secondly, my impression on the evidence as to quantum is that the plaintiffs are more likely to fail than to succeed. In common with Walton J. I find the uncontradicted evidence of the very special field in which the company operates and the very high level of remuneration which obtains in that field very much more impressive than the statistics

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038

**(Cite as: [1988] Ch. 114)**

about general levels of professional remuneration which the plaintiffs adduced. I therefore do not find a prima facie case that the company is entitled to the relief claimed in this category of claim.

### (2) Payments to associated companies or to Billson

The question whether these transactions can properly be claimed to be ultra vires is less clear cut than in relation to payments made to an executive director purportedly by way of remuneration. But my prima facie view is that the question should be answered similarly, that is to say that this is not an ultra vires claim at all.

On this aspect, the defendants' case was primarily based on the necessity for a proper characterisation of the payments made to the associated company or Billson. The evidence of invoices having been rendered by the company or firm for "services rendered," coupled with the absence of proper board resolutions of the company authorising such payments, and the absence of any evidence of a contractual link between the company and the relevant associated company or Billson, showed, it was argued, that there was no legal obligation whatever upon which the impeached payments could be based. In addition they were not shown in the company's accounts as directors' remuneration. Therefore they did not pass the characterisation test and qualify as remuneration, so as to be intra vires the company, whether or not proper as to quantum. Mr. Potts relied on In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016. That was a case where a liquidator of a company compulsorily wound up challenged the validity of payments purportedly by way of remuneration both to a husband and a wife, a Mr. and Mrs. Charlesworth. The two of them were at all material times the only shareholders and directors. The impeached drawings were mainly made out of capital as opposed to profits and those in favour of the wife were made when, because of illness, she took no active part at all in the business. Oliver J. said in relation to the payments made to the husband, at pp. 1038, 1039:

"I accept entirely the submissions of counsel for the liquidator that a gratuitous payment out of the company's capital to a member, qua member, is unlawful and cannot stand, even if authorised by all the shareholders. What I find difficulty in accepting is that, assuming a sum to be genuinely paid to a director-shareholder as remuneration under an express power, it becomes an illegal return of capital to him, qua member, if it does not satisfy some further test of being paid for the benefit of the company as a corporate entity. If he *161 genuinely receives the money as a reward for his directorship, the question whether the payment is beneficial to the company or not cannot, as I see it, alter the capacity in which he receives it: see, for instance, Cyclists' Touring Club v. Hopkinson [1910] 1 Ch. 179, 188. ... What I think counsel's submission comes to is this, that while the company has divisible profits remuneration may be paid on any scale which the shareholders are prepared to sanction within the limits of available profits, but that, as soon as there cease to be divisible profits, it can only lawfully be paid on a scale which the court, applying some objective standard of benefit to the company, considers to be reasonable. But assuming that the sum is bona fide voted to be paid as remuneration, it seems to me that the amount, whether it be mean or generous, must be a matter of management for the company to determine in accordance with its constitution which expressly authorises payment for directors' services. Shareholders are required to be honest but, as counsel for the respondents suggests, there is no requirement that they must be wise and it is not for the court to manage the company.

"Counsel for the liquidator submits, however, that if this is right it leads to the bizarre result that a meeting of stupid or deranged but perfectly honest shareholders can, like Bowen L.J.'s lunatic director, vote to themselves, qua directors, some perfectly outlandish sum by way of remuneration and that in a subsequent winding up the liquidator can do nothing to recover it. It seems to me that the answer to this lies in the objective test which the court necessarily applies. It assumes human beings to be rational and to apply ordinary standards. In the postulated circumstances of a wholly unreasonable payment, that might, no doubt, be prima facie evidence

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

of fraud, but it might also be evidence that what purported to be remuneration was not remuneration at all but a dressed-up gift to a shareholder out of capital, like the ' interest' payment in [Ridge Securities Ltd. v. Inland Revenue Commissioners [1964] 1 W.L.R. 479] which bore no relation to the principal sums advanced.

"This, as it seems to me, is the real question in a case such as the present. I do not think that in circumstances such as those in the instant case the authorities compel the application to the express power of a test of benefit to the company which, certainly construed as Plowman J. held that it should be construed, would be largely meaningless. The real test must, I think, be whether the transaction in question was a genuine exercise of the power. The motive is more important than the label. Those who deal with a limited company do so on the basis that its affairs will be conducted in accordance with its constitution, one of the express incidents of which is that the directors may be paid remuneration. Subject to that, they are entitled to have the capital kept intact. They have to accept the shareholders' assessment of the scale of that remuneration, but they are entitled to assume that, whether liberal or illiberal, what is paid is genuinely remuneration and that the power is not used as a cloak for making payments out of capital to the shareholders as such."

**\*162** His conclusion on the facts as regards Mr. Charlesworth was as follows, at p. 1040:

"Turning now to the facts of the instant case, it seems to me that the question which I have to determine is whether, on the evidence before me, I can say that the payments made to Mr. Charlesworth and to Mrs. Charlesworth were genuinely exercises of the company's power to pay remuneration..."
and he concluded that it was, and he said, at p. 1041:

"But I do not think that, in the absence of evidence that the payments made were patently excessive or unreasonable, the court can or should engage on a minute examination of whether it would have been more appropriate or beneficial to the company to fix the remuneration at £X rather than £Y, so

long as it is satisfied that it was indeed drawn as remuneration. That is a matter left by the company's constitution to its members. In my judgment, a general meeting was competent to sanction the payments which he" - that is Mr. Charlesworth - "in fact drew and the claim in misfeasance against Mr. Charlesworth under this head must fail."
and he said, in connection with Mrs. Charlesworth, the wife, at p. 1042:

"But of course what the company's articles authorise is the fixing of ' remuneration,' which I take to mean a reward for services rendered or to be rendered; and, whatever the terms of the resolutions passed and however described in the accounts or the company's books, the real question seems to me to be whether the payments really were 'directors' remuneration' or whether they were gratuitous distributions to a shareholder out of capital, dressed up as remuneration.

"I do not think that it can be said that a director of a company cannot be rewarded as such merely because he is not active in the company's business."
and the rest of that paragraph was concerned with refuting that proposition. Going on at the foot of the page, he said, at pp. 1042-1043:

"The difficulty that I felt about this at first was that there is, in relation to the misfeasance claim, which is the only claim with which I am concerned, no allegation of fraud or mala fides in relation to these payments. The liquidator's case has been argued throughout on the footing that they were payments of remuneration but were also payments which could not be sanctioned by a general meeting because it was not for the benefit of the company to resolve on payments on this scale. For the reasons which I have endeavoured to state, I think that in circumstances such as exist in this case, where payments are made under the authority of a general meeting acting pursuant to an express power, the matter falls to be tested by reference to the genuineness and honesty of the transaction rather than by reference to some abstract standard of benefit. I do not, however, think that bona fides (in the sense of absence of fraudulent intention) and genuineness are necessarily the **\*163** same thing. It is not suggested here that there was any intent to defraud, but

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

that cannot be conclusive. As Jessel M.R. remarked in In re National Funds Assurance Co. (1878) 10 Ch.D. 118, 128, to say that something is done bona fide is not the same thing as merely to say that the actor had no intention to commit a fraud. The real question is, were these payments genuinely director's remuneration? If your intention is to make a gift out of the capital of the company, you do not alter the nature of that by giving it another label and calling it 'remuneration'."

As a matter of fact he concluded that the payments to Mrs. Charlesworth were not genuine exercises of the power to remunerate at all. He said, at p. 1043:

"I find it really impossible on the facts to hold that the whole of these sums, amounting to £1,500 per annum, drawn during the years 1968- 69 and 1969-70, can be treated as genuine director's remuneration in any real sense of the term."

On the question whether the plaintiffs establish a prima facie case that these payments are ultra vires the company my finding is that they do not. For the reasons already given I state my reasons shortly. First, I am far from convinced that payments at the request of an executive director to an outside entity such as one of the associated companies or Billson is not capable of being a payment in respect of services physically rendered by the executive director concerned within the meaning of the test quoted above from the judgment of Slade L.J. in Rolled Steel Products (Holdings) Ltd. v. British Steel Corporation [1986] Ch. 246. Secondly, the fact that in some instances part only of a series of payments is attacked as ultra vires by the plaintiffs seems to me to lend strong support to this view. There are formidable difficulties in classifying any transaction as partly ultra vires. The analogy with the curate's egg seems to me compelling.

Thirdly, In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016, was concerned with remuneration out of capital and not with the principle to be found in In re George Newman & Co. [1895] 1 Ch. 674, but in any event it is to be noted that the payments which were found to be ultra vires, those to Mrs. Charlesworth, were all ultra vires, and there could scarcely have been, on Oliver J.'s reasoning, a finding that payments to Mr. Charlesworth were partly ultra

vires. Finally, if the payments to the associated companies are found to be shams, as Mr. Potts contends, the reality thus discovered is one of the executive directors drawing remuneration for themselves or at their direction, and although that is perfectly capable of being excessive and improper it is not in itself ultra vires. In short Mr. Potts' argument in my judgment places far too much weight on the label attached to the transaction for characterisation purposes.

As to quantum the same considerations apply as to the claims about direct remuneration, which I dealt with earlier, but there is no doubt but that the plaintiffs are on stronger ground in criticising the mechanics of what was done. In particular, as regards the payments to Cushingham in the years ending 30 June 1981 and 1982, I find there was a prima facie **\*164** case shown of irregularity not fully cured by the subsequent adoption of the accounts by the annual general meeting, at which the accounts, which should have disclosed those payments, were adoPted.

*(3) Claims under section 42 of the Companies Act 1981*

Section 42 provides:

"(1) Subject to the following provisions of this section and sections 43 and 44 of this Act, where a person is acquiring or is proposing to acquire any shares in a company it shall not be lawful for the company or any of its subsidiaries to give financial assistance directly or indirectly for the purpose of that acquisition before or at the same time as the acquisition takes place. (2) Subject to the following provisions of this section and sections 43 and 44 of this Act, where a person has acquired any shares in a company and any liability has been incurred (by that or any other person) for the purpose of that acquisition it shall not be lawful for the company or any of its subsidiaries to give any financial assistance directly or indirectly for the purpose of reducing or discharging the liability so incurred."

It is in relation to the latter subsection that it is claimed that financial assistance was given to Brindeel to the extent of the £28,000 loans made by

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

associated companies to it. Financial assistance is defined by subsection (8):

"In this section 'financial assistance' means - (a) financial assistance given by way of gift;... (d) any other financial assistance given by a company the net assets of which are thereby reduced to a material extent or which has no net assets. In this subsection 'net assets' has the same meaning as it has for the purposes of the 1980 Act."

The references to the purposes of the Companies Act 1980 is something of a trap for the unwary because it is a reference to the purposes of the Act of 1980 as amended by the Act of 1981. Section 87(4) of the Act of 1980 as originally enacted and so far as relevant read:

"For the purposes of this Act - ... (c) the net assets of a company are the aggregate of its assets less the aggregate of its liabilities; and in paragraph (c) above 'liabilities' includes any provision (within the meaning of Schedule 8 to the 1948 Act) except to the extent that that provision is taken into account in calculating the value of any asset of the company."

But paragraph 62(b) of Schedule 3 to the Companies Act 1981 provided for the substitution for the words from "(within the meaning of" to the end of section 87(4) the words "for liabilities or charges (within the meaning of paragraph 88 of Schedule 8 to the 1948 Act)." It will come as no surprise that Schedule 8 to the Act of 1948 only acquired a paragraph 88 at all by the operation of the Companies Act 1981, itself (see section 1(2) and Schedule 1), but if one assembles all the pieces of the jigsaw the result is I think as follows:

"For the purposes of this Act (c) the net assets of a company are the aggregate of its assets less the aggregate of its liabilities and in *165 paragraph (c) above liabilities includes any amount retained as reasonably necessary for the purpose of providing for any liability or loss which is either likely to be incurred or certain to be incurred but uncertain as to amount or as to the date on which it will arise."

There was some discussion in argument why this circuitous definition of "liabilities" was adopted in preference to the apparently identical definition of "liabilities" in section 42(11) which only applies for the limited purposes of section 42(7). It appears that the difference between the two subsections (8) and (11) in relation to net assets resides in the different definitions to which they lead as regards "net assets" rather than "liabilities," but I am not directly concerned with that, there being no doubt but that section 42(7), which only applies to public companies, is irrelevant to the company here.

The question which therefore emerges is whether the admitted payments to the associated companies of £33,000 plus V.A.T. thereon were payments of amounts retained as reasonably necessary for the purpose of providing for a liability likely to be incurred, that is to say the remuneration of the relevant executive director. The time at which this has to be assessed is early August. That was after the end of the financial year in relation to which it is claimed that the remuneration was paid (viz. that ending 30 June 1982) so that the general financial picture of the result of the previous year's activities would be available but well before the accounts for that year were drawn up, let alone approved by the directors, an event which in relation to the first edition of these accounts did not occur until November 1982. I find that a prima facie case of infringement of section 42 of the Companies Act 1981 is established primarily because it does not seem to me to be shown that these were amounts retained as reasonably necessary for the purpose of providing for the liability likely to be incurred of paying directors' remuneration. I say no more than that because I am not deciding the point.

On that footing there is no doubt that the claim is one in respect of an ultra vires transaction, for it is conceded that a transaction in breach of section 42 of the Companies Act 1981 is ultra vires as well as illegal and not capable of ratification.

*(4) Claims in relation to directors' expenses*

I do not consider that there is an ultra vires claim established prima facie here. My reasons are similar to those in relation to direct remuneration, the first category, and as to quantum I regard the report as rebutting a prima facie case in relation to matters

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
(Cite as: [1988] Ch. 114)

arising before the date of the report, for in this instance, unlike the claims under section 42 of the Companies Act 1981, the report does seem to me to state a definite opinion which is based on wide experience and which I am content to adopt for the purposes of a prima facie view. For that limited purpose I would also be prepared to regard the report as a general guide, even as regards expenses incurred after the time covered by the report itself.

The question now arises, more especially in relation to claims under section 42 of the Companies Act 1981 whether the plaintiffs have *166 established a prima facie case that the action falls within the proper boundaries of the exceptions to the rule in Foss v. Harbottle, 2 Hare 461. The same question would arise if the view I have expressed regarding the other three categories of claim is wrong.

In my judgment the arguments addressed to me on this aspect of the case raise two questions of law and one of mixed law and fact before an answer that the action does not fall within the proper boundaries of the exception to the rule in Foss v. Harbottle could be given. The questions of law can be formulated as follows.

(1) Is a minority shareholder always entitled as of right to bring and prosecute an action for the company to recover money paid away in the course of a transaction which was ultra vires the company or is the prosecution of such an action susceptible of coming within the rule in Foss v. Harbottle so that there can be circumstances in which the court will not allow it to continue.

(2) If the latter view is the correct one in relation to those categories of claims based on ultra vires transactions, and also in all cases of minority shareholders' actions to recover money for the company in respect of acts which constitute a fraud on the minority, will the court pay regard to the views of the majority of shareholders who are independent of the defendants to the action on the question whether the action should proceed?

This process of ascertaining the views of the shareholders who are independent of the defendants to

the action was described by Mr. Potts as a secondary counting of heads, an expression which did not much commend itself to Mr. Aldous but goes some way towards explaining what is involved. In terms of the present case the question is whether the court should have regard to the views of Wren Trust, Georgian Investments and Sir Reginald Sheffield, who do not want the action to continue, or is it conclusive that the defendants have voting control so that if the plaintiffs show a prima facie case of fraud on the minority they have a right to prosecute to the end an action for the company to recover in respect of the loss it has suffered, regardless of the views of the rest of the minority. Another way of putting the question is to ask whether if a minority has been the victim of a fraud entitling the company in which they are shareholders to financial redress, the majority within that minority can prevent the minority within that minority from prosecuting the action for redress. The usual reason in practice for wanting to abandon such an action is that there is far more to lose financially by prosecuting the right to redress than by abandoning or not pursuing it, and that view will be reinforced in the minds of those who wish to abandon the claim if their opinion is that it is a bad claim anyway.

The third question which arises is whether in this case Wren Trust should be treated as independent, if the views of an independent majority are relevant? That is a question of fact. But it involves a question of law, namely what constitutes independence for this purpose?

Upon the first question of law which arises, in my judgment the solution is to be found by a correct analysis of the rights which the minority shareholder is seeking to exercise or enforce in relation to *167 the result of an ultra vires transaction. There was no dispute before me but that any individual shareholder, be he in a minority or not, has a personal right to apply to the court to restrain a threatened action which if carried out would be ultra vires. Neither the right to object to such an action nor the shareholder's locus standi to bring proceedings admits of any doubt. The rule in Foss v. Harbottle poses no obstacle, because neither of the

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

two bases for the rule is applicable, that is to say the matter is not, by definition, a mere question of internal management nor is the transaction capable of ratification by or on behalf of the company. I was referred to two general statements of the rule. The first is in Burland v. Earle [1902] A.C. 83, where Lord Davey said, at p. 93:

"It is an elementary principle of the law relating to joint stock companies that the court will not interfere with the internal management of companies acting within their powers, and in fact has no jurisdiction to do so. Again, it is clear law that in order to redress a wrong done to the company or to recover moneys or damages alleged to be due to the company, the action should prima facie be brought by the company itself. These cardinal principles are laid down in the well known cases of Foss v. Harbottle, 2 Hare 461 and Mozley v. Alston (1847) 1 Ph. 790, and in numerous later cases which it is unnecessary to cite. But an exception is made to the second rule, where the persons against whom the relief is sought themselves hold and control the majority of the shares in the company, and will not permit an action to be brought in the name of the company. In that case the courts allow the shareholders complaining to bring an action in their own names. This, however, is mere matter of procedure in order to give a remedy for a wrong which would otherwise escape redress, and it is obvious that in such an action the plaintiffs cannot have a larger right to relief than the company itself would have if it were plaintiff, and cannot complain of acts which are valid if done with the approval of the majority of the shareholders, or are capable of being confirmed by the majority. The cases in which the minority can maintain such an action are, therefore, confined to those in which the acts complained of are of a fraudulent character or beyond the powers of the company. A familiar example is where the majority are endeavouring directly or indirectly to appropriate to themselves money, property, or advantages which belong to the company, or in which the other shareholders are entitled to participate, as was alleged in the case of Menier v. Hooper's Telegraph Works (1874) L.R. 9 Ch.App. 350. It should be added that no mere informality or irregularity

which can be remedied by the majority will entitle the minority to sue, if the act when done regularly would be within the powers of the company and the intention of the majority of the shareholders is clear. This may be illustrated by the judgment of Mellish L.J. in MacDougall v. Gardiner (1875) 1 Ch.D. 13, 25.

"There is yet a third principle which is important for the decision of this case. Unless otherwise provided by the regulations of the company, a shareholder is not debarred from voting or using his voting power to carry a resolution by the circumstance of his having **\*168** a particular interest in the subject matter of the vote. This is shown by the case before this board of the North-West Transportation Co. Ltd. v. Beatty (1887) 12 App.Cas. 589. In that case the resolution of a general meeting to purchase a vessel at the vendor's price was held to be valid, notwithstanding that the vendor himself held the majority of the shares in the company, and the resolution was carried by his votes against the minority who complained."

The other general statement is in Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204, 210 where a slightly condensed version of a passage from Jenkins L.J.'s judgment in Edwards v. Halliwell [1950] 2 All E.R. 1064, 1066 reads:

"The classic definition of the rule in Foss v. Harbottle is stated in the judgment of Jenkins L.J. in Edwards v. Halliwell [1950] 2 All E.R. 1064 as follows. (1) The proper plaintiff in an action in respect of a wrong alleged to be done to a corporation is, prima facie, the corporation. (2) Where the alleged wrong is a transaction which might be made binding on the corporation and on all its members by a simple majority of the members, no individual member of the corporation is allowed to maintain an action in respect of that matter because, if the majority confirms the transaction, cadit quaestio; or, if the majority challenges the transaction, there is no valid reason why the company should not sue. (3) There is no room for the operation of the rule if the alleged wrong is ultra vires the corporation, because the majority of members cannot confirm the transaction. (4) There is also no room for the opera-

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

tion of the rule if the transaction complained of could be validly done or sanctioned only by a special resolution or the like, because a simple majority cannot confirm a transaction which requires the concurrence of a greater majority. (5) There is an exception to the rule where what has been done amounts to fraud and the wrongdoers are themselves in control of the company. In this case the rule is relaxed in favour of the aggrieved minority, who are allowed to bring a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue."

I was also referred by both sides to two articles by Mr. Wedderburn on "Shareholders' rights and the rule in Foss v. Harbottle" [1957] C.L.J. 194, and [1958] C.L.J. 93, to which I should like to acknowledge my indebtedness.

I should also say at this stage that I have not in this judgment used the expressions "derivative" or "corporate" actions, terms which are often used to describe certain categories of minority shareholders' actions. There seemed to me to be a risk of apparent prejudging of issues by the use of such terminology.

The difficulty arises in this case when one considers not the restraint of an illegal or ultra vires transaction but the recovery on behalf of the company of money or property which the company is entitled to claim as the result of the ultra vires transaction. The submissions made to me **\*169** were as follows: Mr. Aldous, with Mr. Oliver's support, drew a distinction on behalf of the fourth and ninth defendants between those cases, on the one hand, where individual shareholders, despite the rule in Foss v. Harbottle, can bring a personal or representative action to enforce contractual rights that the memorandum and articles be observed, such rights not being removable by simple majority votes, and, on the other hand, those cases where what is sought to be done is to bring an action in respect of loss already sustained by a company where the right of action is vested in the company, and an

individual shareholder has, it is submitted, no personal right of action at all but can start an action on behalf of the company if, but only if, he can bring himself within one or other of two well established exceptions to the rule in Foss v. Harbottle. These are (1) Where the loss is attributable to an illegal or ultra vires act, and (2) Where the transaction complained of constitutes a fraud on the minority shareholders.

They further submitted that even where there is a right to start an action to enforce a right of the company because one or other of the exceptions to the rule in Foss v. Harbottle is applicable, a company acting either through an independent board of directors or pursuant to a resolution passed by a majority of independent shareholders can always compromise or waive the cause of action vested in it so long as the decision in question to compromise or waive is taken by the persons concerned bona fide and for reasons genuinely believed to be in the best interests of the company. If such a decision is taken any action started on behalf of the company by a minority shareholder should not be allowed to proceed.

Mr. Potts, on the other hand, drew a distinction between those cases where the minority shareholder on behalf of the company was seeking to rescind a transaction carried out ultra vires and those where, without seeking to rescind the ultra vires transaction, the minority shareholder was seeking to recover damages or other compensation on behalf of the company. In the former Mr. Potts submitted the minority shareholder was entirely outside the rule in Foss v. Harbottle and had an indefeasible right to bring and prosecute the proceedings. There was, he submitted, no difference in principle between his right to bring such proceedings for recission and recoupment and his right to restrain a threatened ultra vires transaction: both were personal rights vested in the individual shareholder which it was entirely within his power to bring or not. He also added that in cases where the plaintiffs rely on ultra vires transactions it is not necessary to prove that the defendants have control of the company.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
(Cite as: [1988] Ch. 114)

This latter point I can dispose of at once by accepting it. By itself, it does not advance the matter much. Mr. Potts did not contend that it was never possible for a company validly to abandon, compromise or decide temporarily not to pursue a right of action for damages vested in it as a result of an ultra vires transaction effected on its behalf, but he submitted that the arguments advanced by the defendants involved denying the ultra vires doctrine altogether and that exactly the same wrong was involved in relation to a past ultra vires transaction as in relation to a prospective one, so that if the defendants' arguments based **\*170** on a company's ability to release its cause of action in respect of a past ultra vires transaction were well founded, the same arguments would apply to a prospective ultra vires transaction, where it is common ground the minority shareholder has a right of action which the company cannot control.

Treating the matter as a question of principle for the moment, when a minority shareholder seeks to enforce a right of the company to claim compensation for a past ultra vires transaction there are two quite separate rights involved. First, there is the minority shareholder's right to bring proceedings at all and secondly, there is the right of recovery which belongs to the company but is permitted to be asserted on its behalf by the minority shareholder. The passage I have quoted from Lord Davey's speech in Burland v. Earle [1902] A.C. 83, 93 makes it clear that the bringing of an action in the name of the company is mere matter of procedure in order to give a remedy for a wrong which would otherwise escape redress. That is an echo of what was said in one of the two cases often cited as the foundation for these doctrines, namely Mozley v. Alston (1847) 1 Ph. 790, 801, where Lord Cottenham L.C. said of a bill alleging that a large majority of the shareholders were of the same opinion as the plaintiffs:

"to allow, under such circumstances, a bill to be filed by some shareholders on behalf of themselves and others, would be to admit a form of pleading which was originally introduced on the ground of necessity alone, to a case in which no such necessity exists."

True it is the Court of Appeal in Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204, 221 said that they were not convinced that it was a practical test to adopt to hold, as Vinelott J. had done at first instance, that there was an exception to the rule in Foss v. Harbottle wherever the justice of the case so requires. But the fact that such a yardstick would or might be unsatisfactory because it does not give a practical guide to the limits of the rule and its exceptions does not detract from the fact that the whole doctrine whereby a minority shareholder is permitted to assert claims on behalf of the company is rooted in a procedural expedient and adopted to prevent a wrong going without redress. Where what is sought is compensation for the company for loss caused by ultra vires transactions the wrong, in my judgment, is a wrong to the company, which has the substantive right to redress. Where the minority shareholder is seeking to prevent an ultra vires transaction or otherwise seeking to enforce his personal substantive rights, the wrong which needs redress is the minority shareholder's wrong.

The peculiar status of the minority shareholder in such actions is also illustrated by the judgments in the Court of Appeal in Towers v. African Tug Co. [1904] 1 Ch. 558, where a company had declared and paid illegally a dividend out of capital and two shareholders who had themselves received their portion of the illegal dividend were held to be disentitled to bring an action on behalf of the company for repayment by the directors. Vaughan Williams L.J. said, at p. 566: **\*171**

"In that state of things, what ought to be done with this action? There is no doubt that the payment of this interim dividend was an ultra vires payment. I start with the assumption one is bound to make, that if an act is done by a company which is ultra vires, no confirmation by shareholders - not even by every member of the company - can convert that which was ultra vires into something intra vires: it always must be ultra vires. As is pointed out in one or two of the cases, the result of that is that if the company are plaintiffs, no amount of acquiescence or resolutions by the shareholders can form an answer to the action by the company for the reinstate-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

ment of things in the position in which they would have been but for the ultra vires act complained of. But, to my mind, it is a different thing where the action is brought by a shareholder on behalf of himself and other shareholders. I am assuming this case to be one of those in which the facts have been such that an individual shareholder ought to be able to sue in a representative action for the purpose of preventing acts being done in reference to the company in which the shareholders are interested, and which might damnify the company by reason of those acts being ultra vires. I assume that an action not only to prevent ultra vires acts in the future but also to remedy acts that have been done ultra vires is an action which can be brought in the form in which this action is brought. But although that is so, my own opinion is that this is a kind of action which has to be brought by a plaintiff personally. It is an action which he cannot bring unless he has an interest; it is an action which a stranger could not bring."

Stirling L.J. said, at p. 569:

"It is proved beyond all contradiction by documents under the hand of Mr. Towers that he was perfectly well aware of the circumstances in which the dividend was paid. It is true that Mr. Wedlake was not in the same position as Mr. Towers; but I think, having regard to the admissions which he made by not denying the allegation in the counterclaim - that he received his dividend 'with full notice of all the facts relating thereto' - and to the fact of his having submitted to judgment against himself on that footing, and also having regard to the high probabilities of the case, that, inasmuch as he did not choose to go into the box and deny it, we ought to assume that he, like his partner Mr. Towers, knew the circumstances in which the dividend was declared.

"Now the action is one by the plaintiffs on behalf of themselves and all other shareholders against the company; originally all the shareholders were not made parties, but the other shareholders were afterwards, at their own request, made defendants, so that now we have here all the shareholders of the company. I think this is a form of action which in certain circumstances may be maintained. That a

shareholder who had received a dividend, without knowing anything of the illegality of it, might maintain such an action I do not doubt. Whether in some circumstances a shareholder so suing ought not to return what he had received in respect of dividend is *172 another question. Why is it that this form of action is allowed? Prima facie the proper plaintiff, where it is sought to bring back the property of the company into its own coffers, is the company itself. But there are exceptions to that rule; and what is the reason of the exceptions? Sir George Jessel M.R. in the case which has been referred to of Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474 , 480, says this: ' The exceptions turn very much on the necessity of the case; that is, the necessity for the court doing justice.'"

Cozens-Hardy L.J. said, at p. 571:

"An action in respect of or arising out of an ultra vires transaction ought properly to be brought by the company; but it has long been well established that there are cases in which such an action may be maintained by a shareholder suing on behalf of himself and all other shareholders against the company as defendants. I will not pause to consider under what particular circumstances such an action may be maintained, but I assume that this is one of those cases in which such an action may be maintained - I mean in point of form. But I think it is equally clear that the action cannot be maintained by a common informer. A plaintiff in an action in this form must be a person who is really interested. When you get that fact clearly established it seems to me impossible to avoid taking the next step - that all personal objections against the individual plaintiff must be gone into and considered before relief can be granted."

That decision illustrates the dual nature of the rights involved. The minority shareholder's locus standi as someone with a real interest greater than that of a common informer is defeasible by showing a personal disability to sue such as was present in Towers v. African Tug Co. But as Lord Davey said in Burland v. Earle [1902] A.C. 83, 93 the plaintiffs cannot have a larger right to relief than the company itself would have if it were plaintiff. and from

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038

**(Cite as: [1988] Ch. 114)**

that it follows in my judgment that if there is a valid reason why the company should not sue it will equally prevent the minority shareholder from suing on its behalf. He is therefore liable to be defeated on two points, first by any ground preventing him from exercising his procedural remedy, and secondly by any ground preventing the company from exercising its substantive right. Conversely, however, he is able to assert a cause of action which arose before he became a shareholder because it is the company's and not his substantive right that is being enforced: Seaton v. Grant (1867) L.R. 2 Ch.App. 459.

Where ultra vires transactions are involved the number of grounds upon which the company can be debarred from suing is limited. In particular it was not argued that ratification of the ultra vires transaction, by however large a majority of shareholders, could prevent the company from suing. There is, however, a clear difference in principle between ratifying what has been invalidly done in the past and abandoning, compromising or not pursuing rights of action arising out of a past ultra vires transaction, and I see no reason in principle why in appropriate **\*173** circumstances the latter should not intervene to prevent the prosecution of a suit on behalf of the company in relation to such rights of action.

Conversely I am not persuaded of the validity of the criterion suggested by Mr. Potts for separating actions brought by minority shareholders to recover property for the company into those where it is sought to rescind the relevant ultra vires transaction or otherwise have it set aside, on the one hand, and those where that transaction is not sought to be set aside but damages or other compensation is claimed, on the other hand. The former according to Mr. Potts' argument fall entirely outside the rule in Foss v. Harbottle, while the latter are, he accepts, within its potential ambit. This distinction in my judgment places too much emphasis on the nature of the remedy sought rather than the substantive right and the legal person in whom it is beneficially vested.

So much for the principles which seem to me to apply to the first legal question which falls for determination. Is there any authority which precludes me from giving effect to the view which I have expressed? I was referred to a very large number of authorities and I see no useful purpose in going through them all. There are certain discernible categories.

(1) One category is where articles of association require a particular type of majority such as a special resolution and it has been held that a simple majority incapable of constituting such a majority cannot achieve indirectly what it is forbidden to achieve directly. An example is Baillie v. Oriental Telephone and Electric Co. Ltd. [1915] 1 Ch. 503, 511 where in the course of argument in relation to a submission by counsel that "If the majority wish an action to be brought and it is found that the special resolutions were improperly obtained, then they would be nullified," Swinfen Eady L.J. said: "It might be opposed by a bare majority, with the result that a bare majority might supersede the necessity for a special resolution."

In his judgment he said, at p. 518:

"It was then contended that the plaintiff is not entitled to sue. The plaintiff's counsel urged that if this as a special resolution was invalidly passed, how is it to be impeached if the plaintiff cannot sue; how can the question of illegality be raised? Suppose he called a meeting and the majority of the shareholders were to say 'We are content with the present position, and we will not raise any question,' can it be said that by a side wind, as it were, not being able to pass a valid special resolution, they could pass an invalid one and then by a bare majority say we will not allow any proceedings to be taken? In my opinion they cannot do that."

That type of case is concerned with preventing the indirect achievement of an unlawful object which raises different considerations from the recovery of compensation for past illegalities.

(2) Another category consists of cases on demurrer, mostly in the middle and last part of the 19th century but including Birch v. Sullivan [1957] 1

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

W.L.R. 1247, although that case was concerned with misfeasance rather than ultra vires. Cases on demurrer are necessarily concerned *174 with the locus standi of the plaintiff to bring the proceedings in question rather than the question whether a properly constituted action should be allowed to proceed. The cases principally relied on by Mr. Potts in this category included Foss v. Harbottle, 2 Hare 461 itself, where there were in fact two complaints made by the plaintiffs, one based on improper intra vires acts and the other on ultra vires activities described by Wigram V.-C., at p. 493, as mortgaging in a manner not authorised by the powers of the Act, and of which he said,

"This, being beyond the powers of the corporation, may admit of no confirmation whilst any one dissenting voice is raised against it."
The first complaint is the context for the very famous statement of basic principle which has given the name of the case to the rule which has been applied on innumerable subsequent occasions.

Mr. Potts relied on this decision as supporting his submission that where there is no claim for rescission of an ultra vires transaction a minority shareholder may be debarred from bringing an action on behalf of the company and that Wigram V.-C. did not deal with what his position would have been had such a claim been made. I accept that submission which seems to me substantiated by the passage, 2 Hare 461, 504, 505:

"The case made with regard to these mortgages or incumbrances is, that they were executed in violation of the provisions of the Act. The mortgagees are not defendants to the bill, nor does the bill seek to avoid the security itself, if it could be avoided, on which I give no opinion. The bill prays inquiries with a view to proceedings being taken aliunde to set aside these transactions against the mortgagees. The object of this bill against the defendants is to make them individually and personally responsible to the extent of the injury alleged to have been received by the corporation, from the making of the mortgages. Whatever the case might be, if the object of the suit was to rescind these transactions, and the allegations in the bill showed that justice could not be done to the shareholders without al-

lowing two to sue on behalf of themselves and others, very different considerations arise in a case like the present, in which the consequences only of the alleged illegal acts are sought to be visited personally upon the directors. The money forming the consideration for the mortgages was received, and was expended in, or partly in, the transactions which are the subject of the first ground of complaint. Upon this, one question appears to me to be, whether the company could confirm the former transactions, take the benefit of the money that has been raised, and yet, as against the directors personally, complain of the acts which they have done, by means whereof the company obtains that benefit which I suppose to have been admitted and adopted by such confirmation. I think it would not be open to the company to do this; and my opinion already expressed on the first point is, that the transactions which constitute the first ground of complaint may possibly be beneficial to the company, and may be so regarded by the proprietors, and admit of confirmation. I am of opinion that this question, - the question of *175 confirmation or avoidance, - cannot properly be litigated upon this record, regard being had to the existing state and powers of the corporation, and that therefore that part of the bill which seeks to visit the directors personally with the consequences of the impeached mortgages and charges, the benefit of which the company enjoys, is in the same predicament as that which relates to the other subjects of complaint. Both questions stand on the same ground, and, for the reasons which I stated in considering the former point, these demurrers must be allowed."
The decision shows quite clearly that similar considerations are capable of applying to an action based on an ultra vires transaction as to a claim based on breach of duty so that the rule in Foss v. Harbottle can apply to the former. It is not in any way conclusive on the nature of the minority shareholder's right to bring proceedings in respect of compensation for an ultra vires transaction.

In Salomons v. Laing (1850) 12 Beav. 377 the side note reads:

"The directors of one incorporated railway company paid over its funds to another railway com-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

pany, for purposes wholly unauthorised; and the latter received them with knowledge of the breach of trust. *Held,* on demurrer, that the second company were properly made parties to a suit to bring back the fund; and, secondly, that, in such a case, an individual shareholder in the first company might sue the second company 'on behalf' etc., without alleging that the corporation of which he was a member had refused to sue."

The plaintiff's right to sue the directors and the South Coast Co., the first company referred to, was conceded and the only matters on which issue was joined on demurrer was whether the Portsmouth company, the second company referred to, could properly be joined as defendant and whether the plaintiff could sue them direct without proving that he had previously attempted to get the concurrence of the South Coast company to sue, both of which were answered in the affirmative. At its highest the case proves no more than that a minority shareholder has a locus standi to bring an action for recovery of property paid out of a company in an ultra vires transaction and is not obliged to prove that an unsuccessful attempt to get the company to sue has been made. Neither of these is disputed.

Bagshaw v. Eastern Union Railway Co. (1849) 7 Hare 114 was another case on demurrer but, contrary to the side note, was concerned not only with a threatened ultra vires application of funds but also with a past misapplication. Here again though, in my judgment, all that was decided was the plaintiff's locus standi to sue in respect of both past and threatened ultra vires activities. Wigram V.-C. said, at p. 129:

"No majority of the shareholders, however large, could sanction the misapplication of this portion of the capital. A single dissenting voice would frustrate the wishes of the majority. Indeed, in strictness, even unanimity would not make the act lawful. This appears to me to take it out of the case of Foss v. Harbottle, 2 Hare 461 to which I was referred. That case does not, I apprehend, upon **\*176** this point, go further than this: that if the act, though it be the act of the directors only, be one which a general meeting of the company could sanction, a bill by some of the shareholders, on be-

half of themselves and others, to impeach that act, cannot be sustained, because a general meeting of the company might immediately confirm and give validity to the act of which the bill complains."

Mr. Potts submitted that the passage showed that the rule in Foss v. Harbottle was not concerned with ultra vires transactions. That, in my judgment, is far too wide a proposition. In Foss v. Harbottle itself, as Mr. Potts rightly pointed out, Wigram V.-C. himself dealt in the same way with claims based both on intra vires but improper transactions and on ultra vires transactions. Certainly Bagshaw's case, 7 Hare 114 is authority for the proposition that a minority shareholder can in appropriate circumstances have a sufficient interest to bring an action for relief with regard to past as well as future apprehended ultra vires transactions. The fact that both past and future acts were involved might well constitute appropriate circumstances.

Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474 was a decision of Sir George Jessel M.R. that was concerned with recovery of some £5,500 claimed by plaintiff minority shareholders to have been paid out ultra vires to the promoters of a competing undertaking to dissuade them from promoting a bill in Parliament in competition with the company's undertaking. In terms the decision allowed a demurrer on the grounds that ultra vires was inadequately pleaded and there was no sufficient allegation that there was a reason preventing the company itself from suing. Jessel M.R. also examined what he described as the exceptions to the rule laid down in Foss v. Harbottle, and said, at p. 480: "the exceptions depend very much on the necessity of the case, that is the necessity for the court doing justice."

He identified two such exceptions. One he described, at p. 481, as cases "in which an individual corporator sues the corporation to prevent the corporation either commencing or continuing the doing of something which is beyond the powers of the corporation." He went on to point out that this may involve the joinder of a non-corporator who is a party to the ultra vires transaction, and that in turn

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

may lead to the action embracing the recovery from that third party of money paid under such an ultra vires agreement. He continued, at pp. 481-482:

"If the detainer or holder of the money or property, that is, the second corporation or other person, is already a party, and a necessary party, to the suit, it would be indeed a lame and halting conclusion if the court were to say it could [not] do justice in a suit so framed by ordering the money to be returned or the property restored." - It is perfectly clear that the word "not" has dropped out between "could " and "do." The judgment continues - "It is a necessary incident to the first part of the relief which can be obtained by individual corporators, and will do complete justice on each side, and that has always been the practice of the court. Therefore, in a case so framed there is no objection to a suit by an **\*177** individual corporator to recover from another corporator, or from any other persons being strangers to this corporation, the money or property so improperly obtained. But that is not the only case. Any other case in which the claims of justice require it is within the exception."

If anything that decision seems to me to assist the defendants, because in relation to the ultra vires aspect of the matter it emphasises the necessity of flexibility to attain justice rather than the imposition of hard and fast rules.

In my judgment the above cases on demurrer establish that a minority shareholder can, as Mr. Potts argued, have a locus standi to bring an action to recover on behalf of a company property or money transferred or paid in an ultra vires transaction and that it is not a necessary averment that control is vested in individual defendants so as to prevent the company from bringing the proceedings. I am not persuaded that it follows from that that the minority shareholder necessarily has an individual and indefeasible right to prosecute that action on the company's behalf.

(3) A third category of case which I only mention to dispose of is made up of matters which the court concludes are mere matters of internal management. MacDougall v. Gardiner (1875) 1 Ch.D. 13 is an example. They are of no assistance to the present problem.

(4) A further category are those cases where an individual member either of a company or a trade union has been held to be entitled to restrain illegal activity by the company or association to which he belongs. That in itself is not a subject of dispute. Simpson v. Westminster Palace Hotel Co. (1860) 8 H.L.Cas. 712 is House of Lords authority if it be needed. Of more help, however, are some modern trade union cases. Thus in Edwards v. Halliwell [1950] 2 All E.R. 1064, from which I have already cited the general statement by Jenkins L.J. quoted by the Court of Appeal in Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204 there is what seems to me a revealing contrast in the treatment by Jenkins L.J., at p. 1067, on the one hand, of acts complained of which are wholly ultra vires the company and therefore incapable of confirmation by a majority so that they constitute exceptions to the general ambit of the rule in Foss v. Harbottle, 2 Hare 461 and, on the other hand, cases such as Edwards v. Halliwell [1950] 2 All E.R. 1064 itself as to which Jenkins L.J. said, at p. 1067:

"In my judgment, this is a case of a kind which is not even within the general ambit of the rule. It is not a case where what is complained of is a wrong done to the union, a matter in respect of which the cause of action would primarily and properly belong to the union. It is a case in which certain members of a trade union complain that the union, acting through the delegate meeting and the executive council in breach of the rules by which the union and every member of the union are bound, has invaded the individual rights of the complainant members, who are entitled to maintain themselves in full membership with all the rights and privileges appertaining to that status so long as they pay contributions in **\*178** accordance with the tables of contributions as they stood before the purported alterations of 1943, unless and until the scale of contributions is validly altered by the prescribed majority obtained on a ballot vote. Those rights, these members claim, have been invaded. The gist of the case is that the personal and individual rights of membership of each of them have been invaded by

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

a purported, but invalid, alteration of the tables of contributions. In those circumstances, it seems to me the rule in Foss v. Harbottle has no application at all, for the individual members who are suing sue, not in the right of the union, but in their own right to protect from invasion their own individual rights as members."

The boundary there seems to me very clearly drawn between suits in the right of the union and suits to protect the individual rights of members. The former are capable of coming within the rule in Foss v. Harbottle; the latter are not.

(5) Another category is to be found where the constitution of a corporation has been sought to be varied in a manner which is ultra vires, e.g. by amalgamation. Clinch v. Financial Corporation (1868) L.R. 5 Eq. 450 , affirmed by the Court of Appeal at L.R. 4 Ch.App. 117, is an example of such a case, but the shareholder's right in such a case was described by Lord Cairns L.C., at p. 122, as a right to bring a suit to arrest a contract on the ground that it was in the eye of the court beneficial to all the shareholders to do so. Similarly Wood V.-C., who heard the case at first instance as well as in the Court of Appeal, said that every shareholder is supposed to have a common interest with the plaintiff in varying any arrangement that may have been entered into ultra vires. The fact that even such ultra vires arrangements are capable of being within the ambit of the rule in Foss v. Harbottle is shown very clearly by Gray v. Lewis (1873) L.R. 8 Ch.App. 1035 chosen by the court in Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204, 217-219, as a simple application of the first aspect of the rule in Foss v. Harbottle, viz. that a company is the proper plaintiff to sue for redress for moneys due to it.

I turn now to a modern case from which I have derived much assistance. This is Taylor v. National Union of Mineworkers (Derbyshire Area) [1985] B.C.L.C. 237. The headnote reads:

"In September 1984 the plaintiffs, who were members of the Derbyshire Area of the National Union of Mineworkers (the Derbyshire union), were successful in obtaining, inter alia, a declara-

tion that a strike called by their union (the Derbyshire union) and the National Union of Mineworkers (N.U.M.) was unlawful. The plaintiffs sought in the present proceedings by way of summary judgment an order restraining the defendants, who were the Derbyshire union and some of its officers, from using the funds of the Derbyshire union for the purpose of a strike called by the N.U.M. and the Derbyshire union, and requiring those defendants who were officers of the Derbyshire union to restore to the union funds which had been used for this purpose.

*179 "*Held* - Injunction granted: summary judgment on the monetary claim refused. Where a member of a union commenced an action on behalf of the union, the union would be treated as being analogous to a company and the member's standing to bring the action would be determined on the same principles as those applicable to an action brought by a shareholder on behalf of a company. These principles did not prevent an individual member from maintaining an action on behalf of the union against its officers where it was clear that the officers had made an ultra vires application of the funds which could not be ratified by the members. In such an action by a member of the union against its officers for the ultra vires misapplication of the union's funds, the court could order the officers responsible to restore the funds as such misapplication would constitute a breach of fiduciary duty. On the facts, it was clear that the Derbyshire union's funds had been used to support the strike and there was no reasonably arguable case that this payment was authorised by the union's rules or could be ratified by the members of the union. Accordingly, as a matter of principle, the plaintiffs were entitled to the order which they sought. However, although the making of the payment could not be ratified by the members of the union, the members could resolve to take no action to remedy the wrong done to the union provided that such resolution was made in good faith and for the benefit of the union. As there was evidence to suggest that the members might so resolve, and as the circumstances in this case were otherwise exceptional, the court would not grant summary judgment on the monetary claims."

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

Then there is a statement that an injunction to prevent future misapplications was available to them. Vinelott J. said, at p. 241:

"The first question is whether the plaintiffs are in a position to maintain an action against the individual defendants in effect on behalf of the Derbyshire union whose members have not been consulted on the question whether proceedings should be brought against the individual defendants. A great wealth of authority has been cited on this issue. The position, in my view, is not open to serious doubt."

He then proceeded to review the authorities, and said, at p. 246:

"The principles which emerge are, I think, clear. Foss v. Harbottle applies to a union but does not bar the right of an individual to maintain an action joining the union and its officers as defendants and claiming that a particular application by the officers was ultra vires and an injunction to restrain further application of the funds of the union for the same purposes and requiring the officers to make good the loss to the union. Being ultra vires the misapplication cannot be ratified by any majority of the members.

"The central issue in this case is whether the payments, amounting to over £1.7 million, were misapplications of the funds of the union within the exception to the rule in Foss v. Harbottle."

**\*180** He answered that question, after a review of the authorities and facts, at p. 254:

"If that is the right conclusion, then it seems to me that it must follow that any payment to a member on unofficial strike whether by way of weekly allowance or by way of intermittent payment or by meeting expenses directly or in any other way with a view to making good the wages lost by the member on unofficial strike must be equally impermissible. So also must payments to pickets be impermissible. ... I find myself therefore driven to the conclusion, uncomfortable though it is, that once it is accepted that the payments in question were made, as they admittedly were made, to pickets and otherwise in furtherance of the strike or for the relief of miners on unofficial strike from hardship caused by the stoppage of work and wages, the conclusions that follow inevitably are first that the pay-

ments were beyond the powers of the union; second, that the two officers, the second and third defendants, who made or sanctioned the payments, are liable to reimburse the union; third that the plaintiffs are entitled to maintain this action; and fourth that the misapplication of the union's fund cannot now be ratified by any majority of the members, however large. Should I therefore make the order which is sought?

"I have come to the conclusion that I should not. My reasons are shortly as follows. Although the misapplication of the funds of a corporate body (I include for this purpose funds belonging to a union) cannot be ratified by any majority of the members, however large, it is open to a majority of the members, if they think it is right in the interests of the corporate body to do so, to resolve that no action should be taken to remedy the wrong done to the corporate body and such a resolution, if made in good faith and in what they considered to be for the benefit of the corporate body will bind the minority. The majority of the members of a trading company, for instance, might properly take the view that the publicity, costs, and the inevitable loss, let us say, of the services of a managing director, who would be the defendant, would outweigh the benefit to the company of successfully prosecuting an action and might properly decide not to pursue it; although, of course, a contractual release of the right of action, as compared with a decision simply not to institute proceedings, would require to be supported by some consideration.

"In the instant case there is an impressive body of evidence filed on behalf of the defendants which is designed to establish that the overwhelming majority of members approves the expenditure in question. It must, I think, follow that they would most probably oppose proceedings for the recovery of the moneys misapplied."

He then went on to deal with three particular reasons advanced by counsel for the plaintiffs against a refusal to give summary judgment. They are particular to the facts of that case and neither the reasons nor the basis for Vinelott J.'s rejection of them is directly material to this case. Vinelott J.'s conclusions were stated, at p. 256: **\*181**

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

"In these circumstances I have come to the conclusion that the right course is not to make an order for summary judgment in the hope that the action will come on, if it does come on, after this dispute has been settled, and that the members will be able to work together in the future for their common benefit within the rules of the union. It will be said that this is a case where hard cases make bad law. My reply to that is that it sometimes happens that hard cases make good law, because they compel a radical re-examination of principles which, rigidly applied, would lead to a result which would be felt widely to be unjust. In particular, the boundary between ratifying a misapplication of a union's funds and resolving to take no action to recover funds innocently misapplied may not be easy to draw in the case of a union and this aspect of the case may, I think, merit further consideration when the union is properly represented."

That authority draws the distinction between impossibility of ratification and the possibility of not suing in respect of the consequences of ultra vires transactions very clearly and in my judgment lends strong support to the view in principle which I have expressed. Overall therefore, on the authorities cited to me, I conclude that there is some support for and no absolute bar on that conclusion.

Another consideration which tends in the same direction is that the plaintiffs have applied for, and until Walton J. discharged the master's order obtained, the benefit of an indemnity as to costs in respect of the action. There was never any suggestion that the plaintiffs were enforcing personal rights in respect of the claimed ultra vires transactions as opposed to the rights of the company. On the contrary, the whole basis of the decision on which reliance was placed - Wallersteiner v. Moir (No. 2) [1975] Q.B. 373 - was that the minority shareholder was acting for the benefit of the company rather than asserting an individual right.

Reliance was also placed by Mr. Aldous on Viscount of the Royal Courts of Jersey v. Shelton [1986] 1 W.L.R. 985 as supporting the distinction between the impossibility of ratifying an ultra vires transaction and the possibility of a compromise or

release of a right of action in respect of such a transaction. I accept Mr. Potts' submission that this authority is concerned with the rather different point how far articles of association can, outside this jurisdiction, which has a statutory prohibition, now contained in section 310 of the Companies Act 1985, confer an immunity from suit on directors who participate in breaches of their fiduciary duty. That is not to say that I regard the distinction drawn by Mr. Aldous as an invalid one.

Mr. Potts further submitted that there were three objections to any reliance on a release, or the equivalent of a release, of the claims against defendants in relation to ultra vires acts. The first was that the right in question was that of the minority shareholder and not of the company, so that neither the board nor the shareholders in general meeting could release it. That I have already dealt with.

Secondly, assuming it to be legally possible, he submitted first that the board had no available power to do so, and that, in the circumstances **\*182** of the present case, is not in dispute; and secondly, that the company in general meeting could only do so by special resolution. The reason for this was that by article 80 of Table A which applies to the company the management of the business of the company is given to the directors. It followed that the shareholders could only pass a valid resolution about the conduct of proceedings, which it is common ground is part of the business of the company, by a resolution capable of altering the articles, i.e. a special resolution. In support he cited the passage in Buckley on the Companies Acts, 14th ed. (1981), vol. 1, p. 989, under the heading "How far members may control directors:"

"There is no provision in this Act corresponding with section 90 of the Companies Clauses Consolidation Act 1845, which provides that the exercise by the board of their powers shall be subject to the control of any general meeting specially convened for the purpose. and it appears now to be established that under an article in the present form, whatever effect is to be given to the words 'to such regulations, being not inconsistent with the aforesaid regulations or provisions, as may be prescribed

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

by the company in general meeting', these words do not enable the shareholders, by resolution passed at a general meeting without altering the articles, to give directions to the directors as to how the company's affairs are to be managed, nor to overrule any decision come to by the directors in the conduct of its business, even as regards matters not expressly delegated to the directors by the articles."

Mr. Aldous countered this submission by drawing a distinction between shareholders in general meeting seeking to compel directors to do that which they declined to do and shareholders in general meeting authorising or ratifying a matter which the directors considered to need their authority or ratification. In the former case a special resolution is needed: in the latter an ordinary resolution will suffice. In my judgment that distinction is validly made and is supported by Buckley J.'s decision in Hogg v. Cramphorn Ltd. [1967] Ch. 254. Buckley J. said, at p. 269:

"Mr. Instone says, no doubt rightly, that the company in general meeting could not by ordinary resolution control the directors in the exercise of the powers under article 10. He goes on to say, with less justification, that what they could not ordain a majority could not ratify. There is, however, a great difference between controlling the directors' exercise of a power vested in them and approving a proposed exercise by the directors of such a power, especially where the proposed exercise of the power is of a kind which might be assailed if it had not the manifest approval of the majority. Had the majority of the company in general meeting approved the issue of the 5,707 shares before it was made, even with the purported special voting rights attached (assuming that such rights could have been so attached conformably with the articles), I do not think that any member could have complained of the issue being made; for in these circumstances, the criticism that the directors were by the issue of the shares attempting to deprive the majority of their constitutional rights would have ceased to have any force. It follows **183** that a majority in a general meeting of the company at which no votes were cast in respect of the 5,707 shares could ratify the issue of those shares. Before setting the allot-

ment and issue of the 5,707 shares aside, therefore, I propose to allow the company an opportunity to decide in general meeting whether it approves or disapproves of the issue of these shares to the trustees."

That passage was cited with approval by Harman L.J. in Bamford v. Bamford [1970] Ch. 212, 240-241. In my judgment it would not be right in a case where the court declines to act on the views of the board as not sufficiently disinterested, to assume that the board was not merely disqualified but also opposed to a decision by the shareholders in general meeting. I see no difference in principle between directors referring a doubtful matter to shareholders in general meeting and the court taking into account the views of shareholders in general meeting where the directors are effectively disqualified from speaking for the company. On this aspect of the matter I accept Mr. Potts' submission that the Court of Appeal in Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204, did not deal at all with the question what sort of resolution would have been needed regarding the non-prosecution of the action.

Mr. Potts' third point was that in any event Wren Trust's views should not be taken into account. I propose to deal with that later.

I turn now to the question whether it is right for the court to have regard to the views of the majority inside a minority which is, I assume for this purpose, in a position to bring an action to recover on behalf of the company in respect of breaches of duty by persons with overall control.

The fourth and ninth defendants claim that it is, the plaintiffs claim that it is not. On their view of the matter all that the court is concerned with, in cases where the exception to the rule in Foss v. Harbottle, 2 Hare 461 based on frauds on the minority applies, is the single question whether the defendants have control. The issue is highlighted by the conflicting interpretations placed by the parties on what the Court of Appeal said in Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204. Immediately after the formulation, at pp.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987]
1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

221-222, of the two matters which in the Court of Appeal's view a plaintiff ought at least to be required to show before proceeding with a minority shareholder's action there comes the following sentence:

"On the latter issue it may well be right for the judge trying the preliminary issue to grant a sufficient adjournment to enable a meeting of shareholders to be convened by the board, so that he can reach a conclusion in the light of the conduct of, and proceedings at, that meeting."

Mr. Potts submitted that the purpose of that adjournment was to enable the courts to discern whether the defendants had control. I reject that submission. In my judgment the concern of the Court of Appeal in making that statement was to secure for the benefit of a judge deciding whether to allow a minority shareholder's action on behalf of a company to go forward what was described, at p. 221, as the commercial **\*184** assessment whether the prosecution of the action was likely to do more harm than good or, as it was put originally by counsel for Newman Industries Ltd., kill the company by kindness. The whole tenor of the Court of Appeal's judgment was directed at securing that a realistic assessment of the practical desirability of the action going forward should be made and should be made by the organ that has the power and ability to take decisions on behalf of the company. Also the question of control pure and simple hardly admitted of any doubt in that particular case.

Mr. Potts submitted, in the alternative, that what the Court of Appeal said was obiter. This I accept, but it was clearly a carefully considered statement contrasting with the express acknowledgment that they had had little argument on the proper boundaries of the exception to the rule in Foss v. Harbottle, 2 Hare 461 and were therefore not making any definitive statement on that subject, and I propose to follow what I understand to be the true construction of this statement albeit obiter, unless there is other authority binding on me the other way.

As to that Mr. Potts submitted that no reported authority held that in a case falling within the fraud on a minority exception to the rule in Foss v. Har-

bottle the court should go beyond seeing whether the wrongdoers are in control and count heads to see what the other shareholders, i.e. those other than the plaintiffs and the wrongdoers, think should be done. I accept that in many reported cases the court has not gone on to the second stage. Mason v. Harris (1879) 11 Ch.D. 97 is one such case, and there are modern examples too, such as Pavlides v. Jensen [1956] Ch. 565 and Daniels v. Daniels [1978] Ch. 406. But the fact that such an investigation was not conducted is not conclusive that it could not be conducted, more especially in the absence of any argument on this precise point. An investigation for interlocutory purposes of the propriety of the exercise of voting power in connection with the proposed prosecution of a minority shareholder's action was conducted by Sir Robert Megarry V.-C. in Estmanco (Kilner House) Ltd. v. Greater London Council [1982] 1 W.L.R. 2. In that case he permitted the action to proceed, but Mr. Aldous submitted that the careful scrutiny to which the propriety of the shareholders' voting activities was subjected is of itself an indication of the significance that the court in a proper case will attach to it. This I accept.

Another indication in the same direction is Walton J.'s reaction in the earlier proceedings in Smith v. Croft [1986] 1 W.L.R. 580 already referred to. He said, at p. 591:

"This is, of course, not an application to strike out the action on the grounds that it cannot be justified as a minority shareholders' action, but quite clearly the same kind of considerations apply. If the majority of the independent shareholders do not wish the action to be continued, clearly the court will not sanction its continuance and certainly not at the expense of the company."

I accept that this is only by way of obiter for that particular question was not argued at that stage or before Walton J. but it represents the reaction of a judge very experienced in this field. In my judgment the **\*185** word "control" was deliberately placed in inverted commas by the Court of Appeal in Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204, 219 because it was recognised that voting control by the defend-

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

ants was not necessarily the sole subject of investigation. Ultimately the question which has to be answered in order to determine whether the rule in Foss. v. Harbottle applies to prevent a minority shareholder seeking relief as plaintiff for the benefit of the company is "Is the plaintiff being improperly prevented from bringing these proceedings on behalf of the company?" If it is an expression of the corporate will of the company by an appropriate independent organ that is preventing the plaintiff from prosecuting the action he is not improperly but properly prevented and so the answer to the question is "No. " The appropriate independent organ will vary according to the constitution of the company concerned and the identity of the defendants who will in most cases be disqualified from participating by voting in expressing the corporate will.

Finally on this aspect of the matter I remain unconvinced that a just result is achieved by a single minority shareholder having the right to involve a company in an action for recovery of compensation for the company if all the other minority shareholders are for disinterested reasons satisfied that the proceedings will be productive of more harm than good. If Mr. Potts' argument is well founded once control by the defendants is established the views of the rest of the minority as to the advisability of the prosecution of the suit are necessarily irrelevant. I find that hard to square with the concept of a form of pleading originally introduced on the ground of necessity alone in order to prevent a wrong going without redress.

I therefore conclude that it is proper to have regard to the views of independent shareholders. In this case it is common ground that there would be no useful purpose served by adjourning to enable a general meeting to be called. For all practical purposes it is quite clear how the votes would be cast, and that I described at the outset of this judgment. The questions therefore remain "What is the test of independence" and "Does Wren Trust pass it?"

Upon the former Mr. Potts submitted I should apply the test formulated in In re Hellenic & General Trust Ltd. [1976] 1 W.L.R. 123 by analogy. That decision was concerned with a scheme of arrangement and was accepted by Mr. Potts not to be direct authority, but he suggested that the passage in the judgment of Templeman J., at p. 125, provides appropriate guidance. He said:

"The question therefore is whether M.I.T. [Manchester Investment Trust Ltd.], a wholly owned subsidiary of Hambros, formed part of the same class as the other ordinary shareholders. What is an appropriate class must depend upon the circumstances but some general principles are to be found in the authorities. In Sovereign Life Assurance Co. v. Dodd [1892] 2 Q.B. 573, the Court of Appeal held that for the purposes of an arrangement affecting the policyholders of an assurance company the holders of policies which had matured were creditors and were a different class from policyholders whose policies had not matured. Lord Esher M.R. **186** said, at p. 580: 'they must be divided into different classes... because the creditors composing the different classes have different interests; and, therefore, if we find a different state of facts existing among different creditors which may differently affect their minds and their judgment, they must be divided into different classes.' Bowen L.J. said, at p. 583: 'It seems plain that we must give such a meaning to the term "class" as will prevent the section being so worked as to result in confiscation and injustice, and that it must be confined to those persons whose rights are not so dissimilar as to make it impossible for them to consult together with a view to their common interest.' Vendors consulting together with a view to their common interest in an offer made by a purchaser would look askance at the presence among them of a wholly owned subsidiary of the purchaser."

Mr. Oliver, on the other hand, took me through a line of authority regarding the efficacy of resolutions passed by or with the help of votes whose validity was impugned. From Allen v. Gold Reefs of West Africa Ltd. [1900] 1 Ch. 656 onwards there has been applied a test whether the votes in question were exercised bona fide for the benefit of the company as a whole. The generality of the test has led to differences of judicial opinion on the result

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038

**(Cite as: [1988] Ch. 114)**

of applying it to a particular set of facts, notably in that particular case. That is further illustrated by the different results reached on not very dissimilar facts in Brown v. British Abrasive Wheel Co. Ltd. [1919] 1 Ch. 290 and Sidebottom v. Kershaw, Leese & Co. Ltd. [1920] 1 Ch. 154. In my judgment in this case votes should be disregarded if, but only if, the court is satisfied either that the vote or its equivalent is actually cast with a view to supporting the defendants rather than securing benefit to the company, or that the situation of the person whose vote is considered is such that there is a substantial risk of that happening. The court should not substitute its own opinion but can, and in my view should, assess whether the decision making process is vitiated by being or being likely to be directed to an improper purpose.

In general terms I would seek to apply the test applied by the Court of Appeal in Allen v. Gold Reefs of West Africa Ltd. [1900] 1 Ch. 656, but it seems to me possible to formulate a more particular one in the circumstances of this case. The analogy with schemes of arrangement and In re Hellenic & General Trust Ltd. [1976] 1 W.L.R. 123, is a good deal less compelling. Moreover the application of such a test as I have indicated should prevent any risk of the danger that Mr. Potts relied upon of the resolution which prevents proceedings being brought on behalf of the company being itself treated as a fraud on the minority.

The question thus arises whether Wren Trust's decision, which is the equivalent of a vote, passes the test or is vitiated by being directed to an improper purpose. The evidence filed by the defendants on this issue consist of two affidavits by Mr. Carr and two by Mr. Baldock, who is the managing director of Gresham Trust Plc. and a director of Wren Trust, its subsidiary. Mr. Baldock deposed in an affidavit sworn on 1 July 1985: **\*187**

"(4) As a director of Gresham Trust and Wren Trust I am involved in making a number of investments in unquoted companies. I can say that, without doubt, the investment in Film Finances has been both in terms of capital appreciation and income, a very successful investment. For the reasons

set out in Mr. Carr's affidavit I am of the opinion that the remuneration which has been paid to Messrs. Soames, Korda and Croft is in all the circumstances reasonable.

"(5) The present litigation is a source of some considerable concern to Gresham Trust and Wren Trust in that it jeopardises a valuable investment. My reasons for so stating are that, as a professional investor, I am of the view that Mr. Soames represents the principal asset of the company. The present proceedings, purportedly brought on behalf of the company, are thus a personal attack on the company's principal asset. Whilst Mr. Soames has a substantial equity stake in the company he is not bound to the company by a long term service contract. There is therefore no reason why if Mr. Soames became so disenchanted with the present litigation he could not either set up business on his own account in this country or seek alternative employment in the same industry in the United States of America. I have no doubt that in view of the record of the company he would have little difficulty in either obtaining the necessary finance to commence business on his own account or to find alternative employment in the United States of America at the same or a higher salary.

"(6) If Mr. Soames were to leave the company the effect upon the investment of all the minority shareholders in the company would in my opinion be catastrophic and, even if it were possible to replace Mr. Soames, then I verily believe that the remuneration which would have to be paid for an appropriate replacement would be at the same level or in excess of that which Mr. Soames is already receiving.

"(7) The statement of claim in these proceedings alleges that the proceedings are brought for the benefit of all shareholders. Wren Trust as a minority shareholder holding some 19.66 per cent. of the issued share capital of the company is of the view: (i) that the remuneration which has been paid to the executive directors is in all the circumstances reasonable; (ii) that the present proceedings are not for the benefit of the minority shareholders; and (iii) that if the present proceedings continue they will put in jeopardy the value of the investment of all

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1986 WL 407459 (Ch D), [1987] 3 All E.R. 909, (1987) 3 B.C.C. 207, [1987] B.C.L.C. 206, [1988] Ch. 114, [1987] 1 F.T.L.R. 319, 1986 P.C.C. 209, [1987] 3 W.L.R. 405, (1987) 84 L.S.G. 2449, (1987) 131 S.J. 1038
**(Cite as: [1988] Ch. 114)**

the minority shareholders."

After the independence of Wren Trust had been challenged he swore a further affidavit on 18 March 1986 in which he said:

"(5) Wren Trust Ltd. is not a party to the present proceedings. However, it has been suggested that because the non-executive chairman of Film Finances Ltd., Mr. Carr, is a director of Wren Trust and Gresham Trust, Wren Trust cannot properly be said to be an independent shareholder. In this regard, the board of Gresham Trust and the board of Wren Trust have carefully considered the passage in the judgment of Walton J....

**\*188** "(6) The directors of Gresham Trust and the directors of Wren Trust have been advised that this Honourable Court would be entitled to disregard the views of Gresham Trust and Wren Trust in assessing whether a majority of the independent shareholders considers that the proceedings are for the benefit of Film Finances Ltd., if they are allowed their consideration of the merits of the present proceedings to be influenced by the fact that Mr. Carr is a defendant in the proceedings.

"(7) The directors of Gresham Trust and the directors of Wren Trust (excluding in each case Mr. Carr) have carefully considered the issues in the present action, the affidavits sworn herein and the judgment of Walton J. For the reasons already set out in my first affidavit... and in the affidavit of Mr. Carr... they have concluded that the present proceedings are not only of no benefit to Film Finances Ltd. but they put at risk the investment of Gresham Trust and Wren Trust in Film Finances Ltd. Accordingly, the directors of Gresham Trust and the directors of Wren Trust (excluding in each case Mr. Carr) have resolved to support the application by Film Finances Ltd. to strike out the present proceedings, and any application which Mr. Carr may be advised to make to strike out the present proceedings, and I have been authorised to swear this affidavit in support of such applications."

Then he exhibits minutes of the relevant board meetings. That in relation to Wren Trust recorded that Mr. Scott, a solicitor, reported on the present state of the proceedings which had been commenced by three minority shareholders in Film Fin-

ances Ltd. where Wren Trust Ltd. is a substantial minority shareholder, and then he refers to the application before Walton J. and the possibility of an appeal. There being no questions of a factual nature Mr. Carr then left the meeting, and the minute then said:

"Mr. Scott explained to the meeting that in considering Film Finances' application to dismiss the proceedings the court would wish to have regard to the views of the independent shareholders. In considering the merits of the proceedings and whether the board considered that the prosecution of the proceedings was in the best interests of Film Finances Ltd. the board must disregard the fact that one of its number was the defendant in the proceedings. The directors should only have regard to the effect of the present proceedings upon its investment in Film Finances Ltd. If, for the reasons set out in the affidavits already sworn by Mr. Carr and Mr. Baldock, the board considered that there were good commercial reasons why the proceedings were not in the best interests of Film Finances Ltd., then it should resolve to support Film Finances' application to dismiss the proceedings, and on the basis of Walton J.'s judgment there was no reason why the court should not take note of Wren Trust's view as to the merit of the proceedings."
and then the resolution is recorded.

An attempt was made on behalf of the plaintiffs to adduce evidence to show that Mr. Baldock as well as Mr. Carr was personally interested **\*189** but that attempt was not persisted in or relied upon at the hearing before me. I need not therefore take up time dealing with it. But the fact that it was made and that repeated offers to tender Mr. Baldock for cross-examination on this issue of the independence of Wren Trust were not taken up is, in my judgment, some indication of the weakness of the plaintiff's case on that issue.

Mr. Potts relied on evidence that showed that Wren Trust has been described as an associate of the executive directors. I accept that there is evidence that Wren Trust sided with the executive directors in the board room tussle that resulted in Mr. Garrett's resignation as a director of the company and could

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

properly be described as associates in that context, and that there is evidence that Gresham Trust itself was involved in the share transactions leading up to Mr. Garrett's resignation. I nevertheless remain firmly of the view that there is no sufficient evidence that in relation to the present question whether these proceedings should continue whether Wren Trust has reached its conclusion on any grounds other than reasons genuinely thought to advance the company's interests. It is not for me to say whether the decision itself is right or wrong. It is for me to say whether the process by which it was reached can be impugned and I hold that it cannot. Nor do I consider that in the circumstances there is shown to have been a substantial risk of Wren Trust's vote having been cast in order to support the defendants as opposed to securing the benefit of the company.

That conclusion means that I accede to the fourth and ninth defendants' motions and direct that the statement of claim be struck out. Before parting with the case I should like to say a further word about the procedure.

Mr. Potts at the end of his long and helpful addresses described the procedure as a shambles. Without going to those lengths I do agree that it had unsatisfactory features not least the length of time taken. The order of speeches did not in the event match the onus of proof and although I doubt whether in the course of his marathon Mr. Potts left any ground uncovered, nevertheless that was another unsatisfactory feature. It may very well be that the Court of Appeal will have an opportunity of elaborating what was said in Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204.

For my part I would say three things. First, I consider there may well be a much stronger case for requiring a prospective plaintiff to have the onus of establishing that his case falls within the exceptions to the rule in Foss v. Harbottle, 2 Hare 461 or outside it altogether than there is for putting the same onus upon him to show that the company would be likely to succeed if it brought the action. Upon the latter it might well be appropriate to apply the usual test under R.S.C., Ord. 18, r. 19 and the inherent jurisdiction which puts the onus on the defendants to show the case is effectively unarguable.

Secondly, I consider it would be highly desirable for applications in respect of costs under Wallersteiner v. Moir (No. 2) [1975] Q.B. 373 procedure to be made at the same time as the plaintiff establishes whatever it is that he does have to establish. A great deal of expense **\*190** has been caused in this case by the piecemeal way in which the matter has proceeded.

Thirdly I believe that it would be helpful for there to be specific procedure laid down, whether by way of rules of court or practice direction I know not, for the initiation and prosecution of actions by minority shareholders to recover on behalf of a company.

**Representation**

Solicitors: Gouldens; Herbert Smith & Co.; Harbottle & Lewis.

Order accordingly. Costs reserved. Statement of claim struck out as against fourth and ninth defendants with costs on standard basis. Leave to appeal. (T. C. C. B. )

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

**TAB I**

*402 Drown v. Gaumont-British Picture Corpora-
tion, Limited.

[1937. D. 413.]

Chancery Division

Ch D

Clauson J.

1937 March 23, 24; April 6, 7, 8, 9.

Company--Reserve fund consisting partly of premi-
ums on shares--Payment of dividend out of reserve
fund.

There is no principle of law which prevents a com-
pany from paying dividends out of assets represent-
ing premiums received on the issue of shares.

MOTION.

By this motion the plaintiff, Mr. William Henry
John Drown, a shareholder in Gaumont-British Pic-
ture Corporation, Ld. (hereinafter called "the com-
pany "), asked, on behalf of himself and all the oth-
er shareholders in the company, for an order that
the company and its directors might be restrained,
pending the trial of the action, from paying, in re-
spect of the financial year ending March 31, 1937, a
dividend on its five and a half per cent. cumulative
first preference shares of 1l. each, on the ground
(among others) that the losses of the company had
so greatly reduced the profits available for dividend
that the proposed dividend would, if paid, be paid
out of capital.

From time to time during the company's history
shares were issued at a premium and the premium
was from time to time carried to reserve. On March
31, 1936, there existed a balance carried to reserve
of 500,000l., built up partly from premiums on the
issue of shares. It appeared from the figures before
the Court that the dividend could not be paid
without utilizing the greater part of this reserve of
500,000l. It was contended on behalf of the plaintiff
that so much of the reserve as represented premi-
ums on shares could not properly be treated as
profits of the company available for dividend.

The case is reported on this point only.

*Harold Christie K.C.* and *J. G. Strangman* for the
plaintiff.

*Sir William Jowitt K.C., Cyril Radcliffe K.C.* , and
*T. D. D. Divine* for the company.

*403 CLAUSON J.

[having stated the facts and his findings on them:]
The reserve fund was built up to a great extent out
of premiums on shares, and it was suggested that
there is some special feature about the money
which has been obtained by way of premium upon
the issue of shares which as a matter of principle
prevents that money being dealt with as available to
pay a dividend. I am not aware of any such feature
or of any such principle, nor can I see any ground
on which such a principle can be established. I can
well appreciate that if moneys which have been ob-
tained by way of premium on the issue of shares are
set aside in some particular fund, and that particular
fund has disappeared, it may properly be said that
the premium has disappeared, and is no longer
available for distribution. If, however, the premium
has become a part of the general assets of the com-
pany I do not see what justification the Court would
have for treating such part of those assets as repres-
ents the premium as on a different footing from the
rest of those assets, or for treating a reserve formed
by setting aside the premium as on any footing dif-
ferent from that of a reserve set aside out of what
one may for convenience call normal profits. Sub-
ject always to anything in the articles of association
to the contrary, there is nothing legally wrong, so
far as I am aware, in a company dividing among its
shareholders a premium obtained on the issue of
shares. The premium from its very nature is not part
of the capital paid up on the shares; it is the surplus
of the sum received in respect of the share over the
amount required to pay up the share to the extent to
which it is treated by the company as paid up. The
capital paid up on the share must not be divided in
dividend: but the premium is not capital paid up on

the share but a sum received by the company in excess of the capital paid up on the share: and the principle that capital paid up on the share must not be divided in dividend is in no way infringed by distributing the premium in dividend.

[His Lordship held that on the evidence before him the plaintiff had failed to discharge the onus of proving that by the payment of the proposed dividend the directors would **\*404** be trenching upon so much of the assets of the company as properly represented the capital paid up on the shares, and dismissed the motion with costs.]

**Representation**

Solicitors: Nordon & Co.; Lawrance, Messer & Co.

(K. R. A. H.)

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

**TAB J**

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

C

**\*246** Rolled Steel Products (Holdings) Ltd. v. British Steel Corporation and
Others

[1975 R. No. 1350][1976 R. No. 4871]; [1985] 2 W.L.R. 908

Court of Appeal
CA
Lawton, Slade and Browne-Wilkinson L.JJ.
1984 March 12, 13, 14, 19, 20, 21, 27, 28, 29; April 2, 3, 4; June 11

Company--Powers--Memorandum of association--Object clause--Power to provide security for such companies as seem expedient--Guarantee and debenture executed for purpose unconnected with company's business pursuant to resolution of inquorate meeting--Debenture holder having notice--Debenture holder appointing receiver and receiving assets--Whether power to provide security independent object or ancillary power--Whether guarantee and debenture intra vires--Whether enforceable by debenture holder--Whether receiver and debenture holder constructive trustees of assets received

The plaintiff company, which was in the business of importing and selling steel and of which S. was one of the two directors and the majority shareholder, owed £400,000 to S. Ltd., a company owned by S. A company controlled by the defendant **\*247** corporation, C. Ltd., was owed over £ 800,000 by S. Ltd., a debt personally guaranteed by S. Both C. Ltd. and the defendant corporation, doubtful that S. Ltd. and S. had sufficient assets to satisfy the debt, instead of pursuing remedies against them, put forward proposals whereby C. Ltd. would lend the plaintiff the money to repay S. Ltd., S. Ltd. in turn would use that money to repay part of its debt to C. Ltd. and the plaintiff would guarantee S. Ltd.'s liabilities to C. Ltd. On 22 January 1969 the plaintiff, which by clause 3 (K) of its memorandum of association had power to give guarantees or become security for such persons, firms or companies "as may seem expedient," passed a resolution approving the

proposals at a board meeting at which S. did not declare any personal interest, as he was required to do by the articles of association if he was to be counted in the quorum of two directors. Pursuant to the resolution, the plaintiff accepted the loan from C. Ltd. and executed a guarantee of S. Ltd.'s indebtedness to C. Ltd. and a debenture over all its assets in favour of C. Ltd. Subsequently, the sums secured by the debenture having been demanded and not paid, C. Ltd. appointed the second defendant receiver and manager, and the sums secured with interest were paid to the defendant corporation as successor to C. Ltd.

In an action against, inter alia, the defendant corporation and the receiver, the plaintiff sought to recover the sums paid out by the receiver, alleging that the guarantee and the debenture, and consequently the appointment of the receiver were void. The judge held that, although the resolution of 22 January 1969 was not formally valid because of the lack of quorum of directors resulting from S.'s failure to declare his interest, C. Ltd. was entitled, in reliance on the rule in Royal British Bank v. Turquand (1856) 6 E. & B. 327, to assume that it had been properly passed, a point not taken until counsel's closing address and the subject of an amendment allowed by the judge when giving judgment; but the judge found that the guarantee and, to the extent of the sum guaranteed, the debenture were executed to the knowledge of C. Ltd. for a purpose other than those authorised by the plaintiff's memorandum of association and that, accordingly, the plaintiff was entitled to have them set aside and require the defendants to repay the sum guaranteed.

On appeal by the defendants and cross-appeal by the plaintiff: -

Held, dismissing the appeal and allowing the cross-appeal,

(1) that a defence based on the rule in Royal British Bank v. Turquand (1856) 6 E. & B. 327 was a plea of mixed fact and law which required to be pleaded and it was far too late to allow the defend-

Case 1:07-cv-01646-RMC    Document 39-4    Filed 01/31/2008    Page 84 of 162

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

ants to do so by the time of judgment; and that, accordingly, as the resolution of 22 January 1969 had not been and could not be assumed to have been duly passed, the plaintiff was entitled to disclaim the guarantee and the debenture as having been made without its authority (post, pp. 285B-C, 286F-G, 310E-F).

(2) That, although as a matter of construction the power, accorded by clause 3 (K) of the plaintiff's memorandum of association, to give guarantees and become security was a mere power ancillary to the objects of the plaintiff and not an independent object, the execution of the guarantee and the debenture were within the plaintiff's corporate capacity and, **\*248** thus, not ultra vires the plaintiff; but that it was beyond the authority of the directors to enter into the guarantee and, to the extent of the guarantee, the debenture in furtherance of purposes not authorised by the plaintiff's memorandum of association; and that, as C. Ltd. and the defendant corporation knew of that lack of authority, they could acquire no rights under those transactions (post, pp. 289D-F, 297D-F, 307B-E, 309E).

In re David Payne & Co. Ltd. [1904] 2 Ch. 608, C.A. and Introductions Ltd. v. National Provincial Bank Ltd. [1970] Ch. 199, C.A. applied.

Dictum of Pennycuick J. in Charterbridge Corporation Ltd. v. Lloyds Bank Ltd. [1970] Ch. 62, 69 approved.

Dictum of Eve J. in In re Lee, Behrens and Co. Ltd. [1932] 2 Ch. 46, 51 disapproved.

(3) That, further, the directors of the plaintiff were acting in breach of the plaintiff's articles of association and their fiduciary duties to the plaintiff in purporting to authorise and in executing the guarantee and the debenture; and that, as the defendant corporation and the receiver had notice of that breach when they received assets of the plaintiff, they were accountable therefor to the plaintiff as constructive trustees (post, pp. 298F-G, 307E, 309E).

Belmont Finance Corporation Ltd. v. Williams Furniture Ltd. (No. 2) [1980] 1 All E.R. 393, C.A. applied.

(4) That, accordingly, the plaintiff was entitled to declarations that the guarantee and the debenture were not deeds of the plaintiff and that the purported appointment of the receiver was void; but that the plaintiff was under an obligation to repay the sum borrowed from C. Ltd. and could not seek redress against the defendants on the basis that such sum had been improperly paid to the defendant corporation, though the defendant corporation was not entitled to retain the interest thereon paid to it by the receiver (post, pp. 299F-G, 300C-E, 307E-F, 310E-F).

Reversion Fund and Insurance Co. Ltd. v. Maison Cosway Ltd. [1913] 1 K.B. 364, C.A. applied.

*Per* Slade and Browne-Wilkinson L.JJ. If confusion is to be avoided, it seems highly desirable that, as a matter of terminology, the phrase "ultra vires" in the context of company law should for the future be rigidly confined to describing acts which are beyond the corporate capacity of a company (post, pp. 297B-C, 303A).

*Per* Lawton L.J. When counsel raises an objection to a question or line of questioning, the trial judge should rule on it at once, and, if he does not, counsel should ask him to do so. If a line of questioning is stopped because it does not relate to an issue on the pleadings, counsel should at once consider whether to amend. If he decides to do so he should apply forthwith and the judge should at once give a ruling (post, pp. 309H - 310B).

*Per* Slade L.J. (i) The rule in Royal British Bank v. Turquand, 6 E. & B. 327 only applies in favour of persons dealing with the company in good faith. Furthermore, even if they do not have actual knowledge that an irregularity has occurred they will be precluded from relying on the rule if the circumstances were such as to put them on inquiry which they failed duly to make. The very nature of a proposed transaction may put a person on inquiry, even if he has no special relationship with the company (post, pp. 284B-C, E-F, 285A).

**\*249** A. L. Underwood Ltd. v. Bank of Liverpool

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

[1924] 1 K.B. 775, C.A. and dictum of Lord Simonds in Morris v. Kanssen [1946] A.C. 459, 475, H.L. (E.) applied.

(ii) If an act is beyond the corporate capacity of a company it cannot be ratified. However, as a general principle any act falling within the letter of the express or implied powers of a company conferred by its memorandum, even though done for a purpose not authorised by the memorandum, will bind the company if it is done with the unanimous consents of all the shareholders or is subsequently ratified by such consents though not where it would constitute a fraud on its creditors (post, p. 296E-G).

Decision of Vinelott J. [1982] Ch. 478; [1982] 3 W.L.R. 715; [1982] 3 All E.R. 1057 reversed in part.

The following cases are referred to in the judgments:

Ashbury Railway Carriage and Iron Co. Ltd. v. Riche (1875) L.R. 7 H.L. 653, H.L.(E.).

Attorney-General's Reference (No. 2 of 1982) [1984] Q.B. 624; [1984] 2 W.L.R. 447; [1984] 2 All E.R. 216, C.A..

Belmont Finance Corporation Ltd. v. Williams Furniture Ltd. (No. 2) [1980] 1 All E.R. 393, C.A..

Charterbridge Corporation Ltd. v. Lloyds Bank Ltd. [1970] Ch. 62; [1969] 3 W.L.R. 122; [1969] 2 All E.R. 1185

Cotman v. Brougham [1918] A.C. 514, H.L.(E.).

Halt Garage (1964) Ltd., In re [1982] 3 All E.R. 1016

Hampshire Land Co., In re [1896] 2 Ch. 743

Horsley & Weight Ltd., In re [1982] Ch. 442; [1982] 3 W.L.R. 431; [1982] 3 All E.R. 1045, C.A..

Introductions Ltd. v. National Provincial Bank Ltd. [1968] 2 All E.R. 1221; [1970] Ch. 199; [1969] 2 W.L.R. 791; [1969] 1 All E.R. 887, C.A..

Lee, Behrens and Co. Ltd., In re [1932] 2 Ch. 46

Mahony v. East Holyford Mining Co. Ltd. (1875) L.R. 7 H.L. 869, H.L.(I.)

Morris v. Kanssen [1946] A.C. 459; [1946] 1 All E.R. 586, H.L.(E.).

Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd. [1983] Ch. 258; [1983] 3 W.L.R. 492; [1983] 2 All E.R. 563, C.A..

Payne (David) & Co. Ltd., In re [1904] 2 Ch. 608, Buckley J. and C.A..

Reversion Fund and Insurance Co. Ltd. v. Maison Cosway Ltd. [1913] 1 K.B. 364, C.A..

Royal British Bank v. Turquand (1856) 6 E. & B. 327

Salomon v. A. Salomon & Co. Ltd. [1897] A.C. 22, H.L.(E.).

Smith (Howard) Ltd. v. Ampol Petroleum Ltd. [1974] A.C. 821; [1974] 2 W.L.R. 689; [1974] 1 All E.R. 1126, P.C..

Somerset, In re [1894] 1 Ch. 231, C.A..

Transvaal Lands Co. v. New Belgium (Transvaal) Land and Development Co. [1914] 2 Ch. 488, C.A..

Underwood (A. L.) Ltd. v. Bank of Liverpool [1924] 1 K.B. 775, C.A..

York Corporation v. Henry Leetham and Sons Ltd. [1924] 1 Ch. 557

The following additional cases were cited in argument:

Anglo-Overseas Agencies Ltd. v. Green [1961] 1 Q.B. 1; [1960] 3 W.L.R. 561; [1960] 3 All E.R. 244

Attorney-General for Canada v. Standard Trust Co. of New York [1911] A.C. 498, P.C..

**\*250** Baker (G. L.) Ltd. v. Medway Building and

Case 1:07-cv-01646-RMC    Document 39-4    Filed 01/31/2008    Page 86 of 162

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

Supplies Ltd. [1958] 1 W.L.R. 1216; [1958] 3 All E.R. 540, C.A..

Bamford v. Bamford [1970] Ch. 212; [1969] 2 W.L.R. 1107; [1969] 1 All E.R. 969, C.A..

Duomatic Ltd., In re [1969] 2 Ch. 365; [1969] 2 W.L.R. 114; [1969] 1 All E.R. 161

E.B.M. Co. Ltd. v. Dominion Bank [1937] 3 All E.R. 555, P.C..

Express Engineering Works Ltd., In re [1920] 1 Ch. 466, C.A..

Fine Industrial Commodities Ltd., In re [1956] Ch. 256; [1955] 3 W.L.R. 940; [1955] 3 All E.R. 707

Hely-Hutchinson v. Brayhead Ltd. [1968] 1 Q.B. 549; [1967] 3 W.L.R. 1408; [1967] 3 All E.R. 98, C.A..

Holder v. Holder [1968] Ch. 353; [1968] 2 W.L.R. 237; [1968] 1 All E.R. 665, C.A..

Home and Colonial Insurance Co. Ltd., In re [1930] 1 Ch. 102

Ideal Bedding Co. Ltd. v. Holland [1907] 2 Ch. 157

Imperial Mercantile Credit Association (Liquidators of) v. Coleman (1873) L.R. 6 H.L. 189, H.L.(E.).

Johnson (B.) & Co. (Builders) Ltd., In re [1955] Ch. 634; [1955] 3 W.L.R. 269; [1955] 2 All E.R. 775, C.A..

Land Credit Co. of Ireland, In re, Ex parte Overend, Gurney & Co. (1869) L.R. 4 Ch.App 460

Newman (George) & Co., In re [1895] 1 Ch. 674, C.A..

Parker and Cooper Ltd. v. Reading [1926] Ch. 975

Rolls-Royce Ltd., In re [1974] 1 W.L.R. 1584; [1974] 3 All E.R. 646

V.G.M. Holdings Ltd., In re [1942] Ch. 235; [1942]

1 All E.R. 224, C.A..

APPEAL AND CROSS-APPEAL from Vinelott J.

The plaintiff, Rolled Steel Products (Holdings) Ltd., in two consolidated actions claimed against the defendants, British Steel Corporation, Mr. Vivian Rupert Vaughan Cooper, the trustee in bankruptcy of Mr. Alexander Ilytch Shenkman, Mr. Ilya Michael Shenkman and, after the death of the latter, his personal representatives, Mrs. Olga Shenkman and Mr. Gregory Alexander Shenkman, inter alia, against the first and second defendants, declarations that a guarantee made between the plaintiff and Colvilles Ltd. and a debenture granted by the plaintiff to Colvilles Ltd. and the purported appointment by the first defendant of the second defendant as receiver and manager of the property purportedly charged by the debenture were void; repayment to the plaintiff of all money realised from the property charged, with interest; alternatively, damages for trespass and conversion.

By order of 23 March 1983 Vinelott J., having granted leave to the first and second defendants to amend their defence to allege that they were entitled to rely on the ostensible authority of the plaintiff's directors to enter into and to execute the guarantee and debenture and having refused leave to the first and second defendants to amend their defence to rely on an allegation that the granting of the guarantee and debenture had been approved by all the plaintiff's shareholders, ordered, inter alia, that (1) the guarantee executed by the plaintiff on 22 January 1969 be set aside; and (2) the first and second defendants were jointly and severally liable to replace and pay to the plaintiff £383,084.77, being the principal amount received by the first defendant in discharge of the **\*251** guarantee out of the proceeds of sale of the plaintiff's assets realised by the second defendant, and interest and other amounts in accordance with accounts and inquiries directed.

The first and second defendants appealed by notice dated 25 April 1983 on the grounds, inter alia, that (1) the judge erred in holding that the guarantee and

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

to the extent of the guarantee the debenture were ultra vires the plaintiff (in the sense of being beyond the powers of the company as a matter of corporate capacity); (2) the judge ought to have held that the execution of the guarantee was intra vires the plaintiff whatever the state of mind of the directors of the plaintiff when they procured its execution on behalf of the plaintiff; (3) the judge erred in holding that it was not open to the first and second defendants to rely, in support of the defence that the guarantee was duly executed by and was binding on the plaintiff, on the contention that the granting of the guarantee had been approved by all the shareholders in the plaintiff prior to the execution thereof; (4) the judge was wrong and/or exercised his discretion on wrong principles and/or materially misdirected himself in ruling, and in delaying his ruling until final judgment, that the first and second defendants should not have leave to amend their defence to enable them to rely on the contention in (3); (5) alternatively, if the judge was correct in holding that whether or not the guarantee was ultra vires the plaintiff depended on the state of mind of the directors, the judge ought to have held, on the evidence, that the plaintiff had failed to prove that the guarantee was executed otherwise than for the purposes of and in the interests of the plaintiff; and (6) in the further alternative, if the judge was correct in holding that whether or not the guarantee was ultra vires the plaintiff depended on the state of mind of the directors and that the guarantee was not executed for the purposes of or in the interests of the plaintiff, the judge was wrong in holding that the first defendant and Colvilles Ltd. either knew or had notice that the guarantee was not executed for the purposes of or in the interests of the plaintiff.

By notice dated 10 June 1983 the plaintiff cross-appealed, contending, inter alia, that (1) the judge ought to have refused the first and second defendants leave to amend their defence so as to plead that they were entitled to rely on the ostensible authority of the directors of the plaintiff to enter into and to execute the guarantee and debenture; and (2) even if the judge was right in allowing such amendment, he erred in holding that in the circumstances the first and second defendants were entitled to assume

that Mr. Shenkman had declared his interest.

By respondent's notice of 6 March 1984 the plaintiff gave notice of its intention to contend that the judgment should be affirmed on the additional ground that, whether or not clause 3(K) of the plaintiff's memorandum of association was on its true construction an object or a power, the giving of the guarantee and to the extent of the sum secured thereby the execution of the agreement and the debenture were each ultra vires in the narrow sense used by the judge on the ground that those transactions could not objectively have seemed expedient within the meaning of clause 3(K).

**\*252** By respondents' notice to the cross-appeal, dated 7 March 1984, the first and second defendants gave notice of their intention to contend that the guarantee and debenture were binding on the plaintiff notwithstanding Mr. Shenkman's interest therein on additional grounds.

The third, fifth and sixth defendants took no part in the appeal.

The facts are stated in the judgment of Slade L.J.

*Allan Heyman Q.C.* and *Thomas Stockdale* for the first and second defendants. The guarantee was intra vires the plaintiff company as a matter of corporate capacity because the provisions of clause 3(K) of its memorandum of association, read together with the closing words of the clause, set out an independent object which the plaintiff was capable of carrying on as such; and the execution of the guarantee fell within that provision.

An express provision in the objects clause of a company may be (i) a substantive object, that is a provision which delineates an activity which the company is authorised to carry on as an independent activity on its own, or (ii) an ancillary power. The category into which an express provision falls is a matter of construction of the company's memorandum of association: see In re Horsley & Weight Ltd. [1982] Ch. 442, 448, 449. It is accepted that intra vires and misfeasance are not mutually exclusive. [Reference was made to Parker and

Case 1:07-cv-01646-RMC    Document 39-4    Filed 01/31/2008    Page 88 of 162

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

Cooper Ltd. v. Reading [1926] Ch. 975, 983.]

If the memorandum of association contains a "separate objects clause", that is a provision to the effect that none of the objects mentioned in any sub-clause is to be considered as subsidiary to the objects mentioned in another sub-clause, full effect will be given to it: see Cotman v. Brougham [1918] A.C. 514, 521, 522 and Anglo-Overseas Agencies Ltd. v. Green [1961] 1 Q.B. 1. However, there are two exceptions: (i) where the subject matter of the sub-clause is of its nature incapable of constituting a substantive object, and (ii) where, though the subject matter of the sub-clause is capable of constituting a substantive object, the memorandum of association expressly or by implication provides that the sub-clause is to be an ancillary power only: see Introductions Ltd. v. National Provincial Bank Ltd. [1968] 2 All E.R. 1221, 1225 and, an appeal, [1970] Ch. 199.

If a company has as an object the granting of guarantees, the motive of the directors in granting a guarantee is irrelevant and, even though granted for a purpose in no way connected with the company's business, a guarantee would be intra vires.

If, contrary to the foregoing argument, the provisions of sub-clause (K) constituted an ancillary power rather than a substantive object, the guarantee was nevertheless intra vires the company as a matter of corporate capacity. That is so, because where a company is carrying on an intra vires business and does an act within the scope of an ancillary power expressed in its memorandum, as did the plaintiff, that act is intra vires the company whatever the state of mind of the directors concerned: see In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016, 1029-1034 and Ashbury Railway Carriage and Iron Co. Ltd. v. Riche (1875) L.R. 7 H.L. 653.

**\*253** Even if such an act has to be done in furtherance of the business which the company is carrying on to be intra vires, the guarantee in the present case was connected with the plaintiff's business, since, taking an all round commercial view, it was

being given for the benefit of the plaintiff because without Mr. Shenkman the plaintiff company would have been useless. [Reference was made to York Corporation v. Henry Leetham and Sons Ltd. [1924] 1 Ch. 557; Charterbridge Corporation Ltd. v. Lloyds Bank Ltd. [1970] Ch. 62 and In re David Payne & Co. Ltd. [1904] 2 Ch. 608.]

The guarantee was valid and binding on the plaintiff because the granting of the guarantee had been approved by all the shareholders prior to its execution.

[BROWNE-WILKINSON L.J. The necessary factual basis of this point involves matters which have not been pleaded.]

The defendants are appealing against the judge's refusal to allow an amendment to rectify that.

[LAWTON L.J. In the absence of Mr. Morritt the court cannot possibly decide whether or not the amendment should have been allowed. However, there is a prima facie case for allowing the amendment and counsel may continue until the court can hear Mr. Morritt.]

A company is bound, in a matter which is intra vires, by the unanimous assent of its members: see Salomon v. A. Salomon & Co. Ltd. [1897] A.C. 22, 56-57; In re Horsley & Weight Ltd. [1982] Ch. 442, 453-455, 456 and Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd. [1983] Ch. 258, 268-269, 280-282, 288-291.

The assent need not be given at a meeting, or on one occasion, it can be given on separate occasions.

It is not necessary for the transaction to which assent is given to be for the benefit of the company. Even if what is done is, strictly, not commercially justified, it is not misfeasance if it is done with the consent of all the shareholders where they are the only persons affected by it. Even if it is not for the benefit of the company it will bind the company unless it constitutes a fraud or a sham: see Attorney-General for Canada v. Standard Trust Co. of New

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

York [1911] A.C. 498 and In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016. [Reference was also made to In re Express Engineering Works Ltd. [1920] 1 Ch. 466; In re B. Johnson & Co. (Builders) Ltd. [1955] Ch. 634; In re Home and Colonial Insurance Co. Ltd. [1930] 1 Ch. 102 and Halsbury's Laws of England, 4th ed., vol. 18 (1977), para 359.]

[ *Andrew Morritt Q.C.* for the plaintiff addressed the court on the question of whether the judge should have given the defendants leave to amend to enable them to raise the issue of ratification by the shareholders, making reference to Salomon v. A. Salomon & Co. Ltd. [1897] A.C. 22, 36-37, 49 and Attorney-General for Canada v. Standard Trust Co. of New York [1911] A.C. 498, 504, 505. *Heyman Q.C.* replied on that issue; and the court adjudged that such leave had been rightly refused.]

*Andrew Morritt Q.C.* and *Charles Aldous* for the plaintiff. Assuming that, on the facts, there was misfeasance by the directors of the plaintiff **\*254** company and that the first defendant knew, or ought to have known, of it, then the first defendant was liable to account for the money paid to it as a recipient of the company's money with notice: See Howard Smith Ltd. v. Ampol Petroleum Ltd. [1974] A.C. 821, 834 and Belmont Finance Corporation Ltd. v. Williams Furniture Ltd. (No. 2) [1980] 1 All E.R. 393, 410.

The judge found that there was misfeasance by the directors in breach of their duties and the first defendant knew. A defence that it could escape liability because it reasonably believed that the shareholders had consented is not open to the first defendant on the facts.

Though that is sufficient to dispose of the defendants' appeal, it would be financially better for the plaintiff to succeed on the issue raised by the cross-appeal and to establish that the judge ought to have refused to allow the defendants to rely on the rule in Royal British Bank v. Turquand (1856) 6 E. & B. 327 or that the judge was wrong in holding that the rule applied.

The question is whether the giving of the guarantee was ultra vires the company in the sense of being beyond its corporate capacity, i.e. "ultra vires in the narrow sense" in the judge's description. Ultra vires "in the wider sense" contemplates an abuse of powers which could include something done by directors in excess of their powers.

On the construction of clause 3(K) of the plaintiff's memorandum of association, even if clause 3(K) is a substantive object, the instant transaction did not come within it, though it is accepted that the cases do seem to go so far as saying that separate objects clauses have to be treated in isolation from surrounding objects, which is very unsatisfactory. In any event one cannot construe clause 3(K) as a substantive object since, however one looks at it, it is plainly an ancillary power. The use of the words "as may seem expedient" require criteria by which expediency can be determined; expediency can only be tested by reference to the business of the company; and that construction is confirmed by other words of clause 3(K). Given that it is a power, and one which on express terms it has to be seen to be expedient to exercise, it is subject to the limitation that it must be exercised for the purposes of the business of the company, though that limitation might not add anything in view of the expediency provision. What matters is the reason for exercising the power. [Reference was made to In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016.] When one looks at the motive for giving the guarantee in the present case it is clear that it was not something which the plaintiff company ought to have been doing. It was a device used to transfer the liability of Scottish Steel to the plaintiff and could not have "seemed expedient" or been a genuine exercise in good faith of the plaintiff's powers.

An act which is ultra vires in the narrow sense is one which the company is incapable of performing, and to ascertain whether an act is in that category, one has to examine the memorandum and articles of association. At the other extreme one has an abuse of power where the company is capable of performing the act but is not entitled to do so in the manner or for the purpose it does, and it is in the latter case

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

that motive becomes all important.

**\*255** In Introductions Ltd. v. National Provincial Bank Ltd. [1970] Ch. 199 it is not clear whether the implied limitation referred to was a limitation on corporate capacity or on the manner and purpose of exercise. The former would also give rise to an act ultra vires in its proper sense, whereas the latter would have the same effect as a limitation on any fiduciary power. In re David Payne & Co. Ltd. [1904] 2 Ch. 608 appears to be a case of abuse of powers and not of ultra vires in the narrow sense.

Abuses of power of the present nature are not capable of being ratified by the members of the company. That result is reached by way of three separate principles. First, given the rule in Foss v. Harbottle that a majority cannot act in fraud of the minority, a fortiori the majority cannot act in fraud of a liquidator, and, that being so, all the shareholders must be precluded from so acting where the minority is being bought off with ill-gotten gains.

Secondly, if one takes the limitation referred to in the Introductions case [1970] Ch. 199 as being a limitation on the manner or purpose of exercise, it is a power given to the company to be exercised for the company's purposes and that limitation binds the members just as much as the directors. It is a limitation on the corporate power. The cases suggest that there is a category of acts which are not capable of ratification: see In re George Newman & Co. [1895] 1 Ch. 674, 684-685; Salomon v. A. Salomon & Co. Ltd. [1897] A.C. 22, 23, 33, 36, 39, 47, 49, 54; Attorney-General for Canada v. Standard Trust Co. of New York [1911] A.C. 498, 504; In re Express Engineering Works Ltd. [1920] 1 Ch. 466, 471 and Parker and Cooper Ltd. v. Reading [1926] Ch. 975, 984.

Thirdly, section 205 of the Companies Act 1948 precludes a company from having provisions in its articles which exempt a director from any liability for breach of trust. If all the members of the plaintiff company had attended for the purpose of altering the articles to authorise the directors to give the guarantee without any liability arising for

breach of trust that action would have been void because of section 205. They cannot be in a better position where they have acted informally.

Though the shareholders could compromise with a director and decide not to sue him for misfeasance, that would not be binding on a liquidator. His decision whether to sue a director cannot be pre-empted. [Reference was made to In re V.G.M. Holdings Ltd. [1942] 2 Ch. 235 and In re Duomatic Ltd. [1969] 2 Ch. 365, 370.] In Bamford v. Bamford [1970] Ch. 212 the power was conferred by the articles: there was no question of corporate capacity or as to exercise of the power. Also it was a power to be exercised for the purposes of the members rather than a power to carry on the company's business. The dishonesty, if it existed, existed vis-à-vis the members themselves.

Obiter dicta in In re Horsley & Weight Ltd. [1982] Ch. 442, 453, 454, 456 support the proposition that a transaction must have been honest to be capable of ratification by the members. In Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd. [1983] Ch. 258, 268 the point was clearly made that there was no allegation of bad faith, so the case is not in any sense authority for the present contention.

**\*256** Accordingly, there is a category of misfeasance which is not capable of being ratified or adopted by the shareholders, namely, transactions which are not honest, and where a transaction puts a company's solvency in doubt it is not one which the shareholders can adopt so as to preclude a liquidator from making claims against some of them. Consequently, that category is one which can be described as acts ultra vires in the wider sense.

In summary, the guarantee was (1) ultra vires in the narrow sense because it did not and could not "seem expedient" or (2) ultra vires in the narrow sense, if the provision for giving guarantees is a power, because it must be read subject to the express limitation of expediency and the implied limitation that it can only be used for the purposes of the company, or (3) ultra vires in the wider sense

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

because the provision for giving guarantees was not exercised for the benefit of the company and would, therefore, be voidable and depend on the knowledge and good faith of the third party.

[BROWNE-WILKINSON L.J. Your second category was put forward as the first argument in In re David Payne & Co. Ltd. [1904] 2 Ch. 608 and rejected at p. 611.]

That is right. It does seem to put abuse of power into the third category but is not consistent with principle, and, in any event, in the present case it is academic.

The nature of the defence under the rule in Turquand's case, 6 E. & B. 327, is that an outsider dealing with a company is entitled to assume that a document purporting to have been executed by the company has been duly executed, unless he is put on inquiry as to whether it has been so executed: see Transvaal Lands Co. v. New Belgium (Transvaal) Land and Development Co. [1914] 2 Ch. 488 and Morris v. Kanssen [1946] A.C. 459.

The judge should never have allowed the defendants to amend their defence to take this point, and to find against the plaintiff on it without the plaintiff having any opportunity to test the defendants' reliance on the rule during the evidence was quite wrong. The Turquand defence plainly raises issues of fact not raised by the pleadings.

But, even having allowed the defendants to take the Turquand's case point, the judge should have found that the nature of the transaction was such as to put the defendant corporation on inquiry as to whether it was properly authorised by the company because generally a director is not authorised to benefit himself at the expense of the company.

As to outsiders being put on inquiry, see A. L. Underwood Ltd. v. Bank of Liverpool [1924] 1 K.B. 775 and E.B.M. Co. Ltd. v. Dominion Bank [1937] 3 All E.R. 555.

By section 199(1) of the Companies Act 1948 a director is required to declare the nature of his interest in a contract or arrangement and under the express terms of the section that has to be done at a formal meeting of the company, presumably so that evidence of the declaration is preserved in the company's minutes book: see also Liquidators of Imperial Mercantile Credit Association v. Coleman (1873) L.R. 6 H.L. 189.

*257 The consequence of the Turquand defence not succeeding would be that the guarantee and the debenture would not be acts of the company and, together with the purported appointment of the receiver, would go, so that there would be no liability on the guarantee and no entitlement to realise property on the debenture. The liquidator would recover the additional sum of £401,448 and the interest paid to the defendant corporation for the creditors and the corporation would rank as an unsecured creditor. Also, as the receiver would have been acting without any authority, his £50,000 expenses and remuneration should be repaid.

The question has been raised of whether at this late stage the defendants should be allowed to contend that the plaintiff's relief should be limited in some way so as to prevent any money going to the contributors.

The difficulty about applying the principle established by In re V.G.M. Holdings Ltd. [1942] Ch. 235 - to the effect that a defaulting director-shareholder is not bound to pay back the amount which would come to him as beneficiary on a distribution - is that this matter was never raised by the pleadings on the basis of which Mr. Shenkman's trustee in bankruptcy took no part in the present proceedings but agreed to abide by the judgment.

*Heyman Q.C.* in reply. Whether the transactions were ultra vires or intra vires the plaintiff company is a matter of law. There is only one legitimate use of the expressions "ultra vires" and "intra vires" and that is to describe transactions which are outside or within a company's capacity. There is no reported case before the present one in which the terms "ultra vires in the narrow sense" and "ultra vires in the wider sense" have been used. When a transaction is

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

outside the corporate capacity of a company, it is void and a nullity and the state of mind of a third party is totally irrelevant. If the transaction is capable of binding the company by reference to the state of mind of a third party, it can only be voidable and, in consequence, cannot be ultra vires.

The heresy that capacity can depend on motive stems from In re David Payne & Co. Ltd. [1904] 2 Ch. 608 being treated as a capacity case, whereas it is an abuse of powers case. The propriety of the purpose is only relevant to the issue of whether there has been an abuse of power and is not relevant to the question whether the power exists at all: see Charterbridge Corporation Ltd. v. Lloyds Bank Ltd. [1970] Ch. 62, 68-69. This existence of section 9 of the European Communities Act 1972 is totally irrelevant.

The question whether the guarantee was within the plaintiff's corporate capacity depends on clause 3(K) and lending and the giving of guarantees are capable of being substantive objects. Further, on a proper construction of the sub-clause, the concept of expediency does not relate to the giving of guarantees, nor does the reference to "customers." [Reference was made to In re Horsley & Weight Ltd. [1982] Ch. 442, 445.] But, even if expedience is material and the reference to customers is to be extended to the giving of guarantees, it does not matter, if clause 3(K) is a substantive object, nor is the state of mind of the directors relevant.

*258 Clause 3(K) is indistinguishable from the provision in the David Payne case [1904] 2 Ch. 608, 609 where the borrowing was held to be intra vires though for an improper purpose. That decision has been accepted for 80 years and is binding on the court.

[BROWNE-WILKINSON L.J. How do you reconcile In re David Payne & Co. Ltd. with Introductions Ltd. v. National Provincial Bank Ltd. [1970] Ch. 199?]

No criticism was made of the David Payne case in Introductions Ltd. v. National Provincial Bank Ltd. and in the latter case the court was dealing with a

power which could not stand on its own in the context of a company carrying on ultra vires business and nothing else.

If, contrary to the defendants' first submission, the provision in clause 3(K) is a mere power, the granting of the guarantee was a genuine exercise of that power. It is a misapprehension that a company owes a duty to its creditors otherwise than to ensure that there is no illegal distribution of capital: see In re Horsley & Weight Ltd. [1982] Ch. 442, 453.

As to whether there was in fact an abuse of power, the guarantee was given in an effort to save the whole commercial set up in which the plaintiff was involved, and it is sufficient that it was given in good faith no matter how misguided it might appear.

As to whether the defendant corporation was on notice as to abuse of power, there is no reason why it should not rely on the fact that the plaintiff had the advice of competent lawyers.

On the issue of when as a matter of law a transaction is capable of being made binding by the unanimous consent of all the shareholders, the only limitations are that the transaction must be intra vires the company and there must be no fraud or dishonesty on the part of the shareholders in giving their assent: see Attorney-General's Reference (No. 2 of 1982) [1984] Q.B. 624, 640. Otherwise, there would not be a valid consent. Accordingly, if shareholders act honestly in ratifying a transaction they can bind the company even if the directors acted in bad faith: see Bamford v. Bamford [1970] Ch. 212, 237-238, 241-242.

Furthermore, even if the transaction in question is not in the interests of the company, it still binds the company if the shareholders were acting honestly. It is not dishonest to make a speculative decision which is outside the bounds of reasonable commercial judgment or if the company is of doubtful solvency but there is a genuine belief that all might be well.

Acceptance of the plaintiff's point in relation to sec-

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

tion 205 of the Companies Act 1948 would result in Salomon v. A. Salomon & Co. Ltd. [1897] A.C. 22; In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016; Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd. [1983] Ch. 258; Bamford v. Bamford [1970] Ch. 212; In re Duomatic Ltd. [1969] 2 Ch. 365 and In re Horsley & Weight Ltd. [1982] Ch. 442 all being wrong.

Dealing next with the question of interest, as the remedy is an equitable one, the relief is a matter of discretion. It would be grossly unfair if the trustee-shareholders, having - with full knowledge - consented to the transactions or, at the very least, stood by and allowed *259 them to take place, were to receive a sum in excess of the £ 1/2 million and almost £1 million more if the plaintiff succeeds on the cross-appeal. [Reference was made to Holder v. Holder [1968] Ch. 353, 394, 399, 405-406.] The creditors will not get any of the interest: see In re Fine Industrial Commodities Ltd. [1956] Ch. 256 and In re Rolls-Royce Ltd. [1974] 1 W.L.R. 1584.]

Since the liquidator must distribute to all the shareholders rateably, Mr. Shenkman would receive a substantial amount which would be most unjust as no one should profit by their own misfeasance.

If the relief is not restricted, the defendant corporation will be in a worse position than if the guarantee had been set aside on the ground of fraud because where there is fraud the relief is restricted to sufficient to repay the defrauded creditors: see Ideal Bedding Co. Ltd. v. Holland [1907] 2 Ch. 157, 172.

[An application by the defendants, opposed by the plaintiff, for leave to amend the notice of appeal to include the limitation of relief, was allowed by the court.]

Turning to the Turquand's case, 6 E. & B. 327, point and section 199 of the Companies Act 1948, Hely-Hutchinson v. Brayhead Ltd. [1968] 1 Q.B. 549 shows that a failure to disclose under section 199 would not make the guarantee and debenture void but merely voidable and deals with the questions of whether restitution is possible if it is

avoided and whether it should stand if it is not. [Reference was made to G. L. Baker Ltd. v. Medway Building and Supplies Ltd. [1958] 1 W.L.R. 1216; Mahony v. East Holyford Mining Co. Ltd. (1875) L.R. 7 H.L. 869; Royal British Bank v. Turquand, 6 E. & B. 327; Gore-Brown on Companies, 43rd ed. (1984), para. 5-2; In re Land Credit Co. of Ireland, Ex parte Overend, Gurney & Co.(1869) L.R. 4. Ch. App. 460 and Morris v. Kanssen [1946] A.C. 459.]

[LAWTON L.J. In Morris v. Kanssen, at pp. 474-476, Lord Simonds stated the rule in Turquand's case and said that a director could not take advantage of the rule because he ought to have been put on inquiry. Applied to the present case, that means there is a question of mixed fact and law as to whether in the circumstances the defendant corporation ought to have been put on inquiry.]

The facts are such that the defendant corporation had no means of knowing what was done at the board meeting apart from the passing of the resolutions and on the basis of the rule in Turquand's case it was entitled to presume that everything was in order.

It is not accepted that, if there was not a proper quorum and there was no ratification by the shareholders, the guarantee and debenture were void.

Coming back to the question of relief, the court has a wide discretion in relation to a beneficiary who has instigated or consented to a breach of trust: see *Snell's Principles of Equity,* 28th ed. (1982), pp. 292-293 and section 62 of the Trustee Act 1925. The two directors of the plaintiff company were in the position of trustees, and the trustee-shareholders and Mr. Shenkman in the position of beneficiaries. Mr. Shenkman, who both instigated and was a full party to any breach of trust, should not be entitled to take anything from the fund remaining when the creditors *260 and the liquidator's costs have been discharged and. so, his share should revert to the defendant corporation. So far as the trustee-shareholders are concerned, if they assented to the transactions, they too should not receive anything.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

[BROWNE-WILKINSON L.J. Can the court decide such matters when they have not been raised by the pleadings and the parties are not present?]

Yes: see In re Somerset [1894] 1 Ch. 231.

In any event, the plaintiff cannot have interest on money to which it was not entitled, and, if both the guarantee and the debenture were void, one still has the position that the defendant corporation lent £401,000 to the plaintiff. No interest can run on that.

*Morritt Q.C.* on matters raised by the reply. It is clear from A.L. Underwood Ltd. v. Bank of Liverpool [1924] 1 K.B. 775, which is binding on the court, that, as a matter of general principle, an outsider dealing with a company can be under a duty to inquire as to the authority of the directors because of the nature of the proposed transaction. In E.B.M. Co. Ltd. v. Dominion Bank [1937] 3 All E.R. 555, which must be regarded as persuasive authority, there was no question as to the bank being under any duty. The passage cited from *Gore-Brown on Companies* is a contradiction in terms and no authority is given for it. [Reference was made to Morris v. Kanssen [1946] A.C. 459.]

If an act is not authorised by a company it is not the company's act, but it is not necessarily accurate to refer to it as being void. The resolution of an inquorate board does not bind the company but, if the rule in Turquand's case provides a good defence, the company is not able to claim that the transaction was not duly passed. The distinction is between transactions which bind a principal and those which do not. The use of the word "void" does not help in making that distinction.

Turning to the question of whether the plaintiff's relief should be limited in some way so as to pay only creditors and the liquidator's costs, the liquidator has a fiduciary responsibility for all those interested in the assets of the company be they creditors or contributors and he has no right or discretion to prejudice their rights without their consent. One of the assets of the company is its claim in the present action which includes not only capital but also in-

come. It is an equitable claim which can only be reduced on equitable principles and not on some notion of fairness or unfairness.

Assuming that there is a surplus for the contributors and that 49 per cent. of the shares are held by the trustees, those shareholders are not parties to the action and they have not been found to have consented to the transactions. The defendants are seeking to raise indirectly an issue which they have been refused leave to amend to plead.

As for Holder v. Holder [1968] Ch. 353, it is made clear, at p. 394, that the whole matter depended on the circumstances of the case, whereas the circumstances in the present case have not been investigated and are not at all clear.

*Cur. adv. vult.*

11 June. The following judgments were handed down. **\*261** SLADE L.J.

This is an appeal by British Steel Corporation and Mr. Vivian Rupert Vaughan Cooper, who were two of the defendants in two consolidated actions, from an order of Vinelott J. made on 23 March 1983. There is also a cross-appeal from the order by Rolled Steel Products (Holdings) Ltd. which was the plaintiff in the action.

The appeal and cross-appeal raise important questions of principle concerning, inter alia, the capacity and powers of companies incorporated under the Companies Acts and the powers and authority of their directors. Section 9(1) of the European Communities Act 1972, which may be important when such questions nowadays fall to be considered as between a company and persons dealing with it in good faith, had not become law when the transactions in issue in the present case were effected. For the purposes of this present judgment that subsection therefore requires no further attention.

The trial of these consolidated actions lasted for about 19 days and ended on or about 7 April 1981. Judgment was given by Vinelott J. on 2 December

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

1981. There then followed a number of disputes concerning the detailed terms required to give effect to this judgment. The matter having been brought back to the judge for the resolution of these disputes, he delivered a further judgment for this purpose on 23 March 1983, following which the order now under appeal was drawn up.

The judgment of 2 December 1981 (some parts of which are now reported [1982] Ch. 478) occupies nearly 100 pages of transcript and sets out very carefully and comprehensively the long and involved history of this case. Since various important findings of fact are challenged, I cannot avoid a similar, if briefer, recital of this history.

The plaintiff, Rolled Steel Products (Holdings) Ltd., which is now in liquidation, was a company which had been incorporated in 1954 under the Companies Act 1948 and had carried on the business of importing and selling steel in the United Kingdom. Its main customers were motor manufacturers. At all material times Mr. Alexander Ilytch Shenkman ("Mr. Shenkman") held 51 per cent. of the issued share capital, the remaining 49 per cent. being held by the trustees of a settlement made by Mr. Shenkman for the benefit of his children ("the trustee-shareholders"). Its directors were Mr. Shenkman and his father, Mr. Ilya Michael Shenkman. The trustee-shareholders were Mr. Wills, who was a former business associate of Mr. Shenkman, the senior trustee, Mr. Hibbert, a senior employee of British Petroleum, and Mr. Perkins, a retired solicitor.

Clause 3 of the memorandum of association of the plaintiff company listed a number of objects, including:

"(A) To carry on business as exporters and importers of, and manufacturers of, and dealers in, and buying and selling agents for, iron, steel, copper, bronze, aluminium, lead, tin, zinc, antimony and other metal goods of all descriptions and home and foreign and dominion and colonial goods, merchandise and produce of all descriptions. ...

"(K) To lend and advance money or give credit to such persons, firms, or companies and on such terms as may seem expedient, and in particular to customers of and others having dealings with the *262 company, and to give guarantees or become security for any such persons, firms, or companies.

"(L) To borrow or raise money in such manner as the company shall think fit, and in particular by the issue of debentures or debenture stock (perpetual or otherwise), and to secure the repayment of any money borrowed, raised, or owing, by mortgage, charge, or lien upon the whole or any part of the company's property or assets (whether present or future), including its uncalled capital, and also by a similar mortgage, charge, or lien to secure and guarantee the performance by the company of any obligation or liability it may undertake."

The objects clause ended with the words:

"It is hereby expressly declared that each sub-clause of this clause shall be construed independently of the other sub-clauses hereof, and that none of the objects mentioned in any sub-clause shall be deemed to be merely subsidiary to the objects mentioned in any other sub-clause."

The articles of association contained, inter alia, the following provisions:

"17. Provided that a director declares his interest in a contract or arrangement or proposed contract or arrangement with the company in manner provided by section 199 of the Act he shall be counted in the quorum at any meeting of directors at which the same is considered and shall be entitled to vote as a director in respect thereof.

"18. (a) The quorum necessary for the transaction of the business of the directors may be fixed by the directors, and unless so fixed, shall be two."

At all material times Mr. Shenkman owned the entire issued capital of another company, Scottish Steel Sheet Ltd. ("Scottish Steel"). In July 1961 the plaintiff company approached Colvilles Ltd. ("Colvilles"), a company engaged in the production of steel, with a proposal that Scottish Steel, which Mr. Shenkman had formed for the purpose, would act as sole distributor in southern England of coil and cut steel sheet produced by Colvilles. Mr. Shenkman further planned to develop a steel service centre which Scottish Steel would operate and Colvilles would supply with coil. The centre itself

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

would supply the customers.

The plaintiff company acquired a leasehold site for the steel service centre at Rainham, Essex, but its erection at that site was not proceeded with. Instead, in 1964 the plaintiff acquired a leasehold site at Andover and began to build a new steel service centre there with moneys amounting to about £400,000 borrowed from Scottish Steel. Though the judge said that the sum owed by the plaintiff to Scottish Steel did not carry interest, it appears that it may have carried interest at five per cent. per annum. Meantime, the plaintiff retained the Rainham site.

Scottish Steel began to purchase coil and cut steel on credit from Colvilles. Its principal customer was Fords. The account of Scottish Steel with Colvilles fell more and more into arrears. In October 1966 Mr. Shenkman agreed to reduce and keep the sum owed by Scottish Steel to *263 below £400,000. In July 1967 Colvilles was renationalised and its shares were vested in British Steel Corporation. By November 1967 the indebtedness of Scottish Steel to Colvilles amounted to £820,000, of which £420,000 was overdue. In December 1967 Mr. Shenkman was told that the arrangement by which the sheet steel was sold through Scottish Steel would be ended and that Colvilles would in the future sell to Fords direct. Once Scottish Steel lost the arrangement with Fords, it would have no income until the new steel service centre became operative; completion of the steel service centre was scheduled for July 1968 at the earliest. Mr. Shenkman was also told in December 1967 that he must take immediate steps to reduce the indebtedness of Scottish Steel to Colvilles to £400,000, and produce a programme for the elimination of the balance after a 60 days' credit period had expired.

By April 1968 Mr. Shenkman had still failed to reduce the debt. Colvilles accordingly reported the matter to the legal services department. Mr. Edwards, the head of that department, decided that the best solution for Colvilles and British Steel Corporation would be for Mr. Shenkman to execute an immediate and binding guarantee of the whole in-

debtedness of Scottish Steel, which by then amounted to about £860,000. On 2 May 1968 Mr. Shenkman entered into a guarantee of this nature. Fifteen days later, on 17 May 1968, Colvilles served on Scottish Steel a statutory demand pursuant to section 222 of the Companies Act 1948 for payment of the sum of £868,000, then claimed to be due from Scottish Steel.

The judge's findings as to the events between June and November 1968 are, I think, accurately and well summarised in [1982] Ch. 478, 482-483, which summary I gratefully adopt:

"By June 1968 British Steel Corporation doubted whether Mr. Shenkman's 51 per cent. interest in the plaintiff and his other assets were sufficient to meet the debt due from [Scottish Steel]. It was decided to offer Mr. Shenkman 14 days to agree to the voluntary liquidation of [Scottish Steel] or failing that a petition would be presented to wind up the company. A meeting was arranged for that purpose on 11 September but, between 3 and 11 September, it occurred to Mr. Hands, assistant to Mr. Edwards in the legal services department, that a solution would be to persuade Mr. Shenkman to procure the plaintiff to guarantee the debt due from [Scottish Steel]. The only significant asset of [Scottish Steel] was the debt owed to it by the plaintiff and the plaintiff had sufficient assets to meet that debt. He wrote to Mr. Shenton of Lovell White & King, solicitors to the corporation, stating that he had it in mind to propose to Mr. Shenkman's advisers that the British Steel Corporation would agree to a liquidator of [Scottish Steel] not pressing the claim against the plaintiff if the plaintiff guaranteed the debt due from [Scottish Steel] to Colvilles. Mr. Shenton consulted with Mr. Arthur Figgis of counsel. He advised that the plaintiff had power to give a guarantee even for a larger sum than the debt owed by the plaintiff to [Scottish Steel]. He advised that the sum should not be so large as to make it plain that the plaintiff could not meet its obligations under the guarantee and pay its creditors 20s. in the *264 £. He added that he did not think the plaintiff's directors would be advised by their legal advisers to grant a guarantee considerably in excess of the plaintiff's debt to [Scottish Steel] and sugges-

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

ted it should be limited to £400,000."

I pause to say two things. First, it is readily intelligible why those advising Colvilles should have been anxious to obtain a guarantee by the plaintiff of the indebtedness of Scottish Steel, since, while the plaintiff appeared to have a substantial surplus of assets over liabilities, Scottish Steel was known by them to be insolvent and the personal guarantee of Mr. Shenkman was known not to be nearly sufficient to cover the indebtedness. Secondly, as he explained in a note of 26 September 1968, the reason why Mr. Figgis recommended a limit of £400,000 being placed on the guarantee was that that appeared at the time to be the limit of the plaintiff's excess of assets over liabilities, on the basis of the information he had been given as to the value of the Rainham land. He added that he was concerned that British Steel Corporation should not be a party to inducing the plaintiff's directors to do that which, on the figures known to British Steel Corporation, would involve a breach of the duties of the plaintiff's directors.

I return to the summary in [1982] Ch. 478, 482-483:

"On 9 October 1968, Mr. Edwards wrote to Mr. Dyson of Montague Cox & Cardales, solicitors to Mr. Shenkman, stating that he could only advise Colvilles to refrain from taking immediate action if (1) there was a prompt payment of £100,000 both on 17 October and 17 November (which were sums claimed from Mr. Shenkman under his guarantee); (2) the plaintiff gave a guarantee of the full amount owing by [Scottish Steel] with a limit of liability of £400,000, payments to be made at a minimum of £50,000 a month starting on 17 December but on the basis that claims would also be made against Mr. Shenkman and, if he paid, the plaintiff would not be expected to pay as well; and (3) the appointment of a nominee of Colvilles to the board of the plaintiff within one week after, but not before, the giving of the guarantee by the plaintiff. There were a number of meetings and Mr. Dyson sought the advice of Mr. Balcombe Q.C. Mr. Dyson then informed Mr. Hands that Mr. Balcombe had advised that for the plaintiff to give a guarantee in excess of the sum owed to [Scottish Steel] would be an act of

gross misfeasance on the part of the directors, that the plaintiff could properly give a guarantee in the sum owed to [Scottish Steel] provided it was given some consideration for payment under the guarantee and that Mr. Balcombe had expressed surprise at the appointment of a director nominated by the British Steel Corporation after the guarantee had been given.

"On 13 November 1968, Colvilles obtained summary judgment under Order 14 against Mr. Shenkman for £100,000 due on 17 October. It gave notice to Mr. Shenkman for the payment under his guarantee of the entire indebtedness of [Scottish Steel]. It also started bankruptcy proceedings against him and served a statutory demand on [Scottish Steel]."

**\*265** On 28 November 1968, Messrs. Foster & Cranfield ("Fosters") wrote to Mr. Dyson advising that, if the Rainham land were to be sold, a price in the region of £850,000 could reasonably be anticipated and that if the sale proceeded by tender the plaintiff could expect to enter into a contract by 29 January 1969.

On 29 November 1968 Mr. Dyson had a meeting with Mr. Edwards, which was held at the office of Lovell, White & King "in order to keep up the pressure" (as Mr. Edwards recorded in a memorandum). The meeting saw the genesis of the proposals which were eventually implemented on 22 January 1969 and are now under attack. At the meeting, Mr. Dyson reported Fosters' advice and made it clear that Mr. Shenkman, for his part, wanted Colvilles paid entirely out of the proceeds. He explained that, while it might be two years before the assessment was made, he had advised that the sale might attract tax of as much as £200,000. He said that he himself would prefer that only £500,000 was paid over, since he "had in mind the possible risk of a subsequent claim by a liquidator that such a payment was a fraudulent preference, or perhaps even a misfeasance." The agreed note of the meeting records that Mr. Edwards commented:

"for his part British Steel Corporation would prefer that the debt to Colvilles were wholly discharged notwithstanding these possibilities, on the assumption that everything possible would be done to reduce the risks."

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908
**(Cite as: [1986] Ch. 246)**

Mr. Dyson then said that there would be no difficulty in the plaintiff paying a part of the debt owed by Scottish Steel equal to the sum owed to Scottish Steel by the plaintiff. As regards the balance, Mr. Dyson went on to explain a scheme which he had in mind under which the trustee-shareholders would agree to the payment, on receipt of certain compensation. Later, at the same meeting, Mr. Edwards made new proposals, which are of great importance because they were subsequently implemented. These were that (a) a sum equal to the debt owed by the plaintiff to Scottish Steel should be lent to the plaintiff by Colvilles; (b) the plaintiff should use this sum in repaying the debt owed by it to Scottish Steel; (c) Scottish Steel should in turn use this sum to repay part of the debt owed by it to Colvilles; and (d) the plaintiff would guarantee the balance of the Scottish Steel debt to Colvilles. The agreed note of the meeting records that

"it was left that Mr. Dyson will consider the proposal put forward by Mr. Edwards with his clients and with counsel to see how it can be implemented."

In this context the judge observed:

"it is to my mind quite clear that the purpose of consulting counsel was not to seek advice as to whether these proposals were or were not in the interests of the plaintiff. The question was whether a scheme could be devised and approved by counsel under which the trustees would be given something in exchange for agreeing a payment out of the assets of the plaintiff which it was not in the interests of the plaintiff to make."

**\*266** On the evidence, this inference seems to me irresistible.

During the course of December 1968 Mr. Dyson, who must have found himself in a difficult position in having as his clients both the trustee-shareholders and Mr. Shenkman, who was facing an imminent threat of bankruptcy, was busy trying to devise a scheme with the object of providing some compensation for the trustee-shareholders. Arrangements for offering the Rainham land for sale by tender were meantime put in hand. In a letter to Mr. Shenton of 5 December 1968 Mr. Dyson stressed that, whatever method was used to transfer the debt

from Scottish Steel to the plaintiff, a transfer of the debt so far in excess of the amount owed by the plaintiff to Scottish Steel "inevitably has something of the characteristics of a misfeasance." He went on to point out that it was therefore "essential" that the trustee-shareholders should approve the transaction. He said that he and Mr. Shenkman must "reserve the right to have the benefit of the views of counsel on the scheme which we propose putting to the trustees."

In letters to Mr. Shenton of 19 December 1968 Mr. Dyson explained that any scheme involving the repayment of Colvilles out of the proceeds of sale of the Rainham land would be complex and delicate and that, whatever method was adopted, the trustee-shareholders must approve what was to be done. He said that a scheme was at the moment before the trustees for their consideration.

On 30 December Mr. Dyson wrote to Mr. Shenton to stress that no documents could be executed until

"all the interested persons at this end have given their consent, and the views of counsel have been obtained, if the present decision to seek such views is adhered to."

In the event counsel was not instructed by Mr. Dyson. Mr. Shenton replied on 1 January 1969, objecting that Mr. Dyson's clients had had

"since 29 November to consider and approve a system under which my clients' debt will be discharged from moneys which your clients say will be raised on the sale of the Rainham land," - and had also had since that date - "to consider the short term arrangements for security which were agreed to by you on 29 November."

He said that he hoped to tender engrossments of the necessary documents before the end of the week, that the return of the documents executed and completed would be required within 10 days thereafter and his clients would expect on or before that date an approved scheme under which payment would be made to them in full satisfaction of their debt, failing all of which the bankruptcy petition and the winding-up petition against Scottish Steel would be filed and presented forthwith.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

Mr. Dyson replied on 2 January 1969 that "the senior trustee [Mr. Wills] has given me, this morning, his views on the scheme" and that the only outstanding problem was that one of the co-trustees was frequently out of the country.

On 3 January 1969 Mr. Dyson wrote to another of the trustee-shareholders, Mr. Perkins, a long letter setting out an outline scheme, which he said that Mr. Wills was prepared to approve, subject to his co-trustees' approval. The scheme in brief provided for the plaintiff to sell **\*267** its lease of the Andover factory for full value and to be put into liquidation; it would be arranged that in the liquidation the trustees would get the proceeds of sale of the Andover lease and the shares of Scottish Steel, while Mr. Shenkman would get the benefit of the debt of £400,000 due from Scottish Steel to the plaintiff, against which would be set off a debt of £200,000 owed by him to Scottish Steel. One of the obstacles which Mr. Dyson said had to be surmounted was

"that the trustees, whose only concern can be their own trust fund, must somehow be properly compensated for an otherwise unwarrantable depreciation in the value of one of the trust assets."

On 6 January 1969 Mr. Dyson spoke to Mr. Maunsell of Lovell White and King and discussed, among other things, ways of possibly saving stamp duty on the debenture which the plaintiff was to give to Colvilles. Mr. Maunsell's note records that Mr. Dyson commented that the timetable envisaged was unreasonable

"since on the advice that he had received from Mr. Balcombe in conference, he was being asked to advise the company to do an act which was probably ultra vires the company and would constitute a misfeasance by its directors. He said, however, that in the circumstances, in order to avoid a very particular situation, he would be prepared to advise the directors and the company to do it, provided that the shareholders of the company consented to it."

Mr. Dyson then pointed out that one of the trustees was in Switzerland and that he could not guarantee that he would reply before the 16th. Also, on 6 January 1969 Mr. Shenton wrote to Mr. Dyson enclosing, inter alia, copies of a draft board resolution

of the plaintiff authorising the transactions. He said that on completion he would require, inter alia, production of a certified copy of this resolution.

On 10 January 1969 Mr. Dyson told Mr. Maunsell that he had spoken to two of the three trustee-shareholders who were agreeable to proceeding. Figures of indebtedness as between Scottish Steel and Colvilles (£784,532 15s. 4d.) and as between the plaintiff and Scottish Steel (£401,448) were finally agreed.

On 16 January 1969 the terms of a proposed agreement, guarantee and debenture were finally agreed. By then it had been agreed that the debenture should be signed and held in escrow until 17 February 1969 in the hope that by that date the sale of the Rainham land would have been achieved, the debenture would be unnecessary and stamp duty would be saved.

On 17 January 1969 Mr. Maunsell confirmed that Colvilles and British Steel Corporation had agreed to defer completion until 22 January.

On 21 January 1969 a meeting attended by Mr. Dyson, Mr. Hawkings and at least two of the trustee-shareholders, Mr. Wills and Mr. Perkins, took place. Mr. Dyson's evidence was that the meeting was called because the scheme outlined by him in earlier correspondence could not be put into operation in the time available. As to this meeting, the judge said: **\*268**

"Mr. Dyson in his evidence said, and I accept, that he could not remember whether Mr. Shenkman or his father were there or whether Mr. Hibbert had then returned from Switzerland."

The judge went on to say that it is probable, although not certain, that Mr. Hibbert was present. This is not quite accurate because Mr. Dyson's evidence had been that Mr. Perkins and Mr. Hibbert were present at the meeting and that he "presumed" Mr. Wills had been there too. On the available evidence the probabilities certainly seem to point to all the three trustees having been there. For, in the telephone conversation of 22 January 1969, noted by Mr. Maunsell, Mr. Dyson told him that "the trustees

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

had agreed to the arrangements provided that Mr. Shenkman gave him certain personal obligations secured on his shares."

On 22 January 1969 the plaintiff executed three documents, namely: (1) a guarantee ("the guarantee") by which it was recited that Scottish Steel owed Colvilles the sum of £383,084 15s. 4d. and the plaintiff guaranteed to Colvilles the repayment by Scottish Steel of all moneys and liabilities then due or becoming due to Colvilles by Scottish Steel; (2) an agreement ("the agreement") by which it was recited that the plaintiff was indebted to Colvilles in the sum of £401,448 and the plaintiff had guaranteed the debt of £ 383,084 15s. 4d. due from Scottish Steel to Colvilles, and the plaintiff agreed that, unless it had before 17 February 1969 entered into a binding contract for the sale of the freehold interest in the Rainham land for a sum which, after discharging any existing charges, would leave the sum of £784,532 15s. 4d. (the aggregate of the debt due from the plaintiff and Scottish Steel to Colvilles) with interest and, unless all the sums due from the plaintiff and Scottish Steel to Colvilles had been paid before 1 March 1969, it would issue to Colvilles a debenture in the form of the agreed draft; and (3) a debenture ("the debenture") which created fixed and floating charges over all the assets of the plaintiff and was delivered to the plaintiff's solicitors on 22 January 1969 as an escrow. The agreement and the debenture provided for interest to be paid on the total sum of £784,532 15s. 4d. at one per cent. above bank rate for the time being.

The execution of these three documents had been preceded by a meeting of the board of directors of the plaintiff also held on 22 January 1969. It was attended by its only directors, Mr. Shenkman and his father, Mr. Ilya Shenkman. The minutes of this meeting record that it had been reported to the board that the plaintiff had agreed with Colvilles: (1) that "in consideration of Colvilles not demanding immediate repayment of all sums due to it from " Scottish Steel, the plaintiff would guarantee the liabilities of Scottish Steel to Colvilles; and (2) that Colvilles had agreed to advance £401,448 to the

plaintiff (being a sum equal to the debt agreed to be owed by the plaintiff to Scottish Steel). The minutes record a resolution that the transactions reported to the board be approved and that the documents put before the board be approved and executed by the plaintiff, as to the guarantee and the agreement for delivering to Colvilles' solicitors on receipt of the advance, and as to the debenture to be held in escrow for delivery in the circumstances described in the agreement.

**\*269** As the judge found as a fact that under arrangements already made the proposed advance of £401,448 by Colvilles to the plaintiff could only be used to discharge the liability of the plaintiff to Scottish Steel, and in turn could only be used by Scottish Steel towards payment of the sum owed by Scottish Steel to Colvilles, the transactions proposed at the meeting of 22 January 1969, if approved, would thus clearly benefit Mr. Shenkman, if only because the loan of £401,448 would be used in a manner which would indirectly reduce his liability under his guarantee of 2 May 1968. However, the minutes of that meeting do not record any declaration by him of this guarantee pursuant to article 17 of the plaintiff's articles of association.

Also on 22 January 1969 an account was opened with the plaintiff's bankers, Midland Bank Ltd., for the benefit of the plaintiff and a banker's draft for £ 401,448 drawn on Colvilles was paid into that account. The sum was immediately transferred to an account with Midland Bank opened in the name of Scottish Steel. A banker's draft was then drawn on that account in favour of Colvilles' solicitors, to whom the guarantee and the agreement were also delivered.

On 23 Janaury 1969 Mr. Dyson wrote to Mr. Wills a long letter referring to the trustee-shareholders' decision to give their consent to the execution of the guarantee in exchange for an indemnity by Mr. Shenkman secured by a charge on his shares in the plaintiff. Mr. Dyson commented:

"It is quite obvious that the trustees must receive suitable compensation, but before knowing what is suitable we must establish precisely what it is that

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

they have lost, and precisely the value of what it is that they may come to receive in exchange."

From this letter of 23 January, the judge drew the following inference, which seems to me fully justified:

"It is, I think, clear from this letter that what was contemplated at the meeting on 21 January was that an indemnity in wide terms would be given by Mr. Shenkman to the trustees secured on his shares of the plaintiff and that it would continue in operation until some other arrangement could be made under which the trustees would be given compensation acceptable to them in recompense for the diminution in value of their shares in the plaintiff consequent on the giving of the guarantee or, if no such arrangement were made, until the excess of the amount paid by the plaintiff to Colvilles over the liability of the plaintiff to Scottish Steel had been made good by Scottish Steel or Mr. Shenkman or one of the Andover companies (the shares of which remained held by or by a company owned by Mr. Shenkman and his wife)."

It is also clear, however, that even the details of the proposed indemnity had not been worked out by 23 January, let alone the details of the possible longer term arrangements. In the events that happened, so far as the evidence shows, no indemnity was ever executed by Mr. Shenkman and no arrangements made for compensating the trustee-shareholders.

**\*270** By 17 February 1969 the Rainham land had still not been sold. The debenture was accordingly delivered on that date to Colvilles, which, under its terms, was entitled to give notice demanding immediate payment of the moneys thereby secured on or after 1 April 1969 and, if the moneys were not paid, to appoint a receiver. On 12 March 1969 Colvilles made a demand for payment on 1 April 1969 of the full amount secured by the debenture. Also on 12 March Colvilles issued a writ against Mr. Shenkman claiming the balance of the sum due under his guarantee. On 25 March 1969 it applied for summary judgment on this claim. On 2 April 1969 the sum secured by the debenture not having been paid, Colvilles appointed Mr. Cooper receiver and manager of the plaintiff. He is the second defendant,

and we have been told that for the purposes of the appeal he has been given an indemnity by British Steel Corporation.

On 16 March 1970 Scottish Steel went into compulsory liquidation. On 18 March 1970 Mr. Shenkman was adjudicated bankrupt. On 29 March 1970, by virtue of the Steel Companies (Vesting) Order 1970 (S.I. 1970 No. 430) British Steel Corporation succeeded to all the assets and obligations of Colvilles. During the receivership the Andover land was sold. In October 1972, after protracted efforts, the receiver sold the Rainham land for £1,025,000. On 29 October 1973 the plaintiff went into compulsory liquidation.

Between the date of his appointment and 31 December 1973, in full discharge of the moneys secured by the debenture (including interest), the receiver paid to British Steel Corporation sums totalling £1,005,347 and also accounted to the Inland Revenue for £92,731 in respect of tax deducted from interest paid to British Steel Corporation. The receiver retained the sum of £50,000 in respect of his fees and expenses as receiver and manager and then accounted to the liquidator of the plaintiff for the surplus of the moneys received by him, £47,778. This surplus is insufficient to meet the other unsecured liabilities of the plaintiff. The three sums of £1,005,347, £92,731 and £50,000 referred to above amount in the aggregate to £1,148,078.

*The pleadings*

By a writ issued on 25 March 1975 and a statement of claim served on 31 December 1975, the plaintiff brought an action against British Steel Corporation, Mr. Cooper, the trustee in bankruptcy of Mr. Shenkman, and Mr. Ilya Shenkman, seeking, inter alia, (1) as against British Steel Corporation and Mr. Cooper, a declaration that the guarantee, the debenture and the purported appointment of Mr. Cooper as receiver and manager were in each case void and of no effect; (2) as against British Steel Corporation and Mr. Cooper, payment to the plaintiff of the sum of £1,148,078 as money had and received to the use of the plaintiff with interest; (3) alternatively, as

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

against all four defendants, a declaration that they were jointly and severally liable to repay to the plaintiff with interest the said sum of £1,148,078 "as moneys of the plaintiff which have been misapplied"; and (4) an order (a) in the case of British Steel Corporation, Mr. Cooper and Mr. Ilya Shenkman for payment; (b) in the case of Mr. Shenkman, leave to **\*271** prove in the bankruptcy for such sums as he might be declared liable to repay to the plaintiff.

Mr. Ilya Shenkman died in 1976. His personal representatives were added as fifth and sixth defendants by an order to carry on, but took no part in the proceedings.

On 11 December 1976 the plaintiff issued a writ against Mr. Shenkman's trustee in bankruptcy seeking similar relief. By an order dated 3 November 1977 the two actions were consolidated; it was further ordered that the statement of claim served on 31 December 1975 should stand as the statement of claim in the consolidated proceedings. Mr. Shenkman and his trustee in bankruptcy took no part in the proceedings before the judge, but the trustee agreed to be bound by any order that might be made.

Under the statement of claim the relief will be seen to be sought on three principal grounds. (1) Neither the guarantee nor the debenture is the deed of the plaintiff because it was not duly executed by the plaintiff. This point, which will be referred to in this judgment as "the no due authorisation point, " is reflected particularly in paragraphs 8, 12 and 13 of the statement of claim. The basis of this submission as pleaded is that Mr. Shenkman was personally interested in the arrangements constituted by the transactions and documents of 22 January 1969 but, so it is said, at the board meeting of the plaintiff held on 22 January 1969 did not disclose his interest in the manner required by section 199 of the Companies Act 1948. Colvilles, it is asserted, knew of these arrangements, of Mr. shenkman's personal interest therein and that the board meeting was attended by only two directors.

(2) If, contrary to the plaintiff's submission, the guarantee and the debenture were the deeds of the plaintiff, each of them was ultra vires and void. This point ("the ultra vires point") is reflected particularly in paragraphs 11 and 13 of the statement of claim. Paragraph 11 asserts:

"The said arrangements were made not for the purposes or benefit of  [the plaintiff] but for the purposes or benefit of Mr. Shenkman and Colvilles and were not and could not have seemed to be expedient in the interests of [the plaintiff]."

(3) If, contrary to the plaintiff's submission, the guarantee and the debenture were the deeds of the plaintiff and were intra vires the plaintiff, Mr. Shenkman and Mr. Ilya Shenkman were acting in bad faith and in breach of their duties as directors of the plaintiff in purporting, on behalf of the plaintiff, to borrow the sum of £401,448 and in authorising the execution by the plaintiff of the guarantee and the debenture. Colvilles and Mr. Cooper knew that the property purported to be charged by the debenture was the property of the plaintiff and knew, or ought to have known, that the sum of £401,488 had purportedly been borrowed, and the guarantee and debenture executed, not for the purposes or benefit of the plaintiff, but in bad faith and in breach of their duties as directors. In the circumstances, it is claimed, the sum of £ 1,148,978 represents moneys of the plaintiff which have been misapplied and the defendants, except Mr. Shenkman's trustee in bankruptcy, are liable in equity to replace them. This claim is embodied in paragraph 15 **\*272** of the statement of claim. It will be seen that its essence is that in regard to the relevant transactions the two directors had been acting in breach of their fiduciary duties to the plaintiff and that British Steel Corporation and Mr. Cooper, having received the moneys with actual or constructive knowledge of this breach, took them as constructive trustees. I will call this "the constructive trust point."

On 2 March 1976 British Steel Corporation and Mr. Cooper served a defence to this statement of claim which, as to the crucial allegations made by the plaintiff, amounted to little more than a traverse.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

They admitted that Colvilles knew that the board meeting of 22 January 1969 had been attended by only two directors, of whom Mr. Shenkman was one, but made no further admissions in regard to the "no due authorisation" point, and indeed affirmatively asserted (in paragraph 11) that the guarantee and debenture had been duly executed. As to the ultra vires point, they simply denied that those two documents had been executed ultra vires. Their answer to the constructive trust point, beyond an admission that Colvilles and Mr. Cooper knew that the property charged by the debenture was the property of the plaintiff, was likewise a simple traverse.

It is to be observed that the defence as pleaded did not contain any suggestion of two further pleas which have subsequently featured prominently in this case, namely, (1) the allegation that all the shareholders in the plaintiff (that is to say, Mr. Shenkman and the trustee-shareholders) consented to the granting of the guarantee and the debenture ("the shareholders' consent point"); and (2) the assertion that, even if the board resolutions of 22 January 1969 had not been duly passed in accordance with the articles of association of the plaintiff, nevertheless Colvilles was unaware of this and was entitled to assume that they had been duly passed ("the Turquand's case point").

*The course of the trial before Vinelott J.*

On this state of the pleadings, the trial of the action began before Vinelott J. on 9 March 1981. I shall have to refer to the course of the trial in some detail, because this gives rise to two issues which, though they might be described as "pleading points," could both be of fundamental importance to the outcome of these proceedings.

On 9 March Mr. Morritt began his opening on behalf of the plaintiff, which lasted for five days. On that first day he drew attention to the fact that the defence to the no due authorisation point was simply the allegation that the transactions had been approved, and properly approved, by the board at a meeting held on 22 January 1969. On 12 March he

made it plain that he derived his understanding of the defendants' case from their pleadings, "because ... I have been told nothing else." On 13 March he observed that the Turquand's case point was not pleaded and was not in issue in the present case and that he had therefore ignored it. Neither the judge nor Mr. Heyman on behalf of the defendants expressed any dissent from this statement.

Also on 13 March Mr. Morritt pointed out once more that the only pleaded defence was that the transactions were properly approved at a properly constituted board meeting on 22 January 1969 and that the **\*273** shareholders' consent point was not raised and was therefore not relevant. There then followed a discussion between the judge and Mr. Morritt as to the position that would arise if the shareholders' consent was relevant and as to the extent to which shareholders could ratify intra vires acts in the case of a company which was of doubtful solvency. But, at the end of this discussion on 13 March 1981 the judge said: The point is not an uninteresting one, but it does not arise because it is not pleaded." Mr. Heyman did not, at that time, assert the contrary.

That was how matters had been left when, on 13 March 1981, the judge began hearing the oral evidence. This extended over 12 working days. The plaintiff's first witness was Mr. Dyson, whose evidence was heard on 13, 16 and 17 March. During the course of cross-examining him on 16 March, Mr. Heyman asked him certain questions apparently designed to elicit the fact (if it was a fact) that the trustee-shareholders had given their consent in respect of the relevant resolutions of 22 January 1969 at a meeting held on 21 January 1969. In re-examination of this witness on 17 March 1981 Mr. Morritt asked some questions as to the information which had been available to the trustee-shareholders on 21 January 1969, but explored this matter of consent no further than this.

Mr. Morritt then called Mr. Shenkman, whose evidence continued over 17, 18, 19, 20 and 23 March 1981. During the course of his cross-examination of Mr. Shenkman on 23 March, Mr. Heyman em-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-01646-RMC    Document 39-4    Filed 01/31/2008    Page 104 of 162

barked on a similar line of questioning concerning the consent of the trustee-shareholders. On this occasion it evoked a strong protest from Mr. Morritt that he was being put in a very difficult position. He again pointed out that the shareholders' consent point had not been pleaded, and that it was not open to the defendants on their pleading. The judge, without ruling on the point, said that he was not going to bar this line of questioning. Mr. Morritt did not examine or re-examine Mr. Shenkman on this issue.

Mr. Heyman, without opening his case, began calling his witnesses later on 23 March 1981. Their evidence extended over 24, 25, 26, 30 and 31 March. The defendants' principal witness was Mr. Edwards. When, on 25 March, Mr. Heyman began to lead evidence from him relating to the consent of the trustee-shareholders, Mr. Morritt objected and did not thereafter cross-examine Mr. Edwards on this evidence.

By the time the evidence closed, no application had been made by the defendants to amend their pleadings in any respect and no intimation had been given that they intended to apply to amend their defence, so as to raise either the shareholders' consent point or the Turquand's case point. Mr. Morritt told us that, in view of what had occurred during the opening, his belief had been throughout the hearing of the evidence that the latter point was not going to be relied on by British Steel Corporation or Mr. Cooper.

On 31 March Mr. Heyman began his address on their behalf. During the course of it, he made it plain that, notwithstanding what had occurred during Mr. Morritt's opening, he did seek to rely on both the Turquand's case point (which, he submitted, did not require to be specifically pleaded) and the shareholders' consent point. On 1 and 2 *274 April Mr. Heyman continued his submissions. On the morning of 2 April, after some discussion and argument on the points, the judge ruled that both these points required to be pleaded and asked Mr. Heyman whether he was going to apply to amend the defence to which he replied that he was. At 2

p.m. that day Mr. Heyman handed in his two proposed amendments. The first, which constituted a proposed addition to paragraph 6 of the defence and raised the Turquand's case point, reads:

"If, which is denied, the resolutions passed at the board meeting of [the plaintiff] on 22 January 1969 were not validly passed these defendants are entitled to rely upon the ostensible authority of the directors of [the plaintiff] to enter into and to execute the guarantee and the debenture and upon the certified extract of the minutes of such board meeting signed by Mr. Shenkman."

The second, which consisted of a proposed addition to paragraph 11 of the defence and raised the shareholders' consent point, reads:

"In support of such averment these defendants will rely upon the fact that the granting of the guarantee and the debenture had been approved by all the shareholders in [the plaintiff] prior to the execution thereof."

The judge then proceeded to hear submissions from Mr. Heyman in support of his application for leave to amend and from Mr. Morritt in opposition to it. He eventually said that he was going to rule on the application on the following Monday morning, 6 April.

When 6 April came Mr. Morritt handed in a draft reply and draft request for further and better particulars which, he said, the plaintiff would like to put in if the defendants got leave to amend. In the event, the judge intimated that he did not intend at that stage to rule on the application for leave to amend but would deal with it in his final judgment, giving reasons for his decision. Mr. Morritt's reply was:

"In that case I will treat the matter, both for the purpose of argument on law and fact, as though your Lordship has given leave to amend, although your Lordship has not in fact done so."

Matters were left thus when the argument concluded on 7 April 1981.

*The judgment of Vinelott J. of 2 December 1981*

On 2 December 1981 Vinelott J. gave his judgment and dealt with the principal issues that arose for his

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

decision as follows.

*(1) As to the no due authorisation point*

The only board meeting of the plaintiff of which any evidence had been produced at the hearing before Vinelott J. was the purported board meeting of 22 January 1969 attended by only Mr. Shenkman and Mr. Ilya Shenkman. Furthermore, Mr. Shenkman's evidence was that there had been no meeting of the board before 22 January at which the desirability of the plaintiff giving a guarantee had been considered. The judge accepted this evidence. Although it was not admitted in their **\*275** defence, it was conceded on behalf of British Steel Corporation and Mr. Cooper at the trial that Mr. Shenkman was personally interested in the transactions of loan, guarantee and debenture. For the purposes of the no due authorisation point, the meeting of 22 January 1969 was thus the only relevant board meeting.

At the trial Mr. Heyman's main argument in this context had been that the plaintiff had not proved that no declaration of Mr. Shenkman's interest had been made at the meeting of the directors in compliance with section 199 of the Companies Act 1948. But Mr. Shenkman's evidence was that he had made no declaration of his interest at the meeting of 22 January 1969 or any earlier meeting; and the judge accepted this evidence without hesitation.

Mr. Heyman's alternative argument was that, even if no such express declaration was made at a formal meeting of the directors, the existence of Mr. Shenkman's guarantee must have been known to Mr. Ilya Shenkman and discussed between him and Mr. Shenkman on earlier occasions, and that in these circumstances no express declaration was necessary. The judge rejected this submission because he did not think there was any sufficient evidence that Mr. Ilya Shenkman did know that Mr. Shenkman had entered into a personal guarantee of the whole of Scottish Steel's debt to Colvilles.

It necessarily followed from these findings, though the judge did not expressly so state, that the resolution which the board of the plaintiff purported to

pass on 22 January 1969 authorising the execution of the guarantee and the debenture had not been regularly passed in accordance with articles 17 and 18(a) of the articles of association of the plaintiff, because there had been no proper quorum of directors voting on the resolution inasmuch as Mr. Shenkman was not entitled to vote on it; it was not a formally valid resolution. It also followed that the plaintiff's claim that neither the guarantee nor the debenture was or is the deed of the company was prima facie well founded in law.

The judge, in his judgment, then proceeded to refer to Mr. Heyman's application to amend the defence to plead the Turquand's case point. In this context, having pointed out that he had already ruled at the trial that an amendment was necessary to raise this point, he quoted the proposed amendment and said:

"It appears to me that, in so far as it is sought to rely upon the ostensible authority of the directors of the plaintiff, this amendment is far too wide. The question I have to decide is whether British Steel Corporation should be allowed to amend the defence to claim that Colvilles was entitled to rely upon the resolution as a formally valid resolution - that is, as a resolution passed at a properly constituted board of directors at which, Mr. Shenkman and Mr. Ilya Shenkman having been the only directors present, a proper disclosure of Mr. Shenkman's interest had been made. I have found this a very difficult question, but after some hesitation I have come to the conclusion that I should allow an amendment in these terms."

**\*276** Inasmuch as the judge described the draft amendment as, in one respect at least, "far too wide," I do not understand him as having given leave to British Steel Corporation and Mr. Cooper to amend their defence in the terms proposed. I take his words as merely meaning (1) that he was giving leave to amend the defence to plead that Colvilles was entitled to rely on the resolution as a resolution passed at a properly constituted board of directors at which, Mr. Shenkman and Mr. Ilya Shenkman having been the only directors present, a proper disclosure of Mr. Shenkman's interest had been made and (2) that he was prepared to decide the case on

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908
**(Cite as: [1986] Ch. 246)**

the footing that such amendment had actually been made.

However, having described the proposed amendment as "far too wide," the amendment which the judge by inference permitted was in one respect itself a wider one than the draft, since it asserted that Colvilles was entitled to rely on the resolution as one passed at a properly constituted board, at which "a proper disclosure of Mr. Shenkman's interest had been made." This was, no doubt, in answer to a point which had been raised by Mr. Morritt in regard to the amendment proposed by British Steel Corporation, namely that "the certified extract of the minutes" of the board meeting, referred to in that proposed amendment, contained no mention of any declaration of interest, and therefore did not apparently comply with the articles of the plaintiff.

The judge, by necessary implication, found that Colvilles knew of Mr. Shenkman's personal interest at the relevant time. However, having permitted amendment of the defence in the manner which I have described, he decided (by necessary implication though, I think, not in terms) that the defence based on the rule in Royal British Bank v. Turquand (1856) 6 E. & B. 327, embodied in such amendment, wholly defeated the plaintiff's first claim based on the no due authorisation point.

*(2) As to the ultra vires point and the constructive trust point*

In his opening before the judge Mr. Morritt accepted that if the plaintiff's first claim failed there could be no objection to the advance by Colvilles to the plaintiff of the sum of £401,448 or the use of that money to discharge the debt owed by the plaintiff to Scottish Steel and that, on that footing, the debenture and, in consequence, the appointment of the receiver thereunder would be valid to the extent of that advance. The judge, in proceeding to consider the plaintiff's ultra vires and constructive trust points, therefore treated them as limited in the case of the debenture to the extent of the sum guaranteed. He thus proceeded on the footing that the loan of £401,448 and the debenture at least to the

extent of that sum were a valid transaction or document.

The judge, in setting out his conclusions, drew no specific distinction between the ultra vires point and the constructive trust point. Instead, he drew a rather different distinction between two types of ultra vires, namely, what he called "ultra vires in the narrow sense" and "ultra vires in the wider sense." After a careful review of the authorities relating to ultra vires, he expressed the opinion [1982] Ch. 478, 497 that, even **\*277** when the question in dispute relates to "the capacity of a company to enter into a given transaction," the phrase ultra vires may be used (a):

"in a narrow sense to describe a transaction which is outside the scope of the powers expressed in the memorandum of association of a company or which can be implied as reasonably incidental to the furtherance of the objects thereby authorised"
and (b) in a "wider sense" so as

"to describe a transaction which, although it falls within the scope of the powers of a company, express or implied, is entered into a furtherance of some purpose which is not an authorised purpose"
- that is to say, not a purpose authorised by the company's memorandum of association.

Vinelott J. went on to say, at p. 499, that a transaction which is ultra vires in the wider sense

"is incapable of being made binding on the company by the assent of all the members, [since] the members cannot authorise the use of the company's property for a purpose other than the purposes which the company is authorised to pursue by its memorandum of association."
This, he suggested, is the reason why a transaction which is ultra vires in the "wider sense" is equated with one which is ultra vires in the narrow sense.

On the other hand, there is, he considered, at p. 499, a crucial difference between the two types of transaction, that is to say a transaction which is ultra vires in the narrow sense is altogether void and cannot confer rights on third parties; whereas

"a transaction which is ultra vires in the wider sense may confer rights on a third party who can

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

show that he dealt with the company in good faith and for valuable consideration and did not have notice of the fact that the transaction, while ostensibly within the powers, express or implied, of the company, was entered into in furtherance of a purpose which was not an authorised purpose."

The judge regarded it as clear, at p. 500, that, notwithstanding the separate objects provision at the end of clause 3 of the plaintiff's memorandum of association, sub-clause (K) is "a power ancillary to and to be exercised when expedient in furtherance of the objects of the company and is not to be construed as an independent object."

Having decided that he was dealing with mere ancillary powers, not independent objects, the judge concluded, at p. 500, that the main questions which he had to consider in the context of ultra vires were whether the guarantee and, to the extent of the sum guaranteed, the debenture, were given by the plaintiff:

"in furtherance of the objects of the plaintiff, in the sense of its substantive objects or purposes, or for some purpose not authorised by the memorandum of association of the plaintiff; and" - if the latter was the case - "whether Colvilles and the British Steel Corporation had notice of that fact."

**\*278** As to the first of these questions, the judge's conclusion on the evidence, at p. 503, was that, after Fosters' advice had been received at the end of November:

"everybody on the plaintiff's side proceeded on the footing that the transactions proposed would not only not be for the purposes or in the interests of the plaintiff, but would be positively injurious to it."

He found the following facts, at p. 503:

"the conclusion is inescapable that of the directors of the plaintiff Mr. Shenkman at least knew that the proposals accepted on behalf of the plaintiff on 19 December and implemented on 22 January involved, to the extent of the guarantee of the liability of [Scottish Steel] in excess of the debt due from the plaintiff to [Scottish Steel] and to that extent the debenture, a gratuitous disposition on the part of

the plaintiff which could not be justified as something done for the purposes or in the interests of the plaintiff."

As to the second of these main questions, the judge's finding of fact on the evidence was, at p. 507:

"... Colvilles and the British Steel Corporation knew that the guarantee and, to the extent of the sum guaranteed, the debenture, were not entered into by the plaintiff for any purpose of the plaintiff but were a gratuitous disposition of the property of the plaintiff and were entered into by the plaintiff for the benefit of [Scottish Steel] and Mr. Shenkman personally."

In relation to the receiver, the judge found as a fact, at p. 511, that, when Mr. Cooper took possession of the assets of the plaintiff as receiver, he had knowledge of facts from which it should have been apparent to him that the giving of the guarantee was ultra vires the plaintiff in the wider sense and also a breach of duty by the directors of the plaintiff.

Essentially, therefore, as I read his judgment, the judge found liability established against British Steel Corporation and Mr. Cooper because the plaintiff had acted ultra vires "in the wider sense" in regard to the relevant transactions and received the relevant assets of the plaintiff with knowledge that the relevant transactions were entered into in furtherance of purposes which were not authorised purposes of the plaintiff.

*(3) As to the shareholders' consent point*

The judge concluded, at pp. 507-508, that it would not be right to allow the first two defendants to amend their defence to plead the shareholders' consent point. However, he went on to express the view, at pp. 508-509, that, even if the documents executed on 22 January 1969 had been executed with the consent of all the shareholders of the plaintiff, this consent, subject to one possible qualification, would not have provided any defence to the plaintiff's claim. The reason, in his opinion, at p. 509, stemmed from the general principle that "shareholders, even acting unanimously, cannot rat-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1986] Ch. 246
Case 1:07-cv-01646-RMC    Document 39-4    Filed 01/31/2008    Page 108 of 162

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908
**(Cite as: [1986] Ch. 246)**

ify or make binding on a company a **\*279** transaction which is ultra vires whether in the narrow or in the wider sense." The judge accepted, at p. 509, that the doctrine of ultra vires will not prevent the shareholders of a company by unanimous agreement from disposing, as they please, of profits available for distribution to shareholders by way of dividend. However, he considered, at p. 510, that this qualification to the general rule was irrelevant on the facts, since on the evidence it appeared that the plaintiff did not have profits available for distribution to its shareholders equal to the amount of the guarantee of the indebtedness of Scottish Steel.

*(4) The judge's conclusion*

The judge's ultimate conclusion [1982] Ch. 478, 510 thus was that

   "the guarantee and, to the extent of the sum guaranteed, the debenture were executed by the plaintiff to the knowledge of Colvilles for a purpose other than the purposes authorised by the memorandum of association of the plaintiff and the plaintiff is entitled to have the guarantee set aside and to require the British Steel Corporation to repay the sum guaranteed with interest."

*The issues on the appeal and the cross-appeal*

British Steel Corporation and Mr. Cooper now appeal from this judgment, asking that the order made against them be wholly set aside and the action as against them be dismissed. The plaintiff cross-appeals, claiming, in effect, that in all the circumstances the judge should not have permitted the defendants to take the Turquand's case point, but that, even if he was right in doing so, it afforded them no defence in law on the evidence adduced at the trial.

Though a large number of subsidiary points have been raised and argued on both sides, I think that the principal issues that have fallen for decision on this appeal have resolved themselves to seven, namely: (1) the shareholders' consent point; (2) the judge's finding that, of the directors of the plaintiff, at least Mr. Shenkman had abused his powers in entering into the relevant transactions; (3) the judge's finding of knowledge of such abuse on the part of

Colvilles, British Steel Corporation and Mr. Cooper; (4) the no due authorisation and Turquand's case points; (5) the ultra vires point; (6) the constructive trust point; and (7) the relief, if any, to be granted to the plaintiff. The first, second, third, fifth and sixth points are raised by the notice of appeal. The fourth is raised by the notice of cross-appeal. The last is raised by both notices.

*The shareholders' consent point*

One of the grounds of appeal of British Steel Corporation and Mr. Cooper was that the judge erred in refusing them leave to amend their defence to raise the shareholders' consent point. At an early stage in his address to this court Mr. Morritt pointed out that a number of other issues would become relevant only if we considered that this contention was well founded. We therefore heard full argument from both sides at that stage on the submission that the judge erred in refusing the defendants leave to amend so as to take this point.

**\*280** At the conclusion of that argument we gave our decision that the amendment to paragraph 11 of the defence, which was requested towards the end of the trial, was rightly refused by the judge in the exercise of his discretion. We said that we would give our reasons when we came to give our judgment on the appeal as a whole.

For the following reasons, among others, I do not see how the exercise of the judge's discretion in refusing leave to amend to raise this point can be faulted. (1) In my opinion, it should at all material times have been obvious to the legal advisers of British Steel Corporation and Mr. Cooper that the point required pleading, if it was to be taken at all.

(2) These defendants have, in my opinion, given this court no sufficient justification or excuse for their failure to apply to make the amendment until the 17th day of the trial, after the evidence had closed.

(3) I am satisfied that if the point had been put in issue by an appropriate amendment, in examining or cross-examining a number of witnesses before

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

the court, the plaintiff's counsel would have wished to explore a number of matters relevant to the consent of the trustee-shareholders, e.g., (a) had they in truth all been present at the meeting on 21 January 1969? (b) had the trustee who was previously abroad returned to this country? (c) were their alleged consents informed consents given with knowledge of all relevant facts? (d) how were the consents given? (e) if the consents were given subject to certain conditions, what precisely were those conditions and were they ever fulfilled? and (f) what legal advice did they have? This list of relevant questions could be greatly expanded.

(4) In my opinion, having regard to the course and conduct of the trial, as outlined above, a substantial injustice would have been caused to the plaintiff if the amendment had been allowed when the application was at long last made on 2 April 1981. Up to that time, having clearly and specifically drawn attention to the point, the plaintiff's counsel had, in my opinion, been fully entitled to conduct the plaintiff's case on the footing that this was not a live issue in the proceedings. In conducting it, they were not obliged to cover the contingency that the defendants' counsel might see fit, at some undisclosed future time, to apply for the requisite leave, when they had given no intimation that they intended to make such application.

*The judge's findings against the directors of the plaintiff*

I have already summarised the judge's ultimate findings of fact against the directors of the plaintiff and Mr. Shenkman in particular. In taking us through the judgment in considerable detail for the purpose of disputing these ultimate findings Mr. Heyman was able to point to scarcely any errors in the findings of primary fact. He submitted, however, that in making these ultimate findings of fact the judge had drawn entirely the wrong inferences. [His Lordship summarised the defendants' argument and reviewed the relevant facts and concluded that the judge was right in describing the grant of the guarantee as "gratuitous" and that the potential advantages to the plaintiff were minimal and continued:]

**\*281** In my judgment, however, it is not correct to judge the propriety of the transactions of 22 January 1969 from a solely objective point of view. In deciding whether they constituted an abuse of the directors' powers, the motives of Mr. Shenkman are of great importance: see for example, Howard Smith Ltd. v. Ampol Petroleum Ltd. [1974] A.C. 821 and In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016, 1032. I have been able to detect no suggestion in the evidence that Mr. Shenkman considered that the prospects of future benefits from the Andover steel centre, or the need to buy time, or the need to save himself from bankruptcy, or any other factor, rendered the proposals which are ultimately implemented on 22 January 1969 beneficial from the point of view of the plaintiff (as opposed to Scottish Steel or Mr. Shenkman personally). On the contrary, as soon as the scheme was mooted, Mr. Shenkman's legal adviser, Mr. Dyson, fully realised that it "inevitably has something of the characteristics of a misfeasance" (as he had said in his letter to Mr. Shenton of 5 December 1968). But, he considered that this would not matter if the consent of the trustee-shareholders was obtained, whose consent, in the same letter, he described as "essential." During the succeeding weeks his efforts were directed to devising a scheme so that, as he put it in his letter to Mr. Perkins of 3 January 1969, the trustees should somehow be properly compensated for an "otherwise unwarrantable depreciation in the value of one of the trust assets." Mr. Shenkman's personal attitude was that he would agree with almost anything that British Steel Corporation proposed to remove the pressure on him so long as it was lawful. After various other schemes for compensating the trustee-shareholders had been mooted, the proposal which Mr. Dyson ultimately put to them was that they should be given a personal indemnity secured on Mr. Shenkman's personal shareholding in the plaintiff (the terms of which indemnity were never agreed) coupled with a hope that they would in due course be given some interest, unspecified, in the Andover steel centre. So far as the evidence shows, no further advice from counsel was sought by Mr. Shenkman or Mr. Dyson

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

from Mr. Balcombe or any other counsel in regard to the proposals implemented on 22 January 1969. I infer that they were well aware that the advice was likely to be that, at least in default of the consent of the trustee-shareholders, these proposals would involve a gross misfeasance.

Thus, in my opinion, there was abundant evidence to justify the judge's finding of fact that at the material time everybody on the plaintiff's side proceeded on the footing that the transactions proposed would not only not be for the purposes or in the interests of the plaintiff, but would be positively injurious to it.

We were referred to a number of decisions which indicate that it is open to the shareholders in a company by unanimous agreement to consent to or ratify acts which would otherwise be a misfeasance on the part of the directors so as to validate them for all purposes, provided that such acts are within the company's corporate capacity and do not involve a fraud on the company's creditors; I will revert briefly to these authorites later in this judgment. However, since it is not open to the **\*282** defendants in the present case to assert that the consent of the trustee-shareholders was in fact obtained, this line of authority has no relevance in the present context.

For the reasons stated, I can see no grounds whatever for displacing the judge's finding that, of the directors of the plaintiff, at least Mr. Shenkman knew that the proposals implemented on 22 January 1969 involved, to the extent of the guarantee of the liability of Scottish Steel in excess of the debt due from the plaintiff to Scottish Steel and to that extent the debenture, a gratuitous disposition on the part of the plaintiff which could not be justified as something done for the purposes of or in the interests of the plaintiff.

*The judge's findings of fact against Colvilles, British Steel Corporation and Mr. Cooper*

The judge, as I have said, also found as facts that Colvilles and British Steel Corporation knew that the guarantee and, to the extent of the sum guaran-

teed, the debenture were not entered into by the plaintiff for any purpose of the plaintiff but were a gratuitous disposition of the property of the plaintiff and were entered into by the plaintiff for the benefit of Scottish Steel and Mr. Shenkman personally. [His Lordship reviewed the argument and the evidence in relation to those findings and concluded:] I think there was abundant evidence to justify the judge's findings of fact as to the knowledge of Colvilles and British Steel Corporation. There has been no serious challenge to the judge's finding of knowledge against Mr. Cooper, on the footing that the last mentioned findings are justified and, in my opinion, that finding also must stand.

*The no due authorisation and Turquand's case points*

Mr. Shenkman unquestionably had a personal interest in the proposed guarantee and debenture which fell for consideration at the board meeting of the plaintiff on 22 January 1969. Under article 17 of the plaintiff's articles of association he was entitled to vote as a director in regard to these transactions and to be counted in the quorum of two directors required by article 18(a), notwithstanding his personal interest, if, but only if he declared his interest "in manner provided by section 199 of the [Companies Act 1948]." The manner provided by that section is this. Under section 199(1) the director has to declare "the nature of his interest at a meeting of the directors of the company." Section 199(2), so far as material, provides:

"In the case of a proposed contract the declaration required by this section to be made by a director shall be made at the meeting of the directors at which the question of entering into the contract is first taken into consideration..."

The judge, as I have said, accepted the evidence of Mr. Shenkman that there had been no meeting of the board of the plaintiff before 22 January 1969 at which the desirability of the plaintiff giving a guarantee had been considered; and that he had made no declaration of his personal interest at the board meeting of 22 January 1969. I can see no grounds for challenging either of these findings of fact. Mr.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

Shenkman **\*283** and Mr. Ilya Shenkman were the only two directors present and voting at the last-mentioned board meeting. So far as this point may be relevant, the judge found that there was no sufficient evidence that Mr. Ilya Shenkman knew that Mr. Shenkman had entered into a personal guarantee of the whole of the Scottish Steel debt to Colvilles, and I can see no grounds for disturbing that finding.

In these circumstances, on the facts as found by the judge, it is, in my opinion, clear that the no due authorisation point as pleaded in the statement of claim is well-founded in law, and the only averment pleaded in the unamended defence in answer to that point, namely that "the guarantee and the debenture were duly executed by the plaintiff," is not well founded in law.

The only remaining questions in this context are whether the judge was right by his judgment to give leave to amend the defence so as to plead that Colvilles was entitled to rely on the resolution as a resolution passed at a properly constituted board of directors at which, Mr. Shenkman and Mr. Ilya Shenkman having been the only directors present, a proper disclosure of Mr. Shenkman's interest had been made; and, if so, to decide that this amendment provided a complete answer in law to the claim against the defendants, in so far as that claim was founded on the no due authorisation point.

The possible relevance of the rule in Royal British Bank v. Turquand, 6 E. & B. 327 in the present context is obvious. The following statement of the rule, taken from Halsbury's Laws of England, 2nd ed., vol. V (1932), p. 423, was approved by the House of Lords in Morris v. Kanssen [1946] A.C. 459 (see *per* Lord Simonds at p. 474):

"persons contracting with a company and dealing in good faith may assume that acts within its constitution and powers have been properly and duly performed and are not bound to inquire whether acts of internal management have been regular."

Lord Simonds later pointed out the rationale of the rule, at p. 475: "The wheels of business will not go smoothly round unless it may be assumed that that

is in order which appears to be in order."

However, section 9(1) of the European Communities Act 1972 apart, persons dealing with a company registered under the Companies Acts must be taken not only to have read both the memorandum and articles of a company but to have understood them according to their proper meaning: see Palmer's Company Law, 23rd ed. (1982), vol. 1, para. 28-02 and the cases there cited.

Colvilles and British Steel Corporation, therefore, must be taken to have known that, under the articles of the plaintiff, a quorum of two was required for the transaction of the business of its directors and of the provisions of those articles relating to the declaration of a personal interest. They were well aware of the personal interest of Mr. Shenkman in the transactions proposed on 22 January 1969.

The signed minutes of the board meeting of that day, a copy which was subsequently supplied to Colvilles' solicitors (and indeed had been drafted by them), made no mention whatever of any declaration of a personal interest by Mr. Shenkman. Since Colvilles and its legal advisers **\*284** must be taken to have had knowledge of the relevant provisions of the plaintiff's articles, they must also be taken to have known that the resolution could not have been validly passed unless Mr. Shenkman had duly declared his personal interest at that board meeting or a previous board meeting.

If, therefore, the defendants are to be allowed both to take and succeed on the Turquand's case point, this must mean that, in the circumstances subsisting in late January 1969, they were as a matter of law entitled to assume (contrary to the fact and without further inquiry) that Mr. Shenkman had duly declared his personal interest either at the board meeting of 22 January 1969 or at some previous board meeting of the plaintiff.

This contention might well have been unanswerable if the rule in Turquand's case, 6 E. & B. 327 were an absolute and unqualified rule of law, applicable in all circumstances. But, as the statement of the rule quoted above indicates, it is not. It is a rule

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

which only applies in favour of persons dealing with the company in good faith. If such persons have notice of the relevant irregularity, they cannot rely on the rule.

Thus, in Transvaal Lands Co. v. New Belgium (Transvaal) Land and Development Co. [1914] 2 Ch. 488 the plaintiff company's articles, while enabling a director to be interested as a member of another company with which the plaintiff company was contracting, required that the director should disclose the nature of his interest and should not vote in respect of any contract in respect of which he was concerned. The provisions of this article were not observed when a contract was entered into by the directors of the plaintiff company when they resolved to enter into a contract with the defendant company, which had full notice of this irregularity. The Court of Appeal held that the plaintiff company had the right to rescind the contract.

Furthermore, even if persons contracting with a company do not have actual knowledge that an irregularity has occurred, they will be precluded from relying on the rule if the circumstances were such as to put them on inquiry which they failed duly to make. As Lord Simonds in Morris v. Kanssen [1946] A.C. 459 pointed out, at p. 475:

"But the maxim has its proper limits. ... It is a rule designed for the protection of those who are entitled to assume, just because they cannot know, that the person with whom they deal has the authority which he claims. This is clearly shown by the fact that the rule cannot be invoked if the condition is no longer satisfied, that is, if he who would invoke it is put upon his inquiry. He cannot presume in his own favour that things are rightly done if inquiry that he ought to make would tell him that they were wrongly done."

Mr. Heyman submitted that Lord Simonds's observation was confined to the particular facts of the case before him where the party seeking to take advantage of the rule was a director of the company and therefore under a duty to see that its transactions were effected in a regular manner: see p. 476. I do not, however, read Lord Simonds's statement

of principle as confined in this manner. The decision of this court in A. L. Underwood Ltd. v. Bank of Liverpool [1924] 1 K.B. 775 *285 , which was cited in Morris v. Kanssen [1946] A.C. 459, in my opinion, illustrates that the very nature of a proposed transaction may put a person upon inquiry as to the authority of the directors of a company to effect it, even if he has no special relationship with the company. Whether in any given case the person dealing with the company is put on inquiry must depend on all the particular circumstances.

It follows, therefore, that, in my opinion, the judge was right in holding that the rule in Turquand's case, 6 E. & B. 327 is not a mere plea of law, which does not have to be pleaded. The plea asserting "entitlement to rely etc. " is a plea of mixed fact and law. It may well be that, as Mr. Heyman submitted, once the point has been properly pleaded it shifts the onus of proof so that the presumption of regularity stands until rebutted: see Mahony v. East Holyford Mining Co. (1875) L.R. 7 H.L. 869. In my opinion, however, it was at very least incumbent on the defendants, if they wished to take the point, to plead in the alternative that, even if (which they denied) the resolution of 22 January 1969 had not been duly passed, they did not know of this irregularity and were entitled to rely on it as one which had been duly passed. This would have been a conventional plea by way of confession and avoidance, which would have put the plaintiff's legal advisers on notice that they had to adduce evidence, if they could, to show actual or constructive knowledge of the relevant facts on the part of Colvilles and British Steel Corporation or their legal advisers and to explore these matters, so far as possible, in cross-examination of the defendants' witnesses.

As matters stood, the plaintiff and its legal advisers had been given no such notice whatever, either by way of pleading or by way of less formal warning, that the Turquand's case point was going to be taken until 31 March 1981, after the evidence had been closed. When, on 2 April, there was full argument as to whether the amendment should be allowed, Mr. Morritt pointed out that he had not

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908
**(Cite as: [1986] Ch. 246)**

cross-examined Mr. Edwards on this line at all and that, if he had done so or if he had opened the point, the defendants might have been obliged to call Mr. Shenton and his assistant Mr. Hoare, which they did not do.

When he came to give judgment, the judge rejected as "fanciful" the possibility that, if the defence had been properly pleaded, the evidence might have taken a different course. Not only did he give the defendants leave to amend to raise the Turquand's case point, he also decided that it afforded a complete answer to the otherwise unanswerable no due authorisation point raised by the plaintiff. In so doing he made no specific finding of fact as to Colvilles' state of knowledge. But, I think that, by necessary implication, he found as a fact that Colvilles neither knew nor ought to have known that Mr. Shenkman had failed duly to declare his personal interest.

This court will always be slow to interfere with the exercise of his discretion by a trial judge in relation to the amendment of pleadings. For my part, however, with great respect to the judge, I feel no doubt that he erred in the exercise of his discretion in dealing with this point in the way in which he did. I am far from satisfied that Mr. Morritt's **\*286** complaints as to the handicaps in which the course of the proceedings had placed him in relation to the adduction of evidence were "fanciful." Though, for obvious reasons, these matters were never ventilated in evidence, I suspect, for example, that cross-examination of Mr. Edwards, as a well-trained lawyer, could well have elicited admissions sufficient to indicate that Colvilles and British Steel Corporation, through their legal advisers, were sufficiently put on inquiry in the relevant sense as to whether Mr. Shenkman had duly declared his interest. If, therefore, the onus were to be regarded as falling on the plaintiff to establish that Colvilles and British Steel Corporation had actual or constructive knowledge of the breach of the articles of the plaintiff, I do not think that the plaintiff was given a fair and adequate opportunity to establish this.

If, on the other hand, this onus is to be regarded as falling on the defendants, I do not see how it can be said that they have discharged it, since they called no evidence from Mr. Edwards, or anyone else, to the effect that they believed that the requisite declaration of interest by Mr. Shenkman had been made. The certified extract of the minutes of the board meeting of the plaintiff which was supplied to Colvilles suggested quite the contrary.

Mr. Heyman submitted that the judge was the best person to judge whether the allowance of the amendment at such a late stage in the trial would truly prejudice the plaintiff. He went on to submit that, if there had been real potential prejudice of this nature, the plaintiff's counsel could, and should, have "insisted" on an immediate ruling by the judge and, if the amendment had been allowed, could have sought an adjournment as far as necessary. He submitted that it would be unjust to the defendants to disallow the amendment at this stage, when it is too late for Mr. Edwards to be recalled to give further evidence on this point. However, in the light of the course of the trial which I have described, I think that the defendants' submission that it was incumbent on the plaintiff's counsel (not counsel who was seeking to take the Turquand's case point) to "insist" on an earlier ruling was, to put it at its lowest, a bold one. By the time that the judge came to give judgment it was, in my respectful opinion, far too late to allow the Turquand's case point to be taken by amendment. If the point was to be taken at all by the defendants' counsel, some warning of this should at very latest have been given during the plaintiff's counsel's opening at the trial, before the start, rather than after the conclusion, of the hearing of the evidence.

It follows that, in my opinion, the plaintiff's cross-appeal succeeds, and there is no defence to the no due authorisation point. Neither the debenture nor the guarantee were the deeds of the plaintiff, which is entitled wholly to disclaim them as having been made without its authority and not duly executed. I will revert to the further consequences of this conclusion when I come to the question of relief.

The ultra vires point

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

For many years the phrase "ultra vires" has from time to time been used by company lawyers in two senses. Primarily it is used to describe **\*287** acts which are beyond the capacity of a company. As is pointed out by the editors of Gore-Browne on Companies, 43rd ed. (1977), para. 3-1, the phrase is also sometimes used to describe acts which are not beyond the capacity of the company but simply beyond the authority of either the board of directors or a majority of the shareholders.

In many instances the sense in which the phrase is being used is far from clear. However, I think it plain that paragraphs 11 and 13 of the statement of claim in this case, in alleging that each of the guarantee and the debenture were "ultra vires and void," were intended to allege that their execution was beyond the corporate capacity of the plaintiff on the grounds that they were executed not for the purposes or benefit of the plaintiff but for the purposes or benefit of Mr. Shenkman.

Subject to a point relating to the true construction of the words "as may seem expedient" in clause 3(K) of the memorandum of association there is no doubt that these two transactions fell within the letter of clause 3(K) and (L) of the memorandum. Accordingly, two important points of principle which arise in the present context may be expressed thus: Is a transaction which falls within the letter of the powers conferred on a company incorporated under the Companies Acts but is effected for a purpose not authorised by its memorandum of association properly to be regarded as being beyond the corporate capacity of the company? Apart from section 9(1) of the European Communities Act 1972, is such a transaction capable of conferring rights on a third party dealing with the company and, if so, in what circumstances?

The legal personality of a company incorporated under the Companies Acts exists only for the purpose of its incorporation, as defined in the objects clause, which have to be set out in its memorandum of association as required by section 2(1)(c) of the Companies Act 1948. It does not, however, follow that any act is beyond its capacity unless expressly authorised by its objects clause. Any such company is treated as having implied powers to do any act which is reasonably incidental to the attainment or pursuit of any of its express objects, unless such act is expressly prohibited by the memorandum: see In re Horsley & Weight Ltd. [1982] Ch. 442, 448 *per* Buckley L.J. Strictly, therefore, it is not essential for the memorandum to insert any reference at all to mere powers as distinct from objects. Indeed, in Cotman v. Brougham [1918] A.C. 514, 522-523 Lord Wrenbury deprecated the widespread practice of introducing what should properly be called mere powers in memoranda, as opposed to articles of association, though he confessed that, when a junior at the Bar, he himself had had to yield to it after "a vain struggle."

The statutory requirement that the objects of a company shall be specified in the memorandum marks one important difference between objects and powers. In my judgment, however, whether a particular transaction, carried out in purported exercise of an express or implied power contained in a company's memorandum of association, is within the capacity of the company must still depend on the true construction of that memorandum.

Correctly, therefore, in my opinion, Mr. Heyman's argument has focused attention in the present context on the wording of the **\*288** memorandum of the plaintiff. His first submission has been that the guarantee was intra vires the plaintiff as a matter of corporate capacity because the provisions of clause 3(K) of the plaintiff's memorandum, read together with the closing words of that clause, set out a separate independent object which the plaintiff was capable of carrying on as such, and that the execution of the guarantee fell within that provision.

If this submission as to the construction of clause 3(K) were well-founded, I think the suggested conclusion would follow and that, while the relevant transactions might have involved breaches of duty on the part of the directors of the plaintiff, there would be no possible question of their having been beyond its corporate capacity. For the recent decision of this court in In re Horsley & Weight Ltd.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1982] Ch. 442 has made clear, if this was not clear before:

"the doing of an act which is expressed" - by the company's memorandum - "to be, and is capable of being, an independent object of the company cannot be ultra vires, for it is by definition something which the company is formed to do and so must be intra vires."

See *per* Buckley L.J. at p. 449, and also *per* Cumming-Bruce L.J. at p. 454 and *per* Templeman L.J. at p. 455. Furthermore, I think this decision also shows that this same principle applies whether or not the transaction in question is of a gratuitous nature:

"The objects of a company do not need to be commercial; they can be charitable or philanthropic; indeed, they can be whatever the original incorporators wish, provided that they are legal. Nor is there any reason why a company should not part with its funds gratuitously or for non-commercial reasons if to do so is within its declared objects."

See *per* Buckley L.J. at p. 450.

In the light of the observations of Buckley L.J. in that case, at p. 452, of Pennycuick J. in Charterbridge Corporation Ltd. v. Lloyds Bank Ltd. [1970] Ch. 62, 69-71 and of Oliver J. in In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016, 1028-1030, the three tests of ultra vires suggested by Eve J. in an often cited passage in his judgment in In re Lee, Behrens and Co. Ltd. [1932] 2 Ch. 46, 51, should, in my opinion, now be recognised as being of no assistance, and indeed positively misleading, when the relevant question is whether a particular gratuitous transaction is within a company's corporate capacity. To this extent the tests should, I think, be finally laid to rest, though they may well be helpful in considering whether or not in any given case directors have abused the powers vested in them by the company.

The question whether clause 3(K) of the plaintiff's memorandum contains a separate independent object of the company is purely one of construction of that memorandum. The decision of the House of Lords in Cotman v. Brougham [1918] A.C. 514 requires that, in answering it, full force must be given, so far as possible, to the provision at the end of clause 3 of the memorandum, which directs that each sub-clause shall be construed independently of the other sub-clauses. I accept Mr. Heyman's **\*289** submission that clause 3(K) must be treated as containing a substantive object unless either (i) the subject matter of this sub-clause is by its nature incapable of constituting a substantive object (as was the power to borrow in Introductions Ltd. v. National Provincial Bank Ltd. [1970] Ch. 199) or (ii) the wording of the memorandum shows expressly or by implication that the sub-clause was intended merely to constitute an ancillary power only: see, for example, the observations of Buckley J. in the latter case at first instance [1968] 2 All E.R. 1221, 1224.

Mr. Heyman has submitted, and I agree, that there is no reason in principle why a company should not be formed for the specific purpose, inter alia, of giving guarantees whether gratuitous or otherwise, rather unusual though such an object might be.

Attention, however, has to be directed to the particular wording of clause 3(K). The authority to give guarantees and become security conferred by the second limb of the sub-clause is not an unrestricted authority. It is merely an authority to give guarantees or become security for "any such persons, firms or companies." The six words just quoted echo the words of the first limb of the sub-clause, which authorise the company to

"lend and advance money or give credit to such persons, firms, or companies and on such terms as may seem expedient, and in particular to customers of and others having dealings with the company."

The phrase "as may seem expedient" necessarily implies that there is some criterion by which expediency is to be tested. The only possible criterion, in my opinion, can only mean "as may seem expedient for the furtherance of the objects of the company." The references in clause 3(K) to the giving of credit and to customers of and persons having dealings with the company make it additionally clear that the sub-clause in its context was intended to comprise merely a series of ancillary powers. It

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

follows that, in my opinion, the powers to give guarantees and become security, which are the relevant powers in the present case, are not to be construed as independent objects of the plaintiff and the judge was right in so holding. Correspondingly, I think he was right to reject the defendants' argument that the relevant transactions were intra vires the plaintiff, in so far as that argument was based on the hypothesis that the powers conferred by clause 3(K) were independent objects of the plaintiff.

What, then, is the position if, as I have concluded, the power to give guarantees and to become security are to be regarded as mere powers ancillary to the objects of the plaintiff? Even on this footing, the plaintiff in executing the guarantee and the debenture was performing acts of a nature which, at least seemingly, it was expressly authorised by clause 3(K) and (L) of its memorandum to perform. The particular exercises of these powers were, on the face of them, well capable of falling within the objects of the plaintiff.

The judge, as I have read his judgment, accepted that these transactions were capable of falling within the scope of the wording of the powers conferred on the plaintiff by its memorandum. Nevertheless, **\*290** he considered that there is a general principle of company law that a transaction, which ostensibly falls within the scope of the wording of a company's memorandum but is in fact entered into for some purpose not authorised by that memorandum, will be ultra vires the company in what he called the "wider sense" and will confer rights on another party only if he can show that he dealt with the company in good faith and did not have notice that the transaction was entered into for an unauthorised purpose [1982] Ch. 478, 499. It was primarily on the basis of this principle that the judge ultimately held the defendants in the present case liable to restore the moneys which they had received.

As Lord Selborne said in Ashbury Railway Carriage and Iron Co. Ltd. v. Riche (1875) L.R. 7 H.L. 653, 693:

"a statutory corporation, created by Act of Parlia-

ment for a particular purpose, is limited, as to all its powers, by the purposes of its incorporation as defined in that Act."

Strict logic might therefore appear to require that any act purported to be done by a company in purported exercise of powers ancillary to its objects conferred on it by its memorandum of association, whether express or implied, (e.g., a power to borrow) would necessarily and in every case be beyond its capacity and therefore wholly void if such act was in fact performed for purposes other than those of its incorporation. However, the practical difficulties resulting from such a conclusion for persons dealing with a company carrying on a business authorised by its memorandum would be intolerable. As Buckley J. put it, in regard to a power to borrow, in In re David Payne & Co. Ltd. [1904] 2 Ch. 608, 613:

"A corporation, every time it wants to borrow, cannot be called upon by the lender to expose all its affairs, so that the lender can say, ' Before I lend you anything, I must investigate how you carry on your business, and I must know why you want the money, and how you apply it, and when you do have it I must see you apply it in the right way.' It is perfectly impossible to work out such a principle."

The David Payne decision, in my opinion, indicates the proper alternative approach. In that case, the company concerned had express power under its memorandum of association "to borrow and raise money for the purposes of the company's business." It borrowed money and issued a debenture to secure the loan. Its liquidator claimed that the debenture was ultra vires and void because there was evidence that the borrowing had not in fact been made for the purposes of the company's business. Buckley J. in his judgment considered the force of the phrase "for the purposes of the company's business." He asked the question, at p. 612:

"is it a condition attached to the exercise of the power that the money should be borrowed for the purposes of the business, or is that a matter to be determined as between the shareholders and the directors?"

In the course of answering this question he said, at p. 612: **\*291**

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

"A corporation cannot do anything except for the purposes of its business, borrowing or anything else; everything else is beyond its power, and is ultra vires. So that the words 'for the purposes of the company's business' are a mere expression of that which would be involved if there were no such words."

This passage has been frequently echoed in later cases and, perhaps not surprisingly, has on occasions been read as referring to the capacity of the company. However, I think that in using the phrase "ultra vires" in this particular context Buckley J. can only have meant "ultra vires the directors. " This, in my opinion, is made clear by what followed. He accepted that, if the phrase "for the purpose of the company's business" was a condition attached to the exercise of the power, a loan would be ultra vires and void if the condition had not been complied with. He did not, however, regard it as such a condition: in his view it did no more than state the obvious. In these circumstances, his conclusion was, at p. 613:

"If this borrowing was made, as it appears to me at present it was made, for a purpose illegitimate so far as the borrowing company was concerned, that may very well be a matter on which rights may arise as between the shareholders and directors of that company. It may have been a wrongful act on the part of the directors. But I do not think that a person who lends to the company is by any words such as these required to investigate whether the money borrowed is borrowed for a proper purpose or an improper purpose. The borrowing being effected, and the money passing to the company, the subsequent application of the money is a matter in which the directors may have acted wrongly; but that does not affect the principal act, which is the borrowing of the money."

In these circumstances, he held, at p. 614, that the defendants:

"who have paid this money and taken this debenture without notice that the money was going to be applied as it was, are not affected by anything arising in regard to that."

The most relevant passages in the judgments of the Court of Appeal in the David Payne case [1904] 2 Ch. 608 are cited in Vinelott J.'s judgment [1982] Ch. 478, 498 and I will not repeat them. Vaughan Williams and Cozens-Hardy L.JJ. expressly approved the manner in which Buckley J. had approached the problem. Vaughan Williams L.J. expressly, at p. 615, and the other members of the court implicitly rejected the borrower's first argument that, since the debenture was not issued to raise money for the purposes of the company, it was ultra vires altogether "in such a sense that nothing could make it right." All three members of the court considered that the plaintiff company could succeed if, but only if, it showed that, at the time of the loan, the lending company knew that the money was going to be applied by the borrowers for an improper purpose and that this had not been proved.

The one crucially important point to which Buckley J. and the Court of Appeal in David Payne did not expressly advert is the basis upon which the lenders would have lost their security if they had known of **\*292** the improper purpose for which they lent were going to be applied. The basis is, in my opinion, this. The directors of the borrowing company in fact had no authority from the company to take the loan and grant the debenture because these transactions were not effected for the purposes of the company. Nevertheless, as a general rule, a company incorporated under the Companies Acts holds out its directors as having ostensible authority to do on its behalf anything which its memorandum of association expressly or by implication gives the company the capacity to do. In David Payne the company's memorandum gave it the capacity to borrow. As a matter of construction of the company's memorandum, the court was not prepared to construe the words "for the purposes of the company's business " as limiting its corporate capacity but construed them simply as limiting the authority of the directors. In the absence of notice to the contrary, the lenders would thus have been entitled to assume, on the authority of the principle in Turquand's case, 6 E. & B. 327 and on more general principles of the law of agency, that the directors of the borrowing company were acting properly and regularly in the internal management of its affairs and were borrowing for the purposes of the com-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

pany's business: see, for example, In re Hampshire Land Co. [1896] 2 Ch. 743, a decision of Vaughan Williams J. which was cited in the David Payne case [1904] 2 Ch. 608, and Bowstead on Agency, 14th ed. (1976), pp. 241-242 and the cases there cited. However, a party dealing with a company cannot rely on the ostensible authority of its directors to enter into a particular transaction if it knows they in fact have no such authority because it is being entered into for improper purposes. Neither the rule in Turquand's case nor more general principles of the law of agency will avail him in such circumstances: see Bowstead on Agency, 14th ed., p. 243. The various passages in the judgments in both courts in the David Payne case which refer to the extent of the lender's obligation, if any, to inquire as to the purposes for which the loan is to be used, in my opinion, are not directed at all to the corporate capacity of the borrowing company; they are directed to the right of the lender to rely on the ostensible authority of the borrower's directors.

In Introductions Ltd. v. National Provincial Bank Ltd. [1970] Ch. 199 the Court of Appeal again had to consider the validity of debentures granted by a company as security for a loan. The company under its memorandum of association had a general ancillary power to borrow money and to issue debentures to secure its repayment. But this power was not an independent object of the company. As Harman L.J. put it, at p. 210, "borrowing is not an end in itself and must be for some purpose of the company." The power was not expressed in terms to be exercisable only "for the purposes of the company" but, following the reasoning of Buckley J. in In re David Payne & Co. Ltd. [1904] 2 Ch. 608, 612, the court held that the words necessarily had to be implied. The company had borrowed money from a bank and granted debentures to secure the loan. But the only business carried on by it was that of pig-breeding which was a purpose not authorised by its memorandum of association. On the liquidation of the company a question arose as to the validity of the debentures. Harman L.J., who gave the leading judgment, after deciding that the power to borrow conferred by the *293 memorandum was a mere ancillary power not an independent object, proceeded

to cite, at p. 210, the following passage from the speech of Lord Parker of Waddington in Cotman v. Brougham [1918] A.C. 514, 521:

"A person who deals with a company is entitled to assume that a company can do everything which it is expressly authorised to do by its memorandum of association, and need not investigate the equities between the company and its shareholder."

This passage, it will be seen, closely echoes some of the language used by Buckley J. in his judgment in the David Payne case [1904] 2 Ch. 608 and is, I think, an expression of the rule in Turquand's case, 6 E. & B. 327 and the more general principles of agency to which I have already referred. Harman L.J. went on to say [1970] Ch. 199, 210:

"I would agree that, if the bank did not know what the purpose of the borrowing was, it need not inquire" - the emphasis is mine - "but it did know, and I can find nothing in Cotman v. Brougham to protect it notwithstanding that knowledge."

The words "it need not inquire," in my opinion, make it clear that Harman L.J. did not regard the borrowing as having been beyond the capacity of the company. However, he then went on to point out that the David Payne decision [1904] 2 Ch. 608 shows that the protection afforded by the principle stated by Lord Parker affords no protection to a lender who knows that the money is intended to be misapplied. The absence of any express provision in the company's memorandum of association requiring the loan to be applied for the purposes of the company, in his judgment, did not improve the bank's position, since such a provision would fall to be implied anyway. He concluded, at p. 211:

"This borrowing was not for a legitimate purpose of the company: the bank knew it, and, therefore," - the emphasis is mine - "cannot rely on its debentures."

As I read his judgment, therefore, Harman L.J. reached his decision that the bank could not rely on the debentures following the ratio of the David Payne decision, that is to say, not because they had been granted by the company in excess of its corporate capacity, but because the bank knew that the directors of the company, in purporting to grant them, had exceeded the authority conferred on them

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

by the company by entering into the transaction for purposes other than the company's corporate purpose.

Russell L.J. [1970] Ch. 199, 211, in a very short judgment, reached the same conclusion but by rather a different route from that of Harman L.J. As I read his judgment, his view was that the borrowing and execution of the debentures were ultra vires the company as a matter of corporate capacity because it was an implicit condition attached to the power to borrow contained in the company's memorandum that moneys should not be borrowed for use in an undertaking ultra vires the company. Since the sole undertaking of that company was the pig-breeding business, which was beyond the company's corporate capacity, **\*294** the loans taken for use in that business were likewise inevitably beyond its corporate capacity. I read Russell L.J.'s decision as being limited to the facts of that particular case and not in any way conflicting with my interpretation of the David Payne decision.

It follows that, in my opinion, the decisions of this court in David Payne [1904] 2 Ch. 608 and Introductions Ltd. [1970] Ch. 199, on their true analysis, lend no support to the plaintiff's submission that the relevant transactions in the present case were beyond the corporate capacity of the plaintiff simply because they were effected for improper purposes not authorised by its memorandum of association. Nor does this argument derive any support from the powerful judgment of Pennycuick J. in Charterbridge Corporation Ltd. v. Lloyds Bank Ltd. [1970] Ch. 62, where one finds the following statement of principle, at p. 69:

"Apart from authority, I should feel little doubt that where a company is carrying out the purposes expressed in its memorandum, and does an act within the scope of a power expressed in its memorandum, that act is an act within the powers of the company. The memorandum of a company sets out its objects and proclaims them to persons dealing with the company and it would be contrary to the whole function of a memorandum that objects unequivocally set out in it should be subject to some implied limitation by reference to the state of

mind of the parties concerned.

"Where directors misapply the assets of their company, that may give rise to a claim based on breach of duty. Again, a claim may arise against the other party to the transaction, if he has notice that the transaction was effected in breach of duty. Further, in a proper case, the company concerned may be entitled to have the transaction set aside. But all that results from the ordinary law of agency and has not of itself anything to do with the corporate powers of the company."

Pennycuick J., having subsequently proceeded to review the authorities cited to him, apparently saw no reason to qualify this statement of the law and neither do I. I respectfully agree with it in its entirety and would regard the principles stated in the David Payne case [1904] 2 Ch. 608 as giving effect to the "ordinary law of agency."

I also respectfully agree with the following observations made by Oliver J., after an extensive review of the authorities, in In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016, 1029-1030:

"I cannot help thinking, if I may respectfully say so, that there has been a certain confusion between the requirements for a valid exercise of the fiduciary powers of directors (which have nothing to do with the capacity of the company but everything to do with the propriety of acts done within that capacity), the extent to which powers can be implied or limits be placed, as a matter of construction, on express powers, and the matters which the court will take into consideration at the suit of a minority shareholder in determining the extent to which his interests can be overridden by a majority vote. These three matters, as it seems to me, raise **\*295** questions which are logically quite distinct but which have sometimes been treated as if they demanded a single, universal answer leading to the conclusion that, because a power must not be abused, therefore, beyond the limit of propriety it does not exist."

My conclusions from these authorities on these questions of principle may be summarised as follows. (1) The basic rule is that a company incorpor-

Case 1:07-cv-01646-RMC      Document 39-4      Filed 01/31/2008      Page 120 of 162

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

ated under the Companies Acts only has the capacity to do those acts which fall within its objects as set out in its memorandum of association or are reasonably incidental to the attainment or pursuit of those objects. Ultimately, therefore, the question whether a particular transaction is within or outside its capacity must depend on the true construction of the memorandum.

(2) Nevertheless, if a particular act (such as each of the transactions of 22 January 1969 in the present case) is of a category which, on the true contruction of the company's memorandum, is capable of being performed as reasonably incidental to the attainment or pursuit of its objects, it will not be rendered ultra vires the company merely because in a particular instance its directors, in performing the act in its name, are in truth doing so for purposes other than those set out in its memorandum. Subject to any express restrictions on the relevant power which may be contained in the memorandum, the state of mind or knowledge of the persons managing the company's affairs or of the persons dealing with it is irrelevant in considering questions of corporate capacity.

(3) While due regard must be paid to any express conditions attached to or limitations on powers contained in a company's memorandum (e.g., a power to borrow only up to a specified amount), the court will not ordinarily construe a statement in a memorandum that a particular power is exercisable "for the purposes of the company" as a condition limiting the company's corporate capacity to exercise the power; it will regard it as simply imposing a limit on the authority of the directors: see the David Payne case [1904] 2 Ch. 608.

(4) At least in default of the unanimous consent of all the shareholders (as to which see below), the directors of a company will not have actual authority from the company to exercise any express or implied power other than for the purposes of the company as set out in its memorandum of association.

(5) A company holds out its directors as having ostensible authority to bind the company to any trans-

action which falls within the powers expressly or impliedly conferred on it by its memorandum of association. Unless he is put on notice to the contrary, a person dealing in good faith with a company which is carrying on an intra vires business is entitled to assume that its directors are properly exercising such powers for the purposes of the company as set out in its memorandum. Correspondingly, such a person in such circumstances can hold the company to any transaction of this nature.

(6) If, however, a person dealing with a company is on notice that the directors are exercising the relevant power for purposes other than the purposes of the company, he cannot rely on the ostensible authority *296 of the directors and, on ordinary principles of agency, cannot hold the company to the transaction.

In the present case I construe the words "as may seem expedient" in clause 3(K) of the plaintiff's memorandum not as limiting the corporate capacity of the plaintiff but as simply imposing a limit on the authority of its directors. To adapt the wording of Harman L.J. in the Introductions Ltd. case [1970] Ch. 199 following the David Payne decision [1904] 2 Ch. 608, the guarantee and pro tanto the debenture were not executed for a legitimate purpose of the plaintiff; Colvilles and British Steel Corporation knew it and, therefore, cannot rely on the guarantee and pro tanto the debenture. All this results from the ordinary law of agency, not from the corporate powers of the plaintiff. The relevant transactions in the present case, in my opinion, were not beyond its corporate capacity.

The judge [1982] Ch. 478, 499 explained that the reason why he regarded a transaction which is within the powers, express or implied, of a company but which is entered into for a purpose which is not authorised by its memorandum of association as equated with one which is ultra vires in the narrow sense is that "such a transaction like a transaction which is ultra vires in the narrow sense is incapable of being made binding on the company even by the assent of all the members." We have had the benefit of extensive argument as to the extent, if any, to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

which the assent of all the members of a company is capable of binding it to a transaction of this nature. Since the shareholders' consent point is not open to British Steel Corporation and Mr. Cooper on the facts of the present case, I wish to make only the following few, obiter, observations in the context of this argument.

First, if an act is beyond the corporate capacity of a company it is clear that it cannot be ratified. As against the company itself "an ultra vires agreement cannot become intra vires by means of estoppel, lapse of time, ratification, acquiescence, or delay": York Corporation v. Henry Leetham and Sons Ltd. [1924] 1 Ch. 557, 573 *per* Russell J. However, the clear general principle is that any act that falls within the corporate capacity of a company will bind it if it is done with the unanimous consents of all the shareholders or is subsequently ratified by such consents: see, for example, Salomon v. A. Salomon & Co. Ltd. [1897] A.C. 22, 57 *per* Lord Davey; In re Horsley & Weight Ltd. [1982] Ch. 442, 454 *per* Buckley L.J. and Multinational Gas and Petrochemical Co. v. Multinational Gas and Petrochemical Services Ltd. [1983] Ch. 258. This last-mentioned principle certainly is not an unqualified one. In particular, it will not enable the shareholders of a company to bind the company itself to a transaction which constitutes a fraud on its creditors: see, for example, In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016, 1037, *per* Oliver J. But none of the authorities which have been cited to us have convinced me that a transaction which (i) falls within the letter of the express or implied powers of a company conferred by its memorandum, and (ii) does not involve a fraud on its creditors, and (iii) is assented to by all the shareholders, will not bind a fully solvent company merely because the intention of the directors, or the shareholders, is to effect a purpose not authorised by the memorandum. **\*297** The recent decision of this court in the Multinational case [1983] Ch. 258 seems to me to point to a contrary conclusion: see also Attorney-General's Reference (No. 2 of 1982) [1984] Q.B. 624, 640, *per* Kerr L.J. However, none of these matters relating to ratification, in my opinion, call for decision on this appeal. I have touched on them only be-

cause they weighed with the judge and have been covered fully in argument.

Whether or not in 1969 the consent or ratification of all the shareholders was incapable of rendering the transactions of 22 January 1969 binding the plaintiff, I myself think that the concept of ultra vires "in the wider sense " embodied by the judge in his judgment carries with it some risk of confusion. If confusion is to be avoided, it seems to me highly desirable that, as a matter of terminology, the phrase "ultra vires" in the context of company law should for the future be rigidly confined to describing acts which are beyond the corporate capacity of a company. Transactions entered into by a company such as those considered in the David Payne case [1904] 2 Ch. 608 and those under consideration in the present case cannot, in my opinion, be properly regarded as beyond its corporate capacity (and, therefore, ex hypothesi wholly void) if they are capable of conferring rights on a third party - albeit only on a third party who dealt with the company in good faith and without notice that they were being entered into in furtherance of improper purposes.

To sum up, my conclusions on the ultra vires point are these. The relevant transactions of 22 January 1969 were not beyond the corporate capacity of the plaintiff and thus were not ultra vires in the proper sense of that phrase. However, the entering into the guarantee and, to the extent of the sum guaranteed, the debenture was beyond the authority of the directors, because they were entered into in furtherance of purposes not authorised by the plaintiff's memorandum. Despite this lack of authority, they might have been capable of conferring rights on Colvilles if Colvilles had not known of this lack of authority. Colvilles, however, did have such knowledge and so acquired no rights under these transactions. Even if the no due authorisation point discussed earlier in this judgment were not open to the plaintiff, because Mr. Shenkman had duly declared his interest at the relevant board meeting, the plaintiff could disclaim these transactions, which its directors had carried out on its behalf, as being unauthorised, inasmuch as they were carried out for

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

improper purposes. The practical relevance of the no due authorisation point discussed in an earlier section of this judgment is that it enables the plaintiff also to disclaim the borrowing of the £401,448 and the whole (as opposed to part only) of the security given by the debenture (as having been in each case entered into by the directors without his authority) and also to attack the validity of the receiver's appointment.

The constructive trust point

I now turn much more briefly to the constructive trust point. Buckley L.J. stated the relevant principle thus in Belmont Finance Corporation Ltd. v. Williams Furniture Ltd. (No. 2) [1980] 1 All E.R. 393, 405 in a judgment with which Goff and Waller L.JJ. agreed: **\*298**

"A limited company is of course not a trustee of its own funds: it is their beneficial owner; but in consequence of the fiduciary character of their duties the directors of a limited company are treated as if they were trustees of those funds of the company which are in their hands or under their control, and if they misapply them they commit a breach of trust (In re Lands Allotment Co. [1894] 1 Ch. 616, 638 per Lindley and Kay L.JJ.). So, if the directors of a company in breach of their fiduciary duties misapply the funds of their company so that they come into the hands of some stranger to the trust who receives them with knowledge (actual or constructive) of the breach, he cannot conscientiously retain those funds against the company unless he has some better equity. He becomes a constructive trustee for the company of the misapplied funds. This is stated very clearly by Jessel M.R. in Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474, 479, where he said: 'In this court the money of the company is a trust fund, because it is applicable only to the special purposes of the company in the hands of the agents of the company, and it is in that sense a trust fund applicable by them to those special purposes; and a person taking it from them with notice that it is being applied to other purposes cannot in this court say that he is not a constructive trustee.'"

The Belmont principle thus provides a legal route by which a company may recover its assets in a case where its directors have abused their fiduciary duties and a person receiving assets as a result of such abuse is on notice that they have been misapplied. The principle is not linked in any way to the capacity of the company; it is capable of applying whether or not the company had the capacity to do the acts in question.

Furthermore, the Belmont principle must, in my opinion, be equally capable of applying in a case where the relevant misapplication of the company's assets by the directors has consisted either of an application for purposes not authorised by its memorandum or an application in breach of the company's articles of association, e.g., pursuant to a board resolution passed at an inquorate meeting of the directors.

From the findings of fact of the judge, with which I see no reason to disagree for reasons already stated, I think it clear that (a) the directors of the plaintiff were acting in breach of the plaintiff's articles of association and of their fiduciary duties to the plaintiff in purporting to authorise and in executing the guarantee and debenture; (b) British Steel Corporation and Mr. Cooper had notice of these facts when they respectively received the relevant assets.

It must follow, in my opinion, that the constructive trust point is well founded and that the plaintiff is entitled to relief on this ground as well as on the additional grounds to which I have already referred.

The relief to be granted

Finally, I turn to consider the relief to be granted to the plaintiff. The judge, having found in favour of the plaintiff on the ultra vires and constructive trust points, ordered in effect that the guarantee be set **\*299** aside. He further ordered that British Steel Corporation and the receiver and, to the extent of the assets coming to their hands as personal representatives, the fifth and sixth defendants, were jointly and severally liable to pay to the plaintiff (a) the sum of £383,084.77 (being the principal amount received by British Steel Corporation in discharge

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1986] Ch. 246
1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908
**(Cite as: [1986] Ch. 246)**

Case 1:07-cv-01646-RMC    Document 39-4    Filed 01/31/2008    Page 123 of 162    Page 41

of the guarantee out of the proceeds of sale of the plaintiff's assets realised by the receiver), and, in addition, (b) all interest paid by the receiver to British Steel Corporation under the terms of the agreement and the debenture of 22 January 1969 in respect of the principal amount secured by the guarantee and (c) the amount for which the receiver accounted to the Inland Revenue in respect of tax deducted therefrom. In the exercise of his discretion he also ordered payment of interest on the abovementioned sums and a number of accounts and inquiries. He also gave the plaintiff liberty to prove in Mr. Shenkman's bankruptcy for various sums payable under the order.

The details of the judge's order of 23 March 1983 were finally settled after his second judgment of that date.

One important matter which had to be dealt with in this judgment was the mode of calculation of the interest payable on the sums recoverable by the plaintiff. This interest element has proved to be very large in amount, particularly since the judge in effect ordered that, as to a major part of these sums, the plaintiff is entitled to compound interest. However, neither the defendants' notice of appeal nor the plaintiff's cross-appeal raises any issue of detail in regard to the form of the order relating to interest or otherwise. As to the form of the order, each of them raises just one major point of principle.

The plaintiff for its part seeks wider relief than that granted by the order on the footing that its no due authorisation point is to be accepted and the defendants' Turquand's case point is to be rejected. On this footing, the notice of cross-appeal seeks (1) a declaration that the guarantee, the debenture and the purported appointment of the receiver was and is in each case void and of no effect; and (2) payment to the plaintiff of the sum of £ 1,148,078.15 as money had and received for the use of the plaintiff with interest under the Law Reform (Miscellaneous Provisions) Act 1934.

As to (1) my present view is that the appropriate

form of relief is a declaration that each of the agreement, guarantee and debenture was not and is not the deed of the plaintiff and that the purported appointment of the receiver was and is void and of no effect. A declaration in this form would leave open the question whether the guarantee and debenture had effect to the extent of exposing the directors of the plaintiff who executed it to some personal liability to Colvilles.

As to (2) the manner in which the sum of £1,148,078.15 is arrived at appears from the last sentence in the opening section of this judgment. Mr. Morritt, however, submitted in effect that, if the plaintiff succeeded on the no due authorisation point the existing order should remain but there should be added to it, first, an order for payment to the plaintiff of an additional sum of £ 401,448 plus interest and, secondly, a declaration that British Steel Corporation is entitled to prove in the liquidation of **300** the plaintiff for this sum but without interest. He further submitted that the sum of £50,000 retained by the receiver should be repaid.

As at present advised, I do not think that an order in the form suggested by Mr. Morritt would do equity. The effect of my conclusion on the no due authorisation point is that the directors of the plaintiff, purporting to act on behalf of the plaintiff but without its authority, have borrowed a sum of £ 401,448 from Colvilles. This particular sum, however, was immediately applied by the directors of the plaintiff for the benefit of the plaintiff in discharging the plaintiff's liability to Scottish Steel. The result was that the aggregate liabilities of the plaintiff remained the same, save for the obligation to pay interest to Colvilles at a rate higher than that (if any) which had been agreed with Scottish Steel. A general principle of equity, as I understand it, is that, by an unauthorised act of an agent, the money of a third party is obtained and applied for the benefit of the principal, the principal is liable to restore such money to the extent that it has been so applied, even though the third party knew that the agent was not authorised to obtain or receive the money: see Bowstead on Agency, 14th ed., p. 330 and Reversion Fund and Insurance Co. Ltd. v.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

Maison Cosway Ltd. [1913] 1 K.B. 364. It seems to me, therefore, that the plaintiff was at all material times under an obligation to repay the £401,448 to Colvilles or British Steel Corporation and that the plaintiff cannot now seek redress against the defendants on the basis that the sum of £401,448 was improperly paid to British Steel Corporation.

However, as I understand the position, the receiver repaid to British Steel Corporation not only the capital sum of £401,448, but interest on this sum as provided by the agreement and debenture. I do not see how British Steel Corporation can justify the receipt and retention of this interest element if the agreement and debenture are not binding on the plaintiff. My present view, therefore, is that the judge's order should be varied so as to include an order for payment of this interest element, plus the £50,000 retained by the receiver in respect of fees and expenses, together with interest on those two respective sums, but not the sum of £401,448 itself.

I now turn to the point of principle raised by British Steel Corporation and the receiver as to the form of the order. If a surplus remains in the hands of the liquidator of the plaintiff after all its liabilities and the costs, charges and expenses of the liquidation have been discharged, that surplus will fall to be distributed among the shareholders of the plaintiff who, so far as the evidence shows, are still the trustee-shareholders and Mr. Shenkman. He, I understand, has now obtained his discharge from bankruptcy. Since Mr. Shenkman was an active participant in the relevant breaches of trust by the directors of the plaintiff and the trustee-shareholders, according to the defendants' submission, consented to those breaches of trust, Mr. Heyman submitted that it would be inequitable if there were any possibility of the order made by the court resulting in the receipt by Mr. Shenkman or the trustee-shareholders of any part of the assets repaid by British Steel Corporation and the receiver to the plaintiff pursuant to the order. He therefore sought, and obtained from this court, leave to amend the notice of appeal by raising *301 a point not pleaded or argued in the court below. The submission is in effect that the order should place a limit on the liab-

ility of British Steel Corporation and the receiver so as to provide that the aggregate amount which falls to be paid by British Steel Corporation and the receiver to the plaintiff, including interest, is not to exceed a sum sufficient to enable the liquidator of the plaintiff to discharge in full the liabilities, costs, charges and expenses already mentioned.

This submission is based on the principle exemplified by the decision of this court in In re Somerset [1894] 1 Ch. 231 which deals with the position of beneficiaries who have instigated or consented to a breach of trust. At least in so far as it is directed against Mr. Shenkman, I have much sympathy with it. In the context of this litigation, he seems to me to have no merits whatever, except that the judge thought him an honest witness. However, in my view, it is impossible for this court to accede to the submission for these two reasons, if no others. First, for the reasons already given, British Steel Corporation and the receiver cannot on this appeal be heard to say that the trustee-shareholders did in fact consent to the transactions. Secondly, Mr. Shenkman's trustee in bankruptcy has a clear interest in this point. He elected to take no part in the proceedings in the court below and this court on the basis of, respectively, the pleadings and the notice of appeal in its original form, neither of which made any reference at all to the possibility of the defendants' liability being limited in this manner. In these circumstances, I do not think that by its order this court can properly place the suggested limit on such liability which might enure to the detriment of the trustee in bankruptcy and the creditors whom he represents.

Mr. Heyman requested that, even if this court did not feel able to restrict the defendants' liability, it should, after directing appropriate inquiries as to what is due to the creditors of the plaintiff in respect of capital and interest and in respect of the costs, charges and expenses of the liquidation, direct an issue to be tried as between (1) British Steel Corporation and the receiver, (2) the trustee-shareholders, (3) Mr. Shenkman and (4) Mr. Shenkman's trustee in bankruptcy.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

For my part, however, I do not think it could be right for this court to make such a direction in the absence of Mr. Shenkman and the trustee in bankruptcy, who have had no notice whatever that the point was going to be raised on this appeal or the trustee-shareholders who are not even parties to the proceedings. While I have in principle some sympathy with the point, the furthest that I feel the court can and should go to assist British Steel Corporation and the receiver is to add a proviso to the order to the effect that (i) the order for payment thereby made shall not prejudice or affect the respective rights (if any) of British Steel Corporation, Mr. Shenkman, Mr. Shenkman's trustee in bankruptcy or the other shareholders in the plaintiff as between themselves to participate in the moneys paid; (ii) the liquidator of the plaintiff shall not distribute any moneys so paid to Mr. Shenkman or his trustee in bankruptcy or the other shareholders in the plaintiff without giving, say, 21 days prior written notice to British Steel Corporation's solicitors of the intention to make such distribution. I should, perhaps, make it clear that, while British Steel Corporation and the receiver have not been **\*302** permitted to raise the shareholders' consent point on this appeal, there will, in my opinion, be nothing to prevent them from raising the point, for what it is worth, in the liquidation of the plaintiff or in any other proceedings.

The decision in the Reversion Fund case [1913] 1 K.B. 364 was not cited in the course of argument before this court. For this reason, if no other, I think the parties must be given the opportunity to present argument to us, if they wish to do so and think it will serve a useful purpose, as to the precise form of relief to be granted in the light of our conclusions on the substantive issues.

Subject to this, I would (1) dismiss the appeal of British Steel Corporation and the receiver; (2) allow the cross-appeal of the plaintiff; (3) vary the judge's order so as to include (a) a declaration that each of the agreement, the guarantee and the debenture of 22 January 1969 was not and is not the deed of the plaintiff, (b) a declaration that the purported appointment of Mr. Cooper as receiver was and is

void and of no effect, (c) an order for payment or repayment of (i) the interest element received by British Steel Corporation from the receiver in respect of the £401,448 (ii) the £50,000 received by the receiver and (iii) interest on these two last mentioned sums, and (d) a proviso of the nature which I have already indicated; and (4) in all other respects uphold the judge's order.

BROWNE-WILKINSON L.J.

I have had the advantage of reading the judgment of Slade L.J., with which I agree. I add my own views only on the ultra vires and constructive trust points which, despite section 9 of the European Communities Act 1972, are still of some general importance.

The judge drew a distinction between two meanings of ultra vires which he called the "narrow sense" and the "wider sense." As I understand his judgment, he treated ultra vires in the narrow sense as covering any transaction outside the express or implied powers of a company stated in its memorandum of association and ultra vires in the wider sense as covering a transaction which, although within such powers, is entered into in furtherance of "some purpose which is not an authorised purpose": [1982] 1 Ch. 478, 497. Although it is not entirely clear, he appears to have treated transactions which are ultra vires in his narrow sense as being wholly void as opposed to those which are ultra vires in the wider sense, which are capable of conferring rights on third parties who have no notice of the invalidity: see p. 499. He then apparently held that the guarantee by the plaintiff was ultra vires in the wider sense and, since British Steel Corporation had notice of that fact, it was unenforceable by British Steel Corporation.

In my judgment, much of the confusion that has crept into the law flows from the use of the phrase "ultra vires" in different senses in different contexts. The reconciliation of the authorities can only be achieved if one first defines the sense in which one is using the words "ultra vires." Because the literal translation of the words is "beyond the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

powers," there are many cases in which the words have been applied to transactions which, although within the capacity of the company, are *303 carried out otherwise than through the correct exercise of the powers of the company by its officers: indeed, that is the sense in which the judge seems to have used the words in this case. For reasons which will appear, in my judgment, the use of the phrase "ultra vires" should be restricted to those cases where the transaction is beyond the capacity of the company and therefore wholly void.

A company, being an artificial person, has no capacity to do anything outside the objects specified in its memorandum of association. If the transaction is outside the objects, in law it is wholly void. But the objects of a company and the powers conferred on a company to carry out those objects are two different things: see Cotman v. Brougham [1918] A.C. 514 especially *per* Lord Parker of Waddington, at p. 520, and *per* Lord Wrenbury, at p. 522. If the concept that a company cannot do anything which is not authorised by law had been pursued with ruthless logic, the result might have been reached that a company could not (i.e., had no capacity) to do anything otherwise than in due exercise of its powers. But such ruthless logic has not been pursued and it is clear that a transaction falling within the objects of the company is capable of conferring rights on third parties even though the transaction was an abuse of the powers of the company: see, for example, In re David Payne & Co. Ltd. [1904] 2 Ch. 608. It is therefore established that a company has capacity to carry out a transaction which falls within its objects even though carried out by the wrongful exercise of its powers.

In my judgment, for this purpose the position of a company is analogous to that of a human being who has fiduciary powers. If two trustees convey trust property in breach of trust, the conveyance is not void. As human beings they have the capacity to transfer the legal estate: their capacity to transfer flows from their status as human beings, not from the powers conferred on them as trustees. Even if their powers under the trust instrument did not authorise the conveyance, the legal estate will vest in

the transferee. Beneficiaries under the trust would be entitled, if they learnt in time, to restrain the execution of such conveyance in excess of the powers of the trustees. If the beneficiaries only discovered the position after the conveyance, the transferee, if he took with notice, would be personally liable as a constructive trustee and the property conveyed could be recovered: but the conveyance would not be a nullity. So in the case of a limited company, if a transaction falls within the objects of the company (and is therefore within its capacity) it is effective to vest rights in a third party even if the transaction was carried out in excess or abuse of the powers of the company. If the members of the company learn of what is proposed in time, they will be able to restrain such transaction: if they only discover the facts later, their remedy lies against those who have wrongly caused the company to act in excess or abuse of the company's powers. If a third party has received the company's property with notice of the excess or abuse of powers, such third party will be personally liable as a constructive trustee and the company will be able to recover the property: see Belmont Finance Corporation Ltd. v. Williams Furniture Ltd. (No. 2) [1980] 1 All E.R. 393.

*304 However, the analogy between companies and trustees is not complete. As an artificial person, a company can only act by duly authorised agents. Apart from questions of ostensible authority, directors like any other agents can only bind the company by acts done in accordance with the formal requirements of their agency, e.g., by resolution of the board at a properly constituted meeting. Acts done otherwise than in accordance with these formal requirements will not be the acts of the company. However, the principles of ostensible authority apply to the acts of directors acting as agents of the company and the rule in Turquand's case, 6 E. & B. 327 establishes that a third party dealing in good faith with directors is entitled to assume that the internal steps requisite for the formal validity of the directors' acts have been duly carried through. If, however, the third party has actual or constructive notice that such steps had not been taken, he will not be able to rely on any ostensible authority of the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

directors and their acts, being in excess of their actual authority, will not be the acts of the company.

The critical distinction is, therefore, between acts done in excess of the capacity of the company on the one hand and acts done in excess or abuse of the powers of the company on the other. If the transaction is beyond the capacity of the company it is in any event a nullity and wholly void: whether or not the third party had notice of the invalidity, property transferred or money paid under such a transaction will be recoverable from the third party. If, on the other hand, the transaction (although in excess or abuse of powers) is within the capacity of the company, the position of the third party depends upon whether or not he had notice that the transaction was in excess or abuse of the powers of the company. As between the shareholders and the directors, for most purposes it makes no practical difference whether the transaction is beyond the capacity of the company or merely in excess or abuse of its power: in either event the shareholders will be able to restrain the carrying out of the transaction or hold liable those who have carried it out. Only if the question of ratification by all the shareholders arises will it be material to consider whether the transaction is beyond the capacity of the company since it is established that, although all the shareholders can ratify a transaction within the company's capacity, they cannot ratify a transaction falling outside its objects.

In this judgment I therefore use the words "ultra vires" as covering only those transactions which the company has no capacity to carry out, i.e., those things the company cannot do at all as opposed to those things it cannot properly do.

The two badges of a transaction which is ultra vires in that sense are (1) that the transaction is wholly void and (consequentially) (2) that it is irrelevant whether or not the third party had notice. It is therefore in this sense that the transactions in In re David Payne & Co. Ltd. [1904] 2 Ch. 608 and Charterbridge Corporation Ltd. v. Lloyds Bank Ltd. [1970] Ch. 62 were held not to be ultra vires. The distinction between the capacity of the company and abuse

of powers was also drawn by Oliver J. in In re Halt Garage (1964) Ltd. [1982] 3 All E.R. 1016, 1034. I consider the reasoning of the decision in In re Lee, Behrens and Co. Ltd. [1932] 2 Ch. 46 *305 to be wrong for the reasons given by Pennycuick J. in the Charterbridge case [1970] Ch. 62: the decision itself can only be justified (if at all) on the footing that the widow who was granted a pension had notice of the impropriety of the grant. The only other case which, at first sight, is difficult to reconcile with my views is Introductions Ltd. v. National Provincial Bank Ltd. [1968] 2 All E.R. 1221 and [1970] Ch. 199, which I will consider later.

For these reasons, in considering a claim based on ultra vires, the first step must be to determine what are the objects (as opposed to the powers) of a company. Not all activities mentioned in the objects clause are necessarily objects in the strict sense: some of them may only be capable of existing as, or on their true construction are, ancillary powers: see Cotman v. Brougham [1918] A.C. 514 and Introductions Ltd. v. National Provincial Bank Ltd. [1970] Ch. 199. and this may be the position even if the memorandum of association contains the usual "separate objects" clause; such a clause is not capable of elevating into an object of the company that which is in essence a power: see Introductions Ltd. v. National Provincial Bank Ltd.

If, on construction of the objects clause, the transactions fall within the objects (as opposed to the powers), it will not be ultra vires since the company has the capacity to enter into the transaction. If the objects clause contains provisions (whether objects or powers) which show that a transaction of the kind in question is within the capacity of the company, that transaction will not be ultra vires. Sometimes the drafting of the memorandum and articles may be such that they put third parties on notice of the fact that certain things can only properly be done subject to certain conditions being satisfied. If the third party is put on notice in this way, he will not be able to rely on any exercise of the power which he knew or ought to have discovered did not comply with such conditions. But a provision that a power can be exercised only "for the purposes of

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

the company's business" does not require a third party to satisfy himself that the power is in fact being exercised for that purpose.

In my judgment, the propositions in the last two paragraphs accord with the decisions in In re David Payne & Co. Ltd. [1904] 2 Ch. 608 and Charterbridge Corporation Ltd. v. Lloyds Bank Ltd. [1970] Ch. 62. As Slade L.J. has pointed out, in the David Payne case the objects clause of the company stated expressly that the power to borrow was "for the purposes of the company's business," yet the borrowing (which was not in fact for the purpose of the company's business) was held not to be ultra vires. Buckley J., at p. 612, plainly treated the provision as a power, not an object. Vaughan Williams L.J. held, at p. 615, that the fact that the validity of the debenture depended on whether or not the lender had knowledge of the impropriety showed that the transaction was not ultra vires. Moreover, it was held that, knowledge being a necessary requirement to render the loan unenforceable, the lender was not put on inquiry whether the money was being borrowed for the purposes of the company's business, notwithstanding that the power to borrow was expressly limited to borrowing for those purposes. That case, therefore, is clear authority for two propositions: (1) that where **\*306** there is a power to borrow for the purposes of the company's business (even if contained in the objects clause) and the borrowing is made otherwise than for those purposes the borrowing is not void as being ultra vires; and (2) a third party is not put on notice by an express requirement that the power is only exercisable for the purposes of the company's business.

The main difficulty in reconciling the authorities is Introductions Ltd. v. National Provincial Bank Ltd. [1970] Ch. 199. In my judgment, however, the decision in that case accords with the views I have expressed. The bank seeking to enforce the debenture had actual knowledge that the company was going to use the borrowed moneys for a purpose (pig breeding) which was wholly outside its main objects. The provision relating to borrowing in the memorandum of association was construed as being an ancillary power to borrow for the purposes of the

company's business. Accordingly, the lender had actual notice of all the facts necessary to appreciate that the borrowing was in excess of the powers, i.e., an abuse of powers. It is to be noted that in the Court of Appeal judgments the transaction is nowhere categorised as ultra vires and void. Indeed, as Slade L.J. has pointed out, the Court of Appeal held that the liability of the bank depended on the fact that it had notice. Buckley J. at first instance [1968] 2 All E.R. 1221 described the borrowing as being ultra vires: but, in my judgment, this was merely an unguarded use of language since he also regarded the bank's knowledge of the facts as being a crucial element rendering the debenture unenforceable: see p. 1225. In my judgment, the Introductions case is not a decision relating to ultra vires in the strict sense: it is an example of a case in which a third party has entered into a transaction with a company with actual notice that the transaction was an abuse of power and accordingly could not enforce the transaction against the company.

I summarise my conclusions as follows. (1) To be ultra vires a transaction has to be outside the capacity of the company, not merely in excess or abuse of the powers of the company. (2) The question whether a transaction is outside the capacity of the company depends solely upon whether, on the true construction of its memorandum of association, the transaction is capable of falling within the objects of the company as opposed to being a proper exercise of the powers of the company. (3) Notwithstanding the fact that the provision authorising the company to enter into the particular transaction is found in the objects clause and there is a provision requiring each paragraph to be construed as a separate object, such provision may be merely a power, and not an object, if either it is incapable of existing as a separate object or it can only be construed as a power ancillary to the other objects in the strict sense. (4) If a transaction falls within the objects, and therefore the capacity, of the company, it is not ultra vires the company and accordingly it is not absolutely void. (5) If a company enters into a transaction which is intra vires (as being within its capacity) but in excess or abuse of its powers, such transaction will be set aside at the instance of the

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

shareholders. (6) A third party who has notice - actual or constructive - that a transaction, although intra vires the company, was entered into in excess or abuse of the powers of the company cannot *307 enforce such transaction against the company and will be accountable as constructive trustee for any money or property of the company received by the third party. (7) The fact that a power is expressly or impliedly limited so as to be exercisable only "for the purposes of the company's business" (or other words to that effect) does not put a third party on inquiry as to whether the power is being so exercised, i.e., such provision does not give him constructive notice of excess or abuse of such power.

Applying those principles to the present case, in my judgment, no question of ultra vires arises. For the reasons given both by the judge and by Slade L.J. the provisions of clause 3(K) of the memorandum of association of the plaintiff do not constitute a separate object but can only be construed as a power. The plaintiff had the capacity to enter into the transactions involving the giving of guarantees and could properly have done so if they had been expedient in the interests of the plaintiff's business. If British Steel Corporation had known no more than that the plaintiff was purporting to give the guarantee as being expedient for the plaintiff's business, the transaction would have been unimpeachable as against British Steel Corporation.

But, as the judge and Slade L.J. have demonstrated, British Steel Corporation had actual knowledge of facts which showed that the giving of the guarantee and the debenture was an abuse of powers by the directors of the plaintiff since the transaction was not even considered to be for the benefit of the plaintiff. The borrowing by the plaintiff from Colvilles of the £401,448 was formally invalid since such borrowing was not approved by a quorate board meeting of the plaintiff and the defence based on the rule in Turquand's case, 6 E. & B. 327 was neither pleaded or established. British Steel Corporation had constructive knowledge of this formal invalidity. Accordingly, British Steel Corporation and the receiver are accountable as constructive trustees for all the moneys of the plaintiff

received by them with such notice.

As to the relief to be granted, my views accord with those of Slade L.J. In particular, as at present advised, I agree with him that Reversion Fund and Insurance Co. Ltd. v. Maison Cosway Ltd. [1913] 1 K.B. 364 appears to establish that the plaintiff is not entitled to recover the principal of £401,448 since the sum borrowed was used to discharge the indebtedness of the plaintiff to Scottish Steel. However, the parties, if they wish, must have an opportunity to present further argument on the relief to be given.

Finally, I have not formed any view on the difficult problems which arise when shareholders consent to a transaction which, though intra vires, is an excess or abuse of the powers of the company. I therefore must not be taken to be either approving or disapproving the views on this point expressed by Slade L.J.

LAWTON L.J.

Stripped of its legal complications, many of which were caused by the way the trial judge dealt with the defendants' applications to amend the pleadings, this case raises issues of fact. When the evidence is looked at in the round, there is revealed an unattractive story of a fairly common kind which shows how some business men *308 manipulate limited liability companies to avoid their financial liabilities and what other business men are driven to do in order to get paid what they are entitled to receive.

In the 1960s Mr. Shenkman was an entrepreneur. He had ideas for selling steel on a large scale but no capital with which to set up a suitable selling organisation. He did what many entrepreneurs do: he used other people's money. Unlike some entrepreneurs, he used no deception to get it. He did not need to do so (and, on the judge's findings, he probably did not want to do so) because of the way Colvilles, then an independent steel company, went about their business of producing and selling steel. They seem to have been more interested in selling their steel than in being paid the price for it. The result was that, by the beginning of 1968, they had sold

and delivered to Mr. Shenkman's order a vast quantity of steel and were owed just under £800,000 for it. When they began to press for the debt to be paid they became aware of the legal problems which faced them. Mr. Shenkman had operated behind a screen of small limited liability companies in which he and family interests controlled all the shares. The company which owed Colvilles this huge debt, Scottish Steel, had no assets. Mr. Shenkman himself had very few. What assets there were (and they were fairly substantial) were in another company, the plaintiff, which had had no dealings with Colvilles but into which Mr. Shenkman had syphoned by way of a loan about £400,000 of Scottish Steel's money which that company should have paid to Colvilles in discharge of its debts. Mr. Shenkman owned 51 per cent. of the plaintiff's shares. The trustees of a settlement in favour of his children owned the remaining 49 per cent.

When in 1968 British Steel Corporation took over Colvilles under the nationalised legislation they were faced with a difficult debt collecting problem. By the late autumn of 1968 they had these options: they could make Mr. Shenkman bankrupt for defaulting on a personal guarantee which he had given on 2 May 1968 for Scottish Steel's debts. A bankruptcy order would have vested Mr. Shenkman's shares in the plaintiff in his trustee but, on the most optimistic assessment, less than about half of Scottish Steel's debts would be recovered. The second option was to put Scottish Steel into liquidation and get the liquidator to press the plaintiff to repay £400,000 which it had borrowed from Scottish Steel. Once again, the best which could have been attained was the repayment of this sum; and the chances of getting it were poor, as the only worthwhile asset the plaintiff had was some land at Rainham which had been valued at about £800,000 if sold over a longish period but which would almost certainly bring in much less if there were a forced sale. Anyway, a sale of any kind was sure to generate a substantial liability on the plaintiff for corporation tax arising from capital gains as the land had been bought for £8,000.

British Steel Corporation had to solve this problem: how could they link Mr. Shenkman and Scottish Steel's liabilities to the plaintiff's assets? Their own legal adviser, Mr. Edwards, considered the problem, as did their experienced solicitors and counsel instructed by them. All, of course, knew that in law the plaintiff was a separate legal entity from Mr. Shenkman and Scottish Steel and that those who directed the affairs **\*309** of the plaintiff (and, as British Steel Corporation knew, they were Mr. Shenkman and his father) had to do so in the interests of the plaintiff and not of Mr. Shenkman himself or Scottish Steel. If they did not, any transactions carried out in breach of trust would be at least voidable and might be void if, on the correct construction of the plaintiff's memorandum of association, there were limitations on the powers of the plaintiff to borrow money or give guarantees.

The scheme which was devised to attach Mr. Shenkman and Scottish Steel's liabilities to the plaintiff's assets has been described in detail by Slade L.J. in his judgment. This scheme was designed to enable British Steel Corporation to strip the plaintiff of nearly all its assets and what was left over was likely to be successfully claimed by the Inland Revenue for corporation tax. Such a scheme, approved by the plaintiff's directors on 22 January 1969, could not possibly have been for the benefit of the plaintiff, and British Steel Corporation, through their advisers, knew that it was not. In my judgment, British Steel Corporation regarded the plaintiff as an alias for Mr. Shenkman. He owed them money under the guarantee he had given in May 1968. They felt justified in tearing away the plaintiff's corporate veil which hid him from his creditors. I have much sympathy for British Steel Corporation. They were being kept out of their money by the legal fiction that the plaintiff was not Mr. Shenkman. Unfortunately for them it is a legal fiction which has been recognised by the law for over a 100 years. It is said to have helped the growth of innumerable new businesses. The fact that limited liability has all too often enabled many to enrich themselves at the expense of those who have given credit to the companies they control is the price the business world has to pay for the po-

1984 WL 282538 (CA (Civ Div)), [1985] 3 All E.R. 52, (1984) 1 B.C.C. 99,158, [1986] Ch. 246, [1985] 2 W.L.R. 908

**(Cite as: [1986] Ch. 246)**

tentiality for growth and convenience which goes with limited liability. In my judgment, British Steel Corporation will have to pay that price. What Mr. Shenkman and his father did on 22 January 1968 by giving the guarantee was a misfeasance and British Steel Corporation knew it was. The legal consequences of what happened are set out in Slade L.J.'s judgment with which I agree.

I wish, however, to add a comment about the pleading points which have had to be considered in this appeal. From the way they were raised by counsel and dealt with by the trial judge I was left with the impression that neither the judge nor defending counsel appreciated as fully as they should have done the need for precision and expedition when dealing with pleading points. My recent experience in this court shows that some counsel and judges are not giving pleadings the attention which they should. Pleadings are formal documents which have to be prepared at the beginning of litigation. They are essential for the fair trial of an action and the saving of time at trial. The saving of time keeps down the costs of litigation. A plaintiff is entitled to know what defences he has to meet and a defendant what claims are being made against him. If the parties do not know, unnecessary evidence may be got together and led or, even worse, necessary evidence may not be led. Pleadings regulate what questions may be asked of witnesses in cross-examination. When counsel raises an objection to a question or a line of questioning, as Mr. Morritt did on a number of occasions, the trial judge should rule on it at once. He should not regard the objection as a **\*310** critical commentary on what the other side is doing. If the judge does not rule, counsel should ask him to do so. If a line of questioning is stopped because it does not relate to an issue on the pleadings, counsel should at once consider whether his pleadings should be amended. If he decides that they should, he should forthwith apply for an amendment and should specify precisely what he wants and the judge should at once give a ruling on the application. The principles upon which amendments should be allowed are well known and are set out in the current edition of *The Supreme Court Practice*. Judicial insistence on precision in plead-

ing should not take the courts back to the days when the successful taking of pleading points sometimes resulted in a denial of justice. The judge's powers of adjourning and ordering the payment of costs thrown away should stop this happening.

With regret, I feel it necessary to make one more comment about the way the judge conducted this case. At the outset of this appeal Mr. Heyman invited our attention to the fact that submissions of counsel ended on 7 April 1982 but judgment was not delivered until 2 December 1982. He submitted that this long and, in my experience, unprecedented delay resulted in the judge making material findings which were not justified by the evidence. I am not satisfied that this was so. But the fact that responsible and experienced counsel, acting for a public corporation, felt it incumbent upon him to make this submission shows that long delays in delivering judgment can cause disquiet and suspicion amongst litigants who lose - and those who win may feel they have been deprived of justice far too long. Delays of this length should not occur unless there are compelling reasons why they should; and, if there are such reasons, it would be prudent of a judge to refer to them briefly. In this case, for all we know, there may have been such reasons. We have kept in mind that the parties had a most patient hearing and that the judge must have kept a very full note to deliver the judgment he did.

For these reasons and the reasons given in Slade L.J.'s judgment, I would dismiss this appeal, allow the cross-appeal and grant the relief suggested by Slade L.J.

**Representation**

Solicitors: Lovell White & King; Herbert Smith & Co.

Appeal dismissed. Cross-appeal allowed. (C. N. )

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**TAB K**

All England Law Reports/1982/Volume 3 /Re Halt Garage (1964) Ltd - [1982] 3 All ER 1016

<span style="color:red">**[1982] 3 All ER 1016**</span>

# Re Halt Garage (1964) Ltd

**CHANCERY DIVISION**

**OLIVER J**

**2, 3, 4, 5, 9, 12, 25 MAY 1978**

*Company - Director - Renumeration - Express power of company in general meeting to award renumeration - Test of company's capacity to award renumeration - Payment to director out of capital - Husband and wife sole shareholders and directors of company - Husband and wife drawing renumeration out of capital after company suffering trading loss - Husband working full-time in business but wife ceasing to be active because of illness - Wife remaining a director - Liquidator claiming to recover remuneration on ground of misfeasance - Whether drawings by husband and wife while company suffering loss ultra vires company - Whether company's capacity to award renumeration under express power dependant on benefit to company - Whether genuine award of remuneration intra vires regardless of benefit to company - Companies Act 1948, s 333, Sch 1, Table A, Part I, reg 76.*

In 1964 the husband acquired a ready-made company and thereafter carried on a garage business through the company. He and his wife owned the only issued share capital in the company and at all material times were the only directors of the company. The company's articles incorporated reg 76[a] of Part I of Table A in Sch 1 to the Companies Act 1948, which gave the company an express power to award remuneration to a director, the remuneration to be determined by the company in general meeting. The company's articles also included express power for the company to determine and pay directors' remuneration for the mere assumption of the post of director. The husband and wife built up the company together and drew weekly sums from the business as

---

[a]   Regulation 76, so far as material, provides: 'The remuneration of the directors shall from time to time be determined by the company in general meeting. Such remuneration shall be deemed to accrue from day to day.'

*[1982] 3 All ER 1016 at  1017*

their director's remuneration. In 1967 the wife became ill. She remained a director of the company but from December 1967 it became apparent that she would not be active again in the business. The husband continued to work virtually full-time in the business until 1971, apart from two periods of three and six months, when he was away from the business because of his wife's illness and an accident he sustained. By the year ended 30 April 1967 the business had a turnover of £106,000 and was making a substantial trading profit. However, in the year 1967-68 the profits began to decline and by the year 1968-69 the accounts showed that despite an increase in turnover the company was insolvent. In March 1971 the company went into voluntary liquidation and was subsequently compulsorily wound up. Throughout the period from January 1968 to March 1971 the husband drew director's remuneration of some £2,500 per annum rising to £3,500 per annum, and the wife drew director's renumeration of £1,500 per annum decreasing to some £500 per

annum even though during that period she took no active part in the business. Throughout that period the drawings of remuneration were mainly out of capital because the company was suffering a trading loss. The liquidator in the winding up brought proceedings against the husband and wife under s 333(1)[b] of the Companies Act 1948 claiming to recover from them jointly and severally the whole of the remuneration drawn by the wife from January 1968 onwards and such part of the husband's renumeration as exceeded the market value of his services to the company, on the ground that the husband and wife were guilty of misfeasance and breach of trust in making the drawings. The liquidator submitted that, although the amounts drawn by the husband and wife were either formally determined by the company in general meeting as directors' remuneration or were otherwise sanctioned as such by the company and although they were made in good faith, nevertheless they were ultra vires the company as being gratuitous payments made out of capital otherwise than for consideration, unless it could be shown that they were made for the benefit of the company and to promote its prosperity. The liquidator further submitted that, having regard to the amount of the drawings, they could not have been made for the company's benefit when it was suffering a loss and the money was needed for the business.

[b]    Section 333(1), so far as material, provides: 'If in the course of winding up a company it appears that any person who has taken part in the formation or promotion of the company, or any past or present director ... has misapplied or retained or become liable or accountable for any money or property of the company, or been guilty of any misfeasance or breach of trust in relation to the company, the court may, on the application of the ... liquidator ... examine into the conduct of the ... director ... and compel him to repay or restore the money or property or any part thereof respectively with interest at such rate as the court thinks just, or to contribute such sum to the assets of the company by way of compensation in respect of the misapplication, retainer, misfeasance or breach of trust as the court thinks just.'

**Held** - (1) Where payments of remuneration to a director were made under the authority of the company acting in general meeting pursuant to an express power in its articles to award director's remuneration and there was no question of fraud on the company's creditors or on minority shareholders, the competence of the company to award the remuneration depended on whether the payments were genuinely director's remuneration (as opposed to a disguised gift out of capital) and not on an abstract test of benefit to the company. The amount of remuneration awarded in such circumstances was a matter of company management and, provided there had been a genuine exercise of the company's power to award remuneration, it was not for the court to determine if, or to what extent, the remuneration awarded was reasonable (see p 1038 *c d*, p 1039 *c e* to *j* and p 1043 a to *c*, post); dictum of Astbury J in *Parker & Cooper Ltd v Reading* [1926] All ER Rep at 328 applied; *Hampson v Price's Patent Candle Co* (1876) 45 LJ Ch 437, *Hutton v West Cork Rly Co* (1883) 23 Ch D 654, *Henderson v Bank of Australasia* (1888) 40 Ch D 170, dictum of Lindley LJ in *Re George Newman & Co* [1895] 1 Ch at 685-686, *Re Lee, Behrens & Co Ltd* [1932] All ER Rep 889, *Parke v Daily News Ltd* [1962] 2 All ER 929, *Ridge Securities Ltd v IRC* [1964] 1 All ER 275, *Re W & M Roith Ltd* [1967] 1 All ER 427 and *Charterbridge Corp Ltd v Lloyds Bank Ltd* [1969] 2 All ER 1185 considered.

*[1982] 3 All ER 1016 at 1018*

(2) There was no evidence that, having regard to the company's turnover, the husband's drawings were patently excessive or unreasonable as director's remuneration, or that they were disguised gifts of capital rather than genuine awards of remuneration. Accordingly, the court would not inquire into whether it would have been more beneficial to the company to have made lesser awards of remuneration to him, since that was a matter for the company. It followed that the claim for misfeasance in regard to the husband's drawings failed (see p 1040 *b* to *d* and *f* to *j*, p 1041 *c d* and p 1045 *b*, post).

(3) In regard to the wife's drawings, although the company's articles included power to award remuneration

for the mere assumption of the office of director even where the director was not active in the conduct of the company's business, that power predicated that a director would receive remuneration for services rendered or to be rendered and the mere fact that the label of 'director's remuneration' was attached to the drawings did not preclude the court from examining their true nature. Having regard to the wife's inactivity during the period in question, it could not be said that the whole of the amounts drawn by the wife in that period were genuine awards of remuneration to her for holding office as a director. That part of her drawings in excess of what would have been a reasonable award of remuneration for holding office as a director amounted to a disguised gift of capital or payment of dividends in recognition of her co-proprietorship of the business and was ultra vires the company and repayable to the liquidator (see p 1042 *f* to *j*, p 1043 *c* to *e* and *j* to p 1044 *c* and *e* to p 1045 *b*, post); *Ridge Securities Ltd v IRC* [1964] 1 All ER 275 applied.

**Notes**

For remuneration of directors, see 7 *Halsbury's Laws* (4th edn) paras 488-489, and for cases on the subject, see 9 *Digest* (Reissue) 480-483, *2857-2879*.

For the Companies Act 1948, s 333, Sch I, Table A, Part I, reg 76, see 5 *Halsbury's Statutes* (3rd edn) 362, 448.

### Cases referred to in judgment

*Allen v Golds Reefs of West Africa Ltd* [1900] 1 Ch 656, [1900-3] All ER Rep 746, CA, 9 *Digest* (Reissue) 624, *3716*.

*British Seamless Paper Box Co, Re* (1881) 17 Ch D 467, CA, 9 *Digest* (Reissue) 524, *3132*.

*Charterbridge Corp Ltd v Lloyds Bank Ltd* [1969] 2 All ER 1185, [1970] Ch 62, [1969] 3 WLR 122, 9 *Digest* (Reissue) 492, *2942*.

*Clemens v Clemens Bros* [1976] 2 All ER 268, *Digest* (Cont Vol E) 59, *4083a*.

*Cyclists' Touring Club v Hopkinson* [1910] 1 Ch 179, 8(2) *Digest* (Reissue) 627, *79*.

*Dunston v Imperial Gas Light Co* (1831) 3 B & Ad 125, 110 ER 47, 10 *Digest* (Reissue) 1334, *8527*.

*Duomatic Ltd, Re* [1969] 1 All ER 161, [1969] Ch 365, [1969] 2 WLR 114, 9 *Digest* (Reissue) 483, *2879*.

*Express Engineering Works Ltd, Re* [1920] 1 Ch 466, CA, 9 *Digest* (Reissue) 557, *3331*.

*Greenhalgh v Arderne Cinemas Ltd* [1950] 2 All ER 1120, [1951] Ch 286, CA, 9 *Digest* (Reissue) 610, *3639*.

*Hampson v Price's Patent Candle Co* (1876) 45 LJ Ch 437, 10 *Digest* (Reissue) 1349, *8641*.

*Henderson v Bank of Australasia* (1888) 40 Ch D 170, 9 *Digest* (Reissue) 582, *3468*.

*Hindle v John Cotton Ltd* (1919) 56 Sc LR 625.

*Hutton v West Cork Rly Co* (1883) 23 Ch 654, CA, 9 *Digest* (Reissue) 685, *4077.*

*Introductions Ltd, Re, Introductions Ltd v National Provincial Bank Ltd* [1969] 1 All ER 887, [1970] Ch 199, [1969] 2 WLR 791, CA; *affg* [1968] 2 All ER 1221, 9 *Digest* (Reissue) 75, *336.*

*Kaye v Croydon Tramways Co* [1898] 1 Ch 358, CA, 10 *Digest* (Reissue) 1179, *7341.*

*Lee, Behrens & Co Ltd, Re* [1932] 2 Ch 46, [1932] All ER Rep 889, 9 *Digest* (Reissue) 571, *3419.*

*Lundy Granite Co Ltd, Re, Lewis's Case* (1872) 26 LT 673, LJJ, 9 *Digest* (Reissue) 177, *1085.*

*National Funds Assurance Co, Re* (1878) 10 Ch D 118, 9 *Digest* (Reissue) 656, *3926.*
                                                                    *[1982] 3 All ER 1016 at  1019*

*Newman (George) & Co, Re* [1895] 1 Ch 674, CA, 9 *Digest* (Reissue) 528, *3168.*

*Parke v Daily News Ltd* [1962] 2 All ER 929, [1962] Ch 927, [1962] 3 WLR 566, 9 *Digest* (Reissue) 690, *4097.*

*Parker & Cooper Ltd v Reading* [1926] Ch 975, [1926] All ER Rep 323, 9 *Digest* (Reissue) 515, *3076.*

*Payne (David) & Co Ltd, Re, Young v David Payne & Co Ltd* [1904] 2 Ch 608, CA, 9 *Digest* (Reissue) 511, *3058.*

*Phillips v Manufacturers' Securities Ltd* (1917) 86 LJ Ch 305, CA, 9 *Digest* (Reissue) 420, *2483.*

*Ridge Securities Ltd v IRC* [1964] 1 All ER 275, [1964] 1 WLR 479, 28(1) *Digest* (Reissue) 178, *536.*

*Roith (W & M) Ltd, Re* [1967] 1 All ER 427, [1967] 1 WLR 432, 9 *Digest* (Reissue) 571, *3420.*

*Smith (Howard) Ltd v Ampol Petroleum Ltd* [1974] 1 All ER 1126, [1974] AC 821, [1974] 2 WLR 689, PC, 9 *Digest* 496, * *1352.*

*Tomkinson v South-Eastern Rly Co* (1887) 35 Ch D 675, 10 *Digest* (Reissue) 1349, *8639.*

**Cases also cited**

*Wallersteiner v Moir (No 2), Moir v Wallersteiner (No 2)* [1975] 1 All ER 849, [1975] QB 373, CA.

**Summons**

By a summons dated 18 January 1974 the liquidator of Halt Garage (1964) Ltd (the company) claimed against the respondents, Robert Charlesworth and his wife, Margaret Gwendoline Charlesworth, the directors of the company, a declaration under s 333 of the Companies Act 1948 that the respondents were guilty of misfeasance and breach of trust in relation to the company in misapplying money and assets of the company (i) by paying any sum by way of director's remuneration to Mrs Charlesworth from 1 March 1967 onwards, and (ii) in paying excessive remuneration to Mr Charlesworth from January 1968 onwards. The facts are set out in the judgment.

*W A Blackburne for the liquidator.*

*David A Smith for the respondents.*

*Cur adv vult*

**25 May 1978. The following judgment was delivered.**

**OLIVER J**

read the following judgment: This is a summons by a liquidator under s 333 of the Companies Act 1948, claiming against the respondents, Mr and Mrs Charlesworth, who were formerly directors of the company in liquidation, the repayment of sums paid to them respectively by way of directors' remuneration in the years 1967-68, 1968-69, 1969-70 and 1970-71. The company went into voluntary liquidation on 15 March 1971 and was subsequently wound up compulsorily. Originally there was a claim for relief under s 332 of the 1948 Act, based on allegations of fraudulent trading, but those have not been pursued and the only live claim is that in respect of the payments of directors' remuneration, the major part of which was voted by the company in general meeting but which the liquidator claims was ultra vires. This absolves me from the necessity of giving more than a summary account of the company's trading history.

The respondent Robert Charlesworth acquired in 1964 a garage site near Woburn Sands in Bedfordshire, which was a prime site because of its proximity to the M 1 motorway. The freehold was acquired with the aid of Continental Oil Co (which I shall refer to as Conoco) and it was done in this way. A sum was paid to Mr Charlesworth as a premium for the grant of a lease of the premises for 50 years by him to Conoco at a peppercorn rent. There was also a loan of a sum of £5,000, with which he was required at his own expense to carry out certain works of development and renovation. Conoco at the same time granted a sublease to Mr Charlesworth at a rent of £1,000 per annum for

*[1982] 3 All ER 1016 at 1020*

21 years, and he personally entered into a service agreement with Conoco for 50 years, tying the garage to accept only Conoco petrol.

Although these arrangements were made with Mr Charlesworth personally and envisaged that the business would be carried on by him personally, he in fact acquired the £2 issued capital of the company, which was a ready-made company, changed its name to Halt Garage (1964) Ltd and thereafter carried on the garage business at the premises through the medium of the company. He and his wife were registered as the holders of the only two issued shares and they were at all material times the only directors. At the end of 1965 a Mr Gore became, and was at all material times thereafter, the secretary.

The company held no estate in the premises. Its occupation can, I think, only have been that of a licensee; the underlease prohibited, or purported to prohibit, assignment or underletting. It paid the rent under the

underlease, which appears to have been well below the full market rent, and, although no doubt Mr Charlesworth could legitimately have charged a profit rental to the company (a letter from Jackson-Stops & Staff, estate agents, in March 1968 indicates that this might have been as much as a further £2,000 per annum) he never in fact did so. Indeed, it would have been disadvantageous to him personally, from an income tax point of view, to receive from the company moneys which could not qualify as earned income. I mention this because it is the submission of counsel on behalf of the respondents that it has some importance in relation to the liquidator's claim.

From 1964 till January 1967 Mr and Mrs Charlesworth built up the business with considerable success. Mr Gore's evidence is that they both worked extremely hard in the business from early morning until late at night and at weekends as well. The garage was one which was utilised extensively by the AA, the RAC and the police for the collection of wrecks and breakdowns from the M 1 and, although the garage was closed for petrol at night, its breakdown service was, I understand, on 24-hour call.

In its first 13 months of operation it achieved a turnover of £80,000, but made a small net loss, £160-odd, after charging directors' remuneration of £1,»µ0. At that stage Mr and Mrs Charlesworth were drawing between them only £30 per week, the amount drawn by each being considerably less than the wages of the fitters employed at the garage. In the following year the turnover increased to £87,000, and the business was able to show a small profit. It is to the third and subsequent years of the company's operations that the present claim relates. The turnover in the year to 30 April 1967 increased substantially to some £106,000, and there was a substantial trading profit amounting to over £10,000. During this year the company's wage books show regular weekly payments to Mr and Mrs Charlesworth at first at a rate of £30 gross between them, then £42.10, then £60 and finally £90, split as to £60 to Mr Charlesworth and £30 to Mrs Charlesworth. Those payments continued throughout until April 1969, when the payments to Mr Charlesworth were reduced to £50 gross, those to Mrs Charlesworth remaining unaltered, so that thereafter they were drawing between them regular weekly amounts of £80. That continued unaltered up to 15 March 1971, when the company went into liquidation, save that in May 1970 the proportionate split between them was varied, apparently as a result of the accountant's advice that it might be difficult to justify payments of £30 per week to Mrs Charlesworth to the Revenue. Thereafter Mr Charlesworth was paid £70 and his wife £10. Throughout, these payments appear to have been made after deduction of tax and national insurance contributions.

Audited accounts for the years 1966-67, 1967-68 and 1968-69 were, according to the company's minute book, presented to general meetings of the company and approved and signed, and at directors' meetings held at the same time formal resolutions were passed that the amounts of the directors' remuneration were correct. I cannot in fact reconcile the amounts of the remuneration shown in the company's accounts with the drawings of Mr and Mrs Charlesworth shown in the wages book and it may be that part of those drawings, for some reason known only to the company's accountants, is shown under the heading of 'Wages and National Insurance'. It is not, however, alleged that

*[1982] 3 All ER 1016 at  1021*

other directors' remuneration was paid in addition to the drawings shown in the company's wages book.

In February 1967 Mrs Charlesworth was taken seriously ill and was removed to hospital. The prognosis was most unfavourable and she was not expected to survive the next two years, although happily, though still very ill, she is still alive. Mr Charlesworth was advised that he must move to the south coast for the benefit of her health and in December 1967 they moved to the Isle of Wight where they still live. From the time when she was taken ill she took no further part in running the business of the company, because she was not able to, and although she remained a director she was able to contribute nothing to the company's prosperity beyond, perhaps, the occasional discussion with her husband and the formal signature of documents.

I am satisfied on the evidence that throughout 1967 up to the end of the first week in December, when they

moved, Mr Charlesworth devoted his full time and attention to the business, working extremely long and unsocial hours and taking about three hours a day off in order to visit his wife in hospital. Having made up his mind to move, however, he was anxious to sell the business and when he did take up residence in the Isle of Wight he ceased full-time attendance, leaving Mr Gore in charge of the business but in telephonic contact when circumstances required.

The business had been valued by a well-known firm of valuers at £125,000 and it seems that a purchaser interested at that price was found but withdrew. Mr Charlesworth was, however, in a very disadvantageous position for bargaining, because he had to look after his wife, and Mr Gore, who was a bookkeeper without any mechanical qualifications, could hardly carry on indefinitely in sole charge. Negotiations accordingly ensued with another purchaser at £60,000 and these continued until March 1968 when that purchaser withdrew. Mr Gore felt unable to carry on and Mr Charlesworth then returned to take personal day-to-day charge of the business, coming up each Monday and returning to the Isle of Wight on Fridays. In the meanwhile, efforts to find a purchaser for the business continued.

It may perhaps be appropriate to mention here a matter which troubled me a good deal when this case was opened. In going through the documents counsel ascertained that some nine years ago I myself, as leading counsel, had advised Mr Charlesworth in connection with the question whether the premises could be disposed of free from the tie to Conoco, and there are references in the correspondence with prospective purchasers to an opinion on that matter which I had written. I confess to very little recollection of the matter beyond the fact that a sale was then urgently required because of Mrs Charlesworth's state of health and it has no bearing on the matters which I am now called on to decide, but I would have been more at ease if the matter could have been transferred to another judge. I have continued to hear the case only on the urgent representations of both parties, who were anxious to avoid the adjournment which would otherwise have been necessary and the costs which would have been thus thrown away, and I have found myself in fact unembarrassed in doing so. I think, however, that it is right that I should mention it.

To continue with the history, Mr Charlesworth continued in overall charge of the business and actively working in it until the end of September 1970, when he had an accident in which he broke both ankles and which precluded further activity. From August 1968 until March 1969 a Mr Axall was engaged as manager, but the evidence is that Mr Charlesworth himself continued to attend the garage during the week, coming up on Monday and leaving on Friday, save that one weekend in four he would stay over to give the manager a break. It seems that, as a result of the business brought in from the M1, the weekends tended to be the busiest time.

Mr Gore's recollection is that Mr Charlesworth's attendance was less frequent than this, but he confesses to some difficulty in remembering, and Mr Charlesworth's own evidence and that of his son is that he was putting in four days a week at the garage. Mr Axall proved unsatisfactory and in March 1969 his employment was terminated and the management was taken over by Mr Charlesworth's son, Andrew, who seems to have

*[1982] 3 All ER 1016 at  1022*

continued to run the business in much the same way, having sole charge three weekends out of four and sharing the management with his father on Monday afternoons to Friday mornings.

The profitability of the business, however, declined drastically. The year 1966-67 showed a net profit of £2,179 after charging directors' remuneration of over £7,000 (which Mr Charlesworth says was never in fact drawn, his and his wife's drawings being the weekly sums of £60 and £30 shown in the wages book). In 1967-68, however, the turnover dropped and the company made a loss of £961 after charging remuneration of £3,900, which again seems to have been merely an accountant's figure. The bank overdraft, which was guaranteed by Mr Charlesworth and secured on the freehold, had risen by £2,000, but there is no reason to think that the company was not still solvent.

In the following year, 1968-69, however, things took a decisive turn for the worse. This seems to have been due in part, if not primarily, to some roadworks which interfered with convenient access to the garage and with the traffic flow over the critical seasonal period of April, May and June. In order to get the business back, an expensive advertising campaign was launched involving the giving of extra Green Shield stamps, and Mr Charlesworth's evidence as to this is that there was an arrangement with Conoco that company and the stamp suppliers would pay the cost, an obligation which they failed to fulfil. Whether this is right or not, the company was in difficulties in paying its suppliers in early 1969. At Whitsun in that year Conoco failed to supply and, disregarding the tie, Mr Charlesworth started to take his supplies from Ultramar, which continued to be the company's supplier until the latter part of 1970.

The accounts for the year 1968-69 showed that, despite an increase in turnover from £98,000-odd to £108,000-odd, a heavy trading loss of over £9,000 had been incurred and the balance sheet, with a capital deficit of over £7,900, showed the company to be insolvent, a matter which was drawn to the attention of Mr Charlesworth by the accountants when the accounts were sent for signature in August 1970.

Unaudited accounts for 1970 show that the losses still continued during that year. The business, however, continued and Mr Charlesworth's evidence is, and I see no reason to disbelieve him, that he still hoped to pull it round, although he was really pinning his hopes on a sale, efforts to effect which continued. Towards the middle of 1970 a Mr Sharpe was on the verge of purchasing, but apparently withdrew for health reasons. Efforts were made to raise the finance for a purchase by Andrew Charlesworth, but they came to nothing. Finally, arrangements were made for the purchase by a Mr Bills, who had previously been the managing director of Ultramar and who, through his own company, had been supplying petrol to the garage from January 1971 onwards, at which date the company owed Ultramar something over £16,000.

As a result of the accident to which I have referred, Mr Charlesworth was away from the garage from the end of September 1970 to December of that year, when he returned for about two or three weeks, still on crutches, but had to leave again as a result of a fall on the forecourt causing a dislocated shoulder. He never thereafter returned to take an active part in the business.

Heads of agreement were signed in February providing for the purchase of the freehold by Mr Bills, the discharge of the bank overdraft by Mr Charlesworth out of the proceeds, and the transfer of the shares in the company to Mr Bills for a nominal consideration. That transaction was completed on 15 March 1971 and on that very day Mr Bills procured the company to be put into voluntary liquidation, although it was subsequently compulsorily wound up on the petition of Ultramar. There was an acute controversy between Mr Charlesworth and Mr Bills whether Mr Charlesworth knew that it was intended to liquidate the company, his contention being that, although the agreement concluded with Mr Bills does not so state, Mr Bills was going to assume responsibility for the discharge of the company's liabilities other than the bank overdraft. It is, however, unnecessary for me to resolve this, because counsel for the liquidator is prepared, helpfully, to accept, for the purposes of these proceedings, that Mr Charlesworth was unaware of Mr Bill's intention in relation to the liquidation.

*[1982] 3 All ER 1016 at 1023*

Those are the salient facts. The liquidator now claims to recover from Mr and Mrs Charlesworth jointly and severally the whole of the remuneration paid to Mrs Charlesworth from January 1968 onwards and such part of the remuneration paid to Mr Charlesworth over the same period as was in excess of the value of the services which he performed, which the liquidator puts at £30 per week.

As I mentioned at the outset, the claim originally made under s 332 of the Companies Act 1948 has not been proceeded with and the present claim is restricted to a claim for misfeasance and breach of trust under s 333. So it has to be shown that in making these payments the directors were in breach of some fiduciary duty which they owed to their beneficiary, which either was not or could not be sanctioned by that beneficiary. In relation to this claim, although it is alleged that the respondents (and that means, effectively,

Mr Charlesworth) knew that the company was making losses and was unable to pay its debts without at least a further injection of funds or a measure of forbearance on the part of its major creditors, there is no allegation of fraud. What is said, quite simply, is that the payments made to Mrs Charlesworth from the date on which it was known that she was incurably ill and would not return and those made to Mr Charlesworth from December 1967 onwards, so far as they exceeded £30 per week, were presents which the company had no power to make and which could not, therefore, be ratified by the shareholders. The claim has, however, been limited in the summons and the pleadings to the period from January 1968 onwards, because counsel then acting thought that some limitation point arose; and counsel for the liquidator has, very properly, not sought to go beyond the pleaded claim, although his submissions involve the consequence that he would be strictly entitled to do so if a suitable amendment were made.

The company's articles in the present case incorporate reg 76 of Table A, Part I (see Sch 1 to the 1948 Act), which provides that the remuneration of the directors shall from time to time be determined by the company in general meeting and shall be deemed to accrue from day to day. The directors, qua directors, are not, therefore, entitled as of right to any remuneration for their services, and in so far as remuneration has been drawn without the proper authority, they are bound to account to the company for it or to pay damages.

Obviously in the case of a lady who is as ill as Mrs Charlesworth is and whose illness, so far as the evidence goes, appears to have been contributed to by the long hours of work and irregularity of meals which she underwent whilst working up the business, the claim is not a very attractive one, but a liquidator has no discretion about the performance of his duties and if the claim is good in law it must succeed. If charity has, to use the words of Bowen LJ in *Hutton v West Cork Rly Co* (1883) 23 Ch D 654 at 673, no business to sit at the board of directors, equally sympathy has no voice at the Bar of the court.

Counsel for the respondents takes his stand on the fact that the company has, by its constitution, an express power to determine and pay directors' remuneration, a power, moreover, which is recognised expressly in the case of every limited company by the Companies Act 1948 (see, for instance, ss 189 and 196). While it is true that a director, under an article in this form, has no entitlement to remuneration, nevertheless his agreement with the company when he accepts office is, impliedly, to serve the company as a director and to take the responsibilities which that office entails at whatever remuneration the company in general meeting may choose to vote to him, be it mean or generous, liberal or illiberal. It may vote nothing. But, if it votes him something, he is entitled to have it and it cannot be recovered from him in misfeasance proceedings, even if it is very greatly in excess of any possible value attributable to his services.

In the absence of fraud on the creditors or on minority shareholders, the quantum of such remuneration is a matter for the company. There is no implication or requirement that it must come out of profits only and, indeed, any requirement that it must be so restricted would, in many cases, bring businesses to a halt and prevent a business which had fallen on hard times from being brought round.

There is, counsel for the respondents submits, no principle of law which establishes

*[1982] 3 All ER 1016 at 1024*

that the payment of a scale of remuneration which the court may consider overgenerous, having regard to the services performed by a particular director, is ultra vires the company, either in to or pro tanto, and indeed it is not for the courts to decide how far remuneration is reasonable, absente some plea that its payment is a fraud on the creditors or on minority shareholders. As long as it is acting within its express powers, a company may be unwise, at least so long as it is honest, and, as I have said, there is now no suggestion of mala fides here.

In this context counsel relies on this passage from the judgment of North J in *Henderson v Bank of Australasia* (1888) 40 Ch D 170 at 181. The judge, having reviewed the cases, said:

> 'I do not fail to notice that the sums which were the subject of discussion in the two last cases were considerably less than the sum which is the subject of the present application, but that is a matter with which I conceive I have nothing to do. It is not for a Judge to express any opinion upon such matters as whether the amount is too large or too small. In the first place he has no means of forming any opinion about that: the directors of the company know a great deal more about these matters than he can possibly do: and in the next place the persons who have power to bind the dissentients are the other members of the company, and they are the persons who have passed the resolution in the present case.'

Counsel goes on to submit that if, contrary to his primary submission, the payments have to be submitted to some further tests of validity beyond that of mere formal compliance with an express power, then they satisfy those tests. It will, however, be convenient if I deal with his first submission which, if correct, concludes the matter against the liquidator's claim as it is now framed.

Counsel for the liquidator concedes, as he has to, that the payments of remuneration were formally determined by the company at general meetings held to consider the accounts for the years 1967-68 and 1968-69 and that even in relation to the subsequent years he would, having regard to the fact that Mr and Mrs Charlesworth were the only shareholders, have difficulty in arguing that it had not been sanctioned by the company in the light of the decision of Buckley J in *Re Duomatic Ltd* [1969] 1 All ER 161, [1969] 2 Ch 365. But, he argues, those determinations and that sanction were ineffective so far as they purported to sanction or ratify the payments to Mrs Charlesworth or excess payments to Mr Charlesworth, either because they were ultra vires or, if nor ultra vires, such as were, on the authorities, incapable of ratification by a general meeting. The shareholders, acting as a body and subject to the rights of minority shareholders, may, he submits, make such disposition as they think fit of that part of the funds of the company which consists of profit available for distribution by way of dividend. But when profits have been exhausted so that the company is dealing with its capital, whether share capital or loan capital, any disposition of the company's assets, otherwise than for consideration and whether made by directors alone or directors acting with the sanction of a general meeting, must, in order to be valid, satisfy the three tests set out in the judgment of Eve J in *Re Lee, Behrens & Co Ltd* [1932] 2 Ch 46, [1932] All ER Rep 889. The payment of a director's remuneration in the absence of a service agreement and under articles such as those applicable in the present case is a gratuitous payment which the company is under no obligation to resolve on, and the cases show that any voluntary and gratuitous disposition by a company of its assets which does not satisfy the three tests mentioned is ultra vires. The acts of the directors who make such a disposition by paying themselves remuneration are not, therefore, capable of ratification.

There is not, so far as I am aware and so far as the industry of counsel has been able to discover, any reported authority in which the competence of a general meeting, while the company is a going concern, to vote remuneration to a director under an article in the form of reg 76 of Table A has formed the subject matter of direct decision, but counsel for the liquidator justifies his propositions by reference to a familiar line of

*[1982] 3 All ER 1016 at  1025*

authorities, starting with *Hutton v West Cork Railway Co* (1883) 23 Ch D 654. I must, I think, look at that case in a little detail.

It was a case where the powers of the company were subject to the provisions of a special Act, which provided in terms that the proceeds of sale of the undertaking, which was transferred to another company, should be applied in making particular payments to debenture holders and shareholders, subject only, for relevant purposes, to 'paying off any revenue debts or charges' so far as the same had not already been paid out of revenue. The Act went on to provide that on payment of the purchase price the company should be dissolved--

> 'excepting for the purpose of regulating their internal affairs and winding-up the same, and of applying the said purchase-money in accordance with the provisions of this Act.'

The question which the court had to determine was whether, in the light of these provisions, a resolution of a general meeting authorising the payment of gratuities to former employees and to the directors was binding on dissentient debenture holders and shareholders.

The company had, whilst a going concern, a power to fix directors' remuneration in general meeting, which had never in fact been exercised, but it could be contended that the resolution in question was in exercise of that power or that it constituted anything but an act of spontaneous generosity, having regard to the directors' past services which they had given free of charge. So the case was concerned not with the construction of express powers applicable while the company was a going concern but with what power still remained, having regard to the provisions of the special Act and whether a power to pay gratuities could be implied as one reasonably incidental to the internal regulation of the company's affairs during its winding up. The members of the court approached the problem in different ways. Cotton LJ's approach was to consider whether what had been done was intra vires in the true sense of the term having regard to the provisions of the special Act. After reciting the sections of the special Act and summarising the effect of the resolution, he said this ((1883) 23 Ch D 654 at 664):

> 'It was said that it is within the powers of the directors of a trading or business company to grant gratuities to its servants, and this case comes within that principle, as the directors of this company retained such powers as were incident to a company of this kind, notwithstanding that its railway had been handed over to the purchasing company--the *Bandon Company*. I think that the directors did continue to have powers, so far as they were necessary for or incidental to the winding-up of the company. But, in my opinion, they had not such powers as only are impliedly given to general meetings or to directors because they are carrying on a business for the purpose of carrying on its business, and for the purpose of making a profit from it.'

A little later he said (at 665-666):

> 'But here the company was gone as a company carrying on business for the purpose of making profit, and the sums paid, therefore, to its officials and managing directors, could not be looked upon as an inducement to them to exert themselves in the future, or as an act done reasonably for the purpose of getting the greatest profit from the business of the company, but must be looked upon simply as a gratuity, perhaps reasonable in itself, but without any prospect of its in any way reasonably conducing to the benefit of the company. In my opinion, therefore, under these circumstances, neither the directors nor the general meeting had any power in the circumstances which are before us, as I understand the facts of the case, of granting that compensation to the officials and other servants.'

As regards remuneration of directors for past services he specifically refrained from laying down any general rule as to the exercise of the company's powers to remunerate directors while it was a going concern. He said (at 666-667):

*[1982] 3 All ER 1016 at 1026*

> 'I do not propose to lay down any general rule as to how far a general meeting could, under the powers of sect. 91 of the *Companies Clauses Act* [1845] in a going concern and where they are not bound by any special clause in their articles as to the application of their funds, give remuneration to directors not only for the current year or the first year, but for past years during which they have acted apparently without intending to receive any remuneration at all.'

A little later he went on to say (at 667):

> 'I quite agree with what [counsel for the company] said that during the first year of a parliamentary company which comes under the *Companies Clauses Act* directors must be acting without any fixed salary, but merely in expectation of receiving such a salary as the general meeting may grant them, and that therefore it must be in expectation. But then I think that would negative the idea that they had agreed to act without any remuneration. They were agreeing to act for

such remuneration during that time at least as the general meeting at the end of the first year should grant them.'

He said later (at 667-668):

'I do not however mean to decide--in fact my opinion is rather they other way--that a general meeting of this company could not in the winding-up, and in exercising for the purpose of winding-up the powers given by sect. 91 of the *Companies Clauses Act*, give to the directors what may be considered a fair remuneration for their services to the company after the railway and the undertaking had been taken over by the *Bandon Company*, and all that was being done was being done for the purposes not of carrying on the railway as a going concern but for the purposes of doing that which was incidental to and connected with the winding-up of the company.'

He concluded (at 668):

'But I think on the evidence the necessary inference is that this sum of £1500 was agreed to or voted to be paid to them not as a reasonable sum for remuneration for their services during that term, but as a sum which might with reasonable generosity be paid to them taking into consideration the fact that they never received anything during the years when they carried on the railway. That, I think, was beyond the powers which the company preserved under sect. 14, and the powers of the *Companies Act* incidental to carrying on the winding-up of the company, and therefore would be *ultra vires.*'

The case is, however, chiefly notable for the classical 'cakes and ale' judgment of Bowen LJ. Although he agreed with Cotton LJ, he approached the problem in a rather different way. Cotton LJ had considered whether, having regard to the restrictive provisions of the sections of the special Act, any power had been expressly or impliedly preserved to the company to make payments of this type. Bowen LJ engaged on a rather wider consideration of whether, even in the case of a going concern, the resolution was the sort of resolution which could be forced on a dissentient minority. He said (at 670): 'Now the directors in this case have done, it seems to me, nothing at all wrong.' A little later he said:

'Not only have they done nothing wrong, but I confess I think the company have done what nine companies out of ten would do, and do without the least objection being made. They have paid, perhaps liberally, perhaps not at all too liberally, persons who have served them faithfully. But that, of course, does not get rid of the difficulty. As soon as a question is raised by a dissentient shareholder, or by a person standing in the position of a dissentient shareholder [I pause there to remark that he is clearly referring to the debenture holders who had also voting rights] sympathy must be cut adrift, and we have simply to consider what the law is. In this particular

[1982] 3 All ER 1016 at 1027

instance the Plaintiff is a person who stands *primâ facie* in the condition of those who are bound by the vote of a general meeting acting within the powers of a general meeting, but he complains that the majority propose to expend certain purchase-money which the company are receiving from the *Bandon Company* in two ways which he thinks are beyond their powers.'

Then, he postulated this question (at 671):

'Now can a majority compel a dissentient unit in the company to give way and to submit to these payments? We must go back to the root of things. The money which is going to be spent is not the money of the majority. That is clear. It is the money of the company, and the majority want to spend it. What would be the natural limit of their power to do so? They can only spend money which is not theirs but the company's, if they are spending it for the purposes which are reasonably incidental to the carrying on of the business of the company. That is the general doctrine. *Bona fides* cannot be the sole test, otherwise you might have a lunatic conducting the affairs of the company, and paying away its money with both hands in a manner perfectly *bona fide* yet perfectly irrational. The test must be what is reasonably incidental to, and within the reasonable scope of carrying on, the business of the company.'

Dealing specifically with directors' remuneration, he said (at 671-672):

'But what is the remuneration of directors? I think it is pretty clear that, like the compensation for loss of the services of the managing director, it is a gratuity. A director is not a servant. He is a person who is doing business for the company, but not upon ordinary terms. It is not implied from the mere fact that he is a director, that he is to have a right to be paid for it.'

A little later he said:

'If there is a special provision for the way in which they are paid, you must look to the special provision to see how to deal with it. But if there is no special provision their payment is in the nature of a gratuity, as was pointed out in the case cited by [counsel for the debenture holder] of *Dunston* v. *Imperial Gas Light and Coke Company* ((1831) 3 B & Ad 125, 110 ER 47). Directors, under those circumstances, often do get money. But whenever they get it it is in the nature of a gratuity voted. That does not get rid of the difficulty, because one must still ask oneself what is the general law about gratuitous payments which are made by the directors or by a company so as to bind dissentients.'

Later he said (at 672-673):

'The test there again is not whether it is *bona fide*, but whether, as well as being done *bona fide*, it is done within the ordinary scope of the company's business, and whether it is reasonably incidental to the carrying on of the company's business for the company's benefit. Take this sort of instance. A railway company, or the directors of the company, might send down all the porters at a railway station to have tea in the country at the expense of the company. Why should they not? It is for the directors to judge, provided it is a matter which is reasonably incidental to the carrying on of the business of the company ... '

He then said (at 673):

'A company could not always go on if the moment the directors had served six weeks or months, or a year, they insisted on their immediate remuneration for the past period. That is not the way to do business. The past remuneration of directors seems to me like the gratuitous wages in *Hampson* v. *Price's Patent Candle Company* ((1876) 45 LJ Ch 437), to be justifiable, provided it is within the scope of the business and secures advantage to the company.'

*[1982] 3 All ER 1016 at 1028*

He then considered how those principles could be applied in the circumstances created by the special Act, and said (at 675):

'It had a special and limited business, and that business was to preside at its own funeral, to wind itself up and carry on its own internal affairs until it had distributed the purchase-money in the way the Act of Parliament prescribed. If that be so, when one is applying the general test whether what has been done is incident to the business of the company, we have this further matter to recollect--what the business of this company is--and we have to ask ourselves whether these payments were necessary for that kind of limited business or could reasonably be said to part of the business.'

He concluded (at 678):

'I do not understand Lord Justice *Cotton* to say that no remuneration can be granted to the directors out of the purchase-money which is reasonably measured by the services they have rendered in winding up this company and in connection with the completion of the dissolution and transfer; but this resolution is couched in much wider terms and is evidently based upon the idea that they might be charitable with reference to past services done for the company at the time it was a going company, and I think a willing majority has not right to bind a dissentient minority by any resolution so conceived.'

So, if I may pause there for a moment, Bowen LJ is clearly considering the question in the context of whether a majority could bind a dissentient minority. Indeed, this last passage shows that he clearly contemplated that there was nothing necessarily improper or wrong with paying reasonable remuneration, albeit it could not be said to be for the benefit of the company, since the business at that time was defunct and the services

which the directors had rendered were past.

Now this was one of the cases applied and relied on by Eve J In *Re Lee, Behrens & Co Ltd* [1932] 2 Ch 46, [1932] All ER Rep 889. This was a case which dealt with the question of the exercise by directors, not by a general meeting, of an implied power of a trading company, it being held that, as a matter of construction of the memorandum, the company's express powers did not extend to what had been done in that case. It was conceded that a trading company had power to make grants for rewarding those who served it well, but the first ground of Eve J's decision rests on the tests to be applied for the valid exercise of such a power. It has, however, to be borne in mind that what Eve J was concerned with was a grant made on the authority of a resolution of the directors only, a matter which very clearly emerges from the report of the argument (see [1932] 2 Ch 46 at 48). Eve J propounds the test for a valid exercise of powers in a passage so well known that I need hardly, I think, refer to it ([1932] 2 Ch 46 at 51-52, [1932] All ER Rep 889 at 890-891):

> 'But whether they be made under an express or implied power, all such grants involved an expenditure of the company's money, and that money can only be spent for purposes reasonably incidental to the carrying on of the company's business, and the validity of such grants is to be tested, as is shown in all the authorities, by the answers to three pertinent questions: (i.) Is the transaction reasonably incidental to the carrying on of the company's business? (ii.) Is it a bona fide transaction? and (iii.) Is it done for the benefit and to promote the prosperity of the company? Authority for each of the foregoing propositions is to be found in the following cases: *Hampson v Price's Patent Candle Co.* ((1876) 45 LJ Ch 437); *Hutton v West Cork Ry. Co.* ((1883) 23 Ch D 654); and *Henderson v Bank of Australasia* ((1888) 40 Ch D 170).'

It is interesting to see that Eve J in fact carries the matter one stage further than *Hutton*'s case, where Bowen LJ had postulated (at 671) the test as 'what' is reasonably incidental to, and within the reasonable scope of carrying on, the business of the company', or (at 672) 'reasonably incidental to the carrying on of the company's business

*[1982] 3 All ER 1016 at  1029*

for the company's benefit'. The test of whether the power is exercised 'for the benefit and to promote the prosperity of the company' is added by Eve J as a separate and distinct matter and must, I think, be derived from the judgment of North J in *Henderson v Bank of Australasia*, and from the line of cases relating to the power of a company in general meeting to alter its articles. It is, of course, wholly appropriate to a consideration of the propriety of the exercise of a fiduciary power and, indeed, it appears from the report that it is in relation to an exercise of the power by directors that Eve J is considering the question. He said ([1932] 2 Ch 46 at 52, [1932] All ER Rep 889 at 891):

> 'The conclusion to which in my opinion such evidence as is available irresistibly points is that the predominant, if not the only, consideration operating in the minds of the directors, was a desire to provide for the applicant, and that the question what, if any, benefit would accrue to the company never presented itself to their minds.'

He then went on to the alternative ground of decision, namely that this being, as he put it ([1932] 2 Ch 46 at 53, [1932] 2 All ER Rep 889 at 891), 'a gift or reward given out of the company's assets by the directors to one of their own body', it could be done only under an express power (of which there was none) or with the sanction of a general meeting (which had not been obtained). The applicant was not in fact 'one of their own body' but the widow of a former director, but that does not affect the principle.

Applying these principles to the instant case, the propositions of counsel for the liquidator may be summarised thus:

1. It is not claimed that the payments of £60 and £30 (or later £50 and £30 or £70 and £10) to Mr and Mrs Charlesworth respectively were payments made under contract or that they purported to be anything other than directors' remuneration.

2. They were therefore gratuitous payments made out of the company's assets.

3. *Re Lee, Behens & Co Ltd* shows that such dispositions of the company's assets are valid only if they satisfy the three stated tests set out in Eve J's judgment.

4. Accepting that they were bona fide and, as payments to the directors for acting as such, incidental to the company's business, they were not, in the case of Mr Charlesworth, so far as they exceeded a reasonable sum for services performed, and in the case of Mrs Charlesworth as to any part, payments made for the benefit of the company or to promote its prosperity. Indeed, the reverse, for they resulted in the company being deprived of funds which it badly needed for its business and the company got nothing in return.

5. Therefore the resolutions of the general meetings sanctioning those payments were ultra vires or pro tanto ultra vires or, alternatively, they were not such as could stand against a dissentient shareholder, if there had been one, and they cannot now stand against the liquidator.

I confess that I have not found it easy to understand the logical basis for the doctrine which emerges from *Re Lee, Behrens & Co Ltd* as it was applied in that case and has been applied in subsequent cases. It is frequently spoken of as a facet of the ultra vires doctrine, but I doubt whether that is strictly correct. If it were, it would involve this, that every power, express or implied, would have to be read and qualified by some such words as 'if (but only if) it is for the benefit of the company's business and to promote its interests'; and if that has to be read into every power, it is difficult to see how the company (at least in the case of a company whose affairs are not public knowledge and whose status or credit could not be affected by its dividend record) could ever declare a dividend, which must necessarily reduce the assets available for the promotion of the company's business.

I cannot help thinking, if I may respectfully say so, that there has been a certain confusion between the requirements for a valid exercise of the fiduciary powers of directors (which have nothing to do with the capacity of the company but everything to do with the propriety of acts done within that capacity), the extent to which powers can be implied or limits be placed, as a matter of construction, on express powers, and the matters which the court will take into consideration at the suit of a minority shareholder in determining the extent to which his interests can be overridden by a majority vote. These three matters, as it seems to me, raise questions which are logically quite distinct

*[1982] 3 All ER 1016 at 1030*

but which have sometimes been treated as if they demanded a single, universal answer leading to the conclusion that, because a power must not be abused, therefore, beyond the limit of propriety it does not exist.

Nevertheless, it cannot, I think, be doubted that, whether it be logically defensible or not and whether it be labelled an application of the ultra vires doctrine or the protection of minorities, the courts have over the past hundred years evolved a series of principles which have been stated to be of general application to gratuitous dispositions of the property of trading companies. These principles were expressed by Plowman J in *Parke v Daily News Ltd* [1962] 2 All ER 929 at 942, [1962] Ch 927 at 954, when, after reviewing the cases, he said:

> 'The conclusions which, I think, follow from these cases are: first, that a company's funds cannot be applied in making ex gratia payments as such; secondly, that the court will inquire into the motives actuating any gratuitous payment, and the objectives which it is intended to achieve; thirdly, that the court will uphold the validity of gratuitous payments if, but only if, after such inquiry it appears that the tests enumerated by EVE, J., are satisfied; fourthly, that the onus of upholding the validity of such payments lies on those who assert it.'

But it is said that *Parke*'s case and the cases which preceded it were all cases where what the court had to consider was the test to be applied where reliance was being placed, either by directors or by a general meeting, on an implied power, whereas the power in the instant case, which is written into the company's constitution and is not subject to any expressed limitation, is an express power.

So far as express powers are concerned, there has been, at least in the context of dealings for value between the company and an outsider, a clear rejection of the *Lee, Behrens & Co* test in *Charterbridge Corp Ltd v Lloyds Bank Ltd* [1969] 2 All ER 1185, [1970] Ch 62, a case concerned with the exercise by directors of an express power in a company's articles to guarantee liabilities either of the company or of other persons falling within a given description. I can take the effect of the decision from the headnote ([1970] Ch 62 at 63)--

> 'that where, as here, a company was carrying out the purposes expressed in its memorandum, and did an act within the scope of a power expressed in it, that act was within the powers of the company; that the memorandum of a company set out its objects and proclaimed them to persons dealing with the company and it would be contrary to the whole function of a memorandum if objects unequivocally set out in it should be subject to some implied limitation by reference to the state of mind of the parties concerned; and that the state of mind of officers of C. Ltd. and the bank as to whether the transaction was intended to benefit the company was irrelevant on the issue of ultra vires.'

I turn now to the judgment, where Pennycuick J said ([1969] 2 All ER 1185 at 1189-1191, [1970] Ch 62 at 69-71):

> 'Apart from authority, I should feel little doubt that where a company is carrying out the purposes expressed in its memorandum, and does an act within the scope of a power expressed in its memorandum, that act is an act within the powers of the company. The memorandum of a company sets out its objects and proclaims them to persons dealing with the company and it would be contrary to the whole function of a memorandum that objects unequivocally set out in it should be subject to some implied limitation by reference to the state of mind of the parties concerned. Where directors misapply the assets of their company, that may give rise to a claim based on breach of duty. Again, a claim may arise against the other party to the transaction, if he has notice that the transaction was effected in breach of duty. Further, in a proper case, the company concerned may be entitled to have the transaction set aside. But all that results from the ordinary law of agency and has not of itself anything to do with the corporate powers of the company. The plaintiff company's contention is formulated under two heads, namely: (i) that the guarantee and legal

*[1982] 3 All ER 1016 at 1031*

> charge were created for purposes outside the scope of Castleford's business; and (ii) that the guarantee and legal charge were created for purposes which were not for the benefit of Castleford. This second contention is intended to mean and is accepted as being intended to mean that the directors of Castleford in creating these obligations were not acting with a view to the benefit of the company ... The second head, namely that the guarantee and legal charge were not created for the benefit of Castleford in the sense which I have indicated, formed the real basis of the argument of counsel for the plaintiff company. As I have said, he founded that argument primarily on the decision in *Re Lee, Behrens & Co Ltd* and I will now turn to that case ... [Then, after reading the headnote of that case and particularly the last sentence of the headnote, which was in these terms, 'The grant of the pension was therefore void and ultra vires the company', Pennycuick J continued:] I think it is really clear that the last sentence does not fully reflect the content of the judgment. The liquidator rejected the proof so far as now material on two distinct grounds: (i) that it was ultra vires the company and void: (ii) alternatively, that it could only be authorised by the company in general meeting and that no such meeting was summoned or held. Neither in the arguments as reported nor in the judgment are these two grounds kept clearly distinct ... It seems to me, on the best consideration I can give to this passage [which is the passage from *Re Lee, Behrens & Co Ltd* [1932] 2 Ch 46 at 51-52, [1932] All ER Rep 889 at 890-891, which I have already read] that the learned judge must have been directing his mind to both the issues raised by the liquidator, without differentiating them. In truth (i), the first of the three pertinent questions which he raises, is probably appropriate to the scope of the implied powers of a company where there is no express power. Question (ii) is appropriate in part again to the scope of implied powers, and in part, and perhaps principally, to the duty of directors. Question (iii) is, I think, quite inappropriate to the scope of express powers, notwithstanding the words "whether they be made under an express or implied power" at the beginning of the paragraph. I doubt very much whether the judge really intended to apply this last question to express powers. None of the cases cited by him ... would support such an application. If he did so intend, his statement is obiter, and with great diffidence I do not feel bound to follow it. Finally, I would observe that the whole passage ([1932] 2 Ch 46 at 53, [1932] All ER Rep 889 at 891) proceeds on the footing that the transaction might have been ratified, which would not be possible if it had been ultra vires the company.'

Pennycuick J then dealt with *Re David Payne & Co Ltd* [1904] 2 Ch 608 which was relied on by counsel for the plaintiff, and cited from the judgment of Buckley J in that case. There are, I think, two further passages which it would be convenient to refer to at this point, although they relate to matters which I shall have to consider later in this judgment. They indicate that, in the absence of evidence that a separate consideration was actually given to the question of the company's benefit, the third limb of the *Lee, Behrens & Co* test is to be applied objectively. Pennycuick J than referred to *Re Introductions Ltd, Introductions Ltd v National Provincial Bank Ltd* [1968] 2 All ER 1221 and said ([1969] 2 All ER 1185 at 1193-1194, [1970] Ch 62 at 73-74):

> 'In that case [*Re Introductions Ltd*] the company concerned was carrying on a single business, pig-breeding, which was not authorised by its memorandum and was consequently ultra vires. BUCKLEY, J., held ([1968] 2 All ER 1221 at 1225, 1227) that the borrowing under an express power was likewise ultra vires. Those passages are directed to the particular case before him, where the company was not carrying on any authorised business, and he held that the power to borrow was not a power which could subsist in isolation from a business. That case, I think, throws no light on the position where, as here, the company concerned is carrying on a business authorised by its memorandum ... Counsel for the plaintiff company contended that in the absence of separate consideration they must, ipso facto, be treated as not

*[1982] 3 All ER 1016 at  1032*

> having acted with a view to the benefit of Castleford. That is, I think, an unduly stringent test and would lead to really absurd results, i.e., unless the directors of a company addressed their minds specifically to the interest of the company in connection with each particular transaction, that transaction would be ultra vires and void, notwithstanding that the transaction might be beneficial to the company ... The proper test, I think, in the absence of actual separate consideration, must be whether an intelligent and honest man in the position of a director of the company concerned, could, in the whole of the existing circumstances, have reasonably believed that the transactions were for the benefit of the company. If that is the proper test, I am satisfied that the answer here is in the affirmative.'

I would add parenthetically that I think that that must be read in context. It applies where there is no evidence of what the directors did consider, but it does not absolve the court from inquiry whether there was any consideration of the company's interest or entitle it to ignore evidence of actual motives. That, I think, is clear from the speech of Lord Finlay in *Hindle v John Cotton Ltd* (1919) 56 Sc LR 625, which was cited with approval in *Howard Smith Ltd v Ampol Petroleum Ltd* [1974] 1 All ER 1126 at 1133, [1974] AC 821 at 835.

Returning to the consideration of the impact of the *Charterbridge* case on the construction or exercise of express powers, counsel for the liquidator submits that it cannot stand with the decision of Buckley J in *Re Introductions Ltd* [1968] 1 All ER 1221, referred to by Pennycuick J and subsequently affirmed in the Court of Appeal ([1969] 1 All ER 887, [1970] Ch 199). But I see no conflict between the two cases. *Re Introductions Ltd* was not, and did not purport to be, an application of the *Lee, Behrens & Co* principle, but was a question of construction and does not appear to me bear at all on the rejection in the *Charterbridge* case of the *Lee, Behrens & Co* test as the test of the company's capacity to exercise an express power where the question arises as between the company and an outsider dealing with the company without knowledge and for value. That point has, in any event, now been overtaken by s 9 of the European Communities Act 1972.

But it does not appear to me, in any event, that the *Charterbridge* case assists very much in the present context. It does not, as I see it, relate at all to the distinctive principles, which the courts have established in relation to gratuitous dispositions of companies' assets. The decision of Plowman J in *Re W M Roth Ltd* [1967] 1 All ER 427, [1967] 1 WLR 432, to which counsel for the liquidator drew my attention and in which Plowman J again applied the *Lee, Behrens & Co* test to what he found, as a fact, was a sham transaction for the purpose of conferring a gratuity on the principal shareholder's widow, was a case of an express power and, indeed, one introduced by the company in general meeting for the very purpose of enabling the transaction to be effected, although the actual exercise of the power which was attacked by the liquidator was an exercise by the directors, as it was in the *Charterbridge* case, without any endorsement by a general

meeting.

Furthermore, I do not think that Pennycuick J himself envisaged his observations in the *Charterbridge* case as affecting the application of the *Lee, Behrens & Co* test to gratuitous dispositions by the directors of a company's assets, certainly so far as made under implied powers. In *Ridge Securities Ltd v IRC* [1964] 1 All ER 275, [1964] 1 WLR 479 he applied the principle to the purported exercise by directors of a power to issue debentures carrying an obviously sham rate of so-called 'interest'. There does not appear to have been any evidence either as to the funds from which this came or as to the powers, whether express or implied, which the directors had purported to exercise. I think that the real ground for the decision was simply that no one had sought to justify the application either as being made under an express power or, if made under some implied power, as having any connection as all with anything that the companies were incorporated to do and that it may, indeed, that been an illegal return of capital to the shareholders. Counsel for the appellants, however, relied on the *Lee, Behrens & Co* test in support of an argument that it would not be right to decide the matter in the absence of the companies the exercise of whose powers was in question. That submission was rejected by Pennycuick J, who did apply the test but pointed out that he had not been asked to look at the companies' express powers in their respective memoranda of association.

*[1982] 3 All ER 1016 at 1033*

Pennycuick J commented on this decision in the *Charterbridge* case, and his observations as to this make it, I think, clear that his view of the applicability of the test to the situation with which he was confronted in the *Ridge* case, namely that of a gratuitous disposition by directors under an implied power, remained unchanged. He said ([1969] 2 All ER 1185 at 1193, [1970] Ch 62 at 73-72):

> "The relevant transaction in [the *Ridge* case] was a dressed-up gift of a large sum by certain companies to another company which had acquired their shares. In the absence of a power in the memorandum of those companies, the transaction was clearly ultra vires, and, I so held ([1964] 1 All ER 275 at 287-288, [1964] 1 WLR 479 at 495). In this passage I referred to *Re Lee, Behrens & Co., Ltd.* and I must plead guilty to citing the whole passage ([1932] 2 Ch 46 at 51, [1932] All ER Rep 889 at 890) in that case without entering on the distinctions which have become important in the present case but which were not important in [that] case.'

However, as I have already mentioned, counsel for the liquidator has not been able to point to any reported case in which the principle has been applied to the determination and payment of directors' remuneration by a company in general meeting while the company is a going concern, and I was at first rather startled by his submissions, which appeared to me to have surprising and very far-reaching consequences. If it is really the case that such a payment is ultra vires unless it be, whether viewed subjectively or objectively, for the benefit of the company and to promote its prosperity as a corporate entity, then it must logically be ultra vires from whatever funds the payment is made and whatever be the company's financial position. But it is a commonplace in private family companies, where there are substantial profits available for distribution by way of dividend, for the shareholder directors to distribute those profits by way of directors' remuneration rather than by way of dividend, because the latter course has certain fiscal disadvantages. But such a distribution may, and frequently does, bear very little relation to the true market value of the services rendered by the directors and if one is to look at it from the point of view of the benefit of the company as a corporate entity, then it is wholly unjustifiable, because it deprives the company of funds which might otherwise be used for expansion or investment or contingency reserves.

Yet unless it is to be said that the *Lee, Behrens & Co* test is to be applied also even to a unanimous exercise of the power of the company in general meeting to distribute profits by way of dividend (which I should hardly have thought was arguable) it is very difficult to see why the payment of directors' remuneration, on whatever scale the company in general meeting chooses, out of funds which could perfectly well be distributed by way of dividend, should be open to attack merely because the shareholders, in their own interests, choose to attach to it the label of directors' remuneration. After all, the close company provisions of the Income Tax Acts are specifically designed to compel distributions and deem them to have taken place if they fall short of the standard required. Is it then to be said that subsequently, perhaps years later, the company, by its liquidator or possibly at the instance of a purchaser of the shares, can come along and demand back profits

paid out as remuneration with the active assent and concurrence of all the shareholders at the time because their payment was ultra vires?

Counsel for the liquidator avoids this particular difficulty by a submission that the *Lee, Behrens & Co* test is one which is to be applied not to all gratuitous payments but only to those made otherwise than out of divisible profits, and he cites *Re George Newman & Co* [1895] 1 Ch 674 in support of that proposition. That was a case of a blatant and dishonest misuse of the directors' powers by dispensing, by way of gratuitous payment to one of the directors, moneys borrowed for the purpose of the company's business. Lindley LJ, delivering the judgment of the court, said (at 685-686):

> 'But in this case the presents made by the directors to Mr. *Newman*, their chairman, were made out of money borrowed by the company for the purposes of its business; and this money the directors had no right to apply in making presents to one of themselves. The transaction was a breach of trust by whole of them; and even if all the shareholders could have sanctioned it, they never did so in such a way as to

*[1982] 3 All ER 1016 at 1034*

> bind the company ... An incorporated company's assets are its property and not the property of the shareholders for the time being; and if the directors misapply those assets by applying them to purposes for which they cannot lawfully be applied by the company itself, the company can make them liable for such misapplication as soon as anyone properly sets the company in motion ... Directors have no right to be paid for their services, and cannot pay themselves or each other, or make presents to themselves out of the company's assets unless authorized so to do by the instrument which regulates the company or by the shareholders at a properly convened meeting. The shareholders, at a meeting duly convened for the purpose, can, if they think proper, remunerate directors for their trouble or make presents to them for their services out of assets properly divisible amongst the shareholders themselves. Further, if the company is a going concern, the majority can bind the minority in such a matter as this. But to make presents out of profits is one thing and to make them out of capital or out of money borrowed by the company is a very different matter. Such money cannot be lawfully divided among the shareholders themselves, nor can it be given away by them for nothing to their directors so as to bind the company in its corporate capacity.'

This certainly appears to support the submission of counsel for the liquidator and indicates that, when it comes to paying gratuities out of profits, there is no necessary requirement of a consideration of the interests of the company's business. The shareholders may do as they please. What they cannot do, at least without the leave of the court, is to return capital to themselves.

But if counsel is right in limiting the application of the doctrine in this way, how is one to account for the decision in *Parke v Daily News* [1962] 2 All ER 929, [1962] Ch 927, where the funds intended to be dispensed by way of gratuity were in fact funds which represented profits on the sale of part of the company's business and could properly have been divided among the shareholders? And what would have been the position in that case if the payment had been sanctioned by the unanimous vote of all the shareholders? If it is truly beyond a company's capacity to make any gratuitous payment out of its funds that is not, viewed objectively, for the benefit of the company and to promote its business, then such a payment cannot logically be sanctioned or ratified even by all the shareholders acting in unison and it cannot logically matter how the company came by the funds. Company funds are company funds whether they are in the form of cash and representing profits earned by trading or in the form of credit from suppliers or moneys drawn on loan from the company's bankers. They do not belong to the shareholders unless and until they are paid to them by way of a properly declared dividend.

I do not find it altogether easy to reconcile the cases or to extract the principle from them, and it is not in this case of merely academic interest to seek to do so, because the payments under attack here were expressly sanctioned by all the shareholders and the liquidator's claim relates in part to a period when there were divisible profits from which the payments could be made and in part to a period when there were not.

I must therefore attempt, although I do so with some unease, some analysis of what I conceive to be the principles which underlie the cases. Part of the difficulty, I think, arises from the fact that Eve J in *Re Lee, Behrens & Co* combined together, in the context of an inquiry as to the effective exercise of directors' powers, two different concepts which have since been regarded as a single composite test of the corporate entity's capacity. In fact, however, as it seems to me at any rate, only one of the three tests postulated in *Lee, Behrens & Co* is truly applicable to that question. The court will clearly not imply a power, even if potentially beneficial to the company, if it is not reasonably incidental to the company's business (see *Tomkinson v South-Eastern Rly Co* (1887) 35 Ch D 675) and express powers are to be construed as if they were subject to that limitation (see *Re Introductions Ltd*, particularly the judgment of Russell LJ ([1969] 1 All ER 887 at 890, [1970] Ch 199 at 211). But the test of bona fides and benefit to the company seems to me to be appropriate, and really only appropriate, to the question of the propriety of an exercise of a power rather than the capacity to exercise it.

<span style="float:right">*[1982] 3 All ER 1016 at 1035*</span>

The cases really divide into two groups: those such as *Hampson v Price's Patent Candle Co, Hutton*'s case, *Henderson v Bank of Australasia* and *Parke v Daily News*, where the question was not so much that of the company's capacity to do a particular act as that of the extent to which a majority in general meeting could force a particular measure on a dissentient minority; and those such as *Lee, Behrens & Co* itself, *Re W & M Roith Ltd, Ridge Securities v IRC* and the *Charterbridge* case, where the question was as to the validity of an exercise of the powers, express or implied, by directors. Although the test of benefit to the company was applied in both groups of cases, I am not at all sure that the phrase 'the benefit of the company' was being employed in quite the same sense in each.

In the latter group, where what was in question was whether an exercise of powers by directors was effective, the benefit regarded seems to have been that of the company as a corporate entity (see the phrase 'to promote the prosperity of the company') whereas in the former group it was, I think, used in the same sense as that in which it was used in the line of cases dealing with, for instance, the power of the majority to alter the articles of association. In *Allen v Gold Reefs of West Africa Ltd* [1900] 1 Ch 656 at 671, [1900-3] All ER Rep 746 at 749 Lindley MR observed that such a power must--

> 'be exercised subject to those general principles of law and equity which are applicable to all powers conferred on majorities and enabling them to bind minorities. It must be exercised, not only in the manner required by law, but also bona fide for the benefit of the company as a whole ... '

And in *Greenhalgh v Arderne Cinemas Ltd* [1950] 2 All ER 1120 at 1126, [1951] Ch 286 at 291 Evershed MR said:

> ' ... it is now plain that "*bona fide* for the benefit of the company as a whole" means not two things but one thing. It means that the shareholder must proceed on what, in his honest opinion, is for the benefit of the company as a whole. Secondly, the phrase, "the company as a whole", does not (at any rate in such a case as the present) mean the company as a commercial entity, distinct from the corporators. It means the corporators as a general body. That is to say, you may take the case of an individual hypothetical member and ask whether what is proposed is, in the honest opinion of those who voted in its favour, for that person's benefit.'

That was specifically adopted by Plowman J in *Parke v Daily News* [1962] 2 All ER 929 at 948, [1962] Ch 927 at 963 as being applicable in that case.

In my judgment the true rationale of this group of cases is not that what was proposed was ultra vires in the sense that it could not be confirmed by a general meeting where there was no dissentient minority, but that they were concerned with a very different question, namely the circumstances in which the court will interfere to prevent a majority from overriding the rights of a dissentient minority to have the company's property administered in accordance with its constitution. I think that, in truth, neither group properly falls to be regarded as exemplifying applications of the ultra vires doctrine. Both, as it seems to me, more properly

belong to the sphere of abuse of power, and part of the confusion has, I think, arisen from the fact that in *Hutton*'s case, which contains the classical judgment of Bowen LJ always cited in this context, the determination of the question of the majority's power to bind the minority did, because the affairs of the company were being conducted under, and only under, the provisions of a special Act conferring very limited powers, necessarily also involve a consideration of the extent of those powers, which was, indeed, a true ultra vires question.

The distinction clearly emerges from the judgment of Vaughan Williams LJ in *Kaye v Croydon Tramways Co* [1898] 1 Ch 358 at 374-375, where he said:

Then it is said that another ground acted upon by the learned judge was that the entering into such a contract was ultra vires of the company. I am not quite sure that the learned judge meant so to decide, although he may have said some things in the judgment which point in that direction. It is plain that if you speak of something as being ultra vires of the company, and something else as being ultra

*[1982] 3 All ER 1016 at  1036*

vires of the directors or officers of the company, you have not exhausted all the possible cases, because there is another case which may arise, and frequently does arise, that is to say, the majority of the shareholders meet together, and they by resolution purport to bind the minority to do something as to which it is not competent for the majority to bind the minority. Now, such a resolution is not ultra vires in the sense in which that word is properly used--it is not ultra vires in the sense in which counsel for the plaintiff asked us to say that the words of ss 85 and 86 of the Companies Clauses Act [1845] made this resolution ultra vires, because when anything is ultra vires in that sense the vote of all the shareholders, every one of them who were present assenting, would not make the matter one which it was competent for the company to carry through. There is another sense in which it might be said that the matter was ultra vires which is not ultra vires in the proper sense of the words "ultra vires of the company", not ultra vires in the much more limited sense of the words "ultra vires of the directors", but ultra vires of the majority of the shareholders.'

It may be, of course, that where the particular power in question is totally divorced from any conceivable connection with the company's activities, it cannot be ratified even by the unanimous vote of all the corporators. This was a situation envisaged by Rigby LJ in the *Croydon Tramways* case, where he said (at 371):

'What is the meaning of an ultra vires contract? It is one which the company has no legal power to carry into effect at all, even although in the opinion of each and every shareholder it is a contract advantageous to the company and to them, and though each individual shareholder, being fully competent to agree for himself, approves of and agrees with it.'

Possibly *Tomkinson v South Eastern Rly Co* (1887) 35 Ch D 675 was such a case, although the action there was in fact brought at the suit of a minority shareholder.

Subject to that, however, it does not appear to me that the group of cases culminating in *Parke v Daily News* really has much bearing on a case where what has been done is something expressly authorised by the company's constitution and has been expressly sanctioned by the unanimous vote of all the shareholders in general meeting. Counsel for the liquidator, however, submits that the liquidator is, in effect, in the position of a minority shareholder. Suppose, he suggests, that the directors of a company vote themselves a present and then use their majority votes as shareholders to override a dissentient minority. Suppose that before the minority can act to challenge this the company is wound up. Can it be said, he asks, that the liquidator cannot pursue a claim on their behalf? That may be perfectly right, but it does not seem to me that it really is of any help in the context of a case where there is not and never has been any minority shareholder.

Is there then anything in the other group of cases which leads to the conclusion that a unanimous vote in general meeting approving directors' remuneration is incompetent, unless it complies with the whole of the composite *Lee, Behrens & Co* test? On what ground, in the absence of fraud or any consideration of minority interests, are the votes of shareholders in general meeting to be treated as if they were, like the powers of directors, exercisable in a fiduciary capacity? The shareholder is under no fiduciary duty to the company as to the manner in which he exercises his vote (see *Phillips v Manufacturers' Securities Ltd* (1917) 86 LJ Ch 305), although the court may in appropriate circumstances, such as oppression or fraud on a minority, restrain the company from acting on the resolution resulting from the exercise (see, for instance, the case of *Clemens v Clemens Bros* [1976] 2 All ER 268).

*Lee, Behrens & Co* itself does not, in my judgment, provide any support for such a proposition. If Eve J had considered that the transaction in that case was incapable of ratification by a general meeting except subject to the same tests as those which affected the exercise of the directors' powers, then the last part of his judgment which forms the

[1982] 3 All ER 1016 at  1037

alternative ground for the decision is really inexplicable. He clearly considered that that which, in the directors, was a breach of their fiduciary duty (because he was treating the applicant, whether rightly or wrongly, as if she herself were a director) could be endorsed by a properly convened meeting of the shareholders. Equally, it does not appear to me that very much guidance is obtained from *Re W & M Roith Ltd*. That was again a case of an exercise of power by the directors, and it is clear from the report that the applicability of the *Lee, Behrens & Co* test in those circumstances was there conceded, and, I think, rightly conceded (see [1967] 1 All ER 427 at 430, [1967] 1 WLR 432 at 437).

No doubt the effectiveness even of a resolution in general meeting will depend on its bona fides. Fraud opens all doors and the court will not uphold or permit the fraudulent exercise of a power. *Re George Newman & Co* [1895] 1 Ch 674 was clear case of dishonesty, and it is not surprising to find in the judgment of the court the doubt expressed whether what was done there could have been sanctioned even by all the shareholders, although the point was not actually decided. But there is no suggestion of bad faith in this case and, as is shown by *Re British Seamless Paper Box Co* (1881) 17 Ch D 467, which is referred to in the judgment of Lindley LJ in the *George Newman* case, the postion is quite different where the transaction is honest and is sanctioned by all members of the company at the time (see also *Re Express Engineering Works Ltd* [1920] 1 Ch 466). It is perhaps worth noting, in this context, that the test of benefit to the company was impliedly rejected in the case of unanimous consent by Astbury J in *Parker and Cooper Ltd v Reading* [1926] Ch 975 at 984, [1926] All ER Rep 323 at 328. After referring to the two cases last cited, he said:

'Now the view I take of both these decisions is that where the transaction is intra vires and honest, and *especially* if it is for the benefit of the company, it cannot be upset if the assent of all the corporators is given to it.' (Emphasis mine.)

He could hardly have expressed this view if he regarded the notion of benefit to the company as already comprehended in the question of whether the transaction was intra vires.

Counsel for the liquidator submits, however, that, even given a bona fide unanimous resolution in general meeting, it still must be a resolution to do something which the company can lawfully do. It cannot, for instance, lawfully return money to its shareholders out of capital. That is plainly right, and *Ridge Securities Ltd v IRC* [1964] 1 All ER 275, [1964] 1 WLR 479 illustrates the proposition. That was a case of what Pennycuick J in the *Charterbridge* case described as 'a dressed-up gift' of a company's funds to its parent company. Counsel for the liquidator has referred me to the passage in the judgment in the *Ridge Securities* case [1964] 1 All ER 275 at 287-288, [1964] 1 WLR 479 at 495 where Pennycuick J said:

'The Special Commissioners have found that none of the companies had any reason to issue a debenture unless the taxpayer company caused it to do so and that the Marlborough companies and Anthracite had no reason at all for borrowing. Indeed, the terms of each debenture indicate on the face of it that the so-called interest represented in fact a

gratuitous disposition of an enormous sum by the company concerned in favour of the taxpayer company. On these facts and in the absence of any further material, it seems to me to follow that it was not within the powers of the company to enter into the covenant or to make the payment. A company can only lawfully deal with its assets in furtherance of its objects. The corporators may take assets out of the company by way of dividend or, with leave of the court, by way of reduction of capital, or in a winding up. They may of course acquire them for full consideration. They cannot take assets out of the company by way of voluntary disposition, however, described, and, if they attempt to do so, the disposition is ultra vires the company.'

He then went on to deal with the *Lee, Behrens & Co* test which, as I have mentioned already, the appellants asserted did apply in that case.

[1982] 3 All ER 1016 at  1038

Of course, when Pennycuick J referred in that passage to the corporators taking money out, he was referring to payments to them qua corporators and I do not for one moment think that he could have had in mind the payment of directors' remuneration as a result of a vote passed in accordance with the express provisions of the company's constitution. In the context of the instant case, however, counsel for the liquidator submits that since (at any rate during most of the material time) there were no profits available in the company for distribution and since directors' emoluments are always gratuities, except where payable under contract, and since the directors were shareholders as well, every payment to them constituted an illegal reduction of capital except to the extent to which it can be justified by the test of benefit to the company. One difficulty about that, even accepting the submission for the moment, is that it the benefit of the company' means, as Plowman J suggested in *Parke v Daily News*, 'the benefit of the shareholders as a whole', it leads him nowhere.

I accept entirely the submission of counsel for the liquidator that a gratuitous payment out of the company's capital to a member, qua member, is unlawful and cannot stand, even if authorised by all the shareholders. What I find difficulty in accepting is that, assuming a sum to be genuinely paid to a director-shareholder as remuneration under an express power, it becomes an illegal return of capital to him, qua member, if it does not satisfy some further test of being paid for the benefit of the company as a corporate entity. If he genuinely receives the money as a reward for his directorship, the question whether the payment is beneficial to the company or not cannot, as I see it, alter the capacity in which he receives it: see, for instance, *Cyclists' Touring Club v Hopkinson* [1910] 1 Ch 179 at 188.

Now, there is no presumption that directors' remuneration is payable only out of divisible profits. That appears clearly from *Re Lundy Granite Co Ltd, Lewis's Case* (1872) 26 LT 673, where an alternative ground for the decision was that the company in general meeting had indeed sanctioned the payment of directors' remuneration out of capital, the company never having made any profits. James LJ said (at 675):

' ... independently of that construction, I think it would be mischievous, after four years' transactions that have been conducted honestly, there being no suggestion of fraud or concealment as against the directors--to open up transactions which had been submitted to the auditors and shareholders of the company who have passed the accounts, which were then submitted to the general meeting, and of which there was distinct notice given to everybody. It is true that the directors' fees appear in the accounts among a number of other items, but everything appears there. Shareholders, like other persons, must be supposed to read the accounts given to them of their own matters, and therefore there was distinct notice on the face of the reports that the directors' fees were paid, although no profits had been made ... It appears to me that it would be most mischievous to suggest that the company could have filed a bill under these circumstances to recover back the money, the payment of which they had assented to in that way. I am of opinion that creditors can be in no better position than the company itself would be in if it were a solvent company, and had raised this question with its directors.'

Mellish LJ said (at 675):

'The only question is whether that must necessarily be implied--whether it is so much the ordinary course, that directors should be paid only out of profits that that must necessarily be implied, and was intended, although it is not expressed. I am not aware that there is any such rule. If people want the services of directors, I presume directors are entitled to

> say, we will not serve unless we are paid for our services. If directors are appointed and act on that understanding. I do not see any reason why they should not be paid.'

Counsel for the liquidator does not go to the extent, in fact, of suggesting that when a company has fallen on bad times the directors must either close the business down

*[1982] 3 All ER 1016 at 1039*

immediately or go on trying to pull it round for nothing. If that were right, I cannot think that the remuneration sanctioned in *Re Duomatic Ltd* [1969] 1 All ER 161, [1969] Ch 365 would have been allowed to stand. The report does not make it entirely clear, but I infer from the facts that an injection of new capital was required in August 1964 and that the company went into liquidation three months later that it must have been in considerable financial difficulties for some time.

What I think counsel's submission comes to is this, that while the company has divisible profits remuneration may be paid on any scale which the shareholders are prepared to sanction within the limits of available profits, but that, as soon as there cease to be divisible profits, it can only lawfully be paid on a scale which the court, applying some objective standard of benefit to the company, considers to be reasonable. But assuming that the sum is bona fide voted to be paid as remuneration, it seems to me that the amount, whether it be mean or generous, must be a matter of management for the company to determine in accordance with its constitution which expressly authorises payment for directors' services. Shareholders are required to be honest but, as counsel for the respondents suggests, there is no requirement that they must be wise and it is not for the court to manage the company.

Counsel for the liquidator submits, however, that if this is right it leads to the bizarre result that a meeting of stupid or deranged but perfectly honest shareholders can, like Bowen LJ's lunatic director, vote to themselves, qua directors, some perfectly outlandish sum by way of remuneration and that in a subsequent winding up the liquidator can do nothing to recover it. It seems to me that the answer to this lies in the objective test which the court necessarily applies. It assumes human beings to be rational and to apply ordinary standards. In the postulated circumstances of a wholly unreasonable payment, that might, no doubt, be prima facie evidence of fraud, but it might also be evidence that what purported to be remuneration was not remuneration at all but a dressed-up gift to a shareholder out of capital, like the 'interest' payment in the *Ridge Securities* case which bore no relation to the principal sums advanced.

This, as it seems to me, is the real question in a case such as the present. I do not think that in circumstances such as those in the instant case the authorities compel the application to the express power of a test of benefit to the company which, certainly construed as Plowman J held that it should be construed, would be largely meaningless. The real test must, I think, be whether the transaction in question was a genuine exercise of the power. The motive is more important than the label. Those who deal with a limited company do so on the basis that its affairs will be conducted in accordance with its constitution, one of the express incidents of which is that the directors may be paid remuneration. Subject to that, they are entitled to have the capital kept intact. They have to accept the shareholders' assessment of the scale of that remuneration, but they are entitled to assume that, whether liberal or illiberal, what is paid is genuinely remuneration and that the power is not used as a cloak for making payments out of capital to the shareholders as such.

It may well be that one way of ascertaining the true nature of the payment made in purported exercise of such an express power is by subjecting it to the three test postulated in the *Lee, Behrens & Co* case, but it cannot, I think, be conclusive that the court, looking at the matter with hindsight, concludes that a particular application was not beneficial to the company as a corporate entity or that the shareholders in considering it did not have that in mind. If benefit in that sense were the conclusive test, it is difficult to see how the directors in *Hutton v West Cork Rly Co* (1883) 23 Ch D 654 could have been paid for their past services in

connection with the winding up. Such a payment, as I have pointed out, could not have been of any possible benefit to the company which was in the course of winding up. Yet both Cotton and Bowen LJJ clearly contemplated that this could quite properly be paid.

I ought perhaps to add that it has not been suggested that the payments made, if otherwise beyond the powers of a general meeting, were validated by s 9 of the European Communities Act 1972. In any event, the view is expressed in *Gore-Browne on Companies*

*[1982] 3 All ER 1016 at 1040*

(43rd edn, 1977) para 3-16, that the recipient of a corporate gift is not 'a person dealing with a company' within the meaning of the section and that those words contemplate a contractual relationship. Since counsel for the respondents does not rely on that section, however, it is not necessary for me to decide the point.

Turning now to the facts of the instant case, it seems to me that the question which I have to determine is whether, on the evidence before me, I can say that the payments made to Mr Charlesworth and to Mrs Charlesworth were genuinely exercises of the company's power to pay remuneration, and counsel for the liquidator very properly concedes that he is in some difficulties as regards the case of Mr Charlesworth. Despite some rather confusing statements made by Mr Charlesworth to the Official Receiver which indicate the contrary (at any rate as regards part of the relevant time), I am satisfied on the evidence that, except for the period from December 1967 to March 1968 when Mr Gore was in charge and the period from September 1970 to March 1971 when he was away (save for two weeks or so in December), he was working more or less full-time in the business. This was a business with a turnover of the order of £100,000 per annum and the director's remuneration for a full-time working director on a scale of £3,500 per annum does not, I am bound to say, appear to me to be over-generous or unreasonable. It has to be borne in mind, in addition, that Mr Charlesworth, although indemnified by the company against the rent under the lease, was not charging, as he might legitimately have done, any profit rental and that he had personally guaranteed the company's overdraft with its bankers. But counsel for the liquidator submits that, at least from December 1970 onwards when he had his second accident and when he was on the eve of selling the business to Mr Bills, Mr Charlesworth ought to have ceased to draw anything at all, since he was no longer working at the garage. I do not see why, and I do not see why those payments ceased, because he was not actually at the garage, to be remuneration properly so-called. He remained a director and retained the overall responsibility for the company's affairs. He remained the guarantor of the company's overdraft. It was by no means certain that the sale to Mr Bills would not have gone off as other previous anticipated sales had. Once bona fides is conceded, there seems to me to be nothing unreasonable in his continuing, as the person with the responsibility, both legal and financial, for the running of the business, to draw remuneration on the same scale as that which had been established and accepted in the past and, according to Mr Gore's evidence, discussed with the company's accountants.

There is nothing, in my judgment, in the circumstances of Mr Charlesworth's absence from the business over this period following his accidents, the latter of which was directly attributable to his work at the garage, to lead me to conclude that his drawings are to be regarded in some different light from those made while he was able to work actively at the garage or to hold that the moneys were not genuinely paid as director's remuneration. The suggestion seems to be that because the payments were drawn weekly it therefore follows that they were not remuneration as regards any week not worked. But that cannot, I think, be right. In my judgment, the remuneration has to be looked at as a whole against the background of the company's practice that drawings were made weekly and that wages continued to be paid during sickness. Mr Charlesworth was a working director over the whole year and the fact that for part of the time, even a substantial part of the time, he was disabled from attending to the business cannot, I think, alter the quality of the payments made. He was throughout the man ultimately in charge.

Even if I am wrong in the view which I take of the applicability and conclusiveness of the composite *Lee, Behrens & Co* test to these premises, those tests were, in my judgment, satisfied, at any rate up to the time

when Mr Charlesworth ceased to be there. But, as I say, I do not think that that is the real question. I have to look to see whether the payment, in my judgment, was a true payment of remuneration under the power in the articles. I bear in mind that Mr Charlesworth, having in April 1969 reduced his weekly drawings to £50, increased them in May 1970 to £70, and there is really no dispute about the reason for this. He had no other means of livelihood apart from the business

*[1982] 3 All ER 1016 at 1041*

and the increase was a direct result of and coincided with the corresponding decrease in the sums paid to his wife. Mr Gore's evidence was that the latter was effected as a result of advice from the company's accountant that it might be difficult to justify to the Inland Revenue payments of more than £10 a week to a non-working director, and I have no doubt that the increase was intended to ensure that their joint earnings from the enterprise remained the same. It meant that Mr Charlesworth's remuneration as, in effect, managing director was increased from £2,500-odd a year, which might be thought to be on the low side having regard to the company's turnover, to £3,500-odd. That is not, in itself, an unreasonable figure and Mr Gore's evidence was that in his view Mr Charlesworth earned every penny of it; but the decision to do this is one which is obviously open to the criticism that it was unwise. The accounts for the year 1969 had not then been completed, but Mr Charlesworth knew that the business was going through a difficult time and was heavily indebted to its suppliers.

But I do not think that, in the absence of evidence that the payments made were patently excessive or unreasonable, the court can or should engage on a minute examination of whether it would have been more appropriate or beneficial to the company to fix the remuneration at £X rather than £Y, so long as it is satisfied that it was indeed drawn as remuneration. That is a matter left by the company's constitution to its members. In my judgment, a general meeting was competent to sanction the payments which he in fact drew and the claim in misfeasance against Mr Charlesworth under this head must fail.

I have felt considerably greater difficulty over the payments to Mrs Charlesworth. If, contrary to the view which I have formed, it be right to apply to them the test of benefit to the company as a corporate entity and if, as counsel for the liquidator submits, they have to be regarded as entirely separate and divorced from her husband's services to the company, it is very difficult indeed to justify them by any rational application of that test and it would follow that the directors' act in paying them could not be ratified by the unanimous consent of all the shareholders, whether or not at a formal general meeting.

It should perhaps be mentioned that even on this footing counsel's own formulation of the applicability of the test would restrict the liquidator's claim to payments made after 30 April 1968. It is true that in the year ending on that date the drawings reduced the trading profit to a loss on the profit and loss account, but the balance sheet of the company shows that, even allowing for this loss, there was a substantial reserve of profit from the previous year, which could quite properly have been distributed by way of dividend. But subject to that and putting aside the sympathy that must inevitably be felt for Mrs Charlesworth, it is really not possible to see how the business can be said to have derived any benefit at all from the payments nor how anyone could reasonably suppose that it could.

It was known from, at the latest, December 1967 onwards, that Mrs Charlesworth could never return to render any services in the actual conduct of the company's business, and she was never thereafter called on, nor was she ever expected, to fulfil any function save that of being a director and carrying out such minimal formal acts as the holding of that office entailed. Mr Charlesworth in his evidence admitted that the company derived no benefit at all from the payments made to her, save such as may be thought to flow from the fact that she held office. She was incurably ill and living at a distance of several hundred miles from the company's place of business. Yet in each of the years 1968-69 and 1969-70 she received a sum of some £1,500 and in the year 1970-71 something over £500. It is true that Mr Charlesworth said in his evidence that it had always been the company's practice to continue the payment of full wages to employees who were off sick, and indeed the company's memorandum of association contains a wide express power in these terms:

'To pay gratuities or pensions or allowances on retirement to any directors who have held any other salaried office or place of profit with the company or to their widows or dependants and to make contributions to any fund and to pay premiums

*[1982] 3 All ER 1016 at  1042*

for the purchase or provision of any such gratuity, pension or allowance and to promote or assist, financially, whether by way of contributions, donations, the payment of premiums or otherwise, any fund or scheme for the benefit, wholly or in part, of directors, ex-directors, or employees, or ex-employees, of the company, or their dependants or relatives, or for charitable purposes generally.'

But it cannot be contended, I think, that Mrs Charlesworth came within that clause. She had never held any office other than that of director and that she retained. Moreover, Mr Charlesworth was not prepared to say that this practice of the company to which he referred had, or was thought to have, any effect on the loyalty of his staff.

The fact is that, however valuable and exacting may have been the services which Mrs Charlesworth had rendered in the past, her continued directorship contributed nothing to the company's future, beyond the fact that she was and remained responsible as a director and was able to make up the necessary quorum for directors' meetings (of which remarkably few took place if the minutes are any accurate guide).

On the other hand, it is said that the Companies Act 1948 imposes on every company incorporated under its provisions an obligation to have a director and it contemplates that those who assume the responsibilities of office, whether they carry them out well or ill, may be paid for that service in such way and in such measure as the company's regulations prescribe or permit. Here the company's constitution conferred on it in express terms a power to award to a director a reward or remuneration for the bare fact of holding office, and that power the company purported to exercise. If it be legitimate for the company to award some remuneration, however nominal, to Mrs Charlesworth for acting as a director and taking on herself, for good or ill, the responsibilities which that office entails, at what point, counsel for the respondents asks, does it become beyond the company's power to do that which its constitution permits it to do and how can the court take on itself the discretion as to quantum which is vested in the shareholders, there being, ex concessis, no mala fides? I have not found the point an easy one, but on the view that I take of the law the argument of counsel for the respondents is very difficult to meet *if* the payments made really were within the express power conferred by the company's constitution.

But of course what the company's articles authorise is the fixing of 'remuneration', which I take to mean a reward for services rendered or to be rendered; and, whatever the terms of the resolutions passed and however described in the accounts or the company's books, the real question seems to me to be whether the payments really were 'directors' remuneration' or whether they were gratuitous distributions to a shareholder out of capital dressed up as remuneration.

I do not think that it can be said that a director of a company cannot be rewarded as such merely because he is not active in the company's business. The mere holding of office involves responsibility even in the absence of any substantial activity, and it is indeed in part to the mere holding of office that Mrs Charlesworth owes her position as a respondent in these proceedings. I can see nothing as a matter of construction of the article to disentitle the company, if the shareholders so resolve, from paying a reward attributable to the mere holding of the office of director, for being, as it were, a name on the notepaper and attending such meetings or signing such documents as are from time to time required. The director assumes the responsibility on the footing that he will receive whatever recompense the company in general meeting may think appropriate. In this case, however, counsel for the liquidator is entitled to submit that the sums paid to Mrs Charlesworth were so out of proportion to any possible value attributable to her holding of office that the court is entitled to treat them as not being genuine payments of remuneration at all but as dressed-up dividends out of capital,

like the dressed-up payments of 'interest' in the *Ridge Securities* case.

The difficulty that I felt about this at first was that there is, in relation to the misfeasance claim, which is the only claim with which I am concerned, no allegation of fraud or mala fides in relation to these payments. The liquidator's case has been argued

*[1982] 3 All ER 1016 at  1043*

throughout on the footing that they were payments of remuneration but were also payments which could not be sanctioned by a general meeting because it was not for the benefit of the company to resolve on payments on this scale. For the reasons which I have endeavoured to state, I think that in circumstances such as exist in this case, where payments are made under the authority of a general meeting acting pursuant to an express power, the matter falls to be tested by reference to the genuineness and honesty of the transaction rather than by reference to some abstract standard of benefit. I do not, however, think that bona fides (in the sense of absence of fraudulent intention) and genuineness are necessarily the same thing. It is not suggested here that there was any intent to defraud, but that cannot be conclusive. As Jessel MR remarked in *Re National Funds Assurance Co* (1878) 10 Ch D 118 at 128, to say that something is done bona fide is not the same thing as merely to say that the actor had no intention to commit a fraud. The real question is, were these payments genuinely director's remuneration? If your intention is to make a gift out of the capital of the company, you do not alter the nature of that by giving it another label and calling it 'remuneration'.

As it seems to me, the submission of counsel for the respondents involves the notion that where there is a purported exercise of an express power by a general meeting the court is slave to whatever form of words the members may have chosen to use in the resolution which they pass. I do not think that can be so. I agree with counsel for the liquidator that it cannot be right that shareholder directors acting in unison can draw any sum they like out of the company's capital and leave the liquidator and the company's creditors without remedy in the absence of proof of intent to defraud merely because they choose to dignify the drawing with a particular description. The cases show, I think, that the mere fact that the company is in low financial water does not prevent the payment of a proper director's remuneration even though it may be technically a gratuity. But equally, the court is not, in my judgment, precluded from examining the true nature of the payments merely because the members choose to call them remuneration.

Now, looking at the payments made to Mrs Charlesworth, I was at first inclined to regard them merely as part of a global (but, on the fact of it, not unreasonable) remuneration for Mr Charlesworth's service which, as a matter of convenience, were allocated to his wife. But that, I think, cannot be. Mr Charlesworth himself did not claim it to be so. They were the same sums as were paid to her when she was genuinely working in the business, and Mr Gore in his evidence made it quite clear that they were, and were intended to be, her own separate money.

Mr Gore gave evidence of a meeting with a representative of the company's auditors, Mr Marshall, in May 1970, following which the payments to Mrs Charlesworth were reduced. Mr Marshall pointed out that the company was carrying too high a proportion of administrative wages as compared with productive wages and suggested that the scale of Mrs Charlesworth's remuneration should be reduced because, according to my note of Mr Gore's answer, 'it was difficult to say that she was earning that class of money'. This shows, I think, first that the amount being paid as remuneration to a non-working director was considered by Mr Marshall (who, after all, was well acquainted with the company's affairs) to be excessive, but it also shows that nobody has previously given any real consideration to the services or responsibilities in respect of which it was allegedly paid. Mr Gore admitted that he had simply gone on paying the weekly sums to Mrs Charlesworth because he could not bring himself to reduce them while she was so ill.

I find it really impossible on the facts to hold that the whole of these sums, amounting to £1,500 per annum, drawn during the years 1968-69 and 1969-70, can be treated as genuine director's remuneration in any real

sense of the term. They were, as it seems to me, simply a recognition that, as a co-proprietor of the business with her husband, she ought to be getting out of the business what she had had before and that 'director's remuneration' was a convenient label to attach to these sums and one which, it was thought, would enable them to be properly paid. The mere attachment of that label cannot, in my view, alter the fact that they were in truth, from 1 April 1968 onwards,

*[1982] 3 All ER 1016 at 1044*

paid out of capital, which, so far at any rate as they exceeded anything which could reasonably be called remuneration for acting as a director, the company had no power to sanction.

I was troubled in the course of the argument by the question whether, logically, a payment made in these circumstances could be apportioned. Accepting counsel for the liquidator's premise that directors' remuneration under an article in this form is a gratuitous payment, can part be, as it were, more gratuitous than the rest? The answer is, I think, that what the article authorises is the making of a gratuitous payment which is related to the services rendered or to be rendered, be it actually working in the business or merely holding an office and taking responsibility. It does not authorise what, for want of a better term, I may call a 'pure gift', however described, although if it is to come out of divisible profits the shareholders can, as Lindley LJ said in the *George Newman* case, do what they like, and it cannot, I think, be right that, where a payment is made out of capital which is described as remuneration but which is so manifestly beyond any possible justifiable reward for that in respect of which allegedly it is paid, it has to be treated as valid in whole simply because a part of it (which may be difficult to quantify) can be genuinely related to some service or office. Counsel for the liquidator, indeed, does not submit that there can be no apportionment, because the whole of his case in respect of Mr Charlesworth's remuneration was based on the premise that that part which genuinely represented a reasonable reward for services rendered was intra vires and the balance ultra vires. Thus, for instance, if a dividend is paid in part out of capital and in part out of profits, it is, I apprehend, only pro tanto ultra vires and can be recovered to that extent from the directors responsible for its payment.

Counsel for the liquidator submits here, however, that the entirety of the payments to Mrs Charlesworth over the relevant period are recoverable because she should and could have been paid nothing at all since she was not actively working in the business at the garage. That I feel unable to accept. As I have said, a sum paid simply for the assumption of the responsibility of being a director is, in my view, properly described as remuneration. The difficulty must necessarily be to know where to draw the line between what could reasonably be described as a genuine reward for service and what could not. Remuneration does not cease to be remuneration because it is generous or even, perhaps, unwisely generous, but there is an obvious difficulty about fixing any point at which it can be said that a purported exercise of the power to pay ceases to be genuine. In the absence of any evidence of actual motive, the court must, I think, look at the matter objectively and apply the standard of reasonableness.

In the instant case, however, there is some evidence of a standard in the interview with Mr Marshall to which I have referred. The sum of £10 per week, which may seem rather on the generous side even in these inflationary days, was the sum which the company's accountant, a partner in a very well-known firm of chartered accountants, thought was a justifiable sum to pay in May 1970 for Mrs Charlesworth's presence on the board of directors, and it was the sum in fact paid from then on. I do not think that the court can proceed on a minute examination of whether that did or did not conform to the average sum paid by companies of this size to non-working directors. It was the sum which the company was professionally advised could legitimately be regarded as remuneration, and I find it difficult, therefore, to say that it was not genuinely paid as such or that to vote it was beyond the power of a general meeting. Accepting, however, that there was no intention to defraud anyone, I cannot regard the payments made to Mrs Charlesworth in excess of this weekly amount, however well intentioned, as being anything more than disguised gifts out of capital. In my judgment, even the sanction of the shareholders in general meeting could not, simply by calling the payments remuneration, validate the acts of the directors in making them, and to this extent the liquidator's summons must succeed in respect of the period from 30 April 1968 to May 1970, subject only to a claim for relief under s 448 of the 1968 Act.

I have not felt able to accede to the submission of counsel for the respondents that the respondents ought to be excused under this section. Mr Charlesworth was well aware of

[1982] 3 All ER 1016 at 1045

the difficulties which the company was exercising, although, according to Mr Gore's evidence, he felt that the accountants were being too pessimistic, and both respondents were told in August 1970 in unmistakable terms that the accounts to the end of the year 1969 showed a state of insolvency. While Mr Charlesworth may well have thought that he would be able to pull the business round, prudence would, I think, have dictated a reduction in overall drawings. Accepting that they have acted honestly, therefore, I do not think that they can be said to have acted resonably.

Accordingly, so far as the claim in respect of Mr Charlesworth's drawings is concerned, the summons fails; but as regards those of Mrs Charlesworth, I feel bound to hold that it must succeed to the extent which I have indicated.

*Order accordingly.*

*Solicitors: William F Prior & Co (for the liquidator); Poole, Bairstow & Co, Bedford (for the respondents).*

Evelyn M C Budd Barrister.

**TAB L**

[1993] 1 Lloyd's Rep. 543                                                                    Page 1
1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

**\*543** Arab Monetary Fund v. Hashim and Others

Queen's Bench Division (Commercial Court)
QBD (Comm)
Feb, 17, 18, 19, 20, 21, 24, 25, 26, 27Mar. 2, 3, 4,
5, 9, 10, 11, 12, 16, 17,
18, 19, 23, 24, 25, 26, 30, 31Apr. 1, 2, 6, 7, 8 and 9,
1992; Nov. 13, 1992
Before Mr. Justice Evans

Principal and agent - Secret commission - Bribe - Contract for construction of plaintiffs' building - Plaintiffs alleged that contractors paid agents a bribe - Whether plaintiffs entitled to restitution or damages.

Conflict of laws - Contract - Jurisdiction - Contract for construction of plaintiffs' building - Plaintiffs alleged that contractors paid agent a bribe - Plaintiffs claimed restitution or damages - Whether claims governed by English law - Whether payment ultra vires - Whether English Court had jurisdiction to hear claims.

Conflict of laws - Limitation of time - Contract for construction of plaintiffs' building - Plaintiffs alleged that contractors paid agent a bribe - Plaintiffs claimed restitution or damages - Whether plaintiffs' claim subject to limitation defences.

The plaintiffs (the AMF) were formed by agreement between 20 Arab States and Palestine in 1977 with its headquarters in Abu Dhabi. The first defendant Dr. Hashim was its first President from 1977 until 1982.

The Bernard Sunley Group was highly successful in obtaining and executing large-scale building and construction contracts in the Gulf area from an early stage in the major expansion of such work which took place from the 1960s onward. The group acquired a deserved reputation for its high standards of work and in 1977 it was able to form, with the permission of the Ruler of Dubai, a Middle East subsidiary (BSME) the third defendants.

When Dr. Hashim took up his appointment as President in May 1977 he had no staff or offices. The plaintiffs decided to have headquarters of their own. The construction of the headquarters was put out to tender and in the event a building contract for the offices was made between the plaintiffs and BSME. The building contract was signed on Jan. 23, 1980. The building was completed in 1982 and final accounts were settled between the plaintiffs and BSME.

The plaintiffs alleged that a single payment of U.S.$1,848,132 was made by the second defendants Bernard Sunley & Sons Ltd., (BSS) to a Swiss bank account in the name of J.O.J. Anstalt on Jan. **\*544** 29, 1980. It was conceded for the purposes of these proceedings only that Dr. Hashim was sufficiently connected with the Anstalt for the payment to be regarded as one made to an account in his own name. The plaintiffs claimed that the payment was a bribe, i.e. a secret commission paid to Dr. Hashim as their agent in connection with the building of their offices in Abu Dhabi.

The plaintiffs claimed the amount of the payment or damages from BSS and BSME as payers and from Dr. Hashim as payee.

BSS and BSME denied liability. They contended that the payment was made by the fourth defendant Mr. John Sunley and the late Mr. John Fryer who were then the chairman and managing director respectively of both companies. BSS and BSME argued that not only was the payment unauthorized by them but that it was ultra vires. If the plea of ultra vires succeeded the plaintiffs claimed against Mr. Sunley personally and against the sixth defendant, the executor of Mr. Fryer's estate.

Dr. Hashim denied liability and challenged the evidence admitted by the other defendants both as to its authenticity and its admissibility in these proceedings. Dr. Hashim further contended that the claims against him were not justiciable in the municipal Courts of England and that he was entitled at

least arguably to the immunity allowed by public international law in respect of the official acts of officials of international organizations.

Various issues arose as to the system or systems of law which should be applied, and as to the limitation defences available to the defendant.

Held, by Q.B. (Com. Ct.) (EVANS, J.), that

(1) on the evidence the disputed documents were authentic, i.e. genuine and what they purported to be and were admissible against the first defendant in so far as the plaintiffs relied upon ss. 2, 4 and 6 of the Civil Evidence Act; it remained important to identify carefully what facts each individual document proved, not only the disputed documents but also those others on which the plaintiffs relied where the maker had not been called (*see* p. 555, col. 2; p. 556, col. 1; p. 557, col. 2);

(2) the coincidence of the date (payment immediately after the contract was signed) and the coincidence of the amount (about 10 per cent. of the contract price) was overwhelming; Dr. Hashim had no explanation for either of the two coincidences and the plaintiffs had discharged the burden of proving that the payment to Dr. Hashim was a bribe (*see* p. 559, col. 2; p. 560, col. 1; p. 595, col. 2);

(3) both defendants (i.e. BSS and BSME) acted as principals and both were liable to the plaintiffs if liability was established under English or Gulf law; Mr. Fryer acted in the interests of and on behalf of both defendants each of whom had their own reasons for obtaining the building contract; BSME as contractor and BSS both for its own involvement and in the general interests of the group; and both parties committed their own funds to the payment, BSS when the payment was made and BSME when they indemnified BSS in respect of it (*see* p. 562, col. 2; p. 563, col. 1);

(4) where the employer had paid the contractor the full amount due under a contract which was induced by a bribe paid to the employer's agent the employer was entitled to recover the amount of the bribe from the contractor on a restitutionary basis since the contractor had received a greater sum than was the true price between them and ought to restore the balance (*see* p. 565, col. 2);

-Mahesan v. Malaysia Housing Association, [1979] A.C. 374, considered.

(5) the plaintiffs' claims were governed by the law of Abu Dhabi; the proper law of the restitutionary obligation was Abu Dhabi; the building transaction was centered there, Dr. Hashim was based there and his duties were owed to the plaintiffs whose headquarters were there; the bribe agreement and the bribe payment were ancillary to the building contract and to Dr. Hashim's employment (*see* p. 566, cols. 1 and 2);

(6) the essential tort allegations were that the plaintiffs suffered damage, whether actual or presumed by reason of the bribe paid to their agent Dr. Hashim in connection with the headquarters' building contract; the bribe agreement was made in London and implemented by means of the payment made from London to the Swiss bank account; in all other respects the torts were committed in Abu Dhabi; the rule of double actionability applied as a matter of English law (*see* p. 567, col. 1);

(7) paying a lawful commission to an agent in return for procuring business for BSS as a building contractor or for BSME as an associated company to be carried out in conjunction with BSS was within the scope of the memorandum of association; the payment made to Dr. Hashim in the circumstances which made it unlawful and a bribe was an act within the scope of par. 3(j) of the memorandum being "remuneration or other compensation or reward for services rendered or to be rendered . . . in or about the conduct of" the business of BSS and/or BSME; the ultra vires defence of the second defendants failed (*see* p. 568, col. 2; p. 569, col. 1; p. 570, col. 1; p. 595, col. 2);

-Rolled Steel Ltd. v. British Steel Corporation, [1986] 1 Ch. 246, considered and applied.

(8) the plaintiffs had the status of an international organization and it had a corporate capacity created by the sovereign ruler of the U.A.E. and recognized as such by the English Courts; the relationship between Dr. Hashim and the plaintiffs was governed by the agreement between them and that agreement was governed by municipal law (*see* p. 572, col. 2; p. 577, col. 2; p. 595, col. 2);

(9) although the director-general of an interna-

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

tional organization such as the plaintiffs was entitled to a general and permanent immunity from local legal process in respect of his official acts, such immunity was granted for the benefit of the organization rather than himself and if the immunity was waived by the organization then **\*545** there was no further bar to proceedings against him; Dr. Hashim's objections to the jurisdiction of the English Court failed (*see* p. 574, cols. 1 and 2);

(10) Dr. Hashim's agreement with Mr. Fryer and his acceptance of the Bernard Sunley payment and his concealment of both from the plaintiffs constituted a breach of contract under Abu Dhabi law and that breach was such as to justify a revocation of the contract under art. 13 of the Civil Violations Code 1966 (*see* p. 577, col. 2);

(11) the events giving rise to the alleged liability occurred in 1979 and 1980; and although the 1966 Civil Violations Act contained no general Shari'a principle as reflected in art. 282 of the UAE Civil Code of 1986 that a person who committed a wrongful act was liable to make good all and any damage caused by such act, the law of Abu Dhabi included, prior to 1986, liability for such unlawful acts and in particular for the payment and receipt of an unlawful secret commission (*see* p. 578, col. 2; p. 579, col. 1; p. 580, cols. 1 and 2);

(12) the plaintiffs had failed to establish that the bribe was paid out of the advance payment made under the building contract to BSME by the plaintiffs; the Bernard Sunley payment was made out of BSS funds and independently of the advance payment made to BSME; the fact that BSME later indemnified BSS was irrelevant; Dr. Hashim was not liable to make restitution in the amount of the bribe (*see* p. 581, col. 1; p. 595, col. 2);

(13) on the evidence the plaintiffs acquired actual knowledge of a payment by BSS in April 1986; there was sufficient actual knowledge on the part of the plaintiffs as amounted to detection of the civil contravention under the 1966 Act or awareness of the occurrence of the harm and of the identity of the person responsible for it under the 1986 Civil Code; and the plaintiffs had actual knowledge of the facts constituting bribery by at the latest Apr. 17, 1986 (*see* p. 587, col. 2, p. 588, cols. 1 and 2; p. 589,

cols. 1 and 2; p. 590, col. 1);

(14) the period of limitation under Gulf law was either two years if the transitional provisions correctly applied or three years from the date of awareness; the longer three year period expired before the writ was issued on Apr. 21, 1989 even though only by a matter of days; and although the period of limitation could be extended to three years under the undue hardship provisions of s. 2 of the Foreign Limitation Periods Act, 1984, it was impossible to hold that applying a three year limitation period caused hardship to the plaintiffs or that the hardship was undue or excessive (*see* p. 591, col. 2; p. 592, col. 2; p. 593, col. 1; p. 595, col. 2);

(15) the claims added by amendment to the points of claim would be deemed pursuant to s. 35 of the Limitation Act, 1980 to have been commenced on the date of the writ; the limitation defences succeeded (*see* p. 593, col. 2; p. 595, col. 1; p. 596, col. 1).

The following cases were referred to in the judgment:

Anangel Atlas Compania Naviera S.A. and Others v. Ishikawajima-Harima Heavy Industries Co. Ltd., [1990] 1 Lloyd's Rep. 167;

Arab Monetary Fund v. Hashim and Others (No. 3) (H.L.) [1991] 2 Lloyd's Rep. 114;

Armagas Ltd. v. Mundogas Ltd., (H.L.) [1986] 2 Lloyd's Rep. 109; [1986] A.C. 717; (C.A.) [1985] 1 Lloyd's Rep. 1; [1986] A.C. 1;

Aspen Trader, The [1981] 1 Lloyd's Rep. 271;

Aveling Barford Ltd. v. Perion Ltd., [1989] B.C.L.C. 626;

Brickfield Properties Ltd. v. Newton, (C.A.) [1971] 1 W.L.R. 862;

Buttes Gas & Oil Co. Ltd. v. Hammer, (H.L.) [1982] A.C. 888;

Casper Trader, The [1991] 2 Lloyd's Rep. 237;

Cohen v. Kuschke & Co., (1900) 83 L.T. 102; D, In

re [1986] 2 F.D. 189;

Donoghue v. Stevenson, (H.L.) [1932] A.C. 568;

Evia Luck, The (H.L.) [1992] 1 Lloyd's Rep. 115; [1991] 3 W.L.R. 875;

Fannon v. Blackhouse, (C.A.) unreported, July 30, 1987;

Findlay (James) Corporation Ltd. v. Meers, [1988] S.L.T. 302;

Grant v. The Gold Exploration and Development Syndicate Ltd., [1900] 1 Q.B. 233;

H. v. Schering Chemicals Ltd., [1983] 1 W.L.R. 143;

Hannibal & Co. Ltd. v. Frost, [1988] 4 B.C.C. 3;

Hovenden and Sons v. Milhoff, (1900) 83 L.T. 41;

International Sales and Agencies Ltd. v. Marcus [1982] 2 All E.R. 551;

Jogia, In re (C.A.) [1988] 1 W.L.R. 484;

Jones (Francis) v. Trollope Colls Cementation Overseas Ltd., (C.A.) unreported, Jan. 24, 1990;

Komninos, The (C.A.) [1991] 1 Lloyd's Rep. 371;

Lee Behrens & Co. Ltd.,In re [1932] 2 Ch. 46;

Letang v. Cooper, (C.A.) [1964] 2 Lloyd's Rep. 339; [1965] 1 Q.B. 232;

Mahesan v. Malaysia Housing Association, (P.C.) [1979] A.C. 374;

Metall und Rohstoff A.G. v. Donaldson Lufkin & Jenrette Inc. (C.A.) [1990] 1 Q.B. 391;

Pegasus, The (C.A.) [1967] 1 Lloyd's Rep. 302;

Pritt v. Fairclough (1812) 3 Camp. 105;

R. v. Jones and Sullivan, [1978] 1 W.L.R. 195;

R. v. Tirado, (1974) 59 Cr. App. Rep. 80;

Rahimtoola v. Nizam of Hyderabad, (H.L.) [1958] A.C. 379;

Rayner (J.H.) (Mincing Lane) Ltd. v. D.T.I. (H.L.) [1990] 2 A.C. 418;

Rolled Steel Ltd. v. British Steel Corporation, (C.A.) [1986] 1 Ch. 246;

Salford Corporation v. Lever, (H.L.) (1891) 1 Q.B. 1, 68;

Steamship Mutual Underwriting Association Ltd. v. Trollope & Colls (C.A.) [1986] 33 B.L.R. 77;

Thompson v. J. Barke & Co. (Caterers) Ltd., [1975] S.l.T. 67;

United Australia Ltd. v. Barclays Bank Ltd. (H.L.) [1941] A.C. 1;

Ventouris v. Mountain (The Italia Express) (C.A.) [1991] 1 Lloyd's Rep. 441;

Zoernsch v. Waldock, (C.A.) [1964] 1 W.L.R. 675.

This was an action by the plaintiffs, the Arab Monetary Fund claiming that the payment made by the second defendants, Bernard Sunley & Sons Ltd., to the first defendant Dr. Jawad Hashim, the President of the AMF between 1977 and 1982, in connection with the building of AMF's headquarters by the third defendants, Bernard Sunley (Middle East) S.A.R.L. was a bribe or a secret commission. The second and third defendants contended that the payment was made by the fourth defendant Mr. John Sunley and the late Mr. John Fryer who were the chairman and managing director respectively of both companies. The sixth defendant Mr. John Alistair Clemence was the personal representative of Mr. Fryer.

**Representation**

Mr. Peter Scott, Q.C., Mr. Michael Brindle, Q.C. and Mr. Craig Orr (instructed by Messrs. Freshfields) for the plaintiffs; Mr. Colin Ross-Munro, Q.C. and Mr. Hugo Page (instructed by Messrs. Landau and Scanlan) for the first defendant Dr.

Hashim; Mr. Christopher Clarke, Q.C. and Miss Catharine Otton-Goulder (instructed by Messrs. Lane & Partners) for the second defendant BSS; Mr. Nicholas Padfield, Q.C. and Mr. Dominic Chambers (instructed by Messrs. Richards Butler) for the third defendant Bernard Sunley (Middle East) S.A.R.L. and the fourth defendant Mr. Sunley; Mr. James Munby, Q.C. and Mr. Christopher Nugee (instructed by Messrs. Dawson & Co.) for the sixth defendant the personal representative of Mr. Fryer's estate.

The further facts are stated in the judgment of Mr. Justice Evans.

Judgment was reserved.

Oct. 1, 1992

**JUDGMENT**

Mr. Justice EVANS:

This case arises out of a single payment of U.S.$1,848,132 made by the second defendants, Bernard Sunley & Sons Ltd. ("BSS") to a Swiss bank account in the name of a Liechtenstein Anstalt, J.O.J. Anstalt ("JOJ") on Jan. 29, 1980. It is conceded for the purposes of these proceedings (only) that the first defendant, Dr. Jawad Hashim, was sufficiently "connected with" the Anstalt for the payment to be regarded as one made to an account in his own name. Dr. Hashim was at that time the president of the Arab Monetary Fund ("AMF") who are the plaintiffs. They claim that the payment was a bribe, that is, a secret commission paid to him as their agent in connection with the building of their headquarters offices in Abu Dhabi. The building contract for the offices was made between the plaintiffs and Bernard Sunley (Middle East) S.A.R.L., ("BSME ") a Lebanese-registered company which formed part of the Bernard Sunley group of companies at that time. BSME is the third defendant. The building contract was signed on Jan. 23, 1980, a few days before the payment was made. The building was completed in 1982 and final accounts were settled between the plaintiffs and BSME.

The plaintiffs claim the amount of the payment, or damages, from the second and the third defendants, as payers, and from their former president, Dr. Hashim, as payee. The second and third defendants deny liability, though they accept that the payment was a bribe. They contend that the payment was made by the fourth defendant, Mr. John Sunley, and the late Mr. John Fryer, who were then the chairman and managing director, respectively, of both companies. The executor of Mr. Fryer's estate is the sixth defendant. The company defendants say, not only that the payment **\*547** was unauthorized by them, but that it was outwith their capacities as a matter of law. If this ultra vires plea succeeds, but not otherwise, then the plaintiffs claim against Mr. Sunley personally and against the sixth defendant as the personal representative of Mr. Fryer.

As against the two companies and the two personal defendants, the evidence is and is acknowledged to be overwhelming that the payment was in fact a secret commission paid to Dr. Hashim as the plaintiffs' agent in order to induce him to act in favour of the Bernard Sunley group in connection with the construction contract for the AMF building - in common parlance, a bribe. But the first defendant, Dr. Hashim, disputes this. Moreover, certain documentary evidence which is admitted by the other defendants is challenged by him, both as to its authenticity and its admissibility in these proceedings. In these circumstances, and understandably, these questions of evidence have figured prominently during the hearing and will have to be considered and ruled upon in this judgment.

To complete this general survey of a complex piece of litigation, I should add four further comments. First, there is an acute difference of view as to the system or systems of law which should be applied - the conflicts of law issues. Secondly, I have heard expert evidence as to the content of the law of Abu Dhabi, which I ruled to be relevant or potentially relevant, unlike the law of Switzerland which I held does not apply. Thirdly, Dr. Hashim as the first defendant raised issues of immunity and justiciability which involved consideration of public international law. Finally, there are numerous limitation de-

fences. These required evidence of the dates when material facts regarding the payment first became known to the plaintiffs and to the respective defendants, other than Dr. Hashim.

The order in which these many issues should be dealt with at the trial was helpfully evolved with a minimum of argument at the outset, and I can conveniently set out the list of issues here (order dated Feb. 19, 1992):

*Stage 1*

(1) All factual issues, except for those relating to (a) the limitation position of the plaintiffs; (b) the content of foreign law; (c) plene administravit and (d) damages only.

(2) All issues of fact and law relating to conflict of laws issues.

(3) All legal issues relating to ultra vires and lack of authority.

*Stage 2*

(4) Non-justiciability and immunity.

*Stage 3*

(5) All factual issues relating to the limitation position of the plaintiffs.

(6) The content of foreign law - expert evidence.

*Stage 4*

(7) All other issues relating to the third party proceedings.

*Stage 5*

(8) Plene administravit adjourned for further consideration, if necessary.

(9) Damages.

Before I become involved in any further detail, I should set out certain aspects of the background and say something more about the parties. The Bernard Sunley Group was highly successful in obtaining and executing large-scale building and construction contracts in the Gulf area from an early

stage in the major expansion of such work which took place from the 1960's onwards. The group acquired a deserved reputation for its high standards of work and in 1977 it was able to form, with permission from H.H. the Ruler of Dubai, a Middle East subsidiary based in Dubai. This was BSME, the third defendant, a company incorporated as already stated in Lebanon and owned by a Jersey subsidiary of the group parent and second defendant, BSS.

Among its successes was the BCCI building in Abu Dhabi. This was designed by a distinguished firm of London architects, Fitzroy Robinson and Partners, and was completed in 1978.

For the inception and status of the AMF, I can refer to the reports of separate litigation in the Chancery Division. That action has been subject to a stay while this action is pending, but it has already been to the House of Lords on interlocutory objections to the plaintiffs' capacity to sue: A.M.F. v. Hashim (No. 3), [1991] 2 A.C. 114. Suffice it to say that the Fund was formed by agreement between 20 Arab States and Palestine in 1977, that its main offices were and are situated in Abu Dhabi, and that Dr. Hashim was its first president from 1977 until 1982.

Dr. Hashim is an Iraqi and had already achieved much as a finance expert and as a politician. He modestly describes his appointment as a political one, but it was approved by the 21 member States and at the age of 39 he was entrusted with the management of substantial sums of money and of a large organization and with a task which demanded considerable political and diplomatic skills.

**\*548** *The AMF building*

When Dr. Hashim took up his appointment as President in May, 1977 he had no staff or offices. He was soon able to obtain impressive accommodation in five floors of the BCCI building which was owned by the son of the Ruler of Abu Dhabi. He met representatives both of the constructors and of the supervisory architects, Fitzroy Robinson. The plaintiffs soon decided to have headquarters of their

Case 1:07-cv-01646-RMC    Document 39-5    Filed 01/31/2008    Page 8 of 212

own. It was inevitable that the Bernard Sunley Group should be interested in obtaining what was on any view a prestige contract. It was equally understandable that the plaintiffs and Dr. Hashim as their President should regard the group, as they did, as contractors who were capable of producing work of high quality, as the BCCI building with which they were familiar demonstrated. Dr. Hashim managed to obtain a suitable site for the headquarters building. He received approaches from at least two contractors other than Bernard Sunley. Then on Oct. 29, 1978 he met Mr. L. F. U. Hayward who introduced himself as the area manager of BSS, giving that company's poste restante address at Dubai (letter dated Nov. 1, 1978). On Nov. 28, 1978 the matter was raised at the meeting of AMF's board of directors. Dr. Hashim reported his plans which were intended to ensure that:

 . . . the Fund's headquarters would be constructed in a suitable way which is compatible with the building which we occupy at the present . . . the new building should reflect the A.M.F. [Minutes of the 11th meeting].

Dr. Hashim announced the appointment of a building committee to supervise the construction of the building and whose functions included deciding on the different offers received from would-be constructors and awarding the tender to the chosen contractor. The committee was required to submit its decision to the President. A further memorandum from Dr. Hashim reported that when the bids had been received -

 . . . a specialist committee would be set up to choose the best of those bids in accordance with internationally recognised practices and under the supervision of the Board.

The chairman of the committee was Dr. Muhammed Lebeeb Shukeir, a distinguished Egyptian and senior legal adviser to the AMF. One of its members was Dr. Basim Asker who later was the official effectively in charge of the project.

The architects were chosen by international competition and Fitzroy Robinson & Co. were appointed by an independent panel. Meanwhile, the committee turned to considering how suitable international contractors might be identified. Dr. Asker was instructed to draw up a questionnaire and to prepare a list of contractors who might be invited to tender (meeting held Feb. 3, 1979). This was done and the matter was discussed at the next meeting held on Feb. 27. The committee resolved that contractor's pre-qualification applications should be assessed on the following basis:

*Ratings*

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Press releases followed, and on Mar. 12, 1979 BSS applied for the pre-qualification form for contractors (letter from an Abu Dhabi address (P.O. box) signed by M. J. Parsons). Receipt of the form was acknowledged by R. d'Souza on behalf of BSS. It was returned duly completed on Apr. 12 with a covering letter from Dubai signed on behalf of Mr. Hayward as area manager. The company's name was stated as BSS with addresses in the UAE at Dubai and Abu Dhabi and its "home office" address at Beckenham in Kent. BSME was listed as a "subsidiary or affiliate", also with addresses at Dubai and Abu Dhabi.

Dr. Asker then recommended to Dr. Hashim 22 applications including Bernard Sunley's out of 82 received. He assessed the Bernard Sunley application as follows:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

The story moves forward to August/Sep- **\*549** tember when Fitzroy Robinson & Co. had won the architects' competition and their local representative, Mr. Peter Mlodzianowski, became actively involved. Drafts of the formal invitation to tender were prepared and by what appears to have been an

extraordinary resolution of the board of directors, signed by Dr. Hashim, a committee of eight members under the chairmanship of Dr. Muhammed Mahmood was appointed to choose 10 contractors from those who had submitted applications. The committee met three times, on Oct. 22, 25 and 28. Dr. Hashim was present at the third and last meeting but not at the earlier two. The minutes show that 52 applicants were eliminated at the first meeting and that Dr. Asker and Mr. Mlodzianowski were asked to prepare detailed reports on the remaining 30. They did this, with BSS rated first at 98 per cent. and nine others rating 89 per cent. or more. The committee discussed their report and decided that a "tolerance factor" of plus or minus five points should be used in the grading. They -

. . . agreed to recommend to the President the attached grading of contractors with a + or - 5 points to each contractor so that the following eventualities are covered: 1. Due to the existence of unforeseen factors that are known to the President due to his continuous follow-up of the project 2. Due to the factors of tolerance of grading discussed above. The significance of par. 1 is not immediately apparent. The committee's final report shows what its effect was. They decided at the third meeting (at which Dr. Hashim was present) that only those contractors who scored above 90 per cent. should be invited to tender. The top 15 were reconsidered. In the result, nine contractors were chosen, including one who previously scored only 86 per cent. and excluding two, both of whom had scored 95 per cent. This was partly explained as follows:

(a) Those contractors who, as the President indicated, exercised improper pressures on the Fund to become qualified, received a decrease in their total score by the full 5 points.

"Bernard Sunley & Sons" was placed first, with the same score as previously, 98 per cent.

It has been suggested that Bernard Sunley received preferential treatment at this stage of the process and that Dr. Hashim was involved on their behalf, but the evidence is inconclusive and I need say no more about it.

The final date for receiving contractors' bids was Dec. 23, 1979. The Bernard Sunley tender was dated Dec. 21 and was signed by Mr. Fryer on behalf of BSME. The price was UAE Dirhams 84,824,455 and the period 18 months. It was handed to the project manager Dr. Asker at 10 10 on Dec. 23 by Mr. Hayward on behalf of "BS & S".

The tenders received were opened on Dec. 24 at a ceremony attended by the committee members. Details of the bids received were posted at the AMF offices. The lowest bid was Dr.76,745,000 but for a 21 months construction period. "Bernard Sunley & Sons" was the second lowest bid. Five other contractors tendered on the basis of 21 months completion (Bernard Sunley alone did not do so) with alternative bids for completion periods ranging from 20 to 26 months.

There followed a period during which the tenders were evaluated and negotiations took place between the AMF and the bidding contractors. Mr. Mlodzianowski was on leave in England until Jan. 6. Dr. Hashim personally as well as Dr. Asker was involved in the negotiations on behalf of AMF and later he claimed to have worked "night and day" or "24 hour days" or "round the clock ", depending on the precise translation of the Arabic phrase, on AMF's behalf in this regard. One result was a reduced tender by BSME in the sum of Dr.77,190,000 for a contract period of 18 months. What was previously the lowest tender was increased to Dr.79,571,000 after the specification of works was checked and found to be inaccurate. The tenders evaluation committee rated the seven original and revised tenders and on Jan. 10 they recommended "Bernard Sunley & Sons" as their preferred choice. The bids rated second and third were from reputable contractors and were for Dr.85,850,000 (20 months) and Dr.83,268,000 (18 months) respectively. The second bid in particular was rated close to Sunley's although the period was longer and the price (Dr.85m. against Dr.77m.) much higher. One bidder had withdrawn.

Dr. Hashim reported to the board on Jan.13 in time for its 18th meeting on Jan. 19. He endorsed the

committee's recommendations of the Bernard Sunley & Sons bid.

In the event the board meeting took place over two days, Jan. 19/20 1980. Mr. Mlodzianowski and Dr. Asker were in attendance. The board was told that an internal estimate of a market price prepared by Dr. Asker had produced a figure of Dr.81m. (Mr. Mlodzianowski's evidence confirms this). There was much discussion of the bid rated second which, one of **550** the directors suggested, was cheaper than Sunley's if adjusted to the same specifications. The suggestion of further negotiations was resisted, however, by Dr. Hashim (who referred at this stage of the discussion to his "24 hour" negotiations with all of the bidders) and by Dr. Asker. Eventually, the board decided:

   . . . to authorise the President to offer the contract to build the Fund's building to the bidders he sees fit and who are covered by the report of the bid analysis committee.

The decision was reached, it seems, during the evening session on Jan. 19, although the meeting continued on other topics on the following day.

At 20 18 on Jan. 19, Dr. Hashim telexed the second-placed bidders asking them to consider a further reduction, and they replied with a substantial (Dr.2-3m.) reduction on Jan. 21. There seem, however, to have been no further negotiations and on Jan. 22, Dr. Hashim reported as president to the head of the legal department that he had awarded the contract to Bernard Sunley & Sons.

The contract agreement is dated Jan. 23, 1980, The parties are AMF and BSME. It was signed in Abu Dhabi by Dr. Shukeir and by Mr. Fryer on behalf of "Bernard Sunley & Sons". On the same day, the AMF made the advance payment required by the contract of Dr.15,438,000 (later adjusted to Dr.15,400,038), equivalent to 20 per cent. of the contract price, to BSME. The BSME ledger shows this as a sum received on Jan. 21 and that one-half (Dr.7,719,060) was transferred to BSS London on Feb. 4. BSME's liability in respect of the advance payment was guaranteed by BCCI's main branch at Abu Dhabi, who also issued a performance bond

for the one-half figure of Dr.7,719,000. The unsuccessful bidders were informed of the outcome (including the amounts of the revised bids) on Jan. 24.

The history of the bids process which I have outlined above was duly recorded in AMF minutes and other records. It was to all appearances entirely regular and no one suggests that the board either was or should have been aware that there were secret dealings between Bernard Sunley and Dr. Hashim in connection with the contract, or at all.

The board did not know that a few days after the contract was signed a sum equivalent to about 10 per cent. of the contract price was paid by BSS into what may be regarded as Dr. Hashim's personal bank account in Switzerland. The payment was made in the following circumstances. On the morning of Jan. 25, Mr. Raymond John Elston who was a director of BSS and principally responsible for bookkeeping, accounts and taxation matters arranged for the sum of £1m. to be transferred from a BSS account with the Clydesdale Bank, Piccadilly Branch, to BCCI at the Commercial Road, London E1, for the account of BSS. He then instructed BCCI to make two transfers, both in U.S. dollars. The first was $267,845 to Credit Suisse in Geneva. The second was $1,848,132 to First Chicago International Banking Corporation, New York for the account of First National Bank of Chicago ("FNBC"), Investment Divisions, Geneva, Reference 1099. That was a reference to the JOJ account. The account had been opened on the instructions of Dr. Hashim in the previous November and he had supplied the details and reference number to Mr. Fryer at about that time. Mr. Elston's instructions to BCCI asked for the transactions to be kept separate from other BSS accounts. He said in evidence that they were carried out on the instructions of Mr. Fryer and that he himself was unaware that the payment was to or for the benefit of Dr. Hashim or that it was connected, if it was, with the AMF contract.

A further letter of the same date from Mr. Elston to the Clydesdale Bank shows that £1m. was withdrawn from deposit with another bank and was to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543

**(Cite as: [1993] 1 Lloyd's Rep. 543)**

be paid, together with interest, to the Clydesdale Bank on Jan. 28 for the account of BSS.

A manuscript document (undated) in Mr. Fryer's handwriting shows that $267,845 was the equivalent of Dr.1,000,000 and $1,848,132 the equivalent of Dr.6,900,000 at the then current rate of exchange. The sterling equivalents were £119,121.63 and £821,956.95 and these together with bank charges made a total of £941,120.58, rather less than the £1m. transferred to BCCI. Mr. Fryer's note also refers to "100,000 Cash".

The records of FNBC which are now available show that $1,848,132 was received for the credit of the JOJ Anstalt account on Jan. 31 (value Jan. 30).

The board of AMF was also unaware, in January, 1980, of the circumstances in which the Bernard Sunley & Sons bid was reduced from Dr.84m. to Dr.77m. on Jan. 3. The evidence is as follows. Mr. Fryer visited Abu Dhabi from Dubai in the company of Mr. Hayward and in the course of that day they saw both Dr. Hashim and Dr. Askar, the project manager. The upshot was a remarkable document in Mr. Fryer's handwriting which was disclosed by the third defendants BSME shortly before the trial. It reads: **\*551**

Agreed between Dr Jawad Hashim, Dr ASKER LFWH [Mr Hayward] & JAEF [Mr Fryer] on 3/1/80

1. Tender price to be reduced from Drs 84 3/4 million to Drs 77,190,000

2. Reduction will be made up by:

(a) Drs 4,000,000 addition to VO's within few months of starting job

(b) Other variations later

(c) Negotiation with Sunleys of a contract for residential accommodation

3. Time to be 18 months with an extension of time of 3 months to be granted with *initial VO's*

4. Sunley to work 2 shifts from commencement.

5. Sunley and Dr Ashga [Asker] to jointly select subcontractors at prices equal to that allowed in tender.

A second manuscript document also in Mr. Fryer's

handwriting is headed:

Sum to be added to BS & S payments in accordance with agreement 3.1.80 made with Dr. Hashim and Dr. Asker.

It shows the difference between the original and revised tender prices, Dr.7,634,455 and a further sum of Dr.1,812,544 as the net "extra" cost of four subcontractors on the basis of item 5 of the agreement already quoted; total Dr.9,446,999.

A third document in Mr. Fryer's handwriting reads as follows:

1. Drs 9,446,999 to be added.

2. How & when?

3. Extn of time 3 months with initial VO.s.

4. Dwg. of site for Housing*** & housing breif (sic)

5. QS breif [sic]

The second and third documents are undated.

Some explanation of these documents is provided posthumously by Mr. Fryer himself, in a memorandum dated Jan. 9, 1980 which he addressed to Mr. John Bernard Sunley with a copy to Mr. Elston. His and Mr. Sunley's movements over the New Year were such that they were unable to meet in London until later in January and so Mr. Fryer made what was in effect a current situation report on a number of different aspects of the group's business. Paragraph 5 refers to the AMF contract negotiations:

5. I went to the U.A.E. on 2nd January to meet his Excellency Dr. Jawad Hashim, President of the AMF, in connection with our AMF Tender, where our price was the second lowest. The lowest being Eastern, an Indian Firm, Government subsidised, whose price was 10% lower than ours. The Project being valued at about £10m. I cannot describe in detail the arrangement made, but it means we will sign a Formal Contract for a Contract period too short (18 months) for a price that is too low. I will, however, by the time we sign have a list of items agreed between myself and Hashim, initialled by him, of which I currently have a photocopy which effectively rectifies the price and time, in addition,

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543

**(Cite as: [1993] 1 Lloyd's Rep. 543)**

commits us and the AMF to a further Contract for 156 high class apartments, valued about £10m. for which we will be the Structural Design Engineers as well. I will explain this in detail, of course, but in the meantime Ray Elston may be able to add a little.

Oral evidence regarding Mr. Fryer's memorandum and the agreement of Jan. 3, was given by Mr. Sunley, Mr. Elston and Mr. Hayward (who was in Abu Dhabi with Mr. Fryer on Jan. 3) as well as by Dr. Hashim himself. These matters lie at the heart of the plaintiffs' allegation that Dr. Hashim showed favours towards Bernard Sunley in connection with the building contract and I shall return to them later in this judgment.

The rest of the story, so far as relevant, is briefly told. On Jan. 29, 1980 BSME wrote formally to BSS confirming the arrangements made between them in connection with the contract:

Our Company has been appointed to carry out this Contract and we hereby appoint [BSS] to carry out the following technical and administrative functions on our behalf.

There follows a list of what was in effect the whole of the administrative and technical services which were likely to be involved, apart from the employment of sub-contractors and of local labour. The letter continued, however:

It should be emphasised that this Service Agreement under no circumstances provides your Company with any decision making right whatsoever and you are required to contact us for conveyance of our specific instructions in any case where this is required.

The appointment was accepted by Mr. Elston on behalf of BSS; the letter probably was signed by Mr. Fryer on behalf of BSME.

This de facto transfer of responsibility to BSS was followed by project meeting No. 1 held at the BSS offices at Beckenham on Feb. 4. BSME **\*552** was described as the "Operating Company" and the

minutes record that no quantity surveyor was appointed. The subject of the meeting was "discuss commencement of contract and procedures to be followed".

Formal instructions to proceed were given by Fitzroy Robinson as architects on Feb. 2, 1980. The works were duly carried out and, as already stated, the accounts were settled between the plaintiffs and BSME. The payment made by BSS to the JOJ account nominated by Dr. Hashim was reimbursed by BSME in the course of accounts stated between the two companies.

In May, 1982 Dr. Hashim's term of office as President of AMF came to an end. He was succeeded by Mr. Ghobash. Dr. Hashim had no residence or other connection with Abu Dhabi. He came to live in England where he owned a flat at 23 Rutland Court, London SW3 and a substantial country house, Denham House in Buckinghamshire which he purchased in July, 1980. His son was at school in this country and he and his wife spent a considerable part of each year here. He now lives in Canada.

Work was done by the Bernard Sunley group on the London property and Denham House in 1980 and 1981. It was done "at cost" because of Dr. Hashim's importance to them as a customer. Payments of £24,500 in May, 1980 and about £ 288,000 between May, 1981 and November, 1982 were made to them by transfer out of the JOJ account with FNBC in Geneva.

After Dr. Hashim left the plaintiffs, and as a result of financial investigations carried out by Messrs. Ernst & Whinney, they came to suspect that he had caused very large amounts of their funds to be diverted to his personal benefit. This he strongly denies and the issue forms the subject-matter of the pending Chancery litigation. It is entirely separate from the headquarters building contract and the Bernard Sunley group is not connected with it in any way. Its history does overlap, however, with the present dispute, for the following reason.

The plaintiffs discovered that transfers were made from an account in their own name with BCCI in

Luxembourg to the JOJ account with FNBC in Geneva, reference number 1099, and that the transfers were made on the instructions of Dr. Hashim. They therefore consulted Swiss lawyers who began proceedings in the nature of a criminal investigation conducted by Court-appointed experts in Geneva. In this way the plaintiffs learned of the disputed payment by BSS into that account and later they obtained full details of the account. That was in 1988. The extent of the plaintiffs' knowledge of the facts relevant to the present claim and the dates when their knowledge progressively increased are material to the limitation defences raised by all the defendants and it is convenient to set out the evidence separately below.

The present action was begun, by writ dated Apr. 21, 1989. The defendants were Dr. Hashim and the two companies BSS and BSME. The plaintiffs alleged that Dr. Hashim had been their employee and that his relationship with them was analogous to that of a director of a company owing fiduciary duties towards them (par. 2). They relied upon the payment by BSS to the JOJ account and upon the coincidence of dates in support of their allegation that the payment was a bribe paid in respect of the headquarters building contract.

It was not until January, 1992, after much interlocutory activity and shortly before the trial date, that the second and third defendants disclosed some documents which had been found in their possession and which appeared to be highly material to the issues in this action. This late disclosure led to further reamendment of the points of claim and to disputes regarding the authenticity and admissibility in evidence of certain documents, as between the plaintiffs and the first defendant. These documents are admitted by the other defendants. Subject to the first defendant's objection to them, they add considerably to the facts which the plaintiffs have to prove in support of their central allegation that the BSS payment was made in connection with the headquarters building contract and was unlawful.

*The disputed documents*

These fall into a number of categories. I should refer first to a letter dated Oct. 20, 1978 on BSME writing paper (for reply to the U.K. office at Beckenham) signed by Mr. Fryer and addressed to "Mr. Talib El-Shibib c/o American Arab Credit Corporation" at an address in New York. The letter reads:

*re Office Building, Abu Dhabi:*

We are writing in confirmation of the agreement reached between us for the construction of the above project.

1. Your company will give us full help and assistance during the negotiations for the award of this contract to our company. You will also give us full assistance on all matters requested during the course of the contract and until such time as the project is entirely completed. In particular, you will assist our company in relations with The Abu Dhabi Government and **\*553** other agencies in order that we shall be able to obtain with a minimum of delay all necessary licences, permits and consents to enable us to carry out this project.

2. In consideration of your undertaking the above negotiations and responsibilities, and subject to our entering into a satisfactory contract, we undertake to pay you assistance services, fees and expenses amounting to 8 million (Eight million dirhams) within seven days of ourselves having received the initial down payment covering this sum. These fees and expenses shall be reimbursed for all costs which you have or will have incurred in carrying out the commitments which you have undertaken to provide.

3. The fee described in 2. to be paid in cash in Abu Dhabi unless otherwise agreed.

Please confirm your acceptance and agreement of the above by signing and returning to us the enclosed copy of this letter.

The letter is countersigned by Talib El-Shibib:

The arrangements detailed above are agreed by us.

On Nov. 19, 1979 a cable was sent by Mr. Fryer on behalf of BSME to Mr. Talib El-Shibib c/o the same company at the same address in New York,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

reading:

WE UNDERSTAND THAT OUR LETTER TO YOU DATED 20TH OCTOBER 1978 IS TO BE REVISED SO THAT THE FIRST WORD OF LINE FIVE OF ITEM 2 READS QUOTE ONE UNQUOTE.

PLEASE CONFIRM YOUR AGREEMENT BY TELEX OR CABLE. RETURN OUR LETTER AND WE WILL SEND YOU NEW LETTER BY MAIL.

This was acknowledged on the same day:

YOUR CABLE RECEIVED. WHICH IS CONSIDERED AN INTEGRAL PART OF THE AGREEMENT AND ACCEPTED BY US. ORIGINAL LETTER FORWARDED TO YOU AND KINDLY MAKE ARRANGEMENTS TO SEND US AMENDED LETTER.

AGREEMENT AS INDICATED BY YR RCA CABLE RECEIVED IN OUR OFFICE THS MORNING, AND OUR PRESENT TELEX.

The cable disclosed by the third defendants has a manuscript note by Mr. Fryer dated Nov. 20, 1979 and addressed to Mr. Carmody "Please prepare appropriate letter". It is marked "JAEF file".

A letter dated Nov. 19, 1979 from Mr. Fryer to Mr. Talib El-Shibib is in the same terms as the previous one, except that the sum stated in par. 2 is Dr.1m. This letter is countersigned as before, dated Nov. 27, 1979. It was acknowledged on Nov. 28, 1979 by a letter from "Amartic Ltd." at the same address in New York, signed by Mr. Baha Al-Shibib, the company's President. He is, I was told, the brother of Mr. Talib El-Shibib. It reads:

Thank you very much for your letter of 19 November 1979 regarding the Office Building in Abu Dhabi.

I enclose herewith a copy of the new agreement duly signed by Mr. Talib El-Shibib together with original agreement which was signed 20th October 1978.

We hope that our cooperation will bring fruitful interests.

Mr. Carmody was asked about this correspondence.

He was a director at the material time of both BSS and BSME. He described his principal function in "the company" as:

I was the one who looked at contracts, dealt with words, wrote letters, tidied up contracts and so therefore [with reference to the letter dated Nov. 19, 1979] it was quite possible for Mr. Fryer to say, look, I have made an arrangement with so and so and will you draft a suitable sponsorship agreement.

The October 1978 letter has the originator/typist reference "JAEF/GAR", the latter being Mr. Fryer's secretary. The November 1979 letter has "JAEF/BH", BH being Mr. Carmody's secretary. This might mean that the letter was drafted by Mr. Carmody for Mr. Fryer to sign, or simply that Mr. Fryer's secretary was away at the time. In fact, Mr. Carmody had some recollection of the second letter, because he remembers being instructed to revise an agreement of this sort which Mr. Fryer had made a year or so earlier. He has no knowledge of Mr. El-Shibib or of the U.S. corporations named in the letters, but his evidence leaves me in no doubt but that both letters were drafted by Mr. Fryer or on his instructions by Mr. Carmody and that they were duly acknowledged and returned to Mr. Fryer's office where they were duly filed by Mr. Carmody. Both referred to the AMF headquarters building although not identified as such in the first letter. The wording was what Mr. Carmody described as "fairly standard ones for sponsorship agree- **\*554** ments" and had been copied, he thought, from another contractor. He also thought that Mr. El-Shibib would "clearly be a front for some local and influential person".

Mr. Carmody's evidence regarding the filing arrangements was illuminating. So-called commission agreements were kept by him in a locked cupboard. When he left the Bernard Sunley group in 1984 he prepared a list at Mr. Fryer's request, with particular reference to "Mohammed Fayed or one of his companies, Dubai Trade & Trust Company" with whom there was a commission arrangement. Mr. Carmody described Mohammed Fayed as their

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

general agent in the Middle East. When the group obtained a contract by competitive tender, even ones which Mr. Fayed had not specifically introduced, he was entitled to a commission of 2 per cent. When, however, the local law required a local national as sponsor for the project, as the law of Abu Dhabi did, one half of the commission was paid to Mr. Fayed's local representative, who was Hareb Al-Otaiba. Mohammed Fayed's local representative in Dubai was H.Bin Dri. Mr. Carmody personally arranged for such payments to be made to Mr. Fayed and to companies and persons nominated by him.

Later, in about 1988, Mr. Carmody was required by the police to make a statement concerning Mohammed Fayed and his activities, and prior to giving that statement he had access to his records from Bernard Sunley & Sons, which included all the commission arrangements payable (sic). The lists he prepared include such arrangements with Mr. Fayed and Mr. Otaiba in respect of the AMF headquarters building, but they do not include the letters to Mr. El-Shibib or others described below, addressed to JOJ Anstalt. From this he infers that the documents recording those arrangements were not kept in his locked cupboard at Beckenham. If they were not, then inferentially they were kept in some other place where they were found and disclosed subsequently by the third defendants. These apparently trivial storage arrangements become important in connection with issues arising under the Civil Evidence Act, 1968.

(a) The first group of disputed documents includes what is, if it is authentic and admissible, direct evidence from Mr. Fryer regarding the arrangement he made with Dr. Hashim regarding the AMF Office Building Abu Dhabi. It is a copy letter dated Nov. 16, 1979 addressed simply to "J.O.J. Anstalt". It is in the same terms as the "standard" type of letter to Mr. El-Shibib. It promises to pay Dr.6m. -

. . . within seven days of ourselves having received the initial down payment covering this sum.

Unlike the El-Shibib letters, this one is not signed, though it bears Mr. Fryer's initials as originator, nor is it countersigned or acknowledged in any way.

On the same day, Nov. 16, 1979, Dr. Hashim made a written request to FNBC to open the account which was given reference number 1099 - the JOJ Anstalt account. He said in evidence that he gave the account number to Mr. Fryer by telex to London a few days after his return to Abu Dhabi, but no telex has been produced or disclosed by the plaintiffs or by the company defendants. In the application form, Dr. Hashim gave his London address and described himself as an Iraqi national and resident of Abu Dhabi and the plaintiffs as his employers. He asked for a discretionary U.S.$ account.

A further letter dated Jan. 25, 1980 addressed to JOJ is likewise unsigned but bears Mr. Fryer's initials ("JAEF/BH") and is in the form of a draft for signature by Mr. Fryer on behalf of BSME. It reads:

*A.M.F. OFFICE BUILDING, ABU DHABI.*

Further to our Agreement dated 16th November, 1979, we would confirm that the Fees and Expenses referred to are hereby amended to DH. 7,000,000 (Seven Million Dirhams) and of this amount DH 100,000 (One Hundred Thousand Dirhams) has been paid in cash in Abu Dhabi and the remaining DH. 6,900,000 (Six Million Nine Hundred Thousand Dirhams) is to be paid in U.S. Dollars to First Chicago International Banking Corporation, New York, for Account First National Bank of Chicago, Investment Division, Geneva, reference 1099, at No. 8 Rue Toepffer, 1206 Geneva.
Please confirm your agreement of the above by signing and returning to us the enclosed copy of this letter.

The text however has been defaced in manuscript with two diagonal lines and the words "not used". The handwriting is unidentified, but it might be "BH ", Mr. Carmody's secretary. This was a document which would go into his "agents file".

Mr. Carmody said at first that he had no recollection of these documents but later that he did know about the first in November, 1979, **555** though he was unaware that JOJ meant Dr. Hashim. He assumed that it was intended to ensure that the group were tenderers, because as he explained it was not

uncommon in the Middle East, even in competitive tender situations, for someone connected with the employing authority to ask all the tenderers to build a commission of 2, 5, or 10 per cent. "or whatever" for him into their tender, so that whichever of the tenderers got the job he would receive his commission. He did not know more than this at the time, but soon afterwards, within a few months, he came to know both that the payment had been made and of the "subsequent arrangements that had been made about reduction of tender", a clear reference to what the plaintiffs allege was agreed on Jan. 3, 1980.

(b) The second group of disputed documents relates to the Jan. 3 agreement. These include the note of what was agreed, in Mr. Fryer's handwriting, which I have already quoted. The authenticity of this and some related documents is admitted, but the plaintiffs are required to prove against the first defendants two further documents which were apparently signed by Miss Goddard, Mr. Fryer's secretary, on his behalf. The first is the memorandum dated Jan. 9, 1980 containing Mr. Fryer's report to Mr. Sunley. The second is a typewritten note of the terms of the agreement, marked "private and confidential", addressed to John Leach (BSME area surveyor) and signed by Miss Goddard in the following terms "This is the only copy . . . . . . 25.1.80".

(c) A note in Mr. Fryer's handwriting shows that the sums in U.S. dollars paid by BSS to Credit Suisse and to FNBC on Jan. 25, were calculated as the equivalent of Dr.1m. and Dr.6.9m. respectively. It also lists a separate item "100,000 Drs cash". A similar note in unidentified handwriting has not been proved and so can be disregarded.

(d) Finally, telexes sent by Mr. Hayward (director of BSME based in Dubai) to Dr. Asker and to Messrs. Fryer and Carmody on Feb. 27/28, 1980 are not admitted by the first defendant, likewise two memoranda from Mr. Hayward to Mr. Fryer dated Mar. 24, 1980 and Mar. 27, 1980, and a "Strictly Confidential" memo from Mr. Fryer to Mr. Baker dated Apr. 2, 1980.

*Authenticity*

The first defendant's closing submissions were confined to five of these documents, only four of which remain significant. I will deal with these documents in turn.

*Group (a)*

Copy letter dated Nov. 16, 1979 addressed to JOJ Anstalt and the further letter dated Jan. 25, 1980 marked "Not used". As proof of authenticity, the plaintiffs rely primarily upon the affidavits verifying the disclosure of these documents by the second and third defendants. The former is described as a copy letter, the second as a draft letter. These statements are relied upon as hearsay evidence against the first defendant by virtue of a Civil Evidence Act notice. Moreover, there is direct evidence from Messrs. Carmody and Deverall that the documents produced by the second and third defendants are genuine and are what they purport to be. The first defendant's suggestion that they were forgeries is unfounded. I hold that their authenticity is proved. Their admissibility and weight are different matters.

*Group (b)*

Memorandum to Mr. Sunley dated Jan. 9, 1980 and a typed note to Mr. Leach dated Jan. 25, 1980, both signed by Miss Goddard on behalf of Mr. Fryer. The first defendant submits that their authenticity is not proved because Miss Goddard was not called as a witness nor the plaintiffs' failure to do so accounted for. But this does not debar the plaintiffs in my judgment from relying upon the second and third defendants' affidavits coupled with Civil Evidence Act notices, or upon the evidence of Messrs. Sunley and Elston (both of whom identified the memorandum as a copy of the document which they received) and of Mr. Watson who remembered seeing the note to Mr. Leach at the time and identified it in evidence, as did Mr. Austin. Again, I hold that these documents are genuine and what they purport to be.

Also in relation to "authenticity", Mr. Ross-Munro,

Q.C. for the first defendant submitted that the documents which were unsigned by Mr. Fryer cannot be relied upon as statements made by him. The authorities referred to (Phipson on Evidence (14th ed.) par. 35-03, Criminal Evidence by Professor Andrews and Mr. Hirst, par. 11.35, The Modern Law of Evidence (2nd ed.) by Adrian Keane (par. 3) and Halsbury's Laws (4th ed.) vol. 17, par. 124) state the need for proof that documents relied upon were "duly executed" and they suggest that this necessarily involves proof either of a signature or of handwriting. None makes specific reference to the case of a typewritten document which is unsigned and Mr. Ross-Munro submits that the "due execution" of such a document can never be proved, except possibly by a person who saw the document being typed or to **\*556** whom the contents were dictated. He accepts, however, that the question is one of degree; the evidence of handwriting, for example, may be conclusive, or compelling, or merely sufficient to discharge the burden of proof.

In my judgment, the submission seeks to elevate into a principle or rule of law what is no more than the need to prove, which may be difficult in practice, that an unsigned and otherwise unacknowledged typewritten document contains statements made by their purported author. Even more difficult if the document was typed on the dictation of the author. Such a document, without more, does not prove that the statements were made by him, any more than a manuscript document does in the absence of evidence of handwriting. But if there is evidence that the document was produced in the normal course of business and is in the form which would be expected of a document so produced, then in my judgment that evidence can be relied upon as proof that the statements contained in it were made by the purported author. Such evidence of course is rebuttable, but in the absence of contrary evidence there is no reason of principle why it should not be sufficient to discharge the burden of proof. This is consistent with the approach adopted by Lord Ellenborough in Pritt v. Fairclough, 3 Camp. 105 as long ago as 1812 (a case of secondary evidence). Here, there is positive evidence that the memorandum dated Jan. 9 and the note dated Jan. 25 to

Mr. Leach were both seen and in circulation and acted upon as "duly executed" documents by Mr. Fryer. Mr. Sunley discussed the contents of the former with him. As for the unsigned letters addressed to JOJ Anstalt, these too are positively identified by Mr. Carmody. They were produced from the third defendants' files. They bear the correct initials for a document dictated by Mr. Fryer to a secretary. There is no contrary evidence which suggests that they are forged or that the contents were not dictated by Mr. Fryer. I hold that there is sufficient proof that the documents were typed by the secretary on Mr. Fryer's dictation on about the dates shown and that in this sense they are "authentic" documents i.e. genuine and what they purport to be.

*Admissibility*

*The copy/draft letters addressed to JOJ Anstalt.* These are relied upon as evidence of statements made by Mr. Fryer to the secretary to whom he dictated the letter; that is to say, oral statements made by him in those circumstances. The fact that the second letter was marked "Not used" and apparently not sent is irrelevant in this connection. The statements were made when the letters were dictated. The question is whether this evidence is admissible against the first defendant under the Civil Evidence Act, 1968.

Section 2(1) provides that in civil proceedings:

. . . a statement made, whether orally or in a document or otherwise, by any person whether called as a witness . . . or not, shall . . . be admissible as evidence of any fact stated therein of which direct oral evidence by him would be admissible.

Because s. 2(3) provides that evidence of a statement "made otherwise than in a document" can only be given by a person who made or heard the statement, and in this case no such witness has been called, it is necessary to consider whether Mr. Fryer can be regarded as having made a statement "in a document " when he dictated the words to a secretary with the intention that they should be transcribed. The Court of Appeal held recently in Ventouris v. Mountain (The Italia Express), [1991] 1

[1993] 1 Lloyd's Rep. 543
Case 1:07-cv-01646-RMC    Document 39-5    Filed 01/31/2008    Page 18 of 212    Page 17
1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

Lloyd's Rep. 441, that an oral statement made into a recording machine with the intention that it shall be duly reproduced in writing is simultaneously a statement made in a document for the purposes of the Act. Their reasoning applies directly, in my judgment, in a case where the statement is dictated to a secretary with the same intention. The contents of the documents produced by Mr. Fryer's secretary, therefore, are statements made by him "in a document" within s. 2 of the Act. They are in no sense merely the secretary's note of what he said, as in In re D., [1986] 2 F.D. 189 where a solicitor made his own record of what his client told him by way of instructions. I must reject the first defendant's first submission that the maker of the statement does not make it as a document unless and until he signs or otherwise indicates his approval of the document, as typed.

Section 6(1) of the Act provides that a statement contained in a document may be proved by the production of the document. This requires proof in accordance with the rules of evidence, as distinct from simply "handing the document to the Court" (per Lord Justice Staughton), but the Act itself may be relied upon, where necessary, to prove the document. In other words, double hearsay (of documentary statements) is permitted (also decided in Ventouris v. Mountain).

Civil Evidence Act Notices were served in respect of the documents upon which the plain- *557 tiffs rely. I hold, therefore, that the statements contained in these documents are admissible as the evidence of Mr. Fryer under the Civil Evidence Act.

The plaintiffs rely, secondly, on s. 4 of the Act. This provides that multiple hearsay evidence is permissible when the statement is:

. . . contained in a document which is or forms part of a record compiled by a person acting under a duty from information supplied [to him] [s. 4(1)].

The question of what is a "record" for this purpose has been considered in a number of cases. There is also an issue as to whether the evidence shows what was the source of the disputed documents, in partic-

ular the copy/draft letters addressed to JOJ Anstalt in the present case.

The authorities are R. v. Tirado, (1974) 59 Cr.App.Rep. 80, H. v. Schering Chemicals Ltd., [1983] 1 W.L.R. 143 and R. v. Jones and Sullivan, [1978] 1 W.L.R. 195. In the criminal cases the question, what is a record, arises under s. 1(1) of the Criminal Evidence Act 1965. In R. v. Tirado the Court left open whether a file of correspondence could be a record -

. . . we have at least some hesitation in saying that a file of correspondence, maintained simply as a file of correspondence, and added to from time to time as letters come in, is or can be a record . . . The language of section 1 seems on its face to contemplate the making or compilation of a record. That means the keeping of a book or a card index, into which information is deliberately put in order that it may be available to others on another day. A cash book, a ledger, a stock book; all these may be records . . . [p. 90.]

On the other hand, in R. v. Jones the documents in question were -

. . . the written records of the particular transaction . . . carefully and deliberately compiled . . . There is no necessity, as we see it, for the contents of these documents to be entered into a book or ledger . . . indeed these very documents might have been copied into a ledger but how, one asks, could that make them any more or less a record than they are at the moment? [p. 199].

"Record" means, or includes, "a history of events in some form which is not evanescent" (ibid). In H. v. Schering Chemicals Mr. Justice Bingham held that a digest or analysis of other records is not itself a "record" within s. 4:

The intention of that section was, I believe, to admit in evidence records which a histor- ian would regard as original or primary sources, that is, documents which either give effect to a transaction itself or which contain a contemporaneous register of information supplied by those with direct knowledge of the facts [p. 146].

The particular issue in the present case is whether

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

the draft/copy letters addressed to JOJ Anstalt are proved to have come from the file of commission agreements described by Mr. Carmody and kept in his locked cupboard at Beckenham. There is no evidence of the precise source of the documents in fact produced on discovery, and Mr. Carmody's evidence as to whether documents relating to the AMF transaction, other than the agreements with Mr. Mohammed Fayed and his nominee Mr. Otaiba, were kept in his file, is equivocal. On balance, however, I would be prepared to hold that they were given to him by Mr. Fryer for safe keeping and for reference as required, and that he kept them in a file suitably marked and in a secure place. His evidence was that, apart from the AMF contract, there were only one or two other cases where payments were made to persons other than Mohammed Fayed and his nominees. They were payments to "an influential employee of the company who was awarding the contract", as the payment to JOJ appeared to be. The inference must be that documents relating to transactions of this sort were kept in the same way as those relating to Mr. Fayed, and it is immaterial in my judgment whether they were in the same cupboard, or in the same folder.

In that event, they were kept as a record of the transaction. The authorities show that a "record" may consist of original documents and that no independent record such as a ledger entry is essential. In my judgment, the JOJ Anstalt letters are proved to have been "records" within the Act.

I hold therefore that the disputed documents are admissible against the first defendant, insofar as the plaintiffs rely upon ss. 2, 4 and 6 of the Civil Evidence Act. I bear in mind, however, that it remains important to identify carefully what facts each individual document proves, not only the disputed documents to which I have made specific reference but also those others upon which the plaintiffs rely where the maker has not been called.

In this connection, a distinction is drawn between the first (copy) letter to JOJ Anstalt dated Nov. 16, 1979 and the second (draft) letter dated Jan. 25, 1980 which is marked "Not used". Clearly, it cannot be suggested that the second is more than a record of what Mr. Fryer **558** dictated to his secretary on one occasion, or that a letter in those terms was ever sent. It is however secondary evidence of the existence of a top copy which has been lost. Likewise, the first (copy) letter is secondary evidence of a lost top copy, and the question arises whether there is evidence that this was ever sent or given to the addressee who is assumed for present purposes to have been the first defendant or his nominee. The top copy is not produced and its receipt is denied. Overall, there is some evidence based on a presumption arising from the course of business described by Mr. Carmody that the top copy was sent or given to Dr. Hashim, but this is not sufficient in my judgment to justify a finding to that effect.

*Dr. Hashim's evidence*

I should say a little more about Dr. Hashim's background. Before his appointment to the AMF, which was in the nature of a secondment by the Government of Iraq, he held high ministerial office in Iraq. His responsibilities included planning and construction projects involving contract values in excess of $200 million. He remained a presidential adviser throughout his time with the AMF. In 1982 he should have returned to Iraq but for reasons of personal safety he decided not to do so and to take up residence in England. In mid-1983 his assets in Iraq were sequestrated by order of the president and he was sentenced to death in absentia by resolution of the Revolutionary Command Council on the grounds that he and others had been plotting to overthrow the regime.

Dr. Hashim's evidence is that he met Mr. Fryer in Abu Dhabi in 1978 either during construction of the BCCI building or at a reception at the British Embassy. They met again at the Hilton Hotel by arrangement a few days later. In the course of an informal discussion, Mr. Fryer expressed his interest in obtaining contracts for Bernard Sunley in Iraq. Dr. Hashim said that he could arrange high-level introductions to influential persons in Iraq and that his fee for doing so would be £1m. They shook

[1993] 1 Lloyd's Rep. 543
1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
(Cite as: [1993] 1 Lloyd's Rep. 543)

Case 1:07-cv-01646-RMC    Document 39-5    Filed 01/31/2008    Page 20 of 212

Page 19

hands on this, but Dr. Hashim was surprised that his proposal had been accepted so readily and he was "half-hearted" about it.

A third meeting took place in London in August/September, 1978. Mr. Fryer made it clear that he was serious and Dr. Hashim in consequence took it seriously also. He explained the considerable risks involved. The situation in Iraq was very different from the Gulf where commission agreements were part of ordinary business life. Such arrangements were regarded in Iraq as serious offences carrying the death penalty, therefore the arrangement had to be kept secret and could not be recorded in writing. Likewise, the introductions had to be effected with the utmost discretion on all sides.

Between January and September, 1979 he effected three introductions, the third being in Abu Dhabi to the Iraqi Ministry of Industry. But on Oct. 18 events took an unexpected turn. He was visiting Iraq on behalf of the AMF at the personal invitation of the president of Iraq and was generally received as a VIP. Without warning, on Oct. 21 he was arrested by the security service and held in custody for 72 hours. He was questioned by the head of the security service and by the minister of industry, to whom he had introduced Mr. Fryer. He was asked why he had said at private parties in Abu Dhabi that Iraqi Government contracts would not be awarded unless commissions were paid to those officials in whose power it was to award them, together with other accusations of disloyalty to the president and government of Iraq, all of which he denies. He was released, he thinks on the intervention of high-ranking non-Iraqis, and was taken to see the president of Iraq who sought to "pacify me and reaffirm our friendship".

He was in London from Nov. 15 to 19 and saw Mr. Fryer on either Friday 16 or Monday 19. He told Mr. Fryer what had happened to him in Iraq and asked whether Mr. Fryer had been indiscreet. They then proceeded to make a further agreement, either a variation of the previous year's bargain regarding Iraqi introductions, as Dr. Hashim says, or in the terms of Mr. Fryer's copy letter dated Nov. 16 re-

garding a payment in connection with the AMF building, as the plaintiffs allege.

Before considering that crucial issue, I should refer to other accounts of his relations with Mr. Fryer during 1978/9 which Dr. Hashim has given. In his affirmation dated June 16, 1989 in these proceedings he said that he believed that the payment of $1,848,132 on about Jan. 31, 1980 was -

. . . the proceeds of conversion of a sterling sum (approximately £ 700,000 at the exchange rate then in force) which Mr. Fryer of BS had agreed to give me as a retainer for introducing him to senior Middle Eastern officials, particularly Iraqis, whom I knew as a result of my time as Minister of Planning . . . . . . BS . . . . . . were not the only company to agree to pay me fees for assisting them to obtain contracts within Iraq. I do not know whether BS undertook any contracts in *559 Iraq . . . . . . the suggestion that this payment was connected with the Plaintiff's building is inherently implausible.

Further accounts were given in the pleadings, including further and better particulars served by Dr. Hashim or on his behalf (for a time he was acting personally). He was cross-examined about discrepancies between his evidence given in Court and these earlier accounts. Only in two respects, in my judgment, are the differences significant. First, there was previously no mention of a £1m. fee, later reduced to £700,000. Secondly, he was uncertain before trial whether Bernard Sunley obtained any Iraqi contracts, but he said in evidence that they did not, and that that was the reason why the payment was less than £1m. as originally agreed.

Dr. Hashim's account of the Nov. 16/19 meeting is that Mr. Fryer -

. . . proposed a reduction in the fee saying this was because the various introductions had not in fact given rise to any business. He therefore wanted only to pay £500,000. I offered to accept £750,000 and we compromised on a payment in U.S. dollars to be the equivalent of £ 700,000 which was to be paid in the very near future.

He says that he sent details of the JOJ account by telex soon after his return to Abu Dhabi and that it

[1993] 1 Lloyd's Rep. 543
1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

Page 20

was "pure coincidence" that the payment was made on Jan. 25, some weeks later but only two days after the AMF contract was signed.

Not even coincidence, however, can explain why the payment was the U.S. dollar equivalent not of £700,000 but of £821,000. Dr. Hashim can provide no other explanation of this difference, which is all the more remarkable if Mr. Fryer on Nov. 16, had sought to reduce the payment to £500,000, one half of what was originally promised, and then agreed to increase the figure to £ 700,000 only as a compromise. (I suspect that the explanation for the £700,000 figure claimed by Dr. Hashim may lie in some confusion regarding the £1/U.S. $ exchange rates. There is some evidence of this in the documents, where $2.248 is wrongly transcribed as $2.48, but the figures cannot be reconciled.)

Dr. Hashim's evidence was that the payment was a fee for effecting introductions and was not dependent in any way upon the introductions resulting in contracts nor related to any contract which Bernard Sunley might obtain. I doubted this evidence when it was given and wondered whether Dr. Hashim understandably was reticent about admitting what would be regarded, according to his own evidence, as a capital offence in Iraq. The evidence given later by Mr. John Sunley and other witnesses made it clear, whatever the prevalence in the Middle East or elsewhere of "commission arrangements" or similar euphemistically described agreements, that an agreement to pay a substantial fee which was not related to any particular contracts would have been unique, so far as the witnesses were concerned. No witness, apart from Dr. Hashim, spoke of such an agreement, and a commitment to pay a large sum which could not be recouped from the price payable under a particular contract and which therefore would have to come from the company's general reserves was something which Mr. Sunley at least never contemplated.

Dr. Hashim's evidence regarding his meeting with Mr. Fryer on Jan. 3, is not easy to reconcile with his statement to the board on Jan. 19, that he had negotiated "round the clock" or some similar phrase

with all of the competing bidders, including Bernard Sunley. He says that his meeting with Mr. Fryer and Mr. Hayward was little more than a social occasion, a formality. The bargaining, he says, was done by Dr. Asker and his staff. Each bid was analysed in detail and each contractor was pressed to reduce the amount of his bid. Each contractor's representative was brought to his office for a mere general discussion, in the course of which he dangled before them the prospect of a further contract for £10m. worth of flats and housing for AMF personnel for the successful bidder (this was reflected in item 2(c) of Mr. Fryer's manuscript note). But there was no negotiation, he says, of the details of the Bernard Sunley bid between himself and Mr. Fryer, and the reduced figure of Dr.77m. had already been established. In particular, there was no question of a further corrupt agreement that the amount of the reduction would be recouped by Bernard Sunley in the ways suggested in Mr. Fryer's note, or at all.

Dr. Hashim refers to the undoubted facts that the contract was put out to tender and the bids evaluated by chosen committees in the way that I have described, and in particular to the extensive discussion at the board meeting on Jan. 19, which resulted in the board giving him authority to select the contractor as he did in accordance with the committee's recommendations.

*Conclusions*

The question is whether the evidence makes good the plaintiffs' allegation that the payment to JOJ/Dr. Hashim was a bribe, that is to say, made in return for or in order to induce favours in connection with the construction contract for **\*560** the AMF headquarters building. The burden of proof is an heavy one, commensurate with the gravity of the allegation made. Nevertheless, I have no hesitation in holding that the burden is discharged. Insofar as it is possible, it is desirable to exclude from consideration the draft and copy letters addressed to JOJ dated Nov. 16, 1979 and Jan. 25, 1980 and the correspondence with Mr. El-Shibib, both because of the contentious basis on which they were intro-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-01646-RMC    Document 39-5    Filed 01/31/2008    Page 22 of 212

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543

**(Cite as: [1993] 1 Lloyd's Rep. 543)**

duced in evidence and because it is necessary to avoid giving them undue weight, as if they were communications with Dr. Hashim (which they are not) or anything more than a transcript of what Mr. Fryer said on two occasions when dictating to his secretary. Putting these on one side, it seems to me that the same conclusion is clearly justified. The coincidence factor is powerful, indeed overwhelming; the coincidence of date (payment immediately after the contract was signed) and the coincidence of amount. The payment was equivalent to Dr.6.9m. and there is evidence of a cash payment of Dr.100,000. The total Dr.7m. itself is close to 10 per cent. of the contract amount, and with Dr.1m. promised to Mr. El-Shibib the total Dr.8m. is almost exactly 10 per cent. There is ample evidence that this was within the range of "normal " commission arrangements when that term was used to mean "bribes".

Dr. Hashim has no explanation for either of the two coincidences. I find his evidence that the payment was in respect of a promised £700,000 incredible. Nor was there any reason for a payment of £821,000 which was the actual sterling equivalent. I feel that £700,000 was chosen as a figure by Dr. Hashim when he believed wrongly that that was the equivalent of the U.S. dollar payment made.

I should add, however, that I do not reject Dr. Hashim's evidence that there was some discussion or arrangement between him and Mr. Fryer regarding Iraq, or that he was promised a payment (even £1m.) in return for introductions which led to Bernard Sunley obtaining contracts in Iraq. The flow of work in the Gulf States was certainly not increasing in 1978/9 and the competition was fierce. Oil-rich Iraq must have been a tempting target for future contracts and Mr. Fryer must have been anxious to obtain introductions and perhaps a "General Agent" there who would be as beneficial for Bernard Sunley as Mr. Mohammed Fayed had been, and was still, in the Gulf.

On Dr. Hashim's own evidence, the matter was discussed between him and Mr. Fryer in London on Nov. 16. That was probably their first opportunity

to do so after Dr. Hashim's alarming experiences in Iraq in October which had made him painfully aware of the risks involved in securing payments related to construction contracts there. If as later events demonstrated there was an agreement between them which related to the AMF contract, then most probably it was made at about that time. It is sufficient for the purposes of this litigation that there was such an agreement, whatever precisely may have been agreed with regard to Iraq either then or previously. Moreover, the corrupt agreement of Jan. 3, which I find was made between Dr. Hashim and Mr. Fryer on that date in Abu Dhabi and in the terms of Mr. Fryer's manuscript records, is ample evidence that favour was shown and confirms that there was a secret arrangement between them, made most probably on Nov. 16. This was what Mr. Fryer reported to Mr. Sunley on Jan. 9. It meant that the reduced bid was what was aptly called in evidence a "bogus tender" and this fact was concealed from the board.

If these findings are justified, as I hold that they are, on the evidence other than the two draft and copy JOJ letters, then those documents are merely further confirmation of the same conclusions, but they also add some non-essential detail. The terms of the copy letter dated Nov. 16 are wholly consistent with the kind of agreement that may be inferred from the other evidence, apart from the Dr.6m. figure which is unexplained, and the copy letter dated Jan. 25, confirm the Dr.6,900,000 and Dr.100,000 (cash payment) figures. It is unnecessary to explore further the relationship, if there was one, between Mr. Fryer's dealings with Dr. Hashim and those with Mr. El-Shibib.

*Post-contract events*

The plaintiffs introduced by re-amendment at the trial certain factual issues arising from the performance history of the contract, but these were not pursued in relation to the liability issues and I need say no more about them. There was in addition a certain amount of evidence of post-contract dealings involving Dr. Hashim and Dr. Asker on behalf of AMF and Mr. Fryer and Mr. Hayward, in particu-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1993] 1 Lloyd's Rep. 543
Case 1:07-cv-01646-RMC    Document 39-5    Filed 01/31/2008    Page 23 of 212
1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**
Page 22

lar, on behalf of Bernard Sunley. The plaintiffs rely upon these as further proof in support of their allegation that the payment was a bribe, and they may or may not be justified in doing so. On no view does this further evidence support the first defendant's denial or weaken the plaintiffs' case, and in the circumstances I need say no more about it.

I should perhaps add that Dr. Asker proved a tough contract manager, independent quantity **\*561** surveyors were soon appointed (this it seems was not anticipated at the outset), and no addition to the contract price and period were permitted except on the architects' and quantity surveyors' approval. It is hardly surprising that Mr. Sunley recalled somewhat ruefully that the contract made a loss, because the accounts he had in mind presumably included the payment made to Dr. Hashim. This was almost exactly equivalent to the amount by which the tender was reduced. The price, as Mr. Fryer said, was not realistic, and in the event it was not "rectified" as he and Dr. Hashim had agreed that it would be. Bernard Sunley obtained the contract but not the benefit which they hoped to obtain from Dr. Hashim's intervention on their behalf.

*Bernard Sunley*

There was much evidence from Mr. John Sunley and other persons involved in Bernard Sunley's affairs at the relevant time regarding the business practices which were prevalent with regard to construction contracts in the Middle East, including the making of "commission arrangements" with what were called with equal euphemism local "agents", and the payment of substantial "fees" when contracts were awarded as a result of their local influence. The only point which is directly relevant in the present case is the extent of the knowledge of various individuals, principally Mr. John Sunley and Mr. Carmody, of the payment made to Dr. Hashim and of the reasons why it was made. I should however say something about the more general matters which form the background against which these issues must be viewed.

Much documentary material is available, because Mr. John Sunley and Mr. Fryer both gave evidence in to the Inspectors appointed by the Department of Trade and Industry in connection with the takeover of the House of Fraser by Mr. Mohammed Fayed in 1985. Their concern was to show that payments made by Bernard Sunley alone during the period since the late 1960's were sufficient to provide some explanation of Mr. Fayed's considerable wealth at the time of the takeover. The figure at actual (contemporary) prices seems to have been some £ 20m. on contracts worth about £200m., mostly but not exclusively in Dubai. This was the gross amount and in many if not most cases part or all of the payments was made not to Mr. Fayed direct but to a third party nominated by him who may have received the payment on his own account, rather than on behalf of Mr. Fayed. This already high figure was inflated to about £40m. in the evidence given to the Inspectors apparently on the basis that that was the mid-1980's equivalent in money terms of the sums actually paid a decade or more earlier, though this explanation was not always consistent or made clear to the Inspectors. If Mr. Sunley's credit was in issue for the purposes of the present case, then it would be necessary for me to consider these matters in greater detail and to make findings accordingly. But it is not, because Mr. Sunley accepted albeit at a late stage of his evidence that he did know of the payment to Dr. Hashim and of the circumstances in which it was made, if not in January, 1980 then shortly afterwards. Moreover, he accepted in cross-examination that the payment was one which either he authorized or, if he had been asked by Mr. Fryer, he would have authorized before it was made. He has no specific recollection of reading Mr. Fryer's memorandum dated Jan. 9, 1980 although he recollects their lunch meeting on Jan. 17 when, he says, other matters were discussed. He does not seriously challenge, as I understand his evidence, the plaintiffs' assertion that he did know the contents of Mr. Fryer's report (the price was too low and the period too short, but these would be "effectively rectified" in ways which Mr. Fryer would describe). He was not directly involved in the construction side of the business, which he left to Mr. Fryer

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1993] 1 Lloyd's Rep. 543
1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

Page 23

while he concentrated on the properties and development. Nevertheless, I find that he was fully aware either on Jan. 25, 1980 or shortly afterwards of the facts that (1) the payment was made, (2) that it was made either to Dr. Hashim or for his benefit, and (3) that it was made in connection with the AMF headquarters building contract. Whether Mr. Sunley had any greater knowledge of the precise reasons for the payment, or of the favours actual or anticipated which Dr. Hashim was to provide, it is not necessary to decide. The payment was, for him, one which inevitably had to be made to a local "agent" if a contract of this sort had to be obtained. The fact that the "agent" was a senior officer or employee of the client company did not, for him, distinguish the case from any other.

I should add some general observations on the evidence of Mr. Sunley and others to whom I have referred. Bernard Sunley first obtained contracts in the Gulf region in about 1968 in Dubai. They did so with the help of Mr. Fayed and another person who was known to be close to and an influential adviser of the Ruler of Dubai. It was necessary to agree to pay a commission to these persons or to others whom they might nominate in order not only to secure the **\*562** award of the contract but also to assist in various ways during the period when the contract was being performed. In Dubai and other Gulf States a local agent was required by law, and a commission payment could legitimately be paid to him.

The situation which arose in relation to the AMF contract was different in one vital respect. Dr. Hashim was president of the client company and therefore was known to be under an obligation - the exact nature of the duty does not matter for this purpose - to act in its interests. Whatever services he might be able to render to Bernard Sunley in relation to the contract necessarily involved a conflict of interest and a breach of his duty towards AMF. Mr. Sunley and other witnesses accepted that paying a secret commission to him or anyone in a like position was wrong and unlawful "by English standards" but they implied that it was justified or at least acceptable in the Middle East, because of

the widespread practice of employing as agents, and paying commission to, persons who were known to be advisers to the client, for example the Ruler of Dubai.

According to their evidence, they did not distinguish between the two situations where the Middle East was concerned. But I was struck by the fact that Mr. Carmody can recall at most only one or two other cases where payments were made to persons who held office or were otherwise connected with the client company, and Mr. Sunley could remember none. Even in the context of 10 to 15 years' successful trading in the Gulf region, therefore, this was something of a special case.

Since this case is not concerned with a payment to an agent who was not employed by the client, or to a person who was at most an adviser to the client, I need not express any view about the legality of such payments. The evidence suggests that the practice was both widespread and notorious, so much so that to obtain a contract without paying a commission in the region of 10 per cent. of the contract value would have been remarkable indeed. Invariably, the payment was funded out of the advance payment made to the contractor when the contract was awarded.

In the present case, a commission of 2 per cent. became due to Mr. Mohammed Fayed as Bernard Sunley's "general agent", or to his nominee, even though he played no part in negotiating or awarding the contract. The payment to Dr. Hashim increased the total to about 10 per cent. Mr. Sunley would have been surprised if the contract had been obtained without making a payment of about this amount. He was able to justify it by reference to the business practices with which he was familiar and to the confidence he felt in Mr. Fryer's judgment, built up during their close association over many years. He does not seek to justify the payment now.

*Who was the payer?*

The primary facts are not in dispute. The payment was made by the second defendants who were later reimbursed by the third defendants who entered in-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

to the building contract with the plaintiffs. The payment was authorized by Mr. Elston, who was a director of the second defendants and who did so on the instructions of Mr. Fryer. He (Mr. Fryer) was acting pursuant to the agreement, formal or otherwise, which he had made with Dr. Hashim.

Mr. Fryer was managing director of both the second and the third defendants. His draft or copy letters to Dr. Hashim (see "The disputed documents" above) were typed on BSME writing paper, but it is unlikely that he specified whether he was acting on behalf of BSME, or BSS, or both, either at the meeting in London on Nov. 16 or at the meeting in Abu Dhabi on Jan. 3.

The third defendants financed their payment to the second defendants out of the proceeds of the advance payment made by the plaintiffs to them.

By their letter dated Jan. 29, 1980 already quoted the third defendants purported to appoint the second defendants as their agents and sub-contractors for performing most of the technical and administrative functions which they had undertaken under the building contract. The third defendants were established as local (Middle East) associates of the second defendants so that profits earned outside the United Kingdom would not be subject to U.K. taxation.

The question which arises in the action (apart that is from the third party proceedings, which will be considered separately) is whether the second and third defendants respectively acted solely as agents or are otherwise free from liability for the plaintiffs' claims. Each of these defendants contends that it acted solely as agent for the other.

In my judgment, both defendants acted as principals and both are liable to the plaintiffs if liability is established under English or Gulf law. Mr. Fryer acted in the interests of and on behalf of both defendants, each of whom had their own reasons for obtaining the building contract; the third defendant as contractor and the second defendant both for its own involve- **\*563** ment and in the general interests of the group. Both parties committed their own

funds to the payment, the second defendants when the payment was made and the third defendants when they indemnified the second defendants in respect of it.

*Conflict of laws*

Three different sections of the case required consideration of the principles underlying legal remedies for bribery and even the nature of bribery itself. These were the conflicts of law issues - what system or systems of law govern the plaintiffs' claims against the various defendants?; the content of Abu Dhabi law; and the limitation defences raised under Abu Dhabi and English law.

The legal submissions under each of these heads and from all parties' Counsel were of the highest quality and I cannot hope to do full or even adequate justice to them in the course of this judgment. I am greatly indebted to all Counsel - leading and junior - for their work.

The starting point has to be English law and the claims made by AMF in the present case. AMF presents itself as the employer both of Dr. Hashim (under a contract of employment or of agency - the difference is immaterial for present purposes) and of the third defendants BSME under the headquarters building contract. They claim that the payment made by the second defendants BSS to Dr. Hashim was a bribe, as I have found and held that it was, that is to say, a payment made in respect of favour shown or to be shown by him in connection with the building contract in his capacity as agent for the plaintiffs, and kept secret from the plaintiffs. Putting on one side for the moment the separate corporate identities of BSS, by whom the payment was made, and of BSME its subsidiary, to whom the building contract was awarded, the remedies available to the plaintiffs under English law are in the alternative: a claim for money had and received, in other words a restitutionary claim categorized as quasi-contract for the amount of the bribe, or a claim for damages for loss caused to them by the secret transaction between the contractors and their agent, classified as a claim in tort.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

The separate corporate identities of BSS and BSME introduce the concept of a contract awarded to one party (BSME) as a result of favour induced by a bribe paid by a third party or "stranger" to the contract (BSS), where it is possible that different legal rules may apply (see Armagas Ltd. v. Mundogas Ltd., [1985] 1 Lloyd's Rep. 1 at p. 72; [1986] A.C. 717 at p. 741 per Lord Justice Robert Goff). It may well be that in circumstances such as those of the present case, when both companies were members of the same group and may be presumed to have been acting in the overall interests of the group, then the distinction between them does not affect the legal position of the plaintiff employer. But, in any event, I am concerned first with the legal principles which apply when there is a tripartite relationship; the contractor, the agent and the employer who has separate contracts with both.

I should note also that this is a case where the bribe was in fact paid and received by the agent. There could be a case where the principal discovered the corrupt arrangement between the agent and the contractor after the contract was awarded but before the bribe was paid; perhaps even before the contract was awarded but in circumstances where the principal seeks to recover either damages or the amount promised to the agent. But here, the contract was awarded and the bribe was paid; moreover, the contract has been fully executed, so that the principal has paid and the contractor has received the full amount due under it in consideration of works actually carried out.

There is no shortage of foreign i.e. non-English connections in the present case. The primary facts are, first, a contract of employment or its equivalent between the plaintiffs and their agent, Dr. Hashim, which is governed by the law of Abu Dhabi and performed essentially in Abu Dhabi where the plaintiffs and Dr. Hashim, for the period of his employment, were both resident; secondly, the building contract with Bernard Sunley, an English group, for the construction of the AMF headquarters building in Abu Dhabi, this contract being governed both expressly and upon any reasonable objective assessment by Abu Dhabi law; thirdly, payments

made by the plaintiffs to BSME, a Lebanese company registered in Abu Dhabi for the purposes of this contract and administered locally in the Gulf from Dubai, which is also part of the United Arab Emirates; and fourthly an agreement between Dr. Hashim and Bernard Sunley which appears to have been made or at least confirmed in London on Nov. 16, 1979 but which resulted in a U.S.$ payment made by BSS in London to a Swiss bank for the account of JOJ as Dr. Hashim's nominee. Not only was the agreement kept secret from the plaintiffs but it was essential to both parties to it that both the agreement and the payment made under it should have as little connection with Abu Dhabi as possible.

The plaintiffs although themselves based in Abu Dhabi contend that their claims are gov- **\*564** erned by English law. They submit, rightly, that this must be the Court's approach unless and until the facts show a foreign element which brings the English law of conflicts into play and the defendants establish that a relevant system of foreign law provides differently from English law in some material respect. They assert that their claims all arise directly or indirectly out of the corrupt agreement between the contractors and their agent. That agreement was made in London between Mr. Fryer who was English and based in London and Dr. Hashim who although temporarily resident in Abu Dhabi was in the process of establishing his home and his family in England and who came to live here when his time with AMF ended in 1982. The payment was made by BSS from its resources in London, and to Switzerland into an account from which it was dispersed to many international destinations, including some payments to England but none to Abu Dhabi or the UAE. These factors, the plaintiffs submit, lead to the conclusion that the English law governs their claim, whether for restitution of the money paid or for damages caused to them, by the corrupt agreement; alternatively, they point to the law of Switzerland in respect of the restitutionary claims, because it was there that the unjust enrichment of Dr. Hashim their agent occurred.

The defendants' rival submissions are to the effect

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

that the law of Abu Dhabi (or the law of UAE. of which Abu Dhabi forms part) governs all the claims, with in the alternative some support for Swiss law in regard to the restitution claim.

The defendants' submissions, in particular those of Mr. Munby, Q.C. for the sixth defendant, led to an analysis of the concepts which underlie the restitution claim. This is said to be available in English law against both the bribe-payer and the bribed agent. But in each case there has to be a claim for money "had and received" by the defendant, and it is apparent that the only recipient of the bribe itself is the bribed agent. There is no logical justification for claiming that the contractor has received a sum of money which in fact he has paid out to the agent. When the contract has been executed, however, and the contractor has been paid the contract price in full, then the principal can demonstrate that the price he has paid exceeded by the amount of the bribe the true (net) price for which the contractor was willing to and did undertake the work. So the claim is for the same amount as the bribe but conceptually the principal seeks recovery of part of what he has paid to the contractor.

This analysis leads also to the questions whether there is an invariable presumption that the principal's claim for over-payment is exactly equivalent to the amount paid to the agent as a bribe and an irrebuttable presumption that the principal has suffered damage in that amount. These questions have been referred to in argument but ultimately in my judgment they are not relevant to the issues which I have to decide at this stage of the proceedings.

Against this background, I turn to the British authorities. The most authoritative and one of the most recent is Mahesan v. Malaysia Housing Association, [1979] A.C. 374 where the judgment of the Privy Council was given by Lord Diplock. After referring to "a new chapter [which] was opened in the law of civil remedies for bribe" by the Court of Appeal's judgment in Hovenden and Sons v. Milhoff, (1900) 83 L.T. 41, Lord Diplock stated the modern law as follows (at p. 383G):

So both as against the briber and the agent bribed

the principal has these alternative remedies: (i) for money had and received under which he can recover the amount of the bribe as money had and received or (2) for damages for fraud, under which he can recover the amount of the actual loss sustained in consequence of his entering into the transaction in respect of which the bribe was given, but he cannot recover both.

In Mahesan the claimant claimed the amount of the bribe from his erstwhile agent, the defendant. He also claimed damages which were assessed at a greater amount. The question was whether in civil proceedings the amount of the bribe could thus be recovered from the dishonest agent twice over (p. 379E). The Judicial Committee held that the plaintiff had to elect between the two remedies and directed that judgment be entered for the amount of the damages claim, which was higher (p. 384). The Committee applied the House of Lords' decision in United Australia Ltd. v. Barclays Bank Ltd., [1941] A.C. 1 (p. 382B) and disapproved that part of the Court of Appeal's judgment in Salford Corporation v. Lever, [1891] 1 Q.B. 168 which held that the principal need not give credit against his damages claim for any sum recovered from the agent in respect of the bribe (p. 382D).

Lord Diplock's judgment was mainly concerned to trace the history of the development of the principal's right to recover the amount of the bribe, as distinct from damages for deceit or conspiracy or for a sui generis tort of bribery, from the bribe giver as well as from the agent. In Salford v. Lever (above) and Grant v. TheGold Exploration and Development Syndicate Ltd., [1900] 1 Q.B. 233 **\*565** some doubts had been expressed as to whether the claim for money had and received did lie against the bribe giver, but in these cases it was sufficient that there was obviously a right of recovery "in some form of action" (per Lord Justice Lindley )[1981] 1 Q.B. at p. 179. Hovenden v. Milhoff "opened a new chapter" because the jury had negatived the allegation of conspiracy and awarded damages of one farthing in a claim by the principal against the bribe-giver, yet the Court of Appeal entered judgment for the principal in what was agreed to be the amount of the bribe (though somewhat mysteri-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

ously this was agreed as less than the amount paid to the plaintiffs' agents - see p. 42). The judgments in Hovenden v. Milhoff demonstrate clearly, in my view, that the basis of the restitutionary claim against the contractor and bribe-giver is the latter's receipt of money from the principal equivalent to the amount of the bribe. Thus, Lord Justice Smith said at p. 42:

If a vendor bribes a purchaser's agent, of course the purchase money is backed by the amount of the bribe. It cannot be claimed. In this case the purchase money was £28,000 in which was included the £700 given to the purchaser's agents. Of course the vendor would have sold the goods for £28,000 less £700. Therefore he has in his pocket £700 money of the purchaser. That £700 he must disgorge.

Lord Justice Williams quoted from the judgment of Lord Justice Collins in Grant's case (above) which referred to -

. . . a specific sum over and above what must be taken as between the parties to be the real price which has found its way into the vendor's pocket as a result of a sale so effected . . . (then the purchaser) is entitled to recover it back.

Lord Justice Romer defined the third of three celebrated propositions in these terms (at p. 43):

. . . if the agent be a confidential buyer of goods for his principal from the briber, the court will assume as against the briber that the true price of the goods as between him and the purchaser must be taken to be less than the price paid to, or charged by, the vendor by, at any rate, the amount or value of the bribe. If the purchaser alleges loss or damage beyond this, he must prove it. As to the above assumption, we need not determine now whether it could in any case be rebutted. As at present advised, I think in the interests of morality, the assumption should be held an irrebuttable one.

This passage was quoted in part by Lord Diplock in Mahesan, [1979] A.C. at p. 383B who then commented that any cause of action so defined would be an hybrid form of legal wrong which does not accord easily with the tort of fraud. He continued "Upon analysis, what these rules really describe" and proceeded to define the alternative remedies to

recover either the amount of the bribe or damages in tort for his actual loss which are available to the principal against the bribe giver as well as against the bribed agent. I respectfully agree with Mr. Justice Leggatt's view in Anangel Atlas Compania Naviera S.A. v. Ishikawajima-Harima Heavy Industries Co. Ltd., [1990] 1 Lloyd's Rep. 167 that what Lord Diplock said does not detract from Lord Justice Romer's judgment.

I hold therefore that in a case such as the present, where the employer has paid the contractor the full amount due under a contract which was induced by a bribe paid to the employer's agent, the employer is entitled to recover the amount of the bribe from the contractor (on a restitutionary basis as distinct from a damages claim) and that the reason for the contractor's liability is that he has received a greater sum than what was the true price between them and must restore the balance.

*Choice of law - restitutionary claims*

The law is stated in Dicey and Morris (11th ed.) as follows (at p. 1350):

*Rule 203* (1) The obligation to restore the benefit of an enrichment obtained at another's expense is governed by the proper law of obligation.

(2) The proper law of the obligation is determined as follows:

(a) If the obligation arises in connection with a contract, its proper law is the proper law of the contract;

(b) (is concerned with immovables)

(c) if it arises in any other circumstances, its proper law is the law of the country where the enrichment occurs.

An obvious case where sub-r. 2(a) may apply is where a contract proves ineffective and claims are made for the recovery of sums paid under it (see Dicey p. 1352), but the present is not such a case. Similarly, the "place of enrichment" test described in sub-r. 2(c) makes obvious sense when the de-

fendant to a restitutionary claim has received a sum of money in a foreign country where either he is resident or **\*566** for some other reason he receives the benefit of enrichment there. But Dr. Hashim had no connection with Switzerland apart from his interest in the JOJ bank account, and the money paid into that account was dispersed to a number of other jurisdictions, presumably on his instructions and for his enjoyment there. Switzerland was at best a temporary staging post for the money and was never its journey's end. A substantial part of it was used to purchase the English property which Dr. Hashim intended to sell and has since made his home. None, or no significant amount, went to Abu Dhabi. This lends support to the plaintiffs' alternative submission, which is that, even if the place of enrichment fact applies (compare In re Jogia, [1988] 1 W.L.R. 484 at p. 495 per Sir Nicolas Browne-Wilkinson V.-C.) the correct choice in the circumstances of the present case is English law.

Their primary submission, however, is that their claims are founded upon the unlawful transactions between Dr. Hashim and Mr. Fryer representing the Bernard Sunley group, and that these consisted mainly of an agreement made in England and a payment from London to Switzerland in U.S. dollars (though the Dirham was the currency of account) which was deliberately and understandably kept outside Abu Dhabi and entirely separate from the AMF headquarters building contract. They submit that if sub-r. 2(a) makes it necessary to focus attention on any contract, then it is the agreement to pay the bribe which lies at the heart of the wrongdoing and which gives them their rights to alternative remedies, restitutionary and in tort (the wrongdoing itself is not waived; see the United Australia case). If regard should be had more generally to factors pointing to the proper law of their right to recover the amount of the bribe from any of the defendants, then the relevant factors point to English law, or to the law of Switzerland, rather than to Abu Dhabi or UAE law.

In my judgment, however, the analysis of the legal basis for the restitutionary claims which emerges from Mahesan and the earlier authorities makes it clear if not inevitable that these claims are governed by the law of Abu Dhabi. Dr. Hashim is sought to be held liable to account to the plaintiffs for a payment made to him as their agent, a benefit improperly received while acting as such. Their relationship with him if subject to any municipal law is clearly governed by the law of Abu Dhabi. Similarly, their restitutionary claim against the second and the third defendants is to recover in part what was paid under the building contract. This too was governed by Abu Dhabi law. Both claims are to enforce obligations which arose in connection with a contract which was governed by that law, and if it is necessary to allocate them to one or other of sub-r. 2(a) and (c) of Dicey's r. 203 I am clear that they are both within sub-r. 2(a). I prefer however to base this conclusion on wider grounds. It seems to me that in such cases the proper law of the restitutionary obligation which the plaintiffs assert is the law of Abu Dhabi. The building transaction was centred there, Dr. Hashim was based there and his duties were owed to the plaintiffs whose headquarters were there. The bribe agreement and the bribe payment were ancillary to the building contract and to Dr. Hashim's employment. If the plaintiffs had contended that the law of Abu Dhabi governed these claims, I doubt whether the contrary suggestion of English law, if it had come from the defendants, would have appeared seriously arguable.

The reason why the plaintiffs do oppose the choice of Abu Dhabi law is because, as will appear, they concede that under that law they have no restitutionary claims against a bribe-giver. They do not submit, however, that Abu Dhabi law should be rejected and English law preferred solely in order to validate those claims.

*Choice of law - tort claims*

The rule of double actionability stated in Dicey's r. 205 (11th ed. p. 1365) has no application unless the tort was "in substance committed in some foreign country": Metall und Rohstoff v. Donaldson Lufkin & Jenrette Inc. [1990] 1 Q.B. 391. The relevant passage from the judgment of the Court of Appeal reads as follows:

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543

**(Cite as: [1993] 1 Lloyd's Rep. 543)**

. . . in double locality cases our courts should first consider whether, by reference exclusively to English law, it can properly be said that *a tort has been committed within the jurisdiction of our courts*. In answering this question, they should apply the now well familiar "substance" test . . . if on the application of this test, they find that the tort was in substance committed in this country, they can thenceforth wholly disregard the rule in Boys v. Chaplin [1971] A.C. 356; the fact that some of the relevant events occurred abroad will thenceforth have no bearing on the defendant's liability in tort. On the other hand, if they find that the tort was in substance committed in some foreign country, they should apply the rule and impose liability upon tort under English law, only if both (a) the relevant events would have given rise to liability in tort in English law if they *567 had all taken place in England, and (b) the alleged tort would be actionable in the country where it was committed (p. 446).

In Metall und Rohstoff A.G. v. Donaldson Lufkin & Jenrette Inc. the plaintiffs alleged that the defendants had comitted the tort of inducing or procuring breaches of contract by a third party which had caused them damage as the innocent contracting party. The acts of inducement and some of the breaches of contract took place in New York, but later breaches of contract occurred in London and the plaintiffs suffered resulting damage there (pp. 448-449). The Court held that as a matter of substance the alleged torts were committed in London (p. 449C).

The essential tort allegations in the present case are that the plaintiffs suffered damage, whether actual or presumed, by reason of the bribe paid to their agent Dr. Hashim in connection with the headquarters building contract. The bribe agreement was made, I can assume, in London and implemented by means of the payment made from London to the JOJ bank account in Switzerland. But in all other respects the torts were committed in Abu Dhabi. It was there that Dr. Hashim made the further corrupt agreement with Mr. Fryer on the Jan. 3, and that thereafter Bernard Sunley falsely represented that their revised bid was genuine when to their knowledge it was bogus, by reason of the concessions

which Dr. Hashim had agreed to make. Dr. Hashim's breach of his duties towards the plaintiffs took place in Abu Dhabi. The building contract was wrongly induced was made there and the plaintiffs' damage in the form of any excess payment which they made to BSME under the contract was suffered there. Overall it is clear in my judgment that as a matter of substance the torts were committed in Abu Dhabi. It follows that the rule of double actionability applies as a matter of English law.

In the light of these conclusions it is unnecessary to consider whether as a matter of principle the same law should govern both the tort and the restitutionary claims: see Dicey at p. 1351 referring to this possible consequence of the United Australia decision. Against that contention is the fact that different laws were recognized as governing restitutionary and tort (damages) claims in the recent House of Lords judgment in The Evia Luck, [1992] 1 Lloyd's Rep. 115; [1991] 3 W.L.R. 85. It is perhaps unsurprising, at least in the present case, that the "proper law" test applied to the restitutionary claims and the "substance" test applied to the alternative damages claims both produce the same result.

*Ultra vires*

This issue arises from the second defendants' allegation in pars. 10 and 11 of their re-amended points of defence:

10. Further or alternatively, the payment was ultra vires BSS and made without the authority of BSS by Messrs Sunley and/or Fryer and/or one or both of Messrs. Carmody and Elston who were the directors of BSS at the material times.

11. In the premises . . . it is denied that the AMF is entitled to recover from BSS the payment as money had and received or damages in tort.

These paragraphs include both "ultra vires" and "want of authority " allegations. The distinction between the former, meaning "corporate capacity ", and authority, meaning the question whether a company is bound by an act done purportedly on its behalf, is fundamental and was recently re-asserted by the Court of Appeal in Rolled Steel Ltd. v. British

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1993] 1 Lloyd's Rep. 543
1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

Page 30

Steel Corporation, [1986] 1 Ch. 246. No question of authority can arise unless the act is within the legal capacity of the company, as defined in the memorandum of association, because the legal entity created thereby cannot perform any act which is outside its scope.

I am only concerned at this stage with the question of capacity, so defined. The plaintiffs take issue with the second defendants but by par. 8 of the amended points of claim they claim in the alternative against Mr. Sunley personally and the sixth defendant as Mr. Fryer's personal representative:

. . . If this is so then the said payment was a matter of law paid by Mr Sunley and Mr Fryer and was and is recoverable from them jointly and/or severally to the same extent as it would have been recoverable from BSS if made intra vires and with his authority.

In these circumstance, Mr. Padfield, Q.C. for the fourth defendant Mr. Sunley and Mr. Munby, Q.C. for the sixth defendant joined with Mr. Scott, Q.C. in opposing Mr. Clarke, Q.C.'s submission on behalf of the second defendants.

The second defendants' allegation is that "the payment" was outside the capacity of BSS, and the plaintiffs respond on the same basis claiming that the payment is recoverable from the personal defendants if not from the company. But the true nature of their claim is to recover either the amount of the bribe from the second (or third) defendants as bribe givers or damages representing their loss caused by **568** entering into the contract thus wrongfully induced. They do not claim payment of the bribe from either of these defendants - it was of course paid to the first defendant - nor do they claim under any agreement to pay the bribe; they rely upon that only as the wrongful act which founds their claims for restitution and in tort. For reasons already given, their restitutionary claim against the second and/or third defendants is to recover an excess payment made under the building contract.

These considerations led Mr. Munby, Q.C. to sub-

mit that the ultra vires defence is a red herring because it has no relevance to the claim in fact made. I have some sympathy with his submission but I cannot go so far as to regard the defence as irrelevant. If the payment was made, not by BSS because it could not, but by Mr. Sunley and Mr. Fryer personally, then the plaintiffs would have no basis for alleging that BSS committed a wrongful act which gives rise to the remedies which they seek. Therefore the issue does arise for decision, but as Mr. Munby submits the question is one of capacity to commit the wrongful act of paying a bribe to Dr. Hashim rather than any question of capacity or ability to enter into contractual arrangements with him or with the plaintiffs. This may be significant in relation to the subsidiary issue arising under s. 9 of the European Communities Act 1972 to which I shall return.

In the Rolled Steel Ltd., case (above) the Court held that the company's capacity depends upon the true construction of its memorandum, bearing in mind that the company -

. . . is treated as having implied powers to do any act which is reasonably incidental to the attainment or pursuit of any of its express objects, unless such act is expressly prohibited by the Memorandum (per Lord Justice Slade at p. 287E) . . .

but also that the express provisions may include what are merely powers as distinct from the objects of the company.

In that case, the Court construed the relevant paragraph of the plaintiff company's memorandum, which read:

(K) To lend and advance money or give credit to such persons . . . as may seem expedient . . . and to give guarantees or become security for any such persons . . .

as conferring a power rather than stating an independent object (per Lord Justice Slade at p. 289F). This led to the submission that the power was limited to such guarantees as were expedient for the company's pursuit of its statutory objects, which the guarantee in question was not. The submission was rejected because the particular act of giving a guarantee -

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

. . . was of a category which on the true construction of the memorandum was *capable* of being performed as reasonably incidental to the ascertainment or pursuit of its objects [and] the state of mind or knowledge of the persons managing the company's affairs or of the persons dealing with it is irrelevant in considering questions of corporate capacity (per Lord Justice Slade at p. 295C).

The underlying principle was explained by Lord Justice Browne-Wilkinson (at p. 303B) as follows:

A company, being an artificial person, has no capacity to do anything outside the objects specified in its memorandum of association. If the transaction is outside the objects in law it is wholly void. But the objects of a company and the powers conferred on a company to carry out those objects are two different things . . . If the concept that a company cannot do anything which is not authorised by law had been pursued with ruthless logic, the result might have been reached that a company could not (i.e. had no capacity) do anything otherwise than in *due* exercise of its powers. But such ruthless logic has not been pursued and it is clear that a transaction falling within the objects of the company is capable of conferring rights on third parties even though the transaction was an abuse of the powers of the company . . . It is therefore established that a company has capacity to carry out a transaction which falls within its objects even though carried out by the wrongful exercise of its powers.

The relevant provisions of the memorandum of association of BSS are these:

3 (a) To carry on business as . . . building contractors; . . .

(f) to cooperate or participate in any way with, or assist or subsidise any company or person carrying on or proposing to carry on any business within the objects of the company; . . .

(j) to give any remuneration or other compensation or reward for services rendered or to be rendered . . . in or about . . . the conduct of its business; . . .

(r) to do all such other things as are incidental or which the company may think condusive to the at-

tainment of the above objects or any of them.

It goes without saying that paying a lawful **\*569** commission to an agent in return for procuring business for BSS as a building contractor, or for BSME as an associated company to be carried out in conjunction with BSS, is within the scope of the memorandum. The second defendants' submission is that paying a bribe, whether or not euphemised as commission, is sufficiently "egregious" to make it impossible to hold that the memorandum on its true construction encompasses such an act.

This submission involves distinguishing between a bribe and lawful commission, which would involve questions as to the knowledge and state of mind of the persons who purported to act on behalf of the company; yet these are irrelevant to the construction of the memorandum and therefore to corporate capacity (per Lord Justice Browne-Wilkinson, above). As a matter of construction, it comes close to if it does not require reading par. 3(j) of the memorandum as if the words were "any *lawful* remuneration".

In my judgment, the payment made to Dr. Hashim in the circumstances which made it unlawful and a bribe was an act within the scope of par. 3(j) being -

. . . remuneration or other compensation or reward for services rendered or to be rendered . . . in or about . . . the conduct of . . .
the business of BSS and/or BSME. Consistently with the *Rolled Steel Ltd.* decision the factors which made the payment unlawful are relevant to questions of authority and as to whether BSS was or might be bound towards Dr. Hashim but they do not take it outside the corporate capacity created by the company's memorandum.

This conclusion is supported by the many authorities which show that a company can commit fraudulent and even criminal acts; see Palmer's Company Law (25th ed.) par. 2-662. It is also supported in my view by the common law principles which may render an employer vicariously liable for tortious acts committed by his servant or agent in the course

of the employment or agency even if expressly forbidden by him (subject to the effect of any express restriction in the company's memorandum, which does not arise here).

The second defendants rely upon International Sales and Agencies Ltd. v. Marcus, [1982] 2 All E.R. 551 and Hannibal & Co. Ltd. v. Frost, [1988] 4 B.C.C. 3. In the former case, the plaintiff company sued for the return of money which had been paid to the defendants by cheques drawn on the company's account by its controlling shareholder who was held to have acted in breach of his fiduciary duty towards the company. Mr. Justice Lawson considered the question of ultra vires at p. 557 of the report. He rejected a submission that the Court was -

. . . not concerned with the *nature* of any transactions in question but merely to inquire whether the form in which it is clothed (for example, the drawing and the issue of cheques) is one covered by the objects clause which would be the case here.

He quoted from the judgment of Lord Dunpark in Thompson v. J. Barke & Co. (Caterers) Ltd., [1975] S.L.T. 67 who referred to the issue of cheques as an -

. . . attempted unlawful application of company funds . . . which no sane director could genuinely believe . . . was desirable in the interests of the company . . .

and he relied upon the judgment of Mr. Justice Eve in Re Lee, Behrens & Co. Ltd., [1932] 2 Ch. 46. The latter judgment was expressly rejected as a precedent on capacity, as distinct from authority, in Rolled Steel Ltd. (see [1986] 1 Ch. at p. 288, where the tests suggested by Mr. Justice Eve were "finally laid to rest") and the former was not followed by Lord Jauncey in the later Scottish case, James Findlay Corporation Ltd. v. Meers, [1988] S.L.T. 302. In my judgment, the International Sales decision on capacity does not affect the application of the judgments in Rolled Steel Ltd. as I have sought to do. Similarly, Hannibal v. Frost although decided by the Court of Appeal (Lord Justice May and Lord Justice Balcombe) after the Rolled Steel Ltd. judgment was concerned with the question of authority rather than capacity. The defendant sought leave to

defend on the plaintiffs' O. 14 summons for summary judgment, on the ground that the money which he had withdrawn from the company was paid as a bribe in the course of the plaintiff company's business; he was its managing director. Leave to defend was refused on the ground that such a payment was unauthorized unless approved by the shareholders as to which there was no evidence. With regard to capacity, Lord Justice May said (at p. 5):

Whether or not bribing Mr. Last was ultra vires the company (as I think it was, though I express no concluded view) . . .

and Lord Justice Balcombe added (at p. 6):

Like my Lord, in the absence of authority I do not wish to give a final view as to whether or not the use by the company of its money to pay bribes to secure business could ever be *570 intra vires the company, though I suspect it could never be . . .

There is no indication in the report that the Rolled Steel Ltd. judgments were cited, and Lord Justice Balcombe reference to the absence of (decided) authority suggests that the question of capacity as distinct from authority was not specifically argued. In my judgment, the Court was concerned only with authority, and it is even doubtful whether the dicta relied upon were consciously directed at the question of corporate capacity.

Finally, in Aveling Barford Ltd. v. Perion Ltd., [1989] BCLC 626, Mr. Justice Hoffmann held that:

. . . the general rule . . . that any act which falls within the express or implied powers of a company conferred by its memorandum of association . . .

may be authorized by the shareholders, and which therefore is intra vires -

. . . is subject to exceptions created by the general law and are such exceptions in that a company cannot without the leave of the court . . . return its capital to its shareholders . . . It follows that a transaction which amounts to an unauthorised return on capital is ultra vires and cannot be validated by shareholder ratification or approval [p. 631].

That was a case, therefore, of a transaction which although within the scope of the memorandum on its true construction was nevertheless ultra vires by

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

virtue of the statutory provisions referred to; the present is not such a case.

For these reasons, in my judgment the ultra vires defence of the second defendants fails. It follows that the plaintiffs do not pursue their claims against the fourth and sixth defendants, although those defendants remain as parties to the third party proceedings.

I should record that the plaintiffs relied in the alternative on s. 9 of the European Communities Act, 1972. This raises other questions the issue whether the relevant transaction was the payment to Dr. Hashim, in which case the "person dealing with the company" was not acting in good faith and s. 9(1) does not apply, or the excess payment made by the plaintiffs under the building contract, in which case no question of ultra vires arises and in any event such payment was made to BSME, not BSS.

*Stage 2*

*Non-justiciability and immunity*

The first defendant submits (1) that the claims against him are not justiciable in the municipal Courts of England, and (2) what he is entitled, at least arguably, to the immunity allowed by public international law in respect of the official acts of officials of international organizations.

Both of those contentions raise questions as to the status of the plaintiffs and as to the terms of the first defendant's appointment as Director General in 1977, which office he held until 1982.

*Status of AMF*

The House of Lords held in Arab Monetary Fund v. Hashim (No. 3), [1991] 2 A.C. 114, that the plaintiffs are entitled to sue in the English Courts by virtue of the corporate status conferred upon them by Federal Decree No. 35 promulgated with the sovereign authority of the United Arab Emirates on Apr. 16, 1977. They do not enjoy that status, however, by virtue of the AMF agreement which created the AMF because that was a treaty agree-

ment between 21 States (including Palestine) which has not been incorporated into English law; the United Kingdom is not a party to it, though even if it was, its provisions would have no effect in English law unless duly incorporated by legislation: J. H. Rayner (Mincing Lane) Ltd. v. D.T.I., [1990] 2 A.C. 418 (see [1991] 2 A.C. at p. 142)

The AMF agreement includes the following provisions:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

 ORGANISATION AND
 ADMINISTRATION

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

**\*571**
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

 The Director-General and the
 Staff:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

The appointment of Dr. Hashim was resolved by the Board of Governors by Resolution No. (1) for the year 1977. The resolution includes:
 . . . he shall be granted the remunerative allowances and privileges as set out in paragraphs Four, Five and Six of resolution No. (3).

*Resolution No. (3) reads:*

Fourthly: The Director-General of the Arab Monetary fund shall receive a monthly remuneration of . . . and shall enjoy the same remuneration, privileges, allowances [etc.] . . . as those enjoyed by the Dir-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

ector-General of the Arab Fund for Economic and Social Development.

Fifthly: the Fund shall provide the Director-General with furnished accommodation commensurate with his status.

Sixthly: Remuneration, allowances and all other privileges shall be paid to the Director-General and Executive Directors from the commencement date of their employment.

There is some dispute as to the correct or best English translation of the Arabic text of resolutions (1) and (3). The plaintiffs called an expert witness, Mr. Irving, while the first defendant was able to put forward his own translation through Counsel. Ultimately, I do not think that the issue turns upon the precise meaning of the word translated as "remuneration", though if necessary I would accept Mr. Irving's evidence that it does not connote a "gratuity" if that is taken to mean some form of voluntary and non-contractual payment.

There is no direct evidence of Dr. Hashim's acceptance of his appointment of director-general but it is common ground that his agreement to do so can be inferred at least from the fact that he took up his duties in April, 1977.

A protocol of privileges and immunities was agreed between the State of United Arab Emirates and the Fund represented by Dr. Hashim as its president/director-general dated Aug. 1, 1977. Its provisions set out the privileges and immunities granted by the host state to the Fund and to its president and employees, including in the case of the president:

. . . the same privileges, immunities, exemp-**572** tions and facilities which are accorded to the heads of diplomatic missions in the U.A.E. Article [Article (14)].

A clear distinction is drawn between the president and employees. Article (21) provides that the protocol is to be:

. . . implemented and interpreted in accordance with established international conventions regarding immunities and privileges for international organisations and employees.

Article (22) provides for negotiation or arbitration between the parties in case of dispute.

*Non-justiciability*

The first defendant's submission rests upon the House of Lords' decision in the Tin Council case (Rayner v. D.T.I., above) that the terms of an unincorporated treaty have no effect in English municipal law. Therefore, it is submitted, the English Court cannot interpret or give effect to the AMF agreement under which Dr. Hashim was appointed and whose appointment was regulated by its terms.

I was puzzled by this submission, because Dr. Hashim is not a subject of international law and, if his appointment was not regulated by any municipal law, then it would seem that no Court or tribunal, international or municipal, would have jurisdiction over any dispute that arose between him and the AMF to which he was responsible (see art. 33). The suggestion that his rights against the AMF could be enforced by an international tribunal was not supported by any identification of the tribunal in question, nor is there any reference to such a tribunal in the AMF agreement or the protocol.

The underlying fallacy, in my judgment, is that the argument assumes that the agreement between Dr. Hashim and the AMF was not a contract regulated by municipal law. If it was, then the contract was clearly governed by the law of Abu Dhabi and no difficulty about enforcing its provisions in the English Courts, so long as they are not an inconvenient forum, can arise. Nor would the fact that terms of the contract were taken from an unincorporated treaty (meaning, unincorporated by statute into English law) prevent the English Court from exercising jurisdiction in the normal way. In the Tin Council case, Lord Oliver expressly recognized this as one of the situations where the English Court may construe the terms of an unincorporated treaty in order to ascertain what private rights and obligations arise between the parties:

. . . where the parties have entered into a domestic contract in which they have chosen to incorporate the terms of the treaty [1990] 2 A.C. at p. 500].

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

That was, in my judgment, the position here. There was an agreement between Dr. Hashim and the AMF. That has the status of an international organization and, apart from whatever may be its corporate status in international law, it has a corporate capacity created by the sovereign ruler of the UAE and recognized as such by the English Courts.

The first defendant also alleges a lack of "subject matter jurisdiction" of the kind described by Lord Wilberforce in Buttes Gas & Oil Co. Ltd. v. Hammer, [1982] A.C. 888 (see p. 937). The matters in issue, it is submitted, concern the relationship between Dr. Hashim as the "high officer" of an international organization and the nature of the duties, fiduciary or otherwise, owed by him towards that organization, and they make necessary an inquiry into the internal affairs of the organization which are the exclusive concern of the member States and in respect of which the English Court cannot identify any "manageable standards" (per Lord Wilberforce) for judicial application.

If, however, there was a contract between Dr. Hashim and the AMF governed by any municipal law, as in my judgment there was, then these objections are in my view of little weight. Certainly there is no reason to suppose that the laws of the UAE or of England cannot supply appropriate standards for the kinds of allegations made by the plaintiffs in the present case. These allegations do not concern the relations between States or other subjects of international law. The parties are, on the one hand, the creature of agreement between 21 States (including Palestine), duly clothed with corporate capacity by one or more of them, and an individual. Whether he is an employee or agent, and whether the plaintiffs resemble an English limited company or not, and whatever the terms of their relationship are, the relationship is governed by the agreement between them and that agreement is governed by municipal law.

I reach this conclusion without finding it necessary to consider whether there is an analogy between the AMF and a limited company under the Companies Acts in England, as Lord Templeman thought that

there was (see [1991] 2 A.C. at 160C), nor whether the first defendant is precluded from raising this objection by reason of the House of Lords' judgment as to the status of the AMF.

**\*573** *Immunity*

The first defendant relies upon the immunity from legal process which, he submits, is required by customary international law for the official acts of the officials of international organizations such as the AMF, and which therefore should be recognized by the English Courts.

I am grateful for the carefully researched and clearly presented submissions made by Professor Brownlie, Q.C. on his behalf.

The starting point is the status accorded to the director-general by the Treaty which created the AMF and by the Protocol between the AMF and Abu Dhabi. By agreement between those parties, his post was the most senior within the organization and he was accorded ambassadorial status. But the United Kingdom is not a party to those international agreements nor, in the absence of domestic legislation, would English municipal law be affected, even if it was.

Reference may be made in passing to the relevant United Kingdom legislation, though it is for that reason irrelevant in the present case. By the International Organisation Act, 1968 provision is made under s. 1 for the status, privilege and immunities of organizations of which the U.K. is a member, and under s. 4 (as amended by the 1981 Act) for organizations of which the U.K. is not a member but which are specified by order in council. No such order has been made in respect of the AMF. Where these statutory provisions apply, they extend privileges and immunities to representatives and "high officers" of the organization (see Sch. 1 Pt. II). The effect of corresponding provisions under earlier statutes was considered by the Court of Appeal in Zoernsch v. Waldock, [1964] 1 W.L.R. 675. The defendant Sir Humphrey Waldock had ceased to be a member of the European Commission of Human Rights, of which he had been President, but his

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543

**(Cite as: [1993] 1 Lloyd's Rep. 543)**

name still appeared on the Foreign Secretary's list of persons entitled to immunity. This was held to confer immunity without more (see p. 683 per Lord Justice Willmer) but the Court also held that he was entitled to immunity as a matter of customary international law which forms part of English law (per Lord Justice Diplock, at p. 691). This was because the acts complained of had been performed in his official capacity and the immunity in respect of such acts continued after he ceased to hold office:

. . . the immunity depends on the quality of the words spoken or the acts done, and not on the time when suit is brought. Once attached, it is not lost by the mere fact of the first defendant ceasing to be a member of the commission . . . While it is true . . . that an envoy when he ceased to be an envoy loses his immunity in respect of acts done in his private capacity, I do not think that this is by any means the case in relation to acts done by him in his official capacity. In so far as he acts in an official capacity, his acts are the acts of the foreign sovereign whom he represents. I do not accept that an envoy, after he has ceased to be an envoy, can be sued in respect of acts performed in his official capacity (per Lord Justice Willmer at p. 684; compare Lord Justice Danckwerts at p. 688 and Lord Justice Diplock at p. 691).

The judgments emphasized that the immunity had not been waived (see pp. 681 and 692). They support Professor Brownlie's submission that the English Courts should give effect to an immunity which is shown to exist under customary international law, though not, I think, his further submission that it suffices for the defendant to show an arguable claim (though that may be established by Rahimtoola v. Nizam of Hyderabad, [1958] A.C. 379 to which the Court of Appeal referred).

Numerous examples of international practice were referred to, as well as commentaries including the Restatement of the Foreign Relations Law of the U.S. (Third) by the American Law Institute (1987) pars. 467(1) incl. Comment (a) and Note 1 (p. 497) and pars. 469 incl. Comment (c)(p. 512), together with passages dealing with waiver at pp. 495 and 513. Mr. Scott, Q.C. for the plaintiffs also referred to par. 223 Comment (e) which summarizes the

United States approach as follows:

*International organisations and non-members.*

An international organisation with a substantial membership is a person in international law even in relation to states not members of the organisation. However, a state does not have to recognise the legal personality of an organisation of which it is not a member, which has few members, or which is regional in scope in a region to which the state does not belong.

I am prepared to assume that the AMF although regional does have the necessary status to acquire immunities for itself and its officers under customary international law thus stated and that such immunities may be acknowledged by the English Courts notwithstanding the fact that the organization has not been recognized under the International

**\*574** Organisations Act or other legislation and notwithstanding the House of Lords' judgment in AMF v. Hashim (No. 3).

The first defendant also relies upon International Institutional Law by Professor Henry Schermer (1980) pars. 484-486 and International Immunities by C. Wilfred Jenks (1961). Both of these sources emphasize the practical need for the senior officials of international organizations to enjoy immunity from local legal process and for this to extend to private as well as official acts during their period in office; they emphasize also that the immunity may be waived, but not by the official concerned. Professor Schermer says this:

When an act of the Secretary-General is at stake the general congress may waive the immunity, or the board of the organisation International officials may not themselves waive their own immunity. [par. 486].

The secretary-general, however, may waive the immunity of the staff (ibid.)

These authorities make it clear, in my judgment, that the director-general of an international organization such as, as I assume, the AMF, is entitled to a general and permanent immunity from local legal

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

process in respect of his official acts. But they also show that the immunity is granted for the benefit of the organization rather than himself and that, if the immunity is waived by the organization, there is no further bar to proceedings against him.

Applying these rules in the present case, the questions which arise are whether the acts alleged by the plaintiffs were official acts and whether the first defendant can assert that the immunity has not been waived, when the proceedings are brought in the name of and duly authorized by the organization itself. It seems to me that these questions fall to be considered together, and that the first defendant's contentions stand the international law rule upon its head. The plaintiffs allege the converse of official acts; it is unarguable that the acts alleged were done in the interests of the organization, because they were by their nature directly opposed to those interests. Similarly, the immunity is for the benefit of the organization, and only indirectly for the benefit of the official when he is sued by a third party. If the immunity is waived by the organization then the immunity does not benefit him at all. The official does not enjoy any immunity from suit by the organization itself; alternatively, the bringing of suit by the organization necessarily involves a waiver of the immunity which the first defendant asserts.

I should record Professor Brownlie's further submissions, that there is no evidence of formal waiver by the member states or by the board of governors of the AMF; that the international law rules render the official non-liable rather than merely immune from suit, relying upon Zoernsch v. Waldock (above) and Modern Diplomatic Law by Michael Hardy (M.U.P.); that there cannot be a waiver affecting non-member states; and that there is no sufficient territorial connection between the acts alleged by the plaintiffs and the United Kingdom. In my judgment, those submissions seek to give a greater effect to the immunity than is justified by the international law authorities relied upon, and as regards jurisdiction, there is no objection to the Court's personal jurisdiction over the first defendant, apart from the non-justiciability and immunity submission already considered, nor is there any ap-

plication in the nature of forum non conveniens. and in any event there is a significant territorial connection with England notwithstanding that, as I have held, the alleged tort was in substance committed in Abu Dhabi.

For these reasons, the first defendant's objections to the jurisdiction of the English Court fail.

*Stage 3*

*Gulf law - liability and limitation*

I have held that the plaintiffs' claims are governed by the law of Abu Dhabi. This is subject, so far as they are claims for compensation which are categorized in English law as claims in tort, to the rule which requires "double actionability" (cf. Metall v. Rohstoff (above)). Gulf law is also relevant to the limitation defences raised by all defendants. The common law rule was that limitation issues in general are matters of procedure and as such are governed by the lex fori, that is, by English law in proceedings before the English Courts (save only where the relevant foreign law extinguished the right asserted by the plaintiff, as distinct from barring remedies in respect of that right). With effect from Oct. 1, 1985, however, the common law rule was superseded by the Foreign Limitation Periods Act, 1984. This followed the Law Commission's Report (Law Com. No. 114) presented to Parliament in June, 1982. Section 1(1) provides that where the law of any other country falls to be taken into account in the determination of any matter (a) the law of that other country relating to limitation shall apply, and (b) the law of England and Wales relating to limitation shall not apply. Section 1(2) and the proviso to s. 1(1)(b) preserve the appli-**575** cation of the English law in cases where both foreign and English law are taken into account as in tort claims subject to rule of double actionability, such as the present case.

The limitation issues were argued before me on the basis that the plaintiffs' claims are subject to any limitation defences available to the defendants under Gulf law, subject also however to the provisions of s. 2(1) and (2):

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

*2. Exceptions to s. 1*

(1) in any case in which the application of section 1 above would to any extent conflict (whether under subsection (2) or otherwise) with public policy, that section shall not apply to the extent that its application would so conflict.

(2) The application of section 1 above in relation to any action or proceedings shall conflict with public policy to the extent that its application would cause undue hardship to a person who is, or might be, a party to the action or proceedings.

The limitation issues are complicated by a number of factors. First, as will appear, the limitation periods under Gulf law are or may be different for the different causes of action relied upon by the plaintiffs (tort claims against all defendants, though not pursued against the fourth and sixth defendants; additional claims for restitution (unjust enrichment), and in contract against the first defendant alone). Secondly, there was an important change in the law of limitation in Abu Dhabi when the UAE Civil Code became effective there on Mar. 29, 1986. Thirdly, there are issues of fact as to when the plaintiffs became aware (acquired actual knowledge) of the alleged wrongdoing and as to whether they ought to have made enquiries and learned the facts earlier than they did. Fourthly, if any of their claims would otherwise be defeated by a relevant limitation period under Gulf law, the plaintiffs rely upon the undue hardship proviso in s. 2(2) of the 1984 Act. Finally, the writ which was issued on Apr. 21, 1989 against the first, second and third defendants relied upon the contractual obligations owed by the first defendant to the plaintiffs and the bribe paid to him by the second or third defendants as grounds which entitled them -

. . . to recover the said sum as money had and received, which claim is a joint and several claim against Dr Hashim, BS and/or BSME . . . (points of claim par. 5(1)].

This was expressly a plea under English law, and one which was conspicuously limited to restitution (quasi-contract) without reference to an additional or alternative claim for compensation or damages in tort.

The plaintiffs of course were entitled to claim under English law and leave it to the defendants to allege and prove that a foreign law was both relevant to the claims and different from English law. The history of the pleadings is itself voluminous, but it was not until sometime after July, 1991 that the plaintiffs sought leave to re-amend the points of claim so as to allege liability in tort as distinct from restitution and, as regards the first defendant, breach of contract. Their application was allowed eventually by the Court of Appeal in January, 1992 on terms which deferred all questions of limitation to the trial. The further complication which arises, therefore, is whether proceedings were commenced in respect of the tort claims only when leave to amend was granted in January, 1992 (or first sought in November, 1991; the difference between these two dates does not seem to be material) or whether the tort claims in effect relate back to the date of the writ (Apr. 21, 1989). This depends upon the application of s. 35 of the Limitation Act, 1980 (cf. R.S.C., O. 20, r. 5).

The plaintiffs anticipated that limitation defences would be raised: par. 6 of the points of claim sets out their contention that they did not discover that the payment had been made until about August, 1988 when the Swiss Court's experts' report was released to them, and alleges that there was deliberate concealment within the meaning of s. 32 of the Limitation Act, 1980 (in the event, the English law of limitation played no part in the argument).

One further preliminary matter. In the course of the hearing, the plaintiffs made the following formal concession, which both established the relevant facts and made further discovery, the extent of which had been disputed, unnecessary:

For the purposes of this action the A.M.F. recognises and accepts:

(1) that it was fully aware or is deemed for all purposes to have been fully aware at all material times (i.e. from April 1986 to January 1992) of all relevant provisions of English law and of UAE/Abu Dhabi law, and (2) that the Writ herein was issued on 21st April 1989 in full awareness of all such provisions as are mentioned in (1) above [signed by

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1993] 1 Lloyd's Rep. 543
1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

Case 1:07-cv-01646-RMC     Document 39-5     Filed 01/31/2008     Page 40 of 212     Page 39

Counsel].

*(1) Liability under the laws of Abu Dhabi*

The plaintiffs' claim is pleaded as follows. Against the first defendant, they claim the amount of the bribe "on the principle of money **\*576** had and received" citing the principles of "unjust enrichment" and "unjustified expropriation" in Abu Dhabi law with particular reference to art. 319(1) of the Civil Code (UAE Law of Civil transactions 1986). Secondly, they allege a breach by Dr. Hashim of his duties towards them as director-general, whether under contract or as their agent. Thirdly, they claim damages in tort, relying upon -

    . . . a general Shari'a principle which is reflected in Article 282 of the Civil Code, that a person who commits a wrongful act is liable to make good all and any damage caused by such act . . . [points of claim, as amended, par. 11(A)(2)].

Against the second and third defendants (their claim against the fourth defendant and Mr. Fryer not being pursued in the light of my ruling that the payment was ultra vires the second defendant), they claim damages in tort by reference to the same general Shari'a principle reflected in art. 282 of the Civil Code, and further or alternatively for damages for the tort of inducing Dr. Hashim to break his contract with them, relying upon art. 13 of the Civil Violations Act 1966 of Abu Dhabi (par. 11(b)).

The payment to Dr. Hashim is alleged to have been a wrongful act under UAE law as a criminal offence -

    . . . both under Shari'a law and under Article 42 of the Penal Code of Abu Dhabi (1960) [ibid].

Supplementary issues were raised regarding what presumption, if any, the Courts of Abu Dhabi would apply as regards the amount of loss and damage suffered by the AMF by reason of the bribe (ibid.) and as regards their entitlement to interest on damages awarded (ibid. par. 11(c)).

The basis for these claims is rather less straightforward than the pleading suggests. The Civil Code became effective only on Mar. 29, 1986 and was not retrospective. The payment to Dr. Hashim was not rendered unlawful by reason of its terms. Hence the plaintiffs' reliance upon "a general Shari'a principle as reflected" in arts. 282 and 319(1) of the 1986 Civil Code. The existence of any such principle as stated in art. 319(1) ("unjust enrichment") is disputed. But the defendants accept that art. 282 does reflect a general Shari'a principle. The question there is whether the law of Abu Dhabi applied the principle before 1986, and in particular in 1980 when the payment was made and at a time when the Civil Violations Act, 1966 was in force which did not contain any provision corresponding to art. 282. It did, how- ever, include art. 13 which the plaintiffs rely upon in the alternative. There, the issue is whether art. 13 applies when there was no "revocation" of Dr. Hashim's contract with the AMF (that word being the defendants' translation of "breach"), however flagrant the breach.

Three expert witnesses were called, for the plaintiffs, first defendant and second defendant respectively. The burden of proving that the law of Abu Dhabi is different from English law rested upon the defendants, and so Sabah al-Mukhtar for the first defendant gave evidence first. He is a qualified and experienced Iraqi lawyer who from May, 1975 until December, 1979 was legal adviser to ADNOC (Abu Dhabi National Oil Company), living and working in Abu Dhabi and appearing in the Courts of Abu Dhabi to represent his employer as well as his advisory work. From 1979 to 1985 he was employed in Sharjah, also in the UAE, and since 1985 he has practised in London as a consultant in Arab and Islamic law. As such, he has a wide experience of Court proceedings and arbitrations both in this country and elsewhere.

The second defendants called Dr. Anis M al-Qasem whose long experience and many qualifications may be summarized as follows. He studied law in London and the United States, becoming a barrister in 1950 and achieving his Ph.D at the University of London in 1969. He was employed as a legal adviser at the Ministry of Justice in Libya from 1952 until 1955 and thereafter was chairman of the Libyan Petroleum Commission and adviser to the gov-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

ernment of Libya. He resigned from government service in 1960 and started a private legal practice in Tripoli, practising there with right of audience before the highest Courts until 1977. He then settled in London and since 1983 he has practised here as a consultant and expert on the laws of Arab countries.

Advocate Hussein al Samahoni from Abu Dhabi gave evidence for the plaintiffs. He graduated from the University of Khartoum in 1962 and thereafter achieved a Masters Degree from Howard University, Washington D.C. in the U.S.A. He was a Judge in the Sudan from 1962 until 1978, becoming a member of the Court of Appeal there in May 1977. From October, 1978 until May, 1981 he was a Judge in the Civil Courts of Abu Dhabi, then he resigned and became a practising lawyer and advocate there, as he continues to be.

As this summary shows, the three witnesses between them had varying degrees of practical experience before the Courts of Abu Dhabi and other Arab countries, and varying amounts of academic and professional experience in Eng-**\*577** lish as well as Arab laws. The law of Sudan with which Dr. Samahoni was familiar was based on English common law, but also on Shari'a principles, and so when he went to Abu Dhabi he was able to operate there in direct continuance of his long experience in the Sudan.

Each of the experts was an impressive witness and their evidence both written and oral was the product of much learning and scholarship as well as wide experience. I regret that I cannot hope to do full justice to it in the necessary confines of this judgment.

It is tempting to begin with some attempt to summarize the historical and religious background to the current state of Arab law, both generally and particularly in the UAE and Abu Dhabi, but I can best present my conclusions by working from certain particular points towards the more general issues that were raised and debated in the evidence.

(a) First, the damages claim under art. 13 of the

Civil Violations Code 1966 - the inducement claim.

Article 13 reads as follows:

*Inducement to revoke contracts*

Anyone who knowingly and without sufficient cause induces another person to revoke a contract that legally binds him toward a third party, shall be deemed to have committed a civil contravention against the third party, unless this action of his is connected to an industrial dispute . . .

The arabic word translated as "revoke" is "naqd". This was the translation supported by both Mr. al-Mukhtar and Dr. al-Qasem. There is no official translation and Dr. Samahoni who is a licensed translator preferred his version which rendered "naqd" as "breach". He agreed that there is a different Arab word "ikhlal" meaning "breach" as distinct from "revocation", but in this context it was his "understanding and feeling towards the section that "naqd " was used to mean breach as distinct from revocation".

Reference to Faruqi's Law Dictionary showed possible translations which include "violation (of promise), infringement". These tend to support Dr. Samahoni's view that the article gives rise to liability when there is a breach without termination of the contract, but on the other hand he was doubtful whether "breach", if it is a correct translation of "naqd", should be limited to a serious breach which could in English law be accepted as a wrongful repudiation of the contract. If liability arises in respect of all breaches, however minor, then the scope of art. 13 is considerably wider than if it is limited to cases where the contract is or might be "revoked". I was told that in 1966, when the Civil Violations Act came into force, Abu Dhabi was at an early stage in its development as a modern federal state and that there was a specific social and political need to deter attempts to attract workmen, particularly foreign workmen, away from their employers. This may be reflected in the last phrase of the article (above).

If the result of an unlawful inducement is termina-

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

tion of the contract then the article is straightforward to apply; if it results in a breach without termination, then a more complicated enquiry is involved. If the article has the meaning for which the defendants contend, then it had the same scope as the common law cause of action "per quod servitium amisit" and it reflects the common law of inducement in the early stage of its development. On balance, I consider that the defendants are correct on this issue. "Revocation" seems the more natural meaning of "naqd" and is justified by the wider considerations to which I have referred.

*(b) Contract*

I have held that there was a contract between Dr. Hashim and the AMF which incorporated the relevant terms of the AMF agreement and which was governed by municipal law. Assuming that the law of Abu Dhabi applies, and the contrary is not suggested, the question arises whether the contract should be categorised as a contract of employment, or of agency, or as sui generis having regard to special nature of the relationship and of the AMF as a corporation created by international agreement and recognised as such by the law of Abu Dhabi. The distinction might be relevant for limitation purposes (see below), but for present purposes the only question is whether Dr. Hashim's agreement with Mr. Fryer and his acceptance of the Bernard Sunley payment, and his concealment of both from the AMF, constituted a breach of the contract under Abu Dhabi law. I am satisfied that there was such a breach and would hold, if necessary, that the breach was such as to justify "revocation" of the contract if art. 13 so required. I do not think that it is necessary to elaborate this finding further.

*(c) Criminal law*

Chapter VI of the Penal Code (1970) is concerned with "Crimes against Public Servants". Article 41 provides that a "Bribe accepted by a Public Servant" shall be punished by imprisonment, or a fine, or both, and art. 42 headed "Presentation of a Bribe to a Public Servant" **\*578** similarly provides for punishment of any person who -

. . . Bribes a Public Servant or present bribe to him or mediate to Bribe a Public Servant or presentation of Bribe to him.

Dr. Samahoni expressed the view that Dr. Hashim as director-general of the AMF was such a public servant, on the grounds that he was a servant of a governmental organisation, created by amongst others the government of Abu Dhabi. I cannot agree with this view. It is clear in my judgment that the articles referred to servants of the government (including the Ruler) or quasi-governmental organisations of Abu Dhabi and that the AMF was not either of these. Again, I do not think that further amplification is necessary.

The plaintiffs' alternative contention is that Dr. Hashim's acceptance of the Bernard Sunley payment constituted a criminal offence under the law of Abu Dhabi by reference to the general principles of the Shari'a even though outside the provisions of the penal law. This requires consideration of the wider questions concerning the Shari'a which can more conveniently be considered in connection with the claims for damages in tort. Apart from those, the evidence establishes in my judgment that Shari'a principles do not create such an offence except in relation to bribery of "authorities" which has been taken to include rulers and Judges and, by extension, government and public servants. The Egyptian Penal Code may be taken to extend the category somewhat further, to include nongovernmental or at least quasi-governmental employees, and the jurist-commentator Ahmed Fathi Bahnasi says that such legislation "is not incompatible with the sayings of the Prophet [the Shari'a]" (Criminal responsibility in Islamic jurisprudence (3rd ed. (1984) p. 104)). But this is not to say that the Shari'a principles create or support the offence, in relation to what are called non-public servants, in the absence of legislation and in Abu Dhabi no such legislation exists.

It became clear during the evidence that the question whether the Shari'a or the law of Abu Dhabi imposes civil liability for the giving or taking of secret commission payments to or by non-public

[1993] 1 Lloyd's Rep. 543
1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

Page 42

employees is confused rather than assisted by regarding this as merely another way of asking whether the liability for bribery has been or should be extended in this way. "Bribery" of public servants is a criminal offence and is understandably unlawful, but the payment of secret commission to a private servant or agent in connection with a commercial contract does not necessarily give rise to the same considerations. The evidence shows that under Shari'a principles and Arab laws generally a bribe may be confiscated by the State (Ruler) and that in certain circumstances it may even be ordered to be returned by the receiver to the giver. Underlying this is the possibility that the giver (as one of the Ruler's subjects) may have been imposed upon by the corrupt servant of the Ruler who has demanded the bribe as the price of showing favour. While confiscation can be regarded in such cases as a form of recovery by the principal, or employer of the corrupt servant, this rests, in my judgment, upon a different basis from the question of recovery by a private employer.

For these reasons, the Shari'a and other Arab law authorities on bribery of public servants are at best only indirectly relevant to the question of civil liability in the present case, to which I now come.

*(d) Civil liability*

It is common ground that the events giving rise to the alleged liability occurred in 1979 and 1980 and that, insofar as the liability is governed by the laws of Abu Dhabi, regard must be had to the laws of Abu Dhabi in force at that date.

The question may be restated as:
   . . . how would the Abu Dhabi courts have decided the claims, if brought before them in 1980?
and the plaintiffs rely upon the fact that there is no recorded case, so far as the researches of all parties and their expert witnesses have shown (and bearing in mind that there was no regular system of law reporting nor established doctrine of precedent), in which the civil courts imposed civil liability for "Bribery" or for the payment or receipt of a secret commission in circumstances such as are actionable

under English law. Nevertheless, in my judgment, the absence of any recorded decisions proves no more than that no such claims were made, and there may be many historical and commercial reasons why they were not.

The issue is whether the evidence in the present case establishes that such liability arose under the laws of Abu Dhabi in force at the material time.

Article 282 of the UAE Civil Code of 1986 is relevant to this issue because it stated the rule, or principle, of liability for damage caused by the defendant ("actor") which, was all parties agree, is a basic principle of Shari'a law. There is a direct analogy with Lord Atkin's explana- **\*579** tion of how the legal rule established by Donoghue v. Stevenson, [1932] A.C. 568 is derived from the Sermon on the Mount, but the analogy must not be pressed too far. Moreover, art. 282 does not depend upon any breach of a duty of care, as the English law of negligence does.

The defendants submit that the Shari'a principle is equivalent only to the moral and religious precepts of the Sermon on the Mount and that it has no force as a rule of law, which may be applied by the Courts, until it is established by legislation such as the 1986 Civil Code. The earlier (1966) Civil Violations Act of Abu Dhabi contained no such rule, apart from art. 13 relating to inducement which in my judgment was limited as I have held, and the defendants rely upon its provisions as showing that the Ruler of Abu Dhabi thereby decreed the extent to which the Shari'a principles should be applied within the Emirate and the limits which should be placed upon them.

The defendants' contentions were supported by the fact that Shari'a jurisprudence recognizes the authority of each Ruler to legislate for the territory of which he is sovereign and thereby to determine the extent to which Shari'a principles should have the force of law within that territory. Article 7 of the Provisional Constitution of the UAE (formed in 1971) recognizes this:
   Islam is the official religion. The Islamic Shari'a

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

shall be a main source of legislation in the Union . . .

Similarly, Federal Law No. 10 of 1973 provides:

   The Supreme Federal Court

   Article 75.

   The Supreme Court shall apply the principles of Islamic Shari'a (jurisprudence) and the federal Laws and other laws in force in the Emirates members of the Union which conform to Islamic jurisprudence. It shall also apply usages and elements of natural and comparative laws which are not opposed to the Shari'a.

Important questions have arisen for decision by the Federal Courts where it has been contended that legislation is ineffective which is inconsistent with the Shari'a or that the Courts are bound to apply Shari'a rules in preference to legislation which is inconsistent with them. In 1981 the Supreme Court held that legislation permitting the recovery of interest is enforceable notwithstanding any inconsistency with the Shari'a; Dr. Samahoni explained that the particular legislation was justified on grounds of practical necessity and therefore was permitted by the Shari'a despite any inconsistency with Shari'a principles, but Dr. al-Qasem relied upon it as showing -

   . . . the continued validity and enforceability of legislation which is inconsistent with the Shari'a and it implies that the application of the Shari'a must come through legislation [Second Report par. 32].

In 1986 the Federal Court gave judgment in a case concerned with the unlawful consumption of alcohol. The decision was that no contravention had been proved of the Shari'a prohibition and that in the circumstances the relevant legislation, which provided for a lighter penalty, could be enforced. The judgment referred to "Prohibited law within the provenance of God", also translated as:

   . . . punishments definitely prescribed by the Shari'a are rights belonging to God. No waiver of them shall be acceptable at the hands of men.

Dr. al-Qasem drew the distinction between acts which are expressly prohibited by the Shari'a and others where legislation is necessary or may take precedence. Dr. Samahoni relied upon prior application of the Shari'a principles.

The specific question in the present case is whether the laws of Abu Dhabi, after 1966 but before 1986, involved civil liability for the payment of an unlawful secret commission in circumstances such as are relevant here. The defendants' contention is that in the absence of express provisions in the 1966 legislation the Shari'a principle which suggests such liability could not be applied. The Court's jurisdiction was defined as follows:

*(1970) Civil Procedure Code.*

*Article 5*. The Courts of the Emirate in any matter which is not covered by a provision of law, shall apply equity, conscience and general principles of justice. In all such instances the Courts may be guided by the principles of Islamic Jurisprudence.

Further, there were provisions in the Federal Law:

*(1978) Federal Law No. 6.*

*Article 8.*

   The Federal Courts shall apply the provisions of the Islamic Shari'a and federal laws and other laws in force, and shall apply such customary rules and general legal principles as do not conflict with the provisions of the Shari'a.

*Article 12.*

   Subject to the provisions of this law, the Federal Courts shall apply the procedures, **\*580** rules, laws presently in force before the local judicial bodies . . .

The Shari'a consists of the sayings of the Prophet recorded in the Koran and as recollected by the later compilers of the Hadeeth (Sunni). These sayings were the basis of five different schools of jurisprudence which may be regarded as equal status, the choice of a particular school (in case of difference and in the absence of legislation) depending upon the decision of the trial judge which is governed in turn by the nature of the society and

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

the circumstances in which the dispute arises. These are supplemented by the opinions and commentaries of distinguished jurists, up to the present day.

It is clear in my judgment that this body of Shari'a jurisprudence has been at all material times the pre-eminent source of law in Abu Dhabi, both as regards legislation by the Ruler and the law applied by the Courts.

This is not a case where legislation contradicts or seems to be inconsistent with the Shari'a. If the 1966 legislation is regarded simply as not providing for the case of an unlawful secret commission, or more generally for a claim for compensation for damage caused by an unlawful act, then there is the absence of express provision for which art. 5 of the Civil Procedure Code expressly directs that "general principles of justice . . . guided by the principles of Islamic jurisprudence" shall apply. This is inconsistent with the defendants' contention that Shari'a principles can have no effect in the absence of legislation. Nor can a principle which is later promulgated as a self-standing provision in the 1986 Civil Code be said to be too vague to be applied as a rule of law. If it is said that the omission of any such provision from the 1966 Code was equivalent to express legislation that the principle should not apply, then in my judgment, and apart from any question whether such legislation could prevail over the Shari'a, the weight of Shari'a jurisprudence is too great for one of its basic rules of civil liability to be displaced this way. This is confirmed, in my judgment, by the terms of arts. 1 and 2 of the 1986 Civil Code:

   *Article 1.* The legislative provisions shall apply to all matters dealt with by those provisions in the letter and in spirit. There shall be no innovative reasoning in the case of provisions of definitive import. If the judge finds no provision in this law, he has to pass judgment according to the Islamic Shari'a. Provided that he must have regard to the choice of the most appropriate (school) . . . If the judge does not find the solution there then he must render judgment in accordance with custom . . .

   *Article 2.* The rules and principles of Islamic jur-

isprudence shall be relied upon in the understanding, construction and interpretation of these provisions.

There is no evidence that this approach was any different from that which was adopted before 1986; and, adopting it in relation to the 1966 Act, the law of Abu Dhabi included liability for damage caused by unlawful acts and in particular for the payment and receipt of an unlawful secret commission.

I should add that this conclusion does not involve acceptance of the plaintiffs' contention that the 1986 Civil Code codified the pre-existing law in Abu Dhabi. It is clear from the introduction to the Code and from the evidence that it drew upon many sources, including not only the Shari'a jurisprudence but also Codes previously established in Egypt, Jordan and elsewhere. The material fact in my judgment is that art. 282 stated a principle which forms part of the Shari'a and as such was always part of the laws of Abu Dhabi.

The plaintiffs also relied upon a 1976 judgment of the Shari'a Court in Abu Dhabi in a case where bribery was alleged against a government official and a second defendant who may not have been a public servant.

Under the Courts Law of 1968, before Federation, the jurisdiction of the Shari'a Court, as distinct from the Civil Courts, was limited to family matters and to civil disputes where the parties agreed that it should have jurisdiction. Dr. Samahoni asserted from his own practical experience that the Shari'a Court does exercise a civil jurisdiction and he referred to an Emirate Decree, which unfortunately he was unable to produce. In the light of my conclusion that the Civil Court had jurisdiction to apply the Shari'a rules so far as relevant for the purposes of this case, it is unnecessary to consider the extent of the Shari'a Court's jurisdiction further.

*(e) Article 15 of the Civil Violations Act, 1966*

The above discussion of civil liability under Shari'a rules may be unnecessary as regards the first defendant, because in the closing stages of the hearing

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543

**(Cite as: [1993] 1 Lloyd's Rep. 543)**

reference was made to an alternative claim under art. 15 of the Civil Violations Act (1966) which deals with fraud and deceit, and Mr. Ross-Munro, Q.C. accepted, as I understand his submission, that such a claim does lie against the first defendant. But the claim is not pleaded and its implications were **\*581** not considered in detail - it may or not be co-extensive with the tort claim, which is pleaded.

*(f) Unjust enrichment*

The plaintiffs' alternative claim against the first defendant is to recover the amount of the bribe as, in English common law terms, "money had and received" by him in the course of his duties as their agent or servant. Again, they rely primarily on a Shari'a principle stated in art. 391(1) of the Civil Code (1986) as follows:

(1) Any person who acquires the property of another person without any dispensation entitling him so to do must return it if that property still exists, or similar property or the value thereof if it no longer exists, unless the law otherwise provides.

Assuming in the plaintiffs' favour that the underlying Shari'a principle could be relied upon in the Civil Courts of Abu Dhabi before 1986, Dr. Samahoni's evidence is that the plaintiffs can rely upon this provision upon proof that:

(a) the bribe was paid out of the advance payment made under the building contract to BSME by the AMF or was otherwise made using funds obtained from the AMF, or

(b) the building contract price paid by the AMF to BSME was inflated by BS/BSME to cover the bribe [First Report par. 5.4].

In his evidence Dr. Samahoni accepted, I think, that proof of (b) without (a) would not suffice; the essence of the remedy is that the defendant has acquired the plaintiffs' property in circumstances where it ought to be returned.

In my judgment, the plaintiffs fail to establish (a) on the undisputed facts of the present case. The Bernard Sunley payment was made out of BS funds and independently of the advance payment made to

BSME. The fact that BSME later indemnified BS by a settlement in account does not, in my judgment, alter this fact.

Moreover, even if art. 319(1) is given wider application, as Dr. Samahoni contends that it should be, I am not satisfied that a claim under the article can be established in the present case. It gives a right of recovery when a payment was lawfully made. The essence of the plaintiffs' claim is that paying and receiving the bribe was an unlawful act. That gives rise to civil liability, if damage is proved, and it is inconsistent with a claim that the payment was lawfully made. Absent proof that the payment was made with the plaintiffs' money, the plaintiffs must assert that the money paid to Dr. Hashim was rightfully theirs, relying on the alternative remedies permitted by English law. This would raise questions of affirmation and satisfaction which have not been addressed, and there is no evidence that Shari'a law permits such recovery as distinct from compensation for damage caused by the unlawful act. Even if only because these concepts had not developed by 1980 (or 1986) in the law of Abu Dhabi, it seems to met that such a claim would have failed. Similarly, the plaintiffs in my view are not entitled to succeed under art. 17 of the Civil Violations Act, 1966 (Transfer of another person's property, akin to a claim for damages for conversion).

*(g) Presumptions*

Dr. Samahoni asserts that the Courts of Abu Dhabi would enforce a presumption that the plaintiffs suffered loss equivalent to the amount paid to Dr. Hashim. He does not suggest, as I understand him, that this is a presumption of law rather than of fact and common sense. There is, I think, no legal issue for me to rule upon at this stage.

I should add, however, that the present case may provide an example of unusual, possibly unique facts by which a presumption might be displaced. If the original Bernard Sunley tender had been accepted (Dr.84m.) and the bribe of Dr.7m. paid then the "true price" between the plaintiffs as employer and the second/third defendants as contractors would

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543

**(Cite as: [1993] 1 Lloyd's Rep. 543)**

have been Dr. 77m. This became the contract price because the defendants were promised an unjustified increase to Dr.84m. which Dr. Hashim failed to deliver. The plaintiffs paid no more than Dr. 77m; the Bernard Sunley defendants received a net amount of Dr.70m., for which they would never have agreed to undertake the work, but this was because they paid Dr. Hashim in full. On one view, therefore, the plaintiffs suffered no loss; the Bernard Sunley defendants did so as the result of making the payment without being assured of the inflated price which they were led to expect. (There is, needless to say, no suggestion that the Jan. 3 agreement was binding on the plaintiffs.)

However, the only present relevance of these conjectures is to demonstrate that any presumptions involved are presumptions of fact, not of law.

*(h) Interest*

In accordance with the 1981 Supreme Court decision already referred to, the plaintiffs are entitled to recover simple, though not com- **\*582** pound, interest on any damages they recover, up to certain limits.

*(2) History*

Dr. Hashim left the AMF in 1982. His successor as director general was Dr. Ghobash. On Jan. 2, 1983 Salah Al Hafidh ("Mr. Al Hafidh") joined as chief internal auditor and he became finance director in May, 1984. He continued in this post until 1989 and as finance director he had direct access to the director general. The senior legal adviser to the AMF was Salah Hassan.

The headquarters building was completed in 1982 but the final settlement of accounts between the AMF and BSME continued into 1983. This did not involve Mr. Al Hafidh but he meanwhile became concerned by apparent irregularities in foreign exchange transactions which had been carried out by or on behalf of the AMF during the time when Dr. Hashim was its Director General. The sums of money involved were huge and the differences which appeared to be unaccounted for totalled in

excess of $20m. and perhaps more. Messrs. Ernst & Whinney, the internationally known accountants, were appointed to inquire into this matter and they did so with the assistance of nearly 700 pages of copy telex messages received or originated by Dr. Hashim which he had instructed the telex operator to destroy but which that person had kept and later handed to Mr. Al Hafidh (this is Mr. Al Hafidh's evidence in the present case; the facts are in issue in other proceedings (the Chancery action) and I include Mr. Al Hafidh's account in this narrative only as a relevant part of the background history). Ernst & Whinney reported in September, 1983 that the missing differences had been paid out from certain AMF bank accounts in Luxembourg and elsewhere to, among others, an account with the First National Bank of Chicago in Geneva. This was the JOJ Anstalt account no. 1099 which is admitted for the purposes of these proceedings to have been Dr. Hashim's personal account.

The next stage for the plaintiffs was to obtain details of this and the other accounts, but the secrecy imposed or permitted by Swiss banking laws made it difficult for them to do so. They contacted the leading Geneva law firm of Lalive & Budin where, after the initial introduction to Dr. Jean-Flavier Lalive, the partner directly concerned was M. Pierre-Andre Beguin ("M. Beguin "). This was in October 1984 and in December M. Lalive and M. Beguin visited the AMF in Abu Dhabi.

The introduction was effected by Shearman & Sterling who were legal advisers to the AMF in Abu Dhabi where the partner in charge was Mr. Phillip Dundas.

On Apr. 29, 1985 M. Beguin's firm on behalf of the AMF filed a criminal complaint dated Mar. 22, 1985 with the Geneva Public Prosecutor alleging that the transfers made to FNBC account no. 1099 constituted a criminal offence under the Swiss Criminal Code. In accordance with the appropriate criminal procedures, the case was assigned to an Investigating Judge, Judge Jacques Foex, on May 10, 1985.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543

**(Cite as: [1993] 1 Lloyd's Rep. 543)**

Shortly afterwards, in June, 1985, criminal proceedings against Dr. Hashim were instituted by the AMF in Abu Dhabi. The charges were serious and understandably these proceedings cast a dark shadow over the relations between the AMF and Dr. Hashim. He refused to return to Abu Dhabi in order to appear before the Court there and in his absence he was not permitted to be represented: the AMF says that this was in accordance with the law of Abu Dhabi, but Dr Hashim responds that the law was changed retrospectively in order to prevent his lawyer from being heard. The Court's judgment was published on Mar. 15, 1987 and Dr. Hashim was convicted and sentenced in absentia.

The only direct relevance of the Abu Dhabi proceedings for present purposes is that they did not include any reference to the payment made by Bernard Sunley nor any suggestion of a bribe or other improper conduct in relation to the headquarters building contract. Nor did the criminal complaint made in Geneva. That was concerned with the unexplained payments made from the AMF bank accounts in Luxembourg to the accounts in Geneva which were or appeared to be Dr. Hashim's personal accounts. It was not suggested to M. Beguin that Dr. Hashim had received or might have received a bribe, whether from Bernard Sunley or any other person concerned with the headquarters building contract, nor did the AMF have any actual knowledge that a bribe had been paid. I make this last finding on the basis of the evidence which I have heard. The only representative of the AMF who gave evidence in relation to this period was Mr. Al Hafidh (Dr. Abdullah El-Kuwaiz, whose witness statement was admitted under the Civil Evidence Act, became director-general in succession to Mr. Said Ghobash in July, 1987). The plaintiffs did not call or produce any evidence from Mr. Ghobash or Salah Hassan even though both are resident in Abu Dhabi and, on the evidence, available as witnesses if required. The first **\*583** defendant rightly commented upon this unexplained failure to call material witnesses but this factor alone, in my judgment, does not permit me to reject Mr. Al Hafidh's evidence that there was no actual knowledge of a payment by BSS until April, 1986,

as will appear below.

Mr. Al Hafidh does confirm, however, that there were strong rumours amongst AMF personnel and more generally in Abu Dhabi that Dr. Hashim had been paid a substantial sum by way of a bribe or secret commission in respect of the headquarters building. The rumoured figure was 10m.; if this meant $10m. (U.S. dollars) then it was obviously incorrect or exaggerated in relation to a contract worth only about twice that amount, but if the figure was Dr.10m. in local currency then it was little in excess of 10 per cent. of the contract value and as such the kind of amount which could be expected to have been paid as a secret commission under the prevailing business practices as they were perceived to be. The corresponding figure in U.S. dollars was rather less than $2m.

Mr. Al Hafidh was sufficiently concerned by these rumours to check for himself in the AMF ledger accounts that no such payment was recorded or evidenced there. This established that the payment, if made, had been kept secret from the AMF. It also meant that the rumours were unsupported by any evidence and that he and the AMF could be suspicious, but no more.

Once the criminal proceedings were commenced in Geneva, the story became one of the gradual emergence of facts concerning the Bernard Sunley payment to the FNBC account which led to the issue of the present writ on Apr. 21, 1989. By that date, the AMF was able to allege that the payment was made on Jan. 30, 1980, a few days after the building contract was signed, and to give precise details of the amount and method of transfer to the JOJ account. It is important to bear in mind that these were the only facts available to the AMF when the writ was issued and that it was not until shortly before the trial that the second and third defendants made belated disclosure of the documents which evidence the agreements made between Dr. Hashim and Mr. Fryer on about Nov. 16, 1979 in London and on Jan. 3, 1980 in Abu Dhabi, and which include Mr. Fryer's memorandum to Mr. Sunley dated Jan. 9, 1980. Until those further documents were produced,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

the defendant made various admissions regarding the payment but they were united in denying that it was a bribe; likewise, however, the plaintiffs relied upon the fact of the payment, its amount and the co-inci-dence of dates with the building contract, to support their assertion that it was.

M. Beguin was naturally the first person representing the plaintiffs to learn the further facts which emerged from the Geneva inquiry. The details of the story are complicated but, for present purposes, attention can be focused on three different periods: - June 1985, March/April, 1986, and March, 1987. First, however, the main narrative.

A formal hearing before Judge Foex took place on June 26, 1985. Mr. Al Hafidh and Mr. Salah Hassan on behalf of the AMF verified the criminal complaint that had been lodged against Dr. Hashim. This was a long and detailed document; there is no reference to bribery or other unlawful payments to Dr. Hashim, apart from the alleged transfers of AMF funds from Luxembourg.

On the following day, Judge Foex appointed two accountants as Court experts. Their instructions were to investigate the origin of funds transferred into the FNBC and other accounts and the destination of funds transferred out of those accounts. The experts were M. Bourqui and M. Pennone.

Judge Foex had previously ordered the freezing of the FNBC and other accounts and had directed FNBC to produce to him certain core documents relating to the account. On June 14 he permitted M. Beguin to inspect these and also gave him some general information about the status of his investigation. This left M. Beguin in no doubt that account no. 1099 although in the name of JOJ Anstalt was controlled by Dr. Hashim personally. The account had been opened in December, 1979 and closed in 1984.

The expert's inquiry proceeded more slowly than the AMF and M. Beguin anticipated. Despite pressure from M. Beguin, nothing of significance occurred until Feb. 28, 1986 when he and M. Bourqui attended before the Judge in order to assess progress. This meeting was precipitated by the fact that Judge Foex was retiring, as he did on the following day when he was succeeded by Judge Laura Rossari.

Although Judge Foex was concerned with procedural matters only, viz. when the experts' report would be ready, the appearance before him gave M. Beguin the opportunity to have further discussions with and make further enquiries of M. Bourqui who had what was in effect unrestricted access to the FNBC's documents relating to account no. 1099. The first such meeting took place at Mr. Bourqui's office immediately after the appearance before the **\*584** Judge. M. Beguin's primary concern was the destination of funds transferred out of the account and at that date - Feb. 28, 1986 - he had received no instructions suggesting that Dr. Hashim had received any bribes from Bernard Sunley or elsewhere.

I should interpose at this stage that the plaintiffs admitted by agreement between Counsel during the hearing, that although M. Beguin did not receive specific instructions with regard to any bribe payment, nevertheless he was instructed and authorized to inquire into the nature and origins of all payments made into the account as well as transfers out of the account, so that he was under a duty as the plaintiffs' agent to report to them any facts relating to the Bernard Sunley payment which he discovered in the course of acting on their behalf. This concession obviated the need for further discovery of documents, which might otherwise have been privileged, showing the scope of his instructions and therefore of his agency for them.

M. Beguin made a further and important visit to M. Bourqui's offices on Apr. 11. On this occasion he was given a four-page schedule which M. Bourqui had prepared showing all transfers into and out of the account. The transfers in - included:
  BCCI
  London
  B/o of Bernard Sunley and Sons
  U.S. $ 1 848 132.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1993] 1 Lloyd's Rep. 543
Case 1:07-cv-01646-RMC    Document 39-5    Filed 01/31/2008    Page 50 of 212    Page 49
1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

Points to note regarding this payment are that no date was specified in the schedule nor is it expressly stated whether the figure of $1,848,132 was a single payment or the total of more than one payment (totals were shown in respect of other banks by whom or to whom more than one payment had been made). The figure was one of the largest shown relating to any bank.

M. Beguin appreciated the importance of this further information, including the Bernard Sunley payment, and his response was to suggest that Mr. Al Hafidh should come to Geneva to meet M. Bourqui and have access to his documents. M. Bourqui agreed and M. Beguin reported this to AMF. How and exactly when he did so is a matter of some dispute. In the result, the meeting was arranged for Apr. 29 and Mr. Al Hafidh went to Geneva for the purpose. However, on the previous day when M. Beguin telephoned M. Bourqui to confirm the arrangements he was told that the latter had spoken to the Judge, now Judge Rossari, and she had told him not to provide information or documents either to Mr. Al Hafidh or to M. Beguin. It is clear that Judge Rossari took a stricter line with regard to communications with the AMF representatives, including their lawyer M. Beguin, than Judge Foex had done, but it is not suggested that either Judge was not acting with complete propriety and within the proper limits of judicial discretion.

Although Mr. Al Hafidh did meet M. Bourqui he did not obtain any further information from him nor was he given access to any documents. In the course of his visit to Geneva, however, he discussed the schedule of payments with M. Beguin and he told him for the first time of the rumours that Dr. Hashim had received a bribe from Bernard Sunley in connection with the headquarters building contract. The payment shown in the schedule appeared to relate to this.

M. Beguin duly reported these developments to the AMF and he suggested that they should write to Bernard Sunley in order to obtain further information with regard to the payment. Acting on the advice of Shearman & Sterling, however, the AMF

decided not to do so, at that stage at least.

Dr. Ghobash met Judge Rossari on Aug. 8, 1986 but she again declined to discuss the matter, even as regards the progress of the investigation and the likely date of its completion. The AMC even suspected that Swiss lawyers representing Dr. Hashim were somehow causing the delay, but M. Beguin did not and does not share this view. The inquiry was both detailed and complicated and it placed considerable burdens on the experts and their staff.

The information obtained by M. Beguin during the period until April, 1986 did enable the AMF to identify certain large transfers out of the FNBC account to other banks and in other jurisdictions, and some steps were taken to locate particular assets there; but the sums involved were relatively small and in general the moneys held in the account from time to time had been dispersed over such a wide area and in so many different amounts that the AMF's primary object in seeking an indictment against Dr. Hashim, as seen by M. Beguin, was to secure an international warrant for his arrest (see M. Beguin's letter dated Mar. 10, 1986, pars. 2 and 5).

The experts' report was signed on Jan. 15, 1987 and presented to the Judge. During March, 1987 she allowed M. Beguin to read it and to make extensive notes, which enabled him to prepare a 13-page summary which was **\*585** effectively a re-copy. She did not, however, permit him to photocopy the report or to keep it, except for the purpose of preparing his summary, nor to see the supporting documents which included those obtained from FNBC regarding account no. 1099. M. Beguin sent the summary to the AMF on Mar. 25, 1987. The relevant extracts are these:

*VII OTHER FUNDS PAID TO HASHIM's AC-COUNT WITH FNBC*

Various payments other than those coming from the Luxembourg accounts were credited to Hashim's account with FNBC. Among them, a payment of US $1,848,132. - by order of Bernard Sunley is worth being mentioned.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1993] 1 Lloyd's Rep. 543
Case 1:07-cv-01646-RMC    Document 39-5    Filed 01/31/2008    Page 51 of 212    Page 50
1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

The other payments do not appear to be worth mentioning for our case.

*VIII PROPERTIES ACQUIRED BY*

*HASHIM THROUGH FNBC*

. . . 2. A payment of £288,583 by order of JOJ Anstalt on behalf of Denham House, seems to have been used to finance an acquisition of property by Hashim in England.

At this stage, however, the Swiss judicial investigation took a dramatic new turn. Judge Rossari questioned whether the Swiss Courts had jurisdiction. Submissions were made on behalf of both parties, the AMF and Dr. Hashim, and on Mar. 7, 1988 the Judge dismissed the complaint for want of jurisdiction. M. Beguin appealed on behalf of the AMF. He did so without express instructions because of the urgency imposed by the five-day time limit. The appeal was dismissed by the Chambre d' Accusation on May 25, 1988. The notice of appeal is relevant because M. Beguin included in it the following ground:

4. The expert report . . . shows that Hashim received a substantial transfer from Bernard Sunley & Sons, London, into his account. Bernard Sunley & Sons are a building company which effected the AMF building at Abu Dhabi. It thus appears that this payment constitutes a commission paid to Hashim. By accepting it in his bank account in Switzerland, Hashim commits the offence of bribery . . .

The penultimate sentence from this extract was translated from the original French during M. Beguin's evidence as follows:

This payment constitutes, as far as we can tell from all the available evidence, a "commission" paid to Hashim [Transcript Day 15 pp. 55-56A].

When the Swiss Courts finally rejected jurisdiction, the complainant AMF became entitled to consult the Court files and in particular to see and copy the experts' report and its supporting documents. M. Beguin did so on behalf of AMF in July and in August 1988. The appendices included three pages

which showed the date of the Bernard Sunley payment, these being the FNBC's internal documents which recorded the transfer from BCCI in London. Copies were sent to the AMF by the hand of Dr. Ali Ezzi Ali, described as an Interpol (police) officer from the UAE, as soon as they were seen by M. Beguin. Thereafter, the AMF instructed their English solicitors, Freshfields, and proceedings were begun against Dr. Hashim, by a writ issued in the Chancery Division in December, 1988 in respect of the alleged diversions of AMF funds from Luxembourg, and as already stated on Apr. 21, 1989 in this action.

*The Chancery Division affidavits*

These events are relevant only to the questions of limitation and before considering them further in relation to the first two of the particular periods which I have identified - June, 1985 and March/April, 1986 - I shall turn to the legal issues so that appropriate questions can be formulated. But the third period - March, 1987 - is in a different category. That was the time when M. Beguin was permitted to see and effectively to re-copy the experts' report, though without making any photocopy or retaining the original. It is not suggested that he or the AMF gained any fresh information from his perusal or from the full summary which he prepared and sent to the AMF, nor did he at that stage see the appendices or the FNBC documents which identified the precise date of the Bernard Sunley payment. However, the extent of his handling and perusal of the report became relevant in the following way. On Apr. 7, 1989 Dr. Hashim said this in the course of a lengthy affirmation in the Chancery proceedings:

26. I am advised by my Swiss lawyers and believe that the Swiss Expert's Report and its Annexes is a Court document which ought not to have been in the possession of any of the parties. An explanation of Messrs. Freshfields use of this document was requested in paragraph 12 of my solicitor's letter of 9th February 1989 . . . and again on 28th February 1989 . . . but has not been forthcoming.

In reply to this affirmation, the plaintiffs filed and

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1993] 1 Lloyd's Rep. 543
1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

served an affidavit sworn by M. Beguin at the British Consulate-General in Geneva on Apr. 27, 1989. He said:

2. I make this Affidavit in response to the allegations raised in paragraph 26 of the Eighth Affidavit [sic] of [Dr Hashim] affirmed on 7 April 1989, concerning the use made by the Plaintiffs of the Swiss Experts' Report and its Annexes. The circumstances in which the Plaintiffs obtained the Swiss Experts' Report and its Annexes are set out below.

**\*586** There followed a short account of how M. Beguin's firm was instructed and thereafter filed a criminal complaint which led Judge Foex to appoint the two experts (pars. 3 and 4). The narrative passes directly and in the same sentence from the filing of the report on Jan. 15, 1987 to Mar. 7, 1988 when Judge Rossari ruled on the question of jurisdiction. It then described how copies of the report and its appendices were obtained after the AMF's appeal was dismissed in May, 1988. There is no reference to the fact that M. Beguin was supplied with a copy of the report in March, 1987 and was permitted to make notes which enabled him, in his own words, effectively to recopy the report in the form of the 13-page summary which he sent to his clients.

This was on the face of it a surprising omission, given the terms of Dr. Hashim's complaint in par. 26 of his affirmation and M. Beguin's acknowledgment of it in par. 2 of his affidavit.

I should say something at this stage in relation to M. Beguin's evidence generally. It was a far from satisfactory episode in the trial. His witness statement was shown by cross-examination to be reticent with regard to his inspection of the FNBC documents, including bank statements for account no. 1099, (par. 5), with Judge Foex's permission in June, 1985 and his access to the experts' report in March, 1987 (par. 16). He came to the witness box with a firm opinion as to the extent to which it was necessary or appropriate for him to produce his firm's documents or to answer questions which might impinge upon his duty of secrecy, or confidentiality, towards his clients. His evidence at first was bedevilled by an unresolved dispute as to disclosure of his firm's documents; at a previous interlocutory hearing I directed that copies of the documents should be available in London during the hearing, so that if any were ordered to be disclosed after hearing argument about relevance and privilege they could be produced immediately. M. Beguin said initially that his firm's files were still in Geneva and that it had not been practical, nor in his opinion necessary, for them to be brought to London after a last-minute request from Messrs. Freshfields. The issues with regard to disclosure and privilege, including waiver, were potentially difficult and far-reaching. On the one hand, the documents prima facie were privileged from disclosure by the AMF, but on the other hand the extent of M. Beguin's and of his clients' knowledge of material facts was in issue and the scope of his instructions also. Superadded to this was M. Beguin's concern with confidentiality, or secrecy as he called it, as distinct from privilege and waiver which are governed by English law.

Happily, these issues were largely resolved by agreement between Counsel and a further bundle was produced (Bundle P3) during the second day of M. Beguin's evidence. It then appeared that M. Beguin had indeed brought with him to London copies of what he regarded as the relevant documents from his firm's files. Having re-read these, he added considerably to and in some respects contradicted the evidence which he had given from recollection and without referring to the documents on his first day. This affected in particular the extent to which he had seen and been able to reproduce the experts' report in March and April, 1987.

M. Beguin said that he had come to London expecting only to have to give evidence in general terms, and when asked about his affidavit he said that it had been drafted by Freshfields and that he had little recollection of it apart from calling at the British Consulate-General in order to swear it. He suggested that there might be some room for doubt, having regard to the status and use of affidavits in Swiss criminal proceedings, as to the extent to which there was any obligation to ensure that the affidavit contained a full as well as truthful account

Case 1:07-cv-04646-RMC    Document 39-5    Filed 01/31/2008    Page 53 of 212
[1993] 1 Lloyd's Rep. 543                                                    Page 52
1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

of the matters stated in it.

In all, his evidence took nearly three days of Court time. This would have been considerably shorter, and probably not more than one day at the most, if the discovery problems had been resolved and all relevant documents produced before rather than during his time in the witness box and if he had been fully prepared and less guarded as a witness. In my judgment, the deficiencies in his affidavit were the result of the same guarded and reticent approach. He cannot be charged with giving untruthful evidence, either in the affidavit or as a witness, but the affidavit was economical to an unacceptable extent and his evidence, at least initially, suffered from the same defect.

I should add that a similar charge was made against Mr. Al Hafidh in respect of an affidavit which he swore in the Chancery proceedings. He had seen M. Beguin's Summary of the experts' report in March/April 1987 and his affidavit likewise asserted that it was not until August, 1988 that the report was "released" to **587** the parties. The charge of economy with the truth is thus made out, but having regard to the facts that Mr. Al Hafidh's knowledge of the extent of disclosure was second-hand only and that his affidavit was drafted by Freshfields, and as in my judgment he was in all other respects a frank and truthful witness, I do not find that the reliability of his evidence is affected thereby.

*(3) Limitation - the law of Abu Dhabi:*

*(a) Civil Liability*

The Civil Violations Act 1966 provides for prescription (Elapse of time) as follows:

*Article 31*

A case of civil contravention shall not be filed after the elapse of two years as of:
(a) The occurrence of the contravention . . .
(c) The date the Plaintiff detected the civil contravention is the date he would have been able to detect it had he exercised a reasonable amount of attention and skill, if the defendant had fraudulently

concealed the contravention . . .

The period of limitation, therefore, on the facts of the present case was two years from the date of discovery ("detection") or from the date, if earlier, when the discovery would have been made if a reasonable amount of attention and skill was exercised.

On Mar. 29, 1986, however, the UAE Civil Code took effect. Not only are the limitation provisions different, but there is express provision for claims which arose before that date:

*Limitation*

*Article 298(1)*

No claim for compensation arising out of an harmful act shall be heard after the expiration of three years from the day on which the victim became aware of the occurrence of the harm and of the identity of the person responsible for it.

*Transitional*

*Article 6.*

(1) The new provisions relating to limitation of time for claims shall apply as from the time they come into force to every period of limitation which has not expired.
(2) Provided that the old provisions shall apply to questions relating to the commencement of the running of time, and the suspension and interruption thereof, in relation to the period prior to the new provisions coming into force.

*Article 7.*

(1) If the new provision lays down a limitation period shorter than that laid down in the old provision, the new period shall apply from the time the new provision comes into effect notwithstanding that the old period has already commenced.
(2) If, however, the remainder of the period provided for under the old period is shorter than the period provided for under the new provision, the period of limitation shall expire upon the expiry of

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

that remainder.

The new period, therefore, is three years from the date of "awareness" and there is no longer any reference to what may be called constructive knowledge.

The application of these provisions must begin with findings as to the date of "detection" or "awareness" which in my judgment are essentially the same concept as actual knowledge. Article 31 in 1966 referred to detection of the civil contravention while art. 298(1) in 1986 prescribes the date of awareness of the occurrence of the harm and of the identity of the person responsible for it. Again, in the present case these are essentially the same. The first question is, when did the plaintiffs acquire actual knowledge of the unlawful act, that is, the secret payment by the second defendant to Dr. Hashim?

The second question, which arises only under 1966 provision, is whether there was any earlier date when the plaintiffs would have acquired such knowledge by the exercise of reasonable attention and skill. This can only apply if there was a failure to exercise reasonable attention and skill before the date of actual detection.

My findings are that the plaintiffs acquired actual knowledge by reason of the information provided to M. Beguin by the Court expert M. Bourqui on Apr. 11, 1986. The precise date on which this knowledge should be attributed to the plaintiffs requires further consideration to which I shall return below.

Secondly, in my judgment there was no failure of reasonable attention and skill before that date.

The defendants contend that, because M. Beguin had access to the FNBC account bank statement in June, 1985, showing the $1,848,132 payment (but without identifying the payer) and because he was instructed to find out as much as he could about payments into as well as out of the account, he should have queried that particular payment; this would have led, the defendants submit, to confirmation that the sum had not been transferred from Luxembourg, as the foreign exchange differences were, and to the FNBC credit advices which named

Bernard Sunley as the transferer. But **\*588** M. Beguin had no reason to suspect that there was a bribe or any other kind of payment into the account and the plaintiffs did not fail to exercise reasonable attention, in my judgment, by not instructing him to search for a possible bribe payment, because of the Abu Dhabi rumours as soon as the Swiss bank account was discovered and before the Swiss Court investigation was complete. I therefore reject this allegation of construction knowledge.

The facts of which M. Beguin gained actual knowledge on Apr. 11, 1986, as set out in the manuscript schedules he was given, made it clear beyond doubt that there was a payment - or more than one payment - by Bernard Sunley to Dr. Hashim of the precise amount of the bribe, which was close, though not exactly equivalent to 10 per cent. of the building contract price. The payment or payments were made between December, 1979 when the account was opened and 1984 when it was closed. The plaintiffs contend that until they knew the precise date and its correspondence with the contract date they did not have sufficient knowledge to constitute "awareness' (or detection) that the payment was unlawful. Mr. Samahoni said that there has to be sufficient knowledge to enable the plaintiff to file legal action, and the plaintiffs' submission, I think, is that the period of limitation did not begin to run until such time as they were able to prove, or at least produce prima facie evidence of their claim sufficient to satisfy a Court. In my judgment, it is important to distinguish between knowledge and means of proof. The latter is not relevant to the former, save to the extent that knowledge must imply a belief in the existence of a fact or of other facts which give rise to an inference that the fact exists. The limitation provisions depend upon knowledge and the question is, knowledge of what? In my judgment, there must be knowledge of facts sufficient to justify a belief that the unlawful act occurred, that is, that the second defendants made an unlawful payment of secret commission to Dr. Hashim in connection with the headquarters building contract. It is not suggested that there could have been an innocent explanation of the payment of $1,848,132 by Bernard Sunley to him, and even

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543

**(Cite as: [1993] 1 Lloyd's Rep. 543)**

if there was, coincidence of amount and the approximate coincidence of time with the making and execution of the building contract could nevertheless provide grounds for belief sufficient to constitute knowledge.

On these findings, the two-year period provided for by art. 31 of the 1966 Act did not begin to run before that Act was superseded by the Civil Code on Mar. 29, 1986. What is the application of arts. 6 and 7 in these circumstances? Was the period still two years under the old provisions, or did it become three years under the new? This depends, according to Article 6, upon whether there was at Mar. 29, 1986 a "period of limitation which has not expired". If there was, then the new provision (three years from awareness) applies, subject to the possible application of art. 7.

The plaintiffs submit that the new (three year) provision applies in all cases, by virtue of art. 6(1), except where the period of limitation had already expired by Mar. 29, 1986 and subject to the effect of s. 7. This I think is correct and is not challenged by the defendants. It implies that there is a pre-existing occurrence giving rise to civil liability and that the time for bringing proceedings has not expired under any of the heads of art. 31. This is borne out in the case of concealed fraud by the proviso in s. 6(2).

The issue centres on the effect of s. 7. Section 7(1) does not apply; the new period is not shorter than the old. It does, however, indicate that the intention behind the Code was that where a shorter period was introduced, that period should prevail. Section 7(2) is consistent with this in cases where the period of limitation is running when the Code comes into effect, because the remainder of the old period, if shorter than the new period, shall prevail. The plaintiffs accept that this would apply if they acquired actual or constructive knowledge before Mar. 29, 1986 so that the two-year period had already commenced. They submit, however, that where the two-year period did not commence before that date, there could be no "remainder" because the period had not begun. Section 7(2) applies, in Mr. Samahoni's view, only when the two-

year limitation period was already running at the Mar. 29, 1986.

In my judgment, the period of limitation referred to in art. 7 is not the two-year period within which art. 31 required proceedings to be brought after actual or constructive knowledge of a concealed fraud was required, but rather the period from the date of the occurrence within which proceedings might be brought. This is consistent with art. 6(1), to which I have already referred, and it ignores the oddity which results if an occurrence detected shortly before Mar. 29, 1986 remains subject to the two-year limit but one detected on the next day (Mar. 30) is subject to the new three-year limit. The plaintiffs submit that s. 7 is "unworkable" unless the length of "remainder of the period provided for under the old provision" can be **\*589** identified as at Mar. 29, 1986 ; it is not possible to say whether the new provision is shorter than the old. But in cases of concealed fraud, undetected as at Mar. 29, 1986, the new three-year period will necessarily be longer than the old, and in any event limitation provisions can only operate retrospectively when proceedings are brought. They will be saved or not depending on the length of the antecedent period since the contravention occurred. Only in this sense does a limitation period "run".

I therefore reject the plaintiff's submission. The limitation period under the law of Abu Dhabi law for claims governed initially by art. 31 of the Civil Violations Law (1966) expired two years after the date of awareness. The precise date depends upon findings as to the events in April 1986.

*Actual knowledge*

The facts which came to M. Beguin's knowledge on Apr. 11, 1986 when he received the schedules prepared by M. Bourqui were that a sum of $1,848,132 was transferred into the JOJ account by BCCI by order of Bernard Sunley by means of one or more payments during the lifetime of the account, that is, between December, 1979 and 1984. This meant nothing to him because he had no knowledge of a possible bribe payment in connection with the

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543

**(Cite as: [1993] 1 Lloyd's Rep. 543)**

headquarters building contract, nor of Bernard Sunley. He did however send photocopies of the schedule to the president of the AMF Dr. Ghobash with his letter dated Apr. 15, and when these were received and seen by Dr. Ghobash or an appropriate officer of the AMF who already knew that Bernard Sunley were the contractors and that there were rumours about a bribe paid to Dr. Hashim in connection with that contract then in my judgment there was sufficient actual knowledge on the part of AMF as amounted to "detection of the civil contravention" under the 1966 Act or "awareness of the occurrence of the harm and of the identity of the person responsible for it" under the 1986 Civil Code. The sum involved, rather less than $2m., was rather less than 10 per cent. of the contract price; there was no other reason, known or suggested, for a payment by Bernard Sunley to Dr. Hashim of such an amount; and although the precise date of the payment was not known, the account was open both at the date of the contract and throughout the period when the work was completed and the accounts settled with the contractors. It was immaterial, in my view, whether there was more than one payment; I do not see why a bribe should not be paid in instalments or by reference to staged contractual payments rather than in a single amount.

This conclusion is supported in my judgment by three factors as follows:

(a) when Mr. Al Hafidh discussed the schedules with M. Beguin in Geneva, on Apr. 28/29, they clearly identified the payment as the rumoured bribe in the absence of any other explanation;

(b) M. Beguin included the bribe allegation in the Grounds of Appeal (in March, 1988) and clearly felt justified in doing so; and

(c) when the writ was issued in these proceedings in April, 1989, the plaintiffs knew no more than they had done in April, 1986, apart from the precise coincidence of the date of the (single) payment with the signing of the building contract. That factor was of course significant, but it was not sufficient in my view to establish knowledge in place of suspicion.

Rather, the essential facts were already known and had been known since April, 1986.

The plaintiffs accept that there were grounds for suspicion on the basis of the facts known in April, 1986 but they contend that those facts were insufficient to establish knowledge of the defendants' wrong-doing or to discharge the burden of proof, if such wrongdoing was alleged. Various dictionary and legal definitions of "knowledge" were referred to, but in my judgment (1) the ability to prove a charge of wrongdoing is not the same thing as knowledge of the facts which justify the charge; apart from other considerations, the requirements of proof may vary from one jurisdiction to another; and (2) any question of "knowledge" ultimately depends upon the strength of belief in relevant facts. The plaintiffs from April, 1986 had no reason to doubt the correctness of the facts which were brought to their notice and in my judgment those facts justified the charge of bribery now made.

There remains the question which may be crucial as to the date when these facts became known to the AMF. This depends on the date when the schedules enclosed with M. Beguin's letter dated Apr. 15 was received and seen by Dr. Ghobash or either of the senior officials who were privy to the correspondence with M. Beguin, that is Mr. Al Hafidh and Mr. Salah Hassan. There was evidence from the postal records of M. Beguin's firm that the letter was posted on Apr. 15 and as to the likely course of post between Geneva and Abu Dhabi, I shall assume in the plaintiffs' favour that this evidence does not establish that the posted letter was received before Apr. 21 (three years before **590** the writ was issued). The vital issue, it seems to me, is whether the letter and schedules were sent on Apr. 15 (or 16) by fax. This was the usual method for transmission of letters between M. Beguin's office in Geneva and the plaintiffs in Abu Dhabi, particularly when the contents were urgent or important. There is no record of any fax transmission being sent by Lalive & Budin or received, either by the plaintiffs or by Shearman & Sterling who were also addressees of the letter in Abu Dhabi and New York. This does not preclude the possibility that the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

letter was sent by fax and M. Beguin said more than once that he would be surprised to learn that it was not. The matter clearly was both important and urgent; M. Beguin considered that Mr. Al Hafidh should come to Geneva for discussion with M. Bourqi and he sent a telex to this effect to Dr. Ghobash late (1705) on Apr.15. Questions then arose as to the whereabouts of Dr. Ghobash and Mr. Al Hafidh on Apr. 15. It seems that they were in Kuwait for a meeting of the board of governors (of AMF) on that day but returned to Abu Dhabi on Apr. 16, a Wednesday. The following day Apr. 17 was a working day (though not Friday Apr. 18). Mr Al Hafidh said that he was first shown a copy of the schedules by Dr. Ghobash in Abu Dhabi, though he was far from clear as to when and where this took place, whether in his own or Dr. Ghobash's office.

In my judgment, the evidence on balance supports the defendant's contention that the AMF through Dr. Ghobash and Mr. Al Hafidh (and perhaps Mr. Salaf Hassan also) had actual knowledge of the facts constituting bribery by at latest Apr. 17 and therefore before Apr. 21, 1986. Alternatively, in the light of M. Beguin's evidence that the letter dated Apr. 15 was such that it was normally sent by fax, it seems to me that his knowledge of the facts contained in it should be attributed to the plaintiffs with effect from the time when a fax would have been received and seen by Dr. Ghobash, and I hold that such knowledge was obtained by the plaintiffs before Apr. 21, 1986. Even in 1867, the "ordinary channels of intelligence in use in the mercantile world" included the telegraph: Proudfoot v. Montefiore, . (1867) L.R 2 Q.B. 511 at 521.

Reference was also made in this context to the reactions of the plaintiffs' legal advisers, M. Beguin and Shearman & Sterling respectively, to the knowledge which was thus acquired. Following Mr. Al Hafidh's visit to Geneva on Apr. 28/29 when the Bernard Sunley payment was specifically discussed, M. Beguin suggested that the AMF should write to Bernard Sunley asking for the reason for the payment (letter dated May 20). The AMF provided copies of the building contract and related documents "which might be useful" (May 27) and

in Mr. Philip Dundas' words "there appears to have been a payment from Sunley directly to Hashim" (June 4). Shearman & Sterling advised, however, that the AMF faced a dilemma, if they wished to keep open the possibility of alleging that the FNBC account, although operated by Dr. Hashim personally, was an AMF account which might enable them to demand reimbursement from FNBC.

. . . if the sum of money in question was paid to an AMF account there could, on the face of it, be no claim by AMF against Sunley. If, on the other hand, we assert in the proposed letter that it was paid to a private account of Hashim, this could be embarrassing for us in any proceedings which we may subsequently take against [FNBC] (in which we might wish to allege that the account in question was an AMF account) [Memorandum dated Paris, June 19, 1986].

The advice, therefore, which was accepted was that M. Beguin should try to learn more details of the payment and that meanwhile no letter should be sent. Perhaps significantly, there was some discrepancy in the plaintiffs' evidence on this point. M. Beguin does not accept that he was asked to make further enquiries; rather, he could not understand why no letter was sent.

The relevance of this evidence, which in my view is limited, is to question whether the facts known up to April, 1986 amounted to "detection" or "awareness " of the wrongdoing which the plaintiffs now assert. I have already given my reasons for holding that they do. Insofar as it may be relevant, I find that the plaintiffs desisted from further inquiries (which could only be expected to elicit a negative response if it was assumed that the payment was in fact discreditable) for tactical reasons of their own as described in the memorandum which I have quoted above.

*(b) Contract*

I confess that I did not find the evidence on this topic easy to follow, and it is accepted, I think, that the respective contentions of the plaintiffs and the first defendant changed somewhat during the course of the hearing. The confusion was partly caused by

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1993] 1 Lloyd's Rep. 543
1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

Page 57

the issue of non-justiciability raised at Stage 2. The plaintiffs pleaded that there was a contract of employment, alternatively of agency, while the first defendant contended that there was no contract, governed by any municipal law, at all. I **\*591** decided this issue in favour of the plaintiffs but it was immaterial to that issue whether the municipal law contract, if there was on, should be classified as a contract of employment or some other kind, under the relevant municipal law.

When the expert witnesses gave evidence of Gulf law, at Stage 3, it became apparent that claims under a contract of employment may be subject, under Gulf law, to a limitation period as short as one year. The plaintiffs then relied upon the first defendants' denial that there was a contract of employment, as originally alleged by them, and they asserted that it was common ground, in the light of my decision at Stage 2, that there was a contract which was not a contract of employment. The first defendant protested, understandably in my view, that this was opportunistic. His previous denial that there was any contract (governed by municipal law) did not preclude him from contending that, if there was a contract, then it was a contract of employment, as the plaintiffs had first alleged.

This sequence of events does no more than provide the background for the evidence which was then given by the three expert witnesses. They differed as to the classification of the contract, if there was one, and as to the appropriate limitation periods both for contracts of employment and for contracts generally.

Two statutory provisions may be relevant if there was a contract of employment. Article 11-7 of the Labour Law 1966 provided:

  No claim arising from a contract of employment shall be heard unless it is filed within the period of twelve calendar months from the date claimed right has arisen.

Mr. Samahoni contended that his law applied only to claims by employees having regard as I understand it to the contents of the Labour Law generally.

Article 922(1) of the UAE Civil Code (1986) provides:

  No claims arising out of a contract of employment shall be heard after the expiration of one year from the date of the termination of the contract.

The Civil Code became effective on Mar. 29, 1986. Dr. Samahoni considered that if the Code applied, the transitional provisions of arts. 6 and 7 (see above) meant that the one year period commenced on that date.

There was uncertainty also as to the period of limitation for contract claims generally. Before 1986, assuming that the Civil Violations Act, 1966 did not apply, the period was governed by the Shari'a, which on one view does not apply any time-limit; according to different schools, the period generally is 15 years but in particular cases may be shorter, and Mr. al-Mukhtar considered the nearest equivalent, a consultant, to be three years; and a further possibility is that a civil Judge applying the Shari'a would dismiss a claim made after a period so long as to be inequitable or fixed by analogy with other statutory limits.

My conclusion is that the Courts of Abu Dhabi would be strongly influenced by the close analogy between the claims for loss caused by the first defendants' wrongdoing regarded as a civil wrong and as a breach of duties owed by contract, and that they would apply the same time limit to both claims unless required by statute to apply the shorter one-year period. All three of the expert witnesses were asked what their advice would have been to the contractor and to an agent or servant to whom the payment was proposed to be made. I was impressed by their reaction, as regards the agent or servant, which was that the principal would be entitled to recover compensation for loss caused by the wrongdoing. They clearly regarded the breach of duties owed by the agent or servant towards his principal or master as the foundation of the civil wrong. I accept what was in effect Mr. Ross-Monro, Q.C.'s alternative submission that the period would be equivalent to that appropriate for the damages claim. This period would be three years from the date of awareness etc., or two years if the transitional pro-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543

**(Cite as: [1993] 1 Lloyd's Rep. 543)**

visions correctly applied have this effect.

As to the Labour Law 1966 and art. 922(1) of the Civil Code after March, 1986, I am not satisfied on the evidence that these provisions do govern the claim made in the present case. The contract is rather one sui generis than a contract of employment between master and servant, and the claim is for breach of duties which are not peculiar to the contract of employment. In the result, however, the distinction is not material because, as will appear below, I am satisfied that if the period is less than three years from the date of awareness then the Court's powers under s. 2 of the Foreign Limitation Periods Act 1984 should be exercised to extend it accordingly, on grounds of undue hardship. Similarly, if the transitional provisions result in a two - rather than three-year period.

*(c) Unjust enrichment*

In the light of my finding that no cause of action arises, I should record:

(1) The plaintiffs contend that the limitation period for any such claim would be 15 years **\*592** under Shari'a principles, modified to three years from the date of awareness by application of the U.A.E. Civil Code with effect from Mar. 29, 1986.

(2) Mr. al-Mukhtar suggested that the period (prior to 1986) should be two years by reference to art. 31 of the Civil Violations Act, 1966.

(3) If the course of action does exist and the period is less than three years then in my judgment it should be extended to three years under s. 2 of the 1984 Act.

*(4) Section 2 of the Foreign Limitation Periods Act 1984*

*"Undue hardship"*

An unreported decision of the Court of Appeal provides guidance for the application of this provision. In Francis Jones v. Trollope Colls Cementation Overseas Ltd., (C.A. Jan. 24, 1990) the plaintiff was injured in a road accident in Pakistan in 1984 (before the Act came into force). The limitation period under Pakistan law was one year. After

some correspondence with the first defendants' solicitors, which led her to believe that her claim would be admitted, and a long spell in hospital in West Germany, the plaintiff who was a citizen of the United States issued a writ in England on July 22, 1986, within the English law limitation period. Lord Justice Farquharson, with whose reasons Sir John Megaw and Lord Justice Neill agreed, held "with some hesitation" that a case of undue hardship was established. He considered a defence submission that the Court should conduct a balancing exercise of factors affecting both the plaintiff and the defendant, by analogy with applications to extend contractual time limits for arbitration under s. 27 of the Arbitration Act, 1950. He rejected the submission, and held that under s. 2:

The Court must look at the circumstances of the plaintiff and decide whether she has suffered hardship of an undue or extensive character.

He accepted, however, that Lord Denning's definition of undue hardship in a s. 27 case (The Pegasus [1967] 1 Lloyd's Rep. 302 at p. 307) does apply:

"Undue" simply means excessive. That is greater hardship than the circumstances warrant. Even though a claimant has been at fault himself, it is an undue hardship on him if the consequences are out of proportion to his fault.

In the light of this authority, I cannot accept the plaintiffs' submission that s. 27 of the Arbitration Act 1950 provides a direct analogy, nor that the balancing exercise described in The Aspen Trader, [1981] 1 Lloyd's Rep. 271 applies here. Section 2 requires, in my judgment, that the application of s. 1 would cause undue hardship to a party, who may not be the plaintiff; it applies equally whether the application of a long limitation period deprives a defendant of his defence, or a short period the plaintiff of his claim. The hardship must be caused by the application of the section, in other words, by applying the foreign law of limitation rather than English law.

It is relevant, therefore, to consider what the English law limitation period would have been and whether applying the foreign law period in its place causes hardship to the party who is prejudiced

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1993] 1 Lloyd's Rep. 543
Case 1:07-cv-01646-RMC    Document 39-5    Filed 01/31/2008    Page 60 of 212    Page 59
1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

thereby which is excessive in all the circumstances of the case. Moreover, the statutory reference to undue hardship in the context of public policy considerations suggests that the provision was intended to have a narrow application; a view which is confirmed by the contents of the Law Commission's Report (par. 4.39: only in "the most unusual circumstances" would the exception apply).

Here, all the plaintiffs' claims whether by original writ or by amendment as late as January, 1992 were made within six years of April, 1986 when as I have held the plaintiffs acquired actual knowledge of the facts. The limitation period under Gulf law was either two or three years. The longer three-year period expired, on my findings, before the writ was issued on Apr. 21, 1989, even though only by a matter of days. The question, therefore, is whether "undue hardship" is caused to the plaintiffs if a three-year period applies in the circumstances of this case.

In my view, it cannot be said that three-year period for claims of this sort is so short that the plaintiffs suffer "undue" hardship merely by reason of the fact that it is imposed. There must be some additional factors which make the hardship excessive in this case. Why were proceedings not begun earlier than April, 1989?

The reasons are instructive. In April, 1986 when the facts became known to the plaintiffs they were pre-occupied, and understandably so, with the grave charges of misappropriating many millions of AMF funds which they brought or intended to bring against Dr. Hashim. In June, 1986 they were advised, and they accepted the advice, to subordinate the question of bribery by Bernard Sunley to those other concerns. In August, 1988 they obtained full documentation from the Swiss Court, including those which originated with FNBC, and they decided to instruct London solicitors *593 with a view to proceeding against Dr. Hashim in England. The writ was issued in the Chancery action in December, 1988. This was concerned with the misappropriation allegations. For some reason, which is unexplained, the bribery allegation was not raised

at the time. Nor is it suggested that the writ in this action was delayed by, for example, correspondence with the defendants' solicitors or by the need for further enquiries to be made. When the writ was issued, the points of claim endorsed upon it were carefully and precisely drawn; it was limited to the restitutionary claim, and in the absence of any other explanation I must infer that the omission of the alternative claim was deliberate and not due to oversight. On any view, the matter had been thoroughly considered, including the possibility of a limitation defence under English law.

At this point, the formal admission which I have already quoted becomes directly relevant. The plaintiffs were fully aware of the relevant provisions of Abu Dhabi as well as of English law, including the general limitation period of three years under the 1986 Civil Code. It was apparent that the claims either were or might well be governed by Gulf law. If the plaintiffs were defeated by the two-year period which in my judgment in fact applies, because of the transitional provisions which are not easy to apply, I should be inclined to hold that a case of undue hardship would be made out; similarly with the claims in unjust enrichment and contract if a period less than three years applies.

In this way the period could be extended to three years for all claims. But I find it impossible to hold that applying a three-year period causes hardship to the plaintiffs, save what inevitably results if the limitation defence succeeds, nor that the hardship is "undue" or "excessive" in the circumstances of this case.

A subsidiary issue was raised by a submission on behalf of the sixth defendant that if the foreign limitation law is disapplied, then English common law rules apply, including the rules of private international law and that under these rules the foreign law is applied if the limitation rules under it are substantive rather than procedural (see Dicey's Conflict of Laws (11th ed.). p. 189); and that on the evidence of the expert witnesses the rules of Gulf law are substantive. The plaintiffs' response is that the foreign period, once disapplied, cannot be reintro-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

duced in this way. In my judgment the plaintiffs are correct. In The Komninos, [1991] 1 Lloyd's Rep. 371 at p. 377, Lord Justice Bingham rejected a similar submission that -

. . . a foreign limitation period once disap- plied under s. 2 (whether on grounds of undue hardship or other conflict with public policy), can spring up afresh and bar the plaintiff's claim.

Moreover, the rules of Gulf law appear to be properly categorized as procedural, in any event, if English law is applied to that issue.

*(5) Section 35 of the Limitation Act, 1980*

The effect of s. 35, broadly stated, is that a new claim may be added by amendment notwithstanding that the limitation period for that claim has expired at the date of the amendment and the new claim if added takes effect from the date of the writ if but only if the provisions of s. 35(5) and any other restrictions imposed by the Rules of Court (cf. O. 20, r. 5) are complied with. Section 35(5) reads:

(5) The conditions referred to . . . above are the following:

(a) in the case of a claim involving a new cause of action, if the new cause of action arises out of the same facts or substantially the same facts as are already in issue on any claim previously made in the original action; . . .

Since in my judgment, for the reasons already stated, the plaintiffs' claims were out of time even if brought at the date of the writ the question whether later claims added by amendment fall within these conditions does not arise for decision. I should, however, refer briefly to the parties' rival contentions and express a provisional view.

Section 35 of the Limitation Act 1980 is linked to the Foreign Limitation Periods Act 1984 by s. 1(3) of the later Act, which reads:

(3) The law of England and Wales shall determine for the purposes of any law applicable by virtue of section 1(a) above whether, and the time at which, proceedings have been commenced in respect of any matter; and accordingly, section 35 of the Limitation Act 1980 (new claims in pending

proceedings) shall apply in relation to time limits applicable by virtue of sub-section 1(a) above as it applies in relation to time limits under that Act.

The questions are (1) whether the new claims involved new causes of action, and (2) if so, whether the new cause of action -

. . . arises out of the same facts or substantially the same facts as are already in issue on any [existing] claim.

Although the history of the pleadings and successive amendments was analysed in some **\*594** detail, the questions were considered on the basis that the original points of claim including only the restitutionary claim (quoted above) and that the 1991/2 amendments added claims for compensation (damages in tort) and against the first defendant for breach of contract also; the relevant claims in the light of my decision on the Conflicts of Law issues being those governed by Gulf law and subject (in tort) to the rule of double actionability.

As regards (1), the plaintiffs contend that the new claims are not new causes of action but rather alternative remedies arising out of the same wrong, as the House of Lords held in the United Australia case. Nevertheless, this submission over-compresses the reasoning in the House of Lords speeches. The speeches when read in the light of Lord Diplock's judgment in Mahesan's case, are based on the premise that for historical reasons there were distinct causes of action arising out of the wrongdoing; the argument for the appellants by A. T. Denning, Q.C. (as he then was) which the House of Lords accepted was that the separate causes of action were alternative remedies rather than distinct rights (see [1940] A.C. at p. 3). Moreover, given the classic definition of a "cause of action" by Lord Diplock in Letang v. Cooper, [1964] 2 Lloyd's Rep. 339; [1965] 1 Q.B. 232 it is clear, in my judgment, that the claims for money had and received and for damages for tort and for breach of contract are different causes of action.

(2) The question is, therefore, whether the new claims arise out of the same or substantially the same facts as those already in issue on the previous

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543

**(Cite as: [1993] 1 Lloyd's Rep. 543)**

claim. It is common ground that this involved a comparison of the factual basis for the previous and new claims respectively, but there is some difference as to the correct legal approach. I should therefore refer to the leading authorities, albeit briefly.

In Brickfield Properties v. Newton, [1971] 1 W.L.R. 862 with reference to O. 25, r. 5(5) Lord Justice Cross said this:

It is no objection to amendment under Ord. 20 R. 5(5) that some of the facts out of which the new cause of action arises are peculiar to it and that some of the facts out of which the old cause of action arises are peculiar to it. It is enough if the overlap is so great that the new cause of action can fairly be said to arise out of substantially the same facts as the old cause of action.

Lord Justice Sachs and Lord Justice Edmund-Davies stated that the relevant question is whether "the same or substantially the same set of facts" falls to be investigated. Since any cause of action depends upon a "set of facts" this text is no different, in my respectful view, from Lord Justice Cross's reference to an "overlap" which is consistent with both causes of action arising out of "substantially the same facts". The facts which are common to both causes of action must form part of the substance of each.

What was paraphrased as a "sufficient overlap" was applied in Steamship Mutual Underwriting Association Ltd. v. Trollope & Colls, (1986) 33 B.L.R. 77 (C.A.) by Lord Justice May and again in The Casper Trader, [1991] 2 Lloyd's Rep. 237 where Lord Justice Staughton said that:

Sufficiently overlap is little more than a paraphrase for the requirement that the facts must be substantially the same.

In Fannon v. Blackhouse (Unreported C.A. July 30, 1987) there clearly was no sufficient overlap and the Court so held. Lord Justice Nourse referred to the plaintiffs' submission that the words "as are already in issue" [in the existing provisions] meant only facts which were already in dispute, so that facts which had been admitted in the existing pleadings could be taken into account, whether or not

they formed part of the cause of action already pleaded. (This could give rise to the question, why, if not part of the old cause of action, had they been pleaded? and to the need to recognise that often facts may be pleaded and put in issue which eventually are held not to form part of the cause of action.) Lord Justice Nourse held that the words "in issue " mean "material to" or "the like". Again, I respectfully agree and in my judgment this does not detract from the "sufficient overlap" text. What cannot have been meant is that the text can never be satisfied when the new cause of action embraces facts which are not already in issue.

The parties' submissions as to the application of the text in the present case necessarily involved a re-examination of the precise components of each of the three relevant causes of action - money had and received (restitution), damages for tort and for breach of contract (compensation) - with further reference to the analysis made by the House of Lords in United Australia and by Lord Diplock in Mahesan. The major difference is the obvious need for the plaintiff to prove that he has suffered damage which was caused by the wrongdoing in the case of the compensation claims, whereas the restitution claim is simply for the amount of the bribe. On closer examination, however, and in the light of the earlier common law authorities **595** to which I have referred (see also Cohen v. Kuschke and Co., (1900) 83 L.T. 102), there is common ground between these two requirements; in particular, the plaintiff's entitlement to recover the amount of the bribe may depend, as against the bribe payer, upon a presumption that is the amount of his loss. While it is true that much additional evidence may be required of the plaintiffs' actual loss if the presumption is rebuttable and is rebutted, this does not prevent the substance or the core of the two claims from being the same.

In my judgment, the damages claims added by amendment do satisfy the sufficient overlap test under s. 35(5) of the Limitation Act, 1980. The substance of both the restitutionary and the compensatory claims is the same; a secret payment to the plaintiffs' servant or agent as an inducement for fa-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

vour in connection with the plaintiffs' affairs and in breach of his duties towards them. The need to prove actual loss if there is no presumption that the loss is equivalent to the amount of the payment does introduce additional evidence but it does not mean, in my view, that the claims do not arise out of substantially the same facts.

I should also refer to two particular aspects of this question in the present case:

(1) the tort claims added by amendment differ from the original claim for money had and received in that the plaintiffs rely upon Gulf law and the double actionability rule. The introduction of Gulf law, the defendants submit, is itself a new "fact" which adds to the differences between the old and the new causes of action. The plaintiffs say that the burden of alleging that a foreign law is different from English law rests upon the defendants and that their response to this does not affect the application of the "sufficient overlap" test under s. 35. In my judgment, the plaintiffs are entitled to say this in the present case, where they would be content to rely upon English law throughout. The situation might be different in a case where the plaintiffs sought to introduce by amendment a cause of action governed by foreign law, not previously in issue.

(2) The second and third defendants' late disclosure of documents which focused attention on the meeting between the first defendant and Mr. Fryer on Jan. 3, 1980 and the extent to which, as the plaintiffs allege, actual favours were shown or attempted to be shown towards the contractors in the course of the works led to further re-amendments of the points of claim at the trial which I allowed subject to all questions of limitation and on the basis that, for the most part, they were relied upon in relation to damages only. These further matters demonstrate that much additional evidence is required in support of the damages claims, if actual loss has to be proved, but in some respects they are material also to the questions whether the payment was corrupt and favours were shown; this applies in particular to the meeting on Jan. 3. Notwithstanding the need for additional evidence, the "sufficient overlap" test in my judgment is satisfied in relation to these amendments as well as those allowed by

Hobhouse J. and the Court of Appeal.

Finally, these issues under s. 35(5) of the Limitation Act have greater significance if contrary to my finding but as they themselves submit the plaintiffs acquired actual knowledge of the bribe payment by Bernard Sunley only in August, 1988. Then the writ was issued within the period allowed by Abu Dhabi law whether that is two or three years but the amendments were not allowed until 1991/2 when the two year period had expired and three years also, unless the relevant date is the plaintiff's first intimation of their intention to seek leave to amend ( a point not argued before me). In these circumstances, therefore, and if, contrary to my view, s. 35 does not apply, the possibility of extending the foreign law period on grounds of "undue hardship" would fall to be considered in relation to claims which might have been but were not included in the original writ and which would have been in time. In view of the double hypothesis, it does not seem profitable for me to speculate further on this issue.

*Conclusions*

(1) The payment was a bribe.

(2) The payment was not ultra vires.

(3) The plaintiffs' claims are governed by the law of Abu Dhabi.

(4) The first defendant is liable, subject to limitation defences, for loss caused by the wrongdoing; but is not liable to make restitution in the amount of the bribe.

(5) The second and third defendants are liable, subject to limitation defences, for loss caused by the wrongdoing.

(6) The limitation period under the law of Abu Dhabi in respect of all claims expired not later than three years from Apr. 20, 1986, that is before the writ was issued.

(7) The limitation might be extended to three years under the "undue hardship " provisions of s. 2 of the Foreign Limitation Periods Act, 1984, but the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

period should not otherwise be disapplied.

(8) The claims added by amendment to the **\*596** points of claim are deemed pursuant to section 35 of the Limitation Act 1980 to have been commenced on the date of the Writ.

(9) The limitation defences therefore succeed.

Friday Nov. 13, 1992

**RULING ON COSTS**

**Lord Justice EVANS:**

I heard submissions with regard to the costs of this action from leading Counsel on behalf of all parties on Nov. 10 and 11, 1992.

It is common ground that in the light of my judgment handed down on Oct. 1, 1992 the plaintiffs' claims against all defendants have to be dismissed, likewise the second defendants' claims against the fourth, first, third and sixth defendants in the third party proceedings. There will be judgment in the action accordingly for each of the defendants against the plaintiffs, and in the third party proceedings for each of the third parties against the second defendants.

There will also be Legal Aid Taxation of the first defendant's costs incurred since Jan. 6, 1992 when an emergency certificate was issued to him.

*Costs*

I have been referred to numerous long-Standing authorities on the exercise of the Court's discretion and to the recent judgment of the Court of Appeal in Re Elgindata (unreported) June 11, 1992 (Lords Justices Nourse, Stocker and Beldam). That case made it necessary for the Court to -

. . . investigate and identify the principles on which a successful party may be deprived of costs or may even be ordered to pay costs to the unsuccessful party [per Lord Justice Nourse].

Here, the successful parties in the action were the defendants, and in the third party proceedings, the third parties, who were in each case defendants also. It is not disputed that the third party claims

were consequential upon the plaintiff's claims against the second defendants in the action; put another way, that the third party proceedings became "moot" with the failure of those claims. In the normal course and subject to any special order, the defendants would be entitled to their costs of the action against the plaintiffs, and the third parties to their costs of the third party proceedings against the second defendants; and at least arguably, that the second defendants would recover those costs, as well as their own of the third party proceedings, from the plaintiffs.

Looked at broadly, although this involves an oversimplification of the issues, the plaintiffs succeeded in establishing liability against the defendants but they were defeated by limitation defences under the law of Abu Dhabi by virtue of the Foreign Limitation Periods Act, 1984. In the course of his submissions, Mr. Peter Scott, Q.C. for the plaintiffs said that I had been prepared to extend the two-year limitation period to three years under the "undue hardship" provisions of the Act, but not by a further five days which would have meant that the action was brought in time. What I held was that, while there might be a case for extending the two-year period under the former laws of Abu Dhabi to the three-year period allowed by the new, I could see no basis for extending the three year period on this ground.

Against this background, I heard submissions from the defendants and the plaintiffs respectively which at the two extremes were as follows. The defendants say that as the successful parties they should be awarded all their costs, including those of the central liability issue on which they failed - that is, the factual issue as to whether the payment made by the second defendants to the first defendant was a bribe. They rely upon the additional factor that here the plaintiffs, on the facts found in my judgment, issued the writ with knowledge (actual or deemed - the difference is immaterial) that there was a substantial limitation defence which was likely or even bound to defeat the claim.

The plaintiffs on the other hand and at the other ex-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

treme say that both the nature of the claim (commercial bribery) and the defendants' various reactions to it are such, that the defendants even though the successful parties should not recover any of their costs: "no order as to costs" would, they say, properly reflect both these aspects of the case and the parties' respective successes on the many issues raised and decided during the proceedings.

The matters particularly relied upon by the plaintiffs are these. This was a case of fraud and deception in which all the defendants were implicated although the plaintiffs remained unaware of it until, on my findings, April, 1986. Even then, the evidence available to them was limited until full discovery took place, and that was considerably delayed until shortly before the trial (December, 1991/January, 1992) when the second and third defendants belatedly disclosed the documents which confirmed that the payment was a bribe paid in connection with **597** the AMF headquarters building contract. The defendants' reactions varied. The first defendant gave evidence which on this point I rejected; the second, third and fourth defendants at first denied that the payment was a bribe and then by degrees moved to a position where no formal admissions were made although individual witnesses effectively admitted that the payment was commission in connection with the building contract and that they knew, if not at the time then shortly afterwards, that it was such (Mr. Carmody and Mr. Sunley). The sixth defendant as personal representative of the late Mr. Fryer also stopped short of any formal admission, and although this is said to have been a necessary result of his position as personal representative it does not give him grounds, in my judgment, for claiming the costs of this issue if otherwise he would not be entitled to them.

I should say at this stage that I am unable to accept either of these submissions at their extremes. It would not be right, in my judgment, to deprive the defendants of the whole of their prima facie entitlement to costs as the successful parties; nor does it follow from this that they should recover the whole of their costs from the plaintiffs. Whether and to

what extent they should do so depends, in my judgment, on the correct application of the principles "investigated and identified" in Re Elgindata (above).

These principles I venture to state for present purposes in the following terms:
  (1) The award of costs prima facie follows the event.
  (2) Particular issues may be identified on which the successful party (overall) has failed. If so, they may be placed in three categories: (a) those in respect of which the successful party may be deprived of his own costs and "even" (per Lord Justice Nourse) ordered to pay the losing party's costs (of that issue); (b) those where the successful party may be deprived of his own costs, but no order is made in respect of the losing party's costs (i.e. "no order" as to the costs of that issue); and (c) those where no special order is made - the successful party recovers his costs including those of the issue(s) on which he has failed.

I hold in the present case that the defendants are entitled to their costs of the action, and the third parties to theirs of the third party proceedings, subject to the qualifications which I shall set out below. I reject the defendants' submission that their costs should be taxed on an indemnity basis; I cannot see any ground upon which it can be said that the standard basis should not apply.

I also hold that the present case is not one where an overall assessment of the parties' respective successes and failures can be translated into an award of a fraction or proportion of the total costs incurred. The issues are so various and the history of the proceedings so complicated that there is no basis even for a rough estimate. Failing agreement, which is unlikely, a taxation is inevitable, and I appreciate that the taxation will not be straightforward or easy.

Separate issues, in the sense indicated above, have been identified as follows:
  (1) the central issue of fact: was the payment a bribe? This nearly but not exactly corresponds with item (1) in Stage 1 in the agreed programme of the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543

**(Cite as: [1993] 1 Lloyd's Rep. 543)**

hearing. The first defendant persisted in his denial of this allegation, both up to and after my decision was announced on Mar. 12, 1992. The other defendants maintained their non-admission almost as long. There is no basis, in my judgment, for ordering the defendants to pay the plaintiffs costs of this issue; the question is whether the defendants should bear their own costs, or recover them from the plaintiffs as part of the general order in their favour. I have come to the conclusion that they should each bear their own; in other words, there will be "no order" as to the costs of this issue, but with one qualification. The basis for this order is that the plaintiffs ought not to become liable to pay the defendants' costs of putting the plaintiffs to proof of an allegation which was not open to serious doubt by the time the matter came to trial and the correctness of which was in the defendants' own knowledge throughout.

The first defendant disputed this allegation, in my judgment, at his own risk to costs, and he has failed. The same does not apply to the same extent either to the company defendants or to Mr. Sunley as fourth defendant and Mr. Clements as sixth defendant. In their cases, in my judgment, there came a time when they likewise persisted in their non-admissions at their own risk as to costs; that time began when they had sufficient opportunity to investigate the allegation for themselves. (This applies to Mr. Sunley also, because it was not proved that he expressly authorised or was personally involved in the payment until after it was made.) That date was, I estimate, July 1, 1991. The action was stayed from May, 1990 until May, 1991. The processes of discovery then took place. That was when, in my judgment, these defendants realized or should have realized (if full discovery was not made at that time, **\*598** they cannot rely upon their own failure so as to improve their position vis-à-vis the plaintiffs as regards costs) that the payment clearly was made in connection with the building contract and was unlawful as a bribe. No contrary assertion or "positive case" has ever been made, except for the first defendant's statements and evidence which even if partly correct do not explain the coincidences as to the amount and date. I should

add that I do not regard the change in beneficial ownership of the second defendants, also in 1989, as relevant in this context. Any difficulties in contracting witness, previous directors, etc. were a consequence of the delay caused by the continued concealment of the true facts from the plaintiffs, rather than of the take-over. Insofar as problems were caused by the takeover, that is a matter for the parties to it and it does not affect, in my judgment, the position between the plaintiffs and the second defendants with regard to costs.

The plaintiffs' submission that the moral blameworthiness of the defendants is such that they should be deprived of their costs supports this conclusion, but I am doubtful whether the submission is correct as a matter of law and I place no reliance upon it.

In respect of this factual issue, therefore, there will be "No Order" between the plaintiffs and the first defendant, and as regards the remaining defendants, "No Order with respect to costs incurred on and after the 1st July 1991".

(2) *Immunity and non-justiciability* (stage 2; plaintiffs and first defendant only)

This was clearly a separate issue in respect of which a special order may be made. The conditions for making a "category one" order apply. The defence was entirely collateral to the plaintiffs' allegations and it never had, in my judgment, any substantial hope of success. The first defendant when he raised it must have realised that he did so at considerable and obvious risk as to costs. In my judgment, he should not recover his costs of this issue and the plaintiffs should recover theirs.

*(3) Swiss law*

The expert evidence of Swiss law played no part in the proceedings before me because I ruled at the end of Stage 1 (Mar. 12 1992) that it was not relevant. But there was a convoluted procedural history which showed that the potential relevance of Swiss law to the restitution claim, which the plaintiffs first made, was raised first by the third defendant, then adopted by the other defendants (apart, I think,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

from the first defendant) and by the plaintiffs themselves. It then emerged as common ground that there is no such liability under Swiss law, but meanwhile, the plaintiffs alleged liabilities in tort (compensatory claims) under Swiss law, if that law applied. There was an unsuccessful attempt in January 1992 to obtain all parties' agreement to Swiss law being excluded in any event, and the "conflicts" issue remained alive at the trial. I am primarily concerned now with the costs of obtaining expert evidence of Swiss law before the trial; in my judgment, the plaintiffs should not bear the defendants' costs of this issue, but neither should they recover their own costs from the defendants. There will be "No Order" between the plaintiffs and all defendants in this respect.

*(4) Ultra vires*

This defence, raised by the second defendants, led to the plaintiffs joining the fourth and sixth defendants as such (they were already third parties) but upon the conditional basis that the claims would not be pursued if the second defendants' defence failed. Following my ruling which was announced on Mar. 12, 1992 the claims were duly withdrawn, subject to any appeal. Mr. Clarke, Q.C. for the second defendants points out that the defence did not compel the plaintiffs to make these alternate claims, nor were they bound to make the claims conditional as they did. The defence has features in common with the "Stage 2" defences raised by the first defendant (2 above); for similar reasons I hold that second defendants shall not recover their costs of this issue and that they shall pay the plaintiffs their costs of it. The question then arises whether the second defendants should also pay the fourth and sixth defendants' costs of the action (as opposed to their costs incurred as third parties) either directly or by means of an indemnity to the plaintiffs insofar as those costs are concerned. In my judgment, the plaintiffs should recover from the second defendants such costs as are paid by them to the fourth and sixth defendants by virtue of their having been made defendants: the appropriate formula I suggest is:

. . . such additional costs as the said defendants

have incurred by reason of being defendants as well as third parties in the proceedings . . .
moreover, the fourth and sixth defendants shall be entitled to recover these costs direct from the second defendants. But their costs will not include those referrable to the issues in respect **\*599** of which "No Order" is made, namely, the factual issue and Swiss law.

(5) It was also suggested that a special order should be made in respect of the costs incurred in relation to Abu Dhabi law, where the plaintiffs were partially successful. So far as liability was concerned, the defendants' liability to a damages claim in tort or (as regards the first defendant) contract was hardly disputed, and it was on this issue that the plaintiffs succeeded. In my judgment, no special order should be made.

Similarly, any costs incurred in respect of "quantum" or other issues not separately dealt with are within the scope of the general order in the defendants' favour.

The costs of the proceedings, even apart from the central issue, have undoubtedly been substantial and I should add a general observation on the history of events from the time when the plaintiffs became aware, on their own case, that the payment was a bribe; that is, in August, 1988. A leading firm of London solicitors was appointed soon afterwards. I do not know why proceedings were not commenced until April, 1989 nor why the 2- or 3-year limitation period of which they had actual or deemed knowledge was allowed to expire, if it had commenced in April, 1986 as I have held. Then, when the writ was issued, it was limited to a restitionary claim, governed by English law. There was no obligation upon the plaintiffs at that stage to include any reference to Abu Dhabi law, though the "double actionability" rule made it desirable if not essential to do so if a tort claim was being pursued. In fact, a tort claim was conspicuous by its absence, even if English law applied, and, given the calibre of the advice available to the plaintiffs, I would be prepared to infer that a deliberate choice was made to limit the claim to one for restitutionary relief at that stage. Since no such relief was available under

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

Abu Dhabi law, the plaintiffs could rely only on English law. It may be that the plaintiffs were already conscious of difficulties which might arise in proving their loss in the peculiar circumstances of this case, where the sum in fact paid was no greater than the plaintiffs' own estimate of the "market" price. They had no knowledge of the Jan. 3 agreement between Mr. Fryer and Dr. Hashim which led to that unusual state of affairs, notwithstanding that the bribe was paid, and which may demonstrate that the first defendant succeeded in misleading Mr. Fryer just as he had betrayed the trust of his employers. Whatever the reason, the proceedings have been greatly complicated by the fact that the plaintiffs have gradually added to the scope of their claims and succeeded eventually on a claim which was not originally pleaded, viz. a compensatory claim governed by Abu Dhabi law.

This brief over-view of the history of the proceedings is not directly relevant to the award of costs, but I have included it in this ruling as part of the background to the issues which arise.

*Third party proceedings*

For reasons which I have set out sufficiently above, the third parties in my judgment should recover their costs of those proceedings from the second defendants, subject to the special orders already referred to. This means that they will not recover their individual costs of the central factual issue or of Swiss law; it seems to me appropriate that these costs should rest where they have fallen, and that the same considerations which apply between the defendants and the plaintiffs apply with equal if not greater force between the third parties and the second defendants. I hold also that the second defendants shall recover from the plaintiffs those costs which they pay to the third parties under this order, and their own costs of the third party proceedings (subject always to special orders, as above).

*Costs reserved*

(1) Order(s) of Mr. Justice Hobhouse dated May 18, 1990. These should be regarded as costs in

cause and be recovered by the defendants/third parties under the general orders in their favour.

(2) Order dated Dec. 13, 1991 (affidavit re. discovery by the plaintiffs). These costs in my judgment should be borne by the plaintiffs, having regard to the later history of disclosure at the trial.

*Costs in cause*

If and insofar as any interlocutory costs orders made "in the cause" relate to issues in respect of which special orders have been made above, they shall take effect in accordance with those special orders. Otherwise, all such costs shall be recovered by the defendants/third parties in accordance with the general orders in their favour.

*Transcript*

The total cost shall be borne equally by the plaintiffs, first defendant, second defendants, third/fourth defendants and sixth defendant (1/ 5 each).

**\*600** *Costs hearing (Nov. 10/11)*

In the circumstances, there will be "No Order" as to these costs.

*Leave to appeal*

Each party has leave to appeal against this ruling insofar as it affects him.

*Stay of execution*

The plaintiffs sought a stay of execution of any order for costs made against them, pending an appeal against my judgment to the Court of Appeal. I consider that taxation should proceed in the normal course, but that all parties shall have liberty to apply to the Commercial Court or, if appropriate, to the Court of Appeal for further directions as to the payment of costs if, when the orders come to be enforced, an appeal is pending.

*Liberty to apply*

Apart from the foregoing, it is desirable that all parties shall have a general liberty to apply to the

1993 WL 965586 (QBD (Comm Ct)), [1993] 1 Lloyd's Rep. 543
**(Cite as: [1993] 1 Lloyd's Rep. 543)**

Commercial Court for further directions if diffi-
culties are experienced in working out the terms of
the proposed order in this complicated case.

The Order should also include, subject to any fur-
ther application which may be made (these matters
were not mentioned during the application before
me): (1) mutual rights of set-off, as necessary, and
(2) a direction that any order against the first de-
fendant is not to be enforced, save as regards set-
off, without leave of the Court.

(c)     Lloyds     of     London     Press     Lim-
ited

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**TAB M**

All England Law Reports/1950/Volume 2 /Edwards and Another v Halliwell and Others - [1950] 2 All ER 1064

**[1950] 2 All ER 1064**

# Edwards and Another v Halliwell and Others

**COURT OF APPEAL**

**SIR RAYMOND EVERSHED MR, ASQUITH AND JENKINS LJJ**

**31 OCTOBER, 1, 2 NOVEMBER 1950**

*Trade Union - Action by member against union - Matter of substance, tinctured with oppression - Invasion of members' individual rights.*

Rule 19 of the rules of the defendant trade union provided: "The regular contributions of employed members shall be as per tables ... and no alteration to same shall be made until a ballot vote of the members has been taken and a two-thirds majority obtained." In December, 1943, a delegate meeting of the union, without taking any ballot, passed a resolution increasing the amount of the contributions of employed members. The plaintiffs, two members of the union, claimed against two members of the executive committee of the union and the union itself a declaration that the alteration adopted at the delegate meeting was invalid.

**Held** - (i) As the matter in question was not a mere irregularity in the internal management of the union, but was a matter of substance and tinctured with oppression, the court would grant the plaintiffs relief if it was proper to do so.

*Amalgamated Society of Engineers v Jones* (1913) (29 TLR 484), *distinguished.*

(ii) it was implicit in the rule in *Foss v Harbottle* (1843) (2 Hare 461) that the matter relied on as constituting the cause of action should be a cause of action properly belonging to the general body of members of the association in question as opposed to a cause of action which some individual member could assert in his own right. In the present case, the personal and individual rights of membership of the plaintiffs had been invaded and particular damage inflicted by the invalid alteration of the tables of contributions, and in such circumstances the rule in *Foss v Harbottle* had no application to individual members who were suing, not in the right of the union, but in their own right to protect from invasion their individual rights as members, and, therefore, the plaintiffs were entitled to their declaration.

*Pender v Lushington* (1877) (6 ChD 70), *applied.*

*Per* Jenkins LJ: The rule in *Foss v Harbottle* does not prevent an individual member suing if the matter in respect of which he is suing can validly be done, not by a simple majority of the members of the association, but, as in the present case, only by some special majority: *Cotter v National Union of Seamen* ([1929] 2 Ch 58), *applied* ... I cannot regard the paying by the majority of the members of the increased rates without demur as equivalent to a ballot vote at which a two-thirds majority was obtained in favor of the alteration.

**Note**

As to the Amendment of the Rules of a Trade Union, see *Halsbury*, Hailsham Edn, Vol 32, p 494, para 787; and for Cases, see *Digest*, Vol 43, p 101, Nos *1048-1052*, and *Digest Supp.*

**Cases referred to in judgments**

*Foss v Harbottle* (1843), 2 Hare 461, 67 ER 189, 13 *Digest* 417, *1377.*

*Amalgamated Society of Engineers v Jones* (1913), 29 TLR 484, 43 *Digest* 101, *1050.*

*Cotter v National Union of Seamen* [1929] 2 Ch 58, 98 LJCh 323, 141 LT 178, *Digest* Supp.

*Pender v Lushington* (1877), 6 ChD 70, 46 LJCh 317, 9 *Digest* 572, *3800.*

**Appeal**

Appeal by the defendants from a judgment of Vaisey J dated 28 July 1950.

The plaintiffs, two members of the Cricklewood branch of the defendant union, claimed a declaration on behalf of themselves and all other members of the branch that the alteration of the general rules of the union adopted at

*[1950] 2 All ER 1064 at  1065*

a delegate meeting in December, 1943, was invalid in so far as it purported to alter the amount of the regular constributions of employed members. The defendants were two members of the executive committee of the union sued as representatives of the committee and the union. Vaisey J granted the declaration. The facts appear in the judgment of Asquith LJ.

*Pascoe Hayward KC and Lindner for the defendants.*

*Milner Holland KC and Hesketh for the plaintiffs.*

**2 November 1950. The following judgments were delivered.**


**SIR RAYMOND EVERSHED MR.**

I will ask Asquith LJ to deliver the first judgment.


**ASQUITH LJ.**

This is an appeal by the defendants from a judgment of Vaisey J whereby he made a declaration asked for by the plaintiffs in terms to which I will refer. The plaintiffs sue on behalf of themselves and all other members of the Cricklewood branch of the National Union of Vehicle Builders, a registered trade union. The defendants are sued on behalf of themselves and all other members of the executive committee of the union, and the union itself is joined as a defendant.

The main point in the appeal is whether Vaisey J has rightly construed r 19 of the rules of the union. The defendants contend that, even if he did rightly construe that provision, the plaintiffs are precluded, for other reasons, from obtaining the relief which they have been awarded. The only relevant part of r 19 is the first five lines, which are:

> "The regular contributions of employed members shall be as per tables (pp. 115 and 116) and no alternation to same shall be made until a ballot vote of the members has been taken and a two-thirds majority obtained."

In December, 1943, a delegate meeting was held at which the delegates, without any ballot, let alone a ballot resulting in a two-thirds majority, purported to increase the regular contributions of employed members and also certain benefits payable to the members. The plaintiffs contend that that alteration in the contributions is a nullity because the condition precedent to its validity laid down in r 19 had not been satisfied. They refused to pay the amount of the increase, and were threatened or actually visited with loss of their rights as union members, including that of eligibility for election to certain offices. In the action they claimed:

> "A declaration that the alteration of the general rules of the National Union of Vehicle Builders adopted at a delegate meeting in December, 1943, is invalid in so far as it purports to alter the regular contributions of employed members."

[His Lordship considered the rules of the union; held that, on construction of them, the alteration in December, 1943, of the rates of contribution was invalid, and continued:] The other point relied on by the defendants was that, even if they were wrong on the point of construction, the court either could not, or should not, grant the plaintiffs the relief which they claim. Under this head counsel for the defendants relied on the alleged principle that, when an action is brought by an individual in respect of a mere irregularity in a matter that is *intra vires* a trade union and concerns its internal management, the court will not as a rule intervene. For this purpose he conceded that a "mere irregularity" meant something not involving fraud, oppression or unfairness. I confess I should have thought the action complained of here was strongly tinctured, not, indeed, with fraud, but with "oppression" and "unfairness." Here were men who had a right not to have their contributions increased except after a ballot resulting in a two-thirds majority. This right was clearly violated. An unauthorised increase was sought to be extorted, and when they refused to pay, as they were entitled to do, severe penalties were imposed or threatened. To call this a mere informality or irregularity without any element of oppression

*[1950] 2 All ER 1064 at 1066*

or unfairness would be an abuse of language. When in circumstances such as I have described a remedy is sought by an individual, complaining of a particular act in breach of his rights and inflicting particular damage on him, it seems to me the principle of *Foss v Harbottle*, which has been so strongly relied upon by the defendants, does not apply either by way of barring the remedy or supporting the objection that the action is wrongly constituted because the union is not a plaintiff. Nor, lastly, can I accept the submission that, if the action is maintainable at law, it should nevertheless be dismissed because the vast majority of members approved the action taken by the defendants. The answer to the defendants' argument under this head will, I hope, be presented more fully by my Lords who are much more familiar with this branch of the law than myself. I think the appeal should be dismissed.

**JENKINS LJ**

stated the facts and continued: I will pass to the argument based on the reluctance of the court to interfere with the domestic affairs of a company or association on the ground of mere irregularity in form in the conduct of those affairs, and the argument based on the more general proposition commonly called the rule in *Foss v Harbottle*. As to the contention that, even though the purported alteration of the tables of

contributions was invalid, the court should not interfere because the omission to hold a ballot and obtain a two-thirds majority as required by r 19 was a mere irregularity in point of form, in my judgment, that argument can be shortly dismissed by saying that this was not a matter of form. It was a matter of substance. The relevant part of r 19, I conceive, was designed to protect members against increases in the rates of contributions unless those increases were agreed to by a particular majority of members on a vote obtained in a particular way--that is to say, a two-thirds majority on a ballot vote. It seems to me that the executive committee's disregard of that express provision in the rules was a wrong done to each individual member on a point of substance. I say "on a point of substance," because it is *nihil ad rem* to point out that the increases in question were merely a matter of pence per week. In my judgment, this question should be viewed in precisely the same way as if the increase had been a matter of pounds, which might have made a substantial difference to the financial position of the members. In my judgment, the case cited on this part of the argument--*Amalgamated Society of Engineers v Jones*--has no bearing on the facts of the present case. In that case a meeting had been held and certain resolutions passed, and it was suggested that the mode of convening the meeting was irregular. The learned judge was able to hold that there had been no wrong done as a matter of substance, but that there had been a mere irregularity in procedure and he took the view that, in those circumstances, the court should not interfere. For the reasons I have endeavoured to state, I regard the present case as an entirely different one.

The rule in *Foss v Harbottle*, as I understand it, comes to no more than this. First, the proper plaintiff in an action in respect of a wrong alleged to be done to company or association of persons is *prima facie* the company or the association of persons itself. Secondly, where the alleged wrong is a transaction which might be made binding on the company or association and on all its members by a simple majority of the members, no individual member of the company is allowed to maintain an action in respect of that matter for the simple reason that, if a mere majority of the members of the company or association is in favour of what has been done, then *cadit quaestio*. No wrong had been done to the company or association and there is nothing in respect of which anyone can sue. If, on the other hand, a simple majority of members of the company or association is against what has been done, then there is no valid reason why the company or association itself should not sue. In my judgment, it is implicit in the rule that the matter relied on as constituting the cause of action should be a cause of action properly belonging to the general

*[1950] 2 All ER 1064 at 1067*

body of corporators or members of the company or association as opposed to a cause of action which some individual member can assert in his own right.

The cases falling within the general ambit of the rule are subject to certain exceptions. It has been noted in the course of argument that in cases where the act complained of is wholly *ultra vires* the company or association the rule has no application because there is no question of the transaction being confirmed by any majority. It has been further pointed out that where what has been done amounts to what is generally called in these cases a fraud on the minority and the wrongdoers are themselves in control of the company, the rule is relaxed in favour of the aggrieved minority who are allowed to bring what is known as a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue. Those exceptions are not directly in point in this case, but they show, especially the last one, that the rule is not an inflexible rule and it will be relaxed where necessary in the interests of justice.

There is a further exception which seems to me to touch this case directly. That is the exception noted by Romer J in *Cotter v National Union of Seamen*. He pointed out that the rule did not prevent an individual member from suing if the matter in respect of which he was suing was one which could validly be done or sanctioned, not by a simple majority of the members of the company or association, but only by some special majority, as, for instance, in the case of a limited company under the Companies Act, a special resolution duly passed as such. As Romer J pointed out, the reason for that exception is clear, because otherwise, if the rule were applied in its full rigour, a company which, by its directors, had broken its own regulations by

doing something without a special resolution which could only be done validly by a special resolution could assert that it alone was the proper plaintiff in any consequent action and the effect would be to allow a company acting in breach of its articles to do *de facto* by ordinary resolution that which according to its own regulations could only be done by special resolution. That exception exactly fits the present case inasmuch as here the act complained of is something which could only have been validly done, not by a simple majority, but by a two-thirds majority obtained on a ballot vote. In my judgment, therefore, the reliance on the rule in *Foss v Harbottle* in the present case may be regarded as misconceived on that ground alone.

I would go further. In my judgment, this is a case of a kind which is not even within the general ambit of the rule. It is not a case where what is complained of is a wrong done to the union, a matter in respect of which the cause of action would primarily and properly belong to the union. It is a case in which certain members of a trade union complain that the union, acting through the delegate meeting and the executive council in breach of the rules by which the union and every member of the union are bound, has invaded the individual rights of the complainant members, who are entitled to maintain themselves in full membership with all the rights and privileges appertaining to that status so long as they pay contributions in accordance with the tables of contributions as they stood before the purported alterations of 1943, unless and until the scale of contributions is validly altered by the prescribed majority obtained on a ballot vote. Those rights, these members claim, have been invaded. The gist of the case is that the personal and individual rights of membership of each of them have been invaded by a purported, but invalid, alteration of the tables of contributions. In those circumstances, it seems to me the rule in *Foss v Harbottle* has no application at all, for the individual members who are suing sue, not in the right of the union, but in their own right to protect from invasion their own individual rights as members.

I would be content so to hold as a matter of self-evident principle, but the

*[1950] 2 All ER 1064 at 1068*

matter is not free from authority. It will, I think, be enough for the present purposes if I refer, briefly, to a passage in the judgment of Sir George Jessel MR in *Pender v Lushington*. There was a discussion in the course of the case whether the action was one which an individual shareholder could maintain and Sir George Jessel MR said (6 ChD 80):

> "But there is another ground on which the action may be maintained. This is an action by Mr. Pender for himself. He is a member of the company, and whether he votes with the majority or the minority he is entitled to have his vote recorded--an individual right in respect of which he has a right to sue. That has nothing to do with the question like that raised in *Foss* v. *Harbottle* and that line of cases. He has a right to say, 'Whether I vote in the majority or minority, you shall record my vote, as that is a right of property belonging to my interest in this company, and if you refuse to record my vote I will institute legal proceedings against you to compel you.' What is the answer to such an action? It seems to me it can be maintained as a matter of substance, and that there is no technical difficulty in maintaining it."

In my judgment, precisely the same conclusions as are there expressed apply in the present case, and the rule in *Foss v Harbottle* affords no answer to the action. It was sought to show that this was not a matter affecting the individual rights of any particular member of the union because all were subject to the same alternation of the tables and, therefore, it was a matter which affected the general body of members as a whole. I do not agree. For one thing, the contributions to be paid by any individual member would depend on the particular category of membership to which he belonged but, for another thing and more important, it seems to me that, although all the members are liable to pay the subscriptions appropriate to their respective categories, the right of each member to maintain himself in membership by paying his subscription--that is to say, by paying whatever subscription appropriate to his case is validly fixed and for the time being in force under the rules--is an individual right of his own which he himself is entitled to protect by an action on his own behalf.

It was pointed out in the course of the argument (though the matter was not fully developed) that the vast majority of members of the union had, in fact, paid without demur subscriptions at the new and invalid rate. It was further pointed out that those who had become entitled to benefits had taken benefits at the enhanced rate. It was further pointed out that in practice r 19(1) had never been resorted to for many years. Before Vaisey J these matters seem to have been put forward as amounting to such acquiescence as to make r 19(1) a dead letter which could no longer be enforced. That argument was not pressed before us, but these considerations were put as showing that the case was without substance. It was said that the fact that the vast majority of members had paid the new rate of subscriptions without demur demonstrated that the will of the union as a whole was in favour of the new subscriptions and consequently the action was without substance. I cannot agree. I cannot regard the mere paying by individual members of the increased rates without demur as equivalent to a ballot vote at which a two-thirds majority was obtained in favour of the alteration. In my judgment, the scale of contributions as fixed in the rules before the disputed alteration must stand unless and until altered in accordance with r 19. It not having been so altered, the rates so fixed remain the only rates properly exigible, and no member is bound to pay any other rate except as a matter of individual consent. It may well be that in most cases it would be found, when the particular member's account was gone into, that he had by his conduct in paying the new rate of subscription expressed his individual consent to the alteration and thereby become bound, but I see no ground in principle or in authority

*[1950] 2 All ER 1064 at 1069*

for holding that these individual assents arising from the conduct of individual members can have any binding effect at all on those members who say: "We are prepared to pay the contributions validly exigible under the rules and no more." Accordingly, I agree that the appeal fails and should be dismissed.


**SIR RAYMOND EVERSHED MR.**


I am entirely of the same opinion. On the question of the construction of the rules, the point was debated whether a delegate conference could validly by ordinary resolution of the conference revise r 19(1) by the abrogation or suspension of the words of prohibition on which the plaintiffs' action has been founded and then proceed by a further ordinary resolution to alter the rates of contribution payable, thereby avoiding any need to have a ballot or to obtain a two-thirds majority upon a ballot. I am not satisfied that, if a delegate conference made such an alteration or revision of r 19 as a mere prelude to the alteration of the rates of contribution, such a procedure would successfully withstand challenge. If it is the desire of those responsible for the administration of the affairs of this union either to abrogate altogether the relevant prohibition in r 19 or to make it inapplicable to an alteration of contribution rates by a delegate conference, I think prudence would demand that such a revision should receive the confirmation of the necessary two-thirds majority. Upon the *Foss v Harbottle* point, I should be guilty of repetition if I added anything to the reasons given by Jenkins LJ with which I find myself in entire agreement. The appeal fails and will be dismissed.

*Appeal dismissed with costs.*

*Solicitors: Rowley, Ashworth & Co (for the defendants); Ernest Bevir & Son (for the plaintiffs).*

F Guttman Esq Barrister.

**TAB N**

Copyright 1997 Reed International Books Australia Pty Ltd
trading as Butterworths

AUSTRALIAN CORPORATIONS AND SECURITIES REPORTS

AUSTRALIAN AGRICULTURAL CO and OTHERS v **OATMONT** PTY LTD and OTHERS

SUPREME COURT OF THE NORTHERN TERRITORY -- COURT OF APPEAL

8 A.C.S.R. 255

7-10 October 1991, 19 March 1992 -- Darwin

19 March 1992 -- Darwin

**CATCHWORDS:**
Ultra vires - Shareholders - Right to seek declaration by shareholder that conduct of corporation is ultra vires - Locus standi - No damages sought - Whether any real interest in the litigation - What may constitute ultra vires conduct in the relevant sense - (CSL) Companies (NT) Code ss 66, 67, 68; - (NSL) Corporations Law ss 160, 161, 162

Directors - Duties - Nature of fiduciary duties owed by directors considered - Circumstances where a shareholder might take action upon a breach by the company of a breach of the general law considered.

**HEADNOTES:**

This was an appeal from a decision of a single judge of the Supreme Court. A company (Oatmont) which claimed to be the shareholder of the defendant company (AACO) sought a declaration that in effect AACO was in breach of a law of the Northern Territory, s 38a of the Crown Lands Act 1979 (NT). Under that Act it was an offence for a person, including a company, to hold or have an interest in pastoral land which exceeded 12,950 square kilometres in area. The penalty for breach was a fine of $ 100 per day and, so Oatmont contended, forfeiture of leases.

The trial judge held that Oatmont, which had recently agreed through a broker to purchase 50 shares in AACO, was for relevant purposes a shareholder, and had established a sufficiently arguable case to bring the proceedings. The Crown Law authorities had declined to act in relation to the alleged breach, and the Minister had been joined in the proceedings.

On appeal the parties agreed that for the purposes of determining the question of the right of Oatmont to bring the proceedings it should be assumed that a breach of s 38a existed. Oatmont argues that as a shareholder it had a private right to prevent corporate misuse of power where that misuse was due to illegal conduct of the kind proscribed by statute.

**Held**, allowing the appeal, per curiam:

(i) The effect of entering into a contract through a broker to purchase shares from another shareholder is to confer on the purchaser an equitable interest as a transferee under an unregistered transfer.

Niord Pty Ltd v Adelaide Petroleum NL (1990) 54 SASR 87, followed.

(ii) As the trial judge correctly held, it is not essential that the plaintiff cannot establish a legal cause of action as a registered shareholder, in order to obtain declaratory relief.

Crouch v Commonwealth (1948) 77 CLR 339, followed.

(iii) The requirement of a plaintiff seeking a declaration to show a real interest in the matter considered.

Boyce v Paddington Borough Council [1903] 1 Ch 109, applied.

(iv) Consideration of the concept of what conduct may constitute ultra vires acclivities, in both a broad and a narrow sense.

(v) Where a company is acting within its corporate capacity, and where it is not alleged that the company did not have the authority or the directors did not have the authority to enter into the transaction, no question of ultra vires, in the true sense or in any wider sense, arises.

(vi) Where all that is alleged is that the company has engaged in conduct that is contrary to the general law, the impugned conduct is not ultra vires, nor is the conduct necessarily unauthorised in the sense that the articles did not authorise the directors to enter into transactions of that kind or in the sense that the transaction was not duly authorised by the directors at a validly called meeting of the directors.

(vii) Nevertheless, there is no doubt that there could be acts of the directors which, while not ultra vires or in excess of the authority of the directors in the requisite sense, are so plainly illegal that the directors have acted in abuse of their powers; similarly, if the directors knew that the acts of the company which they authorised were contrary to law. In the latter case the directors would be in breach of their duties as directors to act in good faith; in the former, to act with reasonable care and diligence. In both cases the directors would be in breach of their fiduciary duty not to disregard the interests of the company as a whole by exposing it to prosecution, adverse publicity, a fine or the like.

(viii) However, not every case which results in criminal prosecution of a company involves these considerations. For example, the directors may have acted honestly on the basis of advice that the behaviour was lawful.

(ix) In some cases a shareholder would have locus standi to bring an action and seek a declaration that proposed behaviour was unlawful. For example, where the directors are acting in abuse of their powers knowingly or recklessly acting contrary to the general law, as a result of which the company sustains loss, this breach of the directors' fiduciary duty could well give rise to a derivative action.

(x) In the present case the cause of action upon which the appellant relies is personal. However, as the Court of Appeal pointed out in the *Prudential Assurance* case, no personal action exists based on any diminution of Oatmont's share value. In this case Oatmont is not seeking damages. The principles remain the same.

Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] 1 Ch 204, applied.

(xi) In this case it is not alleged that AACO or its directors have acted in a way that the directors knew to be unlawful, or that they were recklessly indifferent to the legality of their actions, or even that they were negligent. The position of AACO is that its acts were and are lawful. Accordingly the case falls within the dictum of Buckley J in *Anderson's* case. It would be oppressive to allow a shareholder, where personal rights were not affected except as to a possible diminution in the value of his shares, and who is unable to bring a derivative action, to seek

declaratory relief. The Crown does not assert the conduct is illegal, and the probability of any proceedings being brought against AACO for the alleged offences is practically non-existent.

Anderson v Midland Railways Co [1902] 1 Ch 369, applied.

(xii) A further and separate reason to refuse relief is that Oatmont knew of the alleged illegality when it purchased its minimal number of shares. This would be enough to preclude Oatmont from seeking relief in either a personal or a derivative capacity.

**INTRODUCTION:**

Appeal This was an appeal from a single judge of the Supreme Court of the Northern Territory to the Court of Appeal. The facts are set out in the judgment of Mildren J.

**COUNSEL:**
D G Russell QC and D Trigg instructed by Philip & Mataros for the appellant. R Conti QC and N Henwood instructed by Cridlands for the respondent. R Conti QC and N Henwood instructed by Cridlands for the cross- appellant. T Riley QC and J Waters instructed by solicitor for the Northern Territory for the cross-respondent.

**JUDGES:** ASCHE CJ, MARTIN and MILDREN JJ

**JUDGMENTS:** Asche CJ. I agree with the judgment of Mildren J and the orders proposed by him.

Martin J. I agree with the judgment of Mildren J and the orders proposed by him.

Mildren J. Pursuant to s 38a of the Crown Lands Act 1979 (NT), it is an offence for a person or company to hold or have an interest in pastoral land which exceeds 12,950 square kilometres in area. In the case of a company, it may commit this offence if it and its subsidiaries have between them such an interest. Section 38a(1b) permits the minister to give his consent to extending the area to a maximum of 20,000 square kilometres. Oatmont Pty Ltd (Oatmont) and Delamere Station Pty Ltd (Delamere) commenced this action seeking, inter alia, a declaration that Australian Agricultural Company Ltd (AACO) is in breach of s 38a of the Act, an order that the minister take all necessary steps to forfeit the relevant Crown leases, and an order that AACO cause and procure the disposition of certain pastoral lands held by the other defendants which are its subsidiaries.

By an amended summons filed 30 January 1991, AACO, and those of the other defendants which are its subsidiaries, applied to strike out the proceedings on a number of grounds including the ground that the plaintiffs lacked standing to bring the proceedings. Upon the hearing of the application at first instance the learned judge held that Oatmont, but not Delamere, had established a sufficiently arguable case to found standing to seek the declarations and relief sought against AACO and its subsidiaries. His Honour held that neither Oatmont nor Delamere had any special interest based upon a claim that they were potential competitors for the acquisition of pastoral leases on the Barkly Tableland. However, he held that Oatmont, which claimed to be the holder of 50 shares in AACO, had a sufficiently plausible argument, first, that it was entitled to be treated as a shareholder and, secondly, that as such it had a right to bring an action against AACO to prohibit acts by the company prohibited and penalised by law where the property of the company and the value of its shares were put at risk to prevent the appellants from summarily shutting out Oatmont's action at this stage of the proceedings. His Honour also held that the court could not make an order against the minister to forfeit the leases. The only appropriate order would be to compel the minister to exercise his discretion to forfeit the leases, and it could not be

/ /

said that the only proper exercise of that discretion would demand forfeiture. Accordingly, he dismissed the claims against the minister and the Attorney-General.

AACO has sought leave to appeal against this decision on the ground that Oatmont as a shareholder of AACO has no arguable right of action to prohibit acts by it which are prohibited and penalised by the general law where AACO's property and the value of its shares are put at risk and, alternatively, on the ground that his Honour wrongly held that the facts alleged by Oatmont disclosed an arguable right of action by Oatmont as a shareholder.

Oatmont and Delamere have sought leave to cross-appeal from his Honour's dismissal of the proceedings against the minister, and from that part of his Honour's decision wherein his Honour held that Delamere and Oatmont had no "special" interest in the subject matter of the proceedings sufficient to grant locus standi.

The factual basis in support of the allegations of Oatmont and Delamere is disputed by AACO and the other defendants. However it was common ground before his Honour and before this court that for the purposes of this appeal the facts alleged by Oatmont and Delamere may be taken to have been proven. Similarly, it was agreed by counsel for the parties that the purposes of the argument before his Honour as well as for the purposes of this appeal, it should be assumed that a contravention of s 38a exists (although AACO and the other appellants dispute this as well).

[SEE ORIGINAL SOURCE FOR GRAPHIC]

1. The Peel River Land and Mineral Company Pty Ltd.

2. NT Pastoral Company Pty Ltd.

3. The Gulf Cattle Company Pty Ltd.

4. Waxahachi Pty Ltd.

5. This is the area in square kilometres in which Oatmont and Delamere assert that AACO is deemed to have a beneficial interest pursuant to s 38a(10) of the Crown Lands Act by reason of AACO's subsidiaries' ownership of these leases.

The appellants contend that on the true construction of s 38a(10) the total deemed area is in fact only 10,661 km<2>.

Oatmont contends that all of the above leases are situated in the Barkly Tablelands which is an area ranging from Newcastle Waters Station south east to Lake Nash Station on the border of Queensland and comprises approximately 30 properties. It comprises predominantly "downs country" which is the best all round cattle country in the Northern Territory and among the best in Australia. It is rare for properties on the tableland to come onto the market, and once properties are acquired by large corporations they are rarely, if ever, sold. Most of these properties are of good quality and a large percentage of them are held by large corporations including Heytesbury Pastoral Company Ltd, the Vesteys group, Desa Cattle Company (which is controlled by the Government of Sabah), Australian Consolidated Press Holdings Ltd and North Australian Pastoral Company Ltd, and by the appellants. The rest are mostly in the hands of smaller family companies or individuals. Properties in the tablelands usually come onto the market only when the owners run into financial difficulty, or because of the ill-health or age of the owners. It is unlikely that those properties held by larger corporations would be sold due to adverse financial circumstances.

The present proceedings were commenced by originating motion filed 10 December 1990. On 2 November 1990, Oatmont entered into negotiations with Waxahachi Pty Ltd (which was then not a subsidiary of AACO) to purchase Austral Downs and Burramurra pastoral leases. While the negotiations were still in train, on 12 November 1990, AACO acquired through another subsidiary,

Shillong Pty Ltd, all of the shares in Waxahachi Pty Ltd. At this time Oatmont was not a shareholder in AACO. AACO's purchase was announced to its shareholders and the stock exchange on 13 November 1990 and was widely reported in the media on 14 November 1990. The purchase was, by then at least, known to Mr Peter Sherwin, a director of both Oatmont and Delamere, and the person who controls both of those companies. On 30 November 1990 Oatmont was advised by senior counsel that the purchase by AACO of the shares in Waxahachi Pty Ltd breached s 38a of the Crown Lands Act and on 30 November 1990 Oatmont's solicitors wrote to AACO, Shillong Pty Ltd and Waxahachi Pty Ltd. The letter to AACO included the following passage:

Our client has searched and considered your company's present structure and land holdings and is advised by senior counsel that your company is in breach of s 38a of the Crown Lands Act of the Northern Territory, in that Australian Agricultural Company Ltd controls in excess of 20,000 square kilometres of pastoral land in the Territory which is well in excess of the 12,950 square kilometres limit. The breach will be exacerbated by Shillong's purchase of Waxahachi Pty Ltd.

Our client has asked the Attorney-General of the Northern Territory to seek to prevent the proposed sale, on the basis that to proceed will result in a breach of the statute.

The letters to Shillong Pty Ltd and Waxahachi Pty Ltd contained paragraphs in similar terms. Each letter concluded by requesting an undertaking not to proceed with the sale pending the resolution of the contemplated proceedings.

On the same date, viz, 30 November 1990, Oatmont through Mr Sherwin, contracted to buy 50 shares in AACO through its broker, J B Were & Son. AACO's issued share capital was then in excess of 14 million shares. Registration of the Oatmont shareholding did not occur until 31 December 1990, ie 21 days after the originating motion was issued. Completion of the sale of the shares in Waxahachi Pty Ltd to Shillong Pty Ltd occurred on 14 December 1990. There can be no doubt that at the time Oatmont contracted to purchase its 50 shares in AACO it already had been advised that AACO was in breach of s 38a of the Crown Lands Act and that the sale of the shares in Waxahachi Pty Ltd would also breach s 38a.

Does Oatmont have standing due to its shareholding?

Although Oatmont was granted leave to amend the originating motion at the hearing to claim a right as a member of AACO to bring the action not only on its own behalf but also on behalf of all remaining shareholders of AACO, Mr Conti QC, for Oatmont, told this court that Oatmont was not relying upon an entitlement to bring a derivative action in order to provide standing. Oatmont's contention was that it had a private right as a shareholder to prevent corporate misuse of power where that misuse of power is ultra vires due to illegal conduct of the kind which is proscribed by statute, and attracts penalties. The penalty for a breach of s 38a(1) of the Act is $ 100 per day or part of a day during which the offence continues, and, so Oatmont contends, forfeiture of the leases or at least some of the leases pursuant to s 38a(11) by the minister.

AACO submitted that as Oatmont was not registered as a shareholder at the time of the commencement of the proceedings, there could be no question that it had standing to bring these proceedings in that capacity, and that as Oatmont was aware of the breaches of s 38a(1) of the Act including the illegality resulting from the contract to purchase Waxahachi's shares, it could not rely on that illegality to give it standing, as otherwise this would mean that in any case where the conduct of a company was concerned, a person could acquire locus standi by the simple expedient of acquiring some of its shares. To the extent that the claim for locus standi relied upon the statutory contract between AACO and Oatmont at the time the shares were agreed to be purchased, it was submitted that Oatmont must be regarded as having waived those rights.

The effect of entering into a contract through a broker to purchase shares from another shareholder is to confer on the purchaser an equitable interest as a transferee under an unregistered transfer: Niord Pty Ltd v Adelaide Petroleum NL (1990) 54 SASR 87 at 104. As the learned judge at first instance held, it is not essential in order to obtain declaratory relief under r 23.05 of the Supreme Court Rules that Oatmont cannot establish a legal cause of action: see the cases referred to by his Honour at (1991) 75 NTR 1 at 11; ; Crouch v Commonwealth (1948) 77 CLR 339 at 359 per Williams J. The mere fact, therefore, that Oatmont was not a shareholder at the time of the issue of the proceedings is not necessarily fatal to its right to seek declaratory relief.

The relevant principles to be applied in deciding whether this court should grant declaratory relief have been authoritatively stated by Gibbs J (with whom the rest of the court agreed) in Forster v Jododex Pty Ltd (1972) 127 CLR 421 At 435, Gibbs J said:

The jurisdiction to make a declaration is a very wide one. Indeed, it has been said that, [under the relevant Rule of court]. . . 'the power of the court to make a declaration, where it is a question of defining the rights of two parties, is almost unlimited; I might say only limited by its own discretion': Hanson v Radcliffe Urban District Council [1922] 2 Ch 490 at 507; and see ; Barnard v National Dock Labour Board [1953] 2 QB 18 at 41; and ; Ibeneweka v Egbuna [1964] 1 WLR 219 at 225.

At 437-8, Gibbs J said:

It is neither possible nor desirable to fetter the broad discretion given. . . by laying down rules as to the manner of its exercise. It does, however, seem to me that the Scottish rules summarised by Lord Dunedin in Russian Commercial and Industrial Bank v British Bank for Foreign Trade Ltd [1921] 2 AC 438 at 448, should in general be satisfied before the discretion is exercised in favour of making a declaration: 'The question must be a real and not a theoretical question; the person raising it must have a real interest to raise it; he must be able to secure a proper contradictor, that is to say, someone presently existing who has a true interest to oppose the declaration sought.'

Beyond that, however, little guidance can be given. As Lord Radcliffe said in Ibeneweka v Egbuna [1964] 1 WLR at 225: 'After all, it is doubtful if there is more of principle involved than the undoubted truth that the power to grant a declaration should be exercised with a proper sense of responsibility and a full realisation that judicial pronouncements ought not to be issued unless there are circumstances that call for their making. Beyond that there is no legal restriction on the award of a declaration.'

The requirement that a plaintiff to a suit seeking a declaration must have a real interest to raise the question to be decided is another way of asking the question whether the plaintiff has locus standi. The traditional test expounded by Buckley J in Boyce v Paddington Borough Council [1903] 1 Ch 109 at 114 recognised different tests depending upon whether the plaintiff was alleging an interference with a private right or not: "A plaintiff can sue without joining the Attorney-General in two cases: first, where the interference with the public right is such as that some private right of his is at the same time interfered with (eg, when an obstruction is so placed in a highway that the owner of premises abutting upon the highway is specially affected by reason that the obstruction interferes with his private right to access from and to his premises to and from the highway); and, secondly, where no private right is interfered with, but the plaintiff, in respect of his public right, suffers special damage peculiar to himself from the interference with the public right."

I should observe, in passing, two things. First, the fiat of the Attorney-General to bring these proceedings had been refused; and, secondly, that the Attorney-General has been joined as a defendant to these proceedings. This joinder was presumably felt necessary due to the relief being sought against the minister. The presence of the Attorney-General as a defendant does not

overcome any problem of locus standi where the right in respect of which declaratory relief is sought is a public right. In such cases the Attorney-General must be either a plaintiff or to have given his fiat: see Young, *Declaratory Orders*, para 901.

Leaving the question of waiver to one side for the moment, the first question is whether the learned judge at first instance was correct in deciding that a shareholder, or a person in the position of, or entitled to be treated as, a shareholder for these purposes, has a sufficiently arguable case to found locus standi so as to prevent Oatmont from having its claim summarily dismissed. As his Honour correctly observed, the test to be applied at this stage of the proceedings is that stated by Gibbs J (as he was then) in Robinson v The Western Australian Museum (1977) 138 CLR 283 at 302: ". . . it will be a matter for decision whether the court proceeds to determine the disputed questions whose only immediate relevance is to establish whether the plaintiff has standing to sue, or whether it will be satisfied to accord standing to the plaintiff on the ground that he asserts, not implausibly, that his interests are threatened by the operation of the legislation in question. The court has a discretion: it is not bound to take one course rather than the other. If the plaintiff's claim to have locus standi is merely colourable and can easily be exploded, the court will no doubt proceed immediately to decide the question of standing and, having decided it against the plaintiff, will dismiss the action."

Oatmont submitted that illegality of conduct is ultra vires the company under the general law, in the so called "wide" sense of ultra vires, the distinction being between corporate incapacity (ultra vires in the "narrow" sense), and abuse of powers by directors and shareholders (ultra vires in the "wide" sense). This dichotomy appears to have arisen in the context of legislative changes produced by ss 66c, 67 and 68 of the Companies Acts and Codes 1981: see ss 160, 161 and 162 of the Corporations Law. In ANZ Executors & Trustees Co Ltd v Qintex Australia Ltd (1990) 8 ACLC 900 at 988-9 McPherson J (Lee and MacKenzie JJ concurring) said:

In Plain Ltd v Kinley & Royal Trust Co (1931) 1 DLR 468 at 479, Orde JA spoke of ultra vires 'not in the primary application to the powers of the company as a corporate body, but in its secondary application to the irregular exercise by the directors or the shareholders of their powers or rights within the company. . .' In several recent English decisions, notably ; Rolled Steel Products Ltd v British Steel Corporation [1982] 3 All ER 1057 at 1077, a similar distinction is made between corporate capacity (ultra vires in the narrow sense), and abuse of power by directors or shareholders (ultra vires in the wide sense). It is ultra vires in the second sense that is directly relevant in answering the question 'whether a disposition of the property of the company was made for the benefit and to promote the prosperity of the company'. The distinction was adopted by Browne-Wilkinson LJ in the *Rolled Steel* case on appeal [1986] Ch 246, in a passage adverted to by Mason CJ in Northside Developments Pty Ltd v Registrar-General (1990) 8 ACLC 611 at 621;(1990) 64 ALJR 427 at 433; see also ; Darvall v North Sydney Brick & Tile Co Ltd (No 4) (1988) 6 ACLC 1095 at 1103-4;(1988) 14 ACLR 474 at 483. The judgment of Vinelott J at first instance in the *Rolled Steel* case was responsible in Australia for the amending insertion in 1985 of s 67(3) of the Companies Code, which declares:

'67(3) The fact that the doing of an act by a company would not be, or is not, in the best interests of the company does not affect the legal capacity of the company to do the act.'

The explanatory memorandum accompanying the amending bill, to which Mr Keane QC referred us, explains that s 67(3) 'specifically excludes' the application of the Rolled Steel case [1982] 3 All ER 1057, and is 'designed to prevent any suggestion that any doctrine of "wider ultra vires" as expounded by the courts remains in existence'. Section 67(3) operates, however, to the extent and in the manner intended by s 66c; that is, it is concerned to ensure that the wider form of ultra vires 'does not affect the legal capacity of the company to do the act', thus maintaining the

/ /

7

validity of corporate dealings with outsiders: see s 66c(a). It does not free the directors or shareholders from ensuring that 'rules. . . of the company are given effect to by the company's officers and members': s 66c(b). Except in relation to the validity of corporate dealings with outsiders, it therefore does not disturb the fundamental rule that the powers or funds of a company may be used only for company purposes: cf ; Darvall v North Sydney Brick & Tile Co Ltd (No 4) (1988) 6 ACLC 1095 at 1104;14 ACLR 474 at 484.

Thus it was submitted by Oatmont that conduct which is proscribed by statute necessarily or inherently involves a misuse of corporate power, and, where the proscribed conduct consists of an acquisition of an asset, a misapplication of the corporate funds. In such circumstances, so the argument goes, a shareholder has locus standi (and in this case, a person entitled to be treated as a shareholder is in the same position) to restrain the carrying out of the transaction and a fortiori can seek a declaration.

On the other hand, AACO submitted that ultra vires in the wide sense was not concerned with abuse of corporate capacity; rather it was concerned with abuse of power by directors or shareholders, and that in so far as some authorities had recognised a shareholder's right to bring such an action, that right depended upon ultra vires in the narrow sense, which had now been repealed by ss 160, 161 and 162 of the Corporations Law.

It was submitted by Mr Conti QC that the historical basis for a shareholder's locus standi to enjoin his company's illegal and therefore ultra vires conduct was discussed by Lord Wedderburn in his article "Shareholders' Rights and the Rule in Foss v Harbottle" (1957) Cam LJ 194 at 204- 5, where his Lordship said:

Heading 1. Ultra Vires or Illegal Acts.

It is plain that the minority can sue in this case because the majority cannot ratify an act ultra vires the company; and a fortiori the same reasoning will be applied to acts which are not merely outside the powers of one company, but 'illegal' in the sense of impossible for any registered company, or prohibited under the general law. In such a case, a shareholder has a right of action, primarily for a declaration or injunction to restrain the act in question, suing either on his own behalf alone, or in a representative action on behalf of himself and all the other shareholders of the company, except any who are joined as defendants.

The authorities to which his Lordship referred which bear on the questions of acts prohibited by law are scanty. In Powell v Kempton Park Racecourse Co [1897] 2 QB 242 the plaintiff was a shareholder in the defendant company and sought an injunction against it to prevent it from permitting part of the lands it owned and upon which it had a racecourse, to be used as a place for betting, contrary to the Betting Act 1853. No point was taken to the standing of the shareholder in that case to sue. Lindley LJ observed, at 260, that: "It has been assumed, and probably rightly, that the court has jurisdiction to protect the shareholders of a company from a misapplication by the company of its property, although such misapplication may be punishable as a criminal offence. I will also assume such jurisdiction, and leave this point open for decision when raised and insisted on."

Lopes LJ observed at 268-9: "No point has been made that an injunction will not lie to restrain the commission of a criminal offence. I believe that it will lie when its object is to protect the shareholders of a company from any misapplication of its property, although such application may be punishable as a criminal offence."

None of the other members of the court referred to the matter, but as the injunction was refused on the merits, the question did not arise.

/ /

8

In Anderson v Midland Railway Co [1902] 1 Ch 369 Buckley J dismissed an action for an injunction sought by a shareholder on behalf of himself and all the other shareholders of the company to restrain breaches by the company of s 40 of the Railway Clauses Act which prevented more preference being given to certain customers of the railway, including the defendant Henry Wiggin & Co. In that case, if the plaintiff's contentions were right, the company had a cause of action against Henry Wiggins & Co. Buckley J held that the plaintiff had no cause of action because the breach of the Act, if there was one, was not one which gave rights as between the shareholders and the corporation. That case was clearly concerned with a situation where the company had a cause of action, and there was nothing to show that there was any misconduct on the part of the directors for not pursuing it at that stage. Buckley J said (at 377):

The breach, if there be a breach, of the Act of Parliament is not one which gives rise to any rights as between the corporator and the corporation, but one which gives rise to rights as between the corporation and other customers of the corporation. There is nothing ultra vires in the act which is done by the corporation towards the particular customer of which the corporator can complain; it is an act of which other customers of the corporation may complain by proceedings taken by them before a tribunal different to this, and which will give rise to other remedies altogether different from those sought here.

This is not an action which can be brought by the plaintiff suing on behalf of himself and all other shareholders, except under circumstances which do not exist and are not alleged to exist here.

Of the other authorities referred to in the article, Simpson v Westminster Palace Hotel Co (1860) 8 HL Cas 712 was a case which recognised the right of an individual shareholder to restrain acts by the company which were ultra vires on the basis that the funds of the company were not being applied in accordance with the objects stated in the company's memorandum of association. ; Hoole v Great Western Railway (1867) 3 Ch App 262, was a case of a representative action by a shareholder to restrain the allotment of shares in lieu of dividends contrary to s 30 of the Act governing the company and was therefore ultra vires and illegal. In that case, an injunction was granted. In ; Howden v Yorkshire Miners Assoc [1903] 1 KB 308;[1905] AC 256 affirmed, a member of a trade union was held to be entitled to seek an injunction against the union preventing it from misapplying its funds for purposes not sanctioned by its rules. None of these cases are apposite in my opinion, as they depended upon the power of the court to prevent the misapplication of funds by ultra vires dispositions which were contrary to the Act or constitution governing the particular body. In an analogous situation under the present Corporations Law, the remedy of injunction is conferred by s 1324(1) of the Corporations Law upon the commission or "a person whose interests have been, are or would be affected by the conduct": see s 162(7), which provides that such a contravention may be asserted or relied upon only in the circumstances referred to in that section. The section does not, by its terms, confer any right to apply to the court for relief where the allegation is a breach by the company of the general law, nor is there any such provision elsewhere to be found in the Corporations Law.

As to the concept of ultra vires in the wide sense, in Rolled Steel Products (Holdings) Ltd v British Steel Corp [1986] 1 Ch 246, Browne-Wilkinson LJ identified that expression as referring to transactions which are within the company's capacity, ie within the objects specified by the memorandum of association, but in excess or abuse of the powers of the company to carry out those objects. Slade LJ, on the other hand, seemed to identify ultra vires in the wide sense as also encompassing transactions which were beyond the authority of either the board of directors or of the shareholders. Browne-Wilkinson LJ held that transactions of this kind could be restrained at the suit of shareholders, if they learn of the facts in time. At 303 he said: "If the members of the company learn of what is proposed in time, they will be able to restrain such transaction: if they

only discover the facts later, their remedy lies against those who have wrongly caused the company to act in excess or abuse of the company's powers."

It is not clear whether, in that passage, Browne-Wilkinson LJ was referring to a derivative action, or to an action by an individual shareholder.

However that may be, the authorities to which I have referred show that, where the company is acting within its corporate capacity, and where it is not alleged that the company did not have the authority, or the directors did not have the authority, to enter into the transaction, no question of ultra vires, whether in the true sense or in any wider sense, arises. Where all that is alleged is that the company has engaged in conduct which is contrary to the general law, the impugned conduct is not ultra vires, nor is the conduct necessarily unauthorised in the sense that the articles did not authorise the directors to enter into transactions of that general kind or in the sense that the transaction was not duly authorised by the directors at a validly called meeting of the directors.

Ford, *Principles of Company Law*, 5th ed, p 129 notes (see footnote 8) in relation to corporate criminal liability: "The doctrine of ultra vires did not create difficulty. The idea that a corporation could not commit a crime because any crime would necessarily be ultra vires the corporation is wrong because it seeks to equate civil liability with criminal responsibility. The criminal law has not required any such equation, as witness the criminal liability of a minor for offences involving fraudulent dealing, although he or she lacks capacity to make certain contracts: Welsh (1946) 62 LQR 346-7. Section 68/162 now precludes reference to lack of capacity."

Section 161 of the Corporations Law provides:

A company has, both within and outside this jurisdiction, the legal capacity of a natural person. . .

That it is inappropriate to speak of corporate crime being unauthorised is supported by Knox CJ and Dixon J in Morgan v Babcock & Wilcox Ltd (1929) 43 CLR 163 at 173-4 where their Honours said:

An offence involving corrupt intention can be committed by a corporation only through a servant or agent, who, with the necessary mens rea, does or causes to be done, the forbidden act for and on behalf of the corporation acting within the course of his employment or authority. . .

Sir James Kemnal, in paying the bribe, acted for and on behalf of the company, and it remains only to consider whether it was within the course of his employment or authority. It is consistent with the articles that he had very wide powers indeed, and it is implicit in the description of his office that he administered the business concerns of the company. This is enough to prove a prima facie case that he was acting in the course of his authority." (See also Isaacs J at 157 who observed that the bribe "was an authorised act of the company".)

More recent authority, including this court in S & Y Investments (No 2) Pty Ltd v Commercial Union Assurance Co of Australia Ltd (1986) 44 NTR 14 shows that not every act of an agent of a company is to be treated as an act of the company. Whether the act is that of the company depends upon whether the agent can be considered to be the directing mind and will of the company, either generally, or for the relevant specific conduct constituting the offence: see also ; Tesco Supermarkets Ltd v Nattrass [1972] AC 153. But while not every act of an agent which is a crime can be imputed to a company, it is clear that the criminal acts of agents which are authorised by the company's mind and will are the authorised acts of the company itself.

Nevertheless, there is no doubt that there could be acts of the directors which, while not ultra vires or in excess of the authority of the directors in the sense discussed, are so plainly illegal that the directors have acted in abuse of their powers; similarly, if the directors of a company knew that

/ /

10

the acts of the company which they authorised were contrary to law. In the latter case the directors would be in breach of their duties as directors to act in good faith; in the former, to act with reasonable care and diligence. In both cases, the directors would breach their fiduciary duty not to disregard the interests of the company as a whole by exposing it to prosecution, adverse publicity, a fine, and in some cases, possibly forfeiture of company's property. Perhaps also the directors would be in breach of the duty to act honestly in the exercise of their powers (Corporations Law s 232(2)) or their duty to see that the company's property is not applied towards any improper purpose. But not every act of the directors which results in criminal liability of the company involves these considerations. The board of directors may have honestly acted upon legal advice that the conduct to be engaged in by the company was lawful, for example. Is a shareholder to be given standing to dispute the recommendation to the board by the company's legal advisers that the alleged conduct is lawful?

In some cases, it seems to me, a shareholder may well have locus standi to seek a declaration that the proposed activity is unlawful. For example, where the directors are acting in abuse of their powers by knowingly or recklessly acting contrary to the general law, as a result of which the company sustains loss, this breach of the directors' fiduciary duty could well give rise to a derivative action. In such an action the individual shareholder would seek to bring the action the company has vested in it against the directors for the damages suffered to the company for breach of the fiduciary duty: see generally, Ford, op cit, para 1727 and following. In such a case, the company is a proper party, and if the action is successful judgment is given in favour of the company: Spokes v Grosvenor & West End Railway Terminus Hotel Co Ltd [1897] 2 QB 124. In a case where, on the facts, a derivative action would lie, or might in the future lie, it seems to me that an individual shareholder might well have a sufficient interest to bring an action for a declaration. That, it seems to me, provides one possible explanation for the observations of Lindley LJ and Lopes LJ in ; Powell v Kempton Park Racecourse Company , to which I have already referred. Another possibility is that their Lordships considered that such conduct amounted to a misapplication of property which was ultra vires the company's memorandum of association. If so, it was a case of ultra vires in the narrow sense, which, as Mr Russell QC correctly submitted, has been repealed by ss 160, 161 and 162 of the Corporations Act. But it is worth noting that no derivative action lies where there is mere negligence by the directors: see ; Pavlides v Jensen [1956] Ch 565 and cf ; Prudential Assurance Co Ltd v Newman Industries Ltd (No 2) [1982] 1 Ch 204 at 210-11.

The cause of action upon which Mr Conti QC relies is personal. But, as the Court of Appeal pointed out in the *Prudential Assurance* case, no personal action exists based upon any diminution of Oatmont's share value. At 222-3, the court said:

In our judgment the personal claim is misconceived. It is of course correct, as the judge found and Mr Bartlett did not dispute, that he and Mr Laughton, in advising the shareholders to support the resolution approving the agreement, owed the shareholders a duty to give such advice in good faith and not fraudulently. It is also correct that if directors convene a meeting on the basis of a fraudulent circular, a shareholder will have a right of action to recover any loss which he has been personally caused in consequence of the fraudulent circular; this might include the expense of attending the meeting. But what he cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a 'loss' is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only 'loss' is through the company in the diminution in the value of the net assets of the company, in which he has (say) a 3 shareholding. The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. The shares

themselves, his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practised upon the plaintiff does not affect the shares; it merely enables the defendant to rob the company. A simple illustration will prove the logic of this approach. Suppose that the sole asset of a company is a cash box containing P100,000. The company has an issued share capital of 100 shares, of which 99 are held by the plaintiff. The plaintiff holds the key of the cash box. The defendant by a fraudulent misrepresentation persuades the plaintiff to part with the key. The defendant then robs the company of all its money. The effect of the fraud and the subsequent robbery, assuming that the defendant successfully flees with his plunder, is (i) to denude the company of all its assets; and (ii) to reduce the sale value of the plaintiff's shares from a figure approaching P100,000 to nil. There are two wrongs, the deceit practised on the plaintiff and the robbery of the company. But the deceit on the plaintiff causes the plaintiff no loss which is separate and distinct from the loss to the company. The deceit was merely a step in the robbery. The plaintiff obviously cannot recover personally some P100,000 damages in addition to the P100,000 damages recoverable by the company.

At 223-4, the court further said: "The plaintiffs in this action were never concerned to recover in the personal action. The plaintiffs were only interested in the personal action as a means of circumventing the rule in Foss v Harbottle . The plaintiffs succeeded. A personal action would subvert the rule in ; Foss v Harbottle and that rule is not merely a tiresome procedural obstacle placed in the path of a shareholder by a legalistic judiciary. The rule is the consequence of the fact that a corporation is a separate legal entity. Other consequences are limited liability and limited rights. The company is liable for its contracts and torts; the shareholder has no such liability. The company acquires causes of action for breaches of contract and for torts which damage the company. No cause of action vests in the shareholder. When the shareholder acquires a share he accepts the fact that the value of his investment follows the fortunes of the company and that he can only exercise his influence over the fortunes of the company by the exercise of his voting rights to ensure that the company observes the limitations of its memorandum of association and the right to ensure that other shareholders observe the rule, imposed upon them by the articles of association. If it is right that the law has conferred or should in certain restricted circumstances confer further rights on a shareholder the scope and consequences of such further rights require careful consideration. In this case it is neither necessary nor desirable to draw any general conclusions."

Of course, Oatmont in this case is not seeking damages. It is seeking a declaration, which was not the remedy being sought in the *Prudential case*. Nevertheless, it seems to me that the remarks of the Court of Appeal are relevant to the question of standing, in that they show the nature of Oatmont's rights allegedly affected by AACO's conduct.

In this case, it is not alleged that AACO or its directors have acted in a way which the directors knew to be unlawful, or that they were recklessly indifferent to the legality of their actions, or even that they were negligent. Indeed the position of AACO is that its acts were and are lawful. Consequently the case in my view falls within the dictum of Buckley J in Anderson v Midland Railways Co [1902] 1 Ch 369 to 376-7 to which I have previously referred. In my opinion it would be oppressive to permit an individual shareholder, where personal rights were not affected, except as to a possible diminution in the value of his shares, and who is unable to bring a derivative action, to seek declaratory relief when the lawfulness of the conduct complained of is neither deliberate nor reckless, nor for that matter, negligent. That is particularly so where the Crown does not assert that the conduct is unlawful, and the Attorney-General has refused his fiat, and the probability of any proceedings being brought against AACO for the alleged offence is practically non-existent.

/ /

If I am wrong in this view, it seems to me to be pertinent to note that at the time Oatmont applied to purchase its shares, it was fully aware of the alleged unlawfulness. The learned judge at first instance did not consider this to be relevant. I respectfully disagree. The number of shares purchased was minimal. Even if the purchase of the shares was not made for the sole purpose of giving Oatmont standing, the purchase in the shares in these circumstances would be enough to preclude Oatmont from seeking relief in either a personal or a derivative action: Towers v African Tug Co [1904] 1 Ch 558: see especially the remarks of Vaughan Williams LJ at 556-7 and Cozens-Hardy LJ at 571-2. The reason their Lordships gave for this was that the plaintiff in such a case does not have a real interest in the litigation. For the same reasons, it seems to me that Oatmont does not have a sufficient interest to maintain standing in this case to seek declaratory relief based upon any right it may have to be entitled to be treated as a shareholder of AACO.

In Central Queensland Speleological Society Inc v Central Queensland Cement Pty Ltd [1989] 2 Qd R 512, Derrington J said, at 531, that "a party cannot create his own standing simply by spending money in support of the cause being or intended to be promoted in the litigation, whether it be by printing slogans on T-shirts or by any other means". Similarly, in my opinion, it is not possible to acquire standing by the simple expedient of purchasing a few shares on the stock exchange in the company which the purchaser wishes to sue when the purchaser knows full well the circumstances said to give rise to the presumed unlawful conduct of that company.

I have not overlooked the fact that his Honour's initial finding was that Oatmont had established a sufficiently arguable case, whereas I have gone somewhat further than that. However, the matter was fully argued before us, and there are no other facts which are likely to be elucidated at the trial which could bear on the matter. In these circumstances it seems to me that it would be a waste of time and put the parties to undue expense to limit my considerations to whether there was merely an arguable case.

Do Oatmont and Delamere have standing by virtue of any special interest?

The case which Oatmont sought to establish was that it was a competitor with AACO for the acquisition of land on the Barkly Tablelands generally and for the Austral Downs and Burramurra pastoral leases in particular. While Oatmont did not engage in any tender for the shares in Waxahachi Pty Ltd, it sought to compete commercially with AACO for the acquisition of Austral Downs and Burramurra by entering into negotiations with Waxahachi Pty Ltd to purchase those leases. It has submitted that Oatmont has a special interest in requiring that its competitor for the acquisition of property complies with the law concerning restrictions on entitlement to acquire the property.

Delamere's case was that it was a competitor with AACO for access to and use of cattle fattening country in the Tablelands.

The sale of the shares in Waxahachi Pty Ltd to AACO having been completed, no injunction was now able to be sought preventing that sale completing. Thus the focus of attention was to obtain a declaration that AACO's acquisition of Waxahachi's shares placed it in breach of s 38a of the Crown Lands Act with a view to compelling AACO to either voluntarily sell its interests in Austral Downs and Burramurra, or perhaps some other leases which it holds through its other subsidiaries, or to put in train the forfeiture process in s 38(11) of the Act with a view to enabling Oatmont or Delamere, or both, to enter into negotiations with either Waxahachi Pty Ltd or the relevant subsidiaries concerned, or with the minister, to acquire those interests.

Putting aside any question as to the lack of evidence of the financial capacity of either Oatmont or Delamere to acquire the properties, and assuming that, if the declaration sought was granted, the consequences of the declaration would have the results contended for, it is my

/ /

opinion that neither Oatmont or Delamere has any special interest to give it standing to sue under the second limb of Boyce v Paddington Borough Council [1903] 1 Ch 109 at 114 (which I have cited in full above) as that limb has since been developed by such cases as ; Australian Conservation Foundation v Commonwealth (1980) 146 CLR 493; ; Robinson v The Western Australian Museum (1977) 138 CLR 283 and ; Onus v Alcoa Australia Ltd (1981) 149 CLR 27.

The general principles to be applied have been sufficiently set out in the judgment of the learned judge at first instance at (1990) 75 NTR 1 at 3-5 and there is no need to repeat them.

In my opinion, the point which is fatal to Oatmont's and Delamere's claims for standing is that the best that they could hope for if they succeeded in this litigation is an opportunity, together with any other member of the public, to negotiate to purchase such of the properties as might be forced onto the open market. In Yates Security Services Pty Ltd v Keating (1980) 98 ALR 68, all three members of the Federal Court of Australia rejected standing when that was all that could be shown. Lockhart J said at 81:

The essential findings of the trial judge were that Yates desired to redevelop the site itself and it hoped that success in this proceeding would provide the opportunity to do so; further, that although success in the case would not enable Yates to make a financial claim, it would confer upon it commercial benefit in the sense of the opportunity to negotiate for the acquisition and development of the site. This benefit would not be unique to Yates as other developers would also have the opportunity to negotiate if they wished. The evidence was that Yates had incurred expenditure in excess of $ 100,000 with respect to a proposal for the development of Paddy's Market, a proposal which Yates abandoned during the course of the hearing.

In my opinion the ability to negotiate for the acquisition and development of the site, even if it is a commercial benefit, is one which Yates has whether it wins this case or not. Like any other member of the public it may negotiate for the acquisition and development of the site. The Treasurer's order of revocation places no impediment on Yates negotiating with Rockvale to acquire Paddy's Market and to negotiate with the Darling Harbour Authority to develop the site. The evidence does not establish that Yates has a special interest in the subject matter of the proceedings. Therefore it has no standing to bring it.

Morling J said at 87 and 88:

Moreover, even if it be assumed, contrary to my opinion, that the opportunity to negotiate for the acquisition and development of the Paddy's Market site conferred a benefit upon Yates, such a benefit was enjoyed by all other members of the Australian public. The opportunity to negotiate was in no way special to Yates. The mere fact that it had expressed interest in developing the site did not give it any advantage over any other member of the public who might be interested to negotiate for its acquisition.

In my opinion, there is no authority to support the finding in the present case that Yates had standing to bring the proceedings. In *ACF* Gibbs J made it plain (CLR at 526) that an ordinary member of the public, who has no interest other than that which any member of the public has in upholding the law, has no standing to prevent the violation of a public right or to enforce the performance of a public duty. As his Honour said (CLR at 530; ALR at 270): 'A person is not interested within the meaning of the rule, unless he is likely to gain some advantage, other than the satisfaction of righting a wrong, upholding a principle, or winning a contest, if his action succeeds or to suffer some disadvantage, other than a sense of grievance or a debt for costs, if his action fails.'

Pincus J said at 97: "It should not be forgotten that what was in issue was the validity of the acquisition of an interest in land by Rockvale. It not uncommonly happens that contracts for sale of

land are alleged in specific performance suits to be illegal, on one ground or another. If the decision on standing in this case is correct, then a stranger to the contract might have a claim to be heard in such a suit, merely on the basis that if the sale in question fell through the stranger would be interested in buying the property."

Even if the provisions of the Crown Lands Act could be characterised as aimed at preventing monopolisation of pastoral lands in the Northern Territory, neither the Act nor the relief which Oatmont and Delamere seek, would confer upon them any advantage not enjoyed by all other members of the Australian public. Furthermore, there is nothing to prevent Oatmont or Delamere from now negotiating with Waxahachi Pty Ltd or any of the other subsidiaries of AACO.

```
For these reasons I would allow the appeal and dismiss the cross-appeal,
and I would order that the action be dismissed with costs, the
respondent and the cross-appellant to pay the appellants' and cross-
respondent's costs of this appeal and of the hearing before the learned
judge at first instance.
```

**TAB O**

1977 WL 59441 (Ch D), [1978] 2 All E.R. 89, [1978] Ch. 406, [1978] 2 W.L.R. 73, (1977) 121 S.J. 605
**(Cite as: [1978] Ch. 406)**

**\*406** Daniels and Others v. Daniels and Others
[1976 D. No. 3193]; [1978] 2 W.L.R. 73

Chancery Division
Ch D
Templeman J.
1977 July 20, 21

Company--Shareholder--Rights against company or shareholders--Minority shareholders' action--Directors with majority shareholding causing company to sell land to one director at undervalue--Director making large profit on resale--Whether minority shareholders entitled to bring action against company

The plaintiffs, minority shareholders of a company, brought an action against the two directors and the company. By their statement of claim they alleged that in October 1970 the company, on the instructions of the two directors, who were the majority shareholders, sold the company's land to one of the directors, who was the wife of the other, for £4,250 and that the directors knew, or ought to have known, that that sale was at an undervalue. In 1974 she sold the land for £120,000.

On the directors' summons to strike out the statement of claim as disclosing no reasonable cause of action or otherwise as an abuse of the process of the court:-

Held, dismissing the summons, that the exception to the rule in Foss v. Harbottle, enabling a minority shareholder to bring an action against a company for fraud where no other remedy was available, should include cases where, although there was no fraud alleged, there was a breach of duty by directors and majority shareholders to the detriment of the company and the benefit of the directors; accordingly, on the facts alleged, the minority shareholders had a cause of action (post, pp. 413H - 414A, D-F).

Foss v. Harbottle (1843) 2 Hare 461; Alexander v. Automatic Telephone Co. [1900] 2 Ch. 56, C.A.;

Cook v. Deeks [1916] 1 A.C. 554, P.C. and dictum of Danckwerts J. in Pavlides v. Jensen [1956] Ch. 565, 576 applied.

Turquand v. Marshall (1869) L.R. 4 Ch.App. 376 distinguished.

The following cases are referred to in the judgment:

Alexander v. Automatic Telephone Co. [1900] 2 Ch. 56, C.A..

Atwool v. Merryweather (1867) L.R. 5 Eq. 464n.

**\*407** Birch v. Sullivan [1957] 1 W.L.R. 1247; [1958] 1 All E.R. 56.

Burland v. Earle [1902] A.C. 83, P.C..

Clinch v. Financial Corporation (1868) L.R. 5 Eq. 450.

Cook v. Deeks [1916] 1 A.C. 554, P.C..

Foss v. Harbottle (1843) 2 Hare 461.

Gray v. Lewis (1873) L.R. 8 Ch.App. 1035.

Heyting v. Dupont [1963] 1 W.L.R. 1192; [1963] 3 All E.R. 97; [1964] 1 W.L.R. 843; [1964] 2 All E.R. 273, C.A..

MacDougall v. Gardiner (1875) L.R. 20 Eq. 383.

Mason v. Harris (1879) 11 Ch.D. 97, C.A..

Denier v. Hooper's Telegraph Works (1874) L.R. 9 Ch.App. 350.

Pavlides v. Jensen [1956] Ch. 565; [1956] 3 W.L.R. 224; [1956] 2 All E.R. 518.

Turquand v. Marshall (1869) L.R. 4 Ch.App. 376.

The following additional cases were cited in argument:

Campbell v. Australian Mutual Provident Society (1908) 24 T.L.R. 623, P.C..

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1977 WL 59441 (Ch D), [1978] 2 All E.R. 89, [1978] Ch. 406, [1978] 2 W.L.R. 73, (1977) 121 S.J. 605
**(Cite as: [1978] Ch. 406)**

Dominion Cotton Mills Co. Ltd. v. Amyot [1912] A.C. 546, P.C..

Harris v. A. Harris Ltd., 1936 S.C. 183.

North-West Transportation Co. Ltd. v. Beatty (1887) 12 App Cas. 589, P.C..

Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474.

SUMMONS

On November 24, 1976, the first two defendants, Bernard Edwyn Daniels and his wife, Beryl G. Daniels, the directors and majority shareholders of the third defendant, Ideal Homes (Coventry) Ltd., ("the company") issued a summons under R.S.C., Ord. 18, r. 19 seeking an order, inter alia, to strike out the statement of claim in the action by the plaintiffs, Douglas Percy Daniels, Gordon Eric Daniels and Caroline Emma Soule, minority shareholders of the company, as disclosing no reasonable cause of action or otherwise as an abuse of the process of the court.

The facts are stated in the judgment.

*David Richards* for the first two defendants.

*W. A. Blackburne* for the plaintiffs.

The main submissions of counsel are sufficiently dealt with in the judgment (post, pp. 408F, 409A-B, 410G, 412H - 413A, F, 414E-H).

The additional cases cited in argument were in support of the propositions of law mentioned below:

Russell v. Wakefield Waterworks Co. (1875) L.R. 20 Eq. 474 supports the proposition that on the company's funds being misapplied it is the company and not minority shareholders who can maintain an action. Where majority shareholders' acts are not ultra vires the company, or do not deprive the minority of their rights, and there is no fraud the court will not interfere with the company's internal management at the instance of the minority: Campbell v. Australian Mutual Provident Society (1908)

24 T.L.R. 623; Dominion Cotton Mills Co. Ltd. v. Amyot [1912] A.C. 546; and Harris v. A. Harris Ltd., 1936 S.C. 183. A director can **\*408** exercise his voting rights enabling the company to enter into a contract with himself if the contract is fair in its terms although it is voidable: North-West Transportation Co. Ltd. v. Beatty (1887) 12 App.Cas. 589.

TEMPLEMAN J.

This is an application to strike out a statement of claim as disclosing no reasonable cause of action. The authorised share capital of the third defendant company, Ideal Homes (Coventry) Ltd., consists of 3,000 £1 ordinary shares and the three plaintiffs between them hold 1,348. They are, therefore, in a minority. The first two defendants, who are husband and wife, hold 1,651 shares and they are, therefore, in a majority. The first two defendants, according to the statement of claim, were, in October 1970, the only directors of the company.

The plaintiffs' complaint appears from paragraphs 3 and 4 of the statement of claim. Paragraph 3 alleges that in October 1970 the company sold certain land in Warwickshire to the second defendant for £4,250 on the instructions and by the direction of the directors, who were the first and second defendants. Paragraph 4 alleges that the price of £4,250 paid to the company by the second defendant was less than the current value of the land at the time of the sale, as the first and second defendants well knew or ought to have known. The particulars of that allegation are first that the first and second defendants purported to adopt a probate value made on the death, which took place on June 8, 1969, of the father of the plaintiffs and the first defendant; secondly, that "probate values being conservative in amount, are customarily less than the open market value obtainable as between a willing vendor and a willing purchaser"; thirdly, that in 1974 the land was sold by the second defendant for the sum of £120,000.

Putting it broadly, all the allegations will be denied by the defendants if the action proceeds. But it is

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1977 WL 59441 (Ch D), [1978] 2 All E.R. 89, [1978] Ch. 406, [1978] 2 W.L.R. 73, (1977) 121 S.J. 605
**(Cite as: [1978] Ch. 406)**

common ground that for the purpose of this application I must proceed upon the basis that all the allegations in the statement of claim can be sustained.

Mr. Richards, for the first two defendants who bring this application to strike out, says there is no cause of action shown because the statement of claim does not allege fraud, and in the absence of fraud, minority shareholders are unable to maintain a claim on behalf of the company against a majority. For that proposition he referred first of all to the principles set out in Foss v. Harbottle (1843) 2 Hare 461. That case established the general proposition that minority shareholders cannot maintain an action on behalf of the company, subject to certain exceptions. The exceptions are four in number, and only one of which is of possible application in the present case. The first exception is that a shareholder can sue in respect of some attack on his individual rights as a shareholder; secondly, he can sue if the company, for example, is purporting to do by ordinary resolution that which its own constitution requires to be done by special resolution; thirdly, if the company has done or proposes to do something which is ultra vires; and fourthly, if there is fraud and there is no other remedy. There must be a minority who are prevented from remedying the fraud or taking any proceedings because of the protection given to the fraudulent shareholders or directors by virtue of their majority.

**\*409** Mr. Richards says, and it is conceded, that the statement of claim in its present form does not allege fraud. Mr. Blackburne, for the plaintiffs, says of course he is not alleging fraud because the plaintiffs do not really know what happened: all they know is what is set out in the statement of claim. There has been a sale at an undervalue and the second defendant has made a substantial profit; therefore, fraud is not pleaded. But, says Mr. Blackburne, when the authorities are considered, the rights of a minority are not limited to cases of fraud; they extend to any breach of duty. In the present case if the defendants sold at an undervalue then that was a breach of duty. As the plaintiffs cannot remedy the breach, save by a minority shareholders' action, they should be entitled to

bring the action. Foss v. Harbottle, 2 Hare 461, was a case in which there was no oppression by a majority.

The next case in point of time, to which I was referred, was Atwool v. Merryweather (1867) L.R. 5 Eq. 464n. The exception of fraud in Foss v. Harbottle was emphasised, the reason being, according to Page Wood V.-C., at p. 468:

"If I were to hold that no bill could be filed by shareholders to get rid of the transaction on the ground of the doctrine of Foss v. Harbottle, it would be simply impossible to set aside a fraud committed by a director under such circumstances, as the director obtaining so many shares by fraud would always be able to outvote everybody else."

That was a case described as "simple fraud." In the next case, Clinch v. Financial Corporation (1868) L.R. 5 Eq. 450, allegations were made of fraud and of acts which were said to be ultra vires. The charges of fraud were not sustained, but the minority shareholder was allowed to bring an action to restrain or correct an act which was ultra vires the company.

Then in Turquand v. Marshall (1869) L.R. 4 Ch.App. 376, 386, Lord Hatherley L.C. in dealing with a claim to one of the directors said:

"There was no specific allegation of any impropriety in lending the money to him, nor was any specific relief prayed in this respect. It was within the powers of the deed to lend to a brother director, and however foolish the loan might have been, so long as it was within the powers of the directors, the court could not interfere and make them liable. They were entrusted with full powers of lending the money, and it was part of the business of the concern to trust people with money, and their trusting to an undue extent was not a matter with which they could be fixed, unless there was something more alleged, as, for instance, that it was done fraudulently and improperly and not merely by default of judgment. Whatever may have been the amount lent to anybody, however ridiculous and absurd their conduct might seem, it was the misfortune of the company that they chose such unwise directors; . . ."

1977 WL 59441 (Ch D), [1978] 2 All E.R. 89, [1978] Ch. 406, [1978] 2 W.L.R. 73, (1977) 121 S.J. 605

**(Cite as: [1978] Ch. 406)**

So that even a foolish and negligent loan to a director, if made in good faith and within the powers of the directors, does not enable a minority shareholder to recover in an action.

The next case, Gray v. Lewis (1873) L.R. 8 Ch.App. 1035 , is an **\*410** instance of fraud creating an exception to the rule in Foss v. Harbottle. For example, James L.J. said, at p. 1051:

"I think it is of the utmost importance to maintain the rule laid down in Mozley v. Alston (1847) 1 Ph. 790 and Foss v. Harbottle, 2 Hare 461, to which, as I understand, the only exception is where the corporate body has got into the hands of directors and of the majority, which directors and majority are using their power for the purpose of doing something fraudulent against the minority, who are overwhelmed by them . . ."

In Menier v. Hooper's Telegraph Works (1874) L.R. 9 Ch.App. 350 , a minority shareholders' action was allowed where the majority intended to divide the assets of the company more or less between themselves to the exclusion of the minority. Mellish L.J. said, at p. 354:

"I am of opinion that although it may be quite true that the shareholders of a company may vote as they please, and for the purpose of their own interests, yet that the majority of shareholders cannot sell the assets of the company and keep the consideration, but must allow the minority to have their share of any consideration which may come to them."

In MacDougall v. Gardiner (1875) L.R. 20 Eq. 383, although the actual decision was reversed, Malins V.-C. said that there had to he something at least bordering upon fraud to found a minority shareholders' action.

In Mason v. Harris (1879) 11 Ch.D. 97, Jessel M.R., in an action to set aside a sale by a managing director to the company on the grounds of fraud, said, at p. 107:

"As a general rule the company must sue in respect of a claim of this nature, but general rules have their exceptions, and one exception to the rule requiring their company to be plaintiff is, that where a fraud is committed by persons who can command a majority of votes, the minority can sue. The reason is plain, as unless such an exception were allowed it would be in the power of a majority to defraud the minority with impunity. If the majority were to make a fraudulent sale and put the money into their own pockets, would it be reasonable to say that the majority could confirm the sale."

In 1900 there was a case on which Mr. Blackburne relies of rather wider import. In Alexander v. Automatic Telephone Co. [1900] 2 Ch. 56 directors issued shares, and required some people who took up the shares to make payments in respect of those shares, but the directors did not themselves make payments on the shares which they had taken up,

"if directors require other applicants for shares to make payments on application and allotment, and issue their own shares for which they have subscribed the memorandum without requiring any such payments to be made, and without disclosing to the other shareholders this difference between their position and that of the directors, they commit a breach of duty, even though in so doing they act without fraud, and in the belief that they are doing nothing wrong."

**\*411** A minority shareholders' action was allowed. Fraud was negatived and the basis for the action was given as "breach of duty." Lindley M.R. said, at p. 64:

"The directors, in fact, so managed matters as to place themselves in a better position as regards payment than the other shareholders, and they did so without informing the other shareholders of the fact. This, the plaintiffs contend, was a breach of duty on the part of the directors to those who applied for and took shares upon the faith that the directors were not obtaining advantages at their expense. It is no answer to the plaintiffs' case so put to appeal to the contracts alone, for the charge is that the directors were guilty of a breach of duty in procuring those contracts and in taking advantage of them so as to benefit themselves at the expense of the other shareholders."

The Master of the Rolls said, at pp. 66-67:

1977 WL 59441 (Ch D), [1978] 2 All E.R. 89, [1978] Ch. 406, [1978] 2 W.L.R. 73, (1977) 121 S.J. 605
**(Cite as: [1978] Ch. 406)**

"The court of chancery has always exacted from directors the observance of good faith towards their shareholders and towards those who take shares from the company and become co-adventurers with themselves and others who may join them. The maxim 'caveat emptor' has no application to such cases, and directors who so use their powers as to obtain benefits to themselves at the expense of the shareholders, without informing them of the fact, cannot retain those benefits and must account for them to the company, so that all the shareholders may participate in them."

That was a case which falls within the first exception to Foss v. Harbottle 2 Hare 461, in that the plaintiff shareholder could be said to be suing in respect of his individual rights as a shareholder to receive the same treatment as any other shareholder. But the Master of the Rolls also considered the directors to be in breach of duty to the company. He said [1900] 2 Ch. 56, 69:

"The breach of duty to the company consists in depriving it of the use of the money which the directors ought to have paid up sooner than they did. I cannot regard the case as one of mere internal management which, according to Foss v. Harbottle and numerous other cases, the court leaves the shareholders to settle amongst themselves. It was ascertained and admitted at the trial that, when this action was commenced, the defendants held such a preponderance of shares that they could not be controlled by the other shareholders. Under these circumstances an action by some shareholders on behalf of themselves and the others against the defendants is in accordance with the authorities, and is unobjectionable in form: . . ."

That was a case intermingled with the individual grievances of the shareholders in respect of their own rights, but contemplating an exception to Foss v. Harbottle going wider than fraud.

Shortly thereafter, in Burland v. Earle [1902] A.C. 83, it was said that minority shareholders can sue in their own names, but must show that the acts complained of are either fraudulent or ultra vires. In **\*412** particular, Lord Davey, who delivered the advice of the Judicial Committee, said, at p. 93:

"It is an elementary principle of the law relating to joint stock companies that the court will not interfere with the internal management of companies acting within their powers, and in fact has no jurisdiction to do so. Again, it is clear law that in order to redress a wrong done to the company or to recover moneys or damages alleged to be due to the company, the action should prima facie be brought by the company itself. These cardinal principles are laid down in the well-known cases of Foss v. Harbottle, 2 Hare 461, and in Mozley v. Alston, 1 Ph. 790, and in numerous later cases which it is unnecessary to cite. But an exception is made to the second rule, where the persons against whom the relief is sought themselves hold and control the majority of the shares in the company, and will not permit an action to be brought in the name of the company. In that case the courts allow the shareholders complaining to bring an action in their own names. This, however, is mere matter of procedure in order to give a remedy for a wrong which would otherwise escape redress, and it is obvious that in such an action the plaintiffs cannot have a larger right to relief than the company itself would have if it were plaintiff, and cannot complain of acts which are valid if done with the approval of the majority of the shareholders, or are capable of being confirmed by the majority. The cases in which the minority can maintain such an action are, therefore, confined to those in which the acts complained of are of a fraudulent character or beyond the powers of the company. A familiar example is where the majority are endeavouring directly or indirectly to appropriate to themselves money, property, or advantages which belong to the company, or in which the other shareholders are entitled to participate, . . ."

The decision in this case turned on the fact that those against whom allegations were made were not, in fact, in control of the company.

Then in 1916 minority shareholders were allowed to sue, although fraud in the true sense of the word was not sustained; fraud was pleaded but rejected. In Cook v. Deeks [1916] 1 A.C. 554, directors obtained for themselves the benefit of a contract which might otherwise have gone to the company. Fraud was expressly negatived. Lord Buckmaster

1977 WL 59441 (Ch D), [1978] 2 All E.R. 89, [1978] Ch. 406, [1978] 2 W.L.R. 73, (1977) 121 S.J. 605
**(Cite as: [1978] Ch. 406)**

L.C. said, at p. 563:

"It is quite right to point out the importance of avoiding the establishment of rules as to directors' duties which would impose upon them burdens so heavy and responsibilities so great that men of good position would hesitate to accept the office. But, on the other hand, men who assume the complete control of a company's business must remember that they are not at liberty to sacrifice the interests which they are bound to protect, and, while ostensibly acting for the company, divert in their own favour business which should properly belong to the company they represent."

Mr. Richards said that was really a case of constructive fraud, but express fraud having been negatived, it seems to me that it established that an **\*413** action will lie where, without fraud, directors in a majority, "divert in their own favour business which should properly belong to the company they represent."

Then in 1956 there was a case on which Mr. Richards very strongly relies and from which Mr. Blackburne asked me to differ. In *Pavlides v. Jensen* [1956] Ch. 565, it was alleged that directors had been guilty of gross negligence in selling a valuable asset of the company at a price greatly below its true market value, and it was alleged that the directors knew or well ought to have known that it was below market value. Danckwerts J. struck out the statement of claim as disclosing no cause of action because no fraud was pleaded. The headnote says, at p. 566:

". . . since the sale of the asset in question was not beyond the powers of the company, and since there was no allegation of fraud on the part of the directors or appropriation of the assets of the company by the majority shareholders in fraud of the minority, the action did not fall within the admitted exceptions to the rule in *Foss v. Harbottle* . . ."

Danckwerts J. said, at p. 576:

"On the facts of the present case, the sale of the company's mine was not beyond the powers of the company, and it is not alleged to be ultra vires. There is no allegation of fraud on the part of the directors or appropriation of assets of the company by the majority shareholders in fraud of the minor-

ity. It was open to the company, on the resolution of the majority of the shareholders, to sell the mine at a price decided by the company in that manner, and it was open to the company by a vote of the majority to decide that, if the directors by their negligence or error of judgment had sold the company's mine at an undervalue, proceedings should not be taken by the company against the directors."

Mr. Richards relies very strongly on this decision as showing that, whatever the exceptions to *Foss v. Harbottle* may be, mere gross negligence is not actionable, and he says all that is pleaded in the present case is gross negligence at the most. But in Pavlides v. Jensen [1956] 2 Ch. 565 no benefits accrued to the directors. Mr. Blackburne asks me to dissent from *Pavlides v. Jensen* but the decision seems to me at the moment to be in line with the authorities, in what is a restricted exception to the rule in *Foss v. Harbottle, 2 Hare 461.*

In *Birch v. Sullivan [1957] 1 W.L.R. 1247* the decision really went off on a point of pleading; moreover the judge was not satisfied that the dissenting shareholders could not put matters right by a meeting of the company. Finally I was referred to *Heyting v. Dupont [1963] 1 W.L.R. 1192; [1964] 1 W.L.R. 843.* But that was only an instance of the court refusing on its own initiative to hear an action begun by minority shareholders where the *Foss v. Harbottle* exceptions did not come into play.

The authorities which deal with simple fraud on the one hand and gross negligence on the other do not cover the situation which arises where, without fraud, the directors and majority shareholders are guilty **\*414** of a breach of duty which they owe to the company, and that breach of duty not only harms the company but benefits the directors. In that case it seems to me that different considerations apply. If minority shareholders can sue if there is fraud, I see no reason why they cannot sue where the action of the majority and the directors, though without fraud, confers some benefit on those directors and majority shareholders themselves. It would seem to me quite monstrous - particularly as fraud is so hard to plead and difficult to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1977 WL 59441 (Ch D), [1978] 2 All E.R. 89, [1978] Ch. 406, [1978] 2 W.L.R. 73, (1977) 121 S.J. 605

**(Cite as: [1978] Ch. 406)**

prove - if the confines of the exception to Foss v. Harbottle, 2 Hare 461, were drawn so narrowly that directors could make a profit out of their negligence. Lord Hatherley L.C. in Turquand v. Marshall, L.R. 4 Ch.App. 376, 386, opined that shareholders must put up with foolish or unwise directors. Danckwerts J. in Pavlides v. Jensen [1956] 1 Ch. 565 accepted that the forbearance of shareholders extends to directors who are "an amiable set of lunatics. " Examples, ancient and modern, abound. To put up with foolish directors is one thing; to put up with directors who are so foolish that they make a profit of £ 115,000 odd at the expense of the company is something entirely different. The principle which may be gleaned from Alexander v. Automatic Telephone Co. [1900] 2 Ch. 56 (directors benefiting themselves), from Cook v. Deeks [1916] 1 A.C. 554 (directors diverting business in their own favour) and from dicta in Pavlides v. Jensen [1956] 2 Ch. 565 (directors appropriating assets of the company) is that a minority shareholder who has no other remedy may sue where directors use their powers, intentionally or unintentionally, fraudulently or negligently, in a manner which benefits themselves at the expense of the company. This principle is not contrary to Turquand v. Marshall, L.R. 4 Ch.App. 376, because in that case the powers of the directors were effectively wielded not by the director who benefited but by the majority of independent directors who were acting bona fide and did not benefit. I need not consider the wider proposition for which Mr. Blackburne against some formidable opposition from the authorities contends that any breach of duty may be made the subject of a minority shareholder's action.

I am certainly not prepared to say at this stage of the game that the action brought by the plaintiffs in the present instance is bound to fail. What the result of the action will be I know not, but if the statement of claim is right, and the husband and wife who control 60 per cent. of the shares were responsible for a sale by the company to the wife at an undervalue, which they knew or ought to have known, then a remedy for the minority shareholders ought to lie.

Mr. Richards said that in any event the action does not lie against the husband but only against the wife who took the property, but at the present moment I do not know what the facts are, and the law on the consequences of the facts has not been expounded. It seems to me to be more convenient to allow the action to continue against both husband and wife. Mr. Blackburne has had a warning shot fired across his bows and he might succeed against one defendant and not against the other and would then have to consider the question of costs. But in the present state of affairs before discovery and further consideration I think the best **\*415** thing to do is to allow the action to take its normal course. The result is that I dismiss the present application.

**Representation**

Solicitors: J. E. Baring & Co. for Brindley Twist, Tafft & James, Coventry; Rotherhams, Coventry.

Summons dismissed with costs. Leave to appeal refused. (A. R. )

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

**TAB P**

[1956] Ch. 565                                                            Page 1

1956 WL 17838 (Ch D), [1956] 2 All E.R. 518, [1956] Ch. 565, [1956] 3 W.L.R. 224, (1956) 100 S.J. 452
**(Cite as: [1956] Ch. 565)**

C

*565 Pavlides v. Jensen and Others.
[1950 P. 1662.]; [1956] 3 W.L.R. 224

Chancery Division
Ch D
Danckwerts J.
1956 May 3, 4, 14.

Company--Shareholder--Rights against company or directors--Sale of asset-- Sale at undervalue--Allegation of negligence--Action by minority shareholder-- Sale intra vires--No allegations of fraud or oppression--Whether action maintainable.

A minority shareholder of a company sought to bring an action on behalf of himself and all other shareholders, save three who *566 were directors of the company, against these directors and the company for damages for negligence on the allegation that the directors had been guilty of gross negligence in effecting a sale of a valuable asset of the company at a price greatly below its true market value. The company was controlled by another company, the majority voting power of which was controlled by the same directors.

On an application by the defendants under R.S.C., Ord. 15, r. 2, for determination of the question whether on the facts alleged by the plaintiff the action was maintainable:-

Held, that since the sale of the asset in question was not beyond the powers of the company, and since there was no allegation of fraud on the part of the directors or appropriation of the assets of the company by the majority shareholders in fraud of the minority, the action did not fall within the admitted exceptions to the rule in Foss v. Harbottle (1843) 2 Hare 461, and that, accordingly, it was not maintainable.

Observations of Lord Davey in Burland v. Earle [1902] A.C. 83, 93 applied.

Observations of Jessel M.R. in Russell v. Wake-

field Waterworks Co. (1875) L.R. 20 Eq. 474, 480, 482 considered.

Semble, that it is admissible in certain cases to go behind the apparent ownership of shares in order to discover whether a company is in fact controlled by wrongdoers - as, for instance, in the case where the shares were held by mere nominees bound to vote as the owners required them to vote.

ADJOURNED SUMMONS.

The plaintiff, Sir Paul George Pavlides, was the holder of 1,980 deferred shares in the capital of the defendant company, Tunnel Asbestos Cement Co. Ltd. (the company). The company was incorporated in 1935 under the Companies Act, 1929, as a company limited by shares. The capital of the company (certain redeemable preference shares having all been redeemed) consisted of 600,000 ordinary shares of 10 shillings each and 600,000 deferred shares of one shilling each all of which had been issued and paid up or credited as paid up in full. The deferred shareholders had, after the payment of a dividend of 5 per cent. to the ordinary shareholders, an equal interest with the ordinary shareholders in the profits of the company. But by article 74 of the company's articles the holders of the deferred shares were not entitled to receive notices of or to attend or vote in person or by proxy at any general meeting of the company. 578,000 of the ordinary shares and the greater part of the deferred shares were held by another company, Tunnel Portland Cement Co. Ltd.

The personal defendants Niels Max Jensen, William Thomas Charles Cave and James Asher Mackintosh were directors both of the company and also of Tunnel Portland Cement Co. Ltd.

*567 On June 19, 1950, the plaintiff on behalf of himself and all other shareholders in the company except the defendant directors issued a writ against the first three defendants and the company for damages for negligence.

1956 WL 17838 (Ch D), [1956] 2 All E.R. 518, [1956] Ch. 565, [1956] 3 W.L.R. 224, (1956) 100 S.J. 452
**(Cite as: [1956] Ch. 565)**

The complaint of the plaintiff related to a sale of an asbestos mine in Cyprus, which was acquired by the company (according to the statement of claim) in 1936 for about £142,000 and was resold in 1947 for about £182,000 to Cyprus Asbestos Mines Ltd., in which the company held 25 per cent. of the issued capital. This sale was carried through by the defendant directors, and was not submitted to the approval of the company in general meeting.

By the re-amended statement of claim the plaintiff alleged that the conduct of the defendant directors in effecting the sale was grossly negligent, in that it was a sale at a gross undervalue as the defendant directors well knew or ought to have known the true value of the mine (according to the plaintiff's allegations) having been "somewhere in the neighbourhood of £1,000,000."

The plaintiff claimed that he was entitled to the assistance of the court in the manner of this action because (1) he was unable to requisition or attend a general meeting of the company under its articles and (2) the alleged delinquent directors were in a position to control the company and so prevent the company from taking any action against them. The method of control alleged by the plaintiff in this respect was stated in para. 11 of the re-amended statement of claim as follows: "in that (i) at all material times a majority of the ordinary shares of the defendant company (which shares alone have at such times carried the right to vote at general meetings of the company) have been and still are held by the Tunnel Portland Cement Co. Ltd. and (ii) at all material times the three personal defendants have been directors of that company (the defendant Jensen being the chairman of the directors thereof) and together able as such to command a majority of votes at all meetings of the board thereof except between the 13th day of April, 1953, and 31st day of December, 1954. The three personal defendants were and are thus in a position to control the exercise of the majority voting power attached to the said shares so held by Tunnel Portland Cement Co. Ltd."

The allegations of misfeasance were denied by the defendants, who applied under R.S.C., Ord. 25, r. 2, for the determination before the trial of the action of the following point of law: *568 "Whether on the facts alleged in the re-amended statement of claim the plaintiff was and is entitled to institute or maintain this action."

*Charles Russell Q.C.* and *Kenneth Mackinnon* for the applicants. There is no reported decision in support of the proposition which the plaintiff must establish in order to succeed in this action, namely, that a minority shareholders' action is permissible whenever a minority disagrees with a majority on the question whether property of the company has been sold at an undervalue. On the authorities the plaintiff, in order to maintain his action, must show that the sale of the company's mine was either ultra vires the company or illegal, or that the transaction involved fraud on the part of the directors or fraudulent oppression of a minority. If it were otherwise it would be impossible for the domestic management of a company to be carried on, for a minority of the shareholders would be able to thwart the wishes of the majority upon every transaction and proceeding of the company with which it disagreed: see the following textbooks and authorities: Buckley on the Companies Acts, 12th ed., pp. 168-169; Gore-Browne, Handbook on Joint Stock Companies, 41st ed., pp. 382-386; Palmer's Company Law, 19th ed., p. 230; Palmer's Company Precedents, 16th ed., vol. 1, pp. 1037-1039; Halsbury's Laws of England, 3rd ed., vol. 6, pp. 418-420; Burland v. Earle [FN1]; Atwool v. Merryweather [FN2]; Gray v. Lewis [FN3]; Menier v. Hooper's Telegraph Works [FN4]; Russell v. Wakefield Waterworks Co. [FN5]; MacDougall v. Gardiner [FN6]; Mason v. Harris [FN7]; Spokes v. Grosvenor Hotel Co. [FN8]; Campbell v. Australian Mutual Provident Society [FN9]; Normandy v. Ind, Coope & Co. Ltd. [FN10]; Dominion Cotton Mills Co. Ltd. v. Amyot [FN11]; Cook v. Deeks [FN12]; Foster v. Foster [FN13]; British America Nickel Corporation v. O'Brien [FN14]; Edwards v. Halliwell. [FN15]

FN1 [1902] A.C. 83; 18 T.L.R. 41.

1956 WL 17838 (Ch D), [1956] 2 All E.R. 518, [1956] Ch. 565, [1956] 3 W.L.R. 224, (1956) 100 S.J. 452

**(Cite as: [1956] Ch. 565)**

FN2 (1867) L.R. 5 Eq. 464n.

FN3 (1873) L.R. 8 Ch. 1035, 1050-1051.

FN4 (1874) L.R. 9 Ch. 350.

FN5 (1875) L.R. 20 Eq. 474, 478.

FN6 (1875) 1 Ch.D. 13.

FN7 (1879) 11 Ch.D. 97.

FN8 [1897] 2 Q.B. 124, 126, 128.

FN9 (1908) 77 L.J.P.C. 117; 24 T.L.R. 623.

FN10 [1908] 1 Ch. 84, 106, 108; 24 T.L.R. 57.

FN11 [1912] A.C. 546, 549, 551; 28 T.L.R. 467.

FN12 [1916] 1 A.C. 554, 561.

FN13 [1916] 1 Ch. 532, 546, 550.

FN14 [1927] A.C. 369, 371, 373; 43 T.L.R. 195.

FN15 [1950] W.N. 537; [1950] 2 All E.R. 1064, 1066.

In the present case there is no question of ultra vires, illegality, fraud or fraudulent oppression, nor has there been any attempt *569 to do anything pursuant to an ordinary resolution, which can only be done by way of a special resolution, nor are the alleged wrongdoers the holders of a majority of the shares in the defendant company. If proceedings such as the present action were maintainable it would open the door wide for polite blackmailing actions by minority shareholders who disagreed on certain questions of company policy. It is for the company in general meeting to decide, for example, whether directors should be sued in circumstances such as these, always excepting cases which involve an element of fraud. The present case must be considered as though the transaction in question had been previously agreed upon in general meeting. A minority shareholder could not sue in the absence of fraud. Similarly if the transaction was ratified subsequently. In both cases the answer to the present statement of claim would be that the com-

pany acted intra vires.

The plaintiff must have brought these proceedings on the assumption that if a general meeting of the company had been held to determine whether the defendant directors should be sued the meeting would have voted against taking such action. The plaintiff, however, must show that that is something of which in law he can complain. But in these circumstances, in order validly to bring a minority shareholders' action it must be certain that a majority vote would be cast against bringing proceedings because the alleged wrongdoers are themselves the majority. The defendant directors, however, are not shareholders of the company; the shares are held by another company of which the defendants merely happen also to be among the directors.

The present proceedings are not within the admitted exceptions to the rule in Foss v. Harbottle [FN16] and the action should be dismissed under R.S.C., Ord. 25, r. 3.

FN16 (1843) 2 Hare 461.

Raymond Walton for the respondent, the plaintiff. The plaintiff, by his statement of claim, alleges that the personal defendants have been guilty of gross negligence. The rule in Foss v. Harbottle [FN17] is not disputed, but the admitted exceptions to it of fraud, illegality and ultra vires are not by any means exhaustive, and it is submitted that a minority shareholder's action will lie whenever the facts of the case warrant it. Strong reliance is placed on the observations of Jessel M.R. in Russell v. Wakefield Waterworks Co. [FN18] In Edwards v. Halliwell [FN19] Jenkins L.J. treats the rule in Foss v. Harbottle [FN20] as by no means an inflexible rule but one which may be modified in the *570 interests of justice. It is true that there appears to be only one reported decision in which a minority shareholder's action succeeded where neither fraud, illegality nor ultra vires was invoked, but that case, Alexander v. Automatic Telephone Co., [FN21] carries added weight as an authority since charges of fraud were originally preferred against the directors but were later abandoned.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1956 WL 17838 (Ch D), [1956] 2 All E.R. 518, [1956] Ch. 565, [1956] 3 W.L.R. 224, (1956) 100 S.J. 452
**(Cite as: [1956] Ch. 565)**

FN17 (1843) 2 Hare 461.

FN18 L.R. 20 Eq. 474, 480, 482.

FN19 [1950] 2 All E.R. 1064, 1067.

FN20 2 Hare 461.

FN21 [1900] 2 Ch. 56, 62, 64, 69.

In the present case the plaintiff alleges that the dir-
ectors were guilty of a very grave breach of duty in
selling property of the company at much below its
market value. Alexander's case [FN22] supports the
proposition that in such circumstances it is not ne-
cessary to find fraud in order validly to bring an ac-
tion where there is no other means of obtaining re-
dress for a serious injury done to the company. The
question might be asked: why, if the above proposi-
tion be good in law, is there to be found no decision
in the reports of a case of gross negligence by dir-
ectors as an exception to the rule in Foss v. Har-
bottle? [FN23] The answer lies in the fact that be-
fore 1929 it was common form to insert in articles
of association a clause absolving directors from the
consequences of negligence. The law was altered in
this respect by the Companies Act, 1929, in what is
now section 205 of the Act of 1948. The law would
be reduced to absurdity if a minority shareholder
could only bring an action where a question of
fraud, illegality or ultra vires was involved. Let it
be supposed that a set of amiable lunatics obtained
51 per cent. of the shares of a company and
thereupon deliberately but with the highest motives
sold the company's products at greatly below cost
price.

FN22 [1900] 2 Ch. 56, 62, 64, 69.

FN23 2 Hare 461.

[DANCKWERTS J. An example might be a body
of rabid teetotallers who obtained a controlling in-
terest in a brewery company.]

Yes. It is submitted that in such circumstances a
minority shareholder could bring an action for the
injury done to the company.

The transaction complained of in the present case
was not capable of being for the benefit of the com-
pany and a minority cannot be bound by it. Reli-
ance is placed on the observations of Bowen L.J. in
Hutton v. West Cork Railway Co. [FN24] as show-
ing that a minority are only bound to submit to the
wishes of the majority where it can be shown that
the acts complained of are reasonably incidental to
the carrying on of business for the company's bene-
fit.

FN24 (1883) 23 Ch.D. 654, 672.

**\*571** It was contended for the personal defendants
that they are not shareholders of the company and
that therefore ipso facto they cannot control it. But
the defendants have a controlling interest in Tunnel
Portland Cement Co., which holds a majority of the
shares in the company. The correct date for ascer-
taining control is the date of the issue of the writ in
the action, for otherwise there might thereafter be a
change of control which would affect the action.
True, the control of the defendants is a precarious
control, since it could be interfered with by Tunnel
Portland Cement Co. taking certain actions, for ex-
ample, removing the defendants from the board of
directors. But all control is precarious; until there is
interference there is de facto control.

The present action, if successful, would not open
the door to all polite actions of blackmail, as was
suggested, since the plaintiff must first prove negli-
gence. [Reference was also made to Shuttleworth v.
Cox Brothers & Co. (Maidenhead) Ltd. [FN25] and
Baillie v. Oriental Telephone and Electric Co. Ltd.
[FN26]]

FN25 [1927] 2 K.B. 9; 43 T.L.R. 83.

FN26 [1915] 1 Ch. 503, 518, 519; 31 T.L.R. 140.

*Russell Q.C.* in reply. There may be sound business
reasons why a company should wish to dispose of
some of its property for so much less than its true
market value; it may in the circumstances be a per-
fectly reasonable business transaction. Such a trans-
action would be intra vires the company. In the
present case it is not suggested that what was done

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1956 WL 17838 (Ch D), [1956] 2 All E.R. 518, [1956] Ch. 565, [1956] 3 W.L.R. 224, (1956) 100 S.J. 452

**(Cite as: [1956] Ch. 565)**

was ultra vires or a fraud on a minority. The observations of Jessel M.R. in Russell v. Wakefield Waterworks Co. [FN27] and of Jenkins L.J. in Edwards v. Halliwell [FN28] are obiter. Baillie v. Oriental Telephone and Electric Co. Ltd. [FN29] does not assist the plaintiff because in that case the acts complained of were illegal and ultra vires. The statements in paragraph 5 on p. 169 of Buckley cannot be supported on the authorities. If the exceptions to the rule in Foss v. Harbottle [FN30] be further extended the rule itself will cease to have any operation. [Reference was also made to Greenhalgh v. Arderne Cinemas Ltd. [FN31]]

FN27 L.R. 20 Eq. 474, 480, 482.

FN28 [1950] 2 All E.R. 1064, 1067.

FN29 [1915] 1 Ch. 503.

FN30 2 Hare 461.

FN31 [1951] Ch. 286, 291; [1950] 2 All E.R. 1120.

*Cur. adv. vult.*

**May 14.**

DANCKWERTS J.

read the following judgment. This is an application under R.S.C., Ord. 25, r. 2, for the determination of the following point of law: "Whether on the facts alleged in the re-amended statement of claim the plaintiff was **\*572** and is entitled to institute or maintain this action." [His Lordship stated the facts and continued:] The allegations of negligence or misfeasance are denied by the defendants, but the defendants have asked for the decision of the point of law in this case with the object of determining the action and avoiding the expense of the trial. I have to deal with this application on the footing that the allegations in the statement of claim are true. It is agreed that I ought not to allow myself to be affected either by the smallness of the plaintiff's apparent stake in the fortunes of the company or by any scepticism that I may feel as to the alleged magnitude of the defendants' delinquency.

It is contended on behalf of the defendants that the matters in respect of which the plaintiff complains, and in particular the question whether proceedings should be taken against the directors, is a matter of internal management of the company, with which, on the principle stated in Foss v. Harbottle, [FN32] the court normally will not interfere. It is contended further on behalf of the defendants that the present case - based on negligence of directors - is not within the few recognized exceptions to the above-mentioned rule, namely, cases of ultra vires, illegality, or fraud (including fraudulent oppression of a minority by the majority of the shareholders). Further, it is said, the case is not a case where the control of the voting power is in the hands of the directors of the company whose actions are impugned; for they are not the shareholders; the shares are held by another company of which the defendant directors merely happen also to be among the directors.

FN32 (1843) 2 Hare 461.

For the plaintiff, it is contended that the above-mentioned exceptions are not exhaustive, and the court will grant relief wherever justice requires on any ground, and particularly where an otherwise helpless minority shareholder is in need of assistance by the court. As regards control, it is contended that, except for an immaterial period, the defendant directors, being a majority of the directors of Portland Tunnel Cement Co. Ltd. (the holders of the vast bulk of the shares of the company) were in a position to stifle any attempt to institute proceedings in the name of the company against them.

A number of textbooks and a very large number of decisions were cited to me, partly, of course, with the negative object of eliminating any precedent for the present action. In Buckley on the Companies Acts, 12th ed., pp. 168-169, the position is stated as follows: "1. If an act, which might be done with the approval **\*573** of a majority, be done irregularly and without such approval, then the majority are the only persons who can complain, and the court will not entertain the complaint except at the instance of the majority, and in a proceeding in which the cor-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1956 WL 17838 (Ch D), [1956] 2 All E.R. 518, [1956] Ch. 565, [1956] 3 W.L.R. 224, (1956) 100 S.J. 452
**(Cite as: [1956] Ch. 565)**

poration is plaintiff. 2. In any proceeding brought to redress a wrong done to the corporation or to recover property of the corporation, or to enforce rights of the corporation, the corporation is the only proper plaintiff. Except that if (see rule 3, infra) an individual corporator sues the corporation to prevent it from doing something ultra vires, e.g., to restrain it from carrying out an agreement with a third party, and joins that third party as a defendant, then as a necessary incident to the first part of the relief claimed, the court will go on to direct the repayment of money, or restoration of property paid or disposed of under the agreement. 3. A single shareholder suing on behalf of himself and others, or suing alone and not on behalf, may make the company a defendant and may restrain the company and directors from doing an act which is illegal, or criminal, or ultra vires the corporation, and which a majority are consequently unable to affirm. A stranger who is not specially damaged cannot sue, neither, semble, can a shareholder, who has with knowledge received and retains part of the proceeds of the ultra vires act, except to restrain future ultra vires dealings. If, however, a majority are opposed to the illegal act, quaere whether the company should not be made, or at any rate joined, as plaintiff. 4. If the act complained of be not ultra vires, but be of a fraudulent character or a wrong done to the corporation, of which therefore the corporation alone upon the principles already stated can complain, yet if the alleged wrongdoers be themselves the majority, or turn the scale of the majority, then the minority may sue by one shareholder on behalf of himself and others. So also, semble, if a bare majority are purporting to do or authorize something inconsistent with the articles, though not ultra vires. Semble, one of the majority should be joined as a defendant. 5. The above are general rules strictly adhered to, but not inflexible, and any case in which the claims of justice require that an action in which the company is not plaintiff should be entertained may be made an exception. But if the case is one in which the company ought to sue, then (subject to rule 6) the shareholder must exhaust all reasonable means of obtaining the institution of an action by the company before suing himself. But if

the case be one of class 4, it is idle to say **\*574** that a meeting ought to be called in which the alleged wrongdoers should not vote, for that would be trying the question of fraud as a preliminary step for ascertaining the frame of the action in which it is to be tried." I need not read rules 6 and 7, which follow. Subject to the doubts which I am about to mention, this passage seems to me to be a fair statement of the law on this subject.

Now, the phrases in the passage which I have quoted most favourable to the plaintiff in the present case are the reference to "a wrong done to the corporation," as well as cases of fraud and ultra vires, and the statement that the general rules stated are not inflexible and any case in which the claims of justice require that an action in which the company is not plaintiff should be entertained may be made an exception. It would appear that these are based on statements by Sir George Jessel M.R. in Russell v. Wakefield Waterworks Co. [FN33] In that case Sir George Jessel M.R. said of the rule in Foss v. Harbottle [FN34]: "that is not a universal rule; that is, it is a rule subject to exceptions, and the exceptions depend very much on the necessity of the case; that is, the necessity for the court doing justice." Later Sir George Jessel M.R. said (after referring to Atwool v. Merryweather [FN35]: "As I have said before, the rule is a general one, but it does not apply to a case where the interests of justice require the rule to be dispensed with. I do not intend by the observations I have made in any way to restrain the generality of the terms made use of by the learned judge who decided the case of Foss v. Harbottle." [FN36] These sound very general words, but judicial expressions must be read in the context in which they occur. In Russell v. Wakefield Waterworks Co. [FN37] a shareholder in an incorporated company filed his bill on behalf of himself and all other shareholders against the directors and the promoters of a Bill in Parliament for a rival purpose, alleging an illegal payment of the company's money to such promoters to buy off their opposition and praying that it might be replaced. On a demurrer, Sir George Jessel M.R. held that the action was not maintainable on the allegations made, as (though the word "corrupt" was

1956 WL 17838 (Ch D), [1956] 2 All E.R. 518, [1956] Ch. 565, [1956] 3 W.L.R. 224, (1956) 100 S.J. 452

**(Cite as: [1956] Ch. 565)**

used) there was no allegation that the payments were fraudulent or ultra vires. He gave leave to amend the bill, but it is plain that he regarded the demurrer as final, unless the bill should be amended to raise a claim of fraud or ultra vires, **\*575** both of which are, of course, recognized exceptions in which an action can be brought by a shareholder. It is, therefore, doubtful whether Sir George Jessel's observations should be applied to any wider field than such recognized exceptions to the rule in Foss v. Harbottle. [FN38]

FN33 (1875) L.R. 20 Eq. 474, 480, 482.

FN34 2 Hare 461.

FN35 (1867) L.R. 5 Eq. 464n.

FN36 2 Hare 461.

FN37 L.R. 20 Eq. 474.

FN38 2 Hare 461.

The wide expressions used in Buckley on the Companies Acts and by Sir George Jessel M.R. in the above-mentioned case are not supported by the statement of the law by Lord Davey in the Privy Council case of Burland v. Earle, [FN39] where he says: "It is an elementary principle of the law relating to joint stock companies that the court will not interfere with the internal management of companies acting within their powers, and in fact has no jurisdiction to do so. Again, it is clear law that in order to redress a wrong done to the company or to recover moneys or damages alleged to be due to the company, the action should prima facie be brought by the company itself. These cardinal principles are laid down in the well-known cases of Foss v Harbottle [FN40] and Mozley v. Alston, [FN41] and in numerous later case which it is unnecessary to cite. But an exception is made to the second rule, where the persons against whom the relief is sought themselves hold and control the majority of the shares in the company, and will not permit an action to be brought in the name of the company. In that case the courts allow the shareholders complaining to bring an action in their own names. This, however,

is mere matter of procedure in order to give a remedy for a wrong which would otherwise escape redress, and it is obvious that in such an action the plaintiffs cannot have a larger right to relief than the company itself would have if it were plaintiff, and cannot complain of acts which are valid if done with the approval of the majority of the shareholders, or are capable of being confirmed by the majority. The cases in which the minority can maintain such an action are, therefore, confined to those in which the acts complained of are of a fraudulent character or beyond the powers of the company. A familiar example is where the majority are endeavouring directly or indirectly to appropriate to themselves money, property, or advantages which belong to the company, or in which the other shareholders are entitled to participate, as was alleged in the case of Menier v. Hooper's Telegraph Works." [FN42]

FN39 [1902] A.C. 83, 93; 18 T.L.R. 41 **\*576** .

FN40 2 Hare 461.

FN41 (1847) 1 Ph. 790.

FN42 (1874) L.R. 9 Ch. 350.

These observations, indeed, indicate how the principles involved may easily be misstated. Lord Davey refers to an action by shareholders (instead of the company) being allowed "in order to give a remedy for a wrong done which would otherwise escape redress." But he points out that this is purely a matter of procedure, and he expressly confines the cases in which such proceedings can be brought to those in which the acts complained of are of a fraudulent character (in which he includes appropriation by a majority in fraud of the minority of the shareholders) or beyond the powers of the company. Where the act complained of is within the powers of the company and the intention of the majority of the shareholders, in other cases than these exceptions the action is not maintainable. Lord Davey adds [FN43] that, "Unless otherwise provided by the regulations of the company, a shareholder is not debarred from voting or using his voting power to carry a resolution by the circum-

1956 WL 17838 (Ch D), [1956] 2 All E.R. 518, [1956] Ch. 565, [1956] 3 W.L.R. 224, (1956) 100 S.J. 452
**(Cite as: [1956] Ch. 565)**

stance of his having a particular interest in the subject-matter of the vote."

FN43 [1902] A.C. 83, 94.

On the facts of the present case, the sale of the company's mine was not beyond the powers of the company, and it is not alleged to be ultra vires. There is no allegation of fraud on the part of the directors or appropriation of assets of the company by the majority shareholders in fraud of the minority. It was open to the company, on the resolution of a majority of the shareholders, to sell the mine at a price decided by the company in that manner, and it was open to the company by a vote of the majority to decide that, if the directors by their negligence or error of judgment had sold the company's mine at an undervalue, proceedings should not be taken by the company against the directors. Applying, therefore, the principles as stated by Lord Davey, it is impossible to see how the present action can be maintained.

I have examined again all of the large number of authorities which were cited to me in the course of the arguments. Though there are to be found, in one or two instances, observations which at first sight might justify a more liberal view of the extent of minority shareholders' rights, when taken out of their context, I do not think any of the authorities justify any conclusion other than that which I have reached.

That really disposes of the matter, and it is not really necessary to consider whether, on the allegations contained in the re-amended statement of claim, the defendant directors can be said to have such control of the company as to require (in any **\*577** appropriate case) the allowance of an action by a minority shareholder. The defendant directors are not in fact the holders of the shares, the voting power of which would settle the company's decision. I think that it must be admissible in certain cases to go behind the apparent ownership of shares in order to discover whether a company is in fact controlled by wrongdoers - as, for instance, in the case where the shares were held by mere nominees,

bound to vote as the owners required them to vote. In the present case, the shares are held by a company of which the defendant directors were, for the greater part of the material period, not only directors, but sufficient in number to out-vote the other directors, of the shareholding company. In this manner, it is said they could prevent the shareholding company passing any resolution which might result in proceedings being taken in the name of the company which is alleged to have been injured against them. I suppose the shareholders of the shareholding company could in general meeting decide differently and disagree with the decision of the directors of that company. I am not satisfied that the defendant directors are in such control of the company as is necessary to justify an action by a minority shareholder, but I need not decide this question.

In the result, I reach the conclusion that on the facts alleged in the re-amended statement of claim the action is not maintainable by the plaintiff; and I ought to dismiss the action under R.S.C., Ord. 25, r. 3.

**Representation**

Solicitors: E. F. Turner & Sons; Stibbard, Gibson & Co.

Order accordingly. (J. A. G. )

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**TAB Q**

Butterworths Company Law Cases/BCLC 1985 /Taylor and another v National Union of Mineworkers (Derbyshire Area) and others - [1985] BCLC 237

**[1985] BCLC 237**

# Taylor and another v National Union of Mineworkers (Derbyshire Area) and others

**CHANCERY DIVISION**

**VINELOTT J**

**10, 11, 12, 13, 14 DECEMBER 1984**

*Trade union - Misapplication of funds - Trade union analogous to a company - Member's standing to bring derivative action on behalf of union - The rule in Foss v Harbottle - Effect of members' decision not to sue - Trade Union and Labour Relations Act 1974, s 2 - Employment Act 1982, s 17.*

In September 1984 the plaintiffs, who were members of the Derbyshire Area of the National Union of Mineworkers (the Derbyshire Union), were successful in obtaining, inter alia, a declaration that a strike called by their union (the Derbyshire Union) and the National Union of Mineworkers (NUM) was unlawful. The plaintiffs sought in the present proceedings by way of summary judgment an order restraining the defendants, who were the Derbyshire Union and some of its officers, from using the funds of the Derbyshire Union for the purpose of a strike called by the NUM and the Derbyshire Union, and requiring those defendants who were officers of the Derbyshire Union to restore to the union funds which had been used for this purpose.

**Held -** Injunction granted: summary judgment on the monetary claim refused. Where a member of a union commenced an action on behalf of the union, the union would be treated as being analogous to a company and the member's standing to bring the action would be determined on the same principles as those applicable to an action brought by a shareholder on behalf of a company. These principles did not prevent an individual member from maintaining an action on behalf of the union against its officers where it was clear that the officers had made an ultra vires application of the funds which could not be ratified by the members. In such an action by a member of the union against its officers for the ultra vires misapplication of the union's funds, the court could order the officers responsible to restore the funds as such misapplication would constitute a breach of fiduciary duty. On the facts, it was clear that the Derbyshire Union's funds had been used to support the strike and there was no reasonably arguable case that this payment was authorised by the union's rules or could be ratified by the members of the union. Accordingly, as a matter of principle, the plaintiffs were entitled to the order which they sought. However, although the making of the payment could not be ratified by the members of the union, the members could resolve to take no action to remedy the wrong done to the union provided that such resolution was made in good faith and for the benefit of the union. As there was evidence to suggest that the members might so resolve, and as the circumstances in this case were otherwise exceptional, the court would not grant summary judgment on the monetary claims.

*[1985] BCLC 237 at  238*

 The plaintiffs were, however, entitled to an injunction to restrain further misapplications (see p 246b, 254a-b, 254j-255b, 256d-257a, post).

### Cases referred to in judgment

*Bennett v National Amalgamated Society of Operative House and Ship Painters and Decorators* (1915)

85 LJ Ch 298.

*British Actors' Equity Assocn v Goring* [1978] ICR 791.

*Carter v United Society of Boilermakers* (1915) 85 LJ Ch 289.

*Cotter v National Union of Seamen* [1929] 2 Ch 58.

*Durham Miners Assocn Re, Watson v Cann* (1900) 17 TLR 39, CA.

*Edwards v Halliwell* [1950] 2 All ER 1064, [1950] WN 537.

*Foss v Harbottle* (1843) 2 Hare 461, 67 ER 189.

*Heatons Transport (St Helens) Ltd v Transport and General Workers' Union* [1972] 3 All ER 101, [1973] AC 15, [1972] 3 WLR 431.

*Howden v Yorkshire Miners' Assocn* [1903] 1 KB 308, CA; *affd* [1905] AC 256, HL.

*MacDougall v Gardiner* (1875) 1 Ch D 13, 45 LJ Ch 27.

*Porter v National Union of Journalists* [1980] IRLR 404.

*Taff Vale Rly Co v Amalgamated Society of Railway Servants* [1901] AC 426, 70 LJKB 905, HL.

*Wallersteiner v Moir (No 2)* [1975] 1 All ER 849, [1975] QB 373, [1975] 2 WLR 389.

**Cases also cited**

*Bamford v Bamford* [1969] 1 All ER 969, [1970] Ch 212, [1969] 2 WLR 1107.

*Carter v United Society of Boilermakers* (1915) 85 LJCh 289.

*Cow v Casey* [1949] 1 KB 474, [1949] 1 All ER 197.

*Denaby and Cadeby Main Collieries v Yorkshire Miners' Assocn* [1906] AC 384, HL.

*Express Newspapers Ltd v MacShane* [1980] 1 All ER 65, [1980] AC 672, [1980] 2 WLR 89, HL.

*General Aviation Services (UK) Ltd v TGWU* [1976] IRLR 224.

*Grant v United Kingdom Switchback Rlys Co* (1888) 40 Ch D 135, 58 LJ Ch 211.

*Hodgson v National and Local Government Officers' Assocn* [1972] 1 All ER 15, [1972] 1 WLR 130.

*Howitt Transport Ltd v TGWU* [1973] ICR 1.

*Institution of Mechanical Engineers v Cane and Westminster Corp* [1960] 3 All ER 715, [1961] AC 696, [1960] 3 WLR 978, HL.

*Kelly v Wyld* (1937) 81 Sol Jo 179.

*National Union of Seamen, Re, Wilson v National Union of Seamen* [1929] 1 Ch 216, [1928] All ER Rep 128.

*Russell v Wakefield Waterworks Co* (1875) LR 20 Eq 474.

*Sharpe, Re, Re Bennett, Masonic and General Life Assurance Co v Sharpe* [1892] 1 Ch 154, [1891-4] All ER Rep Ext 1974.

*Steele v South Wales Miners' Federation* [1907] 1 KB 361.

**Motion**

This was an application by the plaintiffs, two working miners, Albert Roland Taylor and John David Wynn Roberts, seeking summary judgment against the defendants, (1) the National Union of Mineworkers (Derbyshire Area) and

*[1985] BCLC 237 at  239*

three officers of the Derbyshire Union (2) Gordon Butler, its secretary (3) John Burrows, its treasurer, and (4) Austin Fairest, its president.

In the action the relief sought was (1) an injunction restraining the defendants from using, procuring or permitting the use of the funds of the Derbyshire Union for the purposes of a strike called at the instance of the Derbyshire Union or the National Union of Mineworkers, and (2) an order requiring the individual defendants to restore to the union £1,736,789.50 spent on the strike in the past eight months. The facts are set out in the judgment.

*Robin Potts QC*, *Michael Todd* and *Patrick Elias* for the plaintiffs.

*Anthony Scrivener QC*, *John G Hendy* and *Jeremy McMullen* for the defendants.

**14 December 1984. The following judgment was delivered.**

**VINELOTT J.**

In this application the plaintiffs, two working miners, Albert Roland Taylor and John David Wynn Roberts seek summary judgment against the defendants, the National Union of Mineworkers (Derbyshire area),

which I will call the 'Derbyshire union' and three officers of the Derbyshire union: Gordon Butler, its secretary; John Burrows, its treasurer; and Austin Fairest, its president. In the action the relief sought is first an injunction restraining the defendants from 'using, procuring or permitting the use of' the funds of the Derbyshire union for the purposes of a strike called at the instance of the Derbyshire union or the National Union of Mineworkers, which I will abbreviate to 'NUM', and second an order in effect requiring the individual defendants to restore to the Derbyshire union moneys which have in the past eight months been used for that purpose.

The history of the litigation is shortly as follows. In July of this year the plaintiffs together with one John Phillips, a mobile plant driver employed by the National Coal Board, which I will abbreviate to the 'NCB', brought an action against the Derbyshire union; the second and third defendants; the NUM; and Arthur Scargill, its president. In that action they sought a declaration that the strike called by the Derbyshire union and the NUM was called in breach of the rules, at least so far as the Derbyshire area was concerned, and as such was unlawful. They also sought a declaration that directions or instructions issued by or on behalf of the Derbyshire union and the NUM requiring their members to strike or not to work or not to cross picket lines were in breach of the rules of the union, that the plaintiffs were entitled to disregard such instructions and directions, and that the Derbyshire union and the NUM were not entitled to invoke any disciplinary procedures against the plaintiffs by reason of their refusal to comply with such instructions or directions. They also sought injunctions against the defendants in the terms of the declarations sought.

That action came before Nicholls J towards the end of September. At the hearing the individual defendants took the unusual course of stating through leading counsel that they were willing to submit to the injunctions sought but not to concede the plaintiffs' right to the declarations on which those injunctions were founded. None of the defendants sought to defend the action. On 28 September Nicholls J gave a long and careful judgment in which he reviewed the rules of the two unions and the circumstances giving rise to the strike call and held that the strike call was made in breach of the rules of the two unions, so far as the Derbyshire area was concerned, and that the plaintiff was entitled to the declarations and injunctions sought. I propose to refer to only one passage in the course of his judgment. He said this:

[1985] BCLC 237 at 240

'The plaintiffs' case, and in fairness to them it should be said, is that they are loyal NUM members, ready to abide by decisions of their union reached constitutionally. Their complaints in this action are not based on mere technicalities, lawyers quibbles on nice points of interpretation of obscure rules. The rules are the constitutions of the unions. They exist for the benefit and protection of all the members. The rules regarding strikes are explicit, but for a period of over six months now the officers of the NUM and the Derbyshire union have chosen to disregard the constitutions under which they hold office, and to ride roughshod over their members by taking action which could be taken lawfully only with the support of a majority vote on a ballot. When challenged to justify their actions, both unions declined to do so. Meanwhile members of the Derbyshire union who wished to do no more than to exercise their right to work are vilified, harassed, disciplined by their union, and sought to be intimidated by violent mass picketing and in other ways and they and their families in the communities where they live are abused or ostracised and threatened with physical violence.'

There was no appeal against that decision. As between the plaintiffs and the defendants other than Mr Fairest the decision (in particular that the strike was called in breach of the rules of the Derbyshire union) is res judicata and cannot be challenged. As regards Mr Fairest the matter may also be res judicata in that he is president of the Derbyshire union. I find it unnecessary to consider this point. The reasons given by Nicholls J for his conclusion seem to me compelling.

On 5 November the two plaintiffs in this action applied ex parte for an order restraining the defendants from using or procuring or permitting the use of the Derbyshire union's funds for the purposes of the strike. I granted an injunction for a short period until the defendants could be heard. The writ was issued on 6 November claiming injunctions in the terms I have described. The writ also sought against the individual defendants damages for breach of contract and/or breach of trust and an order against the Derbyshire union that it permit the plaintiffs with a named accountant to inspect its books of account. The ex parte injunctions came back before me on 9 November, when the individual defendants gave undertakings in the terms of the

injunctions sought until the trial of the action or until further order. No undertakings were offered by counsel for the defendant union (Mr Scrivener QC). It was sought at that time to answer the plaintiffs' evidence. Accordingly an injunction was granted after argument until the further hearing of the motion, when the defendant union had had an opportunity of filing evidence.

Also after hearing argument I made the order sought that the Derbyshire union permit the plaintiffs and the named accountant to inspect its books of account. That was on 9 November. The inspection started, I understand, on 13 November. The accountant's report is dated 22 November. The report shows that between the commencement of the strike and 6 November sums totalling £1,736,789.50 were paid out of the Derbyshire union's funds and recorded in the books of the union as 'paid in support of the strike'. The payments were made by cheque or in cash by the second and third defendants. In affidavit evidence filed in this application it is admitted by the defendants that these sums were paid 'in connection with the strike'. Some payments were made by way of payments to pickets for picketing duties and the expenses of picketing. A large

<div align="right">*[1985] BCLC 237 at 241*</div>

part of the money was applied in making payments to relieve hardship amongst members of the union and their families.

The statement of claim was served on 24 November. It is alleged that the payments made were for the purposes of the strike and were unlawful and a misapplication of the funds of the defendant union, that in making the payments the individual defendants acted in breach of their fiduciary duties to the Derbyshire union, and that they are accountable to the union 'in respect' of that sum. The relief sought apart from permanent injunctions in the terms of the undertakings given and the interlocutory injunction granted on 9 November comprises substantially a claim for damages against the individual defendants for breach of contract and/or breach of trust and all necessary accounts and inquiries. Shortly after the delivery of the statement of claim the plaintiffs gave notice of this present application for summary judgment.

The principles applied in granting or refusing an application for summary judgment are well settled and are not in dispute. The court does not give summary judgment in any case where there is a serious issue of fact which ought to be tried. Leave to defend will also not normally be given if the case raises a difficult question of law, more particularly one where the issues may require to be set a factual matrix. The court only gives summary judgment in a case giving rise to a serious question of law if it is clear that there is no evidence that could be usefully adduced to assist the determination of the question and where the court comes to the conclusion that there is no reasonable doubt as to the principles of law or the application of them to the given case.

In applying these principles to the present case it will, I think, be convenient to deal first with the claim for reimbursement of the Derbyshire union by the individual defendants. Counsel for the plaintiffs (Mr Potts QC) accepted that there is no clear evidence that Mr Fairest authorised the payment or participated in the payment of the sums in question. The claim is therefore pursued against the second and third defendants alone. As I have said, it is not in dispute that the sum claimed was applied with the authority of the second and third defendants (who were required under the rules to sign all cheques on the union's bank accounts) 'in connection with' (to use the third defendant's phrase in his affidavit evidence) the strike. Those two defendants are both officers of the Derbyshire union. It is said by counsel for the defendants (Mr Scrivener QC) that they are employed not by the Derbyshire union but by the NUM. That, it seems to me, does not affect the position one way or the other. As officers holding positions of authority they clearly owed a fiduciary duty to the union. Plainly, to my mind, they are accountable to the Derbyshire union for moneys misapplied by them in breach of that fiduciary duty.

The first question is whether the plaintiffs are in a position to maintain an action against the individual defendants in effect on behalf of the Derbyshire union whose members have not been consulted on the question whether proceedings should be brought against the individual defendants. A great wealth of authority has been cited on this issue. The position, in my view, is not open to serious doubt. I need only refer to two cases, both cases concerning the National Union of Seamen, *Cotter v National Union of Seamen* [1929] 2 Ch 58 and *Edwards v Halliwell* [1905] 2 All ER 1064.

In *Cotter's* case the plaintiffs, members of the union, commenced proceedings to restrain the union and its officers from making an interest-free loan of £10,000 to the Miners' Non-Political Movement and for a declaration that a special

*[1985] BCLC 237 at 242*

general meeting had been invalidly convened and that a resolution of that meeting to make the loan was accordingly invalid. It was held by Romer J and the Court of Appeal that it was within the power of the union to make the £10,000 loan, that an irregularity in calling the meeting and in passing the resolution could be cured by a confirmatory resolution passed at a meeting properly convened, and that in those circumstances the plaintiffs as a minority of the union were not entitled to sue on behalf of the union. Thus the court applied to the union the principle known to company lawyers as the rule in *Foss v Harbottle* (1843) 2 Hare 461.

I do not propose to cite extensively from the judgments in *Cotter's* case. The point is made shortly in a passage in the judgment of Romer J, which was affirmed by the Court of Appeal. He said ([1929] 2 Ch at 71):

> 'The principle, as I understand it, [that is, the principle in *Foss v Harbottle*] does not depend upon the existence of a corporation. The reasoning of it surely applies to any legal entity which is capable of suing in its own name and which is composed of individuals bound together by rules which give the majority of them the power to bind the minority.'

At that time trades union law was still governed by the principles laid down in the Trades Union Act 1871. Section 8 of that Act provided for the property of a union to be vested in trustees for 'the use and benefit of such trade union and the members thereof'. It had been held in the well-known case of *Taff Vale Rly Company v Amalgamated Society of Railway Servants* [1901] AC 426 that the effect of the act was that a union could be sued in its own name and that the effect of s 8 was that the property so held for the benefit of the union and its members was the property of the union which was the beneficial owner of it.

The principle so laid down was, of course, an essential step in the reasoning of Romer J and the Court of Appeal. The trade union was treated as analogous to a company for the purposes of the rule in *Foss v Harbottle* because as regards its property it was to be treated as a separate legal entity governed by the code constituted by its rules and could be sued and be made liable to the extent of its property in its name. The argument of the unsuccessful plaintiff in *Cotter's* case was that the concluding words of the passage in s 8 which I have cited preserved the members beneficial interest in the funds of that union. So, it was said, as in the case of any other unincorporated society such as a club any member could restrain an application of the funds of the union made otherwise than in compliance with the rules of the union. That argument was rejected by both Romer J and the Court of Appeal.

In *Edwards v Halliwell* [1905] 2 All ER 1064 the plaintiff, a member of the same union, claimed that a resolution increasing the contributions of employed members was invalid. Under the rules such a resolution required a two-thirds majority obtained at a ballot vote. The purported resolution was passed without a ballot. The Court of Appeal held that the rule in *Foss v Harbottle* (1843) 2 Hare 461 did not apply to bar the plaintiff's right to sue. The failure to hold a ballot was not a mere irregularity. Any member was entitled to refuse to pay an increased subscription unless made payable by a valid resolution. In a classic exposition of the rule in *Foss v Harbottle*, which is often cited but which I shall cite again, Jenkins LJ said ([1905] 2 All ER at 1066-1067):

*[1985] BCLC 237 at 243*

> 'The rule in *Foss v Harbottle*, as I understand it, comes to no more than this: First, the proper plaintiff in an action in respect of a wrong alleged to be done to a company or association of persons is prima facie the company or the association of persons itself. Secondly, where the alleged wrong is a transaction which might be made binding on the company or association and on all its members by a simple majority of the members, no individual member of the company is allowed to maintain an action in respect of that matter for the simple reason that, if a mere majority of the members of the company or association is in favour of what has been done, then *cadit quæstio*. No wrong had been done to the company or association and there is nothing in respect of which anyone can sue. If, on the other hand, a simple majority of members of the company or association is against what has been done, then there is no valid reason why the company or association itself should not sue. In my judgment, it is implicit in the rule that the matter relied on as constituting the cause of action should be a cause of action properly belonging to the general body of corporators or

members of the company or association as opposed to a cause of action which some individual member can assert in his own right. The cases falling within the general ambit of the rule are subject to certain exceptions. It has been noted in the course of argument that in cases where the act complained of is wholly ultra vires the company or association the rule has no application because there is no question of the transaction being confirmed by any majority. It has been further pointed out that where what has been done amounts to what is generally called in these cases a fraud on the minority and the wrongdoers are themselves in control of the company, the rule is relaxed in favour of the aggrieved minority who are allowed to bring what is known as a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue. Those exceptions are not directly in point in this case, but they show, especially the last one, that the rule is not an inflexible rule and it will be relaxed where necessary in the interests of justice.'

I have read that passage in full, because Jenkins LJ makes it clear that the protection afforded by the rule in *Foss v Harbottle* to a company and a trade union does not extend to cases where the plaintiff seeks to prevent or remedy an application of the funds of the body which is outside the powers conferred by its constitution. The reason is that such an application cannot be ratified by a mere majority of the members or indeed by any majority, however large. Any member is entitled to insist that the funds of the body be used exclusively in furtherance of its objects, those objects to be inferred from its constitution.

Before leaving this issue, I should mention the decisions of the Court of Appeal and the House of Lords in the case of *Howden v Yorkshire Miners' Association* [1903] 1 KB 308; *affd* [1905] AC 256. In that case the officers of the union proposed to apply funds in payment of weekly strike pay to certain of its members. It was held by the Court of Appeal and the House of Lords that the payment of strike pay in the particular circumstances of the case was not authorised by the rules. I shall have to return to this point later. In the Court of

*[1985] BCLC 237 at  244*

Appeal the union was treated as analogous to a company and so within the rule of *Foss v Harbottle.* That case was not cited, but the court relied on the decision of Court of Appeal in *MacDougall v Gardiner* (1875) 1 Ch D 13, where the rule in *Foss v Harbottle* was explained and applied. It was held in the Court of Appeal that the action was maintainable by an individual member, because the action was to restrain a misapplication of the funds of the union for purposes outside the powers of the union. Vaughan Williams LJ said ([1903] 1 KB at 331):

'The case seems to me to come within the cases in which it has been held that an individual member of a society is entitled to sue where something is proposed to be done which would be not only ultra vires on the part of the governing body of the society, but ultra vires on the part of the society itself.'

The *Taff Vale* case had then been decided and though it was not referred to in argument or in the judgments, it must have been present to the minds of their lordships.

In the House of Lords the principle established in *Foss v Harbottle* or in *MacDougall v Gardiner* is not referred to. In the speeches, the case was treated as one in which the plaintiff sought to preserve a fund in which he had an interest. Lord Lindley said in particular ([1905] AC at 281):

'The plaintiff, who is a member of the trade union, and who is beneficially interested in its funds, complains that those who have control of them threaten and intend to apply them to purposes not authorized by the rules of the association; and the whole object of the action is to obtain an injunction to restrain that intended misapplication of the funds.'

However, the main issue to which the argument was directed in the House of Lords was whether the action fell within s 4 of the Trade Union Act 1871, which provided that 'Nothing in this Act shall enable any court to entertain any legal proceeding instituted with the object of directly enforcing or recovering damages for the breach of any of the following agreements', and then there follow under sub-s (3), any agreement 'for the application of the funds of a trades union (a) to provide benefits to members'. Lord Lindley, of course, was one of the judges in the House of Lords who decided the *Taff Vale* case and he specifically held in that case

that the effect of the 1871 Act was that the union was the beneficial owner of its funds (see [1901] AC at 444). Clearly he must have had that in mind. The position, as I see it, in the House of Lords was that once it was held that the case was outside s 4 it was clear as could be that the plaintiff was entitled to maintain the action whether on the ground that the case was within the exception to the rule in *Foss v Harbottle* or on the ground that he was entitled to protect the misuse of a fund in which he had an indirect beneficial interest. It was unnecessary for their lordships to examine the latter aspect of the case further.

The decision of the Court of Appeal in *Howden* was referred to by the Court of Appeal in *Cotter's* case. The speeches in the House of Lords were not. I cannot therefore take the decision of the House of Lords as authority for the proposition that *Foss v Harbottle* (1843) 2 Hare 461 does not apply to a union

*[1985] BCLC 237 at 245*

or that the members have such a beneficial interest in the funds of the union as to entitle them to restrain an application of the funds which while not ultra vires its objects is not regularly made in accordance with its rules.

The trade union legislation has undergone many changes since 1871. It was provided by the Industrial Relations Act 1971, s 74, that a trade union which was registered under the Act if it was not then a body corporate should thereby become a body corporate. A union which did not register remained a mere unincorporated association. The law was further altered by the Trade Union and Labour Relations Act 1974. Section 2 of that Act provides as follows:

> '(1) A trade union which is not a special register body shall not be, or be treated as if it were, a body corporate, but - (*a*) it shall be capable of making contracts; (*b*) all property belonging to the trade union shall be vested in trustees in trust for the union; (*c*) subject to section 14 below, it shall be capable of suing and being sued in its own name, whether in proceedings relating to property or founded on contract or tort or any other cause of action whatsoever; (*d*) proceedings for any offence alleged to have been committed by it or on its behalf may be brought against it in its own name; and (*e*) any judgment, order or award made in proceedings of any description brought against the trade union on or after the commencement of this section shall be enforceable, by way of execution, diligence, punishment for contempt, or otherwise, against any property held in trust for the trade union to the like extent and in the like manner as if the union were a body corporate.'

That section remains in force subject to a minor modification. As I see it the effect of that section is to restore the law as it was under the 1871 Act, in particular as interpreted by the Court of Appeal in *Cotter's* case.

Section 17 of the Employment Act 1982 provides that a category of 'protected property' is to be exempt from damages recovered against the union under s 16. 'Protected property' is defined in s 17(2) as including '(*b*) [property] belonging to any member of the union or association concerned otherwise than jointly or in common with the other members'. That subsection seems to proceed on the assumption that the members of the union do have a beneficial interest in its ordinary funds jointly with the other members. I find it, however, unnecessary to decide what the effect of s 17 is in this regard. Even if s 17(2)(*b*) does modify s 2 of the 1974 Act to some extent, the position of the union in regard to its funds is still not substantially different from the position under the 1871 Act. So I can see no ground for contending that the rule in *Foss v Harbottle* does not still apply to protect a union and its officers against claims by individual members in respect of matters intra vires the union which are capable of being ratified by a majority.

All the cases which I have cited so far were cases where what was sought was a declaration of invalidity of a resolution or proposed act on behalf of a union and an injunction. However, in at least two cases restoration of the funds of a union applied in breach of the rules of the union and for purposes not authorised by its constitution has been ordered. They are the decision of Warrington J in *Bennett v National Amalgamated Society of Operative House and Ship Painters and Decorators* (1915) 85 LJ Ch 298 and the decision of Younger J in *Carter v United Society of Boilermakers* (1915) 85 LJ Ch 289. Both these cases concerned

*[1985] BCLC 237 at 246*

payments made out of union funds in the purchase of the shares of a company, the Labour Newspaper Ltd, formed for the purpose of publishing a newspaper, The Daily Citizen, following an appeal by Mr Ramsay

McDonald. In each case it was held that the application of funds was not an investment and that it was outside the powers of the union. In both cases it was held that trustees who had made the payment were liable to make restoration to the funds of the union concerned.

The principles which emerge are, I think, clear. *Foss v Harbottle* applies to a union but does not bar the right of an individual to maintain an action joining the union and its officers as defendants and claiming that a particular application by the officers was ultra vires and an injunction to restrain further application of the funds of the union for the same purposes and requiring the officers to make good the loss to the union. Being ultra vires the misapplication cannot be ratified by any majority of the members.

The central issue in this case is whether the payments, amounting to over £1.7m, were misapplications of the funds of the union within the exception to the rule in *Foss v Harbottle.* Before turning to that question, I should mention two preliminary objections which have been made by counsel for the defendants.

First, it is said that an action which it is sought to bring within the exception to *Foss v Harbottle* is a representative action and that it should be made clear in the title to the writ that it is brought in a representative capacity. In particular the plaintiff must state on whose behalf the action is brought. In the past actions within the exceptions to *Foss v Harbottle* have been treated as representative actions brought on behalf of the members of the company other than the defendant members. But in fact, as Lord Denning made clear in *Wallersteiner v Moir* (*No 2*) [1975] 1 All ER 849, [1975] 1 QB 373, such an action (now commonly called a 'derivative action') is not in the proper sense a representative action at all. He said ([1975] 1 All ER 849 at 858, [1975] 1 QB 373 at 391):

> 'The counterclaim by Mr Moir was prepared by a careful, learned and skilful member of the bar, Mr William Stubbs. It is not headed "on behalf of himself and all the other shareholders". It is just headed "M.J.G. Moir, plaintiff on counterclaim". The two companies were made parties by being added to the counterclaim. The prayer is: "Mr Moir counterclaims for" several declarations of wrongs done to the two companies, and orders on Dr Wallersteiner to pay specified sums to the two companies, and that he pay the costs of Mr Moir and the two companies. No objection has been taken to that form of proceeding. No suggestion has been made that it should be amended. Quite right. Let it stand as it is. It is in accord with principle. Mr Moir sues in his own name but in reality on behalf of the companies: just as an agent may contract in his own name but in reality on behalf of his principal.'

Those observations clearly apply to the present case.

Second, it is said that it is not clear from the statement of claim that the plaintiff seeks restitution on behalf of the union of sums alleged to have been misapplied by its officers in excess of the union's powers. The statement of claim is not framed with the accuracy I would have expected from junior counsel for the plaintiffs (Mr Todd). In the prayer what is sought is damages

*[1985] BCLC 237 at  247*

for breach of contract and/or breach of trust. But it is, in my judgment, sufficiently clear from the statement of claim as a whole that restitution is what is sought. The allegation in para 13 is that in causing or procuring the union to make the payments complained of, the individual defendants acted in breach of their fiduciary duty to the union and that in consequence they are accountable to the union for the sums so applied. In the light of the statement of claim the word 'damages' in the prayer to my mind is clearly used in the sense which comprehends equitable damages or restitution.

Counsel for the defendants (Mr Scrivener QC) also attacked the statement of claim in that in one paragraph it is said that the rules constitute a contract between the members inter se. He submitted that the true position is that the contract is between each member and the union. It was put that way, I understand, in the action before Nicholls J. I find it unnecessary to express any view on the question whether the contract of membership is a contract with the other members inter se or a contract with the union. The plaintiffs rely on an alleged breach of fiduciary duty owed by the officers of the union to it. It seems to me quite unnecessary in the context of that claim to say whether the plaintiffs' contract of membership is with the other members or with the union.

There is one other matter which has troubled me. In a derivative action a plaintiff seeks recovery on behalf of the defendant company or union from the other defendants. The company or union is nominally a defendant, but in substance a claim is made on its behalf. It is wrong, therefore, for a company or union to be represented by the solicitors and counsel who act for the other defendants. In this case counsel for the defendants claims to be instructed on behalf of the union. In view of the urgency and importance of the case I have listened to his submissions on the footing that as regards the claim for restitution he is in truth acting for the individual defendants.

I turn to the main issue. Were the applications of the funds of the union in question misapplications beyond the powers of the union?

The objects of the Derbyshire union can be briefly stated. The relevant rule, which is r 3, read as follows:

> 'The objects of the union shall be
>
> (*a*)    To support and put into effect within the Derbyshire area the objects of the National Union (a copy of the objects of the National Union is set out in Appendix A) and
>
> (*b*)    To provide in accordance with these rules a weekly allowance for the support of the members and their families when the member is out of work, on strike, locked out or victimised and
>
> (*c*)    To make provision for an old age benefit for members
>
> (*d*)    To secure and promote welfare facilities for members and their families.'

Rule 69 defines the relationship of the Derbyshire union rules to the rules of the national union. It provides:

> 'In any matter in which there is a conflict as between the rules of the union and the National Union, the rules of the National Union shall apply; in cases of doubt the matter shall be decided by the National Executive

*[1985] BCLC 237 at 248*

> Committee, such decision shall be subject to the right of appeal set out in r 30 of the rules of the National Union.'

The objects of the national union are more lengthy, but I need only refer to three of them. They are as follows:

> '(*a*)    To secure the complete organisation in the union of all workers employed in or connected with the mining industry of Great Britain and ancillary undertakings, and membership of the organisation should be a condition of employment in the industry.
>
> (*b*)    To advance and protect the interests of members in relation to questions of wages, hours, holidays, conditions of employment, safety, compensation, and all other questions arising out of and/or in connections with members' employment or occupation.
>
> (*c*)    To negotiate and settle either nationally or locally (as may be necessary or expedient) all disputes arising between members and employers on questions specified in sub-s (b) above ...
>
> ...
>
> (*j*)    To raise funds by contributions, levies, and donations or otherwise for mutual benefits ...
>
> ...

> (*q*)    To raise levies on behalf of and to make grants to any charitable or other purpose (but except out of the political fund not including political objects within the meaning of the Trade Union Act 1913) in conformity with the rules and principles of the union.'

There is a power to alter the rules. That is in r 70. It provides that 'these rules rescind all previous rules and shall not be altered, amended or rescinded, except at the annual conference of the area'. The rule then goes on to provide that the annual conference is to be held in April, that amendments, additions, and deletions to the rules must be in the hands of the area general secretary by a date in February and that 'such an alteration, amendment or rescindment shall receive the approval of the majority of the branches attending annual conference and shall be in accordance with the national rules'. The machinery for voting in fact requires a card vote so that effect is given to the votes cast at the branches.

Returning to the objects in r 3 the provisions referred to in (*b*) and (*c*), - that is, the matters there set out - are dealt with by r 63 (out of work pay for members unemployed for more than five consecutive days); r 65 (old age benefit); r 66 (strike and lockout pay); and r 67 (victim pay). I must, I think, cite r 66 in full:

> '(*a*)    Members on strike by the authority of the National Executive Committee, or locked out, shall be paid, in addition to the amount provided under the rules of the National Union [and then there are set out the amounts].

> (*b*)    The amounts made by resolution of council shall be reduced in accordance with the number of men involved, and the duration of the stoppage.'

It is clear in the light of Nicholls J's judgment that strike pay cannot be paid under that rule, because the members are not on strike properly called with the authority of the NEC.

*[1985] BCLC 237 at  249*

The correct approach to construction of the rules of a union is set out in an often-cited passage in a speech of Lord Wilberforce in *Heatons Transport* (*St Helens*) *Ltd v Transport and General Workers Union* [1972] 3 All ER 101 at 110, [1973] AC 15 at 100-101, where he said:

> 'The basic terms of that agreement [that is, the agreement entered into by members joining a union] are to be found in the union's rule book. But trade union rule books are not drafted by parliamentary draftsmen. Courts of law must resist the temptation to construe them as if they were; for that is not how they would be understood by the members who are the parties to the agreement of which the terms, or some of them, are set out in the rule book, nor how they would be, and in fact were, understood by the experienced members of the court. Furthermore, it is not to be assumed, as in the case of a commercial contract which has been reduced into writing, that all the terms of the agreement are to be found in the rule book alone: particularly as respects the discretion conferred by the members on committees or officials of the union as to the way in which they may act on the union's behalf. What the members understand as to the characteristics of the agreement into which they enter by joining a union is well stated in the section of the TUC Handbook on the Industrial Relations Act which gives advice about the content and operation of unions' rules. Paragraph 99 reads as follows:

> "Trade union government does not however rely solely on what is written down in the rule book. It also depends upon custom and practice, by procedures which have developed over the years and which, although well understood by those who operate them, are not formally set out in the rules. Custom and practice may operate either by modifying a union's rules as they operate in practice, or by compensating for the absence of formal rules. Furthermore, the procedures which custom and practice lays down very often vary from workplace to workplace within the same industry, and even within different branches of the same union." '

That passage was cited and approved by Lord Diplock in *Porter v National Union of Journalists* [1980] IRLR 404. Counsel for the plaintiffs relied on a passage in the speech of Lord Dilhorne in that case. He said ([1980] IRLR at 410):

> 'In construing these rules I adhere to what I said in *British Actors' Equity Association v Goring* [1978] ICR 791, namely that different canons of construction to those applied to any written document are not to be applied to the rules of a union. I regard it as our task to construe them so as to give them a reasonable interpretation which accords with what

> in our opinion must have been intended. The more imprecise the language the greater may be the difficulty in deciding
> what was intended. I agree with my noble and learned friend Lord Wilberforce that the rules must not be construed as
> though drafted by parliamentary draftsmen and that custom and practice may operate to moderate a union's rules as
> they operate in practice (see *Heaton's Transport v Transport and General Workers Union*). But custom and practice,
> while it may moderate the operation of a rule, cannot in my opinion entitle a union to act in conflict with it.'

*[1985] BCLC 237 at 250*

It is quite clear that Lord Dilhorne did not intend to express a different opinion as to the correct approach to the construction of union rules. He in terms agrees with the speech of Lord Wilberforce in *Heaton's* case. The point made by Lord Dilhorne, I think, is that while the principles of construction to be applied to the union rule book are the same as those applied to any other contract the factual context into which the rules must be set is far wider than is normally the case. In particular the rules govern a continuing body with a fluctuating membership. Custom and practice at a particular moment must be borne in mind in construing the rules and seeing what is to be implied in them. But if the rules are clear, custom and practice cannot be given effect if they conflict with the rules.

I return to the *Howden* case. At the time of that decision the 1871 Act required that the rules of a registered union should state its objects. There is no similar requirement in the current legislation. I cannot see that that makes any difference to the construction of the rules. The objects of the union in that case were not, in fact, dissimilar to the objects of the Derbyshire union. Rule 3 provided that the association was established for the objects (amongst others) of raising funds for mutual help, procuring improved enactments for the efficient management of mines, whereby the health and lives of miners might be protected, securing wages bargained for by the members, and protecting members when unjustly dealt with by their employers or their managers, securing compensation for accidents, shortening the hours of labour, providing a weekly allowance in support of members and the families of members when locked out or on strike and other matters. It was provided that the whole of the moneys received should be applied in carrying out the objects and that any officer misapplying the funds should repay the amounts so misapplied, but that provision, as I see it, merely restated the general law.

Rule 64 provided that:

> 'If any branch, member, or members have grievances affecting their wages, mode or manner of working, or the hours
> of labour, and the employers refuse to remedy those grievances, and after all proper and peaceful means have been
> tried to effect a settlement by deputations of members, with the advice and assistance of the council, such member or
> members be permitted to cease work by the sanction of the association and in accordance with the rules, such member
> shall receive [and then certain amounts are specified by way of strike pay] until they can resume work either at the
> place they left, or at some other colliery or the council with the sanction of the majority of members decide otherwise.'

Rule 65 provided:

> 'Any branch, or portion of any branch which may be locked out, or otherwise thrown out of employment, in
> consequence of any action that may legally have been taken by the association to keep up the price, or remedy any
> grievances either at that or any other colliery connected with the association, the members of such branch shall be
> supported at the same rate as the members on strike, until such time as they can get work or the association decide
> otherwise.'

Then r 72 provided that:

*[1985] BCLC 237 at 251*

> '... No branch, or portion of a branch, shall be allowed to strike or leave off work with a view to causing the works to
> stand, unless sanctioned by two-thirds of the members comprising the branch when such strike shall be determined by
> registered ballot.'

A dispute arose between the miners at a particular mine and their employers. The members decided to stop work. The sanction of the union was not obtained at that time, though it was given later. It was held that the

union was not entitled to pay strike pay. Vaughan Williams LJ said ([1903] 1 KB at 331-332):

> 'Though, as I have said, it does not seem to me that it was ever really contended for the defendants that in its initiation
> the strike in this case was one which was justified under rule 64, it was contended that, having regard to what
> subsequently happened, as to which I will say a word or two presently, there was afterwards a strike in accordance with
> rule 64. Speaking for myself, I will say at once that I do not see how that contention can be maintained. There is no
> doubt that the men did cease work originally without the sanction of the association, and, inasmuch as they have never
> resumed work, and have ever since remained out on strike, I do not see how it can be made out that they ever ceased
> work a second time with the sanction of the association within the meaning of rule 64. In my opinion it is clear that they
> ceased work, and went out on strike, entirely of their own choice, and have remained out of work ever since. But it is
> said that, if the case does not come within rule 64, then rule 65 applies. I cannot assent to that contention. It was hardly
> disputed that, if the words of rule 65 were construed literally, they would not cover the case. There has been no
> lock-out by the employers, nor have the men been "thrown out" of employment in consequence of any action legally
> taken by the association. The fact is that the men went out of employment and on strike of their own accord, and have
> never been in employment since. It is quite true that, after the men ceased work, the association took a certain course
> in connection with negotiations for the resumption of work by the men, but that did not lead to the men being "thrown
> out" of employment, for they were then already out of employment, and it was therefore impossible to throw them out of
> employment. It is contended that the words ought not to be read literally, but that "thrown out of employment" should be
> read as equivalent to "unable to obtain employment." But that is not what the rule says. It may be the fact that the men,
> having gone out of employment, were unable to get back into employment by reason of having followed the advice
> given to them by the association. But it seems to me impossible to say that that amounts to being "thrown out of
> employment" within the meaning of the rule.'

In the House of Lords it was treated as clear beyond argument that the strike was not one authorised by the
rules. Counsel for the respondent was not called on on this point.

A similar result was reached in the earlier case of *Re Durham Miners' Assocn, Watson v Cann* (1900) 17
TLR 39. It is sufficient, I think, to read the headnote to that case:

*[1985] BCLC 237 at 252*

> 'The rules of a trade union, the management of which was vested in a council, under whom an executive
> committee acted, provided that no lodge was to give notice of a strike until its case had been laid before a
> council or committee meeting for their approval; and that any lodge or number of men in a lodge, ceasing
> work without the approval of either the committee or council should forfeit all claims on the union. A number
> of men in a lodge ceased work on account of a dispute with their employer without having laid their case
> before the council or the committee for their approval. The executive committee refused to grant strike pay,
> but the council on appeal allowed it. **Held:** that the resolution of the council was ultra vires.'

It is of interest to observe that the objects of the union were wide, indeed as wide, as I see it, as the objects
of the Derbyshire union taken in conjunction with the objects of the National Union in this case. It included a
power to pay a weekly allowance to members locked-out or on strike and in the concluding paragraph
'generally to regulate relations between employers and employed'.

One contention was that the action could not be maintained because the rules could be changed, and the
majority opinion in the union, it was said, was in favour of those out on strike. As to that Rigby LJ said
((1900) 17 TLR at 40):

> 'They were bound to construe the rules as they stood, and if the decision at which they had arrived was contrary to the
> general opinion of the members of the union, they would have their remedy as regards the future in altering the rules.'

He went on to deal with the argument that there was a general power to make payments in the following
passage:

> 'The rules relating to payments to men on strike were rr 50, 51 and 52, and they were far from plain; but he had come
> to the conclusion that the word "claims" in r 51 could not be restricted to claims as of right under any other rule, but
> included all claims to any strike allowance. It was suggested that the council had an independent power
> notwithstanding the rules to make such a grant as had been made in this case. That depended on the question whether

> these rules constituted an exhaustive code. He thought they did and therefore the council had no general overriding
> power, at any rate for the purpose of providing weekly allowances for the support of members on strike.'

The application was accordingly held to be ultra vires. That was decided in the year 1900. I stress that last
passage for reasons which will become apparent later.

The case for the plaintiffs is simply this. It is said that under r 3 the union has power to provide in accordance
with the rules an allowance for the support of members and families of members when on strike. That
provision is made by r 66. That rule in conjunction with the other rules lays down the procedure to be
followed before payments can be made to men on strike. It is clear from the judgment of Nicholls J that the
men are not on strike within the rule. As in the *Howden* and *Durham Miners Association* cases the rules are
inconsistent with

and preclude the assistance of men who are on strike, but on a strike which is not authorised by the rules
and indeed has been called in breach of them.

The case for the defendants is that there is, as admittedly there is, an industrial dispute between the Durham
union, the NUM, and the NCB and that under the general object in (b) of the national rules the executive
committee and the area council, subject in each case to the overriding authority of the NEC, has power to do
anything they or the NEC consider expedient in furtherance of that dispute. It is said that it has long been the
practice to support miners on unofficial strike in this way. The fact that the union may be liable for acts done
by shop stewards in calling an unofficial strike and for the conduct of the strikers was recognised by the
House of Lords in *Heatons's* case. It is said that it would be anomalous that the union should be liable for the
acts of such persons but not able to use its funds to support an unofficial strike. Counsel for the defendants
submitted that the only practical effect of r 66 is that under that rule in the case of an official strike members
have an entitlement to strike pay. In the case of an unofficial strike they have no entitlement but the union
has a discretion to make payments in support of pickets and in relief of hardship of those who have refused
to work.

That last submission, to my mind, rings somewhat hollow in the light of the fact which emerged in the course
of argument that in 1972, when there was an official strike, the officers of the Derbyshire union were
instructed by the NEC of the NUM not to pay strike pay in order to conserve the funds of the union. The
officers of the Derbyshire union, I understand, complied with that instruction.

I find myself unable to accept that counsel for the defendants (Mr Scrivener QC) has established that there is
in this case even a fairly arguable case that the payments in question were within the powers of the union or
that they might be found to be within the powers of the union if the matter were to go for hearing and if the
question were to be decided in the light of the past practices of the union. As Lord Wilberforce pointed out in
the *Heaton* case ([1972] 3 All ER 101 at 111, [1973] AC 15 at 102):

> 'All members [that is, of a union], whether they take part in a strike or not, have an interest in preserving its funds. The
> rules provide that dispute benefit shall only be payable if the strike or lock-out has been approved or recognised by the
> General Executive Council or, in the case of a strike involving the whole of the members of the union, by a Delegate
> Conference. There is no express provision confining to the General Executive Council or a Delegate Conference the
> power to call strikes which involve only a part of the membership. On the contrary, the rules appear to contemplate that
> strikes may be called by other committees or officials of the union, but that, if this is done, dispute benefit is not payable
> out of the union funds without the sanction of the General Executive Council. One sense in which a strike may be said
> to be 'unofficial' is that it has not been recognised by the General Executive Council as entitling the members who take
> part to receive dispute benefit.'

There, of course, Lord Wilberforce was not concerned with the right of a member to strike pay, but his earlier
observation that all members have an

interest in preserving the funds and ensuring that benefit is only payable if the rules so provide is of general

application.

It seems to me that if the rules of a union provide expressly for allowances to be made to members on what I will for convenience call an 'official strike' that is, one called in accordance with the procedures prescribed by the rules - it is impossible to imply consistently with that a power for officers to make a precisely similar allowance to members on 'unofficial strike' - that is, one called or followed in breach of the rules of the union. Every member of the union, as he has an interest in preserving the funds of the union, is, it seems to me, entitled to prevent the funds of the union being used in that way. That was quite clearly the approach of the Court of Appeal and the House of Lords in *Howden's* case, and although there is no doubt that today a more liberal approach to the construction of the rules of a union is appropriate, the principle seems to me equally applicable.

If that is the right conclusion, then it seems to me that it must follow that any payment to a member on unofficial strike whether by way of weekly allowance or by way of intermittent payment or by meeting expenses directly or in any other way with a view to making good the wages lost by the member on unofficial strike must be equally impermissible. So also must payments to pickets be impermissible.

Indeed the position of pickets draws into sharp relief the extreme, and to my mind unacceptable, consequences of counsel for the defendants' approach. Suppose, for instance, that on a ballot of the union properly called a resolution for a strike is defeated by a very large majority, let us suppose that 90% vote against. If counsel for the defendants were right, the officers of the union could pay and indeed on the directions of the NEC would be bound to pay the dissenting 10% to picket the mines and prevent the majority from attending work. It seems to me that that conclusion cannot possibly be right. Counsel for the defendants, as I understand it, accepted that his argument led to that consequence. He submitted that in such a case the area council, which meets monthly and is a democratic body at which card votes are cast, would not allow the payments to be made. However, the area council is subject to the overriding authority of the NEC. Moreover, in the period between monthly meetings, the affairs of the Derbyshire union are in the hands of an area executive committee. Much can happen in a month.

I find myself therefore driven to the conclusion, uncomfortable though it is, that once it is accepted that the payments in question were made, as they admittedly were made, to pickets and otherwise in furtherance of the strike or for the relief of miners on unofficial strike from hardship caused by the stoppage of work and wages, the conclusions that follow inevitably are first that the payments were beyond the powers of the union; second, that the two officers, the second and third defendants, who made or sanctioned the payments, are liable to reimburse the union; third, that the plaintiffs are entitled to maintain this action; and fourth, that the misapplication of the union's funds cannot now be ratified by any majority of the members, however large. Should I therefore, make the order which is sought?

I have come to the conclusion that I should not. My reasons are shortly as follows. Although the misapplication of the funds of a corporate body (I include for this purpose funds belonging to a union) cannot be ratified by any majority of the members, however large, it is open to a majority of the members, if they

*[1985] BCLC 237 at 255*

think it is right in the interests of the corporate body to do so, to resolve that no action should be taken to remedy the wrong done to the corporate body and such a resolution, if made in good faith and in what they considered to be for the benefit of the corporate body, will bind the minority. The majority of the members of a trading company, for instance, might properly take the view that the publicity, costs, and the inevitable loss, let us say, of the services of a managing director, who would be the defendant, would outweigh the benefit to the company of successfully prosecuting an action and might properly decide not to pursue it; although, of course, a contractual release of the right of action, as compared with a decision simply not to institute proceedings, would require to be supported by some consideration.

In the instant case there is an impressive body of evidence filed on behalf of the defendants which is designed to establish that the overwhelming majority of members approves the expenditure in question. It must, I think, follow that they would most probably oppose proceedings for the recovery of the moneys misapplied. At a meeting of a special area council on 19 October it was resolved there that:

'The Area Council reaffirms its decisions of 19 March 1984 and endorses the actions taken by the Derbyshire NUM full-time officials both before and after the commencement of the aforesaid legal proceedings and ratifies and approves all items of expenditure incurred by them in relation to the strike, notwithstanding the terms of the order made against them by the Derbyshire NUM and its full-time officials dated 28 September 1984.'

Affidavits have been filed by the branch secretaries of every one of the union's thirteen branches to say that at branch meetings the members have passed similar resolutions.

Counsel for the plaintiffs submitted that it would be wrong and contrary to principle to refuse to give summary judgment merely on the ground that a majority of members may yet properly decide that it is not in the interests of the union that the second and third defendants should be compelled to make restitution to the union. He gave three reasons why the court should not take this course.

He submitted first that it is for the members of the union, if they are so minded, to convene a meeting, pass the necessary resolution, and either take steps to ensure that their views are represented through the union or apply for a representative to be joined as a defendant to this action. That has not been done. The court, he says, should not defer judgment of its own motion. In particular, the court should not take a course which in effect circumvents the ultra vires rule.

Secondly he submits that the court must look at the facts as they stand and that if there is any question of the members not wishing the judgment to be enforced, the right course is none the less to give summary judgment and to leave it to the majority to resolve, if they are so minded, not to enforce it.

Thirdly he said that it would in practice be impossible for the members or at least an overwhelming majority of the members to consider a resolution that judgment should not be given or enforced against the second and third defendants in a detached way and to form a proper judgment on such a resolution, because most members have received benefit from the union and their personal

*[1985] BCLC 237 at 256*

interest would inevitably militate against a proper decision as to what is and what is not in the interests of the union.

These are powerful arguments, and in a case of proceedings brought against a company and a director, for instance, who, albeit innocently, had misappropriated funds for purposes outside the company's powers, these arguments would in my judgment be insurmountable.

However, the circumstances of this case seem to me wholly unprecedented. When the ballot was held on the question whether the members should go on strike, the resolution in favour was defeated, albeit by a very small margin. None the less, when the NUM and the Derbyshire union called on their members to go on strike, the call, although in contradiction and indeed in flagrant breach of the rules of the Derbyshire union, was obeyed by 85% of the members. Even now, as I understand it, over 60% are on strike. I cannot speculate as to the reasons why members, having voted against a strike, should obey instructions to go on strike and in particular whether their conduct is to be explained by loyalty to the leaders of the NUM or the Derbyshire union or to fear induced by the picketing and violence that has ensued.

It is not in dispute that the payments in question were made in the honest belief that the Derbyshire union had power to make them. There is no question, as I see it, of payments having been made in conscious breach of the rules, far less that they have been made for the personal benefit of the defendants. I do not feel that in these wholly exceptional circumstances it would be safe to rule out entirely the possibility that a majority of members may in the future be able, properly and lawfully, to take the view that it would not be in the interests of the union that the individual defendants should be made personally liable.

It is common ground that the defendants do not have any substantial resources. The benefit to the union of recovering everything that could be extracted from them is likely to prove wholly insignificant in contrast with the very large sums in issue. I see no immediate advantage to the union in obtaining a judgment and perhaps taking steps to bankrupt these defendants. It seems to me that there must be a risk that the

enforcement of the judgment would make it all the more difficult to heal wounds that will have to be healed when this dispute is over. As I have said, I do not think I can safely rule out that possibility altogether in an application for summary judgment under RSC Ord 14 in which the union itself is effectively unrepresented. Nor can I rule out altogether the possibility that some machinery may be found whereby the wishes of those who do not want the defendants to be made personally liable can be met by in effect, diverting part of their future subscriptions following a change of the rules to making good the loss to the union. There are obvious difficulties which confront such a solution, but I do not feel that I can feel wholly confident that it will prove impossible.

In these circumstances I have come to the conclusion that the right course is not to make an order for summary judgment in the hope that the action will come on, if it does come on, after this dispute has been settled, and that the members will be able to work together in the future for their common benefit within the rules of the union. It will be said that this is a case where hard cases make bad law. My reply to that is that it sometimes happens that hard cases make good law, because they compel a radical re-examination of principles which, rigidly applied, would lead to a result which would be felt widely to be unjust. In particular the boundary between ratifying a misapplication of a

*[1985] BCLC 237 at  257*

union's funds and resolving to take no action to recover funds innocently misapplied may not be easy to draw in the case of a union and this aspect of the case may, I think, merit further consideration when the union is properly represented.

It follows from what I have said that the plaintiffs are entitled to an injunction to restrain further misapplications of the union's funds. However, if summary judgment on the monetary or financial claim is refused, there seems to be no advantage in granting permanent injunctions. That can wait until the trial of the action or until further order and can be considered in the light of the circumstances which then obtain. Counsel for the defendants, while admitting that the plaintiffs have shown at the very lowest a strong prima facie case for relief submitted that the balance of convenience favours the relaxation of the injunction so as to permit loans to be made to pickets and payments to be made in relief of hardship. That, with all respect to counsel for the defendants' advocacy, seems to me to turn the case on its head. The plaintiffs to my mind are entitled to an injunction irrespective of the balance of convenience. Even if the balance of convenience were relevant, the plaintiffs would be entitled to protect the union's funds from further depredations in support of a strike called in breach of the union's rules. There is no possibility that any further payments so made could be recovered.

Counsel for the defendants submitted that the evidence showed that the majority supported the continuance of the payments in question and that it would be wrong for the wishes of the majority to be thwarted by an injunction in this way. My answer to that submission is that it is open to the officials of the Derbyshire union or to a sufficient number of the members of the union to call for a further ballot on the question whether a strike should or should not now be called. If there is a majority in favour of a strike, the funds of the union can be applied in furtherance of the strike to the extent that the rules supported or supplemented by reasonably implied powers so permit. If the majority continues to be opposed to the strike, then they cannot, as the rules now stand, require or sanction the use of the union's funds in pursuance of a strike called otherwise than in accordance with the ballot.

As regards costs, I think, in the special circumstances of this case which I have already sufficiently expounded, I will direct that all costs be reserved until the trial of the action.

*Order accordingly.*

Solicitors: *Shacklocks,* Mansfield (for the plaintiffs); *Mathers*, Chesterfield (for the defendants).

Jacqueline Metcalfe Barrister.

**TAB R**

Butterworths Company Law Cases/BCLC 1983 /Devlin v Slough Estates Ltd and others - [1983] BCLC 497

**[1983] BCLC 497**

# Devlin v Slough Estates Ltd and others

**CHANCERY DIVISION**

**DILLON J**

**10, 11 JUNE 1982**

*Accounts - Failure to prepare proper accounts - Shareholder's standing to complain - Derivative action - Companies Act 1948, ss 148, 149, 158 - Companies Act 1967, Schedule 2.*

The accounts of the defendant company had for a number of years contained a note of the possible contingent liability of the company for damages in an action commenced against the company and one of its subsidiaries in France for breach of contract. The accounts for 1979 omitted all references to this contingent liability or to any French litigation. The company's articles of association required the directors to prepare and lay before the company in a general meeting annual accounts prepared in compliance with the Companies Act and to distribute these to the shareholders in advance of the meeting. The plaintiff, a shareholder in the company, commenced an action alleging that the failure to disclose the contingent liability rendered the accounts defective and accordingly he had either as a shareholder a personal right to complain, or alternatively, a right to bring a derivative action on behalf of the company on the grounds that the directors had breached their duty to the company to prepare proper accounts.

**Held** - The scope of the standing of an individual shareholder to bring either a personal or a derivative action to challenge the form of a company's accounts was not unlimited. A personal action would not lie, as the duty to prepare accounts imposed on the directors by the articles of association was a duty owed to the company and not to the shareholders individually. A shareholder could bring a derivative action to prevent the dissipation of the company's funds by, for example, the payment of a dividend out of capital based on inaccurate accounts or, where there was doubt on what the statutory requirements on the preparation of accounts meant, a shareholder could seek guidance from the court. However, a shareholder does not have standing to complain, as in the present case, of the manner in which a company's accounts were prepared, as this type of dispute involved matters of business judgment with which the courts would not interfere in the absence of allegations of bad faith, and the proper way of dealing with such a matter was to complain to the Department of Trade or raise the matter at a shareholders' meeting.

### Cases referred to in judgment

*Drown v Gaumont-British Picture Corp Ltd* [1937] 2 All ER 609, [1937] Ch 402.

*Head* (*Henry*) *& Co Ltd v Ropner Holdings Ltd* [1951] 2 All ER 994, [1952] Ch 124.

### Cases also cited

*Beattie v Beattie* (*E & F*) *Ltd* [1938] 3 All ER 214, [1938] Ch 708, CA.

*Foss v Harbottle* (1843) 2 Hare 461.

*Gouriet v Union of Post Office Workers* [1977] 3 All ER 70, [1978] AC 435, HL.

*National Bank of Wales Ltd, Re* [1899] 2 Ch 629, 68 LJ Ch 634, CA.

*Normandy v Ind Coope & Co Ltd* [1908] 1 Ch 84, 72 LJ Ch 82.

*Pender v Lushington* (1877) 6 ChD 70, 46 LJ Ch 317.

*Prudential Assurance Co Ltd v Newman Industries Ltd* [1979] 3 All ER 507, [1981] Ch 229.

*Prudential Assurance Co Ltd v Newman Industries Ltd* (*No 2*) [1982] 1 All ER 354, [1982] Ch 204, CA.

*Smith* (*Howard*) *Ltd v Ampol Petroleum Ltd* [1974] 1 All ER 1126, [1974] AC 821, PC.

**Summons**

By originating summons, George Devlin, the plaintiff, sought a declaration that a note in respect of the contingent liability of the company, Slough Estates Ltd, should have been annexed in accordance with Sch 2, para 11(5) of the Companies Act 1967, to the statement of account of the company for the year ended 31 December 1979. By summons, an application was made on behalf of the company and the other defendants to the originating summons, to strike out the originating summons on the grounds that the plaintiff had no locus standi to bring the action, and under the inherent jurisdiction of the court. The facts are set out in the judgment of Dillon J.

The plaintiff in person.

*R R H Scott QC* and *T M Stockdale* for the defendants.

**11 June 1982. The following judgment was delivered.**


**DILLON J.**


I have before me a summons issued by the defendants whereby they seek to strike out the originating summons in this matter on the ground that the plaintiff has no locus standi to bring the action and under the inherent jurisdiction of the court.

The proceedings were started by originating summons and they are concerned with the accounts of the first defendant company, Slough Estates Ltd, for the year ended 31 December 1979. The plaintiff is a holder of a number of shares in the company. It is a minority holding only. The second and third defendants are the chairman and managing director of the company who signed the Company's accounts for the year ended 31 December 1979. The second and third defendants do have individual shareholdings in the company, but those also are relatively small minority holdings. They do not have voting control of the company. The plaintiff seeks to make his complaints over the 1979 accounts either on the footing that he has an individual right to complain by legal proceedings about those accounts, because he is an individual shareholder, or by derivative proceedings on behalf of himself and all other shareholders in the company, except the second and third defendants, on the ground that the directors owed a duty to the company to prepare and present

proper accounts, and the shareholders can complain by any shareholder bringing a derivative

*[1983] BCLC 497 at 499*

action if the accounts produced by the directors fail to comply with what is required under the statutes and the company's articles.

The matter which troubles the plaintiff concerns the treatment in the 1979 accounts of certain litigation against the company in France. It is convenient to say a bit about the history of that litigation before I turn to the provisions of the Companies Act and the articles.

The company's accounts for the year 1973 give the first hint of the trouble in Note 17, which is marked 'Contingent liability'. This simply says that the company has been notified verbally that proceedings in respect of an alleged breach of contract may be instituted against the company in France. 'The company is advised that it has a defence and would vigorously contest such proceedings if instituted. It is not possible at this stage to quantify any liability which may arise.'

Various forms of note appeared in subsequent years' accounts. In 1976 it was recorded in Note 18 that 'proceedings had been instituted in France against the company and one of its French subsidiary companies in respect of alleged breaches of contract. The company is advised that it has good defences and where proceedings have been instituted they are being vigorously contested. It is still not possible at this stage to quantify any liability which may arise'. In the 1978 accounts in Note 18 rather more information is given. Again under the heading 'Contingent liability' it is said,

> 'Proceedings instituted in France against the company and one of the French subsidiary companies arising out of alleged breaches of contract are continuing to be vigorously contested. Although most of the claims have been successfully resisted two judgments, both of which are subject to appeal, have been delivered against the company and the subsidiary concerned. One judgment in respect of 45 million French francs (£529,000) has been obtained against the holding company by the liquidator of a French company, and this judgment is subject to appeal before the Cour de Cassation in Paris. Although this judgment is capable of being enforced no steps have yet been taken to enforce it against the holding company. The holding company is advised that it has a good defence in law to the action and it is therefore hoped that the action will be won on appeal.'

The note then goes on to refer to the other judgment, which was a judgment at first instance against the French subsidiary concerned. I need not trouble about that because it appears that that matter was settled in the course of the following year and so passes out of the story. The matter that is fundamental to the plaintiff's complaints is the judgment which in the 1978 accounts was said to be subject to appeal before the Cour de Cassation in Paris.

The 1979 accounts made no reference at all to this French litigation. There was no note about any liability, contingent or otherwise, and no reference to it in the balance sheet. Accordingly at the annual general meeting the plaintiff asked some questions, and what has emerged is that the judgment which was originally a judgment at first instance and was then affirmed by the Court of Appeal at Lyon was again affirmed by the Cour de Cassation, the final Court of Appeal, despite the hopes of success on ultimate appeal expressed in the note in the 1978 accounts. So the position is that there is the judgment of the Cour de Cassation affirming the judgment at first instance, and that judgment has never

*[1983] BCLC 497 at 500*

been satisfied. Conversely it does not appear that any proceedings to enforce it against the company in England have ever been taken. When one looks at the terms of the French judgments of the Court of Appeal at Lyon and of the Cour de Cassation it is apparent that the situation is considerably less straightforward as to the amount of the judgment. It appears that the company had made a contract with a French company called Enterprise Desrat, which is now in liquidation, for the purchase of certain assets of that French company, subject to Bank of England authorisation, that is to say Exchange Control approval. The French company by its liquidator had claimed damages. The company's defence had been that the contract was always a conditional contract, conditional on Bank of England approval, and that that approval had never been forthcoming and so there was no liability. However, the view taken by the French courts, adopting the

riposte of the liquidator of the French company, was that it was the company's obligation to get the Bank of England approval, the company had let the opportunity of getting that go by by not applying sufficiently promptly, and so the French company had suffered by the failure of the company to apply for and obtain the Bank of England authority at a time when it might have been obtained, or at any rate it was not conclusively shown that it could not have been obtained. It seems that the order of the French court was that the company should pay by way of damages to the creditors of the French company up to two-thirds of the liabilities of the French company as they resulted from the cesser of activities of the French company as a result of the failure of the company to complete the purchase of assets. There was also, it would seem, an alternative provision relating to a compromise scheme with creditors of the French company.

The provisions of the Companies Act 1948 as to accounts are as follows. By s 148(1) the directors of every company must once at least in every calendar year lay before the company in general meeting a profit and loss account since the preceding account. By s 148(2) the directors must cause to be made out in every calendar year and to lay before the company in general meeting a balance sheet as at the date to which the profit and loss account is made up. By s 149(1) every balance sheet of a company must give a true and fair view of the state of affairs of the company as at the end of its financial year, and every profit and loss account of the company must give a true and fair view of the profit or loss of the company for the financial year. By s 149(2) a company's balance sheet and profit and loss account must comply with the requirements of the Sch 8 to the 1948 Act so far as applicable thereto. That is now replaced by the Sch 2 to the Companies Act 1967.

Then by s 158 of the Companies Act 1948 it is provided that a copy of every balance sheet, including every document required by law to be annexed thereto, of which a copy is to be laid before the company in general meeting, together with a copy of the auditors' report, shall not less than 21 days before the date of the meeting be sent to every member of the company, whether he is or is not entitled to receive notices of general meetings of the company, and to certain other persons there mentioned.

The company's articles provide by art 150 that the directors shall from time to time in accordance with the provisions of the statutes cause to be prepared and to be laid before the company in general meeting such profit and loss accounts, balance sheets and group accounts, if any, and reports as are specified in the statutes.

*[1983] BCLC 497 at  501*

By art 152 it is provided that a printed copy of the directors and auditors' reports, accompanied by printed copies of the balance sheet, profit and loss accounts and other documents required by the statutes to be annexed or attached thereto shall not less than 21 clear days previously to the annual general meeting be delivered or sent by post to the registered address of every member and holder of debentures of the company and to the auditors and to every other person who is entitled to receive copies.

By art 153 it is provided that whenever an error is discovered in the accounts within three months next after the approval thereof the accounts shall forthwith be corrected and thereupon shall be conclusive.

Going back to Sch 2 to the 1967 Act, that provides in paragraph 2 that the balance sheet must summarise, among other things, the liabilities and assets of the company with such particulars as are necessary to disclose the general nature of the assets and liabilities. It is further provided in Sch 2 that the expression 'liability' shall include all disputed or contingent liabilities. But in para 11 it is provided that the matters referred to in the following sub-paras shall be stated by way of note, if not otherwise shown, and these matters include, under sub-para (5) the general nature of any contingent liabilities not provided for and where practicable the aggregate amount or estimated amount of those liabilities if it is material.

The plaintiff complains that the 1979 accounts failed to comply with the requirements of the Act and therefore fail to comply with the requirements of the articles because they did not include in any way, even by note, the liability under the French judgment which had been affirmed by the Cour de Cassation. He says that he was entitled under art 152 to receive 21 days before the meeting accounts which did satisfy all the

requirements of the Act, and because of the failure to provide properly in the accounts or in notes for the

French judgment his individual right to receive such accounts was infringed, and so that gives him personally an individual right to bring these proceedings.

I do not think that art 152 helps him. Section 158 of the Act provides for the sending out of copies of the balance sheets including documents required to be annexed thereto which are to be laid before the company in general meeting. Though the wording of art 152 is not precisely the same its effect is, in my judgment, the same, and what it requires is that there should be sent to the members before the annual general meeting copies of the accounts in the form in which they are proposed to be laid before the company in general meeting. That was done. Whatever other objections may be made I do not think it can be said that there was a failure to comply with art 152, because the accounts put before the company in general meeting did not comply, if indeed they did not comply, with the requirements of the Act. Indeed, so far as the construction of art 152 is concerned, the position is slightly underlined by art 153 which recognises that an error might be discovered in the accounts within three months after they have been approved by an annual general meeting. Obviously in such a case the accounts sent to the members before the annual general meeting would have been in erroneous form, but it is not suggested that the sending of such erroneous accounts would not comply with art 152.

The alternative way of putting the plaintiff's case is that art 153 imposes a duty on the directors to prepare and to lay before the company in general meeting accounts and a balance sheet which are in accordance with the provisions of the statutes. Either that article confers on each individual shareholder

*[1983] BCLC 497 at  502*

a personal right to insist that the directors comply with it, or, at the least, it imposes on the directors a duty to the company. If the article imposes a personal right then, says the plaintiff, he can enforce that right in these proceedings. If it merely imposes a duty to the company then if what has been done in the accounts is an infringement of the requirements of the statutes it is something which the company in general meeting could never ratify and so he could bring a derivative action on behalf of all the shareholders, or any other shareholder could bring a derivative action, to obtain a declaration as to the true way in which the matter in question should have been dealt with in the accounts.

The annual accounts of a company are obviously very important documents. They give the only information about the company's affairs which the shareholders are entitled to receive. Beyond that, inasmuch as they have to be filed in the Companies Registry or, with quoted companies, supplied to the Stock Exchange, they give information to the world at large as to the financial position of the company on the basis of which those minded to deal with the company or to buy and to sell its shares can make their plans. On the other hand, it would be strange if the court could be approached by any shareholder, possibly in a multiplicity of proceedings relating to the same company in the same year, asking the court to settle the company's accounts in accordance with the statutes.

It seems to me that art 150, despite the importance of the accounts to the shareholders as well as to outsiders, is not an article which gives any individual right to each individual shareholder to insist that the accounts prepared by the directors or on the instructions of the directors are in accordance with the provisions of the statutes. The duty of the directors under art 150 is a duty to the company rather than a duty to the individual shareholders. If that is right these proceedings are misconceived in so far as they seek to rest on any individual right of the plaintiff.

What then is the position in so far as he seeks to obtain relief in a derivative or representative capacity? It should be emphasised that this is not a case in which there is any suggestion at all of bad faith on the part of the directors or of what is commonly called a fraud on the minority. There are many cases in the books which are concerned with derivative actions where what has been in question has been an attempt by directors on behalf of the majority to appropriate to themselves assets of the company, or to exclude from their due benefits the minority shareholders. Those are cases in which the courts have readily intervened in minority shareholders' actions, but all that field of cases is very remote from the present case.

The declaration which the plaintiff actually seeks in the originating summons is as follows:

'A declaration that a note, statement or report should have been annexed to the balance sheet, profit and loss account and summary of the assets and liabilities of the Company for the year ended 31 December 1979 stating the general nature of the contingent liabilities of the Company not provided for and the aggregate amount or the estimated amount of those liabilities pursuant to para 11(5) of Sch 2 to the Companies Act 1967 and that without prejudice to the generality of the foregoing a note relating to the contingent liability of the defendant Company in respect of proceedings in France instituted against it and a French subsidiary company

*[1983] BCLC 497 at  503*

arising out of alleged breaches of contract and referred to in Note 18 to the accounts of the defendant Company for the year ended 31 December 1978 should have been included in or appended to the statement of accounts of the defendant Company for the year ended 31 December 1979 save in so far as such French claims had been settled, withdrawn, defeated or discharged by the time that such statement of accounts was adopted and approved at the annual general meeting of the defendant Company held on 21 May 1980.'

That is saying that there should have been a note in respect of a contingent liability in accordance with sub-para (5) of para 11 of Sch 2 to the Companies Act 1967.

Counsel for the defendants (Mr Scott), accepts the view there put forward by the plaintiff that the liability under the French judgment was a contingent liability. In the terms of the judgments of the French appeal courts it was unquantified and dependent on various matters to which I have alluded. He says that in the year ended 31 December 1979 the properties of the company were revalued, and by the revaluation the value of the properties of the company was increased by over £142 million, with the result that by 31 December 1979 the net assets of the company had increased from £202,600,000 odd in 1978 to over £371 million, and therefore the contingent liability was, in the view of the directors, not material to be disclosed.

The plaintiff has, in the further alternative, in an affidavit sworn on 8 June 1982, suggested in para 15 that if the judgment should properly have been reflected in the balance sheet as an actual liability by virtue of the fact that it was no longer contingent upon a successful appeal, then he should have leave to amend the proceedings and should be granted a declaration of the court to that effect.

If a company is proposing to make a distribution of its moneys which a shareholder says would be illegal because it involves a payment of dividends out of capital or moneys which should be held as capital, then it must be competent for that issue to be raised in a derivative shareholder's action, as was done, although in the result unsuccessfully, in *Drown v Gaumont-British Picture Corp Ltd* [1937] Ch 402. Moreover where there is doubt how matters should be dealt with in accounts it must be possible for the matter, being one depending on the construction of the statutory requirements, to be raised in a friendly motion, as was done in *Henry Head & Co Ltd v Ropner Holdings Ltd* [1952] Ch 124, [1951] 2 All ER 994. But the scope for an individual shareholder to apply for declaratory relief in respect of the form of accounts cannot be unlimited. The purpose of the representative shareholder's action is to prevent the wrongful dissipation of the company's moneys and assets, and I do not think it is an appropriate vehicle open to any shareholder seeking mere declaratory relief as to the form in which accounts for a previous year ought to have been drawn. There are very many matters in accounts where the treatment must be a matter of opinion. The requirement of s 149(1), that every balance sheet shall give a true and fair view of the state of affairs of the company, must involve matters of judgment to which there is no one correct answer, and likewise, apart from the question of materiality under sub-para (5) of para 11 of Sch 2 it must be a matter of judgment as to how liabilities are to be summarised with such particulars as are necessary to disclose their general nature. The

*[1983] BCLC 497 at  504*

shareholder has the protection that the accounts have to be submitted to the auditors and have to be audited. He has the possibility, if he can get sufficient support, of requisitioning a meeting to reject the accounts or reverse the decision whereby they were approved. He has the possibility of applying in an appropriate case, and I do not for the moment suggest that this is such a case, to the Department of Trade. I do not think it is open to him to apply by representative shareholder's action for merely declaratory relief on a matter of account of this nature. Furthermore, in so far as the formulation of the accounts involves matters of judgment such as I have mentioned, that is a matter of business judgment. The court does not interfere with

the business judgment of directors in the absence of allegations of mala fides. The duty of causing the accounts to be prepared and presented to the company is laid on the directors by the Act and by the articles, and there is no allegation of bad faith on the part of the directors. Therefore this originating summons as issued is, in my judgment, misconceived and I order that it be struck out.

As for the plaintiff's alternative claim that he should be given leave to amend to obtain a declaration if the judgment should properly have been reflected in the balance sheet as an actual liability, it seems to me that there is no sufficient basis of fact before me to support that amendment in the face of the terms of the translations of the French appellate judgments as they have been put in evidence by the plaintiff himself, and so I do not give leave to make that amendment.

*Order accordingly.*

Solicitors: *Lovell White & King* (for the defendants).

Evelyn M C Budd Barrister.

**TAB S**

[1990] 2 A.C. 605                                                                    Page 1

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
**(Cite as: [1990] 2 A.C. 605)**

**\*605** Caparo Industries Plc. Respondents v. Dickman and Others Appellants

[1990] 2 W.L.R. 358

House of Lords
HL
Lord Bridge of Harwich    , Lord Roskill    ,
Lord Ackner    , Lord
Oliver of Aylmerton    and Lord Jauncey of Tullichettle

1989 Nov. 16, 20, 22, 23, 27, 28; 1990 Feb. 8

Negligence--Duty of care to whom?--Auditor--Appointment by company to audit and certify company's accounts--Statutory duty to make report to shareholders--Another company making take--over bid by initial purchase of shares--Claim that subsequent completion of take--over by purchase of total issued shares made in reliance on negligently made audit--Whether auditor owing duty of care to shareholders--Whether duty owed to non--shareholding investor-- Companies Act 1985 (c. 6), ss. 236(1)(2), 237(1)

The plaintiffs, a public limited company, which had accomplished the take-over of F. Plc., brought an action against its directors alleging fraudulent misrepresentation and against its auditors claiming that they were negligent in carrying out the audit and making their report, which they were required to do within the terms of **\*606** sections 236 and 237 of the Companies Act1985    . In the statement of claim the plaintiffs alleged that they had begun purchasing shares in F. Plc. a few days before the annual accounts had been published to shareholders, that in reliance on those accounts they made further purchases of shares so as to take over the company, and that the auditors owed both shareholders and potential investors a duty of care in respect of the certification of the accounts and should have known that as F. Plc.'s profits were not as high as projected and its share price had fallen significantly, that it was susceptible to a take-over bid and that reliance on the accuracy of the accounts would be placed by any potential bidder

such as the plaintiffs. On the trial of a preliminary issue against the auditors, on the facts as alleged, the judge determined that the auditors did not owe the plaintiffs a duty of care at common law either as a shareholder of F. Plc. or as an investor holding no shares. On appeal by the plaintiffs the Court of Appeal, by a majority, held that a duty of care was owed to the plaintiffs as shareholders but not as investors.

On appeal by the auditors and cross-appeal by the plaintiffs: -

Held, allowing the appeal and dismissing the cross-appeal, that liability for economic loss due to negligent mis-statement was confined to cases where the statement or advice had been given to a known recipient for a specific purpose of which the maker was aware and upon which the recipient had relied and acted to his detriment; that since the purpose of the statutory requirement for an audit of public companies under the Act of 1985 was the making of a report to enable shareholders to exercise their class rights in general meeting and did not extend to the provision of information to assist shareholders in the making of decisions as to future investment in the company, and since, additionally, there was no reason in policy or principle why auditors should be deemed to have a special relationship with non-shareholders contemplating investment in the company in reliance on the published accounts, even when the affairs of the company were known to be such as to render it susceptible to an attempted take-over, the auditors had not owed any duty of care to the plaintiffs in respect of their purchase of F. Plc.'s shares (post, pp. 621D-G, 623D, 626C-E, F - 627D, E-G, 628H - 629A, E, 631E-G, 638C-E, 649H - 650C, 654B-F, 658F-G, 661H - 662F).

Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd. [1964] A.C. 465    , H.L.(E.) and Smith v. Eric S. Bush [1990] 1 A.C. 831    , H.L.(E.) applied.

Dicta of Denning L.J. in Candler v. Crane, Christ-

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990] E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134 S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400, 2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400

**(Cite as: [1990] 2 A.C. 605)**

mas & Co. [1951] 2 K.B. 164      , 179-182 and Al Saudi Banque v. Clarke Pixley [1990] Ch. 313      approved.

Scott Group Ltd. v. McFarlane [1978] N.Z.L.R. 553      considered.

JEB Fasteners Ltd. v. Marks, Bloom & Co. [1981] 3 All E.R. 289      and Twomax Ltd. v. Dickson, McFarlane & Robinson, 1982 S.C. 113 distinguished.

*Per*      Lord Bridge of Harwich, Lord Roskill, Lord Ackner and Lord Oliver of Aylmerton. Whilst recognising the importance of the underlying general principles common to the whole field of negligence, the law has now moved in the direction of attaching greater significance to the more traditional categorisation of distinct and recognisable situations as guides to the existence, the scope and the limits of the varied duties of **\*607**      care which the law imposes (post, pp. 618C-D, 628D-F, 629E, 633E-G, 635B-C).

Dicta of Brennan J. in Sutherland Shire Council v. Heyman (1985) 60 A.L.R. 1      , 43-44 considered.

Decision of the Court of Appeal [1989] Q.B. 653; [1989] 2 W.L.R. 316; [1989] 1 All E.R. 798 reversed in part.

The following cases are referred to in their Lordships' opinions:

Al Saudi Banque v. Clarke Pixley [1990] Ch. 313; [1990] 2 W.L.R. 344; [1989] 3 All E.R. 361

Anns v. Merton London Borough Council [1978] A.C. 728; [1977] 2 W.L.R. 1024; [1977] 2 All E.R. 492, H.L.(E.)

Candler v. Crane, Christmas & Co. [1951] 2 K.B. 164; [1951] 1 All E.R. 426, C.A.

Candlewood Navigation Corporation Ltd. v. Mitsui O.S.K. Lines Ltd. [1986] A.C. 1; [1985] 3 W.L.R. 381; [1985] 2 All E.R. 935, P.C.

Cann v. Willson (1888) 39 Ch.D. 39

Cattle v. Stockton Waterworks Co. (1875) L.R. 10 Q.B. 453

Clayton v. Woodman & Son (Builders) Ltd. [1962] 2 Q.B. 533      ; [1961] 3 W.L.R. 987; [1961] 3 All E.R. 249      ; [1962] 1 W.L.R. 585; [1962] 2 All E.R. 33      , Salmon J. and C.A.

Donoghue v. Stevenson [1932] A.C. 562, H.L.(Sc.)

Dorset Yacht Co. Ltd. v. Home Office [1970] A.C. 1004; [1970] 2 W.L.R. 1140; [1970] 2 All E.R. 294, H.L.(E.)

Elliott Steam Tug Co. Ltd. v. Shipping Controller [1922] 1 K.B. 127, C.A.

Glanzer v. Shepard (1922) 135 N.E. 275

Grant v. Australian Knitting Mills Ltd. [1936] A.C. 85, P.C.

Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd. [1964] A.C. 465; [1963] 3 W.L.R. 101; [1963] 2 All E.R. 575, H.L.(E.)

Hill v. Chief Constable of West Yorkshire [1989] A.C. 53; [1988] 2 W.L.R. 1049; [1988] 2 All E.R. 238, H.L.(E.)

JEB Fasteners Ltd. v. Marks, Bloom & Co. [1981] 3 All E.R. 289

Junior Books Ltd. v. Veitchi Co. Ltd. [1983] 1 A.C. 520; [1982] 3 W.L.R. 477; [1982] 3 All E.R. 201, H.L.(Sc.)

Leigh and Sillavan Ltd. v. Aliakmon Shipping Co. Ltd. [1986] A.C. 785; [1986] 2 W.L.R. 902; [1986] 2 All E.R. 145, H.L.(E.)

Le Lievre v. Gould [1893] 1 Q.B. 491, C.A.

McLoughlin v. O'Brian [1983] 1 A.C. 410; [1982] 2 W.L.R. 982; [1982] 2 All E.R. 298, H.L.(E.)

[1990] 2 A.C. 605                                                                                                    Page 3

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
**(Cite as: [1990] 2 A.C. 605)**

Ministry of Housing and Local Government v. Sharp [1970] 2 Q.B. 223; [1970] 2 W.L.R. 802; [1970] 1 All E.R. 1009, C.A.

Mutual Life and Citizens' Assurance Co. Ltd. v. Evatt [1971] A.C. 793; [1971] 2 W.L.R. 23; [1971] 1 All E.R. 150, P.C.

Peabody Donation Fund (Governors of) v. Sir Lindsay Parkinson & Co. Ltd. [1985] A.C. 210; [1984] 3 W.L.R. 953; [1984] 3 All E.R. 529, H.L.(E.)

Perl (P.) (Exporters) Ltd. v. Camden London Borough Council [1984] Q.B. 342; [1983] 3 W.L.R. 769; [1983] 3 All E.R. 161, C.A.

Rondel v. Worsley [1969] 1 A.C. 191; [1967] 3 W.L.R. 1666; [1967] 3 All E.R. 993, H.L.(E.)

Ross v. Caunters [1980] Ch. 297; [1979] 3 W.L.R. 605; [1979] 3 All E.R. 580

Rowling v. Takaro Properties Ltd. [1988] A.C. 473; [1988] 2 W.L.R. 418; [1988] 1 All E.R. 163, P.C.

Scott Group Ltd. v. McFarlane [1978] 1 N.Z.L.R. 553

**\*608**    Smith v. Eric S. Bush [1990] 1 A.C. 831; [1989] 2 W.L.R. 790; [1989] 2 All E.R. 514, H.L.(E.)

Smith v. Littlewoods Organisation Ltd. [1987] A.C. 241; [1987] 2 W.L.R. 480; [1987] 1 All E.R. 710, H.L.(Sc.)

Sutherland Shire Council v. Heyman (1985) 60 A.L.R. 1

Twomax Ltd. v. Dickson, McFarlane & Robinson, 1982 S.C. 113

Ultramares Corporation v. Touche (1931) 174 N.E. 441; 255 N.Y. 170

Wagon Mound, The [1961] A.C. 388; [1961] 2 W.L.R. 126; [1961] 1 All E.R. 404, P.C.

Yuen Kun Yeu v. Attorney-General of Hong Kong [1988] A.C. 175; [1987] 3 W.L.R. 776; [1987] 2 All E.R. 705, P.C.

The following additional cases were cited in argument:

Allen, Craig and Co. (London) Ltd., In re [1934] Ch. 483

Aswan Engineering Establishment Co. (M/S) v. Lupdine Ltd. [1987] 1 W.L.R. 1; [1987] 1 All E.R. 135, C.A.

Blue Bell Inc. v. Peat Marwick, Mitchell & Co. (1986) 715 S.W.2d 408

Clarke v. Bruce Lance & Co. [1988] 1 W.L.R. 881; [1988] 1 All E.R. 364, C.A.

Clay v. A. J. Crump & Sons Ltd. [1964] 1 Q.B. 533; [1963] 3 W.L.R. 866; [1963] 3 All E.R. 687, C.A.

Credit Alliance Corporation v. Arthur Andersen & Co. (1985) 483 N.E.2d 110

Customs and Excise Commissioners v. Hedon Alpha Ltd. [1981] Q.B. 818; [1981] 2 W.L.R. 791; [1981] 2 All E.R. 697, C.A.

Dutton v. Bognor Regis Urban District Council [1972] 1 Q.B. 373; [1972] 2 W.L.R. 299; [1972] 1 All E.R. 462, C.A.

Farr v. Butters Brothers and Co. [1932] 2 K.B. 606, C.A.

Haig v. Bamford (1976) 72 D.L.R. (3d) 68

Hickman v. Kent or Romney Marsh Sheepbreeders' Association [1915] 1 Ch. 881

McInerny v. Lloyds Bank Ltd. [1974] 1 Lloyd's Rep. 246, C.A.

Otto v. Bolton and Norris [1936] 2 K.B. 46

Pacific Associates Inc. v. Baxter [1990] 1 Q.B. 993; [1989] 3 W.L.R. 1150; [1989] 2 All E.R. 159,

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990] E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134 S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400, 2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400

**(Cite as: [1990] 2 A.C. 605)**

C.A.

Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204; [1982] 2 W.L.R. 31; [1982] 1 All E.R. 354, C.A.

Rosenblum (H.) Inc. v. Adler (1983) 461 A.2d 138

S.C.M. (United Kingdom) Ltd. v. W. J. Whittal and Son Ltd. [1971] 1 Q.B. 337; [1970] 3 W.L.R. 694; [1970] 3 All E.R. 245, C.A.

Spartan Steel & Alloys Ltd. v. Martin & Co. (Contractors) Ltd. [1973] Q.B. 27; [1972] 3 W.L.R. 502; [1972] 3 All E.R. 557, C.A.

Toro Co. v. Krouse, Kern & Co. Inc. (1987) 827 F.2d 155

APPEAL from the Court of Appeal.

This was an appeal by the third defendants, Touche Ross & Co., a firm of accountants, and a cross-appeal by the plaintiffs, Caparo Industries Plc., in respect of the trial of a preliminary issue in an action by the plaintiffs against the first and second defendants, Steven Graham Dickman and Robert Anthony Dickman, two directors of Fidelity Plc., alleging fraudulent misrepresentation, and against the third defendants alleging negligence in the carrying out of an audit of the accounts of Fidelity for the year ended 31 March 1984, whereby (1) the third **\*609** defendants appealed against that part of the order of the Court of Appeal (Bingham and Taylor L.JJ., O'Connor L.J. dissenting) [1989] Q.B. 653 allowing the plaintiffs' appeal against the decision of Sir Neil Lawson, sitting as a judge of the Queen's Bench Division [1988] B.C.L.C. 387 , that the third defendants did not owe a duty of care to the plaintiffs as shareholders of Fidelity; and (2) the plaintiffs cross-appealed against that part of the order of the Court of Appeal dismissing their appeal against the decision of Sir Neil Lawson that the third defendants did not owe them a duty of care as non-shareholding buyers.

The facts are set out in the opinion of Lord Bridge of Harwich.

*Peter Goldsmith Q.C.* and *Stephen Moriarty* for the auditors. Three elements are needed for a duty of care to exist: there must be reasonable foreseeability, a close and direct relationship of 'proximity' between the parties and it must be fair, just and reasonable to impose liability. No duty of care was owed to Caparo as a potential acquirer of shares because of lack of proximity and because it would not be fair, just and reasonable. If so, Caparo's ability to recover is not improved by the fortuity of ownership of shares because: (i) its loss is qua potential investor; (ii) Caparo was not a relevant shareholder at the relevant time; and (iii) in any event, auditors owe no duty of care to an individual shareholder because of lack of proximity and because it would not be fair, just and reasonable.

Foreseeability can be assumed in the present case, and so is not in issue. However, suggestions based on the well-known passage from the speech of Lord Wilberforce in Anns v. Merton London Borough Council [1978] A.C. 728 , 751, that, subject only to a public policy test, foreseeability of damage is enough to give rise to a duty of care, can no longer be supported. [Reference was made to Yuen Kun Yeu v. Attorney-General of Hong Kong [1988] A.C. 175 ; Hill v. Chief Constable of West Yorkshire [1989] A.C. 53 ; Governors of Peabody Donation Fund v. Sir Lindsay Parkinson & Co. Ltd. [1985] A.C. 210 and Rowling v. Takaro Properties Ltd. [1988] A.C. 473 .]

As to proximity, it may be difficult to define exhaustively, but it clearly involves more than the mere facts that a defendant has acted in performance of a contract between himself and a person other than the plaintiff in circumstances where reliance by, and harm to, the plaintiff was reasonably foreseeable. The requirement cannot be satisfied by the assumed facts of this case. In the context of a claim for economic loss flowing from a negligent statement proximity has been strictly required both in economic claims generally and negligent statement claims specifically so as, importantly, to

[1990] 2 A.C. 605                                                                                                   Page 5
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

avoid liability being imposed upon a person which is out of all proportion to culpability, the fee earned or the ability to insure against the consequence of any negligence. To do otherwise would be to expose defendants to 'liability in an indeterminate amount, for an indeterminate time, to an indeterminate class': Ultramares Corporation v. Touche (1931) 174 N.E. 441      , 444, per Cardozo C.J. Candlewood Navigation Corporation Ltd. v. Mitsui O.S.K. Lines Ltd. [1986] A.C. 1      ; Leigh and Sillavan Ltd. v. Aliakmon Shipping Co. Ltd. [1986] A.C. 785      ; S.C.M. (United Kingdom) Ltd. v. W. J. Whittal and     *610     Son Ltd. [1971] 1 Q.B. 337      and Spartan Steel & Alloys Ltd. v. Martin & Co. (Contractors) Ltd. [1973] Q.B. 27 all show that the courts have sought to limit economic loss on policy grounds.

In the case of a negligent statement it is even more important to be circumspect about imposing liability: see Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd. [1964] A.C. 465      , 534 per Lord Pearce. In negligent statement cases proximity will not be established unless at least the following conditions are satisfied. Usually, the plaintiff must be (i) the person directly intended by the maker of the statement to act upon the statement (ii) in a specific transaction of which the maker knows and (iii) for the purpose for which the statement is made. Exceptionally, conditions (i) and (iii) may be relaxed provided the plaintiff is a person of whose actual existence (if not name) the maker knows, to whom he knows the statement will be communicated, and who it is likely with a high degree of certainty will act upon the statement in a specific transaction of which the maker knows. Probably, in such a case, there should be satisfied a further requirement that there be some factor more closely linking the maker of the statement to the plaintiff: for example, the payment, to the knowledge of the valuers, by the intending purchasers in Smith v. Eric S. Bush [1990] 1 A.C. 831      of their valuation fee. [Reference was made to the judgment of Denning L.J. in Candler v. Crane, Christmas & Co. [1951] 2 K.B. 164      ; Al Saudi Banque v. Clarke Pixley [1990] Ch. 313      ; Clarke v. Bruce Lance & Co. [1988] 1 W.L.R. 881      ; Ross v. Caunters [1980] Ch.

297      ; Ultramares Corporation v. Touche, 174 N.E. 441      ; Credit Alliance Corporation v. Arthur Andersen & Co.      (1985) 483 N.E.2d 110; Toro Co,. v. Krouse, Kern & Co. Inc. (1987) 827 F. 2d 155      ; H. Rosenblum Inc. v. Adler (1983) 461 A. 2d. 138      ; Haig v. Bamford (1976) 72 D.L.R. (3d) 68      ; Scott Group Ltd. v. McFarlane [1978] 1 N.Z.L.R. 553      .] The statement of principle in JEB Fasteners Ltd. v. Marks, Bloom & Co. [1981] 3 All E.R. 289      goes too far and is unjustified; nor is the reasoning in Twomax Ltd. v. Dickson, McFarlane & Robinson, 1982 S.C. 113 supportable.

The relevant statutory provisions are to be found in the Companies Act 1985      . The primary responsibility for a company's accounts lies on the company and its directors. The primary purpose of the accounts is to report on the stewardship of the directors to the shareholders as a body, rather than to provide information for the investing public.

In the light of the requirement of 'proximity,' the relationship between an auditor and a third party investor like Caparo who buys shares in reliance upon an audit report is not such as to give rise to a duty of care. There was no special relationship between Caparo and the auditors: the ability to inspect the accounts and the chance to buy shares are enjoyed by the world at large. Nor were the accounts audited by the auditors with a specific transaction in mind. To impose liability in such circumstances would open up the very prospect of 'indeterminate liability' which it is the purpose of the proximity requirement to avoid.

Even were the proximity requirement to be satisfied on the assumed facts of this case, it could not be 'fair, just or reasonable' to impose a duty of care owed to Caparo, qua investor. [Reference was made to the vulnerability of the professional man, the problems of obtaining cover in     *611     the professional indemnity market, and the danger of overkill in imposing a duty which might lead to 'defensive auditing.']

On the issue of the duty of care in relation to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

shareholders, if a duty of care be owed to Caparo as a shareholder at all, the scope of that duty is limited to loss suffered by it in that capacity and does not extend to losses incurred qua potential investor. There is nothing unusual in a person being owed an obligation in one capacity, in respect of which he is unable to sue in another capacity: Hickman v. Kent or Romney Marsh Sheepbreeders' Association [1915] 1 Ch. 881     . In any event, the shareholders to whom any duty of care is owed by an auditor should be limited to those who are registered shareholders at the date the audit work in question is done, alternatively, at the date of the auditors' report; at the latest it should be those registered when the published accounts are distributed to shareholders. At none of those dates was Caparo a registered shareholder. [Reference was made to In re Allen, Craig & Co. (London) Ltd. [1934] Ch. 483     ; and to Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2) [1982] Ch. 204     .] An auditor does not owe a duty of care to the individual shareholder at all, in any event. In auditing the accounts and making his report to the shareholders, the auditor's purpose is not to give guidance to individual shareholders about their private investment decisions, nor does he have any specific transactions in mind when doing so.

*Christopher Bathurst Q.C., Michael Brindle* and *Craig Orr*     for the plaintiffs, Caparo Industries Plc. The correct approach is to start with an examination of the statutory framework within which auditors operate. The Companies Act 1985     (and its predecessors) make it clear that an auditor reports to every shareholder. A duty to report must be a duty to report carefully. That duty extends to each shareholder; a duty of care to the company alone would conflict with the policy of the Act and would leave many types of loss wholly without remedy. If the duty is owed to the individual shareholder, then it cannot be purely for the purposes of 'stewardship.' It cannot be limited to loss by selling for too little and not extend to loss from buying for too much. Such a distinction would be illogical, since all shareholders are investors and since buying selling and retaining are all the same type of loss. It would also be undesirable in its con-

sequences. There is a natural tendency for directors to seek to present the company in a positive way. The danger, particularly if the company is vulnerable, is that the asset value or profitability will be overstated, unless the auditors exercise due care: see Candler v. Crane, Christmas & Co. [1951] 2 K.B. 164     , 184 as to the law failing to serve the best interests of the community. Such a distinction would also be contrary to the proper approach for determining what damages are recoverable. The essential question in considering the duty of care is whether the duty is owed *to the plaintiff*     ; that is then subject to the type of loss being within the scope of the duty and the type of loss being non-remote. In the instant case, buying, selling and retaining shares all fall within the scope of the duty arising from the statutory function of auditors; and the loss claimed is of a type which is a non-remote consequence of a breach of duty. Certain general probabilities may be assumed.

**\*612** 1. In many instances, accounts which do not give a true and fair view of the state of the company's affairs at the end of the financial year and/or of the company profit or loss for that year will not, and will be inherently unlikely to, cause any damage to the company itself. 2. Equity shareholders in a company are likely to make decisions to buy, retain or sell shares in the company in reliance on the accounts. 3. It is likely that if accounts materially understate the true and fair view, shareholders selling shares will do so at less than their true value. If they materially overstate the true and fair view, shareholders buying shares will do so at more than their true value. 4. An equity shareholder with no peculiar features is inherently much more likely to make an investment decision based on the accounts than to so make a decision to lend to, or trade with, the company. 5. A competent auditor will realise these facts. Reliance is placed on Mutual Life and Citizens' Assurance Co. Ltd. v. Evatt [1971] A.C. 793     , 801.

As to the 'timing' point raised by the auditors, the annual general meeting has always been the principal date when the auditor reports to the members. The fact that the date when the report is sent to the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1990] 2 A.C. 605                                                                                    Page 7
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

shareholder may *also* be relevant does not detract from that. In any event, there is no need to limit the duty to registered shareholders; a shareholding may be beneficial.

There is no single test or formula for determining what constitutes ' proximity.' Certain types of cases are different in principle. There are cases like Hedley Byrne [1964] A.C. 465            where there is no nexus between the plaintiff and defendant save a voluntary assumption of responsibility. There are cases involving public functions, where discretion is involved and a possible conflict between different interests (e.g. Yuen Kun Yeu [1988] A.C. 175            or Rowling v. Takaro Properties Ltd. [1988] A.C. 473            ). There are cases which attempt to 'short-circuit' the contractual chain; and cases where there is an established rule of law (e.g. Leigh and Sillavan [1986] A.C. 785            ). The present case is different. The auditors are performing a statutory function designed to be for the benefit of certain classes of person. In such cases the concept of voluntary assumption of responsibility, on which the auditors founded their case in the Court of Appeal, is unhelpful. In any event, it is satisfied here, if it needs to be. The test is whether performance of the duty is required by policy in order that, inter alia, reliance can be placed on the work done. Crucial factors are that there is positive reliance which is central to the decision to buy; and that such reliance is direct and without opportunity of intermediate examination. (Another factor is that the duty creates no conflict).

Ever since Donoghue v. Stevenson [1932] A.C. 562            it has been established that a duty is owed where there is no reasonable likelihood of, or opportunity for, intervening examination either by the plaintiff or a third party. The rationale behind this is that where there cannot realistically be any intervening examination between the defendant's work and the plaintiff's use of that work, then the plaintiff and the defendant are proximate: Farr v. Butters Brothers and Co. [1932] 2 K.B. 606            , 614-615, and Otto v. Bolton and Norris [1936] 2 K.B. 46            , 57. For this purpose it makes no difference whether the work in question is

manufacture of an article, repair of a building, or the examination of a building or a company's records so as to produce a report on that building or that company. [Reference was made to Dutton v. Bognor Regis Urban District Council [1972] 1 Q.B. 373            ; Smith v. Eric S. Bush [1990] 1 A.C. 831            , 872B-C, *per* Lord Jauncey of Tullichettle; Pacific Associates Inc. v. Baxter [1990] 1 Q.B. 993            , 1031B-H *per* Ralph Gibson L.J.; McInerny v. Lloyds Bank Ltd. [1974] 1 Lloyd's Rep. 246            , 254 *per* Denning M.R.] Just because a very high degree of foreseeability is a strong pointer towards proximity does not mean that our case equates proximity with foreseeability. Although there has to be a sufficiently definable class of person who is likely to be injured (as opposed to the world at large), in this limited class the *identity* of the plaintiff cannot matter: what is required is a *definable* type and class. It would be wrong to equate ' limited' with 'small': provided the class is definable (limited) at the time when the damage may be suffered, it does not matter that the class was potentially much larger at the time that the negligent act was committed.

Apart from shareholders, a duty is owed to unwelcome bidders. They form a special class since it is known that they will rely on the accounts and nothing else. They will not be shown other documents, as a 'white knight' would be. Thus where (as here) a company is particularly vulnerable, the auditor foresees a plain risk of a bid and the virtual certainty of reliance. The degree of vulnerability is a question of fact, but the situation of Fidelity on the assumed facts was very grave. There are many cases which fall between (a) the facts in Candler [1951] 2 K.B. 164            and (b) the categories where Denning L.J. in that case considered that there was no duty. While it is accepted that an unwelcome bidder is not within (a), neither is he within (b). [Reference was made to JEB Fasteners Ltd. v. Marks, Bloom & Co. [1981] 3 All E.R. 289 ; Twomax Ltd. v. Dickson, McFarlane & Robinson, 1982 S.C. 113            ; Scott Group Ltd. v. McFarlane [1978] 1 N.Z.L.R. 553            ; Ultramares Corporation v. Touche, 174 N.E. 441            ; H. Rosenblum

[1990] 2 A.C. 605    Page 8
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

Inc. v. Adler, 461 A.2d 138      and Blue Bell Inc. v. Peat Marwick, Mitchell & Co. (1986) 715 S.W.2d 408      .] The United States authorities present no coherent picture, and authority can be found for any proposition. Nonetheless the recent general tendency (save in New York) is to a test wider than that contended for by the auditors.

If the other requirements of a duty exist, public policy should only defeat that duty in rare cases where cogent reasons are plainly established. The ill-consequences for which the auditors contend are not the consequences of a duty to a bidder, but of unlimited liability, which can only be remedied by legislation. If a duty is recognised, then in respect of any set of accounts the number of plaintiffs in a potential claim will be very limited. The amount of the claim will be the amount by which the shares drop in value when the true position is revealed. Liability cannot extend beyond the 'currency' of those accounts. There are cogent policy reasons in favour of a duty. It is in the interests both of the company and others that audited accounts should be and should be seen to be reliable. Without a duty such as that for which we contend over-optimistic accounts will normally not give rise to any liability. **\*614**      Further, it is in the interests of shareholders that bids should be made; and thus that a bidder has accounts on which he can rely and for which he has a remedy.

*Goldsmith Q.C.*      in reply referred to Clay v. A. J. Crump & Sons Ltd. [1964] 1 Q.B. 533      and Aswan Engineering Establishment Co. (M/S) v. Lupdine Ltd. [1987] 1 W.L.R. 1      . *Bathurst Q.C.*      in rejoinder.

The first and second defendants did not appear and were not represented.

Their Lordships took time for consideration.

8 February 1990. LORD BRIDGE OF HARWICH.

My Lords, the appellants are a well known firm of chartered accountants. At all times material to this appeal, they were the auditors of a public limited company, Fidelity Plc. ('Fidelity'), which carried on business as manufacturers and vendors of electrical equipment of various kinds and whose shares were quoted on the London Stock Exchange. On 22 May 1984 the directors of Fidelity announced the results for the year ended 31 March 1984. These revealed that profits for the year fell well short of the figure which had been predicted, and this resulted in a dramatic drop in the quoted price of the shares which had stood at 143p per share on 1 March 1984 and which, by the beginning of June 1984, had fallen to 63p. Fidelity's accounts for the year to 31 March 1984 had been audited by the appellants and had been approved by the directors on the day before the results were announced. On 12 June 1984 they were issued to the shareholders, with notice of the annual general meeting, which took place on 4 July 1984 and at which the auditor's report was read and the accounts were adopted.

Following the announcement of the result, the respondents Caparo Industries Plc. ('Caparo') began to purchase shares of Fidelity in the market. On 8 June 1984 they purchased 100,000 shares but they were not registered as members of Fidelity until after 12 June 1984 when the accounts were sent to shareholders although they had been registered in respect of at least some of the shares which they purchased by the date of the annual general meeting, which they did not attend. On 12 June 1984, they purchased a further 50,000 shares, and by 6 July 1984 they had increased their holding in Fidelity to 29.9 per cent. of the issued capital. On 4 September 1984 they made a bid for the remainder at 120p per share, that offer being increased to 125p per share on 24 September 1984. The offer was declared unconditional on 23 October 1984, and two days later Caparo announced that it had acquired 91.8 per cent. of the issued shares and proposed to acquire the balance compulsorily, which it subsequently did.

The action in which this appeal arises is one in which Caparo alleges that the purchases of shares which took place after 12 June 1984 and the subsequent bid were all made in reliance upon the accounts and that those accounts were inaccurate and misleading in a number of respects and in particular

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990] E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134 S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400, 2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

in overvaluing stock and underproviding for after-sales credits, with the result that an apparent pre-tax profit of some £1.3m. **\*615** should in fact have been shown as a loss of over £400,000. Had the true facts been known, it is alleged, Caparo would not have made a bid at the price paid or indeed at all. Caparo accordingly commenced proceedings on 24 July 1985 against two of the persons who were directors at the material time, claiming that the overvaluations were made fraudulently, and against the appellants, claiming that they were negligent in certifying, as they did, that the accounts showed a true and fair view of Fidelity's position at the date to which they related. The substance of the allegation against the appellants is contained in paragraph 16 of the statement of claim which is in the following terms:

'Touche Ross, as auditors of Fidelity carrying out their functions as auditors and certifiers of the accounts in April and May 1984, owed a duty of care to investors and potential investors, and in particular to Caparo, in respect of the audit and certification of the accounts. In support of that duty of care Caparo will rely upon the following matters: (1) Touche Ross knew or ought to have known (a) that in early March 1984 a press release had been issued stating that profits for the financial year would fall significantly short of £2.2m., (b) that Fidelity's share price fell from 143p per share on 1 March 1984 to 75p per share on 2 April 1984, (c) that Fidelity required financial assistance. (2) Touche Ross therefore ought to have foreseen that Fidelity was vulnerable to a take-over bid and that persons such as Caparo might well rely on the accounts for the purpose of deciding whether to take over Fidelity and might well suffer loss if the accounts were inaccurate.'

On 6 July 1987, Sir Neil Lawson, sitting as judge in chambers, made an order for the trial of a preliminary issue, as follows:

'Whether on the facts set out in paragraphs 4 and 6 and in sub-paragraphs (1) and (2) of paragraph 16 of the statement of claim herein, the third defendants, Touche Ross & Co., owed a duty of care to the plaintiffs, Caparo Industries Plc., (a) as potential investors in Fidelity Plc.; or (b) as shareholders

in Fidelity Plc. from 8 June 1984 and/or from 12 June 1984; in respect of the audit of the accounts of Fidelity Plc. for the year ended 31 March 1984 published on 12 June 1984.'

Paragraphs 4 and 6 of the statement of claim are those paragraphs in which are set out the purchases of shares by Caparo to which I have referred and in which it is claimed that the purchases made after 12 June 1984 were made in reliance upon the information contained in the accounts. There is, however, one correction to be made. Paragraph 4 alleges that the accounts were issued on 12 June 1984 'to shareholders, including Caparo' but it is now accepted that at that date Caparo, although a purchaser of shares, had not been registered as a shareholder in Fidelity's register of members.

On the trial of this preliminary issue Sir Neil Lawson, sitting as a judge of the Queen's Bench Division [1988] B.C.L.C. 387 , held (i) that the appellants owed no duty at common law to Caparo as investors and (ii) that, whilst auditors might owe statutory duties to shareholders as a **\*616** class, there was no common law duty to individual shareholders such as would enable an individual shareholder to recover damages for loss sustained by him in acting in reliance upon the audited accounts.

Caparo appealed to the Court of Appeal [1989] Q.B. 653 which, by a majority (O'Connor L.J. dissenting) allowed the appeal holding that, whilst there was no relationship between an auditor and a potential investor sufficiently proximate to give rise to a duty of care at common law, there was such a relationship with individual shareholders, so that an individual shareholder who suffered loss by acting in reliance on negligently prepared accounts, whether by selling or retaining his shares or by purchasing additional shares, was entitled to recover in tort. From that decision the appellants now appeal to your Lordships' House with the leave of the Court of Appeal, and the respondents cross-appeal against the rejection by the Court of Appeal of their claim that the appellants owed them a duty of care as potential investors.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1990] 2 A.C. 605                                                                                         Page 10
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

In determining the existence and scope of the duty of care which one person may owe to another in the infinitely varied circumstances of human relationships there has for long been a tension between two different approaches. Traditionally the law finds the existence of the duty in different specific situations each exhibiting its own particular characteristics. In this way the law has identified a wide variety of duty situations, all falling within the ambit of the tort of negligence, but sufficiently distinct to require separate definition of the essential ingredients by which the existence of the duty is to be recognised. Commenting upon the outcome of this traditional approach, Lord Atkin, in his seminal speech in Donoghue v. Stevenson [1932] A.C. 562 , 579-580, observed:

'The result is that the courts have been engaged upon an elaborate classification of duties as they exist in respect of property, whether real or personal, with further divisions as to ownership, occupation or control, and distinctions based on the particular relations of the one side or the other, whether manufacturer, salesman or landlord, customer, tenant, stranger, and so on. In this way it can be ascertained at any time whether the law recognises a duty, but only where the case can be referred to some particular species which has been examined and classified. and yet the duty which is common to all the cases where liability is established must logically be based upon some element common to the cases where it is found to exist.'

It is this last sentence which signifies the introduction of the more modern approach of seeking a single general principle which may be applied in all circumstances to determine the existence of a duty of care. Yet Lord Atkin himself sounds the appropriate note of caution by adding, at p. 580:

'To seek a complete logical definition of the general principle is probably to go beyond the function of the judge, for the more general the definition the more likely it is to omit essentials or to introduce non-essentials.'

*617 Lord Reid gave a large impetus to the modern approach in Dorset Yacht Co. Ltd. v. Home Office [1970] A.C. 1004 , 1026-1027, where he said:

'In later years there has been a steady trend towards regarding the law of negligence as depending on principle so that, when a new point emerges, one should ask not whether it is covered by authority but whether recognised principles apply to it. Donoghue v. Stevenson [1932] A.C. 562 may be regarded as a milestone, and the well known passage in Lord Atkin's speech should I think be regarded as a statement of principle. It is not to be treated as if it were a statutory definition. It will require qualification in new circumstances. But I think that the time has come when we can and should say that it ought to apply unless there is some justification or valid explanation for its exclusion.'

The most comprehensive attempt to articulate a single general principle is reached in the well known passage from the speech of Lord Wilberforce in Anns v. Merton London Borough Council [1978] A.C. 728 , 751-752:

'Through the trilogy of cases in this House - Donoghue v. Stevenson [1932] A.C. 562 , Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd. [1964] A.C. 465 , and Dorset Yacht Co. Ltd. v. Home Office [1970] A.C. 1004 , the position has now been reached that in order to establish that a duty of care arises in a particular situation, it is not necessary to bring the facts of that situation within those of previous situations in which a duty of care has been held to exist. Rather the question has to be approached in two stages. First one has to ask whether, as between the alleged wrongdoer and the person who has suffered damage there is a sufficient relationship of proximity or neighbourhood such that, in the reasonable contemplation of the former, carelessness on his part may be likely to cause damage to the latter - in which case a prima facie duty of care arises. Secondly, if the first question is answered affirmatively, it is necessary to consider whether there are any considerations which ought to negative, or to reduce or limit the scope of the duty or the class of person to whom it is owed or the damages to which a breach of it may give rise: see Dorset Yacht case [1970] A.C. 1004 per Lord Reid at p. 1027.'

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990] E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134 S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400, 2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400

(Cite as: [1990] 2 A.C. 605)

But since the Anns case a series of decisions of the Privy Council and of your Lordships' House, notably in judgments and speeches delivered by Lord Keith of Kinkel, have emphasised the inability of any single general principle to provide a practical test which can be applied to every situation to determine whether a duty of care is owed and, if so, what is its scope: see Governors of Peabody Donation Fund v. Sir Lindsay Parkinson & Co. Ltd. [1985] A.C. 210 , 239f-241c; Yuen Kun Yeu v. Attorney-General of Hong Kong [1988] A.C. 175 , 190e-194f; Rowling v. Takaro Properties Ltd. [1988] A.C. 473 , 501d-g; Hill v. Chief Constable of West Yorkshire [1989] A.C. 53 , 60b-d. What emerges is that, in addition to the foreseeability of damage, necessary ingredients in any situation giving rise to a duty of care are that there *618 should exist between the party owing the duty and the party to whom it is owed a relationship characterised by the law as one of 'proximity' or 'neighbourhood' and that the situation should be one in which the court considers it fair, just and reasonable that the law should impose a duty of a given scope upon the one party for the benefit of the other. But it is implicit in the passages referred to that the concepts of proximity and fairness embodied in these additional ingredients are not susceptible of any such precise definition as would be necessary to give them utility as practical tests, but amount in effect to little more than convenient labels to attach to the features of different specific situations which, on a detailed examination of all the circumstances, the law recognises pragmatically as giving rise to a duty of care of a given scope. Whilst recognising, of course, the importance of the underlying general principles common to the whole field of negligence, I think the law has now moved in the direction of attaching greater significance to the more traditional categorisation of distinct and recognisable situations as guides to the existence, the scope and the limits of the varied duties of care which the law imposes. We must now, I think, recognise the wisdom of the words of Brennan J. in the High Court of Australia in Sutherland Shire Council v. Heyman (1985) 60 A.L.R. 1 , 43-44, where

he said:

'It is preferable, in my view, that the law should develop novel categories of negligence incrementally and by analogy with established categories, rather than by a massive extension of a prima facie duty of care restrained only by indefinable 'considerations which ought to negative, or to reduce or limit the scope of the duty or the class of person to whom it is owed."

One of the most important distinctions always to be observed lies in the law's essentially different approach to the different kinds of damage which one party may have suffered in consequence of the acts or omissions of another. It is one thing to owe a duty of care to avoid causing injury to the person or property of others. It is quite another to avoid causing others to suffer purely economic loss. A graphic illustration of the distinction is embodied in the proposition that:

'In case of a wrong done to a chattel the common law does not recognise a person whose only rights are a contractual right to have the use or services of the chattel for purposes of making profits or gains without possession of or property in the chattel. Such a person cannot claim for injury done to his contractual right:' see Elliott Steam Tug Co. Ltd. v. Shipping Controller [1922] 1 K.B. 127 , 139 per Scrutton L.J.

The proposition derives from Cattle v. Stockton Waterworks Co. (1875) L.R. 10 Q.B. 453 . It has recently been reaffirmed in Candlewood Navigation Corporation Ltd. v. Mitsui O.S.K. Lines Ltd. [1986] A.C. 1 and Leigh & Sillavan Ltd. v. Aliakmon Shipping Co. Ltd. [1986] A.C. 785 . In the former case Lord Fraser of Tullybelton, delivering the judgment of the Privy Council, said, at p. 25:

'Their Lordships consider that some limit or control mechanism has to be imposed upon the liability of a wrongdoer towards those *619 who have suffered economic damage in consequence of his negligence. The need for such a limit has been repeatedly asserted in the cases, from Cattle's case, L.R. 10 Q.B. 453 , to Caltex [Oil (Australia) Pty. Ltd. v. Dredge ' Willemstad' (1976)], 136 C.L.R. 529 , and their Lord-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

ships are not aware that a view to the contrary has ever been judicially expressed.'

The damage which may be caused by the negligently spoken or written word will normally be confined to economic loss sustained by those who rely on the accuracy of the information or advice they receive as a basis for action. The question what, if any, duty is owed by the maker of a statement to exercise due care to ensure its accuracy arises typically in relation to statements made by a person in the exercise of his calling or profession. In advising the client who employs him the professional man owes a duty to exercise that standard of skill and care appropriate to his professional status and will be liable both in contract and in tort for all losses which his client may suffer by reason of any breach of that duty. But the possibility of any duty of care being owed to third parties with whom the professional man was in no contractual relationship was for long denied because of the wrong turning taken by the law in Le Lievre v. Gould [1893] 1 Q.B. 491      in overruling Cann v. Willson (1888) 39 Ch.D. 39       . In Candler v. Crane, Christmas & Co. [1951] 2 K.B. 164       , Denning L.J., in his dissenting judgment, made a valiant attempt to correct the error. But it was not until the decision of this House in Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd. [1964] A.C. 465 that the law was once more set upon the right path.

Consistently with the traditional approach it is to these authorities and to subsequent decisions directly relevant to this relatively narrow corner of the field that we should look to determine the essential characteristics of a situation giving rise, independently of any contractual or fiduciary relationship, to a duty of care owed by one party to another to ensure that the accuracy of any statement which the one party makes and on which the other party may foreseeably rely to his economic detriment.

In Cann v. Willson, 39 Ch.D. 39       mortgagees advanced money in reliance on a valuation of the mortgaged property supplied to them by a valuer employed by the mortgagor. On the mortgagor's default, the property, having been negli-

gently undervalued, proved insufficient to cover the mortgage loan. The mortgagees recovered their loss from the valuer. In his judgment, Chitty J. said, at pp. 42-43:

'In this case the document called a valuation was sent by the defendants direct to the agents of the plaintiff for the purpose of inducing the plaintiff and his co-trustee to lay out the trust money on mortgage. It seems to me that the defendants knowingly placed themselves in that position, and in point of law incurred a duty towards him to use reasonable care in the preparation of the document called a valuation.'

In Candler v. Crane, Christmas & Co. Ltd. [1951] 2 K.B. 164       the plaintiff invested money in a limited company in reliance on accounts of the company prepared by the company's accountants at the request of **620** the managing director, which were shown to the plaintiff and discussed with him by the accountants in the knowledge that he was interested as a potential investor in the company. The accounts were inaccurate and misleading and the plaintiff, having invested in the company in reliance upon them, lost his money. Denning L.J., in his dissenting judgment, held the plaintiff entitled to recover damages for the accountants' negligence.

In Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd. [1964] A.C. 465       bankers were asked about the financial stability of a customer of the bank. They gave a favourable reference, albeit with a disclaimer of responsibility. The circumstances of the inquiry made it clear to the bankers that the party on whose behalf the inquiry was made wanted to know if they could safely extend credit to the bank's customer in a substantial sum. Acting on the reference given, the plaintiffs extended credit to the bank's customer who in due course defaulted. Although the House held that the bankers were protected by the disclaimer of responsibility, the case provided the opportunity to review the law, which led to the reinstatement of Cann v. Willson      , the overruling of the majority decision in the Candler       case and the approbation of the dissenting judgment of Denning L.J. in that case.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1990] 2 A.C. 605     Page 13
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

The most recent decision of the House, which is very much in point, is that of the two appeals heard together of Smith v. Eric S. Bush and Harris v. Wyre Forest District Council [1990] 1 A.C. 831 . The plaintiffs in both cases were house purchasers who purchased in reliance on valuations of the properties made by surveyors acting for and on the instructions of the mortgagees proposing to advance money to the plaintiffs to enable them to effect their purchases. In both cases the surveyors' fees were paid by the plaintiffs and in both cases it turned out that the inspections and valuations had been negligently carried out and that the property was seriously defective so that the plaintiffs suffered financial loss. In the case of Smith the mortgagees were a building society, the surveyors who carried out the inspection and valuation were a firm employed by the building society and their report was shown to the plaintiff. In the case of Harris the mortgagees were the local authority who employed a member of their own staff to carry out the inspection and valuation. His report was not shown to the plaintiff, but the plaintiff rightly assumed from the local authority's offer of a mortgage loan that the property had been professionally valued as worth at least the amount of the loan. In both cases the terms agreed between the plaintiff and the mortgagee purported to exclude any liability on the part of the mortgagee or the surveyor for the accuracy of the mortgage valuation. The House held that in both cases the surveyor making the inspection and valuation owed a duty of care to the plaintiff house purchaser and that the contractual clauses purporting to exclude liability were struck down by section 2(2) and section 11(3) of the Unfair Contract Terms Act 1977 .

The salient feature of all these cases is that the defendant giving advice or information was fully aware of the nature of the transaction which the plaintiff had in contemplation, knew that the advice or information would be communicated to him directly or indirectly and *621 knew that it was very likely that the plaintiff would rely on that advice or information in deciding whether or not to engage in the transaction in contemplation. In these circumstances the defendant could clearly be expected, subject always to the effect of any disclaimer of responsibility, specifically to anticipate that the plaintiff would rely on the advice or information given by the defendant for the very purpose for which he did in the event rely on it. So also the plaintiff, subject again to the effect of any disclaimer, would in that situation reasonably suppose that he was entitled to rely on the advice or information communicated to him for the very purpose for which he required it. The situation is entirely different where a statement is put into more or less general circulation and may foreseeably be relied on by strangers to the maker of the statement for any one of a variety of different purposes which the maker of the statement has no specific reason to anticipate. To hold the maker of the statement to be under a duty of care in respect of the accuracy of the statement to all and sundry for any purpose for which they may choose to rely on it is not only to subject him, in the classic words of Cardozo C.J. to'liability in an indeterminate amount for an indeterminate time to an indeterminate class:' see Ultramares Corporation v. Touche (1931) 174 N.E. 441 , 444; it is also to confer on the world at large a quite unwarranted entitlement to appropriate for their own purposes the benefit of the expert knowledge or professional expertise attributed to the maker of the statement. Hence, looking only at the circumstances of these decided cases where a duty of care in respect of negligent statements has been held to exist, I should expect to find that the 'limit or control mechanism . . . imposed upon the liability of a wrongdoer towards those who have suffered economic damage in consequence of his negligence' [FN1] rested in the necessity to prove, in this category of the tort of negligence, as an essential ingredient of the 'proximity' between the plaintiff and the defendant, that the defendant knew that his statement would be communicated to the plaintiff, either as an individual or as a member of an identifiable class, specifically in connection with a particular transaction or transactions of a particular kind (e.g. in a prospectus inviting investment) and that the plaintiff would be very likely to rely on it for the purpose of deciding whether or not to enter upon that transaction or upon a transaction

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400

**(Cite as: [1990] 2 A.C. 605)**

of that kind.

FN1 Reporter's note. Candlewood Navigation Cor-
poration Ltd. v. Mitsui O.S.K. Lines Ltd. [1986]
A.C. 1        , 25.

I find this expectation fully supported by the dis-
senting judgment of Denning L.J. in Candler v.
Crane, Christmas & Co. [1951] 2 K.B. 164        ,
179, 180-181, 182-184 in the following passages:

'Let me now be constructive and suggest the cir-
cumstances in which I say that a duty to use care in
statement does exist apart from a contract in that
behalf. First, what persons are under such duty? My
answer is those persons such as accountants, sur-
veyors, valuers and analysts, whose profession and
occupation it is to examine books, accounts, and
other things, and to make reports on which other
people - other than their clients - rely in the ordin-
ary course of business.'

*622
'Secondly, to whom do these professional people
owe this duty? I will take accountants, but the same
reasoning applies to the others. They owe the duty,
of course, to their employer or client; and also I
think to any third person to whom they themselves
show the accounts, or to whom they know their em-
ployer is going to show the accounts, so as to in-
duce him to invest money or take some other action
on them. But I do not think the duty can be extend-
ed still further so as to include strangers of whom
they have heard nothing and to whom their employ-
er without their knowledge may choose to show
their accounts. Once the accountants have handed
their accounts to their employer they are not, as a
rule, responsible for what he does with them
without their knowledge or consent. . . . The test of
proximity in these cases is: did the accountants
know that the accounts were required for submis-
sion to the plaintiff and use by him?'

'Thirdly, to what transactions does the duty of
care extend? It extends, I think, only to those trans-
actions for which the accountants knew their ac-
counts were required. For instance, in the present
case it extends to the original investment of £2,000.
which the plaintiff made in reliance on the ac-
counts, because the accountants knew that the ac-

counts were required for his guidance in making
that investment; but it does not extend to the sub-
sequent £200. which he made after he had been two
months with the company. This distinction, that the
duty only extends to the very transaction in mind at
the time, is implicit in the decided cases. . . . It will
be noticed that I have confined the duty to cases
where the accountant prepares his accounts and
makes his report for the guidance of the very person
in the very transaction in question. That is suffi-
cient for the decision of this case. I can well under-
stand that it would be going too far to make an ac-
countant liable to any person in the land who
chooses to rely on the accounts in matters of busi-
ness, for that would expose him to 'liability in an
indeterminate amount for an indeterminate time to
an indeterminate class': see Ultramares Corporation
v. Touche        , per        Cardozo C.J.
Whether he would be liable if he prepared his ac-
counts for the guidance of a specific class of per-
sons in a specific class of transactions, I do not say.
I should have thought he might be, just as the ana-
lyst and lift inspector would be liable in the in-
stances I have given earlier. It is perhaps worth
mentioning that Parliament has intervened to make
the professional man liable for negligent reports
given for the purposes of a prospectus: see sections
40 and 43 of the Companies Act 1948        .
That is an instance of liability for reports made for
the guidance of a specific class of persons - in-
vestors, in a specific class of transactions - applying
for shares. That enactment does not help, one way
or the other, to show what result the common law
would have reached in the absence of such provi-
sions; but it does show what result it ought to reach.
My conclusion is that a duty to use care in state-
ment is recognised by English law, and that its re-
cognition does not create any dangerous precedent
when it is *623        remembered that it is
limited in respect of the persons by whom and to
whom it is owed and the transactions to which it
applies.'

It seems to me that this masterly analysis, if I may
say so with respect, requires little, if any, amplifica-
tion or modification in the light of later authority
and is particularly apt to point the way to the right

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1990] 2 A.C. 605                                                                                                    Page 15
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

conclusion in the present appeal.

Some of the speeches in the Hedley Byrne
case derive a duty of care in relation to negligent
statements from a voluntary assumption of respons-
ibility on the part of the maker of the statements. In
his speech in Smith v. Eric S. Bush [1990] 1 A.C.
831          , 862, Lord Griffiths emphatically rejec-
ted the view that this was the true ground of liabil-
ity and concluded that:
    'The phrase 'assumption of responsibility' can
only have any real meaning if it is understood as re-
ferring to the circumstances in which the law will
deem the maker of the statement to have assumed
responsibility to the person who acts upon the ad-
vice.'
    I do not think that in the context of the present
appeal anything turns upon the difference between
these two approaches.

    These considerations amply justify the conclusion
that auditors of a public company's accounts owe
no duty of care to members of the public at large
who rely upon the accounts in deciding to buy
shares in the company. If a duty of care were owed
so widely, it is difficult to see any reason why it
should not equally extend to all who rely on the ac-
counts in relation to other dealings with a company
as lenders or merchants extending credit to the
company. A claim that such a duty was owed by
auditors to a bank lending to a company was em-
phatically and convincingly rejected by Millett J. in
Al Saudi Banque v. Clarke Pixley [1990] Ch.
313          . The only support for an unlimited duty
of care owed by auditors for the accuracy of their
accounts to all who may foreseeably rely upon them
is to be found in some jurisdictions in the United
States of America where there are striking differ-
ences in the law in different states. In this jurisdic-
tion I have no doubt that the creation of such an un-
limited duty would be a legislative step which it
would be for Parliament, not the courts, to take.

The main submissions for Caparo are that the ne-
cessary nexus of proximity between it and the ap-
pellants giving rise to a duty of care stems (1) from
the pleaded circumstances indicating the vulnerabil-

ity of Fidelity to a take-over bid and from the con-
sequent probability that another company, such as
Caparo, would rely on the audited accounts in de-
ciding to launch a take-over bid, or (2) from the cir-
cumstance that Caparo was already a shareholder in
Fidelity when it decided to launch its take-over bid
in reliance on the accounts. In relation to the first of
these two submissions, Caparo applied, in the
course of the hearing, for leave to amend paragraph
16(2) of the statement of claim by adding the words
'or alternatively that it was highly probable that
such persons would rely on the accounts for that
purpose.'

    The case which gives most assistance to Caparo in
support of this submission is Scott Group Ltd. v.
McFarlane [1978] 1 N.Z.L.R. 553          . The
audited consolidated accounts of a New Zealand
public company *624          and its subsidiaries
overstated the assets of the group because of an ad-
mitted accounting error. Under the relevant New
Zealand legislation its accounts were, as in Eng-
land, accessible to the public. The circumstances of
the group's affairs were such as to make it highly
probable that it would attract a take-over bid. The
plaintiffs made such a bid successfully and when
the accounting error was discovered claimed from
the auditors in respect of the shortfall in the assets.
Quilliam J. held that the auditors owed the
plaintiffs no duty of care. The majority of the New
Zealand Court of Appeal (Woodhouse and Cooke
JJ.) held that the duty of care arose from the prob-
ability that the company would attract a take-over
bid and the bidder would rely on the audited ac-
counts, although Cooke J. held that the shortfall in
the assets below that erroneously shown in the ac-
counts did not amount to a loss recoverable in tort.
Richmond P. held that no duty of care was owed.
He said, at p. 566:
    'All the speeches in Hedley Byrne
seem to me to recognise the need for a 'special' re-
lationship: a relationship which can properly be
treated as giving rise to a special duty to use care in
statement. The question in any given case is wheth-
er the nature of the relationship is such that one
party can fairly be held to have assumed a respons-
ibility to the other as regards the reliability of the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

advice or information. I do not think that such a re-lationship should be found to exist unless, at least, the maker of the statement was, or ought to have been, aware that his advice or information would in fact be made available to and be relied on by a par-ticular person or class of persons for the purposes of a particular transaction or type of transaction. I would especially emphasise that to my mind it does not seem reasonable to attribute an assumption of responsibility unless the maker of the statement ought in all the circumstances, both in preparing himself for what he said and in saying it, to have directed his mind, and to have been able to direct his mind, to some particular and specific purpose for which he was aware that his advice or informa-tion would be relied on. In many situations that pur-pose will be obvious. But the annual accounts of a company can be relied on in all sorts of ways and for many purposes.'

I agree with this reasoning, which seems to me to be entirely in line with the principles to be de-rived from the authorities to which I have earlier re-ferred and not to require modification in any re-spect which is relevant for present purposes by ref-erence to anything said in this House in Smith v. Eric S. Bush [1990] 1 A.C. 831          . I should in any event be extremely reluctant to hold that the question whether or not an auditor owes a duty of care to an investor buying shares in a public com-pany depends on the degree of probability that the shares will prove attractive either en bloc to a take-over bidder or piecemeal to individual investors. It would be equally wrong, in my opinion, to hold an auditor under a duty of care to anyone who might lend money to a company by reason only that it was foreseeable as highly probable that the company would borrow money at some time in the year fol-lowing publication of its *625         audited ac-counts and that lenders might rely on those ac-counts in deciding to lend. I am content to assume the high probability of a take-over bid in reliance on the accounts which the proposed amendment of the statement of claim would assert but I do not think it assists Caparo's case.

The only other English authority to which I need refer in this context in JEB Fasteners Ltd. v. Marks,

Bloom & Co. [1981] 3 All E.R. 289          , a de-cision at first instance of Woolf J. This was another case where the plaintiffs, who had made a success-ful take-over bid for a company in reliance on audited accounts which had been negligently pre-pared, sued the accountants for damages. Woolf J. held that the auditors owed the plaintiffs a duty of care in the preparation of the accounts. He relied on both the Anns case [1978] A.C. 728          and Scott Group Ltd. v. McFarlane [1978] 1 N.Z.L.R. 553          , in reaching the conclusion that the duty could be derived from foreseeability alone. For the reasons already indicated, I do not agree with this. It may well be, however, that the particular facts in the JEB case were sufficient to establish a basis on which the necessary ingredient of proximity to found a duty of care could be derived from the ac-tual knowledge on the part of the auditors of the specific purpose for which the plaintiffs intended to use the accounts.

The position of auditors in relation to the share-holders of a public limited liability company arising from the relevant provisions of the Companies Act 1985          is accurately summarised in the judg-ment of Bingham L.J. in the Court of Appeal [1989] Q.B. 653          , 680-681:

'The members, or shareholders, of the company are its owners. But they are too numerous, and in most cases too unskilled, to undertake the day to day management of that which they own. So re-sponsibility for day to day management of the com-pany is delegated to directors. The shareholders, despite their overall powers of control, are in most companies for most of the time investors and little more. But it would of course be unsatisfactory and open to abuse if the shareholders received no report on the financial stewardship of their investment save from those to whom the stewardship had been entrusted. So provision is made for the company in general meeting to appoint an auditor (section 384 of the Companies Act 1985), whose duty is to in-vestigate and form an opinion on the adequacy of the company's accounting records and returns and the correspondence between the company's ac-counting records and returns and its accounts: sec-tion 237. The auditor has then to report to the com-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

pany's members (among other things) whether in his opinion the company's accounts give a true and fair view of the company's financial position: section 236. In carrying out his investigation and in forming his opinion the auditor necessarily works very closely with the directors and officers of the company. He receives his remuneration from the company. He naturally, and rightly, regards the company as his client. But he is employed by the company to exercise his professional skill and judgment for the purpose of giving the shareholders an independent report on the reliability of the company's accounts and thus on their investment. 'No doubt he is acting antagonistically to the directors **\*626** in the sense that he is appointed by the shareholders to be a check upon them:' In re Kingston Cotton Mill Co. [1896] 1 Ch. 6 , 11, *per* Vaughan Williams J. The auditor's report must be read before the company in general meeting and must be open to inspection by any member of the company: section 241. It is attached to and forms part of the company's accounts: sections 238(3) and 239. A copy of the company's accounts, including the auditor's report, must be sent to every member: section 240. Any member of the company, even if not entitled to have a copy of the accounts sent to him, is entitled to be furnished with a copy of the company's last accounts on demand and without charge: section 246.'

No doubt these provisions establish a relationship between the auditors and the shareholders of a company on which the shareholder is entitled to rely for the protection of his interest. But the crucial question concerns the extent of the shareholder's interest which the auditor has a duty to protect. The shareholders of a company have a collective interest in the company's proper management and in so far as a negligent failure of the auditor to report accurately on the state of the company's finances deprives the shareholders of the opportunity to exercise their powers in general meeting to call the directors to book and to ensure that errors in management are corrected, the shareholders ought to be entitled to a remedy. But in practice no problem arises in this regard since the interest of the shareholders in the proper management of the company's affairs

is indistinguishable from the interest of the company itself and any loss suffered by the shareholders, e.g. by the negligent failure of the auditor to discover and expose a misappropriation of funds by a director of the company, will be recouped by a claim against the auditors in the name of the company, not by individual shareholders.

I find it difficult to visualise a situation arising in the real world in which the individual shareholder could claim to have sustained a loss in respect of his existing shareholding referable to the negligence of the auditor which could not be recouped by the company. But on this part of the case your Lordships were much pressed with the argument that such a loss might occur by a negligent undervaluation of the company's assets in the auditor's report relied on by the individual shareholder in deciding to sell his shares at an undervalue. The argument then runs thus. The shareholder, qua shareholder, is entitled to rely on the auditor's report as the basis of his investment decision to sell his existing shareholding. If he sells at an undervalue he is entitled to recover the loss from the auditor. There can be no distinction in law between the shareholder's investment decision to sell the shares he has or to buy additional shares. It follows, therefore, that the scope of the duty of care owed to him by the auditor extends to cover any loss sustained consequent on the purchase of additional shares in reliance on the auditor's negligent report.

I believe this argument to be fallacious. Assuming without deciding that a claim by a shareholder to recover a loss suffered by selling his shares at an undervalue attributable to an undervaluation of the **\*627** company's assets in the auditor's report could be sustained at all, it would not be by reason of any reliance by the shareholder on the auditor's report in deciding to sell; the loss would be referable to the depreciatory effect of the report on the market value of the shares before ever the decision of the shareholder to sell was taken. A claim to recoup a loss alleged to flow from the purchase of overvalued shares, on the other hand, can only be sustained on the basis of the purchaser's reliance on the report. The specious equation of ' investment de-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

cisions' to sell or to buy as giving rise to parallel claims thus appears to me to be untenable. Moreover, the loss in the case of the sale would be of a loss of part of the value of the shareholder's existing holding, which, assuming a duty of care owed to individual shareholders, it might sensibly lie within the scope of the auditor's duty to protect. A loss, on the other hand, resulting from the purchase of additional shares would result from a wholly independent transaction having no connection with the existing shareholding.

I believe it is this last distinction which is of critical importance and which demonstrates the unsoundness of the conclusion reached by the majority of the Court of Appeal. It is never sufficient to ask simply whether A owes B a duty of care. It is always necessary to determine the scope of the duty by reference to the kind of damage from which A must take care to save B harmless. 'The question is always whether the defendant was under a duty to avoid or prevent that damage, but the actual nature of the damage suffered is relevant to the existence and extent of any duty to avoid or prevent it:' see Sutherland Shire Council v. Heyman, 60 A.L.R. 1 , 48, *per* Brennan J. Assuming for the purpose of the argument that the relationship between the auditor of a company and individual shareholders is of sufficient proximity to give rise to a duty of care, I do not understand how the scope of that duty can possibly extend beyond the protection of any individual shareholder from losses in the value of the shares which he holds. As a purchaser of additional shares in reliance on the auditor's report, he stands in no different position from any other investing member of the public to whom the auditor owes no duty.

I would allow the appeal and dismiss the cross-appeal.

LORD ROSKILL.

My Lords, I have had the advantage of reading in draft the speeches prepared by three of your Lordships. I agree with them and would allow the appeal and dismiss the cross-appeal for the reasons there given. I only add some observations of my own out of respect for the two Lords Justices from whom your Lordships are differing and because of the importance of this case in relation to the vexed question of the extent of liability of professional men, especially accountants, for putting into circulation allegedly incorrect statements whether oral or in writing which are claimed to have been negligently made or prepared and which have been acted on by a third party to that third party's detriment.

That liability for such negligence if established can exist has been made clear ever since the decision of this House in Hedley Byrne & Co. v. Heller & Partners Ltd. [1964] A.C. 465 in which the well known *628 dissenting judgment of Denning L.J. in Candler v. Crane, Christmas & Co. [1951] 2 K.B. 164 was held to have stated the law correctly. Thenceforth it was clear that such a duty of care could be owed by a professional man to third parties in cases where there was no contractual relationship between them, a view of the law long denied as the result of a succession of late 19th century cases of which this House then took the opportunity of disapproving.

But subsequent attempts to define both the duty and its scope have created more problems than the decisions have solved. My noble and learned friends have traced the evolution of the decisions from Anns v. Merton London Borough Council [1977] A.C. 728 until and including the most recent decisions of your Lordships' House in Smith v. Eric S. Bush [1990] 1 A.C. 831 . I agree with your Lordships that it has now to be accepted that there is no simple formula or touchstone to which recourse can be had in order to provide in every case a ready answer to the questions whether, given certain facts, the law will or will not impose liability for negligence or in cases where such liability can be shown to exist, determine the extent of that liability. Phrases such as 'foreseeability,' 'proximity,' 'neighbourhood,' 'just and reasonable,' 'fairness,' 'voluntary acceptance of risk,' or 'voluntary assumption of responsibility' will be found used from time to time in the different cases. But, as your Lordships have said, such phrases are not pre-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

cise definitions. At best they are but labels or phrases descriptive of the very different factual situations which can exist in particular cases and which must be carefully examined in each case before it can be pragmatically determined whether a duty of care exists and, if so, what is the scope and extent of that duty. If this conclusion involves a return to the traditional categorisation of cases as pointing to the existence and scope of any duty of care, as my noble and learned friend Lord Bridge of Harwich, suggests, I think this is infinitely preferable to recourse to somewhat wide generalisations which leave their practical application matters of difficulty and uncertainty. This conclusion finds strong support from the judgment of Brennan J. in Sutherland Shire Council v. Heyman, 60 A.L.R. 1     , 43-44 in the High Court of Australia in the passage cited by my noble and learned friends.

My Lords, I confess that like my noble and learned friend, Lord Griffiths, in Smith v. Eric S. Bush [1990] 1 A.C. 831        , 862, I find considerable difficulty in phrases such as 'voluntary assumption of responsibility' unless they are to be explained as meaning no more than the existence of circumstances in which the law will impose a liability upon a person making the allegedly negligent statement to the person to whom that statement is made; in which case the phrase does not help to determine in what circumstances the law will impose that liability or indeed, its scope. The submission that there is a virtually unlimited and unrestricted duty of care in relation to the performance of an auditor's statutory duty to certify a company's accounts, a duty extending to anyone who may use those accounts for any purpose such as investing in the company or lending the company money, seems to me untenable. No doubt it can be said to be foreseeable that those accounts may find their way into the hands of persons who may use them for such purposes *629    or indeed other purposes and lose money as a result. But to impose a liability in those circumstances is to hold, contrary to all the recent authorities, that foreseeability alone is sufficient, and to ignore the statutory duty which enjoins the preparation of and certification of those accounts.

I think that before the existence and scope of any liability can be determined, it is necessary first to determine for what purposes and in what circumstances the information in question is to be given. If a would-be investor or predator commissions a report which he will use, and which the maker of the report knows he will use, as a basis for his decision whether or not to invest or whether or not to make a bid, it may not be difficult to conclude that if the report is negligently prepared and as a result a decision is taken in reliance upon it and financial losses then follow, a liability will be imposed upon the maker of that report. But I venture to echo the caution expressed by my noble and learned friend, Lord Oliver of Aylmerton, that because different cases may display certain common features, they are necessarily all cases in which the same consequences regarding liability or the scope of liability will follow. Moreover, there may be cases in which the circumstances in which the report was commissioned justify the inclusion of and reliance upon a disclaimer such as succeeded in the Hedley Byrne        case but by reason of subsequent statutory provisions failed in Smith v. Eric S. Bush        .

My Lords it is for these reasons, in addition to those given by my noble and learned friends, that, as already stated, I would allow this appeal and dismiss the cross-appeal.

LORD ACKNER.

My Lords, I have had the advantage of reading the speeches of Lord Bridge of Harwich, Lord Roskill, Lord Oliver of Aylmerton and Lord Jauncey of Tullichettle and for the reasons they give I, too, would allow this appeal and dismiss the cross-appeal.

LORD OLIVER OF AYLMERTON.

My Lords, this appeal, having come to this House on a preliminary point, involves the making of a number of assumptions of fact which might or might not be substantiated at the trial of the action. To begin with, it is to be assumed against the appellants that they showed a lack of reasonable care in certifying that the accounts of Fidelity for the year

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
**(Cite as: [1990] 2 A.C. 605)**

ended 31 March 1984 gave a true and fair view of Fidelity's position. It is also to be assumed that, when they certified the accounts, the appellants knew or would, if they had thought about it, have known that Fidelity was vulnerable to take-over bids, that a potential bidder would be likely to rely upon the accuracy of the accounts in making his bid and that investors in the market generally, whether or not already members of Fidelity, would also be likely to or might well rely upon the accounts in deciding to purchase shares in that company.

Your Lordships are not, however, either required or entitled to make any assumption that the purpose of the certification was anything other than that of fulfilling the statutory duty of carrying out the annual audit with a view to the circulation of the accounts to persons who were **\*630** either registered shareholders or debenture-holders of Fidelity and the subsequent laying of the accounts before the annual general meeting of that company.

  Thus, if and so far as the purpose for which the audit was carried out is a relevant consideration in determining the extent of any general duty in tort owed by the appellants to persons other than the company which is their immediate employer, that purpose was simply that of fulfilling the statutory requirements of the Companies Act 1985 . That, in turn, raises the question - and it is one which lies at the threshold of the inquiry upon which your Lordships are invited to embark - of what is the purpose behind the legislative requirement for the carrying out of an annual audit and the circulation of the accounts. For whose protection were these provisions enacted and what object were they intended to achieve?

My Lords, the primary purpose of the statutory requirement that a company's accounts shall be audited annually is almost self-evident. The structure of the corporate trading entity, at least in the case of public companies whose shares are dealt with on an authorised Stock Exchange, involves the concept of a more or less widely distributed holding of shares rendering the personal involvement of each individual shareholder in the day-to-day man-

agement of the enterprise impracticable, with the result that management is necessarily separated from ownership. The management is confided to a board of directors which operates in a fiduciary capacity and is answerable to and removable by the shareholders who can act, if they act at all, only collectively and only through the medium of a general meeting. Hence the legislative provisions requiring the board annually to give an account of its stewardship to a general meeting of the shareholders. This is the only occasion in each year upon which the general body of shareholders is given the opportunity to consider, to criticise and to comment upon the conduct by the board of the company's affairs, to vote upon the directors' recommendation as to dividends, to approve or disapprove the directors' remuneration and, if thought desirable, to remove and replace all or any of the directors. It is the auditors' function to ensure, so far as possible, that the financial information as to the company's affairs prepared by the directors accurately reflects the company's position in order, first, to protect the company itself from the consequences of undetected errors or, possibly, wrongdoing (by, for instance, declaring dividends out of capital) and, secondly, to provide shareholders with reliable intelligence for the purpose of enabling them to scrutinise the conduct of the company's affairs and to exercise their collective powers to reward or control or remove those to whom that conduct has been confided.

The requirement of the appointment of auditors and annual audit of the accounts, now contained in sections 235 to 246 of the Companies Act 1985 , was first introduced by the Companies Act 1879 (25 & 26 Vict. c. 76) in relation to companies carrying on the business of banking and was extended to companies generally by the Companies Act 1900 . Section 23 of that Act required the auditors to make a report to the shareholders on the company's balance sheet laid before the company in general meeting, stating whether the balance sheet exhibited a true and **\*631** correct view of the state of the company's affairs. By the same section, the report was required to be read before the company in general meeting. Section 19 of the Com-

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

panies Act 1907 substituted a new section 23 which, whilst repeating the requirement that the auditors' report should be read before the company in general meeting, added a requirement that it should be open to inspection by any shareholder, who was entitled, on payment of the fee, to be furnished with a copy of the balance sheet and report. The new section also made it an offence for any officer of the company to be party to issuing, circulating or publishing any copy of the balance sheet which did not either append or contain a reference to the auditors' report. The matter was carried one stage further by section 130 of the Companies Act 1929 (consolidating provisions contained in sections 39 and 41 of the Companies Act 1928 ) which required the annual balance sheet and auditors' report of a public company to be sent not less than seven days before the date of the meeting to every member of the company entitled to receive notice of the meeting and entitled any member of the company and any debenture holder to be furnished on demand and without charge with a copy of the last balance sheet and the auditors' report. Finally, for relevant purposes, section 158 of the Companies Act 1948 required the accounts and report to be sent to every member of the company and to every debenture holder not less than 21 days before the general meeting before which the accounts are to be laid.

Thus the history of the legislation is one of an increasing availability of information regarding the financial affairs of the company to those having an interest in its progress and stability. It cannot fairly be said that the purpose of making such information available is solely to assist those interested in attending general meetings of the company to an informed supervision and appraisal of the stewardship of the company's directors, for the requirement to supply audited accounts to, for instance, preference shareholders having no right to vote at general meetings and to debenture holders cannot easily be attributed to any such purpose. Nevertheless, I do not, for my part, discern in the legislation any departure from what appears to me to be the original, central and primary purpose of these provisions, that is to say, the informed exercise by those inter-

ested in the property of the company, whether as proprietors of shares in the company or as the holders of rights secured by a debenture trust deed, of such powers as are vested in them by virtue of their respective proprietary interests.

It is argued on behalf of the respondent that there is to be discerned in the legislation an additional or wider commercial purpose, namely that of enabling those to whom the accounts are addressed and circulated, to make informed investment decisions, for instance, by determining whether to dispose of their shares in the market or whether to apply any funds which they are individually able to command in seeking to purchase the shares of other shareholders. Of course, the provision of any information about the business and affairs of a trading company, whether it be contained in annual accounts or obtained from other sources, is capable of serving such a purpose just as it is capable of serving as the basis for the giving of financial advice to others, for **\*632** arriving at a market price, for determining whether to extend credit to the company, or for the writing of financial articles in the press. Indeed, it is readily foreseeable by anyone who gives the matter any thought that it might well be relied on to a greater or less extent for all or any of such purposes. It is, of course, equally foreseeable that potential investors having no proprietary interest in the company might well avail themselves of the information contained in a company's accounts published in the newspapers or culled from an inspection of the documents to be filed annually with the Registrar of Companies (which includes the audited accounts) in determining whether or not to acquire shares in the company. I find it difficult to believe, however, that the legislature, in enacting provisions clearly aimed primarily at the protection of the company and its informed control by the body of its proprietors, can have been inspired also by consideration for the public at large and investors in the market in particular.

The question is, I think, one of some importance when one comes to consider the existence of that essential relationship between the appellants and the respondent to which, in any discussion of the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1990] 2 A.C. 605                                                                                    Page 22
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

ingredients of the tort of negligence, there is accorded the description 'proximity,' for it is now clear from a series of decisions in this House that, at least so far as concerns the law of the United Kingdom, the duty of care in tort depends not solely upon the existence of the essential ingredient of the foreseeability of damage to the plaintiff but upon its coincidence with a further ingredient to which has been attached the label 'proximity' and which was described by Lord Atkin in the course of his speech in Donoghue v. Stevenson [1932] A.C. 562 , 581 as:

'such close and direct relations that the act complained of directly affects a person whom the person alleged to be bound to take care would know would be directly affected by his careless act.'

It must be remembered, however, that Lord Atkin was using these words in the context of loss caused by physical damage where the existence of the nexus between the careless defendant and the injured plaintiff can rarely give rise to any difficulty. To adopt the words of Bingham L.J. in the instant case [1989] Q.B. 653 , 686:

'It is enough that the plaintiff chances to be (out of the whole world) the person with whom the defendant collided or who purchased the offending ginger beer.'

The extension of the concept of negligence since the decision of this House in Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd. [1964] A.C. 465 to cover cases of pure economic loss not resulting from physical damage has given rise to a considerable and as yet unsolved difficulty of definition. The opportunities for the infliction of pecuniary loss from the imperfect performance of everyday tasks upon the proper performance of which people rely for regulating their affairs are illimitable and the effects are far reaching. A defective bottle of ginger beer may injure a single consumer but the damage stops there. A single statement may be repeated endlessly with or without the permission of *633 its author and may be relied upon in a different way by many different people. Thus the postulate of a simple duty to avoid any harm that is, with hindsight, reasonably capable of being foreseen becomes untenable without the imposition of some intelligible limits to keep the law of negligence within the bounds of common sense and practicality. Those limits have been found by the requirement of what has been called a 'relationship of proximity' between plaintiff and defendant and by the imposition of a further requirement that the attachment of liability for harm which has occurred be 'just and reasonable.' But although the cases in which the courts have imposed or withheld liability are capable of an approximate categorisation, one looks in vain for some common denominator by which the existence of the essential relationship can be tested. Indeed it is difficult to resist a conclusion that what have been treated as three separate requirements are, at least in most cases, in fact merely facets of the same thing, for in some cases the degree of foreseeability is such that it is from that alone that the requisite proximity can be deduced, whilst in others the absence of that essential relationship can most rationally be attributed simply to the court's view that it would not be fair and reasonable to hold the defendant responsible. 'Proximity' is, no doubt, a convenient expression so long as it is realised that it is no more than a label which embraces not a definable concept but merely a description of circumstances from which, pragmatically, the courts conclude that a duty of care exists.

There are, of course, cases where, in any ordinary meaning of the words, a relationship of proximity (in the literal sense of 'closeness') exists but where the law, whilst recognising the fact of the relationship, nevertheless denies a remedy to the injured party on the ground of public policy. Rondel v. Worsley [1969] 1 A.C. 191 was such a case, as was Hill v. Chief Constable of West Yorkshire [1989] A.C. 53 , so far as concerns the alternative ground of that decision. But such cases do nothing to assist in the identification of those features from which the law will deduce the essential relationship on which liability depends and, for my part, I think that it has to be recognised that to search for any single formula which will serve as a general test of liability is to pursue a will-o'-the wisp. The fact is that once one discards, as it is now clear that one must, the concept of foreseeability of

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400

**(Cite as: [1990] 2 A.C. 605)**

harm as the single exclusive test - even a prima facie test - of the existence of the duty of care, the attempt to state some general principle which will determine liability in an infinite variety of circumstances serves not to clarify the law but merely to bedevil its development in a way which corresponds with practicality and common sense. In Sutherland Shire Council v. Heyman, 60 A.L.R. 1 , 43-44, Brennan J. in the course of a penetrating analysis, observed:

'Of course, if foreseeability of injury to another were the exhaustive criterion of a prima facie duty to act to prevent the occurrence of that injury, it would be essential to introduce some kind of restrictive qualification - perhaps a qualification of the kind stated in the second stage of the general proposition in Anns [1978] A.C. 728 . I am unable to accept that approach. It is preferable, in my view, that the law should develop novel categories of negligence *634 incrementally and by analogy with established categories, rather than by a massive extension of a prima facie duty of care restrained only by indefinable 'considerations which ought to negative, or to reduce or limit the scope of the duty or the class of person to whom it is owed."

The same approach is, I think, reflected in that passage in the speech of Lord Devlin in the Hedley Byrne case [1964] A.C. 465 , 524- 525 in which he considered the impact of Donoghue v. Stevenson on the facts of that case and in which he analysed and described the method by which the law develops:

'In his celebrated speech in that case Lord Atkin did two things. He stated what he described as a 'general conception' and from that conception he formulated a specific proposition of law. In between he gave a warning ' against the danger of stating propositions of law in wider terms than is necessary, lest essential factors be omitted in the wider survey and the inherent adaptability of English law be unduly restricted.'

'What Lord Atkin called a 'general conception of relations giving rise to a duty of care' is now often referred to as the principle of proximity. You must take reasonable care to avoid acts or omissions

which you can reasonably foresee would be likely to injure your neighbour. In the eyes of the law your neighbour is a person who is so closely and directly affected by your act that you ought reasonably to have him in contemplation as being so affected when you are directing your mind to the acts or omissions which are called in question. . . .

'Now, it is not, in my opinion, a sensible application of what Lord Atkin was saying for a judge to be invited on the facts of any particular case to say whether or not there was 'proximity' between the plaintiff and the defendant. That would be a misuse of a general conception and it is not the way in which English law develops. What Lord Atkin did was to use his general conception to open up a category of cases giving rise to a special duty. It was already clear that the law recognised the existence of such a duty in the category of articles that were dangerous in themselves. What Donoghue v. Stevenson did may be described either as the widening of an old category or as the creation of a new and similar one. The general conception can be used to produce other categories in the same way. An existing category grows as instances of its application multiply until the time comes when the cell divides. . . .

'In my opinion, the appellants in their argument tried to press Donoghue v. Stevenson too hard. They asked whether the principle of proximity should not apply as well to words as to deeds. I think it should, but as it is only a general conception it does not get them very far. Then they take the specific proposition laid down by Donoghue v. Stevenson and try to apply it literally to a certificate or a banker's reference. That will not do, for a general conception cannot be applied to pieces of paper in the same way as to articles of commerce or to writers in the same way as to manufacturers. *635 An inquiry into the possibilities of intermediate examination of a certificate will not be fruitful. The real value of Donoghue v. Stevenson to the argument in this case is that it shows how the law can be developed to solve particular problems. Is the relationship between the parties in this case such that it can be brought within a category giving rise to a special duty? As always in English law, the

[1990] 2 A.C. 605
Page 24
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

first step in such an inquiry is to see how far the authorities have gone, for new categories in the law do not spring into existence overnight.'

Perhaps, therefore, the most that can be attempted is a broad categorisation of the decided cases according to the type of situation in which liability has been established in the past in order to found an argument by analogy. Thus, for instance, cases can be classified according to whether what is complained of is the failure to prevent the infliction of damage by the act of the third party (such as Dorset Yacht Co. Ltd. v. Home Office [1970] A.C. 1004      , P. Perl (Exporters) Ltd. v. Camden London Borough Council [1984] Q.B. 342        , Smith v. Littlewoods Organisation Ltd. [1987] A.C. 241           and, indeed, Anns v. Merton London Borough Council [1978] A.C. 728        itself), in failure to perform properly a statutory duty claimed to have been imposed for the protection of the plaintiff either as a member of a class or as a member of the public (such as the Anns        case, Ministry of Housing and Local Government v. Sharp [1970] 2 Q.B. 223          , Yuen Kun Yeu v. Attorney-General of Hong Kong [1988] A.C. 175           ) or in the making by the defendant of some statement or advice which has been communicated, directly or indirectly, to the plaintiff and upon which he has relied. Such categories are not, of course, exhaustive. Sometimes they overlap as in the Anns        case, and there are cases which do not readily fit into easily definable categories (such as Ross v. Caunters [1980] Ch. 297           ). Nevertheless, it is, I think, permissible to regard negligent statements or advice as a separate category displaying common features from which it is possible to find at least guidelines by which a test for the existence of the relationship which is essential to ground liability can be deduced.

The damage which may be occasioned by the spoken or written word is not inherent. It lies always in the reliance by somebody upon the accuracy of that which the word communicates and the loss or damage consequential upon that person having adopted a course of action upon the faith of it. In general, it may be said that when any serious statement, whether it takes the form of a statement of fact or of advice, is published or communicated, it is foreseeable that the person who reads or receives it is likely to accept it as accurate and to act accordingly. It is equally foreseeable that if it is inaccurate in a material particular the recipient who acts upon it may suffer a detriment which, if the statement had been accurate, he would not have undergone. But it is now clear that mere foreseeability is not of itself sufficient to ground liability unless by reason of the circumstances it itself constitutes also the element of proximity (as in the case of direct physical damage) or unless it is accompanied by other circumstances from which that element may be deduced. One must, however, be careful about seeking to find any **636**        general principle which will serve as a touchstone for all cases, for even within the limited category of what, for the sake of convenience, I may refer to as 'the negligent statement cases,' circumstances may differ infinitely and, in a swiftly developing field of law, there can be no necessary assumption that those features which have served in one case to create the relationship between the plaintiff and the defendant on which liability depends will necessarily be determinative of liability in the different circumstances of another case. There are, for instance, at least four and possibly more situations in which damage or loss may arise from reliance upon the spoken or written word and it must not be assumed that because they display common features of reliance and foreseeability they are necessarily in all respects analogous. To begin with, reliance upon a careless statement may give rise to direct physical injury which may be caused either to the person who acts on the faith of the statement or to a third person. One has only to consider, for instance, the chemist's assistant who mis-labels a dangerous medicine, a medical man who gives negligent telephonic advice to a parent with regard the treatment of a sick child, or an architect who negligently instructs a bricklayer to remove the keystone of an archway (as in Clayton v. Woodman & Sons (Builders) Ltd. [1962] 2 Q.B. 533          ). In such cases it is not easy to divorce foreseeability simpliciter and the proximity which flows from the virtual inevitability of dam-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1990] 2 A.C. 605                                                                                               Page 25
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

age if the advice is followed. Again, economic loss may be inflicted upon a third party as a result of the act of the recipient of the advice or information carried out in reliance upon it (as, for instance, the testator in Ross v. Caunters [1980] Ch. 297 or the purchaser in Ministry of Housing and Local Government v. Sharp [1970] 2 Q.B. 223 , both cases which give rise to certain difficulties of analysis). For present purposes, however, it is necessary to consider only those cases of economic damage suffered directly by a recipient of the statement or advice as a result of his personally having acted in reliance upon it.

In his dissenting judgment in Candler v. Crane, Christmas & Co. [1951] 2 K.B. 164 , Denning L.J. suggested three conditions for the creation of a duty of care in tort in such cases. First, the advice must be given by one whose profession it is to give advice upon which others rely in the ordinary course of business, such as accountants, surveyors, valuers and the like: p. 179. Secondly, it must be known to the adviser that the advice would be communicated to the plaintiff in order to induce him to adopt a particular course of action: p. 180. Thirdly, the advice must be relied upon for the purpose of the particular transaction for which it was known to the advisers that the advice was required: p. 182. It is plain, however, from other passages in his judgment, that Denning L.J. did not consider these conditions as necessarily exhaustive criteria of the existence of a duty and the speeches in this House in the Hedley Byrne case [1964] A.C. 465 , where his judgment was approved, indicate a number of directions in which such criteria are to be extended. To begin with, Lord Reid, at p. 486, would not have confined liability to statements made or advice given in the exercise of a profession involving the giving of such advice but would have extended it to: **637**

'all those relationships where it is plain that the party seeking information or advice was trusting the other to exercise such a degree of care as the circumstances required, where it was reasonable for him to do that, and where the other gave the information or advice when he knew or ought to have known that the inquirer was relying on him.'

Lord Morris of Borth-y-Gest, with whom Lord Hodson agreed, whilst initially, at p. 502, referring to persons 'possessed of a special skill' nevertheless went on to state the conditions in which a duty of care might arise in very much wider terms, at p. 503:

'Furthermore, if in a sphere in which a person is so placed that others could reasonably rely upon his judgment or his skill or upon his ability to make careful inquiry, a person takes it upon himself to give information or advice to, or allows his information or advice to be passed on to, another person who, as he knows or should know, will place reliance upon it, then a duty of care will arise.'

Nonetheless, the subsequent decision of the Privy Council in Mutual Life and Citizens' Assurance Co. Ltd. v. Evatt [1971] A.C. 793 , from which Lord Reid and Lord Morris dissented, would have confined the duty of care to cases where the advice relied upon was given in the course of a business or profession involving the giving of advice of the kind in question. For present purposes, it is unnecessary to attempt a resolution of the difference of opinion arising from the Mutual Life case, since there is no question here but that the certifying of the accounts was something done in the course of the ordinary business of the appellants.

Leaving this on one side, however, it is not easy to cull from the speeches in the Hedley Byrne case [1964] A.C. 465 any clear attempt to define or classify the circumstances which give rise to the relationship of proximity on which the action depends and indeed Lord Hodson, at p. 514, expressly stated (and I respectfully agree) that he did not think it possible to catalogue the special features which must be found to exist before the duty of care will arise in the given case. Lord Devlin, at p. 530, is to the same effect. The nearest that one gets to the establishment of a criterion for the creation of a duty in the case of a negligent statement is the emphasis to be found in all the speeches upon 'the voluntary assumption of responsibility' by the defendant. This is a convenient phrase but it is clear that it was not intended to be a test for the existence of the duty for, on analysis, it means no more than

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

that the act of the defendant in making the statement or tendering the advice was voluntary and that the law attributes to it an assumption of responsibility if the statement or advice is inaccurate and is acted upon. It tells us nothing about the circumstances from which such attribution arises.

The point that is, as it seems to me, significant in the present context, is the unanimous approval in this House of the judgment of Denning L.J. in Candler's case [1951] 2 K.B. 164        , 181 in which he expressed the test of proximity in these words: 'did the accountants know that the accounts were required for submission to the plaintiff and **\*638** use by him?' In so far as this might be said to imply that the plaintiff must be specifically identified as the ultimate recipient and that the precise purpose for which the accounts were required must be known to the defendant before the necessary relationship can be created, Denning L.J.'s formulation was expanded in the Hedley Byrne case, where it is clear that, but for an effective disclaimer, liability would have attached. The respondents there were not aware of the actual identity of the advertising firm for which the credit reference was required nor of its precise purpose, save that it was required in anticipation of the placing of advertising contracts. Furthermore, it is clear that 'knowledge' on the part of the respondents embraced not only actual knowledge but such knowledge as would be attributed to a reasonable person placed as the respondents were placed. What can be deduced from the Hedley Byrne        case, therefore, is that the necessary relationship between the maker of a statement or giver of advice ('the adviser') and the recipient who acts in reliance upon it ('the advisee') may typically be held to exist where (1) the advice is required for a purpose, whether particularly specified or generally described, which is made known, either actually or inferentially, to the adviser at the time when the advice is given; (2) the adviser knows, either actually or inferentially, that his advice will be communicated to the advisee, either specifically or as a member of an ascertainable class, in order that it should be used by the advisee for that purpose; (3) it is known either actually or inferentially, that the advice so commu-

nicated is likely to be acted upon by the advisee for that purpose without independent inquiry, and (4) it is so acted upon by the advisee to his detriment. That is not, of course, to suggest that these conditions are either conclusive or exclusive, but merely that the actual decision in the case does not warrant any broader propositions.

Those propositions are, I think, in accord with the two United States authorities which were referred to in the course of the speeches in the Hedley Byrne        decision. In Glanzer v. Shepard (1922) 135 N.E. 275        , where a public weigher negligently certified an overweight so that the purchaser of the goods paid too much for them, the identity of the recipient of the certificate was known, the purpose of the certificate was known, and the certificate was issued for the very purpose of enabling the price of the goods to be ascertained and with the knowledge that it would be acted upon by the recipient for that purpose. In Ultramares Corporation v. Touche, 174 N.E. 441        , on the other hand - a case much nearer to the present - the action failed. There auditors, although aware generally that the certified accounts of the company would be shown to others by the company as the basis of financial dealings generally 'according to the needs of the occasion,' were unaware of the company's specific purpose of obtaining financial help from the plaintiff.

The most recent authority on negligent misstatement in this House - the two appeals in Smith v. Eric S. Bush        and Harris v. Wyre Forest District Council [1990] 1 A.C. 831        which were heard together - does not, I think, justify any broader proposition than that already set out, save that they make it clear that the absence of a positive intention that the advice shall be acted upon by anyone other than the immediate recipient - indeed an expressed intention that it shall not be acted upon **\*639** by anyone else - cannot prevail against actual or presumed knowledge that it is in fact likely to be relied upon in a particular transaction without independent verification. Both appeals were concerned with surveyors' certificates issued to mortgagees in connection with the proposed pur-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1990] 2 A.C. 605                                                                                           Page 27
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

chases for which the mortgagees were contemplating making advances. In each case there was an express disclaimer of responsibility, but in each case it was known to the surveyor that the substance of the report (in the sense of what was important to a purchaser) - that is to say whether or not any repairs to the property were considered essential - would be made known by the mortgagee to the purchaser, the plaintiff in the action, and would be likely to be acted upon by him in entering into a contract to purchase the property. In so far as the case was concerned with the effects of the disclaimer, it does not require consideration in the present context, but there are important passages in the speeches in this House bearing upon the questions which arise on this appeal and indicative of the features which, in that case, led their Lordships to conclude that the necessary relationship of proximity existed between the surveyors and the purchasers of the respective properties. Lord Templeman deduced the relationship from a combination of factors. He said, at pp. 847- 848:

'I agree that by obtaining and disclosing a valuation, a mortgagee does not assume responsibility to the purchaser for that valuation. But in my opinion the valuer assumes responsibility to both mortgagee and purchaser by agreeing to carry out a valuation for mortgage purposes knowing that the valuation fee has been paid by the purchaser and knowing that the valuation will probably be relied upon by the purchaser in order to decide whether or not to enter into a contract to purchase the house. . . . In general I am of the opinion that in the absence of a disclaimer of liability the valuer who values a house for the purpose of a mortgage, knowing that the mortgagee will rely and the mortgagor will probably rely on the valuation, knowing that the purchaser mortgagor has in effect paid for the valuation, is under a duty to exercise reasonable skill and care and that duty is owed to both parties to the mortgage for which the valuation is made.'

Lord Griffiths at p. 862, rejected the voluntary 'assumption of responsibility' as a helpful formula for testing the existence of a duty of care observing that the phrase:

'can only have any real meaning if it is under-

stood as referring to the circumstances in which the law will deem the maker of the statement to have assumed responsibility to the person who acts upon the advice.'

He continued, at pp. 862, 864-865:

'The essential distinction between the present case and the situation being considered in Hedley Byrne [1964] A.C. 465                 and in the two earlier cases, is that in those cases the advice was being given with the intention of persuading the recipient to act upon it. In the present case, the purpose of providing the report is to advise **\*640**                 the mortgagee but it is given in circumstances in which it is highly probable that the purchaser will in fact act on its contents, although that was not the primary purpose of the report. I have had considerable doubts whether it is wise to increase the scope of the duty for negligent advice beyond the person directly intended by the giver of the advice to act upon it to those whom he knows may do so.'

'I therefore return to the question in what circumstances should the law deem those who give advice to have assumed responsibility to the person who acts upon the advice or, in other words, in what circumstances should a duty of care be owed by the adviser to those who act upon his advice? I would answer - only if it is foreseeable that if the advice is negligent the recipient is likely to suffer damage, that there is a sufficiently proximate relationship between the parties and that it is just and reasonable to impose the liability. In the case of a surveyor valuing a small house for a building society or local authority, the application of these three criteria leads to the conclusion that he owes a duty of care to the purchaser. If the valuation is negligent and is relied on damage in the form of economic loss to the purchaser is obviously foreseeable. The necessary proximity arises from the surveyor's knowledge that the overwhelming probability is that the purchaser will rely upon his valuation, the evidence was that surveyors knew that approximately 90 per cent. of purchasers did so, and the fact that the surveyor only obtains the work because the purchaser is willing to pay his fee. It is just and reasonable that the duty should be imposed for the advice is

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

2

[1990] 2 A.C. 605    Page 28
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

given in a professional as opposed to a social context and liability for breach of the duty will be limited both as to its extent and amount. The extent of the liability is limited to the purchaser of the house - I would not extend it to subsequent purchasers. The amount of the liability cannot be very great because it relates to a modest house. There is no question here of creating a liability of indeterminate amount to an indeterminate class. I would certainly wish to stress that in cases where the advice has not been given for the specific purpose of the recipient acting upon it, it should only be in cases when the adviser knows that there is a high degree of probability that some other identifiable person will act upon the advice that a duty of care should be imposed. It would impose an intolerable burden upon those who give advice in a professional or commercial context if they were to owe a duty not only to those to whom they give the advice but to any other person who might choose to act upon it.'

Finally, in relation to the Smith appeal, Lord Jauncey of Tullichettle observed, at p. 871-872:

'The four critical facts are that the appellants knew from the outset: (1) that the report would be shown to Mrs. Smith; (2) that Mrs. Smith would probably rely on the valuation contained therein in deciding whether to buy the house without obtaining an independent valuation; (3) that if, in these circumstances, the **641** valuation was, having regard to the actual condition of the house, excessive, Mrs. Smith would be likely to suffer loss; and (4) that she had paid the building society a sum to defray the appellants' fee. In the light of this knowledge the appellants could have declined to act for the building society, but they chose to proceed. In these circumstances they must be taken not only to have assumed contractual obligations towards the building society but delictual obligations towards Mrs. Smith, whereby they became under a duty towards her to carry out their work with reasonable care and skill. It is critical to this conclusion that the appellants knew that Mrs. Smith would be likely to rely on the valuation without obtaining independent advice. In both Candler v. Crane, Christmas & Co. [1951] 2 K.B. 164 and Hedley

Byrne & Co. Ltd. v. Heller & Partners Ltd. [1964] A.C. 465, the provider of the information was the obvious and most easily available, if not the only available, source of that information. It would not be difficult therefore to conclude that the person who sought such information was likely to rely upon it. In the case of an intending mortgagor the position is very different since, financial considerations apart, there is likely to be available to him a wide choice of sources of information, to wit, independent valuers to whom he can resort, in addition to the valuer acting for the mortgagee. I would not therefore conclude that the mere fact that a mortgagee's valuer knows that his valuation will be shown to an intending mortgagor of itself imposes upon him a duty of care to the mortgagor. Knowledge, actual or implied, of the mortgagor's likely reliance upon the valuation must be brought home to him. Such knowledge may be fairly readily implied in relation to a potential mortgagor seeking to enter the lower end of the housing market but non constat that such ready implication would arise in the case of a purchase of an expensive property whether residential or commercial.'

Thus Smith v. Eric S. Bush [1990] 1 A.C. 831, although establishing beyond doubt that the law may attribute an assumption of responsibility quite regardless of the expressed intentions of the adviser, provides no support for the proposition that the relationship of proximity is to be extended beyond circumstances in which advice is tendered for the purpose of the particular transaction or type of transaction and the adviser knows or ought to know that it will be relied upon by a particular person or class of persons in connection with that transaction. The judgment of Millett J. in the recent case of Al Saudi Banque v. Clarke Pixley [1990] Ch. 313 (decided after the decision of the Court of Appeal in the instant case) contains an analysis of the decision of this House in Smith v. Eric S. Bush and concludes - and I agree - that it established a more stringent test of the requirements for proximity than that which had been applied by the Court of Appeal in the instant case. At p. 335-336 of his judgment, Millett J. gives what I find a helpful analysis of that case and of the fea-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1990] 2 A.C. 605
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

tures which distinguished it from the Hedley Byrne case and from the instant case: *642

'In each of the cases considered by the House of Lords, therefore, there was a tripartite transaction in which the valuation could realistically be regarded as provided by the valuer to the purchaser. In each of the cases the valuation was given to the mortgagee with the intention of being acted on by him in a specific transaction known to the valuer, viz: the making of a mortgage offer in connection with a specific transaction of house purchase, and in the knowledge that the valuation or the gist of the valuation would be communicated to the purchaser and would in all probability be relied upon by him in deciding whether to go ahead with the very transaction for which the mortgage offer was sought. This was a much more restricted context in which to found a duty of care than was present in the Caparo case, for there was in contemplation not only a particular and identified recipient of the information to whom the defendant knew that it would be communicated, but a particular and known purpose for which he could foresee that it would be relied on.

'In Hedley Byrne [1964] A.C. 465 and the cases which followed it, the statement was made directly to the plaintiff with the intention that the plaintiff should act upon it. The JEB Fasteners case [1983] 1 All E.R. 583 can be supported only on the basis that the statement was impliedly confirmed directly to the plaintiff without any such intention, but with a particular transaction in contemplation, and it was foreseeable that the plaintiff would rely upon it in that transaction. In Caparo's case [1989] Q.B. 653 it was made to the plaintiff without any such intention and without any particular transaction in contemplation, but it was foreseeable that the plaintiff might rely upon it in some unknown future transaction. In Smith v. Eric S. Bush [1990] 1 A.C. 831 it was made to a third party with the intention that he should act upon it in a known and contemplated transaction, but in the knowledge that it would be communicated to the plaintiff and would almost certainly be relied upon by him in connection with a transaction without which the transaction of the third party could not proceed.'

My Lords, no decision of this House has gone further than Smith v. Eric S. Bush, but your Lordships are asked by the respondents to widen the area of responsibility even beyond the limits to which it was extended by the Court of Appeal in this case and to find a relationship of proximity between the adviser and third parties to whose attention the advice may come in circumstances in which the reliance said to have given rise to the loss is strictly unrelated either to the intended recipient or to the purpose for which the advice was required. My Lords, I discern no pressing reason of policy which would require such an extension and there seems to me to be powerful reasons against it. As Lord Reid observed in the course of his speech in Hedley Byrne [1964] A.C. 465, 483, words can be broadcast with or without the consent or foresight of the speaker or writer; and in his speech in the same case, Lord Pearce drew attention to the necessity for the imposition of some discernible limits to liability in such cases. He said, at p. 534: *643

'The reason for some divergence between the law of negligence in word and that of negligence in act is clear. Negligence in word creates problems different from those of negligence in act. Words are more volatile than deeds. They travel fast and far afield. They are used without being expended and take effect in combination with innumerable facts and other words. Yet they are dangerous and can cause vast financial damage. How far they are relied on unchecked . . . must in many cases be a matter of doubt and difficulty. If the mere hearing or reading of words were held to create proximity, there might be no limit to the persons to whom the speaker or writer could be liable.'

As I have already mentioned, it is almost always foreseeable that someone, somewhere and in some circumstances, may choose to alter his position upon the faith of the accuracy of a statement or report which comes to his attention and it is always foreseeable that a report - even a confidential report - may come to be communicated to persons other than the original or intended recipient. To apply as a test of liability only the foreseeability of possible

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400

(Cite as: [1990] 2 A.C. 605)

damage without some further control would be to create a liability wholly indefinite in area, duration and amount and would open up a limitless vista of uninsurable risk for the professional man.

On the basis of the pleaded case, as amended, it has to be assumed that the appellants, as experienced accountants, were aware or should have been aware that Fidelity's results made it vulnerable to take-over bids and that they knew or ought to have known that a potential bidder might well rely upon the published accounts in determining whether to acquire shares in the market and to make a bid. It is not, however, suggested that the appellants, in certifying the accounts, or Parliament, in providing for such certification, did so for the purpose of assisting those who might be minded to profit from dealings in the company's shares. The respondents, whilst accepting that it is no part of the purpose of the preparation, certification and publication of the accounts of a public company to provide information for the guidance of predators in the market, nevertheless argue that the appellants' knowledge that predators might well rely upon the accounts for this purpose sufficiently establishes between them and potential bidders that relationship of 'proximity' which founds liability. On the face of it, this submission appears to equate 'proximity' with mere foreseeability and to rely upon the very misinterpretation of the effect of the decision of this House in the Anns case [1978] A.C. 728 which was decisively rejected in the Governors of Peabody Donation Fund v. Sir Lindsay Parkinson & Co. Ltd. [1985] A.C. 210     and in Yuen Kun Yeu v. Attorney-General of Hong Kong [1988] A.C. 175     . Your Lordships have been referred, however, to three authorities, one from New Zealand and two from the United Kingdom, which do undoubtedly support the respondents' contention.

In Scott Group Ltd. v. McFarlane [1978] N.Z.L.R. 553     , the defendants were the auditors of a company which had been successfully taken over in reliance upon certified consolidated accounts in which, as a result of double-counting, the assets were overstated. It was admitted *644 that the failure of the defendants to discover the discrepancy

was due to negligence. In the Supreme Court of New Zealand, Quilliam J. dismissed the plaintiffs' claim on the ground that the appellants, though careless, owed them no duty of care. An appeal to the Court of Appeal failed but the court was divided as to the reasons. Richmond P. held that the appeal failed for the same reason as that stated by the trial judge. Woodhouse J. would have allowed the appeal. Cooke J., on the other hand, whilst concurring with Woodhouse J. that the respondents did in fact owe a duty of care to the appellants, held that the appeal failed because they had failed to show any recoverable loss.

The more restrictive view was expressed by Richmond P. in the following terms, at pp. 566-567:

'The question in any given case is whether the nature of the relationship is such that one party can fairly be held to have assumed a responsibility to the other as regards the reliability of the advice or information. I do not think that such a relationship should be found to exist, at least, the maker of the statement was, or ought to have been, aware that his advice or information would in fact be made available to and be relied on by a particular person or class of persons for the purposes of a particular transaction or type of transaction. I would especially emphasise that to my mind it does not seem reasonable to attribute an assumption of responsibility unless the maker of the statement ought in all the circumstances, both in preparing himself for what he said and in saying it, to have directed his mind, and to have been able to direct his mind, to some particular and specific purpose for which he was aware that his advice or information would be relied on. In many situations that purpose will be obvious. But the annual accounts of a company can be relied on in all sorts of ways and for many purposes. It would be going too far to treat accountants as assuming a responsibility towards all persons dealing with the company or its members, in reliance to some greater or lesser degree on the accuracy of the accounts, merely because it was reasonably foreseeable, in a general way, that a transaction of the kind in which the plaintiff happened to become involved might indeed take place. The relationship between the parties would, I think, be too

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1990] 2 A.C. 605    Page 31
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

general and not sufficiently 'special' to come within the principles underlying the decision in Hedley Byrne . As I have said, I believe it to be essential to the existence of a 'special relationship' that the maker of the statement was or should have been aware that his advice was required for use in a specific type of contemplated transaction. This requirement has not always required emphasis in the course of judicial discussion as to the nature of a special relationship. Probably this is because in most cases the purpose for which the information was required was, on the facts, quite obvious. But certainly this particular point was made very clear indeed in Denning L.J.'s judgment in Candler v. Crane, Christmas & Co . I would think that it must almost inevitably follow, once the maker of the statement is aware of a specific purpose for which his information will be used, that he will also **\*645** have in direct contemplation a specific person or class of persons, even though unidentified by name.'

The New Zealand Companies Act 1955 contained provisions relating to the auditors' report which is similar in substance to those contained in the United Kingdom legislation but with this variation, that the 'true and fair view' which group accounts are certified to give are qualified by the words 'so far as concerns members of the company.' In relation to these provisions, Richmond P. observed, at p. 568:

'The provisions of the Act to which I have just referred are aimed essentially at the protection of the members of the company and of course the auditors, whose contract of employment is with the company itself, are under a contractual duty of care to the company. These provisions do not encourage me to take the view that there is any reason why the auditors of a public company should thereby come under a common law duty of care to third persons dealing with the company or its members on the faith of their audit certificate, such liability being in some way based on a much wider principle than would apply, for example, in the case of auditors certifying the accounts of a private company. Like Quilliam J., I can also see no reason to differentiate between auditors as such and a firm of chartered ac-

countants employed to prepare the accounts of the company. The only point which has given me some concern, so far as the statutory provisions are concerned, is the requirement of section 133(1) whereby a copy of the balance sheet and auditors' report is required to be annexed to the annual return and thus becomes available to the public under section 9(1) of the Act. But on reflection, this only means that the auditor of the accounts of a public company knows that the accounts and his report will become available to the public generally and, consequently, may be relied on by one or more members of the public, to some greater or lesser degree, as the basis of some business transaction. It is not suggested, however, that the Companies Act imposes any statutory duty of care as between auditors and members of the public who rely on the accounts. In the case of a company whose shares are listed on the Stock Exchange the auditor will also know that under the Stock Exchange rules a copy of the accounts must be made available. He knows, too, that shareholders will receive copies of the accounts and that the company itself may well make copies available to business institutions and individuals for various purposes. In the end all these matters merely add up to the fact that the auditor of a public company will necessarily have in his contemplation the possibility that the accounts may be relied on in all sorts of ways by persons other than the company and its members. This, as I have said, is not sufficient to bring about a 'special relationship."

Both Woodhouse and Cooke JJ., who favoured a wider view of responsibility, based themselves upon an interpretation of the speech of Lord Wilberforce in the Anns case [1978] A.C. 728 which required, as the first stage of the two-stage inquiry to which he there referred, no **\*646** more than a consideration of whether harm was foreseeable, thus equating the 'proximate relationship' as comprehending foresight and nothing more. This is made quite clear from the following passage in the judgment of Woodhouse J., at p. 574:

'In this regard it will be noticed that although the first part of the inquiry outlined by Lord Wilber-

[1990] 2 A.C. 605                                                                                                                    Page 32
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

force is to ask whether 'there is a sufficient relationship of proximity' in order to decide whether there is a prima facie duty of care, he would test the sufficiency of proximity simply by the reasonable contemplation of likely harm. And, with respect, I do not think that there is any need for or any sound reason in favour of a more restrictive approach. The issue has been made increasingly complex by the successive and varying formulas that have been used in an effort to confine the general area of responsibility, in particular for negligent words or in respect of purely economic losses. At this initial stage at least it should be possible to remove some degree of uncertainty - in my opinion it is done by the comprehensible and straightforward test of foreseeability.'

Woodhouse J., again emphasised foreseeability as the relevant test for the creation of the relationship of proximity in his judgment where he said, at p. 575:

'Although an audit is undertaken on behalf of the members of a public company it must be within the reasonable contemplation of any auditor that confidence in its ability to handle its commercial arrangements would depend upon the authenticity of its accounts - a confidence that would disappear if reliance could not be put upon the audit report. So I think that when auditors deliberately undertake to provide their formal report upon the accounts of a public company they must be taken to have accepted not merely a direct responsbility to the shareholders but a further duty to those persons whom they can reasonably foresee will need to use and rely upon them when dealing with the company or its members in significant matters affecting the company assets and business. An example, no doubt, would be the banker asked to make substantial advances on the security of the company undertaking. On the other hand, there would seem to be formidable difficulties for a plaintiff who attempted to prove that an auditor should have foreseen the plaintiff's likely reliance upon some newspaper or a Stock Exchange reference to a company's accounts. However, it is sufficient for present purposes to restrict consideration to a take over offer related, as so frequently is the position, to the value of share-

holders' funds. In such a situation the need to rely upon audited accounts is, I think, quite obvious. As a matter of commercial reality I think the auditor and offeror are in a relationship of close proximity.'

Cooke J. was to the same effect. At p. 583 he adopted, as the first step of Lord Wilberforce's two-stage approach, the formulation which equates the relationship of proximity with foreseeability, although at an earlier stage of his judgment he seemed to be disposed to regard the essential **\*647** relationship as arising not simply from the foreseeability that a member of the public might rely on the accounts as a basis of some transaction but, for a reason which I confess I do not fully understand, from the foreseeability that some member of the public might rely on the accounts for the making of a take-over bid. He said, at p. 581:

'The learned judge in the Supreme Court was disposed to regard the requirement of filing audited accounts, which are available for public inspection, as not imposed by Parliament for the purpose of enabling people to deal confidently in reliance on the accuracy of the accounts. He thought it much more likely that the purpose was to enable a proper supervision to be exercised over the activities of companies, and to enable those concerned to ensure that the companies were not trading illegally or dishonestly. With respect, I am unable to agree with him on that point. The statutory requirements regarding the filing of financial information stem, I think, from the view that those *dealing with* or *investing in* a limited liability company have a legitimate interest in being afforded reasonable access to relevant information; and that this interest has to be balanced against the wish for confidentiality naturally entertained by family companies and the like which do not appeal to the public for funds. . . . I would agree, though, that the provisions are obably not aimed, or at least not primarily, at protecting purchasers of shares in the market.'

Thus the majority of the Court of Appeal favoured a more extensive view of the circumstances from which the essential relationship between plaintiff and defendant may be inferred in a negligent statement case than had yet emerged from any

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1990] 2 A.C. 605     Page 33
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

decision in the United Kingdom.

Now, of course, any decision of the Court of Appeal of New Zealand is entitled to the very greatest respect, but it has to be observed that the majority view was based upon an interpretation of Lord Wilberforce's observations in the Anns case [1978] A.C. 728           , 751-752 which has since been severely qualified by subsequent decisions of this House.

The Scott Group case [1978] N.Z.L.R. 553 has, however, since been referred to and accepted in two cases decided in the United Kingdom. In JEB Fasteners Ltd. v. Marks Bloom & Co. [1981] 3 All E.R. 289           , the plaintiffs who had acquired the shares of the company as a result of a take-over, claimed damages against the company's auditors who, it was claimed, had been negligent in certifying the accounts. Woolf J. dismissed the claim on the ground that the plaintiffs failed to show the causative connection between reliance on the erroneous accounts and the take-over and his decision was subsequently affirmed by the Court of Appeal [1983] 1 All E.R. 583           . In the course of his judgment, however, Woolf J. made the following observation with regard to the auditors' liability [1981] 3 All E.R. 289           , 296- 297:

'Without laying down any principle which is intended to be of general application, on the basis of the authorities which I have cited, the appropriate test for establishing whether a duty of care exists appears in this case to be whether the defendants knew or **648** reasonably should have foreseen at the time the accounts were audited that a person might rely on those accounts for the purpose of deciding whether or not to take over the company and therefore could suffer loss if the accounts were inaccurate. Such an approach does place a limitation on those entitled to contend that there has been a breach of duty owed to them. First of all, they must have relied on the accounts and, second, they must have done so in circumstances where the auditors either knew that they would or ought to have known that they might. If the situation is one where it would not be reasonable for the accounts to be relied on, then, in the absence of express knowledge,

the auditor would be under no duty. This places a limit on the circumstances in which the audited accounts can be relied on and the period for which they can be relied on. The longer the period which elapses prior to the accounts being relied on, from the date on which the auditor gave his certificate, the more difficult it will be to establish that the auditor ought to have foreseen that his certificate would, in those circumstances, be relied on.'

Now although he disclaimed any intention of laying down a general principle, it is clear that Woolf J., like Woodhouse and Cooke JJ., was interpreting Lord Wilberforce's two-stage approach in the Anns           case as establishing a test of proximity which depended on the foreseeability of harm alone and that he regarded the limits of liability as being set not by the need for any relationship other than such as might be inferred from such foreseeability but by the factual difficulties likely to be encountered in establishing foreseeability in cases in which the reliance essential to the cause of action was separated in time from the statement or advice relied upon. In the light, therefore, of the observations of Lord Keith of Kinkel in the Peabody case [1985] A.C. 210           and in the Yuen Kun Yeu case [1988] A.C. 175           , this case provides no very convincing authority for the respondents' proposition, although, as Bingham L.J. observed in the instant case, the facts were such as to justify a finding of a relationship of proximity without any extension of the criteria suggested by Denning L.J. in his judgment in Candler's case [1951] 2 K.B. 164           .

The third case upon which the respondents rely is the decision of the Outer House of the Court of Session in Twomax Ltd. v. Dickson, McFarlane & Robinson, 1982 S.C. 113           , the facts in which have a broad similarity to those in the JEB Fasteners           case and in the instant case. The court was concerned with three separate claims from investors (one of whom was a company and two of whom were individuals) who had acquired shares in a private company which, shortly after the investments were made, went into receivership and was subsequently wound up. All three investors claimed that their respective investments were made on the

[1990] 2 A.C. 605

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990] E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134 S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400, 2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400

(Cite as: [1990] 2 A.C. 605)

faith of the company's audited accounts which had been negligently prepared and certified by the defenders, the company's auditors, in the course of their statutory audit. The Lord Ordinary (Lord Stewart), at pp. 122-124, having contrasted the limitations appearing from the speeches of Lord Morris and Lord Hodson in the Hedley Byrne case **\*649** with the broader formulation of general principle in the speech of Lord Wilberforce in the Anns case, accepted the latter as governing the proper approach to the question of whether or not the essential relationship between pursuers and defenders was established in a negligent statement case and followed the guidance of the majority judgments of the New Zealand Court of Appeal in the Scott Group case, save that he could not draw any sensible distinction between the case of the corporate pursuer, which had acquired the controlling interest, and that of the individual minority investors. He thus, by implication, rejected the suggestion that a potential bidder in the market is in some special position as compared with other investors such as to create between him and the auditors carrying out their statutory duties, a special relationship which does not arise in the case of an investor concerned to acquire only a minority interest. and this, with respect, must be correct, for there can be no logical distinction according to whether an investor is likely to acquire many shares or only a few. Such distinction as there is lies only in the scale of the potential loss which may be little or great according to the magnitude of the investment. Indeed, as he pointed out, it could legitimately be said that the smaller the investment the greater the likelihood of the investor accepting the audited accounts as the basis for his action without making any independent investigation. In the result, Lord Stewart held that the knowledge to be imputed to the defenders that there would or might well be potential investors in the market who would be interested in purchasing existing shares or subscribing for new shares and who might be influenced by the accounts was sufficient to create between them and such investors the relationship of proximity which gave rise to an enforceable duty of care.

This case, therefore, falls into the same category as the other two cases. All three were based upon the view of Lord Wilberforce's exposition in the Anns case [1978] A.C. 728 which would result in foreseeability and proximity being treated as synonymous - a view which this House (and, indeed, Lord Wilberforce himself in McLoughlin v. O'Brian [1983] 1 A.C. 410 ) has now decisively rejected. That, of course, does not conclude the question for it would still be open to your Lordships to find in the circumstances of this case that a special relationship existed between the auditor conducting an annual audit in pursuance of his statutory duty and every potential investor in the market or, indeed, any other person who might do business with the company without relying solely upon the foreseeability of potential damage to such person. Just as, for instance, in Smith v. Eric S. Bush [1990] 1 A.C. 831 , one of the factors giving rise to the relationship in that case was the circumstance that the plaintiff was the person who paid for the report upon which the reliance was placed, so here it might be said that a special relationship was to be found in the nature and extent of the statutory duties which the auditor is called upon to fulfil.

For my part, however, I can see nothing in the statutory duties of a company's auditor to suggest that they were intended by Parliament to protect the interests of investors in the market and I see no reason in policy or in principle why it should be either desirable or appropriate **\*650** that the ambit of the special relationship required to give rise to liability in cases such as the present should be extended beyond those limits which are deducible from the cases of Hedley Byrne and Smith v. Eric S. Bush . Those limits appear to me to be correctly and admirably stated in the passages from the judgment of Richmond P. in the Scott Group case to which I have already referred. In particular, I see no reason why any special relationship should be held to arise simply from the circumstance that the affairs of the company are such as to render it susceptible to the attention of predators in the market who may be interested in acquiring all or the majority of the shares rather than merely a parcel of shares by way of addition to a portfolio. It follows that I would dismiss the respondents' cross-appeal.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1990] 2 A.C. 605                                                                                                                                        Page 35
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

I turn, therefore, to the question raised by the appellants' appeal. The Court of Appeal, whilst rejecting unanimously the respondents' contention that the appellants owed them a duty of care simply as potential investors in the market, nevertheless by a majority allowed their claim that a similar duty was owed to them in their capacity as shareholders from the date when they first became registered in respect of shares which they had purchased. Now it cannot be nor is it claimed that this event created for the appellants any new or greater risk of harm in relation to a certification which had already taken place; nor can it be claimed that it brought about some change in the quality or extent of the respondents' reliance upon the (ex hypothesi) inaccurate information which they had previously received and digested. The only difference in their position before registration and their position afterwards was that, as registered shareholders, they now had the statutory right to receive the accounts on which they had already relied in acquiring their original shares and to receive notice of and attend the annual general meeting of Fidelity at which the accounts were to be read and, if thought fit, approved and passed. This change of position seems, on the face of it, less than momentous and in fact they did not trouble to appoint a representative to attend the meeting on their behalf. If a distinction is to be found at all, therefore, it can only be that the nature and purpose of the statutory provisions governing the appointment and duties of auditors and the certification and publication to shareholders and others of the accounts have the effect of creating, between the auditors and individual shareholders, as potential investors in that capacity, that special relationship of proximity which is required to give rise to the duty of care and which does not exist between the auditors and the investing public generally.

Now if it be right, as, for my part, I believe that it is and as the Court of Appeal has held, that no relationship of proximity and thus no duty of care exists between auditors and the investing public generally in relation to the statutory audit - I say nothing, of course, about a case where accounts are audited specifically for the purpose of submission to a potential investor - the attribution of such a duty arising from the receipt of exactly the same information by a person who happens to be the registered holder of a share in the company whose accounts are in question produces entirely capricious results. O'Connor L.J. [1989] Q.B. 653           , 715, in his dissenting judgment, instanced the case of a **\*651** shareholder who, having purchased further shares at an overvalue on the basis of the accounts, shows the accounts to a friend who has no existing shareholding but proceeds to make a similar purchase. Each receives exactly the same information; each relies upon it in exactly the same way and for the same purpose; and the loss sustained in both cases is identical and is equally foreseeable. Yet liability is said to exist in the one case but not in the other. One has indeed only to consider the circumstances of the instant case which must ultimately result in drawing a distinction between the loss sustained as a result of the initial purchase of shares (irrecoverable) and that sustained as a result of purchases made after the first registration (recoverable) although all purchases were made in reliance upon exactly the same information.

So unreasonable a distinction must call in question the analysis which leads to it. The majority in the Court of Appeal deduced the relationship from what Bingham L.J. described, at p. 684D, as 'the degree of closeness between the parties.' It was pointed out that although the auditors are appointed and paid by the company that is the result of the vote of the shareholders in general meeting and their remuneration is paid out of funds which might otherwise be available for distribution to shareholders by way of dividend. Their duty is to report to the shareholders whether the accounts give a true and fair view of the company's financial position and their report is sent to each shareholder as an identifiable individual. Thus, it was said, the relationship, although not a contractual one, was very close to being contractual and was moreover one in which a lack of care would be likely directly to affect the very person whose interest the auditor is engaged to protect, should that person choose to rely upon the accounts for the purpose of making or disposing of an investment. My Lords, of course I see the force of this, but, as I have already sugges-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1990] 2 A.C. 605                                                                                                                    Page 36
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

ted, 'proximity' in cases such as this is an expression used not necessarily as indicating literally 'closeness' in a physical or metaphorical sense but merely as a convenient label to describe circumstances from which the law will attribute a duty of care. It has to be borne in mind that the duty of care is inseparable from the damage which the plaintiff claims to have suffered from its breach. It is not a duty to take care in the abstract but a duty to avoid causing to the particular plaintiff damage of the particular kind which he has in fact sustained. I cannot improve on the analysis which is to be found in the judgment of Brennan J. in the High Court of Australia in the Shire of Sutherland case, 60 A.L.R. 1          to which I have already referred. After citing the speech of Viscount Simonds in The Wagon Mound [1961] A.C. 388          , 425, where he observed that it was vain to isolate the liability from its context and to say that B is or is not liable and then to ask for what damage he is liable, Brennan J. continued, at p. 48:

'The corollary is that a postulated duty of care must be stated in reference to the kind of damage that a plaintiff has suffered and in reference to the plaintiff or a class of which the plaintiff is a member. I venture to repeat what I said in John Pfeiffer Pty. Ltd. v. Canny (1981) 148 C.L.R. 218 , 241-242: 'His duty of care is a thing written on the wind unless damage is caused by the breach of that duty; there is no actionable negligence unless duty, breach and *652 consequential damage coincide . . . for the purposes of determining liability in a given case, each element can be defined only in terms of the others.' It is impermissible to postulate a duty of care to avoid one kind of damage - say, personal injury - and, finding the defendant guilty of failing to discharge that duty, to hold him liable for the damage actually suffered that is of another independent kind - say, economic loss. Not only may the respective duties differ in what is required to discharge them; the duties may be owed to different persons or classes of persons. That is not to say that a plaintiff who suffers damage of some kind will succeed or fail in an action to recover damages according to his classification of the damage he suffered. The question is always whether the de-

fendant was under a duty to avoid or prevent that damage, but the actual nature of the damage suffered is relevant to the existence and extent of any duty to avoid or prevent it.'

In seeking to ascertain whether there should be imposed on the adviser a duty to avoid the occurrence of the kind of damage which the advisee claims to have suffered it is not, I think, sufficient to ask simply whether there existed a ' closeness' between them in the sense that the advisee had a legal entitlement to receive the information upon the basis of which he has acted or in the sense that the information was intended to serve his interest or to protect him. One must, I think, go further and ask, in what capacity was his interest to be served and from what was he intended to be protected? A company's annual accounts are capable of being utilised for a number of purposes and if one thinks about it it is entirely foreseeable that they may be so employed. But many of such purposes have absolutely no connection with the recipient's status or capacity, whether as a shareholder, voting or non-voting, or as a debenture-holder. Before it can be concluded that the duty is imposed to protect the recipient against harm which he suffers by reason of the particular use that he chooses to make of the information which he receives, one must, I think, first ascertain the purpose for which the information is required to be given. Indeed the paradigmatic Donoghue v. Stevenson          case of a manufactured article requires, as an essential ingredient of liability, that the article has been used by the consumer in the manner in which it was intended to be used: see Grant v. Australian Knitting Mills Ltd. [1936] A.C. 85          , 104 and Junior Books Ltd. v. Veitchi Co. Ltd. [1983] 1 A.C. 520          , 549, 552. I entirely follow that if the conclusion is reached that the very purpose of providing the information is to serve as the basis for making investment decisions or giving investment advice, it is not difficult then to conclude also that the duty imposed upon the adviser extends to protecting the recipient against loss occasioned by an unfortunate investment decision which is based on carelessly inaccurate information. Bingham L.J. did, indeed, conclude that the provision of guidance for the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1990] 2 A.C. 605     Page 37
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

making of investment decisions was one of the purposes to be discerned in the statutory provisions. He observed [1989] Q.B. 653 , 681-682:

' . . . I think these provisions also reflect a wider and more commercial intention. The growth and development of limited **\*653** liability companies over a relatively very short period have been phenomenal. Their proliferation and expansion have depended on their acceptance by the investing public as an advantageous and (on the whole) reliable medium of investment. The statutory requirements that companies account to their members and that auditors express an independent opinion to shareholders on the truth and accuracy of company accounts are in my view designed (in part at least) to fortify confidence in the holding of shares as a medium of investment by enabling shareholders to make informed investment decisions. There are obvious reasons, both economic and social, why this end should be regarded as desirable.'

How far he regarded this as an essential feature of the relationship of proximity which he held to exist between the appellants and the respondents as shareholders is not, however, entirely clear, for he attributed the same intention to the legislature in relation to investors generally. He said, at p. 682:

'The publication of accounts must limit, if it cannot eliminate, the scope for rumour-inspired speculation and thus promote an informed and orderly market. It enables prospective investors, like shareholders, to make informed decisions. For such prospective investors the independent opinion of the auditor has the same significance as for existing shareholders.'

As I have already indicated, I am not, for my part, able to share this view of the intention of the legislature. I do not believe and I see no grounds for believing that, in enacting the statutory provisions, Parliament had in mind the provision of information for the assistance of purchasers of shares or debentures in the market, whether they be already the holders of shares or other securities or persons having no previous proprietary interest in the company. It is unnecessary to decide the point on this appeal, but I can see more force in the contention that one purpose of providing the statutory

information might be to enable the recipient to exercise whatever rights he has in relation to his proprietary interest by virtue of which he receives it, by way, for instance, of disposing of that interest. I can, however, see no ground for supposing that the legislature was intending to foster a market for the existing holders of shares or debentures by providing information for the purpose of enabling them to acquire such securities from other holders who might be minded to sell.

For my part, I think that the position as regards the auditor's statutory duty was correctly summarised by O'Connor L.J. in his dissenting judgment when he said, at p. 714:

'The statutory duty owed by auditors to shareholders is, I think, a duty owed to them as a body. I appreciate that it is difficult to see how the over-statement of the accounts can cause damage to the shareholders as a body; it will be the underlying reasons for the over-statement which cause damage, for example fraudulent abstraction of assets by directors or servants, but such loss is recoverable by the company. I am anxious to limit the present case **\*654** to deciding whether the statutory duty operates to protect the individual shareholder as a potential buyer of further shares. If I am wrong in thinking that under the statute no duty is owed to shareholders as individuals, then I think the duty must be confined to transactions in which the shareholder can only participate because he is a shareholder. The Companies Act 1985 imposes a duty to shareholders as a class and the duty should not extend to an individual save as a member of the class in respect of some class activity. Buying shares in a company is not such an activity.'

In my judgment, accordingly, the purpose for which the auditors' certificate is made and published is that of providing those entitled to receive the report with information to enable them to exercise in conjunction those powers which their respective proprietary interests confer upon them and not for the purposes of individual speculation with a view to profit. The same considerations as limit the existence of a duty of care also, in my judgment, limit the scope of the duty and I agree with O'Connor

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400

**(Cite as: [1990] 2 A.C. 605)**

L.J. that the duty of care is one owed to the share-holders as a body and not to individual shareholders.

To widen the scope of the duty to include loss caused to an individual by reliance upon the accounts for a purpose for which they were not supplied and were not intended would be to extend it beyond the limits which are so far deducible from the decisions of this House. It is not, as I think, an extension which either logic requires or policy dictates and I, for my part, am not prepared to follow the majority of the Court of Appeal in making it. In relation to the purchase of shares of other shareholders in a company, whether in the open market or as a result of an offer made to all or a majority of the existing shareholders, I can see no sensible distinction, so far as a duty of care is concerned, between a potential purchaser who is, vis-à-vis the company, a total outsider and one who is already the holder of one or more shares. I accordingly agree with what has already fallen from my noble and learned friend, Lord Bridge of Harwich, and with the speech to be delivered by my noble and learned friend, Lord Jauncey of Tullichettle, which I have had the advantage of reading, and I, too, would allow the appeal and dismiss the cross-appeal.

LORD JAUNCEY OF TULLICHETTLE.

My Lords, it no longer requires a detailed citation of authority to vouch the well-established proposition that a negligent statement may, in certain circumstances, render the maker thereof liable for economic loss occasioned thereby to another. It is sufficient to mention Cann v. Willson (1888) 39 Ch.D. 39        , the dissenting judgment of Denning L.J. in Candler v. Crane, Christmas & Co. [1951] 2 K.B. 164        , and two cases in this House, Hedley Byrne & Co. Ltd v. Heller & Partners Ltd. [1964] A.C. 465      and Smith v. Eric S. Bush [1990] 1 A.C. 831        . Whether liability exists in any particular case will depend upon whether the maker of the statement owes a duty of care to the person who has suffered loss. In this connection I cannot do better than quote the words of Lord Keith of

Kinkel in Governors of Peabody Donation Fund v. Sir Lindsay Parkinson & Co. Ltd. [1985] A.C. 210        , 240-241: **\*655**

'The true question in each case is whether the particular defendant owed to the particular plaintiff a duty of care having the scope which is contended for, and whether he was in breach of that duty with consequent loss to the plaintiff. A relationship of proximity in Lord Atkin's sense must exist before any duty of care can arise, but the scope of the duty must depend on all the circumstances of the case. . . . So in determining whether or not a duty of care of particular scope was incumbent upon a defendant it is material to take into consideration whether it is just and reasonable that it should be so.'

The relationship of proximity to which Lord Keith referred is not one which is created solely by the foreseeability of harm resulting from carelessness in the statement, but is one in which some further ingredient importing proximity is present. Thus in Hill v. Chief Constable of West Yorkshire [1989] A.C. 53        , 60 Lord Keith said:

'It has been said almost too frequently to require repetition that foreseeability of likely harm is not in itself a sufficient test of liability in negligence. Some further ingredient is invariably needed to establish the requisite proximity of relationship between plaintiff and defendant, and all the circumstances of the case must be carefully considered and analysed in order to ascertain whether such ingredient is present.'

Once foreseeability of likely harm from a careless statement has been established, it becomes necessary to examine the circumstances in and the purposes for which the statement was made in order to determine whether there are also present the further ingredients necessary to establish the requisite proximity of relationship between the maker of the statement and the person who has acted upon it. As Bingham L.J. observed in the present case, the concept of proximity is somewhat elusive, extending as it does beyond mere physical proximity. It might be described as the circumstances in which the law considers it proper that a duty of care should be imposed on one person towards another.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

If in any given circumstances a relation of proximity is found to exist, consideration must still be given to the scope of the duty which arises therefrom. In the case of physical proximity, few problems will arise, but where there exists a duty of care in relation to the making of statements, written or oral, problems may arise if those statements are capable of being used for more than one purpose. It is not disputed in the present case that economic loss to the plaintiff as a shareholder was foreseeable by the auditors as a result of any failure on their part to exercise reasonable care in the conduct of the audit. What is disputed is whether the auditors owed any duty to individual shareholders, and if so, what was the scope of that duty.

Before examining the circumstances in this case which may be relevant to the existence of a relationship of proximity, it is helpful to look in a little more detail at the four cases dealing with negligent statements to which I have already referred. In Cann v. Willson, 39 Ch.D. 39                , valuers instructed by an intending mortgagor sent the valuation to solicitors acting for an intending mortgagee knowing that it *656       was hoped thereby to induce the mortgagee to make a loan. Chitty J. held that in the circumstances the valuers owed a duty of care to the mortgagee. In Candler v. Crane, Christmas & Co. [1951] 2 K.B. 164       , the accountants were aware that the accounts were to be shown by their employer to the plaintiff who was a potential investor, and indeed their clerk discussed those accounts with him. Denning L.J., in suggesting the circumstances in which a duty to use care in a statement by professional persons would exist apart from contract, posed three questions: first, what persons are under such duty? Secondly, to whom do those professional people owe this duty? and thirdly, to what transactions does the duty of care extend? In relation to the second question, he said, at pp. 180- 181:

'I will take accountants, but the same reasoning applies to the others. They owe the duty, of course, to their employer or client; and also I think to any third person to whom they themselves show the accounts, or to whom they know their employer is going to show the accounts, so as to induce him to invest money or take some other action on them. But I do not think the duty can be extended still further so as to include strangers of whom they have heard nothing and to whom their employer without their knowledge may choose to show their accounts. Once the accountants have handed their accounts to their employer they are not, as a rule, responsible for what he does with them without their knowledge or consent. . . . But excluding such cases as those, there are some cases - of which the present is one - where the accountants know all the time, even before they present their accounts, that their employer requires the accounts to show to a third person so as to induce him to act on them: and then they themselves, or their employers, present the accounts to him for the purpose. In such cases I am of opinion that the accountants owe a duty of care to the third person. The test of proximity in these cases is: did the accountants know that the accounts were required for submission to the plaintiff and use by him?'

In relation to the third question, he said, at pp. 182-183, 183-184:

'[The duty of care] extends, I think, only to those transactions for which the accountants knew their accounts were required. For instance, in the present case it extends to the original investment of £2,000 which the plaintiff made in reliance on the accounts, because the accountants knew that the accounts were required for his guidance in making that investment; but it does not extend to the subsequent £200 which he made after he had been two months with the company. This distinction, that the duty only extends to the very transaction in mind at the time, is implicit in the decided cases'

'It will be noticed that I have confined the duty to cases where the accountant prepares his accounts and makes his report for the guidance of the very person in the very transaction in question. That is sufficient for the decision of this case. I can well understand that it would be going too far to make an accountant liable to any *657       person in the land who chooses to rely on the accounts in matters of business, for that would expose him to 'liability in an indeterminate amount for an indeterminate time to an indeterminate class': see Ultramares

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1990] 2 A.C. 605                                                                                          Page 40

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

Corporation v. Touche           , *per*
Cardozo C.J. Whether he would be liable if he pre-
pared his accounts for the guidance of a specific
class of persons in a specific class of transactions, I
do not say.'

Denning L.J. clearly considered that the scope of
any duty of care was limited to the precise transac-
tion for which the accountants knew that the ac-
counts were to be used. In Hedley Byrne [1964]
A.C. 465          , a company's bankers were asked
by the plaintiffs' bankers whether the company '
would be good for an advertising contract of £8,000
to £9,000.' The company's bankers answered the
question in the affirmative but, 'without responsibil-
ity on the part of the bank.' When the company
failed, the plaintiffs sought to recover damages
from the bankers for negligence in making the
statement. The action failed because of the express
disclaimer of responsibility, but this House, after
detailed review of authority, held that a negligent
statement, oral or written, could give rise to an ac-
tion of damages for economic loss apart from any
contractual or fiduciary relationship subsisting
between the parties. In the context of this case,
Hedley Byrne         is perhaps most important for
its approval of the dissenting judgment of Denning
L.J. in Candler v. Crane, Christmas & Co          .
After setting out the facts in Candler        , Lord
Reid said [1964] A.C. 465        , 487:

'This seems to me to be a typical case of agreeing
to assume a responsibility: [the accountants] knew
why the plaintiff wanted to see the accounts and
why their employers, the company, wanted them to
be shown to him, and agreed to show them to him
without even a suggestion that he should not rely on
them.'

Lord Reid is again there emphasising the fact that
the maker of the statement was aware of the pur-
pose for which the accounts were required to be
seen. Finally, in Smith v. Eric S. Bush [1990] 1
A.C. 831          , the plaintiff applied for a mort-
gage to a building society which in pursuance of its
statutory duty under the Building Societies Act
1962              instructed independent surveyors to
prepare a written report as to the value of the house

in question. The plaintiff paid to the building soci-
ety a fee in respect of this report, and subsequently
a copy thereof was provided to her. Without obtain-
ing an independent valuation, the plaintiff bought
the house which later turned out to be structurally
defective. The surveyor was found to have been
negligent in failing to discover the defect. This
House held that, notwithstanding the presence of an
exclusion clause in his report, he was thereby in
breach of a duty of care owed to the plaintiff. It is
clear from the speeches which were delivered that
the facts which created the proximate relationship
between the surveyor and the plaintiff were that the
former knew that the valuation had been paid for by
the plaintiff and would be shown to and probably
relied upon by her in deciding whether or not to
buy the house. Thus, Lord Templeman said, at p.
847: *658

'I agree that by obtaining and disclosing a valu-
ation, a mortgagee does not assume responsibility
to the purchaser for that valuation. But in my opin-
ion the valuer assumes responsibility to both mort-
gagee and purchaser by agreeing to carry out a
valuation for mortgage purposes knowing that the
valuation fee has been paid by the purchaser and
knowing that the valuation will probably be relied
upon by the purchaser in order to decide whether or
not to enter into a contract to purchase the house.'

Lord Templeman undoubtedly considered that one
of the necessary ingredients of the relationship of
proximity was the fact that the valuer knew of the
particular transaction for the purposes of which re-
liance would probably be placed on his report.

Lord Griffiths, after setting out three criteria for the
imposition of a duty of care on an adviser, namely,
foreseeability of damage, proximity of relationship
and reasonableness continued, at p. 865:

'The necessary proximity arises from the survey-
or's knowledge that the overwhelming probability is
that the purchaser will rely upon his valuation, the
evidence was that surveyors knew that approxim-
ately 90 per cent. of purchasers did so, and the fact
that the surveyor only obtains the work because the
purchaser is willing to pay his fee. It is just and
reasonable that the duty should be imposed for the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

advice is given in a professional as opposed to a so-cial context and liability for breach of the duty will be limited both as to its extent and amount. The ex-tent of the liability is limited to the purchaser of the house - I would not extend it to subsequent pur-chasers.'

Here Lord Griffiths is limiting the existence and scope of the duty of care to the very person and the very transaction which were in the contemplation of the surveyor at the material time.

My Lords, in each of these cases where a duty of care has been held to exist, the statement in ques-tion has, to the knowledge of its maker, been made available to the plaintiff for a particular purpose upon which he has relied. In the present case, the auditors, by accepting office, came under a stat-utory duty to make their report to the members of the company. The crucial issue is the purpose for which the report was made. To quote the words of Denning L.J. in the Candler case [1951] 2 K.B. 164      , 183, what was the 'very transaction' for which it was provided? To answer this question, it is necessary to look at the relevant provisions of Part VII of the Companies Act 1985      .

Section 221      requires every company to cause accounting records to be kept which should be suf-ficient to show and explain the company's transac-tions, and should be such as (a) to disclose with reasonable accuracy the financial position of the company at the time, and (b) to enable the directors to ensure that any profit and loss account complies with the requirements of the Act. If a company's business involves dealing in goods, the accounting records require to contain statements of stock at the end of each financial year and all statements of stocktaking from which such statements of stock derive. Section *659      227 requires that the directors, by subsection (1)      prepare a profit and loss account for the financial year in respect of each accounting reference period of the company and, by subsection (3)      , prepare a balance sheet as at the last day of the financial year. Section 228(2)      is in the following terms:

'The balance sheet shall give a true and fair view of the state of affairs of the company as at the end

of the financial year; and the profit and loss account shall give a true and fair view of the profit or loss of the company for the financial year.'

In terms of section 235      the directors are re-quired to prepare a report 'containing a fair review of the development of the business of the company and its subsidiaries during the financial year and of their position at the end of it,' and giving particulars of, inter alia, changes in asset values, directors' shareholdings and other interests and contributions for political and charitable purposes. Section 236      makes provision for an auditors' report in the following, inter alia, terms:

'(1) A company's auditors shall make a report to its members on the accounts examined by them, and on every balance sheet and profit and loss ac-count, and on all group accounts, copies of which are to be laid before the company in general meet-ing during the auditors' tenure of office. (2) The auditors' report shall state - (a) whether in the audit-ors' opinion the balance sheet and profit and loss account and (if it is a holding company submitting group accounts) the group accounts have been properly prepared in accordance with this Act; and (b) without prejudice to the foregoing, whether in their opinion a true and fair view is given - (i) in the balance sheet, of the state of the company's af-fairs at the end of the financial year; (ii) in the profit and loss account (if not framed as a consolid-ated account), of the company's profit or loss for the financial year. . . .'

Section 237(1) defines auditors' duties as fol-lows:

'It is the duty of the company's auditors, in pre-paring their report, to carry out such investigations as will enable them to form an opinion as to the fol-lowing matters - (a) whether proper accounting re-cords have been kept by the company and proper returns adequate for their audit have been received from branches not visited by them, (b) whether the company's balance sheet and (if not consolidated) its profit and loss account are in agreement with the accounting records and returns.'

Section 241      provides, inter alia:

'(1) In respect of each financial year of a com-pany the directors shall lay before the company in

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

[1990] 2 A.C. 605    Page 42
1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
(Cite as: [1990] 2 A.C. 605)

general meeting copies of the accounts of the company for that year. (2) The auditors' report shall be read before the company in general meeting, and be open to the inspection of any member of the company. (3) In respect of each financial year the directors - (a) shall deliver to the registrar of companies a copy of the accounts for the year. . . .'

**\*660** The accounts of a company are defined by section 239 to include, inter alia, the company's profit and loss account and balance sheet, and the directors' and auditors' reports. In terms of section 240, a copy of the company's accounts must be sent to every member not less than 21 days before the date of the meeting referred to in section 241(1) . Finally, section 245 imposes penalties on directors whose defective accounts are laid before the company or delivered to the Registrar of Companies.

Three matters emerge from the statutory provisions, namely: (1) that the responsibility for the preparation of accounts giving a true and fair view of the company's financial state is placed fairly and squarely on the shoulders of the directors; (2) that the role of the auditors is to provide an independent report to the members on the proper preparation of the balance sheet and profit and loss account, and as to whether those documents give a true and fair view respectively of the state of the company's affairs at the end of the financial year and of the company's profit and loss for that year. Their role is thus purely investigative rather than creative; (3) that the company's accounts, including the auditors' report, will be furnished to all members of the company as well as to debenture holders and any other persons entitled to receive notice of general meeting. The accounts will, of course, also be available to any member of the public who chooses to examine the company file in the office of the Registrar of Companies.

So much for the circumstances in which company accounts reach the members. Circumstances which render it inevitable that auditors will be aware that their reports will be seen and relied upon by the members. However, that does not answer the funda-

mental question of the purpose, and hence the very transactions, for which the annual accounts of a company are prepared and distributed to its members. Mr. Goldsmith, for the auditors, submitted that the principal purpose was to provide an account of the stewardship of the directors to the shareholders as a body, and not to provide individual investors, whether shareholders or members of the public, with comparative information. Mr. Bathurst, for Caparo, on the other hand, argued that the purpose was to enable shareholders to make such individual decisions as they wished in relation to the company, including decisions as to investment, they already being investors, and decisions as to voting in general meetings.

In the Court of Appeal [1989] Q.B. 653 , 685d-690f Bingham L.J. concluded that the auditors had voluntarily assumed direct responsibility to individual shareholders to whom they owed a duty to exercise reasonable care in carrying out their audit. He further concluded that such duty was owed to a shareholder in respect of any loss sustained by him in selling, retaining, or buying shares in the company. Bingham L.J. referred to the approval by Cardozo C.J. in Ultramares Corporation v. Touche, 174 N.E. 441 , 447 of an earlier statement that:

"negligent words are not actionable unless they are uttered directly, with knowledge or notice that they will be acted on, to **\*661** one to whom the speaker is bound by some relation of duty, arising out of public calling, contract or otherwise, to act with care if he acts at all."

He then said, at p. 686:
'This formulation would not exclude the finding of a sufficiently proximate relationship in the present case if the words 'will be acted upon' are replaced, as in English law I think they should be, by 'may be acted upon."

Taylor L.J. said, at p. 703g:
'once proximity to the shareholder is established, the auditor ought prima facie to be liable for any loss suffered in foreseeable reliance upon the report; . . .'

In my view these observations go too far. Possibility of reliance on a statement for an unspecified purpose will not impose a duty of care on the maker

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-01646-RMC     Document 39-5     Filed 01/31/2008     Page 179 of 212

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990]
E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134
S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400,
2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400
**(Cite as: [1990] 2 A.C. 605)**

to the addressee. More is required. In Smith v. Eric S. Bush [1990] 1 A.C. 831 it was probable, if not highly probable, that the potential purchaser would rely on the valuer's report. This probable reliance was an essential ingredient in establishing proximity. Had it merely been a possibility that the purchaser would rely on the report I very much doubt whether this House would have decided that the valuer owed a duty of care to the purchaser. Furthermore, reliance, even if probable, thereby establishing proximity, does not establish a duty of care of unlimited scope. Regard must be had to the transaction or transactions for the purpose of which the statement was made. It is loss arising from such transaction or transactions rather than 'any loss' to which the duty of care extends.

I do not understand that either Bingham L.J. or Taylor L.J., in reaching their conclusions, relied to any material extent upon the purpose for which accounts of a company, including the auditors' report, are provided to members or consequentially upon the transactions for which the members were expected to use them. O'Connor L.J., in a dissenting judgment, considered that the statutory duty owed by auditors to shareholders was owed to them as a body and not as individuals.

My Lords, Part VII of the Companies Act 1985 provides that the accounts of a company for each financial year shall be laid before the company's general meeting, that is to say before the members in general meeting. Copies of the accounts must be sent to the members at least 21 days in advance, and it is obvious that the reason for this is to enable the members to prepare themselves for attendance at and participation in the meeting. The annual general meeting provides the opportunity for members to question the stewardship of the company during the preceding year, to vote for or against election or re-election of directors, to approve or disapprove the appointment or re-appointment of auditors and to take other decisions affecting the company as a whole or themselves as members of a particular class of shareholders. There is nothing in Part VII which suggests that the accounts are prepared and sent to members for any purpose other than to enable them to exercise class rights in general meeting. I therefore conclude that the purpose of annual accounts, so far as members are concerned, is to enable them to question the past management of the company, to exercise their voting rights, if so advised, and to influence future policy and management. Advice to individual shareholders in relation to present or future investment in the company is no part of the statutory purpose of the preparation and distribution of the accounts. It follows that I am in agreement with the views of O'Connor L.J. as to the nature of the statutory duty owed by auditors to shareholders.

If the statutory accounts are prepared and distributed for certain limited purposes, can there nevertheless be imposed upon auditors an additional common law duty to individual shareholders who choose to use them for another purpose without the prior knowledge of the auditors? The answer must be no. Use for that other purpose would no longer be use for the 'very transaction' which Denning L.J. in the Candler case [1951] 2 K.B. 164 , 183 regarded as determinative of the scope of any duty of care. Only where the auditor was aware that the individual shareholder was likely to rely on the accounts for a particular purpose such as his present or future investment in or lending to the company would a duty of care arise. Such a situation does not obtain in the present case.

The Court of Appeal unanimously rejected a submission by Caparo that an auditor owed a duty to a potential investor who held no shares. In this House it was argued that the relationship of the unwelcome bidder in a potential takeover situation was nearly as proximate to the auditor as was the relationship of a shareholder to whom the report was directed. Since I have concluded that the auditor owed no duty to an individual shareholder, it follows that this argument must also fail. The fact that a company may at a time when the auditor is preparing his report be vulnerable to a take-over bid cannot per se create a relationship of proximity between the auditor and the ultimate successful bidder. Not only is the auditor under no statutory duty to such a bidder but he will have reason at the ma-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

1990 WL 753400 (HL), [1990] 2 A.C. 605, [1990] 1 All E.R. 568, [1990] B.C.C. 164, [1990] B.C.L.C. 273, [1990] E.C.C. 313, [1955-95] P.N.L.R. 523, [1990] 2 W.L.R. 358, (1990) 87 L.S.G. 42, (1990) 140 N.L.J. 248, (1990) 134 S.J. 494, 2-12-1990 Times 753,400, 2-16-1990 Independent 753,400, 2-13-1990 Financial Times 753,400, 2-15-1990 Guardian 753,400, 2-15-1990 Daily Telegraph 753,400

**(Cite as: [1990] 2 A.C. 605)**

terial time to know neither of his identity nor of the terms of his bid. In this context the recent case of Al Saudi Banque v. Clarke Pixley [1990] Ch. 313 is in point. There Millett J. held that the auditors of a company owed no duty of care to a bank which lent money to the company, regardless of whether the bank was an existing creditor or a potential one, because no sufficient proximity of relationship existed in either case between the auditor and the bank. I have no doubt that this case was correctly decided and I would only add that I am in entire agreement with the careful process of reasoning whereby the judge reached his decision.

It only remains to mention Twomax Ltd. v. Dickson, McFarlane & Robinson, 1982 S.C. 113 to which your Lordships were referred. The Lord Ordinary (Lord Stewart) held that auditors owed a duty of care to potential investors who were not shareholders by applying the test of whether the defenders knew or reasonably should have foreseen at the time the accounts were audited that a person might rely on those **\*663** accounts for the purpose of deciding whether or not to take over the company, and therefore would suffer loss if the accounts were inaccurate. There were in that case no such findings in fact as would support the existence of a relationship of proximity between the auditor and the unknown potential investor. I therefore consider that the reasoning of the Lord Ordinary was unsound and that the decision cannot be supported.

For the foregoing reasons, I would allow the appeal.

**Representation**

Solicitors:Freshfields    ;Berwin Leighton    .

Appeal allowed with costs. Cross-appeal dismissed with costs. (C. T. B. )

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**TAB T**



# Companies Act 2006

### CHAPTER 46

## CONTENTS

### PART 1

#### GENERAL INTRODUCTORY PROVISIONS

*Companies and Companies Acts*

1    Companies
2    The Companies Acts

*Types of company*

3    Limited and unlimited companies
4    Private and public companies
5    Companies limited by guarantee and having share capital
6    Community interest companies

### PART 2

#### COMPANY FORMATION

*General*

7    Method of forming company
8    Memorandum of association

*Requirements for registration*

9    Registration documents
10   Statement of capital and initial shareholdings
11   Statement of guarantee
12   Statement of proposed officers
13   Statement of compliance

(4)   The statement must contain a statement by the directors of the company —

    (a)   that the persons by whom or on whose behalf the form of assent is authenticated constitute the whole membership of the company, and

    (b)   if any of the members have not authenticated that form themselves, that the directors have taken all reasonable steps to satisfy themselves that each person who authenticated it on behalf of a member was lawfully empowered to do so.

(5)   The registrar may accept the statement of compliance as sufficient evidence that the company is entitled to be re-registered as an unlimited private company.

**111   Issue of certificate of incorporation on re-registration**

(1)   If on an application for re-registration of a public company as an unlimited private company the registrar is satisfied that the company is entitled to be so re-registered, the company shall be re-registered accordingly.

(2)   The registrar must issue a certificate of incorporation altered to meet the circumstances of the case.

(3)   The certificate must state that it is issued on re-registration and the date on which it is so issued.

(4)   On the issue of the certificate —

    (a)   the company by virtue of the issue of the certificate becomes an unlimited private company, and

    (b)   the changes in the company's name and articles take effect.

(5)   The certificate is conclusive evidence that the requirements of this Act as to re-registration have been complied with.

<div align="center">

**PART 8**

A COMPANY'S MEMBERS

**CHAPTER 1**

THE MEMBERS OF A COMPANY

</div>

**112   The members of a company**

(1)   The subscribers of a company's memorandum are deemed to have agreed to become members of the company, and on its registration become members and must be entered as such in its register of members.

(2)   Every other person who agrees to become a member of a company, and whose name is entered in its register of members, is a member of the company.

58                                                          *Companies Act 2006 (c. 46)*
                                                          *Part 8 — A company's members*
                                                          *Chapter 2 — Register of members*

and the company on the other hand, and generally may decide any question necessary or expedient to be decided for rectification of the register.

(4)  In the case of a company required by this Act to send a list of its members to the registrar of companies, the court, when making an order for rectification of the register, shall by its order direct notice of the rectification to be given to the registrar.

### 126  Trusts not to be entered on register

No notice of any trust, expressed, implied or constructive, shall be entered on the register of members of a company registered in England and Wales or Northern Ireland, or be receivable by the registrar.

### 127  Register to be evidence

The register of members is prima facie evidence of any matters which are by this Act directed or authorised to be inserted in it.

### 128  Time limit for claims arising from entry in register

(1)  Liability incurred by a company —
   (a)  from the making or deletion of an entry in the register of members, or
   (b)  from a failure to make or delete any such entry,
   is not enforceable more than ten years after the date on which the entry was made or deleted or, as the case may be, the failure first occurred.

(2)  This is without prejudice to any lesser period of limitation (and, in Scotland, to any rule that the obligation giving rise to the liability prescribes before the expiry of that period).

### CHAPTER 3

#### OVERSEAS BRANCH REGISTERS

### 129  Overseas branch registers

(1)  A company having a share capital may, if it transacts business in a country or territory to which this Chapter applies, cause to be kept there a branch register of members resident there (an "overseas branch register").

(2)  This Chapter applies to —
   (a)  any part of Her Majesty's dominions outside the United Kingdom, the Channel Islands and the Isle of Man, and
   (b)  the countries or territories listed below.

| | |
|---|---|
| Bangladesh | Malaysia |
| Cyprus | Malta |
| Dominica | Nigeria |
| The Gambia | Pakistan |

*General*

**258    Power to increase financial limits**

(1)    The Secretary of State may by order substitute for any sum of money specified in this Part a larger sum specified in the order.

(2)    An order under this section is subject to negative resolution procedure.

(3)    An order does not have effect in relation to anything done or not done before it comes into force.
       Accordingly, proceedings in respect of any liability incurred before that time may be continued or instituted as if the order had not been made.

**259    Transactions under foreign law**

For the purposes of this Part it is immaterial whether the law that (apart from this Act) governs an arrangement or transaction is the law of the United Kingdom, or a part of it, or not.

## PART 11

DERIVATIVE CLAIMS AND PROCEEDINGS BY MEMBERS

### CHAPTER 1

DERIVATIVE CLAIMS IN ENGLAND AND WALES OR NORTHERN IRELAND

**260    Derivative claims**

(1)    This Chapter applies to proceedings in England and Wales or Northern Ireland by a member of a company —
        (a)    in respect of a cause of action vested in the company, and
        (b)    seeking relief on behalf of the company.
       This is referred to in this Chapter as a "derivative claim".

(2)    A derivative claim may only be brought—
        (a)    under this Chapter, or
        (b)    in pursuance of an order of the court in proceedings under section 994 (proceedings for protection of members against unfair prejudice).

(3)    A derivative claim under this Chapter may be brought only in respect of a cause of action arising from an actual or proposed act or omission involving negligence, default, breach of duty or breach of trust by a director of the company.
       The cause of action may be against the director or another person (or both).

(4)    It is immaterial whether the cause of action arose before or after the person seeking to bring or continue the derivative claim became a member of the company.

(5)    For the purposes of this Chapter—
        (a)    "director" includes a former director;
        (b)    a shadow director is treated as a director; and

*Companies Act 2006 (c. 46)*
*Part 11 — Derivative claims and proceedings by members*
*Chapter 1 — Derivative claims in England and Wales or Northern Ireland*

123

    (c)  references to a member of a company include a person who is not a member but to whom shares in the company have been transferred or transmitted by operation of law.

**261    Application for permission to continue derivative claim**

(1)  A member of a company who brings a derivative claim under this Chapter must apply to the court for permission (in Northern Ireland, leave) to continue it.

(2)  If it appears to the court that the application and the evidence filed by the applicant in support of it do not disclose a prima facie case for giving permission (or leave), the court—

    (a)  must dismiss the application, and

    (b)  may make any consequential order it considers appropriate.

(3)  If the application is not dismissed under subsection (2), the court—

    (a)  may give directions as to the evidence to be provided by the company, and

    (b)  may adjourn the proceedings to enable the evidence to be obtained.

(4)  On hearing the application, the court may—

    (a)  give permission (or leave) to continue the claim on such terms as it thinks fit,

    (b)  refuse permission (or leave) and dismiss the claim, or

    (c)  adjourn the proceedings on the application and give such directions as it thinks fit.

**262    Application for permission to continue claim as a derivative claim**

(1)  This section applies where—

    (a)  a company has brought a claim, and

    (b)  the cause of action on which the claim is based could be pursued as a derivative claim under this Chapter.

(2)  A member of the company may apply to the court for permission (in Northern Ireland, leave) to continue the claim as a derivative claim on the ground that—

    (a)  the manner in which the company commenced or continued the claim amounts to an abuse of the process of the court,

    (b)  the company has failed to prosecute the claim diligently, and

    (c)  it is appropriate for the member to continue the claim as a derivative claim.

(3)  If it appears to the court that the application and the evidence filed by the applicant in support of it do not disclose a prima facie case for giving permission (or leave), the court—

    (a)  must dismiss the application, and

    (b)  may make any consequential order it considers appropriate.

(4)  If the application is not dismissed under subsection (3), the court—

    (a)  may give directions as to the evidence to be provided by the company, and

    (b)  may adjourn the proceedings to enable the evidence to be obtained.

124

*Companies Act 2006 (c. 46)*
*Part 11 — Derivative claims and proceedings by members*
*Chapter 1 — Derivative claims in England and Wales or Northern Ireland*

(5) On hearing the application, the court may —

    (a) give permission (or leave) to continue the claim as a derivative claim on such terms as it thinks fit,

    (b) refuse permission (or leave) and dismiss the application, or

    (c) adjourn the proceedings on the application and give such directions as it thinks fit.

**263    Whether permission to be given**

(1) The following provisions have effect where a member of a company applies for permission (in Northern Ireland, leave) under section 261 or 262.

(2) Permission (or leave) must be refused if the court is satisfied —

    (a) that a person acting in accordance with section 172 (duty to promote the success of the company) would not seek to continue the claim, or

    (b) where the cause of action arises from an act or omission that is yet to occur, that the act or omission has been authorised by the company, or

    (c) where the cause of action arises from an act or omission that has already occurred, that the act or omission —

        (i) was authorised by the company before it occurred, or

        (ii) has been ratified by the company since it occurred.

(3) In considering whether to give permission (or leave) the court must take into account, in particular —

    (a) whether the member is acting in good faith in seeking to continue the claim;

    (b) the importance that a person acting in accordance with section 172 (duty to promote the success of the company) would attach to continuing it;

    (c) where the cause of action results from an act or omission that is yet to occur, whether the act or omission could be, and in the circumstances would be likely to be —

        (i) authorised by the company before it occurs, or

        (ii) ratified by the company after it occurs;

    (d) where the cause of action arises from an act or omission that has already occurred, whether the act or omission could be, and in the circumstances would be likely to be, ratified by the company;

    (e) whether the company has decided not to pursue the claim;

    (f) whether the act or omission in respect of which the claim is brought gives rise to a cause of action that the member could pursue in his own right rather than on behalf of the company.

(4) In considering whether to give permission (or leave) the court shall have particular regard to any evidence before it as to the views of members of the company who have no personal interest, direct or indirect, in the matter.

(5) The Secretary of State may by regulations —

    (a) amend subsection (2) so as to alter or add to the circumstances in which permission (or leave) is to be refused;

    (b) amend subsection (3) so as to alter or add to the matters that the court is required to take into account in considering whether to give permission (or leave).

*Companies Act 2006 (c. 46)*
*Part 11 — Derivative claims and proceedings by members*
*Chapter 1 — Derivative claims in England and Wales or Northern Ireland*

125

(6)  Before making any such regulations the Secretary of State shall consult such persons as he considers appropriate.

(7)  Regulations under this section are subject to affirmative resolution procedure.

### 264  Application for permission to continue derivative claim brought by another member

(1)  This section applies where a member of a company ("the claimant")—

    (a)  has brought a derivative claim,

    (b)  has continued as a derivative claim a claim brought by the company, or

    (c)  has continued a derivative claim under this section.

(2)  Another member of the company ("the applicant") may apply to the court for permission (in Northern Ireland, leave) to continue the claim on the ground that—

    (a)  the manner in which the proceedings have been commenced or continued by the claimant amounts to an abuse of the process of the court,

    (b)  the claimant has failed to prosecute the claim diligently, and

    (c)  it is appropriate for the applicant to continue the claim as a derivative claim.

(3)  If it appears to the court that the application and the evidence filed by the applicant in support of it do not disclose a prima facie case for giving permission (or leave), the court—

    (a)  must dismiss the application, and

    (b)  may make any consequential order it considers appropriate.

(4)  If the application is not dismissed under subsection (3), the court—

    (a)  may give directions as to the evidence to be provided by the company, and

    (b)  may adjourn the proceedings to enable the evidence to be obtained.

(5)  On hearing the application, the court may—

    (a)  give permission (or leave) to continue the claim on such terms as it thinks fit,

    (b)  refuse permission (or leave) and dismiss the application, or

    (c)  adjourn the proceedings on the application and give such directions as it thinks fit.

### CHAPTER 2

#### DERIVATIVE PROCEEDINGS IN SCOTLAND

### 265  Derivative proceedings

(1)  In Scotland, a member of a company may raise proceedings in respect of an act or omission specified in subsection (3) in order to protect the interests of the company and obtain a remedy on its behalf.

(2)  A member of a company may raise such proceedings only under subsection (1).

126

*Companies Act 2006 (c. 46)*
*Part 11 — Derivative claims and proceedings by members*
*Chapter 2 — Derivative proceedings in Scotland*

(3) The act or omission referred to in subsection (1) is any actual or proposed act or omission involving negligence, default, breach of duty or breach of trust by a director of the company.

(4) Proceedings may be raised under subsection (1) against (either or both)—

    (a) the director referred to in subsection (3), or

    (b) another person.

(5) It is immaterial whether the act or omission in respect of which the proceedings are to be raised or, in the case of continuing proceedings under section 267 or 269, are raised, arose before or after the person seeking to raise or continue them became a member of the company.

(6) This section does not affect—

    (a) any right of a member of a company to raise proceedings in respect of an act or omission specified in subsection (3) in order to protect his own interests and obtain a remedy on his own behalf, or

    (b) the court's power to make an order under section 996(2)(c) or anything done under such an order.

(7) In this Chapter—

    (a) proceedings raised under subsection (1) are referred to as "derivative proceedings",

    (b) the act or omission in respect of which they are raised is referred to as the "cause of action",

    (c) "director" includes a former director,

    (d) references to a director include a shadow director, and

    (e) references to a member of a company include a person who is not a member but to whom shares in the company have been transferred or transmitted by operation of law.

**266    Requirement for leave and notice**

(1) Derivative proceedings may be raised by a member of a company only with the leave of the court.

(2) An application for leave must—

    (a) specify the cause of action, and

    (b) summarise the facts on which the derivative proceedings are to be based.

(3) If it appears to the court that the application and the evidence produced by the applicant in support of it do not disclose a prima facie case for granting it, the court—

    (a) must refuse the application, and

    (b) may make any consequential order it considers appropriate.

(4) If the application is not refused under subsection (3)—

    (a) the applicant must serve the application on the company,

    (b) the court—

        (i) may make an order requiring evidence to be produced by the company, and

        (ii) may adjourn the proceedings on the application to enable the evidence to be obtained, and

*Companies Act 2006 (c. 46)*
*Part 11 — Derivative claims and proceedings by members*
*Chapter 2 — Derivative proceedings in Scotland*

127

(c) the company is entitled to take part in the further proceedings on the application.

(5) On hearing the application, the court may —
    (a) grant the application on such terms as it thinks fit,
    (b) refuse the application, or
    (c) adjourn the proceedings on the application and make such order as to further procedure as it thinks fit.

## 267 Application to continue proceedings as derivative proceedings

(1) This section applies where —
    (a) a company has raised proceedings, and
    (b) the proceedings are in respect of an act or omission which could be the basis for derivative proceedings.

(2) A member of the company may apply to the court to be substituted for the company in the proceedings, and for the proceedings to continue in consequence as derivative proceedings, on the ground that—
    (a) the manner in which the company commenced or continued the proceedings amounts to an abuse of the process of the court,
    (b) the company has failed to prosecute the proceedings diligently, and
    (c) it is appropriate for the member to be substituted for the company in the proceedings.

(3) If it appears to the court that the application and the evidence produced by the applicant in support of it do not disclose a prima facie case for granting it, the court—
    (a) must refuse the application, and
    (b) may make any consequential order it considers appropriate.

(4) If the application is not refused under subsection (3) —
    (a) the applicant must serve the application on the company,
    (b) the court—
        (i) may make an order requiring evidence to be produced by the company, and
        (ii) may adjourn the proceedings on the application to enable the evidence to be obtained, and
    (c) the company is entitled to take part in the further proceedings on the application.

(5) On hearing the application, the court may —
    (a) grant the application on such terms as it thinks fit,
    (b) refuse the application, or
    (c) adjourn the proceedings on the application and make such order as to further procedure as it thinks fit.

## 268 Granting of leave

(1) The court must refuse leave to raise derivative proceedings or an application under section 267 if satisfied —

128    Companies Act 2006 (c. 46)
Part 11 — Derivative claims and proceedings by members
Chapter 2 — Derivative proceedings in Scotland

(a) that a person acting in accordance with section 172 (duty to promote the success of the company) would not seek to raise or continue the proceedings (as the case may be), or

(b) where the cause of action is an act or omission that is yet to occur, that the act or omission has been authorised by the company, or

(c) where the cause of action is an act or omission that has already occurred, that the act or omission—

  (i) was authorised by the company before it occurred, or

  (ii) has been ratified by the company since it occurred.

(2) In considering whether to grant leave to raise derivative proceedings or an application under section 267, the court must take into account, in particular—

(a) whether the member is acting in good faith in seeking to raise or continue the proceedings (as the case may be),

(b) the importance that a person acting in accordance with section 172 (duty to promote the success of the company) would attach to raising or continuing them (as the case may be),

(c) where the cause of action is an act or omission that is yet to occur, whether the act or omission could be, and in the circumstances would be likely to be—

  (i) authorised by the company before it occurs, or

  (ii) ratified by the company after it occurs,

(d) where the cause of action is an act or omission that has already occurred, whether the act or omission could be, and in the circumstances would be likely to be, ratified by the company,

(e) whether the company has decided not to raise proceedings in respect of the same cause of action or to persist in the proceedings (as the case may be),

(f) whether the cause of action is one which the member could pursue in his own right rather than on behalf of the company.

(3) In considering whether to grant leave to raise derivative proceedings or an application under section 267, the court shall have particular regard to any evidence before it as to the views of members of the company who have no personal interest, direct or indirect, in the matter.

(4) The Secretary of State may by regulations—

(a) amend subsection (1) so as to alter or add to the circumstances in which leave or an application is to be refused,

(b) amend subsection (2) so as to alter or add to the matters that the court is required to take into account in considering whether to grant leave or an application.

(5) Before making any such regulations the Secretary of State shall consult such persons as he considers appropriate.

(6) Regulations under this section are subject to affirmative resolution procedure.

**269    Application by member to be substituted for member pursuing derivative proceedings**

(1) This section applies where a member of a company ("the claimant")—

(a) has raised derivative proceedings,

(b) has continued as derivative proceedings raised by the company, or

*Companies Act 2006 (c. 46)*
*Part 11 — Derivative claims and proceedings by members*
*Chapter 2 — Derivative proceedings in Scotland*

129

    (c)   has continued derivative proceedings under this section.

(2)   Another member of the company ("the applicant") may apply to the court to be substituted for the claimant in the action on the ground that —

    (a)   the manner in which the proceedings have been commenced or continued by the claimant amounts to an abuse of the process of the court,

    (b)   the claimant has failed to prosecute the proceedings diligently, and

    (c)   it is appropriate for the applicant to be substituted for the claimant in the proceedings.

(3)   If it appears to the court that the application and the evidence produced by the applicant in support of it do not disclose a prima facie case for granting it, the court —

    (a)   must refuse the application, and

    (b)   may make any consequential order it considers appropriate.

(4)   If the application is not refused under subsection (3) —

    (a)   the applicant must serve the application on the company,

    (b)   the court —

        (i)   may make an order requiring evidence to be produced by the company, and

        (ii)   may adjourn the proceedings on the application to enable the evidence to be obtained, and

    (c)   the company is entitled to take part in the further proceedings on the application.

(5)   On hearing the application, the court may —

    (a)   grant the application on such terms as it thinks fit,

    (b)   refuse the application, or

    (c)   adjourn the proceedings on the application and make such order as to further procedure as it thinks fit.

## PART 12

### COMPANY SECRETARIES

#### *Private companies*

**270**   **Private company not required to have secretary**

(1)   A private company is not required to have a secretary.

(2)   References in the Companies Acts to a private company "without a secretary" are to a private company that for the time being is taking advantage of the exemption in subsection (1); and references to a private company "with a secretary" shall be construed accordingly.

(3)   In the case of a private company without a secretary —

    (a)   anything authorised or required to be given or sent to, or served on, the company by being sent to its secretary —

        (i)   may be given or sent to, or served on, the company itself, and

        (ii)   if addressed to the secretary shall be treated as addressed to the company; and

224
Companies Act 2006 (c. 46)
Part 15 — Accounts and reports
Chapter 11 — Revision of defective accounts and reports

(b) amend subsection (4) of that section (purposes for which disclosure permitted) by adding or modifying a description of disclosure unless the purpose for which the disclosure is permitted is likely to facilitate the exercise of a function of a public nature;

(c) amend subsection (5) of that section (overseas regulatory authorities) so as to have the effect of permitting disclosures to be made to a body other than one that exercises functions of a public nature in a country or territory outside the United Kingdom.

(3) An order under this section is subject to negative resolution procedure.

## CHAPTER 12

### SUPPLEMENTARY PROVISIONS

*Liability for false or misleading statements in reports*

**463 Liability for false or misleading statements in reports**

(1) The reports to which this section applies are—
  (a) the directors' report,
  (b) the directors' remuneration report, and
  (c) a summary financial statement so far as it is derived from either of those reports.

(2) A director of a company is liable to compensate the company for any loss suffered by it as a result of—
  (a) any untrue or misleading statement in a report to which this section applies, or
  (b) the omission from a report to which this section applies of anything required to be included in it.

(3) He is so liable only if—
  (a) he knew the statement to be untrue or misleading or was reckless as to whether it was untrue or misleading, or
  (b) he knew the omission to be dishonest concealment of a material fact.

(4) No person shall be subject to any liability to a person other than the company resulting from reliance, by that person or another, on information in a report to which this section applies.

(5) The reference in subsection (4) to a person being subject to a liability includes a reference to another person being entitled as against him to be granted any civil remedy or to rescind or repudiate an agreement.

(6) This section does not affect—
  (a) liability for a civil penalty, or
  (b) liability for a criminal offence.

## PART 30

### PROTECTION OF MEMBERS AGAINST UNFAIR PREJUDICE

*Main provisions*

### 994    Petition by company member

(1)   A member of a company may apply to the court by petition for an order under this Part on the ground—

    (a)   that the company's affairs are being or have been conducted in a manner that is unfairly prejudicial to the interests of members generally or of some part of its members (including at least himself), or

    (b)   that an actual or proposed act or omission of the company (including an act or omission on its behalf) is or would be so prejudicial.

(2)   The provisions of this Part apply to a person who is not a member of a company but to whom shares in the company have been transferred or transmitted by operation of law as they apply to a member of a company.

(3)   In this section, and so far as applicable for the purposes of this section in the other provisions of this Part, "company" means—

    (a)   a company within the meaning of this Act, or

    (b)   a company that is not such a company but is a statutory water company within the meaning of the Statutory Water Companies Act 1991 (c. 58).

### 995    Petition by Secretary of State

(1)   This section applies to a company in respect of which—

    (a)   the Secretary of State has received a report under section 437 of the Companies Act 1985 (c. 6) (inspector's report);

    (b)   the Secretary of State has exercised his powers under section 447 or 448 of that Act (powers to require documents and information or to enter and search premises);

    (c)   the Secretary of State or the Financial Services Authority has exercised his or its powers under Part 11 of the Financial Services and Markets Act 2000 (c. 8) (information gathering and investigations); or

    (d)   the Secretary of State has received a report from an investigator appointed by him or the Financial Services Authority under that Part.

(2)   If it appears to the Secretary of State that in the case of such a company—

    (a)   the company's affairs are being or have been conducted in a manner that is unfairly prejudicial to the interests of members generally or of some part of its members, or

    (b)   an actual or proposed act or omission of the company (including an act or omission on its behalf) is or would be so prejudicial,

he may apply to the court by petition for an order under this Part.

(3)   The Secretary of State may do this in addition to, or instead of, presenting a petition for the winding up of the company.

(4)   In this section, and so far as applicable for the purposes of this section in the other provisions of this Part, "company" means any body corporate that is

## The Companies Act 2006 (Commencement No. 1, Transitional Provisions and Savings) Order 2006

PROVISIONS COMING INTO FORCE ON 1ST JANUARY 2007

**False or misleading statements in reports**

**3.** Section 463 of the Companies Act 2006 (liability for false or misleading statements in reports) does not apply to a directors' report, directors' remuneration report or summary financial statement first sent to members and others under section 238 or 251 of the 1985 Act, or Article 246 or 259 of the 1986 Order, before 20th January 2007.

**TAB U**



# Companies Act 1985

### CHAPTER 6

*LONDON*

HER MAJESTY'S STATIONERY OFFICE

£19·00 net

**12**    c. **6**    *Companies Act 1985*

But any document making or evidencing an alteration in the company's memorandum or articles, and any copy of a company's memorandum or articles as altered, shall be in the same language as the memorandum and articles originally registered and, if that language is Welsh, shall be accompanied by a certified translation into English.

(4) Where a company has under subsection (2) delivered a translation into Welsh of its memorandum and articles, it may, when delivering to the registrar of companies a document making or evidencing an alteration in the memorandum or articles or a copy of the memorandum or articles as altered, deliver with it a certified translation into Welsh.

(5) In this section " certified translation " means a translation certified in the prescribed manner to be a correct translation ; and a reference to delivering a document includes sending, forwarding, producing or (in the case of a notice) giving it.

### A company's membership

Definition
of " member ".
**22.**—(1) The subscribers of a company's memorandum are deemed to have agreed to become members of the company, and on its registration shall be entered as such in its register of members.

(2) Every other person who agrees to become a member of a company, and whose name is entered in its register of members, is a member of the company.

Membership
of holding
company.
**23.**—(1) Except in the cases mentioned below in this section, a body corporate cannot be a member of a company which is its holding company ; and any allotment or transfer of shares in a company to its subsidiary is void.

(2) This does not prevent a subsidiary which was, on 1st July 1948, a member of its holding company, from continuing to be a member ; but (subject to subsection (4)) the subsidiary has no right to vote at meetings of the holding company or any class of its members.

(3) Subject as follows, subsections (1) and (2) apply in relation to a nominee for a body corporate which is a subsidiary, as if references to such a body corporate included a nominee for it.

(4) Nothing in this section applies where the subsidiary is concerned as personal representative, or where it is concerned as trustee, unless the holding company or a subsidiary of it is beneficially interested under the trust and is not so interested only by way of security for the purposes of a transaction entered into by it in the ordinary course of a business which includes the lending of money.

246    c. 6    *Companies Act 1985*

PART XI
CHAPTER II
Power to
close register.

**358.** A company may, on giving notice by advertisement in a newspaper circulating in the district in which the company's registered office is situated, close the register of members for any time or times not exceeding in the whole 30 days in each year.

Power of
court to
rectify
register.

**359.**—(1) If—

(a) the name of any person is, without sufficient cause, entered in or omitted from a company's register of members, or

(b) default is made or unnecessary delay takes place in entering on the register the fact of any person having ceased to be a member,

the person aggrieved, or any member of the company, or the company, may apply to the court for rectification of the register.

(2) The court may either refuse the application or may order rectification of the register and payment by the company of any damages sustained by any party aggrieved.

(3) On such an application the court may decide any question relating to the title of a person who is a party to the application to have his name entered in or omitted from the register, whether the question arises between members or alleged members, or between members or alleged members on the one hand and the company on the other hand, and generally may decide any question necessary or expedient to be decided for rectification of the register.

(4) In the case of a company required by this Act to send a list of its members to the registrar of companies, the court, when making an order for rectification of the register, shall by its order direct notice of the rectification to be given to the registrar.

Trusts not to
be entered
on register in
England and
Wales.

**360.** No notice of any trust, expressed, implied or constructive, shall be entered on the register, or be receivable by the registrar, in the case of companies registered in England and Wales.

Register to be
evidence.

**361.** The register of members is prima facie evidence of any matters which are by this Act directed or authorised to be inserted in it.

Overseas
branch
registers.

**362.**—(1) A company having a share capital whose objects comprise the transaction of business in any of the countries or territories specified in Part I of Schedule 14 to this Act may cause to be kept in any such country or territory in which it transacts business a branch register of members resident in that country or territory.

*Companies Act 1985*      c. **6**      **21**

## CHAPTER III       PART I

### A COMPANY'S CAPACITY ; FORMALITIES
### OF CARRYING ON BUSINESS

**35.**—(1) In favour of a person dealing with a company in good faith, any transaction decided on by the directors is deemed to be one which it is within the capacity of the company to enter into, and the power of the directors to bind the company is deemed to be free of any limitation under the memorandum or articles.

*Company's capacity: power of directors to bind it.*

(2) A party to a transaction so decided on is not bound to enquire as to the capacity of the company to enter into it or as to any such limitation on the powers of the directors, and is presumed to have acted in good faith unless the contrary is proved.

**36.**—(1) Contracts on behalf of a company may be made as follows—

*Form of company contracts.*

   (a) a contract which if made between private persons would be by law required to be in writing, and if made according to the law of England and Wales to be under seal, may be made on behalf of the company in writing under the company's common seal ;

   (b) a contract which if made between private persons would be by law required to be in writing, signed by the parties to be charged therewith, may be made on behalf of the company in writing signed by any person acting under its authority, express or implied ;

   (c) a contract which if made between private persons would by law be valid although made by parol only, and not reduced into writing, may be made by parol on behalf of the company by any person acting under its authority, express or implied.

(2) A contract made according to this section—

   (a) is effectual in law, and binds the company and its successors and all other parties to it ;

   (b) may be varied or discharged in the same manner in which it is authorised by this section to be made.

(3) A deed to which a company is a party is held to be validly executed according to the law of Scotland on behalf of the company if it is executed in accordance with this Act or is sealed with the company's common seal and subscribed on behalf of the company by two of the directors, or by a director and the secretary ; and such subscription on behalf of the company is binding whether attested by witnesses or not.

(4) A notice under this section shall state whether the current or previous accounting reference period of the company—

> (a) is to be treated as shortened, so as to come to an end or (as the case may require) be treated as having come to an end on the new accounting reference date on the first occasion on which that date falls or fell after the beginning of that accounting reference period, or

> (b) is to be treated as extended, so as to come to an end or (as the case may require) be treated as having come to an end on the new accounting reference date on the second occasion on which that date falls or fell after the beginning of that accounting reference period.

(5) A notice which states that the current or previous accounting reference period is to be extended has no effect if the current or previous accounting reference period, as extended in accordance with the notice, would exceed 18 months.

(6) Subject to any direction given by the Secretary of State under the next subsection, a notice which states that the current or previous accounting reference period is to be extended has no effect unless—

> (a) no earlier accounting reference period of the company has been extended by virtue of a previous notice given by the company under this section, or

> (b) the notice is given not less than 5 years after the date on which any earlier accounting reference period of the company which was so extended came to an end, or

> (c) the company is a subsidiary or holding company of another company and the new accounting reference date coincides with the accounting reference date of that other company.

(7) The Secretary of State may, if he thinks fit, direct that subsection (6) shall not apply to a notice already given by a company under this section or (as the case may be) in relation to a notice which may be so given.

**226.**—(1) Where a company has given notice with effect in accordance with section 225, and that notice has not been superseded by a subsequent notice by the company which has such effect, the new date specified in the notice is the company's accounting reference date, in substitution for that which, by virtue of section 224 or this section, was its accounting reference date at the time when the notice was given.

Consequence of giving notice under s. 225.

158     c. 6                    *Companies Act 1985*

(2) Where by virtue of such a notice one date is substituted for another as the accounting reference date of a company—

> (a) the current or previous accounting reference period, shortened or extended (as the case may be) in accordance with the notice, and

> (b) each successive period of 12 months beginning after the end of that accounting reference period (as so shortened or extended) and ending with the new accounting reference date,

is or (as the case may require) is to be treated as having been an accounting reference period of the company, instead of any period which would be an accounting reference period of the company if the notice had not been given.

(3) Section 225 and this section do not affect any accounting reference period of the company which—

> (a) in the case of a notice under section 225(1), is earlier than the current accounting reference period, or

> (b) in the case of a notice under section 225(2), is earlier than the previous accounting reference period.

Directors' duty to prepare annual accounts. **227.**—(1) In the case of every company, the directors shall in respect of each accounting reference period of the company prepare a profit and loss account for the financial year or, if it is a company not trading for profit, an income and expenditure account.

(2) Where it is the company's first accounting reference period, the financial year begins with the first day of that period and ends with—

> (a) the date on which the accounting reference period ends, or

> (b) such other date, not more than 7 days before or more than 7 days after the end of that period, as the directors may determine;

and after that the financial year begins with the day after the date to which the last preceding profit and loss account was made up and ends as mentioned in paragraphs (a) and (b) above.

(3) The directors shall prepare a balance sheet as at the last day of the financial year.

(4) In the case of a holding company, the directors shall secure that, except where in their opinion there are good reasons against it, the financial year of each of its subsidiaries coincides with the company's own financial year.

*Form and content of company individual and group accounts*     PART VII

**228.**—(1) A company's accounts prepared under section 227     CHAPTER I
shall comply with the requirements of Schedule 4 (so far as Form and
applicable) with respect to the form and content of the balance content of
sheet and profit and loss account and any additional informa- individual
tion to be provided by way of notes to the accounts.     accounts.

(2) The balance sheet shall give a true and fair view of the
state of affairs of the company as at the end of the financial
year ; and the profit and loss account shall give a true and fair
view of the profit or loss of the company for the financial year.

(3) Subsection (2) overrides—

(a) the requirements of Schedule 4, and

(b) all other requirements of this Act as to the matters
to be included in a company's accounts or in notes to
those accounts ;

and accordingly the following two subsections have effect.

(4) If the balance sheet or profit and loss account drawn up
in accordance with those requirements would not provide suffi-
cient information to comply with subsection (2), any necessary
additional information must be provided in that balance sheet or
profit and loss account, or in a note to the accounts.

(5) If, owing to special circumstances in the case of any
company, compliance with any such requirement in relation to
the balance sheet or profit and loss account would prevent com-
pliance with subsection (2) (even if additional information were
provided in accordance with subsection (4)), the directors shall
depart from that requirement in preparing the balance sheet or
profit and loss account (so far as necessary in order to comply
with subsection (2)).

(6) If the directors depart from any such requirement, particu-
lars of the departure, the reasons for it and its effect shall be
given in a note to the accounts.

(7) Subsections (1) to (6) do not apply to group accounts pre-
pared under the next section ; and subsections (1) and (2) do not
apply to a company's profit and loss account (or require the
notes otherwise required in relation to that account) if—

(a) the company has subsidiaries, and

(b) the profit and loss account is framed as a consolidated
account dealing with all or any of the company's
subsidiaries as well as the company, and—

(i) complies with the requirements of this Act re-
lating to consolidated profit and loss accounts, and

*Companies Act 1985*    c. 6    307

(3) On granting an application for an order under section 456(4) or (5) the court may order that the applicant's costs be paid out of the proceeds of sale ; and if that order is made, the applicant is entitled to payment of his costs out of those proceeds before any person interested in the shares in question receives any part of those proceeds.

## PART XVI

### FRAUDULENT TRADING BY A COMPANY

**458.** If any business of a company is carried on with intent to defraud creditors of the company or creditors of any other person, or for any fraudulent purpose, every person who was knowingly a party to the carrying on of the business in that manner is liable to imprisonment or a fine, or both.

Punishment for fraudulent trading.

This applies whether or not the company has been, or is in the course of being, wound up.

## PART XVII

### PROTECTION OF COMPANY'S MEMBERS AGAINST UNFAIR PREJUDICE

**459.**—(1) A member of a company may apply to the court by petition for an order under this Part on the ground that the company's affairs are being or have been conducted in a manner which is unfairly prejudicial to the interests of some part of the members (including at least himself) or that any actual or proposed act or omission of the company (including an act or omission on its behalf) is or would be so prejudicial.

Order on application of company member.

(2) The provisions of this Part apply to a person who is not a member of a company but to whom shares in the company have been transferred or transmitted by operation of law, as those provisions apply to a member of the company ; and references to a member or members are to be construed accordingly.

**460.**—(1) If in the case of any company—

(a) the Secretary of State has received a report under section 437, or exercised his powers under section 447 or 448 of this Act or section 44(2) to (6) of the Insurance Companies Act 1982 (inspection of company's books and papers), and

(b) it appears to him that the company's affairs are being or have been conducted in a manner which is unfairly prejudicial to the interests of some part of the members, or that any actual or proposed act or omission of the company (including an act or omission on its behalf) is or would be so prejudicial,

Order on application of Secretary of State.

1982 c. 50.

**TAB V**

STATUTORY INSTRUMENTS

## 2007 No. 2194 (C. 84)

## COMPANIES

## The Companies Act 2006 (Commencement No. 3, Consequential Amendments, Transitional Provisions and Savings) Order 2007

*Made*    -   -   -   -        *25th July 2007*

*Coming into force in accordance with article 1(3)*

The Secretary of State makes the following Order in exercise of the powers conferred by sections 1292, 1294, 1296 and 1300(2) of the Companies Act 2006(**a**).

In accordance with sections 1290 and 1294(6) of that Act, a draft of this instrument was laid before Parliament and approved by a resolution of each House of Parliament.

### Citation, interpretation and coming into force

**1.**—(1) This Order may be cited as the Companies Act 2006 (Commencement No. 3, Consequential Amendments, Transitional Provisions and Savings) Order 2007.

(2) In this Order --

"the 1985 Act" means the Companies Act 1985(**b**); and

"the 1986 Order" means the Companies (Northern Ireland) Order 1986(**c**).

(3) The provisions of this Order come into force as follows—

(a) articles 1, 2, 8, 10 and 11 and Schedules 2, 4 and 5 come into force on 1st October 2007;

(b) article 3 comes into force on 1st November 2007;

(c) article 4 comes into force on 15th December 2007;

(d) article 5 comes into force on 1st October 2008;

(e) other provisions of this Order come into force on the same date as the provisions (or repeals) in relation to which they apply.

### Provisions of the Companies Act 2006 coming into force on 1st October 2007

**2.** --(1) The following provisions of the Companies Act 2006 come into force on 1st October 2007- -

(a) sections 29 and 30 (resolutions and agreements affecting a company's constitution);

(b) sections 116 to 119 (inspection of register of members);

---

(**a**) 2006 c.46.
(**b**) 1985 c.6.
(**c**) S.I. 1986/1032 (N.I. 6).

(c) sections 145 to 153 (exercise of members' rights);

(d) in Part 10 (a company's directors)—

section 154 (companies required to have directors);

section 160 (appointment of directors of public company to be voted on individually);

section 161 (validity of acts of directors);

sections 168 and 169 (removal of directors);

sections 170 to 181 (general duties of directors), except sections 175 to 177 (duty to avoid conflicts of interest, duty not to accept benefits from third parties and duty to declare interest in proposed transaction or arrangement);

sections 188 to 226 (transactions with directors requiring approval of members);

sections 227 to 230 (directors' service contracts);

section 231 (contract with sole member who is also a director);

sections 232 to 239 (directors' liabilities);

sections 247 to 259 (supplementary provisions);

(e) sections 260 to 269 (derivative claims and proceedings by members);

(f) in Part 13 (resolutions and meetings)—

sections 281 to 287 (general provisions about resolutions);

sections 288 to 300 (written resolutions);

sections 301 to 307, 310 to 326, 327(1), (2)(a) and (b) and (3), 328, 329, 330(1) to (5), (6)(a) and (b) and (7), 331, 332, 334 and 335 (resolutions at meetings);

sections 336 to 340 (public companies: additional requirements for AGMs);

sections 341 to 354 (additional requirements for quoted companies);

sections 355 to 359 (records of resolutions and meetings);

sections 360 and 361 (supplementary provisions);

(g) section 417 (contents of directors' report: business review);

(h) sections 485 to 488 (appointment of auditors of private companies);

(i) section 993 (fraudulent trading);

(j) sections 994 to 999 (protection of members against unfair prejudice);

(k) sections 1035 to 1039 and 1124 and Schedule 3 (company investigations: amendments);

(l) sections 1121 to 1123 and 1125 (general supplementary provisions relating to offences), as they apply to offences under Part 14 or 15 of the 1985 Act.

(2) Sections 362 to 379 of the Companies Act 2006 (control of political donations and expenditure), with the exception of the provisions specified in article 5 of this Order (which relate to independent election candidates), come into force in Great Britain on 1st October 2007.

(3) The following provisions of the Companies Act 2006 come into force on 1st October 2007 so far as necessary for the purposes of the provisions mentioned in paragraphs (1) and (2)—

(a) section 17 (a company's constitution);

(b) section 385 (quoted and unquoted companies);

(c) section 540(1) and (4) (shares);

(d) section 545 (companies having a share capital);

(e) section 546 (issued and allotted share capital);

(f) section 548 (equity share capital);

(g) section 629 (classes of shares);

(h) sections 1121, 1122, 1125 and 1127 to 1133 (provisions relating to offences);

2

# SCHEDULE 3

Article 9

## TRANSITIONAL PROVISIONS AND SAVINGS

**Resolutions and agreements affecting a company's constitution (ss.29 and 30)**

**1.**– (1) Sections 29 and 30 of the Companies Act 2006 (resolutions and agreements affecting a company's constitution) apply to resolutions passed and agreements made on or after 1st October 2007.

(2) The provisions of section 380(1) and (5) of the 1985 Act or Article 388(1) and (5) of the 1986 Order continue to apply in relation to resolutions passed and agreements made, but not forwarded to the registrar, before that date.

This does not affect the operation of section 1297 of the Companies Act 2006 (continuity of the law) in relation to things done under those provisions.

**Inspection of register of members (ss.116 to 119)**

**2.**—(1) Sections 116 to 119 of the Companies Act 2006 (inspection of register of members) apply where –

    (a) the request is made on or after 1st October 2007, and

    (b) the company is not obliged to deliver an annual return under section 363 of the 1985 Act or Article 371 of the 1986 Order made up to a date before 1st October 2008.

(2) Sections 356 and 357 of the 1985 Act or Articles 364 and 365 of the 1986 Order continue to apply to requests made before 1st October 2007 or after that date to a company that is so obliged.

**Exercise of members' rights (ss.145 to 153)**

**3.**—(1) Section 145 of the Companies Act 2006 (effect of provisions of articles as to enjoyment or exercise of members' rights) applies in relation to things required or authorised to be done as mentioned in subsection (2) of that section on or after 1st October 2007.

(2) Nominations under section 146 of that Act (traded companies: nomination of persons to enjoy information rights) may be made at any time on or after 1st October 2007.

A company is not required to act on a nomination before 1st January 2008; but if it does so, sections 147 to 150 apply.

(3) Section 152 of that Act (exercise of rights where shares held on behalf of others: exercise in different ways) applies in relation to the exercise of rights on or after 1st October 2007.

(4) A request may be made under section 153 of that Act (exercise of rights where shares held on behalf of others: members' requests) at any time on or after 1st October 2007.

**Validity of acts of directors (s.161)**

**4.**—(1) Section 161 of the Companies Act 2006 (validity of acts of directors) applies to acts done on or after 1st October 2007.

(2) Section 285 of the 1985 Act (validity of acts of director or manager) or Article 293 of the 1986 Order (validity of acts of director) continues to apply to acts done before that date.

**Removal of directors (ss.168 and 169)**

**5.**—(1) Section 169(5) of the Companies Act 2006 (circumstances in which representations need not be sent out or read out at the meeting) applies where the representations are received by the company on or after 1st October 2007.

16

(2) Section 304(4) of the 1985 Act or Article 312(4) of the 1986 Order continues to apply where the representations are received by the company before that date.

### Transactions requiring members' approval: directors' long-term service contracts (ss.188 and 189)

6.—(1) Sections 188 and 189 of the Companies Act 2006 (directors' long-term service contracts: requirement of members' approval) apply to agreements made on or after 1st October 2007.

(2) A resolution passed before that date approving the provision made by such an agreement is effective for the purposes of those sections if it complies with the requirements of those sections.

(3) Section 188(4) (addition of unexpired period of earlier contract in determining guaranteed period under new contract) applies whether the original contract (within the meaning of that provision) was entered into before or after that date.

(4) Section 319 of the 1985 Act or Article 327 of the 1986 Order continues to apply to agreements made before that date.

### Transactions requiring members' approval: substantial property transactions (ss.190 to 196)

7.—(1) Sections 190 to 196 of the Companies Act 2006 (substantial property transactions: requirement of members' approval) apply to arrangements or transactions entered into on or after 1st October 2007.

(2) A resolution passed before that date approving an arrangement or transaction is effective for the purposes of those sections if it complies with the requirements of those sections.

(3) Sections 320 to 322 of the 1985 Act or Articles 328 to 330 of the 1986 Order continue to apply in relation to arrangements or transactions entered into before that date.

### Transactions requiring members' approval: loans, quasi-loans and credit transactions (ss.197 to 214)

8.—(1) Sections 197 to 214 of the Companies Act 2006 (loans, quasi-loans and credit transactions: requirement of members' approval) apply to transactions or arrangements entered into on or after 1st October 2007.

(2) A resolution passed before that date approving a transaction or arrangement is effective for the purposes of those sections if it complies with the requirements of those sections.

(3) Sections 330 to 342 of the 1985 Act or Articles 338 to 350 of the 1986 Order continue to apply in relation to a contravention occurring before that date.

9. Approval is not required under section 197, 198, 200 or 201 of the Companies Act 2006 (requirement of members' approval for loans etc) for anything done by a company in pursuance of an agreement entered into before 1st October 2007 that, by virtue of section 337A of the 1985 Act or Article 345A of the 1986 Order (funding of director's expenditure on defending proceedings), would not have required approval if done before that date.

10.—(1) This paragraph applies where before 1st October 2007 a company has done anything—

  (a) pursuant to section 337(1) or (2) of the 1985 Act or Article 345(1) or (2) of the 1986 Order (funding of director's expenditure on duty to company), and

  (b) on the condition mentioned in section 337(3)(b) of that Act or Article 345(3)(b) of that Order (condition requiring repayment of loan etc if approval of company in general meeting not given within six months).

(2) If that condition has not been satisfied before that date, it continues to apply notwithstanding the repeal of that section or that Article, but subject as follows.

17

(3) In the case of a private company that by reason of the repeal of section 366 of the 1985 Act or Article 374 of the 1986 Order with effect from that date ceases to be required to hold an annual general meeting, the condition shall be read as if it provided—

    (a) that the approval of the company is required on or before the last date on which the company would have been required to hold an annual general meeting but for the repeal, and

    (b) that the loan is to be repaid within six months from that date if such approval is not forthcoming.

11.—(1) This paragraph applies where before 1st October 2007 a company has done anything—

    (a) pursuant to section 337A(1) or (3) of the 1985 Act or Article 345A(1) or (3) of the 1986 Order (funding of director's expenditure on defending proceedings), and

    (b) on the terms mentioned in section 337A(4) of that Act or Article 345A(4) of that Order (terms requiring repayment of loan etc if defendant convicted, has judgment given against him or refused relief).

(2) If immediately before that date—

    (a) it is not yet known whether repayment will be required, or

    (b) repayment is required but had not been made,

those terms continue to apply notwithstanding the repeal of that section or that Article.

**Transactions requiring members' approval: payments for loss of office (ss.215 to 222)**

12.—(1) Sections 215 to 222 of the Companies Act 2006 (payments for loss of office: requirement of members' approval) apply in relation to any such loss of office or employment as is mentioned in section 215(1)(a) or (b), or any such retirement as is mentioned in section 215(1)(c) or (d), occurring on or after 1st October 2007.

(2) A resolution passed before that date approving a payment is effective for the purposes of those sections if it complies with the requirements of those sections.

(3) Sections 312 to 316 of the 1985 Act or Articles 320 to 324 of the 1986 Order continue to apply in relation to loss of office or retirement within the meaning of those provisions occurring before that date.

(4) For the purposes of this paragraph loss of office or retirement is regarded as occurring—

    (a) in the case of a directorship, when the person ceases to be a director;

    (b) in the case of any other office, when the person ceases to hold that office;

    (c) in the case of employment, when the employment comes to an end.

**Directors' service contracts (ss.227 to 230)**

13.—(1) Sections 228 to 230 of the Companies Act 2006 (directors' service contracts) apply to—

    (a) contracts within section 227(1) of that Act entered into on or after 1st October 2007,

    (b) appointments within section 227(2) of that Act made on or after that date, and

    (c) contracts to which section 318(1) of the 1985 Act or Article 326(1) of the 1986 Order applied immediately before that date.

(2) Until regulations under section 1136 of the Companies Act 2006 are made specifying a place for the purposes of section 228(2)(b), the copies and memoranda referred to in section 228 may be kept by a company—

    (a) at any place where its register of members is kept, or

    (b) at its principal place of business,

provided that place is situated in the part of the United Kingdom in which the company is registered.

(3) Until section 1068(1) of the Companies Act 2006 comes into force the notice referred to in section 228(4) must be given on the form prescribed for the purposes of section 318(4) of the 1985 Act or Article 326(4) of the 1986 Order.

(4) The provisions of section 318 of the 1985 Act or Article 326 of the 1986 Order continue to apply in relation to—

    (a) any default before 1st October 2007 in complying with section 318(1) or (5) or Article 326(1) or (5);

    (b) any request for inspection under section 318(7) or Article 326(7) made before that date;

    (c) any duty to give notice under section 318(4) or Article 326(4) arising before that date.

**Contracts with sole member who is a director (s.231)**

**14.**—(1) Section 231 of the Companies Act 2006 (contracts with sole member who is a director) applies to contracts entered into on or after 1st October 2007.

(2) Section 322B of the 1985 Act or Article 330B of the 1986 Order continues to apply to contracts entered into before that date.

**Directors' liabilities (ss.232 to 239)**

**15.**—(1) Sections 232 to 236 of the Companies Act 2006 (restrictions on provision protecting directors from liability) apply to any provision made on or after 1st October 2007.

(2) Sections 309A, 309B and 309C(1) to (3) and (6) of the 1985 Act or Article 318 of the 1986 Order (so far as it relates to directors) continue to apply in relation to any provision to which they applied immediately before that date.

**16.**—(1) Sections 237 and 238 of the Companies Act 2006 (copies of qualifying indemnity provision to be available for inspection etc) apply to—

    (a) qualifying indemnity provision within the meaning of section 237 made on or after 1st October 2007, and

    (b) qualifying third party indemnity provision within the meaning of section 309B(1) of the 1985 Act to which section 309C(4) and (5) of that Act applied immediately before that date.

(2) Until regulations under section 1136 of the Companies Act 2006 are made specifying a place for the purposes of section 237(3)(b), the copies and memoranda referred to in section 237 may be kept by a company—

    (a) at any place where its register of members is kept, or

    (b) at its principal place of business,

provided that place is situated in the part of the United Kingdom in which the company is registered.

(3) Until section 1068(1) of the Companies Act 2006 comes into force the notice referred to in section 237(5) must be given on the form prescribed for the purposes of section 318(4) of the 1985 Act or Article 326(4) of the 1986 Order.

(4) The provisions of section 318 of the 1985 Act, as applied by section 309C(4) and (5), continue to apply in relation to—

    (a) any default before 1st October 2007 in complying with section 318(1) or (5), as so applied;

    (b) any request for inspection under section 318(7), as so applied, made before that date;

    (c) any duty to give notice under section 318(4), as so applied, arising before that date.

**17.**—(1) Section 239 of the Companies Act 2006 (ratification of acts of directors giving rise to liability) applies to conduct by a director on or after 1st October 2007.

(2) Conduct by a director before that date is subject to the law relating to ratification that applied immediately before that date.

### Power to make provision for employees on cessation or transfer of business (s.247)

**18.**—(1) Section 247 of the Companies Act 2006 (power to make provision for employees on cessation or transfer of business) applies to provision made on or after 1st October 2007 (subject to sub-paragraph (2)(b)).

(2) Section 719 of the 1985 Act or Article 668 of the 1986 Order continues to apply—

    (a) to provision made before that date, and

    (b) to anything sanctioned in accordance with subsection (3) of that section or paragraph (3) of that Article before that date.

### Records of meetings of directors (ss.248 and 249)

**19.**— (1) Sections 248 and 249 of the Companies Act 2006 (records of meetings of directors) apply to meetings held on or after 1st October 2007.

(2) Section 382 of the 1985 Act or Article 390 of the 1986 Order continues to apply to meetings of directors held before that date.

### Derivative claims and proceedings by members (ss.260 to 269)

**20.**—(1) On and after 1st October 2007 sections 260 to 264 of the Companies Act 2006 (derivative claims in England and Wales or Northern Ireland) apply to all derivative claims, subject to the following provisions.

(2) Those sections do not apply, and the law in force immediately before 1st October 2007 continues to apply, where the claimant (in Northern Ireland, the plaintiff) has applied for permission (in Northern Ireland, leave) to continue the claim before that date.

(3) If, or to the extent that, the claim arises from acts or omissions that occurred before 1st October 2007, the court must exercise its powers under those sections so as to secure that the claim is allowed to proceed as a derivative claim only if, or to the extent that, it would have been allowed to proceed as a derivative claim under the law in force immediately before that date.

**21.**—(1) This paragraph applies where an application is made under section 266 or 267 (derivative proceedings in Scotland).

(2) If the cause of action arises, wholly or to any extent, from an act or omission that occurred before 1st October 2007, the court shall exercise its powers under those sections so as to secure that the proceedings in respect of that act or omission are allowed to proceed as derivative proceedings only to the extent that they could have been pursued by the applicant under the law in force immediately before that date.

### General provisions about resolutions (ss.281 to 287)

**22.**—(1) Sections 281 to 287 of the Companies Act 2006 (general provisions about resolutions), apply

    (a) to written resolutions to which sections 288 to 300 of that Act apply (see paragraph 24);

    (b) to resolutions (other than written resolutions)—

        (i) of which notice is given on or after 1st October 2007, or

        (ii) that are proposed at a meeting of which notice is given on or after 1st October 2007, other than a meeting convened in pursuance of a requisition made under section 368 or 376 of the 1985 Act or Article 376 or 384 of the 1986 Order made before that date.

(2) The provisions of the 1985 Act or 1986 Order continue to apply to resolutions (other than written resolutions)—

20