**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CITY OF HARPER WOODS EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of BAE SYSTEMS PLC, | ) ) ) | Civil No. 1:07-cv-01646 |
| | ) | Assigned to: Judge Rosemary M. Collyer |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| RICHARD (DICK) L. OLVER et al., | ) ) ) | |
| Defendants, | ) ) | |
| - and – | ) ) | |
| BAE SYSTEMS PLC, an England and Wales corporation, | ) ) ) | |
| Nominal Defendant. | ) | |

**APPENDIX OF UNREPORTED CASES AND OTHER MATERIALS**

## CASES

(in alphabetical order)

*Tab No.*

*Council for Responsible Nutrition v. Hartford Cas. Ins. Co.,*
No. 06-1590 (RMC), 2007 WL 2020093 (D.D.C. July 12, 2007) ...................   A

*Feiner Family Trust v. VBI Corp.,* No. 07 Civ. 1914 (RPP), 2007 WL
2615448 (S.D.N.Y. Sept. 11, 2007)...................................................................   B

*Hbouss v. Coca-Cola Enterprises, Inc.,* No. 05 Civ. 7965 (DLC), 2006 WL
2285598 (S.D.N.Y. Aug. 9, 2006)......................................................................   C

*Huertas v. Kingdom of Spain*, No. 05 Civ. 627 (RWRAK), 2006 WL
785302, (D.D.C. Mar. 27, 2006) ......................................................................   D

*In re: BP P.L.C. Derivative Litigation*, No. 3-AN06-11959CI
(Alaska Sup. Ct. May 17, 2007) .......................................................................   E

*In re: BP P.L.C. Derivative Litigation,* No. S-12747 (Alaska July 19, 2007) .......   F

*Locals 302 and 612 of Intern. Union of Operating Engineers – Employers*
*Const. Industry Retirement Trust v. Blanchard*, No. 04 Civ. 5954 (LAP),
2005 WL 2063852 (S.D.N.Y. Aug. 25, 2005) ...................................................   G

*Seghers v. Thompson*, No. 06 Civ. 308 (RMB) (KNF), 2006 WL 2807203
(S.D.N.Y. Sept. 27, 2006)...................................................................................   H

*Seybold v. Groenink*, No. 06 Civ. 772 (DLC), 2007 WL 737502
(S.D.N.Y. Mar. 12, 2007) ..................................................................................   I

## OTHER MATERIALS

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
INTENTIONAL, RECKLESS OR NEGLIGENT BREACH OF FIDUCIARY
DUTY, CORPORATE WASTE AND ULTRA VIRES CONDUCT .................   J

**TAB A**

Not Reported in F.Supp.2d                                          Page 1
Not Reported in F.Supp.2d, 2007 WL 2020093 (D.D.C.)
**(Cite as: 2007 WL 2020093 (D.D.C.))**

Only the Westlaw citation is currently available.

United States District Court,
District of Columbia.
COUNCIL FOR RESPONSIBLE NUTRITION, et
al., Plaintiffs,
v.
HARTFORD CASUALTY INSURANCE CO., De-
fendant.
**Civil Action No. 06-1590(RMC).**

July 12, 2007.

Janet K. Coleman, Whitney & Bogris LLP,
Towson, MD, for Plaintiffs.

Patrick Florian Hofer, Tracy P. Varghese, Trout-
man Sanders, LLP, Washington, DC, for Defend-
ant.

### *MEMORANDUM OPINION*

ROSEMARY M. COLLYER, United States District
Judge.

**\*1** When an insured is sued for negligent, reckless,
and malicious defamation, does the insurer have a
duty to defend where the insurance policy excludes
coverage for injuries "expected" by the insured?
The answer to this question is "yes" under District
of Columbia law. Council for Responsible Nutrition
and its President, Annette Dickinson, (collectively
"CRN") seek insurance coverage under a policy is-
sued by Hartford Casualty Insurance Company
("Hartford"). The parties have filed cross motions
for summary judgment on the issue of whether
Hartford had a duty to defend CRN in an underly-
ing defamation lawsuit. Because the underlying
complaint stated a claim covered by the policy and
because the exclusion clause is construed narrowly,
Hartford had a duty to defend. Accordingly, CRN's
motion for summary judgment will be granted, and
Hartford's motion for summary judgment will be
denied.

### I. FACTUAL BACKGROUND

Council For Responsible Nutrition is a trade associ-
ation that represents ingredient suppliers and manu-

facturers in the dietary supplement industry. Def.'s
Statement of Material Facts ("Def.'s Facts") ¶ 1.
Both the Council and Ms. Dickinson, as its Presid-
ent, were insured under a commercial business liab-
ility policy number 42 SBA FT4964 (the "Policy"),
issued by Hartford. Compl. ¶¶ 7-8. The Policy cov-
ers "personal and advertising injury" as follows:

   We will pay on behalf of the Insured those sums
   that the insured becomes legally obligated to pay
   as damages because of ... "personal and advert-
   ising injury" to which this insurance applies. We
   will have the right and duty to defend the insured
   against any "suit" seeking damages. However, we
   will have no duty to defend the insured against
   any "suit" ... to which this insurance does not ap-
   ply.

Def.'s Ex. 1, Policy ¶ 1. The Policy defines "person-
al and advertising injury" as:

   injury, including consequential "bodily injury"
   arising out of one or more of the following of-
   fenses:
   ...
   d. Oral, written or electronic publication of ma-
   terial that slanders or libels a person or organiza-
   tion or disparages a person's or organization's
   goods, products or services.

*Id.,* Policy ¶ 15(d). However, the Policy also ex-
cludes coverage for "expected" injury:

   This insurance does not apply to:
   a. Expected or Intended Injury
   ...
   (2) "Personal and advertising injury" arising out
   of an offense committed by, at the direction of or
   with the consent or acquiescence of the insured
   *with the expectation of inflicting "personal and
   advertising injury."*

*Id.,* Policy § B ¶ 1(a)(2) (emphasis added).

CRN brought this suit against Hartford seeking in-
surance coverage for a suit brought against CRN by
ConsumerLab in New York state court (the "Under-
lying Complaint"). The Underlying Complaint, cap-
tioned *ConsumerLab. com LLC v. Council for Re-
sponsible Nutrition,* No. 05-04998 (N.Y. Sup.Ct.

Westchester Co.), was filed on April 5, 2005. *See* Def.'s Ex. 2, Underlying Compl. The Underlying Complaint alleged that on January 12, 2005, CRN filed a request for investigation with the Federal Trade Commission ("FTC") alleging that ConsumerLab engaged in unfair business practices and requesting that the FTC investigate and bring an enforcement action against ConsumerLab. Underlying Compl. ¶ 15. CRN's request for investigation alleged that ConsumerLab engaged in a deceptive scheme whereby ConsumerLab required manufacturers of nutritional supplements to pay a fee to obtain favorable publicity for positive test results or to avoid unfavorable publicity for negative test results. *Id.* Manufacturers who refused to pay the fee allegedly received no publicity if their tests were positive, and ConsumerLab excluded their products from the list of "passing" products. *Id.* ConsumerLab alleged that CRN posted the request for investigation as well as a defamatory press release on its website and that CRN provided this information to various media outlets and an article referring to the request for investigation was published in the Wall Street Journal. *Id.* ¶ 9, 12, 16-17.

**\*2** The Underlying Complaint alleged eight causes of action including defamation, injurious falsehoods, trade libel, infliction of intentional harm, unfair trade practices, unfair competition, tortious interference with contracts, and tortious interference with prospective contractual relationships. Def.'s Ex. 2, Underlying Compl. On May 16, 2006, the New York Supreme Court dismissed for failure to state a claim all but one of the counts; the only count remaining was the count alleging defamation. Compl. ¶ 23-24. The New York court noted that the Underlying Complaint alleged that CRN made false statements about ConsumerLab with "actual malice." *Id.* ¶ 24. Subsequently, the Underlying Complaint was settled and dismissed. There was no finding or admission of liability, and there was no settlement payment by CRN. Pl.'s Mem. of P. & A. in Supp. of Mot. for Partial Summ. J. ("Pl.'s Mem.") at 1.

CRN tendered the Underlying Complaint to Hartford and requested coverage under its Policy. *Id.* ¶

30. Hartford disclaimed any duty to defend or indemnify pursuant to the exclusion for advertising injury "expected" by the insured. *Id.* ¶¶ 31-32. In this suit, CRN alleges that Hartford breached its duty of good faith and fair dealing by refusing to defend CRN with regard to the Underlying Complaint. The suit raises the issues of whether Hartford had a duty to defend, whether Hartford breached its duty of good faith and fair dealing by refusing to defend, and what damages CRN is entitled to recover for this alleged breach. The cross motions for summary judgment currently before the Court address only the first issue, whether Hartford had a duty to defend CRN in the underlying case.

## II. STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Diamond v. Atwood,* 43 F.3d 1538, 1540 (D.C.Cir.1995). Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson,* 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* at 675.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

If the evidence "is merely colorable, or is not signi-ficantly probative, summary judgment may be gran-ted." *Anderson,* 477 U.S. at 249-50 (citations omit-ted).

### III. ANALYSIS

*A. Choice of Law*

**\*3** Federal courts sitting in diversity must apply the conflicts of law rules of the state in which they sit. *Klaxon v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 491, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Thus, to determine what law to apply, this Court must apply the District of Columbia's choice of law analysis. *YWCA v. Allstate Ins. Co.,* 275 F.3d 1145, 1150 (D.C.Cir.2002).

To determine which jurisdiction's law applies in a contract case, the District of Columbia applies the substantial interest test, set forth in the *Restatement (Second) of Conflict of Laws § 188. Ideal Elec. Sec. Co., Inc. v. Int'l Fid. Ins. Co.,* 129 F.3d 143, 148 (D.C.Cir.1997); *see also Jaffe v. Pallotta Teamworks,* 374 F.3d 1223, 1227 (D.C.Cir.2004). Under this test, courts balance the competing in-terests of the two jurisdictions and apply the law of the jurisdiction with the more significant interest. *Id.* Courts consider (1) the place of contracting; (2) the place where the contract was negotiated; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, resid-ence, nationality, place of incorporation and place of business of the parties. Restatement (Second) of Conflict of Laws § 188 (1971). In insurance cases, where the insured is a D.C. citizen and the underly-ing events took place in the District of Columbia, courts have held that D.C. law applies. *See, e.g., Nationwide Mut. Ins. Co. v. Richardson,* 270 F.3d 948, 953 (D.C.Cir.2001); *Potomac Elec. Power Co., v. Cal. Union Ins. Co.,* 777 F.Supp. 968, 973 (D.D.C.1991).

Here, the parties agree that District of Columbia law applies because one of the insureds, Council for Responsible Nutrition, is a citizen of the District of Columbia and the underlying events took place here. Specifically, Council for Responsible Nutri-tion is a corporation which was formed in, and has its principal place of business in, the District of Columbia. Compl. ¶ 2. [FN1] In addition, the al-legedly defamatory actions taken by CRN--the re-quest for an FTC investigation and the posting of information on CRN's website--occurred in Wash-ington, D.C.

> FN1. Ms. Dickinson is a citizen and resid-ent of Maryland or Minnesota, Compl. ¶ 3, and Hartford is incorporated in Indiana with its principal place of business in Con-necticut. *Id.* ¶ 4.

*B. Duty to Defend*

An insurer's duty to defend is independent of its duty to indemnify. *Sherman v. Ambassador Ins. Co.,* 670 F.2d 251, 258-59 (D.C.Cir.1981). The duty to defend is broad, requiring the defense of all claims even if only one potentially falls within the terms of the policy. *Continental Cas. Co. v. Cole,* 809 F.2d 891, 895 (D.C.Cir.1987); *Commonwealth Lloyds Ins. Co. v. Marshall, Neil & Pauley, Inc.,* 32 F.Supp.2d 14, 18 (D.D.C.1998). The duty to defend is determined based on the allegations against the insured. *Continental,* 809 F.2d at 896 (citing *Boyle v. Nat'l Cas. Co.,* 84 A.2d 614, 615-16 (D.C.1951)). If it is possible that the complaint's allegations fall within the coverage of the policy, the insurance company must defend, even if it is ultimately re-lieved of any duty to indemnify. *Sherman,* 670 F.2d at 259. "It is appropriate to examine the complaint for all plausible claims encompassed within the complaint and to ascertain whether the allegations of the complaint state a cause of action within the policy coverage and give fair notice to the insurer that the insured is being sued upon an occurrence which gives rise to a duty to defend under the terms of the policy." *Am. Cont'l Ins. Co. v. Pooya,* 666 A.2d 1193, 1197 (D.C.1995).

**\*4** To determine whether there is a duty to defend, courts take the "eight corners" approach--courts compare the facts as they are alleged in the under-lying complaint with the insurer's obligation to de-fend as set forth in the insurance policy. *Interstate*

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                        Page 4
Not Reported in F.Supp.2d, 2007 WL 2020093 (D.D.C.)
**(Cite as: 2007 WL 2020093 (D.D.C.))**

*Fire & Cas. Co. v. 1218 Wisconsin, Inc.,* 136 F.3d 830, 833 (D.C.Cir.1998); *Travelers Indem. Co. v. United Food & Comm. Workers Int'l Union,* 770 A.2d 978, 986-87 (D.C.2001). "The obligation to defend is not affected by facts ascertained before the suit or developed in the process of litigation or by the ultimate outcome of the suit." *Travelers,* 770 A.2d at 987 (internal quotations omitted).

Any doubt regarding whether the allegations in a complaint come within the insurance policy must be resolved in favor of the insured, and any ambiguities regarding policy coverage must be construed in favor of the insured. *Continental,* 809 F.2d at 896; *Travelers,* 770 A.2d at 986-87.

> Since insurance contracts are written exclusively by insurers, courts generally interpret any ambiguous provisions in a manner consistent with the reasonable expectations of the purchaser of the policy. However, when such contracts are clear and unambiguous, they will be enforced by the courts as written, so long as they do not violate a statute or public policy.

*Travelers,* 770 A.2d at 986.

The insured bears the burden of showing that the underlying complaint comes within the policy's grant of coverage, and the insurer bears the burden of showing that an exclusion under the policy applies. *Cameron v. USAA Prop. & Cas. Ins. Co.,* 733 A.2d 965, 969 (D.C.1999). Hartford concedes that the Underlying Complaint alleges injury covered by the Policy since it covers "personal and advertising injury"--injury which arises out of publication of material that slanders or libels an organization or disparages its services. Def.'s Mem. at 2; *see* Def.'s Ex. 1, Policy ¶ 15(d). The dispute here is whether the "expected" injury exclusion applies--whether the offenses as alleged in the Underlying Complaint were committed by CRN "with the expectation of inflicting 'personal and advertising injury.' " *See* Def.'s Ex. 1, Policy § B ¶ 1(a)(2).

Hartford argues that the Underlying Complaint is replete with allegations of intentional misconduct, and thus the exclusion for injuries "expected" by the insured applies. *See, e.g.,* Underlying Compl. ¶

10 (CRN's filing of the FTC complaint was "intended" to defame); ¶ 11 (CRN "purposefully" initiated and conducted a defamatory media campaign); ¶ 13 (the "purpose" of CRN's media campaign was to silence ConsumerLab); & ¶ 22 (CRN's "purpose" was to "wreak vengeance upon" ConsumerLab).

It is not disputed that the Underlying Complaint contains allegations of intentional conduct. Even so, to obtain insurance coverage CRN does not have to show that *every* allegation in the Underlying Complaint came within the terms of the Policy. The Court must "examine the complaint for all plausible claims," *Pooya,* 666 A.2d at 1197, and determine whether *any* of the allegations would potentially be covered, *Continental,* 809 F.2d at 895. If it is possible that even one of the allegations of the Underlying Complaint is covered by the Policy, Hartford had a duty to defend. *Id.; Sherman,* 670 F.2d at 259. While the Underlying Complaint alleged that CRN acted intentionally, it also alleged that CRN acted negligently: "Defendants published their defamatory statements without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties." Underlying Compl. ¶¶ 31 & 40. Further, it alleged that CRN acted recklessly: "The defamatory statements were made by Defendants with knowledge of the falsity of such statements or with reckless disregard of whether or not such statements were false." Underlying Compl. ¶ 14. The counts for defamation and trade libel alleged that CRN acted with "actual malice." *Id.* ¶¶ 29 & 49. [FN2] Because "actual malice" in a defamation case can be established by showing that a defamatory statement was made with knowledge that it was false or with "reckless disregard" to the truth, *New York Times Co. v. Sullivan,* 376 U.S. 254, 279-80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the allegations of "actual malice" also constituted allegations of reckless conduct.

> FN2. In addition, the counts for defamation and injurious falsehood alleged that CRN in a "grossly irresponsible" manner. Underlying Compl. ¶¶ 30 & 39.

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 2007 WL 2020093 (D.D.C.)
**(Cite as: 2007 WL 2020093 (D.D.C.))**

**\*5** New York law applies to the interpretation of the Underlying Complaint in this case, as the Underlying Complaint was filed in state court in New York. *See Travelers Indem. Co.,* 770 A.2d at 987 n. 9 (the court looked to the law of the state where the underlying action was filed in order to determine the nature of the legal claims that the underlying complaint alleged). To demonstrate a cause of action for defamation under New York law, a plaintiff must show that the defendant made a false statement, published without privilege or authorization to a third party, by "at least a negligence standard of fault," and the statement either caused special damages or constituted negligence per se. *Rapp v. Robinson,* No. 115574/06, 2007 WL 1975001, at \* 1 (N.Y.Sup.Ct. July 6, 2007) (citing *Dillon v. City of New York,* 261 A.D.2d 34, 38, 704 N.Y.S.2d 1 (N.Y.App.Div. 1st Dept.1999)); *cf. Washington v. State Farm & Cas. Co.,* 629 A.2d, 27 n. 8 (D.C.1973) (cause of action for negligent defamation recognized in the District of Columbia). Thus, under New York law, defamation is actionable where it is intentional, reckless, or simply negligent. Since the Underlying Complaint against CRN alleged negligent *and* reckless defamation and the Policy covered advertising injury, such as defamation, which was not "expected" by the insured, Hartford had a duty to defend.

The D.C. Court of Appeals found a duty to defend in a case similar to this one where the underlying complaint alleged defamation and the policy excluded coverage for expected or intended acts that caused injury. In *Pooya,* 666 A.2d 1193, the court held that the insurance company breached its duty to defend when it disclaimed coverage for an underlying complaint that alleged libel and slander done maliciously, intentionally, and with reckless disregard as to the truth. The insurer had a duty to defend because the professional liability policy at issue covered "occurrences," defined as accidents, errors, and omissions "neither expected nor intended by the insured" which result in injuries and give rise to damages. *Id.* at 1194. The court emphasized that because relief could be granted on the complaint based on negligence or recklessness, the exclusion for expected or intentional conduct did

not apply and the complaint was within the scope of the policy. *Id.* at 1199.

In *Fuisz v. Selective Ins. Co. of Am.,* 61 F.3d 238 (4th Cir.1995), the Fourth Circuit interpreted an insurance policy even more like the one at issue here. The policy at issue in *Fuisz* expressly covered defamation but also excluded coverage for acts committed with intent to cause injury. *Id.* at 240. Where the underlying suit against the insured alleged defamation, committed with recklessness and actual malice, the court found that the insurer had a duty to defend. *Id.* at 245. [FN3]

> FN3. The Fourth Circuit in *Fuisz* applied Virginia law. The laws of Virginia regarding the duty to defend and the interpretation of insurance contracts generally are the same as those in the District of Columbia. *Compare Fuisz,* 61 F.3d at 244 n. 3. *with Continental,* 666 A.2d at 1197-98.

Hartford argues that injuries caused by CRN's allegedly defamatory statements were the "natural and probable results" of the insured's actions and thus were not covered by the Policy. Hartford reasons that courts have determined that policies that cover "accidents" or "occurrences" do not cover injuries that "were the natural or probable result of the insured's actions reasonably foreseeable by him or a reasonably prudent man in his position." *Byrd v. Nationwide Mut. Ins. Co.,* 415 A.2d 807, 809 (D.C.1980). Thus, for example, an insured who was convicted of second-degree murder was not entitled to insurance coverage when he was sued in a wrongful death action related to the same murder. *Travelers Indem. Co. v. Walburn,* 378 F.Supp. 860, 861-62 (D.D.C.1974). The *Walburn* court held that because the insured intended or expected injury from his actions, the "occurrence" was not covered. *Id.* at 865-66; *accord Freightquote.com, Inc. v. Hartford Cas. Ins. Co.,* 397 F.3d 888, 893-94 (10th Cir.2005) (insurer did not have a duty to defend a suit alleging tortious interference under the "advertising injury" provision of the insurance policy because the natural and probable consequence of the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

insured's actions was injury and the policy excluded coverage of expected injuries).

**\*6** *Byrd, Walburn,* and *Freightquote* are inapposite. In *Byrd* and *Walburn,* the courts construed insurance policies that covered "occurrences" or "accidents." In this case, the Policy provides offense-based coverage--it expressly covers "advertising injury." Offense-based coverage is triggered by the commission of the specified offense and does not require proof of an accidental occurrence. *Am. Guar. & Liab. Ins. Co. v.1906 Co.,* 273 F.3d 605, 612 (5th Cir.2001). While the policy in *Freightquote* was an offense-based policy that covered advertising injury, the underlying complaint in that case alleged tortious interference, an intentional tort. A claim for tortious interference cannot be based on negligent or reckless acts. Because the underlying complaint alleged intentional conduct and the insurance policy excluded coverage for intentional conduct, the insurer had no duty to defend. *Id.* at 894. Here, by contrast, the Underlying Complaint alleged negligent, reckless, and intentional defamation. Because a plaintiff can recover for negligent and reckless defamation under New York law and the tort is not dependent upon intentional conduct, the Underlying Complaint stated an actionable claim based on negligent and reckless behavior that was not excluded under the Policy.

Hartford also argues that CRN had a legitimate privilege defense to the Underlying Complaint, and thus that the duty to defend did not apply. [FN4] The possibility of a successful defense, however, does not vitiate the duty to defend. The duty to defend is determined by examining the allegations of the complaint, *Pooya,* 666 A.2d at 1197, and is not affected by facts ascertained before the suit or developed during litigation, nor is it affected by the outcome of the litigation. *Travelers,* 770 A.2d at 987. In *Travelers,* the court found that the duty to defend applied to a complaint alleging libel, even if the complaint was subject to a defense of privilege. "If the statements attributed to [the insured] are determined to be privileged and non-actionable--an issue we do not decide--[the] complaint for libel against [the insured] may be dismissed. That pos-

sibility, however, does not negate [the insurer's] duty to defend [the insured] if the complaint against it makes out a facial claim for libel" within the terms of the policy. *Id.* at 990 n. 15. In determining whether the duty to defend applies, the Court is limited to considering the "eight corners" of the Underlying Complaint and the Policy.

FN4. Hartford asserts that CRN had a defense to the defamation claim in the Underlying Complaint based on privilege under the *Noerr-Pennington* doctrine, arising from *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Under this doctrine, citizens who petition the government for governmental action cannot be prosecuted. *Alfred Weissman Real Estate, Inc. v. Big V Supermarkets, Inc.,* 268 A.D.2d 101, 707 N.Y.S.2d 647, 652 (N.Y.App.Div.2d Dept.2000). Thus, the doctrine provides a privilege defense for statements contained in requests for investigation like the one CRN filed with the FTC. The doctrine is subject to a "sham" exception, barring the privilege where the party who petitioned the government did so for the purpose of harassment. Hartford contends that ConsumerLab had to allege intent in order to avoid an anticipated privilege defense in the underlying suit. *See Alfred Weissman,* 707 N.Y.S.2d at 654. Hartford's argument is unavailing. Even if the Court were to go outside the "eight corners" of the documents, it is not clear that the privilege would have provided a complete defense. The Underlying Complaint alleged libel for statements posted on CRN's website and contained in a press release, not only for statements contained in the request for investigation filed with the FTC, and it is not clear that these other statements arose from objectively baseless proceedings.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2020093 (D.D.C.)
**(Cite as: 2007 WL 2020093 (D.D.C.))**

In conclusion, an examination of the "eight corners" of the Underlying Complaint and the Policy demonstrate that Hartford had a duty to defend CRN in the underlying suit. The allegations of the Underlying Complaint included allegations of negligent and reckless defamation, actionable under New York law. The Policy covered advertising injury (such as defamation) that was not "expected" by the insured, such as the negligent and reckless conduct alleged in the Underlying Complaint.

### IV. CONCLUSION

**\*7** For the foregoing reasons, CRN's motion for summary judgment on the duty to defend [Dkt. # 13] will be granted, and Hartford's motion for summary judgment on the duty to defend [Dkt. # 14] will be denied. A memorializing order accompanies this Memorandum Opinion.

Not Reported in F.Supp.2d, 2007 WL 2020093 (D.D.C.)

END OF DOCUMENT

**TAB B**

Slip Copy                                                                                                    Page 1
Slip Copy, 2007 WL 2615448 (S.D.N.Y.)
(Cite as: 2007 WL 2615448 (S.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
FEINER FAMILY TRUST, Individually and on
Behalf of All Others Similarly
Situated, and Derivatively on Behalf of Xcel-
era.com, Inc., a Cayman Islands
Corporation, Plaintiff,
v.
VBI CORPORATION, Alexander M. Vik, Gustav
M. Vik, and Michael J. Kugler,
Defendants,
and
Xcelera.com, Inc., a Cayman Island Corporation,
Nominal Defendant.
No. 07 Civ.1914(RPP).

Sept. 11, 2007.

Abraham Fruchter & Twersky LLP, Attn: Jeffrey
Abraham, Jorge Salva, New York, NY, for
Plaintiff.

Wilmer Cutler Pickering Hale & Dorr L.L.P., Attn:
Peter Macdonald, New York, NY, for Director De-
fendants.

Becker, Glynn, Melamed & Muffly, LLP, Attn:
Robin Alperstein, New York, NY, for Xcelera.com,
Inc.

**OPINION AND ORDER**

ROBERT P. PATTERSON, JR., U.S.D.J.

**\*1** On March 5, 2007, Feiner Family Trust
("Feiner"), which is a shareholder of Xcelera.com,
Inc. ("Xcelera"), filed a two-count complaint.
Count I is a derivative claim on behalf of Xcelera
against Gustav Vik, Alexander Vik, and Michael
Kugler ("Director Defendants") for breach of fidu-
ciary duty. Count II is a purported class action
claim against the Director Defendants and VBI
Corporation ("VBI") for breach of fiduciary duties
owed to all those who currently own Xcelera com-
mon stock, or who have sold Xcelera common
stock to Gustav Vik and Alexander Vik ("Vik De-

fendants") during the time of the alleged wrongful
conduct.

On April 3, 2007, Xcelera moved for dismissal of
the Complaint for (1) lack of diversity jurisdiction;
(2) lack of Article III standing; (3) lack of standing
to bring a derivative suit; (4) failure to state a claim
for breach of fiduciary duty; and (5) failure to com-
ply with the heightened pleading requirements of
Rule 9(b) of the Federal Rules of Civil Procedure.
The Director Defendants have joined in Xcelera's
motion to dismiss and adopted the positions of
Xcelera's motion papers by reference. [FN1] As of
the date of oral argument on this motion, July 18,
2007, service had not yet been effected on VBI.

> FN1. Additionally, the Director Defend-
> ants have moved for dismissal based on
> lack of personal jurisdiction. Kugler also
> claims insufficient service of process. The
> issues raised in Xcelera's motion being dis-
> positive, these claims are not addressed.

For the foregoing reasons, Defendants' motion is
granted in part, and Plaintiff's complaint is dis-
missed.

**I. FACTUAL ALLEGATIONS** [FN2]

> FN2. Since this is the review of a motion
> to dismiss, the allegations in the Complaint
> as accepted as true. *Hill v. City of New
> York,* 45 F.3d 653, 657 (2d Cir.1995).

**A. The Parties**

Xcelera is a Cayman Islands corporation "focused
on founding, developing, operating and financing
technology companies and managing its portfolio of
assets." (Compl.¶ 9.) Xcelera's common stock-
-formerly a registered equity with the SEC--was
traded on the American Stock Exchange ("AMEX")
from 1986 until December 14, 2004 when it was
delisted. (*Id.* ¶¶ 9, 24.) Subsequently, Xcelera's
stock was traded exclusively over-the-counter--on
the "Pink Sheets"-- until November 3, 2006 when

Slip Copy, 2007 WL 2615448 (S.D.N.Y.)
**(Cite as: 2007 WL 2615448 (S.D.N.Y.))**

the SEC revoked the registration of Xcelera's securities. (*Id .* ¶ 24.)

Xcelera's major shareholders are VBI Corporation ("VBI"), [FN3] Alexander Vik, and Gustav Vik, owning 61.2%, 9.8% and 5.3%, respectively, of the company's voting securities as of June 30, 2003. (*Id.* ¶¶ 10-12.) Alexander Vik is Chairman and CEO of Xcelera. (*Id.* ¶ 11.) Gustav Vik is a Director and the Executive Vice President, Treasurer and Secretary of Xcelera. (*Id .* ¶ 12.) Defendant Michael Kugler--not alleged to be a shareholder--is a Director and the Executive Vice President of Xcelera; and as such, is responsible for managing financial operations and investor relations. (Compl.¶ 13.) Plaintiff, Feiner Family Trust, is a minority holder of Xcelera common stock. (*Id.* ¶ 8.)

> FN3. VBI is a private investment firm incorporated in the British Virgin Islands, and it is owned by Alexander Vik, Gustav Vik, and Erik Vik. (Compl.¶ 10.) Alexander Vik is VBI's Chairman and CEO. (*Id.* ¶ 11.)

**B. The Alleged Scheme**

The Complaint alleges a fraudulent scheme designed by the controlling shareholders of Xcelera--Alexander M. Vik, Gustav M. Vik, and VBI Corporation-- to purchase Xcelera common stock from minority shareholders at severely depressed prices. (*Id.* ¶¶ 54-55.) The scheme entailed deliberately depressing Xcelera's common stock price by failing to make required SEC filings or publish any information regarding the company's assets and operations to investors or shareholders. Since Xcelera's securities were registered under section 12 of the Exchange Act, the company was required to file annual financial reports with the SEC pursuant to Rule 13a-1 promulgated under section 13(a) of the Exchange Act. (*Id.* ¶ 29.) Xcelera's agreement with AMEX similarly required the company to "file certain information, documents and reports with the SEC in order to provide adequate public disclosure regarding its financial and operation results." (*Id.*)

**\*2** On August 2004, Xcelera failed to file a report

with the SEC for the fiscal year ending January 31, 2004 as required. (*Id.* ¶ 34.) [FN4] Although Xcelera's website represented that the company intended to file by November, 15, 2004, the filing was never made. (*Id.* ¶ 37.) As a result, on December 1, 2004, AMEX applied to the SEC to strike Xcelera's common stock from listing and registration on the exchange. (Compl.¶¶ 43-44.) [FN5] On December 13, 2004, the SEC granted AMEX's application. (*Id.* ¶ 45.) As a result of Amex's delisting, Xcelera shares were only traded over-the-counter on the "Pink Sheets." (*Id.* ¶ 46.) Thereafter, Xcelera has failed to file any reports with the SEC since August 2, 2005 when Xcelera disclosed it would not file an annual report for the fiscal year ending January 31, 2005. (*Id.* 47.)

> FN4. On February 3, 2004, the Xcelera received a letter from the SEC seeking additional information to determine if Xcelera qualified as an "investment company" under the Investment Company Act of 1940 ("ICA"), which would subject Xcelera to the ICA's regulations and disclosure requirements. (Compl.¶¶ 31-32.) On April 15, 2004, Xcelera responded by letter including some supplemental information. (*Id.* ¶ 33.) The SEC responded by letter on August 16, 2004, requiring Xcelera to demonstrate that it was not an investment company under the ICA. (*Id.* ¶ 36.) Subsequently, Xcelera has not disclosed to the public whether the SEC declared Xcelera an investment company under the ICA. (*Id.* ¶ 38.)

> FN5. On September, 20, 2004, AMEX notified Xcelera that it was going to initiate delisting procedures. (Compl.¶ 40.) On September 27, 2004, Xcelera appealed AMEX's determination and requested a hearing. (*Id.* ¶ 41.) On November 4, 2004, AMEX notified Xcelera that its appeal was denied. (*Id.* ¶ 42.)

On August 28, 2006, the SEC temporarily suspended the trading of Xcelera securities due to the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

company's continuing failures to file periodic reports containing current financial and operation information. (*Id.* ¶ 48.) On September 27, 2006, the SEC issued an Order Instituting Proceedings to determine whether the registration of Xcelera securities should be suspended or revoked. (*Id.* ¶ 49.) On October 27, 2006, Xcelera notified the SEC that Xcelera was not contesting the proceedings and had no objection to the revocation of the registration of its securities. (*Id.* ¶ 50.) As a result of Xcelera's failure to file an answer, the SEC revoked the registration of Xcelera's securities on November 3, 2006. (*Id.* ¶ 52.) Xcelera's securities are no longer permitted to be traded in the U.S. or elsewhere in the world. (*Id* . ¶ 53.) The delisting by AMEX and the SEC's revocation of Xcelera securities are alleged to have been designed by the Vik Defendants as part of a scheme to deprive Plaintiff and minority stockholders of knowing the intrinsic value of Xcelera securities, thereby weakening Xcelera's stock for the Defendants' own personal benefit. (*Id.* ¶ 54.) The alleged scheme involves the direct solicitation of Xcelera's minority shareholders to sell their holdings to Xcelera at artificially low prices. (*Id.* ¶ 55.) With this knowledge, Defendant Kugler, a Xcelera director, "in contact with Xcelera shareholders is offering to buy and has bought their shares of Common Stock on behalf of Xcelera for between twenty and twenty-five cents per share." (*Id.* ¶ 55.) [FN6] These "solicitations have failed to disclose any information regarding Xcelera and its subsidiaries and operations, which, once released to the public, could result in significant increases to the Company's market value." (*Id.* ¶ 55.)

> FN6. The Complaint does not allege that Plaintiff was solicited by Kugler or sold any of its own shares to Xcelera.

### C. The Causes of Action

Count I of the Complaint realleges ¶¶ 1-56, and asserts a derivative claim brought on behalf of Xcelera against the Director Defendants for breach of fiduciary the duties of care, loyalty and good faith to the company in connection with their failure to file timely reports with the SEC. (*Id.* ¶ 56-58.) It

charges that Xcelera has suffered substantial damages based on the following a) depriving its stockholders from trading its securities in a public market resulting from AMEX delisting Xcelera's securities; b) depriving its shareholders and the investment community from obtaining accurate and truthful information about Xcelera by consenting to have the SEC delist its securities; and c) causing a diminution in the value of company shares, so that the Vik Defendants could purchase stock at less than its intrinsic value, thereby perpetuating fraud on the minority under Cayman Islands law. (*Id.* ¶¶ 59-60.) Count II is a proposed class action claim brought on behalf of the class of minority shareholders similarly situated to Plaintiff against the Director Defendants and VBI for breach of fiduciary duties in connection with their solicitation of minority shareholders to sell Xcelera common stock without disclosing any information about the company. (*Id.* ¶¶ 63-69 .)

### II. DISCUSSION

**\*3** Xcelera's motion to dismiss rests on five grounds (1) lack of diversity jurisdiction; (2) lack of Article III standing; (3) lack of standing to bring a derivative suit under Cayman Islands law; (4) failure to state a claim for breach of fiduciary duty under Cayman Islands law; and (5) failure to comply with the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Defendants' motions to dismiss for lack of diversity jurisdiction and for lack of Article III standing are denied. The motion to dismiss Count I of the Complaint for lack of standing to bring a derivative suit under Cayman Islands law is granted. The motion to dismiss Count II for failure to state a claim for breach of fiduciary duty under Cayman Islands law is also granted. Since no counts of the Complaint remain, the issue of whether the Complaint fails to comply with the Rule 9(b) is not addressed in this opinion.

### A. Jurisdiction

Before addressing the merits of either count of the complaint, the Court must address Defendants' con-

tention that it (1) does not have diversity jurisdiction and (2) that Plaintiff does not have Article III standing for Count II of the claim. *See Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.,* 87 F.3d 44, 47 (2d Cir.1996) ("[Courts] must address jurisdictional questions before reaching the merits.").

### 1. Diversity Jurisdiction

Based on the May 3, 2007 Affidavit of Barry Feiner submitted by Plaintiff-- stating that Mr. Feiner is the sole Trustee of the Feiner Family Trust and a citizen of New York--the Director Defendants do not contest subject matter jurisdiction based on diversity. [FN7] For purposes of diversity, a trust is a citizen of the state where its trustee is domiciled. *Navarro Sav. Ass'n v. Lee,* 446 U.S. 458, 462 (1980). Thus, since Xcelera and Plaintiff are citizens of different states, and the other Defendants are citizens of different states than the Plaintiff, diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 at this stage of the case. *See Night Hawk Ltd. v. Briarpatch Ltd.,* 263 F.Supp.2d 700, 702 (S.D.N.Y.2003) (a foreign corporation is a citizen of its principal place of business and place of incorporation). [FN8]

> FN7. *See* Memorandum of Law in Support of Michael J. Kugler's Motion to Dismiss, at n. 2; Memorandum of Law in Support of Alexander M. Vik's Motion to Dismiss, at n. 2; Memorandum of Law in Support of Gustav M. Vik's Motion to Dismiss, at n. 2.

> FN8. Plaintiff provided an unopposed declaration stating that Xcelera is a Cayman Islands corporation with its principal place of business in either Monaco or Connecticut. (*See* Declaration of Jeffrey S. Abraham in Support of Plaintiff's Opposition to Nominal Defendant Xcelera Inc.'s Motion to Dismiss, ¶¶ 3-5.)

### 2. Article III Standing

Defendants have moved that Count II--a class action against Kugler, Alexander Vik, Gustav Vik, and VBI for breach of fiduciary duties to Plaintiff and other minority shareholders--be dismissed for lack of subject matter jurisdiction because Plaintiff lacks standing to sue under Article III of the Constitution.

"Article III of the U.S. Constitution requires that a 'case' or 'controversy' be present in order to confer [jurisdiction] on federal courts for a particular claim; standing to sue is an essential component of that requirement." *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997) (citing *Allen v. Wright,* 468 U.S. 737, 750 (1984) and *Warth v. Seldin,* 422 U.S. 490, 498 (1975)). In order to have standing, three elements must be satisfied. First, Plaintiff must have suffered an injury in fact, i.e., an actual or threatened injury which is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992). Second, there must be a causal connection between the injury and the alleged conduct of the defendants. *Id.* "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " *Id.* at 561. Plaintiff bears the burden of establishing standing under Article III. *See id.; see also Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997).

**\*4** In order to have Article III standing for its class action claim-- Count II--Plaintiff must have standing to litigate its own claim for breach of fiduciary duty independently. *See Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 40 n. 20 (1976).

Count II alleges that Defendants' breach of their fiduciary duty of disclosure has led "Plaintiff and members of the Class [to] suffer[ ] substantial damages resulting from the solicitation of their Xcelera shares at significantly less than the stock's intrinsic value." (Compl.¶ 67.) Although the Complaint alleges that Kugler offered to buy and has bought shares of Xcelera Common Stock on behalf of the Company from certain Xcelera shareholders, (*see id.* ¶ 55), the Complaint does not allege that

Plaintiff was one of these shareholders. Thus, Plaintiff has not established that it was injured by selling its stock at a reduced rate or by being solicited to do so. [FN9]

> FN9. Instead, as alleged, this scheme would theoretically increase the value of all unsold shares, including Plaintiff's. *See infra* n. 13.

The Complaint also alleges that Plaintiff was peripherally damaged by Defendants' management of Xcelera, due to its decision to solicit and purchase shares from other minority shareholders at drastically reduced rates. Specifically, the Complaint alleges that Plaintiff was injured by Defendants' fraud in (1) permitting AMEX's delisting of Xcelera's securities; (2) allowing the SEC's revocation of Xcelera's security registration; (3) thwarting the dissemination of accurate and truthful information concerning Xcelera; and (4) causing the resultant drastic diminution in market value of Xcelera stock. (Compl.¶ 59.) [FN10] The relevant inquiry is whether this type of harm constitutes an "injury in fact" for purposes of Article III standing. *Lujan,* 504 U.S. at 560.

> FN10. Although these allegations are contained in Count I, they are realleged in Count II. (Compl.¶ 63.)

Defendants rely on *Salsitz v. Peltz,* 210 F.R.D. 95, 99 (S.D.N.Y.2002) for the proposition that a solicitation of shares without more is not compensable injury sufficient to confer standing. In *Salsitz,* the court held that a Plaintiff's claim that he was "forced to decide" whether to tender his stock was not an "injury in fact" where Plaintiff actually benefited from his decision not to tender and did not rely on any material misrepresentations in making this decision. *Salsitz* is not applicable to the case at hand. Plaintiff claims it has been, and is being, deprived of a market in which to sell stock rather than being forced to decide whether or not to tender stock. Here Plaintiff's claim that Defendants' alleged fraudulent conduct deprived Plaintiff of any market for its stock is not conjecture or hypothetic-al. Instead, it is actual and sufficiently concrete to constitute an injury in fact and satisfy Article III's "case or controversy" requirement. *See Lujan,* 504 U.S. at 560.

Subject matter jurisdiction exists for both counts of the Complaint. Therefore, the Court will proceed to analyze the merits of the Motion to Dismiss.

## B. Standing to Bring Derivative Claim Under Cayman Islands Law

Count I of the Complaint is a derivative claim brought under Cayman Islands law. (Compl.¶ 60.) It alleges that Xcelera's failure to comply with SEC regulations, its expulsion from AMEX, and the revocation of its registered securities by the SEC, were part of a scheme by Defendants to defraud the Plaintiff and other members of the class from knowing the intrinsic value of Xcelera's stock, thereby artificially weakening Xcelera's stock price for Defendants' own personal benefit. (*Id.* ¶ 54.) It also alleges that the scheme involves the direct solicitation of minority shareholders to sell their shares at artificially low prices; that as a result of Defendants' failure to publish Xcelera's financial and operating results, shareholders are compelled to relinquish their stock based entirely on information provided by the Vik Defendants and their agents; and that if information about Xcelera was released to the public, it could result in significant increases in Xcelera's market value. (*Id.* at ¶ 55.) Accordingly, the Complaint asserts that the Defendants have fraudulently reaped, and are continuing to fraudulently reap, any potential appreciation in Xcelera's stock entirely for themselves. (*Id.*) Xcelera is alleged to have been injured as a result of the Directors' reckless disregard of their fiduciary duties by failing to use the information to advance commercial and financial opportunities for the company's benefit. (*Id.* at ¶ 62)

**\*5** A federal district court sitting in diversity must apply the choice of law analysis of the state where the court sits. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496 (1941). Since Xcelera is incorporated in the Cayman Islands, (Compl.¶ 9),

Cayman Islands law applies to Plaintiff's derivative claims and claims for breach of fiduciary duty. *See Hausman v. Buckley,* 299 F.2d 696, 702 (2d Cir.1962) (summarizing New York's "internal affairs" choice-of-law rule to mean that "[t]he right of a shareholder to object to conduct occurring in the operation of the corporate enterprise is determined by the law of the state of incorporation").

Derivative shareholder suits are limited under Cayman Islands law by the English common law doctrine created by *Foss v. Harbottle,* [1843] 2 Hare 461; *Schultz v. Reynolds,* [1992-93] C.I.L.R. 59 (Cayman Islands A.C.). *Foss v. Harbottle* established that shareholders cannot ordinarily bring derivative actions for wrongs to the company since the company itself would be the proper plaintiff. *Schultz,* [1992-93] C.I.L.R. at 63-64. There are a number of narrow exceptions to this rule. *Id.* at 64. To claim standing in this case, Plaintiff invokes the "fraud on the minority" exception to the rule in *Foss v. Harbottle.* [FN11] This exception was "introduced on the ground of necessity alone in order to prevent a wrong going without redress." *Konamaneni v. Rolls Royce (India) Ltd.,* [2002] 1 WLR 1269, 1277 (Chancery Division) (quoting *Smith v. Croft,* [1988] 1 Ch. 114, 185). For this exception to apply, "[t]here must be a minority who are prevented from remedying the fraud or taking any proceedings because of the protection given to the fraudulent shareholders or directors by virtue of their majority." *Daniels v. Daniels,* [1978] Ch. 406, 408 (Eng. Ch.1977).

> FN11. Specifically, Plaintiff asserts that "[a]s a result of their wrongful conduct and actions in violation of their fiduciary duties, the Director Defendants have caused Defendants to perpetrate a 'fraud on the minority' shareholders of Xcelera within the meaning of the law of the Cayman Islands." (*Id.* ¶¶ 60-61.)

A claim of fraud on the minority requires Plaintiff to show that the alleged wrongdoers (1) control the company; and (2) committed "fraud." *See Konamaneni,* [2002] 1 WLR at 1278; *see also In re*

*Tyco Int'l., Ltd.,* 340 F.Supp.2d 94, 102 (D.N.H.2004). There is no dispute that the Vik Defendants control the company. However, fraud in this context differs from the American understanding of the term in that is refers to "self-dealing" at the company's expense. *See Konamaneni,* [2002] 1 WLR at 1278 ("Fraud includes all cases where the wrongdoers are endeavouring, directly or indirectly, to appropriate themselves money, property or advantages which belong to the company or in which the other shareholders are entitled to participate."); *Daniels,* [1978] Ch. at 414 (stating that "a minority shareholder may sue where directors use their powers, intentionally or unintentionally, fraudulently or negligently, in a manner which benefits themselves at the expense of the company"); *see also Seghers v. Thompson,* No. 06 Civ. 308, 2006 WL 2807203, at *4 (S.D.N.Y. Sept. 27, 2006); *In re Tyco,* 340 F.Supp.2d at 102 ("English courts speak of fraud in this context in a broader equitable sense in which control is misused to benefit the wrongdoers at the company's expense."). "Apart from the benefit to themselves at the company's expense, the essence of the [exception] seems to be an abuse or misuse of power." *Schultz,* [1992-93] C.I.L.R. at 78 (quoting *Estamanco (Kilner House) Ltd. v. G.L.C.* [1982] 1 All E.R. 437, 445).

**\*6** There is no dispute over whether Defendants control Xcelera; the Vik Defendants and VBI own more than 76% of the voting securities. (Compl.¶¶ 10- 12.) [FN12] However, the Complaint fails to allege that Defendants misused this control "in a manner which benefits themselves at the *expense of the company." Daniels,* [1978] Ch. 406 at 414 (emphasis added). Assuming the Complaint's allegations to be true, the Complaint does not state facts showing that the Defendants have benefited themselves at the expense of Xcelera. Thus, the "fraud on the minority" exception to the rule in *Foss v. Harbottle* does not apply. *See Daniels,* [1978] Ch. 406 at 414; *see also In re Tyco,* 340 F.Supp. at 99.

> FN12. The Complaint alleges that Kugler "lacks independence from the Vik [Defendants]" since they "exert influence over Kugler's compensation by virtue of

their positions as Directors, officers and controlling shareholders of the Company." (Compl.¶ 17(d).)

The Complaint only alleges that Xcelera, through Kugler, solicited and purchased shares from minority shareholders at artificially low prices. (See Compl. ¶ 55.) There are no allegations that any shares from minority shareholders were acquired directly by the individual Defendants at artificially low prices. Thus, the alleged scheme would benefit the majority shareholders, and remaining minority shareholders, by increasing the value of the company [FN13] at the expense of any minority shareholders who disposed of their shares at deflated prices. The fraud on the minority exception, however, requires that self-dealing to be at the expense of the *company*, *Daniels*, [1978] Ch. 406 at 414. As Plaintiff's counsel noted at oral argument, "[i]n theory, the company hasn't suffered any damages itself. In theory, the damages are really at the shareholder level ...." (Tr. at 23.) Thus Plaintiff, having failed to allege fraud on the minority properly, lacks standing to sue on Xcelera's behalf under Cayman Islands law.

> FN13. The buyback scheme would theoretically increase the value of all Xcelera stock, benefitting Plaintiff in the same proportion as the majority shareholders since the Complaint does not allege that Plaintiff sold any stock. (See Tr. at 22. (Plaintiff's counsel represented that Plaintiff "has not actually sold its stock back to the Viks.")).

**C. Failure to State a Direct Claim for Breach of Fiduciary Duty**

Count II, the purported class action claim, alleges that the Director and Executive defendants breached their fiduciary duties of disclosure in connection with their solicitation of minority shareholders to sell Xcelera stock without disclosing any information about Xcelera. (Compl.¶ 64.) That duty was triggered "once the Defendants or their agents engaged in contact with minority shareholders for the purpose of soliciting the sale of their Xcelera

shares." (*Id.* ¶ 65.) Count II also alleges that the Defendants concealed all information about Xcelera from their solicitations of minority shareholders, that Plaintiff and members of the class have suffered damages resulting from the solicitation of Xcelera's shares at significantly less than the stocks' intrinsic value, and that "once information regarding Xcelera becomes public, the Vik Defendants will benefit from the full market value of those Xcelera shares that they have acquired from Plaintiff and members of the class." (*Id.* ¶¶ 65, 77.)

Plaintiff's counsel at oral argument acknowledged that Plaintiff had not been solicited by the Defendants to sell its stock in Xcelera, and had not sold its shares in Xcelera to any Defendant or Xcelera. Accordingly, Plaintiff is not a proper party to bring the claims in Count II. Fed.R.Civ.P. 23.

*7 Count II of the Complaint must also be dismissed for failure to state a claim under Cayman Islands law. First, VBI's sole role is as a majority shareholder, and under Cayman Islands law, majority shareholders do not owe fiduciary duties to the company or to minority shareholders. *See Phillips v. Manufacturer's Secs. Ltd.,* [1917] 116 L.T. 290, 296. Kugler, Alexander Vik, and Gustav Vik are Directors and Officers of Xcelera. Accordingly, Plaintiff cannot sustain a claim for breach of fiduciary duties against VBI or the other Defendants in their capacity of shareholders, since under Cayman Islands law, majority shareholders do not have any fiduciary duty to Plaintiff that could be breached.

Secondly, a director does not owe any fiduciary duties to minority shareholders solely based on his or her relationship to the company. *See Peskin v. Anderson,* [2001] 1 B.C.L.C. 372 ¶ 29 (noting that "directors of a company are not trustees for individual shareholders, and may purchase their shares without disclosing pending negotiations for the sale of the company's undertaking" (quoting *Percival v. Wright* [1902] 2 Ch 421)). Nevertheless, a duality of duties may exist where directors, in addition to their duties to the company, owe additional duties to shareholders, that if breached, would permit shareholders to bring direct actions against the dir-

ectors. *Peskin,* [2001] 1 B.C.L.C. 372 ¶¶ 31-32. "The fiduciary duties owed to the shareholders ... are dependent on establishing a special factual relationship between the directors and the shareholders in the particular case." *Id.* ¶ 33. For example, "[e]vents may take place which bring the directors of the company into direct and close contact with the shareholders in a manner capable of generating fiduciary obligations ." *Id. Peskin* lists examples of what types of circumstances could lead a fiduciary relationship between directors and shareholders

There are, for example, instances of the directors of a company making direct approaches to, and dealing with, the shareholders in relation to a specific transaction and holding themselves out as agents for them in connection with the acquisition or disposal of shares; or making material representations to them; or failing to make material disclosure to them of insider information in the context of negotiations for a take-over of the company's business; or supplying to them specific information and advice on which they have relied. These events are capable of constituting special circumstances and of generating fiduciary obligations, especially in those cases in which the directors, for their own benefit, seek to use their position and special inside knowledge acquired by them to take improper or unfair advantage of the shareholders.

*Id.* ¶ 34; *see also Kohn v. Meehan,* (Transcript Smith Bernal), at ¶ 101 (Ch. Div.2003) ("[I]n special circumstances a director may, in addition to the fiduciary duties owed by him to the company, also owe a duty to individual shareholders personally. Where such a duty exists and breach of it has caused loss to a shareholder directly (e.g., by inducing him to part with his shares at an undervalue), the shareholder may bring an action against the director to recover his loss.").

**\*8** Defendants argue that Count II of the Complaint must be dismissed since it pleads no facts to establish the special circumstances necessary under Cayman Islands law to create a fiduciary duty between the Xcelera directors and Plaintiff as a minority shareholder. Although the Complaint alleges that Kugler solicited and purchased shares from minor-

ity shareholders, it does not allege that Plaintiff was solicited or sold any of its own shares to Xcelera or any other Defendant. Nor does the Complaint allege any "direct or close contact" between the Director Defendants and Plaintiff. *Peskin,* [2001] 1 B.C.L.C. 372 ¶ 33. In short, no facts were pled that indicate any relationship between the Director Defendants and Plaintiff aside from the fact that the Director Defendants are directors of Xcelera, and Plaintiff owns shares in Xcelera. Since the Complaint fails to state 1) any facts which constitute a "special factual relationship" between Director Defendants and Plaintiff; or 2) facts which show the Director Defendants have taken advantage of Plaintiff for their own benefit, as required by Cayman Islands law, *see Peskin,* [2001] 1 B.C.L.C. 372 ¶ 33; *Kohn* ¶ 101, Count II does not state a claim for breach of fiduciary duty and must be dismissed.

### III. CONCLUSION

Defendants' motion is granted in part. Count I of the Complaint is dismissed for lack of standing to bring a derivative suit, since the allegations in the Complaint do not fall within the "fraud on the minority" exception to the rule in *Foss v. Harbottle.* Count II is dismissed for failure to state a claim for breach of fiduciary duty under Cayman Islands law, since allegations in the Complaint do not demonstrate that VBI or the Director Defendants owed a fiduciary duty to Plaintiff. The Complaint is dismissed with leave to move to file an amended complaint within thirty days of the date of this opinion.

IT IS SO ORDERED.

Slip Copy, 2007 WL 2615448 (S.D.N.Y.)

END OF DOCUMENT

**TAB C**

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 2285598 (S.D.N.Y.)
**(Cite as: 2006 WL 2285598 (S.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Ahmad HBOUSS and AAAH Holdings Inc.,
v.
COCA-COLA ENTERPRISES INC. and John Does
1-20, Defendants.
**No. 05 CIV. 7965(DLC).**

Aug. 9, 2006.

Richard Turyn, Vano Haroutunian, Ballon Stoll
Bader & Nadler PC, New York, NY, For Plaintiffs.

Michael E. Johnson, Alston & Bird LLP, New
York, NY, James C. Grant, Christina Hull Eikhoff,
Alston & Bird LLP, Atlanta, GA, For Defendants.

*OPINION & ORDER*
DENISE COTE, District Judge.

*1 Defendants move to dismiss the plaintiffs' com-
plaint for failure to state a claim. That motion is
granted.

*Background*
A. Factual Background

The following factual background is taken from
facts as alleged in the complaint. Plaintiff Ahmad
Hbouss is a citizen of Lebanon and the sole share-
holder of plaintiff AAAH Holdings, Inc.
("AAAH"). AAAH is, in turn, a shareholder of non-
party Naya, Inc., a bottler, marketer, and distributor
of bottled water in the United States and Canada.
Both AAAH and Naya are corporations under the
laws of Quebec, Canada. Defendant Coca-Cola En-
terprises, Inc. ("Coca-Cola") is a packager, mar-
keter, and distributor of products of the Coca-Cola
Company.

Until mid-1998, Coca-Cola and some of its subsidi-
aries were distributors of Naya water. At some date
not specified in the complaint, Coca-Cola cancelled
its distribution agreements with Naya. Some time

thereafter, on October 21, 1999, Hbouss and Naya
and Coca-Cola entered into a Settlement Agreement
in which Hbouss and Naya released Coca-Cola, and
Coca-Cola released Hbouss and Naya, from all
claims between them up to that date.

Around the same time, Coca-Cola sought to im-
prove its position in the North American bottled
water market by acquiring existing distributors that
offered water at different price points in the market.
One possible acquisition was Danone, a European
company whose major product was Evian, a brand
of premium priced bottled water. Danone did not
have a product at Naya's non-premium price point.

In order to enhance Danone's position in the Amer-
ican bottled water market, which would benefit
Coca-Cola upon its acquisition of Danone's North
American market share, Coca-Cola undertook sev-
eral actions harmful to Naya. First, Coca-Cola cov-
ertly influenced Naya's financing banks to force
Naya into bankruptcy. It then covertly influenced
Naya's bankruptcy trustee to sell Naya's assets for
less than their true value. And finally it prevailed
upon Danone to acquire Naya's assets from the
bankruptcy trustee in June of 2000. When all of this
had been accomplished, Coca-Cola entered into
various agreements with Danone that ultimately led
in June of 2005 to the acquisition by Coca-Cola of
all of Danone's North American operations, includ-
ing the former assets of Naya.

B. Procedural History

Plaintiffs' complaint was originally filed in New
York Supreme Court for the county of New York
and was removed to this Court by Coca-Cola pursu-
ant to 28 U.S.C. § 1441(a). Immediately following
removal, Coca-Cola filed a motion to dismiss. At a
conference held on November 18, 2005, plaintiffs
requested leave to amend their complaint in order
to join Naya as a co-plaintiff to this action. That ap-
plication was granted on the explicit understanding
that plaintiffs would be given no further opportun-
ity to amend. The amended complaint was to be

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2285598 (S.D.N.Y.)
**(Cite as: 2006 WL 2285598 (S.D.N.Y.))**

filed by January 13, 2006.

In a letter dated January 6, 2006, plaintiffs informed the Court that Canadian counsel had undertaken the required process before the court in Quebec to join Naya to this action. Plaintiffs estimated that an amended complaint could be filed by April 15. The date for filing an amended complaint was adjourned *sine die* pending resolution of the petition before the Quebec court.

**\*2** On January 10, however, plaintiffs informed the Court that Naya's bankruptcy trustee opposed the petition to allow Naya to join this action. As a result, plaintiffs would be unable to file an amended complaint by April 15, 2006.

Coca-Cola again moved to dismiss the unamended complaint. And once again, plaintiffs requested an opportunity to amend. In an Order dated March 23, the Court denied the motion to dismiss and gave the plaintiffs until April 14, 2006 to file an amended complaint.

Plaintiffs filed an amended complaint on April 17, 2006. Naya did not join plaintiffs as a party to this action. Coca-Cola filed this motion to dismiss the amended complaint for failure to state a claim under Rule 12(b)(6).

*Discussion*

Under the pleading standard set forth in Rule 8(a) of the Federal Rules of Civil Procedure, complaints must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "[A] plaintiff is required only to give fair notice of what the claim is and the grounds upon which it rests." *Leibowitz v. Cornell Univ.,* 445 F.3d 586, 590 (2d Cir.2006). "[A] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations" set forth therein. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) (citation omitted); *see also Twombly v. Bell Atl. Corp.,* 425 F.3d 99, 106 (2d Cir.2005) (explaining that dismissal is improper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief" (citation omitted)).

When considering a motion to dismiss, a trial court "must accept as true all the factual allegations in the complaint and draw all reasonable inferences in [the] plaintiff['s] favor." *In re Tamoxifen Citrate Antitrust Litig.,* 429 F.3d 370, 384 (2d Cir.2005) (citation omitted). The court's duty "is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Chosun Int'l, Inc. v. Chrisha Creations, Ltd.,* 413 F.3d 324, 327 (2d Cir.2005) (citation omitted).

The complaint seeks relief on four claims. The first two stem from an alleged breach of the implied covenant of good faith and fair dealing contained in the 1999 Settlement Agreement. The first claim seeks damages for Hbouss as a party to that agreement; the second seeks damages for Hbouss as a creditor of Naya. The third claim seeks relief for AAAH, whose shares in Naya lost value when Coca-Cola forced Naya into bankruptcy. And the fourth claim is a derivative cause of action brought by AAAH in the place of Naya to recover for harm done to Naya by Coca-Cola's destruction of its business.

A. Implied Covenant of Good Faith and Fair Dealing

When jurisdiction is based on diversity of citizenship, a federal court applies the substantive law of the forum state. *Omega Eng'g, Inc. v. Omega, S.A.,* 432 F.3d 437, 443 (2d Cir.2005). The parties do not dispute that New York law governs the causes of action sounding in contract.

**\*3** Under New York law, there is a covenant of good faith and fair dealing implied in all contracts. *511 West 232nd Owners Corp. v. Jennifer Realty Co.,* 98 N.Y.2d 144, 153 (2002). "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract," *id.,* and may thus be breached by conduct not expressly forbidden by any contractual provision. *P.T. & L. Contracting*

*Corp. v. Trataros Const., Inc.,* 816 N.Y.S.2d 508, 508 (2d Dep't 2006). But when a complaint does not adequately allege that the defendant injured plaintiff's right to receive the benefits of their agreement, the claim will be dismissed. *EBC I, Inc. v. Goldman Sachs & Co.,* 5 N.Y.3d 11, 22 (2005).

Plaintiffs' complaint does not make any allegations regarding Coca-Cola's performance under the 1999 agreement. Rather, plaintiffs argue that Coca-Cola "went directly from its negotiation of the 1999 Agreement in which it received a[r]elease from [plaintiffs'] claims for any prior wrongdoing, into a new campaign to drive Naya out of business." Thus, the thrust of their argument with respect to the first and second claims is simply that Coca-Cola engaged in later, unrelated conduct with third parties that had adverse consequences for plaintiffs. The covenant on which plaintiffs base their claim, however, only extends to "the course of contract performance." *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 389 (1995). It "does not encompass future dealings or negotiations between the parties." *Travelers Indem. Co. of Ill. v. CDL Hotels USA, Inc.,* 322 F.Supp.2d 482, 494 (S.D.N.Y.2004) (citation omitted). Because plaintiffs have not alleged that they were denied the benefits of the 1999 Settlement Agreement, they fail to state a claim for breach of the implied covenant of good faith and fair dealing contained in that agreement.

B. Harm to Shareholder

Plaintiffs' third claim alleges that Coca-Cola's actions "deprived AAAH of the fair value of its share holdings in Naya." New York law reflects the general rule that a shareholder may not sue in her own right "where an injury is suffered by a corporation and the shareholders suffer solely through depreciation in the value of their stock." *Vincel v. White Motor Corp.,* 521 F.2d 1113, 1118 (2d Cir.1975); *see also Niles v. New York Cent. & H.R.R. Co.,* 176 N.Y. 119, 123-124 (1903). [FN1] There are exceptions to this rule, as plaintiffs note, when a shareholder "has been damaged individually as a result of [defendant's] breach of contractual and fiduciary duties." *Weiss v. Salamone,* 498 N.Y.S.2d 630, 631

(2d Dep't 1986); *see also Ceribelli v. Elghanayan,* 990 F.2d 62, 63 (2d Cir.1993) ("Under New York law, a shareholder may bring an individual suit if the defendant has violated an independent duty to the shareholder.").

> FN1. The parties have consented to the application of New York law to this claim. That consent is sufficient to end the choice of law inquiry. *See 3Com Corp. v. Banco do Brasil, S.A.,* 171 F.3d 739, 743 (2d Cir.1999).

Yet plaintiffs have not alleged any facts that, if proven, would establish the breach of a contractual or fiduciary duty by Coca-Cola. Even drawing all reasonable inferences in their favor, "plaintiffs suffered damage only derivatively by reason of the diminution in the value of their ... stock." *Vincel,* 521 F.2d at 1118. Having failed to establish the existence of a separate and distinct wrong to itself, AAAH lacks standing under New York law "to sue for an injury to the corporation even though it results in depreciation in the value of [its] shares of the corporation's stock." *Citibank, N.A. v. Plapinger,* 66 N.Y.2d 90, 93 at n.* (1985). The third claim for relief must therefore be dismissed.

C. The Derivative Claim

**\*4** Plaintiffs' fourth claim is a derivative claim asserted on behalf of Naya. New York courts "look to the law of the state of incorporation in adjudicating a corporation's 'internal affairs,' including questions as to the relationship between the corporation's shareholders and its directors." *Galef v. Alexander,* 615 F.2d 51, 58 (2d Cir.1980); *see also Graczykowski v. Ramppen,* 477 N.Y.S.2d 454, 456 (3d Dep't 1984) (noting that the "generally accepted choice-of-law rule with respect to such 'internal affairs' ... is to apply the law of the place of incorporation" (citation omitted)). [FN2] Under this rule, plaintiffs' ability to bring a derivative claim on behalf of Naya is determined by reference to the laws of Quebec. *See Miller v. Schreyer,* 606 N.Y.S.2d 642, 644 (1st Dep't 1994) ("The law of the state of incorporation governs the pre-litigation demand re-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2285598 (S.D.N.Y.)
**(Cite as: 2006 WL 2285598 (S.D.N.Y.))**

quirement in a shareholder derivative action."). The parties do not dispute that Quebecois law applies.

> FN2. *Norlin Corporation v. Rooney, Pace Inc.,* 744 F.2d 255 (2d Cir.1984), does not compel a contrary conclusion. Finding that any conflict between the laws of the state of incorporation and New York, where the corporation had its principal place of business, was "purely illusory," *id.* at 264, the Court of Appeals found it appropriate to apply the forum state's shareholder demand rules.

When confronted with a question of foreign law, a court "may consider "any relevant material or source," including submissions by the parties "whether or not ... admissible under the Federal Rules of Evidence." Fed.R.Civ.P. 44.1; *see also Euromepa, S.A. v. R. Esmerian, Inc.,* 154 F.3d 24, 28 n. 2 (2d Cir.1998) (noting that affidavits submitted by the parties may be considered). The primary point of dispute between the parties is what procedure a shareholder in a corporation must follow to initiate a derivative action after the corporation has filed for bankruptcy in a Canadian court. Defendants argue that, under Canadian law, all claims on behalf of a bankrupt corporation belong exclusively to the bankruptcy estate and can only be asserted by the trustee. *See* Canada Bankruptcy & Insolvency Act ("BIA"), R.S.C. ch B-3, § 2 (defining property to include "any type of property"), § 43(9) (describing bankruptcy trustee as "trustee of the property"). They cite Section 38 of the BIA for the proposition that a third party, including a shareholder, cannot institute an action on behalf of the debtor without express legal authority. *See id.* § 38. Plaintiffs argue in their opposition to this motion that "a derivative suit is not subject to the provisions of Section 38 and the permission of the bankruptcy court is not needed in order to prosecute the derivative action."

Section 38 provides, as its title indicates, for a "[p]roceeding *by creditor* when trustee refuses to act." BIA § 38(1) (emphasis added). There is, as the Second Circuit noted long ago, a "vital difference

between the shareholder and the creditor." Specifically, "[t]he shareholder is an adventurer in the corporate business; he takes the risk, and profits from success. The creditor, in compensation for not sharing the profits, is to be paid independently of the risk of success, and gets a right to dip into the capital when the payment date arrives." *Comm'r v. O.P.P. Holding Corp.,* 76 F.2d 11, 12 (2d Cir.1935). Thus, it would seem that, on its face, Section 38 is not applicable to actions brought by shareholders. At least one Canadian court has read the statute this way. *See In re Bankruptcy of Grandview Ford Lincoln Sales Ltd.,* No. 35- 078561-T, 103 A.C.W.S. (3d) 254 (Ont.Super.Ct. Jan. 15, 2001), *available* at 2001 A.C.W.S.J. Lexis 11963 (dismissing derivative suit brought under Section 38); *see also In re Patricia Appliance Shops Ltd.,* [1922] 3 D.L.R. 1160, 1161 (Ont.Sup.Ct.) ("A shareholder is not a creditor who can prove a claim at all, in the sense in which the word 'claim' is used in the [Bankruptcy] Act.").

**\*5** Plaintiffs' other submissions over the course of this litigation, however, suggest that they have not always subscribed to the view set forth in their opposition brief. They attach to their brief in opposition to this motion a copy of a motion filed in Quebec Superior Court on December 16, 2005 by plaintiffs' Canadian counsel. In the motion, plaintiffs "seek[ ] leave to institute ... in accordance with the provisions of section 38 of the [BIA], an action against [Coca-Cola] and others claiming against them various damages caused to Naya." They aver in the motion that they "have the required interest and have met all the requirements of law in order to avail themselves of the provisions of s. 38 BIA." It is unclear why plaintiffs would have filed this motion if they believed, as they argue here, that a derivative suit is not subject to the provisions of Section 38. [FN3]

> FN3. It also merits mention that plaintiffs misrepresented proceedings in this Court to the Quebec Superior Court. As reflected in the November 18, 2005 Order, this Court granted plaintiffs' request for leave to amend their complaint, which appeared

to be deficient. Nothing in that Order, and nothing that transpired in the pre-trial conference held that same day supports plaintiffs' argument to the Canadian court that their petition "should not be refused inasmuch as it follows a directive" from this Court. Nor does the Order fairly support the inference that this action "is serious on its face." The Court expressed no view on the quality of the complaint, and indeed expressed the contrary view that it appeared to fail to state a claim.

Even if plaintiffs are correct, though, that Section 38 does not apply to derivative suits, they still have not pointed to any legal authority that would support their claim that they do not need permission from the bankruptcy court to pursue this claim on behalf of Naya. The cases submitted by plaintiffs for the Court's review in fact support the opposite conclusion. [FN4] In *Gibson v. Man. Dev. Corp.,* [1982] 18 Man. R.2d. 362 (Man.Ct.App.), the Manitoba Court of Appeal held that shareholders could not bring a derivative suit under Manitoba corporate law when a bankruptcy has intervened. *Id.* at para. 14. At that time, the court noted, "the assets vest in the trustee in bankruptcy and he alone has the right to pursue a chose in action on behalf of the corporate entity." *Id.* at para. 24. The same court later held in *Bank of Montreal v. Northguard Holdings Ltd.,* [1989] 58 Man. R.2d 241 (Man .Ct.App.), that a similar rule applied to corporations in receivership: "As a general rule, the court will not make an order permitting ... a majority of the shareholders [ ] to commence an action which the receiver does not want to bring." *Id.* at para. 20. Such an action might be appropriate in some circumstances, but those circumstances would be determined by a court. *Id.* Finally, the opinion of the Alberta Court of Appeal in *Transamerica Commercial Finance Corp of Canada v. Computercorp Systems Inc.,* [1993] 10 Alta. L.R.3d 337 (Alta.Ct.App.), is simply inapposite. *Transamerica* was not, as the Alberta Court of Appeal noted, "a case where the shareholder attempts, during bankruptcy, a derivative action," and it certainly does not support plaintiffs' position that such a suit could be maintained without court approval.

> FN4. In addition to the three cases discussed in the text, plaintiffs also submitted a case from the Quebec Superior Court. This case is in French, and no translation of the opinion was provided. The Court is thus unable to consider the views of the Quebec Superior Court on this issue.

The rule that seems to emerge from the Caadian authorities provided by the parties is that once a corporation goes into bankruptcy, all property of the corporation, including all causes of action it may have, fall under the control of a trustee. No action may be brought on behalf of the corporation without either the trustee's approval or, if the trustee refuses, an order of the bankruptcy court. This is the rule under American law. *See, e.g., Mitchell Excavators, Inc. v. Mitchell,* 734 F.2d 129, 131 (2d Cir.1984).* [FN5] And the plaintiffs have offered no reason to believe that Canadian bankruptcy law is any different in this respect. *See Clarkson Co., Ltd. v. Shaheen,* 544 F.2d 624, 630 (2d Cir.1976) (noting, in a collateral attack on a Canadian bankruptcy proceeding, that "Canada [is] a sister common law jurisdiction with procedures akin to our own"). Moreover, until briefing on this motion plaintiffs proceeded on this same understanding of Canadian law, representing to this Court in their January 10 letter that it would not be possible to proceed with this action "until the issue of Naya Inc.'s ability to be represented in this action has been resolved by the court handling its insolvency case in Canada." Because plaintiffs fail to point to any legal authority to support their ability to proceed with their derivative claim without approval of the Quebec Superior Court, this claim will be dismissed pending a decision on their petition by that court.

> FN5. "Under 11 U.S.C. § 541, the rights of action of the debtor pass to the estate created by the commencement of the bankruptcy proceeding, not directly to the trustee. Those rights, however, are still normally vindicated by the trustee.... It is true,

of course, under certain circumstances a shareholder may assert a cause of action of the debtor even after the commencement of a bankruptcy proceeding.... But in these cases, some proceeding in the bankruptcy court must take place before a shareholder can assert the right directly." *Mitchell,* 734 F.2d at 131.

*Conclusion*

**\*6** Plaintiffs have failed to state a claim for breach of the implied covenant of good faith and fair dealing and for damages suffered by AAAH as a shareholder in Naya. Accordingly, plaintiffs' first three claims are dismissed with prejudice. *See Arrowsmith v. United Press Intern.,* 320 F.2d 219, 221 (2d Cir.1963) ("[A] dismissal for failure to state a claim upon which relief can be granted is with prejudice.). The problem with plaintiffs' fourth claim is that plaintiffs have not received permission from a Canadian court to proceed with a derivative suit notwithstanding the trustee's refusal to participate. Because the possibility remains that plaintiffs' petition to the Quebec court will be granted and that plaintiffs might one day have authority to bring Naya's claim through a derivative suit, the fourth claim is denied without prejudice. *Cf. Berry v. Kerik,* 366 F.3d 85, 87-88 (2d Cir.2004) (recognizing that dismissal without prejudice is appropriate where a plaintiff has failed to, but still may, exhaust administrative remedies). The Clerk of Court shall close the case.

SO ORDERED:

Not Reported in F.Supp.2d, 2006 WL 2285598 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**TAB D**

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2006 WL 785302 (D.D.C.)
**(Cite as: 2006 WL 785302 (D.D.C.))**

C

Only the Westlaw citation is currently available.

United States District Court, District of Columbia.
Gloria HUERTAS, Plaintiff,
v.
THE KINGDOM OF SPAIN et al., Defendants.
**No. Civ.A. 05-627 RWRAK.**

March 27, 2006.

Montgomery Blair Sibley, Law Office of Rodriguez & Sibley, Washington, DC, for Plaintiff.

Harold G. Belkowitz, Ober, Kaler, Grimes & Shriver, Washington, DC, for Defendant Kingdom of Spain Through its Ambassador Carlos Westendorp y Cabeza.

John M. Simpson, Fulbright & Jaworski, LLP, Washington, DC, for Defendant Jose A. Alepuz.

*MEMORANDUM OPINION*
ROBERTS, J.

**\*1** Plaintiff Gloria Huertas sued Jose Alepuz and the Kingdom of Spain, seeking a declaration of her ownership interest in a house located in the District of Columbia that was purchased by Alepuz, seeking back rent payments for that house from the Kingdom of Spain, and alleging that fraud by Alepuz caused Spain to stop paying the rent. Alepuz moved to dismiss the complaint on the ground of forum non conveniens. The Kingdom of Spain filed a claim in interpleader against the other two parties and asked that it be allowed to pay rent to the clerk of this court until the marital property dispute is decided. Magistrate Judge Alan Kay recommended granting Alepuz's motion to dismiss for forum non conveniens and dismissing or staying the claim against the Kingdom of Spain. Because a divorce action between Huertas and Alepuz involving property distribution is pending in Spain, Spain is a more appropriate forum for this dispute. The magistrate judge's Report and Recommendation will be adopted and Alepuz's motion to dismiss the claims against him for forum non conveniens will be gran-

ted. Huertas's claim against the Kingdom of Spain will be stayed pending resolution by the Spanish Court of the issue of the distribution of marital assets.

*BACKGROUND*
Gloria Huertas and Jose Alepuz are foreign nationals who were married in Washington, D.C. in 2000. (Compl.¶ 8.) In April 2002, Alepuz purchased a house on Hillandale Court, N.W. in Washington, D.C. ("the Hillandale house"). (Compl. ¶ 9.) The deed to the house lists Alepuz as the "sole owner." (Compl., Ex. A, Special Warranty Deed for the Hillandale House.) In October 2002, the Kingdom of Spain leased the Hillandale house from Huertas, who was identified in the lease as the landlord, for a period starting November 1, 2002, and ending July 31, 2007 with monthly rent payments of $5,300 to be paid to Huertas. (Compl., Ex. B, Lease Agreement for the Hillandale House.) Both Huertas and Alepuz currently live in Madrid, Spain. (Alepuz's Mot. to Dismiss for Forum Non Conveniens, Ex. A, Alepuz Decl. ("Alepuz Decl.") ¶ 6, July 7, 2005.)

In September 2004, Huertas filed for divorce in the Spanish Court of First Instance, a court in Spain with jurisdiction to hear family issues such as "separation, divorce, liquidation of the marital regime, custody and alimony." (Alepuz Decl. ¶¶ 7-8.) In February 2005, the Spanish Court of First Instance dissolved the marriage, decided the child custody dispute, and dismissed Huertas's claims regarding alimony, ownership of the Hillandale house and an inventory of the marital property, noting that these claims would be addressed in future proceedings. (Alepuz Decl. ¶ 12.)

Huertas filed a complaint in this court in March 2005, alleging that she "provided in large measure" the money to purchase the Hillandale house and that Alepuz tampered with the deed to omit her name, and that, in October 2004, Alepuz fraudulently represented to the Kingdom of Spain that it did not have to continue to pay Huertas rent. (Compl.¶¶ 9, 10, 13.) Upon learning of the dispute

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

regarding to whom the rent for the Hillandale house should be paid, the Kingdom of Spain stopped paying rent to Huertas, not knowing to whom the rent should properly be paid. (Kingdom of Spain's Answer at 6.) Huertas claims fraud against Alepuz, seeks a declaration that she is entitled to a minimum fifty percent interest in the Hillandale house "under the agreement of the parties and the applicable domestic relation laws," and seeks back rent from the Kingdom of Spain. (Compl.¶¶ 10, 13, 15, 17.) Alepuz moved to dismiss alleging forum non conveniens. Magistrate Judge Kay issued a Report and Recommendation in December 2005, finding that Spain was the more appropriate forum for Huertas's claims against Alepuz and recommending that Huertas's claim against the Kingdom of Spain be transferred to the court in Spain or stayed until the Spanish Court resolves the marital property claims. (Report and Recommendation ("R & R") at 11 n. 10, 12.) Huertas objected to the R & R, and the Kingdom of Spain filed a response to the objection requesting that the recommendation to stay this action pending resolution of the marital action in Spain be adopted.

### DISCUSSION

*2 A magistrate judge's findings and recommendations to which a party objects involving a dispositive motion are reviewed de novo. 28 U.S.C. § 636(b)(1); see Landry v. F.D.I.C., 204 F.3d 1125, 1143 (D.C.Cir.2000).

### I. FORUM NON CONVENIENS

"The doctrine of forum non conveniens permits a court to dismiss an action over which it has jurisdiction when there is an adequate alternative forum in which the case can be more conveniently heard." BPA Int'l, Inc. v. Kingdom of Sweden, 281 F.Supp.2d 73, 84-85 (D.D.C.2003) (citing Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947)). "A court first determines whether there is an adequate alternative forum and, if so, then proceeds to balance both private interest factors and public interest factors in favor of the respective forums." Jackson v. American University, in Cairo, 52 Fed. Appx. 518, 518 (D.C.Cir.2002)

(citing Piper Aircraft Co. v. Reyno, 454 U.S. 235, 241, 255-61, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981)). "If the balance favors the foreign forum, and if the Court is convinced that plaintiff effectively can bring its case in the alternative forum, the Court may dismiss the case on grounds of forum non conveniens." KPMG Fin. Advisory Servs. Ltd. v. Diligence LLC, Civ. Action No. 05-2204, 2006 WL 335768, at *1 (D.D.C. Feb.14, 2006) (citing Pain v. United Techs. Corp., 637 F.2d 775, 785-86 (D.C.Cir.1980)). "The defendant has the burden on all aspects of a motion to dismiss on forum non conveniens grounds, including the obligation to establish as a prerequisite that an adequate alternative forum exists." Id.

To determine whether an adequate alternative forum exists, a court must inquire "whether the defendant is amenable to process in the foreign jurisdiction." Friends for All Children v. Lockheed Aircraft Corp., 717 F.2d 602, 607 (D.C.Cir.1983). In rare cases, the alternative forum may be inadequate because "the remedy offered by the other forum is clearly unsatisfactory." Reyno, 454 U.S. at 255 n. 22; see Nemariam v. Fed. Democratic Republic of Ethiopia, 315 F.3d 390, 395 (D.C.Cir.2003) (reversing dismissal for forum non conveniens because plaintiff lacked a personal right to any remedy the alternative forum could provide and that remedy could be reduced by competing claims). However, a remedy will not be considered inadequate merely because the plaintiff's potential award will be smaller. Reyno, 454 U.S. at 247; In Re Disaster at Riyadh Airport, 540 F.Supp. 1141, 1145 (D.D.C.1982).

In considering the factors in favor of the respective forums, private factors a court must balance include the ease of access to proof, the availability of compulsory process to obtain the attendance of hostile witnesses, costs of transporting witnesses, and other expenses or inefficiencies. Reyno, 454 U.S. at 241 n. 6. Public factors to consider include the desirability of clearing foreign controversies from congested dockets, the extent of any local interest in the dispute, the ease with which the present forum will be able to apply foreign law, avoiding unnecessary

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 785302 (D.D.C.)
**(Cite as: 2006 WL 785302 (D.D.C.))**

problems with the conflict of laws, and the burden to the local jury pool in hearing a foreign controversy. *Id.* The decision to dismiss a case based on forum non conveniens is committed to the sound discretion of the trial court. *Reyno,* 454 U.S. at 257.

A. *Adequate alternative forum*

**\*3** Alepuz argues that Spain is an adequate alternative forum for the claims against him because he and Huertas are Spanish residents, Huertas chose the Spanish courts in which to pursue the divorce, and Huertas's claim of interest in the Hillandale house, including her allegations of fraud, can be raised in the Spanish Court. (Alepuz's Mot. to Dismiss for Forum Non Conveniens at 8.) Huertas counters that she has not raised the claim of fraud in the Spanish Court, and that the Spanish Court has no jurisdiction to reform a deed to real property located in the District of Columbia. (Huertas's Opp'n to Alepuz's Mot. to Dismiss for Forum Non Conveniens at 3-4.)

Spain presents an adequate alternative forum. Alepuz is amenable to process there, as he is already a party in the ongoing divorce proceedings in the Spanish Court. Moreover, this is not one of those rare cases where the alternative forum offers a remedy that is clearly unsatisfactory. According to Alepuz, the secretary of the Spanish Court of First Instance will compile a list of the couple's marital assets and then hold a trial to resolve disputes over ownership. (Alepuz Decl. ¶ 16.) Huertas does not dispute this claim, nor does she contend that a Spanish judgment would be unenforceable in the United States. [FN1] While the Spanish Court cannot directly change the deed to the Hillandale house, that matters little since it will ultimately determine the distribution of the ownership rights to the property and the back rent, and order the parties to effectuate its decree. [FN2] *See Argent v. Argent,* 396 F.2d 695, 697-98 (D.C.Cir.1968).

> FN1. It is well-settled that a foreign judgment will be enforced if there is proper service and the original claim does not violate American public policy. *See, e.g., Tahan v. Hodgson,* 662 F.2d 862, 864

(D.C.Cir.1981) (citing *Hilton v. Guyot,* 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95 (1895)). Nothing here threatens to violate that principle.

> FN2. The parties disagree over whether Huertas raised the issue of fraud by Alepuz in the Spanish proceedings. That is of no moment. Dismissal under the doctrine of forum non conveniens requires the availability of another adequate forum; it does not require that the parties already be litigating the disputed issue in another court. *See, e.g., Friends for All Children,* 717 F.2d at 607.

B. *Private factors*

Alepuz argues that private factors favor dismissal because the primary evidence necessary to resolve this case will be the oral testimony of Huertas and Alepuz, who both reside in Spain, and agents of the Kingdom of Spain whose identities and locations are not revealed in the complaint. (Alepuz's Mot. to Dismiss for Forum Non Conveniens at 9-10.) He asserts that allowing the case to proceed here will result in the cost and burden of transatlantic travel for the primary witnesses. (*Id.* at 10.) Huertas asserts that the Spanish agents to whom Alepuz allegedly made misrepresentations, the closing agent for the purchase of the Hillandale house, and the deed to the property are all located in the District of Columbia. (Huertas's Opp'n to Alepuz's Mot. to Dismiss for Forum Non Conveniens at 3.)

On balance, the private factors favor tilt toward the Spanish forum regarding the two claims in this case against Alepuz. Huertas and Alepuz are the two central witnesses regarding their intentions or arrangements regarding title to the Hillandale house and entitlement to rent payments from it. Both parties reside in Spain and are already subject to compulsory process in the Spanish Court, giving the Spanish forum the greatest ease of access to key proof. There is no evidence to suggest that the agents of the Kingdom of Spain would not be accessible in a Spanish forum. There would be con-

Case 1:07-cv-01646-RMC    Document 40-2    Filed 01/31/2008    Page 29 of 82

Not Reported in F.Supp.2d                                                           Page 4
Not Reported in F.Supp.2d, 2006 WL 785302 (D.D.C.)
**(Cite as: 2006 WL 785302 (D.D.C.))**

siderable expense and burden involved in having Huertas and Alepuz both traveling to and from the United States for pretrial and trial proceedings here. Huertas's choice of this forum is entitled to less than usual deference since this is not her home forum. *Reyno,* 454 U.S. at 255-56.

C. *Public factors*

**\*4** Alepuz contends that the public factors favor dismissal because permitting the case to proceed would allow Huertas to violate the " 'familiar rule that one cause of action cannot be split up and sued upon in several suits' ' and that Spanish law might govern aspects of the case forcing this court to apply Spanish law. (Alepuz's Mot. to Dismiss for Forum Non Conveniens at 11-12 (quoting *Wardman-Justice Motors, Inc. v. Petrie,* 39 F.2d 512, 515 (D.C.Cir.1930)).) Huertas argues that the Spanish court will have a difficult time applying the relevant law of the District of Columbia. (Huertas's Opp'n to Alepuz's Mot. to Dismiss for Forum Non Conveniens at 3.)

The public factors here firmly favor dismissal of the claims against Alepuz. The claims are, at base, a bi-product of a domestic relations dispute between two foreign nationals residing abroad, whose divorce proceedings are already pending abroad, and who have no stated intention to return here. While District of Columbia law would likely determine to whom title to the Hillandale house passed at the time of sale and whether any fraud diverted rent payments, nothing in the record suggests that those historical facts will ultimately bind the Spanish Court in deciding how to divide up the marital assets in any event. How a foreign court ultimately chooses to distribute their marital assets, including two--a house and a debt--with a situs in this forum, is of minimal local interest. This foreign controversy is best cleared from the busy docket here.

Because Spain is an adequate alternative forum and the relevant public and private factors favor dismissal, Huertas's claims against Alepuz will be dismissed for forum non conveniens.

## II. CLAIM AGAINST THE KINGDOM OF SPAIN

Although the Kingdom of Spain did not move for dismissal for forum non conveniens, the magistrate judge concluded that dismissal of Huertas's claim against the Kingdom of Spain for unpaid rent would be appropriate because the claim is "encompassed within and inseparable from" Huertas's other claims. (R & R at 11 n. 10.) In the alternative, the magistrate judge recommended that the proceedings on this claim be stayed until Huertas's claims against Alepuz are resolved.

The Kingdom of Spain has acknowledged its payment obligation, but simply asks that it not be caught in the middle of competing claimants. Spain agrees that this action against it should be stayed until the Spanish courts designate to whom the back rent asset will be distributed. (Kingdom of Spain's Resp. to Huertas's Obj'n at 1-2.) That request is eminently reasonable and ultimately the most efficient manner in which to proceed. Because the distribution of the marital assets must be determined before this claim for back rent can be resolved, the magistrate judge's recommendation will be adopted, and the claim against the Kingdom of Spain will be stayed until the Spanish Court resolves the dispute over the marital assets.

### CONCLUSION

**\*5** Because Spain is a more appropriate forum for this dispute, the magistrate judge's Report and Recommendation will adopted and Alepuz's motion to dismiss for forum non conveniens will be granted. Huertas's claim against the Kingdom of Spain will be stayed pending a decision by the Spanish Court on the distribution of the marital assets. An appropriate Order accompanies this Memorandum Opinion.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

ORDERED that Alepuz's motion [6] to dismiss for forum non conveniens be, and hereby is, GRANTED and the claims against him are dismissed. It is further

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

ORDERED that the claim against the Kingdom of Spain be, and hereby is, STAYED and administratively closed pending a decision by the Spanish Court about the distribution of the marital assets. It is further

ORDERED that Alepuz's motion [7] to dismiss for failure to state a claim, motion [20] for a protective order, and motion [31] to strike be, and hereby are, DENIED as moot. It is further

ORDERED that the Kingdom of Spain's motion [19] for a protective order be, and hereby is, DENIED as moot.

This is a final, appealable Order as to plaintiff's claims against Alepuz.

Not Reported in F.Supp.2d, 2006 WL 785302 (D.D.C.)

END OF DOCUMENT

**TAB E**

# IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

## THIRD JUDICIAL DISTRICT AT ANCHORAGE

In re BP P.L.C. DERIVATIVE
LITIGATION

Lead Case No. 3AN-06-11929CI

## **ORDER DENYING MOTION TO DISMISS**

Defendants have moved to dismiss the Complaint for three reasons: 1)
failure to state a valid derivative claim under English law; 2) lack of jurisdiction
over the Defendants based upon personal jurisdiction, general jurisdiction and
specific jurisdiction; and 3) *forum non conveniens*. Plaintiffs argue: 1) English
law on derivative actions is in a state of transition which will set aside the
common law and allow derivative actions as of October 2007; 2) Defendants
have waived challenges to jurisdiction and *forum non conveniens* based upon
their conduct in this litigation; 3) British Petroleum p.l.c.'s (BP or Company)
conduct and the conduct of its subsidiary, British Petroleum Exploration (Alaska)
Inc. (BPXA) in Alaska establishes jurisdiction; 4) Alaska statutes concerning
corporations doing business in Alaska should apply to British Petroleum; and 5)
conflict of laws principles mandate the application of Alaska law to this case.

## **Summary of Facts:**

This is a stockholder derivative action on behalf of BP against the BP
Board of Directors (Board), several of its present or former officers and directors,
and officers and directors of US subsidiaries of BP. Many of the individual
Defendants and BP assert they are citizens of countries other than the US or
states other than Alaska. Plaintiffs are stockholders of BP, including
retirement/pension funds and individuals. Three Plaintiffs assert they are
residents of Alaska. Plaintiffs allege intentional, reckless and/or negligent
breaches of fiduciary duties of care and candor by Defendants caused BP and

Page 1 of 20

three of its US subsidiaries to violate: 1) environmental protection regulations and laws; 2) worker and workplace safety regulations and laws; and 3) fair and honest trade practices regulations and laws. The United States subsidiaries involved in the action are BP America, Inc., The Standard Oil Company, and BPXA.

Plaintiffs assert: BP is the largest non-US based company listed on the New York Stock Exchange and the largest oil and gas producer in the US. BP is the second-largest liquids pipeline company in the US, operating about 10,000 miles of pipeline. BP is the second largest refiner, fuels marketer, and gasoline marketer in the US. BP commenced its operations at Prudhoe Bay on Alaska's North Slope in 1969 as part-owner, and sole operator, of the largest oil field in the US. The Company employs about 34,000 people in the US, and has offices in Alaska as well as across the country. The Company's operations in the US, including extensive ones in Alaska, are its most substantial anywhere in the world.

Plaintiffs allege that Defendants, in an effort to distance BP from the practices and image of other oil companies, undertook a massive campaign, targeted at shareholders and the public, to portray the Company under their leadership as one that is progressive, ethical, environmentally sensitive, focused on safety and aware of the impact its operations have on both its own workers and the communities in which it operates. Plaintiffs allege Defendants also stressed that BP was achieving substantial profits due to the skillful management of the Company by the Board. Plaintiffs state that the reality differed from those representations. Defendants allegedly permitted, or even encouraged, improper and illegal activities targeted at cutting costs, boosting revenues, and inflating the results reported from the Company's operations. These practices were especially prevalent in BP's North American operations and resulted 1) in a reduction (or elimination) of expenditures on plant and equipment maintenance for both refineries and pipelines; 2) in a decrease of mandatory inspections; and 3) in unfair and illegal trade practices, which included price manipulation of propane, unleaded gas, and crude oil.

BP's operating costs decreased and its revenues increased. Plaintiffs allege these short term financial successes came at the price of the long-term interest held by BP's true owners, the Company's shareholders. Defendants' actions, seen by Plaintiffs as imprudent, reckless, negligent and illegal, allegedly created dangerous conditions for BP employees, damaged the Company's reputation and undermined its financial stability.

Plaintiffs assert Defendants gave precedent to their own short-term financial gains and breached their fiduciary duties to the Company and its shareholders and committed corporate waste. Plaintiffs allege those management practices resulted in the 2006 crude oil leak at the Prudhoe Bay oil field. Plaintiffs assert the leak was caused by inadequate pipeline maintenance, decreased inspections, inadequate worker training and a lack of emergency response plans.

Plaintiffs state that Defendants' "grossly negligent – if not intentional – failure" to perform their fiduciary duties to the Company and its assets have exposed BP to hundreds of millions of dollars in damages, remedial costs and loss of corporate image and reputation. Plaintiffs allege Defendants have failed to properly react to "warnings" about the inadequate operational aspects of BP, including a federal investigation and criminal prosecution against BPXA in 1997 – 1999 for operations at Endicott Island.

## Relief Requested in Complaint

Plaintiffs ask the Court to award money damages against all Defendants; to direct all Defendants to account for all damages caused; for all profits, special benefits, and unjust enrichment given to the Board to be placed in a constructive trust; to direct BP to reform and improve its corporate governance and internal control procedures to comply with the Sarbanes-Oxley Act of 2002[1]; and to award punitive damages.

---

[1] "The Act mandated a number of reforms to enhance corporate responsibility, enhance financial disclosures and combat corporate and accounting fraud, and created the "Public Company Accounting Oversight Board" to oversee the activities of the auditing profession."
http://www.sec.gov/about/laws.shtml

## **Procedural Status**

Plaintiffs filed their Amended Complaint on 10/09/2006 and sought to remove the case to US federal court on October 24, 2006. All Defendants filed notices of consent to removal from state court. Several motions were filed in the federal court before the parties stipulated to return the case to state court on 12/11/2006. Defendants' counsel filed to appear *pro hac vice* in state court. On 12/18/06 Defendants filed a Motion to Disqualify Plaintiffs' counsel. That motion was argued on April 9, 2007. This motion was filed by Defendants on February 13, 2007. This motion was argued on April 24, 2007.

## **Arguments of Parties in This Motion**

### **Defendants**

Defendants argue that the Complaint should be dismissed for three independent reasons.

1. It fails to state a valid derivative claim under English law, which should govern this case under choice of law principles, because BP is incorporated under the law of England and Wales. English law generally does not allow for shareholder derivative claims on behalf of companies and their subsidiaries in instances where the alleged wrongdoing could be ratified by a majority of shareholders. Defendants argue that shareholders could ratify breaches of fiduciary duty and that the limited exceptions provided for by English law do not apply to the case before the Court. Defendants also state that English law does not allow for "double derivative claims," in which shareholders of the parent company bring derivative actions on behalf of its subsidiaries, or the boards or managers of those subsidiaries.

2. This Court lacks: a) personal jurisdiction over BP, because the company is headquartered in London; b) general jurisdiction over former and current BP directors because not one of them is an Alaska domiciliary, and none has engaged in substantial activities in the state; c) general jurisdiction over all but four Defendants who are directors and officers of BP

)

subsidiaries, as they are not Alaska domiciliaries and have not engaged in substantial activities in the state; and d) specific jurisdiction over Defendants because Plaintiffs do not allege any contacts between Defendants and Alaska which are the basis for this action. Defendants argue that the alleged conduct which led to this action took place in London (in BP's case) and in Illinois (in the subsidiaries' case).

3. The doctrine of *forum non conveniens* warrants dismissal. Defendants argue that the courts of England represent an adequate forum for the resolution of this case; the case is governed by English law; England has the greatest interest in the action because it involves alleged breaches of duty of the Board of an English company; and the convenience of the parties and witnesses would be best served if the action could be litigated in the English forum.

4. In their Reply, Defendants assert the State of Alaska has no interest in the real crux of this case – whether or not the Board breached its duties to BP and whether or not BP will recover for those breaches.

## Plaintiffs

Plaintiffs argue that the Complaint should not be dismissed for the following reasons:

1. All Defendants, based on their litigation conduct prior to filing this motion, have waived and forfeited any challenges to jurisdiction, venue, and *forum non conveniens*. Plaintiffs argue that this conduct included removing the action to federal court, remanding the action, and asking the Court to disqualify Plaintiffs' counsel.

2. BP is subject to this Court's jurisdiction because it owns 100% of its US subsidiaries, including its Alaska operations; the substantial misconduct alleged in the Complaint was directed at Alaska; and the significant economic and non-economic damage that BP suffered occurred in Alaska (and the Lower 48).

3. The domicile of one of the individual Defendants is Alaska.

4. Defendants have not met their burden of proving that Alaska constitutes a *forum non conveniens*. Plaintiffs argue that Defendants have not produced evidence to support the five factors required by Alaska law to balance the doctrine's considerations. Plaintiffs argue that the balance of "private" and "public" interests weigh in favor of maintaining the action in this forum because: a) the vast majority of the evidence is located in the US; b) the majority of the witnesses are in the US or have significant US contacts, making it more expensive to litigate this case in England; c) Plaintiffs' choice of forum should be respected, as it does not pose an undue hardship on Defendants; d) Defendants do not meet their burden of showing that the judgment against Defendants will be unenforceable in England; and e) the State of Alaska has a strong interest in this action, as Defendants' conduct was directed at Alaska.

5. BP's substantial activities in Alaska through its subsidiary BPXA subject BP to jurisdiction in the State. Individual Defendants' conduct directed at Alaska and their contacts with the State subject them to jurisdiction of its courts.

6. English law concerning derivative actions is not settled, nor would it necessarily bar Plaintiffs' claims. Plaintiffs argue that Defendants' argument on English derivative actions common law is academic, as the common law rule has been repealed and replaced statutorily.

7. Alaska's Corporations Code applies on its face to all corporations doing business in the State, including foreign corporations.

8. Alaska's conflict of laws principles mandate the application of Alaska law because the State has the most contacts with the issues in this case.

### Legal Analysis

#### 1) Choice of Law Considerations

##### "Internal Affairs" Doctrine

Defendants urge this Court to apply the "internal affairs doctrine", which concludes that "the rights of shareholders in a foreign company, including the right to sue derivatively, are determined by the law of the place where the

company is incorporated." Batchelder v. Kawamoto, 147 F.3d 915, 920 (9th Cir.Cal.1998) (referring to Hausman v. Buckley, 299 F.2d 696, 702 (2d Cir.1962); McDermott Inc. v. Lewis, 531 A.2d 206, 214-17 (Del.1987); Levine v. Milton, 219 A.2d 145, 147 (Del.1966); cf. CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 89, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). See also Seghers v. Thompson, 2006 WL 2807203, at *4 (S.D.N.Y.2006) (Not Reported in F.Supp.2d); In re Tyco Intern., Ltd., 340 F.Supp.2d 94 (D.N.H.2004). "The internal affairs doctrine is equally applicable to double derivative claims brought on behalf of an American subsidiary. cf. Kostolany v. Davis, 1995 WL 662683, *1-3 (Del.Ch.1995) (applying Dutch law to determine a shareholder's right to bring double derivative claims because "plaintiff is a stockholder of the Dutch parent, not of the Delaware subsidiaries")". Id.

Based on Defendants' analysis, Plaintiffs' claims must fail as English law applies to this action. Under English common law, a plaintiff cannot bring a derivative suit for wrongs done to a company when such acts or omissions are capable of ratification by the majority of the shareholders. According to English law, breaches of fiduciary duty are capable of ratification. Defendants also argue that the three exceptions to the Rule do not apply in this case. The exceptions allow a shareholder to bring a derivative action when 1) the alleged wrong is *ultra vires*; 2) the validity of the transaction depends on the approval of the majority of the shareholders; or 3) the wrongdoers, who are in voting control, have profited at the expense of the Company through self-dealing. Plaintiffs' claims against BP would not be actionable under English common law and could not be brought in an English court. Defendants assert under the "internal affairs" doctrine, the claims against BP should be dismissed. Defendants acknowledge shareholders cannot ratify *ultra vires* acts by the Board and directors but fail to explain why alleged breaches of the laws of Alaska and/or the United States would not be considered *ultra vires*.

Even accepting the argument of Defendants, the causes of action against the US subsidiaries would still stand. The right of the BP shareholders to bring action against BP's American subsidiaries would be determined by the location of those companies' incorporation. It is alleged that BP America is incorporated in

Delaware. Delaware law recognizes double-derivative actions. See Sternberg v. O'Neil, 550 A.2d 1105 (Del. 1988). It is alleged that Standard Oil, a subsidiary of BP America, is a "resident" of Illinois. Illinois also recognizes double-derivative actions. See Powell v. Gant, 556 N.E.2d 1241 (Ill. App. 4th,1990). It is alleged that BPXA is a "resident" of Alaska, with its principal place of business in the State, but it is incorporated in Delaware. As noted, Delaware law allows double derivative lawsuits. The ability to bring double-derivative actions appears to be an issue of first impression in Alaska.

Not all state courts follow the "internal affairs" doctrine. Actions and recovery impossible under the law of the location of incorporation have nonetheless been allowed using the statutes of the state where a foreign corporation does business. Rest 2d Conf. §309. (The case summaries which follow are from §309 section of the Restatement.) Schwarz v. Artcraft Silk Hosiery Mills, 110 F.2d 465 (2d Cir.1940) (applying New York statute in action by stockholder and director of Delaware corporation against its officers for mismanagement and waste); In re Burnet-Clarke, Limited, 56 F.2d 744 (2d Cir.1932) (applying New York statute in action by trustee in bankruptcy of Maryland corporation against its directors for improper purchase by corporation of its own stock); German-American Coffee Co. v. Diehl, 109 N.E. 875 (N.Y.1915) (applying New York statute in action by New Jersey corporation against its directors for improper declaration of dividends); cf. Saracco Tank & Welding Co. v. Platz, 150 P.2d 918 (Cal.Ct.App.1944) (permitting recovery by creditor of Nevada corporation against its directors for improper distribution of corporate assets under California statute which, however, predicated liability on an act unauthorized by the local law of the state of incorporation). The US Supreme Court has cited German-American Coffee Co. with approval to illustrate the power of a state to regulate matters pertaining to foreign corporations. (See International Harvester v. Wisconsin Dep't. of Taxation, 322 U.S. 435 (1944)).

## Statute Overruling English Common Law

The parties note that a recently-enacted English statute, which becomes effective on October 1, 2007, has created a new cause of action that will allow derivative claims to "be brought only in respect of a cause of action arising from an actual or proposed act or omission involving negligence, default, breach of duty or breach of trust by a director of the company." *Companies Act 2006,* Ch. 46, § 260(3) (Eng.). That statute will make the causes of action available to shareholders in England identical to those available per Alaska law. The statute was enacted on 11/8/2006. Plaintiffs filed their Consolidated Amended Complaint on 01/11/2007. Plaintiffs' causes of action would be actionable under this new statute.

The statute does not state whether it applies retroactively. However, the statutory definition of "director" encompasses "former directors." Id. Certainly one implication of that definition is that as of October 1, 2007 "former" directors can be sued for acts or omissions which occurred at some point prior to October 1, 2007 when they were at the helm of the Company.

## Alaska Law and Conflict of Laws

No contractual agreement exists in this case from which a "choice of law" clause could be ascertained. The closest thing to it is the Charter BP/BPXA/AMOCO signed with the State of Alaska in 1999. The parties agreed that the Charter was governed by the law of Alaska and that BP Amoco p.l.c. acknowledged and consented "to the jurisdiction of any state or federal court within the State of Alaska for the purposes of enforcing its commitments under section IV of this Charter."[2] It is also unclear at this point if the ADRs held by Plaintiffs contain a choice-of-law provision.[3] If they do, that choice-of-law provision may govern this issue. See Batchelder v. Kawamoto, 147 F.3d 915, (9th Cir. Cal.1998).

---

[2] *Affidavit of Mary K. Blasy,* Exhibit F, at 13, §§ B, C.

[3] "The stocks of most foreign companies that trade in the U.S. markets are traded as American Depositary Receipts (ADRs). U.S. depositary banks issue these stocks. Each ADR represents one or more shares of foreign stock or a fraction of a share."
http://www.sec.gov/answers/adrs.htm

The Alaska Corporations Code provides that a foreign corporation
authorized to do business in the State enjoys the same rights and privileges as a
domestic corporation, and is subject to the same duties, restrictions, penalties,
and liabilities as a domestic corporation of like character. AS § 10.06.740. The
Corporations Code allows shareholder's derivative actions in Alaska:

> (a) An action may be brought in the right of a domestic or foreign
> corporation to procure a judgment in its favor by a holder of shares
> of the corporation, of voting trust of the corporation, or of a
> beneficial interest in the shares of the corporation. AS § 10.06.435.

The Code applies to all corporations doing business in the State, both
foreign and domestic. The statute provides all companies notice that they may
be sued derivatively in the State of Alaska.

Alaska's conflict of laws principles are consistent with and resolved under
the Restatement (Second) of Conflict of Laws. See Long v. Holland America
Line Westours, Inc. 26 P.3d 430 (Alaska 2001). The Restatement states:

[t]he local law of the state of incorporation will be applied to determine the
existence and extent of a director's or officer's liability to the corporation,
its creditors and shareholders, *except where*, with respect to the particular
issue, some other state has a more significant relationship under the
principles stated in § 6 to the parties and the transaction, in which event
the local law of the other state will be applied." Rest 2d Confl. § 309
(emphasis added).

The principles stated in the Restatement and the applicable
considerations in this case are: (a) the needs of the interstate and international
systems. Interstate and international systems must rely on corporations to be
good corporate citizens. Laws which hold corporations liable for their
wrongdoing facilitate the harmonious flow of commerce; (b) the relevant policies
of the forum. The policies of Alaska favor holding Defendants accountable for
their alleged acts and omissions which have an impact within the state. Alaska
policies also favor allowing Plaintiffs to sue in their chosen forum; (c) the
relevant policies of other interested states and the relative interests of those
states in the determination of the particular issue. While England does have an
interest in policing the internal affairs of its corporations, Alaska's interest here
is dominant, as it is the *situs* of the consequences of Defendants' alleged

wrongdoing. Moreover, the corporate law of England currently would not allow these actions to proceed. The legislative and public policy of England is undergoing change as reflected by the referenced statute effective in October 2007. Although that statute may apply retroactively, English courts have not had an opportunity to interpret it. Notably, Defendants argue that it is definitely not retroactive. Regardless of whether the statute is retroactive, Alaska has a significant interest in the management of BP when those decisions detrimentally impact the nature and quality of operations in Alaska; (d) the protection of justified expectations.

The Charter signed between the State and BP indicates state courts have jurisdiction interpreting that Charter. The Corporations Code of Alaska clearly governs foreign corporations operating in Alaska. BP can hardly be surprised that Alaska law governs. BP and its subsidiaries have availed themselves of the laws of this State and could justifiably expect to be held accountable under the same laws which have allowed them to make substantial profits in this State; (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied. An Alaska state court will be able to effectively apply state law. See Rest 2d Confl. § 6.

"If the purposes sought to be achieved by a local statute or common law rule would be furthered by its application to out-of-state facts, this is a weighty reason why such application should be made." Id., Comment (e).

One of the purposes of the Alaska Corporations Code is to allow shareholders of a company, on behalf of that company, to redress alleged wrongdoing which harmed it. That purpose should be honored when considered together with the above public policy factors.

Alaska law is applicable to this cause of action.

## 2) Jurisdiction

### Personal Jurisdiction

The Court entered a previous order indicating it would reserve ruling on personal jurisdiction for those individual Defendants who raised that issue. However, after review of the law, the Court sets aside that order and will enter a ruling on personal jurisdiction. The Defendants' declarations concerning personal jurisdiction were considered.

The Alaska long-arm statute has been interpreted broadly as an attempt by the legislature to establish jurisdiction to the maximum extent permitted by due process. See Jonz v. Garrett/Airsearch Corp., 490 P.2d 1197 (Alaska 1971); Packard v. Cessna Aircraft Co., 366 F. Supp. 966 (D. Alaska 1973). State courts have jurisdiction over a foreign corporation that "is engaged in substantial and not isolated activities in the state, whether the activities are wholly interstate, intrastate, or otherwise." AS § 09.05.015(a)(1)(D). The Alaska Supreme Court has construed the statute "as having for its purpose the providing of a local forum to residents of the state who have a grievance against a foreign corporation growing out of its business activities within the state." Northern Supply, Inc., v. Curtis-Wright Corporation, 397 P.2d 1013, 1015 (Alaska 1965).

Constitutional due process is satisfied when a nonresident defendant has minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. Jonz , 490 P.2d 1197. The 9th Circuit uses the following factors when determining the sufficiency of contacts with the forum: 1) the nonresident defendant must purposefully avail himself of the privilege of conducting business in the forum, thereby invoking the benefits and protections of its laws; 2) the claim must arise from nonresident defendant's forum-related activities; 3) the exercise of jurisdiction must be reasonable. Insurance Co. of N. Am. v. Marina Salina Cruz, 649 F.2d 1266, 1270 (9th Cir. 1981).

The quality, rather than the quantity, of contacts matters when establishing personal jurisdiction. Jonz, 490 P.2d 1197. The occurrence of an injury in Alaska allegedly caused by an act or omission by a defendant outside of Alaska is itself a contact with the State. While insufficient on its own, few additional

contacts must be shown to satisfy due process requirements. Id. The Alaska Supreme Court has upheld jurisdiction in a case involving German and Alaska legal doctrine, documents, exhibits, witnesses and counsel; where the parties were both American and German; and where the original injury and the underlying litigation occurred in the state (despite parties' claims of inconvenience and unreasonableness). Volkswagenwerk v. Klippan, 611 P.2d 498 (Alaska 1980), cert denied, 49 U.S. 974, 101 S. Ct. 385, 66 L. Ed. 2d 236 (1980).

Plaintiffs assert BP owns 100% of its US subsidiaries, including BPXA.; that BP is Alaska's 6th largest employer, the largest investor and taxpayer, the owner of 47% of the Trans-Alaska pipeline; and that BP derives 10% of its worldwide oil production from Alaska. Defendants have not contested these allegations.

Plaintiffs allege that BPXA, BP's subsidiary in Alaska, is the corporate alter ego of BP. Using the test for a corporate alter ego articulated by the Alaska Supreme Court in Jackson v. Gen. Elec., 514 P.2d 1170, 1173 (Alaska 1973), Plaintiffs argue that BP and BPXA are essentially one entity. Plaintiffs state that: 1) BP owns all or most of the capital stock of BPXA; 2) a commonality exists between the directors and officers of BP and BPXA; 3) BPXA's earnings are reflected in BP's financial reports to determine the parent company's income; 4) BPXA has no other business besides that with BP, the parent Corporation, and has no assets except for those conveyed to it by BP; 5) BP characterizes BPXA internally and externally (on its website) as a division or department of BP; 6) BP uses the property of BPXA as its own; and 7) the management of BPXA does not act independently, but takes its orders from the BP Board. The Charter BP signed with Alaska further ties the parent Company to BPXA.

BP operates in the State pursuant to a 1999 Charter for the Development of the Alaskan North Slope. The Charter, entered into by BP, the State of Alaska, and ARCO was a condition of the merger between BP and ARCO and required the companies to make "substantial marketplace and community commitments to Alaska." Lord John Browne and Rodney Chase (for BP), Kevin Meyers (for ARCO), and Richard Campbell (for BPXA) bound the Company, and

themselves as fiduciaries, when they signed the Charter with the State. Browne and Chase are individual Defendants in this case.

The State of Alaska could sue BP under contract theories if there was non-performance under the Charter. BP made a number of environmental and other commitments in the Charter. Plaintiffs allege those commitments were not met as a result of the alleged conduct of the Company and its Board and that the conduct of the Company and Board caused the injuries leading to this action. Those commitments included North Slope spill response requirements, corrosion monitoring and cleanup of abandoned sites. BP also guaranteed that should any of its group companies or assignees fail to fulfill the terms of the Charter, BP Amoco would "cause that performance to be otherwise fulfilled." By consenting to assume responsibility for the acts or omissions of its subsidiaries, BP, as the parent Company, may have assumed liability for the actions of BPXA. See, Nerox Power Systems, Inc. v. M-B Contracting Co., Inc., 54 P.3d 791, n. 42 (Alaska 2002) (quoting Jackson, 514 P.2d 1170 at 1173). Imposition of liability on the parent is justified where "the two corporations are so closely intertwined that they do not merit treatment as separate entities." Id.

BP America, a subsidiary of BP and a Defendant, is incorporated in Delaware. BPXA is also incorporated in Delaware. Corporate case law from Delaware is instructive in evaluating whether BP and its subsidiaries should be subject to Alaska courts. A line of cases from Delaware has held that that "while the stock ownership of a Delaware subsidiary is not, without more, a sufficient contact upon which to predicate jurisdiction, that contact may be sufficient where the cause of action arises from the creation and operation of the Delaware subsidiary." Computer People, Inc. v. Best Intern. Group, Inc., 1999 WL 288119, at *9 (Del.Ch., 1999) (Not Reported in A.2d). The Delaware Supreme Court has held that "a foreign corporation cannot use the laws of this State to govern the operations of its subsidiary and then, in a suit relating to the operation of the subsidiary, claim that jurisdiction in Delaware offends traditional notions of fair play." Id., n.35 (quoting Sternberg v. O'Neil, 550 A.2d 1105, 1121 (Del.1988)). The record seems to indicate that BP created BPXA to facilitate its Alaskan operations. The alleged acts or omissions of BP's Board, officers and directors

had an allegedly negative impact on BPXA, its operation, its profitability, and its corporate citizenship in Alaska. Allegedly those decisions or actions led to an oil spill on the North Slope. The exercise of personal jurisdiction over BP "through" its subsidiary BPXA would be proper.

BP has availed itself of the privilege of doing business in Alaska and of the protections of Alaska's laws, making it reasonable for BP to expect to be haled into court in the State. The claims which are the subject of this litigation arise out of Defendants' decision making that had forum-related impact. The directors and officers of BP and its subsidiaries are and were under fiduciary duties to the companies. The individual defendants availed themselves of the benefits of sitting on the Board or being officers of BP and its subsidiaries. They should all reasonably expect to be responsible for their decisions including the impact where those decisions are carried out. The alleged breach of their duties had an impact on BP's operations in Alaska. The injuries complained of took place in Alaska. Finally, the exercise of jurisdiction over both individual and corporate Defendants is reasonable because witnesses, documents, exhibits, and parties are located in Alaska, and nothing points to Alaska having any less of a jurisdictional claim over Defendants than England would have.

This Court's jurisdiction over Defendants does not offend "traditional notions of fair play and substantial justice". International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158 (1945).

### Waiver

Rule 12(h) of the Alaska Rules of Civil Procedure states that a defense of lack of jurisdiction over a person and improper venue are waived if the defense was omitted in previous motion practice, despite the fact that it was then available to the party claiming lack of jurisdiction in the current motion. Alaska R.Civ.P. 12(g)-(h). The Alaska Supreme Court has ruled that Rule 12(b) "requires the defendant to plead the defense of lack of personal jurisdiction in its answer or by motion, at the peril of waiving the defense pursuant to Rule 12(h)." Morrow v. New Moon Homes, 548 P.2d 279, 294 (Alaska 1976) (overruled on other grounds).

"In addition to waiver by failure to include the defense in a responsive
pleading or in a Rule 12 motion, the defense may be waived as a result of the
course of conduct pursued by a party during litigation." Wright v. Interbank
Capital Inc., 1999 WL 354516, at *2 (N.D.Cal). The 9th Circuit in Wright denied
the defendants' motion to dismiss the action for lack of personal jurisdiction and
venue and found that defendants had waived those defenses through their
litigation conduct. The Court based its decision on a 1st Circuit case, which
affirmed defendants' waiver of venue based on their requests for hearings on
plaintiffs' motions for TROs, the filing of applications to appear pro hac vice and
the signing of two stipulations. Id. The Wright Court emphasized that the case
for waiver before it was especially strong given the defendants "sought
affirmative relief from this Court," which included a motion to remove counsel. Id.

In this case Defendants removed the case to the United States District
Court for the District of Alaska on 10/24/06. All individual Defendants and
nominal Defendants BP America, Inc., BP and BPXA filed notices of consent to
removal on or around the same date. Defendants filed multiple applications for
their counsel to appear pro hac vice in federal court. Defendants filed a motion
to disqualify counsel on 11/17/06 in the federal court. On 12/11/06, Defendants
signed a stipulation to remand the action back to Alaska state court. This was
followed by Defendants' applications to appear pro hac vice in state court. On
12/18/06, Defendants moved to disqualify Plaintiffs' counsel in state court. On
12/22/06, Defendants signed a stipulation to consolidate the pending actions
(Donnelly and Unite Here). In the following months, Defendants engaged in
extensive motion practice without raising the defense of lack of personal
jurisdiction until their motion to dismiss, filed on 2/13/07. Defendants have
waived the defense of lack of personal jurisdiction both procedurally, per Rule
12(h), and based on their litigation conduct.

Defendants' motion to dismiss the case on the basis of lack of personal
jurisdiction over the parties is denied.

## 3) Forum Non Conveniens

Defendants rely on the US Supreme Court's decision in Piper Aircraft Co. v. Reyno, 454 U.S. 235, 102 S.Ct. 252 (1981) to argue that while a degree of deference is afforded to Plaintiffs' choice of forum, the Court must look at whether the forum proposed by Defendants could exercise jurisdiction over Defendants and would be adequate. While this is an accurate statement of the law as articulated by Piper Aircraft, Defendants' reference is incomplete. The text they quote goes on to state:

> In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied. Thus, for example, dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute. cf. Phoenix Canada Oil Co. Ltd. v. Texaco, Inc., 78 F.R.D. 445 (Del.1978) (court refuses to dismiss, where alternative forum is Ecuador, it is unclear whether Ecuadorian tribunal will hear the case, and there is no generally codified Ecuadorian legal remedy for the unjust enrichment and tort claims asserted).

Piper Aircraft Co., 454 U.S. at 255, 102 S.Ct. at 265 n.22. A foreign forum may be seen as inadequate if the remedies it provides are "so clearly inadequate or unsatisfactory" as to afford no remedy at all. Id., at 254, 265.

The Piper Aircraft Court's reasoning is applicable to this case. An alternative forum does exist. It is probable, but not known to a certainty, that England could exercise jurisdiction over all Defendants. But the Court questions whether that forum is in fact an adequate one. In their pleadings, Defendants argue that the English courts are an adequate forum for the resolution of this case while simultaneously asserting that this action could not be brought under English common law, which allows for derivative suits only in extremely limited circumstances. Defendants also argue that the pending English corporate statutory law is not retroactive. Given the current uncertainty as to English law in this area, English courts do not constitute an adequate forum for Plaintiffs. This brings the issue of *forum non conveniens* back to Piper Aircraft, which held the dismissal of an action in cases "where the alternative forum does not permit

litigation of the subject matter of the dispute" inappropriate. Id., at 255, 265, n.22.

The Alaska Supreme Court has ruled that the doctrine of *forum non conveniens* has "'only an extremely limited application' in cases where a plaintiff is a resident of the forum state." Baypack Fisheries, L.L.C. v. Nelbro Packing Co., 992 P.2d 1116, 1119 (Alaska 1999) (quoting Bromley v. Mitchell, 902 P.2d 797, 800 (Alaska 1995)). A court applying the doctrine "should decline to exercise its jurisdiction only if the selected forum is a seriously inconvenient place to conduct litigation." Id., at 1118. The Court also stated that "a plaintiff's choice of forum should rarely be disturbed unless the balance of private and public interests weighs strongly in favor of dismissing the case." Id., at 1119. Three of the five Plaintiffs in this action are identified as Alaska residents.

There are five factors to consider when evaluating alleged *forum non conveniens*: "the ease of proof, the availability and cost of obtaining witnesses, the possibility of harassment of the defendant in litigating in an inconvenient forum, the enforceability of the judgment, [and] the burden on the community in litigating matters not of local concern...." Id. (citing Crowson v. Sealaska Corp., 705 P.2d 905, 907-08 (Alaska 1985)). In the case at bar, the proof and the ease of obtaining it does not point to dismissal. Much of the alleged conduct occurred in Alaska (and the US) and it is likely that much of the supporting documentation will be found here. Although the BP Board is headquartered in London, modern technology will allow evidence and discovery to be transmitted electronically. The availability of witnesses does not point toward dismissal. If witnesses located outside of Alaska or the US cannot attend trial, "their depositions may be used." Id., at 1120. Defendants have sufficient contacts with Alaska to anticipate being involved in litigation in the forum. Plaintiffs assert the cost of transporting witnesses to England will be higher than the cost of transporting the English witnesses here, as more witnesses are located in the US. Regardless of the accuracy of that assertion, "[T]he operative issue is not whether considerations of efficiency and economy make a foreign forum more convenient for defendants, but whether there are factors that render litigating in this forum vexatious or

oppressive." National Union Fire Ins. Co. of Pittsburgh, PA v. BP AMOCO P.L.C., 2003 WL 21180421, at *8 (S.D.N.Y. 2003) (Not Reported in F.Supp.2d).

Nothing has been presented to this Court to show that Plaintiffs have chosen this forum to harass Defendants or that Plaintiffs have engaged in "forum shopping". Plaintiffs' choice appears motivated by their connection to the forum, which was the *situs* of the results of Defendants' alleged misconduct. That choice is entitled to "a high degree of deference". Id., at *3.

The Court has been advised there is a similar action pending in federal court in New York. Plaintiffs are not legally required to join that action. They are free to bring their independent claims for relief as long as the maintenance of the separate suits does not "render[ ] the domestic forum so oppressive and inconvenient that it merits overriding plaintiffs' choice of forum." Id., at *8.

Given BP's extensive holdings in Alaska and the US, nothing will prevent the enforcement of a judgment against the corporate Defendants, should such a judgment be handed down. At least one court has held that "any judgment obtained in New York would be enforceable as easily as one obtained in London. Since BP Amoco is composed of many corporations with offices and assets located around the world, any logistical problems or opportunities involved in enforcing a judgment would be similar in either case." Id., at *6. The relief sought against individual Defendants includes forfeiture of any bonuses and "unjust enrichment" received based upon their positions. To the extent those remunerations have not yet occurred, BP controls the assets and is subject to any decision of the Court, as previously noted. Lastly, the State of Alaska and its citizens have an interest in the board and officer activity of any foreign corporation when those decisions result in injury to the local environment or the local economy.

This case is not dismissed for *forum non conveniens*.

**CONCLUSION**

Defendants' Motion to Dismiss is **DENIED**.

ENTERED this 17th day of May, 2007, in Anchorage, Alaska.

Jack W. Smith
Superior Court Judge

I certify that on ___5/17/07___
a copy of the above was mailed to each of the
following at their addresses of record:    Feldman / Trickey / Torgerson

CSigurdsson
Administrative Assistant

**TAB F**

A-326

# In the Supreme Court of the State of Alaska

In Re: BP P.L.C. Derivative Litigation, )
)    Supreme Court No. S-12747
)
)    **Order**
)    Petition for Review
)
)
)    Date of Order: 7/19/07
)
—————————————————— )
Trial Court Case # 3AN-06-11959CI

Before: Matthews, Eastaugh, Bryner, and Carpeneti, Justices [Fabe, Chief Justice, not participating]

On consideration of the Petition for Review filed on **6/11/07**, and the response filed on 6/25/07 and updated appendix filed on 7/11/07,

IT IS ORDERED:

1.    The Petition for Review is GRANTED.

2.    Formal briefs conforming to Appellate Rule 212 and excerpts conforming to Appellate Rule 210 shall be filed. The petitioner's opening brief and excerpt shall be served and filed on or before **8/21/07**. Briefing and excerpting shall thereafter proceed on the schedule prescribed in Appellate Rule 212(a)(1).

3.    Either party may request oral argument within the time allowed by Appellate Rule 213(a).

Entered by direction of the court.

Clerk of the Appellate Courts

*Marilyn May*
Marilyn May

A-327

In Re: BP P.L.C. Derivative Litigation p. 2
File No. S-12747
7/18/07

cc:    Supreme Court Justices
       Judge Smith
       Trial Court Clerk-Anchorage

Distribution:

Steven J. Purcell
Sullivan & Cromwell LLP
125 Broad St
New York NY 10004

Richard C. Pepperman II
Sullivan & Cromwell LLP
125 Broad Street
New York NY 10004

John L. Warden
Sullivan & Cromwell LLP
125 Broad Street
New York NY 10004

D. Andrew Pietro
Sullivan & Cromwell LLP
125 Broad Street
New York NY 10004

Jeffrey M Feldman
Feldman Orlansky & Sanders
500 L Street Suite 400
Anchorage AK 99501

James E Torgerson
Heller Ehrman White & McAuliffe LLP
510 L Street Suite 500
Anchorage AK 99501

Jonathan W. Cuneo
Cuneo Gilbert & Laduca
507 C Street, NE
Washington DC 20002

William S. Lerach
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego CA 92101

Pamela Gilbert
Cuneo Gilbert & Laduca
507 C Street, NE
Washington DC 20002

Mary K. Blasy
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego CA 92101

Darren J. Robbins
Lerach Coughlin Stoia Geller Rudman & Robins LLP
655 West Broadway, Suite 1900
San Diego CA 92101

Brian J. Robbins
Robbins Umeda & Fink LLP
610 West Ash Street, Suite 1800
San Diego CA 92101

Jeffrey P. Fink
Robbins Umeda & Fink LLP
610 West Ash Street, Suite 1800
San Diego CA 92101

James D. McWilliams
Robbins Umeda & Fink LLP
610 West Ash Street, Suite 1800
San Diego CA 92101

Howard S Trickey
Jermain Dunnagan & Owens
3000 A Street Suite 300
Anchorage AK 99503

**TAB G**

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 2063852 (S.D.N.Y.)
(Cite as: 2005 WL 2063852 (S.D.N.Y.))

C

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
LOCALS 302 AND 612 OF THE INTERNATION-
AL UNION OF OPERATING ENGINEERS-
-EMPLOYERS
CONSTRUCTION INDUSTRY RETIREMENT
TRUST, Indiana Electrical Workers Pension
Trust Fund IBEW, et al. Plaintiffs,
v.
James J. BLANCHARD, et al., Defendants.
No. 04 Civ. 5954(LAP).

Aug. 25, 2005.

OPINION AND ORDER

PRESKA, J.

**\*1** Defendant Nortel Networks Corporation
("Defendant" or "Nortel") presently moves to dis-
miss the derivative action filed by Plaintiff Locals
302 and 612 of the International Union of Operat-
ing Engineers--Employers Construction Industry
Retirement Trust and Plaintiff Indiana Electrical
Workers Pension Trust Fund IBEW (collectively,
"Plaintiffs"). Counsel appeared on August 2, 2005
for oral argument on the motion. Upon considera-
tion of the parties' written and oral submissions,
Nortel's motion to dismiss is granted.

I. *Background*

Nortel is a federally chartered Canadian corporation
with its headquarters and principal place of busi-
ness in Brampton, Ontario, Canada. (Compl., ¶
60(a).) Nortel is a supplier of networking products
using wireless and wireline technologies. (*Id.,* ¶¶ 7,
18.)

On February 15, 2001, Nortel publicly announced
that it would not grow as robustly as it had projec-
ted in previous months. (*Id.,* ¶ 20.) This announce-
ment triggered a substantial drop in Nortel's stock
price. *Id.* Twenty-five class actions were sub-

sequently filed, alleging that Nortel's prior forecasts
constituted securities fraud. (*Id.,* ¶ 23.) Those cases
are ongoing and have been consolidated before the
Honorable Richard M. Berman ("Nortel I").

On October 23, 2003, Nortel publicly announced
that it would file a restatement of certain past finan-
cial statements, adjusting approximately $952 mil-
lion in liabilities that were recorded incorrectly.
(*Id.,* ¶ 32.) Nortel's Audit Committee then initiated
an independent investigation of the circumstances
between the fourth quarter of 2002 and the end of
2003 that caused the irregularities. On March 10,
2004, Nortel issued a press release describing the
need for a further restatement to correct additional
errors regarding liabilities that had been since de-
tected. (*Id.,* ¶ 35.) Shortly thereafter, Nortel termin-
ated for cause its Chief Executive Officer, Chief
Financial Officer and Controller, each of whom is a
named defendant in this case. The March 10, 2004
press release inspired another series of class actions
("Nortel II") alleging the manipulation of reserves
to achieve earnings targets. Those lawsuits are on-
going have also been consolidated before this
Court.

Plaintiff Indiana Electrical Workers Trust Fund
IBEW (the "Electrical Workers Fund") was one of
the parties that originally filed a complaint in
Nortel II. On July 1, 2004, this Court designated
lead plaintiffs and lead counsel, which did not in-
clude the Electrical Workers Fund or its counsel.
(Decl. of Tai H. Park ("Park Decl."), dated May 26,
2005, Ex. A.) One week later, on July 8, 2004, the
Electrical Workers Fund demanded by letter (the
"Demand Letter") that Nortel's Board investigate
the allegations set forth in a 111-page draft com-
plaint attached to the letter. (Park Decl., Ex. B.)
The Demand Letter drew heavily from the allega-
tions of Nortel I and Nortel II, though Plaintiffs
claim that the letter expands upon the scope and
magnitude of those allegations. The Demand Letter
also requested that the Nortel Board commence leg-
al proceedings against a number of current and
former directors and employees of Nortel. (*Id.,* Ex.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2063852 (S.D.N.Y.)
(Cite as: 2005 WL 2063852 (S.D.N.Y.))

B, ¶ 5.)

**\*2** By July 20, 2004, Nortel's Corporate Secretary sent a letter in response, stating that the Nortel Board would review the matters discussed in the Demand Letter, would consider appropriate procedures to evaluate those matters and would provide a fuller response in due course. (*Id.,* Ex. C, ¶ 2.) The Nortel Board then convened a special subcommittee comprised of the single new Board member who had not been listed as a potential defendant in the draft complaint, Dr. Manfred Bischoff. Dr. Bischoff was appointed to the Board in April 2004, well after the alleged malfeasance occurred. (Compl., ¶ 73.)

Notwithstanding Nortel's response letter of July 20, 2004, Plaintiffs filed the present Complaint on July 30, 2004. The five-count Complaint alleges that certain of the individual defendants engaged in accounting improprieties from 2000 to 2004, creating a distorted picture of Nortel's financial condition to inflate artificially Nortel's stock price, that individual defendants unjustly enriched themselves by taking certain bonuses tied to Nortel's allegedly inflated performance, and that Nortel was injured as a result. [FN1] (Compl., ¶¶ 6-38, 40-44.) The Electrical Workers Fund subsequently filed a voluntary dismissal of its complaint in Nortel II. (Park Decl., Ex. D.)

> FN1. Recent events in Canada also provide relevant background to this case. On July 28, 2004, two days prior to the filing of this action, certain shareholders of Nortel commenced an "oppression" proceeding in Ontario, seeking remedies for alleged injuries to shareholders. (Park Decl., Ex. E.) Plaintiffs in that case have asked the Canadian court for: (1) a declaration that Nortel and certain of its directors and officers have contravened Section 241 of the Canadian Business Corporations Act ("CBCA") and have "oppressed, unfairly prejudiced or unfairly disregarded the interests of" plaintiffs and other class members by approving and paying certain bonuses; (2) an

order directing an investigation into Nortel's payments under its bonus program; (3) an accounting from certain directors and officers of the benefits they received under the bonus program; and (4) a declaration that certain of Nortel's directors and officers caused the oppression. (*Id.,* Ex. E, ¶ 2 .) The Canadian case appears to resemble closely the instant case.

Since the filing of the Complaint, Nortel has continued to take remedial action. On January 11, 2005, Nortel publicly filed a restatement of financial data dating back to 2001, taking into account revenue adjustments from 2001 to 2003. Nortel published a summary of the findings of its internal investigation and announced that the independent review of revenue adjustments for 2000 and 2001 was underway and would continue. Additionally, Nortel has demanded the return of bonus payments from terminated employees, and on January 31, 2005, Nortel commenced legal action in Canada against the former Chief Executive Officer, Chief Financial Officer and Controller who refused to comply with the request to return the bonuses. (Park Decl., Ex. G.)

Nortel filed the present motion to dismiss, contending that: (1) Canadian law applies to Plaintiffs' derivative action, and pursuant to the CBCA, a derivative action against a Canadian corporation must seek leave of a specifically enumerated Canadian court; and (2) Plaintiffs have not allowed Defendant sufficient time to respond to their demand as required under the CBCA.

II. *Standard for a Motion to Dismiss*

In deciding a motion to dismiss under Fed.R.Civ.P. 12(b)(6), I must view the complaint in the light most favorable to the plaintiff. *Yoder v. Ortho-molecular Nutrition Inst., Inc.,* 751 F.2d 555, 562 (2d Cir.1985)(citing *Conley v. Gibson,* 355 U.S. 41, 47-48 (1957)). I must accept as true the factual allegations stated in the complaint, *Zinermon v. Burch,* 494 U.S. 113, 118 (1990), and draw all reasonable inferences in favor of the plaintiff. *Scheuer*

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2063852 (S.D.N.Y.)
**(Cite as: 2005 WL 2063852 (S.D.N.Y.))**

v. Rhodes, 416 U.S. 232, 236 (1974); *Hertz Corp. v. City of N.Y.,* 1 F.3d 121, 125 (2d Cir.1993). A motion to dismiss can only be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

III. *Discussion*

A. *Exclusive Jurisdiction of the Canadian Courts*

**\*3** Plaintiffs base their derivative suit on diversity of citizenship. (Compl., ¶ 58.) Accordingly, New York State conflict of law analysis applies. *See Arochem Int'l, Inc. v. Buirkle,* 968 F.2d 299, 269-70 (2d Cir.1992); *Hausman v. Buckley,* 299 F.2d 696, 700 (2d Cir.1962). In considering derivative actions, the Court of Appeals has unambiguously held that such actions are governed by the laws of the forum of the company's incorporation:

> The right of a shareholder to object to conduct occurring in the operation of the corporate enterprise is determined by the law of the state of incorporation. This includes acts that are beyond the purposes of incorporation, acts which are prohibited either by the state of incorporation or by the state where the acts are to be performed and the acts which are alleged to be beyond the authority of the officers or directors.

*Hausman,* 299 F.2d at 702-03 (internal citations omitted). This "internal affairs" choice of law doctrine is "well established and generally followed throughout this country." *Id.*

The internal affairs doctrine is equally applicable to a foreign corporation. *Id.* at 702-06 (applying Venezuelan law to dismiss a derivative action brought on behalf of a corporation chartered in Venezuela); *Batchelder v. Kawamoto,* 147 F.3d 915, 922 (9th Cir.), *cert. denied,* 525 U.S. 982 (1998)(dismissing derivative action filed against Japanese company, where there was no standing under Japanese law). [FN2]

> FN2. Further, stockholders impliedly consent to be governed by the law of a corporation's state of incorporation when they

purchase stock in the company. *See Groom v. Mortimer Land Co.,* 192 F. 849, 852 (5th Cir.1912)("Stockholders ... were impliedly bound by such [state] laws as part of the organic law of the corporation of which they were members."); *Fleeger v. Clarkson Co. Ltd.,* 86 F.R.D. 388, 395 (N.D.Tex.1980)(quoting *Groom* ). Here, Plaintiffs, as Nortel stockholders, have agreed to be bound by the CBCA.

Nortel is a Canadian company incorporated under the CBCA. (Compl., ¶ 60(a).) Section 239 of the CBCA provides the governing law for derivative actions against Canadian corporations and enumerates specific Canadian courts where such actions may exclusively be heard. [FN3] Section 239(2) states that "no action may be brought ... unless the court is satisfied that [the conditions precedent have been met]," and the term "court" is defined in Section 2 of the CBCA as various enumerated Canadian courts. [FN4]

> FN3. The full text of Section 239 reads:
> Commencing derivative action
> 239. (1) Subject to subsection (2), a complainant may apply to a court for leave to bring an action in the name and on behalf of a corporation or any of its subsidiaries, or intervene in an action to which any such body corporate is a party, for the purpose of prosecuting, defending or discontinuing the action on behalf of the body corporate.
> Conditions precedent
> (2) No action may be brought and no intervention in an action may be made under subsection (1) unless the court is satisfied that
> (a) the complainant has given notice to the directors of the corporation or its subsidiary of the complainant's intention to apply to the court under subsection (1) not less than fourteen days before bringing the application, or as otherwise ordered by the court, if the directors of the corporation or its subsidiary do not bring, diligently prosecute or defend or discontinue the action;

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

(b) the complainant is acting in good faith; and

(c) it appears to be in the interests of the corporation or its subsidiary that the action be brought, prosecuted, defended or discontinued.

FN4. (1) In this Act, ... "court" means:

(a) in the Province of Newfoundland, and Prince Edward Island, the trial division or branch of the Supreme Court of the Province,

(a.1) in the Province of Ontario, the Superior Court of Justice, (b) in the Provinces of Nova Scotia and British Columbia, the Supreme Court of the Province

(c) in the Province of Manitoba, Saskatchewan, Alberta and New Brunswick, the Court of Queen's Bench for the Province,

(d) in the Province of Quebec, the Superior Court of the Province, and

(e) the Supreme Court of Yukon, the Supreme Court of the Northwest Territories and the Nunavut Court of Justice.

Both Canadian and United States courts have made clear that where the CBCA specifically establishes exclusive jurisdiction over an action, that choice of forum must be respected. In *Nova Ban-Corp Ltd. v. Tottrup,* [1990] 1 F.C. 288 (F.C.T.D.), plaintiffs brought a derivative action under the predecessor to Section 239 in the Federal Court of Canada. While plaintiffs had been given leave to proceed by the Court of the Queen's Bench in Alberta, when the plaintiffs sought relief in the Federal Court of Canada, the Court held that plaintiffs must bring their derivative action in one of the enumerated Section 2 courts. "It is clear from subsections 232(2) and 234(2) that the action or application when brought must also be brought in the "court" as defined; namely, in Alberta, in the Court of Queen's Bench." *Id.* at 293. *See also Anderson v. Ralston Court Ltd.,* [1993] B.C.J. No. 2700 (Prov. Ct .) (QL)(provincial court lacked jurisdiction over action filed under British Columbia Corporations Act because Act defines a court as British Columbia Supreme Court).

*4 United States Courts have followed this reasoning in deferring to Canadian courts. In *Taylor v. LSI Logic Corp.,* 715 A.2d 837 (Del.1998), the Delaware Supreme Court held that it lacked jurisdiction over a shareholder action seeking an oppression remedy pursuant to Section 241 of the CBCA-- Section 241, like Section 239, contains express references to enumerated "courts." Relying on *Nova Ban-Corp,* the *Taylor* court held:

We, therefore, find that it was the intent of the Parliament that actions brought under Section 241 of the Canada Business Corporations Act be brought only in the courts of Canada identified in Section 2 of the Canadian Act.

*Taylor,* 715 A.2d at 841; *see also Ison v. E.I. DuPont de Nemours & Co., Inc.,* 729 A.2d 832, 838 (Del.1999)(construing *Taylor,* Supreme Court of Delaware observed that the "Canadian law at issue actually required adjudication in a Canadian Court leaving the Court of Chancery with no subject matter jurisdiction"). [FN5]

FN5. *Nord Resources Corp v. Nord Pacific,* (2003), 35 B.L.R. (3d) 260 brings the *Taylor* line of cases full circle. Plaintiffs, having filed a derivative action in a New Mexico state court, moved to stay proceedings before the New Brunswick Court of the Queen's Bench in a parallel action brought under the New Brunswick Corporations Act, which, like Section 239 of the CBCA, defines "court" as a specific Canadian court. The New Brunswick court held that the New Mexico court did not have subject matter jurisdiction over the derivative action and thus that the Canadian action should proceed. *Id.* at 35 B.L.R. (3d) 260.

Applying *Hausman,* the internal affairs doctrine and the *Taylor* line of cases to the present facts, there is no doubt that Canadian law applies to Plaintiffs' claims and that Section 239 of the CBCA requires Plaintiffs to seek leave of a Canadian court specifically enumerated in Section 2 of the CBCA. Accordingly, this Court cannot properly exercise jurisdiction over Plaintiffs' derivative action.

Despite this relatively straightforward application of *Hausman* and the internal affairs doctrine, Plaintiffs attempt a theory by which their derivative action sidesteps the internal affairs doctrine allowing it to proceed in this Court. Plaintiffs initially maintain that they are not obligated to bring their derivative action under the CBCA and may instead bring their action under Sections 626 and 1319 of the New York Business Corporations Law ("NYBCL"), which allows shareholders of a foreign corporation to sue derivatively in the State of New York. [FN6]

> FN6. Indeed, Plaintiffs also suggest that they are free to bring their derivative action under Canadian common law rather than the CBCA, as the CBCA (and specifically § 122(1)) is merely a codification of pre-existing common law. (Pl's.Br, 5.) However, Canadian courts have addressed this issue and held that the common law of derivative actions has been superceded by the statutory law of the CBCA. *See Shield Dev. Co. v. Snyder,* [1976] 3 W.W.R. 44 (enactment of British Columbia's statutory analogue to CBCA Section 239 abrogated the common law derivative remedy); *Farnham v.. Feingold,* [1973] 2 O.R. 132 (analogous section of Ontario Business Corporations Act "embraces all causes of action under any statute in law or in equity, that a shareholder may sue for on behalf of a corporation"). The cases that Plaintiffs cite in support of their common law derivative action argument, *In re Credit Canadien Inc.,* [1937] S.C.R. 305 and *Peso Silver Mines Ltd. (N.P.L.) v. Cropper,* [1966] 58 D.L.R. (2d) 1, were both decided years before the CBCA was enacted in 1975 and are accordingly irrelevant (*Peso* appears to have been mistakenly cited by Plaintiffs as being decided in 1996 as opposed to 1966).

While Plaintiffs seem to suggest that this choice alone resolves this motion in their favor, Section 626 by no means obviates the choice of law analys-

is that must proceed in any action based on diversity of citizenship. New York Courts must look to the law of the state of incorporation for all principles that will govern the action. *See Lewis v. Dicker,* 459 N.Y.S.2d 215, 216 (Sup.Ct. Kings County 1982)(N.Y.BCL § 1319 is "not a conflict of laws rule, and does not compel the application of New York domestic law" to derivative claims; instead, law of state of incorporation applies); *In the Matter of CPF Acquisition Co.,* 682 N.Y.S.2d 3 (App. Div. 1st Dep't 1998)(remanding case where trial court erroneously applied demand requirement under NYBCL § 626 rather than those of Delaware, the state of incorporation); *Hart v. General Motors,* 517 N.Y.S.2d 490, 492 (App. Div. 1st Dep't 1987)(applying Delaware law regarding adequacy of plaintiff's demand because "[o]ne of the abiding principles of the law of corporations is that the issue of corporate governance, including the threshold demand issue, is governed by the law of the state in which the corporation is chartered").

**\*5** Faced with the choice of law analysis, therefore, Plaintiffs respond to *Hausman* and the internal affairs doctrine in two ways. Plaintiffs argue: (1) that *Hausman* is distinguishable from the present facts; and (2) that Section 239 of the CBCA is procedural rather than substantive and therefore should not bar the derivative action from continuing here. Both arguments are without merit.

Plaintiffs address *Hausman* in a single footnote. (Pl's. Br. at 18, n. 17.) Plaintiffs argue that because *Hausman* concerned a requirement under Venezuelan law that the derivative plaintiff obtain the approval of a majority of the Venezuelan company's shareholders prior to commencing the derivative suit--a requirement not imposed by the CBCA--that *Hausman* is inapposite to this case. In essence, Plaintiffs argue that because the specific requirements of Venezuelan law and the CBCA are not identical, the principle enunciated in *Hausman,* that a court must follow the internal affairs doctrine and look to the law of the forum of incorporation in adjudicating claims, is inapplicable. Plaintiffs are simply wrong; the difference between Venezuelan corporate law's majority requirement and the

Not Reported in F.Supp.2d, 2005 WL 2063852 (S.D.N.Y.)
**(Cite as: 2005 WL 2063852 (S.D.N.Y.))**

CBCA's requirement that a plaintiff seek leave of a specifically enumerated Canadian court before bringing a derivative action against a Canadian corporation does not diminish the relevance of the principles of the *Hausman* case to the present facts. [FN7]

> FN7. While Plaintiffs point to *Messinger v. United Canso Oil and Gas, Ltd.,* 486 F.Supp. 788, 797-98 (D.Conn.1980), in support of their position, there are multiple grounds to find *Hausman* far more persuasive authority. Passing for a moment that *Hausman* is binding and *Messinger* is not, the *Messinger* court did not address any conflict of law principles and failed even to mention *Hausman.* Additionally, because the facts underlying *Messinger* occurred prior to the enactment of the CBCA, the court noted that "the new statutes are not directly applicable to the instant case" and appeared to consider the new law in an advisory fashion. *Id.* at 793.

Plaintiffs also argue that the leave of court requirement contained in Section 239 of the CBCA is procedural rather than substantive and, therefore, should not act as a bar to continuation of their derivative action before this Court. Plaintiffs cite *Woodling v. Garrett Corp.,* 813 F.2d 543, 551-52 (2d Cir.1987), for the proposition that choice of law rules are designed only to import another forum's substantive law, not procedural law; however, Plaintiffs have not and, indeed, cannot show that Section 239 of the CBCA is merely procedural.

Relying on an excerpt from a treatise by Dennis H. Peterson, a well-regarded Canadian jurist also cited by Defendants, Plaintiffs attempt to describe Section 239 as procedural:

> The statutory derivative action [CBCA § 239] is a procedural code that allows certain parties in certain conditions to enforce rights or remedies that are otherwise available to the corporation as a question of substantive law.

DENNIS H. PETERSON, SHAREHOLDER REMEDIES IN CANADA § 17.28 (1989). Plaintiffs' at-

tempt to characterize Section 239 as procedural, which is based solely on the Peterson quote and the previously distinguished *Messinger* case, fails for several reasons. [FN8]

> FN8. Over three weeks after Defendants submitted their reply brief in this case, Plaintiffs sent to the Court a request to file a sur-reply which actually attached the rather voluminous sur-reply that was the very subject of the request. Pursuant to *United States v. International Bus. Mach. Corp.,* 66 F.R.D. 383, 385 (S.D.N.Y.1975), I rejected the submission:
> To permit the ... papers to accompany the request, as they do in the instant case, is to enable the requesting party to accomplish its goal of placing the papers before the court, thereby reducing the question of whether the papers should be accepted for filing to relative unimportance.
> *See also Travelers Inc. Co. v. Buffalo Re-insurance Co.,* 735 F.Supp. 492, 495 (S.D.N.Y.1990), *vac'd in part on other grounds,* 739 F.Supp. 209 (S.D.N.Y.1990). The reply papers offered additional argument on the procedure versus substance question, specifically quoting one of Defendants' experts, Stanley M. Beck. Plaintiffs argue that Mr. Beck unequivocally stated that the CBCA's derivative action provisions are procedural in nature. In 1974, before the CBCA was passed, Mr. Beck wrote that: "[s]ome of the matters in [the CBCA's derivative action provisions] ... are procedural only," "attempts to encourage shareholder litigation and clear the procedural thicket that all but blocks entrance to the courts," and "Professor Rostow has characterized such shareholder actions as 'the most important procedure the law has yet developed to police the internal affairs of corporations." Stanley M. Beck, *The Shareholders' Derivative Action,* 52 CANADIAN BAR REVIEW 159, 168 (May 1974).
> Passing that these papers were stricken,

Not Reported in F.Supp.2d, 2005 WL 2063852 (S.D.N.Y.)
**(Cite as: 2005 WL 2063852 (S.D.N.Y.))**

Plaintiffs mischaracterize the meaning of their own quoted selections. Mr. Beck quite obviously does not address any choice of law issues in these quotations, and therefore his comments do not bear on the procedure versus substance argument at hand. Additionally, Plaintiff's carefully chosen quotations are not sufficient to overcome the substantial and detailed Declaration provided by Mr. Beck in support of Defendant's position. (Decl. of Stanley M. Beck, dated May 15, 2005 ("Beck Decl."), ¶¶ 1-20.)

Initially, interpretation of foreign law falls entirely within the discretion of the Court. As Judge Keenan explained in *Rutgerswerke AG & Frendo S.P.A. v. Abex Corp.,* No. 93 Civ. 2914, 2002 U.S. Dist. LEXIS 9965 (S.D.N.Y. June 4, 2002):

Federal Rule of Civil Procedure 44.1 controls determinations of foreign law in federal court. Rule 44.1 gives a district court wide latitude in resolving issues of foreign law: "The court in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law." Fed.R.Civ.P. 44.1. Because of this latitude, a court may reject even uncontradicted expert testimony and reach its own decisions on the basis of independent examination of foreign legal authorities. *See Curtis V. Beatrice Foods Co.,* 481 F.Supp. 1275, 1285 (S .D.N.Y.), aff'd, 633 F.2d 203 (2d Cir.1980).* Moreover, disagreement among legal experts on content, applicability, or interpretation of foreign law, as here, does not create genuine issues of material fact for summary judgment purposes. *See Banco de Credito Indus ., S.A. v. Tesoreria General,* 990 F.2d 827, 838 (5th Cir.1993); *Bassis v. Universal Line, S.A.,* 436 F.2d 64, 68 (2d Cir.1970); *Kashfi v. Phibro-Salomon, Inc.,* 628 F.Supp. 727, 737 (S.D.N.Y.1986).

**\*6** *Id.* at \*16. Plaintiff's singular reference to Mr. Peterson's description of Section 239 of the CBCA as a "procedural code" is insufficient to find the

provision procedural rather than substantive for choice of law purposes. Far more informative and persuasive was the Beck Declaration. There, Mr. Beck, who has more than 30 years of experience in corporate and securities law as a former Canadian law professor and Dean of Osgoode Hall Law School in Toronto, Canada, (Beck.Decl., ¶ 4), described the purpose of Part XX of the CBCA:

Part XX, Remedies, Offences and Punishment, of the CBCA, ss. 238-252, provides a complete statutory code for shareholders' remedies. Part XX encompasses derivative actions, an oppression remedy, restraining and compliance orders, and summary conviction offenses for failure to comply or filing false reports. In addition, under the very broad powers given to the court under the oppression remedy section, the court can make an order directing an investigation, ordering the trial of an issue, or ordering the dissolution of the corporation. In addition, Part XX contains with it a complete code for these particular remedies.

(Beck Decl., ¶ 7.) He notes that "[c]ommon law remedies are completely ousted by the remedial code under Part XX of the CBCA." *Id.,* ¶ 10.) With respect to the leave requirement of Section 239, Mr. Beck states:

Given the definition of court set out above, under Canadian law with respect to corporations organized under the CBCA, a court other than a court set out in section 2 of the CBCA would lack jurisdiction to entertain a claim under Part XX of the Act, and in particular a derivative action under section 239.

*Id.* at ¶ 15. Finally, Mr. Beck concludes:

Canadian courts have consistently held that "matters of internal management of a corporation and questions affecting the status of a corporation" should be determined by the courts in the jurisdiction of the corporation's domicile. And given the very broad powers vested in the court under both the derivative action and the oppression remedy in Part XX of the CBCA, it is clear under conflicts of laws principles, apart from the very clear definition of court in section 2 of the Canada Act, that a derivative action and matters arising therefrom are matters for the courts in the

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2063852 (S.D.N.Y.)
**(Cite as: 2005 WL 2063852 (S.D.N.Y.))**

corporation's domicile.
*Id.* at ¶ 20. I find Mr. Beck's Declaration to be a correct statement of Canadian law on these topics.

Further, both the Supreme Court and Court of Appeals have found that demand rules in derivative actions are substantive in nature. *See Kamen v. Kemper Fin. Servs., Inc.,* 500 U.S. 90, 96-97, 108-09 (1991); *RCM Sec. Fund, Inc. v. Stanton,* 928 F.2d 1318, 1326-27 (2d Cir.1991). As stated in *Hausman,* "the issue is not just 'who' may maintain an action or 'how' it will be brought, but 'if' it will be brought." *Hausman,* 299 F.2d at 701. No determination could be more substantive. Accordingly, the CBCA's leave requirement is "not a mere formality" but rather one of several substantive "statutory preconditions ... intended to protect the corporation from undue interference." *Charas v. Sand Tech. Sys. Int'l Inc.,* No. 90 Civ. 5638, 1992 U.S. Dist. 15227 at *7 (S.D.N.Y. Oct. 7, 1992).

**\*7** In sum, I find that the internal affairs doctrine mandates that the law of the forum of incorporation governs Plaintiffs' claims. Nortel is a federally-chartered Canadian corporation, and, therefore, the CBCA controls. Section 239 of the CBCA requires that a plaintiff seek leave of a specifically enumerated Canadian court before proceeding with a derivative action. Plaintiffs did not seek such leave here, and consequently, this Court has no jurisdiction over Plaintiffs' claim.

B. *Failure to Afford Reasonable Time to Respond to Demand*

Pursuant to Section 239(2)(a) of the CBCA, a derivative action cannot be brought unless "the directors of the corporation ... do not bring, diligently prosecute or defend or discontinue the action." Directors must be allowed a reasonable period of time to decide whether to take the action proposed in a shareholder's demand letter, and a court will not infer that a board has refused to bring an action simply because it has not issued a definitive answer. *See Tremblett v. S.C.B. Fisheries, Ltd.,* [1993] St. J. No. 2455, 1993 A.C.W.S.J. LEXIS 28013 (Nfl.Supr.Ct.1993)(shareholder's application

for leave to sue denied where board charged with investigating plaintiff's demand needed more time to determine whether legal action was appropriate).

This principle mirrors the law in the United States. Fed.R.Civ.P. 23.1 and analogous state law rules require that a demand be made or that shareholders plead with particularity exceptional circumstances that would render a demand futile. *See, e.g., Scalisi v. Fund Asset Mgmt., L.P.,* 380 F.3d 133, (2d Cir.2004); *Kaster v. Modification Systems, Inc.,* 731 F.2d 1014 (2d Cir.1984); *RCM,* 928 F.2d at 1326; *Allison v. Gen. Motors Corp.,* 604 F.Supp. 1106, 1112 (D.Del.), *aff'd,* 782 F.2d 1026 (3d Cir.1985).

Here, Plaintiffs allowed only ten days to elapse between Defendant's response to the Demand Letter and the filing of this Complaint. Defendant received the Demand Letter accompanied by a 111-page draft complaint on July 8, 2004. Defendant's response, dated July 20, 2004, stated that Defendant would "carefully consider the matters raised in [the] letter and accompanying draft complaint ... [and] provide a response ... in due course." (Park Decl., Ex. C, ¶ 2.) The Board then appointed an independent director to investigate the allegations made in the Demand Letter and to analyze whether such a derivative action would be in the company's best interests. (Compl., ¶ 73.) On July 30, 2004, Plaintiffs commenced the derivative action in this Court.

The mere three weeks that Plaintiffs allowed to pass between the Demand Letter and the initiation of this action runs entirely afoul of the cases (both Canadian and United States) considering the appropriate length of time between a demand and the filing of a complaint. Initially, the reasonableness of a time period for investigating a demand varies "in direct proportion to the complexity of the technological, quantitative and legal issues raised by the demand." *Allison,* 604 F.Supp. at 1117-18. Plaintiffs do not cite a single case, Canadian or otherwise, to stand for the proposition that a three-week period between demand letter and complaint is sufficient to investigate the complex financial and accounting issues at stake here.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2063852 (S.D.N.Y.)
**(Cite as: 2005 WL 2063852 (S.D.N.Y.))**

**\*8** In fact, the relevant case law weighs heavily against this notion. *See Tremblett,* 1993 A.C.W.S.J. LEXIS 28013 at \*23-32 (30 days notice not reasonable where board's decision had to consider evolving business consequences); *Bellman v. Western Approaches Ltd .,* (1981), 130 D.L.R. (3d) 193 (B.C.C.A.)(finding that a good faith determination by the board that an action would not be in the best interest of the company "will be a bar to the bringing of a derivative suit by a shareholder"); *Mozes v. Welch,* 638 F.Supp. 215, 21-22 (D.Conn.1986)(eight-month period between demand and filing of action deemed insufficient given complexity of legal issues, ongoing internal investigation and parallel criminal investigation); *Charal Inv. Co., Inc. v. Rockefeller,* No. Civ. A. 14397, 1995 WL 684869 at \*3 (Del. Ch. Nov. 7, 1995)(five-month period deemed insufficient given complicated corporate waste scheme); *Recchion v. Kirby,* 637 F.Supp. 1309, 1319 (W.D.Pa.1986)(two-months insufficient given complex securities fraud allegations).

Plaintiffs respond to this line of cases as they did Section 239's leave requirement. They describe the required interim period between demand letter and complaint as procedural rather than substantive. That argument fails here for the same reason it failed above; the determination of whether or not a derivative action will be brought is entirely substantive.

At oral argument, Plaintiffs also appeared to suggest that the 14-day notice requirement contained in the "conditions precedent" provision of Section 239, Section 239(2)(a)(1), was the only waiting period that the CBCA imposed on a plaintiff in a derivative action. Initially, however, to read the 14-day period as the only requirement would render meaningless the preceding clause which states that "a complainant may apply to a court for leave to bring an action ... for the purpose of prosecuting, defending or discontinuing the action on behalf of the body corporate." For that clause to have any meaning, a corporation must be afforded reasonable time to evaluate and investigate a shareholder's demand letter. *Tremblett,* 1993 A.C.W.S.J. LEXIS

28013 at \*23- 32.

Secondly, in addition to the 14-day requirement, according to Section 239(2)(c), a court must determine whether it "appears to be in the interests of the corporation or its subsidiary that the [derivative] action be brought, prosecuted, defended or discontinued ." As the Nortel Board has taken considerable action since receiving the Plaintiffs' Demand Letter (see pgs. 4- 5, *supra* ) and continues to take remedial steps, it is highly doubtful that a Canadian court would have viewed favorably the three-week window that Plaintiffs allowed Defendants between Demand Letter and Complaint, and Plaintiffs may not sidestep that determination by filing their derivative action here.

Accordingly, even if jurisdiction were present in this court, Plaintiffs have failed to satisfy the conditions precedent to filing a derivative action pursuant to Section 239 of the CBCA.

IV. *Conclusion*

**\*9** For the reasons set out above, Defendant's motion to dismiss is granted. The Clerk of the Court shall mark this action closed and all pending motions denied as moot.

SO ORDERED.

Not Reported in F.Supp.2d, 2005 WL 2063852 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**TAB H**

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 2807203 (S.D.N.Y.)
**(Cite as: 2006 WL 2807203 (S.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Conrad P. SEGHERS, individually and on behalf of
Integral Hedging Offshore,
Ltd., as its founder, sole officer and director, and
Komodo Holdings, Ltd.,
derivatively as a shareholder on behalf of Integral
Hedging Offshore, Ltd.,
Plaintiffs,
v.
David THOMPSON, Wael Chehab, James Alban-
Davies, and Integral Hedging Offshore,
Ltd., as nominal derivative action defendant, De-
fendants.
**No. 06CIV308RMBKNF.**

Sept. 27, 2006.

*DECISION AND ORDER*
BERMAN, J.

I. Introduction

**\*1** On or about January 13, 2006, Conrad P. Segh-
ers ("Seghers") and Komodo Holdings, Ltd.
("Komodo") (together, "Plaintiffs") filed a com-
plaint ("Complaint") against David Thompson
("Thompson"), Wael Chehab ("Chehab"), James
Alban-Davies ("Alban-Davies"), and Integral
Hedging Offshore, Ltd. ("IHO") (together, "Defend-
ants"), alleging that, at a May 28, 2002 sharehold-
ers' meeting, the Defendants improperly "removed
Seghers as a director and caused the purported ap-
pointment of the three Insurgent Directors, the de-
fendants in this action, as directors of IHO." [FN1]
(Complaint ¶ 32.) Subject matter jurisdiction is
based on diversity of citizenship of the parties, pur-
suant to 28 U.S.C. § 1332.

> FN1. IHO is an "offshore hedge fund" that
> is "duly organized and existing under the
> laws of the British Virgin Islands."
> (Complaint ¶ 9, 13.) Komodo "is a British

Virgin Islands international business cor-
poration" which holds 0.814 percent of the
shares of stock in IHO. (Complaint ¶¶ 8,
47.)

Plaintiffs' first and second causes of action allege
violations of IHO's Articles of Association and In-
formation Memorandum ("Articles of Association")
and violations of the International Business Com-
panies Act of the British Virgin Islands ("BVI"), re-
spectively; Plaintiffs' third cause of action alleges
violations of several provisions of New York's
Business Corporation Law ("N.Y. B.C.L." or
"B.C.L."); the fourth cause of action seeks an ac-
counting pursuant to N.Y. B.C.L. § 720; the fifth
cause of action alleges fraudulent concealment; and
the sixth cause of action alleges breach of fiduciary
duty. (*See* Complaint.)

On or about March 21, 2006, Defendants moved to
dismiss the Complaint pursuant to Rules 9(a) and
12(b)(6) of the Federal Rules of Civil Procedure
("Fed. R. Civ.P."), arguing, among other things,
that (1) Komodo lacks standing under BVI law to
bring derivative claims; (2) the provisions of the
N.Y. B.C.L. raised in the third cause of action
"simply [have] no applicability to IHO"; (3) Segh-
ers cannot raise a claim under N.Y. B.C.L. § 720;
(4) "[t]he complaint contains no allegation that the
relationship between Seghers and defendants was
such that defendants had disclosure duties to him";
and (5) Plaintiffs' breach of fiduciary duty claim
fails because "the complaint does not allege that
Seghers is, or ever was, a shareholder of IHO."
[FN2] (Notice of Motion, dated March 21, 2006;
Defendants' Memorandum of Law in Support of
Motion to Dismiss ("Def.Mem."), at 3, 13-15.) De-
fendants also argue that, if Komodo is permitted to
maintain a derivative action, it should be required
to post security pursuant to N.Y. B.C.L. § 627.
(Reply Memorandum of Law in Support of Defend-
ants' Motion to Dismiss and For Security Pursuant
to N.Y. B.C.L. § 627 ("Reply") at 4.)

> FN2. The Defendants do not appear to seek

Not Reported in F.Supp.2d                                                        Page 2
Not Reported in F.Supp.2d, 2006 WL 2807203 (S.D.N.Y.)
**(Cite as: 2006 WL 2807203 (S.D.N.Y.))**

dismissal of the first and second causes of action at this time.

On or about April 25, 2006, Plaintiffs filed an opposition, arguing, among other things, that "the Court can and should declare that the unlawful takeover [of IHO] is a legal nullity under New York law"; that Komodo has standing to bring a derivative action and "Plaintiffs' claim under N.Y. B.C.L. § 720 is sufficient." [FN3] (*See* Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss ("Opposition") at 2.) This order will resolve the open issues of (1) Komodo's standing to pursue derivative claims; (2) the applicability of the provisions of the B.C.L. raised in Plaintiffs' third cause of action; (3) the applicability of N.Y. B.C.L. § 720 as raised in the fourth cause of action; (4) Plaintiffs' fifth cause of action for fraudulent concealment; and (5) Plaintiffs' sixth cause of action for breach of fiduciary duty.

> FN3. Thus, Plaintiffs do not appear to challenge Defendants' arguments for dismissal of the third, fifth or sixth causes of action.

**\*2** Oral argument was held on September 27, 2006.

For the following reasons, Defendants' motion to dismiss is granted in part and denied in part. [FN4]

> FN4. The Court is not here ruling upon the merits of Plaintiffs' claims.

II. Background

The Court treats the following allegations in the Amended Complaint as true for the purposes of this motion. *See, e.g., Eastchester Rehab. & Health Care Ctr., L.L.C. v. Eastchester Health Care Ctr. L.L.C.,* No. 03 Civ. 7786, 2005 WL 887154, at *2 (S.D.N.Y. Apr. 15, 2005) (citing *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999)):

Seghers founded IHO "as an offshore hedge fund and incorporated it on May 19, 2000." (Complaint ¶ 13.) Plaintiffs allege that "IHO's business operations were conducted principally in New York,"

and that "most of IHO's activities, including marketing, documentation, valuations, [and the creation of] shareholder letters, notifications and statements" occurred in New York. (Complaint ¶ 9.) "Between June 2000 and September 2001, IHO raised a total of approximately $17 million in investments from at least 11 investors and at least 25 separate investments." (Complaint ¶ 14.) On September 1, 2001, the value of the assets in IHO was approximately $17,259,000. (Complaint ¶ 15.) "As of December 31, 2001, the value of the assets in IHO was approximately $4,169,000" and "[a]s of the date of this action, the value of the assets in IHO is approximately $50,000." (Complaint ¶¶ 15, 16.)

"In early 2002, several domestic hedge funds founded by Seghers ... were placed under a Dallas, Texas, court-appointed administrator, Daniel Jackson [ ("Jackson") ], in an action styled *The Art Institute of Chicago v. Integral Hedging, L.P., et al.,* No. 01-10623 (Tex.Dist.Ct., Dallas)." (Complaint ¶ 18.) "Jackson was never appointed receiver of the offshore fund, IHO, which had no affiliation with ... the plaintiff in the Dallas, Texas case." (Complaint ¶ 19.)

On May 28, 2002, Defendants, along with several others, "illicitly held an IHO shareholders meeting" (the "May 28 Meeting") at the New York law firm of Bragar, Wexler, Eagel and Morgenstern, P.C., "who, upon information and belief, were retained by or on behalf of the Insurgent Directors." (Complaint ¶ 20.) "The only persons at the meeting who were actually shareholders were [Arnoud de Villegas and Paul Wrench], who upon information and belief controlled only a few percent of the shares of IHO." (Complaint ¶ 22.) At the time of the meeting, Seghers [was] the sole officer and director of IHO." (Complaint ¶ 17.)

Plaintiffs allege that the May 28 Meeting "could only have taken place legally if IHO's sole director in May 2002, Seghers, convened a meeting of shareholders." (Complaint ¶ 25.) Seghers did not convene the May 28 Meeting, "and he never received a written request to convene a meeting by

the members holding 25 percent or more of the out-standing voting shares in IHO," as required by the Articles of Association. (Complaint ¶ 23, 26.) "In-deed, Seghers was not even informed or given no-tice of the shareholders meeting, and only later did he learn that the illicit meeting had taken place ." (Complaint ¶ 27.) The May 28 Meeting did not have a quorum, "and proxy forms were not presen-ted." (Complaint ¶ 28, 29.)

**\*3** At the May 28 Meeting, "the Insurgent Direct-ors, with the participation and consent of Wexler and Morgenstern, removed Seghers as a director and caused the purported appointment of the three Insurgent Directors, the defendants in this action, as directors of IHO." (Complaint ¶ 32.) After Seghers was removed, between late 2002 and early 2003, the Defendants retained the Dallas, Texas law firm of Winstead, Sechrest and Minick, P.C. ("Winstead") as the attorneys for IHO. (Compaint ¶ 36.) Winstead also represented Jackson, the court-appointed receiver of the domestic hedge funds. (Complaint ¶ 36.) "Winstead, acting upon the in-structions of the Insurgent Directors but over the objections of plaintiff Seghers, gave full, *de facto* control of IHO and its assets to receiver Jackson" in the *The Art Institute of Chicago* ("Art Institute") ac-tion. (Complaint ¶ 36.) "However, The Art Institute of Chicago, which had brought its action for losses incurred in other hedge funds, never invested any money into IHO ... [and] the court order defining the scope of and the entities under the receivership [in the Art Institute action] never included IHO." (Complaint ¶ 38.)

"Upon information and belief, the IHO Insurgent Directors, in violation of law and breach of their fi-duciary duties, have purportedly acquiesced in the receiver's allocation and distribution plan, which will result in enormous losses to the IHO share-holders, including plaintiffs, of nearly all of their investments ..." (Complaint ¶ 42.)

III. Legal Standard

"Any Rule 12(b)(6) movant for dismissal faces a difficult (though not insurmountable) hurdle." *Har-*

*ris v. City of New York,* 186 F.3d at 247 (internal citation omitted). "Dismissal of a complaint for failure to state a claim pursuant to Rule 12(b)(6) is proper only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of [his] claim that would entitle [him] to relief.' " *Polar Int'l Brokerage Corp. v. Reeve,* 108 F.Supp.2d 225, 229 (S.D.N.Y.2000) (quoting *Harris,* 186 F.3d at 247). "The court must accept as true all material facts al-leged in the complaint and draw all reasonable in-ferences in the nonmovant's favor." *Id.*

Fed.R.Civ.P. Rule 9(a) "requires not only that the pleader make a specific negative averment of the plaintiff's capacity to sue, but also that the averment include 'such supporting particulars as are peculi-arly within the pleader's knowledge.' " *Pressman v. Estate of Steinvorth,* 860 F.Supp. 171, 176 (S.D.N.Y.1994) (quoting *Marston v. American Em-ployers Ins. Co.,* 439 F.2d 1035, 1041 (1st Cir.1971)).

IV. Analysis

(1) Komodo's Standing to Pursue Derivative Claims

Defendants argue that the Court should apply BVI law and that "under BVI law, minority shareholders [such as Komodo] have no standing to bring deriv-ative claims." (Def. Mem. at 2.) Plaintiffs counter (unpersuasively) that for Defendants "to claim their illicit actions are essentially immune from redress because of British case law governing derivative actions, would be like watching the son of a foreign diplomat strip and sell parts of 40 New Yorkers' cars at the Ninth Avenue street fair and thumb his nose at our citizens under the laws of diplomatic immunity." (Opposition at 4-5.)

**\*4** Where, as here, a derivative suit is based upon diversity jurisdiction, the Court must apply a New York conflict of law analysis. *See Locals 302 & 612 of the Int'l. Union of Operating Eng'rs v. Blan-chard,* No. 04 Civ. 5954, 2005 WL 2063852, at \*3 (S.D.N.Y. Aug. 25, 2005). Specifically, courts ap-ply the "internal affairs" doctrine which states that "[t]he right of a shareholder to object to conduct oc-curring in the operation of the corporate enterprise

is determined by the law of the state of incorporation," which here is the British Virgin Islands. [FN5] *Hausman v. Buckley,* 299 F.2d 696, 702 (2d Cir.1962) (internal citation omitted); *see also Hbouss v. Coca-Cola Enterprises,* No. 05 Civ. 7965, 2006 WL 2285598, at *4 (S.D.N.Y. Aug. 9, 2006) (internal citation omitted).

> FN5. Plaintiffs' reliance on *Norlin Corporation v. Rooney, Pace, Inc.,* 744 F.2d 255 (2d Cir.1984) is misplaced. The court in that case held that New York law applied because "the purported conflict is purely illusory"; that Panamanian law did not apply and that, "[i]n essence, Panama has made a determination that its interest in [Plaintiff's] affairs is insufficient to warrant the application of Panamanian law to this dispute." *Norlin,* 744 F.2d at 264. In contrast here, it appears undisputed that the British Virgin Islands has "explicit laws on derivative standing and thus cannot be said to have no interest in seeing its law applied." (Def. Mem. at 9.); *see also Hbouss,* 2006 WL 2285598, at *4 n. 2.

The parties agree that, under BVI law, derivative actions are governed by the rule in *Foss v. Harbottle,* 2 Hare 461 (Eng.1843), i.e. that "a shareholder may ordinarily bring a derivative claim on behalf of a corporation only if a simple majority of the shareholders could not ratify the conduct on which the suit is based ." [FN6] *In re Tyco Int'l., Ltd.,* 340 F.Supp.2d 94, 102 (D.N.H.2004); (*See* Def. Mem. at 6; First Kite Aff. ¶ 13; Webster Aff. ¶ 19.) Plaintiffs argue that "the British Virgin Islands would allow a derivative action to be brought by Komodo because the wrongful acts complained of fit into the exceptions to the rule in *Foss v. Harbottle.*" (Opposition at 8.) Defendants counter that "plaintiffs' reliance on the BVI 'fraud by the [minority]' exception, and the non-existent 'interests of justice' exception, is utterly misplaced." (Reply at 2.)

> FN6. The parties have each submitted affidavits of attorneys practicing in the British

Virgin Islands. Plaintiffs have provided the Court with the affidavit of Phillip Kite ("Kite"), the partner in charge of the litigation department of the BVI law firm of Harney Westwood and Riegels. Affidavit of Philip Kite in Support of Motion to Dismiss, dated March 20, 2006 ("First Kite Aff.") ¶ 1, 3.) Defendants have submitted the affidavit of Paul Webster ("Webster"), who "ha[s] practiced as a barrister in the Virgin Islands" since 1980, and is "the Senior Partner of the BVI law firm of O'Neal Webster." (Affidavit of Paul Webster in Support of Opposition to Motion to Dismiss ("Webster Aff."), dated April 26, 2006 ¶¶ 2, 3.)

Applying the rule in *Foss v. Harbottle,* the Court finds that Komodo's derivative claims are precluded because "the proper plaintiff for a wrong done to [a] company is the company itself." [FN7] (First Kite Aff. ¶ 15.); *see also Messinger v. United Canso Oil and Gas Ltd.,* 486 F.Supp. 788, 792 (D.Conn.1980) (noting that the court in *Foss v. Harbottle* "did not reject entirely the concept that an individual shareholder could sue for injury to the corporation, but [it] imposed a heavy burden of justification on the complaining party....")

> FN7. Because Komodo's derivative claims are dismissed, the Court need not consider the posting of security pursuant to N.Y. B.C.L. § 627 or the materials submitted under cover of Plaintiffs' letter dated September 27, 2006.

And, the "fraud on the minority" exception to the *Foss v. Harbottle* rule does not apply because two preconditions have not been met. *Tyco,* 340 F.Supp.2d at 98. First, Plaintiffs have not shown that "the alleged wrongdoers [ ] have 'control' over a majority of the stock with voting rights" of IHO. *Tyco,* 340 F.Supp.2d at 98. The Complaint here does not allege that the Defendants directors are shareholders of IHO--let alone that they hold a controlling number of the company's shares. *See Pavlides v. Jensen,* [1956] Ch. 565 (Chancery Divi-

Not Reported in F.Supp.2d, 2006 WL 2807203 (S.D.N.Y.)
**(Cite as: 2006 WL 2807203 (S.D.N.Y.))**

sion).

Second, Plaintiffs are unable to show that the Defendants have committed "fraud" as that term is applied under the fraud on the minority exception. "Fraud" in this context differs from the American definition of the term, and "English courts speak of fraud in this context in a broader equitable sense in which control is misused to benefit the wrongdoers at the company's expense." *Tyco,* 340 F.Supp.2d at 99; *see also Konamaneni v. Rolls Royce (India),* [2002] 1 WLR 1269, 1278 (Chancery Division) ("Fraud includes all cases where the wrongdoers are endeavouring, directly or indirectly to appropriate themselves money, property or advantages which belong to the company or in which the other shareholders are entitled to participate."). "Thus, English law, unlike its American counterpart, does not permit a derivative action to be maintained to remedy a breach of fiduciary duty that does not involve self-dealing by those in control." *Tyco,* 340 F.Supp.2d at 99. Nowhere in the Complaint is it alleged that the individual Defendants acted with the intention of "appropriat[ing] themselves money, property or advantages" which belong to IHO. *Konamaneni,* [2002] 1 WLR at 1278.

**\*5** The "interests of justice" exception to the rule in *Foss v. Harbottle* is also inapplicable, in part at least, because the exception has been called into serious doubt. The United Kingdom's Court of Appeal has "stated it was 'not convinced' that an exception to the rule in *Foss v. Harbottle* 'whenever the justice of the case so requires' was a practical test." *Tyco,* 340 F.Supp. at 102 (quoting *Prudential Assurance Co. v. Newman Indus. (No. 2),* [1982] Ch. 204 at 221); *see also Konamaneni,* [2002] 1 WLR at 1278 (stating that any previous assumption "that there was a general exception to the rule in *Foss v. Harbottle* ... where the interests of justice so require" is "no longer justified since the *Prudential Assurance* case.").

(2) Applicability of the Provisions of the B.C.L. Raised in Plaintiffs' Third Cause of Action

Defendants argue--unopposed and persuasively-

-that "the procedural requirements for IHO shareholder meetings and voting are found in IHO's Articles of Association [ ] and in BVI statutory laws" and that "the New York BCL simply has no applicability to IHO." (Def. Mem. at 13.)

"It is well established that as a matter of law, corporate governance issues are normally controlled by the law of the state of incorporation." *Lagner v. Brown,* 913 F.Supp. 260, 270 (S.D.N.Y.1996); *see also Abu-Nassar v. Elders Future Inc.,* No. 88 Civ. 7906, 1991 WL 45062, at \*12 n. 17 (S.D.N.Y. March 28, 1991) ("When determining whether a foreign corporation has observed the proper corporate formalities, courts apply the law of the country of incorporation."); *Kikis v. McRoberts Corp.,* 225 A.D.2d 455 (1st Dept.1996) ( "[I]ssues of corporate governance are determined by the State in which the corporation is chartered.").

While certain portions of the B.C.L. are applicable to foreign corporations doing business in New York by virtue of B.C.L. § 1319, Plaintiffs' third cause of action does not allege violations of those sections enumerated in section 1319 (including B.C.L. §§ 623, 626, 627, 721 808, and 907), but, rather, Plaintiff alleges that the May 28 Meeting violated B.C.L. § 602 (Meetings of shareholders); B.C .L. § 605 (Notice of meetings of shareholders); B.C.L. § 608 (Quorum of shareholders); B.C.L. § 609 (Proxies), B.C.L. § 703 (Election and term of directors), B.C.L. § 706 (Removal of directors), B.C.L. § 707 (Quorum of directors), B.C.L. § 710 (Place and time of meetings of the board), B.C.L. § 716 (Removal of officers), and B.C.L. § 717 (Duty of directors). (*See* Complaint ¶¶ 67-75.); *See Potter v. Arrington,* 11 Misc.3d 962, 965 (N.Y.Sup.Ct.2006); N.Y. B.C.L. § 1319(a)(1)-(6). The provisions of the B.C.L. raised by the Plaintiffs in the Complaint have no applicability to IHO. Rather, as Plaintiffs acknowledge in the Complaint, IHO is guided by "the Articles of Association and Information Memorandum which govern the directors and shareholders of IHO" and "provisions of The International Business Companies Act ... of the British Virgin Islands." [FN8] (Complaint ¶ 43.)

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2807203 (S.D.N.Y.)
**(Cite as: 2006 WL 2807203 (S.D.N.Y.))**

FN8. The Articles of Association provide, among other things, that "the directors of the Company may convene meetings of the members of the Company ... as the directors consider necessary or desireable," and the "directors shall in the normal course of events give not less than 10 days notice of the meetings of members to those persons whose names on the date the notice is given appear as members in the share register of the Company and are entitled to vote at the meeting." (Complaint ¶ 23.)

(3) The Applicability of B.C.L. § 720 as Raised in the Fourth Cause of Action

**\*6** Defendants argue that B.C.L. § 720 is inapplicable because "the complaint fails to contain allegations demonstrating that IHO was doing business in New York at the time this action was commenced in January 2006." [FN9] (Def. Mem. at 11.) Plaintiffs counter that "the factors [ ] pertinent to the "doing business" determination are not exhaustive, and ... the dispositive factor in any given case can vary, depending on the issues presented." (Opposition at 10.)

FN9. N.Y. B.C.L. § 720 provides, in pertinent part:

(a) An action may be brought against one or more directors or officers of a corporation to procure a judgment for the following relief:

(1) Subject to any provision of the certificate of incorporation authorized pursuant to paragraph (b) of section 402, to compel the defendant to account for his official conduct in the following cases:

(A) The neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge.

(B) The acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties.

(2) To set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness.

N.Y. B.C.L. § 720.

Section 1317 of the B.C.L. permits a cause of action against officers or directors "of a foreign corporation doing business in [New York]." N.Y. B.C.L. § 1317. Plaintiffs, therefore, may proceed with a cause of action under section 720 if it established that IHO was doing business in New York. See Air India v. Pa. Woven Carpet Mills, Inc., 978 F.Supp. 500, 503 (S.D.N.Y.1997). The Complaint alleges that "IHO's business operations were conducted principally in New York," and that "most of IHO's activities, including marketing, documentation, valuations, [and the creation of] shareholder letters, notifications and statements" occurred in New York. (Complaint ¶ 9.) This is sufficient. While Defendants contend that the relevant "inquiry is whether the corporation is doing business in New York at the time the action is brought," there does not appear to the Court to be a section 720 requirement that the corporation be doing business at the time the action was commenced. (Def. Mem. at 10.); see Air India, 978 F.Supp. at 503 (holding in the context of B.C.L. § 720 that "[t]here is no evidence sufficient to warrant an inference that [Plaintiff] is or was doing business in New York."). Plaintiffs' allegations regarding IHO's business contacts with New York, therefore, are sufficient to defeat Defendants' motion to dismiss. See CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 366 (2d Cir.1986); Chaldon Assoc., LLC v. Daedalus Capital, LLC, No. 01 Civ.2015, 2001 WL 1160580, at \*1 (S.D.N.Y. Oct. 1, 2001).

(4) Fraudulent Concealment

Defendants argue--unopposed and persuasively--that the "Complaint contains no allegation that the relationship between Seghers and defendants was such that defendants had disclosure duties to him." (Def. Mem. at 14.)

"Under New York law, a 'court must apply the substantive tort law of the state that has the most signi-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2807203 (S.D.N.Y.)
**(Cite as: 2006 WL 2807203 (S.D.N.Y.))**

ficant relationship with the occurrence and with the parties." ' *TeeVee Toons, Inc. v. Gerhard Schubert GmbH,* No. 00 Civ. 5189, 2006 WL 2463537, at *14 (S.D.N.Y. August 23, 2006) (quoting *Machleder v. Diaz,* 801 F.2d 46, 51 (2d Cir.1986)). Because the fraud alleged took place in New York (where the May 28 Meeting was held) and at least two of the individual Defendants appear to be residents of New York, the Court will apply New York law. *See TeeVee Toons,* 2006 WL 2463537, at *14.

"The elements of fraudulent concealment under New York law are a relationship between contracting parties that creates a duty to disclose, knowledge of material facts by a party bound to make such disclosures, nondisclosure, scienter, reliance, and damage." *Congress Fin. Corp. v. John Morrell & Co.,* 790 F.Supp. 459, 472 (S.D.N.Y.1992). In New York, "a duty to disclose material facts arises (1) where there is a fiduciary relationship between the parties, or (2) where one party possesses superior knowledge, not readily available to the other, and knows that the other party is acting on the basis of the mistaken knowledge." *Id.*

**\*7** The Complaint contains no allegations of a relationship between Seghers and the individual Defendants that imposes a duty to disclose. That is, it is not alleged that the individual Defendants held any position with IHO prior to the May 28 Meeting, let alone one which imposed a fiduciary duty. Nor is it alleged that after becoming directors of IHO at the May 28 Meeting, the individual Defendants owed a fiduciary duty to Seghers, who is not alleged to have been a shareholder of IHO. And, there is no allegation of any contractual relationship between Seghers and the individual Defendants creating a duty to disclose. *See Fagan v. First Sec. Invs., Inc.,* No. 04 Civ. 1021, 2006 WL 2671044, at *5 (S.D.N.Y. Sept. 15, 2006) (dismissing cause of action for breach of fiduciary duty where "there is nothing in the Complaint to suggest the existence of a fiduciary relationship ... except Plaintiffs' conclusory allegation that Defendants were fiduciaries."); *Congress Fin.,* 790 F.Supp. at 472; *see also Bavaria Intern. Aircraft Leasing GmbH v. Clayton, Dubilier & Rice, Inc.,* No. 03 Civ. 0377, 2003 WL

21767739, at *6 (S.D.N.Y. July 30, 2003).

(5) Breach of Fiduciary Duty

Defendants argue--unopposed and persuasively--that the sixth cause of action fails because "the complaint does not allege that Seghers is, or ever was, a shareholder of IHO." (Def. Mem. at 15.) The breach of fiduciary duty claim fails under the laws of either New York or the British Virgin Islands. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of America Sec., LLC,* 446 F.Supp.2d 163, 2006 WL 2053326, at *16 (S.D.N.Y. July 20, 2006) ("The elements of a claim for breach of fiduciary duty under New York law are breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages."); *Polar Intern. Brokerage Corp. v. Reeve,* 187 F.R.D. 108, 116 (S.D.N.Y.1999) ("Generally, under British law, directors owe duties to the company, and not the individual stockholders.").

As noted, Seghers does not allege that he was ever a shareholder of IHO, nor does he allege the existence of any other fiduciary relationship between himself and the individual Defendants. *See Fagan,* 2006 WL 2671044, at *5 (dismissing cause of action for breach of fiduciary duty where "there is nothing in the Complaint to suggest the existence of a fiduciary relationship ... except Plaintiffs' conclusory allegation that Defendants were fiduciaries.").

V. Decision & Order

For the reasons stated, Defendants' motion to dismiss Komodo's derivative claims is granted, as is Defendants' motion to dismiss the third, fifth and sixth causes of action. Defendants' motion is denied as to the fourth cause of action.

The parties are directed to appear at a status/ settlement conference with the Court on October 30, 2006 at 10:15 a.m., in Courtroom 14A of the Daniel Patrick Moynihan Courthouse, 500 Pearl Street, New York, New York, 10007. The parties are directed to engage in good faith settlement negotiations prior to the conference with the Court.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2807203 (S.D.N.Y.)
**(Cite as: 2006 WL 2807203 (S.D.N.Y.))**

Not Reported in F.Supp.2d, 2006 WL 2807203 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

**TAB I**

Not Reported in F.Supp.2d                                                                      Page 1
Not Reported in F.Supp.2d, 2007 WL 737502 (S.D.N.Y.)
**(Cite as: 2007 WL 737502 (S.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Marlene SEYBOLD, IRA derivatively on behalf of
ABN Amro Holdings, N.V.,
Plaintiff,
v.
Rijkman GROENINK, A.A. Loudon, Arthur C.
Martinez, A. Burgmans, D.R.J Baron de
Rothschild, L.S. Groenman, T.A. Maas-de
Brouwer, M.V. Pratini de Moraes, P.
Scaroni, Lord Sharman of Redlynch, A.A. Olijsla-
ger, Rob F. Van den Bergh,
Anthony Ruys, Wilco Jiskoot, Tom de Swaan, Joost
Kuiper, Dolf Collee, and Hugh
Scott-Barrett, Defendants,
and
ABN Amro Holdings, N.V., Nominal Defendant.
**No. 06 Civ. 772(DLC).**

March 12, 2007.

Joseph H. Weiss, James E. Tullman, Joshua M. Ru-
bin, Weiss & Lurie, New York, NY, for Plaintiff.

Thomas A. Arena, Kevin M. Ashby, Alyssa A.
Rower, Milbank, Tweed, Hadley & McCloy LLP,
New York, NY, for Defendants.

*OPINION AND ORDER*
DENISE COTE, District Judge.

**\*1** This litigation raises the issue of whether an
American holder of American Depository Receipts
(ADRs) [FN1] in a bank incorporated in the Nether-
lands has standing to bring a shareholder derivative
action against the corporation's directors for com-
mon law claims of breach of fiduciary duty and in-
demnification. It arises in the aftermath of the cor-
poration's deficient compliance with federal anti-
money laundering laws, deficiencies which have
resulted in the corporation paying hundreds of mil-
lions of dollars to federal authorities. Finding that
in this diversity action [FN2] New York choice of
law rules require that the law of the Netherlands de-

termine whether plaintiff has standing to bring a de-
rivative claim, the defendants' motion to dismiss is
granted.

> FN1. In order for a foreign corporation to
> trade on an American stock exchange, the
> foreign corporation must issue and deposit
> American Depository Shares ("ADSs")
> with an American financial institution.
> *E.ON v. Acciona*, No. 06 Civ. 8720(DLC),
> 2006 WL 3357261, at *1 n. 2 (S.D.N.Y.
> Nov. 20, 2006). The depository institution
> then issues American Depository Receipts
> ("ADRs") to the beneficial owners of the
> ADSs, who may sell the ADSs on Americ-
> an securities exchanges. *Id.* The ADR sys-
> tem is the means by which American in-
> vestors hold and trade equity interests in
> foreign companies. *Id.*

> FN2. While the complaint does not expli-
> citly state that subject matter jurisdiction is
> based on diversity, plaintiff has not offered
> any other possible ground for jurisdiction.
> The requirements of diversity are met,
> however, since the plaintiff is a New Jer-
> sey resident, all of the defendants with the
> exception of two are citizens of foreign
> countries and reside abroad, defendant
> Martinez is a citizen of the United States
> and resides in either Illinois or Connectic-
> ut, defendant van den Bergh is a citizen of
> the Netherlands and resides in Connecticut,
> and the amount in controversy far exceeds
> $75,000.

Plaintiff Marlene Seybold is a New Jersey resident
and holder of 400 ADRs of ABN Amro Holdings,
N.V. ("ABN"), a prominent international corpora-
tion offering banking services and financial
products worldwide. The defendants are eighteen
individuals who are directors and/or senior officers
of ABN, and who served in this capacity during the
period when ABN failed to comply with federal
anti-money laundering statutes. [FN3] Plaintiff has

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 737502 (S.D.N.Y.)
**(Cite as: 2007 WL 737502 (S.D.N.Y.))**

brought a derivative action on behalf of ABN against all of the individual defendants for breach of fiduciary duty and/or aiding and abetting the breach of fiduciary duty, and for indemnification for losses incurred and to be incurred by the corporation as a result of defendants' failures, which exposed ABN to liability to regulators. Seybold seeks disgorgement of any incentive-based or equity-based compensation received by the directors during the relevant time period pursuant to the Sarbanes Oxley Act of 2002, Pub.L. No. 107-204, 116 Stat. 745 (codified in various sections of 11, 15, 18, 28, and 29 of the U.S.C.) and common law. [FN4] She also seeks a judgment (1) declaring that the defendants breached their fiduciary duties, (2) requiring them to pay ABN the amounts it was damaged or will be damaged because of their conduct, (3) obligating the defendants to remit to ABN all of their salaries and other compensation received during the periods when they breached their duties, (4) requiring corrective measures and restraint from future wrongdoing, and (5) attorney's fees, expert fees, and other reasonable costs and expenses.

> FN3. Defendant Rijkman Groenink is the cn Groenink is the chairman of ABN's Managing Board. Defendant Tom de Swaan is ABN's chief fhairman of ABN's Managing Board. Defendant Tom de Swaan is ABN's chief financial officer. Defendant Hugh Scott-Barrett serves as the company's chief operating officer. These individuals, along with defendants Wilco Jiskoot, Joost Kuiper, and Dolf Collee are members of the ABN Managing Board. Defendants A.A. Loudon and Arthur C. Martinez are the chairman and vice chairman respectively of the ABN Supervisory Board. Martinez also serves as the head of the audit committee of the Supervisory Board. Defendants A. Burgmans, D.R.J. Baron de Rothschild, L.S. Groenman, T.A. Maas-de Brouwer, M.V. Pratini de Moraes, P. Scaroni, Lord Sharman of Redlynch, A.A. Olijslager, Rob F. Van den Bergh, and Anthony Ruys are members of the ABN Supervisory Board.

> FN4. The plaintiff does not specify in her complaint the provision of the Sarbanes-Oxley Act that she alleges prohibited the defendants' conduct.

## BACKGROUND

The following facts are taken from the complaint in the instant lawsuit and the parties' submissions on the defendants' motion to dismiss. The defendants' submissions include an expert declaration on the law of the Netherlands by Maarten J. Kroeze, Professor of Company Law, Erasmus University, Rotterdam; a declaration by Hendrik Willem Nagtglas Versteeg, secretary to the Supervisory and Managing Boards of ABN; plaintiff's June 2006 demand to the ABN Board of Directors; and the defendants' July 28 letter communicating the ABN Board of Director's response. The plaintiff's submissions include the July 2004 Agreement between ABN and American federal and state regulators on which the complaint relies.

A) ABN's Non-Compliance with Federal Anti-Money Laundering Statutes

**\*2** ABN is a foreign bank, as defined in Section 3101(7) of the International Banking Act, 12 U.S.C. 3101(7), that is incorporated in Amsterdam, the Netherlands as an "N.V.", a public company with limited liability. It maintains a New York branch ("New York Branch") through which it offers banking services and financial products. Since 2003, ABN has come under investigation by federal and state regulatory authorities for deficiencies in its internal controls to ensure compliance with banking law and federal anti-money laundering laws, and for alleged violations of United States sanctions laws arising from transactions originating in the bank's office in Dubai, United Arab Emirates.

In July 2003, New York state regulators alerted ABN that transactions involving Eastern Europe and limited liability companies located in the United States were "suspect." ABN's subsequent investigation discovered billions of dollars in suspect shell-company transactions. As a result, the company terminated its relationship with certain client

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

banks in Russia, Cyprus and the former Soviet republics. It also hired the U.S. law firm Morrison & Foerster to review the bank's handling of the issue.

B) The Agreement

In July 2004, ABN and its New York Branch entered into a publicly disclosed settlement agreement (the "Agreement") with the Federal Reserve Bank of Chicago, the Federal Reserve Bank of New York, the State of Illinois Department of Financial and Professional Regulation, and the New York State Banking Department. The purpose of this Agreement was to "address deficiencies relating to compliance with applicable federal and state laws, rules, and regulations relating to anti-money laundering policies and procedures." The Agreement required ABN to, among other things, allow the independent testing and audit of the New York Branch's anti-money laundering compliance, train relevant personnel, and institute a diligence program to identify and report suspicious transactions. The Agreement did not state that there had been a finding of money laundering.

C) Order to Destroy

In October 2004, while the chairman of ABN's Managing Board, defendant Rijkman Groenink, met with Federal Reserve Bank regulators in New York over the Eastern European transactions, he received a fax at the Ritz-Carlton Hotel concerning the results of an internal ABN investigation regarding Iran-Libya transactions. Groenink allegedly ordered his aides to destroy the report and to stop sending sensitive documents to the United States. ABN internal investigators later concluded that he rescinded the orders. ABN's in-house counsel reported the incident to Sullivan & Cromwell, the company's principal outside counsel.

D) Dubai Transaction

Notwithstanding the July 2004 Agreement, federal regulators found ABN to have violated U.S. anti-money laundering laws in December 2005. ABN admitted that a "handful" of officers falsely filed paperwork identifying money flows from its Dubai

Branch to the New York Branch as generic interbank transactions when the transfers were destined for companies doing business with Iran and Libya in violation of U.S. sanctions against these countries. ABN conducted an internal investigation and entered into a settlement with U.S. and Dutch regulators calling for $80 million in fines addressing the failure to report suspicious transactions and for conducting illegal business with Iran and Libya. ABN also committed to spending over $250 million annually to retrain its staff, realign its management structure, and strengthen technological safeguards.

E) The Netherlands' Company Law

**\*3** According to Professor Kroeze, corporations in the Netherlands must be governed by two separate bodies: a Managing Board and a Supervisory Board. Managing Board members are responsible for the management and business affairs of the company and owe fiduciary duties to the corporation, not to the corporation's shareholders. These fiduciary duties include a duty to the company to "properly perform" management tasks. Supervisory Board members serve in an advisory role to oversee the Managing Board. Members of both boards "have a duty of good faith which requires them to behave reasonably and equitably toward one another."

As a public company with limited liability, ABN is subject to the rules set forth in the Dutch Civil Code (the "Code"). The Code provides at least three mechanisms to commence suits on behalf of the corporation for injuries sustained as a result of the breach of duties by members of the Managing or Supervisory Boards. First, it authorizes the Managing Board to initiate legal proceedings on behalf of the company, including proceedings for mismanagement against current or former members of either board. Second, the Code also permits "a Managing Board to delegate its representative authority to one or more directors, or a non-director signatory, acting individually or in concert." ABN's Articles of Association delegate the authority to represent the company as follows:

    1. The authority to represent the Company shall

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

either reside with two members of the Managing Board acting jointly, or with one member of the Managing Board and *one duly authorized signatory* acting jointly.

2. The Company may also be represented by authorized signatories with due observance of any restrictions imposed upon their representative authority. The Managing Board shall decide on their authority, their job title and the terms of appointment, on the understanding that the title of Senior Executive Vice President may only be granted in consultation with the Supervisory Board.

(Emphasis supplied.) ABN's Articles of Association do not generally permit an individual shareholder or group of shareholders to commence a legal action on behalf of the corporation to obtain damages for alleged injuries to the corporation. Third, the "[p]revailing opinion among Dutch legal scholars" is that under the Code, the Supervisory Board may also initiate legal proceedings against Managing Board members on behalf of the corporation when there are conflicts of interest between these individuals and the company, absent any contrary provision in the corporation's articles of association.

The Code does not, however, permit a shareholder or group of shareholders to bring a derivative action on behalf of the corporation to redress injuries caused by Managing Board members' breach of their duties to the corporation. It considers "the company [to be] an independent judicial entity whose legitimate interests are ... distinct, and at times even divergent, from the interests of the company's shareholders." For this reason, Dutch jurists and legal scholars have concluded that "the law of the Netherlands does not recognise derivative suits that allow a shareholder of a company to sue on behalf of the company for an action that the company has acquired." [FN5]

> FN5. Professor Kroeze reports that only one lower court decision in the Netherlands has allowed an action resembling a shareholder derivative suit. In 2000, the District Court of the Hague permitted a 50% shareholder and director of a closely

held company to amend a claim in which he alleged harm to the value of his shares due to fraud by the defendant, the other 50% shareholder and director. District Court of The Hague, Den Haag, 12 july 2000, JOR 2001, 90 (ann.MJK) (Neth.). The plaintiff sought compensation for the company from the defendant due to his breach of duties against the company. This lower court decision does not comport with the Supreme Court of the Netherlands' earlier holding in Poot/ABO, Hoge Raad der Nederlanden [HR] [Supreme Court of the Netherlands], 2 december 1994, NJ 288 (ann.Maeijir) (Neth.), that

[t]he property of the company is separate from that of its shareholders. In the event that the company incurs a loss because a third party violates a contractual obligation or commits a tort vis-à-vis the company, only the company can bring an action against such a third party in order to seek compensation.

*Id.*

**\*4** The Code does offer shareholders other means for addressing Managing and Supervisory Board members' malfeasance. First, shareholders may vote to suspend or remove members of either board or even the entire Managing or Supervisory Board. [FN6] Second, the shareholders may pass a simple majority resolution recommending that the company initiate a legal proceeding against one or more members of the Managing Board. Leading Dutch scholars maintain that the company must follow such a directive. Third, shareholders may apply in writing to the Enterprise Chamber of the Amsterdam Court of Appeal for an inquiry into the management and state of affairs of public companies like ABN which maintain corporate headquarters in the Netherlands. [FN7] The Enterprise Chamber is authorized to make such an inquiry and take appropriate restorative action.

> FN6. ABN's Articles of Association permit a two-thirds vote of the general meeting of shareholders to take such action, provided

Not Reported in F.Supp.2d, 2007 WL 737502 (S.D.N.Y.)
**(Cite as: 2007 WL 737502 (S.D.N.Y.))**

that the voted shares comprise at least half of the company's issued share capital. The Supervisory Board may accomplish the same result by majority vote.

> FN7. A shareholder may apply to the Enterprise Chamber if her collective holdings in the company either constitute at least 10% of the company's issued share capital, or have a minimum nominal value of EUR 225,000 or any lower percentage or amount provided in the company's articles of association.

F) Litigation in the SDNY and Plaintiff's Demand

Plaintiff filed her complaint on February 1, 2006. The parties met for an initial pretrial conference on June 16, at which the Court instructed the plaintiff that if she did not make a demand upon ABN's Board by June 30 to pursue an action against the individual defendants, the plaintiff will have forgone any right to make such a demand. The defendants were instructed to advise the Court of their response to any demand by July 28.

After this conference, plaintiff issued a letter on June 21, demanding the ABN Board of Directors [FN8] to "take appropriate legal action" against the individual defendants and "any other individuals or entities responsible for causing the substantial damage to ABN Amro" resulting from acts "constituting money laundering and which could facilitate terrorism and drug trafficking, in violation of both international and U.S. laws." Such damage included the payment of an $80 million fine to the United States Federal Reserve and Treasury Department, the payment of a $41.3 million fine in January 2006 to the United States Department of Housing and Urban Development for falsifying mortgage loan documents, criminal investigation by the Department of Justice in the Southern District of New York, and serious reputational harm. The demand indicated that it was "being made ... solely at the behest of the United States District Court for the Southern District of New York."

> FN8. The plaintiff directed her June 2006

letter to the "ABN Board of Directors" without indicating whether her demand was intended for ABN's Managing or Supervisory Board.

In a July 28 letter, counsel for the individual defendants and ABN advised the Court that the ABN Board [FN9] would respond to the plaintiff's demand in two stages. First, the Board would defer consideration of the demand until resolution of defendants' then imminent motion to dismiss, which would raise the issue of plaintiff's standing to bring a derivative suit. Second, if the Court found standing, it would consider the demand to determine whether to bring claims against any or all of the individual defendants based on allegations of the complaint and consistent with its business judgment.

> FN9. The July 2006 response communicated the position of the "ABN Board of Directors" without specifying whether this position was that of the ABN Managing or Supervisory Board.

Defendants moved to dismiss the instant action on September 15, 2006. Discovery was stayed pending a decision on the motion to dismiss. The motion was fully submitted on November 29.

DISCUSSION

**\*5** The defendants move to dismiss the complaint for failure to state a claim under Rule 12(b)(6), Fed.R.Civ.P., on the grounds that the plaintiff lacks standing to assert a derivative claim on behalf of ABN and that there is no personal jurisdiction. In the alternative, the defendants move for a stay of the action pending the ABN Managing Board's decision on the plaintiff's demand that the corporation bring an action against the named defendants.

I. Standing

The defendants claim that Seybold lacks standing to sue derivatively on behalf of the corporation. [FN10] "It is now well established that in an action brought in a federal district court on the basis of di-

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

versity of citizenship, questions of whether or not a stockholder may bring a derivative action are governed by state law." *Galef v. Alexander,* 615 F.2d 51, 58 (2d Cir.1980); *see also Hausman v. Buckley,* 299 F.2d. 696, 700 (2d Cir.1962) (state law governs "the right of a stockholder of a foreign corporation to participate in its management, i.e., to bring a lawsuit on the corporation's behalf."). "A federal court, sitting in diversity, must look to the choice-of-law rules of the state in which it sits ... to resolve conflict-of-law questions," *Arochem Int'l, Inc. v. Buirkle,* 968 F.2d 266, 269-70 (2d Cir.1992), including the "substantive question of [a] stockholder's right to sue," *Galef,* 615 F.2d at 58.

> FN10. According to the Federal Rules of Civil Procedure, a derivative plaintiff must be a shareholder at the time of the transaction of which he complains, the action must not be a collusive one to confer federal jurisdiction, and the complaint must allege with particularity the efforts made to obtain the desired action from the directors of the corporation or comparable authority. Fed.R.Civ.P. 23.1. The defendants claim that as a holder of ADRs, Seybold "does not possess any ABN Amro shares, [and her] only recourse is to make a demand upon [JPMorgan Chase Bank], as depository of the shares, to bring a derivative action against ABN Amro." For the reasons detailed below, the plaintiff lacks standing on other grounds and this issue need not be reached.

A. New York "Internal Affairs" Doctrine

Under New York law, courts generally look to the law of the state of incorporation to "adjudicate[e] a corporation's internal affairs, including questions as to the relationship between the corporation's shareholders and its directors." *Id.* This conflict of laws rule "recognizes that only one State should have the authority to regulate a corporation's internal affairs--matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders--because otherwise a

corporation could be faced with conflicting demands." *Edgar v. MITE Corp.,* 457 U.S. 624, 645 (1982). The Second Circuit has articulated this so-called internal affairs choice-of-law doctrine, as follows:

> The right of a shareholder to object to conduct occurring in the operation of the corporate enterprise is determined by the law of the state of incorporation. This includes acts that are beyond the purposes of the corporation, acts which are prohibited either by the state of incorporation or by the state where the acts are to be performed and acts which are alleged to be beyond the authority of the officers or directors.

*Hausman,* 299 F.2d at 702 (citation omitted). The internal affairs doctrine is *"well established* and *generally followed* throughout this country." *Id.* (emphasis supplied). While the Second Circuit has noted that the New York Court of Appeals has "rejected any automatic application of the so-called internal affairs choice-of-law rule," *Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255, 263 (2d Cir.1984) (citing *Greenspun v. Lindley,* 36 N.Y.2d 473, 478 (1975)), on the specific question of shareholder standing to bring a derivative suit, the federal appeals court has itself applied the internal affairs doctrine, finding for example that the law of Venezuela barred a plaintiff from bringing a derivative action on behalf of a corporation chartered in that jurisdiction. *See Hausman,* 299 F.2d at 702-06.

**\*6** The parties agree that New York's internal affairs doctrine would apply Dutch law to this action. Federal Rule of Civil Procedure 44.1 grants district courts wide latitude in resolving issues of foreign law: "The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination shall be treated as a ruling on a question of law." Fed.R.Civ.P. 44.1.

The expert declaration of Professor Kroeze establishes, and plaintiff concedes, that the law of the Netherlands affords shareholders no right to bring a claim on behalf of a corporation against members of its Managing or Supervisory Boards for breach

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 737502 (S.D.N.Y.)
(Cite as: 2007 WL 737502 (S.D.N.Y.))

of duties owed to shareholders since, under Dutch law, members of these boards do not owe fiduciary duties directly to shareholders. While Dutch law and the ABN Articles of Association do provide several avenues which, if followed, would grant a minority shareholder standing to bring a derivative suit on behalf of the corporation, the plaintiff has not pled that she has brought her suit through any of these means. Seybold has not pleaded that a majority of ABN shareholders voted at a General Meeting to grant her authority to bring a derivative action. Nor has she pleaded that the ABN Managing Board delegated its representative authority to her by designating her an "authorized signator[y]" with the power to bring an action on behalf of the corporation either independently or with a member of the Managing Board. Finally, Seybold has not pointed to any provision of the ABN Articles of Association that provides an exception to these rules. The plaintiff argues, nevertheless, that Dutch law should not apply because of the public policy exception to New York's internal affairs doctrine.

B. Public Policy Exception

The Second Circuit in *Hausman,* 299 F.2d 696, considered a claim by a shareholder who, like the plaintiff in this action, argued that "even if New York courts adhere to the 'internal affairs' rule generally, they would refuse to apply it in this particular case for reasons of 'public policy.' " *Id.* at 705. As laid out in *Hausman,* application of the public policy exception requires a showing that the foreign law "is immoral or fundamentally unjust" or "outrages the public policy of New York." *Id.* (citation omitted). In applying these concepts, however, a court should be wary of substituting its own "notions of 'public policy' for well-established New York conflict of laws principles." *Id.* at 706.

Plaintiff's argument for a public policy exception to New York's internal affairs doctrine is unavailing. As was true in *Hausman,* the foreign law is different from New York law, but is neither "immoral" nor "fundamentally unjust." "New York courts are not so provincial as to say that every solution of a

problem is wrong merely because it may differ from its own." *Id.*

**\*7** Dutch law provides a variety of means for checking malfeasance by members of the Managing and Supervisory Boards of companies incorporated in the Netherlands. Like the Venezuelan law reviewed in *Hausman,* Dutch law vests primary control of corporate affairs in the directors, and creates a fiduciary duty running from the directors to the corporation. *See id.* at 705. While ABN shareholders generally lack the power to sue derivatively on behalf of the company, they have several means to influence corporate governance. Most importantly, they may exercise their vote to suspend or remove board members as set forth in the ABN Articles of Association. The shareholders as a group may also, by simple majority resolution by the general meeting of the shareholders, ask the company to initiate a legal proceeding against members of the Managing Board--a recommendation that leading Dutch scholars believe must be followed by the company. Finally, even minority shareholders with certain threshold holdings may request an inquiry into the management of a corporation by writing to the Enterprise Chamber of the Amsterdam Court of Appeal. While Dutch law provides *different* avenues for shareholders to address malfeasance by members of corporate Managing and Supervisory Boards than does New York law, there is no reason to conclude that the Dutch system is immoral or fundamentally unjust.

Plaintiff claims that the application of Dutch law will contravene important New York and United States policy and legislation that financial institutions not assist terrorist states and entities or launder money. She argues that an exception to the internal affairs doctrine is warranted to protect the safety of New York's citizens and financial markets, particularly from countries and entities that engage in terrorist activities and are developing nuclear capability. [FN11]

> FN11. In lieu of the internal affairs doctrine, plaintiff calls for the application of an "interest analysis," which would find

Not Reported in F.Supp.2d, 2007 WL 737502 (S.D.N.Y.)
**(Cite as: 2007 WL 737502 (S.D.N.Y.))**

that New York holds a "great[er] concern with the specific issue raised in the litigation," *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.,* 414 F.3d 325, 337 (2d Cir.2005) (citation omitted), than the Netherlands and would apply New York law to find shareholder standing to bring a derivative suit. An interest analysis, however, does not assist the plaintiff, but would also apply Netherlands law. The Netherlands has a significant interest in litigation seeking to redress alleged malfeasance by board members of companies incorporated under its law and headquartered on its territory. It has made this interest clear, for example, by permitting a shareholder with threshold holdings to apply to the Enterprise Chamber of the Amsterdam Court of Appeal for an inquiry into the management of public corporations headquartered in the Netherlands.

Seybold has not shown that the public policy of the Netherlands is less committed to the defeat of terrorism or to the security of financial markets than the public policies of New York. In any event, Seybold is offering the wrong paradigm. The public policy at issue is New York's policy "involving the right of stockholders to participate in the management of a corporation though the intervention of the courts." *Hausman,* 299 F.2d at 705. For the reasons already explained, Seybold has not shown that a public policy exception should be recognized with regard to the application of the New York internal affairs rule on the question of shareholder standing to bring a derivative suit. [FN12]

> FN12. The plaintiff cites only two cases to support its argument for a public policy exception, neither of which treated a conflict of law on the issue of shareholder derivative standing. *See Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,* 446 F.Supp.2d 163, 171, 193 & nn. 215-16 (S.D.N.Y.2006) (direct claims by investor for breach of fiduciary duties and for aiding and abetting fraud

and the breach of fiduciary duties against former directors and a former administrator of hedge funds based in the British Virgin Islands); *Stephens v. Nat'l Distillers & Chem. Corp.,* No. 91 Civ. 2901(JSM), 1996 WL 271789, at *1, 5 (S.D.N.Y. May 21, 1996) (indemnification claim by the Kentucky state insurance commissioner against former officers of an insolvent reinsurance company). Although this Court departed from the internal affairs doctrine in *Nat'l Distillers,* it also concluded that there was no conflict on the point of law at issue in that case--the scope of officer liability for breach of fiduciary duties--because "the applicable standards ... would not differ" under Kentucky and New York law. *Nat'l Distillers,* 1996 WL 271789, at *5 n. 5.

CONCLUSION

The defendants' motion to dismiss is granted on the ground that plaintiff lacks standing to bring a derivative suit on behalf of ABN. The defendants' motion to dismiss for lack of personal jurisdiction and their request to stay the action pending the ABN Managing Board's consideration of plaintiff's demand are both moot. The Clerk of Court shall close this case.

SO ORDERED.

Not Reported in F.Supp.2d, 2007 WL 737502 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

CITY OF HARPER WOODS EMPLOYEES'  )
RETIREMENT SYSTEM, Derivatively on  )   Case No.
Behalf of BAE SYSTEMS PLC,  )
19617 Harper Avenue  )
Harper Woods, MI 48225  )
                                          )
                     Plaintiff,  )

        vs.

RICHARD (DICK) L. OLVER
Bay Lodge
Mill Lane
Dan Bury
Chelmsford U.K. CMC 4HX,  )
                                          )
        and  )
                                          )
MICHAEL J. TURNER  )
79 Fairmile Lane  )
Cobham, Kent  )
U.K. KT 112 DG,  )
                                          )
        and  )
                                          )
WALTER P. HAVENSTEIN  )
90 Colonel Daniels Drive  )
Bedford, NH 03110,  )
                                          )
        and  )
                                          )
_____  )   DEMAND FOR JURY TRIAL
                                          )
[Caption continued on following page.]

Case: 1:07-cv-01646
Assigned To : Collyer, Rosemary M.
Assign. Date : 9/19/2007
Description: Contract

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR INTENTIONAL,
RECKLESS OR NEGLIGENT BREACH OF FIDUCIARY DUTY, CORPORATE WASTE
AND *ULTRA VIRES* CONDUCT

IAN G. KING                                        )
22 The Ridgeway                                    )
Fareham                                            )
Hampshire U.K. PO 168RE,                           )
                                                   )
        and                                        )
                                                   )
GEORGE W. ROSE                                     )
Craven Fold                                        )
Moorside Lane                                      )
Wiswell, Clitherow                                 )
U.K. BB7 9DB,                                      )
                                                   )
        and                                        )
                                                   )
CHRISTOPHER V. GEOGHEGAN                            )
Garden Close                                       )
Maidenhead                                         )
Kent U.K. SL6 4PA,                                 )
                                                   )
        and                                        )
                                                   )
PHILLIP J. CARROLL                                 )
2121 Kriby Drive, Unit 34S                         )
Houston, TX  77019,                                )
                                                   )
        and                                        )
                                                   )
MICHAEL J. HARTNALL                                )
Monkswood Priors Hatch Lane                        )
Hurtmore                                           )
Godalming U.K. GU7 2RJ,                            )
                                                   )
        and                                        )
                                                   )
SIR PETER JAMES MASON                              )
45 Graham Terrace                                  )
City of Westminster                                )
London U.K. SW1 W8HN,                              )
                                                   )
        and                                        )
                                                   )
ROBERTO QUARTA                                     )
100 Eaton Place, #3A                               )
London U.K. SW1 X8LU,                              )
_____          )

[Caption continued on following page.]

and       )
           )
SIR ANTHONY NIGEL RUSSELL RUDD )
Shirley House       )
Shirley Common      )
Park Lane        )
Ashbourne       )
London U.K. DE6 3AZ,    )
           )
  and       )
           )
PETER A. WEINBERG    )
14 Perkins Road      )
Greenwich, CT 06830,    )
           )
  and       )
           )
ANDREW GEORGE INGLIS   )
63 Nelson Road      )
London U.K. E4 9AP,     )
           )
  and       )
           )
ULRICH CARTELLIERI    )
26 Gledhow Gardens     )
Kensington and Chelsea    )
London U.K. SW5 OA2,    )
           )
  and       )
           )
SUE BIRLEY       )
Aspen Lodge       )
Boreham Street      )
Hailsham, Sussex BN27 4SH,   )
           )
  and       )
           )
MICHAEL LESTER     )
49 Sheldon Avenue     )
Haringey Highgate     )
London U.K. 464JR,     )
           )
  and       )
           )
_____)

[Caption continued on following page.]

MARK H. RONALD                          )
7110 44th Street                        )
Chevy Chase, MD 20815,                  )
                                        )
        and                             )
                                        )
MICHAEL DENZIL XAVIER PORTILLO          )
25 Victoria Square                      )
London U.K. SW1 WORB,                   )
                                        )
        and                             )
                                        )
SIR RICHARD HARRY EVANS                 )
Hall Cross Manor                        )
Kirkham Road                            )
Freckleton                              )
Preston PR4 1HU,                        )
                                        )
        and                             )
                                        )
LORD ALEXANDER HESKETH                  )
15 Cranley Place                        )
Kensington, Chelsea                     )
London U.K. 5W7 3AE,                    )
                                        )
        and                             )
                                        )
JOHN PIX WESTON                         )
The Starlings                           )
Oxshott                                 )
Leatherhead Surrey                      )
U.K. KT220 QN,                          )
                                        )
        and                             )
                                        )
KEITH CLARK BROWN                       )
Lyndsay's Farm                          )
Fryerning House, Beggar Hill            )
Fryerning, Ingatestone                  )
Essex U.K. CM4 0PF,                     )
                                        )
        and                             )
                                        )

[Caption continued on following page.]

STEVE LEWIS MOGFORD )
Ainsworth Farm )
Backlane, Heath Charnock )
Chorley, Lancashure PR6 9DJ, )
)
and )
)
PAOLO SCARONI )
C/o Enel Energy )
Viale Regina Margherita #137 )
00198 Rome, Italy, )
)
and )
)
SIR ROBIN BIGGAM )
Old Linslade Grange )
Old Linslade Road Heath and Reach )
Leighton Buzzard )
Bedfordshire U.K. LU7 0DU, )
)
and )
)
SIR CHARLES BEECH GORDON )
  MASEFIELD )
33/4 Palgrave Gardens )
Camden Town )
London U.K. NW1 6EN, )
)
and )
)
PRINCE BANDAR BIN SULTAN )
Glympton Park )
Glympton )
West Oxfordshire )
U.K. OX2O 1AU, )
)
and )
)
THE PNC FINANCIAL SERVICES GROUP, )
INC, as Successor to RIGGS NATIONAL )
CORPORATION/RIGGS BANK, N.A. )
One PNC Plaza, 249 Fifth Avenue )
Pittsburgh, PA 15222, )
)
and )
)

[Caption continued on following page.]

JOSEPH L. ALLBRITTON                          )
2940 Fox Hall Road                            )
Washington, D.C.  20016,                      )
                                              )
    and                                           )
                                              )
ROBERT L. ALLBRITTON                          )
2430 Wyoming Avenue Northwest                 )
Washington, D.C.  20008,                      )
                                              )
    and                                           )
                                              )
BARBARA ALLBRITTON                            )
2940 Fox Hall Road                            )
Washington, D.C.  20016,                      )
                                              )
              Defendants,              )
                                              )
    and                                           )
                                              )
BAE SYSTEMS PLC, an England and Wales         )
corporation,                                  )
Stirling Square                               )
Carlton Gardens                               )
London U.K. SW1Y 5AD,                         )
                                              )
         Nominal Defendant.               )
                                              )
_____          )

    This writing/publication is a creative work fully protected by all applicable copyright laws, as well as by misappropriation, trade secret, unfair competition and other applicable laws. The authors of this work have added value to the underlying factual materials herein through one or more of the following: unique and original selection, coordination, expression, arrangement, and classification of the information.

    No copyright is claimed in the text of statutes, regulations, and any excerpts from analysts' reports quoted within this work.

    Copyright © 2007 by Patrick J. Coughlin and Coughlin Stoia Geller Rudman & Robbins LLP. Patrick J. Coughlin and Coughlin Stoia Geller Rudman & Robbins LLP will vigorously defend all of their rights to this writing/publication.

    All rights reserved – including the right to reproduce in whole or in part in any form. Any reproduction in any form by anyone of the material contained herein without the permission of Patrick J. Coughlin and Coughlin Stoia Geller Rudman & Robbins LLP is prohibited.

"I would be offended if I thought we had the monopoly on corruption .
. . . We did not invent corruption . . . . This happened since Adam and
Eve. . . . [T]his is human nature."

## PRINCE BANDAR BIN SULTAN

*WGBH Interview*
September 2001

### INTRODUCTION

1.      This is a stockholder derivative action on behalf of BAE Systems plc ("BAE" or the

"Company") against the entire current BAE Board of Directors (the "Board") and several of its

present or former officers and directors (collectively the "BAE Defendants") for intentional, reckless

and/or negligent breaches of their fiduciary duties of care, control and candor, involving illegal,

improper and/or *ultra vires* conduct, including causing BAE to violate the laws of the United States

and international business conduct codes and conventions relating to honest trade and business

practices by making, or permitting to be made, improper and/or illegal bribes, kickbacks and other

payments.  Also named as defendants are Prince Bandar Bin Sultan ("Bandar"), PNC Financial

Services Group, Inc. ("PNC"), legal successor by merger to Riggs National Corporation/Riggs Bank,

N.A. ("Riggs"), and three former Riggs executives and controlling shareholders, which were,

respectively, the primary recipient or beneficiary of the bribes, payoffs and improper payments and

the primary intermediary via which these Bandar payments were laundered, actively concealing

them from government regulators and BAE's own auditors.  This conduct has caused, and is

continuing to cause, BAE damage, including the substantial costs of responding to (and the

substantial fines and penalties which may be involved in resolving) civil and criminal investigations

and proceedings – here in the United States and elsewhere – as well as serious harm to BAE's

reputation and goodwill, due to the adverse publicity resulting from these events.

2.      BAE is a publicly owned company.  Its American Depository Receipts ("ADRs") are

registered with the United States Securities and Exchange Commission ("SEC"), traded over-the-

counter in this country and owned by hundreds if not thousands of U.S. citizens.[1]  Its ordinary shares, traded overseas, are also owned by thousands of U.S.-based investors – individuals and institutional.  Approximately 50% of BAE's shareholders reside in the U.S.  BAE is one of the largest defense contractors in the U.S. and one of the largest suppliers to the U.S. Defense Department.  The Company has operations in 36 states here and generates some 40% of its annual revenues – over $9 billion – in the U.S.  BAE has more operations in the U.S. than in any other single country, including substantial operations here in Washington, D.C., which coordinate and oversee its billions of dollars of annual business with the Pentagon.

3.     To hold onto their positions of power, prestige and profit with BAE, BAE's officers and directors have represented in annual directors' reports and otherwise that under their stewardship, BAE was a highly ethical, law abiding corporation which was achieving very substantial profits due to the skills of its top managers, while operating in accordance with applicable rules and laws under the oversight of BAE's Board of Directors.  As a result, these top managers and directors of BAE held onto, and thus enjoyed, their prestigious and lucrative BAE positions, benefiting from the considerable perquisites of their positions with one of the world's largest corporations.

4.     However, the true facts were quite different than these corporate fiduciaries presented to BAE's shareholders in their reports and otherwise.  In fact, BAE's officers and directors were resorting to, or encouraging and/or permitting BAE's managers to resort to, improper, illegal and *ultra vires* activities to boost BAE's reported results, including paying bribes and kickbacks and making other improper payments, as detailed herein, to obtain contracts to make their stewardship of BAE appear more successful.  These illegal and improper actions had the desired effect, *i.e.*,

---

[1]     Each ADR represents four ordinary BAE shares and has the same rights as an ordinary share.

increasing BAE's apparent success and profitability – in the short term. Given the fact that the BAE Defendants had limited tenures in their positions at BAE, this was their real concern, not BAE's long-term profitability or the long-term interests of the actual owners of BAE, *i.e.*, its public shareholders. Defendants' imprudent and unlawful actions have had an inevitable damaging impact, and a very negative one indeed, for BAE's long-term future and the interests of its shareholder community. Despite repeated warnings and "red flags" regarding the dangers of this reckless, imprudent and/or illegal conduct, BAE's directors refused to stop such conduct or take actions they knew were necessary to correct or remedy the dangerous conditions created by that conduct. Those defendants who joined the Company as this course of conduct was ongoing have joined in that conduct, endorsed and affirmed it, allowing it to continue while taking steps to conceal it and cover it up – both from BAE shareholders as well as government investigators. The BAE directors' and officers' false statements and representations and negligent, reckless or intentional failure to properly oversee the operation and conduct of this enterprise have exposed BAE to millions of dollars in damages and potentially hundreds of millions of dollars in remedial costs and possible debarment in the U.S., and have badly damaged BAE's corporate image and reputation.

5.     In an effort to present themselves as competent, honest stewards and managers of BAE's business, the BAE Defendants have repeatedly misrepresented how they were overseeing, managing and operating BAE in a lawful and ethical manner. They told the owners of BAE – the shareholders – that compliance with anti-bribery and anti-corruption laws was especially critical to BAE given the nature of its business, *i.e.*, defense contracts with foreign governments, and thus BAE had in place rigorous internal controls to assure compliance with anti-corruption and anti-bribery laws and extensive training programs for its executives and managers in this regard, and, as a result, it was in compliance with such laws and conventions. These representations were false and misleading. Under their stewardship, the BAE Defendants have caused BAE to engage in a pattern

and practice of making illegal and improper payments to secure contracts and false and misleading statements to conceal and cover them up, thus violating the U.S. Foreign Corrupt Practices Act ("FCPA"), the anti-corruption convention of the Organization for Economic Cooperation and Development ("OECD Convention") and Section 463 of the U.K. Companies Act of 2006 ("Section 463"), all of which were applicable to BAE. Defendants' misconduct also involved repeatedly misleading BAE's shareholders to entrench and enrich themselves by boosting BAE's apparent short-term profits and to justify paying themselves excessive compensation and benefits, even though they knew or recklessly disregarded that their actions would damage BAE in the longer term.

6.      In the mid-1980s, BAE was attempting to obtain a very large military contract from the Saudi Arabian Ministry of Defense to supply 120 fighter/bomber aircraft over the next 20+ years. The officers and directors of BAE knew that if this huge contract – known as "Al Yamamah" – could be obtained, they could point to it as concrete evidence of their successful stewardship of BAE, which would in turn help them hold onto their positions of power, prestige and profit with BAE, so they could receive lucrative payments and bonuses in connection with those positions for many, many years going forward.

7.      Prince Sultan of Saudi Arabia was then in line for the royal throne and serving as the head of Saudi Arabia's Ministry of Defense. Prince Sultan's son was Bandar Bin Sultan. Bandar was the apple of his father's eye. For over 20 years – and during most of the time period relevant hereto – Bandar resided in the U.S. and served as Saudi Arabia's Ambassador to the U.S. Prince Turki bin Nasser is Bandar's brother-in-law. He was head of the Saudi Air Force. Because of their positions and relationships, Prince Sultan, Bandar and Nasser were each in a position to significantly influence whether BAE was awarded the Al-Yamamah contract.

8.      To advance their own positions with BAE by winning the Al-Yamamah contract, the then officers and directors of BAE named as defendants herein undertook illegal and improper

- 4 -

conduct (engaging in *ultra vires* activities) in breach of their fiduciary duties to BAE, including

paying bribes or kickbacks (a/k/a "backhanders") to Bandar and making other improper payments

for his (and his family's) benefit, which have amounted to over $2 billion over the last 20 years.

Although paying such bribes or kickbacks is *ultra vires* and in violation of international business

standards and the laws of the U.S., including the FCPA and the OECD Convention, as well as

BAE's own stated business policies and practices, defendants caused BAE to funnel these illegal

payments to Bandar in significant part through Riggs, located in Washington, D.C., via accounts

that, while nominally in the name of Saudi Arabia, were controlled by Bandar, over which he had

discretion and signature authority and which he used for his personal use and benefit. Riggs was

selected for this purpose because its Washington, D.C. location gave Bandar ready access to it and

because Riggs had a reputation in international commercial circles as a bank willing to facilitate

questionable, if not illegal, currency transfers for international transactions.[2] For many years, Riggs

actively participated in, facilitated and advanced the illegal bribe payments to Bandar, hiding them

from government investigation and BAE's auditors. Then – much later on – as Riggs' questionable

currency activities came under increasing government scrutiny, in an effort to stave off government

action to seize or close the bank, it identified one or more of the accounts being utilized by BAE and

Bandar to facilitate the kickback payments as involving highly questionable or improper conduct and

transactions and took steps to shut them down. At or about that time, Bandar resigned his post as

---

[2]      Riggs was ultimately exposed to have had persistent and widespread involvement in improper currency transfers and other money laundering activities. Riggs, the largest Washington D.C.-based commercial bank for much of its long history, was acquired by PNC in 2004 after various corporate scandals and management problems involving its lucrative embassy business forced Riggs to plead guilty to criminal money-laundering violations and pay $25 million in fines and penalties. In addition to funneling billions of dollars in bribes through BAE to Bandar, Riggs accounts were used to route Saudi money to 9/11 hijackers, to help Augusto Pinochet disguise millions stolen from the Chilean people, and to obfuscate transfers and unreported withdrawals of millions in oil revenues by the dictator of Equatorial Guinea.

Ambassador to the U.S. for "personal reasons" and returned to Saudi Arabia. His father remains heir to the Saudi Arabian throne and head of its Ministry of Defense.

9.    These illegal or improper payments were secretly bargained for at the outset of the Al-Yamamah contract. The payments were provided for in secret schedules to the contract entitled "Letters of Offer and Acceptance." They purported to provide compensation for "support services," which, in fact, Bandar never performed, and which was known by the participants to be a code word and cover for the bribe or kickback payments he, his father and other members of his family were receiving or benefiting from. Most of the monies paid to Bandar were received by him here in the U.S. in Washington, D.C. Significant amounts have been spent by Bandar here in the U.S., including over $100 million to build one of the largest and most lavish personal residences in the U.S., located in Aspen, Colorado.

10.    The illegal and/or improper payments have not only included outright payments to Bandar personally, but also payments by BAE for other expenditures benefiting Bandar and Bandar's family, including paying for his fantastically outfitted Airbus private aircraft, which cost over $100 million, and expenses for members of his family, including millions of dollars paid for a lavish multi-week, multi-country honeymoon for Bandar's daughter and new son-in-law.

11.    The transcript of a BBC Television documentary exposing the details of the illegal payments made in connection with the Al Yamamah contract is attached as Ex. A. These payments are being investigated by the United States Department of Justice ("DOJ") and the SEC. The making of these improper payments has recently received widespread, adverse publicity. For instance, according to a 6/07 edition of *Financial Times*:

**BAE faces threat of fines in US probe**

*             *             *

BAE Systems faces the threat of substantial fines, criminal prosecution of managers and the forced appointment of an independent monitor to oversee its

American business after the US Department of Justice launched a corruption probe into the company.

Europe's biggest arms manufacturer told the London Stock Exchange yesterday that the DoJ is to investigate the 20-year-old Al-Yamamah arms deal with Saudi Arabia. The news caused the company's shares to plunge 8 per cent as investors took fright at the possible damage to BAE's crucial US business.

\*     \*     \*

The US Securities and Exchange Commission is also investigating BAE for possible violations of the books and records provisions of the Foreign Corrupt Practices Act . . . .

Similarly, in late 6/07, *Dow Jones* reported:

Shares of Britain's top arms dealer, BAE Systems, dropped sharply on Tuesday after the company said it was the target of a U.S. Justice Department probe into alleged corruption, notably in its dealings with Saudi Arabia.

\*     \*     \*

News of the enquiry, although widely rumored, sent BAE shares plunging as much as 11%, wiping 1.5 billion pounds ($3 billion) off its stock market value. . . .

The probe could hamper BAE Systems' efforts to gain a larger share of the U.S. defense market. Already the company generates about 40% of sales in the U.S.

\*     \*     \*

The move by the Justice Department wasn't unexpected, as BAE has been accused, notably on the BBC News television program and in articles in *The Guardian* newspaper, of making multimillion-pound payments via a secret slush fund to Saudi Arabia's Prince Bandar bin Sultan to secure a fighter-jet deal.

\*     \*     \*

*The alleged payments to Bandar come under the jurisdiction of the U.S. Department of Justice because the money went through a U.S. bank. Earlier this month, the Guardian first reported allegations that BAE paid the money to Bandar for a least 10 years through Riggs Bank in Washington.*

*BAE has never denied the payments, but has insisted that all payments it has made in connection to the fighter-jet contractor were legal.*

The deal, known as al-Yamamah and worth an estimated 43 billion pounds ($86 billion), provided Hawk and Tornado jets and other military equipment to the Saudis. . . .

On 7/2/07, *FT.com* published an article stating:

> BAE has admitted it paid commissions to agents as part of the £43bn deal, which they say is normal practice in the business, and that given the size of the contracts, the sums were often large. But it has declined to say who received them while repeatedly denying any wrongdoing.
>
> If US Department of Justice investigators find such payments, they would invoke the 1977 US Foreign Corrupt Practices Act that covers US companies, their foreign affiliates and foreign companies issuing securities registered in the US. *In 2003, BAE registered American Depositary Receipts with the Securities and Exchange Commission.*
>
> *The act also covers foreign companies where the business associated with the alleged payments had a connection to the US.*
>
> *       *       *
>
> [I]t is *clear that other payments were made by BAE on behalf of Saudi officials, and those payments did involve transactions in the US*.
>
> *       *       *
>
> *[D]ocuments, seen by the FT, are records of a London-based travel company called Travellers World and include invoices and bank statements*.
>
> They show the travel company's records of payments to cover expenses for lavish hospitality, entertainment and other expenses incurred by Prince Turki bin Nasser, who is also *Prince Bandar's brother-in-law* . . . .
>
> These expenses include hired aircraft, including on one occasion a Boeing 747; and big hotel bills in the US, London and elsewhere. The documents include travel company invoices to BAE for these and other expenses as well as bank statements showing the reimbursement of the exact sums. The *records show more than £60m was paid by BAE's customer solutions and support division to Travellers World to cover these payments over the period from 1991 to February 2002.*
>
> *       *       *
>
> One UK government official familiar with the investigation said the hospitality payments to Prince Turki were just a small part of the total investigation, "a subset of a subset of a general category."

12.     The improper payments also included other payments for Bandar's benefit.

According to the *Sunday Times (London)*:

*THE British arms firm BAE Systems secretly paid nearly £250,000 for a honeymoon for the daughter of Prince Bandar, the Saudi Arabian prince at the centre of bribery allegations.*

A senior BAE executive authorised the payments, allowing Bandar's daughter to enjoy a six-week honeymoon in luxury resorts in Singapore, Malaysia, Bali, Australia and Hawaii. . . .

Peter Gardiner, managing director of the travel agency that organised the honeymoon, said: "*BAE instructed me to give Bandar's daughter and her husband the honeymoon of a lifetime at BAE's expense. Who says that big business doesn't have a heart?*"

\*       \*       \*

*[T]he honeymoon for Bandar's daughter, Princess Reema, was paid for through a £60m slush fund which the Serious Fraud Office (SFO) believes was set up by BAE to encourage Saudi royals to continue with a £ 43 billion arms contract to supply Hawk and Tornado jets.*

The latest twist in the BAE affair has been disclosed by Gardiner, who said he has made a detailed statement to the SFO. He described how his company, Travellers World, was used by BAE to make payments to Saudi royals when they were holidaying around the world. His company would arrange and pay for hotels, airline tickets, apartments, boat and jet charters, as well as hiring limousines and bodyguards.

\*       \*       \*

Last week Gardiner said Tony Winship, a senior BAE marketing executive responsible for overseeing the slush fund, approved the costs of the six-week trip for Princess Reema bint Bandar and Prince Faisal bin Turki, the son of Prince Turki bin Nasser, another Saudi royal implicated in the SFO's bribery inquiry.

\*       \*       \*

The couple were married in Riyadh, the Saudi capital, in December 1996. They flew on Turki's private Boeing 707, staffed by an English captain and crew, to Singapore. There they stayed for a week at Raffles, the country's most exclusive hotel where suites cost from £ 500 to £ 2,800 a night.

They then traveled for a week's stay to the Pangkor Laut resort on a privately owned island off Malaysia. It is often described as the best resort in the world.

\*       \*       \*

After a week in Malaysia, Bandar's daughter and her groom flew by private jet to Bali where they stayed at the five-star Four Seasons Jimbaran Bay resort before flying to Australia, spending Christmas at the Regent hotel in Sydney. During that visit the prince who, like his father-in-law Bandar, is a fan of the Dallas Cowboys

American football team, was keen to watch a critical game. Gardiner says he found a private club in a town 60 miles away that could show the game live on cable TV. The entire club was hired so Bandar's daughter and her husband could watch the match. The three-hour stay cost £ 6,000. BAE again footed the bill.

The couple then flew to the Gold Coast where they stayed at the five-star Sheraton Mirage and Spa. On a day trip they hired a Gulfstream jet to fly to the Great Barrier Reef. The bill, paid by Travellers World and reimbursed by BAE, was £15,000.

Documents in the possession of the SFO show that Travellers World invoiced BAE £45,490 for the couple's stay in Australia. The item is billed as "HM.Aus", which Gardiner said was shorthand for "Honeymoon, Australia". The couple moved on to Hawaii where they spent a few days at the Halekulani on Waikiki beach. From there they flew to the Grand Wailea, on the Hawaiian island of Maui, where their penthouse suite on a private floor cost about £ 4,000.

The files show one part of the bill for Hawaii was £ 101,412. The payments, again paid by BAE, appear as "HM. Haw." and "HM Haw.Xtra". For the month of January alone the cost was £ 190,486. According to Gardiner, this did not include the first leg of the honeymoon, which began in mid-December the previous year. The total cost was nearly £ 250,000, he said.

13.    According to the 6/18/07 edition of *Newsweek*:

**Bandar and the $2 Billion Question**

Hundreds of pages of confidential U.S. bank records may be the missing link in illuminating new allegations that a major British arms contractor funneled up to $2 billion in questionable payments to Saudi Prince Bandar bin Sultan. The BBC and Guardian newspaper reported last week that BAE Systems made "secret" payments to a Washington, D.C., bank account controlled by Bandar, the longtime Saudi ambassador to the United States who is now the kingdom's national-security adviser. The payments are alleged to be part of an *$80 billion* military-aircraft deal between London and Riyadh. . . . Before the U.K. closed the inquiry, British investigators contacted the U.S. Justice Department seeking access to records related to the Saudi bank accounts. Many of these records were first obtained by NEWSWEEK in 2004. At the time, the magazine reported that federal regulators had been alerted to millions of dollars in *"suspicious" activities in Saudi accounts at the now-defunct Riggs Bank*.

*    *    *

The Riggs Bank records show the use of those funds raised concerns among bank officials and U.S. regulators. *In November 2003, Riggs filed a "suspicious activity report" with the Treasury Department disclosing that over a four-month period*, $17.4 million from the Saudi Defense account had been disbursed to a single individual in Saudi Arabia. When Riggs officials asked the Saudis who the person was and why he was receiving the funds, they were told the individual "coordinates

home improvement/construction *projects for Prince Bandar in Saudi Arabia,"* and *the payments were for a "new Saudi palace,"* one document shows.

In another instance, Bandar wired $400,000 from a Riggs account to a luxury-car dealer overseas. "It was impossible to distinguish between government funds and what would normally be considered personal purposes," *said David Caruso, who served as Riggs's compliance officer at the time. Caruso also confirmed to NEWSWEEK that the Saudi Defense account was regularly replenished with $30 million each quarter from an account in London.* But the bank never knew the source of the funds. *The bank was so concerned about the withdrawals that it cut off all business with the Saudis. In May 2005, the U.S. Treasury fined Riggs $25 million for failing to monitor "extensive and frequent suspicious" activity in Saudi and other accounts.*

14.     The Al Yamamah payments were part of a broader pattern and course of conduct of illegal and/or improper payments by the BAE Defendants. The U.K. Serious Fraud Office ("SFO") is investigating allegations that BAE made corrupt payments to politicians and officials in Tanzania, Chile, the Czech Republic, Romania, South Africa and other countries. According to the 5/15/07 *New York Times:*

### Swiss Investigating BAE In Money Laundering Case

Law enforcement authorities in Switzerland confirmed Monday that they had opened a criminal investigation into possible money laundering at BAE Systems, adding to the international scrutiny of the company, the top British military contractor.

Jeanette Balmer, a spokeswoman for the office of the Swiss federal prosecutor in Bern, confirmed that an investigation had been opened after a report from Swiss money laundering investigators.

15.     Demand on the directors of BAE to bring this lawsuit or vigorously pursue it would be a futile and useless act as their conduct was illegal, not the product of the valid exercise of business judgment or candor taken in good faith. Additionally, their conduct cannot be ratified or approved by BAE's shareholders, as that conduct was illegal and *ultra vires* and also violates Section 463. To bring this action, these directors would have to sue themselves and/or people they have hired and supervised and thus not only expose their own incompetent and/or illegal behavior, but also expose themselves to huge uninsured liabilities. This they will not do. In addition, all the

- 11 -

current directors have knowingly or recklessly participated in the continuing publication of false and misleading Directors Reports and a cover up of the Al-Yamamah payments, as well as other illegal or improper payments made by BAE, and have repeatedly publicly represented that all payments made in connection with the Al-Yamamah and other contracts mentioned herein were proper, legal and did not involve wrongdoing. Thus, in order for the true facts to be uncovered, discovered and proved, and the past harm to BAE remedied, with future harm to BAE ameliorated or prevented, this action must be pursued by the plaintiff derivatively on behalf of and for the benefit of BAE. This action is brought in good faith for the benefit of BAE and it is respectfully requested that this Court permit this action to proceed.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(1). The amount in controversy exceeds the jurisdictional minimum of this Court, exclusive of interest and costs, and plaintiff and defendants are citizens of, and domiciled in, different states. Many of the acts alleged in this Complaint arose in Washington D.C. Venue is therefore proper in this District.

17.     Each individual defendant has had substantial and continuous contacts with Washington D.C. and the United States that makes the exercise of personal jurisdiction over him or her proper. BAE does substantial business in Washington, D.C. and the United States, including operating a major office in Washington, D.C. Riggs was the largest D.C.-based commercial bank for most of its history. The Albritton defendants described in ¶¶54-56 operated Riggs out of this District and continue to reside in Washington, D.C. and to operate substantial business operations here. Bandar was a resident of Washington, D.C. for some 15-20 years during the period relevant to the allegations herein. A substantial part of the wrongdoing occurred in and/or had effect in Washington, D.C. Evidence relevant to and necessary to prove plaintiff's claims – including the location of important physical and documentary evidence and witnesses able to provide live

testimony – is here in Washington, D.C. The DOJ and the SEC are both investigating BAE here in Washington, D.C. for important aspects of the conduct complained of herein.

## THE PARTIES

### Plaintiff

18.     Plaintiff City of Harper Woods Employees' Retirement Systems was at relevant times a stockholder of BAE. This plaintiff currently owns approximately 3,500 BAE ADRs. Plaintiff brings this action derivatively in the right of and for the benefit of BAE. Plaintiff will fairly and adequately represent the interests of BAE and its shareholders in enforcing the rights of BAE.

### Nominal Defendant

19.     Nominal defendant BAE is a U.K. corporation with its corporate headquarters in London. BAE has a huge operating subsidiary that operates in the U.S. called BAE Systems, Inc., a Delaware corporation. BAE Systems, Inc. ("BAE-USA") is a wholly owned subsidiary of BAE and a Delaware corporation. BAE has several offices located here in the District. BAE has mitigated the Company's foreign ownership through entry into a Special Security Agreement between the U.S. Government, BAE-USA and BAE. That agreement calls for the appointment of outside directors who, in conjunction with other U.S.-based board members, comprise a Government Security Committee. The Government Security Committee has the responsibility for overseeing the Company's compliance with U.S. Government security and export regulations and meets regularly with U.S. Government defense officials. Compliance with the SSA allows BAE to supply products and services to the U.S. Department of Defense ("DOD"), Intelligence Community and Homeland Security on some of our Nation's most sensitive programs.

20.     BAE has recently described its very substantial business in the U.S. as follows:

(a)     BAE's 2006 Annual Report stated:

BAE Systems is one of the world's leading defence companies and is one of only four companies with global defence sales in excess of $20bn. *It . . . ranks number seven within the US defence industry.*

- 13 -

*   *   *

*The Group's US business now delivers over US$9bn (£5bn) of annual sales and employs approximately 40,000 people in 36 states.*

BAE Systems is both a prime contractor to the US government and a supplier of major sub-systems to the other large prime contractors. . . . BAE Systems has a substantial business supporting network systems and IT for US government agencies and provides technical support services to the US Navy, US Army, NASA and the FAA. In land systems, the Group is one of the two largest suppliers of armoured vehicles in the US and the wider accessible global market.

The US defence market . . . remains one of BAE Systems' key markets . . . . US defence spending has increased substantially over recent years . . . . This high level of funding is expected to sustain further growth in the near term . . . .

. . . [T]he Group is well placed to support the US Department of Defense's likely continued emphasis on force sustainment and readiness.

*The U.S. Defense Department is BAE's largest single customer.*

(b)    Regarding the U.S. market, BAE's 2000 Annual Report stated:

*   *   *

The US is by far the largest defence market . . . . ***BAE SYSTEMS recognises that participation in the US market is a prerequisite to establishing and growing a leading position in the global defence industry.***

*   *   *

**North America**   Four acquisitions in 2000 have enhanced the company's position in the US market.

*   *   *

BAE SYSTEMS North America also has a strong, well-established presence in the services and support market. It is the largest single technical support contractor for the US Navy, with a legacy relationship of more than 35 years. In 2000, it was awarded a $450m contract to provide systems engineering and technical assistance for the Federal Aviation Administration's air traffic control programme.

(c)    BAE's 2001 Annual Report stated:

The US is the world's largest defence market. In 2001, we have seen benefits starting to flow as our recent US acquisitions have been successfully integrated into the group. Our strategy – to strengthen our position in that market – is working to good effect.

*   *   *

- 14 -

**Strategic development**

The US is the world's largest defence market and it is growing. . . .

> *Our position as one of the DoD top suppliers has been enhanced by the successful integration of the four North American acquisitions we made in 2000.*

(d)     CEO Michael J. Turner's 2002 letter (dated 2/03) stated:

BAE SYSTEMS has also continued to build its position in the US, the world's largest, and growing, defence market. The US is the defence technology powerhouse of the world and for BAE SYSTEMS to retain a position at the top of its industry *it must have a strong US presence. The company has already grown its position successfully, establishing itself as a key constituent of the US defence community. BAE SYSTEMS North America is performing strongly and the continued growth of our US industrial position remains an important part of our strategy.*

(e)     BAE's 2004 Annual Report – in CEO Turner's letter – stated:

In the US, five acquisitions were completed. . . .  With these acquisitions BAE Systems now generates annualised sales of some $5.6bn in its North America business and now employs over 27,000 people across the US.

(f)     BAE's 2005 Annual Report – in Chairman Richard L. Olver's letter – stated:

With the increasing importance of BAE Systems' operations in the United States, which now manage 35% of sales, we have appointed three new non-executive directors to the Board to provide further US perspective and experience.

(g)     BAE's 2005 Annual Report stated:

**Grow our business in the United States**

In the summer of 2005, BAE Systems completed the acquisition of United Defense, growing the US business base by $2.6bn in annual sales and 8,000 additional employees. This acquisition established BAE Systems as a major land systems prime contractor with a strong position in support of the US Department of Defense's requirements for force sustainment and affordable transformation.

(h)     BAE's U.S. operations include operations in:   Acton, Massachusetts;

Alexandria, Virginia; Anniston, Alabama; Arlington, Virginia; Austin, Texas; Bellevue, Nebraska;

Berthoud, Colorado; Brea, California; Burlington, Massachusetts; Cheshire, Connecticut; Colorado

Springs, Colorado; Columbia, Maryland; Falls Church, Virginia; Fort Wayne, Indiana; Fort Worth,

Texas; Greenlawn, New York; Heath, Ohio; Honolulu, Hawaii; Hudson, New Hampshire; Irving,

Texas; Johnson City, New York; Lansdale, Pennsylvania; Lexington, Massachusetts; Los Angeles,

California; Manassas, Virginia; McLean, Virginia; Merrimack, New Hampshire; Minneapolis,

Minnesota; Mojave, California; Mount Laurel, New Jersey; Nashua, New Hampshire; Newington,

Virginia; Ontario, California; Pittsburgh, Pennsylvania; Norfolk, Virginia; Redmond, Washington;

Reston, Virginia; Rockville, Maryland; Rome, New York; San Diego, California; Washington, D.C.;

Wayne, New Jersey; Yonkers, New York; and York, Pennsylvania.

(i)     BAE securities are registered with the SEC pursuant to an Amended and

Restated Deposit Agreement dated as of 5/03 and traded Over-the-Counter ("OTC") in the U.S.

According to BAE's 2006 Annual Report:

> The BAE Systems plc American Depositary Receipts (ADRs) are traded on
> the Over The Counter market (OTC) under the symbol BAESY. One ADR
> represents four BAE Systems plc ordinary shares.
>
> JPMorgan Chase Bank, N.A. is the depositary.
>
> If you should have any queries, please contact:
>
> JPMorgan Chase Bank, N.A.
> JPMorgan Service Center
> PO Box 3408
> South Hackensack, NJ 07606-3408
> USA

21.     BAE is incorporated under English law, which permits or will permit this action to be

maintained based on the allegations made in this Complaint. However, due to BAE's extensive U.S.

operations, the large number of BAE shareholders in the U.S., the U.S. connection to the primary

wrongdoing alleged herein, and the interests of the U.S. impacted by that conduct, under the local

law exception to the internal affairs doctrine, the laws of Washington, D.C. (or another appropriate

U.S. jurisdiction) may, if necessary, be applied to permit this action to be maintained.

**The BAE Defendants**

22.     The defendants described in ¶¶23-36 include the entire BAE Board of Directors as of

the filing of this Complaint and are referred to herein sometimes as the "Director Defendants."

Along with the Director Defendants, the remainder of the current and/or former BAE officers and directors named below at ¶¶37-48 are referred to herein as the "BAE Defendants."

23.   Defendant Richard (Dick) L. Olver ("Olver") has served as Chairman of BAE since 7/1/04 and as a director since 5/17/04. Olver resides in and is a citizen of the U.K. Olver serves as Chairman of the BAE Board's Nominations Committee and Chairman of its Non-Executive Directors Fees Committee. Olver receives a fee of £500,000 per annum and other benefits, including the private use of a chauffeur. BAE does not consider Olver to be an independent director.

24.   Defendant Michael J. Turner ("Turner") has served as the Chief Executive Officer ("CEO") of BAE since 2002 and as an Executive Director since 1994. Turner previously served as Chief Operating Officer ("COO") of BAE from 1999 to 3/02. Turner originally joined British Aerospace in 1978 as a Contracts Manager (Military) of what had by then become the Manchester Division of the British Aerospace Aircraft Group. Turner resides in and is a citizen of the U.K. Turner serves on the BAE Board's Executive Committee and its Non-Executive Directors Fees Committees. Turner's current salary is set at £945,000 per annum plus a supplementary payment of 30% of his annual salary in lieu of pension benefits. Turner received £2.4 million in salary, bonus and other compensation in 2006 and £1.6 million in salary, bonus and other compensation 2005.

25.   Defendant Walter P. Havenstein ("Havenstein") has served as an Executive Director of BAE since 1/2/07 and currently serves as its COO, having held a variety of executive positions at BAE since 2000. Havenstein joined Sanders (when it was a part of Lockheed Martin) in 2/99 prior to BAE's acquisition of Sanders in 2000. Havenstein has also served as President and CEO of BAE-USA (formerly, BAE Systems North America, Inc.), a U.S. subsidiary of BAE, since 1/1/07, and serves as a director of BAE-USA. Havenstein resides in and is a citizen of New Hampshire. Havenstein serves as a member of the BAE Board's Executive Committee and its Non-Executive Director Fees Committee. Havenstein's current salary is set at $750,000 per annum plus pension

- 17 -

benefits, including a 50% match on his contributions to his 401(k) plan up to a maximum contribution of 8% of BAE's earnings.

26.     Defendant Ian G. King ("King") has served as a director of BAE and as COO for the U.K. and Rest of World ("RoW") organization, responsible for all U.K. and RoW businesses (excluding BAE's US-led businesses) since 1/07. King joined Marconi in 1976 prior to BAE's acquisition of Marconi. In 1999 King assumed the position of Group Strategy and Planning Director of BAE. King resides in and is a citizen of the U.K. King's current salary is set at £530,000 per annum plus pension benefits.

27.     Defendant George W. Rose ("Rose") has served as BAE's Group Finance Director and an Executive Director since 1998. Rose was previously appointed Director of Financial Control and Accounting of British Aerospace in 6/92 and Director for Finance and Treasury in 2/95. Rose resides in and is a citizen of the U.K. Rose serves as a member of the BAE Board's Executive Committee. Rose's current salary is set at £560,000 per annum plus pension benefits. King received £1.1 million in salary, bonus and other compensation in 2006 and £1 million in salary, bonus and other compensation 2005.

28.     Defendant Christopher V. Geoghegan ("Geoghegan") has served as an Executive Director of BAE since 7/02 and previously served as COO of BAE from 4/02 until being removed from that position in 1/07. Geoghegan originally joined British Aerospace, Manchester, as a Senior Contracts Officer in 1976, and has held a variety of executive positions at the Company and its predecessors. Geoghegan is a past Council Member of SBAC and a member of the BAE Board's Executive Committee. Geoghegan resides in and is a citizen of the U.K. Geoghegan's current salary is set at £490,000 per annum plus an annual payment of 30% of his salary in lieu of pension benefits. Geoghegan received £1 million in salary, bonus and other compensation in 2006 and £893,000 in salary, bonus and other compensation 2005.

29. Defendant Phillip J. Carroll ("Carroll") has served as a Non-Executive Director of BAE since 2005. Carroll resides in and is a citizen of the Texas. Carroll serves on the Board's Nominations and Corporate Responsibility Committees. As of 12/06, Carroll owned no BAE stock. Carroll received a directors' stipend of £70,000 during fiscal 2006 and £18,000 during fiscal 2005.

30. Defendant Michael J. Hartnall ("Hartnall") has served as a Non-Executive Director of BAE since 2003. Hartnall resides in and is a citizen of the U.K. Hartnall, a fellow of the Institute of Chartered Accountants in England and Wales, chairs the BAE Board's Audit Committee. Hartnall received a directors' stipend of £78,000 during fiscal 2006 and £73,000 during fiscal 2005.

31. Defendant Sir Peter James Mason ("Mason") has served as a Non-Executive Director of BAE since 2003. Mason resides in and is a citizen of the U.K. Mason is a member of BAE's Audit and Nominations Committees. Mason received a directors' stipend of £73,000 during fiscal 2006 and £63,000 during fiscal 2005.

32. Defendant Roberto Quarta ("Quarta") has served as a Non-Executive Director of BAE since 2005. Quarta resides in and is a citizen of the U.K. Quarta serves on the Board's Audit and Remuneration Committees. As of 12/06, Quarta owned no BAE stock. Quarta received a directors' stipend of £58,000 during fiscal 2006 and £18,000 during fiscal 2005.

33. Defendant Sir Anthony Nigel Russell Rudd ("Rudd") has served as a Non-Executive Director of BAE since 9/06. Rudd resides in and is a citizen of the U.K. Rudd serves on the Board's Remuneration and Corporate Responsibility Committees. As of 12/06, Rudd owned no BAE stock. Rudd received a directors' stipend of £15,000 during fiscal 2006.

34. Defendant Peter A. Weinberg ("Weinberg") has served as a Non-Executive Director of BAE since 2005. Weinberg resides in and is a citizen of the Connecticut. Weinberg chairs the Board's Corporate Responsibility Committee and serves on its Remuneration Committee. As of

- 19 -

12/06 Weinberg owned no BAE stock. Weinberg received a directors' stipend of £77,000 during fiscal 2006 and £34,000 during fiscal 2005.

35. Defendant Andrew George Inglis ("Inglis") was appointed to the BAE Board by the current Board members on 5/31/07 and was seated on 6/13/07. Inglis resides in and is a citizen of the U.K.

36. Defendant Ulrich Cartellieri ("Cartellieri") has served as a Non-Executive Director of BAE since 1999. Cartellieri resides in and is a citizen of the U.K. Cartellieri served on the Board's Audit Committee. As of 12/06, Cartellieri owned no BAE stock. Cartellieri received directors' stipends of £58,000 during fiscal 2006 and £53,000 during fiscal 2005.

37. Defendant Sue Birley ("Birley") previously served as a BAE Director from 2000 to 2/07. Birley resides in and is a citizen of the U.K. Birley chaired the Board's Remuneration Committee and served on its Corporate Responsibility Committee. Birley received directors' stipends of £73,000 during fiscal 2006 and £63,000 during fiscal 2005.

38. Defendant Michael Lester ("Lester") previously served as BAE's Group Legal Director and an Executive BAE Director from 1999 until he resigned in 12/06. Lester resides in and is a citizen of the U.K. Lester received £1.15 million in salary, bonus and other compensation in 2006 and £1.1 million in salary, bonus and other compensation 2005.

39. Defendant Mark H. Ronald ("Ronald") previously served as a BAE Executive Director from 4/02 until he resigned in 12/06. Ronald previously served as BAE USA's President, COO and CEO until he resigned in 12/06. Ronald resides in and is a citizen of the Maryland. Upon his resignation, Ronald received a lump sum equal to 12 months' salary (or £1 million), continuance of medical benefits for 18 months from his termination date, and was appointed as an advisor and non-executive Chairman of BAE-USA effective 1/15/07. Ronald received £1.9 million in salary,

bonus and other compensation in 2006 and £1.3 million in salary, bonus and other compensation 2005.

40.     Defendant Michael Denzil Xavier Portillo ("Portillo") previously served as a Non-Executive Director of BAE from 2002 to 5/06.  Portillo resides in and is a citizen of the U.K. Portillo owned no BAE common stock as of 12/06.  Portillo received a directors' stipend of £17,000 during fiscal 2006 and £53,000 during fiscal 2005.

41.     Defendant Sir Richard (Dick) Harry Evans ("Evans") is the former Chairman of BAE. Evans began his career in the 1960s with government department posts in the then-nationalized British defense sector.  Evans was appointed CEO of BAE's predecessor in 1990 and rose to become Chairman in 5/98.  Evans made his name by securing the largest arms deal in British history – the Al-Yamamah sales to Saudi Arabia.  For being the architect of the gigantic deal, he was rewarded with a huge salary, a knighthood and considerable power within BAE.  However, during Evans' tenure as Chairman it has been reported "there [was] a feeling in the City that BAE [was] run by a 'mafia,' that Dick is the head and that they are a law unto themselves."  Evans stepped down in 2004 but remained on BAE's payroll as a consultant.  Evans resides in and is a citizen of the U.K.

42.     Defendant Lord Alexander Hesketh ("Hesketh") previously served as a Non-Executive Director of BAE from 1994 to 5/05.  Hesketh resides in and is a citizen of the U.K. Hesketh was receiving £45,000 per year at the time of his termination.

43.     Defendant John Pix Weston ("Weston") previously served as CEO of BAE and as a member of its Board from 1998 until 2002 when he was asked to resign following the Company's shocking profit warning in 12/02 caused by massive cost overruns on two regular Ministry of Defense projects resulting in a £750 million charge on the contracts.  Weston originally joined British Aircraft Corporation in 1970, and served in various positions until 1998, when he became the CEO.  Weston was replaced by Turner.  Weston resides in and is a citizen of the U.K.  Weston

- 21 -

received a salary of £130,000 for fiscal 2002, a £520,000 payment upon termination and assets of £939,000 payable upon termination of his employment contract. During fiscal 2000 and 2001, Weston received a salary of £500,000 and £520,000, respectively, plus a bonus of £100,000 each year.

44.    Defendant Keith Clark Brown ("Brown") previously served as a Non-Executive Director of BAE from 1989 to 2003. Brown resides in and is a citizen of the U.K. Brown served as Chairman of the Board's Audit Committee and received a directors' stipend of £40,000 during fiscal 2001 and £35,000 during fiscal 2000.

45.    Defendant Steve Lewis Mogford ("Mogford") served as a BAE Executive Director and as COO – Programmes – from 4/00 until he was removed as COO in 1/07. Mogford, who originally joined British Aerospace Military Aircraft in 1977 as a Supply Engineer, continued serving as a BAE Board member until 5/07. In 4/07 Mogford announced he was resigning from the BAE Board and joining Finmeccanica SpA's Selex subsidiary as its CEO. Mogford resides in and is a citizen of the U.K. Mogford received salary, bonus and other compensation of £956,000 and £910,000 during fiscal 2006 and 2005, respectively.

46.    Defendant Paolo Scaroni ("Scaroni") previously served as a Non-Executive Director of BAE from 2002-2004 when he resigned. Scaroni backed the replacement of Weston with Turner following the 12/02 shocking profit warning. Scaroni resides in and is a citizen of the Italy. Scaroni, who served on the Board's Audit Committee, owned no BAE stock as of 12/03. Scaroni received directors' stipends of £34,000 during fiscal 2002 and 2003.

47.    Defendant Sir Robin Biggam ("Biggam") previously served as a Non-Executive Director of BAE from 1994-2003. Biggam resides in and is a citizen of the U.K. Biggam served on the Audit, Remuneration and Nominations Committees. Biggam received directors' stipends of £40,000 and £13,000 during fiscal 2002 and 2003, respectively.

48.   Defendant Sir Charles Beech Gordon Masefield ("Masefield") served as Vice Chairman of the BAE Board from 2002 until his termination in 2003. Masefield joined the BAE Board in 1999 when he was appointed Group Marketing Director. Masefield resides in and is a citizen of the U.K. Masefield received a salary of £431,000 and a bonus of £65,000 during fiscal 2002.

**Prince Bandar**

49.   Defendant Prince Bandar Bin Sultan ("Bandar") is a highly influential Saudi official. He was Saudi ambassador to the United States from 1983 to 2005 and is now Secretary-General of the Saudi Arabia National Security Council. Bandar is a son of Crown Prince Sultan bin Abdul Aziz, who was the head of the Saudi Arabia Ministry of Defense for some 20 years and is now the Deputy Prime Minister of Saudi Arabia. Bandar was the Saudi Arabian Ambassador to the United States from approximately 1995 to 2005 when he "resigned" for personal reasons. He lived in the United States for over 20 years, owns property here in the United States worth over $100 million and has transacted over $2 billion in monetary transactions in Washington, D.C. over the past 20 years – mostly through Riggs. Bandar helped negotiate the 1985 Al Yamamah deal and a series of arms sales by BAE to Saudi Arabia worth over £40 billion, including the sale of more than 100 warplanes. To pay off Bandar after the Al Yamamah deal was signed, and to assure that Saudi Arabia continued to make purchases under the contract, BAE funneled secret payments of at least £2 billion into two Saudi embassy accounts in Washington at Riggs, in quarterly or yearly installments for many years. Bandar took money for personal use out of the accounts. The purpose of one of the accounts was to pay the operating expenses of Bandar's private Airbus A340. Bandar resides in and is a citizen of the U.K. Bandar is sued for knowingly and intentionally inducing the other defendants' breaches of their fiduciary duties, aiding and abetting their breaches, conspiring with them to commit and

advance their breaches or scheming with them to commit and advance their breaches of fiduciary duty and of U.S. and/or U.K. or European Union laws or conventions.

**PNC/Riggs**

50.     Defendant PNC Financial Services Group, Inc. ("PNC"), incorporated and headquartered in Pennsylvania, is the legal successor by merger to Riggs Bank, N.A. and Riggs National Corporation (collectively "Riggs"), a Washington, D.C.-based commercial bank, which was for most of its history the largest bank headquartered in the nation's capital. After various corporate scandals and management problems, in 2004 Riggs was acquired by PNC by merger and PNC became its legal successor, legally responsible for Riggs' conduct referred to herein. Notably, Riggs accounts were established for two of the 9/11 hijackers and funded by Bandar's wife. Upon discovery of these transactions, the FBI began investigating the bank for possible money-laundering and terrorist financing. Investigators found lax safeguards at Riggs regarding money laundering. Several Saudi accounts were discovered to have financial improprieties, including a lack of required background checks and a consistent failure to alert regulators of large transactions, in violation of the law. Many of these transactions involved Bandar personally, often transferring over $1 million at a time. On the Al Yamamah deal alone, Bandar received billions in bribes from BAE through Riggs.

51.     Similarly, Augusto Pinochet, the former dictator of Chile, has been widely accused since 1973 of corruption, illegal arms sales, and torture. Nonetheless, in 1994, Riggs officials invited Pinochet to open an account at Riggs. Arrested in 1998 in Britain for possible extradition to Spain, his accounts were ordered frozen by court orders. A recent U.S. Senate report has revealed that Riggs executives helped Pinochet disguise millions of dollars that had been stolen from the Chilean people. By using shell companies and hiding accounts from federal regulators, Riggs illegally allowed Pinochet to retain access to much of his fortune.

52.     In 7/04, the U.S. Senate published an investigation into Riggs, into which most of Equatorial Guinea's oil revenues were paid. The Senate report showed that accounts based at the Equatorial Guinea embassy to the United States were allowed to make large withdrawals without properly notifying federal authorities. In that hearing, the President of Riggs was asked why the bank would willingly enter into a business arrangement with the dictator of Equatorial Guinea, a man who willingly exercises his hold over his people with demonstrations of murder and torture on state-run television. In correspondence to President Mbasogo, a Riggs letter "thanked the president for his establishment of several bank accounts, and encouraged a working relationship to help establish and secure the stable reign of his country."

53.     For its transgressions, Riggs was ultimately fined $25 million for violations of money-laundering laws. A long running DOJ investigation was wrapped up in 2/05, with Riggs pleading guilty and paying a $16 million fine for violations of the U.S. Bank Secrecy Act. And in 2/05, the bank and its controlling shareholder agreed to pay $9 million to Pinochet victims for concealing and illegally facilitating movement of Pinochet money out of Britain. Upon completion of PNC's acquisition of Riggs in 2/05, the Riggs name was abandoned, but PNC has continued its operations in Washington, D.C.

**The Allbritton Defendants**

54.     Defendant Joseph L. Allbritton ("Joe Allbritton") served as Chief Executive Officer and Chairman of Riggs Bank, N.A. until 2001 when his son Robert assumed those positions. Joe Allbritton continued serving on the Board of Directors of Riggs National Corporation (collectively with Riggs Bank, N.A., "Riggs") until May 2004. Joe Allbritton controlled most of the Allbritton family's 41% interest in Riggs and ran the bank as his own private fiefdom until the 2005 sale to PNC following the bank's 2004 plea to federal money laundering charges. Joe Allbritton resides in and operates a substantial business enterprise in the District.

55.    Defendant Robert L. Allbritton ("Robert Allbritton") is the son of defendant Joe

Allbritton and served as Riggs' CEO and Chairman from 2001 until the bank's sale to PNC in

February 2005. Robert Allbritton acquiesced in and participated in his father's efforts to expand the

bank's embassy business at all costs. Robert Allbritton has been chairman and CEO of Allbritton

Communications, which owns television stations and a newspaper in Washington D.C., since 2001.

Robert Allbritton resides in the District.

56.    Defendant Barbara Allbritton ("Barbara Allbritton") is the wife of defendant Joe

Allbritton and served as a director of Riggs National Corporation until May 2004.  Barbara

Allbritton acquiesced in and participated in her husband's efforts to expand the bank's embassy

business at all costs.  Barbara Allbritton resides in the District.

57.    The defendants listed in ¶¶54-56 are referred to herein as the "Allbritton Defendants"

and these defendants acted in concert with defendant PNC (formerly Riggs) to aid and abet

violations of fiduciary duty by the Director Defendants.

58.    The Allbritton Defendants purchased a controlling interest in Riggs in 1981 at the

peak of the bank's influence and prestige.  With all of the bank's assets at their disposal, including

its Gulfstream jet, the Allbrittons scoured the globe acquiring 95% of Washington D.C.'s embassy

account business for Riggs.  The Allbrittons courted an expansive unsavory international clientele,

including Bandar, former Chilean strongman Augusto Pinochet, and Teodoro Obiang Nguema,

dictator of Equatorial Guinea.  The top two federal bank regulators – the Federal Reserve Board and

the Treasury Department's Office of the Comptroller of the Currency – began a criminal

investigation into the Riggs' embassy division in 2002, focusing on transactions in hundreds of

accounts associated with Saudi Arabia, Equatorial Guinea and General Pinochet.  U.S. Senate

investigations followed and disclosed mounds of evidence documenting the Allbritton Defendants'

efforts to obtain and retain embassy business for Riggs: "I am also grateful for our thriving personal

- 26 -

friendship which you have demonstrated through your gracious hospitality and stalwart support of the Riggs," Joe Allbritton wrote in a draft letter to General Pinochet dated November 1997, a year when Riggs was expanding its relationship with both Pinochet and the Chilean military. "I thank you for the marvelous gifts to both Barbie and myself, including the history books which I found fascinating."

59.     Evidence of millions of dollars being funneled through Riggs accounts by diplomats of Saudi Arabia has also been disclosed, including funds paid to Bandar. In its May 2005 enforcement action against Riggs, the U.S. Office of the Comptroller of the Currency specifically cited Riggs' failure to file suspicious activity reports for large-denomination withdrawals of cash by Bandar and others.

60.     Following the 9/11 attacks, in December 2002 the F.B.I. and federal bank regulators began examining Riggs accounts in connection with Saudi cash transactions. What regulators expected to be a one-month examination lasted five months as regulators uncovered improprieties in some of the 150 Saudi accounts at Riggs. Under U.S. law, banks are required to vet the background of their customers, report outsized movements of cash and alert regulators when any banking activities are suspicious. Regulators and members of Congress said Riggs frequently failed to carry out these duties, especially with regards to Saudi accounts. A July 2004 Senate report disclosed that the Saudi accounts were "equally troubling" as other accounts at Riggs that had come under scrutiny, but noted that a more thorough Congressional examination of the Saudi accounts was under way at the Senate Governmental Affairs Committee. Federal regulators eventually concluded that the Allbritton led Riggs inadequately monitored the destinations and uses of large amounts of cash, often more than $1 million at a time, in the Saudi accounts. Many of these transactions involved Bandar personally.

61.     Problems with the Saudi accounts led federal bank regulators to issue a rare and public cease-and-desist order against Riggs in early 2003, requiring it to clean up its practices or face further penalties. But unexplained transactions continued to flow through the Saudi accounts throughout late 2003. By March 2004, though Riggs publicly stated it had closed all Saudi accounts, minutes of a Riggs meeting on April 7, 2004 noted that Bandar had recently requested "$2 million in cash for traveling expenses." "Prince Bandar then asked that Riggs wire $2 million to another bank, which was done," the minutes said, adding that the bank notified regulators about the transaction.

62.     In 2005 Riggs was fined $25 million for violations of money-laundering provisions of the U.S. Bank Secrecy Act and the bank was placed on federal probation. The bank and Allbritton family also agreed to pay $9 million to Pinochet victims for concealing and illegally facilitating movement of Pinochet money out of Britain. This payment was made in settlement of litigation commenced in Spain against Riggs, the Allbritton family and other Riggs executives. The $25 million money-laundering fine for Riggs' "willful, systemic" failure to report suspicious transactions, and its years of failing to follow anti-money laundering laws, was the largest such fine ever levied on an American bank. The members of the Allbritton family all immediately resigned from all Riggs boards. Meanwhile, the family had collectively received tens of millions of dollars in compensation and other perks as a result of their facilitation of the bank's illegal misconduct.

### APPLICABLE ANTI-CORRUPTION LAWS AND CONVENTIONS AND THE U.K. COMPANIES ACT OF 2006

63.     The United States Foreign Corrupt Practices Act ("FCPA") for many years prohibited payments to foreign officials for purposes of:

> *(A)(i)   influencing any act or decision of such foreign official in his official capacity, (ii) inducing such foreign official to do or omit to do any such official, or (iii) securing any improper advantage . . . in order to assist [the company making the payment] in obtaining or retaining business for or with, or directing business to any person.*

- 28 -

15 U.S.C. §78dd-1(a)(1). Thus, the FCPA criminalized every payment to a foreign official that is intended to (1) *influence* a foreign official to act or make a decision in his official capacity, or (2) induce such an official to perform or refrain from performing some act in violation of his duty, or (3) secure some wrongful advantage to the payor.

64.    In 1998, Congress amended the FCPA to implement the Organization of Economic Cooperation and Development ("OECD") Convention on Combating Bribery of Foreign Public Officials in International Business Transactions ("OECD Convention"), signed in 12/97. The amendments expanded FCPA coverage to "*any person*" – not just "*issuers*" or "*domestic concerns*" (defined as any American citizen, national or resident, or American corporation). 15 U.S.C. §§78dd-1 to 78dd-3. The 1998 amendments also removed the requirement – for issuers and domestic concerns – *of a territorial* connection to the United States. Under the FCPA, any United States person or entity violating the FCPA outside the United States is subject to prosecution, regardless of whether any means of interstate commerce were used. 15 U.S.C. §§78dd-1 to 78dd-3; *see* U.S. Const. art. I, §8, cl 1, cl 3 ("The Congress shall have Power . . . . To regulate Commerce with foreign Nations, and among the several States . . . .").

65.    The U.K. Companies Act of 2006 provides:

*Liability for false or misleading statements in reports*

**463    Liability for false or misleading statements in reports**

(1)    The reports to which this section applies are –

    (a)    *the directors' report*,

    (b)    *the directors' remuneration report*, and

    (c)    *a summary financial statement so far as it is derived from either of those reports*.

(2)    *A director of a company is liable to compensate the company for any loss suffered by it as a result of –*

     (a)    *any untrue or misleading statement in a report to which this section applies*, or

     (b)    *the omission from a report to which this section applies of anything required to be included in it*.

(3)    *He is so liable only if –*

     (a)    he knew the statement to be untrue or misleading *or was reckless as to whether it was untrue or misleading*, or

     (b)    *he knew the omission to be dishonest concealment of a material fact.*

(4)    No person shall be subject to any liability to a person *other than the company* resulting from reliance, by that person or another, on information in a report to which this section applies.

## DEFENDANTS' FIDUCIARY DUTIES

66.    By reason of their positions as officers, directors and/or fiduciaries of BAE and because of their ability to control the business and corporate affairs of BAE, the BAE Defendants owed BAE and its shareholders fiduciary obligations of fidelity, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage BAE in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of BAE and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

67.    Each director and officer of the Company owes to BAE the fiduciary duty to comply with the U.K. Companies Act and to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing. In addition, as officers and/or directors of a publicly held company, the BAE Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's finances and operations, and defendants also had an obligation not to entrench themselves as officers and/or directors of the Company, to allow open and honest board

- 30 -

elections and to not advance their own personal, financial or economic interests over and at the expense of the Company's public shareholders.

68.     The BAE Defendants, because of their positions of control and authority as directors or officers of BAE, were able to and did, directly and indirectly, control the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with BAE, each of the defendants had access to all non-public information about the financial condition, operations and future business prospects of BAE, including, without limitation, the illegal and improper activities which the BAE Defendants caused BAE to engage in.

69.     At all times material hereto, each of the BAE Defendants was the agent of each of the other BAE Defendants and of BAE, and was at all times acting within the course and scope of said agency.

70.     To discharge their duties, the officers and directors of BAE were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and operational affairs of BAE. By virtue of such duties, the officers and directors of BAE were required, among other things, to:

(a)     Manage, conduct, supervise and direct the business and internal affairs of BAE in accordance with the laws and regulations of England, the United States, and every country in which BAE conducts business, and pursuant to the charter and bylaws of BAE;

(b)     Neither violate nor knowingly permit any officer, director or employee of BAE to violate applicable laws, rules and regulations;

(c)     Remain informed as to the status of BAE's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection

therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with applicable laws and regulations;

      (d)     Establish and maintain systematic and accurate records and reports of the business and internal affairs of BAE and procedures for the reporting of the business and internal affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

      (e)     Maintain and implement an adequate and functioning system of internal legal, financial and management controls, such that BAE's operations would comply with all applicable anti-corruption/anti-bribery laws, BAE's financial statements and information filed with the English and U.S. financial regulators and disseminated to the public and to BAE shareholders in Directors' Reports would be accurate and the actions of its directors would be in accordance with all applicable laws; and

      (f)     Exercise reasonable control and supervision over the public statements to the securities markets, investors and public shareholders of BAE by the officers and employees of BAE and any other reports or other information required by law from BAE and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of BAE and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

     71.     During all times relevant hereto, each of the BAE Defendants occupied positions with BAE or were associated with the Company in such a manner as to make them privy to confidential and proprietary information concerning BAE, its operations, finances and financial condition. Because of these positions and such access, each of the BAE Defendants knew that the true relevant facts specified herein had not been disclosed to and were concealed from BAE's shareholders. The BAE Defendants, as corporate fiduciaries entrusted with non-public information, are obligated to

disclose material information regarding BAE and to take any and all actions necessary to ensure that the officers and directors of BAE do not abuse their privileged positions of trust, loyalty and fidelity in a manner which causes the Company to violate the law.

72.     BAE's Board of Directors has admitted that the very type of conduct alleged herein, *i.e.*, payment of improper kickbacks or bribes, can harm BAE – while at the same time falsely assuring BAE's shareholders (owners) that no such conduct had occurred or would occur.  BAE's 2006 Annual Report issued in 4/07 stated:

**The Group is subject to risk from a failure to comply with laws and regulations.**

*The Group's operations are subject to numerous domestic and international laws, regulations and restrictions, and non-compliance with these laws, regulations and restrictions could expose the Group to fines, penalties, suspension or debarment, which could have a material adverse effect.*

The Group has contracts and operations in many parts of the world and operates in a highly regulated environment. *The Group is subject to numerous UK, US and other laws and regulations, including, without limitation, regulations relating to import-export controls, money-laundering, false accounting, anti-bribery and anti-boycott provisions.* . . .

*Failure by the Group or its sales representatives, marketing advisers or others acting on its behalf to comply with these laws and regulations could result in administrative, civil or criminal liabilities and could result in significant fines and penalties and could result in the suspension or debarment of the Group from government contracts for some period of time or suspension of the Group's expert privileges.*

*Addressing this exposure the Group has mandated policies and procedures to help ensure that employees act with the highest ethical standards and comply with relevant laws and regulations.  In particular, all dealing with sales representatives and market advisers are governed by detailed compliance procedures, the application of which is monitored by a dedicated compliance function.*

73.     BAE's 2004 Annual Report also stressed the importance of compliance with anti-bribery and anti-corruption laws, stating:

**Compliance with international anti-corruption laws**

*BAE Systems demands and expects honesty, integrity and fairness in all aspects of its business.  In support of this expectation, the company is committed to*

- 33 -

*compliance with laws implementing the OECD Anti-Bribery Convention and the US Foreign Corrupt Practices Act. The company will not tolerate bribery or any attempt by way of gifts, payments or favours to influence improperly the decisions of our customers or suppliers.*

*A comprehensive compliance programme has been in place for a number of years and is aimed at ensuring that our policies in this area are observed and enforced. . . .*

*The Board recognises that compliance with these two areas is of critical importance to the company.*

74.     BAE's 2005 Annual Report stated:

**Key issues for our business**

\*       \*       \*

*The key areas our stakeholders consider material to our business are anti-bribery and corruption practices . . . .*

\*       \*       \*

**Ethics**

BAE Systems is committed to meeting the highest ethical standards in our dealings with others. The nature of our business means it is particularly important that we have strong values and an awareness of public concerns. *We are confident that we meet the highest ethical standards in our dealings with others and have the processes in place to ensure our employees comply with the law in all the countries where we operate. We also recognise the importance of demonstrating this to our stakeholders.*

(b)     The 2006 Directors' Corporate Responsibility Report stated:

**Ethics**

We are committed to meeting the highest ethical standards in our relationships with others. We will not tolerate unethical behaviour or attempts to improperly influence the decisions of customers or suppliers.

*Unethical behaviour is wrong, could lead to loss of business, seriously damage our reputation and leave the Group and its employees open to criminal sanction.*

\*       \*       \*

**Progress**

**Meeting our standards**

- 34 -

The Group has training and awareness programmes to ensure employees understand our policies and the standards expected of them.

We provide training on our anti-bribery programme to managers from marketing, commercial, procurement, finance, customer support and other functions . . . . On completing the training, employees are required to sign a statement confirming they will comply with our policies and will report any issues of concern. This training is mandatory for all senior employees and for those employees involved in dealings with marketing advisers. All BAE Systems' marketing advisers are subject to rigorous due diligence under our compliance programme, are made aware of our anti-bribery policy and are expected to maintain our ethical standards.

*   *   *

*We do not tolerate unethical or illegal conduct.*

75.    BAE's Board has admitted it is its responsibility to assure BAE's compliance with such laws. According to BAE, in describing its Board, its procedures and responsibilities:

**Board Charter**

The Board is responsible for the good management of the Company . . . .

*   *   *

**Standards and Values**

The Board shall set values and standards and agree[d] policies and processes that shall be used to guide the affairs of the Company. *This shall include the setting of clear principles of ethical conduct that apply to all activities undertaken by the Company.*

*   *   *

**Controls**

The Board shall ensure that an effective system of internal controls is in place at all times. Such a system shall be used to identify and manage risks that threaten the fulfilment of the Company's business objectives. *This includes . . . non-compliance with law and regulation, fraud . . . and failure to maintain appropriate accounting records.*

*   *   *

**Matters reserved for the Board**

1.    Approving the Company's . . . *principles of ethical conduct* . . . .

76.    Elsewhere, BAE's 2000 Annual Report stated:

- 35 -

**Statement of directors' responsibilities**

*        *        *

The directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the company and to enable them to ensure that the accounts comply with the Companies Act 1985. They have a general responsibility for taking such steps as are reasonably open to them to safeguard the assets of the group and to prevent and detect fraud and other irregularities.

77.     BAE's 2001 Annual Report also stated:

**Statement of directors' responsibilities**

*        *        *

The directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the company and to enable them to ensure that the accounts comply with the Companies Act 1985.

78.     BAE's 2003 Annual Report stated:

**Statement of directors' responsibilities**

*        *        *

The directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the company and to enable them to ensure that the financial statements comply with the Companies Act 1985.

79.     According to BAE's Board, responsibility for compliance with anti-corruption/anti-bribery laws is assigned to the Board's Corporate Responsibility Committee.  The BAE Board has stated:

**Corporate Responsibility Committee – Terms of Reference**

*        *        *

6.     **Duties**

6.1    The Committee shall assist the Board in overseeing the development of strategy and policy **on . . . *ethical issues***.

6.2.   The Committee shall monitor and review the Company's performance in managing . . . ethical and reputational risks. Specifically, the Committee shall be satisfied that appropriate

policies, systems and metrics are in place . . . . *These shall include . . . business ethics and compliance with anti-corruption laws and regulation*.

*    *    *

6.5.  The Committee Chairman shall report to the Board . . . on a regular basis.

80.  BAE's 2004 Annual Report also stated:

**Corporate responsibility**

The information below acts as a summary of our principles and corporate responsibility activities during 2004 and key highlights from the last year. For the first time the full Corporate Responsibility Report has been formally reviewed by the BAE Systems Board and is available to all stakeholders.

*    *    *

We are determined to be regarded as a well-managed, responsible company. *As a global aerospace and defence business, our* competitiveness and *future success* depends not only on the skills of our employees and the quality of our products, but also on our standing in the community and our commitment to high standards of corporate governance *and corporate responsibility (CR). We aim to be, and to be seen as, a responsible corporate citizen in all the communities in which we operate worldwide*.

We have developed broad statements of intent to encapsulate our strategy and direction on corporate responsibility. These are:

*    *    *

**Marketplace**: *We are committed to ensure compliance with the laws and controls governing defence exports everywhere we operate and ensure we meet the highest standards of conduct in our work*.

**Management**

Overall responsibility for CR lies with the board of directors.

*    *    *

**Governance and risk**

Governance of CR risks are an integral part of our overall corporate governance.

*    *    *

- 37 -

*As a company we demand and expect honesty, integrity and fairness in all aspects of our business. We are committed to comply with the law in every country where we operate. This includes laws implementing the OECD Anti-Bribery Convention and the US Foreign Corrupt Practices Act. We will not tolerate bribery or other attempts to influence improperly the decisions of customers and suppliers.*

*We have an anti-corruption compliance programme in place throughout the company. This includes robust procedures governing transactions with marketing consultants, the proper use of corporate hospitality and our procurement processes.*

81.     BAE's directors have repeatedly denied any impropriety regarding the Al-Yamamah contract. According to BAE's web site:

## OUR POLICIES ON BUSINESS ETHICS

*The intent of our policies is to establish compliance with the law as the minimum . . . .*

Our Operational Framework includes policies and governance systems on business ethics. *It requires all BAE Systems employees to act with honesty [and] integrity . . . and states that we will not tolerate bribery or other attempts to improperly influence the decisions of customers or suppliers.*

*                    *                    *

*The Operational Framework is supported by more detailed policies covering topics such as . . . anti-corruption. Our anticorruption programme has been established in alignment with international standards . . . .*

*                    *                    *

## ETHICS MANAGEMENT STRUCTURE

Compliance with our ethical policies and principles is the specific responsibility of our Group Legal Director, Philip Bramwell, who performs this task on behalf of the Executive Committee and the Board of Directors. . . .

The heads of each business are responsible for ensuring that employees in their area are familiar with the requirements of our business ethics policies, know what is expected of them and know how to act if they suspect wrongdoing. . . .

In the UK our Ethics Review Committee is chaired by the Group Audit Director; its members are the Director of Corporate Responsibility, the Director of Employee Relations, the Director of International Compliance and the Director of Security. The Committee reviews issues raised on the ethics helpline to ensure that these matters are investigated and that appropriate action is taken.

- 38 -

In the US our ethics programme is run by an Ethics Steering Committee with representatives from each operating group and our legal and human resources departments. This reports to an Executive Ethics Oversight Committee made up of senior executives and chaired by the Senior Vice President General Counsel of BAE Systems. An Ethics Officer in each North American business unit is responsible for investigating allegations of unethical conduct.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

82.     Plaintiff brings this action derivatively in the right and for the benefit of BAE to redress injuries suffered and to be suffered by BAE as a direct result of the breaches of fiduciary duty, violations of law, misappropriation of information and corporate waste, as well as the aiding and abetting thereof, by the BAE Defendants.  BAE is named as a nominal party solely in a derivative capacity.

83.     In bringing this action, plaintiff has satisfied all statutory procedural requirements of applicable law.  First, plaintiff has standing to bring this action as it is a shareholders and/or beneficial owner of BAE and was a shareholder and/or beneficial owner of BAE at relevant times. Second, plaintiff will fairly and adequately represent the interests of BAE in enforcing it rights, as detailed herein.  Third, this action is not being used by plaintiff to gain any personal advantage, nor does plaintiff maintain any personal agenda other than seeking to correct the wrong that has been done to the Company.  Fourth, this action is not a collusive one to confer jurisdiction on this Court which it might not otherwise have.  To this end, plaintiff has taken steps to file this action and has retained counsel experienced in derivative litigation and corporate governance actions.  To the extent court permission is required to continue this action, such permission is hereby sought.

84.     As of the filing of this Complaint, the BAE Board consists of defendants Olver, Cartellieri, Turner, Geoghegan, Havenstein, King, Rose, Carroll, Hartnall, Mason, Quarta, Rudd, Weinberg and Inglis.  These defendants are referred to as the "BAE Board."

85.     The BAE Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action, as detailed herein, and thus,

pursuant to Federal Rule of Civil Procedure 23.1 and otherwise, plaintiff's demand upon the Company to take the action requested herein is excused. For the following reasons and those detailed elsewhere in this Complaint, BAE's Board and its management are also antagonistic to this lawsuit and thus, plaintiff has not made a pre-filing demand on the BAE Board to initiate this action:

(a)     The factual allegations contained herein detail a widespread, continuous, global pattern and practice of misconduct that spans more than 20 years. Each of the BAE Defendants had the ability to cause BAE to disclose the existence of the kickback scheme during that 20-year period and failed to do so.

(b)     The misconduct alleged herein is so egregious that it has created a substantial fear of criminal or civil liability in the BAE Board in light of the pending U.K. SFO and DOJ investigations. As a result, the entire BAE Board is incapable of exercising valid business judgment as of the filing of this suit, as to investigate and/or prosecute these claims would expose (or increase the exposure of) each Board member to criminal and/or civil liability for the misconduct alleged herein.

(c)     In addition, the misconduct is so widespread and persisted over so many years that it cannot be the result of an isolated incident or periodic failure of oversight of procedure – it had to be the result of a deliberate policy of the Board or willful or reckless disregard for what has been going on with said illegal or improper payments.

(d)     The BAE Board has repeatedly denied allegations of wrongdoing alleged herein and claimed the "payments" alleged herein were proper. According to BAE's web site:

**FREQUENTLY ASKED QUESTIONS**

1.     IS THERE ANY SUBSTANCE IN THE ONGOING MEDIA ALLEGATIONS ON BRIBERY AND CORRUPTION?

We are disappointed that recent media coverage is proceeding on the assumption, unsupported by any evidence, that allegations against BAE Systems are true and offences have been committed. *We continue to reject these allegations*. . . .

- 40 -

We take our obligations under the law extremely seriously and will *continue* to comply with all legal requirements around the world.

*     *     *

5.    DO YOU PAY COMMISSIONS TO ADVISERS OR CONSULTANTS TO WIN EXPORT SALES?

Companies operating in global markets, in any industry, need access to local advise, capabilities and guidance in order to pursue business. It is perfectly legitimate that such advisers/consultants are paid for what they do. *As with all aspects of our business we audit these arrangements to ensure that no impropriety is taking place* . . . .

(e)    Vigorously investigating the allegations contained herein would require the BAE Board to denounce entrenched positions. Defendants could also have to reveal evidence of their culpability and criminality. Prosecution of the allegations contained herein in light of the BAE Board's prior claims of "innocence" would undermine each Board member's defense and exponentially increase each Board member's exposure to potential civil and/or criminal liability.

(f)    The members of BAE's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein. These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

(g)    The members of BAE's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action. Defendants Olver, Turner, Havenstein, King, Rose and Geoghegan are so-called "inside directors" as they are executives of BAE. In fact, nearly half of BAE's 13 directors are executives of the Company and are dependent upon the other

- 41 -

defendants for continuation of their livelihood. The inside directors were well compensated for their services during the relevant period, as follows:

(i) **Cash Bonuses**. The inside directors are eligible to receive significant cash bonuses as part of their compensation equal to 100% of base salary (150% for the US-based executive director and the CEO). The performance measures the Board's Remuneration Committee uses to justify these cash bonuses include earnings per share ("EPS") and cash targets (and EBITA). The EPS figure used for the bonus plan (and the Executive Share Option Plan described below) is based on underlying reported EPS but may be adjusted (up or down) at the Committee's discretion. The Remuneration Committee determined for 2006 that the Executive Directors earned "stretch" bonuses based on the Company's performance, regardless of the fact that that "performance" was enhanced by the misconduct alleged herein.

(ii) **Stock Options**. Options granted under the BAE Executive Share Option Plan ("ESOP") are exercisable between the third and tenth anniversary of their grant. Option grants under the ESOP may be set as high as 1.5 times base salary (2.25 times base salary for the CEO). In determining the performance measure for the ESOP (and for the Matching Shares in the Share Matching Plan described below), reported EPS is a heavily weighted factor.

(iii) **Performance Share Plan**. Awards of shares made under the Performance Share Plan ("PSP") are vested based on BAE meeting performance criteria established by the Remuneration Committee. Awards under the PSP can be as high as 2 times base salary. Vesting is based largely on a Total Shareholder Return (share price growth plus dividends) ranking relative to a comparator group of 18 other defense and aerospace companies operating internationally, as selected by the Remuneration Committee. By focusing almost exclusively on BAE's share performance *vis-a-vis* other defense/aerospace companies, and disregarding ethical and operational compliance issues, the PSP encouraged the misconduct alleged herein and will continue

to encourage such misconduct. For instance, performance for the 2007 awards provides that: "100% of the conditional shares [will be] awarded to directors if the Company's TSR [Total Shareholder Return] over a three-year period *is in the top 20% of TSRs* achieved by the sectoral comparator group, with 25% vesting if the TSR *is in the top 50%*." Thus BAE's officers are encouraged to obtain market share at all costs.

(iv)    **Restricted Share Plan ("RSP")**.  BAE previously provided inside directors with the option to taking all or a portion of their cash bonus in the form of restricted shares. If an election was made to take shares through the RSP, they were held in trust for a period of three years after which the Company awarded the individual an equal number of shares (Matching Shares).  The matching award of shares was historically not subject to any performance criteria but has now been superseded by the Share Matching Plan which is subject to performance criteria.

(v)    **Share Incentive Plan**.  The BAE Share Incentive Plan permits inside directors to purchase Partnership Shares in BAE.  Dividends paid in respect of the Partnership Shares are reinvested as Dividend Shares.  In 12/06, the Remuneration Committee added a Matching Shares element to the Share Incentive Plan Partnership Shares arrangement and inside directors now receive one free Matching Share for every two Partnership Shares owned. The Matching Shares are not subject to performance conditions.

(h)    The BAE Board has delegated to the Remuneration Committee its authority to set executive pay for the Chairman and executive directors.  Specifically, the Remuneration Committee is charged with: "Approv[ing] the creation of employee share based incentive schemes and . . . any performance conditions to be used for such schemes" and "[d]etermining any share scheme performance criteria." The Remuneration Committee currently consists of (and consisted in 2006 of) defendants Birley (Chair), Rudd, Quarta and Weinberg.  The Remuneration Committee consisted in 2005 of Birley (Chair), Quarta and Weinberg and in 2004 of Birley (Chairman),

- 43 -

Cartellieri and Mason. The Committee included Birley (Chairman), Cartellieri and Mason in 2003 and was part of the Nominations Committee in 2002. By virtue of the fact that each member of the Remuneration Committee was charged with ensuring that BAE's compensation principles preserved the Company's assets and promoted long-term shareholder value, and the compensation principles actually applied achieved the contrary, defendants Birley, Rudd, Quarta, Weinberg, Cartellieri and Mason are personally implicated by the allegations contained herein. Moreover, the Remuneration Committee consults defendants Olver and Turner in establishing the pay for the other executive director defendants, effectively permitting Olver and Turner to dominate and control the other executive defendants.

(i)     The BAE Board's non-executive directors are also rewarded handsomely. Fees payable to the non-executive directors are set by the Non-Executive Directors' Fees Committee. In addition to receiving a directors' stipend (including additional fees for serving as chairs of the BAE Board committees), directors receive a transatlantic meeting allowance of £4,000 per board meeting for traveling to the U.S. from Europe for board meetings or vice versa. The fees payable to the non-executive directors were revised in 2/07 as follows: a fee of £77,500 for the chairman of the Audit Committee; a fee of £72,500 for each of the chairmen of the Remuneration Committee, Corporate Responsibility Committee, and the Senior Independent Director; and a fee of £57,500 for each of the other non-executive directors. Beginning in 1/05, the Board delegated its authority to determine fees payable to non-executive directors to the Non-Executive Directors' Fees Committee which is currently comprised of defendants Olver (Chairman), Havenstein, and Turner and Group Legal Director Philip Bramwell. The Non-Executive Directors' Fees Committee was comprised in 2005-2006 of Olver (Chairman), Turner, Lester and Ronald. By virtue of the fact that each member of the Non-Executive Directors' Fees Committee was charged with ensuring that BAE's compensation principles preserved the Company's assets and promoted long-term

shareholder value, and the compensation principles actually applied achieved the contrary, defendants Olver, Havenstein, Lester, Turner and Ronald are personally implicated in the allegations contained herein.

(j)    Despite defendants' failure to oversee and manage the Company's operations, its repeated violations of law and its resulting exposure to potential criminal liability, excessive fines and penalties, the directors and officers were rewarded handsomely throughout the Relevant Period. Set forth below are tables showing the compensation to the BAE Defendants during 2002-2006:

**Executive Director Defendant Compensation**

| | Year | Salary | Bonus | Salary + Bonus | 2002-2006 |
|---|---|---|---|---|---|
| **Turner** | 2002 | £577,000 | £115,000 | £692,000 | **£7,067,000** |
| Chief Executive Officer | 2003 | 675,000 | 491,000 | 1,166,000 | |
| | 2004 | 730,000 | 712,000 | 1,442,000 | |
| | 2005 | 800,000 | 792,000 | 1,592,000 | |
| | 2006 | 870,000 | 1,305,000 | 2,175,000 | |
| | | | | | |
| **Geoghegan** | 2002 | £186,000 | £19,000 | £205,000 | **£3,408,000** |
| Group Executive | | | | | |
| Officer | 2003 | 403,000 | 198,000 | 601,000 | |
| | 2004 | 423,000 | 399,000 | 822,000 | |
| | 2005 | 445,000 | 423,000 | 868,000 | |
| | 2006 | 468,000 | 444,000 | 912,000 | |
| | | | | | |
| **Lester** | 2002 | £487,000 | £73,000 | £560,000 | **£4,493,000** |
| Group Legal Director | 2003 | 502,000 | 231,000 | 733,000 | |
| | 2004 | 518,000 | 489,000 | 1,007,000 | |
| | 2005 | 540,000 | 529,000 | 1,069,000 | |
| | 2006 | 568,000 | 556,000 | 1,124,000 | |
| | | | | | |
| **Mogford** | 2002 | £391,000 | £39,000 | £430,000 | **£3,656,000** |
| Group Executive | | | | | |
| Officer | 2003 | 403,000 | 169,000 | 572,000 | |
| | 2004 | 423,000 | 414,000 | 837,000 | |
| | 2005 | 445,000 | 441,000 | 886,000 | |
| | 2006 | 468,000 | 463,000 | 931,000 | |
| | | | | | |
| **Ronald** | 2002 | £345,000 | £97,000 | £442,000 | **£4,905,000** |
| Chief Operating Officer | 2003 | 451,000 | 388,000 | £839,000 | |
| | 2004 | 433,000 | 637,000 | £1,070,000 | |
| | 2005 | 495,000 | 744,000 | £1,239,000 | |
| | 2006 | 542,000 | 773,000 | £1,315,000 | |

| | Year | Salary | Bonus | Salary + Bonus | 2002-2006 |
|---|---|---|---|---|---|
| **Rose** | 2002 | £435,000 | £44,000 | £479,000 | **£4,068,000** |
| Group Finance Director | 2003 | 448,000 | 188,000 | 636,000 | |
| | 2004 | 463,000 | 446,000 | 909,000 | |
| | 2005 | 500,000 | 495,000 | 995,000 | |
| | 2006 | 530,000 | 519,000 | 1,049,000 | |

| | 2002 | 2003 | 2004 | 2005 | 2006 | 2002-2006 |
|---|---|---|---|---|---|---|
| **Chairman Fees/Salary** | | | | | | |
| Evans | £528,000 | £400,000 | | | | £928,000 |
| Olver | | | £256,000 | £500,000 | £500,000 | £1,256,000 |
| | | | | | | |
| **Non-Executive Director Defendant Fees** | | | | | | |
| Birley | £36,000 | £44,000 | £55,000 | £63,000 | £73,000 | £271,000 |
| Carroll | | | | £18,000 | £70,000 | £88,000 |
| Cartellieri | £36,000 | £36,000 | £45,000 | £53,000 | £58,000 | £228,000 |
| Hartnall | | £36,000 | £65,000 | £73,000 | £78,000 | £252,000 |
| Mason | | £42,000 | £55,000 | £63,000 | £73,000 | £233,000 |
| Portillo | £11,000 | £36,000 | £45,000 | £53,000 | £17,000 | £162,000 |
| Quarta | | | | £18,000 | £58,000 | £76,000 |
| Rudd | | | | | £15,000 | £15,000 |
| Weinberg | | | | £34,000 | £77,000 | £111,000 |

(k)     Moreover, since *none* of the non-executive director fees are paid in the form of stock or stock options and *there are no share ownership requirements* for non-executive directors, the substantial majority of outside directors *own no equity interest in BAE*, including defendants Carroll, Cartellieri, Portillo, Quarta, Rudd, and Weinberg. As these directors have no pecuniary interest in BAE other than their director stipends, the continuation of which is incumbent upon their remaining in the good graces of BAE's executive directors, defendants Carroll, Cartielliri, Portillo, Quarta, Rudd, and Weinberg are dominated and controlled by the inside directors, including Olver, Turner and Havenstein.

(l)     The members of BAE's Audit Committee were charged with (i) reviewing the effectiveness of the Company's financial reporting, and internal control policies and procedures for the identification, assessment and reporting of risk; (ii) monitoring the role and effectiveness of the internal audit function; (iii) considering and making recommendations to the Board on the

appointment of the outside auditors; (iv) keeping the relationship with the outside auditors under review, including the terms of their engagement and fees, their independence and their expertise, resources and qualifications; (v) monitoring the integrity of the Company's financial statements; and (vi) reviewing significant financial reporting issues and judgments. The Audit Committee specifically received presentations during the relevant period addressing the Company's purported "anti-bribery compliance processes." The Audit Committee currently consists of defendants Hartnall (Chairman), Cartellieri and Mason, though defendant Quarta attends all meetings but cannot formally sit on the Committee as the Audit Committee Charter requires that a majority be British nationals and Quarta and Cartellieri are both U.S. citizens. The Audit Committee consisted of Hartnall (Chairman), Cartellieri, Mason, Quarta and Portillo during 2006 and 2005. In 2004 the Audit Committee included Hartnall (Chairman), Birley, Mason and Portillo; in 2003 it included Hartnall (Chairman), Birley and Portillo. By virtue of the fact that each member of the Audit Committee was charged with ensuring that BAE complied with its anti-bribery compliance processes and applicable law and with ensuring that BAE's accounting and reporting practices reflected all potential liability, defendants Hartnall, Cartellieri, Quarta, Mason, Portillo and Birley are personally implicated by the allegations contained herein.

(m) Members of the BAE Board as a whole have close alliances with and allegiances to the inside directors, who engaged in the primary illegal activities complained of herein, and are dependent upon them for continuation of their lucrative and prestigious positions as directors:

(i) *Interlocking Directorships*. Until 7/1/04, Olver was deputy group chief executive at BP p.l.c. and was appointed to the number two slot at BP on 1/9/03. Olver still serves as deputy chairman of TNK-BP, which houses and operates BP's Russian assets. Inglis serves as managing director of BP, and director of BP and chief executive of its exploration &

production business which oversees TNK-BP. BP is currently embroiled in a political scandal involving allegations that BP provided sex, drugs and prostitutes to Russian businessmen to obtain BP's Russian assets. Upon disclosure of BP's nefarious negotiation tactics, the Russian government unilaterally stripped BP of significant valuable Russian oil assets.

    (ii)  ***Interlocking Directorships***: Since 2006, defendant Turner has served as a director of Lazard Group, a global investment bank, and its U.S. subsidiary Lazard Ltd. Defendant Carroll is a former CEO of Shell Oil Co., the U.S. arm of Royal Dutch Shell, which does substantial business with the Lazard banks. Defendant Weinberg is a partner in the boutique investment bank Perella Weinberg Partners. Perella was formerly with Wasserstein Perella, the investment bank he co-founded with Bruce Wasserstein, who is now the head of Lazard. One of the Perella Weinberg partners formerly worked at Worms & Cie., the Lazard-controlled French bank at the heart of the French Synarchist movement.

    (iii)  ***Interlocking Directorships***: Defendant Quarto is a partner in the private equity fund Clayton, Dubilier & Rice, which has significant ties to J.P. Morgan bank. Defendant Carroll is a former chairman and CEO of Fluor Corp., a global engineering firm now headed by J.P. Morgan vice chairman Lord Robin Renwick.

    (iv)  ***Interlocking Directorships***: Michael (Mike) P. Rouse serves as Group Marketing Director of Programmes of BAE. Rouse has also been a director of Saab AB since 2000. Defendant Rose has served as a director and member of the Remuneration Committee at Saab since 1998.

    (n)  In order to bring this action for breaching their fiduciary duties, the members of the BAE Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

(o)     BAE's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breach of fiduciary duty alleged in this complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of BAE. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions which eliminate coverage for any action brought directly by BAE against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of BAE, there would be no directors' and officers' insurance protection and thus, this is a further reason why the Director Defendants will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

## SUBSTANTIVE ALLEGATIONS

### The BAE Directors' False and Misleading Reports

86.     For many years in their Directors' Annual Reports and other communications with shareholders, BAE's directors have stressed their successful management and oversight of BAE, its ethical behavior and compliance with anti-corruption laws. Each of these representations was false and misleading and was made with reckless disregard for the truth by the directors issuing them. The Directors' Reports to BAE shareholders set forth at ¶¶72-81 and the annual directors' reports set forth below were each false and misleading.

87.     The 2000 Chairman's letter dated (2/01) by Evans stated:

BAE Systems is a well-balanced company *underpinned by a strong order book* and robust balance sheet . . . .

88.     BAE's 2001 Annual Report stated:

**Overview**

> In 2001, we successfully delivered on our plans . . . .  The order book increased 6.8% to £43.8bn.

(Footnote omitted.)

89.   Chairman Evans' 2001 letter (dated 2/02) stated:

> BAE SYSTEMS has delivered on its plans for 2001. . . . The outlook for our defence businesses remains good with a number of important new programmes set to contribute to our profitability.

90.   CEO Weston's 2001 letter (dated 2/02) stated:

> Since the early nineties, we have been pursuing a strategy to transform the company into a world-wide business with systems engineering at its heart. The progress in 2001 has secured that transformation. The company's strategy for growth is directed along three main avenues:

> —   To maximise the value of our existing portfolio through the growth of our order book . . . .

> \*          \*          \*

> We have made good progress against each of these.

91.   Chairman Evans' 2002 letter to shareholders (dated 2/03) stated:

> BAE SYSTEMS is an immensely capable company whose core strength is its people. Its innovation and technological excellence comes from providing an environment in which those people can realise the highest level of performance.

92.   BAE's 2002 Annual Report stated:

**Business integrity**

> We are committed to do business in an ethical manner. ***This means complying with all applicable laws and regulations and with the ethical standards we have set ourselves.***

> \*          \*          \*

> *BAE SYSTEMS adheres to the relevant charters, codes of practice, guidelines and internal policies that govern exports of defence equipment.*

> Our policy is to:

> —   maintain an active and open dialogue with relevant government departments in the territories in which we operate ***to ensure compliance with government***

*policy and the law and regulations of those territories governing the export
of our products*;

*     *     *

—    *respect the values of the international community and the laws of those
countries where we conduct our business*.

93.    Chairman Evans' 2003 letter (dated 2/04) stated:

**Significant progress**

     This has been a year of significant progress. We have continued to build on
our good first half and have delivered full year results to plan.

*     *     *

**Business transformation**

     . . . Today BAE Systems is one of a small group of companies at the top of
the world's aerospace and defence industry.

94.    CEO Turner's 2003 letter (dated 2/04) stated:

**Performance**

     BAE Systems has market leading businesses operating in the fields of
systems and software, support services and, through Airbus, large commercial
jets. . . .

     The North America business group performed well, with double digit organic
growth and strong cash flows. This business continued to design, develop and supply
world class systems and expertise to key US programmes.

95.    BAE's 2004 Annual Report stated:

**Highlights**

Programmes business outlook improving

*     *     *

North America delivering good growth

*     *     *

Strong cash flow

*     *     *

Record order book

- 51 -

\*       \*       \*

## Outlook

\*       \*       \*

Overall, the performance of the company's defence businesses is expected to continue to improve in 2005 . . . .

\*       \*       \*

BAE Systems is now delivering well against its strategy and objectives. . . . [T]he actions continuously being taken to improve performance, enable the group to look forward with confidence to delivering growing returns to its shareholders.

96.    Chairman Olver's 2004 letter (dated 2/05) stated:

I am pleased to report that BAE Systems has made good progress in 2004. . . . Much progress has been made to deliver long-term shareholder value.

97.    CEO Turner's 2004 letter (dated 2/05) stated:

BAE Systems performed well in 2004, both in delivering good financial results and executing actions that will underpin performance improvement over the longer term.

\*       \*       \*

We look forward with confidence to delivering growing returns for our shareholders in the future.

98.    The BAE 2004 Annual Report also stated:

**Corporate governance**

Successful companies are valuable not only to their shareholders but also to a wide community of individuals and organisations that benefit from the goods, services and wealth they generate. A company's board is ultimately responsible for ensuring that the right leadership, strategy and control structures are present to produce and sustain the delivery of this value. The essential elements of good corporate governance are having well thought out and robust means of delivering the right leadership, the right strategy and the right controls.

\*       \*       \*

**The Board**

\*       \*       \*

The Board of BAE Systems recognises that it is responsible for the leadership of the company and that in discharging this responsibility it is required to take decisions objectively and in the best interests of the company. The Board through a single document, the Operational Framework, has provided all employees with details of the standards of behaviour and key policies that are mandatory across the company. The areas covered by it include:

—    business ethics

\*        \*        \*

**Internal control**

\*        \*        \*

BAE Systems has developed a system of internal control that encompasses, amongst other things, the policies, processes, tasks and behaviours, that taken together, seek to:

—    facilitate the effective and efficient operation of the company by enabling it to respond appropriately to significant operational, financial, **compliance** and other risks that it faces in carrying out its business;

—    assist in ensuring that internal and external reporting is accurate and timely and based on the maintenance of proper records supported by robust information gathering processes; and

—    assist in ensuring that the company complies with applicable laws and regulations at all times and also internal policies in respect of the standards of behaviour and conduct mandated by the Board.

\*        \*        \*

The Board has delegated to the Audit Committee responsibility for reviewing in detail the effectiveness of the company's system of internal controls including risk management processes. Having undertaken such reviews, the Committee reports to the Board on its findings so that the Board as a whole can take a view on these matters. In order to assist the Audit Committee and the Board in this review, the company utilises a process, the Operational Assurance Statement (OAS) process. This has been subject to regular review over a number of years, which has resulted in a number of refinements being made.

\*        \*        \*

*The overall responsibility for the system of internal control within BAE Systems rests with the directors of the company.*

\*        \*        \*

**Corporate responsibility**

Recognising the importance of corporate responsibility (CR) concerns the social, environmental and ethical issues associated with the company's operations the Board has agreed that it will review formally on an annual basis the company's performance in this area.

\* \* \*

**Export of defence equipment**

The key elements of our policy concerning the export of defence equipment are:

— to maintain an active and open dialogue with relevant government departments in the territories in which we operate to *ensure compliance with government policy and the law and regulations of those territories governing the export of our products*;

\* \* \*

— *to respect the values of the international community and the laws of those countries where we conduct our business.*

**Compliance with international anti-corruption laws**

*BAE Systems demands and expects honesty, integrity and fairness in all aspects of its business. In support of this expectation, the company is committed to compliance with laws implementing the OECD Anti-Bribery Convention and the US Foreign Corrupt Practices Act. The company will not tolerate bribery or any attempt by way of gifts, payments or favours to influence improperly the decisions of our customers or suppliers.*

*A comprehensive compliance programme has been in place for a number of years and is aimed at ensuring that our policies in this area are observed and enforced. . . .*

*The Board recognises that compliance with these two areas is of critical importance to the company.*

The company publishes a separate Corporate Responsibility Report.

99.    BAE's 2005 Annual Report stated:

**Highlights, outlook and results in brief**

\* \* \*

• Programmes business profitability and risk profile improved

\* \* \*

- 54 -

**Outlook**

Looking forward to 2006, we anticipate an improved performance . . . .

100.    Chairman Olver's 2005 letter (dated 2/06) stated:

With a combination of effective strategy, continued good programme execution and achievement of key business objectives, including a focus on winning future business, 2005 was a successful year for BAE Systems.

\*    \*    \*

In addition to overseeing Company strategy, the Board is responsible for monitoring the Company's performance, maintaining the governance framework, overseeing succession planning for the Board and senior executives, setting appropriate standards of conduct and monitoring compliance with those standards.

101.    CEO Turner's 2005 letter (dated 2/06) stated:

BAE Systems has performed well against its objectives in 2005.  Financial results have been delivered in line with our plan and further significant steps have been taken to implement the Company's strategy.

\*    \*    \*

In 2005, the Company has continued to improve performance . . . .

\*    \*    \*

In summary, we have had a good year, delivering a strong set of financial results and meeting our overall objectives for 2005.

*We are successfully executing our strategy. . . .  We are delivering shareholder value by being the premier transatlantic defence and aerospace company.*

102.    The 2005 Report also stated:

BAE Systems recognises its responsibilities to the people it employs, its customers and suppliers, its shareholders, the wider community and to the environment.

\*    \*    \*

*Corporate responsibility (CR) in BAE Systems is about good business practice and continual improvement.  We recognise our wide-ranging responsibilities and our CR framework has been developed around key stakeholder interest and feedback, potential risk to our business and the extension, review and improvement of existing practices.*

## Governance of CR

The board of directors has overall responsibility for governance of CR matters within the Company.

\*　　　\*　　　\*

## Key issues for our business

It is important that our CR reporting addresses issues that are material to our business and reflect stakeholder concerns. . . .

*The key areas our stakeholders consider material to our business are anti-bribery and corruption practices* . . . .

\*　　　\*　　　\*

## Ethics

BAE Systems is committed to meeting the highest ethical standards in our dealings with others. The nature of our business means it is particularly important that we have strong values and an awareness of public concerns. *We are confident that we meet the highest ethical standards in our dealings with others and have the processes in place to ensure our employees comply with the law in all the countries where we operate. We also recognise the importance of demonstrating this to our stakeholders.* . . .

*We do not tolerate unethical or illegal conduct. The consequences of such conduct may be far reaching and severe not only for the Company and its employees, but also for other stakeholders. For example, we, and our employees, may be subject to criminal sanction, our reputation may be tarnished and we may suffer a loss of business. Such conduct is also morally wrong.*

103.    BAE's 2006 Annual Report issued in 3/07 contained false statements:

(a)    Olver's 2006 letter, dated 2/21/07, stated:

Good operational performance and effective implementation of a well-defined, soundly based strategy are combining to deliver real performance.

The focus of the Group's strategy in recent years has seen a drive to improve returns and eliminate excessive risk in the UK-based operations, alongside the expansion of the Group's presence in the US. This twin approach is transforming the Group's performance in the UK market and has established BAE Systems as one of the major US defence companies.

Notable achievements in 2006 included the resolution of the approach to funding the deficit on the Group's pension schemes, the completion of the sale of our 20% interest in Airbus and good progress towards securing further significant

business in Saudi Arabia. Underlying these individual achievements has been a broad-based improvement in performance across the Group.

In addition to continuing to pursue the development of the Group in its two largest defence and aerospace markets, the UK and the US, the Group's strategy recognises opportunities in the other home markets in which BAE systems has a local presence and capability: Australia, Saudi Arabia, South Africa and Sweden.

Alongside the development of the Group in these six home markets, BAE Systems will continue to nurture a high performance culture. The delivery of continuous performance improvement remains key to the twin objectives of delivering cost-effective capability to our customers and maximizing returns for our shareholders.

The Group's strategy is reviewed regularly as part of the Group's annual business planning process. This review tests the continued relevance of the current strategy. The adaptations made to the strategy are set out on page 11 and reflect the progress made over the past 12 months.

*      *      *

*Our policies for conducting ethical business are clear and unambiguous, with established processes to ensure compliance.*

The underlying UK company law provisions concerning narrative reporting have changed since our last annual report. The matters required to be reported as part of the new business review requirements are dealt with on pages 2 to 40 of this report and cover the Group's activities during the year and likely future developments. . . .

The Group's corporate responsibility performance is summarised on pages 35 to 40 and also detailed in an important separately published report. Like all high performance companies, our policies are kept constantly under review, and we are committed to take action wherever necessary to maintain the highest standard of corporate governance.

(b)     Turner's 2006 letter, dated 2/21/07, stated:

**Year in review**

BAE Systems delivered another year of good financial performance, underpinned by programme schedule and cost adherence across the Group and reflecting the benefits now flowing from our world-class Lifecycle Management and Performance Centred Leadership processes.

The performance of the US businesses has again been excellent with the Group's expansion in the US market over recent years generating good returns. Good progress has continued in the UK businesses with programmes on track and meeting their key milestones.

A number of export opportunities have also progressed, most notably in the Kingdom of Saudi Arabia where, under an agreement between the Kingdom of Saudi Arabia and the UK government, the Group is working to modernise the Saudi armed forces including progressing towards a contract for 72 Typhoon aircraft.

*    *    *

Flight development of the Nimrod MRA4 programme continues . . . .

*    *    *    .

Recognising that the security and welfare of the 4,600 employees and their dependants in Saudi Arabia is paramount, a major construction programme is well underway to create two new residential and workplace facilities.

These investments establish a significant industrial footprint in Saudi Arabia with a growing in-Kingdom technical capability. This will enable the group to satisfy many of its Saudi customer's needs from on-shore companies.

*    *    *

In summary, BAE Systems is progressing well. The Group's strategy is delivering a focused, high performing, defence and aerospace business with good positions in key markets around the globe. As a result, the Group has a robust plan to deliver profitable growth for our shareholders.

(c)    BAE's 2006 Annual Report between pages 2-40 stated:

**Business portfolio actions**

The drive to build sustainable, profitable, through-life businesses in the air, land and sea sectors of the UK market continues, building on the good progress last year.

We continue to seek growth in the US through continuing to target above-market organic growth from the Group's established business activities, and by looking for value-enhancing acquisitions.

Following our success in recent years in establishing a global land systems business we continue to pursue growth opportunities in this market sector.

*    *    *

Two new actions have been introduced.

Building on a relationship that spans several decades we will pursue opportunities to grow our business in the Kingdom of Saudi Arabia. Our focus will be the transition of the relationship from one of an export market to the implementation of a home market strategy.

- 58 -

*    *    *

BAE Systems is one of the world's leading defence companies and is one of only four companies with global defence sales in excess of $20bn. It is Europe's largest defence company and ranks number seven within the US defence industry.

*    *    *

## United States

The Group's US business now delivers over US$9bn (£5bn) of annual sales and employs approximately 40,000 people in 36 states.

*    *    *

## The Kingdom of Saudi Arabia

*Saudi Arabia has been an important market for BAE Systems for many decades and there are significant new opportunities to both continue, and strengthen, this relationship into the future.*

A key growth opportunity is the Group's role in supporting the partnership between the governments of the Kingdom of Saudi Arabia and the UK in updating the capability of the Kingdom's armed forces. We are committed to assisting the Kingdom in developing its defence industrial base and the training and up-skilling of its workforce.

*    *    *

## The Group is subject to risk from a failure to comply with laws and regulations

The Group's operations are operations are subject to numerous domestic and international laws, regulations and restrictions, and non-compliance with these laws, regulations and restrictions could expose the Group to fines, penalties, suspension or debarment, which could have a material adverse effect.

The Group has contracts and operations in many parts of the world and operates in a highly regulated environment. The Group is subject to numerous UK, US and other laws and regulations, including, without limitation, regulations relating to import-export controls, money-laundering, false accounting, anti-bribery and anti-boycott provisions. . . .

Failure by the Group or its sales representatives, marketing advisers or others acting on its behalf to comply with these laws and regulations could result in administrative, civil or criminal liabilities and could result in significant fines and penalties and could result in the suspension or debarment of the Group from government contracts for some period of time or suspension of the Group's export privileges.

*Addressing this exposure the Group has mandated policies and procedures to help ensure that employees act with the highest ethical standards and comply with relevant laws and regulations. In particular, all dealing with sales representatives and marketing advisers are governed by detailed compliance procedures, the application of which is monitored by a dedicated compliance function.*

In 2004 the UK Serious Fraud Office and Ministry of Defence Police commenced an investigation into suspected false accounting and corruption. *The investigation is wide ranging and concerns a number of jurisdictions and contractual arrangements.*

\*        \*        \*

## Governance of CR

The board of directors has overall responsibility for the governance of CR matters within the Group. Specific responsibility has been assigned to the CR committee of the Board. All members of this Committee are non-executive directors and comprise Peter Weinberg, Professor Sue Birley, Sir Nigel Rudd and Phil Carroll.

*Reputation is vital to the long-term sustainability of all companies.* The CR Committee is central to the Board's oversight of the critical non-financial issues that are fundamental to the Group's reputation. The Committee is responsible for reviewing and monitoring the processes the Group uses to manage social, environmental and ethical risk, as well as supporting the Board in the approval of strategy and policy in this area.

The Committee is supported by the Group Legal Director, Audit Director, Group HR Director and Director of Corporate Responsibility.

\*        \*        \*

## Ethics

We are committed to meeting the highest ethical standards in our relationships with others. *We will not tolerate unethical behaviour or attempts to improperly influence the decisions of customers or suppliers. Unethical behaviour is wrong, could lead to loss of business, seriously damage our reputation and leave the Group and its employees open to criminal sanction.*

## 2006 Objectives

In 2006 two objectives specifically relating to ethics were set within the leadership objectives.

—    Meet the standards defined in our internal assurance statement (for ethical issues, the minimum acceptable score within our assurance process is confirmation of compliance with all applicable laws and standards).

- 60 -

—    Develop, pilot and roll out ethics training to all employees in the UK and Australia.

**Progress**

Meeting our standards

The Group has training and awareness programmes to ensure employees understand our policies and the standards expected of them.

We provide training on our anti-bribery programme to managers from marketing, commercial, procurement, finance, customer support and other functions. On completing the training, employees are required to sign a statement confirming they will comply with our policies and will report any issues of concern. This training is mandatory for all senior employees and for those employees involved in dealings with marketing advisers.

*    *    *

Working with others

In July 2006 BAE Systems and other UK defence companies established the UK Defence Industry Anti-corruption Forum, to share good practice on ethics and anti-corruption programmes. Members of the Forum met twice in 2006 and heard from a range of speakers including the Institute of Business Ethics, ICC (UK), Transparency International (UK) and law firms, Linklaters and Bryan Cave LLP.

In the US we are a signatory to the Defense Industry Initiative on Ethics and Business Conduct, and a sponsoring partner of the Ethics and Compliance Officers Association.

*    *    *

Internal Control

The Board has conducted a review of the effectiveness of the Group's system of internal controls, including financial, operational and compliance controls and risk management systems, in accordance with the Turnbull guidance.

BAE Systems has developed a system of internal control, which has been in place throughout 2006 and to the date of this report, that encompasses, amongst other things, the policies, processes and behaviours that, taken together, seek to:

—    facilitate the effective and efficient operation of the Company by enabling it to respond appropriately to significant operational, financial, compliance and other risks that it faces in carrying out its business;

—    assist in ensuring that internal and external reporting is accurate and timely and based on the maintenance of proper records supported by robust information gathering processes; and

- 61 -

&mdash;   assist in ensuring that the Company complies with applicable laws and regulations at all times and also internal policies in respect of the standards of behaviour and conduct mandated by the Board.

*    *    *

The Board has delegated to the Audit Committee responsibility for reviewing in detail the effectiveness of the Company's system of internal controls. Having undertaken such reviews, the Committee reports to the Board on its findings so that the Board as a whole can take a view on this matter. In order to assist the Audit Committee and the Board in this review, the Company has developed the Operational Assurance Statement (OAS) process. This has been subject to regular review over a number of years, which has resulted in a number of refinements being made.

The OAS requires that each part of the business completes a formal review of its compliance against the Operational Framework, including operational and financial controls and risk management processes. The review is signed off by the managing director of every line of business and relevant functional directors. The OAS is completed every half year and includes a formal assessment of business risk. The overall responsibility for the system of internal control within BAE systems rests with the directors of the Company. Responsibility for establishing and operating detailed control procedures lies with the managing director of each operating business.

    (d)    Elsewhere, BAE's 2006 Annual Report stated:

The directors of BAE Systems plc present their report, together with the financial statements for the year ended 31 December 2006.

*    *    *

**Business Review**

The information provided in the operating and financial review on pages 2 to 40 reports on the activities during the year, post balance sheet events and likely future developments. The information in this review constitutes the business review required under the Companies Act and forms part of this Directors' Report.

*    *    *

The Company, through its internal audit department, monitors compliance against the principal policies and guidelines (including the utilisation of credit) and any exceptions found are reported to the TRMC.

*    *    *

By order of the Board
David Parkes
Company Secretary
21 February 2007

## Statement of directors' responsibilities in respect of the annual report and the financial statements

The directors are responsible for preparing the Annual Report and the group and parent company financial statements, in accordance with applicable law and regulations.

Company law requires the directors to prepare group and parent company financial statements for each financial year. Under that law the directors are required to prepare the group financial statements in accordance with International Financial Reporting Standards (IFRS) as adopted by the EU and have elected to prepare the parent company financial statements in accordance with UK Accounting Standards.

The group financial statements are required by law and IFRSs as adopted by the EU to present fairly the financial position and performance of the group: the Companies Act 1985 provides in relation to such financial statements that references in the relevant part of that Act to financial statements giving a true and fair view are references to their achieving a fair presentation.

The parent company financial statements are required by law to give a true and fair view of the state of affairs of the parent company.

In preparing each of the group and parent company financial statements, the directors are required to:

– select suitable accounting policies and then apply them consistently;

– make judgements and estimates that are reasonable and prudent;

– for the group financial statements, state whether they have been prepared in accordance with IFRSs as adopted by the EU;

– for the parent company financial statements, state whether applicable UK Accounting Standards have been followed, subject to any material departures disclosed and explained in the parent company financial statements; and

– prepare the financial statements on the going concern basis unless it is inappropriate to presume that the group and the parent company will continue in business.

The directors are responsible for keeping proper accounting records that disclose with reasonable accuracy at any time the financial position of the parent company and enable them to ensure that its financial statements comply with the Companies Act 1985. They have general responsibility for taking such steps as are reasonably open to them to safeguard the assets of the group and to prevent and detect fraud and other irregularities.

Under applicable law and regulations, the directors are also responsible for preparing a Directors' Report. Directors' Remuneration Report and Corporate Governance Statement that comply with that law and those requirements.

104.    For several years, BAE's Board of Directors has caused to be published annually a

BAE Corporate Responsibility Report to its shareholders.

(a)    The 2001 Director's Corporate Responsibility Report stated:

We are, of course, transparent about our business performance and publish a
detailed report to shareholders.

\*    \*    \*

### Honesty, integrity and fairness

*We demand and expect honesty, integrity and fairness in all aspects of our
business. We are committed to comply with laws implementing the OECD Anti-
Bribery Convention and the US Foreign Corrupt Practices Act. . . .*

### Export of defence equipment

BAE SYSTEMS adheres to relevant laws, charters, codes of practice and
guidelines in addition to our own internal policies, which are designed to ensure the
necessary control over the export of defence equipment. It is our policy:

- To maintain an active and open dialogue with relevant government
departments in the territories in which we operate *to ensure compliance with
the government policy and the law and regulations of those territories
governing the export of our products*.

\*    \*    \*

- *To respect the values of the international community and the laws of those
countries where we conduct our business*.

(b)    The 2002 Corporate Responsibility Report stated:

We see social, ethical and environmental issues as important to our business
performance, posing both risks and opportunities. It is essential that we manage these
issues well. Our principles, code of behaviour and detailed corporate governance
policies are included within the BAE SYSTEMS Operational Framework.

\*    \*    \*

Effective management starts with the senior management team that provides
strong leadership and is clearly accountable. The Control and Risk Frameworks
control the group's activities and are underpinned by requirements on behaviour,
ethics and policy compliance.

\*    \*    \*

- 64 -

**Ethics Policy**

In 2002 we formalised our UK Ethics Policy, using the same approach taken by our US operations. The policy gives our UK employees guidance on the behaviour we expect of them in their daily dealings with each other, customers and our stakeholders. An independent hotline is available for employees to discuss their ethical concerns, get advice or report possible breaches of our ethical standards.

An Ethics Review Committee was set up to monitor the policy. This is chaired by the Audit Director and its members are all senior executives drawn from the legal, internal audit, human resource and security departments. The committee meets quarterly. It will review details of all contacts with the hotline to ensure that proper and timely action is taken to resolve issues.

(c)     The 2003 Directors' Corporate Responsibility Report stated:

**Anti-corruption measures**

*We demand and expect honesty, integrity and fairness in all aspects of our business. We are committed to comply with the law in every country where we operate. This includes laws implementing the OECD Anti-Bribery Convention and the US Foreign Corrupt Practises Act. We will not tolerate bribery or other attempts to improperly influence the decisions of customers and suppliers.*

*We have an anti-corruption compliance programme in place throughout the company. This includes robust procedures governing transactions with marketing consultants, the proper use of corporate hospitality and our procurement processes. This is supported by an awareness-training programme and underpinned by a clear statement that infringements will result in disciplinary action.*

*The valuable experience available from our US colleagues under the Foreign Corrupt Practices Act has also been drawn upon and a review of our policies has been undertaken by external lawyers in the UK and the US. Our procedures accord with anti-corruption rules promulgated by the International Chamber of Commerce.*

We continually review and monitor our policies and procedures in this area and take note of external progress in improving anti-corruption measures across all industries . . . .

\*       \*       \*

An Ethics Review Committee of senior executives meets quarterly to review details of all contacts with the hotline and ensure that action is taken to resolve issues where necessary. The Committee is chaired by the Audit Director, who monitors compliance with the policy.

**ETHICAL BUSINESS CONDUCT POLICY**

In all aspects of doing business, we will behave ethically. What do we mean by behaving ethically? Each of us has an idea of what ethical behaviour means in our daily lives. In our work for the company, behaving ethically means:

- Obeying the laws and regulations in force, wherever we are Preventing actions which harm others or the environment

  \*     \*     \*

- *Showing honesty*, integrity and openness *in dealing with* . . . *customers [and] representatives of governments* . . .

  \*     \*     \*

- Complying with the standards of conduct we have set ourselves

- *Not tolerating unethical behaviour by others*

- *Reporting unethical behaviour which we encounter*

  (d)    The 2004 Directors' Corporate Responsibility Report stated:

**Business ethics and operating principles**

\*     \*     \*

*BAE Systems is committed to comply with all laws governing defence sales and to meeting the highest ethical standards in our dealings with others.*

*We would never condone unethical or illegal conduct.* It is not only wrong, it could also damage the national interests of the countries where we operate, harm the commercial prospects of the company and leave employees and directors liable to imprisonment.

*Our Operational Framework sets out our policies and governance systems to ensure that all employees carry out our business in an ethical way. The Framework is reviewed and updated annually.*

**Ethical conduct**

We are committed to conduct our business to the highest ethical standards. *We comply with the law in all countries where we operate, including laws implementing the OECD Anti-Bribery Convention and the US Foreign Corrupt Practices Act.*

*All BAE Systems' employees are required to act with honesty, integrity and fairness. We will not tolerate bribery or other attempts to improperly influence the decisions of customers or suppliers.*

(e)     The 2005 Directors' Corporate Responsibility Report stated:

"Bribery and corruption are bad for business. Bribery is illegal in most countries and is a form of 'stealing' from shareholders. Being caught making bribes or engaging in corrupt behaviour can seriously damage a company's reputation and lead to loss of business.

The defence industry is one of three sectors most at risk from bribery and corruption . . . ."

\*          \*          \*

*We are committed to meeting the highest ethical standards in our dealings with others. The nature of our business means it is particularly important that we have strong values . . . .*

*We do not condone unethical or illegal conduct. The consequences of such conduct may be far reaching and severe not only for the Company and its employees, but also for other stakeholders. Unethical behaviour is wrong, could lead to loss of business, could seriously damage our reputation and leave the Company and its employees open to criminal sanction.*

\*          \*          \*

**Our policies on business ethics**

*The intent of our policies is to establish compliance with the law as the minimum and to aim for higher standards where possible.*

Our Operational Framework includes policies and governance systems on business ethics. *It requires all BAE Systems employees to act with honesty, integrity, and fairness and states that we will not tolerate bribery or other attempts to improperly influence the decisions of customers or suppliers.*

(f)     The 2005 CEO letter in the 2005 Directors' Corporate Responsibility Report

(dated 2/06) stated:

**Ethics**

\*          \*          \*

Ethical business conduct is fundamental to the reputation and success of our company and we accept no compromise of our principles and policies.

**Our five principles of ethical business conduct are:**

- Accountability – we are personally answerable for our conduct and actions.

- Honesty – there is no substitute for the truth.

- 67 -

- Integrity – we say what we do, we do what we say.

- Openness – when questions are asked, we are frank and straightforward in our answers.

*     *     *

**These principles apply to everything we do.**

**Compliance with Laws & Regulations**

*We conduct ourselves in accordance with applicable laws and regulations of the countries within which we do business. Ignorance of the law and regulations is no excuse.*

*     *     *

**Anti Bribery & Corruption**

*Bribery is a criminal offence. We do not, and will not, pay bribes or offer improper inducements to anyone for any purpose, nor do we or will we accept bribes or improper inducements. To use a third party as a conduit to channel bribes to others is a criminal offence. We do not, and will not, engage indirectly in or otherwise encourage bribery.*

*     *     *

*Any action which is unlawful, dishonest, harmful to others or which is otherwise against our policies is unacceptable. We will take disciplinary action against anyone whose behaviour does not meet our standards.*

(g) The 2006 Directors' Corporate Responsibility Report stated:

**Ethics**

We are committed to meeting the highest ethical standards in our dealings with others. We will not tolerate unethical behaviour or attempts to improperly influence the decisions of customers or suppliers. *Unethical behaviour is wrong, could lead to loss of business, seriously damage our reputation and leave the Group and its employees open to criminal sanction.*

*     *     *

**Progress**

Meeting our standards

The Group has training and awareness programmes to ensure employees understand our policies and the standards expected of them.

We provide training on our anti-bribery programme to managers from commercial, procurement, finance, customer support and other functions. . . . On completing the training, employees are required to sign a statement confirming they will comply with our policies and will report any issues of concern. This training is mandatory for all senior employees and for those employees involved in dealings with marketing advisers. All BAE Systems' marketing advisers are subject to rigorous due diligence under our compliance programme, are made aware of our anti-bribery policy and are expected to maintain our ethical standards.

105.   The statements in BAE's 2001-2006 Annual Reports were false and misleading when made and known to be false by the directors and officers of BAE when those statements were made. The repeated positive and reassuring statements about BAE's controls, procedures and practices to comply with anti-bribery laws, rules and conventions, BAE's actual compliance with them, and BAE's dedication to high ethical standards were false. In fact, BAE's top officers and directors were actively permitting the circumventing of those preventative procedures and controls by permitting the payment of bribes, kickbacks and other improper payments, *i.e.*, unethical and illegal activities.

106.   BAE's 2001-2006 financial statements, published by, and the responsibility of, its directors, were false and misleading in failing to disclose the existence of the illegal and improper payments and/or for failing to make provision for the money fines and penalties likely to result from those payments.

107.   BAE stated that its financial statements are prepared in accordance with "EU endorsed International Financial Reporting Standards (IFRS), International Financial Reporting Interpretations Committee Interpretations (IFRICs) and the Companies At 1985 applicable to companies reporting under IFRS."

108.   To the extent BAE was engaging in conduct that would result in fines or penalties, it was required to disclose these under IFRS. Since the amount was capable of a reasonable estimate – at least $50 million – and the liability was probable, the Company was required to record a provision for them.

- 69 -

109.    International Accounting Standards ("IAS") No. 37, *Provisions, Contingent Liabilities and Contingent Assets Recognition*, requires that a provision be recognized when:

(a)     an entity has a present obligation . . . as a result of a past event;

(b)     it is probable an outflow of resources . . . will be required to settle the obligation; and

(c)     a reliable estimate can be made of the amount of the obligation.

110.    Importantly, IAS No. 37, ¶19, includes as an example a violation of law leading to liability as a situation where a provision needs to be recorded:

> It is only those obligations arising from past events existing independently of an entity's future actions (*i.e.* the future conduct of its business) that are recognised as provisions. Examples of such obligations are penalties or clean-up costs for unlawful environmental damage, both of which would lead to an outflow of resources embodying economic benefits in settlement regardless of the future actions of the entity. Similarly, an entity recognises a provision for the decommissioning costs of an oil installation or a nuclear power station to the extent that the entity is obliged to rectify damage already caused.

Also, unless the possibility of an outflow related to a contingent liability is "remote," the entity must disclose the contingent liability, estimating the financial effect and the timing. IAS No. 37, ¶86. Because a financial penalty was not remote, at a minimum, disclosure was required.

**The *Ultra Vires*, Illegal and Improper Conduct**

111.    BAE operates in a competitive environment. To justify their continuation in their lucrative and prestigious executive and director positions, the BAE Defendants wanted to make it appear that BAE was succeeding under their stewardship and doing so by operating in an ethical manner, in compliance with the laws and conventions applicable to it.

112.    In the mid-1980s, BAE was attempting to obtain a very large military aircraft contract from the Saudi Arabian Ministry of Defense to supply over 120 fighter/bomber aircraft over the next 20+ years, known as the "Al-Yamamah" contract. The officers and directors of BAE knew that if this huge contract could be obtained, they could point to it as concrete evidence of their business acumen and successful stewardship of BAE, which would help justify them holding on to their

positions of power, prestige and profit with BAE, including lucrative payments and bonuses they received in connection with those positions for many, many years going forward.

113.   Prince Sultan of Arabia, then in line for the royal throne, served as the head of Saudi Arabia's Ministry of Defense. He was in a position to significantly influence and determine whether or not BAE received the coveted Al-Yamamah contract. Sultan's son was Bandar, who was the apple of his father's eye. For over 20 years – and during most of the time period relevant hereto – Bandar served as Saudi Arabia's Ambassador to the U.S. and because of his positive relationship with his father was also in a key position to influence and determine if BAE was awarded the Al-Yamamah contract. In order to advance their own positions with BAE by winning the Al-Yamamah contract, the then officers and directors of BAE named as defendants herein undertook a course of illegal and improper conduct (engaging in *ultra vires* activities) in breach of their fiduciary duties to BAE, including paying huge bribes or kickbacks (a/k/a "backhanders") to Bandar, which payments have amounted to over $2 billion over the last 20 years. Although paying such bribes or kickbacks is an *ultra vires* act in violation of international business standards and the laws of the U.S., including the FCPA and the OECD Convention and BAE's own policies of business conduct, defendants caused BAE to funnel these illegal payments to Bandar. The payments were made in significant part through Riggs located in Washington, D.C., where the money was wired by BAE on a regular basis into accounts that, while nominally in the name of Saudi Arabia, were accounts controlled by Bandar and over which he had discretion and signature authority and which accounts (and the proceeds therefrom) he used for his own personal use and benefit.

114.   Riggs was selected for this purpose because its Washington, D.C. location gave Bandar ready access to it and because Riggs had a reputation in international commercial circles as a bank willing to facilitate highly questionable, if not illegal, currency transfers for international transactions, conduct which years later would ultimately lead to the shut down of Riggs. In fact, as

Riggs' activities came under increasing government scrutiny in an effort to stave off action to close Riggs, the bank identified one or more of the accounts being utilized by BAE and Bandar to facilitate the kickback payments to him as accounts involving highly questionable or improper conduct and transactions and took steps to shut down those accounts. At or about that time, Bandar resigned his post as Ambassador to the U.S. for "personal reasons" and returned to Saudi Arabia. His father remains heir to the Saudi Arabian throne and head of its Ministry of Defense.

115.    These illegal kickback payments were explicitly bargained for and recognized at the outset of the Al-Yamamah contract between BAE and the Saudis involved. The payments were provided for in certain schedules to the contract which were kept secret. They were entitled "Letters of Offer and Acceptance" and purported to provide compensation for certain "support services," which, in fact, Bandar never performed and which was known by the participants to be a code word and cover for the bribe or kickback payments he (and his father) were receiving and/or benefiting from.

116.    Most of the bribe and kickback monies paid to or for the benefit of Bandar were received by him here in the U.S. in Washington, D.C. over the last 20 years. Significant amounts of the illegal bribe/kickback payments received by him have been spent by Bandar here in the U.S., including the expenditure of over $100 million on one of the largest and most lavish personal residences here in the U.S., located in Aspen, Colorado, on the ski mountain there, which Bandar currently has for sale for $135 million.

117.    Up to £120 million a year was sent by BAE Systems from the U.K. into two Saudi embassy accounts with Riggs in Washington. These accounts were actually a conduit to Bandar. The purpose of one of the accounts was to pay the expenses of Bandar's private Airbus.

118.    David Caruso, an investigator who worked for Riggs, where the accounts were held,

has said Bandar had been taking money for his own personal use out of accounts that seemed to

belong to his government. He said:

> "There wasn't a distinction between the accounts of the embassy, or official
> government accounts as we would call them, and the accounts of the royal family."

Caruso said he understood this had been going on for "'years and years.'" The payments were

written into the arms deal contract in secret annexes, described as "support services."

119.    The cash bribe and kickback payments to Bandar have not only included outright

payments to him personally, but also payments made by BAE for other personal family expenditures

of Bandar's family, including paying for his fantastically outfitted Airbus private aircraft, which cost

over $100 million, and lavish expenses for members of his family, including millions and millions of

dollars paid for a lavish multi-week, multi-country honeymoon.   These illegal and improper

payments have continued until recent times.

120.    According to the 6/18/07 edition of *Newsweek*:

Bandar and the $2 Billion Question

> Hundreds of pages of confidential U.S. bank records may be the missing link
> in illuminating new allegations that a major British arms contractor funneled up to $2
> billion in questionable payments to Saudi Prince Bandar bin Sultan. The BBC and
> Guardian newspaper reported last week that BAE Systems made "secret" payments
> to a Washington, D.C., bank account controlled by Bandar, the longtime Saudi
> ambassador to the United States who is now the kingdom's national-security adviser.
> The payments are alleged to be part of an *$80 billion* military-aircraft deal between
> London and Riyadh. . . .  Before the U.K. closed the inquiry, British investigators
> contacted the U.S. Justice Department seeking access to records related to the Saudi
> bank accounts. Many of these records were first obtained by NEWSWEEK in 2004.
> At the time, the magazine reported that federal regulators had been alerted to millions
> of dollars in *"suspicious" activities in Saudi accounts at the now-defunct Riggs
> Bank*.

> Tom Rose, a British lawyer for Bandar, denied the Saudi prince had received
> "improper secret" commissions. He said the BAE funds were actually being paid into
> a *Saudi Defense Ministry account over which Bandar had signature authority*, but
> any payouts from those accounts "were exclusively for purposes approved" by the
> ministry. The accounts were known both to the British and Saudi governments. (A
> BAE spokesman said, "*We deny all allegations of wrongdoing*.")

The Riggs Bank records show the use of those funds raised concerns among bank officials and U.S. regulators. *In November 2003, Riggs filed a "suspicious activity report" with the Treasury Department disclosing that over a four-month period*, $17.4 million from the Saudi Defense account had been disbursed to a single individual in Saudi Arabia. When Riggs officials asked the Saudis who the person was and why he was receiving the funds, they were told the individual "coordinates home improvement/construction *projects for Prince Bandar in Saudi Arabia*," and the payments *were for a "new Saudi palace," one document shows*.

In another instance, Bandar wired $400,000 from a Riggs account to a luxury-car dealer overseas. "It was impossible to distinguish between government funds and what would normally be considered personal purposes," *said David Caruso, who served as Riggs's compliance officer at the time. Caruso also confirmed to NEWSWEEK that the Saudi Defense account was regularly replenished with $30 million each quarter from an account in London*. But the bank never knew the source of the funds. *The bank was so concerned about the withdrawals that it cut off all business with the Saudis. In May 2005, the U.S. Treasury fined Riggs $25 million for failing to monitor "extensive and frequent suspicious" activity in Saudi and other accounts*.

121.   The improper payments also included other payments for Bandar's benefit.

According to the *Sunday Times (London)*:

THE British arms firm BAE Systems secretly paid nearly £250,000 for a honeymoon for the daughter of Prince Bandar, the Saudi Arabian prince at the centre of bribery allegations.

A senior BAE executive authorized the payments, allowing Bandar's daughter to enjoy a six-week honeymoon in luxury resorts in Singapore, Malaysia, Bali, Australia and Hawaii. The couple stayed in five-star hotels costing up to £4,000 a night and had a private jet trip to the Great Barrier Reef.

Peter Gardiner, managing director of the travel agency that organized the honeymoon, said: "BAE instructed me to give Bandar's daughter and her husband the honeymoon of a lifetime at BAE's expense. Who says that big business doesn't have a heart?"

\*       \*       \*

[T]he honeymoon for Bandar's daughter, Princess Reema, was paid for through a £60m slush fund which the Serious Fraud Office (SFO) believes was set up by BAE to encourage Saudi royals to continue with a £ 43 billion arms contract to supply Hawk and Tornado jets.

The latest twist in the BAE affair has been disclosed by Gardiner, who said he has made a detailed statement to the SFO. He described how his company, Travellers World, was used by BAE to make payments to Saudi royals when they were holidaying around the world. His company would arrange and pay for hotels,

airline tickets, apartments, boat and jet charters, as well as hiring limousines and bodyguards.

*　　*　　*

Last week Gardiner said Tony Winship, a senior BAE marketing executive responsible for overseeing the slush fund, approved the costs of the six-week trip for Princess Reema bint Bandar and Prince Faisal bin Turki, the son of Prince Turki bin Nasser, another Saudi royal implicated in the SFO's bribery inquiry.

"They were a young, attractive couple in love and on a dream honeymoon. They knew nothing about BAE paying and must have believed it was their parents paying. I was instructed by BAE not to discuss payments with them – or with anyone. I was told by BAE to give them the very best," Gardiner said.

"The couple selected the itinerary. I chose and arranged the hotels, transportation, diplomatic arrivals. They never took advantage and any personal expenditure such as shopping they paid for themselves."

The couple were married in Riyadh, the Saudi capital, in December 1996. They flew on Turki's private Boeing 707, staffed by an English captain and crew, to Singapore. There they stayed for a week at Raffles, the country's most exclusive hotel where suites cost from £ 500 to £ 2,800 a night.

They then traveled for a week's stay to the Pangkor Laut resort on a privately owned island off Malaysia. It is often described as the best resort in the world.

"The honeymoon suite was a two-bedroom, overwater bungalow with a partial glass floor so that guests could see the sea below them," said Gardiner, who accompanied the royal couple during the early part of their stay.

After a week in Malaysia, Bandar's daughter and her groom flew by private jet to Bali where they stayed at the five-star Four Seasons Jimbaran Bay resort before flying to Australia, spending Christmas at the Regent hotel in Sydney. During that visit the prince who, like his father-in-law Bandar, is a fan of the Dallas Cowboys American football team, was keen to watch a critical game. Gardiner says he found a private club in a town 60 miles away that could show the game live on cable TV. The entire club was hired so Bandar's daughter and her husband could watch the match. The three-hour stay cost £ 6,000. BAE again footed the bill.

The couple then flew to the Gold Coast where they stayed at the five-star Sheraton Mirage and Spa. On a day trip they hired a Gulfstream jet to fly to the Great Barrier Reef. The bill, paid by Travellers World and reimbursed by BAE, was £15,000.

Documents in the possession of the SFO show that Travellers World invoiced BAE £45,490 for the couple's stay in Australia. The item is billed as "HM.Aus", which Gardiner said was shorthand for "Honeymoon, Australia". The couple moved on to Hawaii where they spent a few days at the Halekulani on Waikiki beach. From

there they flew to the Grand Wailea, on the Hawaiian island of Maui, where their penthouse suite on a private floor cost about £ 4,000.

The files show one part of the bill for Hawaii was £ 101,412. The payments, again paid by BAE, appear as "HM. Haw." and "HM Haw.Xtra". For the month of January alone the cost was £ 190,486. According to Gardiner, this did not include the first leg of the honeymoon, which began in mid-December the previous year. The total cost was nearly £ 250,000, he said.

122. Riggs was the intermediary chosen to funnel the bribe payments to Bandar. Riggs was chosen because BAE and Bandar knew Riggs would cooperate in secreting the fund transfers, *i.e.*, laundering them to hide them from government regulators and BAE's own auditors, which Riggs did for many years under Joe Allbritton's tutelage. Riggs and Joe Allbritton permitted Bandar to manipulate Saudi accounts to divert funds to himself and members of his family and did so because of the enormous profits Riggs and the Allbritton Defendants made off the Saudi/Bandar accounts and transactions.

123. In the early 2000s, Riggs was beset with scandal. Investigations found little oversight was conducted involving suspicious international transactions. A Saudi named Omar al-Bayoumi housed and opened bank accounts for two of the 9/11 hijackers. About two weeks after the assistance began, al-Bayoumi's wife began receiving monthly payments totaling tens of thousands of dollars from Princess Haifa bint Faisal, the wife of Saudi ambassador Prince Bandar, through a Riggs bank account. Upon discovery of these transactions, the FBI began investigating the bank for possible money-laundering and terrorist financing. Investigators found lax safeguards on monetary transfers at Riggs. Several Saudi accounts were discovered to have financial improprieties, including a lack of required background checks and a consistent failure to alert regulators of large transactions, in violation of the law. Many of these transactions involved Bandar personally, often transferring over $1 million at a time. In the Al Yamamah deal, Bandar received some $2 billion in bribes from BAE through the Riggs.

- 76 -

124. Augusto Pinochet, the former dictator of Chile, has been widely accused since 1973 of corruption, illegal arms sales, and torture. In 1994, Riggs officials invited Pinochet to open an account at Riggs. Arrested in 1998 in Britain for possible extradition to Spain, his accounts were ordered frozen by court orders. A U.S. Senate report revealed that Riggs executives helped Pinochet disguise millions of dollars that had been stolen from the Chilean people, although some of Pinochet's supporters have claimed that the money came from supporters outside Chile. By using shell companies and hiding accounts from federal regulators, Riggs illegally allowed Pinochet to retain access to much of his fortune. The disclosure of the Riggs accounts reignited the case against Pinochet and a ruling that he was not mentally competent to stand trial was overturned when it was proven that Pinochet himself had orchestrated some of the huge transactions. In 2004, he was ordered to stand trial for crimes against humanity, and additional claims of mental and physical incompetence have been overruled.

125. In 7/04, the U.S. Senate published an investigation into Riggs, into which most of Equatorial Guinea's oil revenues were paid until recently. This showed that accounts based at the embassy to the United States of Equatorial Guinea were allowed to make large withdrawals without properly notifying federal authorities. At least $35 million was siphoned off by long-time dictator of Equatorial Guinea, Teodoro Obiang Nguema Mbasogo, his family and senior officials of his regime. The same Mbasogo bought, in 11/06, a $35 million house in Malibu, California. Simon Kareri, the Riggs employee in charge of the Equatorial Guinea and other accounts, stands accused of money laundering in separate charges. As the account manager, it is alleged that he established a fake holding company in his wife's name and diverted funds into this account. In the Senate Permanent Subcommittee on Investigations hearing in 7/04, Kareri refused to answer any questions of the panel by invoking his Fifth Amendment rights. In that hearing, the President of Riggs was asked why the bank would willingly enter into a business arrangement with the dictator of Equatorial Guinea, a

man who willingly exercises his hold over his people with demonstrations of murder and torture on state-run television. In a copy of correspondence to President Mbasogo, the letter "thanked the president for his establishment of several bank accounts, and encouraged a working relationship to help establish and secure the stable reign of his country."

126.    Riggs was fined $25 million for violations of money-laundering laws. A long running Justice Department investigation was wrapped up in 2/05, with Riggs pleading guilty and paying a $16 million fine for violations of the U.S. Bank Secrecy Act after a *Wall Street Journal* article reported on 12/31/04 that Riggs had extensive ties to the CIA, including that several bank officials held security clearances. Also, in 2/05, the bank and its controlling shareholder agreed to pay $9 million to Pinochet victims for concealing and illegally facilitating movement of Pinochet money out of Britain. Riggs was acquired by PNC in 2004. On 5/26/05, the Riggs name was officially retired and all Riggs branches opened as PNC branches.

127.    In 5/04, federal regulators fined Riggs a record $25 million for violating anti-money laundering laws in its handling of tens of millions of dollars in cash transactions in Saudi-controlled accounts under investigation for possible links to terrorism financing. The civil fine against Riggs, a bank with a near-exclusive franchise on business with the capital's diplomatic community, was the largest ever imposed on a financial institution for such violations. The action by the Treasury Department's Office of the Comptroller of the Currency came in an order. The order said the bank's internal controls "were, and continue to be, seriously deficient." "Riggs failed to properly monitor, and report as suspicious, transactions involving tens of millions of dollars in cash withdrawals, international drafts that were returned to the bank, and numerous sequentially numbered cashiers' checks," it said.

128.    The Senate Finance Committee Chairman, Charles Grassley of Iowa, said:

"Riggs Bank deserves every penny of this huge fine. . . . Banks have a patriotic duty, not to mention legal requirement, to report suspicious activity. When banks look the

other way, they put our national security at risk. Whether it's through incompetence, negligence or greed, they are allowing terrorists to funnel their blood money through the system."

129.    Riggs was accused by Treasury regulators of failing to comply with a law requiring banks to notify the government of suspicious transactions. It was classified by the comptroller's office as a "troubled institution" for not complying fully with a 7/03 consent order under which it agreed to strengthen its anti-money laundering controls.

130.    For its transgressions, Riggs was ultimately fined $25 million for violations of money-laundering laws. A long running Justice Department investigation was wrapped up in 2/05, with Riggs pleading guilty and paying a $16 million fine for violations of the U.S. Bank Secrecy Act. And in 2/05, the bank and its controlling shareholder agreed to pay $9 million to Pinochet victims for concealing and illegally facilitating the movement of Pinochet money out of Britain. Upon completion of PNC's acquisition of Riggs in 2/05, the Riggs name was abandoned, but PNC has continued its operations in Washington, D.C.

**BAE'S Pattern and Practice of Illegal/Improper Bribes, Kickbacks and Payments**

131.    The improper and/or illegal Al Yamamah payments were part of a broader pattern and course of conduct of improper payments by the BAE Defendants.

132.    In 1994, the OECD urged member countries to put a stop to overseas bribery. A binding convention was adopted in 1997. It was signed by Britain and came into force in 1999. Signatories promised to outlaw such corruption. To avoid compliance, Evans moved BAE's whole worldwide system of agent payments to Switzerland. Britain's SFO later concluded: "The whole system is maintained in such conditions of secrecy that there is a legitimate suspicion concerning the real purpose of the payments." The system was run from a secure block, Warwick House, at BAE's Famborough premises. "HQ Marketing Services" was headed by Hugh Dickinson. A board-level committee also met to approve each agency agreement. BAE set up a front company called Novelmight Ltd. With the help of the Swiss branch of its bankers, Lloyds TSB, the firm rented a

high-security office in Geneva, on the sixth floor of a block at 48 Route des Acacias. Then, just before Britain signed up to the OECD convention in 1997, the filing cabinets and safes containing the agent details were loaded into a van and driven by trusted staff from Farnborough to Geneva. BAE added a new layer of concealment when the convention came into force in 1999. Novelmight was officially closed down as a U.K.-registered subsidiary. But it was secretly re-registered as an offshore entity in the Caribbean where beneficial ownership could be hidden. Agents often received their payments into Swiss accounts. When agreements were ready to be made or renewed, BAE personnel flew to Geneva and unlocked the office at Route des Acacias for the signing. The contracts were kept in Geneva and could only be inspected there. The purpose of these tortuous arrangements was to ensure that nothing questionable involving the hiring of agents took place within U.K. legal jurisdiction.

133. In 2/98, "Red Diamond Trading Ltd" was anonymously incorporated by BAE in the British Virgin Islands. It was used to channel payments all over the world, via Red Diamond accounts in London, Switzerland and New York. Secret payments have also been made to agents in South America, Tanzania, Romania, South Africa, Qatar, Chile and the Czech Republic. The BAE Defendants never disclosed the existence of Red Diamond in BAE's published company accounts, and have never explained why it was set up. BAE used British Lloyds TSB to transfer cash through Red Diamond accounts and on to its final destination. The next year, BAE set up a second front company, purely to handle the Saudi commission payments for Al-Yamamah. "Poseidon Trading Investments Ltd" was incorporated in the British Virgin Islands on 6/25/99. Funds passed through its accounts to Saudi agents in transfers made by Lloyds TSB. A different method was used to disguise corrupt benefits for Saudi officials who went on vacation trips to the U.S. and Europe. This was what became known as BAE's "slush fund." The head of the Saudi air force, Nasser, along with his relatives, were provided with unlimited shopping, plane tickets and free holidays by BAE. They

ran up enormous bills, totaling £60 million, over the years. BAE used two cooperative companies of travel agents to pick up the bills – Robert Lee International and Travellers World. Peter Gardiner, Travellers World managing director, has stated how deliberately misleading invoices were organized by BAE's executives. They referred merely to "accommodation and support services."

134.    The SFO is investigating BAE for improper or illegal payments of corruption and bribery activities in South Africa, Tanzania, Romania, Chile, the Czech Republic, Qatar, Bosnia, Nigeria, Zambia, Costa Rica and Egypt. The SFO has begun a series of interviews under caution with executives from BAE implicated in allegations of corruption involving investigations into its dealings in other jurisdictions, including Romania, the Czech Republic, Tanzania and South Africa.

135.    Clare Short, a former U.K. international development secretary, has stated she had been told by SFO investigators they had documents showing there was bribery in an arms deal involving the supply of an air-traffic control system by BAE to Tanzania. According to *The Guardian (London)*, the SFO told Short it has seen documents showing that the sale of radar equipment to Tanzania by BAE was corrupt.

136.    The SFO is investigating "substantial payments" made by BAE to a senior South African defense ministry official who had influence over a £1.5 billion contract won by the arms company to supply planes. South Africa's organized crime unit, the Scorpions, was handling a "mutual legal assistance" request from the SFO to investigate the financial accounts of Fana Hlongwane, a politically well-connected businessman, in relation to the 1999 deal. Mr. Hlongwane is a former special adviser to the then South African defense minister, Joe Modise. Modise has been named in allegations of corruption, including claims that he took a £500,000 bribe from BAE and $10 million from a German consortium that signed a contract to sell submarines. The SFO is also investigating John Bredenkamp, a tycoon who is BAE's agent in southern Africa and whose U.K. home and offices were raided in 10/06. Suspicion was cast on the aircraft deal after Modise changed

- 81 -

the formula by which the contract would be decided to discount price as a factor. South Africa's air force chiefs had selected Italian aircraft as cheaper and more modern, but the amended specifications shifted the balance in favor of the aging British Hawks – at nearly double the price. BAE has admitted that it paid tens of millions of pounds in secret commissions to win the £1.5 billion contract. The arms company originally intended to pay 12% of the contract price in commissions but agreed to cut that back to 7% – more than £100 million – following questions from the British authorities underwriting the deal. An internal Foreign Office memo three years ago says BAE named the agent handling the commissions in South Africa as the company Osprey. BAE claimed Osprey had no links with anyone involved in awarding contracts but, in truth, it had close ties with Modise. Among Osprey's shareholders was Tsebe Properties, of which Hlongwane was a director.

137.    According to the 5/31/07 *Financial Times*:

South Africa's former top defence official has revealed that he resigned because he suspected corruption in a UK-backed arms deal involving BAE Systems and other big European companies.

. . . Lt Gen Pierre Steyn told the Financial Times that his concerns led him to leave office in 1998 – months before the prime minister *backed the 30bn rand (£2.1bn) deal by signing an agreement on a package of spin-off industrial projects*.

The controversial arms deal is now being investigated in Britain and Germany . . . .

Gen Steyn said he was concerned about the possibility of graft during negotiations on the deal to buy military aircraft and vessels, although he added that he did not want to make allegations against specific individuals or companies.

*"I suspected corruption – for sure," he said. "So that made me more determined to enforce good practice."*

He said he resigned because he was not satisfied that sufficient safeguards were in place to enable him to prevent or expose any corruption in the bidding process, whose winners included BAE, Germany's Thyssen-Krupp, France's Thales and Saab of Sweden, which is 20 percent owned by BAE.

"When my attempts were frustrated, I said, *'That's it, I must relinquish my responsibility,'*" he said.

- 82 -

138.    A committee has been set up by the Hungarian government to investigate a defense contract signed with a consortium of the U.K.'s BAE and Sweden's Saab. The government ordered the investigation into the Gripen fighter jet contract, which was signed in 2001, after an allegation in the Swedish media that Austrian businessman Alfons Mensdorf-Poilly had received around $6 million to intermediate in the contract. Swedish prosecutors are investigating bribery allegations relating to BAE's dealings in the Czech Republic. Czech police have said they began investigating bribery allegations involving BAE in response to a request by the SFO, which is probing the Company's activities in six countries. The deal under scrutiny by Swedish and Czech authorities is a 2001 (£1.43 billion) agreement to sell 24 Gripen fighters to the Czech military. The deal was done by a 50-50 joint venture between Saab and BAE. Police in Prague have said: "These investigations have begun and are continuing."

139.    According to the 5/15/07 *New York Times*:

Swiss Investigating BAE In Money Laundering Case

Law enforcement authorities in Switzerland confirmed Monday that they had opened a criminal investigation into possible money laundering at BAE Systems, adding to the international scrutiny of the company, the top British military contractor.

Jeanette Balmer, a spokeswoman for the office of the Swiss federal prosecutor in Bern, confirmed that an investigation had been opened after a report from Swiss money laundering investigators.

*        *        *

Swiss banks are required by law to report any suspicious financial transactions. According to The Guardian, a British daily, Swiss investigators will be able to examine accounts held by Wafic Said, a Syrian financier who may have acted as a middleman for payments and whom the Swiss consider a potential witness.

*        *        *

The news follows a meeting last week in The Hague of prosecutors from Austria, Britain, the Czech Republic, Sweden and Switzerland. They are seeking to coordinate corruption inquiries related to the sale and lease of Gripen fighter jets, which are built by Saab of Sweden and sold through a joint venture with BAE. The two companies are accused of offering intermediaries as much as 1 billion kronor,

about $150 million, to promote the sale of the jets to the Czech Republic and Austria in 2002.

Ms. Balmer said that the meeting had been convened under the auspices of Eurojust, an arm of the European Union established in 2002 to coordinate prosecution of serious cross-border and organized crime.

140.    The SFO is also reviewing a Jersey case of tens of millions of pounds of payments allegedly made by a number of European arms companies to a senior Qatari minister. The Jersey probe began in 2000 after the discovery of a trust fund containing £100 million controlled by Sheikh Hamad bin Jassem bin Jabr al-Thani, the Qatari foreign minister. The minister received "substantial commissions from companies seeking to do business with the state of Qatar," according to a 12/01 Jersey court judgment that was published in 2003 after a long court battle by the Jersey *Evening Post* newspaper. According to the 2001 court judgment, al-Thani acknowledged receiving commissions but said they were not bribes. He added that his actions had been authorized by the Emir of Qatar. Jersey court documents show that Qatar tried to derail the investigation into al-Thani by arguing it "vexed" the "peace of nations," foreshadowing the national security concerns. But the Jersey courts said the Qatari argument "went too far," adding that the law had to "take its proper course." "An investigation cannot be stifled because it is the cause of political embarrassment," the 2001 judgment said.

141.    Anti-fraud officials in Slovakia are investigating an arms contract won by BAE. The contract, won in late 2005 and worth about pounds 144m, is for military mobile communications equipment. BAE won the contract, called MOKYS, not long after it donated computer equipment to the country's ministry of defense, something that was not disclosed at the time.

## BAE's Non-Compliance with the FCPA's Accounting and Record-Keeping Requirements and FCPA/OECD Conventions Anti-Bribery Rules

142.    The FCPA imposes accounting and record-keeping requirements specifically applicable to those companies that elect to conduct business in a foreign country. Nevertheless, throughout the relevant time period, BAE did not have an FCPA/OECD Convention compliance

program and, in fact, did not have any meaningful FCPA/OECD Convention compliance procedures in place. More specifically:

  (a)    BAE's Board did not enforce its own anti-corruption policies;

  (b)    BAE's Board did not provide its employees with necessary information concerning applicable anti-corruption laws and conventions;

  (c)    BAE's Board never conducted any effective anti-corruption compliance training; and

  (d)    BAE's Board did not maintain any due diligence files on its foreign agents.

143.    BAE's Board, although there were "storm warnings" concerning its failure to comply with the accounting and record-keeping requirements of the FCPA, failed to properly investigate these warnings and take corrective action.

### FIRST CLAIM FOR RELIEF

#### (Derivative Claim for Breach of Fiduciary Duties Against the BAE Defendants)

144.    Plaintiff hereby incorporates ¶¶1-143.

145.    The BAE Defendants are fiduciaries of BAE and of all of its public shareholders and owe to them the duty to conduct the business of the Company loyally, faithfully, carefully, diligently and prudently. This cause of action is asserted based upon these defendants' acts in violation of applicable law, which acts constitute a breach of fiduciary duty.

146.    The BAE Defendants, in their roles as executives and/or directors of the Company, made false and misleading statement in Annual Reports and participated in the acts of mismanagement alleged herein and/or acted in gross disregard of the facts and/or failed to exercise due care to prevent the unlawful and *ultra vires* conduct complained of.

- 85 -

147. The BAE Defendants are responsible for the gross mismanagement of BAE, for abdicating their corporate responsibilities and mismanaging the Company in at least the following ways:

(a)   They caused BAE to violate applicable law, disregarding their duties as fiduciaries and directors and officers.

(b)   They have caused BAE to violate anti-bribery/corruption laws and conventions and exposed the Company to criminal liability and unnecessary costs, fines and penalties – by engaging in *ultra vires* and illegal conduct.

(c)   They exposed the Company and its shareholders to massive fines and penalties.

(d)   They subjected BAE to adverse publicity and loss of goodwill.

148. As a result of these defendants' wrongful conduct and wrongful actions, including the failure to maintain a system of internal controls adequate to insure the Company's compliance with all applicable laws and conventions, BAE has suffered considerable damage.

149. All the BAE Defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company.

150. The BAE Defendants abused the control vested in them by virtue of their high-level positions in the Company.

151. By reason of the foregoing, these defendants have breached their fiduciary obligations of care, candor and control to BAE and its shareholders, and violated Section 463 of the U.K. Companies Act.

152. BAE and its shareholders have been injured by reason of these defendants' failure to exercise the reasonable and ordinary care owed to the Company by its directors, officers, managing agents and employees in disregard of their fiduciary duties to the Company. Plaintiff, as a

shareholders and a representative of BAE, seeks damages and other relief for the Company as hereinafter set forth.

## SECOND CLAIM FOR RELIEF

### (Derivative Claim for Waste of Corporate Assets Against the BAE Defendants)

153.    Plaintiff hereby incorporates ¶¶1-152.

154.    As a direct result of the wrongdoing alleged herein, the BAE Defendants have unreasonably and unnecessarily caused BAE to wrongfully expend and waste billions of dollars of corporate assets, and have subjected the Company to additional liability in the untold millions of dollars, to the extreme detriment of the Company.

155.    Additionally, as set forth above, these defendants have awarded themselves and their allies excessively lucrative compensation and payments which have no reasonable basis, but instead are designed only to enrich themselves.

156.    As a direct and proximate result of these defendants' waste of corporate assets as alleged herein, BAE has sustained damages.

## THIRD CLAIM FOR RELIEF

### (Derivative Claim for Aiding and Abetting Breaches of Fiduciary Duties Against Bandar, PNC/Riggs and the Allbritton Defendants)

157.    Plaintiff hereby incorporates ¶¶1-156.

158.    By encouraging and accomplishing the illegal and improper payments alleged herein and concealing them from government regulators, Bandar, PNC/Riggs and the Allbritton Defendants have each encouraged, facilitated and advanced the BAE Defendants' breaches of their fiduciary duties and waste of corporate assets.  In so doing, Bandar, PNC/Riggs and the Allbritton Defendants have each aided and abetted, conspired and schemed with BAE Defendants to breach their fiduciary duties, waste BAE's corporate assets and engage in the *ultra vires* and illegal conduct complained of.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.     Awarding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure defendants do not participate therein or benefit thereby;

B.     Directing all defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

C.     Directing BAE to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with Section 463 of the U.K. Companies Act and the Sarbanes-Oxley Act of 2002, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the companies' Articles and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

(i)     an amendment to the Company's Articles limiting the number of executive directors on the BAE Board to two;

(ii)     a proposal to strengthen the BAE Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(iii)     establishing an effective anti-corruption and bribery exposure oversight committee, staffed fully with independent directors and provided a budget to retain independent counsel and advisors;

- 88 -

      (iv)    a provision to permit the shareholders of BAE to nominate at least three candidates for election to the BAE Board;

      (v)    appropriately test and then strengthen the internal audit and control functions;

      (vi)    reform executive compensation;

      (vii)    require full compliance with Sarbanes-Oxley and Section 463; and

      (viii)    permit shareholders to question all executive directors of BAE at the Annual General Meeting and establish a more transparent process for receiving and evaluating shareholder proposals.

D.    Awarding punitive damages;

E.    Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

F.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury with respect to each claim in this Complaint.

DATED: September 13, 2007

LAW OFFICES OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)


_____
      ROGER M. ADELMAN

1100 Connecticut Ave., NW, Suite 730
Washington, DC 20036
Telephone: 202/822-0600
202/822-6722 (fax)

Local Counsel

- 89 -

COUGHLIN STOIA GELLER RUDMAN
   & ROBBINS LLP
DARREN J. ROBBINS
MARY K. BLASY
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

CUNEO GILBERT & LaDUCA, L.L.P.
JONATHAN W. CUNEO(DC Bar # 939389)
WILLIAM H. ANDERSON (DC Bar # 502380)
507 C Street, N.E.
Washington, DC 20002
Telephone: 202/789-3960
202/789-1813 (fax)

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

S:\CptDraft\Derivative\CPT BAE SYSTEMS WSL.doc

## VERIFICATION

I, Mary K. Blasy, hereby declare as follows:

1.　　I am an associate of the law firm of Coughlin Stoia Geller Rudman & Robbins LLP, counsel for plaintiff in the above-entitled action. I have read the foregoing Complaint and know the contents thereof. I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.　　I make this Verification because plaintiff is absent from the County of San Diego where I maintain my office.

Executed this 12th day of September, 2007, at San Diego, California

_____

MARY K. BLASY