UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re BAE SYSTEMS PLC DERIVATIVE LITIGATION | ) ) ) | Civil No. 1:07-cv-01646 |
| | ) | Assigned to: Judge Rosemary M. Collyer |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |

PLAINTIFF'S *EX PARTE* EMERGENCY APPLICATION FOR A TEMPORARY
RESTRAINING ORDER, AN ACCOUNTING, LIMITED EXPEDITED DISCOVERY AND
FOR AN ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTIVE RELIEF
SHOULD NOT ISSUE

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...........................................................................................1

II.  FACTUAL BASIS OF RELIEF REQUESTED.................................................6

A.   Defendants' Illegal Bribery Scheme.................................................6

B.   Bandar Used Bribe Payments to Acquire Hundreds of Millions of Dollars Worth of United States Real Property ........................................8

C.   The BAE Bribery Scheme Is Uncovered and BAE Is Exposed to Criminal Liability.........................................................................9

D.   Defendants' Misconduct Exposes BAE to Hundreds of Millions of Dollars in Damages........................................................................10

E.   Without Judicial Intervention, BAE Faces Irreparable Harm................13

III. EQUITABLE RELIEF TO PRESERVE THE *STATUS QUO* IS WARRANTED..........14

A.   This Action Raises Serious Questions and There Is a Substantial Likelihood Plaintiff Will Succeed on the Merits ...................................15

B.   Injunctive Relief Is Necessary to Preserve the *Status Quo* by Preventing the Transfer of BAE's Assets Outside of the Court's Grasp ................20

C.   The Balance of Hardships Tips Decisively in Favor of Enjoining Dissipation of These Assets from the Court's Grasp............................22

D.   The Public Interest Favors Restraining the Transfer of the Illegal Bribe Proceeds Out of This Court's Grasp ...............................................23

E.   Injunctive Relief May Issue ..........................................................25

IV.  A BOND IS NOT NECESSARY ..................................................................27

V.   THE COURT SHOULD ORDER BANDAR TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE AND ORDER THAT PLAINTIFF BE PERMITTED TO TAKE LIMITED EXPEDITED DISCOVERY TO PROVIDE THE COURT WITH A MORE COMPLETE RECORD .........................28

A.   An Order to Show Cause Should Issue..............................................28

B.   This Court May Grant Expedited Discovery ......................................29

     1.   Limited or "Particularized" Expedited Discovery Is Warranted ..............29

     2.   The Discovery Plaintiff Seeks ...................................................30

**Page**

VI.  CONCLUSION...................................................................................................................31

## TABLE OF AUTHORITIES

**Page**

**CASES**

*1250 24th Street Assocs. Ltd. P'ship v. Brown*,
    684 F. Supp. 326 (D.D.C. 1988) ...................................................................................23

*Abdah v. Bush*,
    No. 04-1254 (HHK) (RMC), 2005 U.S. Dist. LEXIS 4144
    (D.D.C. Mar. 12, 2005) ...............................................................................................16

*Ass'n of Am. Physicians & Surgeons v. Clinton*,
    997 F.2d 898 (D.C. Cir. 1993) .....................................................................................30

*BCCI Holdings (Luxembourg) v. Bin Mahfouz*,
    No. 92-2763 (JHG), 1993 U.S. Dist. LEXIS 1614
    (D.D.C. Feb. 12, 1993) ...............................................................................15, 21, 22, 23

*Citizen's Alert Regarding the Env't v. U.S. DOJ*,
    No. 95-1702 (GK), 1995 U.S. Dist. LEXIS 18619
    (D.D.C. Dec. 8, 1995) ...........................................................................................21, 24

*City of Los Angeles v. Coleman*,
    1975 U.S. Dist. LEXIS 12325 (D.D.C. May 15, 1975) ................................................23

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
    423 F. Supp. 2d 348 (S.D.N.Y. 2006) ..........................................................................17

*CityFed Fin. Corp. v. Office of Thrift Supervision U.S. Dep't of Treasury*,
    58 F.3d 738 (D.C. Cir. 1995) .......................................................................................15

*Coquina Oil Corp. v. Transwestern Pipeline Co.*,
    825 F.2d 1461 (10th Cir. 1987) ...................................................................................29

*Cuomo v. U.S. Nuclear Regulatory Comm'n*,
    772 F.2d 972 (D.C. Cir. 1985) .....................................................................................15

*Deckert v. Independence Shares Corp.*,
    311 U.S. 282 (1940) .....................................................................................................26

*Democratic Cent. Comm. v. Wash. Metro. Area Transit Comm'n*,
    485 F.2d 786 (D.C. Cir. 1973) ................................................................................16, 17

*Doctor's Assocs. v. Distajo*,
    107 F.3d 126 (2d Cir. 1997) .........................................................................................29

*Dooley v. United Techs Corp.*,
    803 F. Supp. 428 (D.D.C. 1992) ..................................................................................25

Page

*Ellipso, Inc. v. Mann,*
    480 F.3d 1153 (D.C. Cir. 2007) ................................................................24

*Ellsworth Assocs. v. United States,*
    917 F. Supp. 841 (D.D.C. 1996) ................................................................30

*Fiona Trust Holding Corp and others v Privalov and others,*
    [2007] EWHC (QB) 1217, ¶85 (Eng.) ........................................................17

*First Commonwealth Corp. v. Pub. Investors, Inc.,*
    No. 90-3316, 1990 U.S. Dist. LEXIS 12743
    (E.D. La. Sept. 25, 1990) ........................................................................30

*Galper v. U.S. Shoe Corp.,*
    815 F. Supp. 1037 (E.D. Mich. 1993) ........................................................29

*Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.,*
    527 U.S. 308 (1999) ................................................................................26

*Halberstam v. Welch,*
    705 F.2d 472 (D.C. Cir. 1983) ........................................................17, 18, 20

*In re Chateaugay Corp.,*
    198 B.R. 848 (S.D.N.Y. 1996) ..................................................................11

*In re UnitedHealth Group Inc. S'holder Derivative Litig.,*
    No. 06-cv-1216 (JMR/FLN), 2007 U.S. Dist. LEXIS 94616
    (D. Minn. Dec. 26, 2007) ........................................................................29

*Mayflower Hotel Stockholders Protective Comm. v. Mayflower Hotel Corp.,*
    173 F.2d 416 (D.C. Cir. 1949) ..................................................................17

*Mova Pharm. Corp. v. Shalala,*
    140 F.3d 1060 (D.C. Cir. 1998) ................................................................15

*Musselman v. Southwinds Realty,*
    704 P.2d 814 (Ariz. Ct. App. 1985) ..........................................................18

*Nat'l Wildlife Federation v. Burford,*
    835 F.2d 305 (D.C. Cir. 1987) ....................................................................5

*Nelson v. Steer,*
    797 P.2d 117 (Idaho 1990) ......................................................................18

*Optic-Elec. Corp. v. United States,*
    683 F. Supp. 269 (D.D.C. 1987) ...............................................................30

**Page**

*Page Commc'n Engineers, Inc. v. Froehlke,*
    475 F.2d 994 (D.C. Cir. 1973) ...................................................................................29

*Polar Int'l Brokerage Corp. v. Reeve,*
    187 F.R.D. 108 (S.D.N.Y. 1999) ..............................................................................17

*(R (Corner House) v. Secretary of State for Trade & Industry,*
    [2005] EWCA (Civ) 192, ¶137 (Eng.)......................................................................24

*SEC v. Current Fin. Servs., Inc.,*
    783 F. Supp. 1441 (D.D.C. 1992) .............................................................................30

*SEC v. World-Wide Coin Inv.,*
    567 F. Supp. 724 (N.D. Ga. 1983) ...........................................................................21

*Semitool, Inc. v. Tokyo Electron Am.,*
    208 F.R.D. 273 (N.D. Cal. 2002) .............................................................................31

*Subscription Television of Greater Wash. v. Kaufmann,*
    606 F. Supp. 1540 (D.D.C. 1983) .............................................................................30

*The Republic of the Philippines v. Marcus, et al.,*
    806 F.2d 344 (2d Cir. 1986)......................................................................................26

*United States v. Kay,*
    359 F.3d 738 (5th Cir. 2004) ....................................................................................25

*United States v. Kearns,*
    595 F.2d 729 (D.C. Cir. 1978) ............................................................................16, 19

*United States v. McLean,*
    738 F.2d 655 (5th Cir. 1984) ....................................................................................19

*United States v. Rodriguez,*
    278 F.3d 486 (5th Cir. 2002) ....................................................................................28

*United States v. Westbrook,*
    119 F.3d 1176 (5th Cir. 1997) ..................................................................................28

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,*
    559 F.2d 841 (D.C. Cir. 1977)..................................................................................16

*Western Alliance Corp. v. Western Reliance Corp.,*
    643 P.2d 1382 (Or. Ct. App. 1982)...........................................................................18

**Page**

*Young v. Netherlands Owners, Inc.*,
    306 F. Supp. 1282 (D.D.C. 1969) ................................................................24

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78dd-1 ................................................................................................19
    §78dd-2 ................................................................................................19
    §78l ......................................................................................................19
    §78o .....................................................................................................19

18 U.S.C.
    §1956 ...............................................................................................27, 28
    §1956(c)(7)(D) ......................................................................................27
    §1957 ....................................................................................................27

28 U.S.C.
    §1651(a) ............................................................................................1, 26

29 U.S.C.
    §1104 ......................................................................................................6

Federal Rules of Civil Procedure
    Rule 26(d) .............................................................................................30
    Rule 34(b) .............................................................................................30
    Rule 65 ..............................................................................................1, 26
    Rule 65(c) .........................................................................................28, 29

## LEGISLATIVE HISTORY

H.R. Rep. No. 95-640 (1977) ...............................................................19, 25

S. Rep. No. 95-114 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4098 ...............25

## SECONDARY AUTHORITIES

Charles Allen Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice &*
    *Procedure: Civil 2d* (2d ed. 1995)
    §2948.1 ..................................................................................................21

*Palmer's Company Law* (1998)
    §8.501 ....................................................................................................17

Restatement (First) of Restitution (1937)
    §138 .......................................................................................................16

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §1651(a) and Local Rule 65.1(a), The City of Harper Woods Employees' Retirement System (the "Retirement System"), a long-term shareholder of BAE Systems plc ("BAE" or the "Company"), submits this Emergency Application for: (i) a Temporary Restraining Order ("TRO") enjoining defendant Prince Bandar Bin Sultan ("Bandar"), and any of his agents, lawyers or others acting on his behalf, from transferring any sales proceeds from the sale of the $167+ million in U.S.-based real property Bandar currently holds from U.S.-based accounts and requiring that any sales proceeds be deposited and/or invested pursuant to a prudent man standard; (ii) an Order to Show Cause Why Preliminary Injunctive Relief Should Not Issue securing these protections and imposing a constructive trust over the sales proceeds pending final resolution of this action (the "PI Motion"); (iii) an Accounting of all sums BAE's executives have caused the Company to pay to Bandar since 1986; and (iv) Limited Expedited Discovery to permit the Court to consider the Retirement System's PI Motion on a more complete record.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

On September 19, 2007, the Retirement System, a public pension fund operated for the benefit of thousands of current and retired City of Harper Woods, Michigan employees and their families and long-term BAE shareholder, filed this shareholder derivative action. Defendants include the entire BAE Board of Directors and several of the Company's current and former high-level executives (the "BAE Defendants"). The action seeks recovery on BAE's behalf for these defendants' intentional, reckless and/or negligent breaches of fiduciary duty, waste of corporate assets, and *ultra vires* conduct in connection with having caused BAE to make at least $2 billion in illegal bribe payments to Bandar between 1986 and the present. Defendants include other parties charged with aiding and abetting the BAE Defendants' breaches of their fiduciary duties, including: (i) Bandar, the alleged recipient of the $2 billion in illegal bribe payments; (ii) PNC Financial Group,

- 1 -

the legal successor to Riggs Bank ("Riggs"), BAE's now defunct Washington D.C.-based bank through which the bribe payments were funneled (hereinafter, "PNC"); and (iii) Joseph, Barbara and Robert Allbritton, the former controlling shareholders and principle operating executives of Riggs who facilitated the bribe payments (the "Allbritton Defendants").

On December 20, 2007 this Court granted plaintiff's motion to serve Bandar by alternative means. Service was immediately effected on Bandar and Bandar is presently represented in this action by Wm. Bradford Reynolds of Howrey LLP. *As Bandar has sold at least three of the U. S.-based properties he purchased with the BAE bribe payments in recent months, and has the ability to instantaneously sell the rest of the U.S.-based property interests he holds and transfer the proceeds out of the country and this Court's grasp without notice, Bandar is not being provided advance notice of this Application for TRO.*

The Complaint filed in this action alleges BAE's officers and directors breached their fiduciary duties and violated U.S., U.K. and international anti-bribery laws by causing the Company to illegally transfer more than $2 billion in bribe payments to Bandar through accounts at Riggs here in this District. The BAE Defendants are also alleged to have falsified BAE's books and records to conceal the bribe payments from regulators in violation of U.S., U.K. and international securities and financial reporting laws and regulations. Defendants' misconduct exposed BAE to hundreds of millions of dollars in criminal fines and penalties and jeopardized its valuable status as a defense contractor operating under a "Special Security Agreement" with the U.S. Department of Defense ("DOD"). Plaintiff seeks damages and equitable relief on behalf of BAE for all damages BAE incurs as a result of the alleged misconduct and seeks recovery of the illegal bribe payments Bandar received, in whatever form they are presently held. As detailed herein, plaintiff's preliminary research indicates Bandar acquired more than $216 million worth of real property in the United States between 1986 and 2007, that Bandar sold over $49 million worth of that property in recent

months as the bribery scheme was revealed, and that Bandar continues to hold an estimated $167.4 million worth of U.S.-based real property that is either presently listed for sale or subject to immediate sale.  Bandar received the BAE bribe payments here in this District and plaintiff's Complaint alleges they were used to acquire Bandar's U.S.-based real property.

This emergency application for a TRO, an accounting, limited expedited discovery and for an order to show cause why preliminary injunctive relief should not issue pending final resolution of this action is sought now to preserve the *status quo* pending final resolution of this action in order to protect BAE's interest in the bribe payments made to Bandar, in whatever form they are held. Bandar continues to hold title to an estimated $167.4 million worth of U.S.-based real estate acquired with bribe payments illegally paid by BAE executives in violation of United States law (including the Foreign Corrupt Practices Act (the "FCPA") enacted in 1977 and Organization of Economic Cooperation and Development ("OECD") Convention on Combating Bribery of Foreign Public Officials in International Business Transactions ("OECD Convention") adopted via a 1998 amendment to the FCPA), and the laws of the United Kingdom, Saudi Arabia, and other international law.  By way of analogy, by this motion plaintiff essentially seeks the same remedy available under the federal money-laundering statutes, *i.e.*, a TRO to prevent the dissipation of the spoils of defendants' illegal bribery scheme, coupled with access to the expedited discovery and accounting of these proceeds plaintiff needs to make the required showing to obtain preliminary injunctive relief to preserve the *status quo*.

Immediate injunctive relief is necessary to preserve plaintiff's remedy against Bandar.  As the timeline below indicates, in addition to listing his $135 million "Hala Ranch" Colorado estate for sale in June 2006 – *making it (then) the most expensive residential listing in United States history*– in recent months Bandar sold $49 million worth of the $216+ million U.S.-based real property he acquired with BAE bribe payments.  Those sales proceeds have already likely been transferred to

- 3 -

Saudi Arabia or other countries outside of this Court's grasp.  Without the judicial intervention sought herein, Bandar may continue selling the U.S.-based property and dissipating the assets.

| BAE Corruption Probe Revelations | Bandar's Conversion of the BAE Bribe Payments |
|---|---|
| | **1986-2004:** Bandar acquires over ***$216 million*** worth of U.S.-based real property assets using illegal bribe payments. |
| **November 2004:** the U.K. Serious Frauds Office ("SFO") discloses, and BAE confirms, that the SFO is investigating allegedly illegal bribe payments made by BAE to members of the Saudi Royal Family in connection with a 1986 Al-Yamamah arms sale from BAE to the Saudis. | **July 2005:** Bandar relinquishes his 22-year Saudi ambassadorship to the U.S. and begins spending far less time at his U.S. properties. |
| **October 2005:** the SFO begins receiving documents demonstrating the payment of some $2 billion in bribe payments from BAE to Saudis in connection with Al-Yamamah. | |
| **December 2005:** bowing to intense pressure from the Saudis to call off the SFO's investigation, including threats that continuing the investigation would harm the U.K.'s national interests both by damaging the U.K. defense-industry and by eroding Saudi support of anti-terrorism efforts, the U.K. begins reconsidering its commitment to uncovering and challenging the BAE bribe payments. | **June 2006:** Bandar lists his Hala Ranch residential estate in Aspen Colorado for sale for ***$135 million***, making it the then-most expensive residential estate listing in U.S. history. |
| **December 16, 2006:** facing Saudi threats to withdraw from negotiations to purchase an additional 72 Eurofighter jets from BAE and to cease cooperating in terrorism-suppression efforts, the SFO terminates its corruption probe. BAE states the SFO's "thorough investigation" is over and its stock price surges 7%. | **May 9, 2007:** Bandar sells a private residence in Aspen, Colorado for ***$3.9 million***. |
| **June 7, 2007:** the *BBC News* runs an investigative report entitled "Princes, Planes & Pay-offs," which reveals that Bandar received more than $2 billion in secret, illegal bribe payments during the prior decade. | **June 2007:** Bandar sells a private residence in Aspen, Colorado for ***$8.6 million.*** |
| **June 26, 2007:** BAE discloses the U.S. Department of Justice ("DOJ") has commenced its own BAE corruption probe. Potential penalties include criminal fines, civil fines, blocking future defense contracts with the U.S. government and surrendering profits from corrupt practices. BAE's stock price plunges 8%, erasing $2 billion in market capitalization. | |
| | **December 4, 2007:** Bandar sells a second private residence in Aspen, Colorado for ***$36.4 million*** – making it the most expensive residential property sale in Aspen's history. |
| | **January 2008:** Bandar continues to hold an estimated ***$167.4 million*** worth of U.S.-based real property. |

As detailed herein, the $167.4 million in U.S.-based real estate Bandar continues to hold was acquired using the billions of dollars in illegal BAE bribe payments Bandar obtained from BAE. By this action, plaintiff seeks equitable recovery of the BAE bribe payments from Bandar, including profits on those payments, in whatever form they are presently held. Plaintiff's successful prosecution of this action will be a pyrrhic victory if Bandar's ability to sell the U.S.-based real property acquired with BAE bribe payments and to transfer the sales proceeds back to Saudi Arabia or other countries outside of this Court's grasp remains unfettered. As all Saudi law stems from and is controlled by the Saudi Royal family, a judgment in favor of plaintiff would in all likelihood be unenforceable in Saudi Arabia.

To be sure, before granting injunctive relief in this Circuit, a court "'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Nat'l Wildlife Federation v. Burford*, 835 F.2d 305, 326 (D.C. Cir. 1987).[1] Compared to the hundreds of millions of dollars in irreparable harm BAE and its shareholders face if Bandar's dissipation of the sales proceeds is not enjoined, Bandar will not be prejudiced at all by entry of the injunctive relief sought. With an estimated net worth of $20 billion (in the fall of 2006, *before the recent oil price explosion*), Bandar does not need the sales proceeds for his daily subsistence. If his financial situation were to change and Bandar did require immediate access to the funds, upon application to this Court, the TRO could be modified or lifted. Moreover, the injunctive relief sought does not interfere with Bandar's ability to sell any real estate interests. And, should Bandar choose to sell any U.S.-based real estate interests, the injunctive relief sought permits Bandar wide latitude to invest and/or deposit the proceeds as he sees fit – as long as they remain in U.S.-

---

[1]     All emphasis is added and citations are omitted unless otherwise noted.

based investments or accounts and as long as those deposits and/or investments meet the "prudent man standard," as that term is defined (for illustrative purposes only) in 29 U.S.C. §1104.

Accordingly, in order to preserve BAE's remedy against Bandar, plaintiff respectfully requests that the Court: (i) immediately grant the requested TRO; (ii) order an Accounting of all payments made by BAE to Bandar; (iii) compel nominal party BAE, defendants Richard (Dick) Harry Evans ("Evans") (BAE's former Chairman and CEO), Bandar, the person most knowledgeable at PNC and the Allbritton Defendants to submit to Limited Expedited Discovery; and (iv) order Bandar to show cause why a preliminary injunction should not issue placing any unliquidated U.S.-based real property assets and sales proceeds (from assets later sold) into a constructive trust in BAE's favor pending final resolution of this action.

## II.    FACTUAL BASIS OF RELIEF REQUESTED

### A.    Defendants' Illegal Bribery Scheme[2]

In 1985, United Kingdom Defense Secretary Michael Heseltine and Saudi Defense Minister Bandar signed the first phase of the Al-Yamamah arms deal. *See* ¶49 and Blasy Aff., Ex. A.  In exchange for $80 billion over 20 years, Al-Yamamah would equip the Saudi Air Force with a fleet of Tornado and Hawk fighter jets. *Id.* The Saudi's would not pay for the planes in cash but in oil. *See* Blasy Aff., Exs. A-B. Britain would receive up to 600,000 barrels of oil a day for over 20 years in payment. *Id.* The United Kingdom government, in turn, would sell the oil and the proceeds would be deposited into an account BAE had access to at the Bank of England. *See* Blasy Aff., Exs.

---

[2]    The cited assertions made by plaintiff in this section are supported by the Verified Shareholder Derivative Complaint for Intentional, Reckless or Negligent Breach of Fiduciary Duty, Corporate Waste and *Ultra Vires* Conduct filed herein on September 19, 2007 (the "Complaint") and the Affidavit of Mary K. Blasy in Support of *Ex Parte* Emergency Application for a Temporary Restraining Order, an Accounting, Limited Expedited Discovery and for an Order To Show Cause Why Preliminary Injunctive Relief Should Not Issue ("Blasy Aff.") and exhibits attached thereto. Unless otherwise noted, all "¶" references are to the Complaint and all "Blasy Aff., Ex. _" references are to the Blasy Aff.

A-D. The oil sales proceeds would then be transferred from the Bank of England to Saudi accounts at Riggs in the District of Columbia, where Bandar had full access to them. *Id.*

BAE's officers and directors knew that if they could obtain the huge 20-year military contract from the United Kingdom Ministry of Defense ("MoD") to supply the 120 fighter/bomber aircraft – known as Al Yamamah – they could point to it as concrete evidence of their successful stewardship of BAE. ¶¶3-6, 111-112 and Blasy Aff., Exs. E-L. This, in turn, would permit the BAE Defendants to retain their positions of power, prestige and profit with BAE, and to continue to receive lucrative payments and bonuses in connection with those positions for many, many years going forward. *Id.*

Having obtained the Al-Yamamah contract in 1985, the BAE Defendants (aided by their co-conspirators, defendants Bandar, Riggs and the Allbritton Defendants) allegedly caused BAE to pay over $2 billion in illegal bribe payments to Bandar here in the District of Columbia – while Bandar resided and worked here as the Saudi Ambassador to the United States. *See* ¶¶8, 11, 13, 49-62 and Blasy Aff., Exs. A-D. Although the payment of bribes, kickbacks, or "backhanders," was *ultra vires* and violated international business standards and the laws of the United States, including the FCPA and the OECD, the laws of the United Kingdom (since 2002 when the United Kingdom signed on to the OECD) and the laws of Saudi Arabia, as well as BAE's own stated business policies and practices, defendants funneled these payments from BAE to Bandar through Riggs, located in Washington, D.C., via accounts that, while nominally in the name of Saudi Arabia, were controlled by Bandar, over which he had discretion and signature authority and which he used for his personal use and benefit. *Id.* Riggs was selected for this purpose because its Washington, D.C. location gave Bandar (then serving as the Saudi Ambassador to the United States) ready access to it and because Riggs had a reputation in international commercial banking circles as a bank willing to facilitate questionable, if not illegal, currency transfers for international transactions. *See* ¶¶8, 11, 13, 49-62,

122-130.[3] Riggs is alleged to have actively participated in, facilitated and advanced the illegal bribe payments to Bandar for many years, concealing them from government regulators and BAE's own auditors. *Id.*

### B.    Bandar Used Bribe Payments to Acquire Hundreds of Millions of Dollars Worth of United States Real Property

The illegal bribe/kickback payments were received and *spent* by Bandar here in the U.S., including over $100 million to build one of the largest and most lavish personal residences in the U.S., located in Aspen, Colorado, and known as "Hala Ranch." ¶¶9, 116 and Blasy Aff., Ex. S. Bandar purchased the 95-acre estate in Pitkin County, Colorado that now contains Hala Ranch in 1989 and in 1991, he completed a 56,000-square-foot main house with 15 bedrooms, 16 bathrooms, a private barbershop and beauty salon and enough space to entertain 450 people. Blasy Aff., Exs. S-W. The main house, which is more than an acre inside, is bigger than the White House. *Id.* No other Aspen home will ever match Hala Ranch's size as Pitkin County officials restricted the size of new homes following its completion in 1991. *Id.* Hala Ranch has its own sewage treatment plant, reflection pools, sculpture gardens, fishing ponds, a tennis court, scenic equestrian and cross-country skiing trails, barbecue pits large enough to roast goats, an indoor swimming pool, a steam room, another with a massive hot tub, an exercise room and a regulation-size racquetball court. *Id.*

In addition to Hala Ranch, Bandar purchased (using bribe payments) and continues to own at least two other private residences in Aspen, 22 units at the Aspen Inn that are used by his staff, and

---

[3]    Riggs, the largest Washington D.C.-based commercial bank for much of its long history, was acquired by PNC in 2004 after various corporate scandals and management problems involving its lucrative embassy business forced Riggs to plead guilty to criminal money-laundering violations and pay $25 million in fines and penalties. Blasy Aff., Exs. M-O. In addition to funneling billions of dollars in bribes through BAE to Bandar, Riggs accounts were allegedly used to route Saudi money to 9/11 hijackers, to help Augusto Pinochet disguise millions stolen from the Chilean people, and to obfuscate transfers and unreported withdrawals of millions in oil revenues by the dictator of Equatorial Guinea. *Id.*

an office suite that houses his Aspen lawyer. Blasy Aff., ¶2. During 2007, Bandar sold three other Aspen residential estates (purchased with bribe payments) for $49 million. *Id.* Bandar also owns a residence in Washington D.C. believed to have been purchased with bribe payments. *Id.* Without judicial intervention, there is simply no barrier to Bandar's immediate sale of the $167+ million in U.S.-based real property Bandar currently holds and the immediate transfer of those sales proceeds out of this Court's grasp.

### C.    The BAE Bribery Scheme Is Uncovered and BAE Is Exposed to Criminal Liability

In 1989, the United Kingdom's National Audit Office ("NAO") opened an inquiry into allegations that members of Saudi Royal family and middlemen were secretly paid huge bribes to land the huge Al-Yamamah contract. *See* Blasy Aff., Ex. A. However, in 1992, British MPs and auditor general Sir John Bourn suppressed the NAO report citing government concerns that its contents would anger the Saudi's. *Id. The* NAO report has never been made public. *Id.* Thereafter, in 2001 a whistleblower alleged that BAE was operating a "slush fund" to make payments to Bandar. *Id.* In 2004, a second whistleblower disclosed to the *London Guardian* further details of the BAE slush fund, kicking off a corruption investigation by the U.K.'s SFO. *Id* and ¶103.

Suddenly, as the SFO investigation heated up in 2005, Bandar resigned his post as Saudi Ambassador to the United States for "personal reasons" and returned to Saudi Arabia; ending his 22+ year tenure as Saudi Arabia's Ambassador to the United States. *See* ¶8 and Blasy Aff., Ex. Q. In December 2006, at the insistence of the United Kingdom Attorney General, the SFO investigation was called off citing national security concerns. *See* Blasy Aff., Ex. A. Angered by the United Kingdom's unwillingness to act, in 2007, the OECD, the world's bribery watchdog, launched its own inquiry into the BAE bribe payments. *Id.* In June 2007 the U.S. DOJ too commenced an investigation into the illicit bribe payment scheme, including potential violations of the FCPA. *See* ¶11 and Blasy Aff., Ex. R. If found guilty, BAE faces tens of millions of dollars in potential criminal

- 9 -

fines, penalties and sanctions, loss of its valuable highest level security clearance contractor status with the DOD, and surrender of past profits from corrupt practices. *Id.* Even if BAE is not convicted of the criminal charges, plaintiff alleges the bribe payments were *ultra vires* and wasted BAE's corporate assets. ¶¶1, 4, 8, 15, 111-130, 146-147 and 158. The Company has already been forced to expend tens of millions of dollars defending itself to these charges and has suffered irreparable harm to its reputation and standing in the United States defense industry. ¶¶4, 72, 103, 147. This action, brought derivatively on behalf of BAE, seeks recovery of the damage BAE has suffered (and will continue to suffer) as a result of defendants' breaches of fiduciary duties – and aiding and abetting those breaches – including recovery of the illegal bribe payments from Bandar in whatever form they are currently held. ¶¶9, 16, 152, and Prayer.

### D.    Defendants' Misconduct Exposes BAE to Hundreds of Millions of Dollars in Damages

As a direct result of defendants' misconduct, BAE is facing immense harm to its public relations and potential financial ruin. First and foremost, BAE's fragile relationship with the U.S. DOD, Intelligence Community and Homeland Security, via its "Special Security Agreement" ("SSA") with the DOD – a highly important source of revenue and income for the Company – is in jeopardy. ¶19. BAE has mitigated the effect the Company's foreign ownership would otherwise have on its ability to obtain lucrative DOD contracts by entering into the SSA between the United States Government, BAE-USA and BAE. *Id.; see also* Blasy Aff., Ex. Y. That agreement calls for the appointment of outside directors who, in conjunction with other U.S.-based board members, comprise a Government Security Committee. *Id.* The Government Security Committee has the responsibility for overseeing the Company's compliance with U.S. Government security and export regulations and meets regularly with U.S. Government defense officials. *Id.* As one court explained, SSAs, such as the one BAE has, offer the "highest form of security clearance available to a

company" that wants to do business in the United States and "is the most difficult to obtain." *In re Chateaugay Corp.*, 198 B.R. 848, 851 (S.D.N.Y. 1996).

Entry into and compliance with the SSA has permitted BAE access to its most valuable customer, the United States, where $9 billion of BAE's 2006 sales revenues originated and 40,000 of its employees work. *See* Blasy Aff., Ex. Z. In fact, according to the Company's 2006 annual shareholder report, the United States accounts for a full *45%* of the entire global defense market. *Id.* BAE now sells more to the U.S. DOD than the U.K. MoD and the U.S. accounts for 50% of BAE's annual sales. *See* Blasy Aff., Ex. AA. The Company's "Corporate Overview," originally published in October 2005 prior to the revelations of Bandar's bribes surfacing, concedes the value BAE has in maintaining its reputation for honesty and integrity, specifically with regards to the SSA:

- **"Special Security Agreement:** Provides access to classified U.S. Government Programs *the same as other U.S. defense companies.*"

- "Trusted national security leaders with *impeccable* credentials."

- "BAE Systems, Inc.'s revenues have grown 250% in five years. . . . *BAE Systems, Inc. is the 6th largest defense company in the U.S.*. . . . BAE Systems stock value has more than doubled in the last two years."

- "BAE Systems is Committed to its Values, Ethics, and Integrity. . . . Performance – Delivering value to shareholders and customers – Honesty and integrity in everything we say and do. . . . *Our values are the basis for the way we do business every day and the foundation of our success.*"

Blasy Aff., Ex. BB.

However, defendants' misconduct is now threatening to crumble this very "foundation of [BAE's] success." *Id.* The Company's public image, standing in the U.S. defense industry, reputation and credibility are being pummeled. On November 2, 2007, the *Lexington Herald-Leader*

reported that congressional leaders who must approve ongoing sales from BAE to the United States defense community are coming under intense pressure to stop buying from BAE:

> *Reform groups in Washington are demanding that Congress strip $25 million in earmarks that Sen. Mitch McConnell, R-Ky., is pushing for a British defense contractor facing a criminal investigation by the U.S. Justice Department and an audit by the U.S. Defense Department.*

*    *    *

> . . . State Department records show that American diplomats have worried in recent years about BAE allegedly bribing officials in several other countries. The *Defense Department's Office of Inspector General in August opened an audit into Army contracts awarded to BAE, to determine whether the rules were followed. That audit, prompted by tips to the Pentagon about BAE, is pending.*

*    *    *

> *McConnell . . . put $25 million for three BAE naval weapons projects in the 2008 defense appropriations bill*, which is expected to go to a conference committee next week to iron out differences between the Senate and House versions.

·  *    *    *

> But, critics say McConnell is propping up a company that apparently can't compete without him. While it sounds good for a senator to defend jobs, *"we should be spending federal money where and as we need to, not to keep the lights on in someone's district,"* said David Williams, vice president of Citizens Against Government Waste, a Washington watchdog group.

> "I want to know when Sen. McConnell became the secretary of defense," Williams said. "The Pentagon has to sit down every year, draw up its priorities and budget its money accordingly. Who is Mitch McConnell to insist that we fund these projects?"

*Dropping of earmarks urged*

> *Apart from the controversy over earmarks, the Justice Department investigation of BAE should prompt McConnell to suspend his assistance for the company*, said Ken Boehm, chairman of the National Legal and Policy Center, one *of the reform groups that urged the appropriations committees to drop the earmarks.*

> Boehm's group and Taxpayers for Common Sense, which joined it in signing the protest letter, are non-partisan, non-profit watchdogs that monitor federal spending for signs of waste, fraud and abuse. Boehm is a former Republican congressional aide.

- 12 -

Boehm said *news of McConnell's BAE earmarks have "created quite a buzz around Capitol Hill," including a front-page story in yesterday's Roll Call, a newspaper, which covers Congress. The* appropriations panels have not responded to his letter yet – their attention this week is on other spending bills -- but he said he's hopeful common sense will prevail.

> *"This is really a questionable use of federal funds," Boehm said. "I'd love to see a poll asking, 'Do you want your tax money going to a company currently under . . . investigation?' I bet you'd see a lot of people saying 'No.'"*

Blasy Aff., Ex. CC. On June 29, 2007, *Time* quoted "a leading Washington expert in the area, who did not want his name used because of the political sensitivity of the topic," as stating that "'[i]f the Justice Department were to find that BAE had committed a significant violation of the Foreign Corrupt Practices Act, *it would automatically raise questions about how rigorously the company is safe-guarding classified information, adhering to export controls and meeting its other obligations under U.S. law.*'" Blasy Aff., Ex. DD.

Regardless of the ultimate outcome of the criminal investigations by the U.S. DOJ and the U.K. SFO and potential risk to BAE's financially lucrative status as a preferred U.S. DOD supplier, BAE will spend tens of millions of dollars on legal defense costs, accountants' fees, and public relations and damage control measures. These are costs BAE is presently bearing and the relief requested herein simply preserves plaintiff's ability to enforce any eventual damage award against Bandar.

### E.    Without Judicial Intervention, BAE Faces Irreparable Harm

Since May 2007, Bandar has sold $49 million worth of U.S.-based real property acquired with the BAE bribe payments. Bandar listed the Hala Ranch estate for sale in June 2006 for $135 million and though Bandar purported to take Hala Ranch off the market in November 2007, the listing still appears on many real estate sales websites, including that of Joshua Saslove, Bandar's personal Aspen realtor who recently sold the other Aspen properties for Bandar, and it is clear that a reasonable offer would be accepted. *See* Blasy Aff., Exs. EE and FF.

- 13 -

If transfer of the sales proceeds from Bandar's remaining U.S.-based real property is not enjoined, plaintiff's success in prosecuting this derivative action on behalf of BAE will ring a hollow victory as recovery of the bribe payments from Bandar in Saudi Arabia may be impossible. While the SFO and/or DOJ may act to punish the BAE Defendants for their illegal conduct, only BAE's public shareholders, such as the City of Harper Woods with a vested equity interest in the Company, can take action to preserve and recover the Company's wrongly-converted assets. However, according to the U.S. Department of State, "Saudi Arabia is a monarchy ruled by a king chosen from and by members of the Al Saud family" and the "king rules through royal decrees issued in conjunction with the Council of Ministers, and with advice from the Consultative Council," where the "king appoints members of both councils," and "Saudi authorities do not permit criticism of Islam or the royal family." *See* Blasy Aff., Ex. X. As such, Saudi Arabia will not likely enforce this Court's judgment in favor of plaintiff against Bandar, a member of the Saudi Royal Family of Al Saud.

Dissipation of the proceeds from the sale of any of Bandar's U.S.-based real estate holdings – and transfer of those funds to foreign accounts outside of the reach of this Court – and thus BAE – threatens to waste tens of millions of dollars of BAE's corporate assets and to deprive plaintiff of an equitable remedy.

## III.    EQUITABLE RELIEF TO PRESERVE THE *STATUS QUO* IS WARRANTED

The four factors which courts in this Circuit consider when determining whether a plaintiff is entitled to injunctive relief are whether: 1) there is a substantial likelihood that the plaintiff will succeed on the merits of its claims; 2) that the plaintiff would suffer irreparable injury if the defendants are not enjoined; 3) that an injunction would not substantially injure other interested parties; and 4) that the public interest favors issuing an injunction. *See CityFed Fin. Corp. v. Office of Thrift Supervision U.S. Dep't of Treasury*, 58 F.3d 738, 746 (D.C. Cir. 1995); *Mova Pharm. Corp.*

*v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998). "This test is not a wooden one, for as our Court of Appeals has noted, relief may be granted 'with either a high probability of success and some injury, or *vice versa*.'" *BCCI Holdings (Luxembourg) v. Bin Mahfouz*, No. 92-2763 (JHG), 1993 U.S. Dist. LEXIS 1614, at *7 (D.D.C. Feb. 12, 1993) (quoting *Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985) (per curiam) (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)).

"The purpose of a TRO is to preserve the status quo and prevent irreparable harm until a hearing can be held." *Abdah v. Bush*, No. 04-1254 (HHK) (RMC), 2005 U.S. Dist. LEXIS 4144, at *7 (D.D.C. Mar. 12, 2005).

> *An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant. There is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success.*

*Holiday Tours*, 559 F.2d at 844. Where the balance of hardships tips decidedly toward the movant, it will "'ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Id.*

### A.    This Action Raises Serious Questions and There Is a Substantial Likelihood Plaintiff Will Succeed on the Merits

*Restatement of the Law, Restitution* §138 Violation of Fiduciary Duty:

(1)  A fiduciary who has acquired a benefit by a breach of his duty as fiduciary is under a duty of restitution to the beneficiary.

(2)  *A third person who has colluded with a fiduciary in committing a breach of duty, and who obtained a benefit therefrom, is under a duty of restitution to the beneficiary.*

*Restatement (First) of Restitution* §138 (1937). The D.C. Circuit applies the *Restatement of Restitution* in civil actions for breach of fiduciary duty seeking recovery of improperly transferred assets. *See United States v. Kearns*, 595 F.2d 729, 733 (D.C. Cir. 1978). "Restitution is essentially

an equitable remedy." *Democratic Cent. Comm. v. Wash. Metro. Area Transit Comm'n*, 485 F.2d 786, 825 (D.C. Cir. 1973). The "'basic question' in quests for restitution 'is whether "the money was obtained in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it."'" *Id.* at 825.

To be sure, choice of law issues may later arise because despite the fact that the majority of BAE's revenues are now derived from the United States, the Company is organized under U.K. law and is physically headquartered there. However, this raises no true conflict of law at this stage of the proceedings. In the United States, "[i]t is, of course, a fundamental principle that directors of a corporation occupy a fiduciary relationship to the corporation and its stockholders and must act in utmost good faith in managing corporate affairs." *Mayflower Hotel Stockholders Protective Comm. v. Mayflower Hotel Corp.*, 173 F.2d 416, 418 (D.C. Cir. 1949). The same is true under English law. *See, e.g., City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 364 (S.D.N.Y. 2006) (holding that "under English law directors owe duties to the companies," citing both English case law and an "affidavit of English barrister David Chivers" admitted "as evidence of English law" which states at ¶16 that "It is clearly established as a matter of English law that, as a general rule, officers and directors of a company owe fiduciary duties to the company"[4]); *Polar Int'l Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 116 (S.D.N.Y. 1999) (same) (citing 5 Francis Beaufort Palmer, *Palmer's Company Law* §8.501 (1998)).

A derivative action also lies on behalf of BAE by minority shareholders against the Company's officers and directors, *and* those third parties who conspired with them to violate their fiduciary duties, for the return of improperly transferred assets and other equitable relief under U.S. law. *See Mayflower Hotel*, 173 F.2d at 427; *see also Halberstam v. Welch*, 705 F.2d 472, 477 (D.C.

---

[4]    The "Report of David Chivers Q.C.," admitted as evidence in *Abbey Nat'l* is submitted herewith as Exhibit MM to the Blasy Aff.

Cir. 1983) (aiding and abetting the breach of fiduciary duty occurs when the defendant "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other"). A cause of action for aiding and abetting breach of fiduciary duty in connection with the payment of bribes also lies under English law. *Fiona Trust Holding Corp and others v Privalov and others*, [2007] EWHC (QB) 1217, ¶85 (Eng.) (Blasy Aff., Ex. PP).

"Aiding-abetting includes the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam*, 705 F.2d at 477. A parallel cause of action for "dishonest assistance" lies under English law against third parties for recovery of bribes paid in breach of fiduciary duties and such claim is enforceable injunctively through a "freezing order." *See Fiona Trust Holding Corp and others v Privalov and others*, [2007] EWHC (QB) 1217, ¶27 (Eng.) (Blasy Aff., Ex. PP) ("'it makes sense for a dishonest assistant to be jointly and severally liable for any loss which the beneficiary suffers as a result of a breach of trust [and] it makes sense for a dishonest assistant to be liable to disgorge any profit which he himself has made as a result of assisting in the breach'"). "[W]hether a fiduciary duty has been breached is a question of fact for the jury and not for the trial court . . . ." *Nelson v. Steer*, 797 P.2d 117, 120 (Idaho 1990); *Western Alliance Corp. v. Western Reliance Corp.*, 643 P.2d 1382, 1387 (Or. Ct. App. 1982); *Musselman v. Southwinds Realty*, 704 P.2d 814, 816 (Ariz. Ct. App. 1985).

There is more than a reasonable probability of success that plaintiff will prevail on its claims that the BAE Defendants breached their fiduciary duties and wasted BAE's assets by illegally paying bribes to Bandar, that Bandar aided and abetted those breaches, and that Bandar must return the ill-gotten gains.

- 17 -

First, the BAE Defendants breached their fiduciary duties by causing BAE to pay allegedly illegal bribe payments to Bandar. The U.S. DOJ has launched a formal investigation of claims against BAE for violations of U.S. anti-bribery laws, FCPA violations and violations of the OECD Anti-Bribery Convention. The U.K.'s SFO was also investigating the legality of the Bandar bribe payments (until the U.K. government stopped the investigation citing Saudi threats to withhold counter-terrorism support) and the English High Court recently ordered an inquiry into the termination of that investigation. Blasy Aff., Ex. GG. Besides the exposure to risk of substantial fines, penalties and other criminal law sanctions, BAE is presently expending tens of millions of dollars defending itself in multiple governmental investigations in the United States and in the United Kingdom.[5]

Though *Kearns* instructs that plaintiff need not demonstrate that BAE "suffered direct financial loss" from the bribery to maintain its action for breach of fiduciary duty (*Kearns*, 595 F.2d

---

[5]    To be sure, while plaintiff is not required to prove any violations of the FCPA for purposes of this motion, and despite that BAE is incorporated and headquartered in the United Kingdom, due to its extensive ownership by United States investors, its wholly-owned United States subsidiary BAE Systems Inc., its extensive contracts with the U.S. DOD and presence and operations in the United States, the fact that the alleged bribe payments were largely negotiated and paid through Riggs in this District, and the fact that BAE operates subject to a SSA with the U.S. DOD, BAE is subject to and potentially liable under FCPA. Substantive violations of the FCPA are established in two sections. 15 U.S.C. §78dd-1 makes it unlawful for an issuer (defined as an entity subject to the securities registration requirements of 15 U.S.C. §§78l and 78o), its officers, directors, employees or agents, to use the mails or other instrumentality of interstate commerce to bribe foreign officials for various purposes including to obtain business. 15 U.S.C. §78dd-2 provides generally the same prohibition for a "domestic concern," its officers, directors, shareholders and employees. "Domestic concern is broadly defined to include any United States citizen, national or resident; *or any corporation (other than an issuer), partnership or other entity subject to United States jurisdiction and control.*" *United States v. McLean*, 738 F.2d 655, 657-58 (5th Cir. 1984). In addition to being potentially liable for aiding and abetting breaches of the BAE Defendants' fiduciary duties, Bandar himself faces potential criminal liability for aiding and abetting violations of the FCPA by BAE. *Id.* at 660 n.9 ("The legislative history indicates that aiding and abetting charges may be brought under the Act. . . . [Citing] H.R. Rep. No. 640, 95th Cong., 1st Sess. 8"). Bandar admits receiving the payments and serious questions have been raised whether those payments violated the FCPA and OCED. *See* Blasy Aff., Exs. GG-II.

at 733), these criminal bribery allegations – whether ultimately proven "beyond a reasonable doubt"

or not – threaten damage of immense proportions to BAE's formerly impeccable reputation for

honesty and integrity, its valuable SSA, and its standing in the international defense industry. As

Nicholas Hildyard, director and policy analyst at Corner House Research, a not-for-profit

organization with expertise on overseas corruption, presented recently to the U.K. High Court,

> Even if *paying bribes* wins contracts, it also *incurs high reputational and other risks for companies*. As Control Risks points out in another report, 'Facing up to Corruption' (pp. 849-870): *"Corruption demands secrecy, but there are fewer secrets in an era of rapid, worldwide communication. Those who break the rules are more likely to be found out. A corruption scandal in one part of the world will affect a company's reputation – and its commercial prospects – thousands of miles away"* (p.853). In addition, bribe paying, like giving in to blackmail, has its own dynamic: *"Once a company has a reputation for paying, officials will seek an opportunity to levy their 'share'. It is hard to resist when a company's earlier behaviour suggests a willingness to pay"* (p.863). Moreover, the results of bribe paying are uncertain: *"The fact that bribery is illegal means that the bribe-payer has no control over the outcome, and cannot complain if they do not get what they paid for"* (p.863). Companies that bribe also have no 'security of tenure': *"They will face new pressures – and possibly new demands – when the person they bribed leaves office"* (p.864). Given these risks, Control Risks concludes: *"It is better not to pay in the first place"* (p.863).

Blasy Aff., Ex. HH, ¶19 (some emphasis in original).

In connection with the illegal BAE bribery payments, plaintiff alleges intentional, reckless or

negligent breach of fiduciary duty, corporate waste, and *ultra vires* conduct against each of the BAE

Defendants. Bandar and others are charged with aiding and abetting those breaches of fiduciary

duty, corporate waste and *ultra vires* conduct. Specifically, plaintiff's aiding and abetting charge

against Bandar raises serious questions because: (1) Bandar is alleged to have not only received, but

demanded the illegal bribe payments BAE's executives paid him; (2) Bandar would have known the

bribe payments were illegal, especially since he helped conceal them; and (3) Bandar caused the

bribe payments to be paid to him at Riggs. *See Halberstam*, 705 F.2d at 477. Bandar does not

contest receipt of the bribe payments, he merely disputes their illegality. *See* Blasy Aff., Ex. II.

However, for purposes of the present motion, where, as here, the funds are at risk of being dissipated

pending final resolution of this action, the Court may order that any "wrongfully received benefits" Bandar received from BAE – in whatever form they are presently held – "be placed in an escrow account until the completion of a full fraud accounting by an independent auditor" so that "a determination may be made with respect to the disposition of [the wrongfully obtained funds/assets] held in escrow and the necessity of any other equitable relief." *SEC v. World-Wide Coin Inv.*, 567 F. Supp. 724, 761 (N.D. Ga. 1983); *see also BCCI Holdings (Luxembourg)*, 1993 U.S. Dist. LEXIS 1614, at *10-*11 (TRO granted to prevent removal of assets from the court's reach pending request for preliminary injunctive relief).

**B.     Injunctive Relief Is Necessary to Preserve the *Status Quo* by Preventing the Transfer of BAE's Assets Outside of the Court's Grasp**

The "'single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered.'" *Citizen's Alert Regarding the Env't v. U.S. DOJ*, No. 95-1702 (GK), 1995 U.S. Dist. LEXIS 18619, at *34 n.7 (D.D.C. Dec. 8, 1995) (citing Charles Allen Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure: Civil 2d* §2948.1 (2d ed. 1995)). "[I]rreparable injury" sufficient to justify "an injunction restraining" the transfer of assets out of this country to Saudi Arabia is demonstrated where "it appears extremely likely that before a final resolution of this case occurs, [defendant] or his agents or employees will transfer substantial assets from the United States to foreign jurisdictions not providing full faith and credit to orders of United States courts." *BCCI Holdings (Luxembourg)*, 1993 U.S. Dist. LEXIS 1614, at *10-*11 (granting preliminary injunctive relief on the basis that "[s]hould such an evacuation of assets occur, plaintiffs likely would never be able to enforce a judgment against [defendant], should one be issued in this case"). Because "a substantial portion of the defendants' assets to which plaintiffs lay claim [may] be instantaneously removed, through electronic transfer, from the United States and secreted in Saudi Arabia or any number of other jurisdictions," the injunctive relief sought should issue.

- 20 -

*BCCI Holdings (Luxembourg), Societe Anonyme, etc. v. Mahfouz*, No. 92-2763 (JHG), 1992 U.S. Dist. LEXIS 18834, at *2, *5 (D.D.C. Dec. 10, 1992) (TRO issued restraining funds from "being withdrawn, transferred, removed, disposed of, or dissipated" from the United States by defendant or those acting in concert with him).

BAE, and its public investors, will suffer *irreparable harm* unless the Court enjoins the transfer of any proceeds from the sale of the remaining U.S.-based real estate Bandar holds to accounts outside of the U.S. While the majority of the alleged misconduct, *i.e.*, the payment of approximately $2 billion in bribe payments by BAE to Bandar, occurred here in the District of Columbia, Bandar used the illegal bribe payments to purchase hundreds of millions of dollars worth of real property all over the United States. *Bandar listed the Hala Ranch estate for sale for $135 million in June 2006 and has sold $49 million worth of the United States-based real property since May 2007!* As noted by the *Rocky Mountain News* when Bandar sold the most recent of his Aspen estates in early December 2007 for $36.5 million, setting a record for a single-family home sale in Aspen, the 14,395-square-floor home on 66.6 acres "*was not listed for sale before the transaction*." Blasy Aff., Ex. KK. As the *Wall Street Journal* noted on December 7, 2008, with that sale, "his third sale there this year," *Bandar "has now sold half of six contiguous Aspen properties he owned."* Blasy Aff., Ex. LL. That Bandar would sell the $135 million Hala Ranch to a willing purchaser cannot be disputed. Moreover, as the *Rocky Mountain News* article makes clear (Blasy Aff., Ex. KK), such a sale could close instantaneously with no fanfare or advance notice to plaintiff or the Court.

Furthermore, once such a transaction closes and the sales proceeds are transferred out of the United States, plaintiff will effectively be powerless to recover them. As the Saudi Royal Family is the source and final arbiter of all law in the Kingdom of Saudi Arabia, plaintiff will likely not be able to enforce a judgment against Bandar there. *See* Blasy Aff., Ex. X. Accordingly, absent

judicial intervention by this Court, BAE and its shareholders may be deprived of any meaningful remedy against Bandar.

### C.    The Balance of Hardships Tips Decisively in Favor of Enjoining Dissipation of These Assets from the Court's Grasp

Where the requested relief "only maintains the status quo and preserves the jurisdiction of this Court by requiring that defendants do not irrevocably dispose of [funds] to which plaintiff may become entitled as a result of these proceedings," and the Court is satisfied that defendant will not suffer "irreparable harm" through its issuance, injunctive relief should issue. *City of Los Angeles v. Coleman*, 1975 U.S. Dist. LEXIS 12325, at *13-*14 (D.D.C. May 15, 1975). Specifically, where the Court finds that in the absence of the injunctive relief sought the defendant may transfer the funds outside of this country to a country that may not give full faith and credit to this Court's orders, and where the Court finds "no other parties will be harmed if plaintiffs' application is granted," injunctive relief may issue enjoining such a transfer. *BCCI Holdings (Luxembourg)*, 1993 U.S. Dist. LEXIS 1614, at *13-*14. Especially where (as here) the injunctive relief sought has been sufficiently "limited . . . in scope" to prevent the threatened harm without unduly burdening defendant, the requested injunction should issue. *1250 24th Street Assocs. Ltd. P'ship v. Brown*, 684 F. Supp. 326, 328 n.5 (D.D.C. 1988).

Here, plaintiff is only seeking TRO, and then a preliminary injunction, requiring that Bandar account for the allegedly illegal bribe payments wrongfully paid by BAE's executives in breach of their fiduciary duties to BAE and enjoining Bandar from transferring the bribe payments, in whatever form they are presently held, outside of his own accounts in the United States. Significantly, Bandar's ability to sell the U.S.-based property will not be affected. Bandar's ability to deposit or invest the funds as he sees fit will also remain intact as long as his deposit/investment selection meets the so-called "prudent man standard." The only other restriction is that Bandar not remove the sales proceeds from the United States. With an estimated net worth of $20 billion,

Bandar does not need these funds for his daily subsistence. Blasy Aff., Ex. JJ. If Bandar's financial situation changes and he requires access to these funds, the Court's order may be modified or terminated upon application by Bandar.

As the proposed injunction does not limit Bandar's use of his U.S.-based real property (or the proceeds from the sale of such property), Bandar will suffer no harm, much less "irreparable harm." Conversely, if permitted to transfer the sales proceeds to Saudi Arabia, the Dutch Antilles (where the corporations that hold legal title to Bandar's Colorado real property in are organized), or other nations that may not give full faith and credit to an order of this Court, Bandar can effectively avoid this Court's judgment. As the "balance of hardships favors [plaintiff] because [plaintiff] may be irreparably harmed without an injunction freezing those assets while [Bandar] would not be irreparably harmed," the requested injunctive relief should issue. *Ellipso, Inc. v. Mann*, 480 F.3d 1153, 1160 (D.C. Cir. 2007).

### D.     The Public Interest Favors Restraining the Transfer of the Illegal Bribe Proceeds Out of This Court's Grasp

"In weighing whether to grant a preliminary injunction, the court must consider whether the public interest will be furthered." *Citizen's Alert,* 1995 U.S. Dist. LEXIS 18619, at *32. Where the "public policy in this area is clearly defined by" statute evidencing legislative intent, and "[t]his public policy can be adequately protected . . . only by the maintenance of the status quo of the parties pending the final resolution of the merits of plaintiff's claim," injunctive relief should issue. *Young v. Netherlands Owners, Inc.*, 306 F. Supp. 1282, 1285-86 (D.D.C. 1969).

The FCPA prohibits the use of the mails or any instrumentality of interstate commerce to offer or pay bribes to foreign officials in order to obtain or retain business. Congress enacted the FCPA in 1977, in response to recently discovered but widespread bribery of foreign officials by United States business interests. Congress resolved to interdict such bribery, not just because it is morally and economically repayment, but also because it was causing foreign policy problems for

- 23 -

the United States. The House Committee stated that such bribes were "counter to the moral expectations and values of the American public," "erode[d] public confidence in the integrity of the free market system," "embarrass[ed] friendly governments, lower[ed] the esteem for the United States among the citizens of foreign nations, and lend[ed] credence to the suspicions sown by foreign opponents of the United States that American enterprises exert a corrupting influence on the political processes of their nations." H.R. Rep. No. 95-640, at 4-5 (1977); S. Rep. No. 95-114, at 3-4 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4098, 4100-01. "[O]btaining contracts by bribery is an evil which offends against the public policy of" the United Kingdom as well (*R (Corner House) v. Secretary of State for Trade & Industry*, [2005] EWCA (Civ) 192, ¶137 (Eng.)) (Blasy Aff., Ex. QQ) and on February 14, 2002, it became illegal under U.K. law to make facilitation payments to foreign officials. Blasy Aff. ¶3. And while the payment of bribes to the Saudi Royal Family is an accepted (if not required) Saudi practice when large government contracts are awarded, even Saudi Arabian law "does not permit commissions or brokerage fees on arms imports or other public sector contracts." Royal Decree No. M/14, 1997; Council of Ministers Resolution No. 1275, 17.9.75.

As the payment of bribes clearly violates U.S. and U.K. positive law and public policy, it would be outrageous to permit Bandar continued unfettered access to sell the U.S.-based property he acquired with the spoils of his alleged crimes and to transfer those funds out of this Court's grasp. As such, the public interest supports enjoining the dissipation of Bandar's ill-gotten gains.[6]

---

[6]     To be sure, private actions alleging violations of FCPA as predicate acts have long been recognized in this District, even against Bandar. *See, e.g., Dooley v. United Techs Corp.*, 803 F. Supp. 428, 439 (D.D.C. 1992) (adjudicating FCPA violations in connection with bribe payments directed by Bandar to procure Black Hawk helicopters for Saudi Arabia and holding "[i]t is clear . . . that in certain instances, foreign nationals may be subject to the provisions of the FCPA"). The breadth and coverage of the FCPA, originally enacted in 1977 and legislatively expanded in 1998, was again expanded in 1998 following the decision in *Dooley*. *See generally United States v. Kay*, 359 F.3d 738, 753-54 (5th Cir. 2004).

### E.    Injunctive Relief May Issue

The TRO, Accounting, Limited Expedited Discovery and Order to Show Cause Why Preliminary Injunction Should Not Issue requested herein will permit plaintiff to both: (i) preserve BAE's interest in the U.S.-based real property Bandar acquired with the bribe payments while the PI Motion is pending, and (ii) provide this Court with a complete record upon which to consider the PI Motion. The Court's equitable power to grant the injunctive relief sought derives primarily from the All Writs Act, 28 U.S.C. §1651(a), which authorizes federal courts to grant all writs "agreeable to the usages and principles of law," and Fed. R. Civ. P. 65, which permits the issuance of an *ex parte* TRO where required to preserve assets. For instance, in *The Republic of the Philippines v. Marcus, et al.*, 806 F.2d 344 (2d Cir. 1986), where the court found defendants Ferdinand and Imelda Marcos were "seeking to liquidate or transfer" New York-based real property assets, plaintiff, the government of the Philippines, alleged the Marcoses had illegally obtained by "accepting payments, bribes, kickbacks, interests in business ventures, and other things of value in exchange for the grant of government favors, contracts, licenses, franchises, loans and other public benefits," the court found plaintiff had "presented enough evidence of illegality to warrant a preliminary injunction based on a claim for imposition of a constructive trust or an equitable lien."[7] *Id.* at 348-49, 355. Under these circumstances, a court "considering a preliminary injunction . . . need not make conclusive factual findings" to enjoin transfer of proceeds from the sale of real property, but may rely upon plaintiff's reasonable (and uncontradicted) inferences and showing of "probable ownership." *Id.* at 352.

---

[7]    To be sure, "preliminary injunctions are proper to prevent a defendant from making a judgment uncollectible." *Republic of the Philippines*, 806 F.2d at 356. *See also Deckert v. Independence Shares Corp.*, 311 U.S. 282, 289 (1940) (injunctive relief proper where "allegations which, if proved, entitle petitioners to some equitable relief"); *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 324-325 (1999) (affirming *Deckert*).

Bandar does not contest receipt of the BAE bribe payments paid to him at Riggs – he merely contests the illegality of those payments. For purposes of the present application, a reasonable supposition may be drawn that the payments Bandar received through the Riggs accounts were used to acquire Bandar's U.S.-based real property interests. For purposes of this motion, plaintiff's claims can be reduced to an equitable claim for disgorgement of the bribe payments (in whatever form they are presently held) that were paid to Bandar in breach of the BAE Defendants' fiduciary duties, that wasted BAE's corporate assets and that constituted *ultra vires* transfers. While Bandar amassed his palatial Colorado estate, *many questioned exactly how Bandar could afford the lavish estate*, the 50 full-time workers Bandar employed there, the entourage that accompanied his and his family's increasing visits to Aspen, and the hundreds of thousands of dollars Bandar was handing out in the Aspen community *"on an ambassador's salary."* Ex. OO. Under these circumstances, the Court can grant injunctive relief to aid plaintiff in tracing and preserving the spoils of the bribery scheme – that obviously went to acquiring Bandar's U.S.-based real property – much as it would the spoils of any money-laundering scheme. *See e.g.* 18 U.S.C. §§1956[8] and 1957.[9] In such enforcement actions, the "government is under no duty to trace the individual funds and 'it is not necessary that a transaction be examined wholly in isolation if the evidence tends to show that it is part of a larger

---

[8]    18 U.S.C. §1956 provides that "Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of *unlawful activity*, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity [and] knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or ...to avoid a transaction reporting requirement under State or Federal law . . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both." For purposes of this section, the "specified unlawful activity" includes violations of the FCPA. 18 U.S.C. §1956(c)(7)(D).

[9]    18 U.S.C. §1957 provides that "Whoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from *specified unlawful activity*, shall be punished as provided . . . ."

scheme that is designed to conceal illegal proceeds.'" *United States v. Rodriguez*, 278 F.3d 486, 491 (5th Cir. 2002). So, for instance, in *United States v. Westbrook*, 119 F.3d 1176 (5th Cir. 1997), a case of money laundering in violation of 18 U.S.C. §1956, the court concluded that a reasonable jury could infer that the defendant bought his Mercedes using drug money, where he did not file a tax return or identify any legitimate income and where there was "ample evidence" that the defendant was involved in extensive drug dealing. *Id.* at 1191. Here too, there is "ample evidence" that Bandar received the $2 billion in bribe payments – he admits it – and as plaintiff's Complaint alleges those payments were illegal, the injunctive relief requested should issue to preserve the *status quo*.

## IV.     A BOND IS NOT NECESSARY

Federal Rule of Civil Procedure 65(c), as recently amended, states the court "may issue a preliminary injunction . . . only if the movant gives security *in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained*." Fed. R. Civ. P. 65(c). Accordingly, the posting of a bond is not a prerequisite to the issuance of a TRO. Here, Bandar cannot demonstrate that preserving the *status quo* will cause him *any* cognizable economic harm. As the requested injunctive relief only minimally interferes with Bandar's use of any sales proceeds and this Court retains the ability to "release funds as necessary to prevent hardship to" Bandar, "there is no immediate need for a bond." *In re UnitedHealth Group Inc. S'holder Derivative Litig.*, No. 06-cv-1216 (JMR/FLN), 2007 U.S. Dist. LEXIS 94616, at *29 (D. Minn. Dec. 26, 2007); *see also Page Commc'n Engineers, Inc. v. Froehlke*, 475 F.2d 994, 997 (D.C. Cir. 1973) (Fed. R. Civ. P. 65(c) "gives the court discretion" in fixing a bond and in "exercising its equity powers" in connection with the bond, is only "bound to effect justice between the parties, avoiding any result that would be inequitable or oppressive for either party"); *Doctor's Assocs. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (district court did not abuse discretion in not requiring bond, since there had been no adequate proof of harm from the

issuance injunctions); *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (under Fed. R. Civ. P. 65(c), judge has discretion to waive posting of security in absence of showing likelihood of possible harm); *Galper v. U.S. Shoe Corp.*, 815 F. Supp. 1037, 1045 (E.D. Mich. 1993) (trial judge is vested with discretion to determine whether bond is required as security for injunctive relief). Bandar, with an estimated net worth of $20 billion, can hardly claim that cognizable harm would result from the issuance of the interim injunctive relief requested pending an order to show cause hearing on a more complete record. And, in the event a true financial hardship requiring the release of these funds to Bandar in Saudi Arabia arises, the Court can easily entertain an application for relief. Accordingly, no bond is necessary.

## V.    THE COURT SHOULD ORDER BANDAR TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE AND ORDER THAT PLAINTIFF BE PERMITTED TO TAKE LIMITED EXPEDITED DISCOVERY TO PROVIDE THE COURT WITH A MORE COMPLETE RECORD

### A.    An Order to Show Cause Should Issue

Plaintiff requests that in addition to granting the requested TRO, the Court order Bandar to show cause why the rest of the real property Bandar continues to hold in the United States should not be placed in a constructive trust and why Bandar should not be preliminarily enjoined from transferring the proceeds of the sale of any real property held by him in the United States out of accounts held in the United States and why those funds should not be invested pursuant to a prudent man standard pending resolution of this action. In order to present the Court with a more complete record, plaintiff requests that the Court order Bandar to provide an accounting of the bribe payments he received from BAE and that Bandar and other defendants submit to limited discovery on issues relevant to the requested preliminary injunction on an expedited basis. *See, e.g., Ex Parte Temporary Restraining Order With an Asset Freeze, an Accounting, Expedited Discovery, and Other Equitable Relief and Order for Defendants to Show Cause Why Preliminary Injunction Should Not*

Be Entered. *FTC v. Inst. for Int'l Licensing, et.al.*, D.D.C. No. 03-cv-0021 (D.D.C. Jan. 9, 2003) (Blasy Aff., Ex. NN).

### B.    This Court May Grant Expedited Discovery

The Federal Rules of Civil Procedure allow a party to seek expedited discovery. Fed. R. Civ. P. 26(d); 34(b) (expedited production of documents); and 30(a) (expedited depositions). "It is clear from this language [Rule 34(b)] that the rules intend to vest discretion in the Court to extend or shorten the time for production of documents." *First Commonwealth Corp. v. Pub. Investors, Inc.*, No. 90-3316, 1990 U.S. Dist. LEXIS 12743, at *2 (E.D. La. Sept. 25, 1990). Precedent for expedited discovery under similar circumstances is well established in the D.C. Circuit. *See, e.g., Ass'n of Am. Physicians & Surgeons v. Clinton*, 997 F.2d 898, 915 (D.C. Cir. 1993); *SEC v. Current Fin. Servs., Inc.*, 783 F. Supp. 1441, 1443 (D.D.C. 1992); *Optic-Elec. Corp. v. United States*, 683 F. Supp. 269, 271 (D.D.C. 1987); *Subscription Television of Greater Wash. v. Kaufmann*, 606 F. Supp. 1540, 1543 (D.D.C. 1983). Indeed, "[e]xpedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." *Ellsworth Assocs. v. United States*, 917 F. Supp. 841, 844 (D.D.C. 1996); *accord Optic-Elec.*, 683 F. Supp. at 271. As "good cause" for expedited discovery has been demonstrated, defendants should be ordered to submit to plaintiff's limited discovery requests so that this Court may decide plaintiff's motion for preliminary injunction on a complete record. *See Semitool, Inc. v. Tokyo Electron Am.*, 208 F.R.D. 273, 276 (N.D. Cal. 2002).

### 1.    Limited or "Particularized" Expedited Discovery Is Warranted

Limited expedited discovery is warranted here given the nature of the equitable relief plaintiff seeks and the public interest served by this proceeding, as set forth herein. *See supra* §§III. As the threat of irreparable injury is significant here, *a fortiori*, good cause exists for expedited discovery. *See supra* §IIIB. Plaintiff's discovery requests are limited in scope and cover materials

the Company should be gathering and producing to the DOJ in connection with its own investigation of the BAE bribe payments, if it did not already produce the same to the SFO. Especially, given the advanced stages of the DOJ's and SFO's investigations, BAE Systems', the BAE Defendants' and Bandar's counsel should have core documents sought by plaintiff in their possession and able to be readily produced.

### 2.    The Discovery Plaintiff Seeks

Plaintiff seeks limited expedited discovery for purposes of the Order to Show Cause hearing to permit the Court to rule on a complete record. Plaintiff seeks the following core documents from BAE, Bandar, Evans, PNC and the Allbritton Defendants:

### WITHIN 7 DAYS

(1)    All documents identifying the location of any funds Bandar obtained from Riggs accounts into which any BAE-related funds had been deposited and any assets derived from such proceeds (including the institution, account number and account name, or, if the proceeds or assets are in the possession, custody or control of a person, the identification and location of any such person);

(2)    Notes, memoranda and work papers concerning any tracing or accounting of payments made to Bandar being conducted by BAE's inside or outside auditors, counsel or representatives;

(3)    All documents provided to the Company's Board of Directors and Audit Committee concerning the alleged bribe payments to Bandar;

(4)    All reports and minutes of the BAE Board of Directors (and subcommittees thereof) generated between January 1, 1986 and the present that relate to the Al-Yamamah contract or payments to Bandar;

(5)    All documents produced to the DOJ, the SEC or the SFO since 2001 that relate to Al-Yamamah payments, including document indexes;

(6)    Deposition or meeting transcripts of documents permitting plaintiff to discover which witnesses have been questioned or deposed by the DOJ, the SEC and/or the SFO and to review the content of the inquiry, including any documents exchanged in relation to such inquiry.

(7)    All documents and computer data evidencing BAE's document destruction or retention policies.

- 30 -

In addition to these limited categories of documents, plaintiff seeks an order providing for the depositions of the persons most knowledgeable concerning the topics governed by the documents sought above at nominal party BAE and defendant PNC, defendants Evans, Bandar, and the Allbritton Defendants, which depositions shall be limited to eight hours each, upon three calendar days' notice.

## VI.    CONCLUSION

For all the reasons stated above, plaintiff's motion should be granted.

DATED:  January 31, 2008                          Respectfully submitted,

LAW OFFICE OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)

_____

ROGER M. ADELMAN

1100 Connecticut Ave., NW, Suite 730
Washington, DC  20036
Telephone:  202/822-0600
202/822-6722 (fax)

CUNEO GILBERT & LaDUCA, L.L.P.
JONATHAN W. CUNEO(DC Bar # 939389)
WILLIAM H. ANDERSON (DC Bar # 502380)
507 C Street, N.E.
Washington, DC  20002
Telephone:  202/789-3960
202/789-1813 (fax)

Co-Liaison Counsel

COUGHLIN STOIA GELLER RUDMAN
    & ROBBINS LLP
PATRICK J. COUGHLIN
MARK SOLOMON
MARY K. BLASY
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff
- 31 -

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

S:\CasesSD\BAE Derivative\TRO_BRF00048736.doc

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re BAE SYSTEMS PLC DERIVATIVE LITIGATION | ) ) ) | Civil No. 1:07-cv-01646 |
| _____ | ) | Assigned to: Judge Rosemary M. Collyer |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |
| _____ | ) | |

AFFIDAVIT OF MARY K. BLASY IN SUPPORT OF *EX PARTE* EMERGENCY
APPLICATION FOR A TEMPORARY RESTRAINING ORDER, AN ACCOUNTING,
LIMITED EXPEDITED DISCOVERY AND FOR AN ORDER TO SHOW CAUSE WHY
PRELIMINARY INJUNCTIVE RELIEF SHOULD NOT ISSUE

I, MARY K. BLASY, declare as follows:

1.      I am counsel for plaintiff in this action and am fully familiar with the matters set forth in this affidavit. I have been admitted *pro hac vice* in this action. I make this affidavit in support of plaintiff's motion pursuant to Fed. R. Civ. P. 65 for injunctive relief restraining the transfer of proceeds from the sale of any interest in United States-based real property held by defendant Prince Bandar Bin Sultan ("Bandar"), for an accounting and limited expedited discovery, and for an order to show cause why a preliminary injunction should not issue.

2.      I have been actively involved in the prosecution of this litigation and am familiar with the proceedings herein. Following the commencement of this action in September 2007, I retained private investigators L.R. Hodges & Associates, Ltd. ("LRH&A") to locate Bandar's United States-based real property holdings. I have reviewed the accompanying memoranda in support of Plaintiff's *Ex Parte* Emergency Application for a Temporary Restraining Order, an Accounting, Limited Expedited Discovery and for an Order to Show Cause Why Preliminary Injunctive Relief Should Not Issue. Based on the investigative work completed for me by LRH&A, the factual matters set forth and the assertions made therein and herein concerning Bandar's U.S. property interests are true and correct to the best of my knowledge, information and belief. As detailed below, Bandar currently holds approximately $167.4 million worth of U.S.-based real property assets after having sold approximately $49 million worth of U.S.-based real property assets during 2007:

**U.S. Real Property Interests Bandar Holds/Held**

| Property | Estimated Fair Market Value | Current Ownership Status |
|---|---|---|
| Office Suite used by William R. Jordan III, Bandar's Colorado Attorney, located at 418 E. Cooper Avenue, Suite 202, Aspen Colorado | $33,400 (at 2005) | Held by ASPCOL Corp. NV for Bandar. |

- 1 -

| Property | Estimated Fair Market Value | Current Ownership Status |
|---|---|---|
| "Hala Ranch" Residential Estate located at 770 Kessler Drive, Aspen Colorado; 680 Kessler Drive, Aspen Colorado; and 691 Kessler Waste Treat Drive, Aspen Colorado | $135 million (at 2006) | Held by ASPCOL Corp. NV for Bandar. |
| Private Residence located at 456 Kessler Drive, Aspen, Colorado | $8.6 million | Previously held by R16 Limited for Bandar but sold in 06/2007 for $8.6 million. |
| Private Residence located at 853 N. Starwood Drive, Aspen, Colorado | $16 million (2007) | Held by BRICOL NV for Bandar. |
| Private Residence located at 565 N. Starwood Drive, Aspen Colorado | $6.3 million (2007) | Held by BRICOL NV for Bandar. |
| Private Residence located at 572 N. Starwood Drive, Aspen, Colorado | $3.925 million (2007) | Previously held by BRICOL NV for Bandar but sold on 5/9/07 for $3.925 million. |
| Private Residence located at 1025 N. Starwood Drive, Aspen Colorado | $36.5 million (2007) | Previously held by BRICOL NV for Bandar but sold 12/4/07 for $36.5 million. |
| 21 Condominium Units in the Inn at Aspen held for use by Bandar's Staff and located at 38750 HWY 82, Unit Nos. 1104, 1106, 1116, 1122, 1154, 1163, 1165, 1169, 2204, 2208, 2210, 2214, 2224, 2230, 2248, 2252, 2254, 2255, 2259, 2261, and 2273, Aspen, Colorado | $7.75 million (2007) | Held by Staff Services Company Ltd. for Bandar. |
| Private Residence located at 2029 Connecticut Avenue NW, Unit 41 and Garage #P24, Washington D.C. | $2.3 million (2008) | Held by International Investment Holdings Company for Bandar. |

**Fair Market Value of Real Property Currently Held by Bandar in the U.S.: $167.4 million (est.)**

**Fair Market Value of Real Property Sold by Bandar in the U.S. in 2007: $49 million (est.)**

3.    The United Kingdom ratified the OECD Convention on December 14, 1998. U.K. law already in existence was submitted to meet the requirements of the Organization of Economic Cooperative and Development ("OECD") Convention; however, it was noted that the nearly century

old U.K. law had then never resulted in a prosecution. In December 2001, the U.K. Government passed the Anti-Terrorism, Crime and Security Act (the "Act"). Part 12 of the Act contained the anti-corruption provisions, implemented the OECD Convention, and entered into force on February 14, 2002. Part 12 criminalized bribery of foreign public officials, in line with the OECD Convention. Part 12 further criminalized facilitation payments, which were not included in the OECD Convention.

      4.      Attached to this Affidavit as Exhibit A is a true and correct copy of "BAE Accused of Secretly Paying £1bn To Saudi Prince," *Guardian*, June 7, 2007, obtained from the *Guardian* website on January 2, 2008;

      5.      Attached to this Affidavit as Exhibit B is a true and correct transcript of the "Princes, Planes and Pay-offs" recorded transmission on BBC One on June 11, 2007, obtained from the BBC's website on January 21, 2008;

      6.      Attached to this Affidavit as Exhibit C is a true and correct copy of "MoD accused over Bandar's £1bn," *Guardian* June 12, 2007, obtained from the *Guardian*'s website on January 2, 2008;

      7.      Attached to this Affidavit as Exhibit D is a true and correct copy of "Attorney general responds to Bandar, £1bn and BAE," *Guardian* June 8, 2007, obtained from the *Guardian*'s website on January 2, 2008;

      8.      Attached to this Affidavit as Exhibit E is a true and correct copy of "Mike Turner to quit as BAE's chief executive," *Financial Times* October 16, 2007, obtained from the TimesOnline website on January 21, 2008;

      9.      Attached to this Affidavit as Exhibit F is a true and correct copy of the Remuneration Report from BAE's 2000 Annual Report to Shareholders obtained from Thomson Financial in September 2007;

10.     Attached to this Affidavit as Exhibit G is a true and correct copy of the Remuneration Report from BAE's 2001 Annual Report to Shareholders obtained from Thomson Financial in September 2007;

11.     Attached to this Affidavit as Exhibit H is a true and correct copy of the Remuneration Report from BAE's 2002 Annual Report to Shareholders obtained from Thomson Financial in September 2007;

12.     Attached to this Affidavit as Exhibit I is a true and correct copy of the Remuneration Report from BAE's 2003 Annual Report to Shareholders obtained from Thomson Financial in September 2007;

13.     Attached to this Affidavit as Exhibit J is a true and correct copy of the Remuneration Report from BAE's 2004 Annual Report to Shareholders obtained from Thomson Financial in September 2007;

14.     Attached to this Affidavit as Exhibit K is a true and correct copy of the Remuneration Report from BAE's 2005 Annual Report to Shareholders obtained from Thomson Financial in September 2007;

15.     Attached to this Affidavit as Exhibit L is a true and correct copy of the Remuneration Report from BAE's 2006 Annual Report to Shareholders obtained from Thomson Financial in September 2007;

16.     Attached to this Affidavit as Exhibit M is a true and correct copy of the United States Senate's Permanent Subcommittee On Investigations, Committee On Governmental Affair's July 14, 2004 Report Entitled Money Laundering And Foreign Corruption: Enforcement And Effectiveness Of The Patriot Act Case Study Involving Riggs Bank Report, obtained from *Thomas.gov* in September 2007;

- 4 -

17.     Attached to this Affidavit as Exhibit N is a true and correct copy of the Government's Memorandum In Aid Of Sentencing, filed on March 22, 2005 in *United States of America v. Riggs Bank N.A.*, District of Columbia No. 05-cr-35(RMU), obtained from U.S. District Court's PACER system in September 2007;

18.     Attached to this Affidavit as Exhibit O is a true and correct copy of the Judgment entered on March 31, 2005 in *United States of America v. Riggs Bank N.A.*, District of Columbia No. 05-cr-35(RMU), obtained from the U.S. District Court's PACER system in September 2007;

19.     Attached to this Affidavit as Exhibit P is a true and correct copy of a transcript of an interview with Bandar conducted by *Frontline* in October 2001, obtained from the *Guardian*'s website on January 2, 2008;

20.     Attached to this Affidavit as Exhibit Q is "Saudi Ambassador to U.S. Steps Down After 22 Years," July 21, 2005 *Washington Post*, obtained from the *Washington Post*'s website on January 21, 2008;

21.     Attached to this Affidavit as Exhibit R is "Shares Plunge as U.S. Justice Department Launches Inquiry," *Guardian* June 27, 2007, obtained from the *Guardian*'s website on January 2, 2008;

22.     Attached to this Affidavit as Exhibit S is "A $135 Million Home, but if You Have to Ask ...," *New York Times* July 2, 2007, obtained from the *New York Times* website on October 13, 2007;

23.     Attached to this Affidavit as Exhibit T is the Christie's Great Estates sales flyer for the sale of Hala Ranch, obtained from the Christie's Great Estates website on October 26, 2007;

24.     Attached to this Affidavit as Exhibit U is a 2007 interview transcript concerning the Hala Ranch listing with Aspen real estate Joshua Saslove, obtained from the Ultimate Homes website on January 21, 2008;

25.     Attached to this Affidavit as Exhibit V is a Hala Ranch sales flyer obtained from Aspen real estate agent Joshua Saslove's website on January 21, 2008;

26.     Attached to this Affidavit as Exhibit W is "For sale: prince's palace, Aspen ZIP - $135 million," *Rocky Mountain Times* July 12, 2006, obtained from the *Rocky Mountain Times* website on January 21, 2008;

27.     Attached to this Affidavit as Exhibit X is the U.S. Department of State's December 2007 Saudi Arabia fact sheet, obtained from the U.S. Department of State's website on January 21, 2008;

28.     Attached to this Affidavit as Exhibit Y is a webshot printed from BAE's website <www.baesystems.com/WorldwideLocations/UnitedStates/AboutBAESystemsUnitedStates/Special SecurityAgreement/index.htm> on January 25, 2008 which describes the Company's Special Security Agreement with the U.S. Department of Defense.

29.     Attached to this Affidavit as Exhibit Z is page 8 of the Annual Review section of BAE's 2006 Annual Report to Shareholders obtained from Thomson Financial on January 26, 2008.

30.     Attached to this Affidavit as Exhibit AA is "Milestone for BAE as its trade with America outstrips MoD business," August 10, 2007 *London Times* obtained from the TimesOnLine website on January 26, 2008.

31.     Attached to this Affidavit as Exhibit BB is a report entitled "BAE Systems, Incorporated Corporate Overview" dated October 2005 obtained from the BAE website on January 26, 2008.

32.     Attached to this Affidavit as Exhibit CC is "Slashing of McConnell earmarks demanded," November 2, 2007 *Lexington Herald-Leader*, obtained from Lexis on January 26, 2008.

33.     Attached to this Affidavit as Exhibit DD is "The Case of the Well-Placed Prince," June 29, 2007 *Time*, obtained from the *Guardian*'s website on November 12, 2007.

- 6 -

34.    Attached to this Affidavit as Exhibit EE is a webshot of the front page of the Joshua & Co. website obtained January 26, 2008.

35.    Attached to this Affidavit as Exhibit FF is a webshot of the Hala Ranch sales flyer obtained from the Joshua & Co. website on January 26, 2008.

36.    Attached to this Affidavit as Exhibit GG is a press release entitled "CAAT and The Corner House win landmark ruling on BAE-Saudi corruption case," issued by Campaign Against Arms Trade and The Corner House on November 9, 2007, obtained from the CAAT website on January 28, 2008.

37.    Attached to this Affidavit as Exhibit HH is the Witness Statement of Nicholas Hildyard, filed in *Corner House Research And Campaign Against Arms Trade v. The Director Of The Serious Fraud Office*, High Court Of Justice, Queen's Bench Division, Administrative Court No. CO/1567/2007, executed April 18, 2007.

38.    Attached to this Affidavit as Exhibit II is "Prince Bandar's Statement," June 8, 2007 *Guardian Unlimited*, obtained from the *Guardian*'s website on January 2, 2008.

39.    Attached to this Affidavit as Exhibit JJ is "Rupali Bank – Saudi Prince Plans to Invest $500m," September 1, 2006 *Bangladesh News*, obtained from the BangladeshNews.com website on January 25, 2008.

40.    Attached to this Affidavit as Exhibit KK is "$36.5 million for Bandar house sets Aspen record," December 6, 2007 *Rocky Mountain News*, obtained from Lexis on January 27, 2008.

41.    Attached to this Affidavit as Exhibit LL is "Saudi Prince Bandar Sells Again in Aspen ," December 7, 2007 *Wall Street Journal*, obtained from Lexis on January 27, 2008.

42.    Attached to this Affidavit as Exhibit MM is the Report of David Quivers Q.C. admitted as evidence in *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, S.D.N.Y. No. 1:2004cv00660, filed June 10, 2004.

43.    Attached to this Affidavit as Exhibit NN is the *Ex Parte* Temporary Restraining Order With an Asset Freeze, An Accounting, Expedited Discovery, and Other Equitable Relief and Order for Defendants to Show Cause Why Preliminary Injunction Should Not Be Entered in *Federal Trade Commission v. The Institute. for International Licensing, et.al.*, D.D.C. No. 03-cv-0021, entered January 9, 2003.

44.    Attached to this Affidavit as Exhibit OO is "Been There, Done That; Prince Bandar, One of the Great Cold Warriors, Faces the Yawn of a New Era," July 21, 1996 *The Washington Post*, obtained from Lexis on January 29, 2008.

45.    Attached to this Affidavit as Exhibit PP is *Fiona Trust Holding Corp and others v Privalov and others*, [2007] EWHC QB) 1217 (Eng.).

46.    Attached to this Affidavit as Exhibit QQ is *R (Corner House) v. Secretary of State for Trade & Industry* [2005] EWCA (Civ) 192 (Eng.).

47.    The temporary relief requested by plaintiff's Application (including hearing this motion without notice to Bandar) is necessary to preserve this Court's ability to issue final equitable relief, including restitution and rescission of illegal bribe payments and disgorgement of Bandar's ill-gotten gains.  Advance notice of this action to Bandar may result in further dissipation or concealment of assets and destruction of documents.  Bandar recently sold $49 million worth – or 25% – of the $216+ million worth of property he acquired with the BAE bribe payments and Bandar has the ability to immediately dispose of the rest of those assets and transfer the funds back to Saudi Arabia.  Dissipation of those assets will cause immediate and irreparable damage by impeding Plaintiff's efforts to recover BAE's damages from Bandar's and the other defendants' illegal misconduct.  Issuing the Temporary Retraining Order and other requested relief without notice facilitates full and effective relief by preserving the *status quo* pending a hearing on the requested Preliminary Injunction.  Together with this motion, Plaintiff has filed a motion to file this matter

- 8 -

under seal for a short duration to avoid advance notice that would cause irreparable harm to BAE and its shareholders.

     I declare under penalty of perjury that the foregoing is true and correct. Executed this 30th day of January, 2008, at San Diego, California.

_____

MARY K. BLASY

S:\CasesSD\BAE Derivative\AFF00048735_for TRO.doc

# *UNITED STATES DISTRICT COURT*
# *FOR THE DISTRICT OF COLUMBIA*

| | |
|---|---|
| **CITY OF HARPER WOODS** **EMPLOYEES' RETIREMENT** **SYSTEM** | |
| Plaintiff(s), | |
| vs. | **Civil Action No.  07-1646 (RMC)** |
| **OLVER, et al.** | |
| Defendant(s). | |

## <u>NOTICE REGARDING BULKY EXHIBITS</u>

Pursuant to the procedures for filing bulky pleadings, bulky exhibits have been filed in

paper in this case.  The exhibits are available at the Clerk's Office for public viewing

and copying between the  hours of 9:00 a.m. and  4:00 p.m., Monday through Friday.


                                    **NANCY MAYER-WHITTINGTON**

                                                    Clerk

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re BAE SYSTEMS PLC DERIVATIVE LITIGATION | ) ) ) | Civil No. 1:07-cv-01646 |
| | ) | Assigned to: Judge Rosemary M. Collyer |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |

[PROPOSED] *EX PARTE* TEMPORARY RESTRAINING ORDER, ORDER FOR AN
ACCOUNTING, LIMITED EXPEDITED DISCOVERY, AND FOR AN ORDER TO SHOW
CAUSE WHY PRELIMINARY INJUNCTION RELIEF SHOULD NOT ISSUE

Plaintiff, The City of Harper Woods Employees' Retirement System (the "Retirement System"), having filed its Verified Shareholder Derivative Complaint on behalf of BAE System plc ("BAE" or the "Company") for intentional, reckless and/or negligent breaches of fiduciary duty, waste of corporate assets, and *ultra vires* conduct in connection with having caused BAE to make at least $2 billion in allegedly illegal bribe payments to defendant Prince Bandar Bin Sultan ("Bandar"), and having moved pursuant to Rule 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §1651(a) and Local Rule 65.1(a), for (1) a temporary restraining order prohibiting the transfer of any sales proceeds from the sale of Bandar's U.S.-based real property out of the U.S., which sales proceeds shall be deposited or invested pursuant to a prudent man standard, (the "TRO"); (2) an immediate accounting of the illegal bribe payments BAE made to Bandar, including the present form and location those funds are being held in; (3) expedited discovery to permit this Court to consider plaintiff's request for preliminary injunction on a more complete record; and (4) an order to show cause why a preliminary injunction should not issue extending the protections provided by the TRO pending final resolution of this action (collectively, with the affidavit and exhibits filed in support of the motion, the "TRO Application"). Having considered the verified complaint and pleadings and exhibits filed in support of the Retirement System's motion, this Court finds that:

1.      This Court has jurisdiction over the subject matter of this case, there is good cause to believe it will have personal jurisdiction over Bandar and/or *in rem* jurisdiction over Bandar's U.S.-based real property assets allegedly acquired with bribe payments illegally obtained by Bandar from BAE, and that venue is proper in this District;

2.      There is good cause to believe that plaintiff's TRO Application raises serious questions and there is a substantial likelihood that the Retirement System will succeed on the merits of its claims that the BAE board members and executives named as defendants in this action (the "BAE Defendants") breached their fiduciary duties, wasted BAE's assets and committed *ultra vires*

acts by allegedly paying $2 billion in illegal bribe payments to Bandar in violation of U.S., U.K. and internal law and that defendants Bandar, PNC Financial Group (the legal successor to Riggs Bank ("Riggs"), BAE's now defunct Washington D.C.-based bank through which the bribe payments were allegedly funneled (hereinafter, "PNC")) and Joseph, Barbara and Robert Allbritton (the former controlling shareholders and principle operating executives of Riggs who allegedly facilitated the bribe payments (the "Allbritton Defendants")) aided and abetted those breaches; and there is good cause to believe that Bandar may be required to return the bribe payments, and profits on those payments (in whatever form they are presently held) to BAE;

3.    There is good cause to believe that immediate and irreparable harm will result if Bandar (with his agents, attorneys, and others representing him) is not immediately enjoined from selling and/or transferring the U.S.-based real property assets Bandar allegedly acquired with BAE bribe payments, and/or transferring sales proceeds from the sale of those properties out of U.S.-based accounts, and is not required to invest and/or deposit any sales proceeds pursuant to a prudent man standard (as that term is defined for illustrative purposes in 29 U.S.C. §1104), and that immediate and irreparable damage to the Court's ability to grant effective final relief for BAE in the form of monetary redress will occur from the transfer out of the U.S. of the proceeds from the sale of Bandar's U.S.-based real property assets unless Bandar is immediately restrained and enjoined by order of this Court, and that pursuant to Fed. R. Civ. P. 65(b), the interests of justice therefore require that plaintiff's motion be heard *ex parte* without prior notice to Bandar;

4.    There is good cause to believe that the irreparable harm to BAE and its shareholders if Bandar transfers the sales proceeds out of this Court's grasp significantly outweighs any potential harm to Bandar arising from the minimal restrictions the TRO places on his use of these assets;

5.    Weighing the equities and determining that a TRO restraining Bandar from transferring out of U.S.-based accounts the sales proceeds from the sale of any U.S.-based real

property, and requiring that any sales proceeds be deposited and/or invested pursuant to a prudent man standard, is in the public interest;

6.     There is no immediate need for a security bond under Fed. R. Civ. P. 65(c) as Bandar has considerable financial means and the TRO does not prevent Bandar from selling real property interests, immaterially interferes with Bandar's ability to invest and/or deposit any sales proceeds as he sees fit, and may be terminated or modified upon application to the Court in the event Bandar's financial condition changes;

7.     Good cause exists for ordering Bandar to provide an accounting of all illegal bribe payments made by BAE to Bandar, including the present form and location they are being held in; and

8.     Good cause exists for ordering limited expedited discovery to permit the Court to consider plaintiff's motion for preliminary injunctive relief on a more complete record.

**IT IS THEREFORE ORDERED AS FOLLOWS:**

**DEFINITIONS**

For purposes of this Order, the following definitions shall apply:

A.     The "Retirement System" means derivative plaintiff The City of Harper Woods Employees' Retirement System.

B.     "Bandar" means defendant Prince Bandar Bin Sultan.

C.     "U.S.-based real property" means any real property situated within the borders of the United States and owned (directly or indirectly) by Bandar (or any Bandar-controlled entity) currently or acquired by him subsequent to the filing of this Order.

D.     "U.S.-based accounts" means any deposit or investment account held in the name of or for the benefit of Bandar at any financial institution located in the U.S.

D.     "BAE bribe payments" or "illegal bribe payments" means the allegedly illegal bribe payments Bandar obtained from BAE giving rise to this shareholder derivative action.

E.    "Prudent man standard" means the standard of investment as that term is defined (for illustrative purposes only) in 29 U.S.C. §1104.

**ORDER PROHIBITING BANDAR FROM TRANSFERRING THE SALES PROCEEDS FROM THE SALE OF ANY U.S.-BASED REAL PROPERTY OUT OF HIS NAME OR BANDAR'S U.S.-BASED ACCOUNTS AND REQUIRING THAT ANY SUCH SALES PROCEEDS BE DEPOSITED AND/OR INVESTED PURSUANT TO A PRUDENT MAN STANDARD**

THEREFORE, IT IS HEREBY ORDERED that Bandar and his officers, agents, servants, employees, and attorneys, including realtor Joshua Saslove and attorney William Jordan III, and those persons in active concert or participation with them who receive actual notice of this Order, by personal service or otherwise, are hereby temporarily restrained and enjoined from transferring the sales proceeds from the sale of any real property that Bandar (or any Bandar-controlled entity) owns (directly or indirectly) out of Bandar's name or Bandar's U.S.-based accounts, which sales proceeds must remain deposited and/or invested pursuant to a prudent man standard.

The assets affected by this provision shall include both existing assets and assets acquired after the effective date of this Order, including, without limitation, those acquired by loan or gift, and assets paid in the form of "commissions" paid to Bandar or his agents in connection with the Al-Yamamah arms contract.  BAE, the nominal defendant, any BAE Defendant and any third party holding assets on behalf of or for the benefit of Bandar that derive from the sale of any U.S.-based real property Bandar (or any Bandar-controlled entity) owns or previously owned (directly or indirectly), who receive actual notice of this Order, by personal service or otherwise, shall hold all such assets pursuant to a constructive trust in favor of BAE and shall invest and/or deposit them pursuant to a prudent man standard in U.S.-based accounts.

**ORDER REQUIRING BANDAR TO SUBMIT AN ACCOUNTING OF ALL PAYMENTS BAE'S EXECUTIVES CAUSED THE COMPANY TO TRANSFER TO BANDAR, DIRECTLY OR INDIRECTLY, SINCE 1986**

THEREFORE, IT IS FURTHER ORDERED that Bandar shall, within five business days after service of this Order, prepare and deliver to counsel for plaintiff:

A.    A complete statement, accurate as of the date of service of this Order upon Bandar and verified under oath, of all payments, transfers, or assignment of funds, assets, or property worth $1,000 or more received by Bandar, directly or indirectly, from BAE since January 1, 1986. Such statement shall include: (a) the amount and type of funds, assets or property transferred or assigned; (b) the name of each transferee or assignee; (c) the date of the assignment or transfer; (d) the type and amount of consideration paid to Bandar; and (e) the current location of the funds, assets or property transferred or assigned (including, if held in deposit or investment accounts, the name of the institution, the account numbers and the account names, and, if used to acquire other U.S.-based assets, a description of the asset, an estimated fair market value of the asset, the physical location of the asset, and the name of the person or entity that holds legal title to the asset). Each statement shall specify the name and address of each financial institution and brokerage firm at which Bandar has accounts or safe deposit boxes.

## ORDER REGARDING EXPEDITED DISCOVERY

THEREFORE, IT IS FURTHER ORDERED that in light of the need to provide the Court with a complete record upon which to resolve the Retirement System's PI Motion, the Retirement System is granted leave to conduct certain expedited discovery, and that, commencing with the time and date of this Order, in lieu of the time periods, notice provisions, and other requirements of Rules 26, 30, 34, and 45 of the Federal Rules of Civil Procedure, and Local Rule 26.1, expedited discovery shall proceed as follows:

1)    Nominal Party BAE and defendants Bandar, Richard (Dick) Harry Evans ("Evans"), PNC and the Allbritton Defendants shall make the following core documents available to counsel for plaintiff within SEVEN DAYS:

A.    All documents identifying the location of any funds Bandar obtained from Riggs accounts into which any BAE-related funds had been deposited and any assets derived from

- 5 -

such proceeds (including the institution, account number and account name, or, if the proceeds or assets are in the possession, custody or control of a person, the identification and location of any such person);

B.    Notes, memoranda and work papers concerning any tracing or accounting of payments made to Bandar being conducted by BAE's inside or outside auditors, counsel or representatives;

C.    All documents provided to the Company's Board of Directors and Audit Committee concerning the alleged bribe payments to Bandar;

D.    All reports and minutes of the BAE Board of Directors (and subcommittees thereof) generated between January 1, 1986 and the present that relate to the Al-Yamamah contract or payments to Bandar;

E.    All documents produced to the United States Department of Justice ("DOJ"), the United States Securities and Exchange Commission ("SEC"), or the United Kingdom Serious Frauds Office ("SFO") since 2001 that relate to Al-Yamamah payments, including document indexes;

F.    Deposition or meeting transcripts of documents permitting plaintiff to discover which witnesses have been questioned or deposed by the DOJ, the SEC and/or the SFO and to review the content of the inquiry, including any documents exchanged in relation to such inquiry; and

G.    All documents and computer data evidencing BAE's document destruction or retention policies.

2)    The persons most knowledgeable concerning the topics governed by the documents detailed above at nominal party BAE and defendant PNC, and defendants Bandar, Evans, and the Allbritton Defendants shall sit for depositions which: (i) shall be limited to eight hours each; (ii)

shall be upon three calendar days' notice; and (iii) may be taken Monday through Saturday. Deposition transcripts that have not been signed by the witness may be used for purposes of the hearing on the Order to Show Cause Why a Preliminary Injunction Should Not Issue.

      A.      Provided that this subparagraph shall not be construed in any manner to preclude plaintiff's right to take subsequent depositions of the same witnesses on the merits of this action.

      B.      Provided that any deposition taken pursuant to this subparagraph is in addition to, and not subject to, the presumptive limits on depositions set forth in Fed. R. Civ. P. 30(a)(2)(A) and Local Rule 26.1.

### ORDER TO SHOW CAUSE

THEREFORE, IT IS FURTHER ORDERED that Bandar shall appear before this Court on the _____ day of _____, 2008, at _____ __.m. at the United States Courthouse, Courtroom _____, _____, District of Columbia, to show cause, if any there be, why this Court should not enter a preliminary injunction, pending final resolution of this action, against Bandar, his officers, agents, servants, employees, and attorneys, including realtor Joshua Saslove and attorneys William Jordan III and Nancy H. Dutton, and those persons in active concert or participation with them who receive actual notice of this Order imposing a constructive trust over and enjoining them from selling for inadequate consideration any real property in which Bandar (or a Bandar-controlled entity) holds an interest in or transferring sales proceeds from the sale of any such property out of U.S.-based accounts, which sales proceeds shall be deposited and/or invested pursuant to a prudent man standard.

### PLEADINGS REGARDING PRELIMINARY INJUNCTION HEARING

IT IS FURTHER ORDERED that:

      A.      Bandar shall file with the Court and serve on counsel for plaintiff any response to the Order to Show Cause Why a Preliminary Injunction Should Not Issue, including all declarations, exhibits, memoranda, and other evidence, not less than forty-eight (48) hours prior to the hearing on

- 7 -

the Order to Show Cause Why a Preliminary Injunction Should Not Issue. Bandar shall serve copies of all such materials on plaintiff, by hand, by facsimile transmission, or by electronic delivery.

B.    Plaintiff shall file with the Court and serve on Bandar any supplemental memoranda, declarations, materials, or other evidence not less than twenty-four (24) hours prior to the hearing on the Order to Show Cause Why a Preliminary Injunction Should Not Issue. Plaintiff shall serve copies of all such materials on counsel for Bandar by hand, by facsimile transmission, or by electronic delivery.

C.    Any party who desires to present live testimony at the hearing shall set forth a witness list that shall include the name, address, and telephone number of any such witness, and either a summary of the witness's expected testimony, or the witness's declaration revealing the substance of such witness's expected testimony, and serve such motion on all opposing parties, not less than twenty-four (24) prior to the hearing on the Order to Show Cause Why a Preliminary Injunction Should Not Issue.

## SERVICE OF THIS ORDER

IT IS FURTHER ORDERED THAT, pursuant to Fed. R. Civ. P. 4(c)(2), copies of this Order and the initial pleadings and papers filed in this matter, may be served by employees and agents of counsel for plaintiff, by employees of any state or other federal law enforcement agency, including but not limited to the United States Marshal's Office, and by agents of any process servers retained by plaintiff, upon Bandar, nominal defendant BAE, any other defendant to this action, by service on those parties' counsel of record, and to Joshua Saslove, William Jordan III and Nancy H. Dutton, any financial institution, or any person or entity that may be in possession of any assets, property, or property rights of Bandar.

## CORRESPONDENCE WITH PLAINTIFF

For purposes of this Order, all service on and correspondence to the Retirement System shall be addressed to: Mary K. Blasy, Coughlin Stoia Geller Rudman & Robbins LLP, 655 W. Broadway, Suite 1900, San Diego, California 92101. Telephone: (619) 231-1058; Facsimile: (619) 231-7423.

## RETENTION OF JURISDICTION

IT IS FURTHER ORDERED that this Court shall retain jurisdiction of this matter for all purposes.

**IT IS SO ORDERED**, this _____ day of _____, 2008, at _____ __m.

_____
THE HONORABLE ROSEMARY M. COLLYER
UNITED STATES DISTRICT JUDGE

S:\CasesSD\BAE Derivative\ORD00048812_TRO2.doc