UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re BAE SYSTEMS PLC DERIVATIVE LITIGATION | ) ) ) | Civil No. 1:07-cv-01646 |
| | ) | Assigned to: Judge Rosemary M. Collyer |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |

PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY LIMITED TO PERSONAL
JURISDICTION

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................................1

II.   MOVANTS' MISLEADING, INCOMPLETE AND INACCURATE
      JURISDICTIONAL DECLARATIONS SHOULD BE WITHDRAWN.........................12

III.  PLAINTIFF IS ENTITLED TO JURISDICTIONAL DISCOVERY TO
      RESPOND TO MOVANTS' RULE 12(b)(2) MOTION TO DISMISS ..........................13

      A.    The Prima Facie Test ................................................................................14

      B.    Plaintiff Has Made a Prima Facie Showing of Personal Jurisdiction ...................15

            1.    The Complaint Details BAE's Extensive Operations in This
                  District and Supports a Finding of General Personal Jurisdiction
                  over BAE ................................................................................15

            2.    The Complaint Details Substantial Misconduct Movants Directed
                  at the District of Columbia  – Directly or Indirectly – and Supports
                  a Finding of Specific Jurisdiction Over Them ...........................................19

                  a.    Plaintiff's Claims Arise Out of Movants Transacting
                        Business in the District of Columbia ..............................................20

                  b.    The Complaint Details Significant Damage Caused by
                        Movants' Actions Outside of the District of Columbia
                        Suffered by BAE in the District of Columbia................................22

            3.    The Complaint Details Each Movants' Acts in Concert with
                  Defendants Not Disputing Personal Jurisdiction .......................................30

      C.    Movants Cannot Rebut the Prima Facie Showing Made ......................................32

IV.   MOVANTS SHOULD BE ORDERED TO RESPOND FULLY TO
      PLAINTIFF'S LIMITED JURISDICTIONAL DISCOVERY .........................................32

      A.    The Court Should Order Limited Jurisdictional Discovery on an Expedited
            Basis ...................................................................................................32

      B.    District of Columbia Federal Courts Afford Generous Discovery to
            Establish Personal Jurisdiction .............................................................34

      C.    The Court Can Order Expedited Discovery ............................................................35

            1.    Plaintiff Is Entitled to Limited Expedited Jurisdictional Discovery
                  Concerning BAE plc's Relationships with its U.S. Subsidiaries..............36

**Page**

2.     Plaintiff Is Entitled to Discovery Concerning Each Movants'
       Contacts with the United States and Knowledge of and/or
       Participation in the Alleged Misconduct in This District .........................38

3.     Plaintiff Is Entitled to Responses to Its Jurisdictional Discovery
       Addressing Each Movants' Contacts with the District of Columbia
       and Every Defendant's Involvement in the Conspiracy to Violate
       U.S. Law and Their Fiduciary Duties in the District of Columbia............38

V.     CONCLUSION...............................................................................................38

# TABLE OF AUTHORITIES

**Page**

## CASES

*Abrams v. Commc'ns Workers of Am.*,
No. 87-2816 (RCL), 1991 U.S. Dist. LEXIS 16150
(D.D.C. Nov. 8, 1991)........................................................................................................13

*Adams v. Unione Mediterranea di Sicurta*,
No. 94-1954 Section "K" (2), 2002 U.S. Dist. LEXIS 5789
(E.D. La. Mar. 28, 2002)................................................................................................11, 33

*Atlantigas Corp. v. Nisource, Inc.*,
290 F. Supp. 2d 34 (D.D.C. 2003)......................................................................................37

*Berlin Democratic Club v. Rumsfeld*,
410 F. Supp. 144 (D.C. Cir. 1976)................................................................................32, 36

*Blumenthal v. Drudge*,
992 F. Supp. 44 (D.D.C. 1998)........................................................................................5, 28

*Brennan v. Int'l Brotherhood of Teamsters, etc.*,
494 F.2d 1092 (D.C. Cir. 1974)..........................................................................................35

*Cali v. East Coast Aviation Servs. Ltd*,
178 F. Supp. 2d 276 (E.D.N.Y. 2001) ......................................................................... *passim*

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)............................................................................................................13

*Chavous v. Dist. of Columbia Fin. Responsibility and Mgmt. Assistance Auth.*,
201 F.R.D. 1 (D.D.C. 2001)................................................................................................35

*Crane v. Carr*,
814 F.2d 758 (D.C. Cir. 1987)..........................................................................3, 8, 26, 27

*Crane v. New York Zoological Soc.*,
894 F.2d 454 (D.D.C. 1990) ..............................................................................................4

*District of Columbia v. Coleman*,
667 A.2d 811 (D.C. 1995) ..................................................................................................2

*Dole Food Co. v. Watts*,
303 F.3d 1104 (9th Cir. 2002) ............................................................................................15

*DSMC, Inc. v. Convera Corp.*,
273 F. Supp. 2d 14 (D.D.C. 2002) ....................................................................................29

**Page**

*Edmond v. United States Postal Serv. Gen. Counsel*,
 949 F.2d 415 (D.C. Cir. 1991) ............................................................... *passim*

*El-Fadl v. Central Bank of Jordan*,
 75 F.3d 668 (D.C. Cir. 1996) ............................................................ 4, 6, 31

*Elec. for Imaging, Inc. v. Coyle*,
 340 F.3d 1344 (D.C. Cir. 2003) ...................................................... 14, 15, 32

*Estate of J. Edgar Monroe v. Bottle Rock Power Corp.*,
 No. 03-2682 Section "L"(3), 2005 U.S. Dist. LEXIS 760
 (E.D. La. Jan. 19, 2005) ..................................................................... 11, 33

*Federal Deposit Ins. Corp. v. O'Donnell*,
 136 B.R. 585 (D.D.C. 1991) ........................................................................ 5

*First Commonwealth Corp. v. Pub. Investors, Inc.*,
 No. 90-3316, 1990 U.S. Dist. LEXIS 12743
 (E.D. La. Sept. 25, 1990) ................................................................... 26, 35

*Freiman v. Lazur*,
 925 F. Supp. 14 (D.D.C. 1996) ..................................................................... 7

*Gatewood v. Fiat, S.p.A.*,
 617 F.2d 820 (D.C. Cir. 1980) .................................................................... 29

*GTE New Media Servs., Inc. v. BellSouth Corp.*,
 199 F.3d 1343 (D.C. Cir. 2000) ...................................................... 11, 32, 36

*Hastings v. Graphic Sys. Div. of Rockwell Int'l Corp.*,
 No. 86-2556-S, 1988 U.S. Dist. LEXIS 2960
 (D. Kan. Mar. 8, 1988) ............................................................................ 35

*Helmer v. Doletskaya*,
 393 F.3d 201 (D.C. Cir. 2004) .................................................................... 26

*Heroes, Inc. v. Heroes Found.*,
 958 F. Supp. 1 (D.D.C. 1996) .................................................................... 19

*In re BP P.L.C. Deriv. Litig.*,
 No. 3AN-06-11929 CI Order Denying Motion to Dismiss,
 (Alaska Super. Ct. May 17, 2007) ........................................................ 15, 28

*In re Chateaugay Corp.*,
 198 B.R. 848 (S.D.N.Y. 1996) .................................................................... 23

**Page**

*Internet Archive v. Shell,*
No. C 06-00397 JSW, 2006 U.S. Dist. LEXIS 33351
(N.D. Cal. May 17, 2006) ..................................................................35

*Jung v. Ass'n of Am. Med. Colleges,*
300 F. Supp. 2d 119 (D.D.C. 2004) ......................................... *passim*

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,*
115 F.3d 1020 (D.C. Cir. 1997) ....................................................6, 29

*Mareno v. Rowe,*
910 F.2d 1043 (2d Cir. 1990)..........................................................26

*McGee v. Int'l Life Ins. Co.,*
355 U.S. 220 (1957)..........................................................................5

*Mouzavires v. Baxter,*
434 A.2d 988 (D.C. Cir. 1981) .....................................................5, 21

*Ohio Nat'l Life Ins. Co. v. United States,*
922 F.2d 320 (6th Cir. 1990) ..........................................................35

*Pennington Seed, Inc. v. Produce Exch. No. 299,*
457 F.3d 1334 (D.C. Cir. 2006) ......................................................14

*Peterson Mfg. Co., Inc. v. Central Purchasing, Inc.,*
740 F.2d 1541 (D.C. Cir. 1984) ......................................................13

*Quinones v. Pennsylvania Gen. Ins. Co.,*
804 F.2d 1167 (10th Cir. 1986) ........................................................7

*Romig v. Gillett,*
187 U.S. 111 (1902)........................................................................13

*Schwartz v. CDI Japan, Ltd.,*
938 F. Supp. 1 (D.D.C. 1996) .........................................................21

*Second Amendment Found. v. United States Conf. of Mayors,*
274 F.3d 521 (D.C. Cir. 2001) ...................................................26, 29

*Sheinkopf v. Stone,*
927 F.2d 1259 (1st Cir. 1991) .........................................................13

**Page**

*Shoppers Food Warehouse v. Moreno,*
    746 A.2d 320 (D.C. Cir. 2001) ...................................................................15, 19

*Siegemund v. Shapland,*
    307 F. Supp. 2d 113 (D. Me. 2004) .......................................................13

*Steinberg v. Int'l Criminal Police Org.,*
    No. 80-1336, 217 U.S. App. D.C. 365
    (D.C. Cir. Oct. 23, 1981) ..................................................................5

*Story v. Sunshine Foliage World, Inc.,*
    120 F. Supp. 2d 1027 (M.D. Fla. 2000).............................................13

*Supra Med. Corp. v. McGonigle,*
    No. 96-cv-3737, 1996 U.S. Dist. LEXIS 13670
    (E.D. Pa. Sept. 17, 1996) ..............................................................28, 35

*Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.,*
    395 F.3d 1275 (D.C. Cir. 2005).................................................14, 15, 19

*United States v. Phillip Morris, Inc.,*
    116 F. Supp. 2d  116 (D.D.C. 2000) .................................................37

*Virgin Records Am., Inc. v. John Does 1-35,*
    No. 05-1918 (CKK), 2006 U.S. Dist. LEXIS 20652
    (D.D.C. Apr. 18,  2006) ..............................................................11, 33

*Wentz v. Memery Crystal,*
    55 F.3d 1503 (10th Cir. 1995) ...........................................................26

*Ye v. Zhang,*
    No. 05-00832 (HHK), 2006 U.S. Dist. LEXIS 15038
    (D.D.C. Mar. 31, 2006)..............................................................25, 26, 29

**STATUTES, RULES AND REGULATIONS**

District of Columbia Annotated Code
    §§13-423(a)(1) ..................................................................... *passim*
    §13-423(a)(3) ...........................................................................19
    §13-423(a)(4) ..................................................................... *passim*
    §13-334 ...............................................................................5

Federal Rules of Civil Procedure
    Rule 4(k) ..............................................................................12
    Rule 12(b) ............................................................................13
    Rule 12(b)(1)........................................................................35

**Page**

Rule 12(b)(2)........................................................................................................13
Rule 26.........................................................................................................11, 33
Rule 26(b)...........................................................................................................34
Rule 26(b)(1).......................................................................................................34
Rule 26(b)(2).......................................................................................................35
Rule 26(d)...............................................................................................12, 34, 35
Rule 26(f)............................................................................................................34
Rule 30(a)...........................................................................................................35
Rule 30(a)(2).............................................................................................12, 34
Rule 33(a)...........................................................................................................12
Rule 34(b)....................................................................................................12, 35
Rule 36(a)...........................................................................................................12
Rule 56(e).................................................................................................. *passim*
Rule 56(f)................................................................................................... *passim*

## SECONDARY AUTHORITIES

11 James W. Moore,
  *Moore's Federal Practice*, (3d ed. 2006)
  §56.14[1][d] ......................................................................................................13

Plaintiff hereby moves for an order providing for limited expedited personal jurisdiction discovery pursuant to Federal Rules of Civil Procedure ("Rule") 26(d), Rule 30(a)(2), Rule 33(a), Rule 34(b), Rule 36(a) and 56(e-f).

## I.    INTRODUCTION

On September 19, 2007, plaintiff the City of Harper Woods Employees' Retirement System ("plaintiff" or the "Retirement System"), commenced a shareholder derivative action in this Court charging 26 of BAE Systems, plc's ("BAE") current and former executives with intentional, reckless and/or negligent breaches of fiduciary duty, waste of corporate assets, and *ultra vires* conduct in connection with their having caused BAE to pay billions of dollars in illegal bribe payments, including at least $2 billion worth paid to defendant Prince Bandar Bin Sultan ("Prince Bandar") in the District of Columbia through accounts at now defunct Riggs National Bank.[1]

The bribe payments alleged to have been paid in this District by BAE are the subject of an ongoing United States Department of Justice ("DOJ") investigation and a United Kingdom Serious Frauds Office ("SFO") investigation.  The bribe payments were initially discovered during a 2003-2005 congressional inquiry of Riggs Bank (collectively with PNC Financial Services, its successor in interest, "Riggs" or "PNC"), that resulted in Riggs being closed in 2005 after 2003 and 2004 findings of improper currency transfers and inadequate banking controls.  Ultimately, Riggs, the largest Washington D.C.-based commercial bank for much of its 169-year history, was acquired by PNC in 2005 after various corporate scandals and management problems involving its lucrative

---

[1]    Prince Bandar denies the relevant payments were bribes or that they were illegal.  However, Prince Bandar has publicly-confirmed BAE deposited *Al-Yamamah*-related payments into Riggs Bank accounts in the District of Columbia and that he acquired funds from those accounts.  *See* Declaration of Mary K. Blasy in Support of Motion of Plaintiff's Motion for Expedited Discovery Limited to Personal Jurisdiction ("Blasy Decl."), Ex. J and ¶8 of the Verified Shareholder Derivative Complaint for Intentional, Reckless or Negligent Breach of Fiduciary Duty, Corporate Waste and *Ultra Vires* Conduct (the "Complaint").  Unless otherwise indicated, all "Blasy Decl., Ex. __" references are to the Blasy Decl. and all "¶__" references are to the Complaint.

embassy business forced Riggs to plead guilty to criminal money-laundering violation and pay $50 million in fines and penalties.[2]

On January 31, 2008, BAE and all but one of the current and/or former BAE executives named as defendants in this action (collectively "Movants") filed a joint motion to dismiss, arguing, *inter alia*, that this Court lacks personal jurisdiction over each Movant, seeking a *forum non conveniens* dismissal and arguing that English law applies and does not permit this action. All three of these challenges require the Court to resolve highly fact intensive, mixed questions of law and fact, *i.e.* (i) personal jurisdiction can be (a) "general" if the Movants' contacts with the forum permit it, (b) "specific" if the Movants' contacts with the forum relate to the claims at issue in the lawsuit or (c) derivative of this forum's exercise of personal jurisdiction over other defendants that Movants conspired with under the "conspiracy theory of personal jurisdiction"; (ii) a *forum non conveniens* dismissal requires that this Court weight the private and public factors that support retention of this action versus relegating plaintiff to a remedy in the English courts; and (iii) under §309 of the Restatement (Second) of Conflict of Laws "government interests" test, which Movants concede applies, the Court must ascertain whether the U.K.'s interest in seeing its law applied outweighs the U.S.'s interest in seeking its law applied, and even if English law applies, whether an archaic English procedural rule bars this action in the United States.[3]

---

[2]    In addition to newly-revealed evidence of the bribe payments underlying this action having been made to Bandar through Riggs accounts in this District, according to U.S. Congressional reports in connection with 2003-2005 investigations, Riggs accounts were used to route Saudi money to 9/11 hijackers, to help Augusto Pinochet disguise millions stolen from the Chilean people, and to obfuscate transfers and unreported withdrawals of millions in oil revenues by the dictator of Equatorial Guinea. ¶¶50-53.

[3]    *See* Memorandum of Points and Authorities in Support of the Motion of BAE Systems PLC and the Individual BAE Systems PLC Defendants to Dismiss the Complaint, filed on January 31, 2008 ("MTD") at 7 (citing *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995) ("[W]e use the 'government interests' analysis" of the "Restatement (Second) of Conflict of Laws"); *see also* Restatement (Second) Conflict of Laws, §§6, 309 (1971) ("The local law of the state of

Moreover, in support of their motion to dismiss for lack of personal jurisdiction, the Movants each attached misleading, inaccurate, incomplete, and self-serving declarations which contain a series of conclusory claims purporting to define each Movants' "citizenship" for purposes of diversity jurisdiction, despite this being a very fact and law-laden determination this Court must make for itself if, as Movants' suggest, the Court looks past the allegations contained within the four corners at the Complaint and weighs the declarations at all. More importantly, other than Movants' own self-serving legal conclusions, these four-line declarations make no mention of the Movants' travels to the United States and/or the District of Columbia, their ownership of property in the United States and/or in the District of Columbia, their business dealings in the United States and/or the District of Columbia, their conduct in the United States and/or the District of Columbia, their participation in (or reckless indifference to) the bribe payment scheme in the United States and in the District of Columbia (in stark violation of their fiduciary duties), or their knowledge of and/or reckless indifference to the alleged misconduct which caused BAE harm in the United States and in the District of Columbia. ***This is especially relevant to the Court's specific and conspiracy jurisdiction analysis as BAE's own declaration concedes the BAE Board and its committees met repeatedly in the United States and in Washington, D.C., but does not describe the matters taken up at those meetings***.

The law of this Circuit is clear that plaintiff is entitled to jurisdictional discovery from each Movant contesting personal jurisdiction. *See generally Crane v. Carr*, 814 F.2d 758, 760 (D.C. Cir.

---

incorporation will be applied . . . except where . . . some other state has a more significant relationship under the principles stated in §6," which in turn addresses: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.")

1987) (vacating, in part, the District Court's judgment, where plaintiff's "case was dismissed with no opportunity for discovery on the issue of personal jurisdiction"); *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996)[4] (vacating the District Court's order dismissing for lack of personal jurisdiction under conspiracy theory of personal jurisdiction and holding that ***a "plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding information concerning its contacts with the forum")***; *see also* Rule 56(e)-(f) (requiring that disputed factual issues be resolved only on the basis of admissible affidavits and permitting non-movants to obtain discovery to respond to dispositive motions requiring that disputed factual determinations be made).

As such, Movants' request that the Court go beyond the Complaint's allegations to make the factual determinations and legal conclusions they seek must be rejected, unless and until plaintiff is permitted to take jurisdictional discovery both to obtain discovery relevant to the fact-intensive inquiry Movants put at issue and to test the *bona fides* of their declarations. Plaintiff established a *prima facie* showing of personal jurisdiction over each Movant through detailed allegations establishing their extensive conduct in and directed at this District through their conduct as an officer or director of BAE (which is subject to general jurisdiction in this District), subjecting each Movant to general jurisdiction in the District of Columbia or, at bare minimum, that each Movant's (direct or indirect) conduct directed at the District of Columbia and/or harm suffered by BAE in the District of Columbia subjects them to specific jurisdiction in the District of Columbia (including under the conspiracy theory of personal jurisdiction).

In determining whether a basis for personal jurisdiction exists, courts resolve factual discrepancies in complaints and affidavits in favor of the plaintiff. *Crane v. New York Zoological*

---

[4]    Citations and footnotes are omitted and emphasis is added unless otherwise noted.

*Soc.*, 894 F.2d 454, 456 (D.D.C. 1990).  General jurisdiction is proper over BAE under District of Columbia Annotated Code ("D.C. Code") §13-422 because BAE has an operating subsidiary that is domiciled in and maintains its principle place of business within 100 miles of this Court.  General jurisdiction is also proper over BAE pursuant to D.C. Code §13-334 as BAE is "doing business" in the District of Columbia.  The D.C. long-arm statute relevant to this Court's determination of jurisdiction over most BAE executive defendants provides for "personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's . . . transacting ***any business*** in the District of Columbia" or "causing tortious injury in the District of Columbia by an ***act or omission outside the District of Columbia*** if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia."  D.C. Code §13-423(a)(1) and (4); *see generally Steinberg v. Int'l Criminal Police Org.*, No. 80-1336, 217 U.S. App. D.C. 365 (D.C. Cir. Oct. 23, 1981) (the D.C. long-arm statute is applicable in actions arising under this Court's diversity jurisdiction).  The D.C. long-arm statute is "given an ***expansive interpretation***" that is "coextensive with the due process clause." *Mouzavires v. Baxter*, 434 A.2d 988, 992 (D.C. Cir. 1981).  The District of Columbia's long-arm statute has "expansive" reach and cases should be dismissed for lack of personal jurisdiction only upon an extraordinary showing that is simply not present here:

> In reaching [the determination of whether defendant had sufficient contacts with D.C. to subject defendant to specific jurisdiction], ***the Court is guided by the quality, not the quantity, of defendant's contacts with the forum***.

*Federal Deposit Ins. Corp. v. O'Donnell*, 136 B.R. 585, 591 (D.D.C. 1991) (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957) (noting that "[i]t is sufficient for purposes of due process that the suit was based on a contract which had ***substantial connection with the State***"); *see also Mouzavires*, 434 A.2d at 992 (stating that a "***single act***" may be sufficient to establish personal jurisdiction under both statutory and constitutional standards); *Blumenthal v. Drudge*, 992 F. Supp.

44 (D.D.C. 1998) (exercising personal jurisdiction over a defendant for **acts or omissions outside of**

**D.C. but causing injury in D.C.** under D.C. Code §13-423(a)(4)).

Moreover, once personal jurisdiction over a single defendant in the District of Columbia has

been established (or has not or cannot be refuted as in the cases of BAE, PNC and Barbara, Joseph,

and Robert Albritton), federal courts in this Circuit expressly recognize the conspiracy theory of

personal jurisdiction as a means of establishing specific jurisdiction over non-resident co-

conspirators in this District.  *See Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 140

(D.D.C. 2004) ("acts undertaken within the forum by one co-conspirator in furtherance of an alleged

conspiracy may subject a non-resident co-conspirator to personal jurisdiction under the long-arm

statute"); and *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1030-31 (D.C. Cir.

1997) (applying the conspiracy theory of personal jurisdiction to the long-arm statute's "transacting

any business" subsection).  Despite being reversible error to dismiss prior to discovery where the

non-movant seeks discovery to demonstrate the conspiracy theory of personal jurisdiction (*see

Central Bank of Jordan*, 75 F.3d at 676), **that is precisely what Movants ask this Court to do.**  As

such, if the Court entertains Movants' motion to dismiss for lack of personal jurisdiction now at all,

prior to the commencement of formal discovery, it cannot do so without permitting plaintiff to take

limited jurisdictional discovery.

First, Movants' pure conjecture that "BAE plc . . . does not have a presence in the United

States," supported by the declaration of BAE's Corporate Secretary, David Parkes ("Parkes Decl."),

is not only misleading and incomplete, it is entirely inaccurate and demonstrates the very reason that

in this District, a "plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled

to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding

information on its contacts with the forum." *Central Bank of Jordan*, 75 F.3d at 676.  BAE plc's

own corporate website belies Movants' assertions, listing multiple BAE operational sites in the

United States and here in the District of Columbia. Specifically, the website displays as part of BAE's global presence, its United States operating subsidiaries, emphasizing right on BAE plc's main web page:

> **BAE Systems has strong positions in each of our six home markets** – Australia, Saudi Arabia, South Africa, Sweden, UK, **US – and have organised the business to reflect this.** The UK and Rest of the World business is responsible for delivering and growing our home markets, optimising our ability to deliver through-life military capability to the front line.

> **BAE Systems Inc. is the US subsidiary of BAE Systems plc. Headquartered in Rockville, Maryland, BAE Systems, BAE Systems Inc. consists of three Operating Groups** that provide support and service solutions for current and future defense, intelligence, and civilian systems; design, develop and manufacture a wide range of electronic systems and subsystems for both military and commercial applications; and design, develop, produce, and provide service support of armored combat vehicles, artillery systems and intelligent munitions.

*See* Blasy Decl., Ex. A. In fact, BAE plc's "United States" web page reiterates those same claims, adding: ***"BAE Systems, Inc., the U.S. subsidiary of BAE Systems plc, is headquartered in Rockville, Maryland, and is responsible for developing BAE Systems' trans-Atlantic business, relationships with the U.S. Government, administration of BAE Systems' Special Security Agreement, and managing its U.S. based operating groups."*** Blasy Decl., Ex. B. In addition to BAE plc's Maryland headquarters being located at 1601 Research Blvd, Rockville, Maryland, a mere 25.4 miles from this Court (*see* Blasy Decl., Ex. C), bringing it well within Rule 4(k)'s 100-mile "bulge" rule extending the reach of this Court's personal jurisdiction,[5] BAE plc's website also contains links to BAE's "LOCATIONS IN THE UNITED STATES," including its "Washington,

---

[5]     *See Quinones v. Pennsylvania Gen. Ins. Co.*, 804 F.2d 1167, 1174 (10th Cir. 1986)("if a party delineated in Rule 4(f) has minimum contacts with the 100-mile bulge area, the district court in the forum state gains personal jurisdiction over such party through service of process pursuant to Fed. R. Civ. P. 4(f), providing due process is satisfied."); *Freiman v. Lazur*, 925 F. Supp. 14, 26 (D.D.C. 1996) ("if a party lacks minimum contacts with the forum state, yet has minimum contacts with the 100-mile 'bulge area,' measured by a 100-mile radius from this courthouse, this Court has personal jurisdiction over the party").

DC facility" located at "1250 24th Street, NW Washington DC." *See* Blasy Decl., Ex. D. As such, BAE is "doing business" regularly in this District via its operating subsidiaries and on that basis alone is subject to the Court's general jurisdiction. *Crane*, 814 F.2d at 763.

Lest there be any doubt that BAE plc "'carries on a continuous and systematic part of its general business within'" the District of Columbia via its U.S. operating subsidiaries sufficient to bring it within this Court's "general personal jurisdiction," the court in *Cali v. East Coast Aviation Servs. Ltd*, 178 F. Supp. 2d 276, 285-86 (E.D.N.Y. 2001) already examined BAE plc's relationship with two of its Pennsylvania operating subsidiaries, utilizing a variation of the same multi-factor test this Court will be required to examine in deciding Movants' motion to dismiss, and concluded "***there is more than enough evidence to support an inference that [BAE plc's United States operating subsidiaries] are the alter-ego of BAE Systems" plc.*** *Id.* at 289. Specifically, the *East Coast Aviation* court found BAE's "lower level officers report directly to higher level management of the parent company" and that BAE's "common marketing scheme, logo and language shows that BAE Systems and its subsidiaries 'hold themselves out to the public as a single entity that is conveniently departmentalized either nationally or world-wide.'" *Id.*

Movants' specious use and interpretation of Parkes' Declaration in their motion to dismiss claiming BAE plc is not subject to this Court's jurisdiction, without citing *East Coast Aviation* and ostensibly disclaiming its findings, raises many disputed legal/factual conclusions, including: (1) whether BAE "does not ***have a presence*** in the United States," (2) whether BAE's wholly owned subsidiary, BAE Systems, Inc. ("BAE-USA") "***is managed separately*** from the English parent BAE plc," (3) whether "BAE plc and [BAE-USA] have ***separate*** boards of directors and ***separate*** management," (4) whether BAE plc and [BAE-USA] have a "***separate*** identity," (5) whether plaintiff's "allegations demonstrate[] that the English parent ***controls*** the U.S. subsidiary," (6) whether plaintiff's "allegations of BAE plc's wrongdoing ***bear [any] relation to*** the U.S. subsidiary

or defense contracting with the U.S.," (7) whether BAE's systematic, 20 year flow of bribe money into this District via Riggs "*establish[es] 'continuous and systematic' contacts supporting general jurisdiction over [BAE]*," (8) whether "the payments to Prince Bandar through Riggs Bank . . . *caused injury* to a person or entity in Washington, D.C.," and (9) whether BAE's payments to Prince Bandar in the District of Columbia via Riggs "is a *virtually random offshoot* of Plaintiff's breach of fiduciary duty and corporate waste claims." *See* MTD at 35-40; Parkes Decl., Ex. 2; ¶¶4-6, 9-10, 20-21.

Similarly, even publicly-available information about Movants' contacts with the United States and the District of Columbia materially contradicts the self-serving declarations submitted on behalf of BAE's executive defendants, *each of whom is (or was during the relevant period) a high ranking officer or director of BAE, then subject to this Court's general jurisdiction,* and renders them misleading, inaccurate and incomplete, including revealing that:

- Several Movants *have been issued United States social security cards*;

- Several Movants *signed BAE's American Depository Shares ("ADS") registration statement filed with the U.S. Securities and Exchange Commission ("SEC") in the District of Columbia in 2003* registering BAE's ADS for sale in the United States under the federal securities laws;

- Several Movants serve (or served recently) as senior officers and directors of companies headquartered in the United States, or having significant U.S. operations, *including one that cleared Ground Zero in New York and rebuilt the Pentagon following the 9/11 terrorist attacks*;

- Several Movants serve as executives of BAE, which derives over 50% of its revenues in the United States, either serving the U.S. Department of Defense ("DOD") or its many Homeland Security organizations, has *40+% ownership by U.S. shareholders and operates pursuant to a Special Security Agreement ("SSA") with the U.S. DOD* that requires significant presence of U.S. citizens on its Board of Directors.

- One Movant, Andrew Inglis, has expressly stated publicly (and recently) that he *resides with his wife and children at their home in Texas*, contrary to his declaration here which states he resides in London and merely has a second home in Texas;

- One Movant is the BAE executive *charged with overseeing BAE's execution of the Al Yamamah arms contract* with Saudi Arabia – the source of the bribe payments;

- 9 -

- • One Movant, then serving as BAE's Chief Executive Officer, routinely stayed at Prince Bandar's compound here in the District of Columbia when conducting business on behalf of BAE here in the District;

- • Several Movants frequently visit this District to attend professional events and carry out business, make speeches, publish commentary in U.S. newspapers, testify before the U.S. congress and meet with U.S. senior officials; and

- • One Movant is a naturalized U.S. citizen with offices in New York who served in the U.S. Army for six years.

*See* Blasy Decl., ¶3.

This publicly-available information casts serious doubt on Movants' conclusory, misleading, inaccurate, incomplete and self-serving declarations, puts at issue certain Movants' "citizenship" for purposes of personal jurisdiction and challenges the basis of Movants' motion to dismiss for lack of personal jurisdiction. Legal terms of art, such as "citizenship" and the other factors raised in the Parkes Declaration are acutely subject to misuse, misinterpretation or even misrepresentation depending on whether the declarant wants (or does not want) to be sued in the District of Columbia. As such, Movants' unchallenged declarations submitted in an attempt to controvert plaintiff's *prima facie* showing with matters outside the Complaint should be accorded little or no weight. The declarations are simply insufficient, misleading, inaccurate, incomplete and should be disregarded by this Court. If Movants will not withdraw them, plaintiff respectfully requests that the Court specifically grant leave to conduct expedited jurisdictional discovery to challenge them, in connection with the rest of the jurisdictional discovery sought herein. In an attempt to meet and confer on this request prior to seeking judicial intervention, plaintiff provided the proposed written discovery to counsel for Movants[6], along with a proposed stipulation providing for responses and

---

[6]     *See* Blasy Decl., Exs. Q-T.

depositions on an expedited basis, which has been rejected by Movants who refuse to submit to **any jurisdictional discovery**.[7]

Accordingly, pursuant to Rule 56(e)-(f) and the common law of this Circuit, plaintiff requests leave to take expedited discovery of each Movants' jurisdictional ties to the United States and the District of Columbia in order to "supplement [the Complaint's] jurisdictional allegations" before any dispositive ruling on personal jurisdiction is made.[8] *GTE New Media Servs., Inc. v. BellSouth Corp.*,

---

[7]     *See* Blasy Decl., Ex. U; *see also* Blasy Decl., ¶¶25-28 describing plaintiffs attempt to meet and confer on their request for expedited discovery. **To be sure, counsel for Movants made no attempt to meet and confer prior to filing their motion to dismiss for lack of personal jurisdiction. Plaintiff's counsel would have most certainly requested personal jurisdiction discovery first had they done so**. *See* Blasy Decl., ¶25.

[8]     Plaintiff is entitled to discovery into Movants' nationwide contacts. Plaintiff seeks to show through discovery, as the court in *East Coast Aviation* already basically found, that BAE's presence in this District via its operating subsidiaries subjects it to general personal jurisdiction in the District of Columbia under an *alter ego* theory (as well as specific and conspiracy jurisdiction). Plaintiff's limited examination of publicly-available sources has demonstrated that the executive defendants who moved to dismiss for lack of personal jurisdiction, besides being officers and directors of BAE, a corporation subject to this Court's general jurisdiction, themselves have extensive contacts throughout the United States, professional, financial, personal and otherwise. *See* Blasy Decl., ¶3. As informational sources concerning Movants' United States "contacts are discoverable" to demonstrate their contacts with this District, regardless of whether "those contacts ultimately will be imputed" for purposes of establishing personal jurisdiction in this District, as those "contacts may lead to the discovery of evidence relevant to personal jurisdiction," plaintiff seeks discovery of Movants' contacts with the entire United States. *Estate of J. Edgar Monroe v. Bottle Rock Power Corp.*, No. 03-2682 Section "L" (3), 2005 U.S. Dist. LEXIS 760, at *12-*13 (E.D. La. Jan. 19, 2005) ("'Relevancy is broadly construed and a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter in the action or if there is any possibility that the information sought may lead to the discovery of admissible evidence.'"); *Adams v. Unione Mediterranea di Sicurta*, No. 94-1954 Section "K" (2), 2002 U.S. Dist. LEXIS 5789, at *5-*6 (E.D. La. Mar. 28, 2002) ("While many of the subject discovery requests seek information concerning UMS's contacts with the United States, rather than the more directly relevant contacts with Louisiana, I cannot conclude that information about UMS's contacts with the United States will not lead to the discovery of admissible evidence in connection with the personal jurisdiction inquiry. My review of the subject original discovery requests and the proposed narrowed requests leads me to conclude that they all seek information relevant to the personal jurisdiction issue under the broad discovery standard."); *see also Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.C. Cir. 1991) (allowing jurisdictional discovery under the "'freely permitted' standard of Rule 26" of non-resident defendants' relationship to alleged misconduct to establish personal jurisdiction under the conspiracy theory of personal jurisdiction in

199 F.3d 1343, 1351-52 (D.C. Cir. 2000) (permitting jurisdictional discovery to ascertain which defendants had contacts with the District of Columbia and to "bolster the District Court's theory of 'substantial effects' within the District.").   Under this scenario, pursuant to Rule 26(d), Rule 30(a)(2), Rule 33(a), Rule 34(b), Rule 36(a), and Rule 56(e)-(f), plaintiff would request that the Court: (i) order BAE and each BAE executive defendant contesting personal jurisdiction to provide full and complete answers to the written discovery propounded in connection with this Motion which is limited to personal jurisdiction issues, (ii) order all Movants to respond to follow-up written discovery, and (iii) sit for depositions, as prescribed in the proposed stipulated order plaintiff previously tendered to counsel for Movants which they rejected.  Moreover, as plaintiff's opposition to Movants' Motions to dismiss are presently due on or before April 1, 2008, plaintiff also requests that if expedited personal jurisdiction discovery is granted, that the due date on plaintiff's oppositions to motion to dismiss be extended for 45 days (or as long as required) to permit plaintiff to conduct the needed discovery.

## II.   MOVANTS' MISLEADING, INCOMPLETE AND INACCURATE JURISDICTIONAL DECLARATIONS SHOULD BE WITHDRAWN

Rule 56(e) provides that "affidavits must be made on personal knowledge, ***set out facts that would be admissible in evidence***, and show that the affiant is competent to testify on the matters stated."   Affidavits/declarations must be based on personal knowledge, and, therefore,

---

response to motion to dismiss for lack of personal jurisdiction holding "discovery under the Federal Rules of Civil Procedure should be freely permitted, and this is no less true when discovery is directed to personal jurisdiction."); *Virgin Records Am., Inc. v. John Does 1-35*, No. 05-1918 (CKK), 2006 U.S. Dist. LEXIS 20652, at *10 (D.D.C. Apr. 18, 2006) (where discovery is sought to establish jurisdiction pursuant to D.C. Code §13-423(a)(1), *i.e.* "the District of Columbia's long-arm statute, which confers jurisdiction over any person or business 'transacting any business in the District of Columbia' or 'causing tortious injury in the District of Columbia by an act or omission in the District of Columbia,'" discovery is proper to demonstrate the court's jurisdiction over defendant "regardless of his/her place of residence," in order to show the defendant "has clearly directed tortious activity into the District of Columbia.").

affidavits/declarations based on nothing more than information and ***belief*** are not sufficient. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Story v. Sunshine Foliage World, Inc.*, 120 F. Supp. 2d 1027, 1030 (M.D. Fla. 2000). Additionally, affidavits that express conclusions of law rather than statements of fact are improper. *Peterson Mfg. Co., Inc. v. Central Purchasing, Inc.*, 740 F.2d 1541, 1551 (D.C. Cir. 1984) (noting that "'***[t]he affidavit is no place for ultimate facts and conclusions of law, nor for arguments of the party's cause***'"), *overruled on other grounds*; *Romig v. Gillett*, 187 U.S. 111, 115-116 (1902); *Story*, 120 F. Supp. 2d at 1030. Even statements that purport to be based on personal knowledge may fail to satisfy Rule 56(e) where they are ***too "amorphous."*** *Sheinkopf v. Stone*, 927 F.2d 1259, 1266 (1st Cir. 1991) *see generally* 11 James W. Moore, *Moore's Federal Practice* § 56.14[1][d], at 56-168 (3d ed. 2006) ("The affidavit, in addition to presenting admissible evidence, must be sufficiently specific to support the affiant's position.").

Movants' jurisdictional declarations make impermissible legal conclusions in that they attempt to proclaim each defendant's "citizenship" for purpose of diversity jurisdiction. The Parkes Declaration also makes unsupported, sweeping, and "amorphous" characterizations purporting to define the legal relationship between BAE plc and its U.S. subsidiaries, a matter that is a very fact intensive and subject to legal dispute. Because these declarations "purport to be based upon personal knowledge . . . but refer[] to undefined events and lack[] the specificity required to satisfy Rule 56(e)," they are inadmissible and irrelevant. *Siegemund v. Shapland*, 307 F. Supp. 2d 113, 117-18 (D. Me. 2004); *see also Abrams v. Commc'ns Workers of Am.*, No. 87-2816 (RCL), 1991 U.S. Dist. LEXIS 16150, at *8 (D.D.C. Nov. 8, 1991) ("the proper course of action for plaintiffs is to argue that defendant is relying on irrelevant information").

## III.    PLAINTIFF IS ENTITLED TO JURISDICTIONAL DISCOVERY TO RESPOND TO MOVANTS' RULE 12(b)(2) MOTION TO DISMISS

Rule 12(b) provides that "[e]very defense, in law or fact, to a claim for relief in any pleading . . . shall be asserted in the responsive pleading thereto if one is required, except that the following

defenses may at the option of the pleader be made by motion . . . (2) lack of jurisdiction over the person." BAE and 25 individual defendants challenge personal jurisdiction. As demonstrated in the Complaint, and this brief, plaintiff presents a *prima facie* case that: (i) BAE is subject to *in personum* jurisdiction both by virtue of its payment or bribe payments to Prince Bandar in this District and having extensive operations in the District of Columbia (via its wholly owned subsidiary and instrumentality, BAE Systems, Inc. ("BAE-USA"), which does extensive business in the District of Columbia and maintains several offices here and which is controlled by BAE); and that (ii) each defendant challenging personal jurisdiction is subject to jurisdiction in the District of Columbia either directly or by virtue of his/her being part of a conspiracy.

###### A.    The Prima Facie Test

To establish personal jurisdiction, absent discovery or an evidentiary hearing, plaintiff need only allege facts constituting a *prima facie* showing of personal jurisdiction. *Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.*, 395 F.3d 1275, 1282 (D.C. Cir. 2005) ("Because there has not been discovery on the jurisdictional issue, [plaintiff] is required 'only to make a *prima facie* showing' of jurisdiction to defeat the motion to dismiss"); *see also Pennington Seed, Inc. v. Produce Exch. No. 299*, 457 F.3d 1334, 1344 (D.C. Cir. 2006) (holding that where the court did not hold an evidentiary hearing on the issue of personal jurisdiction, plaintiff "need only make a *prima facie* case of personal jurisdiction, and [the court] 'must accept the uncontroverted allegations in the plaintiff's complaint as true'"); *Elec. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1349 (D.C. Cir. 2003) (noting that the Federal Circuit "and the Ninth Circuit . . . agree that where the district court's disposition as to the personal jurisdictional question is based on affidavits and other written materials in the absence of an evidentiary hearing, a plaintiff need only make a *prima facie* showing that defendants are subject to personal jurisdiction."). "In the procedural posture of a motion to dismiss, a district court must accept the uncontroverted allegations in the plaintiff's complaint as true and resolve any factual

conflicts in the affidavits in the plaintiff's favor." *Coyle*, 340 F.3d at 1349; *Trintec*, 395 F.3d at 1282 ("In evaluating this [*prima facie*] showing, the district court must construe all pleadings and affidavits in the light most favorable to the plaintiff."). **In establishing a prima facie case, plaintiffs may rely on the complaint, affidavits and other supporting materials**. *Coyle*, 340 F.3d at 1349; *see also Dole Food Co. v. Watts*, 303 F.3d 1104, 1108 (9th Cir. 2002).

**B.     Plaintiff Has Made a Prima Facie Showing of Personal Jurisdiction**

**1.     The Complaint Details BAE's Extensive Operations in This District and Supports a Finding of General Personal Jurisdiction over BAE**

The "District of Columbia permits courts to exercise general jurisdiction over a foreign corporation for claims that do not arise from the corporation's conduct within the District, if the corporation is '**doing business**' in the District and its business contracts are '**continuous and systematic**.'" *Trintec*, 395 F.3d at 1279.  Moreover, D.C. Code §13-423(a)(1) has been **construed broadly** by courts and "'[e]ven a **small amount** of in-jurisdiction business activity is generally enough to permit the conclusion that a nonresident defendant has transacted business here.'" *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 331 (D.C. Cir. 2001).  BAE owns 100% of its U.S. subsidiary, BAE-USA.  BAE, via BAE-USA, owns and/or maintains several offices located here in the District of Columbia.  Further, BAE has entered into a triangular relationship with BAE-USA and the U.S. Government, and established a permanent presence in the District of Columbia thereby, via a SSA which allows BAE to supply its products and services to the U.S. DOD, Intelligence Community and Homeland Security on some of our Nation's most sensitive programs. Given BAE's intimate relationships and dealings with the U.S. federal government in this District via BAE-USA and the SSA, BAE has established a strong presence in the District of Columbia

sufficient to subject it to this Court's general jurisdiction.[9] *See e.g., East Coast Aviation Servs.*, 178 F. Supp. 2d at 289 ("there is more than enough evidence to support an inference that [BAE plc's United States operating subsidiaries] are the ***alter-ego*** of BAE Systems" as BAE's "lower level officers report directly to higher level management of the parent company" and BAE's "common marketing scheme, logo and language shows that BAE Systems and its subsidiaries 'hold themselves out to the public as a single entity that is conveniently departmentalized either nationally or world-wide'").

Specifically, the existence of BAE's "Washington, DC facility" (Blasy Decl., Ex. D), close relationships and dealings with a myriad of U.S. federal government agencies in and in direct proximity to this District, including but not limited to, the U.S. DOD (located in Arlington, Virginia (Blasy Decl., Ex. F)), the Homeland Security Organization (located in Washington, D.C.) (Blasy Decl., Ex. G) and the SEC (located in Washington, D.C.), and its ***alter ego*** presence in this District through BAE-USA, evidence the BAE's continuous and systematic contacts with the District of

---

[9]    Movants' argument that the SSA's requirement that BAE-USA maintain a U.S. board and withhold certain business information concerning the operating subsidiary's business with the DOD from BAE plc may be disposed of quickly.  The evidence will show BAE-USA, regardless of the SSA and the limited purposes to which it applies, is the ***alter-ego*** and mere instrumentality of BAE plc for all meaningful purposes.  *See, e.g.*, *In re BP P.L.C. Deriv. Litig.*, No. 3AN-06-11929 CI, Order Denying Motion to Dismiss (Alaska Super. Ct. May 17, 2007) (Blasy Decl., Ex. E) at 13-15 (finding that "BP has availed itself of the privilege of doing business in Alaska and of the protections of Alaska's laws, making it reasonable for BP [and its senior executives] to expect to be hailed into court in the State" to defend a shareholder derivative action despite BP too being a British corporation headquartered in London) (herein the "BP Order").  In fact, it is an affront to this Court and this country that the executives of BAE plc, which obtains more than one-half of its revenues from U.S. customers, primarily the U.S. government, has substantial U.S. operations, is owned in large part by U.S. equity investors, and operates here by special permission granted to few foreign companies, would now claim, after violating U.S. money laundering laws in a bank in this District – ***to the tune of billions of dollars spanning a 20 year period*** – that the parent and operating subsidiary are too separate to permit the exercise of personal jurisdiction over them or BAE plc. Sharp practices indeed!

Columbia, subjecting BAE to this Court's general jurisdiction.[10]  As the *East Coast Aviation* court

found in 2001, BAE continues to systematically represent its strong U.S. presence – including

BAE's strong desire to further augment its U.S. presence – to its shareholders in company

publications, supporting a finding of general jurisdiction over it in this District.  178 F. Supp. 2d at

289.  For example, as alleged in the Complaint, BAE's 2006 Annual Report stated:

> BAE Systems is one of the world's leading defence companies and is one of only four companies with global defence sales in excess of $20bn.  ***It . . . ranks number seven within the US defence industry***.
>
> ***The Group's US business now delivers of US$9bn (£5bn) of annual sales and employs approximately 40,000 people in 36 states***.
>
> . . . BAE Systems has a substantial business supporting network systems and IT for US government agencies and provides technical support services to the US Navy, US Army, NASA and the FAA.
>
> ***The US defence market . . . remains one of BAE System's key markets*** . . . . US defence spending has increased substantially over recent years . . . .  This high level of funding is expected to sustain further growth in the near term . . . .

¶20.

Further evidencing BAE's presence in the U.S. defense market, the Complaint also alleges

that BAE's 2000 Annual Report stated:

> The US is by far the largest defence market . . . .  ***BAE SYSTEMS recognises that participation in the US market is a prerequisite to establishing and growing a leading position in the global defence industry***.
>
> *     *     *
>
> **North America.**  Four acquisitions in 2000 have enhanced the company's position in the US market.

---

10      As Blasy Declaration, Exs. H and I demonstrate, BAE's operations in this District are substantial and important.  Current employment positions ***available*** at BAE's Washington, D.C. facility include "Senior Intelligence Analyst," "Financial Coordinator," and "Program Manager." Prospective employees are promised they are joining "BAE Systems – one of the ***world's*** foremost providers of advanced aerospace products . . . .," not the small U.S. – only company Movants portend operates in isolation.

¶20.

Additionally, BAE has consistently represented that its U.S. subsidiaries are members of the overall BAE operation, including assurances to its shareholders of the BAE's involvement in and control over the BAE's U.S. operations. For example, throughout its Annual Reports, BAE refers to its U.S. subsidiaries as "BAE Systems North America," suggesting that the U.S. operations are directly controlled by BAE. *Id.* Significantly, BAE has consistently used possessive and personal pronouns such as "our" and "we" when discussing its U.S. subsidiaries and the number of employees employed by those subsidiaries, further demonstrating the singular structure of BAE. *Id.* For example, BAE's 2000 Annual report stated:

> BAE SYSTEMS North America also has a strong, well-established presence in the services and support market. It is the largest single technical support contractor for the US Navy, with a legacy relationship of more than 35 years. In 2000, it was awarded a $450m contract to provide systems engineering and technical assistance for the Federal Aviation Administration's air traffic control programme.

¶20. Moreover, BAE's 2001 Annual Report stated:

> The US is the world's largest defence market and it is growing. . . .
>
> ***Our position as one of the DoD top suppliers has been enhanced by the successful integration of the four North American acquisitions we made in 2000***.

*Id.* CEO Michael J. Turner's 2002 letter (dated 2/03) stated:

> BAE SYSTEMS has also continued to build its position in the US, the world's largest, and growing, defence market. The US is the defence technology powerhouse of the world and for BAE SYSTEMS to retain a position at the top of its industry ***it must have a strong US presence. The company has already grown its position successfully, establishing itself as a key constituent of the US defence community. BAE SYSTEMS North America is performing strongly and the continued growth of our US industrial position remains an important part of our strategy***.

*Id.* CEO Michael J. Turner's letter in BAE's 2004 Annual Report stated:

> In the US, five acquisitions were completed. . . . With these acquisitions BAE Systems now generates annualised sales of some $5.6bn in its North America business and now ***employs over 27,000 people across the US***.

Finally, BAE's 2005 Annual Report stated:

- 18 -

In the summer of 2005, BAE Systems completed the acquisition of United Defense, *growing the US business base by $2.6bn in annual sales and 8,000 additional employees*. This acquisition established BAE Systems as a major land systems prime contractor with a strong position in support of the US Department of Defense's requirements for force sustainment and affordable transformation.

*Id.*

In sum, BAE's presence in this District (including within the 100 mile "bulge" around this Court) and its desire to remain and, indeed, increase its presence in the District is undisputable and clearly satisfies the "small amount of in-jurisdiction business activity" required to exercise jurisdiction over the Company. *Shoppers Food Warehouse*, 746 A.2d at 331.

### 2. The Complaint Details Substantial Misconduct Movants Directed at the District of Columbia – Directly or Indirectly – and Supports a Finding of Specific Jurisdiction over Them

Even assuming, *arguendo*, that BAE and the executive defendants were not subject to general jurisdiction in the District of Columbia, Movants' systematic misconduct directed at the District of Columbia – all of which underlie the allegations giving rise to this shareholder derivative action – provides the Court with specific jurisdiction over them. The D.C. long-arm statute "is interpreted broadly" and plaintiff must only "allege some specific facts evidencing *purposeful activity* by the defendants in the District of Columbia by which they invoked the benefits and protections of the District's laws." *Jung*, 300 F. Supp. 2d at 128. To establish specific personal jurisdiction under the District of Columbia long-arm statute, a plaintiff must demonstrate:

(1) that its claims arose from [defendant's] transacting business in the District of Columbia (subsection (a)(1)); *or*

(2) that [defendant] caused it tortious injury in the District by its conduct in the District (subsection (a)(3)); *or*

(3) that [defendant] caused it tortious injury in the District by its conduct outside the District and that [defendant] "*regularly does or solicits business" in the District*, "engages in any other *persistent course of conduct*" there, or "*derives substantial revenue*" from goods used or services rendered there (subsection (a)(4))."

*Trintec*, 395 F.3d at 1280-81 (citing *Heroes, Inc. v. Heroes Found.*, 958 F. Supp. 1, 2-5 (D.D.C. 1996)).  Movants are subject to specific jurisdiction in this Court, especially in light of the fact that the D.C. long-arm statute is written in the disjunctive and a plaintiff must only demonstrate one of the three prongs in order to prove specific jurisdiction.  *See* D.C. Code §13-423(1), (3), and (4). Here, plaintiff has demonstrated at least two of the three prongs of the D.C. long-arm statute: (1) plaintiff's claims arise out of Movants' transacting business in the District of Columbia; and (2) Movants caused tortious injury to BAE in the District of Columbia through their actions outside of the District by wiring the illegal bribe money into Riggs as part of a persistent 20 year course of conduct from which Movants are alleged to have derived substantial personal financial benefits.

### a.    Plaintiff's Claims Arise Out of Movants Transacting Business in the District of Columbia

Movants transacted business in the District of Columbia.  The Complaint alleges that "[t]o advance their own positions with BAE by winning the Al-Yamamah contract, the then officers and directors of BAE named as defendants herein undertook [the following] illegal and improper conduct" (¶8) in the District of Columbia:

- paid "bribes or kickbacks (a/k/a "backhanders") to [Prince] Bandar and [made] other improper payments for his (and his family's) benefit, which have amounted to over $2 billion over the last 20 years" by depositing monies into ***D.C.-based Riggs Bank***. ¶¶8, 113.

- "caused BAE to funnel these illegal payments to [Prince] Bandar in significant part through Riggs, ***located in Washington, D.C.***," because Riggs' "***Washington, D.C. location*** gave [Prince] Bandar ready access to it and because Riggs had a reputation in international commercial circles as a bank willing to facilitate questionable, if not illegal, currency transfers for international transactions." *Id.*, ¶114.

- paid monies to Prince Bandar "here in the U.S. ***in Washington, D.C.*** over the last 20 years." ¶¶9, 116.

- made ""'secret' payments to a ***Washington, D.C., bank account*** controlled by Bandar"" as part of "***an $80 billion*** military-aircraft deal between London and Riyadh."" ¶13 (quoting *Newsweek*, 6/18/07) (internal quotations omitted).

- had "***substantial and continuous contacts with Washington, D.C.*** and the United States." ¶17.

- sent up to $120 million a year "from the U.K. into two Saudi embassy accounts with Riggs in Washington." ¶117.

- chose Riggs in Washington, D.C. as the intermediary to funnel bribe payments to Prince Bandar "because BAE and [Prince] Bandar knew Riggs would cooperate in secreting the fund transfers, *i.e.*, laundering them to hide them from government regulators and BAE's own auditors, which Riggs did for many years." ¶122.

The Complaint's allegations that BAE and its senior executives transacted business in the District of Columbia make a *prima facie* showing of personal jurisdiction for purposes of the D.C. long-arm statute as "[t]he 'transacting any business' provision of the District's long-arm statute embraces the contractual activities of a non-resident defendant that cause repercussions in the District" and "[i]t is therefore 'sufficient . . . that the suit [be] based on a contract that [has] [a] **substantial connection** with the district.'" *Schwartz v. CDI Japan, Ltd.*, 938 F. Supp. 1, 5 (D.D.C. 1996) (quoting *Mouzavires*, 434 A.2d at 992). The Al-Yamamah contract is alleged to have involved a 20 year-long illegal bribe payment scheme between BAE and Prince Bandar – then serving as the Saudi Ambassador to the U.S. and residing in the District of Columbia. The Complaint's allegations concerning each Movants' involvement in the bribe scheme makes a *prima facie* showing of personal jurisdiction under the D.C. long-arm statute.

For instance, in finding a defendant transacted business in D.C. sufficient to subject defendant to personal jurisdiction under D.C. Code §13-423(a)(1) of the D.C. long-arm statute, the *Schwartz* court held that because the defendant entered into a contract with a D.C.-based entity, indicating defendants' intention "to reap the financial benefits from transacting business" in D.C., and also established that defendant "agreed to make payments and reimbursements" under the contract ***into an account at a District of Columbia bank***, the defendant was subject to personal jurisdiction here. *Schwartz*, 938 F. Supp. at 6-7. Similarly, BAE's senior executives named as defendants in this action are alleged to have caused or acquiesced in BAE entering into the Al-Yamamah contract, the terms of which called for billions of dollars of payments being made to

Prince Bandar, then living in D.C. and serving as the Saudi ambassador to the U.S. These same defendants also allegedly authorized the transfer of bribe payments to Prince Bandar here at his D.C.-based Riggs accounts and deposited payments pursuant to the bribe scheme into Prince Bandar's D.C.-based Riggs accounts. ***Again, Prince Bandar does not contest the payments were made to accounts he used in this District, he merely contests that the payments constituted "bribes" for purposes of the Foreign Corrupt Practices Act or that they were illegal.*** Blasy Decl., Ex. J.

In sum, the Complaint specifically alleges BAE's 20 year improper bribe scheme – pursuant to the Al-Yamamah contract – with Prince Bandar, included BAE's systematic commercial banking transactions in the District of Columbia. Such D.C.-based business transactions underlie the claims giving rise to this shareholder derivative action and provide the Court with specific jurisdiction under D.C. Code §13-423(a)(1).

### b. The Complaint Details Significant Damage Caused by Movants' Actions Outside of the District of Columbia Suffered by BAE in the District of Columbia

It is alleged that billions of dollars damage was done to BAE, the real-party-in-interest in this action – ***in the District of Columbia*** – due to its officers' and directors' reckless disregard and breach of their fiduciary duties. BAE now faces significant criminal liability, disgorgement of bribe-tainted receipts and profits, loss of its valuable SSA and substantial damage to its business and reputation if found to have violated the Foreign Corrupt Practices Act ("FCPA") in this District.

Even if the criminal charges are neither proven nor ever brought, as a direct result of Movants' misconduct in the District of Columbia, BAE is facing immense harm to its public relations and potential financial ruin. First and foremost, BAE's fragile relationship with the U.S. DOD, Intelligence Community and Homeland Security, via its SSA with the DOD – a highly important source of revenue and income for the Company – is in jeopardy. ¶19. BAE has mitigated

the effect the Company's foreign ownership would otherwise have on its ability to obtain lucrative DOD contracts by entering into the SSA between the United States Government, BAE-USA and BAE. *Id.*; *see also* Blasy Decl., Ex. K.  That agreement calls for the appointment of outside directors who, in conjunction with other U.S.-based board members, comprise a Government Security Committee.  *Id.*  The Government Security Committee has the responsibility for overseeing the Company's compliance with U.S. Government security and export regulations and meets regularly with U.S. Government defense officials.  *Id.*  As one court explained, SSAs, such as the one BAE has, offer the "highest form of security clearance available to a company" that wants to do business in the United States and "is the most difficult to obtain."  *In re Chateaugay Corp.*, 198 B.R. 848, 851 (S.D.N.Y. 1996).

Entry into and compliance with the SSA has permitted BAE access to its most valuable customers, United States, government agencies, where $9 billion of BAE's 2006 sales revenues originated and 40,000 of its employees work. *See* Blasy Decl., Ex. L.  In fact, according to the Company's 2006 annual shareholder report, the United States accounts for a full *45%* of the entire global defense market.  *Id.*  BAE now sells more to the U.S. DOD than the U.K. MoD and the U.S. accounts for 50% of BAE's annual sales.  *See* Blasy Decl., Ex. M.  The Company's "Corporate Overview," originally published in October 2005 prior to the revelations of Prince Bandar's bribes surfacing, concedes the value BAE has in maintaining its reputation for honesty and integrity, specifically with regards to the SSA:

- "**Special Security Agreement**: Provides access to classified U.S. Government Programs *the same as other U.S. defense companies*."

- "Trusted national security leaders with *impeccable* credentials."

- "BAE Systems, Inc.'s revenues have grown 250% in five years. . . . *BAE Systems, Inc. is the 6th largest defense company in the U.S.*. . . . BAE Systems stock value has more than doubled in the last two years."

- "BAE Systems is Committed to its Values, Ethics, and Integrity. . . . Performance – Delivering value to shareholders and customers – Honesty and integrity in everything we say and do. . . . *Our values are the basis for the way we do business every day and the foundation of our success.*"

Blasy Decl., Ex. N.

However, Movants' misconduct – specifically paying illegal bribe payments to Prince Bandar in this District – is now threatening to crumble this very "foundation of [BAE's] success." *Id.* The Company's public image, standing in the U.S. defense industry, reputation and credibility are being pummeled. For instance, on November 2, 2007, the *Lexington Herald-Leader* reported that congressional leaders who must approve ongoing sales from BAE to the United States defense community are coming under intense pressure to stop buying from BAE:

> *Reform groups in Washington are demanding that Congress strip $25 million in earmarks that Sen. Mitch McConnell, R-Ky., is pushing for a British defense contractor facing a criminal investigation by the U.S. Justice Department and an audit by the U.S. Defense Department*.

> \*      \*      \*

> . . . State Department records show that American diplomats have worried in recent years about BAE allegedly bribing officials in several other countries. The *Defense Department's Office of Inspector General in August opened an audit into Army contracts awarded to BAE, to determine whether the rules were followed. That audit, prompted by tips to the Pentagon about BAE, is pending*.

> \*      \*      \*

> *McConnell . . . put $25 million for three BAE naval weapons projects in the 2008 defense appropriations bill*, which is expected to go to a conference committee next week to iron out differences between the Senate and House versions.

> \*      \*      \*

> But, critics say McConnell is propping up a company that apparently can't compete without him. While it sounds good for a senator to defend jobs, *"we should be spending federal money where and as we need to, not to keep the lights on in someone's district,"* said David Williams, vice president of Citizens Against Government Waste, a Washington watchdog group.

> "I want to know when Sen. McConnell became the secretary of defense," Williams said. "The Pentagon has to sit down every year, draw up its priorities and

budget its money accordingly. Who is Mitch McConnell to insist that we fund these projects?"

***Dropping of earmarks urged***

> *Apart from the controversy over earmarks, the Justice Department investigation of BAE should prompt McConnell to suspend his assistance for the company, said Ken Boehm, chairman of the National Legal and Policy Center, one of the reform groups that urged the appropriations committees to drop the earmarks*.

> Boehm's group and Taxpayers for Common Sense, which joined it in signing the protest letter, are non-partisan, non-profit watchdogs that monitor federal spending for signs of waste, fraud and abuse. Boehm is a former Republican congressional aide.

> Boehm said ***news of McConnell's BAE earmarks have "created quite a buzz around Capitol Hill," including a front-page story in yesterday's Roll Call, a newspaper, which covers Congress***. The appropriations panels have not responded to his letter yet – their attention this week is on other spending bills – but he said he's hopeful common sense will prevail.

> ***"This is really a questionable use of federal funds," Boehm said. "I'd love to see a poll asking, 'Do you want your tax money going to a company currently under . . . investigation?' I bet you'd see a lot of people saying 'No*.'"***

Blasy Decl., Ex. O. On June 29, 2007, *Time* quoted "a leading Washington expert in the area, who did not want his name used because of the political sensitivity of the topic," as stating that "'[i]f the Justice Department were to find that BAE had committed a significant violation of the Foreign Corrupt Practices Act, ***it would automatically raise questions about how rigorously the company is safe-guarding classified information, adhering to export controls and meeting its other obligations under U.S. law***.'" Blasy Decl., Ex. P. Moreover, regardless of the ultimate outcome of the criminal investigations by the U.S. DOJ and the U.K. SFO and potential risk to BAE's financially lucrative status as a preferred U.S. DOD supplier, BAE will continue spending tens of millions of dollars on legal defense costs, accountants' fees, and public relations and damage control measures as a result of having made these payments to Prince Bandar in the District of Columbia.

And, although plaintiff has alleged specific jurisdiction over Movants under D.C. Code §13-423(a)(1) of the D.C. long-arm statute, in the alternative, Movants are subject to specific jurisdiction

here under D.C. Code §13-423(a)(4) as well. A defendant is subject to specific jurisdiction under D.C. Code §13-423(a)(4) if a plaintiff shows that: (1) he suffered tortious injury in the District of Columbia; (2) the injury was caused by defendant's act or omission outside of the District of Columbia; (3) and [defendant] *regularly does or solicits business*, engages in any other *persistent course of conduct*, or *derives substantial revenue* from goods used or consumed, or services rendered, in the District of Columbia." *Ye v. Zhang*, No. 05-00832 (HHK), 2006 U.S. Dist. LEXIS 15038, at *6 (D.D.C. Mar. 31, 2006); *see also* D.C. Code §13-423(a)(4). Often referred to as "'plus factors,'" these enumerated contacts "need not be related to the tortious act in question; rather, they serve as a 'reasonable connection' between the defendant and the forum." *Ye*, 2006 U.S. Dist. LEXIS 15038, at *6 (quoting *Crane*, 814 F.3d at 763). Plaintiff has met this burden.

    *First*, while the "District of Columbia law does not establish where economic injury occurs, the case law of other circuits is instructive." *Helmer v. Doletskaya*, 393 F.3d 201, 208 (D.C. Cir. 2004). The *Helmer* court cites a Second Circuit employment case for the proposition that "'despite the fact that [the plaintiff] may suffer the economic consequences of his firing in New York [where plaintiff resides], the location of the original event which caused the injury is New Jersey [where plaintiff worked].'" *Id.* (quoting *Mareno v. Rowe*, 910 F.2d 1043, 1045 (2d Cir. 1990)). Likewise, the *Helmer* Court cited *Wentz v. Memery Crystal*, 55 F.3d 1503, 1506 (10th Cir. 1995), where a Colorado resident sued a London law firm for wrongfully withdrawing funds from his trust account. Noting that "the unauthorized disbursals occurred in London and were from a London account, not a Colorado account," the Tenth Circuit held that "*the loss or injury occurred in London where the account was located*, not in Colorado. That [the plaintiff] may be economically impacted in Colorado, *simply because he lives there*, is insufficient to establish personal jurisdiction under . . . the Colorado long-arm statute." *Id.* at 1508. Similarly, BAE was injured each and every time money was deposited – *allegedly illegally in violation of the FCPA* – into Prince Bandar's Riggs

- 26 -

accounts in the District of Columbia, as BAE's financial status and reputation was tied to this potentially ruinous D.C.-based illegal activity. That BAE is headquartered in the U.K. is insufficient to destroy this Court's ability to exercise specific jurisdiction over Movants under the D.C. long-arm statute. The improper payments at issue in this shareholder derivative action were funneled through a District of Columbia bank account and, thus, plaintiff has sufficiently alleged an injury to BAE in the District of Columbia.

**Second**, if Movants are to be believed, and they did not direct the harm to BAE from **within** the District of Columbia (during BAE Board Committee meetings they concede were conducted here in this District (*see* Parkes Decl., ¶¶16-17)), then the injury to BAE was arguably inflicted by Movants from outside the District of Columbia because these payments could not have been made without the acquiescence of BAE's Board and senior officers. Under this scenario, the damage inflicted on BAE in the District of Columbia would have stemmed from Movants' activities outside the District.

**Third**, although one would suffice, plaintiff has alleged all three "plus factors" required under D.C. Code §13-423(a)(4) of the long-arm statute. Plaintiff has shown that Movants regularly conducted business in D.C. (via BAE), engaged in a persistent course of conduct in D.C. (via BAE), and derived substantial revenue from services rendered in D.C. (via BAE), thereby establishing a "reasonable connection" between the jurisdiction in which the court sits "separate from and in addition to" the injury caused in the jurisdiction. *Crane*, 814 F.2d at 762. The Parkes' Declaration submitted in support of Movants' motion to dismiss even concedes at ¶¶16-17 that the BAE Board "met in the United States 9 times" since 2002, that since 2003, eight BAE Board committee meetings were "held in Washington D.C.," and that another 10 Board committee meetings were held elsewhere in the U.S. ***However it does not describe the purpose or outcome of those meetings.*** The

Parkes Declaration does not address BAE's "Washington D.C. facility" (Blasy Decl., Ex. D) directly, but does concede the Company operates in the U.S. pursuant to a SSA. *Id.*, ¶¶19-21.

In *Blumenthal*, to prove the "plus factors" plaintiff alleged that defendant engaged in a persistent course of conduct in the District of Columbia because: (i) defendant's website was transmitted over the Internet and into the District; (ii) defendant had solicited and collected money from persons in the District; (iii) defendant had traveled to the District twice; and (iv) defendant had contacted District residents who supplied him with gossip for his website. The Court agreed and held that defendant's conduct amounted to "a persistent course of conduct in the District" giving rise to personal jurisdiction over defendant under subsection (a)(4) of the long-arm statute. 992 F. Supp. at 54. Similarly here, BAE maintains a website that is transmitted over the Internet and into the District (*see* www.baesystems.com), where BAE investors are undoubtedly located (even if not named as plaintiffs in this action) which falsely assured that BAE was abiding by U.S. law. Movants also caused and/or permitted BAE to transfer illegal bribe payments to Prince Bandar in the District for over 20 years. By their own admissions, Movants traveled to the District for business-related purposes (including BAE Board Committee meetings). Movants also maintained systematic contact with District residents, namely Prince Bandar and Riggs. As such, Movants are alleged to have engaged in a persistent course of conduct in the District of Columbia and are therefore subject to personal jurisdiction here.

For the same reason, in the *In re BP plc Shareholder Derivative Litigation* in Alaska, Judge Jack Smith denied a motion to dismiss brought by BP plc and its officer and director defendants for lack of personal jurisdiction in May 2007, ruling that:

> *BP has availed itself of the privilege of doing business in Alaska and of the protections of Alaska's laws, making it reasonable for BP to expect to be haled into court in the State. The claims which are the subject of this litigation arise out of Defendants' decision making that had forum-related impact. The directors and officers of BP and its subsidiaries are and were under fiduciary duties to the companies. The individual defendants availed themselves of the benefits of sitting*

*on the Board or being officers of BP and its subsidiaries. They should all reasonably expect to be responsible for their decisions including the impact where those decisions are carried out*. The alleged breach of their duties had an impact on BP's operations in Alaska. The inquiries complained of took place in Alaska. Finally, the exercise of jurisdiction over both individual and corporate Defendants is reasonable because witnesses, documents, exhibits, and parties are located in Alaska, and *nothing points to Alaska having any less of a jurisdictional claim over Defendants than England would have*.

*See* Blasy Decl., Ex. E.

Moreover, plaintiff has sufficiently alleged Movants' D.C.-based business transactions in the Complaint and above in plaintiff's D.C. Code §13-423(a)(1) analysis, *supra* at §II(B)(2)(a), demonstrating that Movants regularly conducted business in D.C. Finally, Movants have allegedly derived substantial revenue as a result of their activities in the District of Columbia.[11] Therefore, Defendants are properly subject to personal jurisdiction in this District under D.C. Code §13-423(a)(4) of the D.C. long-arm statute.

---

[11] Particularly, plaintiff has alleged that BAE and the defendants secretly bargained for the illegal or improper payments to be paid into Riggs in the District of Columbia at the outset of the Al-Yamamah contractual negotiations and signing in order to obtain the behemoth $86 billion arms contract from the Saudi Arabian government and so they could point to the contract as concrete evidence of their successful stewardship of BAE, which would in turn help them hold onto their positions of power, prestige and profit with BAE, so they could receive lucrative payments and bonuses in connection with those positions for many years. ¶¶6, 8-11, 15; *see also* ¶158. Further, because a plaintiff "who invokes section [D.C. Code] §13-423(a)(4) *need not show that the injury in the District was directly related to the actual business solicitation, course of conduct, or derivation of revenue*," any of BAE's activities in the District of Columbia will constitute a sufficient "plus factor" subjecting BAE to personal jurisdiction here. *Gatewood v. Fiat, S.p.A.*, 617 F.2d 820, 824 (D.C. Cir. 1980), *see also Ye*, 2006 U.S. Dist. LEXIS 15038, at *6 (noting that *the "'plus factors'" "need not be related to the tortious act in question*."). Thus, plaintiff's allegations regarding BAE's ownership and maintenance of offices in the District of Columbia coupled with its vast and substantial dealings with the U.S. Federal Government in the District of Columbia may all be considered to subject BAE to personal jurisdiction here, even if plaintiff's claims do not arise directly from these contacts. ¶¶19-20.

### 3. The Complaint Details Each Movants' Acts in Concert with Defendants Not Disputing Personal Jurisdiction

Jurisdiction may lie over defendants based not only on their own conduct, but also based on the conduct of others they are alleged to have conspired with. *DSMC, Inc. v. Convera Corp.*, 273 F. Supp. 2d 14, 21 (D.D.C. 2002) (finding personal jurisdiction over defendant under the conspiracy theory of personal jurisdiction because defendant had substantial contacts and a lucrative contract with a business located in D.C.). Under the conspiracy theory of personal jurisdiction, "acts undertaken within the forum by one co-conspirator in furtherance of an alleged conspiracy may subject a non-resident co-conspirator to personal jurisdiction under the long-arm statute." *Jung*, 300 F. Supp. 2d at 140 (citing *Second Amendment Found. v. United States Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001)); *Jungquist*, 115 F.3d at 1030-31 (applying the conspiracy theory of personal jurisdiction to the long-arm statute's "transacting business" subsection). To invoke the conspiracy theory of personal jurisdiction for discovery purposes, plaintiff need only have alleged (1) the existence of a conspiracy; (2) the nonresident's participation in or agreement to join the conspiracy; and (3) that an overt act was taken in furtherance of the conspiracy within the forum's boundaries. *See Edmond*, 949 F.2d at 425. Plaintiff has sufficiently alleged these elements. *See, e.g.*, ¶158 ("By encouraging and accomplishing the illegal and improper payments alleged herein and concealing them from government regulators, Bandar, PNC/Riggs and the Allbritton Defendants have each encouraged, facilitated and advanced the BAE Defendants' breaches of their fiduciary duties and waste of corporate assets. In so doing, Bandar, PNC/Riggs and the Allbritton Defendants have each aided and abetted, conspired and schemed with BAE Defendants to breach their fiduciary duties, waste BAE's corporate assets and engage in the ultra vires and illegal conduct complained of.").

The conspiracy theory of personal jurisdiction is rooted in principles of agency law; co-conspirators are agents of one another. Because a principal can be subject to the jurisdiction of a

court based on acts performed by its agent in that jurisdiction, it logically follows that personal jurisdiction over the non-resident conspirators here (Movants) can be exercised based upon the acts of their co-conspirators within the District of Columbia (defendants Prince Bandar, Riggs/PNC, and, arguably, BAE). *See Jung*, 300 F. Supp. 2d at 141 (stating that "[s]o long as any one co-conspirator commits at least one overt act in furtherance of the conspiracy in the forum jurisdiction, there is personal jurisdiction over all members of the conspiracy").

Since Movants are alleged to have acted in concert to breach their fiduciary duties to BAE by causing or permitting BAE to pay $2 billion in illegal bribe payments to Prince Bandar in the District of Columbia (¶¶8, 113, 158), ***thereby exposing BAE to criminal liability in this District and loss of its most lucrative customer in this District***, jurisdiction should extend to all alleged co-conspirators, wherever they may be physically located. Any other result would work a manifest injustice by allowing co-conspirators to escape liability simply by using agents to undertake their misconduct in a particular forum, thereby robbing citizens of a potential remedy and diluting the effectiveness of state long-arm statutes – such as the District of Columbia's – which were intended to extend to the limits of due process. Movants cannot credibly dispute now that it was not "foreseeable" that BAE or any of its officers and directors, each of whom is alleged to have acted "in concert, engaged in the [alleged] [mis]conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company" (¶149), were directing substantial and continuous activities at the District of Columbia – including a 20 year-long illegal bribe payment scheme between BAE and Prince Bandar via Riggs. ¶¶8, 113, 158. As plaintiff's allegations make a *prima facie* showing of personal jurisdiction under the conspiracy theory of personal jurisdiction, Movants' motion must be denied if plaintiff is not afforded jurisdictional discovery. *Central Bank of Jordan*, 75 F.3d at 676 (vacating the District Court's order dismissing for lack of personal jurisdiction under conspiracy theory of personal jurisdiction and holding that a "plaintiff faced with a motion to dismiss for lack of personal

jurisdiction is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding information concerning its contacts with the forum"); *see also* Rule 56(e)-(f) (requiring that factual issues be resolved only on the basis of admissible affidavits and that non-movants be permitted to obtain discovery to respond to dispositive motions requiring that disputed factual determinations be made).

### C. Movants Cannot Rebut the *Prima Facie* Showing Made

Movants cannot present any compelling evidence why they are not subject to personal jurisdiction in this District.    Instead, plaintiff's detailed allegations of Movants' negligent/reckless/intentional breaches of their fiduciary duties in the District of Columbia resulting in potentially billions of dollars in damages to BAE, plainly satisfy "minimum contacts" and "'fair play and substantial justice.'"  *Jung*, 300 F. Supp. 2d at 128.  Because "a district court must accept the uncontroverted allegations in the plaintiff's complaint as true and resolve any factual conflicts in the affidavits in the plaintiff's favor," plaintiff's *prima facie* showing should not be disturbed. *Coyle*, 340 F.3d at 1349.

### IV. MOVANTS SHOULD BE ORDERED TO RESPOND FULLY TO PLAINTIFF'S LIMITED JURISDICTIONAL DISCOVERY

#### A. The Court Should Order Limited Jurisdictional Discovery on an Expedited Basis

The Court should order expedited jurisdictional discovery, which will provide additional information regarding Movants' contacts with the District of Columbia and the U.S. and participation in a conspiracy to breach fiduciary duties to BAE here by causing or permitting BAE to pay $2 billion in illegal bribe payments to Prince Bandar in the District of Columbia (¶¶8, 113).  *See Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144 (D.C. Cir. 1976); *Edmond*, 949 F.2d 415; *Jung*, 300 F. Supp. 2d at 128; *GTE*, 199 F.3d at 1351-1352.  Movants' arguments are not dispositive, but instead create factual issues concerning personal jurisdiction, requiring that their declarations meet the Rule 56(e) standard ("affidavits . . . ***shall set forth such facts as would be admissible in***

*evidence, and shall show* affirmatively that the affiant is competent to testify as to the matters stated therein") and require that plaintiff be permitted appropriate discovery under Rule 56(f) (a court "may refuse the application for [summary] judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had," if it "appears from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition").

Plaintiff is entitled to discovery into Movants' nationwide contacts.  Plaintiff's limited examination of publicly-available sources has demonstrated that the executive defendants who moved to dismiss for lack of personal jurisdiction, besides being officers and directors of corporation subject to this Court's general jurisdiction, themselves have extensive contacts throughout the United States, professional, financial, personal and otherwise. *See* Blasy Decl. ¶3.  As informational sources concerning Movants' United States "contacts are discoverable" to demonstrate their contacts with this District, regardless of whether "those contacts ultimately will be imputed" for purposes of establishing personal jurisdiction here, as those "contacts may lead to the discovery of evidence relevant to personal jurisdiction," plaintiff seeks discovery of Movants' contacts throughout the United States. *Estate of J. Edgar Monroe*, 2005 U.S. Dist. LEXIS 760, at *12-*13 ("'Relevancy is broadly construed and a request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the subject matter in the action or if there is any possibility that the information sought may lead to the discovery of admissible evidence.'").

Moreover, as the court in *Adams*, 2002 U.S. Dist. LEXIS 5789, at *5-*6, expressly found:

> *While many of the subject discovery requests seek information concerning [Movant]'s contacts with the United States, rather than the more directly relevant contacts with [the forum], I cannot conclude that information about [Movant]'s contacts with the United States will not lead to the discovery of admissible evidence in connection with the personal jurisdiction inquiry.  My review of the subject original discovery requests . . . leads me to conclude that they all seek information relevant to the personal jurisdiction issue under the broad discovery standard.*

*See also Edmond*, 949 F.2d at 425 (allowing jurisdictional discovery under the "'freely permitted' standard of Rule 26" of non-resident defendants' relationship to alleged misconduct to establish personal jurisdiction under the conspiracy theory of personal jurisdiction in response to motion to dismiss for lack of personal jurisdiction holding "discovery under the Federal Rules of Civil Procedure should be freely permitted, and this is no less true when discovery is directed to personal jurisdiction") and *Virgin Records*, 2006 U.S. Dist. LEXIS 20652, at *10 (where discovery is sought to establish jurisdiction pursuant to D.C. Code § 13-423(a)(1), *i.e.* "the District of Columbia's long-arm statute, which confers jurisdiction over any person or business 'transacting any business in the District of Columbia' or 'causing tortious injury in the District of Columbia by an act or omission in the District of Columbia,'" discovery is proper to demonstrate the court's jurisdiction over defendant "regardless of his/her place of residence," in order to show the defendant "has clearly directed tortious activity into the District of Columbia").

The necessity of U.S.-wide discovery is exemplified by the misleading, inaccurate and incomplete characterization in Andrew Inglis' declaration, where he states he is a "citizen of the United Kingdom," who maintains his "primary residence . . . in London," and a "secondary home in Houston, Texas," when in fact the evidence demonstrates Andy Inglis lives and works in Texas with his wife and children! *See* Declaration of Andrew Inglis; *see also* Blasy Decl., Ex. X. Similarly, Dick Evans' declaration makes no mention of the considerable time he spent staying at Prince Bandar's compound in this District. *See* Blasy Decl. ¶3.

### B. District of Columbia Federal Courts Afford Generous Discovery to Establish Personal Jurisdiction

Parties may obtain discovery "regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . . Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Rule 26(b)(1). Rule 26(d) provides that "[a] party may not seek discovery from any source before the

parties have conferred" pursuant to Rule 26(f). However, the Federal Rules allow a party to seek expedited discovery before the Rule 26(f) conference where required to serve "the interests of justice." *See generally* Rule 26(d); *see also* Rule 30(a)(2) (expedited depositions), Rule 33(a) (expedited interrogatories), Rule 34(b) (expedited requests for production of documents), Rule 36(a) (expedited requests for admissions).

The Federal Rules of Civil Procedure recognize that "trial courts are vested with broad discretion to manage the conduct of discovery." *Chavous v. Dist. of Columbia Fin. Responsibility and Mgmt. Assistance Auth.*, 201 F.R.D. 1, 2 (D.D.C. 2001); *Brennan v. Int'l Brotherhood of Teamsters, etc.*, 494 F.2d 1092, 1100 (D.C. Cir. 1974) (noting that "[t]rial courts, as indicated by the Advisory Committee's Notes to Federal Rule of Civil Procedure 26(b), have broad powers to regulate or prevent discovery and such powers have always been freely exercised"). LCvR 26.2 largely adopts the Federal Rules of Civil Procedure, but adds that as to the duration of depositions permitted under the Rules, the "court must allow additional time consistent with Rule 26(b)(2), F. R. Civ. P., if needed for a fair examination of the deponent or if the deponent or another person, or other circumstance impedes or delays the examination."

### C.    The Court Can Order Expedited Discovery

The Federal Rules of Civil Procedure (and the Local Rules of this District) also permit this Court to grant expedited discovery. *See* Rule 26(d); Rule 34(b) (expedited production of documents); and Rule 30(a) (expedited depositions). "It is clear from this language [Rule 34(b)] that the rules intend to vest discretion in the Court to extend or shorten the time for production of documents." *First Commonwealth Corp. v. Pub. Investors, Inc*., No. 90-3316, 1990 U.S. Dist. LEXIS 12743, at *2 (E.D. La. Sept. 25, 1990). Under the Federal Rules of Civil Procedure, resolving contested issues of fact concerning jurisdiction pursuant to a Rule 12(b)(1) motion to dismiss, "a trial court has wide discretion to allow affidavits, documents and even a limited

evidentiary hearing to resolve disputed jurisdictional facts." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990) ("When facts presented to the district court give rise to a factual controversy, the district court must . . . weigh the conflicting evidence . . . ."). Precedent for expedited discovery under similar circumstances is well established. *See, e.g., Supra Med. Corp. v. McGonigle*, No. 96-cv-3737, 1996 U.S. Dist. LEXIS 13670, at *4 (E.D. Pa. Sept. 17, 1996) ("permitting Plaintiff to conduct limited  discovery into jurisdictional issues" on an expedited basis); *Hastings v. Graphic Sys. Div. of Rockwell Int'l Corp.*, No. 86-2556-S, 1988 U.S. Dist. LEXIS 2960, at *3 (D. Kan. Mar. 8, 1988) (granting plaintiff discovery on "the issue of personal jurisdiction" and ordering that the "Magistrate is also directed to expedite this limited discovery"); and *Internet Archive v. Shell*, No. C 06-00397 JSW, 2006 U.S. Dist. LEXIS 33351, at *9 (N.D. Cal. May 17, 2006) ("limited jurisdictional discovery" granted).

### 1.    Plaintiff Is Entitled to Limited Expedited Jurisdictional Discovery Concerning BAE plc's Relationships with its U.S. Subsidiaries

Despite the *East Coast Aviation* decision finding BAE plc was subject to general jurisdiction in the United States where its operating subsidiaries are located, Movants placed at issue this Court's jurisdiction over BAE by their motion. The District of Columbia federal courts permit jurisdictional discovery with respect to determining whether an individual's contacts with the forum will permit the court to exercise personal jurisdiction over them. *See Berlin Democratic Club*, 410 F. Supp. 144 (holding that it would be "improper to hold that there is no personal jurisdiction in the absence of discovery" because "plaintiffs have had no opportunity to establish factually from whence the orders emanated, the contacts between the domestic and overseas defendants, location of the [relevant documents], and other data relevant to the question of personal jurisdiction"); *Edmond*, 949 F.2d at 425 (holding that "it is an abuse of discretion to deny jurisdictional discovery where the plaintiff has specifically alleged: (1) the existence of a conspiracy, (2) the nonresident's participation, and (3) an

injury-causing act of the conspiracy within the forum's boundaries"); *Jung*, 300 F. Supp. 2d at 128, 142 (holding that jurisdictional discovery must take place before the Court can rule on defendant's motion to dismiss and also stating that "since jurisdictional discovery is limited . . . [p]laintiffs do not have to demonstrate the very existence of the conspiracy by a preponderance of the evidence" because "[t]o impose this additional requirement would place on plaintiffs the inequitable burden of demonstrating the existence of something by a preponderance of the evidence about which they have not yet had the opportunity to conduct [complete] discovery"); *GTE*, 199 F.3d at 1351-52 (permitting jurisdictional discovery to ascertain which defendants had contacts with the District of Columbia and to "bolster the District Court's theory of 'substantial effects' within the District"); *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34 (D.D.C. 2003); *United States v. Phillip Morris, Inc.*, 116 F. Supp. 2d 116 (D.D.C. 2000). As such, plaintiff is entitled to and seek discovery as to BAE's activities both in the District of Columbia and the U.S. (through control of the operations of its subsidiaries) that could result in the discovery of evidence leading to the imposition of personal jurisdiction over BAE in this District.[12]  *See* Blasy Decl., Exs. Q-T.

---

[12]     Specifically, under *Atlantigas*, 290 F. Supp. 2d at 53 and *Phillip Morris*, 116 F. Supp. 2d at 130, n.16, plaintiff is entitled to and hereby seeks discovery relevant to each of the following *alter ego* factors: (a) the parent corporation owns all or most of the capital stock of the subsidiary; (b) the parent and subsidiary corporations have common directors or officers; (c) the parent corporation finances the subsidiary; (d) the parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation; (e) the subsidiary has grossly inadequate capital; (f) the parent corporation pays the salaries and other expenses or losses of the subsidiary; (g) the subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation; (h) in the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own; (i) the parent corporation uses the property of the subsidiary as its own; (j) the directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest; and (k) the formal legal requirements of the subsidiary are not observed. ***To be sure, these are the same factors the East Coast Aviation court examined in finding BAE's U.S. operating subsidiaries were its alter ego subjecting it to general personal jurisdiction.*** These are also the same factors the *BP plc* court applied to determine that company's

> 2.    **Plaintiff Is Entitled to Discovery Concerning Each Movants'**
> **Contacts with the United States and Knowledge of and/or**
> **Participation in the Alleged Misconduct in This District**

Plaintiff seeks to show each of the individual BAE executives who moved to dismiss for lack of personal jurisdiction is subject to the Court's general and specific jurisdiction. Discovery relevant to each Movants' contacts with the United States is likely to lead to admissible evidence to their continuous and systematic contacts with this District. Discovery into each Movants' knowledge or and/or acquiescence to the allegations in the Complaint, specifically approval of payments by BAE to Prince Bandar at Riggs is likely to lead to admissible evidence of their specific jurisdiction. *See* Blasy Decl., Exs. Q-T.

> 3.    **Plaintiff Is Entitled to Responses to Its Jurisdictional Discovery**
> **Addressing Each Movants' Contacts with the District of**
> **Columbia and Every Defendant's Involvement in the**
> **Conspiracy to Violate U.S. Law and Their Fiduciary Duties in**
> **the District of Columbia**

Plaintiff is permitted to discovery to determine each Movants' contacts with the District of Columbia and to establish additional minimum contacts between those defendants and the District of Columbia or the U.S. Plaintiff also seeks discovery addressing every defendants' role in the conspiracy to breach their fiduciary duties and permit or cause the Company to violate U.S., U.K. and international anti-bribery laws by purposefully conducting business in and directing their activities that impact the District of Columbia. Plaintiff hereby submits with this Motion written discovery on each Movant relevant to those subjects. *See* Blasy Decl., Exs. Q-T.

## V.    CONCLUSION

For all of the foregoing reasons, plaintiff requests that if Movants will not withdraw their irrelevant, misleading, incomplete and inaccurate declarations, the Court disregard those declarations

---

wholly-owned Alaska operating subsidiary was the "corporate alter ego of BP." *See* Blasy Decl., Ex. E at 13.

in resolving Movants' motions to dismiss for lack of personal jurisdiction.  Moreover, plaintiff

requests that Movants be ordered to submit to limited, expedited personal jurisdiction discovery.  If

such discovery is granted, plaintiff seeks an extension to respond to Movants' motions to dismiss

until such discovery may be conducted.

DATED:  March 12, 2008                    Respectfully submitted,

                                          COUGHLIN STOIA GELLER RUDMAN
                                            & ROBBINS LLP
                                          PATRICK J. COUGHLIN
                                          MARK SOLOMON
                                          MARY K. BLASY


                                                    s/MARY K. BLASY
                                          _____
                                                MARY K. BLASY

                                          655 West Broadway, Suite 1900
                                          San Diego, CA  92101
                                          Telephone:  619/231-1058
                                          619/231-7423 (fax)

CUNEO GILBERT & LaDUCA, L.L.P.
JONATHAN W. CUNEO(D.C. Bar # 939389)
WILLIAM H. ANDERSON (D.C. Bar # 502380)
507 C Street, N.E.
Washington, D.C.  20002
Telephone:  202/789-3960
202/789-1813 (fax)

Co-Liaison Counsel

THE LAW OFFICE OF ROGER M. ADELMAN
ROGER M. ADELMAN (D.C. Bar # 056358)
1100 Connecticut Ave., NW, Suite 730
Washington, D.C.  20036
Telephone:  202/822-0600
202/822-6722 (fax)

Lead Counsel for Plaintiff

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

S:\CasesSD\BAE Derivative\BRF00049523.doc

CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 12, 2008.

s/ MARY K. BLASY
MARY K. BLASY

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: maryb@csgrr.com

# Mailing Information for a Case 1:07-cv-01646-RMC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roger M. Adelman**
  radelman@erols.com,lisamp@csgrr.com,tlatimer@csgrr.com,e_file_sd@csgrr.com

- **Mary K. Blasy**
  maryb@csgrr.com

- **Lawrence Byrne**
  larry.byrne@linklaters.com

- **Patrick J. Coughlin**
  patc@csgrr.com

- **Jonathan Watson Cuneo**
  jonc@cuneolaw.com

- **Matthew John Herrington**
  mherrington@steptoe.com

- **Christopher Talbott Lutz**
  clutz@steptoe.com

- **William Bradford Reynolds**
  ReynoldsW@howrey.com

- **Mark Solomon**
  marks@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re BAE SYSTEMS PLC DERIVATIVE LITIGATION | ) ) ) | Civil No. 1:07-cv-01646 |
| | ) | Assigned to: Judge Rosemary M. Collyer |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |

DECLARATION OF MARY K. BLASY IN SUPPORT OF PLAINTIFF'S MOTION FOR
EXPEDITED DISCOVERY LIMITED TO PERSONAL JURISDICTION

I, MARY K. BLASY, declare as follows:

1.      I am counsel for plaintiff in this action and am fully familiar with the matters set forth in this Declaration.  I have been admitted *pro hac vice* in this action.  I make this Declaration in support of Plaintiff's Motion for Expedited Discovery Limited to Personal Jurisdiction.

2.      I have been actively involved in the prosecution of this litigation and am familiar with the proceedings herein.  Following the January 31, 2008 filing of a motion to dismiss, challenging, *inter alia*, the Court's personal jurisdiction over BAE Systems plc ("BAE") and certain BAE executive defendants (collectively "Movants"), private investigators from L.R. Hodges & Associates, Ltd. ("LRH&A") commenced a preliminarily investigation of the Movants' U.S. contacts.  I have reviewed the accompanying memoranda in support of Plaintiff's Motion to Strike Declarations Submitted in Support Of Challenges to Personal Jurisdiction or, in the Alternative, for Expedited Discovery on Personal Jurisdiction.  Based on my review of the investigative work completed, and other research, the factual matters set forth and the assertions made therein and herein concerning BAE's and certain defendants' contacts with the United States are true and correct to the best of my knowledge, information and belief.

3.      Plaintiff's investigation of Movants' United States contacts for opposing the motion to dismiss is still ongoing.  For purposes of this motion, the following highlights our factual findings concerning certain Movants' United States contacts are relevant, all of which derive from publicly-available sources:

| Movant | United States Contacts |
|---|---|
| BAE, Sir Richard Evans, Michael Turner, Christopher Geoghegan, Mark Ronald, Steven Mogford, George Rose, Michael Lester, Sir Robin Biggam, Susan Birley, Keith Brown, Ulrich Cartellieri, Lord Alexander Hesketh, Sir Peter Mason, | • Signed (or authorized the signing on its/his/her behalf) BAE's Form F6-EF Registration Statement registering BAE's ADSs with the U.S. Securities and Exchange Commission ("SEC") for resale in the U.S. "*pursuant to the requirements of the Securities Act of 1933 . . . on May 1, 2003*." *See* Ex. V. The attached ADR agreement |

| Movant | United States Contacts |
|---|---|
| Michael Portillo and Paolo Scaroni | expressly provides that the "Deposit Agreement and this ADR (which includes the provisions set forth on the reverse hereof) ***shall be governed by and construed in accordance with the laws of the State of New York***"; BAE promised to provide "reports and documents ***required*** *by* . . . under Rule 12g3-2(b) ***under the Securities Exchange Act of 1934***"; and these movants attached a legal opinion providing that the "ADSs covered by the Registration Statement, when issued in accordance with the terms of the Deposit Agreement, w[ould], when sold, be ***legally issued*** *"* under "*the Federal laws of the United States and the laws of the State of New York*." *Id.*  This was significant as in May 2002, BAE abolished its 49.5% "Total foreign shareholding limit," purportedly signaling its desire to encourage foreign investment, including that from the U.S.  *See* Ex. W. |
| Sue Birley | • Previously served as an adjunct professor with the University of Notre Dame in South Bend Indiana. |
| Ulrich Cartellieri | • Served as an International Advisory Committee Member of the Federal Reserve Bank of New York. |
| Sir Richard Evans | • Routinely stayed at Prince Bandar's D.C. compound while serving as BAE's Chief Executive Officer when conducting business on behalf of BAE in the District of Columbia. |
| Christopher Geoghegan | • Served in various senior executive positions at BAE and certain of its operating subsidiaries from 1976 until 2007, overseeing significant U.S. operations, including operations in Virginia, California and Georgia.  Is currently serving as chairman of the board of Hampson Industries plc which has numerous operating subsidiaries in the U.S., including in Texas, Pennsylvania, California and Washington state. |

| Movant | United States Contacts |
|---|---|
| Michael Hartnall | • From May 1992 to May 2003, served in a variety of high level executive positions at Rexam, one of the world's leading consumer packaging and beverage can manufacturers. Rexam has significant U.S. operations in Illinois, Indiana, New York, Wisconsin, Missouri, Connecticut, Kentucky and North Carolina. |
| Walt Haverstein | • Currently serves as Chief Operating Officer BAE plc (and President and CEO BAE Systems Inc.), which derives more than 50% of its revenues from the U.S., is at least 40% owned by U.S. investors, and operates in the U.S. pursuant to a Special Security Agreement with the U.S. DOD. |
| Andrew Inglis | • Has a U.S. Social Security Card issued in Alaska in 1994;<br><br>• Is presently employed by BP plc in Texas as managing director of the BP group and CEO of its Exploration and Production group;<br><br>• Has owned real property and worked for BP in Alaska and Texas;<br><br>• Currently owns a home and three vehicles in Texas;<br><br>• ***Resides with his wife and children in Texas according to a recent interview published in BP Magazine in 2007 which expressly states Inglis is "living in Houston" and refers to him as "devoted family man" who spends "roughly a third of his time . . . with his family in the US."*** *See* Ex. X; and<br><br>• Owns a second home (ski home) in Steamboat Springs, Colorado. |
| Ian King | • Is the BAE executive in charge of the Al Yamamah arms contract with Saudi Arabia.<br><br>• Currently serves as Chief Operating Officer, UK/ROW of BAE which derives more than 50% of its revenues from the U.S., is at least |

| Movant | United States Contacts |
|---|---|
| | 40% owned by U.S. investors, and operates in the U.S. pursuant to a Special Security Agreement with the U.S. DOD.<br><br>• Also serves as managing director of Rotork plc which has significant U.S. operations based out of Rochester, New York. Previously served as a senior executive with Thales Underwater Systems Oversees Limited, Aerosystems International Limited, Selex Sensors and Airborne Systems Infrared Limited, and MBDA UAE Limited, all of which have significant U.S. operations, including in Washington state, California, Arizona, Colorado, Kansas, Oklahoma, Florida, Pennsylvania, New Jersey, Maryland, Virginia, and Georgia. |
| Sir Peter Mason | • Was **chief executive in charge of North America** at AMEC plc from 1996-9/06. During that time period, AMEC was asked to **help clear Ground Zero in New York and rebuild the Pentagon in the wake of September 11**, and has a $800+ million environmental clean-up contract with the U.S. military, among numerous other projects in the U.S. While at AMEC, was a **member of the americas advisory board**, a group established in 2001 purportedly to "make friends, influence people and win work in the Americas." Members' strengths are described to include "US Government and particularly Washington connections." Also during AMEC tenure: the company partnered with Fluor and won two of the major "Phase Two" reconstruction deals in Iraq, funded by an $36+ billion budget approved by U.S. Congress. |
| Steve Mogford | • Currently serves as Chief Operating Officer of BAE Systems – Information Warfare located in New Hampshire. |
| Richard L. Olver | • Has a U.S. Social Security Card issued in California in 1980;<br><br>• Attended the University of Virginia Business |

- 4 -

| Movant | United States Contacts |
|--------|------------------------|
| | School in Charlottesville, Virginia in the 1980s; |
| | • Lived and resided in Houston, Texas from at least 1993 until 2001; |
| | • Reportedly lived in New York and San Francisco at various times; |
| | • Served as a senior BP plc executive in charge of various of its U.S. operations, including serving as chief executive of BP Exploration, USA, vice president of BP Pipelines, Inc. and BP North America, and led the strategic team to formed by BP to acquire Standard Oil; |
| | • Currently serves as Chairman of BAE where he often speaks on BAE's behalf in the U.S., including a July 12, 2005 speech in the District of Columbia entitled "Partnership and Security: Advancing the US/UK Defense Technology Relationship in the Era of Globilization"; |
| | • Serves as a director of Reuters, a global information company listed on the NASDAQ with operations in Washington D.C., Georgia, Illinois, New Jersey, New York, Ohio, Pennsylvania and Virginia; |
| | • Has signed various registration statements filed with the U.S. SEC used to sell shares to U.S. shareholders, including for Reuters and BP; and |
| | • Travels to the U.S. frequently for business, professional and personal reasons, including attending an event with U.S. President George Bush on 2/11/07 at Ford's Theater in Washington D.C., presenting the 2006 BAE Chairman's awards on 11/17/06 in Washington D.C. at the National Air and Space Museum, giving speeches and broadcasts though Woodrow Wilson International, attending the annual meeting of the Trilateral Commission in Washington D.C. in 4/05, and testifying before the 106th |

| Movant | United States Contacts |
|---|---|
| | Congress (1999-2000) Committee on Energy and Natural Resources Meeting concerning the proposed BP Amoco/Atlantic Richfield Company merger. |
| Michael Portillo | • While serving in the British Parliament and English Government in numerous capacities including Secretary of Defense (1995-1997), met often in the U.S. (often in Washington DC) with U.S. heads of state including Colin Powell, Madeleine Albright, Newt Gingrich, Warren Christopher, and Christopher S. Perry (former Secretary of Defense).<br><br>• Is currently employed by Kerr McGee, a U.S.-based company;<br><br>• Has signed documents registered with the SEC in his capacity as director; and<br><br>• Has published various articles in the *New York Times* and *Washington Post*, and hosts various radio and televisions shoes on the *BBC* to an international audience. |
| Roberto Quarta | • ***Is a naturalized U.S. citizen who served in the U.S. Army for 6 years***;<br><br>• ***Maintains an office in New York, New York***;<br><br>• Has a U.S. Social Security Card issued in Massachusetts in the mid 1960's;<br><br>• Attended College of the Holy Cross in Massachusetts (receiving a Bachelor of Arts Degree) in 1971 where he currently serves on their Board of Trustees;<br><br>• Has owned and resided in various homes in Massachusetts and New Hampshire between 1971 and 2007;<br><br>• Currently owns homes in Massachusetts and Florida;<br><br>• Has held various executive positions at U.S. companies or companies with significant U.S. |

| Movant | United States Contacts |
|--------|------------------------|
| | operations, including those in Alabama, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Tennessee, Texas, Virginia, and Washington state, and Wyoming. |
| George Rose | • Currently serves as Group Finance Director for BAE, which derives more than 50% of its revenues from the U.S., is at least 40% owned by U.S. investors, and operates in the U.S. pursuant to a Special Security Agreement with the U.S. DOD, and as a director of BAE Systems Inc., its U.S. operating subsidiary. |
| Sir Anthony Nigel Russell Rudd | • Currently serves as chairman of the board of Pendragon plc whose North American locations throughout Southern California operate franchises for Jaguar, Land Rover, Aston Martin and Saab.<br><br>• Currently serves as a director at Sappi Limited, the leading manufacturer of coated fine paper in the U.S., headquartered in Massachusetts with operations in Maine, Michigan, Minnesota, Pennsylvania, California, Georgia, Illinois, Ohio, Massachusetts and New York; and<br><br>• Currently serves as deputy chairman of Barclays plc which has operations in New York, Oregon, California, Washington D.C., Massachusetts, Illinois, Florida, California and New Jersey and was the fifth largest issuer of U.S. investment grade corporate debt in 2005. |
| Michael J. Turner | • Currently serves as CEO of BAE, which derives more than 50% of its revenues from the U.S., is at least 40% owned by U.S. investors, and operates in the U.S. pursuant to a Special Security Agreement with the U.S. DOD, and as a director of BAE Systems Inc, |

| Movant | United States Contacts |
|--------|------------------------|
|        | its U.S. operating subsidiary; <br><br><br> • Was the 2005 AIAA Defense Conference host held at the Ronald Reagan Building and International Trade Center in Washington, D.C.; <br><br> • Is affiliated with several other businesses with significant U.S. contacts including Lazard Group, Babcock International, Peninsular & Oriental Steam Navigation Company, Commercial Aerospace Services Company, British Aerospace and Airbus. |

4.    Attached to this Declaration as Exhibit A is a true and correct copy of a printout obtained from BAE's website (http://baesystems.com/AboutUs/CompanyStructure/index.htm) on March 8, 2008, which displays BAE's global operations, including those in the "United States."

5.    Attached to this Declaration as Exhibit B is a true and correct copy of a printout obtained from BAE's website (http://baesystems.com/WorldwideLocations/UnitedStates/ ) on March 8, 2008, describing BAE's "LOCATIONS IN THE UNITED STATES," including in "Washington, DC."

6.    Attached to this Declaration as Exhibit C is a true and correct copy of a printout obtained from (http://maps.google.com) on March 8, 2008, calculating the distance between BAE USA's Rockville Maryland headquarters and this Court.

7.    Attached to this Declaration as Exhibit D is a true and correct copy of a printout obtained from BAE's website (http://www.baesystems.com/WorldwideLocations/ UnitedStates/Locations/WashingtonDC) on March 8, 2008, picturing and giving directions to its "Washington, DC facility."

8.      Attached to this Declaration as Exhibit E is a true and correct copy of the *In re BP P.L.C. Derivative Litigation*, No. 3AN-06-11929CI, Order Denying Motion to Dismiss (Alaska Super. Ct. May 17, 2007).

9.      Attached to this Declaration as Exhibit F is a true and correct copy of a printout of the U.S. "Department of Defense 101" obtained from the U.S. Department of Defense's website (http://www.defenselink.mil/pubs/dod101/dod101) on March 8, 2008, describing the DOD's operating infrastructure.

10.     Attached to this Declaration as Exhibit G is a true and correct copy of a printout describing the U.S. Department of Homeland Security's Washington D.C. headquarters obtained from that agency's website (http://www.dhs.gov) on March 8, 2008.

11.     Attached to this Declaration as Exhibit H is a true and correct copy of a printout obtained from the employment section on BAE's website (http://www.baesystems.com/Careers/ CareersinYourCountry/US/index.htm) on March 5, 2008, describing employment with BAE in the United States.

12.     Attached to this Declaration as Exhibit I is a true and correct copy of a printout obtained from the employment section on BAE's website (http://www.baesystems.com/Careers/ CareersinYourCountry/US/index.htm) on March 5, 2008, listing job openings with BAE at its Washington D.C. facility.

13.     Attached to this Declaration as Exhibit J is a true and correct copy of a statement issued by Prince Bandar Bin Sultan as published on the *Guardian* website on June 8, 2007.

14.     Attached to this Declaration as Exhibit K is a true and correct copy of a printout obtained from BAE's website (http://www.baesystems.com/WorldwideLocations/UnitedStates/ AboutBAESystemsUnited) on January 25, 2008, describing its Special Security Agreement with the U.S. DOD.

15.     Attached to this Declaration as Exhibit L is a true and correct copy of page eight of BAE's 2006 Annual Review obtained from Thompson Financial (http://thompson.com) on January 28, 2008.

16.     Attached to this Declaration as Exhibit M is a true and correct copy of the *London Times*, "Milestone for BAE as its trade with America outstrips MoD business," August 10, 2007, David Robertson obtained, from the *Times* website (http://timesonline.co.uk) on January 26, 2008.

17.     Attached to this Declaration as Exhibit N is a true and correct copy of the BAE Systems, Incorporated Corporate Overview obtained from BAE's website (http://www.baesystems.com) on January 28, 2008.

18.     Attached to this Declaration as Exhibit O is a true and correct copy of the *Lexington Herald's* "Slashing of McConnell earmarks demanded," November 2, 2007, John Cheves obtained, from LEXIS on January 28, 2008.

19.     Attached to this Declaration as Exhibit P is a true and correct copy of *Time*'s "The Case of the Well-Placed Prince," June 29, 2007, Adam Zagorin, obtained from the *Time* website (http://www.time.com) on November 12, 2007.

20.     Attached to this Declaration as Exhibits Q-T are Plaintiffs' First Set of Interrogatories and First Request for Production of Documents to All Defendants Contesting Personal Jurisdiction Concerning Jurisdictional Issues.

21.     Attached to this Declaration as Exhibit U is the Joint Stipulation And [Proposed] Order Providing For Limited Expedited Personal Jurisdiction Discovery plaintiff recently proposed to counsel for Movants, and a copy of the February 20, 2008 letter which accompanied it when sent to counsel for Movants.

22.     Attached to this Declaration as Exhibit V is a true and correct copy of BAE's Form F-6EF Registration Statement registering BAE's ADR's with the U.S. Securities and Exchange

Commission for resale in the U.S. pursuant to the Securities Act of 1933 on May 1, 2003, obtained

from the U.S. Securities and Exchange Commission's website (www.sec.gov) on February 25, 2008.

23.    Attached to this Declaration as Exhibit W is a true and correct copy of the "Foreign

Shareholding" history obtained from BAE's website (www.baesystems.com) on February 25, 2008.

24.    Attached to this Declaration as Exhibit X is a true and correct copy of "An interview

with Andy Inglis, Chief Executive of BP Exploration and Production," obtained from BP plc's

website (www.bp.com) on February 25, 2008.

25.    Counsel for plaintiff has made a good faith effort to meet & confer with counsel for

Movants to obtain the limited jurisdictional discovery sought by this motion.  Defendants first

moved to dismiss arguing this Court lacks personal jurisdiction over them on January 31, 2008 (Sue

Birley later joined the motion on February 15, 2008).  Defendants did not meet and confer pursuant

to Local Rule 7.1 before filing this or any other motions to dismiss.

26.    Each Movant seeking dismissal for lack of personal jurisdiction attached a declaration

which, as to the individual executive defendants, states their current/former status with BAE,

purports to define their "citizenship," states where they reside and what their current employment

status is.  The Declaration of David Parkes submitted on behalf of BAE purports to address factors

relevant to the Court's analysis of whether BAE USA's relationship with BAE plc subjects the

former to this Court's personal jurisdiction.  After conducting an expedited investigation of publicly-

available materials challenging the veracity (and completeness) of these declarations, on February

20, 2008, my firm sent by facsimile a letter to Linklaters, counsel for BAE and the individual BAE

defendants, requesting that Movants stipulate to respond to expedited discovery limited to personal

jurisdiction.  *See* Ex. U.  The letter attached the proposed stipulation and the proposed discovery,

copies of which are all attached hereto marked Exhibits Q-U.  Due to timing concerns, the letter

requested that counsel for Movants immediately advise counsel for plaintiff of their "(i). . . clients'

willingness to engage in expedited discovery limited to personal jurisdiction; and (ii) [their] clients'
willingness to comply with the deadlines outlined in the proposed stipulation," deferring for one
week "the scope of the discovery, the form of production and the specific deposition timing issues."
*See* Ex. U.

27.     Counsel for Movants was not available to discuss the request for expedited discovery
until Tuesday, February 26, 2008, at which time they indicated they would still need to confer with
their clients.  Lawrence Byrne of Linklaters telephoned Mark Solomon of my firm on Wednesday,
February 27, 2008, to advise that neither BAE nor the individual BAE executives would submit to
any personal jurisdiction discovery.  This was confirmed to Mr. Solomon and myself in an additional
telephone call with Mr. Byrne on Thursday, February 28, 2008.  Counsel for plaintiff and BAE and
the BAE defendants met and conferred regarding extending the due date on plaintiff's oppositions to
motions to dismiss on March 12, 2008 and are attempting to negotiate a stipulated extension of
plaintiff's response dates.

28.     As the individual BAE executive defendants' declarations submitted in support of
their motions to dismiss for lack of personal jurisdiction provide no information as to the nature,
quality or quantity of their contacts with the District of Columbia, their knowledge of, or
indifference to, the payment of bribes to Bandar in the District of Columbia or their involvement
with or knowledge of other's involvement with those payments, plaintiff requires responses to, the
proposed written discovery followed up by four-hour depositions of each individual BAE executive
defendant in order to permit the Court to rule on these motions to dismiss on a complete record.
Additionally, as David Parkes' Declaration on behalf of BAE is similarly flawed in that it makes a
series of unsupported conclusions concerning BAE USA's relationship with BAE plc, and provides
little or no relevant information concerning BP plc's own contacts with the District of Columbia, its
executives' involvement with or knowledge of other defendants' involvement with those payments,

plaintiff requires responses to the proposed written discovery followed up by four-hour depositions of David Parkes (or the person most knowledgeable concerning BAE's responses to the written discovery) in order to permit the Court to rule on BAE's motion to dismiss on a complete record.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 12th day of March, 2008, at San Diego, California.

s/ MARY K. BLASY
MARY K. BLASY

S:\CasesSD\BAE Derivative\DEC00049522.doc

CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 12, 2008.

s/ MARY K. BLASY
MARY K. BLASY

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  maryb@csgrr.com

# Mailing Information for a Case 1:07-cv-01646-RMC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roger M. Adelman**
  radelman@erols.com,lisamp@csgrr.com,tlatimer@csgrr.com,e_file_sd@csgrr.com

- **Mary K. Blasy**
  maryb@csgrr.com

- **Lawrence Byrne**
  larry.byrne@linklaters.com

- **Patrick J. Coughlin**
  patc@csgrr.com

- **Jonathan Watson Cuneo**
  jonc@cuneolaw.com

- **Matthew John Herrington**
  mherrington@steptoe.com

- **Christopher Talbott Lutz**
  clutz@steptoe.com

- **William Bradford Reynolds**
  ReynoldsW@howrey.com

- **Mark Solomon**
  marks@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

# EXHIBIT A



# EXHIBIT B

**BAE SYSTEMS**

# BAE Systems in the United States



**BAE Systems, Inc., the U.S. subsidiary of BAE Systems plc, is headquartered in Rockville, Maryland, and is responsible for developing BAE Systems' trans-Atlantic business, relationships with the U.S. Government, administration of BAE Systems' Special Security Agreement, and managing its U.S. based operating groups.**

More about BAE Systems in the United States

## LOCATIONS IN THE UNITED STATES

Washington, DC                      Go

## LATEST NEWS

BAE Systems Agrees to Sell Flight Systems Business
5 Mar

BAE Systems Receives Two Follow-On Orders Worth $15.5 Million for MOLLE Componen
5 Mar

BAE Systems Appoints Storme Street as Director of Government Relations
4 Mar



### U.S. Careers
Explore a Career with BAE Systems in the U.S.



### AUSA Winter Symposium
**February 27-29, 2008**
BAE Systems will be exhibiting at Booth 2411 at the AUSA Winter Symposium in Fort Lauderdale, Florida

## BUSINESSES IN THE UNITED STATES

Network Systems

Land & Armaments

Customer Solutions

BAE Systems Products Group

Electronics & Integrated Solutions

## WORLDWIDE LOCATIONS

Select country   Go



### Preliminary Results for 2007
**February 21, 2008**

Copyright © 2006 - 2008 BAE Systems. All rights reserved

EXHIBIT C



Start **1601 Research Blvd**
**Rockville, MD 20850**
End **US District Court**
**333 Constitution Ave NW # 6822,**
**Washington, DC 20001**
Travel **25.4 mi – about 36 mins, up to 45 mins**
**in traffic**



 **1601 Research Blvd**
**Rockville, MD 20850**

Case 1:07-cv-01646-RMC     Document 66-5     Filed 03/12/2008     Page 3 of 3

| | | |
|---|---|---|
| **11.** | Take the exit onto **I-395 N** toward **Washington** | 2.7 mi |
| | Entering District of Columbia | 4 mins |
| **12.** | Take the exit toward **US Capitol** | 0.2 mi |
| ← **13.** | Keep **left** at the fork, follow signs for **D St NW** | 0.1 mi |
| ← **14.** | Turn **left** at **D St NW** | 427 ft |
| ← **15.** | Turn **left** at **3rd St NW** | 0.2 mi |
| | | 1 min |
| → **16.** | Turn **right** at **Constitution Ave NW** | 105 ft |



**US District Court**
**333 Constitution Ave NW # 6822, Washington, DC 20001**

These directions are for planning purposes only. You may find that construction projects, traffic, or other events may cause road conditions to differ from the map results.

Map data ©2008 NAVTEQ™, Sanborn

# EXHIBIT D

**BAE SYSTEMS**

# E&IS – WASHINGTON, DC

## ADDRESS

1250 24th Street, NW
Suite 850
Washington
DC
20037
USA
    +1 202-223-8808
    +1 202-223-1377



**Washington, DC facility**

**RELATED INFORMATION**

**Related links**

Sensor Systems

## DIRECTIONS

### FROM RONALD REAGAN WASHINGTON NATIONAL AIRPORT (DCA) – (5 MILES):

Start out going north on ramp. Merge onto George Washington Memorial Pkwy N (crossing into District of Columbia). Take the exit on the left toward US-50 W / Memorial Bridge / Arlington Cemetery. Keep right at the fork to continue on Arlington Memorial Bridge. Take the ramp toward Rock Creek Pkwy / Kennedy Center. Turn slight right onto Ohio Dr SW. Take the E-Street ramp toward Roosevelt Bridge / Whitehurst Fwy. Stay straight to go onto Potomac River Fwy N. Take the Whitehurst Frwy ramp. Turn left onto 24th Street NW.

### FROM DULLES INTERNATIONAL AIRPORT (IAD) – (27 MILES):

Take Dulles Airport Access Road. Dulles Airport Access Road becomes VA-267 E. VA-267 E becomes I-66 E (crossing into District of Columbia). Take the E Street exit on the left toward I-66 E. Take the ramp toward Whitehurst Freeway / Kennedy Center. Turn slight right onto Potomac River Fwy N. Take the Whitehurst Frwy ramp. Take the ramp toward Pennsylvania Avenue. Turn slight right onto L Street NW. Turn left onto 24th Street NW.

Copyright © 2006 - 2008 BAE Systems. All rights reserved

EXHIBIT E

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

|  |  |  |
|---|---|---|
| In re BP P.L.C. DERIVATIVE LITIGATION | ) ) ) ) ) | MAY 1 8 2007 |
|  | | Lead Case No.  3AN-06-11929CI |

### ORDER DENYING MOTION TO DISMISS

Defendants have moved to dismiss the Complaint for three reasons:  1) failure to state a valid derivative claim under English law; 2) lack of jurisdiction over the Defendants based upon personal jurisdiction, general jurisdiction and specific jurisdiction; and 3) *forum non conveniens*.  Plaintiffs argue: 1) English law on derivative actions is in a state of transition which will set aside the common law and allow derivative actions as of October 2007; 2) Defendants have waived challenges to jurisdiction and *forum non conveniens* based upon their conduct in this litigation; 3) British Petroleum p.l.c.'s (BP or Company) conduct and the conduct of its subsidiary, British Petroleum Exploration (Alaska) Inc. (BPXA) in Alaska establishes jurisdiction; 4) Alaska statutes concerning corporations doing business in Alaska should apply to British Petroleum; and 5) conflict of laws principles mandate the application of Alaska law to this case.

**Summary of Facts**:

This is a stockholder derivative action on behalf of BP against the BP Board of Directors (Board), several of its present or former officers and directors, and officers and directors of US subsidiaries of BP.  Many of the individual Defendants and BP assert they are citizens of countries other than the US or states other than Alaska.  Plaintiffs are stockholders of BP, including retirement/pension funds and individuals.  Three Plaintiffs assert they are residents of Alaska.  Plaintiffs allege intentional, reckless and/or negligent breaches of fiduciary duties of care and candor by Defendants caused BP and

three of its US subsidiaries to violate: 1) environmental protection regulations and laws; 2) worker and workplace safety regulations and laws; and 3) fair and honest trade practices regulations and laws. The United States subsidiaries involved in the action are BP America, Inc., The Standard Oil Company, and BPXA.

Plaintiffs assert: BP is the largest non-US based company listed on the New York Stock Exchange and the largest oil and gas producer in the US. BP is the second-largest liquids pipeline company in the US, operating about 10,000 miles of pipeline. BP is the second largest refiner, fuels marketer, and gasoline marketer in the US. BP commenced its operations at Prudhoe Bay on Alaska's North Slope in 1969 as part-owner, and sole operator, of the largest oil field in the US. The Company employs about 34,000 people in the US, and has offices in Alaska as well as across the country. The Company's operations in the US, including extensive ones in Alaska, are its most substantial anywhere in the world.

Plaintiffs allege that Defendants, in an effort to distance BP from the practices and image of other oil companies, undertook a massive campaign, targeted at shareholders and the public, to portray the Company under their leadership as one that is progressive, ethical, environmentally sensitive, focused on safety and aware of the impact its operations have on both its own workers and the communities in which it operates. Plaintiffs allege Defendants also stressed that BP was achieving substantial profits due to the skillful management of the Company by the Board. Plaintiffs state that the reality differed from those representations. Defendants allegedly permitted, or even encouraged, improper and illegal activities targeted at cutting costs, boosting revenues, and inflating the results reported from the Company's operations. These practices were especially prevalent in BP's North American operations and resulted 1) in a reduction (or elimination) of expenditures on plant and equipment maintenance for both refineries and pipelines; 2) in a decrease of mandatory inspections; and 3) in unfair and illegal trade practices, which included price manipulation of propane, unleaded gas, and crude oil.

BP's operating costs decreased and its revenues increased. Plaintiffs allege these short term financial successes came at the price of the long-term interest held by BP's true owners, the Company's shareholders. Defendants' actions, seen by Plaintiffs as imprudent, reckless, negligent and illegal, allegedly created dangerous conditions for BP employees, damaged the Company's reputation and undermined its financial stability.

Plaintiffs assert Defendants gave precedent to their own short-term financial gains and breached their fiduciary duties to the Company and its shareholders and committed corporate waste. Plaintiffs allege those management practices resulted in the 2006 crude oil leak at the Prudhoe Bay oil field. Plaintiffs assert the leak was caused by inadequate pipeline maintenance, decreased inspections, inadequate worker training and a lack of emergency response plans.

Plaintiffs state that Defendants' "grossly negligent – if not intentional – failure" to perform their fiduciary duties to the Company and its assets have exposed BP to hundreds of millions of dollars in damages, remedial costs and loss of corporate image and reputation. Plaintiffs allege Defendants have failed to properly react to "warnings" about the inadequate operational aspects of BP, including a federal investigation and criminal prosecution against BPXA in 1997 – 1999 for operations at Endicott Island.

**Relief Requested in Complaint**

Plaintiffs ask the Court to award money damages against all Defendants; to direct all Defendants to account for all damages caused; for all profits, special benefits, and unjust enrichment given to the Board to be placed in a constructive trust; to direct BP to reform and improve its corporate governance and internal control procedures to comply with the Sarbanes-Oxley Act of 2002[1]; and to award punitive damages.

---

[1] "The Act mandated a number of reforms to enhance corporate responsibility, enhance financial disclosures and combat corporate and accounting fraud, and created the "Public Company Accounting Oversight Board" to oversee the activities of the auditing profession." http://www.sec.gov/about/laws.shtml

**Procedural Status**

Plaintiffs filed their Amended Complaint on 10/09/2006 and sought to remove the case to US federal court on October 24, 2006. All Defendants filed notices of consent to removal from state court. Several motions were filed in the federal court before the parties stipulated to return the case to state court on 12/11/2006. Defendants' counsel filed to appear *pro hac vice* in state court. On 12/18/06 Defendants filed a Motion to Disqualify Plaintiffs' counsel. That motion was argued on April 9, 2007. This motion was filed by Defendants on February 13, 2007. This motion was argued on April 24, 2007.

**Arguments of Parties in This Motion**

**Defendants**

Defendants argue that the Complaint should be dismissed for three independent reasons.

1. It fails to state a valid derivative claim under English law, which should govern this case under choice of law principles, because BP is incorporated under the law of England and Wales. English law generally does not allow for shareholder derivative claims on behalf of companies and their subsidiaries in instances where the alleged wrongdoing could be ratified by a majority of shareholders. Defendants argue that shareholders could ratify breaches of fiduciary duty and that the limited exceptions provided for by English law do not apply to the case before the Court. Defendants also state that English law does not allow for "double derivative claims," in which shareholders of the parent company bring derivative actions on behalf of its subsidiaries, or the boards or managers of those subsidiaries.

2. This Court lacks: a) personal jurisdiction over BP, because the company is headquartered in London; b) general jurisdiction over former and current BP directors because not one of them is an Alaska domiciliary, and none has engaged in substantial activities in the state; c) general jurisdiction over all but four Defendants who are directors and officers of BP

subsidiaries, as they are not Alaska domiciliaries and have not engaged in substantial activities in the state; and d) specific jurisdiction over Defendants because Plaintiffs do not allege any contacts between Defendants and Alaska which are the basis for this action. Defendants argue that the alleged conduct which led to this action took place in London (in BP's case) and in Illinois (in the subsidiaries' case).

3. The doctrine of *forum non conveniens* warrants dismissal. Defendants argue that the courts of England represent an adequate forum for the resolution of this case; the case is governed by English law; England has the greatest interest in the action because it involves alleged breaches of duty of the Board of an English company; and the convenience of the parties and witnesses would be best served if the action could be litigated in the English forum.

4. In their Reply, Defendants assert the State of Alaska has no interest in the real crux of this case – whether or not the Board breached its duties to BP and whether or not BP will recover for those breaches.

**Plaintiffs**

Plaintiffs argue that the Complaint should not be dismissed for the following reasons:

1. All Defendants, based on their litigation conduct prior to filing this motion, have waived and forfeited any challenges to jurisdiction, venue, and *forum non conveniens*. Plaintiffs argue that this conduct included removing the action to federal court, remanding the action, and asking the Court to disqualify Plaintiffs' counsel.

2. BP is subject to this Court's jurisdiction because it owns 100% of its US subsidiaries, including its Alaska operations; the substantial misconduct alleged in the Complaint was directed at Alaska; and the significant economic and non-economic damage that BP suffered occurred in Alaska (and the Lower 48).

3. The domicile of one of the individual Defendants is Alaska.

4. Defendants have not met their burden of proving that Alaska constitutes a *forum non conveniens*. Plaintiffs argue that Defendants have not produced evidence to support the five factors required by Alaska law to balance the doctrine's considerations. Plaintiffs argue that the balance of "private" and "public" interests weigh in favor of maintaining the action in this forum because: a) the vast majority of the evidence is located in the US; b) the majority of the witnesses are in the US or have significant US contacts, making it more expensive to litigate this case in England; c) Plaintiffs' choice of forum should be respected, as it does not pose an undue hardship on Defendants; d) Defendants do not meet their burden of showing that the judgment against Defendants will be unenforceable in England; and e) the State of Alaska has a strong interest in this action, as Defendants' conduct was directed at Alaska.

5. BP's substantial activities in Alaska through its subsidiary BPXA subject BP to jurisdiction in the State. Individual Defendants' conduct directed at Alaska and their contacts with the State subject them to jurisdiction of its courts.

6. English law concerning derivative actions is not settled, nor would it necessarily bar Plaintiffs' claims. Plaintiffs argue that Defendants' argument on English derivative actions common law is academic, as the common law rule has been repealed and replaced statutorily.

7. Alaska's Corporations Code applies on its face to all corporations doing business in the State, including foreign corporations.

8. Alaska's conflict of laws principles mandate the application of Alaska law because the State has the most contacts with the issues in this case.

## Legal Analysis

### 1) Choice of Law Considerations

#### "Internal Affairs" Doctrine

Defendants urge this Court to apply the "internal affairs doctrine", which concludes that "the rights of shareholders in a foreign company, including the right to sue derivatively, are determined by the law of the place where the

company is incorporated." Batchelder v. Kawamoto, 147 F.3d 915, 920 (9th Cir.Cal.1998) (referring to Hausman v. Buckley, 299 F.2d 696, 702 (2d Cir.1962); McDermott Inc. v. Lewis, 531 A.2d 206, 214-17 (Del.1987); Levine v. Milton, 219 A.2d 145, 147 (Del.1966); cf. CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 89, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987). See also Seghers v. Thompson, 2006 WL 2807203, at *4 (S.D.N.Y.2006) (Not Reported in F.Supp.2d); In re Tyco Intern., Ltd., 340 F.Supp.2d 94 (D.N.H.2004). "The internal affairs doctrine is equally applicable to double derivative claims brought on behalf of an American subsidiary. cf. Kostolany v. Davis, 1995 WL 662683, *1-3 (Del.Ch.1995) (applying Dutch law to determine a shareholder's right to bring double derivative claims because "plaintiff is a stockholder of the Dutch parent, not of the Delaware subsidiaries")". Id.

Based on Defendants' analysis, Plaintiffs' claims must fail as English law applies to this action. Under English common law, a plaintiff cannot bring a derivative suit for wrongs done to a company when such acts or omissions are capable of ratification by the majority of the shareholders. According to English law, breaches of fiduciary duty are capable of ratification. Defendants also argue that the three exceptions to the Rule do not apply in this case. The exceptions allow a shareholder to bring a derivative action when 1) the alleged wrong is *ultra vires*; 2) the validity of the transaction depends on the approval of the majority of the shareholders; or 3) the wrongdoers, who are in voting control, have profited at the expense of the Company through self-dealing. Plaintiffs' claims against BP would not be actionable under English common law and could not be brought in an English court. Defendants assert under the "internal affairs" doctrine, the claims against BP should be dismissed. Defendants acknowledge shareholders cannot ratify *ultra vires* acts by the Board and directors but fail to explain why alleged breaches of the laws of Alaska and/or the United States would not be considered *ultra vires*.

Even accepting the argument of Defendants, the causes of action against the US subsidiaries would still stand. The right of the BP shareholders to bring action against BP's American subsidiaries would be determined by the location of those companies' incorporation. It is alleged that BP America is incorporated in

Delaware. Delaware law recognizes double-derivative actions. <u>See</u> <u>Sternberg v.</u>
<u>O'Neil</u>, 550 A.2d 1105 (Del. 1988). It is alleged that Standard Oil, a subsidiary of
BP America, is a "resident" of Illinois. Illinois also recognizes double-derivative
actions. <u>See</u> <u>Powell v. Gant,</u> 556 N.E.2d 1241 (Ill. App. 4th,1990). It is alleged
that BPXA is a "resident" of Alaska, with its principal place of business in the
State, but it is incorporated in Delaware. As noted, Delaware law allows double
derivative lawsuits. The ability to bring double-derivative actions appears to be
an issue of first impression in Alaska.

     Not all state courts follow the "internal affairs" doctrine. Actions and
recovery impossible under the law of the location of incorporation have
nonetheless been allowed using the statutes of the state where a foreign
corporation does business. Rest 2d Conf. §309. (The case summaries which
follow are from §309 section of the Restatement.) <u>Schwarz v. Artcraft Silk</u>
<u>Hosiery Mills</u>, 110 F.2d 465 (2d Cir.1940) (applying New York statute in action by
stockholder and director of Delaware corporation against its officers for
mismanagement and waste); <u>In re Burnet-Clarke, Limited</u>, 56 F.2d 744 (2d
Cir.1932) (applying New York statute in action by trustee in bankruptcy of
Maryland corporation against its directors for improper purchase by corporation
of its own stock); <u>German-American Coffee Co. v. Diehl</u>, 109 N.E. 875
(N.Y.1915) (applying New York statute in action by New Jersey corporation
against its directors for improper declaration of dividends); <u>cf.</u> <u>Saracco Tank &</u>
<u>Welding Co. v. Platz</u>, 150 P.2d 918 (Cal.Ct.App.1944) (permitting recovery by
creditor of Nevada corporation against its directors for improper distribution of
corporate assets under California statute which, however, predicated liability on
an act unauthorized by the local law of the state of incorporation). The US
Supreme Court has cited <u>German-American Coffee Co.</u> with approval to
illustrate the power of a state to regulate matters pertaining to foreign
corporations. (<u>See</u> <u>International Harvester v. Wisconsin Dep't. of Taxation</u>, 322
U.S. 435 (1944)).

### Statute Overruling English Common Law

The parties note that a recently-enacted English statute, which becomes effective on October 1, 2007, has created a new cause of action that will allow derivative claims to "be brought only in respect of a cause of action arising from an actual or proposed act or omission involving negligence, default, breach of duty or breach of trust by a director of the company." *Companies Act 2006*, Ch. 46, § 260(3) (Eng.). That statute will make the causes of action available to shareholders in England identical to those available per Alaska law. The statute was enacted on 11/8/2006. Plaintiffs filed their Consolidated Amended Complaint on 01/11/2007. Plaintiffs' causes of action would be actionable under this new statute.

The statute does not state whether it applies retroactively. However, the statutory definition of "director" encompasses "former directors." Id. Certainly one implication of that definition is that as of October 1, 2007 "former" directors can be sued for acts or omissions which occurred at some point prior to October 1, 2007 when they were at the helm of the Company.

### Alaska Law and Conflict of Laws

No contractual agreement exists in this case from which a "choice of law" clause could be ascertained. The closest thing to it is the Charter BP/BPXA/AMOCO signed with the State of Alaska in 1999. The parties agreed that the Charter was governed by the law of Alaska and that BP Amoco p.l.c. acknowledged and consented "to the jurisdiction of any state or federal court within the State of Alaska for the purposes of enforcing its commitments under section IV of this Charter."[2] It is also unclear at this point if the ADRs held by Plaintiffs contain a choice-of-law provision.[3] If they do, that choice-of-law provision may govern this issue. See Batchelder v. Kawamoto, 147 F.3d 915, (9th Cir. Cal.1998).

---

[2] *Affidavit of Mary K. Blasy,* Exhibit F, at 13, §§ B, C.

[3] "The stocks of most foreign companies that trade in the U.S. markets are traded as American Depositary Receipts (ADRs). U.S. depositary banks issue these stocks. Each ADR represents one or more shares of foreign stock or a fraction of a share."
http://www.sec.gov/answers/adrs.htm

The Alaska Corporations Code provides that a foreign corporation authorized to do business in the State enjoys the same rights and privileges as a domestic corporation, and is subject to the same duties, restrictions, penalties, and liabilities as a domestic corporation of like character. AS § 10.06.740.  The Corporations Code allows shareholder's derivative actions in Alaska:

> (a) An action may be brought in the right of a domestic or foreign corporation to procure a judgment in its favor by a holder of shares of the corporation, of voting trust of the corporation, or of a beneficial interest in the shares of the corporation.  AS § 10.06.435.

The Code applies to all corporations doing business in the State, both foreign and domestic.  The statute provides all companies notice that they may be sued derivatively in the State of Alaska.

Alaska's conflict of laws principles are consistent with and resolved under the Restatement (Second) of Conflict of Laws.  See Long v. Holland America Line Westours, Inc. 26 P.3d 430 (Alaska 2001).  The Restatement states:

> [t]he local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders, *except where*, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied." Rest 2d Confl. § 309 (emphasis added).

The principles stated in the Restatement and the applicable considerations in this case are: (a) the needs of the interstate and international systems.  Interstate and international systems must rely on corporations to be good corporate citizens.  Laws which hold corporations liable for their wrongdoing facilitate the harmonious flow of commerce; (b) the relevant policies of the forum.  The policies of Alaska favor holding Defendants accountable for their alleged acts and omissions which have an impact within the state.  Alaska policies also favor allowing Plaintiffs to sue in their chosen forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue.  While England does have an interest in policing the internal affairs of its corporations, Alaska's interest here is dominant, as it is the *situs* of the consequences of Defendants' alleged

wrongdoing. Moreover, the corporate law of England currently would not allow these actions to proceed. The legislative and public policy of England is undergoing change as reflected by the referenced statute effective in October 2007. Although that statute may apply retroactively, English courts have not had an opportunity to interpret it. Notably, Defendants argue that it is definitely not retroactive. Regardless of whether the statute is retroactive, Alaska has a significant interest in the management of BP when those  decisions detrimentally impact the nature and quality of operations in Alaska; (d) the protection of justified expectations.

The Charter signed between the State and BP indicates state courts have jurisdiction interpreting that Charter. The Corporations Code of Alaska clearly governs foreign corporations operating in Alaska. BP can hardly be surprised that Alaska law governs. BP and its subsidiaries have availed themselves of the laws of this State and could justifiably expect to be held accountable under the same laws which have allowed them to make substantial profits in this State; (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied. An Alaska state court will be able to effectively apply state law. See Rest 2d Confl. § 6.

"If the purposes sought to be achieved by a local statute or common law rule would be furthered by its application to out-of-state facts, this is a weighty reason why such application should be made." Id., Comment (e).

One of the purposes of the Alaska Corporations Code is to allow shareholders of a company, on behalf of that company, to redress alleged wrongdoing which harmed it. That purpose should be honored when considered together with the above public policy factors.

Alaska law is applicable to this cause of action.

**2) Jurisdiction**

**Personal Jurisdiction**

The Court entered a previous order indicating it would reserve ruling on personal jurisdiction for those individual Defendants who raised that issue. However, after review of the law, the Court sets aside that order and will enter a ruling on personal jurisdiction. The Defendants' declarations concerning personal jurisdiction were considered.

The Alaska long-arm statute has been interpreted broadly as an attempt by the legislature to establish jurisdiction to the maximum extent permitted by due process. See Jonz v. Garrett/Airsearch Corp., 490 P.2d 1197 (Alaska 1971); Packard v. Cessna Aircraft Co., 366 F. Supp. 966 (D. Alaska 1973). State courts have jurisdiction over a foreign corporation that "is engaged in substantial and not isolated activities in the state, whether the activities are wholly interstate, intrastate, or otherwise." AS § 09.05.015(a)(1)(D). The Alaska Supreme Court has construed the statute "as having for its purpose the providing of a local forum to residents of the state who have a grievance against a foreign corporation growing out of its business activities within the state." Northern Supply, Inc., v. Curtis-Wright Corporation, 397 P.2d 1013, 1015 (Alaska 1965).

Constitutional due process is satisfied when a nonresident defendant has minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. Jonz , 490 P.2d 1197. The 9th Circuit uses the following factors when determining the sufficiency of contacts with the forum: 1) the nonresident defendant must purposefully avail himself of the privilege of conducting business in the forum, thereby invoking the benefits and protections of its laws; 2) the claim must arise from nonresident defendant's forum-related activities; 3) the exercise of jurisdiction must be reasonable. Insurance Co. of N. Am. v. Marina Salina Cruz, 649 F.2d 1266, 1270 (9th Cir. 1981).

The quality, rather than the quantity, of contacts matters when establishing personal jurisdiction. Jonz, 490 P.2d 1197. The occurrence of an injury in Alaska allegedly caused by an act or omission by a defendant outside of Alaska is itself a contact with the State. While insufficient on its own, few additional

contacts must be shown to satisfy due process requirements. Id. The Alaska Supreme Court has upheld jurisdiction in a case involving German and Alaska legal doctrine, documents, exhibits, witnesses and counsel; where the parties were both American and German; and where the original injury and the underlying litigation occurred in the state (despite parties' claims of inconvenience and unreasonableness). Volkswagenwerk v. Klippan, 611 P.2d 498 (Alaska 1980), cert denied, 49 U.S. 974, 101 S. Ct. 385, 66 L. Ed. 2d 236 (1980).

Plaintiffs assert BP owns 100% of its US subsidiaries, including BPXA.; that BP is Alaska's 6th largest employer, the largest investor and taxpayer, the owner of 47% of the Trans-Alaska pipeline; and that BP derives 10% of its worldwide oil production from Alaska. Defendants have not contested these allegations.

Plaintiffs allege that BPXA, BP's subsidiary in Alaska, is the corporate alter ego of BP. Using the test for a corporate alter ego articulated by the Alaska Supreme Court in Jackson v. Gen. Elec., 514 P.2d 1170, 1173 (Alaska 1973), Plaintiffs argue that BP and BPXA are essentially one entity. Plaintiffs state that: 1) BP owns all or most of the capital stock of BPXA; 2) a commonality exists between the directors and officers of BP and BPXA; 3) BPXA's earnings are reflected in BP's financial reports to determine the parent company's income; 4) BPXA has no other business besides that with BP, the parent Corporation, and has no assets except for those conveyed to it by BP; 5) BP characterizes BPXA internally and externally (on its website) as a division or department of BP; 6) BP uses the property of BPXA as its own; and 7) the management of BPXA does not act independently, but takes its orders from the BP Board. The Charter BP signed with Alaska further ties the parent Company to BPXA.

BP operates in the State pursuant to a 1999 Charter for the Development of the Alaskan North Slope. The Charter, entered into by BP, the State of Alaska, and ARCO was a condition of the merger between BP and ARCO and required the companies to make "substantial marketplace and community commitments to Alaska." Lord John Browne and Rodney Chase (for BP), Kevin Meyers (for ARCO), and Richard Campbell (for BPXA) bound the Company, and

themselves as fiduciaries, when they signed the Charter with the State.  Browne and Chase are individual Defendants in this case.

The State of Alaska could sue BP under contract theories if there was non-performance under the Charter.  BP made a number of environmental and other commitments in the Charter.  Plaintiffs allege those commitments were not met as a result of the alleged conduct of the Company and its Board and that the conduct of the Company and Board caused the injuries leading to this action.  Those commitments included North Slope spill response requirements, corrosion monitoring and cleanup of abandoned sites.  BP also guaranteed that should any of its group companies or assignees fail to fulfill the terms of the Charter, BP Amoco would "cause that performance to be otherwise fulfilled."  By consenting to assume responsibility for the acts or omissions of its subsidiaries, BP, as the parent Company, may have assumed liability for the actions of BPXA.  See, Nerox Power Systems, Inc. v. M-B Contracting Co., Inc., 54 P.3d 791, n. 42 (Alaska 2002) (quoting Jackson, 514 P.2d 1170 at 1173).  Imposition of liability on the parent is justified where "the two corporations are so closely intertwined that they do not merit treatment as separate entities."  Id.

BP America, a subsidiary of BP and a Defendant, is incorporated in Delaware.  BPXA is also incorporated in Delaware.  Corporate case law from Delaware is instructive in evaluating whether BP and its subsidiaries should be subject to Alaska courts.  A line of cases from Delaware has held that that "while the stock ownership of a Delaware subsidiary is not, without more, a sufficient contact upon which to predicate jurisdiction, that contact may be sufficient where the cause of action arises from the creation and operation of the Delaware subsidiary."  Computer People, Inc. v. Best Intern. Group, Inc., 1999 WL 288119, at *9 (Del.Ch., 1999) (Not Reported in A.2d).  The Delaware Supreme Court has held that "a foreign corporation cannot use the laws of this State to govern the operations of its subsidiary and then, in a suit relating to the operation of the subsidiary, claim that jurisdiction in Delaware offends traditional notions of fair play."  Id., n.35 (quoting Sternberg v. O'Neil, 550 A.2d 1105, 1121 (Del.1988)).  The record seems to indicate that BP created BPXA to facilitate its Alaskan operations.  The alleged acts or omissions of BP's Board, officers and directors

had an allegedly negative impact on BPXA, its operation, its profitability, and its corporate citizenship in Alaska. Allegedly those decisions or actions led to an oil spill on the North Slope. The exercise of personal jurisdiction over BP "through" its subsidiary BPXA would be proper.

BP has availed itself of the privilege of doing business in Alaska and of the protections of Alaska's laws, making it reasonable for BP to expect to be haled into court in the State. The claims which are the subject of this litigation arise out of Defendants' decision making that had forum-related impact. The directors and officers of BP and its subsidiaries are and were under fiduciary duties to the companies. The individual defendants availed themselves of the benefits of sitting on the Board or being officers of BP and its subsidiaries. They should all reasonably expect to be responsible for their decisions including the impact where those decisions are carried out. The alleged breach of their duties had an impact on BP's operations in Alaska. The injuries complained of took place in Alaska. Finally, the exercise of jurisdiction over both individual and corporate Defendants is reasonable because witnesses, documents, exhibits, and parties are located in Alaska, and nothing points to Alaska having any less of a jurisdictional claim over Defendants than England would have.

This Court's jurisdiction over Defendants does not offend "traditional notions of fair play and substantial justice". International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158 (1945).

**Waiver**

Rule 12(h) of the Alaska Rules of Civil Procedure states that a defense of lack of jurisdiction over a person and improper venue are waived if the defense was omitted in previous motion practice, despite the fact that it was then available to the party claiming lack of jurisdiction in the current motion. Alaska R.Civ.P. 12(g)-(h). The Alaska Supreme Court has ruled that Rule 12(b) "requires the defendant to plead the defense of lack of personal jurisdiction in its answer or by motion, at the peril of waiving the defense pursuant to Rule 12(h)." Morrow v. New Moon Homes, 548 P.2d 279, 294 (Alaska 1976) (overruled on other grounds).

"In addition to waiver by failure to include the defense in a responsive pleading or in a Rule 12 motion, the defense may be waived as a result of the course of conduct pursued by a party during litigation." Wright v. Interbank Capital Inc., 1999 WL 354516, at *2 (N.D.Cal). The 9th Circuit in Wright denied the defendants' motion to dismiss the action for lack of personal jurisdiction and venue and found that defendants had waived those defenses through their litigation conduct. The Court based its decision on a 1st Circuit case, which affirmed defendants' waiver of venue based on their requests for hearings on plaintiffs' motions for TROs, the filing of applications to appear *pro hac vice* and the signing of two stipulations. Id. The Wright Court emphasized that the case for waiver before it was especially strong given the defendants "sought affirmative relief from this Court," which included a motion to remove counsel. Id.

In this case Defendants removed the case to the United States District Court for the District of Alaska on 10/24/06. All individual Defendants and nominal Defendants BP America, Inc., BP and BPXA filed notices of consent to removal on or around the same date. Defendants filed multiple applications for their counsel to appear *pro hac vice* in federal court. Defendants filed a motion to disqualify counsel on 11/17/06 in the federal court. On 12/11/06, Defendants signed a stipulation to remand the action back to Alaska state court. This was followed by Defendants' applications to appear *pro hac vice* in state court. On 12/18/06, Defendants moved to disqualify Plaintiffs' counsel in state court. On 12/22/06, Defendants signed a stipulation to consolidate the pending actions (Donnelly and Unite Here). In the following months, Defendants engaged in extensive motion practice without raising the defense of lack of personal jurisdiction until their motion to dismiss, filed on 2/13/07. Defendants have waived the defense of lack of personal jurisdiction both procedurally, per Rule 12(h), and based on their litigation conduct.

Defendants' motion to dismiss the case on the basis of lack of personal jurisdiction over the parties is denied.

**3) Forum Non Conveniens**

Defendants rely on the US Supreme Court's decision in <u>Piper Aircraft Co.</u>
<u>v. Reyno</u>, 454 U.S. 235, 102 S.Ct. 252 (1981) to argue that while a degree of
deference is afforded to Plaintiffs' choice of forum, the Court must look at
whether the forum proposed by Defendants could exercise jurisdiction over
Defendants and would be adequate. While this is an accurate statement of the
law as articulated by <u>Piper Aircraft</u>, Defendants' reference is incomplete. The
text they quote goes on to state:

> In rare circumstances, however, where the remedy offered by the
> other forum is clearly unsatisfactory, the other forum may not be an
> adequate alternative, and the initial requirement may not be
> satisfied. Thus, for example, dismissal would not be appropriate
> where the alternative forum does not permit litigation of the subject
> matter of the dispute. cf. <u>Phoenix Canada Oil Co. Ltd. v. Texaco,</u>
> <u>Inc.,</u> 78 F.R.D. 445 (Del.1978) (court refuses to dismiss, where
> alternative forum is Ecuador, it is unclear whether Ecuadorian
> tribunal will hear the case, and there is no generally codified
> Ecuadorian legal remedy for the unjust enrichment and tort claims
> asserted).

<u>Piper Aircraft Co.</u>, 454 U.S. at 255, 102 S.Ct. at 265 n.22. A foreign forum
may be seen as inadequate if the remedies it provides are "so clearly inadequate
or unsatisfactory" as to afford no remedy at all. <u>Id</u>., at 254, 265.

The <u>Piper Aircraft</u> Court's reasoning is applicable to this case. An
alternative forum does exist. It is probable, but not known to a certainty, that
England could exercise jurisdiction over all Defendants. But the Court questions
whether that forum is in fact an adequate one. In their pleadings, Defendants
argue that the English courts are an adequate forum for the resolution of this
case while simultaneously asserting that this action could not be brought under
English common law, which allows for derivative suits only in extremely limited
circumstances. Defendants also argue that the pending English corporate
statutory law is not retroactive. Given the current uncertainty as to English law in
this area, English courts do not constitute an adequate forum for Plaintiffs. This
brings the issue of *forum non conveniens* back to <u>Piper Aircraft</u>, which held the
dismissal of an action in cases "where the alternative forum does not permit

litigation of the subject matter of the dispute" inappropriate. Id., at 255, 265, n.22.

The Alaska Supreme Court has ruled that the doctrine of *forum non conveniens* has "'only an extremely limited application' in cases where a plaintiff is a resident of the forum state." Baypack Fisheries, L.L.C. v. Nelbro Packing Co., 992 P.2d 1116, 1119 (Alaska 1999) (quoting Bromley v. Mitchell, 902 P.2d 797, 800 (Alaska 1995)). A court applying the doctrine "should decline to exercise its jurisdiction only if the selected forum is a seriously inconvenient place to conduct litigation." Id., at 1118. The Court also stated that "a plaintiff's choice of forum should rarely be disturbed unless the balance of private and public interests weighs strongly in favor of dismissing the case." Id., at 1119. Three of the five Plaintiffs in this action are identified as Alaska residents.

There are five factors to consider when evaluating alleged *forum non conveniens*: "the ease of proof, the availability and cost of obtaining witnesses, the possibility of harassment of the defendant in litigating in an inconvenient forum, the enforceability of the judgment, [and] the burden on the community in litigating matters not of local concern...." Id. (citing Crowson v. Sealaska Corp., 705 P.2d 905, 907-08 (Alaska 1985)). In the case at bar, the proof and the ease of obtaining it does not point to dismissal. Much of the alleged conduct occurred in Alaska (and the US) and it is likely that much of the supporting documentation will be found here. Although the BP Board is headquartered in London, modern technology will allow evidence and discovery to be transmitted electronically. The availability of witnesses does not point toward dismissal. If witnesses located outside of Alaska or the US cannot attend trial, "their depositions may be used." Id., at 1120. Defendants have sufficient contacts with Alaska to anticipate being involved in litigation in the forum. Plaintiffs assert the cost of transporting witnesses to England will be higher than the cost of transporting the English witnesses here, as more witnesses are located in the US. Regardless of the accuracy of that assertion, "[T]he operative issue is not whether considerations of efficiency and economy make a foreign forum more convenient for defendants, but whether there are factors that render litigating in this forum vexatious or

oppressive." <u>National Union Fire Ins. Co. of Pittsburgh, PA v. BP AMOCO</u> <u>P.L.C.,</u> 2003 WL 21180421, at *8 (S.D.N.Y. 2003) (Not Reported in F.Supp.2d).

Nothing has been presented to this Court to show that Plaintiffs have chosen this forum to harass Defendants or that Plaintiffs have engaged in "forum shopping". Plaintiffs' choice appears motivated by their connection to the forum, which was the *situs* of the results of Defendants' alleged misconduct. That choice is entitled to "a high degree of deference". <u>Id.</u>, at *3.

The Court has been advised there is a similar action pending in federal court in New York. Plaintiffs are not legally required to join that action. They are free to bring their independent claims for relief as long as the maintenance of the separate suits does not "render[ ] the domestic forum so oppressive and inconvenient that it merits overriding plaintiffs' choice of forum." <u>Id.</u>, at *8.

Given BP's extensive holdings in Alaska and the US, nothing will prevent the enforcement of a judgment against the corporate Defendants, should such a judgment be handed down. At least one court has held that "any judgment obtained in New York would be enforceable as easily as one obtained in London. Since BP Amoco is composed of many corporations with offices and assets located around the world, any logistical problems or opportunities involved in enforcing a judgment would be similar in either case." <u>Id.</u>, at *6. The relief sought against individual Defendants includes forfeiture of any bonuses and "unjust enrichment" received based upon their positions. To the extent those remunerations have not yet occurred, BP controls the assets and is subject to any decision of the Court, as previously noted. Lastly, the State of Alaska and its citizens have an interest in the board and officer activity of any foreign corporation when those decisions result in injury to the local environment or the local economy.

This case is not dismissed for *forum non conveniens.*

**CONCLUSION**

Defendants' Motion to Dismiss is **DENIED**.

ENTERED this 17th day of May, 2007, in Anchorage, Alaska.

_Jack W. Smith_
Jack W. Smith
Superior Court Judge

I certify that on _5/17/07_ ,
a copy of the above was mailed to each of the
following at their addresses of record: _Feldman / Trickey / Torgerson_

_Claire Sigurdsson_
CSigurdsson
Administrative Assistant

EXHIBIT F



UNITED STATES DEPARTMENT OF
# DEFENSE

Threat Advisory **ELEVATED**

SEARCH ▶

Mar. 08, 2008     War on Terror     Transformation     News Products     Press Resources     Images     Websites     Contact Us

**In the Spotlight**



Honoring WWI Survivors



Travels with Mullen



Military Women's Tradition of Service

**Secretary of Defense**

Speeches

Travels

Messages

Biography

Other Top Leaders

**Special Reports**

China Military Power Report

FY 2009 Budget Request

FY 2007 Agency Financial Report

Heroes

Why We Serve

MRAP Vehicles

Wounded Care

Archive

**Subscribe**

E-Mail

RSS

Podcasts

# DoD 101
## An Introductory Overview of the Department of Defense

**Department of Defense 101 Sections**

- How We Evolved
- 5 Million Strong
- Our Global Infrastructure
- Worldwide Presence
- In Comparison
- We Hire the Best
- We Instill Values
- Who We Work For
- How We're Organized

- Services Train and Equip
- September 11, 2001: Day of Terror
- War on Terror: The Coalition
- Homeland Security and Homeland Defense
- Our Headquarters — The Pentagon
- What We Do
- Our Most Important Resourse
- Our Bottom Line
- The Department of Defense

## Our Global Infrastructure

The national security depends on our defense installations and facilities being in the right place, at the right time, with the right qualities and capacities to protect our national resources. Those resources have never been more important as America fights terrorists who plan and carry out attacks on our facilities and our people.

The Defense Department manages an inventory of installations and facilities to keep Americans safe. The Department's physical plant is huge by any standard, consisting of more than several hundred thousand individual buildings and structures located at more than 5,000 different locations or sites. When all sites are added together, the Department of Defense utilizes over 30 million acres of land.

These sites range from the very small in size such as unoccupied sites supporting a single navigational aid that sit on less than one-half acre, to the Army's vast White Sands Missile Range in New Mexico with over 3.6 million acres, or the Navy's large complex of installations at Norfolk, Virginia with 78,722 employees. *Source:* **DMDC**

TOP

## Worldwide Presence

Department of Defense employees work in more than 163 countries. 450,925 troops and civilians are overseas both afloat and ashore. We operate in every time zone and in every climate. *Source:* **DMDC**

## In Comparison ...

In terms of people and operations, we're busier than just about all of the nation's largest private sector companies.

The Department of Defense has a budget of four hundred nineteen point three billion dollars and more than three million employees; Wal-Mart has a budget of about two hundred twenty-seven billion dollars and employs about one-point-three million people; Exxon-Mobil has a budget of two hundred billion dollars and employs almost ninety-eight thousand; the GM company budget equals one hundred eighty-one billion dollars, it has a workforce of three-hundred sixty-five thousand people; and Ford has a budget of one-hundred sixty billion dollars, and employs three-hundred fifty-four thousand, four hundred people. *Source:* **Department of Defense Budget FY2006**

TOP

## We Hire the Best

The Department of Defense mission is accomplished seeking out our nation's best and brightest. Ninety-five percent of our employees have high school diplomas versus seventy-nine percent of the national work force; five-point-six percent of our troops have masters degrees versus four-point-nine percent of the national work force.
**Source: U.S. Census Bureau website. Work Force data is based on the total population fifteen years of age and older.**

TOP

## We Instill Values

Even with top notch recruits we would not be successful if we didn't provide leadership, professional development, and technical training throughout their careers; we constantly build and reinforce core values that everyone wearing a uniform must live by: duty, integrity, ethics, honor, courage, and loyalty.  Our core values are leadership, professionalism, and technical know-how.

## Who We Work For

**The Chief Executive Officer:**

Our chief executive officer is the President of the United States.  Along with the Secretary of Defense and the National Security Council, the President determines the security needs of the nation, and then take courses of action to ensure that they are met.  The President, in the constitutional role as commander-in-chief of the armed forces, is the senior military authority in the nation and as such is ultimately responsible for the protection of the United States from all enemies, foreign and domestic.

As part of the Constitution's system of checks and balances, our budget must be approved by the U.S. Congress, which acts as our board of directors.  We accomplish this by working with various committees of both houses, primarily those dealing with funding, military operations, and intelligence. Their decisions affect our well being and range from setting civilian pay raises to funding major troop deployments.

**The Stockholders:**

If the President is our CEO, and the Congress is our Board of Directors, then our stockholders are the American people.

Our stockholders know us pretty well.  Almost everyone has had a family member or friend who either works for us now, or used to.

We exist to protect these citizen stockholders, for without their support we would be out of business.

TOP

## How We're Organized

Directions for military operations emanate from the National Command Authority, a term used to collectively describe the President and the Secretary of Defense.  The President, as commander-in-chief of the armed forces, is the ultimate authority. The Office of the Secretary of Defense carries out the Secretary's policies by tasking the military departments, the Chairman of the Joint Chiefs of Staff and the unified commands.

- The military departments train and equip the military forces.
- The Chairman plans and coordinates military deployments and operations.
- The unified commands conduct the military operations.

**Office of the Secretary of Defense**

The Office of the Secretary of Defense helps the Secretary plan, advise, and carry out the nation's security policies as directed by both the Secretary of Defense and the President.

Four key advisers work with the Secretary of Defense in critical areas of policy, finance, force readiness, and purchasing.

Basically, they manage ideas, money, people, and material.

*Source:* **Top Civilian and Military Leaders**

TOP

### Policy

Our coordinator for ideas, formulates national security and defense policy and integrates policies and plans to achieve security objectives.

### Finance

Our chief financial officer, oversees our budgetary and fiscal matters, conducts program analysis and evaluation, and oversees programs to improve general management.

### Force Readiness

Our force readiness director, or "people" person, oversees personnel management; the National Guard and Reserve; health affairs; training; and personnel requirements and management, to include equal opportunity, morale, welfare, and quality of life issues.

### Purchasing

The Purchasing Director oversees all matters relating to buying, researching, testing, producing, and moving material goods, advises on the use of new technology, protects the environment, and controls the Department's use of atomic energy.

TOP

# Services Train and Equip

We train and equip the armed forces through our three military departments: the Army, Navy and Air Force. The Marine Corps, mainly an amphibious force, is part of the Department of the Navy. The primary job of the military departments is to train and equip their personnel to perform warfighting, peacekeeping and humanitarian/disaster assistance tasks.

### Army

The Army defends the land mass of the United States, its territories, commonwealths, and possessions; it operates in more than 50 countries.
**U.S. Army Organization**

### Navy

The Navy maintains, trains, and equips combat-ready maritime forces capable of winning wars, deterring aggression, and maintaining freedom of the seas.

The U.S. Navy is America's forward deployed force and is a major deterrent to aggression around the world. Our aircraft carriers, stationed in hotspots that include the Far East, the Persian Gulf, and the Mediterranean Sea, provide a quick response to crises worldwide.

**U.S. Navy Mission**

TOP

### Air Force

The Air Force provides a rapid, flexible, and when necessary, a lethal air and space capability that can deliver forces anywhere in the world in less than forty-eight hours; it routinely participates in peacekeeping, humanitarian, and aeromedical evacuation missions, and actively patrols the skies above Iraq Bosnia. Air Force crews annually fly missions in all but five nations of the world.

U.S. Air Force History

TOP

**Marine Corps**

The U.S. Marine Corps maintains ready expeditionary forces, sea-based and integrated air-ground units for contingency and combat operations, and the means to stabilize or contain international disturbance.

U.S. Marine Corps Customs and Traditions

**Coast Guard**

The U.S. Coast Guard provides law and maritime safety enforcement, marine and environmental protection, and military naval support.

Prior to the terrorist attacks of Sept. 11, 2001, the U.S. Coast Guard was part of the Department of Transportation during peacetime and part of the Navy's force in times of war. However, since the attacks, it has become part of the Department of Homeland Security. The U.S. Coast Guard provides unique, critical maritime support, patrolling our shores, performing emergency rescue operations, containing and cleaning up oil spills, and keeping billions of dollars worth of illegal drugs from flooding American communities.

U.S. Coast Guard

**Guard & Reserve**

The National Guard and Reserve forces provide wartime military support. They are essential to humanitarian and peacekeeping operations, and are integral to the Homeland Security portion of our mission.

Our National Guard and Reserve forces are taking on new and more important roles, at home and abroad, as we transform our national military strategy. Their personal ties to local communities are the perfect fit for these emerging missions.

National Guard & Reserve

TOP

**Office of the Chairman, JCS**

An all-service, or "joint" service office supports the Chairman of the Joint Chiefs of Staff in his capacity as the principal military advisor to the President, the National Security Council, and the Secretary of Defense.

Its "board of directors" consists of the Chairman, his deputy, the Vice Chairman, and the four-star heads of the four military services.

The Chairman plans and coordinates military operations involving U.S. forces and as such is responsible for the operation of the National Military Command Center, commonly referred to as the "war room," from where all U.S. military operations are directed. He meets regularly with the four Service chiefs to resolve issues and coordinate joint service activities.

Joint Chiefs of Staff

TOP

**Unified Commanders**

The unified commanders are the direct link from the military forces to the President and the Secretary of Defense.

- Five commanders have geographical responsibilities.
- Four commanders have worldwide responsibilities.

The Secretary of Defense exercises his authority over how the military is trained and equipped through the Service secretaries; but uses a totally different method to exercise his authority to deploy troops and exercise military power. This latter authority is directed, with the advice of the Chairman of the Joint Chiefs of Staff, to the nine unified commands.

TOP

### Northern Command

Northern Command oversees the defense of the continental United States, coordinates security and military relationships with Canada and Mexico, and direct military assistance to U.S. civil authorities. For detailed information about U.S. Northern Command please visit: http://www.northcom.mil.

### European Command

The European Command covers more than 13 million square miles and includes 93 countries and territories, to include Iceland, Greenland, the Azores, more than half of the Atlantic ocean, the Caspian sea, and Russia. This territory extends from the North Cape of Norway, through the waters of the Baltic and Mediterranean seas, most of Europe, and parts of the Middle East to the Cape of Good Hope in South Africa. For detailed information about U.S. European Command please visit: http://www.eucom.mil.

TOP

### Central Command

Central Command oversees the balance of the Mid-East, parts of Africa and west Asia, and part of the Indian Ocean. For detailed information about U.S. Central Command please visit: http://www.centcom.mil.

### Southern Command

Southern Command guards U.S. interests in the southern hemisphere, including Central America, South America, and the Caribbean. For detailed information about U.S. Southern Command please visit: http://www.southcom.mil.

### Pacific Command

Pacific Command covers 50 percent of the Earth's surface including Southwest Asia, Australia, and shares with U.S. Northern Command responsibility for Alaska. For detailed information about U.S. Pacific Command please visit: http://www.pacom.mil.

TOP

### Joint Forces Command

Joint Forces Command is the "transformation laboratory" for the U.S. military, in this capacity it searches for promising alternative solutions for future operations through joint concept development and experimentation; defines enhancements to joint warfighting requirements; develops joint warfighting capabilities through joint training and solutions; and delivers joint forces and capabilities to warfighting commanders. For detailed information about U.S. Joint Forces Command please visit: http://www.jfcom.mil.

### Strategic Command

The Strategic and Space Commands merged in 2002 and is now known as the Strategic Command which is responsible for controlling space; deterring attacks on the United States and its allies, launching and operating the satellites systems that support our forces worldwide and should deterrence fail, direcing the use of our strategic forces. For detailed information about U.S. Strategic Command please visit: http://www.stratcom.mil.

TOP

### Special Operations Command

Special Operations Command provides counter-paramilitary, counter-narcotics, guerilla, psychological warfare, civil education, and insurgency capabilities in support of U.S. national and international interests. Special Operations Command is responsible for special military support. For

detailed information about U.S. Special Operations Command please visit: http://www.socom.mil/.

**Transportation Command**

The Transportation Command provide air, land, and sea transportation for the Department of Defense in times of peace and war. It moves people and property around the world. For detailed information about U.S. Transportation Command please visit: http://www.transcom.mil/.

TOP

# September 11, 2001: Day of Terror

"Today, our fellow citizens, our way of life, our very freedom came under attack in a series of deliberate and deadly terrorist acts. The victims were in airplanes, or in their offices; secretaries, businessmen and women, military and federal workers; moms and dads, friends and neighbors. Thousands of lives were suddenly ended by evil, despicable acts of terror," President George W. Bush said in his address to the nation on September 11th, 2001.

On September 11th, 2001, terrorists attacked the United States of America and the civilized world.

**Operation Enduring Freedom**

"As the men and women of America's armed forces, you are the sharp sword of freedom. You fight without pause and complaint on foreign seas and in dangerous skies," Secretary of Defense Donald H. Rumsfeld said in a message to Department of Defense Personnel on October 9th, 2001.

Secretary Rumsfeld and his team advise the President, who is Commander in Chief of the Armed Forces, in directing the war on international terrorism.

Our goals in Operation Enduring Freedom are to communicate that supporting terrorism carries a steep price; acquire intelligence; develop friendly relationships; eliminate terror operations; deny enemy access to offensive systems; and provide humanitarian relief.

On October 7, 2001, less than one month after America was attacked, the Armed Forces of the United States engaged international terrorism.

**Source: DoD News Release**

TOP

**War on Terror: The Coalition**

Citizens from more than 80 nations were killed on Sept. 11, 2001.

The United States began building the coalition on September 12, 2001, and there are currently 70 nations supporting the global war on terrorism. To date, 21 nations have deployed more than 16,000 troops to the U.S. Central Command's region of responsibility. This coalition of the willing is working hard every day to defeat terrorism, wherever it may exist.

Coalition forces have made important contributions in the war against terrorism across the spectrum of operations. Particular contributions include, but are not limited to, providing vital intelligence, personnel, equipment and assets for use on the ground, air and sea. Coalition members also have provided liaison teams, participated in planning, provided bases and granted over-flight permissions – as well as sizable contributions of humanitarian assistance.

Though there has been significant progress, the war on terror continues.

**Progress in Afghanistan**

- The Taliban regime is out of power and the al-Qaeda senior terrorist leadership is in disarray.
- Forty-nine schools are rebuilt, and thirty-thousand boys and girls back in school.
- The children of Afghanistan have held their first Little League baseball game.
- Five-hundred-thousand metric tons of food delivered, enough to feed almost seven million Afghans.

The United States and its coalition allies have removed the dictatorship of terror from Afghanistan,

where children are now free and eager to get back to school.

TOP

**Afghanistan: Moving forward**

The International Security Assistance Force (ISAF) aids in developing Afghanistan's new security structures and assists with the reconstruction effort. It also helps to train the new Afghanistan National Army.

The war on terrorism in Afghanistan and across the globe continues.

Members of the Coalition are helping the leadership in Afghanistan to assemble the ability to defend itself from terrorism and other threats to the national security.

TOP

**Operation Iraqi Freedom**

The United States and its coalition partners assist Iraq in developing a peaceful and representative government that protects the rights of all citizens.

As the central front in the global war on terror, success in Iraq is an essential element in the war against the ideology that breeds international terrorism. The ultimate victory will be achieved in stages, making steady progress in fighting terrorists and neutralizing the insurgency, meeting political milestones; building democratic institutions; standing up robust security forces to gather intelligence, destroy terrorist networks, and maintain security; and tackling key economic reforms to lay the foundation for a sound economy.

# Homeland Security and Homeland Defense

The Department of Defense contributes to homeland security through its military missions overseas, homeland defense, and support to civil authorities. Ongoing military operations abroad have reduced the terrorist threat against the United States.

Homeland defense is the protection of US sovereignty, territory, domestic population, and critical defense infrastructure against external threats and aggression, or other threats as directed by the President. The Department of Defense is responsible for homeland defense.

Homeland Defense includes missions such as domestic air defense, maritime intercept operations, land-based defense of critical infrastructure and assets, and, when directed by the President or the Secretary of Defense, the protection of US and its territory from attack. The Department recognizes that threats planned or inspired by "external" actors may materialize internally. The reference to "external threats" does not limit where or how attacks could be planned and executed. The Department is prepared to conduct homeland defense missions whenever the President, exercising his constitutional authority as Commander in Chief, authorizes military actions.

Defense support of civil authorities, often referred to as civil support, is DoD support, including Federal military forces, the Department's career civilian and contractor personnel, and DoD agency and component assets, for domestic emergencies and for designated law enforcement and other activities. The Department of Defense provides defense support of civil authorities when directed to do so by the President or Secretary of Defense.

**Office of the Assistant Secretary of Defense for Homeland Defense**
**Department of Homeland Security**

TOP

# Our Headquarters — The Pentagon

Headquarters of the Department of Defense, the Pentagon is one of the world's largest office buildings. It is twice the size of the Merchandise Mart in Chicago, and has three times the floor space of the Empire State Building in New York.

Built during the early years of World War II, it is still thought of as one of the most efficient office

buildings in the world. Despite 17.5 miles of corridors it takes only seven minutes to walk between any two points in the building.

There are five historic elements of the Pentagon that are cited for special attention:

- The five outer facades of the Pentagon.
- The Center Courtyard and surrounding facades.
- The terrace fronting the Mall Entrance.
- The terrace fronting the River Entrance.
- The Pentagon's distinctive five-sided shape.

On October 5, 1992, the Pentagon had been designated as a National Historical Landmark. This designation also automatically placed the Pentagon in the National Register of Historic Places.

The 63-year-old structure is undergoing a $1 billion, multiyear renovation. The project started in the early 1990s and involves a complete overhaul of the interior of the Defense Department headquarters.

The Pentagon renovation project is divided into five wedges. Wedge 1 was almost complete when a terrorist-hijacked commercial airliner slammed into the Pentagon on Sept. 11, 2001. The plane struck that section, so it had to be rebuilt while construction continued on Wedge 2, which was completed in December 2005.

Work on Wedge 3 should be completed in October 2007. Wedges 4 and 5 will also be renovated. The entire project is expected to be completed by December 2010.

**Sources:** AFPS article **Displaced Pentagon Workers Return After Fire**
**The Pentagon, Facts & Figures**

TOP

## What We Do

- Warfighting
- Humanitarian Aid
- Peacekeeping
- Disaster Relief
- Homeland Security

We are warfighters first and as such have no peers.

And with the same dedication and patriotism we are proud to be performing a variety of other very important missions for the American people and our allies around the world.

Whether it's saving lives, protecting property or keeping the peace, the U.S. military stands at the ready to keep America strong and free.

TOP

## Our Most Important Resource

It's not tanks, planes or ships,   it's... People

We will never compromise on the quality of our most important resource: the people who have chosen to serve you and serve the nation.

They are your sons and daughters, brothers and sisters, husbands and wives.  People of whom we are very proud.

These are the best of America.

TOP

## Our Bottom Line

• To provide the military forces needed to deter war and to protect the security of the United States.
• Everything we do supports that primary mission.
• Nothing less is acceptable to us, or to the American people.

## The Department of Defense

Thank you for spending time with us. Are there any <u>questions</u>?

<u>TOP</u>

Site Map        Privacy & Security Notice        About DoD        External Link Disclaimer        Web Policy        About DefenseLINK        FirstGov.gov

# EXHIBIT G

 Homeland Security

# Contact Us

✉ Subscribe to free e-mail updates

## Citizen Line

- Operator Number: 202-282-8000

- Comment Line: 202-282-8495

## Mailing Address
U.S. Department of Homeland Security
Washington, D.C. 20528

- Freight and Mail Delivery Instructions

## Homeland Security Components

- FEMA - Includes contacts for regional offices.

- Federal Law Enforcement Training Center

- Transportation Security Administration

- U.S. Citizenship and Immigration Services
  ○ USCIS Field Offices
- U.S. Coast Guard

- U.S. Customs and Border Protection Includes contacts for field offices, Border Patrol sectors and ports of entry.

- U.S. Immigration and Customs Enforcement Includes contacts for field offices and detention facilities.

- U.S. Secret Service

## Immigration Questions

- Immigration questions answered by US Citizenship and Immigration Services National Customer Service Center:
  1-800-375-5283

## Program & Application Contacts

- Chemical Security Assessment Tool (CSAT) FAQs & Helpline

- DHS Trip Questions: Email trip@dhs.gov

- Freedom of Information Act (FOIA), Privacy Office

- Homeland Security Careers on USAJOBS

- Media Contacts

- PCII eSubmissions

- Report Fraud, Waste or Abuse, Office of the Inspector General

- Report Incidents

- School Preparedness

- Selective Placement Coordinators

- Small Business Contacts

- Send a message using our online form about FOIA, Jobs, Security Threats, Website Issues or DHS Press.

This page was last reviewed/modified on January 24, 2008.

EXHIBIT H

**BAE SYSTEMS**

# UNITED STATES

Welcome To BAE Systems Careers

## Be Remarkable

We all have it in us; the ability to shape exceptional achievements.The difference lies in joining BAE Systems - one of the world's foremost providers of advanced aerospace products, intelligent electronic systems and technology services for government and commercial customers. Remarkable individuals work here. Their innovation is our competitive edge. To keep it that way, we invest in our people by providing an energizing, team-oriented environment; the latest technologies; ongoing education; skill development and more. It's the best way to preserve our intellectual resources - and to inspire innovative achievements.



**RELATED INFORMATION**

Employee
Testimonials

## WHAT'S NEW



U.S. BAE Systems Job Openings not including BAE Systems IT

WARNING:  This is a secure web site.  If you receive a security alert asking you if you want to proceed, please click "Yes" to proceed directly to the website. If you would like to avoid receiving this alert in the future, download a digital certificate by clicking the link located on the job search page.



BAE Systems IT Job Openings (Including Ship Repair)

WARNING:  This is a secure web site.  If you receive a security alert asking you if you want to proceed, please click "Yes" to proceed directly to the website. If you would like to avoid receiving this alert in the future, download a digital certificate by clicking the link located on the job search page.

Copyright © 2006 - 2008 BAE Systems. All rights reserved

# EXHIBIT I

**B A E   S Y S T E M S**

# US JOB SEARCH

There are 51 jobs matching your search.
Jobs 1 to 30 are listed below.  Click 'Next' to see more.

➡ **Next**

To view multiple listings, check the box and click the 'View Selected Jobs' button.
To view a specific job, click on the 'Job Title'.

| Job Cart | Revision Date | Original Posting Date | Job Title | Location |
|---|---|---|---|---|
| ☐ | 03/05/2008 | 01/24/2008 | Senior Database Admin/Software Engineer 1023 | Washington - DC |
| ☐ | 03/05/2008 | 03/05/2008 | Desktop Engineer 1195 | Washington - DC |
| ☐ | 03/05/2008 | 03/05/2008 | Program Manager 1198 | Washington - DC |
| ☐ | 03/05/2008 | 03/05/2008 | Deskside Support Technician 1197 | Washington - DC |
| ☐ | 03/04/2008 | 11/29/2007 | Senior Lead Technical Writer/Editor 0850 | Washington - DC |
| ☐ | 03/04/2008 | 03/03/2008 | Help Desk Support Specialist 1185 | Washington - DC |
| ☐ | 03/04/2008 | 03/03/2008 | Senior Lead Technical Writer/Editor 1186 | Washington - DC |
| ☐ | 03/03/2008 | 02/28/2008 | Requirements Analyst - 1164 | Washington - DC |
| ☐ | 02/28/2008 | 02/28/2008 | DMS System Administrator 1176 | Washington - DC |
| ☐ | 02/26/2008 | 02/26/2008 | Administrative Assistant 1157 | Washington - DC |
| ☐ | 02/25/2008 | 02/22/2008 | Project Manager 1127 | Washington - DC |
| ☐ | 02/25/2008 | 02/25/2008 | Financial Coordinator 1138 | Washington - DC |
| ☐ | 02/19/2008 | 11/27/2007 | Senior Systems Administrator | Washington - DC |

|  |  |  |  |  |
|---|---|---|---|---|
| | | | **0838** | |
| ☐ | 02/19/2008 | 11/27/2007 | **Lead Systems Administrator 0832** | Washington - DC |
| ☐ | 02/19/2008 | 11/29/2007 | **Network Engineer 0854** | Washington - DC |
| ☐ | 02/19/2008 | 11/29/2007 | **Principal Systems Administrator 0847** | Washington - DC |
| ☐ | 02/19/2008 | 01/25/2008 | **Imagery Analyst** | Washington - DC |
| ☐ | 02/19/2008 | 02/19/2008 | **SAN Administrator 1116** | Washington - DC |
| ☐ | 02/19/2008 | 02/19/2008 | **GIS Analyst 1109** | Washington - DC |
| ☐ | 02/19/2008 | 01/14/2008 | **Sr. Systems Administrator 0986** | Washington - DC |
| ☐ | 02/19/2008 | 11/27/2007 | **Network Engineer 0836** | Washington - DC |
| ☐ | 02/15/2008 | 02/15/2008 | **Java Developer 1108** | Washington - DC |
| ☐ | 02/12/2008 | 02/28/2007 | **Oracle DBA** | Washington - DC |
| ☐ | 02/12/2008 | 03/05/2007 | **Imagery Analyst** | Washington - DC |
| ☐ | 02/12/2008 | 03/05/2007 | **Senior Intelligence Analyst** | Washington - DC |
| ☐ | 02/12/2008 | 02/12/2008 | **DHS OI&A** | Washington - DC |
| ☐ | 02/12/2008 | 02/12/2008 | **EMS Engineer 1105** | Washington - DC |
| ☐ | 02/12/2008 | 02/12/2008 | **Documentation Specialist 1088** | Washington - DC |
| ☐ | 02/12/2008 | 02/12/2008 | **Geospatial Analyst** | Washington - DC |
| ☐ | 02/11/2008 | 02/11/2008 | **Visual Basic Developer 1086** | Washington - DC |

[ View Selected Jobs ]

[ Start New Search ]

➡ **Next**

Copyright © 2006 BAE Systems. All rights reserved

# EXHIBIT J

Sign in · Register

Go to: [ Guardian Unlimited home ▼ ]



Read today's paper · Jobs

((XM)) ONLY $12.95 A MONTH GET XM TOD

Search: [                    ]
⦿ Guardian Unlimited  ○ Web

**Guardian**Unlimited  **The BAE files**

Home  BAE the company  Global investigations  Video  Documents  Cast of characters

# 'This is an extremely serious allegation ... '

Prince Bandar's statement

**Friday June 8, 2007**
**The Guardian**

**Last night, Prince Bandar released a statement through his London solicitors Herbert Smith. It began: "An article appeared in today's edition of the Guardian entitled 'BAE accused of secretly paying £1 billion to Saudi Prince'.**

"The article refers to payments made into accounts at Riggs Bank in Washington DC whilst Prince Bandar was serving as Saudi Arabia's US ambassador. The clear thrust of the article is that the payments referred to represented improper secret commissions or 'back handers' paid to Prince Bandar. This is an extremely serious allegation against a senior member of the Saudi government and one which Prince Bandar categorically denies.

Article continues ▾



## Find out more ...



**Watch the video**
Prince Bandar on whether there is corruption in deals with the Saudi royal family.
Watch all the videos



**Global investigations map**
An interactive guide to some of BAE's arms sales.



**BAE's position**
BAE and its executives have always denied any wrongdoing or illegality. Read more ...

More from the BAE files

**The BAE files homepage**

**Read the documents**

**Cast of characters**

**What BAE sells**

**Who are David Leigh and Rob Evans?**

**All articles**

The secrets of Britain's arms trade

**Part 1: Healey's machine**

**Part 2: The Ray Brown years**

**Part 3: The Iranian deals**

**Part 4: The unlovable Saudis**

**Part 5: BAE in Saudi Arabia**

"The accounts at Riggs Bank were in the name of the Saudi Arabian Ministry of Defence and Aviation ('MODA'). Any payments into those accounts made by BAE were pursuant to the Al-Yamamah contracts and as such would not in any way have been 'secret' from the parties to those contracts.

"Whilst Prince Bandar was an authorised signatory on the accounts any monies paid out of those accounts were exclusively for purposes approved by MODA.

"In addition the accounts in question were audited on an annual basis by the Saudi Arabian Ministry of Finance on behalf of MODA.

"At no stage have MODA or the Saudi Arabian Ministry of Finance identified any irregularities in the conduct of the accounts whether in relation to monies coming into the accounts or monies going out of the accounts.

"Whilst the article in the Guardian states that Prince Bandar was asked about the alleged payments, Prince Bandar has no record of ever being contacted by anybody from the Guardian. If he had been contacted then he would have made it clear that the story was inaccurate and misleading, as is made clear above.

"Prince Bandar is dismayed and shocked that a newspaper of the standing of the Guardian should print such allegations in such a cavalier manner and without ensuring the accuracy of the article.

"Whilst he would not normally comment about such matters the contents of the article have left him with no choice but to do so in order to try and repair some of the damage done to his reputation by the article.

"Prince Bandar is consulting his solicitors regarding the contents of the article. He will be making no further comments for the time being."

**Guardian response:**

"The Guardian contacted Prince Bandar's UK domestic representative, Col Peter Browne, by prior arrangement, on 1 June at 16.49 hours. Col Browne has previously provided a channel for comment from Prince Bandar to the Guardian.

"He said he was in regular contact with Prince Bandar. We put to him all the allegations in detail in an email.

"Col Browne emailed back at 17.50, saying 'I confirm I have forwarded your email. I would not bet on you getting a reply!'

"The BBC had already emailed the Saudi embassy with similar allegations, on 25 May.

"They had received no response. This was one reason why we

**Part 6: Secrets of al-Yamamah**

**Part 7: Britain blocks reform**

**Part 8: BAE's secret money machine**

**Part 9: Nobbling the police**

**Part 10: The web widens**

• If you'd like to comment on our investigation, please email
bae.files@guardian.co.uk

Case 1:07-cv-01646-RMC    Document 66-12    Filed 03/12/2008    Page 4 of 4

had decided to use a separate channel.

"On 5 June, having received no response, we again contacted Col Browne, saying we should now proceed on the basis that Prince Bandar did not wish to make any comment.

"After publication, we again telephoned Col Browne, inviting Prince Bandar once again to comment on the published articles.

"Col Browne repeated that he was in day-to-day contact with Prince Bandar. An hour later, he rang back to say the prince's lawyers would be issuing the above statement."

---

Printable version | Send it to a friend | Save story

Privacy policy  |  Terms & conditions  |  Advertising guide  |  A-Z index  |  About this site
Join our dating site today

Guardian Unlimited © Guardian News and Media Limited 2007

EXHIBIT K

**BAE SYSTEMS**

# SPECIAL SECURITY AGREEMENT

BAE Systems, Inc. is a Delaware corporation that has mitigated our foreign ownership through a Special Security Agreement between the U.S. Government, BAE Systems, Inc. and BAE Systems plc. That agreement calls for the appointment of outside directors who, in conjunction with other U.S. based board members, comprise a Government Security Committee. The Government Security Committee has the responsibility for overseeing the company's compliance with U.S. Government Security and Export regulations, and meets regularly with U.S. Government oversight agencies to provide feedback on that compliance. Our long history of successful compliance with the SSA allows BAE Systems to supply products and services to the Department of Defense, Intelligence Community and Homeland Security on some of the Nations most sensitive programs.

**RELATED INFORMATION**

Copyright © 2006 - 2008 BAE Systems. All rights reserved

EXHIBIT L

**The Group's US business now delivers over US$9bn (£5bn) of annual sales and employs approximately 40,000 people in 36 states.**

# Delivering growth in the US



BAE Systems is both a prime contractor to the US government and a supplier of major sub-systems to the other large prime contractors. The Group is a market leader in the provision of electronic warfare systems, many of which have application on airborne programmes. BAE Systems has a substantial business supporting network systems and IT for US government agencies and provides technical support services to the US Navy, US Army, NASA and the FAA. In land systems, the Group is one of the two largest suppliers of armoured vehicles in the US and the wider accessible global market.

The US defence market accounts for over 45% of global defence spending and remains one of BAE Systems' key markets, offering programme scale and high levels of investment in research and development. US defence spending has increased substantially over recent years, including the Procurement and Research and Development budgets from which the defence industry derives much of its business. This high level of funding is expected to sustain further growth in the near term, but with a levelling out anticipated towards the end of the decade.

In addition to the underlying defence spend, the US market has seen large supplemental budget allocations to fund overseas operations. This supplemental spend includes the cost of resetting equipment to combat readiness following heavy operational use. BAE Systems has benefited from this funding, which is expected to continue in the near term but then reduce as current overseas deployments of armed forces

decrease. Although growth in US defence spending is expected to slow, the Group is well placed to support the US Department of Defense's likely continued emphasis on force sustainment and readiness.



Sharing between our global businesses
The 57mm Mk 110 Mod 0 Naval Gun System has currently been selected for both versions of the US Navy's Littoral Combat Ship and as the main armament to go aboard the US Coast Guard's National Security Cutter. The system is currently manufactured in Sweden, but plans are underway to transfer assembly to a US facility.

EXHIBIT M

# TIMESONLINE

From The Times

August 10, 2007

# Milestone for BAE as its trade with America outstrips MoD business

David Robertson

BAE Systems, Britain's largest defence company, announced yesterday that it is now receiving more business from the US than from the Ministry of Defence.

The company, which traces its roots to the Second World War aircraft builders Hawker Siddeley and Vickers-Armstrong, revealed that 40 per cent of its sales in the first six months came from America.

George Rose, the finance director, added that this had grown to 50 per cent since the $4.5 billion (£2.2 billion) acquisition of Armor Holdings was completed on July 31. By comparison, the UK accounts for about 39 per cent of the company's business.

BAE has been pursuing a strategy of building its exposure to the US market and has completed 16 deals there since 1999. The company is now the world's third-largest defence contractor after Boeing and Lockheed Martin. In the past two years it has overtaken Raytheon, General Dynamics and Northrop Grumman – key members of the US military-industrial complex.

BAE's success in America comes despite a Department of Justice investigation into allegations of corruption in the company's contracts with Saudi Arabia. A similar investigation by the Serious Fraud Office was shut down by the Government last year.

Defence analysts said yesterday that the strong growth in the US, and the quick approval of the Armor Holdings deal suggested that the US investigation was not yet impeding BAE's business.

BAE's success in America has been built on its land systems division, which makes armoured personnel carriers. Two years ago, the company bought UDI, the maker of Bradley Fighting Vehicles, and the Armor deal gives it greater capacity in this sector.

Demand for heavily armoured troop carriers is rising because of the conflicts in Iraq and Afghanistan. Older troop carriers are being refitted and new ones are being bought.

BAE's transatlantic expansion has prompted speculation that the company could relocate from Britain, but Mike Turner, BAE chief executive, has consistently denied any such plans. However, Mr Turner did indicate that BAE would continue its global expansion when he signalled that the company was ready to make more acquisitions. He said: "We will be making more acquisitions and we are looking very carefully at options in each of the markets we operate in."

BAE reported an 8 per cent rise in sales for the first six months of this year to £6.8 billion and operating profits up 19 per cent to £684 million.

Its order book stands at £31.7 billion, to be enhanced further when Saudi Arabia buys 72 Eurofighter Typhoons. The UK and Saudi governments are expected to sign the £20 billion Typhoon deal within a month.

Jeremy Batstone, of Charles Stanley stockbrokers, described the results as "superb" and noted that BAE achieved the figure despite much of its business being exposed to the weak US dollar.

BAE's share price closed up 4p to 440¼p, having rallied back to the level it stood at when the Department

of Justice announced its investigation in June.

**Heritage trail**

- The history of BAE Systems is tied to the great names of the British aerospace industry

- Among the companies from which it traces its heritage are Hawker Siddeley, which made the Hurricane; de Havilland, which made the Gipsy and Tiger Moths, and Vickers Armstrong, maker of the Supermarine Spitfire

Contact our advertising team for advertising and sponsorship in Times Online, The Times and The Sunday Times.
© Copyright 2008 Times Newspapers Ltd.
This service is provided on Times Newspapers' standard Terms and Conditions. Please read our Privacy Policy.To inquire about a licence to reproduce material from Times Online, The Times or The Sunday Times, click here.This website is published by a member of the News International Group. News International Limited, 1 Virginia St, London E98 1XY, is the holding company for the News International group and is registered in England No 81701. VAT number GB 243 8054 69.

# EXHIBIT N

**BAE SYSTEMS**

# BAE Systems, Incorporated
## Corporate Overview



**BAE SYSTEMS**

# BAE Systems – A Leading Defense Company with a Commanding Breadth of Capabilities



**BAE SYSTEMS**

# One of the World's Largest Defense Companies

- BAE Systems plc
  - 90,000 Employees
  - $75B Order Book
  - $25B Annual Sales
  - 3rd Largest Defense Company
  - Five Home Nations
  - Presence in 130 Nations
- BAE Systems, Inc.
  - 45,000 Employees (35,000 in the U.S.)
  - $10B Annual Sales
  - 6th Largest U.S. Defense Company
  - Major operations in some 30 states and in the UK, Sweden, Israel, Turkey and South Africa
  - A U.S. company chartered in Delaware



**2004 Defense Sales**
as reported by Defense News

**A truly transatlantic company with a balance of employees, shareholders and business portfolio in both the U.S. and UK**

**BAE SYSTEMS**

# A Future Grounded in Strategy



| Strategy |
|---|
| To create sustainable shareholder value by being the premier transatlantic aerospace & defense contractor |

| Strategic Objectives |
|---|
| ■ Embed a high performance culture across the company<br>■ Optimize value from our order book<br>■ Maintain a global presence from a strong transatlantic business base<br>■ Enhance U.S. / UK industrial technology transfer |

| Business Portfolio Actions | | | | | | |
|---|---|---|---|---|---|---|
| Grow the business in the United States | Grow a global support, solutions and services business | Create a sustainable, profitable program business in Air, Land & Sea | Partner with MoD in the transformation of the UK's Armed Forces | Continue to optimize our European position through a rationalized portfolio of Joint Ventures | Grow & maximize the value of Airbus | Manage non-strategic businesses for optimal value |

BAE Systems US-headquartered business has grown to $10 billion.

BAE Systems is growing its position in repair, overhaul and support for both ships and combat vehicles.

BAE Systems is the world's 2nd largest land and armaments business.

**BAE SYSTEMS**

# BAE Systems Organization



# BAE Systems, Inc. Leadership Team





BAE SYSTEMS

# BAE Systems, Inc. Board of Directors

**Dr. Robert S. Cooper**

former
Director, DARPA

**Gen Kenneth A. Minihan**
**(USAF, Retired)**

former
Director, National Security Agency

**Dr. William Schneider, Jr.**

former
Undersecretary of State for Security, Science and Technology

**Richard J. Kerr**

former
Deputy Director of Central Intelligence

**Lee H. Hamilton**

former
Member of Congress
Co-Chair 9/11 Comm.

**Gen. Anthony C. Zinni**
**(USMC, Retired)**

former
Commander-in-Chief, CENTCOM

**Special Security Agreement:** Provides access to classified U.S. Government Programs the same as other U.S. defense companies

**Trusted national security leaders with impeccable credentials**

**BAE SYSTEMS**

# BAE Systems, Inc. Board of Directors



**Dr. Robert S. Cooper**

former
Director, DARPA



**Gen Kenneth A. Minihan**
**(USAF, Retired)**

former
Director, National
Security Agency



**Dr. William Schneider, Jr.**

former
Undersecretary of State
for Security, Science
and Technology



**Admiral Robert Natter**
**(USN, Retired)**

former
Commander of Fleet
Forces Cmd & Atlantic Cmd



**Richard  J. Kerr**

former
Deputy Director
of Central Intelligence



**Lee H. Hamilton**

former
Member of Congress
Co-Chair 9/11 Comm.



**Gen. Anthony C. Zinni**
**(USMC, Retired)**

former
Commander-in-Chief,
CENTCOM



**Gen. J.H. Binford Peay, III**
**(USA, Retired)**

former
Vice Chief of Staff US Army
& Cmdr, U.S. Central Cmd

**Special Security Agreement:** Provides access to classified U.S. Government Programs the same as other U.S. defense companies

**Trusted national security leaders with impeccable credentials**



# BAE Systems, Inc. Locations
**Land & Armaments, Customer Solutions, and Electronics & Integrated Solutions Operating Groups**



**BAE SYSTEMS**

# Growth & Success

- BAE Systems, Inc.'s revenues have grown 250% in five years
- BAE Systems, Inc. has achieved double digit organic growth for three consecutive years
- BAE Systems, Inc. hired nearly 4,000 employees last year, 2,000 of those were newly created jobs
- BAE Systems, Inc. is the 6th largest defense company in the U.S.



**BAE Systems stock value has more than doubled in the last two years**

**This growth and success - and our new capabilities - present new opportunities to better serve our customers**



# BAE Systems is Committed to its Values, Ethics, and Integrity

- **Performance**
  - Delivering value to shareholders and customers
  - Honesty and integrity in everything we say and do
- **Customers**
  - Outstanding customer satisfaction survey results
  - Front-line operational support
  - USO World Partner, $3+ million in financial support
- **People**
  - Employee survey results exceed aerospace and defense industry norms on all measured dimensions
  - Performance Centered Leadership
- **Partnering**
  - Delivering with our partners on such programs as Future Combat System, F-35 JSF, and the Littoral Combat Ship
  - Employer Support of the Guard & Reserve Freedom Award
  - Community support to national charities in our home markets
- **Innovation & Technology**
  - Chairman's Awards provide annual recognition in three categories: Innovation, Transferring Best Practice, and Enhancing Customer Performance

**Performance**

**Customers**

**People**

**Partnering**

**Innovation & Technology**

**Our values are the basis for the way we do business every day and the foundation of our success**

**BAE SYSTEMS**

# A Leader in Science, Technology and Performance Excellence

- High technology work force
  - Greater than 15,000 engineers
  - 45% operate in CMM 4/5 organizations (industry average 12%)
- Above industry average investment in R&D and high-tech facilities
- Productive partnerships with leading educational institutions in the U.S. and UK
- Established the Center for Performance Excellence to develop, embed and sustain a high-performance culture throughout the Company





**A record of innovation and technological breakthroughs from the dawn of flight and invention of the radio**

# BAE Systems, Inc. Operating Groups



**This organization aligns our operating groups to meet customer needs**

Cleared for Public Distribution

13

**BAE SYSTEMS**

# Electronics & Integrated Solutions

19,000 employees / $4.5 billion sales

*E&IS designs, develops and manufactures a wide range of electronic systems and subsystems for both military and commercial applications.*

- ## Platform Solutions

  Supports a wide range of military and commercial platforms – including fixed-wing and rotary-wing aircraft, ground vehicles, and unmanned vehicles -- with capabilities in vehicle management, human-machine interface, precision guidance, and power systems.



- ## Communications, Navigation, Identification & Reconnaissance

  CNIR provides military communications, electronic identification, navigation, and guidance systems for the United States and its allies. CNIR offers broad technical expertise in C4ISR; C3I systems and communications, including transmission systems integration; wideband networking radio systems; guidance and navigation; identification; and airborne ground-based software development.





- ## Electronic Protection

  EP concentrates on integrated avionics requirements for military tactical aircraft. Programs include advanced radar warning; radar jamming; electronic warfare systems; and electronic combat and self-protection systems.





**BAE SYSTEMS**

# Electronics & Integrated Solutions

- ## National Security Solutions

  A world-renowned provider of highly accurate geospatial information from multiple data sources for digital mapping, GIS, 3-D visualization and simulation, commercial maps, urban planning, and other uses; and a key enabler of joint and coalition warfare with intelligence and mission planning systems designed for common architectures and solutions used worldwide.

- ## Sensor Systems

  The Sensor Systems line of business exploits state-of-the-art infrared, millimeter-wave, and laser technologies to design and fabricate missile seekers, guided munitions, and target designators, as well as a wide array of microwave and millimeter wave components, modules and subsystems for government and commercial applications including missile, radar, EW, terrestrial communications, and space applications.

- ## Information Warfare

  A prime supplier of signals intelligence, surveillance and reconnaissance, and information warfare systems and subsystems integrated into multiple platforms across all services and agencies. Key capabilities include signal acquisition, direction finding, signal recognition, digital signal processing, threat analysis, and information warfare techniques.







**BAE SYSTEMS**

# Customer Solutions Operating Group

14,000 employees / $2.4 billion sales

*CS is a leading provider of integrated technical and professional service solutions for the U.S. national security and Federal civilian markets.*



- ## BAE Systems Information Technology

  A full service solutions provider of information technology systems and services, offering a broad spectrum of networked and managed IT operations

- ## BAE Systems Technology Solutions & Services

  Provider of tailored, integrated technical and professional services for the U.S. DoD, Federal Civilian government, and Homeland Security markets



- ## BAE Systems Ship Repair

  A leading non-nuclear ship repair, modernization, and conversion company focused on dry dock and ship repair services for the U.S. Navy, other defense agencies, and commercial customers





**BAE SYSTEMS**

# Land & Armaments

11,000 employees / $3.2 billion sales

*L&A is a global leader in the design, development, production and service of armored combat vehicles, naval guns and launchers, canisters, artillery systems & intelligent munitions.*

- ## Naval Guns & Launchers

  The U.S. sole source supplier for medium to large caliber naval guns and a recognized expert in launching systems, provides the upgrades to current naval guns and successfully designing, developing and testing an automated 155mm gun, magazine and launcher system for the US Navy's next generation surface fleet.

- ## Combat Vehicle Systems

  From the Bradley Combat System and Warrior to the manned ground vehicles of Future Combat System and FRES, providing unmatched lethality, survivability and mobility to current and future forces.  Provides ongoing upgrade and remanufacture while integrating advanced technological enhancements.  Combined installed base of combat vehicles worldwide in excess of 100,000.



Mk45 Mod 4



AGS



Bradley



**BAE SYSTEMS**

# Land & Armaments

- ## Artillery Systems

  Providing accurate long-range 24/7, all-weather artillery support with the M777 lightweight 155mm howitzer for US Army, Marine Corps and Canadian forces and developing advanced fully automated system that integrates all crew operations into a digitized cockpit of Non Line-of-Sight Cannon for U.S. Army.  Conducting firing and mobility testing for 2008 delivery of first prototypes**.**



- ## Intelligent Munitions

  Providing artillery precision, range and lethality while minimizing collateral damage for indirect fire support with 155mm M777 lightweight howitzer and Future Combat System Non Line-of-Sight Cannon artillery systems using GPS guidance technology in Excalibur and sensor fused, spin-stabilized projectiles in BONUS.







**BAE SYSTEMS**

# Strong 2004 Employee Survey Results – Above Industry Norms

- Employee commitment and engagement within the organization exceed the global high performance benchmark

- Results reflect a strong focus on meeting customer needs, goal achievement and teamwork

- Employees demonstrate commitment to ethics and business conduct, community involvement and employee development



2004 Employee Opinion Survey

% Greater Than Aerospace Industry Norms

*Survey Data Compiled by Watson Wyatt*

**BAE Systems North America exceeds aerospace and defense industry norms on all seven performance dimensions**



# BAE Systems
# Involved in the Community




















**BAE SYSTEMS**

# Summary

- Solid financial performance and reputation for program performance

- Leadership in Science, Technology and Engineering

- Dramatic growth and continued investment in jobs, facilities and technology

- Skilled and innovative people, dedicated to national security and supporting the men and women in uniform

- Commitment to ethics and integrity in everything we say and do









# EXHIBIT O

<div align="center">1 of 3 DOCUMENTS</div>

<div align="center">Copyright 2007 The Lexington Herald Leader</div>
<div align="center">All Rights Reserved</div>



<div align="center">The Lexington Herald Leader (Kentucky)</div>

<div align="center">November 2, 2007 Friday</div>

**SECTION:** A; Pg. a1

**LENGTH:** 1010 words

**HEADLINE:** Slashing of McConnell earmarks demanded

**BYLINE:** John Cheves, JCHEVES@HERALD-LEADER.COM

**BODY:**

Reform groups in Washington are demanding that Congress strip $25 million in earmarks that Sen. Mitch McConnell, R-Ky., is pushing for a British defense contractor facing a criminal investigation by the U.S. Justice Department and an audit by the U.S. Defense Department.

"Public confidence in Congress continues to wane, and wasteful spending and corruption continue to be primary causes of public concern," the National Legal and Policy Center and Taxpayers for Common Sense wrote Wednesday to the Senate and House appropriations committees.

Unless Congress removes McConnell's earmarks for BAE Systems, a major McConnell campaign donor, it sends "the message that the way to success in getting taxpayers' money is to put your facilities in key congressional districts, give campaign donations to those congressmen, and hope the Congress rewards you despite an ongoing federal investigation," the groups wrote.

The Herald-Leader first reported on the earmarks Saturday.

McConnell defended his earmarks in an e-mail to the Herald-Leader this week, saying the money helps BAE to keep jobs in Kentucky.

BAE is based in Great Britain but has worldwide operations, including a Louisville factory that makes naval guns and employs 322. McConnell has taken at least $53,000 in campaign donations from BAE's political-action committees and employees since his 2002 re-election. United Defense Industries, which BAE purchased two years ago, pledged $500,000 to a political-science foundation the senator created, the McConnell Center at the University of Louisville.

In June, BAE confirmed that the Justice Department is investigating possible corruption in its Saudi Arabian deals. According to British news reports, BAE set up a slush fund with hundreds of millions of dollars in a Washington, D.C., bank to bribe Saudi Prince Bandar bin Sultan to win weapons contracts. Bandar, who heads the Saudi National Security Council, has denied the allegation.

Slashing of McConnell earmarks demanded The Lexington Herald Leader (Kentucky) November 2, 2007 Friday

Audit on contracts pending

Also, State Department records show that American diplomats have worried in recent years about BAE allegedly bribing officials in several other countries. The Defense Department's Office of Inspector General in August opened an audit into Army contracts awarded to BAE, to determine whether the rules were followed. That audit, prompted by tips to the Pentagon about BAE, is pending.

BAE has declined to comment. After disclosing the Justice Department probe, it launched an internal ethics review, and its chief executive officer announced his retirement earlier than expected.

McConnell, the Senate minority leader, put $25 million for three BAE naval weapons projects in the 2008 defense appropriations bill, which is expected to go to a conference committee next week to iron out differences between the Senate and House versions.

McConnell's office did not return repeated calls for comment. In an e-mail to the Herald-Leader, McConnell said that over the years he has provided many tens of millions of dollars in earmarks to BAE -- or before that, to United Defense -- to protect jobs in Louisville.

"The additional funding I secured is responsible for just under half of the 320 high-paying jobs at the Kentucky plant," McConnell wrote. "Without these funds, the company would have slashed its work force or left our state."

A former BAE vice president for homeland defense in Louisville, Mike Seale, yesterday confirmed that McConnell's earmarks helped keep the plant running. In the 1990s, Seale said, the Navy tried to take away some of its projects.

"The Navy said, 'You know what, we're going to do this maintenance work at our docks now,'" said Seale, who retired this year. "We said, 'No, wait, we have this contract, we have all these people employed here. What are we supposed to do?' And they said, 'Well, that's your tough luck.'"

Instead, McConnell's earmarks directed the Navy to keep its work in Louisville, he said.

Seale and his wife have given at least $67,000 in campaign donations since 1997, mostly to Republican politicians, including about $21,500 to McConnell. Seale said he never feels pressured when McConnell's fund-raisers call him and ask for a check.

"It isn't partisan," Seale said. "If a Democratic senator had supported our factory the way Sen. McConnell has, I'd have given to his campaigns, too."

But critics say McConnell is propping up a company that apparently can't compete without him. While it sounds good for a senator to defend jobs, "we should be spending federal money where and as we need to, not to keep the lights on in someone's district," said David Williams, vice president of Citizens Against Government Waste, a Washington watchdog group.

"I want to know when Sen. McConnell became the secretary of defense," Williams said. "The Pentagon has to sit down every year, draw up its priorities and budget its money accordingly. Who is Mitch McConnell to insist that we fund these projects?"

Dropping of earmarks urged

Apart from the controversy over earmarks, the Justice Department investigation of BAE should prompt McConnell to suspend his assistance for the company, said Ken Boehm, chairman of the National Legal and Policy Center, one of the reform groups that urged the appropriations committees to drop the earmarks.

Slashing of McConnell earmarks demanded The Lexington Herald Leader (Kentucky) November 2, 2007 Friday

Boehm's group and Taxpayers for Common Sense, which joined it in signing the protest letter, are non-partisan, non-profit watchdogs that monitor federal spending for signs of waste, fraud and abuse. Boehm is a former Republican congressional aide.

Boehm said news of McConnell's BAE earmarks have "created quite a buzz around Capitol Hill," including a front-page story in yesterday's Roll Call, a newspaper, which covers Congress. The appropriations panels have not responded to his letter yet -- their attention this week is on other spending bills -- but he said he's hopeful common sense will prevail.

"This is really a questionable use of federal funds," Boehm said. "I'd love to see a poll asking, 'Do you want your tax money going to a company currently under ... investigation?' I bet you'd see a lot of people saying 'No.'"

**LOAD-DATE:** November 2, 2007

EXHIBIT P



**Back to Article**        **Click to Print**



Friday, Jun. 29, 2007

# The Case of the Well-Placed Prince

**By Adam Zagorin/Washington**

When Britain's law enforcement authorities began probing allegations that the leading British arms manufacture had paid bribes to a senior Saudi official, then Prime Minister Tony Blair called a halt to the probe. Its continuation, he warned, would jeopardize British national interests. But the same allegations have resurfaced at the center of an investigation by the U.S. Department of Justice, with potentially explosive consequences.

The Saudi leader at the center of the investigation is Prince Bandar bin-Sultan, who in 2005 wrapped up more than 20 years service as the Kingdom's ambassador in Washington, D.C. Widely praised as an astute player on th global diplomatic stage, Bandar — also known for his intimate access to the highest levels of the U.S. government and his friendship with both President Bush and his father, former President George H. W. Bush — assumed a less visible role as a top national security advisor to the Saudi ruler, King Abdullah.

On June 7, a British Broadcasting Corporation report claimed that Bandar had received secret payments totaling more than $2 billion over a ten-year period from British Aerospace Systems (BAE), Europe's largest arms maker — and also a company that earned roughly close to half of its 2006 revenue in supplying the U.S. These payments were made over a period in which the British company negotiated massive contracts to supply Saudi Arabia. Both BAE and Bandar have categorically denied the allegation of any wrongdoing, claiming they acted properly and lawfully at all times. Bandar has admitted that the money came into accounts related to his signature at the now-defunct Riggs Bank in Washington, D.C., but says these were official Saudi accounts rather than personal ones, and that all the payments went to the Saudi government.

Although the British inquiry was halted late in 2006 on the grounds that it would jeopardize British national security — the government of then-Prime Minister Tony Blair warned that its continuation could cost thousands of British jobs and imperil intelligence ties with the Saudis — BAE revealed this week that it is now under investigation by the U.S. Department of Justice. The DoJ, according to a statement by BAE, is examining the company's compliance with U.S. anti-corruption laws in its business deals "concerning the Kingdom of Saudi Arabia." The American investigation appears to center around the fact that BAE used the U.S. banking system to

Copyright    2007 Time Inc. All rights reserved. Reproduction in whole or in part without permission is prohibited.

make large regular payments to accounts controlled by Bandar.

Whatever the outcome of the DoJ inquiry, the fact that it is taking place at all means that more damaging revelations could lie ahead. Among those agitating to know more is Democratic senator John Kerry, who recently wrote to Attorney General Alberto Gonzales citing a 2002 State Department memorandum on "persistent allegations that BAE Systems pays bribes to obtain business." The State memorandum concluded that "this volume of allegations about one company would have triggered a Department of Justice criminal division investigation long ago." Kerry's letter, which asks for information on how DoJ is handling the BAE matter, also refers to a high-ranking DoJ official who said in 2006 that foreign-owned companies, such as BAE, could be targeted by U.S. investigators.

None of the questions over the British arms manufacturer appears to have had any impact on the Committee on Foreign Investment in the United States, or CFIUS, which last week approved BAE's $4.1 billion bid to acquire Armor Holdings, the Florida-based contractor that makes armor for Humvees and Stryker vehicles. CFIUS , an inter-agency panel which includes a representative of the Justice Department, ruled that Armor's transfer to foreign ownership would not threaten U.S. national security.

The fact that BAE won CFIUS approval for a major acquisition only days before its disclosure of the Justice Department investigation has certainly raised eyebrows in Washington. "If the Justice Department were to find that BAE had committed a significant violation of the Foreign Corrupt Practices Act, it would automatically raise questions about how rigorously the company is safe-guarding classified information, adhering to export controls and meeting its other obligations under U.S. law," says a leading Washington expert in the area, who did not want his name used because of the political sensitivity of the topic.

Allegations of bribery against BAE began surfacing in London in the late 1980's, in connection with the $85 billion al-Yamamah weapons-for-oil deal under which BAE agreed, in 1985, to supply Tornado jets and other military equipment to Saudi Arabia. But it was many years before Britain's Serious Fraud Office began to investigate, and its inquiry was brought to an abrupt halt by the Blair government in December 2006. The stated reason — that the probe could cost British jobs and imperil important ties — carried the obvious implication was that Britain could not afford allow awkward truths about BAE conduct to become public, presumably because of the anticipated reaction of the Saudis. But that which the Blair government had sought to keep under wraps may now be in danger of being exposed by Britain's — and Saudi Arabia's — most important ally, the government of the U.S.

 Click to Print

**Find this article at:**
http://www.time.com/time/world/article/0,8599,1638783,00.html

EXHIBIT Q

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re BAE SYSTEMS PLC DERIVATIVE LITIGATION | ) ) ) | Civil No. 1:07-cv-01646 |
| | ) | Assigned to: Judge Rosemary M. Collyer |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |

PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
TO NOMINAL DEFENDANT BAE SYSTEMS PLC

PROPOUNDING PARTY:          PLAINTIFF

RESPONDING PARTIES:          NOMINAL DEFENDANT BAE PLC

SET:                                          ONE

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, plaintiff requests that Nominal Defendant BAE Systems p.l.c. respond to the following Requests by _____, 2008 and produce the documents described below for inspection and copying on or before _____, 2008, at 10:00 a.m., at the law offices of Coughlin Stoia Geller Rudman & Robbins, LLP, 1100 Connecticut Avenue, N.W., Suite 730, Washington, DC 20036, Phone No. 202/822-6762.

## I.    DEFINITIONS

1.    The terms "BAE," "you" or "your" mean nominal defendant BAE Systems p.l.c. and all of its subsidiaries and affiliates in the United States or elsewhere, and all officers, directors, employees, accountants, attorneys, affiliates, producers, or agents of BAE and its subsidiaries and affiliates or persons occupying a similar status or performing a similar function.  Unless otherwise indicated, all references to "BAE" refer to this definition.

2.    The term "BAE PLC" means nominal defendant BAE Systems p.l.c. and all officers, directors, employees, accountants, attorneys, affiliates, producers, or agents of BAE PLC or persons occupying a similar status or performing a similar function.

3.    The term "BAE INC" means BAE Systems Inc. and all officers, directors, employees, accountants, attorneys, affiliates, producers, or agents of BAE INC and its subsidiaries and affiliates or persons occupying a similar status or performing a similar function.

4.    The term "United States-based BAE subsidiary" refers to any BAE subsidiary headquartered or incorporated in the United States, and all officers, directors, employees, accountants, attorneys, affiliates, producers, or agents and their subsidiaries and affiliates or persons occupying a similar status or performing a similar function.  This includes but is not limited to BAE INC.

5.    The term "BAE Executive" refers to each of the following defendants: Richard (Dick) L. Olver, Michael J. Turner, Walter P. Havenstein, Ian G. King, George W. Rose, Christopher V.

Geoghegan, Phillip J. Carroll, Michael J. Hartnall, Sir Peter James Mason, Roberto Quarta, Sir

Anthony Nigel Russell Rudd, Peter A. Weinberg, Andrew George Inglis, Ulrich Cartellieri, Sue

Birley, Michael Lester, Mark H. Ronald, Michael Denzil Xavier Portillo, Sir Richard Harry Evans,

Lord Alexander Hesketh, John Pix Weston, Keith Clark Brown, Steve Lewis Mogford, Paolo

Scaroni, Sir Robin Biggam, Sir Charles Beech Gordon Masefield, and any of their respective agents,

employees, affiliates, attorneys, accountants or other representatives.

      6.    The terms "Riggs" and/or "PNC" refer to PNC Financial Services Group, Inc., As

Successor to Riggs National Corporation/Riggs Bank, N.A., and any of their respective agents,

employees, affiliates, attorneys, accountants or other representatives.

      7.    The term "Allbrittons" refers to Joseph L. Allbritton, Robert L. Allbritton and

Barbara Allbritton, and any of their respective agents, employees, affiliates, attorneys, accountants or

other representatives.

      8.    The term "Prince Bandar" refers to Prince Bandar Bin Sultan, and any of his agents,

employees, affiliates, attorneys, accountants or other representatives.  For purposes of these requests,

Prince Bandar's agents, employees, affiliates, attorneys, accountants or other representatives shall

include those of any member of the Saudi Royal Family and the Kingdom of Saudi Arabia.

      9.    The term "defendant" refers collectively the BAE Executives, PNC/Riggs, Prince

Bandar and the Allbrittons.

      10.    The term "BAE Executive contesting personal jurisdiction" refers to each of the BAE

Executives (except Paolo Scaroni).

      11.    "United States" shall mean the states and territories comprising the United States of

America.

      12.    "Document" or "documents" are intended to have the broadest possible meaning

under Federal Rule of Civil Procedure 34 and includes, without limitation, any writing or recording

as defined by Federal Rule of Evidence 1001(1), any printed, typed, photostatted, photographed, recorded, electronically created or otherwise reproduced or stored communication or representation, whether comprised of letters, words, numbers, pictures, sounds or symbols, or any combination thereof.  This definition includes copies or duplicates of documents contemporaneously or subsequently created, which have any notes or other markings.  Without limiting the generality of the foregoing, "document" or "documents" includes without limitation any electronic data or digitally encoded data, e-mail, any database, graphic or other data compilation from which information can be obtained, translated if necessary, by the respondent through detection devices into reasonably usable form, or other information, including originals, translations, and drafts thereof and all copies bearing notations and marks not found on the original.

13.    The term "concerning" means relating to, referring to, describing, evidencing, or constituting.

14.    The term "person" means any individual, corporation, partnership, limited partnership, joint venture, sole proprietorship, corporation, trust, governmental agency or other organization recognizable at law, and its agents and employees.

15.    The term "meeting" means any assemble, convocation, encounter, or contemporaneous presence of two or more persons for any purpose, whether or not planned, arranged or scheduled in advance, and whether or not occurring face-to-face, telephonically, via videoconference, and whether or not the meeting was formal or informal or occurred in connection with some other activity.

16.    The term "communications" means any transfer of information of any kind, orally, in writing, or in any other manner.

17.    The singular shall include the plural and the past tense shall include the present tense, and vice versa; the words "and" or "or" shall be both conjunctive or disjunctive; the word "all"

means "any and all"; the word "including" means "including but not limited to"; the word "he" or any other masculine pronoun includes any individual regardless of sex.

## II.     RELEVANT TIME PERIOD

Unless otherwise indicated, the relevant time period for each request is January 1, 1985 through the date of production.

## III.    INSTRUCTIONS

1.     All documents shall be produced in the order they are kept in the ordinary course of business or the documents shall be organized and labeled to correspond with the categories in the Request.  In addition, documents are to be produced in full and unexpurgated form; redacted documents will not constitute compliance with this Request.

2.     These requests relate to all documents which are in any party's possession, custody or control or in the possession, custody or control of the respective directors, officers, managing agents, employees, attorneys, accountants or other representatives of any party.

3.     Each party shall produce the original of each document described below or, if the original is not in its custody, then a copy thereof, and in any event, all non-identical copies which differ from the original or from the other copies produced for any reason, including, but not limited to, the making of notes thereon.

4.     If production of documents is withheld on the ground of privilege, as to each such withheld document state the following information:

(a)     Which privilege is claimed;

(b)     A precise statement of the facts upon which said claim of privilege is based;

(c)     The following information describing each purportedly privileged document:

(i)      Its nature, *e.g.*, agreement, letter, memorandum, tape, etc.;

(ii)     The date it was prepared;

(iii)    The date it bears;

    (iv)        The date it was sent;

    (v)        The date it was received;

    (vi)        The identity of the person preparing it;

    (vii)        The identity of the person sending it;

    (viii)        The identity of each person to whom it was sent or was to have been sent, including all addresses and all recipients of copies; and

    (ix)        A statement as to whom each identified person represented or purported to represent at all relevant times.

5.      A precise description of the place where each copy of that document is kept, including the title or description of the file in which said document may be found and the location of such file.

6.      Whenever a document is not produced in full or is produced in redacted form, so indicate on the document and state with particularity the reason or reasons it is not being produced in full and describe to the best of your knowledge, information and belief, and with as much particularity as possible, those portions of the document which are not being produced.

7.      In the event that any document called for by this Request has been destroyed, lost, discarded or otherwise disposed of, any such document is to be identified as completely as possible, including the following information:  date of disposal, manner of disposal, reason for disposal, person authorizing the disposal and person disposing of the document.

8.      With respect to any category of documents, the production of which you contend is in some way "burdensome" or "oppressive," please state the specific reasons for this objection.

## IV.    REQUESTS FOR PRODUCTION OF DOCUMENTS

REQUEST FOR PRODUCTION NO. 1:

Documents sufficient to demonstrate the number of shares and fair market value of BAE stock held by citizens, residents or domiciles of the United States.

REQUEST FOR PRODUCTION NO. 2:

The corporate by-laws or similar governing documents for each United States-based BAE subsidiary.

REQUEST FOR PRODUCTION NO. 3:

All organizational charts and similar documents that discuss lines of authority or personnel reporting requirements within United States-based BAE subsidiaries.

REQUEST FOR PRODUCTION NO. 4:

All organizational charts and similar documents that discuss lines of authority or reporting requirements between BAE and its United States-based subsidiaries.

REQUEST FOR PRODUCTION NO. 5:

All powers of attorney or similar written authorization executed by or on behalf of any of BAE's United States-based subsidiaries granting it authority to act for, or on behalf of, such subsidiary.

REQUEST FOR PRODUCTION NO. 6:

Documents sufficient to show (separately) the dollar amount of revenues generated from sales by BAE and its subsidiaries in the United States for each year since January 1, 1985.

REQUEST FOR PRODUCTION NO. 7:

For each year starting January 1, 1985, the consolidating financial statements for BAE and all United States-based subsidiaries.

REQUEST FOR PRODUCTION NO. 8:

Documents sufficient to show each debt instrument to which BAE and any of its United States-based subsidiaries were or are jointly obligated.

REQUEST FOR PRODUCTION NO. 9:

Documents sufficient to demonstrate the existence and resolution of any United States-based law suit to which BAE were parties to.

REQUEST FOR PRODUCTION NO. 10:

All employment agreements for any BAE director, officer or employee who also serves or has served as a director, officer or employee of any of BAE's United States-based subsidiaries.

REQUEST FOR PRODUCTION NO. 11:

A representative sample of the types of documents created by each United States-based BAE subsidiary that BAE PLC reviews, approves or authorizes, including budgets, marketing plans, strategic plans, customer presentations, price lists, requests for capital or operating expenditures, customer contracts, employment contracts, or labor contracts.

REQUEST FOR PRODUCTION NO. 12:

All manuals or other documents that discuss procedures to be followed by United States-based BAE subsidiaries regarding annual budgets, capital expenditures, marketing, pricing, financing or other business transactions, or employment manners such as salaries, bonuses, employee performance standards, retirement plans, and insurance coverage.

REQUEST FOR PRODUCTION NO. 13:

All studies, evaluations, reviews, analyses, reports or similar documents discussing coordination of operations among any or all United States-based BAE subsidiaries.

REQUEST FOR PRODUCTION NO. 14:

Documents sufficient to show the process or procedures by which United States-based BAE subsidiaries, directly or indirectly, access funds from all debt instruments to which BAE PLC is a signatory.

REQUEST FOR PRODUCTION NO. 15:

All documents concerning the selection of the leadership of any BAE United States-based subsidiary.

REQUEST FOR PRODUCTION NO. 16:

All documents concerning cost controls imposed upon any United States-based BAE subsidiary by BAE PLC.

REQUEST FOR PRODUCTION NO. 17:

All organizational charts for BAE PLC and any of its United States-based subsidiaries during the Relevant Period.

REQUEST FOR PRODUCTION NO. 18:

All documents reflecting BAE PLC's ownership of BAE INC's capital stock, or the capital stock of any other BAE United States-based subsidiary.

REQUEST FOR PRODUCTION NO. 19:

All documents sufficient to determine each United States-based BAE subsidiary's capitalization.

REQUEST FOR PRODUCTION NO. 20:

All documents concerning the Special Security Agreement BAE has with the United States Department of Defense.

REQUEST FOR PRODUCTION NO. 21:

All documents concerning communications with the United States Department of Defense or any United States congressional body of officer concerning BAE's Special Security Agreement.

REQUEST FOR PRODUCTION NO. 22:

All documents concerning communications between BAE PLC and any United States-based BAE subsidiary concerning the sales to the United States Department of Defense.

REQUEST FOR PRODUCTION NO. 23:

All documents concerning sales by BAE to the United States Department of Defense.

REQUEST FOR PRODUCTION NO. 24:

All documents concerning the transfer of payments, financial instruments, capital assets, inventory, intellectual property or human resources between BAE PLC and any of its United States-based subsidiaries.  There is no time limit to this request.

REQUEST FOR PRODUCTION NO. 25:

All corporate communications between BAE PLC and its United States-based subsidiaries that address or concern management, corporate governance or allocation of resources.

REQUEST FOR PRODUCTION NO. 26:

All income tax returns submitted to the United States Internal Revenue Service by BAE.

REQUEST FOR PRODUCTION NO. 27:

All income tax returns submitted to tax authorities in the United Kingdom that concern BAE's United States-based operations, revenues, expenditures, legal obligations, debt obligations or assets.

REQUEST FOR PRODUCTION NO. 28:

All general liability, fiduciary, directors and officers or umbrella insurance policies BAE has ever obtained that cover(ed) BAE's United States-based operations, revenues, expenditures, legal obligations, debt obligations or assets.

REQUEST FOR PRODUCTION NO. 29:

All documents sufficient to demonstrate BAE PLC's use of BAE INC's assets, or the assets of any United States-based BAE subsidiary.

REQUEST FOR PRODUCTION NO. 30:

All documents sufficient to demonstrate policies and/or protocols concerning the use of BAE INC'S or any BAE United States-based subsidiary's assets (capital, physical or otherwise) by BAE PLC.

REQUEST FOR PRODUCTION NO. 31:

All documents relating to each meeting of BAE's boards of directors or any of their committees where payments to Prince Bandar were discussed, including minutes of each such meeting, notes taken in preparation for, at, or after each such meeting, written presentations prepared for or made at each such meeting, and resolutions passed.

REQUEST FOR PRODUCTION NO. 32:

All documents discussing the role of any BAE agent, employee, director, officer, attorney, accountant or representative in making payments to Prince Bandar.

REQUEST FOR PRODUCTION NO. 33:

Documents sufficient to identify the officers and directors at BAE PLC, BAE INC or any United States-based BAE subsidiary responsible for negotiating and overseeing fulfillment of sales contracts with Saudi Arabia.

REQUEST FOR PRODUCTION NO. 34:

All documents concerning any internal investigation conducted by BAE PLC, BAE INC or any United States-based BAE subsidiary regarding reports of kickbacks and bribes being paid to or accepted by Prince Bandar. There is no time limit to this request.

REQUEST FOR PRODUCTION NO. 35:

All documents concerning any investigation conducted for BAE PLC, BAE INC or any United States-based BAE subsidiary by PricewaterhouseCoopers LLP regarding reports of kickbacks and bribes being paid to or accepted by Prince Bandar, and the accounting treatment of any such payments. There is no time limit to this request.

REQUEST FOR PRODUCTION NO. 36:

All documents concerning any investigation conducted for BAE PLC, BAE INC or any United States-based BAE subsidiary by Allen & Overy LLP regarding reports of kickbacks and bribes being paid to or accepted by Prince Bandar. There is no time limit to this request.

REQUEST FOR PRODUCTION NO. 37:

All documents concerning any investigation conducted by the United States Department of Justice regarding reports of kickbacks and bribes being paid to or accepted by Prince Bandar from BAE. There is no time limit to this request.

REQUEST FOR PRODUCTION NO. 38:

All documents concerning any investigation conducted by the United Kingdom Serious Fraud Office regarding reports of kickbacks and bribes being paid to or accepted by Prince Bandar from BAE. There is no time limit to this request.

REQUEST FOR PRODUCTION NO. 39:

All documents concerning any investigation conducted by the Organization for Economic Co-operation and Development regarding reports of kickbacks and bribes being paid to or accepted by Prince Bandar from BAE. There is no time limit to this request.

REQUEST FOR PRODUCTION NO. 40:

All reports from investigations made by BAE into the accounting treatment of payments made to Prince Bandar by BAE. There is no time limit to this request.

REQUEST FOR PRODUCTION NO. 41:

All notes or minutes of any meeting wherein any investigation into the potentially criminal activities of any defendant was discussed, including internal BAE investigations or investigations by PricewaterhouseCoopers LLP, Allen & Overy LLP, the United States Department of Justice, the United Kingdom Serious Frauds Office and/or the Organization for Economic Co-operation and Development. There is no time limit to this request.

REQUEST FOR PRODUCTION NO. 42:

All documents concerning communications with or financial transactions between Riggs and BAE that involve Prince Bandar.

REQUEST FOR PRODUCTION NO. 43:

All documents relating to any suspected money laundering investigation involving Riggs, including but not limited to communications with and documents reviewed by David B. Caruso, the former Executive Vice President, Compliance & Security of Riggs, and any other banking examiner, congressional investigator or law enforcement agency.

REQUEST FOR PRODUCTION NO. 44:

All documents concerning communications with any United States law enforcement agency, congressional investigatory body, or any bank examiner concerning BAE's accounts at Riggs.

REQUEST FOR PRODUCTION NO. 45:

All documents produced in connection with any investigation by any United States law enforcement agency, congressional investigatory body, or any bank examiner concerning accounts at Riggs.

REQUEST FOR PRODUCTION NO. 46:

All testimony given by any director, officer or employee of BAE concerning BAE's payments to Prince Bandar, including transcripts or audio or video recordings of depositions or trial testimony given by such persons.

REQUEST FOR PRODUCTION NO. 47:

All documents concerning BAE's efforts to seek legal redress from any defendant for United States federal offenses, including, but not limited to, mail fraud, racketeering and conspiracy, or breach of fiduciary duty.

REQUEST FOR PRODUCTION NO. 48:

All documents concerning the cost of settlement of any action related to kickbacks or bribes paid by BAE.

REQUEST FOR PRODUCTION NO. 49:

All documents concerning the cost of defending any action related to kickbacks and bribes paid by BAE, including legal fees and other related costs.

REQUEST FOR PRODUCTION NO. 50:

All documents concerning BAE paying bribes and/or kickbacks to Prince Bandar.

REQUEST FOR PRODUCTION NO. 51:

All documents concerning any payments made by BAE to Prince Bandar through United States-based accounts, including those at Riggs.

REQUEST FOR PRODUCTION NO. 52:

All documents concerning BAE's preparation or assistance in preparation of high ranking

BAE executives for deposition or other forms of testimony in legal proceedings.

REQUEST FOR PRODUCTION NO. 53:

All documents concerning any defendants' approval of payments to Prince Bandar.

REQUEST FOR PRODUCTION NO. 54:

All of the BAE board of directors (and all committees thereof) minutes (including agendas,

all handouts distributed prior to, during and subsequent to each meeting, and the notes of each

director who attended each meeting) during the Relevant Period.

REQUEST FOR PRODUCTION NO. 55:

All communications to BAE shareholders, and all drafts thereof, during the Relevant Period.

REQUEST FOR PRODUCTION NO. 56:

Transcripts of all BAE earnings conference calls.

REQUEST FOR PRODUCTION NO. 57:

All directors' and officers' insurance policies obtained by BAE in each fiscal year between

1985 and the present.

REQUEST FOR PRODUCTION NO. 58:

All documents concerning BAE's policy concerning the retention or destruction of

documents sought by this Request.

DATED:  February __, 2008        COUGHLIN STOIA GELLER RUDMAN
                                                        & ROBBINS LLP
                                              PATRICK J. COUGHLIN
                                              MARK SOLOMON
                                              MARY K. BLASY

_____

                                              MARY K. BLASY

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff

THE LAW OFFICE OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)
1100 Connecticut Ave., NW, Suite 730
Washington, DC  20036
Telephone:  202/822-0600
202/822-6722 (fax)

CUNEO GILBERT & LaDUCA, L.L.P.
JONATHAN W. CUNEO(DC Bar # 939389)
WILLIAM H. ANDERSON (DC Bar # 502380)
507 C Street, N.E.
Washington, DC  20002
Telephone:  202/789-3960
202/789-1813 (fax)

Co-Liaison Counsel

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

C:\PROGRA~1\DocsCorp\PDFDOC~4\users\DianaH\Import\REQ00049247_Nom Def.doc

EXHIBIT R

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re BAE SYSTEMS PLC DERIVATIVE LITIGATION | ) ) ) | Civil No. 1:07-cv-01646 |
| | ) | Assigned to: Judge Rosemary M. Collyer |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |

PLAINTIFF'S FIRST SET OF INTERROGATORIES TO NOMINAL DEFENDANT BAE PLC CONCERNING PERSONAL JURISDICTION

PROPOUNDING PARTY:          PLAINTIFF

RESPONDING PARTIES:          NOMINAL DEFENDANT BAE PLC

SET:                                        ONE

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, plaintiff requests that Nominal Defendant BAE Systems p.l.c. respond to the following Interrogatories by _____, 2008 and produce written answers by _____, 2008.

## I.     DEFINITIONS

1.     The terms "BAE," "you" or "your" mean nominal defendant BAE Systems p.l.c. and all of its subsidiaries and affiliates in the United States or elsewhere, and all officers, directors, employees, accountants, attorneys, affiliates, producers, or agents of BAE and its subsidiaries and affiliates or persons occupying a similar status or performing a similar function.  Unless otherwise indicated, all references to "BAE" refer to this definition.

2.     The term "BAE PLC" means nominal defendant BAE Systems p.l.c. and all officers, directors, employees, accountants, attorneys, affiliates, producers, or agents of BAE PLC or persons occupying a similar status or performing a similar function.

3.     The term "BAE INC" means BAE Systems Inc. and all officers, directors, employees, accountants, attorneys, affiliates, producers, or agents of BAE INC and its subsidiaries and affiliates or persons occupying a similar status or performing a similar function.

4.     The term "United States-based BAE subsidiary" refers to any BAE subsidiary headquartered or incorporated in the United States, and all officers, directors, employees, accountants, attorneys, affiliates, producers, or agents and their subsidiaries and affiliates or persons occupying a similar status or performing a similar function.  This includes but is not limited to BAE INC.

5.     The term "BAE Executive" refers to each of the following defendants: Richard (Dick) L. Olver, Michael J. Turner, Walter P. Havenstein, Ian G. King, George W. Rose, Christopher V. Geoghegan, Phillip J. Carroll, Michael J. Hartnall, Sir Peter James Mason, Roberto Quarta, Sir Anthony Nigel Russell Rudd, Peter A. Weinberg, Andrew George Inglis, Ulrich Cartellieri, Sue

Birley, Michael Lester, Mark H. Ronald, Michael Denzil Xavier Portillo, Sir Richard Harry Evans, Lord Alexander Hesketh, John Pix Weston, Keith Clark Brown, Steve Lewis Mogford, Paolo Scaroni, Sir Robin Biggam, Sir Charles Beech Gordon Masefield, and any of their respective agents, employees, affiliates, attorneys, accountants or other representatives.

6.     The terms "Riggs" and/or "PNC" refer to PNC Financial Services Group, Inc., As Successor to Riggs National Corporation/Riggs Bank, N.A., and any of their respective agents, employees, affiliates, attorneys, accountants or other representatives.

7.     The term "Allbrittons" refers to Joseph L. Allbritton, Robert L. Allbritton and Barbara Allbritton, and any of their respective agents, employees, affiliates, attorneys, accountants or other representatives.

8.     The term "Prince Bandar" refers to Prince Bandar Bin Sultan, and any of his agents, employees, affiliates, attorneys, accountants or other representatives.  For purposes of these requests, Prince Bandar's agents, employees, affiliates, attorneys, accountants or other representatives shall include those of any member of the Saudi Royal Family and the Kingdom of Saudi Arabia.

9.     The term "defendant" refers collectively the BAE Executives, PNC/Riggs, Prince Bandar and the Allbrittons.

10.     The term "BAE Executive contesting personal jurisdiction" refers to each of the BAE Executives (except Paolo Scaroni).

11.     "United States" shall mean the states and territories comprising the United States of America.

12.     The terms "describe," "state" and "identify" mean to state in detail all facts necessary to make your response to each Interrogatory complete.

13.     The terms "identify" and "identity," when used in reference to a natural person, shall require you to state (a) his full name, (b) his present or last known address, and (c) his present or last

known employer and job title.  When used in reference to a corporation or business entity, "identify" or "identity" shall require you to state (a) the full name of the corporation or business entity, (b) the present or last known address, and (c) the principal place of business and state of incorporation. When used in reference to a document, "identify" and "identity" shall require you to state (a) the date of such document, (b) the type of document, (c) the present location of such document or copies of such document, and (d) a brief summary of the contents of such document.

14.    "Document" or "documents" are intended to have the broadest possible meaning under Federal Rule of Civil Procedure 34 and includes, without limitation, any writing or recording as defined by Federal Rule of Evidence 1001(1), any printed, typed, photostated, photographed, recorded, electronically created or otherwise reproduced or stored communication or representation, whether comprised of letters, words, numbers, pictures, sounds or symbols, or any combination thereof.   This definition includes copies or duplicates of documents contemporaneously or subsequently created, which have any notes or other markings.  Without limiting the generality of the foregoing, "document" or "documents" includes without limitation any electronic data or digitally encoded data, e-mail, any database, graphic or other data compilation from which information can be obtained, translated if necessary, by the respondent through detection devices into reasonably usable form, or other information, including originals, translations, and drafts thereof and all copies bearing notations and marks not found on the original.

15.    The term "concerning" means relating to, referring to, describing, evidencing, or constituting.

16.    The term "person" means any individual, corporation, partnership, limited partnership, joint venture, sole proprietorship, corporation, trust, governmental agency or other organization recognizable at law, and its agents and employees.

- 3 -

17.    The term "meeting" means any assemble, convocation, encounter, or contemporaneous presence of two or more persons for any purpose, whether or not planned, arranged or scheduled in advance, and whether or not occurring face-to-face, telephonically, via video conference, and whether or not the meeting was formal or informal or occurred in connection with some other activity.

18.    The term "communications" means any transfer of information of any kind, orally, in writing, or in any other manner.

19.    The singular shall include the plural and the past tense shall include the present tense, and vice versa; the words "and" or "or" shall be both conjunctive or disjunctive; the word "all" means "any and all"; the word "including" means "including but not limited to"; the word "he" or any other masculine pronoun includes any individual regardless of sex.

## II.    RELEVANT TIME PERIOD

Unless otherwise indicated, the relevant time period for each Interrogatory is January 1, 1985, through the date of response to these Interrogatories.

## III.    INSTRUCTIONS

1.    The scope of discovery extends to all relevant and non-privileged information that might reasonably lead to the discovery of admissible evidence.  Each individual interrogatory must be answered fully, in writing, and under oath.  A corporate defendant (nominal or otherwise) has a responsibility to file full and complete answers and to furnish reliable information, documents and other tangible things in its possession, custody or control, or in the possession, custody or control, of (a) past or present officers, agents, servants, and employees, (b) its departments and/or divisions, (c) parent or subsidiary corporations, (d) corporate affiliates, and (e) other persons, firms, or corporations which, because of your business relationship, would (or should) readily respond to your efforts to obtain the information and/or documents requested.  You may refer to your "business records" only if the plaintiff may obtain from those documents the same information you would

provide if you were to answer the interrogatory, and only if the burden placed upon the plaintiff by reference to the document is the same as the burden which would otherwise by placed upon defendant.

2.      These interrogatories shall be deemed continuing so as to require supplemental answers upon receipt of additional information by defendant and/or defendant's attorneys subsequent to the submission of defendant's original responses.

3.      Where an interrogatory requests specific information, if the precise information is unknown to you, approximate the requested information as precisely as you are reasonably capable of doing, and indicate that you have done so.

4.      If any portion of an interrogatory response is withheld under a claim of privilege or other ground, for each such response identify the privilege being asserted and provide information sufficient to permit the Court to rule on your claim.  Please describe in detail the factual basis for such claim.  If a document is withheld under a claim of privilege, identify the custodian of the document, the general subject matter of the document, and all persons who have viewed the document.

5.      With respect to any Interrogatory, the response to which you contend is in some way "burdensome" or "oppressive," please state the specific reasons for this objection.

## IV.      INTERROGATORIES

INTERROGATORY NO. 1:

State the date and place of incorporation of all United States-based BAE subsidiaries and identify all of their directors, officers, and board members by year, title, position, home address, and business address.

INTERROGATORY NO. 2:

Describe any reimbursement or payment policy BAE PLC has concerning attendance by BAE directors at board of director or committee meetings held in the United States.

INTERROGATORY NO. 3:

For each BAE board meeting or committee meeting held in the United States since 1985, state the name of each person attending.

INTERROGATORY NO. 4:

Identify all payments BAE directed to Prince Bandar in the United States, including the date, amount, recipient of payment (including account numbers), and purpose of payment.

INTERROGATORY NO. 5:

Identify all directives, instructions or communications by your officers or directors to any BAE officers, directors, or employees with respect to the payments made to Prince Bandar in the United States at issue in this litigation.

INTERROGATORY NO. 6:

Identify any BAE officers, directors, agents or employees, which were involved in transferring payments to Prince Bandar in the United States.

DATED: February __, 2008         COUGHLIN STOIA GELLER RUDMAN
                                   & ROBBINS LLP
                                 PATRICK J. COUGHLIN
                                 MARK SOLOMON
                                 MARY K. BLASY


                                 _____
                                        MARY K. BLASY

                                 655 West Broadway, Suite 1900
                                 San Diego, CA  92101
                                 Telephone:  619/231-1058
                                 619/231-7423 (fax)

                                 Lead Counsel for Plaintiff

- 6 -

THE LAW OFFICE OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)
1100 Connecticut Ave., NW, Suite 730
Washington, DC  20036
Telephone:  202/822-0600
202/822-6722 (fax)

CUNEO GILBERT & LaDUCA, L.L.P.
JONATHAN W. CUNEO(DC Bar # 939389)
WILLIAM H. ANDERSON (DC Bar # 502380)
507 C Street, N.E.
Washington, DC  20002
Telephone:  202/789-3960
202/789-1813 (fax)

Co-Liaison Counsel

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

C:\PROGRA~1\DocsCorp\PDFDOC~4\users\DianaH\Import\ROG00049246_Nom Def.doc

EXHIBIT S

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re BAE SYSTEMS PLC DERIVATIVE LITIGATION | ) ) ) | Civil No. 1:07-cv-01646 |
| | ) | Assigned to: Judge Rosemary M. Collyer |
| This Document Relates To: | ) ) ) | |
| ALL ACTIONS. | ) ) | |

PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO ALL
DEFENDANTS CONTESTING PERSONAL JURISDICTION

PROPOUNDING PARTY:          PLAINTIFF

RESPONDING PARTIES:          ALL BAE EXECUTIVE DEFENDANTS
                             CONTESTING PERSONAL JURISDICTION

SET NUMBER:          ONE

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, plaintiff requests that all BAE Executive Defendants contesting jurisdiction respond to the following Requests by _____, 2008, and produce the documents described below for inspection and copying on or before _____, 2008, at 10:00 a.m., at the law offices of Coughlin Stoia Geller Rudman & Robbins, LLP, 1100 Connecticut Avenue, N.W., Suite 730, Washington, DC 20036, Phone No. 202/822-6762.

## I.    DEFINITIONS

1.    The terms "you" and "your" mean the specific party responding to these Requests.

2.    The term "BAE" means nominal defendant BAE Systems p.l.c. and all of its subsidiaries and affiliates, and all officers, directors, employees, accountants, attorneys, affiliates, producers, or agents of BAE and its subsidiaries and affiliates or persons occupying a similar status or performing a similar function, whether in the United Kingdom, the United States or elsewhere.

3.    The term "BAE Executive" refers to each of the following defendants: Richard (Dick) L. Olver, Michael J. Turner, Walter P. Havenstein, Ian G. King, George W. Rose, Christopher V. Geoghegan, Phillip J. Carroll, Michael J. Hartnall, Sir Peter James Mason, Roberto Quarta, Sir Anthony Nigel Russell Rudd, Peter A. Weinberg, Andrew George Inglis, Ulrich Cartellieri, Sue Birley, Michael Lester, Mark H. Ronald, Michael Denzil Xavier Portillo, Sir Richard Harry Evans, Lord Alexander Hesketh, John Pix Weston, Keith Clark Brown, Steve Lewis Mogford, Paolo Scaroni, Sir Robin Biggam, Sir Charles Beech Gordon Masefield, and any of their respective agents, employees, affiliates, attorneys, accountants or other representatives.

4.    The terms "Riggs" and/or "PNC" refer to PNC Financial Services Group, Inc., As Successor to Riggs National Corporation/Riggs Bank, N.A., and any of their respective agents, employees, affiliates, attorneys, accountants or other representatives.

5.    The term "Allbrittons" refers to Joseph L. Allbritton, Robert L. Allbritton and Barbara Allbritton, and any of their respective agents, employees, affiliates, attorneys, accountants or other representatives.

6.    The term "Prince Bandar" refers to Prince Bandar Bin Sultan, and any of his agents, employees, affiliates, attorneys, accountants or other representatives.  For purposes of these requests, Prince Bandar's agents, employees, affiliates, attorneys, accountants or other representatives shall include those of any member of the Saudi Royal Family and the Kingdom of Saudi Arabia.

7.    The term "defendant" refers collectively the BAE Executives, PNC/Riggs, Prince Bandar and the Allbrittons.

8.    "United States" shall means the states and territories comprising the United States of America.

9.    The term "BAE Executive contesting personal jurisdiction" refers to each of the BAE Executives (except Paolo Scaroni).

10.    "Document" or "documents" are intended to have the broadest possible meaning under Federal Rule of Civil Procedure 34 and includes, without limitation, any writing or recording as defined by Federal Rule of Evidence 1001(1), any printed, typed, photostated, photographed, recorded, electronically created or otherwise reproduced or stored communication or representation, whether comprised of letters, words, numbers, pictures, sounds or symbols, or any combination thereof.  This definition includes copies or duplicates of documents contemporaneously or subsequently created, which have any notes or other markings.  Without limiting the generality of the foregoing, "document" or "documents" includes without limitation any electronic data or digitally encoded data, e-mail, any database, graphic or other data compilation from which information can be obtained, translated if necessary, by the respondent through detection devices

into reasonably usable form, or other information, including originals, translations, and drafts thereof and all copies bearing notations and marks not found on the original.

11.     The term "concerning" means relating to, referring to, describing, evidencing, or constituting.

12.     The term "person" means any individual, corporation, partnership, limited partnership, joint venture, sole proprietorship, corporation, trust, governmental agency or other organization recognizable at law, and its agents and employees.

13.     The term "meeting" means any assemble, convocation, encounter, or contemporaneous presence of two or more persons for any purpose, whether or not planned, arranged or scheduled in advance, and whether or not occurring face-to-face, telephonically, via videoconference, and whether or not the meeting was formal or informal or occurred in connection with some other activity.

14.     The term "communications" means any transfer of information of any kind, orally, in writing, or in any other manner.

15.     The singular shall include the plural and the past tense shall include the present tense, and vice versa; the words "and" or "or" shall be both conjunctive or disjunctive; the word "all" means "any and all"; the word "including" means "including but not limited to"; the word "he" or any other masculine pronoun includes any individual regardless of sex.

## II.     RELEVANT TIME PERIOD

Unless otherwise indicated, the relevant time period for each Request is January 1, 1985 through the date of production by each BAE Executive Defendant contesting personal jurisdiction.

## III.     INSTRUCTIONS

1.     All documents shall be produced in the order they are kept in the ordinary course of business or the documents shall be organized and labeled to correspond with the categories in the

Request.  In addition, documents are to be produced in full and unexpurgated form; redacted documents will not constitute compliance with this Request.

2.      These requests relate to all documents which are in any defendant's possession, custody or control or in the possession, custody or control of respective directors, officers, managing agents, employees, attorneys, accountants or other representatives.

3.      Each defendant shall produce the original of each document described below or, if the original is not in its custody, then a copy thereof, and in any event, all non-identical copies which differ from the original or from the other copies produced for any reason, including, but not limited to, the making of notes thereon.

4.      If production of documents is withheld on the ground of privilege, as to each such withheld document state the following information:

      (a)      Which privilege is claimed;

      (b)      A precise statement of the facts upon which said claim of privilege is based;

      (c)      The following information describing each purportedly privileged document:

            (i)      Its nature, *e.g.*, agreement, letter, memorandum, tape, etc.;

            (ii)     The date it was prepared;

            (iii)    The date it bears;

            (iv)     The date it was sent;

            (v)      The date it was received;

            (vi)     The identity of the person preparing it;

            (vii)    The identity of the person sending it;

            (viii)   The identity of each person to whom it was sent or was to have been sent, including all addresses and all recipients of copies; and

(ix)    A statement as to whom each identified person represented or purported to represent at all relevant times.

(d)    A precise description of the place where each copy of that document is kept, including the title or description of the file in which said document may be found and the location of such file.

5.    Whenever a document is not produced in full or is produced in redacted form, so indicate on the document and state with particularity the reason or reasons it is not being produced in full and describe to the best of your knowledge, information and belief, and with as much particularity as possible, those portions of the document which are not being produced.

6.    In the event that any document called for by this Request has been destroyed, lost, discarded or otherwise disposed of, any such document is to be identified as completely as possible, including the following information:  date of disposal, manner of disposal, reason for disposal, person authorizing the disposal and person disposing of the document.

7.    With respect to any category of documents, the production of which you contend is in some way "burdensome" or "oppressive," please state the specific reasons for this objection.

## IV.    REQUESTS FOR PRODUCTION OF DOCUMENTS

REQUEST FOR PRODUCTION NO. 1:

Copies of each page of any passport ever issued to you.  There is no time limit to this request.

REQUEST FOR PRODUCTION NO. 2:

All documents listing or concerning your ownership of any monies, holdings or assets of any kind in the United States.

REQUEST FOR PRODUCTION NO. 3:

All documents concerning any communications or meetings which you, or others acting at your behest or on your behalf, have had with representatives of BAE, whether or not those communications or meetings took place in the United States.

REQUEST FOR PRODUCTION NO. 4:

All documents concerning any agreement or contract for any purpose between BAE and you or any entity beneficially owned or controlled by you.

REQUEST FOR PRODUCTION NO. 5:

All documents concerning loans sought or received by you or members of your immediate family (spouse, siblings, parents, children) from BAE.

REQUEST FOR PRODUCTION NO. 6:

All documents reflecting income earned by you as a result of any activity conducted in the United States, including tax returns or declarations of income or assets you have filed with the United States, any state or any political subdivision within the United States.

REQUEST FOR PRODUCTION NO. 7:

Documents which list your checking, savings or other accounts with banks, brokerage firms or other financial institutions with offices in the United States.

REQUEST FOR PRODUCTION NO. 8:

All documents concerning press releases and/or public statements distributed in the United States by you or at your behest, or which you participated in writing or editing.

REQUEST FOR PRODUCTION NO. 9:

All documents concerning any donations or contributions you have made to any political organization or campaign, educational, non-profit or philanthropic organization located in the United States.

REQUEST FOR PRODUCTION NO. 10:

All documents concerning your directorship or trusteeship of, or any managerial function you may have or had, with respect to any charitable, educational or non-profit organization, foundation or trust which is or was organized or located in the United States.

REQUEST FOR PRODUCTION NO. 11:

All documents concerning any business activities of whatever nature conducted by you directly or indirectly in the United States.

REQUEST FOR PRODUCTION NO. 12:

All documents concerning entities that conduct business in or have an office in the United States in which you have or had a direct or indirect ownership interest.

REQUEST FOR PRODUCTION NO. 13:

All deeds, lease agreements, or other indicia of ownership, use or beneficial rights by you for any real property located within the United States.

REQUEST FOR PRODUCTION NO. 14:

All deeds, lease agreements, or other indicia of ownership or right to beneficial use by you of any personal property located within the United States.

REQUEST FOR PRODUCTION NO. 15:

All telephone records and other documents reflecting any telephone calls made or received by you to, or from telephone numbers located within the United States.

REQUEST FOR PRODUCTION NO. 16:

All documents concerning or showing a record of any mailing or deliveries made by you or on your behalf to an address or addresses in the United States.

REQUEST FOR PRODUCTION NO. 17:

All diaries, daybooks, calendars, appointment books, telephone logs or similar documents reflecting your business activities and personal activities in the United States.

REQUEST FOR PRODUCTION NO. 18:

Any and all documents which you sent to or were sent to you from any regulatory body of the United States or any of its political subsidiaries.

REQUEST FOR PRODUCTION NO. 19:

All documents concerning any presentations by you conducted in the United States.

REQUEST FOR PRODUCTION NO. 20:

All documents identified in your response to Plaintiff's First Set of Interrogatories to All Defendants Contesting Jurisdiction.

REQUEST FOR PRODUCTION NO. 2122:

All documents concerning income or revenue derived by you, whether directly or indirectly, in the United States.

REQUEST FOR PRODUCTION NO. 23:

All documents concerning any attempt by you to solicit any business in the United States or from United States residents.

REQUEST FOR PRODUCTION NO. 24:

All documents concerning any effort by you to advertise in the United States or to direct advertising at United States residents.

REQUEST FOR PRODUCTION NO. 25:

All documents concerning any attempt by you to solicit residents of the United States for employment with any entity you own or control, and all documents concerning the hiring of any United States resident by you or any entity you own or control.

REQUEST FOR PRODUCTION NO. 26:

All documents concerning any payments made by BAE to Prince Bandar in the United States.

REQUEST FOR PRODUCTION NO. 27:

All documents concerning any communication received by you from any United States or United Kingdom regulator or law enforcement personnel or agency concerning BAE's payments to Prince Bandar in the United States.

REQUEST FOR PRODUCTION NO. 28:

All documents concerning any communication between you and any United States or United Kingdom regulator or law enforcement personnel or agency concerning BAE's payments to Prince Bandar in the United States.

REQUEST FOR PRODUCTION NO. 29:

All documents produced by you to any United States or United Kingdom regulator, law enforcement personnel or agency, or bank examiner concerning BAE's payments to Prince Bandar in the United States.

REQUEST FOR PRODUCTION NO. 30:

All documents concerning any communication between you and PriceWaterhouseCoopers LLP or Allen & Overy LLP concerning BAE's payments to Prince Bandar in the United States.

REQUEST FOR PRODUCTION NO. 31:

All documents concerning any meetings of the BAE Board of Directors or board of any BAE subsidiary (or committee thereof) you attended at which BAE's payments to Prince Bandar in the United States were discussed. This includes all meeting minutes, travel documents, travel expense or reimbursement records and all materials distributed at, in advance of or after the meeting.

REQUEST FOR PRODUCTION NO. 32:

All documents reflecting communications or meetings with PNC or Riggs concerning payments made by BAE to Prince Bandar.

REQUEST FOR PRODUCTION NO. 33:

All documents reflecting any communications or meetings with the Allbrittons.

REQUEST FOR PRODUCTION NO. 34:

All documents reflecting any communications or meetings with the Prince Bandar.

REQUEST FOR PRODUCTION NO. 35:

All documents concerning your policy and practice concerning the retention or destruction of documents sought by this set of document Requests.

DATED:  February __, 2008          COUGHLIN STOIA GELLER RUDMAN
                                      & ROBBINS LLP
                                   PATRICK J. COUGHLIN
                                   MARK SOLOMON
                                   MARY K. BLASY


                                   _____
                                            MARY K. BLASY

                                   655 West Broadway, Suite 1900
                                   San Diego, CA  92101
                                   Telephone:  619/231-1058
                                   619/231-7423 (fax)

                                   Lead Counsel for Plaintiff

                                   THE LAW OFFICE OF ROGER M. ADELMAN
                                   ROGER M. ADELMAN (DC Bar # 056358)
                                   1100 Connecticut Ave., NW, Suite 730
                                   Washington, DC  20036
                                   Telephone:  202/822-0600
                                   202/822-6722 (fax)

CUNEO GILBERT & LaDUCA, L.L.P.
JONATHAN W. CUNEO(DC Bar # 939389)
WILLIAM H. ANDERSON (DC Bar # 502380)
507 C Street, N.E.
Washington, DC  20002
Telephone:  202/789-3960
202/789-1813 (fax)

Co-Liaison Counsel

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

S:\CasesSD\BAE Derivative\REQ00049249_Ex Def.doc

EXHIBIT T

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re BAE SYSTEMS PLC DERIVATIVE LITIGATION | ) ) ) | Civil No. 1:07-cv-01646 |
| | ) | Assigned to: Judge Rosemary M. Collyer |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |

PLAINTIFF'S FIRST SET OF INTERROGATORIES TO ALL BAE EXECUTIVE
DEFENDANTS CONTESTING PERSONAL JURISDICTION

PROPOUNDING PARTY:        PLAINTIFF

RESPONDING PARTIES:        ALL BAE EXECUTIVE DEFENDANTS CONTESTING
                           PERSONAL JURISDICTION

SET:                       ONE

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, plaintiff requests that all BAE Executive defendants contesting personal jurisdiction respond to the following Interrogatories by _____, 2008 and produce written answers by _____, 2008.

## I.    DEFINITIONS

1.    The terms "you" and "your" mean the specific party responding to these interrogatories.

2.    The term "BAE" means nominal defendant BAE Systems p.l.c. and all of its subsidiaries and affiliates, and all officers, directors, employees, accountants, attorneys, affiliates, producers, or agents of BAE and its subsidiaries and affiliates or persons occupying a similar status or performing a similar function, whether in the United Kingdom, the United States or elsewhere.

3.    The term "BAE Executive" refers to each of the following defendants: Richard (Dick) L. Olver, Michael J. Turner, Walter P. Havenstein, Ian G. King, George W. Rose, Christopher V. Geoghegan, Phillip J. Carroll, Michael J. Hartnall, Sir Peter James Mason, Roberto Quarta, Sir Anthony Nigel Russell Rudd, Peter A. Weinberg, Andrew George Inglis, Ulrich Cartellieri, Sue Birley, Michael Lester, Mark H. Ronald, Michael Denzil Xavier Portillo, Sir Richard Harry Evans, Lord Alexander Hesketh, John Pix Weston, Keith Clark Brown, Steve Lewis Mogford, Paolo Scaroni, Sir Robin Biggam, Sir Charles Beech Gordon Masefield, and any of their respective agents, employees, affiliates, attorneys, accountants or other representatives.

4.    The terms "Riggs" and/or "PNC" refer to PNC Financial Services Group, Inc., As Successor to Riggs National Corporation/Riggs Bank, N.A., and any of their respective agents, employees, affiliates, attorneys, accountants or other representatives.

5.    The term "Allbrittons" refers to Joseph L. Allbritton, Robert L. Allbritton and Barbara Allbritton, and any of their respective agents, employees, affiliates, attorneys, accountants or other representatives.

6.      The term "Prince Bandar" refers to Prince Bandar Bin Sultan, and any of his agents, employees, affiliates, attorneys, accountants or other representatives.  For purposes of these requests, Prince Bandar's agents, employees, affiliates, attorneys, accountants or other representatives shall include those of any member of the Saudi Royal Family and the Kingdom of Saudi Arabia.

7.      The term "defendant" refers collectively the BAE Executives, PNC/Riggs, Prince Bandar and the Allbrittons.

8.      The term "BAE Executive contesting personal jurisdiction" refers to each of the BAE Executives (except Paolo Scaroni).

9.      "United States" shall mean the states and territories comprising the United States of America.

10.     The terms "describe," "state" and "identify" mean to state in detail all facts necessary to make your response to each Interrogatory complete.

11.     The terms "identify" and "identity," when used in reference to a natural person, shall require you to state (a) his full name, (b) his present or last known address, and (c) his present or last known employer and job title.  When used in reference to a corporation or business entity, "identify" or "identity" shall require you to state (a) the full name of the corporation or business entity, (b) the present or last known address, and (c) the principal place of business and state of incorporation. When used in reference to a document, "identify" and "identity" shall require you to state (a) the date of such document, (b) the type of document, (c) the present location of such document or copies of such document, and (d) a brief summary of the contents of such document.

12.     "Document" or "documents" are intended to have the broadest possible meaning under Federal Rule of Civil Procedure 34 and includes, without limitation, any writing or recording as defined by Federal Rule of Evidence 1001(1), any printed, typed, photostated, photographed, recorded, electronically created or otherwise reproduced or stored communication or representation,

whether comprised of letters, words, numbers, pictures, sounds or symbols, or any combination thereof. This definition includes copies or duplicates of documents contemporaneously or subsequently created, which have any notes or other markings. Without limiting the generality of the foregoing, "document" or "documents" includes without limitation any electronic data or digitally encoded data, e-mail, any database, graphic or other data compilation from which information can be obtained, translated if necessary, by the respondent through detection devices into reasonably usable form, or other information, including originals, translations, and drafts thereof and all copies bearing notations and marks not found on the original.

13.    The term "concerning" means relating to, referring to, describing, evidencing, or constituting.

14.    The term "person" means any individual, corporation, partnership, limited partnership, joint venture, sole proprietorship, corporation, trust, governmental agency or other organization recognizable at law, and its agents and employees.

15.    The term "meeting" means any assemble, convocation, encounter, or contemporaneous presence of two or more persons for any purpose, whether or not planned, arranged or scheduled in advance, and whether or not occurring face-to-face, telephonically, via video conference, and whether or not the meeting was formal or informal or occurred in connection with some other activity.

16.    The term "communications" means any transfer of information of any kind, orally, in writing, or in any other manner.

17.    The singular shall include the plural and the past tense shall include the present tense, and vice versa; the words "and" or "or" shall be both conjunctive or disjunctive; the word "all" means "any and all"; the word "including" means "including but not limited to"; the word "he" or any other masculine pronoun includes any individual regardless of sex.

## II.    RELEVANT TIME PERIOD

Unless otherwise indicated, the relevant time period for each Interrogatory is January 1, 1985, through the date of response to these Interrogatories by each BAE Executive Defendant contesting personal jurisdiction.

## III.    INSTRUCTIONS

1.    The scope of discovery extends to all relevant and non-privileged information that might reasonably lead to the discovery of admissible evidence.  Each individual interrogatory must be answered fully, in writing, and under oath.  You may refer to your "business records" only if the plaintiff may obtain from those documents the same information you would provide if you were to answer the interrogatory, and only if the burden placed upon the plaintiff by reference to the document is the same as the burden which would otherwise by placed upon defendant.

2.    These interrogatories shall be deemed continuing so as to require supplemental answers upon receipt of additional information by defendant and/or defendant's attorneys subsequent to the submission of defendant's original responses.

3.    Where an interrogatory requests specific information, if the precise information is unknown to you, approximate the requested information as precisely as you are reasonably capable of doing, and indicate that you have done so.

3.    If any portion of an interrogatory response is withheld under a claim of privilege or other ground, for each such response identify the privilege being asserted and provide information sufficient to permit the Court to rule on your claim.  Please describe in detail the factual basis for such claim.  If a document is withheld under a claim of privilege, identify the custodian of the document, the general subject matter of the document, and all persons who have viewed the document.

4.    With respect to any Interrogatory, the response to which you contend is in some way "burdensome" or "oppressive," please state the specific reasons for this objection.

- 4 -

## IV.     INTERROGATORIES

INTERROGATORY NO. 1:

Identify all communications or meetings you or others acting at your behest have had with persons located in the United States.  For each such communication or meeting, specify the date, location, method of communication, purpose, and any person who participated in the meeting or communication or was the designated recipient of the communication (whether held telephonically, by videolink or otherwise).

INTERROGATORY NO. 2:

Identify any and all of your employees, agents or other representatives who live(d) or solicit(ed) or conduct(ed) business for you in the United States, while acting as your agent, employee or representative.  For each such person, specify their name, last known residential and business addresses and telephone numbers and the nature of their relationship with you.

INTERROGATORY NO. 3:

Identify any activities or operations, of whatever nature, in the United States conducted by you or on your behalf.  Describe such activities or operations, including any communications made in connection with such matters.

INTERROGATORY NO. 4:

Identify each meeting you or anyone acting at your behest attended, either telephonically or by videolink, or in person, which meeting was held (or in the case of a telephonic or video meeting, included someone located) in the United States.  For each such meeting, specify the date, location and purpose of the meeting.

INTERROGATORY NO. 5:

Identify every business entity in which you are or you have been an owner, a general or limited partner, manager or beneficial owner, and which maintains offices in, or conducts business

in, the United States (including any partnership in which you have been a member which is a partner in an entity which maintains offices in or conducts business in the United States), including the full name of the business operation and the address of its principal office or location of its facility.

INTERROGATORY NO. 6:

Identify every charitable organization or foundation organized or existing under the laws of the United States or any political subdivision thereof of which you have acted as a director, trustee, founder or honoree.

INTERROGATORY NO. 7:

If you have been a party or witness to any civil lawsuit, other than the instant litigation, or the subject of any criminal investigation or proceeding in the United States, identify and describe such litigation or investigation.

INTERROGATORY NO. 8:

Identify all real and personal property located in the United States in which you have or had any direct, indirect or beneficial ownership interest.

INTERROGATORY NO. 9:

Identify all investments or holdings in the United States in which you have or had any direct, indirect or beneficial ownership interest.

INTERROGATORY NO. 10:

Describe in detail any license, registration, degree or title that you have obtained from any entity located in the United States.

INTERROGATORY NO. 11:

If you have maintained any checking, savings or other account at any bank, brokerage firm or any other financial institution in the United States, describe the nature and location of each account in detail.

INTERROGATORY NO. 12:

If you have paid any taxes to, or filed any tax returns or declarations of income or assets within the United States or any state or political subdivision located in the United States, describe the date and nature of the tax.

INTERROGATORY NO. 13:

If you have placed, authorized, paid for or shared in the payment of any advertisements in newspapers, magazines or any other publications or media which are distributed in the United States, for each such advertisement identify the publication or other media in which it appeared, the subject matter or content and the date of the advertisement.

INTERROGATORY NO. 14:

If you have maintained a telephone listing or used a post office box or other mailing address in the United States, state the dates, identity of the person listed, the number and/or exchange and the address.

INTERROGATORY NO. 15:

Identify all publicly disseminated documents prepared on behalf of BAE that you received copies of, wrote in whole or in part, or edited prior to publication.

INTERROGATORY NO. 16:

Describe any communication or correspondence you participated in regarding the dissemination of documents or information to the public regarding BAE.

INTERROGATORY NO. 17:

Describe any communication or correspondence you had concerning the alleged unlawful conduct complained of in this action, either before or after such unlawful conduct occurred.

INTERROGATORY NO. 18:

Describe all positions (*e.g.*, employee, officer or other) that you have held at BAE during the period of time from 1985 to the present which involved the performance of any duties in, or working with people located in the United States.

INTERROGATORY NO. 19:

Identify all entities in the United States of which you are or were an officer, director, partner, trustee or substantial investor (*i.e.*, having an interest of 10% or more) during the period of time from 1985 to the present.

INTERROGATORY NO. 20:

Describe all employment that you had in the United States during the period of time from 1985 to the present.

INTERROGATORY NO. 21:

Identify all applications you prepared or signed for any license or certificate from the United States, or any entity or political subdivision thereof.

INTERROGATORY NO. 22:

Identify all press releases and public statements published for availability in the United States by you or at your behest.

INTERROGATORY NO. 23:

Describe in detail any communication or correspondence you had concerning payments made by BAE to Prince Bandar, including but not limited to communications with any United States or United Kingdom governmental or regulatory body, any bank examiner, PricewaterhouseCoopers LLP or Allen & Overy LLP.

INTERROGATORY NO. 24:

Describe in detail all meetings you attended in which payments made by BAE to Prince Bandar were discussed, including but not limited to those concerning communications with any United States or United Kingdom governmental or regulatory body, any bank examiner, PricewaterhouseCoopers LLP or Allen & Overy LLP.

INTERROGATORY NO. 25:

Describe in detail all actions taken by you concerning compliance with any request for information or documents received from any United States or United Kingdom governmental or regulatory body, any bank examiner, PricewaterhouseCoopers LLP or Allen & Overy LLP.

INTERROGATORY NO. 26:

Describe in detail all actions taken by you concerning BAE's payments to Prince Bandar.

INTERROGATORY NO. 27:

Describe in detail the location and circumstances under which you attended any meeting of the BAE Board of Directors or any board of any BAE subsidiary (or committee thereof).  There is no geographical limitation to this Interrogatory.

INTERROGATORY NO. 28:

List all trips that you have taken to the United States, and for each, describe the purpose, the destination, duration and the activities conducted during the trip.

DATED:  February __, 2008                    COUGHLIN STOIA GELLER RUDMAN
                                                      & ROBBINS LLP
                                             PATRICK J. COUGHLIN
                                             MARK SOLOMON
                                             MARY K. BLASY


                                             _____
                                                      MARY K. BLASY

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff

THE LAW OFFICE OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)
1100 Connecticut Ave., NW, Suite 730
Washington, DC  20036
Telephone:  202/822-0600
202/822-6722 (fax)

CUNEO GILBERT & LaDUCA, L.L.P.
JONATHAN W. CUNEO(DC Bar # 939389)
WILLIAM H. ANDERSON (DC Bar # 502380)
507 C Street, N.E.
Washington, DC  20002
Telephone:  202/789-3960
202/789-1813 (fax)

Co-Liaison Counsel

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

C:\PROGRA~1\DocsCorp\PDFDOC~4\users\DianaH\Import\ROG00049248_Ex Def.doc

EXHIBIT U



SAN DIEGO • SAN FRANCISCO
NEW YORK • BOCA RATON
WASHINGTON, DC
LOS ANGELES • PHILADELPHIA

Mary K. Blasy
maryb@csgrr.com

February 20, 2008

<u>VIA FACSIMILE</u>

Lawrence Byrne
Mary K. Warren
LINKLATERS LLP
1345 Avenue of the Americas
New York, New York 10105
Facsimile: (212) 903-9100

Re:   *BAE Systems p.l.c. Shareholder Derivative Litigation*
      U.S. District Court for the District of Columbia No. 07cv1646

Dear Larry and Mary:

We are in receipt of the Motion By BAE Systems p.l.c. ("BAE") and the Individual, BAE Systems p.l.c. Defendants ("BAE Executives") To Dismiss The Complaint filed on January 31, 2007. It is our understanding that all of the BAE Executives (excepting Paolo Scaroni) have now been served and join the motion to dismiss. We also received declarations from David Parkes (for BAE) and each of the BAE Executives seeking dismissal for lack of personal jurisdiction.

We have reviewed the motion to dismiss, including the various declarations your clients provided containing bald assertions as to their citizenship. It is our position that the Complaint's allegations satisfy plaintiffs' *prima facie* burden of pleading specific, if not general, personal jurisdiction under the District of Columbia's long-arm statute as to BAE and each BAE Executives Defendant contesting personal jurisdiction. If, however, by this motion to dismiss your clients seek to go beyond the Complaint's allegations and seek an evidentiary finding on the issue of personal jurisdiction at this time, plaintiff is entitled to jurisdictional discovery from BAE and each BAE Executives Defendant contesting personal jurisdiction. *See gen. Crane v. Carr*, 814 F.2d 758, 760 (D.C. Cir. 1987) (vacating, in part, the District Court's judgment, where plaintiff's "case was dismissed with no opportunity for discovery on the issue of personal jurisdiction"); *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir. 1996) (vacating the District Court's order dismissing for lack of personal jurisdiction under conspiracy theory of personal jurisdiction and holding that a "plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding information on its contacts with the forum").



**COUGHLIN
STOIA
GELLER
RUDMAN
ROBBINS** LLP

Lawrence Byrne
Mary K. Warren
February 20, 2008
Page 2

Had BAE and the BAE Executives Defendants met and conferred prior to filing their motion, as required by LCvR 7(m), discovery on this important issue could have been taken on an entirely more reasonable time schedule. But in light of the deadlines presented, in accord with LCvR 26.2, we have prepared and enclose requests for production of documents and interrogatories directed at Nominal Defendant BAE and each BAE Executives Defendant contesting personal jurisdiction and a stipulation providing for the limited expedited personal jurisdiction discovery plaintiff requires to obtain the necessary discovery prior to the March 31st due date on its opposition to the motion to dismiss.

Please review the proposed stipulation and the written discovery and contact me by Friday, February 22nd to discuss: (i) your clients' willingness to engage in expedited discovery limited to personal jurisdiction; and (ii) your clients' willingness to comply with the deadlines outlined in the proposed stipulation. We can discuss the scope of the discovery, the form of production and the specific deposition timing issues next week.

Thank you.

Very truly yours,

MARY K. BLASY

cc:    Mark Solomon, Esq.
       Roger Adelman, Esq.

S:\CasesSD\BAE Derivative\Corres\Letter to Linklaters re Limited Jurisdictional Discovery.doc

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re BAE SYSTEMS PLC DERIVATIVE LITIGATION | ) ) ) | Civil No. 1:07-cv-01646 |
| | ) | Assigned to: Judge Rosemary M. Collyer |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |

JOINT STIPULATION AND [PROPOSED] ORDER PROVIDING FOR LIMITED
EXPEDITED PERSONAL JURISDICTION DISCOVERY

**WHEREAS,** on January 31, 2008, Nominal Defendant BAE Systems p.l.c. ("BAE") and individual defendants Richard (Dick) L. Olver, Michael J. Turner, Walter P. Havenstein, Ian G. King, George W. Rose, Christopher V. Geoghegan, Phillip J. Carroll, Michael J. Hartnall, Sir Peter James Mason, Roberto Quarta, Sir Anthony Nigel Russell Rudd, Peter A. Weinberg, Andrew George Inglis, Ulrich Cartellieri, Michael Lester, Mark H. Ronald, Michael Denzil Xavier Portillo, Sir Richard Harry Evans, Lord Alexander Hesketh, John Pix Weston, Keith Clark Brown, Steve Lewis Mogford, Sir Robin Biggam, and Sir Charles Beech Gordon Masefield (collectively, with defendant Sue Birley who joined on February 15, 2008, the "BAE Executive Defendants") moved to dismiss plaintiff's claims against them based on lack of personal jurisdiction, supported by declarations of each movant attesting to their residence, citizenship and employment status;

**WHEREAS,** pursuant to Pretrial Order No. 1, plaintiff's the City of Harper Woods Employee Retirement System, opposition to the motion to dismiss is due March 31, 2008; and

**WHEREAS**, in order provide the Court with a complete record upon which to resolve BAE's and the BAE Executive Defendants' motion to dismiss for lack of personal jurisdiction, on February 20, 2008, pursuant to agreement of the parties plaintiff served First Requests for Production of Documents and Interrogatories on BAE and on each of the BAE Executive Defendants contesting personal jurisdiction and the parties, through their respective counsel of record, agreed to jointly seek leave to conduct the following limited expedited personal jurisdiction discovery,

**NOW**, **THEREFORE**, it is hereby stipulated and agreed between plaintiff, BAE and the BAE Executive Defendants, through their respective counsel listed below, subject to the approval of the Court, that commencing with the time and date of this Order, in lieu of the time periods, notice provisions, and other requirements of Rules 26, 30, 34, and 45 of the Federal Rules of Civil Procedure and Local Rule 26.1, limited expedited personal jurisdiction discovery shall proceed under LCvR 26.2 as follows:

1.      On or before February 27, 2008, Nominal Defendant BAE and each BAE Executive Defendant contesting personal jurisdiction shall serve objections, if any, to plaintiff's First Requests for Production of Documents and Interrogatories;

2.      On or before March 5, 2008, Nominal Defendant BAE and each BAE Executive Defendant contesting personal jurisdiction shall answer plaintiff's First Interrogatories and make ready for copying all documents responsive to plaintiff's First Requests for Production of Documents;

3.      During the weeks of March 10 – 22, 2008, the person most knowledgeable at BAE concerning BAE's responses to plaintiff's First Requests for Production of Documents and Interrogatories and each BAE Executive Defendant contesting personal jurisdiction shall make himself or herself available for a deposition (of up to four hours in duration) limited to personal jurisdiction issues;

4.      Said personal jurisdiction depositions shall be taken at BAE's London headquarters, locations to be arranged by counsel for plaintiffs within 50 miles of the residence of each BAE Executive Defendant contesting personal jurisdiction, or at such other location agreed to by the parties, between the hours of 8 a.m. and 7 p.m., Monday through Saturday;

5.      Counsel for the parties shall cooperate in good faith to schedule the limited personal jurisdiction depositions in such a fashion as to permit all BAE Executive Defendants contesting personal jurisdiction that reside in or near a given city to be deposed on a single day;

6.      Deposition transcripts that have not been signed by the witnesses may be used for purposes of opposing the motion to dismiss for lack of personal jurisdiction;

7.      This Order shall not be construed in any manner to preclude plaintiff's right to seek further discovery or to take subsequent depositions of the same witnesses on the merits of this action;

8.      Any discovery or depositions taken pursuant to this Order is in addition to, and not subject to, the presumptive limits on depositions set forth in the Federal Rules of Civil Procedure or Local Rule 26.1; and

9.      No party waives or forfeits any rights, claims, or defenses by entering into this Stipulated Order Providing for Limited Expedited Personal Jurisdiction Discovery.

**IT IS SO STIPULATED.**

DATED:  February __, 2008                LAW OFFICES OF ROGER M. ADELMAN
                                         ROGER M. ADELMAN (DC Bar # 056358)


                                         _____
                                                  ROGER M. ADELMAN

                                         1100 Connecticut Ave., NW, Suite 730
                                         Washington, DC  20036
                                         Telephone:  202/822-0600
                                         202/822-6722 (fax)

                                         CUNEO GILBERT & LaDUCA, L.L.P.
                                         JONATHAN W. CUNEO(DC Bar # 939389)
                                         WILLIAM H. ANDERSON (DC Bar # 502380)
                                         507 C Street, N.E.
                                         Washington, DC  20002
                                         Telephone:  202/789-3960
                                         202/789-1813 (fax)

                                         Co-Liaison Counsel

- 3 -

COUGHLIN STOIA GELLER RUDMAN
  & ROBBINS LLP
PATRICK J. COUGHLIN
MARK SOLOMON
MARY K. BLASY
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiff

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

DATED:  February ___, 2008    LINKLATERS, LLP
LAWRENCE BYRNE (DC Bar # 4761)
MARY WARREN (DC BAR #_____)


_____
                    LAWRENCE BYRNE

1345 Avenue of the Americas
New York, NY  10105
Telephone:  212/903-9105
212/903-9100 (fax)

Counsel for Nominal Party BAE Systems p.l.c. and
the BAE Executive Defendants

**IT IS SO ORDERED.**


DATED:  _____    _____
THE HONORABLE ROSEMARY M. COLLYER
UNITED STATES DISTRICT JUDGE

EXHIBIT V

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 FfdV31Z7Lotff0uRBYJFwd0K+9zk6DUyLxHVKpOqPF24MViaaNgoHy5QMb+DIDPm
 dzyezXM+LcP7BjDB3MVVew==
```

<SEC-DOCUMENT>0000950117-03-001869.txt : 20030502
<SEC-HEADER>0000950117-03-001869.hdr.sgml : 20030502
<ACCEPTANCE-DATETIME>20030502153933
ACCESSION NUMBER:		0000950117-03-001869
CONFORMED SUBMISSION TYPE:	F-6EF
PUBLIC DOCUMENT COUNT:		4
FILED AS OF DATE:		20030502
EFFECTIVENESS DATE:		20030502

FILER:

	COMPANY DATA:
		COMPANY CONFORMED NAME:			BAE SYSTEMS PLC
		CENTRAL INDEX KEY:			0001230244
		FISCAL YEAR END:			1231

	FILING VALUES:
		FORM TYPE:		F-6EF
		SEC ACT:		1933 Act
		SEC FILE NUMBER:	333-104949
		FILM NUMBER:		03679724

	BUSINESS ADDRESS:
		STREET 1:		1 CHASE MANHATTAN PLAZA
		STREET 2:		40TH FLOOR
		CITY:			NEW YORK
		STATE:			NY
		ZIP:			10081
		BUSINESS PHONE:		2125524904
</SEC-HEADER>
<DOCUMENT>
<TYPE>F-6EF
<SEQUENCE>1
<FILENAME>a35193.txt
<DESCRIPTION>BAE SYSTEMS PLC
<TEXT>
<PAGE>

Registration Statement No. 333-

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

----------------------
FORM F-6
REGISTRATION STATEMENT
Under
THE SECURITIES ACT OF 1933
For American Depositary Shares Evidenced by American Depositary Receipts
----------------------
BAE SYSTEMS plc
(Exact name of issuer of deposited securities as specified in its charter)

N/A
(Translation of issuer's name into English)
----------------------
England and Wales
(Jurisdiction of Incorporation or organization of Issuer)
----------------------
JPMORGAN CHASE BANK
(Exact name of depositary as specified in its charter)

```
                    1 Chase Manhattan Plaza, New York, New York 10081
                            Tel. No.: (212) 552-4944
            (Address, including zip code, and telephone number of depositary's
                              principal offices)
                            ----------------------
                        BAE SYSTEMS North America, Inc.
                              1601 Research Blvd.
                              Rockville, MA 20850
                                (301) 838-6000
               (Address, including zip code, and telephone number of agent for
                                   service)
                            ----------------------
                                  Copies to:
                            Scott A. Ziegler, Esq.
                        Ziegler, Ziegler & Associates LLP
                              570 Lexington Avenue

                            New York, New York 10022
                                212-319-7600
```

[X]   immediately upon filing  [ ]  on [date] at [time]

If a separate registration statement has been filed to register the deposited
shares, check the following box.    [ ]

<div align="center">CALCULATION OF REGISTRATION FEE</div>

<TABLE>
<CAPTION>

| Title of Each Class of Securities to be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Unit (1) | Proposed Maximum Aggregate Offering Price (2) | Amount of Registration Fee |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |
| American Depositary Shares evidenced by American Depositary Receipts, each American Depositary Share representing four (4) ordinary shares of BAE SYSTEMS plc | 50,000,000 | $5.00 | $2,500,000 | $203 |

</TABLE>

(1) Each unit represents 100 American Depositary Shares.

(2) Estimated solely for the purpose of calculating the registration fee.
Pursuant to Rule 457(k), such estimate is computed on the basis of the maximum
aggregate fees or charges to be imposed in connection with the issuance of such
Receipts evidencing such American Depositary Shares.

<PAGE>

        This Registration Statement may be executed in any number of
counterparts, each of which shall be deemed an original, and all of such
counterparts together shall constitute one and the same instrument.

<div align="center">2</div>

<PAGE>

       The Prospectus consists of the form of American Depositary Receipt
("ADR") included as Exhibit A to the form of Deposit Agreement filed as Exhibit
(a) to this Registration Statement, which is incorporated herein by reference.

<div align="center">3</div>

<PAGE>

<div align="center">PART I</div>

<div align="center">INFORMATION REQUIRED IN PROSPECTUS</div>

Item 1. DESCRIPTION OF SECURITIES TO BE REGISTERED

<div align="center">CROSS REFERENCE SHEET</div>

<TABLE>
<CAPTION>

| Item Number and Caption | Location in Form of ADR Filed Herewith as Prospectus |
|---|---|
| `-----------` | `-------------------` |
| `<S>` | `<C>` |
| 1.  Name of depositary and address of its principal executive office | Face, introductory paragraph and final sentence on face. |
| 2.  Title of ADR and identity of deposited securities | Face, top center and introductory paragraph |
|     Terms of Deposit | |
|     (i)   The amount of deposited securities represented by one unit of ADRs | Face, upper right corner and introductory paragraph |
|     (ii)  The procedure for voting, if any, the deposited securities | Reverse, paragraph (12) |
|     (iii) The collection and distribution of dividends | Face, paragraphs (4), (5) and (7); Reverse, paragraph (10) |
|     (iv)  The transmission of notices, reports and proxy soliciting material | Face, paragraphs (3) and (8); Reverse paragraph (12) |
|     (v)   The sale or exercise of rights | Face, paragraphs (4) and (5); Reverse, paragraph (10) |
|     (vi)  The deposit or sale of securities resulting from dividends, splits or plans of reorganization | Face, paragraphs (4) and (5); Reverse paragraphs (10) and (13) |
|     (vii) Amendment, extension or termination of the deposit agreement | Reverse, paragraphs (16) and (17) (no (no provision for extension) |

</TABLE>

<div align="center">I-1</div>

```
<PAGE>

<TABLE>
<CAPTION>
                                                  Location in Form of
               Item Number                        ADR Filed Herewith
               and Caption                           as Prospectus
               -----------                        -------------------
<S>                                               <C>
     (viii)Rights of holders of ADRs         Face, paragraph (3)
               to inspect the transfer books
               of the Depositary and the
               lists of holders of ADRs

     (ix)  Restrictions upon the right       Face, paragraphs (1), (2), (4) and (5)
               to deposit or withdraw the
               underlying securities

     (x)   Limitation upon the liability     Reverse, paragraph (14)
               of the Depositary and/or the
               Company

3.   Description of all fees and             Face, paragraph (7)
     charges which may be imposed
     directly or indirectly against
     the holders of ADRs
</TABLE>

Item 2. AVAILABLE INFORMATION

<TABLE>
<CAPTION>
                                                  Location in Form of
               Item Number                        ADR Filed Herewith
               and Caption                           as Prospectus
               -----------                        -------------------
<S>                                               <C>
2(a) Statement that the foreign issuer       Face, paragraph (8)
furnishes the Securities and Exchange
Commission with certain public reports
and documents required by foreign law or
otherwise under Rule 12g3-2(b) under the
Securities Exchange Act of 1934, as
amended
</TABLE>


                              I-2




<PAGE>


                              PART II

            INFORMATION NOT REQUIRED IN PROSPECTUS

Item 3. EXHIBITS

        (a) Form of Amended and Restated Deposit Agreement dated as of May ,
2003 among BAE SYSTEMS plc (fka British Aerospace Public Limited Company),
JPMorgan Chase Bank (fka Morgan Guaranty Trust Company of New York), as
depositary (the "Depositary"), and all holders from time to time of ADRs issued
thereunder (the "Deposit Agreement").
```

(b) Any other agreement, to which the Depositary is a party, relating to the issuance of the Depositary Shares registered hereby or custody of the deposited securities represented thereby. - None.

(c) Any material contract relating to the deposited securities between the Depositary and the issuer of the deposited securities in effect at any time within the last three years. - None.

(d) Opinion of Ziegler, Ziegler & Associates LLP, counsel to the Depositary, as to the legality of the securities to be registered.

(e) Certification under Rule 466.

Item 4. UNDERTAKINGS

(a) The Depositary hereby undertakes to make available at the principal office of the Depositary in the United States, for inspection by holders of the ADRs, any reports and communications received from the issuer of the deposited securities which are both (1) received by the Depositary as the holder of the deposited securities; and (2) made generally available to the holders of the underlying securities by the issuer.

(b) If the amounts of fees charged are not disclosed in the prospectus, the Depositary undertakes to prepare a separate document stating the amount of any fee charged and describing the service for which it is charged and to deliver promptly a copy of such fee schedule without charge to anyone upon request. The Depositary undertakes to notify each registered holder of an ADR thirty days before any change in the fee schedule.

                              II-1




<PAGE>

                            SIGNATURE

        Pursuant to the requirements of the Securities Act of 1933, as amended, JPMorgan Chase Bank, on behalf of the legal entity created by the Deposit Agreement, certifies that it has reasonable grounds to believe that all of the requirements for filing on Form F-6 are met and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of New York, State of New York, on May 1, 2003.

                         Legal entity created by the form of Deposit
                         Agreement for the issuance of ADRs evidencing
                         American Depositary Shares


                         By: JPMORGAN CHASE BANK, in its capacity as
                             Depositary


                         By: /s/Jordana Chutter
                             -------------------------------------------
                         Name:  Jordana Chutter
                         Title: Vice President


                              II-2




<PAGE>

                            SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, BAE SYSTEMS plc certifies that it has reasonable grounds to believe that all the requirements for filing on Form F-6 are met and has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized on May 1, 2003.

BAE SYSTEMS plc


By: /s/Michael Turner
    ------------------------------------------
Name: Michael Turner
Title: Chief Executive Officer

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Sir Richard Evans, Michael Turner, Christopher Geoghegan, Steven Mogford, Mark Ronald, George Rose and Michael Lester, and each of them (with full power to each of them to act alone) his true and lawful attorney-in-fact and agent, with the power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities to sign any and all amendments, including post-effective amendments, and supplements to this registration statement, and to file the same, with all exhibits thereto and other documents in connection therewith, with the United States Securities and Exchange Commission, granting unto said attorneys-in-fact and agents and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in and about the premises, as fully for all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents or any of them or their substitute or substitutes may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this Registration Statement has been signed by the following persons in the capacities indicated on May 1, 2003.

| Name | Title |
| ---- | ----- |

/s/Sir Richard Evans                 Chairman and Director
- -------------------------------------
Sir Richard Evans


/s/Michael Turner                    Chief Executive Officer and Director
- -------------------------------------
Michael Turner


/s/Christopher Geoghegan             Chief Operating Officer and Director
- -------------------------------------
Christopher Geoghegan


II-3


<PAGE>


/s/Mark Ronald                       Chief Operating Officer and Director
- -------------------------------------
Mark Ronald


/s/Steven Mogford                    Chief Operating Officer and Director
- -------------------------------------

Steven Mogford

```
/s/George Rose                          Group Finance Director
- --------------------------------------
George Rose


/s/Michael Lester                       Group Legal Director
- --------------------------------------
Michael Lester


/s/Sir Robin Biggam                     Director
- --------------------------------------
Sir Robin Biggam


                                        Director
- --------------------------------------
Professor Susan Birley


                                        Director
- --------------------------------------
Keith Brown


                                        Director
- --------------------------------------
Dr. Ulrich Cartellieri


                                        Director
- --------------------------------------
Rt. Hon Lord Hesketh


                                        Director
- --------------------------------------
Sir Peter Mason
```

                                  II-4




<PAGE>

```
                                        Director
- --------------------------------------
Rt. Hon Michael Portillo


                                        Director
- --------------------------------------
Paolo Scaroni
```

                    SIGNATURE OF AUTHORIZED REPRESENTATIVE

        Pursuant to the requirements of the Securities Act of 1933, as
amended, the undersigned, the duly authorized representative in the United
States of BAE SYSTEMS plc., has signed this Registration Statement on Form F-6
in the City of New York, State of New York on May 1, 2003.

DEPOSITARY MANAGEMENT CORP.

```
By: /s/Scott A. Ziegler
- -------------------------------------
Name: Scott A. Ziegler
Title: Authorized Officer
```

                              II-5




```
<PAGE>

INDEX TO EXHIBITS

<TABLE>
<CAPTION>
Exhibit                                                 Sequentially
Number                                                  Numbered Page
- -------       <C>                                     -------------
<S>
(a)             Form of Amended and Restated Deposit Agreement.        <C>

(d)             Opinion of Ziegler, Ziegler & Associates LLP,
                counsel to the Depositary, as to the legality
                of the securities to be registered.

(e)             Rule 466 Certification
</TABLE>
```

                              II-6


```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99
<SEQUENCE>3
<FILENAME>ex99-a.txt
<DESCRIPTION>EXHIBIT (A)
<TEXT>
<PAGE>
```

==============================================================================

                          BAE SYSTEMS plc

                                AND

                       JPMORGAN CHASE BANK,
                          As Depositary

                                AND

                HOLDERS OF AMERICAN DEPOSITARY RECEIPTS

                   Amended and Restated Deposit Agreement
                        Dated as of May , 2003

==============================================================================




```
<PAGE>
```

                          TABLE OF CONTENTS

```
                                                                        Page
                                                                        ----

PARTIES.................................................................. 1
RECITALS................................................................. 1
Section 1.   Certain Definitions
        (a)        ADR Register.............................................. 1
        (b)        ADRs; Direct Registration ADRs............................ 1
        (c)        ADS....................................................... 1
        (d)        Articles.................................................. 1
        (e)        Custodian................................................. 2
        (f)        Deliver, execute, issue et al............................. 2
        (g)        Delivery Order............................................ 2
        (h)        Deposited Securities...................................... 2
        (i)        Direct Registration System................................ 2
        (j)        Holder.................................................... 2
        (k)        Securities Act of 1933.................................... 2
        (l)        Securities Exchange Act of 1934........................... 2
        (m)        Shares.................................................... 2
        (n)        Transfer Office........................................... 2
        (o)        Withdrawal Order.......................................... 2
Section 2.   ADR Certificates.............................................. 3
Section 3.   Deposit of Shares............................................. 3
Section 4.   Issue of ADRs................................................. 4
Section 5.   Distributions on Deposited Securities......................... 4
Section 6.   Withdrawal of Deposited Securities............................ 4
Section 7.   Substitution of ADRs.......................................... 4
Section 8.   Cancellation and Destruction of ADRs.......................... 4
Section 9.   The Custodian................................................. 4
Section 10.  Co-Registrars and Co-Transfer Agents.......................... 5
Section 11.  Lists of Holders.............................................. 5
Section 12.  Depositary's Agents........................................... 5
Section 13.  Successor Depositary.......................................... 5
Section 14.  Reports....................................................... 6
Section 15.  Additional Shares............................................. 6
Section 16.  Indemnification............................................... 6
Section 17.  Notices....................................................... 6
Section 18.  Miscellaneous................................................. 7
Section 19.  Amendment and Restatement of Old Deposit Agreement............ 7
TESTIMONIUM................................................................ 8

SIGNATURES................................................................. 8
```

-i-

<PAGE>

```
                                                                        Page
                                                                        ----

                              EXHIBIT A

FORM OF FACE OF ADR...................................................... A-1

    Introductory Paragraph............................................... A-1

    (1)    Issuance of ADRs.............................................. A-2
    (2)    Withdrawal of Deposited Securities............................ A-2
    (3)    Transfers of ADRs............................................. A-2
    (4)    Certain Limitations........................................... A-3
    (5)    Taxes......................................................... A-3
    (6)    Disclosure of Interests....................................... A-4
    (7)    Charges of Depositary......................................... A-4
    (8)    Available Information.......................................... A-5
    (9)    Execution..................................................... A-5
```

    Signature of Depositary.....................................A-5

    Address of Depositary's Office..............................A-5

FORM OF REVERSE OF ADR.........................................A-6

    (10)  Distributions on Deposited Securities.................A-6
    (11)  Record Dates..........................................A-7
    (12)  Voting of Deposited Securities........................A-7
    (13)  Changes Affecting Deposited Securities................A-7
    (14)  Exoneration...........................................A-7
    (15)  Resignation and Removal of Depositary; the
          Custodian.............................................A-8
    (16)  Amendment.............................................A-8
    (17)  Termination...........................................A-9

-ii-

<PAGE>

        AMENDED AND RESTATED DEPOSIT AGREEMENT dated as of May , 2003 (the "Deposit
Agreement") among BAE SYSTEMS plc (fka British Aerospace PLC) and its successors
(the "Company"), JPMORGAN CHASE BANK, as depositary hereunder (the
"Depositary"), and all holders from time to time of American Depositary Receipts
issued hereunder ("ADRs") evidencing American Depositary Shares ("ADSs")
representing deposited Shares (defined below).

                                WITNESSETH:

        WHEREAS, the Company and the Depositary entered into a deposit
agreement dated as of September 28, 1998 (the "Old Deposit Agreement") to
provide for the deposit of Shares of the Company with the Depositary or with the
Custodian as agent of the Depositary for the purposes set forth in such Old
Deposit Agreement, for the creation of American depositary shares representing
the Shares so deposited and for the execution and delivery of American
depositary receipts ("Old ADRs") evidencing the ADSs;

        WHEREAS, the Company and the Depositary desire to amend certain terms
of the Old Deposit Agreement in accordance with paragraph (16) of the Form of
ADR thereof and to reflect such amendments pursuant to the terms and conditions
set forth in this Deposit Agreement; and

        WHEREAS, it is desired to provide, as hereinafter set forth in this
Deposit Agreement, for the deposit of Shares of the Company from time to time
with the Custodian for the purposes set forth herein, and for the issuance of
ADRs, in respect of the Shares so deposited.

        NOW THEREFORE, in consideration of the premises, it is agreed by and
among the parties hereto as follows:

    1. Certain Definitions.

    (a) "ADR Register" is defined in paragraph (3) of the form of ADR.

    (b) "ADRs" mean the American Depositary Receipts executed and delivered
hereunder. ADRs may be either in physical certificated form or Direct
Registration ADRs. ADRs in physical certificated form shall be substantially in
the form of Exhibit A annexed hereto (the "form of ADR"). The term "Direct
Registration ADR" means an ADR, the ownership of which is recorded on the Direct
Registration System. References to "ADRs" shall include Direct Registration
ADRs, unless the context otherwise requires. The form of ADR is hereby
incorporated herein and made a part hereof; the provisions of the form of ADR
shall be binding upon the parties hereto.

    (c) Subject to paragraph (13) of the form of ADR, each "ADS" evidenced by
an ADR represents the right to receive four (4) Shares and a pro rata share in

any other Deposited Securities.

<PAGE>

(d) "Articles" means the Articles of Association of the Company, as in effect from time to time.

(e) "Custodian" means the agent or agents of the Depositary (singly or collectively, as the context requires) and any additional or substitute Custodian appointed pursuant to Section 9.

(f) The terms "deliver", "execute", "issue", "register", "surrender", "transfer" or "cancel", when used with respect to Direct Registration ADRs, shall refer to an entry or entries or an electronic transfer or transfers in the Direct Registration System.

(g) "Delivery Order" is defined in Section 3.

(h) "Deposited Securities" as of any time means all Shares at such time deposited under this Deposit Agreement and any and all other Shares, securities, property and cash at such time held by the Depositary or the Custodian in respect or in lieu of such deposited Shares and other Shares, securities, property and cash.

(i) "Direct Registration System" means the system for the uncertificated registration of ownership of securities established by The Depository Trust & Clearing Corporation ("DTCC") and utilized by the Depositary pursuant to which the Depositary may record the ownership of ADRs without the issuance of a certificate, which ownership shall be evidenced by periodic statements issued by the Depositary to the Holders entitled thereto. For purposes hereof, the Direct Registration System shall include access to the Profile Modification System maintained by DTCC which provides for automated transfer of ownership between DTCC and the Depositary.

(j) "Holder" means the person or persons in whose name an ADR is registered on the ADR Register.

(k) "Securities Act of 1933" means the United States Securities Act of 1933, as from time to time amended.

(l) "Securities Exchange Act of 1934" means the United States Securities Exchange Act of 1934, as from time to time amended.

(m) "Shares" mean the ordinary shares of the Company and shall include the rights to receive Shares specified in paragraph (1) of the form of ADR.

(n) "Transfer Office" is defined in paragraph (3) of the form of ADR.

(o) "Withdrawal Order" is defined in Section 6.

2. ADR Certificates. (a) ADRs in certificated form shall be engraved, printed or

2

<PAGE>

otherwise reproduced at the discretion of the Depositary in accordance with its customary practices in its American depositary receipt business, or at the request of the Company typewritten and photocopied on plain or safety paper, and shall be substantially in the form set forth in the form of ADR, with such changes as may be required by the Depositary or the Company to comply with their

obligations hereunder, any applicable law, regulation or usage or to indicate any special limitations or restrictions to which any particular ADRs are subject. ADRs may be issued in denominations of any whole number of ADSs. ADRs in certificated form shall be executed by the Depositary by the manual or facsimile signature of a duly authorized officer of the Depositary. ADRs in certificated form bearing the facsimile signature of anyone who was at the time of execution a duly authorized officer of the Depositary shall bind the Depositary, notwithstanding that such officer has ceased to hold such office prior to the delivery of such ADRs.

(b) Direct Registration ADRs. Notwithstanding anything in this Deposit Agreement or in the form of ADR to the contrary, ADSs shall be evidenced by Direct Registration ADRs, unless certificated ADRs are specifically requested by the Holder.

(c) Holders shall be bound by the terms and conditions of this Deposit Agreement and of the form of ADR, regardless of whether their ADRs are Direct Registration ADRs or certificated ADRs.

3. Deposit of Shares. In connection with the deposit of Shares hereunder, the Depositary or the Custodian may require the following in form satisfactory to it: (a) a written order directing the Depositary to issue to, or upon the written order of, the person or persons designated in such order a Direct Registration ADR or ADRs evidencing the number of ADSs representing such deposited Shares (a "Delivery Order"); (b) proper endorsements or duly executed instruments of transfer in respect of such deposited Shares; (c) instruments assigning to the Custodian or its nominee any distribution on or in respect of such deposited Shares or indemnity therefor; and (d) proxies entitling the Custodian to vote such deposited Shares. As soon as practicable after the Custodian receives Deposited Securities pursuant to any such deposit or pursuant to paragraph (10) or (13) of the form of ADR, the Custodian shall present such Deposited Securities for registration of transfer into the name of the Custodian or its nominee, to the extent such registration is practicable, at the cost and expense of the person making such deposit (or for whose benefit such deposit is made) and shall obtain evidence satisfactory to it of such registration. Deposited Securities shall be held by the Custodian for the account and to the order of the Depositary at such place or places and in such manner as the Depositary shall determine. Deposited Securities may be delivered by the Custodian to any person only under the circumstances expressly contemplated in this Deposit Agreement. Shares may also be deposited hereunder by such delivery thereof as the Depositary or the Custodian may reasonably accept, including, without limitation, by causing them to be credited to an account maintained by the Custodian for such purpose with an accredited intermediary, such as a bank, acting as a registrar for the Shares or otherwise through the CREST real time settlement system for U.K. securities, in each case together with delivery of the documents, payments and Delivery Order referred to herein to the Custodian or the Depositary.

4. Issue of ADRs. After any such deposit of Shares, the Custodian shall notify the

3

<PAGE>

Depositary of such deposit and of the information contained in any related Delivery Order by letter, first class airmail postage prepaid, or, at the request, risk and expense of the person making the deposit, by cable, telex or facsimile transmission. After receiving such notice from the Custodian, the Depositary, subject to this Deposit Agreement, shall properly issue at the Transfer Office, to or upon the order of any person named in such notice, an ADR or ADRs registered as requested and evidencing the aggregate ADSs to which such person is entitled.

5. Distributions on Deposited Securities. To the extent that the Depositary determines in its discretion that any distribution pursuant to paragraph (10) of

the form of ADR is not practicable with respect to any Holder, the Depositary
may make such distribution as it so deems practicable, including the
distribution of foreign currency, securities or property (or appropriate
documents evidencing the right to receive foreign currency, securities or
property) or the retention thereof as Deposited Securities with respect to such
Holder's ADRs (without liability for interest thereon or the investment
thereof).

    6. Withdrawal of Deposited Securities. In connection with any surrender of
an ADR for withdrawal of the Deposited Securities represented by the ADSs
evidenced thereby, the Depositary may require proper endorsement in blank of
such ADR (or duly executed instruments of transfer thereof in blank) and the
Holder's written order directing the Depositary to cause the Deposited
Securities represented by the ADSs evidenced by such ADR to be withdrawn and
delivered to, or upon the written order of, any person designated in such order
(a "Withdrawal Order"). Directions from the Depositary to the Custodian to
deliver Deposited Securities shall be given by letter, first class airmail
postage prepaid, or, at the request, risk and expense of the Holder, by cable,
telex or facsimile transmission. Delivery of Deposited Securities may be made by
the delivery of certificates (which, if required by law shall be properly
endorsed or accompanied by properly executed instruments of transfer or, if such
certificates may be registered, registered in the name of such Holder or as
ordered by such Holder in any Withdrawal Order) or by such other means as the
Depositary may deem practicable.

    7. Substitution of ADRs. The Depositary shall execute and deliver a new
Direct Registration ADR in exchange and substitution for any mutilated
certificated ADR upon cancellation thereof or in lieu of and in substitution for
such destroyed, lost or stolen certificated ADR, unless the Depositary has
notice that such ADR has been acquired by a bona fide purchaser, upon the Holder
thereof filing with the Depositary a request for such execution and delivery and
a sufficient indemnity bond and satisfying any other reasonable requirements
imposed by the Depositary.

    8. Cancellation and Destruction of ADRs. All ADRs surrendered to the
Depositary shall be cancelled by the Depositary. The Depositary is authorized to
destroy ADRs in certificated form so cancelled in accordance with its customary
practices.

    9. The Custodian. Any Custodian in acting hereunder shall be subject to the
directions of the Depositary and shall be responsible solely to it. The
Depositary may from time to time, after consultation with the Company if
practicable, appoint one or more agents to act for it as Custodian hereunder.
Each Custodian so appointed (other than JPMorgan Chase Bank) shall give written
notice to the Company and the Depositary accepting such appointment and agreeing

                                    4


<PAGE>

to be bound by the applicable terms hereof. Any Custodian may resign from its
duties hereunder by at least 30 days written notice to the Depositary. The
Depositary may discharge any Custodian at any time upon notice to the Custodian
being discharged. Any Custodian ceasing to act hereunder as Custodian shall
deliver, upon the instruction of the Depositary, all Deposited Securities held
by it to a Custodian continuing to act.

    10. Co-Registrars and Co-Transfer Agents. The Depositary may, after
consultation with the Company if practicable, appoint and remove (i)
co-registrars to register ADRs and transfers, combinations and split-ups of ADRs
and to countersign ADRs in accordance with the terms of any such appointment and
(ii) co-transfer agents for the purpose of effecting transfers, combinations and
split-ups of ADRs at designated transfer offices in addition to the Transfer
Office on behalf of the Depositary. Each co-registrar or co-transfer agent
(other than JPMorgan Chase Bank) shall give notice in writing to the Company and
the Depositary accepting such appointment and agreeing to be bound by the

applicable terms of this Deposit Agreement.

11. Lists of Holders. The Company shall have the right to inspect transfer records of the Depositary and its agents and the ADR Register, take copies thereof and require the Depositary and its agents to supply copies of such portions of such records as the Company may request. The Depositary or its agent shall furnish to the Company promptly upon the written request of the Company, a list of the names, addresses and holdings of ADSs by all Holders as of a date within seven days of the Depositary's receipt of such request.

12. Depositary's Agents. The Depositary may perform its obligations under this Deposit Agreement through any agent appointed by it, provided that the Depositary shall notify the Company of such appointment and shall remain responsible for the performance of such obligations as if no agent were appointed. The Depositary shall use its reasonable efforts under the circumstances to consult with the Company prior to appointing any agent hereunder (other than those agents which, on the date hereof, are acting in an agency capacity for JPMorgan Chase Bank).

13. Successor Depositary. If the Depositary acting hereunder shall resign or be removed, the Company shall use its best efforts to appoint a bank or trust company having an office in the Borough of Manhattan, The City of New York, as successor depositary hereunder. Every successor depositary shall execute and deliver to its predecessor and to the Company written acceptance of its appointment hereunder, and thereupon such successor depositary, without any further act or deed, shall become Depositary hereunder; but such predecessor, upon payment of all sums due it and on the written request of the Company, shall execute and deliver an instrument transferring to such successor all rights and powers of such predecessor hereunder and assigning all interest in the Deposited Securities to such successor, and shall deliver to such successor a list of the Holders. Any bank or trust company into or with which the Depositary may be merged or consolidated, or to which the Depositary shall transfer substantially all its American depositary receipt business, shall be the successor of the Depositary without the execution or filing of any document or any further act. Upon the appointment of any successor depositary hereunder, any agent of the Depositary then acting hereunder shall forthwith become such agent hereunder of such successor depositary and such successor depositary shall, on the written request of any such agent, execute and deliver to such agent any instruments necessary to

<div align="center">5</div>

<PAGE>

give such agent authority as such agent hereunder of such successor depositary.

14. Reports. On or before the first date on which the Company makes any communication available to holders of Deposited Securities or any securities regulatory authority or stock exchange, by publication or otherwise, the Company shall transmit to the Depositary a copy thereof in English or with an English translation or summary. The Company has delivered to the Depositary, the Custodian and any Transfer Office, a copy of all provisions of or governing the Shares and any other Deposited Securities issued by the Company or any affiliate of the Company and, promptly upon any change thereto, the Company shall deliver to the Depositary, the Custodian and any Transfer Office, a copy (in English or with an English translation) of such provisions as so changed. The Depositary and its agents may rely upon the Company's delivery thereof for all purposes of this Deposit Agreement.

15. Additional Shares. Neither the Company nor any company controlling, controlled by or under common control with the Company shall issue additional Shares, rights to subscribe for Shares, securities convertible into or exchangeable for Shares or rights to subscribe for any such securities or shall deposit any Shares under this Deposit Agreement, except under circumstances complying in all respects with the Securities Act of 1933. The Depositary will use reasonable efforts to comply with written instructions of the Company not to

accept for deposit hereunder any Shares identified in such instructions at such
times and under such circumstances as may reasonably be specified in such
instructions in order to facilitate the Company's compliance with securities
laws in the United States.

16. Indemnification. The Company shall indemnify, defend and save harmless
each of the Depositary and its agents against any loss, liability or expense
(including reasonable fees and expenses of counsel) that may arise out of (a)
its acceptance and performance of its powers and duties in respect of this
Deposit Agreement, except to the extent such loss, liability or expense is due
to its negligence or bad faith, or (b) any offer or sale of ADRs, ADSs, Shares
or other Deposited Securities or any registration statement under the Securities
Act of 1933 in respect thereof, except to the extent such loss, liability or
expense arises out of information (or omissions from such information) relating
to it furnished in writing to the Company by it expressly for use in any such
registration statement. The Depositary shall indemnify, defend and save harmless
the Company against any loss, liability or expense incurred by the Company in
respect of this Deposit Agreement to the extent such loss, liability or expense
is due to the negligence or bad faith of the Depositary. In no event shall the
Depositary or any of its agents be liable for any indirect, special, punitive or
consequential damages. The obligations set forth in this Section 16 shall
survive the termination of this Deposit Agreement and the succession or
substitution of any indemnified person.

17. Notices. Notice to any Holder shall be deemed given when first mailed,
first class postage prepaid, to the address of such Holder on the ADR Register
or received by such Holder. Notice to the Depositary or the Company shall be
deemed given when first received by it at the address or facsimile transmission
number set forth in (a) or (b), respectively, or at such other address or
facsimile transmission number as either may specify to the other by written
notice:

        (a)  JPMorgan Chase Bank

                                      6


<PAGE>

              1 Chase Manhattan Plaza (40th Floor)
              New York, New York 10081
              Attention:  ADR Administration
              Fax: (212) 552-4944

        (b)   BAE SYSTEMS plc
              6 Carlton Gardens
              London SW1Y 5AD
              England
              Attention: Company Secretary
              Fax: +44 1252 383015

18. Miscellaneous. This Deposit Agreement is for the exclusive benefit of
the Company, the Depositary, the Holders, and their respective successors
hereunder, and shall not give any legal or equitable right, remedy or claim
whatsoever to any other person. The Holders and owners of ADRs from time to time
shall be parties to this Deposit Agreement and shall be bound by all of the
provisions hereof. If any such provision is invalid, illegal or unenforceable in
any respect, the remaining provisions shall in no way be affected thereby. This
Deposit Agreement may be executed in any number of counterparts, each of which
shall be deemed an original and all of which shall constitute one instrument.

19. Amendment and Restatement of Old Deposit Agreement. The Deposit
Agreement amends and restates the Old Deposit Agreement in its entirety to
consist exclusively of the Deposit Agreement, and each Old Receipt is hereby
deemed amended and restated to substantially conform to the form of ADR set
forth in Exhibit A annexed hereto.

7

<PAGE>

     IN WITNESS WHEREOF, BAE SYSTEMS plc and JPMORGAN CHASE BANK have duly executed this Deposit Agreement as of the day and year first above set forth and all holders of ADRs shall become parties hereto upon acceptance by them of ADRs issued in accordance with the terms hereof.

                                         BAE SYSTEMS plc

                                         By:
                                           --------------------------------
                                       Name:
                                       Title:

                                       JPMORGAN CHASE BANK

                                         By:
                                             --------------------------------
                                       Name:
                                       Title: Vice President

8

<PAGE>

                           EXHIBIT A
              ANNEXED TO AND INCORPORATED IN
                    DEPOSIT AGREEMENT

                 [FORM OF FACE OF ADR]

AS PROVIDED IN THE ARTICLES OF ASSOCIATION OF BAE SYSTEMS plc AND THE DEPOSIT AGREEMENT REFERRED TO BELOW, THE HOLDER HEREOF, THIS ADR, THE ADSs EVIDENCED HEREBY AND THE SHARES REPRESENTED THEREBY ARE SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS, INCLUDING INFORMATION REQUIREMENTS, RESTRICTIONS ON OWNERSHIP AND PROVISIONS FOR, AMONG OTHER THINGS, THE CANCELLATION OF ADSs AND COMPULSORY SALE OF THE SHARES REPRESENTED THEREBY AND LIMITATION OF VOTING RIGHTS. SUCH RESTRICTIONS MAY CHANGE FROM TIME TO TIME. SEE PARAGRAPH (6) BELOW.

                           No. of ADSs:
_____
Number

                                 --------------------
                                 Each ADS represents
                                 Four (4) Shares

                                 CUSIP:

               AMERICAN DEPOSITARY RECEIPT

                       evidencing

               AMERICAN DEPOSITARY SHARES

                     representing

ORDINARY SHARES

of

BAE SYSTEMS plc

(Incorporated under the
laws of England and Wales)

JPMORGAN CHASE BANK, a New York corporation, as depositary hereunder (the "Depositary"), hereby certifies that _____ is the registered owner (a "Holder") of _____ American Depositary Shares ("ADSs"), each (subject to paragraph (13) representing four (4) ordinary

A-1

<PAGE>

shares (including the rights to receive Shares described in paragraph (1), "Shares" and, together with any other securities, cash or property from time to time held by the Depositary in respect or in lieu of deposited Shares, the "Deposited Securities"), of BAE SYSTEMS plc, a corporation organized under the laws of England and Wales (the "Company"), deposited under the Amended and Restated Deposit Agreement dated as of May , 2003 (as amended from time to time, the "Deposit Agreement") among the Company, the Depositary and all Holders from time to time of American Depositary Receipts issued thereunder ("ADRs"), each of whom by accepting an ADR becomes a party thereto. The Deposit Agreement and this ADR (which includes the provisions set forth on the reverse hereof) shall be governed by and construed in accordance with the laws of the State of New York.

(1) Issuance of ADRs. This ADR is one of the ADRs issued under the Deposit Agreement. Subject to paragraph (4), the Depositary may so issue ADRs for delivery at the Transfer Office (defined in paragraph (3)) only against deposit with the Custodian of: (a) Shares in form satisfactory to the Custodian; (b) rights to receive Shares from the Company or any registrar, transfer agent, clearing agent or other entity recording Share ownership or transactions; or, (c) other rights to receive Shares (until such Shares are actually deposited pursuant to (a) or (b) above, "Pre-released ADRs") only if (i) Pre-released ADRs are fully collateralized (marked to market daily) with cash or U.S. government securities held by the Depositary for the benefit of Holders (but such collateral shall not constitute "Deposited Securities"), (ii) each recipient of Pre-released ADRs agrees in writing with the Depositary that such recipient (a) owns such Shares, (b) assigns all beneficial right, title and interest therein to the Depositary, (c) holds such Shares for the account of the Depositary and (d) will deliver such Shares to the Custodian as soon as practicable and promptly upon demand therefor and (iii) all Pre-released ADRs evidence not more than 30% of all ADSs (excluding those evidenced by Pre-released ADRs), provided, however, that the Depositary reserves the right to change or disregard such limit from time to time as it deems appropriate. The Depositary may retain for its own account any earnings on collateral for Pre-released ADRs and its charges for issuance thereof. At the request, risk and expense of the person depositing Shares, the Depositary may accept deposits for forwarding to the Custodian and may deliver ADRs at a place other than its office. Every person depositing Shares under the Deposit Agreement represents and warrants that such Shares are validly issued and outstanding, fully paid, nonassessable and free of pre-emptive rights, that the person making such deposit is duly authorized so to do and that such Shares (A) are not "restricted securities" as such term is defined in Rule 144 under the Securities Act of 1933 unless at the time of deposit they may be freely transferred in accordance with Rule 144(k) and may otherwise be offered and sold freely in the United States or (B) have been registered under the Securities Act of 1933. Such representations and warranties shall survive the deposit of Shares and issuance of ADRs. The Depositary will not knowingly accept for deposit under the Deposit Agreement any Shares required to be registered under the Securities Act of 1933 and not so registered; the Depositary may refuse to accept for such deposit any Shares identified by the

Company in order to facilitate the Company's compliance with such Act.

    (2) Withdrawal of Deposited Securities. Subject to paragraphs (4) and (5), upon surrender of (i) a certificated ADR in form satisfactory to the Depositary at the Transfer Office or (ii) proper instructions and documentation in the case of a Direct Registration ADR, the Holder hereof is entitled to delivery at the Custodian's office of the Deposited Securities at the time

                                    A-2


<PAGE>

represented by the ADSs evidenced by this ADR. At the request, risk and expense of the Holder hereof, the Depositary may deliver such Deposited Securities at such other place as may have been requested by the Holder. Notwithstanding any other provision of the Deposit Agreement or this ADR, the withdrawal of Deposited Securities may be restricted only for the reasons set forth in General Instruction I.A.(1) of Form F-6 (as such instructions may be amended from time to time) under the Securities Act of 1933.

    (3) Transfers of ADRs. The Depositary or its agent will keep, at a designated transfer office in the Borough of Manhattan, The City of New York (the "Transfer Office"), (a) a register (the "ADR Register") for the registration, registration of transfer, combination and split-up of ADRs, and, in the case of Direct Registration ADRs, shall include the Direct Registration System, which at all reasonable times will be open for inspection by Holders and the Company for the purpose of communicating with Holders in the interest of the business of the Company or a matter relating to the Deposit Agreement and (b) facilities for the delivery and receipt of ADRs. The term ADR Register includes the Direct Registration System. Title to this ADR (and to the Deposited Securities represented by the ADSs evidenced hereby), when properly endorsed (in the case of ADRs in certificated form) or upon delivery to the Depositary of proper instruments of transfer, is transferable by delivery with the same effect as in the case of negotiable instruments under the laws of the State of New York; provided that the Depositary, notwithstanding any notice to the contrary, may treat the person in whose name this ADR is registered on the ADR Register as the absolute owner hereof for all purposes. Subject to paragraphs (4) and (5), this ADR is transferable on the ADR Register and may be split into other ADRs or combined with other ADRs into one ADR, evidencing the same number of ADSs evidenced by this ADR, by the Holder hereof or by duly authorized attorney upon surrender of this ADR at the Transfer Office properly endorsed (in the case of ADRs in certificated form) or upon delivery to the Depositary of proper instruments of transfer and duly stamped as may be required by applicable law; provided that the Depositary may close the ADR Register at any time or from time to time when deemed expedient by it or requested by the Company. At the request of a Holder, the Depositary shall, for the purpose of substituting a certificated ADR with a Direct Registration ADR, or vice versa, execute and deliver a certificated ADR or a Direct Registration ADR, as the case may be, for any authorized number of ADSs requested, evidencing the same aggregate number of ADSs as those evidenced by the certificated ADR or Direct Registration ADR, as the case may be, substituted.

    (4) Certain Limitations. Prior to the issue, registration, registration of transfer, split-up or combination of any ADR, the delivery of any distribution in respect thereof, or, subject to the last sentence of paragraph (2), the withdrawal of any Deposited Securities, and from time to time in the case of clause (b)(ii) of this paragraph (4), the Company, the Depositary or the Custodian may require: (a) payment with respect thereto of (i) any stock transfer or other tax or other governmental charge, (ii) any stock transfer or registration fees in effect for the registration of transfers of Shares or other Deposited Securities upon any applicable register and (iii) any applicable charges as provided in paragraph (7) of this ADR; (b) the production of proof satisfactory to it of (i) the identity and genuineness of any signature and (ii) such other information, including without limitation, information as to citizenship, residence, exchange control approval, beneficial ownership of any securities, compliance with applicable law,

A-3

<PAGE>

regulations, provisions of or governing Deposited Securities and terms of the
Deposit Agreement and this ADR, as it may deem necessary or proper; and (c)
compliance with such regulations as the Depositary may establish consistent with
the Deposit Agreement. The issuance of ADRs, the acceptance of deposits of
Shares, the registration, registration of transfer, split-up or combination of
ADRs or, subject to the last sentence of paragraph (2), the withdrawal of
Deposited Securities may be suspended, generally or in particular instances,
when the ADR Register or any register for Deposited Securities is closed or when
any such action is deemed advisable by the Depositary or the Company.

        (5) Taxes. If any tax or other governmental charge shall become payable by
or on behalf of the Custodian or the Depositary with respect to this ADR, any
Deposited Securities represented by the ADSs evidenced hereby or any
distribution thereon, such tax or other governmental charge shall be paid by the
Holder hereof to the Depositary. The Depositary may refuse to effect any
registration, registration of transfer, split-up or combination hereof or,
subject to the last sentence of paragraph (2), any withdrawal of such Deposited
Securities until such payment is made. The Depositary may also deduct from any
distributions on or in respect of Deposited Securities, or may sell by public or
private sale for the account of the Holder hereof any part or all of such
Deposited Securities (after attempting by reasonable means to notify the Holder
hereof prior to such sale), and may apply such deduction or the proceeds of any
such sale in payment of such tax or other governmental charge, the Holder hereof
remaining liable for any deficiency, and shall reduce the number of ADSs
evidenced hereby to reflect any such sales of Shares. In connection with any
distribution to Holders, the Company will remit to the appropriate governmental
authority or agency all amounts (if any) required to be withheld and owing to
such authority or agency by the Company; and the Depositary and the Custodian
will remit to the appropriate governmental authority or agency all amounts (if
any) required to be withheld and owing to such authority or agency by the
Depositary or the Custodian. If the Depositary determines that any distribution
in property other than cash (including Shares or rights) on Deposited Securities
is subject to any tax that the Depositary or the Custodian is obligated to
withhold, the Depositary may dispose of all or a portion of such property in
such amounts and in such manner as the Depositary deems necessary and
practicable to pay such taxes, by public or private sale, and the Depositary
shall distribute the net proceeds of any such sale or the balance of any such
property after deduction of such taxes to the Holders entitled thereto.

        (6) Disclosure of Interests. (a) The Company may from time to time request
Holders or former Holders to provide information as to the capacity in which
they hold or held ADRs, regarding the identity of any other persons then or
previously holding any beneficial or other interest in such ADRs and the nature
of such interest and various other matters, including, without limitation,
information relating to nationality, residence and domicile, in order to ensure
that ownership of Shares and other securities complies with the Articles.
Notwithstanding any other provision of the Deposit Agreement or this ADR, each
Holder additionally agrees to comply with reasonable requests from the Company
pursuant to English law, the rules and requirements of each stock exchange or
automated quotation system on which the Shares are, or will be, registered or
traded, or the Articles, which are made to provide information as to such
capacity, identity and interests. Each such Holder agrees to provide promptly
any such

A-4

<PAGE>

information pursuant to paragraph 6(a) whether or not still a Holder at the time
of such request, in sufficient detail to enable the Company to determine
conclusively whether the Holder is, and whether the ownership of Shares and
other securities is, in compliance with the Articles. The Depositary agrees to
use its reasonable efforts to comply with written instructions received from the
Company requesting that the Depositary forward any such request to such Holders
(in some cases for further forwarding to beneficial owners holding ADSs through
such Holder) and to the last known address, if any, of such former Holders and
to forward to the Company any responses to such requests received by the
Depositary, and to use its reasonable efforts to assist the Company in obtaining
such information with respect of the ADRs received from Holders, provided that
nothing herein shall be interpreted as obligating the Depositary to provide or
obtain any such information not provided to the Depositary or its agents
appointed hereunder by such Holders or former Holders. To the extent that
provisions of or governing any Deposited Securities or the applicable laws,
rules or regulations of any governmental authority or the Articles may require
the disclosure of or limit the beneficial or other ownership of Deposited
Securities, other Shares and other securities and/or limit the aggregate number
of securities deposited at any time and may provide for blocking transfer and
voting or other rights to enforce such disclosure or limit such ownership or
deposits, the Depositary shall use its reasonable efforts to comply with Company
instructions as to American Depositary Receipts in respect of any such
enforcement or limitation or any reversal of any conversion of Shares into ADRs,
and Holders shall comply with all such disclosure requirements, ownership
limitations and reversals and shall cooperate with the Depositary's compliance
with such Company instructions.

    (b) The Company may restrict transfers of the Shares where such transfer
might result in ownership of Shares or other securities exceeding limits imposed
by applicable law or the Articles. The Company may also restrict, in such manner
as it deems appropriate, transfers of the ADSs where such transfer may result in
the total number of Shares represented by the ADSs together with any other
Shares or other securities owned by one or more persons to exceed any such
limits. Notwithstanding any inability of any party to physically restrict a
transfer of ADSs, Holders agree contractually to abide by the Company's
instructions. The Company reserves the right to instruct Holders to deliver
their ADRs (including those evidencing ADSs held by such Holder for any person
or entity having a beneficial interest deriving from the ownership of an ADS)
for cancellation and withdrawal of the Deposited Securities so as to permit the
Company to deal directly with the Holder thereof as a holder of Shares. The
Company may also refuse to allow such Holder to redeposit such Shares into the
ADR facility and require such Holder to submit to the disenfranchisement or
mandatory sale of such Shares in order that the ownership of Shares and other
securities of the Company by persons complies with the Articles. The Depositary
agrees to cooperate with the Company in its efforts to inform Holders (on behalf
of such Holders in their individual capacity and the beneficial owners who hold
their ADSs through such Holders) of the Company's exercise of its rights under
this paragraph and agrees to consult with, and provide reasonable assistance
without risk or expense on the part of the Depositary to, the Company on the
manner or manners in which it may enforce such rights with respect to any
Holder. Each holder acknowledges that, as of the date hereof, the Company's
Articles limit the ownership of Shares (including Shares represented by ADSs) of
the Company by persons who are foreigners (as defined in the Articles) to an
individual foreign shareholding limit of 15% of all outstanding Shares.

                                   A-5

<PAGE>

    (c) Notwithstanding any provision of the Deposit Agreement or of this ADR
and without limiting the foregoing, by being a Holder of an ADR, each such
Holder agrees to provide such information as the Company may request in a
disclosure notice (a "Disclosure Notice") given pursuant to the Great Britain
Companies Act 1985 (as amended from time to time and including any statutory

modification or re-enactment thereof, the "Companies Act") or the Articles. By accepting or holding this ADR, each Holder acknowledges that it understands that failure to comply with a Disclosure Notice may result in the imposition of sanctions against the holder of the Shares in respect of which the non-complying person is or was, or appears to be or has been, interested as provided in the Companies Act and the Articles which currently include, the withdrawal of the voting rights of such Shares and the imposition of restrictions on the rights to receive dividends on and to transfer such Shares. In addition, by accepting or holding this ADR each Holder agrees to comply with the provisions of the Companies Act with regard to the notification to the Company of interests in Shares, which currently provide, inter alia, that any Holder who is or becomes directly or indirectly interested (within the meaning of the Companies Act) in 3% or more of the outstanding Shares, or is aware that another person for whom it holds such ADRs is so interested, must within two business days after becoming so interested or so aware (and thereafter in certain circumstances upon any change to the particulars previously notified) notify the Company as required by the Companies Act. After the relevant threshold is exceeded, similar notifications must be made in whole respect of whole percentage figure increases or decreases, rounded down to the nearest whole number.

(7) Charges of Depositary. The Depositary may charge each person to whom ADRs are issued against deposits of Shares, including deposits in respect of Share Distributions, Rights and Other Distributions (as such terms are defined in paragraph (10)), and each person surrendering ADRs for withdrawal of Deposited Securities, U.S. $5.00 for each 100 ADSs (or portion thereof) evidenced by the ADRs delivered or surrendered. The Depositary may sell (by public or private sale) sufficient securities and property received in respect of Share Distributions, Rights and Other Distributions prior to such deposit to pay such charge. The Company will pay all other charges and expenses of the Depositary and any agent of the Depositary (except the Custodian) pursuant to agreements from time to time between the Company and the Depositary, except (i) stock transfer or other taxes and other governmental charges (which are payable by Holders or persons depositing Shares), (ii) cable, telex and facsimile transmission and delivery charges incurred at the request of persons depositing, or Holders delivering Shares, ADRs or Deposited Securities (which are payable by such persons or Holders), (iii) transfer or registration fees for the registration of transfer of Deposited Securities on any applicable register in connection with the deposit or withdrawal of Deposited Securities (which are payable by persons depositing Shares or Holders withdrawing Deposited Securities; there are no such fees in respect of the Shares as of the date of the Deposit Agreement) and (iv) expenses of the Depositary in connection with the conversion of foreign currency into U.S. dollars (which are paid out of such foreign currency). These charges may be changed in the manner indicated in paragraph (16).

(8) Available Information. The Deposit Agreement, the provisions of or governing Deposited Securities, the Articles and any written communications from the Company, which are both received by the Custodian or its nominee as a holder of Deposited Securities and made generally available to the holders of Deposited Securities, are available for inspection by Holders at the offices of the Depositary and the Custodian and at the Transfer Office. The Depositary will mail copies of such communications (or English translations or summaries thereof) to

A-6

<PAGE>

Holders when furnished by the Company. The Company furnishes the United States Securities and Exchange Commission (the "Commission") with certain public reports and documents required by foreign law or otherwise under Rule 12g3-2(b) under the Securities Exchange Act of 1934. Such reports and documents may be inspected and copied at the public reference facilities maintained by the Commission located at the date of the Deposit Agreement at Judiciary Plaza, 450 Fifth Street, N.W., Washington, D.C. 20549.

(9) Execution. This ADR shall not be valid for any purpose unless executed by the Depositary by the manual or facsimile signature of a duly authorized officer of the Depositary.

Dated:

                              JPMORGAN CHASE BANK, as Depositary


                              By
                                 --------------------------------
                                 Authorized Officer

    The Depositary's office is located at 1 Chase Manhattan Plaza, New York, New York 10081.


                              A-7




<PAGE>

                         [FORM OF REVERSE OF ADR]

    (10) Distributions on Deposited Securities. Subject to paragraphs (4) and (5), to the extent practicable, the Depositary will distribute by mail to each Holder entitled thereto on the record date set by the Depositary therefor at such Holder's address shown on the ADR Register, in proportion to the number of Deposited Securities (on which the following distributions on Deposited Securities are received by the Custodian) represented by ADSs evidenced by such Holder's ADRs: (a) Cash. Any U.S. dollars available to the Depositary resulting from a cash dividend or other cash distribution or the net proceeds of sales of any other distribution or portion thereof authorized in this paragraph (10) ("Cash"), on an averaged or other practicable basis, subject to (i) appropriate adjustments for taxes withheld, (ii) such distribution being impermissible or impracticable with respect to certain Holders, and (iii) deduction of the Depositary's expenses in (1) converting any foreign currency to U.S. dollars by sale or in such other manner as the Depositary may determine to the extent that it determines that such conversion may be made on a reasonable basis, (2) transferring foreign currency or U.S. dollars to the United States by such means as the Depositary may determine to the extent that it determines that such transfer may be made on a reasonable basis, (3) obtaining any approval or license of any governmental authority required for such conversion or transfer, which is obtainable at a reasonable cost and within a reasonable time and (4) making any sale by public or private means in any commercially reasonable manner. (b) Shares. (i) Additional ADRs evidencing whole ADSs representing any Shares available to the Depositary resulting from a dividend or free distribution on Deposited Securities consisting of Shares (a "Share Distribution") and (ii) U.S. dollars available to it resulting from the net proceeds of sales of Shares received in a Share Distribution, which Shares would give rise to fractional ADSs if additional ADRs were issued therefor, as in the case of Cash. (c) Rights. (i) Warrants or other instruments in the discretion of the Depositary representing rights to acquire additional ADRs in respect of any rights to subscribe for additional Shares or rights of any nature available to the Depositary as a result of a distribution on Deposited Securities ("Rights"), to the extent that the Company timely furnishes to the Depositary evidence satisfactory to the Depositary that the Depositary may lawfully distribute the same (the Company has no obligation to so furnish such evidence), or (ii) to the extent the Company does not so furnish such evidence and sales of Rights are practicable, any U.S. dollars available to the Depositary from the net proceeds of sales of Rights as in the case of Cash, or (iii) to the extent the Company does not so furnish such evidence and such sales cannot practicably be accomplished by reason of the nontransferability of the Rights, limited markets therefor, their short duration or otherwise, nothing (and any Rights may lapse). (d) Other Distributions. (i) Securities or property available to the Depositary resulting from any distribution on Deposited Securities other than Cash, Share Distributions and Rights ("Other Distributions"), by any means that the Depositary may deem equitable and practicable, or (ii) to the extent the

Depositary deems distribution of such securities or property not to be equitable and practicable, any U.S. dollars available to the

A-8

<PAGE>

Depositary from the net proceeds of sales of Other Distributions as in the case of Cash. Such U.S. dollars available will be distributed by checks drawn on a bank in the United States for whole dollars and cents (any fractional cents being withheld without liability for interest and added to future Cash distributions).

(11) Record Dates. The Depositary may, after consultation with the Company if practicable, fix a record date (which shall be as near as practicable to any corresponding record date set by the Company) for the determination of the Holders who shall be entitled to receive any distribution on or in respect of Deposited Securities, to give instructions for the exercise of any voting rights, to receive any notice or to act in respect of other matters and only such Holders shall be so entitled.

(12) Voting of Deposited Securities. As soon as practicable after receipt from the Company of notice of any meeting or solicitation of consents or proxies of holders of Shares or other Deposited Securities, the Depositary shall mail to Holders a notice stating (a) such information as is contained in such notice and any solicitation materials, (b) that each Holder on the record date set by the Depositary therefor will be entitled to instruct the Depositary as to the exercise of the voting rights, if any, pertaining to the Deposited Securities represented by the ADSs evidenced by such Holder's ADRs and (c) the manner in which such instructions may be given, including instructions to give a discretionary proxy to a person designated by the Company. Upon receipt of instructions of a Holder on such record date in the manner and on or before the date established by the Depositary for such purpose, the Depositary shall endeavor insofar as practicable and permitted under the provisions of or governing Deposited Securities to vote or cause to be voted the Deposited Securities represented by the ADSs evidenced by such Holder's ADRs in accordance with such instructions. The Depositary will not itself exercise any voting discretion in respect of any Deposited Securities.

(13) Changes Affecting Deposited Securities. Subject to paragraphs (4) and (5), the Depositary may, in its discretion, amend this ADR or distribute additional or amended ADRs (with or without calling this ADR for exchange) or cash, securities or property on the record date set by the Depositary therefor to reflect any change in par value, split-up, consolidation, cancellation or other reclassification of Deposited Securities, any Share Distribution or Other Distribution not distributed to Holders or any cash, securities or property available to the Depositary in respect of Deposited Securities from (and the Depositary is hereby authorized to surrender any Deposited Securities to any person and to sell by public or private sale any property received in connection with) any recapitalization, reorganization, merger, consolidation, liquidation, receivership, bankruptcy or sale of all or substantially all the assets of the Company, and to the extent the Depositary does not so amend this ADR or make a distribution to Holders to reflect any of the foregoing, or the net proceeds thereof, whatever cash, securities or property results from any of the foregoing shall constitute Deposited Securities and each ADS evidenced by this ADR shall automatically represent its pro rata interest in the Deposited Securities as then constituted.

(14) Exoneration. The Depositary, the Company, their agents and each of them shall: (a) incur no liability (i) if law, regulation, the provisions of or governing any Deposited Securities,

A-9

<PAGE>

act of God, war or other circumstance beyond its control shall prevent, delay or
subject to any civil or criminal penalty any act which the Deposit Agreement or
this ADR provides shall be done or performed by it, or (ii) by reason of any
exercise or failure to exercise any discretion given it in the Deposit Agreement
or this ADR; (b) assume no liability except to perform its obligations to the
extent they are specifically set forth in this ADR and the Deposit Agreement
without gross negligence or bad faith; (c) in the case of the Depositary and its
agents, be under no obligation to appear in, prosecute or defend any action,
suit or other proceeding in respect of any Deposited Securities or this ADR; (d)
in the case of the Company and its agents hereunder be under no obligation to
appear in, prosecute or defend any action, suit or other proceeding in respect
of any Deposited Securities or this ADR, which in its opinion may involve it in
expense or liability, unless indemnity satisfactory to it against all expense
(including fees and disbursements of counsel) and liability be furnished as
often as may be required; or (e) not be liable for any action or inaction by it
in reliance upon the advice of or information from legal counsel, accountants,
any person presenting Shares for deposit, any Holder, or any other person
believed by it to be competent to give such advice or information. The
Depositary, its agents and the Company may rely and shall be protected in acting
upon any written notice, request, direction or other document believed by them
to be genuine and to have been signed or presented by the proper party or
parties. The Depositary and its agents will not be responsible for any failure
to carry out any instructions to vote any of the Deposited Securities, for the
manner in which any such vote is cast or for the effect of any such vote. The
Depositary and its agents may own and deal in any class of securities of the
Company and its affiliates and in ADRs. The Company has agreed to indemnify the
Depositary and its agents under certain circumstances and the Depositary has
agreed to indemnify the Company against losses incurred by the Company to the
extent such losses are due to the negligence or bad faith of the Depositary. In
no event shall the Depositary or any of its agents be liable for any indirect,
special, punitive or consequential damages. No disclaimer of liability under the
Securities Act of 1933 is intended by any provision hereof.

     (15) Resignation and Removal of Depositary; the Custodian. The Depositary
may resign as Depositary by written notice of its election to do so delivered to
the Company, or be removed as Depositary by the Company by written notice of
such removal delivered to the Depositary; such resignation or removal shall take
effect upon the appointment of and acceptance by a successor depositary. The
Depositary may appoint substitute or additional Custodians and the term
"Custodian" refers to each Custodian or all Custodians as the context requires.

     (16) Amendment. Subject to the last sentence of paragraph (2), the ADRs and
the Deposit Agreement may be amended by the Company and the Depositary, provided
that any amendment that imposes or increases any fees or charges (other than
stock transfer or other taxes and other governmental charges, transfer or
registration fees, cable, telex or facsimile transmission costs, delivery costs
or other such expenses), or that shall otherwise prejudice any substantial
existing right of Holders, shall become effective 30 days after notice of such
amendment shall have been given to the Holders. Every Holder of an ADR at the
time any amendment to the Deposit Agreement so becomes effective shall be
deemed, by continuing to hold such ADR, to consent and agree to such amendment
and to be bound by the Deposit Agreement as amended thereby. In no event shall
any amendment impair the right of the Holder of any ADR to surrender such ADR
and receive the Deposited Securities represented thereby, except in order to
comply with mandatory provisions of applicable law. The parties hereto agree

                                    A-10

<PAGE>

that any amendments or supplements which (i) are reasonably necessary (as agreed

by the Company and the Depositary) in order for (a) the ADSs to be registered on Form F-6 under the Securities Act of 1933 or (b) the ADSs or Shares to be traded solely in electronic book-entry form and (ii) do not in either such case impose or increase any fees or charges to be borne by Holders, shall be deemed not to prejudice any substantial rights of Holders. Notwithstanding the foregoing, if any governmental body should adopt new laws, rules or regulations which would require amendment or supplement of the Deposit Agreement or the form of ADR to ensure compliance therewith, the Company and the Depositary may amend or supplement the Deposit Agreement and the ADR at any time in accordance with such changed rules. Such amendment or supplement to the Deposit Agreement in such circumstances may become effective before a notice of such amendment or supplement is given to Holders or within any other period of time as required for compliance.

       (17) Termination. The Depositary may, and shall at the written direction of the Company, terminate the Deposit Agreement and this ADR by mailing notice of such termination to the Holders at least 30 days prior to the date fixed in such notice for such termination. After the date so fixed for termination, the Depositary and its agents will perform no further acts under the Deposit Agreement and this ADR, except to receive and hold (or sell) distributions on Deposited Securities and deliver Deposited Securities being withdrawn. As soon as practicable after the expiration of six months from the date so fixed for termination, the Depositary shall sell the Deposited Securities and shall thereafter (as long as it may lawfully do so) hold in a segregated account the net proceeds of such sales, together with any other cash then held by it under the Deposit Agreement, without liability for interest, in trust for the pro rata benefit of the Holders of ADRs not theretofore surrendered. After making such sale, the Depositary shall be discharged from all obligations in respect of the Deposit Agreement and this ADR, except to account for such net proceeds and other cash. After the date so fixed for termination, the Company shall be discharged from all obligations under the Deposit Agreement except for its obligations to the Depositary and its agents.


                                  A-11


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99
<SEQUENCE>4
<FILENAME>ex99-d.txt
<DESCRIPTION>EXHIBIT (D)
<TEXT>
<PAGE>

                 [Letterhead of Ziegler, Ziegler & Associates LLP]

                            May 1, 2003

JPMorgan Chase Bank, as Depositary
1 Chase Manhattan Plaza
New York, New York 10081

                      American Depositary Shares
                evidenced by American Depositary Receipts
                        for deposited Shares of
                          BAE SYSTEMS plc

Dear Sirs:

       Referring to the Registration Statement on Form F-6 relating to the above-entitled American Depositary Shares ("ADSs") evidenced by American Depositary Receipts ("ADRs") each ADS representing four ordinary shares of BAE SYSTEMS plc (the "Company"), a corporation incorporated under the laws of England and Wales. Capitalized terms used herein that are not herein defined shall have the meanings assigned to them in the Deposit Agreement appearing, or incorporated by reference, in Exhibit (a) to the Registration Statement.

       We are of the opinion that the ADSs covered by the Registration

Statement, when issued in accordance with the terms of the Deposit Agreement, will, when sold, be legally issued and will entitle the holders thereof to the rights specified in the Deposit Agreement and the ADRs.

The foregoing opinion is limited to the Federal laws of the United States and the laws of the State of New York, and we are expressing no opinion as to the effect of the laws of any other jurisdiction.

We hereby consent to the use of this opinion as Exhibit d of the above-mentioned Registration Statement. In giving such consent, we do not admit thereby that we are within the category of persons whose consent is required under Section 7 of the Securities Act of 1933, as amended.

Very truly yours,

/s/Ziegler, Ziegler & Associates LLP

```
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-99
<SEQUENCE>5
<FILENAME>ex99-e.txt
<DESCRIPTION>EXHIBIT (E)
<TEXT>
<PAGE>
```

Certification under Rule 466

The depositary, JPMorgan Chase Bank, represents and certifies the following:

(1) That it previously had filed a registration statement on Form F-6 (British Aerospace plc 333-9424) that the Commission declared effective, with terms of deposit identical to the terms of deposit of this registration statement.

(2) That its ability to designate the date and time of effectiveness under Rule 466 has not been suspended.

JPMORGAN CHASE BANK, as Depositary

By /s/Jordana Chutter
---------------------------------
Name: Jordana Chutter
Title: Vice President

```
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```

# EXHIBIT W



EXHIBIT X





An interview with...

# Andy Inglis

## Chief Executive of BP Exploration and Production

Heading up BP's Exploration and Production business in London and living in Houston might not seem that conducive to a sensible work-life balance, but as devoted family man Andy Inglis explains to JUDI BEVAN, it's all about stamina and personal drive.

When Andy Inglis and his family go skiing in America, he likes to race with his 12-year-old daughter Paula. "We set up a slalom race course and compete," he says with a fond smile. "She just about beat me last time if you take into account her lighter body weight."

Inglis (pronounced Ingalls) is a comfortable-looking father of five, however, beneath the laid back exterior, lurks a highly competitive animal, who is out for whichever team he is leading and, most of all, for BP.

"I want BP to win," he says in his hybrid accent, hovering between the north of England and North America. "Performing to a high level is important to me. I believe BP has the assets and the people to deliver what we promise." Colleagues admire his clarity, ability to break down complex problems and his sheer tenacity.

Inglis took over from Tony Hayward as head of BP Exploration and Production last February when Hayward was named BP's chief executive designate. He had been Hayward's deputy since 2004. For much of his career, he has travelled the world, encouraging and motivating BP's individual business leaders, negotiating with government officials and visiting the operations. Competitive he may be, but his style is to set goals and then stand back. "He is good at giving people the space to get things fixed," says David Clarkson, the performance unit leader for the new Tangguh gas project in Indonesia. "He lets the team take the credit for success, which motivates everyone."

In Angola, Mary Shafer-Malicki, who heads the business unit there and joined BP during the merger with Amoco, agrees and says she has not been surprised by his rise through the ranks. "There was always something different about Andy – a drive and ambition you only feel when you meet an obvious leader."

Despite suffering a severe back injury on the rugby field in his second year at Cambridge, Inglis displays considerable stamina, spending roughly a third of his time at BP's St James's Square headquarters in London, a third visiting operations worldwide and a third with his family in the US. "When I am at home, I am at home: at work, I work," he says. "I fiercely defend my weekends and rarely make calls or send emails."

Alaska has strong ties for his family as it holds memories of tragedy as well as happiness.

He was first posted to Alaska in 1994 and, shortly afterwards, his first wife died suddenly. He was left with two-and-a-half year old Georgina, baby Paula »







and a responsible job as head of the Kuparuk field there.

"It was the biggest thing I had ever dealt with and it shaped me hugely," he says. "It showed me that I had no control and that life deals some really tough blows." He found BP as an organisation, and his then boss, John Morgan, greatly supportive. "John helped me hugely at the time," he says.

Just before he was due to leave Alaska after two years, a colleague introduced him to Bobbye. They married a year later in 1997 and "she has been my soulmate ever since." Together, they have a six-year-old daughter, Grace, baby twin boys born eighteen months ago, as well as Georgina and Paula.

Inglis was born in Sale, Cheshire, but grew up in Lytham St Annes, one of the homes of the British Open golf championship. It rubbed off and he started playing at the age of 10. He recalls being able to see the course from the classrooms of the King Edward VII grammar school he attended. His father was a director of British Nuclear Fuels and an engineer like Inglis. Both he and his father are fellows of the Institute of Mechanical Engineers and of the Royal Academy of Engineering. The family connection means a lot to him. "There are a very small number of fathers and sons in the Academy," he says proudly.

At school, he excelled at maths and science and showed early leadership qualities, captaining the rugby team and becoming head boy. He took maths, physics and chemistry at A-level, gaining a place at Pembroke College, Cambridge – the third oldest college at the university. He took a year off before going up, spending his time at a craft training centre. It might not be every student's dream of a gap year, but he loved it. "I worked as a fitter's mate and spent a year in oily coveralls, which was a great way to start an engineering degree at Cambridge," he says with genuine enthusiasm.

Today, he still takes pleasure in basic engineering and has a talent for communicating with operators on drilling rigs and construction sites. "There are two Andys," says David Clarkson. "There is the focused, analytical businessman in the office, but when he is out in the field, you can see him light up. He really enjoys talking to engineers and touching the hardware."

Inglis was attracted to the oil industry because he wanted to build substantial projects. "My attraction was to engineering that made a lasting difference."

Although he was sponsored through Cambridge by the Central Electricity Generating Board, he was not impressed by the job the organisation offered him. The North Sea was 'hot' and, inspired by the success of British operators, he applied to Shell and BP, finally taking the BP offer. Yet, when he arrived, he was sent to the engineering department in North Britannic House, which he describes as a Victorian workhouse with about 40 desks in rows facing each other. Bravely, for a young recruit, he complained to his manager that a life of bureaucratic pen-pushing was not

what he had signed up for and the very next day he found himself headed north to the Shetland Islands to work on the Sullom Voe oil terminal, at the time, the largest construction site in Europe. To his delight, he was given responsibility for building one of the oil tanks. "I had a fantastic 18 months and learned a huge amount about the oil industry."

All did not go smoothly, though, with labour strikes and various other forms of industrial disputes, but it taught him a great deal. "It was the real world of actually getting something of that scale built."

He moved on to various roles in the North Sea and praises the training he received as a young engineer. "It was very high quality and it is a huge priority now. In the upstream business alone, we take on more than 500 graduates a year, so it is vital that they get grounded in a discipline and given deep experience in the workplace."

In 1994, he was posted to Alaska and a short time ago he was back on the North Slope to celebrate BP's 30 years in Prudhoe Bay. He believes there are another 50 productive years ahead. "There is a great future for gas and heavy oil in Alaska," he enthuses.

He was brought back to London in 1996 as chief of staff for the upstream business, before being posted to the Gulf of Mexico, where production from the deep water was just getting under way

"There are two Andys. There is the focused, analytical businessman in the office but when he is out in the field you can see him light up. He really enjoys talking to engineers and touching the hardware."
**David Clarkson**



> "If you are bringing something to a country that it needs, you are not just a contractor, you have a mutual agenda. We can then build a long-term partnership with the government and other stakeholders."

with output of 50,000 barrels of oil a day. Now production is approaching 300,000 barrels a day. "At heart, we are an engineering and technology company and the pace of change is hugely exciting," he says. "When I started, we were working in 915m [3,000 feet] of water and we thought that was difficult. Now, the Atlantis field will start up in 2,100m [7,000 feet] of water."

He has since been involved in all BP's new areas, including Azerbaijan, Angola, Trinidad, Egypt, Algeria, the Far East and Russia. So what is the secret to operating in fast-growing and sometimes unstable regimes?

"Mutual advantage," he says without hesitation. "If you are bringing something to a country that it needs, you are not just a contractor, you have a mutual agenda. We can then build a long-term partnership with the government and other stakeholders."

He cites Russia as an example where BP made four key promises, firstly, to grow production, second, bring capability and technology, third to bring good governance and fourth, to be good citizens and pay taxes. TNK-BP has paid more than $40 billion in tax since it was formed, he points out. "When we meet President Putin, he goes through that list."

In Azerbaijan, the country has been transformed by developing its oil. "We

have brought technology as well as achieving high international standards in terms of environmental and social performance."

Inglis believes passionately that it is BP's technical expertise that will continue to win it new projects such as the recent acreage in Libya and a tight gas play in Oman. "In Oman, we were able to



demonstrate that we are the best tight gas company in the world because of our experience in North America."

For the moment, Inglis's life, split three ways, looks complicated, but he has ways of simplifying it. In London he owns no car and after a short Pilates routine for his back, he walks the half hour to and from his flat to St James's Square to keep fit. He does not have enough time for playing golf these days but he finds skiing an ideal family sport – although it will be a couple of years before they put the twin boys on skis. "The family is hugely important to me," he reflects. "When you lose something, it makes it more valuable. The challenge is how you manage a full business career with a full family life." Luckily, he is someone who enjoys a challenge. **BPM**

**Writer biography>**
**JUDI BEVAN** is a journalist and author. A former deputy City editor of the *Sunday Times*, she wrote profiles of leading businessmen for the *Sunday Telegraph* for six years and is the author of *The Rise and Fall of Marks & Spencer*.

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re BAE SYSTEMS PLC DERIVATIVE LITIGATION | ) ) ) | Civil No. 1:07-cv-01646 |
| | ) | Assigned to: Judge Rosemary M. Collyer |
| | ) | |
| This Document Relates To: | ) | |
| | ) | |
| ALL ACTIONS. | ) | |
| | ) | |

[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR EXPEDITED
DISCOVERY LIMITED TO PERSONAL JURISDICTION

The Court has read and considered the memoranda of points and authorities and other documents in support of and in opposition to Plaintiff the City of Harper Woods Employee Retirement System's Motion for Expedited Discovery Limited to Personal Jurisdiction pursuant to Fed. R. Civ. P. 56(e)-(f).  Plaintiff's Motion requests 45 days for plaintiff to undertake limited discovery consisting of narrowly-tailored requests for production of documents, interrogatories and four-hour depositions of BAE Systems plc's person most knowledgeable and each defendant moving to dismiss for lack of personal jurisdiction (collectively, "Movants") solely as to the issue of personal jurisdiction.

The Court, after duly considering all of filings of the parties on this matter, finds as follows:

IT IS HEREBY ORDERED that:

1.     Plaintiff's motion to conduct expedited discovery limited to personal jurisdiction as set forth above is GRANTED and the written discovery attached as Exs. Q-T to the Blasy Declaration are deemed served effective as of the date of entry of this Order.

2.     Commencing with the date of this Order, in lieu of the time periods, notice provisions, and other requirements of Rules 26, 30, 34, and 45 of the Federal Rules of Civil Procedure, and Local Rule 26, expedited discovery limited to personal jurisdiction shall proceed as follows:

(a)     Movants shall respond to plaintiff's written discovery within SEVEN DAYS;

(b)     Counsel for plaintiff and Movants shall meet and confer and make a good faith effort to narrow any disputes concerning the scope of the written discovery sought within THREE DAYS of service of Movants' responses;

(c)     Should the parties be unable to agree upon the scope and means of production of documents responsive to plaintiff's written discovery, the parties shall simultaneously serve and

file briefs detailing the areas of agreement and the areas of disagreement within SEVEN DAYS of service of Movants' responses;

(d)     Movants shall also answer all interrogatories and produce all documents responsive to the requests for production and interrogatories they are amenable to answering within SEVEN DAYS of service of Movants' responses;

(e)     Counsel for plaintiff and for Movants shall make themselves available for a telephonic hearing on any disputed interrogatories or requests for production of documents at the Court's convenience following filing of their respective briefing on the discovery dispute; and

(f)     Movants shall answer all interrogatories and produce all documents responsive to the requests for production as so ordered by this Court within THREE DAYS of this Court's ruling on the discovery dispute.

3.     The person most knowledgeable concerning the topics governed by the documents detailed in BAE's responses to the written discovery at nominal party BAE Systems plc (as defined in Fed. R. Civ. P. 30(b)(6)) and each individual defendant contesting personal jurisdiction shall sit for depositions which: (i) shall be limited to four hours each; (ii) shall be upon three calendar days' notice; and (iii) may be taken Monday through Saturday at a location to be agreed to by counsel for the parties.  Deposition transcripts that have not been signed by the witness may be used for purposes of opposing the motion to dismiss for lack of personal jurisdiction.

(a)     Provided that this subparagraph shall not be construed in any manner to preclude plaintiff's right to take subsequent depositions of the same witnesses on the merits of this action.

(b)     Provided that any deposition taken pursuant to this subparagraph is in addition to, and not subject to, the presumptive limits on depositions set forth in Fed. R. Civ. P. 30(a)(2)(A) and Local Rule 26.1.

4.    Plaintiff's opposition to the motions to dismiss shall be due within 20 days of the completion of the jurisdictional discovery ordered herein.

IT IS SO ORDERED.

DATED: _____    _____

THE HONORABLE ROSEMARY COLLYER
UNITED STATES DISTRICT JUDGE

S:\CasesSD\BAE Derivative\ORD00049862.doc