UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re BAE SYSTEMS PLC DERIVATIVE LITIGATION | ) ) ) | Civil No. 1:07-cv-01646 |
| | ) | Assigned to: Judge Rosemary M. Collyer |
| This Document Relates To: | ) ) | ORAL ARGUMENT REQUESTED |
| ALL ACTIONS. | ) ) ) | |

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR EXPEDITED DISCOVERY
LIMITED TO PERSONAL JURISDICTION

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ...................................................1

II.     MOVANTS' DILATORY REQUEST THAT THEIR JURISDICTIONAL
        CHALLENGES BE HELD IN ABEYANCE PENDING RESOLUTION OF THE
        SUBSTANTIVE MOTIONS TO DISMISS SHOULD BE REJECTED...........................2

III.    PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY LIMITED TO
        PERSONAL JURISDICTION SHOULD BE GRANTED ...............................................13

        A.      Movants' Challenges to Plaintiff's *Alter Ego* Showing Raise Contested
                Issues of Fact..........................................................................................................14

        B.      The BAE Executive Defendants' Claim They Are Exculpated by the So-
                Called "Fiduciary Shield Doctrine" Raises Contested Issues of Fact...................20

        C.      Whether Plaintiff Adequately "Alleged Substantial Business Transactions
                in This District" Raises Contested Issues of Fact .................................................21

        D.      Plaintiffs' Conspiracy Theory of Personal Jurisdiction Argument Raises
                Disputed Issues of Fact .........................................................................................23

IV.     MOVANTS SHOULD BE ORDERED TO MEET AND CONFER ON THEIR
        OBJECTIONS TO THE SCOPE OF THE JURISDICTIONAL DISCOVERY ..............23

V.      CONCLUSION.....................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## CASES

*Am. Directory Serv. Agency v. Beam*,
    131 F.R.D. 635 (D.D.C. 1990)................................................................20

*Arrowsmith v. United Press Int'l*,
    320 F.2d 219 (2d Cir. 1963)..................................................................7

*Ashford v. E. Coast Express Eviction*,
    245 F.R.D. 36 (D.D.C. 2007)................................................................24

*Belbacha v. Bush*,
    No. 07-5258, 2008 U.S. App. LEXIS 5486
    (D.C. Cir. Mar. 14, 2008)....................................................................6

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
    274 F. Supp. 2d 86 (D.D.C. 2003)........................................................11

*Cali v. East Coast Aviation*,
    178 F. Supp. 2d 276 (E.D.N.Y. 2001) ..........................................15, 16, 19

*Chalabi v. Hashemite Kingdom Jordan*,
    503 F. Supp. 2d 267 (D.D.C. 2007)..................................................9, 22

*Chase v. Pan-Pacific Broadcasting, Inc.*,
    617 F. Supp. 1414 (D.D.C. 1985).....................................................20, 21

*Continental Illinois Bank & Trust Co. v. Caton*,
    130 F.R.D. 145 (D. Kan. 1990).............................................................10

*Crane v. Carr*,
    814 F.2d 758 (D.C. Cir. 1987)........................................................13, 14

*Diamond Chem. Co., Inc. v. Atofina Chem., Inc.*,
    268 F. Supp. 2d 1 (D.D.C. 2003).....................................................13, 15

*DSMC, Inc. v. Convera Corp.*,
    273 F. Supp. 2d 14 (D.D.C. 2002)........................................................23

*Edmond v. United States Postal Serv. Gen. Counsel*,
    949 F.2d 415 (D.D.C. 1991) ...........................................................13, 23

*Gorman v. Ameritrade Holding Corp.*,
    293 F.3d 506 (D.C. Cir. 2002)..............................................................13

**Page**

*GTE New Media Servs. Inc. v. BellSouth Corp.,*
   199 F.3d 1343 (D.C. Cir. 2000)..................................................................14, 15

*Guidi v. Inter-Continental Hotels Corp.,*
   224 F.3d 142 (2d Cir. 2000).............................................................................12

*Helmer v. Doletskaya,*
   393 F.3d 201 (D.C. Cir. 2004)..........................................................................22

*Hulme v. Ferris,*
   No. 87-48, 1987 WL 11702,
   (D.D.C. May 21, 1987) ....................................................................................21

*In re Asbestos School Litig.,*
   No. 83-0268, 1987 U.S. Dist. LEXIS 7338
   (E.D. Pa. Jul. 31, 1987)......................................................................................7

*In re Tyco Int'l, Ltd. Multidistrict Litig.,*
   No. MDL No. 02-1335-B, 2003 WL 23830479
   (D.N.H. Jan. 29, 2003)......................................................................................10

*In re Vitamins Antitrust Litig.,*
   120 F. Supp. 2d 58 (D.D.C. 2000)...................................................................21

*In re Vitamins Antitrust Litig.,*
   No. 99-197, 2001 WL 855469
   (D.D.C. Jul. 2, 2001).......................................................................................20

*In Skidmore v. Syntex Labs., Inc.,*
   529 F.2d 1244 (5th Cir. 1976) .........................................................................14

*Ionescu v. E. F. Hutton Co. (France) S. A.,*
   465 F. Supp. 139 (S.D.N.Y. 1979) .....................................................................7

*Islamic Am. Relief Agency v. Unidentified FBI Agents,*
   394 F. Supp. 2d 34 (D.D.C. 2005)...................................................................13

*Johns v. Rozet,*
   770 F. Supp. 11 (D.D.C. 1991).....................................................................20, 21

*Jung v. Ass'n of Am. Med. Colleges,*
   300 F. Supp. 2d 119 (D.D.C. 2004)..................................................................23

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,*
   115 F.3d 1020 (D.C. Cir. 1997)........................................................................23

**Page**

*Koster v. American Lumbermens Mut. Cas. Co.*,
    330 U.S. 518 (1947)..........................................................................................................12

*Madara v. Hall*,
    916 F.2d 1510 (11th Cir.1990) .....................................................................................3, 7

*Marra v. Papandreou*,
    33 F. Supp. 2d 17 (D.D.C. 1999) ......................................................................................9

*New Mexico Navajo Ranchers Ass'n v. Interstate Commerce Comm'n.*,
    850 F.2d 729 (D.C. Cir. 1988).........................................................................................6

*Odilla Mutaka Mwani v. Osama Bin Laden*,
    417 F.3d 1 (D.C. Cir. 2005).............................................................................................13

*People with Aids Health Group v. Burroughs Wellcome Co.*,
    No. 91-0574, 1991 U.S. Dist. LEXIS 14389
    (D.D.C. Oct. 11, 1991)....................................................................................................10

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981).........................................................................................................11

*Renner v. Lanard Toys*,
    33 F.3d 277 (3d Cir. 1994)..............................................................................................14

*Ruhrgas AG v. Marathon Oil Co.*,
    526 U.S. 574 (1999)...........................................................................................................9

*Schwartz v. CDI Japan*,
    938 F. Supp. 1 (D.D.C. 1996) ....................................................................................22, 23

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*,
    127 S. Ct. 1184 (2007)............................................................................................3, 7, 9, 10

*Steel Co. v. Citizens for Better Env't*,
    523 U.S. 83 (1998)...............................................................................................................3

*Surpitski v. Hughes-Keenan Corp.*,
    362 F.2d 254 (1st Cir. 1966)...........................................................................................14

*Twin City Fire Ins. Co. v. Employers Ins. of Wausau*,
    124 F.R.D. 652 (D. Nev. 1989).......................................................................................10

*Virgin Records Am., Inc. v. Does*,
    No. 05-1918 (CKK), 2006 WL 1028956
    (D.D.C. Apr. 18, 2006) ...................................................................................................13

Page

**STATUTES, RULES AND REGULATIONS**

28 U.S.C.
§1404..............................................................................................................12

District of Columbia Code Annotated
§13-423(a).......................................................................................................20

Federal Rules of Civil Procedure
Rule 4(d)(3) ......................................................................................................8
Rule 12(b) .........................................................................................................3
Rule 12(b)(2)..............................................................................................3, 5, 7
Rule 12(b)(6)...............................................................................................7, 9
Rule 12(d) .........................................................................................................3
Rule 12(h)(3).....................................................................................................6
Rule 26(f).........................................................................................................24
Rule 26(c)........................................................................................................10

**SECONDARY AUTHORITIES**

Charles A. Wright & Arthur R. Miller,
*Federal Practice and Procedure, Civil 2d* (3d ed. 2004)
§1351.................................................................................................................3

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Almost two months after filing a legally defective motion to dismiss challenging the Court's personal jurisdiction over nominal defendant BAE Systems plc ("BAE" or the "Company") – despite that its U.S. headquarters are located within 30 miles of this Courthouse, despite that it conducts significant operations from offices here in the District, and despite that the conduct underlying these derivative claims occurred largely in this District – and ***every single*** BAE executive defendant served with process – including two who reside less than ten miles from this Courthouse – now ask plaintiff and the Court to essentially ignore that the motion was filed.  BAE and the BAE executive defendants (collectively, "Movants") demand this acknowledging that plaintiff submitted proposed jurisdictional discovery to them within 20 days of the filing their motion to dismiss challenging personal jurisdiction ("PjX MTD"), knowing that plaintiff stated it needed and sought discovery to respond to the PjX MTD, knowing since February 27th that plaintiff was moving for an order for expedited discovery limited to personal jurisdiction and knowing that ***when all else failed*** and plaintiff was forced to seek an order shortening time to obtain the discovery it is entitled to, it was Movants who offered to stipulate to defer plaintiffs' responses to ***all*** motions to dismiss ("MTDs") on March 12, 2008 to avoid plaintiff's motion.  Movants openly acknowledge being aware of all of this because plaintiff repeatedly attempted to meet and confer with them to obtain the discovery it seeks and is entitled to.

Nonetheless, Movants, now joined by defendants PNC Financial Services Inc. ("PNC") and Joseph, Barbara and Robert Allbritton ("Allbrittons") (collectively, "defendants"), without motioning the Court (much less meeting and conferring on that request or withdrawing their misleading, incomplete and inaccurate jurisdictional declarations), suggest that the Court simply hold their defective PjX MTD in abeyance and adjudicate other merits-based grounds for dismissal to avoid having to comply with the limited expedited jurisdictional discovery plaintiff seeks.

Moreover, despite having steadfastly maintained for almost two months that they categorically would not participate in *any* expedited jurisdictional discovery, in order to add color to their objection, Movants now, *for the first time*, raise objections to the scope of the jurisdictional discovery sought.

For the reasons stated herein and those detailed in the Motion for Expedited Discovery Limited to Personal Jurisdiction ("Exp. Disc. Mtn." or "Expedited Discovery Motion") filed herein on March 12, 2008, plaintiff requests the Court deny Movants' suggestion that the PjX MTD be held in abeyance while other merits-based grounds for dismissal are adjudicated, grant the expedited discovery limited to personal jurisdiction sought, and order Movants to meet and confer in good faith concerning their newly concocted objections to the scope of expedited jurisdictional discovery.[1]

## II.    MOVANTS' DILATORY REQUEST THAT THEIR JURISDICTIONAL CHALLENGES BE HELD IN ABEYANCE PENDING RESOLUTION OF THE SUBSTANTIVE MOTIONS TO DISMISS SHOULD BE REJECTED

Only under the rarest of circumstances do courts diverge from the time-honored rule that "*a federal court generally may not rule on the merits of a case without first determining that it has*

---

[1]      Though PNC/Allbrittons stipulated on March 17th, *at the request of Movants not plaintiff*, to defer briefing on their own grounds for dismissal pending resolution of this Expedited Discovery Motion, they filed a separate objection to the Expedited Discovery Motion loaded with exaggerated hyperbole suggesting that plaintiff waited until the last minute to seek expedited jurisdictional discovery and that plaintiff did this *instead of* drafting responses to their MTDs.  As detailed in the Declaration of Mary K. Blasy in Support of Plaintiff's Motion for Expedited Discovery Limited to Personal Jurisdiction ("Blasy Decl.") filed with the Expedited Discovery Motion, ¶¶25-28 and the Supplemental Declaration of Mary K. Blasy in Support of Plaintiff's Reply in Support of Motion for Expedited Discovery Limited to Personal Jurisdiction ("Supp. Blasy Decl.") filed herewith, ¶9, plaintiff began attempting to meet and confer with Movants concerning these jurisdictional challenges soon after they were filed.  Moreover, as PNC/Allbrittons did not join the MTDs challenging personal jurisdiction and thus have no standing to object to the requested discovery, in recognition of the fact that PNC/Allbrittons' inflammatory objections to the Expedited Discovery Motion appear to be a misguided attempt to bolster Movants' own objection, to the extent any of PNC/Allbrittons' missives deserve a response, plaintiff will address them in this single Reply.  For the reasons stated herein, PNC/Allbrittons' request that their merits-based MTDs be adjudicated prior to the challenges to personal jurisdiction should also be rejected.

*jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction).*"[2] *Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 127 S. Ct. 1184, 1191 (2007) (citing *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83 (1998)); *see also Madara v. Hall*, 916 F.2d 1510, 1513-14 & n. 1 (11th Cir.1990); 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure, Civil 2d* §1351, at 312-13 (3d ed. 2004). Under those rarest of circumstances, Fed. R. Civ. P. "Rule 12(d) gives the district court discretion to delay its determination of the Rule 12(b)(2) motion" to dismiss for lack of personal jurisdiction while it resolves other *non-substantive* motions to dismiss. *See* 5B Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure, Civil 2d* §1351, at 305-12 (3d ed. 2004) ("In particularly complex cases, . . . it may be desirable to hold in abeyance a decision on a motion to dismiss for lack of personal jurisdiction" where "[d]oing so will enable the parties to employ discovery on the jurisdictional issue, which might lead to a more accurate judgment than one made solely on the basis of affidavits."); *see also Sinochem Int'l*, 127 S. Ct. at 1191. These are not those rarest of circumstances and adherence to the general rule and its sound policy justifications militate forcefully against granting defendants' dilatory suggestion that their PjX MTD be held in abeyance here while other *substantive* MTDs are adjudicated.

First, rather than answering the Complaint,[3] pleading an affirmative defense challenging the Court's personal jurisdiction over them, immediately moving to dismiss on the English law standing issue and *forum non conveniens* **– which potentially could have kept everyone out of this procedural predicament of Movants' own making -** Movants **chose** to seek Rule 12(b) dismissals

---

[2]    All citations and footnotes are omitted and emphasis added, unless otherwise noted.

[3]    All references to the "Complaint" or ¶__ or ¶¶__ are to the Verified Shareholder Derivative Complaint for Intentional, Reckless or Negligent Breach of Fiduciary Duty, Corporate Waste and *Ultra Vires* Conduct, filed September 19, 2007.

on all three grounds.  This cannot be explained as the product of a hasty decision under the pressure
of litigation deadlines with little time to consider the consequences, but instead arose in the context
of a motion to dismiss filed ***more than four months after BAE received plaintiff's Complaint.** See*
Supp. Blasy Decl., ¶¶3-9. In fact, having advised the Court on October 30, 2007, ***three months prior
to the filing of their motion to dismiss,*** that the "preparation of [their] motions to dismiss . . .
[would] require significant amounts of time" as "[a]ffidavits w[ould] be submitted from the BAE
Systems Defendants directly," to justify the lengthy extension Movants sought to respond to the
Complaint, it was surprising to see that all 25 declarations the BAE executive defendants submitted
in support of their PjX MTD were nearly identical and contained but four lines each.  *See* Motion of
Certain Individual BAE Systems PLC Defendants for Extensions of Time to Answer, Move or
Otherwise Respond to the Complaint; Blasy Decl., ¶3; Exp. Disc. Mtn. at 9-10.  The declarations
contained nothing but rote statements addressing: (i) the current status of each Movants' relationship
to BAE; (ii) a self pronouncement of each Movants' "citizenship" for purposes of jurisdiction – a
legal term of art – but no facts to back that characterization up; (iii) a statement of ***present*** residence,
despite the lengthy relevant period the Complaint covers; and (iv) Movants' ***current*** employment
status.  Exp. Disc. Mtn. at 9-10.  That even these terse four-line declarations could contain
misstatements was disarming.  *Id*.  That Movants stood on their PjX MTD all the way through their
March 24, 2008 suggestion ***– for the first time –*** that it should be held in abeyance pending
resolution of other MTDs is inexcusable. *See* Supp. Blasy Decl., ¶9.  Under ***these*** circumstances,
Movants' request that their PjX MTD be set to the side while the other MTDs are resolved should be
denied as unduly dilatory alone.[4]  But there is more.

---

[4]      Movants' complaint that plaintiff filed its Expedited Discovery Motion before the deadline to
oppose Movants' MTD is nonsensical.  First, Pretrial Order #1 would not have prohibited plaintiff
from filing its opposition as early as February 1st.  The claim that plaintiff somehow jumped the gun

Despite plaintiffs' repeated requests for jurisdictional discovery following the filing of Movants' PjX MTD, Movants neither withdrew the misleading, incomplete and inaccurate declarations they filed in support of their PjX MTD *nor* properly moved the Court for an abeyance of the PjX MTD (much less met and conferred on such a request as Local Rule 7.1 would have required). *See* Blasy Decl., ¶¶25-28; Supp. Blasy Decl., ¶9. Had Movants suggested they wanted to abate their PjX MTD prior to requiring that plaintiff prepare and attempt to negotiate the service of expedited jurisdictional discovery; prepare, meet and confer on and file its detailed Expedited Discovery Motion; and prepare and meet and confer on a motion seeking an order shortening time on its Expedited Discovery Motion, the parties likely could have reached some accomodation that protected both sides' interests.

Instead, having flatly rejected plaintiff's requests for *any* jurisdictional discovery and *after* obtaining the benefit of a preview of plaintiff's jurisdictional arguments, for the *first time* in their opposition to the Expedited Discovery Motion filed on March 24, 2008, Movants *now* seek to temporarily abandon their nearly two-month old PjX MTD. *See* Supp. Blasy Decl., ¶9. Instead, all defendants claim an entitlement to have the other merits-based MTDs adjudicated first. *Id.* But all Movants have done is signal a refusal to withdraw their PjX MTD (and the faulty declarations "supporting" it) or to concede plaintiff has at least stated a *prima facie* case of personal jurisdiction sufficient to permit the Complaint to proceed past the Rule 12(b)(2) stage so that plaintiff's jurisdictional allegations may be tested in discovery. *A proper request for abeyance requires more than this.*

In fact, Movants' present request that their PjX MTD be held in abeyance is a tacit acknowledgement that plaintiff has at least made a "colorable claim" of personal jurisdiction over

___

grossly conflicts with PNC/Allbrittons' theme that plaintiff was somehow dilatory in seeking discovery. As detailed in the Supp. Blasy. Decl., ¶¶3-9, both missives should be ignored.

each Movant. *See Belbacha v. Bush*, No. 07-5258, 2008 U.S. App. LEXIS 5486, at *9 (D.C. Cir.

Mar. 14, 2008) ("Neither this court nor the district court could have held these cases in abeyance

unless we thought they presented a substantial jurisdictional question." (citing *New Mexico Navajo*

*Ranchers Ass'n v. Interstate Commerce Comm'n.*, 850 F.2d 729, 731-32 (D.C. Cir. 1988) ("Our

decision to [hold the case] in abeyance seems necessarily to have rested on an assumption that this

court secured jurisdiction . . . .")) and Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time

that it lacks subject-matter jurisdiction, the court must dismiss the action")). ***But since no motion***

***for abeyance is presently pending, none should be granted.***

Arguably more importantly, this Court should not hold Movants' PjX MTDs in abeyance in

favor of the other ***merits-based*** MTDs, *i.e.*, plaintiffs' standing to sue under English law (a very fact

intensive mixed question), PNC's and the Allbrittons' argument that plaintiff has not stated a cause

of action against them for aiding and abetting breaches of fiduciary duties,[5] or PNC/Allbrittons' as of

---

[5]    Incredibly, PNC/Allbrittons now complain that because their own MTD "does *not* raise the issue of personal jurisdiction," resolution of their own MTDs "should not be held hostage" to plaintiff's jurisdictional discovery request.  PNC's and the Allbrittons' Joint Response to Plaintiff's Motion for Expedited Discovery Limited to Personal Jurisdiction ("PNC Opp.") at 1-2.  This clearly contradicts PNC's early position where they sought and obtained several extensions to respond to the Complaint arguing that their own MTDs ***had to be resolved with (or following) Movants' MTDs*** because Movants' MTDs raised "threshold" issues:

> "***[I]t would make little sense to require PNC to respond well ahead of many other defendants.*** PNC is included in the Complaint for having allegedly "aided and abetted" the actions of BAE, its directors, and others by providing banking services and the transfer of funds. PNC certainly believes it will have its own unique defenses to the claims against it, ***but there will probably be certain threshold defenses (including, among other things, whether the plaintiff has any right to assert its claims on BAE's behalf) that are common to all defendants.*** In view of these common defenses, ***the logical and orderly approach would be for most of the defendants to respond to the Complaint at about the same time***."

*See* Supp. Blasy Decl., ¶6 (quoting PNC's Motion for Extension of Time to Respond to the Complaint).  PNC/Allbrittons' new position dramatically contradicts PNC's earlier stated position.  Moreover, as counsel for plaintiff relied on counsel for Movants to negotiate entry of Pretrial Order #2 deferring resolution of the MTDs pending resolution of this Expedited

yet un-pled (much less proven) *in parli delicto **affirmative defense***. Resolution of any of the **substantive** MTDs implicates *res judicata* issues, which is precisely why only under the rarest of circumstances do courts diverge from the general rule that ***"a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)."*** *See Sinochem*, 127 S. Ct. at 1191. This general rule is adhered to, despite the inherent "inconvenience" defendants' here complain of, because "due process" requires it: a defendant that is not subject to the jurisdiction of the court "could not be personally bound by its rulings." *Madara*, 916 F.2d at 1514.

Thus, as a preliminary matter, courts ascertain that they have the power to bind a defendant with a ruling on the merits of the case before resolving substantive motions to dismiss. *Id.* That a dismissal for failure to state a claim is with prejudice whereas a dismissal for lack of jurisdiction is without prejudice also counsels against bypassing the jurisdictional issue. *Id.* at 1514 n.1 (contrasting consequences of dismissals made under Fed. R. Civ. P. 12(b)(2) and Fed. R. Civ. P. 12(b)(6) (citing *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963) (en banc)); *see also In re Asbestos School Litig.*, No. 83-0268, 1987 U.S. Dist. LEXIS 7338, at *5-*6 (E.D. Pa. Jul. 31, 1987) ("I realize that [defendants'] challenge to this court's personal jurisdiction over it ***is just one of numerous reasons*** [defendant] raises for dismissal of the claims against it. I will not, however, determine the ***merits*** of [defendants'] other arguments until I have ruled on the personal jurisdiction issue."); and *Ionescu v. E. F. Hutton Co. (France) S. A.*, 465 F. Supp. 139, 141 (S.D.N.Y. 1979) ("motion to dismiss on the grounds of *Forum non conveniens* . . . held in abeyance pending further discovery to illumine questions of foreign law and jurisdiction").

---

Discovery Motion, plaintiff was caught off guard by PNC/Allbritton's objection. *See* Supp. Blasy Decl., ¶¶5-8.

Adherence to the general rule against disposing of merits-based MTDs is especially important here where Movants are suggesting a *forum non conveniens* dismissal and asking that plaintiff be relegated to the courts of London. If Movants' approach were adopted here, and this Court ruled on their MTD that plaintiff lacks standing to bring its claims derivatively, the Court would, *inter alia*, prejudge: (i) whether U.S. or U.K. law applied to the issue of plaintiff's ability to pursue these claims; (ii) if the new 2006 Companies Act applies retroactively, and (iii) potentially reach and prejudge defendants' *Foss v. Harbottle* procedural defense. If the Court resolved any of Movants' or PNC/Allbrittons' merits-based grounds for dismissal, and then shipped the case to England under a *forum non conveniens* ruling or after finding it lacked personal jurisdiction, Movants and PNC/Allbrittons would not be bound by the rulings – but plaintiff might be.[6]

This case demonstrates a textbook example of why jurisdictional challenges must be addressed before merits defenses such as plaintiff's standing under English law, ability as an ADR holder to maintain this action, PNC/Allbrittons' argument that the aiding and abetting claims are not sufficiently pled, and/or PNC/Allbrittons' argument that their *in parli delicto* affirmative defense applies and exculpates them here. Besides requiring that the Court decide substantive merits issues prior to establishing its own jurisdiction, such a result would also require the Court to resolve

---

[6]     PNC/Allbrittons' claim that plaintiff was dilatory because "the Plaintiff picked, without defense objection" a 60 day deadline to object to their MTDs must be rejected. *See* PNC Opp. at 8. BAE and almost all defendants (except Prince Bandar Bin Sultan ("Bandar") and certain individual defendants who had not yet been but have now been served) obtained extensions of nearly 150 days to respond to the Complaint largely because of the foreign status of Movants. *See* Fed. R. Civ. P. 4(d)(3). All defendants, including PNC/Allbrittons, complained they needed to ***jointly*** coordinate their responses to the Complaint. *See* Supp. Blasy Decl., ¶¶4-8. PNC/Allbrittons took the extra time even though as U.S. defendants, they did not face the same overseas coordination issues. As such, PNC/Allbrittons' attempts to now have their own MTDs resolved separately and on a more advanced schedule that Movants' PjX MTD must be rejected. Similarly, having ***joined*** only one of Movants' three MTDs, PNC/Allbrittons waived right to demand these *forum non conveniens* MTD they did not join be decided immediately.

defendants' affirmative defenses – which must be pled and proved – prior to the commencement of discovery.[7]

The Supreme Court's *Sinochem* decision actually militates against holding Movants' PjX MTD in abeyance here while other dispositive **merits-based** MTDs are adjudicated. First, the *Sinochem* court faced two **non-substantive** bases for dismissal (personal jurisdiction and *forum non conveniens*) and simply held they could be disposed of in either order. 127 S. Ct. at 1191. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574 (1999) stands for the same unremarkable proposition. *Id.* at 578. Neither applies to what Movants seek here: resolution of PNC/Allbrittons' yet un-pled and unproven *in parli delicto* affirmative defense, PNC/Allbrittons' Rule 12(b)(6) motion to dismiss for failure to state a cause of action of aiding and abetting breaches of fiduciary duties, and defendants' joint MTD for lack of standing under English law brought as a Rule 12(b)(6) "challenge[] the legal sufficiency of the complaint"[8] – **before establishing the Court has personal jurisdiction.**

*Sinochem* is also inapposite as it requires the Court to first find that "**forum non conveniens considerations weigh heavily in favor of dismissal**" before adjudicating *forum non conveniens* before ascertaining its own jurisdiction. 127 S. Ct. at 1194. Whereas they may have in *Sinochem*, the *forum non conveniens* considerations do not weigh "heavily in favor of dismissal" here. Instead, the *Sinochem* result is limited to its own unique facts where all activities underlying the suit occurred

---

[7]      *Chalabi v. Hashemite Kingdom Jordan*, 503 F. Supp. 2d 267, 273 (D.D.C. 2007), cited by PNC/Allbrittons, does not contradict this: the *Chalabi* court established it had personal jurisdiction **before** addressing defendants' merits bases for dismissal. *Id.* Similarly, *Marra v. Papandreou*, 33 F. Supp. 2d 17, 20 (D.D.C. 1999), also cited by PNC/Allbrittons, stands for the unremarkable position that a "court [should] explore dispositive **jurisdictional issues** before ordering discovery," which, like *Sinochem,* might permit the Court to rule on the *forum non conveniens* motion the PNC/Allbrittons' have not joined, but it would not permit the Court to rule on any merits-based dispositive motions.

[8]      *See* Memorandum of Points and Authorities in Support of the Motion of BAE Systems PLC and the Individual BAE Systems PLC Defendants to Dismiss the Complaint ("BAE MTD") at 5.

in China and a Chinese court had already spent years adjudicating the precise issues untimely raised in the much later-filed U.S. lawsuit. *Id.* Here, conversely, there is no derivative action pending (or threatened) in the U.K. and the bribe payments were paid to Bandar largely here in this District rather than in London or Saudi Arabia.

Moreover, while plaintiff will fully address the private and public law factors relevant to the Courts' decision on the *forum non conveniens* motion, along with the more immediate defects, in its opposition to Movants' MTD,[9] for the immediate purposes of this Reply, suffice it to say that this

---

[9]    Movants' additional missives should also be rejected, including: (i) that discovery should be stayed pending resolution of the MTDs as responding would be unduly burdensome; (ii) attempts to latch onto the Court's comments during the hearing on plaintiff's Temporary Restraining Order ("TRO") motion that plaintiff's efforts to obtain discovery here may be limited by the criminal proceedings; and (iii) claims that plaintiff's discovery requests threaten to disclose state secrets of the U.K. and/or Saudi Arabia. In *In re Tyco Int'l, Ltd. Multidistrict Litig.*, No. MDL No. 02-1335-B, 2003 WL 23830479, at *2 (D.N.H. Jan. 29, 2003) Judge Barbadoro denied prosecutors' request for a "blanket" discovery stay in a shareholder derivative action noting that responding to written discovery did not implicate Fifth Amendment protections, prosecutors could seek tailored protective orders and that the prosecutors' "concern that witnesses in the criminal cases may exploit information obtained through discovery . . . to commit perjury" had to be "balanced against the significant interest that the parties in [the derivative] proceeding ha[d] in obtaining an expeditious resolution of the pending claims." As alluded to at the TRO hearing, the Department of Justice ("DOJ") is aware of these civil proceedings and has made no attempt to intervene or to stay discovery here. Neither the U.K. Government nor the Kingdom of Saudi Arabia have sought to intervene either. Movants have not moved for a stay of discovery based on any of these red herrings either. They have simply raised these objections in passing in their objection to plaintiff's request for expedited discovery. This does not satisfy Movants' burden and their unspoken request for a stay may be denied for this reason alone. *See* Fed. R. Civ. P. 26(c) (parties seeking to avoid discovery claiming "undue burden or expense" must demonstrate it); *People with Aids Health Group v. Burroughs Wellcome Co.*, No. 91-0574, 1991 U.S. Dist. LEXIS 14389, at *2 (D.D.C. Oct. 11, 1991) (a "party seeking to stay discovery has the burden of justification"); *Twin City Fire Ins. Co. v. Employers Ins. of Wausau*, 124 F.R.D. 652, 653 (D. Nev. 1989) ("the burden is on the party seeking relief to show some plainly adequate reason for the order. . . . [A] pending motion to dismiss is not ordinarily a situation that in and of itself would warrant a stay of discovery"). Instead, where, as here, "defendant has failed to demonstrate beyond mere allegations that resources will be conserved by granting the stay," the request must be denied. *People with Aids*, 1991 U.S. Dist. LEXIS 14389, at *2. "'[B]are assertions that discovery will be unduly burdensome or that it should be stayed pending dispositive motions that will probable by [*sic*] sustained, are insufficient to justify the entry of an order staying discovery generally.'" *Id.* (citing *Continental Illinois Bank & Trust Co. v. Caton*, 130 F.R.D. 145, 148 (D. Kan. 1990)).

Court can and should reject defendants' defective request for a *forum non conveniens* dismissal here for the same reasons Judge Robertson did in the 9/11 litigation noting:

> [One defendant] also makes a cursory motion to dismiss on the ground of *forum non conveniens*. **However, on such a motion, [defendant] bears the burden of making the preliminary showing that an adequate alternative forum exists**. *See El-Fadl v. Cent. Bank of Jordan*, 316 U.S. App. D.C. 86, 75 F.3d 668, 677 (D.C. Cir. 1996). [Defendant's] vague musings on the interests of Saudi Arabia [or England] in the litigation of this matter do not establish the courts of that nation as adequate alternative fora.

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 96 (D.D.C. 2003).  Faced with a similar motion for a *forum non conveniens* dismissal in the *In re BP plc Derivative Litigation* in Alaska state court, Judge Jack Smith correctly noted that while the Supreme Court's seminal *forum non conveniens* decision, *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981), requires that before a "foreign forum" such as England may be adjudged "inadequate" to rule on a derivative case brought on behalf of a company organized under its laws, the court must find the "remedies it provides are 'so clearly inadequate or unsatisfactory' as to afford no remedy at all." *See* Blasy Decl., Ex. E at 17. However, Judge Smith also aptly held that because defendants there (as they do here) attempted to "argue that the English courts are an adequate forum for the resolution of this case while simultaneously asserting that this action could not be brought under English common law," coupled with the fact that "[d]efendants also argue that the pending English corporate statutory law is not retroactive" (*i.e.*, the 2006 Companies Act), ***despite the clear expression of public sentiment that the country's derivative law needed to be liberalized***, led him to rule that "[g]iven the current uncertainty as to English law in this area, English courts do not constitute an adequate forum for Plaintiffs." *Id.*

The same may be said here.  Movants simultaneously advance two conflicting grounds for dismissal – both of which they bear the burden of persuasion on – arguing that on the one hand, England provides an adequate alternative jurisdiction for the resolution of plaintiff's claims, while at

the same arguing (and submitting an expert declaration stating) that plaintiff's claims are not cognizable under English law, either under the new 2006 Companies Act, or under the old rule of *Foss v. Harbottle*. BAE MTD at 13-21.  Plaintiff will demonstrate why the latter is not true in due course, but suffice to say that Movants cannot meet their contradictory burdens of persuasion within the same brief and for that reason alone the *forum non conveniens* MTD they herald may be denied.

Movants' suggestion that the Court defer to English shareholder derivative proceedings that have not been commenced misses the mark for other reasons as well.  PNC and the Allbrittons are not citizens of England and would arguably challenge jurisdiction there, in large part because all of the illegal misconduct relevant to the claims against them occurred here in the U.S. in this District. Bandar owns a huge home in England and may be an English citizen for jurisdictional purposes, but plaintiff may not be able to obtain service of process on him under the laws of England.  Conversely, Bandar has been served with process and has appeared in these proceedings.  ***Moreover, pursuant to the Joint Stipulation and Order Regarding Sales Proceeds from Sales of U.S. Real Property Owned or Acquired by Defendants Prince Bandar Bin Sultan (the "PI Stipulation") entered herein on February 13, 2008, the Court has already obtained in rem jurisdiction over some of the spoils of the bribe payment conspiracy[10].***  Finally, defendants' *forum non conveniens* request ignores that "heightened deference should be given in the balancing of conveniences to an American citizen's choice of his or her home forum" and that plaintiff's "'home forum' as American citizens *is a United States court*." *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 146 (2d Cir. 2000).[11]

---

[10]    To the extent Movants lament that they were not given notice of or an opportunity to object to entry of the TRO or the PI Stipulation, this is a red herring as lodging such an objection would have been a further gross violation of their fiduciary duties to BAE, especially if done simply to provide themselves with a tactical litigation advantage in these proceedings.

[11]    To be sure, as Movants suggest in their MTD at 22, the Supreme Court in *Koster v. American Lumbermens Mut. Cas. Co.*, 330 U.S. 518 (1947) limited the "home forum" preference rule in representative litigation, but *Koster* involved what now results in an intra-district ***transfer*** under 28

As such, granting Movants' *forum non conveniens* motion (particularly at the insistence of PNC and the Allbrittons, obvious benefactors of such a dismissal) would be extremely prejudicial to the interests of BAE and its shareholders and should be denied. For all of these reasons, Movants' dilatory request that their jurisdictional challenges be held in abeyance pending resolution of the substantive MTDs should be rejected.

## III.    PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY LIMITED TO PERSONAL JURISDICTION SHOULD BE GRANTED

In their opposition to the Expedited Discovery Motion, Movants attempt to obfuscate that which is clear in the District of Columbia: "the 'Federal Rules of Civil Procedure generally provide for *liberal discovery to establish jurisdictional facts*.'"[12]   In light of this well recognized right, several appellate courts have found that district courts erred in denying discovery in cases even where plaintiffs did not allege sufficient facts to make a *prima facie* case for personal jurisdiction. *See*, *e.g.*, *Edmond*, 949 F.2d at 425 (the lower court's decision to deny discovery was error because

---

U.S.C. §1404, rather than the *forum non conveniens* **dismissal** sought here.  The Second Circuit found this distinction dispositive in *Inter-Continental Hotels Corp.*, 224 F.3d at 147 n.4 ("in a *forum non conveniens* case involving a foreign court, 'the "home forum" for the plaintiff is any federal district in the United States, not the particular district where the plaintiff lives'").  As such, plaintiff, a U.S. citizen, enjoys a strong presumption against *forum non conveniens* dismissal. *Id.*

[12]    *See Odilla Mutaka Mwani v. Osama Bin Laden*, 417 F.3d 1, 17 (D.C. Cir. 2005); and *Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 425 (D.D.C. 1991) (jurisdictional discovery "*freely permitted*"); *Crane v. Carr*, 814 F.2d 758, 760 (D.C. Cir. 1987) (reversing dismissal with "no opportunity for discovery on the issue of personal jurisdiction"); *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 510 (D.C. Cir. 2002) ("discovery . . . should be *freely permitted*, and this is no less true when discovery is directed to personal jurisdiction'"); *Diamond Chem. Co., Inc. v. Atofina Chem., Inc.*, 268 F. Supp. 2d 1, 15 (D.D.C. 2003) ("[t]his Circuit's standard for permitting jurisdictional discovery is *quite liberal*"); *Virgin Records Am., Inc. v. Does*, No. 05-1918 (CKK), 2006 WL 1028956, at *3 (D.D.C. Apr. 18, 2006) ("'plaintiff . . . is *entitled* to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding information on its contacts with the forum'"); *Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 56 n.24 (D.D.C. 2005) ("discovery concerning personal jurisdiction [is] *liberally granted* whenever a party has 'a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant'").

the plaintiffs' allegations were "far from conclusory."); *Surpitski v. Hughes-Keenan Corp.*, 362 F.2d 254, 255-56 (1st Cir. 1966); *Renner v. Lanard Toys*, 33 F.3d 277, 283 (3d Cir. 1994) (discovery should have been granted where the record was "ambiguous" and "incomplete."); *In Skidmore v. Syntex Labs., Inc.*, 529 F.2d 1244, 1248 (5th Cir. 1976) (discovery should have been allowed because the plaintiff's attorney was not at fault for having failed to discover the requisite jurisdictional facts earlier.); *Crane*, 814 F.2d at 760, 762 (vacating dismissal where plaintiff "pointed to ***links*** [the defendant corporation] ha[d] with the District ***sufficient at least to permit further inquiry*** regarding personal jurisdiction"); *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000) (jurisdictional discovery should be denied ***only*** if the plaintiff cannot "demonstrate[] that it can supplement its jurisdictional allegations through discovery").

The Complaint, Expedited Discovery Motion and this Reply make *a prima facie* showing that Movants are subject to both general and specific personal jurisdiction in the District of Columbia. Movants' challenges to the *alter ego* analysis, claims that the fiduciary shield doctrine insulate them from jurisdiction, and challenges to plaintiff's allegations that "substantial business transactions" were undertaken in this District, if entertained at all, ***raise contested issues of fact that plaintiff is entitled to discovery to counter.*** Memorandum of Points and Authorities by BAE Systems PLC and the Individual BAE System PLC Defendants in Opposition to Plaintiff's Motion for Expedited Discovery Limited to Personal Jurisdiction ("BAE Opp.") at 23.

### A.    Movants' Challenges to Plaintiff's *Alter Ego* Showing Raise Contested Issues of Fact

Permitting jurisdictional discovery to demonstrate an *alter ego* relationship, the *GTE* court noted that (1) the owners of various websites potentially giving rise to personal jurisdiction were not yet known; (2) plaintiff needed discovery to bolster its claim that the parent company and its subsidiaries should be treated as one under an *alter ego* theory; and (3) that new facts might bolster the District Court's theory of "'substantial effects'" within the District. 199 F.3d at 1352. While

noting that it had not been shown that jurisdictional discovery would be fruitful, the *GTE* court held "*[j]urisdictional discovery will help to sort out the[] matter[]*." *Id.*; *see also Diamond Chem.*, 268 F. Supp. 2d at 15 ("[g]iven [the *GTE* court's] statement. . . , *this Court finds it hard to imagine a situation where a plaintiff could not 'demonstrate[] that it can supplement its jurisdictional allegations through discovery*'") (citing *GTE*, 199 F.3d at 1351).

Movants too argue plaintiff's allegations concerning BAE's relationship with its U.S. operating subsidiaries are too tenuated to demonstrate BAE-USA is BAE plc's *alter ego*. However, even if the Court agrees, this would simply entitle plaintiff to limited jurisdictional discovery under this District's liberal standard for granting discovery to "supplement . . . jurisdictional allegations" and to help "sort out" personal jurisdiction challenges. *See GTE*, 199 F.3d at 1351-52 (permitting jurisdictional discovery so plaintiff could bolster her "claim that the parent companies and subsidiaries involved in [the] lawsuit should be treated identically"); *see also Diamond Chem.*, 268 F. Supp. 2d at 15-16 (permitting jurisdictional discovery of information pertaining to defendants' *alter ego* presence through companies located in the District of Columbia).

Movants' attempt to elevate plaintiff's pleading burden to require trial level proof and suggestion that plaintiff's detailed factual allegations and the Expedited Discovery Motion's explanation of how the discovery sought will lead to evidence relevant to personal jurisdiction should be rejected too. BAE Opp. at 17. By this ruse, Movants attempt to distract the Court with a string of inapposite cases where jurisdictional discovery was denied because plaintiffs made absolutely no showing that the discovery sought might lead to relevant jurisdictional evidence. BAE Opp. at 16-17. That is simply not the case here.

Similarly, Movants' attempt to discount the *Cali v. East Coast Aviation*, 178 F. Supp. 2d 276 (E.D.N.Y. 2001) *alter ego* holding arguing they have since technically created a separate board for BAE-USA (that evidently still has members that overlap with the BAE plc board) does not

distinguish the *East Coast Aviation* holding. If anything it raises disputed issues of fact. In fact, Movants' persistent misleading claim that BAE plc – with its U.S. operational headquarters located within the perimeter of this Court's 100 mile bulge rule jurisdiction reach and which now ***derives 50% of its global sales*** here, largely from its sales to the U.S. Government in this District pursuant to a Special Security Agreement with the U.S. Government – "'does not have a presence in the United States'" and thus is not amenable to this Court's general jurisdiction, based on their claim that "BAE plc has firmly refuted Plaintiff's alter-ego theory by providing facts about the two companies in the declaration under penalty of perjury that BAE plc's company secretary David Parkes submitted to the Court" is incredulous. *See* Exp. Disc. Mtn. at 7n. 5, 8; BAE Opp. at 20; BAE MTD at 35. The contrived, self-serving David Parkes Declaration is incomplete, misleading and inaccurate. Plaintiff seeks discovery to check its *bona fides*. Movants' continued reliance on it simply confirms that the Court's jurisdiction over BAE – to the extent the Court goes beyond the Complaint's allegations and plaintiff's *prima facie* showing – raises contested issues of fact that simply cannot be made without discovery.

In fact, other than the self-serving David Parkes Declaration, nobody at BAE Systems plc appears to really believe that the fact that BAE's corporate headquarters are presently located in London – rather than in Rockville Maryland – has any meaningful import. For instance, explaining to the *Sunday Telegraph* in June 2007 that BAE ***could*** permanently move its corporate headquarters to Rockville Maryland (but stating that so long as the U.K. government continued appropriate defense spending it would not), defendant Mike Turner, BAE's outgoing Chief Executive Officer ("CEO"), unambiguously explained that "***BAE's devolved management structure*** could have allowed the group to relocate" as "***BAE had management specific to each country it operated in,***" such that "it did not matter where BAE's headquarters were." Supp. Blasy Decl., Ex. A. Juxtaposed to Turner's comments just one year earlier in June 2006, it is clear that contrary to the conclusory

- 16 -

inferences Movants would have the Court adopt, BAE's growing U.S. presence is dramatically altering its geographic center:

> Last year, about **30%** of the company's $28 billion in sales came from the U.S . . . .
>
> \*        \*        \*
>
> [Question] Do you see a day when more than half of BAE's revenues will come from the U.S.?
>
> [Turner Response] Yes. Why would you not want to keep growing in the most important market in the world, where the technology is? There's very good technology in the U.K., but not on the wide scale that it is in the U.S. **We will grow to a point hopefully sooner rather than later where we're bigger in the U.S. than anywhere else in the world.**
>
> [Question] Sooner being this decade?
>
> [Turner Response] That would be my ambition. . . .
>
> [Question] If the U.S. becomes more than half your revenues, could BAE move its headquarters here?
>
> [Turner Response] There could be a point where you'd have to do that, where it would be the natural thing to do. If we got to a point where 60-70% of the company was selling to the U.S. government, it would be quite difficult to remain a U.K.-headquartered company.
>
> [Question] And 60-70% is conceivable?
>
> [Turner Response] **I think so**.

*See* Supp. Blasy Decl., Ex. B.  Defendant Walt Halverstein, BAE Inc.'s CEO, issued a similarly unqualified denial of any meaningful separation between BAE plc and its U.S. operating subsidiaries:

> [Question] A senior aide to the French defense minister is expressing concerns about Europe's ability to maintain a viable defense industry if BAE Systems plc moves its headquarters from the U.K. to the U.S. How worried should the Europeans be about such a move?
>
> [Haverstein's Response]  I don't think they should be worried at all, **whether that happened** or not. **BAE Systems thinks of itself as a global business.** We don't pick markets because of where the headquarters is. We've demonstrated that-**-we're in the U.S.**, South Africa, Sweden, the U.K., Australia and Saudi Arabia. **Those are our home markets. Where the headquarters is irrelevant. I think of this [U.S.] headquarters in Rockville, Md., as simply a forward deployed element of the plc.**

- 17 -

> So if someone asks, "When is the headquarters going to shift?" I say, "Hell if I know. ***Oh, by the way, it doesn't matter.***" You [in the media] all think about this a hell of a lot more than I do. And the guy in France thinks about it a hell of a lot more than [BAE Chief Executive] Mike Turner does, I can assure you.

*See* Supp. Blasy Decl., Ex. C.  Moreover, Defendant Mark H. Ronald, a Maryland resident who simultaneously served as a BAE plc executive director and as BAE USA's President, COO and CEO until he resigned in December 2006, and has since served as an advisor to and the non-executive Chairman of BAE-USA, even confirmed to *The Independent* as recently as October 2006 that it was entirely possible that BAE plc could merge into and become a U.S. corporation in the not so distant future, stating that "***BAE has broached the issue with Boeing and General Dynamics . . . .***"  *See* Supp. Blasy Decl., Ex. D.  While Ronald also told *The Independent* that he did "not expect BAE to move its headquarters or domicile ***any time soon*** to the US," Ronald carefully qualified that assessment by adding that "'***[s]ome day it may happen. . . . Maybe if we ended up with 80 per cent of our business in the States it would become a possibility***, but I don't see that happening in the short term.'"[13] *Id.*  When Ronald made these statements to *The Independent* in October 2006, BAE was deriving approximately 45% of its revenues from the U.S.  *See* Blasy Decl., Ex. L. However, with the Armor Holdings acquisition completed in July 2007, BAE significantly increased its U.S. sales and BAE now derives more than 50% of its worldwide sales in the U.S. compared to only 39% in the U.K. *See* Blasy Decl., Ex. M.

Nonetheless, vociferously arguing that *East Coast Aviation's* finding that BAE plc is the *alter ego* of its U.S. subsidiaries for purposes of determining personal jurisdiction no longer governs, Movants unsuccessfully attempt to separate themselves from BAE's U.S. operations by claiming that "BAE plc's wrongdoing bear[s] no relation to the U.S. subsidiary or defense contracting with the

---

[13]    In July 2006, the *Dow Jones Newswire* reported that another top BAE executive told it that "BAE Systems PLC . . . might eventually become a U.S. company if the Pentagon becomes the company's overwhelmingly dominant customer."  *See* Supp. Blasy Decl., Ex. E.

U.S." BAE MTD at 38. However, this ignores that Bandar is alleged to have received the significant majority of the bribe payments while serving for 20 years as Saudi Arabia's U.S. Ambassador to the United States in this District. ¶49. Saudi Arabia is one of BAE's self-professed "six home markets." *See* Blasy Decl., Ex. A. BAE's Rockville Maryland U.S. headquarters are located within the 100 mile bulge rule jurisdiction of this Court. *See* Blasy Decl., Ex. C, Exp. Disc. Mtn. at 7 n.5. Despite the fact that *all* of BAE's U.S. operations are run through Rockville Maryland and the fact that the Company has operations right here in the District, including an Electronics & Integrated Solutions ("E&IS") division (*see* Blasy Decl., Ex. D), ***defendants would apparently have the Court believe that none of the defense armaments sold to Saudi Arabia through the Al-Yahamah bribe scheme were manufactured in the U.S.***[14] Even if the Court were forced to adopt this speculation as fact, which it is not, once again Movants' supposition is belied by statements on BAE's own website:

> The Al-Yamamah contract, a government-to-government agreement for the sale of Tornado, IDS/ADV, Hawk and PC9 was signed by Michael Heseltine and HRH Prince Sultan Bin Abdul Aziz Al Saud in 1986. ***BAE Systems are the prime contractors supplying not only the hardware, but a full "turn-key" package including design, construction, training and support. This has broadened in time into a range of activities as the Saudi-British Defence Co-operation Programme. We currently employ some 5,000 people in Saudi Arabia.***

*See* Supp. Blasy Decl., Ex. F.

Plaintiff has alleged sufficient facts to subject BAE to general personal jurisdiction in this District because BAE conducts substantial and continuous business in this District via BAE-USA and derives substantial revenue from this District thereby and Movants' attempt to distinguish *East Coast Aviation* from the facts of this case fails. However, should the Court require more detailed

---

[14] BAE's website describes the EI&S wares as follows (Blasy Supp. Decl., Ex. G): "***E&IS designs, develops, produces and supports electronic systems and subsystems for military and commercial applications.***" Moreover, EI&S "is composed of these four lines of business": Electronic Warfare, Network Systems, Platform Solutions and Sensor Systems.

allegations, plaintiff's jurisdictional discovery is designed to obtain further factual detail concerning BAE's relationship with its U.S. subsidiaries, its own general contacts with District and specific facts demonstrating BAE plc's payment of bribes in this District.

### B.    The BAE Executive Defendants' Claim They Are Exculpated by the So-Called "Fiduciary Shield Doctrine" Raises Contested Issues of Fact

The BAE executive defendants' improper attempt to shield themselves from liability with the "'fiduciary shield doctrine'" or "corporate shield doctrine'" must also be rejected.  BAE Opp. at 22-23.  To invoke this doctrine, Movants must negate that they chose to breach their fiduciary duties, at least in part, for personal financial or other gain, raising contested issues of fact.  The fiduciary shield doctrine is also *per force* "'an equitable doctrine and its application is *discretionary*.'" *In re Vitamins Antitrust Litig.*, No. 99-197, 2001 WL 855469, at *3 (D.D.C. Jul. 2, 2001); *Am. Directory Serv. Agency v. Beam*, 131 F.R.D. 635, 641 (D.D.C. 1990) (noting that "the doctrine *cannot be applied as mechanically* as [] defendants suggest").  The *Vitamins Antitrust* court held the fiduciary shield will not apply where it is alleged: (1) "'the defendant was motivated *in part* or solely by personal interest . . . (2) . . . the defendant is the alter-ego of the entity for which he is a fiduciary . . . (3) . . . where the *defendant was a director or officer who had discretion regarding whether the contacts occurred*.'" *Vitamin*, 2001 WL 855469, at *3.  Moreover, the fiduciary shield doctrine does not protect corporate officers and directors where jurisdiction is predicated, as it is here, on the "transacting business" prong – D.C. Code §13-423(a) – of the D.C. long-arm statute.  *Chase v. Pan-Pacific Broadcasting, Inc.*, 617 F. Supp. 1414, 1422-23 (D.D.C. 1985) (a "'*defense* that [one] *is not liable* because he was acting for a disclosed corporate principal goes to the *merits* of the case, not to the *power* of the court to make the adjudication.'") (emphasis in original); *see also Johns v. Rozet*, 770 F. Supp. 11 (D.D.C. 1991) (quoting *Chase* and noting that the "*fiduciary shield does not apply to motions to dismiss*; defense that individual is 'not liable because he was acting for a disclosed corporate principal goes to the *merits* of the case, not to the *power* of the court to make the

- 20 -

adjudication'"); *Hulme v. Ferris*, No. 87-48, 1987 WL 11702, at *2 (D.D.C. May 21, 1987) (declining to address defendant's assertion of the fiduciary shield, noting that "'***this contention really goes to the merits of this case against her, not to the power of the court to adjudicate***'") (citing *Chase*, 617 F. Supp. at 1423).

Plaintiff has alleged extensively how all of the BAE executive defendants participated, facilitated, and/or caused the breaches of fiduciary duties giving rise to this shareholder derivative action in order to hold on to their positions of ***power, profit, and prestige***. ¶¶3-4, 6, 8, 85, 111-112; Exp. Disc. Mtn. at 20, 29 n.11. As high-ranking officers and directors, the BAE executives shared in any ill-gotten financial gains stemming from the 20-year-long illegal and improper bribe scheme to Bandar and also aggrandized themselves as powerful and prestigious figures at BAE. *Id.* Furthermore, the BAE executive defendants should not be shielded because at all relevant times they were senior corporate officers who were in a position to decide whether – and indeed decided for personal financial and other gain – to participate in the breaches of fiduciary duty giving rise to this action. *In re Vitamins Antitrust Litig.*, 120 F. Supp. 2d 58, 71 (D.D.C. 2000); ¶68. In summary, the fiduciary corporate shield is inappropriate at the motion to dismiss stage, as the doctrine raises contested factual questions which go to the merits of the case.

## C. Whether Plaintiff Adequately "Alleged Substantial Business Transactions in This District" Raises Contested Issues of Fact

Movants invite the Court to conclude based on nothing but hyperbole and innuendo that ***the 20-year-long improper and illegal bribe scheme, which funneled and laundered over $2 billion in this District***, was "isolated" and "insubstantial" and that no injury occurred inside this District. The Court would not need to resolve this contested factual issue even if it did credit Movants' musings. Plaintiff has specifically pled that the injuries giving rise to this action stemmed from Movants' illegal and improper conduct in this District. ¶¶8-9, 13, 17, 113-114, 116-117, 122; Exp. Disc. Mtn. at 20-21. Plaintiff's allegations that BAE and its senior executives transacted business in the

District of Columbia make a *prima facie* showing of personal jurisdiction for purposes of the D.C. long-arm statute as "[t]he 'transacting any business' provision of the District's long-arm statute embraces the contractual activities of a non-resident defendant that cause repercussions in the District" and "[i]t is therefore 'sufficient . . . that the suit [be] based on a contract that [has] [a] ***substantial connection*** with the district.'" *Schwartz v. CDI Japan*, 938 F. Supp. 1, 5 (D.D.C. 1996). The Al-Yamamah contract is alleged to have involved a 20 year-long illegal bribe payment scheme between BAE and Bandar – then serving as the Saudi Ambassador to the U.S. and residing in the District of Columbia. Thus, plaintiff's allegations concerning each Movants' involvement in the bribe scheme makes a *prima facie* showing of personal jurisdiction under the D.C. long-arm statute. *See*, *e.g.*, *Chalabi v. Hashemite Kingdom of Jordan*, 503 F. Supp. 2d 267, 273 (D.D.C. 2007) ("as an additional jurisdictional nexus, the complaint also asserts that Defendants' mismanagement of Petra Bank in Jordan caused a direct effect in the United States: the disruption or repudiation of 'hundreds of millions' of banking transactions with customers in the United States, the collapse of PIBC (the U.S. subsidiary), and the loss of 30 jobs in the District of Columbia" and "accepting the factual allegations as true, the complaint asserts facts sufficient to confer . . . personal jurisdiction over the Defendants").

The Court also need not be distracted by Movants' assertion that the illegal bribe payments "are neither the basis of an injury occurring in the District, nor a part of a larger contractual relationship that is centered in the District." BAE Opp. at 24. First, although this District has not established where economic injury occurs under the long-arm statute, *Helmer v. Doletskaya*, 393 F.3d 201, 208 (D.C. Cir. 2004), plaintiff has sufficiently alleged that BAE was injured each and every time money was deposited – ***allegedly illegally in violation of the FCPA*** – into Bandar's Riggs accounts in the District of Columbia as BAE's financial status and reputation was tied to this potentially ruinous D.C.-based illegal activity. Second, contrary to Movants' assertion, plaintiff

- 22 -

need not allege that bribes giving rise to this action are part of a larger contractual relationship centered in this District, since a lawsuit must only be "'based on a contract that [has] [a] **substantial connection** with the district'" in order for specific personal jurisdiction to attach.  *Schwartz*, 938 F. Supp. at 5.

### D.    Plaintiffs' Conspiracy Theory of Personal Jurisdiction Argument Raises Disputed Issues of Fact

Essentially ignoring plaintiff's conspiracy theory of personal jurisdiction argument – relegating the entire issue to a mere footnote, *see* BAE Opp. at 23 n.8 – Movants fail to refute that the Complaint makes a *prima facie* showing of a conspiracy for purposes of personal jurisdiction. Defendants also failed to negate that this District recognizes the conspiracy theory of personal jurisdiction which should not be rejected unless and until plaintiff is afforded jurisdictional discovery. *See DSMC, Inc. v. Convera Corp.*, 273 F. Supp. 2d 14, 21 (D.D.C. 2002) (finding personal jurisdiction over defendant under the conspiracy theory of personal jurisdiction because defendant had substantial contacts and a lucrative contract with a business located in D.C.); *Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 140 (D.D.C. 2004); *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1030-31 (D.C. Cir. 1997).  To the extent that plaintiff has not – as defendants argue – sufficiently alleged the conspiracy, the courts in this District permit jurisdictional discovery before dismissing for failure to allege a conspiracy. *Edmond*, 949 F.2d at 425 (finding abuse of discretion when jurisdictional discovery was denied where the plaintiff had alleged (1) the existence of a conspiracy, (2) the nonresident's participation, and (3) an overt act in furtherance of the conspiracy occurred within the forum)).

### IV.    MOVANTS SHOULD BE ORDERED TO MEET AND CONFER ON THEIR OBJECTIONS TO THE SCOPE OF THE JURISDICTIONAL DISCOVERY

Having previously refused to participate in *any* jurisdictional discovery, Movants now object to the scope of plaintiff's limited jurisdictional discovery for the first time in their objection to the

Expedited Discovery Motion. *See* Blasy Decl., ¶¶26-27, Supp. Blasy Decl., ¶9. As detailed in the Court's March 18, 2008 Standing Order, Movants were "required, under both Fed. R. Civ. P. 26(f) and LCvR 7.1(m), to confer in good faith in an effort to resolve any discovery dispute ***before*** bringing it to the Court's attention." 3/18/08 Standing Order at 1. As Judge Facciola recently held, by "repeatedly" meeting "[p]laintiffs' discovery requests . . . with silence and resistance despite numerous attempts to meet and confer," "[d]efendants have wholly abandoned their discovery responsibilities under the Federal Rules of Civil Procedure" and may be ordered to immediately "respond to all outstanding discovery requests." *Ashford v. E. Coast Express Eviction*, 245 F.R.D. 36, 38 (D.D.C. 2007). While the parties are required to meet and confer to narrow the areas of disagreement ***before*** requiring the Court to referee discovery disputes and, as detailed in plaintiff's Expedited Discovery Motion at 38-46, plaintiff's counsel believes all discovery requested is relevant or likely to lead to the discovery of evidence relevant to Movants' challenges to personal jurisdiction, plaintiff's counsel are also cognizant of their duty to meet and confer in good faith and request that the Court order Movants to do so forthwith.

## V.    CONCLUSION

For the reasons stated herein and in plaintiff's Expedited Discovery Motion, plaintiff respectfully request that the Court deny Movants' suggestion that their PjX MTD be held in abeyance while the other merits-based grounds for dismissal are adjudicated, grant the expedited discovery limited to personal jurisdiction requested, and order Movants to meet and confer concerning their newly raised objections to the scope of expedited jurisdictional discovery.

DATED:  March 31, 2008                    Respectfully submitted,

                                          COUGHLIN STOIA GELLER RUDMAN
                                            & ROBBINS LLP
                                          PATRICK J. COUGHLIN
                                          MARK SOLOMON
                                          MARY K. BLASY


                                                    s/ MARY K. BLASY
                                          _____
                                                 MARY K. BLASY

                                          655 West Broadway, Suite 1900
                                          San Diego, CA  92101
                                          Telephone:  619/231-1058
                                          619/231-7423 (fax)

Lead Counsel for Plaintiff

THE LAW OFFICE OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)
1100 Connecticut Ave., NW, Suite 730
Washington, DC  20036
Telephone:  202/822-0600
202/822-6722 (fax)

CUNEO GILBERT & LaDUCA, L.L.P.
JONATHAN W. CUNEO(DC Bar # 939389)
WILLIAM H. ANDERSON (DC Bar # 502380)
507 C Street, N.E.
Washington, DC  20002
Telephone:  202/789-3960
202/789-1813 (fax)

Co-Liaison Counsel

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

S:\CasesSD\BAE Derivative\BRF00050253.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 31, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 31, 2008.

s/ MARY K. BLASY
MARY K. BLASY

COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:MaryB@csgrr.com

# Mailing Information for a Case 1:07-cv-01646-RMC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roger M. Adelman**
  radelman@erols.com,lisamp@csgrr.com,tlatimer@csgrr.com,e_file_sd@csgrr.com

- **Mary K. Blasy**
  maryb@csgrr.com

- **Lawrence Byrne**
  larry.byrne@linklaters.com

- **Patrick J. Coughlin**
  patc@csgrr.com

- **Jonathan Watson Cuneo**
  jonc@cuneolaw.com

- **Matthew John Herrington**
  mherrington@steptoe.com

- **Christopher Talbott Lutz**
  clutz@steptoe.com

- **William Bradford Reynolds**
  ReynoldsW@howrey.com

- **Mark Solomon**
  marks@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re BAE SYSTEMS PLC DERIVATIVE LITIGATION | ) ) ) | Civil No. 1:07-cv-01646 |
| | ) | Assigned to: Judge Rosemary M. Collyer |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |

SUPPLEMENTAL DECLARATION OF MARY K. BLASY IN SUPPORT OF PLAINTIFF'S
REPLY IN SUPPORT OF MOTION FOR EXPEDITED DISCOVERY LIMITED TO
PERSONAL JURISDICTION

I, MARY K. BLASY, declare as follows:

1.      I am counsel for plaintiff in this action and am fully familiar with the matters set forth in this Declaration.  I have been admitted *pro hac vice* in this action.  I make this Declaration in support of Plaintiff's Reply in Support of Motion for Expedited Discovery Limited to Personal Jurisdiction.

2.      I have been actively involved in the prosecution of this litigation and am familiar with the proceedings herein.

3.      Immediately after filing the Complaint in this action on September 19, 2007, on September 20, 2007, I caused a copy of the Complaint to be sent by overnight delivery to Phillip Bramwell, Group Legal Director, BAE Systems plc ("BAE"), advising him that the same had been filed, providing a proposed Notice and Waiver to permit the company to accept service without necessitating formal service of process, offering to prepare waivers of service for each of the BAE directors and executives named in the lawsuit to avoid formal service, and offering "to discuss a common response date with [BAE's] outside counsel."  Meanwhile, my firm began attempting personal service on all U.S.-based defendants.

4.      In connection with a telephone call I received from Mike Osnato at Linklaters LLP on October 9, 2007 indicating that Linklaters would be representing BAE and all of the current and former BAE executives in this action, agreeing to accept service and seeking a universal extension of the response dates and briefing schedule, plaintiffs agreed to short extensions of the response dates of defendants Mark H. Ronald and Peter A. Weinberg "to allow the Parties to continue to negotiate a framework for a ***common date for responses to the Complaint***" which purportedly would "ease[] the administrative burden on the Court that would be caused by ***multiple response dates***, particularly given the high likelihood that the BAE Systems plc Defendants [would] move to dismiss the Complaint." *See* Renewed Stipulation to Extend Time filed herein on October 16, 2007.

5.      With plaintiff's consent, on October 16, 2007, PNC also filed an agreed to Motion in Support of Stipulation to Extend Time indicating that there were "over 30 defendants" with "[m]ost of them hav[ing] listed addresses outside the United States," that "a number of overseas defendants ha[d] not yet been served" so that "the case w[ould] not be fully at issue, for some time," and stating that "PNC anticipate[d] that . . . counsel w[ould] confer and try to agree on a *coordinated schedule* . . . ."

6.      However, Linklaters ultimately conveyed that they were not authorized to accept service for all individual BAE executive defendants, that they could only accept service for BAE and the current BAE Board member defendants, and that in effect, plaintiff would be required to effect personal service on each of their other clients located outside of the U.S. (the "unserved BAE executive defendants") under the Hague Convention.  As this contradicted the earlier agreement, counsel for plaintiff did not agree to defendants' additional request to again extend their response dates.  Thereafter, on October 26, 2007, PNC filed a second Motion for Extension of Time to Respond to the Complaint indicating it had been served with process "in late September," noting that because many of the overseas defendants still had not been served because *an agreement had not been reached as to their service or a common response date*, *PNC sought an extension of its own response date.*  Specifically, PNC provided the following reason all response dates (including the briefing of all motions to dismiss) should be coordinated:

> Finally, under the circumstances, *it would make little sense to require PNC to respond well ahead of many other defendants.* PNC is included in the Complaint for having allegedly "aided and abetted" the actions of BAE, its directors, and others by providing banking services and the transfer of funds. PNC certainly believes it will have its own unique defenses to the claims against it, but there will probably be certain *threshold defenses* (including, among other things, whether the plaintiff has any right to assert its claims on BAE's behalf) that are common to all defendants. *In view of these common defenses, the logical and orderly approach would be for most of the defendants to respond to the Complaint at about the same time.* The extension sought here would facilitate that.

7.     Thereafter, on October 30, 2007, by their Motion of Certain Individual BAE Systems Plc Defendants For Extension of Time To Answer, Move Or Otherwise Respond To The Complaint, BAE and the BAE executive defendants' counsel also sought an extension of their responses until January 11 – almost four months after the Complaint had been sent to BAE's General Counsel – arguing that "[c]onsolidation of these motions *and supporting affidavits* into one briefing schedule instead of more than 20 briefing schedules would *serve judicial economy and conserve the resources of the parties*," that "January 11, 2008 [was] the response date requested by the Defendant PNC Financial Services," that "should the parties reach agreement as to consent to waiver of service by any or all of the remaining BAE plc Systems Defendants, a response date of January 11, 2008 rather than something near-term *increases the likelihood that the yet-unserved BAE Systems plc Defendants will agree to that response date without the necessity of service*," and that the extension was being sought by BAE and the BAE executive defendants to permit them "to *respond to the complaint in an orderly fashion*."

8.     Despite the statement of their counsel to the Court on October 30th that providing a *70 day extension* to respond to the Complaint would *"increase[] the likelihood that the yet-unserved BAE Systems plc Defendants w[ould] agree to that response date without the necessity of service*," no such concession was made and plaintiff has been forced to effect personal service on the BAE executive defendants who are not current Board members or U.S. residents under the Hague Convention at considerable additional expense. Nonetheless, after the Court granted BAE, certain of the BAE defendants, and PNC a shorter extension to respond on October 30, 2008, counsel for all parties (except Prince Bandar Bin Sultan who had not yet been served) executed a stipulation providing that BAE, the current BAE Board member defendants, the U.S.-based BAE executive defendants, all unserved BAE executive defendants who plaintiff effected service on before January 31, 2008, the Allbrittons and PNC would *jointly* have until January 31, 2008 to respond to the

Complaint, which was entered as the order of the Court on December 7, 2007 ("Joint Stipulation and [Proposed] Pretrial Order No. 1").  Ultimately all "unserved BAE executive defendants" (except two) were served prior to January 31st, one more was served after January 31st, and all (except Paulo Scaroni) moved, along with BAE, the Allbrittons and PNC, to dismiss this action on January 31, 2008.

9.    As one of their grounds for dismissal, BAE and the BAE executive defendants (collectively, "Movants") challenged this Court's personal jurisdiction over them.  Never prior to their March 24, 2008 oppositions to plaintiff's motion for expedited discovery limited to personal jurisdiction had any Movant suggest that their motion to dismiss challenging the Court's personal jurisdiction over them should be held in abeyance pending resolution of their other motions to dismiss.

10.    Attached to the Declaration as Exhibit A is a true and correct copy of "BAE Systems 'Will Stay in Britain' Insists Chief Executive," *The Sunday Telegraph* June 24, 2007, obtained from LEXIS March 31, 2008.

11.    Attached to this Declaration as Exhibit B is a true and correct copy of "Beyond Britain; BAE Systems Chief Sees The Company's Future – And Perhaps Its Headquarters – Outside Europe," *Aviation Week & Space Technology* July 17, 2006 obtained from LEXIS on March 29, 2008.

12.    Attached to this Declaration as Exhibit C is a true and correct copy of "Land Grab; BAE Systems' New U.S. Chief Broadens Push Into Land Systems, While Dismissing Talk Of A Mega-Merger," *Aviation Week & Space Technology* May 21, 2007 obtained from LEXIS on March 29, 2008.

13.     Attached to this Declaration as Exhibit D is a true and correct copy of "BAE CEO Sees No Merger With US Peer In Next 3 Yrs," AFX.COM October 27, 2006 obtained from LEXIS on March 29, 2008.

14.     Attached to this Declaration as Exhibit E is a true and correct copy of "BAE Exec: US Headquarters Possible In Long-Term Plan," *Dow Jones International News* July 21, 2006 obtained from LEXIS on March 29, 2008.

15.     Attached to this Declaration as Exhibit F is a true and correct copy of "About BAE Systems Saudi Arabia," obtained from the BAE Systems plc website on March 29, 2008 (http://www.baesystems.com/WorldwideLocations/SaudiArabia/AboutBAESystemsSaudiArabia).

16.     Attached to this Declaration as Exhibit G is a true and correct copy of "E&IS - About US," obtained from the BAE Systems plc website on March 29, 2008 (http://www.baesystems.de/Businesses/EIS/AboutUs/index.htm).

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 31st day of March, 2008, at San Diego, California.

s/ MARY K. BLASY
_____
MARY K. BLASY

S:\CasesSD\BAE Derivative\DEC00050256.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 31, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 31, 2008.

s/ MARY K. BLASY
MARY K. BLASY

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail:MaryB@csgrr.com

# Mailing Information for a Case 1:07-cv-01646-RMC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roger M. Adelman**
  radelman@erols.com,lisamp@csgrr.com,tlatimer@csgrr.com,e_file_sd@csgrr.com

- **Mary K. Blasy**
  maryb@csgrr.com

- **Lawrence Byrne**
  larry.byrne@linklaters.com

- **Patrick J. Coughlin**
  patc@csgrr.com

- **Jonathan Watson Cuneo**
  jonc@cuneolaw.com

- **Matthew John Herrington**
  mherrington@steptoe.com

- **Christopher Talbott Lutz**
  clutz@steptoe.com

- **William Bradford Reynolds**
  ReynoldsW@howrey.com

- **Mark Solomon**
  marks@csgrr.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)

EXHIBIT A

9 of 45 DOCUMENTS

Copyright 2007 Telegraph Group Limited
All Rights Reserved
The Sunday Telegraph (LONDON)

June 24, 2007 Sunday

**SECTION:** CITY; Pg. 2

**LENGTH:** 514 words

**HEADLINE:** BAE Systems 'will stay in Britain' insists chief executive

**BYLINE:** SYLVIA PFEIFER

**BODY:**

MIKE Turner, the chief executive of BAE Systems, has insisted that Britain's largest defence contractor will not quit the UK.

Despite rumours that the group is looking to the US as a new headquarters, Turner said it would "never" make sense for the company to get a New York listing.

Turner said last week he did not see any reason why the company should not retain its headquarters in Britain "as long as the UK market is important to us". He said: "Before the defence industrial strategy there was a big question mark. In all fairness to defence procurement minister Lord Drayson, he's now got the strategy. What he needs now is the right budget to be able to implement it fully."

According to Turner, BAE's devolved management structure could have allowed the group to relocate. BAE had management specific to each country it operated in. As long as intellectual property rights appropriate to every UK programme remained in the UK, it did not matter where BAE's headquarters were, he said.

Turner's denial will surprise industry watchers. BAE has made no secret of its ambition to focus on the US defence market, which recently became its biggest customer.

Speculation that BAE would move has increased since the company sold its stake in Airbus, the European aerospace group, last year.

BAE's ambitions in the US received a boost on Thursday when the Bush administration approved its $4US.1bn ( pounds 2bn) takeover of Armor Holdings, which makes armour for the Humvee military vehicle. The approval ended rumours that the transaction could come under scrutiny in the wake of bribery allegations at BAE.

The company has been at the centre of controversy ever since the UK abandoned a fraud probe into the 20-year-old Al Yamamah deal with Saudi Arabia last year. The US Department of Justice is reportedly taking a preliminary look at whether to investigate several BAE deals. The company said it has received no indication that this would happen

Last week Turner again insisted the company had done nothing wrong. He said the only reason the Serious Fraud Office had begun its inquiries was because of allegations in the UK media. "I think the US Department of Justice is more robust about standing up to the press. Just because the press make accusations, you don't have to then start an

BAE Systems 'will stay in Britain' insists chief executive The Sunday Telegraph (LONDON) June 24, 2007 Sunday

investigation. We've done nothing wrong," he said.

Turner insisted that the company knew in 1999 when it first entered the US market that it would have to be seen as "whiter than white" in order to operate across the Atlantic.

"If the US is going to make an example of anybody on advisers and commissions, it would be BAE Systems. This legal, illegal stuff is just absolute bloody nonsense. No company, particularly a defence company reliant on government contracts, is ever going to do anything illegal," he said.

Separately, Turner, who turns 60 next year, said that he was keen to stay on as chief executive until "at least 65". He said: "I think I'm a fairly young guy. I've been through some difficult times a few years ago, but the company is in great shape. Why would I want to stop now?"

**LOAD-DATE:** June 24, 2007

EXHIBIT B

1 of 1 DOCUMENT

Copyright 2006 The McGraw-Hill Companies, Inc. http://www.mcgrawhill.com
All Rights Reserved



Aviation Week & Space Technology

**July** 17, 2006

**SECTION:** World News & Analysis; Pg. 49 Vol. 165 No. 3

**LENGTH:** 2629  words

**HEADLINE: Beyond Britain;**
**BAE Systems chief sees the company's future**--and perhaps its headquarters--outside Europe

**BYLINE:** Anthony L. Velocci, Jr.; Joseph C. Anselmo

**BODY:**

   With defense spending stagnating in Europe, BAE Systems has focused on growing its business outside the U.K. Last year, about 30% of the company's $28 billion in sales came from the U.S., making it by far the most successful European company to tap into the lucrative American defense market. But BAE's decision to sell its 20% stake in Airbus--and likely use the money to expand its defense business--has been called into question by a surprisingly low valuation of the commercial aircraft company. On a visit to Washington last week, Chief Executive Mike Turner talked about BAE's future with AW&ST Editor-in-Chief Anthony L. Velocci, Jr., and Business Editor Joseph C. Anselmo. Excerpts follow.

   Aviation Week & Space Technology: Why does BAE want to relinquish its 20% share in Airbus?

   Turner: When we announced that we have decided to go forward with the [sale] option that we negotiated five or six years ago, we said two things. First, the Airbus holding clearly is noncore to the strategy of BAE Systems. Secondly, the liquidation of our 20% is in the long-term interests of our shareholders. Clearly now there's disappointment in the market about the 2.75-billion-euro [$3.46-billion] value that [investment bank] Rothschild put on our holding. We have an audit of Airbus underway now. The board of BAE Systems has not met since we heard the number from Rothschild. So I think it would be a bit premature for me to say any more than that.

   If the second opinion validates the 2.75-billion-euro valuation of your share, will that be good enough for you and the board to go forward with the sale?

   It's not a second opinion on the value. Rothschild has said in their opinion this is the value. If we decided to proceed with a recommendation to our shareholders today, that would be the value. But we have other options available to us. Clearly, a lot went on inside EADS and Airbus leading up to the valuation coming out of Rothschild. We need to understand all of that. There may be some legal issues around all that we have to take into consideration.

Beyond Britain; BAE Systems chief sees the company's future--and perhaps its headquarters--outside Europe Aviation Week & Space Technology July 17, 2006

The Rothschild valuation would suggest there are problems in Airbus beyond the recent A380 delays. Is that the case?

What Airbus is now facing is a resurgence of Boeing. After some years of doubt, Boeing decided to stay in the commercial aircraft business. And after messing around for some time with things like the Sonic Cruiser, they eventually got it right with the 787. Airbus so far has got it wrong with the A350 in response. But it will get it right. The A350 replacement program will be extremely competitive. So there will be a few years of issues because we now have the backlog to make up because of the dispute we've had over the last few months and the uncertainty over the leadership. But that is settling down. We'll launch an A350 replacement. It will be very competitive with the Boeing family. There will be ups and downs, but Airbus is a very sound, solid business in the long term.

Would you not agree that with Airbus in its current precarious position there is smaller margin for mistakes?

It's not precarious. It's got a cash cow coming in the A380, just like Boeing had with the 747. The world is not building many new airports. There's going to be huge demand for aircraft at the top end, which is now the A380 and not the 747. Boeing will launch the 747-800 and try to take some of the edge off that market. No matter what they say, they recognize that's a very sweet spot they enjoyed for many decades with the 747. What Airbus now has to do is create an aircraft that's competitive with the 787, and they will. And then as soon as Airbus and/or Boeing decide, the A320 and the 737 will be replaced. So there's a new cycle in investment coming now. That's why the BAE Systems board took the decision in April that, having been in for the creation of the first family, now was a good time to come out of Airbus.

Conventional wisdom is that should you proceed with the sale of the Airbus stake, the proceeds will go into a war chest for acquisitions.

The balance sheet had to recover from the $4.2 billion we invested in acquiring United Defense Industries [in 2005]. We've done that. We have a strong balance sheet. Clearly, if we proceed with the sale of our Airbus stake it will be even stronger. There are a number of options for investments around the world, including in the U.S. Or, there's always the option of returning money to our shareholders if there's no apparent need for the time being for use of those funds.

So how large of an acquisition can you make?

I think we could do many billions [of dollars] if we put our minds to it. But it's got to be the right acquisitions. We've made 13 or 14 in the U.S. over the last 5-6 years. They've all been good, we've met our targets. But we've got to be careful. Prices are high in the U.S. at the moment. There's a view they will tail off in the next year or two as the Defense Dept. budget begins to level.

What about a mega-merger with a U.S. prime?

At the moment that's not on the agenda. We're sticking to our strategy of growing in our six domestic markets [the U.K., U.S., Australia, Sweden, South Africa and Saudi Arabia]. But clearly if one of the Big Five was interested and the U.S. and U.K. governments would allow it, we'd be interested in exploring it.

It was a masterful job how BAE Systems positioned itself in the U.S. defense market.

We had a real competitive advantage. We're the only European company that could make very high-tech acquisitions. I don't think anybody else in Europe could do that [and win U.S. government approval]. So I think we did right to exploit that position. I think if Europe had been a growth market, it would have been much more difficult for the board to decide what to do. But when you see the size of the defense market in the U.S., and the fact that there's a lack of appetite among politicians in Europe to invest in defense and security, it made it an easier decision.

But government spending isn't the only obstacle to the growth and long-term well-being of the European defense

Beyond Britain; BAE Systems chief sees the company's future--and perhaps its headquarters--outside Europe Aviation Week & Space Technology July 17, 2006

industry. In some countries the industry is a jobs program.

Isn't that true with any company? That's true in the United States. Come on, the way the Hill works here is the same. Every senator and congressman fights for jobs in their districts. You just have more money to fight over. It's as bad here as anywhere.

But in the U.S., companies can reduce the sizes of their workforces. In Europe it's prohibitively expensive.

It's more expensive, but they do it. In MBDA, the one real joint venture we've got left in Europe, with the French and the Italians on missiles, there's been a huge downsizing of jobs, not only in the U.K. but also in France. And we're working on it in Italy. It will happen. It has to. Yes, it takes a bit longer and it's more expensive, but you have to manage it.

Is the European defense industry more competitive than it was 10-15 years ago?

Certainly in the U.K. there has been strong recognition that to survive as a defense company you have to export, and therefore you have to be very, very competitive. I'm not sure that's entirely true in France. It still is a very protected market. I think French companies do very well in France and it's very difficult for non-French companies to succeed. It's the same in Italy. The problem in Europe is there's no money. They're not investing--certainly not since 9/11--anywhere near the extent the U.S. invests in defense R&D. In defense, technology is everything. If you're going to [be a peacemaker] around the world, you've got to make sure your lads have the best technology. That's the United States.

What's BAE's future in Europe? Besides MBDA, some observers say you appear to be disengaging.

You go where the market is. If you look at continental Europe, apart from France--which has a healthy defense budget but is a pretty closed market--you've got to question whether the rest of the continental European countries are prepared to invest in defense and security. At the moment, the answer is "no." So if there's a program the U.K. government wanted to undertake in Europe we would join that program. What we're not going to do is invest in businesses in continental Europe that don't have any growth because the government's not prepared to invest in defense, unlike in the U.S.

Could BAE Systems sell off its stake in MBDA?

It's possible. But after many years of difficulties, it's now giving a good and growing return to our shareholders. On the back of Eurofighter Typhoon's success around the world, you can believe MBDA will do very well in the missile business. So why would we want to sell it before we exploit that position?

Do you see a day when more than half of BAE's revenues will come from the U.S.?

Yes. Why would you not want to keep growing in the most important market in the world, where the technology is? There's very good technology in the U.K., but not on the wide scale that it is in the U.S. We will grow to a point hopefully sooner rather than later where we're bigger in the U.S. than anywhere else in the world.

Sooner being this decade?

That would be my ambition. It depends on how successful we are in other parts of the world. In the U.K. we are certainly growing our share and our profitability. Saudi Arabia is a really important growth market. If you believe the U.S. and the U.K. [defense budgets] are going to flatten out in the next few years, there are very few growth markets in the world--and Saudi Arabia has got to be a leading one. We've been established there for decades. We have 5,000 people there. Saudi Arabia could become a very big percentage of BAE Systems sales.

If the U.S. becomes more than half your revenues, could BAE move its headquarters here?

Beyond Britain; BAE Systems chief sees the company's future--and perhaps its headquarters--outside Europe Aviation Week & Space Technology July 17, 2006

There could be a point where you'd have to do that, where it would be the natural thing to do. If we got to a point where 60-70% of the company was selling to the U.S. government, it would be quite difficult to remain a U.K.-headquartered company.

And 60-70% is conceivable?

I think so. It depends on what happens in the U.K. market with the Defense Industrial Strategy and with Saudi Arabia.

BAE Systems seems to have perfected the business model of going into another market and becoming an indigenous supplier.

I believe that's the only way. In the modern world, governments increasingly want high-value jobs for their citizens. Defense is seen as a means, because it's government money, after all, that is buying these systems. You've had offsets for decades, but offsets tended to be at the lower level of technology. Governments are waking up to this. Even the U.K. government is saying that on Joint Strike Fighter (JSF). We want to be seen in the U.S. as a U.S. company, in the U.K. as a U.K. company, and in Australia as an Australian company. About a year ago I was asked to join the prime minister on a trip to Australia to promote U.K. exports to Australia. I said "No, that's wrong." Because in Australia we've got 3,000 people and we're Australian. I don't want the Australians to think we're a U.K. company.

For the most part, U.S. companies have not followed the same strategy, to their detriment.

They haven't had to. The growth has been so huge here in the U.S. and the market here is very benign in terms of trade. The [government] recognizes the industry has to make a reasonable return for their shareholders. So it's been an easy ride for the defense industry in the U.S. That may change now with the leveling off of the defense budget at some point. We keep waiting for it, but the U.S. government keeps going. But at some point, because of the [U.S. budget] deficit, that may change.

How big of a problem are U.S. restrictions on technology sharing?

If the U.K. really wanted some technology to maintain its sovereignty and it had the money to create capabilities equivalent to what the U.S. industry has, I think a way would be found for that technology to flow. The issue, I believe, is one of affordability.

Are you satisfied with the outcome of the U.K.'s Defense Industrial Strategy?

We fought hard for 3-4 years to get a Defense Industrial Strategy. It recognizes for the first time the importance of retaining the highest level of systems integration capability in the U.K. in air, land and sea, and really putting an emphasis on through-life [the entire life of a product, including aftermarket]. We're very comfortable with what was written. We now have to implement it, and we're heavily into negotiations on air, land and sea on long-term partnering agreements for legacy and future programs. We'll have to see what happens over the next few months, whether the U.K. Ministry of Defense and ourselves are comfortable enough to sign those agreements. That will determine the long-term future of BAE Systems in the United Kingdom.

Can BAE really sustain four military aircraft facilities in the U.K.?

In the medium to long term, there has to be a question mark over Woodford and Brough. We are busy on Nimrod [a maritime patrol aircraft] at Woodford. We're heavily into the design and development phase, and hopefully we'll shortly have a contract for 12 Nimrods to be produced and that will take many years to be fulfilled. So Woodford has a future for some time, but at the end of that, I think you have to have a question mark as to what follows. Brough in the northeast is very much tied to Hawk [a jet trainer], and as long as we continue selling Hawks profitably around the world Brough will continue. Warton and Samlesbury have got a tremendous future: Eurofighter Typhoons, JSFs,

Beyond Britain; BAE Systems chief sees the company's future--and perhaps its headquarters--outside Europe Aviation Week & Space Technology July 17, 2006

UCAVs [unmanned combat air vehicles]. There's a long future there in those programs.

Would you consider moving Hawk from Brough?

No, that would be too expensive. I think the future of Hawk and Brough are linked.

Do you anticipate the U.K. going forward with the Tranche III production run of the Eurofighter Typhoon aircraft program?

The four partner nations in Eurofighter Typhoon [the U.K., Germany, Italy and Spain] say they want Tranche III aircraft. Whether they have the money will be based on two things. One is the commitment of European governments to defense. Is it strong in terms of wanting to spend money? Secondly, there are already strong demands on the defense procurement budgets in European nations, including the U.K. So we'll have to wait and see. I don't know the answer.

Are you disappointed the U.K. government didn't push harder for JSF final assembly in the U.K.?

I don't think that's over yet. It will come down to affordability. The U.K. is determined to have the ability to look after the aircraft itself. I think if it comes to the conclusion that a final assembly and checkout capability is a good lead-in to through-life support, then it will happen.

Will Airbus and Boeing reach an equitable resolution on the subsidies issue?

There will be a resolution. There's no doubt that Airbus has benefited from government support over a number of decades, but so has Boeing. What I would like to see is full transparency of what each gets. The one that I think is the most difficult for Boeing to defend--and for Europe to get at--is the support that Boeing gets from Japan. We all know that one-third of the 787 has been paid for by Japan. Where would that come in a settlement? If that stays in place and Europe were to give up repayable launch investment, that's not a level playing field.

Mike Turner

|  |
|  |
|  |
|  |
|  |

**GRAPHIC:** photograph, Mike Turner, ALLAN YANKOSKY/BAE SYSTEMS illustration

**LOAD-DATE:** July 21, 2006

EXHIBIT C

11 of 45 DOCUMENTS

Copyright 2007 The McGraw-Hill Companies, Inc. http://www.mcgrawhill.com
All Rights Reserved



Aviation Week & Space Technology

May 21, 2007

**SECTION:** Face To Face; Pg. 68 Vol. 166 No. 19

**LENGTH:** 1742  words

**HEADLINE:** Land Grab;
BAE Systems' new U.S. chief broadens push into land systems, while dismissing talk of a mega-merger

**BYLINE:** Staff

**BODY:**

   BAE Systems' $4.5-billion deal to purchase Florida-based Armor Holdings would position the global defense giant as the Pentagon's sixth-largest contractor while furthering its expansion into the land systems market by adding wheeled combat vehicles to its core tracked vehicle business. If the acquisition wins regulatory approval it would add more than $3 billion to BAE's U.S. sales, which reached $11 billion last year, and move the London-based company close to its goal of generating half its revenues from North America, up from 25-30% before the $4.2-billion purchase of United Defense Industries two years ago. The Armor Holdings deal also is likely to fuel long-standing speculation about whether BAE, which sold its 20% stake in Airbus last year, will shift its headquarters across the Atlantic. Walter P. Havenstein became president and CEO of BAE Systems Inc., the company's wholly owned U.S. subsidiary, in January. Shortly before the Armor Holdings deal was announced, Havenstein met with AW&ST Editor-in-Chief Anthony L. Velocci, Jr., and Senior Business Editor Joseph C. Anselmo at BAE's U.S. headquarters in Rockville, Md., to outline the company's goals and how it aims to weather a less lucrative defense environment in the coming years.

   AW&ST: In five years, will BAE Systems look about the way it does today? Or is it possible we'll see a company that looks quite different?

   Havenstein: I'd be surprised if you didn't see a company that looked quite different [because] the growth opportunities will invariably move around. Before 9/11 [2001], there was very little concern about the speed of resetting the Army and the Marine Corps Ground systems. BAE Systems did not have a global land systems business. We do today. So I would be surprised if some other inflection point didn't occur during the next five years that would cause us to shift. And I think that's one of the things that BAE Systems has been able to do fairly well. Think about what we did in just the last 18 months: the acquisition of United Defense, creating a global land and armament systems business, and exiting Airbus. We've made some fairly strong moves.

   Do you share the concern of some of your peers that the bottom is going to fall out of the defense industry in the next few years?

Land Grab; BAE Systems' new U.S. chief broadens push into land systems, while dismissing talk of a mega-merger
Aviation Week & Space Technology May 21, 2007

I recognize that as we get past the Bush administration there will be some changes. But I don't think the bottom will fall out. Is it possible the budget will flatten? Yes. Do I still think there are attractive areas for growth within a flat budget? The answer is yes. Do I still think there are very attractive areas to be competitive in if you're performing? Absolutely. So I have less worry about doom and gloom. We have probably as balanced a portfolio as anybody in our industry.

Your predecessor, Mark Ronald, said two years ago that he had set a goal of 50% of BAE Systems' sales coming from North America. Where are you now?

We're just about there. Mark probably picked 50% as a target because the bigger market was here and the opportunities for growth were in the U.S. Whether 50% is the right number--or 90% is the right number--depends on how the market shapes out. But no matter what happens over the next five years, we still see the U.S. as the most attractive market for BAE Systems' growth.

What are your annual sales to the U.S. government?

Approximately $11 billion [not including Armor Holdings]. The Defense Dept. only measures [prime contracts]. If you look at that list, we're number eight. But an awful lot of our work is as the EW [electronic warfare] system provider--on the F-22, the Joint Strike Fighter (JSF). That's a significantly larger amount of work than what we do directly for the government. And that $11 billion includes work we do on the JSF coming out of the U.K.

A senior aide to the French defense minister is expressing concerns about Europe's ability to maintain a viable defense industry if BAE Systems plc moves its headquarters from the U.K. to the U.S. How worried should the Europeans be about such a move?

I don't think they should be worried at all, whether that happened or not. BAE Systems thinks of itself as a global business. We don't pick markets because of where the headquarters is. We've demonstrated that--we're in the U.S., South Africa, Sweden, the U.K., Australia and Saudi Arabia. Those are our home markets. Where the headquarters is is irrelevant. I think of this [U.S.] headquarters in Rockville, Md., as simply a forward deployed element of the plc. So if someone asks, "When is the headquarters going to shift?" I say, "Hell if I know. Oh, by the way, it doesn't matter." You [in the media] all think about this a hell of a lot more than I do. And the guy in France thinks about it a hell of a lot more than [BAE Chief Executive] Mike Turner does, I can assure you.

It has been nearly two years since you closed on the acquisition of United Defense Industries (UDI). What's your acquisition strategy going forward?

If you look at strategic capabilities, our four big blue arrows are technical services, which includes information technology; electronic systems, including electronic warfare; land systems, both tracked and wheeled; and armament systems, which includes precision munitions. Here in the U.S., we'll continue to look at acquisitions that add shareholder value in those four areas. We may even look at adjacent markets, but only to the extent they add value. But the market is pretty hot. The market cap on some of these companies is at all-time highs.

Some people in the investment community still shake their heads at the $4.2-billion price that BAE paid for UDI. Has the perceived value in that acquisition been validated?

Some people were shocked when we acquired United Defense. They didn't think it made any sense. Mark Ronald didn't know anything about vehicles. I was his executive vice president and I didn't know anything about them. But we knew those vehicles were wearing out and they needed somebody who would be responsive in fixing them. I'm absolutely jazzed about that deal. It certainly has met the business case we put together. I don't think people fully appreciate how quickly United Defense has become BAE Systems--not just on the outside, but on the inside--and how they relate to the ethos of this company. Now if people are missing it from a financial standpoint they must be blind. The order book is magnificent and that part of the sector is very profitable.

Land Grab; BAE Systems' new U.S. chief broadens push into land systems, while dismissing talk of a mega-merger
Aviation Week & Space Technology May 21, 2007

What are the chances that BAE could merge with a big U.S. prime contractor, such as a Boeing?

I know people have talked in the past about a big bang--a big merger--but to the best of my knowledge, there's nothing we're considering now.

Would you welcome such an opportunity? It would be pretty exciting for something like that to break on your watch.

I try not to get too distracted with that kind of thinking. I've got plenty to worry about. We've done our fair share of acquisitions and I think that I don't need to be distracted by thinking about that big bang kind of stuff. It will be interesting to see how everyone [else] behaves. You asked about the bottom falling out [of the defense market]. Even if it just kind of tips, my guess is we'll end up seeing some strange behavior like we saw in the early 1990s [when the Cold War ended]. That can result in a whole bunch of things.

Given your technical background, are we likely to see your in-house R&D spending go up?

I wouldn't be a bit surprised. Because a lot of the R&D stuff on our major programs is moving into production. That gives us the opportunity to start thinking farther out. We tend to focus on mission capabilities as opposed to large-scale integration. My view is we have not been well served by the LSI concept. I equate companies that want to become LSIs to a five-year-old with a pencil. They say, "We connect the dots." The world is not that simple. If you're going to be effective as a mission capability integrator, you'd better own some of the dots.

Do you have the equivalent of a Skunk Works?

I've got a whole bunch of Skunk Works. [Across the U.S.] we have several innovation centers, some fairly sophisticated modeling and simulation labs, a networking lab. All those labs are connected. So the idea is to be able to create a Skunk Works in a virtual sense. I would also tell you our land and armaments business has what we call dome simulators, and probably the next thing on our agenda is to start integrating these simulation centers across our operating groups.

Do you think directed infrared countermeasures will ever make it onto commercial airliners?

I think it will be one of the options that will be considered. [But] the last thing you want is some knucklehead like me out there promoting the fact that the airline industry needs this capability. That's bulls---. The U.S. government and the airline industry will determine the need, not us. That's why we will never get out ahead of the FAA, the Homeland Security Dept. or the airline industry. Our nation and the economy are dependent upon the security of our airline industry. I'm not going to go out there and start mucking around with that by creating some hysteria.

Former Defense Secretary Donald Rumsfeld never met with top leaders of the defense industry. Have you detected a more open posture on the part of Secretary Robert Gates?

Yes, but I don't think it makes a damn bit of difference. I won't criticize Secretary Rumsfeld for the posture he took. It's not his job to keep the people in industry happy. He's got [deputies]. That's their job. I don't lose any sleep over whether Secretary Rumsfeld or Secretary Gates will take my phone call. I hope they're thinking about the war and about the leadership within the department.

WALTER P. HAVENSTEIN

Land Grab; BAE Systems' new U.S. chief broadens push into land systems, while dismissing talk of a mega-merger
Aviation Week & Space Technology May 21, 2007

|  |
| --- |
|  |
|  |
|  |

**GRAPHIC:** photograph, ALAN YANKOSKY/BAE SYSTEMS

**LOAD-DATE:** June 11, 2007

EXHIBIT D

13 of 45 DOCUMENTS


Copyright 2006 AFX News Limited
AFX.COM

October 27, 2006 Friday 7:36 AM GMT

**LENGTH:** 184 words

**HEADLINE:** BAE CEO sees no merger with US peer in next 3 yrs

**BODY:**

LONDON (AFX) - BAE Systems CEO Mark Ronald does not expect the aerospace and defence giant to achieve a hoped-for merger with a US peer for at least three years.

'I don't think anything will happen in the next three years. It will take longer than that,' he said in an interview with The Independent.

BAE has broached the issue with Boeing and General Dynamics, but in both cases discussions proved fruitless.

Ronald also does not expect BAE to move its headquarters or domicile any time soon to the US, where it is now the seventh largest defence company.

'Some day it may happen, but it is not in the plan. Maybe if we ended up with 80 per cent of our business in the States it would become a possibility, but I don't see that happening in the short term,' he added.

newsdesk@afxnews.com

jms

COPYRIGHT

Copyright AFX News Limited 2006. All rights reserved.

The copying, republication or redistribution of AFX News Content, including by framing or similar means, is expressly prohibited without the prior written consent of AFX News.

AFX News and AFX Financial News Logo are registered trademarks of AFX News Limited

**LOAD-DATE:** October 27, 2006

EXHIBIT E

18 of 45 DOCUMENTS

Copyright 2006 Factiva, a Dow Jones and Reuters Company
All Rights Reserved

# Dow Jones Factiva

(c) 2006 Dow Jones & Company, Inc.

# Dow Jones Newswires

Dow Jones International News

July 21, 2006 Friday 3:09 PM GMT

**LENGTH:** 783 words

**HEADLINE:** BAE Exec: US Headquarters Possible In Long-Term Plan

**BYLINE:** By Rebecca Christie, Of DOW JONES NEWSWIRES

**BODY:**

FARNBOROUGH, England (Dow Jones)--BAE Systems PLC (BA.LN) might eventually become a U.S. company if the Pentagon becomes the company's overwhelmingly dominant customer, a top BAE executive told Dow Jones Newswires.

Alison Wood, BAE's group strategy director, said long-term ties to the U.K.'s Ministry of Defence make any near-term relocation unlikely. But she said the company already is mulling the circumstances that would justify a transatlantic move.

"Is it a question that the board looks at periodically? Yes," Wood said, in an interview at this week's Farnborough International Airshow. "It's about decades, not years."

Another big merger with a U.S. company, like BAE's recent takeover of United Defense Industries, could trigger a new discussion in a couple of years, Wood said. But she said U.S. business would need to make up about 75% of revenues before a headquarters shift might start to seem worthwhile.

Any such move would be quite controversial in the U.K. because BAE is descended from the company that built the iconic Spitfire fighter planes that battled the Luftwaffe in World War II. And even though many in the industry believe BAE hopes eventually to link up with one of the major U.S. defense contractors, the U.K. government could veto a merger thanks to the so-called golden share it holds in the formerly state-owned company. U.S. antitrust regulators would also put such a deal under the microscope.

Still, BAE expects U.S. business to make up an increasing share of revenues because American defense spending dwarfs that of its allies. But the company doesn't have the same dominant position in Washington as it does in the U.K..

"We have a special security arrangement to protect U.S. interests, because we have a U.S. subsidiary as part of the U.K. PLC. Should we get to the point where the future of the group is driven by its U.S. presence rather than the U.K. presence, I would actually expect that arrangement to flip," Wood said.

BAE Exec: US Headquarters Possible In Long-Term Plan Dow Jones International News July 21, 2006 Friday 3:09 PM GMT

### Growing Presence In Saudi

In the meantime, BAE plans to continue its U.S. expansion, while also increasing its presence in Saudi Arabia through that country's new fighter program. Wood said BAE has a "healthy pipeline" of U.S. deals and is particularly interested in companies with $500 million to $2 billion in annual revenues.

Wood wouldn't comment on recent rumors that BAE Systems might want to buy L-3 Communications Holdings Inc. (LLL). But she did discuss L-3's current leadership transition after the recent death of its founder and chief executive, Frank Lanza.

When L-3 was in the midst of a growth spurt, it beat out BAE Systems for several acquisitions like Raytheon Co.'s (RTN) aircraft modification and integration unit, Wood noted. She said BAE might retain its interest in those businesses if they came back on the market.

"You look at those and you think if parts of those businesses in a few years' time came back on the market, we'd potentially still be interested. However, since then, we'd got other capabilities," she said.

BAE is more interested in integrating new companies than racing from deal to deal, Wood said. She noted the company's progress in its current drive to mesh United Defense into the corporate framework as an example.

"If that means we don't do two other deals in the meantime, I'm OK with that," Wood said.

Earlier this year, BAE announced it might wish to sell its 20% stake in Airbus to the European Aeronautic Defence and Space Co. (5730.FR), which owns the other 80% of the European aircraft maker. BAE now is weighing whether to accept a lower-than-expected valuation or sit tight for a few years, which might bring a higher price but also require a capital infusion to help Airbus regroup.

Wood said the company would like to use the proceeds from an Airbus sale to further its U.S. and defense expansion. At the same time, BAE doesn't want to take a deal that would be bad for shareholders.

"It's been a very good business for us, but we have always realized we can never own more than 20%, so at some point we knew we would elect to sell our holding," Wood said.

No matter how big BAE gets in the U.S., it always wants to keep a global perspective, she said. The company is currently in the top seven Pentagon contractors, but it has a higher overseas profile than its U.S. counterparts.

"I don't want BAE Systems to be another Raytheon, or another Lockheed (LMT). You have four of those," she said, referring to the U.S. defense industry's top tier. "I want BAE Systems to be differentiated at being an international company."

  -By Rebecca Christie, Dow Jones Newswires; +1-202-862-9243;
Rebecca.Christie@dowjones.com


  [ 21-07-06 1510GMT ]

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** July 22, 2006

EXHIBIT F

**BAE SYSTEMS**

# ABOUT BAE SYSTEMS SAUDI ARABIA

**BAE Systems' links with Saudi Arabia date back to 1966, when as the British Aircraft Corporation, we were awarded the contract to supply the Lightning and Strikemaster aircraft.**

The Al-Yamamah contract, a government-to-government agreement for the sale of Tornado, IDS/ADV, Hawk and PC9 was signed by Michael Heseltine and HRH Prince Sultan Bin Abdul Aziz Al Saud in 1986. BAE Systems are the prime contractors supplying not only the hardware, but a full "turn-key" package including design, construction, training and support. This has broadened in time into a range of activities as the Saudi-British Defence Co-operation Programme. We currently employ some 5,000 people in Saudi Arabia.

Good working relationships have been developed with our Saudi customer and these were reinforced during the Gulf conflict.

**RELATED INFORMATION**

Copyright © 2006 - 2008 BAE Systems. All rights reserved

EXHIBIT G

**BAE SYSTEMS**

## E&IS
# ABOUT US

### The most dependable supplier of innovative solutions

Based in Nashua, New Hampshire, E&IS is a major defense electronics business, with 17,000 employees at more than 50 sites in the United States, the United Kingdom and Israel.

E&IS designs, develops, produces and supports electronic systems and subsystems for military and commercial applications. Capabilities include electronic warfare and self-protection systems; surveillance and intelligence; aircraft controls and avionics; sensors and precision targeting systems; communication, navigation, identification, and reconnaissance systems; enterprise solutions and information management for the defense and intelligence communities; mission-specific software and geospatial exploitation products; and rapid C4ISR prototyping.

This operating group of BAE Systems is composed of these four lines of business:

- Electronic Warfare
- Network Systems
- Platform Solutions
- Sensor Systems

### OUR VALUES
We have dedicated ourselves to these five guiding values:

### High Performance
Set targets to be the best, continually challenging and improving the way we do things.

### Customers
Understand our customers' needs and expectations, and deliver on our commitments.

### People
Follow our principles of accountability, honesty, integrity, openness, and respect, and encourage all to realize their full potential as valued members of our team.

### Partnering
Become the partner of choice, respected by everyone for our cooperation and openness.

### Innovation and Technology
Encourage new ideas, technologies, and ways of working to secure sustained competitive advantage.

**RELATED INFORMATION**

**Capabilities**

Aircraft survivability

Engine Controls

Missiles and missile countermeasures

*More capabilities...*

**Divisions**

Electronic Warfare

Platform Solutions

Sensor Systems

Network Systems

**Locations**

Austin, Texas

Greenlawn, New York

Johnson City, New York

*More locations...*

Copyright © 2006 - 2008 BAE Systems. All rights reserved