UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re BAE SYSTEMS PLC DERIVATIVE LITIGATION | ) ) ) | Civil No. 1:07-cv-01646 |
| | ) | Assigned to: Judge Rosemary M. Collyer |
| This Document Relates To: | ) ) | ORAL ARGUMENT REQUESTED |
| ALL ACTIONS. | ) ) ) | |

PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF THE ARGUMENT ........................................1

II.   STATEMENT OF THE CASE............................................................................................7

    A.    The Al-Yamamah Bribe Payment Scheme ........................................................7

    B.    Riggs and the Allbrittons' Facilitation of the Illegal Al-Yamamah Bribe
        Scheme ................................................................................................................8

    C.    The OCC Consent Orders/Decrees Directed at Riggs' Saudi Account
        Abuses ................................................................................................................9

    D.    Riggs Pleads Guilty to Violating the Bank Secrecy Act........................................13

    E.    Procedural History ..........................................................................................13

III.  DEFENDANTS HAVE NOT MET THEIR HEAVY *FORUM NON
CONVENIENS* BURDEN ..............................................................................................15

    A.    Defendants' Heavy Burden................................................................................17

    B.    The Balance of "Private" and "Public" Interests Weigh in Favor of
        Maintaining This Action in the District of Columbia.............................................20

        1.    Access to Proof ......................................................................................20

        2.    Location of Witnesses............................................................................21

        3.    Selection of Forum.................................................................................22

        4.    Enforceability of Judgment....................................................................24

        5.    Burden on the District of Columbia.........................................................25

IV.   DISMISSAL FOR LACK OF STANDING UNDER RULE 12(b)(1) IS NOT
WARRANTED ................................................................................................................26

    A.    Plaintiff Has Standing Under the Plain Language of Rule 23.1 and the
        D.C. Code............................................................................................................28

    B.    The *Rule of Foss v. Harbottle* Presents an Inapplicable Procedural Barrier
        at Best so No True "Conflict of Law" Has Been Presented ..................................32

    C.    The District of Columbia's Interest in Having Its Law Applied Outweighs
        that of England's ................................................................................................34

Page

D.   The Application of English Law Would Not Abrogate Plaintiff's Standing Here ............................................................................................................45

1.   Mr. Moore's Declaration Is Inadmissible to Controvert Plaintiff's Standing Allegations ..............................................................................45

2.   The Procedural Aspects of the *Rule of Foss v. Harbottle* Must Be Adhered to Should the Court Decide to Apply the *Rule* ............................47

3.   The *Rule of Foss v. Harbottle* Does Not Deprive This Court of Standing ..............................................................................................53

a.   The Alleged Illegal Conduct Was *Ultra Vires* ................................56

b.   Fraud on the Minority and Wrongdoer Control Was Adequately Alleged ......................................................................58

c.   "[T]he justice of the Case" Militates Against Dismissal Under the Archaic *Rule of Foss v. Harbottle* ................................60

E.   Plaintiff's Status as a Beneficial Shareholder Does Not Deprive It of Standing to Proceed Derivatively ...........................................................61

F.   Plaintiff Has Stated a Claim for Relief Under §463 of the 2006 Companies Act ........................................................................................................66

V.   AN ACTIONABLE AIDING AND ABETTING CAUSE OF ACTION HAS BEEN STATED ..............................................................................................69

A.   PNC/Allbrittons Have Not Demonstrated that Plaintiff's Claims Are Not Cognizable Under "Any Set of Facts Consistent with the Allegations in the Complaint" ......................................................................................69

1.   The Complaint's Well-Pled Allegations Establish that the BAE Defendants "Perform[ed] a Wrongful Act that Cause[d] an Injury" to BAE and Its Shareholders ..................................................................71

2.   Plaintiff Alleged PNC/Allbrittons Were "Generally Aware of [Their] Role" in the BAE Defendants' Systematic Breaches of Their Fiduciary Duties ............................................................................73

3.   PNC/Allbrittons "Knowingly and Substantially Assist[ed]" the BAE Defendants' Systematic Breaches of Fiduciary Duties ...................75

B.   Leave to Amend Should Be Freely Granted if the Court Sustains Any Part of PNC/Allbrittons' Motion to Dismiss ..................................................82

Page

VI.     PLAINTIFF'S CLAIMS AGAINST PNC/ALLBRITTON ARE NOT BARRED
        BY THE *IN PARI DELICTO* DOCTRINE........................................................................82

        A.      *In Pari Delicto* Is an Equitable Doctrine that Should Not Be Applied to
                Resolve a Motion to Dismiss .................................................................................83

        B.      The Equitable Alignment of Plaintiff, BAE and PNC Is Critical in
                Applying *In Pari Delicto* Analysis and Bars Application of the Doctrine in
                This Case.................................................................................................................85

        C.      The Court Cannot Resolve Whether the Parties Are "of Equal Fault" on a
                Motion to Dismiss..................................................................................................86

        D.      The *In Pari Delicto* Doctrine Does Not Bar These Claims for Public
                Policy Reasons .......................................................................................................87

VII.    CONCLUSION...............................................................................................................89

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adler v. Taylor*,
No. 04-8472-RGK (FMOx),
2005 U.S. Dist. LEXIS 5862 (C.D. Cal. Feb. 2, 2005).......................................................47

*Aetna Cas. and Sur. Co. v. Leahey Constr. Co.*,
219 F.3d 519 (6th Cir. 2000) .......................................................................................75

*Agudas Chasidei Chabad v. Russian Fed'n*,
466 F. Supp. 2d 6 (D.D.C. 2006) .................................................................................25

*Am. Library Ass'n v. F.C.C.*,
401 F.3d 489 (D.C. Cir. 2005) .....................................................................................19

*Anderson v. Airco, Inc.*,
No. 02 C-12-091 HdR, 2004 Del. Super. LEXIS 393
(Del. Super. Ct. Nov. 30, 2004) ..................................................................................72

*Anderson v. Hall*,
755 F. Supp. 2 (D.D.C. 1991) ................................................................................29, 65

*Asch v. Taveres*,
467 A.2d 976 (D.C. Cir. 1983) ....................................................................................15

*Autolog Corp. v. Regan*,
731 F.2d 25 (D.C. Cir. 1984) .......................................................................................68

*Avianca, Inc. v. Corriea*,
705 F. Supp. 666 (D.D.C. 1989) ..................................................................................29

*Baker O'Neal Holdings, Inc. v. Ernst & Young LLP*,
No. 1:03-cv-0132-DFH, 2004 WL 771230
(S.D. Ind. Mar. 24, 2004)..........................................................................83, 86, 87, 89

*Barnhart v. Sigmon Coal Co.*,
534 U.S. 438 (2002)....................................................................................................67

*Batchelder v. Nobuhiko Kawamoto*,
147 F.3d 915 (9th Cir. 1998) .................................................................................64, 65

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
472 U.S. 299 (1985)....................................................................................83, 86, 88

*Behradrezaee v. Dashtara*,
910 A.2d 349 (D.C. 2006) ...........................................................................................29

**Page**

*Bell Atl. Corp. v. Twombly*,
  127 S. Ct. 1955 (2007) ........................................................................69, 70, 81

*Berkwitz v. Humphrey*,
  130 F. Supp. 142 (D. Ohio 1955) .....................................................................32

*Bernhardt v. Polygraphic Co.*,
  350 U.S. 198 (1956) ........................................................................................33

*Bertozzi v. King Louie Int'l, Inc.*,
  420 F. Supp. 1166 (D.R.I. 1976) .....................................................................16

*Biscoe v. Arlington County*,
  738 F.2d 1352 (D.C. Cir. 1984) .................................................................36, 37

*Brown v. Bedford City Land & Improvement Co.*,
  91 Va. 31 (1895) .............................................................................................53

*Browning v. Clinton*,
  292 F.3d 235 (D.C. Cir. 2002) ........................................................................68

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
  274 F. Supp. 2d 86 (D.D.C. 2003) ........................................................15, 74, 75, 78

*Camejo v. Ocean Drilling & Exploration*,
  838 F.2d 1374 (5th Cir. 1988) ........................................................................19

*Caparos v. Morton*,
  No. 00 CH 14690, 2004 WL 5326432
  (Ill. Cir. Jun 18, 2004) ....................................................................................29

*Central Bank, N.A. v. First Interstate Bank, N.A.*,
  511 U.S. 164 (1994) ........................................................................................71

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
  423 F. Supp. 2d 348 (S.D.N.Y. 2006) .............................................................44

*CNH Capital America LLC v. McCandless*,
  No. C05-2087, 2007 WL 1498357
  (N.D. Iowa May 18, 2007) ..............................................................................73

*Cohen v. United States*,
  129 F.2d 733 (8th Cir. 1942) ..........................................................................83

*Cohen v. Wolgin*,
  No. 87-2007, 1988 WL 65970
  (E.D. Pa. June 20, 1988) .................................................................................87

**Page**

*Conley v. Gibson,*
   355 U.S. 41 (1957).............................................................................................70

*Creative Tech. v. Aztech Sys. PTE,*
   61 F.3d 696 (9th Cir. 1995) .............................................................................17

*Cresta v. Neurology Center, P.A.,*
   557 A.2d 156 (D.C. Cir. 1989) ............................................................15, 23, 24

*Deckard v. GMC,*
   307 F.3d 556 (7th Cir. 2002) ..........................................................................83

*Demoulas v. Demoulas Super Mkts., Inc.,*
   424 Mass. 501 (1997)......................................................................................43

*Derensis v. Coopers & Lybrand Chartered Accountants,*
   930 F. Supp. 1003, 1009 (D.N.J. 1996) ..........................................................16

*District of Columbia v. Coleman,*
   667 A.2d 811 (D.C. 1995) .........................................................................30, 34

*Drenis v. Haligiannis,*
   452 F. Supp. 2d 418 (S.D.N.Y 2006)..............................................................32

*Drummond v. Spero,*
   350 F. Supp. 844 (D. Vt. 1972)......................................................................83

*El-Fadl v. Bank of Central Jordan,*
   75 F.3d 668 (D.C. Cir. 1996) .....................................................................15, 16, 19

*Employers Constr. Indus. Ret. Trust v. Blanchard,*
   No. 04 Civ. 5954 (LAP), 2005 WL 2063852
   (S.D.N.Y. Aug. 25, 2005) ...............................................................................44

*Endotech USA v. Biocompatibles Int'l PLC,*
   No. 00-0957 Section "K" (5), 2000 U.S. Dist. LEXIS 18623
   (E.D. La. Oct. 24, 2000)..................................................................................46

*Erickson v. Pardus,*
   127 S. Ct. 2197 (2007)....................................................................................70

*FDIC v. O'Melveny & Myers,*
   61 F.3d 17 (9th Cir. 1995) ..............................................................................83

*Feiner Family Trust v. VBI Corp.,*
   No. 07 Civ. 1914 (RPP), 2007 WL 2615448
   (S.D.N.Y. Sept. 11, 2007)...............................................................................44

Page

*Feld & Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick, & Cabot*,
    458 A.2d 545 (Pa. Super. Ct. 1983)................................................................86

*Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*,
    414 F.3d 325 (2d Cir. 2005),
    *cert. denied*, 126 S. Ct. 2968 (2006)............................................................36

FNC.  *Am. Dredging Co. v. Miller*,
    510 U.S. 443 (1994)........................................................................... *passim*

*Foman v. Davis*,
    371 U.S. 178 (1962)................................................................................82

*Francis v. United Jersey Bank*,
    162 N.J. Super. 355 (Law Div. 1978),
    *aff'd*, 171 N.J. Super. 34 (App. Div. 1979)..................................................43

*Friends for All Children, Inc. v. Lockheed Aircraft Corp.*,
    587 F. Supp. 180 (D.D.C. 1984).............................................................23, 37

*Gaither v. Myers*,
    404 F.2d 216 (D.C. Cir. 1968)..................................................................36

*German-Am. Coffee Co. v. Diehl*,
    109 N.E. 875 (N.Y. 1915).......................................................................35

*Goldberg v. Meridor*,
    567 F.2d 209 (2d Cir. 1977)....................................................................26

*Gould v. American-Hawaiian S.S. Co.*,
    535 F.2d 761 (3d Cir. 1976).....................................................................71

*Goya Foods, Inc. v. Unanue*,
    233 F.3d 38 (1st Cir. 2001)......................................................................43

*Grand Lodge of the Fraternal Order of Police v. Ashcroft*,
    185 F. Supp. 2d 9 (D.D.C. 2001)...............................................................49

*Guidi v. Inter-Continental Hotels Corp.*,
    224 F.3d 142 (2d Cir. 2000)................................................................18, 22

*Gulf Oil Corp. v. Gilbert*,
    330 U.S. 501 (1947).........................................................................16, 17, 25

*Haase v. Sessions*,
    835 F.2d 902 (D.C. Cir. 1987)............................................................... *passim*

**Page**

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ................................................................. *passim*

*Harper v. AT&T Co.*,
    54 F. Supp. 2d 1371 (S.D. Ga. 1999)................................................................87

*Hasan v. CleveTrust Realty Investors*,
    729 F.2d 372 (6th Cir. 1984) ................................................................59

*HB Mgmt., LLC v. Brooks*,
    No. 04-LT-37313, 2005 D.C. Super. LEXIS 6
    (D.C. Super. Ct. Feb. 1, 2005) ................................................................28

*Hbouss v. Coca-Cola Enters., Inc.*,
    No. 05 Civ. 7965 (DLC), 2006 WL 2285598
    (S.D.N.Y. Aug. 9, 2006) ................................................................44

*Heath v. Erie Ry. Co.*,
    11 F. Cas. 976 (C.C.S.D.N.Y. 1871) ................................................................57

*Hendry v. Pelland*,
    73 F.3d 397 (D.C. Cir. 1996).................................................................29

*Herbert v. District of Columbia*,
    808 A.2d 776 (D.C. 2002) ................................................................37

*HFG Co. v. Pioneer Publ'g Co.*,
    162 F.2d 536 (7th Cir. 1947) ................................................................62, 63

*Hurley v. Atlantic City Police Dep't*,
    174 F.3d 95 (3d Cir. 1999)................................................................72

*Hurt v. Cotton States Fertilizer Co.*,
    145 F.2d 293 (5th Cir. 1944) ................................................................62

*In re BAE Sys. PLC Derivative Litig.*,
    No. 07-1646 (RNC), Temporary Restraining Order
    (D.D.C. Feb. 5, 2008) ................................................................14

*In re Bennett Funding Group Inc.*,
    No. 96-61376, 1999 Bankr. LEXIS 1857
    (N.D.N.Y. Aug. 6, 1994) ................................................................83

*In re BP p.l.c. Derivative Litig.*,
    507 F. Supp. 2d 302 (S.D.N.Y. 2007)................................................................44

*In re Burnet-Clarke, Ltd.*,
    56 F.2d 744 (2d Cir. 1932)................................................................35

**Page**

*In re Del-Met Corp.*,
  322 B.R. 781 (Bankr. M.D. Tenn. 2005) ..........................................................86

*In re Dow*,
  132 B.R. 853 (Bankr. S.D. Ohio 1991).............................................................86

*In re England*,
  375 F.3d 1169 (D.C. Cir. 2004) .......................................................................29

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
  235 F. Supp. 2d 549 (S.D. Tex. 2002) .......................................................54, 55

*In re Greater Southeast Cmty. Hosp. Corp. I*,
  353 B.R. 324 (Bankr. D.D.C. 2006) ................................................................83

*In re Korean Air Lines Disaster*,
  935 F.Supp. 10 (D.D.C.1996) ..........................................................................36

*In re Nat'l Mortgage Equity Corp. Mortgage Pool Certificates Sec. Litig.*,
  636 F. Supp. 1138 (C.D. Cal 1986) .................................................................87

*In re Pittsburgh & Lake Erie R. R. Co. Sec. & Antitrust Litig.*,
  543 F.2d 1058 (3d Cir. 1976)...........................................................................62

*In re Sealed Case*,
  494 F.3d 139 (D.C. Cir. 2007) ...................................................................69, 70

*In re Tyco Int'l, Ltd.*,
  340 F. Supp. 2d 94 (D.N.H. 2004)...................................................................44

*Int'l Cargo Mgmt. Specialists v. EG&G Dynatrend*,
  No. 91-1360 (NHJ), 1995 U.S. Dist. LEXIS 9577
  (D.D.C. Mar. 31, 1995) ....................................................................................29

*Int'l Harvester Co. v. Wisconsin Dep't. of Taxation*,
  322 U.S. 435 (1944).........................................................................................35

*Int'l Telecommunications Satellite Org. v. Colino*,
  No. 88-1266 (RCL), 1992 WL 93129
  (D.D.C. Apr. 15, 1992) .....................................................................................80

*Jaffe v. Pallotta Teamworks*,
  374 F.3d 1223 (D.C. Cir. 2004)...........................................................25, 34, 36, 39

*Johnson v. Johnson*,
  676 So. 2d 458 (Fla. Dist. Ct. App. 1996) .......................................................47

Page

*Joy v. Bell Helicoper Textron*,
   999 F.2d 549 (D.C. Cir. 1993) ........................................................................29

*Joy v. North*,
   692 F.2d 880 (2d Cir. 1982)............................................................................59

*Kaiser-Georgetown Community Health Plan, Inc. v. Stutsman*,
   491 A.2d 502 (D.C. 1985) ...................................................... *passim*

*Kassem v. Wash. Hosp. Ctr.*,
   513 F.3d 251 (D.C. Cir. 2008)........................................................................70

*Knauer v. Jonathan Roberts Fin. Group*,
   348 F.3d 230 (7th Cir. 2003) .........................................................................83

*Koch Refining v. Farmers Union Cent. Exch., Inc.*,
   831 F.2d 1339 (7th Cir. 1986) .......................................................................83

*Kona Enters. v. Estate of Bishop*,
   179 F.3d 767 (9th Cir. 1999) .........................................................................62

*Koster v. (Am.) Lumbermens Mut. Casualty Co.*,
   330 U.S. 518 (1947)...................................................................16, 20, 22

*Kotan v. Pizza Outlet, Inc.*,
   400 F. Supp. 2d 44 (D.D.C. 2005)..................................................................23

*KPMG Fin. Advisory Servs. Ltd. v. Diligence LLC*,
   No. 05-2204 (PLF), 2006 WL 335768
   (D.D.C. Feb. 14, 2006) ............................................................15, 17, 22

*Kreindler v. Marx*,
   85 F.R.D. 612 (N.D. Ill. 1979).......................................................................62

*Lamphier v. Washington Hosp. Ctr.*,
   524 A.2d 729 (D.C. 1987) ......................................................................25, 36

*LaSala v. Bank of Cyprus Pub. Co. Ltd.*,
   510 F. Supp. 2d 246 (S.D.N.Y. 2007).......................................................41, 77

*Lerner v. Fleet Bank, N.A.*,
   459 F.3d 273 (2d Cir. 2006).........................................................................80

*Levant v. Whitley*,
   755 A.2d 1036 (D.C. 2000) ...........................................................................47

*Liberty Mut. Ins. Co. v. Greenwich Ins. Co.*,
    441 F. Supp. 2d 8 (D. Mass. 2004),
    *aff'd*, 417 F.3d 193 (1st Cir. 2005) ................................................................23

*Linde v. Arab Bank, PLC*,
    384 F. Supp. 2d 571 (E.D.N.Y. 2005) ...........................................................80

*Mansfield Hardwood Lumber Co. v. Johnson*,
    268 F.2d 317 (5th Cir. 1959) ........................................................................32

*Marwil v. ENT & Imler CPA Group, P.C.*,
    No. 1:03-cv-00678-DFH-VS, 2004 WL 2750255
    (S.D. Ind. Nov. 24, 2004)........................................................................83, 86

*Marwil v. Farah*,
    No. 1:03-cv-0482-DFH, 2003 WL 23095657
    (S.D. Ind. Dec. 11, 2003) ..............................................................................86

*Mayflower Hotel Stockholders Protective Comm. v. Mayflower Hotel Corp.*,
    173 F.2d 416 (D.C. Cir. 1949).......................................................................31

*Mayflower Hotel Stockholders Protective Comm. v. Mayflower Hotel Corp.*,
    193 F.2d 666 (D.C. Cir. 1951).......................................................................31

*McKesson HBOC, Inc. v. Islamic Republic of Iran*,
    271 F.3d 1101 (D.C. Cir. 2001).....................................................................51

*Meng v. Schwartz*,
    305 F. Supp. 2d 49 (D.D.C. 2004).................................................................69

*Mercier v. Sheraton Int'l, Inc.*,
    935 F.2d 419 (1st Cir. 1991)..........................................................................19

*Merrill Lynch Pierce Fenner & Smith, Inc. v. Cheng*,
    901 F.2d 1124 (D.C. Cir. 1990).....................................................................29

*Messinger v. United Canso Oil & Gas, Ltd.*,
    486 F. Supp. 788 (D. Conn. 1980)............................................................57, 61

*Mick's at Pa. Ave., Inc. v. BOD, Inc.*,
    389 F.3d 1284 (D.C. Cir. 2004).....................................................................83

*Modaressi v. Vedadi*,
    441 F. Supp. 2d 51 (D.D.C. 2006).................................................................25

*Murdock v. Follansbee Steel Corp.*,
    213 F.2d 570 (3d Cir. 1954)...........................................................................62

Page

*Nat'l Union Fire Ins. Co. v. BP Amoco P.L.C.*,
No. 03 Civ. 0200 (GEL), 2003 U.S. Dist. LEXIS 8432
(S.D.N.Y. May 20, 2003)...................................................................20, 23, 26

*Nemariam v. Fed. Democratic Republic of Etn.*,
315 F.3d 390 (D.C. Cir. 2003) ...........................................................15, 17, 19

*Norlin Corp. v. Rooney, Pace, Inc.*,
744 F.2d 255 (2d Cir. 1984)...............................................................26, 31, 32

*Pain v. United Techs. Corp.*,
637 F.2d 775 (D.C. Cir. 1980) .................................................................16, 17

*Perma Life Mufflers v. Int'l Parts Corp.*,
392 U.S. 134 (1968) ......................................................................................88

*Piper Aircraft Co. v. Reyno*,
454 U.S. 235 (1981)...........................................................................17, 19, 24

*Polar Int'l Brokerage Corp. v. Reeve*,
187 F.R.D. 108 (S.D.N.Y. 1999) ..................................................................44

*Qi-Zhuo v. Meissner*,
70 F.3d 136 (D.C. Cir. 1995)........................................................................67

*Reiman v. First Union Real Estate Equity and Mortg. Inv.*,
614 F. Supp. 255 (D.D.C. 1985) .......................................................22, 26, 61

*Rolf v. Blyth, Eastman Dillon & Co.*,
570 F.2d 38 (2d Cir. 1978)............................................................................75

*Roma Constr. Co. v. Russo*,
96 F.3d 566 (1st Cir. 1996)...........................................................................83

*Saracco Tank & Welding Co. v. Platz*,
150 P.2d 918 (Cal. Ct. App. 1944) ...............................................................35

*Saunders v. Hankerson*,
312 F. Supp. 2d 46 (D.D.C. 2004) .................................................................28

*Sax v. World Wide Press Inc.*,
809 F.2d 610 (9th Cir. 1987) ........................................................................28

*Schoenbaum v. Firstbrook*,
405 F.2d 200 (2d Cir. 1968),
*rev'd in part on other grounds en banc*, 405 F.2d 215 (2d Cir. 1968) ............26

**Page**

*Scholes v. Lehmann*,
   56 F.3d 750 (7th Cir. 1995) .................................................................85, 86

*Schwarz v. Artcraft Silk Hosiery Mills*,
   110 F.2d 465 (2d Cir.1940)...........................................................................35

*SEC v. Bilzerian*,
   378 F.3d 1100 (D.C. Cir. 2004) ....................................................................65

*Seghers v. Thompson*,
   No. 06 Civ. 308 (RMB) .................................................................................44

*Sengupta v. Univ. of Alaska*,
   21 P.3d 1240 (Alaska 2001)...........................................................................19

*Shirk v. Garrow*,
   505 F. Supp. 2d 169 (D.D.C. 2007) ........................................................70, 81

*Silling v. Erwin*,
   881 F. Supp. 236 (S.D. W. Va. 1995)............................................................62

*Simon v. Philip Morris Inc.*,
   124 F. Supp. 2d 46 (E.D.N.Y. 2000) .............................................................69

*Smith v. Sperling*,
   354 U.S. 91 (1957)...................................................................................28, 57

*Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*,
   170 F.3d 191 (D.C. Cir. 1999)..................................................................32, 36

*Stephens v. Nat'l Distillers & Chem. Corp.*,
   No. 91 Civ. 2901 (JSM), 1996 U.S. Dist. LEXIS 6915
   (S.D.N.Y. May 21, 1996)...............................................................................29

*Surowitz v. Hilton Hotels Corp.*,
   383 U.S. 363 (1966)........................................................................................53

*Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*,
   740 F. Supp. 880 (D.D.C. 1990),
   *rev'd* 940 F.2d 685 (D.C. Cir. 1991)............................................................29

*Thomson v. Palmieri*,
   355 F.2d 64 (2d Cir. 1966)......................................................16, 21, 22, 26

*Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*,
   906 A.2d 168 (Del. Ch. 2006),
   *aff'd*, 2007 Del. LEXIS 357 (Del. 2007) .....................................................85

Page

*Tubbs v. United Cent. Bank, N.A.*,
    451 N.W.2d 177 (Iowa 1990) ........................................................................73

*Turner & Newall, PLC v. Am. Mut. Liab. Ins. Co.*,
    No. 82-1339, 1985 U.S. Dist. LEXIS 23777
    (D.D.C. Aug. 1, 1985).................................................................................62

*United States v. Nguyen*,
    493 F.3d 613 (5th Cir. Tex. 2007) ..............................................................73

*United States v. Philip Morris USA, Inc.*,
    327 F. Supp. 2d 8 (D.D.C. 2004) ................................................................83

*Waggaman v. Forstmann*,
    217 A.2d 310 (D.C. 1966) ...........................................................................46

*Warth v. Seldin*,
    422 U.S. 490 (1975)....................................................................................48

*Whelan v. Abell*,
    48 F.3d 1247 (D.C. Cir. 1995) ....................................................................28

*Wilson v. Toussie*,
    260 F. Supp. 2d 530 (E.D.N.Y. 2003) ........................................................87

*Winn v. Schafer*,
    499 F. Supp. 2d 390 (S.D.N.Y. 2007).........................................................44

*Wuliger v. Office of the Comptroller of Currency*,
    394 F. Supp. 2d 1009 (N.D. Ohio 2005)......................................................77

*Zapata Corp. v. Maldonado*,
    430 A.2d 779 (Del. 1981) .......................................................................59, 60

**STATUTES, RULES AND REGULATIONS**

18 U.S.C.
    §1961................................................................................................13

28 U.S.C.
    §1404................................................................................................22

31 U.S.C.
    §5311....................................................................................................9
    §5312....................................................................................................9
    §5313....................................................................................................9
    §5314....................................................................................................9
    §5315....................................................................................................9

Page

§5316 .................................................................................................................... 9
§5317 .................................................................................................................... 9
§5318 .................................................................................................................... 9
§5319 .................................................................................................................... 9
§5320 .................................................................................................................... 9
§5321 .................................................................................................................... 9
§5322 .................................................................................................................... 9
§5323 .................................................................................................................... 9
§5324 .................................................................................................................... 9
§5325 .................................................................................................................... 9

D.C. Code

§29-101.04 ........................................................................................................ 29
§29-101.07 ........................................................................................................ 30
§29-101.100 ...................................................................................................... 30
§29-1058 ........................................................................................................... 28

N.Y. Bus. Corp. Law

§626 .................................................................................................................. 31
§1319(a) ............................................................................................................ 31

Federal Rules of Civil Procedure

Rule 8 ......................................................................................................... *passim*
Rule 8(a) ........................................................................................................... 70
Rule 12(b)(1) .............................................................................................. *passim*
Rule 12(b)(6) .............................................................................................. *passim*
Rule 15(a) ......................................................................................................... 82
Rule 19 .............................................................................................................. 61
Rule 19(a)(1) .................................................................................................... 65
Rule 23(b) ......................................................................................................... 62
Rule 23.1 .................................................................................................... *passim*
Rule 28(b)(1) .................................................................................................... 21
Rule 28(b)(2) .................................................................................................... 21
Rule 28(b)(3) .................................................................................................... 21
Rule 29 .............................................................................................................. 21

12 C.F.R.

§21.11(a) ...................................................................................................... 73, 77

**SECONDARY AUTHORITIES**

13 *Fletcher Cyclopedia of Corporations* (1991)

§5942 ................................................................................................................ 89
§5976 ................................................................................................................ 62

4 James W. Moore, *Moore's Federal Practice* (2d ed. 1979) ...................................... 21

**Page**

Adolf A. Berle, Jr. & Gardner C. Means, *The Modern Corporation and Private Property* (1932).................................................................................................................58

Charles Allen Wright & Arthur R. Miller, *Federal Practice & Procedure: Civil 3d* (3d ed. 2008)
§1277.......................................................................................................................83

Claire Moore Dickerson, *From Behind The Looking Glass: Good Faith, Fiduciary Duty & Permitted Harm*, 22 Fla. St. U. L. Rev. 955 (1995)............................................59

Kenneth B. Davis Jr., *Structural Bias, Special Litigation Committees, and the Vagaries of Director Independence*, 90 Iowa L. Rev. 1305 (2005) ..................................59

Restatement (Second) Conflict of Laws (1971)
§6..................................................................................................................... *passim*
§55.........................................................................................................................35
§309..............................................................................................................30, 35, 40

Restatement (Second) Law of Torts (1979)
§876 ..................................................................................................................70, 76

Robert R. Pennington, *Company Law* (8th Ed. 2006) ....................................................64

Robin Hollington Q.C., *Shareholders' Rights* (5th ed. 2007) ......................................50

## I.     INTRODUCTION AND SUMMARY OF THE ARGUMENT

On September 19, 2007, plaintiff the City of Harper Woods Employees' Retirement System ("plaintiff"), commenced this shareholder derivative action charging 26 of BAE Systems plc's ("BAE" or the "Company") current and former executives (the "BAE defendants") with intentional, reckless and/or negligent breaches of fiduciary duty, waste of corporate assets, and *ultra vires* conduct in connection with their having caused BAE to pay billions of dollars in illegal bribe payments to foreign government officials, including at least $2 billion paid to defendant Prince Bandar Bin Sultan ("Prince Bandar") here in the District of Columbia through accounts at now-defunct Riggs National Corporation/Riggs Bank, N.A. ("Riggs").[1]  The bribe payments are the subject of investigations by the U.S. Department of Justice ("DOJ") and the U.K. Serious Frauds Office ("SFO") that have already cost BAE hundreds of millions of dollars in reputational damage and defense costs and, if proved, expose the Company to hundreds of millions more in criminal fines and penalties and disgorgement of billions of tainted profits under the Foreign Corrupt Practices Act ("FCPA").  Defendants include five other parties charged with aiding and abetting the BAE Defendants' breaches of their fiduciary duties, including: (i) Prince Bandar, the alleged recipient of the $2 billion in illegal bribe payments; (ii) PNC Financial Group ("PNC"), the legal successor to Riggs; and (iii) Joseph, Barbara and Robert Allbritton, the former controlling shareholders and principal operating executives of Riggs, who facilitated the bribe payments (the "Allbrittons").

To be sure, defendants deny that the concealed payments Bandar admits receiving were "bribes" or that they were illegal.  But the Court is not asked to decide on the legality of those

---

[1]     *See* Verified Shareholder Derivative Complaint for Intentional, Reckless or Negligent Breach of Fiduciary Duty, Corporate Waste and *Ultra Vires* Conduct (the "Complaint").  Unless otherwise indicated, all paragraph references ("¶__" or "¶¶__") are to the Complaint and all Exhibit references ("Ex. _") are to the Declaration of Mary K. Blasy in Support of Plaintiff's Consolidated Opposition to Defendants' Motion to Dismiss ("Blasy MTD Decl.").

payments here.  All that must be shown is that the payments were in fact made and Prince Bandar has already publicly-confirmed BAE deposited *Al-Yamamah*-related payments into Riggs accounts in D.C. and that he acquired funds from those accounts.  Ex. A; ¶8.  David Caruso, a bank compliance officer installed at the insistence of the U.S. Comptroller of the Currency ("OCC") in response to consent orders and decrees being entered against Riggs by the OCC in 2002 and 2003, who was specifically charged with restoring Riggs' criminally-defective banking controls, has confirmed that the Saudi accounts were so ineptly handled by Riggs that "it was impossible to distinguish between government funds and what would normally be considered personal purposes." ¶13.  The bank knew the accounts were being replenished quarterly by a London source, but Caruso says the rank-and-file at Riggs never asked and "never knew the source of the funds."  *Id.*

The situation grew so out of hand by 2004 that Riggs was fined $25 million for continuing to violate the OCC orders.  Finally, in May 2005, Riggs pled guilty to a violation of the nation's anti-money laundering laws, paid another $16 million fine for again failing to monitor "extensive and frequent suspicious" activity its the embassy accounts, and Riggs' doors were permanently closed. *Id.*  Riggs' plea agreement confirms that "[t]hroughout this period, ***senior officers at Riggs Bank were informed of Riggs Bank's problems in complying with its obligations [and that] . . . the warnings . . . should have put Riggs Bank on notice that this was a significant problem that needed addressing***."  Ex. B.[2]  But for the bank's failure to comply with its "independent statutory obligation" to monitor activity in the Saudi accounts and its active concealment of the "suspicious activities" in those accounts, the BAE defendants could not have illegally laundered the billions worth of bribe payments through Riggs, a U.S. bank, exposing BAE to immense criminal liability under U.S. law in this District.  *Id.*

---

[2]      Unless otherwise noted, all emphasis is added and citations are omitted.

Nonetheless, on January 31, 2008, PNC and the Allbrittons jointly moved to dismiss this action challenging plaintiff's standing, arguing plaintiff failed to adequately plead their aiding and abetting and raising an *in pari delicto* (equal fault) affirmative defense.  *See* Memorandum of Points and Authorities in Support of PNC's and the Allbrittons' Joint Motion to Dismiss (Docket No. 32) ("PNC Brf.").  BAE and all but one of the current and/or former BAE executive defendants in this action also filed a joint motion to dismiss, arguing, *inter alia*, that this Court lacks personal jurisdiction over each of them, seeking dismissal on *forum non conveniens* grounds and arguing that English law applies and negates plaintiff's standing in this action.  *See* Memorandum of Points and Authorities in Support of the Motion of BAE Systems plc and the Individual BAE Systems plc Defendants to Dismiss the Complaint (Docket No. 35) ("BAE Brf.").  All five of these challenges improperly request that the Court render contested factual determinations in defendants' favor, something entirely improper at this pre-discovery stage of the proceedings.[3]  For the reasons summarized below and detailed more comprehensively herein, defendants' premature motions should be denied and the parties should get on with litigating the merits of the case.

***Forum Non Conveniens***: Notwithstanding BAE's being organized under U.K. law and ***presently*** headquartered in London, the Company is very much a U.S. concern with a substantial presence in this District – one that arguably exceeds its London presence: (i) "[a]pproximately 50% of BAE's shareholders reside in the U.S." (¶2); (ii) "BAE is one of the largest defense contractors in the U.S. and one of the largest suppliers to the U.S. Defense Department" (*id.*); (iii) the "Company

---

[3]     Following briefing on plaintiff's motion for expedited discovery on personal jurisdiction, on March 1, 2008 the Court ruled that it would "consider grounds for dismissal not based on personal jurisdiction first."

has operations in 36 states . . . and generates some [50%[4]] of its annual revenues . . . in the U.S." (*id.*); (iv) "BAE has more operations in the U.S. than in any other single country, including substantial operations here in Washington, D.C., which coordinate and oversee its billions of dollars of annual business with the Pentagon" (*id.*); (v) BAE operates in the U.S. (and in this District) pursuant to a "a Special Security Agreement [("SSA")] between the U.S. Government, BAE-USA and BAE" designed to ensure "the Company's compliance with U.S. Government security and export regulations" that in turn "allows BAE to supply products and services to the U.S. Department of Defense (DOD), Intelligence Community and Homeland Security on some of our Nation's most sensitive programs" (¶19); (vi) the $2 billion in alleged bribe payments were paid to Prince Bandar in this District through accounts at Riggs over a 20-year period while Prince Bandar resided in the greater D.C. area (¶8); and (viii) the bribed payments allegedly violated U.S. law, including the FCPA (¶11).  Clearly, the center of gravity for these claims is in this District.  For these reasons alone, the BAE defendants' *forum non conveniens* plea fails as they cannot show the private and public factors support dismissal of this action in favor of a ***yet-unfiled*** action in England.

In fact, defendants' showing does not even warrant a balancing of those factors as it fails to clear the preliminary *forum non conveniens* hurdles.  Before reaching the factor-test, defendants carry a ***heavy burden*** in this Circuit of demonstrating an adequate alternative jurisdiction exists.  Yet, in addition to seeking dismissal for *forum non conveniens*, defendants seek to prove that English law applies and negates plaintiff's standing to proceed derivatively.  To meet that burden, defendants submitted testimonial "evidence" they proffer proves U.K. law does not permit this action – anywhere.  If defendants and their lawyers are correct in arguing that plaintiff's claims are barred

---

[4]      While BAE was reportedly receiving 40% of its revenues in the U.S. at the time the Complaint was filed last fall, following its acquisition of Armor Holdings the U.S. now accounts for 50% of BAE's annual sales.  *See* Ex. C.

under English law – *which they are not* – this is all the more reason not to discuss *forum non conveniens*, but instead to apply the public policy exception to the internal affairs doctrine.

*Each defendant* was also required to affirmatively submit to the English courts as part of their *forum non conveniens* showing.  This explains, perhaps, why PNC, the Allbrittons and Prince Bandar did not join the *forum non conveniens* motion: obviously none of them cares to willingly waive jurisdictional, limitations and other perceived procedural defenses in England.  Besides the fact that that this Court has already acquired *in rem* jurisdiction over tens of millions of dollars worth of U.S.-based real estate that Prince Bandar acquired with the spoils of the bribe payments, there is simply no reason to believe, much less *proof offered*, that any defendant will submit to the courts of England. The *forum non conveniens* motion must be denied for this reason as well.

*Choice of Law/Standing*:  Before even analyzing the government interests test that all parties agree governs any choice-of-law issue in this Circuit, the *plain language* of the D.C. Code and Fed. R. Civ. P. 23.1 must be applied.  Plaintiff meets their standing requirements and the inquiry ends there.  For the same reason, there is simply no reason in 2008 to attempt to apply an archaic English procedural device that was legislatively repealed in 2006.  The chancery courts in England that hear derivative actions are courts of equity.  There is ample support in the English case law for applying an "interests of justice" exception to a procedural barrier that was expressly jettisoned by the English legislature as being too uncertain and outdated.  U.S. courts are no more constrained by the draconian old rule than the English courts would be and for this reason alone U.S. law should apply.

Even if the Court did engage in an interests analysis, given the (i) grave nature of defendants' alleged criminal activities here; (ii) the U.S.'s strong interest in seeing its FCPA complied with by the executives of the multi-national companies that come to our shores in the pursuit of profits; (iii) BAE's and the U.S.'s strong interest in promoting accountability to the investment community – and to the defense and homeland security communities; and (iv) D.C. and the U.S. being the *situs* of the

wrongdoing and the harm, the U.S. has a much stronger interest in seeing its law applied to ensure the wrongdoers at BAE are held accountable for their misconduct.  Conversely, it appears the U.K. government has little, if any, interest it is presently willing to advance in regulating the misconduct which underlies these claims.  The U.K. government expressly disavowed any interest in addressing the bribe scheme when it demanded that the SFO investigation be terminated in December 2006, claiming it was "contrary to the public interest," and reaffirmed that stance in a recent legal challenge, stating English lives were at stake.  Ex. D, ¶3.

While the U.S. government's interest in this action significantly outweighs the U.K. government's, even if the Court did apply English law, it would provide no bar here.  Instead, the applicable Fed. R. Civ. P. 12(b)(1) standard and the English procedural rules that underlie the *Rule of Foss v. Harbottle* defendants insist we borrow, both require that the Court undertake its own factual assessment, conducting what is essentially a mini-trial on this preliminary issue, rather than resolving disputed issues of fact in defendants' favor based according to the dictates of their own "expert," *sans* discovery.  While plaintiff believes that U.S. law applies and provides standing, should the Court choose to employ the *Foss v. Harbottle* procedure, plaintiff seeks leave to conduct the discovery described in the affidavit of counsel which accompanies this brief.

***Aiding and Abetting Affirmative Defenses***: PNC and the Allbrittons jointly move for dismissal, arguing the Complaint does not provide the trial level proof of their knowing participation they insist is required and that they are entitled to dismissal by virtue of a yet unpled and unproven *in pari delicto* affirmative defense.  They are wrong on both accounts.  Rule 8 of the Federal Rules of Civil Procedure governs the pleading standard and it is met.  Moreover, *in pari delicto* is never applied against innocents such as shareholder derivative plaintiffs.  Compounding the difficulty, of course, are the facts that PNC/Allbrittons' conceptual diffidence is not with the Rule 8 mandated notice pleading, but with the aiding and abetting theory itself, and that *in pari delicto* is an

affirmative defense – raised by PNC/Allbritton, not plaintiff.  Accordingly, the expectation that all facts sufficient to adjudicate these issues would be available in the Complaint is unrealistic, especially given that it is PNC/Allbrittons' burden to conclusively establish their affirmative defenses.  Plaintiff respectfully submits that the Court deny the aiding and abetting pleading challenge outright (or grant leave to amend) and decline to apply the *in pari delicto* analyses on the limited record before the Court.

Applying these standards, the Court should deny defendants' motions to dismiss.

## II.   STATEMENT OF THE CASE

### A.     The Al-Yamamah Bribe Payment Scheme

The events underlying this action stretch back to 1985, when the U.K. Defense Secretary and the Saudi Defense Minister signed the first phase of the Al-Yamamah arms deal, which involved a series of arms sales by BAE to Saudi Arabia worth over £40 billion, including the sale of more than 100 warplanes. ¶49.  The Complaint alleges that to pay off Prince Bandar, BAE funneled some $2 billion in secret payments into Saudi embassy accounts at Riggs, in quarterly or yearly installments, over 20 years.  *Id.*  Prince Bandar treated and spent these funds though they were his own.  *Id.*

The bribe money moved on a circuitous path to Prince Bandar's accounts at Riggs.  The Saudis would pay for the planes under the Al-Yamamah contract not in cash, but in oil. ¶11; Complaint Ex. A.  Britain would receive up to 600,000 barrels of oil a day for over 20 years in payment.  *Id.*  The U.K. government, in turn, would sell the oil and the proceeds were deposited into an account at the Bank of England that BAE used.  *Id.*  BAE then transferred oil sales proceeds from the Bank of England to be laundered in Saudi accounts at Riggs in D.C., where Prince Bandar – who resided in (or about) the District as the Saudi Ambassador to the U.S. – was given unfettered access to them.  *Id.*

Plaintiff alleges BAE's officers and directors knew that if they could obtain the huge 20-year Al-Yamamah military contract from the United Kingdom Ministry of Defense ("MoD") to supply

the 120 fighter/bomber aircraft they could point to it as concrete evidence of their successful stewardship of BAE.  ¶¶3-6, 111-112.  This, in turn, would permit the BAE executive defendants to retain their positions of power, prestige and profit with BAE, and to continue to receive lucrative salaries and bonuses in connection with those positions for many, many years going forward.  ¶¶3, 6, 112.  But BAE needed assistance to execute the 20 year-long bribery scheme.  Riggs was more than willing and able to provide it.  ¶158.

> **B.**    **Riggs and the Allbrittons' Facilitation of the Illegal Al-Yamamah Bribe Scheme**

The Complaint alleges that Riggs (PNC) and the Allbrittons knowingly participated in, actively encouraged, and handsomely profited from the illegal bribe payment scheme by facilitating and concealing the payments to Bandar into and out of Riggs.  ¶¶8, 11, 13, 49-62, 113-114, 118, 122-130, 158.  The BAE executive defendants funneled these payments through Riggs via accounts that, while nominally in the name of Saudi Arabia, were controlled by Prince Bandar, who used the accounts as his own.  ¶49.  Riggs' Washington, D.C. bank was a pivotal location because it provided Prince Bandar, then living in (or about) the District, ready access to them.  Riggs had a reputation in international commercial banking circles for being the bank willing to facilitate questionable, if not illegal, currency transfers for international transactions.  *See* ¶¶8, 11, 13, 49-62, 122-130. PNC/Allbrittons are alleged to have actively participated in, facilitated, advanced, and encouraged the illegal bribe payments to Prince Bandar for 20 years, all the while actively concealing them from government regulators and BAE's own auditors, in order to augment Riggs' lucrative embassy business.  ¶¶1, 8, 8 n.2, 55-56, 58, 122.  Further, the Complaint shows that, tellingly, Riggs identified the BAE/Prince Bandar accounts only *after* it came under increasing government scrutiny in order to stave off government action to seize or close the bank.  ¶¶8, 114.

Indeed, PNC/Allbrittons *permitted, facilitated and/or encouraged* Prince Bandar to manipulate Saudi accounts to divert funds to himself and members of his family and did so because

of the enormous profits the PNC/Allbrittons – as 40% owners of Riggs – made off the Saudi/Prince Bandar accounts and transactions.  ¶122.  Riggs stood to gain much by way of its knowing participation in and encouragement and facilitation of the illegal bribe scheme between BAE and Prince Bandar.  *Id.*

C.     **The OCC Consent Orders/Decrees Directed at Riggs' Saudi Account Abuses**

By late 2002/early 2003, Riggs controlled 95% of the so-called embassy banking business in the U.S.  ¶58.  When it was discovered two of the 9/11 hijackers had Riggs accounts believed to be funded by Prince Bandar's wife, in December 2002 "the FBI and federal bank regulators began examining Riggs accounts in connection with Saudi cash transactions" for possible money laundering and terrorist financing.  ¶¶50, 60, 114, 123.  What regulators expected to be a one-month examination lasted five months, "as regulators uncovered [massive] improprieties in some of the ***150 Saudi accounts at Riggs***," many of which exhibited ***illegally lax controls*** in violation of the Bank Secrecy Act ("BSA"), which requires banks to vet the background of their customers, report outsized movements of cash, and alert regulators when any banking activities are suspicious.  ¶¶53, 60-61, 126, 130; *see also* 31 U.S.C. §§5311-5325.[5]  These Saudi accounts – many of which belonged to Bandar or which Bandar had access to – were not subjected to the required background checks and involved large and suspicious transactions that Riggs consistently and illegally concealed from regulators.  ¶¶53, 60-61, 126, 130.  "Regulators and members of Congress said Riggs frequently failed to carry out these duties, ***especially with regards to Saudi accounts***."  *Id.*

---

[5]     The Bank Secrecy Act of 1970 requires financial institutions to maintain records and ***provide reports to regulators*** which, in turn, assist in the investigation of criminal, tax or regulatory proceedings. ***An underlying purpose of the BSA was to counter money-laundering activities*** such as those alleged in plaintiff's Complaint.  The Complaint shows Riggs' illegally-lax banking controls by alleging that "the U.S. Office of the Comptroller of the Currency specifically cited Riggs' failure to file suspicious activity reports for [multiple] large-denomination withdrawals of cash by Bandar and others" and "uncovered improprieties in some of the ***150 Saudi accounts at Riggs***" that predated the 9/11 terrorist attacks.  ¶¶59-60.

Regulators uncovered tens of millions of dollars in cash withdrawals from accounts related to the Embassy of Saudi Arabia; dozens of sequentially-numbered international drafts that totaled millions of dollars drawn on accounts related to officials of Saudi Arabia and that were returned to the bank; and dozens of sequentially-numbered cashier's checks that were drawn from accounts related to officials of Saudi Arabia made payable to the account holder.  ¶127.  Federal regulators eventually concluded that the Allbrittons permitted Riggs to employ illegally inadequate controls, resulting in large cash transactions, often more than $1 million at a time, in the Saudi accounts, "*[m]any [of which] involved Bandar personally*."  ¶123.  The findings led federal bank regulators to issue a rare and public cease-and-desist order ("C&D Order") against Riggs in early 2003, requiring it to clean up its practices or face further penalties.  ¶61.

According to Riggs, the C&D Order expressly

stated that *the OCC found Riggs Bank's "compliance program [to be] deficient in all four elements: internal controls, independent testing, designation of individual(s) to coordinate and monitor compliance, and training appropriate personnel*."  Similarly, the Federal Reserve Cease and Desist Order stated it was being imposed because of "deficiencies in [Rigg's] compliance with applicable federal laws, rules, and regulations relating to anti-money laundering policies and procedures."  The *FinCEN Order was even more pointed, concluding that Riggs's AML and BSA deficiencies were "systemic" and demonstrated that "Riggs' internal controls were not designed to take into account the exposure posed by the customers, products, services, and accounts from high-risk international geographic locations that are commonly viewed as high-risk for money laundering*."

Ex. E, ¶28.  Blatantly disregarding the 2003 C&D Order, Riggs continued to permit unexplained transactions to flow through the Saudi accounts throughout late 2003 and early 2004.  *Id.*  A June 2004 Senate hearing would later detail Riggs' defiance:

[The investigations of Riggs] focused on certain suspicious transactions involving the Saudi Embassy relationship and culminated in a July 2003 cease-and-desist order, directing Riggs to undertake a long list of corrective actions.

*Yet when [regulators from the Office of the Comptroller of the Currency] returned to the bank in October 2003, the same pattern surfaced*. . . . Our reaction this time was fundamentally different than before and ultimately led to the assessment of a record $25 million civil monetary penalty against the bank.  We also

continue to evaluate whether additional actions are warranted.

*See* Ex. F at 9; ¶61.  Shockingly, in "March 2004, though Riggs publicly stated it had closed all Saudi accounts, minutes of a Riggs meeting on April 7, 2004 noted that Prince Bandar had recently requested '$2 million in cash for traveling expenses.'  'Prince Bandar then asked that Riggs wire $2 million to another bank, ***which was done***,' the minutes said."  ¶61.

The rampant abuses of Saudi accounts and illegally lax banking controls spurred regulators to conduct in-depth investigations into all of Riggs' banking practices which revealed Riggs employed illegally lax banking controls with respect to the Saudi accounts.  ¶60.  Federal regulators eventually concluded that Riggs inadequately monitored the destinations and uses of large amounts of cash, often more than $1 million at a time, in the Saudi accounts.  Many of these transactions involved Prince Bandar personally.  *Id.*; *see also* Ex. G.  Riggs was ultimately fined $25 million in May 2004 for its "***willful, systemic***" failure to comply with anti-money-laundering laws in its dealings with the Saudi Arabian embassy.  *See* ¶¶52-53, 62; Exs. G-H.

Emphasizing Riggs' knowing, willful, and consistent failure to comply with BSA requirements in connection with Saudi and other accounts, Senator Jim Bunning said at the June 2004 Senate hearing:

> ***Riggs was skirting Bank Secrecy Act procedures, and moving large sums of cash without making Suspicious Activity Reports or SAR's.  SAR's are not something that are that obscure.  They were even mentioned on an episode of the Sopranos. Surely a banker would know to file them.  The only conclusion could be that SAR's were knowingly not filed.  The OCC has recently fined Riggs $25 million.  But I am very concerned why the Riggs scandal lasted as long as it did.  And I want to make sure this type of problem does not happen again***.

*See* Ex. F at 41; *see also* ¶62.

The U.S. Senate hearings in June and July 2004 further illuminate Riggs' illegally lax banking practices.  ¶¶51-54, 58, 60, 124-125, 128.  A June 2004 Senate report disclosed that examination of the improper Saudi embassy accounts led to the discovery of other lax and illegal banking controls at Riggs.  ¶¶60-62. Detailing the FBI and banking regulators' findings, the Senate

- 11 -

report disclosed that Riggs maintained 150 improperly-monitored Saudi accounts. ¶60.  The report also revealed that throughout 2002 and 2003 Riggs assured regulators that it was implementing more effective controls and would bring its banking into compliance with the law.  ¶61.  However, Riggs consistently missed deadlines and ultimately failed to achieve many of the commitments it had previously made to the OCC.  When regulators found that Riggs continued to operate in violation of the law – including facilitating questionable transactions for Prince Bandar in March and April of 2004 even after Riggs had declared that it had reformed (*see id.*) – the OCC levied the first $25 million fine against Riggs in May 2004.  ¶¶52-53, 62; Exs. J & H.

The highly-critical 111-page Senate report issued on July 15, 2004 (Ex. G) concluded that Riggs had significant deficiencies in its anti-money laundering compliance programs:

> ***The evidence reviewed by the Subcommittee staff establishes that, since at least 1997, Riggs has disregarded its anti-money laundering (AML) obligations, maintained a dysfunctional AML program despite frequent warnings from OCC regulators, and allowed, or at times, actively facilitated suspicious financial activity.***

*Id.* at 2.

The day the report was issued, Senate Finance Committee Chairman Charles Grassley said:

> "***Riggs Bank deserves every penny of this huge fine. . . .  Banks have a patriotic duty, not to mention legal requirement, to report suspicious activity. When banks look the other way, they put out national security at risk.  Whether its through incompetence, negligence, or greed, they are allowing terrorists to funnel their blood money through the system***."

¶128.  At the same hearing, Senator Levin lambasted Riggs for its blatant disregard of the law:

> ***The problem is that Riggs Bank right here in the heart of the Nation's capital ignored its anti-money laundering obligations before the Patriot Act and continued to ignore them afterward*** . . . .

> ***In the meantime, Riggs operated its bank with blatant disregard for its anti-money laundering obligations***.

Ex. I at 4.  And when Riggs' then-President and CEO, Lawrence Herbert, testified before the Senate in July 2004 on the topic of Riggs' illegally lax banking controls, his attempt to downplay Riggs'

involvement in or knowledge of the conduct was harshly rebuked:

> *Again, I hope you understand the difficulty we have sitting here in looking at this account [a $750 million Equatorial Guinea account], and looking at the problems associated with it, and it does not take a Ph.D. or a degree in finance or accounting for some red lights to go on and for somebody to think, hey, you know something?  There is something amiss here.*

*Id.* at 29.

### D.    Riggs Pleads Guilty to Violating the Bank Secrecy Act

A long-running DOJ investigation was concluded in early 2005, with Riggs admitting that it was criminally liable for failing to comply with U.S. banking laws, entering a guilty plea to a violation of the BSA and paying an additional $16 million fine.  ¶¶53, 126, 130.  Also in early 2005, Riggs and two members of the bank's controlling shareholders – Joe and Robert Allbritton – agreed to pay $9 million to victims of Agusto Pinochet, the former dictator of Chile, for Riggs' role in facilitating the movement of Pinochet's ill-gotten wealth out of England in violation of an international freeze on Pinochet's assets.  *Id.*; *see also* ¶¶62, 124.  All told, Riggs paid $50 million in civil and criminal fines for their illegally lax banking controls and their provision of knowing, intentional, and substantial assistance to and facilitation of the illegal banking activities of Prince Bandar, and others.[6]

### E.    Procedural History

Plaintiff is a pension fund operated for the benefit of thousands of retired employees and their families and a long-term BAE shareholder.  ¶18.  Following the filing of its Complaint on September

---

[6]      In July 2005, Riggs and Joseph and Robert Allbritton also settled a multi-million dollar private class action brought on behalf of Riggs' shareholders alleging they engaged in acts of money laundering, wire fraud, and mail fraud in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1961 *et seq*.  According to the shareholder plaintiff, the illegally lax banking controls at Riggs caused a significant decline in the value of Riggs' stock resulting in its July 2004 merger with PNC.  *See Freeport Partners, L.L.C. v. Allbritton*, No. 04-2030 (GK), 2006 U.S. Dist. LEXIS 9710, at *2 (D.D.C. Mar. 13, 2006).

9, 2007, plaintiff served all defendants (except Paulo Scaroni) and sought and obtained an *ex parte* temporary restraining order prohibiting Prince Bandar from transferring proceeds from the sale of his U.S.-based real property out of U.S.-based accounts pending final resolution of this action and requiring that those funds be deposited pursuant to a prudent man standard. *In re BAE Sys. PLC Derivative Litig.*, No. 07-1646 (RNC), Temporary Restraining Order (D.D.C. Feb. 5, 2008) (Docket No. 44). On February 13, 2008, the Court entered plaintiff's and Prince Bandar's agreed-to preliminary injunctive relief stipulation. Joint Stipulation and Order Regarding Sales Proceeds from Sales of U.S. Real Property Owned or Acquired by Defendant Prince Bandar Bin Sultan (Docket No. 60) ("PI Stipulation").

Meanwhile, on January 31, 2008, nominal defendant BAE and the BAE defendants (except Paolo Scaroni) moved to dismiss on three grounds: (i) lack of personal jurisdiction; (ii) that English law applies and does not permit this action; and (iii) that D.C. presents an inconvenient forum warranting dismissal. On the same day, PNC/Allbrittons moved to dismiss: (i) challenging standing; (ii) claiming the aiding and abetting allegations were not adequately pled; and (iii) an raising an *in pari delicto* affirmative defense.

On March 12, 2008, after counsel for the parties met and conferred several times regarding the discovery sought, plaintiff moved for expedited discovery limited to personal jurisdiction to enable it to properly respond to BAE's motion for dismissal based on lack of personal jurisdiction. *See* Plaintiff's Motion for Expedited Discovery Limited to Personal Jurisdiction (Docket No. 66) ("PjX Mtn."). On April 3, 2008, the Court denied plaintiff's motion with leave to re-file if the Court denies defendants' other arguments for dismissal not based on personal jurisdiction.

## III.  DEFENDANTS HAVE NOT MET THEIR HEAVY *FORUM NON CONVENIENS* BURDEN

*In this District*,[7] while the decision whether to dismiss an action under the *forum non conveniens* ("*FNC*") doctrine is left to the sound discretion of the trial court, the doctrine "is nevertheless **limited** by the **heavy burden** of proof upon a defendant who moves the court for dismissal under this **procedural doctrine**."  *Cresta v. Neurology Center, P.A.*, 557 A.2d 156, 159 (D.C. Cir. 1989).[8]  Indeed, the doctrine has **no application where defendants' chosen forum offers no remedy at all**.[9]  Because the "'purpose of the doctrine of *forum non conveniens* . . . is to avoid litigation in a **seriously inconvenient forum**, rather than to ensure litigation in the most convenient forum,'" *Cresta*, 557 A.2d at 161 (emphasis in original), "the [court] must consider . . . the **private interest of the litigant** and the public interest."  *Asch v. Taveres*, 467 A.2d 976, 978 (D.C. Cir. 1983).

Putting aside defendants' and their "expert's" argument that the antiquated *Rule of Foss v. Harbottle* bars this action – a consideration which alone should render any English court inadequate

---

[7]     District of Columbia law governs *FNC*.  *Am. Dredging Co. v. Miller*, 510 U.S. 443, 454 n.4 (1994) (holding that *FNC* "is **not a substantive right** of the parties, but a **procedural rule** of the forum"); *Phillips v. China Airlines, Ltd*., No. 91-56026, 1993 U.S. App. LEXIS 3136, at *4 (9th Cir. Feb. 3, 1993) (law of the forum governs *FNC* analysis).

[8]     *See also Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 96 n.6 (D.D.C. 2003) ("on a [*FNC* motion to dismiss], **[defendant] bears the burden of making the preliminary showing that an adequate alternative forum exists**") (citing *El-Fadl v. Bank of Central Jordan*, 75 F.3d 668, 677 (D.C. Cir. 1996)); *KPMG Fin. Advisory Servs. Ltd. v. Diligence LLC*, No. 05-2204 (PLF), 2006 WL 335768, at *1 (D.D.C. Feb. 14, 2006) ("The defendant has the burden on **all aspects** of a motion to dismiss on *forum non conveniens* grounds, including the obligation to establish as a prerequisite that an adequate alternative forum exists.") (citing *Nemariam v. Fed. Democratic Republic of Etn.*, 315 F.3d 390, 392 (D.C. Cir. 2003)).

[9]     *See Nemariam*, 315 F.3d at 395 ("While a more limited recovery than is available in the plaintiff's forum of choice does not automatically make the alternative forum inadequate, we fail to see how an alternative forum in which the plaintiff can recover nothing for a valid claim may also be deemed adequate.").  A court should decline to exercise its jurisdiction only "'*if that court would be a seriously inconvenient forum*.'"  *Cresta*, 557 A.2d at 160 (emphasis in original).

– and the fact that no legal proceeding has been commenced in England – defendants do not submit to the English courts (*i.e.*, PNC/Allbrittons and Prince Bandar).[10]   The law in this Circuit expressly "require[s] that two alternative forums have jurisdiction over the subject matter and parties in the suit before the doctrine of forum non conveniens even comes into play." *Pain v. United Techs. Corp.*, 637 F.2d 775, 783-84 (D.C. Cir. 1980) "As a prerequisite, the court must establish whether an adequate alternative forum exists which possesses jurisdiction over the whole case." *Id*. at 784. Moreover, plaintiff's choice of venue must be shown great deference and is rarely disturbed.  "Next, the trial judge must consider all relevant factors of private interest, weighing in the balance a strong presumption against disturbing plaintiffs' initial forum choice.  If the trial judge finds this balance of private interests to be in equipoise or near equipoise, he must then determine whether or not factors of public interest tip the balance in favor of a trial in a foreign forum." *Id.*  Defendants must meet their **heavy FNC burden** by demonstrating the balance of the private and public factors: (i) ease of access of proof; (ii) availability and cost of obtaining witnesses; (iii) selection of forum; (iv) enforceability of judgment; and (v) burden of litigating matters not of local concern "**strongly favor**" dismissal.  *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947) ("[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should **rarely be disturbed**.").  That the action is styled derivatively is of no moment.[11]

---

[10]     *El-Fadl*, 75 F.3d at 678 ("[I]f the foreign forum would deny [the plaintiff] access to its judicial system on the claims in his complaint, dismissal on *forum non conveniens* grounds is inappropriate.").

[11]     *Koster v. (Am.) Lumbermens Mut. Casualty Co.*, 330 U.S. 518, 537 (1947) ("[m]ere inconvenience [to officers and directors in shareholder derivative action] is not enough"). To be sure, **Koster involved a choice between two U.S. fora** – not a U.S. and a foreign forum – and has been distinguished on this basis, citing the availability of cheap air travel between the U.S. and England. *See Thomson v. Palmieri*, 355 F.2d 64, 66 (2d Cir. 1966) ("witnesses employed by the defendant . . . [subject to] examin[ation] in the United Kingdom, by letters rogatory"); *Derensis v. Coopers & Lybrand Chartered Accountants*, 930 F. Supp. 1003, 1009 (D.N.J. 1996) ("*Koster* is readily distinguishable . . . because it involved a choice **between two United States forums . . . plaintiffs here have chosen a forum in the United States as opposed to a foreign forum, and the court finds that it is appropriate to give**

As defendants have not met their burden of establishing an adequate alternative jurisdiction exists, the presumption that plaintiff's chosen jurisdiction should not be disturbed ends the inquiry and the Court need not analyze the private and public factors.[12]  Nonetheless, plaintiff demonstrates they too compel retention of this action in this jurisdiction.

### A.    Defendants' Heavy Burden

Because defendants have failed to meet *their initial burden* that an adequate alternative forum exists, the Court need not even reach the so-called private and public factors.  *KPMG*, 2006 WL 335768, at *1 (collecting cases).  A forum is not adequate unless it possesses jurisdiction over the "*whole case*" and defendants were required to submit evidence (in the form of an affidavit) that each defendant agreed to submit to the courts of England to meet their burden of proof on *FNC*. *Nemariam*, 315 F.3d at 392; *Pain*, 637 F.2d at 784.  Despite that defendants bear the burden of proof on their *FNC* motion, not one of the eight U.S.-based defendants offered to submit to the jurisdiction of the U.K. courts – and none of the defendants agreed to waive statute of limitations or other procedural defenses that may arise under English law.[13]  In fact, the BAE defendants state they

---

*deference to that choice*."); *Bertozzi v. King Louie Int'l, Inc*., 420 F. Supp. 1166, 1173 (D.R.I. 1976) ("substantial inconvenience" not documented and "'this is simply not the kind of case where it is critically necessary to have ready access to a slew of voluminous and complex corporate and accounting documents'").

[12]     Defendants' *conjecture* that plaintiff is merely "attempt[ing] to pursue shareholder derivative claims that are unavailable in [BAE's] home jurisdiction" (BAE Brf. at 31) does not meet their heavy burden.  *See KPMG*, 2006 WL 335768, at *1 ("The defendant has the burden on *all aspects* of a motion to dismiss on *forum non conveniens* grounds." (citing *Nemariam*, 315 F. 3d at 392)).

[13]     Despite that the law defendants cite does not reach the *FNC* factors until "an alternative forum" is established, defendants have not – because they cannot – shown that any English court has jurisdiction over this case.  *See Nemariam*, 315 F.3d at 392 ("'As a prerequisite . . . an adequate [alternative] forum [must] exist[] which possesses jurisdiction over the *whole case*.'"); *Pain*, 637 F.2d at 784 (other forum must have jurisdiction over the "*whole case*" and all parties must submit to jurisdiction there); *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 242 (1981) (*defendants "agreed to submit to the jurisdiction of the Scottish courts and to waive any statute of limitations defenses that might be available*"); *Gulf*, 330 U.S. at 506-07 (doctrine presupposes that an alternative forum exists); *Creative Tech. v. Aztech Sys. PTE*,

"certainly do not concede that this Plaintiff or its claims would succeed in or **even be heard by an English court**."  BAE Brf. at 24.

In contrast, this Court arguably has jurisdiction over all defendants.  Conversely, Prince Bandar has been served with process and has appeared in these proceedings.  **Moreover, pursuant to the PI Stipulation, the Court has already obtained in rem jurisdiction over some of the spoils of the bribe payment conspiracy**.  As PNC/Allbrittons argued adamantly in their motion to dismiss that all of their conduct relevant to these claims occurred in this District (PNC Brf. at 11-12), in their reply to plaintiff's motion for expedited discovery and that they would be greatly inconvenienced by attending depositions in London, it is clear they will not willingly consent to jurisdiction there.  Similarly, after having reportedly issued significant threats to members of the English government to get them to stop the SFO investigation in 2006, Prince Bandar will not willingly submit to jurisdiction there and the English courts have not obtained *in rem* jurisdiction over the spoils of the bribe payment scheme.

As described in more detail below, defendants' *FNC* request ignores that "heightened deference should be given in the balancing of conveniences to an American citizen's choice of his or her home forum" and that plaintiff's "'home forum' as American citizens **is a United States court**." *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 146 (2d Cir. 2000).

Even assuming *arguendo* that defendants could prove the existence of an adequate alternative forum in England, defendants ignore **their** heavy burden to produce testimonial evidence on all five *FNC* factors.  Instead, they **imply** the English parties and witnesses might be unwilling/unavailable to testify here and simply declare that the "cost of transporting witnesses and the ability of the Court to obtain the attendance of witnesses likewise favors England."  BAE Brf. at 27.  However, such

---

61 F.3d 696, 701 (9th Cir. 1995) ("all parties . . . have submitted to the jurisdiction of the High Court of Singapore").

prejudice, if any, must be attested by an affidavit which "'provide[s] enough information to enable the District Court'" to evaluate defendant's chosen forum. *El-Fadl*, 75 F.3d at 677 (citing *Camejo v. Ocean Drilling & Exploration*, 838 F.2d 1374, 1379-80 & n.17 (5th Cir. 1988) ; *Mercier v. Sheraton Int'l, Inc.*, 935 F.2d 419, 425 (1st Cir. 1991) (holding *FNC* dismissal improper when "the affidavit through which [the defendant] attempted to meet its burden contains substantial gaps").[14]

Finally, as Judge Smith recognized in the BP Derivative Litigation, defendants cannot simultaneously argue that this case should be heard in England ***and*** that English law deprives plaintiffs of standing:

> ***In their pleadings, Defendants argue that the English courts are an adequate forum for the resolution of this case while simultaneously asserting that this action could not be brought under English common law, which allows for derivative suits only in extremely limited circumstances. Defendants also argue that the pending English corporate statutory law is not retroactive. Given the current uncertainty as to English law in this area, English courts do not constitute an adequate forum for Plaintiffs.***[15]

---

[14]     Any attempt to sandbag plaintiff by submitting the requisite affidavits on reply should be rejected.  It is improper for a movant to withhold purported evidence until filing a reply brief to which the opposing party (ostensibly) cannot respond.  *See Am. Library Ass'n v. F.C.C.*, 401 F.3d 489, 494 (D.C. Cir. 2005) (permitting opposing party to respond to materials submitted with party's reply brief in order to "prevent the sandbagging of opposing parties"); *Sengupta v. Univ. of Alaska*, 21 P.3d 1240, 1261 (Alaska 2001) (rejecting affidavits).

[15]     Ex. K at 8; *see also Kaiser-Georgetown Community Health Plan, Inc. v. Stutsman*, 491 A.2d 502, 507 (D.C. 1985) (affirming denial of defendant's *FNC* motion, noting that "had this case been dismissed on the grounds of *forum non conveniens*, the plaintiff's access to Virginia courts ***would not have been assured***, for ***appellants simultaneously argue that the Virginia statute of limitations bars this action***"); *El-Fadl*, 75 F.3d at 677 (noting that *FNC* dismissal "'would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute'"); *Nemariam*, 315 F. 3d at 393 (noting that "'the trial judge must finally ***ensure*** that plaintiffs can reinstate their suit in the alternative forum without undue inconvenience or prejudice'"); *Piper*, 454 U.S. at 254 (noting that "if the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is ***no remedy at all***, the unfavorable change in law may be given substantial weight; the district court may conclude that dismissal would not be in the interests of justice").  That plaintiffs have the right to a grievance process in England, as they and their "expert" contend, is on no moment.

**B.     The Balance of "Private" and "Public" Interests Weigh in Favor of Maintaining This Action in the District of Columbia**

"It unquestionably would be more efficient, from [defendants'] perspective, to dismiss this suit in favor of . . . London . . . [but] *the operative issue is not . . . conveni[ence] for defendants*, *but whether . . . litigating in this forum [is] vexatious or oppressive*." *Nat'l Union Fire Ins. Co. v. BP Amoco P.L.C.*, No. 03 Civ. 0200 (GEL), 2003 U.S. Dist. LEXIS 8432, at *27 (S.D.N.Y. May 20, 2003) (some emphasis in original).[16]   Defendants cannot meet this heavy *FNC* burden and, accordingly, this important shareholder derivative action should proceed in this Court.

**1.     Access to Proof**

That the Complaint's allegations are directed, in part, at BAE management does not mean "*the vast majority*" of evidence will be located at the corporate headquarters of BAE in London. BAE Brf. at 25.  Several defendants and potential witnesses have *no* connection to England and much, if not most, of the relevant documentary and testimonial evidence in this case will be found *in the U.S. and in D.C.* and where Congress and the DOJ investigated, and where court actions were filed against PNC, and where the $2 billion in illegal bribe payments passed through Riggs for over *20 years*.  This is not a situation where, as *Koster* described, "not a single fact provable by record or witness [can be found] within the district or state where [plaintiff] has brought suit" or where "every source of evidence to prove plaintiff's own case, as well as for defendant to disprove it, is in" England.  *Koster*, 330 U.S. at 526; *see also Harrods*, [1992] Ch. 72, at 39 ("nothing appears to turn on the details of the company's constitution").  There is no reason to believe more evidence is

---

[16]     English law is in accord: "[I]t is very important to remember . . . that '*conveniens*' is *not* adequately translated as 'convenient.'"  *In re Harrods (Buenos Aires) Ltd.*, [1992] Ch 72, at 13, 38 (granting *FNC* dismissal of shareholder action addressing an English company as "credibility" was a "significant matter" and all the "acts" and "witnesses" were in Argentina, not London).  All citations to English and U.K. cases are attached to the Appendix of Foreign Cases Cited in Plaintiff's Consolidated Opposition to Defendants' Motions to Dismiss filed concurrently herewith.  The page references to these cases correspond to the .pdf page number as there is no pagination within the documents.

located in the U.K. than in the U.S., Switzerland, Saudi Arabia, the Caribbean, South America, Tanzania, Romania, South Africa, Qatar, Chile and the Czech Republic. ¶¶132-133.  In fact, of all these locations, the U.K. is likely to have the least documentary evidence because, as alleged, when the U.K. adopted the OECD in 1997 (and implemented it in 1999), BAE's executives moved all bribe-payment related evidence out of England to avoid liability.  *Id.*

### 2.    Location of Witnesses

This factor weighs against dismissal as well.  The Federal Rules of Civil Procedure provide for the taking of deposition evidence abroad in a manner stipulated in writing by the parties, Fed. R. Civ. P. 29; on notice before a person authorized to administer oaths at the place of the examination, either under a local law or American law, Fed. R. Civ. P. 28(b)(1); or before a person specially commissioned by the court to administer the oath, Fed. R. Civ. P. 28(b)(2).  *See* 4 James W. Moore, *Moore's Federal Practice* ¶¶28.03-04, 28.03-06 (2d ed. 1979).  Depositions of unwilling witnesses may be taken pursuant to the provision in Fed. R. Civ. P. 28(b)(3) authorizing the issuance of letters rogatory.  As defendants point out, of the 31 total defendants named in this action, only 20 of them are residents of England.  BAE Brf. at 26.  This is hardly a case where, despite defendants' urging, England is "***clearly*** a more convenient forum than the District of Columbia."  *Id.*

Further, there is nothing showing that the cost of obtaining witness testimony would be greater if this case is litigated in this District, rather than in the England.  *See Thomson*, 355 F.2d at 66 (discounting defendant's "location of witness" argument by citing the availability of cheap air travel between the U.K. and New York).  Many of the key fact witnesses are either U.S. (and D.C.) residents or are BAE executive defendants who are U.S. residents and/or have significant U.S.

contacts.[17]  *See* Declaration of Mary K. Blasy in Support of Plaintiff's Motion for Expedited Discovery Limited to Personal Jurisdiction (Docket No. 66-2) ("Blasy Aff.").  Deposition testimony of certain BAE directors will likely be the only non-U.S.-based testimony.  Although many of the BAE director defendants are U.K. citizens, those with significant U.S. contacts will very likely have the most relevant testimony and their attendance at trial can be compelled.  In any event, they "can be examined in the United Kingdom, by letters rogatory enforced by comity accorded the United States court by United Kingdom courts."  *Thomson*, 355 F.2d at 66; *Reiman v. First Union Real Estate Equity and Mortg. Inv.*, 614 F. Supp. 255 (D.D.C. 1985) (some inconvenience to at least some parties would occur whether the case was litigated in D.C. or in the forum defendant preferred).

### 3.    Selection of Forum

Defendants' *FNC* dismissal request ignores that "heightened deference should be given in the balancing of conveniences to an American citizen's choice of his or her home forum" and that plaintiff's "'home forum' as American citizens *is a United States Court*."  *Guidi*, 224 F.3d at 146 n.3.  To be sure, as BAE defendants suggest, the Supreme Court in *Koster* limited the "home forum" preference rule in representative litigation, but *Koster* involved what now results in an intra-district *transfer* under 28 U.S.C. §1404, rather than the *FNC dismissal* to a foreign country sought.  *Koster*, 330 U.S. at 524-25; *see also* BAE Brf. at 25.  The Second Circuit found this distinction dispositive in *Guidi*, stating that "in a *forum non conveniens* case involving a foreign court, 'the "home forum" for the plaintiff is *any federal district in the United States*, not the particular district where the plaintiff lives.'"  *Guidi*, 224 F.3d at 147 n.4; *see also KPMG*, 2006 WL 335768, at *1 (noting that the court

---

[17]    *See* PjX Mtn. at 33.  There is no showing that the number of English witnesses will far exceed the number of American witnesses, or that the cost of transporting these witnesses to the U.S. would exceed the cost of transporting plaintiffs' witnesses to the U.K.

must weigh all relevant *FNC* factors "against the ***presumed validity of plaintiff's initial choice of forum***"). As such, plaintiff, a U.S. citizen, enjoys a strong presumption against *FNC* dismissal. *Id.*

Further, there is no related action currently pending in England or elsewhere and, according to defendants and their "expert," no such action could ever be brought there. In *Nat'l Union*, important **related** litigation was already pending in London, and while consolidation would have "ma[d]e things much easier" for BAE, *FNC* was still denied as "not . . . in the interests" of plaintiffs. *Nat'l Union*, 2003 U.S. Dist. LEXIS 8432, at *20. Where defendants have failed to "demonstrate[] any great hardship . . . 'that would adversely affect [their] ability to litigate this case' in the District of Columbia," *FNC* dismissal is inappropriate. *Liberty Mut. Ins. Co. v. Greenwich Ins. Co.*, 441 F. Supp. 2d 8, 13 (D. Mass. 2004), *aff'd*, 417 F.3d 193 (1st Cir. 2005) (quoting *Kotan v. Pizza Outlet, Inc.*, 400 F. Supp. 2d 44, 50 (D.D.C. 2005)).

Defendants' insinuation that this District is inappropriate (BAE Brf. at 22-32) should be disregarded. In *Cresta*, the court denied defendant's *FNC* motion even though ***all*** of the misconduct giving rise to the lawsuit occurred in Maryland and not in D.C., in part because the D.C. office of defendant corporation accounted for 13% of the company's gross income and because 35%-50% of the company's business was in D.C. *Cresta*, 557 A.2d at 159. Similarly, a tort "'***need not occur within a particular jurisdiction for that jurisdiction to be connected to the occurrence***.'" *Kaiser*, 491 A.2d at 507. "[W]hile the situs of an injury is a factor to be considered when applying the doctrine of *forum non conveniens*, it is not the sole determinant in our analysis." *Cresta*, 557 A.2d at 160. Here, plaintiff has alleged BAE's substantial contacts with D.C. and the U.S., and that the bribe payments were funneled through Riggs in this District for 20 years. Plaintiff has selected to prosecute this action in D.C. for good reason and that selection should not be disturbed.

Defendants' suggestion that the England's interest is "even more pressing given that Plaintiff's allegations concern the Al-Yamamah programme which is 'classified pursuant to the laws

of both the United Kingdom and the Kingdom of Saudi Arabia'" demonstrates the infirmity of their argument. ***This case*** is about the hundreds of millions – if not billions – of dollars of damage done to BAE here in the U.S., where the $2 billion in bribe payments were paid to Prince Bandar allegedly in violation of U.S. law (the FCPA), exposing BAE to immense reputational harm, hefty potential criminal fines and penalties, felony criminal conviction (or negotiated plea agreement) in the U.S., and possible disgorgement of bribe-tainted profits – which, if 50% of the Company's business is derived here in the U.S., must significantly exceed the business derived in England. *See* Supplemental Declaration of Mary K. Blasy in Support of Plaintiff's Reply in Support of Motion for Expedited Discovery Limited to Personal Jurisdiction (Docket No. 72-2), Ex. C. (noting that BAE has significant "home markets" in the U.S., South Africa, Sweden, the U.K., Australia and Saudi Arabia.  In fact, as alleged in ¶¶132-133, it is clear that defendants were attempting not to transact the illegal bribe payment transactions on English soil and that they were keeping the relevant records and conducting all the illegal transactions in the U.S., Switzerland, the Caribbean, and other remote locales to avoid being prosecuted in England.  These same defendants cannot be heard now to claim entitlement to having these claims tried in England.

Moreover, defendants do not show plaintiff chose to litigate this case in D.C. – where the $2 billion in illegal bribe payments passed through Riggs for 20 years while Prince Bandar resided here – "solely in order to harass the defendant[s]." *Piper*, 454 U.S. at 249 n.15; *Cresta*, 557 A.2d at 160 (noting that an absence of evidence of forum shopping is a factor weighing in favor of plaintiff's selected forum).  Plaintiff's selection of forum should be afforded its due deference.

### 4.    Enforceability of Judgment

That defendants do not even speculate that an English court would not recognize or enforce this Court's final judgment speaks volumes about their inability to meet their heavy burden of

demonstrating this Court's judgment would not be enforced there.[18]  If the Court concludes it lacks

jurisdiction, ***the case will not go forward***, but conjecture on this yet unresolved issue cannot meet

defendants' heavy burden.  Moreover, as defendants arguably violated the SSA to which BAE is a

party – and as 50% of BAE shareholders are in the U.S. and 50% of its revenues are derived here, it

is not at all clear London's approval is necessary for a binding judgment.

### 5. Burden on the District of Columbia

"It is no mere coincidence that this case is being heard in the District of Columbia." *Agudas*

*Chasidei Chabad v. Russian Fed'n*, 466 F. Supp. 2d 6, 29-30 (D.D.C. 2006).  "The District of

Columbia is the seat of the United States government, and is the location of various foreign

embassies." *Id.*  "There is a public interest in resolving issues of significant impact in a more central

forum, such as this one" (*id.*), especially where the bribe payments were arranged and paid around

the globe – rather than in England.  *See Gulf*, 330 U.S. at 509.  "Simply put, even if a substantial part

of the events in this case took place in [England – as defendants repeatedly urge –] that does not

preclude plaintiff from filing suit in the District of Columbia if a substantial part of the events took

place here, as well." *Modaressi v. Vedadi*, 441 F. Supp. 2d 51, 57 (D.D.C. 2006).  Because much of

the illegal conduct underlying this action took place in the District of Columbia – in violation of U.S.

and international laws – this District has a substantial interest in adjudicating these claims.  *Jaffe v.*

*Pallotta Teamworks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004) (citing *Lamphier v. Washington Hosp.*

---

[18]     *See generally Kakish*, 2005 Mich. App. LEXIS 3295, at *11-*12 ("The record reveals no
***evidence*** . . . that a Michigan judgment will be difficult to enforce."); *cf. Agudas*, 466 F. Supp. 2d at 29
("The defendants appear to be suggesting that this Court should divest itself of jurisdiction because if it
rules against the defendants, they may refuse to abide by its judgment.  Such an argument is an affront to
this Court and does not militate in favor of dismissal on the grounds of *forum non coveniens*."); *Dagen*,
2002 U.S. Dist. LEXIS 25767, at *58 (If defendants' "concern" that plaintiffs "would have difficulty . . .
enforcing any judgment," were "true," "one would think that [p]laintiff[s] would share this concern."
Furthermore, "because one of the key defendants . . . is a New York company, the claim . . . carries little
weight.").

*Ctr.*, 524 A.2d 729 (D.C. 1987)).   That this case involves one of the U.S.'s largest defense contractors operating pursuant to an SSA, BAE's global operations and one of the Company's largest defense contracts involving billions of dollars in bribes that were paid to Prince Bandar through Riggs in this District for a period of 20 years, militates forcefully against dismissal.[19]

Any burden imposed on D.C. by prosecution of this case here is far outweighed by the strong public policy interests this Court – and indeed, this Nation – has in adjudicating this important shareholder derivative action.   Given the potential FCPA violations underlying this action, the U.S. has a strong interest in seeing executives of BAE held to account.   Granting BAE's *FNC* motion – particularly at the insistence of the PNC/Allbrittons, obvious benefactors of such a dismissal – would be extremely prejudicial to the interests of BAE and its shareholders and should be denied.

## IV.   DISMISSAL FOR LACK OF STANDING UNDER RULE 12(b)(1) IS NOT WARRANTED

Defendants' attempt to end before it begins this important shareholder derivative action, based on an spurious claimed right of immunity under a legislatively-repealed procedural provision of English law, must be rejected.   *First,* plaintiff's standing to proceed derivatively in this action in the place of the BAE Board of Directors (the "Board") is governed by Fed. R. Civ. P. 23.1 and the plain language of the D.C. Code, neither of which discriminates against shareholders of foreign companies.   These standing requirements are met and the inquiry should end there.   *Second,* before

---

[19]     *Thomson*, 355 F.2d at 65-67; *Nat'l Union*, 2003 U.S. Dist. LEXIS 8432, at *28-*34 ("While the losses that gave rise to this lawsuit are dispersed all over the world, the conduct most directly at issue, defendants' alleged misrepresentations, took place in the United States. . . . [T]hat foreign law applies is not . . . sufficient to render London the more convenient forum.").   Public interest supports permitting U.S. shareholders to proceed with shareholder derivative actions relating to foreign companies having substantial U.S. operations, even if foreign law must be applied.   *See Norlin Corp. v. Rooney, Pace, Inc.*, 744 F.2d 255, 262 (2d Cir. 1984) (in derivative action brought on behalf of Panamanian corporation in New York, plaintiff "could proceed under New York law"); *Goldberg v. Meridor*, 567 F.2d 209, 214-21 (2d Cir. 1977) (derivative action on behalf of Panamanian corporation); *Schoenbaum v. Firstbrook*, 405 F.2d 200, 206-09 (2d Cir. 1968) (derivative action on behalf of Canadian corporation), *rev'd in part on other grounds en banc*, 405 F.2d 215 (2d Cir. 1968).

engaging in a full-blown conflict-of-law analysis, this Court must first ascertain that the English law defendants claim deprives this Court of standing is substantive (rather than procedural) and that the highest English tribunal would still apply it despite it having been legislatively repealed in 2006.  As the jettisoned, fuzzy old *Rule of Foss v. Harbottle* was a procedural device (not a substantive right) and contained the same "interests of justice" exception all equitable rules do, and where the express intention of the drafters of the 2006 Companies Act was to create a "'new derivative procedure with more modern, flexible and accessible criteria for determining whether a shareholder can pursue an action,'" the old *Rule* does not deprive plaintiff of standing.  Ex. M at 4.  ***Third,*** as defendants concede, the courts in this District (D.C. and federal) employ the Restatement (Second) Conflict of Laws (1971) "government interests" test to determine which locale has the stronger interest in seeing its law applied.  Notwithstanding that BAE is technically organized under U.K. law and ***presently*** headquartered in London, U.S. law, and specifically the law of this District, should apply here in the U.S. where (i) 50% of BAE's shareholders reside; (¶2), (ii) BAE is one of the largest defense contractors and one of the largest suppliers to the U.S. DOD (*id.*), (iii) the Company has operations in 36 states and generates some 50% of its annual revenues (*id.*), (iv) BAE has more operations in the U.S. than in any other single country, including billions of dollars of annual business with the Pentagon (*id.*); (v) BAE operates in the U.S. (and in this District) pursuant to a SSA (¶19), (vi) the alleged bribe payments were paid to Prince Bandar here in this District through accounts at Riggs (¶8), and (viii) the bribe payments allegedly violated the FCPA (¶11).  Clearly, the center of gravity of these claims is here in this District, and the U.S. has a substantial interest in seeing its own laws abided on its own soil – by executives of one of its primary defense contractors.  ***Fourth,*** if the Court decides to review plaintiff's standing under the *Rule of Foss v. Harbottle*, the procedural rules of this District and the applicable English protocol both require that the Court undertake its own factual assessment, conducting what is essentially a mini-trial of this preliminary issue, rather than resolving

disputed issues of fact in defendants' favor based on the dictates of their own "expert" before

plaintiff has been permitted to take discovery.  While defendants' "expert" improperly opines on the

application of English law (defined by him), plaintiff's own expert, Judge Paul Girolami Q.C.,

deputy High Court Judge in the Chancery Division, discusses what the law is rather than how he, as

a Judge would apply that law in Declaration of Paul Girolami Q.C. ("Girolami Decl.").

### A.     Plaintiff Has Standing Under the Plain Language of Rule 23.1 and the D.C. Code

The procedural requirements of Fed. R. Civ. P. 23.1 govern plaintiff's standing to proceed

derivatively in this District.[20]  Rule 23.1 provides that "when one or more **shareholders or members**

**of a corporation or an unincorporated association** bring a derivative action to enforce a right that

the **corporation or association** may properly assert but has failed to enforce," the shareholder need

only "allege that the plaintiff was a **shareholder or member** at the time of the transaction

complained of" to invoke standing.  Fed R. Civ. P. 23.1.

Even if the Court determined defendants' standing challenges are substantive (rather than

procedural), D.C. law applies.  This is a diversity action and the "breach of fiduciary duty" claims

are quintessential "common law torts."  ¶16; *see also Whelan v. Abell*, 48 F.3d 1247, 1250 (D.C. Cir.

1995).   "Because this case comes within the Court's diversity jurisdiction, it must look to the

---

[20]     *See Smith v. Sperling*, 354 U.S. 91, 95-98 (1957) (a district court should constrain its review to the "face of the pleadings and [to the] nature of the controversy" in resolving jurisdictional issues in derivative actions founded on diversity); *Saunders v. Hankerson*, 312 F. Supp. 2d 46, 67 (D.D.C. 2004) ("Fed. R. Civ. P. 23.1 sets forth the following **procedural requirements** for bringing a derivative action on behalf of an unincorporated association."); *Sax v. World Wide Press Inc.*, 809 F.2d 610, 613 (9th Cir. 1987) ("In federal courts, derivative suits are subject to the **procedural requirements** of Fed. R. Civ. P. 23.1.").  Defendants' reliance on D.C. Code §29-1058 is misplaced.  BAE Brf. at 8 n.4.  BAE is not a "foreign limited liability company" as defined under D.C. law as "an LLC resembles a partnership . . . with respect to **direct member control** of the business."  *HB Mgmt., LLC v. Brooks*, No. 04-LT-37313, 2005 D.C. Super. LEXIS 6, at *4 (D.C. Super. Ct. Feb. 1, 2005).  Instead, "PLC" means "public limited company."  Companies Act 2006, Ch. 46, §58 (Eng.) (Ex. L).  For purposes of this action, BAE is either a corporation or an unincorporated association.

substantive law of the District of Columbia in analyzing plaintiffs' claim of breach of common law

fiduciary duty."[21]   "Pleadings in derivative suits are governed by Super. Ct. Civ. R. 23.1" and

interpretations of its federal counterpart have "the force and effect of law" in the District.

*Behradrezaee v. Dashtara*, 910 A.2d 349, 355, 356 n.8 (D.C. 2006).

The "***plain language***" of the D.C. statutes addressing suits brought on behalf of corporations,

including their application to "foreign corporations," must be applied as written[22]:

> ***Each corporation shall have power***:

D.C. Code §29-101.04

---

[21]    *Avianca, Inc. v. Corriea*, 705 F. Supp. 666, 678 (D.D.C. 1989); *see also Joy v. Bell Helicopter Textron*, 999 F.2d 549, 553 (D.C. Cir. 1993) (applying D.C. substantive law to tort claim arising under the court's diversity jurisdiction); *Hendry v. Pelland*, 73 F.3d 397, 400-01 (D.C. Cir. 1996) ("District of Columbia law governed" breach of fiduciary duty claim brought against a D.C. lawyer concerning his representation of several Virginia state residents in Virginia state court, with jurisdiction based on diversity, and finding that the lawyer's "violat[ion of] one of the rules of the District of Columbia Code of Professional Responsibility was sufficient to support their claim that he violated his common law fiduciary duty"); *Merrill Lynch Pierce Fenner & Smith, Inc. v. Cheng*, 901 F.2d 1124, 1128 (D.C. Cir. 1990) (applying District of Columbia common law breach of fiduciary duty law in a diversity action against a D.C. broker by a Kentucky investor); *Int'l Cargo Mgmt. Specialists v. EG&G Dynatrend*, No. 91-1360 (NHJ), 1995 U.S. Dist. LEXIS 9577, at *38-*39 (D.D.C. Mar. 31, 1995) (holding in a diversity action for breach of fiduciary duties against customs specialists the "substantive law of the District of Columbia applies to this proceeding"); *Anderson v. Hall*, 755 F. Supp. 2, 5 (D.D.C. 1991) (applying D.C. law to action for "[n]egligent supervision" and breach of fiduciary duty against lawyers in a diversity action); *Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 740 F. Supp. 880, 881 n.1 (D.D.C. 1990), *rev'd* 940 F.2d 685 (D.C. Cir. 1991) (noting in a diversity action that a cause of action arising under D.C. law would also lie against the "D.C. non-profit corporation liable for breach of fiduciary duty").  *See also* Ex. K at 5 – applying Alaska choice of law in statute.

[22]    *In re England*, 375 F.3d 1169, 1170 (D.C. Cir. 2004) ("'It is well established that "when the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms."'"); *see also Stephens v. Nat'l Distillers & Chem. Corp.*, No. 91 Civ. 2901 (JSM), 1996 U.S. Dist. LEXIS 6915, at *14 (S.D.N.Y. May 21, 1996) (construing a similar New York statute to mean that "'[w]hen a foreign corporation comes into New York State and transacts its business there, it must yield obedience to its laws'" and ***applying New York law to breach of fiduciary duty claims brought against a Kentucky corporation***); *Caparos v. Morton*, No. 00 CH 14690, 2004 WL 5326432, at *5 (Ill. Cir. Jun 18, 2004) ("It would appear that by virtue of Section 901 of the Illinois Act, 805 ILCS 210/901, relating to foreign limited partnerships, matters relating to procedure with regard to derivative suits, and specifically with regard to who is a proper or necessary party in such suits, would be governed by Illinois law, rather than the law of the jurisdiction where the limited partnership was formed.").

*     *     *

***(2) To sue and be sued, complain and defend, in its corporate name*** . . . .

*A foreign corporation . . . shall . . . enjoy the same rights and privileges as, but no greater rights and privileges than, a domestic corporation . . . and . . . shall be subject to the same duties, restrictions, penalties, and liabilities now or hereafter imposed upon a domestic corporation* . . . .

D.C. Code §29-101.100

*[An action lies to remedy an unlawful] conveyance or transfer of real or personal property to or by a corporation [in which] lack of capacity or power may be asserted*.

*     *     *

***(2) In a proceeding by the corporation, whether acting directly or . . . through shareholders in a representative suit, against the incumbent or former officers or directors of the corporation*** . . . .

D.C. Code §29-101.07

Defendants concede the Restatement (Second) Conflict of Laws governs choice-of-law issues (*see* BAE Brf. at 7 (citing *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995))) and Restatement (Second) Conflict of Laws §309, specifically addressing directors' and officers' liability, invokes Restatement (Second) Conflict of Laws §6's general choice-of-law choice principles.  Restatement (Second) Conflict of Laws §309.  Restatement (Second) Conflict of Laws §6, in turn, expressly provides that: **"A court, *subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law*."**  Restatement (Second) Conflict of Laws §6.[23]

---

[23]     A statute may embody a controlling directive as to applicable law, even where it does not include an explicit reference to choice of law, so long as the legislation, or policy evidenced therein, reflects an intent as to choice of law.  *See* Restatement (Second) Conflict of Laws §6 cmt. b ("The court should give a local statute the range of application intended by the legislature when these intentions can be ascertained and can constitutionally be given effect. . . .  Provided that it is constitutional to do so, the court will apply a local statute in the manner intended by the legislature even when the local law of another state would be applicable under usual choice-of-law principles.").

In fact, D.C. common law has permitted the prosecution of shareholder derivative actions by shareholders of foreign corporations under its own law for nearly 60 years – probably because the claims are typically for breach of fiduciary duty, a general common law tort.  In *Mayflower Hotel Stockholders Protective Comm. v. Mayflower Hotel Corp.*, 173 F.2d 416, 423 (D.C. Cir. 1949), where the court held it would be "profitable to set out a few general principles believed to be universally accepted before undertaking analysis of the specific allegations of the [derivative] complaint," stating "[i]t is, of course, a fundamental principle that directors of a corporation occupy a fiduciary relationship to the corporation and its stockholders and must act in utmost good faith in managing corporate affairs." *Id.* at 418.  The court also noted that the "defendant, Mayflower Hotel Corporation, was incorporated under the laws of the State of Delaware in the year 1934 for the sole purpose of owning and operating the Mayflower Hotel in the City of Washington." *Id.* at 423.  The court confirmed two years later in *Mayflower Hotel Stockholders Protective Comm. v. Mayflower Hotel Corp.*, 193 F.2d 666, 668 (D.C. Cir. 1951), that the "internal affairs" doctrine presented no automatic bar:

> [I]t is seen that the action involves to some extent the internal affairs of a foreign corporation. In such circumstances the courts of another jurisdiction will not ordinarily interfere. . . . ***But there is a discretion*** . . . ***and we construe this court's action in deciding the merits of the prior appeal as a proper exercise of discretion to entertain the case in this jurisdiction***.

Similarly, in *Norlin*, 744 F.2d at 255, defendants invoked Panamanian law – the nominal defendant's state of incorporation – to defend a derivative suit.  Applying N.Y. Bus. Corp. Law §1319(a), which explicitly states that N.Y. Bus. Corp. Law §626, New York's shareholder derivative statute, applies to "a foreign corporation doing business in this State" (*Norlin*, 744 F.2d at 261 n.3), ***the Court held that because a New York resident brought its action in New York instead of***

*Panama, the New York derivative statute applied*.[24]  The court explained it "***need not discuss the fidelity of New York courts to the internal affairs rule at this juncture . . . because the New York legislature has expressly decided to apply certain provisions of the state's business law to any corporation doing business in the state, regardless of its domicile*.**"  *Norlin*, 744 F.2d at 261.

Again, issues may later arise in this action that compel the application of English law.  But plaintiff's standing to proceed is not one of them.  As ¶18 of the Complaint alleges, "Plaintiff City of Harper Woods Employees' Retirement Systems was at relevant times a stockholder of BAE," "currently owns approximately 3,500 BAE ADRs," "brings this action derivatively in the right of and for the benefit of BAE," and "will fairly and adequately represent the interests of BAE and its shareholders in enforcing the rights of BAE," plaintiff's standing to proceed derivatively under Fed. R. Civ. P. 23.1 and the D.C. Code has been established.

### B.    The *Rule of Foss v. Harbottle* Presents an Inapplicable Procedural Barrier at Best so No True "Conflict of Law" Has Been Presented

Even if the Court did not apply of the D.C. statutes and common law, that alone would not compel that the application of an antiquated procedural barrier that has been statutorily repealed in the U.K.  Instead, the Court must first ascertain that a true conflict of law exists, which is questionable in light of the 2006 legislative repeal of the *Rule of Foss v. Harbottle*, and then apply the choice of law principles of the jurisdiction in which it sits.  *See, e.g.*, *Stephen A. Goldberg Co. v. Remsen Partners, Ltd.*, 170 F.3d 191, 193-94 (D.C. Cir. 1999).  Simply stated, there is no "choice-of-law" to be made here.

---

[24]    *See also Mansfield Hardwood Lumber Co. v. Johnson*, 268 F.2d 317, 320-21 (5th Cir. 1959) (automatic deference to the law of the state of incorporation rejected); *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 427 (S.D.N.Y 2006) (applying the law of the forum); *Berkwitz v. Humphrey*, 130 F. Supp. 142, 145 (D. Ohio 1955) ("fact that Pennsylvania is the State of incorporation of the defendant does not enlarge or extend the right granted by the statute").

Even when the old *Rule* was still good law in England (before its repeal), determination of "the exceptions to the rule [had] been regarded as a ***procedural device***" and English courts never claimed ***exclusive jurisdiction*** to hear derivative claims concerning U.K. companies, but instead had deemed it desirable that shareholder actions be tried in the country where the underlying allegations took place, putting great emphasis on the "access to proof" in their own *forum non conveniens* analysis in international shareholder derivative jurisprudence.[25]

Moreover, defendants' lengthy dissertation on the *Rule of Foss v. Harbottle* is of course academic now as the remaining differences in U.S. and English derivative law hardly continue to warrant a choice-of-law analysis. The old *Rule* was legislatively repealed in 2006 and replaced by a statute that operates very similarly to this District's law. Now, "***[a] derivative claim . . . may be brought . . . in respect of a cause of action arising from an . . . act or omission involving negligence, default, breach of duty or breach of trust by a director of the company***," and that the "***cause of action may be against the director or another person (or both)***." Companies Act 2006, Ch. 46, §260 (Eng.) (Ex. L). This would be the same result if the D.C. rules, statutes and common law providing for shareholder derivative actions were applied here. Legislative intent to repeal the old *Rule of Foss v. Harbottle* is a significant factor to be considered in this Court's analysis of whether the highest tribunal in England would apply the old *Rule* in the instant action. *See Bernhardt v. Polygraphic Co.,* 350 U.S. 198, 211 (1956) ("[C]ourts do not always wait for legislation to find a judicial doctrine outmoded. . . . 'A steady legislative trend, presumably manifesting a strong social policy, properly makes demands on the judicial process.'"). The drafters

---

[25]        *See Konamaneni v. Rolls-Royce Indus. Power (India) Ltd.*, [2002] 1 All ER 979, at 12, 14 (noting the "the *lex fori*" theoretically provides the rule of law as to standing in derivative actions "on the basis that the right of shareholders to sue is a matter of procedure" and citing corporate law expert Gower as saying "that the basic rule in Foss v Harbottle is part of the law of civil procedure"); *Heyting v. Dupont*, [1964] 2 All ER 273, at 3 ("I dare say that the rule in Foss v. Harbottle . . . clearly . . . is a matter of procedure to be decided according to the law of this forum.").

of the 2006 Companies Act expressly intended to create a "new derivative procedure with more modern, flexible and accessible criteria for determining whether a shareholder can pursue an action." Ex. M at 4.  As defendants' own "expert" concedes, a fourth "interests of justice" exception to the old "rule in *Foss v. Harbottle*" has been recognized under English common law.  Declaration of Martin Moore QC (Docket No. 43-4) ("Moore Decl.") at 10 n.13[26]; *see also Nurcombe v Nurcombe*, [1985] 1 All ER 65, at 7 (the courts of equity permit the action if a technicality would lead to manifest injustice).  The old English derivative law contained an "interests of justice" exception and there is no reason to doubt it could be applied here, especially in light of the legislative purposes expressed in adopting the 2006 Companies Act.

## C.  The District of Columbia's Interest in Having Its Law Applied Outweighs that of England's

While defendants fail to cite the relevant D.C. law, they concede the Restatement (Second) Conflict of Laws governs choice-of-law issues.  *See* BAE Brf. at 7 (citing *Coleman*, 667 A.2d at 816).  As the federal D.C. Circuit Court of Appeals held in *Jaffe*, 374 F.3d at 1227, D.C.'s adherence to the Restatement is strong and applies equally to issues arising in tort and contract law.  Of

---

[26]     Mr. Moore correctly notes application of this fourth exception was drawn into question in *Prudential Assurance Co. Ltd. v. Newman Indus. Ltd.*, (No. 2) [1982] 1 Ch 204, with the court saying it was "not convinced [it was] a practical test, particularly if it involves a full dress-trial before the test is applied."  *Id.* at 13.  But in determining whether the highest court of England would apply the old Rule in this case, nearly two years post its legislative repeal in the U.K., clearly would not require a "full dress-trial" because the "interests of justice" militate strongly against applying a repealed procedural barrier to an otherwise meritorious suit.  Moreover, as Mr. Moore concedes, the implementation order of the 2006 Companies Act does not say the new liberalized derivative procedure cannot be applied to cases addressing pre-10/07 conduct, rather it simply requires that "the claim [be] allowed to proceed as a derivative claim only if, or to the extent that, it would have been allowed to proceed as a derivative claim under the law in force immediately before that date."  Moore Decl., ¶12; *see also* Girolami Decl., ¶11.

particular relevance to the issues presented in this action, Restatement (Second) Conflict of Laws §309, Directors' or Officers' Liability, provides[27]:

> The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders, ***except where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in §6 to the parties and the transaction, in which event the local law of the other state will be applied***.

Restatement (Second) Conflict of Laws §309.  Restatement (Second) Conflict of Laws §6 provides

that "the factors relevant to the choice of the applicable rule of law include:

(a)     the needs of the interstate and international systems,

(b)     the relevant policies of the forum,

(c)     the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d)     the protection of justified expectations,

(e)     the basic policies underlying the particular field of law,

(f)     certainty, predictability and uniformity of result, and

(g)     ease in the determination and application of the law to be applied."[28]

------

[27]     Particularly relevant here, where the Court has already been called upon to exercise its equitable powers, Restatement (Second) Conflict of Laws §55, Decree Affecting Thing in Another State, provides that:

> A state has power to exercise judicial jurisdiction to order a person, who is subject to its judicial jurisdiction, to do, or not to do, an act in the state, although the carrying out of the decree may affect a thing in another state.

Restatement (Second) Conflict of Laws §55.

[28]     The case summaries from the commentary to  Restatement (Second) Conflict of Laws §309 demonstrate that not all courts follow the "internal affairs" doctrine but instead apply the so-called "local law exception" to the internal affairs doctrine using the statutes of the forum states where foreign corporations do business. *See, e.g.*, *Schwarz v. Artcraft Silk Hosiery Mills*, 110 F.2d 465 (2d Cir.1940) (applying New York statute in action by stockholder and director of Delaware corporation against its officers for mismanagement and waste); *In re Burnet-Clarke, Ltd.*, 56 F.2d 744 (2d Cir. 1932) (applying New York statute in action by trustee in bankruptcy of Maryland corporation against its directors for

There is no "established hierarchy in the application of . . . [the] 'dizzying number of factors' made relevant by Restatement with little hint as to their relative weight."[29]  However, in "balanc[ing] the competing interests of the two jurisdictions, and apply[ing] the law of the jurisdiction with the more 'substantial interest' in the resolution of the issue," the federal D.C. Circuit has established a bright line rule that an issue that "directly affects [the forum's] ability, through its substantive tort law, to regulate . . . conduct within its borders" is *per se* "substantial."[30]  It is of no moment that BAE Systems Inc. is located in Rockville Maryland rather than precisely "in the District."[31]

---

improper purchase by corporation of its own stock); *German-Am. Coffee Co. v. Diehl*, 109 N.E. 875 (N.Y. 1915) (applying New York statute in action by New Jersey corporation against its directors for improper declaration of dividends); *cf. Saracco Tank & Welding Co. v. Platz*, 150 P.2d 918 (Cal. Ct. App. 1944) (permitting recovery by creditor of Nevada corporation against its directors for improper distribution of corporate assets under California statute which, however, predicated liability on an act unauthorized by the local law of the state of incorporation).  The U.S. Supreme Court has cited *German-Am. Coffee Co.* with approval to illustrate the power of a state to regulate matters pertaining to foreign corporations.  (*See Int'l Harvester Co. v. Wisconsin Dep't. of Taxation*, 322 U.S. 435 (1944)).

[29]     *Stephen A. Goldberg Co.*, 170 F.3d at 193; *see generally Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 337 (the "[i]nterest analysis is a 'flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation'") (2d Cir. 2005), *cert. denied*, 126 S. Ct. 2968 (2006).

[30]     *Jaffe*, 374 F.3d at 1227 (citing *Lamphier v. Washington Hosp. Ctr.*, 524 A.2d 729, 731 (D.C. 1987) for the proposition that "the District [of Columbia] has a strong and recognized interest in determining the liability . . . for negligence . . . that occurs within the District"); *In re Korean Air Lines Disaster*, 935 F.Supp. 10, 14 (D.D.C.1996) ("consideration of the factors in §6 convinces this Court that the United States law should govern these cases . . . 'application of United States law supports "ease in the determination and application of the law applied"'"); *Biscoe v. Arlington County*, 738 F.2d 1352, 1361 (D.C. Cir. 1984) ("'The state where the defendant's conduct occurs has the dominant interest in regulating it and in determining whether it is tortious in character.  Similarly, [it] will, usually at least, have the dominant interest in determining whether the interest affected is entitled to legal protection.'").

[31]     *Gaither v. Myers*, 404 F.2d 216, 223 (D.C. Cir. 1968) (Recognizing the special and largely unique interest the District has in protecting persons who live in the surrounding suburbs: "[T]o confine the benefits of the . . . rule to the territory ceded by the states of Maryland and Virginia to form the Nation's Capital would be to shun the present reality of the economically and socially integrated greater metropolitan area. . . .   District residents and businesses have an interest in the well-being of these citizens of the Free State.").

In fact, in *Herbert v. District of Columbia*, 808 A.2d 776, 779 (D.C. 2002), the court held that "[u]nder a choice of law analysis, this Court applies another state's law ***[only when (1) its interest in the litigation is substantial, and (2) 'application of District of Columbia law would frustrate the clearly articulated public policy of that state*.'"** Applying the four "governmental interest" factors, the Court found D.C. had the stronger interest because the relationship to the events was centered in D.C. *Id.* at 779-80. Noting that the "[d]ecedent's residence [was] the only factor in this analysis weighing against an otherwise straightforward analysis favoring the application of District law," the court affirmatively held that "residency is not dispositive of this analysis." *Id.* at 780.

Moreover, it is inconceivable that England has any "interest," much less a greater interest than the U.S., in having its law applied here. "When the policy of one state ***would be advanced*** by application of its law, and that of another state ***would not be advanced*** by application of its law, ***a false conflict appears and the law of the interested state prevails***." *Biscoe,* 738 F.2d at 1360. For obviously self-serving reasons, defendants argue that the U.K. has a stronger interest than the U.S. in seeing its law applied in this action. However, as recently emphasized in a judgment of the High Court of Justice, Queen's Bench Division Administrative Court, which reviewed the English Government's decision in December 2006 to prematurely terminate the SFO's investigation into the Al-Yamahama-related bribe payment scheme claiming it was ***not in England's interest*** to continue ***– even though BAE, and not Prince Bandar, was the target*** – there is simply no reason to believe that England has ***any interest it is presently willing to advance*** in connection with the conduct underlying this action. *See Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 587 F. Supp. 180, 191 (D.D.C. 1984) (in conducting an interests analysis, a court can presume "foreign jurisdictions have no interest in applying their law . . . if it would result in less protection to their nationals"). In fact, contrary to their arguments here, according to the High Court of Justice, the

BAE defendants emphatically told the British Government that its own "continued investigation [into these matters] would be ***contrary to the public interest***":

    1.     This is the judgment of the Court.

    2.     Between 30 July 2004 and 14 December 2006 a team of Serious Fraud Office lawyers, accountants, financial investigators and police officers carried out an investigation into allegations of bribery by BAE Systems plc (BAE) in relation to the Al-Yamamah military aircraft contracts with the Kingdom of Saudi Arabia. ***On 14 December 2006 the Director of the Serious Fraud Office announced that he was ending the SFO's investigation***.

    3.     In October 2005 BAE sought to persuade the Attorney General and the SFO to stop the investigation on the grounds that its continued investigation would be contrary to the public interest: it would adversely affect relations between the United Kingdom and Saudi Arabia and prevent the United Kingdom securing what it described as the largest export contract in the last decade. Despite representations from Ministers, the Attorney General and the Director stood firm. The investigation continued throughout the first half of 2006.

    4.     In July 2006 the SFO was about to obtain access to Swiss bank accounts. The reaction of those described discreetly as "Saudi representatives" was to make a specific threat to the Prime Minister's Chief of Staff, Jonathan Powell: if the investigation was not stopped, there would be no contract for the export of Typhoon aircraft and the previous close intelligence and diplomatic relationship would cease.

    5.     Ministers advised the Attorney General and the Director that if the investigation continued those threats would be carried out; the consequences would be grave, both for the arms trade and for the safety of British citizens and service personnel. In the light of what he regarded as the grave risk to life, if the threat was carried out, the Director decided to stop the investigation.

    6.     The defendant in name, although in reality the Government, contends that the Director was entitled to surrender to the threat. The law is powerless to resist the specific and, as it turns out, successful attempt by a foreign government to pervert the course of justice in the United Kingdom, by causing the investigation to be halted. The court must, so it is argued, accept that whilst the threats and their consequences are "a matter of regret", they are a "part of life."

    7.     So bleak a picture of the impotence of the law invites at least dismay, if not outrage. The danger of so heated a reaction is that it generates steam; this obscures the search for legal principle. The challenge, triggered by this application, is to identify a legal principle which may be deployed in defence of so blatant a threat. However abject the surrender to that threat, if there is no identifiable legal principle by which the threat may be resisted, then the court must itself acquiesce in the capitulation.

Ex. D.  Under circumstances identical to these, the D.C. Court of Appeals found that dispositive differences between D.C. and Virginia law presented such a "false conflict," and applied D.C. law after finding that while Virginia "undoubtedly had an interest in the welfare of its residents," "compl[iance] with [the Virginia] administrative prerequisite[]" could "in no sense be said to protect the interests of plaintiffs," so applying Virginia law *could not be said to "further that interest*." *Kaiser-Georgetown*, 491 A.2d at 504-11 ("It is undoubtedly true that *these defendants* would be better served were we to apply Virginia's Malpractice Act here.  *Nevertheless, the interests of the State of Virginia and of these defendants are not identical*.").[32]  Here too, the "interests tests" all parties agree applies must be employed to balance the interests of the U.S. and U.K. governments in seeing their respective law applied.  As exemplified in the language quoted from the High Court judgment above, the U.K. government has expressly denounced its "interest" in litigating the conduct underlying these claims, saying that investigating the bribe payment scheme undermines the U.K.'s public interest.  That the SFO investigation focuses on the BAE executives' potential criminal liability where this action focuses on their alleged breaches of fiduciary duty is a distinction without a difference – the subject conduct is the same.  Said another way, the U.K. government could have no greater interest in seeing the BAE defendants prosecuted for violating their fiduciary duties in

---

[32]     The *Jaffe* court also emphasized that a forum's interest in seeing its law applied is "not substantially diluted by the fact that" the relevant activities transpired across multiple jurisdictions, that contracts were executed outside the forum, or that a "non-resident" was the tort victim, recognizing that a forum "obviously has an interest in preventing non-residents from being negligently injured . . . within its borders." *Jaffe*, 374 F.3d at 1228 (as tortfeasors "presumably do not tailor the level of care they provide based on the residence of individual [victims,] the tort liability exposure they face toward non-residents will likely also influence the level of care they observe toward residents, and vice versa").  Analogous to the present situation where 50% of BAE's shareholders reside in the U.S. and 50% of its revenues are derived here, *Jaffe* held that the fact that the law of a forum other than the tort victim's residence was being applied was of little consequence where the "services provided" were being "performed mostly" in the forum whose law was being applied. *Id.*  Finally, *Jaffe* makes a strong point that where companies like BAE operate across multiple jurisdictions, and there is "nothing in the record [to] indicate[] that the [profits] are destined only to" London "and not at least in part to" the forum, "[i]t is impossible to gauge . . . whether the [other forum's] interest . . . is any more meaningful." *Id*. at 1229.

carrying out the bribe scheme than it professed in terminating the SFO investigation of the bribe scheme its officials deemed "contrary to the public interest" and a threat to the "the previous close intelligence and diplomatic relationship" between the "United Kingdom and Saudi Arabia." Ex. D.

Where, as here, U.S. law is alleged to have been violated, the U.K. has disclaimed any interest in prosecuting the relevant misconduct, and the misconduct occurred not just in London but in the U.S., Saudi Arabia, Maryland and D.C., the Restatement (Second) Conflict of Laws §309 factors strongly favor of applying D.C. law:

(a)   *The needs of the interstate and international systems*: Interstate and international systems must rely on corporations to be good corporate citizens. Laws which hold corporations liable for their wrongdoing facilitate the harmonious flow of commerce. The U.S. has a strong interest in seeing the FCPA policies enforced as rigorously against executives of foreign corporations as they would be against executives of domestic corporations, as evidenced by the 1998 amendments to the FCPA to extend coverage to foreigners to keep U.S. companies on a level playing field.[33]   The U.S. also has a strong interest in seeing claims against bank executives prosecuted where they are readily subject to the court's jurisdiction and their assets and the evidence is accessible.  Finally, that Prince Bandar purportedly threatened the English Government (and its constituency) in unison with BAE executives – the targets of the investigation – demonstrates *per force* the U.S. cannot turn a blind eye.

---

[33]     The FCPA was amended in 1998 by the International Anti-Bribery Act of 1998 (Pub. L. 105-366, 112 Stat. 3302, enacted 1998-11-10) which was designed to implement the antibribery conventions of the Organisation for Economic Co-operation and Development.  The antibribery provisions of the FCPA make it unlawful for a U.S. person, and certain foreign issuers of securities, to make a payment to a foreign official for the purpose of obtaining or retaining business for or with, or directing business to, any person. Since 1998, they also apply to foreign firms and persons who take any act in furtherance of such a corrupt payment while in the U.S.

(b) **The relevant policies of the forum**: D.C. has a strong interest in seeing its prohibitory law applied, including banking regulations and anti-corruption laws. *See, e.g.*, *LaSala v. Bank of Cyprus Pub. Co. Ltd.*, 510 F. Supp. 2d 246, 265 (S.D.N.Y. 2007) ("The reputability of the country's banking system is intimately connected to the effectiveness of the country's regulation of its banks, and it has a stronger interest in policing its financial system than does [another forum] in ensuring that [its currency is] not laundered abroad to the detriment of" the shareholders of a company headquartered in another forum.).

(c) **The relevant policies of other interested states and the relative interests of those states in the determination of the particular issue**: While England does have an interest in policing the internal affairs of its corporations, D.C.'s interest here is dominant, as its laws were broken and its banking integrity was compromised as a result of the misconduct. Moreover, if defendants are to be believed, the corporate law of England currently would not allow these actions to proceed. The legislative and public policy of England is undergoing change as reflected by the 2006 Companies Act. English courts have not had an opportunity to interpret the applicability, but defendants argue that it is definitely not retroactive. Regardless of whether the statute could be judicially preempted by the U.K.'s highest tribunal, D.C. has a significant interest in the management of BAE when those decisions detrimentally impact the nature and quality of conduct carried out in D.C., and the U.S. has a particularly strong interest in seeing its law applied by companies operating on its soil in its defense industry – so strong an interest that the SSA "calls for the appointment of outside directors who, in conjunction with other U.S.-based board members, comprise a Government Security Committee" that "has the responsibility for overseeing the Company's compliance with U.S. Government security and export regulations and meets regularly with U.S. Government defense officials." ¶19. As the *Kaiser-Georgetown* court recognized: where "plaintiff's access to [England's] courts . . . have [not] been assured, for [defendants] simultaneously

argue that [the Rule of *Foss v. Harbottle*] bars this action," D.C. law should apply.  *Kaiser-Georgetown*, 491 A.2d at 505-06.

        (d)      ***The protection of justified expectations***: The SSA "between the U.S. Government, BAE-USA and BAE" mandates oversight of BAE's "compliance with U.S. Government security and export regulations . . . [which] allows BAE to supply products and services to the U.S. Department of Defense (DOD), Intelligence Community and Homeland Security on some of our Nation's most sensitive programs." ¶19.  Some 50% of BAE's shareholders are located here and 50% of its revenues are derived here.  The bribes were paid to Prince Bandar here. The D.C. Code applies, on its face, to foreign corporations.  BAE and its subsidiaries have availed themselves of the laws of D.C. and could justifiably expect to be held accountable under the same laws which have allowed them to make substantial profits in this country.  As such, BAE's executives "can hardly be surprised that [U.S. and/or D.C.] law governs" and they too "could justifiably expect to be held accountable under the same laws which have allowed them to make substantial profits in this [country and District]." Ex. K at 5 (BP Order).

        (e)      ***The basic policies underlying the particular field of law***: *See* Restatement (Second) Conflict of Law §6.  "If the purposes sought to be achieved by a local statute or common law rule would be furthered by its application to out-of-state facts, this is a weighty reason why such application should be made." *Id.*, cmt. (e).  One of the purposes of D.C. Rule 23.1 (and the D.C. derivative case law) is to allow shareholders of a company, on behalf of that company, to redress alleged wrongdoing which harmed it.  That purpose should be honored when considered together with the above public policy factors.

        (f)      ***Certainty, predictability and uniformity of result***: This case is for breach of fiduciary duties, not for violating (or not violating) the *Rule of Foss v. Harbottle*. As the old procedural *Rule* was legislatively jettisoned in the U.K. in 2006, there is no "certainty, predictability

[or] uniformity" to be achieved by applying the old *Rule* here.  Restatement (Second) Conflict of Law §6.

(g)  ***Ease in the determination and application of the law to be applied***: The federal courts of this District, located in the nation's capital, have the most experience and are arguably the best equipped to adjudicate cases with international implications.  The U.S. capital is located in this District as are the SEC, the DOJ and the DOD, all potentially relevant federal agencies.  As such, the District has a well developed body of law available to it.  English law is readily available on Lexis and Westlaw, and forms the basis of our own common law, including the torts of breach of fiduciary duty.

Furthermore, because the claims alleged in this action did not occur ***just in England***, or ***just in Saudi Arabia***, or ***just in Switzerland*** or ***just in the U.S.***, but instead are alleged to have occurred around the globe (¶¶14, 132-141), the fact that the bribe payments were made to Prince Bandar here in this District, while he resided in this District, allegedly in violation of U.S. law, and because the U.S. has a substantial interest in seeing that its own laws are abided on its own soil – here by executives of its own defense contractors – the nexus of these claims is in this District and the law of D.C. applies.[34]  *See, e.g.*, Ex. K at 5 ("While England does have an interest in policing the internal

---

[34]      *See also Demoulas v. Demoulas Super Mkts., Inc.*, 424 Mass. 501, 511 (1997) (applying local law exception to the internal affairs doctrine where the claims involved occurrences that all took place in that forum, noting the internal affairs doctrine is rejected "***where, on a 'particular issue' another State has a more 'significant relationship'***"); *Goya Foods, Inc. v. Unanue*, 233 F.3d 38, 43 (1st Cir. 2001) (applying local law exception to claims arising out of a corporations' alter ego's conduct in the forum). ***For the same reasons, "in this case we should follow the exception stated to §309 rather than the basic rule stated in that section***."  *Francis v. United Jersey Bank*, 162 N.J. Super. 355, 368-69 (Law Div. 1978), *aff'd*, 171 N.J. Super. 34 (App. Div. 1979) (applying New Jersey law to shareholder litigation concerning New York corporation where, among other things, all of the transactions occurred in New Jersey and there were relevant legal proceedings taking place in New Jersey).

affairs of its corporations, Alaska's *interest here is dominant, as it is the situs of the consequences of Defendants' alleged wrongdoing*.").

Not only does D.C. have the greatest concern with specific issues raised in the litigation, but this is one of those rare situations where application of English law would frustrate the clearly-articulated public policy of the U.S. The officers and directors of companies that choose to operate in the U.S. choose obey U.S. laws – especially when they sign onto SSA's and rely significantly on business with the U.S. defense industry. In fact, unlike the cases relied upon by defendants,[35] the allegations underlying this action involve one of the most sensitive and compelling issues confronting the international community, the U.S. and, in particular, D.C.: preventing corporate executives from benefiting by violating the anti-corruption laws, either directly by boosting their

---

[35]     Once the Moore Decl. is properly disregarded, defendants' entire argument rests upon ten readily distinguishable decisions, none of which are from this District: (i) *In re Tyco Int'l, Ltd.*, 340 F. Supp. 2d 94, 102 (D.N.H. 2004) (it was "*undisputed* that" the defendant board was "*aggressively prosecuting*" the would-be derivative claims on its own, negating "wrongdoer control"); (ii) *Seghers v. Thompson*, No. 06 Civ. 308 (RMB) (KNF), 2006 U.S. Dist. LEXIS 71103, at *1-*2 (S.D.N.Y. Sept. 27, 2006) (parties agreed the case was governed by *Foss v. Harbottle*)(iii) *Feiner Family Trust v. VBI Corp.*, No. 07 Civ. 1914 (RPP), 2007 WL 2615448, at *6-*7 (S.D.N.Y. Sept. 11, 2007) (parties agreed the case was governed by *Foss v. Harbottle*); (iv) *In re BP p.l.c. Derivative Litig.*, 507 F. Supp. 2d 302, 309 (S.D.N.Y. 2007) (specifically finding BP "*[did] not conduct business in New York*, and most of the events at issue *took place outside of New York*" and expressly recognizing that the motion to dismiss in the Alaska BP Derivative Litigation had been denied; (v) *Winn v. Schafer*, 499 F. Supp. 2d 390, 393 (S.D.N.Y. 2007) (parties agreed the case was governed by *Foss v. Harbottle*); (vi) *Seybold v. Groenick*, No. 06 Civ. 772 (DLC), 2007 WL 737502, at *6 (S.D.N.Y. Mar. 12, 2007) (Dutch law applied which *never* affords shareholders the right to sue derivatively); (vii) *Hbouss v. Coca-Cola Enters., Inc.*, No. 05 Civ. 7965 (DLC), 2006 WL 2285598, at *2, *4 (S.D.N.Y. Aug. 9, 2006) (where parties "*[did] not dispute*" that Quebecois law applied and where the dispute centered around the *unique Quebecois bankruptcy procedures* requiring plaintiff to request the bankruptcy trustee to bring suit or, if the trustee refused, to request permission from the bankruptcy court before proceeding derivatively); (viii) *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 363 (S.D.N.Y. 2006) (where plaintiff in a securities fraud action against an English company brought a tag along derivative claim and did not even attempt to meet the pleading requirements of Fed. R. Civ. P. 23.1); (ix) *Locals 302 and 612 of Int'l . Union of Operating Engineers – Employers Constr. Indus. Ret. Trust v. Blanchard*, No. 04 Civ. 5954 (LAP), 2005 WL 2063852, at *3-*4 (S.D.N.Y. Aug. 25, 2005) (Canadian statutory rather than common law applied); (x) *Polar Int'l Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 116 (S.D.N.Y. 1999) (where the company had no significant contacts with New York, so New York had no substantial interest in the action).

own incentive-based pay and cash bonuses based on the short-term profits they create – or by avoiding personal liability where they control the corporate machinery and can simply employ it to cause the corporation to bear the brunt of any civil or criminal penalties resulting from their own misconduct.  Far from being a remote area of non-interest to the U.S., BAE's corporate governance is an area of prime importance as reflected the SSA's requirement that the BAE Board be populated with U.S.-based directors who routinely meet with the DOD and are charged with ensuring BAE's "compliance with U.S. Government security and export regulations" that in turn "allows BAE to supply products and services to the U.S. [DOD], Intelligence Community and Homeland Security on some of our Nation's most sensitive programs."  ¶19.  In fact, if defendants and their lawyers were correct in arguing that plaintiffs' claims are barred under English law, this is all the more reason not to discuss *forum non conveniens*, but instead to apply the public policy exception to the internal affairs doctrine.

> **D.** **The Application of English Law Would Not Abrogate Plaintiff's Standing Here**

>> **1.** **Mr. Moore's Declaration Is Inadmissible to Controvert Plaintiff's Standing Allegations**

Mr. Moore is an English barrister who: (i) admittedly served as a legal advisor to defendants during the relevant period; and (ii) is still gainfully employed by defendants in connection with this matter.  *See* Moore Decl., ¶¶3-4, 7.  Despite the obvious conflict of interest, defendants have chosen to submit Mr. Moore's legal arguments in the form of an "expert declaration" rather than adding him to their caption and arguing his points in their legal brief.  Mr. Moore's declaration should be rejected as an inappropriate attempt to use expert testimony to decide the application of English law, the sole province of this Court.

> It is well settled in this jurisdiction that to warrant the use of expert testimony the subject dealt with ***must be so distinctively related*** to some science, profession, business or occupation as to be ***beyond the ken of the average layman***, and second, [t]he witness must have such skill, knowledge or experience in that field or calling that his opinion will probably aid the trier in his search for truth.

*Waggaman v. Forstmann*, 217 A.2d 310, 311 (D.C. 1966).  "It is equally well established that where the trier of facts is as competent as an expert to consider and weigh the evidence and to draw conclusions therefrom, it is improper to use expert testimony."  *Id.*  The Court and the scores of lawyers involved in this case are all conversant in English and capable of reading and applying English common law – upon which all U.S. and D.C. law is based.  A Louisiana judge held in adjudicating a *forum non conveniens* motion involving an English company, where, as here, (i) defendants attempted to garner support for their interpretation of the law by submitting what was tantamount to legal argument in the form of an expert "opinion"; (ii) "[t]he parties do not agree what law will be applicable to th[e] matter"; (iii) "[u]nder no circumstances will the entire case be decided solely under the laws of England should the matter remain in this forum as plaintiffs have alleged causes of action arising under state law"; (iv) "[a]s to the pertinent contacts of each state to the parties – there are potentially three states involved, England as to [BAE] and [Delaware] with respect to" BAE Systems Inc. (BAE's U.S. operating subsidiary) and D.C. as to PNC and the Allbrittons; and (v) "th[e] Court is familiar with [D.C.] law and to some extent the common law of [Delaware] and the law of those states will predominate," there is simply no need to admit expert testimony on English common law and defendants' expert "opinion" of the law may properly be ignored.

> *In the event that the Court would have to apply English law in resolving some of the issues, this problem is not significant*.  The Court has reviewed the affidavit[s] of the English barrister produced by the defendant and is confident that *should English law be applicable, the Court would not encounter any vast difficulties considering that there is no problem with translation and that the common law of the United States was generally derived from the English law*.

*Endotech USA v. Biocompatibles Int'l PLC*, No. 00-0957 Section "K" (5), 2000 U.S. Dist. LEXIS 18623, at *17-*20 (E.D. La. Oct. 24, 2000).  As the fact-finder in this case is also a learned judge capable of applying English common law, there is simply no need to admit expert testimony on what English case law says – all of which is readily available on Westlaw and Lexis.

Courts asked to accept **contested** expert "opinions" on English law consistently refuse to admit their, especially where, as here, the opinions are submitted in support of a motion on the pleadings **before the parties have been afforded an opportunity to depose each other's experts**:

> *The Court need not reach the merits of Taylor's choice-of-law argument at this time. Taylor relies on declaration evidence that may or may not be contested to establish what the result would be in this case under English law.  However, a motion to dismiss for failure to state a claim is judged on the pleadings, not declarations such as Taylor has provided to the Court.*[36]

### 2.    The Procedural Aspects of the *Rule of Foss v. Harbottle* Must Be Adhered to Should the Court Decide to Apply the *Rule*

In D.C., "'the defendant in a derivative action has the burden of demonstrating that the plaintiff is an inadequate representative,'" which is essentially what the *Rule of Foss v. Harbottle* attempts to address.  *Levant v. Whitley*, 755 A.2d 1036, 1049 (D.C. 2000).

Yet, feigning an incredulous confusion over which standard governs their challenge to plaintiff's standing – Rule 12(b)(1) or Rule 12(b)(6) (*see* BAE Brf. at 5-6) – the BAE defendants wrongly invite the Court to apply Rule 12(b)(6).  However, where, as here, "[t]he motion expressly and exclusively states that the defect presented . . . is want of standing," the law of this Circuit recognizes that defendants "unambiguously [seek] dismissal . . . pursuant to Rule 12(b)(1)." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).  In this context, "[t]he distinctions between 12(b)(1) and 12(b)(6) are important and well understood." *Id.*  Resolution of the former "presents a ***threshold challenge*** to the court's jurisdiction," while resolution of the latter "presents a ruling on the merits with *res judicata* effect." *Id.*  As such, in Rule "12(b)(1) proceedings, it has been long accepted that the judiciary may make 'appropriate inquiry' beyond the pleadings to 'satisfy itself on authority to

---

[36]     *Adler v. Taylor*, No. 04-8472-RGK (FMOx), 2005 U.S. Dist. LEXIS 5862, at *13-*14 (C.D. Cal. Feb. 2, 2005); *see also Johnson v. Johnson*, 676 So. 2d 458, 460 n.2 (Fla. Dist. Ct. App. 1996) (denying motion to dismiss and invitation to apply the disputed English law suggested by defendants' "expert," holding that "[i]f Barrister Scott's opinion of English law pertaining to notice and jurisdiction is correct, which we doubt, it would provide additional cause to celebrate the Declaration of Independence").

entertain the case.'"  *Id.*  But under Rule 12(b)(1), the confines of the "appropriate inquiry" are dictated by the Court, not by defendants:

> "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. . . . ***At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing***. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed."

*Id.* (citing *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975)).  While the *Haase* court was clear that matters outside the complaint may be consulted, ***if presented by plaintiff***, the Court was equally clear that if ***defendants*** intend to challenge standing relying on affidavits and other matters outside the complaint, ***they*** must do so in a summary judgment motion, ***not on a motion on the pleadings***. *See id.* ("'the impropriety of transforming Rule 12(b)(1) motions into summary-judgment motions is well-settled,'" but the "absence of the conversion feature in 12(b)(1) does not preclude a defendant from challenging standing via a motion for summary judgment") (original emphasis omitted).

Attempting to avoid the obvious procedural due process defect that would ensue if the Court accepted at face value and weighted the ***legal arguments*** made by the BAE defendants' English law advocate in his declaration to resolve disputed issues of law and fact in their standing challenge, defendants claim such an approach is permissible here – despite clearly relying on materials and "facts"[37] outside the four corners of the Complaint to challenge plaintiff's standing – because BAE is an English company and "there is no reported precedent in this District discussing the applicability of Rule 12(b)(1) in the context of standing to bring a shareholder derivative claim[] governed by

---

[37]     In his declaration Mr. Moore applies defendants' adversarial version of the law to the facts defendants have been willing to publicly divulge thus far, though couching that application in terms of the "Complaint does not sufficiently allege" this or "there is no suggestion in the complaint [of] that," ***where there has been no discovery yet***. *See* Moore Decl., ¶¶39, 42, 45, 49, 52, 54-55, 57, 58-61, 62-64, 70-71, 73-74, 80-81.

foreign law." BAE Brf. at 6 n.3.[38]  A closer inspection of *Haase* exposes defendants' true motive

here: if governed by a Rule 12(b)(1) standard, defendants' complex, mixed law and fact standing

challenge must be raised in a summary judgment motion, where plaintiff is entitled to discovery to

respond:

> As a general matter, ***a plaintiff's standing to pursue a claim rests on the theory of
> injury presented in the complaint and the facts alleged in support of the claim***. If
> ***the claim*** is ***logically defective*** in some manner, the court is obliged to dismiss the
> action and to do so no matter when the defect is brought to the court's attention.

*Haase*, 835 F.2d at 907.   Instead of simply attempting to argue plaintiff's ***claim*** is somehow

"logically defective," because it is not, defendants improperly attempt to prevail on disputed issues

of law and fact by cloaking their legal arguments in the robe of an "expert declaration" that

improperly intrudes upon matters neither "presented in the complaint" nor "alleged in support of the

claim." *Id.*  But *Haase* requires more where defendants argue disputed issues of fact:

> ***To the extent the assessment turns on factual evidence***, the court may consider all
> matters developed in the record at the time of its decision.  ***At this stage, however,
> the plaintiff is protected from an evidentiary attack on his asserted theory by the
> defendant***, just as the defendant is protected from compulsory discovery.  This is the
> meaning of the many Supreme Court decisions emphasizing that the standing inquiry
> turns on the allegations in the complaint. . . .   Directed discovery cannot be allowed
> when the focus is on the logical sufficiency of the complaint.  ***The plaintiff is the
> beneficiary of this rule as he can freely augment his pleadings with affidavits,
> while the defendant is barred at this stage of the proceedings from attacking the
> claims made therein.  Assuming the theory presented in the complaint is not itself
> inherently flawed, the standing inquiry is ordinarily now complete***.
>
> . . . The option remains with the defendant and, in any event, with the court to test the
> asserted theory of injury, causation, and redressability at the factual, evidentiary
> level.  ***The defendant can force this inquiry by filing a motion for summary***

---

[38]     Defendants attempt to argue that *Haase* does not apply because it arose in the "context of actions
seeking declaratory or injunctive relief," BAE Brf. at 6 n.3.  but this is non-sensical.  Within the very
same footnote they cite *Grand Lodge of the Fraternal Order of Police v. Ashcroft,* 185 F. Supp. 2d 9, 13
(D.D.C. 2001), which cites *Haase* for the proposition that the "'defect of standing is a defect in subject
matter jurisdiction'" and held "[t]herefore, the court will confine its consideration to the 12(b)(1) motion
to dismiss.'"  Conversely, defendants cite no authority for the proposition that a Rule 12(b)(6) standard is
appropriate.

> *judgment for want of standing. Alternatively, the court can initiate this factual inquiry at the motion to dismiss stage. In this latter case, the court will then explicitly base its standing decision on its assessment of the facts*. . . .
>
> *[However,] [o]nce the inquiry moves into this latter, fact-based stage, discovery by the parties must be allowed subject to whatever defenses and privileges a party can properly assert in response to the discovery process*.[39]

*Id.* (some emphasis in original).

As such, even if, as defendants urge, the Court were required to apply draconian procedural aspects of English law, including the outdated and spurious *Rule of Foss v. Harbottle* (which was legislatively repealed in England in 2006), the Court would first be required to resolve several disputed issues of fact defendants' own expert (Moore) concedes are relevant, including:

- Whether there is any reasonable chance that the alleged wrongs are "capable of ratification by ordinary resolution of the shareholders" upon full and frank disclosure of the misconduct (as required[40]);

- Whether the making of bribe payments was "outside the scope of the directors' powers because . . . they act[ed] from some improper motive";

- Whether there is any reasonable chance that the "past transaction" of paying bribes would "be ratified by a special resolution" of BAE's shareholders "upon full and frank disclosure" (as required);

- Whether plaintiff's claims amount to a "transaction which is '*ultra vires*' in the sense that it is prohibited by the 1985 Act or 2006 Act";

- Whether the making of the bribe payments was "clearly capable of being within the objects specified in [BAE's] memorandum";

- Whether the alleged "wrong enabled the defendants to make a profit at the expense of the company";

---

[39]   *Plaintiff has not obtained any discovery on the standing issue*.  "In considering standing under 12(b)(1), only the court, not the plaintiff (or defendant), can elicit information outside the pleadings. This permits the court to undertake an independent investigation to assure itself of its own subject matter jurisdiction. At the same time, it protects both plaintiff and defendant from burdensome and unnecessary discovery at a premature stage of the proceedings."  *Id.* at 908.

[40]   English case law clearly dictates ratification under the *Rule of Foss v. Harbottle* does not come into play unless "full and frank disclosure" on the matters shareholders will be asked to ratify is being provided.  *See* Robin Hollington Q.C., *Shareholders' Rights* (5th ed. 2007) (hereinafter, "Hollington's Treatise") §6-09, at 129; *Bamford v. Bamford*, [1970] Ch. 212 (Eng.).

- "[W]hether the Defendants can exercise control over BAE PLC in general meeting"; and

- Whether there is a "necessary causal link between the 'false and misleading' statements [contained in pages 2-40 and 66-67 of BAE's 2006 Annual Report to Shareholders] and the loss alleged in the Complaint" sufficient to state a cause of action for relief under §463 of the 2006 Companies Act.[41]

Because defendants' standing challenge raises more factual questions than it answers, and because "determinations of foreign law" should "be resolved at summary judgment," defendants must either "force this inquiry by filing a motion for summary judgment for want of standing" or "the court can initiate this factual inquiry [and] explicitly base its standing decision on its assessment of the facts." But because defendants' and their "expert's" conjecture requires the Court to do far more than determine plaintiff's "claim is logically defective in some manner," the dismissal on the papers defendants seek is not warranted.[42]

In fact, as Hollington describes in his Treatise in the section detailing the application of the *Rule of Foss v. Harbottle* and the "Procedure" that is implicit in its application, the following protocol must be followed during the Court's assessment:

(1)  The aggrieved shareholder issues a claim form. . . .  [T]he claim should be as *fully pleaded and particularised as circumstances permit, although it may be possible in the evidence to be filed in step (3) below to make good any deficiencies in the statement of case. . . .  It will often be the case that the claimant has only limited information at the outset.  An application for pre-action disclosure . . . may . . . need to be considered* . . . .

(2) The claimant applies to the court . . . for permission to continue . . . that he ought to be allowed to sue on behalf of the company. . . .

---

[41]    Moore Decl., ¶¶36, 39, 42, 45, 47, 48, 53, 55, 62, 73.  As Girolami explains, the issues of *ultra vires* conduct, fraud and wrongdoer control are much broader.

[42]    *See McKesson HBOC, Inc. v. Islamic Republic of Iran*, 271 F.3d 1101, 1108-10 (D.C. Cir. 2001) (citing Rule 44.1 for the proposition that disputed issues concerning the existence and application of foreign law are reserved for summary adjudication and detailing the use of evidentiary submissions establishing issues like "company policy" and whether "compliance . . . would have been futile" using testimony and discovery plaintiff has not yet been able to take); *see also Haase*, 835 F.2d at 907.

> (3)  ***The claimant serves the application and the evidence in support . . . on the defendants****. . . .*
>
> (4)  The defendants, including the company, decide whether to contest the claimant's entitlement to continue the action as a derivative claim and respond accordingly. . . .
>
> (5)  ***The defendants will file such evidence in answer as they may be advised to do, dealing with such issues as*** the merits of the case against them, matters going to the discretion of the court, and the views of independent shareholders . . . .
>
> (6)  ***At the hearing, the court may grant permission to continue the claim upon such terms as it thinks fit, or it may dismiss the action, or it may give directions for, amongst other things, the canvassing of the views of other shareholders . . . if that has not already been done, disclosure and cross-examination***.

*See* Hollington's Treatise §6-38, at 149-50 ("time-table for a derivative action"); *see also Prudential v. Newman Indus.*, [1982] Ch. 204 ("*Prudential No. 2*") (a case cited extensively by Mr. Moore which established the relevant procedure for adjudicating *Rule of Foss v. Harbottle* challenges to derivative plaintiff's standing, which, as Hollington explains in §6-34, formed the basis for later-enacted CPR 19.9, the English procedural rule that governs procedure in derivative actions).  "Since a derivative action is a remedy fashioned by equity to ensure that a claim to remedy a wrong done to the company is not stifled improperly, the court has a wide discretion in deciding whether and on what terms to permit the derivative action to proceed." Hollington's Treatise §6-27, at 143-44. While the *Prudential* court criticized the trial court's decision to permit a full 72-day trial on the merits of the derivative claims rather than employing a more summary procedure to ascertain whether the action was permitted by the *Rule of Foss v. Harbottle*, *Prudential No. 2*, [1982] Ch. 204 (and later CPR 19.9) definitely requires more than the rash, *sans* discovery decision on the pleadings defendants demand from this Court.  [1982] Ch. 204  ***Notably, BAE mailed notice of its 2008 Annual General Meeting ("AGM") on 3/28/08, two months after the motions to dismiss were filed in this action, and it seeks shareholder approval of 18 separate resolutions at the Company's***

*5/9/08 AGM, none of which provide "full and frank" disclosure of the claims alleged herein and none of which seek shareholder ratification of a voluntary dismissal of this action*.[43]

As such, if the Court decides to review plaintiff's standing under the *Rule of Foss v. Harbottle* at all, the procedural rules of this District and the applicable English protocol both require that the Court undertake its own factual assessment, conducting what is essentially a mini-trial of this preliminary issue, and potentially requiring BAE to canvass the shareholder body (if after disclosures, it appears ratification is even remotely possible), rather than resolving disputed issues of fact in defendants' favor based on the dictates of their own "expert" before plaintiff has been permitted to take discovery.

### 3.    The *Rule of Foss v. Harbottle* Does Not Deprive This Court of Standing

Defendants are, in reality, simply urging policies limiting derivative suits as a general matter – policy considerations that have been expressly rejected in the U.K.  Even if one considers policy considerations regarding shareholder access to the civil justice system to hold defaulting corporate fiduciaries responsible, they cut in favor of proceeding.  When the U.K.'s Company Law Review Commission was charged in 1998 with "consider[ing] how core company law could be modernised," it determined "there should be a 'new derivative procedure with more modern, flexible and accessible criteria for determining whether a shareholder can pursue an action.'"  Companies Act 2006 Explanatory Notes §4, at 1 and §491, at 74 (Ex. T).  American law has long recognized "[d]erivative suits play[] a[n] . . . important role in protecting shareholders of corporations from the designing schemes and wiles of insiders who are willing to betray their company's interests in order to enrich themselves." *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 371 (1966); *see also Brown v. Bedford City Land & Improvement Co.*, 91 Va. 31, 38 (1895).  And with good reason.  "[W]hat may

---

[43]       *See* Ex. N (2008 AGM Notice).

have been implausible two or three years ago is hardly so today, in light of a plethora of revelations, investigations, evidence, indictments, guilty pleas, and confessions of widespread corporate corruption and fraud by companies, auditors, brokerage houses, and banks.  Lining one's pockets with gold, at the expense of investors, employees, and the public, appears too often to be a dominating ambition . . . ."  *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 686 (S.D. Tex. 2002).  When this type of corporate wrongdoing occurs, applicable U.K. law – the existing law as well as the 2006 Companies Act – as well as that of D.C., provides there is legal recourse for a shareholder and that plaintiff is entitled to its day in court.

Without compromising plaintiff's right to take discovery and further augment its arguments here should the Court determine the *Rule of Foss v. Harbottle* applies at all, in the interests of expediency plaintiff will briefly discuss why exceptions take this case outside of the *Rule*.

As noted by Hollington: "***Derivative actions are allowed by the courts, generally speaking, where the alleged wrongdoers are directors or persons connected with them who would otherwise be able to stifle an action by reason of their control of the company's organs, i.e. the board and company in general meeting***."  Hollington's Treatise §6-14, at 132.  A close examination of the seminal English *Foss v. Harbottle* decision demonstrates it is nothing but a majority rule doctrine based on the unremarkable proposition that minority shareholder plaintiffs cannot pursue a derivative action – against the will of the majority – ***where the decision to proceed in the derivative action can readily be overridden by a majority of the shareholders at a properly convened meeting***.  *See Foss v. Harbottle*, [1843] 2 Hare 461, 493-99.  If the matter cannot be brought to the shareholders for an up or down vote, however, the *Rule of Foss v. Harbottle* has no application.  *See* Hollington's Treatise §2-13, at 9 ("Principle 11 – ratification by the shareholders of breach of fiduciary duty owed by the directors to the company. . . .  The shareholders ***in general meeting*** . . . have a ***general residual power*** under general principles ***by a simple ordinary majority*** to waive or

ratify a breach of duty by a director *upon full and frank disclosure being made to them*.").  Unlike the situation the *Foss v. Harbottle* court was presented with, majority override has no bearing in the instant matter.  Defendant directors control access to the corporate machinery.

In fact, *Foss v. Harbottle* expresses the same suspicion against relegating shareholders' ability to sue derivatively to the very board members who would be "answerable in respect [to] the transactions in question," something "against their personal interest," that U.S. courts recognize as the doctrine of demand futility in shareholder derivative jurisprudence.  *Id.* at 486; *cf.* Rule 23.1 (requiring that shareholder derivative plaintiffs make a pre-suit demand or explain the reasons such a demand would be futile).  Furthermore, English case law clearly dictates ratification under *Foss v. Harbottle* does not come into play unless "full and frank disclosure" on the matters shareholders will be asked to ratify is being provided.  Hollington's Treatise §6-09, at 129; *Bamford v. Bamford*, [1970] Ch. 212.  However, such "full and frank disclosure" in the present matter would clearly expose each defendant – not to mention BAE itself – to unacceptably high levels of exposure to criminal liability, including in regards to the DOJ and SFO investigations, and as such, "full and frank disclosure" simply cannot objectively be expected to occur.  But as recounted in *Edwards v. Halliwell*, [1950] 2 All E.R. 1064, there is simply "no room for the operation of the rule" unless a majority of the shareholders can confirm the transactions at issue. Hollington's Treatise §6-09, at 129.

Even if the *Rule of Foss v. Harbottle* were in play, the facts of this case fall within several relevant exceptions to the "*Rule*":

(1)     "There is no room for the operation of the rule if the the alleged wrong is *ultra vires* the corporation, because the majority of members cannot confirm the transaction";

(2)     "There is an exception to the rule where what has been done amounts to fraud and the wrongdoers are themselves in control of the company"; and

(3)     There is no room for operation of the rule where "the interests of justice" forbid it.

*See* Hollington's Treatise §6-05, at 127 (original emphasis omitted); *Edwards*, [1950] 2 All ER 1064

at 4.

As follows, this action may be maintained under each of these exceptions. First, the *ultra vires* exception is satisfied because the conduct alleged was not permitted under BAE's SSA and was ***illegal per se***. Second, the fraud on the minority exception is satisfied because it was alleged those in control of BAE misrepresented the quality of their stewardship and compliance with legal requirements in order to stay in office and these defendants can effectively stymie any effort to obtain shareholder approval to proceed with this action due to their practical control of BAE and its corporate machinery. Third, the so-called "interests of justice" exception applies, as the U.K. legislature has found that modernizing the law to explicitly allow shareholder derivative actions without overcoming the burdens of *Foss v. Harbottle* serves the public interest.

### a.      The Alleged Illegal Conduct Was *Ultra Vires*

English cases defining the *ultra vires* exception hold "that an individual shareholder cannot bring an action in the courts to complain of an irregularity ***(as distinct from an illegality)*** in the conduct of the company's internal affairs ***if the irregularity is one which can be cured by a vote of the company in general meeting***." *Prudential No. 2*, [1982] Ch. 204, at 6. Transactions incapable of ratification fall outside the *Rule*. In shareholder actions such as this, seeking recovery on behalf of a corporation for damages arising out of breaches of fiduciary duty, "a minority shareholder can . . . have a *locus standi* to bring an action to recover on behalf of a company property or money transferred or paid in an *ultra vires* transaction and . . . it is not a necessary averment that control is vested in individual defendants so as to prevent the company from bringing the proceedings." *Smith v. Croft*, [1988] Ch. 114, at 42. That an individual shareholder has standing to challenge illegal or *ultra vires* acts was also confirmed by *Edwards*, [1950] 2 All ER 1064, at 4:

> The cases falling within the general ambit of the rule [*i.e.*, the *Rule of Foss v. Harbottle*] are subject to certain exceptions. It has been noted in the course of argument that in cases ***where the act complained of is wholly ultra vires the***

*company or association the rule has no application because there is no question of the transaction being confirmed by any majority*.

Because the conduct alleged here constitutes illegal violations of U.S. anti-corruption laws, the case falls outside the *Rule*. *See, e.g.*, *Prudential Assurance Co. Ltd. v. Newman Indus. Ltd.* ("*Prudential No. 1*"), [1981] Ch. 257, at 29 (holding if it was shown a bribe payment was made illegally, it was perforce *ultra vires*); *see also Towers v. African Tug Co. Ltd.*, [1904] 1 Ch. 558, at 6 (holding payments were illegal and that as such, a court "start[s] with the assumption one is bound to make, that if an act is done by a company which is *ultra vires*, no confirmation by shareholders – *not even by every member of the company* – can convert that which was *ultra vires* into something *intra vires*: it always must be *ultra vires*"); *Heard v. Pickthorne*, [1913] 3 KB 299 (same).[44]

*Bamford*, [1970] Ch. 212, holds where directors "'go on doing for years'" otherwise *ultra vires* conduct,

> "then they find that everything has been so to speak wrongly done because it was not done by a proper board, *such directors can, by making a full and frank disclosure and calling together the general body of the shareholders, obtain absolution and forgiveness of their sins*; and *provided that acts are not ultra vires the company* as a whole everything will go on as if it had been done right from the beginning. . . . *Of course, if the majority of the general meeting will not forgive and approve, the directors must pay for it*."

The *Bamford* court also points out that dismissal on the pleadings "is wholly inappropriate," where this analysis "is not plain and obvious." *Smith*, [1988] Ch. 114, at 6-7. Where the Company was objectively acting in violation of its SSA (and thus U.S. law, including perhaps False Claims Act violations), and where the Company is alleged to have violated the FCPA and §463 of the 2006

---

[44]   U.S. law too recognizes an *ultra vires* exception to procedural standing requirements in derivative actions. *See Heath v. Erie Ry. Co.*, 11 F. Cas. 976, 998 (C.C.S.D.N.Y. 1871) (analyzing and applying number of cases arising under both English law, including the *Rule of Foss v. Harbottle*, and under relevant U.S. law). And, as *Messinger v. United Canso Oil & Gas, Ltd.*, 486 F. Supp. 788, 795 (D. Conn. 1980), instructs, *illegal acts and breaches of fiduciary duty are incapable of ratification for purposes of invocation of the Rule of Foss v. Harbottle in U.S. courts*.

Companies Act, the alleged conduct was *ultra vires* and not capable of ratification.  *See* Girolami

Decl., ¶¶17-28.  This alone takes this action out of the *Rule of Foss v. Harbottle,* but there is more.

**b.** **Fraud on the Minority and Wrongdoer Control Was
Adequately Alleged**

A second exception for allegations of fraud on the minority coupled with wrongdoer control

take this action outside of the *Rule*.  Here, "'Fraud' in the phrase 'fraud on the minority'" involves

"'not only fraud at common law but also fraud in the wider equitable sense of that term, as in the

equitable concept of a fraud on a power.'"  Hollington's Treatise §6-18, at 137 (citing *Daniels v.*

*Daniels*, [1978] Ch. 406 at 12).  *Daniels* distinguishes between cases where directors have been

negligent or even grossly negligent where it would seem that even in the latter case no derivative

action would lie, and on the other hand cases where there is improper purpose or indeed gross

negligence **coupled with the possibility of benefit accruing to the directors personally, i.e.,**

**deflecting attention from their own complicity and avoiding creating additional attention/evidence**

**to establish it**.

As noted herein at §II.A, the Complaint details defendants' self-dealing in connection with

the making of the bribe payments.  ¶¶85, 150-151.  *Daniels* expressly held that shareholders must

put up with "foolish or unwise directors" and even "'an amiable set of lunatics,'" but "a minority

shareholder who has no other remedy may sue where directors use their powers intentionally or

unintentionally, fraudulently or negligently in a manner which benefits themselves at the expense of

the company." [1978] Ch. 406, at 9.  Plaintiff's allegations must be assumed to be true for purposes

of a Rule 12(b)(1) motion to dismiss and raise triable issues of fact.

Moreover, contrary to the strict numerical concept of "control" defendants attempt to foist

upon the Court, in modern day corporations where ownership ***and*** management of the corporation

have been separated due to widely dispersed and fragmented public ownership (*see* Adolf A. Berle,

Jr. & Gardner C. Means, *The Modern Corporation and Private Property* 69-118 (1932)) and thus

where officers and directors inevitably wield practical (if not near absolute) control over the proceedings and general shareholder meetings, "practical control" satisfies the required control showing as to this exception to the *Rule*.  As Hollington recounts in his Treatise §6-22, at 139, the court in *Smith v. Croft* expressly held "'the word "control" was deliberately placed in inverted commas by the Court of Appeal in *Prudential Assurance* . . . because ***it was recognised that voting control by the defendants was not necessarily the sole subject of investigation***.'" (Emphasis in original.)  *See* Girolami Decl., ¶¶29-31.

The BAE Board wields considerable control over general meetings of the Company's shareholders.  Where directors and officers wield *de facto* control of all corporate actions, "the controlling shareholder can be a minority shareholder if functionally in control."[45]

---

[45] *See* Claire Moore Dickerson, *From Behind The Looking Glass: Good Faith, Fiduciary Duty & Permitted Harm*, 22 Fla. St. U. L. Rev. 955, 1020 n.128 (1995) ("For example, the structure can give the minority shareholder a veto . . . or the rest of the shares can be so widely distributed in the public as to give the holder of a minority block practical control.").  A related concept is the so-called "structural bias" of board's special litigation committees ("SLC") impaneled to decide whether shareholder litigation should be permitted to go forward:

> [F]actors include the CEO's and other corporate insiders' practical control over nominating new directors and removing incumbents; business relationships that may exist between outside directors and the corporation; the common cultural and professional background of many directors, and the frequent social ties among them; SLC members may often be CEOs or directors of other corporations and in that capacity be themselves defendants in a derivative suit (or see themselves as potential defendants); SLC members will have an ongoing collegial relationship with the director-defendants after possibly subjecting them to liability; a "circle the wagons" ethic among board members when confronted with a challenge from the outside; and the role of the defendant-directors in selecting the SLC membership.

Kenneth B. Davis Jr., *Structural Bias, Special Litigation Committees, and the Vagaries of Director Independence*, 90 Iowa L. Rev. 1305, 1308 (2005); *see also Joy v. North*, 692 F.2d 880 (2d Cir. 1982); *Hasan v. CleveTrust Realty Investors*, 729 F.2d 372, 377 (6th Cir. 1984); *Zapata Corp. v. Maldonado*, 430 A.2d 779, 787 (Del. 1981) (describing "a 'there but for the grace of God go I' empathy").

As it cannot be said that as a matter of law the fraud on the minority coupled with wrongdoer control exception cannot be demonstrated under either the facts alleged (or pled through amendment), the *Rule of Foss v. Harbottle* does not apply here.

**c.** **"[T]he justice of the Case" Militates Against Dismissal Under the Archaic *Rule of Foss v. Harbottle***

The origins of this exception are in *Foss v. Harbottle*.  The judgment of Sir James Wigram V-C teaches that in most cases the corporation will be the proper plaintiff, but not without strongly worded statements that the rule was "much too broadly stated on the part of the Defendants." *Foss v. Harbottle*, [1843] 2 Hare 461, 491. Sir Wigram explained "***the claims of justice would be found superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue***."  *Id.* at 492.

While the modern-day description of the exception in *Prudential No. 1*, [1981] Ch. 257, at 24, "[when] the justice of the case demands it," was ultimately criticized in *Prudential No. 2*, [1982] Ch. 204, at 2, it cannot be seriously disputed that the shareholder derivative remedy, even as limited by the *Rule*, is equitable and permits a court, under the proper circumstances, to apply the *Rule* flexibly where required in the "interests of justice."  The very purpose of the equitable (or ecclesiastic) courts was perforce to dispense with the harsh code pleading regime.  As such, an "interests of justice" exception – even if rarely available – must exist.

If such an exception exists, this case presents a textbook situation where it gets applied.  The *Rule of Foss v. Harbottle* was statutorily slain – after ten long and arduous years of effort – by the 2006 Companies Act.  BAE is a global corporation with 50% of its shareholders residing in the U.S., where it also derives 50% of its revenues and operates pursuant to the SSA.  Plaintiff brought its action in D.C. and D.C. has the "more significant relationship" to the allegations and a stronger interest in seeing its own law applied.  *See* §§I, VI.C.

Finally, under U.S. law, legislative intent to repeal the old *Rule* is a significant factor to be considered in this Court's analysis of whether the "highest courts" of England would apply the old *Rule* here.  *See Messinger*, 486 F. Supp. at 794-95 (legislative intent to conform derivative law with modern realities must be considered).  Indeed, the drafters of the 2006 Companies Act expressly set out to create a "'new derivative procedure with more modern, flexible and accessible criteria for determining whether a shareholder can pursue an action."  Ex. M at 4.  Because the interests of justice militate in favor of permitting this action to go forward, the *Rule* has no application here.

### E.   Plaintiff's Status as a Beneficial Shareholder Does Not Deprive It of Standing to Proceed Derivatively

Defendants argue that "[a]s a threshold matter, Plaintiff does not satisfy English law conditions to bring a shareholder derivative lawsuit because Plaintiff is not a ***shareholder***."  BAE Brf. at 13-14.  Relying on a single English law decision cited by their conflicted, self-interested English law advocate, defendants argue that "in order to sue derivatively on behalf of a company, a person must be a 'member' of the company," and that a "member of a company is defined under English law as an actual holder of shares, appearing on the company register, and does not include one holding only a beneficial interest."  *Id.*  As such, defendants argue plaintiff's action may only be pursued if authorized by the ADR "custodian, Guaranty Nominees Limited, for the depositary JPMorgan Chase . . . that appears on the BAE plc company register."  *Id.*  While defendants concede that even if the standing "defect" they raise warrants merit at all, it can be cured by joinder – either by adding another ordinary shareholder plaintiff or by naming JP Morgan Chase, the ADR custodian – under Fed. R. Civ. P. 19's liberal standards for "Joinder of Persons Needed for Just Adjudication."  But as demonstrated below, defendants' aspersions to the contrary notwithstanding, the Court need not even reach the joinder issue.

***First***, plaintiff's standing to sue derivatively is governed by Fed. R. Civ. P. 23.1, the procedural rules of the forum, and the plain language of Rule 23.1 does not distinguish between

"shareholder[s] or member[s]" registered on the Company's role of shareholders in London and

those registered on the ADR-holder role in New York.[46]  *See* Fed. R. Civ. P. 23.1; *Kona Enters. v.*

*Estate of Bishop*, 179 F.3d 767, 769 (9th Cir. 1999) ("Rule 23.1's . . . share ownership requirement is

procedural in nature and thus applicable in diversity actions.").  As the Seventh Circuit Court of held

over fifty years ago in a decision directly on point,

> [I]t seems unreasonable to think that [Fed. R. Civ. P. 23.1] contemplates the right to
> proceed in a Federal court by one in whose name the stock in a corporation has been
> issued merely because such stock is recorded but who as a matter of fact owns
> nothing, and at the same time deny such right to one who owns all the equitable and
> beneficial interest in the stock merely because it was not issued in his name and
> therefore not of record.

*HFG Co. v. Pioneer Publ'g Co.*, 162 F.2d 536, 540 (7th Cir. 1947).[47]  Here, BAE's American

Depositary Receipt (which the BAE defendants and Moore neglected to submit with their motion to

---

[46]     The BAE ADR agreement expressly ensures that BAE obtains "the names, addresses and
holdings of ADSs by all Holders." Ex. O at 14, 19-20.

[47]     In *HFG*, 162 F.2d at 540, the Seventh Circuit expressly rejected the contention that the federal
rulemakers intended to limit standing to sue derivatively under Rule 23(b) to "record owners," as
required by Illinois law and held instead that the question of "who is a shareholder" is to be determined
solely by reference to federal procedural law.  The *HFG* holding has been adopted by this District as
establishing "the legal consequences of stock ownership often extend beyond the entity that is the record
holder to beneficial holders," and the notion that "the term 'stockholder' can only refer to record holders"
has been rejected. *Turner & Newall, PLC v. Am. Mut. Liab. Ins. Co.*, No. 82-1339, 1985 U.S. Dist.
LEXIS 23777, at *25, *27 (D.D.C. Aug. 1, 1985).  *See also Murdock v. Follansbee Steel Corp.*, 213 F.2d
570, 574 (3d Cir. 1954) ("the term stockholder there used to include a beneficial or equitable owner").
"Persons with a clear beneficial interest in a corporation may bring a derivative suit without being
shareholders of record." *Silling v. Erwin*, 881 F. Supp. 236, 239 (S.D. W. Va. 1995) (citing *In re
Pittsburgh & Lake Erie R. R. Co. Sec. & Antitrust Litig.*, 543 F.2d 1058, 1067 (3d Cir. 1976) (pledgee of
stock "'has the same right to protect his stockholder's equity as a pledgor'"); *Hurt v. Cotton States
Fertilizer Co.*, 145 F.2d 293 (5th Cir. 1944) (plaintiff, the actual legatee of the shares, was found to have
equitable ownership and standing to maintain an action); 13 *Fletcher Cyclopedia of Corporations* §5976,
n.2 (1991).  ***As the "ownership of stock may shift, notwithstanding the fact that no corresponding
change is noted on the stock transfer books of the corporation*[,] . . . *it is manifest that the stock
transfer books of a corporation cannot be safely relied upon to ascertain the ownership of stock*."**
*Murdock*, 213 F.2d at 576.  To be sure, some courts have differed with *HFG.* on whether "who is a
shareholder" is governed by federal or state law, but even those courts state only that "the *HFG* decision
can be limited to the distinction between equitable shareholders and shareholders of record," the precise
issue here. *Kreindler v. Marx*, 85 F.R.D. 612, 615 (N.D. Ill. 1979).

dismiss) expressly provides at ¶2 that plaintiff, the ADR "Holder . . . is entitled to delivery" of the ordinary shares that underlie the ADR agreement upon demand, clearly establishing plaintiff's status as a beneficial owner of BAE shares.  Moreover, ¶6 of the American Depositary Receipt requires that ADR holders immediately disclose their "ownership" to BAE so that it may keep track of how much of its stock is owned by foreigners.  Neither of these provisions speaks directly to whether an ADR holder may bring a derivative action in his own name or whether he must enlist the support of JP Morgan (something the agreement is silent on).  But they clearly establish that plaintiff and not JP Morgan is the beneficial owner of the ordinary shares underlying plaintiff's 3,500 ADRs.  And under the teachings of *HFG,* beneficial holders like plaintiff and not nominee holders like JP Morgan have standing to pursue derivative claims under Rule 23.1 ***in this forum***.  *See HFG Co.*, 162 F.2d at 540.

**Second**, even if the Court deemed plaintiff's standing to be a substantive issue governed by English law, defendants' (and their "expert's") reliance on *Birch v. Sullivan*, [1957] 1 All ER 56 is misplaced.  The *Birch* plaintiff's derivative standing was challenged because he was declared bankrupt after he filed his derivative action and thus forfeited ***all interest*** in the company shares he once owned to the trustee of his bankruptcy estate.  Both legal and beneficial title to the stock had transferred to the trustee by the time the motion to dismiss was decided in *Birch*.  Under ***those*** unique circumstances, simply not present here, the plaintiff had no interest in the company's stock – beneficial or otherwise – and so the chancery court stayed the action "so long as the plaintiff alone remain[ed] the plaintiff, with liberty to apply to dismiss it if the trustee in bankruptcy [did] not cause himself to be put on the record as plaintiff within three months."  *Id.* at 4.

While the 50-year-old *Birch* decision is not instructive to the analysis of plaintiff's standing as a beneficial holder under English law, a recent English Court of Appeals decision issued in 2005 is.  *Jafari-Fini v. Skillglass Ltd*, [2005] EWCA Civ 356, notes that when asked on October 11, 2004 "to determine as a preliminary question whether the Claimant, Mr. Jafari-Fini, had standing to seek

an order under CPR 19.9 [the English equivalent of Rule 23.1] in circumstances that he was not a **member** of" the company in whose name he sought permission to sue derivatively, the *Jafari-Fini* trial court judge expressly held "*that he should not be excluded from doing so solely because his interest is beneficial only, and he is not the registered owner*." *Id*. at 6; ¶¶35, 37. While the *Jafari-Fini* court ultimately dismissed the derivative claims, holding plaintiff's direct claims should be tried before his derivative claims (and later reported decisions indicate they were), the Chancery Court's ruling that a beneficial holder had standing to sue derivatively was not disturbed. In fact, the Court of Appeals expressly refused to review that ruling recognizing that if the direct claims were meritorious, the *Jafari-Fini* plaintiff would become a majority shareholder and as such his claims would not be governed by the *Rule of Foss v. Harbottle. Id.* Then, he could sue directly in the company's name and he would not need derivative standing. *Id.*[48]

Defendants' reliance on *Batchelder v. Nobuhiko Kawamoto*, 147 F.3d 915 (9th Cir. 1998), for the proposition that all ADR holders lack standing is misguided. First, the plaintiff in *Batchelder* relied on a provision from the Honda ADR agreement which expressly stated Japanese law applied to claims brought by ADR holders in their status as Honda shareholders. *Id.* at 917-18. Conversely, the BAE ADR agreement makes no such representation and instead states only that the relationship between the parties to the ADR agreement, including "BAE SYSTEMS plc . . . JPMORGAN CHASE BANK . . . and all holders from time to time of American Depositary Receipts issued hereunder," "shall be governed by and construed in accordance with the laws of the State of New York." *See* Ex. O at 10, 17. New York State corporate law expressly provides that a shareholder derivative "action may be brought in the right of a domestic **or foreign corporation** to procure a

---

[48]     Similarly, in his seminal treatise on English corporate law, distinguished academic commentator Robert Pennington states that "[a] derivative action may be brought by a person who is entitled to shares or an interest in them but is not registered as the holder of them in the company's register of members . . ." *See* Robert R. Pennington, *Company Law*, 798 (8th Ed. 2006) (Ex. R).

judgment in its favor, by a holder of shares or of voting trust certificates of the corporation *or of a beneficial interest in such shares or certificates*." NY CLS Bus Corp §626(a) (2008). Moreover, there was simply no attempt (or indication of willingness) in *Batchelder* to join JP Morgan, which was also the depositary custodian there.

Defendants in *Seybold*, 2007 WL 737502, at \*16 n.10, actually argued that JP Morgan, which was also the ADR trustee there, *had to be joined* to the derivative action to preserve the derivative standing of the ADR holder plaintiff. The *Seybold* court expressly refused to rule on the issue of joining JP Morgan because that case was brought on behalf of ABN Amro, a Netherlands corporation, and the court found Dutch law did not permit shareholders – *ADR or otherwise* – to proceed derivatively – so the entire case was dismissed. *Id.* As such, *Seybold* too in inapposite.

Here too, defendants infer that either JP Morgan must be joined or that another shareholder-plaintiff who owns BAE ordinary shares must intervene to perfect plaintiff's standing. Not so. *See, e.g.*, *SEC v. Bilzerian*, 378 F.3d 1100, 1108 (D.C. Cir. 2004) (where an assignee's "only rights with respect to [a security] were 'derived from the assignment'" and were "subject to all defenses and rights of" the assignor, the assignee's "presence was not needed [and] 'complete relief' could 'be accorded among those already parties,'" so the assignee "was not a necessary party" under Rule 19(a)(1)). JP Morgan is plaintiff's assignee here and as such its presence is not required. Plaintiff of course stands willing and able to move to join either should the Court disagree.[49]

_____

[49] To be sure, "dismissal for failure to join indispensable parties often requires judicial consideration of matters outside the pleadings," requiring that plaintiff be permitted to take discovery. *Anderson v. Hall*, 755 F. Supp. 2, 5 (D.D.C. 1991). Mr. Girolami suggests at ¶38 that under English law, permission would be needed from JPMorgan to join them. In the event the Court agreed and they refused, discovery would be sought to challenge that refusal.

### F.   Plaintiff Has Stated a Claim for Relief Under §463 of the 2006 Companies Act

As promised, an occasional legitimate issue of English law will arise in this action.  As part of its breach of fiduciary duty, corporate waste and *ultra vires* conduct claims, plaintiff alleged defendants violated §463 of the 2006 Companies Act.  Defendants (BAE Brf. at 22 n.9) and their English law "expert" (Moore Decl., ¶¶65-74) concede that §463 permits a company to bring a cause of action against a director who makes untrue, misleading, or incomplete statements in certain statutorily required reports, and that it applies the to the 2006 Annual Report (which was issued after the 1/07 commencement date).  Yet for purposes of their standing challenge, defendants dispute whether a cognizable claim has been pled.  Specifically, defendants appear to claim that ***any liability they have to BAE*** which arises under §463 is subject to the *Rule of Foss v. Harbottle* and that the "causal link" between defendants' misstatements and "BAE plc's alleged losses" has not been adequately pled. BAE Brf. at 22 n.9.  Defendants are wrong on both accounts.

Section 463 is part of the omnibus 2006 Companies Act, the single largest in England's history, which gained Royal Assent in November 2006.  The Preamble to the Act explains it is "[a]n Act to reform company law and restate the greater part of the enactments relating to companies." Ex. P.  Defendants concede §463 provides a private right of action that enables companies to sue their directors for losses arising from misstatements in their financial reports and defendants concede the claim can be brought derivatively by shareholders.  However, citing only themselves as authority, defendants claim the new cause of action is encumbered by the old *Rule of Foss v. Harbottle* that was legislatively repealed by the 2006 Companies Act.  Specifically, defendants claim that because the BAE 2006 Annual Report was issued on 4/7/07, and the new derivative procedure outlined in §260 of the Companies Act does not take derivative actions out of the old *Rule of Foss v. Harbottle* unless the underlying conduct occurred after 10/07, they are protected from liability to BAE for violations of §463 by virtue of the *Rule of Foss v. Harbottle*.

All "statutory construction . . . begin[s] with the language of the statute." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002).  "The inquiry ceases 'if the statutory language is unambiguous and "the statutory scheme is coherent and consistent."'" *Id.*  "Where . . . the plain language of the statute is clear, the court generally will not inquire further into its meaning, at least in the absence of 'a clearly expressed legislative intent to the contrary.'" *Qi-Zhuo v. Meissner*, 70 F.3d 136, 140 (D.C. Cir. 1995).  The relevant implementation order simply provides "Section 463 of the Companies Act 2006 (liability for false or misleading statements in reports) does not apply to a directors' report, directors' remuneration report or summary financial statement first sent to members and others . . . before 20th January 2007."  Ex. Q at 20.  Nowhere in §463, the implementation order or its Explanatory Note is there a mention the old *Rule*.  *See* Ex. Q at 4, 21.  As such, the old *Rule* cannot govern provisions of the new Act, the point of which was to legislatively repeal the old *Rule*.

Even if one did look past the plain language with a view toward the "spirit" of the law, it is clear the new Act's drafters were in the business of repealing rather than preserving the *Rule of Foss v. Harbottle*.  The Law Commission's Explanatory Notes accompanying the 2006 Companies Act state the drafters intended to create a "'new derivative procedure with more modern, flexible and accessible criteria for determining whether a shareholder can pursue an action." Ex. M at 4; ¶491.  It cannot be denied – in fact defendants do not attempt to refute – that the 2006 Companies Act was enacted in order to put the inequities that arose under the *Rule of Foss v. Harbottle* to rest.  Thus, in order to preserve the applicability of the *Rule of Foss v. Harbottle*, the statute or implementation order would need to at least mention it.  As both are silent to it, the *Rule of Foss v. Harbottle* does not apply here.

Turning to the "causal link," as they did throughout their briefing, the BAE defendants again labor to isolate the entire §463 claim to "two solitary statements . . . at paragraph 103(d)" (BAE Brf. at 22 n.9), while the relevant directors' report, directors' remuneration report and summary financial

statements, including the additional sections of BAE's 2006 Annual Report expressly incorporated therein by reference,[50] cover all the statements pled in ¶103[51] that span more than 6 pages (pages 56-62), and contain portions of (i) the "Chairman's letter," (ii) the "Chief Executive's Review," (iii) BAE's disclosures concerning its "Business portfolio actions," "United States" business, "The Kingdom of Saudi Arabia" business, (iv) disclosures concerning the "Group . . . risk[s] from failure to comply with laws and regulations," (v) the Board's oversight of its "Governance of [Corporate Responsibility]" and BAE's "Ethics," (vi) disclosures concerning BAE's "2006 Objectives," "Progress," "Working with Others," and "Internal Control[s]," and (vii) the Director Report's "Business Review," all of which are alleged to have been misleading.  Misstatements in (or incorporated in) the directors and remuneration reports were also alleged at ¶72 (describing "risk from a failure to comply with laws and regulations"), and ¶104(g) ("Corporate Responsibility Report" and "Ethics" disclosures).  The elements of §463 are also detailed in ¶65.

After having inappropriately minimized the relevant allegations, defendants argue the "causal link" between the two statements they identified and the harm to BAE is inadequately alleged, but cite no civil procedure, statutory or common law rule that requires the trial level proof they demand now.  Rule 8 governs the pleading standard and requires "simply" that "the defendant [receive] fair notice of what the plaintiff's claim is and the grounds upon which it rests."[52]  The Complaint's

---

[50]     Note that the Directors' Report, which itself starts on page 66 of the 2006 Annual Report, incorporates pages 2-40, 42-43, 44-48, 32, 51-65, 76-80 and 111-13 (Ex. U).

[51]     The only language in ¶103 which is not ostensibly incorporated into the directors' report is the representation reiterated on page 63 of the Complaint that contains the "Statement of directors' responsibilities in respect of the annual report and the financial statements," which discusses defendants' duty to compile and report the materials contained in the "Directors' Report," the "Directors' Remuneration Report," and "Corporate Governance Statement." ¶103.

[52]     *Browning v. Clinton*, 292 F.3d 235, 240, 242 (D.C. Cir. 2002) (a court must "[c]onstru[e] the complaint liberally and giv[e] plaintiff] the 'benefit of all inferences that can be derived from the facts alleged'").  Recognizing that not all causal links had been spelled out in *Browning*, the federal D.C.

detailed allegations exceed the Rule 8 standard in this regard.  *See* ¶¶1, 4, 105, 106, 111.  As such, plaintiff has pled a §463 allegation.

## V.    AN ACTIONABLE AIDING AND ABETTING CAUSE OF ACTION HAS BEEN STATED

### A.    PNC/Allbrittons Have Not Demonstrated that Plaintiff's Claims Are Not Cognizable Under "Any Set of Facts Consistent with the Allegations in the Complaint"

PNC/Allbrittons argue U.S. law applies to the claims against them for aiding and abetting breach of fiduciary duty. PNC Brf. at 12 & n.11.  Plaintiff agrees.[53]  Contrary to PNC/Allbrittons' suggestion, however, the law of this Circuit is clear that plaintiff "need not plead the facts sufficient to prove [its] allegations and evidence that will ultimately be used at trial . . . to avoid dismissal of [its] complaint under FED. R. CIV. P. 12(b)(6)."  *In re Sealed Case*, 494 F.3d 139, 147 (D.C. Cir. 2007).  Instead, following the U.S. Supreme Court's decision in *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007), it is still the case that against a motion to dismiss, "once a claim has been stated adequately, it may be supported by showing ***any set of facts consistent with the allegations in***

---

Circuit affirmed the denial of dismissal, expressly holding that under Rule 8 plaintiffs are entitled to the "benefit of all inferences and confin[ing the court's] analysis to the facts alleged," and that "[w]hether a triable issue of fact exist[ed] regarding" plaintiff's causation theory was "a question for summary judgment."  *Id*. at 243; *see also Autolog Corp. v. Regan*, 731 F.2d 25, 31 (D.C. Cir. 1984) ("It is well settled that plaintiff has standing to challenge conduct that indirectly results in injury . . . . 'We are concerned here not with the length of the chain of causation, but on [sic] the plausibility of [each of] the links that comprise the chain.'").

[53]    "D.C. has the 'more substantial interest'" in the claims against all defendants for breaching fiduciary duties owed to BAE and it shareholders as D.C. is the locus where the bribes were paid ***that allegedly violated the FCPA*** and exposed BAE to criminal fines and penalties, loss of reputation and potential disgorgement of tainted profits.  *Meng v. Schwartz*, 305 F. Supp. 2d 49, 60 (D.D.C. 2004). While different parts of the misconduct may have happened around the globe, the "locus of the tort" is where the "'last event necessary to make the actor liable occurred.'" *See Simon v. Philip Morris Inc.*, 124 F. Supp. 2d 46, 58 (E.D.N.Y. 2000).  As demonstrated herein at §§III.B.5, IV, VI.C, these same arguments apply equally to the direct breach of fiduciary duty claims as well.

*the complaint*," *and courts must still "'constru[e] the complaint liberally in the plaintiff's favor with the benefit of all reasonable inferences derived from the facts alleged.*'"[54]

There are two significant variations of vicarious liability for concerted action, (i) *civil-conspiracy*, or concerted action *by agreement*, and (ii) *aiding-abetting*, concerted action by *substantial assistance*.  "For harm resulting to a third person from the tortious conduct of another, one is subject to liability [under an aiding-abetting theory] if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."  *See* Restatement (Second) Law of Torts §876 (1979).  This section of the Restatement is the law of this Circuit and was cited with approval and elaborated on in great detail by the D.C. Circuit Court of Appeals in its seminal case delineating aiding-abetting liability in the civil context: *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) (hereinafter, "*Halberstam*").  *Halberstam,* which has been lauded by the U.S. Supreme Court as "a comprehensive opinion on the

---

[54]       *Sealed Case*, 494 F.3d at 145.  In so doing, the Court still "treats the complaint's allegations as true and draws all reasonable inferences in [plaintiff]'s favor."  *Kassem v. Wash. Hosp. Ctr.*, 513 F.3d 251, 252-57 (D.C. Cir. 2008) (reversing and holding a "complaint cannot be dismissed at the pleading stage" where plaintiff made out a "*prima facie* case").  In fact, if anything, in *Twombly* the Supreme Court *specifically reaffirmed* the notice pleading standards of Fed. R. Civ. P. 8(a).  127 S. Ct. at 1964 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (stating that Federal Rule of Civil Procedure 8(a)(2) requires *only* "'*a short and plain statement of the claim*'" *showing that the pleader is entitled to relief*, in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests")).  This was confirmed in the Supreme Court's subsequent opinion in *Erickson v. Pardus*, an Eighth Amendment cruel-and-unusual punishment case, where the Court specifically cited to its *Twombly* decision in reaffirming the notice pleading standard of Rule 8(a)(2).  *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) ("Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'  *Specific facts are not necessary*; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'").  As Judge Urbina recently held unequivocally reaffirming the Rule 8(a) notice pleading requirement post-*Twombly*, plaintiffs still only need allege "a 'plausible entitlement to relief,' by setting forth '*any set of facts* consistent with the allegations'" in their complaints, and "a complaint '*does not need detailed factual allegations*'" because, "[i]n resolving a Rule 12(b)(6) motion, the court *must* treat the complaint's factual allegations – including mixed questions of law and fact – as true and draw all reasonable inferences therefrom *in the plaintiff's favor*."  *Shirk v. Garrow*, 505 F. Supp. 2d 169, 172 (D.D.C. 2007) (quoting *Twombly*, 127 S.Ct. at 1967, 1969)).

subject" of aiding and abetting liability (*see Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164, 181 (1994)), details ***three elements*** that show a *prima facie* showing of aiding and abetting breach of fiduciary duty:

> (1) the party whom the defendant aid[ed] must [have] perform[ed] a wrongful act that cause[d] an injury;
>
> (2) the defendant must [have been] generally aware of his role as part of an overall illegal or tortious activity at the time that he provide[d] th[is] assistance; [and]
>
> (3) the defendant must knowingly and substantially assist the principal violation.

*Halberstam*, 705 F.2d at 477.  As detailed below, the Complaint alleges each element.

> **1.     The Complaint's Well-Pled Allegations Establish that the BAE Defendants "Perform[ed] a Wrongful Act that Cause[d] an Injury" to BAE and Its Shareholders**

The BAE defendants are alleged to have breached their fiduciary duties to BAE and its shareholders by causing BAE to participate in – or failing to prevent BAE from participating in – the illegal bribery scheme that has exposed BAE to significant potential criminal and civil sanctions, including fines, penalties and tainted profit disgorgement, severe damage to reputation and millions of dollars in costs and expenses responding to the criminal investigations.  PNC/Allbrittons are alleged to have aided and abetted those breaches by knowingly operating with illegally lax banking controls that facilitated, if not ensured, that the Prince Bandar bribe scheme could go on for many years undetected.

To be sure, "negligently fail[ing] to perform [one's] duty . . . establishes the wrongful act." *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 779 (3d Cir. 1976).  Unlike civil conspiracy,

> aiding-abetting liability may flow from negligent conduct. The Restatement's comment to subsection (b) provides: "***If the act encouraged is known to be tortious[,] it has the same effect upon the liability of the adviser as participation or physical assistance.  If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act***.  This is true both when the act done is an intended trespass and when it is merely a negligent act.  ***The rule applies whether or not the other knows his act is tortious*** . . . ."

*Anderson v. Airco, Inc.*, No. 02 C-12-091 HdR, 2004 Del. Super. LEXIS 393, at \*23 (Del. Super. Ct. Nov. 30, 2004) (citing *Halberstam*, 705 F.2d at 478).  Moreover, "'inaction can form the basis of aiding and abetting liability if it rises to the level of providing substantial assistance or encouragement.'"  *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 128 (3d Cir. 1999). "[K]nowing inaction by a high-level employee with responsibility . . . could . . . rise to the level of substantial assistance."  *Id.*

　　　　PNC/Allbrittons misstate the Complaint's allegations attempting to avoid the simple showing that through the bank's illegally lax oversight practices and failure to submit required suspicious activity reports ("SARs"), it provided substantial assistance to the BAE defendants in the breach of their fiduciary duties by selectively picking and choosing allegations – and even phrases from allegations – to posit the unremarkable proposition that *sans* discovery, plaintiff does not have trial level proof and could not detail every instance of their misconduct.  From this, they posit the conclusion that plaintiff has not pled the first aiding-abetting element.  They are wrong.

　　　　The shear amount of money involved - $2 billion in bribe payments – the amount of time they were alleged to have been being paid – 20 years – and the fact that PNC/Allbrittons' operation of Riggs with illegally lax oversight ***was illegal***, permits a reasonable inference that PNC/Allbrittons knew, or were reckless or negligent in not knowing, that they were assisting the BAE defendants in breaching their fiduciary duties to BAE and its shareholders.  The amount, duration and illegality of the bribe payment scheme significantly undercuts PNC/Allbrittons' version of the story here.  In fact, while plaintiff does not need to show knowledge, much less specific intent here, and while it will only need to establish liability by a preponderance of the evidence, as the Fifth Circuit recently held in a criminal money laundering case, since the "jury found [defendants] ***deliberately ignorant, and thus, subjectively aware of the high probability of illegalities around them, evidence of their continued facilitation of those highly suspicious transactions may constitute 'specific intent' to***

***further an illegal purpose for which they were deliberately ignorant***," allowing the jury to conclude

that defendants knew of the unlawful purpose of the transactions they were facilitating.  *United*

*States v. Nguyen*, 493 F.3d 613, 624-25 (5th Cir. Tex. 2007).

**2.     Plaintiff Alleged PNC/Allbrittons Were "Generally Aware of [Their] Role" in the BAE Defendants' Systematic Breaches of Their Fiduciary Duties**

"As for the second issue in aiding-abetting, the extent of liability, . . . a person who assists a

tortious act may be liable for other reasonably foreseeable acts done in connection with it."

*Halberstam*, 705 F.2d at 484-85.  "Foreseeability is surely an elusive concept and does not lend itself

to abstract line-drawing."  *Id.*  Even mere "silence or inaction" alone, coupled with a "a duty to

disclose," "may create liability" where, such as here, the BSA reporting requirements have been in

place since the 70s and the 12 C.F.R. §21.11(a) reporting requirements were in place since at least

1996.  *Halberstam*, 705 F.2d at 486 n.14 (noting that "in at least one nonsecurities case, a court has

concluded that silence encouraged the commission of tortious acts").  Was it foreseeable that

permitting Prince Bandar to operate 150 Riggs accounts while employing illegally lax banking

controls for decades involving dubious multi-million dollar transfers – regardless of the failure to

submit legally required SARs – could result in violations of the anti-money laundering laws – or

worse?  Certainly.[55]

Here, it cannot be seriously disputed that plaintiff's allegations that "the U.S. Office of the

Comptroller of the Currency specifically cited Riggs' failure to file suspicious activity reports for

[multiple] large-denomination withdrawals of cash by Bandar and others" and "uncovered

---

[55]     *Id.*; *see also CNH Capital America LLC v. McCandless*, No. C05-2087, 2007 WL 1498357 (N.D. Iowa May 18, 2007) (citing *Halberstam* as the law on aiding and abetting liability and stating that "'[g]eneral awareness' by an aider and abettor is sufficient to meet the knowledge component of an aiding and abetting claim"); *Tubbs v. United Cent. Bank, N.A.*, 451 N.W.2d 177, 182 (Iowa 1990) (applying the "general awareness" standard to an aiding and abetting allegation that a bank aided and abetted another bank in committing fraud, breaches of fiduciary duties, and securities law violations).

- 73 -

improprieties in some of the 150 Saudi accounts at Riggs" that predated the 9/11 terrorist attacks (¶¶59-60) do not allege with sufficient specificity that PNC/Allbrittons "knew about" and "acted to support" the BAE defendants' breaches of fiduciary duties sufficient to satisfy the second prong of *Halberstam*, 705 F.2d at 488.  In particular, plaintiff's allegations, once proven, will show that Riggs **hid** and **cooperated in secreting the illegal bribe payments** from BAE to Prince Bandar from government investigations, **refused to report the suspicious transactions** between BAE and Prince Bandar, which persisted over a period of approximately 20 years, **knew of – but failed to report** – the fact that Prince Bandar used BAE-replenished Saudi government accounts for his personal use for "'years and years,'" and **facilitated** improper and unexplained payments to Prince Bandar in the amount of $4 million even after Riggs had been investigated, served with a public cease-and-desist order, and falsely announced that it had reformed.  ¶¶8, 13, 50-56, 62, 113-14, 118, 122-30, 158.  As such, plaintiff has adequately alleged PNC/Allbrittons' general awareness of their role in the BAE defendants' breaches of fiduciary duties and satisfied the second prong of *Halberstam* sufficient to withstand a motion to dismiss prior to discovery.[56]

As circumstantial evidence of their knowledge, detail of PNC/Allbrittons' **motive** was provided to place the allegations in context.  Plaintiff specifically alleged PNC/Allbrittons' overt efforts to court and obtain 95% of Washington, D.C.'s embassy account business at any cost.  ¶58.  Beyond demonstrating motive, these allegations demonstrate that PNC/Allbrittons' zeal for embassy clients – including the Saudi embassy headed by Prince Bandar – led to allegations of criminal misconduct focusing on illegal transactions in hundreds of accounts associated with Saudi Arabian

---

[56]     While plaintiff will "eventually have to 'prove that [PNC/Allbrittons generally] knew of [the BAE defendants]' illegal activities," courts in this District do "'not dismiss a complaint before discovery unless it appears beyond doubt that [plaintiff] can prove no set of facts in support of their claim which would entitle them to relief,'" including to resolve innocent explanations which are "'fact question[s] that cannot be resolved at this early stage of the litigation.'"  *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 107 (D.D.C. 2003).

(including Prince Bandar and his family), Equatorial Guinean and Chilean heads of state. *Id.* While the Complaint details nowhere near all of the evidence obtained by U.S. Congressional investigators and documented in their records and reports which illustrate PNC/Allbrittons' efforts to obtain and retain embassy business for Riggs – ***at all costs*** – it does provide certain facts relevant to show PNC/Allbrittons' demonstrated pattern and practice of engaging in questionable – if not outright illegal – practices performed to retain such business.

### 3. PNC/Allbrittons "Knowingly and Substantially Assist[ed]" the BAE Defendants' Systematic Breaches of Fiduciary Duties

Contrary to PNC/Allbrittons' manipulation of the Complaint's detailed allegations, PNC/Allbrittons' "***substantial assistance or encouragement***" of the BAE defendants' breaches of their fiduciary duty is shown. *Halberstam*, 705 F.2d at 486. Moreover, sufficient facts from which the Court may properly infer knowledge by PNC/Allbrittons of the BAE defendants' egregious breaches of fiduciary duty, including the existence of detailed bank records showing that BAE paid at least $2 billion to Prince Bandar into and out of PNC/Riggs over a ***20-year period***, cannot be disputed – especially as demonstrated by the transcript of the BBC Television documentary exposing the details of the illegal payments made in connection with the Al-Yamamah contract was attached as Ex. A to the Complaint. PNC/Allbrittons would have the Court believe that precise account numbers, dollars and dates of transfer had to be alleged, along with admissions that PNC/Allbrittons knew each transfer was illegal, which is simply not true.[57]

---

[57]    *See Halberstam*, 705 F.2d at 486 (holding that the factual inferences drawn from defendant's general awareness of the wrongful behavior were permissible and supported a finding of knowing and substantial assistance); *Burnett*, 274 F. Supp. 2d at 104 (finding plaintiff's allegations of ongoing relationships between al Qaeda and defendants to be "more than sufficient to permit the inference that [defendants]" knowingly provided material support to al Qaeda's terrorist activities and, as such, that defendants were liable as aiders and abettors); *see also Aetna Cas. and Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 535 (6th Cir. 2000) (citing *Halberstam's* definition of aiding and abetting liability and holding the requisite intent and knowledge may be shown by circumstantial evidence). *Rolf v. Blyth,*

While a showing of "knowing substantial assistance" must be adequately pled, that does not require an onerous showing and allegations that constitute "knowing substantial assistance or encouragement and . . . the extent to which an aider-abettor is liable for injuries caused by the principal tortfeasor," and need not manifest a defendant's "physical[] assistance" or "a finding of action in concert" or knowledge of "an appreciable risk of harm to others," much less intent. *Halberstam*, 705 F.2d at 481-82. For instance, describing a scenario where an "aider-abettor" who clearly did not appreciate the full import of his actions was nonetheless found liable, *Halberstam* instructs the "contributing activity itself need not be . . . obviously nefarious" by describing a case that

> involved students throwing erasers at one another in a classroom. One eraser struck the plaintiff, a nonparticipant in the "horse play"; her eye glasses shattered and she lost the use of an eye. The court found that a student who had only aided the throwers by retrieving and handing erasers to them was still liable for the injury, because he had substantially encouraged the wrongful activity that resulted in the injury. ***It did not matter that the defendant may not even have given any particular aid to the boy who threw the eraser that hit the plaintiff***.

*Id*. at 482.[58]

*Halberstam* further counsels that five factors identified in the Restatement (Second) Law of Torts §876 (1979) on "Persons Acting in Concert" – plus an important sixth the Court recognizes –

---

*Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978) ("Proof of a defendant's knowledge or intent will often be inferential[.]").

[58]      *Halberstam* also instructs that "the aiding-abetting action may also be more distant in time and location and still be substantial enough to create liability" so long as defendants' misconduct proves "an indispensable prerequisite" to the injury. *Id*. *Halberstam* also establishes that aiding-abetting liability for "injuries caused by the acts of the person assisted when the acts were not specifically contemplated by the defendant at the time he offered aid" may be established where an actor unwittingly provides "substantial aid through actual participation" in another's misconduct, so long as the "damage" to the victim (here BAE) was "foreseeable." *Id*. at 483. PNC/Allbrittons do not even attempt to negate this – as they cannot.

be considered, all of which demonstrate PNC/Allbrittons' knowing substantial participation here (*Halberstam*, 705 F.2d at 477):

(1)    ***The Nature of the Act Encouraged:***  While the act of "encouragement" here was non-verbal and transactional (rather than the proverbial "war cry"), the fact that what is alleged to have transpired is ***money laundering*** through U.S. banks in the U.S. capital, an ancient crime that threatens the "reputability of the country's banking system" and "is ultimately connected to the effectiveness of the country's regulation of its banks," especially where the U.S. has "a strong[] interest in policing its financial systems," the "nature of the act encouraged" – money laundering facilitated by Riggs' illegally and intentionally lax banking controls – weighs in favor of finding PNC/Allbrittons provided knowing substantial participation.  *LaSala*, 510 F. Supp. 2d at 265.

(2)    ***The Amount [and Kind] of Assistance Given:*** While PNC/Allbrittons proffer that the alleged illegally lax banking controls do not in and of themselves prove their knowing participation in money laundering, violations of the FCPA or the OECD Convention, the fact that the nation places the oneous on banks to detect and issue SARs, rather than merely passively confirming their customers' promises that no such violations occurred (such as accountants do for issuers' filings with the Securities and Exchange Commission), weighs heavily in favor of finding of PNC/Allbrittons offered knowing substantial participation here when they allegedly ***failed to file such reports for many years in the face of many transactions that would have required such reporting***.  *See Halberstam*, 705 F.2d at 484.[59]  Here plaintiff's allegations that "the U.S. Office of

---

[59]    Federal regulations in effect since 2/5/96 have required "national banks" to file SARs "when they detect a known or suspected violation of Federal law or a suspicious transaction related to a money laundering activity or a violation of the Bank Secrecy Act." 12 C.F.R. §21.11(a). "Whenever a national bank files a SAR . . . , the management of the bank shall promptly notify its board of directors . . . ." *Id*. at §21.11(h).  In fact, the "Bank Secrecy Act of 1970 ('BSA') requires financial institutions to maintain records and ***provide reports to regulators*** which, in turn, assist in the investigation of criminal, tax or regulatory proceedings. ***An underlying purpose of the BSA was to counter money-laundering***

the Comptroller of the Currency specifically cited Riggs' failure to file suspicious activity reports for [multiple] large-denomination withdrawals of cash by Bandar and others" and "uncovered improprieties in some of the 150 Saudi accounts at Riggs" that predated the 9/11 terrorist attacks (¶¶59-60) adequately allege that by running BAE's accounts with illegally lax banking controls Riggs (and thus PNC/Allbrittons) provided culpable knowing substantial participation. *See, e.g.*, *Burnett*, 274 F. Supp. 2d at 107 ("money laundering . . . .allegations were sufficient to state a claim under the aiding and abetting theory" as it "gave defendants fair notice of what plaintiffs' claim was and the grounds upon which it rested").

(3)     ***The Defendants' Absence or Presence at the Time of the Tort:***  While mere "presence" during the commission of another's tort, with nothing more in terms of "real assistance," does not demonstrate knowing substantial participation (*Halberstam*, 705 F.2d at 484), where, as here, it is alleged that the bribery scheme has "been going on for 20 years" and that "Al-Yamamah was and still is the biggest and most lucrative arms deal in history" (Complaint, Ex. A) "***that had gone on for years and years***," with the Riggs' "***accounts [depicted] as a spider web, that was a wheel, a hub and spoke, that was the hub, and then from that account money would be transferred to other accounts***" (Complaint, Ex. A), "real assistance" is alleged, weighing in favor of a finding of knowing substantial participation.

(4)     ***The Defendant's Relation to the Tortious Actor:*** Participation in a "free-for-all" that is later shown to have been both "dangerous and ultimately injurious" can result in even a "minimally-involved participant" being found "liable." *Halberstam*, 705 F.2d at 484.  Here, the fact that Riggs' illegally lax banking controls allegedly violated the nations' banking laws and regulations, and ultimately facilitated the BAE defendants' bribe scheme and violations of the FCPA

---

*activities*" such as those alleged in the Complaint. *Wuliger v. Office of the Comptroller of Currency*, 394 F. Supp. 2d 1009, 1013 (N.D. Ohio 2005).

and the OECD Convention (¶¶8, 13, 49-61), demonstrates Riggs was much more than a "minimally-involved participant" and weighs in favor of finding PNC/Allbrittons' knowing substantial participation.

    (5)  ***The Defendants' State of Mind:*** While the bank itself arguably had no "state of mind" independent of that of its executives, where it is alleged that "[w]ith all of the bank's assets at their disposal, including its Gulfstream jet, the Allbrittons scoured the globe acquiring 95% of Washington D.C.'s embassy account business for Riggs," that the "Allbrittons courted an expansive unsavory international clientele, including Bandar," that Joe Allbritton "ran the bank as his own private fiefdom," that his son Robert Allbritton "acquiesced in and participated in his father's efforts to expand the bank's embassy business at all costs," and that "Barbara Allbritton acquiesced in and participated in her husband's efforts to expand the bank's embassy business at all costs" (¶¶54-58). Therefore, not only are defendants' "state[s] of mind alleged," their  motivation is detailed – more than is required to demonstrate knowing substantial participation.

    (6)  ***Duration of the Assistance Provided:*** Counseling that this is an "important" factor, *Halberstam* holds that ***the "length of time an alleged aider-abettor has been involved with a tortfeasor almost certainly affects the quality and extent of their relationship and probably influences the amount of aid provided as well; additionally, it may afford evidence of the defendant's state of mind***." 705 F.2d at 484.  The bribe scheme is alleged to have gone on for "over the last 20 years" with "Riggs actively participat[ing] in, facilitat[ing] and advanc[ing] the illegal bribe payments to Bandar, hiding them from government investigation and BAE's auditors" "[f]or many years." ¶8.  Other allegations reveal "that BAE paid the money to Bandar for a least 10 years through Riggs Bank in Washington" (¶11), and that "Al-Yamamah was and still is the biggest and most lucrative arms deal in history" (Complaint, Ex. A).  These allegations of the "quality and extent" of this "relationship" and the "influence[s]" it has on the alleged "amount of aid provided"

cannot be discounted and show PNC/Allbrittons' knowing substantial participation.  *Halberstam*, 705 F.2d at 484; *see also Int'l Telecommunications Satellite Org. v. Colino*, No. 88-1266 (RCL), 1992 WL 93129, at *14 (D.D.C. Apr. 15, 1992) (finding defendant's assistance substantial where defendant's involvement was a "necessary element to the successful accomplishment of each scheme" and was of a long duration).

To be sure, the *Halberstam* court concluded that "the implications of tort law in this area [civil remedies for criminal acts] as a supplement to the criminal justice process and possibly as a deterrent to criminal activity ***cannot be casually dismissed***."  705 F.2d at 489.  Similarly, here, Congress has expressly made criminal violations of the FCPA and OECD Convention, the need for holding PNC/Allbrittons accountable for their aiding and abetting the BAE defendants' breaches of duties "'cannot be casually dismissed.'"  *Accord Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571, 583-84 (E.D.N.Y. 2005) (citing *Halberstam* and holding defendant bank liable for aiding and abetting terrorists' violation of anti-terrorism laws); *see also Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 278 (2d Cir. 2006) (allegations "that the defendant banks assisted [the lawyer] by failing to report his overdrafts on attorney fiduciary accounts to the state bar for disciplinary action ***and by evading their reporting duties***" sufficient to withstand Rule 12(b)(6) scrutiny).

Notwithstanding that plaintiff has adequately alleged PNC/Allbrittons' knowing and substantial assistance in the BAE defendants' systematic breaches of their fiduciary duties, PNC/Allbrittons proffer that they had no idea BAE and Prince Bandar employed Riggs as a conduit to funnel illegal bribe payments and that their alleged provision of "normal banking services" somehow belies the substantial assistance they provided to the BAE defendants' breaches.  PNC Brf. at 17-21.  However, PNC/Allbrittons' assertions are undermined by plaintiff's allegations of their knowledge – or allegations from which the Court may properly infer knowledge by PNC/Allbrittons – of the BAE defendants' knowing participation in an illicit enterprise that ultimate resulted in

substantial harm to BAE.  *Halberstam*, 705 F.2d at 484.  While PNC/Allbrittons did provide "usual banking services," "evaluated in the context of the enterprise they aided," the illegality demonstrates PNC/Allbrittons' knowing, substantial participation in Prince Bandar's and the BAE defendant's illegal enterprise.  *Id.* at 488.  Just like in *Halberstam*, PNC/Allbrittons' conduct constituted an ***important*** "***laundering function***" in accepting the deposit of bribe payments and transforming them into what everyone hoped would later appear to be "'legitimate' wealth."  *Id.*  Significantly, PNC/Allbrittons lent their "time and talents" and unsavory banking expertise to the improper and illegal activity ***over a 20-year period***.  *Id.*  And, "although the ***amount of assistance*** [PNC/Allbrittons] gave [the BAE defendants] may not have been overwhelming as to any given [illegal bribe payment] in the [twenty]-year life of this criminal operation, ***it added up over time*** to an ***essential*** part of the pattern."  *Id.*  PNC/Allbrittons' "***continuous participation*** reflected [their] intent and desire to make the venture succeed" and "the ***duration of the assistance***" given is "indeed substantial enough to justify liability on an aider-abettor theory."  *Id.*

Plaintiff's detailed allegations establish that PNC/Allbrittons played an ***integral role*** in the illegal bribe scheme.  For without PNC/Riggs' willingness to operate Prince Bandar's 150 accounts under illegally lax controls, accepting millions of dollars in deposits from BAE and permitting millions of dollars in suspicious transfers and withdraws by Prince Bandar, the bribe scheme never would have happened.  Taken together, plaintiff has sufficiently alleged PNC/Allbrittons' aider-abettor status by setting forth a "'***set of facts*** consistent with the allegations'" that PNC/Allbrittons "knowingly substantially participated" in the BAE defendants' breaches of fiduciary duties.  *Shirk*, 505 F. Supp. 2d at 172 (quoting *Twombly*, 127 S. Ct. at 1967, 1969).  Taken as true as they must be, these allegations and reasonable inferences to be drawn from them are more than sufficient to state an actionable claim for aiding and abetting under prevailing D.C. authority.

### B.  Leave to Amend Should Be Freely Granted if the Court Sustains Any Part of PNC/Allbrittons' Motion to Dismiss

For the foregoing reasons, PNC/Allbrittons' motion to dismiss should be denied.  If, however, the Court dismisses any claims, plaintiff requests leave to amend to add any additional aiding and abetting or other allegations necessary to address any concerns expressed by the Court.[60]

## VI.  PLAINTIFF'S CLAIMS AGAINST PNC/ALLBRITTON ARE NOT BARRED BY THE *IN PARI DELICTO* DOCTRINE

PNC/Allbrittons hide behind the *in pari delicto* doctrine as a cloaking device to permit them to escape the consequences of their grievous – even illegal – misconduct.  Yet, absurdly, PNC, successor to Riggs, now argues that BAE's equity owners should be denied any remedy against Riggs and its former executives for their complicity in the "money laundering, wire fraud, and mail fraud" that brought Riggs down, even though PNC itself "backed out of the merger" and dramatically slashed the price it paid for Riggs by $127 million, more than 16% of the agreed to price, "shortly after Riggs entered its guilty plea, . . . citing 'unexpected adverse developments at Riggs' and 'a litany of legal and regulatory matters that Riggs continue[d] to face.'" *Freeport Partners, L.L.C.*, 2006 U.S. Dist. LEXIS 9710, at *7.  Perhaps this is because "[i]n its merger with Riggs, PNC agreed to indemnify ***all Riggs directors*** and employees for any litigation arising out of actions they took in their official capacities." *Id.* at *9 n.3.  For whatever reason, PNC/Allbrittons' argument here is that no matter how outrageous the alleged misconduct – here involving years of

---

[60]     *See* Fed. R. Civ. P. 15(a) (stating that the court "should freely give leave [to amend] when justice so requires"); *Foman v. Davis*, 371 U.S. 178 (1962) (noting that leave to amend should be liberally granted).  Plaintiff has provided, in the Statement of the Case, additional evidence available in the Congressional record.  Plaintiff does not intend that any of the additional facts be employed by the Court in its analysis to determine if plaintiff has met its pleading standard.  They are provided here only to highlight some of that which plaintiff could provide in an amended complaint.  By virtue of the criminal proceedings, the civil RICO and derivative actions by Riggs' shareholders, and the litigation between Riggs and PNC concerning the reduced price PNC paid for Riggs, there is certainly more.

violations of federal banking laws and regulations – no one can call it to account: **not** BAE, **not**

BAE's shareholders and certainly **not** this Court.  That simply is not the law.

Essentially, PNC/Allbrittons' use *in pari delicto* theory is that the knowledge and

participation of wrongdoing directors and officers must be imputed to BAE and, thus, bars all of

plaintiff's claims against them in this lawsuit.  They are wrong.  This doctrine must be applied

equitably, involves determinations that are improper on a motion on the pleadings, and the result

defendants seek would violate public policy.

A. ***In Pari Delicto* Is an Equitable Doctrine that Should Not Be Applied
to Resolve a Motion to Dismiss**

PNC/Allbrittons' assertion that the existence of the *in pari delicto* defense is evident on the

face of the complaint (PNC Brf. at 27-28) is belied by the legal authority below which calls into

question whether the doctrine even applies at all to shareholder derivative suits and by case law

holding that courts should postpone consideration of affirmative defenses such as *in pari delicto*

until the complaint is answered.  *See Knauer v. Jonathan Roberts Fin. Group*, 348 F.3d 230, 237

(7th Cir. 2003); *In re Bennett Funding Group Inc.*, No. 96-61376, 1999 Bankr. LEXIS 1857, at *38

(N.D.N.Y. Aug. 6, 1994).  Thus, even if this Court considers PNC/Allbrittons' dubious *in pari

delicto* argument, that consideration is premature.

The doctrine of *in pari delicto* is an affirmative defense that must be pled and proved by a

preponderance of the evidence.[61]  As a highly fact-specific defense, the *in pari delicto* defense

cannot be resolved *sans* discovery.[62]

---

[61]    *See Mick's at Pa. Ave., Inc. v. BOD, Inc.*, 389 F.3d 1284, 1288 (D.C. Cir. 2004) (*in pari delicto* is
an affirmative defense); *In re Greater Southeast Cmty. Hosp. Corp. I*, 353 B.R. 324, 361-62 (Bankr.
D.D.C. 2006) (same); *United States v. Philip Morris USA, Inc.*, 327 F. Supp. 2d 8 (D.D.C. 2004) (same);
*see also* Charles Allen Wright & Arthur R. Miller, *Federal Practice & Procedure: Civil 3d* §1277, at 626
(3d ed. 2008) ("***most defensive matters cannot be the basis for a motion to dismiss*** the plaintiff's
complaint"); *Deckard v. GMC*, 307 F.3d 556, 560 (7th Cir. 2002) (the ***existence of a defense does not
undercut the adequacy of a claim***); *Drummond v. Spero*, 350 F. Supp. 844 (D. Vt. 1972) (the defense of

PNC also conspicuously ignores the equitable nature of *in pari delicto*, arguing instead for a mechanistic and formulaic application of this doctrine that is inconsistent both with the facts alleged in the Complaint and the case-specific analysis required on a motion to dismiss.  A number of complex factual inquiries will be required to determine the applicability of *in pari delicto* here.  These include, but are not limited to, of course, the difficult factual assessments and balancing that must be done in determining whether the fault, if any, ultimately attributable to BAE may be lesser, greater, or equal to fault attributable to Riggs (PNC), the Allbrittons, the BAE and Prince Bandar.  Such a detailed factual analysis is improper on a motion to dismiss.

Compounding the difficulty is the fact that *in pari delicto* is an affirmative defense – raised by PNC, not plaintiff.  Accordingly, the expectation that all facts sufficient to adjudicate the issue would be available in the Complaint is unrealistic, especially given that it is PNC's burden to conclusively establish any such affirmative defense.  For these reasons, plaintiff respectfully submits

---

privilege in a suit for libel or slander **cannot be raised by a motion to dismiss**); *Cohen v. United States*, 129 F.2d 733, 737 (8th Cir. 1942) (affirmative defenses "must be **set forth affirmatively**").

[62]     *See Knauer*, 348 F.3d at 237 n.6 ("*[I]n pari delicto* is an affirmative defense and generally **dependent on the facts**, and so often **not an appropriate basis for dismissal**."); *Bennett Funding Group*, 1999 Bankr. LEXIS 1857, at *38 ("it is **exceedingly difficult** for a defendant to obtain a Fed. R. Civ. P. 12(b)(6) dismissal on the basis of the **fact-sensitive in pari delicto defense**"); *Baker O'Neal Holdings, Inc. v. Ernst & Young LLP*, No. 1:03-cv-0132-DFH, 2004 WL 771230 (S.D. Ind. Mar. 24, 2004) (same). A plaintiff need not try to plead around affirmative defenses. *See Marwil v. ENT & Imler CPA Group, P.C.*, No. 1:03-cv-00678-DFH-VS, 2004 WL 2750255 (S.D. Ind. Nov. 24, 2004); *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 311-12 n.21 (1985) (We note, however, the inappropriateness of resolving the question of the [plaintiff's] fault solely on the basis of the allegations set forth in the complaint.); *Roma Constr. Co. v. Russo*, 96 F.3d 566, 570 n.2 (1st Cir. 1996) (Dismissal for *in pari delicto* is "a fact-intensive 'equal involvement' defense [that] would be inappropriate on the undeveloped record presently before the court [on a motion to dismiss]." "[T]he district court erred in finding that plaintiffs could prove no set of facts which would show their nonculpability."); *FDIC v. O'Melveny & Myers*, 61 F.3d 17, 19 (9th Cir. 1995)  (the party stepping into the shoes of the corporation "was neither party to the original inequitable conduct nor is it in a position to take action prior to [stepping into the shoes of the corporation] to cure" the wrongdoing); *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1352 (7th Cir. 1986) (noting that "because the corporation itself was injured, it is not *in pari delicto* with the wrongdoers" because the "'corporation is not at fault for being the **alter ego** of the defendants, just as it is not liable for defendants' breach of fiduciary duty to it'").

that the Court should decline to apply the *in pari delicto* analysis in the context of the limited record before it on a motion to dismiss.

> **B.      The Equitable Alignment of Plaintiff, BAE and PNC Is Critical in Applying *In Pari Delicto* Analysis and Bars Application of the Doctrine in This Case**

Ignoring for a moment that such a defense is inappropriate at the motion to dismiss stage, *in pari delicto* is simply not available when a corporation brings an action against an insider for misconduct.  *See, e.g.*, *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 212 n.132 (Del. Ch. 2006), *aff'd*, 2007 Del. LEXIS 357 (Del. 2007) ("***Many of the great corporate scandals have involved concerted activity by company advisors and insiders, activity that sometimes harmed not only outsiders but also, derivatively, the company's innocent stockholders. The doctrine of in pari delicto has never operated in Delaware as a bar to providing relief to the innocent by way of a derivative suit***."); *Scholes v. Lehmann*, 56 F.3d 750, 754 (7th Cir. 1995) ("***the defense of in pari delicto loses its sting when the person who is in pari delicto is eliminated***").  Similarly, this is a derivative case and while nobody has (yet) been removed from BAE's executive ranks, by "stepping into the shoes" of the board of directors as a shareholder plaintiff *perforce* does, the wrongdoers as benefactors of the lawsuit have been essentially "eliminated" and the action is brought to "recover corporate assets unlawfully dissipated by" them.  *Id.* at 754-55.  As an equitable doctrine, *in pari delicto* has simply never been applied against innocents:

> If there was no *delictum* on the part of the claimants, there was no *par delictum* on their part, and the rule expressly requires equal wrong in order that the law should leave the parties where it finds them.  "***The maxim does not apply unless both the litigating parties are in delicto; it cannot be insisted upon as a defense, either by or against an innocent party***."

*Bailey's Case*, 15 Ct. Cl. 490 (1879), *aff'd*, 109 U.S. 432 (1883).  This Court should follow the path laid in *Trenwick* and *Scholes* and reject defendants' *in pari delicto* yet unpled and unproven

*affirmative defense*.[63]  The Complaint here is brought derivatively in the place and stead of the BAE Board of Directors under the Court's equitable powers.  The Prayer expressly seeks a judgment "[a]warding money damages against all defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, ***molded in a fashion to ensure defendants do not participate therein or benefit thereby***." Complaint, Prayer.

### C.      The Court Cannot Resolve Whether the Parties Are "of Equal Fault" on a Motion to Dismiss

The obvious question the *in pari delicto* defense raises is whether the "fault" thus attributed to plaintiff (on behalf of BAE) equals or exceeds the level of culpability attributable to the defendants, which include PNC/Allbrittons and Prince Bandar – who apparently demanded the bribes and whose benefit PNC/Allbrittons participated in the bribe scheme.  Predictably, resolution of the question is impractical on a motion to dismiss: "'[I]n cases where both parties are *in delicto*, concurring in an illegal act, it does not always follow that they stand *in pari delicto*; for there may be, and often are, very different degrees in their guilt.'"[64]

The allegations in plaintiff's Complaint do not support a finding, as a matter of law, of equal fault at this stage in the litigation.  First, even if the directors' and officers' acts are imputed in some

---

[63]      *See, e.g.*, *Baker O'Neal Holdings*, 2004 WL 771230, at *8 ("[T]he equitable context in which the *in pari delicto* defense is asserted is crucial."); *Marwil v. Farah*, No. 1:03-cv-0482-DFH, 2003 WL 23095657 (S.D. Ind. Dec. 11, 2003); *Marwil v. ENT & Imler CPA Group, PC*, No. 1:03-cv-00678-DFH-VS, 2004 WL 2750255, at *9 (S.D. Ind. Nov. 24, 2004) ("The [*Scholes* and *Knauer*-line of] cases highlighted that the equitable alignment of plaintiff and defendant is crucial in applying the *in pari delicto* defense."); *In re Del-Met Corp.*, 322 B.R. 781, 819 (Bankr. M.D. Tenn. 2005) (noting that the "'***equitable context*** in which the *in pari delicto* defense is asserted is ***crucial***'").

[64]      *In re Dow*, 132 B.R. 853, 860 (Bankr. S.D. Ohio 1991) (alteration in original) (quoting *Feld & Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick, & Cabot*, 458 A.2d 545 (Pa. Super. Ct. 1983)); *see also Bateman Eichler*, 472 U.S. at 306-07 (same).  Even BAE would only be barred by *in pari delicto* if the company's fault was equal to or greater than the fault or guilt of the defendants, here PNC/Allbrittons, Prince Bandar's and the BAE defendants.  *See Dow*, 132 B.R. at 860.

part to BAE, and thus plaintiff, those acts may also be attributable to other entities like Bandar and the BAE defendants.  The determination whether plaintiff/BAE is "of equal fault" with all of these defendants will require an assessment of whether the Company's vicarious responsibility for its defalcating agents exceeds the responsibility of the very "gatekeepers" and custodians who were expressly hired to manage its assets for its benefit.  *In pari delicto* must be applied cautiously in this circumstance:

> *The risk of a liberal application of in pari delicto is that tortfeasors preparing to defraud an entity could potentially immunize themselves from liability simply by enlisting the help of an executive in the victim-corporation. . . . [T]he best case for not applying the in pari delicto defense is where the insider and the third-party tortfeasor were essentially acting as co-conspirators.*

*Baker O'Neal Holdings, Inc.*, 2004 WL 771230, at *9-*10.  In the same way, where Riggs was expressly required under the federal banking statutes and regulations – which it was found to have violated by both the Congress and the OCC – to monitor, restrict, and report upon any potential improper or suspicious activities, a rule that exonerates those banks any time management itself acted improperly would always immunize the institutions from liability or responsibility. Such a rule must be rejected.

### D. The *In Pari Delicto* Doctrine Does Not Bar These Claims for Public Policy Reasons

Many federal courts have concluded that the common-law defense of "*in pari delicto*" is wholly unavailable and inapplicable as a defense to the private enforcement of statutory RICO, antitrust, securities and environmental law violations – not because they are statutory or federal claims, but because of the laudable public policy goals private enforcement of the statutes promote.[65]

---

[65]    *See, e.g.*, *Harper v. AT&T Co.*, 54 F. Supp. 2d 1371, 1380 (S.D. Ga. 1999) ("In considering the . . . common law defense [of] *in pari delicto*, several courts have held that it is not applicable in federal RICO cases.") (citing cases and declining to apply the doctrine in a RICO case); *Wilson v. Toussie*, 260 F. Supp. 2d 530, 539 (E.D.N.Y. 2003) ("[I]t is unclear whether either [the *in pari delicto* or unclean hands] doctrine may properly be applied to civil RICO claims."); *Cohen v. Wolgin*, No. 87-2007, 1988

In *Bateman Eichler* (securities statute violation) and *Perma Life* (anti-trust violation), the Court rejected *in pari delicto* in situations in which applying the defense would have left known violators of the regulatory statutes immune from civil liability under statutes expressly designed to confer civil liability. *See, e.g., Bateman Eichler*, 472 U.S. at 315-17. In *Bateman Eichler*, defendants had given the plaintiff purported "inside" information that was false in an attempt to induce the plaintiff to trade the securities. The deceived plaintiff, who had himself attempted to trade on inside information, sued under RICO. The Supreme Court found that application of *in pari delicto* to bar such a claim would interfere with the enforcement of the securities laws. *See Bateman Eichler*, 472 U.S. at 315. "It is particularly important to permit 'litigation among guilty parties [that will serve] to expose their unlawful conduct and render them more easily subject to appropriate civil, administrative, and criminal penalties.'" *Id.* at 315-16. Similarly, in *Perma Life*, the Supreme Court rejected *in pari delicto* and permitted suit against the Midas Muffler franchisor by dealers who were themselves parties to the franchise agreement alleged to be an illegal restraint of trade. The Supreme Court held that the "strong public interest in eliminating restraints on competition" precluded the application of the defense, so that "private action will be an ever-present threat to deter anyone contemplating [illegal] business behavior." *Perma Life Mufflers v. Int'l Parts Corp.*, 392 U.S. 134, 139, 151 (1968).

If the *in pari delicto* doctrine were permitted as a defense in the circumstances now before this Court, a conspicuous loophole would be forged in shareholder protections, thus significantly interfering with the public interest and the integrity of our financial markets. Moreover, under PNC/Allbrittons' logic, key participants in a blatant bribery scheme designed to injure and loot a

---

WL 65970, at *7 (E.D. Pa. June 20, 1988) ("Courts have disagreed whether this defense is applicable to RICO claims.") (citing *e.g., In re Nat'l Mortgage Equity Corp. Mortgage Pool Certificates Sec. Litig.*, 636 F. Supp. 1138, 1156 (C.D. Cal 1986) (declining to apply *in pari delicto* in a RICO action)).

corporation (and the Saudi people) could wholly immunize themselves from liability simply by making certain that some corporate officers were part of their scheme.  Given that schemes to abuse a corporation and steal or loot its assets will frequently be facilitated by having at least some corporate insiders act as part of the conspiratorial enterprise, a legal rule or doctrine that would tend to immunize participants from prosecution in derivative litigation is clearly at odds with the public interest.  *Baker O'Neal Holdings*, Inc., 2004 WL 771230, at *9-*10 ("***The risk of a liberal application of in pari delicto is that tortfeasors preparing to defraud an entity could potentially immunize themselves from liability simply by enlisting the help of an executive in the victim-corporation***.")  Each of the 50 U.S. states has statutes and court rules specifically designed to facilitate the equitable right of shareholders to sue derivatively to protect their investments (*see Fletchers' Cyclopedia* §5942), including suits against third-party tortfeasors.  A rule that permitted the *in pari delicto* defense would eliminate the remedy.

## VII.   CONCLUSION

For the reasons stated herein, defendants' motions to dismiss should be denied.

DATED:  April 23, 2008                    Respectfully submitted,

                                          COUGHLIN STOIA GELLER RUDMAN
                                            & ROBBINS LLP
                                          PATRICK J. COUGHLIN
                                          MARK SOLOMON
                                          MARY K. BLASY


                                                  s/ MARY K. BLASY
                                          ────────────────────────────
                                               MARY K. BLASY

                                          655 West Broadway, Suite 1900
                                          San Diego, CA  92101
                                          Telephone:  619/231-1058
                                          619/231-7423 (fax)

                                          Lead Counsel for Plaintiff

THE LAW OFFICE OF ROGER M. ADELMAN
ROGER M. ADELMAN (DC Bar # 056358)
1100 Connecticut Ave., NW, Suite 730
Washington, DC  20036
Telephone:  202/822-0600
202/822-6722 (fax)

CUNEO GILBERT & LaDUCA, L.L.P.
JONATHAN W. CUNEO(DC Bar # 939389)
WILLIAM H. ANDERSON (DC Bar # 502380)
507 C Street, N.E.
Washington, DC  20002
Telephone:  202/789-3960
202/789-1813 (fax)

Co-Liaison Counsel

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

S:\CasesSD\BAE Derivative\BRF00050756_Opp.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 23, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 23, 2008.

s/ MARY K. BLASY
MARY K. BLASY

COUGHLIN STOIA GELLER
        RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail: maryb@csgrr.com

# Mailing Information for a Case 1:07-cv-01646-RMC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roger M. Adelman**
  radelman@erols.com,lisamp@csgrr.com,tlatimer@csgrr.com,e_file_sd@csgrr.com

- **Mary K. Blasy**
  maryb@csgrr.com

- **Richard L. Brusca**
  rbrusca@skadden.com

- **Lawrence Byrne**
  larry.byrne@linklaters.com

- **Patrick J. Coughlin**
  patc@csgrr.com

- **Jonathan Watson Cuneo**
  jonc@cuneolaw.com

- **Matthew John Herrington**
  mherrington@steptoe.com

- **James Neil Lombardo**
  nlombard@skadden.com,dlmlcwas@skadden.com

- **Christopher Talbott Lutz**
  clutz@steptoe.com

- **William Bradford Reynolds**
  ReynoldsW@howrey.com

- **Eric M. Roth**
  emroth@wlrk.com

- **Mark Solomon**
  marks@csgrr.com

- **Adir G. Waldman**
  awaldman@wlrk.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)