UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re BAE SYSTEMS PLC DERIVATIVE LITIGATION | ) ) ) | Civil No. 1:07-cv-01646 |
| | ) | Assigned to: Judge Rosemary M. Collyer |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) ) | |

NOTICE OF ERRATA RE PLAINTIFF'S CONSOLIDATED OPPOSITION TO
DEFENDANTS' MOTIONS TO DISMISS

PLEASE TAKE NOTICE THAT Exhibit D to the Declaration of Mary K. Blasy In Support

of Plaintiff's Consolidated Brief In Opposition to Defendants' Motion to Dismiss (filed as an

attachment to Plaintiff's Consolidated Opposition to Defendants' Motions to Dismiss on April 23,

2008) was improperly formatted for the Court's electronic docketing system.  Attached to this Notice

is a properly formatted copy of Exhibit D for the Court's record and all parties.

DATED:  April 24, 2008                    Respectfully submitted,

                                          COUGHLIN STOIA GELLER RUDMAN
                                            & ROBBINS LLP
                                          PATRICK J. COUGHLIN
                                          MARK SOLOMON
                                          MARY K. BLASY


                                          _____
                                               s/ MARY K. BLASY
                                               MARY K. BLASY

                                          655 West Broadway, Suite 1900
                                          San Diego, CA  92101
                                          Telephone:  619/231-1058
                                          619/231-7423 (fax)

                                          Lead Counsel for Plaintiff

                                          THE LAW OFFICE OF ROGER M. ADELMAN
                                          ROGER M. ADELMAN (DC Bar # 056358)
                                          1100 Connecticut Ave., NW, Suite 730
                                          Washington, DC  20036
                                          Telephone:  202/822-0600
                                          202/822-6722 (fax)

                                          CUNEO GILBERT & LaDUCA, L.L.P.
                                          JONATHAN W. CUNEO(DC Bar # 939389)
                                          WILLIAM H. ANDERSON (DC Bar # 502380)
                                          507 C Street, N.E.
                                          Washington, DC  20002
                                          Telephone:  202/789-3960
                                          202/789-1813 (fax)

                                          Co-Liaison Counsel

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

S:\CasesSD\BAE Derivative\NOT00050758.doc

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 24, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 24, 2008.

s/ MARY K. BLASY
MARY K. BLASY

COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail: maryb@csgrr.com

S:\CasesSD\BAE Derivative\NOT00050758.doc

# Mailing Information for a Case 1:07-cv-01646-RMC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roger M. Adelman**
  radelman@erols.com,lisamp@csgrr.com,tlatimer@csgrr.com,e_file_sd@csgrr.com

- **Mary K. Blasy**
  maryb@csgrr.com

- **Richard L. Brusca**
  rbrusca@skadden.com

- **Lawrence Byrne**
  larry.byrne@linklaters.com

- **Patrick J. Coughlin**
  patc@csgrr.com

- **Jonathan Watson Cuneo**
  jonc@cuneolaw.com

- **Matthew John Herrington**
  mherrington@steptoe.com

- **James Neil Lombardo**
  nlombard@skadden.com,dlmlcwas@skadden.com

- **Christopher Talbott Lutz**
  clutz@steptoe.com

- **William Bradford Reynolds**
  ReynoldsW@howrey.com

- **Eric M. Roth**
  emroth@wlrk.com

- **Mark Solomon**
  marks@csgrr.com

- **Adir G. Waldman**
  awaldman@wlrk.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`

EXHIBIT D



Neutral Citation Number: [2008] EWHC 714 (Admin)

Case No: CO/1567/2007

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**ADMINISTRATIVE COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 10 April 2008

**Before** :

**LORD JUSTICE MOSES**
**MR JUSTICE SULLIVAN**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

| | |
|---|---|
| The Queen on the Application of Corner House Research and Campaign Against Arms Trade | **Claimants** |
| - and - | |
| The Director of the Serious Fraud Office | **Defendant** |
| - and - | |
| BAE Systems PLC | **Interested Party** |

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Dinah Rose QC, Philippe Sands QC and Ben Jaffey (**instructed by **Leigh Day & Co**) for the
**Claimants**
**Philip Sales QC, Hugo Keith and Karen Steyn** (instructed by **The Treasury Solicitor**) for the
**Defendant** and **Clare Montgomery QC** (instructed by **Allen & Overy LLP**) for the **Interested
Party**

Hearing dates: 14th-15th February, 2008
- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

**Lord Justice Moses :**

*Introduction*

1.      This is the judgment of the Court.

2.      Between 30 July 2004 and 14 December 2006 a team of Serious Fraud Office lawyers, accountants, financial investigators and police officers carried out an investigation into allegations of bribery by BAE Systems plc (BAE) in relation to the Al-Yamamah military aircraft contracts with the Kingdom of Saudi Arabia.  On 14 December 2006 the Director of the Serious Fraud Office announced that he was ending the SFO's investigation.

3.      In October 2005 BAE sought to persuade the Attorney General and the SFO to stop the investigation on the grounds that its continued investigation would be contrary to the public interest: it would adversely affect relations between the United Kingdom and Saudi Arabia and prevent the United Kingdom securing what it described as the largest export contract in the last decade.  Despite representations from Ministers, the Attorney General and the Director stood firm.   The investigation continued throughout the first half of 2006.

4.      In July 2006 the SFO was about to obtain access to Swiss bank accounts.  The reaction of those described discreetly as "Saudi representatives" was to make a specific threat to the Prime Minister's Chief of Staff, Jonathan Powell:   if the investigation was not stopped, there would be no contract for the export of Typhoon aircraft and the previous close intelligence and diplomatic relationship would cease.

5.      Ministers advised the Attorney General and the Director that if the investigation continued those threats would be carried out; the consequences would be grave, both for the arms trade and for the safety of British citizens and  service personnel.  In the light of what he regarded as the grave risk to life, if the threat was carried out, the Director decided to stop the investigation.

6.      The defendant in name, although in reality the Government, contends that the Director was entitled to surrender to the threat.  The law is powerless to resist the specific and, as it turns out, successful attempt by a foreign government to pervert the course of justice in the United Kingdom, by causing the investigation to be halted.  The court must, so it is argued, accept that whilst the threats and their consequences are "a matter of regret", they are a "part of life".

7.      So bleak a picture of the impotence of the law invites at least dismay, if not outrage.  The danger of so heated a reaction is that it generates steam; this obscures the search for legal principle.  The challenge, triggered by this application, is to identify a legal principle which may be deployed in defence of so blatant a threat.  However abject the surrender to that threat, if there is no identifiable legal principle by which the threat may be resisted, then the court must itself acquiesce in the capitulation.

*Facts*

8.      Since this case has aroused public concern, we should stress that which is well-recognised in the field of public law.  This court is not concerned to conduct an

Case 1:07-cv-01646-RMC    Document 81-2    Filed 04/24/2008    Page 4 of 43

Judgment Approved by the court for handing down.                    Corner House Research SFO

enquiry into the facts which led to the Director's decision, save to the extent necessary to reach a conclusion as to whether that decision was lawful. The defendant has disclosed facts which are sufficient for the purpose of reaching a conclusion but they are not comprehensive and it is not part of the court's function in these judicial review proceedings to achieve a more complete account of the events, unless omission inhibits a correct legal conclusion. We emphasise that, through the efforts of Treasury Counsel and those by whom he is assisted, there has been sufficient disclosure to enable us to reach a solution to the essential question whether the Director acted lawfully. We turn, then, to the facts on which the court needs to rely.

9.     On 14 October 2005 the SFO issued a statutory notice to BAE requiring it to disclose details of payments to agents and consultants in respect of the Al-Yamamah contracts. On 7 November 2005, in response to that notice, BAE's solicitors wrote to the Attorney General in a memorandum described as "strictly private and confidential" seeking to persuade him to halt the investigation on the grounds that it would be:-

> "seriously contrary to the public interest on the grounds that it would adversely and seriously affect relations between the UK and Saudi Arabian Governments and would almost inevitably prevent the UK securing its largest export contract in the last decade".

The Group Legal Director told the Attorney General that he had discussed those issues with the Permanent Secretary at the Ministry of Defence. The Legal Secretary to the Law Officers replied that it was not appropriate for law officers to receive a memorandum cloaked with confidentiality. The representations were then sent to the Director of the SFO. The foundation for BAE's fears, described in its memorandum, was that compliance with the Statutory Notice would be regarded by the Saudi Arabian Government as a serious breach of confidentiality by BAE and by the UK Government.

10.    On 15 November 2005 the SFO's Case Controller, Matthew Cowie, questioned BAE's solicitors as to :-

> "…why the pursuance by the SFO *of its independent statutory powers of investigation* could properly be regarded as a breach of duty of confidentiality by the United Kingdom Government." (our emphasis)

He reminded the solicitors for BAE that it was a participant in the Organisation for Economic Co-operation and Development (OECD) process, committed to the principles of the OECD's Convention on Combating Bribery of Foreign Public Officials in International Business Transactions 1997 (The Convention), and set out the terms of Article 5 of the Convention:

> "Investigation and prosecution of the bribery of a foreign public official shall be subject to the applicable rules and principles of each Party. They shall not be influenced by considerations of national economic interest, the potential

effect upon relations with another State or the identity of the
natural or legal persons involved."

11.    On 6 December 2005 the Director and the Attorney General started what is known as
a "Shawcross exercise".  We shall consider later the claimants' challenge based on the
conduct of that exercise.  For the moment, it is sufficient to recall that a Shawcross
exercise is the means by which facts including any consideration affecting public
policy can be sought from Government ministers by the Attorney General in order to
acquaint himself with all that is relevant to his decision whether it is in the public
interest to pursue a prosecution.    The letter, inviting the views of the Government,
drew specific attention to Article 5 of the Convention prohibiting parties to the
Convention from being influenced by considerations of national economic interest or
the potential effect upon relations with another state.  It recorded  that the Attorney
had assured the OECD working group in 2004 that:-

"none of the considerations prohibited by Article 5 would be
taken into account as public interest factors not to prosecute
foreign bribery cases."

The letter reminded the Cabinet Secretary that he would have to have regard to the
Convention in any comments made in response.

12.    On 16 December 2005 the Cabinet Secretary, in response to the Shawcross exercise,
commented that:-

"it is, of course, for the Attorney General and the prosecuting
authorities to decide whether there should be a prosecution, and
also to decide how Article 5 bears on the current circumstances.
We have, however, assumed that it may be possible for
considerations of the kind mentioned in Article 5 at least to be
taken into account for the purpose of taking an early view on
the viability of any investigation."

13.    The note did, indeed, take into account those considerations prohibited by Article 5.
It emphasised the importance of the relationship with Saudi Arabia and that the Al-
Yamamah air defence programme, including the upgrade programme for Tornado
aircraft, was a cornerstone of that relationship.  It referred to the procurement by the
Saudis of the next generation of attack aircraft, the Typhoon.  After referring to such
commercial considerations it turned to counter-terrorism work and the vital strategic
interest of stability in the Middle East.  It referred to the importance of Saudi Arabia
in the fight against Islamic terrorism and the damage to British security interests
should the investigation continue.  It described Saudi Arabia as a key country in the
Middle East in its advocacy of moderate foreign policy.  Its stability was of vital
strategic interest to the United Kingdom and to the west generally.

14.    The response of the SFO is of considerable importance in this application.  At this
early stage it was, again, the case controller who understood the implications of the
Cabinet Office's response.  His advice, dated 19 December 2005, to the Director,
deserves quotation.  In answer to the question as to whether the public interest
consequences should be considered by the SFO at the stage the investigation had
reached he referred to the duty of the SFO to investigate crime and pursue reasonable

lines of enquiry in the light of domestic and international obligations.  He referred to Article 5 of the OECD Convention and the likely ratification in the future of Article 35 of the UN Convention on corruption, and then continued:-

> 'those international instruments envisage an independent role for law enforcement outside of (*sic*) economic or political considerations.  *To have any meaningful effect they must have application, regardless of the seriousness of the consequences stated.*  There are always likely to be economic and political consequences of any major enquiry into defence contracts.  That is why such considerations must ultimately be irrelevant to the independent conduct of such enquiries.  It is impossible for the Director of the SFO to weigh up these competing public interest considerations.'  (our emphasis)

15.    The brief then continued:-

> "**If it is conceded that public interest features of this importance have to be considered by the investigating authority or by the Attorney General, at this stage in the investigation, how should the public interest in the rule of law as opposed to economic and political consequences be balanced?**"
>
> The SFO does not concede this point and believes identical considerations apply to the role of the Attorney General."

16.    The brief summarises the effect of the note in response to the Shawcross exercise and continues:-

> "The only challenge we can make, if it is conceded that this issue is not covered by Article 5 of the OECD Convention is if we have grounds to believe that the Cabinet are not fully apprised of considerations that are capable of altering the balance of the public interest.
>
> *Have they given full consideration to the public interest in the rule of law, the independence of the SFO and MDP and the role of central government, all of which could suffer reputational damage if it emerged that an investigation by the SFO had been cut short,* [the words which follow have been deleted from public scrutiny]." (our emphasis)

17.    The Attorney General and the Director resisted the representations to halt the investigation on public interest grounds.  Their view is recorded in a letter dated 25 January 2006:-

> "Having weighed all the public interest considerations and having regard to the OECD Convention…the Attorney General considers that it is in the public interest for the SFO investigation to proceed."

18.   It is important to appreciate that the grounds upon which it was said that the public interest would be damaged by continuing the investigation at the end of 2005 are the same grounds as those resurrected later in 2006.  But on this occasion, in early 2006, the Attorney General and the Director were of the view that they were not such as to justify discontinuing the investigation.  What changed later in 2006?

19.   Investigations continued throughout 2006 until, as we have said, the SFO was about to obtain access to bank accounts in Switzerland.  This provoked an explicit threat made with the specific intention of halting the investigation.  We should pause in the narrative to record the evidence in relation to that threat.  On 29 September 2006 the Cabinet Secretary wrote to the Attorney General's Legal Secretariat to report what he described as "some significant recent developments".  He referred to the earlier commercial, diplomatic and counter-terrorism co-operation considerations which he said had become even more compelling:

> "…the severe damage to the public interest…we feared was likely in December 2005 is now imminent.  If the Saudis are already deciding to take such steps in relation to the Typhoon programme, then we must anticipate that they could follow though (*sic*) [redaction] in relation to counter-terrorism and the bi-lateral relationship…the Saudis understanding of the manner and direction of the investigation affect the likelihood of this damage occurring at any given time, and the recent course of the investigation…has taken us to the brink of such consequences.  We accept entirely that these matters are for the Attorney General to decide, acting independently of Government.  We would be grateful if he would, in light of these developments, consider reviewing the decision recorded in your letter to me of 25 January 2006."

20.   The Government has contended that it is not in the public interest for the details of those "significant recent developments" to be disclosed.  It issued Public Interest Immunity certificates to that effect.  We should record that in order to allay concern that the omission might cause these proceedings to be resolved on the basis of a misapprehension as to the true facts, the court was shown unredacted versions of all the documents disclosed, including the letter of 29 September 2006.  This is not the occasion to determine the propriety of such a procedure.  We have not taken up time, either at an interlocutory stage or at the hearing, to reach any final conclusion as to the correct procedure to be adopted in judicial review proceedings where the Government takes the view that it is not in the public interest to lay all the cards on the table.  But, fundamentally, it is the obligation of the defendant, in the instant case the Government, to ensure that its response to the challenge is not misleading.

21.   However, the opportunity to see the unredacted version has ensured that the challenge can be advanced on a fair and accurate factual basis.  We have proceeded on this basis because we take the view that we have sufficient information to do justice to the challenge and to ensure, in the light of the information we have been given by the Government, that its resistance is not on a misleading factual basis.

22.   The allegation made by the claimants is clear.  It sets out a report from the Sunday Times dated 10 June 2007.  The report states that:-

> "Bandar (Prince Bandar bin Sultan bin Abdul Aziz of al-Saud)
> went into Number 10 and said 'get it stopped' [words omitted].
> Bandar suggested to Powell he knew the SFO were looking at
> the Swiss accounts…if they didn't stop it, the Typhoon contract
> was going to be stopped and intelligence and diplomatic
> relations would be pulled."

23.   There has never been a specific admission of those facts by the Government.  On the
      contrary, in both the summary and the detailed grounds of resistance, the defendant
      merely stated that on 29th September 2006 the Attorney General's office had received
      further representations from the Cabinet Secretary regarding the public interest in the
      light of more recent developments (see § 7 of the summary and § 8 of the detailed
      grounds).  It is true that those responses were to a challenge based on Article 5 of the
      Convention.  Accordingly, Collins J, in refusing leave, was unaware that "the recent
      developments" were an explicit threat designed to interfere with the course of the
      investigation.  It was only as a result of the efforts of Treasury Counsel and Treasury
      Solicitor that some redacted documents were disclosed.  In response to that letter of
      29 September 2006, the Legal Secretary to the Law Officers referred to
      representations made and consequences threatened by "Saudi representatives" (letter
      3 October 2006).

24.   No admission of a specific threat was made in the Government's skeleton argument.
      In those circumstances the court asked Mr Sales QC, on behalf of the defendant, to
      explain the factual basis upon which the court should proceed.  We were told that we
      should base our judgment on the facts alleged by the claimants.  We shall do so: there
      is no other legitimate basis.  Moreover, the facts alleged are of particular significance
      in the instant application.  The significant event which was soon to lead to the
      investigation being halted was a threat made by an official of a foreign state, allegedly
      complicit in the criminal conduct under investigation, and, accordingly, with interests
      of his own in seeing that the investigation ceased.

25.   The letter from the Legal Secretariat dated 3 October 2006 recorded that the Attorney
      General had noted the strength of the representations made by the Saudi
      representatives, but concluded:-

> "The Attorney is of the firm view that, if the case is in fact
> soundly based, it would not be right to discontinue it on the
> basis that the consequences threatened by the Saudi
> representatives may result."

26.   The history thereafter shows that the Director of the SFO was persuaded that the
      Government of Saudi Arabia intended to carry out the threat if the investigation was
      not halted.  The Assistant Director appreciated the significance of the source of the
      threat.  In her letter to the Legal Secretary dated 27 October 2006, Helen Garlick
      suggested that caution should be exercised when considering the views of the official
      who had made the threat.  In addition, she exhibited a healthy scepticism as to the
      fears expressed by the Cabinet Secretary.

27.   She pointed out that the arguments were the same as those pressed the previous year.
      She said:-

> "This is an old issue and in our view nothing new emerges from this recent correspondence."

The feared consequences had not occurred despite the fact that the enquiry in October 2005 had provoked submissions on the public interest. Accordingly, she advised that caution should be exercised when considering the views of he who had uttered the threat (the rest of that part of her letter has been redacted) and continued:-

> "The SFO and MDP [Ministry of Defence Police] would expect that, if our investigation directly impinges on wider operations, proper guidance and briefing on the substance of that threat and risk would be undertaken and furthermore, that we would have been alerted to this at the outset of the investigation and certainly during the [course] of the Shawcross representation in November last year."

28.   In order to assess the likelihood that the threat would be carried out and the consequences of that threat the Director met the United Kingdom Ambassador to Saudi Arabia on three occasions in November and early December 2006. We have no note of those meetings but Mr Wardle recalls in his first statement that on 30 November 2006 the Ambassador directly confirmed to him that the threats to international security were very grave indeed and were as represented by the Cabinet Secretary in his letter dated 29 September 2006.

> "as he put it to me, British lives on British streets were at risk"
> (see § 28 of his first witness statement).

29.   The Director and his case team proposed to explore whether BAE might plead guilty to corruption on what the Director describes as a limited basis. On 5 December 2006, he discussed this possible approach with the Attorney, who had no objection. But on the evening of that day, 5 December 2006, the Legal Secretary suggested that the Prime Minister be briefed. The Prime Minister's response was to make further representations to the Attorney General.

30.   It is apparent that on the same day, 5 December 2006, Prince Bandar met foreign office officials (see Hansard 16 May 2007, Col 781W). He had shortly before spent the week in Paris negotiating the purchase of alternative fighter aircraft with President Chirac.

31.   The representations made by the Prime Minister are recorded in a personal minute from the Prime Minister to the Attorney General dated 8 December 2006. In that minute the Prime Minister asked the Attorney if he would consider again the public interest issues raised by the ongoing investigation.

> **"It is my judgment on the basis of recent evidence and the advice of colleagues that these developments have given rise to the real and immediate risk of a collapse in UK/Saudi security, intelligence and diplomatic cooperation. This is likely to have seriously negative consequences for the UK public interest in terms of both national security and our**

**highest priority foreign policy objectives in the Middle East.**
[redaction]

The issue, in Saudi eyes, is not so much about the specifics of any element of the investigation, [redaction] but one of cumulative damage to overall competence in their relationship with the UK.  I am advised in strong terms that we are now at high risk of a serious collapse in that confidence.

Article 5 of the OECD Convention on Combating Bribery prohibits you from being influenced by considerations of the national economic interest or the potential effect upon relations with another state.  As you know, I strongly support our commitment to the Convention and am proud of this Government's record on putting bribery issues onto the agenda and into law.  While this letter is not primarily concerned with the serious damage being done to our bilateral relationship by the investigation, it is of course of concern to me, not least because of the critical difficulty presented to the negotiations over the Typhoon contract.

My primary duty is however to UK national security and it is on this basis that I must urge you to consider the public interest in relation to the pursuit of this investigation.

The damage being currently done to Saudi confidence in the UK as an international partner has these two important consequences for the public interest: our direct national security, through our exchanges with the Saudi authorities in countering international terrorism; and the Government's highest foreign policy priority of working towards peace and stability in the Middle East.  As you will know, it is my strong belief that our Middle East work is fundamentally also a matter of our national security – directly in the threat to our soldiers in Iraq, and indirectly through the effects of Middle East stability more widely.  In both of these objectives, I want to explain to you how the help and confidence of the Saudi authorities is critical to success, and how recent developments are throwing that cooperation into jeopardy.

…

In summary, it is in my judgement very clear that the continuation of the SFO investigation into Al Yamamah risks seriously damaging Saudi confidence in the UK as a partner.  It is also my judgement that such damage risks endangering UK national security, both directly in protecting citizens and service people, and indirectly through impeding our search for peace and stability in this critical part of the world.  This letter, and the attached papers, I hope help to explain those judgments.  The Defence Secretary endorses what is said earlier in this

> letter about the impact on Defence interests and both he and the
> Foreign Secretary share my overall view, as expressed here, on
> the damaging impact of the SFO investigation.    This
> assessment is formed on the basis of advice from the
> Government's most senior national security official advisors.
>
> I understand and respect the constitutional position and the
> independent judgement you are required to make on extremely
> difficult and delicate issues of this nature, and I know any
> intervention you make in the conduct of this investigation must
> be your decision alone.   For my part, after much careful
> thought I have come to the conclusion that the seriousness of
> these risks to the national interest is such that I would be failing
> in my duty if I did not bring them directly to your attention ask
> you to consider them.  That is why I am taking the exceptional
> step of writing to you myself."

32.    The note from the Permanent Secretary, Intelligence, Security and Resilience dated 23
       November 2006 stresses that the intelligence and security relationship with Saudi
       Arabia is fundamental to what he describes as the United Kingdom's global counter-
       terrorist strategy.  Were the Saudis to withdraw co-operation, he says that the United
       Kingdom would be deprived of the support of a key partner in that strategy.  He
       points out that the Saudi leadership has made counter-terrorism a top priority and
       that:-

> "The Saudis undoubtedly view the US as their key foreign
> partner, including on security issues.  But they continue to be
> receptive to assistance and advice on security and counter-
> terrorism from the UK."

33.    The second attachment was a letter from the Permanent Under-Secretary to the
       Foreign Office, stressing the United Kingdom's dependence on Saudi Arabia's
       support for its policies in Israel and Palestine.  The loss of Saudi co-operation would,
       he said, severely disable the United Kingdom's efforts to promote peace and security
       in the Middle East.

34.    The Director was shown that minute at a meeting with the Legal Secretariat on 11
       December 2006.  The following day he had a third meeting with the Ambassador at
       which the Ambassador repeated that the risk that Saudi Arabia would carry out the
       threat to withdraw co-operation with the UK on counter-terrorism was "real and
       acute".  He repeated that there was a real threat to UK lives and expressed the view
       that the SFO could not pursue any attempt to prosecute without endangering UK
       national security.  On 11 December 2006 the Prime Minister and the Attorney General
       met.  A letter dated 12 December 2006 sent from the Prime Minister's Principal
       Private Secretary to the Legal Secretary records the highlights of that meeting:-

> "The Attorney, opening the meeting, said that while he could
> see the force of the points in the Prime Minister's minute, he
> had to weigh these up against other considerations.    In
> particular, he was concerned that halting the investigation
> would send a bad message about the credibility of the law in

this area, and look like giving into threats.  He was clear however that he felt justified in questioning whether the grounds of the investigation were soundly based and in exploring legal options for resolving the case as quickly as possible.

The Prime Minister responded that, as per his minute, he felt higher considerations were at stake.  Proceeding with the case would result in the end of Saudi-UK cooperation.  [Redaction] Losing the confidence Saudi Arabia placed in the UK risked very serious damage to the UK national interest in the fields of counter-terrorism and the search for peace and stability in the Middle East. [Redaction]  While the Prime Minister understood that halting the investigation was not a step to be taken lightly, he was clear that in this case there was a supervening national interest at stake, and that the British people would regard these as higher interests.

In discussion, the following main points were made:

- [Redaction]

- Any proposal that the investigation be resolved by parties pleading guilty to certain charges would be unlikely to reduce the offence caused to the Saudi Royal Family, even if the deal were accepted, and the process would still drag out for a considerable period;

- [Redaction]

- It was important that the Government did not give people reason to believe that threatening the British system resulted in parties getting their way.  But the Government also needed to consider the damage done to the credibility of the law in this area by a long and failed trial, and its good reputation on bribery and corruption issues compared with many of its international partners.

Summing up, the Prime Minister said that while he accepted that supervision of the investigation had to be a matter for the Attorney, the Prime Minister would be failing in his duty to national security and the public interest not to bring the potential damage to Britain's counter-terrorist effort, Middle East diplomacy and other important aspects of the relationship with Saudi Arabia to the Attorney's attention.  This was the clearest case for intervention in the public interest he had seen.  The Attorney said he would consider the Prime Minister's representations, with due regard to the need for separation between the law and public policy."

It is not clear whether Mr Wardle ever saw this letter before he made his decision to halt the investigation. He attended a meeting with the Law Officers on 13 December 2006. In a note prepared the following day by Helen Garlick; the Director is recorded as saying:-

> "In the last few days the representations on public interest had been made with renewed and increasing force by HM Ambassador. If further investigation will cause such damage to national and international security he accepted that it would not be in the public interest."

He and the Attorney General differed as to the sufficiency of the evidence and he is recorded as asking for time to consider the Attorney General's reservations as to the evidence and to take leading counsel's advice.

35.  At that meeting the Attorney General asked for Helen Garlick's views and she expressed the view that the SFO had not sought to place the interests of the investigation above those of national and international security. She said that although the Attorney General and the Director were qualified to make judgments on the law and the evidence, on questions of security they had to take the advice of others. She assumed that the Attorney General had better advice and expressed the view that if the investigation:-

> "…caused another 7/7, how could we say that our investigation which at this stage might or might not result in a successful prosecution was more important?"

36.  The Attorney General expressed his views about the strength of the evidence and Helen Garlick continued:-

> "If the investigation was ended on public interest grounds there were a number of implications. One [Redaction], two, the US might well take up the case into [Redaction], three, the Swiss might launch a money-laundering and corruption investigation, based on material we had asked them to get which we were not being allowed to acquire.

> The AG asked us to enquire into the Swiss and US positions.

> Throughout the meeting he made it clear that he, whilst he had wished to test the SFO case, was committed to supporting it provided it was viable, whatever the outcome might be. He was extremely unhappy at the implications of dropping it now."

37.  That same day, 13 December 2006, the Director told the Attorney that he had concluded that to continue the investigation risked:-

> "real and imminent damage to the UK's national and international security and would endanger the lives of UK citizens and service personnel."

He confirmed his decision the next morning, 14 December.  The decision was announced in a press release that day:

> "This decision has been taken following representations that have been made both to the Attorney General and the Director of the SFO concerning the need to safeguard national and international security.
>
> It has been necessary to balance the need to maintain the rule of law against the wider public interest.
>
> No weight has been given to commercial interests or to the national economic interest."

38.    On the same day, 14 December 2006, the Attorney General announced that decision in the House of Lords.  He referred to the views of the Prime Minister and of the Foreign and Defence Secretaries that the investigation would cause serious damage to UK/Saudi security, intelligence and diplomatic co-operation, and the likelihood that this would have "seriously negative consequences for the United Kingdom public interest in terms of both national security and our highest priority foreign policy objectives in the Middle East…"  He also said:-

> "Article 5 of the OECD Convention…precludes me and the Serious Fraud Office from taking into account considerations of the national economic interest or the potential effect upon relations with another state, and we have not done so."

In response to Lord Thomas of Gresford, who suggested that the Attorney General's two statements were contradictory, the Attorney General spoke of:-

> "…a very difficult balance to strike.  The short statement from the SFO makes that clear by saying that it has been necessary to balance the need to maintain the rule of law against the wider public interest."

### The Director's Reasons for Discontinuing the Investigation

39.    The Director, in his first witness statement, states that the reason why he discontinued the investigation was that to continue:-

> "would risk an immediate cessation of co-operation in relation to national and international security which might have devastating effects on the UK's national security interest – both locally in the UK and in the wider international field in the Middle East…a compelling case had been made out that the UK's national security and innocent lives would be put in serious jeopardy if the SFO's investigation continued." (§ 48)

He says:-

> "It was this feature of the case which I felt left me with no choice but to halt the investigation."

40.     In reaching that decision he says that he had well in mind that the United Kingdom is a signatory to the Convention and he had in mind Article 5.  He took the view that to discontinue the investigation was compatible with Article 5 because he was not influenced by considerations of national, economic interest, nor what he describes as :-

>       "the potential effect upon relations with another state, *per se*"
>       (§ 48)

41.     He did not consider what his decision would have been had he taken the view that it was not compatible with Article 5 but he says that he is in no doubt whatever that he would have decided to discontinue the investigation even had he thought to do so was incompatible with that Article:-

>       "The threat which I considered existed to UK national and
>       international security if the investigation continued was so great
>       that I did not believe that there was any serious doubt about the
>       decision I should make." (§ 51).

42.     In his second statement, dated 31 January 2008, the Director was in a position to focus on amendments to the grounds of the application and in particular the issue which they raised as to the Director's role in protecting the rule of law.  He draws attention to the references to the need for an independent decision by the Director under the superintendence of the Attorney General, rather than for Government.  He refers to a letter from Detective Superintendent Allen of the Ministry of Defence Police dated 11 January 2006 to the Attorney General which we have not seen.  In the letter the officer drew attention to the rule of law, the OECD Convention and the damage which would be done to the Government's reputation "for leadership and commitment to anti-corruption".

43.     The Director states that before October 2006 it had not been suggested to him that the danger to Saudi Arabian co-operation with the UK in combating terrorism was imminent.  But he says that in that month the position changed significantly, because of-

>       "…actual representations made by Saudi representatives as to
>       the consequences of continuing the investigation." (paragraph
>       19)

He says that he instinctively wanted to stand up to such threats but that following his first meeting with the Ambassador he began to entertain the thought that the national security public interest might be so compelling that he would have no real alternative to discontinuing the investigation.   He explains the reference to balancing the need to maintain the rule of law against the wider public interest, as a reference to the need to balance the public interest in pursuing a criminal investigation against other public interests.

44.     At the end of that second statement he emphasises that the subject of the criminal investigation was BAE and not any Saudi officials.  He points out that further investigations were continuing in relation to BAE's conduct in other countries.  We suspect that the Director felt the need to refer to those other investigations in an

attempt to rebut any suggestion that the SFO's investigation of corruption and bribery was less than enthusiastic. That, of course, is not the ground upon which his decision is challenged.

### *The Parties*

45. The first claimant, Corner House Research (Corner House) is a non-profit making organisation which conducts research, education and campaigns in relation to overseas corruption and the role of the United Kingdom in combating bribery. It emphasises the corrosive effect of bribery and corruption in its distortion of markets and its contribution to the spread of organised crime. Of particular relevance is the acknowledgement by leaders of all the G8 countries of the impact of bribery and corruption on national security: it encourages terrorism. (See the final communiqué from the 2006 G8 St. Petersburg Summit "Fighting High Level Corruption", July 2006, page 874.) Both the Home Office's strategy document on combating organised crime and the Foreign Office acknowledged the threat to national security caused by the instability which flows from corruption. The second claimant, Campaign Against Arms Trade, is an unincorporated association engaged in campaigning and lobbying against the arms trade.

46. It is important to stress the limits of this application for Judicial Review brought by the claimants. The reason given for discontinuing the investigation was not the fear that the evidence would not support the allegation of bribery. Accordingly, this court is not concerned with the issue which troubled the Attorney General, namely that after a lengthy investigation the prosecution would collapse because bribery could not be proved. We emphasise this feature in fairness to BAE. By s.108 of the Anti-terrorism, Crime and Security Act 2001, domestic courts have jurisdiction over anything done abroad by a body incorporated under UK law which would constitute an offence at common law, or under the Prevention of Corruption Acts 1889-1916 if done within the United Kingdom. The essence of any bribery offence in relation to payments to an agent is the absence of approval by the employer or principal. The need to rebut the defence of consent is a particular difficulty in relation to offences overseas, as the Attorney General pointed out in his evidence to the Constitutional Affairs Committee (Q335, 27 June 2007) and as is noted at paragraph 4.93 in the Law Commission Consultation Paper (No. 185) "Reforming Bribery".

47. According to the Attorney General's evidence, BAE has always contended that any payments it made were approved by the Kingdom of Saudi Arabia. In short they were lawful commissions and not secret payments made without the consent or approval of the principal. The cause of anti-corruption is not served by pursuing investigations which fail to distinguish between a commission and a bribe. It would be unfair to BAE to assume that there was a realistic possibility, let alone a probability, of proving that it was guilty of any criminal offence. It is unfortunate that no time was taken to adopt the suggestion (§ 34) to canvass with leading counsel the Attorney's reservations as to the adequacy of the evidence.

48. Equally, we should stress that Prince Bandar has had no opportunity in these proceedings to give his account of the circumstances which have led to the allegation that he threatened the United Kingdom as to the consequences if the investigation was continued. In order to determine the legality of the Director's decision we have, for the reasons we have given, been compelled to proceed on a factual basis which has

not been disputed or denied.  It is that factual base, namely that he issued a threat to force the end of the investigation, which gives rise to the first of the issues which found the claimants' challenge.  We shall identify all the grounds in the order in which we shall deal with them.

### The Claimants' Challenge

49.    By a process of amendment and re-amendment the Director's decision is challenged on six grounds.

    i)    It was unlawful for the Director to accede to the threat made by Prince Bandar or his agent; such conduct was contrary to the constitutional principle of the rule of law;

    ii)    the Director failed to take into account the threat posed to the UK's national security, the integrity of its system of criminal justice and the rule of law caused by surrender to the type of threats made in the instant case;

    iii)    the Director mis-directed himself and thus took into account irrelevant considerations by mis-interpreting Article 5 of the OECD Convention;

    iv)    the Director failed to take into account as a relevant consideration that if the threats made by Saudi Arabia were carried out, it would commit an act in breach of its international law obligations;

    v)    the advice on the public interest given by ministers was tainted by irrelevant considerations, in particular commercial interests of the United Kingdom and its diplomatic relations with Saudi Arabia;

    vi)    the Shawcross exercise was conducted improperly in that ministers expressed their opinions as to what the Director's decision should be.

### The Director's Decision and the Rule of Law

50.    The power of the Director of the Serious Fraud Office to investigate a suspected offence is conferred by statute (S.1(2) Criminal Justice Act 1987). Although he is required to discharge his functions under the superintendence of the Attorney General, any decision he makes as to investigation or prosecution is for him to reach independently.

51.    That the width of this prosecutorial discretion is wide cannot be doubted. Although the decision of a prosecutor is susceptible to judicial review, the courts have traditionally been most reluctant to interfere with the exercise of his discretion (see e.g. the citation of domestic authority in *Sharma v. Brown-Antoine* [2007] 1 WLR 780 at 788B-C).  Recently Laws LJ said that it would "take a wholly exceptional case on its legal merits to justify a judicial review" of the Director's decision to investigate or not (*R (Bermingham) v. Director of SFO* [2007] QB 727 § 63-64).  He described the discretion   whether to investigate as even more *open-ended* than the decision to prosecute.

52.    Thus, in the instant application, to seek to impugn the Director's decision, taken on the grounds that to continue the investigation would be to imperil national security,

seems to be a more than usually Quixotic task.  The decision is subject to the Code for Crown Prosecutors, which, since the fourth edition, (published in 2000) makes specific reference to national security.  The process by which decisions to prosecute are taken is well-known; there are two  stages: the evidential stage and, if passed, the public interest stage .  The Code lists a wide range of public interest factors in favour and against prosecution.  Amongst the factors identified  is the danger that:

> "details may be made public that could harm sources of information, international relations or national security"(5.11.i).

53.     It is true that the question whether a prosecution is in the public interest will usually be decided after the prosecutor has collated all the information necessary to reach a conclusion as to whether the evidence is sufficient to found a successful prosecution.  The Code (at 5.1)  does not envisage any need to consider the public interest if the evidence is insufficient.  But a prosecutor is entitled to conclude an investigation well before all potential evidence is gathered, for example when he foresees that the process will be so long and costly as not to be worth the candle.  Moreover, there is a danger in placing the evidential and public interest issues in too confined a pair of compartments.  An investigation which raises public interest issues may well be required to pass a more stringent evidential test than one in which no public interest issue arises.  The instant case is an example of the overlap: once it is accepted that a prosecution would seriously damage commercial and diplomatic relations with Saudi Arabia, it would be folly to pursue a prosecution without a rigorous analysis of its prospect of success.

54.     We must start, therefore, by accepting, at least as a generality, that the Director's discretion is of sufficient width to entitle him to take into account risk to life and to national security in deciding whether to continue an investigation. For example, the need to protect the safety, or even the life of an informant may lead to a decision to discontinue a prosecution.   Article 2 of the ECHR requires the Director and a government in a democratic society to protect and safeguard the lives of its citizens.  The obligation was described by Lord Hope  as essential to the preservation of democracy:-

> "It is the duty of the court to do all it can to respect and uphold that principle."  (See *A v SSHD* [2005] 2AC 68 at paragraph 99.)

55.     The court, in an application for judicial review, is not in a position to assess the extent of the risk to life or to national security, asserted by those who advised the Attorney General and the Director. The Director, himself, was not in any position to exercise an independent judgment as to the gravity of the risk of which he had been informed in the last three months of 2006, as the Assistant Director acknowledged in the meeting on 13 December.  He may lawfully accord appropriate weight to the judgment of those with responsibility for national security who have direct access to sources of intelligence unavailable to him (see *Huang v. Home Secretary* [2007] 2 AC 167 at § 16).

56.     The separation of power between the executive and the courts requires the courts not to trespass on what Lord Phillips CJ described as one of *the forbidden areas*, a decision affecting foreign policy (*R on the application of Abbasi v Secretary of State*

*for Foreign and Commonwealth Affairs* [2002] EWCA 1598 § 106). In a case touching foreign relations and national security the duty of decision on the merits is assigned to the elected arm of government. Even when the court ensures that the Government complies with formal requirements and acts rationally, the law accords to the executive an especially wide margin of discretion (*R (Al Rawi) v Foreign Secretary* [2007] 2 WLR 1219 § 148). The courts are under no less an obligation to respect and maintain the boundary between their role and the role of government than the executive.

57.     But to describe the claimants' application as a challenge either to the relevance of national security to the decision of the Director, or to the Government's assessment of the risk to national security misses the essential point of this application. The essential point, as we see it, derives from the threat uttered, it is said, by Prince Bandar to the Prime Minister's Chief of Staff. The nature and implications of that explicit threat have a significant impact on this application. The challenge was originally resisted, in part, on the basis that the Director was entitled to discontinue the investigation as a result of the *very grave threats* to national and international security (see e.g. Detailed Grounds of Resistance § 10). But there is an ambiguity in the use of the word *threat* in that context. *Threat* as used in response to the claimants' original challenge meant no more than risk. The Director's decision was taken after assessment of the risk to security. But the grounds of resistance did not mention the fact that representatives of a foreign state had issued a specific threat as to the consequences which would flow from a refusal to halt the investigation. It is one thing to assess the risk of damage which might flow from continuing an investigation, quite another to submit to a threat designed to compel the investigator to call a halt. When the threat involves the criminal jurisdiction of this country, then the issue is no longer a matter only for Government, the courts are bound to consider what steps they must take to preserve the integrity of the criminal justice system.

58.     The constitutional principle of the separation of powers requires the courts to resist encroachment on the territory for which they are responsible. In the instant application, the Government's response has failed to recognise that the threat uttered was not simply directed at this country's commercial, diplomatic and security interests; it was aimed at its legal system. In written argument, the Director suggested that we should attach significance to the fact that the threat was not directed against him. But it was. While he, personally, was not being threatened with any adverse consequences, the threat was effectively being made to him, in his capacity as Director, and in relation to his statutory functions. The Government acted merely as a conduit, passing the threat on to him with an assessment of the danger should it be carried out. That threat was made with the specific intention of interfering with the course of the investigation. The Saudis knew what was proposed: the SFO intended to inspect Swiss bank accounts. Those who uttered and adopted the threat intended to prevent the course which the SFO wished to pursue. It is unlikely that so blatant a threat would have been made had those responsible not believed that it might well succeed.

59.     Had such a threat been made by one who was subject to the criminal law of this country, he would risk being charged with an attempt to pervert the course of justice. The course of justice includes the process of criminal investigation (*R v Cotter [2002] 2 Cr App R. 29* at § 30 and 31). But whether or not a criminal offence might have

Case 1:07-cv-01646-RMC    Document 81-2    Filed 04/24/2008    Page 20 of 43

Judgment Approved by the court for handing down.                    Corner House Research SFO

been committed, the essential feature is that it was the administration of public justice which was traduced, it was the exercise of the Director's statutory powers which was halted.

60.    Threats to the administration of public justice within the United Kingdom are the concern primarily of the courts, not the executive.  It is the responsibility of the court to provide protection.  To put it plainly:

> "One thread runs consistently through all the case law: the recognition that public authorities must beware of surrendering to the dictates of unlawful pressure groups.  The implications of such surrender for the rule of law can hardly be exaggerated.  As suggested in certain of the authorities, there may be a lawful response.  But it is one thing to respond to unlawful threats, quite another to submit to them---the difference, although perhaps difficult to define, will generally be easy to recognise.  Tempting though it may sometimes be for public authorities to yield too readily to threats of disruption, they must expect the courts to review any such decision with particular rigour-this is not an area where they can be permitted a wide area of discretion.  As when fundamental human rights are in play, the courts will adopt a more interventionist role."

These words of Simon Brown LJ (in *R v Coventry Airport ex parte Phoenix Aviation [1995]* 3 All ER 37 at p.62) concerned the surrender of the discretion of port authorities to pressure as to which legal trades they should choose to handle.  The rationale for the court's intervention is its responsibility to protect the rule of law.  Simon Brown LJ's words were obiter but the sources to which he referred establish a well-settled principle.  The surrender of a public authority to threat or pressure undermines the rule of law (see Lawton LJ's emphatic response to those who sought to frustrate the exercise of statutory powers in *R v Chief Constable of Devon and Cornwall Constabulary, ex p. CEGB* [1982] QB 458,472-3, cited by Simon Brown LJ at p.61).  That principle must apply with even greater force where the exercise of statutory powers in relation to the administration of justice has been halted by threats.

61.    Mr Sales wisely counselled this court to exercise restraint.  He warned that to invoke the rule of law adds nothing to the argument in this case.  There continues to be debate about the meaning and scope of the rule of law see Lord Bingham *The Rule of Law* [2007] CLJ 67 at 68 and Professor Craig's paper on the Rule of Law (Appendix 5) in response to the request of the House of Lords Select Committee on the Constitution *Relations between the executive, the judiciary and Parliament* HL Paper 151(2006-2007) (§ 23).

62.    He argued that, in the context of the Director's decision, the rule of law requires no more than he should act in a manner consistent with the well-recognised standards which the courts impose by way of judicial review.  The Director must exercise the powers conferred on him by the 1987 Act  reasonably, in good faith , for the purposes for which they were  conferred and without exceeding the limits of such powers (see Lord Bingham's sixth sub-rule, p.78).  Thus, as Lord Hoffman has observed, judicial review gives effect to the rule of law (*R (Alconbury Developments Ltd) v Secretary of State for the Environment* [2003] 2 AC 295 paragraph 73).

63.    At the heart of the obligations of the courts and of the judges lies the duty to protect the rule of law :-

> "the rule of law enforced by the courts is the ultimate controlling factor on which our constitution is based"(*per* Lord Hope in *R (Jackson) v Attorney-General* [2006] 1 AC 262 paragraph 107).

64.    The legislature has sought to reinforce the separation of powers by statutory regulation of the relationship between the Executive and the Judiciary in the Constitutional Reform Act 2005. S.1 recognises the rule of law as an existing constitutional principle. The Act acknowledges the relationship between the independence of the judiciary and the rule of law in s.3.

65.    The rule of law is nothing if it fails to constrain overweening power. The Honourable J.J Spigelman AC, Chief Justice of New South Wales has described judges and lawyers as :

> "boundary riders maintaining the integrity of the fences that divide legal constraint from the sphere of freedom of action" (*Address on Judicial Independence to the 7th Worldwide Common Law Judicial Conference April 2007*).

So too must the courts patrol the boundary between the territory which they safeguard and that for which the executive is responsible.

66.    It is beyond question that had the Director decided to halt the investigation in response to a threat made by those susceptible to domestic jurisdiction, the court would have regarded the issues which arose as peculiarly within their sphere of responsibility.

67.    We turn then to how the courts discharge that responsibility.  The courts fulfil their primary obligation to protect the rule of law, by ensuring that a decision-maker on whom statutory powers are conferred, exercises those powers independently and without surrendering them to a third party.

68.    No revolutionary principle needs to be created.  Mindful of Mr Sales' minatory words, we can deploy well-settled principles of public law.  In yielding to the threat, the Director ceased to exercise the power to make the independent judgment conferred on him by Parliament.  There are many authorities which illustrate the proposition that by the surrender of independent judgment to a third party, a public body abdicates its responsibility ( see *Fordham Judicial Review Handbook, 4th Edn*.50.2., p.861-2). But we need look no further than *Sharma* :

> "It is well established that a decision to prosecute is ordinarily susceptible to judicial review, and surrender of what should be an independent prosecutorial decision to political instruction (*or the Board would add, persuasion or pressure*) is a recognised ground of review."( Governing Principles at [5], p.788 A:"( our emphasis).

69.    That line of well-established authority demonstrates how the courts protect the rule of law by ensuring the independence of the decision-maker, free from pressure and threat.

70.    Independence is fundamental to the proper exercise of the Director's powers.  Those authorities on which the Director relied to establish the width of his discretion support that proposition.  One of the very bases for affording a prosecutor so wide an ambit of judgment is the recognition of his independence (see the references by Lord Bingham CJ to the independence of the Director of Public Prosecutions, answerable to the Attorney General and to no one else and to the independent judgment of Treasury Counsel in *R v DPP Ex p Manning* [2001] 1 QB 330 at § 23).  The Director of the SFO is answerable to no one.  By the 1987 Act, Parliament has conferred on him alone the power to reach an independent, professional judgment, subject only to the superintendence of the Attorney General.  Whatever superintendence may mean, it does not permit the Attorney General to exert pressure on the Director, let alone make a decision in relation to an investigation which the Director wishes to pursue.

71.    The reason why the executive, the Attorney General and the Director himself stress that the decision was for the Director alone is instructive.  All appreciate that to make a decision under the influence of pressure would be to abdicate the responsibility to reach an independent, professional judgment, imposed by statute.  The essential purpose of s.1(2) of the 1987 Act is undermined if the Director's decision is made in submission to threats.

72.    Mr Sales responds that the Director did exercise an independent judgment, in the light of the advice he received as to the dangers to national security were the threat to be carried out.  But that is no answer at all.  We accept that, in assessing the *consequences*  of the threat, the Director exercised what may be described as independent judgment, notwithstanding its total reliance on the advice of others.  But that misses the point.  In halting the investigation he surrendered to a threat made with the  specific intention of achieving surrender.  We know he would not have done so but for the threat.  He had not stopped the investigation throughout 2005.  He was about to pursue it in Switzerland.

73.    The Government's answer is that the courts are powerless to assist in resisting when the explicit threat has been made by a foreign state.  Saudi Arabia is not under our control; accordingly the court must accept that there was nothing the Director could do, still less that the court can do now. Mr Sales said, as we have already recalled, that whilst it is a matter of regret, what happened was *a part of life*.  The court cannot intervene but should leave  the Government to judge the best course to adopt in response to the threat.

74.    This dispiriting submission derived from the uncontroversial proposition that  the courts in England will not adjudicate upon acts done abroad by virtue of sovereign authority (see *Buttes Gas v Hammer* [1982]AC 888 at 931G-932F and *R v Bow Street Magistrate ex p. Pinochet(no.3)* [2000] 1 A.C. 147 at 210).

75.   The legal relationships of the different branches of government, and the separation of powers  depend on internal constitutional arrangements.  They are of no concern to foreign states (see Lord Millett in *R v Lyons* [2003] 1 AC 976 at § 105).

76.   Those decisions were not concerned with threats to the administration of justice within the United Kingdom. Such threats, as we have sought to demonstrate, are particularly within the scope of the courts' responsibility.  It is difficult to identify any integrity in the role of the courts to uphold the rule of law, if the courts are to abdicate in response to a threat from a foreign power.

77.   Mr Sales' submission appears to us not to be one of principle but rather one of practicality: resistance is useless, the judgement of the Government is that the  Saudi Arabian government will not listen and the authorities in the United Kingdom must surrender.  That argument reveals the extent to which the Government has failed to appreciate the role of the courts in upholding and protecting the rule of law.

78.   The courts protect the rule of law by upholding the principle that when making decisions in the exercise of his statutory power an independent prosecutor is not entitled to surrender to the threat of a third party, even when that third party is a foreign state. The courts are entitled to exercise their own judgment as to how best they may protect the rule of law, even in cases where it is threatened from abroad.  In the exercise of that judgment we are of the view that a resolute refusal to buckle to such a threat is the only way the law can resist.

79.   Surrender deprives the law of any power to resist for the future.  In *ex p.  Phoenix Aviation,* Simon Brown LJ criticised the public authorities who failed to consider what he described as *the awesome implications for the rule of law*, and the inevitable impact upon the *ever more enthusiastic* future conduct of the protesters [p.62].  The context of the threat, in the present case, was the investigation of making bribes to foreign public officials, an offence introduced in 2001. If the Government is correct, there exists a powerful temptation for those who wish to halt an investigation to make sure that their threats are difficult to resist.  Surrender merely encourages those with power, in a position of strategic and political importance, to repeat such threats, in the knowledge that the courts will not interfere with the decision of a prosecutor to surrender.   After all, it was that appreciation which, no doubt, prompted the representatives of the Saudi Arabian government to deliver the threat.  Had they known, or been told, that the threat was futile because any decision to cave in would be struck down by the courts, it might never have been uttered or it might have been withdrawn.

80.   Certainly, for the future, those who wish to deliver a threat designed to interfere with our internal, domestic system of law, need to be told that they cannot achieve their objective. Any attempt to force a decision on those responsible for the administration of justice will fail, just as any similar attempt by the executive within the United Kingdom would fail.

81.   Mr Sales suggests that the law must recognise that  there are cases when the prosecutor has no choice but to accede to the threat.   He draws attention to the case of Leila Khalid in 1970 (described by Edwards, in *The Attorney General, Politics and the Public Interest (1984)* p.324).  Khalid was a member of the PLO, in custody following her attempt to hijack an aeroplane.  The PLO threatened to kill Swiss and

German hostages, unless she was released. Sir Peter Rawlinson, the Attorney General accepted the advice that prosecution would increase the danger to the lives of those hostages and ordered her release. Edwards describes the decision as *clearly defensible,* since the Attorney General was faced with the *awful dilemma of measuring the freedom and, possibly, the lives of the hostages against non-enforcement of the criminal law* (p.325).

82. The release of Khalid was not the subject of any review by the courts. But we acknowledge that there may be circumstances so extreme that the necessity to save lives compels a decision not to detain or to prosecute. But it is for the courts to decide whether the reaction to a threat was a lawful response or an unlawful submission. As Simon Brown LJ recognised (*ex p Phoenix* at p.62*,* cited § 60*)* although the difference is difficult to define, it will be generally easy to recognise. And it is for the courts in drawing the line between unavoidable submission and unlawful surrender to review *with particular rigour* a decision and rule whether the decision-maker yielded *too readily*.

83. In the case of Khalid, those who had made the threat had the power to carry it out immediately; the Attorney General's choice was to release Khalid or let the foreign nationals whose governments were in the process of negotiations be killed. Both in domestic and in customary international law (as to which see below at [§ 144), the law recognises the defence of duress and, in some circumstances the justification of necessity (see e.g., the conjoined twins case at *Re A (children)* [2002] 4 All ER 961 and the discussion in *Smith & Hogan Criminal Law 11th Edn.* 314-325).

84. It is unnecessary for this court to attempt to identify those circumstances in which necessity may justify submission to a threat, designed to prevent a prosecutor from exercising his power to continue an investigation. There is no reported case of so blatant a threat. To say that the threat must be imminent merely opens the discussion as to what that means and what standard is to be applied to test the imminence of the threat. Mr Wardle says that *he felt he had no choice* (paragraph 50 of his 1st statement). It is for the court to assess whether he and the Government yielded too readily.

85. It was not suggested either in evidence or in argument that the threat to the lives of citizens and servicemen was to be likened to that made against the Swiss and German hostages in *Khalid.* There was, it is true, ample reference to direct threats to UK citizens (e.g. Prime Minister's minute 8 December, 2006 and the references to the risk described by the ambassador). But we must recall that, unlike the Khalid incident, there was no specific, direct threat made against the life of anyone. The threat made was to withdraw co-operation in relation to counter-terrorism. In order to assess the risk to life, it is necessary to hypothesise that a terrorist outrage was planned within the United Kingdom or elsewhere against British citizens or servicemen, of which Saudi Arabian intelligence had become aware and which it deliberately withheld. We readily accept that in 2006 and even now there is a serious risk of unpredictable terrorist attack, the greater the sources of intelligence the better that may be avoided and, as we are told, Saudi Arabia remains an irreplaceable source. But those factors do not, in our view, require us to accept that the Director was faced with the same degree of compulsion as the Attorney General in Khalid had to confront.

86.   Apart from the absence of a specific, immediate threat there is another significant feature. In order properly to scrutinise the decision taken to submit, the courts are bound to question whether all the steps which could reasonably be taken to divert the threat had been pursued. Absent such an inquiry, the courts are in no position to assess whether the decision-maker has yielded too readily. In Khalid it was plain that the dilemma was *awful*. It is difficult, at least on the information now disclosed in relation to Khalid, to see what other steps could have been taken after prolonged negotiations, short of military intervention. The facts as described show how imminent was the risk to life and why it was the Attorney General had no choice if he was to save the lives of the hostages.

87.   Contrast the instant case. There is no evidence whatever that any consideration was given as to how to persuade the Saudis to withdraw the threat, let alone any attempt made to resist the threat. The Director did not himself consider this issue. His assessment of the threat and its consequences relied on the advice of others. There is nothing to suggest that those advising him on this issue had made any attempt to resist the threat. They merely transmitted the threat to the Director, and explained the consequences if it was carried out. When this question was raised, in argument, Mr Sales responded that that issue was not one which the defendant had come to court to meet. Moreover, he suggested the court should assume that due consideration had been given as to whether the Saudis might be persuaded to withdraw their threat and as to how its consequences might be avoided.

88.   We are not prepared to make any such assumption. It is not implicit in Mr Wardle's statement. The defendant and Government were well aware that the accusation was that they had surrendered too readily; it was for them to show not only that the consequences of the threat were dire but that the threat itself could not be mitigated or withdrawn. It was explicitly argued by the claimants, in the context of state necessity, that it cannot be plausibly asserted that the decision was the only means of safeguarding the state's interest against a grave and imminent peril:

> "There is no indication of any assessment by the UK of whether there were other means available to safeguard the UK's essential interest…"(paragraph 47, (vi)(e) claimants' written submissions).

89.   This challenge was not met by any additional evidence either before the proceedings started or when the point was raised during the first day of oral argument. We accept that Mr Sales has had to look after the interests of four other departments, besides those of the Director. But if it was to be argued that the Director had no alternative, then to focus merely on the consequences of the threat, if it was carried out, was insufficient. It was incumbent on the Director, once it was alleged that he ought not to have succumbed to the threat, to satisfy the court that he had not given way without the resistance necessary to protect the rule of law.

90.   No-one suggested to those uttering the threat that it was futile, that the United Kingdom's system of democracy forbad pressure being exerted on an independent prosecutor whether by the domestic executive or by anyone else; no-one even hinted that the courts would strive to protect the rule of law and protect the independence of the prosecutor by striking down any decision he might be tempted to make in submission to the threat. If, as we are asked to accept, the Saudis would not be

Case 1:07-cv-01646-RMC    Document 81-2    Filed 04/24/2008    Page 26 of 43

Judgment Approved by the court for handing down.                    Corner House Research SFO

interested in our internal, domestic constitutional arrangements, it is plausible they would understand the enormity of the interference with the United Kingdom's sovereignty, when a foreign power seeks to interfere with the internal administration of the criminal law. It is not difficult to imagine what they would think if we attempted to interfere with their criminal justice system.

91. The reason no attempt appears to have been made to persuade the Saudis that the threat could not succeed is not difficult to find. The response of the Case Controller on 19 December 2005 and of the Ministry of Defence detective superintendent (§ 42) never seems to have reached the higher reaches of Government: to submit would damage the rule of law and the independence of the SFO. Mr Cowie spoke of *reputational* damage; but as Lawton and Brown LJJ understood, the damage is not merely to the reputation of the SFO and the government but to the reputation and very existence of the rule of law. The evidence laid before us shows no sufficient appreciation of the damage to the rule of law caused by submission to a threat directed at the administration of justice.

92. In response to the challenge on the second ground we have identified (§ 48(ii)), Mr Wardle accepts that he did not take into account the damage to national security, the integrity of the criminal justice system and to the rule of law by discontinuing the investigation in response to the threat (1st statement paragraph 58). He is bound to acknowledge that omission. Before the House of Lords Constitutional Committee he was asked by Mr Tyrie (Q246):

> "What was your reaction when you discovered that another government, effectively, was putting a gun to our heads and saying, "You are not to investigate further, otherwise we will withdraw co-operation arrangements and leave your country less well defended
>
> "My reaction was, I suppose, I was resigned to it"
>
> Q269 David Howarth: Does that also apply to the obvious problem which would flow from Mr Tyrie's question, which is that if other countries get to know that Britain gives in to this sort of pressure, that in itself could be a threat to our national security? Was that risk taken into account in the decision?
>
> Robert Wardle: No, it was not expressed in the risk, and I am not sure how much of a risk it really is. I think this was an exceptional case. We are continuing other investigations, both into BAE Systems Plc and into other areas, where we are doing our best to pursue them. I think that the risk of people thinking we can get away with it, which is effectively, I think, what you are saying, will be lessened if we are able to pursue those investigations, which we are, indeed, doing [3/1564]."

93. The Director now asserts that although he did not consider the issue, it was considered at the meeting between the Prime Minister and the Attorney General on 11 December 2006, an assertion also made in his Amended Summary Grounds (§ 68). This is not

borne out by the note of the meeting on 11 December 2006, at which the Attorney General's concern is recorded :

> "halting the investigation would send a bad message about the credibility of the law in this area and look like giving in to threats", and

> "It was important that the Government did not give people reason to believe that threatening the British system resulted in parties getting their way. But the Government also needed to consider the damage done to the credibility of the law in this area by a long and failed trial, and its good reputation on bribery and corruption issues compared with many of its international partners."

94.     These passages reveal that the issue of damage to the rule of law was never properly considered. It was indeed important that *the British system* did not give way to threats but the response recorded is no answer to that issue; the discussion appears to have been diverted onto a different path, the adequacy of the evidence on which the Director's view differed from that of the Attorney General, nor does the reference to the Government's good reputation on bribery and corruption issues compared with many of its international partners begin to meet the issue of damage to the rule of law.

95.     The Director's response in Committee (cited at § 93) again misses the point; the suggestion was that damage to the criminal justice system could be alleviated by pursuing other investigations. But there is no suggestion that those other investigations were being pursued despite threats. A failure to resist a threat cannot be excused by demonstrating a willingness to prosecute absent such a threat. The question was how to avoid threats in the future; to say that other investigations will be pursued provides no answer, without assurance that any threat to stop an investigation would be resisted.

96.     The issue for the Government and for the Attorney General, in the exercise of the task he acknowledged of *making sure the Government upholds the Rule of Law* (*evidence to Constitutional Affairs Committee Q.363 27.6.2007*), was how the rule of law might be protected. The point was missed as to the effect on national security and on the rule of law of submission to the threat.

97.     There can be no dispute as to the need for the courts to safeguard the integrity of the judicial process and to avoid bringing British justice into disrepute (Lord Brown's description of *A v SSHD (No 2)* [2006] 2 AC 221 in *SSHD v MB(FC)* [207] UKHL at § 91). The fulfilment of that need is demonstrated in the recognition by the House of Lords in *A (No 2)* of the rule which excludes evidence obtained by torture, and their refusal to allow so fundamental a rule to be compromised even to fight terrorism. *A (No2)* is an illustration of how the law demands that the means used to resist terrorism must be lawful. The different approaches, the one permitted to the executive, the other demanded of the judiciary, were explained by Lord Nicholls (§ 70-71). The demands on the judiciary stem from their obligation to enforce the rule of law.

98.     Lest it be thought that there is any true distinction between national security and the rule of law, we need only refer to the Attorney General's adoption of the principle that

preserving the rule of law constitutes an important component in the means by which democracy is secured (speech to the Cour de Cassation June 2004). This was echoed by the G8 communiqué (referred to at § 45).

99.    The principle we have identified is that submission to a threat is lawful only when it is demonstrated to a court that there was no alternative course open to the decision-maker. This principle seems to us to have two particular virtues.

100.   Firstly, by restricting the circumstances in which submission may be endorsed as lawful, the rule of law may be protected. If one on whom the duty of independent decision is imposed may invoke a wide range of circumstances in which he may surrender his will to the dictates of another, the rule of law is undermined.

101.   Secondly, as this case demonstrates, too ready a submission may give rise to the suspicion that the threat was not the real ground for the decision at all; rather it was a useful pretext. It is obvious, in the present case, that the decision to halt the investigation suited the objectives of the executive. Stopping the investigation avoided uncomfortable consequences, both commercial and diplomatic. Whilst we have accepted the evidence as to the grounds of this decision, in future cases, absent a principle of necessity, it would be all too tempting to use a threat as a ground for a convenient conclusion. We fear for the reputation of the administration of justice if it can be perverted by a threat. Let it be accepted, as the defendant's grounds assert, that this was an exceptional case; how does it look if on the one occasion in recent memory, a threat is made to the administration of justice, the law buckles? The Government Legal Service has every reason to be proud of its reputation for giving independent and, on occasion, unpalatable advice; but can that be maintained if in exceptional cases, when a threat comes from a powerful and strategically important ally, it must yield to pressure? Our courts and lawyers have the luxury and privilege of common law and statutory protection against power which threatens the rule of law. All the more important, then, that they provide support and encouragement to those in a less happy position. How do they do so, if they endorse surrender, when in Uganda the courts are forced to resist when those whom they have released on bail are re-arrested on the court-room steps by armed agents of the executive, or when the Chief Justices of Fiji and Pakistan are deposed by military rulers?

102.   The Director failed to appreciate that protection of the rule of law demanded that he should not yield to the threat. Nor was adequate consideration given to the damage to national security and to the rule of law by submission to the threat. No-one took any steps to explain that the attempt to halt the investigation by making threats could not, by law, succeed. The Saudi threat would have been an exercise in futility, had anyone acknowledged that principle. We are driven to the conclusion that the Director's submission to the threat was unlawful.


*Article 5*

103.   Throughout the period of 2005-2006, during which the Director considered whether to halt the investigation, both he and the Attorney General were determined that the decision should be consistent with the United Kingdom's obligations under Article 5 of the OECD Convention. For convenience we set it out again, with emphasis added:-

> "Investigation and prosecution of the bribery of a foreign public official shall be subject to the applicable rules and principles of each Party. They shall not be influenced by considerations of national economic interest, <u>the potential effect upon relations with another State</u> or the identity of the natural or legal persons involved."

104.    The Legal Secretary to the Law Officers had made it clear, on 6 December 2005, that his consideration of the responses received from other departments as a result of the Shawcross exercise would be governed by Article 5.   He recorded the Attorney General's assurance to the OECD Working Group in 2004 that none of the considerations prohibited by Article 5 would be taken into account as public interest factors not to prosecute foreign bribery cases.   Neither the Attorney General nor the Director ever indicated that they would resile from that approach.   On the contrary, when the decision to discontinue the investigation was taken on 14 December 2006, the Attorney General made it clear to Parliament that:-

> "Article 5 of the OECD Convention…precludes me and the Serious Fraud Office from taking into account considerations of the national economic interest or the potential effect upon relations with another state, and we have not done so." (Hansard 14 December 2006 Col 1712)

This assurance was repeated to the OECD on 12 January 2007.

105.    The claimants' essential argument is that the decision was taken because of the potential effect of the investigation upon relations with another state.   For that reason, the grounds upon which the decision was taken were contrary to the prohibition contained within Article 5.   In taking the view that his decision to discontinue was compatible with Article 5, the Director mis-directed himself and erred in law.

### *Justiciability*

106.    Despite the repeated assertions that his decision was compatible with Article 5, the defendant contended that the court should not rule on whether the decision was compatible with the Convention.   To do so would require the court to give its own view as to the meaning of Article 5 of the Convention.   That Convention is an international instrument which does not form part of English law; consequently the court has no jurisdiction either to interpret it or to apply it.

107.    The starting point for this submission must be the principle that municipal courts do not and cannot have competence to adjudicate upon or to enforce rights arising out of transactions entered into by independent sovereign states between themselves at the level of international law (see *J H Rayner (Mincing Lane) Limited v Department of Trade and Industry* [1992] AC 418 at 499F-500D and *R v Lyons* [2003] 1 AC 976 at § 27 and *R (Campaign for Nuclear Disarmament) v Prime Minister & Others* [2002] EWHC 2777 (Admin) at § 23).

108.    *CND* provides a useful benchmark against which to test the claimants' invitation to rule on the compatibility of the Director's decision with Article 5.   In that case, CND sought declaratory relief by way of an advisory declaration as to the true meaning of

Resolution 1441 at a time when it feared that the UK Government would take military action against Iraq without a further Resolution.  It is important to note that the Government had not itself publicly declared any definitive view of the position in international law.  The court was being asked to interpret an international instrument, not incorporated into English domestic law, in circumstances where no right, interest or duty under domestic law required determination (see § 36).

109.    Further, in circumstances in which the Government had not given any view as to the legal effect of Resolution 1441, to require the court to give its interpretation would damage the United Kingdom's interests in international relations, themselves a forbidden area (see § 41 and 42).

110.    In the course of his judgment Simon Brown LJ contrasted that application with a case where it is necessary to examine an international convention for the purpose of reviewing the legality of the decision under domestic law (see § 36).  Richards J, in concurring, identified what he described as a further exception to the basic rule enunciated in *Lyons*:-

> "Where a decision-maker has expressly taken into account an international treaty and the court thinks it appropriate to examine the correctness of the self-direction or advice on which the decision is based."  (Paragraph 61 (iv))

111.    He contrasted that exception with CND's application in which the Government had avoided any direction on the interpretation of Resolution 1441.

112.    Further, it is important not to overlook the context in which it is said that the court should depart from the basic rule that national courts have no jurisdiction to interpret or apply international treaties.  Since there is no domestic legal obligation which expressly requires the Director to take into account Article 5 of the Convention, we are prepared to accept, for the purposes of these submissions, that it was for him to decide whether it was a relevant consideration for his decision, not for the court (see, e.g., *R (Al Rawi) v Foreign Secretary* [2007] 2 WLR 1219 at 1269 § 131-2).  But we add this caveat: in view of the Attorney General's assurance to the OECD Working Group in 2004, a failure to have regard to the Convention would probably have been flawed on the basis that it was an "obviously material" consideration: see *In re Findlay* [1985] AC 318 at 334.

113.    The authorities which Richards J described as a further exception were *R v Secretary of State for the Home Department ex p Launder* [1997] 1 WLR 839, 867C-F and *R v Director of Public Prosecutions ex p Kebilene* [2002] AC 326, 341 and 367E-H.  As Richards J pointed out, both of them were cases where the court had regard to the European Convention on Human Rights before the Human Rights 1998 came into force.  These cases do no more, submits Mr Sales, than establish the limited grounds upon which the courts may derogate from the basic rule enunciated in *Lyons*.

114.    In *Launder* the question relevant for the purposes of this application was the extent to which the court could review the Secretary of State's decision to extradite an accused if to do so would violate the accused's rights under the European Convention prior to the incorporation of that Convention into United Kingdom law. The accused had contended that the legal, penal and judicial system in Hong Kong, after 1 July 1997,

Case 1:07-cv-01646-RMC    Document 81-2    Filed 04/24/2008    Page 31 of 43

Judgment Approved by the court for handing down.                                    Corner House Research SFO

would not protect his right to a fair trial and, if convicted, to appropriate punishment. The Secretary of State had asserted that he had taken account of the applicant's representations that extradition to Hong Kong would be a breach of the Convention in reaching his decision that he should be extradited. The court took the view that the Secretary of State was entitled to reach the conclusion that there was no serious risk of injustice or oppression and had not overlooked what he described as the Human Rights context (page 869A-B).

115.    In reaching that conclusion Lord Hope pointed out that prior to incorporation, whilst the Convention might influence the common law, it did not bind the Executive. He continued:-

> "The whole context of the dialogue between the Secretary of State and the applicant in this case was the risk of an interference in the applicant's human rights. That in itself is a ground for subjecting the decisions to the most anxious scrutiny…then there is the question whether judicial review proceedings can provide the applicant with an effective remedy, as Article 13 requires, where complaints are raised under the Convention in extradition and deportation cases.…If the applicant is to have an effective remedy against a decision which is flawed because the decision-maker has mis-directed himself on the Convention which he himself says he took into account, he must surely be right to examine the substance of the argument. The ordinary principles of judicial review permit this approach because it was to the rationality and legality of the decisions, and not to some independent remedy that Mr Vaughan directed his argument." (867C-F).

116.    Mr Sales contended that that passage, which provides the foundation for the claimants' arguments, also sets the boundaries to the circumstances in which the court is permitted to interpret an international instrument for the purposes of considering whether a domestic decision is compatible with the International Convention. It identifies four conditions which must be satisfied before it is appropriate for the court to do so. They are said, by Mr Sales, to be demonstrated in the passage of Lord Hope's speech which we have already cited:-

i)      that the decision relates to an individual's human rights where domestic law requires anxious scrutiny of the grounds upon which the decision was taken;

ii)     that the Treaty obligation requires the domestic legal order to produce a remedy;

iii)    that there exists an authoritative legally developed jurisprudence as a source of interpretation. In *Launder* (and in *R v Director of Public Prosecutions ex p Kebilene* [2002] AC 326) the court was able to draw upon the authority of the European Court of Human Rights. Absent such an authoritative source domestic courts would only be arrogating to themselves a power which rests only in an international authority;

iv)    even if those conditions were satisfied, the subject matter of the case, in the instant application, foreign relations and national security may be such as to require the courts to refrain from intervention.

117.    *Ex p Kebilene* adopts the principles identified by Lord Hope in *ex p Launder*.  In *Kebilene* the question was whether the court could review the soundness of the advice on the basis of which the DPP consented to the prosecution of the applicants under the Prevention of Terrorism (Temporary Provisions) Act 1989.  The Director had sought advice as to whether s.16A was compatible with the European Convention on Human Rights.  Lord Bingham CJ took the view that it was appropriate for the court to review the legal advice:-

> "…on which the Director has made clear, publicly, that he relied; for if the legal advice he relied on was unsound he should, in the public interest, have the opportunity to reconsider the confirmation of his consent on a sound legal basis." (page 341E)

He considered that that approach was compatible with Lord Hope's observations and *Ex p Launder*.  Lord Steyn endorsed that approach although he cited only a short portion of the speech of Lord Hope, referring to the need for an effective remedy (367E-G and Lord Hope at 375F-376A).

118.    Under ordinary principles of public law a court may be required to determine the lawfulness of a self-direction or advice on which a decision is based.  Where that self-direction or advice turns on a point of interpretation of an international instrument then the court may be compelled to consider the correctness of that interpretation.  But in doing so, it is not purporting to do any more than assess the legality of the decision under domestic law.  As Lord Hope put it, in doing so, the court is doing no more than reviewing the rationality and legality of the decision by testing that decision against the standard which the decision-maker has chosen to adopt. A court may only interpret an international instrument in the context of reviewing the legality of a decision under domestic law and only for that purpose (see Simon Brown LJ at paragraph 36 in *CND*).

119.    In the instant application, the Director has chosen, publicly, (to echo Lord Bingham's description of the decision of the Director in *Kebilene*) to justify his decision by reference to Article 5.  The public justification for the decision depended upon the assertion that it was necessary to discontinue the investigation for reasons which were compatible with Article 5, that is, national security. In order to achieve public acceptance of a controversial decision, he invoked compliance with the UK's international obligations under Article 5.  If the Director mis-directed himself as to such compatibility then his public justification and reasons for the decision are flawed.  The fact that the Attorney General and Director chose to justify the decision by invoking compatibility with the Convention entitles this court to review the legality of the decision under ordinary domestic law principles.  For example, if it could be demonstrated that the true reason for the decision was commercial, contrary to the assertion of the Director, then that decision would be susceptible to review on the grounds that no reasonable decision-maker could have reached that view.

120.   Nor do we think that the court should refrain from assessing compliance with Article 5, because of the reference to *the potential effect on relations with another* state. We accept that assessment of the potential effect of relations with another state is a matter for Government and not for the courts. Since the public justification for this decision was that it was not taken under the influence of the potential effect upon relations with another state, the court is entitled to assess the legality of the decision, because that requires consideration of the scope of the prohibition. By reason of the grounds upon which the Director and the Attorney General have publicly chosen to rely, the court is not debarred, on the grounds of trespass into a forbidden area, from seeking to interpret the Convention in determining the legality of the exercise of the Director's discretion under domestic law; we distinguish *CND* where no domestic law issue arose.

121.   There is a further ground which affords justification for the court to venture upon an interpretation of the Convention. It is true, as Mr Sales points out, that the Convention, unlike the European Convention on Human Rights, does not require any effective domestic remedy. But Article 1 of the Convention requires the parties to create a criminal offence for the bribery of a foreign public official. Section 109 of the Anti-terrorism, Crime and Security Act 2001 was brought into force for the very purpose of complying with the UK's obligation under Article 1. In those circumstances the exercise of discretion, whether to continue to investigate or to prosecute in a manner which undermines the very purpose for which the criminal offence was created seems to us a matter susceptible to the review of the courts. Parliament has chosen to honour the UK's international obligation under Article 1 and the decision of the Director ought to be considered in that context.

122.   In the light of our view that we are doing no more than applying ordinary public law principles to the decision we turn then to the interpretation of Article 5.

### The Absence of any reference to  National Security in the Convention

123.   The claimants adopt the position that absent any express reference to national security it was not open to the Director to discontinue the investigation on national security grounds.

124.   It is true that a number of bilateral and multilateral treaties to which the United Kingdom is a party refer specifically to national security (e.g., the bilateral 1994 Treaty Between the USA and the United Kingdom on Mutual Legal Assistance in Criminal Matters (Article 3(1)) and the multilateral 1996 International Covenant on Civil and Political Rights).

125.   The flaw in this argument is that Article 5 preserves *the applicable rules and principles of each party* by which investigation and prosecution of the bribery of a foreign public official are to be pursued. In the case of three of the Contracting Parties, the United Kingdom, Canada and Germany, the OECD Working Group on Bribery in International Business Transactions ( the WGB) has evaluated their applicable rules. We shall return later to the importance  of the WGB in ensuring compliance under Art. 12 of the Convention. In Canada, as in the United Kingdom, the prosecutorial code refers to disclosure which might harm international relations or security. We were informed that the WGB had raised no objection to either code. In German domestic law, proceedings may be discontinued in circumstances where there

is a risk of a severe disadvantage for Germany or an overriding public interest against prosecution. The OECD Review of Implementation described those provisions as references mainly to offences involving national security interests (see page 11 of the OECD Review). The WGB recorded that those provisions complied with the standards of the Convention (page 19). Since the wide discretion of the prosecutor is preserved in the opening sentence of Article 5, there was, in our view, no need for specific reference to national security.

126. Further, the right of a State to protect its security in the sense of protecting the lives of its citizens against terrorism is fundamental. As the PCIJ put it in the case of the *SS Wimbledon* (PCIJ Reports Series A No. 1 (1923) page 37:-

> "The right of a State to adopt the course which it considers best suited to the exigencies of its security and to the maintenance of its integrity, is so essential a right that in case of doubt, treaty stipulations cannot be interpreted as limiting it, even though those stipulations do not conflict with such an interpretation".

127. Associated with the right of a state to take those measures which it considers necessary to protect its citizens, is the importance of those international norms which protect human rights and, in particular, the right to life. Some norms have a special or privileged status because of their content (see *Higgins, President of the International Court of Justice* [2006] ICLQ 800). Their special or privileged status is recognised by international law in the maxim that a general provision does not derogate from a special one. The right to life is expressed in Article 3 of the Universal Declaration of Human Rights 1948, Article 6 of the International Covenant on Civil and Political Rights (1996) and, of course, Article 2 of the ECHR. The obligation of a government in a democratic society to protect and safeguard the lives of its citizens was, as we have already recalled, described by Lord Hope as essential to the preservation of democracy.

128. Accordingly, we reject the claimants' contention that because the Convention makes no specific reference to national security, in the sense of protecting and safeguarding the lives of UK citizens and soldiers, it was a prohibited consideration.

129. But that does not dispose of the issue. Article 31(1) of the Vienna Convention on the Law of Treaties requires that:-

> "A treaty should be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in that context and in the light of its object and purpose."

130. In order to achieve the objective of the Convention, two features are essential. Firstly, that some distinction is drawn between national security, consideration of which is not excluded by Article 5, and *the potential effect upon relations with another state*. Unless a distinction is drawn, Article 5 is deprived of any sensible effect. Secondly, that distinction must be applied in a manner which is uniform throughout the Contracting Parties. Without uniformity of standards, the Convention cannot achieve its objective: uniformity of standards requires uniformity of interpretation.

### The Distinction between National Security and Relations with Another State

131.    We deal first with the distinction on which the efficacy of Article 5 depends. Reliance upon the commentary adopted by the negotiating conference on the same day as the OECD Convention is relevant, either pursuant to Article 31(3)(b) of the Vienna Convention as declarations constituting state practice, or as part of the context under Article 31(1), or as a supplementary means of interpretation under Article 32. Paragraph 6 of the Annex to the 1997 OECD Revised Recommendation, which the commentaries describe as complementing Article 5, states that prosecutorial discretion should not be influenced by consideration of national economic interest and *fostering good political relations*.

132.    That commentary does not seem to us to be of assistance in determining how to distinguish between being influenced by considerations of the potential effect upon relations with another state and being influenced by fears for national security. Yet, if the reference to the potential effect upon relations with another state in Article 5 is to have any effective content, a line must be drawn.

133.    The very context of the Convention demonstrates how important it is to draw that line. The context is the intention of one state to investigate and prosecute bribery of a public official of another state. The purpose of the Convention is to ensure that the Contracting Parties resist a damaging reaction by a state which wishes to avoid the investigation and prosecution of its public official. The Convention foresees that the reaction of the other state may be to threaten to damage the investigating state's economic interests, and to impede co-operation. A foreign state whose public official is under investigation, is likely, if it wishes to escape investigation, to deploy threats to the relationship with the investigating state in the most effective way it can. If that foreign state is powerful and of strategic importance, it is all the more likely that one of the effects of a deterioration in relations will be damage to the national security of the investigating state by a diminution or withdrawal of co-operation in intelligence, nowadays an essential currency of the exchange between states which share a friendly relationship.

134.    The defendant's submissions demonstrate the difficulty in making any distinction. He contends (at § 66 of the written argument) that it matters not if the cause of the damage to national security is a deterioration in relations with the foreign state. He contends that "it cannot plausibly be supposed" that the contracting states intended that that causal mechanism should be taken to govern the ability of the investigating state to base its decision on national security.

135.    Moreover, the facts of this investigation in 2005 and 2006 demonstrate the difficulty in drawing the line between a consideration which may properly influence the prosecutor and that is which is proscribed by Article 5. The reasons given, in the representations to the Attorney General of the Government, are replete with references to the effect on relations with Saudi Arabia. The letter dated 29 September 2006 referred back to the response of Government to the Shawcross exercise on 16 December 2005. That response in December 2005 referred not only to the Al-Yamamah Air Defence Programme but:-

>        "the importance of relations with Saudi Arabia, in terms of the UK national interest, range more widely. The central

consideration is the potential impact on our national security and particularly as regards our counter-terrorism work, and the broader search for stability in the Middle East."

The letter of 29 September 2006 referred to:-

"very strong indications that the severe damage to the public interest (over and above that to the national economic interest covered by Article 5…) we feared was likely in December 2005 is now imminent.  If the Saudis are already starting to take such steps in relation to the Typhoon programme, then we must anticipate that they could follow though (*sic*) then [redaction] in relation to counter-terrorism *and the bilateral relationship*." (our emphasis)

It is noteworthy that the Cabinet Secretary appears to have overlooked that not only the national economic interest but also what he calls the "bilateral relationship" was covered by Article 5.

136.    The personal minute from the Prime Minister dated 8 December 2006 spoke of the real and immediate risk of collapse not only in security and intelligence but also in diplomatic co-operation.  The minute acknowledged that Article 5 covered not only influence by consideration of national economic interest but also the potential effect upon relations with another state.  It explained the damage to UK national security, consequential on:-

"…our exchanges with the Saudi authorities in countering international terrorism; and the Government's highest foreign policy priority of working towards peace and stability in the Middle East.  As you will know, if is my strong belief that our Middle East work is fundamentally also a matter of our national security."

137.    The attachments to the minute make clear that it is the breakdown in a joint approach with the Saudi authorities in relation to the Middle East which would cause consequential damage to national security.  This is emphasised in the attachments to the minute, particularly from Sir Richard Mottram, who speaks of the danger if the Saudis withdrew co-operation that the United Kingdom would be denied the support of a "key partner in our Global counter-terrorist strategy".  The second attachment, the letter from the Permanent Under-Secretary, speaks of the dramatic impact withdrawal of Saudi co-operation on Middle East issues would have on the UK's ability to pursue its objectives in the region.  The UK depends on Saudi Arabian support in advancing its policies on Israel and Palestine.  Saudi Arabia had potential to act as a moderating influence in what he described as a highly-charged region.

138.    The letter, dated 12 December 2006, records the Prime Minister's fear that if Saudi Arabia lost the confidence it placed in the UK, it would very seriously damage the UK's national interest in what he describes as the fields of counter-terrorism and the search for peace and stability in the Middle East.  The Prime Minister's summary linked the UK counter-terrorist effort, Middle East diplomacy, and what he describes as other important aspects of the relationship with Saudi Arabia.

139.   The causal connection between damage to the relationship with Saudi Arabia and damage to national security was echoed in the Attorney General's references to the views of the Prime Minister and the Foreign and Defence Secretaries which he repeated in the House of Lords on 14 December 2006:-

> "They have expressed the clear view that continuation of the investigation would cause serious damage to UK/Saudi security, intelligence and diplomatic co-operation, which is likely to have seriously negative consequences for the United Kingdom public interest in terms of both national security and our highest priority foreign policy objectives in the Middle East."

He then continued, in the passage we have already quoted, by assuring Parliament that those considerations precluded by Article 5 had not been taken into account.

140.   This evidence again demonstrates the difficulty of distinguishing between consideration of the potential effect upon relations with another state and consideration of national security.   National security is, to a significant extent, dependent upon co-operation with other states.   That co-operation is dependent on fostering or maintaining good relations.   If the investigating state depends upon good relations with the foreign state whose public official it seeks to investigate for its own national security, Article 5 seems to have little, if any, utility.   It is all too easy for a state which wishes to maintain good relations with another state whose official is under investigation to identify some potential damage to national security should good relations deteriorate, all the more so where that other state is powerful and of strategic importance.

### *Uniformity of Interpretation*

141.   Article 5 recognises how susceptible each of the contracting Parties may be to permitting self-interest to overcome the need to combat bribery.  Only by multilateral co-operation and uniformity can the object of the Convention to stamp out bribery in international business transactions be achieved:-

> "…recognising that achieving equivalence among the measures to be taken by the Parties is an essential object and purpose of the Convention, which requires that the Convention should be ratified without derogations affecting this equivalence;" (see 8th preamble)

142.   Self-interest is bound to have the tendency to defeat the eradication of international bribery.   The Convention is deprived of effect unless competitors are prepared to adopt the same discipline.   The state which condones bribery in its economic or diplomatic self-interest will merely step into the commercial shoes of the states which honour their commitment.   Unless a uniform distinction is drawn between the potential effect upon relations with another state and national security, some signatories of the Convention will be able to escape its discipline by relying upon a broad definition of national security, thus depriving the prohibited consideration of the effect upon relations with another state of any force.

### State Necessity

143.  The solution offered by the claimants is more likely to achieve uniformity and the objective of the Convention by closely defining the circumstances in which considerations of the potential effect on relations with another state may be taken into account, notwithstanding Article 5, because of the potential impact on an investigating state's national security.  It does  so by invoking the doctrine of necessity in customary international law which is recognised as excusing a state from a breach of its international obligation or, as it is put in the *argot* of international law, as precluding the wrongfulness of an act not in conformity with an international obligation.

144.  The source of this submission is Article 25 of the International Law Commission's Draft Articles on State Responsibility.  Article 25 provides that:-

> "1. Necessity may not be invoked by a State as a ground for precluding the wrongfulness of an act not in conformity with an international obligation of that State unless the act:
>
> (a) Is the only way for the State to safeguard an essential interest against a grave and imminent peril; and
>
> (b) Does not seriously impair an essential interest of the State or States towards which the obligation exists, or of the international community as a whole.
>
> 2. In any case, necessity may not be invoked by a State as a ground for precluding wrongfulness if:
>
> (a) The international obligation in question excludes the possibility of invoking necessity; or
>
> (b) The State has contributed to the situation of necessity."

145.  It is important to appreciate that this doctrine of necessity only arises where a state has not acted in conformity with an international obligation.  The doctrine does not provide that there has been no breach, but  that the state is not responsible for that breach.  Thus the conditions under which a state may escape the consequences of its breach of an international obligation are narrowly defined.   It applies only to exceptional cases where:-

> "The only way a state can safeguard an essential interest threatened by grave and imminent peril is, for the time being, not to perform some other international obligation of lesser weight or urgency."  (See the commentary to the ILC articles, Report of the ILC 53rd Session 2001 at 80.)

146. In the case concerning the *Gabcikovo-Nagymaros* project (International Court of Justice Judgment of 25 September 1997) the International Court of Justice confirmed that those strict conditions reflect customary international law.

147. The doctrine of necessity provides a clear basis for distinguishing between those decisions which are influenced by the potential effect upon relations with a foreign state and those decisions which, while they are influenced by those considerations, are nevertheless justified by national security. A prosecutor would only be able to discontinue an investigation or prosecution in circumstances where that was the only means of protecting the security of its citizens. Moreover, such an approach would achieve uniformity since each of the contracting states would be required to bring itself within the strict conditions identified in Article 25 before it could justify its action. That uniformity would be enhanced by the principle identified by the ICJ in *Gabcikovo-Nagymoros* that the state in question cannot be the sole judge of whether the conditions of necessity had been met (see paragraph 51).

148. The only way, as we see it, of achieving the purpose of Article 5 is to permit consideration of national security only in circumstances which on an international plane would be regarded as justifying the defence of state necessity. We can see no other way of distinguishing national security and relations with another state.

149. Were such a distinction not to be drawn, in every case where an investigating state fears that the consequences of a deteriorating relationship will be a loss of intelligence co-operation and consequential damage to national security, the investigating state will be able to withdraw. The feared consequences to national security were caused by the fear of loss of Saudi co-operation in counter-intelligence. But that counter-intelligence was only a part, if an essential part, of the UK's relations with Saudi Arabia. There is no rational means of distinguishing between the counter-intelligence relationship and any other aspect of the relationship between the UK and Saudi Arabia. The sharing of intelligence information was integral, as all the advice and memoranda from Government emphasised, to the relationship between Saudi Arabia and the UK.

### Conclusion on Article 5

150. Before we base any decision on that ground, we must recall that we are a national court exercising jurisdiction in relation to a domestic decision. If each of the Contracting Parties draws a line between that which is a permitted consideration and that which is forbidden, the objective of uniform discipline cannot be achieved. The Convention provides its own mechanism for uniform interpretation and compliance in Art. 12 :

> "The Parties shall co-operate in carrying out a programme of systematic follow-up to monitor and promote the full implementation of this Convention. Unless otherwise decided by consensus of the Parties, this shall be done in the framework of the OECD Working Group on Bribery in International Business Transactions and according to its terms of reference….."

151.    A Foreign and Commonwealth official, Nigel Dickerson, has described the defence advanced by the Government to the WGB's investigation of the decision to discontinue and Phase 2(bis) of WBG's continuing assessment. Mr Dickerson is anxious to ensure that the UK's defence is not hampered by any decision of this court.

152.    As Miss Rose QC points out, the considerations which inhibited this court's intervention in *CND* are not the same. In that case the UK had not purported to give any interpretation of the international instrument. In this case, the UK has invoked the Article in its public domestic defence of its decision. Moreover, it has informed the WGB of these proceedings, and told the WGB that the question whether the Director's decision "was compatible with Article 5…is therefore now likely to be determined by the English High Court". In these circumstances, we would not regard the fact that the UK now has to defend itself at an international level as a ground for precluding this court from assessing the legality of the decision in accordance with domestic law.

153.    But there are two considerations which seem to us to compel a cautious, perhaps pusillanimous approach. Firstly, we have emphasised the need for uniformity. That requires that the line between that which is permitted and that which is precluded be drawn in a manner which is authoritative and uniform. The Contracting Parties have invested the authority to draw that line not on the domestic courts of those Parties but on the WGB. If this court was to strike down the decision by deciding where the line should be drawn it would damage the uniformity on which the Convention depends. Miss Rose contended that there can only be one meaning to the Convention. We agree, but to the extent that it is a matter of interpretation, the words of demarcation must have an autonomous meaning, and that is for the WGB, through which the Contracting Parties achieve consensus.

154.    Secondly, a ruling on Article 5 is not necessary for our decision. We have already concluded that under conventional domestic law principles, the Director's decision was unlawful. A decision as to Article 5 is not, therefore, necessary.

155.    We must recall that the question we have to consider is whether Mr Wardle misdirected himself as to the meaning of Article 5. He has made no attempt to explain how he drew the distinction between being influenced by considerations of the potential effect on relations with Saudi Arabia and being influenced by fears for national security. He merely asserts that *he was not influenced by the potential effect upon relations with another state* (§ 48). His addition of the coda *per se* is not illuminating, nor are we enlightened by his statement in the next sentence :-

> "I understood, of course, that continuing the investigation would damage the UK's relations with Saudi Arabia, but, in and of itself, that consideration did not concern me".

156.    The Director appears to be making a distinction between fears of damage to the UK's relations and fears of the consequences of such damage. But that does not assist in identifying that which is permitted and that which is prohibited by Article 5. In every case an investigating state will be concerned as to the consequences of damage to its relations with the other state. Those consequences might deter an investigating state, absent the prohibition in Article 5. Although we have grave doubts as to whether

Article 5 can achieve its objective if a distinction is drawn between considerations of national security and consideration of the effect on relations with another state, we have also acknowledged that the Convention has not excluded considerations of national security. Thus we have accepted that there is a distinction; the difficulty lies in making it.

157. Faced with the WGB's apparent endorsement of the domestic rules and principles of prosecutions in the UK, Canada and Germany and absent any further ruling of the WGB, we express no concluded view as to whether it was open to the Director to take the view that his decision was in compliance with Article 5. The Government will have to defend itself before the court of that body. It will be for that body to determine whether it was open to the UK to yield to the explicit threat, which we note does not appear in Mr Dickerson's description given to the WGB in January and March 2007 (see § 6 of his statement).

158. Because we have deliberately drawn back from reaching a conclusion on this ground we are spared any comment on the unattractive alternative submission that, despite seeking public acceptance of the decision by invoking Art 5, the Director is entitled to pray in aid his subsequent evidence that he would have made the same decision, even if to do so would have involved acting in breach of the Convention. If the fight against international bribery and corruption is to succeed, there must surely be transparency in the standards which are to be applied in deciding whether to investigate and prosecute and rigour in the way they are interpreted. But we must remind ourselves that neither an absence of transparency nor of rigour, without more, is a ground for judicial review.

### Other Issues

159. The claimants focussed on the three issues we have already covered. We shall follow its course and dispose briefly of two of the remaining submissions. They contended (issue iv) that the Director ought to have taken into account Saudi Arabia's threatened breach of its own international law obligations.

160. Our discussion of the principles relating to Article 5 provides the answer. Firstly, it was for the Director to determine those considerations relevant to his decision to discontinue, subject to his obligation to exercise the power conferred on him by the 1987 Act (see our previous reference to *Al Rawi* at § 56). Secondly, it is not for this court to determine whether the Saudi threat to withdraw co-operation breached Security Council Resolution 1373/2001 (see e.g. *Buttes Gas* at 931G-932F). However, the fact that no consideration appears to have been given by either the Attorney General or the Director as to whether it could properly be contended in response to the threat that carrying it out would be contrary to resolution 1373/2001 is a further illustration of the lack of any resistance to the threat.

161. The submission (issue v) that the advice on public interest from ministers during the Shawcross exercise was tainted by reference to matters proscribed by Art 5 misses the target. Ministers could not and did not make the decision impugned. The WGB will decide whether the Director was influenced by considerations outwith Article 5.

162. But we are not surprised that the allegation is made. Since, as we have already indicated, the Director has failed to explain how he distinguished between the

influence of a consideration of the potential effect on relations between Saudi Arabia and considerations of national security, no-one can be confident that he maintained that distinction in reaching his conclusion. But that does not entitle us to reject his assurance that he was not influenced by considerations which were in his view prohibited by Article 5. The Director has escaped judgment on this issue because we have accepted that there is a distinction and that it is for the WGB to determine where the boundary is to be defined.

163.    The final challenge (issue vi) complains that ministers breached the rules announced by the Attorney General, Sir Hartley Shawcross on 29 January 1951. The Shawcross rules require ministers to limit their observations to informing the Attorney General of considerations which may affect his decision; they should not tell him what his decision should be. The Prime Minister, so it is alleged, broke the rules by forcefully expressing his opinion that the investigation should be halted.

164.    A number of hotly contested issues arise in relation to the Shawcross exercise. It is disappointing to record that we do not need to resolve them. The starting point is a dispute as to the content of those rules. The claimants rely on the statement by Sir Hartley to the House of Commons (Hansard 29/1/1951, Vol.483, Col. 683-4):

> "I think the true doctrine is that it is the duty of an Attorney-General, in deciding whether or not to authorise the prosecution, to acquaint himself with all the relevant facts, including, for instance, the effect which the prosecution, successful or unsuccessful as the case may be, would have upon public morale and order, and with any other considerations affecting public policy.
>
> In order so to inform himself, he may, although I do not think he is obliged to, consult with any of his colleagues in the Government; and indeed, as Lord Simon once said, he would in some cases be a fool if he did not. On the other hand, the assistance of his colleagues is confined to informing him of particular considerations which might affect his own decision, and does not consist, and must not consist, in telling him what the decision ought to be. The responsibility for the eventual decision rests with the Attorney General, and he is not to be put, and is not put, under pressure by his colleagues in the matter".

165.    The Government interpret this statement as meaning that ministers must not instruct the Attorney General to make a particular decision, must not direct him what his decision ought to be. But there is no objection to their giving an opinion as where they think the public interest lies. Indeed, the head of the Legal Secretariat to the Attorney General recalls a number of previous occasions, as do his predecessors, when opinions as to where the public interest lay have been vigorously expressed.

166.    Both interpretations may be respectably derived from the original statement (as both *Edwards op.cit 323-4* and *Marshall in Constitutional Conventions, The Rules and Forms of Political Accountability (*1993) pp.113-4 acknowledge). There might, we venture to suggest, be some advantage in public clarification of what the Government, in submission, suggests is an ambiguity in the existing statement. But we take the view that it is not for this court to resolve for the following reasons.

167.    In even the most forceful expression of views, the Prime Minister made it clear that the decision was for the Attorney General and the Director. The Director has stated that he formed his own judgment and we accept his assurance. In those circumstances, the interesting question whether, even if a breach of the rules could be established, such a breach is justiciable does not fall to be resolved.

168.    The significant feature of this argument lies in the repeated assertion that, as the Prime Minister acknowledged, the decision was for the independent judgment of the Director. However the Shawcross rules are to be interpreted, the danger which flows from the Government's expression of too vigorous an opinion, is that it makes it all the more difficult for the independent decision maker clearly to demonstrate that his decision was exercised independently and free from what Sir Hartley describes as *pressure by his colleagues*. The rationale behind the Shawcross rules is the need to preserve independence of judgment and the freedom from pressure which such independence requires.

169.    How piquant it is, then, that the more the defendant stresses that he reached a conclusion free from pressure imposed by the UK Government, the more he demonstrates the inconsistency in submitting to pressure applied by the government of a foreign state. We have identified a principle of law which seeks to protect him from both.

### Conclusion

170.    The claimants succeed on the ground that the Director and Government failed to recognise that the rule of law required the decision to discontinue to be reached as an exercise of independent judgment, in pursuance of the power conferred by statute. To preserve the integrity and independence of that judgment demanded resistance to the pressure exerted by means of a specific threat. That threat was intended to prevent the Director from pursuing the course of investigation he had chosen to adopt. It achieved its purpose.

171.    The court has a responsibility to secure the rule of law. The Director was required to satisfy the court that all that could reasonably be done had been done to resist the threat. He has failed to do so. He submitted too readily because he, like the executive, concentrated on the effects which were feared should the threat be carried out and not on how the threat might be resisted. No-one, whether within this country or outside is entitled to interfere with the course of our justice. It is the failure of Government and the defendant to bear that essential principle in mind that justifies the intervention of this court. We shall hear further argument as to the nature of such intervention. But we intervene in fulfilment of our responsibility to protect the independence of the Director and of our criminal justice system from threat. On 11 December 2006, the Prime Minister said that this was the clearest case for intervention in the public interest he had seen. We agree.