# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITY OF HARPER WOODS EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of BAE SYSTEMS PLC, | ) ) ) ) | Civil No. 1:07-cv-01646 |
| | | Assigned to: Judge Rosemary M. Collyer |
| Plaintiff, | ) ) | |
| | ) | **ORAL HEARING REQUESTED** |
| vs. | ) ) | |
| RICHARD (DICK) L. OLVER et al., | ) ) | |
| Defendants, | ) ) | |
| – and – | ) ) | |
| BAE SYSTEMS PLC, an England and Wales corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | |

## REPLY MEMORANDUM IN SUPPORT OF THE MOTION OF BAE SYSTEMS PLC AND THE INDIVIDUAL BAE SYSTEMS PLC DEFENDANTS TO DISMISS THE COMPLAINT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT .................................................................................................................... 2

   I.    ENGLISH LAW GOVERNS PLAINTIFF'S CLAIMS ...................................................... 2

       A.    The internal affairs doctrine requires the application of English law ........................ 2

       B.    Plaintiff ignores the exceedingly narrow applicability of a local law exception to the internal affairs doctrine, including that this District has almost never applied such an exception in a case involving corporate governance. ................................................................................................................ 3

       C.    Plaintiff grossly overstates the District's interest in the internal affairs of BAE plc as compared to the interest of England. ........................................................ 5

   II.    PLAINTIFF LACKS STANDING AND HAS FAILED TO STATE A CLAIM UNDER ENGLISH LAW ............................................................................................ 8

       A.    As a holder of American Depositary Receipts, Plaintiff lacks standing to pursue this derivative lawsuit ................................................................................... 9

       B.    The Rule in *Foss v. Harbottle* Applies to Plaintiff's Complaint ............................. 11

       C.    No exceptions to the Rule in *Foss v. Harbottle* apply to this case .......................... 11

           1.    The Fraud on the Minority Exception ............................................................. 12

           2.    The *Ultra Vires* Exception ............................................................................ 13

   III.    PLAINTIFF FAILS TO PERSUADE THAT THIS DISTRICT IS A CONVENIENT FORUM IN WHICH TO LITIGATE A DERIVATIVE ACTION AGAINST AN ENGLISH COMPANY .............................................................................................. 15

       A.    Plaintiff misstates the Doctrine of *Forum Non Conveniens* .................................. 16

       B.    Plaintiff fails to demonstrate that England is an inadequate forum .......................... 17

       C.    Plaintiff's choice of forum is entitled to little deference because the real party in interest is BAE plc, a foreign corporation .................................................. 20

       D.    The *Gilbert* factors weigh in favor of dismissal ...................................................... 21

CONCLUSION ................................................................................................................ 23

# TABLE OF AUTHORITIES

**Page**

## CASES

*Am. Dredging Co. v. Miller*,
510 U.S. 443 (1994)................................................................................................16

*Arab Monetary Fund v. Hashim & Others*,
[1993] 1 Lloyd's Rep. 543........................................................................................15

*BCCI Holdings (Luxembourg), Societe Anonyme v. Khalil*,
184 F.R.D. 3 (D.D.C. 1999)......................................................................................8

*BCCI Holdings (Luxembourg), Societe Anonyme v. Mahfouz*,
828 F. Supp. 92 (D.D.C. 1993)................................................................................20

*BPA Int'l, Inc. v. Kingdom of Sweden*,
281 F. Supp. 2d 73 (D.D.C. 2003) ..........................................................................17

*Bastin v Davies*,
[1950] 2 KB 579 .....................................................................................................14

*Batchelder v. Nobuhiko Kawamoto*,
147 F.3d 915 (9th Cir. 1998) ....................................................................................3

*Birch v. Sullivan*,
[1957] 1 WLR 1247 .................................................................................................10

*CTS Corp. v. Dynamics Corp. of Am.*,
481 U.S. 69 (1987)....................................................................................................3

*Coalition for Underground Expansion v. Mineta*,
333 F.3d 193 (D.C. Cir. 2003) ..................................................................................6

*In re Disaster at Riyadh Airport, Saudi Arabia, on Aug. 19, 1980*,
540 F. Supp. 1141 (D.D.C. 1982) ...........................................................................19

*El-Fadl v. Cent. Bank of Jordan*,
75 F.3d 668 (D.C. Cir. 1996) .............................................................................18, 22

*Ford v. Brown*,
319 F.3d 1302 (11th Cir. 2003) ...............................................................................19

*Foss v. Harbottle*,
(1843) 2 Hare 461 ............................................................................................*Passim*

ii

*Ganem v. Heckler*,
746 F.2d 844 (D.C. Cir. 1984) ........................................................................................8

*Guidi v. Inter-Continental Hotels Corp.*,
224 F.3d 142 (2d Cir. 2000) ..........................................................................................20

*Gulf Oil Corp. v. Gilbert*,
330 U.S. 501 (1947) ..................................................................................................17, 22

*Herbert v. Dist. of Columbia*,
808 A.2d 776 (D.C. 2002) .............................................................................................4

*Herron v. Veneman*,
305 F. Supp. 2d 64 (D.D.C. 2004) ................................................................................6

*Jafari-Fini v. Skillglass Ltd.*,
[2005] EWCA Civ 356 ..............................................................................................9, 10

*Jaffe v. Pallotta Teamworks*,
374 F.3d 1223 (D.C. Cir. 2004) .....................................................................................4

*Jota v. Texaco, Inc.*,
157 F.3d 153 (2d Cir. 1998) ..........................................................................................19

*Kaiser-Georgetown Comty. Health Plan, Inc. v. Stutsman*,
491 A.2d 502 (D.C. 1985) .............................................................................................4

*Kamen v. Kemper Fin. Servs., Inc.*,
500 U.S. 90 (1991) ..........................................................................................................3

*Koster v. (Am.) Lumbermens Mut. Cas. Co.*,
330 U.S. 518 (1947) ......................................................................................................20

*Mayflower Hotel Stockholders Protective Comm. v. Mayflower Hotel Corp.*,
173 F.2d 416 (D.C. Cir. 1949) .......................................................................................4

*Mayflower Hotel Stockholders Protective Comm. v. Mayflower Hotel Corp.*,
193 F.2d 666 (D.C. Cir. 1951) .......................................................................................4

*Nemariam v. Fed. Democratic Republic of Eth.*,
315 F.3d 390 (D.C. Cir. 2003) .....................................................................................18

*Pain v. United Techs. Corp.*,
637 F.2d 775 (D.C. Cir. 1980) ........................................................................17, 19, 20

*Phillips v. China Airlines, Ltd.*,
No. 91-56026, 1993 WL 28362 (9th Cir. Feb. 3, 1993) ............................................16

*Piper Aircraft Co. v. Reyno*,
454 U.S. 235 (1981) ....................................................................................17, 18, 20

*R v. Director of the Serious Fraud Office & BAE Sys. PLC*,
[2008] EWHC 714 ..........................................................................................6

*Rolled Steel Prods. (Holdings) Ltd. v British Steel Corp.*,
[1986] Ch 246 ..............................................................................................15

*Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*,
127 S. Ct. 1184 (2007) ................................................................................16, 21

*Stromberg v. Marriott Int'l, Inc.*,
474 F. Supp. 2d 57 (D.D.C.), *aff'd*, 256 F. App'x 359 (D.C. Cir. 2007) .....................18

*Veba-Chemie A.G. v. M/V Getafix*,
711 F.2d 1243 (5th Cir. 1983) ..........................................................................19

*Watson v. Merrell Dow Pharms., Inc.*,
769 F.2d 354 (6th Cir. 1966) ............................................................................19

## STATUTES & RULES

28 U.S.C. § 2072(b) ........................................................................................3

Fed. R. Civ. P. 12(b)(1) ....................................................................................6

Fed. R. Civ. P. 23.1 ..........................................................................................3

Fed. R. Civ. P. 44.1 ..........................................................................................8

## OTHER AUTHORITIES

5B Charles Allen Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1350 ..................6

Restatement (Second) of Conflicts of Laws § 302 ..............................................2, 3, 5

Frances Gibb, *House of Lords to Rule on BAE Corruption Inquiry*, The Times,
Apr. 25, 2008, *available at* http://business.timesonline.co.uk/tol/business/
law/article3807584.ece (last visited May 22, 2008) ..................................................7

iv

## PRELIMINARY STATEMENT

The BAE Systems plc Defendants respectfully submit this brief reply in further support of their motion to dismiss the derivative claims brought against them by Plaintiff City of Harper Woods Employee's Retirement System.[1]  This case should be dismissed on the grounds of Plaintiff's lack of standing and failure to state a claim under English law, and on *forum non conveniens* grounds.[2]  Plaintiff's arguments against application of English law to this case simply ignore the overwhelming weight of authority applying the internal affairs doctrine to disputes involving the corporate governance of a foreign corporation like BAE plc.  In addition, Plaintiff raises no genuine argument against the fact that under English law it has no standing to sue because it is an ADR holder rather than a registered shareholder of BAE plc.  Plaintiff's arguments that the Rule in *Foss v. Harbottle* does not apply to its allegations are, in some instances, actually rejected by its own English law expert Paul Girolami QC, and in other instances, flatly contradicted by applicable English authorities, as explained by Martin Moore QC, the BAE Systems plc Defendants' expert.  As to *forum non conveniens* dismissal, Plaintiff continues in the face of all the evidence to claim that the Court should treat BAE plc and its United States subsidiary BAE Inc. as one entity, even though BAE plc's Company Secretary has submitted a declaration showing that the companies are separate entities, and even though Plaintiff has not named the United States subsidiary as a party.  Likewise, Plaintiff insists that factors of convenience weigh in favor of litigation in this District, but fails to identify any

---

[1]     Capitalized terms, if not defined herein, are used as defined in the BAE Systems plc Defendants' Motion to Dismiss filed January 31, 2008 ("Motion" or "Motion to Dismiss").

[2]     The case should also be dismissed for lack of personal jurisdiction over the BAE Systems plc Defendants, but consideration of this ground for dismissal has been deferred until after the Court addresses the other two arguments for dismissal.  *See City of Harper Woods Employees' Ret. Sys. v. Olver et al.*, No. 07-1646 (D.D.C. Apr. 1, 2008) (order denying motion for expedited discovery).

specific reasons why this is so, other than Plaintiff's repetitive references to defunct bank accounts at the former Riggs Bank. Nearly all of the BAE Systems plc Defendants reside outside the United States; none reside in the District. Moreover, due to the significance to United Kingdom national security of the Al-Yamamah arrangement that is the Complaint's focus, England has a far larger stake in this case than does Washington, D.C., and for reasons of national interest as well as convenience to the Court and the parties, this case should proceed in England, if it proceeds at all.

## ARGUMENT

## I.    ENGLISH LAW GOVERNS PLAINTIFF'S CLAIMS

### A.    The internal affairs doctrine requires the application of English law

In its Opposition Brief ("Opp. Br."), Plaintiff attempts to avoid the application of English law by ignoring inconvenient facts. Plaintiff's first tactic is to argue that the Court should deem the English company BAE plc and its United States subsidiary BAE Inc. as one United States company, which would supposedly confer the requisite interest of the District in applying its laws. (Opp. Br. 27.) But the separate nature of the two companies and their operations was described in the sworn declaration of BAE plc Company Secretary David Parkes that was filed with the Motion to Dismiss. Plaintiff has not submitted any facts or evidence to contradict Mr. Parkes' declaration, yet goes on characterizing the English parent and the United States subsidiary as one entity in blithe disregard of the record. (*E.g.*, Opp. Br. 27.) Clearly, that tactic should be rejected.

Second, Plaintiff embarks on a convoluted choice of law analysis based on a selective reading of the Restatement (Second) of Conflict of Laws that ignores the ample federal precedent holding that cases involving the internal affairs of a foreign corporation should be decided under the law of the state of incorporation. (Motion at 7-9 (collecting cases)). United

States Supreme Court precedent emphasizes the importance of the internal affairs doctrine, which counsels that "a corporation – except in the rarest situations – is organized under, and governed by, the law of a single jurisdiction, traditionally the corporate law of the State of its incorporation." *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 90 (1987). Despite this firmly established doctrine, which has been repeatedly applied by courts asked to examine the internal affairs of British companies (Motion 10-11, collecting cases), Plaintiff argues that Federal Rule of Civil Procedure 23.1[3], the District of Columbia Code, and the general interest factors described in Restatement (Second) of Conflict of Laws § 6 require the application of the District's laws to BAE plc. (Opp. Br. 28-30, 35.)  None of these piecemeal arguments overcome the ample federal precedent for cases of this kind: "[u]nder the 'internal affairs' doctrine, the rights of shareholders in a foreign company, including the right to sue derivatively, are determined by the law of the place where the company is incorporated." *Batchelder v. Nobuhiko Kawamoto*, 147 F.3d 915, 920 (9th Cir. 1998) (collecting cases).

> B.     **Plaintiff ignores the exceedingly narrow applicability of a local law exception to the internal affairs doctrine, including that this District has almost never applied such an exception in a case involving corporate governance.**

Plaintiff's analysis relies on an amalgam of choice of law cases that are not breach of fiduciary duty or corporate governance actions, and fails to recognize the exceedingly narrow applicability of a "local law exception" to the internal affairs doctrine in this District and elsewhere. Indeed, as the BAE Systems plc Defendants observed in the Motion, "no recent

---

[3]     Plaintiff makes much of Federal Rule of Civil Procedure 23.1 and the supposed latitude it provides for Plaintiff to pursue in this Court a case about the corporate governance of an English company. (Opp. Br. 5, 28-32, 61-62.)  Plaintiff's argument ignores the Supreme Court's cautionary statement that "as a rule of procedure issued pursuant to the Rules Enabling Act, Rule 23.1 cannot be understood to 'abridge, enlarge or modify any substantive right.'"  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991) (quoting 28 U.S.C. § 2072(b)).  Rule 23.1 cannot, therefore, be an independent source of Plaintiff's right to bring this action, particularly where the governing English law is clear that Plaintiff has no such right.

decision of a court in this District has applied or even discussed such an exception." (Motion 11.)

Faced with precedent overwhelmingly unfavorable to its position, the only corporate governance related case that Plaintiff can cite in response is *Mayflower Hotel Stockholders Protective Committee v. Mayflower Hotel Corp.*, 173 F.2d 416, 423 (D.C. Cir. 1949). In *Mayflower,* a panel of the Circuit Court, without commenting on choice of law, applied the District's law to a breach of fiduciary duty claim involving a Delaware corporation. *Id.* Resolving a successive appeal, the court reasoned that the prior panel was within its discretion to apply the District's law and, notably, that the potentially applicable laws of the District and Delaware were in "substantial accord." *See Mayflower Hotel Stockholders Protective Comm. v. Mayflower Hotel Corp.*, 193 F.2d 666, 668, 677 nn.1, 2 (D.C. Cir. 1951). The case stands only for the proposition that it is not error *per se* for a court to apply local law to the internal affairs of a foreign corporation where the potentially applicable laws do not vary significantly. Plaintiff has not cited a single case that follows this 1951 decision to apply a local law exception and, even if the case were authoritative precedent, there is no "substantial accord" in the instant case between United States and English law regarding derivative lawsuits.[4]

Finally, Plaintiff attempts to sow confusion about the proper interest factors identified by the Restatement (Second) of Conflicts of Laws (Opp. Br. 30, 34-36, 40-45), so we

---

[4]     Plaintiff's remaining citations to choice of law decisions consist of inapposite cases that do not address the forum's interest, or lack thereof, in regulating the internal affairs of a foreign corporation. *See, e.g., Jaffe v. Pallotta Teamworks*, 374 F.3d 1223 (D.C. Cir. 2004) (choice of law regarding release from liability for negligence in wrongful death and negligence action, cited at Opp. Br. 34, 36 n.30, 39 n.32); *Herbert v. Dist. of Columbia*, 808 A.2d 776, 779 (D.C. 2002) (choice of law regarding damages in wrongful death action, cited at Opp. Br. 37); *Kaiser-Georgetown Comty. Health Plan, Inc. v. Stutsman*, 491 A.2d 502, 507 (D.C. 1985) (choice of law regarding limitations on medical malpractice liability, cited at, *e.g.*, Opp. Br. 39, 41-42). Plaintiff's cases do not bear on the issues germane to the instant litigation. (*Compare* Motion 10-11 (collecting cases applying law of state of incorporation).)

briefly clarify those proper factors.  The Restatement's commentary reinforces the internal affairs doctrine, observing that "the local law of the state of incorporation should be applied except in the extremely rare situation where a contrary result is required by the overriding interest of another state in having its rule applied."  Restatement (Second) of Conflict of Laws § 302, cmt. g.  It identifies three principal factors that may help determine whether another law than that of the state of incorporation should nevertheless be applied:

> (1) the nature and extent of the corporation's relationship to the state of incorporation, (2) the nature and extent of the corporation's relationship to the state whose local law is sought to be applied and (3) whether the act [breach of fiduciary duty, in this case] is of the sort discussed in Comment e – namely, one which cannot practicably be governed by the local law of more than one state.

*Id.*  The factors rightly emphasize the connections *between the corporation and the forum*, as the BAE Systems plc Defendants urge, rather than the nature of alleged wrongdoing, which is what Plaintiff asks the Court to view as the overriding factor.  The Restatement rejects Plaintiff's approach because the purpose of the internal affairs doctrine is to ensure that a stable body of law is applied to the affairs of a corporation: "Uniform treatment of directors, officers and shareholders is an important objective which can only be attained by having the rights and liabilities of those persons with respect to the corporation governed by a single law." *Id*. cmt. e. When the Restatement factors are correctly applied, they demonstrate that the jurisdiction with the greater interest in the instant case is England.  (*See* Motion 7-10.)

**C.     Plaintiff grossly overstates the District's interest in the internal affairs of BAE plc as compared to the interest of England.**

Not surprisingly given the Complaint's focus on the governance of BAE plc, Plaintiff has not identified any "dominant interest" of this District in this case.  Restatement (Second) of Conflict of Laws § 302, cmt. g (discussing the applicability of a local law exception).  Plaintiff argues that the Court should deem BAE plc a *de facto* United States

company because it derives income from the U.S. and has U.S. shareholders (*e.g.*, Opp. Br. 42.)
But that argument deliberately ignores the independent incorporation and governance of the U.S.
subsidiary BAE Inc., as well as its separate operations, all facts that are described in the sworn
declaration of Mr. Parkes.[5]  Plaintiff also points to the existence of the Special Security
Agreement with the United States Government (Opp. Br. 42), but does not address or account for
Mr. Parkes' description of the Agreement's provisions which *reinforce* the importance of the
separate legal existence of BAE plc and BAE Inc.  (*See* Parkes Decl. ¶ 21.)[6]  Plaintiff has failed
to cast any doubt on the fact that BAE plc is an English entity whose primary ties are to England,
not the United States.

　　　　　Contrary to Plaintiff's assertion, England's strong interest in this litigation is
highlighted, not weakened, by the recent decision of the English High Court of Justice criticizing
the Serious Fraud Office's ("SFO") termination of its investigation of BAE plc.  *See* (Opp. Br.
37-39); *R v. The Director of the Serious Fraud Office & BAE Sys. PLC,* [2008] EWHC 714

---

[5]　　　In tacit recognition of the fact that Plaintiff has not controverted any of the BAE Systems plc
Defendants' evidence, Plaintiff argues that the Court must construe the BAE System plc
Defendants' arguments under English law as Federal Rule of Civil Procedure 12(b)(1) matters.
(Opp. Br. 47-48.)  Plaintiff's insistence that Rule 12(b)(1) governs this motion, despite the lack of
precedent in this Circuit and general uncertainty in federal case law regarding the appropriate
ground for dismiss when a plaintiff has failed to state a claim under foreign law (Motion 6 n.3),
stems from its contention that this Court may not consider evidence submitted by a defendant
moving to dismiss under Rule 12(b)(1).  But Rule 12(b)(1) does not, as Plaintiff suggests, limit
the Court to considering extrinsic evidence supplied by only Plaintiff.  *See, e.g., Coalition for
Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (upholding motion to
dismiss for lack of standing and finding no error in district court's consideration of affidavit
submitted by defendant); *Herron v. Veneman*, 305 F. Supp. 2d 64, 70 (D.D.C. 2004) ("A court
may consider such materials outside the pleadings as it deems appropriate to resolve the question
whether it has jurisdiction to hear the case"); 5B Charles Allen Wright & Arthur R. Miller,
*Federal Practice & Procedure* § 1350 (collecting cases) ("When the movant's purpose is to
challenge the substance of the jurisdictional allegations, he may use affidavits and other
additional matter to support the motion.").  Thus this Court is free to consider the evidence
submitted by the BAE Systems plc Defendants on all potential grounds for dismissal.

[6]　　　Citations to "Parkes Decl." refer to the Declaration of David Parkes filed January 31, 2008.

(Admin) (available in Decl. of Mary K. Blasy in Support of Pl.'s Consolidated Br. in Opp'n to Defs.' Mots. to Dismiss at Ex. D). Though Plaintiff strains to argue that it is not in England's interest to investigate BAE plc's actions, the decision of the High Court is irrefutable evidence to the contrary: namely, that the Al-Yamamah arrangement and the investigation of BAE plc's role in it are live issues in England, and properly addressed under English law. Moreover, the English House of Lords has recently announced that it will review the decision of the High Court, a development that further undermines Plaintiff's argument. *See* Frances Gibb, *House of Lords to Rule on BAE Corruption Inquiry*, The Times, Apr. 25, 2008, *available at* http://business.timesonline.co.uk/tol/business/law/article3807584.ece (last visited 5/22/08).

   The remaining interests of the District asserted by Plaintiff relate not to the internal affairs of BAE plc but rather to the alleged wrongdoing that supposedly occurred in the District. Plaintiff points to its allegations about the deposit of funds in defunct accounts at the former Riggs Bank, purportedly in violation of the Foreign Corrupt Practices Act (Opp. Br. 40-41), but any interest that might arise from those allegations does not vitiate the internal affairs doctrine or strengthen the argument in favor of applying D.C. law to the issue of derivative standing. (Motion 12-13.)

   As to the issue of derivative standing, this Court's inquiry should focus on the District's interest in a *derivative action about the governance of an English corporation*, not its interest (or the interest of the United States) in applying the Foreign Corrupt Practices Act, tort law aiding and abetting liability, or criminal law regarding alleged banking irregularities. Setting aside those irrelevant "interests", Plaintiff has failed to identify a "dominant interest" of the District's law regarding derivative actions. The law of England thus controls Plaintiff's ability to maintain this suit.

## II.    PLAINTIFF LACKS STANDING AND HAS FAILED TO STATE A CLAIM UNDER ENGLISH LAW

Although Plaintiff has submitted the declaration of Paul Girolami QC[7] to bolster its English law arguments, Plaintiff fails to demonstrate that it has standing to pursue this derivative action under English law.  Initially, we note that Plaintiff's expert Mr. Girolami agrees with Martin Moore QC, the expert for the BAE Systems plc Defendants, on several important propositions.[8]  Mr. Girolami agrees with Mr. Moore (i) that the pre-Companies Act 2006 Rule in *Foss v. Harbottle* applies to alleged wrongs predating October 1, 2007, such as those alleged in the Complaint; (ii) that breaches of the duties of supervision and oversight are ratifiable and thus cannot be the subject of a derivative suit; (iii) that a derivative suit must allege that a director or officer benefitted from an alleged wrong; and (iv) that Section 463 of the Act applies only to reports first sent to company members after January 20, 2007.  (Girolami Decl. ¶ 6(2), 17, 29, 39.)  Even in instances where Mr. Girolami does not affirmatively agree with Mr. Moore, his opinions are expressed in tentative fashion, noting ambiguities in English (and non-English) law rather than actual disputes with Mr. Moore's elucidation of English law.  (*See, e.g.*, Girolami Dec. ¶ 22.)   Moreover, Mr. Girolami notably does *not* advance or adopt several of the arguments made by Plaintiff in its Opposition Brief.  (*See, e.g.*, Girolami Decl. ¶ 11 (observing that the Rule

---

[7]    Plaintiff refers to its expert as "Judge" Girolami even though Mr. Girolami himself does not use that title.  *See* Opp. Br. *passim*.  Service as a generalist part-time Chancery Division deputy judge does not lend more weight to Mr. Girolami's opinions than those of Mr. Moore, whose long career has focused on company law.  (Moore Decl. I (CV); Moore Decl. II ¶ 52.)

[8]    Plaintiff's argument that the Moore Declaration is inadmissible (Opp. Br. 45-46), is contrary to Federal Rule of Civil Procedure 44.1, which Plaintiff fails to cite.  The use of an expert to provide guidance regarding the application of foreign law is authorized by the Rule.  "[The] court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1.  Written or oral expert testimony accompanied by extracts from foreign legal material is the ordinary method by which foreign law is proven.  *See Ganem v. Heckler*, 746 F.2d 844, 854 (D.C. Cir. 1984); *see BCCI Holdings (Luxembourg), Societe Anonyme v. Khalil*, 184 F.R.D. 3, 9 (D.D.C. 1999).

in *Foss v. Harbottle* in effect prior to the Companies Act 2006 applies to alleged wrongs predating October 1, 2007, despite Plaintiff's argument that House of Lords might apply the Act to those suits (Opp. Br. 33)); ¶ 32-38 (omitting *Jafari-Fini v. Skillglass Ltd.*, [2005] EWCA Civ 356 (cited at Opp. Br. 63-64), from the cases that could suggest beneficial shareholder standing); ¶ 39-41 (not suggesting, despite Plaintiff's argument to the contrary (Opp. Br. 66-67), that Plaintiff may pursue Section 463 claim without regard to the Rule in *Foss v. Harbottle*).) Perhaps that is why Plaintiff substantively relies on Mr. Girolami's declaration only four times (*see* Opp. Br. 34 n.26, 58, 59, 65 n.49), and instead embarks on its own creative – and wrong – interpretations of English law using textbooks and Westlaw.  (Moore Decl. II ¶¶ 38-52.)[9]

### A. As a holder of American Depositary Receipts, Plaintiff lacks standing to pursue this derivative lawsuit

Plaintiff lacks standing to sue derivatively because it is a holder of ADRs, rather than registered BAE plc shares, and Plaintiff's status as an ADR holder is not in dispute as it is alleged in the Complaint.  (Motion 13-14.)   Plaintiff cites a single English case to support its standing to sue derivatively as an ADR holder, *Jafari-Fini v. Skillglass Ltd.*, [2005] EWCA Civ 356.  (Opp Br. 63-64.)  But as Mr. Moore explains, that case is limited to its unique facts and could stand for only the narrow proposition that a beneficial shareholder may "commence derivative proceedings if (i) his trustee is joined to proceedings, (ii) it is alleged that the plaintiff would be a registered shareholder but for the trustee's breach of trust and (iii) the trustee is a director of the company or (perhaps) the company otherwise has actual knowledge of the breach of trust."  (Moore Decl. II ¶ 13.)  The "unusual circumstances of the case," *Jafari-Fini*, [2005] EWCA Civ 356 at 56, including that the plaintiff was not represented by counsel and that

---

[9]    Citations to "Moore Decl. II" refer to the Second Declaration of Martin Moore QC filed with this Reply Memorandum on May 23, 2008, while citations to "Moore Decl. I" refer to the Martin Moore QC filed on January 31, 2008.

plaintiff was pursuing a personal not a derivative claim, are not present in the instant case, and therefore *Jafari-Fini* is inapplicable.  (Moore Decl. II ¶ 11-13.)

Setting aside Plaintiff's questionable reliance on *Jafari-Fini*, this Court has before it declarations from *three* English law experts, *none* of whom contend there is clear English authority to support Plaintiff's standing as a beneficial owner of BAE shares.  Not just Mr. Moore, the expert for the BAE Systems plc Defendants, but also David Chivers QC, whose declaration *Plaintiff* submitted in support of its Ex Parte Emergency Application for a Temporary Restraining Order against Prince Bandar, *conclude that Plaintiff's status as an ADR holder does not give it standing*.  (Moore Decl. ¶ 27-28; Moore Decl II ¶¶ 6-13; Chivers Decl. ¶ 30.3, available in Aff. of Mary K. Blasy in Support of Ex Parte Emergency Application for a TRO, an Accounting, Limited Expedited Disc. and for an Order to Show Cause Why Prelim. Inj. Relief Should Not Issue at Ex. MM.)  Mr. Girolami, Plaintiff's present expert, only states: "Prior to the 2006 Act, there is no English authority I am aware of to suggest that a derivative action could not be maintained by a beneficial owner, although there is only very limited authority which suggests that it might be maintainable."  (Girolami Decl. ¶ 35 (footnote omitted).)  That is a far cry from assuring the Court that a derivative action *can* be maintained by an ADR holder and, as Mr. Moore comments, this opinion-in-the-negative is not supported by any of the cases cited by Mr. Girolami.  (Moore Decl. II ¶¶ 6-8.)

A restrictive reading of the term "member" to exclude beneficial shareholders is supported not only by English case law (Motion 13-14 (citing Moore Decl. I ¶ 26-28, in turn citing *Birch v Sullivan*, [1957] 1 WLR 1247); Moore Decl. II ¶ 7), but also the Companies Act 2006, which both Mr. Moore and Mr. Girolami agree excludes beneficial shareholders from the class of members (Moore Decl. II ¶ 10; Girolami Decl. ¶ 34.)  It would be contrary to the

liberalizing effect of the Act, as Mr. Moore points out (Moore Decl. II ¶ 10), if the Act's definition is more restrictive than the common law requirement.

Indeed, the principle that only registered shareholders have standing is reflected in BAE plc's Articles of Association, which disclaim recognition of any shares held in trust.  (Ex. A to Second Declaration of David Parkes, dated May 22, 2008, Art. 10; *see* Moore Decl. II ¶ 9.) Thus English law and its embodiment in BAE plc's governing documents refute Plaintiff's argument that is may pursue this derivative action as an ADR holder.

### B.    The Rule in *Foss v. Harbottle* Applies to Plaintiff's Complaint

Even if Plaintiff could cure its lack of standing as an ADR holder, it cannot cure the application of the Rule in *Foss v. Harbottle* to its claims. (Motion 15-22.)  Plaintiff's absurd argument that the House of Lords would set aside the Rule in *Foss v. Harbottle* (Opp. Br. 32-34), ignores the choice of the statute drafters to apply the reforms of the Companies Act 2006 prospectively only.  Both Mr. Moore and Mr. Girolami agree that the Companies Act 2006 "came into force on the 1st October 2007," and that claims arising from acts or omission before that date may only be brought if they comply with the Rule in *Foss v. Harbottle*.  (Moore Decl. ¶¶ 11-12; Moore Decl. II ¶ 39; *see* Girolami Decl. ¶ 11.)  Neither expert, nor any authority cited by Plaintiff, suggests that the courts of England would ignore the conscious choice of Parliament and apply the Act to case arising from acts or omissions occurring prior to October 1, 2007. (Moore Decl. ¶¶ 40-41.) As discussed in the Motion to Dismiss, Plaintiff's claims of wrongdoing all predate October 1, 2007, and so the Companies Act 2006 does not apply. (Motion 3-6.)

### C.    No exceptions to the Rule in *Foss v. Harbottle* apply to this case

Plaintiff's arguments that it can satisfy two of the exceptions to the Rule in *Foss v. Harbottle* – the Fraud on the Minority Exception and the *Ultra Vires* Exception – rely on pure

theorizing that is not supported by English decisional law.[10]  The Opposition Brief, and to a lesser extent the declaration of Mr. Girolami, offer speculative interpretations of the exceptions to stretch them to accommodate Plaintiff's case.  But their theories are not supported by English case law or the intent behind *Foss v. Harbottle* and its narrow exceptions, and fail to overcome the weight of case law demonstrating the difficulty of claiming a right to proceed under the Rule's exceptions. (Motion 21-22 (collecting cases).)

### 1.    The Fraud on the Minority Exception

Faced with the fact that the Individual BAE Systems plc Defendants control a tiny fraction of the ordinary shares of BAE plc (Motion 19 n.8; Parkes Decl. ¶ 18), Plaintiff is compelled to argue that "control," as the term is understood for purposes of the "wrongdoer control" requirement of the Fraud on the Minority Exception, means something less than, and more indefinable than, actual control.  (Opp. Br. 58-59.)  Both Mr. Moore and Mr. Girolami agree that a plaintiff is not required to show that the members of a company's board *hold* a majority of the voting shares to demonstrate wrongdoer control (Moore Decl. II ¶ 16; Girolami Decl. 31).   According to Mr. Moore, the control requirement "is nevertheless firmly focused on the ability to obtain (directly or indirectly) a majority of the votes cast in general meeting," (Moore Decl. II ¶ 17), while Mr. Girolami argues that a plaintiff might succeed by "show[ing] that the claim was not being pursued by the company because the wrongdoers were effectively preventing that claim from being pursued" (Girolami Decl. ¶ 31).  Yet Mr. Girolami does not provide any specific example of what that sort of control would entail, or how it could be applied to the BAE Systems plc Defendants.  Indeed, as Mr. Moore points out, Plaintiff's version of

---

[10]    Plaintiff also posits the existence of a so-called "Interests of Justice" exception, and astonishingly mischaracterizes Mr. Moore's rejection of that exception in his first Declaration. (*See* Opp. Br. 60.)  English law does not support the existence of that exception (Moore Decl. I ¶ 34 n.13; Moore Decl. II ¶¶ 44-47), and it is not endorsed even by Plaintiff's own expert Mr. Girolami.

wrongdoer control premised on the mere fact that BAE plc has billions of outstanding shares "would embrace derivative claims relating to almost all public companies." (Moore Decl. II ¶ 19.) And under either standard there is, as Mr. Moore describes, nothing to suggest that the Individual BAE Systems plc Defendants had the ability to preclude Plaintiff from pursuing *with the company* the grievance it brings to this Court. (Moore Decl. II ¶¶ 18-20.)

Moreover, the Fraud on the Minority Exception also requires "self-dealing at the company's expense", which Plaintiff still has not alleged. (Motion 18-19.) Plaintiff's expert Mr. Girolami concedes that in order for the exception to apply, there must have been benefits wrongly received by the Individual BAE Systems plc Defendants on account of the alleged self-dealing. (Girolami Decl. ¶ 30.) But the Complaint alleges only that the Individual BAE Systems plc Defendants benefited by receiving compensation as directors and officers. (Motion 18.) Mr. Moore has explained the distinction between compensation and self-dealing (Moore Decl. ¶ 59-60), and Plaintiff's Complaint alleges at most only the receipt of compensation that was unjustified due to poor performance of duties. (*See* Motion 17-18.) Plaintiff cannot pursue its derivative claim under the Fraud on the Minority exception.

### 2.    The *Ultra Vires* Exception

Plaintiff asks this Court to permit the derivative action to proceed under the *Ultra Vires* Exception, seeking to expand that narrow exception to include broadly defined "unratifiable acts." (Opp. Br. 56-58.) Plaintiff's argument rests on Mr. Girolami's theory that *ultra vires* acts include not only "transaction[s] which [are] either beyond the capacity of the company as established by its memorandum of association or . . . prohibited by the statute to which the company owed its existence," (Moore Decl. ¶ 41), but also a "broader class of acts unratifiable by a simple majority," including acts that are illegal under the general statutes (Girolami Decl. ¶ 27). The distinction is significant because this case could proceed only under

Mr. Girolami's broader definition; Plaintiff does not, and cannot, identify any act that falls within Mr. Moore's definition of *ultra vires*. (*See* Motion 19-21; Opp. Br. 57-58.)

As Mr. Girolami concedes about his argument: "there is a dearth of decided English cases in support of the point, such decided cases as there are are not free from difficulty, and the extent of the breaches of duty which are unratifiable for this purpose is uncertain." (Girolami Decl. ¶ 22.) Following this candid admission that there is no authority for his theory, Mr. Girolami quotes principally from textbooks and treatises that are not authoritative English case law. (Moore Decl. II ¶¶ 22-24.) Those quotations are, however, inconsistent with the classic and authoritative formulations of the Rule in *Foss v. Harbottle*, which say nothing about illegal acts. (Moore Decl. II ¶ 25.)

Mr. Moore addresses Mr. Girolami's cited texts as follows. As a first principle, he observes that English courts "'would never hesitate to disagree with a statement in a textbook, however authoritative, or however long it had stood, if it thought it right to do so'" (Moore Decl. II ¶ 23 (quoting *Bastin v Davies*, [1950] 2 KB 579, at 582-3)), in part because "in England, it is the primary materials, not academic commentary, which are the authoritative statements of the law" (Moore Decl. II ¶ 24). After refuting Mr. Girolami's reliance on textbooks (*e.g.*, Girolami Decl. ¶ 23), Mr. Moore collects and dismisses the cases cited by Mr. Girolami that "are substantially older, and apparently were not recognized at the time they were decided (or in the subsequent judicial formulations of the rule in *Foss v Harbottle*) as creating an additional exception to the rule." (Moore Decl. II ¶ 27.) Finally, Mr. Moore reasserts the English authorities which narrowly construe the term *ultra vires.* (Moore Decl. II ¶¶ 28-37.) In short, English law rejects a broad construction of *ultra vires* acts.

14

That leaves Plaintiff to try again to claim that its allegations meet the (correct) definition of *ultra vires* acts, but to no avail. Mr. Moore explained in his first Declaration that *Arab Monetary Fund v. Hashim & Others*, [1993] 1 Lloyd's Rep. 543, resolved the issue of whether the Complaint alleged *ultra vires* acts because the court in that case held that the payment of a bribe is not an *ultra vires* act of a company (Motion 20). Mr. Girolami attempts to limit *Arab Monetary Fund* by arguing that the case was not a derivative suit and dealt only with whether the company was liable for the bribe. (Girolami Decl. ¶ 28.) But as Mr. Moore explains, that distinction was rejected in *Rolled Steel Products (Holdings) Limited v. British Steel Corp.*, [1986] Ch 246 (Moore Decl II ¶ 31). *Arab Monetary Fund* wholly precludes Plaintiff's argument that the bribes alleged in the Complaint are *ultra vires* acts. Whatever might be included in the "broader class of [*ultra vires*] acts" advanced by Plaintiff, it cannot argue that bribery is one of those acts and therefore its resort to the *Ultra Vires* Exception must fail.[11] The case should therefore be dismissed under English law.

## III.   PLAINTIFF FAILS TO PERSUADE THAT THIS DISTRICT IS A CONVENIENT FORUM IN WHICH TO LITIGATE A DERIVATIVE ACTION AGAINST AN ENGLISH COMPANY

The BAE Systems plc Defendants' second ground for dismissal is the doctrine of *forum non conveniens*, namely that this case should be resolved in the courts of England, which

---

[11]    Plaintiff's argument that it has standing to pursue a claim under Section 463 of the Companies Act 2006 may again be dismissed in a footnote. (Motion 22 n.9.) Plaintiff argues that statements "expressly incorporated" in reports sent to members on or after January 20, 2007, may be the basis for a Section 463 claim, and that Plaintiff may bring a derivative claim asserting a violation of the section without satisfying an exception to the Rule in *Foss v. Harbottle*. (Opp. Br. 67-68.) Plaintiff's argument that the Rule in *Foss v. Harbottle* is inapposite because it is not mentioned by Section 463 or the "implementation order" fails to explain how a member, rather than a company, may bring a Section 463 claim if not by means of a derivative action. (Moore Decl. II ¶ 42-43.) Finally, Plaintiff's incorporation by reference argument is contradicted by the Commencement Order, SI 3428/2006, accompanying Section 463, which exempts from its coverage statements first sent to members before January 20, 2007. (Moore Decl. ¶ 69.) Plaintiff cites no authority for its argument that re-publication may avoid the exemption. Notably, Mr. Girolami does not join either of Plaintiff's Section 463 arguments. (Girolami Decl. ¶¶ 39-41.)

is the state of BAE plc's incorporation, the location of its principal office, and the residence of

20 Individual BAE Systems plc Defendants. (Motion 23, 26.) Under the doctrine, this Court

"may dismiss an action on the ground that a court abroad is the more appropriate and convenient

forum for adjudicating the controversy." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp*.,

127 S. Ct. 1184, 1188 (2007). As it did when it argued in favor of applying the District's law,

Plaintiff again seizes on BAE plc's alleged deposit of funds in accounts at the former Riggs Bank

to argue that this litigation must remain in the District. (Opp. Br. 20.) Plaintiff fails to persuade

that this District and the BAE Systems plc Defendants should be burdened with litigating foreign

corporate governance issues in Washington D.C.

**A.      Plaintiff misstates the Doctrine of *Forum Non Conveniens***

As a preliminary matter, contrary to Plaintiff's assertion that "District of

Columbia law governs FNC," (Opp. Br. 15 n.7), *forum non conveniens* is a federal common law

doctrine that permits federal courts sitting in diversity to "decline jurisdiction in appropriate

cases, whether or not the State in which they sit chooses to burden its judiciary with litigation

better handled elsewhere." *Am. Dredging Co. v. Miller*, 510 U.S. 443, 454 n.4 (1994); *see also*

*Phillips v. China Airlines, Ltd.*, No. 91-56026, 1993 WL 28362, at *2 (9th Cir. Feb. 3, 1993)

(stating that because "federal forum non conveniens law is admittedly procedural . . . . [i]n a

diversity case, a federal court applies federal procedural law," but cited by plaintiff for the

contrary proposition, Opp. Br. 15 n.7)). As the Court in *Sinochem* explained, *forum non*

*conveniens* is "essentially, 'a supervening venue provision, permitting displacement of the

ordinary rules of venue when, in light of certain conditions, the trial court thinks that jurisdiction

ought to be declined.'" 127 S. Ct. at 1190 (quoting *Am. Dredging Co.*, 510 U.S. at 453).

Next, Plaintiff creates a *forum non conveniens* test that discusses only those

factors which, according to Plaintiff, weigh in its favor. To construct its test, Plaintiff

improperly relies on the *forum non conveniens* standard articulated in *Pain v. United Technologies Corp.*, 637 F.2d 775, 783-84 (D.C. Cir. 1980), which was overruled in part by *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981) (holding that either private or public interest factors may be basis for dismissal). The *Pain* test, quoted by Plaintiff (Opp. Br. 16), required a court to find the private interest factors were "in equipoise or near equipoise" before it considered the public interest factors. 637 F.2d at 784-85. That analysis was set aside by *Piper*, which instructs district courts to separately weigh both the private interest factors and public interest factors in favor of each forum. 454 U.S. at 242-44. After erroneously creating a test that prioritizes the private interest factors, Plaintiff then proceeds to analyze only five factors rather than discussing the full range of private and public interests described in the controlling Supreme Court precedent *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947). (*See* Opp. Br. 16, 20-26.) The appropriate *forum non conveniens* test, as described in the Motion to Dismiss, permits dismissal in favor of an adequate alternative forum if *either* the private interest factors *or* the public interest factors weigh in favor of dismissal (Motion 22). *See Piper Aircraft Co.*, 454 U.S. 257; *BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73, 85 (D.D.C. 2003). The BAE Systems plc Defendants have met both parts of the test: an adequate alternative forum in England exists and the balance of interest factors favors dismissal of this case in favor of that forum.

B.    **Plaintiff fails to demonstrate that England is an inadequate forum**

Plaintiff ignores case law holding that England is an adequate alternative forum (Motion 23), and fails to articulate any legitimate reason that England is an inadequate forum for this case. The general test for the adequacy of the alternative forum examines whether a defendant is amenable to suit and whether litigation regarding the subject matter of the United States litigation is permitted. (*Id.*) A forum may be deemed inadequate only in "rare circumstances" where the remedy offered is so "clearly inadequate" that it is "no remedy at all."

17

*Piper Aircraft Co.*, 454 U.S. at 254, 255 n.22.   This case simply does not represent one of those "rare circumstances."

    Plaintiff's principal argument is that England is an inadequate forum because it offers Plaintiff "no remedy at all."  (Opp. Br. 15.)  That argument relies on the assumption that Plaintiff's ability to pursue this derivative action might differ between a United States and a British court.  But, as the BAE Systems plc Defendants have explained, *Plaintiff's opportunity for recovery is not dependent on the choice between United States and United Kingdom courts because English law applies in either instance*.  (Motion 24, citing *Stromberg v. Marriott Int'l, Inc.*, 474 F. Supp. 2d 57, 61-62 (D.D.C.), *aff'd*, 256 F. App'x 359 (D.C. Cir. 2007)).  This is not an instance in which proceeding in an alternative forum will deny Plaintiff a remedy for a *valid* claim, *see Nemariam v. Federal Democratic Republic of Ethiopia*, 315 F.3d 390, 394 (D.C. Cir. 2003) (holding that commission lacking power to directly award any relief to individual was an inadequate forum), and thus this Court is not required to consider the significance of an "unfavorable change in law," *Piper Aircraft Co.*, 454 U.S. at 254-55; *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 678 (D.C. Cir. 1996)  ("A foreign forum is not inadequate merely because it has less favorable substantive law, because it employs different adjudicative procedures, or because of general allegations of corruption in the judicial system" (citations omitted)).  Moreover, Plaintiff does not dispute that English law offers a range of additional remedies to aggrieved shareholders, which Plaintiff has not pursued.  (Moore Decl. I ¶ 75-78.)

    Plaintiff also argues that England is an inadequate forum because an English court's jurisdiction might not be concurrent with the jurisdiction of this Court.  (Opp. Br. 15-18.)  That concern should not limit this Court's ability to employ the "flexible" *forum non conveniens* doctrine, *Piper*, 454 U.S. at 249, because the Court may condition its dismissal on Defendants'

submission to jurisdiction in England.  *See, e.g., Pain*, 637 F.2d at 785 (noting with approval the district court's dismissal conditioned on, among other things, the defendant submitting to the jurisdiction of the foreign forum); *Ford v. Brown*, 319 F.3d 1302, 1310 (11th Cir. 2003) (approving of "conditional dismissals, in which the district court dismisses the case only if the defendant waives jurisdiction and limitations defenses, and only if it turns out that another court ultimately exercises jurisdiction over the case"); *Jota v. Texaco, Inc.*, 157 F.3d 153, 159 (2d Cir. 1998) ("[D]ismissal for forum non conveniens is not appropriate [] absent a commitment by [defendant] to submit to the jurisdiction of the Ecuadorian courts for the purposes of this action."); *Watson v. Merrell Dow Pharms., Inc.*, 769 F.2d 354, 357 (6th Cir. 1985) (affirming dismissal on *forum non conveniens* grounds where defendant had consented to submit to jurisdiction of foreign forum); *Veba-Chemie A.G. v. M/V Getafix*, 711 F.2d 1243, 1245 (5th Cir. 1983) ("[A] defendant's submission to the jurisdiction of an alternate forum renders that forum available for the purposes of *forum non conveniens* analysis.").  Such an outcome is perfectly in line with federal court precedent.[12]

Finally, it is important to observe that Plaintiff's argument is of no moment if the Court determines that English law and the Rule in *Foss v. Harbottle* apply to this case. Plaintiff's arguments about an English court's jurisdiction over the Defendants will be beside the

---

[12]    To the extent Plaintiff intimates that this Court could not entertain a *forum non conveniens* motion should England not have complete jurisdiction, Plaintiff's argument is an improper attempt to restrict the Court "to the search for a problem-free forum," which was the standard rejected by the court in *In re Disaster at Riyadh Airport, Saudi Arabia, on Aug. 19, 1980*, 540 F. Supp. 1141, 1154 n.35 (D.D.C. 1982).  Indeed, the Sixth Circuit in *Watson v. Merrell Dow Pharms., Inc.*, 769 F.2d 354, 357 (6th Cir. 1985), approved a partial *forum non conveniens* dismissal, affirming the dismissal of one defendant on *forum non conveniens* grounds while remanding the case regarding the remaining defendants to the district court for further proceedings.  It would be inconsistent with the Supreme Court's choice to "repeatedly emphasize[] the need to retain flexibility," *Piper*, 454 U.S. at 249, to adopt Plaintiff's narrow view of the doctrine.

point if the primary claims against the BAE Systems plc Defendants are dismissed on the ground

of lack of standing and failure to state a claim, which would necessitate dismissal of the aiding

and abetting claims against the remaining Defendants.  In that case, this litigation will not

proceed against any Defendant.

> **C.    Plaintiff's choice of forum is entitled to little deference because the real party in interest is BAE plc, a foreign corporation**

Plaintiff ignores the well-established principle that, while there is "ordinarily a

strong presumption in favor of the plaintiff's choice of forum," the presumption "applies with

less force when the plaintiff or real parties in interest are foreign."  *Piper Aircraft Co.*, 454 U.S.

at 255.  As explained in the BAE Systems plc Defendants' Motion, Plaintiff's choice of the

District of Columbia is not entitled to significant weight in the *forum non conveniens* analysis

because Plaintiff is suing in a representative capacity on behalf of a foreign corporation.  (Motion

25); *see Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947); *BCCI Holdings*

*(Luxembourg), Societe Anonyme v. Mahfouz*, 828 F. Supp. 92, 95 (D.C. Cir. 1993).  The Circuit

Court observed in a section of *Pain* that survived *Piper*:

> [f]ederal courts have long treated motions for forum non conveniens
> dismissal differently depending upon whether the United States plaintiffs
> suing American defendants are plaintiffs suing in their own right or are so-
> called "nominal plaintiffs," suing as . . . representatives of foreign
> companies.  In the latter case, courts have generally refused to give special
> deference to the domestic forum choice of a nominally American plaintiff.

637 F.2d at 797-98.  Thus, Plaintiff's argument that its choice of a United States court deserves

"heightened deference" because it is an American citizen (Opp. Br. 22-23), misses the mark.[13]

---

[13]    None of the cases cited by Plaintiff supports its proposition that a "home forum" rule applies to a nominal plaintiffs suing on behalf of a foreign corporation.  *See, e.g., Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 146-47 (2d Cir. 2000) (applying home forum rule where plaintiffs were "ordinary American citizens" suing a corporation for "a relatively simple tort violation").  Quite the opposite, as Plaintiff concedes, *Koster* "limited the 'home forum' preference rule in representation litigation." (Opp. Br. 22); *Koster*, 330 U.S. at 524-25 (presumption in favor of

D.     **The *Gilbert* factors weigh in favor of dismissal**

Plaintiff's remaining arguments fail to negate the *Gilbert* factors for dismissal. (*See* Motion 24-32.)  Under the private interest factors, England is the forum where the majority of the witnesses and other evidence will be found.  (Motion 25-27.)  Under the public interest factors, England is the forum with the weightiest interest in considering a shareholder derivative suit brought against the officers and directors of an English company based on alleged breaches of duty involving the Al-Yamamah arrangement that is still a focus of debate in England. (Motion 27-28; Section I.C *supra*.)

In response to the BAE Systems plc Defendant's arguments and evidence – including the declaration submitted by Company Secretary David Parkes – Plaintiff ignores the proper *forum non conveniens* test and instead selects certain interest factors to create its own test not found in case law.  (Opp. Br. 16; *see* Section III.A. *supra*).  But even Plaintiff's test fails to identify factors that favor the District.  First, Plaintiff does not deny the fact that none of the 26 Individual BAE Systems plc Defendants reside or work in District, and that most reside in England (Motion 26).  And in response, Plaintiff cannot name even one of the "potential witnesses" it insists has "no connection to England," (Opp. Br. 20).  Incredibly, Plaintiff asserts that (i) "[t]here is no reason to believe more evidence is located in the U.K." than in a variety of locations including the "Caribbean" and "South America" (Opp. Br. 20-21); and (ii) "much, if not most, of the relevant documentary and testimonial evidence in this case will be found in the U.S. and in D.C." (Opp. Br. 20).  But those assertions utterly fail to address the evidence in Company Secretary David Parkes' declaration that most of the relevant documents, as well as

---

plaintiff's choice of forum is "considerably weakened" in a derivative action).  Plaintiff's choice of the District of Columbia thus should not be accorded significant weight when balanced against this Court's weighing of the private and public interest factors.  *See Sinochem*, 127 S. Ct. at 1191.

witnesses, will be located in England.  (Motion 25-26; Parkes Decl. ¶ 6 ("The books and records of BAE plc are maintained in London, United Kingdom; Farnborough, United Kingdom; and Worthing, United Kingdom."), ¶ 13 (Board of Directors documents and support functions located in England.).)  Plaintiff also ignores, and therefore concedes, the BAE Systems plc Defendants' contention that applying English law to Plaintiff's claims weighs in favor of dismissal.[14]  (Motion 30-31.)

Finally, Plaintiff's failure to present *any* evidence contradicting the sworn Declarations of the BAE Systems plc Defendants leads it to a meritless attack on the sufficiency of the Defendants' evidence.  Plaintiff incorrectly asserts that a defendant is required to "produce testimonial evidence on all five FNC factors."  (Opp. Br. 18.)  Although a court may consider evidence submitted by the defendants, the quantity and nature of the evidence required varies according to the facts of each case.  *See El-Fadl*, 75 F.3d at 677 ("The amount of information that the defendant must provide, in supporting affidavits or other evidence, depends on the facts of the individual case. Accordingly, the defendant must provide more detailed information if the plaintiff provides evidence that controverts the defendant's evidence." (citations omitted)).  Plaintiff's misstatement of the law only highlights Plaintiff's inability to refute the BAE Systems plc Defendants' evidence that both the private and public interest factors favor England as the proper forum.  This court should dismiss Plaintiff's claims under the doctrine of *forum non conveniens*.

---

[14]    Plaintiff's selection of factors is flawed due in part to its misunderstanding of the *forum non conveniens* inquiry.  A court must first determine that an adequate alternative forum exists, and then it must weigh the "relative conveniences to the parties against the presumption of the plaintiff's forum selection."  *El Fadl*, 75 F. 3d at 677; (Motion 22).  Plaintiff consistently confuses the test by claiming that forum selection is a factor related to the convenience of the parties.  For example, Plaintiff lists "selection of forum" as one of its five "FNC factors."  (Opp. Br. 16, 22-24).  This misconstrues *Gilbert*, 330 U.S. at 508-9, and is an impermissible attempt to add additional weight to Plaintiff's selection of this forum.  That "factor" should be disregarded.

## CONCLUSION

For the foregoing reasons, the BAE Systems plc Defendants respectfully request that this

Court dismiss the Complaint in its entirety and with prejudice.

Dated: May 23, 2008
      New York, New York

                              Respectfully submitted,
                              LINKLATERS LLP
                              LAWRENCE BYRNE (DC Bar # 4761)

                              *Lawrence Byrne / JD*
                              LAWRENCE BYRNE

                              Of Counsel:
                              Mary K. Warren
                              Sterling Darling
                              Kristopher Kerstetter

                              LINKLATERS LLP
                              1345 Avenue of the Americas
                              New York, NY 10105
                              Telephone:  212-903-9105
                              Facsimile: 212-903-9100

                              Attorneys for Nominal Defendant BAE Systems plc
                              and Individual Defendants Sir Robin Biggam, Sue
                              Birley, Keith Clark Brown, Philip J. Carroll, Ulrich
                              Cartellieri, Sir Richard Harry Evans, Christopher V.
                              Geoghegan, Michael J. Hartnall, Walter P.
                              Havenstein, Lord Alexander Hesketh, Andrew
                              George Inglis, Ian G. King, Michael Lester, Sir
                              Charles Beech Gordon Masefield, Sir Peter James
                              Mason, Steve Lewis Mogford, Richard (Dick) L.
                              Olver, Michael Denzil Xavier Portillo, Roberto
                              Quarta, Mark H. Ronald, George W. Rose, Sir
                              Anthony Nigel Russell Rudd, Michael J. Turner,
                              Peter A. Weinberg, and John Pix Weston

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CITY OF HARPER WOODS EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of BAE SYSTEMS PLC,<br><br>          Plaintiff,<br><br>vs.<br><br>RICHARD (DICK) L. OLVER et al.,<br><br>          Defendants,<br><br>- and –<br><br>BAE SYSTEMS PLC, an England and Wales corporation,<br><br>          Nominal Defendant. | Civil No. 1:07-cv-01646<br><br>Assigned to: Judge Rosemary M. Collyer |

## <u>SECOND DECLARATION OF DAVID PARKES</u>

Pursuant to 28 U.S.C. § 1746, I, David Parkes, declare as follows:

      1.      I am a citizen of the United Kingdom and the Company Secretary of BAE Systems plc. I submit this Declaration further to my First Declaration submitted in support of the motion to dismiss this action filed by BAE Systems plc and the individual defendants on 31 January 2008.

      2.      Attached to this Declaration as Exhibit A is a true and correct copy of the Articles of Association of BAE Systems plc dated 7 May 2008.

      3.      The Articles were adopted by Special Resolution passed on 1 May 1996 and subsequently amended on by Special Resolutions passed on 29 April 1998, 4 May 2000, 3 May 2002, 5 May 2004, 4 May 2005, 9 May 2007, and 7 May 2008.

      4.      A Special Resolution was passed at the Company's Annual General Meeting on 7 May 2008 which amended the Articles of Association to take account of the changes in English

company law brought about by the Companies Act 2006.  Article 10 was not, however, amended by

the Special Resolution, and thus appears in the attached Articles of Association dated 7 May 2008

in the form in force on 19 September 2007, the date of the filing of the plaintiff's Complaint.

I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct.

Executed on _22_  May 2008.

_____
David Parkes

# Exhibit A

No. 1470151

*The Companies Act 1948 to 1983,*
*The Companies Act 1985 and 1989*
*and The Companies Act 2006*

———

COMPANY LIMITED BY SHARES

———

# 𝔐𝔢𝔪𝔬𝔯𝔞𝔫𝔡𝔲𝔪

*(Amended by Special Resolutions passed on 2nd January, 1981,*
*1st May, 1996 and 4th May, 2000)*

AND

# 𝔄𝔯𝔱𝔦𝔠𝔩𝔢𝔰 𝔬𝔣 𝔄𝔰𝔰𝔬𝔠𝔦𝔞𝔱𝔦𝔬𝔫

*(Adopted by Special Resolution passed on 1st May, 1996 and amended by*
*Special Resolutions passed on 29th April, 1998, 4th May, 2000,*
*3rd May, 2002, 5th May, 2004, 4th May, 2005, 9th May, 2007 and*
*7th May, 2008)*

OF

# BAE SYSTEMS plc

**Incorporated the 31st day of December, 1979.**

LINKLATERS LLP
ONE SILK STREET,
LONDON EC2Y 8HQ.

# INDEX

| | Article No. | Page No. |
|---|---|---|
| Accounts .. .. .. .. .. .. .. .. .. | 131—133 | 61 |
| Alternate Directors .. .. .. .. .. .. .. .. | 91 | 43—44 |
| Auditors .. .. .. .. .. .. .. .. .. | 134—135 | 61—62 |
| Authentication of Documents .. .. .. .. .. | 114 | 55 |
| Borrowing Powers .. .. .. .. .. .. .. | 104 | 48—52 |
| Calls .. .. .. .. .. .. .. .. .. | 21—26 | 11—12 |
| Capitalisation of Profits and Reserves .. .. .. | 129—130 | 58—61 |
| Corporations acting by Representatives .. .. .. | 73 | 37 |
| Directors— | | |
|     Alternate .. .. .. .. .. .. .. | 91 | 43—44 |
|     Appointment and Retirement .. .. .. .. | 83—90 | 40—43 |
|     Borrowing Powers .. .. .. .. .. .. | 104 | 48—52 |
|     Committees .. .. .. .. .. .. .. | 101—102 | 47—48 |
|     Executive Directors .. .. .. .. .. .. | 81 | 39—40 |
|     Expenses .. .. .. .. .. .. .. | 79 | 39 |
|     Insurance .. .. .. .. .. .. .. | 80 | 39 |
|     Interest in contracts— | | |
|         entitlement .. .. .. .. .. .. | 81 | 39—40 |
|         voting .. .. .. .. .. .. .. | 97 | 45—47 |
|     Meetings and proceedings .. .. .. .. | 92—103 | 44—48 |
|     Nationality .. .. .. .. .. .. | 74 | 38 |
|     Number .. .. .. .. .. .. .. | 74(E) | 38 |
|     Pensions .. .. .. .. .. .. .. | 80 | 39 |
|     Powers— | | |
|         borrowing .. .. .. .. .. .. | 104 | 48—52 |
|         general .. .. .. .. .. .. | 105—110 | 52—54 |
|     Qualification .. .. .. .. .. .. | 76 | 38 |
|     Remuneration .. .. .. .. .. .. | 77—78 | 39 |
| Dividends .. .. .. .. .. .. .. .. | 116—128 | 56—58 |
| Executive Directors .. .. .. .. .. .. | 81 | 39—40 |
| Forfeiture and Lien .. .. .. .. .. .. | 27—35 | 12—14 |
| General Meetings | | |
|     Notice of .. .. .. .. .. .. .. | 49—50 | 28—29 |
|     Proceedings at .. .. .. .. .. .. | 51—61 | 29—32 |
| Indemnity .. .. .. .. .. .. .. .. | 145 | 65—66 |
| Notices .. .. .. .. .. .. .. .. | 136—140 | 62—64 |
| Preliminary .. .. .. .. .. .. .. | 1—2 | 1—4 |
| Reserves .. .. .. .. .. .. .. .. | 115 | 55 |
| Seal .. .. .. .. .. .. .. .. | 112,—113 | 54—55 |
| Secretary .. .. .. .. .. .. .. | 111 | 54 |
| Share Capital .. .. .. .. .. .. .. | 3 | 4 |
|     Alteration of .. .. .. .. .. .. | 6—9 | 5—6 |
|     Increase .. .. .. .. .. .. .. | 6 | 5 |
|     Reduction .. .. .. .. .. .. | 8 | 6 |
|     Reorganisation of .. .. .. .. .. | 7 | 5 |
|     Purchase of shares .. .. .. .. .. | 9 | 6 |
| Share Certificates (see also Article 108) .. .. | 16—20 | 10—11 |
| Shares .. .. .. .. .. .. .. .. | 10—14 | 6—8 |
|     Calls on .. .. .. .. .. .. .. | 21—26 | 11—12 |
|     Directors' power to allot .. .. .. .. | 12 | 6—8 |
|     Equitable interests not recognised .. .. .. | 10 | 6 |
|     Forfeiture and Lien .. .. .. .. .. | 27—35 | 12—14 |
|     Issue .. .. .. .. .. .. .. | 12 | 6—8 |
|     Purchase .. .. .. .. .. .. | 9 | 6 |
|     Renunciation of allotments .. .. .. .. | 14 | 8 |
|     Special Share .. .. .. .. .. .. | 15 | 8—10 |
|     Transfer .. .. .. .. .. .. | 36—42 | 14—17 |
|     Transmission .. .. .. .. .. .. | 44—46 | 27—28 |
|     United Kingdom Control .. .. .. .. | 43 | 17—27 |
|     Variation of Rights .. .. .. .. .. | 4—5 | 4 |
| Special Share .. .. .. .. .. .. .. | 15 | 8—10 |
| United Kingdom Control .. .. .. .. .. | 43 | 17—27 |
| Votes of Members .. .. .. .. .. .. | 62—72 | 32—37 |
| Winding up .. .. .. .. .. .. .. | 143—144 | 64—65 |



# Certificate of Incorporation

## ON CHANGE OF NAME

Company No.    1470151

The Registrar of Companies for England and Wales hereby certifies that

BRITISH AEROSPACE PUBLIC LIMITED COMPANY

having by special resolution changed its name, is now incorporated under the name of

BAE SYSTEMS PLC

Given at Companies House, London, the 5th May 2000

K. DAVIS

*For The Registrar of Companies.*

No. 1470151



# Certificate of Incorporation

## ON RE-REGISTRATION AS A PUBLIC COMPANY

I HEREBY CERTIFY that BRITISH AEROSPACE PUBLIC LIMITED COMPANY has this day been re-registered under the Companies Acts 1948 to 1980 as a public company, and that the company is limited.

DATED Cardiff the 2nd January, 1981

D. B. NOTTAGE

*Registrar of Companies.*

No. 1470151



# Certificate of Incorporation

I HEREBY CERTIFY that BRITISH AEROSPACE LIMITED is this day incorporated under the Companies Acts 1948 to 1976 and that the Company is Limited.

GIVEN UNDER MY HAND AT Cardiff the 31st December, 1979

E. A. WILSON

*Assistant Registrar of Companies.*

*The Companies Act 1948 to 1983,*
*The Companies Act 1985 and 1989*
*and The Companies Act 2006*

———————————

COMPANY LIMITED BY SHARES

———————————

# Memorandum of Association

*(Amended by Special Resolutions passed*
*on 2nd January, 1981, 1st May, 1996 and 4th May, 2000)*

of

# BAE SYSTEMS plc

1.  The name of the Company is "BAE SYSTEMS plc".*

2.  The Company is to be a public company.

3.  The registered office of the Company will be situate in England.

4.  The objects for which the Company is established are:—

    (1)  To invent, design, develop, manufacture, construct, assemble, test, repair, maintain, buy, sell, hire, let on hire, operate, import, export and deal in aeroplanes, airships, sea-planes, aircraft, hovercraft, space vehicles, communications satellites, navigational or guidance systems, guided missiles, rockets, propellers, and other machines or apparatus of any kind designed or capable of being used for or in connection with aerial transit, conveyance or communication, arms and weapons, whether guided or otherwise, torpedoes,

---

*Note: On 2nd January, 1981 the Company became a public company and the name of the Company was changed from "British Aerospace Limited" to British Aerospace Public Limited Company.*

*On 5th May 2000 the name of the Company was changed from British Aerospace Public Limited Company to BAE SYSTEMS plc.*

i

explosives and ammunition and armaments of all kinds, motor cars and vehicles generally, boats and all other conveyances, whether armoured or not, and means of locomotion of all descriptions, and any component or other parts thereof and accessories and fittings therefor, and all kinds of machinery and apparatus capable of being used in connection with such invention, design, development, manufacture, construction, assembly, testing, repair and maintenance and in connection with the operation and use of aeroplanes, airships, sea-planes, aircraft, hovercraft, space vehicles, communications satellites, guided missiles, rockets, propellers and such other machines or apparatus as aforesaid, airports and the like, and to carry on the business of flying and gliding instructors, and to establish, maintain and operate lines of aerial, land and sea conveyances and craft.

(2)  To carry on all or any of the trades or businesses of aeronautical, electrical, electronic, micro-electronic, micro-processing, mechanical, metallurgical and chemical engineers in all their respective branches and to deal in or supply all apparatus and things capable of being used in connection therewith.

(3)  To carry on the business of armament manufacturers in all its branches and in particular to manufacture, sell, maintain, repair and deal in propelling and auxiliary machinery for ships and accessories or component parts thereof and guns, gun-carriages, tanks, armoured cars and other vehicles, machine guns, rifles and small arms and all descriptions of ordnance, armament, arms, weapons, whether guided or otherwise, rockets, torpedoes, ammunition, explosives and munitions of war and all component parts thereof and accessories thereto.

(4)  To conduct research and development in connection with the operations of the Company, to establish and maintain research stations, laboratories, workshops, ranges, testing and proving grounds, facilities and establishments and generally to act as researchers and developers.

(5)  To carry on all or any of the businesses of insurance brokers, insurance underwriters, managers of property, freight contractors, carriers by land, water and air of passengers and goods, barge owners, lightermen, forwarding agents, ice merchants, refrigerating storekeepers, storage contractors, warehousemen, wharfingers, general traders, licensed victuallers, refreshment room proprietors, club, hotel and

ii

inn proprietors, photographers, printers, builders, contractors, painters and decorators.

(6)    To crush, win, get, quarry, smelt, refine, manufacture, grow, produce, treat and prepare for market and deal in ores, metals, chemicals, mineral, vegetable and animal substances and oils, timber, fabrics, yarns, fibres, cellulose of all kinds, and their respective derivatives and by-products, and all machinery, tools and apparatus used in connection therewith and to carry on any business relating to the winning, production, treatment, working or use thereof and the preparation thereof for market, and to carry on business as engineers, ironmasters, steel makers, steel workers, brass founders, colliery proprietors, coke manufacturers, miners, smelters, tinplate makers, brick-makers, distillers, die-makers, metallurgists, chemists, gas producers and suppliers of petrol, oil, spirit and other motive power.

(7)    To design, build, construct, equip, execute, carry out, improve, work, develop, administer, maintain, manage or control works, plants, factories, wharves, jetties, roads, warehouses, depots, offices, hangars, aerodromes and laboratories and other buildings, structures or facilities of all kinds, whether for the purposes of the Company or for sale or letting on hire to or in return for any consideration from any company, firm or person, and to contribute to or assist in or carry out any part of any such operation.

(8)    To manufacture, buy, sell, let on hire and deal in articles and things wholly or partly made of metal and/or wood and in all kinds of machinery, gears, wireless and other apparatus, tools and all engineering products.

(9)    To manufacture and deal in all kinds of articles and things required for the purposes of any such business as aforesaid or commonly dealt in by persons engaged in any such business, and to carry on any other trade or business, whether subsidiary or not, which can in the opinion of the Directors be carried on advantageously in connection with any of the trades or businesses aforesaid, or which, in the opinion of the Directors, will enhance the value of any of the Company's property.

(10)    To carry on any other business of any nature whatsoever which may seem to the Directors to be capable of being conveniently carried on in connection or conjunction with any business of the Company hereinbefore or hereinafter

authorised or to be expedient with a view to rendering profitable or more profitable any of the Company's assets or utilising its know-how or expertise.

(11) To subscribe, underwrite, purchase, or otherwise acquire, and to hold, dispose of, and deal with, any shares or other securities or investments of any nature whatsoever, and any options or rights in respect thereof, and to buy and sell foreign exchange.

(12) To draw, make, accept, endorse, discount, negotiate, execute and issue, and to buy, sell and deal with, bills of exchange, promissory notes and other negotiable or transferable instruments or securities.

(13) To purchase, or otherwise acquire for any estate or interest, any property or assets or any concessions, licences, grants, patents, trade marks, copyrights or other exclusive or non-exclusive rights of any kind and to develop and turn to account and deal with the same in such manner as may be thought fit and to make experiments and tests and to carry on all kinds of research work.

(14) To amalgamate or enter into partnership or any joint venture or profit-sharing arrangement or other association with any company, firm, entity or person.

(15) To purchase or otherwise acquire and undertake all or any part of the business, property and liabilities of any company, firm or person carrying on any business which the Company is authorised to carry on or possessed of any property suitable for the purposes of the Company.

(16) To promote, or join in the promotion of, any company, whether or not having objects similar to those of the Company.

(17) To borrow and raise money and to secure or discharge any debt or obligation of or binding on the Company in such manner as may be thought fit and in particular by mortgages and charges upon all or any part of the undertaking, property and assets (present and future) and the uncalled capital of the Company, or by the creation and issue of debentures, debenture stock or other securities of any description.

(18) To advance, lend or deposit money or give credit to or with any company, firm, person or governmental, municipal or

statutory authority or body on such terms as may be thought fit and with or without security.

(19) To guarantee or give indemnities or provide security, whether by personal covenant or by mortgage or charge upon all or any part of the undertaking, property and assets (present and future) and the uncalled capital of the Company, or by all or any such methods, for the performance of any contracts or obligations, and the payment of capital or principal (together with any premium) and dividends or interest on any shares, debentures or other securities, of any person, firm or company including (without limiting the generality of the foregoing) any company which is for the time being a holding company of the Company or another subsidiary of any such holding company or is associated with the Company in business.

(20) To issue any securities which the Company has power to issue for any other purpose by way of security or indemnity or in satisfaction of any liability undertaken or agreed to be undertaken by the Company.

(21) To sell, lease, grant licences, easements and other rights over, and in any other manner deal with or dispose of, the undertaking, property, assets, rights and effects of the Company or any part thereof for such consideration as may be thought fit, and in particular for shares or other securities, whether fully or partly paid up.

(22) To procure the registration or incorporation of the Company in or under the laws of any territory outside England.

(23) To subscribe or guarantee the payment of money or the transfer of any other property for any national, charitable, benevolent, public, general or useful object or for any purpose which may be considered likely directly or indirectly to further the interests of the Company or of its members.

(24) To establish and maintain or contribute to any pension or superannuation or death benefit funds or schemes for the benefit of, and to give or procure the giving of donations, gratuities, pensions, allowances or emoluments to, any individuals who are or were at any time in the employment or service of the Company or of any company which is its holding company or is a subsidiary of the Company or any such holding company or of any company or body to whose business the Company is, in whole or in part, its successor

v

directly or indirectly or of any company which is otherwise allied to or associated with the Company, or who are or were at any time directors or officers (or held comparable or equivalent offices) of the Company or of any such other company or body, and the wives, widows, families and dependants of any such individuals; to establish and subsidise or subscribe to any institutions, associations, clubs or funds which may be considered likely to benefit any such persons or to further the interests of the Company or of any such other company; and to make payments for or towards the insurance of any such persons.

(25)    To purchase and maintain insurance for and for the benefit of any persons who are or were at any time directors, officers or employees of the Company, or of any other company in which the Company has any interest whether direct or indirect or which is, in any way, allied to or associated with the Company, or of any subsidiary undertaking of the Company or of any such other company, or who are or were at any time trustees of any pension fund in which any employees of the Company or of any such other company or subsidiary undertaking are interested, including (without prejudice to the generality of the foregoing) insurance against any liability incurred by such persons in respect of any act or omission in the actual or purported execution and/or in the exercise or purported exercise of their powers and/or otherwise in relation to their duties, powers or offices in relation to the Company or any such other company, subsidiary undertaking or pension fund and to such extent as may be permitted by law otherwise to indemnify or to exempt any such person against or from any such liability; for the purposes of this paragraph "subsidiary undertaking" shall have the same meaning as in the Companies Act 1989.

(26)    To establish, operate and fund any arrangement for encouraging or facilitating the holding of shares or other securities in the Company or other company associated with it, by or for the benefit of its employees, former employees or other persons connected with the Company or any other company associated with it, and any immediate family of such employees, former employees or other persons, so far as permitted by law.

(27)    To distribute among members of the Company in specie or otherwise, by way of dividend or bonus or by way of

reduction of capital, all or any of the property or assets of the Company, or any proceeds of sale or other disposal of any property or assets of the Company, with and subject to any incident authorised and consent required by law.

(28) To do all or any of the things and matters aforesaid in any part of the world, and either as principals, agents, contractors, trustees or otherwise, and by or through trustees, agents, subsidiary companies or otherwise, and either alone or in conjunction with others.

(29) To do all such other things as may be considered to be incidental or conducive to any of the above objects.

And it is hereby declared that the objects of the Company as specified in each of the foregoing paragraphs of this Clause (except only if and so far as otherwise expressly provided in any paragraph) shall be separate and distinct objects of the Company and shall not be in any way limited by reference to any other paragraph or the order in which the same occur or the name of the Company.

5.    The liability of the members is limited.

6.    The share capital of the Company is £7 divided in 7 shares of £1 each.*

WE, the several persons whose names and addresses are subscribed, are desirous of being formed into a company, in pursuance of this memorandum of association, and we respectively agree to take the number of shares in the capital of the company set opposite our respective names.

| NAMES, ADDRESSES AND DESCRIPTIONS OF SUBSCRIBERS | Number of shares taken by each subscriber |
|---|---|
| J. B. EVANS,<br>   21 Hazelbury Road, London, SW6 2NA.<br>        Civil Servant. | Four |
| JOHN McELHERAN,<br>   131 Dora Road, London SW19 7JT.<br>        Civil Servant. | Three |
| Total Shares taken: | Seven |

Dated 6th December, 1979.

Witness to the above Signatures:—
    PENNY WALTERS,
      8 Coombs Street,
        Islington,
          London, N.1.

                                 Civil Servant.

---

*Note:

By Ordinary Resolution passed on 2nd January, 1981 each of the existing shares was sub-divided into two Ordinary Shares of 50p each and the capital of the Company was increased to £40,000,000 divided into 80,000,000 Ordinary Shares of 50p each by the creation of 79,999,986 new Ordinary Shares of 50p each.

By Special Resolution passed on 3rd February, 1981 the capital of the Company was increased to £115,000,000 divided into 230,000,000 Ordinary Shares of 50p each by the creation of 150,000,000 new Ordinary Shares of 50p each.

By Special Resolution passed on 29th April, 1985 the capital of the Company was increased to £150,000,001 divided into 300,000,000 Ordinary Shares of 50p each and one Special Share of £1 by the creation of 70,000,000 new Ordinary Shares of 50p each and the said Special Share.

By Special Resolution passed on 10th May, 1989 the capital of the Company was increased to £170,000,001 divided into 340,000,000 Ordinary Shares of 50p each and one Special Share of £1 by the creation of 40,000,000 new Ordinary Shares of 50p each.

By Special Resolution passed on 16th August, 1989 the capital of the Company was increased to £260,000,001 divided into 382,500,000 Ordinary Shares of 50p each, 275,000,000 7.75p (net) Cumulative Convertible Redeemable Preference Shares of 25p each and one Special Share of £1 by the creation of 42,500,000 new Ordinary Shares of 50p each and 275,000,000 7.75p (net) Cumulative Convertible Redeemable Preference Shares of 25p each.

By Special Resolution passed on 7th October, 1991 the capital of the Company was increased to £341,250,001 divided into 275,000,000 7.75p (net) Cumulative Convertible Redeemable Preference Shares of 25p each, 545,000,000 Ordinary Shares of 50p each and one Special Share of £1 by the creation of 162,500,000 new Ordinary Shares of 50p each.

By Special Resolution passed on 19th October, 1992 and with the sanction of an Order of the High Court of Justice dated 11th November, 1992 the capital of the Company was reduced from £341,250,001 divided into 275,000,000 7.75p (net) Cumulative Convertible Redeemable Preference Shares of 25p each, 545,000,000 Ordinary Shares of 50p each and one Special Share of £1 to £123,250,001 divided into 275,000,000 7.75p (net) Cumulative Convertible Redeemable Preference Shares of 25p each, 545,000,000 Ordinary Shares of 10p each and one Special Share of £1.

By a resolution passed on 29th April, 1998 the Ordinary Share Capital of the Company was subdivided into 2,180,000,000 Ordinary Shares of 2.5p each.

By Special Resolution passed on 8th November, 1999 the capital of the Company was increased to £165,000,001 divided into 275,000,000 7.75p (net) Cumulative Redeemable Preference Shares of 25p each, 3,850,000,000 Ordinary Shares of 2.5p each and one Special Share of £1.

By Ordinary Resolution passed on 4th May, 2005, the share capital of the Company was increased from £165,000,001 to £180,000,001 by the creation of 600,000,000 ordinary shares of 2.5p each.

By Ordinary Resolution passed on 2nd May, 2008, the share capital of the Company was increased from £180,000,001 to £188,750,001 by the creation of 350,000,000 ordinary shares of 2.5p each.

No. 1470151

*The Companies Acts 1948 to 1980*

------------------

*COMPANY LIMITED BY SHARES*

------------------

## 𝕽𝖊𝖘𝖔𝖑𝖚𝖙𝖎𝖔𝖓

of

# BRITISH AEROSPACE PUBLIC LIMITED COMPANY

*(passed on 3rd day of February, 1981)*

At an EXTRAORDINARY GENERAL MEETING of the above named Company duly convened and held at 20 Fenchurch Street, London EC3 3DB on the 3rd day of February, 1981 the following RESOLUTION was duly passed as a SPECIAL RESOLUTION:—

### RESOLUTION

1    THAT conditionally upon the Underwriting Agreement relating to the proposed Offer for Sale of up to 100,000,000 Ordinary Shares of the Company by Kleinwort Benson Limited on behalf of the Secretary of State for Industry, being executed, becoming unconditional and not being terminated pursuant to the terms thereof:—

(i)    the authorised share capital of the Company be hereby increased from £40,000,000 to £115,000,000 by the creation of an additional 150,000,000 Ordinary Shares of 50p each;

(ii)    the sum of £26,666,666.50, being part of the amount standing to the credit of the Statutory Reserve of the Company, be capitalised and applied in paying up in full at par 53,333,333 unissued

Ordinary Shares of 50p each in the capital of the Company to be allotted and distributed credited as fully paid up to and amongst the Shareholders of the Company in proportion to their existing holdings of Ordinary Shares;

(iii)   pursuant to sub-section (1) of Section 14 of the Companies Act 1980, the Directors of the Company be and they are hereby authorised generally and unconditionally to allot relevant securities (as defined in sub-section (10) of the said Section 14) up to a maximum nominal value of £75,000,000, including the allotment referred to in (ii) above, such authority (unless previously revoked or varied by the Company in General Meeting) to expire on 2nd February, 1986; and

(iv)   pursuant to sub-section (1) of Section 18 of The Companies Act 1980, the Directors be and they are hereby given power to allot equity securities (as defined in sub-section (11) of Section 17 of that Act) pursuant to the authority conferred upon them by (iii) above as if the pre-emption rights contained in sub-section (1) of Section 17 of that Act did not apply to any such allotment.

No. 1470151

*The Companies Act 1985*

------------

*COMPANY LIMITED BY SHARES*

------------

# 𝕾𝖕𝖊𝖈𝖎𝖆𝖑 𝕽𝖊𝖘𝖔𝖑𝖚𝖙𝖎𝖔𝖓

of

# BRITISH AEROSPACE
# PUBLIC LIMITED COMPANY

At an EXTRAORDINARY GENERAL MEETING of the above-named Company duly convened and held at the London Marriott Hotel, Grosvenor Square, London W1 on Wednesday, 16th August, 1989 the following RESOLUTION was duly passed as a SPECIAL RESOLUTION:—

1.  "THAT subject to and conditional upon the Offer (as defined in the Offer document dated 24th July, 1989 issued by J. Henry Schroder Wagg & Co. Limited on behalf of the Company and addressed, *inter alia,* to the ordinary shareholders of Arlington Securities Plc and including any amendment, revision or extension thereof) or any additional or other offer or offers by J. Henry Schroder Wagg & Co. Limited on behalf of the Company for the issued ordinary share capital of Arlington Securities Plc becoming unconditional in all respects (other than as regards any condition relating to the passing of this Resolution):—

    (i)  the authorised share capital of the Company be increased from £170,000,001 to £260,000,001 by the creation of 275,000,000 7.75p (net) cumulative convertible redeemable preference shares of

25p each and by the creation of 42,500,000 new Ordinary Shares of 50p each;

(ii) the Articles of Association of the Company be amended by the deletion of Article 3 and the substitution therefor of the new Article 3 set out in the document submitted to the Meeting and signed by the Chairman for the purpose of identification;

(iii) the Directors be generally and unconditionally authorised in accordance with Section 80 of the Companies Act 1985 ("the Act") to exercise all the powers of the Company to allot relevant securities up to an aggregate nominal amount of £68,750,000 provided that:—

(a) this authority shall expire on 31st July, 1990; and

(b) the authority hereby conferred shall be additional to and without prejudice to the authority and power conferred upon the Directors by Article 11(B) of the Articles of Association of the Company as renewed by Special Resolution 2 passed at the Annual General Meeting of the Company on 10th May, 1989;

(iv) to the extent necessary in connection with the allotment of Ordinary Shares of 50p each on conversion of any 7.75p (net) cumulative convertible redeemable preference shares of 25p each (howsoever effected), the Directors be empowered to allot equity securities pursuant to and during the period of the authority conferred by paragraph (iii) above as if Section 89 of the Act did not apply to any such allotment;

(v) by the authorities and powers contained in paragraphs (iii) and (iv) above the Directors may during the period of the authority conferred by paragraph (iii) above make offers or agreements which would or might require the allotment of securities after the expiry of such period; and

(vi) for the purpose of this Resolution words and expressions defined in or for the purposes of Part IV of the Act shall bear the same meanings herein."*

---

*Note: A further Special Resolution passed at the said Annual General Meeting effected certain amendments to the Company's Articles of Association, which were replaced by the Articles of Association contained in this document on 1st May, 1996.

No. 1470151

*The Companies Act 1985*

---

*COMPANY LIMITED BY SHARES*

---

# Special Resolution

of

# BRITISH AEROSPACE PUBLIC LIMITED COMPANY

At a separate GENERAL MEETING of the above-named Company the holders of the 7.75p (net) Cumulative Convertible Redeemable Preference Shares of 25p each in the capital of the Company duly convened and held at The Queen Elizabeth II Conference Centre, Broad Sanctuary, Westminster, London SW1 on Monday, 19th October, 1992, the following resolution was passed as an Extraordinary Resolution:—

THAT the holders of the 7.75p (net) Cumulative Convertible Redeemble Preference Shares of 25p each in the capital of the Company HEREBY GIVE ALL SUCH CONSENTS for the purposes of Article 3(B)(6)(a)(v) of the Articles of Association of the Company as may be required for the variation of the voting rights attaching to the Ordinary Shares in the capital of the Company proposed to be effected by the Special Resolution set out in the Notice convening an Extraordinary General Meeting of the Company for 19th October, 1992 (a copy of which is produced to the Meeting and signed for the purpose of identification by the Chairman).

No. 1470151

*The Companies Act 1985*

————————————

*C O M P A N Y   L I M I T E D   B Y   S H A R E S*

————————————

# Special Resolution

of

# BRITISH AEROSPACE
# PUBLIC LIMITED COMPANY

At a separate GENERAL MEETING of the above-named Company the holders of the Ordinary Shares of 50p each in the capital of the Company duly convened and held at The Queen Elizabeth II Conference Centre, Broad Sanctuary, Westminster, London SW1 on Monday, 19th October, 1992, the following resolution was passed as an Extraordinary Resolution:—

THAT the holders of the Ordinary Shares of 50p each in the capital of the Company HEREBY SANCTION the variation of the voting rights attaching to the Ordinary Shares proposed to be effected by the Special Resolution set out in the Notice convening an Extraordinary General Meeting of the Company for 19th October, 1992 (a copy of which is produced to the Meeting and signed for the purposes of identification by the Chairman).

No. 1470151

*The Companies Act 1985*

---

*COMPANY LIMITED BY SHARES*

---

# Special Resolution

of

# BRITISH AEROSPACE PUBLIC LIMITED COMPANY

At an EXTRAORDINARY GENERAL MEETING of the above-named Company duly convened and held at The Queen Elizabeth II Conference Centre, Broad Sanctuary, Westminster, London SW1 on Monday, 19th October, 1992, the following Resolutions were passed as Special Resolutions:—

THAT:

1    (a)    the capital of the Company be reduced by cancelling paid up capital to the extent of 40p on each of the issued Ordinary Shares of 50p and reducing the nominal value of each of the Ordinary Shares both issued and unissued to 10p;

     (b)    the Share Premium Account of the Company be reduced by cancelling £599,057,394.80 of the amount standing to the credit thereof; and

     (c)    subject to and upon the reduction of capital and Share Premium Account provided for by this paragraph taking effect the Articles of Association of the Company be and they are hereby altered by

deleting sub-clause (A) of article 3 and substituting therefor the following sub-clause:—

"(A) The share capital of the Company at the date of the adoption of this sub-clause of this Article is £123,250,001 divided into 545,000,000 Ordinary Shares of 10p each, 275,000,000 7.75p (net) Cumulative Convertible Redeemable Preference Shares of 25p each ("Convertible Preference Shares") and one Special Share of £1.".

*Note: A further Special Resolution passed at the said Annual General Meeting effected certain amendments to the Company's Articles of Association, which were replaced by the Articles of Association contained in this document on 1st May, 1996.

No. 1470151

*The Companies Act 1985*

---

*C O M P A N Y   L I M I T E D   B Y   S H A R E S*

---

# Special Resolution

of

# BRITISH AEROSPACE
# PUBLIC LIMITED COMPANY

At the ANNUAL GENERAL MEETING of the above-named Company duly convened and held at the Queen Elizabeth II Conference Centre, Broad Sanctuary, Westminster, London SW1 on 1st May, 1996, the following RESOLUTIONS were passed as SPECIAL RESOLUTIONS:—

1       "THAT the provisions of the Memorandum of Association of the Company be altered by deleting the existing sub-clause (26) of clause 4 thereof and substituting therefor the following sub-clause:—

"To establish, operate and fund any arrangement for encouraging or facilitating the holding of shares or other securities in the Company or other company associated with it, by or for the benefit of employees, former employees or other persons connected with the Company or any other company associated with it, and any immediate family of such employees, former employees or other persons, so far as permitted by law."

2       "THAT the draft Articles of Association produced to the meeting and signed by the Chairman of the meeting for the purpose of identification, be adopted as the Articles of Association of the Company in substitution for and to the exclusion of all the existing Articles of Association of the Company."

No. 1470151

*The Companies Act 1985*

---

*C O M P A N Y   L I M I T E D   B Y   S H A R E S*

---

# Ordinary Resolution

of

# BRITISH AEROSPACE
# PUBLIC LIMITED COMPANY

*(passed on 8th day of November, 1999)*

---

At an EXTRAORDINARY GENERAL MEETING of the above-named Company duly convened and held at The Queen Elizabeth II Conference Centre, Broad Sanctuary, Westminster, London SW1 on Monday, 8th November, 1999, the following RESOLUTION was passed:—

THAT:

1. **Approval of merger**

    (i)  the merger of the Company with the MES Business (as defined in the Listing Particulars of the Company dated 11 October 1999 (the "Listing Particulars")) by way of the acquisition by the Company or any of its subsidiaries of shares in MES Holdco (as defined in the Listing Particulars) on the terms and conditions described in the Listing Particulars or such other terms and conditions (not constituting a material change in the nature of the transaction as a whole) as may be approved by the Board of Directors of the Company (the "Board", which expression shall in this Resolution include any duly constituted committee thereof); and

(ii)  all arrangements or agreements made or entered into, or which may in the future be made or entered into, by the Company or any of its subsidiaries in connection with such merger with the approval of the Board,

be and are hereby approved and the Board be and is hereby authorised to do or procure the doing of such other things as the Board may consider necessary or desirable in connection with such merger;

## 2.    Authority to allot shares

subject to the condition to the making of an Election (as defined in the Listing Particulars) being fulfilled or, where permitted, waived:

(i)  the authorised share capital of the Company be increased from £123,250,001 to £165,000,001 by the creation of 1,670,000,000 new ordinary shares of 2.5p each;

(ii)  the Directors be and are hereby generally and unconditionally authorised in accordance with Section 80 of the Companies Act 1985 (the "Act") to exercise all powers of the Company to allot relevant securities, directly or indirectly, in connection with the merger referred to in paragraph 1 of this Resolution up to an aggregate nominal amount of £29,195,289.5, provided that:

(a)  this authority shall expire on 30 June 2001; and

(b)  this authority shall be additional to and without prejudice to the authority and power conferred upon the Directors by Article 12(B) of the Articles of Association of the Company as renewed by a special resolution passed at the Annual General Meeting of the Company on 29 April 1998;

(iii)  the Directors may during the period of the authority conferred by this paragraph 2 make offers or agreements which would or might require the allotment of securities after the expiry of the period referred to in sub-paragraph (ii) above; and

(iv)  words and expressions defined in or for the purpose of Part IV of the Act shall bear the same meanings in this Resolution; and

## 3.    Relaxation of borrowing limit

(i)  subject to the merger referred to in paragraph 1 above being completed, pursuant to Article 104(B)(1), sanction be and is hereby given to the Directors at any time and from time to time to procure or permit the aggregate amount for the time being remaining outstanding of all money borrowed by the Group and for the time

being owing, subject as provided in Article 104, to persons other than the Company and its wholly-owned subsidiaries to exceed the limit set out in that Article provided that such aggregate amount outstanding and owing shall not exceed one and a half times the Adjusted Capital and Total Reserves (as defined in paragraph 3(ii) of this Resolution);

(ii)   in this paragraph 3:

    (a)   "Adjusted Capital and Total Reserves" means at any material time a sum equal to the aggregate of the Adjusted Capital and Reserves (as defined in Article 104(B)(2)) and the sums (if any) deducted in the calculation thereof pursuant to Article 104(B)(2)(vii); provided that during the period from completion of the merger referred to in paragraph 1 until the time when an audited balance sheet of the Company as at a date following the date of such completion becomes available to the Directors, the Adjusted Capital and Total Reserves shall be deemed to be £6,942 million; and

    (b)   references to Articles are to Articles of the Articles of Association of the Company; and

(iii)   paragraph 3 of this Resolution 1 shall be construed as if it formed part of Article 104 of the Articles.

No. 1470151

*The Companies Act 1985*

---

*C O M P A N Y   L I M I T E D   B Y   S H A R E S*

---

# Special Resolution

of

# BRITISH AEROSPACE PUBLIC LIMITED COMPANY

*(passed on 4th day of May, 2000)*

---

At an Annual General Meeting of the above-named Company duly convened and held at The Queen Elizabeth II Conference Centre, Broad Sanctuary, Westminster, London SW1 on Thursday, 4th May 2000, the following resolutions were passed as Special Resolutions:

1.  THAT the name of the Company be changed to BAE SYSTEMS plc.

2.  THAT the Articles of Association of the Company be and are hereby amended by deleting the existing Article 85 in its entirety and replacing it with the following:

    "85. At the Annual General Meeting in every year:

    (i)   any Director who was elected or last re-elected a Director at or before the Annual General Meeting held in the third calendar year before the current year shall retire by rotation; and

    (ii)  such further Directors (if any) shall retire by rotation as would bring the number retiring by rotation up to one-third of the Directors for the time being (or, if their number is not a multiple of three, the number nearest to but greater than one-third)."

No. 1470151

*The Companies Act 1985*

--------------------

*C O M P A N Y   L I M I T E D   B Y   S H A R E S*

--------------------

# 𝔖𝔭𝔢𝔠𝔦𝔞𝔩 �civ𝔢𝔰𝔬𝔩𝔲𝔱𝔦𝔬𝔫

of

# BAE SYSTEMS plc

*(passed on 3rd day of May, 2002)*

==================================================

At the Annual General Meeting of the above-named Company duly convened and held at The Queen Elizabeth II Conference Centre, Broad Sanctuary, Westminster, London SW1 on Friday, 3rd May 2002, the following resolutions were passed as Special Resolutions:

1. **Amendments to the Articles of Association — Electronic communication with shareholders and other matters**

   THAT the amendments to the Articles of Association of the Company set out in the printed document marked "A" produced to the meeting and signed by the Chairman for purposes of identification be and are hereby adopted.

2. **Amendments to the Articles of Association relating to the Special Shareholder**

   THAT:

   (i)  subject to and conditional upon the consent of the Special Shareholder being given in accordance with the Articles of Association, the changes to the Articles of Association of the Company set out in the printed document marked "B" produced to the meeting and signed by the Chairman for the purposes of identification be and are hereby adopted; and

(ii)    the person who is the Government Director on the later of the date this Resolution is passed and the date the consent of the Special Shareholder is given in relation to sub-paragraph (i) of this Resolution shall continue in office, unless such office is previously vacated, until the next following Annual General Meeting whereupon he shall be deemed to retire by rotation under Article 85(i) in addition to any other Directors retiring under such Article and be eligible for re-election; and

(iii)    subject to and conditional upon the consent of the Special Shareholder being given in relation to sub-paragraph (i) of this Resolution, all notices given pursuant to the existing Article 43(B) prior to the later of the date this Resolution is passed and the date the consent of the Special Shareholder is given in relation to sub-paragraph (i) of this Resolution shall be withdrawn and cease to have effect.

Company No. 1470151

*The Companies Act 1985*

———————————

*COMPANY LIMITED BY SHARES*

———————————

# Resolutions

of

# BAE SYSTEMS plc

════════════════════════════════════════

I hereby certify that the following is a true and fair copy of certain Resolutions passed at the Company's Annual General Meeting on the 5th May 2004:

Ordinary Resolution

> THAT the authority conferred on the Directors by Article 12(B)(I) of the Articles of Association of the Company be and is hereby renewed for the period ending on 5 May 2009 and that for such period the Section 80 Amount shall be £19,748,171.

Special Resolutions

> THAT the power conferred on the Directors by Article 12(B)(ii) of the Articles of Association of the Company be and is hereby renewed for the period ending on 5 May 2009 and that for the period the Section 89 amount shall be £3,825,091.

> THAT the Company be and is hereby unconditionally and generally authorised for the purposes of Section 166 of the Companies Act 1985 to make market purchases, as defined in Section 163 of that Act, of ordinary shares of 2.5p each in the capital of the Company provided that:

> (a)  the maximum number of shares that may be purchased is 306,007,313;

> (b)  the minimum price which may be paid for each share is 2.5 pence;

(c)    the maximum price that may be paid for each share is an amount equal to 105 per cent of the average of the middle market quotations of the Company's ordinary shares as derived from the London Stock Exchange Daily Official List for the five business days immediately preceding the day on which such share is contracted to be purchased; and

(d)    this authority shall expire on the conclusion of the Annual General Meeting of the Company held in 2005 or, if earlier, 5 August 2005 (except in relation to the purchase of shares the contract for which was concluded before the expiry of such authority and which may be executed wholly or partly after such expiry) unless such authority is renewed prior to such time; and, where such shares are held in treasury, the Company may use them for the purposes of its employee share schemes.

THAT the Articles of Association of the Company be and are hereby amended as detailed in the Appendix to the Notice of Annual General Meeting dated 31 March 2004 (a copy of which is presented to the meeting and signed by the Chairman for the purpose of identification).

No. 1470151

*The Companies Act 1985*

---

*COMPANY LIMITED BY SHARES*

---

# BAE SYSTEMS plc

I HEREBY CERTIFY THAT the following is a true and fair copy of resolutions passed at an Annual General Meeting of the above-named Company duly convened and held at the Queen Elizabeth II Conference Centre, Broad Sanctuary, Westminster, London SW1 on Wednesday 4 May 2005.

**The following resolutions were passed as Ordinary Resolutions:**

Increase of Authorised Share Capital

> THAT the share capital of the Company be increased from £165,000,001 to £180,000,001 by the creation of 600,000,000 ordinary shares of 2.5p each.

Authority to Allot New Shares

> THAT the authority conferred on the Directors by Article 12 (B)(i) of the Articles of Association of the Company be and is hereby renewed for the period ending on 5 August 2006 or, if earlier, on the day before the Company's Annual General Meeting in 2006 and that for such period the Section 80 Amount shall be £26,750,818 if Resolution 10 is passed or £15,989,518 if Resolution 10 is not passed.*
>
> * Resolution 10 was duly passed at the meeting

**The following resolutions were passed as Special Resolutions:**

Disapplication of Pre-emption Rights

> THAT the power conferred on the Directors by Articles 12(B)(ii) of the Articles of Association of the Company be and is hereby renewed for the period ending on 5 August 2006 or, if earlier, on the day before the Company's Annual General Meeting in 2006 and that for the period the Section 89 amount shall be £4,013,024.

Authority to Purchase own Shares

THAT the Company be and is hereby unconditionally and generally authorised for the purposes of Section 166 of the Companies Act 1985 to make market purchases, as defined in Section 163 of that Act, of ordinary shares of 2.5p each in the capital of the Company provided that:

a)      the maximum number of ordinary shares that may be purchased is 321,041,924;

b)      the minimum price which may be paid for each share is 2.5p;

c)      the maximum price that may be paid for each share is an amount equal to 105 per cent. of the average of the middle market quotations of the Company's ordinary shares as derived from the London Stock Exchange Daily Official List for the five business days immediately preceding the day on which such ordinary share is contracted to be purchased; and

d)      this authority shall expire on the conclusion of the Annual General Meeting of the Company held in 2006 or, if earlier, 3 August 2006 (except in relation to the purchase of shares the contract for which was concluded before the expiry of such authority and which may be executed wholly or partly after such expiry) unless such authority is renewed prior to such time.

Amendment to the Articles relating to the provision of Indemnities

THAT the Articles of Association of the Company be and are hereby amended as detailed in the appendix marked A accompanying the notice of Annual General Meeting dated 29 March 2005 (a copy of which is presented to the meeting and signed by the Chairman for the purpose of identification).

## APPENDIX "A"

**Amendments to Articles of Association**

This is the appendix marked "A" referred to in Resolution 23 of the notice of Annual General Meeting dated 29 March 2005. It is proposed that the Articles of Association of BAE Systems plc be amended by the deletion of the existing Article 145 and its replacement by the following:

Article 145

Subject to the provisions of, and so far as may be permitted by and consistent with, the Statutes and subject as mentioned below, every Director of the Company shall be indemnified by the Company out of its own funds against (a) any liability incurred by or attaching to him in connection with any negligence, default, breach of duty or breach of trust by him in relation to the Company other than (i) any liability to the Company or any associated company (as defined in Section 309A(6) of the Act) and (ii) any liability of the kind referred to in Sections 309B(3) or (4) of the Act; and (b) any other liability incurred by or attaching to him in the actual or purported execution and/or discharge of his duties and/or the exercise or purported exercise of his powers and/or otherwise in relation to or in connection with his duties, powers or office. Such indemnity shall not, however, extend to any liability incurred by or attaching to a Director as a result of his own fraud or wilful default but shall extend to other liabilities arising after he ceased to be a Director in respect of acts or omissions while he was a Director. Where a person is indemnified against any liability in accordance with this paragraph 145, such indemnity shall extend to all costs, charges, losses, expenses and liabilities incurred by him in relation thereto.

Company No. 1470151

*The Companies Act 1985*

---

*C O M P A N Y   L I M I T E D   B Y   S H A R E S*

---

# Ordinary Resolutions

of

# BAE SYSTEMS plc

*(passed on 13th day of May, 2005)*

---

At an EXTRAORDINARY GENERAL MEETING of the above-named Company duly convened and held at ExCel London, One Western Gateway, Royal Victoria Dock, London E16 on Friday 13th May 2005, the following RESOLUTION was passed:-

THAT:

    (i)    pursuant to Article 104(B)(1), sanction be and is hereby given to the directors of the Company at any time and from time to time to procure or permit the aggregate amount for the time being remaining outstanding of all money borrowed by the Group (as defined in Article 104(B)(1)) and for the time being owing, subject as provided in Article 104, to persons other than the Company and its wholly-owned subsidiaries to exceed the limit set out in that Article provided that such aggregate amount outstanding and owing shall not exceed one and a half times the Adjusted Capital and Total Reserves (as defined in paragraph (ii) of this resolution);

    (ii)    in this resolution:

        (a)    "Adjusted Capital and Total Reserves" means at any material time a sum equal to the aggregate of:

(i)   the Adjusted Capital and Reserves (as defined in Article 104(B)(2)); and

(ii)  the sums (if any) deducted in the calculation thereof pursuant to Articles 104(B)(2)(vii);

provided that Article 104(B)(2) shall be construed as if it contained the following additional provision after Article 104(B)(2)(vii):

"(viii) excluding post-employment assets and liabilities as calculated in accordance with International Accounting Standard ("IAS") 19-Employee Benefits, as from time to time amended, and any standards, principles, practices or rules that may from time to time, directly or indirectly, supplement or replace this standard or any part of it, and

(ix) excluding amounts recognised in accordance with IAS 32-Financial Instruments: Disclosure and Presentation ("IAS 32") and IAS 39-Financial Instruments: Recognition and Measurement ("IAS" 39) (as from time to time amended, and any standards, principles, practices or rules that may from time to time, directly or indirectly, supplement or replace any of these standards or any part of them) and including the relevant amounts that would have been recognised had the accounts been prepared in accordance with the relevant accounting standards applicable to the Company's accounts for the year ended 31 December 2004 under the United Kingdom generally accepted accounting principles in so far as they relate to the matters dealt with by IAS 32 and IAS 39 (as so amended, supplemented or replaced from time to time)."

(b)  references to Articles are to Articles of the Articles of Association of the Company; and

(iii)  this Resolution shall be construed as if it formed part of Article 104 of the Articles.

No. 1470151

*The Companies Act 1985*

*C O M P A N Y   L I M I T E D   B Y   S H A R E S*

# BAE SYSTEMS plc

I HEREBY CERTIFY THAT the following is a true and fair copy of resolutions passed at an Annual General Meeting of the above-named Company duly convened and held at the Queen Elizabeth II Conference Centre, Broad Sanctuary, Westminster, London SW1P 3EE on Thursday 4 May 2006.

**The following resolution was passed as an Ordinary Resolution:**

Authority to Allot New Shares

> THAT the authority conferred on the Directors by Article 12 (B)(i) of the Articles of Association of the Company be and is hereby renewed for the period ending on 3 August 2007 or, if earlier, on the day before the Company's Annual General Meeting in 2007 and that for such period the Section 80 Amount shall be £26,829,626.

**The following resolutions were passed as Special Resolutions:**

1.  Disapplication of Pre-emption Rights

    > THAT the power conferred on the Directors by Articles 12(B)(ii) of the Articles of Association of the Company be and is hereby renewed for the period ending on 3 August 2007 or, if earlier, on the day before the Company's Annual General Meeting in 2007 and that for the period the Section 89 amount shall be £4,024,846.

2.  Authority to Purchase own Shares

    > THAT the Company be and is hereby unconditionally and generally authorised for the purposes of Section 166 of the Companies Act 1985 to make market purchases, as defined in Section 163 of that Act, of ordinary shares of 2.5p each in the capital of the Company provided that:

(i)     the maximum number of ordinary shares that may be purchased is 321,987,720;

(ii)    the minimum price which may be paid for each share is 2.5p;

(iii)   the maximum price that may be paid for each ordinary share is an amount equal to 105 per cent. of the average of the middle market quotations of the Company's ordinary shares as derived from the London Stock Exchange Daily Official List for the five business days immediately preceding the day on which such ordinary share is contracted to be purchased; and

(iv)    this authority shall expire on the conclusion of the Annual General Meeting of the Company held in 2007 or, if earlier, 4 August 2007 (except in relation to the purchase of ordinary shares the contract for which was concluded before the expiry of such authority and which may be executed wholly or partly after such expiry) unless such authority is renewed prior to such time.

No. 1470151

*The Companies Act 1985*

---

*C O M P A N Y   L I M I T E D   B Y   S H A R E S*

---

# BAE SYSTEMS plc

---

I HEREBY CERTIFY THAT the following is a true and fair copy of resolutions passed at an Annual General Meeting of the above-named Company duly convened and held at the Queen Elizabeth II Conference Centre, Broad Sanctuary, Westminster, London SW1P 3EE on Wednesday 9 May 2007.

**The following resolution was passed as an Ordinary Resolution:**

Authority to Allot New Shares

THAT the authority conferred on the Directors by Article 12 (B)(i) of the Articles of Association of the Company be and is hereby renewed for the period ending on 8 August 2008 or, if earlier, on the day before the Company's Annual General Meeting in 2008 and that for such period the Section 80 Amount shall be £26,664,742.

**The following resolutions were passed as Special Resolutions:**

1.  Disapplication of Pre-emption Rights

    THAT the power conferred on the Directors by Articles 12(B)(ii) of the Articles of Association of the Company be and is hereby renewed for the period ending on 8 August 2008 or, if earlier, on the day before the Company's Annual General Meeting in 2008 and that for the period the Section 89 amount shall be £4,000,111.

2.  Authority to Purchase own Shares

    THAT the Company be and is hereby unconditionally and generally authorised for the purposes of Section 166 of the Companies Act 1985 to make market purchases, as defined in Section 163 of that Act, of ordinary shares of 2.5p each in the capital of the Company provided that:

(i)    the maximum number of ordinary shares that may be purchased is 320,008,915;

(ii)    the minimum price which may be paid for each ordinary share is 2.5p;

(iii)    the maximum price that may be paid for each ordinary share is an amount equal to 105 per cent. of the average of the middle market quotations of the Company's ordinary shares as derived from the London Stock Exchange Daily Official List for the five business days immediately preceding the day on which such ordinary share is contracted to be purchased; and

(iv)    this authority shall expire on the conclusion of the Annual General Meeting of the Company held in 2008 or, if earlier, 9 August 2008 (except in relation to the purchase of ordinary shares the contract for which was concluded before the expiry of such authority and which may be executed wholly or partly after such expiry) unless such authority is renewed prior to such time.

3.    Approval of electronic and website communications and consequential amendments to the Articles of Association

THAT

(i)    the Company be authorised, subject to and in accordance with the provisions of the Companies Act 2006, the Disclosure and Transparency Rules published by the Financial Services Authority and the Articles of Association, to send, convey or supply all types of notices, documents or information to the members by means of electronic equipment for the processing (including digital compression), storage and transmission of data, employing wires, radio optical technologies, or any other electromagnetic means, including, without limitation by sending such notices, documents or information by electronic mail or by making such notices, documents or information available on a website; and

(ii)    the Articles of Association of the Company be and are hereby amended as detailed in the Appendix accompanying this Notice of Annual General Meeting dated 3 April 2007 (a copy of which is presented to the meeting and signed by the Chairman for the purposes of identification) with effect from the end of this meeting.

Secretary

No. 1470151

*The Companies Act 1985 – 2006*

---

*COMPANY LIMITED BY SHARES*

---

# BAE SYSTEMS plc

I HEREBY CERTIFY THAT the following is a true and fair copy of a special resolution passed at an Annual General Meeting of the above-named Company duly convened and held at the Queen Elizabeth II Conference Centre, Broad Sanctuary, Westminster, London SW1 on Wednesday 7 May 2008.

THAT:

(a)  with effect from the end of this Annual General Meeting or any adjournment thereof, the Articles of Association of the Company be and are hereby amended so that they shall be in the form of the amended articles of association produced to the meeting, marked 'A' and initialled by the Chairman of the meeting for the purposes of identification; and

(b)  with effect from 00:01 on 1 October 2008 or any later date on which Section 175 of the Companies Act 2006 comes into effect:

  (i)   for the purposes of Section 175 of the Companies Act 2006, the Directors be given power in the Articles of Association of the Company to authorise certain conflicts of interest as described in that section; and

  (ii)  the Articles of Association of the Company then in force be and are hereby amended by the deletion of Articles 96 and 97 in their entirety, by the insertion in their place of new Articles 96, 97, 98, 99 and 100 and by the making of all consequential numbering amendments therefor required, as detailed in the amended articles of association produced to the meeting, marked 'B' and initialled by the Chairman for the purposes of identification.

*The Companies Act 1948 to 1983,*
*The Companies Act 1985 and 1989*
*and The Companies Act 2006*

---

*COMPANY LIMITED BY SHARES*

---

NEW

# Articles of Association

*(Adopted by Special Resolution passed on 1st May, 1996 and amended*
*by Special Resolutions passed on 29th April, 1998, 4th May, 2000,*
*3rd May, 2002, 5th May, 2004, 4th May, 2005, 9th May, 2007 and*
*7th May, 2008)*

of

# BAE SYSTEMS plc

## PRELIMINARY

1.    The regulations in Table A in The Companies (Tables A to F)  Table A not to apply
Regulations 1985 (as amended) and in any Table A applicable to the Company
under any former enactment relating to companies shall not apply to the
Company.

2.    In these presents (if not inconsistent with the subject or context and  Definitions
save as expressly provided herein) the words and expressions set out in the first
column below shall bear the meanings set opposite to them respectively:—

| | |
|---|---|
| Auditors | The auditors from time to time of the Company. |
| Director | A director of the Company. |
| Month | Calendar month. |
| Office | The registered office of the Company for the time being. |
| Paid | Paid or credited as paid. |

1

| | |
|---|---|
| These presents | These Articles of Association as from time to time altered by Special Resolution. |
| Seal | The Common Seal of the Company. |
| Securities Seal | An official seal kept by the Company for sealing securities issued by the Company, or for sealing documents creating or evidencing securities so issued, as permitted by the Companies Acts. |
| Special Share | The one Special Share of £1 in the share capital of the Company and the expression "Special Shareholder" shall mean the holder for the time being of the Special Share. |
| The Statutes | The Companies Acts and every other enactment for the time being in force concerning companies and affecting the Company (including the Companies Act 2006). |
| The Statutory Reserve | The statutory reserve of the Company, as defined in Section 4(1) of the British Aerospace Act 1980, (if any) for the time being. |
| The Stock Exchange | London Stock Exchange plc. |
| Substantive Resolutions | All resolutions (other than resolutions of a procedural nature). |
| Transfer Office | The place where the Register of Members is situate for the time being. |
| The UK Listing Authority | The Financial Services Authority in its capacity as competent authority for official listing under Part VI of the Financial Services and Markets Act 2000. |
| The United Kingdom | (Except for the purposes of Article 43) Great Britain and Northern Ireland. |
| In writing | Written or produced by any substitute for writing (including anything in electronic form) or partly one and partly another. |
| Year | Calendar year. |

The expression "address" shall include any number or address used for the purposes of sending or receiving notices, documents or information by electronic means and/or by means of a website.

The expression "business day" means a day (not being a Saturday or Sunday) on which clearing banks are open for business in London.

2

All such of the provisions of these presents as are applicable to shares shall apply to stock, and the words "share" and "shareholder" shall be construed accordingly.

The expression "Companies Acts" shall have the meaning given thereto by Section 2 of the Companies Act 2006 but shall only extend to provisions which are in force at the relevant date.

The expression "Company Communications Provisions" shall have the same meaning as in the Companies Acts.

The expressions "hard copy form", "electronic form" and "electronic means" shall have the same respective meanings as in the Company Communications Provisions.

The expressions "debenture" and "debenture holder" shall respectively include "debenture stock" and "debenture stockholder".

The expression "entitled by transmission" means, in relation to a share, entitled as a consequence of the death or bankruptcy of a member or of another event giving rise to a transmission of entitlement by operation of law.

The expression "holder" means, in relation to a share, the member whose name is entered in the register as the holder of that share.

The expressions "recognised clearing house" and "recognised investment exchange" mean any clearing house or investment exchange (as the case may be) granted recognition under the Financial Services and Markets Act 2000.

The expression "register" means the register of members of the Company.

The expression "Secretary" shall include any person appointed by the Directors to perform any of the duties of the Secretary including, but not limited to, a joint, assistant or deputy Secretary.

The expression "subsidiary undertaking" shall have the same meaning as in the Companies Acts.

Except where the context otherwise requires, any reference to issued shares of any class (whether of the Company or of any other company) shall not include any shares of that class held as treasury shares.

In these presents any reference to any statutory provision or enactment shall include any statutory modification or re-enactment thereof for the time being in force (whether coming into force before or after the adoption of these presents or the incorporation of the Company).

Words denoting the singular shall include the plural and vice versa. Words denoting the masculine shall include the feminine. Words denoting persons shall include bodies corporate and unincorporated associations.

3

A Special Resolution shall be effective for any purpose for which an Ordinary Resolution is expressed to be required.

Subject as aforesaid any words or expressions defined in the Companies Acts shall (if not inconsistent with the subject or context) bear the same meanings in these presents.

Headings in these presents do not affect the interpretation of these presents.

<div style="float:left">Share capital</div>

## SHARE CAPITAL

3.    The share capital of the Company is £180,000,001* divided into 4,450,000,000 Ordinary Shares of 2.5p each ("Ordinary Shares"), 275,000,000 7.75p (net) Cumulative Convertible Redeemable Preference Shares of 25p each ("Convertible Preference Shares") and one Special Share of £1.

<div style="float:left">Class rights and variation</div>

## VARIATION OF RIGHTS

4.    Whenever the share capital of the Company is divided into different classes of shares, the special rights attached to any class may, subject to the provisions of the Statutes, be varied or abrogated either with the consent in writing of the holders of three-fourths in nominal value of the issued shares of the class or with the sanction of a Special Resolution passed at a separate General Meeting of the holders of the shares of the class (but not otherwise) and may be so varied or abrogated whilst the Company is a going concern or during or in contemplation of a winding-up. To every such separate General Meeting all the provisions of these presents relating to General Meetings of the Company and to the proceedings thereat shall *mutatis mutandis* apply, except that the quorum shall be two persons at least holding or representing by proxy one-third in nominal value of the issued shares of the class (but so that if at any adjourned meeting a quorum as above defined is not present, any one holder of shares of the class present in person or by proxy shall be a quorum) and that any holder of shares of the class present in person or by proxy may demand a poll and that every such holder shall on a poll have one vote for every share of the class held by him. The foregoing provisions of this Article shall apply to the variation or abrogation of the special rights attached to some only of the shares of any class as if each group of shares of the class differently treated formed a separate class the special rights whereof are to be varied.

<div style="float:left">Further issues not variation</div>

5.    The special rights attached to any class of shares having preferential rights shall not, unless otherwise expressly provided by the terms of issue thereof, be deemed to be varied by (a) the creation or issue of further shares ranking as regards participation in the profits or assets of the Company in some or all respects *pari passu* therewith but in no respect in priority thereto or (b) the purchase or redemption by the Company of any of it own shares in accordance with the Statutes and these presents.

---

* *By Ordinary Resolution passed on 7ᵗʰ May, 2008, the share capital of the Company was increased from £180,000,001 to £188,750,001 by the creation of 350,000,000 ordinary shares of 2.5p each.*

## ALTERATION OF SHARE CAPITAL

6.    The Company may from time to time by Ordinary Resolution Increase of capital increase its capital by such sum to be divided into shares of such amounts as the resolution shall prescribe. All new shares shall be subject to the provisions of these presents with reference to allotment, payment of calls, lien, transfer, transmission, forfeiture and otherwise.

7.    (A) The Company may by Ordinary Resolution:—    Reorganisation of capital

(1)   Consolidate and divide all or any of its share capital into shares of larger nominal value than its existing shares.

(2)   Cancel any shares which, at the date of the passing of the resolution, have not been taken, or agreed to be taken, by any person and diminish the amount of its capital by the amount of the shares so cancelled.

(3)   Sub-divide its shares, or any of them, into shares of smaller nominal value than is fixed by the Memorandum of Association (subject, nevertheless, to the provisions of the Statutes), and so that the resolution whereby any share is sub-divided may determine that, as between the holders of the shares resulting from such sub-division, one or more of the shares may, as compared with the others, have any such preferred, deferred or other special rights, or be subject to any such restrictions, as the Company has power to attach to unissued or new shares.

(B) If, as a result of consolidation of shares, the holders of shares become entitled to fractions of a share, the Directors may on behalf of such holders of shares or otherwise deal with the fractions as they think fit. In particular, the Directors may, subject to the Statutes and provided that the necessary unissued shares are available, issue to a member credited as fully paid by way of capitalisation of reserves (and without the sanction required in Article 129) the minimum number of shares required to round up his holding of shares to an integral multiple of the number of shares to be consolidated into a single share (such issue being deemed to have been effected immediately prior to consolidation). The amount required to pay up such shares shall be appropriated at the Directors' discretion from any of the sums standing to the credit of any of the Company's reserve accounts (including without limitation the Statutory Reserve, any share premium account and capital redemption reserve fund) or to the credit of profit and loss account and capitalised by applying the same in paying up such shares. A resolution of the Directors capitalising part of the reserves shall have the same effect as if the capitalisation had been declared by Ordinary Resolution of the Company pursuant to Article 129. In relation to the capitalisation, the Directors shall be entitled to exercise all the powers conferred on them by Article 129 without an Ordinary Resolution of the Company.

5

Reduction of capital

8.   The Company may by Special Resolution reduce or cancel its share capital or any capital redemption reserve fund or share premium account in any manner and with and subject to any incident authorised and consent required by law.

Purchase of shares

9.   (A) Subject to the provisions of the Statutes, the Company may purchase, or may enter into a contract under which it will or may purchase, any of its own shares of any class (including any redeemable shares).

(B) The Company may not exercise any right in respect of treasury shares held by it, including any right to attend or vote at meetings, to participate in any offer by the Company to shareholders or to receive any distribution (including in a winding-up), but without prejudice to its right to sell the treasury shares, to transfer the treasury shares for the purposes of or pursuant to an employees' share scheme, to receive an allotment of shares as fully paid bonus shares in respect of the treasury shares or to receive any amount payable on redemption of any redeemable treasury shares.

## SHARES

Trusts not recognised

10.   Except as ordered by a court of competent jurisdiction or as required by law or pursuant to the provisions of Article 43, no person shall be recognised by the Company as holding any share upon any trust, and the Company shall not be bound by or compelled in any way to recognise (even if it has notice of it) any equitable, contingent, future, partial or other claim to or interest in any share, or any claim to or interest in any fractional part of a share, or (except only as by these presents or by court order or law otherwise provided) any other right in respect of any share (or any fractional part thereof), except an absolute right to the entirety thereof in the holder.

Special rights

11.   Without prejudice to any special rights previously conferred on the holders of any shares or class of shares for the time being issued, any share in the Company may be issued with such preferred, deferred or other special rights, or subject to such restrictions, whether in regard to dividend, return of capital, voting or otherwise, as the Company may from time to time by Ordinary Resolution determine (or, in the absence of any such determination, as the Directors may determine) and subject to the provisions of the Statutes the Company may issue shares (including preference shares) which are, or at the option of the Company or of the holder are to be liable, to be redeemed.

Directors' power to allot securities and to sell treasury shares

12.   (A) Subject to the provisions of the Statutes relating to authority, pre-emption rights and otherwise and of any resolution of the Company in General Meeting passed pursuant thereto, all unissued shares shall be at the disposal of the Directors and they may allot (with or without conferring a right of renunciation), grant options over, offer or otherwise deal with or dispose of unissued shares (whether forming part of the original or any increased capital),

6

or rights to subscribe for or convert any security into shares to such persons, at such times and on such terms and conditions as they think proper.

(B) (i) The Directors shall be generally and unconditionally authorised pursuant to and in accordance with Section 80 of the Companies Act 1985 to exercise for each prescribed period all the powers of the Company to allot relevant securities up to an aggregate nominal amount equal to the Section 80 Amount (as defined below).

(ii) During each prescribed period the Directors shall be empowered to allot equity securities wholly for cash pursuant to and within the terms of the said authority and to sell treasury shares wholly for cash:—

(a) in connection with a rights issue; and

(b) otherwise than in connection with a rights issue up to an aggregate nominal amount equal to the Section 89 Amount as if Section 89(1) of the Companies Act 1985 did not apply to any such allotment.

(iii) By such authority and power the Directors may during such period make offers or agreements which would or might require the allotment or sale of securities after the expiry of such period and may allot or sell securities in pursuance of such offers or agreements.

(iv) For the purposes of this Article:—

(a) "rights issue" means an offer of equity securities open for acceptance for a period fixed by the Directors to (i) holders (other than the Company) on the register on a fixed record date of Ordinary Shares in proportion to their respective holdings and (ii) holders on the register on a fixed record date of other equity securities to the extent expressly required or (if considered appropriate by the Directors) permitted by the rights attached thereto, but subject in both cases to such exclusions or other arrangements as the Directors may deem necessary or expedient in relation to fractional entitlements or legal or practical problems under the laws of, or the requirements of any recognised regulatory body or any stock exchange in, any territory;

(b) "prescribed period" means in the first instance the period from the date of the adoption of this Article to the date of the Annual General Meeting in 1997 or 31st July, 1997, whichever is the earlier, and shall thereafter mean any period (not exceeding 5 years on any occasion) for which the authority conferred by sub-paragraph (i) above is renewed or extended by Resolution of the Company in General Meeting stating the Section 80 Amount for such period;

7

(c) the "Section 80 Amount" shall for the first prescribed period be £14,292,992 and for any other prescribed period shall be that stated in the relevant Resolution;

(d) the "Section 89 Amount" shall for the first prescribed period be £2,143,949 and for any other prescribed period shall be that stated in the relevant Special Resolution renewing or extending the power conferred by paragraph (ii) above for such period;

(e) the nominal amount of any securities shall be taken to be, in the case of rights to subscribe for or to convert any securities into shares of the Company, the nominal amount of such shares which may be allotted pursuant to such rights; and

(f) words and expressions defined in or for the purposes of Part IV of the Companies Act 1985 shall bear the same meanings in this Article 12.

Commissions   13. The Company may exercise the powers of paying commissions conferred by the Statutes to the full extent thereby permitted. The Company may also on any issue of shares pay such brokerage as may be lawful.

Renunciation   14. Subject to the provisions of the Statutes and of these presents, the Directors may at any time after the allotment of any share but before any person has been entered in the Register of Members as the holder recognise a renunciation thereof by the allottee in favour of some other person and may accord to any allottee of a share a right to effect such renunciation upon and subject to such terms and conditions as the Directors may think fit to impose.

## SPECIAL SHARE

Issue of and rights attaching to Special Share   15. (A) The Special Share may only be issued to, held by and transferred to the Secretary of State for Trade and Industry or his successor or a nominee on his behalf.

(B) Notwithstanding any provision in these presents to the contrary, the amendment, removal or alteration of the effect of all or any of the following Articles or, where specified, the relevant parts of the following Articles shall be deemed to be a variation of the rights attaching to the Special Share and shall accordingly only be effective with the consent in writing of the Special Shareholder:—

(i) the definitions of "Special Share", "Special Shareholder" and "The United Kingdom" in Article 2;

(ii) this Article 15;

(iii) Article 43;

8

(iv) Articles 74(A), 74(B) and 91(A) insofar as they impose requirements as to the citizenship of Directors and their alternates;

(v) Article 82(B); and

(vi) Articles 94, 100 and 102 insofar as they impose requirements as to Directors of any specified citizenship either in making up the quorum for meetings or on signing written resolutions or on forming a majority in the number of the members of any committee.

(c) The Special Shareholder shall be entitled to receive notice of and to attend at any General Meeting or any meeting of any class of shareholders of the Company, but the Special Share shall carry no right to vote nor any other rights at any such meeting except that, at any such meeting at which any matter mentioned in this Article ("relevant business") is dealt with, it shall carry the right to speak in relation to any business which is, or includes, relevant business.

(D) In a distribution of capital in a winding-up of the Company, the Special Shareholder shall be entitled to repayment of the capital paid up on the Special Share in priority to any repayment of capital to any other member. The Special Share shall confer no other right to participate in the capital or profits of the Company.

(E) The Special Shareholder may require the Company at any time, either (i) subject to the provisions of the Statutes, to redeem the Special Share at par, or (ii) to convert the Special Share into one ordinary voting share (within the meaning of Section 5 of the British Aerospace Act 1980) in the Company ("ordinary voting share") by serving written notice upon the Company requiring such redemption or, as the case may be, conversion and delivering the share certificate for the Special Share to the Company, whereupon the Company shall, in the case of a redemption, redeem the Special Share for cash at par and, in the case of a conversion, issue to the Special Shareholder a certificate in respect of the share into which the Special Share is converted, in each case within 21 days of the receipt of the share certificate for the Special Share by the Company.

(F) If an ordinary voting share has a nominal value in excess of £1 and if the Special Shareholder shall have required the Company to convert the Special Share into an ordinary voting share, then the Special Share shall carry the right to subscribe for one ordinary voting share for cash at par. In any such case, the Special Share shall be treated as converted and the nominal value of £1 shall be applied in part payment of the nominal value of the ordinary voting share and the Special Shareholder shall pay up the balance of the nominal value in cash.

(G) If the Special Shareholder shall have required the Company to convert the Special Share into an ordinary voting share, the Directors may

9

effect such conversion in any manner they consider appropriate and, without prejudice to the generality of the foregoing, may redeem such Special Share and apply the proceeds of redemption in payment or, if paragraph (F) above applies, in part payment of the nominal value of the ordinary voting share into which the Special Share is to be converted.

(H) (i) The Articles and parts of Articles listed in Article 15(B) (other than this Article 15(H)) shall have effect subject to anything to the contrary in any regulations made by the Directors and approved by the Special Shareholder. Without limitation, such regulations may provide that, with effect from a particular time or on the occurrence of a particular event or subject to any other conditions, any of the relevant Articles or parts of the Articles shall not apply or shall apply as if they were modified in such manner as the regulations may specify.

(ii) Such regulations may not have the effect of reducing the proportion of the votes which are ordinarily eligible to be cast on a poll at General Meetings of the Company or the votes which are attributable to all Shares in which any Foreign Person may have an Interest below 15 per cent. This paragraph (ii) shall be construed as if it were part of Article 43.

(iii) The Directors may from time to time abrogate, vary or otherwise modify any regulations made pursuant to this Article 15(H) in such manner as they consider appropriate and as the Special Shareholder may approve.

## SHARE CERTIFICATES

Issue of certificates    16.  Every definitive share certificate shall be issued under the Seal (or the Securities Seal or in the case of shares on a branch register, an official seal for use in the relevant territory) and shall specify the number and class of shares to which it relates and the amount paid up thereon. No definitive certificate shall be issued representing shares of more than one class. Unless the Directors otherwise determine no definitive certificate shall be issued in respect of shares held by a recognised clearing house or a nominee of a recognised clearing house or of a recognised investment exchange in respect of whom the Company is not required by law to complete and have ready for delivery a certificate.

Joint holders    17.  In the case of a share held jointly by several persons the Company shall not be bound to issue more than one certificate therefor and delivery of a certificate to one of two or more joint holders shall be sufficient delivery to all.

Entitlement to certificates    18.  Subject to the provisions of these presents, any person (excluding a recognised clearing house or a nominee of a recognised clearing house or of a recognised investment exchange to whom no certificate is to be issued pursuant to Article 16 above) whose name is entered in the register in respect of any shares of any one class upon the issue or transfer thereof shall be entitled without payment to a certificate therefor (in the case of issue) within one month

10

(or such longer period as the terms of issue shall provide) after allotment or (in the case of a transfer of fully-paid shares) within 14 days after lodgment of transfer or (in the case of a transfer of partly-paid shares) within two months after lodgment of transfer.

19. Where some only of the shares comprised in a share certificate are Splitting certificates transferred the old certificate shall be cancelled and a new certificate for the balance of such shares be issued in lieu without charge.

20. (A) Any two or more certificates representing shares of any one class held by any member may at his request and on surrender of the original certificate(s) be cancelled and a single new certificate for such shares issued in lieu without charge.

(B) If any member shall surrender for cancellation a share certificate representing shares held by him and request the Company to issue in lieu two or more share certificates representing such shares in such proportions as he may specify, the Directors may, if they think fit, comply with such request.

(c) If a share certificate shall be worn out, damaged or defaced, lost, stolen or destroyed (or alleged to have been lost, stolen or destroyed), a new certificate representing the same shares may be issued to the holder upon request subject to delivery up of the old certificate or (if lost, stolen or destroyed or alleged to have been lost, stolen or destroyed) compliance with such conditions as to evidence and indemnity and (in either case) to the payment of out-of-pocket expenses of the Company in connection with the request as the Directors may think fit.

(D) In the case of shares held jointly by several persons any such request may be made by any one of the joint holders.

## CALLS ON SHARES

21. The Directors may from time to time make calls upon the members Calls in respect of any money unpaid on their shares (whether on account of the nominal value of the shares or, when permitted, by way of premium) but subject always to the terms of issue of such shares. A call shall be deemed to have been made at the time when the resolution of the Directors authorising the call was passed and may be made payable by instalments.

22. Each member shall (subject to receiving at least 14 days' notice Payment of calls specifying the time or times and place of payment) pay to the Company at the time or times and place so specified the amount called on his shares. The joint holders of a share shall be jointly and severally liable to pay all calls in respect thereof. A person on whom a call is made remains liable to pay the amount called despite the subsequent transfer of the share in respect of which the call is made. A call may be revoked or postponed, in whole or in part, as the Directors may determine.

11

Interest on calls    23.  If a sum called in respect of a share is not paid before or on the day appointed for payment thereof, the person from whom the sum is due shall pay interest on the sum from the day appointed for payment thereof to the time of actual payment at such rate (not exceeding 25 per cent. per annum) as the Directors determine but the Directors shall be at liberty in any case or cases to waive payment of such interest wholly or in part.

Deemed calls    24.  Any sum (whether on account of the nominal value of the share or by way of premium) which by the terms of issue of a share becomes payable upon allotment or at any fixed date shall for all the purposes of these presents be deemed to be a call duly made and payable on the date on which by the terms of issue the same becomes payable. In case of non-payment all the relevant provisions of these presents as to payment of interest and expenses, forfeiture or otherwise shall apply as if such sum had become payable by virtue of a call duly made and notified.

Differentiation of calls    25.  The Directors may on the allotment or issue of shares differentiate between the allottees or holders as to the amount of calls to be paid and the times of payment.

Payment in advance of calls    26.  The Directors may if they think fit receive from any member willing to advance the same all or any part of the moneys (whether on account of the nominal value of the shares or by way of premium) uncalled and unpaid upon the shares held by him and such payment in advance of calls shall extinguish *pro tanto* the liability upon the shares in respect of which it is made and upon the money so received (until and to the extent that the same would but for such advance become payable) the Company may pay interest at such rate (not exceeding 12 per cent. per annum) as the member paying such sum and the Directors agree upon.

### FORFEITURE AND LIEN

27.  If a member fails to pay in full any call or instalment of a call on or before the due date for payment thereof, the Directors may at any time thereafter serve a notice on him or on a person entitled by transmission to the share in respect of which the call was made requiring payment of so much of the call or instalment as is unpaid together with any interest which may have accrued thereon and any expenses incurred by the Company by reason of such non-payment.

Contents of notice    28.  The notice shall name a further day (not being less than seven days from the date of service of the notice) on or before which, and the place where, the payment required by the notice is to be made, and shall state that in the event of non-payment in accordance therewith the shares on which the call was made will be liable to be forfeited.

Forfeiture    29.  If the requirements of any such notice as aforesaid are not complied with, any share in respect of which such notice has been given may at any time

12

thereafter, before payment of all calls and interest and expenses due in respect thereof has been made, be forfeited by a resolution of the Directors to that effect. Such forfeiture shall include all dividends declared or other amounts payable in respect of the forfeited share and not actually paid before forfeiture. The Directors may accept a surrender of any share liable to be forfeited hereunder.

30.  Until cancelled in accordance with the Statutes, a share so forfeited *Consequences of* or surrendered and all rights attaching to it shall become the property of the *forfeiture* Company and may be sold, re-allotted or otherwise disposed of either to the person who was before such forfeiture or surrender the holder thereof or entitled thereto or to any other person upon such terms and in such manner as the Directors shall think fit and at any time before a sale, re-allotment or disposition the forfeiture or surrender may be annulled by the Directors on such terms as they think fit. The Directors may, if necessary, authorise some person to transfer a forfeited or surrendered share to any such other person as aforesaid. The Company may receive the consideration (if any) for the share on its disposal and may register the transferee as the holder of the share(s).

31.  A member whose shares have been forfeited or surrendered shall cease to be a member in respect of the shares (and shall surrender to the Company for cancellation the certificate for such shares) but shall notwithstanding the forfeiture or surrender remain liable to pay to the Company all moneys which at the date of forfeiture or surrender were presently payable by him to the Company in respect of the shares with interest thereon at such rate (not exceeding 25 per cent. per annum) as the Directors may determine from the date of forfeiture or surrender until payment and the Directors may at their absolute discretion enforce payment without any allowance for the value of the shares at the time of forfeiture or surrender or waive payment in whole or in part.

32.  The Company shall have a first and paramount lien on every share *Liens* (not being a fully paid share) for all moneys (whether presently payable or not) called or payable at a fixed time in respect of such share and, subject to the provisions of the Statutes, the Company shall also have a first and paramount lien on all shares (other than fully paid shares) standing registered in the name of a single member for all the debts and liabilities of such member or his estate to the Company whether the same shall have been incurred before or after notice to the Company of any equitable or other interest of any person other than such member and whether the period for the payment or discharge of the same shall have actually arrived or not and notwithstanding that the same are joint debts or liabilities of such member, of his estate and any other person, whether a member of the Company or not. The Directors may waive any lien which has arisen and may resolve that any share shall for some limited period be exempt wholly or partially from the provisions of this Article.

13

Power of sale      33.   The Company may sell in such manner as the Directors think fit any share on which the Company has a lien, but no sale shall be made unless some sum in respect of which the lien exists is presently payable nor until the expiration of 14 days after a notice in writing stating and demanding payment of the sum presently payable and giving notice of intention to sell in default shall have been given to the holder for the time being of the share or the person entitled thereto by reason of his death or bankruptcy or otherwise by operation of law.

Proceeds of sale      34.   The net proceeds of such sale after payment of the costs of such sale shall be applied in or towards payment or satisfaction of the debts or liabilities in respect whereof the lien exists so far as the same are presently payable and any residue shall (upon surrender to the Company for cancellation of the certificate for the shares sold and subject to a like lien for debts or liabilities not presently payable as existed upon the shares prior to the sale) be paid to the person entitled to the shares at the time of the sale. For giving effect to any such sale the Directors may authorise some person to transfer the shares sold to, or in accordance with the directions of, the purchaser.

Evidence of forfeiture or surrender      35.   A statutory declaration in writing that the declarant is a Director or the Secretary of the Company and that a share has been duly forfeited or surrendered or sold to satisfy a lien of the Company on a date stated in the declaration shall be conclusive evidence of the facts therein stated as against all persons claiming to be entitled to the share. Such declaration and the receipt of the Company for the consideration (if any) given for the share on the sale, re-allotment or disposal thereof together with the share certificate delivered to a purchaser or allottee thereof shall (subject to the execution of a transfer if the same be required) constitute a good title to the share and the person to whom the share is sold, re-allotted or disposed of shall be registered as the holder of the share and shall not be bound to see to the application of the purchase money (if any) nor shall his title to the share be affected by any irregularity or invalidity in the proceedings relating to the forfeiture, surrender, sale, re-allotment or disposal of the share.

## TRANSFER OF SHARES

Form of transfer      36.   All transfers of shares may be effected by transfer in writing in any usual or common form or in any other form acceptable to the Directors and may be under hand only. The instrument of transfer shall be signed by or on behalf of the transferor and (except in the case of fully paid shares) by or on behalf of the transferee. The transferor shall remain the holder of the shares concerned until the name of the transferee is entered in the Register of Members in respect thereof.

Suspension of register      37.   The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine and either

14

generally or in respect of any class of shares. The register shall not be closed for more than 30 days in any Year.

38.   Without prejudice to the provisions of Article 43, the Directors may in their absolute discretion refuse to register any transfer of shares (not being fully paid shares) provided that, where any such shares are admitted to the official list maintained by the UK Listing Authority, such discretion may not be exercised in such a way as to prevent dealings in the shares of that class from taking place on an open and proper basis. The Directors may also refuse to register an allotment or transfer of shares (whether fully paid or not) in favour of more than four persons jointly. If the Directors refuse to register an allotment or transfer, whether pursuant to the provisions of this Article or Article 43, they shall as soon as practicable and in any event within two months after the date on which a letter of allotment or transfer was lodged with the Company send to the allottee or transferee notice of the refusal giving reasons for the refusal.

39.   (A) The Directors may decline to recognise any instrument of transfer unless the instrument of transfer is in respect of only one class of share and is lodged (duly stamped if required) at the Transfer Office accompanied by the relevant share certificate(s) and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer (and, if the instrument of transfer is executed by some other person on his behalf, the authority of that person so to do). In the case of a transfer by a recognised clearing house or a nominee of a recognised clearing house or of a recognised investment exchange the lodgment of share certificates will only be necessary if, and to the extent that, certificates have been issued in respect of the shares in question. *Refusal to register*

(B) All instruments of transfer which are registered may be retained by the Company. *Requirements of transfer*

40.   No fee will be charged by the Company in respect of the registration of any instrument of transfer or probate or letters of administration or certificate of marriage or death or stop notice or power of attorney or other document relating to or affecting the title to any shares or otherwise for making any entry in the Register of Members affecting the title to any shares. *No fees*

41.   The Company shall be entitled to destroy all instruments of transfer which have been registered at any time after the expiration of six Years from the date of registration thereof and all dividend mandates and notifications of change of address at any time after the expiration of two Years from the date of recording thereof and all share certificates which have been cancelled at any time after the expiration of one Year from the date of the cancellation thereof and it shall conclusively be presumed in favour of the Company that every entry in the register purporting to have been made on the basis of an instrument of transfer or other document so destroyed was duly and properly made and every instrument of transfer so destroyed was a valid and effective instrument *Destruction of transfers*

15

duly and properly registered and every share certificate so destroyed was a valid and effective certificate duly and properly cancelled and every other document hereinbefore mentioned so destroyed was a valid and effective document in accordance with the recorded particulars thereof in the books or records of the Company. Provided always that:—

(i) The provisions aforesaid shall apply only to the destruction of a document in good faith and without notice of any claim (regardless of the parties thereto) to which the document might be relevant;

(ii) Nothing herein contained shall be construed as imposing upon the Company any liability in respect of the destruction of any such document earlier than as aforesaid or in any other circumstances which would not attach to the Company in the absence of this Article;

(iii) References herein to the destruction of any document include references to the disposal thereof in any manner.

*Untraced shareholders*    42. (1) The Company shall be entitled to sell at the best price reasonably obtainable at the time of sale the shares of a member or the shares to which a person is entitled by virtue of transmission if and provided that:—

(i) during the period of 12 years prior to the date of the publication of the advertisements referred to in paragraph (ii) below (or, if published on different dates, the first thereof) at least three dividends in respect of the shares have become payable and no dividend in respect of those shares has been claimed;

(ii) the Company shall on expiry of such period of 12 years have inserted advertisements in both a national daily newspaper and in a newspaper circulating in the area in which the last known address of the member or the address at which service of notices may be effected under these presents is located giving notice of its intention to sell the said shares;

(iii) during the period of three months following the publication of such advertisements (or, if published on different dates, the second thereof) the Company shall have received no communication from such member or person; and

(iv) notice shall have been given to the Stock Exchange of its intention to make such sale.

(2) To give effect to any such sale the Company may appoint any person to execute as transferor an instrument of transfer of the said shares and such instrument of transfer shall be as effective as if it had been executed by the holder of or person entitled by transmission to such shares and the title of the transferee shall not be affected by any irregularity or invalidity in the proceedings relating thereto. The net proceeds of sale shall belong to the

16

Company which shall be obliged to account to the former member or other person previously entitled as aforesaid for an amount equal to such proceeds and shall enter the name of such former member or other person in the books of the Company as a creditor for such amount which shall be a permanent debt of the Company. No trust shall be created in respect of the debt, no interest shall be payable in respect of the same and the Company shall not be required to account for any money earned on the net proceeds, which may be employed in the business of the Company or invested in such investments (other than shares of the Company or its holding company if any) as the Directors may from time to time think fit.

## UNITED KINGDOM CONTROL

43.                                                                    Individual Foreign
                                                                       Shareholding Restriction

(A) (i)  It is a cardinal principle that the Company should be and remain under United Kingdom control. The purpose of this Article is to support this principle by imposing restrictions on the holding of shares by Foreign Persons. These restrictions comprise provisions ensuring that no Foreign Person is able to be interested in Shares carrying more than 15% of those votes (the **"Individual Foreign Shareholding Restriction"**).

(ii)  The Individual Foreign Shareholding Restriction is set out in paragraph (B) below. Paragraphs (C) and (D) below require that registers of Foreign-held Shares and of Interests of Foreign Persons be maintained. Certain words and expressions used in this Article are defined in paragraphs (E) to (H) below and various ancillary provisions are contained in paragraphs (I) and (J) below.

(iii)  This Article shall apply notwithstanding any provisions to the contrary in any other Article but subject to the provisions of Article 15(H).

(B) (i)  In this paragraph (B), the expression **"Irregular Foreign Person"** means any Foreign Person who has Interests in Shares which carry more than 15% of either:

(a)  the votes which are ordinarily eligible to be cast on a poll at General Meetings of the Company; or

(b)  the votes which are attributable to all Shares.

(ii)  The Directors shall not register any allotment or transfer of a Share to any person whom the Directors believe is an Irregular Foreign Person or to any other person if the Directors believe that, following the allotment or transfer, an Irregular Foreign Person would have an Interest in the relevant Share.

17

(iii) If at any time, the Directors believe that a person is an Irregular Foreign Person, they shall as soon as is reasonably practicable give notice in writing to that person and to the registered holders of all Shares in which they believe that person is Interested requiring them within 21 days of the date of service of the notice (or such longer time as the Directors consider reasonable) to dispose of such number of Shares as will cause the relevant person to cease to be an Irregular Foreign Person.

(iv) A Share in respect of which such a notice (a **"Disposal Notice"**) has been served shall not confer any right to receive notice of, or to attend and vote at, General Meetings of the Company or other meetings of shareholders or any class of shareholder from (and including) the date of service until the time of its transfer to another person so that it ceases to be a Foreign-held Share or, if earlier, the time at which the relevant Disposal Notice is withdrawn.

(v) If the requirements of any Disposal Notice are not complied with to the satisfaction of the Directors within the period specified in the relevant notice, unless the relevant Disposal Notice is withdrawn, the Director shall arrange for the Company to sell the Shares to which that notice relates. For this purpose, the Directors may make such arrangements as they deem appropriate. In particular, without limitation, they may authorise any officer or employee of the Company to execute any transfer or other document on behalf of the holder or holders of the relevant Share and, in the case of a Share in uncertificated form, may make such arrangements as they think fit on behalf of the relevant holder or holders to transfer title to the relevant Share through a Relevant System.

(vi) Any sale pursuant to sub-paragraph (v) above shall be at the best price reasonably obtainable but the Directors shall not be liable to the holder or holders of the relevant Share for any alleged deficiency in the amount of the sale proceeds or any other matter relating to the sale.

(vii) The net proceeds of the sale of any Share under this paragraph (B) shall be paid over by the Company to the former holder or holders of the relevant Share upon surrender of any certificate relating to it, without interest. The receipt of the Company shall be a good discharge for the purchase money.

(viii) The title of any transferee of shares shall not be affected by an irregularity or invalidity of any actions purportedly taken pursuant to this paragraph (B).

Identification and
registration
of Foreign-held
Shares

(C) (i) The Directors shall not register any person as a holder of a Share unless they have received:

18

(a) a declaration stating either (i) that, upon registration, the relevant Share will not be a Foreign-held Share or (ii) that, upon registration, that Share will be a Foreign-held Share;

(b) such evidence (if any) as the Directors may require of the authority of the signatory of that declaration;

(c) such evidence or information (if any) as to the matters referred to in the declaration as the Directors consider appropriate; and

This shall not, however, apply to the registration of an allottee of any Share which is being issued paid up by way of capitalisation of profits or reserves or to the registration of a person as a trustee of any Profit-sharing Scheme or Share Scheme (as defined in sub-paragraph (E)(i) below).

(ii) The Directors may at any time:

(a) give notice in writing to the holder (or to any one of the joint holders) of a Share requiring him, within 21 days of the date of service of the notice (or such longer time as the Directors consider reasonable), to deliver to the Company a declaration as to whether or not the relevant Share is a Foreign-held Share; and

(b) to provide such evidence or information (if any) as to the matters referred to in the declaration as the Directors consider appropriate.

(iii) If at any time, the Directors believe that a Share which is not then treated as a Foreign-held Share may be such a Share, they shall give notice in writing to the holder (or to any one of joint holders) requiring him, within 21 days of the date of service of the notice (or such longer time as the Directors consider reasonable) to show to their satisfaction that the relevant Share is not a Foreign-held Share.

(iv) If within the period specified in a notice served under sub-paragraph (iii) above, or such longer time as the Directors consider reasonable, the Directors are not satisfied that the relevant Share is not a Foreign-held Share, they shall declare that Share to be a Foreign-held Share.

(v) The Directors shall maintain a separate register in which shall be entered particulars of any Share which:

(a) has been acknowledged by the holder (or by any one of joint holders) or the Operator (as defined in the Crest Regulations) to be a Foreign-held Share; or

19

(b) has been declared to be a Foreign-held Share by virtue of a declaration of the Directors made pursuant to sub-paragraph (iv) above;

and, in either case, which has not ceased to be a Foreign-held Share.

(vi) The Directors shall remove from the Foreign-held Share Register any Share in respect of which they have received:

(a) a declaration stating that the relevant Share is not a Foreign-held Share;

(b) such evidence (if any) as the Directors may require of the authority of any signatory of that declaration; and

(c) such evidence or information (if any) as to the matters referred to in the declaration as the Directors consider appropriate.

This shall not apply, however, if the Directors are not satisfied that the relevant Share is not a Foreign-held Share.

(vii) A declaration under any of sub-paragraphs (i), (ii) or (vi) above shall not be valid unless it is in such form as the Directors may from time to time prescribe or approve and is either:

(a) signed by or on behalf of the person who is registered, or is proposed to be registered, as a holder of the relevant Share or, in the case of a corporation, executed under the seal of the corporation or signed on its behalf by an attorney or a duly authorised officer or agent; or

(b) in the case of shares in uncertificated form, received through a Relevant System.

(viii) A declaration made pursuant to the Article which this Article replaced (or pursuant to regulations made under that Article) as to whether or not a Share is or will be a Foreign-held Share (as defined in that Article) shall be deemed for the purposes of this paragraph (C):

(a) to be a declaration made pursuant to sub-paragraph (i) above; and

(b) in the case of a declaration that the relevant Share is or will be a Foreign-held Share (as so defined), to comprise an acknowledgement by the holder (or one of the joint holders) or the Operator that the Share is a Foreign-held Share (as defined in paragraph (F) below).

(D) (i) The provisions of Part VI of the Act shall apply to the Company as if such provisions extended to Interests of Foreign Persons. The Company, its Members and all persons Interested in Shares shall

20

have the rights and obligations referred to in Part VI of the Act in relation to all Interests of Foreign Persons.

(ii) The Directors shall maintain a register (which shall be separate from that maintained under Part VI of the Act) in which shall be entered particulars of Interests of Foreign Persons disclosed to the Company.

<div style="text-align: right; font-size: small;">Identification and registration of Interests of Foreign Persons</div>

(E) (i) Subject to sub-paragraph (ii) below, in this Article, the word **"Share"** means any share in the capital of the Company which:

<div style="text-align: right; font-size: small;">Shares to which this Article applies</div>

    (a) carries the right to vote on a poll at General Meetings of the Company whether ordinarily or only in certain circumstances; and

    (b) at the material time, is not either:

        (I) held by the trustees of any profit sharing scheme established by the Company and approved by the Board of Inland Revenue in accordance with the provisions of Sections 186 and 187 and Schedules 9 and 10 of the Income and Corporation Taxes Act 1988 (a "profit-sharing scheme"); or

        (II) held pursuant to arrangements approved by the Directors by trustees for the benefit of employees or officers (or former employees or officers) of the Company, of the Company's subsdiaries or any associated undertakings or their wives, husbands, widows, widowers or children or step-children under the age of 18 (a "Share Scheme").

(ii) A Share at any time which does not carry a present right to vote at any General Meeting of the Company shall be treated for the purposes of paragraphs (A) and (B) of this Article as if it were not a "Share" unless the Directors shall have resolved that those paragraphs should apply to it. The Directors may so resolve at any time and from time to time at their discretion and may, likewise, revoke any such resolution which they have previously passed.

(iii) If any such resolution is passed in respect of a Share which is a Foreign-held Share, for the purposes of sub-paragraph (B)(iii) above, particulars of that Share shall be deemed to have been entered into the Foreign-held Share Register at the time of the passing of the relevant resolution.

(F) (i) Subject to sub-paragraph (ii) below in this Article, the expression **"Foreign-held Share"** means any Share in which any Foreign Person has an Interest.

<div style="text-align: right; font-size: small;">Meaning of "Foreign-held Shares" and "Foreign Persons"</div>

(ii) For the purposes of paragraph (A) above, Shares registered in the Foreign-held Share Register shall be deemed to be Foreign-held

<div style="text-align: center;">21</div>

Shares and Shares not so registered shall be deemed not to be Foreign-held Shares.

(iii) In this Article the expression **"Foreign Person"** means any person who is a Foreigner, a Foreign Corporation or a Corporation under Foreign Control and, for this purpose:

**"Corporation under Foreign Control"** means any corporation (other than a Foreign Corporation):

(a) of which one third or more of the directors (or persons occupying the position of directors by whatever name called) are Foreigners or Foreign Corporations or are accustomed to act in accordance with the suggestions, instructions or directions of Foreigners or Foreign Corporations; or

(b) of which shares carrying more than thirty per cent. of the votes which are ordinarily eligible to be cast on a poll at General Meetings of the corporation are for the time being held by Foreigners or Foreign Corporations.

**"Foreign Corporation"** means:

(a) any corporation other than a corporation which is incorporated under the laws of any part of and which has its principal place of business and central management and control in the United Kingdom; or

(b) a government or government department or government agency or body other than of the United Kingdom or any part thereof; or

(c) any municipal, local, statutory or other authority or any undertaking or body established in any country other than the United Kingdom.

**"Foreigner"** means any individual who is not a British citizen, a British Dependent Territories citizen or a British Overseas citizen by virtue of the British Nationality Act 1981.

Meaning of "Interest" in Shares

(G) (i) Subject to sub-paragraph (ii) to (viii) below, for the purposes of this Article, a person shall be deemed to have an **"Interest"** in Shares if he has any interest which would be taken into account in deciding whether a notification by that person to the Company would be required under Part VI of the Act if all Shares were "relevant share capital" for the purposes of that Part.

(ii) Any right pursuant to the provisions of any agreement to control, influence or participate in the exercise of any right conferred by the holding of any Share (including, without prejudice to the generality of the foregoing, any right relating to the retention or disposal of any Share) shall be deemed to comprise such an interest and, for the purpose of this paragraph (ii):

22

(a) any restraint or restriction to which any such right is or may be subject shall be disregarded;

(b) **"agreement"** includes any agreement, arrangement or understanding (whether formal or informal) irrespective of whether such agreement, arrangement or understanding includes a provision of the acquisition by any one or more of the parties to it of any interest in any Share or is part of a proposal to obtain or consolidate control of the Company; and

(c) **"provisions of any agreement"** includes any undertaking, expectation or understanding (whether express or implied and whether absolute or not) operative under any agreement, except that a right pursuant to an agreement which is not legally binding shall not be taken into account in determining whether a person has an interest unless the agreement involves mutuality in the undertakings, expectations or understandings of the parties to it.

(iii) The following interests shall be disregarded:

(a) any interest of a bare trustee or which, if the incidents of the interest are governed by a law other than the law of England and Wales, is in all material respects identical to the interest of a bare trustee under the law of England and Wales;

(b) any interests which exist only by virtue of an obligation (contingent or otherwise) to purchase or subscribe for Shares pursuant to underwriting or sub-underwriting arrangements approved by the Directors and, for a period of three months following the relevant purchase or subscription, in respect of interests in Shares purchased or subscribed pursuant to such an obligation;

(c) any interest of a person which exists only by virtue of the entering into or performance by that person of an agreement approved by the Directors under which that person (whether alone or with other persons) is to procure purchasers or subscribers of the relevant Shares, as principal or as agent, as part of the distribution of those Shares (whether to the public or otherwise), provided that such interests shall only be disregarded for a period of three months from the date of the relevant agreement;

(d) any interest of either the Chairman of a meeting of the Company or of a meeting of the holders of Shares of any class (acting in that capacity);

(e) any interests of a Clearing House or Depositary acting in its capacity as such;

23

(f) any interest of a person which exists only by virtue of that person being a trustee of:

    (I) any retirement benefits scheme for the employees of a business or undertaking carried on (wholly or mainly) in the United Kingdom other than by a Foreign Person which is, or is treated by the Commissioners of Inland Revenue as, an exempt approved scheme for the purposes of Chapter 1 of Part XIV of the Income and Corporation Taxes Act 1988; or

    (II) any charity which is registered under the provisions of the Charities Act 1993; or

    (III) any exempt charity within the meaning of that Act,

    other than (in any case) a retirement benefits scheme, charity or exempt charity of which the majority of the trustees are Foreign Persons.

(iv) In calculating the number of Shares in which a trader in securities is interested at any particular time, the trader's gross sales (up to a maximum equal to the traders gross purchases) shall be deducted from the number of Shares in which he would be interested but for this sub-paragraph (iv) and, in this paragraph:

"**gross sales**" means the number of Shares which, at the relevant time, the trader shall be under an obligation to sell pursuant to contracts entered into in the ordinary course of his business as a trader in securities each of which requires delivery to be made not later than 14 days after the contract shall have been entered into; and

"**gross purchases**" means the number of Shares which, at the relevant time, the trader shall be under an obligation to purchase pursuant to such contracts.

(v) Section 209(1)(a) of the Act shall be disregarded.

(vi) If, in respect of any Shares, the Directors resolve that they have made reasonable enquiries and have been unable to determine whether or not a specified person has an Interest in the relevant Shares, that person shall be deemed to have such an Interest.

(vii) Where Interests in Shares are held by a Clearing House or Depositary in its capacity as such:

    (a) any person who has rights in relation to Shares in which the Clearing House or Depositary holds such an Interest shall be deemed to be Interested in the number of Shares for which the Clearing House of Depositary is or may become liable to account to him; and

(b) any Interest which (by virtue of his being a tenant in common in relation to or holding of common property Interests in Shares so held by the Clearing House or Depository or otherwise) he would otherwise be treated as having in a larger number of Shares shall (in the absence of any other reason why he should be so treated) be disregarded.

(viii) **"Interested"** shall be construed accordingly.

(H) In this Article: <span style="float:right">Other definitions</span>

**"Act"** means the Companies Act 1985 (as amended), and all regulations made thereunder, as in force on 1 March 1998;

**"Clearing House"** means a recognised clearing house or a nominee of such a clearing house or of a recognised investment exchange (in each case as defined in the Financial Services and Markets Act 2000) or a pooled nominee service provided by an operator of any Relevant System (including, for the avoidance of doubt, CREPON Limited when acting in its capacity as nominee in connection with the pooled nominee service provided by CRESTCo Limited);

**"Crest Regulations"** means the Uncertificated Securities Regulations 2001;

**"Depositary"** means a person appointed by or with the approval of the Directors to issue depositary receipts or other securities which evidence the deposit of Shares or the right to receive or to call for the delivery of Shares or a custodian or nominee appointed by or with the approval of any such person in connection with any such securities or any clearing agent for such securities;

**"Foreign-held Share Register"** means the register maintained pursuant to paragraph (C) above;

**"Relevant System"** means a relevant system as defined as in Crest Regulations;

**"United Kingdom"** means Great Britain, Northern Ireland, the Channel Islands and the Isle of Man,

and reference to Shares being **"in uncertificated form"** are reference to Shares being uncertificated units of a security as defined in the Crest Regulations.

(I) (i) The Directors shall be entitled to presume without enquiry, unless any <span style="float:right">Miscellaneous provisions</span> Director has reason to believe otherwise, that all Shares particulars of which are entered in the Foreign-held Shares Register (including those entered by reason of sub-paragraph (C) (viii) above) are

Foreign-held Shares, that all other Shares are not Foreign-held Shares and that no person is an Irregular Foreign Person.

(ii) The Directors shall not be required to give any reasons for any decision or determination pursuant to this Article and any such determination or decision shall be final and binding on all persons unless and until it is revoked or changed by the Directors. Any disposal or transfer made by or on behalf of the Board or any Director pursuant to this Article shall be binding on all persons and shall not be open to challenge on any ground whatsoever.

(iii) The Directors shall not be obliged to serve any notice required under this Article upon any person if they do not know either his identity or his address. The absence of service of such a notice in such circumstances any accidental error in or failure to give any notice to any person upon whom notice is required to be served under this Article shall not prevent the implementation of or invalidate any procedure under this Article.

(iv) The provisions of Articles 136 to 142 shall apply to the service upon any Member of any notice required by this Article. Any notice required by this Article to be served upon a person who is not a Member or to a person who is a Member but whose address is not within the United Kingdom and who has failed to supply to the company an address within the United Kingdom pursuant to Article 136, shall be deemed validly served if such notice is sent through the post in a pre-paid cover addressed to that person or Member at the address if any, at which the Directors believe him to be resident or carrying on business or, in the case of a holder of depository accepts or similar securities, to the address, if any, in the register of holders of the relevant securities. Service shall, in such a case be deemed to be effected on the day of posting and it shall be sufficient proof of service if that notice was properly addressed, stamped and posted.

(v) Any notice required or permitted to be given pursuant to this Article may relate to more than one Share and shall specify the Share or Shares to which it relates.

(vi) The Directors shall be under no liability to the Company or any other person for:

(a) failing to treat a Share (other than one particulars of which are entered in the Foreign-held Share Register) as a Foreign-held Share;

(b) treating a Share particulars of which are entered in the Foreign-held Share Register as a Foreign-held Share; or

26

(c) doing anything or failing to do anything pursuant to this Article 43 in consequence of any such classification,

unless any Director has reason to believe that the classification of the relevant Share is incorrect.

(J)    The Directors may make such regulations as they consider appropriate and as the Special Shareholder may approve with a view to ensuring that any shares can become or remain units of "a participating security" (as defined in the Uncertificated Securities Regulations 2001) without prejudicing the fulfilment of the objective of this Article 43. The Directors may also from time to time abrogate, vary or otherwise modify such regulations in such manner as they consider appropriate and as the Special Shareholder may approve. This Article 43 shall not apply to the extent specified in such regulations, which shall bind the Company and its members to the same extent as if they had been set out herein. <span>Crest</span>

## TRANSMISSION OF SHARES

44.    In case of the death of a shareholder, the survivors or survivor where the deceased was a joint holder, and the executors or administrators of the deceased where he was a sole or only surviving holder shall be the only person or persons recognised by the Company as having any title to or interest in the shares, but nothing in this Article shall release the estate of a deceased holder (whether sole or joint) from any liability in respect of any share held by him. <span>Death of shareholder</span>

45    Any person becoming entitled to a share in consequence of the death or bankruptcy of a member or of any other event giving rise by operation of law to such entitlement may (subject as herein provided) upon supplying to the Company such evidence as the Directors may reasonably require to show his title to the share either be registered himself as holder of the share upon giving to the Company notice in writing of his desire to be so registered or transfer such share to some other person. All the limitations, restrictions and provisions of these presents relating to the right to transfer and the registration of transfers of shares shall be applicable to any such notice or transfer as aforesaid as if the death or bankruptcy of the member or other event as aforesaid had not occurred and the notice or transfer were a transfer executed by such member. The Directors may give notice requiring a person to notify the Company in writing of his desire to be so registered or transfer, as aforesaid, such share to some other person. If that notice is not complied with within 60 days, the Directors may withhold payment of all dividends and other amounts payable in respect of the share until the notice as aforesaid has been given or the transfer as aforesaid has been made. <span>Entitlement on death or bankruptcy</span>

46.    Save as otherwise provided by or in accordance with these presents, a person becoming entitled to a share in consequence of the death or bankruptcy <span>Entitlement to dividend etc.</span>

27

of a shareholder or other event giving rise by operation of law to such entitlement (upon supplying to the Company such evidence as the Directors may reasonably require to show his title to the share) shall be entitled to the same dividends and other advantages as those to which he would be entitled if he were the holder of the share except that he shall not be entitled in respect thereof (except with the authority of the Directors) to receive notice of or exercise any right conferred by membership in relation to meetings of the Company or a separate meeting of the holders of a class of shares until he shall have been registered as a member in respect of the share.

## GENERAL MEETINGS

**Annual General Meetings**

47. An Annual General Meeting shall be held once in each period of 6 months beginning on the day following the Company's accounting reference date at such place, date and time as may be determined by the Directors.

**Other General Meetings**

48. The Directors may whenever they think fit, and shall on requisition in accordance with the Statutes, proceed to convene a General Meeting.

## NOTICE OF GENERAL MEETINGS

**Notice of meetings**

49. An Annual General Meeting shall be called by notice of at least 21 days. Any other General Meeting shall be called by notice of at least 14 days. The period of notice shall in each case be exclusive of the day on which it is served or deemed to be served and of the day on which the meeting is to be held and shall be given in manner hereinafter mentioned to all members other than such (if any) as are not under the provisions of these presents entitled to receive such notices from the Company and to all Directors and the Auditors: Provided that a General Meeting notwithstanding that it has been called by a shorter notice than that specified above shall be deemed to have been duly called if it is so agreed:—

(A) in the case of an Annual General Meeting by all the members entitled to attend and vote thereat; and

(B) in the case of a General Meeting other than an Annual General Meeting by a majority in number of the members having a right to attend and vote thereat, being a majority together holding not less than 95 per cent. in nominal value of the shares giving that right.

Provided also that the accidental omission to give notice to or, in cases where it should have been sent out with the notice, an instrument of proxy to, or the non-receipt of either by, any person entitled thereto shall not invalidate any General Meeting or any proceedings thereat.

**Contents of notice**

50. (A) Every notice calling a General Meeting shall specify the place and the date and time of the meeting and there shall appear with reasonable prominence in every such notice a statement that a member is entitled to

28

appoint another person or persons (pursuant to Article 68) as his proxy or proxies to exercise all or any of his rights to attend, to speak and to vote, and that a proxy or proxies need not be a member of the Company.

(B) In the case of an Annual General Meeting, the notice shall also specify the meeting as such.

(c) In the case of any General Meeting the notice shall specify the general nature of the business to be transacted; and if any resolution is to be proposed as a Special Resolution, the notice shall contain a statement to that effect.

## PROCEEDINGS AT GENERAL MEETINGS

51. The Chairman of the Board of Directors, failing whom the Deputy Chairman (and, if more than one, the Deputy Chairman who shall have held that office for the greater or greatest length of time), shall preside as chairman at a General Meeting. If there be no such Chairman or Deputy Chairman, or if at any meeting neither shall be present within five minutes after the time appointed for holding the meeting and willing to act, the Directors present shall choose one of their number (or, if no Director be present or if all the Directors present decline to take the chair, a member may be elected by a resolution of the Company passed at the meeting), to be chairman of the meeting. *Chairman of meetings*

52. No business other than the appointment of a chairman shall be transacted at any General Meeting unless a quorum is present at the time when the meeting proceeds to business. Five members present in person or by proxy and entitled to vote at that meeting shall be a quorum for all purposes. *Quorum*

53. If within fifteen minutes from the time appointed for a General Meeting (or such longer interval as the chairman of the meeting may think fit to allow) a quorum is not present, or if during the meeting a quorum ceases to be present, the meeting, if convened on the requisition of members, shall be dissolved. In any other case it shall stand adjourned to such other day (not being less than seven days thereafter) and such time and place as may have been specified for the purpose in the notice convening the meeting or (if not so specified) as the chairman of the meeting may determine and in the latter case not less than seven days' notice of the adjourned meeting shall be given in like manner as in the case of the original meeting. At the adjourned meeting any two members present in person or by proxy shall be a quorum. If a quorum is not present within fifteen minutes from the time fixed for the start of the adjourned meeting, the meeting shall be dissolved.

54. The chairman of the meeting may with the consent of any General Meeting at which a quorum is present (and shall if so directed by the meeting) adjourn the meeting from time to time (or *sine die*) and from place to place, but no business shall be transacted at any adjourned meeting except business which *Absence of quorum*

might lawfully have been transacted at the meeting from which the adjournment took place. Where a meeting is adjourned *sine die*, the time and place for any adjourned meeting shall be fixed by the Directors. When a meeting is adjourned for 30 days or more or *sine die*, not less than seven days' notice of any adjourned meeting shall be given in like manner as in the case of the original meeting.

Notice of
adjournment
Adjournment

55.  Save as hereinbefore expressly provided, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

Amendment to
resolutions

56.  If an amendment shall be proposed to any resolution under consideration but shall in good faith be ruled out of order by the chairman of the meeting the proceedings on the substantive resolution shall not be invalidated by any error in such ruling. In the case of a resolution duly proposed as a Special Resolution no amendment thereto (other than a mere clerical amendment to correct a patent error) may in any event be considered or voted upon. Subject to the Statutes and without prejudice to any other restriction on the right to move amendments to Substantive Resolutions, in the case of a Substantive Resolution duly proposed as an Ordinary Resolution, no amendment thereto (other than a mere clerical amendment to correct a patent error) shall be considered or voted upon unless written notice of the intention to move it shall have been lodged at the Office no later than the seventh day prior to the date appointed for the holding of the relevant meeting (or adjourned meeting).

Voting

57.  At any General Meeting all Substantive Resolutions (and proposed amendments to Substantive Resolutions) put to the vote of the meeting shall be determined on a poll and all other resolutions (including any amendments thereto) put to the vote of the meeting shall be decided on a show of hands unless a poll is (before or on the declaration of the result of the show of hands) demanded by:—

(i)   the chairman of the meeting; or

(ii)  not less than three members present in person or by proxy and entitled to vote at the meeting; or

(iii) a member or members present in person or by proxy and representing not less than one-tenth of the total voting rights of all the members having the right to vote at the meeting; or

(iv)  a member or members present in person or by proxy and holding shares in the Company conferring a right to vote at the meeting being shares on which an aggregate sum has been paid up equal to not less than one-tenth of the total sum paid up on all the shares conferring that right.

30

58.   A demand for a poll may, before the poll is taken, be withdrawn but only with the approval of the chairman of the meeting. A demand so withdrawn shall not be taken to have invalidated the result of a show of hands declared before the demand was made. In the case of a poll demanded before the declaration of the result of show of hands, the meeting shall continue as if the demand had not been made. If a poll is required or demanded, it shall be taken in such a manner (including the use of ballot or voting papers or tickets) as the chairman of the meeting may direct, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was required or demanded. The chairman of the meeting may (and if so directed by the meeting shall) appoint scrutineers (who need not be members). The chairman may decide the time and place for the declaration of the result of the poll or may decide that the result should be publicised as soon as is reasonably practicable through The Stock Exchange or in such other manner as he may determine. The chairman may, having announced his decision, adjourn or close the relevant meeting.

59.   On a vote on a resolution at a meeting on a show of hands, a **Validity and result of vote** declaration by the Chairman that the resolution has or has not been passed or has been passed with a particular majority, is conclusive evidence of that fact without proof of the number or proportion of the votes recorded in favour of or against the resolution. An entry in respect of such a declaration in minutes of the meeting recorded in accordance with the Companies Acts is also conclusive evidence of that fact without such proof. This Article does not have effect if a poll is demanded in respect of the resolution (and the demand is not subsequently withdrawn).

60.   A poll demanded on the election of a chairman of the meeting or on **Taking of polls** a question of adjournment shall be taken forthwith. A poll required or demanded on any other question shall be taken either immediately or at such subsequent time (not being more than 30 days from the date of the meeting) and place as the chairman of the meeting may direct. No notice need be given of a poll not taken immediately if the time, date and place at which it is to be taken are announced at the meeting at which it is required or demanded. In any other case, at least seven days' notice shall be given specifying the time, date and place at which the poll is to be taken.

The requirement or demand for a poll shall not prevent the continuance of the meeting for the transaction of any business other than the question on which the poll has been required or demanded.

61.   Subject to the Statutes and without prejudice to any other restriction on the consideration of resolutions at General Meetings, no Substantive Resolution shall be considered or voted upon at a General Meeting unless either (1) the full text of the relevant Substantive Resolution (or, in the case of a Substantive Resolution to be considered or voted upon at an Annual General Meeting, reference to the substance of such Resolution) is set out in the notice

31

of the relevant meeting or (2) written notice of the intention to propose the Substantive Resolution shall have been lodged at the Office no later than (i) in the case of an Annual General Meeting the proposed date of which shall have been announced by the Company prior to the despatch of the notice of meeting, no later than the sixtieth day prior to that proposed date or, if later, the twenty-first day after the date of the relevant announcement or (ii) in all other cases, the seventh day prior to the date appointed for the holding of the relevant meeting (or adjourned meeting). A valid notice given pursuant to this Article 61 shall not be rendered invalid by any subsequent change in the date or proposed date of the relevant General Meeting.

## VOTES OF MEMBERS

Voting rights

62.  Subject to any special rights or restrictions as to voting attached by or in accordance with these presents to any shares or class of shares, on a show of hands every member who is present in person and every proxy present who has been duly appointed by a member entitled to vote on the resolution shall have one vote and on a poll every member who is present in person or by proxy shall have one vote for every share of which he is the holder.

Jointholders

63.  In the case of joint holders of a share the vote of the senior who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register of Members in respect of the share.

Receiver etc. for shareholder

64.  Where in England or elsewhere a receiver or other person (by whatever name called) has been appointed by any court claiming jurisdiction in that behalf to exercise powers with respect to the property or affairs of any member on the ground (however formulated) of mental disorder, the Directors may in their absolute discretion, upon or subject to production of such evidence of the appointment as the Directors may require, permit such receiver or other person on behalf of such member to vote in person or by proxy at any General Meeting or to exercise any other right conferred by membership in relation to meetings of the Company.

Suspension of voting etc. rights

65.  (A) No member shall, unless the Directors otherwise determine, be entitled in respect of shares held by him to vote at a General Meeting or meeting of the holders of any class of shares of the Company either personally or by proxy or to exercise any other right conferred by membership in relation to meetings of the Company or meetings of the holders of any class of shares of the Company if any call or other sum presently payable by him to the Company in respect of such shares remains unpaid.

(B) If any member, or any other person appearing to be interested in shares (within the meaning of Part 22 of the Companies Act 2006) held by such member, has been duly served with a notice under Section 793 of the

32

Companies Act 2006 and is in default for the prescribed period in supplying to the Company the information thereby required then (unless the Directors otherwise determine), in respect of the shares in the shareholding account in the Register of Members which comprises or includes the shares in relation to which the default occurred (or such of them as the Directors may determine from time to time) (all, or the relevant number as appropriate, of such shares being the "default shares" which expression shall include any further shares which are issued in respect of such shares), for so long as the default continues the member shall not, nor shall any transferee to whom any of such shares are transferred otherwise than pursuant to an approved transfer or pursuant to Article 65(c)(ii)(a), be entitled to vote either personally or by representative or by proxy at a General Meeting of the Company or a meeting of the holders of any class of shares of the Company or to exercise any other right conferred by membership in relation to General Meetings of the Company or meetings of the holders of any class of shares of the Company.

(c) Where the default shares represent at least 0.25 per cent in nominal value of the issued share capital of the class of shares concerned (excluding any shares in the Company held as treasury shares), the Directors may in their absolute discretion at any time by a notice (a "direction notice") to such members direct that:—

(i)     in respect of the default shares any dividend or part thereof or other money which would otherwise be payable on such shares shall be retained by the Company without any liability to pay interest thereon when such money is finally paid to the member and the member shall not be entitled to elect to receive shares in lieu of dividend; and/or

(ii)    no transfer of any of the shares held by such member shall be registered unless:—

(a)     the member is not himself in default as regards supplying the information requested and the transfer is of part only of the member's holding which, when presented for registration, is accompanied by a certificate by the member in a form satisfactory to the Directors to the effect that after due and careful enquiry the member is satisfied that no person in default as regards supplying such information is interested in any of the shares the subject of the transfer; or

(b)     the transfer is a transfer duly made in accordance with Article 43(G); or

(c)     the transfer is an approved transfer.

33

The Company shall send to each other person appearing to be interested in the shares the subject of any direction notice a copy of the notice, but the failure or omission by the Company to do so shall not invalidate such notice.

(D) (i) Save as herein provided, any direction notice shall have effect in accordance with its terms for so long as the default in respect of which the direction notice is issued continues and shall cease to have effect thereafter upon the Directors so determining (such determination to be made within a reasonable period, not exceeding one week of the default being duly remedied). Written notice of such determination shall be given to the member.

(ii) Any direction notice shall cease to have effect in relation to any shares which are transferred by such member by means of an approved transfer or in accordance with Article 65(c)(ii)(a) above.

(E) For the purpose of this Article:—

(i) a person shall be treated as appearing to be interested in any shares if the member holding such shares has given to the Company a notification whether under the said Section 793 or otherwise which either (a) names such person as being so interested or (b) fails to establish the identities of those interested in the shares and (after taking into account the said notification and any other relevant Section 793 notification) the Company knows or has reasonable cause to believe that the person in question is or may be interested in the shares;

(ii) the prescribed period is 28 days from the date of service of the notice under the said Section 793 except that if the shares in respect of which the said notice is given represent at least 0.25 per cent. in nominal value of the issued share capital of the class of shares concerned at the time of the giving of the relevant notice under the said Section 793, the prescribed period is 14 days from such date; and

(iii) a transfer of shares is an approved transfer if but only if:—

(A) it is a transfer of shares to an offeror by way of or in pursuance of acceptance of a

34

takeover offer (as defined in Section 974 of the Companies Act 2006, for a company; or

(B)   the Directors are satisfied that the transfer is made pursuant to a bona fide sale of the whole of the beneficial ownership of the shares to a party unconnected with the member or with any person appearing to be interested in such shares (including any such sale made through a stock exchange on which the Company's shares of the class in question are normally traded). For the purposes of this paragraph any associate (as that term is defined in Section 435 of the Insolvency Act 1986) shall be included amongst the persons who are connected with the member or any person appearing to be interested in such shares.

(F) The provisions of this Article are in addition and without prejudice to the provisions of the Companies Act 2006.

66. No objection shall be raised as to the admissibility of any vote except at the meeting or adjourned meeting at which the vote objected to is or may be given or tendered and any vote not disallowed at such meeting shall be valid for all purposes. Any such objection shall be referred to the chairman of the meeting whose decision shall be final and conclusive. <span>Objections to votes</span>

67. On a poll votes may be given either personally or by proxy and a person entitled to more than one vote need not use all his votes or cast all the votes he uses in the same way. <span>Proxy votes</span>

68. (A) A proxy need not be a member of the Company. <span>Proxy not member</span>

(B) A member is entitled to appoint a proxy or (subject to Article 68(C)) proxies to exercise all or any of his rights to attend and to speak and vote at a meeting of the Company.

(C) A member may appoint more than one proxy in relation to a meeting provided that each proxy is appointed to exercise the rights attached to a different share or shares held by him.

69. The appointment of a proxy must be in writing in any usual or common form or in any other form which the Directors may approve and:

(a) in the case of an individual must either be signed by the appointor or his attorney or authenticated in accordance with Article 141; and

35

(b) in the case of a corporation must be either given under its common seal or be signed on its behalf by an attorney or a duly authorised officer of the corporation or authenticated in accordance with Article 141.

Any signature on or authentication of such appointment need not be witnessed. Where an appointment of a proxy is signed or authenticated in accordance with Article 141 on behalf of the appointor by an attorney, the power of attorney or a copy thereof certified notarially or in some other way approved by the Directors must (failing previous registration with the Company) be submitted to the Company, failing which the appointment may be treated as invalid.

70. (A) The appointment of a proxy (together with any supporting documentation required under Article 69) must be received at the address or one of the addresses (if any) specified for that purpose in, or by way of note to, or in any document accompanying, the notice convening the meeting (or if no address is so specified, at the Transfer Office):

(1) in the case of a meeting or adjourned meeting, not less than 48 hours before the commencement of the meeting or adjourned meeting to which it relates;

(2) in the case of a poll taken following the conclusion of a meeting or adjourned meeting, but not more than 48 hours after the poll was demanded, not less than 48 hours before the commencement of the meeting or adjourned meeting at which the poll was demanded; and

(3) in the case of a poll taken more than 48 hours after it was demanded, not less than 24 hours before the time appointed for the taking of the poll;

and in default shall not be treated as valid.

(B) The Directors may at their discretion determine that, in calculating the periods mentioned in Article 70(A), no account shall be taken of any part of any day that is not a working day (within the meaning of Section 1173 of the Companies Act 2006).

(c) The appointment of a proxy shall, unless the contrary is stated thereon, be valid as well for any adjournment of the meeting as for the meeting to which it relates. Provided that an appointment relating to more than one meeting (including any adjournment thereof) having once been so delivered for the purposes of any meeting shall not require again to be delivered for the purposes of any subsequent meeting to which it relates.

36

71.  (A)  A proxy shall have the right to exercise all or any of the rights of his appointor, or (where more than one proxy is appointed) all or any of the rights attached to the shares in respect of which he is appointed the proxy to attend, and to speak and vote, at a meeting of the Company.

(B)  Unless his appointment provides otherwise, a proxy may vote or abstain at his discretion on any resolution put to the vote at a shareholders' meeting.

72.  (A)  Neither the death or insanity of a member who has appointed a proxy, nor the revocation or termination by a member of the appointment of a proxy (or of the authority under which the appointment was made), shall invalidate the proxy or the exercise of any of the rights of the proxy thereunder, unless notice of such death, insanity, revocation or termination shall have been received by the Company in accordance with Article 72(B). <span style="float:right">Revocation of proxy</span>

(B)  Any such notice of death, insanity, revocation or termination must be received at the address or one of the addresses (if any) specified for receipt of proxies in, or by way of note to, or in any document accompanying, the notice convening the meeting to which the appointment of the proxy relates (or if no address is so specified, at the Transfer Office):

(1)  in the case of a meeting or adjourned meeting, not less than one hour before the commencement of the meeting or adjourned meeting to which the proxy appointment relates;

(2)  in the case of a poll taken following the conclusion of a meeting or adjourned meeting, but not more than 48 hours after it was demanded, not less than one hour before the commencement of the meeting or adjourned meeting at which the poll was demanded; or

(3)  in the case of a poll taken more than 48 hours after it was demanded, not less than one hour before the time appointed for the taking of the poll.

## CORPORATIONS ACTING BY REPRESENTATIVES

73.  Subject to the Statutes, any corporation which is a member of the Company may by resolution of its directors or other governing body authorise a person or persons to act as its representative or representatives at any meeting of the Company or of any class of members of the Company. The Solicitor for the affairs of Her Majesty's Treasury may, so long as he is a member of the Company, authorise in writing under his hand such person as he thinks fit to act as his representative at any meeting of the Company or of any class of members of the Company. <span style="float:right">Corporate representatives</span>

DIRECTORS

Nationality of
Directors

74. (A) Any Director (and their alternate) who holds the office of either Chairman (where such office is held in an executive capacity) or Chief Executive shall be a person who is a British Citizen or British Dependent Territories citizen or British Overseas citizen by virtue of the British Nationality Act 1981. In addition, if at any time the Company has a Deputy Chairman as well as a Chairman and the persons holding those offices each hold office in a non-executive capacity, at least one of such Directors (and their alternate) shall be a person who is a British Citizen or British Dependent Territories citizen or British Overseas citizen by virtue of the British Nationality Act 1981. If any such persons for the time being cease to be such a citizen and as a result the requirements of this Article 74(A) cease to be fulfilled, his office of Director shall thereupon be vacated.

(B) The majority of the Directors holding office with the Company for the time being shall be persons who are British citizens or British Dependent Territories citizens or British Overseas citizens by virtue of the British Nationality Act 1981. If at any time one half or more of the Directors are persons who are not such citizens, then such a number of such Directors shall forthwith vacate their offices with the Company as shall be necessary to comply with this Article 74(B).

(c) The Directors who are not such citizens shall vacate office, so as to ensure compliance with Article 74(B), in such order that those who have been in office for the shortest period since their appointment shall vacate their office first (unless all of the Directors otherwise agree amongst themselves).

(D) Each Director shall for the purposes of this Article 74 inform, and keep informed, as fully and promptly as is reasonably possible, the Directors of any change, or possible change, in his nationality.

(E) The Directors shall not (subject to compliance with the foregoing provisions of this Article) be less than six in number. If at any time the number of Directors shall, to comply with such foregoing provisions, be reduced to less than six (or other such minimum number as may be fixed in accordance with the following sentence), then such number of persons shall be appointed as Directors as soon as is reasonably practicable to reinstate the number of Directors to six (or such other minimum number as aforesaid) or more. The Company may by Ordinary Resolution from time to time vary the minimum number and/or fix and from time to time vary a maximum number of Directors.

75. INTENTIONALLY BLANK

No share qualification

76. A Director shall not be required to hold any shares of the Company by way of qualification. A Director who is not a member of the Company shall be entitled to attend and speak at General Meetings.

38

77. Each Director shall be entitled to receive remuneration for his services at such rate as the Directors may from time to time determine and such remuneration shall accrue *de die in diem*. The Company in General Meeting may increase the amount of the remuneration to the Directors either permanently or for a year or longer term. <span style="font-size:smaller">Directors' fees</span>

78. Any Director who holds any executive office (including for this purpose the office of Chairman or Deputy Chairman whether or not such office is held in an executive capacity), or who serves on any committee, or who otherwise performs services which in the opinion of the Directors are outside the scope of the ordinary duties of a Director, may be paid such extra remuneration by way of salary, commission or otherwise as the Directors may determine. <span style="font-size:smaller">Directors' remuneration</span>

79. The Directors may repay to any Director all such reasonable expenses as he may incur in attending and returning from meetings of the Directors or of any committee of the Directors or General Meetings or otherwise in or about the business of the Company. <span style="font-size:smaller">Directors' expenses</span>

80. (A) The Directors shall have the power to pay and agree to pay pensions or other retirement, superannuation, death or disability benefits to (or to any person in respect of) any Director or ex-Director and for the purpose of providing any such pensions or other benefits to contribute to any scheme or fund or to pay premiums. <span style="font-size:smaller">Directors' Pensions</span>

(B) Without prejudice to the provisions of Article 145 the Directors shall have power to purchase and maintain insurance for or for the benefit of any persons who are or were at any time Directors, officers or employees of the Company, any holding company of the Company or of any other body, whether or not incorporated, in which the Company or such holding company or any of the predecessors of the Company or of such holding company has or has had any interest whether direct or indirect or which is in any way allied to or associated with the Company, or of any subsidiary undertaking of the Company or of any such other body (together "Relevant Company"), or who are or were at any time trustees of any pension fund or employees' share scheme in which any employees of any Relevant Company are interested, including (without prejudice to the generality of the foregoing) insurance against any liability incurred by such persons in respect of any act or omission in the actual or purported execution and/or discharge of their duties and/or in the exercise or purported exercise of their powers and/or otherwise in relation to their duties, powers or offices in relation to any Relevant Company or any such pension fund or employees' share scheme.

81. (A) Subject to the provisions of these presents, the Directors may from time to time appoint one or more of their body to be the holder of any executive office (including, where considered appropriate, the office of Chairman or Deputy Chairman) on such terms and (subject to the Statutes) <span style="font-size:smaller">Executive Directors</span>

for such period as they may determine and, without prejudice to the terms of any contract entered into in any particular case, may at any time revoke any such appointment.

(B) The appointment of any Director to the office of Chairman or Deputy Chairman or Joint Deputy Chairman or Chief Executive or Joint Chief Executive or Managing or Joint Managing or Deputy or Assistant Managing Director shall automatically determine if he ceases to be a Director but without prejudice to any claim for damages for breach of any contract of service between him and the Company.

(c) The appointment of any Director to any other executive office shall not automatically determine if he ceases from any cause to be a Director, unless the contract or resolution under which he holds office shall expressly state otherwise, in which event such determination shall be without prejudice to any claim for damages for breach of any contract of service between him and the Company.

82. (A) The Directors may entrust to and confer upon any Director holding any executive office any of the powers exercisable by them as Directors upon such terms and conditions and with such restrictions as they think fit and either collaterally with or to the exclusion of their own powers, and (without prejudice to the terms of any contract entered into in any particular case) may from time to time revoke, withdraw, alter or vary all or any of such powers.

Delegation by Directors

(B) If the Directors appoint any person to the office of Chief Executive who is not a Director, the Directors shall ensure that such person is a British citizen or British Dependent Territories citizen or British Overseas citizen by virtue of the British Nationality Act 1981 and that, if any such person for the time being ceases to be such a citizen, the office of Chief Executive shall thereupon be vacated.

## APPOINTMENT AND RETIREMENT OF DIRECTORS

Vacation of office

83. The office of a Director shall be vacated in any of the following events, namely:—

(i) If he shall become prohibited by law from acting as a Director.

(ii) If he shall resign by writing under his hand left at the Office or if he shall in writing offer to resign and the Directors shall resolve to accept such offer.

(iii) If he shall have a bankruptcy order made against him or in Scotland has his estate sequestrated or shall compound with his creditors generally or shall apply to the court for an interim order under Section 253 of the Insolvency Act 1986 in connection with a voluntary arrangement under that Act.

40

(iv) If in England or elsewhere an order shall be made by any court claiming jurisdiction in that behalf on the ground (however formulated) of his mental disorder or his detention or for the appointment of a guardian or for the appointment of a receiver or other person (by whatever name called) to exercise powers with respect to his property or affairs.

(v) If he shall be removed from office by notice in writing served upon him signed by all his co-Directors, to the effect that his office as Director shall on receipt (or deemed receipt) of such notice *ipso facto* be vacated, but so that if he holds an appointment to an executive office which thereby automatically determines such removal shall be deemed an act of the Company and shall have effect without prejudice to any claim for damages for breach of any contract of service between him and the Company.

(vi) If he shall be absent from meetings of the Directors for six months without leave and the Directors shall resolve that his office be vacated.

84. At the Annual General Meeting in every year:      Retirement by rotation

(i) any Director who was elected or last re-elected a Director at or before the Annual General Meeting held in the third calendar year before the current year shall retire by rotation; and

(ii) such further Directors (if any) shall retire by rotation as would bring the number retiring by rotation up to one-third of the Directors for the time being (or, if their number is not a multiple of three, the number nearest to but greater than one-third).

85. The Directors to retire by rotation shall include (so far as necessary   Directors to retire to obtain the number required) any Director who wishes to retire and not to offer himself for re-election. Any further Directors so to retire shall be those of the other Directors subject to retirement by rotation who have been longest in office since their last re-election or appointment and so that as between persons who became or were last re-elected Directors on the same day those to retire shall (unless they otherwise agree among themselves) be determined by lot. A retiring Director shall be eligible for re-election.

86. The Company at the meeting at which a Director retires under any   Re-election of provision of these presents may by Ordinary Resolution fill up the office being   Directors vacated by electing thereto the retiring Director or some other person eligible for appointment. In default the retiring Director shall be deemed to have been re-elected except in any of the following cases:—

(i) Where at such meeting it is expressly resolved not to fill such office or a resolution for the re-election of such Director is put to the meeting and lost.

41

    (ii)   Where such Director has not given notice in writing to the Company by the date of the Notice convening the Annual General Meeting at which he will retire by rotation that he is willing to be re-elected.

    (iii)   Where the default is due to the moving of a resolution in contravention of the next following Article.

The retirement shall not have effect until the conclusion of the meeting except where a resolution is passed to elect another person in the place of the retiring Director or a resolution for his re-election is put to the meeting and lost and accordingly a retiring Director who is re-elected or deemed to have been re-elected will continue in office without break.

**Separate resolutions to appoint Directors etc.**

87. A resolution for the appointment of two or more persons as Directors by a single resolution shall not be moved at any General Meeting unless a resolution that it shall be so moved has first been agreed to by a meeting without any vote being given against it; and any resolution moved in contravention of this provision shall be void.

**Eligibility for appointment**

88. No person other than a Director retiring at the meeting shall, unless recommended by the Directors for election, be eligible for appointment as a Director at any General Meeting unless not less than seven nor more than 42 days (inclusive of the date on which the notice is given) before the date appointed for the meeting there shall have been lodged at the Office notice in writing signed or authenticated in accordance with Article 141 by some member (other than the person to be proposed) duly qualified to attend and vote at the meeting for which such notice is given of his intention to propose such person for election and also notice in writing signed (or sufficiently authenticated to the satisfaction of the Directors) by the person to be proposed of his willingness to be elected.

**Removal of Directors**

89. The Company may in accordance with and subject to the provisions of the Statutes by Ordinary Resolution of which special notice has been given remove any Director from office (notwithstanding any provision of these presents or of any agreement between the Company and such Director, but without prejudice to any claim he may have for damages for breach of any such agreement) and appoint another person in place of a Director so removed from office and any person so appointed shall be treated for the purpose of determining the time at which he or any other Director is to retire by rotation as if he had become a Director on the day on which the Director in whose place he is appointed was last elected a Director. In default of such appointment the vacancy arising upon the removal of a Director from office may be filled as a casual vacancy.

**Appointment of Directors**

90. The Company may (subject to Article 74) by Ordinary Resolution appoint any person to be a Director either to fill a casual vacancy or as an additional Director. Without prejudice thereto the Directors shall have power at

any time so to do, but so that the total number of Directors shall not thereby exceed the maximum number (if any) fixed by or in accordance with these presents. Any person so appointed by the Directors shall hold office until the next Annual General Meeting and shall then be eligible for re-election, but shall not be taken into account in determining the number of Directors who are to retire by rotation at such meeting.

## ALTERNATE DIRECTORS

91. (A) Any Director may at any time by writing under his hand and deposited at the Office, or delivered at a meeting of the Directors, appoint any person (including another Director but provided that where the appointor is a British citizen or British Dependent Territories citizen or British Overseas citizen by virtue of the British Nationality Act 1981 his appointee shall also be a person who is a British citizen or British Dependent Territories citizen or British Overseas citizen by virtue of the British Nationality Act 1981) to be his alternate Director and may in like manner at any time terminate such appointment. Such appointment, unless previously approved by the Directors, shall have effect only upon and subject to being so approved. <sub>Alternate Directors</sub>

(B) The appointment of an alternate Director shall determine on the happening of any event which if he were a Director would cause him to vacate such office or if his appointor ceases to be a Director.

(c) An alternate Director shall (except when absent from the United Kingdom) be entitled to receive notices of meetings of the Directors and shall be entitled to attend and vote as a Director at any such meeting at which the Director for whom he is appointed an alternate is not personally present and generally at such meeting to perform all the functions of a Director and for the purposes of the proceedings at such meeting the provisions of these presents shall apply as if he (instead of the Director for whom he is appointed an alternate) were a Director. If he shall be himself a Director or shall attend any such meeting as an alternate for more than one Director his voting rights shall be cumulative but he shall not be counted more than once for the purposes of a quorum. If the Director for whom he is appointed an alternate is for the time being absent from the United Kingdom or temporarily unable to act through ill-health or disability his signature to any resolution in writing of the Directors shall be as effective as the signature of the Director for whom he is appointed an alternate. To such extent as the Directors may from time to time determine in relation to any committee of the Directors the foregoing provisions of this paragraph shall also apply *mutatis mutandis* to any meeting of any such committee of which the Director for whom he is appointed an alternate is a member. An alternate Director shall not (save as aforesaid) have power to act as a Director nor shall he be deemed to be a Director for the purposes of these presents.

43

(D) An alternate Director shall be entitled to contract and be interested in and benefit from contracts or arrangements or transactions and to be repaid expenses and to be indemnified to the same extent *mutatis mutandis* as if he were a Director but he shall not be entitled to receive from the Company in respect of his appointment as alternate Director any remuneration except only such part (if any) of the remuneration otherwise payable to the Director for whom he is appointed an alternate as such Director may by notice in writing to the Company from time to time direct.

## MEETINGS AND PROCEEDINGS OF DIRECTORS

Meetings of Directors    92.  Subject to the provisions of these presents the Directors may meet together for the despatch of business, adjourn and otherwise regulate their meetings as they think fit. At any time any Director may, and the Secretary on the requisition of a Director shall, summon a meeting of the Directors. Any Director may waive notice of any meeting and any such waiver may be retrospective. Notice must be given to all Directors, except those to whom it is not possible to give reasonable notice or who waive their entitlement to notice, prospectively or retrospectively.

Telephone Meetings    93.  The Directors, and any committee of the Directors, shall be deemed to meet together if, being in separate locations, they are nonetheless linked by conference telephone or other communication equipment which allows those participating to hear and to speak to each other, and a quorum in that event may be constituted by persons so linked. Such a meeting shall be deemed to take place where the largest group of those participating is assembled or, if there is no such group, where the Chairman of the meeting then is.

Quorum    94.  The quorum necessary for the transaction of the business of the Directors may be fixed from time to time by the Directors and unless so fixed at any other number shall be two, provided that such quorum shall not be satisfied in relation to any business transacted during any part of the relative proceedings at a time when the number of the Directors present and entitled to vote who are British citizens or British Dependent Territories citizens or British Overseas citizens by virtue of the British Nationality Act 1981 does not exceed one half of the total number of the Directors then present and entitled to vote. A meeting of the Directors at which a quorum is present shall be competent to exercise all powers and discretions for the time being exercisable by the Directors.

Voting    95.  Questions arising at any meeting of the Directors shall be determined by a majority of votes. In case of an equality of votes the chairman of the meeting shall have a second or casting vote.

96.  Subject to the provisions of these presents and the Statutes, and provided that he has disclosed to the Directors the nature and extent of any material interest of his, a Director notwithstanding his office may be a party to

44

or in any way interested in any contract or arrangement or transaction or proposal to which the Company is a party or in which the Company is in any way interested (including any body corporate promoted by the Company) and he may hold and be remunerated in respect of any office or place of profit (other than the office of Auditor of the Company or any subsidiary thereof) under the Company or any other company in which the Company is in any way interested (including any body corporate promoted by the Company) and he (or any firm of which he is a partner, employee or member) may act in a professional capacity for the Company or any such other company (other than as Auditor) and be remunerated therefor and in any such case as aforesaid (save as otherwise agreed) he may retain for his own absolute use and benefit all profits and advantages accruing to him thereunder or in consequence thereof and no such contract, transaction or arrangement or proposal shall be liable to be avoided on the grounds of any such interest or benefit.

97. (A) Subject as provided in these presents, a Director shall not vote in Directors' interests respect of any contract or arrangement or any other proposal whatsoever in which he has an interest which (together with any interest of any person connected with him within the meaning of the Companies Acts) is to his knowledge a material interest otherwise than by virtue of his interests in shares or debentures or other securities of or otherwise in or through the Company. A Director shall not be counted in the quorum at a meeting in relation to any resolution on which he is debarred from voting.

(B) Subject to the provisions of the Statutes and as provided in these presents, a Director shall (in the absence of some other material interest than is indicated below) be entitled to vote (and be counted in the quorum) in respect of any resolution concerning any of the following matters, namely:—

(i) The giving of any security, guarantee or indemnity in respect of money lent or obligations incurred by him or by any other person at the request of or for the benefit of the Company or any of its subsidiary undertakings.

(ii) The giving of any security, guarantee or indemnity in respect of a debt or obligation of the Company or any of its subsidiary undertakings for which he himself has assumed responsibility in whole or in part under a guarantee or indemnity or by the giving of security.

(iii) Any contract, arrangement or proposal concerning an offer of shares or debentures or other securities of or by the Company or any of its subsidiary undertakings in which offer he is or may be entitled to participate as a holder of securities or in the underwriting or sub-underwriting of which he is to participate.

(iv) Any contract, arrangement or proposal, relating to any other company in which he and any persons connected with him (within the meaning of the Companies Acts) do not to his knowledge hold an interest in

Shares (as that term is used in Part 22 of the Companies Act 2006) representing one per cent. or more of either any class of the equity share capital of, or the voting rights in, such company.

(v) Any contract, arrangement or proposal relating to an arrangement for the benefit of the employees of the Company or any of its subsidiary undertakings which does not award him any privilege or benefit not generally awarded to the employees to whom such arrangment relates.

(vi) Any contract, arrangement or proposal concerning insurance which the Company proposes to maintain or purchase for the benefit of any Directors of the Company or for the benefit of persons including Directors of the Company.

(c) Where proposals are under consideration concerning the appointment (including fixing or varying the terms of appointment) of two or more Directors to offices or employments with the Company or any company in which the Company is interested, such proposals may be divided and considered in relation to each Director separately and in such case each of the Directors concerned (if not debarred from voting under paragraph (B) (iv) of this Article) shall be entitled to vote (and be counted in the quorum) in respect of each resolution except that concerning his own appointment.

(D) If any question shall arise at any meeting as to the materiality of a Director's interest or as to the entitlement of any Director to vote and such question is not resolved by him voluntarily agreeing to abstain from voting, such question shall be referred to the chairman of the meeting and his ruling in relation to any Director other than himself shall be final and conclusive except in a case where the nature or extent of the interests of the Directors concerned has not been fairly disclosed.

(E) For the purposes of Article 96 and this Article 97:—

(1) a general notice given to the Directors that a Director is to be regarded as having an interest of the nature and extent specified in the notice in any contract, transaction, arrangement or proposal in which a specified person or class of persons is interested shall be deemed to be a disclosure that the Director has an interest in any such contract, transaction, arrangement or proposal of the nature and extent so specified;

(2) an interest of a person who is connected (within the meaning of the Companies Act) with a Director shall be treated as an interest of the Director; and

(3) an interest (whether his or of such a connected person) of which a Director has no knowledge and of which it is

46

unreasonable to expect him to have knowledge shall not be treated as an interest of his.

98. The continuing Directors may act notwithstanding any vacancies, but if and so long as the number of Directors is reduced below the minimum number fixed by or in accordance with these presents the continuing Directors or Director may act for the purpose of filling up such vacancies or of summoning General Meetings, but not for any other purpose. If there be no Directors or Director able or willing to act, then any two members may summon a General Meeting for the purpose of appointing Directors. <span style="float:right">Vacancies</span>

99. The Directors may elect from their number a Chairman and a Deputy Chairman (or two or more Deputy Chairmen) and determine the period for which each is to hold office. If no Chairman or Deputy Chairman shall have been appointed, or if at any meeting neither be present within five minutes after the time appointed for holding the same, the Directors present may choose one of their number to be Chairman of the meeting. If the Chairman is absent from any meeting and at the relevant time there is more than one Deputy Chairman then (unless the Directors present resolve otherwise) the Deputy Chairman present (if more than one) who shall have held that office for the greater or greatest length of time shall be entitled to preside at the meeting. <span style="float:right">Chairman</span>

100. A resolution in writing signed by all the Directors for the time being in the United Kingdom shall (provided that more than half of the Directors signing the same are British citizens or British Dependent Territories citizens or British Overseas citizens by virtue of the British Nationality Act 1981) be as effective as a resolution duly passed at a meeting of the Directors and may consist of several documents in the like form, each signed by one or more Directors. <span style="float:right">Written resolutions</span>

101. The Directors may delegate any of their powers or discretions (including without prejudice to the generality of the foregoing all powers and discretions whose exercise involves or may involve the payment of remuneration to or the conferring of any other benefit on all or any of the Directors) to committees. Any such committee shall, unless the Directors otherwise resolve, have power to sub-delegate to sub-committees any of the powers or discretions delegated to it. Any such committee or sub-committee shall consist of one or more Directors and (if thought fit) one or more other named person or persons to be co-opted as hereinafter provided. Insofar as any such power or discretion is delegated to a committee or sub-committee, any reference in these Articles to the exercise by the Directors of the power or discretion so delegated shall be read and construed as if it were a reference to the exercise thereof by such committee or sub-committee. Any committee or sub-committee so formed shall in the exercise of the powers so delegated conform to any regulations which may from time to time be imposed by the Directors. Any such regulations may provide for or authorise the co-option to <span style="float:right">Committees</span>

47

the committee or sub-committee of persons other than Directors and may provide for members who are not Directors to have voting rights as members of the committee or sub-committee.

**Committees' proceedings**

102. The meetings and proceedings of any such committee or sub-committee consisting of two or more members shall be governed *mutatis mutandis* by the provisions of these presents regulating the meetings and proceedings of the Directors so far as the same are not superseded by any regulations made by the Directors under the last preceding Article. The number of Directors on any such committee or sub-committee from time to time who are British citizens or British Dependent Territories citizens or British Overseas citizens by virtue of the British Nationality Act 1981 shall exceed one half of the total number of the members of such committee or sub-committee.

**Validity of Directors' acts**

103. All acts done by any meeting of Directors, or of any such committee, or by any person acting as a Director or as a member of any such committee, shall as regards all persons dealing in good faith with the Company, notwithstanding that there was some defect in the appointment of any of the persons acting as aforesaid, or that any such persons were disqualified or had vacated office, or were not entitled to vote, be as valid as if every such person had been duly appointed and was qualified and had continued to be a Director or member of the committee and had been entitled to vote.

## BORROWING POWERS

**Borrowing powers**

104. (A) Subject as hereinafter provided and to the provisions of the Statutes, the Directors may exercise all the powers of the Company to borrow money, and to mortgage or charge all or part of its undertaking, property and assets (present and future) and uncalled capital, and to issue debentures and other securities, whether outright or as collateral security, for any debt, liability or obligation of the Company or of any third party.

(B) (1) The Directors shall restrict the borrowings of the Company and exercise all voting and other rights or powers of control exercisable by the Company in relation to its subsidiary companies (if any) so as to secure (so far as regards subsidiaries, as by such exercise they can secure) that the aggregate amount for the time being remaining outstanding of all money borrowed by the Group (which expression in this Article means the Company and its subsidiaries for the time being) and for the time being owing, subject as hereinafter provided, to persons other than the Company and its wholly-owned subsidiaries shall not, without the previous sanction of an Ordinary Resolution of the Company, at any time exceed an amount equal to one and a half times the Adjusted Capital and Total Reserves.

(2) In this Article the expression "Adjusted Capital and Total Reserves" means at any material time a sum equal to the aggregate of:—

48

(a) the amount paid up (or credited as or deemed to be paid up) on the issued share capital of the Company; and

(b) the amount standing to the credit of the capital and revenue reserves of the Group (including without limitation the statutory reserve and any share premium account or capital redemption reserve fund) after adding thereto or deducting therefrom any balance standing to the credit or debit of the profit and loss account of the Group;

all based on a consolidation of the then latest audited balance sheets of the Company and its subsidiaries but after:—

(i) excluding any sums set aside for taxation;

(ii) making such adjustments as may be appropriate in respect of any variation in the amount of such paid up share capital or any such reserves subsequent to the relevant balance sheet date and so that for this purpose if any issue or proposed issue of shares by the Company for cash has been underwritten then such shares shall be deemed to have been issued and the amount (including any premium) of the subscription moneys payable in respect thereof (not being moneys payable later than six months after the date of allotment) shall to the extent so underwritten be deemed to have been paid up on the date when the issue of such shares was underwritten (or, if such underwriting was conditional, on the date when it became unconditional);

(iii) making such adjustments as may be appropriate in respect of any distributions declared, recommended or made by the Company or its subsidiaries (otherwise than attributable directly or indirectly to the Company) out of profits earned up to and including the date of the latest audited balance sheet of the Company or subsidiary (as the case may be) to the extent that such distribution is not provided for in such balance sheet;

(iv) making such adjustments as may be appropriate in respect of any variation in the interests of the Company in its subsidiaries since the date of the latest audited balance sheet of the Company;

(v) making all such adjustments, if the calculation is required for the purposes of or in connection with a transaction under or in connection with which any company is to become or cease to be a subsidiary, as would be appropriate if such transaction had been carried into effect;

(vi) excluding minority interests in subsidiaries;

(vii) excluding post-employment assets and liabilities as calculated in accordance with International Accounting Standard ("IAS") 19 – Employee Benefits, as from time to time amended, and any standards,

principles, practices or rules that may from time to time, directly or indirectly, supplement or replace this standard or any part of it; and

(viii) excluding amounts recognised in accordance with IAS 32 Financial Instruments: Disclosure and Presentation ("IAS 32") and IAS 39 Financial Instruments: Recognition and Measurement ("IAS 39") (as from time to time amended, and any standards, principles, practices or rules that may from time to time, directly or indirectly, supplement or replace any of these standards or any part of them) and including the relevant amounts that would have been recognised had the accounts been prepared in accordance with the relevant accounting standards applicable to the Company's accounts for the year ended 31 December 2004 under United Kingdom generally accepted accounting principles in so far as they relate to the matters dealt with by IAS 32 and IAS 39 (as so amended, supplemented or replaced from time to time).

(c) For the purposes of the foregoing limit the following provisions shall apply:—

(1) there shall be deemed, subject as hereinafter provided, to have been borrowed and to be outstanding as borrowed money of the relevant member of the Group (but only to the extent that the same would not otherwise fall to be taken into account):—

(a) the principal amount of all debentures of any member of the Group which are not for the time being beneficially owned within the Group;

(b) the outstanding amount of acceptances (not being acceptances of trade bills in respect of the purchase or sale of goods in the ordinary course of trading) by any bank or accepting house under any acceptance credit opened on behalf of and in favour of any member of the Group;

(c) the nominal amount of any issued and paid-up share capital (other than equity share capital) of any subsidiary of the Company not for the time being beneficially owned by any member of the Group;

(d) the nominal amount of any other issued and paid-up share capital and the principal amount of any other debentures or other borrowed moneys (not being shares or debentures which or borrowed moneys the indebtedness in respect of which are for the time being beneficially owned within the Group) the redemption or repayment whereof is guaranteed or wholly or (to the extent the same is partly secured) partly secured by any member of the Group;

50

(e) any fixed or minimum premium payable on final redemption or repayment of any debentures, share capital or other borrowed moneys falling to be taken into account; and

(f) sums representing rental payments whether due and payable or contingently payable by any member of the Group under hire purchase agreements in respect of plant, equipment or machinery hired by any member of the Group and any agreements ancillary thereto;

(2) moneys borrowed by any members of the Group for the purposes of repaying or redeeming (with or without premium) in whole or in part any other borrowed moneys falling to be taken into account and intended to be applied for such purpose within six months after the borrowing thereof shall not during such period, except to the extent so applied, themselves fall to be taken into account;

(3) any amounts borrowed by any member of the Group from bankers or others for the purpose of financing any contract up to an amount not exceeding that part of the price receivable under such contract which is guaranteed or insured by the Export Credits Guarantee Department or other institution or body carrying on a similar business shall be deemed not to be borrowed moneys;

(4) moneys borrowed (including share capital to which paragraph (c) (1) (c) applies) by a partly-owned subsidiary and not owing to another member of the Group shall be taken into account subject to the exclusion of a proportion thereof equal to the minority proportion of the borrower and moneys borrowed (including such share capital as aforesaid) by a member of the Group from and owing to a partly-owned subsidiary shall be taken into account to the extent of a proportion thereof equal to the minority proportion of the lender; for the purposes aforesaid "minority proportion" shall mean the proportion of the issued equity share capital of the partly-owned subsidiary which is not attributable to the Company or any subsidiary of the Company;

(5) for the avoidance of doubt it is hereby expressly provided that for the purposes of the foregoing limit the following sums shall be deemed not to be borrowed moneys of the Group:—

(a) sums which, but for the provisions of this paragraph (5), would be borrowed moneys of any member of the Group at the time of, and for a period of six months after, such company becoming a subsidiary of the Company otherwise than pursuant to the provisions of the British Aerospace Act 1980;

51

(b) sums advanced or paid to any member of the Group (or their agent or nominee) by customers of any member of the Group as unexpended customer receipts or progress payments pursuant to any contract between such customer and a member of the Group or any guarantees or indemnities given by any member of the Group in relation thereto;

(c) sums representing rental or other payments whether due and payable or contingently payable by any member of the Group under leases or credit sale agreements in respect of plant, equipment or machinery leased to or the subject of any such credit sale agreement with any member of the Group, and any agreements ancillary thereto;

(d) sums which otherwise would fall to be treated as borrowed moneys of any member of the Group which were treated, with the concurrence of the Auditors and in accordance with any current Statement of Standard Accounting Practice or other accountancy principle or practice generally accepted for the time being in the United Kingdom, in the latest audited balance sheet of the relevant member of the Group on which such consolidation was based as otherwise than borrowed moneys of that member of the Group;

(6) borrowed moneys of any member of the Group expressed in or calculated by reference to a currency other than sterling or a combination of currencies including a currency or currencies other than sterling shall (as regards the currency or currencies other than sterling) be converted into sterling by reference to the rates of exchange used for the conversion of such currencies in the latest audited balance sheet of the relevant member of the Group or, if any relevant currency was not thereby involved, by reference to the rate of exchange or approximate rate of exchange therefor ruling on the date of such latest audited balance sheet and determined on such basis as the Auditors may determine or approve.

(D) No person dealing with the Company or any of its subsidiaries shall be concerned to see or enquire whether the limit imposed by the provisions of this Article is observed and no debt incurred or security given in excess of such limit shall be invalid or ineffectual unless the lender or the recipient of the security had, at the time when the debt was incurred or security given, express notice that the said limit had been or would thereby be exceeded.

## GENERAL POWERS OF DIRECTORS

Directors' powers          105. (A) The business and affairs of the Company shall be managed by the Directors, who may exercise all such powers of the Company as are not by

the Statutes or by these presents required to be exercised by the Company in General Meeting, subject nevertheless to any regulations of these presents, to the provisions of the Statutes and to such regulations, being not inconsistent with the aforesaid regulations or provisions, as may be prescribed by Special Resolution of the Company, but no regulation so made by the Company shall invalidate any prior act of the Directors which would have been valid if such regulation had not been made. The general powers given by this Article shall not be limited or restricted by any special authority or power given to the Directors by any other Article.

(B)  Without prejudice to the foregoing provisions of this Article, the Directors may at any time seek the views of all or any of the shareholders of the Company (or any class thereof) on any matter in such manner as the Directors shall think fit. In particular, without limitation, the Directors may organise postal ballots and determine all matters relating to the conduct of such ballots.

106. The Directors may establish any local, group or divisional boards, Local etc. boards agencies or committees for managing any of the affairs of the Company, either in the United Kingdom or elsewhere, and may appoint any persons to be members of such local, group or divisional boards, agencies or committees or any managers or agents, and may fix their remuneration and may delegate to any local, group or divisional board, agency or committee or manager or agent any of the powers, authorities and discretions vested in the Directors, with power to sub-delegate, and may authorise the members of any local, group or divisional board, agency or committee, or any of them, to fill any vacancies therein, and to act notwithstanding vacancies, and any such appointment or delegation may be made upon such terms and subject to such conditions as the Directors may think fit, and the Directors may remove any person so appointed, and may annul or vary any such delegation, but no person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

107. The Directors may from time to time and at any time by power of Attorneys attorney or otherwise appoint any company, firm or person or any fluctuating body of persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys of the Company for such purposes and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the Directors under these presents) and for such period and subject to such conditions as they may think fit, and any such power of attorney may contain such provisions for the protection and convenience of persons dealing with any such attorney as the Directors may think fit, and may also authorise any such attorney to sub-delegate all or any of the powers, authorities and discretions vested in him.

108. The Directors may from time to time appoint any person to any office Title "Director" or employment having a designation or title including the word "Director" or attach to any existing office or employment with the Company such a

53

designation or title and may at any time determine any such appointment or the use of any such designation or title. The inclusion of the word "Director" in the designation or title of any such office or employment with the Company shall not imply that the holder thereof is a Director of the Company nor shall such holder thereby be empowered in any respect to act as a Director of the Company or be deemed to be a Director for any of the purposes of these presents.

Branch register    109. Subject to and to the extent permitted by the Statutes, the Company, or the Directors on behalf of the Company, may cause to be kept in any territory a branch register of members resident in such territory, and the Directors may make and vary such regulations as they may think fit respecting the keeping of any such register.

Cheques etc.    110. All cheques, promissory notes, drafts, bills of exchange, and other negotiable or transferable instruments, and all receipts of moneys paid to the Company, shall be signed, drawn, accepted, endorsed, or otherwise executed, as the case may be, in such manner as the Directors shall from time to time by resolution determine.

## SECRETARY

Secretary    111. The Secretary shall be appointed by the Directors on such terms and for such period as they may think fit. Any Secretary so appointed may at any time be removed from office by the Directors, but without prejudice to any claim for damages for breach of any contract of service between him and the Company. If thought fit two or more persons may be appointed as Joint Secretaries. The Directors may also appoint from time to time on such terms as they think fit one or more Assistant Secretaries.

## THE SEAL

Seals    112. (A) The Directors shall provide for the safe custody of the Seal and the Securities Seal (if any) and neither shall be used without the authority of the Directors or of a committee authorised by the Directors in that behalf.

(B) Every instrument to which the Seal shall be affixed shall be signed autographically by one Director and the Secretary or by two Directors save that as regards any certificates for or evidencing shares or debentures or other securities (including options) of the Company the Directors may by resolution determine that such signature or either of them shall be dispensed with or affixed by some method or system of mechanical signatures.

(C) The Securities Seal shall be used only for sealing securities issued by the Company and documents creating or evidencing securities so issued. Any such securities or documents sealed with the Securities Seal shall not require to be signed.

54

(D) Any instrument signed by one Director and the Secretary or by two Directors or by a Director in the presence of a witness who attests to the signature and expressed to be executed by the Company shall have the same effect as if executed under the Seal, provided that no instrument which makes it clear on its face that it is intended to have effect as a deed shall be so signed without the authority of the Directors or of a committee authorised by the Directors in that behalf.

113. The Company may exercise the powers conferred by the Statutes with regard to having an official seal for use abroad and such powers shall be vested in the Directors. <span style="float:right">Seal for use abroad</span>

## AUTHENTICATION OF DOCUMENTS

114. Any Director or the Secretary or any person appointed by the Directors for the purpose shall have power to authenticate any documents affecting the constitution of the Company and any resolutions passed by the Company or the Directors or any committee, and any books, records, documents and accounts relating to the business of the Company, and to certify copies thereof or extracts therefrom as true copies or extracts; and if any books, records, documents or accounts are elsewhere than at the Office the local manager or other officer of the Company having the custody thereof shall be deemed to be a person appointed by the Directors as aforesaid. A document purporting to be a copy of a resolution, or an extract from the minutes of a meeting, of the Company or of the Directors or any committee which is certified as aforesaid shall be conclusive evidence in favour of all persons dealing with the Company upon the faith thereof that such resolution has been duly passed or, as the case may be, that such minutes or extract is a true and accurate record of proceedings at a duly constituted meeting. <span style="float:right">Authentication of documents</span>

## RESERVES

115. The Directors may from time to time set aside out of the profits of the Company and carry to reserve such sums as they think proper which, at the discretion of the Directors, shall be applicable for any purpose to which the profits of the Company may properly be applied and pending such application may either be employed in the business of the Company or be invested. The Directors may divide the reserve into such special funds as they think fit and may consolidate into one fund any special funds or any parts of any special funds into which the reserve may have been divided. The Directors may also without placing the same to reserve carry forward any profits. In carrying sums to reserve and in applying the same, the Directors shall comply with the provisions of the Statutes. <span style="float:right">Reserves</span>

55

## DIVIDENDS

Dividends

116. The Company may by Ordinary Resolution declare dividends but no such dividends shall exceed the amount recommended by the Directors.

Fixed dividends

117. Insofar as in the opinion of the Directors, the profits of the Company justify such payments, the Directors may declare and pay the fixed dividends on any class of shares carrying a fixed dividend expressed to be payable on fixed dates on the half-yearly or other dates prescribed for the payment thereof and may also from time to time declare and pay interim dividends on shares of any class of such amounts and on such dates and in respect of such periods as they think fit. Subject to the Directors acting in good faith, they shall not incur any liability to the holders of shares conferring preferred rights for any loss they may suffer by the lawful payment of an interim dividend on any share having deferred or non-preferred rights.

Apportionment of dividends

118. Unless and to the extent that the rights attached to any shares or the terms of issue thereof otherwise provide, all dividends shall (as regards any shares not fully paid throughout the period in respect of which the dividend is paid) be apportioned and paid *pro rata* according to the amounts paid on the shares during any portion or portions of the period in respect of which the dividend is paid. For the purposes of this Article no amount paid on a share in advance of calls shall be treated as paid on the share.

Dividends out of profits

119. No dividend shall be paid otherwise than out of profits available for distribution under the provisions of the Statutes.

No interest on dividends

120. No dividend or other moneys payable on or in respect of a share shall bear interest as against the Company.

Pre-acquisition profits

121. Subject to the provisions of the Statutes, where any asset, business or property is acquired by the Company as from a past date (whether such date be before or after the incorporation of the Company) the profits and losses arising therefrom as from such date may at the discretion of the Directors in whole or in part be carried to revenue account and treated for all purposes as profits or losses of the Company. Subject as aforesaid, if any shares or securities are purchased cum dividend or interest, such dividend or interest may at the discretion of the Directors be treated as revenue, and it shall not be obligatory to capitalise the same or any part thereof.

Retention of dividends

122. (A) The Directors may retain any dividend or other moneys payable on or in respect of a share on which the Company has a lien, and may apply the same in or towards satisfaction of the debts, liabilities or engagements in respect of which the lien exists.

(B) The Directors may retain the dividends payable upon shares in respect of which any person is under the provisions as to the transmission of shares hereinbefore contained entitled to become a member, or which any

person is under those provisions entitled to transfer, until such person shall become a member in respect of such shares or shall transfer the same.

123. The waiver in whole or in part of any dividend on any share by any <span style="float:right">Waiver of dividends</span> document (whether or not under seal) shall be effective only if such document is signed or authenticated in accordance with Article 141 by the holder thereof (or the person becoming entitled to the share in consequence of the death, bankruptcy or mental disorder of the holder or by operation of law or any other event) and delivered to the Company and if or to the extent that the same is accepted as such or acted upon by the Company.

124. The payment by the Directors of any unclaimed dividend or other <span style="float:right">Unclaimed dividends</span> moneys payable on or in respect of a share into a separate account shall not constitute the Company a trustee in respect thereof and any dividend shall be forfeited and shall revert to the Company if such dividend is unclaimed after a period of twelve years from the date it was declared or became due for payment.

125. The Company may upon the recommendation of the Directors by <span style="float:right">Dividends in specie</span> Ordinary Resolution direct payment of a dividend in whole or in part by the distribution of specific assets (and in particular of paid-up shares or debentures of any other company) and the Directors shall give effect to such resolution, and where any difficulty arises in regard to such distribution, the Directors may settle the same as they think expedient and in particular may issue fractional certificates and fix the value for distribution of such specific assets or any part thereof and may determine that cash payments shall be made to any members upon the footing of the value so fixed in order to adjust the rights of all parties and may vest any such specific assets in trustees as may seem expedient to the Directors.

126. (A) Any dividend or other moneys payable in cash on or in respect <span style="float:right">Payment of dividends</span> of a share may be paid (i) by cheque or warrant sent through the post to the registered address of the member or person entitled thereto (or, if two or more persons are registered as joint holders of the share or are entitled thereto in consequence of the death, bankruptcy or mental disorder of the holder or by operation of law or any other event, to any one of such persons) or to such person at such address as such member or person or persons may in writing direct, or (ii) by inter-bank transfer to such account as the payee or payees may in writing direct, or (iii) by such other method of payment as the member (or in the case of joint holders of a share, all of them) may agree to. In the case of payment by cheque or warrant, every such cheque or warrant shall be made payable to the order of the person to whom it is sent or to such person as the holder or joint holders or person or persons entitled to the share in consequence of the death, bankruptcy or mental disorder of the holder or by operation of law or any other event may direct and payment of the cheque or warrant by the banker upon whom it is drawn shall be a good discharge to the Company. Every

such cheque or warrant shall be sent at the risk of the person entitled to the money represented thereby.

(B) Subject to the provisions of these presents and to the rights attaching to any shares, any dividend or other moneys payable on or in respect of a share may be paid in such currency as the Directors may determine.

(c) The Company may cease to send any cheque, warrant or order by post for any dividend on any shares which is normally paid in that manner if, on each of the three most recent occasions when dividends have been payable on those shares, the cheque, warrant or order has been returned undelivered or remains uncashed but, subject to the provisions of these presents, shall recommence sending cheques, warrants or orders in respect of the dividends payable on those shares if the holder or person entitled by transmission claims the arrears of dividend and does not instruct the Company to pay future dividends in some other way.

Payments to joint holders etc.

127. If two or more persons are registered as joint holders of any share, or are entitled jointly to a share in consequence of the death, bankruptcy or mental disorder of the holder or by operation of law or any other event, any one of them may give effectual receipts for any dividend or other money payable or property distributable on or in respect of the share.

Record dates

128. Notwithstanding any other provision of these presents but subject always to the Statutes, the Company or the Directors may by resolution specify any date (the "Record Date") as the date at the close of business (or such other time as the Company or the Directors, as the case may be, may determine) on which persons registered as the holders of shares or other securities shall be entitled to receipt of any dividend, distribution, interest, allotment, issue, notice, information, document or circular and such Record Date may be on or at any time before the date on which the same is paid, made, given or despatched but without prejudice to the rights *inter se* in respect of the same of transferors and transferees of any such shares or other securities.

## CAPITALISATION OF PROFITS AND RESERVES

Capitalisation of profits and reserves

129. The Directors may, with the sanction of an Ordinary Resolution of the Company, capitalise any sum standing to the credit of any of the Company's reserve accounts (including without limitation the Statutory Reserve, Share Premium Account and Capital Redemption Reserve Fund) or any sum standing to the credit of profit and loss account by appropriating such sum to the holders of Ordinary Shares on the Register of Members at the close of business on the date of the Resolution (or such other date as may be specified therein or determined as therein provided) in proportion to their then holdings of Ordinary Shares and applying such sum on their behalf in paying up in full unissued Ordinary Shares (or, subject to any special rights previously conferred on any

shares or class of shares for the time being issued, unissued shares of any other class not being redeemable shares) for allotment and distribution credited as fully paid up to and amongst them in the proportion aforesaid. The Directors may do all acts and things considered necessary or expedient to give effect to any such capitalisation, with full power to the Directors to make such provisions as they think fit for any fractional entitlements which would arise on the basis aforesaid (including provisions whereby fractional entitlements are disregarded or the benefit thereof accrues to the Company rather than to the members concerned). The Directors may authorise any person to enter on behalf of all the members interested into an agreement with the Company providing for any such capitalisation and matters incidental thereto and any agreement made under such authority shall be effective and binding on all concerned.

130. The Directors may with the prior sanction of an Ordinary Resolution of the Company offer the holders of Ordinary Shares the right to elect to receive Ordinary Shares, credited as fully paid, instead of cash in respect of such dividend or dividends (or part thereof) as are specified by any such Resolution. The following provisions shall apply:

(i) the said Resolution may specify a particular dividend or may specify all or any dividends declared or resolved in respect of a specified period but such period may not end later than the expiry of two months following the conclusion of the fifth Annual General Meeting following the date of the Meeting at which such Resolution is passed provided nevertheless that the Directors may in their absolute discretion suspend or terminate (whether temporarily or otherwise) such right to elect and may do such things and acts considered necessary or expedient with regard to, or in order to effect, any such suspension or termination;

(ii) the entitlement of each Ordinary Shareholder to new Ordinary Shares shall be determined by the Directors so that the Relevant Value thereof shall be as nearly as possible equal to (but not in excess of) the cash amount that such Shareholders would have received by way of dividend. For this purpose "Relevant Value" shall be calculated by reference to the average of the middle market quotations for the Company's Ordinary Shares on The Stock Exchange, as derived from the Daily Official List on the day when the Ordinary Shares are first quoted "ex" the relevant dividend and on the four subsequent dealing days, adjusted (if need be) as the Auditors may consider appropriate;

(iii) the Directors may specify a minimum number of Ordinary Shares in respect of which the right of election may be exercised. The basis of allotment shall be such that no member may receive a fraction of a share and the Directors may make such provision as they think fit for

any fractional entitlements including provisions whereby the benefit of fractional entitlements in whole or in part is disregarded or accrues to the Company and/or under which the benefit of fractional entitlements is accumulated on behalf of any shareholder without entitlement to interest on terms that the relevant amount may subsequently be applied to the allotment by way of bonus or cash subscription on behalf of such shareholder of fully paid ordinary shares (or in payment to such shareholder in cash). Any such allotment shall be made in accordance with the foregoing provisions of this Article;

(iv)   the Directors may make exclusions or restrictions as respects the rights of certain shareholders to elect to receive Ordinary Shares instead of cash as they think necessary or desirable in relation to compliance with legal or practical problems under the laws of, or the requirements of any recognised regulatory body or any stock exchange in, any territory;

(v)   the Directors, after determining the basis of allotment, shall notify the holders of Ordinary Shares in writing of the right of election offered to them, and shall issue forms of election and specify the procedure to be followed and place at which, and the latest time by which, duly completed forms of election must be lodged in order to be effective and may also from time to time establish or vary a procedure for election mandates, under which a holder of Ordinary Shares may elect in respect of future rights of election to be offered to that holder under this Article until the election mandate is revoked in accordance with the procedure;

(vi)   the dividend (or that part of the dividend in respect of which a right of election has been offered) shall not be payable on Ordinary Shares in respect whereof the said election has been duly made (the "elected Ordinary Shares") and instead thereof additional Ordinary Shares shall be allotted to the holders of the elected Ordinary Shares on the basis of allotment determined as aforesaid; for such purpose the Directors shall capitalise out of such of the sums standing to the credit of reserves (including any share premium account or capital redemption reserve) or any of the profits which could otherwise have been applied in paying dividends in cash as the Directors may determine, a sum equal to the aggregate nominal amount of the additional Ordinary Shares to be allotted on such basis and apply the same in paying up in full the appropriate number of unissued Ordinary Shares for allotment and distribution to and amongst the holders of the elected Ordinary Shares on such basis. A resolution of the Directors capitalising any part of the reserves of profits hereinbefore mentioned shall have the same effect as if such capitalisation had been sanctioned

by an Ordinary Resolution of the Company in accordance with Article 129; and

(vii)   the additional Ordinary Shares so allotted shall be allotted as of the record date for the dividend in respect of which the right of election has been offered and shall rank *pari passu* in all respects with the fully paid Ordinary Shares then in issue save only that the shares so allotted will not rank for any dividend or other distribution or other entitlement which has been declared, made, paid or payable by reference to such record date or any earlier record date.

## ACCOUNTS

131. Accounting records sufficient to show and explain the Company's transactions and otherwise complying with the Statutes shall be kept at the Office, or at such other place as the Directors think fit, and shall always be open to inspection by the officers of the Company. Subject as aforesaid no member of the Company or other person shall have any right of inspecting any account or book or document of the Company except as conferred by statute or as ordered by a court of competent jurisdiction or as authorised by the Directors. <small>Accounting records</small>

132. Subject as provided by this Article and Article 133, a copy of the Company's annual accounts and reports which are to be laid before a General Meeting of the Company (including every document required by law to be comprised therein or attached or annexed thereto shall not less than 21 days before the date of the meeting be sent to every member of, and every holder of debentures of the Company and to every other person who is entitled to receive notice of meetings from the Company under the provisions of the Statutes or of these presents. Provided that this Article shall not require a copy of these documents to be sent to more than one of joint holders or to any person of whose address the Company is not aware, but any member or holder of debentures to whom a copy of these documents has not been sent shall be entitled to receive a copy free of charge on application at the Office. If all or any of the shares or debentures of the Company shall for the time being be listed on the official list maintained by the UK Listing Authority, there shall be forwarded to the UK Listing Authority such number of copies of such documents as may for the time being be required under its regulations or practice. <small>Deliver accounts etc. to shareholders etc.</small>

133. If the Statutes so permit the Company need not send copies of the documents referred to in Article 132 to members to whom are sent summary financial statements or such other documents as may be authorised by the Statutes.

## AUDITORS

134. Subject to the provisions of the Statutes, all acts done by any a person acting as an Auditor shall, as regards all persons dealing in good faith <small>Validity of acts of auditors</small>

with the Company, be valid, notwithstanding that there was some defect in his appointment or that he was at the time of his appointment not qualified for appointment or subsequently became disqualified.

Auditors may attend meetings

135. An Auditor shall be entitled to attend any General Meeting and to receive all notices of and other communications relating to any General Meeting which any member is entitled to receive and to be heard at any General Meeting on any part of the business of the meeting which concerns him as Auditor. To the extent permitted by Statute, the notices and other communications relating to any General Meeting referred to in this Article may be sent by electronic communication.

## COMMUNICATIONS WITH MEMBERS

Notices

136. (A) The Company may, subject to and in accordance with the Companies Acts and these Articles, send or supply all types of notices, documents or information to members by electronic means and/or by making such notices, documents or information available on a website.

(B) The Company Communications Provisions have effect for the purposes of any provision of the Companies Acts or these Articles that authorises or requires notices, documents or information to be sent or supplied by or to the Company.

(C) Any notice, document or information (including a share certificate) which is sent or supplied by the Company in hard copy form, or in electronic form but to be delivered other than by electronic means, and which is sent by pre-paid post and properly addressed shall be deemed to have been received by the intended recipient at the expiration of 24 hours (or, where first class mail is not employed, 48 hours) after the time it was posted, and in proving such receipt it shall be sufficient to show that such notice, document or information was properly addressed, pre-paid and posted.

(D) Any notice, document or information which is sent or supplied by the Company by electronic means and/or by means of a website shall be deemed to have been received by the intended recipient at 9 a.m. on the day following that on which it was transmitted, and in proving such receipt it shall be sufficient to show that such notice, document or information was properly addressed.

(E) Any notice, document or information which is sent or supplied by the Company by means of a website shall be deemed to have been received when the material was first made available on the website or, if later, when the recipient received (or is deemed to have received) notice of the fact that the material was available on the website.

(F) The accidental failure to send, or the non-receipt by any person entitled to, any notice of or other document or information relating to any

62

meeting or other proceeding shall not invalidate the relevant meeting or proceeding.

(G) The provisions of this Article shall have effect in place of the Company Communications Provisions relating to deemed delivery of notices, documents or information.

137. (A) Anything which needs to be agreed or specified by the joint holders of a share shall for all purposes be taken to be agreed or specified by all the joint holders where it has been agreed or specified by the joint holder whose name stands first in the register in respect of the share. <span style="float:right">Notices to joint holders</span>

(B) Any notice, document or information which is authorised or required to be sent or supplied to joint holders of a share may be sent or supplied to the joint holder whose name stands first in the register in respect of the share, to the exclusion of the other joint holders. For such purpose, a joint holder having no registered address in the United Kingdom and not having supplied an address within the United Kingdom for the service of notices may, subject to the Statutes, be disregarded.

(c) The provisions of this Article shall have effect in place of the Company Communications Provisions regarding joint holders of shares.

138. (A) A person who claims to be entitled to a share in consequence of the death or bankruptcy of a member or otherwise by operation of law shall supply to the Company: <span style="float:right">Notices to persons entitled to shares</span>

    (i) such evidence as the Directors may reasonably require to show his title to the share,

    (ii) an address at which notices may be sent or supplied to such person,

whereupon he shall be entitled to have sent or supplied to him at such address any notice, document or information to which the said member would have been entitled. Any notice, document or information shall for all purposes be deemed to be duly sent or supplied to all persons interested (whether jointly with or as claiming through or under him) in the share.

(B) Save as provided by paragraph 138(A), any notice, document or information sent or supplied to the address of any member in pursuance of these Articles shall, notwithstanding that such member be then dead or bankrupt or in liquidation, and whether or not the Company has notice of his death or bankruptcy or liquidation, be deemed to have been duly sent or supplied in respect of any share registered in the name of such member as sole or first-named joint holder.

(c) The provisions of this Article shall have effect in place of the Company Communications Provisions regarding the death or bankruptcy of a holder of shares in the Company.

Notices where no
registered
address
139. Subject to the Statutes, the Company shall not be required to send notices, documents or information to a member who (having no registered address within the United Kingdom) has not supplied to the Company an address within the United Kingdom for the service of notices.

Suspension of postal
services
140. If at any time by reason of the total suspension or curtailment of postal services within the United Kingdom the Company is unable to give notice by post in hard copy form of a General Meeting, such notice shall be deemed to have been given to all members entitled to receive such notice in hard copy form if such notice is advertised in at least two leading daily newspapers (at least one of which shall be a London newspaper) and such notice shall be deemed to have been given at noon on the day when the advertisement appears. In any such case, the Company shall (i) make such notice available on its website from the date of such advertisement until the conclusion of the meeting or any adjournment thereof and (ii) send confirmatory copies of the notice by post to such members if at least 48 hours prior to the meeting the posting of notices again becomes practicable.

## SIGNATURE OR AUTHENTICATION OF DOCUMENTS SENT BY ELECTRONIC MEANS

141. Where these Articles require a notice or other document to be signed or authenticated by a member or other person then any notice or other document sent or supplied in electronic form is sufficiently authenticated in any manner authorised by the Company Communications Provisions or in such other manner as may be approved by the Directors. The Directors may designate mechanisms for validating any such notice or other document, and any such notice or other document not so validated by such mechanisms shall be deemed not to have been received by the Company.

Statutory provisions
as to notices
142. Nothing in any of the preceding six Articles shall affect any provision of the Statutes that requires or permits any particular notice, document or information to be sent or supplied in any particular manner.

## WINDING-UP

Winding-up
143. The Directors shall have power in the name and on behalf of the Company to present a petition to the Court for the Company to be wound up.

Powers of liquidator
144. If the Company shall be wound up (whether the liquidation is voluntary, under supervision, or by the court) the Liquidator may, with the authority of a Special Resolution and subject to any provision sanctioned in accordance with the provisions of Section 187 of the Insolvency Act 1986, divide among the members in specie or kind the whole or any part of the assets of the Company and whether or not the assets shall consist of property of one kind or shall consist of properties of different kinds, and may for such purpose set such value as he deems fair upon any one or more class or classes of property and may determine how such division shall be carried out as between

64

the members or different classes of members. The Liquidator may, with the like authority, vest any part of the assets in trustees upon such trusts for the benefit of members as the Liquidator with the like authority shall think fit, and the liquidation of the Company may be closed and the Company dissolved, but so that no contributor shall be compelled to accept any shares or other property in respect of which there is a liability. The Liquidator may make any provision referred to in, and sanctioned in accordance with the provisions of, Section 187 of the Insolvency Act 1986.

## INDEMNITY

145. (A)  Subject to the provisions of, and so far as may be permitted by and consistent with, the Statutes, the rules of the UK Listing Authority and subject as mentioned below, every Director of the Company may be indemnified by the Company out of its own funds against: (a) any liability incurred by or attaching to him in connection with any negligence, default, breach of duty or breach of trust by him in relation to the Company or any Associated Company or the Company other than (i) any liability to the Company or any Associated Company of the Company and (ii) any liability of the kind referred to in Sections 234(3) of the Companies Act 2006; and (b) any other liability incurred by or attaching to him in the actual or purported execution and/or discharge of his duties and/or the exercise or purported exercise of his powers and/or otherwise in relation to or in connection with his duties, powers or office. <span style="float:right">Indemnity of Directors</span>

(B)  Subject to the provisions of, and so far as may be permitted by and consistent with, the statutes, the rules of the UK Listing Authority and subject as mentioned below, every Director of the Company may be indemnified by the Company out of its own funds against (a) any liability incurred by or attaching to him in connection with any negligence, default, breach of duty or breach of trust by him in relation to the Company or any Associated Company of the Company if it is the trustee of an occupational pension scheme (within the meaning of Section 235(6) of the Companies Act 2006), in so far as such liability relates to the Company's or any such Associated Companies' activities as trustee of such occupational pension scheme and other than any liability of the kind referred to in Sections 235(3) of the Companies Act 2006 and (b) any other liability incurred by or attaching to him in the actual or purported execution and/or discharge of his duties and/or the exercise or purported exercise of his powers and/or otherwise in relation to or in connection with his duties, powers or office.

(c)  Indemnities provided for under this Article 145 shall not, however, extend to any liability incurred by or attaching to a Director as a result of his own fraud or wilful default but shall extend to other liabilities arising after he ceased to be a Director in respect of acts or omissions while he was a Director. Where a person is indemnified against any liability in accordance with

this Article 145, such indemnity shall extend to all costs, charges, losses, expenses and liabilities incurred by him in relation thereto.

(D) In this Article "Associated Company" shall have the meaning given thereto by Section 256 of the Companies Act 2006.

No. 1470151

*The Companies Act 1948 to 1983,*
*The Companies Act 1985 and 1989*
*and The Companies Act 2006*

---

COMPANY LIMITED BY SHARES

---

Memorandum

*(Amended by Special Resolutions passed on*
*2nd January, 1981, 1st May, 1996 and 4th May, 2000)*

AND

Articles of Association

*(Adopted by Special Resolution passed on*
*1st May, 1996 and amended by*
*Special Resolutions passed on*
*29th April, 1998, 4th May, 2000, 3rd May, 2002,*
*5th May, 2004, 4th May, 2005, 9th May, 2007 and*
*7th May, 2008)*

OF

**BAE SYSTEMS plc**

**Incorporated the 31st day of December, 1979.**

LINKLATERS LLP
ONE SILK STREET,
LONDON EC2Y 8HQ.

BOWNE
U55427

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITY OF HARPER WOODS EMPLOYEES'<br>RETIREMENT SYSTEM, Derivatively on<br>Behalf of BAE SYSTEMS PLC, | ) ) ) | Civil No. 1:07-cv-01646 |
| | ) | Assigned to: |
| | ) | Judge Rosemary M. Collyer |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| RICHARD (DICK) L. OLVER et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| – and – | ) | |
| | ) | |
| BAE SYSTEMS PLC, an England and Wales<br>corporation, | ) ) | |
| | ) | |
| Nominal Defendant. | ) | |

## <u>SECOND DECLARATION OF MARTIN MOORE QC</u>

Pursuant to 28 U.S.C 1746, I, Martin Luke Moore QC of Erskine Chambers, 33 Chancery Lane, London WC2A 1EN, declare as follows:

## INTRODUCTION

1    I make this declaration further to my first declaration dated 28 January 2008. I make it on the same basis as set out in paragraph 6 of that declaration – namely that I owe my duties to this Court and not to the party appointing me. The purpose of this declaration is to expand upon the evidence given in my first declaration as to the circumstances in which a beneficial owner of shares in the position of the Plaintiff is entitled, as a matter of English law, to bring proceedings derivatively on behalf of a company. I do so in the light of the declaration of Plaintiff's expert Mr Girolami made on 23 April 2008.

**LITTLE DISAGREEMENT IN EXPERTS' VIEWS**

2    In the light of Mr Girolami's declaration, it appears that there is little difference between us on a number of points. It appears that we may disagree on the logically prior question of the characterisation of the claims against the BAE PLC Defendants – although his suggestion (at paragraph 19) that "It seems to me possible that the allegations consist of, or include a deliberate course of conduct by the Defendant Directors of making illegal or improper payment" is expressed in tentative terms rather than conveying a firm conclusion.

3    The question of how to categorise the claims made seems to me to be an interpretational one on which the Court can take its own view, but as an English lawyer reading the Complaint, I stand by my original interpretation as set out in paragraphs 16 and 17 of my first declaration. The Complaint seems to me to be based on alleged mismanagement and lack of control by the directors, not on specific allegations that some or all of them authorised or made particular illicit payments. I do not consider that an English Court looking at the Complaint would say that the Plaintiff had adequately pleaded allegations of such a positive course of conduct by the directors.

4    It appears to me that there are only three issues between Mr Girolami and me, being:

    (a)    The standing of a non-member to bring derivative proceedings.

    (b)    (To a more limited extent) the scope of the "wrongdoer control" exception to the rule in <u>Foss v Harbottle</u>.

    (c)    If Mr Girolami's tentative suggestions as to characterisation of the Complaint are assumed to be correct, there is a third issue, namely whether there is (as he suggests) a further exception to the rule in <u>Foss v Harbottle</u> where directors are accused of causing the company to engage in conduct which is not ultra vires the company in the sense of being beyond its objects clause or contrary to the statutes to which the company owes its existence, but which is criminally illegal.

5    I have also had the opportunity to read the purported statements of English law made in the Plaintiff's Consolidated Opposition to Defendants' Motions to Dismiss, filed on 23 April 2008 ("Plaintiff's Opposition Brief"). There are certain respects in which the Plaintiff's Opposition Brief fundamentally mis-states English law, and makes claims in respect of it which go much further than Mr Girolami has done, and in some instances are at odds with

Mr Girolami's declaration. In particular, there is insufficient appreciation of the restrictiveness of the approach taken by the English courts to shareholder derivative litigation. Accordingly, for the assistance of the Court and in the interests of accuracy where the assertions are fundamental to the application of English law on these facts, I have corrected those erroneous assertions in the final portion of this declaration. In doing so I have focussed on the significant issues and my lack of comment on other, more peripheral, points should not be taken as any endorsement by me.

## ONLY A REGISTERED SHAREHOLDER HAS STANDING TO SUE DERIVATIVELY

6    At paragraphs 32 to 38 of his declaration, Mr Girolami considers whether a beneficial owner of shares in these circumstances has standing, as a matter of English law, to bring a derivative action. His (again) tentative conclusion is that there is no authority that he cannot, although "there is only very limited authority that it might be maintainable".

7    I do not consider that the beneficial owner of shares has standing to bring a derivative action. The best English authority on the point is Birch v Sullivan [1957] 1 WLR 1247, in which Harman J (later Lord Justice Harman) dismissed a derivative action which had been brought by a bankrupt, on the basis that his name had been removed from the company's register of members. Considering what the position would have been, had the plaintiff been bankrupt but remained on the register of members, Harman J said (at 1249) that "I am not satisfied that so long as he remains registered he could not maintain such an action even if he be a bankrupt". It is clear from that case that Harman J favoured the view that the register of members is determinative of standing to sue. I note that Mr Girolami does not dispute the applicability or holding of Birch v. Sullivan.

8    Of particular significance is Svanstrom v Jonasson (1997) 23 ACSR 475, a decision of the Court of Appeal of the Cayman Islands which considers the English authorities (including the cases cited by Mr Girolami at paragraph 35 of his declaration, and the quote from Pennington's Company Law[1] on which he relies) and the Australian authorities cited by Mr

---

[1]    I do not consider that the authorities cited in *Pennington* support the contrary proposition as stated therein. Both Bagshaw v Eastern Union Railway Co (1849) 7 Hare 114 and Binney v Ince Hall Coal and Cannel Co (1866) 35 LJ Ch 363 are distinguished in Svanstrom. Neither of those cases was a derivative action. Mr Girolami cites a third case, McGrattan v McGrattan [1985] NI 28. Although in that case the plaintiff complained that a resolution had been passed using the

Girolami. In <u>Svanstrom</u>, the court held that a beneficial owner has no right to bring a derivative action. This was said to be a function of the general company principle enunciated by Lord Coleridge CJ in <u>Re Perkins; ex parte Mexican Santa Barbara Mining Co</u> (1890) 24 QBD 613 that:

> *"It is important not to throw any doubt on the principle that companies have nothing whatever to do with the relations between trustees and their cestuis que trust in respect of the shares of the company. If a trustee is on the company's register as the holder of shares, the relations which he may have with some other person in respect of the shares are matters with which the company have nothing whatever to do; they can look only to the man whose name is upon the register".*

**9**    In the case of BAE PLC, this principle is embodied in Article 10 of its Articles of Association, the relevant parts of which provide that:

> *"Except as ordered by a court of competent jurisdiction or as required by law or pursuant to the provisions of Article 43, no person shall be recognised by the Company as holding any share upon any trust, and the Company shall not be bound by or compelled in any way to recognise (even if it has notice of it) any equitable, contingent, future, partial or other claim to or interest in any share … or (except only as by these presents or by court order or by law otherwise provided) any other right in respect of any share … except an absolute right to the entirety thereof in the holder".*[2]

**10**    Further circumstantial evidence is to be found in the use of the word "member" in section 260(1) of the Companies Act 2006. In his paragraph 34, Mr Girolami appears (quite rightly) to accept that this means that under the 2006 Act, only a member has standing to sue. Its use of the word "member" is significant. This is because there does not appear to have been any suggestion – either by the Company Law Review, the Explanatory Notes[3], or anywhere else, that the 2006 Act was understood to be changing the law in this regard. It would be strange if the legislation which (as the Plaintiff's Opposition Brief repeatedly emphasizes)

---

votes attached to shares in which he was beneficially interested, he was a registered shareholder of the company in respect of other shares. Again, this was not a derivative claim.

[2]    Article 43 cited in this passage is the article requiring BAE PLC to be kept in United Kingdom control, and is of no relevance here.

[3]    The Plaintiff's Opposition Brief states at page 67 that these notes were produced by "the Law Commission". This is not correct – as the notes state on their face, they were produced by the Department of Trade and Industry, the government department with overall responsibility for the Bill. Their precise status has yet to be commented upon by the Courts. It is made clear that the Notes have not been endorsed by Parliament.

was designed as a liberalizing statute in fact made the standing requirements more onerous. It would be stranger still for this to pass without comment.

11      The only derivative case cited by the Plaintiff (in its Opposition Brief but not in Mr Girolami's declaration) on the topic of a beneficial owner's ability to sue is <u>Jafari-Fini v Skillglass Ltd</u> [2005] EWCA Civ 356. The reported decision is that of the Court of Appeal, but the Plaintiff relies on a passage which quotes in part the decision of His Honour Judge Rich QC in the County Court (a local tribunal inferior in status to the High Court). It appears that in that decision, Judge Rich gave the plaintiff permission to continue a derivative claim, in circumstances where the registered holders of the shares in which he had a beneficial interest were also the directors of the company. It was alleged that had they not acted in breach of trust, the plaintiff would have become the majority registered shareholder and would have been able to cause the company to bring the claim.

12      Judge Rich's decision is of little precedential value for several reasons. County Court decisions are not binding on any other tribunal. Further, his findings on standing were not at issue in the Court of Appeal. At paragraph 56 of his judgment, Chadwick LJ took great pains to emphasise this point, along with the "unusual circumstances of the case" and the fact that Mr Jafari-Fini was not represented by counsel. Thus, the fact that the Court of Appeal did not itself reconsider the issue cannot be taken as tacit approval of Judge Rich's decision (as suggested by page 64 of the Plaintiff's Opposition Brief). The lack of a report means that we have no idea whether the relevant authorities were cited to Judge Rich.

13      Due to its unusual facts, if <u>Jafari-Fini</u> were authority for anything at all, it would stand only for the proposition that it may be possible for a beneficial shareholder to commence derivative proceedings if (i) his trustee is joined to proceedings, (ii) it is alleged that the plaintiff would be a registered shareholder but for the trustee's breach of trust and (iii) the trustee is a director of the company or (perhaps) the company otherwise has actual knowledge of the breach of trust. So far as I am aware, the depositary is not joined to these proceedings, there is no allegation of breach of trust in relation to the ADRs, and certainly no allegation that BAE PLC had knowledge of such a breach. Accordingly, I do not consider that <u>Jafari-Fini</u> offers any significant guidance as to the way in which the highest court in England would approach this issue.

5

**THE RULE IN <u>FOSS V. HARBOTTLE</u> REFLECTS SUBSTANTIVE POLICIES OF ENGLISH COMPANY LAW**

14    In various parts of the Opposition Brief, the Plaintiff describes the rule in <u>Foss v Harbottle</u> as, variously, "fuzzy", "old", and out of step, as if mere antiquity deprived the principle embodied in it of any validity. But the rule has been consistently applied by the English Courts for well over 150 years. Rightly or wrongly, the English courts have adopted a consistently restrictive and sceptical approach to shareholder litigation, described by one commentator[4] as: ". . . a marked judicial antipathy, even hostility, towards the minority shareholder who comes before the court as litigant".

15    Accordingly, the English courts have never regarded the rule in <u>Foss v Harbottle</u> as a mere procedural rule, to be judicially abrogated at a convenient time. Rather, it has been seen as an essential aspect of owning shares in an English company. So in <u>Prudential Assurance Co Ltd v Newman Industries Ltd (No 2)</u> [1982] Ch 204, the Court of Appeal said:

> *"This is not merely a tiresome procedural obstacle placed in the path of a shareholder by a legalistic judiciary. The rule is a consequence of the fact that a corporation is a separate legal entity. Other consequences are limited liability and limited rights. The company is liable for its contracts and torts; the shareholder has no such liability. The company acquires causes of action for breaches of contract and for torts which damage the company. No cause of action vests in the shareholder. When the shareholder acquires a share he accepts the fact that the value of his investment follows the fortune of the company and that he can only exercise his influence over the fortunes of the company by the exercise of his voting rights in general meeting."*

**PLAINTIFF DOES NOT SATISFY THE "FRAUD ON THE MINORITY" EXCEPTION OF THE RULE IN <u>FOSS V. HARBOTTLE</u>**

16    There does not appear to me to be much difference between my view on the "wrongdoer control" element of the "fraud on the minority" exception and that of Mr Girolami. I agree with him that:

a)    The test is in effect a practical one.

b)    It is not always necessary to show that the wrongdoers hold the majority of the shares in the company.

---

[4]    Sealy, "Problems of Standing, Pleading and Proof in Corporate Litigation" in Pettet (ed) *Company Law In Change*, (1987).

17    However, as to point (b), I observe that although the "wrongdoer control" test extends beyond the situation where the wrongdoers are the majority shareholders, it is nevertheless firmly focused on the ability to obtain (directly or indirectly) a majority of the votes cast in general meeting. This is apparent from the Court of Appeal's formulation in <u>Prudential (No 2)</u>, as quoted by Mr Girolami in paragraph 31 of his declaration, stating that "control" may embrace:

> *"a broad spectrum extending from an <u>overall absolute majority</u> of votes at one end, <u>to a majority of votes</u> at the other end made up of those likely to be cast by the delinquent himself plus those voting with him as a result of influence or apathy".* (my emphasis)

18    As I indicated in my first declaration, it does not seem to me that the Plaintiff has alleged anything which would satisfy an English court that this requirement was met. There is no allegation of wrongdoer control in the above sense in the Complaint. At page 59 of the Plaintiff's Opposition Brief there is a bald assertion that "the BAE Board wields considerable control over general meetings of the Company's shareholders". However, I am not aware of any factual allegations made to explain this "control".

19    Considering the question in the abstract, I do not consider that an English court would think it sufficient for the Plaintiff to claim that a listed company had a wide shareholder base, and that the company's shareholders usually supported the board's recommendations as to which way to vote at general meetings. For obvious reasons, such a wide interpretation of "wrongdoer control" would embrace derivative claims relating to almost all public companies. The English courts would be very unlikely to apply such a low threshold.

20    In my view, the proper interpretation is that in order to show true "control" in the hands of the board, it would be necessary to show either that shareholders have no effective choice but to toe the board's line, or that they are accustomed to giving the Chairman "open" proxies to vote on their behalf as he sees fit. Merely giving weight to the board's recommendations in deciding how to vote is not the same as submitting to board "control" – particularly in a listed company with a wide shareholder base including institutional and other sophisticated investors.

**CRIMINAL ACTS ARE NOT A FORM OF ULTRA VIRES EXCEPTION TO THE RULE IN <u>FOSS v HARBOTTLE</u>**

21    At paragraph 27 of his declaration, Mr Girolami suggests that there is a "broader class of acts unratifiable by a simple majority" than those which are ultra vires in the sense of being beyond a company's objects clause or prohibited by a statute to which the company owes its existence. Although Mr Girolami does not state clearly his view as to the scope of this class, he implies that it includes the situation where the company has been procured to commit a criminally illegal act.

22    Mr Girolami cites a number of textbooks which comment favourably (if extremely briefly) on this proposition, so it is important to emphasise that the underlying English authorities simply do not reflect the proposition stated in the textbooks. As is well known, comments in textbooks do not always accurately reflect the primary sources, and a tendency amongst editors and authors to cross-refer means that errors are notoriously contagious. These points were noted by the Court of Appeal and the House of Lords in <u>R v Button and Swain</u> [1966] AC 591, at 607-9, 627, recording and refusing to follow an error which had been first been committed in 1822 and had been repeated in the leading textbooks for well over a century.

23    These frailties mean that English courts are not shy of departing from the views of textbook writers when the underlying material does not support the statement. As Lord Chief Justice Goddard said in <u>Bastin v Davies</u> [1950] 2 KB 579, at 582-3:

> *"This court would never hesitate to disagree with a statement in a textbook, however authoritative, or however long it had stood, if it thought it right to do so. In fact, it has had occasion, I think, in the past to differ from statements in Stone's Justices' Manual, which justices are accustomed to treat almost with the respect paid to the Bible."*

24    I note that one comparative study by English and American academics[5] suggests that academic writings are less influential in English law than in the United States. I do not comment on the United States courts' use of such works, which is beyond my knowledge. I merely emphasise the point that in England, it is the primary materials, not academic commentary, which are the authoritative statements of the law[6].

---

[5]    Atiyah and Summers, *Form and Substance in Anglo-American Law* (1987), at 401-403.

[6]    There is also a risk that textbooks may be cited out of context. Mr Girolami does not commit this error, but some of the citations of Hollington's treatise in the Plaintiff's Opposition Brief are out of context in this way. For example, the citation at page 52 of the Plaintiff's Opposition Brief,

**25**    Accordingly the first, crucial, point is that the authoritative statements of the rule in <u>Foss v Harbottle</u>, both old and new, do not suggest that there is an exception to the rule where conduct is illegal:

(a)    <u>Foss v Harbottle</u> itself makes no mention of such exception.

(b)    The rule as set out by the Court of Appeal in <u>Edwards v Halliwell</u>, and authoritatively restated by the Court of Appeal in <u>Prudential (No 2)</u>, describes three exceptions. Two of these, being "wrongdoer control" and the "super-majority exception" have no relevance here. Jenkins LJ described the relevant exception thus:

> *"There is no room for the operation of the rule is the alleged wrong is ultra vires the corporation, because the majority of members cannot confirm the transaction".*

(c)    The Law Commission's Consultation Paper on Shareholder Remedies, published at a time when Lady Justice Arden (the contributor to Buckley to whom Mr Girolami refers at page 14 of his declaration) was Chairman of the Law Commission, considered the rule in <u>Foss v Harbottle</u> in some detail. At paragraph 4.21 it explained the ultra vires exception thus:

> *"However, where an act which a company commits is illegal it is not also ultra vires unless it is also beyond the capacity it is given by the Companies Acts. In <u>Smith v Croft</u>, the illegal act was conceded to be ultra vires because it involved the giving of financial assistance . . . . The description of the rule in <u>Foss v Harbottle</u> that is given above applies to illegal acts which are ultra vires in this sense. Where the company proposes to do some other illegal act, a member may bring proceedings to restrain the company from so acting, but it is doubtful whether he can bring proceedings to recover any loss . . . without showing fraud on the minority."*

**26**    The suggestion that (despite the absence of any such suggestion in the classic formulations of the rule) general illegality creates an exception to the rule in <u>Foss v Harbottle</u> appears to be a relatively recent arrival. For example, Mr Girolami cites the most recent edition of Buckley, but in the previous (14th) edition of the work, published in 1981, the treatment of

---

suggesting that the court has a "wide discretion" to give permission to proceed might be read as suggesting that the rule in <u>Foss v Harbottle</u> is somehow optional or discretionary. In fact, what this section of Hollington's Treatise is referring to is the court's equitable discretion as to whether or not to give permission to continue (and on what terms), which arises only once an exception to <u>Foss v Harbottle</u> has already been established.

this issue makes no suggestion that illegality (as opposed to ultra vires) forms an exception to the rule.

27    I note that no recent case law is cited to support the view that there has been any shift in the meaning of the rule. The cases cited in the books and by Mr Girolami, at paragraphs 23-27, are substantially older, and apparently were not recognized at the time they were decided (or in the subsequent judicial formulations of the rule in <u>Foss v Harbottle</u>) as creating an additional exception to the rule:

(a)    In <u>Powell v Kempton Park Racecourse</u> [1897] 2 QB 242 (the case most heavily relied on), the question of standing was, as Mr Girolami rightly acknowledges, conceded by the defendant. Further, that case was a personal action to restrain the company's future illegal act, not a derivative claim arising from a past illegal act. As the extract from the Law Commission Consultation Paper observes, such actions are not subject to the same rules (indeed <u>Foss v Harbottle</u> does not apply to such personal claims at all).

(b)    <u>Baillie v Oriental Telephone and Electric Co Limited</u> [1915] 1 Ch 503, was, again, a personal action, not a derivative claim. In that case, the judge merely observed that (i) ratification was not effective on the facts due to an absence of disclosure and (ii) an ordinary resolution will not suffice to ratify something which requires a special resolution – a point which would be relevant only to the "super-majority exception".

(c)    <u>Cockburn v Newbridge Sanitary Steam Laundry Co Limited v Llewellyn</u> [1915] 1 IR 237 is an Irish case and is not binding on the English courts. Further, the reasoning underlying the decision is fundamentally incompatible with important and binding English authority, in particular <u>Rolled Steel Products (Holdings) Limited v British Steel Corporation</u> [1986] Ch 246 and <u>Arab Monetary Fund v Hashim</u> [1993] 1 Lloyd's Rep 543. The Court permitted the claim in <u>Cockburn</u> on the basis that participating in a crime "could not be in any way within the powers of a company", although this does not appear from the Report to have formed any part of the argument. That may have been true as a matter of Irish law in 1915, but as a matter of English law the established position is entirely the reverse, as I explain at paragraphs 28 to 31 below.

(d)    <u>Australian Agricultural Co v Oatmont Pty</u> [1992] is an Australian case, again not binding on the English courts, and should be treated with caution in the light of the

Australian courts' less restrictive approach to the rule in <u>Foss v Harbottle</u>. Further, it is not clear that the comments quoted by Mr Girolami at his paragraph 25 refer to an exception to the rule at all. It is clear that the court considers that causing the company to act illegally would be a breach of the directors' duties, but all that is said is that this "could well give rise" to a derivative action. It is not suggested that such an action could necessarily be pursued in the absence of one or more of the established exceptions to the rule in <u>Foss v Harbottle</u> (in particular, fraud on the minority)[7].

28    Most importantly, there are significant English authorities which indicate that general illegality does not constitute an exception to the rule in <u>Foss v Harbottle</u>. For example, in <u>Smith v Croft (No2)</u> [1988] 1 Ch 114, the case described in paragraph 42 of my first declaration, the allegations against the directors included "an ultra vires gift made otherwise than in good faith . . . with a view to benefiting the director concerned and made in dishonest breach of fiduciary duty" (at 157). Under English law, this conduct would be criminally illegal (being theft, and possibly criminal fraud). Yet (at 160-163) Knox J found that this conduct did not fall with an exception to the rule in <u>Foss v Harbottle</u>, because it was a payment for services rendered and therefore within the capacity of company. This is exactly the conclusion that was reached (in different circumstances) in <u>Arab Monetary Fund v Hashim</u>.

29    It is also instructive to consider the distinction between the claim rejected by Knox J in <u>Smith v Croft (No 2)</u> and the second claim in that case, which he did allow to proceed. The second claim was that, in breach of the Companies Acts, the company had given unlawful financial assistance for the acquisition of its own shares. It was conceded by counsel (at 164) that "a transaction in breach of section 42 CA 1981 is ultra vires as well as illegal and not capable of ratification". It is clear that in <u>Smith v Croft (No 2)</u> a distinction was being drawn between Companies Act illegalities and breaches of the general law.

30    At paragraph 28 of his declaration, Mr Girolami attempts to distinguish <u>Arab Monetary Fund v Hashim</u> on the basis that it was a case concerned with whether the company was

---

[7]    Other cases cited are similarly inappropriate. <u>Drown v Gaumont-British Picture Corporation Limited</u> [1937] Ch 402 was a case in which the relevant act was ultra vires in the correct sense of being contrary the Companies Act, the statute to which the company owed its existence. <u>Const v Harris</u> (1824) Turn & R 496 is a partnership case. The pages cited in *Buckley* (518-9) appear simply to confirm the principle of majority rule.

liable for the illegal act. I accept his description of the facts, but this does not assist him in drawing any relevant distinction. The Plaintiff's argument in this case, that a criminally illegal act is not capable of ratification, depends on exactly the same proposition as the losing argument in <u>Arab Monetary Fund</u> – namely that there is a lack of capacity in relation to such an act, so it cannot be validly adopted as an act of the company.

31    It is exactly this proposition that was comprehensively rejected by Lord Justice Browne-Wilkinson (later elevated to the House of Lords) in <u>Rolled Steel</u>, at 303:

> *"If the concept that a company cannot do anything which is not authorised by law had been pursued with ruthless logic, the result might have been reached that a company could not do (i.e. had no capacity) to do anything otherwise than in due exercise of its powers. But such ruthless logic has not been pursued and it is clear that a transaction falling within the objects of the company is capable of conferring rights on third parties even where it was an abuse of the powers of the company . . . It is therefore established that a company has capacity to carry out a transaction which falls within its objects even though carried out by wrongful exercise of its powers."*

32    Considering the purpose of the exceptions to the rule in <u>Foss v Harbottle</u>, I do not consider it surprising or anomalous that the English authorities do not extend the ultra vires exception to cover illegal conduct. At paragraph 14(2) of his declaration, Mr Girolami correctly observes that a derivative claim is concerned with the alleged breaches of duty to BAE PLC by the Defendant Directors, and not (directly) with the any breach of criminal or civil law by BAE PLC.

33    The purpose of permitting derivative claims in certain circumstances is to allow the Company to seek relief where it is has been harmed by wrongs done <u>to it</u>. The question of whether a wrong has been done <u>by it</u> is essentially irrelevant to that purpose. This point was made forcefully by Buckley J in <u>Anderson v Midland Railway Company</u> [1902] 1 Ch 369 at 377, where he refused to permit a derivative action to proceed in circumstances where the member was complaining that the company had acted illegally towards its customers:

> *"The breach, if there be a breach, of the Act of Parliament is not one which gives rise to rights as between the corporator and the corporation, but one which gives rise to rights as between the corporation and other customers of the corporation. There is nothing ultra vires in the act which is done by the corporation towards the particular customer of the corporation of which the corporator can complain; it is an act of which other customers of the corporation may*

> *complain by proceedings taken by them . . . which will give rise to other*
> *remedies altogether different from those sought here."*

**34** Extending the exceptions to the rule in <u>Foss v Harbottle</u> to include illegal acts would have rendered an advisedly restrictive rule of little practical utility and risked absurdity:

(a) A high number of derivative actions will allege some kind of dishonesty which is likely to amount to criminal conduct. The payments in <u>Smith v Croft</u> are one such example. An illegality exception would allow all such cases to proceed without a need to show "fraud on the minority".

(b) Why should a derivative action alleging, for example, that the directors caused the company to commit a relatively trivial criminal offence or indeed a strict liability offence involving no mental element, be allowed to proceed without more, when a claim that the directors had acted pursuant to a serious conflict of interest and with real moral blame (but not criminally) would be barred unless personal benefit and wrongdoer control could both be shown? A borderline based on "obvious" or "knowing" illegality would permit the same difficulty.

(c) Furthermore, a threshold based on "serious illegality" would be question-begging and extremely uncertain, would also, importantly, ignore the fact that the relevance of the matter to the Company is not the seriousness of the wrong it has to done to someone else, but the loss it has suffered by reason of a wrong done to it.

**35** These are some of the points surroundings the wider illegality exception which any serious commentator would wish to consider and raise. The fact that the authors and editors of textbooks in which the wider exception is posited do not do so strongly suggests to me that the brief comments to that effect have not been fully considered and should not be accorded even the slight weight that more obviously considered extracts would receive.

**36** Indeed the only extract cited by Mr Girolami from a book on the specific subject of minority shareholders and their rights[8], as opposed to a general treatise on the vast subject of company law, which supports the wider exception, is Mr Joffe's book. In that respect the Court may care to know that Mr Joffe and I gave expert evidence, respectively for the Plaintiffs and the Company, in the BP Derivative Action in New York. I believe our

---

[8]   Hollington's treatise on the subject, much relied upon in the Plaintiff's Opposition Brief, does not support this contention. It suggests (at page 133) that an act is only unratifiable if it is "an ultra vires act or one which requires authorisation by more than a simple ordinary majority".

statements are publicly available. From these it can be seen that the claims were similar, arising out of acts which were said to involve the Company in numerous breaches of regulatory, civil or criminal law. I made the same point in the evidence in that case as to the non-existence of a further exception for general illegality. In his declarations at paragraphs 8 and 13 Mr Joffe stated that he had no substantive disagreement with my description of the rule in <u>Foss v Harbottle</u>.

37    I note that, although Mr Girolami contends that there is "broader class of unratifiable acts", his evidence is again vague and tentative, in that he does not set out the scope of that class or suggest where the line is drawn. This reflects the speculative nature of his analysis on this point. English authority simply does not support the existence of a broad class embracing illegalities which are not strictly ultra vires, and (taking into account the purpose of the rule and the exceptions) there is no reason to believe that the English courts would extend the exception to <u>Foss v Harbottle</u> this far.

## MISCHARACTERISATIONS OF ENGLISH LAW IN PLAINTIFF'S OPPOSITION BRIEF (NOT BY MR. GIROLAMI)

38    Each of these four points below in Plaintiff's Opposition Brief is a mischaracterisation of English law. As they are not (and could not be) supported by expert evidence from Mr Girolami, I deal with them as shortly as possible.

39    The first error is the Plaintiff's contention that the highest court in England, the House of Lords, would not apply the rule in <u>Foss v Harbottle</u> because it was legislatively repealed in 2006 and because the intention of the 2006 Act was to create "a new derivative procedure with more modern, flexible and accessible criteria". (pages 27 and 61 of Opposition Brief) This assertion is contrary to the relevant Commencement Order for the Companies Act 2006, cited in paragraph 12 of my first declaration. The text of paragraph (3) the Commencement Order is unambiguous: abolition of the rule in <u>Foss v. Harbottle</u> is effective only in relation to claims based on conduct taking place on or after 1 October 2007. As to claims such as those asserted against the BAE PLC Defendants, where the actions complained of predate 1 October 2007, the old rule applies.

40    Thus the best sense I can make of the contention is that it is being suggested that the highest English Court (the House of Lords) would today determine that the "law in force

14

immediately before" the statutory repeal of the old rule was, in fact, not the old rule at all, but a new and relaxed version of that old rule, substituted for it in anticipation of the statutory repeal. This would be the purest speculation and there is no basis at all for such a conclusion. The calls for the replacement of the Rule, both in the Law Commission's Report on Shareholder Remedies[9] and in the Company Law Review[10], were explicit in indicating that primary legislation would be required to alter it. The notion that the House of Lords would "jump the gun" in order to render paragraph (3) of the Commencement Order meaningless is both unsupported and unsupportable.

41    I am not at all surprised that Mr Girolami does not take this approach. In fact, Mr Girolami makes clear at paragraph 9 of his declaration that paragraph (3) applies to the claim in these proceedings. He clearly and rightly believes that the rule in <u>Foss v Harbottle</u> applies to the Plaintiff's claim, and that the only issue is whether one or more of the exceptions apply to this claim. Quite properly, he does not at any point suggest that these exceptions are irrelevant because the House of Lords would no longer recognise the rule in <u>Foss v Harbottle</u>. Such a contention has no basis in English law.

42    The second error of English law in Plaintiff's Opposition Brief is that, in relation to the claim based on section 463 of the Companies Act 2006, there is no need to find an exception to the rule in <u>Foss v Harbottle</u>, because that rule simply does not apply to section 463 (pages 66 and 67). This is claimed to be so because the Commencement Order for section 463[11] does not expressly provide that the rule in <u>Foss v Harbottle</u> should govern any derivative claim based on the section, and "the point of [the new Act] was to legislatively repeal the old rule". I do not believe that any English Court would give credence to such an interpretation. It is subject to the same fallacy identified above, namely an assumption that the rule in <u>Foss v Harbottle</u> has no applicability following the passing of the 2006 Act.

43    In fact, as Mr Girolami and I have both been at pains to explain, the rule continues to apply to all derivative claims based on conduct pre-dating 1 October 2007. Sub-paragraph (3) of the Commencement Order applies as much to a derivative claim under section 463 as to as any other derivative claim. Hence it is fallacious to assume that it would be necessary for

---

[9]    Report LC 246 (1997).

[10]    Final Report – *Modern Company Law* (DTI, 2001).

[11]    SI 3428/2006

the Commencement Order to make special provision for the rule in <u>Foss v Harbottle</u> to apply to a derivative claim under section 463. If a section 463 claim is advanced by a member, it is by the terms of the Companies Act 2006 legislation and the Commencement Order subject to the same rules as any other derivative claim. Again, I note that Mr Girolami does not suggest that section 463 is to be treated differently from the remainder of the claim.

44    Plaintiff's third error of English law – and seeming complete misreading of my first declaration – is the contention that there is a general "interests of justice" exception to the rule in <u>Foss v Harbottle</u>. At page 34 of the Plaintiff's Opposition Brief it is asserted that:

> *"As defendants' own "expert" concedes, a fourth "interests of justice" exception . . . has been recognized under English common law."*

45    I do not think that can be taken as a fair summary of my evidence. The assertion is supported by reference to footnote 13 of my first declaration, the first sentence of which reads:

> *"It has been argued that the "interests of justice" could provide a fourth exception to the rule in <u>Foss v Harbottle,</u> but the Court of Appeal has firmly rejected this contention".*

I simply do not see how this can be presented as an acknowledgement that such an exception is recognised under English law.

46    The Plaintiff's brief refers to <u>Nurcombe v Nurcombe</u> [1985] 1 WLR 370 as authority for the "interests of justice exception". That case does indeed make reference to the "interests of justice" – but only to explain that the purpose of the rule in <u>Foss v Harbottle</u> and the various exceptions is to preserve the interests of justice. It certainly does not suggest that the "interests of justice" are a nebulous and free-standing additional exception to the rule. Indeed the point as to its purpose is made in almost every case concerning the rule in <u>Foss v Harbottle</u> – but the purpose of the rule does not define its limits.

47    It appears that I am in accord with Mr Girolami on this point – he does not suggest that there is any interests of justice exception, and deals only with the "fraud on the minority" exception and the further exception which he says may exist in relation to illegal acts.

48    Finally, the Plaintiff asserts wrongly that, unless and until the BAE PLC Directors provide to the Plaintiff and to the registered shareholders of BAE PLC "full and frank disclosure" of

all potentially relevant factual material, a derivative claim may proceed under English law because ratification would be impossible (page 55 of the Opposition Brief). This contention is confused and mischaracterises English law. It is correct that a shareholder resolution ratifying wrongful conduct is not valid unless made on the basis of full and frank disclosure. That proposition is supported by the authorities cited on page 55. However, it is irrelevant to the exceptions to the rule in <u>Foss v Harbottle</u>.

49     The fallacy is that the relevance of ratification under <u>Foss v Harbottle</u> is not whether factual circumstances exists which make a valid ratification likely or possible. Rather, it is a question of whether the wrong is one of a nature which <u>could in principle</u> be ratified by the shareholders. This is the meaning of the statements in <u>Edwards v Halliwell</u> [1950] 2 All ER 1064 that:

> *The claim is barred "(2) where the alleged wrong is a transaction which might be made binding on the corporation and on all its members by a simple majority of the members"*
> *"(3) There is no room for the operation of the rule if the alleged wrong is ultra vires the corporation, because the majority of members cannot confirm the transaction"*
> *"(4) There is also no room for the operation of the rule if the transaction complained of could be validly done or sanctioned only by a special resolution or the like, because a simple majority cannot confirm a transaction, which requires the concurrence of a greater majority"*

50     Points (3) and (4) from <u>Edwards</u> make clear that the question of what is and is not a ratifiable wrong is a function of legal classification, not factual circumstances. As can be seen from paragraph 27 of Mr Girolami's declaration, this is a question of whether the act falls into the "class of acts unratifiable by a simple majority". Hence the debate between me and Mr Girolami as to whether an act which is illegal but not ultra vires is in principle ratifiable by the members in general meeting. The practicalities of how to achieve an effective ratification are irrelevant to this issue.

51     For clarification, I add that point (5) in <u>Edwards</u> goes not to the question of "unratifiable wrongs", but to the entirely distinct exception applying where there is "fraud on the minority" (including "wrongdoer control"). It seems to me that page 55 of the Plaintiff's Opposition Brief reflects some confusion between the "ultra vires" and "wrongdoer control" exceptions to the rule in <u>Foss v Harbottle</u>.

52    Finally, I note that the Plaintiff's Opposition Brief refers to Mr Girolami as "Judge Girolami", which may convey an incorrect impression to those not familiar with what being a Deputy High Court Judge entails. In every Division of the High Court except the Chancery Division to which Mr Girolami has been assigned, in order to be appointed under section 9(4) of the Supreme Court Act 1981, it is necessary to go through the Judicial Appointments Commission in an open competition. In contrast, in the Chancery division such appointments are made by the Chancellor, who is the Head of the Division (although technically made by the Minister of Justice on recommendation of the Chancellor). On appointment Deputies agree to sit for a number of weeks each year to assist the discharge of the business of the Chancery Division, which includes land law, trusts and probate, tax, pensions, insolvency, intellectual property, insurance, banking and nearly all aspects of law affecting commercial life. Mr Girolami would, I am sure, be the first to agree that it is a misnomer to call him "Judge Girolami" and that the views of a Queen's Counsel who acts as a part-time judge are not to be accorded any greater weight simply by virtue of that fact.

**CONCLUSIONS**

53    In summary, my evidence as to English law is as follows:

    a)    A non-member has no standing to bring a derivative action. (See Decl. I paragraphs 26-28; Decl. II paragraphs 6-13.)

    b)    The House of Lords would apply the rule in <u>Foss v Harbottle</u> to this case pursuant to the relevant exceptions in the Companies Act 2006. (See Decl. I paragraphs 8-12, 30; Decl. II paragraphs 39-41.)

    c)    The rule in <u>Foss v Harbottle</u> applies to the whole of the derivative claim, including the claim under section 463. The old regime applies to all derivative claims advanced in respect of acts occurring before 1 October 2007, regardless of the basis of the claim. (See Decl. I paragraphs 8-12, 67; Decl. II paragraphs 39, 42-43.)

    d)    Under English law, there is no general "interests of justice" exception to the rule in <u>Foss v Harbottle</u>. (See Decl. I paragraph 34 n.13; Decl. II paragraphs 44-47.)

    e)    A wrong is only unratifiable if it is ultra vires in the sense that it is outside the company's objects clause or contrary to the statute to which the company owes its existence. A wrong is not ultra vires or unratifiable simply because it involves the

company in a breach of the criminal law. (See Decl. I paragraphs 41-51; Decl. II paragraphs 21-37.)

f)  To the extent that the question is whether alleged wrongs are "unratifiable", what matters is whether the wrongs fall into a category which makes them capable of ratification as a matter of law, not whether sufficient disclosure has been given to make ratification possible as a matter of fact. (See Decl. I paragraphs 36-40; Decl. II paragraphs 48-51.)

g)  The test of "wrongdoer control" is focused on voting control. Directors do not have "control" merely because a listed company has a wide shareholder base. (See Decl. I paragraphs 54-57, 62-64; Decl. II paragraphs 16-20.)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 23rd May 2008.

Martin Luke Moore QC

19

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CITY OF HARPER WOODS EMPLOYEES' RETIREMENT SYSTEM, Derivatively on Behalf of BAE SYSTEMS PLC, | ) ) ) | Civil No. 1:07-cv-01646 |
| | ) | Assigned to: Judge Rosemary M. Collyer |
| Plaintiff, | ) ) | |
| | ) | |
| vs. | ) ) | |
| RICHARD (DICK) L. OLVER et al., | ) ) | |
| Defendants, | ) ) | |
| – and – | ) ) | |
| BAE SYSTEMS PLC, an England and Wales corporation, | ) ) ) | |
| Nominal Defendant. | ) ) | |

**APPENDIX OF ADDITIONAL FOREIGN AUTHORITY CITED IN
THE REPLY MEMORANDUM IN SUPPORT OF THE MOTION OF BAE SYSTEMS
PLC AND THE INDIVIDUAL BAE SYSTEMS PLC DEFENDANTS TO DISMISS THE
COMPLAINT AND SECOND DECLARATION OF MARTIN MOORE QC**

## **CASES**

**Tab**

*Anderson v. Midland Railway Co.*,
[1902] 1 Ch 369 ................................................................................................................A

*Bastin v. Davies*,
[1950] 2 KB 579 ...............................................................................................................B

*Edwards v. Halliwell*,
[1950] 2 All ER 1064 ........................................................................................................C

*In re Perkins ex parte. Mexican Santa Barbara Mining Co.*,
(1890) 24 QBD 613 ..........................................................................................................D

*R v. Button & Swain*,
[1966] AC 591 ...................................................................................................................E

*Svanstrom v. Jonasson*,
(1997) 23 ACSR 475 .........................................................................................................F

# Tab A

[1902] 1 Ch. 369                                                           Page 1
1901 WL 11415 (Ch D), [1902] 1 Ch. 369
**(Cite as: [1902] 1 Ch. 369)**

C

**\*369** Anderson v. Midland Railway Company.
[1901 A. 278.]

Chancery Division
Ch D
Buckley J.
1901 Oct. 26, 29.

Railway Company--Tolls--Equality--Undue Preference--Ultra Vires-- Shareholder--Action by Shareholder against Railway Company and Preferred Customer--Railways Clauses Act, 1845 (8 & 9 Vict. c. 20), s. 90--Railway and Canal Traffic Act, 1854 (17 & 18 Vict. c. 31), s. 2.

If a railway company carries goods for a customer at a lower rate than that charged to other customers, it may be an undue preference and give to other customers a right to complain before the Railway and Canal Commissioners, but it is not an act ultra vires the company, and it gives no right to a shareholder of the company to bring an action against the company and the preferred customer for an account and an order that the preferred customer should make good the deficiency, or for an injunction to restrain further preferences.

POINT OF LAW.

The plaintiff was a shareholder in the Midland Railway Company, and he brought this action, suing on behalf of himself and all other the shareholders of the company, against the Company and Henry Wiggin & Co., Limited. By his statement of claim he alleged that the Midland Railway Company were, as a railway company, forbidden by law to give any undue preference in favour of or to prejudice any firm in regard to carriage of goods, and were required to charge tolls equally as regards all persons, and that any such preference, favour, inequality, or advantage was ultra vires the said Midland Railway Company; that the railway company by their fixed scale of rates charged more for goods described as

nickel than for those described as metal; that the defendants H. Wiggin & Co. had been in the habit of sending by the Midland Railway large consignments of goods which ought to have been described as nickel but were described as metal; that the difference between the tolls they had paid and those which they ought to have paid had amounted for several years to 1000l. a year, and that the profits of the shareholders of the railway had been diminished by that amount; that upon such erroneous declarations being notified from the Railway Clearing House the **\*370** railway company took no steps to enforce payment of the proper rate of charge, but permitted Henry Wiggin & Co. to continue to send goods by such incorrect descriptions, thus giving them an undue preference; that any agreement for that purpose was ultra vires the Midland Railway Company; and that by reason of such preference other consignors were entitled to claim reductions of the charges to them, and the company and its shareholders are deprived of their legitimate profits.

The plaintiff further alleged that Henry Wiggin & Co. were liable to account to the railway company for the proper charges for all consignments in respect of which false declarations had been made; and he claimed an account of all transactions between the defendant companies, an inquiry as to incorrect declarations made by Henry Wiggin & Co., and the amounts by which the payments for the goods so declared had been deficient; that Henry Wiggin & Co. might be ordered to pay to the railway company the amounts which should appear due on taking the account and inquiry; and an injunction to restrain the continuance of such transactions as aforesaid.

Both the defendants delivered statements of defence on the merits, and also submitted that the statement of claim did not disclose any cause of action against them. Orders were accordingly made under Rules of Supreme Court, Order XXV., r. 2, that the points of law thus raised should be set down for hearing and disposed of before the trial,

Case 1:07-cv-01646-RMC    Document 83-6    Filed 05/23/2008    Page 5 of 72

and the questions now came on together for argument.

*R. J. Parker* , for H. Wiggin & Co. Even if the plaintiff can take proceedings against the Midland Railway Company, he has no cause of action against H. Wiggin & Co. His allegations of ultra vires and undue preference on the part of the railway company are inconsistent with his attempt to make us liable. If anything ultra vires has been done, it has consisted in charging other customers too much, not in charging us too little. If we are bound on an implied contract to pay the larger tolls, that would give the railway company a claim against us; but it would not give the plaintiff any right of action, nor would it be a fraudulent preference as against **\*371** another customer. In fact, there has been nothing ultra vires; there is no implied contract; the contract with us is valid, but other customers may have claims against the railway company.

Even if it is an undue preference we ought not to be made defendants. The plaintiff relies apparently upon s. 90 of the Railways Clauses Act, 1845, and s. 2 of the Railway and Canal Traffic Act, 1854, which he says provide for equality of tolls. That under those sections the illegality consists, not in charging one customer less, but in charging others more, is clear from the cases in which traders who have paid more than others have been held entitled to recover the difference. There is nothing in those sections to shew that an undue preference is ultra vires.

Sect. 90 applies only to carriage between the same terminals, and there is nothing in the statement of claim to shew that it touches this case: Great Western Ry. Co. v. Sutton [FN1]; Evershed v. London and North Western Ry. Co. [FN2]; Denaby Main Colliery Co. v. Manchester, Sheffield and Lincolnshire Ry. Co. [FN3] Sect. 2 of the Act of 1854, which forbids undue preference, refers, not to tolls, but to facilities for carriage; and by s. 3, any person complaining may apply to the Superior Courts. By s. 6 of the Regulation of Railways Act, 1873, this

jurisdiction was transferred to the Railway Commissioners. Ry s. 8 of the Railway and Canal Traffic Act of 1888, all the jurisdiction of the Railway Commissioners is transferred to the Railway and Canal Commissioners, including tolls (s. 10); and they can award damages (s. 12). The railway company cannot sue us for undue preference; therefore the plaintiff cannot do so; and if he can take any proceedings it can only be by way of complaint to the Railway and Canal Commissioners: Denaby Main Colliery Co. v. Manchester, Sheffield and Lincolnshire Ry. Co. [FN4]

FN1 (1869) L. R. 4 H. L. 226.

FN2 (1877) 2 Q. B. D. 254.

FN3 (1885) 11 App. Cas. 97 .

FN4 11 App. Cas. 97, 112.

The statement of claim does not allege that there was no difference in circumstances between the carriage of our goods and those of other customers, and there may be inequality of **\*372** charge where the circumstances are different: Pickering Phipps v. London and North Western Ry. Co. [FN5], overruling Budd v. London and North Western Ry. Co. [FN6]

FN5 [1892] 2 Q. B. 229.

FN6 (1877) 4 Ry. & Can. Cas. 393.

The only remaining point is the allegation in the statement of claim that we have declared our goods by a wrong description, that the railway company can recover the deficiency in the tolls from us, and that the plaintiff can insist on the railway company enforcing that claim. But if there is no question of ultra vires, the only cause of action against us by the railway company would be for deceit, and the directors are the only persons who can decide whether the action ought to be brought. It is not suggested that the plaintiff represents the majority of the shareholders; so he cannot sue except to restrain the Company from acting ultra vires: Buckley

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1901 WL 11415 (Ch D), [1902] 1 Ch. 369

**(Cite as: [1902] 1 Ch. 369)**

on the Companies Acts, 7th ed. p. 522.

*Ingpen, K.C.* , and *Sargant,* for the Midland Railway Company. The question whether we ought to bring an action against H. Wiggin & Co. is one for the governing body of our company to decide. The plaintiff cannot bring this action until he has exhausted all reasonable means of obtaining a remedy through the company, and this he does not allege that he had done: Morris v. Morris. [FN7] The railway company as common carriers have the right within certain limits to make different charges. A contract at a lower rate is good unless another customer in similar circumstances is charged more: in which case he can recover the difference from us, but there is nothing ultra vires.

FN7 W. N. (1877) 6.

[They adopted the arguments of H. Wiggin & Co.]

*Gatey* and *J. A. Compston,* for the plaintiff. We admit that the plaintiff's right of action against H. Wiggin & Co. depends upon whether what the railway company have done was ultra vires, and that is the only question for consideration now. He can sue them in contract for money owed to the company, and also in tort in an action for deceit. He is entitled to bring an action to restrain the railway company from acting ultra vires by carrying goods contrary to the terms of the statutes, and he **\*373** can therefore bring an action against H. Wiggin & Co. The Acts say that everybody is to be charged at the same rate. The railway company can vary its rates from time to time, but equality must be maintained. Sect. 90 of the Act of 1845, which gives this power, shews that it is illegal and ultra vires to do it in any other way. A variation in favour of one person is a breach of the section and ultra vires: Ashbury Railway Carriage and Iron Co. v. Riche. [FN8] A shareholder may bring an action against his company in respect of an act which is ultra vires: Simpson v. Westminster Palace Hotel Co. [FN9] It is ultra vires the company to do anything which a statute forbids them to do, and s. 90 forbids them to do what they have done. The contract to carry goods for less than

those of other customers is void altogether, although, so far as the railway company have actually carried goods for H. Wiggin & Co., they can claim payment from them.

FN8 (1875) L. R. 7 H. L. 653.

FN9 (1860) 8 H. L. C. 712.

[BUCKLEY J. I agree that if the railway company and H. Wiggin & Co. are joining in an ultra vires act you can ask for an injunction to restrain the railway company from doing so, and you can add H. Wiggin & Co. as defendants; but you must shew ultra vires.]

The fact that other customers acquire rights against the company does not make the act done less ultra vires; but it does give the plaintiff an additional cause of action. If a railway company directed its servant to commit an assault, that would be illegal and ultra vires, but the person assaulted would have a cause of action. Sect. 2 of the Act of 1854 is to the same effect. It is said that the jurisdiction under that Act has been transferred to the Railway and Canal Commissioners, and it may be that the customers could not suee in this Court; but the plaintiff is not a customer complaining and asking for damages within the Acts. Sect. 30 of the Act of 1888 shews that shareholders are not referred to in the Act: Lancashire and Yorkshire Ry. Co. v. Greenwood & Sons. [FN10] This Court has power under its ordinary jurisdiction to protect a shareholder from having his property applied to wrongful purposes.

FN10 (1888) 21 Q. B. D. 215, 217.

**\*374 BUCKLEY J.**

For the purpose of to-day, and for that purpose only, I have to assume that all the allegations in the statement of claim are true, and, assuming that they are all true, I have to see whether there is any cause of action disclosed.

The plaintiff is a shareholder in the Midland Rail-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

way Company, who professes to sue on behalf of himself and all other shareholders. He joins the company as a defendant, and he joins certain customers of the company, Henry Wiggin & Co., Limited, as co-defendants. The case which he alleges, quite shortly stated, is this: That the Midland Railway Company have tolls for the carriage of goods, including a toll for the carriage of goods falling under the head of nickel, and another toll for goods falling under the head of metal. The toll for nickel is higher than the toll for metal. It is alleged that Henry Wiggin & Co. consigned nickel for carriage by the Midland Railway Company and have declared their goods as being metal, and that they paid the lower charge - that for metal. Paragraph 9 is this: "Upon such erroneous declarations being notified from the Railway Clearing House to the said Midland Railway Company in respect of the defendants Henry Wiggin & Co., Limited, the said Midland Railway have taken no steps to enforce payment of the proper rate of charge, but have permitted the defendants Henry Wiggin & Co., Limited, to continue to send goods by such incorrect descriptions as aforesaid, and to pay the lower rate of charge as aforesaid, thus giving an undue and unreasonable preference and advantage in favour of the defendants Henry Wiggin & Co., Limited. The said Midland Railway Company's secretary has alleged that this course was taken under some special authority or arrangement, of the particulars of which the plaintiff has no knowledge. If such authority or agreement exists, it is ultra vires the Midland Railway Company." Pausing there, the plaintiff says that Henry Wiggin & Co. sent goods the proper charge for which was a certain sum, declared them to be in a different class, the charge for which was lower, and that the Midland Railway Company have taken no steps to enforce the payment of the higher charge. That is a plain **375** statement of a right of action alleged to reside in the Midland Railway Company, which of course, on principles well settled, must be asserted by the corporation, and not by an individual corporator, and it is in respect of that that a single corporator is professing to sue. Primâ facie that is wrong. Then

he says that after being informed of what had taken place the railway company permitted the defendants Henry Wiggin & Co. to continue to send goods and to pay the lower rate of charge. That is an allegation that the Midland Railway Company, knowing that Henry Wiggin & Co. ought to pay the higher rate, allowed them to consign at the lower rate, and it says that that was an undue and unreasonable preference. As regards the latter half of the clause, paragraph 10 goes on thus: "By reason of such preference other consignors are entitled to claim reductions of the charges to them, and the company and its shareholders are deprived of their legitimate profits." The allegation here, therefore, is that, because the railway company have made to a particular customer a lower charge the result is that other consignors situate in like case are entitled to claim a reduction. It seems to me it is impossible to contend in that state of things that the act, which is said to give rise to rights in other people, can be an act which does not bind the corporation at all, and that, of course, is what is meant by ultra vires. According to the pleader's own statement it is not ultra vires, because his allegation is that by reason of the company having done the thing - inferring, therefore, that they could do and did do it, or in other words that it is not ultra vires - other people have acquired rights. It seems to me that there he has pleaded himself out of Court. Then paragraph 12 goes on thus:"The defendants Henry Wiggin & Co., Limited, are liable to account to the said Midland Railway Company for and to make good to them the proper charges for all consignments in respect of which such false declarations as aforesaid have been made." That must mean either one of two things. Either that when Henry Wiggin & Co. consigned nickel by a false description they entered into an implied contract with the Midland Railway Company that they would pay the **376** charges for nickel, and when the company found out the truth, that it was nickel and not metal, that Henry Wiggin & Co. became liable to pay the larger sum - which would be an action on an implied contract; or that the Midland Railway Company was deceived by being induced to carry certain goods at a lower

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1901 WL 11415 (Ch D), [1902] 1 Ch. 369
**(Cite as: [1902] 1 Ch. 369)**

charge when in fact the goods were of a higher class, and they were entitled to a higher rate, and that they were entitled to damages for the deceit. In either of those two cases the right of action is the right of action of the corporation, and cannot be asserted by an individual corporator. It was very fairly admitted by Mr. Gatey, who appears in support of the pleading, that he cannot sustain the action at all except upon the ground of ultra vires. He does not dispute, and could not dispute, that an individual corporator cannot, on the allegations of this statement of claim, maintain a cause of action of the corporation only, and his case depends upon ultra vires. He says this, and truly, that under s. 90 of the Railways Clauses Act of 1845 and under s. 2 of the Act of 1854 and some later enactments, railway companies are compellable to treat their customers upon terms of equality. As regards s. 90 of the Act of 1845, it has been held that it applies only to consignors whose goods are carried from and to the same terminals over the same line of rails; s. 2 of the Act of 1854 is wider, and under that section equality is to be given as between customers of the railway company over different parts of the railway. Any breach of those provisions is what is known as an undue preference; and if there be a breach of those provisions, then the scheme of the Acts is that persons who are affected by them are entitled to go, not to this Court, because this Court has no jurisdiction in the matter, but to the Railway and Canal Commissioners, to lay the facts before them, and to insist that the provisions of the Acts of Parliament shall be complied with which provide for equal treatment of all customers. The plaintiff's case here is that there has been a breach of those provisions. Suppose there has, what is there that enables a shareholder in the company which has committed a breach to come and ask for relief against his company and the customers of his company *377 based upon that breach, upon the footing that it is ultra vires? It appears to me that there is no ground for that at all. The breach, if there be a breach, of the Act of Parliament is not one which gives rise to any rights as between the corporator and the corporation, but one which gives rise to

rights as between the corporation and other customers of the corporation. There is nothing ultra vires in the act which is done by the corporation towards the particular customer of which the corporator can complain; it is an act of which other customers of the corporation may complain by proceedings taken by them before a tribunal different to this, and which will give rise to other remedies altogether different from those sought here.

This is not an action which can be brought by the plaintiff suing on behalf of himself and all other shareholders, except under circumstances which do not exist and are not alleged to exist here. There is, therefore, no cause of action shewn on the statement of claim. I hold that the points of law are well founded.

### Representation

Solicitors: Sharpe, Parker & Co., for Mathews, James & Crosskey, Birmingham; Beale & Co. ; Hamlin, Grammer & Hamlin, for Clifford Dunn, Leeds.

(H. C. R.)

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# Tab B

[1950] 2 K.B. 579                                                                                                  Page 1

1950 WL 10263 (DC), 114 J.P. 302, [1950] 2 K.B. 579, 66 T.L.R. (PT. 2) 719, [1950] 1 All E.R. 1095, 48 L.G.R. 451

(Cite as: [1950] 2 K.B. 579)

**\*579** Bastin v. Davies.

Divisional Court

DC

Lord Goddard C.J., Morris and Finnemore JJ.

1950 Apl. 26.

Food and Drugs--Article of food "not of .... nature or substance or quality "--Separate offences--Information alleging all three defects disjunctively-- Uncertainty--Food and Drugs Act, 1938 (1 & 2 Geo. 6 c. 56), s. 3, sub-s. 1.

Section 3, sub-s. 1 of the Food and Drugs Act, 1938, creates the three distinct offences of selling to the prejudice of the **\*580** purchaser food which is not of (a) the nature, (b) the substance, (c) the quality of the food demanded. Accordingly an information which charges the sale of an article of food which was not of the nature or not of the substance or not of the quality of the article demanded is bad for uncertainty.

*Quaere* whether an information would be good which alleged that the article was neither of the nature nor of the substance nor of the quality of the article demanded.

Thomson v. Knights [1947] K. B. 336 distinguished.

CASE STATED by Brecon justices.

At a court of summary jurisdiction sitting at Hay an information was preferred by the appellant, Gerald Elwin Bastin, chief inspector of food and drugs to Breconshire County Council, against the respondent, Jack Edward Davies, alleging that on October 5, 1949, he sold to the prejudice of the purchaser a certain article of food, to wit, beef sausages, which was not of the nature or not of the substance or not of quality of the article demanded in that it was 32.6 per cent deficient in meat, contrary to s. 3 of the Food and Drugs Act, 1938.

At the hearing of the information it was contended for the defendant that the information was bad in law on the ground that it disclosed three separate and distinct offences, referable, respectively, to "nature," "substance" and "quality," whereas it should have contained an allegation of one only of those matters.

For the prosecutor it was contended that s. 3 of the Act of 1938 had the effect of creating one offence only; that the words, "nature," "substance" and "quality" were only used incidentally; that they bore a similar meaning and were impossible to differentiate; and that the information was therefore correctly drawn. The attention of the justices was drawn to Jones v. Sherwood [FN1] and Edwards v. Jones [FN2].

FN1 [1942] 1 K. B. 127 .

FN2 [1947] K. B. 659.

The justices dismissed the information, being of opinion that it was bad for duplicity.

The prosecutor appealed.

*Gattie* for the prosecutor. The offence here is ene of selling food to the prejudice of the purchaser. The food may be bad in three different ways. The purchaser may receive something which constitutes an offence against all three, and it would therefore be unsafe to omit any of the words, "nature, " **\*581** "quality," or "substance." The inclusion of all three words does not make the information bad. It is not necessary for the information to follow the exact words of the statute, and the justices could have made the necessary amendment had they wished. It matters not whether the food demanded is deficient in its nature," its "quality" or its "substance": those words are purely adjectival. It is the analyst's certificate which always shows the offence, here one of quality. [He referred to Jones v. Sherwood [FN3], Edwards v. Jones [FN4], Thomson v. Knights [FN5] and Bell's Sale of Food and Drugs (12th ed.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Page 2

1950 WL 10263 (DC), 114 J.P. 302, [1950] 2 K.B. 579, 66 T.L.R. (PT. 2) 719, [1950] 1 All E.R. 1095, 48 L.G.R. 451

**(Cite as: [1950] 2 K.B. 579)**

p. 94.]

FN3 [1942] 1 K. B. 127 .

FN4 [1947] K. B. 659.

FN5 Ibid 336.

The respondent did not appear and was not represented.

LORD GODDARD C.J.

, read the information and continued: The point taken for the defendant, to which the justices gave effect, was that this information was bad for duplicity, in that it disclosed three offences. The blemish, however, if any, is not duplicity but uncertainty. Duplicity consists in charging two or more separate offences in one information or count conjunctively: uncertainty arises when two or more offences are so charged in the alternative or disjunctively, for obviously such a procedure leaves it quite uncertain with which of those offences the defendant is charged, and the conviction, which must follow the information, would also leave it in doubt of which offence the defendant had been found guilty. The question therefore is whether this information did in fact charge three offences in the alternative, or disjunctively, or whether it disclosed only one offence.

Mr. Gattie has argued that the real offence here is selling to the prejudice of the purchaser and that the other words only show the matters in which the article of food may be to the prejudice of the purchaser. He relied particularly on Thomson v. Knights [FN6]. In that case a man had been convicted of being in charge of a motor car while under the influence of drink or a drug. It was contended that the information was bad for uncertainty because it was one offence to be in charge of a vehicle while under the influence of drink and another to be in charge of a vehicle while under the influence of a drug. The court rejected that argument, saying that the offence was that of driving in a state of intoxication, it mattered not whether the

toxic condition was induced by drink or a drug. **\*582** In my opinion, the reasoning of that case does not apply to this case, because I think that the defendant is entitled to be told by the prosecution whether they are saying that the article is not of the nature demanded or not of the quality demanded.

FN6 Ibid 336.

With regard to the meaning of the word "substance" it is not necessary to give a considered opinion, but I think that the view of the author of Bell's Sale of Food and Drugs (12th ed.) p. 94 is probably right, that "substance " would include matters where there had been adulteration of the article. However that may be, I think that the prosecution must decide what they are going to allege. If they are in doubt, they can issue more than one information against the defendant, charging him with selling to the prejudice of the purchaser in that in the one case the nature of the article was not as demanded and in the next it was not of the quality demanded. That is because the conviction must be drawn up in accordance with and following the information so that it can be seen on what charge the justices convicted. I think that these are different offences in the sense that the constituent facts in the offence would be, or may be, different.

The view which the justices took was in accordance with, and no doubt influenced by, the view put forward in Bell's Sale of Food and Drugs (12th ed.) at p. 94. Note (e) which appears there states: "It should usually he possible to decide which of the three words is most appropriate to use in an information and to use that word only. Thus, apples or fish not of the variety or kind asked for, are not of the 'nature' demanded. For articles not containing the proper ingredients or containing some added adulterant, 'substance' is perhaps the most appropriate word to use, although in many instances, 'quality' would also be fitting. If preserved eggs are sold as new laid eggs, the word ' quality' would seem apt. In any event, the summons should not be for selling food 'not of the nature, substance or quality.'"

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case 1:07-cv-01646-RMC    Document 83-6    Filed 05/23/2008    Page 12 of 73

1950 WL 10263 (DC), 114 J.P. 302, [1950] 2 K.B. 579, 66 T.L.R. (PT. 2) 719, [1950] 1 All E.R. 1095, 48 L.G.R. 451

**(Cite as: [1950] 2 K.B. 579)**

We need not decide whether, if the information had alleged deficiency in "nature, substance and quality," it would have been good. The charges are made disjunctively here, the information alleging that the beef sausage was not of the nature or not of the substance or not of the quality demanded. I bear in mind that this note has appeared in many editions of Bell's work. This court would never hesitate to disagree with a statement in a textbook, however authoritative, or **\*583** however long it had stood, if it thought right to do so. In fact, it has had occasion, I think, in the past to differ from statements in Stone's Justices' Manual, which justices are accustomed to treat with almost the respect paid to the Bible. Communis error facit jus is a maxim of very limited application; but, as Lord Ellenborough C.J., said in Isherwood v. Oldknow [FN7], it is truer to say "communis opinio is evidence of what the law is." It would be unfortunate if doubt had to be thrown on a statement which has appeared in a well-known textbook for a great number of years without being judicially doubted and after it had been acted on by justices and their clerks for many years. Ih my opinion, however, this statement in Bell is right; though if I had doubt about it, I should resolve the doubt in favour of the statement because it has been treated as the law for a great number of years and has never been dissented from. I think that, on analysis of the matter, it is clear that the justices came to a right decision though the reason that they gave for it was technically wrong. This appeal should be dismissed.

FN7 (1815) 3 M. & S. 382, 396.

MORRIS J.

I agree.

FINNEMORE J.

I agree.

**Representation**

Solicitors: Sharpe, Pritchard & Co., for C. M. S. Wells, Brecon.

Appeal dismissed. (L. F. J. MCD. )

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# Tab C

All England Law Reports/1950/Volume 2 /Edwards and Another v Halliwell and Others - [1950] 2 All ER 1064

[1950] **2 All ER 1064**

# Edwards and Another v Halliwell and Others

**COURT OF APPEAL**

**SIR RAYMOND EVERSHED MR, ASQUITH AND JENKINS LJJ**

**31 OCTOBER, 1, 2 NOVEMBER 1950**

*Trade Union - Action by member against union - Matter of substance, tinctured with oppression - Invasion of members' individual rights.*

Rule 19 of the rules of the defendant trade union provided: "The regular contributions of employed members shall be as per tables ... and no alteration to same shall be made until a ballot vote of the members has been taken and a two-thirds majority obtained." In December, 1943, a delegate meeting of the union, without taking any ballot, passed a resolution increasing the amount of the contributions of employed members. The plaintiffs, two members of the union, claimed against two members of the executive committee of the union and the union itself a declaration that the alteration adopted at the delegate meeting was invalid.

**Held** - (i) As the matter in question was not a mere irregularity in the internal management of the union, but was a matter of substance and tinctured with oppression, the court would grant the plaintiffs relief if it was proper to do so.

*Amalgamated Society of Engineers v Jones* (1913) (29 TLR 484), *distinguished.*

(ii) it was implicit in the rule in *Foss v Harbottle* (1843) (2 Hare 461) that the matter relied on as constituting the cause of action should be a cause of action properly belonging to the general body of members of the association in question as opposed to a cause of action which some individual member could assert in his own right. In the present case, the personal and individual rights of membership of the plaintiffs had been invaded and particular damage inflicted by the invalid alteration of the tables of contributions, and in such circumstances the rule in *Foss v Harbottle* had no application to individual members who were suing, not in the right of the union, but in their own right to protect from invasion their individual rights as members, and, therefore, the plaintiffs were entitled to their declaration.

*Pender v Lushington* (1877) (6 ChD 70), *applied.*

*Per* Jenkins LJ: The rule in *Foss v Harbottle* does not prevent an individual member suing if the matter in respect of which he is suing can validly be done, not by a simple majority of the members of the association, but, as in the present case, only by some special majority: *Cotter v National Union of Seamen* ([1929] 2 Ch 58), *applied* ... I cannot regard the paying by the majority of the members of the increased rates without demur as equivalent to a ballot vote at which a two-thirds majority was obtained in favor of the alteration.

**Note**

As to the Amendment of the Rules of a Trade Union, see *Halsbury*, Hailsham Edn, Vol 32, p 494, para 787; and for Cases, see *Digest*, Vol 43, p 101, Nos *1048-1052*, and *Digest Supp*.

**Cases referred to in judgments**

*Foss v Harbottle* (1843), 2 Hare 461, 67 ER 189, 13 *Digest* 417, *1377*.

*Amalgamated Society of Engineers v Jones* (1913), 29 TLR 484, 43 *Digest* 101, *1050*.

*Cotter v National Union of Seamen* [1929] 2 Ch 58, 98 LJCh 323, 141 LT 178, *Digest* Supp.

*Pender v Lushington* (1877), 6 ChD 70, 46 LJCh 317, 9 *Digest* 572, *3800*.

**Appeal**

Appeal by the defendants from a judgment of Vaisey J dated 28 July 1950.

The plaintiffs, two members of the Cricklewood branch of the defendant union, claimed a declaration on behalf of themselves and all other members of the branch that the alteration of the general rules of the union adopted at

*[1950] 2 All ER 1064 at   1065*

a delegate meeting in December, 1943, was invalid in so far as it purported to alter the amount of the regular constributions of employed members. The defendants were two members of the executive committee of the union sued as representatives of the committee and the union. Vaisey J granted the declaration. The facts appear in the judgment of Asquith LJ.

*Pascoe Hayward KC and Lindner for the defendants.*

*Milner Holland KC and Hesketh for the plaintiffs.*

**2 November 1950. The following judgments were delivered.**

**SIR RAYMOND EVERSHED MR.**

I will ask Asquith LJ to deliver the first judgment.

**ASQUITH LJ.**

This is an appeal by the defendants from a judgment of Vaisey J whereby he made a declaration asked for by the plaintiffs in terms to which I will refer. The plaintiffs sue on behalf of themselves and all other members of the Cricklewood branch of the National Union of Vehicle Builders, a registered trade union. The defendants are sued on behalf of themselves and all other members of the executive committee of the union, and the union itself is joined as a defendant.

The main point in the appeal is whether Vaisey J has rightly construed r 19 of the rules of the union. The defendants contend that, even if he did rightly construe that provision, the plaintiffs are precluded, for other reasons, from obtaining the relief which they have been awarded. The only relevant part of r 19 is the first five lines, which are:

> "The regular contributions of employed members shall be as per tables (pp. 115 and 116) and no alternation to same shall be made until a ballot vote of the members has been taken and a two-thirds majority obtained."

In December, 1943, a delegate meeting was held at which the delegates, without any ballot, let alone a ballot resulting in a two-thirds majority, purported to increase the regular contributions of employed members and also certain benefits payable to the members. The plaintiffs contend that that alteration in the contributions is a nullity because the condition precedent to its validity laid down in r 19 had not been satisfied. They refused to pay the amount of the increase, and were threatened or actually visited with loss of their rights as union members, including that of eligibility for election to certain offices. In the action they claimed:

> "A declaration that the alteration of the general rules of the National Union of Vehicle Builders adopted at a delegate meeting in December, 1943, is invalid in so far as it purports to alter the regular contributions of employed members."

[His Lordship considered the rules of the union; held that, on construction of them, the alteration in December, 1943, of the rates of contribution was invalid, and continued:] The other point relied on by the defendants was that, even if they were wrong on the point of construction, the court either could not, or should not, grant the plaintiffs the relief which they claim. Under this head counsel for the defendants relied on the alleged principle that, when an action is brought by an individual in respect of a mere irregularity in a matter that is *intra vires* a trade union and concerns its internal management, the court will not as a rule intervene. For this purpose he conceded that a "mere irregularity" meant something not involving fraud, oppression or unfairness. I confess I should have thought the action complained of here was strongly tinctured, not, indeed, with fraud, but with "oppression" and "unfairness." Here were men who had a right not to have their contributions increased except after a ballot resulting in a two-thirds majority. This right was clearly violated. An unauthorised increase was sought to be extorted, and when they refused to pay, as they were entitled to do, severe penalties were imposed or threatened. To call this a mere informality or irregularity without any element of oppression

*[1950] 2 All ER 1064 at    1066*

or unfairness would be an abuse of language. When in circumstances such as I have described a remedy is sought by an individual, complaining of a particular act in breach of his rights and inflicting particular damage on him, it seems to me the principle of *Foss v Harbottle*, which has been so strongly relied upon by the defendants, does not apply either by way of barring the remedy or supporting the objection that the action is wrongly constituted because the union is not a plaintiff. Nor, lastly, can I accept the submission that, if the action is maintainable at law, it should nevertheless be dismissed because the vast majority of members approved the action taken by the defendants. The answer to the defendants' argument under this head will, I hope, be presented more fully by my Lords who are much more familiar with this branch of the law than myself. I think the appeal should be dismissed.

**JENKINS LJ**

stated the facts and continued: I will pass to the argument based on the reluctance of the court to interfere with the domestic affairs of a company or association on the ground of mere irregularity in form in the conduct of those affairs, and the argument based on the more general proposition commonly called the rule in *Foss v Harbottle*. As to the contention that, even though the purported alteration of the tables of contributions was invalid, the court should not interfere because the omission to hold a ballot and obtain a two-thirds ma-

jority as required by r 19 was a mere irregularity in point of form, in my judgment, that argument can be shortly dismissed by saying that this was not a matter of form. It was a matter of substance. The relevant part of r 19, I conceive, was designed to protect members against increases in the rates of contributions unless those increases were agreed to by a particular majority of members on a vote obtained in a particular way--that is to say, a two-thirds majority on a ballot vote. It seems to me that the executive committee's disregard of that express provision in the rules was a wrong done to each individual member on a point of substance. I say "on a point of substance," because it is *nihil ad rem* to point out that the increases in question were merely a matter of pence per week. In my judgment, this question should be viewed in precisely the same way as if the increase had been a matter of pounds, which might have made a substantial difference to the financial position of the members. In my judgment, the case cited on this part of the argument--*Amalgamated Society of Engineers v Jones*--has no bearing on the facts of the present case. In that case a meeting had been held and certain resolutions passed, and it was suggested that the mode of convening the meeting was irregular. The learned judge was able to hold that there had been no wrong done as a matter of substance, but that there had been a mere irregularity in procedure and he took the view that, in those circumstances, the court should not interfere. For the reasons I have endeavoured to state, I regard the present case as an entirely different one.

The rule in *Foss v Harbottle*, as I understand it, comes to no more than this. First, the proper plaintiff in an action in respect of a wrong alleged to be done to company or association of persons is *prima facie* the company or the association of persons itself. Secondly, where the alleged wrong is a transaction which might be made binding on the company or association and on all its members by a simple majority of the members, no individual member of the company is allowed to maintain an action in respect of that matter for the simple reason that, if a mere majority of the members of the company or association is in favour of what has been done, then *cadit quaestio*. No wrong had been done to the company or association and there is nothing in respect of which anyone can sue. If, on the other hand, a simple majority of members of the company or association is against what has been done, then there is no valid reason why the company or association itself should not sue. In my judgment, it is implicit in the rule that the matter relied on as constituting the cause of action should be a cause of action properly belonging to the general

*[1950] 2 All ER 1064 at  1067*

body of corporators or members of the company or association as opposed to a cause of action which some individual member can assert in his own right.

The cases falling within the general ambit of the rule are subject to certain exceptions. It has been noted in the course of argument that in cases where the act complained of is wholly *ultra vires* the company or association the rule has no application because there is no question of the transaction being confirmed by any majority. It has been further pointed out that where what has been done amounts to what is generally called in these cases a fraud on the minority and the wrongdoers are themselves in control of the company, the rule is relaxed in favour of the aggrieved minority who are allowed to bring what is known as a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue. Those exceptions are not directly in point in this case, but they show, especially the last one, that the rule is not an inflexible rule and it will be relaxed where necessary in the interests of justice.

There is a further exception which seems to me to touch this case directly. That is the exception noted by Romer J in *Cotter v National Union of Seamen*. He pointed out that the rule did not prevent an individual member from suing if the matter in respect of which he was suing was one which could validly be done or sanctioned, not by a simple majority of the members of the company or association, but only by some special majority, as, for instance, in the case of a limited company under the Companies Act, a special resolution duly passed as such. As Romer J pointed out, the reason for that exception is clear, because otherwise, if the rule were applied in its full rigour, a company which, by its directors, had broken its own regulations by doing something without a special resolution which could only be done validly by a special resolution could

assert that it alone was the proper plaintiff in any consequent action and the effect would be to allow a company acting in breach of its articles to do *de facto* by ordinary resolution that which according to its own regulations could only be done by special resolution. That exception exactly fits the present case inasmuch as here the act complained of is something which could only have been validly done, not by a simple majority, but by a two-thirds majority obtained on a ballot vote. In my judgment, therefore, the reliance on the rule in *Foss v Harbottle* in the present case may be regarded as misconceived on that ground alone.

I would go further. In my judgment, this is a case of a kind which is not even within the general ambit of the rule. It is not a case where what is complained of is a wrong done to the union, a matter in respect of which the cause of action would primarily and properly belong to the union. It is a case in which certain members of a trade union complain that the union, acting through the delegate meeting and the executive council in breach of the rules by which the union and every member of the union are bound, has invaded the individual rights of the complainant members, who are entitled to maintain themselves in full membership with all the rights and privileges appertaining to that status so long as they pay contributions in accordance with the tables of contributions as they stood before the purported alterations of 1943, unless and until the scale of contributions is validly altered by the prescribed majority obtained on a ballot vote. Those rights, these members claim, have been invaded. The gist of the case is that the personal and individual rights of membership of each of them have been invaded by a purported, but invalid, alteration of the tables of contributions. In those circumstances, it seems to me the rule in *Foss v Harbottle* has no application at all, for the individual members who are suing sue, not in the right of the union, but in their own right to protect from invasion their own individual rights as members.

I would be content so to hold as a matter of self-evident principle, but the

[1950] 2 All ER 1064 at    1068

matter is not free from authority. It will, I think, be enough for the present purposes if I refer, briefly, to a passage in the judgment of Sir George Jessel MR in *Pender v Lushington*. There was a discussion in the course of the case whether the action was one which an individual shareholder could maintain and Sir George Jessel MR said (6 ChD 80):

> "But there is another ground on which the action may be maintained. This is an action by Mr. Pender for himself. He is a member of the company, and whether he votes with the majority or the minority he is entitled to have his vote recorded--an individual right in respect of which he has a right to sue. That has nothing to do with the question like that raised in *Foss* v. *Harbottle* and that line of cases. He has a right to say, 'Whether I vote in the majority or minority, you shall record my vote, as that is a right of property belonging to my interest in this company, and if you refuse to record my vote I will institute legal proceedings against you to compel you.' What is the answer to such an action? It seems to me it can be maintained as a matter of substance, and that there is no technical difficulty in maintaining it."

In my judgment, precisely the same conclusions as are there expressed apply in the present case, and the rule in *Foss v Harbottle* affords no answer to the action. It was sought to show that this was not a matter affecting the individual rights of any particular member of the union because all were subject to the same alternation of the tables and, therefore, it was a matter which affected the general body of members as a whole. I do not agree. For one thing, the contributions to be paid by any individual member would depend on the particular category of membership to which he belonged, but, for another thing and more important, it seems to me that, although all the members are liable to pay the subscriptions appropriate to their respective categories, the right of each member to maintain himself in membership by paying his subscription--that is to say, by paying whatever subscription appropriate to his case is validly fixed and for the time being in force under the rules--is an individual right of his own which he himself is entitled to protect by an action on his own behalf.

It was pointed out in the course of the argument (though the matter was not fully developed) that the vast majority of members of the union had, in fact, paid without demur subscriptions at the new and invalid rate. It

was further pointed out that those who had become entitled to benefits had taken benefits at the enhanced rate. It was further pointed out that in practice r 19(1) had never been resorted to for many years. Before Vaisey J these matters seem to have been put forward as amounting to such acquiescence as to make r 19(1) a dead letter which could no longer be enforced. That argument was not pressed before us, but these considerations were put as showing that the case was without substance. It was said that the fact that the vast majority of members had paid the new rate of subscriptions without demur demonstrated that the will of the union as a whole was in favour of the new subscriptions and consequently the action was without sub-stance. I cannot agree. I cannot regard the mere paying by individual members of the increased rates without demur as equivalent to a ballot vote at which a two-thirds majority was obtained in favour of the alteration. In my judgment, the scale of contributions as fixed in the rules before the disputed alteration must stand unless and until altered in accordance with r 19. It not having been so altered, the rates so fixed remain the only rates properly exigible, and no member is bound to pay any other rate except as a matter of individual con-sent. It may well be that in most cases it would be found, when the particular member's account was gone into, that he had by his conduct in paying the new rate of subscription expressed his individual consent to the alteration and thereby become bound, but I see no ground in principle or in authority

*[1950] 2 All ER 1064 at     1069*

for holding that these individual assents arising from the conduct of individual members can have any binding effect at all on those members who say: "We are prepared to pay the contributions validly exigible under the rules and no more." Accordingly, I agree that the appeal fails and should be dismissed.


**SIR RAYMOND EVERSHED MR.**

I am entirely of the same opinion. On the question of the construction of the rules, the point was debated whether a delegate conference could validly by ordinary resolution of the conference revise r 19(1) by the abrogation or suspension of the words of prohibition on which the plaintiffs' action has been founded and then proceed by a further ordinary resolution to alter the rates of contribution payable, thereby avoiding any need to have a ballot or to obtain a two-thirds majority upon a ballot. I am not satisfied that, if a delegate conference made such an alteration or revision of r 19 as a mere prelude to the alteration of the rates of con-tribution, such a procedure would successfully withstand challenge. If it is the desire of those responsible for the administration of the affairs of this union either to abrogate altogether the relevant prohibition in r 19 or to make it inapplicable to an alteration of contribution rates by a delegate conference, I think prudence would demand that such a revision should receive the confirmation of the necessary two-thirds majority. Upon the *Foss v Harbottle* point, I should be guilty of repetition if I added anything to the reasons given by Jenkins LJ with which I find myself in entire agreement. The appeal fails and will be dismissed.

*Appeal dismissed with costs.*

*Solicitors: Rowley, Ashworth & Co (for the defendants); Ernest Bevir & Son (for the plaintiffs).*

F Guttman Esq Barrister.

---- End of Request ----
Print Request: Current Document: 8
Time Of Request: Friday, May 23, 2008  21:32:41

# Tab D

[1890] L.R. 24 Q.B.D. 613                                      Page 1
1890 WL 10042 (CA), (1890) LR 24 Q.B.D. 613
**(Cite as: (1890) LR 24 Q.B.D. 613)**

C

**\*613** In Re Perkins ex parte. Mexican Santa Barbara Mining Company

Court of Appeal

CA

Lord Coleridge, C.J., Lord Esher, M.R., Fry, L.J.

1890 Feb. 14

Bankruptcy--Bankruptcy Petition--Secured Credit-or--Obligation to give up or value Security--Company--Debt due from Shareholder--Lien on Shares--Equitable Owner of Shares--Bankruptcy Act, 1883(46 & 47 Vict. c. 52), ss. 6, 168.

Upon the hearing of a bankruptcy petition presented by a limited company it appeared that the debtor had obtained judgment against one of the registered shareholders of the company, declaring that he was a trustee of some of his shares for the debtor. The articles of association of the company provided that the company should "have a first and paramount li-en on all shares for all moneys due to the company from the registered holder thereof, or other the persons for the time being entitled thereto as against the company":--

Held, that, as the company were not bound to re-cognise trusts of their shares, the debtor was not a person "entitled to the shares as against the com-pany," and, consequently, that they had no lien upon the shares for the debt due to them from him, and were not "secured creditors" of the debtor with-in the meaning of the Bankruptcy Act, 1883.

APPEAL against the dismissal of a bankruptcy pe-tition presented by the Mexican Santa Barbara Min-ing Company.

The company stated in their petition that they did not hold any security on the debtor's estate, or on any part thereof, for the payment of the debt in re-spect of which the petition was presented. The ob-jection was taken that the company did in fact hold security for their debt, and the registrar held upon the evidence that they did, and required them to amend the petition by stating that they held secur-ity, and, in accordance with s. 6 of the Bankruptcy Act, 1883, by stating that they were willing to give up the security for the benefit of the creditors of the debtor, or putting a value on it. The company de-clined to do this, and the registrar dismissed the pe-tition.

The debt in respect of which the company peti-tioned was incurred under the following circum-stances: One J. M. Dickey was the registered holder of a number of shares in the company, and the debt-or commenced an action in the Queen's Bench Divi-sion against Dickey, the company, and another de-fendant, claiming from Dickey certain shares and debentures of the company. **\*614** On April 8, 1889, judgment was given in this action, whereby it was declared that Dickey was "trustee in stock or shares for three-fifths of the agreed partnership share of profits of which Dickey was entitled to one-fifth, and J. B. Coule, for whom Dickey was and is act-ing, to the remaining one-fifth." And it was ad-judged that the plaintiff "recover against the de-fendant Dickey shares and debentures in the Mexic-an Santa Barbara Mining Co. amounting to 23,408l., and costs to be taxed." As against the company the action was dismissed with costs. The company's costs were taxed at 129l. 3s. 9d., and this was the debt on which the bankruptcy petition was founded.

Dickey had, in fact, on May 15, 1888, executed transfers to other persons of all the shares in the company which stood in his name, but the company refused to register these transfers, on the ground that Dickey was indebted to them.

The company's articles of association contained the following clauses:--

    "16. The board may, without assigning any reas-on, decline to register any transfer of shares made by a member who is indebted to them, or, so long as the amount of the shares has not been fully

called up, to a person not approved by them."

"20. The company shall have a first and para-mount lien on all shares, and on the dividends thereon, for all moneys due to or liabilities subsisting with the company from or on the part of the registered holder or holders thereof, or other the person for the time being entitled thereto as against the company, either alone or jointly with any other person or persons, including calls for which resolutions shall have been passed by the board, but which may not have become due and payable, and may enforce such lien by forfeiture and sale of the shares on which such lien may attach."

The Registrar held that, by reason of the lien which the company had on the shares as against Dickey, they were "secured creditors" within the meaning of the Act.

The company appealed.

*Yate Lee* (*Barnes, Q.C.*, with him), for the company. The company are not "secured creditors" of the debtor within the **\*615** meaning of [FN1] ss. 6 and 168 of the Bankruptcy Act, 1883. Clause 20 of the articles of association does not give them any lien on the shares as against the debtor. The company are not bound to recognise trusts of their shares; they are entitled to recognise only the legal owner in whose name the shares are registered. The debtor is not, within the meaning of clause 20, "a person entitled to the shares as against the company." Dickey is the legal owner of the shares, and the company have no lien on the shares in respect of a debt due to them from the debtor. Moreover, as Dickey had, before the judgment which declared that he was a trustee for the debtor, executed and lodged for registration transfers to third persons of all his shares, there were no shares upon which the judgment could operate in favour of the debtor.

FN1 Sect. 6provides: "(2.) If the petitioning creditor is a secured creditor, he must, in his petition, either state that he is willing to give up his security for the benefit of the creditors in the event of the debtor being adjudged bankrupt, or give an estimate

of the value of his security." By s. 168: "'Secured creditor' means a person holding a mortgage, charge, or lien, on the property of the debtor, or any part thereof, as a security for a debt due to him from the debtor."

*Poley*, for the debtor. The debtor is in equity the owner of the shares of which Dickey has been declared to be a trustee for him, and therefore clause 20 of the articles gives the company a lien on that equitable interest for the debt which the debtor owes them. The transfers of his shares executed by Dickey to other persons, not having been registered, give to those persons only an inchoate title to the shares, which is not sufficient to defeat the equitable title of the debtor: Roots v. Williamson. [FN2]

FN2 38 Ch. D. 485.

*Yate Lee*, in reply.

LORD COLERIDGE, C.J.

This is a bankruptcy petition presented by the Santa Barbara Company against the debtor, and it is founded upon a judgment debt of 129l. In their petition the company stated that they held no security for their debt upon the debtor's estate, and the answer was that they were really secured creditors of the debtor, because he was the cestui que trust of certain shares in the company which stood in the name of one Dickey, and that, as between himself and Dickey, the **\*616** debtor had a right to a transfer of those shares. If the shares were transferred to him they would greatly overtop the debt which he owed to the company, and by their articles of association the company were entitled to a lien upon shares in respect of a debt due to them from the shareholder. This was the ground, as I understand it, upon which the registrar refused to make a receiving order.

I am unable to agree with the registrar's view upon two grounds. In the first place, it seems to me extremely important not to throw any doubt on the principle that companies have nothing whatever to do with the relations between trustees and their ces-

[1890] PR 24 Q.B.D. 613    Page 3
1890 WL 10042 (CA), (1890) LR 24 Q.B.D. 613
**(Cite as: (1890) LR 24 Q.B.D. 613)**

tuis que trust in respect of the shares of the company. If a trustee is on the company's register as the holder of shares, the relations which he may have with some other person in respect of the shares are matters with which the company have nothing whatever to do; they can look only to the man whose name is upon the register. It seems to me that, if we were to throw any doubt upon that rule, we should make the carrying on of their business by joint stock companies extremely difficult, and might involve those companies in very serious questions, and the ultimate result would be anything but beneficial to the holders of shares in such companies themselves.

I think, therefore, that, although there may have been transactions which, if they were settled as between Dickey and his cestui que trust Perkins, would give the latter rights as against the company, yet, till those transactions have been settled, and so long as Dickey and Perkins remain in the situation of trustee and cestui que trust, those transactions cannot be treated by the Court as creating any relation between the company and the debtor, which the company were bound to regard.

The second ground arises, as I think the Master of the Rolls has already pointed out, on the very words of s. 168 of the Bankruptcy Act. If the company have any security at all, it is a lien upon the shares held by Dickey, and s. 168 says that "'secured creditor' means a person holding a mortgage, charge, or lien on the property of the debtor, or any part thereof, as a security for a debt due to him from the debtor." Here the lien of the company, which is their only security, is upon the shares standing in **\*617** the name of Dickey, and it is sought to make that lien a security for a debt due to the company, not from Dickey, but from the debtor. Now the shares are not, so far only as the company can regard them, the property of the debtor, and they cannot therefore be security for a debt due from him to the company; they may be security for a debt due to the company from Dickey; but with that security we have nothing to do now.

It seems to me, therefore, that the registrar was wrong in refusing to make a receiving order, and on those two short grounds his judgment must be reversed.

LORD ESHER, M.R.

The company presented a bankruptcy petition against the debtor, on the ground that he owed them a debt of 129l., which he had neglected to pay. His answer to the petition is, "It has been decided by a Court of competent jurisdiction that I am in equity entitled to a certain number of shares in the company, the value of which greatly overtops the company's claim for 129l. It has been declared by that Court that I am the cestui que trust of those shares, and that Dickey is a bare trustee of them for me."

In answer to that the company say, first, "You may be the cestui que trust of these shares; a Court of competent jurisdiction may have declared that you are; but we know nothing about you; we are legally entitled to take no notice of you, and we have a right to treat you as if you were not a cestui que trust, and, although you may have a right which in some way or other you can enforce to become a shareholder in the company to the extent of 23,000l., we are entitled to make you a bankrupt if you do not pay the 129l." In the second place, the company say, "Dickey, who is said to be your trustee, owes us money, and we have therefore a lien on the shares which stand in his name, and we insist on that lien." The debtor replies, "If you have a lien on the shares as against Dickey, you are secured creditors, and you must either value your security or give it up for the benefit of the creditors." To this the company answer, "That lien does not make us secured creditors of you, Perkins, within the meaning of s. 168 of the Bankruptcy Act, 1883."

With regard to the first point, I confess I have had a great **\*618** desire to overrule it if I could, because to say to a man, "We admit that you are a cestui que trust of the shares; we admit that the man in whose name they stand is a bare trustee for you; we admit, therefore, that you must ultimately be entitled to

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1890 WL 10042 (CA), (1890) LR 24 Q.B.D. 613
**(Cite as: (1890) LR 24 Q.B.D. 613)**

shares in our company to a large amount; nevertheless, we have a right to make you a bankrupt for a much smaller sum"--does seem to me a very strong thing. But it is said that the company have a legal right to do this, because it is necessary for the protection of companies that they should not be bound to recognise trusts affecting their shares. So far as I understand the law, now that I have fully considered it, it does give the company power to do this. Therefore, the first ground of objection to the bankruptcy petition fails, because the first step which the debtor must take is, to shew that he is a cestui que trust of the shares. The law has given the company the right to say, "We do not care whether you are a cestui que trust or not; if you are, we have a right to take no notice of you." I agree that is the law, though I think it is hard law; but we have nothing to do with the question of hardship.

Then comes the other question, which was the ground of the judgment of the registrar. I doubt whether the first point was really argued before him; at any rate, it was not the point upon which he based his judgment. He held that the company had a lien as against Dickey upon the shares which stood in his name. In virtue of that lien the company declined to consider the claim of the debtor upon the shares. If the matter had stood upon the Bankruptcy Act of 1869, I should have been very much inclined to say that that lien was a security in the hands of the company against any claim which the debtor might have upon them, and to hold that they were creditors holding security for their debt. I should have been inclined to say that they had a security in fact and in law. But then the Act of 1869 has been altered by the Act of 1883, and some effect must be given to the alteration. The alteration is in the definition of a "secured creditor" contained in the Act. Sect. 168 defines a "secured creditor" as meaning "a person holding a mortgage, charge, or lien on the property of the debtor, or any part thereof, as a security for a debt due to him from the debtor." The words "from the debtor" **\*619** have been added to the definition contained in s. 16 of the Bankruptcy Act, 1869. We must give effect to those words. The

question here is not whether this lien is a security to the company as against Dickey, but whether it is a security for a debt due to the company from the debtor. I think it cannot in fairness be said to be a lien in respect of a debt due to the company from the debtor, and, therefore, although in one sense it is a security in their hands, it is not such a security as makes them "secured creditors" of the debtor within the meaning of the Act. This new definition shuts that lien out. Therefore, although I agree with the registrar that the company had a lien, I cannot agree that that lien, which was a lien against Dickey, was such a lien as made them "secured creditors" of the debtor, for the lien as against Dickey was not a security for a debt due to them from the debtor.

I think, therefore, that we ought to disagree with the registrar's decision, and to hold that a receiving order must be made.

FRY, L.J.

I am of the same opinion.

The debtor owed the company 129l. upon a judgment. Dickey was a shareholder in the company, and he had been declared by a competent Court to be a trustee of some of those shares for the debtor. It is said that under these circumstances the company have a lien on the shares for the 129l. which is due to them from the debtor. Reliance is placed upon the 20th clause of the company's articles of association, which provides that "the company shall have a first and paramount lien on all shares, and on the dividends thereon, for all moneys due to, and liabilities subsisting with, the company from or on the part of the registered holder or holders thereof, or other person for the time being entitled thereto as against the company." It must be, and indeed is, conceded that the debtor is not the registered holder of these shares.

The only question, therefore, is, was he "a person for the time being entitled thereto as against the company"? In my opinion, he was not. The policy

of the Companies Acts, as has been already pointed out by the Lord Chief Justice, is to free companies from any obligation to take notice of trusts. As against **\*620** Dickey, no doubt the debtor was the person entitled to the shares; but, as against the company, Dickey, and not the debtor, was the person entitled, because they knew nothing of the litigation between him and Dickey; and the Court is not bound to know anything of that litigation, which has been determined as between him and Dickey.

It may be said that some meaning must be given to the words, "other the person for the time being entitled thereto as against the company." In my opinion, those words can be satisfied in other ways. One obvious meaning of the words would include the executors or administrators of a deceased shareholder, or the trustee in bankruptcy of a bankrupt shareholder, or any person who might have obtained a judgment from a Court of competent jurisdiction against the company, whether in an action or in a proceeding under s. 35 of the Companies Act, 1862, that he was entitled as against the company to be registered as the holder of shares. All those persons would come within the meaning of clause 20. In my judgment, the words do not include cestuis que trust of shares, however clear the trust may be, however certain the right of the cestui que trust, because the company are not bound to take notice of trusts.

The present case illustrates, as it seems to me, the expediency of that rule. The position of the debtor as against Dickey is not free from complications. He has obtained a judgment that Dickey is his trustee of certain shares; but the company claim to have a lien on the shares for a very large sum of money as against Dickey. Whether that claim is well or ill founded I know not. The company have the absolute right, under clause 16 of the articles of association, to refuse to register any transfer of the shares, so long as any money is due to them from Dickey, without giving any reason for their refusal. Other persons have lodged transfers of the shares with the company, and insist that those transfers have prior-

ity. All these questions have been raised and discussed.

It appears to me, therefore, that the particular circumstances of this case strongly illustrate the expediency of adhering to the general rule which the Lord Chief Justice has stated. But I base my decision on the broad general ground, that the debtor is **\*621** not "a person entitled as against the company" to these shares, and not upon the particular circumstances of the case, although I have used them by way of illustration. I think, therefore, that a receiving order should be made.

**Representation**

Solicitors: Francis & Johnson; E. Kimber.

Appeal allowed. (W. L. C.)

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

**Tab E**

[1966] A.C. 591                                                                                          Page 1
1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965]
3 W.L.R. 1131, (1965) 109 S.J. 872
**(Cite as: [1966] A.C. 591)**

**\*591** Button Appellant v. Director of Public Pro-
secutions Respondent
Swain Appellant v. Director of Public Prosecutions
Respondent
[1965] 3 W.L.R. 1131

House of Lords
HL
Lord Gardiner    L.C.    , Lord Reid    , Lord
Morris of Borth-Y-
Gest    , Lord Pearce    and Lord Pearson.
1965 Oct. 5, 6, 27
Court of Criminal Appeal
Lord Parker    C.J.    , Marshall    and
Widgery    JJ.
1965 Jan. 25, 26; Feb. 23
[On Appeal from Regina v. Button; Regina v.
Swain]

Crime--Affray--Public place--Nature and ambit of
offence--Communis error-- Whether public place
necessary ingredient of offence--Fight on private
premises to the terror of bystanders--Whether suffi-
cient to constitute affray.

Judicial Precedent--Decision long undisturbed
Criminal law--Affray.

On May 22, 1964, a darts league held its annual
dance in a private hall and only persons who had a
ticket were admitted. During the dance some youths
created a disturbance and fighting broke out. The
defendants were charged with making an affray and
the particulars of the offence in the indictment al-
leged that at **\*592**    the hall they "unlawfully
fought and made an affray. " The trial judge direc-
ted the jury that it was an ingredient of the offence
of affray that the fighting took place in a public
place, which meant "in a place to which at the time
of the fighting the general public, or at least a sub-
stantial portion of the public, had access." The de-
fendants were convicted:-

Held, that the common law offence of an affray had

been a recognised offence long before the start of
the nineteenth century. It consisted of two or more
persons fighting together to the terror of the
Queen's subjects and need not be committed in a
public place.

Although for more than a century trials had been
conducted on the hypothesis that only in respect of
acts done in a public place could there be a convic-
tion for affray, there was no adequate reason why
the House of Lords should not correct the error,
since the only effect of it had been that during that
period victims of affrays in private places had in
practice been deprived of the protection of the law.

  Decision of the Court of Criminal Appeal    ,
post, p. 598E; [1965] 2 W.L.R. 992; [1965] 1 All
E.R. 964, C.C.A.    affirmed.

APPEAL from the Court of Criminal Appeal.

The Radstock and District Darts League had 183 re-
gistered members who formed teams to play darts
in 14 public-houses in the area. On May 22, 1964,
the league's annual presentation of prizes and dance
was held in a private building, the Scout Hall, Rad-
stock, hired for the occasion. No charge was made
for admission but admission was by ticket only and
the number of tickets issued was limited by the de-
cision of the officers and committee of the league.
Each member had a number of tickets which he
could distribute among relatives and friends and a
limited number was made available to the licensees
of the 14 public-houses to distribute among their
customers; tickets were not distributed in any other
way.

The dance was attended by about 200 people and a
doorkeeper was posted to see that only ticket-
holders entered; if non-ticket-holders did get in dur-
ing the dance, they were an insignificant few.
Whilst the dance was in progress a number of
youths, including the defendants, Graham Cecil
Button and Gerald Swain, created a disturbance in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965]
3 W.L.R. 1131, (1965) 109 S.J. 872
**(Cite as: [1966] A.C. 591)**

the hall and a number of fights developed.

On November 4, 1964, Button and Swain and six other men appeared at the Bristol Assizes on an indictment charging them in the first count with making an affray. The particulars of the offence in the indictment were that they, "on May 22, 1964, at Radstock, in the county of Somerset, unlawfully fought and made an affray." In the second to sixth counts Button and Swain and three other men **\*593** were charged with unlawful wounding. In the seventh count Swain and another man were charged with common assault. The trial took place on November 4, 1964, before MacKenna J. and a jury and, before arraignment, a motion to quash the count of the indictment alleging an affray was made on behalf of all the defendants on the ground that there was no averment that the offence took place in a public place. The judge made no ruling on the point, refused to quash the indictment, and exercised his powers under section 5 of the Indictments Act, 1915, to amend the count so that the particulars of the offence were that the defendants, "on May 22, 1964, at the Scout Hall, Radstock, in the county of Somerset, unlawfully fought and made an affray."

At the end of the prosecution's case, the defence submitted that the evidence showed that the fighting did not take place in a public place and that the general public was not present. MacKenna J. overruled that submission and held that the offence was committed in public if it was committed in a place to which the public, or any substantial portion of the public, had access at the material time. Evidence was then given on behalf of the defendants and MacKenna J., in his summing-up, directed the jury that

    "You must be satisfied of the following matters. First, that two or more people fought together of whom the accused was one. Secondly, that they fought in a public place. Thirdly, that the manner of their fighting was such that it was likely to cause alarm in persons of reasonable firmness and courage. Fourthly, that the fighting was within the sight

and hearing of such persons who might be alarmed in that way. When I say the fighting must be in a public place before you can convict anyone of this offence I mean that it must be in a place to which at the time of the fighting the general public, or at least a substantial portion of the public, had access. In the present case ... the general public did not have access to the Scout Hall where the prosecution say the fighting took place."

Button and Swain and two other men were found guilty of making an affray. Button and three other men were found guilty of wounding. Swain and another man were found guilty of common assault. For the two offences, Button and Swain were sentenced to a concurrent period of three months imprisonment.

On November 20, 1964, both defendants appealed against their conviction of causing an affray on the ground that the judge erred in law in directing the jury that a public place for the purpose of the law relating to affray was a place to which the public or a substantial number thereof might be permitted to resort.

**\*594** On December 11, 1964, the judge certified, under section 3 (b) of the Criminal Appeal Act, 1907, that

    "The case involves questions of law about the nature of the offence of making an affray, (i) whether it is an essential element of that offence that the fighting complained of should be in public and, if it is, (ii) whether I misdirected the jury about the meaning of 'in public'."

The appeals were heard after the appellants had served their sentences.

*Raymond Stock Q.C.* and *G. G. Macdonald* for the defendant, Button. In an affray, the fighting takes place in a public place and it has been the custom when drawing up the indictment to state in the particulars of the offence that the affray occurred in a public place, see Archbold's Pleadings and Evidence in Criminal Cases, 1st ed.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965]
3 W.L.R. 1131, (1965) 109 S.J. 872
**(Cite as: [1966] A.C. 591)**

(1822), p. 337, and in later editions including the current edition, Archbold's Pleading, Evidence and Practice in Criminal Cases, 35th ed. (1962), p. 1389, para. 3593; Stone's Justices Manual, 96th ed. (1964), vol. 2, p. 2272; Halsbury's Laws of England, 3rd ed. (1955), vol. 10, p. 584, para. 1086. Before there can be an affray, the fighting must take place in a public place and the offence can be traced back to the Statute of Northampton, 1328.

[LORD PARKER C.J. Accepting that in an affray the fighting must be in a public place, what is a public place?]

A public place is a place where the public have the right of or are permitted access at the material time whether on payment or not. It may not be necessary for all members of the public to have the right of access provided that sufficient numbers of the public do have that right solely as members of the public and not by invitation or because they are members of a society. In one sense everybody is a member of the public but they do not always act in that capacity. In this case, there was no evidence that a substantial number of the public attended in their capacity as members of the public; the dance was attended by the members of the Radstock and District Darts League, their guests and those who obtained tickets from the licensees of the public houses and who were really the friends of the licensees.

In Timothy v. Simpson, [FN1] the affray took place in a private house but it was a civil matter concerning an action for damages and there is no indication that the term "affray" was used in the technical sense known to the criminal law. Alderson B. in *595 Reg. v. Hunt & Swanton [FN2] held that an affray must occur in a public place and not in a place a considerable distance from the highway even though the defendants fought amidst a great crowd. Whiteside C.J. in the Irish case of Reg. v. O'Neill, [FN3] stated that not only was an affray a public offence which had to be committed in a public place but it must be alleged in the indictment that the offence

occurred in such a place. Although Reg. v. Woodrow, [FN4] concerned the question whether the indictment was bad for duplicity, the fighting took place in a street and it is implicit in that case that an affray must be in a public place and see *per* Lord Goddard C.J. in Reg. v. Sharp, [FN5] which is another case concerning fighting in a street.

FN1 (1835) 1 Cr.M. & R. 757 .

FN2 (1845) 1 Cox C.C. 177 .

FN3 (1871) I.R. 6 C.L. 1 , 4.

FN4 (1959) 43 Cr.App.R. 105, C.C.A.

FN5 [1957] 1 Q.B. 552, 561; [1957] 2 W.L.R. 472; [1957] 1 All E.R. 577,C.C.A.

[LORD PARKER C.J. Maybe the meaning of a public place means in the presence of the public. In Reg. v. Hunt & Swanton, [FN6] the fight occurred in a public place and, therefore, the case was decided on the point that the crowd were aiders and abettors.]

FN6 1 Cox C.C. 177 .

The report states that there was a crowd of people and the aiders and abettors refer to the other defendants. The report fails to show why it was not a public place.

[MARSHALL J. Would you concede that the mischief aimed at is the putting in terror members of the public and not fighting in a public place?]

If the offence is not committed in a public place it cannot be committed in public. It is not a numerical test but a question of status; a large private wedding may have hundreds of guests whilst a political meeting in a village hall may be attended by only a few members of the public but the first will be in a private place and the latter in a public place. It must be in a public place and in the presence of the public; a fight in a deserted street cannot be an affray.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965]
3 W.L.R. 1131, (1965) 109 S.J. 872
**(Cite as: [1966] A.C. 591)**

A public place includes premises where the public have permission to enter whether or not they have a legal right; see Reg. v. Morris, [FN7]    Reg. v. Clark    [FN8]    and *per*    Paull J. in Reg. v. Mapstone.    [FN9]    The Court of Criminal Appeal gave unqualified approval to the direction that "An affray is a fight between two or more people in a public street that is likely to terrify passers-by or residents" in Reg. v. Allan. [FN10]

FN7 (1963) 47 Cr.App.R. 202    .

FN8 (1963) 47 Cr.App.R. 203    .

FN9 [1964] 1 W.L.R. 439; [1963] 3 All E.R. 930    .

FN10 [1965] 1 Q.B. 130, 132, 135; [1963] 3 W.L.R. 677; [1963] 2 All E.R. 897, C.C.A.

The use of the words "or other public place" in **\*596**    section 6 of the Road Traffic Act, 1960    , was considered in Reg. v. Waters [FN11]    ; Elkins v. Cartlidge    [FN12] and Reg. v. Beaumont.    [FN13]    Reg. v. Wellard    [FN14] and Reg. v. Crunden, [FN15]    dealt with the question whether a place was a public one or not and there are statutory definitions of "public place" in section 9 (1) of the Public order Act, 1936    , and section 1 (4) of the Prevention of Crime Act, 1953    .

FN11 (1963) 47 Cr.App.R. 149 C.C.A.

FN12 [1947] 1 All E.R. 829, D.C.

FN13 [1964] Crim.L.R. 665, C.C.A.

FN14 (1884) 14 Q.B.D. 63, C.C.R.

FN15 (1809) 2 Camp. 89    .

There was no evidence that the public had access to the dance and, therefore, either this case should not have been left with the jury or there was no evidence to support their verdict. Even if in the old common law form of affray it was not essential that

the fighting occurred in a public place, it has been presumed for a number of years that it is essential and, if an error has crept in, it should not now be rectified.

*E. Wynroe Thomas*    for the defendant, Swain, adopted the argument put forward on behalf of the first defendant.

*J. F. Platts-Mills Q.C.*    and *J. H. Inskip* for the Crown. An affray, like its kindred common law offences of riot and riotous assembly, may take place behind locked doors as well as in a public place. The essential factor is that there must be innocent bystanders who do not participate in the fighting. Over the centuries, writers have distinguished between private and public wrongs and certain crimes are classified as public offences; it would be an extraordinary decision to decide that a public offence must occur in a public place.

The people attending this dance came from all walks of life and their only common characteristic was in interest in darts, they were as homogeneous as a football crowd. Those who went to the dance were the publicans, organisers and supporters of the league, the players with their wives and guests and three people who came to present the prizes. A witness said that when he saw the gang of youths enter the hall he knew there would be trouble: one of the dart players was a member of that gang.

The aim of the Statute of Northampton, 1328, was to stop the not unusual practice of the lord of the manor riding armed and with his armed men into the market place. Later this offence was used to prevent duels and prize fights, it was not to be expected that a duel took place in public. Today, the offence is a practical way of putting down the lawlessness of gangs of young people who often cause fighting in the street and frequently in such places as dance halls and public-houses. There has been nothing like it in **\*597**    the past and the nearest parallel is that of trouble caused by apprentices. The difficulty in this type of case is that witnesses are unable to give details of the individual assaults

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965] 3 W.L.R. 1131, (1965) 109 S.J. 872
**(Cite as: [1966] A.C. 591)**

but they are able to say that the fighting occurred due to the acts of certain persons.

There is an error in the summing up which is due to a widely held error as to the ingredients of the offence of affray. The doctrine of communis error facit jus has a limited application. It may be applied in chancery actions, rarely in civil and it is not applicable to criminal cases; see Woolmington v. Director of Public Prosecutions [FN16] and Broom's Legal Maxims, 10th ed. (1939) p. 86. There can be no acquired right to commit an offence by practice, prescription or error of law nor can the common law be altered by an erroneous decision: see Hickman v. Potts [FN17] ; per Lord Wright in Westminster Corporation v. Southern Railway Co. [FN18] ; per Greer L.J. in Robinson Brothers (Brewers) Ltd. v. Houghton and Chester-le-Street Assessment Committee [FN19] ; per Lord Wright in National Anti-Vivisection Society v. Inland Revenue Commissioners [FN20] and per Lord Buckmaster in Bourne v. Keane. [FN21]

FN16 [1935] A.C. 462; 51 T.L.R. 446 , H.L.(E.).

FN17 [1940] 1 K.B. 29, 44; 55 T.L.R. 1016; [1939] 3 All E.R. 794, C.A.

FN18 [1936] A.C. 511, 563; 52 T.L.R. 541; [1936] 2 All E.R. 332 , H.L.(E.).

FN19 [1937] 2 K.B. 445, 462; 53 T.L.R. 609; [1937] 2 All E.R. 298 , C.A.

FN20 [1948] A.C. 31, 46; 63 T.L.R. 424; [1947] 2 All E.R. 217 , H.L. (E.).

FN21 [1919] A.C. 815, 874; 35 T.L.R. 560 , H.L.(E.).

Coke in the Third Part of the Institutes of the Laws of England, 1st ed. (1648), p. 158, states that

"An affray is a public offence to the terror of the king's subjects, and is an English word, and so called, because it affrighteth and maketh men

afraid."

There is no indication that the fighting must be in a public place nor is there such an indication in Hale's Pleas of the Crown, 1778 ed., Vol. 2, p. 95, where he deals with the powers of arrest. In Hawkin's Pleas of the Crown, 7th ed. (1795), Vol. 2, p. 19, it is stated that if the fighting occurs in a private place it cannot be said to be to the terror of the people and cited in support is Coke's Institutes of the Laws of England, Dalton's Country Justice and Lambard's Eirenarcha. It is further stated that a private place is where the contestants are alone and out of sight of onlookers and that a constable has power to break down the door if an affray occurs in a private house. In an affray, the essential requirement is that people were frightened by the fighting, and this might explain the use of public place in Blackstone's Commentaries on the Laws of England, 10th ed. (1787), Vol. 4, p. 145; he also speaks of the power of the **\*598** constable to break down the door of a private house. Burn's Justice of the Peace, 15th ed. (1785), Vol. 1, p. 19, does not mention public place but Archbold's Pleadings and Evidence in Criminal Cases, 1st ed. (1822), p. 337, Russell on Crime and Misdemeanours, 3rd ed. (1843), Vol. 1, p. 291, and article 89 of Stephen's Digest of the Criminal Law, 8th ed. (1947), follow Blackstone and state that the offence must be in a public place. The only authority which seems to support that contention is Reg. v. Hunt & Swanton, [FN22] where a large crowd had come to enjoy a prize fight; it would be difficult to say that some of them were frightened. Reg. v. O'Neill, [FN23] does not add anything to our knowledge of the ingredients of the offence of affray and Lord Goddard C.J. in Reg. v. Sharp, [FN24] said that it was sufficient in an indictment to allege that the defendant caused an affray.

FN22 1 Cox C.C. 177 .

FN23 I.R. 6 C.L. 1 .

FN24 [1957] 1 Q.B. 552 , 560.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1966] A.C. 591    Page 6
1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965] 3 W.L.R. 1131, (1965) 109 S.J. 872
**(Cite as: [1966] A.C. 591)**

*Stock Q.C.*    in reply. In the seventeenth century, the difference between the offence of affray and that of assault was only just beginning to be distinguished; see Lambard's Eirenarcha (1614), p. 126, and Thomas Wood's An Institute of the Laws of England, 6th ed. (1738), p. 425. At that time the necessity for the fighting to be in a public place had not emerged, but the textbook writers and the authorities in the last 200 years have consistently stated that the fighting occurs in a public place. There is no necessity now to resile from that view and replace it by something which may never have been the law.

*Cur. adv. vult.*

### February 23. MARSHALL J.

read the following judgment of the court, in which he stated the facts and continued: At the very beginning of the trial the point that this court has to consider arose in the course of a motion made on behalf of all the accused to quash the affray count in the indictment. This count had been framed in the following terms - that all the accused "on May 22, 1964, at Radstock in the County of Somerset unlawfully fought and made an affray." Relying on the authority of Reg. v. O'Neill,
[FN25]    it was submitted that the want of any reference to a public place rendered the indictment bad: that it was necessary to detail the actual place and then aver that it was a "public place." In the course of this submission it was stated that the prosecution were seeking to "raise an experimental form of indictment."

FN25 (1871) I.R. 6 C.L. 1    .

Indeed in his reply to the submission Mr. Platts-Mills, who led for the prosecution, vigorously argued that the wording of count **599**    1 was sufficient since it was not an essential ingredient of the offence of affray that it should take place in a public place or highway. It was sufficient that the affray took place in the presence of members of the public who were thereby frightened or put in fear.

At this stage the judge gave no ruling on this point. He refused to quash the count and, exercising his powers under section 5 of the Indictments Act, 1915    , he ruled that the count should be amended so as to read "at the Scout Hall, Radstock," and the trial proceeded.

At the end of the case for the prosecution the defence submitted that they had no case to answer, since, on the evidence, the Scout Hall at Radstock was not a "public place," only a particular and limited class of persons being entitled to be present at the function. It was a private social function open only to selected ticket-holders. The tickets were not available to the general public and before a private building could be regarded as a public place for the purposes of the offence of affray, the general public must be present as of right or by leave.

The following cases were relied on to support this submission: Timothy v. Simpson
[FN26]    ; Reg. v. Hunt & Swanton
[FN27]    ; Reg. v. Sharp
[FN28]    ; Reg. v. Morris
[FN29]    ; Reg. v. Allan [FN30]    ;
Reg. v. Mapstone    [FN31]    ; Reg. v.
Waters    [FN32]    ; Reg. v. Beaumont.
[FN33]    This court has read and considered all these cases but we do not regard it as necessary to refer to them in detail. It is clear that they all were decided on the basis that the offence of affray, being an offence against the public, must either take place in a public place or street or, if committed in a geographically private place or building, the general public, or a substantial element of it, must be present by licence or by right at the material time.

FN26 (1835) 1 Cr.M. & R. 757    .

FN27 (1845) 1 Cox C.C. 177    .

FN28 [1957] 1 Q.B. 552; [1957] 2 W.L.R. 472; [1957] 1 All E.R. 577,C.C.A.

FN29 (1963) 47 Cr.App.R. 202    .

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965] 3 W.L.R. 1131, (1965) 109 S.J. 872

**(Cite as: [1966] A.C. 591)**

FN30 [1965] 1 Q.B. 130; [1963] 3 W.L.R. 677; [1963] 2 All E.R. 897, C.C.A.

FN31 [1964] 1 W.L.R. 439; [1963] 3 All E.R. 930          .

FN32 (1963) 47 Cr.App.R. 149, C.C.A.

FN33 [1964] Crim.L.R. 665          .

In reply, Mr. Platts-Mills returned to and repeated his earlier submission that "public" in relation to the offence of affray only meant in the presence of members of the public and it mattered not if such members of the public were present whether the offence was committed in a public place or highway or on premises that were private. He traced the origins of this common law misdemeanour through the old authorities.

These this court has read and considered with care. We feel **\*600** that we cannot do better than to read the clear and admirable terms in which MacKenna J. dealt with these authorities.

"The parties do not agree about the nature of the offence of making an affray. The seven defendants charged with the offence contend that it is one of six essential elements that the fighting shall be in a place which the general public are entitled to use as of right or which they are permitted to use. The prosecution have argued that it is not essential that the place shall be public in either of these senses, or indeed in any sense at all. That there should be uncertainty about the elements of this ancient offence is regrettable. The need for codification of our criminal law, it is evident, does not grow less with time.

The argument began with a quotation from the Third Part of Coke's Institutes of the Laws of England (1797), Chap. 72, p. 157: 'An affray is a publique offence to the terrour of the king's subjects, and is an English word, and so called, because it affrighteth and maketh men afraid, and is enquirable in a leet as a common nusans.' It is clear that the word ' publique' applied by Coke to this offence is

not used to describe the place of its commission. A little further on in the Institutes at p. 174 he writes that 'a libeller ... committeth a publick offence, and may be indicted therefore at the common law.' This cannot possibly refer to the place where the libellous offence is committed. Again at p. 209 he writes: 'If a man be taken by the kings writ in an action of debt or another private action, the plaintif may discharge the gaoler of him, and set him at liberty, though he be in execution: but if he be taken in an appeal of death, robbery, rape, etc. the plaintif cannot discharge him, because it is a publique offence, wherein the king hath an interest, and he may after nonsuit by the plaintif be arraigned at the kings suit.' A public offence is one in which the King has an interest and which is not, like a private offence, merely actionable at the suit of the injured party.

Lambard's Eirenarcha (1614), at pp. 125-126 was also cited: 'The words affray and assault, be indifferently used of most men, and that also in some of our booke cases: but yet (in my opinion) there wanteth not a just difference betweene them.' This means in the author's opinion there is a difference between the two offences. He continues: 'For, affray, is derived of the French effraier which signifieth to terrifie, or bring feare, which the law understandeth to be a common wrong, and therefore it is inquirable and punishable in the turne of the sherife, and in a leete. Otherwise it is of an assault, as it seemeth by those verie bookes.' Lambard's 'common wrong' is the equivalent of Coke's 'public offence.'

The author of Les Termes de la Ley (1721), which was also cited, paraphrases Lambard by saying at p. 29: 'An assault is but a wrong to the party, but an affray is a wrong to the Commonwealth.' He adds: "An affray is the fighting of many together.'

Hale's History of the Pleas of the Crown, 8th ed. (1800), **\*601**          Vol. 2, p. 94, deals with affray but only in connection with the power of arrest. It says: 'If there be an affray in a house, where the doors are shut whereby there is likely to

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965] 3 W.L.R. 1131, (1965) 109 S.J. 872
**(Cite as: [1966] A.C. 591)**

be manslaughter or bloodshed committed, the constable of the vill having notice thereof, and demanding entrance, if they within refuse to do it, but continue the affray, the constable may break open the doors to keep the peace and prevent the danger.'

Dalton's Country Justice (1727), at p. 38, defined affray: Affray is in our law a skirmish or fighting between two or more; and is derived of the French word effrayer, which signifieth to terrifie, and which the law understandeth to be a common wrong.' He deals at length with the constable's powers including that of breaking down the door when the affray is in a house and the doors are shut. So far there is nothing in the definition of the offence which requires that the fighting shall be in any particular kind of place. The offence is putting the King's subjects in fear by fighting.

Hawkins' Pleas of the Crown, 7th ed. (1795), Vol. 2, p. 19, says of the offence: 'It is said, that the word "affray" is derived from the French word "effraier," to terrify, and that, in a legal sense, it is taken for a public offence to the terror of the people. From this definition it seems clearly to follow, that there may be an assault which will not amount to an affray; as where it happens in a private place, out of the hearing or seeing of any, except the parties concerned; in which case it cannot be said to be to the terror of the people; and for this cause such a private assault seems not to be inquirable in a court leet, as all affrays certainly are, as being common nuisances.' For these propositions he cites Coke, Dalton and Lambard. Like Dalton he assigns to the constable the power of breaking down the door when the affray is in a house. When Hawkins writes that an assault committed in a private place out of the sight and hearing of any but the contestants cannot be an affray, I do not think he is saying two separate things about that kind of assault, namely (i) that it must be committed in a private place, and (ii) it must be committed in a place where the contestants were alone. The words ' a private place' are in my opinion defined or explained by the words that follow. On this reading a private place is one where the contestants are alone; there is only a single requirement for an assault which is not an affray, namely that it should be out of the sight and hearing of all save those concerned in the fighting. Hawkins purports to deduce his statement about an assault from what he has already said about an affray. 'From this definition it seems clearly to follow,' and so on, but nothing follows from his definition of an affray except it must be in the presence or hearing of people who could be terrified by it. Nothing that is relevant follows from his repetition of Coke's words about an affray being a 'public offence.' Like Hale, Hawkins also asserts the constable's power to break open doors in order to prevent an affray.

**\*602** The trouble begins with Blackstone, who is the next writer to be considered. At p. 145 of Vol. 4 of the Commentaries on the Laws of England, 10th ed. (1787) citing only Hawkins, he defines 'affray' as: 'the fighting of two or more persons in some public place, to the terror of His Majesty's subjects: for, if the fighting be in private, it is no affray but an assault.' He adds, again citing Hawkins, that the constable can break open doors to suppress an affray. I doubt whether Blackstone gave much thought to his choice of the words 'public place' as the contrary of Hawkins' expression a 'private place.' If, as I think, Hawkins meant by a 'private place' one in which the contestants were alone the words 'public place' do not aptly describe any place where the contestants are not alone. A place is not a ' public place' in any sense of the words merely because people are fighting in it to the terror of innocent onlookers. With Blackstone's introduction of those words the way is open for those who would argue there are two requirements for an affray, not one, that it must be not merely to the terror of innocent people but also in a public place, whatever those words may mean. It is clear that for Blackstone they could include a place within closed doors.

Most of the later writers follow Blackstone by including the words a ' public place' in the definition

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1966] A.C. 591    Page 9
1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965]
3 W.L.R. 1131, (1965) 109 S.J. 872
**(Cite as: [1966] A.C. 591)**

of an affray. Burn's Justice of the Peace, 24th ed. (1825) Vol. 1, p. 34 is an exception. He says nothing about a ' public place' but copies Hawkins more exactly than Blackstone merely denying the character of an affray to an assault committed in a private place out of the hearing and seeing of any except the parties concerned and saying nothing about the locus of the fighting in the case of an affray.

Russell on Crime and Misdemeanors, 3rd ed. (1843) Vol. 1, p. 291, copies Blackstone, defining an affray as 'the fighting of two or more persons in some public place, to the terror of His Majesty's subjects.' Archbold's Pleading and Evidence in Criminal Cases, 17th ed. (1871), p. 847, does the same. 'Prove' he says, 'that the defendants fought in a public street or highway: for if it be in private, it is an assault and battery merely, and not an affray.' His precedent of an indictment for an affray charges the defendants that they 'being unlawfully assembled together and arrayed in warlike manner, in a certain public street and highway, situate in the parish of B., in the County of M., unlawfully, and to the great terror and disturbance of divers liege subjects of our said lady the Queen then and there being, did make an affray.' Article 89 of Stephen's Digest of the Criminal Law, 8th ed. (1947), copies Blackstone verbatim.

I turn now to the decided cases which were cited to me. Timothy v. Simpson [FN34]            was the first of them. It was a civil case arising out of a disturbance in a linen draper's shop. The judgment of the Court of Exchequer delivered by Parke **\*603**      B. [FN35]            describes the fight as an affray, calls the contestants 'affrayers' but says nothing about the fight being in public or in private. He sometimes describes the scene of the fight as a shop and sometimes as the defendant's dwellinghouse. I do not get any help from this case.

FN34 1 Cr.M. & R. 757            .

FN35 1 Cr.M. & R. 757            , 758.

Reg. v. Hunt & Swanton [FN36]            was the first of the criminal cases. The report is a short one and I shall read it in full, beginning with the head note: 'The principals and seconds in a prize fight cannot be indicted either for a riot or an affray where the fight takes place at a distance from any public highway, and being at an end when the constables arrive, the parties yield on being required to do so. Semble, they might be indicted for an assault. The prisoners were indicted in one count for a riot, and in another for an affray. The evidence was, that the first two prisoners had fought together amidst a great crowd of persons, and that the others were present, aiding and abetting. That the place where they fought was at a considerable distance from any highway, and when the officers made their appearance, the fight was at an end. The prisoners, on being required to do so, quietly yielded.' Alderson B. said [FN37]            : 'It seems to me that there is no case against these men. As to the affray, it must occur in some public place, and this is to all intents and purposes a private one. As to the riot, there must be some sort of resistance made to lawful authority to constitute it, some attempt to oppose the constables who are there to preserve the peace. The case is nothing more than this:- Two persons choose to fight, and others look on, and the moment the officers present themselves, all parties quietly depart. The defendants may be indicted for an assault, but nothing more.'

FN36 1 Cox C.C. 177            .

FN37 1 Cox C.C. 177            .

It is clear that Alderson B. accepted Blackstone's requirement that the fight must be in a 'public place.' He described the scene of the fighting (which according to the report was a considerable distance from the highway) as being 'to all intents and purposes a private one.' Mr. Platts-Mills for the prosecution, pointing to the words of the reporter which say [FN38]            'others were present aiding and abetting.' argues that 'others' refers to all the people present and that the ratio of the decision

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965] 3 W.L.R. 1131, (1965) 109 S.J. 872

**(Cite as: [1966] A.C. 591)**

is that no place is public unless some person is present other than a principal in the first or second degree and that all places are public when such another person is present. I cannot accept this interpretation. I read ' others' as referring to the defendants other than Hunt and Swanton. I surmise that the prosecution failed because they did not prove that the scene of the fighting was a public place and that the judge's reason for holding it to be a private place was its distance from the highway. But none of this is clearly stated in the judgment.

FN38 1 Cox C.C. 177                    .

Reg. v. O'Neill,                [FN39] decided in 1871, was the next case cited to me. The head note reads: 'An indictment for an affray **\*604** which does not aver that the affray took place in a public street or highway is bad, and, upon error brought, will be quashed after verdict.' The main proposition for the successful argument for the defendants is in these words [FN40]            : 'It is of the essence of an affray that it be in public, for if it be in private it is an assault and battery merely, and not an affray.' The authorities given for this proposition are the passages I have already cited in Archbold and Hawkins. The following passage in the judgment of Whiteside C.J. accepts this proposition [FN41]            : 'It is a public offence, and, therefore, it must be alleged to have been committed in a public place. It is equally clear that the form of indictment which should have been followed describes it as an offence that had been committed in a public street or highway.' The reasoning is bad, as I have shown by my quotation from Coke. Its being a public offence does not import the requirement that it should be committed in a public place. But the conclusion is unambiguous. It is essential that the offence should have been committed in a public place.

FN39 I.R. 6 C.L. 1                    .

FN40 I.R. 6 C.L. 1                , 2.

FN41 Ibid. 4.

The nature of an affray was considered for the first time by the Court of Criminal Appeal in Reg. v. Sharp.            [FN42] The fighting in that case had clearly been in a public street, so the question I have to decide did not arise. But reference to the judgment of the court delivered by Lord Goddard C.J. shows that in his view an affray imported a fighting in public. He says [FN43]            that the passage in Coke's Institutes about an affray suggests that it was that writer's opinion that 'a combat in public is a great breach of the royal peace.' He cites [FN44]            without disapproval Blackstone's definition of an affray as fighting in a public place. He defines the offence in his own words as [FN45]            'a real disturbance of the peace by two persons fighting each other in public instead of settling their difference in the royal courts.'

FN42 [1957] 1 Q.B. 552                    .

FN43 [1957] 1 Q.B. 552                , 559.

FN44 [1957] 1 Q.B. 552                , 559.

FN45 Ibid. 560.

In 47 Criminal Appeal Reports there is noted a direction to a jury by Marshall J. in Reg. v. Morris            [FN46]            in 1963. The judge proceeded upon the assumption the offence could be committed only in a public place. He borrowed for his definition of a 'public place' part of the statutory definition of those words contained in section 1 (4) of the Prevention of Crime Act, 1953            . [FN47]            'Any highway and any other premises or place to which at the material time the public have or are permitted to have access, whether on payment or otherwise.' The same note refers to a direction in 1963 of Howard J. in Reg. v. Clark            [FN48] where that judge similarly assumed that the offence could be committed only in a public place, but held that the public bar of a public house was such a place.

FN46 47 Cr.App.R. 202                    .

FN47 Ibid. 203.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965] 3 W.L.R. 1131, (1965) 109 S.J. 872

**(Cite as: [1966] A.C. 591)**

FN48 Ibid. 203.

The next authority dealing with the nature of an affray is Reg. v. Allan, [FN49] decided by the court of Criminal Appeal in *605 1963. In that case Thesiger J. had defined the nature of an affray in four propositions, only one of which (the fourth) was challenged on appeal. The first proposition was in these terms [FN50] : 'An affray is a fight between two or more people in a public street that is likely to terrify passers-by or residents.' It was stated in the judgment of the court delivered by Edmund Davies J. [FN51] that no criticism had been or properly could be levelled against that proposition.

FN49 [1965] 1 Q.B. 130 .

FN50 [1965] 1 Q.B. 130 , 132.

FN51 Ibid.

The last case cited was that of Reg. v. Mapstone, [FN52] a direction of Paull J. He defined the offence as a fight in a public place or road in such a way as might well frighten any members of the public who might be present.

FN52 [1964] 1 W.L.R. 439 , 440.

Faced by these authorities, extending from Alderson B. in 1845 to the Court of Criminal Appeal and Paull J. in 1963, I feel it would be impossible for me, sitting in this court, to rule that it is not an essential element of the offence that it should be committed in public or in a public place. I can indeed agree with the prosecution's submission that this requirement seems to have crept into the law by error. If it is not an error it is surely a surprising thing that there is no similar requirement in the case of the analogous offences of riot and unlawful assembly which, like that of affray, must also be committed to the terror of the King's subjects. Why should it be necessary in the one case that the terror should be inspired in public but not so in the others? But if it is an error it is by now

communis error and must be accepted by me at least as the law."

The judge finally overruled the submission in the following terms:

"The question remains what is meant in this connection by the requirement that the offence must be committed in public or in a public place? Here subject to correction by a higher court I feel a greater freedom. I would hold that the offence is committed in public if it is committed in a place to which the public, or any substantial portion of the public, have access at the material time."

He declined to apply to the offence of affray the same tests as to the meaning of "a public place" as has been applied to offences under the Road Traffic Acts, in the following terms:

"The application would confine the law of affray within very narrow limits. I am reluctant to do that. I do not wish to reduce the scope of this useful law more than I am bound to do by authority.

I recognise that the view which I have adopted is itself unsupported by authority, and for that reason I have felt much hesitation and uncertainty in adopting it. *606

To conclude this part of the case, if I am wrong in holding that it is a requirement of the law that the offence shall be committed in public, my error favours the defendants. But if I have erred against their interests in defining too widely what is meant by 'in public' I can be corrected by the Court of Criminal Appeal."

Further submissions on issues of fact were overruled and evidence by and on behalf of the defendants was called.

In his summing up to the jury the judge directed them as to the law governing the offence of affray in the following terms:

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1966] A.C. 591

Page 12

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965] 3 W.L.R. 1131, (1965) 109 S.J. 872

**(Cite as: [1966] A.C. 591)**

"You must be satisfied of the following matters. First, that two or more people fought together of whom the accused was one. Secondly that they fought in a public place. Thirdly that the manner of their fighting was such that it was likely to cause alarm in persons of reasonable firmness and courage. Fourthly that the fighting was within the sight and hearing of such persons who might be alarmed in that way.

When I say the fighting must be in a public place before you can convict anyone of this offence I mean that it must be in a place to which at the time of the fighting the general public, or at least a substantial portion of the public, had access. In the present case, members of the jury, the general public did not have access to the Scout Hall where the prosecution say the fighting took place.

Only a limited class of persons were admitted to that hall those who were given tickets or who were helping with the arrangements for the presentation of the prizes.

You can, I think, disregard the fact that some persons may have entered the hall without tickets through the carelessness of the door keeper, whose duty it was to keep them out.

If that happened it would not make the hall a place to which the general public had access. But it is enough as I have explained that the place shall be one to which a substantial portion of the public had access.

If the evidence satisfies you that the class of person given tickets, because admission was by ticket only, and thus permitted to attend the dance, were the dart players of some fourteen public houses in the Radstock area who had registered as members of the Darts League, their wives and friends and some of the regular customers of those houses for whom the landlords were given spare tickets, you would, in my judgment, be entitled to hold that they formed a substantial portion of the public and that the Scout Hall where they were met together was

for the time being a public place.

Of course, if you thought the dance was merely a domestic occasion as where a host invites to a party members of his family and his and their friends, you would be bound to find the dance was not held in public, it would be a private affair.

**\*607** But if you accept the evidence of the prosecution witnesses on this point, the net was cast much wider than that. Any person could get a free ticket who was a registered member of the Darts League and any member of the public could join that league by paying a small subscription. There were at the time of the dance some 180 members of the league. Further anyone could come to the dance if he was a person to whom one of these numerous members had chosen to give a ticket.

Even if not a friend of one of those members he could come if he could get a spare ticket from the landlord of one or other of the fourteen public houses where the Darts League games were played. Some hundreds of these free tickets were issued and over 100 persons attended the dance: one person put it at over 200. If those are the facts you would, in my judgment, be entitled to hold that those who had access to the hall were a portion of the public in this part of Somerset and a substantial portion at that. By 'substantial' I mean a really considerable portion of the public."

It is on this part of the judge's summing-up that the defendants found their contention that he misdirected the jury and ask this court to quash these convictions. Indeed we have the somewhat unusual situation in which the prosection for quite different reasons have taken an equally strong objection.

The defendants have contended that the dance in question on the facts proved was a private social affair, confined to a strictly limited section of people, and was held on private property; the affray, if such took place, had neither occurred in a "public place" nor in the presence of "the public" as required by the law. The prosecution have argued that it matters

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1966] A.C. 591                                                                                   Page 13
1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965]
3 W.L.R. 1131, (1965) 109 S.J. 872
**(Cite as: [1966] A.C. 591)**

not where the affray took place, whether in a public street or place or on private property, it is sufficient if it is proved that it took place in the presence of members of the public, they being non-participators who offered no encouragement and who were put in fear. We have been greatly helped by the clear and careful arguments of Mr. Stock and Mr. Thomas for the defendants and Mr. Platts Mills for the Crown.

Is it the law that an affray must be proved to have occurred in a "public place," and if so, what for the purposes of the offence is a "public place"?

This court does not feel called upon to repeat in detail the review of the law by MacKenna J. All the writers on the law of affray down to the latter part of the eighteenth century, which we have examined, refer to it as a "public offence" or a "common wrong" but nowhere do they say that the fighting has to be in any particular kind of place. Much is written concerning powers of arrest to indicate that the offence can take place on private **\*608** property, since to the constable is assigned the power of breaking down the door when an affray is in a house.

We begin to see the first possibility of error creeping in when Hawkins in his Pleas of the Crown, 7th ed. (1795), Vol. 2, p. 19, writes

"It is said that the word 'affray' is derived from the French word ' effraier,' to terrify, and that, in a legal sense it is taken for a publick offence to the terror of the people. From this definition it seems clearly to follow, that there may be an assault which will not amount to an affray; as where it happens in a private place, out of the hearing or seeing of any, except the parties concerned; in which case it cannot be said to be to the terror of the People."

Here we appear to have the first specific reference to "a private place." This court agrees with MacKenna J. when he says that these words are defined or explained by the words that follow. The "private place" to which Hawkins is there referring is a place where the contestants are alone.

The possibility of error grows greater when Blackstone in his Commentaries, 10th ed. (1787), vol. 4, p. 145, citing Hawkins, defines affray as "the fighting of two or more persons in some public place, to the terror of His Majesty's subjects: for, if the fighting be in private, it is no affray but an assault." He, quoting Hawkins, goes on to say that the constable can break open doors to suppress an affray. It was an unfortunate use of the words "public place." We have no doubt that though it is not an apt phrase to describe any place where those who fight are not alone, Blackstone intended it in that sense.

It did not take long for the journey to error to be accomplished. It emerges complete in the 1st ed. (1822) of Archbold's Pleadings and Evidence in Criminal Cases. At page 337 he deals with "affray" by saying that it must be proved that the accused fought "in a public street or highway" and, quoting Hawkins, goes on to add "for if it be in private it is an assault and battery merely, and not an affray."

With the exception of Burn's Justice of the Peace (1825), the error is repeated by all who have since written on the law of affray, and all cases brought in respect of the offence have proceeded on the basis that one essential ingredient to be proved is that it occurred in "some public place or highway."

If it is still said that the offence of affray can only occur in some public street or highway or other public place to which the public generally is present by right or by leave and licence, this court is satisfied that is not the law. The common law conceived **\*609** it as one of a number of offences designed to uphold public order and to protect the public generally against lawlessness and disorder. In our view where two or more people fight in the presence of persons who neither participate in nor encourage the fighting, and thereby some of these persons are frightened or put in fear, then the offence of affray is complete. Such offences will for the most part take place in public places to which the public can go as of right or by leave and licence.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1966] A.C. 591    Page 14

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965] 3 W.L.R. 1131, (1965) 109 S.J. 872

**(Cite as: [1966] A.C. 591)**

This court does not think that the number of persons present when such fighting takes place is to be taken as a test. In our view it matters not whether few or many persons are present. The few are entitled to the same protection as the many. We do not find any assistance in the use of such terms as "substantial number." It is not a case where heads can be counted. All are entitled to the protection of the law when public order is being violated.

In addition to the cases already referred to in the ruling of MacKenna J., one other case, Price v. Seeley, [FN53] gives support to our view that an affray can take place on private premises.

FN53 (1848) 10 Cl. & Fin. 28.

The next argument advanced on behalf of the defendants is based upon the doctrine of communis error. After over a century of misconception concerning the law of affray it is now too late (so the argument runs) to return to the proper common law conception of the offence. We should not at this stage return to the wider view but continue to confine its operation to "public places."

This is a doctrine that is well supported by authority, the latest of which is to be found in Vane v. Yiannopoullos. [FN54] In that case the magistrate had dismissed an information alleging that the respondent, the holder of an on-licence, had knowingly sold intoxicating liquor to persons to whom he was not permitted to sell it, contrary to section 22 (1) (a) of the Licensing Act, 1961. The facts are not important, save that the decision turned on whether the licensee could be held vicariously liable for the acts of his servant committed without his knowledge against his orders.

FN54 [1965] A.C. 486; [1964] 3 W.L.R. 1218; [1964] 3 All E.R. 820. H.L.(E.).

In the course of his speech Lord Reid said [FN55]:

"Counsel for the appellant strenuously argued that this distinction is illogical and not warranted by any statutory provision. He maintained that if a licence holder entrusts to his wine waiter the duty of selling intoxicating liquor that is sufficient delegation and that, if the wine waiter disobeys his orders and sells to persons to whom he ought not to sell, **\*610** there is nothing to justify the licence holder being acquitted if he happens to have been in some other part of the premises but held vicariously liable if he happens to have gone out, leaving the wine waiter in charge.

FN55 [1965] A.C. 486, 497.

If this were a new distinction recently introduced by the courts, I would think it necessary to consider whether a provision that the licence holder shall not knowingly sell can ever make him vicariously liable by reason of the knowledge of some other person. But this distinction has now been recognised and acted on by the courts for over half a century. It may have been unwarranted in the first instance but I would think it now too late to upset so longstanding a practice.

It is, however, quite another matter to extend a longstanding anomaly, particularly because there may in this matter be good practical reasons for requiring a licence holder to be specially careful about the persons whom he chooses to leave in charge in his absence. One might have expected to find in the Licensing Acts some provisions regulating the position in the common case of a licence holder being absent from the licensed premises during the permitted hours, but there appears to be none. So if the courts have in effect legislated to fill the gap, I think we should leave matters as they are."

It should be noted that had the appeal been allowed on the arguments advanced on behalf of the appellants the respondent and other on-licence holders with him would have been deprived of a defence that had been upheld by authority over at least 60 years.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965] 3 W.L.R. 1131, (1965) 109 S.J. 872

**(Cite as: [1966] A.C. 591)**

We believe that in this case different considerations apply. Although the view for which the defendants contend has been acted upon for well over a century, there have been surprisingly few cases charging the offence. Apart from the Irish case, Reg. v. O'Neill, [FN56] decided in 1871, there have been no reported cases between 1845 and 1957. It is only in recent years that the offence of affray has been used to deal with the growing number of cases in which gangs of men fight and disturb the public peace.

FN56 I.R. 6 C.L. 1 .

In Sykes v. Director of Public Prosecutions [FN57] in which the House of Lords considered the offence of misprision of felony, Lord Goddard [FN58] drew attention to the guidance given by Lord Sumner in Bowman v. Secular Society Ltd. [FN59] In that case the House of Lords were considering offences which were obsolete or fallen into desuetude, and Lord Sumner said [FN60] : *611

"If that maxim expresses a positive rule of law, once established, though long ago, time cannot abolish it nor disfavour make it obsolete."

FN57 [1962] A.C. 528; [1961] 3 W.L.R. 371; [1961] 3 All E.R. 33 , H.L.(E.).

FN58 [1962] A.C. 528 , 568.

FN59 [1917] A.C. 406; 33 T.L.R. 376, H.L.

FN60 [1917] A.C. 406 , 454.

Again Lord Goddard [FN61] drew from the well of wisdom of Bacon:

"Penal laws if they have been sleepers of long time or if they have grown unfit for present use should by wise judges be confined in execution."

FN61 [1962] A.C. 528, 568.

It seems to this court that the offence of affray is a long-established offence and far from falling into

dis-favour or being unfit for present use it is a striking example of how an old common law offence is still at hand to deal with a new aspect of our modern society.

Taking everything into consideration we see no reason why we should continue to uphold the erroneous conception of the offence of affray. It evolved under the common law for the general protection of the public against public disorder, whether the public who were put in fear were at the time in a public or private place, and there are strong and valid reasons in the public interest why it should now be reasserted in its true common law form.

Since this is our view, it follows that the direction by MacKenna J., to which the defendants take exception, is one that erred in a way favourable to them. Had the direction been in terms which clearly stated that the fact that the Scout Hall, Radstock, dance was a private occasion on private property mattered not, so long as the fighting in which the defendants participated had taken place in the presence of a number of members of the public who had been thereby put in fear, we have no doubt that the jury on the evidence before them must have convicted. The appeal of both defendants is accordingly dismissed.

*Appeals dismissed. Certificate that a point of law of general public importance was involved and leave to appeal to House of Lords granted under section 2 (1) of the Administration of Justice Act, 1960. (H. J. )*

**Representation**

Solicitors:Registrar, Court of Criminal Appeal ;Director of Public Prosecutions .

**\*612** The Court of Criminal Appeal, in granting both appellants leave to appeal to the House of Lords, certified that a point of law of general public importance was involved in their decision, namely, "as to the true ingredients of the offence of affray."

*Raymond Stock Q.C.* and *G. G.*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1966] A.C. 591    Page 16
1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965] 3 W.L.R. 1131, (1965) 109 S.J. 872
**(Cite as: [1966] A.C. 591)**

for the appellant Button. An essential ingredient of an affray is that it must be committed in a public place. This dance hall was not a public place. For the present purpose a "public place" may be defined as a place to which members of the public, as members of the public, are entitled to go on payment or otherwise. It is conceded that before the end of the eighteenth century there is no instance of its having been specifically laid down in any decision that the offence of making an affray must be in a public place, but until the start of the nineteenth century there was no clear definition of an affray. However, since then it has always been held that it is a necessary ingredient of an affray that it should take place in public. This view should be affirmed, because the law of affray in its original condition was too unformed, embryonic and vague to be resurrected now.

In approaching earlier writers it is very relevant to have regard to the way in which criminal offences were described at the time when they wrote. On this point reliance is placed on the introductory chapter of Proceedings Before the Justices of the Peace in the 14th and 15th Centuries, edited by Bertha Putnam for the Ames Foundation (1938) (Spottiswoode, Ballantyne & Co. Ltd.). From this it appears that in the middle ages crimes were not precisely defined. Complaint was made in narrative form and no one inquired very strictly what was the particular crime committed: see the chapter entitled "A Commentary on the Indictments," pp. cxxxiii et seq. See also Stephen's History of the Criminal Law of England, Vol. I, p. 82.

As to the development of the offence of making an affray: see the Statute of Northampton 1328 (2 Edw. 3    , c. 3), together with the note in Halsbury's Statutes of England, 2nd ed. (1948), Vol. V, p. 449; Lambard's Eirenarcha or the office of the Justices of the Peace (1610 ed.), ch. 3, pp. 124 et seq., 130-131; Dalton's Country Justice (1697 ed.), ch. 8, pp. 35 et seq.; (1727 ed.), pp. 38 et seq. In this work affray is not defined in a complete sense and the reference to any affray in a house does not indicate a purely domestic occasion. What the author has in mind is an offence which takes place in public and injures and frightens the public. See also p. 144 in chapter 70 on "Peace" (1727 ed.), p. 212, where an **\*613**    affray is assumed to be something which can be recognised on sight by the justices of the peace. At this period there is no clear common law definition of affray; it is just one of several assorted types of ill behaviour; see pp. 194 et seq. in ch. 82 "Riots, Routs etc." (1727 ed.), pp. 292 et seq. In riot and unlawful assembly there is an element of premeditation which is not an ingredient of affray. The definition of "affray" in John Rastell's "Les Termes de la Ley " (1721 ed.), pp. 28-29, shows that at the time the offence was not exactly defined and was sometimes confused with assault. Wood's Institute of the Laws of England (1728 ed.), pp. 423, 425 also indicates that the same confusion exists. In Coke's Institutes (1797 ed.), Pt. III, c. 72, p. 157, there is no indication that an affray was then an offence which could be committed in a private house. (The passage is the same in the edition of 1817.) In matters relating to the King's peace the basic distinction is not between the King's justice and local justice, but between criminal justice and mere trespasses which may be actionable. In Hawkins' Pleas of the Crown (1795 ed.), Vol. II, c. 63, p. 19, p. 21 (s. 8), p. 23 (s. 16), there is nothing to justify the view that a domestic occasion in a house is being considered. In Blackstone's Commentaries (1765-9 ed.), Book IV, ch. XI, p. 145, affray is defined as occurring in a public place. This remains unchanged in the 1826 edition. What is said in Hale's Pleas of the Crown (1800 ed.), Vol. II, ch. XI, p. 95, accords with the observations in the work published by the Ames Foundation. Hale was more concerned not so much with what is an affray as with procedural problems: see also Burn's Justice of the Peace, first published in 1755, 24th ed. (1825), p. 34. Particular reliance is placed on Archbold's Criminal Pleadings, 1st ed. (1822), p. 337. The note on evidence shows that the offence must be committed in a public street or highway. The matter has been put in the same way ever since the 17th edition (1871), p. 847, in all subsequent

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965] 3 W.L.R. 1131, (1965) 109 S.J. 872

**(Cite as: [1966] A.C. 591)**

editions till 1956. This work has always been regarded as being of high authority. The profound researches of the original author into the ancient authorities are set out at the start of the preface of the first edition. This has always been a practitioner's book and it is also used by the judges. Any cases of affray in the nineteenth century were almost inevitably dealt with on the basis of Archbold. If what is said was wrong, it is strange that no court questioned it in any way. There has been no effective challenge to it from 1822 onwards. The House of Lords should not reverse so long-standing a practice: see also Russell on Crimes, 1st ed. *614 (1819), Vol. I, p. 388, and 2nd ed. (1826), Vol. I, p. 270. The law is summarised in Halsbury's Laws of England, 3rd ed. (1955), Vol. X, p. 584, para. 1086. It is now too late to challenge the view that a public place (that is, a place to which members of the public can have access) is an essential ingredient in this offence.

As to the authorities, there is no definition of "affray" in the Year Books: see also Bertha Putnam's book, p. 222, case No. 42 (Assize Roll 796, Southampton 9-16, Rich. II). In Timothy v. Simpson [FN62] there was no evidence that the public did not have access to the shop in question but, in any event, the word "affray" was there used, not in the technical sense, but to indicate a disturbance. In Price v. Seeley [FN63] there was no evidence whether the place where the misbehaviour in question took place was public or not. This case [FN64] sheds no light on the question whether an affray need or need not occur in a public place. In Reg. v. Hunt and Swanton, [FN65] a case of a prize fight, there was no evidence that any spectator was terrified and the matter was decided on the basis that the place in question was away from the highway and therefore private. A prize fight, which is a fighting to exhaustion, is illegal, wherever it takes place. The spectators are guilty of assault, and if they go there to create a disturbance, they are also guilty of unlawful assembly: see also Reg. v. Coney [FN66] and Rex v. Billingham,

[FN67] also prize fighting cases, in neither of which was a charge of affray made. In Reg. v. O'Neill [FN68] the indictment was quashed because it was not alleged that the affray had been in a public place. In Reg. v. Sharp and Johnson [FN69] it was taken for granted that an affray must be in a public place. It is sometimes hard to say what precisely is a public place. An Albert Hall meeting of ex-Servicemen would be a meeting of citizens, members of the public of a particular description and therefore public. But that would be very different from the dance at which the present disturbance took place, a free club dance with admission by ticket only, which was not a public occasion. A party for members of a single restricted group is not public.

FN62 (1835) 1 Cr.M. & R. 757        .

FN63 (1843) 10 Cl. & F. 28, H.L.

FN64 (1843) 10 Cl. & F. 28, H.L.

FN65 (1845) 1 Cox C.C. 177        .

FN66 (1882) 8 Q.B.D. 534, D.C.

FN67 (1825) 2 C. & P. 234        .

FN68 (1871) 6 Ir.R.C.L. 1.

FN69 (1957) 1 Q.B. 552        , 555, 556, 558 et seq.; [1957] 2 W.L.R. 472; [1957] 1 All E.R. 557, C.C.A.

In Reg. v. Woodrow [FN70] the nature of the offence of making an affray was considered. Cases in which it was accepted that an affray must be in a public place were Reg. v. Morris [FN71] ; *615 Reg. v. Clark [FN72] ; Reg. v. Allan [FN73] ; Reg. v. Mapstone [FN74] and Reg. v. Kane. [FN75]

FN70 (1959) 43 Cr.App.R. 105        , 108, C.C.A.

FN71 (1963) 47 Cr.App.R. 202        .

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965] 3 W.L.R. 1131, (1965) 109 S.J. 872

**(Cite as: [1966] A.C. 591)**

FN72 (1963) 47 Cr.App.R. 203        .

FN73 [1965] 1 Q.B. 130; [1963] 3 W.L.R. 677; [1963] 2 All E.R. 897, C.C.A.

FN74 [1964] 1 W.L.R. 439n.; [1963] 3 All E.R. 930n        .

FN75 [1965] 1 All E.R. 705        , 708-709.

   On the question what constitutes a public place, see Reg. v. Welland        [FN76]        and Elkin v. Cartlidge, [FN77]        and the definitions of "public place" in section 1 (4) of the Prevention of Crime Act, 1953        , and section 9 of the Public order Act, 1936        .

FN76 (1884) 14 Q.B.D. 63        , 66.

FN77 (1947) 177 L.T. 519; [1947] 1 All E.R. 829, D.C.

In summary, for a long time it has been regarded as essential that an affray should occur in a "public place," which means the same as in the Act of 1953. It is not proper now to fall back on some earlier state of the law, because one cannot find a definition of "affray" before the end of the eighteenth century. Before then the law on this point was intangible and ill-defined. In any event, even if it can be found that in the fifteenth and sixteenth centuries an affray could occur in a private place, since Blackstone the law has been as the appellants submit and it would be wrong to go back so far as to another state of the law. It would serve no useful purpose and would only lead to a multiplication of charges, since wherever a charge of affray could lie a charge of assault would also lie, and that is adequate to protect the public. The long-defined boundaries of the offence should not be extended. The law on "affray" is designed to protect innocent passers-by and it is not necessary to invade domestic privacy.

*E. Wynroe Thomas*        for the appellant Swain. This appellant was wrongly convicted of affray. On his behalf the argument already delivered on the meaning of "public place" is adopted.

It is part of the definition of "affray" that it is a fight which must occur in a public place. That was laid down categorically in Blackstone's Commentaries, first published in 1765, Vol. IV, p. 145. That volume dealt with "Public Wrongs."

The present case raises the question how far one should delve into the recesses of past law and where one is to stop. The common law evolves by a continuous process. If it evolves towards a restricted field of enforcement, that does not mean that it is wrong. Arguments might be found to undermine the doctrine of mens rea on the ground that it was not known in the twelfth century. If one looks back before Blackstone the question may be asked whether the common law knew such an offence at all as "making an affray." At common law before the eighteenth century it was **\*616**        not an indictable offence but covered a group or genus, some statutory and some common law. The present case is not like Sykes v. Director of Public Prosecutions [FN78]        and what Lord Goddard there said about antiquated laws does not apply.

FN78 [1962] A.C. 528, 568; [1961] 3 W.L.R. 371; [1961] 3 All E.R. 33        H.L.(E.).

   There is no suggestion that this appellant has committed no offence at all. He was guilty of an assault and it is not necessary to find another word to describe his conduct. What was said in the Court of Criminal Appeal [FN79]        suggesting that the wider scope of the offence of affray was necessary "to deal with a new aspect of our modern society" is not well conceived. Fighting has always existed in society and been condemned by the law.

FN79 Ante, p. 611B; [1965] 2 W.L.R. 992; [1965] 1 All E.R. 964        .

A convenient starting point for the consideration of this matter is Lambard's Eirenarcha, which is accepted by scholars as supreme among sixteenth century treatises on the law relating to Justices of

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965]
3 W.L.R. 1131, (1965) 109 S.J. 872
**(Cite as: [1966] A.C. 591)**

the Peace. In Blackstone's Commentaries (1765 ed.), Vol. I, p. 343, it is recommended to students. On the title page of the edition of 1581 it is stated that this work was "gathered 1579 and now revised." Affrays are dealt with in chapter 17 "Of the breach of the Peace" at pp. 134-135, where affray is distinguished from assault. Fear is common to both offences and the distinction between them lies elsewhere. As to the duties of bystanders in regard to such breaches of the peace, see pp. 140- 141. In the analysis at pp. 134-135 the point at which the offences of assault and affray diverge is that affray is

"a common wrong done, and therefore is inquirable and punishable in the turne of the Sherife and in a leet, by 4 H.6.10 and 8 E.4.5. Otherwise it is an assault."

Further.

"both the Statute of Northampton (2 E. 3 ca.3) made against the wearing of armour and weapon, and the writte thereupon grounded, doe speeke of it, by the wordes, effray del pays, and, and in terrorem populi."

In so far as "affray" is a distinct offence, it is an offence created by that statute. For the text of the Statute of Northampton, 1328, and the translation of it, see Halsbury's Statutes of England, 2nd ed. (1948), Vol. V, p. 449, where "ne force mesner en affrai de la pees" is translated "nor bring no form in affray of the peace." This casts doubt on Lambard's text. By the time Lambard was writing the turn of the sheriff could not punish anyone and the leet was virtually dead. As to the sheriff's turn, see Pollock and **\*617** Maitland's History of English Law, 2nd ed. (1898), Vol. I, p. 530 (Bk. II, c. III). As to franchise courts, see pp. 531-532 in the same volume. See also Holdsworth's History of English Law, 7th ed. (1956), Vol. I, p. 80, which refers to the statute of 1461 which took away the sheriff's power to levy fines. In view of that Lambard may be wrong in saying that affray was punishable in the sheriff's turn. For examples of affray in the court leet see Leet Jurisdiction in the City of Norwich, edited by William Hudson (Vol. V of the Selden Society Publications) pp. 69 et seq.

The next authority at which it is convenient to look is "The Newe Boke of Justices of the Peas" by A. F. K., which initials stand for Anthony Fitzherbert, Knight. The date is 1538. At folio 49a the author says that constables were ordained to keep the peace, to repress felons and to take sureties of such persons as they shall find making affrays. There is no definition of affrays. But at folio 74a under the heading "Affrayes in Walis and the marches," the author deals with "assautes mayhemes and bateryes." At p. 48b the author says: "If one make an assaulte upon the constable, the constable may defende him and may take him. ..." Lambard dealing with the same situation at p. 143 of his book says:

"If one doe make an affray upon the justice of peace, constable, or such other officer, he maye not only defende himselfe, but may also apprehende the offendour."

Thus it would appear that there was then no clear distinction between affrays and assaults.

The next authority to consider is Staunford's Pleas of the Crown, published in 1557, 2nd ed. (1560). To the edition of 1583 there is appended "The new Table to this Booke," which is included in subsequent editions. In this index is found the entry: "Affray or strikinge. Penaltie pur ces 38 b c d." At folio 38 "affray" figures in the marginal note to paragraph (d) and the text refers to a case in which one of the king's justices arrested a person who had made the affray before him. But there is no reference to "affray" in paragraphs (b) and (c). Paragraph (b) deals with misprision, where the author refers to the case of a man who drew his sword before a justice sitting in judgment. In paragraph (c) there is a reference to the statute 33 Hen. 8, c. 12 : see Halsbury's Statutes of England, 2nd ed. (1948), Vol. V, p. 484, where this statute of 1541 is set out. In this book "affray" is dealt with in relation to the criminal law in contrast with the duties of justices and the true common law form of affray cannot be deduced from it.

**\*618** "The Boke of Justices of the Peas" is anonym-

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965] 3 W.L.R. 1131, (1965) 109 S.J. 872

**(Cite as: [1966] A.C. 591)**

ous and undated, but the catalogue of the Bodleian Library assigns it the possible date of 1503. At folio 12b it is stated:

"Chaunce medeley and manslaughter is, where two men or mo mete, and by chaunce medeley they fall at affray, so that one of them sleeth another, it is but felony in hymselfe."

The offence there is not affray but manslaughter. Offences against the Statute of Northampton are dealt with at folio 17a:

"Also ye shall enquere of them that come in for-cyble array, where congregation is in fayres, mar-kettes, or in any other places, or that they ryde, or go armed, other by nyght or by daye, it is a pro-vocacyon to dystorte the peas, wherefore it is not lawful any so to ryde or go in any place, excepte the kynges mynystres in doynge and executynge theyr offyces, the statute thereof is anno 2 E.3 ca.3."

Thus up to and including the time of the publication of Eirenarcha the word "affray" might cover assault, battery, wounding, mayhem, offences against the Statute of Northampton and offences against the statute of 1541.

The next relevant authority is the third part of the Institutes of the Laws of England by Coke (1648 ed.), p. 158, where an affray is said to be

"a publique offence to the terrour of the kings subjects ... and is so called because it affrighteth and maketh men affraid and is enquirable in a leet as a common nusans."

It is strange that Coke should mention the court leet because he knew it had limited powers and was in decay: see Bullen's    case [FN80]    and Godfrey's    case. [FN81]

FN80 (1610) 6 Co.Rep. 77b    .

FN81 (1614) 11 Co.Rep. 42a    , 43b-44a.

The fact that a particular word is used in a statute is no ground for saying that there is a corresponding common law offence.

Other old authorities are De Pace Regis et Regni by Ferdinando Pulton (1609), folio 25a, para. 5, and A Law Dictionary on the Interpretation of Words and Terms by John Cowell (1708 ed.), containing a definition of "affray." In Dalton's Country Justice (1727 ed.), at p. 39 there is a reference, under the heading "Affray," to Rex v. Darcy and Collins,    [FN82]    but in the report of that case there is no mention of "affray": see also Burn's Justices of the Peace, 25th ed. (1830), p. 38.

FN82 (1664) 1 Sid. 186    .

In summary, before the eighteenth century no common law form of "affray" had evolved. Lambard first tried to give it a precise meaning and others copied him without reproducing his **\*619** reservations. Before Reg. v. Hunt and Swanton    [FN83]    in 1845 there is no reported case of an indictment for an affray. In the early writings the emphasis was on stopping the affray, not on punishing it. To say that people "fought" expresses very little, for that may cover both a fist fight and hacking one another with swords: see Dalton's Country Justice (1727 ed.), p. 38. Affray became an indictable offence in the nineteenth century when it assumed a precise form. By then it had evolved through the works of authoritative writers and it must be either accepted in the form in which they presented it or rejected altogether. By Reg. v. Hunt and Swanton [FN84]    it had crystallised.

FN83 1 Cox C.C. 177    .

FN84 1 Cox C.C. 177    .

*Sir Dingle Foot Q.C., S.-G., J. F. Platts-Mills Q.C.*    and J. H. Inskip for the Crown. The Crown entirely supports the reasoning of the trial judge and the Court of Criminal Appeal. Though the trial judge felt bound by authority to hold that an affray must be in a public place, it is apparent from the terms of his ruling that, had he felt free to do so, he would have adopted the view which later prevailed in the Court of Criminal Appeal.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965] 3 W.L.R. 1131, (1965) 109 S.J. 872

**(Cite as: [1966] A.C. 591)**

The following are the submissions for the respondent: (1) An affray is committed when two or more persons fight together to the terror of the Queen's subjects. (2) It is not an essential ingredient of the offence that it should be committed on a public highway or in some other place of public resort. (3) The contrary view expressed in various textbooks, notably in Archbold, represents an error which has crept into the law since Blackstone. The Court of Criminal Appeal were right in holding that this error can now be corrected. (4) Alternatively, the trial judge was right in directing the jury that the offence had been committed if a substantial portion of the public had access to the place in question. There was evidence on which the jury could arrive at the conclusion which they reached.

The essential feature of affray is that it is one of the offences against the King's Peace, which was originally limited to certain persons, places and occasions but by the twelfth century had become universal: see Maitland's Constitutional History of England, pp. 104-105. By the end of that century the King's Peace was all-embracing.

None of the writers cited on behalf of the appellants doubted that in early times there was such a common law offence as affray. Not until Blackstone does one find the distinction contended for on behalf of the appellant making the existence of an affray depend **\*620** on the place where it was committed. This error was followed by other writers and formed the basis of erroneous decisions. All the old authorities agreed that a constable could break into a house where an affray was being committed: see Lambard's Eirenarcha (1581), p. 144.

For two centuries authoritative writers have dealt again and again with the law relating to affray; showing that in the sixteenth, seventeenth and eighteenth centuries it was a recognised offence. The following is a chronological list. Fitzherbert's "Newe Boke of Justices of the Peas" (1538); Lambard's Eire-narcha (1581); Fitzherbert's "L'office et aucthortie de Justices de peace" (Richard Crompton's editions 1584 and 1606); "Termes de la Ley "

(1615); Dalton's Country Justice, 1st ed. (1618); Coke's Institutes (1642-4); Hale's, Pleas of the Crown (1678); Cowell's Law Dictionary (1708); Hawkins' Pleas of the Crown (1716); Nelson's Justice of the Peace (1704) 6th ed. (1718); Burn's Justice of the Peace (1755) and Blackstone's Commentaries (1765).

See in particular Fitzherbert's Newe Boke of Justices of the Peas (1538), pp. 49 and 74, and his "L'office et aucthortie de Justices de peace" (1606 ed.), pp. 146-7; where there is a reference to an affray in a house. Lambard's Eirenarcha (1881 ed.), p. 134, 144. In discussing affray similarly refers to the constable's power to enter a house and says this is "because the prince hath an interest in the matter, and then a man's house shall be no refuge for him": see also 1610 edition, pp. 124-5, 134. In John Rastell's "Les Termes de la Ley" (1721 ed.), pp. 28-29, it is said that an affray "is a wrong to the commonwealth." See also Dalton's Country Justice (1727 ed.), pp. 38, 39. Coke and Hale likewise say that in the case of an affray the constable may break into a house: see Coke's Institutes (1813 ed.), Vol. III, p. 157, Hale's Pleas of the Crown (1800 ed.), Vol. II, p. 94, Nelson's Justice of the Peace (1718 ed.), pp. 9, 10 and 11, Hawkins' Pleas of the Crown (1824 ed.), Vol. II, p. 136 and Burn's Justice of the Peace (1825 ed.), p. 34.

A man may be convicted of an affray even when it is not possible to prove any other offences by him, for example a common assault. In the general disturbance of fighting it is hard to get evidence of particular assaults. It is unlikely that a slow motion film will be available to show how each man in the fight behaved. If each one were charged with assault, there might be great confusion and difficulties as to evidence and as to what injuries were inflicted by which person. Then the appropriate course is to charge an affray, as, for example, in the case of conflicts between "Mods" and "Rockers" at the seaside.

**\*621** There is nothing in Burn's Justice of the Peace to show that an affray was simply an offence

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965] 3 W.L.R. 1131, (1965) 109 S.J. 872

**(Cite as: [1966] A.C. 591)**

against the Statute of Northampton, which is only a particular form of affray. The indictment for an affray in Burn's Justice of the Peace (1756 ed.), p. 10, has nothing to do with the statute and makes no reference to the King's justices or other ministers: see also the forms of indictment in Nelson's Justice of the Peace (1710 ed.) p. 11. By the eighteenth century the law had reached this degree of certainty based on a considerable body of authority and at no stage was any distinction made between a public place and a private place. If such a distinction existed, it is almost incredible that none of the writers should have observed it. To constitute an affray, which is an invasion of the King's Peace, it is essential that someone else besides the fighters themselves should be put in fear. One person is enough, just as in indecent exposure observation by one person constitutes what is done a public offence. Compare what is said about the offence of riot in Archbold's Criminal Practice 35th ed. (1962), p. 1383, para. 3581. In Blackstone's Commentaries (1765-69 ed.), Vol. IV, which deals with public wrongs, chapters 10 to 13 treat respectively of offences against public justice, the public peace, public trade and the public health. Affrays are dealt with in Chapter 11, "Offences against the Public Peace," along with riots, routs and unlawful assemblies. In the whole of the passage dealing with it (pp. 145-146) there is no clear distinction drawn between a public place and a private place, nor is there any foundation for such a distinction. It is since then that the distinction has crept into our law.

It is right that this error should now be corrected. In Woolmington v. Director of Public Prosecutions [FN85] the House of Lords went back almost 200 years to hold that the law as it had come to be thought to be was wrong. In Chan Kall v. The Queen [FN86] the Judicial Committee of the Privy Council modified a passage in Archbold: see also Reg. v. Lobell. [FN87]

FN85 [1935] A.C. 462, 473, 479-550; 1 T.L.R. 446, H.L.

FN86 [1955] A.C. 206, 211-212; [1955] 1 All E.R. 266, P.C.

FN87 [1957] 1 Q.B. 547, 551; [1957] 2 W.L.R. 524; [1957] 1 All E.R. 734, C.C.A.

When the House of Lords has found that an error has slipped into the law, it has never hesitated to set it right. There is no reason why the present error should not be corrected, even if the correction favours the prosecution. One must consider, not only the rights of the accused, but also those of the persons who have been put in terror, since all bystanders are entitled to the **\*622** protection of the King's peace. Accordingly, there is no reason for not restoring the law to its original condition.

As to the point that the offence has been committed if a substantial portion of the public has access to the place in question, Panama (Piccadilly) Ltd. v. Newberry [FN88] affords some help. In the present case the reasoning of the trial judge was correct in that here a substantial portion of the public had access to the place in question and his ruling was right. There was nothing to show that anyone at all could not become a member of this darts club at will. It was not like joining a West End Club where discrimination is exercised. It was sufficient to be a regular customer of one of the public houses where darts was played. The case falls on the same side of the line as the Panama case. [FN89]

FN88 [1962] 1 W.L.R. 610, 615; [1962] 1 All E.R. 709,D.C.

FN89 [1962] 1 W.L.R. 615       .

As to affrays in a house see also East's Pleas of the Crown (1803), Vol. I, p. 322.

*J. Platts-Mills Q.C.* following. Looking at the merits of this case, we face in this day a novel situation in which bands of young people group together to have battles. A charge of making an affray is a necessary weapon in the law's armoury. When such a fight as this takes place a bystander may have no

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965]
3 W.L.R. 1131, (1965) 109 S.J. 872
**(Cite as: [1966] A.C. 591)**

idea in the confusion who hit whom. Bands fighting in different villages may arouse fear both before and after the event so that witnesses may be unwilling to identify particular assaults.

*Raymond Stock Q.C.* in reply. There can be no case of affray which, if properly analysed, does not involve some other offence. If it can be shown that a person is taking part in a mêlée, he is responsible for whatever takes place within the scope of the common purpose, even if he himself cannot be shown actually to have struck anyone, he will be responsible for any assaults or malicious wounding within the scope of that common purpose. To charge all those concerned with making an affray is a crude weapon, not well adapted to discovering the different degrees of guilt. If a bottle is used by one man and he can be identified, he will be charged with wounding, but, if he cannot be identified, it must be found whether or not the use of the bottle was part of the common purpose. To char4ge all the men with an affray does not solve such problems as that. There is accordingly no overriding reason of public policy for extending the law of affray to a private place.

As to breaches of the peace see Glanville Williams on Criminal Law, 2nd ed. (1961), para. 227, p. 715, and **\*623** Reg. v. Sharp and Johnson. [FN90] one can have a binding over to keep the peace for a wide range of offences. Indecent exposure is a breach of the peace: Reg. v. Wellard [FN91] ; see Archbold's Criminal Pleading, 35th ed. (1962), para. 3835, p. 1481. But it is not indictable as a common nuisance if visible only by one person.

FN90 [1957] 1 Q.B. 552 , 561-562.

FN91 14 Q.B.D. 63 .

It is wrong to define a crime in a way in which no reported case has defined it in the past, and there is no reported case of an affray in a private place. It is not desirable to burden the courts with a mass of prosecutions for affray.

Their Lordships took time for consideration.

October 27. LORD GARDINER L.C.,

having stated the facts, continued: For reasons which will become clear, I do not think that I need state the extent to which admission to the hall was restricted or unrestricted.

The appellants have contended throughout that it is a necessary ingredient of the offence of an affray that it should take place in a public place, and that the dance hall was not a public place. The respondent has contended throughout that it is not an ingredient of an affray that it should take place in a public place but that, if it is, the dance hall was a public place.

MacKenna J. felt bound by recent authorities to hold that an affray must be in a public place, but directed the jury that they were entitled to find that the dance hall was a public place if on the occasion in question a substantial part of the public had access to it. The Court of Criminal Appeal was of the opinion that an affray did not have to be in a public place and therefore dismissed the appeals.

In this House the appellants contended that until about the beginning of the nineteenth century there was no clear definition of an affray but that since then it had always been held that it was a necessary ingredient of an affray that it should take place in public and they relied on Blackstone's Commentaries (1769), Vol. IV, p. 145, which defines an affray as

"the fighting of two or more persons in some public place to the terror of His Majesty's subjects: for, if the fighting be in private, it is no affray but an assault";

Archbold's Pleading and Evidence in Criminal Cases (1st ed., 1822), in the 17th edition (1871), p. 847:

"Prove that the defendants fought in a public street or **\*624** highway: for if it be in private, it is an assault and battery merely, and not an affray"

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

[1966] A.C. 591    Page 24
1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965]
3 W.L.R. 1131, (1965) 109 S.J. 872
**(Cite as: [1966] A.C. 591)**

(in which form it remained in Archbold from 1822 to 1956); Russell on Crimes and Misdemeanours, 2nd ed. (1826), Vol. I, p. 270,

"Affrays are the fighting of two or more persons in some public place, to the terror of His Majesty's subjects"; Reg. v. Hunt and Swanton, [FN92] in which Alderson B. was clearly of the opinion that an affray had to be in a public place; Reg. v. O'Neill, [FN93] in which the indictment was quashed after verdict because it had not alleged that the affray had taken place in a public place; Reg. v. Sharp and Johnson, [FN94] in which it is clear that Lord Goddard C.J. was of the opinion that an affray had to be in a public place; Reg. v. Morris [FN95] and Reg. v. Clark, [FN96] in which Marshall J. and Howard J. respectively appear to have accepted that an affray must be in a public place or on a public road; Reg. v. Mapstone, [FN97] in which Paull J. directed the jury that it was essential to constitute an affray that it should be in a public place or on a public road; Reg. v. Kane, [FN98] in which Barry J. similarly directed the jury, and Reg. v. Allan, [FN99] in which Thesiger J. similarly directed a jury.

FN92 (1845) 1 Cox C.C. 177    .

FN93 (1871) I.R. 6 C.L. 1    .

FN94 [1957] 1 Q.B. 552; [1957] 2 W.L.R. 472; [1957] 1 All E.R. 557, C.C.A.

FN95 (1963) 47 Cr.App.R. 202    .

FN96 Ibid. 203.

FN97 [1964] 1 W.L.R. 439n.; [1963] 3 All E.R. 930n    .

FN98 [1965] 1 All E.R. 705    .

FN99 [1965] 1 Q.B. 130; [1963] 3 W.L.R. 677; [1963] 2 All E.R. 897 C.C.A.

The respondent contended that the common law offence of an affray had been a recognised offence long before the beginning of the nineteenth century and consisted of two or more persons fighting together to the terror of the Queen's subjects and that it need not be committed in a public place. He relied on Fitzherbert's Newe Boke of Justices of the Peas (1538), pp. 49 to 74; Lambard's Eirenarcha (1581), in the 1610 edition, pp. 124 and 125; Fitzherbert's L'office et aucthortie de Justices de peace (edition 1584); Termes de la Ley (1624), in the 1721 edition, p. 28; Dalton's Country Justice (1618), in the 1727 edition, p. 38; Coke's Institutes (1644), in the 1817 edition, Vol. III, p. 157; Hale's Pleas of the Crown (1678), in the 1800 edition, Vol. II, p. 94; Cowell's Law Dictionary (1708); Hawkins' Pleas of the Crown (1716), in the 1824 edition, Vol. II, p. 136; Nelson's Justice of the Peace (1st ed., 1704), in the 6th edition, 1718, pp. 10 and 11; Burn's Justice (1755), in the 1825 edition, p. 34, each of which, he contended, showed that in the sixteenth, seventeenth and eighteenth centuries an affray was **625** a recognised offence, that it was not an ingredient of it that it should take place in a public place and that Blackstone fell into error and was followed by later authors and, erroneously, in the decisions relied upon by the appellants.

We are much indebted to counsel, whose arguments have involved research back into the centuries. In my opinion, the respondent's argument is right.

The essence of the offence is that two or more fight together to the terror of the Queen's subjects. Nowhere in the earlier writings is it suggested that the place where the fight occurs is a decisive matter.

Lambard's Eirenarcha in 1581 (c. 17, p. 134) under the sidenote "Affray and Assault," said:

"The wordes affray and assault, be indifferently used of many men, even in our booke cases, but yet

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Case: 1:07-cv-01646-RMC     Document 83-6     Filed 05/23/2008     Page 52 of 73

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965] 3 W.L.R. 1131, (1965) 109 S.J. 872

**(Cite as: [1966] A.C. 591)**

there wanteth not just difference between them in myne opinion. For, affray is derived of the french *effrayer*, which signifieth to terrifie, or bring feare."

He describes it as a "common wrong." It is true that assault and affray were sometimes spoken of loosely as if they were inter-changeable. This is perhaps not surprising since in each case the wrongful act is the same yet the mischief of the act falls on the victim in the offence of assault but on the bystander in the offence of affray.

In 1584 Fitzherbert's L'office et aucthortie de Justices de peace, having dealt with affrays in a high street and affrays in the presence of the constable, referred to "an affray which has taken place in a house" and also said:

"If two men are affraying in a house and the door of the house is shut even if no one is hurt before the entry into the house yet the constable may enter. ..."

(1610 ed., pp. 146-7, translated.) This makes clear beyond doubt that in the author's view an affray could take place other than in a public place.

So too in 1618 Dalton's Country Justice dealt with the constable's powers of breaking down doors when the affray is in an house with the doors closed. In 1641-44 Coke's Institutes described the offence as a "public offence to the terror of the King's subjects," but it is clear in the context that Coke was not referring to the place where the offence was committed nor suggesting that it could not occur except in a public place. Hale's Pleas of the Crown in 1678 also referred to affrays in an house and the power of the constable to break open the door on such **\*626** occasions. In 1710 Nelson's Justice of the Peace (3rd ed., p. 11) provided two forms of indictment for affray, one

"for an affray generally" alleging that it was "to the terror and disturbance of divers subjects of our said lord King then and there existing ... and against the peace," and another "for an affray and beating another."

In neither is there any allegation that the act was done in a public place.

Hawkins in his Pleas of the Crown in 1716, having said (Vol. 1, p. 134) that the offence was "to the terror of the people," continued (pp. 134-5)

"from whence it seems clearly to follow that there may be an assault which will not amount to an affray; as to where it happens in a private place out of the hearing or seeing of any except the parties concerned; in which case it cannot be said to be to the terror of the people; and for this cause such a private assault seems not to be inquirable in a court-leet, as all affrays certainly are, as being common nuisances."

Later (p. 137) the author says: "... if an affray be in a house, the constable may break open the doors to preserve the peace." It is clear, therefore, that the words "private place" are not used as being in themselves an answer to the charge; they must be read with the words that accompany them, namely, "out of the hearing or seeing of any except the parties concerned. " Thus read it is obviously good sense and in accord with the views of previous writers.

In 1755 Burn's Justice provided a form of indictment for affray which made no allegation that the act was committed in a public place.

Up to this point of time it thus appears that none of the writers suggested that the offence could only be committed in a public place. It was generally considered that it could take place in an house. The offence was clear and well defined; and since there are no reported cases bearing on the subject, it is fair to assume that no doubts had been thrown by judges on the validity of the legal writings in this matter.

In 1769, however, Blackstone (Vol. IV, p. 145) used words which led to subsequent error. Citing Hawkins, he defined affray as

"the fighting of two or more persons in some public place, to the terror of His Majesty's subjects: for, if the fighting be in private, it is no affray but an assault."

There are two reasons which lead me to think that he cannot have been intending to depart from

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965]
3 W.L.R. 1131, (1965) 109 S.J. 872
**(Cite as: [1966] A.C. 591)**

the views expressed by former **\*627** writers. First, he goes on to cite Hawkins as to the power of the constable to break open doors when an affray is in an house and, secondly, he could hardly have sought to introduce a novel limitation on the old offence of affray without some discussions and justification of his innovation. I think he used the words "public place" loosely (and unfortunately) in order to exclude, as Hawkins had done, fighting in a private place where none but the contestants were present. Certainly, in 1803, East in his Pleas of the Crown (p. 322) does not appear to have thought that Blackstone had produced any divergence in the stream of legal opinion, since he follows the earlier writers in referring to the power to break open doors "if an affray be in a house" and makes no suggestion that an affray must be in a public place.

In 1822, however, the first edition of Archbold's Criminal Law erroneously asserted without any supporting authority that the allegation "in a public street or highway" should be charged in the indictment and proved. Later editions continued this error until 1956, when the allegation was enlarged to include a public place. This error, drawn, no doubt, from Blackstone, was repeated in Russell on Crimes (1843 edition), p. 291, and was assumed to be the law in the later cases referred to above. It therefore seems to me clear, as it did to both courts below, that an error crept into the law from about 1820 onwards.

Being of the opinion that the Court of Criminal Appeal was right in holding that an affray need not take place in a public place, it is unnecessary for me to consider how a public place is, for that purpose, to be defined or whether the dance hall in question might or might not be a public place for that purpose.

There remains the only point on which I felt some difficulty, namely, whether your Lordships should, after more than a century, correct an error in a sense which widens a criminal offence so as to remove a defence which a person accused of that offence would in practice have had at any time during the last 100 years.

It was argued that the original condition of the law of affray was too vague, unformed, and embryonic to justify resuscitation and that one should therefore confirm and follow the mid-nineteenth and twentieth century view of it. I cannot accept the argument that its earlier principles were vague and ill-defined. From the legal writings to which I have referred it is shown that in the seventeenth century and even earlier there were clearly defined and generally accepted principles of affray and that, at least in the eighteenth century, affray was an established indictable offence.

It was further argued that no practical purpose is served by **\*628** re-establishing the law relating to affray, since it could only lead to the multiplication and overlapping of charges. Where a charge of affray could lie, it is said, so too would a charge of assault, and thus the latter charge suffices to protect the public. The respondent, however, contended that evidence is difficult to obtain in the mêlée of disturbance and fighting and that there are situations in which it would be possible to convict of affray on evidence that would not justify a conviction of assault. The Court of Criminal Appeal took the view that the offence of affray was a useful part of the criminal law in modern times. I agree with that view.

The most powerful argument for the appellants is that afforded by the lapse of over a century since the error crept into the law. During that period one may assume that prosecutions and trials have been based on the hypothesis that only in respect of acts done in a public place can there be a conviction for affray. But no alteration of the surrounding law has been founded on that hypothesis, nor can it properly be regarded as an intentional development of the law of affray. The only result of it has been that during that period the citizen who has been the victim of affray in a private place has in practice been deprived of the protection of the law. That is not in itself any reason to continue the deprivation. Moreover, there is no argument of principle or logic

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

1965 WL 20727 (HL), (1966) 130 J.P. 48, [1966] A.C. 591, [1965] 3 All E.R. 587, (1966) 50 Cr. App. R. 36, [1965] 3 W.L.R. 1131, (1965) 109 S.J. 872

**(Cite as: [1966] A.C. 591)**

to gild the error. In riot and assault, two kindred offences which legal writers have so often treated in association with affray, there is no requirement that they should be committed in a public place. To distinguish affray in this respect is captious and illogical. There seems, therefore, no adequate reason to perpetuate the error.

I agree with the judgment of the Court of Criminal Appeal. I would dismiss these appeals.

LORD REID.

My Lords, I have read the speech prepared by my noble and learned friend, the Lord Chancellor. I agree with it and do not think it necessary to add anything. I too would dismiss these appeals.

LORD MORRIS OF BORTH-Y-GEST.

My Lords, I have read the speech prepared by my noble and learned friend, the Lord Chancellor, and I agree with it. Accordingly, I would dismiss these appeals.

LORD PEARCE.

My Lords, I have read the opinion of my noble and learned friend, the Lord Chancellor, with which I agree. I would accordingly dismiss these appeals.

**\*629** LORD PEARSON.

My Lords, I have read the speech prepared by my noble and learned friend, the Lord Chancellor. I agree with it, and accordingly would dismiss these appeals.

**Representation**

   Solicitors:Collyer-Bristow & Co.    for F. S. and R. A. Ingle, Bath; Director of Public Prosecutions.

(F. C. )

(c) Incorporated Council of Law Reporting For England & Wales

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# Tab F

## SVANSTROM and NINE OTHERS v. JONASSON

COURT OF APPEAL (Zacca, P., Georges and Kerr, JJ.A.): April 4th, 1997

*Companies—legal proceedings—action in respect of corporate wrong— only shareholders on register may bring action under exception to rule in Foss v. Harbottle against controlling interests for loss caused to company—no locus standi for beneficial owners even if registered shareholders joined as defendants*

The respondent brought an action against the first four appellants in the Grand Court to recover damages for losses caused to his companies by breaches of their fiduciary duties.

The respondent was the beneficial owner of a minority shareholding in the seventh and eighth appellant companies. The first four appellants were directors of the companies and together held the beneficial interest in a majority of the shares of both. The entire issued share capital of both companies was registered in the name of the ninth appellant.

The respondent claimed on behalf of himself and other beneficial owners of minor shareholdings in the companies for loss resulting from the sale of company assets by the first four appellants at an undervalue and from the loss of contracts which the directors diverted to other companies in which the four of them held substantial interests.

All the appellants except the ninth and tenth appellants—the nominee shareholders representing, respectively, the first eight appellants and the respondent—filed a summons seeking to have the respondent's claim struck out on the ground, *inter alia*, that he had no *locus standi* to bring the action.

The Grand Court dismissed the summons on the basis that the respondent had *locus standi* to bring his action on behalf of each company in respect of a wrong done to it, under an exception to the general rule that the company itself must be the plaintiff, allowing a minority shareholder to complain of fraud on the part of the controlling majority. He relied on Cayman precedent for the proposition that, provided that registered shareholders were joined as defendants, a person such as the respondent, for whom those nominees held on trust, could bring such an action.

On appeal the first eight appellants submitted that (a) the trial judge had erred in his construction of the Cayman case law, since the issue of whether a beneficial owner of shares could bring a derivative action on behalf of the company had not yet been determined by the Cayman courts; (b) the exception to the common law principle that the company

C.A.                                          SVANSTROM V. JONASSON

itself was the proper plaintiff to bring an action based on a wrong
perpetrated against it applied only to aggrieved minority shareholders
who would otherwise be denied justice by the fraudulent majority's
refusal to sue on the company's behalf; and (c) since the respondent and
his fellow beneficial owners were not on the register of company
shareholders, and since under art. 11 of each company's articles of
association the company was not bound to recognize any equitable
interest in its shares, they did not constitute an aggrieved minority with
*locus standi* to bring an action.

The respondent submitted in reply that (a) authority both in England
and the Cayman Islands showed that the beneficial owner of a minority
shareholding had *locus standi* to bring an action on behalf of the company
if he alleged fraud and the wrongdoers were in control of the company;
(b) any other interpretation of the exception to the general common law
rule would enable the first four appellants to avoid being held accountable
in the courts to all those with substantial beneficial interests in the two
companies; and (c) the trial judge had therefore correctly dismissed the
appellant's summons to strike out his action against them.

**Held,** striking out the respondent's action:

(1) The respondent, as beneficial owner of a minority interest in the
seventh and eighth appellants, had no *locus standi* to bring an action on
behalf of the companies against their directors. The proper plaintiff in such
cases was the company itself, subject to well-recognized exceptions, the
relevant one in this case being where a minority shareholder wished to
allege fraud by the controlling members resulting in loss to the company
(page 200, line 34 – page 201, line 6; page 205, line 44 – page 206, line 17).

(2) Since the respondent was not a registered member of either
company, however, he did not fall within this general exception, and there
was no authority to the contrary in either England or the Cayman Islands.
In the absence of an arrangement between the nominee shareholder and
the beneficial owners of the companies' shares whereby the nominee
could be compelled to bring proceedings on behalf of the companies, the
respondent had no remedy. He could not succeed merely by joining the
registered shareholder as a defendant (page 197, line 31 – page 198, line
21; page 202, lines 1–16; page 203, lines 18–44; page 207, lines 17–26;
page 208, lines 27–43).

(3) Moreover, the common law principle that a company was not
obliged to recognize a trust affecting its shares was reflected in each
company's articles of association, which stated that the company was not
bound to recognize any equitable interest but would regard a registered
shareholder as being absolutely entitled. For this reason too the
respondent had no standing to bring the proceedings (page 199, lines 4–5;
page 200, lines 19–33; page 203, lines 29–34; page 207, line 41 – page
208, line 14).

**Cases cited:**
  (1) *Bagshaw* v. *Eastern Union Ry. Co.* (1849), 7 Hare 114; 68 E.R. 46;
      18 L.J. Ch. 193, distinguished.
  (2) *Binney* v. *Ince Hall Coal & Cannel Co.* (1866), 35 L.J. Ch. 363; 14
      L.T. 392, distinguished.
  (3) *Edwards* v. *Halliwell*, [1950] 2 All E.R. 1064; (1950), 94 Sol. Jo.
      803, *dicta* of Jenkins, L.J. applied.
  (4) *Foss* v. *Harbottle* (1843), 2 Hare 461; 67 E.R. 189, applied.
  (5) *Fulloon* v. *Radley* (1991), 9 A.C.L.C. 1434; [1992] 2 Qd. R. 290,
      observations of Master White applied.
  (6) *Great W. Ry. Co.* v. *Rushout* (1852), 5 De G. & Sm. 290; 64 E.R.
      1121, not followed.
  (7) *Hooker Invs. Pty. Ltd.* v. *Email Ltd.* (1986), 10 A.C.L.R. 443, *dicta*
      of Young, J. applied.
  (8) *Maas* v. *McIntosh* (1928), 28 S.R. (N.S.W.) 441; 45 W.N. (N.S.W.)
      107, *dicta* of Harvey, C.J. in Eq. applied.
  (9) *Perkins, In re, ex p. Mexican Sta. Barbara Mining Co.* (1890), 24
      Q.B.D 613, followed.
  (10) *Prudential Assur. Co. Ltd.* v. *Newman Indus. Ltd. (No. 2)*, [1982]
      Ch. 204; [1982] 1 All E.R. 354, applied.
  (11) *Schultz* v. *Reynolds*, 1992–93 CILR 59, explained.
  (12) *Stena Fin. BV* v. *Sea Containers Ltd.*, [1989] L.R.C. (Comm.) 641.

**Legislation construed:**
Companies Law (1995 Revision) (Laws of the Cayman Islands, 1963,
    *cap.* 22, revised 1995), s.37: The relevant parts of this section are set
    out at page 000, lines 00–00.

*A. Bueno, Q.C.* and *D.A. Harris* for the first, seventh and eighth
    appellants;
*A. Bueno, Q.C.* and *H. St.J. Moses* for the third, fifth and sixth appellants;
*J.A. Leo-Rhynie, Q.C.* and *A. McN. McLaughlin, Jnr.* for the respondents.
The fourth, ninth and tenth appellants did not appear and were not
    represented.

   **GEORGES, J.A.:** The respondent, Mr. Jonasson, is the beneficial          35
owner of 15.11% of the shares in Rio Number Two Ltd. (the seventh
appellant) and Rio Number Three Ltd. (the eighth appellant). The first to
fourth appellants are the directors of the seventh and eighth appellants
and together hold the beneficial interest in 51.02% of these two
companies. Campbell Nominees Ltd. ("CNL") is the registered            40
shareholder of the entire share holdings in the seventh and eighth
appellants and was named as the ninth and tenth defendants in the action
in relation to its holdings in each of the companies. It entered appearances
in the action but thereafter took no further part.
   The action is a derivative action. The respondent claims on behalf of      45

194

himself and other shareholders of the seventh and eighth appellants (save the first, second, third and fourth appellants) for loss caused to the seventh and eighth appellants when their assets were sold at an undervalue and contracts which they could have secured were diverted to
5  other companies in which the first to fourth appellants held substantial interests. The details of the allegations supporting these claims need not now be canvassed.

The first to eighth defendants filed a summons asking that the action be struck out under r.41 of the Grand Court (Civil Procedure) Rules or under
10  the inherent jurisdiction of the court on two grounds: first, that the respondent did not at the date of the commencement of the action have *locus standi* to bring the action and secondly, that the action was obviously unsustainable against any of the appellants. At the hearing of the summons, arguments were advanced solely to the ground of *locus*
15  *standi*. The judge dismissed the summons, gave leave to appeal and stayed all further proceedings until the hearing and determination of the appeal.

Both sides agree that the principle has been clearly established in *Foss* v. *Harbottle* (4) that in an action in respect of a wrong to a company,
20  *prima facie*, the proper plaintiff is the company itself. In *Prudential Assur. Co. Ltd.* v. *Newman Indus. Ltd.* (*No. 2*) (10) the Court of Appeal in England (Cumming-Bruce, Templeman and Brightman, L.JJ.) set out the classic definition of the rule in *Foss* v. *Harbottle* as stated in the judgment of Jenkins, L.J. in *Edwards* v. *Halliwell* (3) as follows ([1982] Ch. at
25  210–211):

"(1) The proper plaintiff in an action in respect of a wrong alleged to be done to a corporation is, prima facie, the corporation. (2) Where the alleged wrong is a transaction which might be made binding on the corporation and on all its members by a simple majority of the
30  members, no individual member of the corporation is allowed to maintain an action in respect of that matter because, if the majority confirms the transaction, cadit quaestio; or, if the majority challenges the transaction, there is no valid reason why the company should not sue. (3) There is no room for the operation of the rule if
35  the alleged wrong is ultra vires the corporation, because the majority of members cannot confirm the transaction. (4) There is also no room for the operation of the rule if the transaction complained of could be validly done or sanctioned only by a special resolution or the like, because a simple majority cannot confirm a transaction
40  which requires the concurrence of a greater majority. (5) There is an exception to the rule where what has been done amounts to a fraud and the wrongdoers are themselves in control of the company. In this case the rule is relaxed in favour of the aggrieved minority, who are allowed to bring a minority shareholders' action on behalf of
45  themselves and all others. The reason for this is that, if they were

195

denied that right, their grievance could never reach the court
because the wrongdoers themselves, being in control, would not
allow the company to sue."

The short question which arose for decision was whether the beneficial
holder of the shares whose name did not appear on the company's register       5
of shareholders could exercise the right to sue on behalf of the company
in the circumstances set out in para. 5 of the passage quoted above.

The trial judge, in reaching his conclusion, held that whatever may be
the position in England, the Court of Appeal of the Cayman Islands in
*Schultz* v. *Reynolds* (11) had decided that the beneficial owner of shares in       10
a company whose name did not appear on the register of its members
could bring a derivative action on behalf of the company to claim
remedies for harm done to the company. He concluded his judgment thus:

> "However attractive I find Mr. Bueno's arguments, Georges, J.A.
> in particular stated the proposition that a minority shareholder       15
> seeking to bring a derivative action may do so if he falls within the
> exception to the rule in *Foss* v. *Harbottle* and joins the registered
> shareholders as defendants if they refuse to take action themselves,
> with such force that I do not consider that it is for me to say other
> than that it represents the state of the law in the Cayman Islands at       20
> the present time. That being so, I dismiss the application with costs."

Although the consequence will be to increase significantly the length of
this judgment, it is necessary to cite fully the passage in the judgment
which is stated to express forcefully the conclusion that a beneficial
owner of shares whose name does not appear on the register can bring an       25
action under the exception to the rule in *Foss* v. *Harbottle* (4) if the
registered owner of the shares is named as defendant. It is to be found in
*Schultz* v. *Reynolds* (11) (1992–93 CILR at 76–77):

> "It was also contended that even before the rule itself came to be
> considered, the appellant lacked the status to sue because she was       30
> not a member of the company, Newport Ltd. The register of
> shareholders showed that all the shares in that company were held
> by CMS. Section 37 of the Companies Law (Revised) identified as
> members of a company those persons whose names appeared in the
> register. In *Birch* v. *Sullivan* . . . the plaintiff had been adjudicated a       35
> bankrupt and a trustee in bankruptcy had been appointed. His name
> still appeared on the register of members of a company in which he
> held shares. He issued a writ against Sullivan who was a director of
> the defendant company claiming declarations for misfeasance as a
> director. The action was stayed so long as the plaintiff remained on       40
> the record as the plaintiff. Liberty was granted to have the action
> dismissed if the trustee in bankruptcy did not apply to be substituted
> as plaintiff within a fixed time.

> The Chief Justice rejected the submission that the appellant had
> no *locus standi*. He relied on a statement in *Bagshaw* v. *Eastern*       45

196

C.A.                          SVANSTROM V. JONASSON (Georges, J.A.)

*Union Ry. Co.* . . . that the holder of a 'scrip' in a company had an 'inchoate right to become a registered holder of the perpetual stock' and for that reason could sue on its behalf. It was emphasized in that case . . . that it was not argued that—

5        'the holders of scrip certificates in the perpetual stock had not such an interest in the application of the capital of the company as was necessary to enable them to maintain a bill properly framed, to prevent a misapplication of the capital of the company.'

10   The only issue was whether such persons could represent both scrip holders and holders of regular stock. The statement was, therefore, *obiter* and was made without the benefit of argument.

There is some further support in *Stena Fin. BV* v. *Sea Containers Ltd.* . . . In that case, however, the plaintiff had become a registered shareholder by the date of hearing. The authority cited, *Great W. Ry.*
15   *Co.* v. *Rushout* . . . , had decided that the beneficial owner of shares could sue if he joined the registered shareholder as a defendant.

In this case, however, there is an additional complication. The plaintiff, though a beneficial owner, is a joint beneficial owner with Dupre. It is clear law that although as between themselves joint
20   tenants and joint owners had separate rights, as against everyone else they were in the position of a single owner. There was absolute unity between them. Together they formed one person and could not commence proceedings without the aid of the other or others. As regards joint shareholders this principle was recently restated by
25   Harman, J. in *Re Exchange Travel (Holdings) Ltd.* . . . to the effect that—'joint tenants of a share are joint covenanters and can only act together. . . .' This suit is, therefore, not properly constituted in the absence of CMS and Dupre as plaintiffs. Neither would, of course, consent to be joined as plaintiffs. Consequently, they should have
30   been named as defendants."

I do not accept that the passage makes any clear statement that a beneficial owner of shares has *locus standi* to bring a derivative action so long as he joins the registered shareholder as defendant. The opening words of the passage cited make it clear that contentions are being
35   examined rather than propositions of law laid down.

In the second paragraph, a statement in a case on which the Chief Justice (against whose judgment the appeal had been filed) had relied, *Bagshaw* v. *Eastern Union Ry. Co.* (1) was found to be *obiter* and made without the benefit of argument. The case of *Stena Fin. BV* v. *Sea*
40   *Containers Ltd.* (12) was noted but it was pointed out that by the date of hearing the plaintiff had become a registered shareholder. At that stage *Great W. Ry. Co.* v. *Rushout* (6) is noted and the proposition which it supports set out without comment. Thereafter, the second issue is raised—the complication that a joint beneficial owner had not been
45   joined. The language then changes:

197

"It is clear law that although as between themselves joint tenants
and joint owners had separate rights, as against every one else they
were in the position of a single owner. . . . Together they formed one
person and could not commence proceedings without the aid of the
other or others."                                                                      5
The issue being discussed was the decision of the Chief Justice that the
plaintiff had *locus standi*. No conclusion was reached on the applicability
of *Great W. Ry. Co.* v. *Rushout*. But even if that case was accepted as
applicable in *Schultz*, the registered shareholders had not been joined so
that, in any event, even on that authority, the action was not properly         10
constituted. It was not, in the context in which it appears, a positive
finding that the action would have been properly constituted had they
been joined.

I find Mr. Leo-Rhynie's arguments in support of the construction which
the trial judge placed on the passage to be unacceptable, since the passage    15
in question does not support the proposition that the beneficial owner can
sue if the registered owner is joined as a defendant. It goes no further than
to state that even if the beneficial owner could file a derivative action, the
proceedings were not properly constituted because one of the two joint
beneficial owners had not been joined. The issue in this case is not             20
covered by a previous authority of this court and is open for determi-
nation.

*Great W. Ry. Co.* v. *Rushout* (6) undoubtedly supports the proposition
that a beneficial owner of shares has the standing to bring a derivative
action even though its name does not appear on the company's register of       25
shareholders. The Great Western Railway Co. ("GWR") had filed a
derivative action naming as defendant the Oxford, Worcester &
Wolverhampton Railway Co. Ltd. ("OWWR") in which it held a
substantial number of shares in the hands of trustees whose names
appeared on the register of that company. Also named as defendants were        30
the directors of the OWWR and the trustees who held the shares on behalf
of the GWR. Counsel for the OWWR took a preliminary objection that
the GWR, as beneficial owner of the shares, had no standing to launch the
action.

It is significant that counsel for GWR acknowledged, in presenting             35
their arguments, that there might be force in the argument in ordinary
cases but that the special rights given to the GWR under its act of
incorporation entitled it to complain of the internal management of the
OWWR which affected its interest. Parker, V.-C. held that the GWR had
an interest to maintain the suit because the shares were held on a valid        40
trust on behalf of the GWR and that they had an interest in what was
sought by the bill—namely the protection of the property of the OWWR
in which the shares were held. He did go on to add, however, that the Act
of Parliament under which the GWR had been incorporated assumed that
the GWR might, in the normal course of events, have had only an                 45

198

C.A.                    SVANSTROM V. JONASSON (Georges, J.A.)

equitable interest in the shares which it held. The GWR was accordingly in precisely the situation which the Act envisaged and did have standing to bring the action to protect the OWWR.

It is a fundamental rule of company law that a company is under no
5    obligation to recognize trusts affecting its shares. In *In re Perkins, ex p. Mexican Sta. Barbara Mining Co.* (9) the company filed a bankruptcy petition against Perkins, the debtor. Perkins had sued Dickey, whose name appeared on the list of shareholders, claiming a declaration that Dickey held the shares in trust for him. He joined the company as a
10    defendant. He succeeded in obtaining the declaration but the action against the company was dismissed with costs. These were taxed at £129 3s. 9d., which was the sum in respect of which the company filed the petition. The value of the shares, the subject of the action, was £23,408. The articles of association of the company gave it a lien on its shares for
15    any debt due to it. Objection was taken to the petition on the ground that since the company had a lien on the shares for the costs due, the company could not file unless it surrendered its security. The objection succeeded before the Registrar but failed on appeal.

Lord Esher, M.R. stated (24 Q.B.D. at 617–618):
20        "With regard to the first point, I confess I have had a great desire to overrule it if I could, because to say to a man, 'We admit that you are a cestui que trust of the shares; we admit that the man in whose name they stand is a bare trustee for you; we admit, therefore, that you must ultimately be entitled to shares in our company to a large
25        amount; nevertheless, we have a right to make you bankrupt for a much smaller sum'—does seem to me a very strong thing. But it is said the company have a legal right to do this, because it is necessary for the protection of companies that they should not be bound to recognise trusts affecting their shares. So far as I
30        understand the law, now that I have fully considered it, it does give the company power to do this. Therefore, the first ground of objection to the bankruptcy petition fails, because the first step which the debtor must take is, to shew that he is a cestui que trust of the shares. The law has given the company the right to say, 'We do
35        not care whether you are a cestui que trust or not; if you are, we have the right to take no notice of you.' I agree that is the law, though I think it is hard law; but we have nothing to do with the question of hardship."

Lord Coleridge, C.J. was emphatically of the same view (*ibid.*, at
40    616):
        "In the first place it seems to me extremely important not to throw any doubt on the principle that companies have nothing whatever to do with the relations between trustees and their cestuis que trust in respect of the shares of the company. If a trustee is on the company's
45        register as the holder of shares, the relations which he may have

199

THE CAYMAN ISLANDS LAW REPORTS                    1997 CILR

with some other person in respect of the shares are matters with
which the company have nothing whatever to do; they can look only
to the man whose name is upon the register. It seems to me that, if
we were to throw any doubt upon that rule, we should make the
carrying on of their business by joint stock companies extremely          5
difficult, and might involve those companies in very serious
questions, and the ultimate result would be anything but beneficial
to the holders of shares in such companies themselves."
It should be noted that those presenting the bankruptcy petition relied on
art. 20 of the articles of association which read (*ibid.*, at 614):       10
    "The company shall have a first and paramount lien on all shares,
    and on the dividends thereon, for all monies due to, and liabilities
    subsisting with the company from or on the part of the registered
    holder or holders thereof, or other the [*sic*] person for the time being
    entitled thereto as against the company. . . ."                        15
The words "or other the [*sic*] person for the time being entitled thereto as
against the company" could have been generously interpreted to include a
cestui que trust, but they were not because the company was under no
obligation to take notice of trusts. Lord Coleridge, C.J. stated (*ibid.*, at
616) that it was "extremely important not to throw any doubt on the        20
principle that companies have nothing whatever to do with the relations
between trustees and their cestuis que trust in respect of the shares of the
company." Article 11 of the articles of association of Rio Number Two
and Rio Number Three restate this principle:
    "Except as required by law, no person shall be recognized by the      25
    company as holding any shares upon trust and the company shall not
    be bound by or be compelled in any way to recognize (even when
    having notice thereof) any equitable, contingent, future or partial
    interest in any share or interest in any fractional part of a share or
    (except only as by the articles or by law otherwise provided) any     30
    other rights in respect of any share except an absolute right to the
    entirety thereof in the registered holder or in the case of a share
    warrant in the bearer of the warrant for the time being."
As has been indicated, the exceptions to the rule in *Foss* v. *Harbottle* (4)
confer a right to bring an action on behalf of the company on "the         35
aggrieved minority, who are allowed to bring a minority shareholders'
action on behalf of themselves and all others." The only members of the
company are its shareholders. Section 37 of the Companies Law (1995
Revision) reads:
    "The subscribers of the memorandum of association of any             40
    company shall be deemed to have agreed to become members of the
    company whose memorandum they have subscribed, and upon
    registration of the company shall be entered as members on the
    register of members hereinafter mentioned, and every other person
    who has agreed to become a member of a company and whose name       45

200

C.A.                SVANSTROM V. JONASSON (Georges, J.A.)

is entered on the register of members, shall be deemed to be a
member of the company."
The application of these principles would preclude a person who holds a
beneficial interest in the shares of a company and whose name does not
5   appear on the register of members from being one of the "aggrieved
minority" permitted to bring an action on behalf of the company.
   Undoubtedly, the holder of a beneficial interest in shares in a company
whose name did not appear on the register was allowed in *Great W. Ry.
Co.* v. *Rushout* (6) to bring a derivative action on behalf of the company.
10  The issue is the weight to be attached to that decision, which is plainly
not binding on this court. The case is cited once in 7(2) *Halsbury's Laws
of England*, 4th ed., para. 1713, at 1259 but not in support of the
proposition that a person holding a beneficial interest in the shares of a
company has the standing to bring a derivative action. It is cited to
15  support the proposition that all questions arising at a meeting of directors
are to be decided by a majority of votes of directors present but such
decisions are binding on the minority only if the minority has been
allowed an opportunity to make their voice heard and to state their views.
   In Pennington, *Company Law*, 7th ed. at 870 (1995) the learned author
20  states:
       "A derivative action may be brought by a person who is entitled
    to shares or an interest in them but is not registered as the holder of
    them in the company's register of members; such persons include an
    equitable mortgagee of shares or the renouncee of a letter of
25     allotment of shares. . . ."
*Great W. Ry. Co.* v. *Rushout* (6) is not cited in support of that proposition.
The two cases are *Binney* v. *Ince Hall Coal & Cannel Co.* (2) and
*Bagshaw* v. *Eastern Union Ry. Co.* (1). The report of the first case, the
facts of which are somewhat complicated, certainly does not indicate that
30  this was a derivative action filed to enforce a right of the company in
circumstances in which action could not be taken in the name of the
company. By the deed of settlement under which the company was
constituted, a particular shareholder, William Lancaster, was granted
certain exemptions and accorded privileges as compared with other
35  shareholders. At a general meeting of the company, resolutions were
passed which, in Mr. Lancaster's view, infringed these rights. At the
general meeting he protested. By then he had assigned his shares by way
of mortgage to a trustee for the company and had further charged them by
way of equitable mortgage to the plaintiff.
40    The plaintiff as equitable mortgagee filed a bill against the company to
restrain the company from carrying the resolutions into effect. Objection
was taken on the ground that the plaintiff had no right to sue—the
underlying argument being that he could not interfere with the internal
management of the company. Article 142 of the deed of settlement stated
45  (35 L.J. Ch. at 364): "The company shall not be affected by notice of any

trust relating to any share or shares in the company. . . ." Kindersley, V.-C. stated (*ibid.*, at 368) that that clause—

> "does not preclude a cestui que trust of [shares registered in the name of the trustee] from coming and saying 'Do not pay my trustee the monies as though they belonged to him but pay them to me.' Nor    5
> does it preclude the plaintiff from coming to the company and saying 'You are injuring these shares in respect of a right which attaches to them. . . .'"

He concluded that to interpret the clause in the manner contended for by the company would enable it to say: "We will by our deed make a    10
provision, that whatever injustice we choose to perpetuate there shall be no remedy against that injustice in a Court of equity."

This does not appear to me to be an approach which should be taken to the development of company law today. It should not be applied to derivative actions and, on the facts of the case, the action does not appear    15
to have been a derivative action.

The other case cited in support of the proposition in Pennington, *Company Law* is *Bagshaw v. Eastern Union Ry. Co.* (1). No question of an equitable title to shares arose in that case. The plaintiff was the holder of scrip certificates. In 5 *Stroud's Judicial Dictionary*, 4th ed., at 2453 (1974)    20
a scrip certificate is defined as "a certificate, transferable by delivery, entitling its holder to become a shareholder or bondholder in respect of the shares or bonds therein mentioned." In the course of the judgment in *Bagshaw's case* Ingram, V.-C. stated (7 Hare at 130; 68 E.R. at 53):

> "It was not, I think, argued by the Defendants that the proprietors    25
> and holders of scrip certificates in the perpetual stock had not such an interest in the application of the capital of the company as was necessary to enable them to maintain a bill properly framed, to prevent a misapplication of the capital of the company. It clearly could not be so argued; for there was an inchoate right in such    30
> parties to become general shareholders in the company."

Neither of these cases support the proposition that the beneficial owner of shares registered in the name of a nominee has the standing to file a derivative action on behalf of himself and other shareholders claiming on behalf of the company for a wrong alleged to be suffered by the company.    35

Support for the proposition contended for by the respondent in this case was found in a statement in *Mayson, French & Ryan on Company Law*, 10th ed., at 539 (1993):

> "It seems that the beneficial owner of shares held in trust may be permitted to bring a derivative action in an appropriate case: such an    40
> action was permitted in *Great Western Ry. Co. v. Rushout* . . . which concerned a statutory company."

The language is certainly tentative. It does no more than encapsulate the decision in that case offering neither support nor criticism. The paragraph is omitted from the 11th edition of the text.    45

202

C.A.    SVANSTROM V. JONASSON (Georges, J.A.)

*Gower's Principles of Modern Company Law*, 4th ed., at 652–653 (1979) states:

> "(v) The right to bring a derivative action is afforded the individual member as a matter of grace. Hence the conduct of a
> 5    shareholder may be regarded by a court of equity as disqualifying him from appearing as plaintiff on the company's behalf. This will be the case, for example, if he participated in the wrong of which he complains. But the mere fact that the plaintiff was not a member at the time of the wrong will not bar him from bringing the action, for
> 10   he is enforcing the company's rights, not his own, and without his intervention a wrong to the company might go unremedied. But he must be a shareholder of record at the time when he brings his action."

This formulation rests on the principle clearly stated by the Court of
15   Appeal in *In re Perkins, ex p. Mexican Sta. Barbara Mining Co.* (9) that no doubt should be cast on the principle that companies are under no obligation to recognize any trust which may exist in relation to its shares. The relationship between a trustee whose name appears on the register of shareholders of a company and the beneficial owner of the shares is
20   purely a matter for contractual arrangement between them. This can be structured in such a way that the trustee or nominee can always be compelled to act on the instructions of the cestui que trust or beneficial owner in matters concerning the filing of derivative actions to protect the company from damage inflicted by a majority in circumstances in which
25   such an action may be filed.

Where such arrangements do not exist it may well be the case that hardships may appear to arise because the beneficiary is unable to compel the nominee to transfer the shares to him or to induce him to file an action to remedy the alleged wrong. The temptation is strong to introduce what
30   has been described as "flexibility" in the application of the exceptions to the rule in *Foss* v. *Harbottle* (4) by permitting a beneficiary to file when his name does not appear on the register of members. Permitting this would, in my view, weaken the fundamental principle of non-recognition by the company of trusts affecting its shares. In the language of Lord
35   Coleridge, C.J. in *In re Perkins, ex p. Mexican Sta. Barbara Mining Co.* (9) (24 Q.B.D. at 616), this "ultimate result would be anything but beneficial to the holders of shares in such companies. . . ."

Against that background I conclude that since *Great W. Ry. Co.* v. *Rushout* (6) casts doubt on the principle that companies are in no way
40   obliged to recognize any trusts existing in relation to their shares, it should be treated as a decision on its own facts, strongly influenced by the consideration that the company was a statutory company. It should not, therefore, be regarded as enunciating a general principle applicable to all companies.

45   In three Australian cases there is support for the proposition that only

203

members whose names appear on the register of members of the company can bring a derivative action seeking redress on behalf of the company. They are *Maas* v. *McIntosh* (8), *Hooker Invs. Pty. Ltd.* v. *Email Ltd.* (7) and *Fulloon* v. *Radley* (5). It was contended that each of these cases on its facts could be distinguished from the case under consideration and this is indeed correct but that does not, in my view, weaken the support.          5

In *Maas* v. *McIntosh* it would appear that the plaintiffs were registered shareholders in respect of 150 shares which had been transferred to them by order of the court. Their suit was in respect of dividends and shares registered in the names of trustees, two of whom were acting as directors     10
of the company. The principal objection of the defendants on an application to strike out was that the statement of claim was not intelligible and that such remedies as were sought on behalf of the company were in relation to matters of internal management in regard to which the court had no jurisdiction. Harvey, C.J. in Eq. stated (28 S.R.          15
(N.S.W.) at 446):

"It is quite true that in a suit by beneficiaries in which the company, and the shareholder trustees are parties, the Court may give effect to the rights of the beneficiaries and may protect their interests to prevent them being sacrificed, by the trustees and the     20
company between them, but under no circumstances can persons only beneficially interested in shares bring a suit on behalf of themselves and all other shareholders, because they are not themselves shareholders."

The statement may indeed be *obiter*. The application to strike out did not     25
succeed. But it appears to me to be sound as a matter of principle.

It was adopted and applied in *Hooker Invs. Pty Ltd.* v. *Email Ltd.* (7). That case is again on the facts distinguishable. The plaintiffs there were not beneficial owners of shares held in the name of a nominee. At the date of the suit they had contracted to purchase a large number of shares from     30
a registered shareholder. Young, J. stated (10 A.C.L.R. at 445):

"Thus it seems that the better view is that the duty is a duty owed to the company, the company is normally the proper plaintiff, but in suitable circumstances the court will listen to proceedings brought in the name of a shareholder. However, with respect to this sort of duty     35
it is clear that an equitable holder of shares is not permitted by the court to bring the action that the shareholder might bring. This was clearly decided by Harvey C.J. in Eq. in *Maas & Anor* v. *McIntosh & ors* . . . a decision, as far as I am aware, which has never been criticised on this point."          40

It does not seem logical to contend that the right of a person holding an equitable interest in shares should depend on the nature of the equitable interest and that the equitable interest of a person who has contracted to purchase is distinguishable from that of a shareholder who has opted to hold shares in the name of a nominee, so that in the one situation the     45

C.A.                    SVANSTROM V. JONASSON (Kerr, J.A.)

equitable owner could file a derivative action and in the other situation he
could not.

   The position was carefully examined in *Fulloon* v. *Radley* (5). In that
case the plaintiffs filed a derivative action based on their equitable title as
5   trustees of shares held by the Fulloon Family Trust. They held these
shares pursuant to certain unregistered share transfers referred to in
notices of a general meeting of the company signed by Radley, one of two
directors of the company. Again, the circumstances giving rise to the
equitable interest are different from those in this case but the issue was
10   decided on the basis that the plaintiffs did hold an equitable interest.
Master White stated ([1992] 2 Qd. R. at 295):
       "There may arguably have been an allotment of shares by virtue
       of the matters pleaded in para. 7 of the amended statement of claim
       but no facts are pleaded which make the plaintiffs members of
15      Datalog. The question is whether, as alleged, equitable owners of
       shares may maintain a derivative action against the company."
Master White quoted the statement from Pennington, *Company Law*
already set out above and analysed the decisions cited as authority in
support. He noted that *Binney* v. *Ince Hall Coal & Cannel Co.* (2) had
20   been cited to Harvey, C.J. in Eq. in *Maas* v. *McIntosh* (8), who had held
that in no circumstances could persons only beneficially interested in
shares bring a suit on behalf of themselves and all other shareholders
because they were not themselves shareholders. He noticed that that
decision had been applied in *Hooker Invs. Pty. Ltd.* v. *Email Ltd.* (7). He
25   concluded that the plaintiffs had no standing to sue as the alleged
equitable owners of shares in Datalog. I am satisfied that the principle
stated in these cases is correct.

   Accordingly, I would allow the appeal and strike out the action on the
ground that the plaintiff did not, at the date of its commencement, have
30   *locus standi* to bring it. The respondent will pay to the plaintiff the costs
of this application here and below.

   **KERR, J.A.:** I have had the benefit of reading the draft judgment of
Georges, J.A. and I am in agreement with his reasoning and conclusion.
35   Notwithstanding that, I am constrained to add a few words, as the sole
question in this appeal was whether or not the plaintiff, as a beneficial
owner of shares, was competent to bring a derivative action within the
contemplation of the exception to the rule in *Foss* v. *Harbottle* (4) and
whether or not the learned trial judge was right in answering this question
40   in the affirmative by relying on his interpretation of certain statements of
Georges, J.A., in his judgment in the case of *Schultz* v. *Reynolds* (11), in
which the same question arose and in which judgment I unreservedly
concurred.

   It is agreed by all that the general rule in *Foss* v. *Harbottle*, namely,
45   that in an action in respect of a wrong done to a company, *prima facie*, the

205

THE CAYMAN ISLANDS LAW REPORTS                    1997 CILR

proper plaintiff is the company itself, was well recognized and respected.
The debate in this appeal was concerned with the question whether the
status of the plaintiff as beneficial owner of the shares of the company
was within the contemplation of a certain and accepted exception to the
rule as expressly recognized by Jenkins, L.J. in *Edwards* v. *Halliwell* (3)      5
in what was regarded approvingly by the Court of Appeal in *Prudential
Assur. Co. Ltd.* v. *Newman Indus. Ltd. (No. 2)* (10) as a "classic definition
of the rule." The relevant exception as formulated in the judgment of the
Court of Appeal reads ([1982] Ch. at 211):
    "There is an exception to the rule where what has been done         10
    amounts to a fraud and the wrongdoers are themselves in control of
    the company. In this case the rule is relaxed in favour of the
    aggrieved minority, who are allowed to bring a minority
    shareholders' action on behalf of themselves and all others. The
    reason for this is that, if they were denied that right, their grievance   15
    could never reach the court because the wrongdoers themselves,
    being in control, would not allow the company to sue."
The learned judge, on the basis of his interpretation of certain passages in
the judgment of Georges, J.A. in the *Schultz* case (11) concluded:
    "However attractive I find Mr. Bueno's arguments, Georges, J.A.        20
    in particular stated the proposition that a minority shareholder
    seeking to bring a derivative action may do so if he falls within the
    exception to the rule in *Foss* v. *Harbottle* and joins the registered
    shareholders as defendants if they refuse to take action themselves,
    with such force that I do not consider that it is for me to say other     25
    than that it represents the state of the law in the Cayman Islands at
    the present time. That being so, I dismiss the application with costs."
It is implicit in that statement that, whether or not there were statements
in the decided cases from other jurisdictions in conflict with the reasoning
and decision in *Schultz*, he considered himself bound by the local        30
decision.
    Georges, J.A. in his judgment in the instant appeal has quoted the
relevant passages from *Schultz*. Taking advantage of this, it is enough to
say that in those passages in relation to the specific question he had (i)
summarized the arguments of the appellant's counsel before the Chief       35
Justice; (ii) recited the Chief Justice's opinion; and (iii) recognized in
the submissions then before the court the relevance and reliance which
was placed upon *dicta* from certain cited cases thus (1992–93 CILR at
76):
    "There is some further support in *Stena Fin. BV* v. *Sea*             40
    *Containers Ltd.* . . . In that case, however, the plaintiff had become
    a registered shareholder by the date of hearing. The authority cited,
    *Great W. Ry. Co.* v. *Rushout* . . . , had decided that the beneficial
    owner of shares could sue if he joined the registered shareholder as
    a defendant."                                                          45

206

C.A.                          Svanstrom v. Jonasson (Kerr, J.A.)

However, instead of deciding this point, Georges, J.A. continued (*ibid.*, at 77):

> "In this case, however, there is an additional complication. The plaintiff, though a beneficial owner, is a joint beneficial owner with Dupre. It is clear law that although as between themselves joint tenants and joint owners had separate rights, as against everyone else they were in the position of a single owner. There was absolute unity between them. Together they formed one person and could not commence proceedings without the aid of the other or others. As regards joint shareholders this principle was recently restated by Harman, J. in *Re Exchange Travel (Holdings) Ltd.* . . . to the effect that—'joint tenants of a share are joint covenanters and can only act together. . . .' This suit is, therefore, not properly constituted in the absence of CMS and Dupre as plaintiffs. Neither would, of course, consent to be joined as plaintiffs. Consequently, they should have been named as defendants."

It was clear to me then, as it is now, that the decision rested on the overriding want of competence in the plaintiff being but "a joint beneficial owner of shares in the company" and in any event, lacking *locus standi* to go it alone. The learned judge in the instant case elevated the recitals of Georges, J.A. and his recognition of the *dicta* cited in support of argument, to the level of *ratio decidendi* and the conclusion that the plaintiff was competent as beneficial owner of the shares to bring the derivative action. In so doing, the learned judge plainly erred. The respondent's counsel, in his endeavours to support the judge's interpretation, also read too much into the passages upon which he relied.

In concurring with Georges, J.A. in *Schultz* (11), I am not to be taken as in any way dissenting from this clear and concise statement of Zacca, P. (*ibid.*, at 69):

> "In my view it is only CMS, the registered shareholder of Newport Ltd., who can institute an action against Newport Ltd. The appellant, as a beneficial owner of the shares, is not entitled to bring a derivative action against Newport Ltd."

Now Georges, J.A., having rejected the infelicitous interpretation placed on his *dicta* in *Schultz*, went on in his judgment to deal diligently with the arguments and authorities for and against extending *locus standi* to beneficial owners of shares in a company to bring this type of derivative action. On the reasoning set out in his judgment, he concluded, correctly in my view, that the plaintiff at the date of the commencement of the action had not the *locus standi* to bring the action.

Indeed, it seems on the face of it an illogical synthesis to argue that the beneficial owner of shares, who is not within the defined category of shareholder, may bring this special and exceptional derivative action on behalf of himself and other members of the company—a category to which he clearly does not belong—*a fortiori*, when in fact he belongs to a

207

THE CAYMAN ISLANDS LAW REPORTS                1997 CILR

category (namely, the beneficial owner of shares) the existence of which,
in the light of the following article common to the relevant companies,
each company was entitled to ignore:

> "11. Except as required by law, no person shall be recognized by the
> company as holding any shares upon any trust, and the company          5
> shall not be bound by or be compelled in any way to recognize (even
> when having notice thereof) any equitable, contingent, future or
> partial interest in any share or any interest in any fractional part of a
> share or (except only as by the articles or by law otherwise
> provided) any other rights in respect of any share except an absolute   10
> right to the entirety thereof in the registered holder or in the case of a
> share warrant in the bearer of the warrant for the time being."

For these reasons I concur in allowing the appeal and in the order to strike
out the plaintiff's action with attendant costs to the appellant.

15

ZACCA, P.: I have had an opportunity of reading the judgment of
Georges, J.A. I am in agreement with his reasons and conclusions. I
would allow the appeal. However, in view of the submissions of Mr. Leo-
Rhynie that the decision in *Schultz* v. *Reynolds* (11) was to the effect that
the beneficial owner of shares in a company, whose name did not appear    20
on the register of members of the company, could bring a derivative
action on behalf of the company to claim remedies for harm done to the
company if the registered shareholder is joined as a defendant, I find it
necessary to add a few words.

In the instant case the trial judge relied on the *Schultz* case and held   25
that the Cayman Court of Appeal in that case decided that such an action
could be brought. I do not accept that the passage in the *Schultz* case
relied on by Mr. Leo-Rhynie invokes the principle that a beneficial owner
of shares has *locus* to bring a derivative action so long as he joins the
registered shareholder as a defendant. This was not the issue in the       30
*Schultz* case and no arguments were presented to the court to that effect.
The court clearly stated in that case that the beneficial owner of shares
could not bring a derivative action. In my judgment (1992–93 CILR at
69) I stated:

> "In my view it is only CMS, the registered shareholder of            35
> Newport Ltd., who can institute an action against Newport Ltd. The
> appellant, as a beneficial owner of the shares, is not entitled to bring
> a derivative action against Newport Ltd."

In my view the proposition of Mr. Leo-Rhynie that the decision in *Schultz*
v. *Reynolds* supports his contention that a beneficial owner of shares can   40
bring a derivative action if he joins the registered shareholder as a
defendant cannot be accepted. That case is not previous authority for such
a proposition.

*Appeal allowed.*

208

GRAND CT.                              IN RE OMNI SECS. LTD. (NO. 2)

Attorneys: *Quin & Hampson* for the first, seventh and eighth appellants; *Hunter & Hunter* for the third, fifth and sixth appellants; *Charles Adams, Ritchie & Duckworth* for the respondent.

---

## IN THE MATTER OF OMNI SECURITIES LIMITED (No. 2)

### GRAND COURT (Harre, C.J.): May 6th, 1997

*Companies—compulsory winding up—examination of witnesses by court—court exercising discretion under Companies Law (1995 Revision), s.126 to weigh reasonable requirements of liquidators' investigation against possible oppression of witness—exposure to liability through compliance and value of information sought relevant*

*Companies—compulsory winding up—examination of witnesses by court—application by liquidators under Companies Law (1995 Revision), s.126 seeking examination of auditors employed by associated firm may be reasonable requirement of investigating company's affairs—no necessary conflict of interest in liquidators*

*Companies—liquidators—powers and duties—ex parte application under Companies Law (1995 Revision), s.126 for examination of witnesses on oath justified if liquidators applied in good faith and with reasonable cause, even though no particular urgency or need for confidentiality*

The respondent liquidator applied for an order to require the partners and officers of the applicant firm to be examined on oath.

The applicant, D&T (Cayman), was the successor of a firm of accountants which had been responsible for auditing the accounts of Omni Securities Ltd., a company now in liquidation. The respondent was a partner in C&L (Cayman), a part of the international accountancy firm whose clients included other companies in the Omni Group, following a merger in the United Kingdom between an associated firm of the applicant's predecessor and C&L (U.K.).

The respondent obtained an *ex parte* order for the applicant's staff to produce and give evidence about the accounting records and working papers relating to the auditing of Omni Securities Ltd. over a three-year period. The applicant applied for the order to be set aside or varied to relieve it of any obligation to produce the documentation requested.

209

## CERTIFICATE OF SERVICE

I certify that, besides having been filed and distributed electronically on the ECF system, copies of the foregoing REPLY MEMORANDUM IN SUPPORT OF THE MOTION OF BAE SYSTEMS PLC AND THE INDIVIDUAL BAE SYSTEMS PLC DEFENDANTS TO DISMISS THE COMPLAINT, SECOND DECLARATION OF DAVID PARKES, SECOND DECLARATION OF MARTIN MOORE QC, and APPENDIX OF ADDITIONAL FOREIGN AUTHORITY CITED IN THE REPLY MEMORANDUM IN SUPPORT OF THE MOTION OF BAE SYSTEMS PLC AND THE INDIVIDUAL BAE SYSTEMS PLC DEFENDANTS TO DISMISS THE COMPLAINT AND SECOND DECLARATION OF MARTIN MOORE QC were sent on May 23, 2008, by First Class Mail, to the following counsel of record:

> Patrick Coughlin
> Mark Solomon
> Mary K. Blasy
> Coughlin Stoia Geller Rudman & Robbins LLP
> 655 West Broadway - Suite 1900
> San Diego, California 92101
>
>     Counsel for Plaintiff
>
>
> Roger M. Adelman
> 1100 Connecticut Avenue, N.W. - Suite 730
> Washington, D.C. 20036
>
>     Counsel for Plaintiff
>
>
> Jonathan W. Cuneo
> William H. Anderson
> Cuneo Gilbert & LaDuca LLP
> 507 C Street, N.E.
> Washington, D.C. 20002
>
>     Counsel for Plaintiff

Michael J. Vanoverbeke
Thomas C. Michaud
Vanoverbeke Michaud & Timmony PC
79 Alfred Street
Detroit, Michigan 48201

    Counsel for Plaintiff


Christopher T. Lutz
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036

    Counsel for Defendant The PNC Financial
    Services Group, Inc.


Eric M. Roth
Adir G. Waldman
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, New York 10019

    Of Counsel for Defendant The PNC Financial
    Services Group, Inc.


Richard L. Brusca
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005

Michael W. Mitchell
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036

    Counsel for the Allbritton Defendants


Wm. Bradford Reynolds
Howrey, LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

    Counsel for Defendant Prince Bandar bin Sultan


_Lawrence Byrne / JD_