UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re BAE SYSTEMS PLC DERIVATIVE LITIGATION | ) ) ) ) | Civil No. 1:07-cv-01646 Assigned to: Judge Rosemary M. Collyer |
| This Document Relates To: ALL ACTIONS. | ) ) ) ) ) | |

NOTICE OF RECENT EVENTS

Plaintiff, the City of Harper Woods Employees' Retirement System ("plaintiff"), submits this Notice of Recent Events to apprise the Court of a July 30, 2008 Opinion by the English House of Lords (the "Opinion"), a copy of which is attached hereto.

At the hearing on defendants' Motion to Dismiss, defendants highlighted to the Court the April 10, 2008 decision of the High Court of Justice, Queen's Bench Division. In that decision, the English High Court held that the decision of the Director of the Serious Fraud Office ("SFO") to call off its corruption investigation of the payments BAE Systems plc ("BAE") made to Prince Bandar Bin Sultan ("Prince Bandar") in connection with the Al-Yamamah arms deal was unlawful. The payments in question underlie many of the allegations in this action and the U.S. Department of Justice's own criminal investigation.

The House of Lords Opinion overrules the decision of the High Court and finds that the SFO acted lawfully in deciding it was not in the U.K.'s public interest to pursue BAE, stating:

> The Director was confronted by an ugly and obviously unwelcome threat. . . .
> It may indeed be doubted whether a responsible decision-maker could, on the facts
> before the Director, have decided otherwise.

*R v. Director of the Serious Fraud Office*, [2008] UKHL 60, at p. 19.

Before the issuance of the House of Lords Opinion, plaintiff had already argued that the U.K. government had expressly renounced its interest in pursuing BAE's conduct concerning Al-Yamamah and Prince Bandar. *See* Plaintiff's Consolidated Opposition to Defendants' Motions to Dismiss at 39-40.

Immediately after the House of Lords decision was issued on July 30, 2008, the SFO issued a press release, a copy of which is attached hereto, announcing that in light of the House of Lords' ruling it will not resume any investigation involving Al-Yamamah or the Saudis (or, by implication, the associated bribery and/or money-laundering in Washington, D.C.). Instead, the SFO announced, it will investigate only the non-Saudi corruption allegations against BAE and its senior executives.

*Id.*; *see also* ¶¶14, 134-136, 140 of the Verified Shareholder Derivative Complaint for Intentional,

Reckless or Negligent Breach of Fiduciary Duty, Corporate Waste, and *Ultra Vires* Conduct filed

herein on September 19, 2007.

DATED:  August 1, 2008    COUGHLIN STOIA GELLER RUDMAN
              & ROBBINS LLP
           PATRICK J. COUGHLIN
           MARK SOLOMON
           MARY K. BLASY


               s/ MARK SOLOMON
              MARK SOLOMON

           655 West Broadway, Suite 1900
           San Diego, CA  92101
           Telephone:  619/231-1058
           619/231-7423 (fax)

           Lead Counsel for Plaintiff

           THE LAW OFFICE OF ROGER M. ADELMAN
           ROGER M. ADELMAN (DC Bar # 056358)
           1100 Connecticut Ave., NW, Suite 730
           Washington, DC  20036
           Telephone:  202/822-0600
           202/822-6722 (fax)

           CUNEO GILBERT & LaDUCA, L.L.P.
           JONATHAN W. CUNEO(DC Bar # 939389)
           WILLIAM H. ANDERSON (DC Bar # 502380)
           507 C Street, N.E.
           Washington, DC  20002
           Telephone:  202/789-3960
           202/789-1813 (fax)

           Co-Liaison Counsel

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Attorneys for Plaintiff

S:\CasesSD\BAE Derivative\ntc events.doc

CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2008, I electronically filed the foregoing with the Clerk of

the Court using the CM/ECF system which will send notification of such filing to the e-mail

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on August 1, 2008.

s/ MARK SOLOMON
MARK SOLOMON

COUGHLIN STOIA GELLER
    RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  marks@csgrr.com

# Mailing Information for a Case 1:07-cv-01646-RMC

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Roger M. Adelman**
  radelman@erols.com,lisamp@csgrr.com,tlatimer@csgrr.com,e_file_sd@csgrr.com

- **Mary K. Blasy**
  maryb@csgrr.com

- **Richard L. Brusca**
  richard.brusca@skadden.com

- **Lawrence Byrne**
  larry.byrne@linklaters.com

- **Patrick J. Coughlin**
  patc@csgrr.com

- **Jonathan Watson Cuneo**
  jonc@cuneolaw.com

- **Sterling Darling , Jr**
  sterling.darling@linklaters.com

- **Matthew John Herrington**
  mherrington@steptoe.com

- **James Neil Lombardo**
  nlombard@skadden.com,dlmlcwas@skadden.com

- **Christopher Talbott Lutz**
  clutz@steptoe.com

- **William Bradford Reynolds**
  ReynoldsW@howrey.com

- **Eric M. Roth**
  emroth@wlrk.com

- **Mark Solomon**
  marks@csgrr.com

- **Adir G. Waldman**
  awaldman@wlrk.com

- **Mary K. Warren**
  mary.warren@linklaters.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Michael W. Mitchell
SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
Four Times Square
New York, NY 10036
```

EXHIBIT A

# Newsweek

# Gag Order

**How Saudi Arabia's Prince Bandar muscled Tony Blair into silence.**

**Michael Isikoff and Mark Hosenball**
NEWSWEEK WEB EXCLUSIVE
Updated: 5:49 PM ET Jul 30, 2008

The United Kingdom's highest court today provided new details of how the Saudis pressured British Prime Minister Tony Blair's government to shut down a politically embarrassing bribery investigation two years ago that implicated the Saudi ambassador to Washington. The ruling, by a House of Lords judicial panel, offers an unusually revealing window into how international power politics is played in the post-9/11 era.

The five-member panel recounts how Blair, faced with Saudi threats to cut off cooperation on counterterrorism operations, personally intervened to scuttle a criminal investigation into billions of dollars in allegedly improper payments made by British Aerospace Systems (BAE) to obtain Saudi contracts.

But the former prime minister, the court found, acted out of good faith: he and his advisers were genuinely worried that, if the Saudis followed through on their threats, it could lead to another "7/7"—British shorthand for the devastating July 7, 2005, terrorist bombings in the London subway system that killed 52 commuters and injured 700.

"The threats to national and international security [are] very grave indeed and ... British lives on British streets would be at risk," the British ambassador to Riyadh warned the Serious Fraud Office, the British unit conducting the probe, according to the court ruling.

Today's decision overrules a lower-court finding that Serious Fraud Office officials had improperly closed the investigation under pressure from Blair and thus effectively ends any chance that the SFO will pursue the BAE bribery allegations. (In a statement, the SFO said it will pursue other allegations against BAE not related to the Saudis. A spokesman for BAE denied wrongdoing but declined comment on the ruling.) The ruling was therefore a vindication of sorts for Blair and his top advisers, as well as a key victory for the Saudis and Prince Bandar bin Sultan, the former Saudi ambassador to the United States who was allegedly the prime recipient of the improper payments by BAE—even if the confirmation of their strong-arm tactics are not likely to win them any new friends in London or Washington.

Bandar, a longtime close personal friend of the Bush family who is now national-security adviser to Saudi King Abdullah, was so worried about investigations into the BAE payments that last year he hired the international legal and security firm Freeh Group International, headed by former FBI director Louis Freeh, to defend him from the charges. Among the Freeh Group's partners is Sir Stephen Mitchell, a prominent British barrister and former High Court judge. In addition, Bandar has hired William Bradford Reynolds, a former top official in the Reagan Justice Department, to represent him in a private shareholder lawsuit relating to the alleged improper payments.

Today's ruling is not likely to end the controversy over the BAE payments, however. The U.S. Justice Department is conducting its own investigation into whether BAE, which operates widely in the United States and has a growing portfolio of Pentagon contracts, violated the Foreign Corrupt Practices Act in making payments to Bandar and other Saudi officials.

The ruling is also likely to fuel criticism that the Saudi government—which portrays itself as a key ally of the United States and Great Britain in the War on Terror—is far less cooperative than it publicly claims. "This shows how the Saudis can get foreign governments to disregard their own justice system," said Ali Al-Ahmed, the director of the Gulf Institute, a Washington-based think tank that is critical of the Saudi government. "Terrorism is being used to blackmail the West. You watch, it is only a matter of time before they do this in the U.S."

As a sign of how the Saudis frequently forge alliances with Western leaders who help them, Ahmed pointed out that just two weeks ago Blair was among the most prominent guests to show up at a worldwide conference of religions hosted by Saudi King Abdullah in Madrid. At the conference, Blair—who recently set up his own private foundation—lavished praise upon Abdullah. "The king has made a lot of reforms," said Blair. NEWSWEEK was unable to obtain comment from the Saudi Embassy on the new ruling.

The British investigation into the BAE payments to Bandar was triggered in part by "suspicious activity reports" filed with the U.S. government by the now-defunct Riggs Bank. The reports, first reported by NEWSWEEK, showed that a Saudi Embassy account in D.C. had received $17.4 million in unexplained payments during a four-month period in late 2003 from an overseas source. When Riggs officials inquired about the payments, they were told they were being used to coordinate "home improvement/construction projects for Prince Bandar in Saudi Arabia." The British media later reported that the payments had come from BAE as part of a secret agreement connected to an $80 billion military aircraft deal between London and Riyadh.

Lawyers for the Saudis and spokesmen on their behalf have repeatedly argued that the payments were entirely legitimate and were made to a Saudi Defense Ministry account over which Bandar, whose father is the Saudi defense minister, had control. But evidence of the payments prompted Britain's Serious Fraud Office to launch an inquiry into whether BAE had violated British laws in paying bribes to Saudi officials. In 2006, Saudi officials—and reportedly Bandar himself—stepped up the pressure on Blair's government to close the investigation, suggesting that pursuit of the probe could lead them to cut off cooperation with the British on counterterrorism matters.

The court ruling today, written by Lord Thomas Bingham, described how Blair himself and Sir Sherard Cowper-Coles, Britain's ambassador to Saudi Arabia, used Saudi threats of new terror attacks in Britain to get the SFO to shut down the bribes investigation. According to the ruling, Blair personally sent a "personal minute" about the matter to the U.K. Attorney General, who oversees SFO operations. Blair warned of "a real and immediate risk of a collapse in UK/Saudi security, intelligence and diplomatic cooperation," and included attachments based on information from Britain's secret intelligence agencies, M.I.5 and M.I.6.

In three meetings with the head of the Serious Fraud Office, Ambassador Cowper-Coles conveyed increasingly dire warnings about possible new terror attacks on British soil, the ruling states. "At the first meeting the ambassador had described the threats to national and international security as very grave indeed and had said that British lives on British streets would be at risk," according to Lord Bingham's ruling, summarizing the evidence presented to the court. "At the second meeting, he had again said that lives would be at risk. At the third he had spoken of a real threat to British lives."

One assistant SFO director concluded following these warnings that if the Saudis carried out their threats to withdraw counterterrorism cooperation, it could lead to "another 7/7."

Though the U.K. government declined to explicitly confirm the incident to the courts, last year London's Sunday Times reported that in a meeting with one of Blair's top advisers, Bandar personally threatened that the Saudis' "intelligence and diplomatic relations" with Britain would be curtailed unless the SFO's investigations related to Bandar were shut down.

In the judgment of the House of Lords, all this made the final decision by the Serious Fraud Office to shut down the bribery investigation into BAE entirely justified. Wrote Lord Bingham: "What determined the decision [to shut down the investigation] was the [SFO] Director's judgment that the public interest in saving British lives outweighed the public interest in pursuing BAE to conviction."

Case 1:07-cv-01646-RMC     Document 87-2     Filed 08/01/2008     Page 4 of 4

URL: http://www.newsweek.com/id/149626

© 2008

EXHIBIT B



**THE WALL STREET JOURNAL.**



User Name: | Password: |
☑ Remember Me    Log In ▶
Forgot your username or password? | Subscribe

As of Thursday, July 31, 2008

Set My Home Page |

Home
News ▶
Technology ▶
Markets ▶
Opinion ▶
Lifestyle ▶

**Special Offer**

Subscribe to the print Journal today! Click Here!

**Advertiser Links**

A WSJ Quarterly Fund Analysis, presented by Janus

The World Petroleum Congress presented by ExxonMobil

Weigh in on the Retirement Debate! Presented by WSJ & Allstate

AT&T's World Roaming Plan

John Hancock presents The Best of Personal Finance

The AIDS Ride That Will Change Your World Forever

Visit theupsstore.com

Open a Scottrade Account Today

Save $200 on new HP notebooks.

Stories of Innovation by IBM®

The Journal Report: Business Insight

Midsize Businesses run SAP

## U.K. Ruling Backs Ending of BAE Inquiry

**Associated Press**
*July 31, 2008; Page B2*

LONDON -- Britain's House of Lords ruled that the nation's antifraud agency acted lawfully when it halted a corruption inquiry into a jet-fighter and arms deal between BAE Systems PLC and Saudi Arabia, overturning an earlier verdict.

The ruling was a blow to the lobby groups that challenged the Serious Fraud Office's decision to drop its investigation into whether BAE offered sweeteners to Saudi officials in return for contracts. The agency cited national-security concerns when it ended the inquiry. The Campaign Against Arms Trade and social lobby group Corner House had won an earlier decision in the High Court, where judges sharply criticized the agency, the government and the Saudi royal family, and said the agency acted illegally in its decision to drop the inquiry.

U.S. and Swiss authorities are still running their own investigations into allegations that BAE, one of the world's largest arms makers, ran a multimillion-dollar "slush fund" to woo Saudi officials as part of the al-Yamamah arms deal in the 1980s.

British authorities are still looking into possible BAE bribes to Tanzania, Romania, Chile and the Czech Republic. BAE has denied wrongdoing.

The Serious Fraud Office stopped its probe into the Saudi contracts in 2006 after British government officials warned that the investigation risked undermining national security because Saudi officials threatened to withhold crucial cooperation on antiterrorism.

All five members of the House of Lords considering the case Wednesday ruled that the Serious Fraud Office had been correct in deciding to halt the investigation.

Lord Thomas Bingham, who headed the group, said the agency's assistant director believed Saudi cooperation on intelligence issues was crucial in Britain preventing terror attacks such as the bombings that killed 52 London commuters in 2005.

Lord Alan Rodger said the fraud office had "no option but to discontinue the investigation because of the potential threat to national and international security." The comments by the Lords contrasted sharply with comments by the High Court judges earlier this year, who determined that the agency's decision represented an "abject surrender" to pressure from a foreign government.

The High Court judges had called the Saudi threats a "successful attempt by a foreign government to pervert the course of justice in the United Kingdom." There was no immediate answer at the Saudi Embassy in London.

Corner House spokesman Nicholas Hildyard said the ruling revealed that invoking national security could halt any inquiry, at the potential expense of the government's obligations under international antibribery legislation.

"The unscrupulous who have friends in high places overseas willing to make such threats now have a 'Get Out of Jail Free' card and there is nothing the public can do to hold the government to account if it abuses its national-security powers," Mr. Hildyard said. "Parliament needs urgently to plug this gaping hole in the law and in the constitutional checks and balances dealing with national security," he added.

*Copyright © 2008 Associated Press*



✉EMAIL  🖶PRINT  ★MOST POPULAR

YAHOO! BUZZ  📧 DIGG THIS

➕MY SPACE  📶 GET RSS FEEDS

advertisement

**TODAY'S MOST POPULAR**

1. Low-Speed Electric Vehicles Catch On
2. Opinion: Obama's Iraq Fumble
3. Ivy Leaguers' Big Edge: Starting Pay
4. Opinion: Is John McCain Stupid?
5. Opinion: Check, Please

MORE

**PEOPLE WHO READ THIS...**

Also read these stories:

**COMPANIES**

Dow Jones, Reuters

BAE Systems PLC 7.75% Cum. Redeem. Pfd. (BA.LN)
PRICE        0.00
CHANGE       0.00
             7/15

* At Market Close

**► E-MAIL SIGN-UP**

NEW: Sign up now for Keyword or Symbol Alerts. **Click here**

Don't miss a thing. Sign up to receive the latest European news in your inbox daily. Check the box, then click below to subscribe.

☐ Europe Morning Update
☐ The Morning Brief



To view all or change any of your e-mail settings, click to the E-Mail Setup Center

**RELATED INDUSTRIES**

• Defense & Aerospace
• Law

**Personalized Home Page Setup**
Put headlines on your homepage about the companies, industries and topics that interest you most.



Return To Top

**WSJ Digital Network:**

MarketWatch | Barrons.com | AllThingsDigital

Dow Jones News Alerts | FiLife | MORE

Help    Email Setup    Customer Service: | Print

Privacy Policy    Subscriber Agreement & Terms of Use    Copyright Policy    Mobile Devices

News Licensing    Advertising    About Dow Jones

Copyright © 2008 Dow Jones & Company, Inc. All Rights Reserved

EXHIBIT C

HOUSE OF LORDS

SESSION 2007–08
**[2008] UKHL 60**
*on appeal from: [2008] EWHC 246 (Admin)*

# OPINIONS
## OF THE LORDS OF APPEAL
## FOR JUDGMENT IN THE CAUSE

**R (on the application of Corner House Research and others) (Respondents) *v* Director of the Serious Fraud Office (Appellant) (Criminal Appeal from Her Majesty's High Court of Justice)**

**Appellate Committee**

**Lord Bingham of Cornhill**
**Lord Hoffmann**
**Lord Rodger of Earlsferry**
**Baroness Hale of Richmond**
**Lord Brown of Eaton-under-Heywood**

### Counsel

*Appellants*:
Jonathan Sumption QC
Philip Sales QC
Vaughan Lowe QC
Hugo Keith
Karen Steyn
Rachel Kamm

(Instructed by Treasury Solicitors)

*Respondents*:
David Pannick QC
Dinah Rose QC
Philippe Sands QC
Ben Jaffey

(Instructed by Leigh Day & Co)

*Interested Party (BAE Systems plc)*
Julian Knowles
(Instructed by Allen & Overy LLP)

*Interveners (Justice)*
Nigel Pleming QC
Thomas de la Mare
Shaheed Fatima
(Instructed by Mayer Brown International LLP)

*Hearing dates:*
7 and 8 JULY 2008

## ON
## WEDNESDAY 30 JULY 2008

## HOUSE OF LORDS

## OPINIONS OF THE LORDS OF APPEAL FOR JUDGMENT IN THE CAUSE

## R (on the application of Corner House Research and others) (Respondents) *v* Director of the Serious Fraud Office (Appellant) (Criminal Appeal from Her Majesty's High Court of Justice)

## [2008] UKHL 60

## LORD BINGHAM OF CORNHILL

My Lords,

1.    The issue in this appeal is whether a decision made by the appellant, the Director of the Serious Fraud Office, on 14 December 2006, to discontinue a criminal investigation was unlawful.    The Queen's Bench Divisional Court (Moses LJ and Sullivan J) held it to be so: [2008] EWHC 714 (Admin).    That court accordingly quashed the Director's decision and remitted it to him for reconsideration.    In this appeal to the House the Director contends, as he contended below, that the decision was not unlawful.    Mr Robert Wardle, the Director who made the decision under review, has now been succeeded in his office, but this change of office-holder does not affect the issue to be decided. The respondents are public interest organisations.    The House has received written submissions on behalf of *JUSTICE*.

*The facts*

2.    By sections 108-110 of the Anti-terrorism, Crime and Security Act 2001 it was made an offence triable here for a UK national or company to make a corrupt payment or pay a bribe to a public officer abroad.    The payment or bribe must not be authorised or approved by the officer's principal.    The enactment of these sections gave effect to the UK's obligation under the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions (1997).

3.      Under section 1(3) and (5) of the Criminal Justice Act 1987 the Director "may investigate any suspected offence which appears to him on reasonable grounds to involve serious or complex fraud", and "may … institute and have the conduct of any criminal proceedings which appear to him to relate to such fraud".  In performing his functions the Director is subject to the superintendence of the Attorney General (section 1(2) of the Act).  On 29 July 2004 the Director, as authorised by section 1(3), launched an investigation into allegations of corruption against BAE Systems Plc.    That company has observed but not participated in these proceedings. No finding has been made against it.  One aspect of the investigation concerned what is known as the Al Yamamah contract, a valuable arms contract between Her Majesty's Government and the Kingdom of Saudi Arabia for which BAE was the main contractor.  The contract contained a confidentiality clause binding on both Governments.  A valuable extension to the contract, providing for the supply of Typhoon aircraft, was in course of negotiation in 2004-2006.  Between 30 July 2004 and 14 December 2006 a team of SFO lawyers, accountants, financial investigators and police officers investigated the allegations of corrupt payments allegedly made by BAE in connection with this contract.  During the investigation the SFO issued a number of statutory notices to BAE seeking information and disclosure.  The fifth of these notices, issued on 14 October 2005, required BAE to disclose details of payments to agents and consultants in connection with the Al Yamamah contract.

4.      In response to this notice BAE wrote an unsolicited letter dated 7 November 2005 to the Attorney General, Lord Goldsmith QC, enclosing a memorandum marked "Strictly Private and Confidential". The gist of the memorandum was that disclosure of the required information would adversely affect relations between the UK and Saudi Arabia and jeopardise the Al Yamamah contract because the Saudis would regard it as a serious breach of confidentiality by BAE and HMG. The letter said that the issues canvassed in the memorandum had been discussed with Sir Kevin Tebbit, Permanent Under-Secretary of State at the Ministry of Defence, who on the same date, 7 November, telephoned the Legal Secretary to the Law Officers (hereafter "the Legal Secretary") to express his view that this was a unique case in which the public interest should be considered at an early stage.  The Legal Secretary replied to BAE.  He said that the Law Officers were aware of BAE's letter but had not read the memorandum, that it was not appropriate for representations to be made privately to the Law Officers, that the proper recipient of such representations was the SFO and that the letter and memorandum had been forwarded to the Director.

2

5.     Mr Cowie, the SFO's Case Controller, wrote to BAE's solicitors on 15 November 2005.  In his letter he complained of BAE's failure to comply with the fifth notice and questioned why the pursuit by the SFO of its independent powers of investigation could properly be regarded as a breach of confidentiality on the part of HMG.  He made reference to the OECD Convention on Bribery and quoted the terms of article 5 of the Convention:

> "Investigation and prosecution of the bribery of a foreign public official shall be subject to the applicable rules and principles of each Party.  They shall not be influenced by considerations of national economic interest, the potential effect upon relations with another State or the identity of the natural or legal persons involved."

Mr Cowie invited BAE's solicitors to supply any material there might be pertaining to the national interest.

6.     On 15 November 2005 Sir Kevin Tebbit telephoned the Director to tell him that the investigation created a serious risk of damage to important aspects of the UK's relationship with Saudi Arabia.  He suggested that the question of where the balance of the public interest lay should be considered at that stage.  The Director considered that if he was to insist on compliance by BAE with the fifth notice he should be in a position to inform the company that its public interest representations had been fully considered with all the relevant authorities. He therefore sought the advice of the Attorney General.  On 30 November 2005 the Secretary to the Cabinet asked the Attorney General whether it would be proper for the government to make any representations as to the public interest considerations raised by the SFO investigation and, if so, whether such representations could be made at the investigation stage.  The Attorney General said he would consider this and respond.  On 2 December 2005 the Attorney General and the Director decided that it would be appropriate to invite the views of other Government ministers, in order to acquaint themselves with all the relevant considerations, so as to enable them to assess whether it was contrary to the public interest for the investigation to proceed.  This practice is familiarly known as a "Shawcross exercise", since it is based on a statement made by Sir Hartley Shawcross QC, then the Attorney-General, in the House of Commons on 29 January 1951.  The effect of the statement was that when deciding whether or not it is in the public interest to prosecute in a case where there is sufficient evidence to do so the Attorney General may, if he chooses, sound opinion among his ministerial colleagues, but that the ultimate decision rests with him

3

alone and he is not to be put under pressure in the matter by his colleagues.

7.      On 6 December 2005 the Attorney General initiated a Shawcross exercise.  The Legal Secretary, on his behalf, wrote to the Cabinet Secretary inviting ministers to provide any information which might be relevant to the decision whether it was in the public interest to continue the investigation.  The letter quoted article 5 of the OECD Convention, and referred to the Attorney General's assurance to an OECD working group evaluating the UK's compliance with the Convention in 2004 that "none of the considerations prohibited by Article 5 would be taken into account as public interest factors not to prosecute" foreign bribery cases. The letter made clear that the final decision would be one for the SFO and the Attorney General acting independently of government and having due regard to the OECD Convention.  The letter was copied to a number of official recipients.  On 7 December 2005 the Director spoke to BAE's Group Legal Director, who wished to make further representations as to the public interest.  The Director told him that as BAE was the suspect in a criminal investigation it would be better if he made any representations in writing, by the following day.  The Director indicated that since BAE was a suspect he did not think he would give much weight to the company's views on the public interest in continuing the investigation.

8.      BAE sent a further memorandum to the Director on 8 December 2005.  The Cabinet Secretary responded to the Attorney General's invitation on 16 December, attaching a note which had been seen by the Prime Minister, the Foreign Secretary and the Defence Secretary, and which had their support.  The note was largely directed to the importance of the commercial relationship between the UK and Saudi Arabia but also stressed the importance of the UK's relationship in the context of national security, counter-terrorism and the search for stability in the Middle East.  Saudi Arabia was described as "a key partner in the fight against Islamic terrorism".  The note accepted that the decision was one for the Attorney General and the Director acting independently of government but asked them to consider the points made in the note.

9.      After receipt of the Cabinet Secretary's letter and note, Mr Cowie drafted a brief to the Director (copied to Helen Garlick, Assistant Director) dated 19 December.  It pointed out that "The SFO must investigate crime.  It has a reasonable belief that crime has been committed.  It must investigate all reasonable lines of enquiry and do so

4

in the light of our domestic and international obligations". He suggested that article 5 of the OECD Convention (and another instrument yet to be ratified) envisaged an independent role for law enforcement "outside of economic or political considerations". He addressed the question how the public interest in the rule of law might be balanced against economic and political consequences. He went on to question whether the Cabinet had given full consideration to the public interest in the rule of law, the independence of the SFO and the Ministry of Defence Police, all of which could suffer reputational damage if it emerged that an investigation by the SFO had been cut short.

10.     On 11 January 2006 the Director and other SFO officers attended a meeting with, among others, both Law Officers. He expressed his view that the Al Yamamah investigation should continue. The Attorney General reached the same conclusion. By letter dated 25 January 2006 the Legal Secretary informed the Cabinet Secretary that the Attorney General, in consultation with the Director, had concluded that it was in the public interest for the investigation to continue.

11.     The Al Yamamah investigation did continue and in the autumn of 2006 the SFO intended to investigate certain bank accounts in Switzerland to ascertain whether payments had been made to an agent or public official of Saudi Arabia. The SFO had obtained the co-operation of the Swiss authorities. This attempt to gain access to Swiss bank information provoked an explicit threat by the Saudi authorities that if the Al Yamamah investigation were continued Saudi Arabia would withdraw from the existing bilateral counter-terrorism co-operation arrangements with the UK, withdraw co-operation from the UK in relation to its strategic objectives in the Middle East and end the negotiations then in train for the procurement of Typhoon aircraft.

12.     On 29 September 2006 the Cabinet Secretary wrote to the legal Secretary to update him "on some significant recent developments of which we think the Attorney General should be made aware". Reference was made to the public interest considerations canvassed in the Cabinet Secretary's earlier letter of 16 December 2005, which were said still to apply "and if anything the significance of UK/Saudi co-operation on counter-terrorism and the broader search for stability in the Middle East has become even more compelling". There were said to be strong indications that severe damage to the public interest, over and above the national economic interest, was now imminent in relation to counter-terrorism and the bilateral relationship. The Attorney General showed this letter to the Director at a meeting on 30 September. On

3 October the Legal Secretary replied to the Cabinet Secretary, expressing the Attorney General's firm view that if the case against BAE was soundly based, which the SFO were reviewing, "it would not be right to discontinue it on the basis that the consequences threatened by the Saudi representatives may result".

13.    The Attorney General was concerned to ensure that the case against BAE was indeed soundly based and so, following the meeting on 30 September 2006, the SFO undertook further work. In particular, the Attorney General considered that evidence needed to be obtained to show who (under the Saudi constitutional arrangements) was the principal contracting party in relation to the Al Yamamah contract and whether the financial arrangements at the centre of the investigation had been approved or authorised by that principal. In a letter to the Legal Secretary after the meeting, the Assistant Director dismissed the Saudis' reliance on the confidentiality clause in the Al Yamamah contract and asserted that the SFO's duty was to continue to investigate alleged corruption despite the acknowledged importance to the company and the MOD of maintaining commercial relations with the Kingdom of Saudi Arabia. On 27 November 2006 the Director agreed to try to obtain evidence from Saudi Arabia to address the issue of the principal's consent.

14.    To that end, the Director held the first of three meetings with HM Ambassador to Saudi Arabia (Sir Sherard Cowper-Coles) on 30 November 2006 to explore with him the possibility of obtaining evidence on this issue. At this meeting the Ambassador told the Director that the threats to national and international security were very grave indeed. He said that "British lives on British streets were at risk".

15.    At the beginning of December 2006 the Director and his case team proposed to explore whether BAE might plead guilty to corruption on what was called a "limited basis". This proposal was discussed with the Attorney General, who had no objection, but on 5 December it was suggested to the Director (and he agreed) that the Prime Minister should be informed of this changed approach. On the same day Prince Bandar, National Security Adviser to the Kingdom of Saudi Arabia, met officials of the Foreign and Commonwealth Office in Riyadh.

16.    On 6 December 2006 the Director agreed with the Legal Secretary what the latter should say to the Prime Minister's Private Secretaries, and later that day the Legal Secretary telephoned the

Director to say that he had approached the Prime Minister's Office and been told that the Prime Minister wished to make further representations before BAE was approached. This caused some delay and the Director put off a proposed visit by the SFO to BAE.

17.    The further representations made by the Prime Minister were set out in a "personal minute" from the Prime Minister to the Attorney General dated 8 December 2006. The Prime Minister asked the Attorney General to consider again the public interest issues raised by the ongoing investigation. In his letter the Prime Minister expressed his judgment, based on evidence and the advice of colleagues, that recent developments had given rise to a real and immediate risk of a collapse in UK/Saudi security, intelligence and diplomatic co-operation, which was likely to have seriously negative consequences for the UK public interest in terms of both national security and the UK's highest priority foreign policy objectives in the Middle East. The Prime Minister expressed strong support for the OECD Convention, but considered that his primary duty was to UK national security, and on that basis urged the Attorney General to consider the public interest in relation to the pursuit of the investigation. The papers attached to the Prime Minister's minute were: (1) a note dated 23 November 2006 on the value of Saudi co-operation in the field of counter-terrorism by Sir Richard Mottram, Permanent Secretary for Security, Intelligence and Resilience in the Cabinet Office, which drew on material from the Secret Intelligence Service and the Security Service, and (2) a letter dated 24 November 2006 by Sir Peter Ricketts, Permanent Under-Secretary at the FCO, on the importance of Saudi Arabia to the UK's efforts to win peace and stability in the Middle East. It was arranged that the Director should attend at the Attorney General's office on Monday 11 December to read the Prime Minister's minute. Before that meeting, on 8 December, the Director had a second meeting with the Ambassador, who confirmed his view of the damage to national security which any continuation of the investigation would in his assessment inevitably cause. He said that lives were at risk.

18.    On 11 December the Director met the Legal Secretary and read the Prime Minister's minute and its attachments. On the same day the Prime Minister and the Attorney General met. The effect of the meeting was summarised in a letter dated 12 December from the Prime Minister's Principal Private Secretary to the Legal Secretary. The Attorney General pointed out that he had to weigh the points in the Prime Minister's minute against other considerations. He was concerned that halting the investigation would send a bad message about the credibility of the law in this area, and look like giving in to threats.

He felt justified, however, in questioning whether the grounds for the investigation were soundly based and in exploring legal options for resolving the case as quickly as possible. The Prime Minister felt that higher considerations were at stake, as indicated in his minute. It was important that the Government did not give people reason to believe that threatening the British system resulted in parties getting their way. But the Government also needed to consider the damage done to the credibility of the law in this area by a long and failed trial, and its good reputation on bribery and corruption issues compared with many of its international partners. The Prime Minister recognised that supervision of the investigation was a matter for the Attorney General but considered this the clearest case for intervention in the public interest he had seen. The Attorney General said he would consider the Prime Minister's representations, with due regard to the need for separation between law and policy. The Director did not attend this meeting and did not see a copy of the letter until after he had made his decision on 14 December.

19.    The Attorney General decided that in discharge of his function of superintending the SFO he should himself review the case in detail, with the benefit of full briefing from SFO investigators and lawyers, sight of the underlying material and advice from independent leading counsel. His review was carried out over the period 12-14 December 2006 and involved the consideration of many files.

20.    On 12 December the Director attended a third meeting with the Ambassador. Also present were the Solicitor General and the Legal Secretary. The Ambassador repeated his view that the risk of Saudi Arabia withdrawing its co-operation with the UK in countering terrorism was real and acute. He expressed the view that there was a real threat to British lives.

21.    On 13 December 2006 the Director attended a meeting with the Attorney General, the Solicitor General, the Legal Secretary and Helen Garlick (the Assistant Director). She made a record of the meeting the next day. In answer to a question from the Attorney General, the Director said that in the last few days representations on public interest had been made with renewed and increasing force by HM Ambassador. If further investigation would cause such damage to national and international security he accepted that it would not be in the public interest. What he could not accept was the view that there was insufficient evidence to continue, although he would wish to consider that aspect and explore it with counsel. The Attorney General then

asked Helen Garlick for her view. She replied that the SFO had never sought to place the interests of the investigation above those of national and international security. While the SFO was qualified to make judgments on the law and evidence, on questions of national security it had to take the advice of others. The SFO's only source was the Ambassador, but he had said that "British lives on British streets were at risk". If the Saudi action caused "another 7/7" how could the SFO say that its investigation, which might or might not result in a successful prosecution, was more important? The Attorney General expressed doubts (not shared by the Director) about the strength of the case, and was recorded by the Assistant Director as being "extremely unhappy at the implications of dropping it now". The Attorney General and the Director agreed that the latter should reflect on his decision overnight.

22.    The Director discussed the matter further with his case team that evening. On the morning of 14 December he confirmed to the Legal Secretary that his conclusion remained the same: that in his view continuing the Al Yamamah investigation would risk serious harm to the UK's national and international security. He accordingly decided that the Al Yamamah investigation (but not other investigations pertaining to BAE) should be discontinued. His decision was announced in a press release the same day. It read:

> "The Director of the Serious Fraud Office has decided to discontinue the investigation into the affairs of BAE SYSTEMS Plc as far as they relate to the Al Yamamah defence contract with the government of Saudi Arabia.
>
> This decision has been taken following representations that have been made both to the Attorney General and the Director of the SFO concerning the need to safeguard national and international security.
>
> It has been necessary to balance the need to maintain the rule of law against the wider public interest.
>
> No weight has been given to commercial interests or to the national economic interest".

The Attorney General made a statement in Parliament the same day. He referred to the strong public interest in upholding and enforcing the criminal law, in particular against international corruption, and also to

the views of the Prime Minister and the Foreign and Defence Secretaries as to the public interest considerations raised by the investigation. They had, he said,

> "expressed the clear view that continuation of the investigation would cause serious damage to UK/Saudi security, intelligence and diplomatic co-operation, which is likely to have seriously negative consequences for the United Kingdom public interest in terms of both national security and our highest priority foreign policy objectives in the Middle East. The heads of our security and intelligence agencies and our ambassador to Saudi Arabia share this assessment."

The Attorney General pointed out that article 5 of the OECD Convention precluded him and the SFO from taking into account considerations of the national economic interest or the potential effect upon relations with another state, and added that "we have not done so".

*The judgment of the Divisional Court*

23.    The judgment of the Divisional Court, given by Moses LJ, does not lend itself to simple or succinct summary. The breadth of the Director's discretion in relation to prosecution and investigation was accepted, as was the reluctance of the courts to interfere with the exercise of the discretion (para 51). Authority was cited. Reference was made (para 52) to the Code for Crown Prosecutors, where the familiar two-stage test is explained and an illustrative list of factors which may be relevant to the public interest test is given. One common public interest factor telling against prosecution is that details may be made public that could harm national security. The court accepted, as a generality, that the Director's discretion was of sufficient breadth to entitle him to take into account a risk to life and national security in deciding whether to continue an investigation (para 54). By article 2 of the European Convention on Human Rights, the Director and the Government were required to protect and safeguard the lives of British citizens. On an application for judicial review the court could not assess the extent of the risk to life or to national security by those who advised the Attorney General and the Director, and the Director himself could not exercise an independent judgment on these matters (para 55). He might lawfully accord appropriate weight to the judgment of those with responsibility for national security who had direct access to sources of intelligence unavailable to him. In cases touching on foreign relations

and national security the duty of decision on the merits lay with the Government, and the courts were obliged to maintain the boundary between their role and that of the Government.

24.    The essential point of the claimants' challenge did not, however, relate to the relevance of national security to the Director's decision or the Government's assessment of the risk to national security but to the threat uttered (as it was said) by Prince Bandar to the Prime Minister's Chief of Staff (para 57). It was one thing to assess the risk of damage which might flow from continuing an investigation, quite another to submit to a threat designed to compel the investigation to call a halt. When the threat involved the criminal jurisdiction of this country, the issue was no longer a matter only for the Government, and the courts were bound to consider what steps they must take to preserve the integrity of the criminal justice system. The constitutional principle of the separation of powers required the courts to resist encroachment on the territory for which they were responsible (para 58). Had the threat been made by a person subject to English criminal law he would risk being charged with an attempt to pervert the course of justice (para 59) and threats to the administration of justice within the UK were the concern primarily of the courts, not the executive (para 60). The decisions of the Court of Appeal in *R v Coventry City Council, Ex p Phoenix Aviation* [1995] 3 All ER 37 and *R v Chief Constable of Devon and Cornwall, Ex p Central Electricity Generating Board* [1982] QB 458 were cited. Reference was made to the existing constitutional principle of the rule of law, now recognised in section 1 of the Constitutional Reform Act 2005, but the rule of law amounted to nothing if it failed to constrain overweening power (paras 61-65). It was beyond question that had the Director decided to halt the investigation in response to a threat made by those susceptible to domestic jurisdiction, the courts would have regarded the issues which arose as peculiarly within their sphere of responsibility (para 66).

25.    The court then considered how the courts discharge that responsibility, and held that the courts fulfil their primary obligation to protect the rule of law by ensuring that a statutory decision-maker exercises the powers conferred on him independently and without surrendering them to a third party (para 67). In yielding to the threat, the Director ceased to exercise the power to make the independent judgment required of him by Parliament (para 68). The court accepted (para 72) that in assessing the consequences of the threat the Director exercised an independent judgment, despite his total reliance on the advice of others, but that was not the point: in halting the investigation he surrendered to a threat made with the specific intention of achieving

surrender. The court could identify no integrity in the role of the courts to uphold the rule of law if they (the courts) were to abdicate in response to a threat from a foreign power (para 76). Surrender deprived the law of any power to resist for the future, as recognized in *Phoenix Aviation* (para 79). Reference was made to the case of Leila Khalid, a PLO terrorist released by the Attorney General in face of a threat to kill Swiss and German hostages held by the PLO, and the court accepted that there might be circumstances so extreme that the necessity to save lives might compel a decision not to detain or prosecute (paras 81-82). But it was for the courts to decide whether the reaction to a threat was a lawful response or an unlawful submission (para 82), and in the present case the court had to assess whether the Director and the Government yielded too readily (para 84). The present case was distinguishable on its facts from that of Leila Khalid (para 85).

26.     The court was also bound to question whether all the steps which could reasonably be taken to divert the threat had been pursued (para 86). It did not accept that due consideration had been given to persuading the Saudis to withdraw their threat (paras 87-88). No one had suggested to the Saudis that threats were futile since Britain's democracy forbade the exertion of pressure on an independent prosecutor (para 90). There had been no sufficient appreciation of the damage to the rule of law caused by submission to a threat directed at the administration of justice (para 91), which the Director had not specifically considered at the time (para 92).

27.     The court laid down the principle that submission to a threat is lawful only when it is demonstrated to a court that there was no alternative course open to the decision-maker (para 99). That principle had two particular virtues: by restricting the circumstances in which submission might be endorsed as lawful, the rule of law might be protected (para 100); and, as this case was said to demonstrate, too ready a submission might give rise to the suspicion that the threat was not the real ground for the decision at all, but was a pretext (para 101). The court was driven to the conclusion that the Director's submission to the threat was unlawful (para 102).

28.     The court also addressed a separate ground on which the claimants sought to challenge the Director's decision: that the Director had taken account of the potential effect of the investigation upon relations between the UK and Saudi Arabia, a consideration which he was precluded from taking into account by article 5 of the OECD Convention (para 105). It was argued for the Director that since the

Convention was an unincorporated treaty and had no effect in domestic law he was not bound by article 5 and therefore this issue was not justiciable (para 106). The court concluded that since the Director had publicly claimed to observe the prohibition in article 5 his legal self-direction could be reviewed, particularly since section 109 of the 2001 Act had been enacted to give effect to the Convention (paras 119, 121).

29. The claimants also attached significance to the absence of any reference to national security in article 5 (para 123), but the court did not accept that it was for that reason a prohibited consideration (para 128). It did, however, find it difficult to distinguish between national security and relations with another state (paras 131-140). It concluded that the doctrine of necessity as recognised in international law provided a clear basis for distinguishing the one from the other (para 147). But the court drew back from giving a final ruling on interpretation. It had recognised (paras 141-142) the virtue of uniformity in the interpretation of international treaties and acknowledged (para 150) that the parties had, under the Convention, established a standing Working Group on Bribery as a mechanism for monitoring compliance with it. The court held that it was for the Working Group to achieve a consensus on the interpretation of the Convention (para 153), and a ruling was not in any event necessary since the court had already held the Director's decision to be unlawful (para 154). The court therefore expressed no concluded view whether it had been open to the Director to consider that his decision was in compliance with article 5 (para 157).

*The main issue*

30. It is common ground in these proceedings that the Director is a public official appointed by the Crown but independent of it. He is entrusted by Parliament with discretionary powers to investigate suspected offences which reasonably appear to him to involve serious or complex fraud and to prosecute in such cases. These are powers given to him by Parliament as head of an independent, professional service who is subject only to the superintendence of the Attorney General. There is an obvious analogy with the position of the Director of Public Prosecutions. It is accepted that the decisions of the Director are not immune from review by the courts, but authority makes plain that only in highly exceptional cases will the court disturb the decisions of an independent prosecutor and investigator: *R v Director of Public Prosecutions, Ex p C* [1995] 1 Cr App R 136, 141; *R v Director of Public Prosecutions, Ex p Manning* [2001] QB 330, para 23; *R (Bermingham and others) v Director of the Serious Fraud Office* [2006]

EWHC 200 (Admin), [2007] QB 727, paras 63-64; *Mohit v Director of Public Prosecutions of Mauritius* [2006] UKPC 20, [2006] 1 WLR 3343, paras 17 and 21 citing and endorsing a passage in the judgment of the Supreme Court of Fiji in *Matalulu v Director of Public Prosecutions* [2003] 4 LRC 712, 735-736; *Sharma v Brown-Antoine and others* [2006] UKPC 57, [2007] 1 WLR 780, para 14(1)-(6). The House was not referred to any case in which a challenge had been made to a decision not to prosecute or investigate on public interest grounds.

31.    The reasons why the courts are very slow to interfere are well understood. They are, first, that the powers in question are entrusted to the officers identified, and to no one else. No other authority may exercise these powers or make the judgments on which such exercise must depend. Secondly, the courts have recognised (as it was described in the cited passage of *Matalulu*)

> "the polycentric character of official decision-making in such matters including policy and public interest considerations which are not susceptible of judicial review because it is within neither the constitutional function nor the practical competence of the courts to assess their merits".

Thirdly, the powers are conferred in very broad and unprescriptive terms.

32.    Of course, and this again is uncontroversial, the discretions conferred on the Director are not unfettered. He must seek to exercise his powers so as to promote the statutory purpose for which he is given them. He must direct himself correctly in law. He must act lawfully. He must do his best to exercise an objective judgment on the relevant material available to him. He must exercise his powers in good faith, uninfluenced by any ulterior motive, predilection or prejudice. In the present case, the claimants have not sought to impugn the Director's good faith and honesty in any way.

33.    The first duty of the Director is, in appropriate cases, to investigate and prosecute. The Director and his colleagues performed that duty. They launched the investigation into BAE. They pursued it by serving a series of statutory notices to obtain the information they needed. They rejected strong representations made by the company and senior ministers including the Prime Minister at the end of 2005 that the

investigation should be discontinued on public interest grounds. The duty to prosecute was spelled out in clear terms in the Case Controller's brief to the Director of 19 December 2005. They continued the investigation until the autumn of 2006, by which time they were on the point of obtaining access to potentially significant Swiss bank accounts. That provoked the threat or threats by Saudi representatives which gave rise to these proceedings. Even then the Attorney General (3 October 2006) was of the firm view that the investigation should be continued if it was soundly based and the Assistant Director (27 October) explicitly recognised the SFO's duty to continue to investigate. A month later the Director agreed to try and obtain evidence from Saudi Arabia bearing on the issue of principal's consent.

34.    In para 18 of its judgment the Divisional Court recorded that in early 2006 the Attorney General and the Director were of the view that the public interest grounds relied on did not justify discontinuing the investigation and posed the question: "What changed later in 2006?". The Director gives the answer very clearly in para 21 of his second witness statement:

> "It was only following my first meeting with the Ambassador on 30 November 2006 that I seriously began to entertain the thought that the national security public interest might be so compelling that I would have no real alternative.    Ultimately, I was convinced by my discussions with the Ambassador and the Prime Minister's minute that there was a very real likelihood of serious damage to UK national security".

It will be recalled that at the first meeting the Ambassador had described the threats to national and international security as very grave indeed and had said that British lives on British streets were at risk. At the second meeting he had again said that lives would be at risk. At the third he had spoken of a real threat to British lives. The Assistant Director, in the light of those statements, envisaged that the withdrawal of co-operation might lead to "another 7/7". It is not suggested that the fears expressed by the Ambassador and senior ministers were fanciful or ill-founded, or that the Director should have discounted them as being so.

35.    The evidence makes plain that the decision to discontinue the investigation was taken with extreme reluctance. As the Director put it in his second witness statement (para 11):

"The investigation and prosecution of serious crime is a major public interest that the SFO exists to promote. My job is to investigate and prosecute crime. The Al Yamamah investigation was a major investigation. The idea of discontinuing the investigation went against my every instinct as a prosecutor ..."

The Attorney General on 13 December 2006 was said to be "extremely unhappy" at the implications of dropping the investigation at that stage. What determined the decision was the Director's judgment that the public interest in saving British lives outweighed the public interest in pursuing BAE to conviction. It was a courageous decision, since the Director could have avoided making it by disingenuously adopting the Attorney General's view (with which he did not agree) that the case was evidentially weak. Had he anticipated the same consequences and made the same decision in the absence of an explicit Saudi threat it would seem that the Divisional Court would have upheld the decision, since it regarded the threat as "the essential point" in the case.

36.     The Divisional Court was right to hold that a person subject to the jurisdiction of the court who sought to impede an SFO investigation would be at risk of prosecution for attempting to pervert the course of justice, and also right to hold that the Saudis were not subject to the court's jurisdiction.  But there is little assistance to be gained in resolving the present problem from the authority which the Divisional Court cited.  The underlying dispute in *R v Chief Constable of Devon and Cornwall, Ex p Central Electricity Generating Board* [1982] QB 458 was between a public board seeking to exercise its statutory powers and perform its statutory obligations and a group of protesters unlawfully trying to stop it doing so.  The effect of the decision was to remind the board of its right to exercise self-help and the police that they had the power to ensure that the board could perform its functions.  In this context both Lord Denning MR and Lawton LJ (at pp 471E and 473A) referred to the rule of law.  But the case involved no choice between competing aspects of the public interest.

37.     *R v Coventry City Council, Ex p Phoenix Aviation and others* [1995] 3 All ER 37 involved three applications for judicial review.  The underlying dispute was between three sea and airport authorities and groups unlawfully seeking to prevent the authorities handling live animal cargoes.  The Divisional Court held, first, that the authorities had no discretion to refuse to handle the cargoes.  On that basis there was again no choice between competing aspects of the public interest:  there

were authorities subject to a public duty on one side and groups unlawfully seeking to prevent the authorities performing their duty on the other. But the court went on to consider what the position would be if the authorities had had a discretion, and in that context emphasised the importance of maintaining the rule of law. The court said (at p 62 e-h) that public authorities must beware of surrendering to the dictates of unlawful pressure groups, that it is one thing to respond to unlawful threats and quite another to submit to them, and that yielding to the threats would encourage the protesters to concentrate on an even smaller number of outlets. The Divisional Court in the present case relied strongly on these dicta. But even on the assumption which underlay this part of the judgment, there were on one side authorities with a discretion to perform their public duties and on the other protesters seeking unlawfully to prevent them doing so. The court pointed out, moreover, that the police had ample powers to control unlawful protest and ensure that the general public, including other port users, were not intolerably affected by it (p 63j). Thus there was no significant factor to weigh against the public interest in performance by the authorities of their public duty. In *R v Chief Constable of Sussex, Ex p International Trader's Ferry Ltd* [1999] 2 AC 418 the situation and the outcome were different, because the Chief Constable had a discretion how best to deploy the resources available to him and protection of the company's right to ship live animal cargoes had to be balanced against the other demands on and duties of the police.

38.    The Divisional Court held (para 68) that "No revolutionary principle needs to be created … we can deploy well-settled principles of public law". But in para 99 of its judgment the court did lay down a principle which, if not revolutionary, was novel and unsupported by authority:

> "The principle we have identified is that submission to a threat is lawful only when it is demonstrated to a court that there was no alternative course open to the decision-maker".

The virtues which the court saw in that principle have been summarised in para 27 above, but the second of those (that, as this case was said to demonstrate, "too ready a submission may give rise to the suspicion that the threat was not the real ground of the decision at all; rather it was a useful pretext") should not be understood as reflecting on the good faith of the Director or the Attorney General which has never been in issue. The objection to the principle formulated by the Divisional Court is that it distracts attention from what, applying well-settled principles of

public law, was the right question: whether, in deciding that the public interest in pursuing an important investigation into alleged bribery was outweighed by the public interest in protecting the lives of British citizens, the Director made a decision outside the lawful bounds of the discretion entrusted to him by Parliament.

39.    The decision of the then Attorney General to release Leila Khalid to avert a threat by the PLO to execute Swiss and German hostages was described as "clearly defensible" in Edwards, *The Attorney General, Politics and the Public Interest* (1984), p 325, and is not criticised by the Divisional Court. It is perhaps the only occasion on which a British public prosecutor has been deflected from what would otherwise have been his duty by a foreign threat. But the case is not easily distinguished. It is true that the threat to the hostages was more direct and immediate than that to the British public in the present case. But the Ambassador did not give the Director to understand that the contingency of which he warned was remote or improbable, the potential loss of life in the present case was much greater and the threat here was to those whose safety it is the primary duty of the British authorities to protect.

40.    The Divisional Court accepted that the Attorney General had no choice but to release Leila Khalid. Here, it was found, there were other things the Director could have done. It could have been explained to the Saudis that under the British constitution the Director is independent of the Government and any attempt to deflect him from his duty would be futile. Attempts should have been made to dissuade the Saudis from implementing their threat. It was submitted in argument that the Saudi threat to withdraw security co-operation put them in breach of Security Council Resolution 1373 (2001) on measures to counter terrorism and a complaint could have been lodged with the United Nations. These findings and contentions overlook the important fact that the Director was a prosecutor with no diplomatic access to representatives of the Government of Saudi Arabia. He was, as the Divisional Court rightly held, obliged and entitled to rely on the expert assessments of others. These findings and contentions are also untenable on the facts. Evidence before the House shows that the Saudis were repeatedly told of the separation, under our system, between the prosecuting authority and the executive but, according to the Ambassador, found it difficult to accept that the UK Government and the Prime Minister could not stop the investigation if they chose to do so. Considerable thought was given within the SFO to the possibility of persuading the Saudis to withdraw their threat, but this was not in the Ambassador's view a viable course of action. The notion of complaining to the United Nations, if put to the Divisional Court, did not receive its endorsement. As a means of

achieving wholehearted co-operation such an initiative would seem unpromising. The Director has accepted that he did not at the time assess whether there would be a threat to British national security if other countries learned that Britain had given in to pressure but has also explained that his view at the time was, and remains, that the case was wholly exceptional and unlikely to have any appreciable effect on other corruption cases. A discretionary decision is not in any event vitiated by a failure to take into account a consideration which the decision-maker is not obliged by the law or the facts to take into account, even if he may properly do so: *CREEDNZ Inc v Governor General* [1981] 1 NZLR 172, 183.

41.    The Director was confronted by an ugly and obviously unwelcome threat. He had to decide what, if anything, he should do. He did not surrender his discretionary power of decision to any third party, although he did consult the most expert source available to him in the person of the Ambassador and he did, as he was entitled if not bound to do, consult the Attorney General who, however, properly left the decision to him. The issue in these proceedings is not whether his decision was right or wrong, nor whether the Divisional Court or the House agrees with it, but whether it was a decision which the Director was lawfully entitled to make. Such an approach involves no affront to the rule of law, to which the principles of judicial review give effect (see *R (Alconbury Developments Ltd) v Secretary of State for the Environment, Transport and the Regions* [2001] UKHL 23, [2003] 2 AC 295, para 73, per Lord Hoffmann).

42.    In the opinion of the House the Director's decision was one he was lawfully entitled to make. It may indeed be doubted whether a responsible decision-maker could, on the facts before the Director, have decided otherwise.

*Article 5 of the OECD Convention*

43.    It is common ground that had the Director ignored article 5 of the OECD Convention, an unincorporated treaty provision not sounding in domestic law, his decision could not have been impugned on the ground of inconsistency with it. But the Director publicly claimed to be acting in accordance with article 5. The claimants accordingly contend (1) that it is open to the domestic courts of this country to review the correctness in law of the Director's self-direction; (2) that our courts should themselves interpret article 5; (3) that the Director's interpretation

should be held to be incorrect; and (4) that the Director's decision should be quashed. Each of these steps in the argument is, in the judgment of the House, problematical.

44.    In support of step (1) in this argument reliance was placed in particular on *R v Secretary of State for the Home Department, Ex p Launder* [1997] 1 WLR 839, 866-867 and *R v Director of Public Prosecutions, Ex p Kebilene* [2000] 2 AC 326, 341-342, 367, 375-376. Both cases concerned decision-makers claiming to act consistently with the European Convention at a time when it had not been given effect in domestic law.  The courts accepted the propriety of reviewing the compatibility with the Convention of the decisions in question.  But there was in the first case no issue between the parties about the interpretation of the relevant articles of the Convention, and in the second there was a body of Convention jurisprudence on which the courts could draw in seeking to resolve the issue before it.  Whether, in the event that there had been a live dispute on the meaning of an unincorporated provision on which there was no judicial authority, the courts would or should have undertaken the task of interpretation from scratch must be at least questionable.  It would moreover be unfortunate if decision-makers were to be deterred from seeking to give effect to what they understand to be the international obligations of the UK by fear that their decisions might be held to be vitiated by an incorrect understanding.

45.    Step (2) in the claimants' argument calls for consideration of article 12 of the Convention.  This provides:

> "*Monitoring and Follow-up*
>
> The Parties shall co-operate in carrying out a programme of systematic follow-up to monitor and promote the full implementation of this Convention.   Unless otherwise decided by consensus of the Parties, this shall be done in the framework of the OECD Working Group on Bribery in International Business Transactions and according to its terms of reference, or within the framework and terms of reference of any successor to its functions, and Parties shall bear the costs of the programme in accordance with the rules applicable to that body".

It was pointed out, correctly, that this provision does not provide for a binding judicial interpretation of the Convention. It does, on the other hand, provide for a forum in which and a means by which differences of approach to the interpretation and application of the Convention can be discussed and either reconciled or resolved. As the Divisional Court rightly recognised, uniformity in these respects is highly desirable. For that reason, a national court should hesitate before undertaking a task of unilateral interpretation where the contracting parties have embraced an alternative means of resolving differences.

46.    The clear effect of article 5 is to permit national investigators and prosecutors to act in accordance with the rules and principles applicable in their respective states, save that they are not to be influenced by three specific considerations: (i) national economic interest, (ii) the potential effect upon the relations with another state, and (iii) the identity of the natural or legal persons involved. It is obvious why the parties wished to prohibit the paying of attention to (i): a bribery investigation or prosecution may very probably injure commercial, and thus economic, interests. The reason for excluding consideration of (iii) is also obvious: investigators and prosecutors should not be deterred from acting by the high ministerial office or royal connections of an allegedly corrupt person. The ambit of consideration (ii) is more doubtful. Clearly the investigator or prosecutor is not to be deterred by the prospect or occurrence of a cooling of relations between his state and that of the allegedly corrupt official, even if this escalates into a diplomatic stand-off involving (for instance) the denial of visas, the cutting off of cultural and sporting exchanges, the obstruction of trading activities, the expulsion of diplomats and the blocking of bank accounts. But can the negotiators have intended to include multiple loss of life within the description "potential effect upon relations with another State"? And can they, if so, have intended to deny to member states the right to rely on a severe threat to national security? An affirmative answer is given by Rose-Ackerman and Billa, "Treaties and National Security Exceptions" (Yale Law School, 2007). A negative answer was given by the Attorney-General in Parliament on 1 February 2007 (HL Debates, Hansard, col 378):

> "I do not believe that the Convention does, or was ever intended to, prevent national authorities from taking decisions on the basis of such fundamental considerations of national and international security. I do not believe that we would have signed up to it if we had thought that we were abandoning any ability to have regard to something

21

as fundamental as national security, and I do not believe
that any other country would have signed up either".

The extreme difficulty of resolving this problem on a principled basis
underlines the desirability of resolving an issue such as this in the
manner provided for in the Convention.

47.     In my opinion, it is unnecessary and undesirable to resolve these
problematical questions in this appeal, for two reasons. First, it is clear
that the Director throughout based his adherence to article 5 on a belief
that it permitted him to take account of threats to human life as a public
interest consideration.  Secondly, the Director has given unequivocal
evidence that he would undoubtedly have made the same decision even
if he had believed, which he did not, that it was incompatible with
article 5 of the Convention.  I cannot doubt, given its conclusion in para
41 above, that he would indeed have done so.

48.     I would allow the appeal and set aside the order of the Divisional
Court save as to costs.  The costs provision imposed by the Divisional
Court on the Director as a condition of granting him leave to appeal will
be given effect.

**LORD HOFFMANN**

My Lords,

49.     I have had the advantage of reading in draft the speech of my
noble and learned friend Lord Bingham of Cornhill.  For the reasons he
gives, with which I agree, I too would allow this appeal.

**LORD RODGER OF EARLSFERRY**

My Lords,

50.     I have had the privilege of considering the speeches of my noble
and learned friends, Lord Bingham of Cornhill and Lord Brown of

Eaton-under-Heywood, in draft.  For the reasons which they give, with which I am in entire agreement, I too would allow the appeal.

51.    In particular, I am satisfied that, as he deposed in his affidavit, the Director would have made the same decision, even if he had believed that it was incompatible with article 5 of the OECD Convention.  That is consistent with the other evidence.  The Director had received advice from a number of sources about the threat to national security if the investigation continued.  It is plain that he weighed the advice carefully before acting on it, as he was fully entitled to do.  In the light of the advice, the Director concluded that he had no option but to discontinue the investigation because of the potential threat to national and international security – British lives would be put at risk.  In these circumstances, it is unnecessary, even supposing that it would be competent, for the House to interpret article 5.

## BARONESS HALE OF RICHMOND

My Lords,

52.    I confess that I would have liked to be able to uphold the decision (if not every aspect of the reasoning) of the Divisional Court. It is extremely distasteful that an independent public official should feel himself obliged to give way to threats of any sort. The Director clearly felt the same for he resisted the extreme pressure under which he was put for as long as he could. The great British public may still believe that it was the risk to British commercial interests which caused him to give way, but the evidence is quite clear that this was not so. He only gave way when he was convinced that the threat of withdrawal of Saudi security co-operation was real and that the consequences would be an equally real risk to "British lives on British streets". The only question is whether it was lawful for him to take this into account.

53.    Put like that, it is difficult to reach any other conclusion than that it was indeed lawful for him to take this into account. But it is not quite as simple as that. It is common ground that it would not have been lawful for him to take account of threats of harm to himself, threats of the "we know where you live" variety. That sort of threat would have been an irrelevant consideration. So what makes this sort of threat different? Why should the Director be obliged to ignore threats to his

own personal safety (and presumably that of his family) but entitled to take into account threats to the safety of others? The answer must lie in a distinction between the personal and the public interest. The "public interest" is often invoked but not susceptible of precise definition. But it must mean something of importance to the public as a whole rather than just to a private individual. The withdrawal of Saudi security co-operation would indeed have consequences of importance for the public as a whole. I am more impressed by the real threat to "British lives on British streets" than I am by unspecified references to national security or the national interest. "National security" in the sense of a threat to the safety of the nation as a nation state was not in issue here. Public safety was.

54.    I also agree that the Director was entitled to rely upon the judgment of others as to the existence of such a risk. There are many other factors in a prosecutor's exercise of discretion upon which he may have to rely on the advice of others. Medical evidence of the effect of a prosecution upon a potential accused is an obvious example. Of course, he is entitled, even obliged, to probe that evidence or advice, to require to be convinced of its accuracy or weight. But in the end there are some things upon which others are more expert than he could ever be. In the end there are also some things which he cannot do. He is not in a position to try to dissuade the Saudis from carrying out their threat. Eventually, he has to rely on the assurances of others that despite their best endeavours the threats are real and the risks are real.

55.    I am therefore driven to the conclusion that he was entitled to take these things into account. I do not however accept that this was the only decision he could have made. He had to weigh the seriousness of the risk, in every sense, against the other public interest considerations. These include the importance of upholding the rule of law and the principle that no-one, including powerful British companies who do business for powerful foreign countries, is above the law. It is perhaps worth remembering that it was BAE Systems, or people in BAE Systems, who were the target of the investigation and of any eventual prosecution and not anyone in Saudi Arabia. The Director carried on with the investigation despite their earnest attempts to dissuade him. He clearly had the countervailing factors very much in mind throughout, as did the Attorney General. A lesser person might have taken the easy way out and agreed with the Attorney General that it would be difficult on the evidence to prove every element of the offence. But he did not.

56.     As to whether the safety of British lives on British streets is a prohibited consideration under article 5 of the OECD Convention, we do not need to express a view. Professor Susan Rose-Ackerman and Benjamim Billa of Yale Law School make a powerful case that there is no implicit exception for "national security" under the OECD Convention ("Treaties and National Security Exceptions", Yale Law School, 2007). But the Director has made it clear that he would have reached the same conclusion in any event and as a matter of domestic law he was entitled to do so.

57.     For these reasons, although I would wish that the world were a better place where honest and conscientious public servants were not put in impossible situations such as this, I agree that his decision was lawful and this appeal must be allowed.


## LORD BROWN OF EATON-UNDER-HEYWOOD


My Lords,


58.     I have had the advantage of reading in draft the opinion of my noble and learned friend Lord Bingham of Cornhill and agree with everything that he says. On the first part of the case—the question whether the Director acted lawfully in "surrender[ing] to a threat" as the first certified question puts it—there is almost nothing that I wish to add to my Lord's opinion. The Divisional Court appears to have founded its decision very largely on my judgment in the Divisional Court in the *Phoenix Aviation* case: *R v Coventry City Council, ex parte Phoenix Aviation and others* [1995] 3 All ER 37.   That was, however, a strikingly different case.  As I pointed out (at p.62), on the assumption that the port authorities there had a discretion whether or not to handle the export of live animals, they (or, in the case of Plymouth, the city council who were trying to stop their own port authority from continuing to permit this trade) "gave [not] the least thought" to the implications for the rule of law in barring this trade because of threats of disruption.  The contrast with the position here could hardly be starker. As Lord Bingham has explained, the Director (and the Attorney General to whose superintendence he was subject) gave prolonged and profound thought to the implications for the rule of law in suspending this investigation in response to the Saudi Arabian threat. It is, indeed, some indication of the Director's recognition of the extreme undesirability of doing so that he stood out for so long.  In the end, however, the reality

and the gravity of the threat having become ever more apparent to him, he concluded that there was no alternative:

> "I considered the threat to the UK's national and international security to be of such compelling weight that it was imperative that I should halt the SFO investigation at this point, in the public interest. It was this feature of the case which I felt left me with no choice but to halt the investigation. This was not a conclusion which I arrived at lightly; far from it."

59.     The second certified question goes to the true construction and application of article 5 of the OECD Convention and the respondents' argument here, powerfully advanced by Ms Dinah Rose QC, is that the Director wrongly believed himself to be acting consistently with article 5 and should now be required to exercise his discretion afresh. True it is that he has stated:

> "[E]ven had I thought that discontinuing the investigation was not compatible with article 5 of the Convention, I am in no doubt whatever that I would still have decided, by reason of the compelling public interest representations . . ., that the investigation should be discontinued. The threat which I considered existed to UK national and international security if the investigation continued was so great that I did not believe there was any serious doubt about the decision I should make."

Nevertheless, submit the respondents, there could be no certainty that he (or rather his successor) would reach the same decision once the Court had stated publicly that this would involve a breach of the Convention. He would then have to face up to the political consequences of such an act.

60.     The position here is not, submit the respondents, as it was in *R v Secretary of State for the Home Department ex parte Fininvest Spa* [1997] 1 WLR 743.    There the Italian prosecuting authorities had requested the UK's assistance under the European Convention on Mutual Assistance in Criminal Matters, 1959 (which was incorporated into domestic law).    Article 2 of the Convention imposed a duty on the Secretary of State to assist save in the case of a political offence where

he had a discretion to refuse.  The Secretary of State, rightly as the Divisional Court ultimately held, declined to regard the particular offences in question as political and accordingly gave no thought to the exercise of a discretion.  I pointed out, however, that in any event the Secretary of State had no need to have reached a decision on whether the offences were political:

> "He could instead, had he wished, have decided that whether or not they were—whether or not in other words a discretion arose under article 2(a)—he would not in any event exercise it to refuse cooperation with the Italian authorities in the particular circumstances of this case. Had he followed that course or, indeed, had he deposed in the present proceedings that, even had he reached a contrary view on the political offence question, he would still have decided to comply with the request, his decision would in my judgment be proof against this particular ground of challenge, irrespective of whether or not he directed himself correctly on the substantive issue."

61.    The respondents submit that it is one thing for a decision-maker to say, and for the Court to accept, that even had he understood the law correctly he would still have reached the same decision in circumstances where, as in *Fininvest*, the decision would have remained perfectly lawful; quite another where, as here, the same decision taken on a correct legal understanding would *ex hypothesi* have been unlawful.

62.    I see the force of this (although, of course, in this case, unlike the position in *Fininvest*, any unlawfulness would be under international law, not domestic law), and I accept also the respondent's submissions, first, that there are indeed occasions when the Court will decide questions as to the state's obligations under unincorporated international law (two such cases being *R v Secretary of State for the Home Department ex parte Launder* [1997] 1 WLR 839 and *R v Director of Public Prosecutions ex parte Kebilene* [2000]   2 AC 326, both concerned with the European Convention on Human Rights before it took effect in domestic law) and, secondly, that nothing in either *R (Campaign for Nuclear Disarmament) v Prime Minister* [2002] EWHC 2777 (Admin) or, more recently, in *R (Gentle) v Prime Minister* [2008] 2 WLR 879 (both concerning essentially unreviewable decisions) would preclude the Court from doing so here.

63.    Why, then, should the Court here not accede to the respondents' invitation to construe article 5 and, if it accepts the respondents' contended for construction, quash the Director's decision and require it to be re-determined?

64.    There is not to my mind any one simple answer to this question although I am perfectly clear that the invitation must be declined and that the Divisional Court was right to have done so.

65.    Although, as I have acknowledged, there are occasions when the Court will decide questions as to the state's obligations under unincorporated international law, this, for obvious reasons, is generally undesirable.    Particularly this is so where, as here, the Contracting Parties to the Convention have chosen not to provide for the resolution of disputed questions of construction by an international court but rather (by article 12) to create a Working Group through whose continuing processes it is hoped a consensus view will emerge.    Really this is no more than to echo para 44 of Lord Bingham's opinion.    For a national court itself to assume the role of determining such a question (with whatever damaging consequences that may have for the state in its own attempts to influence the emerging consensus) would be a remarkable thing, not to be countenanced save for compelling reasons.

66.    Are there such compelling reasons here?  In my judgment there are not.  There seem to me to be very real differences between this case and both *Launder* and *Kebilene*.  In the first place, as Lord Bingham points out at para 43, there is a marked distinction between seeking to apply established Convention jurisprudence to the particular case before the court (as there) and determining, in the absence of any jurisprudence whatever on the point, a deep and difficult question of construction of profound importance to the whole working of the Convention (as here). Secondly, it seems to me tolerably plain that the decision-makers in both *Launder* and *Kebilene*, deciding respectively on extradition and prosecution,    would    have    taken    different    decisions    had    their understanding of the law been different.  In each case the decision-maker clearly intended to act consistently with the UK's international obligations whatever decision that would have involved him in taking. That, however, was not the position here.  Although both the Director (and the Attorney General) clearly believed—and may very well be right in believing—that the decision was consistent with article 5, it is surely plain that the primary intention behind the decision was to save this country from the dire threat to its national and international security and that the same decision would have been taken even had the Director had

doubts about the true meaning of article 5 or even had he thought it bore the contrary meaning. All that he and the Attorney General were really saying was that they believed the decision to be consistent with article 5. This clearly they were entitled to say: it was true and at the very least obviously a reasonable and tenable belief. Both the Director's and Attorney General's understanding of article 5 was clearly apparent from their public statements: it was implicit in these that they understood article 5 not to preclude regard being had to fundamental considerations of national and international security merely because these would be imperilled by worsening relations with a foreign state.

67.    The critical question is not, as the respondents' arguments suggest, whether the Director's successor would make the same decision again once the Courts had publicly stated that this would involve a breach of the Convention; rather it is whether the Court should feel itself impelled to decide the true construction of article 5 in the first place. It simply cannot be the law that, provided only a public officer asserts that his decision accords with the state's international obligations, the courts will entertain a challenge to the decision based upon his arguable misunderstanding of that obligation and then itself decide the point of international law at issue. For the reasons I have sought to give it would certainly not be appropriate to do so in the present case.

68.    Since writing the above I have chanced upon an article in the July 2008 Law Quarterly Review Vol. 124, p.388, International law in Domestic Courts: The Developing framework, by Philip Sales QC and Joanne Clement. This has strongly confirmed to me the view I have already taken. The following passage in particular seems to me worth quoting (omitting the footnoted references ) at pp 406 and 406:

> "Part of the problem here is that the executive may not have any practical option but to direct itself by reference to international law, and if the rule of law in *Launder* is treated as unlimited it will lead to very extensive direct application of treaties and international in the domestic courts, thereby for practical purposes undermining the basic constitutional principle about non-enforceability of unincorporated treaties. One solution might be for the domestic courts, in recognition of the limits of their competence to provide a fully authoritative ruling on the point, the limits of their competence under domestic constitutional arrangements to rule on the subject-matter in question and the dangers posed to the national interest by

them ruling definitively on the point at all, either to decline to rule or to allow the executive a form of 'margin of appreciation' on the legal question, and to examine only whether a tenable view has been adopted on the point of international law (rather than ruling on it themselves, as if it were a hard-edged point of domestic law). This is the approach which has been adopted by the ECtHR, when it has to examine questions of international law which it does not have jurisdiction to determine authoritatively itself. Adoption of a 'tenable view' approach would be a way—under circumstances where the proper interpretation of international law is uncertain, the domestic courts have no authority under international law to resolve the issue and the executive has responsibility within the domestic legal order for management of the United Kingdom's international affairs (including the adoption of positions to promote particular outcomes on doubtful points of international law)—to allow space to the executive to seek to press for legal interpretations on the international place to favour the United Kingdom's national interest, while also providing a degree of judicial control to ensure that the positions adopted are not beyond what is reasonable."

The article goes on to suggest that the *Launder* approach must indeed be subject to limitations, dependent perhaps upon "the intensity of judicial scrutiny judged appropriate in domestic law terms in the particular context". I have no doubt this is so and that the question will require further consideration on a future occasion. I have equally no doubt, however, that in this particular context the "tenable view" approach is the furthest the Court should go in examining the point of international law in question and, as I have already indicated, it is clear that the Director held at the very least a tenable view upon the meaning of article 5.

69.    It follows that the Divisional Court's order cannot be saved by reference to this second part of the case. I too would accordingly allow the Director's appeal and make the order proposed by Lord Bingham.

# EXHIBIT D

The Serious Fraud Office

# News

## Press Releases

*30 July 2008*

### BAE/Saudi defence contract: House of Lords ruling on the discontinued investigation

The Serious Fraud Office welcomes the House of Lords decision to allow the appeal against the judgement of the Administrative Court. This means that the SFO's former Director, Robert Wardle, acted lawfully in discontinuing an investigation into alleged bribery and corruption surrounding the BAE contract to supply Tornados to the government of Saudi Arabia (The "Al Yamamah" contract).

As a result of this legal ruling the current Director, Richard Alderman, has concluded that the investigation into the Al-Yamamah arms deal remains discontinued.

The SFO's investigations into some of BAE's non Saudi activities will continue.

**Serious Fraud Office**
Elm House,
10-16 Elm Street,
London WC1X 0BJ, United Kingdom

Press Office tel: 020 7239 7001/7190
Main switchboard tel: 020 7239 7272
Mobile: 07818 076 688
Em

© The Serious Fraud Office. All Rights Reserved 2008.