**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CITY OF HARPER WOODS EMPLOYEES'**<br>**RETIREMENT SYSTEM, Derivatively on**<br>**Behalf of BAE SYSTEMS PLC,**<br><br>           **Plaintiff,**<br><br>     **v.**<br><br>**RICHARD (DICK) OLVER,** *et al.*,<br><br>           **Defendants,**<br><br>     **and**<br><br>**BAE SYSTEMS PLC,**<br><br>           **Nominal Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **Civil Action No. 07-1646 (RMC)**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

<u>**MEMORANDUM OPINION**</u>

Plaintiff, City of Harper Woods Employees' Retirement System, alleges breach of

fiduciary duty and waste of corporate assets by current[1] and former[2] directors of BAE Systems plc

---

[1] Plaintiff names BAE plc as a nominal defendant and also names as defendants the following BAE plc directors who were members of the board at the time that Plaintiff filed the Complaint: Philip J. Carroll, Ulrich Cartellieri, Christopher V. Geoghegan, Michael J. Hartnall, Walter P. Havenstein, Andrew George Inglis, Ian G. King, James Mason, Richard (Dick) L. Olver, Roberto Quarta, George W. Rose, Sir Anthony Nigel Russell Rudd, Michael J. Turner, and Sir Peter A. Weinberg.

[2] Plaintiff also names the following BAE plc directors who were former members of the board at the time that Plaintiff filed the Complaint: Sir Robin Biggam, Sue Birley, Keith Clark Brown, Sir Richard Harry Evans, Lord Alexander Hesketh, Michael Lester, Sir Charles Beech Gordon Masefield, Steve Lewis Mogford, Michael Denzil Xavier Portillo, Mark H. Ronald, Paolo Scaroni, and John Pix Weston. With the exception of Paolo Scaroni, these defendants are collectively referred to along with the individuals listed in footnote 1, *supra*, as the "Individual Defendants." As Mr. Scaroni has not been served by Plaintiff and has not agreed to accept service, he is not required to respond to the Complaint and therefore does not join in the motion.

("BAE plc" or the "Company").  BAE plc and the Individual Defendants (collectively, "Defendants")

urge this Court to dismiss for any one of three separate and independently dispositive grounds.  *See*

Dkt. # 43.  First, under the law of the United Kingdom ("U.K."), which Defendants contend governs

this action, Plaintiff lacks standing to bring a shareholder derivative suit against BAE plc, and has

failed to state a cognizable claim under the rule in *Foss v. Harbottle*, (1843) 2 Hare 461.  Second,

Defendants contend that this case should be dismissed on the basis of *forum non conveniens*.

Finally, Defendants ask for dismissal because the Court allegedly lacks personal jurisdiction over

BAE plc and the Individual Defendants.[3]  For the reasons that follow, Defendants' Motion to Dismiss

[Dkt. # 43] will be granted and this case will be dismissed.

## I.  BACKGROUND

The City of Harper Woods Employees' Retirement System is a pension fund located

in Harper Woods, Michigan, that is operated for the benefit of thousands of retired City employees

and their families.  Compl. ¶ 18.  Plaintiff is a holder of approximately 3500 BAE plc American

Depositary Receipts ("ADRs")[4] and describes itself as a "shareholder and/or beneficial owner" of

---

[3]  The Court will not analyze Defendants' personal jurisdiction arguments in this Memorandum Opinion.  Following briefing on Plaintiff's motion for expedited discovery on personal jurisdiction [Dkt. # 66], the Court ruled that it would "consider grounds for dismissal not based on personal jurisdiction first."  *See* Apr. 3, 2008 Order [Dkt. # 74].  Plaintiff was given leave to renew its request for discovery "if the Court denies all of the defendants' arguments for dismissal not based on personal jurisdiction."  *Id.*

[4]  ADRs "give companies outside of the U.S. access to the U.S. capital markets."  *See* http://www.adr.com (website operated by JPMorgan Chase; last visited Sept. 9, 2008).  "At the most fundamental level, a Depositary Receipt represents ownership of equity shares in a foreign company.  These shares are issued against ordinary shares held in custody of the issuer's home market."  *Id.*  The ADRs of BAE plc are traded over the counter, they are issued by the depositary JPMorgan Chase, and are not listed on a U.S. stock market.  *Id.*; *see also* Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") [Dkt. # 43], Ex. 2 (Declaration of David Parkes ("Parkes Decl.") ¶ 8) (explaining that the "over the counter" market refers to the trading of securities directly between two parties rather than on an open exchange).  JPMorgan Chase employs Guaranty Nominees Limited

BAE plc.  *Id*. ¶ 83.  Nominal defendant BAE plc is a U.K. defense contractor headquartered in

London.  *Id*. ¶¶ 19, 21.  It has a U.S. subsidiary, BAE Systems, Inc., but BAE Systems, Inc. is not

named as a defendant in this case.

   Plaintiff alleges that, commencing in the mid-1980s, the Individual Defendants

permitted BAE plc to make a series of payments to Prince Bandar bin Sultan of Saudi Arabia in

connection with the Al-Yamamah military program, by which the U.K. sold war planes to the

Kingdom of Saudi Arabia.  *Id*. ¶¶ 6-10, 111-30.  Plaintiff asserts that the payments constituted

improper bribes to Prince Bandar, son of the then-head of the Saudi Ministry of Defense, to secure

the Company's role in the program.  *Id*.¶¶ 7-8.  The payments are alleged to have been deposited for

Prince Bandar's behalf "in significant part" in an account in Riggs Bank in Washington, D.C.  *Id*.

¶¶ 1, 8, 50, 111-30.  At the time in question, Prince Bandar was the Saudi Ambassador to the United

States.  Plaintiff claims that the payments to Prince Bandar, over a 20-year period, amounted to two

billion dollars ($2,000,000,000).  *Id*. ¶ 113.  According to Plaintiff,

> The bribe money moved on a circuitous path to Prince Bandar's
> accounts at Riggs.  The Saudis would pay for [warplanes] under the
> Al-Yamamah contract not in cash, but in oil.  Britain would receive
> up to 600,000 barrels of oil a day for over 20 years in payment.  The
> U.K. government, in turn, would sell the oil and the proceeds were
> deposited into an account at the Bank of England that BAE used.
> BAE then transferred oil sales proceeds from the Bank of England to
> be laundered in Saudi accounts at Riggs [Bank] in D.C., where Prince
> Bandar – who resided in (or about) the District as the Saudi
> Ambassador to the U.S. – was given unfettered access to them.

Pl.'s Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n") [Dkt. # 79] at 7 (citing Compl. ¶ 11, Ex. A).

   Plaintiff alleges that the Individual Defendants permitted or encouraged the alleged

bribery to increase the Company's "success and profitability – in the short term" and to enhance their

---

as custodian to hold the depositary's shares.  Parkes Decl. ¶ 8.

own "power, prestige and profit." Compl. ¶¶ 3-4.[5] Plaintiff contends that the Individual Defendants

jeopardized the Company's financial health because the Al-Yamamah payments breached the U.S.

Foreign Corrupt Practices Act ("FCPA"), 18 U.S.C. § 371, and the Anti-Corruption Convention of

the Organization for Economic Cooperation and Development ("OECD Convention"), exposing the

Company to damages.  *Id*. ¶¶ 4-5.[6] Plaintiff also claims that the Individual Defendants made

misleading public statements to the effect that the Company operated in accordance with applicable

rules and laws, including Section 463 of the U.K. Companies Act 2006.  *Id*. ¶¶ 5, 86-110.  These

actions have "have exposed BAE to millions of dollars in damages and potentially hundreds of

millions of dollars in remedial costs and possible debarment in the U.S., and have badly damaged

BAE's corporate image and reputation."  *Id*. ¶ 4.

Plaintiff's Complaint asserts two causes of action against the Individual Defendants:

a derivative claim for breach of fiduciary duty and a derivative claim for waste of corporate assets.

*Id*. ¶¶ 144-56.  The Complaint also names as defendants Saudi Arabian Prince Bandar bin Sultan;[7]

---

[5] Plaintiff also alleges a broad pattern of illegal and/or improper payments by BAE plc in connection with its business in various other countries, including Tanzania, Chile, the Czech Republic, Qatar, Romania, Slovakia, and South Africa. Compl. ¶¶ 131-41. Plaintiff alleges "secret agent" payments administered by the Company from its offices in Geneva, Switzerland, and the British Virgin Islands.  *Id*. ¶¶ 131-33.

[6] Plaintiff asserts that "[t]he bribe payments are the subject of investigations by the U.S. Department of Justice ("DOJ") and the U.K. Serious Frauds Office ("SFO") that have already cost BAE hundreds of millions of dollars in reputational damage and defense costs and, if proved, expose the Company to hundreds of millions more in criminal fines and penalties and disgorgement of billions of tainted profits . . ." Pl.'s Opp'n at 1.  More recently, Plaintiff informed the Court that the U.K.'s highest court affirmed the SFO's decision to discontinue its investigation.  *See* Dkt. # 87. The investigation was allegedly called off because, *inter alia*, Saudi Arabian officials threatened to cut off cooperation with the U.K. on counterterrorism matters if the probe continued.  *Id*.

[7] On February 5, 2008, Plaintiff sought and obtained an *ex parte* temporary restraining order ("TRO") prohibiting Prince Bandar from transferring proceeds from any sale of his U.S.-based real property out of U.S.-based accounts and requiring that any such funds be invested pursuant to a

the PNC Financial Services Group, Inc. ("PNC"), as successor to Riggs National Corporation and

Riggs Bank; and Joe, Robert, and Barbara Allbritton (the "Allbrittons"), individuals who formerly

held a controlling interest in Riggs Bank. *Id*. ¶¶ 1, 58. Prince Bandar, PNC, and the Allbrittons are

alleged to have aided and abetted the Individual Defendants in their breach of fiduciary duties. *Id*.

¶¶ 157-58.[8]

There is no allegation that the wrongful activities described in the Complaint are

continuing, and to the extent that Plaintiff specifies a time period for any of its allegations, the time

period ranges from the 1980s to several years ago.

## II. LEGAL STANDARD

Defendants move to dismiss the Complaint on three grounds: (1) lack of standing; (2)

*forum non conveniens*; and (3) lack of personal jurisdiction. Because the first ground is dispositive

of this case, the Court's analysis will begin and end there.

In this jurisdiction, a motion to dismiss for lack of standing is treated as a challenge

to the subject matter jurisdiction of the court, and is properly analyzed under Rule 12(b)(1). *See*

*Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) (explaining that "the defect of standing is a

---

prudent man standard. *See* Dkt. # 44. On February 13, 2008, Prince Bandar entered into a stipulation by which he agreed to adhere to the terms of the TRO "until the claims against Prince Bandar in this action have been resolved or disposed of, whether on motions, after trial or otherwise." *See* Dkt. # 60. As part of the Joint Stipulation, Prince Bandar "is to respond, move or otherwise answer the Complaint . . . [no later than] 30 days following disposition of pending dismissal motions filed by the Nominal and Individual BAE Systems plc Defendants." *Id*. Because the case will be dismissed for lack of standing, Prince Bandar does not need to respond to the Complaint. The TRO will remain in place pending appeal, if any.

[8] On January 31, 2008, PNC and the Allbrittons jointly moved to dismiss this action, challenging Plaintiff's standing and arguing Plaintiff failed to adequately plead their aiding and abetting allegations. Dkt. # 32. PNC and the Allbrittons also raised an *in pari delicto* (equal fault) affirmative defense. *Id*. These arguments are not addressed here.

defect in subject matter jurisdiction").

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Because subject matter jurisdiction is an Article III as well as a statutory requirement, "no action of the parties can confer subject-matter jurisdiction upon a federal court." *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003). On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing that the court has subject matter jurisdiction. *Rasul v. Bush*, 215 F. Supp. 2d 55, 61 (D.D.C. 2002) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 182-83 (1936)).

The court must give a plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. *Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003). The court is not limited to the allegations contained in the complaint. *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Instead, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings, *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992), including expert testimony on the application of foreign law, *see* Fed. R. Civ. P. 44.1 ("the court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence"); *Ganem v. Heckler*, 746 F.2d 844, 854 (D.C. Cir. 1984).

## III. DISCUSSION

### A.    Choice of Law

Plaintiff asserts that the Court has subject matter jurisdiction over this case based on diversity of citizenship. Compl. ¶ 16. A federal court sitting in diversity must apply the conflict of

law rules of the forum in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Therefore, federal courts in the District of Columbia apply the District of Columbia's choice of law framework to determine which substantive law applies in a particular case. *Council for Responsible Nutrition v. Hartford Cas. Ins. Co.*, No. 06-1590, 2007 WL 2020093, at *3 (D.D.C. July 12, 2007) (citing *YWCA v. Allstate Ins. Co.*, 275 F.3d 1145, 1150 (D.C. Cir. 2002)).

    1.    *Internal Affairs Doctrine*

    When faced with derivative claims of improper corporate governance, courts in the District of Columbia invoke the "internal affairs doctrine," and apply the law of the state of incorporation of the nominal defendant corporation. *See, e.g.*, *Labovitz v. Wash. Times Corp.*, 900 F. Supp. 500, 503 (D.D.C. 1995) ("When a particular claim addresses matters of corporate governance or other internal affairs of the organization, most states apply the law of the state where the corporation is incorporated, and the District of Columbia follows suit.") (citations omitted); *see also Edgar v. MITE Corp.*, 457 U.S. 624, 625 (1982) (describing the doctrine as "a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs"); *Flocco v. State Farm Mut. Auto. Ins. Co.*, 752 A.2d 147, 151 (D.C. 2000) (applying the law of the state of incorporation, Illinois, in determining viability of derivative action).

    The internal affairs doctrine is not limited to the application of the laws of the States of the United States. *See, e.g.*, *Meng v. Schwartz*, 305 F. Supp. 2d 49, 58 (D.D.C. 2004) ("Because the plaintiffs' breach of fiduciary duty and negligence claims deal substantially with matters of corporate governance and the internal organizational affairs, the Court finds that Bermuda, as the place of incorporation, has the 'more substantial interest' in having its laws applied."); *Feiner Family Trust v. VBI Corp.*, No. 07-1914, 2007 WL 2615448, at *5 (S.D.N.Y. Sept. 11, 2007) (applying law of the Cayman Islands in derivative shareholder suit); *In re BP p.l.c. Derivative Litig.*, 507 F. Supp.

2d 302, 311 (S.D.N.Y. 2007) (applying U.K. law in derivative shareholder suit).

Based on the internal affairs doctrine, BAE plc, incorporated in the U.K., is subject to U.K. law. Plaintiff, however, asks the Court to invoke the local law or public policy exception to the doctrine. *See* Compl. ¶ 21; Pl.'s Opp'n at 35, 45. Such an exception to the internal affairs doctrine is sometimes available when "the pertinent laws of the jurisdiction of incorporation are objectively 'immoral' or 'unjust'" or "where 'application of the local law of some other state is required by reason of the overriding interest of that other state in the issue to be decided.'" *In re BP p.l.c.*, 507 F. Supp. 2d at 308-09 (citations omitted); *see also* Restatement (Second) Conflict of Laws § 309 ("The local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders, except where, with respect to the particular issue, some other state has a more significant relationship . . . in which event the local law of the other state will be applied.").

This exception to the internal affairs doctrine does not apply here. First, the laws of the U.K. are not immoral or fundamentally unjust, as they provide a variety of remedies to shareholders pursuing complaints about corporate governance. *See* Defs.' Mem., Ex. 4 (Declaration of Martin Moore QC ("Moore Decl.") ¶¶ 75-79). "[T]he derivative action is but one avenue open to regulate and remedy conduct of directors of English companies that is below acceptable standards." *Id*. ¶ 75. For example, shareholders "can assert statutory rights to require the company to hold meetings of shareholders and submit resolutions for consideration at general meetings" and "remove directors by ordinary resolution." *Id*. ¶ 76. Other courts have found that such shareholder remedies provided by U.K. law are fair. *See, e.g.*, *In re BP p.l.c.*, 507 F. Supp. 2d at 309-10.

Second, there is no "overriding interest" of the District of Columbia at issue here. Where this exception has been applied before, it has been in instances where a corporation had little

contact, apart from the fact of its incorporation, with the state of its incorporation, and had the great majority of its contacts with the state whose local law was applied.  *See* Restatement (Second) Conflict of Laws § 302 cmt. g (explaining that the local law of another state other than state of incorporation may apply "where the corporation does all, or nearly all, of its business in that state and most of the corporation's shareholders are domiciled there" and "where the corporation has little contact with the state of incorporation," apart from the fact of its incorporation).

Here, BAE plc is incorporated and maintains its principal offices in the U.K., the great majority of its present and former board members reside in the U.K., and the board's support functions are administered in the U.K.  *See* Parkes Decl. ¶¶ 12-18.  Implicitly conceding this point, Plaintiff attempts to conflate BAE plc with its U.S. subsidiary, BAE Systems Inc.  BAE Systems, Inc. is incorporated in Delaware and headquartered in Rockville, Maryland; it has its own board of directors and management pursuant to a Special Security Agreement with the U.S. Government. Moreover, BAE Systems, Inc. is not a defendant, nominal or otherwise, in this case.  Thus, Plaintiff errs by confusing the two separate legal entities.  Plaintiff's assertion that Prince Bandar's alleged receipt of payments from BAE plc at Riggs Bank in Washington, D.C. necessitates the application of D.C. law is also unpersuasive.  At the heart of the Complaint are claims of breach of fiduciary duty and corporate waste premised on decisionmaking by the U.K. board of directors of a U.K. company – not the alleged flow of funds into a D.C.-based bank through the Company's use of its bank accounts abroad.

2.    *Whether the Laws of D.C. and the U.K. Are in Substantial Accord*

Relying on *Mayflower Hotel Stockholders Protective Committee v. Mayflower Hotel Corporation*, 193 F.2d 666, 668 (D.C. Cir. 1951), Plaintiff argues that even if the exception to the internal affairs doctrine does not apply, the Court should nonetheless apply District law.  *See* Pl.'s

Opp'n at 31.   In *Mayflower*, the D.C. Circuit Court of Appeals affirmed the district court's application of D.C. local law to a breach of fiduciary duty claim involving a Delaware corporation. In affirming, the Circuit explained that the potentially-applicable laws of the District and Delaware were in "substantial accord."   193 F.2d at 677 nn. 1, 2.   The case, therefore, stands for the proposition that it is not error *per se* for a court to apply local law to the internal affairs of a foreign corporation when the potentially-applicable laws of different jurisdictions do not vary significantly. In this case, there is no "substantial accord" between the District of Columbia and U.K. law regarding derivative lawsuits.   As detailed below, the rule in *Foss v. Harbottle* precludes shareholders from bringing derivative actions under U.K. law except in very limited circumstances; D.C. law provides for a more liberal derivative remedy.[9]

The District of Columbia's choice of law rules, therefore, require that this derivative action involving a corporation incorporated under the laws of the U.K. be governed by the laws of the U.K.

**B.      Standing under U.K. Law to Maintain Derivative Action**

1.      *Beneficial Owner Status*

As a threshold matter, it is unclear that Plaintiff has standing to sue derivatively under U.K. law because it is not a direct shareholder, but holds ADRs.   This distinction may be crucial, as other courts have recognized.   *See, e.g.*, *Batchelder v. Kawamoto*, 147 F.3d 915, 921-22 (9th Cir. 1998) (holding that an ADR holder could not sue derivatively under Japanese law as only shareholders appearing on the company's shareholders' register may institute a derivative action); *Tomran, Inc. v. Passano*, 891 A.2d 336, 348 (Md. 2006) (holding that an ADR holder could not sue

---

[9] Plaintiff argues, and Defendants do not refute, that D.C. law would grant Plaintiff standing in this case.   *See* Pl.'s Opp'n at 29-30, 62-63.

derivatively under Irish law in light of the dearth of any statutory or common law authority indicating that Irish courts recognize the right of beneficial owners to sue derivatively).

According to Defendants' expert, in order to sue derivatively in the U.K. on behalf of a company, a person must be a "member" of the company.  Moore Decl. ¶ 26 (citing *Birch v. Sullivan*, [1957] 1 W.L.R 1247).  A "member" is defined as an actual holder of shares, appearing on the company shareholder register, and does not include one holding only a beneficial interest.  Moore Decl. ¶¶ 26-27.  Plaintiff is the holder of approximately 3500 BAE plc ADRs.  Compl. ¶ 18.  The shares underlying Plaintiff's ADRs are held by a custodian, Guaranty Nominees Limited, for the depositary JPMorgan Chase.  *Id*. ¶ 20(i).  It is the custodian, Guaranty Nominees Limited, that appears on the BAE plc company register, not Plaintiff.  Parkes Decl. ¶ 22.  According to Defendants, "Plaintiff as a holder of ADRs is not a shareholder as defined in English law, and its purported shareholder derivative action can be dismissed on that basis alone."  Defs.' Mem. at 6.

Plaintiff suggests that any such standing defect due to its status as a beneficial owner may "be cured by joinder – either by adding another ordinary shareholder plaintiff or by naming JPMorgan Chase, the ADR custodian – under Fed. R. Civ. P. 19's liberal standards for 'Joinder of Persons Needed for Just Adjudication.'"  Pl.'s Opp'n at 61.  The Court need not resolve this particular issue.  Even assuming that Plaintiff could commence a derivative action as a beneficial owner, or that joinder could cure any problem, Plaintiff cannot overcome its lack of standing under the rule in *Foss v. Harbottle*, discussed below.

2.      *The Rule in Foss v. Harbottle*

Prior to the U.K. Companies Act 2006, shareholder derivative suits under English law were governed by the rule in *Foss v. Harbottle*, which prevented shareholders from bringing derivative actions except in limited instances.  *See In re BP p.l.c.*, 507 F. Supp. 2d at 311.  That rule

11

applies here.

> English law provides a narrowly tailored cause of action for a shareholder to sue on behalf of a corporation. The leading case, *Foss v. Harbottle* (1843) 2 Hare 461 (Eng.), established over 150 years ago that a shareholder may not bring a derivative action for "wrongs" to the company if those wrongs are capable of ratification by a majority of shareholders – and notably, breach of fiduciary duty is capable of ratification under English law – unless an exception applies.

*Id*.; Moore Decl. ¶¶ 29-32. The Rule was summarized by the U.K. Court of Appeal (Civil Division) as follows:

> (1) The proper plaintiff in an action in respect of a wrong alleged to be done to a corporation is, prima facie, the corporation. (2) Where the alleged wrong is a transaction which might be made binding on the corporation and on all its members by a simple majority of the members, no individual member is allowed to maintain an action in respect of that matter because, if the majority confirms the transaction, *cadit quaestio*; or, if the majority challenges the transaction, there is no valid reason why the company should not sue. (3) There is no room for the operation of the rule if the alleged wrong is ultra vires the corporation, because the majority of the members cannot confirm the transaction. (4) There is also no room for the operation of the rule if the transaction complained of could be validly done or sanctioned only by a special resolution or the like, because a simple majority cannot confirm a transaction, which requires the concurrence of a greater majority. (5) There is an exception to the rule where what has been done amounts to fraud and the wrongdoers themselves are in control of the company. In this case the rule is relaxed in favour of the aggrieved minority, who are allowed to bring a minority shareholders' action on behalf of themselves and all others. The reason for this is that, if they were denied that right, their grievance could never reach the court because the wrongdoers themselves, being in control, would not allow the company to sue.

*Prudential Assurance v. Newman Indus.*, [1982] 1 Ch. 204, 210-11 (citing *Edwards v. Halliwell*, [1950] 2 All E.R. 1064)).

> Thus, applying the rule in *Foss v. Harbottle* requires a court to examine first whether the alleged wrongdoing is capable of ratification by a simple majority of shareholders. Moore Decl.

¶ 36.  If the alleged wrong is capable of ratification, then the decision whether to pursue an action "can and should be taken by the members of the company and the action cannot proceed as a derivative action unless it falls within one of the exceptions to the Rule." *Id*.  "It is not necessary that actual ratification take place; it is only necessary that the acts are *capable* of ratification."  *Id*. ¶ 38 (emphasis added); *see also Prudential Assurance v. Newman Indus.*, [1982] 1 Ch. 204, 210-11 ("[t]here is also no room for the operation of the rule if the transaction complained of could be validly done").  If the actions are capable of ratification, a plaintiff does not have standing to pursue a derivative action, unless an exception to the rule applies.[10]

    (a)        Whether Actions are Ratifiable

           i.        *Whose Conduct Gives Rise to Derivative Actions*

Plaintiff argues that the Individual Defendants' alleged authorization of bribe

---

[10] Jurists and commentators have recognized the great limitations on derivative actions embodied in *Foss v. Harbottle*.  *See, e.g.*, L.S. Sealy, Problems of Standing, Pleading and Proof in Corporate Litigation, in Company Law in Change: Current Legal Problems (B.G. Pettet ed. 1987) (describing the approach to shareholder litigation as "a marked judicial antipathy, even hostility, towards the minority shareholder who comes before the court as a litigant").  The Court of Appeal in *Prudential Assurance* explained, however, that the rule in *Foss v. Harbottle*

> is not merely a tiresome procedural obstacle placed in the path of a shareholder by a legalistic judiciary.  The rule is the consequence of the fact that a corporation is a separate legal entity.  Other consequences are limited liability and limited rights.  The company is liable for its contracts and torts; the shareholder has no such liability.  The company acquires causes of action for breaches of contract and for torts which damage the company.  No cause of action vests in the shareholder.  When the shareholder acquires a share he accepts the fact that the value of his investment follows the fortune of the company and that he can only exercise his influence over the fortunes of the company by the exercise of his voting rights in general meeting.

*Prudential Assurance v. Newman Indus.*, [1982] 1 Ch. 204, 224.

payments is unratifiable.  *See* Compl. ¶ 113.  However, this argument confuses the analysis.  The wrongs which have allegedly been done *to* BAE plc by the Individual Defendants are not breaches of regulatory, civil, or criminal law – those are the wrongs allegedly committed by BAE plc – but the breaches of their fiduciary duty in causing BAE plc to commit such wrongs and in failing to supervise and ensure that BAE plc did not commit such wrongs.  *See* Moore Decl. ¶ 39 ("The wrong which can form a subject of a derivative action is a wrong which harms the company.").[11]  This distinction is significant.  "Under English law, the alleged failures of the duty to supervise and ensure that BAE plc did not commit such wrongs 'are all capable of ratification in the sense that the shareholders can by ordinary resolution ensure that the acts of the directors are no longer breaches of duty by ratifying them.'"  Defs.' Mem. at 16 (quoting Moore Decl. ¶ 38).  In other words, the shareholders *could* validate the alleged improprieties by a vote that absolved the directors of personal liability to the corporation, without regard to any public liability the corporation might face.  The effect of ratification would be to render the wrongful act no longer a breach of duty to the company.  *See* Third Declaration of Martin Moore QC ("Moore 3d Decl.") [Dkt. # 85] ¶ 4.

ii.    *Full and Frank Disclosure*

Plaintiff next argues that ratification would be impossible in this particular set of facts

---

[11] Failure of supervision and oversight – whether done intentionally, recklessly, or negligently – is the essence of Plaintiff's Complaint.  *See, e.g.*, Compl. ¶ 70 ("the officers and directors of BAE were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and operational affairs of BAE"); *id.* ¶ 85(a) ("Each of the BAE Defendants had the ability to cause BAE to disclose the existence of the kickback scheme during that 20-year period and failed to do so."); *id.* ¶ 85(c) ("the misconduct . . . had to be the result of a deliberate policy of the Board or willful or reckless disregard for what has been going on with said illegal or improper payments"); *id.* ¶ 85(j) (the Individual Defendants "fail[ed] to oversee and manage the Company's operations"); *id.* ¶ 146 ("The BAE Defendants . . . participated in the acts of mismanagement alleged herein and/or acted in gross disregard of the facts and/or failed to exercise due care to prevent the unlawful and *ultra vires* conduct complained of.").

because the Individual Defendants would never make "full and frank disclosure" on the matters to

be ratified, as it "would clearly expose each defendant . . . to unacceptably high levels of exposure

to criminal liability." *See* Pl.'s Opp'n at 55. While "full and frank disclosure" may be a requirement

for ratification to be valid, *see* Second Declaration of Martin Moore QC ("Moore 2d Decl.") [Dkt.

# 83] ¶¶ 48-49, it is irrelevant to the *ratifiability* of certain conduct. That is, the relevant question

is whether the wrong is one of a nature which *could*, in principle, be ratified by the shareholders –

not whether factual circumstances exist to make a valid ratification more or less probable. *Id* ¶ 49.

Even if the relevant inquiry were the latter, Plaintiff merely speculates that the Individual Defendants

failed to provide full and frank disclosure to the Company or its members. *See, e.g.*, Pl.'s Opp'n at

55 (such disclosure "cannot objectively be expected to occur").

### iii.    *Ultra Vires*[12]

"There is no room for the operation of the rule if the alleged wrong is ultra vires the

corporation, because the majority of members cannot confirm the transaction." *See Prudential*

*Assurance*, [1982] 1 Ch. 204, 210. The Court concludes that the alleged actions here were not *ultra*

*vires*. As Defendants' expert states, and Plaintiff's expert does not refute, *ultra vires* has a very

narrow meaning in English company law. For the purpose of the rule in *Foss v. Harbottle*, the term

"*ultra vires*" refers to a transaction that is either beyond the capacity of a company as established by

its memorandum of association or a transaction prohibited by the statute to which a company owes

---

[12] Some courts discuss *ultra vires* actions in the context of an exception to the rule in *Foss v. Harbottle. See, e.g.*, *In re BP p.l.c.*, 507 F. Supp. 2d at 311. However, this Court addresses such actions in the context of whether actions are ratifiable. The distinction does not change the ultimate analysis because *ultra vires* actions, are, by nature, unratifiable. *See Winn v. Schafer*, 499 F. Supp. 2d 390, 396 n.31 (S.D.N.Y. 2007) ("there has been some suggestion that the exceptions are not exceptions at all, but rather examples of conduct on which a derivative action may be brought under the related general rule, namely conduct that could not be ratified by a simple majority") (citing *In re Tyco Int'l, Ltd.*, 430 F. Supp. 2d 94, 98 (D.N.H. 2004)).

its existence.  Moore Decl. ¶ 41; Pl.'s Opp'n, Ex. 49 (Declaration of Paul Girolami QC ("Girolami Decl.") ¶ 22) (referring to *ultra vires* action as, "in the strictest sense," "a breach beyond the capacity of the company as established by its memorandum of association").

Here, the Complaint does not contain any allegation of a transaction that was beyond the capacity of BAE plc as established by its memorandum of association or a transaction prohibited by statutes to which BAE plc owes its existence.  Instead, the Complaint asserts that the alleged payments to Prince Bandar and others were illegal and improper and therefore beyond the scope of the directors' proper powers.  However, "[t]he payment by a company of commission to agents of third parties in carrying out its business is clearly capable of being within the objects specified in a company's memorandum."  Moore Decl. ¶¶ 45-46; *Arab Monetary Fund v. Hashim and Others*, [1993] 1 Lloyd's Rep. 543.  In *Arab Monetary Fund*, the plaintiffs claimed that a payment made for the purposes of securing a construction contract was a bribe and, as such, was *ultra vires*.  The court emphasized that the distinction between *ultra vires* or lack of capacity on one hand, and lack of authority on the other, was "fundamental" to the question of whether a bribe could be considered *ultra vires* to a company. *Arab Monetary Fund*, [1993] 1 Lloyd's Rep. 543, 568.  The court concluded that the payment of the bribe was within the capacity of the company; that is, it was an act that was not *ultra vires*.  It is "established that a company has capacity to carry out a transaction which falls within its objects even though carried out by the wrongful exercise of its powers."  *Id*. (citing *Rolled Steel Ltd. v. British Steel Corp.*, [1986] 1 Ch. 246).

Thus, under English law, the question of whether an act by a company is *ultra vires* for the purposes of the exception to the rule in *Foss v. Harbottle* is separate and apart from the question of what liability a company may incur by that act under the general law, whether civil or criminal.  Moore Decl. ¶¶ 49-50.  The fact that an act is a violation of civil or criminal law does not

automatically make the act *ultra vires*.  *Id*. ¶ 49.

> [W]hen the shareholders of a company ratify a wrongful act by a director, they adopt that act as an authorised act of the company, and in doing so forgive the wrong done to the company. . . [T]he only effect of ratification is to render the wrongful act no longer a breach of duty to the company.  This bars a claim by the company or by any shareholder seeking to bring a derivative claim on its behalf. Ratification of an illegal act does not in any sense make the act legal – it does not absolve the director or the company of criminal responsibility, nor of any civil liability to an outsider who has a claim arising from the illegal act.
>
> Because ratification involves the adoption by the company of the wrongful act, its ability to ratify is limited by its corporate capacity. The company (through its shareholders) cannot adopt something which is *ultra vires* in the sense of being beyond the company's legal capacity.

Moore 3d Decl. ¶¶ 4-5 (citations omitted) (emphasis in original); *id*. ¶ 9 ("The general English law rule that illegal acts are ratifiable unless *ultra vires* preserves the principle that the shareholders, as owners of the company, are entitled to decide upon their own best interests, and thus may, if they desire, release any claim that the company may have.").

Plaintiff does not suggest that BAE plc lacked the capacity to make the payments under its memorandum of association or the statute to which BAE plc owes its existence. Accordingly, the doctrine of *ultra vires*, as limited by English law, does not apply or permit this suit.

(b)   Wrongdoer Control Exception

An exception to the rule in *Foss v. Harbottle* is applied when the wrong alleged amounts to fraud and the wrongdoers are themselves in control of the company, and could thus procure ratification.  This exception is referred to as the "wrongdoer control exception" or the "fraud

on the minority exception."[13]

In order to invoke the "wrongdoer control exception," it must be the case that: (1) Defendants have, in breach of their fiduciary duty, committed fraud; that is, they have taken advantage of their position to commit the company to transactions that benefit themselves at the expense of the company, *see* Moore Decl. ¶ 53; Girolami Decl. ¶ 29; and (2) the Defendants were in control of the company for all practicable purposes, *see* Moore Decl. ¶ 55; Girolami Decl. ¶ 31. On the second prong, such "'[w]rongdoer control' means control of the company in general meeting, because it is on ratification by the company in general meeting that the Rule and its exceptions are based." Moore Decl. ¶ 55. The theory behind the exception is that "a complainant should exhaust his internal corporate remedies unless such an effort would be idle or futile." *Messinger v. United Canso Oil & Gas, Ltd.*, 486 F. Supp. 788, 793 (D. Conn. 1980). Plaintiff has failed to establish either of the requirements for the exception.

i.     *Fraud or Self-Dealing*

First, Plaintiff has not alleged fraudulent conduct involving self-dealing by any Individual Defendant. Under English law, "the exception will apply only if the wrong enabled the defendants to make a profit at the expense of the company." Moore Decl. ¶ 53; *see also Konamaneni v. Rolls Royce Indus. Power (India) Ltd.*, [2002] 1 All E.R. 979, 988 ("Fraud includes all cases where the wrongdoers are endeavouring, directly or indirectly, to appropriate themselves money, property or advantages, which belong to the company or in which the other shareholders are entitled to

---

[13] Plaintiff also argues for the application of an "interests of justice" exception to *Foss v. Harbottle* to this case. "The old English derivative law contained an 'interests of justice' exception and there is no reason to doubt it could be applied here . . ." Pl.'s Opp'n at 34. However, experts for both parties agree that there is no such exception, *see* Moore Decl. ¶ 34 n.13; Girolami Decl. ¶ 6(3), and the Court therefore will not address it.

participate.").  At most, Plaintiff alleges that the Individual Defendants failed to perform their jobs

properly and were overpaid in compensation and bonuses.  *See* Compl. ¶¶ 6, 155.  For example, the

Complaint alleges that the Individual Defendants knew that if the Al-Yamamah program "could be

obtained, they could point to it as concrete evidence of their successful stewardship of BAE, which

would in turn help them hold onto their positions of power, prestige and profit with BAE, so they

could receive lucrative payments and bonuses in connection with those positions for many, many

years going forward."  *Id*. ¶ 6.  These allegations do not constitute the necessary self-dealing by a

director sufficient to underpin the exception.  A recent decision in the U.S. District Court for the

Southern District of New York presented the same issue and that court also declined to invoke the

wrongdoer control exception.

> Plaintiff alleges that the Individual Defendants "receive substantial
> salaries, bonus payments, benefits, and other emoluments by virtue of
> their membership on the Board and their control of Scottish Re.  They
> have thus benefitted from the wrongs herein alleged and have engaged
> therein to preserve their positions of control and the perquisites
> thereof . . . ."  These allegations, however, are precisely the type of
> allegations that were found to be insufficient in [*Tyco*, 340 F. Supp.
> 2d at 100] and which were consistently found to be insufficient to
> prove director self-interest in the analogous context of derivative
> actions applying American law. . . . Thus, plaintiff cannot establish
> either of the requirements to invoke the fraud on the minority
> exception.

*Winn*, 499 F. Supp. 2d at 398 (discussing *Foss v. Harbottle*).  The Court adopts the reasoning and

conclusion in *Winn* and finds insufficient allegations of legal self-dealing.

        ii.     *Control*

Even if Plaintiff could establish the requisite fraudulent conduct, it has not shown the

necessary control to trigger the exception.  "'Wrongdoer control' means control of the company in

general meeting,[14] because it is on ratification by the company in general meeting that the Rule and its exceptions are based."  Moore Decl. ¶ 55; Girolami Decl. ¶ 31; *In re BP p.l.c.*, 507 F. Supp. 2d at 310 (defining "control" as "voting control of the company").  The Complaint offers no information about whether the Individual Defendants, who collectively own just 0.04 percent of BAE's outstanding ordinary shares, *see* Parkes Decl. ¶ 18, can exercise control over BAE plc in general meetings.  *Cf. Feiner Family Trust*, 2007 WL 2615448, at *6 ("There is no dispute over whether Defendants control Xcelera; the [Defendants] own more than 76% of the voting securities.").  While ownership of voting shares is not dispositive of the issue, *see* Moore 2d Decl. ¶ 16; Girolami Decl. ¶ 31; *see also Winn*, 499 F. Supp. 2d at 396-97 ("[A] corporation's board of directors will be deemed to have control of a majority of the corporation's voting shares for purposes of the fraud on the minority exception if the evidence demonstrates that it has acquired *de facto* control.") (quoting *Tyco*, 340 F. Supp. 2d at 99)), the control requirement "is nevertheless firmly focused on the ability to obtain (directly or indirectly) a majority of the votes cast in general meeting."  Moore 2d Decl. ¶ 17.  Plaintiff does not provide any factual support for the allegation that Defendants exerted such control.[15]  Accordingly, the Court finds the wrongdoer control exception inapplicable in this case.

---

[14] U.K. law requires a public company to hold at least one general shareholder meeting per year.  Moore Decl. ¶ 55.  General meetings are either called by the board of directors or a quorum of shareholders.  *Id.*

[15] Although the Court assumes Plaintiff's allegations are true at this stage, *see Smith v. Harvey*, 541 F. Supp. 2d 8, 12 (D.D.C. 2008) (citing *Artis v. Greenspan*, 158 F.3d 1301, 1306 (D.C. Cir. 1998)), the Court "need not accept inferences drawn by plaintiff[] if such inferences are unsupported by the facts set out in the complaint.  Nor must the court accept legal conclusions cast in the form of factual allegations," *Rodriguez v. Nat'l Ctr. for Missing & Exploited Children*, No. 03-120, 2005 U.S. Dist. LEXIS 5658, at *20-21 (D.D.C. Mar. 31, 2005) (alteration in original) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

3.      *U.K. Companies Act 2006*

Experts for both parties agree that under U.K. law, the rule set forth in *Foss v. Harbottle* applies to corporate conduct that occurred before October 1, 2007, *see* Girolami Decl. ¶ 6(2)); Moore Decl. ¶ 12, as did the alleged improprieties here.  Despite these expert opinions, and seeking to avoid the strictures of *Foss v. Harbottle*, Plaintiff argues that Section 260 of the U.K. Companies Act 2006 should be applied to the conduct at issue.  However, while the requirements under U.K. law for a shareholder derivative suit were altered by Section 260 of the Companies Act 2006,[16] the Act, which came into force on October 1, 2007, does not have retroactive effect, and therefore does not apply to the allegations in the Complaint.  *See* Moore Decl. ¶¶ 8-12.  The statute states:

> If, or to the extent that, the claim arises from acts or omissions that occurred before 1st October 2007, the court must exercise its powers under those sections so as to secure that the claim is allowed to proceed as a derivative claim only if, or to the extent that, it would have been allowed to proceed as a derivative claim under the law in force immediately before that date.

*Id*. ¶ 12 (citing SI 2007/2194 Art. 9, Schedule 3, para. 20(3)).[17]  Because the allegations of conduct

---

[16] The Explanatory Notes accompanying the U.K. Companies Act 2006 state that the drafters intended to create a "new derivative procedure with more modern, flexible and accessible criteria for determining whether a shareholder can pursue the action."  Pl.'s Opp'n, Ex. M at 4.  Among other things, "the new action includes within its ambit negligent breaches of duty not involving personal benefit to the wrongdoer and it is no longer necessary to establish wrongdoer control which was, save in certain circumstances, a pre-requisite of entitlement to sue derivatively."  Moore Decl. ¶ 9.

[17] *See also In re BP p.l.c.*, 507 F. Supp. 2d at 311.  The court in *In re BP p.l.c.* explained that the "U.K. Minister for Industry and the Regions, Hon. Margaret Hodge, recently issued a statement which clarified the question of retroactive application of The Companies Act 2006.  Ms. Hodge unequivocally stated that 'the newer clearer procedures should be used for all claims stated on or after 1 October 2007 [and] courts should ensure that the outcome of any claim based on acts or omissions by a director before 1 October 2007 will be what it would have been under the old, common law that applied at that time.'"  *Id*. (citations omitted).

21

in the Complaint concern events occurring prior to October 1, 2007, the standards applying to derivative claims under the Companies Act 2006 Act are inapplicable here.[18]

## IV.  CONCLUSION

Under U.K. law, which applies to this case, Plaintiff lacks standing to bring a derivative action.  The Motion to Dismiss filed by BAE plc and the Individual Defendants [Dkt. # 43] will be granted.  Because the Complaint will be dismissed for lack of standing, the Court does not reach the merits of Defendants' arguments on *forum non conveniens* and personal jurisdiction.  Nor will the Court reach the merits of the motion to dismiss filed jointly by PNC and the Allbrittons.  *See Mann v. GTCR Golder Rauner, LLC*, 483 F. Supp. 2d 884, 899 (D. Ariz. 2007) (explaining that, because the plaintiffs did not have standing to bring derivative claims for breach of fiduciary duty, they also could not pursue counts for aiding and abetting those breaches).  Complaint allegations against those Defendants will also be dismissed.  A memorializing order accompanies this Memorandum Opinion.

Date: September 11, 2008                           _____/s/_____
                                                   ROSEMARY M. COLLYER
                                                   United States District Judge

---

[18] Plaintiff also claims that the Individual Defendants harmed the Company by violating Section 463 of the Companies Act 2006, *see* Compl. ¶¶ 5, 151, which permits a company to bring a cause of action against a director who makes untrue, misleading, or incomplete statements in certain statutorily required reports.  However, this Section, like Section 260, does not have retroactive effect, *see* Moore Decl. ¶¶ 65-66.  Moreover, Plaintiff has not articulated a causal link between the alleged losses and any statements made in reports.  *See* Girolami Decl. ¶ 41; Moore Decl. ¶ 72 (explaining that the establishment of a causal link between allegedly deficient statements and losses of the company is necessary to make out a claim under Section 463).